**22-11150**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

# 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———— • ————

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME THREE

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

# TABLE OF CONTENTS

**VOLUME I:**

**TAB DS –** District Court Docket Sheet ................................................... 1

**TAB 1 –** Complaint
  Filed February 14, 2018 ................................................................. 53

Exhibit to Motion to Dismiss the Complaint
  Filed April 16, 2018:

  **TAB 12-2 –** Exhibit B, Declaration of Craig Wright ................................. 91

**TAB 24 –** Amended Complaint and Jury Demand
  Filed May 14, 2018 ...................................................................... 97

Exhibit to Motion to Dismiss Amended Complaint
  Filed June 15, 2018:

  **TAB 33-3 –** Exhibit C, Declaration of Craig Wright ............................... 150

**TAB 80 –** Answer to Amended Complaint
  Filed January 10, 2019 ............................................................... 157

**TAB 83 –** Second Amended Complaint and Jury Demand
  Filed January 14, 2019 ............................................................... 191

**VOLUME II:**

  **TAB 83-1 –** Exhibit 1 ............................................................... 240

  **TAB 83-2 –** Exhibit 2 ............................................................... 336

  **TAB 83-3 –** Exhibit 3 ............................................................... 341

  **TAB 83-4 –** Exhibit 4 ............................................................... 344

  **TAB 83-5 –** Exhibit 5 ............................................................... 449

**VOLUME III:**

**TAB 83-6 –** Exhibit 6 ................................................................... 460

**TAB 83-7 –** Exhibit 7 ................................................................... 463

**TAB 83-8 –** Exhibit 8 ................................................................... 468

**TAB 83-9 –** Exhibit 9 ................................................................... 482

**TAB 83-10 –** Exhibit 10 ............................................................... 494

**TAB 83-11 –** Exhibit 11 ............................................................... 509

**TAB 83-12 –** Exhibit 12 ............................................................... 524

**TAB 83-13 –** Exhibit 13 ............................................................... 566

**TAB 83-14 –** Exhibit 14 ............................................................... 568

**TAB 83-15 –** Exhibit 15 ............................................................... 573

**TAB 83-16 –** Exhibit 16 ............................................................... 583

**TAB 83-17 –** Exhibit 17 ............................................................... 585

**TAB 83-18 –** Exhibit 18 ............................................................... 587

**TAB 83-19 –** Exhibit 19 ............................................................... 595

**TAB 83-20 –** Exhibit 20 ............................................................... 600

**TAB 83-21 –** Exhibit 21 ............................................................... 622

**TAB 83-22 –** Exhibit 22 ............................................................... 632

**TAB 83-23 –** Exhibit 23 ............................................................... 640

**TAB 83-24 –** Exhibit 24 ............................................................... 643

**TAB 83-25 –** Exhibit 25 ................................................................ 665

**TAB 83-26 –** Exhibit 26 ................................................................ 667

**TAB 83-27 –** Exhibit 27 ................................................................ 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 ................................................................ 684

**TAB 83-29 –** Exhibit 29 ................................................................ 693

**TAB 83-30 –** Exhibit 30 ................................................................ 700

**TAB 83-31 –** Exhibit 31 ................................................................ 705

**TAB 83-32 –** Exhibit 32 ................................................................ 707

**TAB 83-33 –** Exhibit 33 ................................................................ 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019 ................................................................ 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019 ................................................................ 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ................................................................ 757

**TAB 144-6 –** Exhibit F ................................................................ 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019 ................................................................ 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019 ................................................................ 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
Filed June 14, 2019 ...................................................................... 780

**TAB 222 –** Redacted Declaration of Craig Wright
Filed June 20, 2019 ...................................................................... 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
Filed July 2, 2019 ........................................................................ 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
Filed July 9, 2019

    **TAB 242-2 –** Exhibit 2 ............................................................... 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
Filed August 15, 2019 .................................................................. 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
Filed August 27, 2019 .................................................................. 816

    **TAB 277-1** – Exhibit 1 ............................................................. 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain
Facts Established and "Striking" Certain Affirmative Defenses
Filed November 25, 2019 ............................................................. 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright,
4/4/19
Filed November 26, 2019 ............................................................. 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order
"Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed December 16, 2019 .............................................................. 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's
Motion to Compel
Filed January 10, 2020 ................................................................. 918

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020 Order
  Filed January 14, 2020...................................................................... 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
  Filed May 8, 2020 ............................................................................. 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
  Filed May 18, 2020............................................................................ 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in Limine
  Filed May 22, 2020............................................................................ 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus Motion for Sanctions
  Filed May 27, 2020............................................................................ 991

  **TAB 541-1** – Exhibit 1 ................................................................... 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
  Filed June 2, 2020.......................................................................... 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
  Filed June 24, 2020......................................................................... 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
  Filed August 3, 2020

  **TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson, November 8, 2019 ............................................................... 1053

  **TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan, March 17, 2020 ................................................................... 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
  Filed September 21, 2020 .............................................................. 1073

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
    Filed November 18, 2020 ........................................................ 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
    Filed November 20, 2021 ........................................................ 1196

    **TAB 794-1**– Exhibit A ........................................................ 1206

    **TAB 794-2**– Exhibit B ........................................................ 1209

**VOLUME VII:**

    **TAB 794-3**– Exhibit C ........................................................ 1212

**TAB 800-1 –** Court's Instructions to the Jury
    Filed November 22, 2021 ........................................................ 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
    Filed December 16, 2021

    **TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi ........................................................ 1264

    **TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

    **TAB 829-30 –** Exh. P122 – email chain ................................ 1272

    **TAB 829-41 –** Exh. P149 – email chain ................................ 1276

    **TAB 829-48 –** Exh. P161 – email chain ................................ 1278

    **TAB 829-55 –** Exh. P189 – email chain ................................ 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
    Filed December 20, 2021........................................................ 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
Filed December 20, 2021 ............................................................. 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
Filed December 20, 2021 ............................................................. 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
Filed December 20, 2021 ............................................................. 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
Filed December 20, 2021 ............................................................. 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
Filed December 20, 2021 ............................................................. 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
Filed December 20, 2021 ............................................................. 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
Filed January 4, 2022 ................................................................. 1342

    **TAB 861-1** – Exhibit A ......................................................... 1357

    **TAB 861-2** – Exhibit B ......................................................... 1391

    **TAB 861-3** – Exhibit C ......................................................... 1398

    **TAB 861-4** – Exhibit D ......................................................... 1403

    **TAB 861-5** – Exhibit E ......................................................... 1409

    **TAB 861-6** – Exhibit F ......................................................... 1417

    **TAB 861-7** – Exhibit G ......................................................... 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's Motion for a New Trial
        Filed January 18, 2022 ................................................................. 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed January 31, 2022

        **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright, August 11, 2014 ....................................................................... 1446

        Exh. P173 – Transcript of Interview with Craig Wright, August 18, 2014 ....................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed February 17, 2022

        **TAB 885-9 –** Exh. P464 – Redacted email chain ................................... 1538

**TAB 887 –** Order on Motion for New Trial
        Filed February 28, 2022 .............................................................. 1652

**TAB 889 –** Amended Final Judgment
        Filed March 9, 2022 ..................................................................... 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
        Filed February 24, 2020 ............................................................... 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 .................................................................. 1673

**TAB 507-1 –** Exhibit 1 ........................................................... 1701

**TAB 507-8 –** Exhibit 8 ........................................................... 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ......................................................... 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes................................ 1717

Exh. D102 – Excerpt of Progress Notes.................................... 1719

**TAB CS –** Certificate of Service

# TAB 83-6

# EXHIBIT 6

 Gmail

---

## Fwd: Re: Dave

<@gmail.com>

---------- Forwarded message ----------
From: **Craig Wright** <craig@rcjbr.org>
Date: Sat, Feb 15, 2014 at 9:15 PM
Subject: RE: Re: Dave
To: Ira K

If Patrick can do it, that would be good.

I do not know what was going on with Dave at the end and I had no idea he had any troubles financially. He never shared that and I would have helped him with anything. A year ago, liquidity and other issues made spending Bitcoin difficult. There are still issues.

Dave owned 50% of a US company that controlled a Belize based trust. I have attached a little more of what we did together. We had several DHS research programs.

These projects are listed below and the R&D conducted here is a part of these as well:

| | | |
|---|---|---|
| TTA 01 - Software Assurance economic measures | $650,000 | Software assurance through |
| TTA 14 - Software Assurance MarketPlace (SWAMP) Information Security risk markets | $1,200,000 | Software derivative markets & |
| TTA 05 - Secure, Resilient Systems and Networks | $1,800,000 | SCADA Isolation |
| TTA 09 - Cyber Economics | $2,200,000 | Risk Quantification |

These are the types of research projects Dave was involved with.

We used the Dept of Homeland Security and Australian government for base research funding on some of it.

Nobody involved with this wants to ever (even after death be known). The myth is more powerful than all of us combined. I want Dave's family to know, but please understand, he would not have wanted the world knowing.

I am a moody, grumpy bastard who loved Dave as he was one of the few people who would give me the time of day, let alone be as much of a friend as he is. When you start looking through all of this, it starts to become more like the

461

Bond movie.

If the DHS and others had known what we were doing, they would have stopped it early. If others (public) know the DHS funded the research, it will be a huge problem.

The myth is a part of Dave's legacy.

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914

http://www.rcjbr.org


cid:image001.jpg@01CCA14C.26B11E30      cid:image002.jpg@01CCA14C.26B11E30
cid:image003.jpg@01CCA14C.26B11E30

---

**3 attachments**

**A preamble into aligning Systems engineering and Information security ri....pdf**
1027K

**Safecomp2011.pdf**
549K

**W&K Info Defense Research LLC - 08.pdf**
118K

462

# TAB 83-7

# EXHIBIT 7

---------- Forwarded message ----------
From: **Craig S Wright** <craig.wright@hotwirepe.com>
Date: Fri, Apr 25, 2014 at 11:22 PM
Subject: Chronology of Craig Wright.docx
To: Ira K ███████████████████

And more reading

## Chronology of Craig Wright (CSW) activities & transactions

**2009**   Craig Wright mines some bitcoins and attempts to incorporate IP into Integyrs

**2010**   ATO Rejects IP transaction and CSW retains IP

**2011**   CSW sends Bitcoin overseas.  Value at that stage AUD $0.02    Founds a company in USA with David Kleiman, a business associate from forensic & security related IT areas.   Kleiman & Wright co-authored books on the subject and had fairly longstanding relationship.  The established was W&K Info Defense.   It was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies (CSW was by then lecturing regularly for Charles Sturt University and others) and to mine Bitcoin.   This was done on behalf of entities in Belize (related to Kleiman) and entities in Singapore and the Seychelles (related to Wright).   There is an agreement between CSW and W&K whereby CSW loans his Bitcoin and expertise to the company with payback and payment to be received in Bitcoin. In all, 1.1 million Bitcoin reverted to Sq and Seychelles accounts.   It is unkown how much reverted to Belize and Kleiman.

**2012**   CSW forms 2 UK trust companies  (non trading)  and owned through Seychelles.
          Permanent Success    &   Design by Human
Plans from W&K develop to the point where there is imminent product in the eLearning space.  Discussions progress.  At the same time CSW is contemplating Bitcoin and its regulation.

**2013**   Structural discussions progress to a plan and an agreement between W&K and CSW.  See share sale agreement.  See also Strasan Agreement.   This is done by early April 2013.  David Kleiman dies shortly thereafter reportedly from infections related to injuries incurred in US military. He was wheelchair bound and had related circulatory issues.  Per terms of the Agreement, CSW forms Hotwire Pre-emptive Intelligence Pty Ltd in Australia and continues the planned program.  ( June 2013)  Acquires IP and software from Strasan and registers for R&D with AusIndustry.  All prior to June 30.  AusIndustry accepts his application and both AI and ATO do an audit.  Hotwire passes AI audit but ATO audit drags on.

During the early 2013 period, CSW is pursuing Exchange and banking ideas with Bitcoin.  At the same time he is a lecturer and a speaker at functions on topics around IT security and SCADA.  At one of these in March 2013, he meets a fellow introduced as Mark Ferrier.  They chat about mining and security and CSW says he's is actively pursuing the Bitcoin banking possibility but is stumbling due to the need for core banking software.  Nothing more said. Within days, weeks he starts receiving emails from Ferrier (MJF) who intimates he may have someone who can help with the banking stuff.  There are a series of emails that follow this and a further meeting at some point and it all culminates on the 2nd of June 2013, when CSW agrees to buy a variety of things through MJF's company as agent.   These include:

465

- Core banking software and source code from al Baraka
- Seimens automation software
- Exchange software - micropayments
- Some gold ore
- And even MJF's father providing some consulting. Ian Ferrier – noted accountant

There are invoices for all of this.   CSW did due diligence on MJF through ASIC D&B  Whois etc and both the individual and his company came up clean. The notion of Ian Ferrier lent some credibility.  Missed social media however, which would probably have given him a better idea as to who he was dealing with.  Payment was from one of the UK entities and a directed payment supported by a Loan agreement to CSW.   He has since traced destination as somewhere in Africa.

The software and source code have all been delivered.  It has been determined that MJF is unable to deliver the gold ore and his father denies any knowledge of any agreement and purports to be estranged from his son.  On that basis CSW took action in the Supreme court of NSW for recovery of his Bitcoin or value for the Ore Purchase and consulting fees.  Judgment has been given.

Emails, contracts and any correspondence has been provided both in court and to the ATO in support of the facts.   CSW has offered to assist the ATO in pursuit of MJF should they choose to do so.  We are prepared and have briefed counsel on a Federal court action for misleading and deceptive behavior as well as the judgment debt.

Return to early July 2013, CSW communicates with ATO and briefs them on his intention to do the MJF transaction including the offshore payment in Bitcoin.  He states at that time his relative holding or control of considerable quantities of Bitcoin and a hope/intention of developing a regulated Bitcoin bank in Australia. He has actively pursued Private Rulings with ATO on many of his transactions and processes;  forms a nucleus of companies for Research and Development of the eLearning opportunity and also eBanking.

Since that time, CSW has populated Hotwire with some top people to pursue both R&D projects.  He has paid for all this through cashing in Bitcoin when and where possible and after a long struggle with the ATO receiving 1.45Million in R&D rebate from the 2013 tax return for Hotwire.  He has spent about 450,000 BTC over that period, much of it at values less than $120.00 so there is no questioning his commitment to trying to do something positive in Australia.

He has also been under audit for most of 2014 financial year by one entity or another.  And that leads us to today.  What the hell is he up to?

There is a lot of IP and 'stuff' in the mix.  All up, it's around a hundred million dollars' worth.  This IP originates in work CSW has been doing for more than 10years; it originates in things that came from W&K; it has to do with the software acquired.   The values and distribution have all

466

been given to the ATO.  It amounts to a third each for Cloudcroft  Hotwire and Coin exch.
Cloudcroft gets the security related IP,  Coin-Exch gets the banking and exchange and Hotwire
gets all of the automation and  R&D based stuff.  The transactions were all intended to go into
the Trust to be distributed.  That may or may have been the way it transacted.  That is the
cleanest solution.

Why not just run the purchase through the entities?  Because each transaction had a mix of
acquisitions that needed to parsed to different entities.    MJF had banking, automation,
exchange and Ore; W&K also had variety as did the other.  The neatest solution was to bring
them into one pot and then distribute accordingly.  And that is the mess we are in.

# TAB 83-8

# EXHIBIT 8

## Patrick Paige

| | |
|---|---|
| **From:** | Patrick Paige |
| **Sent:** | Sunday, February 16, 2014 8:38 PM |
| **To:** | ▮▮▮▮▮▮▮▮; Carter Conrad |
| **Subject:** | FW: Difficult |

If he was posting anon. then vistomail would do the trick.

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
▮▮▮▮▮▮▮

*www.ComputerForensicsLLC.com*

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Sunday, February 16, 2014 8:33 PM
**To:** Patrick Paige
**Subject:** RE: Difficult

He had vistomail accounts.
I have no idea of what the details in Belize were.

The number would be related to the account.

**From:** Patrick Paige ▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Monday, 17 February 2014 11:53 AM
**To:** Craig Wright
**Subject:** RE: Difficult

Any users names, email addresses etc. that we may be unaware of in association with the activities DK used?  In regards to the account you listed, have you made any inquiries or try to contact them?  Any information on the name of the bank? Is the number listed an account number?

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
▮▮▮▮▮▮▮

*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Sunday, February 16, 2014 3:41 PM
**To:** Patrick Paige
**Subject:** RE: Difficult

I do not have a lot to give you. These may help:

- W&K Info Defense Research LLC

1

469

- GICSR Trust
- ██████
- TTA-1-14

Locations

- Belize

It is not much, but then Dave always did things his way.

Regards,

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

## RCJBR.org

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

  

---

**From:** Patrick Paige ████████████████████
**Sent:** Monday, 17 February 2014 1:01 AM
**To:** Craig Wright
**Subject:** RE: Difficult

What about accounts and location DK had etc.? I thought you were going to put a list together.

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
████████
*www.ComputerForensicsLLC.com*

---

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Saturday, February 15, 2014 8:04 PM
**To:** Patrick Paige; Ira K
**Subject:** RE: Difficult

Well, preservation is first. The thing with a BTC address is that it will never disappear and if I am right will appreciate over time

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

## RCJBR.org

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

  

---

**From:** Patrick Paige ████████████████████
**Sent:** Sunday, 16 February 2014 10:59 AM
**To:** Craig Wright
**Subject:** RE: Difficult

2

470

Hey Craig, what's the plan... any progress?

*Patrick Paige EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**

*www.computerforensicsllc.com*

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Friday, February 14, 2014 12:20 AM
**To:** Patrick Paige
**Subject:** RE: Difficult

You will have it tomorrow

On 14/02/2014 4:06 pm, "Patrick Paige" ██████████████ wrote:

Hi Craig... I spoke to Dave's brother who is going to let me examine DK's laptop and thumb drives. Were you able to put together a list of what we should look for? Also I and Carter would like to see what information you have that confirms the news you shared with me. As close friends of DK we would love to hear the story of how this all played out. Talk soon

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*

*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Wednesday, February 12, 2014 2:28 PM
**To:** Patrick Paige; Carter Conrad
**Subject:** RE: Difficult

I will try calling again later. My number is +61 417 683 914

Dave could have some paper wallets, but he was careful. He would have had some way to recover. It would also have been cryptic.

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914
http://www.rcjbr.org

  

3

471

**From:** Patrick Paige [
**Sent:** Thursday, 13 February 2014 1:06 AM
**To:** Craig Wright; Carter Conrad
**Subject:** RE: Difficult

Hi Craig,

Dave was also my best friend and like a brother to me. He wasn't in the right mindset when he decided to give up on life weeks before his death. He mentioned Bitcoins to me a while ago, but we never discussed it in depth. The issue would be that all his hard drives were encrypted including his cell phone. Do the wallets only exist on Dave's computers or are there backups somewhere else? Also "The amount DK mined is far too large to email." Please clarify.

*Patrick Paige* EnCE SCERS
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*

*www.computerforensicsllc.com*

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Wednesday, February 12, 2014 5:21 AM
**To:** Carter Conrad; Patrick Paige
**Subject:** Difficult

Hello,

I know both of you knew Dave and trusted him.

Dave and I had a project in the US. He ran it there. We kept what we did secret.

The company he ran there mined Bitcoin. I do not believe there has been anything of this in the estate, but I also know his father is not IT literate. I would ask that if you know of any of his computers, that you help ensure that any wallet.dat files he has are saved. I know that is a long time, but I had thought Dave would have planned more for the end, but he did not always do that.

The amount DK mined is far too large to email. I know this is cryptic and I know I gave Dave the shits with this and some of the things we did in WK, but he was my best friend and I am not sure where else to contact.

I am not looking for anything, just that Dave's estate gets what was in it. I do not want any of it at all. Please note, I am not seeking anything in this, but I want his family taken care of.

Talk soon,

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914

http://www.rcjbr.org

<<...>>   <<...>>   <<...>>

5

## Patrick Paige

| | |
|---|---|
| **From:** | Craig S Wright <craig@rcjbr.org> |
| **Sent:** | Monday, August 04, 2014 11:57 PM |
| **To:** | |
| **Cc:** | Patrick Paige |
| **Subject:** | RE: This is a long shot but... |

Hello Paul,
I am sorry to state that Dave has passed away a little while ago.

I am the other researcher. Basically, there is nothing to be recovered. Once a drive is wiped, any data that was there is lost forever. There is no way to recover it.

Regards,
Craig

**From:** Patrick Paige
**Sent:** Tuesday, 5 August 2014 5:48 AM
**To:** Craig Wright
**Subject:** FW: This is a long shot but...
**Importance:** High

Hi Craig, I hope all is well... We got this email that was sent to Dave... Wanted to see if you would like to respond since you worked with Dave on it... If not just disregard... Thanks

**Patrick Paige** *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**

**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Paul Knight [
**Sent:** Monday, August 04, 2014 11:24 AM
**To:** Dave Kleiman
**Subject:** This is a long shot but...
**Importance:** High

Dear Dave,

My name is Paul Knight and I am the founder and Chairman of CNE Direct, Inc. located just north of Boston. I am writing to seek your help with a subject that you are clearly an expert on. It's related to your 2009 paper: Overwriting Hard Drive Data: The Great Wiping Controversy.

1

474

About five years ago, at a customer's request, we began to wipe, test and resell used hard drives that were no longer of use to them, but were very useful to smaller customers in developing countries. The drives were coming out of used DVR set top boxes. Over time we have expanded the program and it's still in existence today. Our supplier is able to manage the asset in the most environmentally responsible manner and recover some money. Customers around the world are able to purchase "cheap storage" and stretch their limited technology budget further.

As we sought to offer this service to other companies, we found that the overwhelming majority of entities with used/de-installed hard drives were destroying the product for fear of facing some kind of data security breach. For our own peace of mind, we made a number of attempts to find someone who could access data from a drive which had undergone our "secure erase" overwrite process, and could not. However, there is still a seemingly universal agreement in the business community that there is always the possibility of accessing data "post wipe" and destruction of the asset is the most prudent course of action. You can imagine how I excited I was when I found your paper. I had long suspected that the science behind the "security breach" hysteria was lacking, and your paper validated my suspicion.

At the moment, we are in early discussions with a large data center who is considering the option of partnering with us to wipe, test, and resell drives which can be completely overwritten with no bad sectors. As you can imagine, they are struggling to accept the notion that this asset can be safely processed and re-used with the right controls. Our main contact there (an engineer by background), is desperately looking for an independent, educated voice to validate what seems to be contrary to "conventional wisdom". As I thought more about this, I realized the best source of this information/opinion would be the very people who authored the paper. Therefore, I am asking if you would be willing to speak with our contact if I can set up the call? I'd be happy to pay you for your time and would insist that you not take on any role or responsibility as it relates to our commercial interest with him. I would simply like him to speak with a "real expert" and then make his own decision about what makes sense.

I imagine you're extremely busy and not even sure if this e-mail will reach you. For that reason I am sending this message to all three co-authors of the paper. Hopefully one of you will get this message and be willing to help. If you could, please confirm your receipt of this message and feel free to ask me any further questions about my inquiry. I appreciate your consideration,

Sincerely,

**Paul Knight**
**Founder and Chairman**

**CNE**DIRECT
www.cnedirect.com

5 Fifth St.
Peabody, MA 01960 USA

█████████████

pknight@cnedirect.com

**Linked in**   www.linkedin.com/in/pcknight/

Inc. 5000 Fastest-Growing Private
Companies in America 2010, 2011, 2012, 2013
http://www.inc.com/inc5000/profile/cne-direct

🖨 **Please consider the environment before printing this email**

3

## Patrick Paige

| | |
|---|---|
| **From:** | Carter Conrad |
| **Sent:** | Monday, March 17, 2014 7:49 PM |
| **To:** | Patrick Paige |
| **Subject:** | RE: Update |

What? It's like the mumblings of a drunkard...
It's too bizarre

Carter V Conrad, Jr
Computer Forensics, LLC
1880 N. Congress Avenue, Suite 333
Boynton Beach, Florida 33426
██████████████

www.ComputerForensicsLLC.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

Sent from my Android phone using TouchDown (www.nitrodesk.com)

-----Original Message-----
**From:** Patrick Paige ████████████
**Received:** Monday, 17 Mar 2014, 6:05PM
**To:** Carter Conrad ████████████
**Subject:** FW: Update

This guy is just full of information huh...

*Patrick Paige EnCE SCERS*
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*
██████████████

*www.computerforensicsllc.com*

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

1

477

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Monday, March 17, 2014 3:52 PM
**To:** Patrick Paige
**Subject:** Re: Update

Dave and.
Not one person.

On 18/03/2014 5:36 am, "Patrick Paige" [redacted] wrote:

Hi Craig, hope all is well… In reading some recent articles from Newsweek I see that the "real" creator of BC recently posted "I am not Dorian Nakamoto", how can this be if this was supposed to be Dave?

*Patrick Paige EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**

*www.computerforensicsllc.com*

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**Patrick Paige**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Tuesday, November 24, 2015 7:21 PM |
| **To:** | Patrick Paige |
| **Subject:** | RE: Hey |
| **Attachments:** | smime.p7s |

When it all comes out, there is no way Dave will be left out.

We need at least a year more.

**From:** Patrick Paige ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, 25 November 2015 2:10 AM
**To:** Craig Wright <craig@rcjbr.org>
**Subject:** RE: Hey

OK, that sounds good... I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins. I realize there is a lot of things to consider releasing this information but my question is when?

**Patrick Paige** *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
▮▮▮▮▮▮

**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Monday, November 23, 2015 3:49 PM
**To:** Patrick Paige ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: Hey

Not yet.

We are in the process of finalising some of the research. I was hoping we could be at the point of release before the reporters started sniffing.

Craig

On 24 Nov 2015 5:26 am, "Patrick Paige" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮wrote:

No problem... I don't think it's about computers, he mentioned bitcoins in his message. Maybe they something about yours and Dave's bitcoin involvement. You want me to return his call and feel him out? Are you guys close to releasing any information on Dave's involvement in Bitcoins?

1

479

*Patrick Paige* EnCE SCERS

*1880 North Congress Ave. Ste 333*

*Boynton Beach FL 33426*

██████████

**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, November 19, 2015 1:06 PM
**To:** Patrick Paige ██████████████████
**Subject:** Re: Hey

Thanks for the heads up. Reporters are always troubling. They ignored the stuff Dave and I did when he was alive. I don't know what has started to interest them now.

The computer we are running made the top 20 within the top 500 supercomputer list so this may be new?

http://top500.org/

The first one was COIN in 2013 just before he died and the new one is Tulip.

Dave helped design the first one and as you know did a fair amount of research with me. Most yet to be completed and published.

A worry that they are starting to be nosey now.

Thanks again for the heads up.

On 20 Nov 2015 03:50, "Patrick Paige" ██████████████████ wrote:

Hi Craig… how goes it, just wanted to touch base with you. I got a call from a reporter who left a message asking about Dave and you. I don't plan to call him back, but Carter and I were curious if something is going on.

*Patrick Paige* EnCE SCERS

2

480

*1880 North Congress Ave. Ste 333*

*Boynton Beach FL 33426*

▮▮▮▮▮▮▮

*www.computerforensicsllc.com*

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

3

# TAB 83-9

# EXHIBIT 9

*DLM = Sensitive – when completed*

# Record of client contact

☐ **Interview**          ☐ **Telephone call**          ☑ **Other meeting**

| Person/s Interviewed | Authorised contact, John Chesher<br>Bookkeeper, Ann Wrightson |
|---|---|
| **Representatives for the ATO** | Andrew Miller and Jenifer Trinh |
| **Date:**<br>**Location:** | 26 February 2014<br>Interview Room 1, ATO Parramatta Office<br>2-12 Macquarie Street<br>Parramatta NSW 2150 |
| **Start time:**<br>**End time:** | 1:00PM<br>2:50PM |

*Important: Interview notes are an important part of gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

## Contact summary:

### *Purpose of the contact*

Meeting was for John Chesher to explain workings in the revised activity statements sent to the ATO on 25 February 2014

### Issues Discussed:

1. Craig Wright
2. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)
3. The Trustee for the Wright Family Trust (DeMorgan)
4. Coin-Exch Pty. Ltd. (Coin-Exch)
5. Cloudcroft Pty. Ltd. (Cloudcroft)
6. Strasan Pty Ltd (Strasan)
7. Pholus Pty. Ltd. (Pholus)

## Record of Conversation:

ATO auditor, Andrew Miller (AM) brought authorised contact (John Chesher) and bookkeeper, Ann Wrightson (AW) into Interview Room 1 at 1:00pm on 26 February 2013.  AM and ATO auditor, Jenifer Trinh (JT) then introduced themselves to JC and AW.

After the introduction, the meeting commenced. To the best of my recollection, and

1

483

based on notes I made during the meeting, the conversation was as follows:

**JC:** Have you been able to have a chance to look at the briefing report sent earlier today?

**AM:** I did have a chance to look at the briefing before the meeting. I will be holding a meeting with Marina Dolevski and Hoa Do tomorrow and will raise the issues raised in the briefing at the meeting.

**JC:** We have gone through various stages of how the Bitcoins are viewed. We have gotten our legal adviser, Andrew Sommer to have a final look at it and he has advised us that our previous treatment of the Bitcoins was incorrect and that it should have been treated as an assignment of right of Bitcoins as no Bitcoins were actually physically exchanged between the related entities.

**AM:** I have had a brief look into the revised activity statements sent by you yesterday. Our meeting today is an opportunity for you to walk through the revisions made on the activity statements for the various entities.

**JC:** There is not much difference between the revised activity statements and the original activity statements. Initially, we treated the Bitcoins as money. Now, we will be treating them as an assignment of right of Bitcoins. The outcome to the ATO would not be much different. The focus on the audits should be on the external transaction, that is, the transactions made with MJF Consulting Pty Ltd (MJF).

**AM:** We will first start with the GST worksheet provided for Craig Wright himself. *AM then shows JC a relationship map titled 'Other Observations'.* This is my understanding of the relationship amongst the related entities. I may be making changes to it or adding things to the current diagram during the meeting. I can give you a copy of this as well.

*JC looks at the diagram and points at Craig Wright on the diagram.*

**JC:** This all starts with Craig Wright. Craig Wright started all this in 2009 when he started mining Bitcoins. There was a previous GST audit conducted on Craig Wright. The audit was in relation to transactions that occurred relating to Intellectual Property. The auditor took an adverse view. The auditor and Craig Wright had a difference of personality. The outcome of the audit resulted in allowable deductions and GST acquisitions revised to nil. Craig Wright couldn't save the two entities. We took the audits to objection but the objection officer agreed with the auditor. The decision was upheld in objections. We then took the matter to the AAT and the court allowed some of the deductions. The audit resulted in liabilities being raised and your debt department was onto us immediately. However, the AAT decision changed this. From owing the ATO hundreds of thousands, we were now allowed a net loss to be carried forward to future years.

We were apprehensive about director Des McMaster's involvement with the current audits due to his past involvement with the previous GST audit.

**AM:** That shouldn't be a problem. I am the auditor conducting the audit, not Des.

**JC:** We understand. Craig Wright took the Bitcoins that he had mined offshore. At the time, it was worth 3-4 cents. The total value of this was around $5000. He then started up W&K Info Defense LLC (W&K) with Mr Dave Kleiman. W&K was an entity created for the purpose of mining Bitcoins. Craig Wright is a forensic computer expert. He is constantly updating himself attending courses, workshops and training sessions. He is also a university lecturer at Charles Sturt University and conducts courses. He even provides services to some Australian government agencies including the ATO and the Defence Force. However, this is all done on a very high level.

2

484

Craig Wright had mined a lot of Bitcoins. Craig then took the Bitcoins and put them into a Seychelles Trust. A bit of it was also put into Singapore. This was run out of an entity from the UK. Craig had gotten approximately 1.1 million Bitcoins. There was a point in time, when he had around 10% of all the Bitcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. He was a war veteran; he was wheel chair bound.

The deed between Craig Wright and W&K was created in 2012. W&K gave Craig Wrights rights to the Bitcoins and he has used the Bitcoins to do all this stuff.

Mr Kleiman and Craig Wright decided to start up W&K because they both wanted to get involved with Bitcoins. They recognised that this industry was not regulated and they wanted to start up a regulated Bitcoin bank. They knew they couldn't do this in the US so they wanted to do this in Australia.

In the agreement entered into, it was stated that Strasan Pty Ltd (Strasan) was to perform the ground work and create the e-learning package for them. W&K was responsible for providing funding. It was decided that one entity will also be created to be banking front. This was basically the reason why Coin-Exch Pty. Ltd. (Coin-Exch) was created. W&K then bought all the work done by Strasan.

A deed was then entered into with Hotwire. It is noted that at the time, Strasan did not belong to Craig Wright. It was an independent entity at the time. Panopticrypt is a shareholder of Strasan. Craig had a minor shareholding in Panopticrypt Pty Ltd (Panopticrypt). He was only a minor shareholder at the time and did not control have control of this entity at the time.

Strasan then got a person from the UK by the name of David Rees to create a pathway outline to go forward with the e-learning process.

Craig Wright was speaking in a conference in Melbourne. He was giving a talk about Bitcoins and mining. He was then approached by a man by the name of Mark Ferrier and that was how they met. This was how the relationship was formed. They started talking. Craig Wright told Mark Ferrier that he wanted to start up a Bitcoin bank. They then started emailing. Mark Ferrier told him that he knew someone who could help him start up the bank. This was all done in early June 2013. Everything was done very quickly- most of it was done in one weekend. Craig Wright, with the help of Mark Ferrier, agreed to purchase banking software from Al Baraka. Mark Ferrier also convinced him to purchase gold ore. He also offered Ian Ferrier's services to Mark Ferrier. Ian Ferrier is Mark Ferrier's father. Before engaging in Mark Ferrier's services, Craig Wright had conducted lots of checks on him and everything came up clean. So in essence, Craig Wright wanted the banking software and Mark Ferrier wanted Bitcoins.

Around mid-July/August, Craig Wright released funds from an entity located in the UK to MJF Consulting. This was all going through a server located in Central West Africa.

Mark Ferrier was then arrested in September 2013. Craig Wright then started to take action to protect his own rights. Your director, Des McMaster has informed us that ASIC documents show that Mark Ferrier was only put on as a director for one day. Craig Wright then contacted Pitcher Partners in Brisbane and asked them for an explanation. We found out that Mark Ferrier was never a director. The address that he had on ASIC was false as well.

Craig Wright was able to get hold of the banking software and automation system. He has everything but not the gold ore. He was expected to receive the gold in 2015 but now that's not happening as the gold can't be delivered. Craig Wright has also contacted Ian Ferrier. Ian Ferrier advised us that he has not spoken to Mark Ferrier for 2 years and wants nothing to do with him. We have a case against MJF Consulting with the Supreme Court of NSW and also the Federal Court. The case with the Federal Court is for deceptive conduct against Mark Ferrier

3

485

personally as an individual.

Due diligence was conducted on Mark Ferrier before we engaged him. We have done all we could to protect ourselves.

If you look at the transactions made, you will see that every transaction was pegged against the currency exchange rate at the time. Craig Wright has already advised you that the accounting method for this personal enterprise should be changed from cash to accruals. The accounts should be on accruals from the start of the 2013 income year. Craig Wright has previously informed the ATO of this.

We have previously been dealing with ATO officers from different sites at first, e.g. some initial work was being conducted from the Hurstville office, Brisbane office etc. But then Des McMaster made a decision for all the audits to be done from Parramatta. The audits were then being conducted by Celso. I am uncomfortable with the fact that Des McMaster is looking after these audits. We have had past dealings with him in the previous audits.

**AM:** That is why I'm coming in with a fresh pair of eyes.

**JC:** Des' judgment is tainted due to his involvement with the old audits. We don't want the current audits to be tainted by the past audits.

**AM:** Yes, I understand.

**JC:** We want to make sure that you are comfortable with all the transactions.

**AM:** We should have all the documents already provided on our systems. I have a question to ask. Were actual Bitcoins physically paid to MJF Consulting or Mark Ferrier?

**JC:** Yes. We paid Bitcoins to him. We paid the Bitcoins to where he directed for the Bitcoins to be paid into.

**AM:** Just to confirm, was it actual physical Bitcoins that was paid?

**JC:** Yes.

*JC then opened his folder and showed AM written communication between Craig Wright and Mark Ferrier. He first showed a letter dated 1 June 2013 from MJF Consulting. His second (dated 1 June 2013) and subsequent documents were email correspondence between Mark Ferrier and Craig Wright.*

**JC:** *(referring to an email correspondence between Mark Ferrier and Craig Wright)* After the deal was signed, Mark Ferrier signed the agreement. Popal *(the name was referenced in one of email correspondence between Craig Wright and Mark Ferrier showed to AM )* is the person responsible for bringing Mark Ferrier into the deal. From our correspondence and understanding of Mark Ferrier, it appears that the person behind this is much smarter than Mark Ferrier. There was a spike in the value of shares at the time from $2 to $6 in the weekend that we signed the deal. We believe that this was done intentionally. We are now dealing with Al Baraka ourselves. We are liaising with the people in Turkey. I hope that you've been able to get an understanding of how this all started now.

**AM:** I have an understanding of the background now.

**JC:** Craig Wright has a Blockchain view of this. In relation to the transactions done with Mark Ferrier, the Bitcoins left Doncaster in UK and was transferred to West Africa. Craig Wright

4

obtained the automation and banking software through Mark Ferrier. The software first goes to Craig Wright and then he transfers them into The Wright Family Trust (DeMorgan) for distribution. The banking software was transferred into Coin-Exch as this company is acting as the banking front. The automation and exchange software was transferred to Hotwire. Basically, everything goes through Craig Wright and then into the trust. The security work was performed by W&K.

In relation to the valuation of the software, Al Baraka determined the value of the software that was obtained from them. The Supreme Court of NSW determined the value of the software obtained from W&K. You should already have copies of the two Supreme Court of NSW judgments.

**AM:** When was the Supreme Court judgments made? On the invoices you provided us, they appear to be dated sometime in mid-to-late 2013?

**JC:** The W&K transactions were dated 1 September 2013. The judgments came through in November/ December 2013. There is a time difference of a few months here as Craig Wright had to demonstrate the value of the claims to the Court. He was dealing with this matter from 1 September 2013.

So essentially to sum it up, software and intellectual property were sitting in DeMorgan and was distributed out as follows:
- A third was distributed to Hotwire.
- A third went to Coin-Exch.
- A third went to Cloudcroft. Craig Wright may be the sole director of this entity at the moment but he was not the sole director at the time the company started. This company was responsible for performing security work at the time it was first established.

Most of the intellectual property and software were licensed to the three entities and not sold. The reason for this is because the licenses costs will be considered an expense and not an asset and this protects the R&D position.

Cloudcroft was actually started-up by his ex-wife, Lynn Wright. It was 100% owned by Lynn Wright at the time. They were separating at the time it started. He was dealing with clients including Hoyts in his security role. Lynn Wright had 100% ownership of the company until late 2012 when the company was put into liquidation. The liquidators decided to pursue Cloudcroft and Lynn Wright for the contract to sell from W&K to Cloudcroft. However, no deal came out of this.

Lynn Wright then went bankrupt. This was when Craig Wright took over Cloudcroft. It is possible that he may currently be the sole shareholder.

Coin-Exch is the banking front of the group and is holding the banking software.

Hotwire has the exchange and automation software and is also the R&D engine for the group. Hotwire came into existence because of the contract entered into between W&K and Strasan. It was stipulated in the contract, that a company would be created; and consequently, Hotwire was formed as a result. Hotwire is funded by a Deed of Assignment. The initial funding was by an equity distribution of rights in late July/ August.

1. **Craig Wright**

**AM:** I will start by going through the revised activity statement for Craig Wright.

**JC:** All the transactions made amongst the related entities are GST neutral. The overall GST

5

487

credit expected from the related entities is around $5.5 million. The sum total of the GST on the Al Baraka deal is around $5.346 million.

*(JC then looks at the revised GST ledger (sent on 25 February 2014) for Craig Wright)* You can see this at the bottom of page 3 and top of page 4 of the GST ledger. The total amount as stated on page 4 is $5.376 million.

**AM:** The original activity statement lodged for Craig Wright resulted in a GST payable amount of $2.3 million. The new revised activity statement results in an increased payable amount of around $4.2 million. Just to clarify, do you want this to be amended on our systems? Or are you just putting forward these figures for us to consider?

**JC:** I want you to revise the activity statements for us. The process for us to change the accounting method from cash to accruals and then to request a new activity statement to be generated on your system is just too complicated. We were not able to change to accruals on the Portal and we already requested many times for this to be changed to accruals. However, at the moment, the accounting method is still cash on your system.

**AM:** To confirm, the new revised statement is on accruals basis?

**JC:** Yes, it's on accruals. We have previously advised of this before. Craig Wright has been asking for this consistently.

You should also note that I have only come on board after October/November 2013. Jamie Wilson was previously responsible for the accounts for the entities. Jamie was responsible for introducing Xero. His role fell apart around October 2013 due to his personal situation. ■

**AM:** I had a quick look at the revised activity statements. It looks like the main difference between the two is that there is now an additional $31 million included under the accruals method. In the current statement, there are two lots of income received from DeMorgan of $34.1 million each. The cash version only showed one lot of $34.1 million. Why is there an additional sale made to DeMorgan in the current statement?

**JC:** *(JC checks this on his laptop for a few moments.)* I believe this is in relation to the international payments made. Those were external payments made. It came in externally and went out externally.

## 2. The Trustee for Wright Family Trust (DeMorgan)

**AM:** Let's move on to the second entity, The Trustee for Wright Family Trust (DeMorgan). Who is the trustee of the trust?

**JC:** I think it may be Panopticrypt or Craig Wright himself. I'm not uncertain of this though. I will get back to you on this.

**AM:** No changes were made from the original activity statement. There is nothing to discuss on this one.

## 3. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)

**AM:** I'll move onto Hotwire now. The combined total of G10 and G11 has decreased. The end result is a slight increase in refund.

6

488

**JC:** *(JC checks this on his laptop for a few moments.)* This is for minor expenses, like general expenses. These were previously sitting in GST-free. We have moved all the computer equipment of the group to Pholus Pty. Ltd. (Pholus). Pholus will be providing the funding for the IT services. We initially went to the bank to get a lease. But the bank told us that they will give us $90,000 in return for $90,000. If we give them $90,000.00, they will lend us $90,000. That didn't make sense to me. We didn't get a lease from them. We are currently setting up Pholus to do the IT side of things. Our next task is to move the assets to Pholus. The leasing expenses for the equipment will be treated as a liability.

**AM:** There were four invoices issued from DeMorgan to Hotwire on the same day. Just out of curiosity, why was it separated into four tax invoices? The payments made added up to approximately $37 million. It was for tax invoices numbered 1, 2, 3 and 4.

**JC:** *(checks laptop for a few moments)* This is because they obtained a three year licence for the intellectual property. It was $10 million per annum. One tax invoice is for payment for the current year and the other two are prepaid payments made. They moved in as a lump. For the R&D side of things, it is considered to be a prepayment. A similar situation has occurred in Coin-Exch as well.

### 4.  Coin-Exch Pty. Ltd. (Coin-Exch)

**AM:** We will now move on to Coin-Exch. The revised calculation shows a significant increase in capital purchases of $21.8 million. This is marked as a GST-free capital expense for Bitcoin Assignment. However, there is no change in the overall GST refund as the new $21.8 million is marked as GST-free.

**JC:** That is an assignment of right. It reflects the Bitcoin assignment made.

**AM:** Did Craig Wright make a Bitcoin right assignment to Coin-Exch?

**JC:** Yes.

**AM:** What was this in exchange for? If Craig Wright made an assignment to Coin-Exch, what did he get back in return?

**JC:** Let me check this. *(JC checks this on his laptop)*

**AM:** Could this be for the IP Licence obtained from DeMorgan?

**JC:** So what happened is that Coin-Exch has an assignment of right and the corresponding transaction made against it is marked as a loan. It is a loan from Craig Wright for the right to use it.

**AM:** This is different to what happened to Hotwire. Was there a written agreement between Craig Wright and Hotwire for the assignment? Were they both marked as GST-free?

**JC:** Yes. They were moving through as a series of loans made. The Deed moved from the UK to Craig Wright and then he distributes this.

**AM:** The word 'loan' was not used in the briefing paper that you sent earlier today. 'Loan' and 'Rights' have different meanings.

**JC:** They are not loans, they are Assignment of Rights. I got confused as the assignment of rights is categorised as a liability and consequently, I called it a loan. But it's not actually a loan.

489

**AM:** Okay. So to confirm, Coin-Exch acquired intellectual property from DeMorgan. The right to call BTC is then assigned to Coin-Exch?

**JC:** Yes.

**AM:** Jenifer do you have any questions to ask?

**JT:** No.

**JC:** She is too busy writing up the minutes.

**AM:** We can send you a copy of today's minutes if you like?

**JC:** Yes, that would be appreciated.

### 5.  Cloudcroft Pty. Ltd. (Cloudcroft)

**AM:** We will now move onto Cloudcroft. Overall sales reported in the revised statement have decreased. The export sale on the original ledger is no longer included in the revised calculation. The previous statement showed export sales of $3.1 million. However, this does not affect the final GST amount.

**JC:** *(JC checks this on his laptop)* I have no reference on my report of this amount.

**AM:** If you go back to the original statement, you will see that there is export income of $3.1 million reported.

**JC:** That may have been a mistake. The only thing that jumps to me is the Strasan transaction which was also for $3.1 million.

**AM:** The amount is GST-free. For your record, GST refund remains the same.

**JC:** We have an entity in Singapore. The export sales may have been made to that entity.

**AM:** Was it for a sale of a software package to Singapore?

**JC:** This is possible, but I can't confirm.

### 6.  Strasan Pty Ltd (Strasan)

**AM:** I have no more questions to ask in relation to Cloudcroft. I will now move on to Strasan. You provided us revised GST ledgers for the tax periods ended 30 June 2013 and 30 September 2013. However, I noticed just before the meeting that the two PDF documents are the same.

**JC:** I must have forgotten to change the header. I will send this to you again. Nothing happened in the first quarter of 2014 except for sales.

**AM:** As I only have the revised June 2013 quarter, I will just be asking questions in relation to that. I can see that the sales have been reduced to $nil.

**JC:** *(Checks his laptop)* This was for payment to Strasan from Hotwire for work performed. They issued a Deed of Assignment at the end of June 2013. It was paid out of the wallets given to you in July/August.

490

**AM:** Who were the expenses incurred to? Was it Hotwire or Craig Wright?

**JC:** Strasan got the benefit of 'DeMorgan Info Security Services' which was otherwise known as DISS. This entity does not exist anymore. Craig Wright was involved with this entity in early 2000s. DeMorgan is Craig Wright's grandmother's name. The company created a bunch of stuff. Craig had a dispute with the director and then got out even though he had 75% of the shareholding. They ended up stripping the company. Craig Wright then had a ten year court case against DISS and had legal fees incurred for the ten years. A judgement made in Court assigned the right of 4 projects to Craig Wright and Strasan got the benefit of the 4 different projects.

**AM:** In relation to the expenses reported, which entity is responsible for reporting the corresponding sales made for the June 2013 quarter?

**JC:** Strasan was working for Hotwire and received payment which was the Right of Assignment of $3.8 million.

**AM:** There is no income reported by Strasan in the revised statement. There were $5.3 million in sales reported in the original statement. The revised BAS has no sales but does have expenses.

**JC:** That's odd. I have the $5.3 million in sales on the laptop as well. This amount is not part of the GST audit so it must be GST-free. The amount was for export sales made.

**AM:** It would most likely be a G2 amount then.

*JC then shows AM the laptop screen.*

**JC:** This amount shows up as an export sale made. I will need to get back to you on this. In August, there was an invoice with a due date for payment as 30 October 2013. There was another amount to Hotwire but that was for the previous year. In the fourth quarter in 2013, there was a sale amount made of $3.2 million. There should be a corresponding amount in June for Hotwire for $3.2 million.

**AM:** In the original statement lodged, there was a GST-free amount of $5.3 million reported. The description provided for the transaction is 'Dallah Group (INV-0001)'.

*JC then checks this on his laptop.*

**JC:** That invoice was voided. *(JC then shows AM the invoice on the laptop.)* This was entered into the wrong entity. See the bottom note made here, it states that the invoice has been voided. Dallah has nothing to do with Strasan. You will see the transaction in another entity. It would be in either Coin-Exch or Hotwire.

**AM:** Let's have a look now. *(AM then looks at the revised statements provided for Hotwire and Coin-Exch.)* It doesn't appear to be in Hotwire or Coin-Exch.

**JC:** It was voided in November 2013 because it didn't exist and there was no Dallah at that point in time. Micropayment system was part of the stuff that came in. It if went anywhere, it would have gone to Coin-Exch or Hotwire. We are looking to do micropayments in Bitcoins. The micropayment system allows people to buy fractions of a Bitcoin. The smallest fraction is a satoshi. The micropayment system was about half the value of the software package.

9

491

### 7. **Pholus Pty Ltd (Pholus)**

**AM:** Now, we'll be moving onto the final entity, which is Pholus. Sales and export sales made have remained the same. Export purchase reported in original statement of $2.3 million has now decreased to nil. G10 was originally $2.3 million and has been revised to nil. The reverse has occurred for label G11. The amount reported was originally nil and has been revised to $2.3 million. The description provided is 'university software- install system design and deployment'.

**JC:** We had a bunch of chords as inventory. There are around a thousand of them. We moved them to Pholus as part of their inventory. These chords are similar to CPUs. Each chord is a data miner. We changed it from G10 to G11 as they are inventory and should have been classified as a non-capital purchase instead of a capital purchase as they are not capital. The other stuff reported was for accounting and consulting services.

**AM:** That's all the questions I have. Do you have any questions to ask Jenifer?

**JT:** No.

**JC:** After the meeting, we will get back to you on the following:
- Who the shareholders of Cloudcroft are;
- Clarification of the loan or rights issue;
- The discrepancy identified in relation to the Dallah Group invoice;
- The anomalies not appearing in Coin-Exch or Hotwire; and
- Who the trustee of DeMorgan is.

You should have the backup for everything with you. You can see that the fundamental issue is the external transaction made with MJF Consulting.

**AM:** I will be having a discussion tomorrow with our AC, Marina Dolevski and Hoa Do in relation to the Assignment of Rights. I am happy to relay the outcome back to you after the meeting.

**JC:** That would be much appreciated if you could do so. Craig Wright has been moving stuff around but if you look at in holistically, he isn't moving anything around at all. The only external transaction is with MJF Consulting and to David Rees. The transaction with David Rees was GST-free as it was for educational stuff.

So, what's next from here?

**AM:** I can't say at the moment. This will be dependent on the meeting to be held tomorrow. We will make a decision as to how to go forth from there.

**JC:** There is an amount coming our way. We want to propose receiving 20% of this amount first. I will be putting this forth to Marina. If this is not a reality, we will have further discussions but if it is, we want it released immediately. We have spent a lot of money during this process and we need the funds to ease our cash flow. The Bitcoin industry is very volatile and there is no clear picture as to the future. Our bank options are limited. Everything we have been doing is legitimate. If you were able to come out to our premise today to hold the meeting, you would have seen 40 to 50 people working out there. We have lots of activity happening at the moment. $5 million does make a difference. We need to recover the money already spent.

**AM:** I can't comment on this. This discussion is best held with Marina Dolevski.

**JC:** We need to be back in a position of control.

GIZMODO

492

**AM:** I will be having a meeting with Marina and Hoa Do tomorrow at 2pm. I will let you know of the outcome of tomorrow's meeting.

*AM then thanked JC and AW for their time.*

Meeting concluded at 2:50pm.

**Include reference/hyperlink to main documents relied upon:**

Relationship_Diagram_No_Markings
Relationship_Diagram_with_Markings

**Author's name: Jenifer Trinh**
**Date of document:   27 February 2014**

_____



493

# TAB 83-10

# EXHIBIT 10

# INTELLECTUAL PROPERTY LICENCE
# FUNDING AGREEMENT

**PARTIES**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Financer)

**AND**

**W&K Info Defense LLC**
(Provider)

Ref: CEWK01

*K C*

**THIS DEED** dated 22nd day of April 2011

**BETWEEN**
> Craig Wright of Craig Wright R&D
>
> (Financer)

And
> Dave Kleiman for W & K Info Defense LLC
>
> (Provider)

**RECITALS**

**A.**   The Financer controls the following Bitcoin (BTC) addresses:

>   (a)   12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm.
>
>   (b)   12C9c9VQLMrLi4Ffzq2wDvwrKnUPaAaNFp.

**B.**   The Provider desires the intellectual property for the permitted use and to extend this for other purposes desirable to both parties.

**C.**   The Provider will use the funding for the development of several software products.

**D.**   The provider will return the loaned finances (in Bitcoin) on or before 01 July 2013 and 30 Dec 2013.

**E.**   The Provider will remain completely confidential on all matters in this deed (including even that family members do not have knowledge of the transaction).

**F.**   The financer will send the following amounts (in Bitcoin) to to following address by 30 April 2011:

>   (a)   165,140 BTC
>
>   (b)   1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7

**G.**   The financer will send the following amounts (in Bitcoin) to toe following address by 30 August 2011:

>   (a)   50,000 BTC
>
>   (b)   1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

**H.**   The Financer and the Provider wish to record the licence, which has been granted to the Provider to use the intellectual property in accordance with this deed.

**I.**   The Financer is the absolute owner of the entire unencumbered copyright in the works described in the schedule when complete.

**J.**   The Financer has agreed to license the works to the Provider and the Provider has agreed to accept such licence on the following terms and conditions.

**K.**   The provider will fund the software development using Bitcoin.

2

**L.**     The Financer will provide 1,024 core Xeon and GPU based hardware solution.

    (a)     It is acknowledged that two SGI ICE XE310 – 512 core hosts have been provided and are in a data centre specified by the provider

    (b)     The provider will use these systems to mine Bitcoin

    (c)     The provider expects to earn 12,000 BTC per month using these systems for the period to 30 June 2013

    (d)     The systems will be hosted in the US at a facility managed by the provider.

**M.**     The provider will pay for the use of the systems and the loan as follows:

    (a)     250,000 BTC to be repaid on 30 June 2013

    (b)     50,000 BTC to be repaid on 30 Dec 2013

    (c)     The developed software will be exclusively licensed perpetually to the financer (as of 30 June 2013).

    (d)     The software may be used but not distributed by the provider.

**N.**     The contract is complete when 300,000 BTC have been repaid.

**O.**     It is agreed that the value of the loan to be repaid is $ AUD 20,000,000 in two parts (for a total of $40,000,000).

**P.**     The server systems will return to the Financer at the completion of the contract.

**Q.**     On default, the contract is to be repaid in full to the financer.

3

**OPERATIVE PART**

1. **Definitions**

   In this deed:

   (a) Business means the business operated by the Provider described as such in the schedule;

   (b) Business day means a day, not being a Saturday, Sunday or gazetted public holiday, on which banks are open for commercial business where performance of an obligation under this deed is to take place;

   (c) Claim means, in relation to a person, a claim, demand, remedy, suit, injury, damage, loss, cost liability, action, proceeding, right of action, chose in action, claim for compensation or reimbursement or liability incurred by or to be made or recovered by or against the person, however arising and whether ascertained or unascertained, or immediate, future or contingent;

   (d) Commencement date means the date so specified in the schedule;

   (e) Confidential information means all technical and other information and know how, including all information and know how in any eye or machine readable form or other format, disclosed or given to the Provider from any source in respect of or incidental to:

      (i) The product;

      (ii) The technology;

      (iii) The Financer; and

      (iv) Any other information disclosed or given to the Provider by the Financer which is declared by the Financer to be confidential information;

   (f) Improvements means any improvement, modification, enhancement or derivative of the intellectual property arising during the term;

   (g) Intellectual property means:

      (i) The confidential information;

      (ii) The improvements;

      (iii) The patent; and

      (iv) The trade mark;

   (h) Licence fee means the amount calculated and paid by the Provider to the Financer specified in the schedule;

4

(i)   Notice means a written notice, consent approval, direction, order or other communication;

(j)   Obligation means any legal, equitable, contractual, statutory or other obligation, deed, covenant, commitment, duty, undertaking or liability;

(k)   Patent means the registered patent or patent application including the provisional and complete specifications described in the schedule;

(l)   Permitted use means to conduct the business to exploit market, promote, develop, integrate, research, sell and conduct and any other activity undertaken with respect to the product for profit or reward;

(m)   Product means the product described as such in the schedule;

(n)   Right includes a legal, equitable, contractual, statutory or other right, power, authority, benefit, privilege, remedy, discretion or cause of action;

(o)   Technology means all that technical information which relates to or forms part of the product, including, without limitation, methodology, techniques, drawings, outlines, notes, algorithms, detailed designs, flow charts, results, software: partial or intermediate versions and prototypes, data, formulae and other proprietary information and know how in the Provider's possession or control or which is revealed to the Provider which relates to the product;

(p)   Term means the term set out in the schedule; and

(q)   Trade mark means the registered trade mark, trade mark registration application and common law trademarks described in the schedule.

## 2.   Interpretation

This deed is governed by the law of NSW and the parties submit to the non-exclusive jurisdiction of the courts of that state.

In the interpretation of this deed:

(a)   References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under the legislation;

(b)   Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or deeds also mean those documents or deeds

5

499

as changed, novated or replaced, and words denoting one gender include all genders;

(c) Grammatical forms of defined words or phrases have corresponding meanings;

(d) Parties must perform their obligations on the dates and times fixed by reference to the schedule;

(e) Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

(f) If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g) References to a party are intended to bind their executors, administrators and permitted transferees; and

(h) Obligations under this deed affecting more than one party bind them jointly and each of them severally.

3. **Licence**

The Financer hereby grants to the Provider an exclusive licence to use the intellectual property for the permitted use on the terms of this deed.

In consideration of the licence fee payable hereunder the Financer grants to the Provider an exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 01st July 2013.

In consideration of the licence hereby granted to the Provider the Provider must pay a one off licence fee of $20,000,000 (GST exclusive) to the Financer on or before the 30th June 2013. The provider will also transfer the designated account of the provider:

(a) 250,000 BTC to be repaid on 30 June 2013

(b) 50,000 BTC to be repaid on 30 Dec 2013

6

500

The payment is to be issued in Bitcoin as per the schedule.

**4. Provider's promises**

(a) **Undertakings**

The Provider undertakes to:

(i) Use its reasonable commercial endeavours to:

(1) Preserve the value and validity of the intellectual property; and

(2) Create, promote, retain, and enhance the goodwill in the intellectual property;

(ii) During the term and thereafter the termination of this deed not to allow or facilitate the use, nor exploit the intellectual property in a manner in any way detrimental to the Financer and not contravene, deny or contest the rights subsisting in the intellectual property, and take such steps as may be appropriate and available to the Provider to prevent the infringement of any and all the rights subsisting in the intellectual property;

(iii) In connection with the permitted use not give any warranty:

(1) Beyond that which the Provider is obliged in law to give; or

(2) Which has not been approved in writing by the Financer;

(iv) To use the intellectual property only for the permitted use and not for any other use;

(v) Treat as confidential the confidential information except that which at the time of its disclosure to the Provider was generally available, or subsequently became known to the public provided always that this covenant shall continue in full force and effect notwithstanding that this deed has terminated; and

(vi) Devote all reasonable commercial endeavours in the conduct and operation of the business.

(b) **Indemnity**

(i) The Provider hereby agrees to fully, effectually, and promptly indemnify the Financer against any loss, either direct or indirect, damage or expense whatsoever which the Financer may suffer or incur in respect of:

(1) Any breach by the Provider of the provisions of this deed; or

7

501

(2)　Any claim by any person against the Financer arising out of or in respect of the exploitation of the intellectual property by the Provider; and

(ii)　The Provider hereby irrevocably releases the Financer and waives all claims which the Provider may have in the future against the Financer, in respect of any action claim or remedy whatsoever in any way attributable to the exploitation of the intellectual property by the Provider.

**5.　Improvements**

If the Provider develops any improvements, the Financer hereby irrevocably:

(a)　Grants to the Provider the right to apply for any incidental intellectual property rights available in respect of that improvement and in connection with such application, the Financer shall:

(i)　Make, supply and assist in the preparation of all models, plans, drawings or specifications necessary or convenient for the proper understanding or development of the improvements; and

(ii)　Grant and do all things necessary to give effect to an assignment of the intellectual property rights in respect of the improvements to the Provider;

(b)　Assigns, transfers and sets over absolutely to the Provider all right title and interest to the improvements including all claims as they relate to the improvements.

**6.　GST**

(a)　GST means a goods and services tax as defined in A New Tax System (Goods and Services Tax) Act 1999.

(b)　In respect of any taxable supply, the Provider must pay to the Financer an additional amount equal to the prevailing GST rate on the supply. The additional amount referred to in this clause is payable at the same time and in the same manner as the licence fee subject to the receipt by the Provider of a valid tax invoice, as defined in A New Tax System (Goods and Services Tax) Act 1999.

8

7. **Term and termination**

   (a) **Term**

      This deed begins on 01st July 2019 the commencement date and will continue for the term unless it is earlier terminated.

   (b) **Termination on notice**

      Either party may terminate this deed by notice in writing to the other if the other party commits any breach of any provision of this deed, and has failed to remedy such breach within fourteen days of receipt of notice specifying:

      (i) The exact nature of the breach committed by the defaulting party; and

      (ii) What is required by the defaulting party to remedy the breach;

8. **Licence fee**

   (a) **Payment of licence fee**

      The Provider must pay the licence fee specified in the schedule to the Financer during the term.

   (b) **Late payment**

      If the licence fee or any other monies payable by the Provider to the Financer remain unpaid for seven days after the due date for payment, whether or not formal demand has been made, then the Provider shall pay, in addition to any monies actually owing to the Financer, interest at the rate of 2% over the bank indicator lending rate nominated by the Financer on such monies from the date the payment actually fell due until such monies are recovered and paid to the Financer.

9. **Warranties by Financer**

   The Financer warrants to the Provider that:

   (a) The Financer has the power and authority to enter into this deed; and

   (b) The intellectual property rights granted under this deed will not when used in accordance with this deed infringe the intellectual property rights of any person.

9

503

## 10. Third party claim

(a) Provided that the Provider is not in breach of its obligations under this deed, if a third party makes a claim against the Provider alleging that use of the intellectual property infringes its intellectual property rights, the Financer will defend, indemnify and hold harmless the Provider from such a claim provided that the:

   (i) The Provider notifies the Financer in writing promptly of the claim;

   (ii) The Provider provides such information, assistance and co-operation as the Financer may reasonably request and at its expense, from time to time; and

   (iii) The Financer has full discretion to defend, compromise or settle any such claim on such terms as the Financer deems fit.

(b) If the Financer cannot satisfactorily settle the claim so as to retain ownership of the intellectual property, its liability will be limited to terminating this deed, and refunding the Provider an amount equal to the portion of any licence fee paid for the period following termination.

(c) Nothing in this clause authorises the Provider to defend, compromise or settle any claim on the Financer's behalf.

## 11. Limitation of liability

(a) Other than in respect of a party's:

   (i) Breach of the confidentiality provisions of this deed; or

   (ii) Infringement of another party's intellectual property rights; or

   (iii) Indemnification obligations under this deed; or

   (iv) Wilful misconduct.

(b) Neither party will be liable to the other for any consequential, special or punitive damages arising out of this deed. Each party's cumulative direct damages will be limited to the licence fee payable under this deed in the prior twelve month period. This clause survives the termination or expiration of this deed.

10

504

## 12. Assignment

No party may assign its rights or obligations under this deed without the prior written consent of the other parties, which consent may be given or withheld, or given on conditions, in the absolute discretion of those other parties.

## 13. Time

The parties hereto agree that time shall in all respects be of the essence in regards this deed.

## 14. Notices

A communication required by this deed, by a party to another, must be in writing and may be given to them by being:

(a)  Delivered personally; or

(b)  Posted to their address specified in this deed, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c)  Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending, or

(d)  Sent by email to their email address, when it will be treated as received on that day.

## 15. Waiver or variation

(a)  A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)  The exercise of a power or right does not preclude:

  (i)  Its future exercise; or

  (ii)  The exercise of any other power or right; or

  (iii)  The variation or waiver of a provision of this deed or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

11

505

**16.  Counterpart**

This deed may be executed in any number of counterparts each of which will be an original, but counterparts together will constitute one and the same instrument, and the date of the deed will be the date on which it is executed by the last party.

**17.  Costs**

(a)  Each party will pay its own costs of and incidental to this deed.

(b)  The Provider will bear all duty payable on this deed and keep indemnified the Financer in respect of that liability.

(c)  The Provider will bear all GST payable in respect of any supply under this deed upon receipt of tax invoice issued by the Financer.

**18.  Escrow**

(a)  The paper Bitcoin Wallet with address 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a will be held by the financer as assurance or the contract and will convert to the ownership of the financer on default of the provider.

(b)  All source code and agreements are to be held in a manner that the financer can access on default.

12

## REFERENCE SCHEDULE

**Deed date:**          01st April 2011

**Licence fee:**          (a)     250,000 BTC to be repaid on 30 June 2013

(b)     50,000 BTC to be repaid on 30 Dec 2013

(ex GST) for exclusive perpetual assignment

**Product:**          Bitcoin and Exchange Software in C/C++/C#/R code

**Commencement date:**          01st July 2011

**Term:**          Two (2) years

**Trademark:**          All Marks Associated with C01N and associated marks

To be filed

**Patent:**          All IP under BAA-001 / 002 / 003 / 004

13

507

**SIGNED AS A DEED**

Executed by
W & K Info Defense LLC                    )
in accordance with s.127                  )
Corporations Act 2001 (CTH) and its constitution        )

*Dave Kleiman*

Dave Kleiman
 DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

14

508

# TAB 83-11

# EXHIBIT 11

FILED

1 3 AUG 2013

VO

Form 3B (version 4)
UCPR 6.2

# STATEMENT OF CLAIM

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division / Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 | 245661 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contractual Dispute

~~Mercantile Law – Other – Money Lent~~

510

**RELIEF CLAIMED**

1    That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ $28,533,016.79 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ $28,534,049.79** |

**PLEADINGS AND PARTICULARS**

1    Between 2011 and 2013 the plaintiff provided contract labour services to the defendant. The plaintiff loaned money to the defendant to the defendant at a set interest rate with a commercial expectation that the said monies would be repaid in full when a project was completed.

2    This was issued in Bitcoin. The value at the current date is $13,917,775.

3    The Software and SDK developed under this project is guaranteed against the amounts of this claim.

4    The defendant is a company that operates from Palm Beach, FL, USA and does research in homeland security research.

5    By contract dated 8 January 2009, the Defendant agreed to pay the Plaintiff for property and consulting services to complete research. The contract was bonded against the intellectual property of the defendant.

6    The material terms of the purchase contract were:

   a.   The Plaintiff was the contractor and financier

   b.   The Defendant was the Vendor

   c.   Completion was to take place on 30 June 2013.

   d.   Time was of the essence of the contract.

   e.   That in the event that the Purchaser breached the contract, the Seller could either affirm or terminate the contract with a full return of value.

7    The plaintiff conducted a project for the development of a Bitcoin SDK and exchange.



USCA11 Case: 22-11150    Document: 41-3    Date Filed: 09/07/2022    Page: 69 of 256
Case 9:18-cv-80176-BB   Document 83-11   Entered on FLSD Docket 01/14/2019   Page 4 of 25

3

8       The contract was executed with an agreement that all created Intellectual property reverts to the ownership of the plaintiff with interest if the project concludes without assignment of shares in the defendant.

9       The contract set the interest rate at 12% calculated annually.

10      The exchange rate was contracted with a formula to be $1.12 at the point of breach.

11      The funding was supplied using Bitcoin and Gold bonds.

12      A bond of Au $20,000,000.00 was provided to cover funding aspects of the research and for the provision of ASC hardware as a pooled amount with a depreciated capitals value of $8,828,571.29 with straight line depreciation which has 5 years remaining.

13      The contract stated that a breach would lead to liquidated damages to the amounts stated as the project limits. If the liquidated amount is not paid all IP and systems returns to the sole ownership of the plaintiff.

14      The IP is software and code used in the creation of a Bitcoin system.

15      The defendant is unable to complete its responsibilities due to the death of its director, Mr Kleiman.

16      The total debt after depreciation of the hardware comes to $22,746,346.29 in Australian dollars. The Interest on this amount is calculated at $AU 5,786,670.50.

17      The plaintiff claims:

Debt of $ 28,533,016.79.

Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

**SIGNATURE**

I acknowledge that court fees may be payable during these proceedings.  These fees may include a hearing allocation fee.

Signature

Capacity                          Plaintiff

Date of signature            12 Aug 13

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**
- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.
- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.
- The court registry for limited procedural information.

You can respond in one of the following ways:

**1**  **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

**2**  **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed. If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.
- Filing an acknowledgement of the claim.
- Applying to the court for further time to pay the claim.

**3**  **If money is claimed, and you believe you owe part of the money claimed**, by:

- Paying the plaintiff that part of the money that is claimed.
- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |

**#AFFIDAVIT VERIFYING**

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 12 Aug 2013 |

I say on oath:

1    I am the plaintiff.

2    I believe that the allegations of fact in the statement of claim are true.

SWORN at                          Gordon

Signature of deponent    _____

Name of witness    ~~Craig Steven Wright~~

Address of witness    818 Pacific Hwy
Gordon NSW 2072

CHRISTIAN HOFMANN
Reg. No 195484
Justice of the Peace in and for
the State of New South Wales

Capacity of witness    Justice of the peace

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1    #I saw the face of the deponent. [OR, delete whichever option is inapplicable]
~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2    ~~#I have known the deponent for at least 12 months. [OR, delete whichever option is inapplicable]~~
#I have confirmed the deponent's identity using the following identification document:

NSW Driver Licence
_____
Identification document relied on (may be original or certified copy) †

Signature of witness    _____

Note:  The deponent and witness must sign each page of the affidavit.  See UCPR 35.7B.

_____

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]

514

#PARTY DETAILS

**PARTIES TO THE PROCEEDINGS**

**Plaintiff**                                     **Defendant**

Craig Steven Wright                              W&K INFO DEFENSE RESEARCH LLC

                                                 4371 Norhtlake Blvd #314

                                                 Palm Beach

                                                 FL 33410 - 6253 [Defendant]

**FURTHER DETAILS ABOUT PLAINTIFF[S]**

**Plaintiff**

Name                          Craig Steven Wright

Address                       43 St Johns Ave

                              Gordon NSW 2072

**Contact details for plaintiff acting in person or by authorised officer**

Address for service           as above

Telephone                     0417 683 914

Email                         craigswright@acm.org

**DETAILS ABOUT DEFENDANT**

**Defendant**

Name                          W&K INFO DEFENSE RESEARCH LLC

Address                       4371 Norhtlake Blvd #314

                              Palm Beach

                              FL 33410 - 6253



Form 3B (version 4)
UCPR 6.2

FILED

25 JUL 2016

# STATEMENT OF CLAIM 



## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division *Common Law* |
| List | *General.* |
| Registry | Sydney |
| Case number | 2013 / 225983 |

## TITLE OF PROCEEDINGS

Plaintiff          **Craig Steven Wright (ABN 97 481 146 384)**

Defendant          **W&K INFO DEFENSE RESEARCH LLC**

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contract~~ual~~ *Dispute*.

~~Mercantile Law – Other – Money Lent~~

*...ation has been filed before the Court*

*30 October 2013*

*9·00am*

*Clerk of the Court*



Case 9:18-cv-80176-BB   Document 83-11   Entered on FLSD Docket 01/14/2019   Page 9 of 15

2

## RELIEF CLAIMED

1    That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ 28,253,633.00 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ 28,254,666.00** |

## PLEADINGS AND PARTICULARS

1    Between 2011 and 2013 the plaintiff provided contract labour services to the defendant. The plaintiff loaned money to the defendant to the defendant at a set interest rate with a commercial expectation that the said monies would be repaid in full when a project was completed.

2    The defendant is a company that operates from Palm Beach, FL, USA and does research in homeland security research.

3    By contract dated 27 October 2008, the Defendant agreed to pay the Plaintiff for property and consulting services to complete research. The contract was bonded against the intellectual property of the defendant.

4    The material terms of the purchase contract were:

   a.   The Plaintiff was the contractor and financier

   b.   The Defendant was the Vendor

   c.   Completion was to take place on 30 June 2013.

   d.   Time was of the essence of the contract.

   e.   That in the event that the Purchaser breached the contract, the Seller could either affirm or terminate the contract with a full return of value.

5    The plaintiff conducted four (4) projects associated with the DHS (Dept. of Homeland Security USA) with the defendant under contract:

   a.   BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures



517

3

  b. BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure. Resilient Systems and
    Networks

  c. BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics

  d. BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace
    (SWAMP)

6  In May 2013 the primary director of the defendant died leaving the project not
   transferred to the plaintiff and not returning funds. These funds were rated as:

    a. TTA 01  US$ 650,000

    b. TTA 05  US$ 1,8000,000

    c. TTA 09  US$ 2,200,000

    d. TTA 14  US$ 1,200,000

7  The contract was executed with an agreement that all created Intellectual property
   reverts to the ownership of the plaintiff with interest if the project concludes without
   assignment of shares in the defendant.

8  The contract set the interest rate at 8% calculated annually.

9  The exchange rate was contracted with a formula to be $1.12 at the point of breach.

10  The funding was supplied using Bitcoin and Gold bonds.

11  A bond of Au $20,000,000.00 was provided to cover funding aspects of the
   research.

12  The contract stated that a breach would lead to liquidated damages to the amounts
   stated as the project limits. If the liquidated amount is not paid all IP returns to the
   sole ownership of the plaintiff.

13  The IP is software and code used by the US Military, DHS and other associated
   parties.

14  The defendant is unable to complete its responsibilities due to the death of its
   director, Mr Kleiman.

15  The debt of US$ 5,850,000 comes to $6,552,000 in Australian $. The Interest on this
   amount is calculated at $AU 1,701,633.00.

16  The plaintiff claims:

Debt of $ 28,253,633.00



4

Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

**SIGNATURE**

I acknowledge that court fees may be payable during these proceedings. These fees may include a hearing allocation fee.

Signature

Capacity                    Plaintiff

Date of signature           25 Jul 13

5

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**
- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.
- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.
- The court registry for limited procedural information.

You can respond in one of the following ways:

1    **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

2    **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed. If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.
- Filing an acknowledgement of the claim.
- Applying to the court for further time to pay the claim.

3    **If money is claimed, and you believe you owe part of the money claimed**, by:

- Paying the plaintiff that part of the money that is claimed.
- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |



6

### #AFFIDAVIT VERIFYING

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 23 July 2012 |

I say on oath:

1     I am the plaintiff.

2     I believe that the allegations of fact in the statement of claim are true.

| | | |
|---|---|---|
| SWORN at | Gordon | |
| Signature of deponent | | |
| Name of witness | Craig Steven Wright | Karle Wiggins. |
| Address of witness | KARLIE WIGGINS | Ku·ring·gai Council |
| | Reg. No. 194194 | |
| | A Justice of the Peace in and for the | 818 Pacific Highway, Gordon |
| | State of New South Wales | Locked Bag 1056, Pymble, NSW 2073 |
| Capacity of witness | Justice of the peace | ABN: 86 408 856 611 |

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1     #I saw the face of the deponent. [OR: delete whichever option is inapplicable]

~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2     ~~#I have known the deponent for at least 12 months.~~ [OR: delete whichever option is inapplicable]

#I have confirmed the deponent's identity using the following identification document:

NSW D/L. 12510410.

Identification document relied on (may be original or certified copy) †

Signature of witness

Note:  The deponent and witness must sign each page of the affidavit.  See UCPR 35.7B.

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]



7

8

#### #PARTY DETAILS

**PARTIES TO THE PROCEEDINGS**

**Plaintiff**

Craig Steven Wright

**Defendant**

W&K INFO DEFENSE RESEARCH LLC

4371 Norhtlake Blvd #314

Palm Beach

FL 33410 - 6253 [Defendant]

**FURTHER DETAILS ABOUT PLAINTIFF[S]**

**Plaintiff**

| Name | Craig Steven Wright |
| Address | 43 St Johns Ave |
| | Gordon NSW 2072 |

**Contact details for plaintiff acting in person or by authorised officer**

| Address for service | as above |
| Telephone | 0417 683 914 |
| Email | craigswright@acm.org |

**DETAILS ABOUT DEFENDANT**

**Defendant**

| Name | W&K INFO DEFENSE RESEARCH LLC |
| Address | 4371 Norhtlake Blvd #314 |
| | Palm Beach |
| | FL 33410 - 6253 |



# TAB 83-12

# EXHIBIT 12

## AUSCRIPT AUSTRALASIA PTY LIMITED

ABN 72 110 028 825

Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)    **F:** 1300 739 037
**E:** clientservices@auscript.com.au    **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT IN CONFIDENCE

O/N H-356057

**AUSTRALIAN TAXATION OFFICE**


**RECORD OF INTERVIEW**



| | |
|---|---|
| **INTERVIEWER:** | **DES McMASTER**<br>**MARINA DOLEVSKI**<br>**HOA DOA** |
| | |
| **INTERVIEWEE:** | **CRAIG WRIGHT**<br>**JOHN CHESTER**<br>**ANDREW SOMMER** |
| | |
| **CONDUCTED AT:** | **SYDNEY** |
| | |
| **DATE:** | **TUESDAY, 18 FEBRUARY 2014** |


**TRANSCRIBED BUT NOT RECORDED BY**
**AUSCRIPT AUSTRALASIA PTY LIMITED**

.WRIGHT 18.02.14

# Interview conducted with Craig WRIGHT

On the 18th February 2014

Sydney

Interviewers: Des McMaster, Marina Dolevski, Hoa Doa

| | | |
|---|---|---|
| 5 | | |
| | Sommer | Okay, well, if everyone's happy, I really wanted to sort of – I know you've had a number of different discussions and I really wanted to sort of make this as productive as possible for everybody's time so I thought I would put as much as I can up on the slides and at least that way we've got a process for discussing things.  The agenda that John sent through to Marina yesterday afternoon, basically, I thought it would be useful just to highlight some of our current issues, go through quickly the history of development, our current state, vis a vis audits, the relevance of bitcoin treatment which I think is critical to where we are and what's going on;  looking at current transactions, both – at a high level.  So what I would like to do is agree, the in-principle treatment of various types of transactions and then – you know, it is undoubted that there is going to have to be revisions for the BASs that are lodged so a lot of the process and a lot of the grinding of wheels that's going on at the moment is information requests and stuff about BASs that have been lodged and simply they've got to be changed anyway.  So we're spending a lot of energy worrying about BASs that, on the Tax Office's view of the law, are wrong and so therefore we need to change those BASs anyway.  So if we can agree a process for actually the way in which those BASs should be filed what I would like to do is then have someone from a fresh team sit down with John and rebuild the BAS, so somebody from within the Tax Office who understands the way we've agreed the way that these transactions should be done sit down with John - it's only a hundred lines of transactions, rebuild the relevant BASs and resubmit them on the basis of – on an agreed basis so we can actually do something else without going - - - |
| 30 | Dolevski | So if I just understand that correctly, Andrew - - - |
| | Sommer | Yep. |
| | Dolevski | So just basically on the tax view, which is outlined in the private binding rulings you're saying - - - |
| | Sommer | Being singular, but we will get to that, yep. |
| 35 | Dolevski | Yep.  So you're saying that the BASs – you're accepting that the current BASs lodged are obviously not in line with the rulings and the ATO view so you're proposing - - - |
| | Sommer | I don't think that's controversial, is it? |
| | Dolevski | No. |
| 40 | Sommer | No. |
| | Dolevski | No. |
| | Sommer | Okay.  Yep. |
| | Dolevski | No, just wanting to clarify. |
| | Sommer | Yep |
| 45 | Dolevski | And therefore, based on that, you would be – you're proposing to revise the BAS, the BASs that have already been lodged? |

526

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| 5 | Sommer | If we can reach an agreed treatment about the way in which things need to be done, yeah, sure, let's just move on.  Do we think bitcoin is money?  Yes.  Can I stand here for four hours and argue with the three of you that I think bitcoin is money and, you know, it passes the test established by Emmett at Travelex, the landmark case referred to in the ruling of facility and all that sort of – the landfill case facility.  Yeah, I can do all that but that's not going to progress the issue and I want to get these guys back to doing business and we can have the esoteric discussion about the nature of bitcoin and whether or not it's money later but let's free up this process because it's drowning them in unproductive wheel-grinding, constantly frustrating on both sides and I would like today to break that cycle. |
| 10 | | |
| | Dolevski | So rather than having the changes made from a compliance perspective it would just be a revision of BAS that you would want some assistance? |
| | Sommer | Yes. |
| 15 | Dolevski | Is that right?  Yep. |
| | Sommer | I think that - - - |
| | Chester | And rather than us ..... something and resubmitting it, let's just sit down and let's go, "Okay, tick, tick, tick, tick, done" and we can go, "That looks good.  That's good.  Fine.  We're done".  I think, as Andrew said, there's not many – it's not like there's thousands of transactions out there.  There's none. |
| 20 | | |
| | Dolevski | No, no. They're the first quarter BASs that were lodged. |
| | Sommer | Yeah.  That's right. |
| | Dolevski | And there's a couple – I think there's one that's a post issue. |
| | Sommer | Yep. |
| 25 | McMaster | There are a couple of post issues. |
| | Dolevski | That have gone through. |
| | Sommer | Yep.  And we will get to that. |
| | McMaster | Yeah. |
| | Dolevski | Yeah. |
| 30 | Sommer | Okay.  So a simple without prejudice meeting intended to resolve the issues that can be resolved, narrow the scope of issues that are under review and focus on the areas in which we can agree rather than issues of general grievance I think, you know.  I get the impression from having looked at some of the stuff that there's a bit of frustration in the Tax Office.  I don't know from talking to my clients if there's a bit of frustration on our side.  You know, let's just put all that to one side and try and work on those things that we can agree on and move this along.  The current issues:  we've got formal notices regarding retention of refunds.  We've got a multiplicity of audits.  We've got the issue for these guys being cash flow as a new business.  We're really struggling from a cash flow perspective and also from a resources perspective.  We need to sort of ..... for the guys to do it.  Now, the retention of refunds is troubling because the current – we don't have any revised assessments yet and just from a process perspective a number of the documents that have been issued I think are wrong as a matter of law and we need to sort of tighten that process up.  So these are notices issued to Hotwire, Coin Exchange, Cloudcroft whereby – and I will show you an extract in a minute – whereby the decision to retain the refund is based on an |
| 35 | | |
| 40 | | |
| 45 | | |

527

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 | | interpretation of the law rather than the pending verification of information. Now, section 8AALZGA entitles you to retain a refund in certain circumstances pending verification of information. It doesn't entitle you to retain a refund without issuing an amended assessment in instances where you just happen to ..... the law. Now, you can go away and have a look at that. The notices that were issued purports to give the taxpayer an objection right. |
| | Dolevski | An objection right? |
| | Sommer | Against the - - - |
| 10 | Dolevski | It's retaining. |
| | Sommer | Yeah. |
| | Dolevski | Yeah. |
| 15 20 | Sommer | Now, the only – my only understanding is that you get – we hadn't looked into AALZGA ..... objection ..... process in relation to that decision doesn't apply generally and so even the decision to withhold it under that section ..... because there's no information verification referred to or it's not something else so it's just one of those process issues that I think needs to be cleaned up and it's a relatively new section. And certainly some of the ..... and some of the other notices refer to specific bits of information but the ones to Coin Exchange, Hotwire and Cloudcroft don't. |
| | Dolevski | The actual retention and the notice - - - |
| 25 | Sommer | Yeah. So we've got a bit of a problem there because we haven't got anything we can object to. Now, I don't want to go down the objection and appeals path because it's too slow and, as I say, if we can agree a basis, excellent, we don't have to worry about it. |
| | Dolevski | Well, the objection to hold isn't going to give you any technical clarity on the issue itself. |
| | Sommer | No. Look, it's a bit - - - |
| | Dolevski | There's just – yeah. But, I mean - - - |
| 30 | Sommer | It's a bit of a silly provision and I don't know why we put it in there in the first place. But we haven't got - - - |
| | Dolevski | But in terms of us speeding the assessments, I mean, we're ready to go with the imposition papers that were issued. |
| | Sommer | Yeah. No, no, but that's an interim ..... What I'm saying is - - - |
| 35 | Dolevski | We can get to final quite quickly. |
| 40 | Sommer | Yeah. Well, you probably shouldn't, on the basis of what they say, but the problem is the guys have got nothing to object against. They've got notices and they keep saying to me, "I've got this letter from the Tax Office that says I have an objection right" and I'm saying actually you don't have an objection right. There is nothing you can object to at the moment". There isn't. The assessment that was made when the return was lodged, the deemed self-assessment, is in accordance with their duty and there's nothing ..... to which they can object. |
| 45 | Dolevski | Well, we would say that under 8AAZLGA that that gives us the right to hold, under - - - |
| | Sommer | For what purpose? |

Page 3 of 40

528

Interview Conducted with Craig WRIGHT

| | Dolevski | For us to substantiate that the refund is in fact valid. |
|---|---|---|
| | Sommer | I don't think it really says that. |
| | Dolevski | Well, I don't have the Act – we don't actually have it there - - - |
| | Doa | No, I've got the GST - - - |
| 5 | McMaster | What Marina is saying is the commonly-held view within the office, okay, and has been since the legislation came into being - you do have rights of objection on the private binding rulings which would go to the heart of issue. |
| | Sommer | Yes, but not – true, but not for where there's an assessment that has been issued and our assessment doesn't line up with the private ruling and the private ruling was only issued on 23 September – December, I think. |
| 10 | McMaster | Yeah. |
| | Sommer | So – anyway.  Have a look at 8AALZGA. |
| | Wright | And the private ruling didn't actually align.  It was a totally separate thing to the companies, anyway, because it was unrelated and never was related, which was informed right back to the beginning, before Selso even came on. |
| 15 | McMaster | Okay. |
| | Dolevski | So - - - |
| | Wright | So that private ruling had nothing to do with any of the other transactions. |
| 20 | Dolevski | So under those provisions the Commissioner may retain an amount and we go through and address all of the 10 factors under - - - |
| | Sommer | Yep.  And which one of them says because you formed a different view of the law? |
| 25 | Dolevski | So we say – so the first one, "The Commissioner may retain an amount that he or she otherwise would have to refund to an entity if the entity has given the Commissioner notification that affects or may affect the amount".  Sorry, I haven't gone into this - - - |
| | Sommer | Yep.  Anyway, I don't want to get tied up on that today.  You guys have a look at it. |
| | Dolevski | Yep. |
| 30 | Sommer | But I don't think those notices as they are issued to Cloudcroft Coin Exchange - - - |
| | Dolevski | I will check them. |
| | Sommer | - - - and Hotwire - - - |
| | Dolevski | So you're saying only three of them are defective as far as you're concerned? |
| 35 | Sommer | Yep.  Yep, those three. |
| | Dolevski | And the others, we've actually got it right? |
| | Sommer | Yep.  Well, the others - - - |
| | Dolevski | We need to check what letters - - - |
| | McMaster | I think they would have been identical letters. |
| 40 | Dolevski | That's right. |
| | Sommer | ..... I can check. |

Page 4 of 40

529

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay. I will double check. That's okay. |
| | Sommer | Yep. That's okay. |
| | Dolevski | Unless we've used incorrect letters. I don't know - - - |
| | McMaster | I would be surprised but I will double check. |
| 5 | Dolevski | Yep. All right. |
| | Sommer | Okay. So - - - |
| | Wright | There were three different people issued the three different initial letters and then Selso issued subsequent different ones. |
| | Sommer | Yeah. |
| 10 | McMaster | The initial ones would have been the retention of refund letter which would have come from, highly likely, the Refund Integrity Team. The subsequent ones that Selso would have issued would be providing you with the objection rights to the decision to withhold because it met the various requirements of timeframes. |
| 15 | Sommer | Yep. |
| | Dolevski | But we will look into that. |
| | McMaster | Yep. |
| | Sommer | Good. Okay. So the objective is to try and free up the cash flow and try and free up the resources so we can get all these issues ..... rather than continually dealing with various ongoing issues. So just to sort of – for those players who are new to it, I thought it was useful just to quickly walk through the chronology of where we got to, or how we got to here. In 2009 the mining of bitcoin commences. There's audit and ensuing disputes with the Tax Office regarding information defence ..... and Dr Wright personally back in 2009 and that dragged on for a couple of years. 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as ..... effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately David ..... dies in the US towards the end of April 2013. In July we have the MJF transactions which are germane to the returns that are being looked at currently. They involve software services and ..... and in July discussions commenced between – with the Tax Office about the nature of bitcoin. September, following the death of David ..... in the US, there was a transfer of intellectual property out of a US entity to Dr Wright pursuant to orders granted in the New South Wales Supreme Court. Those orders in the New South Wales Supreme Court substantiated value of the claims being made for that intellectual property in the amounts shown there, roughly 28 million a piece. 2013, September, intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on. 2013, December, 23 December, while I was having Christmas with my family, private ruling issued on the nature of bitcoin and January 2014 we got the retention refund notices and so on. And that's how we got to – all right. So these are the entities that I think are the key players in these transactions. So we've got the UK companies; we've got Singaporean |

Page 5 of 40

530

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | companies; we've got Seychelles, so they're all on the outside of the dotted line. We've got Craig which we've referred to with the ..... as CSW ..... is the trustee of the Wright Family Trust. We've got Hotwire PE, Coin Exchange, Cloudcroft, Strasan, Denariuz and if you look at it ..... audit, audit, audit, |
| 5 | | refund to ..... and audit. So we're busy, and this is my point, that we're stretched in terms of our resources to answer these questions at the moment and it would be nice if we could wrap this up and get these audits sorted. So we've got copies of all those notices. I don't think anyone's worried about it but those are effectively the current drain on our compliance resources to deal |
| 10 | | with all these questions. Okay. This is the refund retention letter that I was referring to in relation to – this one's the Cloudcroft one and letters in the same form were issued to Hotwire and Coin Exchange. A couple of issues. One is, "We've decided retaining a refund for the following reasons: we are maintaining our interim position with treating the transfer of bitcoin to pay for your acquisitions in accordance with ....." etcetera. So it doesn't refer to any |
| 15 | | clarification of information. |
| | Dolevski | So that's our objection letter. |
| | Sommer | That's the objection letter, yeah. |
| | Dolevski | Yeah, but that's not the retention letter. |
| 20 | Sommer | Yeah, but this is saying – it also says, "How to object, and your objection", right? |
| | Dolevski | Yep. |
| | Sommer | Absent the mechanism provided by 8AALZGA how can I object to that notice? |
| | Dolevski | Why would you say "absent to 8AALZGA"? |
| 25 | Sommer | Well, if the only – if you're – the reason you've decided to retain my refund - - - |
| | Dolevski | Is to verify - - - |
| | Sommer | No, no, it doesn't say verify, and we're just maintaining our view about the treatment of bitcoin. |
| | Dolevski | So - - - |
| 30 | McMaster | No, no. The reason that that objection letter has gone out is simply that we have exceeded the 75 days with the information held in the office and at that point in time there is a right to review the decision to retain the refund. |
| | Dolevski | Retain. That's right. |
| | McMaster | Within the office. |
| 35 | Sommer | I agree. I agree with that. |
| | Dolevski | So the objection - - - |
| | McMaster | The other part is actually irrelevant for the purpose of what we're looking at. |
| | Sommer | Well, the indication of a decision – well, that says to me that, "We have decided to retain your refund for the following reasons. We have a view of the |
| 40 | | law" and that bullet point is a view of the law, okay? I don't know how to object to that. |
| | Mr .......... | And the other problem is the private ruling was never issued - - - |
| | Sommer | Well, I will get to that. So I've got two problems with it. One is that that decision to maintain – to retain the refund because of a view of the law is not |
| 45 | | a decision ..... 8AALZGA, okay? The problem was that 30 – the other |

531

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | problem is that 30 September 2013 ruling was never received.  It was never issued by the Tax Office and it was never received by the taxpayer.  Even if it had been, we've got a letter from Mr Walmsley dated 15 October 2013 specifically saying that he – oops, sorry – that we weren't going to be getting that ruling.  So it says in that highlighted paragraph, "However, any" – you know, "You may have got this ruling" in the first para.  "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked but that is not correct".  The final sentence there, "However, any private ruling made on the basis of the existing application would be either invalid or worthless so the obtaining of additional information is unavoidable".  So both the – the notice refers to a ruling that was never issued and even if it had been issued it was – we got subsequent correspondence saying it was invalid or worthless in the Tax Office's view. That - - - |
| 15 | Wright | And the actual ruling was actually created in November and backdated. |
| | Sommer | So that being – even as recently as last Friday we've got the interim report still making reference to this private ruling that was never issued to us and even if it had been issued to us it was declared by Mr Walmsley that it would be invalid or worthless.  So I'm – it's just – there seems to be a bit of a - - - |
| 20 | Wright | I had the particular authorisation number investigated.  I have – I know people in the ATO because I've been training for years and that was actually issued on 29 November as a backdated ..... internally. |
| | McMaster | Who provided that to you? |
| | Dolevski | To who, worry? |
| 25 | McMaster | To you, Craig. |
| | Wright | No one I will be saying until we go to court. |
| | McMaster | So you've approached a personal contact in the office and obtained information? |
| | Wright | No.  I went to Internal Fraud and Investigations. |
| 30 | McMaster | Okay. |
| | Sommer | In any event – let's leave - - - |
| | McMaster | Well, no, that's very important because you shouldn't be doing that and whoever gave you information should not be doing that either, okay? |
| | Dolevski | Anyway, let's deal with this issue.  So we've made reference to a ruling dated 30 September. |
| 35 | | |
| | Wright | That was never issued. |
| | Dolevski | It was never issued, and then was there something issued in December? |
| | Sommer | Yes, so there – about 23 December 2013 the private ruling was.  But the important thing about that is, that was long after the first batch of BASs were submitted so it's a bit different getting one on 30 September and then lodging BASs on 28 October that are different to the one in which a private ruling was issued, which is the imputation that that carries, versus getting one two months after you've lodged the first quarter's BASs which is the way in which it seems to have happened.  So I'm – it's a bit – I think there's something strange going on where that private ruling keeps popping up in references there - - - |
| 40 | | |
| 45 | | |

Interview Conducted with Craig WRIGHT

| | Dolevski | Well, it's still sitting on our records. |
|---|---|---|
| | McMaster | That's why.  It's on the single case management system. |
| | Dolevski | On the – that's right. |
| 5 | McMaster | And it's sitting there as not withdrawn.  It's sitting there as a valid PBR.  Unfortunately, I don't recall seeing from Peter Walmsley - - - |
| | Dolevski | So, Andrew – sorry – that letter - - - |
| | Sommer | So that's the - - - |
| | Dolevski | That letter that you made reference to from Peter Walmsley, are you saying that it said disregard the previous, it's not accurate? |
| 10 | Sommer | Well, it says, "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked, but that is not correct".  That's the first paragraph.  And then even if we had got one he's saying that, "Any private ruling we made would be invalid or worthless". |
| | Dolevski | Okay. |
| 15 | Wright | And the particular ruling there, if you read it, doesn't say "bitcoins";  it says "commodities". |
| | Dolevski | Okay. |
| | Sommer | So we've got some strange things going on there but that continued reference to 30 September is frustrating to the client because it was never received.  However it's represented in your system, it wasn't sent to us and even if it had been sent to us we would have been instructed by Mr Walmsley's letter to ignore it. |
| 20 | | |
| | Dolevski | So, sorry, just that date from Peter Walmsley saying - - - |
| | Sommer | 15 October. |
| 25 | Dolevski | 15 October. |
| | Chester | We even met with him .....  Was it about that time, or shortly after that?  Discussing bitcoin in general ..... |
| | Wright | The two rulings, if you actually read the public thing or whatever else – what has happened is the one on the 23rd has been copied and backdated. |
| 30 | Mr .......... | I think – I – I - - - |
| | Dolevski | Sorry, the one on 23 December you're saying has been - - - |
| | Wright | Has been copied. |
| | Dolevski | - - - copied. |
| | Wright | And ..... to look like it was issued before. |
| 35 | Dolevski | Well, it was authored by Peter Walmsley so I'm not sure that I can - - - |
| | McMaster | Sorry, could you re-state that please, Craig?  I didn't quite understand - - - |
| | Dolevski | Craig is saying that the 23 December ruling is a copy of the September ruling yet he has got a letter from Peter Walmsley saying that the 30 September ruling is inaccurate.  That's the statement you're making. |
| 40 | McMaster | Well, at that point in – okay.  So at that point in - - - |
| | Wright | No, we've got nothing issued. |

GIZMODO

533

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Dolevski | Is it?  Sorry? | |
| Sommer | Nothing was issued so - - - | |
| McMaster | So not even the letter of 23 December? | |
| Sommer | No, no.  No, no, 23 December was certainly issued.  I remember this - - - | |
| 5 | McMaster | Okay.  And it basically was verbatim of this other particular - - - |
| | Sommer | Well, we don't – we - - - |
| | Dolevski | They never received the 30 September. |
| | Sommer | We never received the 30 September ruling is my instruction. |
| | Ms .......... | Actually, yeah. |
| 10 | McMaster | I'm just trying to understand how, if you've never received it – how you know it's a copy. |
| | Sommer | I think Craig's saying that he publicly – the version that's on the public PBR - - - |
| | McMaster | Okay. |
| 15 | Sommer | - - - the register on the internet is verbatim to the version of 23 December ruling that – so it seems to be the same ruling. |
| | McMaster | Okay. |
| | Sommer | We never got it – based on the edited version on the website. |
| | McMaster | But you would accept that that ruling is a valid private binding ruling? |
| 20 | Sommer | Which one?  23 December? |
| | McMaster | Yes. |
| | Sommer | I'm not contesting that at all, no. |
| | McMaster | Okay. |
| | Sommer | I'm not accepting it but I'm not contesting it either. |
| 25 | McMaster | And that's fair enough.  And that's fair enough. |
| 30 35 40 | Sommer | I don't accept anything that I don't have to but I'm not presently objecting to the form, content or otherwise of the 23 December ruling other than the fact that it's wrong as a matter of fact but we will get to that .....  Okay.  So treatment of bitcoin.  Wherever we go with that first quarter of transactions there is nothing more fundamental to it than the way in which we're going to end up treating bitcoin in one sense because it creates all these interdependencies between the various entities and the way in which things were moved around.  We've made submissions to the Tax Office regarding the fact that it's broad - the definition of money for GST purposes is broad enough.  For my part I think it's simpler, I think it's more certain, and I think it's more predictable to treat bitcoin like money.  I think it's almost inevitable that it's going to – if it hasn't crossed the threshold .....  we're going to have to do it ..... and treat it like money for the purposes of it, but this isn't the forum to do that.  You know, as I say, that's where I would rather devote my resources as to esoteric questions of law because that's far more interesting to me.  But, really, I mean, we've got three options and, you know, I've been working with friends of mine who are on the OECD and representing various countries and talking to them about bitcoin because we had nothing else to do over Christmas and, really, the world is looking at it in three different ways.  One, |

534

Interview Conducted with Craig WRIGHT

|     |        |     |
|-----|--------|-----|
| 5 | | you're treating it like a taxable barter, which is the way in which the UK initially tried to treat it and then they've recanted, bless them.  I think in Europe there's an option to treat it as money but not input taxed and I think that's probably where this concept of private money which exists under European law, which is probably where the Germans are going, probably where the English will follow the Germans, and it will be effectively in our purposes not fiat currency but treated as an input tax for exempt supplier to avoid the problems that arose in the UK. |
| | Wright | The same as barter dollars. |
| 10 | Sommer | Yeah, with the HCMEU of it being a taxable barter that caused everybody to get upset and they seem to be moving inexorably and you don't know what it is, but it's exempt.  Under our system that's probably a little bit more complicated because of our exemption rules and I'm not entirely sure how we would make it exempt input tax if it's not money.  I don't know how we're going to do that but that's ..... and maybe one we will throw at the feet of Mr ..... in due course.  The other option is money.  Now, we have – and I think with all due respect to Mr Walmsley, Mr Walmsley is coming ..... from an income tax perspective and the income tax ..... he sees things like income tax and he sees things in delineation between Australian currency and foreign currency which is, you know, an all-encompassing – it has either got to be issued by the Australian Government or it has got to be the currency of another country, which I think is the way in which he sees the income tax world and I think that colours the way in which the definition of "money" is being approached.  But the definition of "money" for the GST purposes is very different and I think we owe to the issue to look at the GST definition of "money" rather than this notion of currency that we find in the income tax law.  I say that because of the references in the private ruling and in the – what I will call interim activity audit report that make reference to the New South Wales landfill case which is a stamp duty case which is – and the payment instrument in that case was found not to be money for stamp duty purposes but it would still be within the definition of money for GST purposes because it's a promissory note which is specifically picked up.  So I'm not quite sure why we're fixating on that case and saying, "Oh, see, it's not money" but it is money because that thing would have been ..... under our law but no bitcoin.  Anyway.  That's a question.  More relevant for present purposes is where are they?  How are they supplied?  What are consequences of ..... supplied?  The ATO view is expressed in the private ruling that it's not property.  Personally, I have the greatest difficulty accepting a proposition that bitcoin isn't property.  How the Tax Office can form the view that it's not property in any form I struggle with.  They say it's akin to confidential information because you need the private key.  Well, a private key attaches to the wallet not the bitcoin itself.  The bitcoins themselves, you know, aren't confident information.  The bitcoins are different to the wallets.  The bitcoins carry with them their own history of the wallets to which they've been allocated.  So I just think there's real problems in the private ruling about what bitcoin are and how they work and so on.  There's - - - |
| | Wright | And one of the other difficulties is at the moment we're looking at doing it in a trust.  We will hold that in Singapore and we will issue trust rights in Australia.  A trust is – you know, unit trusts are input taxed and I will automate them.  I will build the software the same as bitcoin, as a wrap-around bitcoin, and we will have a GST-free bitcoin because it's attached to a trust. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Yeah.  So I think – as far as I'm concerned the bitcoins display the characteristics of property in the sense that they can be owned, they can be transferred, and you can work out who owns them.  They're functionable like money because if they're stolen, you know, they're – you know, like – much like currency.  If, you know, John was to pinch the $10 from my wallet the presumption would be that he owns that money because that's the way in which the property law acts on money and money is slightly different and bitcoins follow that path but they do ..... the characteristics of money and we can talk elements of property but for the sake of time we will skip on.  Even if we were to perceive that bitcoin isn't money, which I think is – I can – you know, we're never going to agree a treatment for the BASs on the – if I – if we for the present purposes hold the line that we think bitcoin is money.  We do think bitcoin is money but we might have to go with the Tax Office view for the sake of resolving these outstanding BASs.  For the purposes of a without prejudice discussion, to move things along, we could adopt a view that a bitcoin is a form of intangible property which I think probably is a better view than trying to argue that bitcoin isn't property in any form.  That – again, my reason for going over all of that is that we need to work where it is, how it's applied and those sorts of things. Even if we're going to adopt your view as to it not being money, we still need to work out the operation of the nexus test in 9-25, the operation ..... and so on in relation to bitcoin in order to get any traction or any progress at all.  Mostly the bitcoin haven't been brought to Australia by Dr Wright so mostly bitcoin is subsisting in entities that exist outside of Australia.  So you will recall that on those opening slides we talked about bitcoin mining commenced and then they were transferred out of Australia to other overseas entities.  Mostly they have remained outside there.  They are held in wallets owned by non-resident entities outside of Australia.  An exception is the bitcoin brought to Australia for the purpose of the Denariuz transaction, which we will get to at the end.  Now, I think, Marina, you were talking about – that there is one BAS for the second quarter.  That is the one that I think has been – that is the one you're referring to, the Denariuz transaction, the Denariuz BAS that was lodged for the period ending 31.12.2013 and that contains a specific-purpose transaction which was done to demonstrate the way in which the Tax Office view of bitcoin ..... But as far as I know that's the one that you've got ..... in dispute with you guys. |
| | McMaster | There was a BAS lodged prior to 30 June for a previous quarter in which a refund claim was made and released for one of the entities. |
| | Sommer | Okay. |
| | Dolevski | Yeah. |
| | McMaster | And I just can't remember exactly which one it is. |
| | Sommer | Okay. |
| | Chester | That was the R and D claim that was released. |
| | Wright | That wasn't GST. |
| | Dolevski | No, that was - - - |
| | McMaster | There was a GST. |
| | Dolevski | Panopticrypt. |
| | Chester | Panopticrypt. |
| | Dolevski | Yep.  So 157,368 refund was issued. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Okay. |
| | McMaster | Okay. And - - - |
| | Doa | So you say they're held in wallets outside. You're saying that where the wallets are held is basically where the bitcoins are located? |
| 5 | Sommer | Well, yeah, I suppose. I mean, it's like an intangible asset sitting in a trust in the sense that if the trust is a non-resident, it has got no relevant connection with Australia and it's holding an intangible asset the assumption is that the intangible asset is sitting outside of Australia. Yeah - - - |
| | Doa | So all the private keys are being held - - - |
| 10 | Sommer | By the non - - - |
| | Doa | By the non-resident trust account. |
| | Sommer | True. |
| | McMaster | So how are you trading the bitcoins between the entities? |
| 15 | Sommer | This is the point to which we will soon come. Current transactions. Right. In my view they seem to break down into three types of transactions. There is – what I want to do, as I said, agree a basis for transaction in principle and then ..... All right How do we do it? Capitalisation of the ..... seems to happen in the following way. Craig holds an interest in – sorry, Dr Wright holds an interest in the offshore trust which holds the bitcoins so Craig is there holding a bitcoin and sitting overseas. Craig has an equitable interest in that trust and what seems to be happening, because there is no physical transfer of the bitcoin, is that the equitable interest in the offshore trust is transferred to the subsidiary in consideration for the issuance of shares. So they are capitalised, not with actual bitcoin because as I understand it there is no transfer of the bitcoin into the vehicles and there is no movement of the bitcoin, except for the Denariuz transaction to which we will return, and Hotwire in this case – and I have to choose that as indicative of the others – receives that equitable interest in the offshore bitcoin which still sits out there and issues shares to Dr Wright in return. So the supply of shares is clearly going to be taxed. Dr Wright didn't supply actual bitcoin to the company, as I understand it. Rather, Dr Wright transferred some of the equitable interest that he holds in the offshore trust to the company in consideration for the shares. The company could then call for a transfer of bitcoin to it absolutely or it could direct the offshore trust to transfer the bitcoin to a third party purchaser at the company's direction. Now - - - |
| | McMaster | Excuse me ..... |
| | Sommer | Sure. |
| | McMaster | Do you have copies of this – Marina is busy drawing ..... |
| | Sommer | Yeah, I will give you copies afterwards if that's okay. |
| 40 | Dolevski | Okay. Terrific, yep. |
| | McMaster | Excellent. Thank you. |
| | Sommer | Yeah. Des, you would be entitled to say that, "Andrew, you guys have always told us that we transferred bitcoin" and I think that's right and I think that's largely because we saw bitcoin as money and transferring balances around and ledger amounts of money from one entity to another entity if it's done on paper is done on paper and is still there, kind of – it's still money moving around. It doesn't change the character of it. But once you start saying, |

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
| 5 |  | "Okay, bitcoin is some form of non-money, it's some form of intangible rights that subsist out there" you have to then start saying, "Well, did you actually get legal title to it or did you get something less than legal title to it?"  And we got – the problem is Dr Wright does not hold the legal title to those bitcoin.  They sit in the trust sitting in the UK or the Seychelles or in Singapore or wherever and so he couldn't transfer the actual bitcoin into the entities.  The rights that were transferred were the right to call for that bitcoin in accordance with the existing trust arrangements that are there. |
| 10 | McMaster | So Dr Wright would have the appropriate agreements etcetera with these entities that are overseas? |
|  | Sommer | I think they're – with the entities that overseas, absolutely. |
|  | McMaster | Because this is the first time - - - |
|  | Sommer | Yeah.  No, I - - - |
|  | McMaster | - - - I've heard of the overseas trusts. |
| 15 | Wright | Okay.  Well - - - |
|  | McMaster | I suspect it's probably the first time Michael Hardy would have heard of these. |
|  | Sommer | I don't think so, no.  I - - - |
|  | Wright | Yeah, it was emailed to Michael and it was emailed to the people before Michael on 17 July. |
| 20 | Sommer | Okay. |
|  | Wright | We have those emails where I communicated ..... |
|  | McMaster | Well, that would be nice to get hold of because I've not seen those emails. |
| 25  30  35  40  45 | Sommer | I understand all of that and I understand that unfortunately – because – I think the problem is because everybody has been around the bitcoin issue rather than tackling the bitcoin issue everything has become fragmented and so what I'm desperately trying to do with all this is to try and put it all together because I can't understand it until it's in a cohesive framework, which means I can't communicate it to you guys until it's in a cohesive framework, and I'm trying to put this in a way that I – I have come to terms with what seems to be happening.  I am totally conscious of the fact that some of this information and some of the way in which we're looking at this is different and it's because changing that – pulling out that peg of bitcoin as money and saying, "All right, well, it's not money"  fundamentally changes the way in which a lot of this is seen from a legal perspective.  And, as I said, I'm – you know, if we, you know, had a million years to resolve this, which Craig tells me I don't, I could happily with, you know, as many people from the Tax Office as possible and we could debate and go and get declaratory relief and all that sort of stuff, and that's stuff we will have to do if we can't reach some sort of agreement.  But I would – I owe it to my client to say, "Look, there is a way through this where we can agree a treatment with the Tax Office while we work on the treatment of bitcoin".  Now, the treatment of bitcoin is really, really important because without it our business model doesn't work, but that's a business problem, that's not a tax-compliance problem.  I'm here to try and solve the tax-compliance problem in the short term and then we can, you know, have agents dancing on pinheads for the purposes of working out the definition of "money" later.  Right.  Again, purchased by the Australian companies of third party suppliers in Australia.  So if we have a supply of goods and services in Australia from an Australian supplier, the box in the bottom right, to the |

Page 13 of 40

538

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 |   | companies – Hotwire again used as indicative – what seems to be happening – and, you know, we can go through the documentation with this – is that there is the supply that takes place here;  there is no transfer of bitcoin out of Hotwire because Hotwire aint got none.  What it does is it says to the Australian supplier, "I will grant you a right which you can exercise against the offshore trust to have them transfer bitcoin to you in satisfaction of my interest in the trust".  It's something different to the intragroup transactions so as you go here, see what there is from Craig to Hotwire, is a supply of the interest in the overseas trust.  I don't think there's any intention to have the Australian |
| 10 |   | supplier a beneficiary of that but what it's doing is saying, "I will nominate you as the person to receive bitcoin in satisfaction of my interest in the trust" and the offshore trust then, you know, does what needs to be done in order to transfer the bitcoin out of the trust and at the direction of the Australian supplier.  Whether it goes to the Australian supplier there's ..... whatever, you |
| 15 |   | know, is a whole other question. |
|   | McMaster | By "Aus supply" do you mean a related entity or a totally unrelated - - - |
|   | Sommer | No, no, no.  So these are third-party suppliers. |
|   | McMaster | Okay.  So the only one that I'm reasonably certain of is MJF at the moment. |
|   | Sommer | MJF is the one - - - |
| 20 | McMaster | The prime one, obviously. |
|   | Sommer | The prime one, yeah.  So - - - |
|   | Wright | Some of the others  - - - |
|   | Sommer | Again, I'm trying to set up a framework for understanding when we do this - - - |
|   | McMaster | Sure.  Sure.  I understand. |
| 25 | Sommer | If we ever do this again.   But, yeah, MJF is the principal one that we're worried about for the purposes of the outstanding BASs. |
|   | McMaster | Okay. |
| 30 | Sommer | Supplied by the Australian supplier will be a taxable supply ..... payable.  A supply by the undertaking of ..... is not a supply of bitcoin because they aint got any but there's a supply of right and supply is a right for use outside of Australia, the enforcement of transfer of bitcoin in accordance with agreement.  Supply of that right is probably GST free on the basis of section 38-190 item 4, you know, supply in relation to rights for use outside of Australia, much like Travelex and so on.  So that's where we would see that going.  Again, |
| 35 |   | purchased by an Australian company and the third-party supply is from an offshore supplier.  Again, very similar other than we have, you know, possibly – whether or not the supplier is connected with Australia is another approach under section 9-555 and all those sort of things – again, there is supply of a right as against the offshore trust by the Australian company to the offshore |
| 40 |   | supplier so again, you know, 38-190 item 4 or even 38-190 item 2(b) as well in relation to the GST-free treatment of a supply of that right. |
| 45 | Wright | And the IP ID which is ..... location information assigned to an IP address, for the date of the supply is matching all the emails to do with the transfers etcetera is – matches Doncaster, UK where the entity that manages the trust happens to be sitting. |
|   | Sommer | So - - - |
|   | Wright | As are the dates and it's public information that can't be changed ..... |

539

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Sommer | | So they're the different ways.  So the outstanding – a number of BASs that have been lodged by the various entities, they're held up and all that ..... numerous ..... variables which start to go crazy.  But if you look at Hotwire when it was lodged, right – so the basis underpinning the lodgement of the Hotwire was that there was an issue of shares;  there was a transfer of bitcoin but there was software coming from the Wright Family Trust in the far left of the screen;  there were transactions with Coin Exchange and Panopticrypt.  There are also some other little transactions that are immaterial and admitted for the purposes of the diagram.  I think – and, you know, I wasn't involved in the original lodgement and I'm coming to it with reasonably fresh eyes and going through the legal arrangements and so on.  This is the way I see it, that there's – at the top of the screen you see the capitalisation transaction that we have looked at and then you have a range of intragroup supplies across the bottom, Panopticrypt , Coin Exchange and the Wright Family Trust where there is a transfer of the equitable interest in the offshore trusts made in consideration for various supplies being made in and out of Hotwire.  Within the group, as Des is saying, there is a transfer of the equitable interests.  That's not intended to be the case for MJF Mining Services.  I think we've all had enough to do with Mark Ferrier that we don't want to provide him with any equitable interests in anything and so he got the right to have bitcoin transferred out of the offshore trust, which is what in fact happened but it was transferred to him in satisfaction of the invoices that were issued.  So that's the way I would see it working, that there are a whole lot of supplies being made between the related entities in consideration for basically rebalancing the ledger of the equitable interests held in those Seychelles' trusts, for example, so that, you know, there's very little that actually moves.  It just depends at which point who is entitled to how much of the interest in the bitcoin sitting in the Seychelles.  As regards third parties there is in fact a physical transfer of bitcoin out of those trusts to those third-party suppliers where there is, you know, something real happening.  Now, that something real that happens does not seem to have a relevant connection with Australia in the sense that things are moving out of the Seychelles' trusts to, you know, the wallets designated by the relevant contractual counter party.  There's nothing that touches Australia.  The only thing that happens in Australia is the grant of that right to have the bitcoin transferred out of the trust.  Bitcoin didn't move, except in relation to the Al Baraka transactions and the MJF transactions.  The capitalisation ..... were covered.  Intragroup payments are affected by the transfer of equitable interests in the offshore trust and Dr Wright acted as agent of Hotwire in negotiating the Al Baraka transaction which is, "Andrew, that's all very well but show me the proof" which we will come to in a minute.  As such, no acquisition ..... supply by Dr Wright or the Wright Family Trust in relation to the Al Baraka ..... software and that is different to the way in which the BAS was lodged. There was an assumption I think that there was an acquisition and a ..... supply.  Having looked at the agreement there and the parties, I don't think that's right.  So I think that, really, Dr Wright personally was in there as the negotiating party on behalf of the end recipients and that seems to be the clear agreement between the parties, that Hotwire PE is acting through its agent, Craig Wright, R and D. Craig Wright ..... is authorised to represent Hotwire, etcetera, etcetera.  So the contractual – the interpretation of that as a matter of law, when I come to have a look at that agreement, says there's an agreement between the contracting parties and there are agents in there acting on their behalf. |
| Wright | | If I can just show you something.  This is Mr Ferrier ..... you can take it down and copy it later.  You will notice the dates.  It's a Telstra thing.  I don't have |

540

Interview Conducted with Craig WRIGHT

|   |          |   |
|---|----------|---|
|   |          | any access to the Telstra systems.  1 June 2013 we talked about the contract which is ..... |
|   | Dolevski | I think we've got that anyway. |
|   | Wright   | This is an email.  This is - - - |
| 5 | Dolevski | Have you been – have you sent ..... |
|   | Wright   | You probably have it. |
|   | McMaster | There was an image of - - - |
|   | Doa      | Yeah.  I thought - - - |
|   | McMaster | I think you've sent that image to Michael Harding. |
| 10 | Wright  | I have, yes. |
|   | Doa      | Yeah.  Yep. |
|   | McMaster | And Michael has provided that to us. |
|   | Doa      | Yep. |
|   | Wright   | Okay.  I didn't know if you had or not. |
| 15 | McMaster | No, that's okay, because we've asked Michael to give us everything - - - |
|   | Wright   | Because - - - |
|   | McMaster | So that we can form an appropriate opinion. |
|   | Wright   | What happened was the day before sort of everything else we did the contract exchange but I formed the company the day after, so we had an agreement that I would form this company, which I then did, but – so I was acting for a company I was going to form, which was sort of out there but not out there, if that makes sense. |
| 20 |          | |
|   | McMaster | A slight timing difference. |
|   | Doa      | Yep. |
| 25 | Wright  | Yes.  But the idea was to bring it into the company, so to speak. |
|   | McMaster | I remember reading this and I formed the same view as you, Andrew, that the thing that sort of still sticks with me is the ..... contracting so obviously there must have been some contact between them and Al Baraka. |
|   | Sommer   | One would imagine. |
| 30 | McMaster | But - - - |
|   | Sommer   | I don't know.  My Saudi Islamic law is not so good so - - - |
|   | McMaster | No.  Better than mine. |
|   | Sommer   | So I think that's the way I see that, and then I see no acquisition, no taxable supply by the Wright Family Trust into Hotwire or other stuff, so there are other transactions.  Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire in consideration of the transfer of the interest in the offshore bitcoin trust so I think that filtered through.  There's lots of reasons I understand that took place and that is that there – you know, the combined 56 million worth of IP that came out of WK Info Defence was then broken up by Craig and put into different entities that were going to need the |
| 35 |          | |
| 40 |          | |

GIZMODO

541

Interview Conducted with Craig WRIGHT

_____

| | | |
|---|---|---|
| | | different bits. That's the way I'm instructed that that happened and that seems - - - |
| 5 | Wright | I wasn't intending to make it messy. It was just trying – I had a big pool of stuff and I wanted to split it into each of the things that we're doing, each of the bits, so that - - - |
| | Sommer | Messy was a by-product rather than an objective. That's good. |
| | Chester | ..... |
| | Wright | But you will be happy to know I agreed that I don't touch any of these things ever again and Andrew and John and ..... |
| 10
15 | Chester | But one thing they were broken up for is – it wasn't just convenience; it's that there was differential IP for – one was for security and it was all security-based stuff. That went into the security entity and the stuff that was learning, that went into the learning environment. There was – so each of those different things was – it was – it was – they were sectioned out based on content rather than, "Oh, let's throw some of that over here and some of that over there". That was the idea, put them where they were going to be used. |
| | Sommer | So at this point we're really saying, "I can understand how this all got a little bit out of – confused between ..... auditors" and Craig, you know ..... quick responses and so it's very easy to misunderstand what's going on. |
| 20 | McMaster | Got a habit of ..... too much. |
| | Sommer | It's very confusing. It has got to be done and try and put it in some sort of cohesive framework so if you've got any questions about that framework as we go, please let me know. |
| 25 | Dolevski | I think the fundamental difference in our understanding is that we actually thought bitcoins were being ..... |
| | Sommer | Me too, until recently. |
| | Dolevski | Whereas an interest now in bitcoins via a trust. |
| | Sommer | It was when I had a conversation with Dr Wright where he said that nothing has even moved because – and I've got - - - |
| 30 | Wright | Apart from the external stuff. |
| 35
40 | Sommer | Apart from the external stuff and then it's just, like, "Okay, look" – I then literally at that point – I went back – had to go back to the drawing board and reconstruct all the diagrams because until then I had, like you, assumed – and Des has assumed and we've probably, you know, caused you to believe that bitcoin had been moving around. But it seems that part from the Denariuz transaction, which is different, we will get to that, nothing seems to have moved and so therefore we are dealing in subsidiary interests in these things that remain and that in one sense is consistent with the way in which it has been done, that it's effectively ledger entries in the equitable – moving around an equitable interest rather than actually conducting the transfers. Okay. Which then brings us to the - - - |
| | Wright | Just as an aside now I was going to say from all of that my assumption is that it's money. |
| | Sommer | Yeah. |
| 45 | Wright | So therefore if I treat it as money then it's how I move it so - - - |
| | Sommer | Yeah. |

Page 17 of 40

542

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I just assumed that - - - |
| | Dolevski | I have to say it took me a while to get my head around bitcoins and them moving so you can imagine where I'm at at the moment. |
| | Sommer | Yeah.  See – no, you – this ..... |
| 5 | Dolevski | Which from an audit perspective of is – we were kind of having discussions about what's your starting point, your stops and blows, which is why we thought in your particular entity as a sole trader we would have to actually – or start from a point of how many do you own.  We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots. |
| 10 | | |
| | Wright | ..... and buckets. |
| | Dolevski | That's right, you know, but now I - - - |
| | Wright | Yeah.  After the first instance I moved everything offshore just because – well - - - |
| 15 | Dolevski | Well, I'm kind of now starting – if the trust actually is even offshore and it's all paper transaction what's the fundamental reason that you're moving around interests, really? |
| | Sommer | Oh, well, to pay for stuff.  It's not an unusual – I mean, if you think about a large corporate group that has got a single bank account you have a ledger of the transactions when those – you know, for intragroup transactions.  You know, one may rent property to another and the payment is on a ledger but no money actually leaves the account. |
| 20 | | |
| | Dolevski | I know.  There's actually no movement. |
| 25 | Sommer | That's exactly right, and that happens all the time.  It's just – and that's why I think there was – these things were documented in the way they were documented because, really, it was just a ledger interest between effectively related parties. |
| | Wright | And - - - |
| 30 | Sommer | And moving around those subsidiary interests of the offshore trusts so it's – I think of it much like that corporate group with a single bank account.  No money is moving but payment of consideration is clearly made;  just at any one point which company – the extent of each company's interest in that agglomerated bank account is then – can only be ..... by going through their individual accounting records so - - - |
| 35 | Wright | It was never the intention to make it more complex but when I spoke to you guys in July last year I said this is what I want to do and I was told I had to account for all these separately.  I said, "Why can't I just record ..... there" and I got sort of a blank look and – like I was the anti-Christ. |
| | Sommer | Yeah - - - |
| 40 | Dolevski | Well, we have to consider it separately because when you're moving it in different entities - - - |
| | Wright | Because they're – of course.  They're separate, yes. |
| | Dolevski | Every entity is a taxpayer so we have to separate it that way. |
| | Sommer | Yeah. |
| 45 | Wright | And they have different shareholders.  Not every company has - - - |

Page 18 of 40

543

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But, I mean, even the private binding ruling is based on bitcoins. |
| | Wright | Yeah. |
| | Dolevski | Certainly not on interest. |
| 5 | Wright | And the other issue is each of the companies has different shareholdings. Hotwire has other shareholders; Coin Ex has other shareholders. It's not just me in any of these so – I mean, that was the other thing when I was talking to people because what I've moved into Hotwire has nothing to do with any of the other companies so if for instance someone who has shares in Denariuz can't then claim against Hotwire or vice versa because I'm not the only shareholder. I might be the major shareholder in everything but I'm not the only one. |
| 10 | | |
| 15 | Sommer | Yeah. So that seems to be how all that has happened so – in terms of the transfer of those subsidiary interests because nothing seems to have moved. I mean, if nothing has moved I need to be able to tell you guys what it was that has moved. It seems to me that there's trusts, that there's an equitable interest in the trust, that the idea was that each of those persons could call directly for the transfer to them absolutely. As you see – you will see that they've effected payment by instructing that trust to make payment to third-party contractual counter parties and so there was a transfer of a beneficial interest in – or part of a beneficial interest held by Dr Wright or held by one of the other contractual counter parties to the other group companies. You know, these group companies ..... related companies, I suppose, is probably the ..... I should adopt. |
| 20 | | |
| 25 | Wright | I will interrupt and say the reason for the PR was on a wallet that I do hold in Australia and I've dealt with – that's the only one I hold in Australia but I haven't transferred it yet. |
| | Dolevski | So that has got nothing to - - - |
| | Wright | No. |
| | Dolevski | The private binding ruling on the 55,000 wallet - - - |
| 30 | Wright | I still have that one. |
| | Dolevski | - - - of bitcoins has nothing to do with these transactions. |
| | Wright | No. And that didn't go through because I – the private ruling. I want to use it and that's part of where we're trying to figure out for selling the damn things in Australia versus overseas versus all the rest. |
| 35 | Sommer | Yeah. So the relevance, the – our real need for clarification on the treatment of bitcoin isn't so much for some of these transactions, which are some of these transactions because they were conducted with actual bitcoins but most of those bitcoins were offshore. The Australian legal treatment of bitcoin is critical to the business model because you can't have - - - |
| 40 | Dolevski | But not in respect of these group entities. |
| | Sommer | No, not in relation to – yeah, not in relation to the intragroup transactions. |
| | Dolevski | But isn't this – aren't we now talking about a trust and group of entities that's actually paying the things out of an interest in a trust - - - |
| | Sommer | Sure. |
| 45 | Dolevski | - - - that owns property? |
| | Sommer | Yep. |

Page 19 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | And fundamentally, if we're just talking theoretically - - - |
| | Sommer | It could be ..... |
| | Dolevski | It could be anything. |
| | Sommer | Exactly. |
| 5 | Dolevski | And so bitcoins is really a side issue which has perhaps confused us all but not relevant to - - - |
| | Sommer | Not relevant to the audits. |
| | Dolevski | No. |
| 10 | Sommer | But absolutely critical to what Dr Wright wants to do with his business because if you want to try and create a bitcoin exchange the whole liquidity and the convertibility of the currency is only going to be achieved if it's treated like money. |
| | Wright | If - - - |
| 15 | Sommer | The liquidity – if every time you transact, if every time I buy a bitcoin from you I have to pay you 110 per cent of its value because you've got a taxable supply then we've got a problem with the transactability of it. |
| | Wright | Which means you will go to Singapore or the US. |
| 20 | Dolevski | But, Andrew, if we raise these assessments or not release the refunds and revise the BASs, say – you know, whether the interim position paper read – I mean, if we take out that paragraph about the reference to the September ruling or whatever, it will clean up our system, but – so we take that out and our bottom line is not going to change with the revised – okay? |
| | Sommer | No. |
| 25 | Dolevski | That's still – even if you dispute that, that's still not going to get you your technical clarity on bitcoins because we literally have to walk away from here. |
| | Sommer | We're not dealing with bitcoin. |
| | Dolevski | We're not dealing with bitcoins here. |
| | Sommer | Except for Denariuz, and we will get to Denariuz because Denariuz is the answer. |
| 30 | Wright | Denariuz is – like, I did - - - |
| | Sommer | They actually did a physical transfer of bitcoin. |
| | Dolevski | So there has been lots of – and dare I say a lot of heated conversations amongst different people - - - |
| | Sommer | A lot of colour ..... movement but not a lot of progress and that's - - - |
| 35 | Dolevski | No. |
| | McMaster | But there was no clarity. |
| | Dolevski | No. |
| | Sommer | Hence why I wanted to – and that's why .... |
| | Wright | I apologise for that but - - - |
| 40 | Sommer | It's just that that's why – and I think there has been so much grinding of the wheels and that's why I really wanted to have this circuit-breaker meeting to |

Page 20 of 40

545

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
|  |  | actually say, "Let's just really try and put it in some sort of cohesive framework and actually understand at law what really happened" because that's why I ..... |
|  | Dolevski | Well, we're getting back to you and your facts of what has happened. |
|  | Sommer | Well, that kind of helps so - - - |
| 5 | Dolevski | It does. |
|  | Sommer | So this is where things start to get to where we really – so all of those intragroup transactions, intra-related party transactions, whether or not they produce – you know, if they're bitcoins that are taxable then they're taxable on both sides. They're probably not taxable on both sides in the present circumstances because we're dealing with subsidiary interests in offshore bitcoin rather than actual bitcoin. All of that nets out to a whole bunch of not very much. So there's rats and mice stuff where we've paid for parking and rent and photocopiers and those sorts of things. There's intragroup stuff. The real refund that the guys need is in relation to the MJF transactions. The rest of it is more a spinning of the wheels. So these things are the things where we have paid GST-inclusive amounts to our supplier and they're considerable and we need those, you know, refunds ..... to us is to try and get those refunds back so they continue funding activities in Australia. So that – that's – but this is the real pain of the retained refunds. A lot of those – you know, there's 60 million here and you can flick through the BASs. They're huge numbers but most of that is a lot of, you know, intragroup circling around of stuff and - - - |
|  | Dolevski | Plus ..... |
|  | Sommer | Exactly. Moving stuff around between - - - |
| 25 | Dolevski | Yep. |
|  | Sommer | Moving those large lumps of IP around whereas these MJF ones are the ones that, you know, I'm particularly focused on making sure - - - |
|  | Dolevski | And so MJF – because obviously we can't discuss - - - |
|  | Sommer | No. |
| 30 | Wright | That's right. |
|  | Dolevski | It's a separate taxpayer but - - - |
|  | Sommer | Yep. |
|  | Dolevski | So where does this connect in terms of which of Craig Wright's entities? |
| 35 | Sommer | Okay. So this was – and that's exactly where these lines are going. So MJF contracting so the tax invoice that they issued and so there's two highlighted ones there, are acquisitions by Dr Wright personally. So those acquisitions are valuation services by Ferrier for fifty five thousand or fifty thousand dollars in the top line there which – I'm sorry, you can't quite read. |
|  | Wright | Can we focus that any better, do you think? |
| 40 | Sommer | I will be gentle - - - |
|  | McMaster | We've seen that invoice today. |
|  | Wright | You should have it. |
|  | Dolevski | Yeah, the one that you showed me. Yeah. |
|  | McMaster | Yep. |

546

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
| | Sommer | I will be gentle. I will be gentle. That's about the best we're going to do there. |
| | Dolevski | Yep. Yep. |
| | McMaster | Yeah. |
| | Sommer | Okay. So - - - |
| 5 | Chester | And one of those is – the top one is Ferrier promising his Ian Ferrier services to ..... as a consultant ..... |
| | Dolevski | And we've got a copy of that. |
| | Sommer | Yeah. |
| | McMaster | Yeah, we've got - - - |
| 10 | Chester | You've got all the stuff. |
| | Dolevski | Yep, yep. |
| | McMaster | Yes, we do. |
| | Chester | You've got all the stuff. |
| 15 | Sommer | So this is why I say that I think some of Dr Wright's confusion related to just how these were transacted and so some of these are Dr Wright transacting on his own account; some of these are Dr Wright transacting as agent of the other entities. So these two are, as I understand it, personal transactions for Dr Wright. They relate to the valuation services because I think they couldn't – they weren't going to be allocated to any particular entity at that point, where this was something to have up your sleeve, you know, if you need valuation services which, you know, in a world of intellectual property are always useful. |
| 20 | | |
| | McMaster | So was there any valuation done? |
| | Sommer | It was - - - |
| | Wright | No. |
| 25 | Sommer | It's due for March 2014 so it's prepayment against future delivered services so, as I understand it, they haven't been delivered as yet. And the last one, the last line there, is gold ore. |
| | McMaster | That would have been the Payne - - - |
| 30 | Sommer | The Payne ..... gold transaction and that's clear from the last line of that tax invoice and, again, I think – sorry, when I say "I think", I'm instructed that was a transaction that Dr Wright was doing for his own - - - |
| | Wright | And that was my trust. |
| | Sommer | That was to go into the Wright Family Trust, was it? |
| | Wright | Yes. |
| 35 | Sommer | Okay. I apologise. So that the right to that gold ..... so I will revise that – were to go into the Wright Family Trust. Okay. Then supply in 1B, so just working through that tax invoice – supply of the automation software was a supply made to Hotwire again for five – this one for $5.5 million including GST and that's from Siemens – is that right? |
| 40 | Wright | Yes. |
| | Sommer | And then it was supplied through MJF. |
| | McMaster | Sorry. |

Page 22 of 40

GIZMODO

547

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Sorry? |
| | McMaster | What did you say?  Siemens? |
| | Sommer | Siemens. |
| | Wright | Siemens. |
| 5 | Sommer | S-i-e-m-e-n-s, the - - - |
| | Wright | They're a German software – or Germany everything group. |
| | Sommer | That's - - - |
| | Wright | I have that software sitting in the office at the moment. |
| | McMaster | So how did you acquire that software? |
| 10 | Wright | We were given a licence key which was emailed – I believe John has got it – and a download link. |
| | McMaster | Okay.  And that came from Siemens or from MJF? |
| | Wright | That came through MJF. |
| | McMaster | And it worked?  Okay. |
| 15 | Wright | It does ..... |
| | McMaster | I accept what you're saying.  It's just given Mark's prior history I'm a little bit surprised. |
| | Wright | We were very careful with the software.  When I did the software stuff I made sure I – the payments happened as I got the software. |
| 20 | McMaster | Okay. |
| | Wright | And then what happened was - - - |
| | McMaster | Wise. |
| | Wright | Yeah.  And then I trusted them and the gold is a different issue. |
| | McMaster | The gold futures.  Okay. |
| 25 | Chester | It was the classic works, works, works, doesn't work routine, yeah. |
| | McMaster | Okay. |
| | Wright | So I kept going through and, "Wow, this is good.  This is good.  This is – he's disappeared". |
| | McMaster | Unfortunately. |
| 30 | Sommer | Okay.  And then my 1C, that's - - - |
| | Wright | Which I just made the assumption if you keep paying someone and they keep coming through they must be trustworthy. |
| | Sommer | That seems to be an acquisition by Coin Exchange through Dr Wright acting as its agent and eleven and a half million dollars plus GST.  That's - - - |
| 35 | McMaster | Is that the Al Baraka? |
| | Sommer | That is from Al Baraka and that's clear on the tax invoice there.  In the last line of the highlighted section there it says "Dallah Al Baraka Group" so – and that's the Microfinance software so the accounting packages. |
| | Chester | ..... my glasses ..... |
| 40 | Sommer | Okay.  And then - - - |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | We will also admit that since everything we've spent an inordinate amount of time rather than building on our damn software at the moment going through it with a fine-tooth comb trying to make sure there's no back doors or such other such things after finding out what Mark Ferrier is actually like. |
| 5 | Sommer | Yeah. |
| | McMaster | That would be a priority, I would suspect. |
| | Sommer | It's – yes. |
| | Wright | Yes.  We can't go live with it until we can trust it. |
| | Sommer | It has been a disappointing contractual experience - - - |
| 10 | Wright | Yes.  I don't want to run something that we have 100,000 bitcoin one day and the next day, oops, it's gone. |
| | McMaster | I know there has been some issues overseas with Mount Cox. |
| | Sommer | Mount Cox. |
| | Wright | Mount Cox, yeah. |
| 15 | Sommer | Yeah, Mount Cox is causing us trouble for all other sorts of reasons at the moment. |
| | Wright | Yes.  The little buggers won't release my fucking money. |
| 20 | Sommer | Acquisition by Coin Ex so this is – I think this is the second of the MJF contracting invoices and I've put this one as an acquisition by – well, I've got Coin Exchange but actually there is – some of that was broken up and apportioned to the other entities as well because there's a commitment fee in there and so from an audit perspective – and this is why I think it's really important to agree the principles and then go – have someone sit down with John and rebuild everything from scratch because it seems perfectly reasonable to apportion commitment fees from this one across some of the other acquisitions but it means none of the numbers line up neatly and, you know, I'm a ..... so I like things to match up really nicely and of course they don't.  So the idea is yes, some of that gets broken up and apportioned to the other acquisitions included on there which is why I think one of them is 5.3 in the accounts instead of five even but I – you know, if we can agree the big issues, minor issues about the apportionment of the commitment fees services and the basis on which that gets spread out, I don't think is going to be too controversial and there's certainly nothing too intellectually difficult about any of that;  it's just a matter of explaining why nothing particularly lines up.  Now - - - |
| 35 | Wright | And that sort of thing, Alan .....  program manager, has been dealing with people in Turkey at Al Baraka.  It's definitely the Turkish Al Baraka website but whether they have any other dealings with Mr Ferrier I have no idea.  All I know is I've got this offer and I believe it's right and if they haven't – what they've done internally, I have no idea, but we have the people there and we have been dealing with the people there and I can pass all that info. |
| 45 | Sommer | So we've got the software.  We've got that line 2 there, line 3 there we've got.  Line 1 is not due for performance yet.  Line 4 technically isn't due for performance yet but it would be fair to say that reasonable minds have suspicion as to whether or not that's going to be performed in accordance with the terms of that contract such that we've engaged litigators to secure what performance we can. |

Page 24 of 40

549

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | What it looks like and what we have information from at the moment that we would be happy to hand over is there are three directors at Payne who ████████ ████████████████████████ Just on the first, when I signed my contract, they bought up massively. When it was depressed they issued a "everything's terrible" release. Then, when I signed my contract, on the day of, they started buying even though there was a stop order, so I don't know how they bought. So they weren't meant to be doing anything until releasing the fourth but they – whatever. And then when the final contract came through with Mark and everything like that, everyone did the – waited and then sold at really high prices and that was, like, a 300 per cent increase and they made about another 20 million that way. |
| | Sommer | Yeah. And that's the subject of ..... being taken. |
| | Chester | Which we're happy to help you with if you would like to explore. |
| | Wright | And from my point of view those action – you know, if we can get someone tied into Payne then we can try and recover something there because - - - |
| | Sommer | That's about making sure that we get the ..... We paid for it. It hasn't failed yet. We're a bit squeamish about it, given some of the changes in character and the disappearance with Ferrier at different banks. |
| | Wright | Again |
| | Sommer | And just to be clear, because Mr Ferrier – people by the name of Ferrier are, you know, scattered throughout the tax world. We're talking about a completely different Mark Ferrier to the one in charge of tax ..... or special projects and - - - |
| | Wright | The one whose dad's rather high-profiled - - - |
| | Sommer | Yep. |
| | McMaster | Yeah. |
| | Sommer | So – right. So we have got those details of the payments that were made in satisfaction of those tax invoices so 245,000 bitcoin on 30 August and 135,000 bitcoin on 15 September. Again, no bitcoin transferred directly by Dr Wright to Hotwire and Coin Exchange. Bitcoin was transferred for a trust ..... the trustee of which I believe is the entity by the name of ..... Limited. |
| | Wright | Not any more. |
| | Sommer | Not any more. Right. |
| | Wright | We changed the names of the two companies. |
| | Sommer | Okay. So it's the - - - |
| | Wright | To ..... and Coin. |
| | Sommer | Right. So it's the same company, it has just got a less weird name. Yes? |
| | Wright | Now you've - - - |
| | Sommer | I'm not doubting it was designed by ..... It's just one of those names that - - - |
| | McMaster | So there was a separate transfer of bitcoin to Al Baraka? |
| | Sommer | There was a transfer of bitcoin to the wallets nominated by Ferrier so he nominated wallets into which the money should be transferred. We asked for confirmation and we received confirmation from Ferrier that all the transfers had gone through and all was tickety boo. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| McMaster | Okay. So that amount up there includes the Al Baraka? | |
| Sommer | All of it. | |
| McMaster | Okay. | |
| Wright | Yeah. That was - - - | |
| 5 | Sommer | So - - - |
| McMaster | And that all went to Ferrier? | |
| Sommer | Yep. | |
| Wright | My - - - | |
| Sommer | As I understand it those - - - | |
| 10 | McMaster | Okay. |
| Sommer | Those amounts should line up to the totals invoiced on each one. | |
| Wright | My understanding was Mr Ferrier didn't actually want any bitcoin. He wanted the monetary value that he was going to get from these other guys for doing all the stuff, these things, so he was going - - - | |
| 15 | Sommer | We weren't involved in paying Ferrier. |
| McMaster | Sure. | |
| Sommer | Whatever Ferrier got he got from Al Baraka. | |
| McMaster | Okay. | |
| Wright | All he had to do was ..... | |
| 20 | Sommer | From the other people that we had paid into the wallets that were nominated by him, got confirmation we've got the software keys, got the downloads and the, you know, source code that we needed. |
| McMaster | Exactly. So we would be able to get those wallet address, I would presume? | |
| Sommer | I've got them with but - - - | |
| 25 | McMaster | Later on - - - |
| Sommer | - - - subject to – in fact, I think they've been provided but again let's try do it in a cohesive way and - - | |
| McMaster | Yes. That's okay. | |
| 30 | Wright | They go right back to July where I did the – these are my things and whatever and I did actually tell someone but it's like everything you tell random people at the Tax Office what you're doing and - - - |
| Sommer | Unsurprisingly - - - | |
| Wright | - - - it goes randomly into buckets of - - - | |
| 35 | McMaster | Well, there are 26-odd – well, 20,000-odd of us floating around so that could easily happen. |
| Sommer | Because of the enforcement proceedings that we are preparing in case it's not – the gold one is not performed in accordance with ..... my litigation colleagues have all those records being dug out and - - - | |
| McMaster | Excellent. | |

551

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I'm happy to share all the litigation stuff that we have, that we are chasing ..... with, if we can actually find him again because he seems to have vanished again. |
| | Sommer | Okay. So any questions about any of that? Do you need to change - - - |
| 5 | McMaster | No, it's good for another 15 minutes. |
| | Sommer | Okay. Good. This is going to make riveting listening. |
| | McMaster | Well, the Aus transcript person is going to love it. |
| | Sommer | Excellent. I always – you know, my students sometimes hate my lectures and just cannot understand why it is unless they're suffering from, you know - - - |
| 10 | McMaster | Insomnia? |
| | Sommer | Sleep deprivation. |
| | Wright | I did my best to try and hide the fact that I've been running bitcoin since 2009 but I think it's getting – most – most – by the end of this I think half the world is going to bloody know. |
| 15 | Sommer | Yeah, well. |
| | McMaster | So your mining would have started at Lisarow, at the server farm? |
| | Wright | Lisarow was part of it where you have the garage full of computers and the other was at Bagnu. |
| | McMaster | Okay. |
| 20 | Wright | That's why we had that big fibre cabling put in and - - - |
| | McMaster | Yes, you want to speed. |
| | Wright | Yeah. And we changed the – the whole area. Like, Telstra is not going to do anything for the area. No wireless or whatever else it was – a community of 20 people so "stuff you" basically. |
| 25 | McMaster | Yeah. |
| | Wright | Until we put the fibre in and suddenly ADSL and everything ..... |
| | Sommer | Okay. So a similar situation. So we've been through Hotwire in detail. |
| | McMaster | Yep. |
| 30 | Sommer | So a similar situation now of understanding at lodgement – a revised understanding – oops, sorry. There's twitching in my fingers. I need more caffeine. Right to have bitcoin transferred, issue of shares, essentially the same. Exactly the same pattern in relation to it. It just seems that for – as you see them, which we did and those wallet addresses, I'm instructed, were overseas and were in Africa and seemed to have been effectively at the direction of Al Baraka and our informal – our contractual arrangements were with Al Baraka and it seems that the money that went to Ferrier went to Ferrier from Al Baraka. So they collected all the money and then, "Here's your cut" and - - - |
| 35 | | |
| 40 | Wright | I got told, "This is how, you know, we do it. This is how we check. This is where they go. This is what we're doing". |
| | Sommer | Yep. |
| | Wright | And my understanding - - - |
| | McMaster | So would that have – sorry to interrupt. Go on. |

Interview Conducted with Craig WRIGHT

| | Wright | I was going to say my understanding was - somehow he got paid.  He got – I don't know what his cut was or anything like this but – or even if he got paid in Australia.  All I know is he supposedly got paid into a trust somewhere. |
|---|---|---|
| 5 | McMaster | Okay.  So the Siemens and the Al Baraka one would have went to different wallets and the personal services - - - |
| | Wright | ..... |
| | McMaster | - - - and the gold - - - |
| | Sommer | There's a series of recipients but they don't – as I understand it they don't line up with each of those line items there. |
| 10 | McMaster | Okay. |
| | Sommer | They line up – those two transfers there line up with the invoiced amounts. |
| | McMaster | Okay. |
| | Sommer | The total invoiced amounts rather than the line items. |
| | McMaster | Okay. |
| 15 | Sommer | So we were – because we were told, dealing with MJF, put the money here in satisfaction of the invoice that MJF had issued to us, and we did. |
| | McMaster | Okay. |
| | Wright | I could explain it slightly differently but I think I will confuse the buggery out of everyone. |
| 20 | Sommer | Is what I said right? |
| | Wright | Right at what level?  Right at my level or right at - - - |
| | McMaster | Let's try our level. |
| | Wright | It's sort of right.  It covers things and yes, but is it actual – exactly how the things occur? |
| 25 | Sommer | Does it correctly describe the legal relationships? |
| | Wright | From a lawyer's point of view, yes. |
| | Sommer | Thank you.  I will take that as endorsement.  Right.  So again that's just the text describing what's on the previous slide so – all that.  I haven't finished this one yet.  Like I said, this is all a work in progress as I'm still trying to isolate the similar issues in relation to the Wright Family Trust.  I think there are clearly some software transactions between it and Hotwire Coin Exchange which is effectively the proceeds of the Supreme Court, New South Wales Supreme Court action which seems to have been broken up and transferred out of the Wright Family Trust.  My understanding, and we are being totally frank here – it is my understanding of those proceedings that they seem to be by Dr Wright personally and may have involved Dr Wright personally getting them and then on-supplying them to the Wright Family Trust.  I'm not entirely certain that's the case.  I would need to get clarification from my client as to that but I think that's one of the things – but that seems to be one of the inter-related party transactions that's going to go around in loops and circles and whichever way we look at it it's probably not going to produce any net tax across the different entities.  Yes, one entity might end up owing something and the other one will have an offsetting credit but I'm trying to aggregate stuff as much as possible for the purposes of resolving concepts and then we can try and line up ..... |
| 30 | | |
| 35 | | |
| 40 | | |
| 45 | | |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | And part of the whole finalising ..... and whatever else was my wife – now – made the comment that if I don't clean these up and get them out of the way then she doesn't marry me so – so we settled for – without going after any directors.  We settled without a whole lot of other things and with the understanding that if I wanted to get married I get the bullshit out of the way. |
| | Sommer | Fair enough.  Okay.  Denariuz.  Now, this is the only one where we've actually got an actual transfer of actual bitcoin, just to show that we actually do have them, and this is the one that was done as I understand it after the 23 December 2013 private ruling was issued to us.  And the intention of the parties was to demonstrate the way in which this would operate, and I think just by aside this does demonstrate why treating it as money is a much better idea.  So if you've got a sale of $38 million worth of bitcoin from the Wright Family Trust into an Australian registered entity it then takes that and then, you know, if you've got an output tax liability in relation – from the trust, input tax credit entitlement for the Australian company who then sells the bitcoin to a non ..... not carrying on an enterprise in Australia you've got an input tax credit entitlement in Denariuz that's not offset by any output tax liability because you've got a GST-free supplier on the way out and you've got a massive – like $19 million is a $1.9 million refund because you've sold half of the - - - |
| | Wright | ..... |
| | Sommer | - - - bitcoin rather than all of it.  If we had sold all of it we would have, you know, effectively a $4 million refund due to Denariuz and no output tax liability.  I just think that's inexorably the consequences of the 23 December ruling, that if you're going to treat it as a taxable supply, you know, you're going to have these very lumpy transactions that are going to give rise to a whole lot – you know, I could preach for hours on the fact that it's a consumption tax - - - |
| | Dolevski | So, Andrew - - - |
| | Sommer | - - - and there has been no consumption so - - - |
| | Dolevski | So, so far in the Wright Family Trust only interest to the trust that actually owned or - - - |
| | Sommer | I can only assume - - - |
| | Dolevski | How did the bitcoins then get into the Wright Family Trust - - - |
| | Sommer | This is the - - - |
| | Dolevski | - - - for them to be able to sell them - - - |
| | Sommer | This is a question I haven't asked, that I – I can only assume that they called for a transfer to them absolutely of part of the interest that they hold in those trusts. |
| | Dolevski | Well, that's the part we would need substantiated for obvious reasons. |
| | Sommer | Understood but they haven't lodged their BAS for that tax period yet and so we will no doubt get to that in due course. |
| | Dolevski | So that will be in the January quarter? |
| | Sommer | No, no.  That will be in the December that - - - |
| | McMaster | No. |
| | Sommer | It will be a 28 February BAS. |

Page 29 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Their quarter - - - |
| | Sommer | 28 February. |
| | Dolevski | Their quarterly lodges so, yeah, February. |
| | Sommer | Yeah, yep. 28 February. 28 February BAS. |
| 5 | McMaster | Yep. |
| | Sommer | So, yeah, that's something that will have to be addressed shortly, included in the return that's lodged for the 31 December - - - |
| | Wright | And the idea there was not to – just as a demonstration, yeah, and one that I think ..... the tourist refund scheme ..... |
| 10 | Dolevski | Well, I mean, with those export – I mean, we – you know, that's clear legislation in terms of - - - |
| | Sommer | I know, but - - - |
| | Dolevski | - - - products that are exported are entitled to the ITC scheme but - - - |
| 15 | Sommer | It's just - my point is this: creating these lumpy supplies where there's no actual consumption where, you know, it's basically – you know, moneys are ..... value and what we've done is move a ..... value from one entity to another entity or a third entity where it retains its value without any consumption and you've got – the whole idea of the consumption tax is not to drag that sort of transaction into the system and by treating as something other than money, that's what we're doing. And I take ..... entirely that, you know, that – refunds, sure. And if it was $38 million worth of goods I wouldn't have a problem but it's $38 million of stuff that can't be consumed - - - |
| 20 | | |
| | Wright | But that's why I've made it a paper wallet so that it is a thing. |
| 25 | McMaster | But a paper wallet, if I understand it correctly, is the private key, okay, and you can - - - |
| | Wright | That stores within it, yes. |
| | McMaster | Okay. And so you would have stored it on a USB stick or something like that or - - - |
| | Wright | No, no, actual paper wallet. |
| 30 | McMaster | - - - you physically wrote it down? |
| | Wright | I physically made a paper wallet containing the keys. |
| | McMaster | Okay. |
| 35 | Wright | And actually took that to the guys at the tourist fund scheme thing and sort of handed it over and said, "This is what it is. This is how we can validate it and here's the QR code" and they went, "What's a QR code?" And then I said, "Well, okay. If we do our phone here, and what you do is you take a photo of it so that you can check later if you can't figure it now and here's what we do" and I stepped them all through it and they called their manager and said, "What the hell is this?" |
| 40 | McMaster | They would have been flustered. |
| | Wright | Yeah, and then we - - - |
| | McMaster | Okay. |

Page 30 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Then we did the 10 million plus bit and then we – "There's no enough digits, sir" and called over someone else and then the whole team got over there and then I held up the line for half an hour and everyone must have hated me - - - |
| | Chester | Anything just to prove a point. |
| 5 | Sommer | I don't think it's – I don't - - - |
| | McMaster | Was that - - - |
| | Sommer | - - - think it's goods anyway. |
| | McMaster | Was that wallet registered anywhere, by the way?  With Blockchain, for instance? |
| 10 | Wright | Is it - - - |
| | McMaster | A registered wallet with Blockchain. |
| | Wright | Yes, yeah. |
| | McMaster | Because I had a look at the invoice you provided to the Customs people and unless I've mis-keyed it I can't locate it. |
| 15 | Wright | You should be able to. |
| | McMaster | Yeah.  It may be that I've mis-keyed it but I will have another go. |
| | Sommer | I don't think it matters in the sense that it's not goods.  I don't care what you – I don't care how much paper Craig creates, it's not goods.  It doesn't qualify but it was transferred between legal people. |
| 20 | McMaster | Yeah |
| | Wright | That's the number down the bottom if you want to take it. |
| | McMaster | That's okay.  I will go back to the invoice that you had on you at the time and if I still can't get it – and it could simply be that I'm keying it in - - - |
| | Wright | I could have typed it wrong in the invoice too because - - - |
| 25 | McMaster | You could have done. |
| | Wright | A capital in the wrong place or - - - |
| | McMaster | Yeah.  It's easy enough. |
| | Wright | But, yeah, the one we handed over had the correct thing. |
| | Chester | They're not like ..... PIN numbers ..... |
| 30 | McMaster | Yeah, they are. |
| | Dolevski | No, unfortunately. |
| | McMaster | Now, we're coming to the end of recording here. |
| | Sommer | Yeah. Do you want to change it and then I will wrap up? |
| | McMaster | Yeah.  I will wait till it stops first. |
| 35 | Sommer | Okay. |
| | McMaster | It has got to go through its process and then we can wrap.  I know, I know. |
| | Sommer | Even the CDs are bureaucratic here.  Sorry. |
| | McMaster | Well, you've got to write them.  What can I say? |
| | Sommer | Oh, that was recorded too. |

556

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | That's okay, Andrew. It won't be held against you. |
| 5 | Sommer | Don't tell James I said that. Okay. So Denariuz is the first BAS to be lodged after receiving a private ruling on the bitcoin transaction ..... blah, blah, blah, we've done all of that. Transfer the supply from Denariuz Australia to Denariuz Singapore is going to be GST-free ..... liability ..... and all of that. Okay. So where are we? Clearly, revisions are going to be necessary to all the BASs that we've lodged. Some transactions are uncontroversial and should give rise to immediately available ..... day-to-day transactions ..... stuff and we intend to buy a lot of computers and we intend t buy, you know, a lot of those sorts of things in order to ..... but, you know. Day-to-day transactions we paid cash out of the entities and it's all fairly simple. |
| 10 | | |
| | Wright | We just like ..... |
| 15 | Sommer | Some transactions are more complicated but still give rise to the import tax credits and net input tax credits such as the MJF transactions, they need to be documented properly into the BASs. Some transactions need to be removed ..... So where some of the ways in which I think the BASs have reflected some of the transactions needs to change. So what would we want? I would like to reach an agreed position in relation to these transactions that we can then sit down and it really should only be a matter of a couple of hours to sit down with someone to work through how these BASs should be re-lodged and have the Tax Office happy with them so we can say, "All right. Here's the principles. Let's apply them to these transactions". As John said, I think there's about a hundred transactions and so get them into the right BASs. Let's get them in and get them lodged and correct the issues and then we can then have the agreed principles for the lodging of future BASs so we don't have to do this again. And then the third point there is to continue dialogue about the treatment of bitcoin, whether it should be treated as money, because that's not critical necessarily to the resolution of the BASs and I think subject to the discussion before we're probably happy to re-lodge the BASs on that basis, on the basis that bitcoin is money but because we've been dealing with subsidiary interests, apart from Denariuz, they're minimising a number of taxable supplies that actually occurred of bitcoin but, as I say, it's critical to the business that the guys want to do that we try and convince you guys that it's money, but that's more from a broad policy perspective rather than an immediate audit perspective. And that's really it. So - - - |
| 20 | | |
| 25 | | |
| 30 | | |
| 35 | | |
| | Wright | The other bit I've offered a few times is if you have anything that you want to do with Mr Ferrier – I know I can't get any information on other taxpayers but there's nothing stopping me from giving you information. I'm happy for - - - |
| | Dolevski | True, there's nothing stopping you from giving us information. |
| 40 | Wright | No. So I'm happy for Nick - - - |
| | Dolevski | Everyone's entitled to make a dob – you know, dob in or whatever - - - |
| | McMaster | Well, they call them Turks. |
| | Dolevski | Dob in a Turk. |
| | Sommer | So - - - |
| 45 | Wright | I'm not friendly with the guy at the moment so I'm happy to give over anything. Trust me. |
| | McMaster | Understandable. |

557

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | And simply as a by-product if you like of some of the heat and light and frustration that seems to have gone on, I think we would like to have an independent person come in and assist with the preparation of those revised BASs. |
| 5 | Dolevski | So, Andrew, would you be proposing that your firm put the revised BASs together? |
| | Sommer | No, I'm not a BAS agent.  I don't do that sort of stuff. |
| | Wright | Have someone who does it. |
| | Sommer | No.  John will sit - - - |
| 10 | Dolevski | Well, it would actually need someone to provide the information and we've got – I mean, who I'm thinking of is Andrew. |
| | McMaster | Yeah.  He would be a good person and he's independent of Selso so it's not a problem. |
| | Sommer | Andrew? |
| 15 | McMaster | Miller. |
| | Sommer | Okay. |
| | Dolevski | He's from Parramatta and he's from our audit area. |
| | Wright | What I would like to say is - - - |
| 20 | Dolevski | Because, I mean, I don't think it's – there's no bias here in terms of – let me put that on the table. |
| | Sommer | Yep. |
| 25 | Dolevski | There's certainly not bias in terms of the way these audits are being conducted.  I think there has been a lack of clarity and understanding and even what we thought we actually had understood and we had put our own structure together from what we could put together - - - |
| | Sommer | Yep. |
| | Dolevski | But - - - |
| | McMaster | This is what we thought it was. |
| | Dolevski | But it was all pretty much around bitcoins. |
| 30 | Sommer | Yep. |
| | Dolevski | I have to say that I think we haven't been too off the mark in terms of - - - |
| | Wright | One for John. |
| | Dolevski | - - - how things have flowed. |
| | Sommer | Yep. |
| 35 | Wright | Yeah. |
| | McMaster | But obviously that's no longer the - - - |
| | Dolevski | But I think - - - |
| | Sommer | No, no, no. |
| | Dolevski | No. |
| 40 | Sommer | And we're not ..... |

GIZMODO

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But I think from my perspective – and Andrew is the one that, you know, independently took all the information and, with another officer - - - |
| | McMaster | And prepared this flowchart. |
| 5 | Dolevski | - - - you know, assisted him and prepared this so I think with now at least having that background - - - |
| 10 | Sommer | Yep. I think my – I'm instructed to request as humbly as possible that we move away from Parramatta and that may simply be a matter of perception rather than anything else but given some of the complicated history and particularly given some of the difficulties with some of the previous interactions with the Tax Office prior to these issues we would ask if it's at all possible to have it transferred to an audit team in a different ..... |
| | Dolevski | Well, all of the audit teams reported to me so - - - |
| | Sommer | I don't - - - |
| | Dolevski | Yeah. |
| 15 | Sommer | That would be something we would appreciate. |
| | Dolevski | Okay. |
| | Sommer | With the greatest of respect to the team that has been doing it it would give an additional degree of comfort to the taxpayer to have it relocated to a different team. |
| 20 | Dolevski | Even though we're now talking about a pure revision of BASs? |
| | Sommer | Yep. |
| | Dolevski | Accepting the ATO view and purely - - - |
| | Sommer | Yep. |
| 25 | Dolevski | - - - advising the BAS is based on that, you would still feel uncomfortable with - - - |
| | Sommer | I wouldn't put it like that - - - |
| | Dolevski | We would remove Selsa as the - - - |
| | Sommer | - - - but I would say I would feel more comfortable - - - |
| | Dolevski | Well, your request – yep. |
| 30 | Sommer | - - - if it was in one of the other offices, is what we're requesting. |
| | Chester | But ..... what we can do, though, because we're using zero ..... base, we can do it anyway ..... we just sit there and do it, just – I don't know ..... It doesn't have to be one of these ..... We could do it in this room ..... |
| 35 | Wright | And, see, you've got here, "Have not even acquired it yet". I mean, I've already - - - |
| | Sommer | ..... |
| | Dolevski | Yeah. It has been – we acknowledge that it's – yeah. |
| | McMaster | Well, it's based on what information we had. |
| | Wright | Yeah. |
| 40 | Dolevski | We've had misunderstandings and - - - |

Page 34 of 40

559

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
| | Sommer | Look, I would like not to have to do a, you know, line-by-line response to the interim audit report and all those sorts of things - - - |
| | Dolevski | No.  We were just - - - |
| | Sommer | If we can withdraw that and then, you know ..... |
| 5 | Wright | And the other bit is - - - |
| | Dolevski | So, Andrew, just on the interim report, though - - - |
| | Sommer | Yep. |
| | Dolevski | Well, I suppose it's riddled with reference to ..... isn't it? |
| 10 | McMaster | Well, it is. What has been presented today - - - |
| | Doa | Yeah. |
| | Dolevski | It's factually incorrect. |
| | McMaster | What has been presented today is factually incorrect, yeah. |
| | Dolevski | Instructions that have been put forward today ..... in light of those. |
| 15 | Sommer | Yeah. |
| | Dolevski | Agreed that the facts are wrong. |
| | McMaster | Totally. |
| | Dolevski | Okay.  I hear what you're saying and I still think it's a little bit unfair to judge the auditors based on the information they weren't given. |
| 20 | Sommer | No, no, no, it's not so much that.  It's just that the point – and we're not saying that they're – we're not making any allegation of impropriety.  It's merely – I think it would be seen as a nice fresh start if we could start in a different office ..... |
| 25 | Dolevski | It's just the timing aspect.  We would lose so much time with people that, you know - - - |
| | Sommer | I understand that but it would be - - - |
| | Dolevski | - - - have to come to grips of - - - |
| | Sommer | In many ways it would be nice to start with people who start afresh with what we now understand to be the way in which it happened ..... |
| 30 | Chester | But they're not going to review any of ..... confusion.  We're just going through an audit revision based on an agreed process ..... |
| | Dolevski | Well, leave that one with me. |
| | McMaster | Can I suggest we take it on advisement? |
| 35 | Dolevski | Yeah, absolutely.  We will have to look at it because, I mean, I have to look at what capacity auditors have and - - - |
| | Sommer | Sure.  Understood.  Resources. |
| | Dolevski | There is a – yeah.  There is an element of urgency in withholding refunds. |
| | Sommer | Yep. |
| | Chester | ..... so we would like to get that as quickly as possible. |
| 40 | Wright | And especially ..... of their money so - - - |

Page 35 of 40

560

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | ..... |
| | Dolevski | We will consider it.  I mean, that's why I thought Andrew.  You know, he's fresh.  He hasn't done any of this. |
| 5 | Sommer | I mean, but if he prepared those on the basis of the previous submissions then he has already - - - |
| | Dolevski | Well, I mean, but - - - |
| | McMaster | Only the documents received. |
| | Dolevski | Yeah, absolutely. |
| 10 | Sommer | Yeah, and I'm not – and, as I say, I'm not - - - |
| | Dolevski | Yeah.  And this is purely – I mean, we all in this room – we all thought it was bitcoins we're talking about so – I mean, this presentation has certainly shed quite a, you know, different light on things so - - - |
| | McMaster | Dramatically. |
| 15 | Dolevski | Yeah. |
| | Wright | See, but part of this is – I still see it as bitcoins. |
| | Dolevski | Shh.  Yeah. |
| | Wright | You have the lawyer hassling.  I mean, it's rights and - - - |
| | Dolevski | Yeah, but - - - |
| 20 | Wright | I have the technology - - - |
| 25 | Sommer | You see it as ..... until the point you say to me, "Andrew, nothing has ever moved and nothing has ever come to Australia" at which point I have to say, "Is there a taxable supply in Australia", and if nothing is here then I can't apply the nexus tests to that so what has actually transpired as the supply between those two entities?  It can only be, you know, the – you know, what is it, the nemo dat principle, you can only supply what you've got.  They don't have actual bitcoin.  They've only got rights to call for bitcoin.  Those rights came from you.  Those rights subsist against the trusts and that's – again, that's how, you know, I've – I've – Craig's entirely right.  This is my legal analysis of the facts as I understand them, based on what seems to have happened. |
| 30 | | |
| | Wright | See, I have the car in the UK and I had a piece of paper and whatever else and I sold – I – rather than say that I'm selling you a car, it may stay in the UK and everything like that and – but anyway. |
| | Dolevski | It has got nothing to do with tax in Australia then if you sold that car in the UK. |
| 35 | Sommer | ..... |
| 40 | Chester | What happened is that there's a whole treatment and the – I suppose the response that we got from Craig in terms of information generally has been a paranoia process based on prior experience and ..... taking things out or leave them, in 2010 or whatever it was, off to America and other places was a response to the experience that he had the last time ..... and the way he set things up was ..... |
| | McMaster | Well, the auditors that were involved in that prior one are nowhere near involved in this one. |
| | Chester | Well, you were involved in it. |

GIZMODO

Page 36 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Well, only as a director, but I wasn't an auditor. |
| | Wright | I guess I gained a little bit of paranoia on that one - - - |
| 5 | McMaster | Look, I can understand where you're coming from, okay, and I can also understand the communication confusion because you clearly see these things as bitcoins. |
| | Wright | I see them as money. |
| 10 | McMaster | You see them as currency and you treat them in the same way and when you talk to us about them, that's how you talk about them and, unfortunately, that has created a confusion around what actually occurred, and that's all that me as a director and Marina as my Assistant Commissioner are trying to clarify. What are the true facts here and if at the end of the day you've got a refund, you've got a refund. End of story. You're entitled. |
| 15

20

25 | Sommer | And all we're trying to do, all I'm trying to do is, you know – you know, if I was a nefarious litigator – and I know lots of them – there's nothing I would rather do than run a declaratory proceeding against you guys about ..... money. However, with Craig and John in their current situation that's going to tie more of their money up and, you know, I don't work for free, and that's not going to progress things. I would rather come to you guys and say, "Look, listen, the whole treatment of bitcoin is not what we anticipated but if we actually look at what you've said and try and make it work" – and I'm a big fan of trying to make things work as far as we can. We can always ..... you know, when you guys lose in the Federal Court and, you know, you decide not to appeal and bitcoin is money, we can always go back and revise the BASs again but at least we can make some progress and actually stop this business being strangled, and that's really what I want to achieve. I just want to actually let these guys escape from under six different audits and try and get back to the business. That's my objective. |
| | Chester | And whatever ..... so if Andrew's the guy and you vouch for Andrew. He's the guy? |
| 30 | McMaster | He is a very good top-notch person. |
| | Chester | And make no mistake, there's nothing wrong with Selsa. |
| | McMaster | Yep. |
| 35 | Chester | We've had some good work with Selsa. The problem is the way that he received things at the outset was ..... and we tried to explain on many different occasions and there was no – the difficulty is that it's – for all of us, that we're dealing in cyberspace and the problem with cyberspace is that it's out there some place but – and it doesn't exist, but it does exist; and it doesn't exist, but it does. It's like Europe. The Euro isn't fiat money either. It's just that people agree that it's money. |
| 40 | Dolevski | But, John, I don't think we actually even need to get confused by that. |
| | Chester | Yeah. We can ignore it. |
| | Dolevski | You know, I think if we just look at the documents and what they're telling us, that's what we need to form a view on. Just what Andrew has done, he has looked at, and that's what we need to do as tax administrators. |
| 45 | Wright | Yep. And unfortunately there was bad timing as well. |

Interview Conducted with Craig WRIGHT

|   | | |
|---|---|---|
| | Dolevski | What  - you guys get on with your business, we don't need to be involved in; we just need to understand the transactions and then we can see how they apply and what is the relevant tax, if any. |
| 5 | Wright | And unfortunately there was also a bad situation in that just as all this happened the guy who was the CFO of the company, Jamie, had ████████ and I'm the first to acknowledge I'm not good at getting things to you guys.  I just dump everything.  I don't structure anything properly and that's ..... job. |
| 10 | Dolevski | Look, I mean – you know.  Anyway, look, I will discuss it with Des but my preference still, and I would strongly recommend that you agree about Andrew.  He's an excellent auditor which is why we actually had him review this and, you know, a very different way of working so - - - |
| | McMaster | Why don't my clients confer and they can - - - |
| | Dolevski | Yep. |
| 15 | McMaster | They can confirm or disavow .....  But, yeah. |
| | Dolevski | But I would love your presentation, please. |
| | Sommer | Yeah, yeah.  I will just – I will clean it up and - - - |
| | Dolevski | I think that's certainly – yeah. |
| | Sommer | - - - get Craig's authority to provide it to you and then I will send it to you. |
| 20 | McMaster | That would be good because we will need that sort of information in what we're doing because we still need to run that past yourself. |
| | Sommer | Yep.  And we've built this up – I mean, John and I built this up yesterday afternoon from the documents so we can provide you with the documents and I've tried to, as much as possible, put them up on the screen for you. |
| 25 | McMaster | Sure. |
| 30 | Sommer | So you can actually – because, you know, there's a difference between ..... and making assertions and actually giving you documents so where I've got easy extraction documents to show you I've tried to do that.  There are other documents behind all of that but I was pretty confident that once – if we could actually do this – and thank you for accommodating me with the projector because it – and I just thought if we could do it this way – I'm quite sure everything ..... |
| | McMaster | Visual is so much better. |
| | Sommer | Yeah, well, you know - - - |
| 35 | Dolevski | Which is why we tried to draw - - - |
| | Sommer | Yeah, exactly, and I've got – like, I could – I won't, but I could show you my notes going back from the start of January where I've completely scratched everything out and started again now that I understand what's going on, so - - - |
| 40 | McMaster | Which is what we've got to do. |
| | Sommer | Exactly.  All right.  Well - - - |
| | Wright | And I admit my problem is – I mean, I will point you to Economics 101 which says money is a stored value of blah blah blah and whether the – whatever you say, I will get stuck on that bit and ..... we will get nowhere. |

GIZMODO

563

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | But we will do is we will drive Michael Harding mad with that and we will try and keep you sane and get the audits process - - - |
| | Dolevski | That would be good. |
| | Sommer | I always enjoy - - - |
| 5 | McMaster | Sounds reasonable to me. |
| | Dolevski | Yeah. |
| | Sommer | I thought you would like that.  All right. |
| | McMaster | Okay. So any other discussion, because I will stop this and start recording it. |
| | Dolevski | Well, Hoa, have you got any questions considering you've come from Perth? |
| 10 | McMaster | Yeah, exactly. |
| | Doa | So did you want us to have another look at the objection right issues? |
| | Sommer | I think you should.  I think you should have a look at those notices. |
| | Doa | Yeah. |
| | Dolevski | Yep. |
| 15 | Doa | Yeah - - - |
| | Sommer | Call for a copy of those notices and actually have a look at whether or not you're happy with them. |
| | Doa | Yeah. |
| 20 | Sommer | Because John sent an email saying, "I can't see where the objection rights are in this because you don't seem to be telling me you need any information. You're telling me you formed a view as to the operation of the law". |
| | Doa | Yep. |
| 25 | Sommer | Tell me where my objection right is and then we will – so don't ..... refer to 8AALZGA and then if you're happy with them, send me an email saying, you know, you've looked at them and you're happy with them and if you're not happy with them then, you know, at least give us something that we can choose to object to if we want to. |
| | Doa | Sure.  Yep. |
| 30 35 | Sommer | But all of that, hopefully, if we can – my preference is just to raise that as a systems issue for you guys because I know it's a new provision.  I've never seen these notices before but when I got them I said, "I don't think these work".  But when – and I was involved in the drafting of it.  When we drafted the part ..... you into that section I thought it was a waste of time anyway because, you know, with a good conscious how do I tell the client that they should spend their money on a procedural review rather than answering the damn questions.  So it's always easier just to answer the questions. |
| | Doa | Yeah. |
| | Sommer | So, yeah. |
| | McMaster | Not a problem then. |
| 40 | Doa | Yeah.  And if we could that, that would be really good to review the transactions based on the new understanding.  And with the interim audit reports we will just leave them sitting to the side for a minute? |

Interview Conducted with Craig WRIGHT

| | Sommer | Well, probably best to send the letter saying – if you don't mind just sending a letter saying - - - |
|---|---|---|
| | Doa | ..... withdrawn. |
| 5 | Sommer | "We will withdraw these to reconsider the additional information we've provided". |
| | Wright | And just on a different note, but you want a formal – I'm happy for Nick, who is the litigator, to give you all the evidence that we have ..... to tie that together too. |
| 10 | Sommer | I think that will just bury you guys but if – once we've prepared the brief, because we are – you know, the full brief.  If you guys want a copy of the proof we have against ..... of MJF and so on because it may be of assistance to you in any action you may or may not choose to take in relation to a taxpayer who's not in the room - - - |
| | Wright | And you don't need to give me information about - - - |
| 15 | Sommer | - - - then I suppose we can do that but I think we're still working on putting all that together at the moment.  And if you think that would be useful from a – can I say interest perspective – we can probably do that in due course. |
| | McMaster | Okay. |
| 20 | Wright | Because the current one is – we might have it against the company but we're trying to build a unconscionable conduct-type thing against the individual so that – because if you're just a director you ..... and - - - |
| | Sommer | Okay.  Thank you so much.  I really appreciate - - - |
| | McMaster | Not a problem. |

GIZMODO

565

# TAB 83-13

# EXHIBIT 13

From: Craig S Wright
To: dave@davekleiman.com
Subject: This week
Date: Tue, 22 May 2012 09:45:31 +1000

Dave,
A recycled rant. I have done the same to Ramona.

It is not a good several weeks from now. Tomorrow I have the AAT and then teaching. Tonight changes and writing. Thursday, webinars and more. I return a week from now even busier. I return a week from now when I return doing following few months are basically hell with less heat.

CSU wants to expand what I can do and also have a backup, so they have moved me to a subject I do not like much from one I started and love next semester. I am not teaching the ethical hacking class next semester, but rather I am teaching windows domain management (A subject I know but find boring). Knowing I have to spend the next 4 months from when I return doing something I do not enjoy far less than I thought adds little to removing my stress.

I have missed my deadline with Making and will miss the journal for the first time in 9 months. I know I will not have time at all over the weekend to write, so I have until Thursday night to finish editing 172 pages for Bob and the book chapters. This is a hard deadline and I cannot miss it. Right now, I have 168 pages to go.

I am stressed right now. FUCKING ARGHHHH!

I still have not started reviewing my slides and I am no closer with the work for FASV. They have no real idea what, but it could be a way to help with funds as I find a means to make a Bitcoin extension that cannot be lost. One that is money you do not lose when you die, but is still all Bitcoin it. They still crap all over my paper and dismiss it. Bloody academic cryptographers. The Blockchain is better than they will ever do and they all fucking dismiss it. Fucking Scheiner stole my early ideas now the prick shits all over the new ones. One day.

The meeting with the AAT should have occurred weeks ago, but the ATO have stalled and put it off. John has all the materials and the ATO are simply BS'ing again. It costs me money in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try shit on us then. FUCKING DICKS. Bloody lying ATO cock sucking bastards! They lost evidence and use my temper against me. I hate their lies. I did everything right and I am STILL punished.

I am not spending time with family. I fail to talk with you Dave other than rants and work. I am sorry, but I have nothing much more than rants and work. This drives me.

I need more time. I need to have time to do what it takes.

I would sell my grandmother for banking code. I am not getting what I need. I have been doing core banking reviews and these help with the middle wear and the process, but I NEED code. NO TIME. No access and a fucking recalcitrant bloody tax office who thinks I am the anti-christ.

I need a way to get something soon. I need an ERD at least. I will work for a bloody bank if I need to. I have friends in the Commonwealth bank here, but I just want source code. Why is it so hard to get? And again, it is the bloody ATO. They have made it so fucking hard with the closing of my companies.

567

# TAB 83-14

# EXHIBIT 14

---------- Forwarded message ----------
From: **Craig S Wright** <craig.wright@hotwirepe.com>
Date: Sat, Mar 1, 2014 at 3:00 PM
Subject: Re: Bond villains
To: Ira K <clocktime2020@gmail.com>


Around that. Minus what was needed for the company's use

Sent from my HTC

----- Reply message -----
From: "Ira K" <clocktime2020@gmail.com>
To: "Craig S Wright" <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sun, Mar 2, 2014 06:42

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you,
he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part.
I was figuring the other 700,000 is yours.  Is that correct?

Ira

On Sat, Mar 1, 2014 at 9:23 AM, Ira K <clocktime2020@gmail.com> wrote:
Can you allocate 20% to my dad and 80% to myself?

So if I understand correctly, you have the rights to the remaining portion of Bitcoins
stored on one of Dave's drives here?  If that's true we just need to figure out how to
decrypt the drives.

Ira


On Friday, February 28, 2014, Craig S Wright <craig.wright@hotwirepe.com> wrote:
The trust Dave setup should have around 300,000

We moved everything offshore as a result of my early fight with the Tax office. This was back in 2011.
The BTC would be on a server or hard drive, just the rights are overseas.

The price is displayed in the diagram below.


I do not know what was going on with Dave before he died, or if he was taking notice – he seemed
distant and we did not talk much in April other than a couple company matters. In the couple months
before the end, it finally started to be worth something. Then it crashed just before he died, then it
recovered.

I need to allocate shares to Dave's estate. You need to tell me how.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Saturday, 1 March 2014 12:53 PM
**To:** Craig S Wright
**Subject:** Re: FW: Bond villains


Hi Craig,


I was just noticing the sentence where Dave mentioned Bitcoins were not worth much at the time.

That must be why he never cashed any in.


Do you still have a million bitcoins in the trust he setup?   And do you think there is a chance of finding

the bank holding them?  If I can be of help just let me know what you need.  Since Dave setup the trust,

perhaps my identification is needed in order to gain access?


Do you know how the bitcoins are stored in the trust?  Are they on a hard drive?

I don't quite understand why it was necessary to keep them in these offshore places.


And are there two seperate trusts?


1.) GICSR Trust in Belize.

2.) Design by Human in Seychelles.


Sorry if I sound a bit confused... it's because I am.  :-)


Ira

On Fri, Feb 28, 2014 at 12:54 AM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

Just some emails from Dave.

**From:** Craig S Wright
**Sent:** Monday, 25 January 2010 2:15 PM
**To:** 'Craig Wright'
**Subject:** Bond Villains

-----BEGIN PGP SIGNED MESSAGE-----

Hash: SHA1

Craig,

How does the following sound?

*I very much wanted to find some way to include a short message, but the problem is, the whole world would be able to see the message. As much as you may keep reminding people that the message is completely non-private, it would be an accident waiting to happen.*

Look up Wotty - it is not a mistake.

Are you really sure you want to know nothing of the Panama fund? I know you are having tax problems, but Bitcoins are not worth enough to be a bother. They are a wonderful idea, but you need to get some others involved and actually accept help from somebody other than me one day. I am not going to be here for you forever you know.

Worse, if you send yourself bankrupt it will not help anyone. I know you are a stubborn bastard mate (I can be an Ozzie too), I have helped you in many of the fights you get into online and more, but you need to know when to stop. Leave the government for now. Stop or they will really do some damage to you.

Dave

PS, thanks for making me a part of this.

# TAB 83-15

# EXHIBIT 15

## DEED OF LOAN

### PARTIES

**Design by Human Ltd (08248988) UK**
(Mortgagee)

### AND

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

### AND

**Denariuz Seychelles Trust**
(Guarantor)

CRAIG S WRIGHT

Confidential
Not to be disclosed.

Uyen T. Nguyen

574

**THIS DEED** dated 23 day of October 2012

**BETWEEN:**

Uyen Nguyen of Design by Human Ltd (08248988) UK

**(Mortgagee)**

And

Craig Steven Wright of Craig Wright R&D (ABN 97 481 146 384)

**(Mortgagor)**

And

Panopticrypt Pty Ltd for Denariuz Seychelles International Trust

**(Guarantor)**

## RECITALS

A. The mortgagee has, at the request of the guarantor, if applicable, agreed to **lend money (in the form of Bitcoin) to the mortgagor in accordance with and** subject to the terms of this deed.

B. **The guarantor, if any, and the mortgagor acknowledge that the money referred** to in this deed has been received by the mortgagor.

C. **It is noted that the Mortgagee holds a sum of Bitcoin (in wallets noted in** appendix A) for a trust that wishes to extend the uptake and value of Bitcoin globally.

## OPERATIVE PART

1. **Loan**

   (a) The mortgagee has at the request of the guarantor, agreed to lend to the **mortgagor the principal sum shown in the first schedule on the drawdown** date shown in the first schedule.

   (b) **The mortgagee may at the request of the mortgagor lend further amounts** of money to the mortgagor and all such amounts shall be deemed to be **money lent by the mortgagee to the mortgagor pursuant to this clause** provided always that the mortgagee shall not be obliged or required to lend such further money to the mortgagor hereunder.

2. **Interest**

   The mortgagor covenants with the mortgagee to pay to the mortgagee interest **in respect of the principal sum calculated in accordance with the provisions of** the second schedule at the time and in the manner therein set forth and to duly

Uyen T. Nguyen

Page 1 of 7

and punctually observe and perform every other obligation contained in the second schedule.

3. **Repayment**

    (a) The mortgagor covenants with the mortgagee to repay the principal sum **or so much thereof as is then unpaid to the mortgagee on the due date** shown in the first schedule.

    **(b) The mortgagor further covenants with the mortgagee that the money owing will be repaid upon written demand being made by the mortgagee at any time after the happening of any of the following events:**

        (i) Default being made by the mortgagor in the due or punctual payment to the mortgagee of any money which comprises part of the money owing;

        (ii) The failure of the mortgagor to rectify a default in the due or punctual **observance or performance of any other obligations on the part of** the mortgagor under this deed within 7 days of being requested to do **so by the mortgagee;**

        (iii) Any collateral security or any mortgage, charge or encumbrance **ranking in priority to or pari passu with any collateral security** becoming enforceable;

        **(iv) If any collateral security is or becomes wholly or partly void, voidable or unenforceable or is claimed to be so by the mortgagor; and**

        (v) If any event occurs that renders a collateral security enforceable.

4. **Early repayment**

The mortgagor shall be entitled to repay the whole of the principal sum or the amount then unpaid at any time with interest to the date of repayment.

5. **Security**

    (a) In consideration of the mortgagee advancing money to the mortgagor under or pursuant to this deed each of the mortgagor and the guarantor, if any, agrees to execute or upon demand from the mortgagee procure the

Ugen T. Nguyen

Page 2 of 7

execution in favour of the mortgagee of the securities referred to in the third schedule.

(b) The mortgagor and the guarantor, if any, agree that each of the securities described in the third schedule is a collateral security to the intent that the money owing is secured thereby. Default under any of the collateral securities shall constitute default under this deed.

(c) Collateral security means any mortgage, charge or other encumbrance affecting any real or personal property now in existence or which may in the future be given to the mortgagee by the mortgagor or any other person as security for the payment of the whole or any part of the money owing whether or not any other money is also secured thereby.

6. **Governing laws and jurisdiction**

The laws in force in Seychelles govern this deed.

7. **Guarantors guarantee and indemnity**

(a) The guarantor agrees that the guarantee and indemnity is a continuing guarantee, and extends to the ultimate balance owing under this deed, and that the guarantor remains fully liable under the guarantee and indemnity despite the fact that the mortgagee might have done something which may otherwise have the effect at law or in equity of varying or discharging the guarantor's liability.

(b) The mortgagee need not first exercise its rights against any of the mortgagors or against the mortgagors' security before exercising its rights under this guarantee against the guarantors.

8. **Costs**

The mortgagor shall pay all costs fees and duties in relation to this deed and any collateral security.

THE FIRST SCHEDULE

| | | |
|---|---|---|
| Item 1 | **Principal sum 650,000 BTC** | |
| Item 2 | **Due date** 30 June 2020 | |
| Item 3 | **Drawdown date 01st July 2013** | |

Uyen T. Nguyen

Page 3 of 7

## THE SECOND SCHEDULE

**Interest only loan**

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as **shall remain unpaid on 30 June 2020 and in meantime may pay multiples of BTC 50,000** in reduction of the principal sum on any due day for payment and interest **shall reduce accordingly from the date of such partial reduction in the principal sum.**

In the meantime the mortgagor will pay interest only to the mortgagee on any amount payable under this deed at the rate of 0.05% per annum calculated on monthly rests and payable on the first day of each and every month commencing on the 30th day of July 2016 and compounding monthly from the date upon which the amount becomes **due until payment.** Such interest may be capitalised by the mortgagee as it deems appropriate and the mortgagor shall pay interest on the capitalised interest at the **same rate and calculated in the same manner. Provided always, and it is hereby** agreed and declared, that if the mortgagor shall on every day on which interest is **hereinbefore made payable under this security, or within 14 days after each such** days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month **for which such interest shall be paid to the mortgagee within such 14 days aforesaid.**

The mortgagor agrees, as an independent obligation which will not merge in any **judgment or order, to pay interest on any judgement or order for the payment of all or** any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

OR

**Reducible mortgage principal and interest repayments**

Page 4 of 7

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as shall remain unpaid on 30 June 2018.

In the meantime the mortgagor will pay the principal and interest on the principal sum or on so much thereof as for the time being shall remain unpaid, and upon any judgment or order in which this or the preceding covenant may become merged at the rate of 0.05% per annum as follows, namely, by equal monthly payments on the first day of each and every month in each and every year until the principal sum and interest shall be fully paid and satisfied, the first of such payments computed from 01st July 2017 to be made on 01st July 2018 next. Provided always, and it is hereby agreed and declared, that if the mortgagor shall on every day on which principal and interest is hereinbefore made payable under this security, or within 14 days after each such days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month for which such interest shall be paid to the mortgagee within such 14 days aforesaid.

The mortgagor agrees, as an independent obligation which will not merge in any judgment or order, to pay interest on any judgment or order for the payment of all or any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

## THE THIRD SCHEDULE

(COLLATERAL SECURITY) First/Second mortgage over PERMANENT SUCCESS LIMITED UK being the whole of the shares comprised in UK company reference 08260048 and all related trusts.

Uyen T. Nguyen

Page 5 of 7

579

**EXECUTED AS A DEED**

**Design by Human Ltd (08248988) UK**
(Mortgagee)

By: Uyen Nguyen
016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

By: Craig Wright
7 Eastgate Ave Gordon NSW 2072

**Denariuz Seychelles Trust**
(Guarantor)

Page 6 of 7

580

**Appendix 1:**
Bitcoin block addresses transferred:

| | |
|---|---|
| 12tLs9c9RsALt4ockxa1hB4lTCTSmxj2me | 10,000.00 |
| 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a | 111,114.00 |
| 1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF | 79,957.05 |
| 1f1miYFQWTzdLiCBxtHHnNiW7WAWPUccr | 10,009.25 |
| 1MHdm5XZMrfoZFoUktEaGhYevmdiXoc4x4 | 12,950.00 |
| 18JPragfuDVHWWG8ABQ15cghJFetnXUJBD | 24,404.50 |
| 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD | 34,512.80 |
| 1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1 | 10,689.03 |
| 1F34duy2eeMz5mSrvFepVzy7Y1rBsnAyWC | 10,770.52 |
| 1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1 | 10,000.00 |
| 18k9tin39LKegFzHe8rxSgvJXDpuMriGJq | 10,000.00 |
| 1HtTw9zR9wWFfgV8Jy8MqsaeVI7ZXrjdq6 | 1,014.00 |
| 18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz | 750.00 |
| 12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea | 23,249.04 |
| 12tkqA9xSoowkzoERHMWNKsTey55YEBqkv | 28,150.04 |
| 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy | 40,000.04 |
| 12HddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq | 40,000.04 |
| 1P3S1grZYmcqYDuaEDVDYobJ5Fx85E9fE9 | 50,000.04 |
| 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K | 30,000.04 |
| 145YHsQU7HMzkRnD5SBSuFAzQgCYnAnLkN | 10,000.00 |
| 16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY | 10,000.00 |
| 1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm | 10,000.00 |
| 1FLFnbN7m5psLfvLEwYfRUUjJ34YkmV3dM | 3,700.00 |
| 1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2 | 4.65 |
| 16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT | 53,000.00 |
| 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr | 31,000.04 |



Page 7 of 7



**Consent to act**

I Uyen Nguyen of:

**016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh,**

Consent to act as director of the following companies from the later date of 30 June 2013:

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 **8DA)**
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

**I also accept the position of COO (Chief Operations Officer) of the following companies from 18 Oct 2012.**

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 **8DA)**
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, **DN6 8DA)**

Signed:

Uyen T. Nguyen

582

# TAB 83-16

# EXHIBIT 16

## Computer Forensics, LLC Operating Agreement

This Agreement executed on February 1, 2013 shall strictly state the activity governing Computer Forensics, LLC business operations.

Computer Forensics, LLC shall be owned equally by Carter Conrad, Dave Kleiman, and Patrick Paige. Each individual shall be a Managing Member of Computer Forensics, LLC, with a fiscal year of each calendar year (January to December). Each Managing Member shall possess, and own, a 33.33% interest of Computer Forensics, LLC. Gross revenue produced, and received, by Computer Forensics, LLC shall be distributed as follows: 20% of all gross proceeds shall go to Computer Forensics, LLC for expenses and overhead, the remaining 80% shall be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income. Upon the end of the fiscal year, should there be proceeds in excess of operation expenses remaining with in the accounts of Computer Forensics, LLC, each member shall be awarded an equal 33.33% share of income determined not to be bookmarked for expenses, by a majority of the Managing Members. All equipment, software, hardware, or other intellectual property, owned individually by each member shall remain in the ownership of that member. Any equipment, software, hardware, or other intellectual property purchased with Computer Forensics, LLC assets shall be owned by Computer Forensics, LLC, with all provisions as stated above.

This operating agreement shall be enforced from the date noted above and supersedes any and all previous agreements.

So witnessed by our hand and signature below,

_____

Carter Conrad

Digitally signed by Dave Kleiman
DN: cn=Dave Kleiman, o=DaveKleiman.com, ou=Forensics,
email=dave@davekleiman.com, c=US
Reason: I agree to the terms defined by the placement of
my signature on this document
Location: Miami, Florida
Date: 2013.02.13 11:49:04 -05'00'

_____

Dave Kleiman

_____

Patrick Paige

Page **1** of **1**

584

# TAB 83-17

# EXHIBIT 17

STATE OF FLORIDA          )
                          )  SS
COUNTY OF PALM BEACH      )

I, DAVID ALAN KLEIMAN declare to the officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my will.

_____, Testator
DAVID ALAN KLEIMAN

We, ___Marcia J. Varney___ (Witness) and _Beverley Brownlee_ (Witness) have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared the instrument to be the Testator's will and signed it in our presence and that we each signed the instrument as a witness in the presence of the Testator and of each other.

_____
Witness

_____
Witness

Acknowledged and subscribed before me by DAVID ALAN KLEIMAN, the Testator, who is personally known to me or who has produced _____ as identification, and sworn to and subscribed before me by ___Marcia J. Varney___ (Witness) who is personally known to me or who has produced _____, as identification and _Beverly Brownlee_ (Witness) who is personally known to me or who has produced _____, as identification, and subscribed by me in the presence of the Testator and the subscribing witnesses, all on July 30, 2003.

_____
Notary Public

Notary Seal

LAURA E. AHLERS
My Comm. Exp. 5/18/05
No. DD 006618
[ ] Personally Known  [ ] Other I.D.

My commission expires: _____

4

586

# TAB 83-18

# EXHIBIT 18

GPO Box 9990 IN YOUR CAPITAL CITY


**Australian Government**
Australian Taxation Office

Coin-Exch Pty Ltd
C/- Clayton Utz
Attn: Andrew Sommer
Level 15, 1 Bligh Street
Sydney    NSW    2000

| | | |
|---|---|---|
| | Reply to: | |
| Our reference: | 1-526DVU8 | |
| Contact officer: | Andrew Miller | |
| Phone: | (02) 9354 6379 | |
| Fax: | (02) 6225 0929 | |
| | | |
| ABN: | 31 163 338 467 | |

22 June 2015

**Completion of audit**
**For your information and action**

Dear Mr Sommer

We have completed the audit of Coin-Exch Pty Ltd for the period 1 July 2013 to 30 September 2013. Thank you for your time and cooperation during this audit.

The result of this audit is:

| | |
|---|---|
| Reduced activity statement credit | $3,787,429.00 |
| Administrative penalty (activity statement) | $1,893,714.50 |
| **Total amount payable** | **$5,681,143.50** |

**Our decision**
The reasons for our decision were explained in the audit position paper sent to you on 26 September 2015. We have also enclosed our administrative penalty decision.

A penalty amount of $1,893,714.50 also applies. You will also receive a notice of assessment of administrative penalty shortly.

**What will happen next**
Your objection to the amended assessment has been received and the officer managing your objection is speaking with you about this matter.

**Record keeping**
You need to keep your business records for five years, including all records examined as part of this audit. We don't intend to audit your activity statement for the period 1 July to 30 September 2013 again.  However, we may need to look at the records again if new information suggests the need for further enquiries.

**Your right to object**
You may object to:
■ the assessment of a tax shortfall penalty
■ a decision not to remit all of the tax shortfall penalty.

We understand that you have already objected to the assessment of revised GST amounts and another ATO officer is speaking with you in respect of this matter.

**How to lodge your objection**
Your objection needs to:
■ be in writing
■ be signed and dated

70122.00561 2-09-2013

588

■ state fully and in detail the grounds you are relying on, and
■ be sent via:
  – the tax agent or business portals
  – fax to **1300 139 031**, or
  – mail to:
      Australian Taxation Office
      PO Box 3524
      ALBURY  NSW  2640

Time limits of 60 days or four years apply when lodging an objection.

Objection forms and further information about how to lodge an objection, including advice on time limits, agent declarations and documents to send with your objection form, are available from our website at **ato.gov.au** by searching for 'objection' or by phoning **13 28 66** between 8.00am and 6.00pm, Monday to Friday.

**More information**
If you have any questions, please phone **13 28 69** between 8.00am and 5.00pm, Monday to Friday, and ask for Andrew Miller on extension **46379**.

Yours sincerely

James O'Halloran
Deputy Commissioner of Taxation

**Reasons for our Penalty Decision**
**Coin-Exch Pty Ltd**
**ABN: 31 163 338 467**

**Shortfall amount**

Section 284-75 of Schedule 1 to the *Taxation Administration Act 1953* (TAA) imposes an administrative penalty if you make a statement to us which is false or misleading in a material particular whether because of things in it or omitted from it. A material particular is something that is likely to affect a decision regarding the calculation of an entity's tax-related liability or an entitlement to a credit or payment.

Where a shortfall arises as a result of making a false or misleading statement, the penalty is assessed in four stages:
■ determine the shortfall amount,
■ work out the base penalty amount,
■ the base penalty amount may be increased and/or reduced, and
■ consider remission of the penalty amount.

You made a statement to the Commissioner by lodging your activity statement. The statement was false or misleading as it incorrectly stated the assessed net amount. The assessed net amount includes any amount of GST that you have to pay. This is explained in the issue relating to the shortfall.

Your shortfall amount for penalty purposes is $3,787,429.

Miscellaneous Taxation Ruling MT 2008/1 *Penalty relating to statements: meaning of reasonable care, recklessness and intentional disregard* explains that you are required to take the same level of care to fulfil your tax obligations that could be expected of a reasonable person in your position, taking into account your own personal circumstances, knowledge, experience, education and skill.

You are not liable to a penalty for making a false or misleading statement if you exercised reasonable care in making the statement.

**Base penalty Amount**

Where a false or misleading statement results in a shortfall amount, the base penalty amount is worked out according to the level of care taken by the taxpayer in making the statement.

Additionally, as you are responsible for the authorised actions of your employees and representatives, their behaviour may also be relevant to determining your behaviour for penalty purposes.

MT2008/1 explains that the reasonable care test requires that a taxpayer to take the same care in fulfilling their tax obligations that could be expected of a reasonable ordinary person in their position. The standard of care required is commensurate with a reasonable person with the same background as the person making the statement.

Please refer to the following paragraphs in our decision with regards to the level of care taken by you at the time of, and leading up to, the making of the false or misleading statement.

MT 2008/1 explains that recklessness is gross carelessness. You act recklessly when your conduct clearly shows disregard of, or indifference to, consequences that are foreseeable by a reasonable person as being a likely result of your actions.

We have determined that you are liable to an administrative penalty because you behaved recklessly when you made the statement. This is because the facts show that you should have reasonably foreseen that your actions may have led to a shortfall amount.

590

We have taken the following into consideration:

■ On 30 September 2013, you made a statement to the Commissioner when you lodged your BAS for the quarter ended 30 September 2013;

■ Your statement to the Commissioner included purported transactions for the acquisition of a software licence from the Trustee for the Wright Family Trust (DeMorgan) which is considered an entity related to you. In evidence of the purported transactions, you provided tax invoices prepared by Craig Wright on behalf of DeMorgan, issued on 1 July 2013. On 11 August 2014, during an interview with Counsel engaged by the ATO, your Director and controlling mind, Craig Wright, has admitted that he backdated these invoices.

■ You claim that the purported acquisition of the software licence is evidenced by these invoices; and also by an 'IP Deed of Assignment' with DeMorgan dated 15 September 2013 and an 'Intellectual Property Licence' dated 22 August 2013. Under the intellectual property licence, you claim to have acquired a licence to use software, said to be owned by Craig Wright who 'has clear title internationally based on the judgement from NSWSC 2013/245661'. This is understood this to be a reference to a New South Wales Supreme Court Case (number 2013/245661) which was not finalised until 6 November 2013; after the deed date of 22 August 2013. That is, the licence agreement makes specific reference to an event which had not yet occurred, raising questions as to its validity.

■ DeMorgan purports to have acquired the software (which it licenced to you) from Craig Wright, pursuant to a contract dated 15 July 2013, which predates its existence and establishment as a trust. DeMorgan cannot have licenced to you something which it did not validly own. Craig Wright, in acting on your behalf, would have known this as he created documents relating to the sales and licencing of the software, such as invoices and contracts; many of which are signed or dated before any valid transaction could have occurred;

■ You also claim to have paid up share capital of $41,500,000, as disclosed to ASIC. Craig Wright initially advised the ATO that your share capital was paid in Bitcoin (not dollars) and later, on 18 February 2014, advised that your share capital is in the form of equitable interests in a Seychelles Trust which holds Bitcoin. You claim that this share capital was paid to you by Craig Wright under a 'Deed of Assignment of Equitable Interests', though this does not explain how the capital was paid, for shares owned by other entities. You purport to have expended a significant portion of this share capital as consideration paid to DeMorgan for purchase of the aforementioned software licence.

■ Craig Wright purports to have received a loan of 650,000 Bitcoin from the Seychelles Trust pursuant to a Deed of Loan entered into with the Trustee for the Seychelles Trust; a company called Design by Human Ltd (DBH). However, records show Craig Wright was only informed of the existence of this company on a date after the purported Deed of Loan was entered into. Furthermore, the Deed of Loan was not validly executed by an authorised person, and signed on a date where DBH was merely a dormant shelf company. As it was Craig Wright who modified the Directorship of DBH in January 2014 (after the date you made this statement to the Commissioner) he had knowledge that the person purportedly signing the Deed of Loan on behalf of DBH did not have authority to do so and therefore that the deed was invalid.

■ Craig Wright may claim that he was not reckless as he sought a private ruling from the Tax Office in relation to transactions involving you and your related entities. However, his ruling request related to the transfer of Bitcoin and therefore bears no resemblance to your purported transactions. There is clearly a difference between transferring Bitcoin and transferring interests in an offshore trust and Craig Wright would not have entered into the purported arrangement involving offshore trust interests if it did not offer a benefit of some kind. The private ruling issued to Craig Wright in December 2013 explained that GST would be levied on supplies of Bitcoin and therefore if you had acquired the purported software licence and paid in Bitcoin, you would not have been entitled to the GST refund you claimed. The effect of your purported arrangement involving transferring interests in an offshore trust is that, prima facie, you are entitled to claim a refund, removing the effect of GST on Bitcoin. This is understood to be the benefit Craig Wright was seeking to obtain.

■ Furthermore, information obtained from Her Majesty's Revenue and Customs (HMRC) confirms that your Director, Craig Wright, only obtained control of DBH in January 2014 (after the ATO issued its private ruling) and had no prior involvement with the company. It also suggests he backdated the Directorship of Uyen Nguyen and Dave Kleiman. He would therefore have been

591

aware that the company could not have entered into the Deed of Loan on 23 October 2012 and as a result, that the purported rights could not have been transferred as consideration.

■ Your lodged BAS claimed a refund of $3,787,429; purported to be the GST paid on your acquisition of the aforementioned software licence from DeMorgan. In claiming such a substantial refund, a reasonable person would take necessary steps to ensure the statement they are making is correct. Craig Wright, as your representative, has not shown this level of care.

■ Craig Wright made the following statement to us on 28 March 2014 in response to questions asked of one of your related entities. '*The agreements are all centred on the following mantra: Bitcoin is not to be sold or transacted… in any country that is not free. The least free of any country is that which taxes money. Any country that taxes money is to be avoided. Fiat is not true money. Bitcoin and Gold are… If a value added tax is applied, we will create a system that undermines this through the use of legal avenues. We will create financial instruments based on the item we wish to promote, but as a derivative that undermines the effect of the tax*'. This mantra shows a level of indifference to the law. The arrangement involving interests in an offshore trust undermines the effects of tax which would otherwise be payable on transactions.

■ Additionally, you have not demonstrated an ability to earn income other than claiming ATO refunds, you have not traded with any third parties or employed any staff. As set out in our decision relating to the shortfall, your intended business activities could not turn a profit and there has not been any real or lasting contribution to your share capital by your purported shareholders. There is therefore, no evidence that you were conducting an enterprise during the period for which the statement was made.

This finding is consistent with paragraphs 28, 56, 61, 79, 92, 102, 105, 106 and example 8 contained in MT 2008/1.

Paragraph 56 says that '*in determining whether a person having special skill or competence has breached the standard of reasonable care, the appropriate benchmark is the level of care that would be expected of an ordinary and competent practitioner practising in that field and having the same level of expertise*'. Craig Wright, acting on your behalf, has a Masters Degree in Law, yet made this statement to the Commissioner despite knowledge of the facts and details in which the purported Deed of Loan was entered into. This includes the fact that it was only in January 2014 that he had any involvement with DBH, prior to which it was a dormant shelf company. Paragraph 79 explains that if an employee fails to meet the reasonable care standard, the employer is liable for that failure.

Paragraph 61 explains that reasonable care can be taken when an entity makes a genuine effort to research and support a position. However, as set out above, the private ruling sought by Craig Wright is not commensurate with your purported transactions as you claim to have dealt with equitable interests in a trust, not Bitcoin. Craig Wright has not made a genuine effort to research and support a position.

Paragraph 92 states that the size of the shortfall arising from the false or misleading statement indicates the magnitude of the risk. We consider your claimed refund of $3,787,429 to be significant and therefore requiring a higher standard of care. However, this standard of care has clearly not been taken.

In *Hart v FC of T*[1] the Full Federal Court endorsed the comments of Cooper J in *BRK (Bris) Pty Ltd v Federal Commissioner of Taxation*[2] who said:

> *Recklessness in this context means to include in a tax statement material upon which the Act or regulations are to operate, knowing that there is a real, as opposed to a fanciful risk that the material may be incorrect, or be grossly indifferent as to whether or not the material is true and correct, and a reasonable person in the position of the statement-maker would see there was a real risk that the Act and regulations may not operate correctly to lead to the assessment of the proper tax payable because of the content of the tax statement.*

---

[1] Hart v FC of T (2003) 131 FCR 2003
[2] BRK (Bris) Pty Ltd v Federal Commissioner of Taxation [2001] FCA 164

Paragraphs 105 and 106 of MT2008/1 summarise the issues in Hart explaining the finding that a reasonably informed person would address the possibility that no business was being carried on and that a rational consideration of the facts may assist in concluding whether a business is being carried on. You have not adequately addressed the possibility that no business was being conducted for the relevant tax period. You and Craig Wright knew there would be a real risk that your statement may be incorrect and, according to the 'mantra', were grossly indifferent to the application of the law.

Section 284-90 of Schedule 1 to the TAA sets a base penalty amount of 50% of your shortfall amount when the shortfall results from recklessness.

**Increase or reduction of the base penalty amount**
The base penalty amount is increased or reduced in accordance with criteria set out in the law.  In your case there are no facts that warrant any change to the base penalty amount.

**Remission considerations**
Section 298-20 of Schedule 1 to the TAA enables us to remit all or part of the penalty in appropriate circumstances. To guide us in making these decisions, the Commissioner has issued several Law Administration Practice Statements.

Law Administration Practice Statement PS LA 2012/5 *Administration of penalties for false or misleading statement that result in shortfall amounts* outlines the circumstances in which the Commissioner considers it fair and reasonable to remit penalties applying to false or misleading statements resulting in shortfall amounts.

PS LA 2012/5 confirms that our remission decisions need to consider that a major objective of the penalty regime is to promote consistent treatment by reference to specified rates of penalty and that objective would be compromised if the penalties imposed at the rates specified in the law were remitted without just cause. Remission is only appropriate to the extent that the prescribed rates of penalty cause unintended or unjust results.

We have considered remission under PS LA 2012/5 which gives guidance on grounds for remission. Further, remission was also considered under the principles of the ATO compliance model and the Taxpayers' Charter. In your case we have decided that there are no facts that warrant any remission of penalty.

Case 9:18-cv-80176-BB   Document 83-18   Entered on FLSD Docket 01/14/2019   Page 8 of 8

The following tables are a summary of the shortfall identified in the audit and the level of penalty to be applied to each.

**Issue List**

| Issue # | Issue description | | Tax type | Issue Shortfall $ | * Penalty Shortfall $ | Total Penalty $ |
|---|---|---|---|---|---|---|
| 1 | Overstated Acquisitions | | Goods and services tax | 3,787,429 | 3,787,429 | 1,893,714.50 |
| | | **Total (all issues)** | | **3,787,429** | **3,787,429** | **1,893,714.50** |

* Credit offsets applied within the same tax period result in differences between the issue shortfall and penalty shortfall amounts. Credit offsets cannot be applied across different tax periods and may result in the total penalty shortfall being higher than the total issue shortfall. The *Summary of activity statement amendments* provides issue details for each tax period.

**Summary of penalty decision – net amount***

| Period | Issue # | Penalty Shortfall $ | Behaviour | Base Penalty % | Base Penalty Amount $ | Increase $ | Reduction $ | Remission $ | Penalty Payable $ |
|---|---|---|---|---|---|---|---|---|---|
| 1 July 2013 – 30 September 2013 | 1 | 3,787,429 | Recklessness | 50% | 1,893,714.50 | - | - | - | 1,893,714.50 |
| **Totals (all periods)** | | **3,787,429** | | | | | | | **1,893,714.50** |

***Net amount** includes any goods and services tax (activity statement labels 1A and 1B), wine tax (activity statement labels 1C and 1D) and luxury car tax (activity statement labels 1E and 1F) applicable to you. If you are a GST instalment payer, the total GST instalments paid by you (activity statement label 1H) are taken into account in working out your net amount.

594

# TAB 83-19

# EXHIBIT 19

FILED

2 8 AUG 2013

Form 44 (version 2)
UCPR 36.1A

## CONSENT ORDER

### COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 245661 |

### TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

### PREPARATION DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

### TERMS OF ORDER MADE BY THE COURT BY CONSENT

Orders/Judgment:

1.    Judgment in the sum of $28,534,049.79 in favour of the plaintiff.

2.    No order as to costs.

3.    The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.

### SIGNATURES

**Plaintiff**
The plaintiff consents.
Signature of plaintiff

_____

Craig S Wright

Capacity                                    Plaintiff

596

Date of signature                    28th Aug 2013

**Defendant**

The defendant consents.

Signature of or on behalf of party
if not legally represented

Capacity                             Authorised officer

Date of signature                    28th Aug 2013

_____J Wilson_____ consents.

**SEAL AND SIGNATURE**

Court seal

Signature                    _____

Capacity

Date made or given

Date entered

**NOTICE**

Subject to limited exceptions, no variation of a judgment or order can occur except on

application made within 14 days after entry of the judgment or order.

FILED

2 8 AUG 2013



Form 44 (version 2)
UCPR 36.1A

# CONSENT ORDER

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 225983 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## PREPARATION DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TERMS OF ORDER MADE BY THE COURT BY CONSENT

Orders/Judgment:

1.    Judgment in the sum of $28,254,666.00 in favour of the plaintiff.

2.    No order as to costs.

3.    The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.

4.    A deed of transfer for the Intellectual Property is to be completed before 01Sept 2013.

598

2

**SIGNATURES**

**Plaintiff**

The plaintiff consents.

Signature of plaintiff

Craig S Wright

Capacity                          Plaintiff

Date of signature                 28th Aug 2013

**Defendant**

The defendant consents.

Signature of or on behalf of party
if not legally represented

Capacity                          Authorised officer

Date of signature                 28th Aug 2013

____J Wilson_____ consents.

**SEAL AND SIGNATURE**

Court seal

Signature

Capacity

Date made or given

Date entered

**NOTICE**

Subject to limited exceptions, no variation of a judgment or order can occur except on
application made within 14 days after entry of the judgment or order.

# TAB 83-20

# EXHIBIT 20

 Gmail

## Fwd: Questions

---------- Forwarded message ----------
From: **Craig S Wright** <craig@rcjbr.org>
Date: Wed, Apr 23, 2014 at 8:56 PM
Subject: RE: Questions
To: Ira K
Cc: Andrew <asommer@claytonutz.com>

Ira,

Andrew can give you a good idea of the history. The problems we have faced come to knowledge of what we have been doing. The Tax office know that Dave and I have been working on this since 2008.

Next week (Tuesday) I am attending a session to help people at the senior commission/commissioner level in the tax office come to terms with Bitcoin. I have been dragged before the Federal Police to teach them, state police, treasury.

I am being made to know my place.

The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically, the GST (like a Vat) cancels as it is an international transfer. That stated, they can still use it as a means to make sure I am in my place.

The way this is working is,

- WK to me                  International and NO GST (all good)
- ME to company          GST cancels

In this, I have a GST debt, the company has a gain. On the software from WK to Coin-Exch, I have an overall GST debt owed of $3.7 million (give or take). The company gets a return of 3.7 million. The net outcome is zero tax as they cancel.

What the tax office can do is use this and hold payments back to the company. They are trying to fish. They want information that they are not legally entitled to have. So far, they have fabricated documents (and been caught), used half-truths to make it seem as if things are wrong to others and more.

601

One issue they have is that I will be reinvesting all of what I get for now. This means I do not pay taxes as I will be taking the gain and spending it exclusively on deductible areas that will grow the business. I live on an income less than half my staff but it is enough. What does matter is that by doing this, we can create something.

I will send you a timeline of events this weekend.

I do not know what your views are, but you will learn some more of Dave and I. I still do a lot of work with Casinos, Sport Betting and other gaming firms. Some of this is not really legal within the US, hence Panama. Much of that secrecy comes from the fact that the US government would have closed what we did down as well if they could have, gaming would have been a great excuse to kill off Bitcoin. The thing is, it paid the bills. I do not gamble myself at all, but the guys who run these sites pay well and we needed funds.

Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already.

I have told you I would answer anything, but it is perhaps time I start just telling you everything.

Craig

**From:** Ira K [mailto: ████████████████████]
**Sent:** Wednesday, 23 April 2014 7:37 PM
**To:** Craig S Wright
**Subject:** Re: Questions

i'd better get some sleep.. it's 5:30am here.

goodnight.

On Wed, Apr 23, 2014 at 5:35 AM, Ira K ██████████████████████ wrote:

alright, thank you.

On Wed, Apr 23, 2014 at 5:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira, when I offered to tell you everything and involve you, I was serious.

I have told the solicitor (attorney) that you are able to ask anything. I do mean that.

Not just half-truths that others with agendas will state, but ANYTHING.

602

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions


alright, thanks for explaining things.


On Wed, Apr 23, 2014 at 5:31 AM, Craig S Wright <craig@rcjbr.org> wrote:

You will have it in the morning.


**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:30 PM
**To:** Craig S Wright
**Subject:** Re: Questions


yes, thanks.


On Wed, Apr 23, 2014 at 5:29 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will put a spread sheet together that lets you see the impact of taking money early vs later tomorrow if this is OK?


Yearly amounts

500k, 1mill,... ,4 million.


**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:20 PM
**To:** Craig S Wright
**Subject:** Re: Questions


Would it be possilbe to sell just 1 year of my holdings and keep the rest?


On Wed, Apr 23, 2014 at 5:15 AM, Craig S Wright <craig@rcjbr.org> wrote:

And if it does work (and I believe it will) we change the world in a manner that has not been seen for a long time – even more than the Internet


**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:05 PM
**To:** Craig S Wright
**Subject:** Re: Questions

603

If I stay the course Dave's estate is guaranteed 8 million in 2016?

or is that with risk?

On Wed, Apr 23, 2014 at 4:58 AM, Craig S Wright <craig@rcjbr.org> wrote:

He ran W&K

Uyen only started to help in Dec 2012 and we never completed moving things.

I moved everything in 2011 to Dave as I needed the development to be at "arms length". I could not be directly involved in it

I thought Dave would live forever. I know, a bad error.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 6:52 PM
**To:** Craig S Wright
**Subject:** Re: Questions

Why did you choose to let him hold a seperate bitcoin wallet that you didn't have access to?

I thought all these assets belonged to W&K.

On Wed, Apr 23, 2014 at 4:46 AM, Craig S Wright <craig@rcjbr.org> wrote:

Denariuz will license from Coin-Exch.

The license will be paid is shares and the company will be owned by Coin-Exch over time. Trying to do it in a manner that is internationally tax advantageous.

Basically, I am not avoiding tax, but trying to make sure that we create a structure like Google uses to make the amount we pay as small as possible.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 6:45 PM
**To:** Craig S Wright
**Subject:** Re: Questions

604

and Denariuz?

On Wed, Apr 23, 2014 at 4:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been led to believe. But I am not trying to take anything from Dave's estate.

The eLearning program is to create a new form of MooC. The idea is to have large scale adaptive learning to the world. Nearly free.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 6:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions

I'm certainly not going to do anything to stifle the growth of the business you and he worked

so hard at.

On Wed, Apr 23, 2014 at 4:14 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I have sold all the BTC that I plan to sell for now. In doing what we wanted to do, Dave and I arranged for the sale or around 500,000 BTC so that we could have access to Core Banking software. The rest that I hold are in trust. The terms of that trust are not met as yet and hence if I was to break it, I would also cause the tax liability to fall and that would result in over 50% of the total being owed in taxes – a result that would drop the price to about nothing and leave nothing. I will not do that. I will not collapse years of work for anyone or anything.

Dave and I decided to start Coin-Exch so that we could lock in some of the value. When we started planning this, it was late 2012. We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smarter, but we took the option to cash out. That was Dave. If we had waited even 3 months the value would have been 5 times more.

No, I am not doing this as I think it is going to make me a trillionaire. I am working to make a system that is fraud resistant. One that does not allow printing money and fractional reserve banking. No inflation and no federal reserve BS.

If you read the terms of the Judgement from the court, I did not receive Dave's Bitcoin. I accepted the software Dave was developing for me. We had already exchanged this before he died. It is software that I started working on in 2003. Dave completed it for me after we split things up. He did this contracting other people.

605

I locked in the R&D amounts based on Dave's convincing me that was best. I am willing to take risks far more than him, but to me, this will work or I will die trying.

I thought Dave just wanted to have some time to work less. That he was planning on taking some time off and doing some relaxing and travel. He told me repeatedly that he was fine. He said the VA Hospital was covered as he was a vet. He said that he was all good. He wanted some cash to be able to do some other things he planned and we did talk about the exoframe idea. I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time.

I told him again and again that the wait is worth it. I gave him the figures and stated that he could have sold the amount I would leave him with. I wanted the software. That is what this is and always was about for me. With it, I can complete what I have worked on for 11 years now.

My eggs are not all in one basket. They are now tied to the Research funding as well.

I did the court action to ensure that the value was accepted. Not to force you, the estate etc into giving me anything, but to ensure I had a value against the software that I had received already.

I assume you know nothing of how Dave funded W&K?

I sell myself to gaming companies. I am a security professional, cryptographer and programmer. I wrote software and designed systems that created and became Lasseter's OnLine Casino. I worked with Playboy Casino. I did coding for Centrebet, Sporting Bet, BetLife etc.

In 2010 I gave the source code for a good number of online casinos to Dave. Hence Panama. I put him in contact with the people at Playboy. He used this code to fund the work, research etc.

I have files of Dave's that I cannot access now. These are TrueCrypt partitions. We held backups for the other, but no passwords. I cannot access these. If I cannot finds a key or a password on these, I do not believe that I can on yours. Dave was smarter than I was in some ways. He broke his wallets into many 50BTC sized addresses. I left several large addresses that are not easy to move without making the world notice.

Dave estate is only worth 12 million IF you want to cash out right now.

IF you stay, you get the value AND the shares.

I will list these in coming years and THEN they are worth more.

"Craig's worth valued at $500 million"

606

There is a trust as I noted. Less than 200,000 Bitcoin remain. We need 100,000 to make the bank idea work. I cannot touch these yet even if I want to. And right now, I do. That stated, I will not move more now in any event. Dave held more and MtGox held some. I see both those sources as lost. Dave's drives are a one day possible. Each year, it is possible to crack more than double the key length that was previously possible. What I know of Dave's passwords places them at around 80 bits. We can expect them to be worth trying to crack in 10-12 years. Spending the next 5 years on this is going to cover 5-10% of the possibilities at a large cost. This is how crypto works.

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.

- Intellectual Property, design, codes etc

- Research claims

If we reinvest the Research rebates, we get 45% back in the following year. The program has been approved for three years and locked in using an advance finding. This means, if we take the existing spend, we will get the following each October:

- 2014    $12 million base

- 2015    $12 million base plus the 45% from 2014 reinvested = 17.4 million

- 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million

That comes to around $50 million cash over three years. Of this, I will drive 30 million back into the company and leave the last return as a wait and see if this all fails.

In 2016, Dave's estate gets 8 Million PLUS still has a share of the company.

IF you want, I will arrange that you can pull out. In this case, the following occurs:

- 2014    $12 million base – 4 million to Dave's Estate  after costs plus 4 million from share sale (well I will try).

- 2015    $12 million base plus the 45% from 2014 remaining million reinvested = 17.4 million and 4 million to Dave's Estate  after costs.

- 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million with 4 million to Dave's Estate  after costs.

Here, in 2014, 2015 and 2016 the estate gets $4 million a year, but that is it.

If you do the latter option – I will raise funds to cover the shortfall using your shares, so I end in the same position expenditure wise.

607

You can be a part of it and get paid. I offered this already.

You are talking of greed to me. Right now, I have told you that you can cash out at 4 million a year for three years or see where this goes and have a payment of over 8 million plus a large share of what will be a listed company. That is with risk. 12 Million without.

W&K used my software to fund everything.

If you think I will give up the software I have received from this and pull what Dave and I have worked years to put together you are mad. I will make this open source before I end it. If that happens, nobody makes anything. Not me, not you , no one.

I am working on this no matter what. The amounts are locked in ONLY because of Dave. He wanted certainty. He wanted to make sure we had something now. I did this and have structured it so that we have this money now. We did this early and the increase in BTC has been a loss really.

The software (including banking software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116.

IF Dave and I did not start this when we did and waited 6 months (not that Dave could have) we could have used 10% of the Bitcoin we held to do this. So, NO I will not move more now. If you get access to Dave's drives, then you can move those. I am not in a rush. In the next few months, the company will get money in AUD$ and I will STILL not be taking it other than to repay bills used in this process.

When Dave and I planned this, the ENTIRE holding, his, mine and that in trust was worth 20 million.

What Craig is worth in 10 years is up in the air, but I WILL drive 99% of this (my share) back into the project. What you do is your choice. I will negotiate this, I will allow you to work with it as Dave's heir, but I WILL NOT give it up.

So Ira, the simple thing is do you want to be a part of it or to be paid out. I have spent the money. If you want, fight me and have a copy of software that will be of little use without the parts we have completed since.

ALL I have is in this. EVERYTHING. If you want to not be a part, then I will provide Dave's estate with its due. If you want to be a small part, then be a small part, if you want to be all in, then work as if you are.

There are no other options. Unless you can access Dave's drive, then the BTC Dave held remain locked away. The ones I spent in doing this are spent and there is NO way to unspend them. The ones in trust are there for a purpose

608

and I selected a jurisdiction that cannot be forced to give them over. Not even if the US government tries to make me.

So, as I have been saying, do you want to be a part of this? This is either as a silent shareholder or as a director. I have offered both. Or do you want to argue the point? There is no more to get and if you know my history, I will make sure that everything ends up completely worthless before I lose what I am doing.

Ave did not want to ta $4million a year from this. He wanted something to live on. He never asked for more. I am not taking that much, but that is YOUR choice. There are options, but one thing I will not do is give over the software or end this.

Dave bullshitted me about how he was doing and worked himself ragged. He lied to me about what he needed. There is NO WAY that I am stopping this now. I owe this to Dave and I will NOT give it up even to make Ramona's life simpler and I love her.

So, do you wan to know more and be involved or do you want to argue it and I will end up making it completely open source if I lose and then in place of the share I agreed with Dave you can have 100% of $0.

Craig

**From:** Ira K [mailto:█████████████████]
**Sent:** Wednesday, 23 April 2014 3:38 PM

**To:** Craig Wright
**Subject:** Re: Questions

Please explain to me what is stopping you from selling some?

Just because you think it will be worth trillions?

On Wed, Apr 23, 2014 at 1:37 AM, Ira K █████████████████ wrote:

It's not a matter of not believing in your abilities.  I absolutely do.

But that doesn't mean something shouldn't be taken off the table.

Just like trading stocks, you have to know when to take a profit

and let the rest ride.  No need for all eggs in one basket.

On Wed, Apr 23, 2014 at 1:33 AM, Craig Wright <craig@rcjbr.org> wrote:

And yes. Worst case

609

On 23/04/2014 3:31 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮ wrote:

I am trying.  But from what I understand so far, you are placing his value

in a gambled situation and worst case scenario, 12 million?


On Wed, Apr 23, 2014 at 1:28 AM, Craig Wright <craig@rcjbr.org> wrote:

Before you go off on rash paths.... Try ans understand what. Is therre

On 23/04/2014 3:24 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮ wrote:

54k of coins could be mined in a few months with your operation if you still have it running.

Or your new venture's success will recoup this payment.


On Wed, Apr 23, 2014 at 1:20 AM, Ira K ▮▮▮▮▮▮▮▮▮▮ wrote:

I don't understand your hesitancy.  You know he was worth the amount I am asking.


On Wed, Apr 23, 2014 at 1:19 AM, Ira K ▮▮▮▮▮▮▮▮▮▮ wrote:

I told you, I don't want to end up on the same sword as Dave.

He had faith.  It doesn't always pan out.


On Wed, Apr 23, 2014 at 1:18 AM, Craig Wright <craig@rcjbr.org> wrote:

Then have faith

On 23/04/2014 3:17 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮ wrote:

He is worth more than that.


On Wed, Apr 23, 2014 at 1:16 AM, Craig Wright <craig@rcjbr.org> wrote:

Then take the 12 million and go

On 23/04/2014 3:12 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮ wrote:

Look where it got Dave by holding on for too long.

Timing is Everything.


On Wed, Apr 23, 2014 at 1:11 AM, Craig Wright <craig@rcjbr.org> wrote:

We locked them into cash payment s

On 23/04/2014 3:09 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮ wrote:

I simply want the fair share that Dave earned.

You told me you guys had 1 million bitcoins between you.

610

I was only asking for 54,910. and you could keep all

his drives which may contain more.

On Wed, Apr 23, 2014 at 1:04 AM, Craig S Wright <craig@rcjbr.org> wrote:

Would you prefer to know what you own or to argue it

You want assets list, balance sheets etc, then ask. You ARE a major shareholder.

You want to be a director and know it intimately – ask I have offered

You want to pull out – then do so and I will pay you out based on what Dave and I had been arranging.

If you want to stay, then do so and come to know more of what Dave and I did.

**From:** Ira K [mailto███████████████████]
**Sent:** Wednesday, 23 April 2014 2:56 PM

**To:** Craig S Wright
**Subject:** Re: Questions

"You have the 40% of the refunds – I get any upside."

Can you explain that to me?

On Wed, Apr 23, 2014 at 12:54 AM, Craig S Wright <craig@rcjbr.org> wrote:

In 10 years I believe this will be 100 times bigger.

But I am serious, if you want to cash out, I will arrange something on the cash

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:54 PM

**To:** Craig S Wright
**Subject:** Re: Questions

611

Why not take some off the table?

On Wed, Apr 23, 2014 at 12:53 AM, Craig S Wright <craig@rcjbr.org> wrote:

You agree to that – I will have the lawyers draft something for you to have reviewed

I have NOT cashed out

I will not

**From:** Ira K [mailto:█████████████]
**Sent:** Wednesday, 23 April 2014 2:51 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I am open to arranging distribution of 10 million a year for 3 years,

but not through a new untested business that you just stated "worst

case scenarios 4 million".

On Wed, Apr 23, 2014 at 12:48 AM, Craig S Wright <craig@rcjbr.org> wrote:

This is WHY wed the software transfer!

It locked in payments starting in Oct this year of 10 million a year for 3 years – get it now!

That was Dave – his idea

We turn the BTC into R&D grants as cash!

YOU ARE his estate – I have added you!

**From:** Ira K [mailto:█████████████]
**Sent:** Wednesday, 23 April 2014 2:47 PM

**To:** Craig S Wright
**Subject:** Re: Questions

612

Dave would prefer to lock in secured gains that have already been made.


On Wed, Apr 23, 2014 at 12:46 AM, Ira K <████████████> wrote:

There could be a new alternate crypto-currency that comes out and steals the thunder from Bitcoin

and the new business goes bankrupt.


On Wed, Apr 23, 2014 at 12:44 AM, Ira K <████████████> wrote:

It wouldn't matter if I had 100%.  What if the business doesn't fly?


On Wed, Apr 23, 2014 at 12:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira – look at the balance sheet – you have 40% of the total worth in it


Do you get that?


NOT 10%


**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:41 PM

**To:** Craig S Wright
**Subject:** Re: Questions


I understand, but that is water under the bridge.  We can't do anything about that now.

But we can provide his estate with fair compensation for his assistance.  If he was

50% partner, or even 33% partner.. he would deserve more than 10% in a unproven

business and undisclosed coins.


On Wed, Apr 23, 2014 at 12:38 AM, Craig S Wright <craig@rcjbr.org> wrote:

One issue that you have been fed half-truths on.


And yes, there is a lot that is messy from the time. I had no idea Dave was as sick as he was. He told me he was on top of it all. I believed him.

613

He said it was just a small operation and he would be up again soon, that we would present a paper in June that year. So, yes, lots that was missed.

**From:** Ira K [mailto:████████████████]
**Sent:** Wednesday, 23 April 2014 2:35 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Like I said, that is just one issue.. there are so many more.

On Wed, Apr 23, 2014 at 12:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Check:

- Otto

- Otto Maurer

It is the font

Mine is an image

All that makes it a signature is PGP

**From:** Ira K [mailto:████████████████]
**Sent:** Wednesday, 23 April 2014 2:30 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't matter if you create a new font from scratch that looks exactly like the one on the contract.

Each contract has signatures with variations.  It is crystal clear to see.

On Wed, Apr 23, 2014 at 12:23 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will need to dig through old emails and documents, but I can show it is a PDF type font.

614

http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/adobe-acrobat-xi-esign-pdf-file-tutorial-ue.pdf

That will take time and I will need to look up what font was in there when Dave did this. I will also dig up the PGP signature for you. Dave's public key is out there on the web if you want to validate it.

I assume you know that Dave would not give ANYONE his private key – that includes me.

Andrew is a partner at Clayton Utz. I do not believe he will lie- for all people say about lawyers (sorry Andrew). Ask him – he has received the PGP singed versions.

http://www.claytonutz.com/

I will put all this together for you by the weekend. I will show the font (as noted I need to check what it was as I do not know what Dave's system defaulted to. I am really sorry you have been lead to believe this is something more than it was, but will this help?

Craig

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:15 PM
**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't look like a type font.

There are 2 seperate contracts with the same style handwriting, but with slight variations.

On Wed, Apr 23, 2014 at 12:13 AM, Craig S Wright <craig@rcjbr.org> wrote:

Yes.

The PGP key is the signature.

The PDF just adds it.

615

**From:** Ira K [mailto:█████████████ ]
**Sent:** Wednesday, 23 April 2014 2:10 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Are you saying that the signature was just computer generated, a type font?

Ira

On Wed, Apr 23, 2014 at 12:05 AM, Craig S Wright <craig@rcjbr.org> wrote:

The document was signed using PGP. That is the digital signature. The other was a PDF thing that gets applied. It was and never was handwritten. The signature is the PGP signing.

Dave's interest is in founder shares in Coin-Exch.

The sale of the software and its use leads to an Research & Development refund into the company. Coin-Exch receives the moved the software and uses it for an R&D claim. That is why it was done. This is 45% of the expense.

That is what is obtained from this. That is what the ATO do not like.

Craig

**From:** Ira K [mailto:█████████████ ]
**Sent:** Wednesday, 23 April 2014 1:59 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

It's not about information that they fed me.  It's about contracts that you signed and agreements that don't seem logical.

I don't understand why Dave would make that agreement with you for a business divorce.  Why would a successful partnership suddenly seperate and leave one partner with everything of accountable value and the other(Dave) with only 10% in a future venture and a undisclosed amount of Bitcoins?  And the contract (CEWK01 and CEWK03) is signed the same month of his death and without his real signature.  Nor do I believe it to be a digital signature.

It doesn't even come close to his handwriting  That is obviously a females signature.   Things just don't make sense.

Ira

On Tue, Apr 22, 2014 at 11:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

Dave died. I did the actions to make sure that the court signed off on what Dave and I planned.

The reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed.

"I thought you appreciated Dave's contribution. "

More than I could express. This was not about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did that action as accountants etc advised it was necessary.

I think they have mislead you as to what this is about. There is no GST (tax) on the software Dave transferred, but it is being used by the ATO as an excuse to try and not pay other amounts that are owed.

Craig

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 1:37 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

The information I have to work with is what you have told me and the documents from the ATO office.

From those documents it appears clear to see a systematic transfer of assets out of W&K back to you.

Up until April 15 I was a complete believer in what you were telling me.  But you never mentioned

any of the actions you were taking against W&K prior to contacting us.

We could start by going step by step through the questionaire the ATO sent me.  But I really didn't think

you would want to get into those details.  I thought you appreciated Dave's contribution.  Helping you

get the government funding to start it all, etc.

617

If you have more information that I'm missing you are more than welcome to email it to me.


Regards,

Ira




On Tue, Apr 22, 2014 at 11:02 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been told, but I think there is a need to go into detail.


Andrew (CC'd) is a tax partner with Clayton Utz. I am happy for you to ask him anything. This is permission for that. I am sure he will give better truth than the tax office. At least more of it and without filtering things.


Dave signed electronically. I have not ever stated that these are his. If I had wanted to do that I would have dug up copies from the old company filings. The ATO and the court had the digitally signed documents. There is a wrapper as the signature.


Dave held his BTC, not me for him.


I do not know what Dave's resignation is. You mention a resignation, I do not know of one. I know what we planned – I  not know all of what was occurring in WK.



Craig



**From:** Ira K [mailto███████████████]
**Sent:** Wednesday, 23 April 2014 11:49 AM

618

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

Just as Dave believed in your vision and abilities, I share that

same belief.   There is no doubt in my mind that you are capable of

achieving the goals you have set.  And I am still in awe of your brilliance.

However, since receiving the documents from the ATO and spending more time

reviewing them, I feel like there are questionable discrepancies in the

contracts between you and W&K such as Dave's signatures, his resignation,

transfer of all accountable value, Uyen's role of Director, BAA projects, etc.

No need to go into details.

I can understand how you may have felt pressured to take actions to secure

the business you and Dave started.  And the last thing I want to do is

stifle the growth of it.  But I do believe we need to remedy the lopsided

contractual exchange.

As the Executor for the Estate of the Director at W&K I propose we

reach an agreement that Dave himself would approve.

Good sir, my request equates to peace and prosperity for all:

1. Return 17% of the 323k bitcoins to Dave's estate.

2. Retain only half our current holdings in Coin-Exch.

3. Remain friends that avoid all taxing troubles henceforth.

And I would still welcome you to attempt gaining access to Dave's drives.

If you are able to find his bitcoin files I would gladly give you half

and invest Dave's other half into your new business.

Sincerely,

Ira

619

On Tue, Apr 15, 2014 at 9:41 PM, Ira K <███████████████████████> wrote:

Sure, that sounds good to me.

Thanks.

On Tue, Apr 15, 2014 at 9:28 PM, Craig S Wright <craig@rcjbr.org> wrote:

I would love you to be involved.

How about we add you once we get the tax audit out of the way and also get directors insurance for you?

**From:** Ira K [mailto:████████████████████]
**Sent:** Wednesday, 16 April 2014 11:17 AM

**To:** Craig S Wright
**Subject:** Re: Questions

Honestly I don't know.  I'm not sure what obligations must be met as a director?

If it jallows me to follow what's going on in the business, that would be interesting.

But if you feel it's in my best interest not to be involved with it because it might expose

me to legal liablilities, then I will certainly understand.

Thanks,

Ira

On Tue, Apr 15, 2014 at 8:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Hi Andrew,

Can you help Ira with this please.

It is hostile everywhere right now. That stated, Dave

...

[Message clipped]

# TAB 83-21

# EXHIBIT 21

**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

Science and Technology

March 22, 2018

**SENT VIA E-MAIL TO:  kroche@BSFLLP.com**

Kyle Roche
Boies Schiller Flexner LLP
333 Main Street
Armonk, NY 10504

Re:  **2018-STFO-00106**

Dear Mr. Roche:

This is the electronic final response to your March 12, 2018, Freedom of Information Act
(FOIA) request to the Department of Homeland Security (DHS) Science and Technology
Directorate (S&T) for copies of any documentation you have pertaining to the project
proposal listed below:
Company name: W&K Info Defense Research
Company owner: Dave Kleiman
Project: BAA 11-02-TTA 14-0025
Software Assurance MarketPlace (SWAMP)
Division/Agency: The Department of Homeland Security (DHS) Science;
Technology (S&T) Homeland Security Advanced Research Projects Agency
(HSARPA); and The Office of Intelligence and Analysis (I&A)
Please limit your search of the above to the period of January 1, 2011 through December
31, 2012.
This office received your request on March 13, 2018.

In responding to a FOIA request, DHS/S&T will search for responsive documents in its
control on the date the search began.  We began our search on March 16, 2018.  A search
of the Homeland Security Advanced Research Projects Agency, Cyber Security Division
of the Department of Homeland Security (DHS) Science and Technology Directorate
(S&T) for documents responsive to your request produced a total of 2 pages.

The Office of Intelligence and Analysis is not part of the Science and Technology
Directorate.

We are granting your request under FOIA, 5 U.S.C. § 552, and DHS FOIA regulations at
6 C.F.R. Part 5.  After carefully reviewing the responsive documents, I determined that

623

they are appropriate for public release.  The documents are enclosed in their entirety; DHS S&T has claimed no deletions or exemptions.

Provisions of FOIA allow DHS to charge for processing fees, up to $25, unless you seek a waiver of fees.  In this instance, because the cost is below the $25 minimum, there is no charge.

If you need any further assistance or would like to discuss any aspect of your request, please contact the analyst below who processed your request and refer to **2018-STFO-00106**.  You may send an e-mail to stfoia@hq.dhs.gov, call 202-254-5700, or you may contact our FOIA Public Liaison in the same manner.

Sincerely,

*Sally Harris*

Sally Harris

Enclosure(s):  2 letters, 2 pages

**www.dhs.gov**

624



U.S. Department of Homeland Security
Science & Technology Directorate
Washington, DC 20528

May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN: Dave Kleiman
4371 Norhtlake Blvd #314 Palm Beach, FL 33410-6253

Subject: Notification Regarding BAA 11-02-TTA 14-0025-WP

Dear Dave Kleiman:

This letter is in reference to the subject White Paper submitted in response to the Department of Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set forth in BAA 11-02. Based on this review, it has been determined DHS is not interested in pursuing the technology development described in the submitted White Paper. As a result, you are not invited to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written request to STCyberSecurityBAA@dhs.gov. The request must be received within three calendar days of the date of this letter in order to be considered. Ensure all pertinent point of contact information is included in your request, including the following:

    White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
    Name of and location of entity submitting request
    Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02. Your efforts to propose novel solutions to meet the technical challenges required to keep our homeland secure are very much appreciated. I would like to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov, and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide opportunities for prospective offerors to propose solutions to our many needs.

Sincerely,

Cherita Thomas

Cherita Thomas
Contracting Officer, DHS
Office of Procurement Operations
Science & Technology Acquisition Division

625

**U.S. Department of Homeland Security**
Washington, DC 20528



July 25, 2017

**SENT BY ELECTRONIC MAIL TO:  bluetap22@gmail.com**

Mr. Ira Kleiman
155 Bent Tree Drive
Palm Beach Gardens, Florida 33418

Re:  **2017-STFO-00078**

Dear Mr, Kleiman:

This is the electronic final response to your Freedom of Information Act (FOIA) request
to the Department of Homeland Security (DHS) Science and Technology Directorate
(S&T), dated July 13, 2017, and received by this office on July 13, 2017.  You are
seeking copies of the following records:

-   BAA 11-02-TTA 01-0127-WP:  TTA 01
Software Assurance through Economic Measures - $650,000

-   BAA 11-02-TTA 05-0155-WP: TTA 05
Secure Resilient Systems and Networks - $1,800,000

-   BAA 11-02-TTA 09-0049-WP: TTA 09
Cyber Economics -  $2,200,000

A search of the Cyber Security Division for documents responsive to your request
produced a total of three pages.  Of those pages, I have determined that no (0) pages of
the records are releasable in their entirety, all (3) pages are partially releasable, and no (0)
pages are withheld in their entirety pursuant to Title 5 U.S.C. § 552 (b)(6).

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files
the release of which would cause a clearly unwarranted invasion of personal privacy.
This requires a balancing of the public's right to disclosure against the individual's right
privacy.  In the present instance, a DHS Contracting Officer's signature was redacted as it
constitutes Personally-Identifiable Information (PII).  The privacy interests in that
individual's signature outweighs any minimal public interest in disclosure of the

information.  Any private interest you may have in that information does not factor into the aforementioned balancing test.

You have a right to appeal the above withholding determination.  Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter, to:  Privacy Office, Attn: FOIA Appeals, U.S. Department of Homeland Security, 245 Murray Lane, SW, Mail Stop 0655, Washington, D.C. 20528-0655, following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.8. Your envelope and letter should be marked "FOIA Appeal."  Copies of the FOIA and DHS FOIA regulations are available at www.dhs.gov/foia.

Provisions of FOIA allow DHS to charge for processing fees, up to $25, unless you seek a waiver of fees. In this instance, because the cost is below the $25 minimum, there is no charge.

If you need any further assistance or would like to discuss any aspect of your request, please contact the analyst below who processed your request and refer to **2017-STFO-00078**.  You may send an e-mail to stfoia@hq.dhs.gov, call 202-254-5700, or you may contact our FOIA Public Liaison in the same manner.

Additionally, you have a right to right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation.  If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.  You may contact OGIS as follows:  Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

*Gina Goldblatt*

Gina Goldblatt
FOIA Officer (Acting)


Enclosures: Responsive Record, 3 pages
                   Inventory Sheet, 1 page

**U.S. Department of Homeland Security**
**Science & Technology Directorate**
Washington, DC 20528



May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN:  Craig S. Wright
4371 Norhtlake Blvd #314 Palm Beach,  FL 33410-6253

Subject:  Notification Regarding BAA 11-02-TTA 01-0127-WP

Dear Craig S. Wright:

This letter is in reference to the subject White Paper submitted in response to the Department of
Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency
Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities
website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set
forth in BAA 11-02.  Based on this review, it has been determined DHS is not interested in pursuing
the technology development described in the submitted White Paper.  As a result, you are not invited
to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written
request to STCyberSecurityBAA@dhs.gov.  The request must be received within three calendar
days of the date of this letter in order to be considered. Ensure all pertinent point of contact
information is included in your request, including the following:

    White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
    Name of and location of entity submitting request
    Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02.  Your efforts to propose novel solutions to meet the
technical challenges required to keep our homeland secure are very much appreciated.  I would like
to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the
Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov,
and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide
opportunities for prospective offerors to propose solutions to our many needs.

Sincerely,

(b)(6)

Cherita Thomas
Contracting Officer, DHS
Office of Procurement Operations
Science & Technology Acquisition Division

628

**U.S. Department of Homeland Security**
**Science & Technology Directorate**
Washington, DC 20528



May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN:  Dave Kleiman
4371 Norhtlake Blvd #314 Palm Beach,  FL 33410-6253

Subject:  Notification Regarding BAA 11-02-TTA 05-0155-WP

Dear Dave Kleiman:

This letter is in reference to the subject White Paper submitted in response to the Department of
Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency
Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities
website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set
forth in BAA 11-02.  Based on this review, it has been determined DHS is not interested in pursuing
the technology development described in the submitted White Paper.  As a result, you are not invited
to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written
request to STCyberSecurityBAA@dhs.gov.  The request must be received within three calendar
days of the date of this letter in order to be considered. Ensure all pertinent point of contact
information is included in your request, including the following:

    White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
    Name of and location of entity submitting request
    Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02.  Your efforts to propose novel solutions to meet the
technical challenges required to keep our homeland secure are very much appreciated.  I would like
to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the
Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov,
and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide
opportunities for prospective offerors to propose solutions to our many needs.

                                            Sincerely,

(b)(6)

                        Cherita Thomas
                        Contracting Officer, DHS
                        Office of Procurement Operations
                        Science & Technology Acquisition Division

**U.S. Department of Homeland Security**
**Science & Technology Directorate**
Washington, DC 20528



May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN: Craig S. Wright
4371 Norhtlake Blvd #314 Palm Beach, FL 33410-6253

Subject: Notification Regarding BAA 11-02-TTA 09-0049-WP

Dear Craig S. Wright:

This letter is in reference to the subject White Paper submitted in response to the Department of
Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency
Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities
website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set
forth in BAA 11-02. Based on this review, it has been determined DHS is not interested in pursuing
the technology development described in the submitted White Paper. As a result, you are not invited
to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written
request to STCyberSecurityBAA@dhs.gov. The request must be received within three calendar
days of the date of this letter in order to be considered. Ensure all pertinent point of contact
information is included in your request, including the following:

    White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
    Name of and location of entity submitting request
    Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02. Your efforts to propose novel solutions to meet the
technical challenges required to keep our homeland secure are very much appreciated. I would like
to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the
Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov,
and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide
opportunities for prospective offerors to propose solutions to our many needs.

Sincerely,

(b)(6)

Cherita Thomas
Contracting Officer, DHS
Office of Procurement Operations
Science & Technology Acquisition Division

U.S. Department of Homeland Security
Science and Technology Directorate
Inventory Sheet
2017-STFO-00078

| Document Number | Number of Pages | Name of Document/Description | Document Date | Exemption |
|---|---|---|---|---|
| 1 | 1 | Notification Regarding BAA 11-02-TTA 05-0155-WP | 5/31/2011 | 6 |
| 2 | 1 | Notification Regarding BAA 11-02-TTA 01-0127-WP | 5/31/2011 | 6 |
| 3 | 1 | Notification Regarding BAA 11-02-TTA 09-0049-WP | 5/31/2011 | 6 |

1

631

# TAB 83-22

# EXHIBIT 22

# SUPREME COURT OF NSW

## RECORD OF PROCEEDINGS

Date:            06 November 2013                         Reference no. 2

Coram:           Acting Registrar R Kenna

Listing:         Directions (Common Law Registrar)

Case Details:    **Craig Steven Wright v W&K Info Defense Research LLC
                 2013/00225983**

Appearance(s)    *Wright in person*

**Listed for hearing on** _____ **at 10am. Estimate of hearing** _____

Please indicate the following listing type/s below:

☐ Directions (Common Law Registrar) at 9am

☐ Argument at 9.30am (Defamation List before Defamation Judge)

☐ Defamation matter - Election for Trial by Jury made by _____
   **Registry to issue an invoice for Requisition for Trial by Jury**.

☐ Directions Common Law at 10am (Duty Judge's list.)

☐ Directions (Possession Judge) at 9.30am.

☐ Directions Professional Negligence Judge at 9am (1st Friday of each month)

☐ Status Review at 9am before Common Law Registrar.

☐ Rule 13.6 letter to be issued. (Notice of listing - No appearance)

**(Please tick below appropriately)**

| | |
|---|---|
| ☐ Jury | ☐Overseas witness  ☐ Interstate witness  ☐ Country witness |
| ☐ Non-jury | ☐Not Reached Once |
| ☐ Assessment only | ☐Not Reached Twice |
| ☐ Liability only | ☐New Trial Ordered |
| ☐ Interlocutory/Motion | ☐ Expedited |
| ☐ Defamation - s 7A | ☐Reduced Life Expectancy |
| ☐ Defamation - Final | ☐Other priority reasons (please specify) _____ |
| | *(Transfer of I/P has taken place)* |

**Other orders or directions:**

*Orders 1 - 4 of C/orders.*

_____please turn over …

633

## COMMON LAW REGISTRAR'S CASE MANAGEMENT ORDERS

☐ **1**. Make orders to enable Expert evidence to be given concurrently.

☐ **2**. The Plaintiff to file and serve an Evidentiary Statement by _____

☐ **3**. The Defendant/ Defendants to file and serve a Statement of Issues in Dispute within 28 days of receipt of the Plaintiffs Evidentiary Statement.

☐ **4**. Each Defendant to notify the plaintiff within 28 days of receipt of the evidentiary statement of those parts of the statement, which the Defendant requires to be given orally.

☐ **5**. The Plaintiff is to serve on each party within 14 days of the receipt of the Statement of Issues in Dispute a statement identifying those issues, which are agreed and not agreed.

☐ **6**. The Plaintiff is to file and serve a Statement of Damages by _____

☐ **7**. The Defendant/Defendants is/are to file and serve a Statement of Damages by
_____

☐ **8**. Experts in their respective areas of expertise are to confer and provide a report on matters agreed and disagreed setting out the reasons for their disagreement. Such conference is to take place by
_____

☐ **9**. The report from the Experts is to issue by _____

☐ **10**. Pursuant R31.4 UCPR I direct that the Plaintiff is to serve on each active party a written statement or statements of the oral evidence that the Plaintiff or any other witness on the Plaintiff's behalf intends to adduce in chief on all questions of fact to be decided at the hearing, on or before _____

☐ **11**. Pursuant to R31.4 UCPR I direct that the Defendant /Cross Claimant is to serve on each active party a written statement or statements of the oral evidence that the defendant /cross claimant or any other witness on behalf of the Defendant/Cross Claimant intends to adduce in chief on all questions of fact to be decided at the hearing, on or before _____

☐ **12**. I direct that all parties serve, pursuant to R31.4 UCPR statements except for the above statements on each other active party, containing all statements of the oral evidence which the parties intend to adduce in chief on all questions of fact at the hearing on or before _____

☐ **13**. Parties to advise within _____ days of receipt of the witness statements of those parts of the statements they require to be given orally.

☐ **14**. Parties to file and serve a Final Joint Memorandum of Issues in Dispute by _____

☐ **15**. List the matter for a Telephone Conference on _____

_____

_____

_____

7/6/2017 JusticeLink Web Application

Listing Details

Heard at: **06/11/2013** by: Acting Registrar R Kenna;
**Supreme Court Sydney**
**Supreme Court – Civil**

2013/00225983-001 Acting Registrar R Kenna Directions (Common Law Registrar) Craig Steven Wright v W&K Info Defense Research LLC 09:00 AM 5 MINUTES

## View Outcome Text



| | | | Record Outcome | Edit Outcome | Close |
| --- | --- | --- | --- | --- | --- |

Date of Listing: 06 Nov 2013 before Acting Registrar R Kenna at Supreme Court – Civil, Supreme Court Sydney

Appearances:
W&K Info Defense Research LLC, Defendant , No Appearance
Wright, Craig Steven, Plaintiff , No Appearance

2013/00225983-001 / Statement of Claim: Craig Steven Wright v W&K Info Defense Research LLC /

BY CONSENT
Orders/Judgment:
1. Judgment in the sum of $28,254,666.00 in favour of the plaintiff.
2. No order as to costs.
3. The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.
4. A deed of transfer for the Intellectual Property is to be completed before 01 Sept 2013.
(ID 25837158)

635

Form 43
UCPR 36.11

## JUDGMENT/ORDER

### COURT DETAILS

Court                Supreme Court of NSW
Division             Common Law
List                 Common Law General
Registry             Supreme Court Sydney
Case number          2013/00225983

### TITLE OF PROCEEDINGS

First Plaintiff      Craig Steven Wright

First Defendant      W&K Info Defense Research LLC

### DATE OF JUDGMENT/ORDER

Date made or given   6 November 2013
Date entered         6 November 2013

### TERMS OF JUDGMENT/ORDER

BY CONSENT
Orders/Judgment:
1. Judgment in the sum of $28,254,666.00 in favour of the plaintiff.
2. No order as to costs.
3. The court notes the agreement of the parties that the plaintiff will
accept the transfer of Intellectual property held by the plaintiff in full
and final satisfaction of the judgment.
4. A deed of transfer for the Intellectual Property is to be completed
before 01 Sept 2013.

### SEAL AND SIGNATURE



Signature            N. Langi (l.s.)

If this document was issued by means of the Electronic Case Management System (ECM), pursuant to the Uniform Civil
Procedure Rules (UCPR) 3.7, this document has taken to have been signed if the person's name is printed where his or
her signature would otherwise appear.

Capacity             Chief Clerk
Date                 8 November 2013

NL0009052006

636

## SUPREME COURT OF NSW

## RECORD OF PROCEEDINGS

Date: 06 November 2013 Reference no.

Coram: Acting Registrar R Kenna

Listing: Directions (Common Law Registrar)

Case Details: **Craig Steven Wright v W & K Info Defense Research LLC**
**2013/00245661**

Appearance(s) *Wright in person.*

**Listed for hearing on _____ at 10am. Estimate of hearing _____**

Please indicate the following listing type/s below:

☐ Directions (Common Law Registrar) at 9am

☐ Argument at 9.30am (Defamation List before Defamation Judge)

☐ Defamation matter - Election for Trial by Jury made by _____
   **Registry to issue an invoice for Requisition for Trial by Jury**.

☐ Directions Common Law at 10am (Duty Judge's list.)

☐ Directions (Possession Judge) at 9.30am.

☐ Directions Professional Negligence Judge at 9am (1st Friday of each month)

☐ Status Review at 9am before Common Law Registrar.

☐ Rule 13.6 letter to be issued. (Notice of listing - No appearance)

**(Please tick below appropriately)**
| | |
|---|---|
| ☐ Jury | ☐Overseas witness ☐ Interstate witness ☐ Country witness |
| ☐ Non-jury | ☐Not Reached Once |
| ☐ Assessment only | ☐Not Reached Twice |
| ☐ Liability only | ☐New Trial Ordered |
| ☐ Interlocutory/Motion | ☐ Expedited |
| ☐ Defamation - s 7A | ☐Reduced Life Expectancy |
| ☐ Defamation - Final | ☐Other priority reasons (please specify) |

*(see Aff in 2013/225983) (if transferred)*

**Other orders or directions:**

*Orders 1 - 3 of C/orders*

_____ please turn over ...

| 637 |

## COMMON LAW REGISTRAR'S CASE MANAGEMENT ORDERS

☐ **1.** Make orders to enable Expert evidence to be given concurrently.

☐ **2.** The Plaintiff to file and serve an Evidentiary Statement by _____

☐ **3.** The Defendant/ Defendants to file and serve a Statement of Issues in Dispute within 28 days of receipt of the Plaintiffs Evidentiary Statement.

☐ **4.** Each Defendant to notify the plaintiff within 28 days of receipt of the evidentiary statement of those parts of the statement, which the Defendant requires to be given orally.

☐ **5.** The Plaintiff is to serve on each party within 14 days of the receipt of the Statement of Issues in Dispute a statement identifying those issues, which are agreed and not agreed.

☐ **6.** The Plaintiff is to file and serve a Statement of Damages by _____

☐ **7.** The Defendant/Defendants is/are to file and serve a Statement of Damages by _____

☐ **8.** Experts in their respective areas of expertise are to confer and provide a report on matters agreed and disagreed setting out the reasons for their disagreement. Such conference is to take place by _____

☐ **9.** The report from the Experts is to issue by _____

☐ **10.** Pursuant R31.4 UCPR I direct that the Plaintiff is to serve on each active party a written statement or statements of the oral evidence that the Plaintiff or any other witness on the Plaintiff's behalf intends to adduce in chief on all questions of fact to be decided at the hearing, on or before _____

☐ **11.** Pursuant to R31.4 UCPR I direct that the Defendant /Cross Claimant is to serve on each active party a written statement or statements of the oral evidence that the defendant /cross claimant or any other witness on behalf of the Defendant/Cross Claimant intends to adduce in chief on all questions of fact to be decided at the hearing, on or before _____

☐ **12.** I direct that all parties serve, pursuant to R31.4 UCPR statements except for the above statements on each other active party, containing all statements of the oral evidence which the parties intend to adduce in chief on all questions of fact at the hearing on or before _____

☐ **13.** Parties to advise within _____ days of receipt of the witness statements of those parts of the statements they require to be given orally.

☐ **14.** Parties to file and serve a Final Joint Memorandum of Issues in Dispute by _____

☐ **15.** List the matter for a Telephone Conference on _____

_____

_____

_____

638

7/6/2017                                                JusticeLink Web Application



Listing Details

Heard at: **06/11/2013**                                    by: **Acting Registrar R Kenna;**
        **Supreme Court Sydney**
        **Supreme Court - Civil**

2013/00245661-001   Acting Registrar R Kenna   Directions (Common Law Registrar)   Craig Steven Wright v W & K Info Defense Research LLC   09:00 AM   5 MINUTES

## View Outcome Text

| | Record Outcome | Edit Outcome | Close |

Date of Listing: 06 Nov 2013 before Acting Registrar R Kenna at Supreme Court - Civil, Supreme Court Sydney

Appearances:
W & K Info Defense Research LLC, Defendant , No Appearance
Wright, Craig Steven, Plaintiff , No Appearance

2013/00245661-001 /  Statement of Claim: Craig Steven Wright v W & K Info Defense Research LLC /

BY CONSENT
Orders/Judgment:
1. Judgment in the sum of $28,534,049.79 in favour of the plaintiff.
2. No order as to costs.
3. The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.
(ID 25837259)

639

# TAB 83-23

# EXHIBIT 23



---

## Fw: Re: Dave

---

**Lou K** ██████████████████████                    ████████████████

----- Forwarded Message -----
**From:** Lou K <██████████████>
**To:** "craig.wright@hotwirepe.com" <craig.wright@hotwirepe.com>
**Sent:** Wednesday, February 12, 2014, 3:34:40 PM EST
**Subject:** Re: Dave

Craig:

After reviewing the information you sent , I want to thank you very much.

My home address is: ████████████, West Palm Beach, Florida 33417

I look forward to any information you can give me about my son DAVID. To me,

he was alway's someone special.     Lou Kleiman

On Tuesday, February 11, 2014 6:23 PM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

> Hello Louis,
> Your son Dave and I are two of the three key people behind Bitcoin:
> https://bitcoin.org/
> http://www.motherjones.com/politics/2013/04/what-is-bitcoin-explained
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world:
> http://techcrunch.com/2014/02/10/bitcoin-wins-best-technology-achievement-but-satoshi-doesnt-show/
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA,
> _____
> **Dr. Craig S Wright GSE LLM**
> **Chief Executive Officer**
> **Hotwire Preemptive Intelligence (Group)**
> Mobile: + 61.417.683.914
> craig.wright@hotwirepe.com
> 

641



642

# TAB 83-24

# EXHIBIT 24



---

## Fwd: Questions

---

---------- Forwarded message ----------
From: **Craig S Wright** <craig@rcjbr.org>
Date: Wed, Apr 23, 2014 at 8:56 PM
Subject: RE: Questions
To: Ira K ███████████
Cc: Andrew <asommer@claytonutz.com>

Ira,

Andrew can give you a good idea of the history. The problems we have faced come to knowledge of what we have been doing. The Tax office know that Dave and I have been working on this since 2008.

Next week (Tuesday) I am attending a session to help people at the senior commission/commissioner level in the tax office come to terms with Bitcoin. I have been dragged before the Federal Police to teach them, state police, treasury.

I am being made to know my place.

The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically, the GST (like a Vat) cancels as it is an international transfer. That stated, they can still use it as a means to make sure I am in my place.

The way this is working is,

- WK to me                    International and NO GST (all good)

- ME to company          GST cancels

In this, I have a GST debt, the company has a gain. On the software from WK to Coin-Exch, I have an overall GST debt owed of $3.7 million (give or take). The company gets a return of 3.7 million. The net outcome is zero tax as they cancel.

What the tax office can do is use this and hold payments back to the company. They are trying to fish. They want information that they are not legally entitled to have. So far, they have fabricated documents (and been caught), used half-truths to make it seem as if things are wrong to others and more.

644

One issue they have is that I will be reinvesting all of what I get for now. This means I do not pay taxes as I will be taking the gain and spending it exclusively on deductible areas that will grow the business. I live on an income less than half my staff but it is enough. What does matter is that by doing this, we can create something.

I will send you a timeline of events this weekend.

I do not know what your views are, but you will learn some more of Dave and I. I still do a lot of work with Casinos, Sport Betting and other gaming firms. Some of this is not really legal within the US, hence Panama. Much of that secrecy comes from the fact that the US government would have closed what we did down as well if they could have, gaming would have been a great excuse to kill off Bitcoin. The thing is, it paid the bills. I do not gamble myself at all, but the guys who run these sites pay well and we needed funds.

Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already.

I have told you I would answer anything, but it is perhaps time I start just telling you everything.

Craig

**From:** Ira K [mailto: ████████████████]
**Sent:** Wednesday, 23 April 2014 7:37 PM
**To:** Craig S Wright
**Subject:** Re: Questions

i'd better get some sleep.. it's 5:30am here.

goodnight.

On Wed, Apr 23, 2014 at 5:35 AM, Ira K ██████████████████ wrote:
alright, thank you.

On Wed, Apr 23, 2014 at 5:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira, when I offered to tell you everything and involve you, I was serious.

I have told the solicitor (attorney) that you are able to ask anything. I do mean that.

Not just half-truths that others with agendas will state, but ANYTHING.

**From:** Ira K [mailto:▓▓▓▓▓▓▓▓▓▓▓]
**Sent:** Wednesday, 23 April 2014 7:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions


alright, thanks for explaining things.


On Wed, Apr 23, 2014 at 5:31 AM, Craig S Wright <craig@rcjbr.org> wrote:

You will have it in the morning.


**From:** Ira K [mailto:▓▓▓▓▓▓▓▓▓▓▓]
**Sent:** Wednesday, 23 April 2014 7:30 PM
**To:** Craig S Wright
**Subject:** Re: Questions


yes, thanks.


On Wed, Apr 23, 2014 at 5:29 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will put a spread sheet together that lets you see the impact of taking money early vs later tomorrow if this is OK?


Yearly amounts

500k, 1mill,… ,4 million.


**From:** Ira K [mailto:▓▓▓▓▓▓▓▓▓▓▓]
**Sent:** Wednesday, 23 April 2014 7:20 PM
**To:** Craig S Wright
**Subject:** Re: Questions


Would it be possilbe to sell just 1 year of my holdings and keep the rest?


On Wed, Apr 23, 2014 at 5:15 AM, Craig S Wright <craig@rcjbr.org> wrote:

And if it does work (and I believe it will) we change the world in a manner that has not been seen for a long time – even more than the Internet


**From:** Ira K [mailto:▓▓▓▓▓▓▓▓▓▓▓]
**Sent:** Wednesday, 23 April 2014 7:05 PM
**To:** Craig S Wright
**Subject:** Re: Questions

646

If I stay the course Dave's estate is guaranteed 8 million in 2016?

or is that with risk?

On Wed, Apr 23, 2014 at 4:58 AM, Craig S Wright <craig@rcjbr.org> wrote:

He ran W&K

Uyen only started to help in Dec 2012 and we never completed moving things.

I moved everything in 2011 to Dave as I needed the development to be at "arms length". I could not be directly involved in it

I thought Dave would live forever. I know, a bad error.

**From:** Ira K [mailto:█████████████]
**Sent:** Wednesday, 23 April 2014 6:52 PM
**To:** Craig S Wright
**Subject:** Re: Questions

Why did you choose to let him hold a seperate bitcoin wallet that you didn't have access to?

I thought all these assets belonged to W&K.

On Wed, Apr 23, 2014 at 4:46 AM, Craig S Wright <craig@rcjbr.org> wrote:

Denariuz will license from Coin-Exch.

The license will be paid is shares and the company will be owned by Coin-Exch over time. Trying to do it in a manner that is internationally tax advantageous.

Basically, I am not avoiding tax, but trying to make sure that we create a structure like Google uses to make the amount we pay as small as possible.

**From:** Ira K [mailto:█████████████]
**Sent:** Wednesday, 23 April 2014 6:45 PM
**To:** Craig S Wright
**Subject:** Re: Questions

647

and Denariuz?


On Wed, Apr 23, 2014 at 4:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been led to believe. But I am not trying to take anything from Dave's estate.


The eLearning program is to create a new form of MooC. The idea is to have large scale adaptive learning to the world. Nearly free.


**From:** Ira K [mailto:███████████████████]
**Sent:** Wednesday, 23 April 2014 6:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions


I'm certainly not going to do anything to stifle the growth of the business you and he worked

so hard at.


On Wed, Apr 23, 2014 at 4:14 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I have sold all the BTC that I plan to sell for now. In doing what we wanted to do, Dave and I arranged for the sale or around 500,000 BTC so that we could have access to Core Banking software. The rest that I hold are in trust. The terms of that trust are not met as yet and hence if I was to break it, I would also cause the tax liability to fall and that would result in over 50% of the total being owed in taxes – a result that would drop the price to about nothing and leave nothing. I will not do that. I will not collapse years of work for anyone or anything.


Dave  and I decided to start Coin-Exch so that we could lock in some of the value. When we started planning this, it was late 2012. We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smarter, but we took the option to cash out. That was Dave. If we had waited even 3 months the value would have been 5 times more.


No, I am not doing this as I think it is going to make me a trillionaire. I am working to make a system that is fraud resistant. One that does not allow printing money and fractional reserve banking. No inflation and no federal reserve BS.


If you read the terms of the Judgement from the court, I did not receive Dave's Bitcoin. I accepted the software Dave was developing for me. We had already exchanged this before he died. It is software that I started working on in 2003. Dave completed it for me after we split things up. He did this contracting other people.

648

2/14/2018    Gmail - Re: Questions

I locked in the R&D amounts based on Dave's convincing me that was best. I am willing to take risks far more than him, but to me, this will work or I will die trying.

I thought Dave just wanted to have some time to work less. That he was planning on taking some time off and doing some relaxing and travel. He told me repeatedly that he was fine. He said the VA Hospital was covered as he was a vet. He said that he was all good. He wanted some cash to be able to do some other things he planned and we did talk about the exoframe idea. I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time.

I told him again and again that the wait is worth it. I gave him the figures and stated that he could have sold the amount I would leave him with. I wanted the software. That is what this is and always was about for me. With it, I can complete what I have worked on for 11 years now.

My eggs are not all in one basket. They are now tied to the Research funding as well.

I did the court action to ensure that the value was accepted. Not to force you, the estate etc into giving me anything, but to ensure I had a value against the software that I had received already.

I assume you know nothing of how Dave funded W&K?

I sell myself to gaming companies. I am a security professional, cryptographer and programmer. I wrote software and designed systems that created and became Lasseter's OnLine Casino. I worked with Playboy Casino. I did coding for Centrebet, Sporting Bet, BetLife etc.

In 2010 I gave the source code for a good number of online casinos to Dave. Hence Panama. I put him in contact with the people at Playboy. He used this code to fund the work, research etc.

I have files of Dave's that I cannot access now. These are TrueCrypt partitions. We held backups for the other, but no passwords. I cannot access these. If I cannot finds a key or a password on these, I do not believe that I can on yours. Dave was smarter than I was in some ways. He broke his wallets into many 50BTC sized addresses. I left several large addresses that are not easy to move without making the world notice.

Dave estate is only worth 12 million IF you want to cash out right now.

IF you stay, you get the value AND the shares.

I will list these in coming years and THEN they are worth more.

<span style="color:red">"Craig's worth valued at $500 million"</span>

https://mail.google.com/mail/?ui=2&ik=ccbe4c253f&jsver=eqR4NK8aFo8.en.&view=pt&msg=161928d4dd12fa62&search=inbox&siml=161928d4dd12…    6/21

There is a trust as I noted. Less than 200,000 Bitcoin remain. We need 100,000 to make the bank idea work. I cannot touch these yet even if I want to. And right now, I do. That stated, I will not move more now in any event. Dave held more and MtGox held some. I see both those sources as lost. Dave's drives are a one day possible. Each year, it is possible to crack more than double the key length that was previously possible. What I know of Dave's passwords places them at around 80 bits. We can expect them to be worth trying to crack in 10-12 years. Spending the next 5 years on this is going to cover 5-10% of the possibilities at a large cost. This is how crypto works.

What company owns right now is:

• Software – incl source code and perpetual licenses valued at over $50 million.

• Intellectual Property, design, codes etc

• Research claims

If we reinvest the Research rebates, we get 45% back in the following year. The program has been approved for three years and locked in using an advance finding. This means, if we take the existing spend, we will get the following each October:

• 2014    $12 million base

• 2015    $12 million base plus the 45% from 2014 reinvested = 17.4 million

• 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million

That comes to around $50 million cash over three years. Of this, I will drive 30 million back into the company and leave the last return as a wait and see if this all fails.

In 2016, Dave's estate gets 8 Million PLUS still has a share of the company.

IF you want, I will arrange that you can pull out. In this case, the following occurs:

• 2014    $12 million base – 4 million to Dave's Estate  after costs plus 4 million from share sale (well I will try).

• 2015    $12 million base plus the 45% from 2014 remaining million reinvested = 17.4 million and 4 million to Dave's Estate  after costs.

• 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million with 4 million to Dave's Estate  after costs.

Here, in 2014, 2015 and 2016 the estate gets $4 million a year, but that is it.

If you do the latter option – I will raise funds to cover the shortfall using your shares, so I end in the same position expenditure wise.

650

You can be a part of it and get paid. I offered this already.

You are talking of greed to me. Right now, I have told you that you can cash out at 4 million a year for three years or see where this goes and have a payment of over 8 million plus a large share of what will be a listed company. That is with risk. 12 Million without.

W&K used my software to fund everything.

If you think I will give up the software I have received from this and pull what Dave and I have worked years to put together you are mad. I will make this open source before I end it. If that happens, nobody makes anything. Not me, not you , no one.

I am working on this no matter what. The amounts are locked in ONLY because of Dave. He wanted certainty. He wanted to make sure we had something now. I did this and have structured it so that we have this money now. We did this early and the increase in BTC has been a loss really.

The software (including banking software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116.

IF Dave and I did not start this when we did and waited 6 months (not that Dave could have) we could have used 10% of the Bitcoin we held to do this. So, NO I will not move more now. If you get access to Dave's drives, then you can move those. I am not in a rush. In the next few months, the company will get money in AUD$ and I will STILL not be taking it other than to repay bills used in this process.

When Dave and I planned this, the ENTIRE holding, his, mine and that in trust was worth 20 million.

What Craig is worth in 10 years is up in the air, but I WILL drive 99% of this (my share) back into the project. What you do is your choice. I will negotiate this, I will allow you to work with it as Dave's heir, but I WILL NOT give it up.

So Ira, the simple thing is do you want to be a part of it or to be paid out. I have spent the money. If you want, fight me and have a copy of software that will be of little use without the parts we have completed since.

ALL I have is in this. EVERYTHING. If you want to not be a part, then I will provide Dave's estate with its due. If you want to be a small part, then be a small part, if you want to be all in, then work as if you are.

There are no other options. Unless you can access Dave's drive, then the BTC Dave held remain locked away. The ones I spent in doing this are spent and there is NO way to unspend them. The ones in trust are there for a purpose

651

and I selected a jurisdiction that cannot be forced to give them over. Not even if the US government tries to make me.

So, as I have been saying, do you want to be a part of this? This is either as a silent shareholder or as a director. I have offered both. Or do you want to argue the point? There is no more to get and if you know my history, I will make sure that everything ends up completely worthless before I lose what I am doing.

Ave did not want to ta $4million a year from this. He wanted something to live on. He never asked for more. I am not taking that much, but that is YOUR choice. There are options, but one thing I will not do is give over the software or end this.

Dave bullshitted me about how he was doing and worked himself ragged. He lied to me about what he needed. There is NO WAY that I am stopping this now. I owe this to Dave and I will NOT give it up even to make Ramona's life simpler and I love her.

So, do you wan to know more and be involved or do you want to argue it and I will end up making it completely open source if I lose and then in place of the share I agreed with Dave you can have 100% of $0.

Craig

**From:** Ira K [mailto:███████████████████]
**Sent:** Wednesday, 23 April 2014 3:38 PM

**To:** Craig Wright
**Subject:** Re: Questions

Please explain to me what is stopping you from selling some?

Just because you think it will be worth trillions?

On Wed, Apr 23, 2014 at 1:37 AM, Ira K ████████████████████ wrote:

It's not a matter of not believing in your abilities.  I absolutely do.

But that doesn't mean something shouldn't be taken off the table.

Just like trading stocks, you have to know when to take a profit

and let the rest ride.  No need for all eggs in one basket.

On Wed, Apr 23, 2014 at 1:33 AM, Craig Wright <craig@rcjbr.org> wrote:

And yes. Worst case

On 23/04/2014 3:31 pm, "Ira K" ████████████ wrote:

I am trying.  But from what I understand so far, you are placing his value

in a gambled situation and worst case scenario, 12 million?


On Wed, Apr 23, 2014 at 1:28 AM, Craig Wright <craig@rcjbr.org> wrote:

Before you go off on rash paths.... Try ans understand what. Is therre

On 23/04/2014 3:24 pm, "Ira K" ████████████ wrote:

54k of coins could be mined in a few months with your operation if you still have it running.

Or your new venture's success will recoup this payment.


On Wed, Apr 23, 2014 at 1:20 AM, Ira K ████████████████ wrote:

I don't understand your hesitancy.  You know he was worth the amount I am asking.


On Wed, Apr 23, 2014 at 1:19 AM, Ira K ██████████████ wrote:

I told you, I don't want to end up on the same sword as Dave.

He had faith.  It doesn't always pan out.


On Wed, Apr 23, 2014 at 1:18 AM, Craig Wright <craig@rcjbr.org> wrote:

Then have faith

On 23/04/2014 3:17 pm, "Ira K" ████████████ wrote:

He is worth more than that.


On Wed, Apr 23, 2014 at 1:16 AM, Craig Wright <craig@rcjbr.org> wrote:

Then take the 12 million and go

On 23/04/2014 3:12 pm, "Ira K" ████████████ wrote:

Look where it got Dave by holding on for too long.

Timing is Everything.


On Wed, Apr 23, 2014 at 1:11 AM, Craig Wright <craig@rcjbr.org> wrote:

We locked them into cash payment s

On 23/04/2014 3:09 pm, "Ira K" ████████████ wrote:

I simply want the fair share that Dave earned.

You told me you guys had 1 million bitcoins between you.

653

I was only asking for 54,910. and you could keep all

his drives which may contain more.

On Wed, Apr 23, 2014 at 1:04 AM, Craig S Wright <craig@rcjbr.org> wrote:

Would you prefer to know what you own or to argue it

You want assets list, balance sheets etc, then ask. You ARE a major shareholder.

You want to be a director and know it intimately – ask I have offered

You want to pull out – then do so and I will pay you out based on what Dave and I had been arranging.

If you want to stay, then do so and come to know more of what Dave and I did.

**From:** Ira K [mailto:███████████████████]
**Sent:** Wednesday, 23 April 2014 2:56 PM

**To:** Craig S Wright
**Subject:** Re: Questions

"You have the 40% of the refunds – I get any upside."

Can you explain that to me?

On Wed, Apr 23, 2014 at 12:54 AM, Craig S Wright <craig@rcjbr.org> wrote:

In 10 years I believe this will be 100 times bigger.

But I am serious, if you want to cash out, I will arrange something on the cash

**From:** Ira K [mailto:███████████████████]
**Sent:** Wednesday, 23 April 2014 2:54 PM

**To:** Craig S Wright
**Subject:** Re: Questions

654

Why not take some off the table?

On Wed, Apr 23, 2014 at 12:53 AM, Craig S Wright <craig@rcjbr.org> wrote:

You agree to that – I will have the lawyers draft something for you to have reviewed

I have NOT cashed out

I will not

**From:** Ira K [mailto: ███████████████████ ]
**Sent:** Wednesday, 23 April 2014 2:51 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I am open to arranging distribution of 10 million a year for 3 years,

but not through a new untested business that you just stated "worst

case scenarios 4 million".

On Wed, Apr 23, 2014 at 12:48 AM, Craig S Wright <craig@rcjbr.org> wrote:

This is WHY wed the software transfer!

It locked in payments starting in Oct this year of 10 million a year for 3 years – get it now!

That was Dave – his idea

We turn the BTC into R&D grants as cash!

YOU ARE his estate – I have added you!

**From:** Ira K [mailto: ███████████████████ ]
**Sent:** Wednesday, 23 April 2014 2:47 PM

**To:** Craig S Wright
**Subject:** Re: Questions

655

Dave would prefer to lock in secured gains that have already been made.

On Wed, Apr 23, 2014 at 12:46 AM, Ira K <████████████████> wrote:

There could be a new alternate crypto-currency that comes out and steals the thunder from Bitcoin

and the new business goes bankrupt.

On Wed, Apr 23, 2014 at 12:44 AM, Ira K <████████████████> wrote:

It wouldn't matter if I had 100%.  What if the business doesn't fly?

On Wed, Apr 23, 2014 at 12:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira – look at the balance sheet – you have 40% of the total worth in it

Do you get that?

NOT 10%

**From:** Ira K [mailto:████████████████]
**Sent:** Wednesday, 23 April 2014 2:41 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I understand, but that is water under the bridge.  We can't do anything about that now.

But we can provide his estate with fair compensation for his assistance.  If he was

50% partner, or even 33% partner.. he would deserve more than 10% in a unproven

business and undisclosed coins.

On Wed, Apr 23, 2014 at 12:38 AM, Craig S Wright <craig@rcjbr.org> wrote:

One issue that you have been fed half-truths on.

And yes, there is a lot that is messy from the time. I had no idea Dave was as sick as he was. He told me he was on top of it all. I believed him.

656

He said it was just a small operation and he would be up again soon, that we would present a paper in June that year. So, yes, lots that was missed.

**From:** Ira K [mailto:█████████████████]
**Sent:** Wednesday, 23 April 2014 2:35 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Like I said, that is just one issue.. there are so many more.

On Wed, Apr 23, 2014 at 12:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Check:

- Otto

- Otto Maurer

It is the font

Mine is an image

All that makes it a signature is PGP

**From:** Ira K [mailto:█████████████████]
**Sent:** Wednesday, 23 April 2014 2:30 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't matter if you create a new font from scratch that looks exactly like the one on the contract.

Each contract has signatures with variations.  It is crystal clear to see.

On Wed, Apr 23, 2014 at 12:23 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will need to dig through old emails and documents, but I can show it is a PDF type font.

657

http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/adobe-acrobat-xi-esign-pdf-file-tutorial-ue.pdf

That will take time and I will need to look up what font was in there when Dave did this. I will also dig up the PGP signature for you. Dave's public key is out there on the web if you want to validate it.

I assume you know that Dave would not give ANYONE his private key – that includes me.

Andrew is a partner at Clayton Utz. I do not believe he will lie- for all people say about lawyers (sorry Andrew). Ask him – he has received the PGP singed versions.

http://www.claytonutz.com/

I will put all this together for you by the weekend. I will show the font (as noted I need to check what it was as I do not know what Dave's system defaulted to. I am really sorry you have been lead to believe this is something more than it was, but will this help?

Craig

**From:** Ira K [mailto:████████████████████]
**Sent:** Wednesday, 23 April 2014 2:15 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't look like a type font.

There are 2 seperate contracts with the same style handwriting, but with slight variations.

On Wed, Apr 23, 2014 at 12:13 AM, Craig S Wright <craig@rcjbr.org> wrote:

Yes.

The PGP key is the signature.

The PDF just adds it.

658

**From:** Ira K [mailto███████████████]
**Sent:** Wednesday, 23 April 2014 2:10 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Are you saying that the signature was just computer generated, a type font?

Ira

On Wed, Apr 23, 2014 at 12:05 AM, Craig S Wright <craig@rcjbr.org> wrote:

The document was signed using PGP. That is the digital signature. The other was a PDF thing that gets applied. It was and never was handwritten. The signature is the PGP signing.

Dave's interest is in founder shares in Coin-Exch.

The sale of the software and its use leads to an Research & Development refund into the company. Coin-Exch receives the moved the software and uses it for an R&D claim. That is why it was done. This is 45% of the expense.

That is what is obtained from this. That is what the ATO do not like.

Craig

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 1:59 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

It's not about information that they fed me.  It's about contracts that you signed and agreements that don't seem logical.

I don't understand why Dave would make that agreement with you for a business divorce.  Why would a successful partnership suddenly seperate and leave one partner with everything of accountable value and the other(Dave) with only 10% in a future venture and a undisclosed amount of Bitcoins?  And the contract (CEWK01 and CEWK03) is signed the same month of his death and without his real signature.  Nor do I believe it to be a digital signature.

It doesn't even come close to his handwriting  That is obviously a females signature.   Things just don't make sense.

Ira

On Tue, Apr 22, 2014 at 11:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

Dave died. I did the actions to make sure that the court signed off on what Dave and I planned.

The reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed.

"I thought you appreciated Dave's contribution. "

More than I could express. This was not about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did that action as accountants etc advised it was necessary.

I think they have mislead you as to what this is about. There is no GST (tax) on the software Dave transferred, but it is being used by the ATO as an excuse to try and not pay other amounts that are owed.

Craig

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 1:37 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

The information I have to work with is what you have told me and the documents from the ATO office.

From those documents it appears clear to see a systematic transfer of assets out of W&K back to you.

Up until April 15 I was a complete believer in what you were telling me.  But you never mentioned

any of the actions you were taking against W&K prior to contacting us.

We could start by going step by step through the questionaire the ATO sent me.  But I really didn't think

you would want to get into those details.  I thought you appreciated Dave's contribution.  Helping you

get the government funding to start it all, etc.

660

If you have more information that I'm missing you are more than welcome to email it to me.


Regards,

Ira


On Tue, Apr 22, 2014 at 11:02 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been told, but I think there is a need to go into detail.


Andrew (CC'd) is a tax partner with Clayton Utz. I am happy for you to ask him anything. This is permission for that. I am sure he will give better truth than the tax office. At least more of it and without filtering things.


Dave signed electronically. I have not ever stated that these are his. If I had wanted to do that I would have dug up copies from the old company filings. The ATO and the court had the digitally signed documents. There is a wrapper as the signature.


Dave held his BTC, not me for him.


I do not know what Dave's resignation is. You mention a resignation, I do not know of one. I know what we planned – I  not know all of what was occurring in WK.



Craig


**From:** Ira K [mailto███████████████ ]
**Sent:** Wednesday, 23 April 2014 11:49 AM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

Just as Dave believed in your vision and abilities, I share that

same belief.   There is no doubt in my mind that you are capable of

achieving the goals you have set.  And I am still in awe of your brilliance.

However, since receiving the documents from the ATO and spending more time

reviewing them, I feel like there are questionable discrepancies in the

contracts between you and W&K such as Dave's signatures, his resignation,

transfer of all accountable value, Uyen's role of Director, BAA projects, etc.

No need to go into details.

I can understand how you may have felt pressured to take actions to secure

the business you and Dave started.  And the last thing I want to do is

stifle the growth of it.  But I do believe we need to remedy the lopsided

contractual exchange.

As the Executor for the Estate of the Director at W&K I propose we

reach an agreement that Dave himself would approve.

Good sir, my request equates to peace and prosperity for all:

1. Return 17% of the 323k bitcoins to Dave's estate.

2. Retain only half our current holdings in Coin-Exch.

3. Remain friends that avoid all taxing troubles henceforth.

And I would still welcome you to attempt gaining access to Dave's drives.

If you are able to find his bitcoin files I would gladly give you half

and invest Dave's other half into your new business.

Sincerely,

Ira

662

On Tue, Apr 15, 2014 at 9:41 PM, Ira K <██████████████████> wrote:

Sure, that sounds good to me.


Thanks.


On Tue, Apr 15, 2014 at 9:28 PM, Craig S Wright <craig@rcjbr.org> wrote:

I would love you to be involved.


How about we add you once we get the tax audit out of the way and also get directors insurance for you?


**From:** Ira K [mailto:██████████████████]
**Sent:** Wednesday, 16 April 2014 11:17 AM

**To:** Craig S Wright
**Subject:** Re: Questions


Honestly I don't know.  I'm not sure what obligations must be met as a director?

If it jallows me to follow what's going on in the business, that would be interesting.

But if you feel it's in my best interest not to be involved with it because it might expose

me to legal liablilities, then I will certainly understand.


Thanks,

Ira




On Tue, Apr 15, 2014 at 8:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Hi Andrew,

Can you help Ira with this please.


It is hostile everywhere right now. That stated, Dave

...

[Message clipped]

664

# TAB 83-25

# EXHIBIT 25

## 2014 LIMITED LIABILITY COMPANY REINSTATEMENT

**DOCUMENT# L11000019904**

**FILED**
**Mar 28, 2014**
**Secretary of State**

**Entity Name:** W&K INFO DEFENSE RESEARCH LLC

**Current Principal Place of Business:**

3119 CONTEGO LANE
PALM BEACH GARDENS, FL  33418     US

**New Principal Place of Business:**

3128 MERCED AVE, EL MONTE
EL MONTE
PALM BEACH GARDENS, CA  91733     US

**Current Mailing Address:**

4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL  33410     US

**New Mailing Address:**

3128 MERCED AVE, EL MONTE
EL MONTE
PALM BEACH GARDENS, CA  91733     US

| FEI Number: | FEI Number Applied For ( ) | FEI Number Not Applicable (X) | Certificate of Status Desired (X) |
|---|---|---|---|

**Name and Address of Current Registered Agent:**

KLEIMAN, DAVID A
3119 CONTEGO LANE
PALM BEACH GARDENS, FL  33410     US

**Name and Address of New Registered Agent:**

NGUYEN, UYEN T
4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL  33410     US

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:  UYEN NGUYEN                                        03/28/2014
_____         _____
Electronic Signature of Registered Agent                          Date

**AUTHORIZED PERSONS:**

Title:        MS
Name:       NGUYEN, UYEN T MS
Address:    4371 NORTHLAKE BLVD #314
City-St-Zip:  PALM BEACH GARDENS, FL  33410 US

Title:        DR
Name:       COIN-EXCH PTY LTD
Address:    502 / 32 DELHI RD
City-St-Zip:  NORTH RYDE, NS  02113 AU

I hereby certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am authorized to execute this report as required by Chapter 605, Florida Statues.

SIGNATURE:  UYEN NGUYEN                         MS            03/28/2014
_____         _____
Electronic Signature of Authorized Person                          Date

666

# TAB 83-26

# EXHIBIT 26

## Table of Contents

1. **ASSIGNMENTS** ..................................................................................................... **4**
  1.1 ASSIGNMENT TO THE ASSIGNEE ..................................................................... 4
  1.2 PERFECTION OF ASSIGNMENT .......................................................................... 4
  1.3 WARRANTIES AND CONFIRMATIONS ................................................................ 4
2. **INDEMNITIES** ..................................................................................................... **4**
  2.1 ASSIGNORS INDEMNITY TO ASSIGNEE ............................................................ 4
3. **NOTICES** ............................................................................................................ **5**
  3.1 METHOD OF NOTICE .......................................................................................... 5
  3.2 TIME OF EFFECT OF NOTICE .............................................................................. 5
4. **GENERAL** ............................................................................................................ **5**
  4.1 GENERAL ............................................................................................................ 5
  4.2 VARIATION ......................................................................................................... 5
  4.3 EXERCISE OF RIGHTS ....................................................................................... 5
  4.4 NO IMPLIED WAIVER .......................................................................................... 5
  4.5 ASSIGNMENT ..................................................................................................... 5
  4.6 RELATIONSHIP OF PARTIES ............................................................................... 6
  4.7 SEVERABILITY .................................................................................................... 6
  4.8 ENTIRE AGREEMENT ......................................................................................... 6
  4.9 COUNTERPART ................................................................................................... 6
  4.10 GOVERNING LAW ............................................................................................... 6
5. **DEFINITIONS AND INTERPRETATION** ............................................................. **6**
  5.1 DEFINITIONS ...................................................................................................... 6
  5.2 INTERPRETATION ............................................................................................... 7

© Copyright 2013.




668

# IP DEED OF ASSIGNMENT

This deed is made by:

The Wright Family Trust          ABN 72 433 066 448

DeMorgan       (**Assignor**);

Coin-Exch Pty Ltd        ABN 31 163 338 467

       (**Assignee**);

## Background

(A)   The Assignor owns the Intellectual Property (IP) and Intellectual Property Rights in the Core Technology that has been formally and completely assigned and transferred from Craig Wright R&D (ABN 97 481 146 384).

(B)   The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABN 97 481 146 384) through the following unrelated entities:

    a.   MJF Mining Services WA Pty Ltd (MJF) for Al Baraka

    b.   MJF Mining Services WA Pty Ltd (MJF) for Siemens

    c.   W&K Information Defense Research LLC [as two batches)

(C)   In consideration of benefits granted to the Assignor, the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology.

**Page 7**

    a.   The assignment will be issued as an exclusive four (4) year license for use pending the payment in full (end date).

    b.   On payment in full of the consideration, the license will become an irrevocable assignment of all included property and rights.

    c.   The Assignee may, at their discretion complete the payment of all consideration prior to the end date. At this point the assignment of the exclusive license will become an irrevocable assignment of all included property and rights immediately.

(D)   It is noted that although the contract with W&K Information Defense Research LLC has been executed, the principle died before completion. This has led to the filing of a Statement of Claim (SoC) against this entity for this IP.

    a.   This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case.

    **b.**   The deed may not been invalidated once the judgment has been entered but the assignor can dispute this assignment if the judgment is not forthcoming.

---

© Copyright 2013.            Page 3 of 8



**It is agreed** as follows:

## 1.  ASSIGNMENTS

### 1.1  Assignment to the Assignee

The Assignor confirms for the benefit of the other parties that they have completed, or will complete at the earliest opportunity the irrevocable assignment to the Assignee of:

(a)    all or any existing and future Intellectual Property and Intellectual Property Rights as and from the Assignment Date notwithstanding any deficient action, omission or actual or potential invalidity in any aspect of the Assignment; and

(b)    an exclusive use license for the assignee pending the completion of the payment of consideration; and

(c)    the right to take legal action, seek injunctive relief or to recover damages for any infringement of any Intellectual Property Right occurring prior to the date of this assignment.

### 1.2  Perfection of Assignment

The Assignor:

(a)    irrevocably agrees to transfer absolutely and directly to the Assignee any Intellectual Property and Intellectual Property Rights that has not been fully assigned in accordance with this deed or which later comes within their possession, ownership or control (even if after the date of this deed); and

(b)    until the assignments are fully effected, unconditionally and irrevocably licenses to the Assignee the full use of the Intellectual Property and Intellectual Property Rights without royalty or any other compensation.

### 1.3  Warranties and Confirmations

(a)    The Assignors warrants that as far as it is aware no person has any Intellectual Property Rights in the Core Technology other than as provided for in this deed and that they are not aware of any lawful ground of objection or revocation to those rights.

(b)    The Assignor confirms that it is not entitled to any compensation or other consideration for any of the assignments, other dispositions or transactions contemplated by this deed nor will they seek or claim such compensation or consideration.

## 2.  INDEMNITIES

### 2.1  Assignors indemnity to Assignee

The Assignor individually forever indemnifies the Assignee against any loss including any liability, cost, expense (including legal costs on a full indemnity basis), claim, proceeding, action, demand, damage or expense that the Assignee incurs or suffers which is caused by an alleged infringement of any of the Intellectual Property Rights originally held by that Assignor or the moral rights of that Assignor, or which is actionable for defamation, passing off, unfair competition, breach of confidence, invasion of privacy, or as a result of the Assignor's use of the Intellectual Property before the Assignment Date or otherwise.

670

## 3.    NOTICES

### 3.1    Method of Notice

A notice, consent, information, application or request that must or may be given or made to a party under this deed is only given or made if it is in writing and:

(a)    delivered or posted to that party at its address set out below; or

(b)    faxed to that party at its fax number or emailed to the party's email address set out below.

If a party gives the other party 3 business days' notice of a change of its address, email or fax number, a notice, consent, information, application or request is only given or made by that other party if it is delivered, posted, emailed or faxed to the latest address, email or fax number.

### 3.2    Time of Effect of Notice

A notice, consent, information, application or request is to be treated as given or made at the following time:

(a)    if it is delivered, when it is left at the relevant address;

(b)    if it is sent by post, two business days after it is posted; or

(c)    if it is sent by email or fax, as soon as the sender receives from the sender's fax machine a report of an error free transmission to the correct fax number.

(d)    if a notice, consent, information, application or request is delivered, or an error free transmission report in relation to it is received, after the normal business hours of the party to whom it is sent, it is to be treated as having been given or made at the beginning of the next business day.

## 4.    GENERAL

### 4.1    General

If the day on or by which something is required to be done or may be done is not a business day, that thing must be done on or by the next business day.

### 4.2    Variation

No variation of this deed will be of any force or effect unless it is in writing and signed by the parties to this deed.

### 4.3    Exercise of rights

The fact that either party fails to do, or delays in doing, something the other party is entitled to do under this deed, does not amount to a waiver of that party's right to do it.  A waiver by either party is only effective if it is writing.

### 4.4    No Implied waiver

A written waiver by either party is only effective in relation to the particular obligation or breach in respect of which it is given.  It is not to be taken as an implied waiver of any other obligation or breach; or as an implied waiver of that obligation or breach in relation to any other occasion.

### 4.5    Assignment

671

Neither party may novate, assign or subcontract this deed or any of their obligations under this deed without the prior written consent of the other party. That consent may be given or withheld at a party's absolute discretion.

**4.6    Relationship of parties**

No party has any power or authority to act for or to assume any obligation or responsibility on behalf of another party, to bind another party to any agreement, negotiate or enter into any binding relationship for or on behalf of another party or pledge the credit of another party except as specifically provided in this deed or by express agreement between the parties.

**4.7    Severability**

If a clause or part of a clause of this deed can be read in a way that makes it illegal, unenforceable or invalid, but can also be read in a way that makes it legal, enforceable and valid, it must be read in the latter way. If any clause or part of a clause is illegal, unenforceable or invalid, that clause or part is to be treated as removed from this deed, but the rest of this deed is not affected.

**4.8    Entire Agreement**

This deed contains everything the parties have agreed on in relation to the matters it deals with. No party can rely on an earlier document, or anything said or done by another party, or by a director, officer, agent or employee of that party, before this deed was executed, save as permitted by law.

**4.9    Counterpart**

This deed is properly executed when a party executes either this deed or an identical counterpart and will be binding on that party as regards itself and in favour of each other party when they execute this agreement.

**4.10    Governing Law**

This deed is governed by the laws in force in the State of New South Wales. The parties submit to the exclusive jurisdiction of its courts.

**5.    DEFINITIONS AND INTERPRETATION**

**5.1    Definitions**

In this deed the following definitions apply:

**Assignment Date** means 15 Sept 2013.

Core Technology means:

Core Banking and Exchange Software as held by DeMorgan. This included the source code, compiler code, Machine Language (MASM/NASM), algorithms and manuals. Any and all trademarks, pending patents and other external filings associated with these IP items is included in this bundle:

- Core Banking Software
  - MJF iMal (Source Code)
  - MJF T24 updates and guides



---

© Copyright 2013.

672

○ WK (2)    - Metered Payments system

○ WK (2) - Software Derivative Markets & Information Security Risk Systems

○ WK (2)    - Software Assurance MarketPlace (SWAMP)

An appendix lists the software in further detail.

It is assured for the purpose of this deed that all rights in the WK software will be perfected by the NSW Supreme court.

**Intellectual Property** means all intellectual and technological property of whatever kind including but not limited to all patterns and designs artwork, protocols, patents and formula, compositions, mathematical equations, all processes, application, treatment and methodology, brand names, logos, words and phraseology that are used in the business, all other non-descript material, documents and merchandise, all registrable and non-registrable designs, registered or unregistered patents, trademarks, service marks, know-how, business names and all mental and human thoughts, ideas and intellect relating to the Core Technology.

**Intellectual Property Rights** means all present and future rights, title and interests in and to inventions, know-how, patents, patent applications, registered and unregistered trademarks, service marks, registered and unregistered designs, copyrights, circuit layouts, domain names, internet addresses, computer programs, confidential information, trade secrets, trade or business names and brand names.

**5.2    Interpretation**

In this deed, unless the context otherwise requires:

(a)    a reference to this deed includes any variation or replacement of it;

(b)    the singular includes the plural and vice versa;

(c)    a reference to a person, includes reference to the person's executors, administrators, successors, substitutes and assignees;

(d)    a reference to a person includes a reference to a corporation and vice versa;

(e)    a reference to one gender includes each other gender;

(f)    headings are included for ease of reference only and do not affect the interpretation of this deed; and

(g)    any reference to a statute, regulation, rule or other legislative provision includes any amendment, modification, or re-enactment of legislative provisions substituted for and any statutory instrument issued under that statute, regulation, rule or other legislative provision.

**EXECUTED AS A DEED** on 15 Sept 2013:

Signed by for and on behalf of **Assignor** by
its authorised signatory:

_____    _As Appointor._
Signature of Authorised Signatory

_RAMONA WATTS._
name of Authorised Signatory

Date: 15 Sept 2013

Signed by **Assignee**:

_CRAIG WRIGHT_
Name of Assignee

_____
Witness

Date: 15  Sept 2013

© Copyright 2013.                                  Page 8 of 8

674

# TAB 83-27

# EXHIBIT 27

# DeMorgan

**Wright Family Trust**

# IP Deed of
# Assignment

15 September 2013

© Copyright 2013.                                        Page 1 of 8

**676**

## Table of Contents

1. **ASSIGNMENTS** ........................................................................................................... 4

   1.1   ASSIGNMENT TO THE ASSIGNEE ................................................................... 4

   1.2   PERFECTION OF ASSIGNMENT ..................................................................... 4

   1.3   WARRANTIES AND CONFIRMATIONS ............................................................. 4

2. **INDEMNITIES** ............................................................................................................. 4

   2.1   ASSIGNORS INDEMNITY TO ASSIGNEE ........................................................ 4

3. **NOTICES** ..................................................................................................................... 5

   3.1   METHOD OF NOTICE ..................................................................................... 5

   3.2   TIME OF EFFECT OF NOTICE ......................................................................... 5

4. **GENERAL** ................................................................................................................... 5

   4.1   GENERAL ...................................................................................................... 5

   4.2   VARIATION .................................................................................................... 5

   4.3   EXERCISE OF RIGHTS ................................................................................... 5

   4.4   NO IMPLIED WAIVER ...................................................................................... 5

   4.5   ASSIGNMENT ................................................................................................ 5

   4.6   RELATIONSHIP OF PARTIES .......................................................................... 6

   4.7   SEVERABILITY .............................................................................................. 6

   4.8   ENTIRE AGREEMENT ..................................................................................... 6

   4.9   COUNTERPART ............................................................................................. 6

   4.10  GOVERNING LAW .......................................................................................... 6

5. **DEFINITIONS AND INTERPRETATION** ..................................................................... 6

   5.1   DEFINITIONS ................................................................................................. 6

   5.2   INTERPRETATION .......................................................................................... 7

677

## IP DEED OF ASSIGNMENT

This deed is made by:

The Wright Family Trust                         ABN 72 433 066 448

DeMorgan                    (**Assignor**);


Hotwire Preemptive Intelligence Pty Ltd         ABN 48 164 068 348

                    (**Assignee**);

### Background

(A)     The Assignor owns the Intellectual Property (IP) and Intellectual Property Rights in the Core Technology that has been formally and completely assigned and transferred from Craig Wright R&D (ABN 97 481 146 384).

(B)     The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABN 97 481 146 384) through the following unrelated entities:

   a.  MJF Mining Services WA Pty Ltd (MJF) for Al Baraka

   b.  MJF Mining Services WA Pty Ltd (MJF) for Siemens

   c.  W&K Information Defense Research LLC [as two batches]

(C)     In consideration of benefits granted to the Assignor, the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology.

   a.  The assignment will be issued as an exclusive four (4) year license for use pending the payment in full (end date).

   b.  On payment in full of the consideration, the license will become an irrevocable assignment of all included property and rights.

   c.  The Assignee may, at their discretion complete the payment of all consideration prior to the end date. At this point the assignment of the exclusive license will become an irrevocable assignment of all included property and rights immediately.

(D)     It is noted that although the contract with W&K Information Defense Research LLC has been executed, the principle died before completion. This has led to the filing of a Statement of Claim (SoC) against this entity for this IP.

   a.  This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case.

   **b.**  The deed may not been invalidated once the judgment has been entered but the assignor can dispute this assignment if the judgment is not forthcoming.

**It is agreed** as follows:

## 1.    ASSIGNMENTS

### 1.1    Assignment to the Assignee

The Assignor confirms for the benefit of the other parties that they have completed, or will complete at the earliest opportunity the irrevocable assignment to the Assignee of:

(a)    all or any existing and future Intellectual Property and Intellectual Property Rights as and from the Assignment Date notwithstanding any deficient action, omission or actual or potential invalidity in any aspect of the Assignment; and

(b)    an exclusive use license for the assignee pending the completion of the payment of consideration; and

(c)    the right to take legal action, seek injunctive relief or to recover damages for any infringement of any Intellectual Property Right occurring prior to the date of this assignment.

### 1.2    Perfection of Assignment

The Assignor:

(a)    irrevocably agrees to transfer absolutely and directly to the Assignee any Intellectual Property and Intellectual Property Rights that has not been fully assigned in accordance with this deed or which later comes within their possession, ownership or control (even if after the date of this deed); and

(b)    until the assignments are fully effected, unconditionally and irrevocably licenses to the Assignee the full use of the Intellectual Property and Intellectual Property Rights without royalty or any other compensation.

### 1.3    Warranties and Confirmations

(a)    The Assignors warrants that as far as it is aware no person has any Intellectual Property Rights in the Core Technology other than as provided for in this deed and that they are not aware of any lawful ground of objection or revocation to those rights.

(b)    The Assignor confirms that it is not entitled to any compensation or other consideration for any of the assignments, other dispositions or transactions contemplated by this deed nor will they seek or claim such compensation or consideration.

## 2.    INDEMNITIES

### 2.1    Assignors indemnity to Assignee

The Assignor individually forever indemnifies the Assignee against any loss including any liability, cost, expense (including legal costs on a full indemnity basis), claim, proceeding, action, demand, damage or expense that the Assignee incurs or suffers which is caused by an alleged infringement of any of the Intellectual Property Rights originally held by that Assignor or the moral rights of that Assignor, or which is actionable for defamation, passing off, unfair competition, breach of confidence, invasion of privacy, or as a result of the Assignor's use of the Intellectual Property before the Assignment Date or otherwise.

© Copyright 2013.



## 3. NOTICES

### 3.1 Method of Notice

A notice, consent, information, application or request that must or may be given or made to a party under this deed is only given or made if it is in writing and:

(a)     delivered or posted to that party at its address set out below; or

(b)     faxed to that party at its fax number or emailed to the party's email address set out below.

If a party gives the other party 3 business days' notice of a change of its address, email or fax number, a notice, consent, information, application or request is only given or made by that other party if it is delivered, posted, emailed or faxed to the latest address, email or fax number.

### 3.2 Time of Effect of Notice

A notice, consent, information, application or request is to be treated as given or made at the following time:

(a)     if it is delivered, when it is left at the relevant address;

(b)     if it is sent by post, two business days after it is posted; or

(c)     if it is sent by email or fax, as soon as the sender receives from the sender's fax machine a report of an error free transmission to the correct fax number.

(d)     if a notice, consent, information, application or request is delivered, or an error free transmission report in relation to it is received, after the normal business hours of the party to whom it is sent, it is to be treated as having been given or made at the beginning of the next business day.

## 4. GENERAL

### 4.1 General

If the day on or by which something is required to be done or may be done is not a business day, that thing must be done on or by the next business day.

### 4.2 Variation

No variation of this deed will be of any force or effect unless it is in writing and signed by the parties to this deed.

### 4.3 Exercise of rights

The fact that either party fails to do, or delays in doing, something the other party is entitled to do under this deed, does not amount to a waiver of that party's right to do it. A waiver by either party is only effective if it is writing.

### 4.4 No Implied waiver

A written waiver by either party is only effective in relation to the particular obligation or breach in respect of which it is given. It is not to be taken as an implied waiver of any other obligation or breach; or as an implied waiver of that obligation or breach in relation to any other occasion.

### 4.5 Assignment

© Copyright 2013.                                                          Page 5 of 8

Neither party may novate, assign or subcontract this deed or any of their obligations under this deed without the prior written consent of the other party. That consent may be given or withheld at a party's absolute discretion.

**4.6    Relationship of parties**

No party has any power or authority to act for or to assume any obligation or responsibility on behalf of another party, to bind another party to any agreement, negotiate or enter into any binding relationship for or on behalf of another party or pledge the credit of another party except as specifically provided in this deed or by express agreement between the parties.

**4.7    Severability**

If a clause or part of a clause of this deed can be read in a way that makes it illegal, unenforceable or invalid, but can also be read in a way that makes it legal, enforceable and valid, it must be read in the latter way. If any clause or part of a clause is illegal, unenforceable or invalid, that clause or part is to be treated as removed from this deed, but the rest of this deed is not affected.

**4.8    Entire Agreement**

This deed contains everything the parties have agreed on in relation to the matters it deals with. No party can rely on an earlier document, or anything said or done by another party, or by a director, officer, agent or employee of that party, before this deed was executed, save as permitted by law.

**4.9    Counterpart**

This deed is properly executed when a party executes either this deed or an identical counterpart and will be binding on that party as regards itself and in favour of each other party when they execute this agreement.

**4.10   Governing Law**

This deed is governed by the laws in force in the State of New South Wales. The parties submit to the exclusive jurisdiction of its courts.

## 5.    DEFINITIONS AND INTERPRETATION

**5.1    Definitions**

In this deed the following definitions apply:

**Assignment Date** means 15 Sept 2013.

Core Technology means:

Automation Software as held by DeMorgan. This included the source code, compiler code, Machine Language (MASM/NASM), algorithms and manuals. Any and all trademarks, pending patents and other external filings associated with these IP items is included in this bundle:

- MJF Siemans Control and Operations Suite
- WK (1) - Software Assurance through Economic Measures and Anti-Fraud System

681

- WK (1) - Risk Quantification system (for financial modelling in Bitcoin)

An appendix lists the software in further detail.

It is assured for the purpose of this deed that all rights in the WK software will be perfected by the NSW Supreme court.

**Intellectual Property** means all intellectual and technological property of whatever kind including but not limited to all patterns and designs artwork, protocols, patents and formula, compositions, mathematical equations, all processes, application, treatment and methodology, brand names, logos, words and phraseology that are used in the business, all other non-descript material, documents and merchandise, all registrable and non-registrable designs, registered or unregistered patents, trademarks, service marks, know-how, business names and all mental and human thoughts, ideas and intellect relating to the Core Technology.

**Intellectual Property Rights** means all present and future rights, title and interests in and to inventions, know-how, patents, patent applications, registered and unregistered trademarks, service marks, registered and unregistered designs, copyrights, circuit layouts, domain names, internet addresses, computer programs, confidential information, trade secrets, trade or business names and brand names.

**5.2** **Interpretation**

In this deed, unless the context otherwise requires:

(a)     a reference to this deed includes any variation or replacement of it;

(b)     the singular includes the plural and vice versa;

(c)     a reference to a person, includes reference to the person's executors, administrators, successors, substitutes and assignees;

(d)     a reference to a person includes a reference to a corporation and vice versa;

(e)     a reference to one gender includes each other gender;

(f)     headings are included for ease of reference only and do not affect the interpretation of this deed; and

(g)     any reference to a statute, regulation, rule or other legislative provision includes any amendment, modification, or re-enactment of legislative provisions substituted for and any statutory instrument issued under that statute, regulation, rule or other legislative provision.

682

**EXECUTED AS A DEED** on 15 Sept 2013:

Signed by for and on behalf of **Assignor** by
its authorised signatory:

_____
Signature of Authorised Signatory

CRAIG WRIGHT
_____
name of Authorised Signatory

Date: 15 Sept 2013

Signed by **Assignee**:

_____          Ramona Watts
Name of Assignee

_____
Witness

Date: 15  Sept 2013

683