**22-11150**

# United States Court of Appeals

*for the*

# Eleventh Circuit

———————————•———————————

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME FOUR

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

# TABLE OF CONTENTS

**VOLUME I:**

**TAB DS –** District Court Docket Sheet...................................................... 1

**TAB 1 –** Complaint
    Filed February 14, 2018................................................................. 53

Exhibit to Motion to Dismiss the Complaint
    Filed April 16, 2018:

    **TAB 12-2 –** Exhibit B, Declaration of Craig Wright.................................. 91

**TAB 24 –** Amended Complaint and Jury Demand
    Filed May 14, 2018........................................................................ 97

Exhibit to Motion to Dismiss Amended Complaint
    Filed June 15, 2018:

    **TAB 33-3 –** Exhibit C, Declaration of Craig Wright.............................. 150

**TAB 80 –** Answer to Amended Complaint
    Filed January 10, 2019................................................................. 157

**TAB 83 –** Second Amended Complaint and Jury Demand
    Filed January 14, 2019................................................................. 191

**VOLUME II:**

    **TAB 83-1 –** Exhibit 1 ................................................................. 240

    **TAB 83-2 –** Exhibit 2 ................................................................. 336

    **TAB 83-3 –** Exhibit 3 ................................................................. 341

    **TAB 83-4 –** Exhibit 4 ................................................................. 344

    **TAB 83-5 –** Exhibit 5 ................................................................. 449

## VOLUME III:

**TAB 83-6 –** Exhibit 6 ................................................................. 460

**TAB 83-7 –** Exhibit 7 ................................................................. 463

**TAB 83-8 –** Exhibit 8 ................................................................. 468

**TAB 83-9 –** Exhibit 9 ................................................................. 482

**TAB 83-10 –** Exhibit 10 ............................................................. 494

**TAB 83-11 –** Exhibit 11 ............................................................. 509

**TAB 83-12 –** Exhibit 12 ............................................................. 524

**TAB 83-13 –** Exhibit 13 ............................................................. 566

**TAB 83-14 –** Exhibit 14 ............................................................. 568

**TAB 83-15 –** Exhibit 15 ............................................................. 573

**TAB 83-16 –** Exhibit 16 ............................................................. 583

**TAB 83-17 –** Exhibit 17 ............................................................. 585

**TAB 83-18 –** Exhibit 18 ............................................................. 587

**TAB 83-19 –** Exhibit 19 ............................................................. 595

**TAB 83-20 –** Exhibit 20 ............................................................. 600

**TAB 83-21 –** Exhibit 21 ............................................................. 622

**TAB 83-22 –** Exhibit 22 ............................................................. 632

**TAB 83-23 –** Exhibit 23 ............................................................. 640

**TAB 83-24 –** Exhibit 24 ............................................................. 643

**TAB 83-25 –** Exhibit 25 ............................................................ 665

**TAB 83-26 –** Exhibit 26 ............................................................ 667

**TAB 83-27 –** Exhibit 27 ............................................................ 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 ............................................................ 684

**TAB 83-29 –** Exhibit 29 ............................................................ 693

**TAB 83-30 –** Exhibit 30 ............................................................ 700

**TAB 83-31 –** Exhibit 31 ............................................................ 705

**TAB 83-32 –** Exhibit 32 ............................................................ 707

**TAB 83-33 –** Exhibit 33 ............................................................ 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019 ................................................................ 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019 .................................................................. 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ............................................................ 757

**TAB 144-6 –** Exhibit F ............................................................ 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019 ................................................................... 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019 ................................................................... 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
Filed June 14, 2019 ..................................................................... 780

**TAB 222 –** Redacted Declaration of Craig Wright
Filed June 20, 2019 ..................................................................... 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
Filed July 2, 2019 ........................................................................ 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
Filed July 9, 2019

    **TAB 242-2 –** Exhibit 2 ............................................................... 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
Filed August 15, 2019 ................................................................. 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
Filed August 27, 2019 ................................................................. 816

    **TAB 277-1** – Exhibit 1 ............................................................. 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed November 25, 2019 ............................................................ 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright, 4/4/19
Filed November 26, 2019 ............................................................ 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed December 16, 2019 ............................................................. 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's Motion to Compel
Filed January 10, 2020 ................................................................ 918

iv

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020 Order
      Filed January 14, 2020.................................................................. 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
      Filed May 8, 2020 ....................................................................... 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
      Filed May 18, 2020....................................................................... 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in Limine
      Filed May 22, 2020....................................................................... 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus Motion for Sanctions
      Filed May 27, 2020....................................................................... 991

      **TAB 541-1** – Exhibit 1 .............................................................. 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
      Filed June 2, 2020....................................................................... 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
      Filed June 24, 2020...................................................................... 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
      Filed August 3, 2020

      **TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson, November 8, 2019 .................................................................. 1053

      **TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan, March 17, 2020......................................................................... 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
      Filed September 21, 2020............................................................. 1073

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
     Filed November 18, 2020 ........................................................ 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
     Filed November 20, 2021 ........................................................ 1196

     **TAB 794-1**– Exhibit A ........................................................ 1206

     **TAB 794-2**– Exhibit B ........................................................ 1209

**VOLUME VII:**

     **TAB 794-3**– Exhibit C ........................................................ 1212

**TAB 800-1 –** Court's Instructions to the Jury
     Filed November 22, 2021 ........................................................ 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
     Filed December 16, 2021

     **TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi ........................................................ 1264

     **TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

     **TAB 829-30 –** Exh. P122 – email chain ................................. 1272

     **TAB 829-41 –** Exh. P149 – email chain ................................. 1276

     **TAB 829-48 –** Exh. P161 – email chain ................................. 1278

     **TAB 829-55 –** Exh. P189 – email chain ................................. 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
     Filed December 20, 2021........................................................ 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
Filed December 20, 2021 ............................................................... 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
Filed December 20, 2021 ............................................................... 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
Filed December 20, 2021 ............................................................... 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
Filed December 20, 2021 ............................................................... 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
Filed December 20, 2021 ............................................................... 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
Filed December 20, 2021 ............................................................... 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
Filed January 4, 2022 ................................................................... 1342

    **TAB 861-1** – Exhibit A ......................................................... 1357

    **TAB 861-2** – Exhibit B ......................................................... 1391

    **TAB 861-3** – Exhibit C ......................................................... 1398

    **TAB 861-4** – Exhibit D ......................................................... 1403

    **TAB 861-5** – Exhibit E ......................................................... 1409

    **TAB 861-6** – Exhibit F ......................................................... 1417

    **TAB 861-7** – Exhibit G ......................................................... 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's
Motion for a New Trial
        Filed January 18, 2022.............................................................. 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint
Notice of filing Admitted Exhibits
        Filed January 31, 2022

        **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright,
        August 11, 2014......................................................................... 1446

        Exh. P173 – Transcript of Interview with Craig Wright,
        August 18, 2014......................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint
Notice of filing Admitted Exhibits
        Filed February 17, 2022

        **TAB 885-9 –** Exh. P464 – Redacted email chain .................................... 1538

**TAB 887 –** Order on Motion for New Trial
        Filed February 28, 2022........................................................... 1652

**TAB 889 –** Amended Final Judgment
        Filed March 9, 2022................................................................. 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
        Filed February 24, 2020........................................................... 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 ................................................................ 1673

**TAB 507-1 –** Exhibit 1 .......................................................... 1701

**TAB 507-8 –** Exhibit 8 .......................................................... 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List

Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ....................................................... 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes................................ 1717

Exh. D102 – Excerpt of Progress Notes.................................. 1719

**TAB CS –** Certificate of Service

# TAB 83-28

# EXHIBIT 28



**Wright Family Trust**

# IP Deed of Assignment

15 September 2013





© Copyright 2013.

Page 1 of 8

## Table of Contents

| | | |
|---|---|---|
| 1. | ASSIGNMENTS | 4 |
| 1.1 | ASSIGNMENT TO THE ASSIGNEE | 4 |
| 1.2 | PERFECTION OF ASSIGNMENT | 4 |
| 1.3 | WARRANTIES AND CONFIRMATIONS | 4 |
| 2. | INDEMNITIES | 4 |
| 2.1 | ASSIGNORS INDEMNITY TO ASSIGNEE | 4 |
| 3. | NOTICES | 5 |
| 3.1 | METHOD OF NOTICE | 5 |
| 3.2 | TIME OF EFFECT OF NOTICE | 5 |
| 4. | GENERAL | 5 |
| 4.1 | GENERAL | 5 |
| 4.2 | VARIATION | 5 |
| 4.3 | EXERCISE OF RIGHTS | 5 |
| 4.4 | NO IMPLIED WAIVER | 5 |
| 4.5 | ASSIGNMENT | 5 |
| 4.6 | RELATIONSHIP OF PARTIES | 6 |
| 4.7 | SEVERABILITY | 6 |
| 4.8 | ENTIRE AGREEMENT | 6 |
| 4.9 | COUNTERPART | 6 |
| 4.10 | GOVERNING LAW | 6 |
| 5. | DEFINITIONS AND INTERPRETATION | 6 |
| 5.1 | DEFINITIONS | 6 |
| 5.2 | INTERPRETATION | 7 |




686

## IP DEED OF ASSIGNMENT

This deed is made by:

Craig Wright R&D (for direct assignment to the Assignee) ABN 97 481 146 384

The Wright Family Trust                              ABN 72 433 066 448

DeMorgan                    (**Assignor**);

Cloudcroft Pty Ltd                                  ABN 94 149 732 365

                    (**Assignee**);

## Background

(A)    The Assignor owns the Intellectual Property (IP) and Intellectual Property Rights in the Core Technology that has been formally and completely assigned and transferred from Craig Wright R&D (ABN 97 481 146 384). As this is a direct assignment without a long license term, the assignment is made with DSeMorgan as agent only.

(B)    The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABN 97 481 146 384) through the following unrelated entities:

    a.  MJF Mining Services WA Pty Ltd (MJF) for Al Baraka

    b.  MJF Mining Services WA Pty Ltd (MJF) for Siemens

    c.  W&K Information Defense Research LLC [as two batches]

(C)    In consideration of benefits granted to the Assignor, the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology.

    a.  On payment in full of the consideration, the license will become an irrevocable assignment of all included property and rights.

(D)    It is noted that although the contract with W&K Information Defense Research LLC has been executed, the principle died before completion. This has led to the filing of a Statement of Claim (SoC) against this entity for this IP.

    a.  This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case.

    b.  The deed may not been invalidated once the judgment has been entered but the assignor can dispute this assignment if the judgment is not forthcoming.

687

**It is agreed** as follows:

## 1.  ASSIGNMENTS

### 1.1  Assignment to the Assignee

The Assignor confirms for the benefit of the other parties that they have completed, or will complete at the earliest opportunity the irrevocable assignment to the Assignee of:

(a)  all or any existing and future Intellectual Property and Intellectual Property Rights as and from the Assignment Date notwithstanding any deficient action, omission or actual or potential invalidity in any aspect of the Assignment; and

(b)  an exclusive use license for the assignee pending the completion of the payment of consideration; and

(c)  the right to take legal action, seek injunctive relief or to recover damages for any infringement of any Intellectual Property Right occurring prior to the date of this assignment.

### 1.2  Perfection of Assignment

The Assignor:

(a)  irrevocably agrees to transfer absolutely and directly to the Assignee any Intellectual Property and Intellectual Property Rights that has not been fully assigned in accordance with this deed or which later comes within their possession, ownership or control (even if after the date of this deed); and

(b)  until the assignments are fully effected, unconditionally and irrevocably licenses to the Assignee the full use of the Intellectual Property and Intellectual Property Rights without royalty or any other compensation.

### 1.3  Warranties and Confirmations

(a)  The Assignors warrants that as far as it is aware no person has any Intellectual Property Rights in the Core Technology other than as provided for in this deed and that they are not aware of any lawful ground of objection or revocation to those rights.

(b)  The Assignor confirms that it is not entitled to any compensation or other consideration for any of the assignments, other dispositions or transactions contemplated by this deed nor will they seek or claim such compensation or consideration.

## 2.  INDEMNITIES

### 2.1  Assignors indemnity to Assignee

The Assignor individually forever indemnifies the Assignee against any loss including any liability, cost, expense (including legal costs on a full indemnity basis), claim, proceeding, action, demand, damage or expense that the Assignee incurs or suffers which is caused by an alleged infringement of any of the Intellectual Property Rights originally held by that Assignor or the moral rights of that Assignor, or which is actionable for defamation, passing off, unfair competition, breach of confidence, invasion of privacy, or as a result of the Assignor's use of the Intellectual Property before the Assignment Date or otherwise.

## 3.    NOTICES

### 3.1    Method of Notice

A notice, consent, information, application or request that must or may be given or made to a party under this deed is only given or made if it is in writing and:

(a)    delivered or posted to that party at its address set out below; or

(b)    faxed to that party at its fax number or emailed to the party's email address set out below.

If a party gives the other party 3 business days' notice of a change of its address, email or fax number, a notice, consent, information, application or request is only given or made by that other party if it is delivered, posted, emailed or faxed to the latest address, email or fax number.

### 3.2    Time of Effect of Notice

A notice, consent, information, application or request is to be treated as given or made at the following time:

(a)    if it is delivered, when it is left at the relevant address;

(b)    if it is sent by post, two business days after it is posted; or

(c)    if it is sent by email or fax, as soon as the sender receives from the sender's fax machine a report of an error free transmission to the correct fax number.

(d)    if a notice, consent, information, application or request is delivered, or an error free transmission report in relation to it is received, after the normal business hours of the party to whom it is sent, it is to be treated as having been given or made at the beginning of the next business day.

## 4.    GENERAL

### 4.1    General

If the day on or by which something is required to be done or may be done is not a business day, that thing must be done on or by the next business day.

### 4.2    Variation

No variation of this deed will be of any force or effect unless it is in writing and signed by the parties to this deed.

### 4.3    Exercise of rights

The fact that either party fails to do, or delays in doing, something the other party is entitled to do under this deed, does not amount to a waiver of that party's right to do it. A waiver by either party is only effective if it is writing.

### 4.4    No Implied waiver

A written waiver by either party is only effective in relation to the particular obligation or breach in respect of which it is given. It is not to be taken as an implied waiver of any other obligation or breach; or as an implied waiver of that obligation or breach in relation to any other occasion.

### 4.5    Assignment

© Copyright 2013.

Neither party may novate, assign or subcontract this deed or any of their obligations under this deed without the prior written consent of the other party. That consent may be given or withheld at a party's absolute discretion.

**4.6    Relationship of parties**

No party has any power or authority to act for or to assume any obligation or responsibility on behalf of another party, to bind another party to any agreement, negotiate or enter into any binding relationship for or on behalf of another party or pledge the credit of another party except as specifically provided in this deed or by express agreement between the parties.

**4.7    Severability**

If a clause or part of a clause of this deed can be read in a way that makes it illegal, unenforceable or invalid, but can also be read in a way that makes it legal, enforceable and valid, it must be read in the latter way. If any clause or part of a clause is illegal, unenforceable or invalid, that clause or part is to be treated as removed from this deed, but the rest of this deed is not affected.

**4.8    Entire Agreement**

This deed contains everything the parties have agreed on in relation to the matters it deals with. No party can rely on an earlier document, or anything said or done by another party, or by a director, officer, agent or employee of that party, before this deed was executed, save as permitted by law.

**4.9    Counterpart**

This deed is properly executed when a party executes either this deed or an identical counterpart and will be binding on that party as regards itself and in favour of each other party when they execute this agreement.

**4.10    Governing Law**

This deed is governed by the laws in force in the State of New South Wales. The parties submit to the exclusive jurisdiction of its courts.

## 5.    DEFINITIONS AND INTERPRETATION

**5.1    Definitions**

In this deed the following definitions apply:

**Assignment Date** means 15 Sept 2013.

Core Technology means:

SCADA Software as held by DeMorgan. This included the source code, compiler code, Machine Language (MASM/NASM), algorithms and manuals. Any and all trademarks, pending patents and other external filings associated with these IP items is included in this bundle:

SCADA Software

i.        Siemans Process and Operations Suite

ii.       WK (1) SCADA measurements suite of Software

© Copyright 2013.                                                      Page 6 of 8

An appendix lists the software in further detail.

It is assured for the purpose of this deed that all rights in the WK software will be perfected by the NSW Supreme court.

**Intellectual Property** means all intellectual and technological property of whatever kind including but not limited to all patterns and designs artwork, protocols, patents and formula, compositions, mathematical equations, all processes, application, treatment and methodology, brand names, logos, words and phraseology that are used in the business, all other non-descript material, documents and merchandise, all registrable and non-registrable designs, registered or unregistered patents, trademarks, service marks, know-how, business names and all mental and human thoughts, ideas and intellect relating to the Core Technology.

**Intellectual Property Rights** means all present and future rights, title and interests in and to inventions, know-how, patents, patent applications, registered and unregistered trademarks, service marks, registered and unregistered designs, copyrights, circuit layouts, domain names, internet addresses, computer programs, confidential information, trade secrets, trade or business names and brand names.

**5.2    Interpretation**

In this deed, unless the context otherwise requires:

(a)    a reference to this deed includes any variation or replacement of it;

(b)    the singular includes the plural and vice versa;

(c)    a reference to a person, includes reference to the person's executors, administrators, successors, substitutes and assignees;

(d)    a reference to a person includes a reference to a corporation and vice versa;

(e)    a reference to one gender includes each other gender;

(f)    headings are included for ease of reference only and do not affect the interpretation of this deed; and

(g)    any reference to a statute, regulation, rule or other legislative provision includes any amendment, modification, or re-enactment of legislative provisions substituted for and any statutory instrument issued under that statute, regulation, rule or other legislative provision.

**EXECUTED AS A DEED** on 15 Sept 2013:

Signed by for and on behalf of **Assignor** by
its authorised signatory:

_____
Signature of Authorised Signatory *As Appointor*

_____
name of Authorised Signatory

Date: 15 Sept 2013

Signed by **Assignee**:

_____
Name of Assignee

_____
Witness

Date: 15  Sept 2013

_____
© Copyright 2013.                                    Page 8 of 8

692

# TAB 83-29

# EXHIBIT 29

Case 9:18-cv-80176-BB   Document 93-29   Entered on FLSD Docket 04/16/2019   Page 2 of 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176**

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,

      Plaintiff,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## DECLARATION OF CRAIG WRIGHT

      I, Craig Wright, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

I am over the age of 18, and I am competent to testify.

I give this declaration based on my personal knowledge.

I am a citizen of Australia and Antigua.

I reside in London, England.

I have never been a citizen of the United States or a resident of Florida.

      1.    I have been to Florida only once in my life. Specifically, in approximately March 2009, I attended a cyber-security conference in Orlando where I spoke about information security. I was there for approximately seven days. My attendance at that conference was unrelated to Bitcoin, W&K Info Defense Research LLC ("W&K"), or Dave Kleiman.

      2.    Dave Kleiman was my friend. We first became acquainted in an online forum on cryptography.



Case 9:18-cv-80176-BB   Document 83-29   Entered on FLSD Docket 04/16/2019   Page 2 of 7

3.   I only met Dave in person twice. The first time we met in person was at a cyber security conference in San Diego, California before 2009, which I attended as an invited speaker. My attendance at that conference was unrelated to Bitcoin, W&K, or Dave Kleiman. The second and last time I met Dave was when I was in Florida for the Orlando conference in 2009, where I was an invited speaker.

4.   I have never been to Dave's home or to any W&K office in Florida or elsewhere.

5.   I do not have any assets, property, funds, business interests, or bank accounts in the United States.

6.   I have never had an office in Florida.

7.   I have never had a license to do business in Florida.

8.   I have never advertised services in Florida or to Florida residents.

9.   I have never been a member of W&K or any Florida business.

10.   I have never shared in the profits, or had a duty to share in the losses, of W&K or any Florida business.

11.   I have never been an agent of W&K or any Florida business.

12.   I have never been a director, member, shareholder, officer, employee, or representative of W&K or of any Florida business.

13.   I have never exercised authority or control over W&K or any Florida business, and have not had any right to exercise authority or control over W&K or any Florida business.

14.   I have never used or accessed hardware located in Florida or anywhere else in the United States to mine or obtain Bitcoin.

2



Case 9:18-cv-80176-BB    Document 83-29    Entered on FLSD Docket 04/16/2019    Page 3 of 7

15.   I have never configured hardware or developed software in Florida or anywhere else in the United States or for any purpose relating to a Florida business, including W&K.

16.   I have never transferred Bitcoin to a trust in Florida or anywhere else in the United States.

17.   Documents and information about any Australian Tax Office ("ATO") investigation relating to me are supposed to be located in Australia. I have never authorized the ATO or anyone else to release, leak, or otherwise make public any of the confidential or privileged information, documents, transcripts, or records from any ATO investigation related to me.

18.   I have no documents in my possession from any ATO investigation. To the extent that my attorneys have any documents from any ATO investigation related to me, those documents would be located in Australia.

19.   The transcripts attached to the Complaint as exhibits 6 and 7 are not accurate.

20.   As far as I know, all potential witnesses relevant to this lawsuit are located outside of Florida, including:

a.   **Hoa Doa,** who is listed in the Complaint as an ATO official present at an ATO interview held on February 26, 2014. To the best of my knowledge, she is located in Australia.

b.   **Marina Doleviski,** who is listed in the Complaint as an ATO official present at an ATO interview held on February 18, 2014. As far as I know, she is located in Australia.

c.   **John Chesher,** who was an advisor to me and to a group of companies ultimately owned by Demorgan Ltd., a group of Australian businesses in which I was a

3



Case 9:18-cv-80176-BB  Document 92-29  Entered on FLSD Docket 04/16/2019  Page 5 of 7

founder and a shareholder. To the best of my knowledge, he is located in Sydney, New South Wales, Australia.

d. **Des McMaster,** who is listed in the Complaint as an ATO official present at an ATO interview held on February 26, 2014. To the best of my knowledge, he is located in Australia.

e. **Andrew Miller,** who is listed the Complaint as an ATO auditor present at an ATO interview held on February 25, 2014. To the best of my knowledge, he is located in Australia.

f. **Uyen Nguyen,** who is listed in the Complaint as a manager and secretary of W&K. To the best of my knowledge, she is located in California.

g. **Alan Pedersen,** who is a manager of Demorgan Ltd. living in Australia.

h. **Andrew Sommer,** who was my solicitor in Australia and is a partner at the law firm of Clayton Utz. By referring to him here, I do not mean to waive any privilege afforded me by law, including the attorney-client privilege.

i. **Janifer Trinh,** who is listed in the Complaint as a bookkeeper present at an ATO interview held on February 25, 2014. To the best of my knowledge, she is located in Australia.

j. **Ann Wrightson,** who is listed in the Complaint as a bookkeeper for Demorgan Ltd. To the best of my knowledge, she is located in Australia.

21. As far as I know, all businesses (active and inactive) relevant to this lawsuit are located outside of the United States, including:



Case 9:18-cv-80176-BB    Document 93-29    Entered on FLSD Docket 04/16/2019    Page 5 of 7

a.  **C01n Pty. Ltd.**, Australian company number 152 222 421, an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia;

b.  **Cloudcroft Pty. Ltd.**, Australian company number 149 732 365, an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia;

c.  **Coin-Exch Pty. Ltd.**, Australian company number 163 338 467, an Australia company registered in New South Wales. It is under external administration. To the best of my knowledge, its books and records are in Australia;

d.  **Demorgan Ltd.**, Australian company number 601 560 525, an Australia company registered in Queensland, Australia. To the best of my knowledge, its books and records are in Australia;

e.  **Hotwire Preemptive Intelligence Pty. Ltd.**, Australian company number 164 068 348, an Australia company registered in New South Wales and deregistered in 2017. To the best of my knowledge, its books and records are in Australia;

f.  **Panopticrypt Pty. Ltd.**, Australian company number 151 567 118, is an Australian company registered in New South Wales. To the best of my knowledge, its books and records are in Australian; and

g.  **Pholus Pty. Ltd.**, Australian company number 165 472 079, is an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia.

22.  I do not store any digital or paper records, files, or documents in the United States.



Case 9:18-cv-80176-BB    Document 93-29    Entered on FLSD Docket 04/16/2019    Page 7 of 7

23.    As a citizen of New South Wales, Australia, I am amenable to service of process

for litigation there.

I declare that the foregoing is true and correct under penalty of perjury and in accordance

with the laws of the United States of America.

This sworn declaration was signed in ___/___ on April ___, 2018.


Craig Wright
Identification Number:

6

699

# TAB 83-30

# EXHIBIT 30

30/10 Dir
Reg Bradford

FILED

1 9 AUG 2013

Form 35 (version 2)
UCPR 20.34

## ACKNOWLEDGEMENT OF LIQUIDATED CLAIM

### COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 225983 |

### TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

### FILING DETAILS

| | |
|---|---|
| Filed for | Defendant |
| Contact name and telephone | Dr C Wright, 02 8003 7553 |

### ACKNOWLEDGEMENT

1    I am the legal agent and representative for the defendant.

2    I acknowledge the whole of the amount being claimed by the plaintiff.

### SIGNATURE

| | |
|---|---|
| Signature | |
| Capacity | Defendant |
| Date of signature | 19th August 2013 |

701

2

## FURTHER DETAILS ABOUT FILING PARTY

[Include your contact details if you have not previously given this information to the court.  Do not include the contact details for any other parties.]

**Filing party**

Name                    W&K INFO DEFENSE RESEARCH LLC  *51 Cowangarra Rd*

Address                 Bagnoo NSW 2446

**Contact details for filing party acting in person or by authorised officer**

Name of authorised officer

Capacity to act for filing party      Director / Australian Agent

Address for service                   as above
[The filing party must give an address for
service.  This must be an address in
NSW unless the exceptions listed in
UCPR 4.5(3) apply.  State "as above" if
the filing party's address for service is
the same as the filing party's address
stated above.]

Telephone                             02 8003 7553

Email                                 craig@integys.com

702

51

NFLD.

FILED

19 AUG 2013



CL Reg
30/10

Form 35 (version 2)
UCPR 20.34

# ACKNOWLEDGEMENT OF LIQUIDATED CLAIM

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 245661 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## FILING DETAILS

| | |
|---|---|
| Filed for | Defendant |
| Contact name and telephone | Dr C Wright, 02 8003 7553 |

## ACKNOWLEDGEMENT

1    I am the legal agent and representative for the defendant.

2    I acknowledge the whole of the amount being claimed by the plaintiff.

## SIGNATURE

| | |
|---|---|
| Signature | |
| Capacity | Defendant |
| Date of signature | 19th August 2013 |

703

2

## FURTHER DETAILS ABOUT FILING PARTY

[Include your contact details if you have not previously given this information to the court.  Do not include the
contact details for any other parties.]

**Filing party**

| | |
|---|---|
| Name | W&K INFO DEFENSE RESEARCH LLC |
| Address | Bagnoo NSW 2446 |

**Contact details for filing party acting in person or by authorised officer**

Name of authorised officer

Capacity to act for filing party          Director / Australian Agent

Address for service                          as above
[The filing party must give an address for
service.  This must be an address in
NSW unless the exceptions listed in
UCPR 4.5(3) apply.  State "as above" if
the filing party's address for service is
the same as the filing party's address
stated above.]

Telephone                                       02 8003 7553

Email                                            craig@integys.com

704

# TAB 83-31

# EXHIBIT 31

From: Craig Wright [mailto:craig@rcjbr.org]
Sent: Wednesday, 10 October 2012 4:55 PM
To: Dave Kleiman [mailto:dave@davekleiman.com]
Subject: FW: IFIP-WG11.9 CFP

We need to discuss the trsut and work out what the fuck we are doing with it all.

So, a good tax deductible way to have a visit and also write a paper.

706

# TAB 83-32

# EXHIBIT 32

-----Original Message-----
From: Craig S Wright [mailto:craig.wright@information-defense.com]
Sent: Wednesday, 12 March 2008 6:37 PM
To: dave kleiman
Subject: FW: Defamation and the diffculties of law on the Internet.

I need your help editing a paper I am going to relase later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin...

You are always there for me Dave. I want you to be a part of it all.

I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.

Craig

708

# TAB 83-33

# EXHIBIT 33



June 19, 2018

Andres Rivero, Esq.
Rivero Mestre LLP
2525 Ponce de Leon Blvd., Suite 1000
Miami, FL 33134
arivero@riveromestre.com

     Re:    ***Kleiman v. Wright***
           **Case No. 9:18-cv-80176-BB**
           **Civil Theft Demand Letter**

Dear Mr. Rivero,

    My clients intend to amend their lawsuit against your client to add a cause of action for civil theft. As you know, this statute provides for threefold the actual damages sustained along with attorney's fees.

    As detailed in the Amended Complaint, the value of bitcoins and intellectual property taken from my clients has fluctuated between $201,728,340.04 and $27,332,125,781.68.

    As required by Fla. Stat. § 772.11, demand is hereby made for $81,996,377,345.04. Under this statute, your client has 30 days from the date of this letter to comply with this demand and receive a written release from further civil liability.

    The foregoing is not intended to be a complete recitation of all applicable law and/or facts, and shall not be deemed to constitute a waiver or relinquishment of any of my clients' rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

                                Sincerely,

                                Vel Freedman

710

# TAB 87

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,
and W&K INFO DEFENSE RESEARCH,
LLC

      Plaintiffs,

v.                                                     **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      Defendant.

_____/

## <u>AMENDED ANSWER</u>

Dr. Craig Wright answers the Second Amended Complaint as follows:

## <u>ANSWER</u>

Except to the extent expressly admitted here, Dr. Wright denies each and every allegation

in the Second Amended Complaint. The numbered paragraphs in this answer correspond to the

numbered paragraphs of the Second Amended Complaint, as do the headers.[1] Dr. Wright uses

the terms as defined in the Second Amended Complaint. By answering the Second Amended

Complaint, Dr. Wright does not admit the accuracy, validity, admissibility, or appropriateness of

any of the Exhibits to the Second Amended Complaint and reserves all rights and objections with

respect to those Exhibits.

## <u>PARTIES</u>

    1.      Dr. Wright lacks knowledge or information sufficient to form a belief as to the

---

[1] By referencing the headers, Dr. Wright does not in any way adopt them or acquiesce to their validity or accuracy.
The use of the headers is simply for convenience of the Court and ease of review.

711

truth of the allegations in paragraph 1, except that he believes that Ira Kleiman was the adopted brother of David Kleiman and has held himself out to be the personal representative of the estate.

2.      Dr. Wright admits the allegations in the first sentence of paragraph 2 but lacks knowledge or information sufficient to form a belief as to the truth of the second sentence of paragraph 2. Dr. Wright denies the allegations in the last sentence.

3.      Dr. Wright admits the allegations in the first sentence of paragraph 3, but denies the allegations in the second sentence.

## JURISDICTION AND VENUE

4.      The allegations in paragraph 4 of the Second Amended Complaint consist of legal conclusions and contain no factual allegations to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations and notes that Plaintiff's Defense of Trade Secrets Act claim has been dismissed with prejudice. Thus, there is no jurisdiction pursuant to 28 U.S.C. § 1331 or 18 U.S.C. § 1836(c).

5.      The allegations in paragraph 5 of the Second Amended Complaint consist of legal conclusions and contain no factual allegations to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

6.      The allegations in paragraph 6 of the Second Amended Complaint consist of legal conclusions and contain no factual allegations to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

## INTRODUCTION

7.      The allegations in paragraph 7 of the Second Amended Complaint consist of legal conclusions and contain no factual allegations to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

712

8.      The allegations in paragraph 8 of the Second Amended Complaint consist of legal conclusions and contain no factual allegation to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

9.      Dr. Wright admits the allegations in the first two sentences of paragraph 9 of the Second Amended Complaint except states that Bitcoin is a peer-to-peer digital currency. As for the last sentence of the paragraph, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegation regarding its market cap.

10.      Dr. Wright denies the allegations in paragraph 10 of the Second Amended Complaint.

11.      Dr. Wright admits that Dave died on April 26, 2013, but lacks sufficient knowledge or information to form a belief as to the cause of Dave's death.

12.      The allegations in paragraph 12 of the Second Amended Complaint consist of legal conclusions and contain no factual allegation to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

13.      The allegations in paragraph 13 of the Second Amended Complaint consist of legal conclusions and contain no factual allegation to which a response is required. To the extent that a response is required, Dr. Wright denies those allegations.

14.      Dr. Wright denies the allegations in paragraph 14, but admits that he communicated with Ira, after originally reaching out to Louis Kleiman, Dave's father, several months after Dave's death.

15.      Dr. Wright denies the allegations in paragraph 15 of the Second Amended Complaint.

16.      Dr. Wright denies the allegations in paragraph 16 of the Second Amended

713

Complaint.

17.     Dr. Wright denies the allegations in paragraph 17 of the Second Amended

Complaint, but admits that he is the Chief Science Officer of NChain, a UK company.

18.     The allegations in paragraph 18 of the Second Amended Complaint consist of

legal conclusions and contain no factual allegation to which a response is required. To the extent

that a response is required, Dr. Wright denies those allegations.

19.     The allegations in paragraph 19 of the Second Amended Complaint consist of

legal conclusions and contain no factual allegation to which a response is required. To the extent

that a response is required, Dr. Wright denies those allegations.

## FACTUAL ALLEGATIONS

### Bitcoin

20.     Dr. Wright admits the allegations in paragraph 20, except states that Bitcoin is a

peer-to-peer digital currency. Dr. Wright lacks knowledge or information sufficient to form a

belief as to the truth of the allegation regarding its market cap.

21.     Dr. Wright denies the allegations in paragraph 21 of the Second Amended

Complaint.

22.     Dr. Wright denies the first, third, and fifth sentences of paragraph 22 of the

Second Amended Complaint and admits the second and fourth sentences of the paragraph.

23.     Dr. Wright denies the allegations in paragraph 23 of the Second Amended

Complaint.

24.     Dr. Wright denies the allegations in paragraph 24 of the Second Amended

Complaint.

25.     Dr. Wright denies the allegations in paragraph 25 of the Second Amended

714

Complaint.

26.    Dr. Wright admits the allegations in paragraph 26 of the Second Amended Complaint, but denies the first sentence of the paragraph.

27.    Dr. Wright admits the allegations in paragraph 27 of the Second Amended Complaint.

28.    Dr. Wright admits the allegations in paragraph 28 of the Second Amended Complaint.

29.    Dr. Wright admits the allegations in paragraph 29 of the Second Amended Complaint.

**History of Bitcoin**

30.    Dr. Wright admits the allegations in paragraph 30 of the Second Amended Complaint.

31.    Dr. Wright denies the allegations in paragraph 31 of the Second Amended Complaint.

32.    Dr. Wright denies the allegations in paragraph 32 of the Second Amended Complaint.

33.    Dr. Wright admits the allegations in paragraph 33 of the Second Amended Complaint.

34.    Dr. Wright admits the allegations in first two sentences of paragraph 34 of the Second Amended Complaint but lacks knowledge or information sufficient to form a belief as to the truth of the last sentence.

35.    Dr. Wright denies the allegations in paragraph 35 of the Second Amended Complaint.

715

36.     The allegations in paragraph 36 are based on a newspaper article that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it. Further, Dr. Wright does not adopt any statements in the article.

**Bitcoin "forks"**

37.     Dr. Wright admits the allegations in the first sentence of paragraph 37 of the Second Amended Complaint but denies the allegations in the second sentence.

38.     Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Second Amended Complaint.

39.     Dr. Wright denies the allegations in paragraph 39 of the Second Amended Complaint.

40.     Dr. Wright denies the allegations in paragraph 40 of the Second Amended Complaint.

41.     The allegations in paragraph 41 of the Second Amended Complaint are legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations.

**Background on parties and key individuals**

42.     Dr. Wright admits the allegations in paragraph 42 of the Second Amended Complaint.

43.     Dr. Wright admits the allegations in paragraph 43 of the Second Amended Complaint.

44.     Dr. Wright admits the allegations in paragraph 44 of the Second Amended Complaint.

45.     Dr. Wright admits the allegations in paragraph 45 of the Second Amended

716

Complaint.

46.     Dr. Wright lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 46 of the Second Amended Complaint.

47.     Dr. Wright admits the allegations in paragraph 47 of the Second Amended Complaint.

48.     Dr. Wright lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Second Amended Complaint but admits that Dave was in and out of the hospital from 2010 until his death and that Dave died on April 26, 2013.

49.     Dr. Wright lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Second Amended Complaint but admits that Ira was Dave's adopted brother and that Ira has held himself out as the personal representative of Dave's estate.

50.     Dr. Wright denies the allegations in paragraph 50 of the Second Amended Complaint, but admits he is an Australian computer scientist and businessman, he began his career in information technology working for various entities in Australia, including the Australian Securities Exchange, and he has numerous degrees and technical certifications.

51.     Dr. Wright denies the allegations in paragraph 51 of the Second Amended Complaint.

**Dave and Craig's early relationship**

52.     Dr. Wright admits the allegations in paragraph 52 of the Second Amended Complaint.

53.     Dr. Wright admits the allegations in paragraph 53 of the Second Amended Complaint.

717

54.    Dr. Wright admits the allegations in paragraph 54 of the Second Amended Complaint, but denies discussions about difficult issues in cryptography.

55.    The allegations in paragraph 55 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

56.    Dr. Wright denies the allegations in the first sentence of paragraph 56 of the Second Amended Complaint but admits that in late 2008 Craig communicated with Dave regarding the paper. Dr. Wright denies the allegations in the second sentence of paragraph 56.

57.    Dr. Wright denies the allegations in paragraph 57 of the Second Amended Complaint.

58.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the Second Amended Complaint.

59.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 of the Second Amended Complaint.

60.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Second Amended Complaint.

61.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 of the Second Amended Complaint.

62.    The allegations in paragraph 62 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

63.    The allegations in paragraph 63 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-

context characterization of it, and any inaccurate inferences or conclusions derived from it.

64.    The allegations in paragraph 64 of the Second Amended Complaint consist of legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations, but admits that Dave assisted in editing the Satoshi white paper.

65.    Dr. Wright denies the allegations in paragraph 65 of the Second Amended Complaint.

66.    The allegations in the first and last sentences of paragraph 66 of the Second Amended Complaint consist of legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations. The allegations in the second sentence of paragraph 66 appear to be a quote from an email that has not been identified as an exhibit. As such, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in that sentence or the accuracy of the quote.

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67.    The allegations in paragraph 67 of the Second Amended Complaint consist of legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies the allegations in paragraph 67.

68.    Dr. Wright denies the allegations in paragraph 68 of the Second Amended Complaint.

69.    The allegations in paragraph 69 of the Second Amended Complaint are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

70.    Dr. Wright denies the allegations in the first sentence of paragraph 70, and states that he lacks knowledge or information sufficient to form a belief as to whether W&K has an

719

operating agreement. The allegations in the second through fifth sentences of paragraph 70 are based on documents that speak for themselves, some of which were not legally obtained, and as such, no response to such scandalously obtained documents should be required. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom. Dr. Wright also denies faking any contract or committing perjury. Dr. Wright further notes that the inclusion of Exhibit 9 of the Second Amended Complaint violates Australian law. The allegations in the last sentence of paragraph 70 appear to be speculation on the part of Plaintiffs to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

71.     The allegations in paragraph 71 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies the allegations in paragraph 71.

72.     Dr. Wright denies the allegations in paragraph 72 of the Second Amended Complaint.

73.     Dr. Wright denies the allegations in paragraph 73 of the Second Amended Complaint.

74.     The allegations in paragraph 74 of the Second Amended Complaint are based on documents and emails that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom.

75.     The allegations in paragraph 75 of the Second Amended Complaint are based on admittedly leaked and unauthenticated documents that were not legally obtained, and as such, no response to such scandalously obtained documents should be required. Dr. Wright further notes that the inclusion of Exhibit 9 of the Second Amended Complaint violates Australian law. To the

10

720

extent that a response is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the documents referenced in paragraph 75, and any inaccurate inferences or conclusions derived therefrom.

76.    The allegations in paragraph 76 of the Second Amended Complaint are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom.

77.    The allegations in paragraph 77 of the Second Amended Complaint are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom.

78.    The allegations in paragraph 78 of the Second Amended Complaint are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom.

**Dave and/or W&K owned a substantial amount of bitcoin**

79.    The allegation in the first sentence of paragraph 79 is a legal conclusion to which no response is required. To the extent that a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of that allegation. The allegations in the remainder of paragraph 79 are based on unidentified documents and conversations as well as admittedly leaked and unauthenticated documents, and as such, no response to such vague or scandalously obtained documents should be required. To the extent that a response is required,

721

Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 79.

80.    To the extent discernable, the allegations in the first two sentences of paragraph 80 of the Second Amended Complaint are based on emails and documents (although not specifically identified) that speak for themselves, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of them, and any inaccurate inferences or conclusions derived therefrom. The allegations in the last sentence of paragraph 80 appear to be speculation by Plaintiffs to which no response is required. To the extent a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

81.    The allegations in paragraph 81 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

82.    The allegations in paragraph 82 of the Second Amended Complaint are based on admittedly leaked and unauthenticated documents that were not legally obtained, and as such, no response to such scandalously obtained documents should be required. Dr. Wright further notes that the inclusion of Exhibit 12 of the Second Amended Complaint violates Australian law. To the extent that a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82.

83.    The allegations in paragraph 83 of the Second Amended Complaint are based on admittedly leaked and unauthenticated documents that were not legally obtained, and as such, no response to such scandalously obtained documents should be required. Dr. Wright further notes that the inclusion of Exhibit 9 of the Second Amended Complaint violates Australian law. To the

722

extent that a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83.

83. The allegations in paragraph 84 of the Second Amended Complaint are based on admittedly leaked and unauthenticated documents, and as such, no response to such scandalously obtained documents should be required. To the extent that a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.

85. Dr. Wright admits that he was interviewed by Andrew O'Hagan. The allegations in paragraph 85 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of that document, and any inaccurate inferences or conclusions derived therefrom.

86. The allegations in paragraph 86 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom.

87. The allegations in paragraph 87 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom.

88. The allegations in paragraph 88 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom.

89. The allegations in paragraph 89 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations.

723

90.    The allegations in paragraph 90 of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

91.    The allegations in the first two sentences of paragraph 91 of the Second Amended Complaint are based on a document that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it. Dr. Wright denies the allegation in the last sentence of paragraph 91.

92.    The allegations in paragraph 92 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations.

93.    Dr. Wright denies the allegations in paragraph 93 of the Second Amended Complaint.

94.    The allegations in paragraph 94 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95.    The allegations in paragraph 95 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies the allegations that he took sole ownership or control over anything that he was not entitled to.

96.    The allegations in paragraph 96 appear to be speculation on the part of Plaintiffs to which no response is required. In addition, the allegations in the last sentence of paragraph 96 contain legal conclusions to which no response is required. To the extent a response is required,

14

724

Dr. Wright denies those allegations.

97.    The allegations in paragraph 97 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies the allegations in paragraph 97.

98.    The allegations in paragraph 98 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies the allegations in paragraph 98.

99.    Dr. Wright denies the allegations in the first sentence of paragraph 99 of the Second Amended Complaint since electronic signatures including signature fonts can constitute an individual's signature. Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the remainder of paragraph 99.

100.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 but admits that there are computer signature fonts.

101.    As Plaintiffs have failed to provide any time frame for the allegations in paragraph 101 of the Second Amended Complaint, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegation but admits that Dave Kleiman's signatures on certain documents were computer generated. To the extent that the allegations in this paragraph are based on documents that speak for themselves, Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of those documents, and any inaccurate inferences or conclusions derived therefrom.

102.    The allegation in paragraph 102 is incomprehensible, and therefore, Dr. Wright denies it.

103.    The allegations in the first sentence of paragraph 103 of the Second Amended

725

Complaint are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it. Dr. Wright denies the allegations in the second sentence of paragraph 103.

104.    The allegations in paragraph 104 of the Second Amended Complaint are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom. The allegations also appear to contain legal conclusions to which no response is required. To the extent that a response is required, Dr. Wright denies those allegations.

105.    The allegations in paragraph 105 of the Second Amended Complaint are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of them, and any inaccurate inferences or conclusions derived therefrom.

106.    The allegations in paragraph 106 of the Second Amended Complaint are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom.

107.    The allegations in the first sentence of paragraph 107 contain legal conclusions to which no response is required. To the extent that those allegations require a response, they appear to be based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom. The second sentence of paragraph 107 appears to be speculation on the part of Plaintiffs to which no response is required. To the extent a response is required, Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth that sentence.

726

108.    The allegations in paragraph 108 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom. Further, the last clause of the paragraph in parentheses is pure speculation on the part of Plaintiffs, which Dr. Wright denies.

109.    The allegations in paragraph 109 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

110.    Dr. Wright denies the allegations in the first sentence of paragraph 110 of the Second Amended Complaint. The allegations in the remainder of paragraph 110 are based on uncertified, incomplete, unverified, and unreliable documents that were not legally obtained. As such, no response to these allegations should be required. To the extent that a response is required, Dr. Wright denies the allegations in the paragraph, and notes that the inclusion of Exhibits 12 and 18 of the Second Amended Complaint violates Australian law.

111.    The allegations in paragraph 111 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

112.    The allegations in paragraph 112 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

113.    The allegations in paragraph 113 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

114.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 114.

115.    Dr. Wright denies the allegations in paragraph 115 of the Second Amended Complaint.

116.    The allegations in paragraph 116 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

**Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts**

117.    The allegations in paragraph 117 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

118.    The allegations in paragraph 118 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

119.    Dr. Wright denies the allegation in the first sentence of paragraph 119 of the Second Amended Complaint. Dr. Wright lacks knowledge or information sufficient to form a belief as to the allegations in the second sentence of paragraph 119.

120.    The allegations in paragraph 120 contain legal conclusions to which no response is required. To the extent a response is required, those allegations are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

121.    The allegations in paragraph 121 contain legal conclusions to which no response is required. To the extent a response is required, those allegations are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

122.    Dr. Wright denies the allegations in paragraph 122 of the Second Amended Complaint.

123.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 123. The remaining allegations in paragraph 123 are based on an email chain that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

124.    The allegations in paragraph 124 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

125.    The allegations in paragraph 125 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

126.    The allegations in paragraph 126 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

127.    The allegations in paragraph 127 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it and any inaccurate inferences or conclusions derived therefrom.

128.    The allegations in the first sentence of paragraph 128 contains legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations. The allegations in the second sentence of paragraph 128 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

129.    The allegations in the first sentence of paragraph 129 contain legal conclusions to which no response is required. To the extent a response is required, those allegations are based

729

on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom. Dr. Wright admits that W&K, as defined in the Second Amended Complaint, did not exist until 2011, but notes that other companies in other countries that also contained W&K in their names were in existence prior to 2011.

130.    The allegations in the first sentence of paragraph 130 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom. The second sentence of paragraph 130 contains legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies the allegations in that sentence, but does not dispute that the document referenced says what it says. He denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

131.    The allegations in paragraph 131 contain legal conclusions to which no response is required. Further, the allegations are based on uncertified, incomplete, unverified, and unreliable documents that were not legally obtained. As such, no response to these allegations should be required. Dr. Wright further notes that the inclusion of Exhibit 12 of the Second Amended Complaint violates Australian law. To the extent a response is required, Dr. Wright denies the allegations in paragraph 131. To the extent that the paragraph relies on and references the allegations in paragraphs 142–143, Dr. Wright fully incorporates his responses to those paragraphs here as well.

**Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, secure an ally in his fight against the ATO**

132.    The allegations in paragraph 132 appear to be speculation on the part of Plaintiffs

20

730

to which no response is required. To the extent a response is required, Dr. Wright denies the allegations, but admits that he reached out to Louis Kleiman.

133.    The allegations in the first sentence of paragraph 130 are based on an email that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom. Dr. Wright lacks knowledge or information sufficient to form a belief as to the age of Louis Kleiman in February 2014.

134.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134, but admits that after he corresponded with Louis Kleiman, he began corresponding with Ira Kleiman primarily.

135.    To the extent that the allegations in paragraph 135 are based on documents, they speak for themselves, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom. In all other respects, Dr. Wright denies the allegation in paragraph 135.

136.    The allegations in paragraph 136 are based on an email that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

137.    The allegations in paragraph 137 are based on an email that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or conclusions derived therefrom.

138.    The allegations in paragraph 138 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

139.    The allegations in the first sentence of paragraph 139 contain legal conclusions to

731

which no response is required. To the extent a response is required, Dr. Wright denies the

allegations in that sentence, but does not dispute that the document referenced therein says what

it says. He denies any erroneous, incomplete, or out-of-context characterizations of it, and any

inaccurate inferences or conclusions derived therefrom. The allegations in the second and third

sentences of paragraph 139 are based on a document that speaks for itself. Dr. Wright denies any

erroneous, incomplete, or out-of-context characterizations of it, and any inaccurate inferences or

conclusions derived therefrom. The allegations in the last sentence of paragraph 139 contain

legal conclusions to which no response is required. Further, the allegations in that sentence are

based on uncertified, incomplete, unverified, and unreliable documents that were not legally

obtained, and as such, no response to such scandalously obtained documents should be required.

Dr. Wright notes that the inclusion of Exhibit 18 of the Second Amended Complaint violates

Australian law. As such, no response to these allegations should be required. To the extent a

response is required, Dr. Wright denies the allegations in the last sentence of paragraph 139.

> 140.    Dr. Wright denies the allegations in paragraph 140.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave**

> 141.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 141 of the Second Amended Complaint and denies that he

had any expectation that the ATO would reach out to Ira.

> 142.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 142 of the Second Amended Complaint.

> 143.    The allegations in paragraph 143 are based on documents that speak for

themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of

732

them, and any inaccurate inferences or conclusions derived therefrom.

**Craig continues to assure Ira and reveals the nature of the intellectual property
owned by, and misappropriate from, W&K and Dave[2]**

144.    The allegations in paragraph 144 are based on an email chain that speaks for

itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the

email chain, and any inaccurate inferences or conclusions derived therefrom.

145.    The allegations in paragraph 145 are based on an email chain that speaks for

itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the

email chain, and any inaccurate inferences or conclusions derived therefrom.

146.    The allegations in paragraph 146 are based on an email chain that speaks for

itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the

email chain, and any inaccurate inferences or conclusions derived therefrom.

147.    The allegations in paragraph 147 are based on documents that speak for

themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of

them, and any inaccurate inferences or conclusions derived therefrom

148.    The allegations in paragraph 148 are based on articles that speak for

themselves. Dr. Wright does not adopt any statements in those articles and denies any erroneous,

incomplete, or out-of-context characterizations of them, and any inaccurate inferences or

conclusions derived therefrom. Dr. Wright also denies the allegations in paragraph 148 of the

Second Amended Complaint.

149.    Dr. Wright denies the allegations in paragraph 149 of the Second Amended

Complaint.

---

[2] Dr. Wright notes that all misappropriation claims have been dismissed with prejudice.

23

733

150.    Dr. Wright denies the allegations in paragraph 150 of the Second Amended Complaint.

151.    The allegations in paragraph 151 are based on an email chain that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

152.    The allegations in paragraph 152 are based on an email chain that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

153.    The allegations in paragraph 153 are based on an email chain that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

**Craig claims that he and Dave are Satoshi Nakamoto**

154.    The allegations in paragraph 154 are based on articles that speak for themselves, and notably, are admittedly based on leaked and unauthenticated documents. Dr. Wright does not adopt any statements in those articles and denies any erroneous, incomplete, or out-of-context characterizations of them, and any inaccurate inferences or conclusions derived therefrom.

155.    The allegations in paragraph 155 are based on an article that speak for itself. Dr. Wright does not adopt any statements in that articles and denies any erroneous, incomplete, or out-of-context characterizations of it and any inaccurate inferences or conclusions derived therefrom.

156.    Dr. Wright admits that he was interviewed by Andrew O'Hagan. The allegations in paragraph 156 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of that document, and any inaccurate

734

inferences or conclusions derived therefrom. Dr. Wright denies all remaining allegations in paragraph 156.

157.    The allegations in paragraph 157 appear to be based on various emails, presumably attached to the Second Amended Complaint. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

158.    Dr. Wright admits the allegations in the first sentence of paragraph 158 but denies the allegations in the second sentence.

159.    Dr. Wright denies the allegations in paragraph 159.

**Fraud on this Court**

160.    Dr. Wright admits that the allegations in paragraph 160 are the same allegations that Plaintiffs set forth in their initial complaint.

161.    The allegations in paragraph 161 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the email chain, and any inaccurate inferences or conclusions derived therefrom.

162.    The allegations in paragraph 162 contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

163.    The allegations in paragraph 163 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the document, and any inaccurate inferences or conclusions derived therefrom. Dr. Wright denies the remaining allegations in the paragraph.

164.    The allegations in paragraph 164 are based on a document that speaks for itself. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of the

735

document, and any inaccurate inferences or conclusions derived therefrom. Dr. Wright denies the remaining allegations in the paragraph.

165.    The allegations in paragraph 165 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them and any inaccurate inferences or conclusions derived therefrom.

166.    Dr. Wright denies the allegations in paragraph 166.

167.    The allegations in paragraph 167 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them and any inaccurate inferences or conclusions derived therefrom.

168.    The allegations in paragraph 168 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them and any inaccurate inferences or conclusions derived therefrom.

169.    The allegations in paragraph 169 are based on documents that speak for themselves. Dr. Wright denies any erroneous, incomplete, or out-of-context characterizations of them and any inaccurate inferences or conclusions derived therefrom. To the extent that the paragraph relies on and references the allegations in paragraph 120, Dr. Wright fully incorporates his responses to that paragraph here as well.

170.    Dr. Wright denies the allegations in paragraph 170.

**<u>CLAIMS FOR RELIEF</u>**
**COUNT I**
**Conversion**
*(Asserted by the Estate and W&K)*

171.    The allegations in paragraph 171 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

172.    The allegations in paragraph 172 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

### COUNT II
### Unjust Enrichment
*(Asserted by Estate and W&K)*

173.    The allegations in paragraph 173 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

174.    The allegations in paragraph 174 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

175.    The allegations in paragraph 175 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

176.    The allegations in paragraph 176 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

177.    The allegations in paragraph 177 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

### COUNT III
### Misappropriation
*(Asserted by the Estate and W&K)*

178.    This claim has been dismissed by the Court with prejudice. As such, no response

27

737

to paragraphs 178 through 184 is required.

## COUNT IV
### Federal Defense of Trade Secrets Act
*(Asserted by the Estate and W&K)*

185.    This claim has been dismissed by the Court with prejudice. As such, no response to paragraphs 185 through 191 is required.

## COUNT V
### Breach of Fiduciary Duty
*(Asserted by the Estate and W&K)*

192.    The allegations in paragraph 192 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

193.    The allegations in paragraph 193 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

194.    The allegations in paragraph 194 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

195.    The allegations in paragraph 195 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

196.    The allegations in paragraph 196 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

## COUNT VI
### Breach of Partnership Duties of Loyalty and Care
*(Asserted by the Estate)*

197.     The allegations in paragraph 197 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

198.     The allegations in paragraph 198 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

199.     The allegations in paragraph 199 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

200.     The allegations in paragraph 200 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

201.     The allegations in paragraph 201 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

## COUNT VII
### Fraud
*(Asserted by the Estate and W&K)*

202.     The allegations in paragraph 202 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

203.     The allegations in paragraph 203 of the Second Amended Complaint contain legal

739

conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

204.    The allegations in paragraph 204 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

205.    The allegations in paragraph 205 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

## COUNT VIII
### Constructive Fraud
*(Asserted by the Estate and W&K)*

206.    The allegations in paragraph 206 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

207.    The allegations in paragraph 207 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

208.    The allegations in paragraph 208 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

209.    The allegations in paragraph 209 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

210.    The allegations in paragraph 210 of the Second Amended Complaint contain legal

740

conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

211.    The allegations in paragraph 211 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

212.    The allegations in paragraph 212 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

## COUNT IX
### Permanent Injunction
*(Asserted by the Estate and W&K)*

213.    The allegations in paragraph 213 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

214.    The allegations in paragraph 214 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

## COUNT X
### Civil Theft - § 772.11 Fla. Stat.
*(Asserted by the Estate and W&K)*

215.    Dr. Wright denies the allegations in paragraph 215 of the Second Amended Complaint.

216.    Dr. Wright denies the allegations in paragraph 216 of the Second Amended Complaint.

217.    Dr. Wright denies the allegations in paragraph 217 of the Second Amended

31

741

Complaint.

218.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 218.

219.    Dr. Wright denies the allegations in paragraph 219 of the Second Amended Complaint.

220.    The allegations in paragraph 220 of the Second Amended Complaint are based on a document that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived therefrom. The allegations in paragraph 220 also contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright admits that his counsel received this document but denies the remaining allegations.

221.    The allegations in paragraph 221 of the Second Amended Complaint contain legal conclusions to which no response is required. To the extent a response is required, Dr. Wright denies those allegations.

222.    Dr. Wright denies the allegations in paragraph 222 of the Second Amended Complaint.

223.    Dr. Wright lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 223.

<u>**AFFIRMATIVE DEFENSES**</u>

Dr. Wright asserts the following affirmative defenses without undertaking or assuming the burden of proof on any issue or matter for which such burden would not otherwise be his.

<u>**FIRST AFFIRMATIVE DEFENSE**</u>
**(Statute of Limitations)**

Plaintiffs' claims are barred by the applicable statute(s) of limitations.

32

742

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

Plaintiffs unreasonably delayed filing this action. Their unreasonable delay prejudiced

Dr. Wright's assertion of rights and defenses. Plaintiffs' claims are barred by the doctrine of

laches.

## THIRD AFFIRMATIVE DEFENSE
### (Good Faith)

To the extent Plaintiffs allege that the 2011 Intellectual Property License Funding

Agreement, the 2012 Deed of Loan, and the 2013 Contract for the Sale of Shares of Company

Owning Business ("the Contracts") are unenforceable, Dr. Wright acted in good faith to

effectuate David Kleiman's intent after David Kleiman's death.

## FOURTH AFFIRMATIVE DEFENSE
### (Accord and Satisfaction)

Plaintiffs' claims are barred by accord and satisfaction because, by agreement, Plaintiffs

received shares in a corporation from Dr. Wright as compensation for rights of David Kleiman.

## FIFTH AFFIRMATIVE DEFENSE
### (Release)

Plaintiffs, by accepting shares in a corporation from Dr. Wright as compensation for

rights of David Kleiman, released Dr. Wright.

## SIXTH AFFIRMATIVE DEFENSE
### (Payment)

Plaintiffs' claims are barred because they received payment in the form of shares in a

corporation.

743

### SEVENTH AFFIRMATIVE DEFENSE
**(Set-off)**

Plaintiffs' damages, if any, are set-off by their receipt of shares in a corporation from Dr.

Wright as compensation for rights of David Kleiman.

### EIGHTH AFFIRMATIVE DEFENSE
**(Failure to Mitigate Damages)**

Plaintiffs failed to mitigate their alleged damages because Plaintiffs failed to sell the

shares in the corporation they received from Dr. Wright as compensation for rights of David

Kleiman when offered money in exchange for those shares.

### SEVENTH AFFIRMATIVE DEFENSE
**(Waiver)**

Plaintiffs' claims are barred by waiver because Plaintiffs accepted shares in a corporation

as satisfaction of David Kleiman's rights and waited years to file this action.

### EIGHTH AFFIRMATIVE DEFENSE
**(Estoppel)**

Plaintiffs are estopped from asserting their claims of fraud against Dr. Wright because

they were aware of the Australian Taxation Office investigation, as well as the New South Wales

lawsuit against W&K Info Defense Research, LLC, no later than April 2014, and took no action

in those proceedings that are in any way consistent with the allegations they now make about

those proceedings in this action.

### NINTH AFFIRMATIVE DEFENSE
**(Unclean Hands and Illegality)**

Plaintiffs' claims are barred by the doctrine of unclean hands because, *inter alia*, Ira

Kleiman, as the representative of David Kleiman's estate, manipulated his dead brother's estate

to avoid payment of taxes and violated various laws, including, but not limited to, Florida and

foreign laws that protect against the invasion of privacy and the misuse of private, personal, or

34

744

confidential information.

### TENTH AFFIRMATIVE DEFENSE
**(Statute of Frauds)**

Plaintiffs' alleged oral partnership agreement is barred by the statute of frauds because there was no written partnership agreement between Dr. Wright and David Kleiman and/or W&K Info Defense Research, LLC.

### ELEVENTH AFFIRMATIVE DEFENSE
**(Lack of Personal Jurisdiction)**

This Court lacks personal jurisdiction over Dr. Wright under Fla. Stat. §48.193(1)(a). Dr. Wright never performed any relevant act while physically in the state of Florida, nor any tortious act causing injury in the state of Florida, and does not possess minimum contacts with the state of Florida from which Plaintiffs' claims arise or to which they relate.

### TWELFTH AFFIRMATIVE DEFENSE
**(Res Judicata and Collateral Estoppel)**

The res judicata and collateral estoppel effect of judgments rendered more than five years ago by the Supreme Court of New South Wales bar Plaintiffs' claims arising from Dr. Wright's alleged ownership and possession of W&K Info Defense Research, LLC's intellectual property.

DATED: January 28, 2019

745

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Craig Wright*
2525 Ponce de Leon Boulevard,
Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveromestre.com
Email: arolnick@riveromestre.com
Email: zmarkoe@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
ALAN H. ROLNICK
Florida Bar No. 715085
ZAHARAH R. MARKOE
Florida Bar No. 504734

## CERTIFICATE OF SERVICE

I certify that on January 28, 2019, I electronically filed this document with the Clerk of

the Court using CM/ECF. I also certify that this document is being served today on all counsel of

record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S.

Mail.

/s/ Andrés Rivero
Andrés Rivero

36

746

# TAB 127

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       plaintiffs,

v.                                  **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

       defendant.

_____/

### JOINT DISCOVERY MEMORANDUM[1]

     With the exception of the second point raised by Defendant,[2] the parties certify they have

complied with the requirements for pre-hearing consultation contained in the Court's Standing

Discovery Order, ECF No. [102], 9. The following issues require resolution by the Court:

**1.     Defendant's Submission**

     **A.    Dr. Wright Requests that the Court Resolve Two Key Discovery Disputes**

     **Defendant:** Dr. Wright requests that the Court resolve two discovery disputes, each of

which stem from a single issue—the discovery of Dave Kleiman's documents and devices.

Those issues are as follows: (1) plaintiffs have not produced *a single* document from Dave

Kleiman; and (2) plaintiffs are attempting to block the depositions of two non-parties who likely

have information regarding a central, yet unanswered, question: what happened to Dave's

devices after his death.

---

[1] The Court has scheduled the discovery hearing to take place on March 26, 2019, at 2:30 p.m.
[2] To be clear, Dr. Wright disagrees with this statement regarding his second point, which involves his attempts to schedule non-party depositions. *See* **Ex. B**.

747

***First***, despite the importance of Dave's documents and devices to this action, and the seriousness of the nature of plaintiffs' claims, there is no excuse—particularly at this stage—for plaintiffs' failure to produce any of Dave's documents. Plaintiffs have not provided any explanation for withholding these critical documents. Instead, they refer to their initial production of "1,000 documents" from Ira Kleiman, not Dave.[3] That is insufficient—Dr. Wright is entitled to defend himself against plaintiffs' unsubstantiated claims for civil theft, starting now.

Separately, plaintiffs have not told us what search terms they used to collect their initial production from Ira. This unilateral document production process has proven, as should have been expected, to be a wasteful exercise. The undisclosed search terms generated batches of documents that were nothing more than a Facebook logo, Facebook notification, or redacted "thank you for your payment" emails from credit-card companies. This initial production does not solve the problem of a prioritized production of Dave's documents, or otherwise mean plaintiffs have complied with the robust production that the Court contemplated in its previous order.

***Second***, plaintiffs are objecting to the issuance of subpoenas to depose two non-parties—Dave's former business partners, Patrick Paige and Carter Conrad. *See* V. Freedman email to B. Paschal, dated March 19, 2019, attached as **Exhibit B**. Plaintiffs have identified Paige and Conrad to have information regarding the preservation of Dave's devices. Therefore, Paige and Conrad are directly relevant to this action, and plaintiffs should not be allowed to block these depositions.

---

[3] *See* A. McGovern email to K. Roche, dated March 20, 2019, attached as **Exhibit A**.

Plaintiffs are objecting to these depositions because they want a full production from Dr. Wright before they will even schedule the depositions. *See* **Ex. B**. However, even if that were a basis for holding up the scheduling of these depositions, plaintiff Ira Kleiman has been engaged in separate litigation with Carter and Paige *since November 21, 2016*, and he has taken discovery in that case regarding Dr. Wright and Dave. Plaintiffs, therefore, have already received whatever documents that they need in advance of Paige and Conrad's depositions (which, notably, they have yet to produce to us).

**Plaintiffs' response to #1**: As explained in more detail below, Defendant's assertion that Plaintiffs haven't turned over any of Dave Kleiman's documents is misleading because Defendant *just* requested Plaintiffs prioritize these documents late last week. Before then, Defendant's top priority was obtaining the forensic images of Dave Kleiman's drives and producing documents based on "W&K" search terms. Plaintiffs are now switching gears to accommodate Defendant's request and by the time of hearing expect to have already produced ~2000 of Dave Kleiman's documents.

To respond in greater detail, without the benefit of search terms Plaintiffs proactively ran searches and produced over 1000 documents of emails between (i) *Dave* and Ira, (ii) Ira and Craig, (iii) Ira and Ramona, (iv) Ira and Stefan Matthews, and (v) Ira and Andrew Sommer.[4] Subsequently, Plaintiffs produced another 1,355 documents that hit on "W&K" search terms the

---

[4] Plaintiffs used the following search terms to produce this data: dex561@yahoo.com; dex561@aol.com; goldkey@gmail.com; craig.wright@information-defense.com; craigswright@acm.org; craig@rcjbr.org; craig.wright@demorgan.com.au; ramona.watts@hotwirepe.com; ut.ng@hotwirepe.com; ramona@rcjbr.org ramona@demorgan.com.au; stefan.matthews@demorgan.com.au; asommer@claytonutz.com; kleimandave@yahoo.com; davesdigitalforensics@gmail.com; dave@davekleiman.com ; dave@netmedic.net ; dave@isecureu.com

749

Defendant requested Plaintiffs prioritize and will shortly supplement that production with another few thousand documents, approximately 2000 of which are expected to be from Dave Kleiman.

Late last week, Defendants asked Plaintiffs to prioritize documents from Dave Kleiman. Plaintiffs had a call with their ESI vendor and are working on reshuffling production to prioritize sources of ESI from Dave Kleiman. To be sure, Plaintiffs are working diligently to produce documents. Counsel spent over three hours conferring with Defendant about their search terms last week. Furthermore, in addition to ESI specialists, Plaintiffs have a team of seven attorneys who are engaged in the full time review of Plaintiffs documents for production. In short, Plaintiffs are prioritizing Dave Kleiman's documents and doesn't see a dispute for this Court to resolve.

**Plaintiffs' response to #2:** Plaintiffs requested Defendant speak with Plaintiffs (on the phone or in person) about this issue, even citing this Court's requirement that the parties do so, but Defendant declined. Plaintiffs remain hopeful the parties can work this out without Court intervention, but includes its position below in case the Court decides to resolve it prior to then.

The Defendant has simple requests from Mr. Page and Mr. Conrad. He wants to learn about Dave Kleiman's devices. Admittedly, this doesn't take much document production. But Plaintiffs need to depose these witnesses too. And Plaintiffs area of inquiry is complex and detailed. These witnesses spoke with the Defendant and had correspondence with him about Dave's role in creating Bitcoin, mining bitcoins, and developing intellectual property. They are Dave Kleiman's former best friends. In fact, the Second Amended Complaint quotes directly from some emails Craig sent to Mr. Page in support of its intellectual property related claims: "**[Dave] did a fair amount of research with me. Most yet to be completed and published . . .** When it all comes out, there is no way Dave will be left out. **We need at least a year more.**"lECF. No. [83], ¶¶ 151, 153 (emphasis in original).

4

Both parties have subpoenaed these witnesses, but no response has yet been received. Both parties have search terms related to these witnesses, but production of documents that hit on those search terms has not yet occurred.

In sum, Plaintiffs remain hopeful the parties can be reasonable about scheduling these witnesses for deposition at a reasonable time after relevant documents production has taken place. But if Defendant won't try to schedule these with Plaintiffs offline, Plaintiffs request the Court instruct Defendant to wait until the relevant production has taken place.

## 2.    Plaintiffs' Submission

### A.    Defendant's objections to Plaintiffs' revised interrogatories 5 and 6

**Plaintiffs**: Revised interrogatories No. 5 and 6 seek the identity of all persons who collaborated in the initial projects of the Satoshi Nakamoto partnership and who controlled the partnership's email accounts. **Exhibit C**. The answer to this interrogatory is directly relevant to establishing the existence of a partnership and identifying relevant witnesses. Plaintiffs alleged that in c. 2008 Dave and Craig formed the Satoshi Nakamoto partnership and through it created Bitcoin, mined bitcoins, and developed blockchain based IP. Plaintiffs alleged this association as co-owners of a business for profit continued under the Satoshi Nakamoto name until at least 2011 when W&K was formed, so that when Craig took sole possession of the partnership's bitcoins and intellectual property he, *inter alia*, breached his duties of loyalty and care to the partnership. ECF No. [83], ¶ 197. At trial, Plaintiffs have the burden of proof to demonstrate that Craig and Dave's formation of the Satoshi Nakamoto partnership was the association of co-owners of a business for profit. If the answer to this interrogatory is "Dave and Craig were the sole participants," it helps Plaintiffs' case. If it includes other individuals, they are relevant witnesses, and Plaintiffs must be aware of their existence to prepare for trial. Defendant's objection, that the identity of who

participated in the partnership is "not relevant to plaintiffs' claims," when one of Plaintiffs' claims is for breach of the duties of loyalty and care owed to the Satoshi Nakamoto partnership, is patently frivolous.

      **Defendant**: Plaintiffs' Revised Interrogatories 5 and 6 continue to seek irrelevant and highly sensitive information. Who had access to certain email accounts that were associated with a pseudonym provides no information whatsoever as to whether or not Dave Kleiman and Dr. Wright were partners in a "business for profit." Similarly, who assisted in draft a paper that was published in 2008 and who worked on writing the software/computer code that constitute intellectual property that was made public in 2009 has nothing to do with whether or not Dave and Dr. Wright were partners, even less to do with any allegation that Dr. Wright stole anything since those materials were made public long before Dave died and Dave never made any such allegation.

**B.**     **Defendant's claim that there are no email addresses with potentially relevant ESI**

      **Plaintiffs:** Pursuant to the parties ESI agreement Dr. Wright has disclosed there are no email addresses relevant to this case. To date, however, Plaintiffs have compiled a list of 18 email addresses for Dr. Wright they believe are relevant to the case.[5] Furthermore, based on production to date, it appears that Craig and Dave corresponded heavily through Bitmessage, an encrypted communications protocol,[6] but Defendant has failed to identify these accounts as well. *See e.g.*

---

[5] craig@rcjbr.org; craig.wright@demorgan.com.au; craig.wright@hotwirepe.com; craig.wright@Information-defense.com; craig.wright@gicsr.org; overlyqualified@gmail.com; craig@panopticrypt.com; craig.wright@itmasters.edu.au; mad.men@hushmail.com; Craig.Wright@bdo.com.au; cwright@bdosyd.com.au; craigsw@ozemail.com.au; craig.wrigh@asx.com.au; wright_c@demorgan.com.au; doshai@pip.com.au; craigswright@acm.org; tuliptrading@hushmail.com; craigw@dg.ce.com.au.

[6] https://en.wikipedia.org/wiki/Bitmessage

**Exhibit D**.[7] Plaintiffs seek an order directing Defendant to fully disclose all email accounts, Bitmessage accounts, and to conduct a full collection of them all.

**Defendant:** Dr. Wright disclosed, as agreed all sources of potentially relevant ESI. Dr. Wright does not maintain as long as the relevant of time. We have collected numerous .pst files from the over 31 electronic devices we have collected from Dr. Wright. Those .pst files contain potentially relevant emails, and Dr. Wright disclosed those facts to plaintiffs. Moreover, as is clear from the productions thus far, Dr. Wright prints out or .pdfs certain emails, and those have been produced and will continue to be produced.

<u>**C.    Defendant's refusal to collect documents from his Australian attorneys**</u>

**Plaintiffs**: At the last hearing, the Court ordered Defendant to obtain all documents within his possession, custody, or control unless he moves not to on burden grounds. Plaintiffs requested the Defendant collect documents from his Australian attorneys because the Defendant swore "**I have no documents in my possession from any ATO investigation.** To the extent that my attorneys have any documents from any ATO investigation related to me, those documents would be located in Australia." ECF No. [33-3] at 3-4 (emphasis added). In an email to counsel, however, Ms. McGovern has now stated that "documents that would be produced by attorneys would be duplicative." **Exhibit E** (highlight added). This is in complete conflict with his sworn statement above. Plaintiffs seek an order directing Dr. Wright to collect documents from his Australian attorneys.

**Defendant:** It is clear from the productions thus far that Dr. Wright was mistaken in his statement in the affidavit. Indeed, we have produced responsive and relevant documents from

---

[7] Defendant has marked **Exhibit D** (DEF_00000049-68) "confidential." To facilitate expeditious resolution, Plaintiffs will bring it to the hearing for the Court's review instead of filing it.

753

various ATO investigations. Defendant's counsel made clear that documents relating to the ATO proceedings were produced. Ms. Markoe personally went to Dr. Wright's home and reviewed binders of materials from the ATO investigations that were hardcopies of materials provided to counsel, and often had counsel's names on the binders. Further, Ms. Markoe has reviewed a sampling of the privileged ESI that contain email addresses from Dave Kleiman and that ESI consisted of communications to Dr. Wright's counsel and Dr. Wright's companies' counsel providing them with documents related to various ATO investigations.

### D.    Defendant's failure to cooperate in the coordination of ESI

**Plaintiffs**: The Court ordered Defendant to:

> be transparent about what you've got, where it is, what it is, the categories you have. Because the more transparent you can be, then it is going to help Mr. Freedman and his team target in on what they want to prioritize . . . This is a historical case. The facts are what they are. The faster you all come to that realization and work it out and get the information exchanged, then you can really focus on the things that are important in this case. So I order the parties to do all of that.

2/20/19 Hr. Tr. at 37:3-7, 39:5-8. Plaintiffs have tried to work with Defendant to understand the scope of discovery, and narrow requests into high yield areas, but Defendant has refused to provide certain highly relevant information in advance of Mr. Wright's deposition on April 4. Plaintiffs ask the Court to order Defendant: (1) to provide the names of the 30 trusts and companies he claims involved him, but not Dave Kleiman; and (2) to provide a list of Australian companies, attorneys, accountants, and employees he's collected ESI from. Both these lists will help focus Defendant's deposition (and all discovery) into more high-yield areas of inquiry. Plaintiffs believe these requests are reasonable and consistent with this Court's directives, but Defendant has refused to provide them.

**Defendant**: The compilation of the names of the 30 trusts and companies we discussed with the Court at the March 6th hearing is work product. To date, Dr. Wright has produced over

754

22,000 pages of documents to plaintiffs consisting of over 5,000 documents (less than 1,000 of which are hard copies). Many of those documents provide the information plaintiffs seek. Dr. Wright is under no obligation to create documents that do not otherwise exist but can be gleaned from a review of produced materials.

**E.      Disputed search terms**

    **Plaintiffs**: have listed the search terms it requests, but Defendant objects to, and their hits, in **Exhibit F**. Plaintiffs believe these search terms are patently relevant and narrowly tailored. Plaintiffs are prepared to discuss them if the Court has any questions.

    **Defendant:** As can be seen from the hit count report attached as **Exhibit G,** these search terms are not narrowly tailored, and some of them are simply not relevant based on this Court's previous rulings.

**F.      Outstanding RFPs**

    At the last discovery hearing, the Court deferred ruling on Plaintiffs' Second Set of RFPs No. 16, 18-27, 36-37, 40-41, 45, and 88. These RFPs have been briefed by the parties in ECF No. [114], at 4-7. **Defendant:** With regard to RFPs 36-37, 40-41, 45, plaintiffs provided usable search terms after 11 p.m. on March 19. Dr. Wright provided hit counts on those searches on March 20. *See* **Exhibit H.**

Respectfully submitted,

*Counsel to Plaintiffs Ira Kleiman as*
*Personal Representative of the Estate*
*of David Kleiman and W&K Info*
 *Defense Research, LLC.*

<u>s/ Velvel (Devin) Freedman</u>
Velvel (Devin) Freedman, Esq.
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zmarkoe@riveromestre.com
Email: receptionist@riveromestre.com

Facsimile:  (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
Admitted Pro Hac Vice
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

By: s/ *Andres Rivero*
ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
ZAHARAH MARKOE
Florida Bar No. 504734

## CERTIFICATE OF SERVICE

I certify that on March 24, 2019, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman

10

756

# TAB 144-1

| | |
|---|---|
| From: | Dave Klieman |
| To: | Uyen Nguyen |
| Subject: | Apppointment letter |
| Date: | Thursday, 20 December 2012 8:19:03 AM |

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA1

UT
Craig speaks highly of you.

I am going to need and ask for your help. You know Craig well and I am an enigma. I have been unwell and in the VA far too much. I need a person who can run around. Craig is too far away and we need him to remain off of this.

I will ask you to be a director with me in W&K Information Defense Research LLC. We are setting up a company in Australia and will move the assets back from Panama once this is complete. We placed them there to protect Craig.

At the time, the Australian IRS valued the IP at nothing, now it is ok, but one day it could be worth more than anything we can imagine. For this reason, we need to work to stop it being seen in the wrong light.

Craig is a great guy, but too volatile. He also does not know when to accept that rules get broken by others far too much. Unless I hear otherwise, I will assume you are coming on-board. I will work out a time to meet with you in May if my health improves. Do not let Craig badger you too much.

Dave
-----BEGIN PGP SIGNATURE-----
Version: GnuPG v2.0.19 (MingW32)

iQEcBAEBAgAGBQJTH+uQAAoJELiFsXrEW+0bCacH/3KruseVIurwbAVr3b2ckSiv
YXX5lMkwsBXTVfkxm/at1nvCwrzYNroiv1Ee5jLIOhFZhr7mqpqAQ7yYURUPtNl9
U3Eh+tXaH20eLrXayUaFvEKzS6N0cA+W+8DWLt/VmlycxdYojxAoHXDM2UAp6RFl
w5T8yZ6Z1acAUgmvaX+sTm8tQ1P0U2BYC7T0cpTZ2mX+dhYCuJDyhFo2IoeHlhs7
D7ruF+/QepxDDySN70qi3IstNOkMNyc4H3Kw9rbEizy0y3xtM7FjcNtOPW1t4/Ge
ePFclnXZaHk/Aw5RT6F1lFBjTaCZ58WQnxgiehDTvGNatTGsszBHjM9lwoMs0YU=
=7JsV
-----END PGP SIGNATURE-----

# TAB 144-6

| | |
|---|---|
| **From:** | Dave.Klieman |
| **To:** | Uyen Nguyen |
| **Subject:** | Apppointment letter |
| **Date:** | Thursday, 20 December 2012 9:11:14 AM |

Uyen

I am glad you will accept being a director of W&K.

As soon as I am out of the VA I will get all of the paperwork fixed for the company. We will make sure it is maintained, as I am a little behind. Nothing too bad, but old illnesses. I will be back soon.

The process will be one where I instruct you and you strart to act more and more for me as you become the director and we start moving assets back into Australia.

When Craig first moved these in 2011 following a discussion and plans in late 2010, the value was close to nothing. We did use Craig's source code with his permission to gain a large amount of funding, so this is a part fo where the value is from, the rest is in the use of bitcoin.

Dave

# TAB 154

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                                    **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/

<u>**NOTICE OF WITHDRAWING EXHIBIT**</u>

      Dr. Craig Wright respectfully notifies the Court that he withdraws **Exhibit A** to his

Motion for Judgment on the Pleadings for Lack of Subject-Matter Jurisdiction [D.E. 144-1]. That

exhibit is an email exchange between Dave Kleiman and Uyen Nguyen. Dr. Wright withdraws

the exhibit because he cannot verify the date of that email exchange. Dr. Wright is not

withdrawing the motion and maintains that this Court lacks subject-matter jurisdiction over this

759

action.

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Dr. Craig Wright*
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveromestre.com
Email: arolnick@riveromestre.com
Email: bpaschal@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
ALAN H. ROLNICK
Florida Bar No. 715085
AMANDA MCGOVERN
Florida Bar No. 964263
BRYAN L. PASCHAL
Florida Bar No. 091576

## CERTIFICATE OF SERVICE

I certify that on April 18, 2019, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/Andres Rivero
ANDRES RIVERO

# TAB 159

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**JUDGMENT ON THE PLEADINGS FOR LACK OF**
**SUBJECT-MATTER JURISDICTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 2

   I.   THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS ACTION. ..... 3

     A.   Dave was W&K's sole member. .................................................... 3

     B.   The evidence Craig cites, even if accepted as authentic, shows absolutely nothing related to the membership of W&K. ....................................................... 4

   II.   CRAIG'S EXHIBIT A IS A FORGERY HE CREATED A YEAR AFTER DAVE'S DEATH AND WHICH HE ONLY WITHDREW IN THE FACE OF MASSIVE PUBLIC CONDEMNATION FOR SUBMITTING FRAUDULENT DOCUMENTS TO THIS COURT. .................................................................................................. 6

     A.   The email is a forgery. ............................................................... 7

     B.   Without the fraudulent email, the entire motion falls. ................................ 11

   III.   THIS COURT HAS SUPPLEMENTAL JURISDICTION IN ANY EVENT. ................ 11

## TABLE OF AUTHORITIES

**Cases**

*Ametex Fabrics, Inc. v. Just In Materials, Inc.*,
   140 F.3d 101 (2d Cir.1998) ....................................................................... 13

*Canales v. ALM Media, LLC*,
   No. 12-CV-1036, 2013 WL 12121453 (W.D. Tex. Jan. 9, 2013) ................ 5

*Carter v. Bayview Loan Servicing LLC*,
   No. 4:18-CV-00822, 2018 WL 5732083 (S.D. Tex. Aug. 27, 2018) ........... 5

*Delgado v. Pawtucket Police Dept.*,
   668 F.3d 42 (1st Cir. 2012) ...................................................................... 13

*Enercomp, Inc. v. McCorhill Pub., Inc.*,
   873 F.2d 536 (2d Cir. 1989) ..................................................................... 13

*HCA Health Services of Florida v. Hillman*,
   906 So. 2d 1094 (Fla. 2nd DCA 2004) ..................................................... 14

*Koul v. Strong Memorial Hospital*,
   282 F.Supp.3d 569 (W.D.N.Y. 2017) ...................................................... 13

*McElmurray v. Consol. Govt. of Augusta-Richmond County*,
   501 F.3d 1244 (11th Cir. 2007) .................................................................. 2

*Moore v. Ocwen Loan Servicing, LLC*,
   No. 1:17-CV-1867, 2017 WL 8186863 (N.D.Ga., 2017) ........................... 4

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) ................................................................................... 3

*Palmer v. Hospital Authority of Randolph Co.*,
   22 F.3d 1559 (11th Cir. 1994) ................................................................. 12

*Parker v. Scrap Metal Processors, Inc.*,
   468 F.3d 733 (11th Cir. 2006) ............................................................ 12, 14

*Pilkington v. United Airlines, Inc.*,
   921 F.Supp. 740 (M.D.Fla. 1996) ........................................................... 13

*Roe v. Michelin N. Am., Inc.*,
   613 F.3d 1058 (11th Cir.2010) .................................................................. 2

*Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*,
   374 F.3d 1020 (11th Cir. 2004) .................................................................. 4

*Scarfo v. Ginsberg*,
   175 F.3d 957 (11th Cir.1999) ............................................................................ 2

*Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*,
   349 F. Supp. 3d 1316 (S.D. Fla. 2018) (Martinez J.)...................................... 4

*Slater v. United States Steel Corp.*,
   871 F.3d 1174 (11th Cir. 2017) ........................................................................ 3

*Thomas v. United Steelworkers Local 1938*,
   743 F.3d 1134 (8th Cir. 2014) ........................................................................ 13

*United Mine Workers v. Gibbs*,
   383 U.S. 715 (1966)................................................................................... 11, 12

**Other Authorities**

13D Wright & Miller, Fed. Prac. & Proc. Juris. § 3567.3 (3d ed.)............................ 13

28 USC § 1367(a) ...................................................................................................... 11

Fla. Stat. § 608.0407 ............................................................................................... 4, 5

Fla. Stat. § 608.422-.4229 ....................................................................................... 4, 5

Fla. Stat. §§ 608.402 (18)-(22)................................................................................ 4, 5

764

Ira Kleiman ("Ira") and W&K Info Defense Research, LLC ("W&K") (collectively "Plaintiffs") respectfully submit this opposition to Defendant's ("Craig's") Motion for Judgment on the Pleadings for Lack of Subject-Matter Jurisdiction (ECF No. [144]).

<u>**INTRODUCTION**</u>

This case arises from Craig's theft of over $11 billion worth of bitcoins and intellectual property from the estate of Dave Kleiman ("Dave") and W&K shortly after Dave's 2013 death. W&K is a Florida LLC founded by Dave in February 2011.

Craig has now moved for judgment on the pleadings claiming that W&K has alien members which destroy diversity. As explained below, Craig's motion fails to provide any evidence to demonstrate alien **membership** in W&K. Furthermore, and in any event this Court has supplemental jurisdiction.

That aside, and as discussed below in detail, Craig has lied to this Court every single time he's tried to dismiss this case. This motion is no exception.

On April 16, 2018, Craig moved to dismiss Plaintiff's original complaint. (ECF No. [12]). In support of his argument that this Court lacked personal jurisdiction, Craig submitted false testimony claiming he had no relationship with W&K. (ECF No. [12-1], at 2.) Plaintiffs caught him in this lie and exposed that he swore the opposite to the Australian courts. (ECF No. [83], at ¶¶160-170).

After Plaintiffs amended the complaint – in part to expose his lies – Craig moved to dismiss again. (ECF No. [33]). Craig argued this Court should dismiss the case on forum non conveniens grounds because the relevant evidence was in Australia. (*Id*. at 19-27.) In support of this argument, Craig again submitted false testimony claiming "I have no documents in my possession from any ATO investigation" and that if such documents existed, they were with his attorneys "in Australia." (ECF No. [33-3] at ¶18). During discovery, however, Craig completely contradicted this

testimony. He now claims that he has so many documents from the ATO investigation in his own possession that he should not be required to ask his Australian lawyers for copies, and he has expressly admitted his prior contrary sworn statement was "mistaken." (ECF No. [127] at 7.)

Craig's most recent motion – requesting that this Court dismiss Plaintiffs' case for lack of subject-matter jurisdiction – demonstrates that his proclivity for lying to this Court has no bounds. In support of his motion, Craig attached an email that purportedly shows Dave appointing Uyen Nguyen ("Uyen") as a "director" of W&K. However, as explained below, Craig forged this fraudulent email a year after Dave's death in an effort to facilitate his theft of W&K's property.

For these reasons, and the reasons articulated below, Craig's motion should be denied.

## ARGUMENT

"[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint." *McElmurray v. Consol. Govt. of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007). "A 'facial attack' on the complaint require[s] the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Id.* (internal quotations omitted). "'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id.* (internal quotations omitted). "In a factual attack, the presumption of truthfulness afforded a plaintiff under Federal Rule of Civil Procedure 12(b)(6) does not attach, and the court is free to weigh the evidence." *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir.1999). Further, "courts may use their judicial experience and common sense in determining whether the case stated in a complaint meets federal jurisdictional requirements." *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir.2010). Because Plaintiffs have met this burden and sufficiently demonstrated that Dave

2

766

Kleiman was W&K's sole member – and Craig has not shown this Court any evidence to demonstrate otherwise – his motion must be denied.

**I.  THIS COURT HAS SUBJECT-MATTER JURISDICTION OVER THIS ACTION.**

    **A.  Dave was W&K's sole member.**

Plaintiffs adequately alleged that Dave was W&K's sole member (ECF No. [83] ¶¶ 69-71), and the evidence demonstrates the truth of this allegation. Craig testified that it was Dave's idea to create W&K. (Redacted Craig Dep. Tr. 218:7-8, attached as Ex. 1). Dave created W&K in Florida on February 14, 2011. (ECF No. [83-3]). Further, when Dave filed W&K's articles of organization, he listed solely *himself* as its **member** and manager. (ECF No. [83-3], at 3 (listing "David A. Kleiman" with the title "MGRM"); *compare with* Ex. 2, available at https://efile.sunbiz.org/llc_ar_help.html (defining "MGRM - A person who is a **member** and also manages the company"); *see also* ECF No. [83] at ¶69.) As explained below, there is no other evidence of additional members in W&K, and Craig cannot claim to have any information to the contrary because he testified at his deposition that he has "no idea" who owns W&K. (Ex. 1, 219:12-220:01).[1]

As demonstrated by W&K's articles of organization and Craig's own statements, Dave, a Florida resident, was the sole member of W&K. The Personal Representative of his estate

---

[1] Craig has previously claimed an ownership interest in W&K alongside Dave. (ECF No. [83-4] at 5). But no evidence supports his claim and he has sworn to this Court that his past statement was untrue in that he never owned any interest in W&K. (ECF No. [12-2] ¶¶ 9, 12.) He swore the same at his deposition, disavowing any interest in W&K, in any form. (Ex. 1 at 219:10-11, 15-16, 230:19-21. (Q: "Did you have any ownership in W&K?" A: "No." . . . Q: "who owned W&K in reality?" A: "not me." . . . Q: "Was W&K your company?" . . . A: "No.").) Consistent with his testimony to this Court, Craig's motion also never claims any ownership in W&K. Indeed, any such assertion would be barred under the doctrine of judicial estoppel. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1180–82 (11th Cir. 2017) (*en banc*). Craig's testimony, consistent with the evidence cited above, leaves Dave as W&K's sole member.

succeeded to that membership interest upon his death and Craig's motion has produced no evidence – legitimate or fraudulent – to suggest otherwise. (ECF No. [83] ¶ 71.).

### B.    The evidence Craig cites, even if accepted as authentic, shows absolutely nothing related to the membership of W&K.

Craig is correct that, for diversity purposes, an LLC has the citizenship of its members, and that diversity is destroyed if aliens are on both sides of the "v." But W&K has no alien membership, and nothing Craig has submitted even begins to show membership in W&K at all.

Said simply, even if all the evidence Craig submitted with his motion were legitimate – it's not – this Court would still have subject-matter jurisdiction over this action. Craig's motion is premised entirely on the notion that alleged foreign nationals Uyen and Coin-Exch PTY Ltd. ("Coin-Exch") are **members** of W&K. But Craig has submitted **no evidence at all** that Uyen and Coin Exch were ever W&K **members**. Instead, his evidence – at best – demonstrates that Uyen and Coin Exch were directors, managers, and secretaries of W&K. But officers of a company do nothing to establish residence for jurisdictional purposes.

Under Florida law, an LLC is owned by "members," and is managed by either the members themselves, non-owner "managers," or by "member managers." Fla. Stat. §§ 608.402 (18)-(22), .0407, 422-.4229 (effective January 1, 2006 to June 10, 2015); *see also Moore v. Ocwen Loan Servicing, LLC*, No. 1:17-CV-1867, 2017 WL 8186863, at *1 (N.D.Ga., 2017) ("By definition, an LLC is owned by its members.").

"But for purposes of diversity jurisdiction, it is the citizenship of an LLC's *members*—not its managers—that is relevant." *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1324 (S.D. Fla. 2018) (Martinez J.) (emphasis in original) *citing Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004); *Carter v. Bayview Loan Servicing LLC*, No. 4:18-CV-00822, 2018 WL 5732083, at *3 (S.D. Tex. Aug.

4

768

27, 2018) ("While Plaintiff identifies a list of some individuals—who may or may not be—acting as various officers and directors of Bayview (e.g. president, secretary, chief financial officer, etc.), they are not the members of Bayview from whom its citizenship is determined."); *Canales v. ALM Media, LLC*, No. 12-CV-1036, 2013 WL 12121453 at *3 (W.D. Tex. Jan. 9, 2013) ("The application lists three individuals who are identified as managers of ALM Media. None of these persons are identified as members of the company or as owning a membership interest in the company.").

Craig's motion relies on a March 2014 online Sunbiz filing, submitted a year after Dave's death, by Craig's agent Uyen, who listed herself (with a false Florida address) as W&K's new "registered agent" for service when she fraudulently reinstated W&K. (ECF No. [83-25], at 2). In that same filing, Uyen added herself and Coin Exch under the "authorized persons" section of W&K's reinstatement with specific "titles," giving herself the position of "MS" (*i.e.,* manager and secretary) and Coin Exch the position of "DR" (*i.e.,* director) [2]. (*Id.*) Putting aside the fact that Uyen was never authorized to file this document, it in no way states or implies that Uyen or Coin Exch were **members** of W&K.

W&K's publicly filed articles of organization identify only Dave as the LLC's **member** and manager. Uyen's subsequent filing – even if not fraudulent – does not suggest otherwise. An LLC's registered agent need not be, and often is not, an LLC member. The same is true for an LLC's managers and "authorized representatives," such as a "secretary" or a "director" (actually,

---

[2] The "Title Abbreviations" on the Florida Division of Corporations' website define "M" as Manager, "S" as Secretary, and "D" as Director." (Ex. 3, available at https://dos.myflorida.com/sunbiz/search/guides/corporation-records/title-abbreviations/.) True to form, Craig completely fails to mention that he himself admitted Uyen "added herself as registered agent, manager, and secretary for W&K, and added Coin-Exch Pty Ltd. as director" in his first motion to dismiss the case where he never mentioned a word about their alleged "**membership**" in W&K. (ECF No. [12], at 5).

769

LLCs do not even have directors). Fla. Stat. §§ 608.402 (18)-(22), .0407, 422-.4229 (effective January 1, 2006 to June 10, 2015); *Cox & Hazen*, *supra*. Craig's motion states repeatedly that Uyen and Coin Exch have been "publicly identified" as W&K "members," but he cites literally nothing that so says, and he does not even attempt to explain how a secretary or director or registered agent can *ipso facto* be deemed a member of an LLC.

Thus, even putting aside the audacious forgery he submitted in support of this motion (*see* Part II below), his attempt to "attack" the jurisdiction of this Court by identifying "alien" members of W&K has no supporting authority or evidence, and should be rejected by this Court as frivolous.

## II.    CRAIG'S EXHIBIT A IS A FORGERY HE CREATED A YEAR AFTER DAVE'S DEATH AND WHICH HE ONLY WITHDREW IN THE FACE OF MASSIVE PUBLIC CONDEMNATION FOR SUBMITTING FRAUDULENT DOCUMENTS TO THIS COURT.

The sole basis for Craig's claim that Uyen had authority to make the 2014 Sunbiz filing he relies on is his false allegation that Uyen was a "director" of W&K. Craig's motion asserts (at 3) that "before his death, Dave Kleiman (and not Dr. Wright) personally appointed Ms. [Uyen] Nguyen as a 'director' of W&K." The basis for this allegation is a purported December 20, 2012 email that Craig alleged Dave sent to Uyen and signed with a PGP key. (ECF No. [144-1].) But within hours of Craig filing his motion, the cryptocurrency community erupted with news that the PGP signature at the bottom of the email was generated on March 12, 2014 – one year *after* Dave's

death and a few short weeks before Uyen's fraudulent Sunbiz filing.[3] Dave did not write or send this email (he was dead). It is a fake forged by Craig.

Recognizing he had been caught in yet another lie, Craig withdrew the exhibit "because he cannot verify the date of the email exchange." (ECF No. [154].) This was another lie. He knows for a fact when it was created because, as demonstrated below, documents produced in discovery prove that Craig himself drafted the fraudulent email mere minutes before a PDF of the forgery was created.

### A.    The email is a forgery.

Suspiciously, Craig produced the "email" attached to his motion as Exhibit A (ECF No. [141-1]) as a PDF and not an original email file. (Edman Aff. ¶ 16, attached hereto as Ex. 9.) Tellingly, the metadata on the PDF file shows that it was created on April 16, 2014, *i.e.,* almost a year and a half after it was allegedly sent by Dave Kleiman, and a year after he died. (*Id.* at ¶¶ 29-30.) The metadata further indicates that the local time zone of the computer on which the PDF was created is the same time zone associated with eastern Australia (*id.* at ¶ 29) – the country Craig lived in during 2014.

But if that itself wasn't enough to call the "email" PDF into question, *just six minutes* before Craig last modified that PDF, he emailed a "draft" of the final forgery from himself to himself! (Ex. 10, DEF_00030487). Notably, the forgery-in-progress wasn't yet complete – it was missing the critical fields stating that the email came "From: Dave Klieman [sic]," went "To: Uyen

---

[3] *See e.g.* Ex. 4, available at https://www.ccn.com/craig-wright-allegedly-submits-fake-e-mail-in-dave-kleiman-lawsuit; Ex. 5, available at
https://www.reddit.com/r/Bitcoin/comments/bdxkii/the_fraud_continues_craig_wright_just_purposely/; Ex. 6, available at https://www.chepicap.com/en/news/8963/did-craig-wright-just-submit-a-faked-email-as-evidence-for-his-lawsuit-.html; Ex. 7, available at
https://www.cryptovibes.com/crypto-news/faketoshi-craig-wright-presents-provably-fake-documents-in-kleiman-case/; Ex. 8, available at
https://twitter.com/DrFunkenstein6/status/1118229116711518211.

771

Nguyen," and was dated "December 20, 2012." (ECF No. [144-1].) In the intervening six minutes,

Craig completed the forgery, saving it as a PDF, but was apparently too rushed to correctly spell

the name of his deceased "best friend." (*Id.* (spelling Dave Kle**i**man's last name "Kl**ie**man"); (Ex.

1 at 48:17-18)). For the Court's convenience, the draft forgery and the final forgery are reproduced

below:



**Draft Forgery**
**(Ex. 10, (Email file sent from Craig to Craig, dated April 16, 2014).)**

From: Craig S Wright
Sent: Wednesday, April 16, 2014 10:22 PM
To: Craig Wright
Subject: Apppontment letter

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA1
UT
Craig speaks highly of you.
I am going to need and ask for your help. You know Craig well and I am an enigma. I have been unwell and in the VA far too much. I need a person who can run
around. Craig is too far away and we need him to remain off of this.
I will ask you to be a director with me in W&K Information Defense Research LLC. We are setting up a company in Australia and will move the assets back from
Panama once this is complete. We placed them there to protect Craig.
At the time, the Australian IRS valued the IP at nothing, now it is ok, but one day it could be worth more than anything we can imagine. For this reason, we need
to work to stop it being seen in the wrong light.
Craig is a great guy, but too volatile. He also does not know when to accept that rules get broken by others far too much. Unless I hear otherwise, I will assume
you are coming on-board. I will work out a time to meet with you in May if my health improves. Do not let Craig badger you too much.
Dave
-----BEGIN PGP SIGNATURE-----
Version: GnuPG v2.0.19 (MingW32)

iQEcBAEBAgAGBQJTH+uQAAoJELiFsXrEW+0bCacH/3KruseVIurwbAVr3b2ckSiv
YXXSlMkwsBXTVffxm/at1nvCwrzYNrolv1Ee5jLlOhFZhr7mqpqAQ2yYURUPtN/9
U3Eh+tXaH20eLrXayUaFvEKrS6N0cA+W+8DWLt/VmiycxdYojxAoHXDM2UAp6RFl
w5T8yZ6Z1acAUgmvaX+sTm8tQ1P0U2BYC7T0cpTZ2mX+dHYCuJDyhFo2IoeHlhs7
D7ruF+/QepxDDySN70qi3lstNOkMNyc4H3Kw9rbE:zy0y3xtM7FjcNtOPW1t4/Ge
ePFcinXZaHk/AwSRT6F1IFBjTaCZ58WQnxgiehDTvGNatTGsszBHjM9lwoMsDYU=
=7JsV
-----END PGP SIGNATURE-----

**Final Forgery**
**(ECF No. [144-1] (PDF file with email headers forged and "Kleiman" misspelled).)**

From:     Dave Klieman
To:       Uyen Nguyen
Subject:  Appoointment letter
Date:     Thursday, 20 December 2012 8:19:03 AM

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA1

UT
Craig speaks highly of you.

I am going to need and ask for your help. You know Craig well and I am an enigma. I have been
unwell and in the VA far too much. I need a person who can run around. Craig is too far away
and we need him to remain off of this.

I will ask you to be a director with me in W&K Information Defense Research LLC. We are setting
up a company in Australia and will move the assets back from Panama once this is complete. We
placed them there to protect Craig.

At the time, the Australian IRS valued the IP at nothing, now it is ok, but one day it could be
worth more than anything we can imagine. For this reason, we need to work to stop it being
seen in the wrong light.

Craig is a great guy, but too volatile. He also does not know when to accept that rules get broken
by others far too much. Unless I hear otherwise, I will assume you are coming on-board. I will
work out a time to meet with you in May if my health improves. Do not let Craig badger you too
much.

Dave
-----BEGIN PGP SIGNATURE-----
Version: GnuPG v2.0.19 (MingW32)

iQEcBAEBAgAGBQJTH+uQAAoJELiFsXrEW+0bCacH/3KruseVIurwbAVr3b2ckSiv
YXX5IMkwsBXTVfkxm/at1nvCwrzYNroiv1Ee5jLlOhFZhr7mqpqAQ7yYURUPtNI9
U3Eh+tXaH20eLrXayUaFvEKzS6NOcA+W+8DWLt/VmlycxdYojxAoHXDM2UAp6RFI
w5T8yZ6Z1acAUgmvaX+sTm8tQ1P0U2BYC7T0cpTZ2mX+dhYCuJDyhFo2loeHlhs7
D7ruF+/QepxDDySN70qi3IstNOkMNyc4H3Kw9rbEizyOy3xtM7FjcNtOPW1t4/Ge
ePFcInXZaHk/Aw5RT6F1IFBjTaCZ58WQnxgiehDTvGNatTGsszBHjM9IwoMsOYU=
=7JsV
-----END PGP SIGNATURE-----

9

773

Finally, if there were any doubt remaining as to the email's fraudulent nature – there isn't – Craig's attempt to make the perfect forgery backfired. Craig included a "PGP Signature" in the email in an attempt to make it cryptographically "indisputable" that the email was sent by Dave Kleiman. This proved to be his undoing.

Pretty Good Privacy ("PGP") is a computer software program that, allows a user to, among other things, encrypt and decrypt data such as emails, files, or documents. (Ex. 9 ¶ 18.) Communication programs, such as GnuGP, leverage PGP encryption so that a recipient can verify the data received has (i) originated from the sender and (ii) has not been altered. (*Id.* at ¶¶ 19-20.) In order to create a PGP signature of an email, the sender creates a hash of the emails' content with a "private key" that is possessed by the sender. **<u>Critically</u>**, the resulting signature creates a timestamp indicating when the digital signature was created. (*Id.* at ¶ 22.) Furthermore, while that timestamp is present, it's not obvious to the uninitiated and takes advanced computer knowledge to decode. (*Id.*)

After the flurry of helpful public analysis from the cryptocurrency community, Plaintiffs retained Dr. Matthew J. Edman. Dr. Edman has a Ph.D in Computer Science and is an expert in cryptography, bitcoin, and PGP Software. (*Id.*) As explained in detail in his affidavit, Dr. Edman confirmed that the PGP signature was in fact created on March 12, 2014 at 5:07:28 AM UTC according to the computer on which the signature was created. (*Id.* at ¶¶ 15, 23-24.) That is, **more than a year after Dave died** and a mere two weeks before Uyen filed her fraudulent Sunbiz filing.

Clearly this email purporting to show Dave appointing Uyen as a "director" of W&K is a forgery. Dave **never** appointed Uyen to be a director in any company. In fact, Uyen told Ira via email that she knew nothing about Dave. (Ex. 11, KLEIMAN_00004796.) But after being caught

lying to this Court for the fourth time,[4] he withdrew the exhibit under the pretense of yet a *fifth* lie, that he couldn't verify the date he'd drafted and sent the forgery. (ECF No. 154).

### B.    Without the fraudulent email, the entire motion falls.

When Craig withdrew the fake email as an exhibit, he stated that he was nevertheless "not withdrawing the motion and maintains that this Court lacks subject-matter jurisdiction over this action." (*Id.* at 1-2.) However, without this exhibit, there is no evidence that Uyen was ever authorized to act for W&K and file the 2014 Sunbiz filing. In which case, Craig has **nothing** at all to support his contention that Uyen's 2014 Sunbiz filing was legitimate.

To be sure, and as explained above, the substance of the evidence – even it was all legitimate – would not support Craig's motion for dismissal based on subject matter jurisdiction because they say nothing about W&K's membership.

### III.    THIS COURT HAS SUPPLEMENTAL JURISDICTION IN ANY EVENT.

As shown above, there is no evidence that anyone other than Dave Kleiman was a member of W&K. Accordingly, this Court plainly has diversity jurisdiction for this case. But even if it did not, the Court has supplemental jurisdiction under 28 USC § 1367, which codified *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). This Court undisputedly had original jurisdiction prior to the dismissal of Plaintiffs' federal trade secrets claim and thus, under § 1367(a), the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The state claims are all closely related to the federal claim and are part of the same "case or controversy," arising from the same "common nucleus of operative fact."

---

[4] Before Judge Reinhart, Craig also falsely a national security objection as a basis for not answering certain questions at his deposition, later having his counsel retract that assertion, claiming instead that his personal security was at issue. (ECF No. [145] at 9.)

*Gibbs*, 383 U.S. at 725.

Of course, the exercise of this supplemental jurisdiction is subject to 28 USC § 1367(c)(3), which gives the Court the discretion to decline to retain jurisdiction if all federal claims are dismissed. The Court's discretion should be guided by principles of "judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 745 (11th Cir. 2006); *Palmer v. Hospital Authority of Randolph Co.*, 22 F.3d 1559, 1569 (11th Cir. 1994). Plaintiffs submit that these factors warrant retention of jurisdiction by this Court.

With respect to judicial economy, this Court and Judge Reinhart have already devoted countless hours to this case that has been pending before this Court for over a year. Judge Reinhardt has:

- reviewed numerous discovery memorandums

- held five lengthy courtroom discovery hearings;

- held a telephone hearing during Craig's London deposition;

- adjudicated a dispute regarding the confidentiality stipulation;

- adjudicated a dispute over the forensic imaging of Dave Kleiman's drives;

- issued a report and recommendation on a motion; and

- handled various other matters in this complicated case.

(*See* ECF No. [79], [90], [103], [104], [107], [110], [117], [122-24], [129-30], [135], [137], [146].)

In addition, this Court has authored a 39-page opinion largely denying Craig's motion to dismiss (which consisted of over 150 pages of briefing), a four-page opinion granting Craig's motion to stay discovery, set and amended the case scheduling order and trial date, and resolved various other issues. (*See* ECF No. [21], [28], [30], [39], [54], [57], [68], [72], [78], [143], [148].)

776

In light of the extensive expenditure of judicial and party resources, it would not make sense to force the parties to start anew in state court. *See*, *e.g.*, *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1141 (8th Cir. 2014) (no error in exercising supplemental jurisdiction given the "substantial amount of time and judicial resources expended in this case"); *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 546 (2d Cir. 1989) (in light of "over eleven months of often heated pretrial litigation," it "would have been a pointless waste of judicial resources to require a state court to invest the time and effort necessary to familiarize itself with a case well-known to the presiding federal judge"); 13D Wright & Miller, Fed. Prac. & Proc. Juris. § 3567.3 (3d ed.) ("the federal court should retain supplemental jurisdiction if it has already invested substantial judicial resources in the supplemental claims").[5]

With respect to convenience, this federal court is more convenient to all parties and witnesses than the Palm Beach County state court. Both parties' counsel are in Miami, and the Miami International Airport has many more flights than its Palm Beach counterpart. As for "whether all the claims would be expected to be tried together," the answer is a definite yes, as all

---

[5] There are cases suggesting a court should "usually" decline to exercise supplemental jurisdiction if all federal claims are dismissed "before trial" but, as the above-cited authorities demonstrate, that is not so where, as here, substantial federal judicial resources have been spent on the case. *Accord*, *e.g.*, *Delgado v. Pawtucket Police Dept*., 668 F.3d 42, 48 (1st Cir. 2012) (affirming retention of jurisdiction where "the court had already determined many substantial questions of state law at summary judgment"); *Ametex Fabrics, Inc. v. Just In Materials, Inc*., 140 F.3d 101, 105–06 (2d Cir.1998) (no abuse of discretion in maintaining jurisdiction after discovery and a settlement conference had taken place); *Koul v. Strong Memorial Hospital*, 282 F.Supp.3d 569, 570–71 (W.D.N.Y. 2017) (jurisdiction retained because the court had "already developed knowledge about the case and the respective positions of the parties" and dismissal would "involve significant duplication of efforts not only by the attorneys but by a state court judge"); *Pilkington v. United Airlines, Inc*., 921 F.Supp. 740, 747-48 (M.D.Fla. 1996) (retaining jurisdiction in light of extensive discovery and the substantial "amount of time and effort expended by the Court and the litigants in developing this case").

777

of Plaintiffs' claims arise from a "common nucleus of operative fact." *Parker*, 468 F.3d at 743

(citing *Gibbs*, 383 U.S. at 725).

Last but not least is simple fairness. This case involves the outright theft of billions of

dollars' worth of property. Plaintiffs are entitled to a prompt day in court, particularly in light of

Craig's perjury and delay tactics. Furthermore, as the case has been pending for over a year, should

the Court dismiss this case and force Plaintiffs to file again in state court, Craig will certainly try

to argue that all of Plaintiffs' claims are time barred. *See HCA Health Services of Florida v.*

*Hillman*, 906 So. 2d 1094 (Fla. 2nd DCA 2004).

This Court has diversity jurisdiction so any discussion of supplemental jurisdiction is moot,

but in any event, all of the discretionary factors point in favor of the retention of jurisdiction by

this Court. Craig's motion should be denied, and he should be told that his incessant use of lies

and fraudulent evidence will not be condoned.

14

778

Dated: April 28, 2019                          Respectfully submitted,

                                               */s/ Velvel (Devin) Freedman*
                                               Velvel (Devin) Freedman, Esq.
                                               Florida Bar No. 99762
                                               BOIES SCHILLER FLEXNER LLP
                                               100 SE Second Street, Suite 2800
                                               Miami, Florida  33131
                                               Telephone:  (305) 539-8400
                                               Facsimile:   (305) 539-1307
                                               vfreedman@bsfllp.com

                                               Kyle W. Roche, Esq.
                                               *Admitted Pro Hac Vice*
                                               BOIES SCHILLER FLEXNER LLP
                                               333 Main Street
                                               Armonk, NY10504
                                               Telephone: (914) 749-8200
                                               Facsimile:  (914) 749-8300
                                               kroche@bsfllp.com

                                               *Counsel to Plaintiff Ira Kleiman as Personal*
                                               *Representative of the Estate of David Kleiman*
                                               *and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 28, 2019 I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record via transmission of Notices of Electronic Filing

generated by CM/ECF.

                                               *    /s/ Velvel (Devin) Freedman*
                                               VELVEL (DEVIN) FREEDMAN

779

# TAB 217

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-CIV-80176-Bloom/Reinhart

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and
W&K INFO DEFENSE RESEARCH, LLC,

          Plaintiffs,

v.

CRAIG WRIGHT,

          Defendant.

_____/

## ORDER ON PLAINTIFF'S MOTION TO COMPEL (DE 210)

Encryption has existed as far back as the time of Julius Caeser.[1]  The fundamental idea is simple:  use a technique to hide something now, with a secret way to reveal it later.  For text, the technique often involves a cipher – a way to encode the text itself.  For physical objects, it generally involves creating a secure location that can only be entered using an access device, such as a key.

The modern world depends on encryption.  Financial systems, national security, secure personal communications, and cloud storage all require encryption technology; otherwise they would be unprotected from hackers or intruders.

Modern cryptography is built on mathematics.  The most famous cryptographic tool is the so-called "RSA" algorithm, which was developed by three MIT professors in 1977: Ron Rivest,

---

[1] Simon Singh, The Code Book: The Science of Secrecy from Ancient Egypt to Quantum Cryptography, p. 9-10 (1999).

780

Adi Shamir, and Leonard Adleman.[2]   The RSA algorithm is predicated on the computational difficulty of factoring the products of extremely large prime numbers.[3]   In the RSA system, the encryption and decryption keys are numbers, specifically, integers.

On March 14, 2019, Dr. Wright was ordered to produce a list of his bitcoin holdings as of December 31, 2013.  DE 124 at 18-23. On April 18, 2019, he filed a motion for protective order claiming that it would be unduly burdensome for him to produce the list.  DE 155.[4]  He claimed that he could not produce a complete list because, in or about 2010, he stopped keeping track of the public addresses (i.e., the unique identifiers) for the bitcoin that he mined.[5]  He further stated, "In 2011, Dr. Wright transferred ownership of all of his Bitcoin into a blind trust."  *Id.* at 2. He therefore claimed that he did not "know any of the public addresses which hold any of the bitcoin in the blind trust [and that he] cannot provide any other public addresses."  *Id.*

The motion for protective order was denied.  DE 166.  Dr. Wright was further ordered to produce certain documents and certifications related to the trusts.  Among the items he was ordered to produce were "all transactional records of the blind trust, including but not limited to any records reflecting the transfer of bitcoin into the blind trust in or about 2011."  *Id.* at 4. This production was to be accompanied by a sworn declaration of authenticity.  *Id.*

---

[2] *Id.* at 272-79.

[3] *Id.*

[4] The motion was filed under seal.  A redacted version of the motion is filed in the public record at Docket Entry 184.

[5] Dr. Wright produced a partial list of bitcoin public addresses that he mined prior to 2011.  DE 155 at 2-3.

781

Dr. Wright provided a sworn declaration dated May 8, 2019.[6]  He swore that in October 2012 he settled a trust "whose corpus included the Bitcoin that I mined, acquired and would acquire in the future."  Wright Declaration at ¶ 5.[7]  He also swore, "Access to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined, requires myself and a combination of trustees referenced in [the blind trust] to unlock based on a Shamir scheme."  *Id.* at ¶ 23.

Plaintiffs move to compel Dr. Wright to comply with the Court's March 14 Order. They seek sanctions for his failure to do so.  DE 197.  Dr. Wright concedes that he has not complied with the Court's order, but argues that compliance is impossible. He expands upon the representation made in Paragraph 23 of his declaration.  He argues that information necessary to produce a complete list of his bitcoin holding on December 31, 2011, is in the blind trust in an encrypted file that is further encrypted using "'Shamir's Secret Sharing Algorithm', an algorithm created by Adi Shamir to divide a secret, such as a private encryption key, into multiple parts." DE 204 at 5.  Dr. Wright asserts that he cannot decrypt the outer level of encryption because he does not have all of the necessary decryption keys.  *Id.*  He states that after using a Shamir system to encrypt this information, "The key shares were then distributed to multiple individuals through the [blind] trusts" and "he alone does not have ability to access the encrypted file and data contained in it."  *Id.*

---

[6] A copy of this declaration was emailed to the Court, but was not filed with the Clerk of the Court. Defendant shall file an unredacted version under seal forthwith and, after conferring with Plaintiffs, submit a proposed redacted version for filing in the public record.

[7] Dr. Wright now states that the bitcoin itself was not transferred to the trust.  Rather, the private keys necessary to transfer the bitcoin were transferred to the trust, in an encrypted file.

782

A Shamir scheme is a technique for encrypting a piece of data.[8]  Rather than securing the data with a single numerical key, multiple numerical keys are created.  No single key can unlock the data.  Some minimum number of the keys are needed for decryption. If the keys are distributed to multiple people, no single person can unilaterally unlock the data.

The underlying math can be complicated, but the end result is not.[9]  A Shamir scheme creates a virtual safe deposit box.  What, after all, is a safe deposit box?  It is a location where items are stored but that cannot be opened by a single key.  As anyone who has utilized a bank safe deposit box knows, opening the box requires both the bank's key and the customer's key.  The customer keeps her key, so the bank cannot get into the box alone.  The bank keeps its key so that the customer (or someone who steals the customer's key) cannot get into the box alone.  Both keys are needed to open the box.

Under Shamir's system, each "key" is an ordered pair of numbers.  The person encrypting the data can create multiple keys, all of which are needed to "unlock" the encrypted data.  Think of a safe deposit box with many keyholes, not just two.  The underlying concept is the same.  If you get enough of the keys, you can unlock the data.

Dr. Wright concedes that a list of his bitcoin holdings could be generated from the information in the encrypted file in the trust. DE 204 at 4 (the encrypted file contains, *inter alia,* "other data from which information about bitcoin mined after block 70 could be re-generated."). Dr. Wright voluntarily encrypted this information using a Shamir system.  *Id.* at 5 (Dr. Wright "purposely set up a Shamir system.").  His declaration indicates that he is aware of the other

---

[8] Adi Shamir, <u>How to Share a Secret</u>, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612.

[9] The mathematics is polynomial interpolation over a finite field modulo $p$, where $p$ is a prime number.  *Id.* at 613.

4

783

individuals who possess decryption keys.  Those individuals are trustees of Dr. Wright's blind trust.  He has not explained why he cannot obtain, and has not obtained, the necessary keys from these third parties.  At this point, the record before the Court fails to demonstrate that Dr. Wright cannot through reasonable diligence comply with the Court's March 14th Order.  The Court will allow the parties to develop a full evidentiary record before it decides whether sanctions are warranted.

    **WHEREFORE**, it is ordered that:

1. The Motion to Compel (DE 210) is **GRANTED**.  On or before **June 17, 2019**, Dr. Wright shall produce a complete list of all bitcoin he mined prior to December 31, 2013.

2. Dr. Wright shall appear in person before the undersigned at the Paul G. Rogers Federal Building, 701 Clematis Street, West Palm Beach, Florida, on **June 28, 2019 at 9:00 a.m.** to show cause why the undersigned should not certify the facts recited above to the Hon. Beth Bloom and order Dr. Wright to appear before Judge Bloom to show cause why he should not be adjudged in civil and/or criminal contempt by reason of these facts.  28 U.S.C. § 636(e)(6)(B) (2019).

3. At the June 28, 2019, hearing, the Court also will determine whether, independently, sanctions short of contempt should be imposed under Fed. R. Civ. P. 37 for Dr. Wright's failure to comply with the Court's March 14, 2019, Order.

    **DONE AND ORDERED** in Chambers this 14th day of June, 2019, at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

5

784

# TAB 222

CONFIDENTIAL UNDER THE TERMS OF THE CONFIDENTIALITY AGREEMENT

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,

      Plaintiff,

v.

CRAIG WRIGHT,

      Defendant.

_____/

### DECLARATION OF CRAIG WRIGHT

I, Craig Wright, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.  I am over the age of 18, and I am competent to testify.

2.  I give this declaration based on my personal knowledge.

3.  On May 7 and 8, 2019, I met with my counsel in the United Kingdom to provide them with additional details and clarity regarding trusts that I settled that hold or held Bitcoin that I mined or acquired on or before December 31, 2013.

**Tulip Trusts**

4.  I mined Bitcoin during the years 2009 and 2010. I mined that Bitcoin directly into a trust, named ███████████████████████████████████. The trust was located in Panama. No formal trust documentation was executed regarding the Bitcoin. There are no transactions related to the Bitcoin that I mined. I

785

**CONFIDENTIAL UNDER THE TERMS OF THE CONFIDENTIALITY AGREEMENT**

later transferred the encrypted files that control access to these Bitcoin in 2011, as explained below.

5.    In June of 2011, I took steps to consolidate the Bitcoin that I mined with Bitcoin that I acquired and other assets. In October 2012, a formal trust document was executed, creating a trust whose corpus included the Bitcoin that I mined, acquired and would acquire in the future. The name of that trust is TulipTrust. It was formed in the Seycelles. I refer to this trust below as Tulip Trust I.

6.    While the trustee was initially David Kleiman, additional trustees were appointed upon the execution of the formal trust document.

7.    The trustees for Tulip Trust I are:

    a.    the company in the UK registered by #█████████, which is CO1N Ltd. UK. This company was dissolved on July 4, 2017;

    b.    Ms Uyen Nguyen;

    c.    Craig Steven Wright;

    d.    David Kleiman;

    e.    Panopticrypt Pty. Ltd. (ABN ███████████), an Australian entity now in liquidation;

    f.    Savanah Ltd., a Seycelles entity; and

    g.    the holder of PGP key IDs ███████████████████ ██████████, which is Satoshi Nakamoto (i.e., Craig Wright).

8.    I have not been in touch with Ms. Nguyen since 2016. The last contact information I have for her is as follows:

███████████████████████

2

786

CONFIDENTIAL UNDER THE TERMS OF THE CONFIDENTIALITY AGREEMENT



9.  The contacts at CO1N were Dave Kleiman and Ms. Nguyen, who was terminated as a director on June 1, 2016. Presently, there is no one other than myself who was a contract person for this entity.

10.  Craig Steven Wright may be contacted through Rivero Mestre LLP.

11.  The contact person for Panopticrypt Pty. Ltd., prior to liquidation, was Ramona Watts. Ms. Watts may be contacted through Rivero Mestre LLP.

12.  My individual point of contact for Savanah Ltd. was Denis Mayaka, whose email addresses are ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮

13.  The beneficiaries of Tulip Trust I are Wright International Investments Ltd. (IBC ▮▮▮) and Tulip Trading Ltd. (IBC ▮▮▮).

14.  I am the contact person for both beneficiaries. I can be contacted through my counsel Rivero Mestre LLP.

15.  From 2011 through 2013, I directed staff at HighSecured and Signia Enterprises to acquire Bitcoin on the market and hold it on behalf of the Tulip Trust.

16.  The principals of HighSecured were arrested in 2015. The balance of Bitcoin purchased and held remains unaccounted for.

787

CONFIDENTIAL UNDER THE TERMS OF THE CONFIDENTIALITY AGREEMENT

17.    My primary contact at HighSecured was Ritzela DeGracia. Her email address

was ████████████████        In attempts to locate her, I learned of the following

address and phone number: ████████████████████████    All

attempts to reach her at that phone number, however, have been met with no response.

18.    In 2014, I settled a trust, also known as the Tulip Trust, in the Seychelles

(registered trust number T000712). I refer to this trust as Tulip Trust II.

19.    The trustee for Tulip Trust II is Equator Consultants AG. My contact person is

Denis Mayaka, whose contact information is: ███████████████ and

████████████████    Mr. Mayaka prepared an organogram that documents the

trust.

20.    The primary beneficiaries of Tulip Trust II are me and my wife, Ramona Watts.

21.    The secondary beneficiaries of this trust are ███████████████████

████████████████████

22.    All beneficiaries may be contacted through my attorneys, Rivero Mestre, LLP.

23.    Access to the encrypted file that contains the public addresses and their associated

private keys to the Bitcoin that I mined, requires myself and a combination of trustees

referenced in Tulip Trust I to unlock based on a Shamir scheme.

I declare that the foregoing is true and correct under penalty of perjury and in

accordance with the laws of the United States of America.

This sworn declaration was signed in London on May 8, 2019.

_____

Dr. Craig S. Wright

4

788

# TAB 236

```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                      Case No. 18-80176-CIV-BB
 3
     IRA KLEIMAN, ET AL.,           )
 4                                  )
          PLAINTIFFS,               )
 5                                  )
          -v-                       )
 6                                  )
     CRAIG WRIGHT,                  )
 7                                  )
          DEFENDANT.                )    West Palm Beach, Florida
 8                                  )    June 28, 2019
     _____)
 9

10        TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

11          BEFORE THE HONORABLE BRUCE E. REINHART

12              UNITED STATES MAGISTRATE JUDGE

13

14   Appearances:

15   (On Page 2.)

16

17   Reporter              Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768         Official Court Reporter
18                         701 Clematis Street
                           West Palm Beach, Florida  33401
19                         E-mail:  SFranklinUSDC@aol.com

20

21

22

23

24

25
```

```
1    Appearances:

2    FOR THE PLAINTIFFS          Velvel Freedman, ESQ.
                                 Boies, Schiller, Flexner, LLP
3                                100 Southeast 2nd Street
                                 Suite 2800
4                                Miami, FL 33131
     -and-
5                                Andrew Brenner, ESQ.
                                 Boies, Schiller, Flexner, LLP
6                                100 Southeast 2nd Street
                                 Suite 2800
7                                Miami, FL 33131
     -and-
8                                Kyle Roche, ESQ.
                                 Boies, Schiller, Flexner, LLP
9                                333 Main Street
                                 Armonk, NY 10504
10
     FOR THE DEFENDANT:          Amanda M. McGovern, ESQ.
11                               Rivero Mestre, LLP
                                 2525 Ponce de Leon Boulevard
12                               Suite 1000
                                 Coral Gables, FL 33134
13   -and-
                                 Schneur Z. Kass, ESQ.
14                               Rivero Mestre, LLP
                                 2525 Ponce De Leon Boulevard
15                               Suite 1000
                                 Coral Gables, FL 33134
16   -and-
                                 Andres Rivero, ESQ.
17                               Rivero Mestre, LLP
                                 2525 Ponce de Leon Boulevard
18                               Suite 1000
                                 Coral Gables, FL 33134
19   -and-
                                 Zaharah R. Markoe, ESQ.
20                               Rivero Mestre, LLP
                                 2500 Ponce de Leon Boulevard
21                               Suite 1000
                                 Miami, FL 33134
22
                                  *  *  *  *  *
23

24

25
```

```
 1   Q    Okay.  So the eight of 15 that are required to unlock the

 2   addresses that the Court has ordered you to provide, who

 3   received each of the 15 key slices?

 4   A    The Court hasn't ordered me to give over the slices of

 5   those keys.

 6   Q    I'm asking you who holds the 15 key slices to access that

 7   address, those addresses?

 8   A    I hold some.

 9   Q    How many?

10   A    I don't know off the top of my head.

11   Q    You don't -- okay.  Who else holds?

12   A    I haven't looked at the file.  No one asked me to look at

13   the file.

14   Q    You were ordered to produce the addresses; is that

15   correct?

16   A    Um, yes, but this is not the addresses.

17   Q    To produce the addresses, you need to open this file; is

18   that correct?

19   A    I can't open that file without the --

20   Q    Is that -- Dr. Wright, if you'd answered my question, I'd

21   appreciate it.  To produce the addresses, you need to open

22   that file.  Is that a correct statement?

23   A    It is an incorrect statement and is misleading what I

24   said.

25   Q    What did you say, Dr. Wright?  Is it to produce the
```

791

1  addresses you need to unlock that file?

2  A    No.  What I said is you need all the different key

3  slices.

4           THE COURT:  Can I interrupt for a second?  Let me

5  try it this way.

6                         Examination

7  BY THE COURT:

8  Q    Dr. Wright, there's an outermost encrypted file, correct?

9  A    Yes.

10  Q    Okay.  How many slices do you need for that file?

11  A    Eight of 15.

12  Q    Who has them?

13  A    I don't know.

14  Q    What efforts have you made to find them?

15  A    I've tried looking through documents, et cetera.  The way

16  it was set up was I gave slices to Dave, and he was directed

17  to give them to bonded couriers that would send slices based

18  on different events.  One of those events was June 20, 2020,

19  was one to be returned, or one set to be returned.

20           I don't know whether Dave set those up correctly.

21  They used a DX service, which is bonded courier in this

22  country, I guess, where you pay someone so that if an event

23  happens, they will send the mail, a registered post for

24  instance.

25           I can't ask Dave whether he did that correctly.  To

```
1   be able to tell the Australian tax office that I had zero
2   control, I needed to hand over enough slices to Dave that I
3   didn't have control.
4   Q    Understood, but let me go back.  For this outermost
5   encrypt file, you say you need eight of 15.  Do those have to
6   be in a particular order or can they be in any order?
7   A    Those ones have to be in order.
8   Q    Okay.  Where is that order kept?
9   A    With the --
10  Q    Where is the necessary information to know that order
11  kept?
12  A    With the actual slice.  They have a number indexing them
13  for each one.
14  Q    Okay.
15  A    So it would be zero one number, zero two number.
16  Q    Okay.  And how many of those slices were -- did you keep?
17  A    Um, I have and can get a total of seven.
18  Q    Who else besides you and Dave do you know of who has
19  slices?
20  A    I know Uyen potentially had some slices.
21  Q    Okay.  Who else?
22  A    I don't know.  I was basically instructing Dave to make
23  sure I didn't know who he gave them to.
24  Q    Okay.  And so you haven't had contact with Uyen since
25  2016, correct?
```

# TAB 242-2

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

**<u>SUPPLEMENTAL AFFIDAVIT OF DR. MATTHEW J. EDMAN</u>**

1

I, Dr. Matthew J. Edman, declare under penalty of perjury, as follows:

## I.    SUMMARY OF OPINION

1.    In my previous affidavit (ECF No. [159-9]) that I submitted in response to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-1]), I determined that Exhibit A to that Motion (ECF No. [144-1], hereafter referred to as "Exhibit A") was likely created from an email the Defendant sent to himself on or about April 16, 2014 (UTC), which was then converted to a PDF and modified to appear to have been sent from "Dave Klieman (*sic*)" to Uyen Nguyen on or about December 20, 2012. I also determined that Exhibit A contained a PGP signature allegedly created by Dave Kleiman on or about March 12, 2014 – almost a year after he died.

2.    Since the submission of my previous affidavit, I have conducted further analysis of Exhibit A and identified additional forensic artifacts contained within the PDF itself that support my previous opinion. I have also conducted a forensic analysis of Exhibit F to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-6], hereafter referred to as "Exhibit F") and determined that it was created by further modifying Exhibit A to make it appear as if Exhibit F is actually a separate email sent from Dave Kleiman to Uyen Nguyen, when, in my opinion, it is simply another revision to the PDF created from an email the Defendant sent to himself on or about April 16, 2014.[1]

3.    In sum, Exhibit A and Exhibit F, which appear to be emails sent from Dave Kleiman to Uyen Nguyen on December 20, 2012, are manipulations of a PDF created from an email the Defendant sent from himself to himself on or about April 16, 2014.

---

[1] I understand Exhibit A was subsequently withdrawn by the Defendant "because he cannot verify the date of that email exchange." To my knowledge, Exhibit F has not been withdrawn by the Defendant.

## II.    __EXHIBIT A__

4.      As described in my previous affidavit, Exhibit A is a PDF document that purports to be an email sent from "Dave Klieman (*sic*)" to Uyen Nguyen on or about 8:19:03 AM on Thursday, December 20, 2012.  The metadata associated with the PDF, however, indicates the PDF was created on or about April 17, 2014 at 8:23:41 AM using Acrobat PDFMaker 11 for Microsoft Outlook on a computer whose time zone was consistent with Sydney, Australia (UTC+10), and then modified less than five minutes later.  I have further analyzed the internal contents and structure of the PDF, and have now identified those specific portions of the PDF that were edited after the PDF was created.

5.      In general, when the text within a PDF document is modified using Adobe Acrobat, the software automatically adds a "marked-content point" (indicated by an "MP" operator in the PDF's internal document structure) and is labeled "TouchUp_TextEdit" to indicate the marked-content point was created using Adobe Acrobat's "Touch Up" text editing feature. The modified text is also often represented using a sequence of 4-digit "codes," each of which is mapped to a particular character to display in a PDF reader. For example, in the PDF associated with Exhibit A, the 4-digit code "0027" corresponds to an uppercase "D".

6.      I identified a "TouchUp_TextEdit" marked-content point in the PDF file associated with Exhibit A which indicated that the text associated with the "From:", "To:", and "Date:" fields at the top of Exhibit A were edited. Figure 1 shows an excerpt from the internal structure of Exhibit A with line numbers added for reference. Line 1 shows the "TouchUp_TextEdit" marked-content point, which indicates that what follows has been modified. The text highlighted in red on Lines 6, 8, 17, 21, and 27 contain the modified text. Figure 2 provides a screenshot of how the corresponding text object appears in a PDF reader, with the modified characters highlighted in red.

3

797

**FIGURE 1**. Excerpt from the source code contained within Exhibit A indicating where changes were made in the header for Exhibit A (highlighted in red).

```
 1.    /TouchUp_TextEdit MP
 2.    BT
 3.    /CS1 cs 0 0 1  scn
 4.    /C2_0 7.5 Tf
 5.    155.85 771.598 Td
 6.    <0027004400059004800003002E004F004C0048005000440051>Tj
 7.    0 -10.5 TD
 8.    <0038005C004800510030031004A0058005C0048005100030000B0058005C00480051001100
       51004A0058005C0048005100570023005C0044004B005200520011004600520050000C>Tj
 9.    /CS0 cs 0  scn
10.    /TT1 7.5 Tf
11.    T*
12.    (Apppointment letter)Tj
13.    T*
14.    (Thursday, )Tj
15.    /C2_0 7.5 Tf
16.    35.226 0 Td
17.    <00150013>Tj
18.    /TT1 7.5 Tf
19.    ( )Tj
20.    /C2_0 7.5 Tf
21.    <00270048004600480050004500480055>Tj
22.    /TT1 7.5 Tf
23.    44.07 0 Td
24.    ( 201)Tj
25.    /C2_0 7.5 Tf
26.    14.626 0 Td
27.    <0015>Tj
28.    /TT1 7.5 Tf
29.    ( 8:19:03 AM)Tj
30.    ET
```

**FIGURE 2**. Screenshot of the rendered text object from Figure 1 with the corresponding text modifications again highlighted in red.

| From: | **Dave Klieman** |
|---|---|
| To: | **Uyen Nguyen (uyen.nguyent@yahoo.com)** |
| Subject: | Apppointment letter |
| Date: | Thursday, **20 December** 2012 8:19:03 AM |

4

798

III.    **EXHIBIT F**

7.      Exhibit F is alleged by the Defendant to be a second email from "Dave Klieman (*sic*)" to Uyen Nguyen sent less than an hour after Exhibit A in which Dave is purportedly thanking Nguyen for accepting a position as director of W&K Info Defense Research LLC.

8.      The version of Exhibit F filed by the Defendant does not bear a Bates label. DEF_00027288 was produced in this litigation by the Defendant and is visually identical to Exhibit F. I used the PDF file produced as DEF_00027288 in my analysis below.

9.      I determined that Exhibit F is a derivative of Exhibit A – which itself was based on an email sent from the Defendant to himself. Further, I have determined that Exhibit F contains additional modifications to the "Date:" field, as well as modifications to the body of the alleged email itself.

10.     As described in my previous affidavit, PDF files often contain metadata which provide information about the document, such as who created it and when, as well as when it was last modified. The metadata contained within the PDF files associated with Exhibit A and Exhibit F also contain "DocumentID" and "InstanceID" attributes. "DocumentID" is an identifier used to associate multiple versions or revisions of a particular document, whereas "InstanceID" is a unique identifier assigned to a specific version or revision of that document.

11.     As shown in Figures 3 and 4, Exhibit A and Exhibit F contain the same DocumentID but different InstanceID values, which indicates that they are both versions of the same original document. The metadata further shows that Exhibit A and Exhibit F were both created on the exact same date (as shown by the CreateDate fields), but the ModifyDate fields indicate that someone modified Exhibit F approximately five minutes after Exhibit A was last modified.

5

799

**FIGURE 4**. PDF metadata extracted from Exhibit A.

```
1 0 obj
<</Length 3320/Subtype/XML/Type/Metadata>>stream
<?xpacket begin="ï»¿" id="W5M0MpCehiHzreSzNTczkc9d"?>
<x:xmpmeta xmlns:x="adobe:ns:meta/" x:xmptk="Adobe XMP Core 5.4-c005 78.147326, 2012/08/23-13:03:03
">
   <rdf:RDF xmlns:rdf="http://www.w3.org/1999/02/22-rdf-syntax-ns#">
      <rdf:Description rdf:about=""
            xmlns:xmp="http://ns.adobe.com/xap/1.0/"
            xmlns:xmpMM="http://ns.adobe.com/xap/1.0/mm/"
            xmlns:dc="http://purl.org/dc/elements/1.1/"
            xmlns:pdf="http://ns.adobe.com/pdf/1.3/">
         <xmp:ModifyDate>2014-04-17T08:28:01+10:00</xmp:ModifyDate>
         <xmp:CreateDate>2014-04-17T08:23:41+10:00</xmp:CreateDate>
         <xmp:MetadataDate>2014-04-17T08:28:01+10:00</xmp:MetadataDate>
         <xmp:CreatorTool>Acrobat PDFMaker 11 for Microsoft Outlook</xmp:CreatorTool>
         <xmpMM:DocumentID>uuid:6a5e8226-043f-4de4-8879-3f41e143b0c3</xmpMM:DocumentID>
         <xmpMM:InstanceID>uuid:42c69e4f-6d06-4166-bcff-52c26160a0e9</xmpMM:InstanceID>
         <dc:format>application/pdf</dc:format>
         <dc:title>
            <rdf:Alt>
               <rdf:li xml:lang="x-default"/>
            </rdf:Alt>
         </dc:title>
         <pdf:Producer>Adobe PDF Library 11.0</pdf:Producer>
      </rdf:Description>
   </rdf:RDF>
</x:xmpmeta>
```

**FIGURE 3**. PDF metadata extracted from Exhibit F.

```
2 0 obj
<</Length 3320/Subtype/XML/Type/Metadata>>stream
<?xpacket begin="ï»¿" id="W5M0MpCehiHzreSzNTczkc9d"?>
<x:xmpmeta xmlns:x="adobe:ns:meta/" x:xmptk="Adobe XMP Core 5.4-c005 78.147326, 2012/08/23-13:03:03
">
   <rdf:RDF xmlns:rdf="http://www.w3.org/1999/02/22-rdf-syntax-ns#">
      <rdf:Description rdf:about=""
            xmlns:xmp="http://ns.adobe.com/xap/1.0/"
            xmlns:xmpMM="http://ns.adobe.com/xap/1.0/mm/"
            xmlns:dc="http://purl.org/dc/elements/1.1/"
            xmlns:pdf="http://ns.adobe.com/pdf/1.3/">
         <xmp:ModifyDate>2014-04-17T08:33:16+10:00</xmp:ModifyDate>
         <xmp:CreateDate>2014-04-17T08:23:41+10:00</xmp:CreateDate>
         <xmp:MetadataDate>2014-04-17T08:33:16+10:00</xmp:MetadataDate>
         <xmp:CreatorTool>Acrobat PDFMaker 11 for Microsoft Outlook</xmp:CreatorTool>
         <xmpMM:DocumentID>uuid:6a5e8226-043f-4de4-8879-3f41e143b0c3</xmpMM:DocumentID>
         <xmpMM:InstanceID>uuid:b2815a05-9c27-40fc-a085-140c7633e45a</xmpMM:InstanceID>
         <dc:format>application/pdf</dc:format>
         <dc:title>
            <rdf:Alt>
               <rdf:li xml:lang="x-default"/>
            </rdf:Alt>
         </dc:title>
         <pdf:Producer>Adobe PDF Library 11.0</pdf:Producer>
      </rdf:Description>
   </rdf:RDF>
</x:xmpmeta>
```

800

12.    I compared the edits made in Exhibit F to those previously made in Exhibit A and determined that the "Date:" field was modified to make it appear as if it were sent less than an hour after Exhibit A was allegedly sent. Figure 5 highlights in blue the "new" modifications made in Exhibit F. Figure 6 shows how that modified email header field appears in a PDF reader while also highlighting all the edits made to the email header field. In addition to the edits shown in Figure 5 and Figure 6, the data contained within the PDF file associated with Exhibit F also indicates that the body of the email was altered from the body of the email contained in Exhibit A.

801

**FIGURE 5**. Excerpt from the source code contained within Exhibit F showing a PDF text object which contains modifications. The modifications made previously in Exhibit A are highlighted in red. The edits subsequently made in Exhibit F are highlighted in blue.

```
1.    /TouchUp_TextEdit MP
2.    BT
3.    /CS1 cs 0 0 1  scn
4.    /C2_0 7.5 Tf
5.    155.85 771.598 Td
6.    <0027004400590048000300082E004F004C0048005000440051>Tj
7.    0 -10.5 TD
8.    <0038005C0048005100030031004A0058005C0048005100030080005800050C0048005100110050001004A0058005C00480051005700230030005C00440048005200520011004600520050000C>Tj
9.    /C2_1 7.5 Tf
10.   140.533 0 Td
11.   <0003>Tj
12.   /CS0 cs 0  scn
13.   /TT1 7.5 Tf
14.   -140.533 -10.5 Td
15.   (Apppointment letter)Tj
16.   -0.009 Tw T*
17.   (Thursday, )Tj
18.   /C2_0 7.5 Tf
19.   0 Tw 1 0 0 1 191.076 740.098 Tm
20.   <00150013>Tj
21.   /TT1 7.5 Tf
22.   ( )Tj
23.   /C2_0 7.5 Tf
24.   <0027004800460048005000450048005500>Tj
25.   /TT1 7.5 Tf
26.   0.008 Tw 44.07 0 Td
27.   ( 201)Tj
28.   /C2_0 7.5 Tf
29.   0 Tw 14.626 0 Td
30.   <0015>Tj
31.   /TT1 7.5 Tf
32.   ( )Tj
33.   /C2_1 7.5 Tf
34.   <001C>Tj
35.   /TT1 7.5 Tf
36.   (:1)Tj
37.   /C2_1 7.5 Tf
38.   17.278 0 Td
39.   <0014>Tj
40.   /TT1 7.5 Tf
41.   (:)Tj
42.   /C2_1 7.5 Tf
43.   <00140017>Tj
44.   /TT1 7.5 Tf
45.   ( AM)Tj
46.   ET
```

8

802

**FIGURE 6**. Screenshot of the rendered text object from Figure 5 with the text modifications from Exhibit A highlighted in red and the subsequent modifications made in Exhibit F highlighted in blue.

| | |
|---|---|
| **From:** | **Dave Klieman** |
| **To:** | **Uyen Nguyen (uyen.nguyent@yahoo.com)** |
| **Subject:** | Apppointment letter |
| **Date:** | Thursday, **20 December** 2012 **9**:11:**14** AM |

Dated:  July 9, 2019

Dr. Matthew J. Edman
Miami, Florida

9

803

# TAB 265

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

### <u>ORDER</u>

**THIS CAUSE** is before the Court upon Defendant Craig Wright's Motion for Judgment on the Pleadings, ECF No. [144] ("Motion"). The Court has reviewed the Motion, all supporting and opposing submissions, the record and applicable law, considered the arguments presented by counsel at the hearing on July 10, 2019, and is otherwise fully advised.  For the reasons that follow, the Motion is denied.

### I.    BACKGROUND

The factual background giving rise to this action has been set forth previously in prior opinions issued by this Court and are incorporated by reference. *See e.g.* ECF No. [68].  The facts relevant to the instant Motion are as follows.  On April 15, 2019, the Defendant filed the instant Motion challenging the Court's subject matter jurisdiction.  Specifically, the Defendant argues that the record evidence demonstrates that Dave Kleiman was not the sole member of Plaintiff W&K Info Defense Research, LLC ("W&K"), and that other members of the company exist whose membership would destroy diversity. The other proposed members include: 1) Uyen Nguyen ("Nguyen"); 2) Coin-Exch PTY Ltd. ("Coin-Exch"); and 3) Lynn Wright.

804

Case No. 18-cv-80176-BLOOM/Reinhart

Further, the Defendant argues that the Second Amended Complaint ("SAC"), ECF No. [83], is deficient because it alleges that both that W&K's exact ownership structure is "unclear due to Craig's contradictory statements" and that "[a]s best as can presently be discerned, [Dave Kleiman] was the sole 'member' of W&K." ECF No. [83], at ¶¶ 70-71. Therefore, the Defendant challenges the Court's subject matter jurisdiction in both a factual and facial attack. On July 10, 2019, the Court held an extensive hearing ("Hearing") on the instant Motion.

## II. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). It is presumed that a federal court lacks jurisdiction in a particular case until the plaintiff demonstrates the court has jurisdiction over the subject matter. *See id.* (citing *Turner v. Bank of No. Am.*, 4 U.S. 8, 11 (1799); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 182 (1936) ("It is incumbent upon the plaintiff properly to allege the jurisdictional facts ....")). A district court may inquire into the basis of its subject matter jurisdiction at any stage of the proceedings. *See* 13 C. WRIGHT, A. MILLER & E. COOPER, Federal Practice & Procedure § 3522 (1975).

Attacks on subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either facial or factual. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). Like a Rule 12(b)(6) motion, "[a] 'facial attack' on the complaint requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in the complaint are taken as true...." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Factual attacks differ because they "challenge[ ] the existence of subject matter jurisdiction in fact ... and matters outside of the pleadings, such as testimony and affidavits, are

2

805

Case No. 18-cv-80176-BLOOM/Reinhart

considered." *Id.* If a defendant shows a lack of diversity by meeting its burden of production for a factual attack, then the plaintiff must respond with proof definitively evincing diversity exists. *See OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). Factual attacks also differ from facial attacks because "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891.

## III.   DISCUSSION

In the instant Motion, the Defendant argues that the SAC should be dismissed because the Court lacks subject matter jurisdiction over this action. Federal district courts have subject matter jurisdiction over civil actions where the amount in controversy exceeds $75,000.00 and the suit is between citizens of different states. *See* 28 U.S.C. § 1332(a). In analyzing diversity, the citizenship of a limited liability company is determined by the citizenship of its members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (requiring all LLC members to be diverse from all opposing parties). In the Defendant's Motion, he asserts a factual challenge on subject matter jurisdiction. However, in his Reply, the Defendant has focused on a facial challenge. *Compare* ECF No. [144], at 9-14 *with* ECF No. [171], at 5. As for his factual attack, the Defendant suggests that other foreign members of W&K exist and thus diversity jurisdiction is destroyed. ECF No. [144], at 9-14. As for the Defendant's facial argument, the Defendant contends that the SAC fails to allege the complete membership of W&K and includes language that reveals that the Plaintiff may be uncertain as to the company's actual ownership. ECF No. [171], at 5. Thus, the Defendant claims that the SAC is facially deficient by failing to adequately allege diversity jurisdiction exists. The Court addresses each argument in turn.

3

Case No.  18-cv-80176-BLOOM/Reinhart

### a) *Factual Attack*

Defendant first focuses his factual attack on the Court's subject matter jurisdiction. "While the plaintiff has the burden to prove diversity in a factual attack, that burden exists only if the defendant has first proffered evidence to show a lack of diversity." *JPMCC 2005-CIBC13 Collins Lodging*, 2010 WL 11452084, at *3 (denying motion because defendant's "factual attack on diversity of citizenship is *devoid of evidentiary support*") (emphasis added); s*ee also RG Martin Investments, LLC v. Virtual Tech. Licensing, LLC*, 2017 WL 7792564 at *2 (S.D. Fla. July 7, 2017) ("The burden of pleading diversity of citizenship is upon the party invoking federal jurisdiction, and if jurisdiction is *properly challenged*, that party also bears the burden of proof.") (emphasis added).  For the reasons that follow, the Court finds that the Defendant has failed to provide *credible* evidence showing a lack of diversity. As such, he has failed to satisfy his burden of production.

In his Motion, Defendant argues that both Nguyen and Coin-Exch were members of W&K, and that their membership would destroy diversity in this action.  ECF No. [144], at 11-13. Then, for the first time in his Reply, the Defendant argues that his ex-wife Lynn Wright was also a member of W&K. ECF No. [171], at 6-7.

> *"Oh! What a tangled web we weave when first we practice to deceive."*
> **Sir Walter Scott, <u>Marmion</u> (1808).**

This is not the first time that the Defendant has made certain representations regarding the membership of W&K.  Indeed, the Court notes that the Defendant has made ***several conflicting statements*** regarding even his own ownership of W&K. ECF No. [256], at 29:24-25 ("Judge, I get that there are a number of different statements by Dr. Wright.")

4

807

Case No. 18-cv-80176-BLOOM/Reinhart

These statements include:

On *April 2, 2013*, the Defendant signed a contract, representing that Dave Kleiman is **100% owner** of W&K, which was filed before the Supreme Court of New South Wales. ECF No. [83-5], at 1.

On or about *July and August of 2013*, the Defendant filed a sworn affidavit in the Supreme Court of New South Wales declaring that he and Dave Kleiman each **owned 50%** of W&K. ECF No. [83-4], at 4.

On *April 16, 2018*, in a sworn affidavit the Defendant stated that he has "**never** been a member of W&K." ECF No. [12-2], at ¶ 12 (emphasis added).

On *June 28, 2019*, during his deposition the Defendant testified under oath that he has "**no idea**" who the owners of W&K were, and unequivocally stated that he was not an owner of W&K. *See* ECF No. [242-1], at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

Now, in his Motion and contrary to the statements above, the Defendant argues that three additional parties may be members of W&K. Defendant claims that the record evidence supports the presence of the additional members. ECF No. [144], at 11-14. The Defendant recognizes, in both his Motion and at the Hearing, that in determining whether the Defendant has sufficiently challenged subject matter jurisdiction on a factual attack, the Court is "free to weigh the evidence" presented by the Defendant in his challenge. ECF No. [144], at n.3 (citing *RG Martin Inv., LLC v. Virtual Tech. Licensing, LLC*, 2017 WL 7792564, at *2); ECF No. [256], at 12:14 ("[M]y obligation is—initially to put this in play, is to show the Court evidence. The Court can weigh the evidence."). The Court has thus conducted a careful review of the evidence presented by the Defendant and the record in this case, and finds, however, that the Defendant has failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K.

   i) **Uyen Nguyen & Coin-Exch**

In his Motion, the Defendant argues that Nguyen, a Vietnamese national, is a member of W&K and Coin-Exch, an Australian corporation, is a member of W&K. ECF No. [144], at 11-13.

5

808

Case No. 18-cv-80176-BLOOM/Reinhart

Because Nguyen is a foreign national and Coin-Exch is a foreign corporation, Defendant asserts that their membership in W&K destroys diversity jurisdiction. *Id.* At the time the Defendant filed his Motion, the Defendant's evidentiary support for these assertions included emails between Dave Kleiman, Craig Wright, and Lynn Wright, public filings available on the Florida Department of State Division of Corporations ("Sunbiz"), and several letters from Ira Kleiman to the Australian Tax Office ("ATO").

As for the emails, which were between Nguyen and Dave Kleiman, the Defendant claimed it evidenced Dave Kleiman extending an offer to serve as a "director" of W&K to Nguyen. ECF No. [144-1]. Three days after the instant Motion was filed, the Defendant filed a Notice Withdrawing Exhibit A. ECF No. [154] (the "Notice"). In the Notice, the Defendant indicated that Exhibit A was being withdrawn because the Defendant could not "verify the date of the email exchange." ECF No. [154]. At the Hearing, the Defendant also withdrew another exhibit (Exhibit F), ECF No. [144-6], attached to his Motion, which was an additional email exchange between Dave Kleiman and Nguyen for the same reasons presented in his Notice. ECF No. [256], at 39:6-9 ("We're not relying on [Exhibit F] ... I would withdraw it now."). In their Response to the Motion, Plaintiffs argued that Exhibit A was a forged email which came to light as a result of the public exposing it as a fraud. ECF No. [159], at 6-11. Specifically, the Plaintiffs claim Exhibit A was withdrawn after members of the public uncovered that the "PGP signature"[1] of the email, purported to be authored/sent by Dave Kleiman, was created *a year after his death*. *Id.* at 6-7. Nonetheless, because the Defendant has now withdrawn each of these exhibits[2] the Court will not consider either for the purposes of this Motion.

---

[1]"PGP" stands for "Pretty Good Privacy" and is a computer software program that allows a user to "encrypt and decrypt data such as emails, files, or documents." ECF No. [159], at 10.

[2] The Court also notes that the emails in question were produced by the Defendant during discovery. The Defendant, however, is not the sender, recipient, nor copied to the emails. At the Hearing, given that the

809

Case No.  18-cv-80176-BLOOM/Reinhart

As for the Sunbiz filings, the Defendant contends that the March 28, 2014, Sunbiz filing evidences that Nguyen and Coin Exch were members, because Nguyen listed herself as the registered agent and "MS," and Coin Exch as "DR." *Id.* At the Hearing, the Defendant argued that "DR" stood for "director" but that there was some ambiguity as to what "MS" possibly meant. Defendant claims that "M" could be an abbreviation for "manager," however, it could also stand for "member."  ECF No. [256], at 35:13-16 ("But Judge, for the purpose of this discussion, we can think of 'M' as manager. But I just want to suggest to the Court the way the State sets this up there's an ambiguity and it could also mean member.").

Taking the 2014 Sunbiz filing at face value, it cannot be discerned that Nguyen nor Coin-Exch were listed as members of W&K.  Indeed, in the March 2014 Sunbiz filing, Nguyen solely listed herself as W&K's "registered agent" and "MS."  ECF No. [83-25].  Nguyen further listed Coin Exch as holding the position of "DR." *Id.* Sunbiz provides a "Title Abbreviations" index for the public to utilize. *See* ECF No. [159-3]. This index states that the list of abbreviations is not exhaustive and further, that other abbreviations "may be used that are not identified." However, the index provides that the listed abbreviations can hold the following meanings: 1) M = Manager; 2) S = Secretary; and 3) D = Director.  ECF No. [159-3], at 3-4.  Therefore, the evidence the Defendant attempts to utilize to support the additional membership of Nguyen and Coin-Exch in W&K is completely speculative in nature.

Concerning the May 1, 2014, letter from Ira Kleiman to the ATO, this document evidences solely Ira Kleiman's belief that Nguyen was a director of W&K.  *See* ECF No. [144-7], at 2 ("I understand that Ms[.] Nguyen was appointed as a director [of W&K].").  Even the Defendant

---

Defendant claims he has not been in contact with Nguyen "in years," the Court questioned how the Defendant came into possession of the emails. The Defendant claimed he received them as "records" from companies when he left Australia.

810

Case No.  18-cv-80176-BLOOM/Reinhart

testified during his deposition that he understood Nguyen to be the director and not the manager of W&K.  *See* ECF No. [246-1] (287:24-288:1) ("Q. Are you aware of any role [Nguyen] played with W&K? A. I believe she was a director."). For purposes of diversity jurisdiction, it is the citizenship of an LLC's members—not its managers—that is relevant. *Silver Crown Investments, LLC v. Team Real Estate Mgmt., LLC*, 349 F. Supp. 3d 1316, 1324 (S.D. Fla. 2018) (Martinez J.) (citing *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).

The Defendant also argues that the Court should look at the extrinsic evidence to demonstrate that Nguyen is a member of W&K.  Specifically, he cites her reinstatement of W&K and the payment of the annual fees in 2014.  ECF No. [171], at 7-8.  The Court first notes that these filings occurred after Dave Kleiman's death.  Further, it is disputed by the parties whether Nguyen or Coin-Exch were even authorized to file on behalf of W&K after Dave Kleiman's death.  As such, the "extrinsic evidence" that the Defendant argues should be considered in his factual attack relating to whether Nguyen and Coin Exch were members of W&K is simply not credible.  The Defendant also contends that Ira Kleiman did not have the authority to remove Nguyen and Coin-Exch as members of W&K.  ECF No. [144], at 13.  Because the Court finds that no credible evidence has been presented that Nguyen and Coin-Exch were even members of W&K it need not address this argument.

The evidence proffered by the Defendant is insufficient to meet his burden of production.  If the evidence proffered is representative of anything, it does nothing more than represent that other people/entities held officer positions within the company. It does not evidence that W&K had other members.

8

811

Case No. 18-cv-80176-BLOOM/Reinhart

### ii) **Lynn Wright**

For the first time and in his Reply, the Defendant argues that his ex-wife, Lynn Wright, may also be a member of W&K. ECF No. [171], at 6-7. As evidence of Lynn Wright's membership, the Defendant proffered a February 16, 2011, email between Dave Kleiman, Lynn Wright, and the Defendant. *See generally* ECF No. [157-2]. At the Hearing, the parties disputed whether the email exchange was truly between Dave Kleiman, the Defendant, and Lynn Wright, or just Dave Kleiman and the Defendant due to the varying names that appear in the sender, recipient, and courtesy copy lines of the emails. The sum and substance of the email exchange includes the inquiry by Dave Kleiman as to whether he could list "you as mgr or mgrm with a foreign address." *Id.* at 2. First, the Court notes that it is unclear whether this question was directed to the Defendant or Lynn Wright. Second, the email chain does not show the response by either the Defendant or Lynn Wright to this question. *See generally id.*

As for the parties surmising what Dave Kleiman intended, even the Defendant's counsel conceded at the Hearing that interpretation of these emails was "extremely speculative." *See* ECF No. [256], at 94:18-21 (". . . the series of emails is interpretations which are extremely speculative, about what was in David Kleiman's head."). Nonetheless, this email does not demonstrate what ultimately occurred. Indeed, upon the first registration of W&K as a limited liability company in Florida, Dave Kleiman listed himself as the "mgrm," the managing member. *See* ECF No. [83-3].

Further, in the Defendant's June 14, 2019 sworn affidavit, the Defendant identified "all potential witnesses relevant to this lawsuit." ECF No. [33-3], at ¶ 20. Of note is that while the Defendant now claims that this email evidences that his then wife Lynn Wright was a member of W&K, he did not list her as a relevant witness at that time. *Id.* Then at his April 4, 2019 deposition, the Defendant testified that he had no idea who owned W&K. *See* ECF No. [242-1], at 22-23 ("Q.

812

Case No. 18-cv-80176-BLOOM/Reinhart

You have no idea who owns W&K? A. I do not know that."). Similar to the claims made relating to Nguyen and Coin-Exch, the Defendant fails to proffer any credible evidence challenging the Court's subject matter jurisdiction.

At the Hearing, Defendant argued that the Court cannot both rely upon and find that the statements and evidence provided by him are untrue. *See* ECF No. [256], at 100:6-9 ("Judge, if everything's a lie, then the stuff they rely on when Wright files a contract, or when Wright makes a statement, can't be credited either."). Here, Defendant's argument is novel. He seems to argue that even though his numerous conflicting statements are the very reason confusion has been created as to the ownership of W&K, the Court should nonetheless use these statements as a basis to challenge the Court's subject matter jurisdiction. In essence, the Defendant uses the evidence proffered as both his sword and his shield. Unfortunately, the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court. In weighing the evidence, the Court simply does not find the Defendant's testimony to be credible. As for the remaining "extrinsic evidence," none of the evidence demonstrates additional membership in W&K other than Dave Kleiman.

Accordingly, the Court finds that the Defendant's assertions in his Motion are insufficient as he has failed to provide any credible evidence showing a lack of diversity. While the plaintiff has the burden to prove diversity in a factual attack, that burden exists only if the defendant has first proffered evidence to show a lack of diversity. *See OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002). The Defendant has utterly failed in his burden of production.

### b) *Facial Attack*

As for his facial attack, Defendant argues in his Reply that the SAC insufficiently alleges the citizenship of the parties. ECF No. [171], at 5. A complaint survives a facial attack on subject

813

Case No.  18-cv-80176-BLOOM/Reinhart

matter jurisdiction if the plaintiff's allegations, which are taken as true, sufficiently provide a basis

for subject matter jurisdiction. *See Menchaca*, 613 F.2d at 511. As a limited liability company,

W&K's citizenship is determined by the citizenship of its members.  The SAC alleges that the

"exact ownership structure [of W&K] is unclear due to Craig's contradictory statements."  ECF

No. [83], at ¶ 70.  However, the SAC then alleges in the next paragraph that "[a]s best as can

presently be discerned, Dave was the sole 'member' of W&K."  *Id.* at ¶ 71.  During the Hearing,

Plaintiff argued that the SAC was drafted to reflect that the only possible members of W&K could

have been the Defendant or Dave Kleiman. ECF No. [256], at 84:17-22 ("And so we were just

being careful, saying: "Look, as best as can be discerned, based on everything we have, on our

information and belief, and on all the evidence available to us, [publicly] available and privately

available, Dave Kleiman was the sole member."). Since the initiation of this case, however, the

Defendant has unequivocally affirmed in a sworn affidavit that he has "never been a director,

member, shareholder, officer, employee, or representative of W&K."  ECF No. [12-2], at ¶ 12.  A

"[c]ourt may dismiss the complaint based on a facial challenge only if it is clear that no relief could

be granted *under any set of facts that could be proven consistent with the allegations*." *World Fuel

Servs., Inc. v. Pan Am World Airways Dominicana, S.A.*, No. 18-20321-Civ, 2018 WL 3730903,

at *2 (S.D. Fla. Apr. 17, 2018) (Torres, J.) (emphasis added) (quoting *Hames v. City of Miami*, 479

F. Supp. 2d 1283-84 (S.D. Fla. 2007)).

Here, the Court is cognizant of the Defendant's argument that the SAC includes an

allegation that the exact ownership structure of W&K is "unclear."  However, by the Defendant's

own admission, he was not an owner nor a member of W&K.  Thus, any ambiguity in the SAC is

easily dispelled. Further, the SAC also directly states that Dave Kleiman was the "sole owner" of

11

Case No. 18-cv-80176-BLOOM/Reinhart

W&K. As such, the Court concludes that the SAC survives the facial attack related to the Court's diversity jurisdiction.

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [144]**, is **DENIED**.

**DONE AND ORDERED** in Chambers, at Miami, Florida, on August 15, 2019.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

12

815

# TAB 277

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-CIV-80176-Bloom/Reinhart

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and
W&K INFO DEFENSE RESEARCH, LLC,

                Plaintiffs,

v.

CRAIG WRIGHT,

                Defendant.

_____/

### ORDER ON PLAINTIFFS' MOTION TO COMPEL [DE 210][1]

This matter is before the Court on the Plaintiffs' Motion to Compel, DE 210, and the Court's Order dated June 14, 2019.  DE 217.  The Court has considered the totality of the docketed filings, including all pleadings referenced herein and transcripts of all cited court proceedings.  As the judicial officer who presided at the relevant proceedings, I retain a current and independent recollection of the events discussed below.  I have reviewed all of the exhibits introduced into the record at the evidentiary hearing, including the deposition excerpts filed in the record.  *See* DE 270.  Finally, I have carefully considered the arguments of counsel.  The Court is fully advised and this matter is ripe for decision.  The Court announced its ruling from the bench on August 26,

---

[1] Magistrate judges may issue an order on any "pretrial matter not dispositive of a party's claim or defense." Fed. R. Civ. P. 72(a). "Thus, magistrate judges have jurisdiction to enter sanctions orders for discovery failures which do not strike claims, completely preclude defenses or generate litigation-ending consequences." *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1295 (S.D. Fla. 2015) (J. Goodman).

816

2019.  This Order memorializes that ruling.  To the extent the relief granted in the written Order deviates from the oral pronouncement, the Order controls.

Two preliminary points.  First, the Court is not required to decide, and does not decide, whether Defendant Dr. Craig Wright is Satoshi Nakamoto, the inventor of the Bitcoin cybercurrency.[2]  The Court also is not required to decide, and does not decide, how much bitcoin, if any, Dr. Wright controls today.  For purposes of this proceeding, the Court accepts Dr. Wright's representation that he controlled (directly or indirectly) some bitcoin on December 31, 2013, and that he continues to control some today.

## PROCEDURAL HISTORY

This case arises from a dispute over the ownership of bitcoin and Bitcoin-related intellectual property.  Plaintiffs allege in the Second Amended Complaint that David Kleiman and Dr. Wright were partners in the creation of the Bitcoin cybercurrency and that they "mined" (i.e., acquired) a substantial amount of that currency together.  DE 83.  Dr. Wright denies any partnership with David Kleiman, and further denies that David Kleiman had an ownership interest in the bitcoin that was mined.  Alternatively, Dr. Wright asserts that David Kleiman transferred any interest he had in the bitcoin and the intellectual property to Dr. Wright in exchange for equity in a company that ultimately failed.  *See* DE 87.  David Kleiman died in 2013.

As early as July 2018, Plaintiffs sought discovery to identify the bitcoin that Dr. Wright owned and controlled (his "bitcoin holdings").  In Ira Kleiman's First Set of Interrogatories served on July 31, 2018, he asked Dr. Wright to identify "public keys and public addresses" for any cryptocurrency he currently or previously owned.  DE 91-2 at 8.  Dr. Wright responded on

---

[2] A note on terminology.  Unless otherwise specified, when I refer to units of the cybercurrency, I will use the lower-case "bitcoin" (like "dollars").  When I refer to the particular cybercurrency system, I will use the upper-case "Bitcoin" (like "the U.S. Dollar").

2

817

February 1, 2019, by objecting that the discovery request was "irrelevant, grossly overbroad, unduly burdensome, harassing and oppressive, and not proportional to the needs of the case."  DE 91-2 at 14-19.[3]   Under the procedures required by my Standing Discovery Order (DE 22, 102), the parties requested a discovery hearing to resolve their respective objections.  That hearing was scheduled for February 20, 2019.  DE 90.

Dr. Wright submitted his pre-hearing memorandum on February 14, 2019.  DE 92.  He noted that Plaintiffs had requested all documents relating to any bitcoin transactions by Dr. Wright between 2009 and 2014.  *Id.* at 3.  Dr. Wright argued that the discovery requests were disproportionate to the needs of the case.  He represented that he "stands ready to produce documents in his possession, custody, or control that relate to Dave [Kleiman], any trust in which Dave [Kleiman] was a trustee or beneficiary, and W&K Info Defense Research, LLC."  *Id.* at 4.

At the hearing on February 20, the Court and the parties had a discussion about Plaintiffs' request for evidence relating to Dr. Wright's bitcoin transactions.  DE 123 at 120-123 (hearing transcript).  I declined to order Dr. Wright to produce his current bitcoin holdings.  Rather, I said Plaintiffs should identify a starting date and seek production of Dr. Wright's bitcoin holdings on that date.  Plaintiffs could use the Bitcoin evidence trail to trace forward from there.

Running in parallel with the interrogatories, Plaintiffs served a Second Set of Requests for Production on Dr. Wright on or about January 17, 2019.  DE 92-5 at 30.  Request for Production #1 sought "All documents or communications that provide and/or estimate the value of your cryptocurrency holdings.  This includes, but is not limited to, loan applications, financial statements, tax returns, life insurance applications, financing agreements, sale papers, assignment contracts, etc." 2 DE 114-1 at 5-6.  On February 19, Dr. Wright served a written objection to

---

[3] Discovery was stayed from August 2, 2018, to December 31, 2018. DE 57, 72.

Request #1 based on relevance, over-breadth, harassment, and disproportionality.  *Id.* at 5-6.  The parties conferred but were unable to resolve the objection.  *Id.* at 7.  A discovery hearing was scheduled for March 6, 2019.  DE 104.

On March 4, the parties submitted their Joint Discovery Memorandum.  DE 109.  They indicated that Plaintiffs' Request for Production #1 was still in dispute.  *Id.* at 7.  The hearing was held on March 6.  DE 110, DE 122 (hearing transcript).  The parties deferred the Request for Production issue to the next discovery hearing.  DE 122 at 56.  Plaintiffs explained that they were revising the Request for Production related to Dr. Wright's bitcoin holdings: "We have chosen – we have moved everything back to 2013, which is when Dave died.  You Honor will have an opportunity to hear from both sides, but we basically said give us the information as of that date and then we will move forward from there."  *Id.* at 62.  Another discovery hearing was set for March 14.

On March 13, the parties submitted their Joint Discovery Memorandum for the March 14 discovery hearing.  DE 114.  Plaintiffs represented that they had "limited the request to: 'produce any documents that existed as of 12/31/13 which estimate the value of Defendant's bitcoin holdings.'"  *Id.* at 3.  Plaintiffs argued that this information was relevant to trace the assets of the alleged partnership between David Kleiman and Dr. Wright.  *Id.*  Dr. Wright argued that, even as limited, the request was "overly broad, unduly burdensome and harassing by seeking such personal financial information such as loan applications, financial statements, tax returns, life insurance applications, etc."  *Id.*

At the hearing on March 14, Plaintiffs further explained that the purpose of this request for production was to help establish the universe of bitcoin that was mined during the alleged Kleiman-Wright partnership.  DE 124 at 18-19 (hearing transcript).  Plaintiffs agreed that what they were

4

really seeking was "a listing of all the bitcoin that was owned [by Dr. Wright directly or indirectly] on December 31, 2013." *Id.* at 19-20.   Dr. Wright objected on relevance grounds.   The Court found "what bitcoin existed on December 31, 2013, and where it's gone since then is relevant to [Plaintiffs'] claim." *Id.* at 21.   Turning to proportionality and undue burden, the Court asked Dr. Wright's counsel, "[H]ow difficult would it be to come up with information?   I assume it's just a list of Bitcoin wallets from December 2013." *Id.* at 21.   Dr. Wright's counsel responded, "Well, it's a list of – it would be a list of public addresses, but it would identify Craig Wright as being the owner of those addresses, which sort of like opens the door to, you know, a lot of financial information, and without any evidence that all of those — or what portion of those Dave Kleiman had an interest in." *Id.*

The Court ruled that Plaintiffs were entitled to a list of Dr. Wright's bitcoin holdings, but granted Dr. Wright leave to file a motion for protective order based on undue burden. *Id.* at 22-23.  Notably, the Court did not specify the information Dr. Wright was required to use to generate the list.  Specifically, the Court did not order production of a list of public addresses.  The Court did not set a specific deadline for production or for the filing of the motion for protective order.

Dr. Wright was deposed on April 4.  During his deposition, he testified that a trust called the Tulip Trust was formalized in 2011, but never owned or possessed private keys to bitcoin addresses.  DE 270-1 at 22.  He also testified that Uyen Nguyen had ceased to be a trustee of any trust related to Dr. Wright in 2015. *Id.* at 24.  He further testified that he had stopped mining bitcoin in 2010.  He declined to answer questions about how much bitcoin he mined in 2009-2010; this issue was reported to the Court during the deposition.  I deferred ruling on the issue.  DE 137 at ¶ 1 ("The request to compel Dr. Wright to disclose the amount of bitcoin he mined during 2009 and 2010 is denied without prejudice.  The Court will revisit this issue after the parties brief

820

whether production of a list of Dr. Wright's bitcoin ownership would be unduly burdensome.").

Again, the Court referenced "a list of Dr. Wright's bitcoin ownership." The Court did not mention

a list of public addresses.

A discovery hearing was held on April 11. DE 142. At that hearing, I set a deadline of

April 19 for Dr. Wright to file a motion regarding Plaintiffs' request for a list of his bitcoin holdings

on December 31, 2013. DE 146 at 38-39 (hearing transcript).

On April 18, Dr. Wright filed a Sealed Motion Regarding Production of a List of the Public

Addresses of his Bitcoin as of December 31, 2013. DE 155.[4]   Dr. Wright incorrectly framed the

issue as, "The Court has ordered Dr. Wright to identify all public addresses that he owned as of

December 31, 2013 or, if he cannot do so, explain why identification is unduly burdensome." *Id.*

at 1. He then stated:

> Dr.Wright does not have a complete list of the public addresses that he
> owned as of any date. To create such a list would be unduly burdensome. A Bitcoin
> public address is an identifier of 26-35 alphanumeric characters. Such addresses are
> not intended to be memorized and remembered for a period of nearly a decade.
> However, Dr. Wright knows that he mined the ▮▮▮▮▮▮▮ on the blockchain.
> Because the public addresses associated with blocks are publicly available, Dr.
> Wright is able to identify the public addresses associated with the ▮▮▮▮ blocks on
> the blockchain and provides those public addresses below. ▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮ Dr. Wright did not keep track of which Bitcoin blocks he mined.
> Dr. Wright does not know any of the other Bitcoin public addresses.
>
> In 2011, Dr. Wright transferred ownership of all of his Bitcoin into a blind
> trust. Dr. Wright is not a trustee or a beneficiary of the blind trust. Nor does Dr.
> Wright know any of the public addresses which hold any of the bitcoin in the blind
> trust. Thus, Dr. Wright does not know and cannot provide any other public
> addresses.
>
> First, as of December 31, 2013, all of Dr. Wright's bitcoin had been
> transferred to the blind trust, and therefore are owned by the trusts, not by Dr.
> Wright. The public addresses referenced above are as follows:

---

[4] The motion was filed under seal. A redacted version of the motion is filed in the public record
at Docket Entry 184.

6

[REDACTED] [5]

DE 184 at 1-2.  As shown above, the Court had not ordered Dr. Wright to produce a list of public addresses.  Dr. Wright did not assert, then, that public addresses were a meaningless data point. He simply argued that he could not produce them.

Plaintiffs filed a response in opposition to the Motion.  DE 162.[6]  They sought an order requiring Dr. Wright to identify all bitcoins he owned as of December 31, 2013, to provide the trust documents, and to provide a sworn statement identifying all bitcoins he transferred to the blind trust as well as the identities of the trustees and trust beneficiaries.  DE 183 at 5-6.

The Court denied Dr. Wright's Motion on May 3, 2019.  DE 166.  After reviewing the procedural history, the Court stated:

> Thereafter, Dr. Wright filed an unverified motion in which he identified a number of bitcoin public addresses that he mined. Although not delineated as a Motion for Protective Order, that is what the pleading is. Dr. Wright asserted that he does not have a complete list of the public addresses he owned on any date, including December 31, 2013. He further asserted that in 2011 he transferred ownership of all his bitcoin to a blind trust. Although he makes the conclusory statement that it would be unduly burdensome to produce a list of his bitcoin holdings as of December 31, 2013, this conclusion is not supported by facts. In essence, he does not argue undue burden, he argues impossibility. The argument that Dr. Wright is incapable of providing an accurate listing of his current or historical bitcoin holdings was never presented in any of the prior hearings before this Court, when the Court was crafting the scope of discovery. Notably, [Dr. Wright's motion] does not refute the obvious response to this argument – get the information from the trustee of the blind trust.

DE 166 at 2-3.  Again, the Court referenced a "listing of" Dr. Wright's bitcoin holdings, not a list of public addresses.  The Court ordered:

---

[5] Dr. Wright produced a partial list of bitcoin public addresses that he mined prior to 2011.  DE 155 at 2-3.

[6] The Response was filed under seal.  A redacted version is filed in the public record at Docket Entry 183.

822

- On or before May 8, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall provide to Plaintiffs a sworn declaration identifying the name and location of the blind trust, the name and contact information for the current trustee and any past trustees, and the names and contact information of any current or past beneficiaries.

- On or before May 9, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall produce to Plaintiffs a copy of any and all documents relating to the formation, administration, and operation of the blind trust. The production shall be accompanied by a sworn declaration of authenticity.

- On or before May 15, 2019, at 5:00 p.m. Eastern time, Dr. Wright shall produce all transactional records of the blind trust, including but not limited to any records reflecting the transfer of bitcoin into the blind trust in or about 2011. The production shall be accompanied by a sworn declaration of authenticity.

- Dr. Wright shall execute any and all documents, or other legal process, necessary to effectuate the release of documents in the possession, custody, or control of the Trustee.

*Id.* at 4.

Defendant's counsel sought an extension of time to comply with the May 3 Order so that they could fly to London to meet with their client in person to prepare the required declaration. DE 167. That request was granted. DE 195 (Telephonic Hearing Transcript), DE 172.

Dr. Wright provided a sworn declaration dated May 8, 2019. DE 222.[7] He swore that he had met with his counsel in person on May 7 and 8 to "provide them with additional details and clarity regarding trusts that I settled that hold or held Bitcoin that I mined or acquired on or before December 31, 2013." DE 222 at ¶ 3. Dr. Wright further swore:

- In 2009 and 2010 he had mined bitcoin directly into a trust in Panama, that there were no transactions related to those bitcoin, and that he later "transferred the encrypted files that control access to these Bitcoin in 2011, as explained below." *Id.* ¶ 4.

- In June 2011, he consolidated "the Bitcoin that I mined with Bitcoin that I acquired and other assets." *Id.* ¶ 5.

---

[7] A sealed copy was filed at DE 223. A redacted copy was filed at DE 222.

- To that end, "[i]n October 2012, a formal trust document was executed, creating a trust whose corpus included the Bitcoin that I mined, acquired and would acquire in the future. The name of that trust is Tulip Trust. It was formed in the Seycelles [sic]." *Id.*

- The trustees of Tulip Trust I are COIN Ltd. UK., Uyen Nguyen, Dr. Wright, David Kleiman, Panopticrypt Pty. Ltd, and Savannah Ltd. *Id.* ¶ 6. Dr. Wright is the contact person for COIN Ltd. UK. The contact person for Panoptycript Pty. Ltd. is Dr. Wright's wife. The contact person for Savannah Ltd. is Denis Mayaka. *Id.* ¶¶ 9-12.

- The beneficiaries of Tulip Trust I are Wright International Investments Ltd. and Tulip Trading Ltd. Dr. Wright is the point of contact for both of the beneficiaries. *Id.* ¶¶ 13-14.

- A second Tulip Trust exists. Dr. Wright and his wife are the beneficiaries. *Id.* at ¶¶ 19-20.

- "Access to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined, requires myself and a combination of trustees referenced in Tulip Trust I to unlock based on a Shamir scheme." *Id.* at ¶ 23.

He also provided certain documents related to the trust.[8]

On June 3, Plaintiffs filed a Motion to Compel Defendant to Comply with this Court's Orders Directing Him to Produce a List of the Bitcoins He Held as of December 31, 2013. DE 197 (sealed) (redacted version filed at DE 210). Plaintiffs asked the Court to impose sanctions under Rule 37 and to order Dr. Wright to provide a sworn statement identifying the public addresses of the bitcoin transferred into the Tulip Trusts, to provide transactional records and communications relating to the trusts, and to sit for a renewed deposition. DE 210 at 6. Although

---

[8] Plaintiffs represent, "In response to the Court's order, Craig produced two sworn statements, copies of various trust instruments, and a statement from the purported trustee re-attaching a trust instrument." DE 210 at 3. Dr. Wright's Response states that he "produced trust formation documents along with a sworn declaration of authenticity," as well as "documents reflecting the use of bitcoin rights from the trust to support research and development by his Australian entities." DE 211 at 3.

824

the Plaintiffs "defer[red] to the Court's judgment as to the appropriate sanction," they requested that if Dr. Wright continued to refuse to comply that the Court deem all of Dr. Wright's holdings in the Tulip Trust to be joint property belonging to both Dr. Wright and David Kleiman. DE 210 at 6; DE 221 at 15.

In his response, Dr. Wright conceded that he has not complied with the Court's order, but argued that compliance was impossible. DE 204 (redacted version filed at DE 211). Expanding on the representation made in Paragraph 23 of his declaration, he argued that information necessary to produce a complete list of his bitcoin holding on December 31, 2011, was in the Tulip Trust I in a file that is encrypted using "'Shamir's Secret Sharing Algorithm', an algorithm created by Adi Shamir to divide a secret, such as a private encryption key, into multiple parts." DE 211 at 5. Dr. Wright asserted that he could not decrypt the outer level of encryption because he did not have all of the necessary decryption keys. *Id.* He stated that after using a Shamir system to encrypt this information, "The key shares were then distributed to multiple individuals through the [blind] trusts" and "he alone does not have ability to access the encrypted file and data contained in it." *Id.*

The Court held a hearing on June 11 on the Motion. DE 221. Plaintiffs' counsel pointed out that under oath in his deposition Dr. Wright denied ever putting bitcoin into a trust, and denied putting any private keys into the Tulip Trust. DE 221 at 8-9. After hearing further oral argument from the parties, the Court once again gave Dr. Wright an opportunity (and a deadline of June 17, 2019) to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." DE 217. Again, the Court did not order a list of public addresses. The Court simultaneously entered an Order to Show Cause why it should not certify a contempt of court to the District Judge. The Court also put Dr. Wright on notice that it was considering sanctions under Rule 37 for his

10

825

continued non-compliance with the Court's March 14 Order.  DE 217 at 5; DE 221 at 32-33.  An evidentiary hearing was scheduled for June 28.

Dr. Wright's deposition reconvened on June 28 immediately prior to the evidentiary hearing.  I presided over the deposition to rule on any objections.  Dr. Wright was asked about the trusts referenced in his declaration.  He responded, "I'm not the trustee of these trusts."  DE 270-2 at 7.  Dr. Wright was asked if he transferred all of his bitcoin into blind trust in 2011.  He responded, "What I actually did was, I transferred the algorithms and software that I had used, the nonpublic version of Bitcoin that I was working on, into an encrypted file.  The encrypted file was then – basically the key was split so that other people could have it."  DE 270-2 at 21-22.

## THE EVIDENTIARY HEARING

The Court heard from three live witnesses during two days of testimony:  Dr. Wright, Steven Coughlan a/k/a Steve Shadders, and Dr. Matthew Edman.  DE 236, 264.  Plaintiffs also submitted excerpts from the depositions of Jonathan Warren and Dr. Wright.  DE 261, 270.   The Court heard oral argument on August 26, 2019.

Dr. Wright testified to his inability to comply with the Court's Orders.  He claimed that after drug dealers and human traffickers began using Bitcoin, he wanted to disassociate himself completely from it.  He engaged David Kleiman for that purpose.  As part of that process, Dr. Wright put control over the bitcoin he mined in 2009-2010 into an encrypted file, which he put into a blind trust called the Tulip Trust.  The encryption key was divided into multiple key slices. A controlling number of the key slices were given to Mr. Kleiman, who distributed them to others through the trust.  Today, Dr. Wright does not have access to a sufficient number of the key slices to decrypt the file.  Therefore, he cannot produce a list of his bitcoin holdings.

Mr. Shadders testified to efforts he made to filter the public Bitcoin blockchain to identify Dr. Wright's bitcoin.  Dr. Edman testified about alleged alterations to documents.

### APPLICABLE LEGAL PRINCIPLES

The Court gave notice that it would consider discovery sanctions under Federal Rule of Civil Procedure 37, and independently consider sanctions for contempt.[9]

*Rule 37*

Rule 37 authorizes the Court to award attorney's fees against a party and/or the party's counsel as a sanction for certain discovery-related conduct.  Additionally, the Court may impose sanctions that affect the further litigation of the merits (what I will call "substantive sanctions"), including:

    (i)      directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

    (ii)     prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    (iii)    striking pleadings in whole or in part;

    (iv)    staying further proceedings until the order is obeyed;

    (v)     dismissing the action or proceeding in whole or in part;

    (vi)    rendering a default judgment against the disobedient party; or

    (vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

---

[9] Plaintiffs' Motion for Sanctions also references the Court's inherent power to sanction for bad faith conduct.  DE 210 at 5.  The June 14 Order on Plaintiff's Motion to Compel did not put Dr. Wright on notice that the Court would consider sanctions under its inherent power.  The sanctions otherwise available under Rule 37 are sufficient to address Dr. Wright's behavior, so the Court would not impose additional sanctions even if it were to invoke its inherent power.

12

Fed R. Civ. P. 37(b)(2)(A).

The burden of proof for Rule 37 sanctions is a preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016). Rule 37 sanctions "are intended to: (1) compensate the court and other parties for the added expense caused by discovery abuses; (2) compel discovery; (3) deter others from engaging in similar conduct; and (4) penalize the offending party or attorney." *Steward v. Int'l Longshoreman's Ass'n., Local No. 1408*, 306 Fed. Appx. 527, 529 (11th Cir. 2009). District courts possess wide discretion over the discovery process and when discovery sanctions are appropriate. *Dude v. Cong. Plaza, LLC,* 17-80522-CIV, 2018 WL 4203888, at *5 (S.D. Fla. July 20, 2018) (J. Matthewman), *report and recommendation adopted sub nom. Dude v. Cong. Plaza. LLC,* 17-CV-80522, 2018 WL 4203886 (S.D. Fla. Aug. 29, 2018). "The severe sanctions permitted by Rule 37(b) are usually only imposed by district courts upon a finding '(1) that the party's failure to comply with the order was willful or a result of bad faith, (2) the party seeking sanctions was prejudiced by the violation, and (3) a lesser sanction would fail to adequately punish and be inadequate to ensure compliance with court orders.'" *Id.* (citations omitted).

In a situation where a party asserts inability to comply with a discovery order, the proponent of sanctions bears the initial burden of making a *prima facie* showing that the opposing party failed to comply with the Court's order. Once the moving party makes that showing, the opposing must introduce evidence that it was impossible to comply. *See Malautea v. Suzuki Motor Co*., 987 F.2d 1536, 1542-43 (11th Cir. 1993) (affirming sanctions where non-movant had "shown no evidence of inability to comply"); *Broadcast Music, Inc. v. Bourbon Street Station, Inc.,* 2010 WL 1141584, *2 (M.D. Fla. Mar. 23, 2010); *Chairs v. Burgess,* 143 F.3d 1432, 1436 (11th Cir. 1998) (quoting *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir. 1991)). That is, the

party must establish that he "has in good faith employed the utmost diligence in discharging his ...

responsibilities." *Phoenix Marine Enterprises, Inc. v. One (1) Hylas 46' Convertible*

*Sportfisherman Hull No. 1,* 681 F. Supp. 1523, 1528–29 (S.D. Fla. 1988) (J. Nesbitt) (quoting

*Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975)); *Piambino*

*v. Bestline Prod., Inc.*, 645 F. Supp. 1210, 1214 (S.D. Fla. 1986).

> This burden is satisfied by making "in good faith *all* reasonable efforts to comply."
> *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976). We construe this
> requirement strictly. "Even if the efforts he did make were 'substantial,' 'diligent'
> or 'in good faith,' ... the fact that he did not make 'all reasonable efforts' establishes
> that [respondent] did not sufficiently rebut the ... prima facie showing of contempt.
> The ... use of a 'some effort' standard for measuring the strength of [the] defense
> [would be] an abuse of discretion."

*Id.*at 1213 (quoting *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir.1984)).[10]

Several provisions of the Federal Rules of Civil Procedure authorize reasonable expenses,

including attorney's fees, as a sanction for discovery violations.  *See* Fed. R. Civ. P. 37(a)(5)(A)

(expenses associated with motion to compel); Fed. R. Civ. P. 37(b)(2)(C) (expenses associated

with failure to comply with discovery order); Fed. R. Civ. P. 26(c)(3) (expenses associated with

motion for protective order); Fed. R. Civ. P. 26(g)(3) (expenses associated with non-compliance

with discovery certification).  Rule 37(a)(5) authorizes an award of expenses if a Motion to Compel

is granted after a party "fails to produce documents . . .  as requested under Rule 34."  Fed. R. Civ.

P. 37(a)(3)(iv).  "[A]n evasive or incomplete disclosure, answer, or response must be treated as a

failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).  All of these rules apply the same

structure:  the prevailing party receives reasonable expenses, including attorney's fees, unless the

---

[10] Many of the cases addressing inability to comply involve contempt proceedings, not Rule 37
sanctions.  Nevertheless, the situations are analogous and I will apply the same burden-shifting
approach.

losing party's conduct was "substantially justified" and/or "other circumstances make an award of expenses unjust."

*Contempt*

Where, as here, the parties have not consented to have a United States Magistrate Judge preside over this civil case, I cannot hold a person in civil contempt or indirect criminal contempt (i.e., a contempt occurring outside the Court's presence).  28 U.S.C. § 636(e)(6)(B).  Instead, if the person's conduct, "in the opinion of the magistrate judge," constitutes an indirect criminal contempt or a civil contempt, "the magistrate judge shall forthwith certify the facts to a district judge" for further proceedings.  *Id.*

The sanction of civil contempt "may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC,* 478 U.S. 421, 443 (1986) (internal quotation marks omitted), *cited and quoted in F.T.C. v. Leshin*, 719 F.3d 1227, 1231 (11th Cir. 2013).   "A finding of civil contempt must be supported by clear and convincing evidence . . . The evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order. The absence of willfulness is not a defense to a charge of civil contempt, and substantial, diligent, or good faith efforts are not enough; the only issue is compliance."  *Jysk Bed'N Linen v. Dutta-Roy*, 714 Fed. Appx. 920, 922 (11th Cir. 2017) (citations omitted).   Clear and convincing evidence is evidence that "place[s] in the mind of the ultimate factfinder an abiding conviction that the truth of its factual contentions is 'highly probable.'"  *Colorado v. New Mexico,* 467 U.S. 310, 316 (1984); *Powell v. Home Depot U.S.A.,* 2009 WL 1515073, at *8 (S.D. Fla. June 1, 2009) (J. Hurley).

830

Criminal contempt is punitive. An alleged criminal contempt occurring outside the presence of the Court (i.e., an indirect contempt) must be proven beyond a reasonable doubt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 834 (1994).

## FINDINGS

I make the following findings, each of which will be further explained below. First, I find that Dr. Wright has not met his burden of proving by a preponderance of the evidence that he is unable to comply with the Court's Orders. Second, in my opinion the evidence in the record before me does not rise to the level of proof beyond a reasonable doubt necessary for a criminal contempt. Although I find clear and convincing evidence that would support a civil contempt, the sanctions available under Rule 37 are sufficient, so I exercise my discretion and do not certify facts to Judge Bloom for civil contempt proceedings. Third, an award of attorney's fees is warranted against Dr. Wright, but not against his counsel. Fourth, I impose the following sanctions pursuant to Rule 37(b). For purposes of this action, it is established that (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin; (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership, (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them. To conform to these established facts, the Court strikes Dr. Wright's Third Affirmative Defense (Good Faith), Fourth Affirmative Defense (Accord and Satisfaction), Fifth Affirmative Defense (Release), Sixth Affirmative Defense (Payment), Seventh Affirmative Defense (Set-off), Eighth Affirmative Defense (Failure to Mitigate Damages), Seventh [sic] Affirmative Defense (Waiver), and Tenth Affirmative Defense (Statute of Frauds).

16

831

## DISCUSSION

The factual issue for decision is whether a preponderance of the evidence proves that Dr. Wright is incapable of complying with the Court's Orders, specifically, whether Dr. Wright proved that the evidence necessary to identify his bitcoin holdings on December 31, 2013, is encrypted in a file that is in a blind trust and for which Dr. Wright does not have (and cannot presently get) the decryption keys. The evidence offered in support of this hypothesis was (1) the testimony of Dr. Wright and (2) the testimony of Steven Coughlan a/k/a Steve Shadders.

A finder of fact must consider the following questions in assessing witness credibility:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

Eleventh Circuit Pattern Civil Jury Instruction 3.4.   As will be discussed below, the evidence in the record demonstrated that Dr. Wright (directly and through counsel) made inconsistent statements about material matters. In considering that evidence, the Court is mindful "that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an

17

832

important fact or about an unimportant detail." Eleventh Circuit Pattern Civil Jury Instruction 3.5.1. A party's disbelieved testimony can be considered substantive evidence in support of the opposing party's burden of proof. *United States v. Brown,* 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as *substantive evidence* of the defendant's guilt.") (emphasis in original).

Mr. Shadders testified that he was asked by Dr. Wright to try to reconstruct Dr. Wright's bitcoin holdings by applying six data filters to the public Bitcoin blockchain. Mr. Shadders is the Chief Technology Officer at nChain, Ltd., a Bitcoin technology company in London. DE 264 at 12. Dr. Wright is the Chief Scientist at nChain. DE 236 at 5.

Dr. Wright provided the six filter criteria. Mr. Shadders wrote computer code to apply the criteria to the master blockchain. Mr. Shadders devoted approximately 12-16 hours total to the project. DE 264 at 49. His analysis identified approximately 27,000 bitcoin public addresses that met all six criteria. Because one of the criteria was that the public address correspond to a newly mined Bitcoin block, each public address represents 50 bitcoin. Therefore, Mr. Shadders' analysis identified approximately 1,350,000 bitcoin. These could not be further distilled to identify bitcoin controlled by Dr. Wright.

I found Mr. Shadders' testimony about his effort to apply filter criteria to the public blockchain to be credible and worthy of belief. I understand the inference that Dr. Wright would not have wasted Mr. Shadders' time if Dr. Wright were capable of complying with the Court's Orders. I also accept that Mr. Shadders' efforts demonstrate a good faith attempt by Dr. Wright to comply. For the reasons discussed below, however, I give limited weight to these inferences.

I now turn to Dr. Wright's testimony.

Apparently, dead men tell no tales, but they (perhaps) send bonded couriers. *See* John Dryden, "The Spanish Fryar or The Double Discovery", Act IV, Scene 1 (1681) ("there is a Proverb, I confess, which says, That Dead men tell no Tales."). I completely reject Dr. Wright's testimony about the alleged Tulip Trust, the alleged encrypted file, and his alleged inability to identify his bitcoin holdings.

Dr. Wright's story not only was not supported by other evidence in the record, it defies common sense and real-life experience. Consider his claims. He designed Bitcoin to be an anonymous digital cash system with an evidentiary trail. DE 236 at 15. He mined approximately 1,000,000 bitcoin, but there is no accessible evidentiary trail for the vast majority of them. He is a latter-day Dr. Frankenstein whose creation turned to evil when hijacked by drug dealers, human traffickers, and other criminals. *Id.* at 16-17. To save himself, he engaged David Kleiman to remove all traces of his involvement with Bitcoin from the public record. *Id.* at 16. As part of his efforts to disassociate from Bitcoin and "so that I wouldn't be in trouble," he put all his bitcoin (and/or the keys to it – his story changed) into a computer file that is encrypted with a hierarchical Shamir encryption protocol. *See Id.* at 23. He then put the encrypted file into a "blind" trust (of which he is one of the trustees), gave away a controlling number of the key slices to now-deceased David Kleiman, and therefore cannot now decrypt the file that controls access to the bitcoin. His only hope is that a bonded courier arrives on an unknown dated in January 2020 with the decryption keys. If the courier does not appear, Dr. Wright has lost his ability to access billions of dollars worth of bitcoin, and he does not care. *Id.* at 21-22. Inconceivable.

During his testimony, Dr. Wright's demeanor did not impress me as someone who was telling the truth. When it was favorable to him, Dr. Wright appeared to have an excellent memory and a scrupulous attention to detail. Otherwise, Dr. Wright was belligerent and evasive. He did

19

834

not directly and clearly respond to questions.  He quibbled about irrelevant technicalities.  When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers.  None of these excuses were corroborated by other evidence.

Sadly, Dr. Wright does not write on a clean slate.  As Judge Bloom recently noted in denying Dr. Wright's Motion for Judgment on the Pleadings, Dr. Wright has taken directly conflicting factual positions at different times during this litigation.  DE 265 at 10 ("[T]he record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court.).  As discussed below, that behavior continued before me.

Dr. Wright has a substantial stake in the outcome of the case.  If Plaintiffs succeed on their claims, Dr. Wright stands to lose billions of dollars.  That gives him a powerful motive not to identify his bitcoin.  As long as the relevant addresses remain secret, he can transfer the bitcoin without the Plaintiffs being able to find them.  After all, Bitcoin is an anonymous cybercurrency.

Similarly, Dr. Wright had many reasons not to tell the truth. Most notably, Dr. Wright might want to prevent the Plaintiffs (or others) from finding his Bitcoin trove.  Alternatively, there was evidence indicating that relevant documents were altered in or about 2014, when the Australian Tax Office was investigating one of Dr. Wright's companies.  Perhaps Dr. Wright's testimony here is motivated by certain legal and factual positions he took in the Australian Tax Office investigation and from which he cannot now recede.

There was substantial credible evidence that documents produced by Dr. Wright to support his position in this litigation are fraudulent.  There was credible and compelling evidence that documents had been altered.  Other documents are contradicted by Dr. Wright's testimony or

20

835

declaration. While it is true that there was no direct evidence that Dr. Wright was responsible for alterations or falsification of documents, there is no evidence before the Court that anyone else had a motive to falsify them. As such, there is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.

One example is the Deed of Trust document for the Tulip Trust. Among the trust assets identified in the purported Deed of Trust creating the Tulip Trust on October 23, 2012, are "All Bitcoin and associated ledger assets transferred into Tulip Trading Ltd by Mr David Kleiman on Friday, 10th June 2011 following transfer to Mr Kleiman by Dr Wright on the 09th June 2011 . . .This incles [sic] the 1,200,111 Bitcoin held under the former arrangement and the attached conditions." P. Ex. 9 at 2. Notably absent from the list of trust assets is any encrypted file, software, public or private keys. The Deed of Trust states that the parties forming the Tulip Trust are Wright International Investments Ltd and Tulip Trading Ltd. *Id.* at 1. There was credible and conclusive evidence at the hearing that Dr. Wright did not control Tulip Trading Ltd. until 2014. P. Exs. 11-14; DE 236 at 88-96. Moreover, computer forensic analysis indicated that the Deed of Trust presented to the Court was backdated. The totality of the evidence in the record does not substantiate that the Tulip Trust exists. Combining these facts with my observations of Dr. Wright's demeanor during his testimony, I find that Dr. Wright's testimony that this Trust exists was intentionally false.[11]

Dr. Wright's false testimony about the Tulip Trust was part of a sustained and concerted effort to impede discovery into his bitcoin holdings. Start with Dr. Wright's deceptive and incomplete discovery pleadings. He testified at the evidentiary hearing that at least as early as

---

[11] Although I am only required to make this finding by a preponderance of the evidence, I find clear and convincing evidence to support it.

December 2018 he knew that he could not provide a listing of his bitcoin holdings. Yet, the Court was not told this "fact" until April 18, 2019. I give Dr. Wright the benefit of the doubt that prior to May 14 the Plaintiffs were seeking information that went beyond a list of his bitcoin holdings on December 31, 2013. After the May 14 discovery hearing, however, Dr. Wright was aware that the Court expected him to provide Plaintiffs with sufficient information so those bitcoin holdings could be traced.

Nevertheless, having failed to hold off discovery on legal grounds, after March 14, Dr. Wright changed course and started making affirmative misleading factual statements to the Court. His April 18 Motion argued for the first time, "In 2011, Dr. Wright transferred ownership of all his Bitcoin into a blind trust. Dr. Wright is not a trustee or beneficiary of the blind trust. Nor does Dr. Wright know any of the public addresses which hold any of the bitcoin in the blind trust. Thus, Dr. Wright, does not know and cannot provide any other public addresses." This pleading was intended to communicate the impression that Dr. Wright had no remaining connection to the bitcoin. It was also intended to create the impression that the bitcoin themselves had been transferred to the trust. [12]

Dr. Wright almost immediately made irreconcilable statements about the Tulip Trust. The April 18 Motion stated it was a blind trust and he was not a trustee. His sworn declaration three weeks later stated that he is one of the trustees of the Tulip Trust. The trust can hardly be considered "blind" (as represented in the April 18 Motion) if Dr. Wright is one of the trustees. At

---

[12] Although the pleading was not verified, it was signed by Dr. Wright's counsel. By signing the document, they certified that "the allegations and other factual contentions [in the pleading had] evidentiary support." Fed. R. Civ. P. 11. The sole source for that evidentiary support would have been Dr. Wright, so the Court finds that he provided the information contained in the April 18 Motion.

least one set of these representations about the trust and Dr. Wright's status as a trustee necessarily is intentionally misleading.

Dr. Wright also changed his story about what is in the alleged trust. The April 18 Motion states that Dr. Wright's *bitcoin* had been transferred to a blind trust, and therefore are owned by the trusts, not by Dr. Wright. The Court gave Dr. Wright an extension of time so he could meet with his counsel to draft and file a declaration about the trust. In the May 8 declaration, he swore that he met with counsel and that he provided counsel "with additional details and clarity regarding trusts that I settled that *hold or held Bitcoin* that I mined or acquired on or before December 31, 2013." DE 222 at ¶ 3 (emphasis added). He further swore, "In June 2011, I took steps to consolidate the Bitcoin I mined with Bitcoin that I acquired and other assets. In October 2012, a formal trust document was executed, creating a trust *whose corpus included the Bitcoin that I mined, acquired and would acquire* in the future. The name of that trust is Tulip Trust. It was formed in the Seycelles [sic]." *Id.* at ¶ 5 (emphasis added). His declaration was unequivocal that the trust held bitcoin. Nevertheless, at his deposition on June 26 (and at the evidentiary hearing), he changed his story to say that the trust contained an encrypted file with the keys to the bitcoin, not the bitcoin itself.

The hearing testimony that the trust holds only keys, not bitcoin, cannot be reconciled with the statements in the April 18 Motion and the May 8 declaration that it contains bitcoin. At least one of these representations is intentionally false. During his testimony at the evidentiary hearing, Dr. Wright made a point of being precise in his use of terms, including contesting whether a document was an email or a pdf of an email. It is not credible that, given his claim to have an unmatched understanding of Bitcoin, he would have mistaken the Bitcoin currency for the keys that control the ability to transfer the currency. I find instead that he belatedly realized that any

23

838

transaction(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain, that he would then be required to identify those transaction(s), and that Plaintiffs could use that information to trace the bitcoin. So, Dr. Wright changed his story to say that only the keys had been transferred.

Ultimately, Dr. Wright's claim of inability to comply with the Court's Orders relies on the existence of an encrypted file in the Tulip Trust containing the information necessary to reconstruct Dr. Wright's bitcoin holdings. I find that this file does not exist. Dr. Wright testified this file is an encrypted compressed file containing multiple sub-files. He swore, "Each of those files has a differently calculated encryption key . . . It's a hierarchical system, where, based on a combination of the file hash and the original encryption key – there are a variety of those – there are multiple Shamir schemes." DE 236 at 107. The Shamir scheme divides a single encryption key into multiple key slices; some subset of the total key slices is needed to decrypt the file.[13] Dr. Wright testified that 15 key slices existed for the outermost file, only eight key slices were needed to decrypt this file, but he only had access to seven key slices. DE 236 at 125-26; *see also* DE 236 at 114 ("The eight of 15 is the key that we're talking about to regenerate all of the addresses"). After observing Dr. Wright's demeanor and the lack of any other credible evidence in the record that this file exists, I find that a preponderance of the evidence establishes that no such file exists and that Dr. Wright's testimony was intentionally false.[14]

---

[13] For a more detailed discussion of the Shamir scheme see this Court's Order on Plaintiff's Motion to Compel, DE 217, and Appendix 1 to this Order.

[14] Here, too, although the necessary burden of proof is a preponderance of the evidence, there was clear and convincing evidence to support this finding. One other point. Dr. Wright testified that the key slices had to be applied in a particular order. DE 236 at 108, 125-26. This testimony is inconsistent with Dr. Shamir's paper describing his encryption scheme. *See* Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612. According to the paper, a Shamir Scheme is decrypted by inserting each key slice into the same polynomial to

24

839

Another aspect of Dr. Wright's story also changed at the evidentiary hearing. He argued for the first time that a list of public addresses was meaningless. This position is particularly disturbing because it was Dr. Wright who first injected the idea of public addresses into this discovery matter. At the May 14 hearing, Dr. Wright's counsel first introduced the idea of compiling a list of his Bitcoin holdings by using public addresses. Admittedly, counsel answered the Court's question without consulting with Dr. Wright and without time to fully research the situation. If, as Dr. Wright now asserts, counsel was wrong, Dr. Wright (the self-proclaimed creator of Bitcoin and therefore a person who claims to have intimate knowledge of how Bitcoin works) should have corrected the record long before the evidentiary hearing. Instead, in his April 18 motion, Dr. Wright explained why he could not produce a list of public addresses. He never said that public addresses lacked evidentiary value. This behavior continued in Dr. Wright's May 8 declaration, where he again talked about public addresses, but never argued that they were meaningless.

Although Dr. Wright may not have an obligation to correct an opposing party if its discovery request is imprecise, the Court is different, particularly where (as here) the Court's intent was unmistakable. It was clear that the Court was ordering Dr. Wright to produce evidence to document the existence and extent of his bitcoin holdings, so that Plaintiffs could attempt to trace them through the master blockchain. If, as Dr. Wright now claims, the public addresses are not the proper data point to identify the bitcoin he held on December 31, 2013, he had an obligation

_____

create a series of linear equations. These equations are then solved simultaneously. There is no ordering of the key slices. *See* Exhibit 1. That being said, I do not exclude the possibility that Dr. Wright could have employed a modified Shamir Scheme, so I do not consider this testimony in making my findings.

to tell the Court. Either his delay in to doing so is deceptive and misleading, or his testimony that the public address is a meaningless piece of evidence is intentionally false.

In sum, after days of testimony, multiple discovery hearings, and lengthy pleadings, the sole evidence supporting Dr. Wright's claim that he cannot comply with the Court's Orders is the uncorroborated word of Dr. Wright. That word is insufficient to meet his evidentiary burden. Moreover, the totality of the evidence, including a negative inference drawn from Dr. Wright's incredible testimony and use of fraudulent documents, is more than sufficient to meet Plaintiffs' burden.

Dr. Wright argues that he would never risk going to jail for contempt or having sanctions imposed against him if he could produce a list of his bitcoin holdings. He argues it would not be credible that anyone would make that choice. Equally, if not more incredible, is the idea that someone who controlled almost 1 million bitcoin would encrypt it in a way that he could not access it, and then would not care if he lost it all. Additionally, as discussed above, there are many reasons a person in Dr. Wright's situation would take that risk.

**REMEDY**

I now turn to the question of a proper remedy. Plaintiffs' Motion asked the Court to declare that "the 1,100,111 bitcoin referenced to in to [sic] the Tulip Trust document is joint property belonging equally to both Dave Kleiman and Craig Wright." DE 210 at 6. On August 26, at oral argument on the Motion, Plaintiffs asked the Court to strike Dr. Wright's pleadings. Rule 37 specifically recognizes that an appropriate discovery sanction is for the Court to deem certain facts established for purposes of this action. Fed. R. Civ. P. 37(b)(2)(a)(i). Rule 37 also permits a Court to strike pleadings. Fed. R. Civ. P. 37(b)(2)(A)(iii).

26

841

I find without hesitation that sanctions are not warranted against Dr. Wright's counsel. Several Rules of Civil Procedure authorize the Court to require a party's counsel to pay expenses associated with discovery violations; the expense award can be separately against counsel or jointly against counsel and the client. *See* Fed. R. Civ. P. 37(a)(5)(A), (B); Fed. R. Civ. P. 37(b)(2)(C); Fed. R. Civ. P. 26(g)(3). The Court finds no basis to sanction Dr. Wright's counsel. I have conducted numerous hearings and have been able to closely observe counsel's conduct. Counsel has zealously and ethically advocated for their client. Counsel has unfailingly been candid with this Court, even when Dr. Wright's conduct and conflicting statements have created awkward situations for counsel. I find that counsel reasonably relied on Dr. Wright as a source of information. I find that Dr. Wright, alone, is fully responsible for any evasion, incomplete or false representations to the Court, or non-compliance with the Court's orders.

There is clear and convincing evidence that Dr. Wright's non-compliance with the Court's Orders is willful and in bad faith, that Plaintiffs have been prejudiced, and (particularly given the extended pattern of non-compliance and its egregiousness) a lesser sanction is not adequate to punish or to ensure future compliance with the Court's Orders. Therefore, sanctions under Rule 37(b) are warranted.

To this day, Dr. Wright has not complied with the Court's orders compelling discovery on May 14 and June 14. Rather, as described above, the evidence establishes that he has engaged in a willful and bad faith pattern of obstructive behavior, including submitting incomplete or deceptive pleadings, filing a false declaration, knowingly producing a fraudulent trust document, and giving perjurious testimony at the evidentiary hearing. Dr. Wright's conduct has prevented Plaintiffs from obtaining evidence that the Court found relevant to Plaintiffs' claim that Dr. Wright and David Kleiman formed a partnership to develop Bitcoin technology and to mine bitcoin.

27

842

Plaintiffs have also been prejudiced by not being able to try to trace the bitcoin that was mined. His conduct has wasted substantial amounts of the Court's and the Plaintiffs' time and resources. It has unnecessarily protracted this litigation.

Counsel for Dr. Wright argued that it would be fundamentally unfair to Dr. Wright, and contrary to concepts of justice to impose discovery sanctions that forfeited his right to fully litigate the merits of his case. I have found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony. No conduct is more antithetical to the administration of justice. The sanctions I am imposing are necessary to achieve the remedial and punitive purposes of Rule 37. No lesser sanction would suffice.

**WHEREFORE**, it is ordered that:

1. The Motion to Compel [DE 210] is GRANTED. The Court will consider an award of reasonable expenses, including attorney's fees, related to filing and litigating this motion. *See* Fed. R. Civ. P. 37(a)(5)(A).

2. The Court will consider an award of reasonable expenses, including attorney's fees, related to filing and litigating Dr. Wright's Motion Regarding Production of a List of the Public Addresses of his Bitcoin as of December 31, 2013 [DE 155], which the Court construes as a Motion for Protective Order. *See* Fed. R. Civ. P. 26(c)(3).

3. On or before **September 20, 2019**, Plaintiffs may submit a request for reasonable fees and costs. A Response and Reply may be filed in accordance with time frames in the Local Rules. The parties should indicate in their respective pleadings whether they believe an evidentiary hearing is needed.

4. Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i), the Court deems the following facts to be established for purposes of this action: (1) Dr. Wright and David Kleiman entered into

28

843

a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin; (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership, (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

5. Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii) and (iii), the Court strikes Dr. Wright's Third Affirmative Defense (Good Faith), Fourth Affirmative Defense (Accord and Satisfaction), Fifth Affirmative Defense (Release), Sixth Affirmative Defense (Payment), Seventh Affirmative Defense (Set-off), Eighth Affirmative Defense (Failure to Mitigate Damages), Seventh [sic] Affirmative Defense (Waiver), and Tenth Affirmative Defense (Statute of Frauds).

**DONE AND ORDERED** in Chambers this 27th day of August, 2019, at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

844

# TAB 277-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-CIV-80176-Bloom/Reinhart

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and
W&K INFO DEFENSE RESEARCH, LLC,

     Plaintiffs,

v.

CRAIG WRIGHT,

     Defendant.

_____/

**Appendix to Opinion**

Shamir's $(n,k)$ threshold scheme is based on the mathematical concepts of polynomial interpolation and modular arithmetic.[1] A polynomial equation is a function in one variable (here, the variable is $x$) with the following form:

$$f(x) = a_0 + a_1x + a_2x^2 + a_3x^3 + \ldots \ a_kx^k$$

The largest power of $x$ (here, $k$) is the "degree" of the polynomial. A polynomial function in one variable can be plotted as a curve in a two-dimensional coordinate plane. For example, a polynomial function of degree 1 plots as a straight line. A polynomial function of degree 2 (also known as a quadratic function) plots as a parabola. The precise shape of the curve depends on the coefficients assigned to the powers of $x$ (that is, the values for $a_0$, $a_1$, $a_2$, etc.). Polynomial interpolation is the technique of computing these coefficients so that the curve passes through a known set of points in a plane.[2]

Modular arithmetic, sometimes known as "clock arithmetic," can be thought of as the mathematics of remainders.[3] For example, on a clock, the only numbers that represent the hours of the day are 1-12. After the 12th hour of the day, we restart the count with the number 1 (which is the remainder after deducting 12 from 13). No number greater than 12 exists in this system. In mathematical terms, the number that comes after 12 is not 13 (because 13 does not exist); it is "1

---

[1] Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11 (November 1979), p. 613.

[2] MIT OpenCourseWare. Lecture notes to Chapter 3 of Numerical Analysis (Course 18.330), p.1 ("Interpolation is the problem of fitting a smooth curve through a given set of points, generally as the graph of a function."). https://ocw.mit.edu/courses/mathematics/18-330-introduction-to-numerical-analysis-spring-2012/lecture-notes/MIT18_330S12_Chapter3.pdf.

[3] https://www.khanacademy.org/computing/computer-science/cryptography/modarithmetic/a/what-is-modular-arithmetic.

modulo 12" (abbreviated "1 mod 12"). This pattern repeats. So, the numbers that would otherwise correspond to 25, 37, 49, 61 etc. are all equivalent to 1 mod 12.

Shamir's ($n,k$) threshold scheme allows a person to use polynomial interpolation to encrypt a number in a way that can only be decrypted by simultaneously using multiple keys. The number of keys necessary for decryption is one more than the degree of the underlying polynomial. Therefore, for a linear function (degree 1), two keys are necessary. For a quadratic polynomial (degree 2), three keys are necessary.

So, to require $k$ keys, start with a polynomial of order $k$-1. Then, select a finite field of prime order $p$, where $p$ is greater than $k$ and greater than the secret number you are trying to hide.[4] Here's an example. Use the quadratic polynomial f(x)= $a_0 + a_1x + a_2x^2$ over the finite field consisting of the integers less than or equal to 4 – {0,1,2,3,4}. This field is denoted $F_5$.

(1) Set $a_0$ equal to the number you want to hide. Here, we will designate "3" as the hidden data.

(2) Assign an integer coefficient of your choice from the finite field to each of the other "$a$" terms of the polynomial. We assign $a_1$=2 and $a_2$=1, which gives the polynomial function: f(x)= $3 + 2x + x^2$

(3) Compute f($x$) for at least $k$ values of $x$, where $x$ is not equal to zero:

|  |  |  |
|---|---|---|
| Ex: | for $x$=1 | f($x$)=6, which is 1 mod 5 |
|  | for $x$=2 | f($x$)=11, which is 1 mod 5 |
|  | for $x$=3 | f($x$)=18, which is also 3 mod 5 |
|  | for $x$=4 | f($x$)=27, which is 2 mod 5 |

(4) Designate the ordered pairs corresponding to ($x$, f($x$)):

| (1, 1) | ie., when $x$=1, f($x$) is 1 mod 5 |
|---|---|
| (2, 1) | ie., when $x$=2, f($x$) is 1 mod 5 |

---

[4] A finite field is a type of alegebraic structure. The number of elements of the field is its "order." The order of a finite field must be a prime number or a power of a prime (usually represented as p). Michael Artin, Algebra, 1st Ed. (1991) p. 510, theorem 6.4.

2

847

$(3, 3)$      ie., when $x$=3, f($x$) is 3 mod 5

$(4, 2)$      ie., when $x$=4, f($x$) is 2 mod 5

The ordered pairs $(1, 1)$, $(2,1)$, $(3,3)$, and $(4,2)$ are the decryption keys. Anyone who has 3 or more of these keys can compute the hidden value of $a_0$ by plugging in the values of x and f(x), then solving the simultaneous equations:

For $(1,1)$, the polynomial becomes: $1 = a_o + a_1 + a_2$

For $(3,3)$, the polynomial becomes: $3 = a_o + 3a_1 + 9a_2$ which is equivalent to $3 = a_o + 3a_1 + 4a_2$ mod 5

For $(4,2)$, the polynomial becomes: $2 = a_o + 4a_1 + 16a_2$ which is equivalent to $2 = a_o + 4a_1 + a_2$ mod 5

You now have three equations in three variables, which can be solved using simple linear algebra.[5] The solution gives $a_0$=3, which is the number we wanted to encrypt.

---

[5] See generally, Gilbert Strang, Introduction to Linear Algebra, 4th Edition, (2009), Chapter 2 (explaining how to solve a system of linear equations).

848

# TAB 311

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       plaintiffs,

v.                                         **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

       defendant.

_____/

**DR. CRAIG WRIGHT'S OBJECTION**
**TO MAGISTRATE ORDER "DEEMING" CERTAIN FACTS**
**ESTABLISHED AND "STRIKING" CERTAIN AFFIRMATIVE DEFENSES**

849

## **INTRODUCTION**

A two-day evidentiary hearing yielded uncontroverted testimony and other evidence establishing that (1) it was impossible for Dr. Craig Wright to produce a complete list of all bitcoin that he mined nearly a decade ago, and (2) even though producing such a list was impossible, Dr. Wright had taken extraordinary steps to create a list of the most probable Bitcoin addressees that he had mined. In those two days, plaintiffs failed to rebut either of these facts, or demonstrate that a list of Dr. Wright's mined Bitcoin addresses would have any connection to any allegation in their complaint. Instead, plaintiffs focused on purported bad acts they allege Dr. Wright committed, none of which had anything to do with the discovery issue that was the subject of the evidentiary hearing.

Despite this, the Order [D.E. 277] (the "Order") rejected uncontroverted evidence of the impossibility of producing a list of all bitcoin that Dr. Wright mined nearly a decade ago. Compounding this plain error, the Order obliterated the boundaries of the limited discovery issue before the Magistrate, by making four findings of fact and purporting to strike eight of Dr. Wright's affirmative defenses, despite confirming that it had no jurisdiction to do so. *See* Order at n.1 (stating that "magistrate judges have jurisdiction to enter sanctions orders for discovery failures which ***do not*** strike claims, completely preclude defenses or generate litigation-ending consequences.") (citing *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1295 (S.D. Fla. 2015) (emphasis added)).

The Order's findings would deprive Dr. Wright of his fundamental rights to procedural due process, and to have a jury resolve factual disputes in this case. Moreover, the Order would operate to turn inconceivable "facts" that are wholly unrelated to the discovery issue, into

2

850

indisputable "facts" that are diametrically opposed to the actual evidence. The Order's resolution of a narrow discovery issue may not establish "facts" that otherwise never would exist.

As more fully demonstrated below, the Order was (1) wholly without evidentiary support, (2) improperly exceeded the scope of the matters before the Magistrate and the Magistrate's jurisdiction, and (3) would improperly deprive Dr. Wright of fundamental due process rights and a fair trial. It should be vacated to prevent a miscarriage of justice.

## DISCUSSION

### A. There Is Absolutely No Basis for Imposing Any Sanctions on Dr. Wright, Because the Uncontroverted Evidence Shows that He is Unable to Access a Listing of the Bitcoin that He Mined

There was only *one narrow discovery issue* before the Magistrate: Dr. Wright's stated inability to comply with the Court's discovery order to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. On that single issue, Dr. Wright unequivocally testified in detail as to why he was unable to comply. The algorithm necessary to generate a complete list of his Bitcoin public addresses is in an encrypted file that is protected by a Shamir encryption scheme.[1] June 28, 2019, Hr. Tr. 11:13-12:20. To unlock the encrypted file, Dr. Wright would need at least 8 of the 15 key slices, but he has only 7. *Id.* 107:20-108:4; 122:4-17; 126:16-17. His best friend, Dave Kleiman, set up a system whereby Dr. Wright would, at the

---

[1] A Shamir encryption scheme is an additional layer of encryption that can be used to protect sensitive information, such as cryptographic keys. The scheme works by generating a pre-determined number of "key slices," and defining the number of slices required to reveal the original secret, known as the threshold. Without enough key slices to meet the threshold, the original secret will not be divulged. In practice, one would first encrypt a file with a cryptographic key. That encryption key would then be further encrypted using the Shamir encryption scheme, resulting in multiple key slices. To decrypt the file, one would need to combine enough key slices to meet the threshold and reveal the original encryption key. The revealed key can then be used to decrypt the file. *See* Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612.

3

earliest, start to receive the remaining key slices in January of 2020 by bonded courier, at which point, Dr. Wright would be able to comply with the Court's order. *Id.* at 23:23-24:7. Dr. Wright is unable to circumvent this system to obtain the eighth key slice at an earlier date because he was not involved in setting up the courier system and because Dave Kleiman is no longer alive. *Id.* at 125:20-126:3.

Dr. Wright also testified as to his substantial good faith efforts to comply with the Court's order. The bitcoin that Dr. Wright mined can be identified by six select criteria, such as the node values and date mined. Aug. 5, 2019, Hr. Tr. 16:3-20:2. At Dr. Wright's direction, Steve Shadders, the Chief Technology Officer of nChain, created a computer script to analyze the blockchain for bitcoin that met those six criteria, identifying approximately 27,000 matching Bitcoin addresses.[2] June 28, 2019, Hr. Tr. 172:10-173:9; Aug. 5, 2019, Hr. Tr. 13:17-25:11. Dr. Wright produced a list of those bitcoin to plaintiffs in June of 2019. Dr. Wright also provided plaintiffs a list of all bitcoin that he definitively knows he mined, which includes the first 3,500 bitcoin mined and bitcoin that he sent to Mike Hearn. D.E. 211 at 3; June 25, 2019 email from Z. Markoe to V. Freedman, attached as Exhibit A. Dr. Wright also produced all non-privileged documents (more than 2,500) that contained the word "Tulip" or "Seychelles" and were related to trusts or bitcoin.[3] D.E. 211 at 3; June 3, 2019 email from Z. Kass to V. Freedman, attached as Exhibit B.

---

[2] The list is overinclusive because there are a number of bitcoin that may match the six characteristics but were not mined by Dr. Wright. What is certain, however, is that all bitcoin Dr. Wright mined are on the list he produced, excluding a few he mined on his laptop. Aug. 5, 2019, Hr. Tr. 25:15-22.

[3] The documents produced included documents plaintiff used in the evidentiary hearing to try and show that certain other documents were altered. If Dr. Wright had been trying to deceive this Court, as the Order suggests, one would have expected him to withhold the supposedly incriminating documents. Dr. Wright did not.

It is well-established in the 11th Circuit that there is no basis for sanctioning a party unable to comply with a court order. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (citing *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991); *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir.1988)). A party shows that it is unable to comply by demonstrating that it has "made 'in good faith all reasonable efforts to comply.'" *Id.* (quoting *Watkins*, 943 F.2d at 1301). Specifically, that demonstration can be made through the party's testimony. *United States v. Rizzo,* 539 F.2d 458, 466 (5th Cir. 1976) (There was no basis for contempt sanctions after the noncompliant party testified that he searched for, and was unable to locate, patient forms that the court ordered produced.); *United States v. Spilotro*, 1985 WL 384, at *4 (N.D. Ill. 1985) ("Respondent has satisfied his burden of production with regard to his defense that he is unable to comply with the production order," by testifying that the records were destroyed by the "fire and flood that struck his home."); *United States v. Barnette*, 902 F. Supp. 1522, 1538 (M.D. Fla. 1995) ("[T]he Court finds that [the non-compliant party] has satisfied his burden of production by introducing evidence supporting his claim of inability to comply with the court order," namely his own testimony as to his "attempts to obtain the stock" that the court ordered produced.); *United States Commodity Futures Trading Comm'n v. Capital Blu Mgmt., LLC*, 2010 WL 11508136, at *2 (M.D. Fla. 2010) (The court "cannot find, on this record, that these Defendants are likely in contempt for failing" to produce the computers ordered by the court when the noncompliant party has "testified that all of the computers from the Melbourne office . . . were turned over to the United States Attorney's Office."); *In re Coastal Land Dev. Corp.,* 2009 WL 2985700, at *3–4 (Bankr. S.D. Miss. 2009); *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 2009 WL 10697338, at *3-4.  (S.D. Fla. 2009).

Dr. Wright unequivocally testified that he was unable to comply with the Court's order, explained in detail why compliance was not possible, and testified about his good faith efforts to comply. ***That testimony stands unrebutted by plaintiffs***. While plaintiffs challenge the veracity of certain documents related to the formation of the Tulip Trusts, they have not introduced ***any evidence*** challenging Dr. Wright's testimony regarding his inability to produce a complete list of all bitcoin that he mined prior to December 31, 2013, ***which was the only issue before the Magistrate***. Plaintiffs have neither introduced any evidence showing that Dr. Wright can access a complete list of bitcoin that he mined, nor have they introduced any evidence that he didn't make good-faith reasonable efforts to comply with the Court's order by providing an overinclusive list of Bitcoin addresses, providing his best, a partial list of the bitcoin that he mined, and producing the documents related to the Tulip trusts. For these reasons, there simply was no basis to sanction Dr. Wright, and the sanctions imposed by the Order are contrary to law.

This conclusion is unchanged by the supposedly "inconceivable" nature of Dr. Wright's testimony, which supposedly defies "real-life experience." *See* Order at 19 (Making a "finding" that no one would set up a system where they could potentially lose "billions" of dollars "if [a] bonded courier does not appear."). Moreover, as a factual matter, Dr. Wright's testimony is not inconceivable.

The Order failed to consider five important facts. First, it failed to consider that the bitcoin were worth around a million dollars—not billions—when Dr. Wright started the process of putting them in the trust.[4] Second, the Order failed to consider the redundant nature of the Shamir

_____

[4] In the end of April 2011, the value of one bitcoin ranged from $1.18 to $2.03. https://99bitcoins.com/bitcoin/historical-price/  (last visited Nov. 21, 2019). Thus, the 821,050 bitcoin in the Tulip Trust were worth between $968,839 and $1.6 million dollars when the trust was created, as opposed to the approximately 8 billion dollars they were worth when the Order

6

Scheme. Dr. Wright testified that there were 15 available key slices, of which, only a threshold number of 8 were necessary to decrypt the files. June 28, 2019, Hr. Tr. 106:17-108:4. As such, ***even if 7 keys were permanently lost***, Dr. Wright still would be able to decrypt the file—so long as he received the other 8 keys. Third, the Order failed to consider that when Dr. Wright asked Dave Kleiman to set up the courier system, he had no way of knowing that Dave would die only a few years later, which would make Dr. Wright totally reliant on the system Dave set up. Fourth, the Order fails to consider that the Bitcoin blockchain contains 1.3 million bitcoin that share the six unique characteristics to which Mr. Shadders testified, and that those unique characteristics make it probable that one person mined a vast majority of those bitcoin—yet those bitcoin have not been spent in almost ten years. Those bitcoin ***must belong to somebody***, and that somebody likely has a good reason for having not spent them. Dr. Wright's testimony as to his inability to access his bitcoin and their addresses fits perfectly with this provable (and proven) reality. Fifth, as to what's conceivable or not, the Order fails to consider that the Magistrate's life experience and, frankly, most people's life experience, may not correspond to that of the inventor of Bitcoin.

It is beyond dispute that the inventor of Bitcoin is not a typical person. Bitcoin is a pseudonymous, revolutionary digital currency that is not reliant on a central institution to control it. Instead, it is secured by powerful encryption comprised of public and private key pairs and maintained by miners. In other words, the Bitcoin system was set up by a security-conscious contrarian. Against that backdrop, it is not at all inconceivable that Dr. Wright (the professed inventor of Bitcoin), would use powerful and complex encryption to protect his bitcoin—even if a typical person might not. In fact, the idea of using a Shamir scheme to protect bitcoin has recently

---

was issued, when one bitcoin was worth approximately $10,000. Further, when the trust was created, the very concept of cryptocurrency was extremely novel, and it was far from certain that the bitcoin would even maintain their value—let alone appreciate nearly ten thousand-fold.

855

gone mainstream in the Bitcoin community. *See* Trezor Blog, *Shamir Backup—Our Newest Security Standard,* https://blog.trezor.io/shamir-backup-the-revolution-of-private-keys-backup-is-here-858687ed7fe7 (last visited Oct. 10, 2019).

### B. The Draconian Sanctions the Order Purported to Impose Would Violate Dr. Wright's Due Process Rights Because They Improperly Went Far Beyond the Single, Narrow, Discovery Issue Before the Magistrate and Amounted to a Determination of Liability Without an Opportunity to Defend on the Merits

There was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's asserted inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. Nonetheless, citing Rule 37, the Order imposed draconian sanctions in the form of deemed facts (the "Deemed Facts")[5] that went *far beyond* the one, narrow discovery issue before the Magistrate, made extensive purported findings on the merits of the case, and purported to strike eight affirmative defenses for being "inconsistent" with the Deemed Facts. *See* Order at 29. The Deemed Facts would establish that: 1) a partnership existed between Dr. Wright and Dave; 2) plaintiffs have an ownership interest in the bitcoin that Dr. Wright mined prior to Dave's death; and 3) plaintiffs have an ownership interest in Dr. Wright's bitcoin-related intellectual property developed prior to Dave's death. *See* Order at 28-29.

---

[5] The Magistrate "deemed" the following facts established:
> (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin;
> (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership,
> (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and,
> (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

Order at 28-29.

8

856

In imposing sanctions that far exceeded the scope of the single, narrow discovery issue before the Magistrate, the Order violated Dr. Wright's due process rights. More than sixty years ago, the Supreme Court made clear that the "provisions of Rule 37 . . . must be read in light of the provisions of the Fifth Amendment that *no person shall be deprived of property without due process of law . . . .*" *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 209 (1958) (emphasis added). "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Id.* Under Rule 37(b)(2), "the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 708 (1982). In other words, there must be a "nexus between the information [] not produced" and the sanction imposed. *C & M Oil Co. v. CITGO Petroleum Corp.*, 2007 WL 9751801, at *5 (S.D. Fla. 2007); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2009 WL 982460, at *4 (S.D. Fla. 2009).

There is no nexus between the single, narrow discovery issue before the Magistrate and the broad sanctions the Order purported to impose through the Deemed Facts. Starting with the Deemed Facts regarding ownership of Dr. Wright's intellectual property and a purported partnership between Dr. Wright and Dave, there is absolutely *no evidence* that a listing of the bitcoin *that Dr. Wright mined* would have aided plaintiffs in establishing that Dave had any ownership interest in any of Dr. Wright's intellectual property or that there was any partnership between them to do anything. In fact, there is no logical connection between the two subjects.

As for the Deemed Facts granting plaintiffs an ownership interest in Dr. Wright's bitcoin, there is no record evidence showing that a listing of bitcoin *that Dr. Wright mined* would have

helped plaintiffs prove that Dave had an ownership interest in those bitcoin, let alone that Dave mined them. Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin miners or owners. [6] Aug. 5, 2019, Hr. Tr. 26:14-27:2. At most, the discovery ordered would have shown that bitcoin Dr. Wright had mined were moved from one pseudonymous public address to another pseudonymous public address.[7] Even if plaintiffs knew the identity of Dave's public addresses (they have failed to introduce ***any*** such evidence) and were able to strip away the pseudonymity, showing that bitcoin *Dr. Wright mined* were later transferred into Dave's public addresses[8] would not show that Dr. Wright stole bitcoin from Dave. If anything, ***it would show that Dave stole bitcoin from Dr. Wright***.

### C.   The Draconian Sanctions the Order Purported to Impose Also are Improper Because There is No Record Evidence of Any Prejudice to Plaintiffs, which is an Essential Requirement for Imposing Sanctions under Rule 37(b)

As shown above, the Order's draconian sanctions would violate Dr. Wright's due process rights, because there is no nexus between the discovery ordered and the sanctions imposed for being unable to provide it. Those sanctions also are improper because there is no evidence of any prejudice to plaintiffs—and this is evident from the face of the Order.

"The severe sanctions permitted by Rule 37(b) are usually only imposed" when "the party seeking sanctions was prejudiced by the violation." *Dude v. Cong. Plaza, LLC*, 2018 WL

---

[6] Further, there are no "accounts" on the Bitcoin network. Bitcoin are cryptographically locked on the blockchain and can be identified by their public addresses, which is a template used to represent the unlocking script for the bitcoin.

[7] That is assuming that the bitcoin were in fact moved. Dr. Wright testified that they were not, and plaintiffs have not introduced ***any*** evidence to the contrary.

[8] As stated in the Bitcoin white paper, Bitcoin public addresses are designed to be only used one time. *See* D.E. 238-1 at 6 ("a new key pair should be used for each transaction to keep them from being linked to a common owner"). As such, it is highly unlikely that Dave would have reused his Bitcoin addresses, which would make plaintiffs hypothetical tracing impossible—even if they knew some of his Bitcoin addresses.

4203888, at *5 (S.D. Fla. 2018), *report and recommendation adopted*, *Dude v. Cong. Plaza. LLC*, 2018 WL 4203886 (S.D. Fla. 2018) (citations omitted); *Wouters v. Martin Cty., Fla.*, 9 F.3d 924, 934 (11th Cir. 1993) (The district court abused its discretion in dismissing 14 plaintiffs because "plaintiffs' noncompliance with the discovery order did not prejudice defendant.").

The 29-page Order dedicates *just one conclusory line* to discussing plaintiffs' purported prejudice, stating that "plaintiffs have also been prejudiced by not being able to try and trace the bitcoin that was mined." Order at 28. The lack of any detail is telling.

At the evidentiary hearing, plaintiffs failed to introduce any evidence as to 1) how their purported bitcoin tracing would work, 2) how it would help them prove any of their claims, or 3) how they would be prejudiced in its absence. Like the Order, plaintiffs merely assumed that this purported tracing was important, without providing any logical, much less factual, basis for that assumption.

As the parties and the Court are aware, Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin miners or owners. There is nothing in the record that even hints at how tracing[9] bitcoin that Dr. Wright mined, from one pseudonymous public address to another pseudonymous public address, would aid plaintiffs in establishing that Dr. Wright stole any bitcoin from Dave, let alone that they mined any bitcoin together.

In dispositive contrast, Dr. Wright **did submit evidence** at the evidentiary hearing which showed that bitcoin tracing would be useless to plaintiffs because of the pseudonymous nature of Bitcoin. Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug. 5, 2019, Hr. Tr. 26:14-27:2. That testimony stands

---

[9] Again, plaintiffs' "tracing" theory assumes that the bitcoin was moved from one public address to another public address and could thus be traced. But Dr. Wright testified that the bitcoin never was moved. That testimony has not been contradicted.

11

859

unrebutted, and demonstrates that the Order's conclusory statement about purported prejudice to plaintiffs is contradicted by the *only evidence* on this issue.

Further, even if there were a way to somehow trace Dr. Wright's bitcoin to Dave (there isn't), and also assuming that tracing would somehow help plaintiffs establish their claims (it wouldn't), plaintiffs could simply perform that analysis on the overinclusive list of Bitcoin addresses that Dr. Wright provided. As noted above, in a good faith effort to comply with the Magistrate's order, Dr. Wright had the Chief Technology Officer of nChain, Steve Shadders, prepare a list of Bitcoin addresses using select criteria that Dr. Wright provided. *See* Aug. 5, 2019 Hr. Tr. 11:6-28:16. Mr. Shadders was able to compile a list of 1,263,650 bitcoin,[10] which includes all of the 821,050 bitcoin that Dr. Wright mined. Aug. 5, 2019, Hr. Tr. 25:15-22. There is no reason why plaintiffs could not conduct their "tracing" on that list of 1,263,650 bitcoin, nor is there any reason why they could not conduct "tracing" on the Bitcoin addresses Dr. Wright already had provided.[11] In fact, plaintiffs failed to introduce *any evidence* at the hearing that they *even tried* to conduct any tracing—despite having had the overinclusive list of bitcoin for more than a month.

---

[10] The list of bitcoin that was introduced as defendants Exhibit 2 contained 27,973 Bitcoin addresses. D.E. 266-1. Mr. Shadders testified that he was able to further reduce that list by 2,700 addresses. Aug. 5, 2019 Hr. Tr. 23:8-24:19. Thus, the total amount of Bitcoin addresses identified by Mr. Shadders was 25,273 (27,973-2,700=25,273). Each of the Bitcoin addresses contained 50 bitcoin, which resulted in a total of 1,263,650 bitcoin (25,273x50=1,263,650).

[11] The possibility that the Magistrate might not have believed that the overinclusive list contained Dr. Wright's Bitcoin address (despite the fact that the criteria matched the Tulip Trust documents), begged the question whether the Magistrate would have believed that any list of Bitcoin addresses were Dr. Wright's. It well may be that the Magistrate only would have been satisfied if Dr. Wright had produced a list of Bitcoin addresses that showed a large number of bitcoin transfers between April 2013 (Dave's death) and December 31, 2013 (the cut-off date ordered by the Magistrate). Of course, that would be putting the cart before the horse, as it would assume such transfers demonstrated a theft.

860

Finally, Dr. Wright testified that he should be receiving, at the earliest, the missing key slices that would enable him to generate a list of his bitcoin holdings in January of 2020. June 28, 2019, Hr. Tr. 23:23-24:7. At a minimum, Dr. Wright should have been afforded the opportunity to wait until that date to see if he receives the key slices to generate the list of his bitcoin holdings, which he could then provide to plaintiffs. At that point, even plaintiffs would have to concede that Dr. Wright's inability to do the impossible and comply with the discovery order caused them absolutely no prejudice.

### D. The Order's Attack on Dr. Wright's Character Has no Bearing on Whether he Could Produce the List of Bitcoin Addresses, and is Without Record Support

It is undisputed that there was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's stated inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. Moreover, it also is undisputed that Dr. Wright's testimony regarding his inability to provide a list of his bitcoin holdings is uncontroverted and unchallenged by any record evidence. Yet, the vast majority of the Order focuses on supposed "bad acts" by Dr. Wright ***that had absolutely nothing to do with whether he could access a list of his bitcoin holdings***. For that reason, those purported "bad acts" are simply irrelevant. Yet, despite their irrelevance, Dr. Wright is compelled to address those purported "bad acts" due to the extreme nature of the Order's findings and the extreme prejudice those findings would cause him.

According to the Order, Dr. Wright is a conniving and uncooperative defendant who "changed his story," provided the Court with "inconsistent," "intentionally misleading," and "perjurious" statements, and who "intentionally submitted fraudulent documents to the Court," as "part of a sustained and concerted effort to impede discovery into his bitcoin holdings." Order at 17-28.  Yet, in reaching those "conclusions," the Order overlooked critical evidence and misstated

13

861

the record. Specifically, it cited six instances of purported "bad conduct" by Dr. Wright. They are

as follows:

i)      "Inconsistencies" as to the identities of the Tulip Trust trustees [Order at 22-23];

ii)     "Inconsistencies" in the manner that Dr. Wright described the transfer of the bitcoin holdings into the Tulip Trust [Order at 23];

iii)    The "lack" of record support for the encrypted file containing Dr. Wright's Bitcoin addresses [Order at 21];

iv)    Dr. Wright's "intentional submission" of fraudulent documents [Order at 20-21, 26-28];

v)     Dr. Wright's failure to tell the Court prior to the evidentiary hearing that a list of public addresses would not aid plaintiffs' case [Order at 25-26]; and,

vi)    Dr. Wright's failure to tell the Court in March that a list of his bitcoin holdings was inaccessible [Order at 21-22].

We address each of these purposed instances of "bad conduct" below.

### i.    *The Purported "Inconsistencies" as to the Identities of the Tulip Trust Trustees*

The Order found that Dr. Wright made "irreconcilable statements about the Tulip Trust,"

stating that "[t]he April 18 Motion stated it was a blind trust and he was not a trustee. His sworn

declaration three weeks later stated that he is one of the trustees of the Tulip Trust." Order at 22.

In making this finding, the Order failed to consider that there are two Tulip Trusts. *See* D.E. 237-

22; 237-9. As shown by the trust documents, Dr. Wright is the trustee of one of the Tulip Trusts

but is not a trustee of the other.

### ii.    *Purported "Inconsistencies" in the Manner that Dr. Wright Described the Transfer of Bitcoin Holdings to the Tulip Trust*

The Order found that Dr. Wright "changed his story" as to what assets were transferred

into the trusts, and that he provided an "intentionally false" representation on that issue. Order at

23.  According to the Magistrate, Dr. Wright "unequivocal[y]" stated in his April 18th motion and

May 8th declaration that the "trust held bitcoin," but "testified at his deposition and the

evidentiary hearing that "the trust only holds keys," not actual bitcoin. *Id.*

14

Having purportedly "caught" Dr. Wright in this inconsistency, the Order then speculated as to Dr. Wright's purported motivation. It speculated that Dr. Wright "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain . . . so he changed his story to say only the keys had been transferred." Order at 23-24.

This finding reflects a misunderstanding of Bitcoin technology and is unsupported by the record. First, it is impossible to hold or store bitcoin. The bitcoin *always remains on the Bitcoin blockchain*. In common parlance, when someone states that their bitcoin is stored on a hard drive, what they mean is that the hard drive contains the private keys that can be used to transact with corresponding bitcoin on the Bitcoin blockchain. Thus, there is no basis for attempting to distinguish between a trust holding bitcoin or Bitcoin keys. *They are the same thing*.

For that reason, there also is no difference between bitcoin transferred on the blockchain into a new set of public addresses controlled by a trust, and bitcoin transferred off the blockchain by transferring the Bitcoin private keys. In both instances, *the only thing held by the trust would be private keys*.

Second, even assuming arguendo that there were a difference between holding actual bitcoin and holding Bitcoin private keys (there is not), the Order's conclusion that Dr. Wright made inconsistent statements as to the trust holdings is unsupported by the record. The Order reached its conclusion by cherry-picking sentences from two documents, Dr. Wright's May 8th Declaration and his April 18th motion, but those very same documents contain other sentences that undermine the Order's conclusion.

In Dr. Wright's May 8, 2019 declaration (produced long before the evidentiary hearing where Dr. Wright supposedly "changed his story), Dr. Wright stated that "I later transferred the

15

863

encrypted files that control access to these bitcoin in 2011 . . . " and that "access to the encrypted file that contains the ***public addresses and their associated private keys to the bitcoin that I mined***, requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock based on a Shamir scheme." D.E. 222 at 1, 2, 4 (emphasis added). Dr. Wright's declaration was unequivocal. The trust contained the ***private keys*** associated with the ***bitcoin that he mined***—not the "actual" bitcoin (which have no physical existence in the usual sense).[12] Additionally, Dr. Wright's April 18th motion states that he "transferred *ownership* of all his Bitcoin into a blind trust." D.E. at 184 at 2 (emphasis added). Transferring "ownership" of bitcoin is accomplished by transferring the private keys.

Further, there are additional documents that undermine with the Order's speculation that Dr. Wright "changed his story" because he "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain." Order at 23, 24. The trust documents (also produced long before the evidentiary hearing) make it clear that the bitcoin never moved (*i.e.,* were not transferred on the blockchain). One document describes the trust assets as follows: 1) "the settlor has had paid the trustee the sum of XBT 821,050" and 2) "the XBT (bitcoin) have ***never been spent or moved***." D.E. 237-22 at 2 (emphasis added).  And if the bitcoin "never moved," the only other method of transfer could have been an off-blockchain transfer of the private keys—to which Dr. Wright testified.

---

[12] We emphasize that Dr. Wright stated in the declaration that he transferred the private keys to *the **bitcoin that he mined***, not the private keys to the ***bitcoin that were currently in the trust***. If Dr. Wright had meant to state that he'd transferred the bitcoin on the blockchain into the trust, as the Order incorrectly concluded [Order at 23, 24], then the correct terminology would have been the latter, not the former. This is so, because transferring the bitcoin on the blockchain would have required ***a new set of public addresses and corresponding private keys***.

864

### iii.    The Purported "Lack" of Record Support for the Encrypted File Containing Dr. Wright's Bitcoin Addresses

The Order found that "notably absent" from the trust documents "is any encrypted file, software, public or private keys," and that there was no "other credible evidence" that the file existed. Order at 21, 24. Thus, the Order concluded that the "file does not exist." Order at 24.

The Order's conclusion is unsupported and contradicted by the record evidence. First, one of the trust documents refers to an encrypted file that can be accessed by private keys. *See* 237-9. This document states that the trust is "DAC formed using a split key cryptographic process," which is controlled by the distribution of keys. *Id.* at 2. That high-level description fits perfectly with a split-key Shamir-Scheme encryption of the software necessary to generate Dr. Wright's Bitcoin addresses.

Second, numerous documents that were produced early on in discovery and introduced during the evidentiary hearing make reference to the Shamir Scheme for protecting the trust assets. For example, a document that appears to be a Bitmessage exchange between Dr. Wright and Dave states "[t]he keys are divided using the SSSS (Shamir's secret sharing scheme) scheme you had us work on." D.E. 237-16 at 8.[13]

Third, plaintiffs' counsel is currently in possession of the encrypted file that Dr. Wright stated contains the software necessary to generate his public Bitcoin addresses.[14] Dr. Wright's

---

[13] Plaintiffs claim that the received date on the Bitmessage pre-dates the public release of the Bitmessage software, however, Jonathan Warren, the creator of Bitmessage, testified that the software was stored on an unprotected server in his parents' home and that it may have been released on the dark web prior to the public release. D.E. 261-1 at 89:24-90:2; 104:22-107:19.

[14] Dr. Wright's discovery vendors produced the file to plaintiffs on August 27, 2019, the same day the Court issued its Order. Dr. Wright had not previously produced the file to plaintiffs because his discovery vendors had not been able to decrypt it, making it of little use to anyone, including plaintiffs. Upon receiving the Magistrate's order that doubted the existence of the encrypted file, Dr. Wright promptly produced that file to plaintiffs.

17

865

discovery vendor also is in possession of that file and has been working on decrypting the file (so far without any success).

### iv.    Dr. Wright's Purported "Intentional Submission" of Fraudulent Documents

The Order repeatedly found that Dr. Wright "intentionally submitted fraudulent documents to the Court." Order at 28, 27, 26, 21, and 20. This conclusion appears to be based on the testimony of plaintiffs' expert, Matthew Edman, who testified as to inconsistencies with several documents. However, Edman *also testified* that he was unable to conclude who had created these inconsistencies, he conceded that many of them could have innocent explanations, and he failed to analyze the original ESI emails.[15]

Notably, the Order addresses only one of the supposedly "fraudulent documents," a document dated October 23, 2012 establishing one of the Tulip Trusts. D.E. 237-9. According to the Order, "computer forensic analysis indicated that the Deed of Trust presented to the Court was backdated." Order at 21.  The Order appears to be relying on the testimony of Edman, who testified that the font files embedded in the document were copyrighted in 2015, implying that the document really was drafted in 2015. Aug. 5, 2019, Hr. Tr. 181:11-184:20. However, Edman conceded that the document could have been drafted in 2012, but simply OCR'd in 2015, which could have embedded the 2015 fonts into the document. *Id.* at 239:16-240:16. As such, Edman's testimony is not conclusive of anything.

---

[15] The timing inconsistencies in the PGP signatures could have been caused by a poorly configured computer clock. The supposed issues with the PGP version histories could have been caused by an Alpha or Beta version of the software. The supposed timing issues with the Bitmessages could be due to a pre-release version of the Bitmessage software. The supposed changes to the Tulip Trust email could have been caused by forwarding the original native email and then PDFing it. Each of these plausible explanations contradicts the "Fraudulent documents" accusation. None of them even were considered by the Order.

Further, even if there were no innocent explanations for the purportedly "fraudulent" documents (there are), the mere fact that a document may be altered—does not make that document "fraudulent." "Fraud" is a legal term of art that requires four elements to be met. "The elements of fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement is false; (3) defendant's intent that the statement induce the plaintiff to act; and (4) plaintiffs' reliance on the statement." *JPMorgan Chase Bank, N.A. v. Hayhurst Mortg., Inc.*, 2010 WL 2949573, at *3 (S.D. Fla., 2010) (citing *Parham v. Fla. Health Scis. Ctr., Inc.*, 35 So.3d 920, 928 (Fla. 2d DCA 2010)).

Here, the only evidence introduced at the evidentiary hearing was that certain documents purportedly were altered. There was absolutely no evidence as to any of the other elements of fraud.[16] The Order fails to even address the elements of fraud, let alone analyze whether the purportedly altered documents satisfied any of those elements.

### v.     Dr. Wright's Purported Failure to Tell the Court Prior to the Evidentiary Hearing that a List of Public Addresses Would Not Aid Plaintiffs' Case

The Order chastises Dr. Wright for "changing his story" at the evidentiary hearing regarding the utility of public addresses, where he purportedly "argued for the first time that a list of public addresses was meaningless." Order at 25. The Order found this "particularly disturbing because it was Dr. Wright who first injected the idea of public addresses into this discovery matter," and "the Court did not order production of a list of public addresses." *Id.* at 25, 5, 10.

---

[16] In fact, the Magistrate ruled at the evidentiary hearing that he would not permit plaintiffs' expert to testify that a document was purportedly "fraudulent" because the expert could not know Dr. Wright's "state of mind, which is what is necessary for testimony that it was fraudulent." Aug. 5, 2019, Hr. Tr. 112:22-113:19. Further, while many of the documents were produced by Dr. Wright in this case as part of his discovery obligations, his document production included documents from computers and servers that were used and maintained by others in Dr. Wright's various companies. Thus, even if one were able to ascertain a "state of mind," there is no basis to concluded that it was ***Dr. Wright's state of mind***.

The Order stated that the Court had ordered Dr. Wright to produce "a listing of [his] bitcoin holdings." *Id.* at 7 (internal quotations omitted). That statement is contradicted by the record, misconstrues Dr. Wright's arguments, and reflects a lack of understanding as to the workings of Bitcoin.

*First,* it was plaintiffs—not Dr. Wright—who injected the idea of public addresses into this discovery matter. In January 2019, Plaintiffs asked Dr. Wright to "identify the public keys and *public addresses* for any cryptocurrency that (i) you possess the private keys to . . . ." D.E. 91-2 at 8 (emphasis added). It was *this very discovery request* that formed the basis of plaintiffs' motion to compel, and which then led to the evidentiary hearing that resulted in the Order. *See* D.E. 210 at 2.

*Second,* in adjudicating plaintiffs' motion to compel, the Magistrate *did in fact order* Dr. Wright to produce a list of Bitcoin addresses:

> "So back in March -- March 14th, I think it was – I ordered Dr. Wright to produce a listing of the ***public addresses*** of his Bitcoin holdings as of December 31, 2013."

> "I will give Dr. Wright until June 17, 2019 to produce a complete list of the ***public addresses*** of all Bitcoin that he mined prior to December 31, 2013."

June 11, 2019 Hearing Tr. at 5:1-4, 31:13-15 (emphasis added).[17]

*Third,* Dr. Wright did not wait until the hearing to argue "for the first time" that the list of public addresses was irrelevant.  Order at 25. Dr. Wright raised that objection in *February 2019*, in responding to Plaintiffs' interrogatory asking for a listing of public addresses. *See* D.E. 91-2 at 15. Dr. Wright's counsel further articulated his relevancy objection at the March 14, 2019,

---

[17] Further, the Order again reveals that the central issue was the public addresses of Dr. Wright's bitcoin, and not his bitcoin holdings. On page 20, the Order speculates about his "powerful motive not to identify his bitcoin," for "as long as the ***relevant addresses*** remain secret, he can transfer the bitcoin without the Plaintiffs being able to find them." Order at 20 (emphasis added).

hearing. *See* March 14, 2019, Hearing Tr. at 20:11-22:8. But the Magistrate overruled those objections, stating "I think it's relevant," and ordered Dr. Wright to produce the listing of his bitcoin or to file a motion arguing undue burden. *Id.* at 22:10-23:7 (emphasis added). Dr. Wright filed that motion on April 18, 2019. D.E. 155. In light of the Magistrate's ruling, Dr. Wright reasonably concluded that it would be inappropriate to again raise relevancy objections in his motion.

Dr. Wright did, however, again raise relevancy objections at the next appropriate moment. On June 11, 2019, plaintiffs filed their motion to compel, arguing—for the first time—that the list of Bitcoin addresses went to "the heart of Plaintiffs' case," and that not having the list of Bitcoin addresses was "frustrating Plaintiffs' ability to prove their case," two statements plaintiffs never supported with evidence (because there isn't any). *See* D.E. 210 at 2, 4.  In responding to that motion, Dr. Wright argued that plaintiffs had neither demonstrated any harm, nor "how they will use those addresses to determine which particular bitcoin were purportedly mined by Dave or belonged to Dave." D.E. 211 at 6. In other words, plaintiffs' claim of "harm" was unfounded because they had not demonstrated how the Bitcoin addresses even were relevant.

Dr. Wright's counsel further elaborated at the June 11th hearing before the Magistrate:

> Let's assume we had the addresses that contained the Bitcoin that was mined during the relevant time period. What information would the plaintiffs be able to discern? Specifically, would they be able to discern the information they're claiming they desperately need and we are stonewalling to give. That is to say, **evidence that would show the Bitcoin in those public addresses was mined in partnership.**
>
> Without wanting to raise an objection, so I'll say it myself, **counsel has been able to confirm unequivocally that having that public address is not going to give plaintiffs that information**, and we've actually asked to do the following study of our experts. All Bitcoin mined during the relevant time period that did not move.

June 11, 2019, Hr. Tr. 20:8-20 (emphasis added). Nonetheless, the Magistrate ruled that he wasn't "going to resolve that issue today," and summarily ordered Dr. Wright to produce a list of his Bitcoin addresses for bitcoin he mined prior to December 31, 2013. *Id.* at 30: 9-10, 31:13-15.

Dr. Wright again raised the relevancy issue at the evidentiary hearing that resulted in the Order, when Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug 5, 2019, Hr. Tr. 26:14-27:2. Dr. Wright's counsel raised it yet again in closing arguments. Aug 26, 2019, Hr. Tr. 11:2-12:1.

*Fourth*, putting aside the fact that 1) it was *plaintiffs* that initially asked for a list of public addresses, 2) the Magistrate *did order* Dr. Wright to produce a list of Bitcoin addresses, and 3) Dr. Wright objected *long before* the evidentiary hearing on the basis of relevancy and lack of prejudice to plaintiffs, the Order's attempt to split hairs and distinguish between ordering a list of Bitcoin addresses and a list of bitcoin holdings not only reflects a lack of understanding of how Bitcoin works, but is a distinction without a difference.

There are only four ways to identify a list of Bitcoin holdings: 1) a list of public addresses; 2) a list of public keys; 3) a list containing bitcoin block height and transaction number; or 4) a transaction ID. Even if it were true (it isn't) that the Magistrate ordered only a listing of Dr. Wright's bitcoin holdings, the only way Dr. Wright could have complied with that order would have been by providing one of these four datapoints. And regardless of which datapoint he chose, that information still would be meaningless (and useless) to plaintiffs—because none of those datapoints contain personally identifying information.[18] Moreover, none of them would show who mined or owns the bitcoin.

---

[18] See Exhibit C, showing what a Bitcoin transaction looks like. Regardless of which datapoint one chooses, the fact remains that nowhere does it contain any personally identifying information.

>      *vi.    Dr. Wright's Purported Failure to Tell the Court in March 2019 that a List of*
>             *His Bitcoin Holdings was Inaccessible*

The Order claims that Dr. Wright failed to promptly inform the Court that he was unable to

provide plaintiffs with a list of his bitcoin holdings. Order at 21-22. Specifically, the Order cites

the one-month period between the March 14th hearing[19] and the April 18th motion when Dr.

Wright informed the Court that the bitcoin was held in trust and that he did not have access to their

addresses.[20]

Dr. Wright acknowledges that a sooner response would have aided the Court and

apologizes for the delay. He notes, however, that the one-month delay occurred during an

extremely busy discovery period. His counsel was preparing him for his deposition, which

occurred on April 4, 2019 in London. Moreover, after the deposition, the Court ordered Dr.

Wright to file multiple motions on issues related to that deposition. *See* D.E. 137.

## E. The Magistrate Improperly Relied on Inadmissible Hearsay Evidence in Issuing the Sanctions

As noted above, the Order repeatedly labels documents that Dr. Wright produced as

"fraudulent" based on metadata that plaintiffs' expert claims to have extracted from documents

produced by Dr. Wright.[21] Those documents, and the metadata that Edman extracted, are

inadmissible hearsay. Dr. Wright made that very objection during the evidentiary hearing, but the

Magistrate overruled it, finding the documents and metadata to be business records. Aug. 5, 2019,

Hr. Tr. 155:5-15. But that ruling was contrary to law. "Business records are only admissible if the

---

[19] The Order states "May 14th", but that hearing actually occurred on March 14th.

[20] As for the time period between December 2018 and March 14th, 2019, the Order gave Dr. Wright the benefit of the doubt, because "Plaintiffs were seeking information that went beyond a list of his bitcoin holdings on December 31, 2013." Order at 22.

[21] Those Exhibits are: 3, 4, 7, 8, 27, 28, 29, 31, 33, 34, 35, 37, 39; 40 and 43, which can be found at D.E. 237-3; 237-3; 237-7, 237-8; 268-4; 268-5; 268-6; 268-8; 268-10; 268-11; 268-12; 268-14; 268-16; 268-17; 268-20.

record (1) was made at or about the time of the event it describes; (2) was made by a person with knowledge of that event; (3) was made and kept in the course of a regularly conducted business activity; and (4) has an indicia of trustworthiness." *Acciard v. Whitney*, 2011 WL 13294620, at \*2 (M.D. Fla. 2011) (citing Fed. R. Evid. 803(6); *United States v. Fernandez*, 392 Fed. Appx. 743, 746 (11th Cir. 2010)) (emphasis added). "A party lays the proper foundation for the trustworthiness of computer generated business records and the records are admissible, in the following circumstances: '(1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion.'" *Fernandez*, 392 F. App'x at 745–46 (citing *United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir.1985)).

Plaintiffs did not establish that the computer-generated documents were trustworthy, nor did they establish the remaining elements of the business record exception. *First*, plaintiffs introduced no evidence as to how the documents were stored or the motivation for creating the documents. More importantly, plaintiffs affirmatively argued that the electronically stored documents and their associated metadata *were not trustworthy*. In fact, Plaintiffs' *own expert testified that the metadata was altered and manipulated*. For example, Edman testified that the metadata he extracted from Exhibit 2 and introduced as Exhibit 3 was altered in the following method: "a significant portion of the mail transport header had been truncated or removed," and the "data in the mail transport header . . . contain[ed] the date Thursday, June 24th, 2011," when that date really was a Friday. Aug. 5, 2019, Hr. Tr. 148:18-149:11. After having "established" that the documents contain altered metadata, there simply is no way that plaintiffs could simultaneously establish that the metadata was trustworthy.

24

872

*Second*, plaintiffs failed to introduce evidence as to the remaining elements of the business record exception, nor could they. Plaintiffs contend that the documents were backdated, so they clearly couldn't ever establish that this document was "made at or about the time of the event it describes." *Acciard,* 2011 WL 13294620, at *2. They also contend that the communications never occurred, so the document couldn't have been "made by a person with knowledge of that event." *Id.* They further contend that the documents were intentionally altered, and there is no evidence that altering records was a "regularly conducted business activity." *Id.*

Of course, plaintiffs introduced these documents and metadata for *the truth of the matter asserted*, and thus they are inadmissible absent a hearsay exception. Continuing with the example of the metadata extracted from Exhibit 2, plaintiffs relied on the metadata to suggest that the email was modified in 2014 by Dr. Wright. According to Edman, "the modified date and metadata dates on lines 12 and 14 indicate that the document was modified October 22nd, 2014" and the email return path "contain[s] the e-mail address craig@panopticrypt.com." Aug. 5, 2019, Hr. Tr. 148:3-5; 149:24-150:2.

Finally, the Magistrate also erred when he permitted plaintiffs to introduce as exhibits hearsay documents that plaintiffs' expert found online,[22] on the basis that the documents fell under Rule 803(18)'s exception for learned treatises, periodicals, or pamphlets. Aug. 5, 2019, Hr. Tr. 135:1-138:15. First, that exception only permits statements to be read into evidence. It does not permit a document to be introduced as an exhibit—as the Magistrate permitted here. Second, it is highly unlikely that most of those documents, consisting of website printouts, are reliable authorities.

---

[22] The Exhibits are: 25, 26, 41, and 44, which can be found at D.E. 268-2; 268-3; 268-18; 268-21.

873

**F. The Court Should Reverse and Vacate the Order Because It Exceeded the Magistrate's Jurisdiction and Authority by Issuing Case-Ending Dispositive Sanctions in a Discovery Order**

Magistrate judges have limited authority, pursuant to Rule 72 of the Federal Rules of Civil Procedure. As to non-dispositive matters, a magistrate may issue a ruling in an order. Fed. R. Civ. P. 72(a). As to dispositive matters, a magistrate may issue only a recommended disposition, usually termed a Report and Recommendation, and only after an assignment of those dispositive matters by a district judge. Fed. R. Civ. P. 72(b).

Thus, magistrates exceed their authority by issuing dispositive sanctions in discovery orders. This is so, *even if* the magistrate has the authority to hear the underlying discovery dispute. *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 594, 599–600 (W.D.N.Y. 1996) ("Discovery is clearly a pretrial matter, and magistrate judges have general authority to order discovery sanctions, however, a magistrate judge cannot issue sanctions which fall within the eight so-called dispositive motions[23]. . . ."); *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462 (10th Cir. 1988) ("Discovery is clearly a pretrial matter, and magistrates thus have general authority to order discovery sanctions. They may not do so, however, if those sanctions fall within the eight dispositive motions . . . ."); *Bennett v. Gen. Caster Serv. of N. Gordon Co.*, 976 F.2d 995, 998 (6th Cir. 1992).

---

[23] The eight dispositive motions are set out in 28 U.S.C.A. § 636. They are motions for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. Many courts also have included in the list of "dispositive motions," any motion that would have the same effect as those eight dispositive motions. *E.g., Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462-63 (10th Cir. 1988) (Striking pleadings with prejudice has the same effect as dismissing an action and thus "constitutes an involuntary dismissal . . . .").

26

874

The Order exceeded the Magistrate's authority because it imposed dispositive sanctions. Starting with the most obvious, the Magistrate purported to strike eight of Dr. Wright's affirmative defenses. *See* Order at 29. It is well-settled that "strik[ing] an affirmative defense is clearly 'dispositive of a ... defense of a party.'" *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005) (citing *United States v. Davis*, 794 F. Supp. 67, 68 (D.R.I.1992)); *Jeeper's of Auburn, Inc. v. KWJB Enter., L.L.C.*, 2011 WL 1899195, at *1 (E.D. Mich. 2011), *report and recommendation adopted*, 2011 WL 1899531 (E.D. Mich. 2011) (collecting cases)).

Further, even if the Order hadn't exceeded the Magistrate's authority by striking eight of Dr. Wright's affirmative defenses, the Deemed Facts would have the same effect as striking the affirmative defenses. This is so, because if those facts were to be deemed established without trial (or even a summary judgment motion), it would be futile for Dr. Wright to put on evidence in support of those defenses, which renders them effectively stricken.[24] In fact, these improper "findings of fact" were the very basis for the Magistrate's *ultra vires* decision to "strike" eight of Dr. Wright's affirmative defenses: "these affirmative defenses are inconsistent with the facts *as I have deemed them*, *so they are stricken*." *Id.*; August 26, 2019, Hr. Tr. 89:4-8 (emphasis added); Order at 16 ("To confirm to these established facts, the Court strikes . . . .").

Finally, if the Court were to ignore this reversible error, the standard of review would be de novo. Rule 72(a) provides that orders on non-dispositive matters (e.g., discovery disputes) are reviewed for clear error or for being contrary to law, while Rule 72(b) subjects reports and

---

[24] For example, one of Dr. Wright's affirmative defenses is accord and satisfaction, based on the plaintiffs' having received corporate shares from Dr. Wright as compensation for rights of David Kleiman. D.E. 87 at 33. This defense plainly is inconsistent with the Magistrate's Deemed Facts that half of Dr. Wright's bitcoin and intellectual property (as of a certain date) belong to plaintiffs. The affirmative defenses that would be vitiated by the Deemed Facts are on page 29 of the Order.

27

875

recommendations on dispositive matters to de novo review. The Order doesn't cleanly fit into either rule, because it exceeded the Magistrate's jurisdiction and authority, and purported to issue dispositive sanctions in a discovery order (a legal impossibility). However, because the Magistrate attempted to impose dispositive sanctions, the proper reference would be to Rule 72(b), which requires de novo review. *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1463 (10th Cir. 1988); *Boxer F2, L.P. v. Bronchick,* 722 F. App'x 791, 796 (10th Cir. 2018).

## CONCLUSION

For all the foregoing reasons, the Court should reverse and vacate the Order, which amounted to a judgment of liability without trial in the guise of a discovery order. There was no basis for the Order's sanctions of Dr. Wright, which far exceeded the scope of the single, limited discovery issue before the Magistrate and would violate Dr. Wright's due process rights.

## CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I certify that counsel for the movant has conferred with all parties who may be affected by the relief sought in this motion. Plaintiffs' counsel does not agree with the relief sought.

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: arolnick@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO

28

876

Florida Bar No. 613819
JORGE MESTRE
Florida Bar No. _____
AMANDA MCGOVERN
Florida Bar No. 964263
ALAN ROLNICK
Florida Bar No. 715085
SCHNEUR KASS
Florida Bar No. 100554

## **CERTIFICATE OF SERVICE**

I certify that on November 25, 2019, I electronically filed this document with the Clerk of

the Court using CM/ECF. I also certify that this document is being served today on all counsel of

record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.


  /s/ Andres Rivero_____
ANDRES RIVERO
Florida Bar No. 613819

29

877

# TAB 312-1

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


------------------------------)
                              )
                              )
                              )
IRA KLEIMAN, as the personal  )CASE NO:
representative of the Estate  )9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info)
Defense Research, LLC         )
                              )
          Plaintiffs,         )
                              )
v.                            )
                              )
                              )
CRAIG WRIGHT                  )
                              )
          Defendant.          )
                              )
                              )
------------------------------)



Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by:  Paula Foley



Page 2

```
 1              A P P E A R A N C E S
 2   On behalf of the Plaintiffs:
 3        VELVEL (DEVIN) FREEDMAN, ESQ.
          Boies Schiller Flexner LLP
 4        100 SE Second Street, Suite 2800,
          Miami, Florida 33131
 5
          KYLE W. ROCHE, ESQ.
 6        Admitted Pro Hac Vice
          Boies Schiller Flexner LLP
 7        333 Main Street
          Armonk, NY 10504
 8
 9   On behalf of the Defendant:
10        ANDRÉS RIVERO
          ZAHARAH R. MARKOE
11        Rivero Mestre LLP
          2525 Ponce de Leon Blvd.
12        Ste. 1000 Miami,
          FL 331134
13
14
     Court Reporter:
15
          PAULA FOLEY
16        Magna Legal Services
          1635 Market Street,
17        Philadelphia,
          PA 19103
18        United States
19
     Also Present:
20
          PHILIP HILL (Videographer, Magna Legal
21        Services)
22        ANDREW S. BRENNER, ESQ (Boies Schiller
          Flexner LLP) for the Plaintiff By Telephone
23
          JOHN MCADAMS, ESQ (Boies Schiller Flexner
24        LLP) By Telephone
25        IRA KLEIMAN (Plaintiff) By Telephone
```



879

Page 293

1   never put money into the trust.  Dave never had any

2   Bitcoin in the trust.  Dave never mined any Bitcoin that

3   had anything to do with the trust.  None of the Bitcoin

4   was ever involved with any mining in the US.  No Bitcoin

5   was post 2010 from that trust.  No company Dave owned

6   was involved with the trust.  No shares Dave owned was

7   involved with the trust.  Nothing Dave owned was

8   involved with the trust.  Dave had no rights to the

9   trust, no ownership of the trust, no knowledge of the

10  set-up of the trust.  He did not know about the

11  companies in the trust.  He did not know about Wright

12  International Investments that I set up in 2009.  Dave

13  did not know about any of those details.  Dave was asked

14  simply to hold a part of some documents and keys that

15  were split using Shamir's Secret Sharing scheme so that

16  he did not even know what he was actually holding.

17           MS. MARKOE:  Can you spell Shamir's for

18  the court reporter, please.

19           THE WITNESS:  S-H-A-M-I-R-S.

20  BY MR. FREEDMAN:

21      Q.      Did you put Bitcoin into the trust in

22  2011?

23           MS. MARKOE:  Objection.  You may answer.

24           THE WITNESS:  I founded the trust.

25  BY MR. FREEDMAN:



880

Page 294

1          Q.     Did you put Bitcoin into the trust in

2     2011?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  No.

5     BY MR. FREEDMAN:

6          Q.     Did you put Bitcoin into the trust in

7     2012?

8                 MS. MARKOE:  Objection.

9                 THE WITNESS:  No.

10    BY MR. FREEDMAN:

11         Q.     Did you ever put Bitcoin into the trust?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  No.

14    BY MR. FREEDMAN:

15         Q.     Did anyone ever put Bitcoin into the

16    trust?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  No.

19    BY MR. FREEDMAN:

20         Q.     Did the Tulip Trust ever come to hold

21    private keys to Bitcoin wallets?

22         A.     No.

23         Q.     Did it ever come to own or possess

24    private keys to Bitcoin addresses?

25         A.     No.



Page 295

1           Q.      What is the relationship between the

2    Tulip Trust and Bitcoin?

3                   MS. MARKOE:  Objection.  Again, where are

4    we on the topics?

5                   THE WITNESS:  What the hell does that

6    question even mean?

7                   MR. FREEDMAN:  We are permitted to

8    enquire into Dr. Wright's companies.

9                   THE WITNESS:  That is not a company.

10                  MR. RIVERO:  Hold on, Dr. Wright.  Tell

11   us what topic or tell us where in the transcripts

12   because we can review the transcript.

13                  MR. FREEDMAN:  Number 10.

14                  MS. MARKOE:  Number 10?  Can you point

15   out where the Tulip Trust is referenced in the exhibits

16   that are referenced in topic 10?  It could be there.

17   I just do not recall.

18                  MR. FREEDMAN:  We just do not have time,

19   so I guess you are going to instruct him not to answer?

20                  MR. RIVERO:  If we do not get some

21   connection ----

22                  MR. FREEDMAN:  The court has authorised

23   us.  I do not know which number it is because I do not

24   have it in front of us.  I believe Ms. Markoe has been

25   at many hearings where the court has authorised us to



882