**22-11150**

# United States Court of Appeals

*for the*

# Eleventh Circuit

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME FIVE

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

COUNSEL PRESS • VA – (804) 648-3664

# TABLE OF CONTENTS

**VOLUME I:**

**TAB DS** – District Court Docket Sheet ................................................................... 1

**TAB 1** – Complaint
        Filed February 14, 2018 ........................................................... 53

Exhibit to Motion to Dismiss the Complaint
        Filed April 16, 2018:

      **TAB 12-2** – Exhibit B, Declaration of Craig Wright .................................... 91

**TAB 24** – Amended Complaint and Jury Demand
        Filed May 14, 2018 ................................................................. 97

Exhibit to Motion to Dismiss Amended Complaint
        Filed June 15, 2018:

      **TAB 33-3** – Exhibit C, Declaration of Craig Wright ................................ 150

**TAB 80** – Answer to Amended Complaint
        Filed January 10, 2019 .......................................................... 157

**TAB 83** – Second Amended Complaint and Jury Demand
        Filed January 14, 2019 .......................................................... 191

**VOLUME II:**

      **TAB 83-1** – Exhibit 1 ............................................................... 240

      **TAB 83-2** – Exhibit 2 ............................................................... 336

      **TAB 83-3** – Exhibit 3 ............................................................... 341

      **TAB 83-4** – Exhibit 4 ............................................................... 344

      **TAB 83-5** – Exhibit 5 ............................................................... 449

## VOLUME III:

**TAB 83-6 –** Exhibit 6 ................................................................. 460

**TAB 83-7 –** Exhibit 7 ................................................................. 463

**TAB 83-8 –** Exhibit 8 ................................................................. 468

**TAB 83-9 –** Exhibit 9 ................................................................. 482

**TAB 83-10 –** Exhibit 10 ............................................................. 494

**TAB 83-11 –** Exhibit 11 ............................................................. 509

**TAB 83-12 –** Exhibit 12 ............................................................. 524

**TAB 83-13 –** Exhibit 13 ............................................................. 566

**TAB 83-14 –** Exhibit 14 ............................................................. 568

**TAB 83-15 –** Exhibit 15 ............................................................. 573

**TAB 83-16 –** Exhibit 16 ............................................................. 583

**TAB 83-17 –** Exhibit 17 ............................................................. 585

**TAB 83-18 –** Exhibit 18 ............................................................. 587

**TAB 83-19 –** Exhibit 19 ............................................................. 595

**TAB 83-20 –** Exhibit 20 ............................................................. 600

**TAB 83-21 –** Exhibit 21 ............................................................. 622

**TAB 83-22 –** Exhibit 22 ............................................................. 632

**TAB 83-23 –** Exhibit 23 ............................................................. 640

**TAB 83-24 –** Exhibit 24 ............................................................. 643

**TAB 83-25 –** Exhibit 25 ................................................................ 665

**TAB 83-26 –** Exhibit 26 ................................................................ 667

**TAB 83-27 –** Exhibit 27 ................................................................ 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 ................................................................ 684

**TAB 83-29 –** Exhibit 29 ................................................................ 693

**TAB 83-30 –** Exhibit 30 ................................................................ 700

**TAB 83-31 –** Exhibit 31 ................................................................ 705

**TAB 83-32 –** Exhibit 32 ................................................................ 707

**TAB 83-33 –** Exhibit 33 ................................................................ 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019 .................................................................. 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019 .................................................................... 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ................................................................. 757

**TAB 144-6 –** Exhibit F ................................................................. 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019 ...................................................................... 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019 ...................................................................... 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
Filed June 14, 2019 ..................................................................... 780

**TAB 222 –** Redacted Declaration of Craig Wright
Filed June 20, 2019..................................................................... 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
Filed July 2, 2019 ....................................................................... 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
Filed July 9, 2019

    **TAB 242-2 –** Exhibit 2 ............................................................... 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
Filed August 15, 2019 ................................................................. 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
Filed August 27, 2019 ................................................................. 816

    **TAB 277-1** – Exhibit 1 ............................................................... 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain
Facts Established and "Striking" Certain Affirmative Defenses
Filed November 25, 2019 ............................................................ 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright,
4/4/19
Filed November 26, 2019 ............................................................ 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order
"Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed December 16, 2019............................................................ 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's
Motion to Compel
Filed January 10, 2020................................................................ 918

iv

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020
Order
........ Filed January 14, 2020................................................................... 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
........ Filed May 8, 2020 .................................................................... 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
........ Filed May 18, 2020.................................................................... 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in
Limine
........ Filed May 22, 2020.................................................................... 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus
Motion for Sanctions
........ Filed May 27, 2020.................................................................... 991

........ **TAB 541-1** – Exhibit 1 .............................................................. 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
........ Filed June 2, 2020.................................................................... 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
........ Filed June 24, 2020.................................................................... 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
........ Filed August 3, 2020

........ **TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson,
November 8, 2019 .................................................................... 1053

........ **TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan,
March 17, 2020.................................................................... 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
........ Filed September 21, 2020.................................................................... 1073

v

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
          Filed November 18, 2020 ........................................................ 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
          Filed November 20, 2021 ........................................................ 1196

          **TAB 794-1**– Exhibit A ........................................................ 1206

          **TAB 794-2**– Exhibit B ........................................................ 1209

**VOLUME VII:**

          **TAB 794-3**– Exhibit C ........................................................ 1212

**TAB 800-1 –** Court's Instructions to the Jury
          Filed November 22, 2021 ........................................................ 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
          Filed December 16, 2021

          **TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi  ........................................................ 1264

          **TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

          **TAB 829-30 –** Exh. P122 – email chain ................................ 1272

          **TAB 829-41 –** Exh. P149 – email chain ................................ 1276

          **TAB 829-48 –** Exh. P161 – email chain ................................ 1278

          **TAB 829-55 –** Exh. P189 – email chain  ............................... 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
          Filed December 20, 2021........................................................ 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
Filed December 20, 2021 ............................................................. 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
Filed December 20, 2021 ............................................................. 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
Filed December 20, 2021 ............................................................. 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
Filed December 20, 2021 ............................................................. 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
Filed December 20, 2021 ............................................................. 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
Filed December 20, 2021 ............................................................. 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
Filed January 4, 2022 .................................................................. 1342

    **TAB 861-1** – Exhibit A ........................................................ 1357

    **TAB 861-2** – Exhibit B ........................................................ 1391

    **TAB 861-3** – Exhibit C ........................................................ 1398

    **TAB 861-4** – Exhibit D ........................................................ 1403

    **TAB 861-5** – Exhibit E ........................................................ 1409

    **TAB 861-6** – Exhibit F ........................................................ 1417

    **TAB 861-7** – Exhibit G ........................................................ 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's
Motion for a New Trial
       Filed January 18, 2022............................................................................... 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint
Notice of filing Admitted Exhibits
       Filed January 31, 2022

       **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright,
       August 11, 2014......................................................................... 1446

       Exh. P173 – Transcript of Interview with Craig Wright,
       August 18, 2014......................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint
Notice of filing Admitted Exhibits
       Filed February 17, 2022

       **TAB 885-9 –** Exh. P464 – Redacted email chain .................................... 1538

**TAB 887 –** Order on Motion for New Trial
       Filed February 28, 2022............................................................................ 1652

**TAB 889 –** Amended Final Judgment
       Filed March 9, 2022.................................................................................. 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
       Filed February 24, 2020............................................................................ 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 .................................................................. 1673

**TAB 507-1 –** Exhibit 1 ............................................................ 1701

**TAB 507-8 –** Exhibit 8 ............................................................ 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ........................................................ 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes................................ 1717

Exh. D102 – Excerpt of Progress Notes.................................. 1719

**TAB CS –** Certificate of Service

# TAB 332

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

       Plaintiffs,

v.

CRAIG WRIGHT

       Defendant.

**CASE NO.:  9:18-cv-80176-BB/BR**

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTION TO MAGISTRATE ORDER "DEEMING" CERTAIN FACTS ESTABLISHED AND "STRIKING" CERTAIN AFFIRMATIVE DEFENSES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 3

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

   A.   Legal Standards ........................................................................................................... 2

     (i)   Rule 37 Sanction ................................................................................................... 2

     (ii)   Standard of review ............................................................................................. 4

   B.   Judge Reinhart correctly determined that Craig's violation of his discovery order was not the result of impossibility ........................................................................................... 5

     (i)   J. Reinhart's finding that Craig lacked credibility undermines the sole support for his "impossibility" defense (Craig's word) ......................................................................... 6

     (ii)   Judge Reinhart's factual determinations are supported by the record evidence which demonstrate Craig has perjured, forged, and deceived his way through these proceedings... 8

        (a).   Craig's changing story demonstrates its falsity ......................................... 9

        (b).   Evidence of forgeries ................................................................................. 13

            1.   The Dave Kleiman Trust documents (ECF No. 237-1) are forgeries ................. 14

            2.   The Tulip Trust I document (ECF No. [237-9]) is a forgery. ........................... 15

        (c).   History of Craig's lies ............................................................................... 16

        (d).   Craig's post hearing statement confirms Judge Reinhart's findings were correct.. 16

   C.   Craig's deception prejudiced plaintiffs and no lesser sanction would have sufficed ....... 17

   D.   The sanctions relate to Craig's conduct and do not violate due process ......................... 21

     (i)   The withheld evidence is relevant to the issues affected by the sanctions ................... 22

     (ii)   The sanctions meet the Hammond Packing presumption and specifically related to the claim at issue in the litigation ................................................................................. 23

     (iii)   Craig waived the right to challenge the relationship between the discovery order and the sanctions. ......................................................................................... 24

   E.   Craig's conduct is consistent with conduct for which courts impose terminating sanctions .......................................................................................................... 24

   F.   Judge Reinhart did not rely on Hearsay ......................................................................... 25

   G.   Public Addresses ............................................................................................................ 27

   H.   This Court should uphold Judge Reinhart's sanctions under its inherent power............. 28

CONCLUSION .................................................................................................................... 29

884

## TABLE OF AUTHORITIES

**Cases**

*1st Fin. SD, LLC v. Lewis*
  No. 11-CV-00481-MMD, 2012 WL 4761931 (D. Nev. Oct. 5, 2012) ................................... 25

*Amlong & Amlong, P.A. v. Denny's, Inc.*
  500 F.3d 1230 (11th Cir. 2007) ................................................................................. 5

*CA, Inc. v. Simple.com, Inc.*
  780 F. Supp. 2d 196 (E.D.N.Y. 2009) .................................................................. 25

*Consumer Fin. Prot. Bureau v. Morgan Drexen*
  101 F. Supp. 3d 856 (C.D. Cal. 2015) .................................................................. 18

*Costa v. Datapro, Inc.*
  No. 10-23172-CIV, 2011 WL 7318760 (S.D. Fla. Aug. 5, 2011) .............................. 2, 3, 6, 16

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*
  561 F.3d 1298 (11th Cir. 2009) ............................................................................ 28

*Forsberg v. Pefanis*
  634 F. App'x 676 (11th Cir. 2015) ................................................................. 18, 25

*Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*
  No. 12 CV 1851, 2016 WL 4765689 (N.D. Ill. Sept. 13, 2016) ...................... 18, 20

*Hammond Packing Co. v. Arkansas*
  212 U.S. 322 (1909) ............................................................................................. 22, 23

*Hosny v. Thiam*
  No. 13-cv-04103, 2016 WL 10587115 (N.D. Ga. Aug. 17, 2006) .................................. 18, 25

*In re Chase & Sanborn Corp.*
  872 F.2d 397 (11th Cir.1989) .................................................................................... 3

*In re Gabapentin Patent Litig.*
  312 F. Supp. 2d 653 (D.N.J. 2004) ......................................................................... 24

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*
  456 U.S. 694 (1982) ........................................................................................ 22, 24, 25

*Jordan v. Comm'r, Mississippi Dep't of Corr.*
  908 F.3d 1259 (11th Cir. 2018) .................................................................................. 4

*Liberty Synergistics Inc. v. Microflo Ltd.*
  718 F.3d 138 (2d Cir. 2013) ....................................................................................... 5

iii

885

*Littler v. Martinez,*
　No. 2:16-CV-00472-JMSDLP, 2019 WL 1043256 (S.D. Ind. Mar. 5, 2019) ......................... 18

*McDowell v. Seaboard Farms of Athens, Inc.*
　No. 95-609-CIV-ORL-19, 1996 WL 684140 (M.D. Fla. Nov. 4, 1996) ................................. 18

*Moore v. Napolitano*
　723 F. Supp. 2d 167 (D.D.C. 2010) .......................................................................................... 4

*Perez v. New Auto Image Mktg., Inc.*
　No. 15-cv-21893, 2016 WL 7540272 (S.D. Fla. May 20, 2016) ............................................ 24

*Pigott v. Sanibel Dev., LLC*
　CIVA 07-0083-WS-C, 2008 WL 2937804 (S.D. Ala. July 23, 2008) ...................................... 4

*Ramirez v. T&H Lemont, Inc.*
　845 F.3d 772 (7th Cir. 2016) ........................................................................................... 3, 6, 8

*Sprint Sols., Inc. v. Fils-Amie*
　83 F. Supp. 3d 1290 (S.D. Fla. 2015) .............................................................. 3, 18, 21, 25

*Steward v. Int'l Longshoreman's Ass'.*
　*Local No. 1408,* 306 Fed. Appx. 527 (11th Cir. 2009) .......................................... 3, 29

*United States v. Cofield*
　272 F.3d 1303 (11th Cir. 2001) ............................................................................................... 5

*United States v. Lizarraga-Tirado*
　789 F.3d 1107 (9th Cir. 2015) ............................................................................................... 25

*United States v. Raddatz*
　447 U.S. 667 (1980) ................................................................................................................. 5

*United States v. Ramirez-Chilel*
　289 F.3d 744 (11th Cir. 2002) ............................................................................................... 5

*Vargas v. Peltz*
　901 F. Supp. 1572 (S.D. Fla. 1995) ....................................................................................... 19

**Rules**

Fed. R. Civ. P. Rule 72 ................................................................................................................ 4

Fed. R. Civ. P. Rule 37(b)(2)(A) ............................................................................................... 22

iv

## INTRODUCTION

Notwithstanding Craig's claims that he has somehow been treated unfairly, it was his own conduct that left Judge Reinhart essentially no choice but to enter an order deeming certain facts established and striking certain affirmative defenses (the "Order"). Craig is not the victim here. To the contrary, as Judge Reinhart found, Craig's conduct in this litigation has been "antithetical to the administration of justice" and "no lesser sanction would suffice."

As set forth below, the record entirely supports Judge Reinhart's findings, and the remedy he chose is absolutely justified given the gravity of Craig's offenses. Indeed, Craig's Objection to the Order, far from calling into question its correctness, demonstrates that he is recalcitrant, and – given the opportunity – would engage in the same conduct that led to the Order in the first place. In fact, mere hours after Judge Reinhart read the Order into the record, Craig walked out of court and into an interview where he admitted that he lied to the Court.[1] The next day he gave an interview calling Judge Reinhart a "silly judge."[2]

The following is not in dispute. Plaintiffs sought, through proper discovery, to identify the bitcoin mined as part of the partnership between Dave and Craig. As was his right, Craig objected to that discovery on grounds of relevance initially and then on burden grounds. Those objections were fully litigated and ultimately overruled by Judge Reinhart.

At that point, Craig had two choices: (1) seek review of the ruling by this Court or (2) comply with Judge Reinhart's discovery order. Instead, on June 11, 2019, Craig asserted – for the

---

[1] Brendan Sullivan, *EXCLUSIVE: First interview with Craig Wright after judge orders him to pay $5 billion in bitcoin*, MODERN CONSENSUS (August 26, 2019) (attached hereto as Exhibit 1). Available at https://modernconsensus.com/cryptocurrencies/bitcoin/exclusive-interview-with-craig-wright-just-after-ordered-to-pay-5-billion-in-bitcoin/

[2] MetaNetTV Livestream August 2019 – Dr. Craig S. Wright, available at https://youtu.be/mBNT7X5sjPM?t=1539 at 26:01.

1

887

first time – that providing Plaintiffs with a list of his bitcoin holdings was impossible because he did not possess the information necessary to access it. (ECF No. [211] at 5.)

Judge Reinhart gave Craig an opportunity to demonstrate it was impossible to comply with the discovery order. To carry that burden, Craig told (under oath) a fanciful story about a mysterious "encrypted file" held in a trust. Not only did this story conflict with his previous sworn testimony and his motion papers, as explained below, the story itself was self-conflicting. In support of his story, Craig put forward documents which he swore were "authentic" to prove that the "encrypted file" and the trust exist. Plaintiffs exposed these documents as forgeries.

But instead of being ashamed, or trying to hide behind some procedural or legal technicality, Craig brazenly opened his objection to Judge Reinhart's Order by asserting that "there is absolutely no basis for imposing any sanctions" on him because "the uncontroverted evidence shows that he is unable to access a listing of" his bitcoin. The only thing "uncontroverted" about Craig is that he's a perjurer and a forger. Craig's claim that his "testimony stands unrebutted by plaintiffs" is simply blind to reality.

Faced with this record, Judge Reinhart entered a sanctions Order that was reasonable and commensurate with the conduct it addressed. For this reason, and the reasons set forth below, this Court should affirm the Order.

## ARGUMENT

### A.   Legal Standards

#### (i)   Rule 37 Sanction

Fed. R. Civ. P. 37 provides that when "a party . . . fails to obey an order to . . . provide discovery . . . the court . . . may issue . . . orders including . . .  designated facts be taken as established for purposes of the action . . . [and] striking pleadings . . . in part." *Costa v. Datapro, Inc.*, No. 10-23172-CIV, 2011 WL 7318760, at *5 (S.D. Fla. Aug. 5, 2011), *report and*

2

888

*recommendation adopted*, No. 10-23172-CIV, 2011 WL 13100072 (S.D. Fla. Aug. 26, 2011). Procedurally, "[o]nce the moving party makes a prima facie showing of a discovery violation, the non-movant must show that it was impossible to comply with the relevant court order(s) to avoid sanctions." *Id. citing In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir.1989).

Rule 37 sanctions "are intended to: (1) compensate the court and other parties for the added expense caused by discovery abuses; (2) compel discovery; (3) deter others from engaging in similar conduct; and (4) penalize the offending party or attorney." *Steward v. Int'l Longshoreman's Ass'n., Local No. 1408*, 306 Fed. Appx. 527, 529 (11th Cir. 2009). The burden of proof is a preponderance of the evidence. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016). Courts will only impose these sort of severe sanctions "upon finding (1) that the party's failure to comply with the order was willful or a result of bad faith, (2) the party seeking sanctions was prejudiced by the violation, and (3) a lesser sanction would fail to adequately punish and be inadequate to ensure compliance with court orders." *Costa*, 2011 WL 7318760, at *5.

A party's history of improper actions in litigation is relevant to determining whether their failure to obey was willful, negligent, or due to an impossibility. *Id*. ("Although only Costa's violation of a court order may serve as a predicate for sanctions . . . this lengthy history [of improper acts] is nevertheless relevant to determine whether Costa acted in bad faith . . .").

Furthermore, courts recognize it is of paramount importance to ensure parties don't manipulate the system in a way that prevents an "honest and true airing of the real facts." *Sprint Sols., Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1298 (S.D. Fla. 2015). Indeed, courts recognize that failing to punish dishonest behavior is a direct threat to the integrity of the judicial process. *Id.* at 1298 ("Moreover, in light of Defendants' demonstrated comfort with fabricating testimony and their disregard for their obligations to Sprint and the court, allowing this case to proceed would

3

only provide Defendants with further opportunities to subvert the integrity of the judicial process.").

(ii)    *Standard of review*

The appropriate standard of review depends on which parts of the Order are characterized as dispositive, and which are non-dispositive. *See* FED. R. CIV. P. 72. "If the matter is non-dispositive, the district court reviews the magistrate judge's ruling under the 'clearly erroneous or contrary to law' standard," but for dispositive matters "the district court must review any objected-to portion of the magistrate judge's ruling de novo." *Jordan v. Comm'r, Mississippi Dep't of Corr.*, 908 F.3d 1259, 1263 (11th Cir. 2018).

Here, the standard of review is mixed. Judge Reinhart's rulings on the underlying discovery motion should be reviewed for clear error as those rulings "generally would not be considered a dispositive matter." *Id.* at 1263–64 (11th Cir. 2018). Similarly, the parts of Judge Reinhart's Order deeming certain facts admitted are likewise reviewed for clear error. A ruling can be non-dispositive despite significantly affecting a claim or defense, and this is often the case with evidentiary sanctions.[3] "Case law is abundant for the common-sense proposition that a magistrate judge ruling on a nondispositive matter does not somehow mutate into a ruling on a dispositive matter simply because that ruling ultimately affects the outcome of a claim or defense." *Pigott v. Sanibel Dev., LLC*, CIVA 07-0083-WS-C, 2008 WL 2937804, at *4 (S.D. Ala. July 23, 2008) (collecting cases).

However, the part of Judge Reinhart's Order striking certain affirmative defenses is likely dispositive, and the Court should therefore treat that aspect of the order as a report and

---

[3] Craig makes conclusory arguments (Br. at 26-28) that the deemed facts are dispositive, but he fails to show how they either establish all the elements of a claim or eliminate a defense in its entirety. This hardly convincing when even severe sanctions, such as precluding a defendant from rebutting a prima facie case of discrimination, have been held non-dispositive. *See Moore v. Napolitano*, 723 F. Supp. 2d 167, 185 (D.D.C. 2010).

4

recommendation subject to *de novo* review. *See, e.g.*, *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 144 (2d Cir. 2013) (ratifying district court's decision to deem the magistrate's "memorandum opinion and order" to be a report and recommendation).[4]

When conducting a de novo review, a district court is obligated to accept the magistrate judge's credibility determinations unless (i) the transcript demonstrates those determinations were "unbelievable" or (ii) the district court chooses to hold a new hearing. *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (courts "should defer to the magistrate judge's determinations unless his understanding of the facts appears to be 'unbelievable.'"); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1245 (11th Cir. 2007) (where "demeanor was important to the magistrate judge's determination," the Court must "hold a new evidentiary hearing and take testimony before rejecting the magistrate judge's findings."). The rationale for this rule is obvious; the magistrate judge "personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002); *Amlong*, 500 F.3d at 1245.

There is no preference to hold a new hearing and district courts are free to rely on magistrate credibility determinations without holding one. *United States v. Cofield*, 272 F.3d 1303, 1305 (11th Cir. 2001) *citing United States v. Raddatz*, 447 U.S. 667 (1980) (a "district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings.").

**B.    Judge Reinhart correctly determined that Craig's violation of his discovery order was not the result of impossibility**

There's no dispute Craig was ordered to produce a complete list of all bitcoin he'd mined or acquired as of December 2013. (ECF Nos. 124 at 22-23 (hearing transcript); 166, at 2-3; 217;

---

[4] *But see Royal Park Investments SA/NV v. U.S. Bank Nat'l Ass'n*, 285 F. Supp. 3d 648, 653 (S.D.N.Y. 2018) ("there is some disagreement among courts regarding whether a motion to strike an affirmative defense is a dispositive matter subject to determination by a magistrate judge").

891

221, at 32-33.) There is also no dispute that Craig hasn't complied with that Order. Consequently, there can be no dispute that Plaintiffs have made "a prima facie showing of a discovery violation." *Costa*, 2011 WL 7318760, at *5.

Craig's sole defense to this discovery violation is that it's impossible for him to comply because the list is locked in an encrypted file, held by a trust, that he doesn't have access to. To avoid sanctions, Craig bore the burden of demonstrating this by a preponderance of the evidence. *Ramirez*, 845 F.3d at 777. For the reasons identified by Judge Reinhart, and those explained at length below, he didn't carry that burden, and was appropriately sanctioned.

(i)     *J. Reinhart's finding that Craig lacked credibility undermines the sole support for his "impossibility" defense (Craig's word)*

As mentioned above, Craig's only defense to Rule 37 sanctions is that he cannot comply with Judge Reinhart's order because the information needed to identify the bitcoin is locked in an "encrypted file," held by a "blind" trust.[5]  That defense is supported solely by the contradictory testimony of Craig, and forged documents produced by him.

There is no independent evidence such an encrypted file exists. *No one* – not even Craig – testified to having seen it. Craig testified that "I haven't looked at the file. No one asked me to look at the file." *June 28, 2019 Hrg. Trn.* 124:12-13. Further, Steve Shadders – a witness Craig put forward to vouch for Craig's attempted compliance – testified that *he too* has "never seen that file." *Aug. 5, 2019 Hrg. Trn.*, at 97:12-17. And even if he had seen it, he likewise testified that he has "no mechanism of being able to independently confirm" its "apparent[]" contents. *Id. at* 51:2-5. Thus, "after days of testimony, multiple discovery hearings, and lengthy pleadings, the sole

---

[5] As described below, the exact form of the trust and file have been a moving target with Craig. And while the ever shifting changes to his inability to comply speak to his lack of credibility, the point remains that the sole "justification" for his "impossibility" defense is that the information is locked beyond his reach. *June 26, 2019 Hrg. Trn.*, at 18:12 ("If I could have, I would have. I locked everything away.").

6

evidence supporting Dr. Wright's claim that he cannot comply with the Court's Orders is the uncorroborated word of Dr. Wright" that the information necessary for compliance is locked in a "blind" trust protected encrypted file that he hasn't seen. Order, at 26.

But Judge Reinhart found that Craig has no credibility and cannot be trusted. Specifically stating that "[d]uring his testimony, Dr. Wright's demeanor did not impress me as someone who was telling the truth." Order, at 19. Judge Reinhart explained this in further detail:

> When it was favorable to him, Dr. Wright appeared to have an excellent memory and a scrupulous attention to detail. Otherwise, Dr. Wright was belligerent and evasive. He did not directly and clearly respond to questions. He quibbled about irrelevant technicalities. When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence.

*Id*.

Craig's impossibility defense hinges on the existence of the "blind" trust and its allegedly inaccessible encrypted file. But Judge Reinhart found "clear and convincing evidence" that Craig's testimony that the "Trust exists was intentionally false." Id. at 21. Importantly, Judge Reinhart specifically stated that this determination was a result of both the record facts **and** his "observations of Dr. Wright's demeanor during his testimony." *Id*. at 21. In fact, this finding isn't limited to the existence of the trusts. Judge Reinhart made the same exact finding when discussing the existence of the encrypted file that serves as the keystone to Craig's impossibility defense:

> After observing Dr. Wright's demeanor and the lack of any other credible evidence in the record that this file exists, I find that a preponderance of the evidence establishes that no such file exists and that Dr. Wright's testimony was intentionally false . . . although the necessary burden of proof is a preponderance of the evidence, there was clear and convincing evidence to support this finding.

*Id*. at 24, n14.

There is certainly no reason to find Judge Reinhart's credibility determinations

"unbelievable." *Ramirez-Chilel*, 289 F.3d at 749. Judge Reinhart (in both his written order and at the August 26 hearing) expressly went through every factor provided by the 11ᵗʰ Circuit for factfinders to determine witness credibility; for each one he found that Craig lacked credibility. Order at 17-26 (citing Eleventh Circuit Pattern Civil Jury Instruction 3.4).

Thus, this Court must defer to Judge Reinhart's credibility determinations unless it conducts its own hearing. But as described below, any such hearing would be a waste of the Court's and parties' resources because Judge Reinhart's credibility determinations are well supported by the record evidence he cites, other record evidence, and this Court's own independent determination that "the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court." ECF No. 265, at 10. For these reasons alone, Judge Reinhart's decision to sanction Craig should be upheld.

(ii)    *Judge Reinhart's factual determinations are supported by the record evidence which demonstrate Craig has perjured, forged, and deceived his way through these proceedings*

Beyond the general credibility determinations made by Judge Reinhart, Craig's shifting justifications for not producing the list, his irreconcilable sworn statements about the trust and mined bitcoin, and his submission of forged evidence to the Court, collectively demonstrate willful deception and prove that his story is fake, and that he is purposely disobeying a court order.

At bottom, Craig refuses to comply with the Court's order because he wants to keep Plaintiffs "from finding his Bitcoin trove," and proving his theft using the public blockchain. Order at 20. Consequently, he tried to avoid producing the list by falsely claiming his bitcoin were locked in an "encrypted file" held by a blind trust. But as the Court's inquiries and discovery orders began requiring Craig to substantiate this claim, he began trying to shore up the lie by both (1) submitting forged documents, and (2) using perjurious testimony to change his story. This pattern of behavior reveals the trusts are not real. The bitcoin are not locked away in an "encrypted file." Craig can

8

894

comply with the Order – he is simply choosing not to – and his bad faith refusal should be sanctioned.

### (a).    Craig's changing story demonstrates its falsity

In July 2018, Plaintiffs propounded an interrogatory seeking a listing of Craig's bitcoin holdings. Craig fought that production on legal grounds, but never said that it would be *impossible* to respond to the Interrogatory Similarly, in January 2019, Plaintiffs requested documents providing an estimate/value of Craig's cryptocurrency holdings. Craig fought that production on legal grounds, again never mentioning "impossibility." In March 2019, after numerous discovery hearings, the Court ordered Craig to provide a listing of his bitcoin holdings as of December 2013. At no time during any hearing did Craig ever claim "impossibility."

At Craig's April 4, 2019 deposition, he testified that (1) he never put any bitcoin into a trust;[6] and that (2) the Tulip Trust never came to hold the private keys to bitcoin addresses.[7] He also testified that Dave knew nothing about the trust, its set up, or Shamir Secret Sharing keys.[8] As indicated below, Craig subsequently contradicted all three of these sworn statements.

At the end of Craig's deposition, the parties called Judge Reinhart to rule on several issues that arose during the deposition. Judge Reinhart made it clear that Craig was to produce the list of his bitcoin holdings unless a motion for protective order was granted on burdensomeness grounds. (ECF No. [312] at 368:12-21.) Now forced to articulate a factual (as opposed to legal) reason not to produce the bitcoin list, Craig changed his story.

---

[6] ECF No. 312-1, at 294:1-18 ("Q. Did you put Bitcoin into the trust in 2011? No. Q. Did you put Bitcoin into the trust in 2012? No. Q. Did you ever put Bitcoin into the trust? No. Q. Did anyone ever put Bitcoin into the trust? No.")

[7] ECF No. 312-1, at 294:20-295:6 ("Q. Did the Tulip Trust ever come to hold private keys to Bitcoin wallets? No. Q. Did it ever come to own or possess private keys to Bitcoin addresses? No. Q. What is the relationship between the Tulip Trust and Bitcoin? What the hell does that question even mean?")

[8] ECF No. 312-1, at 293:8-16 ("Dave had no rights to the trust no ownership of the trust, no knowledge of the set-up of the trust . . . Dave was asked simply to hold a part of some documents and keys that were split using Shamir's Secret Sharing scheme so that he did not even know what he was actually holding.")

895

He filed a motion for protective order which, **in complete conflict with his sworn deposition testimony that he never put bitcoin or private keys into the trust**, stated that "[i]n 2011, Dr. Wright transferred ownership of all of his Bitcoin into a blind trust. ECF No. [155] (sealed); [184] (redacted copy). He also claimed he was "not a trustee or a beneficiary of the blind trust." *Id*. This was the first time Craig's raised the false "impossibility" defense.[9]

The Court denied Craig's motion and pointed out the "obvious"; Craig hadn't even tried to request the bitcoin list from the trustees of the alleged blind trust. ECF No. 166, at 3. It therefore ordered him to provide robust sworn disclosures about the trusts to include all of the trustees' names and contact information. It also ordered him to provide all documents related to the formation, administration, and operation of the trust, all transactional records of the trust, including records showing the alleged 2011 transfer of bitcoin into the blind trust – and to swear to the authenticity of these documents. *Id*. at 4.

Now forced to provide specific details to back up his assertions, Craig submitted a sworn statement *that contradicted both his sworn deposition testimony and his prior motion*. Specifically, in addition to his newfound claim that he *did* put bitcoin into the trusts,[10] he now

---

[9] Further evidence this was a factual pivot engineered by Craig is that, at the deposition just two weeks before, his own counsel had stated that "to compile that list would be incredibly burdensome," not that it would be "impossible." ECF No. 312-1 at 365:11-12. Clearly, Craig had not yet dreamed up this excuse and therefore his counsel had no knowledge of it.

[10] ECF No. 222 (redacted); 223 (sealed/unredacted) ("a formal trust document was executed, creating a trust whose corpus included the Bitcoin that I mined, acquired and would acquire in the future. The name of that trust is Tulip Trust.")

10

896

admitted that he *was* a trustee of the "blind" trusts,[11] and that he *was* a beneficiary of the trusts.[12]

Five days later, and in support of his statement that the bitcoin were locked in a trust, he submitted another sworn statement producing and authenticating the alleged trust formation documents to prove the trusts existed. (Ex 2.)[13] This statement unequivocally authenticated, *inter alia*, the following "trust" documents: ECF Nos. [237-1] (Dave Kleiman Trust documents) and [237-9] (Tulip Trust 1). As discussed below, Plaintiffs proved these documents are forgeries.

This May 13 declaration marked another contradiction as to what exactly was in the alleged Tulip Trust. At his April 4 deposition, he swore that the Tulip Trust didn't have bitcoin or private keys. (ECF No. 312, at 294:11-22 ("Q. Did you ever put Bitcoin into the trust? No . . . Did the Tulip Trust ever come to hold private keys to Bitcoin wallets? No.").)  However, his April 18 motion stated that the trust held all of Craig's bitcoin. ECF No. 184 ("Dr. Wright transferred ownership of all of his Bitcoin into a blind trust"). His May 8 declaration also stated that the trust held the bitcoin. ECF No. [222] (referring to conversations with counsel "regarding trusts that I settled that *hold or held Bitcoin* that I mined . . ." and "a formal trust document was executed, creating a trust whose corpus included the Bitcoin that I mined . . .").[14] But when Craig realized

---

[11] Id. ("the trustees for Tulip Trust 1 are . . . Craig Steven Wright . . . Satoshi Nakamoto (i.e., Craig Wright)."). In his objection (at 14), Craig tried to explain this contradiction by noting that "the Order failed to consider that there are two Tulip Trusts . . . [Craig] is the trustee of one . . . not . . . of the other." This is pure sophistry. In his April 18 motion Craig stated he couldn't list his bitcoin because they were locked in a blind trust that he wasn't a trustee over. In his sworn declaration he identified that trust as Tulip Trust 1 by stating that access to the "public addresses . . . requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock. But in that same declaration he also swore that he was a trustee of Tulip Trust 1. Thus, the trust mentioned in his motion and his declaration are the same trust. Craig's disingenuous argument that there are two trusts is simply another instance of Craig showing whatever is expedient to avoid justice.

[12] *Id.* ("I am the contact person for both beneficiaries"); Id. ("the primary beneficiaries of Tulip Trust II are me and my wife . . .")

[13] At the June 26 hearing both of Craig's declarations (May 8 and May 13) were handed to the Court (81:5-16) whereupon Judge Reinhart took "judicial notice of the two declarations of Dr. Wright, which I believe are both filed in the record in redacted form." ECF No [236] at 82:7-9. On review, however, Plaintiffs cannot find the May 13 declaration in the docket. Plaintiffs have attached it as Ex. 2 (Craig Wright's May 13, 2019 Declaration).
[14] In classic Craig fashion, this declaration is self-contradictory and leaves just enough ambiguity to allow him to argue that the bitcoin or just the keys were transferred (whichever is more convenient). Specifically, it states that

that any transfer of bitcoin into the alleged Tulip Trust would necessarily be reflected on the Bitcoin blockchain, that he'd be required to identify those transactions, and that Plaintiffs could then use that information to trace the stolen bitcoin, he pivoted again. In his May 13 declaration he swore that "**the electronic files** that would be used to create the private keys to the Bitcoin that I mined . . . **were transferred into Tulip Trust 1. The Bitcoin itself, however, has never been transacted**." Ex. 2 (emphasis added). He perpetuated this new story through his June 26 deposition and the show cause hearing. Order at 23.[15]

At the show cause hearing and in further effort to prove he could not comply with the Court's order, Craig shifted his story yet again. In complete conflict with his sworn deposition testimony that "Dave had . . . no knowledge of the set-up of the trust" and "did not even know what he was . . . holding," Craig now claimed that it was Dave who *essentially* set up the entire "trust," and that Dave (and only Dave) was in charge of distributing the key slices and arranging for a bonded courier to return the final piece to Craig in 2020.[16]

But his misrepresentations at the hearing didn't end there. Craig was aware that many

---

[""]there are no transactions related to the Bitcoin that I mined." He also cryptically mentions that "[a]ccess to **the** encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined" could only be unlocked by himself and a "combination of trustees . . . based on a Shamir scheme." *Id.*

[15] In an attempt to reconcile Craig's contradictory statements about what he transferred into the trust (bitcoin v. private keys) the objection (at 14-16) attempts to argue that transferring bitcoin to an alternate address and providing someone with a private key to your bitcoin are the same thing. But this is no truer than wiring money into someone else's bank account and providing them with the password to your bank login are the same thing. The objection misses Judge Reinhart's greater point. While both methods may provide control to the transferee, "it is not credible that, given his claim to have an unmatched understanding of Bitcoin, he would" not have used the correct terminology when discussing how he made the transfer. Order at 23. Quite simply, the "self-proclaimed creator of Bitcoin and therefore a person who claims to have intimate knowledge of how Bitcoin works" would not have made this mistake. *Id.* at 25.

[16] ECF No [236] at 16:12-15, 23:8-9, 23:23-24:7, 29:10-19, 30:9-31:14, 107:24-25, 125:15-24 ("Dave was tasked, as part of helping me destroy everything and hiding things, with making sure that there was a long time between any of this ever coming back to me . . . Part of that was I guess you'd call them a bonded courier over here . . . I made sure Dave didn't tell me who he used . . . It was Dave who talked me out of destroying it utterly. . . The way it was set up was I gave slices to Dave, and he was directed to give them to bonded couriers that would send slices based on different events. One of those events was June 20, 2020.")

documents he produced contain contradictory representations about how many key slices were required to open the allegedly encrypted file.[17] To explain these discrepancies, Craig pivoted yet again to say that there were multiple encrypted files, each holding different data and each requiring its own critical mass of key slices to unlock. (ECF No [236] at 106:24-108:23). This, of course, contradicted his May 8 declaration that the relevant information was inside a **single** file.[18]

In fact, even Craig's testimony at the hearing about the allegedly encrypted file itself was inconsistent. Craig first testified that "there is a file, and that consists of many files inside" (6/28, 107:7-8) and that the "outermost encrypted file" (*id.*, 125:8-9) requires "eight of 15" key slices to open, (id. 10-11) but that "I don't know" who has those keyslices (*id.* at 12-13). But Craig later testified that he *was* able to access one of the subfiles.[19] This, of course, should have been impossible since he "allegedly" couldn't get past the first outermost encrypted file.

Craig's ever-changing story is evidence of its falsehood. It's well accepted that lies necessitate conflicting stories because as this Court has pointed out, "Oh! What a tangled web we weave when first we practice to deceive." (ECF No. [265], at 4).

(b).    *Evidence of forgeries*

As mentioned above, when the Court required Craig to substantiate his claim that he'd transferred his bitcoin into a blind trust, he was forced to produce documents to shore that lie up.

---

[17] ECF Nos. [237-16], at 8 ("there are 15 key segments. It is divided with a threshold of 12"); [237-17], at 4 ("In the 'Tulip Trust,' a scheme of 3 of 5 keys has been created."); [237-18], at 1 ("There are 15 Key slices . . . 8 slices are required to reconstruct the main key files"); [237-19], at 2 ("not less than eight (8) of the fifteen (15) slices are required").

[18] ECF No. [222] (emphasis added) ("Access to **the** encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined")

[19] Dr. Wright identified the private keys to blocks 1-10 as one of the encrypted subfolders. *Id.* at 122:24-123:3 ("This is to do with the access to the first 10 Bitcoin addresses . . . I said there were four; this is one of them."). He then testified that he obtained the keys to access this file and signed with the private keys in blocks 1-10. *Id.* at 135:17-21("I was being told to sign with the first 10 addresses; I ended up doing that; that was it.")

13

899

As demonstrated below, the "trust documents" Craig submitted to "prove" the trusts exist, and which he swore were authentic, are abject forgeries. ECF No. [222]; Ex. 2. This demonstrates the trust itself is also a clear fabrication, and Craig's claim that the trust's alleged control over an "encrypted file" is all part of an elaborate ruse designed by Craig to hide his bitcoin. Judge Reinhart's order discussed just "one example" of the "substantial credible evidence" that "documents produced by Dr. Wright to support his position in this litigation are fraudulent." ECF No. 277, at 20. Based on this evidence, Judge Reinhart concluded, as this Court should, that "[t]he totality of the evidence in the record does not substantiate that the Tulip Trust exists." *Id*. at 21. As discussed above, this also led him to find, by "clear and convincing evidence" that "Dr. Wright's testimony that this Trust exists was intentionally false." *Id*. Whether on clear error or *de novo* review, Judge Reinhart's findings are well supported.

### 1.    *The Dave Kleiman Trust documents (ECF No. 237-1) are forgeries*

As discussed above, Craig produced and relied on an email Dave allegedly wrote to him in June 2011 regarding the Tulip Trust. On its face, the email appeared to support Craig's narrative that his bitcoin had been placed in a trust that Dave controlled.[20] But forensic evidence conclusively demonstrated Dave did not write this email. To the contrary, Craig did -- in 2014, over a year after Dave died. Craig (presumably by accident) produced another copy of this same email that reflects the true date it was written and sent is October 17, 2014. ECF No. [237-6]. The metadata of the versions of this email show that it was originally sent from a computer located in Australia named with Craig's initials (ECF No. [264] at 129:17-19), from Craig's email address to Craig's email address (*id.* at 129:20-130:14), but that it's "from" and "to" fields had been

---

[20] At Craig's second (and Court supervised) deposition, he testified that Dave wrote, and he received, ECF No. [237-1] on or about June 24, 2011. Ex. 4 at 447:7-12. As described below, this was a lie.

modified to appear as if it came from Dave to Craig (*id.* at 147:19-24), that its email headers had been badly modified so that the date and day of the week were wrong (*id.* at 149:6-11), that it was sent from and created by software that didn't exist in 2011 (*id.* at 148:24-149:5), and that Dave's purported cryptographic signature was used after Dave died (*id.* at 171:10-16). Forensics also showed that both 2011 version is a revision of the 2014 version (*id.* at 146:19-147:11).

> 2.    *The Tulip Trust I document (ECF No. [237-9]) is a forgery.*

On its face, this appears to be the document Craig used to settle Tulip Trust I in 2012, *i.e.,* the blind trust allegedly preventing Craig's access to the bitcoin list.[21] Thus, this document is the central document to Craig's impossibility defense. It's dated October 23, 2012. Craig swore it was authentic. ECF No. 222; Ex. 2. But it's a forgery. The document names Tulip Trading Ltd (IBC 093344) as a beneficiary. ECF No. [237-9] at 1-2 ¶1. But at the hearing, Plaintiffs proved (via emails and other documents Craig himself produced) that Craig didn't even own Tulip Trading Ltd until 2014 when he bought it as a shelf company. ECF No. [237-11, 12, 13, 14]; ECF No. 236, 88:5-97:11 (cross examination on subject). Furthermore, the metadata for the document allegedly created in 2012 contained fonts copyrighted by Microsoft in 2015. (ECF No. [264] at 16-23.)[22]

---

[21] At his second deposition, Craig testified that he bought "Tulip Trading" (a beneficiary of Tulip Trust 1) sometime before 2012. *Id*. at Ex. 4 at 414:1-11. As described below, this was a lie.

[22] Plaintiffs' expert Dr. Matthew Edman showed that the "trust documents" could not have been prepared in 2012, as Craig claims. (DE 264, at 121 et seq.) Craig's objection argues, based on a number of improbable scenarios, that Dr. Edman's testimony that the documents were backdated is not "conclusive" or exclude other "plausible explanations." (DE 311, at 18 & n.15.)  Craig's individual explanations are all incredibly unlikely, but he completely fails to appreciate that the likelihood of all these excuses occurring (which is necessary for his exoneration) is so incredibly unlikely, its laughable. Add that to the fact that Craig couldn't put forward evidence that any of these unique situations occurred, and this argument becomes preposterous. But the law does not require absolute certainty, and Judge Reinhart properly evaluated Dr. Edman's credibility and credited his detailed testimony, which provides the only logical explanation for the mention of Tulip Trading Ltd. in documents dated in 2012.  Craig offered no expert testimony to rebut Dr. Edman.

15

901

   *(c). History of Craig's lies*

   A party's litigation conduct is relevant to determining bad faith. *Costa*, 2011 WL 7318760, at \*5. Even outside the lies told in the context of protecting the bitcoin list, Craig has lied and submitted forged evidence to this Court at every opportunity in this litigation.

   In support of his original motion to dismiss this case on personal jurisdiction grounds, Craig submitted false testimony claiming no relationship with W&K (ECF No. [12-1], at 2) which was directly contrary to his sworn testimony in Australia (ECF No. [83], at ¶¶160-170). In other words, Craig was willing to cheat to win.

   Undeterred, again in support of another potentially case-dispositive motion to dismiss the amended complaint for forum non conveniens, Craig swore he had "no documents" from "any ATO investigation" and if he did, they were "in Australia." (ECF No. [33-3] at ¶18). After he lost the motion, however, he flipped positions arguing he was "mistaken" and had so many ATO documents he shouldn't have to go to Australia to collect more. (ECF No. [127] at 7.) Again, he was willing to cheat to win.

   Apparently believing the adage that "the third time is the charm," Craig submitted two forged exhibits in support of his motion for judgment on the pleadings. But counsel was forced to withdraw those documents when they were exposed as fakes. ECF No. 265, at 6. Again, Craig was willing to cheat to win. As this Court has already noted, "[u]nfortunately, the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court." *Id*. at 10. Craig's testimony and evidence regarding the encrypted file and trust fit this unfortunate pattern.

   *(d). Craig's post hearing statement confirms Judge Reinhart's findings were correct*

   After Judge Reinhart issued the sanction from the bench on August 26, 2019, Craig walked

out of the courthouse, stepped in the car, and got on a video call with Brendan Sullivan, a journalist. In that interview, which took place minutes after receipt of the Court's sanction, he clearly admitted that, contrary to the testimony he gave to this Court, he *could* access his bitcoin, but *chose* not to. Specifically, the article, which has been sworn accurate by Mr. Sullivan (Ex. 3), quoted Craig saying:

> Everyone makes me look like a mean [expletive]. I might have been a [expletive], but I was the [expletive] who was withholding. **I could have tanked the market anytime in the last 10 years and ran away laughing.** I didn't.

Ex. 1 (emphasis added). As is clear from the context of the interview, Craig's statements that he could tank the market meant that he could have done so by flooding the market with bitcoin – something he could only do if he could (contrary to his sworn testimony) access the partnership's bitcoin hoard.[23]

**C.     Craig's deception prejudiced plaintiffs and no lesser sanction would have sufficed**

Craig's assertion that the sanctions "are improper because there is no evidence of any prejudice to Plaintiffs" is wrong because, as explained below, Plaintiffs were prejudiced as a matter of law due to Craig's campaign of lies and forgeries, which demonstrate Plaintiffs cannot have a fair trial as Craig won't hesitate to lie to the jury, forge evidence, or otherwise cheat to win. This prejudice is especially strong under the unique circumstances of this case where Dave is not available to tell the true story, the partnership was purposely kept confidential, and Craig is the only person left with direct knowledge of many of the critical facts. But Plaintiffs have also been

---

[23] Further support that he can access the bitcoin if he wants to came in response to Mr. Sullivan's statement that: "But how will you actually get the money? . . . **now you'll have to break the Tulip Trust** to transfer the coins." Craig responded with: "**If the court makes an order, I will comply with the order** . . ." Ex. 1 (emphasis added). Thus, implying that he has the ability to "break" the trust.

prejudiced factually because Craig's failure to comply with discovery has prevented them from tracing the partnership's bitcoin that form the core of their claims.

As a matter of law, a plaintiff is necessarily prejudiced when a defendant falsifies evidence or commits perjury. "[T]hose 'who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants." *Forsberg v. Pefanis*, 634 F. App'x 676, 680 (11th Cir. 2015). Indeed, allowing a defendant who has "demonstrated comfort with fabricating testimony" to continue to defend against a claim "would only provide [such a defendant] with further opportunities to subvert the integrity of the judicial process." *Sprint*, 83 F. Supp. 3d at 1298; *see also Consumer Fin. Prot. Bureau v. Morgan Drexen*, 101 F. Supp. 3d 856, 875 (C.D. Cal. 2015) ("Based on the extent of [defendant's] misrepresentations and falsification of evidence, the Court anticipates that [defendant] would continue to deceive the Court, its own trial counsel, and opposing counsel if the Court allowed this case to proceed to trial."); *Littler v. Martinez,* No. 2:16-CV-00472-JMSDLP, 2019 WL 1043256 (S.D. Ind. Mar. 5, 2019) (based on defendant's "repeated perjury," "[t]he Court has no confidence that [defendant] would testify truthfully to the jury").[24]As a result, district courts have found that there is "no sanction short of striking of the answer to adequately address the issue of fabricated evidence." *See Forsberg v. Pefanis*, 634 F. App'x 676, 679-80 (11th Cir. 2015); *see also McDowell v. Seaboard Farms of Athens, Inc.*, No. 95-609-CIV-ORL-19, 1996 WL 684140, at *2 (M.D. Fla. Nov. 4, 1996) (noting that "federal case law is well established" that dismissal and default sanctions are "appropriate" where "a party fabricates evidence purporting to

---

[24] In analogous situations where a litigant has deprived his opponent of evidence, Courts have found that "a specific finding of prejudice is not required . . . once the court has found . . . an intent . . . to prevent the other party from using it in the litigation." *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co.*, No. 12 CV 1851, 2016 WL 4765689, at *10 (N.D. Ill. Sept. 13, 2016); See Advisory Committee Note to 2015 Amendment to Fed. R. Civ. P. 37(e). The specific prejudice finding isn't required because "the finding of intent to deprive the other party of the use of certain information also supports the inference that the missing information was unfavorable to the party that destroyed it—and thus the further inference that the party who now cannot use the lost evidence has been prejudiced by that loss." Id.

904

substantiate its claims"); *see also Hosny v. Thiam*, No. 13-cv-04103, 2016 WL 10587115, at *1-2 (N.D. Ga. Aug. 17, 2006) ("[G]iven the egregiousness of [defendant's] conduct in forging evidence, the Court concludes an appropriate sanction is to strike his Answer and Counterclaim, and to enter default.").  Lesser sanctions are inadequate to deter such misconduct because, "if manufactured evidence is merely excluded while the lawsuit continues," litigants would "infer that they have everything to gain, and nothing to lose" by continuing to falsify evidence. *Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995).  Craig has demonstrated a consistent and repeated disregard for truth, honesty, and integrity. And since Craig is the only individual left with first-hand knowledge of many of the facts central to Plaintiff's claims, Plaintiffs ability to prove those claims has been, and will be, substantially prejudiced due to his lies and forgeries.

But the prejudice goes further than Craig's refusal to tell the truth. Craig's specific withholding of the bitcoin list has also prejudiced Plaintiffs. Craig testified to mining over 800,000 bitcoins while Craig and Dave were operating the Satoshi Nakamoto partnership. The core allegation of Plaintiffs complaint is that Craig stole the partnership's bitcoin after Dave died. (ECF No. [83] ¶ 7.) If Craig were forced to provide the list of those bitcoin, Plaintiffs could trace the date and time they moved, what they were spent on, as well as who received them.  This could help Plaintiffs prove their case in many ways. For example, if the list shows massive transfers of bitcoin into Craig's wallets shortly after Dave's death, it would help establish Craig's theft. Alternatively, if the list shows expenditure of bitcoin prior to 2013 to benefit both Dave and Craig it would support the existence of a partnership and its ownership of the bitcoin. Furthermore, the list would lead Plaintiffs to witnesses, *i.e.,* recipients of bitcoin transferred from (or to) Craig.[25]

---

[25] In fact, as Craig testified he paid for Dave to manage people that created intellectual property (*April 4, 2019 Depo. Trn.* 230:2-235:19), these witnesses would likely also have information about the intellectual property Dave and Craig created together.

Of course, these facts would establish the existence of the Satoshi Nakamoto partnership and the ownership of the intellectual property that comes with it.

Indeed, Craig has admitted that "the one thing Bitcoin does: more than anything else, it provides an immutable evidence trail that is admissible in court."[26] To be sure, tracing bitcoin for insight gleaned from its movement is a significant industry in the cryptocurrency space. *See e.g.* Chainalysis, https://www.chainalysis.com/ (providing insight into bitcoin movement and tracing).

Craig's refusal to provide the bitcoin list has therefore prevented Plaintiffs from engaging experts to track these movements and potentially prove these facts or others.

Of course, Craig claims that the bitcoin have never moved on the blockchain – *i.e.* that he has never spent them. As an initial matter, this assertion should be disregarded. Craig is a proven perjurer and his testimony cannot be trusted. But most importantly, his refusal to supply the list must support the inference that its disclosure would show information, including movement, that would help prove Plaintiff's case. See *Glob. Material Techs., Inc.,* 2016 WL 4765689, at *10. In fact, as described above, it's easy to see how disclosure of this list could be detrimental to Craig's defense of this case.

But even if Craig's testimony were true (it's not), and he hasn't moved any of the bitcoin (he has), his refusal to provide the list is still prejudicial because the list would still contain helpful information. For example, it would show exact date and times each of the bitcoins were mined. This information could be helpful in showing Dave's active participation, or Craig's non-participation. Furthermore, there are many advanced techniques to differentiate the manner in which unmoved bitcoin were mined that could help identify whether all the bitcoin were mined by the same source and potentially where those bitcoin were mined. Indeed, Craig can't deny this

---

[26] Craig Wright, Immutable Evidence, February 16, 2019 Medium.com post, available at: https://medium.com/predict/immutable-evidence-386b60a33123

906

because he suggested just such a method to try and reconstruct his holdings. (ECF No. [264] at 17-23.)

Finally, Plaintiff have been prejudiced because, as admitted by Craig, Bitcoin's unique design means that once he identifies the bitcoin, Plaintiffs could enlist the Court's help to obtain it back:

> But the thing to imagine here is a world where blackmail or cybercrime creates a scenario where the victim can quickly freeze bitcoin or require the rightful implementation. **The thief will want to give back the bitcoin because there will be a record.** If they don't return it and they spend it on an exchange knowing that it's already subject to a freezing order, **AML and KYC laws will link their identity indelibly in a manner that can be used as evidence in a court**.

Craig Wright, https://craigwright.net/blog/bitcoin-blockchain-tech/bitcoin-is-anything-but-anonymous/ (emphasis added). His refusal to identify the bitcoin, however, prevent Plaintiff from tracing it forward.

In sum, Craig lied and submitted forged evidence in an effort to prevent Plaintiffs from pursuing the core elements of their case. As articulated by Judge Reinhart "Craig has a Dr. Wright has a substantial stake in the outcome of the case. If Plaintiffs succeed on their claims, Dr. Wright stands to lose billions of dollars. That gives him a powerful motive not to identify his bitcoin." Craig has "demonstrated comfort with fabricating testimony," so allowing him to continue defending against Plaintiffs' claims would simply serve to provide Craig "with further opportunities to subvert the integrity of the judicial process." *See Sprint*, 83 F. Supp. 3d at 1298. Accordingly, no remedy other than striking Craig's pleadings is appropriate under these circumstances.

D.    **The sanctions relate to Craig's conduct and do not violate due process**

Judge Reinhart specifically found that Craig willfully withheld evidence critical to Plaintiffs' claims in violation of multiple discovery orders and "intentionally submitted fraudulent

907

documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony." (DE 277, at 28.)  Craig nonetheless argues that the sanctions imposed violate *his* due process rights because "[t]here is no nexus between the single, narrow discovery issue before the Magistrate [Judge] and the broad sanctions the Order purported to impose through the Deemed Facts."  (DE 311, at 9.)  That assertion is demonstrably false.  Judge Reinhart specifically—and correctly— found that the sanctions not only relate to the evidence Craig has improperly withheld, but that "[n]o lesser sanction would suffice."  (DE 277, at 16, 27-29.)

    *(i)*      *The withheld evidence is relevant to the issues affected by the sanctions*

    A district court's exercise of its broad discretion to impose sanctions under Rule 37(b)(2)(A) and manage its affairs does not violate due process unless the sanctions are not "just" or "specifically related to the particular claim which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).[27] In further explaining the requirement that the sanction be "related to the particular claim," the Court said that the power to issue a default judgment under Rule 37

> was permissible as an expression of the undoubted right . . . to create a presumption of fact as to the bad faith and untruth of an answer begotten from the . . . failure to produce the proof ordered. The preservation of due process was secured by the presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense."

    *Id.* at 705 *quoting Hammond Packing Co. v. Arkansas*, 212 U.S. 322 (1909). In essence, the Supreme Court found that due process was protected if the failure to produce the discovery ordered could support the negative inference that, had the discovery been produced, it would have

---

[27] Craig does not (and could not) argue that the sanctions imposed by Judge Reinhart are not just. And of course, it was. Craig was "warned of a possible sanction."  *Ins. Corp. of Ireland*, 456 U.S. at 708. And "[c]onfronted with continued delay and an obvious disregard of its orders, the trial court's invoking of its powers under Rule 37 was clearly appropriate." *Id*. Moreover, the Court's finding that Plaintiffs own half the Bitcoin and intellectual property "was not a frivolous claim" as ample evidence supports this finding including Craig's own admission that he and Dave were "partners." *Id*.; (ECF. [83-2], at 2). Further, Craig had "ample warning that a continued failure to comply with the discovery orders would lead to the imposition of this sanction." *Id.*

22

908

undermined that party's defense. *See id.* Thus, "[d]ue process is violated **only if** the behavior of the defendant will not support the *Hammond Packing* presumption. *Id.* (emphasis added). Finally, once the *Hammond Packing* presumption is met, a severe sanction isn't problematic. *Id*. ("[t]hat a particular legal consequence . . . follows from [the sanction], does not in any way affect the appropriateness of the sanction.")

> (ii)    *The sanctions meet the Hammond Packing presumption and specifically related to the claim at issue in the litigation*

As discussed above, Craig's failure to provide the bitcoin list supports the negative inference that had he produced the list, it would have undermined his defense and shown Dave owned half the bitcoin. As discussed above, it's easy to see how. For example, the list could have shown massive transfers of bitcoin occurring shortly after Dave's death, thus supporting Craig's theft and providing a mechanism to trace the bitcoin. Additionally, it could show joint access to the bitcoin if transactions were initiated to benefit both Craig and Dave. Of course, these facts would establish the existence of the Satoshi Nakamoto partnership and the ownership of the intellectual property that comes with it. This is completely in line with Judge Reinhart's finding that Craig's "conduct has prevented Plaintiffs from obtaining evidence that the Court *found relevant* to Plaintiffs' claim that Dr. Wright and David Kleiman formed a partnership to develop Bitcoin technology and to mine bitcoin." (Order at 27-28 (emphasis added).) This evidence was, in fact, highly relevant to Plaintiffs' claims and the loss of that evidence is highly prejudicial to Plaintiffs' claims.

Thus, Judge Reinhart's sanction, finding that Craig's failure to produce the list merits a sanction establishing that (i) the partnership existed, that therefore (ii) half the bitcoin and intellectual property belonged to the partnership, and that therefore (iii) any affirmative defenses

inconsistent with those facts must be stricken – easily satisfies the *Hammond Packing* presumption.

> (iii)   Craig waived the right to challenge the relationship between the discovery order and the sanctions

As seen from above, Craig's "due process" argument is simply a repackaging of his original argument that evidence of his bitcoin holdings is not relevant to Plaintiffs' claims.  However, the Court expressly rejected that argument in an order read into the record by Judge Reinhart *more than eight months ago*.  (*See* DE 124, at 20:2-23:7.)  Under Rule 72(a), a party has fourteen days to object to an ordered issued by a Magistrate Judge.  *See* Fed. R. Civ. P. 72(a).  Because Craig failed to do so, he has waived any argument that the evidence is not relevant to Plaintiffs' claims. *See Perez v. New Auto Image Mktg., Inc.*, No. 15-cv-21893, 2016 WL 7540272, at *2 n.4 (S.D. Fla. May 20, 2016) (party that "failed to object to [the Magistrate Judge's] ruling" had "waived his ability to present evidence" relating to a particular issue where the Magistrate Judge had denied the party's motion to compel production of evidence concerning that issue).[28]

**E.   Craig's conduct is consistent with conduct for which courts impose terminating sanctions**

As mentioned above, the severity of the sanction does not cause it to violate due process. *Ins. Corp. of Ireland*, 456 U.S. at 705. ("[t]hat a particular legal consequence . . . follows from [the sanction], does not in any way affect the appropriateness of the sanction.")

---

[28] Although Rule 72(a) concerns the amount of time that a party has to object to a "written order" issued by a Magistrate Judge, "[a]n oral order read into the record by the magistrate will satisfy this requirement." *In re Gabapentin Patent Litig.*, 312 F. Supp. 2d 653, 658 (D.N.J. 2004) (quoting Fed. R. Civ. P. 72(a) advisory committee notes).  Craig did not object to that order, or any of the other orders requiring Craig to produce evidence of bitcoin holdings.  (*See* ECF No. [166] (denying Craig's motion for protective order); ECF No. [217] (granting motion to compel). Furthermore, to the extent there wasn't a written order by virtue of the oral order read into the record, that oral order clearly became written when the Court entered ECF No. [212] (granting Plaintiffs' motion to compel production of Craig's bitcoin holdings "in accordance with the Court's prior orders").

24

910

Nonetheless, Craig's conduct during these proceedings demonstrates that he is willing to go to great lengths—"including submitting incomplete or deceptive pleadings, filing a false declaration, knowingly producing a fraudulent trust document, and giving perjurious testimony at the evidentiary hearing"—to prevent Plaintiffs from obtaining evidence relevant to their claims. (DE 277, at 27.)  This conduct, which the Court appropriately found to be "antithetical to the administration of justice," (*id.*, at 28), is more than sufficient to support an inference that Craig lacks *any* meritorious defense to Plaintiffs' claims.  *See Ins. Corp. of Ireland*, 456 U.S. at 705-06 ("Due process is violated only if the behavior of the defendant will not support" the "presumption that the refusal to produce evidence material to the administration of due process was but an admission of the want of merit in the asserted defense."  (citations omitted)).  Indeed, courts in this Circuit have imposed *terminating sanctions* for less egregious conduct.[29]  Accordingly, the Court should readily reject Craig's assertion that the non-default sanctions imposed by Judge Reinhart violate due process.

**F.    Judge Reinhart did not rely on Hearsay**

Craig argues that Judge Reinhart "improperly relied on inadmissible hearsay" in support of his sanctions Order.  More specifically, Craig contends that the "metadata that plaintiffs' expert claims to have extracted from documents produced by [him]" is hearsay.  Craig's argument lacks any merit.

Metadata is not hearsay.  *1st Fin. SD, LLC v. Lewis*, No. 11-CV-00481-MMD, 2012 WL 4761931, at *2–3 (D. Nev. Oct. 5, 2012) (holding that metadata "cannot be excluded as hearsay");

---

[29] *See, e.g.*, *Forsberg v. Pefanis*, 634 F. App'x 676, 679-80 (11th Cir. 2015) (striking answer where defendant forged affidavit); *Sprint Sols., Inc. v. Fils-Amie*, 83 F. Supp. 3d 1290, 1295-98 (S.D. Fla. 2015) (imposing default where defendants provided false testimony); *Costa v. Datapro, Inc.*, No. 10-cv-23172, 2011 WL 7318760, at *6-9 (S.D. Fla. Aug. 5, 2011) (striking answer where defendant misrepresented facts at deposition and claimed he could not produce his own bank records); *Hosny v. Thiam*, No. 13-cv-04103, 2016 WL 10587115, at *1-2 (N.D. Ga. Aug. 17, 2006) (same, where defendant fabricated evidence).

911

*CA, Inc. v. Simple.com, Inc.*, 780 F. Supp. 2d 196, 224 (E.D.N.Y. 2009) (same, and explaining that "a party opposing computer generated data must put forth more than mere assertions of tampering"); *see also United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) (holding that a "tack placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay" and joining other circuits in the rule that "machine statements aren't hearsay"); The Sedona Conference Commentary on ESI Evidence & Admissibility, 9 Sedona Conf. J. 217, 224 (Mar. 2008) ("System metadata does not constitute 'hearsay,' at least not under the Federal Rules of Evidence, because system metadata is generated by a computer without human assistance.").

Indeed, the metadata in question is not something that Plaintiffs or their expert created. Instead, as the undisputed evidence at the hearing demonstrated, the metadata is part of, and was extracted from, documents produced by Craig. (ECF No. [264] at 122, 127-28.) Stated differently, the metadata was produced by Craig as part of the documents itself, and it was simply made readable through generally accepted means by Plaintiffs' expert. *Id*

Craig never disputed the metadata in question came from the documents he produced, some of which he submitted with sworn a declaration of authenticity. Ex. 2. Indeed, he was quite conversant with metadata generally and how the metadata was extracted from the documents he produced. ECF No. [236] at 38. Dr. Edman similarly explained what metadata is, and how it was extracted from the documents produced by Craig. (ECF No. [264] at 122:2-6). No contrary evidence was presented.

There is also no dispute that the metadata of Craig's documents demonstrate the documents were altered prior to their production by Craig. In fact, when confronted with the metadata, Craig did not deny the documents had been altered. Instead, he claimed that unnamed people who were

912

"trying to force [his] companies into liquidation" had "hacked" his computer. (ECF No. [236] at 53:1-3, 54:24). As Judge Reinhart observed in his Order, this claim is not believable:

> When confronted with evidence indicating that certain documents had been fabricated or altered, [Dr. Wright] became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence.

Judge Reinhart further observed that Dr. Wright was not "writ[ing] on a clean slate" and, quoting this Court, observed that the "record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court." Order at 20.

Ironically, Defendant tries to turn these undisputed facts on their head and argues that because the metadata was "altered and manipulated," it renders it inadmissible hearsay. Specifically, Defendant states that "having 'established' that the documents [produced by Craig] contain altered metadata, there is simply no way that plaintiffs could simultaneously establish that the metadata was trustworthy." Not surprisingly, Defendant has not come forward with any authority for the novel proposition that if he produces evidence that is later demonstrated to have been falsified by him, that evidence must deemed "untrustworthy" and inadmissible "hearsay."

Simply stated, the metadata admitted by Judge Reinhart is evidence that Defendant's document production is replete with forgeries and fraud. It is "trustworthy" for that purpose – and it is certainly not inadmissible hearsay.

**G.    Public Addresses**

At the evidentiary hearing, Craig's testified that "there are no public addresses in the Bitcoin system" (ECF No [236] at 9:23), that "[t]here are no public addresses at all in Bitcoin" (*id.* at 10:8-9), that "[p]ublic addresses don't exist" (*id.* at 10:16), and that referring to public addresses would be "like saying: how do unicorns relate to this Court." *Id.* at 10:18-19.

913

Incredibly, however, Craig's objection now admits that public addresses **are** relevant as one of the "only four ways to identify a list of Bitcoin holdings" is to use "a list of public addresses." Objection at 22. The objection then goes on to accuse *Judge Reinhart* of having "a lack of understanding of how Bitcoin works" and creating "a distinction without a difference" because his Order "attempt[s] to split hairs and distinguish between ordering a list of Bitcoin addresses and a list of bitcoin holdings." *Id*. But Judge Reinhart's comments on "public addresses" were all meant to address the fact that (i) Craig understood his obligation was to disclose his bitcoin holdings however that was to be accomplished, that (ii) if public addresses *were* irrelevant, Craig should have raised that issue earlier, that (iii) the Court had not, in fact, even used the term "public address" when giving the original order — and that therefore (iv) Craig was acting in bad faith by refusing to provide the information he knew he had to give.[30]

**H.    This Court should uphold Judge Reinhart's sanctions under its inherent power**

Judge Reinhart found that the "sanctions otherwise available under Rule 37 are sufficient to address Dr. Wright's behavior, so the Court would not impose *additional* sanctions even if it were to invoke its inherent power." Order at 12, n9 (emphasis added). To the extent this Court has any hesitation at affirming Judge Reinhart's sanctions under Rule 37 (it shouldn't), it has the power to, and should, impose identical sanctions (or more severe ones) under its inherent power. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) (holding that the power to impose sanctions under the Fed. R. Civ. P. don't "displace" a federal court's "inherent power to impose sanctions for bad-faith conduct," a power that "extends to a full range of litigation abuses."); *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009) (noting that

---

[30] Viewed in this light, the filing insults its own filer by stating, in no uncertain terms, that Craig demonstrates "a lack of understanding of how Bitcoin works" by claiming that "public addresses" are useless when, in fact, they are one of the "only four ways to identify a list of Bitcoin holdings." *Id.* at 22.

"[a] court may impose sanctions for litigation misconduct under its inherent power," and explaining that "[t]he key to unlocking a court's inherent power is a finding of bad faith").

## <u>CONCLUSION</u>

Judge Reinhart and this Court are faced with a litigant that has no respect for the authority of the Court, or for the fair administration of justice. He has lied throughout this case and, now caught, cloaks himself in the blanket of "due process." He still does not admit what he did and this Court should not have any illusion that his conduct, if not severely punished, will not be repeated again. As Judge Reinhart found, "[n]o lesser sanction would suffice." Order at 28. This is what's necessary to "deter others from engaging in similar conduct; and (4) penalize the offending party or attorney." *Steward*, 306 Fed. Appx. at 529.

Judge Reinhart gave Craig every opportunity to show that his admitted violation of the Court's Order was due to the impossibility of compliance. He failed to meet that burden.

Craig was sanctioned harshly, but fairly. Craig's Objections should be overruled in their entirety.

Dated: December 16, 2019

Respectfully submitted,

*s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
**ROCHE FREEDMAN LLP**
200 S. Biscayne Blvd.
Suite 5500
Miami, Florida 33131
vel@rochefreedman.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
**ROCHE FREEDMAN LLP**
185 Wythe Avenue F2
Brooklyn, New York 11249
kyle@rochefreedman.com

Andrew S. Brenner, Esq.

29

915

**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaintiffs Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC.*

30

916

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 16, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

31

917

# TAB 373

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

**<u>ORDER</u>**

    **THIS CAUSE** is before the Court upon Defendant Craig Wright's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses (the "Objection"). *See* ECF No. [311]. The Court has reviewed the Objection, the opposing and supporting submissions, the record and applicable law, and is otherwise fully advised. For the reasons that follow, Defendant's Objection is sustained in part and overruled in part. The Magistrate Judge's Order, ECF No. [277], is vacated in part.

    **I.    BACKGROUND**

    The factual background giving rise to this action has been set forth previously in prior opinions issued by this Court and are incorporated by reference. *See e.g.* ECF No. [68].

    Pursuant to 28 U.S.C. § 636 and this District's Magistrate Judge Rules, all discovery matters in this action were previously referred to the Honorable Bruce E. Reinhart. *See* ECF No. [21]. The proceedings relevant to the present appeal relate to a discovery dispute, initiated when the Plaintiffs sought to identify the bitcoin owned and controlled by the Defendant (herein referred to as Defendant's "Bitcoin Holdings"), and are as follows:

Case No.  18-cv-80176-BLOOM/Reinhart

### a. *Plaintiffs' First Set of Interrogatories*

On July 31, 2018, Plaintiffs served their First Set of Interrogatories, requesting Defendant identify the "public keys and public addresses" for any cryptocurrency he currently or previously owned. ECF No. [91-2], at 8. Defendant objected to the discovery request as "irrelevant, grossly overbroad, unduly burdensome, harassing and oppressive, and not proportional to the needs of the case." ECF No. [91-2], at 14-19. The Defendant, however, did not object in his discovery responses that the information sought was impossible to produce. *See generally* ECF No. [91-2].

A discovery hearing to resolve these respective objections was scheduled before Judge Reinhart on February 20, 2019. ECF No. [90]. In the parties' Joint Discovery Memorandum, Defendant argued that the Plaintiffs' requests were disproportionate to the needs of the case because they sought all documents relating to any bitcoin transactions by him between 2009 and 2014. ECF No. [92], at 3-4. The Defendant represented, however, that he "stands ready to produce documents in his possession, custody, or control that relate to David [Kleiman], any trust in which David [Kleiman] was a trustee or beneficiary, and W&K Info Defense Research, LLC." *Id.* At the hearing, the Court directed the Plaintiffs to identify the starting date and seek production of Defendant's Bitcoin Holdings on that date, and then use the Bitcoin evidence trail to trace forward from there. ECF No. [123], at 120-123. The Defendant did not object in his discovery responses that the information sought was impossible to produce.

### b. *Plaintiffs' Second Set of Requests for Production*

On January 17, 2019, Plaintiffs served a Second Set of Requests for Production on Defendant. ECF No. [92-5], at 13-30. In Request No. 1 of the Second Set of Requests for Production (herein referred to as "Request No. 1") Plaintiffs sought "[a]ll documents or

919

Case No. 18-cv-80176-BLOOM/Reinhart

communications that provide and/or estimate the value of your cryptocurrency holdings. This includes, but is not limited to, loan applications, financial statements, tax returns, life insurance applications, financing agreements, sale papers, assignment contracts, etc." ECF No. [92-5], at 18. Defendant objected to Request No. 1 on relevance, over-breadth, harassment, and disproportionality grounds. ECF No. [114-1], at 5-7. Defendant again did not object in his discovery responses that the information sought was impossible to produce. *See generally id.*

Another discovery hearing was thereafter scheduled. ECF No. [104]. In the parties' pre-hearing Joint Discovery Memorandum, they indicated that Request No. 1 was still in dispute. ECF No. [109], at 7. The discovery hearing was held on March 6, 2019. ECF Nos. [110], [122]. At the hearing, the parties deferred the issues surrounding Request No. 1 to the next discovery hearing after the Plaintiffs represented that they were revising the scope of time referenced in Request No. 1. ECF No. [122], at 56-62. Defendant again did not argue that the information sought was impossible to produce. The Court scheduled another discovery hearing for March 14, 2019.

### c. *The March 14, 2019 Discovery Hearing*

In the Joint Discovery Memorandum for the March 14 discovery hearing, Plaintiffs represented that they had limited Request No. 1 to "produce any documents that existed as of 12/31/13 which estimate the value of Defendant's bitcoin holdings," arguing that such information was relevant to trace the assets of the alleged partnership between David Kleiman and Defendant. ECF No. [114], at 3. Defendant argued that the request was still "overly broad, unduly burdensome and harassing by seeking such personal financial information such as loan applications, financial statements, tax returns, life insurance applications, etc." *Id.* The Defendant did not object, however, that the discovery was impossible to produce. *See generally id.*

At the hearing the Plaintiffs argued that the information sought in Request No. 1 was

3

920

Case No.  18-cv-80176-BLOOM/Reinhart

necessary to establish the universe of bitcoin that was mined during the alleged partnership between David Kleiman and Defendant. ECF No. [124], at 18-19. Plaintiffs ultimately agreed that what they were seeking was "a listing of all the bitcoin that was owned [by Dr. Wright directly or indirectly] on December 31, 2013." *Id.* at 20:21-25. Plaintiff reiterated that "it's just an attempt to find the partnership's assets."  *Id.* at 19:7-8. At the hearing, the Defendant conceded that the information sought was relevant, but objected to its production on the basis of proportionality and potential undue burden. *Id.* at 21:6-10.

At that time, Defendant admitted that a list of public addresses would "identify Craig Wright as being the owner of those addresses, which sort of like opens the door to, you know, a lot of financial information, and without any evidence that all of those — or what portion of those David Kleiman had an interest in." *Id.* at 21:17-22. Based on this representation, the Court ruled that Plaintiffs were entitled to a list of Defendant's bitcoin holdings, but granted Defendant leave to file a motion for protective order based on undue burden. *Id.* at 22-23. At this hearing, the Defendant did not argue that the information sought was impossible to produce.

### d.  *Defendant's April 4, 2019 Deposition*

The Defendant was deposed on April 4, 2019. During his deposition, he testified that a trust called the Tulip Trust was formalized in 2011 ("Tulip Trust I"), but that Tulip Trust I never owned or possessed private keys to bitcoin addresses. ECF No. [270-1], at 22. Defendant also refused to answer questions about how much bitcoin he mined in 2009-2010. The parties raised this issue with Judge Reinhart, who deferred ruling on the issue. ECF No. [137], at ¶ 1 ("The request to compel Dr. Wright to disclose the amount of bitcoin he mined during 2009 and 2010 is denied without prejudice. The Court will revisit this issue after the parties brief whether production of a list of Dr. Wright's bitcoin ownership would be unduly burdensome.").

4

921

Case No.  18-cv-80176-BLOOM/Reinhart

###### e.  *April 11, 2019 Discovery Hearing*

Another discovery hearing was held on April 11, 2019. ECF No. [142]. During this hearing, Judge Reinhart required the Defendant file a motion for protective order regarding Plaintiffs' request for a list of his Bitcoin Holdings no later than April 19, 2019. ECF No. [146], at 38-39.

Pursuant to the Magistrate Judge's instructions, the Defendant timely filed a sealed motion. ECF No. [155]. In that Motion, the Defendant represented that he did "not have a complete list of the public addresses that he owned as of any date." *Id.* at 1. He also argued that the creation of such a list would be unduly burdensome. *Id.* Beyond identifying himself as the miner for the first 70 blocks of the bitcoin blockchain, and providing the public addresses for those blocks, the Defendant also claimed that he did not know any other bitcoin public addresses. *Id.* The Defendant represented that in 2011, he transferred ownership of all of his Bitcoin into a blind trust, of which he was not a trustee or a beneficiary. *Id.* at 2. Defendant also claimed that he did not "know any of the public addresses which hold any of the bitcoin in the blind trust . . . and cannot provide any other public addresses." *Id.* Thus, Defendant maintained that as of December 31, 2013, all of his bitcoin had already been transferred into the blind trust, and therefore are owned by the trusts, not the Defendant himself. *Id.*

Judge Reinhart denied the Defendant's Motion, finding Defendant's assertion that the production of a complete list of his public addresses he owned as of December 31, 2013 was unduly burdensome to be unsupported by the facts. ECF No. [166], at 2. The Court further stated that the Defendant "does not argue undue burden, he argues impossibility," and noted that "[t]he argument that Dr. Wright is incapable of providing an accurate listing of his current or historical bitcoin holdings was never presented in any of the prior hearings before this Court." *Id.* at 2-3.

922

Case No.  18-cv-80176-BLOOM/Reinhart

Judge Reinhart then ordered the Defendant provide (1) a sworn declaration identifying the name and location of the blind trust, the name and contact information for the current trustee and any past trustees and the names and contact information of any current or past beneficiaries; (2) a copy of any and all documents relating to the formation, administration, and operation of the blind trust, accompanied by a sworn declaration of authenticity; (3) all transactional records of the blind trust, including but not limited to any records reflecting the transfer of bitcoin into the blind trust in or about 2011, accompanied by a sworn declaration of authenticity; and (4) ordered the Defendant execute any and all documents, or other legal process, necessary to effectuate the release of documents in the possession, custody, or control of the trustee. *Id.* at 4.

In his attempts to comply with Judge Reinhart's Order, the Defendant provided a sworn declaration, in which he stated that he had met with his counsel and provided them "with additional details and clarity regarding trusts that I settled that hold or held Bitcoin that I mined or acquired on or before December 31, 2013." ECF No. [222], at ¶ 3. Defendant further affirmed that he had mined bitcoin in 2009 and 2010 directly into a trust in Panama, that there were no transactions related to that bitcoin, and that he later "transferred the encrypted files that control access to these Bitcoin in 2011, as explained below." *Id*. ¶ 4. In June 2011, the Defendant represented that he consolidated "the Bitcoin [] mined with Bitcoin that [he] acquired and other assets." *Id.* ¶ 5. Defendant claims that "[i]n October 2012, a formal trust document was executed, creating a trust whose corpus included the Bitcoin that [he] mined, acquired and would acquire in the future. The name of that trust is Tulip Trust. It was formed in the Seycelles [sic]." *Id.* Defendant then identified the trustees of Tulip Trust I as (1) COIN Ltd. UK,[1] (2) Uyen Nguyen, (3) Dr. Wright, (4) David

---

[1] Dr. Wright is the contact person for CO1N Ltd. UK.

6

923

Case No. 18-cv-80176-BLOOM/Reinhart

Kleiman, (5) Panopticrypt Pty. Ltd.,[2] and (7) Savannah Ltd.[3] *Id.* ¶ 6. Dr. Wright is the contact person for CO1N Ltd. UK. The contact person for Panopticrypt Pty. Ltd. is Defendant's wife. The contact person for Savannah Ltd. is Denis Mayaka. *Id.* ¶¶ 9-12. Defendant further affirmed that the beneficiaries of Tulip Trust I are Wright International Investments Ltd. and Tulip Trading Ltd. Defendant is the point of contact for both of the beneficiaries. *Id.* ¶¶ 13-14. Defendant then asserted for the first time that "[a]ccess to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin [] mined, requires myself and a combination of trustees referenced in Tulip Trust I to unlock based on a Shamir scheme." *Id.* at ¶ 23.

The Defendant's affidavit also outlined the structure of the second Tulip Trust ("Tulip Trust II"). Defendant admitted that he and his current wife are the beneficiaries to Tulip Trust II. *Id.* at ¶¶ 19-20. At that time, Defendant provided a limited number of documents related to the trust. According to the Plaintiffs, Defendant "produced two sworn statements, copies of various trust instruments, and a statement from the purported trustee re-attaching a trust instrument." ECF No. [210], at 3. The documents, however, apparently did not identify the specific bitcoin that were transferred into the blind trusts, nor did they indicate what the blind trusts have done with the bitcoin since their transfer. *Id.* Defendant claimed that he "produced trust formation documents along with a sworn declaration of authenticity," as well as "documents reflecting the use of bitcoin rights from the trust to support research and development by his Australian entities." ECF No. [211], at 3. Defendant did not produce any documents related to the administration and operation of the blind trust as ordered by the Court. *See* ECF No. [166]; ECF No. [197] at 4, fn 1.

### f. *Plaintiffs' Motion to Compel*

On June 3, 2019, Plaintiffs filed a Motion to Compel Defendant to Comply with this

---

[2] The contact person for Panopticript Pty. Ltd. is Dr. Wright's wife.
[3] The contact person for Savannah Ltd. is Denis Mayaka.

924

Case No.  18-cv-80176-BLOOM/Reinhart

Court's Orders Directing Him to Produce a List of the Bitcoins He Held as of December 31, 2013. ECF No. [197] (the "Motion to Compel"). In the Motion to Compel, Plaintiffs sought an order from the Court imposing sanctions under Federal Rule of Civil Procedure 37, and to order the Defendant to provide a sworn statement identifying the public addresses of the bitcoin transferred into the Tulip Trusts, to provide transactional records and communications relating to the trusts, and to sit for a renewed deposition. *Id.* at 6. Plaintiffs specifically requested that should the Defendant continue to refuse to comply with the Court's Orders, that the Court deem all of Dr. Wright's holdings in the Tulip Trust to be joint property belonging to both the Defendant and David Kleiman. ECF No. [210], at 6.

In his Response in Opposition to the Motion to Compel, Defendant conceded that he did not comply with the Court's Order. ECF No. [204]. However, for the first time, Defendant argued in these discovery proceedings that compliance with the Court's Order was "impossible." ECF No. [204]. Moreover, in this Response, Defendant claimed that information necessary to comply with the Court's Order was in Tulip Trust I in an encrypted file protected by a "Shamir's Secret Sharing Algorithm."[4] ECF No. [204], at 5. Defendant then represented that he could not decrypt the "outer level of encryption" because he did not have all of the necessary keys, and represented that the encryption keys needed were "distributed to multiple individuals through the [blind] trusts" and "he alone does not have ability to access the encrypted file and data contained in it." *Id.*

A held was hearing on June 11, 2019 on the Motion to Compel. ECF No. [221]. At the hearing, Plaintiffs' counsel presented the Court with the Defendant's earlier deposition where he denied ever putting bitcoin into a trust and denied putting any private keys into the Tulip Trust, which was contrary to the position the Defendant was now taking in his Opposition to the Motion

---

[4] An algorithm created by Adi Shamir to divide a secret, such as a private encryption key, into multiple parts. ECF No. [277], at 10.

Case No.  18-cv-80176-BLOOM/Reinhart

to Compel. ECF No. [221], at 8-9. The Court once again gave the Defendant an opportunity to "produce a complete list of all bitcoin that he mined prior to December 31, 2013," and entered an Order to Show Cause why it should not certify a contempt of court to the District Judge. ECF No. [217]. An evidentiary hearing was scheduled for June 28, 2019.

### g.  Evidentiary Hearing

On June 28, 2019, a two-day evidentiary hearing began before Magistrate Judge Reinhart. The Court heard from three witnesses (1) the Defendant, (2) Steven Coughlan a/k/a Steve Shadders, and (3) Dr. Matthew Edman. ECF Nos. [236], [264]. Plaintiffs also submitted excerpts from the depositions of Jonathan Warren and Dr. Wright. ECF Nos. [261], [270]. The Magistrate Judge also heard oral argument on August 26, 2019.

During the Defendant's testimony, the Defendant testified that it was impossible to comply with the Court's Orders regarding his Bitcoin Holdings due to the Shamir Scheme implemented related to the encrypted file. Defendant also claimed that he enlisted the now deceased David Kleiman to implement and carry out these safeguards. ECF No. [236], at 125:15-126:23.  He testified that to decrypt the outer most layer of the encryption he needed eight "key slices," of which he presently only has seven in his possession. Id. at 125. It was the Defendant's position that he simply could not produce a list of his Bitcoin Holdings even if he wanted to. Id. at 14:8-14. Judge Reinhart did not find the Defendant's testimony to be credible, and his testimony and demeanor did not impress Judge Reinhart as someone who was "telling the truth." ECF No. [277], at 19.

Steven Coughlan a/k/a Steve Shadders ("Shadders") testified as to his effort to apply the filter criteria to identify the Defendant's Bitcoin Holdings. Judge Reinhart found Shadders' testimony to be credible and worthy of belief. ECF No. [277], at 18. Judge Reinhart found that

9

926

Case No.  18-cv-80176-BLOOM/Reinhart

employing Shadders to identify the Bitcoin Holdings demonstrated a "good faith attempt" by the Defendant to comply with the Court's Order. However, Judge Reinhart found that this finding warranted little weight in light of the Defendant's conduct. *Id.* Finally, Matthew Edman testified about alleged alterations in the documents produced by the Defendant during discovery.

### h. *The Order on the Motion to Compel*

On August 27, 2019, Judge Reinhart issued his Order on Plaintiffs' Motion to Compel, ECF No. [277] (the "Order"). In the Order, he found that the Defendant had not met his burden of proving by a preponderance of the evidence that he was unable to comply with the Court's Order, and thus Rule 37 sanctions were warranted.[5] As one of those sanctions, the Magistrate Judge held that for the purposes of this action the following facts were deemed established:

> (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin;
>
> (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership;
>
> (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and
>
> (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

ECF No. [277], at 16 (herein referred to as the "Deemed Facts"). The Magistrate Judge also struck several of the Defendant's affirmative defenses, including: Third Affirmative Defense (Good

---

[5] The Court notes that although the Defendant was ordered to produce all documents related to the blind trust by May 9, 2019, ECF No. [166], the Defendant had still failed to timely produce all documents that he had in his possession as of the evidentiary hearing date. In fact, as late as January 6, 2020, it was the Plaintiff who advised the Court that the Defendant produced another document purportedly related to the blind trusts. ECF No. [369]. Plaintiffs advise that the Defendant has not provided any explanation as to the document's late disclosure. ECF No. [367]. At the status conference on January 9, 2020, Plaintiffs also called into question the document's authenticity.

927

Case No.  18-cv-80176-BLOOM/Reinhart

Faith); Fourth Affirmative Defense (Accord and Satisfaction); Fifth Affirmative Defense (Release); Sixth Affirmative Defense (Payment); Seventh Affirmative Defense (Set-off); Eighth Affirmative Defense (Failure to Mitigate Damages); Seventh [*sic*] Affirmative Defense (Waiver); and Tenth Affirmative Defense (Statute of Frauds). *Id.* (collectively referred to as the "Affirmative Defenses").

While Judge Reinhart found that there was clear and convincing evidence that would support a civil contempt certification, he determined that the sanctions imposed pursuant to Rule 37 and referenced above, were sufficient to sanction the Defendant for his conduct. *Id.* at 16. In exercising his discretion, Judge Reinhart, therefore, did not certify facts to this Court for civil contempt proceedings. *Id.* The Magistrate Judge also noted that while he found that the record evidence could support a civil contempt certification, he did not find the record evidence rose to the level of proof beyond a reasonable doubt needed to support a certification of facts for criminal contempt proceedings. *Id.* Judge Reinhart also awarded the Plaintiffs attorneys' fees associated with bringing the Motion to Compel. *Id.* at 28.

Defendant now appeals the Magistrate Judge's Order, arguing that there is "no basis" to impose any sanctions on the Defendant because his "uncontroverted" testimony evidences that he is unable to access the information sought by the Plaintiffs. *See generally* ECF No. [311]. Defendant characterizes the sanctions imposed by Judge Reinhart as "draconian" and argues that their imposition would violate his due process rights. *Id.* Finally, the Defendant argues that the factual findings made by the Magistrate Judge went far beyond the limited discovery issue that was before the Court.

928

Case No.  18-cv-80176-BLOOM/Reinhart

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(a) provides that upon the filing of objections to a magistrate judge's order regarding a non-dispositive matter, the district judge to whom the case is assigned shall consider such objections and modify or set aside any portion of the order found to be clearly erroneous or contrary to law. This is an extremely deferential standard of review, and this "high bar" is "rarely invoked." *Cox Enters., Inc. v. News-Journal Corp.*, 794 F.3d 1259, 1272 (11th Cir. 2015). The magistrate judge's orders should not be disturbed absent a clear abuse of discretion that leaves the reviewing court with the "definite and firm conviction that a mistake has been committed." *Linea Naviera de Cabotaje C.A. v. Mar Caribe de NevaGacion, C.A.*, 169 F. Supp. 2d 1341, 1355 (11th Cir. 2001).

## III.    DISCUSSION

In his Objection, the Defendant argues that there was no basis for the Magistrate's imposition of sanctions, and further that their imposition would violate his due process rights. *See generally id.* Defendant also contends that the Deemed Facts went far beyond the limited discovery issue before the Court. *See generally id.* Thus, the Defendant seeks an order from this Court reversing and vacating Judge Reinhart's Order. *Id.* Plaintiffs oppose the relief sought, claim that the record supports the sanctions imposed in Judge Reinhart's Order and their imposition was well within his discretion and authority. For the reasons that follow, the Defendant's Objection is sustained in part and overruled in part. The Magistrate Judge's Order is vacated in part.

The Court has the "inherent power to regulate litigation and sanction the parties ... for abusive practices." *Tarasewicz v. Royal Caribbean Cruises, Ltd.*, Case No. 14-CIV-60885-Bloom/Valle, 2016 WL 3944176, at * 4 (S.D. Fla. Feb. 9, 2016) (citations omitted) (report and recommendation adopted by *Tarasewicz*, 2016 WL 3944178 (S.D. Fla. March 17, 2016)). The

929

Case No.  18-cv-80176-BLOOM/Reinhart

Court's authority to impose sanctions must, however, be "exercised with restraint and discretion."

*Sahyers v. Prugh, Holliday & Karatinos, P.L.*, 560 F.3d 1241, 1244 (11th Cir. 2009) (citing

*Chambers v. NASCO, Inc.*, 111 S.Ct. 2123, 2132 (1991)).

Federal Rule of Civil Procedure 37 authorizes the Court to award attorneys' fees against a

party and/or the party's counsel as a sanction for certain discovery-related conduct. Thus, when a

party refuses to participate in discovery, the court may issue an order compelling the party to

disclose. Fed. R. Civ. P. 37(a). If a party then disobeys the court's order, more severe sanctions

are available. *See* Fed. R. Civ. P. 37(b)(2). Federal Rule of Civil Procedure 37(b)(2) states in

relevant part:

> (2) Sanctions Sought in the District Where the Action Is Pending.
> (A) For Not Obeying a Discovery Order. If a party or a party's
> officer, director, or managing agent--or a witness designated under
> Rule 30(b)(6) or 31(a)(4)--fails to obey an order to provide or permit
> discovery, including an order under Rule 26(f), 35, or 37(a), the
> court where the action is pending may issue further just orders. They
> may include the following:
> (i) directing that the matters embraced in the order or other
> designated facts be taken as established for purposes of the action,
> as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing
> designated claims or defenses, or from introducing designated
> matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order
> except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37 (b)(2). "These sanctions 'are intended to 1) compensate the court and parties for

the added expenses caused by discovery abuses, 2) compel discovery, 3) deter others from

engaging in similar conduct, and 4) penalize the offending party or attorney.'" *Thornton v. Hosp.*

*Mgmt. Assocs., Inc.*, 787 F. App'x 634, 638 (11th Cir. 2019) (citing *Wouters v. Martin County*, 9

13

930

Case No. 18-cv-80176-BLOOM/Reinhart

F.3d 924, 933 (11th Cir. 1993)). District courts possess wide discretion over the discovery process and when discovery sanctions are appropriate. *Dude v. Cong. Plaza, LLC,* 17-80522-CIV, 2018 WL 4203888, at *5 (S.D. Fla. July 20, 2018), *report and recommendation adopted sub nom. Dude v. Cong. Plaza. LLC,* 17-CV-80522, 2018 WL 4203886 (S.D. Fla. Aug. 29, 2018). "The severe sanctions permitted by Rule 37(b) are usually only imposed by district courts upon a finding '(1) that the party's failure to comply with the order was willful or a result of bad faith, (2) the party seeking sanctions was prejudiced by the violation, and (3) a lesser sanction would fail to adequately punish and be inadequate to ensure compliance with court orders.'" *Id.* (citations omitted).

### a. The Defendant's Conduct Warrants Sanctions

In his Objection, the Defendant first argues that there is "absolutely no basis" to impose any sanctions on the Defendant because his "uncontroverted" testimony evidences that he is unable to comply with the Court's Order. ECF No. [311], at 3. The Court first notes the obvious novelty of this argument. Indeed, the Defendant testified that the now deceased David Kleiman was the only person he is aware of who knew who else controlled the Shamir key slices. ECF No. [236], at 126:20-23. Therefore, the only testimony that could conceivably rebut the Defendant's testimony is from one who is deceased. A fact of which the Defendant is fully aware.

Additionally, the sole evidence put forward to establish the Defendant's claim of impossibility, his own testimony, was found not to be credible by Judge Reinhart.[6] *See* ECF No. [277] ("I completely reject Dr. Wright's testimony about the alleged Tulip Trust, the alleged

---

[6] Defendant also takes issue with the Order's "attack" on his character. In his Objection, the Defendant argues that the Magistrate Judge's character determinations should have no bearing on whether he is able to produce the list of Bitcoin Holdings. ECF No. [311], at 13. As the judge presiding over the Evidentiary Hearing, it was entirely proper for the Court to consider the entire record, the Defendant's prior statements and whether there were any inconsistencies with his present testimony, and the Defendant's conduct in evaluating the Defendant's credibility. Therefore, these determinations by the Magistrate Judge are relevant to the extent that they relate to whether the Magistrate Judge believed the Defendant to be credible.

14

931

Case No.  18-cv-80176-BLOOM/Reinhart

encrypted file, and his inability to identify his bitcoin holdings . . . During his testimony, Dr. Wright's demeanor did not impress me as someone who was telling the truth."). This Court is not required to rehear witness testimony in accepting a Magistrate Judge's credibility findings. *See United States v. Cofield*, 272 F.3d 1303, 1305–06 (11th Cir. 2001) (citing *United States v. Raddatz*, 447 U.S. 667 (1980)). The Court has also reviewed the transcripts from the Evidentiary Hearing held by Judge Reinhart and agrees with his credibility findings relating to Defendant. Indeed, in answering opposing counsel's questions, the Defendant was evasive, refused to give and interpret words in their very basic meanings, was combative, and became defensive when confronted with previous inconsistencies.[7]

    Second, even if the Court believed the Defendant's testimony that it is impossible to comply with the Magistrate Judge's Order, he has still failed to satisfy his burden that he has made "in good faith *all* reasonable efforts to comply." *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976). It is undisputed that the Defendant has failed to produce a list of his Bitcoin Holdings and has failed to comply with the Magistrate Judge's discovery order. Therefore, it was the Defendant's burden to introduce evidence not only that it was impossible to comply, but that he had made all reasonable efforts to comply. While the Court notes that the Defendant did present evidence of a single good faith attempt to comply with the Order—his recruitment of Shadders to apply the filter criteria to the public blockchain–such does not demonstrate that the Defendant made *all* reasonable efforts to comply. Indeed, the Defendant admitted during the Evidentiary Hearing that he had not even "looked" at the encrypted file. *See* ECF No. [236], at 124:12-16 ("A. I haven't looked at the file. No one asked me to look at the file. Q. You were ordered to produce the addresses; is that correct? A. Um, yes, but this is not the addresses.").

---

[7] The Defendant also argues that the Magistrate Judge improperly relied on hearsay evidence in issuing his ruling. ECF No. [311], at 23-25. The Court rejects this argument.

Case No. 18-cv-80176-BLOOM/Reinhart

Notably, the Defendant admitted in his November 25, 2019 Objection that he did not even turn over the encrypted file to the Plaintiffs until August 27, 2019—the day the Magistrate Judge issued his Order on the Motion to Compel. *See* ECF No. [311], at 17. The Defendant cannot in good faith contend that he made all reasonable efforts to comply, where throughout the entirety of these proceedings, he failed to even look at the encrypted file he maintains prohibits his compliance.

Next, the Court notes the obvious. Given the posture and the amount of effort expended by the parties on this discovery issue, even if the Court were to find the Defendant's assertion that the information sought was impossible to obtain, sanctions would still be warranted. Defendant had a continued duty to advise the Court if compliance with its orders was not possible. Pursuant to Federal Rule of Civil Procedure 37(c) the Court may award sanctions where a party fails to disclosure or supplement an earlier response given throughout the discovery process. Rule 37 (c) states in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c). Federal Rule of Civil Procedure 37(c) "provides the consequences for a party's failure to disclose, pursuant to the requirements of Rule 26." *Nance v. Ricoh Elecs, Inc.*, 381 Fed. Appx. 919, 922 (11th Cir. 2010). Because, under Rule 26(e)(1)(A), supplementation of

933

Case No. 18-cv-80176-BLOOM/Reinhart

incorrect responses is required, the obligation to supplement pertinent information continues throughout the case.

Here, Plaintiffs first requested that the Defendant identify the public addresses for any of his cryptocurrency in their First Set of Interrogatories served on July 26, 2018. ECF No. [92-2], at 8. ("[i]dentify the . . . public addresses for any cryptocurrency that . . .you possess the private keys to."). The request was later reasserted as Request No. 1 of Plaintiffs' Second Request for Production. ECF No. [92-5], at 18. The Defendant's argument that compliance with the Court's discovery orders was impossible, however, completely ignores the fact that the Defendant did not even raise this issue with the Court until the filing of his Response in Opposition to the Motion to Compel in June 2019. *See* ECF No. [211].[8]

Further, the Defendant explicitly testified at the Evidentiary Hearing that he had been aware that he could not generate the list of Bitcoin Holdings throughout the entirety of the discovery proceedings on this specific issue:

> Q. Until at least 2020, you have no ability to get to these files, is that what your testimony is?
> A. Yes, Your Honor.
> Q. Okay. And so you knew that fact on February 19th of this year, correct?
> A. Yes.
> Q. You knew that on March 14th of this year, correct?
> A. Yes.
> Q. And you knew that on April 8th of this year?
> A. Yes.

---

[8] The Court also notes that Federal Rule of Civil Procedure 34(b)(2)(C) requires that objections to discovery specifically state the basis that the discovery is being withheld. *See* Fed. R. Civ. P. 24(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest."). Further, it is possible for an objection to be waived if it is not timely raised by the party withholding the discovery. *Bailey v. City of Daytona Beach Shores*, 286 F.R.D. 625, 628 (M.D. Fla. 2012) (finding a party has waived a relevance objection where it was not initially asserted); *Bank of Mongolia v. M & P Glob. Fin. Servs., Inc.*, 258 F.R.D. 514, 518 (S.D. Fla. 2009) (holding a defendants' untimely objections were waived).

934

Case No.  18-cv-80176-BLOOM/Reinhart

ECF No. [236], at 127:5-14. Therefore, the Defendant readily admits that he knew it was "impossible" to comply with the Court's discovery order but chose not to notify the Court or the parties of this fact. Rather, the Defendant wasted both time and resources litigating this issue for the past seven months.

Rule 37 provides in pertinent part that, "[i]f the motion [to compel] is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5) (emphasis added). However, "the court must not order this payment if ... (i) the movant filed the motion before attempting in good faith to obtain the disclosure of discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.* Nothing in the record demonstrates, however, that the Defendant's non-disclosure was substantially justified.

Accordingly, the Defendant cannot in good faith argue that there is "absolutely no basis" to issue sanctions against him. Discovery is meant to ensure that the parties have fair and timely access to the documents and facts needed to litigate their case. The Defendant has willfully obstructed this process. Accordingly, the Court agrees with Judge Reinhart's Order that attorneys' fees are warranted in this case. As to the award of attorneys' fees against the Defendant related to filing and litigating the Motion to Compel, the Order is affirmed.

### b.  *The Deemed Facts and the Striking of Defendant's Affirmative Defenses*

In his Objection, the Defendant also argues that the imposition of the Deemed Facts as a sanction violated the Defendant's due process rights and exceeded the Magistrate Judge's

18

935

Case No.  18-cv-80176-BLOOM/Reinhart

jurisdiction and authority for resolving a limited discovery issue. ECF No. [311], at 8. After a close review of the record revolving around the discovery issue at the center of these proceedings—the list of Defendant's Bitcoin Holdings—and a review of the sanctions imposed, the Court agrees with the Defendant that this sanction was improperly imposed.

The broad discretion of the district court to manage its affairs is governed, of course, by the most fundamental safeguard of fairness: the Due Process Clause of the Fifth Amendment. *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 708 (1982). "To comply with the Due Process Clause, a court must impose sanctions that are both 'just' and 'specifically related to the particular 'claim' which was at issue in the order to provide discovery.'" *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1151 (11th Cir. 2006).

In *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, the Eleventh Circuit Court of Appeals reversed the lower court's order in part, finding that the district had erred where it struck the defendant's affirmative defenses, and there was "no nexus" between the documents the district court ordered be produced in its discovery orders and the court's sanction striking the defendant's affirmative defenses. *Serra Chevrolet, Inc.,* 446 F.3d at 1152. There the Eleventh Circuit found that the defenses struck by the district court had no apparent relationship with the discovery abuse. *Id.*

As it relates to the Deemed Facts imposed by the Magistrate Judge in his Order, the Court agrees with the Defendant that those facts are not specifically related to the particular discovery abuse at issue. The discovery issue pending before the Magistrate Judge was the production of a list of the Defendant's Bitcoin Holdings on December 31, 2013. ECF No. [124], at 19-20; ECF No. [92-5], at 8. Moreover, the Magistrate Judge determined that the failure to provide the discovery and the Defendant's false testimony were relevant to the issue of sanctions. The Deemed

Case No.  18-cv-80176-BLOOM/Reinhart

Facts, however, are aimed at establishing the partnership that is alleged to have existed between David Kleiman and the Defendant and the determination of that partnership's property:

> (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin;

> (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership;

> (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and

> (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

ECF No. [277], at 16. The Magistrate Judge noted that "the Court was ordering Dr. Wright to produce evidence to document the existence and extent of his bitcoin holdings, so that Plaintiffs could attempt to trace them through the master blockchain." *See* ECF No. [277] at 25. However, even if this Court were to permit the Deemed Facts to remain established, the discovery abuse remains "uncured" because the amount of bitcoin owned by the Defendant remains unknown, or at the very least, still at issue. Because the Court finds that the Deemed Facts do not specifically relate to the discovery issue that was pending before the Magistrate Judge, the Court agrees that the Deemed Facts imposed as a sanction was not proper.

Further, because the Court agrees with the Defendant that the Deemed Facts are improper, the striking of the affirmative defenses as a sanction must also be set aside. In his Order, the Magistrate Judge solely indicated that he was striking the Affirmative Defenses in order "[t]o conform to these established facts." ECF No. [277], at 16. Because the Court finds that the Deemed Facts were improper, it cannot permit the striking of affirmative defenses premised on the conformity of a sanction set aside.

Case No.  18-cv-80176-BLOOM/Reinhart

Accordingly, the Order is vacated in part, to the extent that it sought to impose sanctions, which included the establishing of the Deemed Facts, and the striking of the Defendant's Affirmative Defenses.

Defendant also argues that there is no basis to impose sanctions because there is no record evidence that Plaintiffs have suffered any prejudice. ECF No. [311], at 11. Specifically, the Defendant argues that the Plaintiffs' inability to trace the Bitcoin is insufficient to establish prejudice. *Id.* Sanctions permitted by Rule 37(b) "are usually only imposed" when "the party seeking sanctions was prejudiced by the violation." *Dude v. Cong. Plaza*, LLC, 2018 WL 4203888, at *5 (S.D. Fla. 2018), *report and recommendation adopted*, *Dude v. Cong. Plaza. LLC*, 2018 WL 4203886 (S.D. Fla. 2018) (citations omitted);

Here, the Court has no doubt that the Plaintiffs were prejudiced by the Defendant's antics. It is clear to the Court that the Defendant's conduct was anything but substantially justified or harmless. Defendant's conduct delayed and obstructed the discovery process of this case, wasted valuable time and resources in litigating this issue, and prevented the Plaintiff from obtaining evidence that the Magistrate Judge found relevant to the Plaintiffs' claims. Therefore, the Court rejects the Defendants' argument that no prejudice has been suffered by the Plaintiffs as a result of the Defendant's conduct. Such argument is entirely devoid of merit.

Finally, the Defendant argues that at minimum he "should have been afforded the opportunity to wait until [the date the bonded courier is set to come] to see if he receives the key slices to generate the list of his bitcoin holdings, which he could then provide to plaintiffs." ECF No. [311], at 13.  Defendant contends that in the event this occurs, "even plaintiffs would have to concede that Dr. Wright's inability to do the impossible and comply with the discovery order caused them absolutely no prejudice." *Id.* Given the Defendant's many inconsistencies and

938

Case No. 18-cv-80176-BLOOM/Reinhart

misstatements, the Court questions whether it is remotely plausible that the mysterious "bonded courier" is going to arrive, yet alone that he will arrive in January 2020 as the Defendant now contends. However, given that the Defendant maintains that he should at least be afforded this opportunity, the Court will indulge him this much.

In light of the Defendant's representations that the bonded courier is scheduled to arrive in January 2020, the Court will permit the Defendant **through and including February 3, 2020**, to file a notice with the Court indicating whether or not this mysterious figure has appeared from the shadows and whether the Defendant now has access to the last key slice needed to unlock the encrypted file. In the event this occurs, and further if the Defendant produces his list of Bitcoin Holdings as ordered by the Magistrate Judge, then this Court will not impose any additional sanctions other than the ones discussed above.

In the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information, which the Court has already founded directly relevant to their claims, the Court finds additional sanctions would be warranted. Specifically, pursuant Rule 37(c)(1)(B), the Court will inform the jury of the Defendant's failure to disclose the information sought by the Plaintiffs. *See* Fed. R. Civ. P. 37(c)(1)(B). The Court will also extend the discovery period, upon motion by the Plaintiffs, in order to permit the Plaintiffs to conduct additional discovery beyond the presently set discovery cutoff period. Additionally, the Court will consider any renewed discovery requests that the Plaintiff may have.

**IV.   CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Order, **ECF No. [277]**, is **AFFIRMED IN PART AND REVERSED IN PART**. The Order is **VACATED** solely as it relates to the imposition of the

22

939

Case No.  18-cv-80176-BLOOM/Reinhart

Deemed Facts and Striking of the Defendant's Affirmative Defenses. The Order is

**AFFIRMED** as it relates to the award of reasonable attorneys' fees and costs

against the Defendant related to litigation surrounding the Motion to Compel.

2.  Defendant's Objection, **ECF No. [311]**, is **SUSTAINED IN PART AND**

**OVERRULED IN PART** as articulated in this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida on January 10, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

The Honorable Bruce E. Reinhart

Counsel of Record

23

940

# TAB 376

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 9:18-cv-80176**

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,
and W&K INFO DEFENSE RESEARCH,
LLC

       Plaintiffs,

v.

CRAIG WRIGHT,

       Defendant.

_____/

**CRAIG WRIGHT'S NOTICE OF COMPLIANCE**
**WITH COURT'S JANUARY 10, 2020 ORDER**

Dr. Craig Wright files this Notice of Compliance with this Court's Order dated January

10, 2020 [D.E. 373]. Specifically, Dr. Wright notifies the Court that a third party has provided

the necessary information and key slice to unlock the encrypted file, and Dr. Wright has

produced a list of his bitcoin holdings, as ordered by the Magistrate Judge, to plaintiffs today.

Dated: January 14, 2020

                                    **RIVERO MESTRE LLP**

                                    *Attorneys for Craig Wright*
                                    2525 Ponce de León Blvd., Suite 1000
                                    Miami, Florida 33134
                                    Telephone:  (305) 445-2500
                                    Facsimile:   (305) 445-2505
                                    E-mail: arivero@riveromestre.com
                                    E-mail: amcgovern@riveromestre.com
                                    E-mail: zmarkoe@riveromestre.com
                                    E-mail: zkass@riveromestre.com
                                    Secondary: receptionist@riveromestre.com

941

By: <u>s/ Andres Rivero</u>
ANDRES RIVERO
Florida Bar NO. 613819
AMANDA MCGOVERN
Florida Bar No. 964263

**<u>CERTIFICATE OF SERVICE</u>**

   I certify that on January 14, 2020, I served this document on all counsel of record by email.

         _ <u>/s/Amanda McGovern</u>
          AMANDA MCGOVERN

2

942

# TAB 488-17

LYNN CARROLL WRIGHT                              January 13, 2020

08:38:02

```
              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                 ~~~~~~~~~~~~~~~~~~~~


     IRA KLEIMAN, as the personal    ) CASE NO.:
     representative of the Estate     )
     of David Kleiman, and W&K Info   ) 9:18-cv-8016-BB/BR
     Defense Research, LLC            )
                                      )
                  Plaintiffs,         )
                                      )
                                      )
     v.                               )
                                      )
                                      )
     CRAIG WRIGHT                     )
                                      )
                  Defendant.          )
     _____)



           VIDEOTAPED DEPOSITION OF MS LYNN CARROLL WRIGHT



     ON:          Monday, January 13, 2020

     AT:          8.57am (Australian Eastern Daylight Savings
                  Time)


     TAKEN AT:    95 Woodview Avenue,
                  Lisarow, NSW, 2250


     COURT REPORTER:   Sally Hicks, JP
```

LYNN CARROLL WRIGHT                              January 13, 2020

```
  1                      A-P-P-E-A-R-A-N-C-E-S

  2        ON BEHALF OF THE PLAINTIFFS:

  3               ROCHE FREEDMAN LLP
                  185 WYTHE AVENUE
  4               BROOKLYN, NY11249
                  PH:  +1 716 348-6003
  5
           BY:    MR KYLE W. ROCHE
  6
                  BOIES SCHILLER FLEXNER LLP
  7               100 SE 2ND STREET, SUITE 2800
                  MIAMI, FLORIDA 33131
  8               PH:  +1 305 539-8400

  9        BY:    MR ANDREW S.  BRENNER

 10
           ON BEHALF OF THE DEFENDANT:
 11
                  RIVERO MESTRE LLP
 12               2525 PONCE DE LEON BOULEVARD,
                  SUITE 1000,
 13               MIAMI, FLORIDA 33134
                  +1 305 445-2500
 14
           BY:    MS ZAHARAH R. MARKOE
 15

 16

 17        ALSO PRESENT:

 18               (IN AUSTRALIA)
                  Mr Wayne Matthews, Videographer
 19               Ms Sati Nagra (Solicitor) King & Wood Mallesons
                  Mr Nathan Sexton (Solicitor) Piper Alderman
 20
                  (IN THE USA)
 21               Mr Joe Delich (with Mr Kyle Roche)
                  Ms Amanda McGovern (with Ms Zaharah Markoe)
 22

 23

 24

 25
```

LYNN CARROLL WRIGHT                                    January 13, 2020

| | |
|---|---|
| 1 | **WITNESS INDEX** |
| 2 | Deponent            Examined by          Page |
| 3 | Lynn Carroll Wright   Ms Zaharah Markoe      6 |
|   |                      Mr Kyle Roche         40 |
| 4 |                      Ms Zaharah Markoe    138 |
| 5 | |
|   | **E X H I B I T   I N D E X** |
| 6 | |
|   | No.        Description                      Page |
| 7 | |
| 8 | 1    Series of emails dated February 15, 2015    10 |
|   |      commencing with Bates stamp DEF_00009663 |
| 9 | 2    Email dated February March 24, 2014         13 |
|   |      commencing with Bates stamp DEFAUS_00706832 |
| 10 | |
| 11 | 3    Agreed Property Settlement and Terms        22 |
|    |      commencing with Bates stamp DEFAUS_01518187 |
| 12 | 4    Plaintiffs' Cross-Notice of Taking Video    85 |
|    |      Deposition Duces Tecum (not Bates stamped) |
| 13 | |
| 14 | 5    Series of emails dated April 20 2015        86 |
|    |      Bates stamp DEFAUS_00640897 |
| 15 | 6    Affidavit of Lynn Wright dated November 5,   93 |
|    |      2013 commencing with Bates stamp |
| 16 |      DEFAUS_01070641 |
| 17 | 7    Agreement between Craig Steven Wright and   101 |
|    |      Carroll Lynn Wright dated June 30, 2009 |
| 18 |      (Bates stamp reference not provided) |
| 19 | 8    Email dated October 23, 2013 commencing     109 |
|    |      with Bates stamp ending 75974 |
| 20 | |
| 21 | 9    Paper titled "How can the Australian Tax    109 |
|    |      Office benefit from Bitcoin Currency?" |
|    |      commencing with Bates stamp ending 75975 |
| 22 | |
| 23 | 10   Series of emails dated October 18, 2011     113 |
|    |      and October 19, 2011 commencing with |
|    |      Bates stamp ending 01210717 |
| 24 | |
| 25 | 11   Series of emails dated February 4, 2014     119 |
|    |      commencing with Bates stamp ending |
|    |      01559220 |

*Epiq*
*Suite 204, Level 2, 105 Pitt Street, Sydney, NSW 2000*
*Phone: Int + 61-2-92253500*

945

LYNN CARROLL WRIGHT                                January 13, 2020

```
 1
        12      Email dated November 21, 2011,              121
 2              Bates stamped DEFAUS_00698432

 3      13      Sale Agreement between Information Defense   131
                Pty Ltd and Lynn Wright/Cloudcroft Pty Ltd
 4              commencing with Bates stamp ending 01212940

 5      14      Letter from Lynn Wright to the Australian    138
                Taxation Office dated March 22, 2011
 6              commencing with Bates stamp DEFAUS_01559250

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Epiq*
*Suite 204, Level 2, 105 Pitt Street, Sydney, NSW 2000*
*Phone: Int + 61-2-92253500*

946

Appendix.

Signed for Lynn Wright                                    Signed for Craig Wright

*Lynn Wright mBA*

Witness:

Michael Shehadie (Solicitor)

```
EXHIBIT
   3
Jan 13, 2020
```

Page 2 of 2
Agreed Property settlement and terms
June 2011

CONFIDENTIAL
                                          DEFAUS_01518187

947

Appendix.

| The following documents the agreed property split for the Family law settlement between Craig and Lynn Wright | |
|---|---|
| **Lynn Wright** | **Craig Wright** |
| Cloudcroft Pty Ltd | |
| Cloudcroft Pty Ltd<br>• Business of Information Defense PL<br>• All income<br>• Craig Wright to work on loan with no repayment before Jan 2013<br>• Craig Wright to provide Training and consulting<br>• Use of GreyFog IP | Craig Wright to provide services (at rate) to Cloudcroft for 2 years<br><br>ALL IP to remain with Craig Wright.<br>Cloudcroft to retain a right to use existing IP |
| W&K Information Defense LLC | |
| 50% of shares from Craig Wright | Existing shares to be split and divided – 50% to go to Lynn Wright |
| Other | |
| Wine collection | Rydal Glasses |
| Intellectual Property | |
| Lynn Wright will have rights to use IP needed for Cloudcroft and associated with Information Defense PL for 5 years. | Craig Wright is to maintain and retain ownership of any and all IP developed by or with himself including (but not limited to):<br>• Spyder<br>• Blacknet<br>• Greyfog<br>• Security and risk<br>• Bitcoin<br>• University Studies |
| | Any and ALL Bitcoin, private keys, trusts and software associated with Bitcoin. |
| Household | |
| First choice at Lisarow | First Choice at 51 Cownagarra Rd |
| Property – to remain with existing split | |
| Lynn Wright to maintain property | Craig Wright to pay for rates and mortgage |
| Personal Items | |
| No change to ownership | No change to ownership |
| Conditions | |
| • If either party dies, becomes incapacitated or bankrupt, the other will retain rights to either the Real property, company, IP or both. | |
| Loan | |
| Lynn Wright is to repay Craig Wright for the time and services to Cloudcroft in full starting in Jan 2013 at an agreed rate from the profit derived in this company. | The property mortgage will be used for Cloudcroft and the funding of this business. The payments will be made under loan by Craig Wright until the company is in a position to complete and repay this arrangement. |
| A formal property settlement may be drafted to formalise these agreed terms but may not materially alter this agreement. | |

Page 1 of **2**
Agreed Property settlement and terms
June 2011

CONFIDENTIAL                                                                                           DEFAUS_01518188

948

# TAB 510

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative | CASE NO.:  9:18-cv-80176-BB/BR
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC,

     *Plaintiffs,*

v.

CRAIG WRIGHT,

     *Defendant.*

_____

**PLAINTIFFS' OMNIBUS MOTION IN LIMINE**

1

949

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................... 3

II.    LEGAL STANDARD ........................................................................................... 3

III.    ARGUMENT ........................................................................................................ 4

MIL #1:    To exclude testimony about Ira Kleiman's sibling-relationship with his    brother Dave 4

MIL #2:    To preclude Dr. Wright from contradicting judicially admitted documents ................... 7

MIL #3:    Preclude Defendant from selectively claiming his computers were hacked or   his documents were forged .......................................................................................... 12

MIL #4:    Preclude Defendant's use of late disclosed documents ...................................... 17

MIL #5:    Preclude Dr. Wright from stating that Dave Kleiman committed suicide ...................... 20

MIL #6:    Preclude Dr. Wright from presenting evidence or testimony regarding Dave's drug use and social habits ......................................................................................... 21

MIL #7:    Exclude testimony or references to Dr. Wright's childhood trauma .............................. 21

CONCLUSION .......................................................................................................... 22

950

I.      **INTRODUCTION**

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs move *in limine* to exclude reference or introduction of the following 7 issues:

1.  Evidence or testimony related to Ira and Dave Kleiman's sibling relationship;

2.  Evidence or testimony that would contradict Defendant's prior judicial admissions;

3.  Selective and *ad hoc* claims by Defendant that his computers were "hacked" or that his documents were forged;

4.  Defendant's use of untimely produced documents;

5.  Claims by Defendant that Dave Kleiman committed suicide;

6.  Evidence or testimony related to Dave Kleiman's social habits and alleged drug use;

7.  Evidence or testimony related to Dr. Wright's alleged childhood trauma.

II.     **LEGAL STANDARD**

A motion *in limine* functions to "give the trial judge notice of a movant's position so as to avoid the introduction of damaging evidence, which may irretrievably affect the fairness of a trial." E.g., *Fagundez v. Louisville Ladder*, Inc., 2012 WL 253214, at *1 (S.D. Fla. Jan. 26, 2012). Accordingly, the utility of a motion *in limine* is to "present[] a pretrial issue of admissibility of evidence that is likely to arise at trial, and as such, the order, like any other interlocutory order, remains subject to reconsideration by the court throughout the trial." *Id*. (citing Schuler *v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 729 N.E. 2d 536, 246 Ill. Dec. 163 (Ill. App. Ct. 2000)); *Smith v. Royal Caribbean Cruises*, Ltd., 302 F.R.D. 688, 688-89 (S.D. Fla. Oct. 10, 2014). A trial court derives authority to rule *in limine* from its inherent power to manage trial and should exercise

3

951

that power where evidence is clearly inadmissible for any purpose. *Soto v. Geico Indem. Co*., 2014 WL 3644247 *1 (M.D. Fla. 2014).

### III.    <u>ARGUMENT</u>

**MIL #1:       To exclude testimony about Ira Kleiman's sibling-relationship with his brother Dave**

Plaintiff anticipates Defendant will attempt to introduce evidence or arguments regarding Ira Kleiman's ("Ira") relationship with his brother, Dave Kleiman ("Dave").[1] Specifically, Plaintiffs anticipate Defendant will seek to portray the brothers as estranged or otherwise not close. Defendant may also seek to introduce evidence Dave was adopted. But Ira's relationship with Dave (and the entire Kleiman family relationship) is essentially irrelevant to these proceedings.

Ira is a party to this suit as the Personal Representative of Dave Kleiman's Estate, not personally. In that capacity, Ira has a duty to marshal the Estate's assets. Finally, given Ira's admitted lack of first-hand, contemporaneous knowledge of almost all of the relevant facts that occurred during Dave's lifetime, any effort to portray their relationship in a negative light has minimal probative value and it substantially outweighed by the prejudice it would cause to Plaintiffs.

*Background*: Subsequent to Dave's death, and in accordance with Dave's will, Ira was appointed the personal representative of Dave's estate. In that capacity, Ira is "under a duty to settle and distribute the estate of the decedent" and do so for "the best interests of the estate." FL. Probate Code 733.602. Ira is doing exactly that – marshaling the Estate's assets – by bringing this action.

---

[1] Because they share the same last name, Plaintiffs are using Ira and Dave to differentiate between the two men.

With almost no exceptions, Ira does not have personal knowledge of the underlying facts in the case that occurred while his brother was alive.[2] Indeed, the facts about this case about which Ira has the most personal knowledge, namely his communications with Dr. Wright, all occurred after Dave died.  His ability to recollect and/or testify about those facts is wholly unrelated to his personal relationship with his late brother.

Notwithstanding these facts, Defendant has questioned Ira's personal relationship with his brother Dave on numerous occasions.  For example, at both of Ira's depositions,[3] Defendant's counsel asked Ira a number of questions such as:[4]

- If "it was fair to say that you weren't really close with Dave?"  [Apr., 107:16-17]

- "Were you close to Dave" [Jan. 9:3]

- Whether Ira visited Dave in the hospital [Apr., 28:8-16 & Jan., 12:2-6, 140:18-20] or at his house [Jan., 10:10, 23:6-17]

- The number of times Ira spoke to Dave while he was in the hospital [Apr., 28:8-16]

- How close Ira lived to Dave  [Apr., 51:2-17; Jan., 9:18-10:10]

- The last time Ira saw Dave  [Apr., 24:12-16; Jan. 141:2-6]

- Whether Ira discussed with Dave prior to his death that he would be appointed as personal representative of Dave's estate [Apr., 27:16-23]

- The amount of times Ira had seen Dave's alleged fiancé and her son and the amount of times Dave mentioned Ira to them [Jan. 10:14-11:4]

---

[2] The extent of Ira's personal knowledge of facts germane to this lawsuit while Dave was alive is largely limited to Ira and Dave's November 26, 2009 (Thanksgiving Day) dinner conversation where Dave said he was making "digital money" and was partnering with a "wealthy individual." See Compl. ¶58-61, Ira related this story to Dr. Wright in an email at the outset of their relationship and prior to their being any adversity between them.

[3] Ira was deposed in April 2019 and in January 2020.

[4] The following examples from Ira's April 2019 deposition are attached collectively hereto as Ex. 1 and examples from his January 2020 deposition are attached collectively hereto as Ex. 2.

953

Counsel also engaged in similar questioning regarding Ira's relationship with Dave in depositions with Dave's former business partners, Patrick Paige and Carter Conrad. *See* Paige Dep. Trn. 10:15-25, attached hereto as Ex. 3 ("Do you know if Ira Kleiman ever visited Dave in the hospital?"), 11:1-7 ("Do you think Dave was close to Ira Kleiman?"); Conrad Dep. Trn. 13:21-25, attached hereto as Ex. 4 ("Did you ever see Ira visit Dave at the hospital?"), 14:1-8 ("So [Dave and Ira] didn't have a good relationship?"). Defendant has also retained an expert to opine or, more accurately, speculate that the lack of visitation and support from friends and family may have contributed to the "uncontrolled infection" found at the time of Dave's death. Apr. 8 McIntyre Rep., at 3, attached hereto as Ex. 5.[5]

These lines of inquiry are clearly an attempt to paint Ira as an underserving Plaintiff because he was not close to his brother, didn't see him "enough," and therefore doesn't "deserve" the massive wealth his brother accumulated with Dr. Wright. However, this is not a wrongful death suit, and Ira is not seeking damages for the loss of his brother. Instead, Ira is fulfilling his legal obligation as Personal Representative to marshal the assets of Dave's estate. The fact that those monies will ultimately flow to Ira as a beneficiary of the estate does not put his relationship with his brother at issue. *See Erony v. Alza Corp.*, No. 94 CIV. 5413 (DC), 1996 WL 554612, at *2 (S.D.N.Y. Sept. 30, 1996) (excluding testimony about family relationship unless it was put at issue by plaintiffs).

Finally, even if there were some probative value to this evidence – there is none – it is substantially outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury. Fed. R. Evid. 403. Any reference or discussion of Ira's quality as a brother has the potential to influence the jury through an emotional, rather than legal, basis. *See* Fed. R. Evid.

---

[5] Dr. McIntryre's opinions are the subject of a separate Motion to Strike being filed concurrently with this Motion.

6

954

403, Advisory Comm. Note (1972) (in excluding evidence for unfair prejudice, the evidence must have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"); *Johnson v. Jennings*, 772 F. App'x 822, 826 (11th Cir. 2019) (stating that Rule 403 guards against making decisions on an emotional basis and finding that details of plaintiff's son's medical issues were unfairly prejudicial); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (finding that sexist comments were properly excluded as unfairly prejudicial because under Rule 403, "unfair prejudice means an undue tendency to suggest decision on….an emotional [basis]").

The only reason for Defendants to introduce such evidence would be to suggest to the jury that Ira was an absent sibling who abandoned his brother during Dave's time of need, and has only reappeared to claim Dave's fortune.[6] Such evidence would severely prejudice Plaintiffs in front of a jury that may make a decision in the case premised on how "good" of a brother Ira was or whether Ira "deserves" Dave's fortune – instead of basing their decision on the facts and merits of the case.

Because the harm done by allowing the foregoing testimony or evidence will not be erased from the minds of the jury by an objection or curative instruction, this testimony should be precluded in advance of trial.

**MIL #2:        To preclude Dr. Wright from contradicting judicially admitted documents**

Fed. R. Civ. P. Rule 8(b) requires defendants responding to a complaint to "admit or deny the allegation asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B). Once an allegation is admitted, "the general rule is that a party is bound by the admissions in his pleadings."

---

[6] As a factual matter, these insinuations are hurtful, wrong, and do not take into the account the complex and diverse way family relationship are shown and/or exhibited.

*Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009). "Judicial admissions are proof possessing the highest possible probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); see *Cooper*, 575 F.3d at 1177. Accordingly, courts routinely exclude evidence introduced to controvert a judicially-admitted fact. *See, e.g., Cooper*, 575 F.3d at 1177 ("[t]hese judicial admissions are binding, and the four appellants cannot now claim the exact opposite to be true"); *Johnson v. Publix Super Mkts., Inc.*, No. 10-cv-61100, 2012 WL 13001421, at *6 (S.D. Fla. Mar. 29, 2012) ("Further, the Court notes that it will not consider the facts that controvert Defendant's Admission in its Answer . . ."). This is consistent with "the theory of Rule 8(b) . . . that a defendant's pleading should apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established" *Wright & Miller*, 5 Fed. Prac. & Proc. Civ. § 1261 (3d ed.); *Mitchell v. Wright*, 154 F.2d 924, 926–27 (5th Cir. 1946).

In response to numerous allegations in Plaintiffs' Second Amended Complaint that reference or quote documents purportedly authored by or signed by Dr. Wright, his Amended Answer to Second Amended Complaint asserts[7]:

> The allegations in paragraph [X] of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

---

[7] ECF No. [87], ¶¶7 55, 63, 70, 74, 76, 77, 78, 81, 86, 87, 88, 91, 103, 104, 105, 106, 108, 109, 117, 118, 120, 123, 125, 126, 127, 133, 137, 143, 145, 146, 147, 151, 152, 153, 163, 164, 165, 169. The majority are as quoted, some replace the word "email" with "email chain" or "documents" and others make other modifications (*e.g.*, limited to sentence that references the document) that do not change the sum or substance of "the document speaks for itself."

8

Through these admissions, Dr. Wright has judicially admitted that each of the following documents "speaks for itself": **ECF Nos. [83-2]** (¶63); **[83-4]** (¶¶70, 76, 77, 121, 163-164); **[83-5]** (¶¶70, 74, 103, 105, 106, 109); **[83-6]** (¶¶70); **[83-7]** (¶¶74, 147); **[83-8]** (¶¶74, 81, 151-153); **[83-10]** (¶¶78, 104, 105, 108); **[83-11]** (¶¶78, 117-118, 125-127); **[83-13]** (¶¶87); **[83-14]** (¶¶88); **[83-15]** (¶¶91, 105); **[83-19]** (¶121); **[83-20]** (¶¶123, 145-146); **[83-23]** (¶133); **[83-24]** (¶137); **[83-26]** (¶143); **[83-27]** (¶143); **[83-28]** (¶143); **[83-30]** (¶77, 120, 169); **83-31** (¶86); **83-32** (¶55).

The Court should hold Craig to his admission that each document "speaks for itself." Common sense says that if a document says it is from Craig Wright, and that document speaks for itself, then that document is, indeed, from Craig Wright. *See Charleston v. Salon Secrets Day Spa, Inc.*, No. CIV.A. 08-5889, 2009 WL 1795529, at *1 (E.D. Pa. June 24, 2009) (party conceded that "speaks for itself" responses were "equivalent to an admission"). This is especially true since it's quite clear from the Second Amended Answer that Wright knows exactly how to question the authenticity of a document referenced or quoted in the Second Amended Complaint, or otherwise challenge the content of those documents. In fact, he did just that in his Amended Answer in several instances.

For example, in his response to ¶¶ 110, 131, 139, Wright states that "[t]he allegations . . . are based on uncertified, incomplete, unverified, and unreliable documents that were not legally obtained." Further, in ¶¶148, 154, and 155 Wright sated that the referenced articles "speak for themselves" but that he "does not adopt any statements" therein. Finally, in ¶¶ 75, 79, 82, 83, 84, Wright does not state that the document "speaks for itself" and instead claims they were based on "admittedly leaked and unauthenticated documents" that for some he claims "were not legally obtained."

9

957

Just as the Court "need not 'suspend reality or shelve common sense' in determining whether" a complaint meets jurisdictional requirements, it should not do so when construing the import of an answer. *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061–62 (11th Cir. 2010). No one would say a document "speaks for itself" if they truly believed a document had been fabricated from whole cloth by a malicious third party in an effort to frame them. Any other reading of Defendant's "speaks for itself" responses would allow him to do precisely what Rule 8 prohibits by enabling him to neither admit nor deny allegations about which he necessarily has personal knowledge sufficient to answer. *See Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1030 (C.C.P.A. 1982) ("An answer which attempts to evade the pleading requirements of Rule 8 by the tactic of an equivocal admission or denial is an admission"). As courts have explained, "[n]o reasonable party would deny an allegation describing an event on the basis that 'the events described in paragraph [x] speak for themselves.'" *FDIC v. Stovall*, No. 2:14-cv-00029, 2014 WL 8251465, at *12 (N.D. Ga. Oct. 2, 2014).

If Defendant had more to say about these documents, he should have denied the allegations. Instead, he opted to let those documents speak for themselves, and Plaintiffs ask the Court to hold him to that. *See In re Cotter*, No. 08-bk-12504, 2011 WL 5900811, at *8 (Bankr. D.N.J. Oct. 24, 2011) ("Thus, the Defendants' responses that the 'document speaks for itself' is deemed an admission as to the information in the document").

Despite these clear judicial admissions, Wright has impermissibly tried to walk them back throughout this proceeding. For example, for several of these documents, he has gone on to offer sworn testimony that the documents do not speak for themselves, and what purport to be emails from Wright, documents signed by him, or documents authored by him – are in fact not from him.

10

958

For example, 83-23, when "speaking for itself", says that it is an email from "Craig S. Wright" and reads indisputably as an email from Dr. Wright:

> Your son Dave **and I** are two of the three key people behind Bitcoin . . . **I** will explain . . . **I** do not seek anything other then to give you information . . . **I** will talk to you again soon . . . **I** will let you know much more of Dave. **I** will also help you recover what Dave owned. **I** will let you know when **I** am in the USA [signature block:] Dr. Craig S. Wright GSE LLM Chief Executive Officer Hotwire Preemptive Intelligence

Indeed, at Wright's first deposition, when asked "it says . . . your son Dave and I are two of the three key people behind Bitcoin. Did you write that," he responded "I typed that." Craig Wright Apr. 4, 2019 Dep. Trn., at 126:16-19, attached hereto as Ex. 6. But at his March 2020 deposition 1-year later, in response to "it says . . . your son Dave and I are two of the three key people behind Bitcoin . . . did you type that" he responded "no I did not". Craig Wright Mar. 16, 2020, Dep. Trn. 139:18-24[8], attached hereto as Ex. 7. Wright's March 2020 testimony is forbidden and must be excluded as it contradicts his judicial admission that the document "speaks for itself." *Best Canvas Prod. & Supplies, Inc.,* 713 F.2d at 621.

Similarly, 83-14, when speaking for itself says that it was an email that came from "Craig S Wright" to "Ira K." *Id.* Indeed, at Wright's April 2019 deposition he testified that he recognized this document as an "exchange of emails between you and Ira Kleiman." Craig Wright Apr. 4, 2020 Dep. Trn., at 315:2-6, attached hereto as Ex. 8. And in response to the question "can you read above that **your** response at March 1[st], 2014 at 3p.m." he stated "**Mine.** 'Around that. Minus what was needed for the company's use." *Id.* at 318:3-6 (emphasis added). But in March 2020, in response to "is this an exchange of emails between you and Ira Kleiman" he responded "No . . . I

---

[8] When asked about the changed position, Dr. Wright claimed that what he meant in April 2019 was that "[i]n discussions with my lawyers, I typed that exact sentence" but not that email. Craig Wright Mar. 16, 2020 Dep. Trn. 141:3-145:15, attached hereto as Ex.7.

11

959

did not send that e-mail." Craig Wright Mar. 18, 2020 Dep. Trn., at 95:13-25, attached hereto as Ex. 9. Wright's March 2020 testimony is forbidden and must be excluded as it contradicts his judicial admission that the document "speaks for itself." *Best Canvas Prod. & Supplies, Inc.,* 713 F.2d at 621.

There are other examples, but they are all along the same vein. Once Wright admitted that the document speaks for itself, he cannot later elect to speak for it and say, for example, that while it says that it came from me – it actually didn't, or while it bears my signature – it actually doesn't.

For these reasons Plaintiffs request an order precluding Wright from contradicting the plain meaning of the documents that come from him, were drafted by him, or were signed by him and which he judicially admitted, "speak for themselves" in his Answer. Specifically: **ECF Nos. [83-2]; [83-4]; [83-5]; [83-6]; [83-7]; [83-8]; [83-10]; [83-11]; [83-13]; [83-14]; [83-15]; [83-19]; [83-20]; [83-23]; [83-24]; [83-26]; [83-27]; [83-28]; [83-30]; [83-31]; [83-32]**.

**MIL #3:        Preclude Defendant from selectively claiming his computers were hacked or his documents were forged**

Our civil justice system is built around an expansive discovery process, designed to avoid "trial by ambush." *Waite v. All Acquisition Corp.*, No. 15-62359, 2016 WL 4433713, *3 (S.D. Fla. 2016) (recognizing that the Federal Rules were designed "specifically [to] guard against 'trial by ambush'"). Here, however, as he has done in many other parts of this case,[9] and despite his self-proclaimed reverence for the rule of law, Dr. Wright has turned that concept on its head. June 28 Evid. Hrg., at 27:19 -28:2, attached hereto as Ex. 10. ("Law is incredibly important to me…. I'm very focused on ensuring things fall within the rules, and if I'm ordered to do something by a valid court, and I can do it, I will do whatever I have to to do it").

---

[9] *See generally* Plf's Response to Def's Objection to Magistrate Judge [277] Order, ECF No. [333].

Although he's produced a large *volume* of documents, Dr, Wright has granted himself a "get of a jail free card."  To be more specific, Dr. Wright seeks to retain the right, at any time and for any reason, to claim that inconvenient documents (*i.e.* ones that contradict his defenses) are "hacked," "forged," or otherwise inauthentic. Dr. Wright's attempt to make a mockery of the justice system in this manner should not be permitted.[10]

The computer era has provided politicians, celebrities, and ne'er-do-wellers a convenient and easy to use excuse when confronted with digital evidence of their wrongdoing: "I was hacked." Consistent with the times, Dr. Wright intends to testify, on a self-serving and *ad hoc* basis, and without any meaningful evidentiary foundation beyond his word, that various documents— generally those that do not support his current version of events or contradict one of his various earlier versions of events—are the result of an alleged hacking scheme.  Dr. Wright has presented no specific or independent evidence of the individuals involved in the alleged hacking (beyond that he has "reasons to think" it was his "staff" and "other people"), and no forensic evidence showing that any hacking in fact occurred.  Mar. 16, 2020 Craig Wright Depo Trn., at 167:19-25, attached hereto as Ex. 11.

Plaintiffs have observed this tactic deployed in Wright's deposition multiple times. And Dr. Wright engaged in exactly this conduct at the evidentiary hearing in August 2019:

> When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence . . . While it is true that there was no direct evidence that Dr. Wright was responsible for alterations or falsification of documents, there is no evidence before the Court that anyone else had a motive to falsify them. As such, there is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.

---

[10]  For many of these documents. Dr. Wright has already admitted that they "speak for themselves" which necessarily includes the admission that they were authored by him. *See MIL #2, supra.*

ECF No. [277], at 20-21. Importantly, as noted by Judge Reinhart, "Dr. Wright does not write on a clean slate" here either. *Id.* at 20.

Similarly, Counsel for Dr. Wright's Australian companies terminated their representation due to forgeries he had submitted to the Australian Taxation Office ("ATO"). Specifically, in a June 2015 email from counsel to Ms. Watts (Wright's wife) he stated:

> Set out below is a sample of the information the ATO has. They have significantly more material than this . . . you can see the differences between the ATO's records and the records in your submission. The differences are intended to support the position Craig wanted to advance. In each case the "supportive" wording does not appear on the ATO version of the emails but only the version of the emails contained in [your] submission . . . this is extremely serious. I understand [people] ha[ve] been in touch regarding obtaining future representation for Craig to assist him with these matters. You will understand why I and Clayton Utz can no longer act. I urge the company to seek appropriate advice and Craig to seek separate advice in relation to these allegations by the ATO . . .

DEF_01894962 (attached hereto as Ex. 12). Two days letter Clayton Utz sent a formal termination letter stating:

> "information has been provided to our firm which raises serious questions about the integrity of documents provide by Dr. Craig Wright, both to our office and to the Australian Taxation Office. We believe this information to be credible. In these circumstances, we can no longer represent DeMorgan . . .

DEFAUS_01868823 (attached hereto as Ex. 13).

As this Court has observed, Wright does not hesitate to commit perjury in open Court. ECF No. [420], at 6 ("I have previously found that Dr. Wright gave perjured testimony in my presence."); *See* ECF No. [265] ("Unfortunately, the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court."). Given this lack of integrity, Plaintiffs go into trial not knowing which of the hundreds of thousands of documents Dr. Wright has produced, he will suddenly and without warning, disavow as the result of hacking, forgery, or whatever else he comes up with.

The potential for trial by ambush is perhaps best illustrated by Dr. Wright's latest gambit regarding his signature on key documents. Specifically, he has retained a handwriting expert to opine that his signature, on documents he produced from his own files, that he submitted to the ATO in support of his positions there, and that he swore bore his signature and handwriting at deposition, are forgeries. *See also* Plf's *Daubert* Motion to Strike Expert F. Harley Norwitch.

In fact, the only theme that seems to tie together the hacking and forging claims by Dr. Wright is that it only seems to apply to documents that contradict his most recent story about this case. And even that is difficult to predict because Dr. Wright's theories of the case have not been a paragon of consistency. For example, Defendant has tried to get this case dismissed based on any alleged lack of jurisdiction based on the membership in Plaintiff W&K. However, Dr. Wright has taken every different possible position on the "facts" of this issue. As this Court observed:

> This is not the first time that the Defendant has made certain representations regarding the membership of W&K. Indeed, the Court notes that the Defendant has made *several conflicting statements* regarding even his own ownership of W&K. ECF No. [256], at 29:24-25 ("Judge, I get that there are a number of different statements by Dr. Wright.")
>
> These statements include:
>
> On *April 2, 2013*, the Defendant signed a contract, representing that Dave Kleiman is **100% owner** of W&K, which was filed before the Supreme Court of New South Wales. ECF No. [83-5], at 1.
>
> On or about *July and August of 2013*, the Defendant filed a sworn affidavit in the Supreme Court of New South Wales declaring that he and Dave Kleiman each **owned 50%** of W&K. ECF No. [83-4], at 4.
>
> On *April 16, 2018*, in a sworn affidavit the Defendant stated that he has "**never** been a member of W&K." ECF No. [12-2], at ¶ 12 (emphasis added).
>
> On *June 28, 2019*, during his deposition the Defendant testified under oath that he has "**no idea**" who the owners of W&K were, and unequivocally stated that he was not an owner of W&K. *See* ECF No. [242-1], at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

15

963

> Now, in his Motion and contrary to the statements above, the Defendant argues that three additional parties may be members of W&K. Defendant claims that the record evidence supports the presence of the additional members.

ECF No. [265]. What Defendant appears poised to do with his "hacking" and "forgery" defenses will turn the trial of this case into a sham.

Defendant claims to be a world-renowned expert in computers. If his "hacking" claims were anything other than a sham to avoid responsibility for documentary evidence that contradicts his defenses in this case, he would have come forward with forensic evidence that his computers were "hacked." Indeed, he has retained computer experts, but none were asked to examine *his* devices to substantiate his hacking claims. *See* Chambers Rep., at 5, attached hereto as Ex.14 (asked to inspect all of Dave Kleiman's devices and identify any evidence of formatting, new file creations or modifications, and the impact of any such activity); *see also* Madura Rep., at 3, attached hereto as Ex. 15 (opining on whether Dave Kleiman had the "requisite skills and experience to have written the original Bitcoin core software"). Instead, on an *ad hoc* basis, without warning, and with no support other than his word, Dr. Wright wants to be allowed to inject the idea of "hacking" into this trial to discount the damning evidence against him that he himself produced. This should not be allowed. *See United States v. Finley*, 1:11-CR-04, 2017 WL 3495345, at *7 (W.D. Pa. Aug. 15, 2017) (defendant's "theory of various possible complex unseen computer hacking scenarios resulting in an intrusion into his computer . . . is a completely unsupported speculative allegation."); *see also Cohen v. Porsche Cars N. Am., Inc*., 2:19-CV-05530 AFM, 2019 WL 6700941, at *2 (C.D. Cal. Dec. 6, 2019) (holding that unsupported allegations of "hacking" were insufficient to state a claim for relief where plaintiffs failed to "specify how the 'hacking' took place, in what way [the hacked] device was defective, . . . when

16

964

and where the hacking took place and do not refer to any technical analysis that supports their assertion of hacking.").

A party that is willing to do anything, and say anything, to win is a threat to the civil justice system itself. *See Leor Exploration and Production, LLC. v. Aguiar*, 2010 WL 3782195 at *4 (S.D. Fla. 2010) (upholding terminating sanctions where a party had crossed the line between "wanting to win" and "doing anything, whether legal or not, to win"). To allow Dr. Wright's "hacking" and forgery gambits to proceed is a threat to the integrity of the system. *See Perna v. Electronic Data Systems, Corp.*, 916 F. Supp. 388, 397 (D. N.J. 1995) ("courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system").

Accordingly, Plaintiffs request that Dr. Wright be precluded from claiming his computers were "hacked" or that his signatures were forged. In the alternative, to avoid a trial by ambush, Plaintiffs request that Dr. Wright be compelled to disclose, at least 30 days before trial, all documents he has produced that he claims are the result of hacking, are forged, or are otherwise inauthentic, with a detailed and sworn explanation for who, how, when, and why this hacking occurred.

**MIL #4:          Preclude Defendant's use of late disclosed documents**

Defendant produced almost 2000 pages of documents *after* both his deposition and expert discovery cutoff. Defendant should either be (i) precluded from using them at trial or (ii) be required to sit for an additional deposition so Plaintiffs may explore the newly disclosed information, after which Plaintiffs should be entitled to update their expert disclosures if necessary.

Defendant's deposition took place on March 16 and 18. Parties were required to disclose all expert reports by April 10 and rebuttal reports by April 17, with all fact and expert discovery

closed by May 1. ECF No. [441]. In between the completion of Defendant's deposition and the close of discovery, Defendant produced three additional productions: (i) 6 pages of documents on March 25; (ii) 749 pages on April 6; and (iii) 1099 pages on April 24.

The documents produced appear relevant to major issues in this case. The productions include lists and data associated with of thousands of mined bitcoin blocks and accounting records for Wright International Investments Ltd., invoices for Information Defense Pty Ltd., intellectual property invoices for Bitcoin Database rights, and sales records for a company called Malaysian Global. Many of the documents purportedly date back to 2009, a highly relevant time period in this case given its proximity to the original creation of the Bitcoin protocol. Notably, the production appears to include purchase and transfer records for nearly 1.25 million bitcoin from sources that have not been previously disclosed, including records related to bitcoin that was mined shortly after the inception of the Bitcoin protocol.

Despite the limited amount of time since the documents were produced, Plaintiffs have already identified significant red flags. As just one example, Defendant's counsel represented that these materials were "directly from the MYOB cloud/internet environment and not from any device that was collected," and provided by Defendant "after he regained access to the online account to counsel in zip files who sent those files to AlixPartners." April 29, 2020 Email from Z. Markoe *re Prod. Delivery Notice*, attached hereto as Ex. 16. Yet the production included file types, such as "docx" that appear to be unsupported by MYOB's export function, and metadata for many of the documents shows a different law firm, SCA Ontier—which represents Defendant and his wife—as the creator of the documents.

18

966



Because of the late production,[11] Plaintiffs are unable to use written and oral discovery to probe the documents' content and reliability. Given the Defendant's conduct to date, including a propensity to manipulate documents and mysteriously obtain new documents (which conveniently contain no metadata) that support his story, these late-disclosed documents certainly need to be explained by the Defendant and tested by Plaintiff's experts. Plaintiffs, unfortunately, cannot rule out the possibility that these documents were withheld by Dr. Wright (or just fabricated) in an attempt to prejudice Plaintiffs' trial preparation.

With the Defendant's deposition over, Plaintiffs have no opportunity to question the person most knowledgeable about the documents and the circumstances surrounding their production. Additionally, given the passing of expert deadlines, Plaintiffs cannot ask their experts to opine or supplement their reports in response.

Without remedy, Defendant's tardy disclosure will accomplish its intended effect and prejudice Plaintiff's ability to adequately prepare for trial. Courts can remedy such prejudice by excluding these documents from use by Defendant at trial or by ordering Defendant to sit for an additional deposition to fully explore the newly disclosed information. *Debose v. Broward Health*, 2009 WL 1410348, at *2 (S.D. Fla. May 20, 2009) (precluding defendants from using documents at trial that were disclosed after discovery deadlines and depositions); *In re Delta/AirTran Baggage*

---

[11] Plaintiffs recognize that Judge Reinhart ruled that the parties could produce documents up until the discovery cutoff. Jan. 2, 2020 Hrg. Trn., at 43:14-22, attached hereto as Ex. 17. However, there is no reason to believe that Judge Reinhart was giving Defendant blanket permission to hold relevant documents until after depositions and expert disclosures so as to sandbag plaintiffs before trial.

*Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1347 (N.D. Ga. 2012), modified sub nom. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 2012 WL 12952328 (N.D. Ga. July 18, 2012) (reopening discovery to allow plaintiffs to explore newly raised information where defendants produced relevant documents after discovery deadlines). Given that trial is less than two months away, and there is significant pre-trial work to be done, Plaintiffs respectfully request that this Court preclude Defendant from using documents he disclosed after his deposition. However, if the Court determines that the Defendant should be able to rely on these documents, Plaintiffs request the Court to compel Dr. Wright to sit for an additional 4-hour deposition.[12]

**MIL #5:      Preclude Dr. Wright from stating that Dave Kleiman committed suicide**

During Wright's March 2020 deposition he made the unsolicited, unsubstantiated, and provably wrong statement that Dave committed suicide. *See e.g.,* Mar. 18, 2020 Craig Wright Dep. Trn., at 16:11-15, attached hereto as Ex. 18 ("David Kleiman that is -- committed suicide a number of days before he was due and required under the contract to return the software and other payments").[13] This purposeful attempt to malign Dave's memory is irrelevant to the issues before the jury, is completely unsupported by the record, and is in fact directly contrary to the medical evidence. Specifically, after Dave's death, the Office of the District Medical Examiner for Palm Beach County issued an autopsy report for David Kleiman stating that the "CAUSE OF DEATH" was "CORONARY ARTERY DISEASE" and that the "MANNER OF DEATH" was

---

[12] To be sure, Plaintiff would need much less time with any other witness, but at each deposition, the Defendant is evasive, gives irrelevant answers, and needlessly wastes time.

[13] *See also*, attached collectively as Ex. 18, 104:23-25 ("Unfortunately, Mr. Kleiman committed suicide . . ."); 123:25-124:1 ("I know Dave committed suicide at that time, yes."); 200:12-13 ("It would not be a random occurrence when someone commits suicide it is still fate.").

20

968

"NATURAL." See D. Kleiman autopsy report, attached hereto as Ex. 19. Any evidence or testimony that Dave committed suicide should be excluded.

**MIL #6:    Preclude Dr. Wright from presenting evidence or testimony regarding Dave's drug use and social habits**

At Ira's April 2019 deposition, Dr. Wright's attorneys asked a number of questions relating to Dave's alleged drug use. Defendant should be precluded from introducing evidence relating to Dave's alleged drug use, as well as evidence regarding Dave's social habits, including Dave's dating life and any alleged tendency to visit strip clubs, as such evidence is irrelevant and, therefore, inadmissible. *See* Fed. R. Evid. 402. Moreover, even if such evidence were relevant, and it's not, it should be excluded on the basis that that it presents a danger of unfair prejudice that substantially outweighs its probative value. *See United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) (noting "the extreme potential for unfair prejudice flowing from evidence of drug use"); *Nobles v. Sushi Sake NMB, Inc.*, No. 17-cv-21828, 2018 WL 3235534, at *1-2 (S.D. Fla. July 2, 2018) (excluding evidence of defendant's drug use because it was "unduly prejudicial and its probative value [was] de minimis"); *Hall v. Mayor Aldermen of City of Savannah*, No. 4:03-cv-248, 2005 WL 8156263, at *1-2 (S.D. Ga. Oct. 5, 2005) (excluding evidence that defendant worked at a strip club as "too irrelevant and prejudicial under Rule 403").

**MIL #7:    Exclude testimony or references to Dr. Wright's childhood trauma**

Defendant may seek to introduce evidence about matters related to traumatic events that allegedly occurred during his childhood. Such matters are irrelevant to the issues of this case (which only involve Dr. Wright's actions during adulthood) and are highly prejudicial to Plaintiffs. Defendant's expert, Dr. Klin, who opined as to Dr. Wright's purported Autism

21

969

Spectrum Disorder and how it impacts his presentation in these proceedings, noted that Dr. Wright and his siblings were "exposed to, and experienced, traumatizing events attributed to his biological father, and subsequently, to one of his stepfathers." Klin Rep., at 4, attached hereto as Ex. 20.  In his deposition, Dr. Klin also described how Dr. Wright was "relentlessly bullied by others" and how he "could be observed [at the] playground alone, dressed as a ninja and playing as if he was the weirdest person in the world."  Klin Dep. Trn., at 238:5-15, attached hereto as Ex. 21.  Yet, Dr. Klin firmly stated that he is "absolutely not" opining that Dr. Wright's alleged trauma suffered during childhood "was the cause or a contributing cause to his autism."  Klin Dep. Trn., at 245:21-246:5, attached hereto as Ex. 22.

Matters related to Dr. Wright's suffering as a child have potential to influence the jury to make decisions based on sympathy rather than on the pertinent facts germane to the issues of this case.  Fed. R. Civ. P. 403; *Johnson v. Jennings*, 772 F. App'x 822, 826 (11th Cir. 2019) (stating that Rule 403 guards against making decisions on an emotion basis and finding that details of plaintiff's son's medical issues were unfairly prejudicial"); *See also* Plf's Motion *in limine* to exclude Ira and Dave's familial relationship *supra*. Such matters are irrelevant and highly prejudicial to Plaintiffs and should be excluded.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request the Court grant the motions *in limine* described herein.

970

### S.D. FLA. L.R. 7.1 CERTIFICATION

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Plaintiffs conferred with Defendant's

counsel regarding each of these Motions in Limine, and is informed that Defendant opposes the

relief sought herein.


Dated: May 8, 2020                              Respectfully submitted,

                                                /s/ Andrew S. Brenner
                                                Andrew S. Brenner, Esq.
                                                Florida Bar No. 978663
                                                **BOIES SCHILLER FLEXNER LLP**
                                                100 SE 2nd Street, Suite 2800
                                                Miami, Florida 33131
                                                abrenner@bsfllp.com

                                                Velvel (Devin) Freedman, Esq.
                                                Florida Bar No. 99762
                                                **ROCHE CYRULNIK FREEDMAN LLP**
                                                200 S. Biscayne Blvd, Suite 5500
                                                Miami, Florida  33131
                                                Telephone: (305) 357-3861
                                                vel@rcfllp.com
                                                nbermond@rcfllp.com

                                                Kyle W. Roche, Esq.
                                                Joseph M. Delich, Esq.
                                                *Admitted Pro Hac Vice*
                                                **ROCHE CYRULNIK FREEDMAN LLP**
                                                99 Park Avenue, Suite 1910
                                                New York City, NY 10016
                                                kyle@rcfllp.com
                                                jdelich@rcfllp.com

                                                *Counsel to Plaint.,f Ira Kleiman as Personal*
                                                *Representative cf the Estate cf David Kleiman*
                                                *and W&K Irfo Defense Research, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 8, 2020 a true and correct copy of the foregoing was

filed under Seal with CM/ECF, and served by E-mail to all counsel of record.

*s/ Andrew S. Brenner*
ANDREW S. BRENNER

24

972

# TAB 523

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

        plaintiffs,

v.                                                                                     **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

        defendant.

_____/

**DR. CRAIG WRIGHT'S OPPOSITION**
**TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE**

      In the Omnibus Motion in Limine (the "Motion"), plaintiffs ask this Court to exclude seven categories of evidence on the bases that: (1) the evidence is not relevant; (2) even if it were relevant, it is unfairly prejudicial; (3) it allegedly contradicts "judicially-admitted" facts; and (4) they were produced later in the discovery period than plaintiffs would have liked. Plaintiffs' attempt to exclude those seven categories of documents is little more than an attempt to whitewash Dave Kleiman's character and sanitize his actions. That evidence, however, is directly relevant to whether Dave, during a very turbulent period of time in his life in which he was: (1) in and out of the hospital; (2) abusing drugs; (3) exhibiting violent tendencies towards women; and (4) living a reckless lifestyle on the apparent verge of poverty while at the same time frequenting strip clubs, was simultaneously creating (and amassing a fortune for creating) one of the most technologically advanced, game-changing electronic or digital cash systems in the world. And evidence that during this time, through his death, Dave and Ira had a very acrimonious relationship, is directly relevant to the reason why Ira, Dave's estate's personal representative, haphazardly destroyed Dave's data and documents which, if plaintiffs' theory of this case is to be believed, could have contained the proof necessary for plaintiffs' claims, or more likely, contained just the opposite. To be sure, the Motion seeks to strip the context from some of the most probative evidence in this case. But facts do not, and cannot, exist in a vacuum and without context. And to allow plaintiffs to place them in that light by excluding these seven categories of evidence would allow them to

973

distort the truth. The Court should deny the Motion and address the admissibility of each category of evidence in the natural course at trial.

## LEGAL STANDARD

A motion in limine alters the normal conduct of a trial, in which a party offers evidence, to which the opposing party can acquiesce or object, at which point the court will decide, considering the context of the trial, whether the evidence should be admitted or excluded. Instead, a motion in limine asks a court to consider, out of context and in a vacuum, whether the evidence (which may or may not eventually be offered by a party) should be admitted. *See Roberts v. Charter Nat. Life Ins. Co.*, 105 F.R.D. 492 (S.D. Fla. 1985) ("Consideration of evidentiary rulings on an item by item, piecemeal basis is counter-productive to the effective administration of justice in a busy trial court. When these rulings are made at the time the exhibit is offered in evidence, the trial judge has the benefit of full development of all relevant facts constituting the introductory predicate for admission of the item or statement. Motions in limine rarely provide this factual background."). Accordingly, motions in limine are disfavored and should be granted sparingly. *Biscayne Cove Condo. Ass'n Inc. v. QBE Ins. Corp.*, 2013 WL 2646828, at *3 (S.D. Fla. 2013) (citation omitted) ("A motion in limine is traditionally disfavored because questions of admissibility should be dealt with at trial."). In fact, a court considering a motion in limine should, by default, deny it unless and until the movant can demonstrate that there is no possible ground on which the evidence could be admitted. *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010) ("In fairness to the parties and their ability to put on their case, a court should exclude evidence in limine only when it is clearly inadmissible on all potential grounds . . . [and the] movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground."). In other words, unless the movant can establish that there is no possible way the evidence could be admissible, the motion should be denied and the admissibility of the evidence determined at trial, in the ordinary course. *Salomon Constr. & Roofing Corp. v. James McHugh Constr. Co.*, 2019 WL 5256980, at *1 (S.D. Fla. 2019) ("Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.") (citing *In re Seroquel Prods. Liab. Litig.*, 2009 WL 260989, at *1 (M.D. Fla. 2009)).

Regardless of when the admissibility of the evidence is considered, under the Federal Rules of Evidence, relevant evidence is admissible, unless the opponent of that evidence can

2

974

establish that it meets very limited—and sparingly used—criteria for exclusion. *See AIM Recycling of Fla., LLC v. Metals USA, Inc.*, 2020 WL 236719, at *2 (S.D. Fla. 2020) (Bloom, J.) ("Evidence is admissible if relevant, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence.") (internal citations omitted). One of those narrowly-construed exceptions is Federal Rule of Evidence 403, under which a court may exclude otherwise admissible evidence "if its probative value is ***substantially*** outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence*." Id.* (citing Fed. R. Evid. 403) (emphasis added). But exclusion under Rule 403, being an exception to the default rule that relevant evidence is admissible, "is an extraordinary remedy which the district court should involve sparingly, and the balance should be struck in favor of admissibility." *Id.* (citing *United States v. Patrick*, 513 Fed. App'x 82, 886 (11th Cir. 2013)). "Rule 403's 'major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *AIM Recycling*, 2020 WL 236719, at *2 (quoting *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001)). Because plaintiffs have scarcely attempted to—and never could—meet their burden of "demonstrating that the evidence is inadmissible on any relevant ground," *Gonzalez*, 718 F. Supp. 2d at 1345, the Court should refuse to exclude the relevant evidence defendant intends on presenting at trial.

## DISCUSSION

The Motion raises seven categories of evidence that plaintiffs seek to have the Court preemptively exclude. Defendant addresses each category in turn.

### A.    The Court Should Not Find That Defendant's Answers Constituted a Judicial Admission

Plaintiffs first ask this Court to issue an order "precluding [Dr.] Wright from contradicting the plain meaning of the documents that come from him, were drafted by him, or were signed by him and which he judicially admitted, 'speak for themselves' in his Answer." Motion at 12. As a legal basis for this extremely broad and all-encompassing request, plaintiffs cite to the doctrine of judicial admissions. But such a statement cannot constitute a judicial admission, and even if it could, the admission does not go as far as plaintiffs suggest.

3

975

### 1.    The statement that a document "speaks for itself" cannot constitute a judicial admission

"A statement must be 'deliberate, clear, and unambiguous' to be considered a judicial admission." *In re Kattouah*, 452 B.R. 604, 608 (E.D. Mich. 2011) (citing *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)). "In order to satisfy these elements, the statement in context must amount to an express concession of a fact." *In re Kattouah*, 452 B.R. at 608 (citing *Robinson v. McNeil Consumer Healthcare*, 671 F.Supp.2d 975, 981–82 (N.D. Ill. 2009)). Stated differently, "[j]udicial admissions generally arise only from deliberate voluntary waivers that expressly concede for the purposes of trial the truth of an alleged fact." *United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975).

The statement that a "document speaks for itself" is not an "express concession of fact," nor is it a "deliberate voluntary waiver." *Serv. Source, Inc. v. Office Depot, Inc.*, 259 F. App'x 768, 772–73 (6th Cir. 2008) (finding that the defendant's statement that the document speaks for itself is "not the type that should be considered to be judicial admissions by a court."). This is because the statement that a "document speaks for itself" is ambiguous. *E.g. N. Ind. Metals v. Iowa Exp., Inc.*, 2008 WL 2756330, at *3 (N.D. Ind. 2008) ("Iowa Express' response that the document speaks for itself ***could either be interpreted as an admission or denial*** and does not directly respond to the allegations in the Complaint.") (emphasis added). And an ambiguous statement cannot serve as a basis for a judicial admission. *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972) ("To be binding, judicial admissions ***must be unequivocal***.) (emphasis added) (citing *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880)). As such, Dr. Wright's statement that the "document speaks for itself" cannot serve as a judicial admission.

Further, were there any doubt as to whether the statement that the "documents speak for themselves" constitutes a judicial admission (there isn't, because it doesn't), it should be resolved in defendant's favor. "Considerations of fairness and the policy of encouraging judicial admissions require that trial judges be given broad discretion to relieve parties from the consequences of judicial admission in appropriate cases." *Belculfine*, 527 F.2d at 944 (1st Cir. 1975) (citing *United States v. Cline*, 388 F.2d 294, 296 (4th Cir. 1968)); *accord Serv. Source, Inc.*, 259 F. App'x at 772–73. This is especially true in this case, where plaintiffs waited nearly a year and a half to raise this issue and assert that defendant is "attempt[ing] to evade the pleading requirements of Rule 8,"

4

976

(Motion at 10) and where plaintiffs' own conduct demonstrates that they did not consider defendant's statements to be judicial admissions.[1]

Plaintiffs should have raised any challenges that they had with defendant's answer many months ago, as required by the law. *See* Fed. R. Civ. P. 12(f) (providing a deadline to file a motion to strike either before responding to the allegedly deficient pleading or, if no response is allowed, within 21 days after being served with that pleading).[2] It simply is unfair for plaintiffs to sit on their hands for nearly a year and a half, wait until the time to amend the answer without leave of Court has long passed, wait until discovery has concluded, and then spring a gotcha on the eve of trial. Plaintiffs should have filed a timely motion to strike defendants' answer, at which point, the Court could have provided leave to amend under Rule 15's liberal amendment policy, were the Court persuaded by plaintiffs' arguments. *See Gulf Restoration Network v. U.S. Envtl. Prot. Agency*, 2018 WL 5297743, at *4 (E.D. La. 2018) (noting that the "liberal amendment policy of Rule 15 provides a safety valve that permits the district court to allow deviations from poorly framed denials when it seems appropriate to do so," and granting leave to amend an answer stating that a "document spoke for itself"); *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, 2015 WL 5730662, at *3 (N.D. Ind. 2015) (granting leave to amend responses that stated the "documents spoke for themselves"); *Do It Best Corp. v. Heinen Hardware, LLC*, 2013 WL 3421924, at *6 (N.D. Ind. 2013) (same). Plaintiffs' challenge is untimely and prejudicial to defendant.

Further, plaintiffs' conduct throughout discovery demonstrates that they never considered the statements that the "documents speak for themselves" to be judicial admissions. As noted in their own Motion, plaintiffs have questioned Dr. Wright on multiple occasions as to the authorship and contents of certain documents that "speak for themselves." Motion at 11 (relating how plaintiffs' counsel asked Dr. Wright who "wrote" or "typed" certain documents). Obviously, if Dr.

---

[1] Plaintiffs cite to *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1030 (C.C.P.A. 1982)), but that case dealt with a defendant who qualified his answer by stating it was "upon information and belief," not one that answered the "documents speak for themselves."

[2] Plaintiffs filed a motion to strike affirmative defenses to the second amendment complaint [D.E. 95]. While plaintiffs sought to have the Court strike defendant's fifth, sixth, eight, ninth, eleventh, and twelfth affirmative defenses, at no point did plaintiffs move to strike defendant's statements that "documents speak for themselves."

977

Wright judicially admitted the authenticity of those documents and the veracity of the statements contained within them, then there would have been no need for plaintiffs to ask those questions.

Finally, the cases that plaintiffs rely on in their Motion are easily distinguishable, and in many cases simply irrelevant, as they do not involve assertions that the "documents speak for themselves." Instead, the cases address clear and unambiguous statements, like: (1) the "principle place of business is in Florida," *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009); (2) that an action is "brought in the judicial district in which the cause of action arises," *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); or (3) that the plaintiffs applied for a job position. *Johnson v. Publix Super Markets, Inc.*, 2012 WL 13001421, at *6 (S.D. Fla. 2012). Accordingly, these cases are not helpful in determining whether an ambiguous statement that a "document speaks for itself" could be considered a judicial admission.[3]

While the remaining cases at least address the statement that the "document speaks for itself," they do not advance plaintiffs' position. In *FDIC v. Stovall*, 2014 WL 8251465, at *12 (N.D. Ga. 2014), the court actually found that "***the opposing party did not really admit anything***" by stating that a "document speaks for itself." (Emphasis added). This directly contradicts plaintiffs' position that such a statement is a judicial admission. In *Charleston v. Salon Secrets Day Spa, Inc.*, 2009 WL 1795529, at *1 (E.D. Pa., 2009), while the court found the statement that the "documents speak for themselves" to be the "equivalent of an admission," it only did so because the ***defendant conceded*** that it was an admission. Tellingly however, the *Charleston* court concluded that other rather ambiguous answers which defendant did not concede were admissions, such as that: (1) the averment was directed to another defendant; (2) it was without knowledge sufficient to form a belief as to the averment; or (3) no answer was required because it was merely a conclusion of law, were not deemed admissions. *Id.* Lastly, in *In re Cotter*, 2011 WL 5900811 (Bankr. D.N.J. 2011), the plaintiffs moved to strike an answer for failure to comply with Rule 8(b). In other words, the court was adjudicating the sufficiency of the defendant's response (*i.e.* whether there was a legally sufficient admission or denial). The court was not asked to, and did not, determine whether the statement was sufficiently clear and unambiguous to serve as a judicial

---

[3] Plaintiffs also cite to *Mitchell v. Wright*, 154 F.2d 924, 926–27 (5th Cir. 1946), but it is entirely unclear how that has any bearing on this case. In any event, it certainly does not deal with an answer that stated that the documents speak for themselves.

admission, which is what the plaintiffs ask the Court to do here. As noted above, courts that have addressed **this exact issue** have found that the statement that a "document speaks for itself" is "not the type that should be considered to be judicial admissions by a court." *Serv. Source, Inc.* 259 F. App'x at 772–73.

### 2. Even if the statement that a "document speaks for itself" could constitute a judicial admission (it can't), the admission does not go as far as plaintiffs suggest

As demonstrated above, the statement that a "document speaks for itself" cannot constitute a judicial admission. Yet, even if it could, the admission would not go as far as plaintiffs suggest. According to plaintiffs, by stating that the "document speaks for itself," defendant admitted that: (1) the document is authentic; (2) the content of the entire document is true; and (3) plaintiffs' interpretation of the "plain meaning" of the document controlled. Motion at 12. Plaintiffs go too far.

As an initial matter, defendant did not solely answer that the "documents speak for themselves." He further specified that he "denies any erroneous, incomplete, or out-of-context characterization of [the document], and any inaccurate inferences or conclusions derived from [the document]." Amended Answer to Second Amended Complaint [D.E. 87] ¶¶ 36, 55, 62, 63, 69, 70, 74, 76, 77, 78, 80, 81, 85, 86, 87, 88, 90, 91, 101, 103, 104, 105, 106, 107, 108, 109, 117, 118, 120, 121, 123, 125, 126, 127, 128, 129, 130, 133, 135, 136, 137, 139, 143, 144, 145, 146, 147, 148, 151, 152, 153, 154, 155, 156, 161, 163, 165, 167, 168, 169, and 220. In other words, defendant admitted that the words appear in the document that plaintiffs rely on, but did not (and does not) admit that plaintiffs' interpretation of those words is accurate, that the words in the document are true, or even that the document is authentic.

### 3. Were the Court inclined to consider any remedy, it should be to permit the defendant to amend his answer to the complaint

The remedy plaintiffs request is severe and would result in great prejudice to defendant. It would effectively prohibit him from testifying about emails and documents that plaintiffs maintain were drafted and sent by defendant. As a basis for this harsh remedy, plaintiffs exploit an admittedly ambiguous statement made by defendant in his answer, about which plaintiffs were silent for almost a year and a half.

Were the Court inclined to find that the statement that a "document speaks for itself" could be considered a judicial admission, then the just remedy would be to permit defendant to amend

979

his answer to further specify in detail what exactly he was admitting or denying. Plaintiffs will not be prejudiced by this amendment, because as demonstrated above, plaintiffs' conduct throughout discovery shows that they did not consider that statement to be an admission.

**B.    The Court Should Not Exclude Testimony Relating to the Hack of Defendant's Electronic Devices**

Plaintiffs next ask this Court to preclude defendant from stating that "his computers were 'hacked' or that his signatures were forged." Motion at 17. In the alternative, they ask the Court to compel defendant to "disclose, at least 30 days before trial, all documents that he has produced that he claims are the result of hacking, are forged, or otherwise inauthentic, with a detailed and sworn explanation for who, how, when, and why this hacking occurred." *Id.* Unsurprisingly, plaintiffs don't cite *even one case* that supports their extraordinary request.[4]

The purpose of a motion in limine is to permit the Court to rule on evidentiary objections in advance of trial. *See Salomon*, 2019 WL 5256980, at *1. Obviously, ***there needs to be an evidentiary basis to exclude the testimony***. Here, plaintiffs proffer none. Instead, plaintiffs unilaterally conclude that defendant's computers were not hacked and thus ask the Court to exclude testimony related to that "non-existent hack." But plaintiffs are not the determiner of fact. The jury is. Moreover, there is ample evidence to support defendant's testimony that he was hacked. ***First***, private and privileged communications that appear to be between defendant and his Australian counsel were obtained by a "hacker" and posted online. *See* https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692 (last accessed May 14, 2020).

***Second,*** plaintiffs' characterization that defendant is trying to "make a mockery of the justice system" by "testify[ing], on a self-serving and *ad hoc* basis, and without any meaningful evidentiary foundation beyond his word, that various documents . . . are the result of an alleged hacking scheme," Motion at 13, is both disingenuous and factually incorrect. As plaintiffs well know because they were produced by or to them long ago, there are many documents dating years

---

[4] While plaintiffs cite to two cases, neither of them remotely supports plaintiffs' position that this court should preclude defendant from introducing evidence that he was hacked. In *United States v. Finley*, 2017 WL 3495345, at *2 (W.D. Pa. 2017) the court ruled on a motion to vacate the defendant's conviction based on alleged ineffective assistance of counsel, and in *Cohen v. Porsche Cars N. Am., Inc.*, 2019 WL 6700941, at *2 (C.D. Cal. 2019) the court ruled on the sufficiency of a pleading. Neither of those cases dealt with whether a court should exclude relevant testimony in a motion in limine simply because it undermines plaintiffs' claims.

8

before this lawsuit began, discussing the hack of defendants' computers. *See, e.g.* email chain last dated Dec. 8, 2015 from C. Wright to S. Matthews and R. Watts, attached as **Exhibit A** (discussing hack of defendant's computers); email chain last dated Dec. 9, 2015 from P. Paige to K. Andreou, forwarding email from I. Kleiman to C. Wright, attached as **Exhibit B** (same). Defendant's hack is not an *ad hoc*, recent fabrication, but instead is a well-documented, years long issue that plaintiffs are intimately aware of.

*Third*, F. Harley Norwith, a forensic document examiner with over 40 years of experience, has provided an opinion that certain documents contain a forged version of defendant's signature. *See* Plaintiffs' Omnibus Daubert Motion to Strike Defense Experts, Ex. 11 [D.E. 509-11]. Presumably, one would not intentionally forge their own signature on a document and then retain that document in their possession. But a hacker who gained access to a computer system certainly could have placed that document there. Third, defendant is a high-profile figure in the bitcoin community and a prime target for hackers. Hacks and online attacks are part of the "bitcoin story," as Gavin Andresen testified in his deposition, which explained that Satoshi's email had been hacked that that defendant likely was as well. And J. Nguyen testified that ***even before plaintiffs brought this lawsuit***, defendant informed him that "someone hacked his company computers and tried to change documents." J. Nguyen Depo Tr. 137:3-15, attached as **Exhibit C**.[5]

In sum, plaintiffs have known for at least a year—and for much longer—that defendant was the victim of hacks[6] and thefts of documents and, they have had more than sufficient time to fully explore the contours of that hack during discovery.[7] It is for the jury to determine what weight to give to the ample evidence that defendant was hacked—not plaintiffs. *Teller v. Patten*, 61 U.S. 125, 127 (1857) ("It was the province of the jury to determine the weight of the evidence before them."); *Gunning v. Cooley*, 281 U.S. 90, 94 ("Issues that depend on the credibility of

---

[5] With respect to the citations to deposition transcripts in this opposition, the corresponding exhibits include the relevant excerpt from the transcript. Should the Court desire any additional portion of the transcript, defendant will file the requested portion. Citation to the deposition transcripts shall be [deponent] [page]:[line].

[6] As plaintiffs' note in their motion, defendant testified at the August 2019 hearing that he was hacked.

[7] In fact, ***it was plaintiffs that elicited the testimony from J. Nguyen that defendant was hacked***. Plaintiffs simply are not happy with the substance of his testimony. But that is not a valid basis to exclude it.

witnesses, and the effect or weight of evidence, are to be decided by the jury."). Plaintiffs' attempt to usurp the role of the jury is unwarranted, contrary to law, and should be denied.

**C.      The Court Should Not Exclude Testimony about Ira Kleiman's Relationship with his Brother Dave**

Plaintiffs next ask the Court to exclude any testimony regarding Ira's relationship with Dave. Motion at 4. According to plaintiffs, their relationship is "essentially irrelevant" (Motion at 4) and "the only reason for [sic] Defendants to introduce such evidence would be to suggest to the jury that Ira was an absent sibling who abandoned his brother during Dave's time of need, and has only reappeared to claim Dave's fortune." Motion at 7. In making that argument, plaintiffs ignore a key piece of evidence on which they rely.

Plaintiffs' entire case is premised on Dave allegedly co-inventing the bitcoin protocol, mining a fortune of bitcoin with defendant, and developing valuable bitcoin intellectual property with defendant. Yet discovery has revealed that Dave never said anything to his closest friends—including friends who visited him every day and family members that he lived with—to suggest that he invented the bitcoin protocol, mined any bitcoin, or developed bitcoin intellectual property. *See* P. Paige Depo. Tr. 12:1-8, attached as **Exhibit D**; C. Conrad Depo. Tr. 14:10-12; 17:21-24, attached as **Exhibit E**; and K. Andreou Depo Tr. 19:20-20:12. attached as **Exhibit F**. To address this inconvenient reality, plaintiffs appear intent on arguing that Dave's involvement in bitcoin was a "secret," and thus he was unable to share the details with his closest of friends and family. I. Kleiman January 13, 2020 Depo Tr. 13:20-17:12, attached as **Exhibit G**.

Yet at the same time, plaintiffs allege that at a 2009 Thanksgiving dinner, Dave and Ira had a conversation that just so happened to fill the evidentiary void. Ira claims that in that conversation:

A.  Dave told Ira that "he was working on "something bigger" than Facebook, that he was "creating his own money." D.E. 83 ¶ 58.

B.  Dave told Ira that "he was making 'digital money.'" *Id.* ¶ 60.

C.  Dave "opened his wallet, took out a business card, flipped it over, drew a 'B' with a line or two through it, and commented on how "we" were working on a logo." *Id.*

D.  Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. *Id.* At 61.

10

982

     E.  Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners. *Id.*

Importantly, that alleged conversation is ***the only evidence*** (apart from what comes from defendant—which plaintiffs argue is incredible and should be afforded no weight) that plaintiffs have to substantiate their claims. And that is why Ira's relationship with Dave is relevant, highly probative, and essential to defendant's defense of this case.

If Ira and Dave had a close relationship, then Ira's story about the 2009 Thanksgiving dinner could make sense. Sometimes people tell "secrets" to their best friends or close family members—even when they aren't supposed to. But if Ira and Dave were estranged, if Ira lived a ten-minute drive from Dave but never once visited Dave, and if Ira never visited Dave when he was sick in the VA, then it is less likely that Dave would have broken the "secret" and told Ira about his involvement in bitcoin, especially when Dave didn't say anything to the people who did visit him every day, and who were close friends and family members that lived with him.

Evidence of the brothers' acrimonious relationship also is directly relevant and highly probative with respect to Ira's motivation for deleting or destroying Dave's electronic devices and physical files after Dave's passing. Ira admitted to his "mistake" when defendant advised Dave's family that none of Dave's data or documents should be lost or destroyed. If, as defendant maintains and intends to demonstrate at trial, the brothers were estranged, that destroyed data could very well have revealed that Dave did not intend for Ira, as Dave's estate's representative, to have any claim against defendant, or that Dave in fact did not have any claim against defendant. Thus, in light of the supposed Thanksgiving conversation between the brothers, where Dave allegedly told Ira about bitcoin and Dave's role in developing it, the motivation behind Ira's admitted destruction of Dave's files, and Ira's actions with respect to Dave's property after his death are directly relevant to plaintiffs' claims in this action.

The evidence as to Ira's relationship with Dave (or lack thereof) is not a "matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983). And to the extent that there is any prejudicial effect, it is easily outweighed by the highly probative nature of this evidence. *United States v. Mills*, 704 F.2d 1553, 1560 (11th Cir. 1983) ("Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts

11

983

tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.").

**D.      The Court Should Not Preclude Defendant's Use of Timely-Disclosed Documents**

Plaintiffs ask this Court to either (1) exclude documents that defendant produced after his deposition and expert disclosures or (2) compel him to sit for another deposition regarding those documents. Motion at 20. As with many of plaintiffs' requests in the Motion, they fail to cite to any law or caselaw that would support this remedy. While plaintiffs cite two cases (Motion at 19-20), none are remotely similar to the issue in front of this Court. In *Debose v. Broward Health*, the defendant produced the documents almost two months after discovery concluded, three days before the pre-trial conference, and 17 days before the start of trial. 2009 WL 1410348, at \*2 (S.D. Fla. 2009). And in *In re Delta/AirTran Baggage Fee Antitrust Litig.* the defendant produced the documents nearly a year after the discovery deadline concluded. 846 F. Supp. 2d 1335, 1354 (N.D. Ga. 2012), *mod.fied sub nom. In re Delta/Airtran Baggage Fee Antitrust Litig.*, 2012 WL 12952328 (N.D. Ga. 2012). Here, defendant timely produced the documents before the close of discovery and well before the scheduled trial date.

Discovery closed on May 1, 2020, which, as plaintiffs acknowledge in their Motion, was the date by which all documents had to be produced. Motion at 19, n.11. Yet Plaintiffs complain that defendant produced 1,854 pages of documents in March and April of 2020. In doing so, they ignore the almost two million pages of documents that defendant produced prior to that date, and they ignore the fact that *plaintiffs were producing critical documents up until 2 hours and 21 minutes before the close of discovery*. *See* email from K. Roche to counsel for defendant dated May 1, 2020 at 9:38:41 p.m., attached as **Exhibit H** (sending documents that included a recorded conversation between Ira Kleiman and defendant in 2015). They also ignore the fact that plaintiffs produced more than sixty thousand pages of documents after their depositions. At bottom, this is a complex case and plaintiffs have served many expansive discovery requests. In fact, in response to plaintiffs' request that defendant produce all documents by a certain date, Judge Reinhart found: "Now, you have asked for a lot in this case, Mr. Freedman. I've given you a lot, but when you ask for a lot, don't complain that you got a lot." Hr. Tr. 43:20-22 (Jan. 2, 2020). Judge Reinhart then stated that the document production may continue until the close of discovery. *Id.* 43:10-19 ("That's what discovery means. Discovery closes on that date"). Defendant complied with that

order. It simply is not reasonable to expect defendant to have produced ever single document before his deposition.

Further, plaintiffs' allegation that the timing of defendant's production is part of an elaborate scheme to sandbag plaintiffs is baseless. Motion at 19, n.11. The existence of those files was no secret. Defendant told plaintiffs during his deposition that he had recently gained access to the files about which plaintiffs now complain: "We have access now to the Wright International Investment accounts from the period of 2009 on. As soon as I was told that those could be accessed, the access was granted and given to the forensic people that the lawyers mentioned, that my counsel have sort of hired." Dr. C. Wright March 18, 2020 Depo tr. 260:15-20, attached as **Exhibit I**. Counsel then asked defendant to elaborate: "Dr. Wright, you said 'accounts' here multiple times. What do you mean by you have access to the accounts?" *Id*. at 260:23-25. Defendant responded: "I mean the accounts, as in accounting software, general ledgers, balances, that sort of stuff." *Id*. at 261:1-3. Plaintiffs' counsel chose not to probe any further. Instead, counsel moved to other topics, such what company currently had the bitcoin: "You have no access to the actual Bitcoin—strike that.  Dr. Wright, where does the 800,000 and change Bitcoin you mined between 2009 and 2010 -- where is that currently? With what company?" *Id*. at 261:4-8.

Subsequent to that deposition, plaintiffs never followed up about the accounting records. Nor did they demand an immediate production. Nonetheless, defendant produced the documents on his own accord prior to the close of discovery. Plaintiffs now claim that those records are so important that they should have been produced earlier, and as a remedy, plaintiffs should able to re-depose defendant on those records or exclude them in their entirety.  Motion at 18 (arguing that "the document produced appear relevant to major issues in this case"). But plaintiffs prior silence belies that claim. In fact, one could argue that it is plaintiffs who are sandbagging defendant.

**E.    The Court Should Not Exclude Evidence Tending to Show that Dave Brought About His Own Death**

Next, plaintiffs ask that this Court to exclude "[a]ny evidence or testimony that Dave committed suicide." Motion at 21. In support, plaintiffs claim that such evidence is nothing more than a "purposeful attempt to malign Dave's memory" and that it is "irrelevant to the issues before the jury, is completely unsupported by the record, and is in fact directly contrary to the medical evidence." *Id*. at 20. According to plaintiffs, because Dave's autopsy report stated that the "cause of death" was "coronary artery disease" and that the "manner of death" was "natural," any

13

985

evidence that Dave's death was the result of his "self-directed injurious behavior with an intent to die as a result of the behavior,"[8] should be excluded.

Defendants intend to present evidence that on March 25, 2013, Dave was given a three-day pass by the VA hospital where he was being treated for a number of very serious medical conditions, including MRSA, which, as he knew, if left untreated (as it was subsequent to Dave's flight from the hospital) could (and unfortunately did) prove fatal. Dave's passing, while tragic, was not a sudden, unexpected event. Dave never returned to the VA hospital, did not return calls from the VA hospital and was deemed to have gone AWOL. *See* Dr. MacIntyre Report dated April 8, 2020. Plaintiffs' Omnibus Daubert Motion to Strike Defense Experts, Ex. 14 [D.E. 509-14]. The evidence defendant intends to present will show that it was not just the likely, but the unavoidable, result of Dave's discontinued treatment. "The law provides a rebuttable presumption that every man intends the natural and probable consequences of his own acts. *United States v. Wilkinson*, 460 F.2d 725, 730 (5th Cir. 1972). The evidence will show that Dave intended to end his own life by discontinuing his treatment. Nevertheless, in the month between Dave's life-ending decision to discontinue treatment and its inevitable result, Dave did nothing to distribute the fortune plaintiffs claims they were entitled to, nor to inform anyone, including his brother Ira, his estate's personal representative, of the keys necessary to access his bitcoin wallet. Given plaintiffs' claim that Dave was one of the architects of bitcoin, surely he would have known that without passing on those keys, which only he could have known about, his supposed fortune would have been lost forever at his death. Yet he chose to do nothing to transfer those keys or in any way preserve his assets. Dave's conscious decision to discontinue his medical treatment—the proximate cause of his death—without his arranging for the transfer of his bitcoin keys, is inconsistent with the state of mind of someone who allegedly obtained and owned hundreds of millions of dollars' worth of bitcoin. Thus, evidence of his decision to bring about his own death is relevant because it "has any tendency to make a fact"—in this case—that Dave was not a co-inventor of bitcoin and did not have a treasure trove of bitcoin that he intended to leave to his estate—"less probable than it would be without the evidence." Fed. R. Evid. 401(a). And plaintiffs have not even attempted to meet, let alone met, their heavy burden of proving that probative value of evidence of Dave's decision to discontinue his medical treatment is not "substantially outweighed by danger of . . .

---

[8] This is the National Center for Biotechnology Information's (a branch of the National Institutes of Health) definition of "suicide." https://www.ncbi.nlm.nih.gov/books/NBK137739/table/ch1.t1/.

unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Accordingly, the court should not grant the "extraordinary remedy" of excluding this evidence. *See AIM Recycling*, 2020 WL 236719, at *2.

### F.  The Court Should Not Exclude Evidence of Dave's Drug Use and Social Habits

Plaintiffs' next request is that the Court exclude "evidence relating to Dave's alleged drug use, as well as evidence regarding Dave's social habits, including Dave's dating life and any alleged tendency to visit strip clubs, as such evidence is irrelevant, and therefore, inadmissible." Motion at 21. Further, plaintiffs claim, even if that evidence were relevant, "it should be excluded on the basis that that [sic] it presents a danger of unfair prejudice that substantially outweighs its probative value." *Id*.

Throughout this litigation, plaintiffs have portrayed Dave as a focused, driven computer engineer, veteran, and law-and-order type of guy, who refused to cash in on the massive fortune he amassed through his bitcoin holdings in the hopes of further appreciation of those assets. In other words, plaintiffs have put Dave's habits at issue in this case. To the extent plaintiffs present evidence in their case about Dave's habits, defendant should have the right to present evidence tending to establish the Dave suffered from significant financial distress towards the end of his life, his history of being a spendthrift, along with substance abuse issues, and even domestic violence episodes, including incidents where he threw hot cooking oil on his girlfriend and threw a sharp knife at her with intent of causing severe harm.

With respect to plaintiffs' argument that such evidence "presents a danger of unfair prejudice that substantially outweighs its probative value," Motion at 21, plaintiffs have failed to meet their "burden of demonstrating that the evidence is inadmissible on any relevant ground." *Gonzalez*, 718 F. Supp. 2d at 1345. Thus, because plaintiffs have failed to establish that this "evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, 2009 WL 260989, at *1 (internal citation omitted).

In support of their argument, plaintiffs cite to inapposite cases. The first, *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) was a criminal case in which the court found that "[t]here was certainly no evidence that [a witness against whom evidence of prior drug use was excluded] was under the influence of drugs or alcohol [at the relevant time]." The Court went on

15

987

to note that "this Court has held that such evidence may properly be limited to 'specific instances of drug use during relevant periods of trial and the transaction charged in the indictment." *Id*. Here, the evidence defendant seeks to introduce regarding Dave's drug use and social habits is "during the relevant time,"—the period of time plaintiffs claim Dave was immersed in creating bitcoin and allegedly bitcoin and blockchain related intellectual property. Similarly, in *Nobles v. Sushi Sake MMB, Inc.*, an employment discrimination case, the court was asked to exclude "references to [plaintiff's] alleged drug use, any alleged drug sale, any alleged drug purchase and 'references to alleged prior arrests, detention, or prior interaction with law enforcement officers' on the grounds that such evidence would result in undue prejudice under Fed. R. Evid. 403." 2018 WL 3235534, at *1 (S.D. Fla. 2018). The court excluded the evidence only after noting that the plaintiff stated that "there is no evidence, beyond speculation by defense witnesses, that Plaintiff smoked marijuana at the restaurant, came to her shift after smoking marijuana, or otherwise violated Sushi Sake's substance policy." *Id*. In that light, the Court found that "any reference to the plaintiff's marijuana use is unduly prejudicial and its probative value is de minimis." *Id*. at *2. To the contrary, in this case, the probative value of the evidence directly contradicts plaintiffs' portrayal of Dave is highly probative as to whether he was in fact a co-developer of bitcoin, and is not based on pure speculation. And possible prejudice resulting from the evidence does not so substantially outweigh its probative value as to warrant exclusion.

Finally, in *Hall v. Mayor Aldermen of City of Savannah, GA*, a sexual harassment case, the extent of the court's discussion with respect to evidence regarding a strip club was that "[t]he Court agrees with the City . . . that evidence of [the plaintiff's supervisor]'s off-duty work at a lounge some thought to be a 'strip club' is too irrelevant and prejudicial under Rule 403. Thus, evidence is therefore excluded." 2005 WL 8156263, at *3 (S.D. Fla. 2005). Again, here, Dave's drug use and social and dating habits directly bear on not only the core issues in this case, but on plaintiffs' own portrayal of Dave. Thus, unlike in *Sellers, Nobles,* and *Hall*, the evidence is not only highly probative, but its prejudicial effect does not substantially outweigh that probative value. The Court should refuse to exclude this evidence.

16

988

### G. The Court Should Not Exclude Evidence of Defendant's Childhood Abuse and Trauma

Lastly, plaintiffs ask the Court to exclude evidence "about matters related to traumatic events that allegedly occurred during [defendant's] childhood" because "[s]uch matters are irrelevant to the issues of this case (which involve Dr. Wright's actions during adulthood) and are highly prejudicial to Plaintiffs." Motion at 21. Throughout this litigation, plaintiffs have constantly put defendant's character at issue, have focused on a number of alleged inconsistencies in statements he has made throughout the span of several years, and have pointed to defendant's distancing from bitcoin in 2010, all in professed support of their case. Defendant intends to offer evidence of the childhood trauma he suffered to place his character in context and explain his conduct, both before and during this litigation, including his disappearance as Satoshi Nakamoto in 2010, which was brought on by defendant's discovery that his creation—bitcoin—had been used to facilitate abuse similar to what he had suffered as a child. This evidence is highly probative and is not substantially outweighed by the potential prejudice to plaintiffs if it is allowed.

Plaintiffs cite a single case, *Johnson v. Jennings*, 772 Fed. Appx. 822 (11th Cir. 2019), for the proposition that "Rule 403 guards against making decisions on an emotion [sic] basis and finding that details of plaintiff's son's medical issues were unfairly prejudicial." Motion at 22. But the *Johnson* court did allow evidence of the plaintiff's son's medical condition; what the court held was properly excluded was further, cumulative and more detailed references to it:

> We cannot say the District Court committed a clear error of judgment in excluding the evidence on this basis. *Cf., e.g.*, Fed. R. Evid. 403 advisory committee's note to proposed rules (stating that Rule 403 guards against, among other things, 'decision on an improper basis, commonly, though not necessarily, an emotional one'). Defendants conceded that K.J. had a disability. And the district judge permitted reference to K.J.'s 'extraordinary gastrointestinal issues and frequent bathroom usage.' The evidentiary value of *further* references to K.J.'s stoma and to the details of her bathroom needs is slight, and the danger of unfair prejudice is great.

*Johnson*, 772 Fed. Appx. At 826 (emphasis in original). Here, defendant does not seek to introduce the kind of detailed and cumulative evidence regarding his childhood abuse and trauma—he merely intends to present evidence to meet plaintiffs' allegations and evidence regarding his character and behavior both before and during this litigation, including supposed inconsistent statements and his disappearance as Satoshi Nakamoto in 2010, all of which have

989

been put at issue by the plaintiffs, not by defendant. Thus, because the evidence is relevant and there is no risk of prejudice to plaintiffs, the Court should refuse to exclude it at this time.

### CONCLUSION

As discussed above, plaintiffs have not met their burden for obtaining the extraordinary relief of exclusion of the seven categories of evidence included in the Motion. The Court should deny the Motion and take up the admissibility of that evidence at trial.

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: amcgovern@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Amanda McGovern
AMANDA MCGOVERN
Florida Bar No. 964263
ANDRES RIVERO
Florida Bar No. 613819
SCHNEUR KASS
Florida Bar No. 100554

### CERTIFICATE OF SERVICE

I certify that on May 22, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/ Amanda McGovern
Amanda McGovern
Florida Bar No. 964263

990

# TAB 541

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC | **CASE NO.:  9:18-cv-80176-BB/BR** |
| Plaintiffs, | |
| v. | |
| CRAIG WRIGHT | |
| Defendant. | |

**<u>NOTICE OF SUPPLEMENTAL EVIDENCE SUPPORTING PLAINTIFFS' OMNIBUS
MOTION FOR SANCTIONS ECF No. [507]</u>**

Plaintiffs' file this supplement to notify the Court of new evidence that further proves the "CSW Filed List" is not a list of Wright's bitcoin public addresses but is instead a purposeful fabrication by him.

After this Court ordered the parties to confer on redactions to Plaintiffs' Sanctions Motion, Plaintiffs' counsel's office mistakenly filed Exhibit 7 (the CSW Filed List) on the public docket. [1]

On May 24, 2020, someone anonymously posted a message at this link https://paste.debian.net/plain/1148565. The message said:

> *Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message . . . We are all Satoshi*

**The message was notable, however, because the author signed it with the private keys to 145 of the bitcoin addresses appearing on the CSW Filed List**. *See* Declaration of Andreas

---

[1] On a prior meet and confer, the parties agreed Defendant would provide slip sheets stating "fully redacted" for any exhibit he believed should be fully withheld. Unfortunately, that did not happen. Instead, Defendant sent redacted exhibits to file, authorized the filing of others, and asked for Exhibit 7 to remain under seal. Without this slip sheet, and despite Plaintiffs' attempt to ensure the filing was being properly submitted, Exhibit 7 was inadvertently included in a public filing. On being notified of this error, multiple members of Roche Cyrulnik Freedman LLP immediately called the clerk to have the list sealed; Plaintiffs then filed an emergency motion to seal (ECF No. [513]) which was granted by this Court. In total, the document was public for under 45 minutes. In that time, however, the Courtlistener website obtained a copy of the document which remains publicly available.

Antonopoulos ¶ 1 (attached as Exhibit 1). All 145 signatures are valid. *Id.* at ¶3. As explained in the attached declaration of Andreas Antonopoulos, whomever authored the message unequivocally possesses the private keys to the 145 bitcoin addresses. *Id.* at ¶4. You cannot sign a message in this way unless you have the private key to those addresses. *Id.* at ¶3. However, Wright swore that each of these addresses were his own, and that the private keys for each are locked in a trust, and inaccessible even to him. *See* ECF No. [512], 6-8 (citing Wright's sworn declarations and testimony)*.* Plaintiffs Sanctions Motion had already demonstrated that the CSW Filed List was a forgery intended to deceive Plaintiffs and this Court, and that Wright created it to avoid sanctions pursuant to this Court's Order. ECF No. [373] ("[i]n the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information . . . the Court will inform the jury of the Defendant's failure to disclose the information sought by the Plaintiffs."). But this message further proves that the list is not an accurate listing of Wright's bitcoin, and that he is still hiding the true list from Plaintiffs and the Court.[2]

Said simply, Wright represented these 145 addresses were part of his bitcoin holdings and were locked in an inaccessible encrypted file. This week, the person that *actually* controls the private keys to those addresses used those private keys to declare that "Craig Steven Wright is a liar and a fraud" and "doesn't have the keys" for those addresses — thus proving the addresses do not belong to Wright.[3]

Dated:  May 27, 2020                    Respectfully submitted,

                                        s/ *Velvel (Devin) Freedman*
                                        Velvel (Devin) Freedman, Esq.
                                        **ROCHE CYRULNIK FREEDMAN LLP**
                                        200 S. Biscayne Blvd.
                                        Suite 5500 Miami, Florida 33131

---

[2] This has been widely reported beyond Plaintiffs' expert's declaration, *e.g.*, https://finance.yahoo.com/news/craig-wright-called-fraud-message-144414280.html
[3] Notably, these signatures come from addresses controlling ~$65 million worth of bitcoin.

992

vel@rcfllp.com
nbermond@rcfllp.com

Kyle W. Roche, Esq.
Joseph M. Delich
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, New York 10016
kyle@rcfllp.com
jdelich@rcfllp.com

Andrew S. Brenner, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaintiffs Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2020, a true and correct copy of the foregoing was filed with CM/ECF, which caused a copy to be served on all counsel of record.

/s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman

3

993

# TAB 541-1

# EXHIBIT 1

994

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

<u>**DECLARATION OF ANDREAS ANTONOPOULOS**</u>

995

I, Andreas Antonopoulos, declare under penalty of perjury, as follows:

1.  On May 24, 2020, someone anonymously published a message (Exhibit A) that contained a text message, 145 bitcoin addresses,[1] and 145 digital signatures of the format commonly created when signing text messages with bitcoin private keys. The message is located here: https://paste.debian.net/plain/1148565.

2.  The message reads: "Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message. The Lightning Network is a significant achievement. However, we need to continue work on improving on-chain capacity. Unfortunately, the solution is not to just change a constant in the. code or to allow powerful participants to force out others. We are all Satoshi".

3.  At counsel's request, I analyzed the message, bitcoin addresses, and digital signatures; I then compared the 145 bitcoin addresses on Exhibit A to the CSW Filed List. My analysis revealed that:

    a)  All 145 bitcoin addresses in Exhibit A were claimed by the Defendant on the CSW Filed List;

    b)  All 145 signatures on Exhibit A were valid digital signatures that had signed the message in ¶2 above by using the private key corresponding to the respective bitcoin address (the only way to generate such a signature).

4.  This means that whoever produced the digital signatures in Exhibit A unequivocally possessed the private keys to all 145 bitcoin addresses that appear on both Exhibit A and the CSW Filed List. This individual was able to spend the bitcoin locked to those 145 bitcoin addresses. They didn't. Instead, just three days after the CSW Filed List became public for the first time, they chose to sign a message broadcasting that "Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message.[...]"

5.  The 145 private keys used to sign this message control a total of 7250 bitcoin, valued at approximately $64.7 million USD as of May 25, 2020.

6.  It's notable that whoever signed this message appears to have undertaken significant work to make their point. Specifically:

    a)  Producing 145 signatures is not a trivial effort. It either required significant manual effort, or the application of a custom program.

    b)  The keys used in this posting were created in 2009 and early 2010 and had not been used to transact or, to my knowledge, sign messages prior to May 24, 2020.

---

[1] The Court and the parties have sometimes referred to these as "public addresses." The technically correct term is "address."

7. Thus, whoever constructed these signatures expended non-trivial effort and used keys that had not been used for 10 years to cryptographically prove they had possession of keys the Defendant claimed to own.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 27th day of May, 2020.

*Andreas M. Antonopoulos*

Andreas Antonopoulos

# EXHIBIT A

Signed message from https://paste.debian.net/plain/1148565

"Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message.

The Lightning Network is a significant achievement. However, we need to continue work on improving on-chain capacity.

Unfortunately, the solution is not to just change a constant in the code or to allow powerful participants to force out others.

We are all Satoshi"

1FbPLPR1XoufBQRPGd9J8LPbKLaGjbaxSm G3SsgKMKAOiOaMzKSGqpKo5MFpt0biP9MbO5UkSl7VxRKcv6Uz+3mHsuEJn58lZlRksvazOKAtuMUMolg/hE9WI=
19PYG68GkQ9nY99Qm0SyUFy6vWxSyPmXA8 HFjd/SzCNDyXRY/sxSjEKusK/adVtBf0ldT1ayvP0+WsLuSQr0A4seEKjQmtg9K/wc3nv/E3F5TezZN8/ULoZI8=
12cFuwo13FMhkmJoCN8D45jeCeRsXf96q Gy5QXGlZ+Meq3brwDzg3lq7GSttee0g+0A9Q5gGKzCcOmET5vnULXoВv5b6anu1wLSL18huD0p73U91+c43Fqf8w=
1NWRrbPwHhpp28eQeman5YRV84D2aYe1Yw HDE35UqJUUa8tkjt3NThu+SwF8arV27Lwg6idBTN71m+epmjdQlvnWvCqUHroBPCPQ50aK5VhLnUUFIEDE4kXlo=
1MN82eH1Eu3hzneWHFkfsAajknhj78Uup5 HAZ+otObWlK4t40kTqC9H0tCjVeCa3WCR0xyYNMX94uqAAXTOHIIT8X0QzQI4UFlHcZhfcxsgMgnliTV0FkUHc=
1DYHUEjrVESgyKAn7P13wuRhs6x9EeijBX Q08ZpNNnXNawyvIEpa79QpP4+MjZh8d1+0/nAGcCI5X2Dgtqf1DvYVpkVg9VXXy9rG78/NK8Tmd04ep62QLkvIw=
1KnT26DTvstGKw7P68xM8Ez8QbKa1iix9C HF48P/4D1RR338M150rcI9MDNWAf0Zo3apmD+wzPPMfdAfuzt0ue0OOrUNW6ye+6mPYSwmnOAUfhR2Egyiv CpX4=
1K3Qs6bx1wvxCjLcb6jxfjk5kksS3hlWyK HALVyRQXVIEYRc7lnOTa43ahzzcqRUM95Tc1WuXmhR/hCWASbOWa5a357gjE9QC1W71qPDbTHnz19hfThd2JmLi8=
1EAGWgwskQB6o3f1GGsbsW5hXPr77Q1ULE GwheMMNzkA7dyNsXavj30y2CYVfgWWnCqYqMLq68jR0Kd0I2g8Zc0ySKirtxKUedFzyeH31rmjcliLdaoD4Q8iuU=
1NVou7bbmdsdVLEphqZadmX2gbR3QCDPAz HAKdwn9TvEpS0Km2lzROVk7z9Kpu+nxcOSYGlOB5197RIAF+Lszul4fn6sdrqL86L31t7GGmWx1HTGG8SGwGi6s=
1LBUqhwVyUZ8QZw8UCEbgFQjDFjikL1C58 HFWLeeyWNSYSpZh/opcT5A0YJitxEtqMrhK44JnyNqy6ZT/xjHB84wcs7FxNVcqYh5oRYwJnxsp3aSHhii1wv90=
1MUzEx65ycYArLPPhxecjkBj4pzMmmjfsu HGRuRXr+qnleuYfHnETabltBEBhu33wRUqD670RhIwK2G5swvENDelZ77szZPkNCYCH+KcDEZQds+XZLkk4Rp5o=
15RJkhWxG3PP5Az1RIAHVWovZxFt3nFyiyN GwAeaSecx9Hga24RwasCbhKNFqxDX/tswamIkYzmNFKcCnz/g78eHBXKQ3FHhv49VIH0rL86PSCaFQjrtWsO4Wg=
1HTUifl1gDAwse9fAXwcdMGo4QPx1hqrio GzmTb2eEUh3PleP0liRkiRz8uSy5m0TeOb4kwdWIfox0Ixh3br/qrgpnTI5LhTrzwZ8b8meA/x0w44RMp48PIEQ=
1EuHqvmmDA6dFRmDyu4rzk8b7VkAmEn7Vq Gx9YsNS1x0oVxnRVt0oDn908n003eUkulhT2YqgnBFcbWcXYRCKxW31319C9RvlNLZSu+7vVEeYMuNEam38C3TdvQ=
1FTtHk9sc29yJX0cxXJdtz8C6YHyA0MgwU G2wVjSHOSrbAMgeRA+QLgSVAN5Dwmobuy3GqCu7UrFdwWSvhv0f2hM0kCyS7M3wooe2T5wEkIXr/vb0/AsVP/XA=
1NVTcGUYSP6s4zH95ex86ctATzv8peV5mR G3U3R3twYs+p8MYM07VpTZkUORp41ANO7MTeyeRCGDwQQ6tp+3BFsmvZWlAlUDXNkswhfAC6Y3LrZDAV8PfoH+s=
18zkn1xNDGfyesGcTbFuyE1D2nyCgEY6r5 HBPPuUg63tzZ6XFER3dH1n7PqNbW23WPMNKkIT9e3EYCX/jY+eXrCaGV48XVMf5KCBIH2As4q+QfLuqoo5Gc3ClEc=
1LBmJDqhNboEbyJveb8j8STNKWSGW7qDoN G3ZFQ6i8bxcSo5J11l+4DqXn7R8qMiF0nF0Q8r1Ax69CXxQudk0+guVtxm30IIeOaHkbPh1g0n93DWhxxHiFgE=
1GgLxr81stVBpRQPNQKn5F25kyEcpHCnz5 HGE9wCVVY7Nq0x4Prc2mrX5EjCxwxEzSQYzFgCfd5HWkBKLzOQhHnUy9GeOGOFFR5o2m66hhh45Px7c/ATTXU=
1CpkvbaAhn81Vc4vbx1yr9jGuETvetutBj HD5PjDblrRPV3F/Y2ytk+TFzhYkBjX6DHapxpvh5BCtvUDs+nh99KnUx40OOeOwLBRwh3YOeVEGHW0vN+xRBTCA=
14CmMfkbvkfzM1cU68wZMvBwJuSE31N7Ns HFk8Xj5iW/hgTiPH+NhOnwWKBVVfEfn7D0nEO9SG1GHEesT8Co0EPX11G3rmk2mhFqdwLcWMwEn99F/J41Lr070=
12KFC3Lu9D7PzbZg8LuNMj2MpfgzdD37KR HCMmCr3x8fHBBychp+Y8j/jC0Uw91iWKEVFB2V3SrUqAZZy09A11lcb+SMF19wGPV5Pq3oJhLgvAoj8R1nprylw=
1HRhFWoCspCQWrhoEWht7Zqu4XXRjR81B8Z G3AKmnNMj+f18OhpIMye0PMozT5DY6IyXxn1Nyr£99vxMmeuSyF0fjhr/cvuOKkRBPtEe+WEdiewDRzZu4WpXpEw=
1NdmECSHxfLSH6Z5xoxQbC8h3sfFo75SRD HAG7DNJCxI8u1mXM8noDz3pi3ai9YtRS0rxmPM3P2gZoUKF+1bj/PbUG7RAwmfbXPt79NheEYFT541HbaXw91tM=
1LXUhX4tXfWGekjucDASYWSsPzYLhYM282 GyBAdsIVFj3pyvXU9tnwAS8qM847JVbEWr6Mozxbhf2pKKEtkgDH6pJvN14usF8fHUlWDU013Es+ZtFpe+JnOc=
1LK8dnWdxZWxLcdTCpqRH6bGwWVcMAPo6X G19eMW8TBD3ydxcMEgQq2cyW583Ap+envXwh5r91QnvUYc6G23s33+UNVpfwzmmHk/sGgrR01110kyuOTifqH+A=
14RdV6JPBrTVeV5HfFqhGgfsZhNhCFotoQ G1Hc8RbnPmKHC5NImRBOCSiKnxhrrf/bItYXlksa14i8ZVr4/ddZyalTsjWiQuVf979uvfuai851KjYtXAeQw20=
1MNaNFHzjuZKWAoPxhfD8xknSSC5dWkfy G2Tz08fKWlqjxFVLg0aLNr8xWmiqa13Qrf16VyQ4nVuZwSEdLDfMv7rq5Sr1h/jWJxw0mPkwrOqCm7sd3AK0d0g4=
1Kynn7w9MF8NUvqdaRRXY4KLWtwnGdh2Uo HC0LBvFELRkL5F41iHnEuhimwjVhODxqfXnp/3ol2fzIb5bTuybCejdi ou/PWZI1YrvMzVtP3eINQIVocahf+r8=
17u34144cabkgraRhwLuzKUANYzf7UB5Jq G29Sny2O2kb0HvuO1Bxtj RhwKH/zTv4MOIcy5bLC20GOE9tXfLWrgjibEaFwFryxo4PVX1VsBX/Q3C6j6VU9/Jw=
1HtMsYAjGXqnehgCXpTz8UkAw44ZLGdAJf GzMrJK3FGglC+/13xUEC5TwP6yLkjYsYrq3wRmUYt0IMfjbdHAm8ehcXrWQu3+1cwFfgGaqH3QagO4Jr4k82B3s=
1MwWRakazdQySercEfg2Den8vWpHw3kvCz GwpG+CF8Tq/w8oamXpqri4IfuIOf25mMcywnkEU8w+jr1ndO/3EHSu4Q+521gvx4rsb0yGrIm58aYb80wHHP45k=
1C6BG4rqDdnaC3t3mzapNu46j9yVv1x4Eo G2vbVNEcAVE35AD7L3016o981PbX26U14OaJQ840bMJYIfRZyc+imKNFjbWv38ijr3EVGpz2+j8Nor39zaCypp1=
18aBUQfeUVjSRwBuHN5J9wZqAZCSqweP19 G1QIbOxDzEmFlnlOKa9BPdULQtIMTwKfnjsI6G0hdAWzGT0pttXKF87oRCqfWucjfRhX21kai/7zhp16gCouFIYYU=
17gzLQ924bNxXBHjgJVBaJEQAXVYTqzaR2 G2kPlBc+89z1RlInsByr0/ZISDQoO/NWnF2MhW2tMX/4Ews80VAP2FwQYuS9z4xkh63fWDTFXXqhVlkAwp3pXPU=
13jEwgtkahPdHQKPTtbHwFm6mvC4Vq71Tj HDJXeN/WZY1JgIJTxgUgyA0T0551/md39PVMQ041QyIOYf6KrDpisTgM3y00dwyW+ZkKZ5b+j211Cmzsa6VnEmE=
1X5NfjvcBzdidakWzw37YQPXkBqXr4e6X HFpb4dJ2NgnMm1Fa8ruWTn7bAu+N2WGYrO0I1cOXHNzpKy8wKeCt1wrr9g4x+Fqr3Y1RDxppd6LZztZVDOungXk=
12CTHhy3tr49LgoUShbWgebLBv1LAFj6nj G2uKasfGyQ2CXXUFng2U00FRNDiqRQECprRrQizEDKS8LWd1gkYYRgGso38uJu1X4XEFaiyd3wOMDd07Zp+wfuc=
1M2iLUvkkm32zE1EjARx66XXA1EZsfxos HEjA9638ejTC3sT1K3syNReyWj8MFPK/0RkiwkS/8f5IYhyeccaubX5m9NQxM5mP1schlwTt+pNhohA9vsenAVEc=
16TqRUQtrBRv9jnpuyVFEH13SRKZhqrCQ7 HM0Qqel68W3s0b2DnaK/y45ZFQaFG4+dj7qzfJfX54Un1GlcBz2AkkIg3VKhJywfia75CfqyLPbQMR5SU2HbOH5I=
18Po3xfuLWD5xZRVU61o9bEbW2XXywLduY HFHdkW89u7EFFxQ8DwoyzZ+bwJOEnM7kHGKTjt1TIkLC8ECzcGKUW86kXmPoua8tPr7ezuc7qGhl3WVVp/M7/w=
17fH8bs2eBSxYC4fLQgVPWXw2cV5bNrpon Gzpt/gIIDG8Vg3ooa4fcNWMAtgGafpOj/dfV2MiZVKsNDWLNisTOenYu+c0KHLgEVZEr32oEZjKPczCv8TjPEo=
1DkxqjAGGihnBHhiWGuJUMVRco6LHFpovT HHGpTe2EUGLJMb1EK2s+8msGrKXxjAcD5Z/gXrCX0oaMeokz7Duu+L1qGaTw2K2YFUfqiK92NCdZoob9usb0=
1AfE9BbPDPGx8egt5qRBoSvLDiy4RrLNeV G21/Dkww97yrenst96SrzufOXA4HnU/Y/RrX18yhQo8+ZGu7KEC7o8vfVaIy9sCQuckyTKox551y8gquPY=
1NQxEQi9pgmoCzi5vh38y79EgAbQackUo H8OpFkigKPt89N7Tqv41RVRAEtw41mRyQe9xwtSbC2CFdCpxQY8M51V1f1oyH6fh1Q42v$6dh9WauKgHmQt/m0=
1DpuecprK8vV6A4FtHU6VLqkUs4D2P59PU GzZIwDnUGfdmV48o8FxVR3zvqo8dxg4gNA3LYPXAZSyCu28uqA6HUFSTTPKZhj4T7KUu+HpEUU3gCRyVGVxmRE=
14ZiwXFoDVKoxVykjeZjdtSHsYnJxSRFSH HAOvCgi/gg/EYsUQ/V1wmIceGMp58Q4vEaVTKuQWfXZrBK7ZNhoPHTmVoXB3vdD+d3bu0yawIO1t1eLUuM4Lng=
1PwaH872F5nb7hurX8jmC93MUDtMqHgdCY H8aUjHTftGJ4Uo1FyI2Hr9wJaUVRdS fVN0P+qkZHeN8fA66bqynmqkqnS1sGfQXB1XuaCUQ3jWjAZxinA+6bvNg=
1LWFZazD8Rt6bGDbBukCoH9029758pma GyD+PWQhv+FgT7CMzqvGL0Ygpvyk£z0oM3Uq3L68FcvWTOYHhjayIK0m4YlcZx1T+ZENbDat8u3bjddQavgk++A=
15zQPNWD3uA812THBgQP4VSLYC8RPZ3N Gwu82X0yvD2yRK8yFx+WCXxONGwowdARIa3Dvh4/+hEh6ZKArxTae5jGLgWfvweMhKcEDxgUfcIsNF+/G83g=
1KkajS3KDc1JbfRk2Vg25jUE6eKdiMktAa G1lwwFRfUoENzSXSYWCGQXgn7lFGnbzQpHe5/xngEU/c9mkDctygqpn/g3Mdr1U2/N9DWwVPy1268zVsiO=
1FxyVmPEsngnVS8baCjyuTBsdFH87reTam G0kmATyO30jPrS5PB91pptUkyMQH3IFVdTdfhO+kuvVRpXRZUJ3U86kleP+WGhyBFZhADGK3LhdXASci/yBqYK=
1HenciVLZmE9ugshcrW3GtZttPlbqr8K3s G1L84aWZ4Gop6pM2z8HKg6IL4JbdudTEp8THTxoF4j1QDmWLwj7ZztV+0BIOMFYd9jxK5scS4kyuq0tLjcvIdo=
12jaQdf2C29Cobh3XZHj4WoPk8091MK4jy HAeKKuTPOMLVa1V0uFRr13KcDucYdCqs6vW6zqMwTQgIu6A/EpY2YsTelcGE4jwS0sKDeoA/9+qds7vq+VYghE=
1Mhpa575XxxyqvcvJCLBw22L76gDDpysJm GyLWdD7HbKaysxzpt6Rq88wHzfrvpNLSFSnwsgufIwKLB807xEWgZFnwgX1zAIwwHv2Rw8PRo1bhkmgmIe7Ly0=
1KF7rv8hTcC88MWeYzXaBuUoecWaQJ91m G21NwFRfUOENzSXSUYVWCGQXgn7lFGnbzQpHe5/xngEU/c9mkDctygqpn/g3Mdr1U2/N9DWwVPy1268zvsiO=
1Ey9QHtKgcY6aLDLW2xBoMxPJbaXxZcyAK HHFeDZvHHHfPPEYR38mvJ0R3CSG68Vqoi09Lri655kbewM+05XetW0mUKO4v3VbshUfLuWbjfg2xvf97iukTVFB8=
168BCJoyBBuyk2bKM6r4EGCADgiacdpBsKP HDd0M73oo/hsoj0vt9t2kq9b0Kv081OIJaTvSAWxE3n6/TMT9zMsTh5v5Zny5CN/h5IUE5JqEUlRn9AjJqejRasY=
1VketozRRbdwxygHPRh4BL4jQgnH3xPWt G3x12R1pw9JHbyywbzClGc+r4SGox6Rx2IG8KWHi/u+hZiFBPmUlR0KHoaWKSdSaYKRi9Dwes/dv9qJBnepxKOM=
18DfVFHfCAVFBhbmBLYxsE3HZqpaSu1Wvw HHgcWuomf7hkZU+kWfS+7WL43nk+1hTUGFZUSa/tS8w7MJz0WNg+8G4108jiTNWQNG3aAonXySalJCfP8VJ2IJ4=
1F39FW9NU8tuSCVhxVstd7p1VSNw4YVGXY Gwan8+QOUsvmuCFrqMdSAWhAJJZQYgSC013yLOi4QWL4nMKy7Nzb5wNTrIXOZ+pekK6X1V8oyKxzI8hdMzkcIna0=

17iZXQzMYjxBxRbThhs36fmgR3cRKuD1yP G04mVmvc5Ini13/uCf0tYKd3HdK8yoXWsXkUHqDNF4jIXuufz/KboTxQnhvbdLS8Dx9b00GuHSxoHo1Y2NdMgs=
1C4Ym7bZZffCCjtRwcwvR6phVzCwQDyEK7 HDBhqpzzKv3zqnWF71ggIov/4n21Jw3M3ySmp/3wz3tC32k3fLb6xlc3ZxpGHLF4/31xsAkxLbEcqlpujsUM1M=
18qJJUcMRWyXhMXR3F18v3XaHJRPYrxwYm Gy2uk46aI7OzkeSuyUWK8XW0QxF4BxghoLGUM8LU0kTWfXOOS4HjOwPdXt2nZTugOgInKob2r5XTTvzEb3Pf9xQ=
1LHgE4M96DyCt735H2wzcVPWN3t9zD1U5f HECNWlWVrdt+DpW/Lv6J1HrHJqzZfMPeBa2u7f9AcYaDJ82c8qfnIVW6+JokRK5p3ybX3arE5OS+2Q4YYtMBiZE=
13forcak6Mv1ZYBo9wv3zee088UhDw83r5S HHBL5hJgIRpWJBTCahSAlW29gEGQsSdUZG4ZDLPcNSaX9I5o6ORVPr26wBD8QI/UgpJ/+AgR+S8EE1JdROGCA=
1LVWSzpeQyoMYPzDuYVktPuH8qJq8lsKUF GwGCu+7YjpkpO+wJTP+43x3vv31w8E150twcYzosoihRfZI5uVOlh83Tge/bNAbO3YRdEYmwno8wZ17gMDDgMao=
1MTMHBrnXtfTkPrNt9xpZVy2095skfBhYy G2xsi59nC+gv/xlNgRrL0IoXh299XTtawYW0ECtkaPcAwV7g88c7o36pzf/CuBcH3ySkTeggrub1aXMkqj489B0=
12vQPdDVU8KHeXMSXBY7e4rRierNjWETLi Gzy6+cwDz8w5T12PTIMV90nfFBj3dE12iGO19YMid+bAt7bxxdYkeChaYjyZEtsxmR6ctuXjIWerGFfmmM2mv4=
1KH2yPhaxPKKh53VqkghjnZjfXDJWHRpbJ GytNo239pLFRhEIJybhezJFbGZt9X97nGN72rxkOHHfVBK+451bt4IPWFQvVayfEbWWXRbOaVOqsPZy9/QwDVAzU=
1HGHEhR1tFjiF895SC2PHgRiZyGjpTV5dg GxIazGZo5RrCVEc2EW8WIDWPMyFv6YFVYsX+oTw+kXn7vyEyfKmUYqK6HcqJhcjUN2Dynhcsdi/93d10=
1LpCzHxxWaxKBUCqbyXRUsKn1R5vNuRupT HH66nlu/fDDK83dQx5nm3zOohlq cY22TfStoSb//51RkZQjmvkkC8Hh3YKEg43r2r25joA15UghdHYzzWVMYzQ=
1EwiVKDkBLVUaoPuFVzW9NA82iaUUPZruU HAFBEtMmLiIIRoqBzS4WL58pqV4/e/pxOIxYrECmq24KE6h2MHgeOD2MxG5Z13cxDRUFQHer2D42MXXTEPs8Ar=
13PaeVWHFvEVWjUJiCAono12o39CLeBEEd HF2gVCM52aZiHKGeyjFVCIqiWB34GgPLA466QjBd04uUa1JG4T0hbpno/80d3fm5G1Vxsb7QIkfRz+ms2Ba7ah8=
1HhHqRamECC7y4qfSEeYNvLJKCRUkxBY1u HCZOuJcNg3bzYms76j1Mqsrzj75b05waaKq3vrvFknE1WyhQYCmiPAgpoNaEaUYLOMZC5bqEePASUx3hxTCUDM4=
1GwaiUArAF6MfSHVP9SwCnp5LKEEbu9qrQ9 G3i/C3cv7qlADjcbE1UleX4EGcQWIAEcw7BbxN2YtNfxbdv6HD34P5pzE105iEHmDGPgQ7MktyOscRjWukLDFKs=
1zo1ifkrGNggtBKPhCn4486xHaaW0bXUd HAPVvSdnOwAzvO1R8Uk711hQVAp3/dEpq3n+tdb3q+MmXK2DVyYpeQ7L8z+Cc7ubdFCU1mWCDuFVRSwCt9zVHPY=
12Ft7JjoqV6fTzUA3mRnosDYt3ekVqnZpT HEAtPU1RtcHWNe606eka13/zw8HqlLHD18/Y30tFREYcA+8pv6+iv+YZYf+fslnlbkFXMpsUAQy9QuyoueKVMU=
18pxRfV68gE4Wfg5fog6FFZ8wGs1fcEreS HGO4tv7Fcpe0V8RLz/1ttxUTe4xIhLrDc3VF7szMrWNCUdwdgsei8y8f1ipHunQFVA+4F0CfPhKCwIa/XpLH9oPA=
1H6ou5ZVaKzyoV3uJeiSqQHnc3v831RTcz Gz+OWDwBglYeAdRz3n8OQUpHDcrciSYtkl21/qyQkJbuT5cjaGCudx1kGhlh7Cb8r3s14253eM42GEFeZteixY=
12MZnJfu7GNrC8bSPuZhgNDr9otmUZnALu HEMq2txrk+/tU01NHgn6u7FNWPch8X13Ol1YOyyd1jp6YRYL2NVNYvj06+cxvWSLit8Kb1iLJuD7djeN/5+/oPUkGqU=
1P5ItXj2ET31bwGTwFx4xb6EMaGaMRgTtP HGw3jesxjC0P7UPVC95CKWrgy7t1C5k8UZMonaFtnbrZKJrf jX+9Gu+gdGGOOzuG1u5PMzwxSsBpMyJOtn2LWg=
1D1C172Bhde38avQjP2GyyzGZhPzmgvoik HH15718WJw32Lfdf3cEouo81HU0L20oYFKIrtwHCiLtkXWrQYCaifkrW5179QDSkRdECg6LvlHlm3ttRyEe0m28=
1FUjNePwqBw2gcGZFTkCM88j7qD2gWL4NA HB86CK2qH2dI0+Ex3yJe6TbWEz6c+wLAf6L3wMK8DImeWwN3aHKbqeqUW0uQn89PmODpFj3e331Ez+/SejY=
15mVDLozNmscibeBCy33yYyH7AKdsuAcKe HGpueu03hyGJ+c+sfA6XWRzgUHLzGdzRR31hgNS9b0k1Du2HiET/OWirZ9CzK4mkgfVWTVBA0WMB1UoWN1H9Rgjs=
15tOD6n2ZTygoc7PM2bY13aAkwybNBUwn8 GxlPS1rma4jk80i48NbsyFVJH4aepdvD6N3SPCkRcuKvezw77wBA5OZWZKxZWHc5oy9WHkfATF84wxXIxFva fUU=
19bf2fMfCt1b3MLbHwah3fdUNoZXTxYdSD HCC2LTC/mLxcxEYXXQsALb59gkK/3nViPKo/IDW0I7GIE11s4+lg/TVXeq2SkNnMtAojnxn0MIY/d9qKF2vCaYs=
1PDUuv3fhoiijbqnGeHZZwXRJoBCsaQ5r9 G3g8yL78aPiziLxP8OoHE3TfQl1AyH6pFxmc29ZXNwULQw+yE4eOaoIcc2bpghMzT2CExZZnCl74J+ZqFCun+0/I=
1NChqEan8XUffIYPtgPYC9q2prfR1rXu9L HCA51b3yKpjkvwbauxMA5pdlVnk2d1fOmRDN4HcO4zn+FHNZ1Niz+CE4zuEaq89/fnGj5//GvaDjRveTYxIoziI=
1BQqVjRAGndm8tRrwQNwdgJR8yhDhxXzE7 G3FktXSq1581nzs57LDLM6adlxPZ12+WgYHWtRuNsnhQIFHfh4dPE/G5XiWtGAoVhV+x8G2x+Lcsfln1E4O0O5GM=
1KC2mZujBHLTD2NPQycfDow5fni895pXL9 H829hksJj11kGQWCt6bu4XZ2KEELss/b1gD5IMOcEF8AfSVkja/nU1ZDmgQ20K+G1z5IA1+WjCSaTnFh6Pgvc3s=
12isdcKgXGQt1F42tCYHPevErL7rsax4Uc HA760pE5yOfcm8fNE1QrFddqWd22aGIxcQmjME1YVsGkjxMijg4fT0wq+4RYy1AO3EvJaeaQIfEv8Lg+iFu+w=
1DPqcdb4kzgoPyjpyri9xzhmMsJ55eQqvw HEPVEaue02x0c<2RMMJbML313CX446zxiZA88prfcqisPcıavkOQEZaB81cFQEo9XFovN8kHoXRMR8OWAo2bRQw=
1CdZDnukUZ40X3YnjkShukupczV2zzrXFn HGkNHGeauIqN2R3Oqq5SwOkZR17L4DubKwr+WTNASnvcCs+LUfV1M9sD2QhDmq9tkUxL7Qz1z<rG2b2xh0x+xPKw=
12JMQYuelsRt4FMupqHYafeGqJNY3kf4A3M HEyR3VKSEdsStTk+4wfL1+d36JVQDXofrsxT16x1d2jKTKUWz/oXYR0/Eqb7PP62d5I3AuZLbIszAzWIyWmntc=
1B8tBmGzxLynfxop38RpNaJ8SM5wr3oj4W HDQcnkzZCyYh+j2kYnPQ4XeWLxtZB5TTLQKEy1756L/zHj002tc5EqNzXN0KtPjRjobkfSfbZYWidDlQcbmDiU0=
1EpU3v1wRsPxBkpCsZCiA8QGa8jYXSRE18 G3PvWEDGd7eJEr094CzEjc5pobfT1EAiS/r19FA3TKLyZVaCIdM1ltWm0R3BX5QELmtfGECa3Rt3awGkqOMpPSI=
1BMncaBdAqphg9e98ALoZyJch2NmDirvyY G0fybNv1Mj3IJrj1Lt12TdX75pE3M4FNnIopAEf9EIU3CoNiovFIujIiyH0M4FKnrj0h6GmjgZdRfmn6VjxNF08=
17W5v1Rk42u6vUbLg1xUixCQfC5tIzgjQX Gxn24C8jv8mpIv5UpUd7sJ1+tVfQXe9OhACkFrUEp1Sge37QQDxz1RQxzCynKI6dnagvAHPrS3rSG5SIE/I0ddk=
12XFruyEEtdvr5vfWvXYt1ieKoFZgoSgbxi HAvxX3Y9RP42J1AkqQ8DYPRH+QbyTHNqlcSWi42zcCbjPyFMrwgbnnWwGb5rtGsIXaLTpuHnfYmQSR5hhk+19Fo=
1Q9mviQSHc4if71KZPG43re568u651kQo1 GyEBHQ8I3+h6zawNF1MFQUUE3DbsnaXtaXRKVb1mTxHEPUyT3Rp81MWANHemHWbFhz2DEmajHz1kjeUiAsW4m8g=
1NcXJKwGAbsSBCi86zjgFsLCT8HoT9nVTW GzDsn56A3EqGZdBYfN6pJP9MdZkpB8sb3t4ENEoFrTU+QttYLS6uoNjKbxLOnTK0HlrhfN62Ag2eY39c383aXE8=
1JQ77snx817zmx748FYJbXfXEexdMgWr6d G07kxYGwQrf10wjWVgzL7u0HcpZKTGtD0UEXh1Vprzr5NjHQ01upUKPibyRK7dUtuHPGVYPAXba+FvVnaV1nY0E=
1HCvxY4Ek8P7EpXCYpRTLrrNuRfEdb4wuV G1fHnA/kQAIaIR811lk+DmWEomfgZ36EOAAGmwrqy8FKP2Gm3a28uwn03rAc/XsaXHfUFq01hckvQw/Yqx21ZPpRGU=
17KSkVatkQB5RDUk+fMtgbFYfQZM3uv8L59 H839ktvivQSMAFQg+qI6y5sfG/3nbHW7eP7PdpQOf6jVUN+ZOxIwH4Wyy5fQgVsln8A9QqtTZ5bPnIE0GapRzo=
1EmRU4xtkAsiskwyALP7cJnRcWkwHls90Vw Gw6mWvISAfZ+G4a73F0xC/koT65SWvMX3YsZ42VPhcSCap8JFaV2BxBxv8GPc3wu3mK4FKyJ7BhROPSRgKrVmPJI=
13aKrlNjceGmggKYQkURmatQv6LXyvU1AB Gzyzrkz/iN55KCDL2MHy6duoHkc+cKo8cDA8mGGI3m5sa/Nd7d5+PooVbLygM10bTp7b+GDXX33ptZEe/x3/dho=
1MraZtUepR19wk9Nt18dTnFUKDnxZ UigT5 HE8oSsxGxd+9hDiimjKIIRViONRYTmX41Xx2wqrPUEr1QVW8t1WJFaRn1Oxps4P0A1DM0mR0CMV3kD8E+K1MWk=
16TGQooBCkfV68AKPEK3BHG4dUEecnSckv HA9X3EhjCam2HP6sBUD/9hf5+xctcgtUmKzs4CJ3jckOUE1Q4b7W0l80C8EHfV3VNWxZMsd+5Lh8ZN/Q}/C5INU=
18sxpzUFZQK3WBIaNUt5oyFV7fcuL9xRo4 HCIyv1zVhtWSrETmggxrg8PF3Tecsdcy8H1WkDvwSd/EWyZfC83whhcFqbyPy0fdzGkBtaZcVZf/Y6+yMas1Ilw=
1VaPTvD7fn6dYN0kbsNU13jN9mB1GnWFBi G31CZuQYAvVQpnW3fsQLkxFM9XEHqO2FeMQ88NMXI5AbzHwodm35OQM+N5FT4tFtA6X7157tuNbN6T3rQ3AjIeE=
1MjLPVSZ8Z7YWjdMrf4DUus4DVAFkpgAmD G00DwuqBer/8+RUEw6unToXgC1Q70F9IHG03kUn64kzORnRYl/3alINLS3Z124MRf/eN5gOX+qIwCQom7w6zzM=
19Tf3PQDTFf4uZj8vYnt4f3rxRx8TBELu G0Zt3RGvn1wJ7AP3R9+eRqccSM4Z/YwhMYmW0R8Po/4kGOuehLK0JyZ3EHQ/EL9cUtqpKxvqVZZ1k03/tVOyEUSg=
1L3c6PhvkmLvcqg8wcjJw29kXXm6rfGMi HHYSHpHjdX0WpwMwjSFxHL6BHATby+FWFXA6P+hIHYIRCRCgaK19HtKI0c/LA4CowfStoy578nS271P/7A8gnQY=
1511Vad237FF6JLS2zjGyM23U3pBv8tyt2 G2tTHZaaGoX9wnTtgqoypxVmlf4VoIyd8pzeetVeCWr4GrGoPXnKIptltuvoGd52o3DJMndmnzqyoKiwHm6WmfD5w=
1FVD5rzMP6tR8Juubg Y5FiupiP33Hn5GkZ GweFJH5dL8lxCIUuzrAMnqz2j48oIXLg10eQtVvrpnxL+8qC/UTC517XLOn/Pjti33x/1T7NTPrGFFhk+aJRC=
153MKfaXPwhYRpDkAeE6YxVhC5bRuskWk5 HDfEMFZurF0GgCjXIkA8w73Vb3QmaSAA9yAsvDl2uhtMf6i04+uM11thqOPv0T4sybol4QTHWKzRQ3MgXOEhUA4=
1Bn5U322mFuMXyoC95jKayfzbrpe3T3QscR HEd7kcenHjnY8xmR/8o+AvZjZTXUmYogUe9dxK44c5wGJHmA68mVbwgirtfO9+hvqcM0LAzACa5891vRxV6RYik=
1MfjttGt7a3JExwcoocokQxLNE1jDEqh6LFXF HDWLZ+v7q8POLC7WQOlwUYWZJW/34XKonD5n88EVUpSeRkB1SK9GFZ/e1sL6CdC20s+HWx3jytKYMZGPUeYfa2k=
1B8yuLe4598R4cxG163Yfg2th5yu5D2x98 GxfdmfI31v0iufEWIf4s3aT3CZRuJh1p5kUxUTe0XYMqkFjc5JMMEUOXegpKKFVIrGUgoVaTv1szO0dCs1vy3kc=
1yKCpySRz2YQCGoovGSW7wASo93p7yhEF HGq905HkZx508Fdtc5/cbeAohtUW1bXdzgOXJq2Go5/WdDZXklFbqpvqUB65n4HWWaYapXe2YWKxE6GTgy+YhXYX=
15yfaqOUXSvPFTpP2qSVHMvHFWBedwrxVz HHZ+ssSGiqL7Zb6ECgPdouL9EPGFZqroyFSMkZKMgo5ybHfo6hVRSA8Qz2ego5/3P5QT1SsCpjdX73z8We2On7H3Ag=
1Mc9yttKMQBVweUUzAHgvq6gzmglgyELhY HD88+pt1Gap65L/ZXUfdggu10q8vKk5p0TKFzQXkVqE051J7KLzJ88YbI0dstcOLOnNPxs0eqW4Nu/oTSfXaACE=
19aXsBvYyGeiFnAbCaGWtmeQwiFFxzRJmZ HE0warZzRcMMb/uMcShK8fbsd2xIN6xzjecf5fqVcxGqJ9YWY536yBdLggP9AKS4EB9OCggK8f3PEy13NmkXUS8=
1Bh4Var18cLBc0d9WJUXt5sN4dA4vWfQe3 HHMt5PgzBbmJ/twpRxH1qWXK892oYztc+SyTOZUDK C/KvVx61D4w8Bx5mZZV0D3ZzkInyyah9wxdrdLFXjUbnRo1g=
153wG4iJW1ZUXYeqpDVVbb8YYhzps6VmW GxUbCr/JbPT3J0Pj2p1Mt5a2rethh+aRR8phwRbOnzkaXduQHNxr5+CSd1HMh8zHXwiIIZxQQ6rX7sWl6/hXs6eU=
1CoFNufmnGZFPhqkuzzAl5ZawoM7zf7REb HG50vyDq5SV/wAC2ijbAx3T9UWZ3Bazt6nhuWXJMr98cTD26XjYhQau9DGuzHMMTTEUV3AU2aLBoueJV9Jmf8580=
13MPLmKGdg9Dtz3a4bHMpQzxJf6rxjmeHo HGfzuCj7gUAHMr0eu26TUrwl/D4+Akd37g9E5q8cMHM4KKNYVZ28ts4oA55YPw68TaUClS51LofPTAg3KD/8Q=
1FXcjyxCRuJkY72zrLxBjtERqQdGdv4f89oy Gx7VwuB4vSmsXaHPPJR8K8ZDZ3U0YEa Yy+f7VipjksGhfA1aa0BYSpMnKgEIdW7Wse5pFgczXWO/1BS5ccxS3Pr/g=
1208NX5RddYAfBgA9MN5DAL zWWtU5dZHxW HDvLawvkRgMECu66dtovodC30iqVF9m0XHTEEUSS3aslVFVIDZGL0QlSKEk95Egg7NgNuiUKsr1d/cJokxrmo95DP/g=
1GdDBfutYmwr6Z7CtV8pQLRXG2ZGHw8GX HHHzLxNi66hYrxptwRenw402IKrx38LCwFMOKL7nGMTGATKWFPf79c2kZhcFIVcB0bvW3aJxMljoe57bc30MuM=
1PLU3yAtpYgMKWuUjCrcxLzqg4LdPX2uZ G3ZOlqSIT188qEmrVWSPp3GpAev0MNxDVu1mRcXdicnX79/uxzHAO5cDxaUT3d5Wd9vgZG9UA318MMpr82rp4k=
1DYXxem7TuGT3oLgF2RxkyVcSec1s3821H Gxk31MRckkST6TsFgqvdT1W0m4oOBsKj3h/ksf+hn73alMvqiAANnEdfujR/2o3GXovBDRMEtaGoKRzy1A=
1Ef6TCo7MMqMepWZ6tKAEUyigTqJWpjPT HHOjA+/onm1tG5jPL3yGT36kXuKFB1N654R2Nr7vWr355t004ltYIdwqvlomLQSHboxdAOl6JWKLwWWUvPZW2FU=
1L855Adck9jMuLYusKKkq5QPywxMUs4GerE Gymjkyrv3q1RUIcq6GkK1Qk07qe5ur/m//VFDigICxFFX8Cj9CkekKbfP8QN93L78+tD5hciMWg66Qjb9vdtc+rY=
1PGZSrRhYbDDDJP1ZHW4F7f5FUGTkch2n5 HEZ8gaJI+zvOAQRIFD7fYIYHuQXLkrYtnSxgAMtGA4yAkUu8YIX3dT1yTttw6dFkbjyiUkRmhwHnUbGW45sQ8=
1Q3MYAZwnooayQZWEKYSThI35JKcbpfF3P HG7rYGHFDWHZj9VXFGX6Wy+YRz3YSGJ9q9wpaFVR4C9yfn1eGZA1NSPPHD91YHIPQOW/ymezE5nt+13G8jw12VapalI4=
1FDs6Tf2wxAPhPKgkT4eCd51HAmWGsYuFdXKR GxmBURzz/29FCrufSxcMPq6tYpyf3S1/Pd4cC2p5K91m/aohm08aaaX9DwWnJRkcQBwr8p/z+44z9vzkrp/Q=
189k1PT89s9tUMUgeJkHoccuu44QRwEc2Tf Gz6NDQvpxicXdwxZn595b3lPyj14QLlbMT8p72RIqbT39a5YQZZ2RAfYho5ErdVdtvsA06gFKpY8A1jhp2RGbtLk=
1FuF5iWcHnEFMAhpk5cHbtzdZq1vkTdwka G2skTdTeEQXxe4XLxRuVFfmp4Q8zWg92eQ5QC3QRX+oCIkcTlr15bN/rVD7fbFW6OMyhK7rU9GyW+fPwr7Sl=
1LfgsdyXxa59sggxG7iHC2jZdy26fWqBij HEpXgWMULQMUibPCOfIDINIMLa1t2ppE7U6cDG+NOQgYOMtYHEyQgQIO4gA3Xn1bcCdHxmtnshpIxZPQ7+1NFC0c=

1LTXYmotcmkwp65Zv1UtcKaRNRrFQYmduP G17YIs4I1UUlS2+VgigtLH4fMc7E50j2cfLt60TT2RnsOo7ogyrMfTi0p6W5duzUkJxYZsKxeNtepc/sdTmmtAA=
1LsZpodgMzW8bzHiSQS1kpZu9JzpdVLPB9 HFgEichnJiZr7K3r8Dm+8TEqNWF0oUPsKHukejwDD8crdmnDDfjQMnqOVKpwYeU4Jh6HrMTyNOAIU3wIKLmjsY4=
1MRHrSxnmtUTv48UpxorA9PX2nSEC9yndi G24cpYefSw4ZqxLORiazQkoM4Or5KFUwTKO7ICVfU49VQiAcCI/0C8BWvCsaJBeB4Ne2fJ5tCnEghbP8PTFu5IQ=

1000