**22-11150**

# United States Court of Appeals

*for the*

# Eleventh Circuit

———— • ————

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME SIX

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

# TABLE OF CONTENTS

**VOLUME I:**

**TAB DS** – District Court Docket Sheet.................................................... 1

**TAB 1** – Complaint
    Filed February 14, 2018.................................................... 53

Exhibit to Motion to Dismiss the Complaint
    Filed April 16, 2018:

    **TAB 12-2** – Exhibit B, Declaration of Craig Wright.................................. 91

**TAB 24** – Amended Complaint and Jury Demand
    Filed May 14, 2018.................................................... 97

Exhibit to Motion to Dismiss Amended Complaint
    Filed June 15, 2018:

    **TAB 33-3** – Exhibit C, Declaration of Craig Wright.................................. 150

**TAB 80** – Answer to Amended Complaint
    Filed January 10, 2019.................................................... 157

**TAB 83** – Second Amended Complaint and Jury Demand
    Filed January 14, 2019.................................................... 191

**VOLUME II:**

    **TAB 83-1** – Exhibit 1 .................................................... 240

    **TAB 83-2** – Exhibit 2 .................................................... 336

    **TAB 83-3** – Exhibit 3 .................................................... 341

    **TAB 83-4** – Exhibit 4 .................................................... 344

    **TAB 83-5** – Exhibit 5 .................................................... 449

i

## VOLUME III:

**TAB 83-6 –** Exhibit 6 ................................................................... 460

**TAB 83-7 –** Exhibit 7 ................................................................... 463

**TAB 83-8 –** Exhibit 8 ................................................................... 468

**TAB 83-9 –** Exhibit 9 ................................................................... 482

**TAB 83-10 –** Exhibit 10 ............................................................... 494

**TAB 83-11 –** Exhibit 11 ............................................................... 509

**TAB 83-12 –** Exhibit 12 ............................................................... 524

**TAB 83-13 –** Exhibit 13 ............................................................... 566

**TAB 83-14 –** Exhibit 14 ............................................................... 568

**TAB 83-15 –** Exhibit 15 ............................................................... 573

**TAB 83-16 –** Exhibit 16 ............................................................... 583

**TAB 83-17 –** Exhibit 17 ............................................................... 585

**TAB 83-18 –** Exhibit 18 ............................................................... 587

**TAB 83-19 –** Exhibit 19 ............................................................... 595

**TAB 83-20 –** Exhibit 20 ............................................................... 600

**TAB 83-21 –** Exhibit 21 ............................................................... 622

**TAB 83-22 –** Exhibit 22 ............................................................... 632

**TAB 83-23 –** Exhibit 23 ............................................................... 640

**TAB 83-24 –** Exhibit 24 ............................................................... 643

**TAB 83-25 –** Exhibit 25 .................................................................. 665

**TAB 83-26 –** Exhibit 26 .................................................................. 667

**TAB 83-27 –** Exhibit 27 .................................................................. 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 .................................................................. 684

**TAB 83-29 –** Exhibit 29 .................................................................. 693

**TAB 83-30 –** Exhibit 30 .................................................................. 700

**TAB 83-31 –** Exhibit 31 .................................................................. 705

**TAB 83-32 –** Exhibit 32 .................................................................. 707

**TAB 83-33 –** Exhibit 33 .................................................................. 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019................................................................. 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019.................................................................. 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ................................................................ 757

**TAB 144-6 –** Exhibit F ................................................................ 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019.................................................................. 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019.................................................................. 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
Filed June 14, 2019 ...................................................................... 780

**TAB 222 –** Redacted Declaration of Craig Wright
Filed June 20, 2019 ...................................................................... 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
Filed July 2, 2019 ........................................................................ 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
Filed July 9, 2019

   **TAB 242-2 –** Exhibit 2 ............................................................. 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
Filed August 15, 2019 ................................................................. 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
Filed August 27, 2019 ................................................................. 816

   **TAB 277-1** – Exhibit 1 ............................................................ 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain
Facts Established and "Striking" Certain Affirmative Defenses
Filed November 25, 2019 ............................................................ 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright,
4/4/19
Filed November 26, 2019 ............................................................ 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order
"Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed December 16, 2019 ............................................................. 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's
Motion to Compel
Filed January 10, 2020 ................................................................ 918

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020 Order
　　　Filed January 14, 2020.................................................................... 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
　　　Filed May 8, 2020 ......................................................................... 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
　　　Filed May 18, 2020........................................................................ 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in Limine
　　　Filed May 22, 2020........................................................................ 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus Motion for Sanctions
　　　Filed May 27, 2020........................................................................ 991

　　　**TAB 541-1** – Exhibit 1 ............................................................. 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
　　　Filed June 2, 2020....................................................................... 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
　　　Filed June 24, 2020..................................................................... 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
　　　Filed August 3, 2020

　　　**TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson, November 8, 2019 ...................................................................... 1053

　　　**TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan, March 17, 2020...................................................................... 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
　　　Filed September 21, 2020........................................................... 1073

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
>Filed November 18, 2020 ........................................................ 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
>Filed November 20, 2021 ........................................................ 1196

>**TAB 794-1**– Exhibit A .......................................................... 1206

>**TAB 794-2**– Exhibit B .......................................................... 1209

**VOLUME VII:**

>**TAB 794-3**– Exhibit C .......................................................... 1212

**TAB 800-1 –** Court's Instructions to the Jury
>Filed November 22, 2021 ........................................................ 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
>Filed December 16, 2021

>**TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi ........................................................................ 1264

>**TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

>**TAB 829-30 –** Exh. P122 – email chain ................................. 1272

>**TAB 829-41 –** Exh. P149 – email chain ................................. 1276

>**TAB 829-48 –** Exh. P161 – email chain ................................. 1278

>**TAB 829-55 –** Exh. P189 – email chain ................................. 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
>Filed December 20, 2021........................................................ 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
 Filed December 20, 2021.................................................................. 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
 Filed December 20, 2021.................................................................. 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
 Filed December 20, 2021.................................................................. 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
 Filed December 20, 2021.................................................................. 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
 Filed December 20, 2021.................................................................. 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
 Filed December 20, 2021.................................................................. 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
 Filed January 4, 2022.................................................................. 1342

  **TAB 861-1** – Exhibit A .......................................................... 1357

  **TAB 861-2** – Exhibit B .......................................................... 1391

  **TAB 861-3** – Exhibit C .......................................................... 1398

  **TAB 861-4** – Exhibit D .......................................................... 1403

  **TAB 861-5** – Exhibit E .......................................................... 1409

  **TAB 861-6** – Exhibit F.......................................................... 1417

  **TAB 861-7** – Exhibit G .......................................................... 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's Motion for a New Trial
        Filed January 18, 2022................................................................. 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed January 31, 2022

        **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright, August 11, 2014......................................................................... 1446

        Exh. P173 – Transcript of Interview with Craig Wright, August 18, 2014......................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed February 17, 2022

        **TAB 885-9 –** Exh. P464 – Redacted email chain ................................... 1538

**TAB 887 –** Order on Motion for New Trial
        Filed February 28, 2022............................................................... 1652

**TAB 889 –** Amended Final Judgment
        Filed March 9, 2022.................................................................... 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
        Filed February 24, 2020............................................................... 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 ................................................................. 1673

**TAB 507-1 –** Exhibit 1 ........................................................... 1701

**TAB 507-8 –** Exhibit 8 ........................................................... 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ...................................................... 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes ................................ 1717

Exh. D102 – Excerpt of Progress Notes ................................... 1719

**TAB CS –** Certificate of Service

# TAB 558

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.: 9:18-cv-80176-BB |
| *Plaint₃fs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

<u>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR OMNIBUS MOTION IN LIMINE**</u>

## **TABLE OF CONTENTS**

I.     EVIDENCE RELATING TO DAVID'S CHARACTER, IRA'S RELATIONSHIP WITH DAVID, AND CRAIG'S CHILDHOOD SHOULD BE EXCLUDED ........................................ 1

    A.     MIL #1:  David and Ira's relationship ............................................................... 1

    B.     MIL #6:  Alleged drug abuse, social life and domestic violence ..................................... 2

    C.     MIL #5:  Alleged suicide ................................................................................. 3

    D.     MIL # 7: Exclude testimony or references to Dr. Wright's childhood trauma. ............... 4

II.    WRIGHT SHOULD BE PRECLUDED FROM CONTRADICTING JUDICIALLY ADMITTED DOCUMENTS .................................................................................... 4

III.   WRIGHT SHOULD BE PRECLUDED FROM TESTIFYING THAT HE WAS HACKED ........................................................................................................ 7

IV.    THE COURT SHOULD PRECLUDE THE USE OF THE LATE DISCLOSED DOCUMENTS ................................................................................................... 9

    A.     Wright does not address—much less deny—the significant red flags calling into question the authenticity of the late produced documents ........................................... 9

    B.     Wright sat on the late produced documents for nearly five months ............................... 9

    C.     The multimedia files Plaintiffs produced on the last day of discovery were never requested by Wright ....................................................................................... 10

CONCLUSION .................................................................................................... 10

1002

I.      **EVIDENCE RELATING TO DAVID'S CHARACTER, IRA'S RELATIONSHIP WITH DAVID, AND CRAIG'S CHILDHOOD SHOULD BE EXCLUDED**

After successfully derailing the discovery period of this case with his "antics" (ECF No. [373], at 21), Wright now seeks to derail the trial of this case away from the merits and onto an emotional appeal where he seeks to ask the jury not to award a "bad," "undeserving," and "estranged" brother the assets that his "drug using," "strip club going," "woman abusing," and "suicidal" adopted brother created.

This case is about whether David Kleiman and Wright formed a partnership to mine bitcoin and develop blockchain related intellectual property. Wright has made clear that he intends to defend this case by debasing David, who he once described as his "best friend" and tearfully eulogized in public,[1] as an impoverished, women-beating drug addict, who visited strip clubs, hated his brother, and committed suicide. Putting aside that most of these claims lack evidentiary support, this should not be allowed.

A.      **MIL #1:  David and Ira's relationship**

Wright claims he needs to introduce evidence of Ira's relationship with David to attack Ira's credibility. But the extent of Ira's personal knowledge of facts germane to this lawsuit while David was alive is largely limited to Ira and David's November 26, 2009 (Thanksgiving Day) dinner conversation where David said he was making "digital money" with a "rich foreign man." *See* ECF No. [83-2], at 2.

Wright's contends he needs to tell the jury Ira was a "bad brother" to cast doubt on the Thanksgiving story since it's implausible David would tell his "estranged" brother he was creating secret digital money. First, if Wright's theory of relevance is the state of Ira and David's relationship in 2009, no post-2009 relationship evidence should come in (*e.g.*, hospital visitation). But more importantly, evidence demonstrating Ira was not close to David in 2009 has very little probative value, certainly outweighed by its prejudicial effect, given the undisputed evidence that Ira emailed this story to Wright in 2014 (before any known adversity) and **Wright responded by confirming it**. *Id*. Given this prior admission, it's obvious Wright's desire to introduce the "bad brother" evidence is not motivated by showing the conversation didn't take place, but as an effort

---

[1] Crypto Me!, *Craig Wright tribute video to friend Dave Kleiman (some say this pair is "Satoshi")*. *RIP (1967-2013)*, YouTube (May 10, 2018), https://youtu.be/uVtOkE5vHbY.

to smear Ira, and paint him as an undeserving plaintiff.[2] The Court should exclude all such evidence, *but at a minimum*, should exclude all post-2009 evidence of their relationship.

Equally unavailing is Wright's speculative contention that Ira's relationship with David could have motivated Ira to destroy David's files after his death. *See* ECF No. [523], at 11. Wright speculates that data on David's devices could have shown "that Dave did not intend for Ira, as Dave's estate's representative, to have any claim against defendant, or that Dave in fact did not have any claim against defendant." *Id.* Ira's relationship with David is completely irrelevant to Wright's baseless allegation that Ira destroyed evidence.

Wright's conduct demonstrates his desire to inject evidence of Ira and David's relationship into this trial is nothing more than a smear campaign. If Wright *actually* believed Ira destroyed evidence, he would have brought a spoliation claim and allowed the Court to determine if a remedy is necessary. *See* Fed. R. Civ. P. 37(e). Wright did not, because there's no evidence of spoliation. Instead, Wright intends to litigate his speculative and nonsensical theory before the jury. The Court should not allow this improper end-run around Rule 37(e).[3]

The Court should see these attempts for what they are. Wright wishes to portray Ira as "undeserving," in the hope that the jury will turn its focus away from the merits of the case. This case is about David and Wright's business relationship—not a sibling relationship. The state of Ira and David's relationship does not change, or even relate to, David and Wright's joint bitcoin mining and intellectually property development. To the extent testimony about the relationship has any probative value to vet a quick conversation that took place in 2009 that Wright has already confirmed the accuracy of—it is substantially outweighed by the prejudice Wright seeks to exploit.

### B.    MIL #6:  Alleged drug abuse, social life and domestic violence

Wright's opposition confirms that he seeks to introduce improper evidence of David's alleged drug abuse, social life and domestic violence. This conduct is irrelevant to the claims and defenses in this action. *See* Fed. R. Evid. 404(a)-(b).

Wright repeatedly claims, without explanation, that David's alleged drug and domestic abuse bear on the core issues. But his sole claim that this evidence is relevant is that it counters the

---

[2] Wright's theory that Dave and Ira had an "acrimonious relationship" is belied by the fact that Dave's Will named Ira as the sole beneficiary and Personal Representative of his Estate.

[3] Further, there is no evidence that Ira deleted any of David's electronic files containing relevant evidence. Ira explained at his deposition that he only (1) "discard[ed] some papers" that "didn't look relevant to keeping" like "junk mail," and (2) reformatted two devices that did not have anything on them. ECF No. [488-14], at 44:20–45:3, 48:10–14, 49:13–17, 53:3–4.

2

portrayal of David as someone who refused to cash in on the massive fortune he amassed. ECF No. [523], at 15. But Wright never explains how alleged drug use or visiting adult clubs has any bearing on David's ability to honor an agreement not to touch assets. *See Murphy v. Precise*, No. 16-cv-0143, 2017 WL 6002581, at *12 (M.D. Ala. Dec. 1, 2017) (inflammatory character evidence "subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened").

Moreover, there is currently no evidence in the record whatsoever that David was "abusing drugs" or that he abused women. Instead, the record evidence on drug "abuse" is limited to a single reference in an Autopsy Report (ECF No. [497-19]) that David may have had trace amounts of cocaine in his body at his time of death.[4] But even if David had drugs in his system when he died, there is no evidence that it impacted, in any way, the question of whether he and Wright had a joint business relationship, or David's ability to honor an agreement not to touch assets. There also is no record evidence that David abused women. Wright's portrayal of David as a drug and women "abuser" is just another one of Wright's ploys to obfuscate and distract the jury.

## C.    MIL #5:  Alleged suicide

The Palm Beach County Medical Examiner, the official charged with cause of death investigations (Fla. Stat. § 406.11(1)) investigated the cause of David's death, and conclusively determined it was **not** suicide, but: "NATURAL." *See* ECF No. [497-19], at 1. Yet, Wright confirms he intends to testify that David committed suicide.

Wright is a lay witness and incompetent to testify about the cause of David's death. *See Wingster v. Head*, 318 F. App'x 809, 814-15 (11th Cir. 2009) (cause of death determinations are "beyond the scope of a layperson's knowledge" and "present[] a technical and scientific issue that requires the specialized knowledge of an expert medical witness"); Fed. R. Evid. 701(c).

Further, this testimony is irrelevant because the circumstances of David's death are not at issue in this case. *See* Fed. R. Evid. 401(b). And any relevance it does have (it has none) would be substantially outweighed by the prejudice that will occur if it is admitted.

---

[4] The Autopsy Report itself is inconclusive as it indicates cocaine was found in Dave's urine screen but not his blood screen. *Id*. at 5-6.

3

1005

In sum, Wright should be precluded from offering his personal opinion that "Dave intended to end his own life." ECF No. [523], at 14.[5]

**D.    MIL # 7: Exclude testimony or references to Dr. Wright's childhood trauma.**

Wright seeks to introduce evidence of physical and sexual trauma *he* allegedly suffered as a child "to explain his conduct, both before and during this litigation." ECF No. [523], at 17. Wright is clearly attempting to direct the jury away from the facts and improperly arouse empathy for himself.

As this Court is aware, Wright has hired an expert to opine that his mental health—specifically his never-before-diagnosed "severe" autism, Ex. 1 (Klin Dep.), at 167:4-169:7; 181:6-10—is relevant to the jury's assessment of his credibility. Plaintiffs have moved to strike this testimony. *See* ECF No. [509], at 1. However, it is notable that Dr. Klin stated he is "absolutely not" opining that Wright's alleged childhood trauma "was the cause or a contributing cause to his autism." ECF No. [497-22], at 245:21-246:5. Because Wright's alleged childhood trauma had no bearing on his ASD diagnosis, it follows that testimony related to Wright's childhood trauma is completely irrelevant to Wright's conduct and ASD. *See id*.

Wright's alternative reason for introducing evidence of his alleged abuse is to help explain "his disappearance as Satoshi Nakamoto in 2010, which was brought on by Wright's discovery that his creation—Bitcoin—had been used to facilitate abuse similar to what he had suffered as a child." ECF No. [523], at 17. This highly specious, self-serving testimony has no bearing on whether he and David formed a joint business relationship.[6] In sum, evidence of Wright's alleged childhood trauma is an irrelevant and improper attempt to garner empathy and should be excluded.

## II.    <u>WRIGHT SHOULD BE PRECLUDED FROM CONTRADICTING JUDICIALLY ADMITTED DOCUMENTS</u>

If a document says it is from Craig Wright, and Wright says in his answer the document speaks for itself, that is an admission the document is from Craig Wright. *Graham Eng'g Corp. v.*

---

[5] Of course, if Wright is allowed to testify that David committed suicide, Ira should be allowed to testify to the possibility that Wright had David murdered to steal his bitcoin fortune. There is evidence in the record that supports this theory. For example, the bullet hole in David's mattress and the bullet casing found in his home (ECF No. [488-14], at 334–35), Wright's sudden wealth after David died (ECF No. [511-9], at 35:15–41:6), Craig's affiliation with Gareth Williams, who was a cryptographer and "former GCHQ MI6 operative killed by Russian agents," (ECF No. [534-4], at 2; *see also* Tom Warren, Jason Leopold, et al., *The Secrets of The Spy in the Bag*, Buzzfeed News (June 20, 2017), https://www.buzzfeed.com/tomwarren/secrets-of-the-spy-in-the-bag), and Wright's connection to international arms dealer, Paul Calder Le Roux (ECF No. [156], at 3).

[6] Notably, Judge Reinhart already found this testimony "defies common sense and real-life experience." ECF No. [277].

4

*Adair*, 2018 WL 1907063, at *2 (M.D. Pa. Apr. 23, 2018) ("the response that a document speaks for itself is generally deemed an admission that the contents of a document are what they are purported to be"); *Kurz-Kasch, Inc. v. Holtzberg*, 2006 WL 561918, at *3 (D.N.J. Mar. 7, 2006) ("Defendants admitted to execution of the promissory note in stating that the promissory note speaks for itself").[7] Yet, Wright asks this Court to hold otherwise, and allow him to deny the authenticity of documents at trial that he admitted at the outset were authentic.

Defendant asserts that his "speaks for itself" answers are "ambiguous" and that ambiguous answers cannot be judicial admissions. But the only proper responses in an answer are admissions, denials, and statements that the pleader lacks sufficient knowledge or information to form a belief—any other response is improper and evasive, and may be deemed an admission. *See Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1030 (C.C.P.A. 1982) ("An answer which attempts to evade the pleading requirements of Rule 8 by the tactic of an equivocal admission or denial is an admission"); *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied").[8]

Most cases cited by Wright on ambiguity involve less formal oral and written statements of counsel that were arguably inadvertent or inartful.[9] His primary case, *Service Source, Inc. v. Office Depot, Inc.*, 259 F. App'x 768 (6th Cir. 2008), does not say that a "speaks for itself" response cannot constitute an "express concession of fact" or a "deliberate voluntary waiver," as Wright asserts. There, the defendant stated in its answer that an alleged written contract "speaks for itself." In a later filing that "superseded the pleadings of the parties," the defendant argued that the person

---

[7] *See also Carnahan v. Alpha Epsilon Pi Fraternity, Inc.*, 2018 WL 5825310, at *3 (W.D. Wash. Nov. 7, 2018) (response that "the letter speaks for itself" deemed an admission);; *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. S.D. Warren Co.*, 382 F. Supp. 2d 130, 138 n.7 (D. Me. 2005) (answer that the award speaks for itself construed "as an admission that Attachment B was an accurate copy of the arbitration award").

[8] *See also Kule-Rubin v. Bahari Grp. Ltd.*, 2012 WL 691324, at *3 (S.D.N.Y. Mar. 5, 2012) ("an answer that neither admits nor denies allegations is deemed to admit the truth of those allegations"); *United States v. $67,775.00 in U.S. Currency*, 278 F.R.D. 345, 347 (D. Md. 2012) (responses that "failed to specifically deny the allegations" of the complaint deemed admitted).

[9] *See MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997) (statements of counsel using words such as "probably" and "suggesting," thus "indicating that such remarks were guarded and qualified"); *United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975) ("somewhat casual statement" in a footnote to a brief and trial testimony about what a witness "believed" or "thought"); *Robinson v. McNeil Consumer Healthcare*, 671 F. Supp. 2d 975, 981 (N.D. Ill. 2009) ("counsel's statements of his conception of the legal theory of a case"). Wright also cites *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir. 1972), which held that a party **did** judicially admit the authenticity of trial exhibits by failing to object.

1007

who signed the document was not authorized to do so. *Id*. at 774. Stating that "the district court did not err in finding that [the defendant] had not admitted that Anderson had authority," the Sixth Circuit affirmed a defense verdict. *Id*. at 773. Notably, the defendant in that case did not claim that the subject document was not, in fact, signed by Anderson, or that it was a hacked document placed in its computer files.

No person would say a document "speaks for itself" if they truly believed the document had been fabricated from whole cloth by a malicious third party to frame them. Wright unambiguously admitted to the authenticity of the documents, and is bound by that admission.

It is true that the Court has discretion to allow Wright to amend his answer to delete his admissions, but this requires "exceptional circumstances," a showing "that the admitted fact is clearly untrue and the party was laboring under a mistake when he made the admission." *Aligned Bayshore Holdings, LLC v. Westchester Surplus Lines Ins. Co*., 2020 WL 564037, at *2 (S.D. Fla. Feb. 5, 2020); *Castellanos v. Portfolio Recovery Assocs*., 297 F. Supp. 3d 1301, 1311 (S.D. Fla. 2017). Here, Wright has not provided any grounds for the exercise of the Court's discretion. The true explanation for Wright's change of heart about these documents is obvious—Wright is a chronic liar,[10] and as the case progressed, he realized the documents are detrimental to his defense and now wants to deny their authenticity.

Leave to amend, if Wright were to formally move for it, should be denied in light of Wright's repeated perjury and bad faith. *See Local 472 v. Georgia Power Co*., 684 F.2d 721, 724 (11th Cir. 1982) (leave to amend may be denied for "undue delay in filing, bad faith or dilatory motives"); *United States v. Vehicle 2007 Mack 600 Dump Truck*, 680 F. Supp. 2d 816, 829 (E.D. Mich. 2010) (deeming admitted evasive and equivocal answers and declining to grant leave to amend because the "request is made in bad faith"). Moreover, the deadline for amendments to pleadings was almost two years ago, ECF No. [21], at 2 (deadline of July 10, 2018), and granting leave now could require additional discovery.

Finally, Plaintiffs were in no way obliged to move to strike Wright's Answer, particularly since he confirmed the authenticity of some of these documents at his 2019 deposition. Only

---

[10] Judge Reinhart found that Wright had "intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony." ECF No. [277], at 28. This Court "agree[d] with [Judge Reinhart's] credibility findings relating to Defendant." ECF No. [373], at 15. This Court has also found that "the record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court." ECF No. [265], at 10.

6

recently, at his March 2020 deposition, did he change his testimony. The burden was on Wright to request leave to amend, and to do so before plaintiffs moved to have the responses deemed admitted. *See Vehicle 2007*, 680 F. Supp. 2d at 829 (leave denied where not requested until "two months after the Government filed the motion to have the allegations of the Amended Complaint deemed admitted"); *Aligned Bayshore Holdings*, 2020 WL 564037, at *3 (leave denied where not sought "until after the issue was raised in the summary judgment briefing"); *Castellanos*, 297 F. Supp. 3d at 1311–12 (granting summary judgment because "Defendant offers no reason whatsoever, much less show exceptional circumstances, warranting relief from Defendant's judicial admission"). Plaintiffs' motion *in limine* on judicial admissions should be granted.

**III.    WRIGHT SHOULD BE PRECLUDED FROM TESTIFYING THAT HE WAS HACKED**

Plaintiffs' Motion requested two alternative forms of relief vis-à-vis Wright's unsubstantiated claims that his documents have been "hacked." First, since the claims are completely unsupported by any independent evidence, Plaintiffs asked that Wright be precluded from making that claim at trial. Second, if the Court declines to bar Wright from claiming this "hack," Plaintiffs requested that to prevent unfair surprise, Wright *at least* be required to identify all so-called "hacked" documents 30 days before trial. In his opposition brief, Wright does not specify any reason why the Court should not grant this alternative relief. Basic fairness demands no less. Wright makes two arguments in response to the primary relief sought by Plaintiffs. First, he criticizes Plaintiff for not identifying any cases on this precise issue. Second, he claims he is not making a "mockery of the judicial system" since he has previously made this same unsubstantiated claim of hacking.

As to the first charge, Wright is correct. There does not appear to be a case with this specific cornucopia of deceit. For example, the Court has already found that "there is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents." ECF No. [277], at 21. Worse, Wright has repeatedly validated and authenticated documents, only later to claim they are forgeries. Wright has claimed "document speaks for" themselves to later claim they are hacked (*see* Section b), he testified that he recognized emails with Ira and referred to an email as "mine" only to later claim he never sent the email (*see* ECF No. [510], at 11-12), and he testified a signature was his and then submitted an expert to opine that signature was a forgery (*see* ECF No. [509], at 22-23).

1009

And while courts have dealt with litigants who refuse to tell the truth or otherwise forge evidence through sanctions, *see* ECF No. [512], the relief requested here is much more pointed. Specifically, Wright should not be allowed to wave off all adverse evidence with a generic and unsubstantiated claim of hacking. Why does Wright, a computer security expert[11] with an impressive number of security related certifications,[12] have no evidence?

That leads to Wright's second "defense." He cites himself, and his self-proclaimed litigation "liaison" (Ex. 4 (First J. Nguyen Dep.), at 63:7-15) for the proposition that he has been making this same "hacking" claim for years. But Mr. Nguyen admitted he's seen no evidence of the hacking beyond the say-so of Dr. and Mrs. Wright. *See* Ex. 5 (Second J. Nguyen Dep.), at 251:17-252:2. To the extent Wright has been making this hacking claim for years, it is because he has been trying to explain away inconvenient documents for years. Indeed, the pattern is the same. When facing a difficult situation, Wright manipulates and forges documents that support his position, and then, when caught accuses others of doing the same to him. *See, e.g.*, Ex. 6 (Watts Dep.), at 224:21-225:13. He has done this in his various legal proceedings in Australia, and it has led to a Court finding of deceit and his own lawyers firing him because he was using them as a conduit to transmit forged evidence to the Court. *See, e.g.*, Ex. 7 (Wright v. Ryan & Anor [2005] NSWCA 368), ¶¶ 10-13 (claiming own emails were fabricated); ECF No. [510], at 14 (terminated by attorneys based on "serious questions about the integrity of documents" he provided).

Relatedly, to "prove" a hacker exists, Wright cites his own handwriting expert's opinion[13] and claims one would not forge their own signature and keep the document. But Wright needed that document for the ATO, to whom he submitted it, and relied on it extensively for his defense there. *See* ECF No. [509], at 23 n.10; *see also* ECF No. [525], at 8-9. This argument also ignores that Wright swore he signed it at deposition. *See* ECF No. [509], at 22-23.

In sum, Defendant must not be allowed to use an unsubstantiated "hacking" claim as an excuse to disavow the documents he produced in this case. He has had ample time to come forward with any proof of this claim but has decided not to. He has hired multiple computer experts yet

---

[11] Ex. 2, About Craig (last visited June 1, 2020), available at https://craigwright.net/about/.

[12] Ex. 3, Professional Certifications (last visited June 1, 2020), available at https://craigwright.net/about/#professional-certifications.

[13] Unfortunately, the defense misrepresents the expert's opinion. Norwitch (whose opinion should be excluded) did not opine the document bore a "forged version of defendant's signature." As clarified at deposition, he does not know whether Wright signed the Deed of Loan, the represented known samples, or neither. He simply opined that the same person did not sign both.

1010

asked none of them to investigate his hacking claim. The reason is simple – there is no evidence that his devices were hacked because they weren't. At a bare minimum, Wright should be ordered to disclose, 30 days before trial, any documents he intends to claim were the result of "hacking."

IV.   **THE COURT SHOULD PRECLUDE THE USE OF THE LATE DISCLOSED DOCUMENTS**

The Court should exclude Wright's late disclosed documents from trial. However, if the Court finds that remedy too harsh, Wright should be compelled to sit for an additional 4-hour deposition to allow Plaintiffs to adequately investigate these documents and their authenticity.

A.   **Wright does not address—much less deny—the significant red flags calling into question the authenticity of the late produced documents**

Plaintiffs' Motion sets out several reasons to believe these suddenly discovered, late-produced documents are, in fact, yet more forgeries from Wright, fabricated by him to help his case at trial. *See* ECF No. [510], at 18–19. While delaying production of authentic evidence alone would have been prejudicial to Plaintiffs, the late production of new forgeries poses an even greater threat because it has significantly handcuffed Plaintiffs' ability to expose the frauds. *Id.*

Wright's response "utterly fail[ed] to address" this argument, thereby "implicitly conceding the point." *Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015) (Bloom, J.) (collecting cases); *see also Nat'l Union Fire Ins. Co. of Puttsburgh v. Tyco Integrated Sec., LLC*, No. 13-CIV-80371, 2015 WL 11251736, at *3 (S.D. Fla. July 29, 2015) (Bloom, J.) ("Plaintiff has elected not to address Defendant's argument with respect to Rule 37 and has thereby conceded the point.") (granting motion to exclude testimony).

The Court should treat Wright's silence as an admission that much of this evidence was, in fact, fabricated by Wright, or his wife, which alone is ample reason to exclude it.

B.   **Wright sat on the late produced documents for nearly five months**

In his response, Wright argues that the "existence of those files was no secret." ECF No. [523], at 13. What Wright fails to acknowledge, however, is that he apparently obtained these files no later than December 2019 or January 2020. *See* Ex. 6 (Watts Dep.), at 142:18–25. That means Wright elected not to produce them until much later, after he was deposed, even as he was able to promptly produce other documents. *See* ECF No. [373], at 10 n.5.

Wright blames Plaintiffs for "never follow[ing] up" and failing to "demand an immediate production" after the documents were alluded to in Wright's March deposition, but he never offers any excuse for not producing them sooner or why Plaintiff would need to make demands above

9

1011

those they issued under Rule 34 on May 30, 2018. *See* ECF No. [36-1], at 7 (Request 7-8).

**C.      The multimedia files Plaintiffs produced on the last day of discovery were never requested by Wright**

Finally, Wright attempts to excuse his own conduct by accusing Plaintiffs of being equally guilty for producing materials on the last day of discovery. But context matters. The materials produced by Plaintiffs were part of a group of multimedia files that had been identified to Wright on November 26, 2019. However, per the parties' agreements, none of those files were required to be produced absent a request for specific files. Wright fails to mention that, while he eventually requested certain files, he never requested the ones Plaintiff produced at the close of discovery. *See* Ex. 8 (April 1, 2020 email between Zaharah Markoe and Kyle Roche). Plaintiffs voluntarily produced these files in an abundance of caution so Wright would not claim surprise if Plaintiffs used them at trial (not that this claim would be well-founded). There is simply no equivalence between how Wright and Plaintiffs have fulfilled their discovery obligations. This is true generally and as it relates to these late produced documents.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' motions *in limine*.

Respectfully submitted,

Dated: June 2, 2020

*/s/ Velvel Freedman*
Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
**ROCHE CYRULNIK FREEDMAN LLP**
200 S. Biscayne Blvd, Suite 5500
Miami, Florida 33131
Telephone: (305) 357-3861
vel@rcfllp.com
nbermond@rcfllp.com

Kyle W. Roche, Esq.
Joseph M. Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Avenue, Suite 1910
New York, NY 10016
kyle@rcfllp.com
jdelich@rcfllp.com

1012

Andrew S. Brenner, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaint₀f Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Ir.fo Defense Research, LLC*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 2, 2020, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

/s/ Velvel Freedman
VELVEL (DEVIN) FREEDMAN

11

1013

# TAB 595

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

<u>**ORDER**</u>

**THIS CAUSE** is before the Court upon Plaintiffs' Omnibus Sanctions Motion, ECF No. [507] ("Motion"),[1] and Plaintiffs' Notice of Supplemental Evidence Supporting Plaintiffs' Omnibus Motion for Sanctions, ECF No. [541] ("Supplement"). Defendant filed a Response, ECF No. [551] ("Response"), to which Plaintiffs filed a Reply, ECF No. [572] ("Reply"). The Court has reviewed the Motion, the Supplement, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

**I.    BACKGROUND**

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68]; [83]; [265]; [373]. This Motion arises from Defendant's alleged failure to curb his litigation misconduct throughout the proceedings, even after having been

---

[1] The Motion was filed under seal. On May 18, 2020, the Court denied Plaintiffs' motion to seal the Motion, ECF No. [506], and directed Plaintiffs to re-file the Motion with redactions following a good faith conference with Defendant regarding what portions of the Motion, if any, should be exempt from the public's right of access. *See* ECF No. [508]. On May 21, 2020, the Motion was refiled with redactions. *See* ECF No. [512]. For ease of reference, the Court cites to ECF No. [507].

Case No.  18-cv-80176-BLOOM/Reinhart

sanctioned previously by the Court. According to Plaintiffs, throughout the litigation Defendant "has engaged in a sustained pattern of perjury, forged evidence, misleading filings, and obstruction," including submission of false evidence, and Defendant's "well documented history of lies, forgeries and overall disdain for the legal system continues unabated." ECF No. [507] at 3. Indeed, since being sanctioned, Defendant allegedly has "submitted a false notice of compliance, a forged list of his bitcoin, and relied on forged documents in his summary judgment motion[.]" *Id.* Plaintiffs assert that they have been prejudiced by Defendant's alleged misconduct, and they contend that his actions demonstrate sanctionable bad faith. In their view, the severe sanction of striking Defendant's Amended Answer and entering a default judgment is warranted.

### A. ALLEGED MISCONDUCT

Plaintiffs represent that Defendant's actions fit the following behavioral framework: (1) Defendant "has repeatedly lied under oath and submitted forged evidence in a failed effort to avoid trial and win this case through dispositive motions;" (2) Defendant "provides perjurious testimony and forged evidence in an effort to avoid compliance with Court orders;" (3) Defendant "submitted new lies and forgeries directly to this Court to avoid sanctions and to prevent Plaintiffs from proving their case;" (4) Defendant "has the ability to open the encrypted file, but won't because it will contain evidence of the partnership and its bitcoin holdings;" (5) Defendant has "flagrantly obstructed the discovery process and Plaintiffs' attempts to prove the scope and extent of the Satoshi Nakamoto partnership;" and (6) Defendant's "conduct has made and will continue to make a mockery of the judicial system." *See generally* ECF No. [507]. The Court details the allegations in each category below.

#### i. Lying under oath and submission of forged evidence related to jurisdictional issues

Plaintiffs contend that Defendant committed the following misconduct:

2

1015

Case No. 18-cv-80176-BLOOM/Reinhart

First, on April 16, 2018, Defendant submitted a sworn declaration claiming no relationship with W&K in support of his original motion to dismiss for lack of personal jurisdiction, *see* ECF No. [12-2][2] at 2, but this declaration was "directly contrary to a sworn declaration he submitted in Australia." ECF No. [507] at 3 (citing ECF No. [83] at ¶¶ 160-70). Specifically, the declaration submitted in support of the motion to dismiss stated that Defendant has "never been a member of W&K or any Florida business," he has "never shared in the profits, or had a duty to share in the losses, of W&K or any Florida business," he has "never been an agent of W&K or any Florida business," he has "never been a director, member, shareholder, officer, employee, or representative of W&K or of any Florida business," he has "never exercised authority or control over W&K or any Florida business, and [has] not had any right to exercise authority or control over W&K or any Florida business." *See* ECF No. [12-2] at 2.

However, as noted in the Motion, Plaintiffs attached as an exhibit to the operative Second Amended Complaint, ECF No. [83] ("SAC"), a sworn affidavit submitted by Defendant to the Supreme Court of New South Wales in Australia in which he lists himself as a "50.0%" shareholder in W&K Info Defense LLC. *See* ECF No. [83-4] at 5. That affidavit further stated that W&K was an "incorporated partnership" in which "[a]ll shares are held jointly," a "shareholders meeting" occurred on August 16, 2013 in which he was present, and that he voted "yes" on a motion to appoint Jamie Wilson to "act as director for the purposes of consenting to orders and the company to be wound down." *Id.* at 5-6. That Australian affidavit also included records in which Defendant signed documents as W&K's "authorized representative," *see id.* at 56, 63, 70, 76, 83,

---

[2] Upon review of the record, Plaintiffs' citation to ECF No. [12-1] at 2 does not support Plaintiffs' contention. That document references an affidavit from attorney Gordon Grieve, and page two does not discuss W&K. However, Plaintiffs' representation is more appropriately examined by reference to ECF No. [12-2] at 2, which is a declaration from Defendant and which discusses Defendant's alleged relationship to W&K.

1016

Case No.  18-cv-80176-BLOOM/Reinhart

90, identified himself as W&K's "lead researcher," *see id.* at 45-46, and its "technical contact,"
*see id.* at 50, 57, 64, 71, 77, 84, affiliated his "mailing address" with W&K's Florida address, *see
id.* at 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90, and four emails confirming Defendant's uploads
of various proposals on behalf of W&K. *See id.* at 40-43. Additionally, Plaintiffs attached as an
exhibit to the SAC two "Acknowledgement of Liquidated Claim" filings in Australia in which
Defendant signed as the "legal agent and representative" of W&K and as its "Director / Australian
Agent." *See* ECF No. [83-30].

Second, on June 15, 2018, Defendant submitted a declaration swearing that he has "no
documents in [his] possession from any ATO [Australian Tax Office] investigation" and that if he
did, they would be in Australia. *See* ECF No. [33-3] at ¶ 18. However, according to Plaintiffs,
discovery revealed that Defendant "has thousands of documents from the ATO" and that he later
opposed discovery of ATO documents. ECF No. [507] at 1-2 (citing ECF No. [127] at 7).

Third, on April 15, 2019, Defendant submitted two allegedly forged exhibits in support of
his motion for judgment on the pleadings. *See id.* at 2 (citing ECF Nos. [144-1] and [144-6]).
Specifically, these exhibits purported to demonstrate that W&K had foreign members. Defendant
later withdrew these exhibits, *see* ECF Nos. [154] and [265] at 6.

Fourth, on May 8, 2020, Defendant submitted his Motion for Summary Judgment, ECF
No. [487], in which he argues that the Court lacks subject matter jurisdiction over this action, in
part, based on a "divorce decree" from Australia in which Defendant's ex-wife, Lynn Wright, was
allegedly given an ownership interest in W&K. ECF No. [507] at 2 (citing ECF No. [487] at 13).
According to Plaintiffs, the "divorce decree" refers to an "appendix" purporting to be a "family
law settlement" from June 2011 between Defendant and Lynn Wright in which she is given "50%
of shares from Craig Wright[.]" *See* ECF No. [488-17] at 147. Plaintiffs represent that this

4

1017

Case No. 18-cv-80176-BLOOM/Reinhart

document is a forgery because they "obtained the Wrights' divorce records directly from the Federal Magistrates Court in Australia, which include no such copy of the agreement," and the court file "revealed that their <u>2013</u> divorce application states, unequivocally, that there were not <u>any 'binding agreements . . . about family law . . . involving any of the parties</u>[.]'" *See* ECF No. [507] at 2 (emphasis in original; citing ECF No. [507-1] at 7).

Fifth, on March 3, 2020, Defendant produced a document allegedly executed in February 2011 by Dave Kleiman purporting to be an operating agreement for W&K that identified Lynn Wright as a member of W&K. *See id.* at 3 (citing ECF No. [507-2] at 3). Under section III.H of the document, ECF No. [507-2] at 5, it notes that the members' duties are governed by the Florida Revised Limited Liability Company Act, but according to Plaintiffs, that statute, Fla. Stat. § 605.0101 *et seq.*, was not enacted until June 2013[3] after Dave Kleiman had passed away. ECF No. [507] at 3. Thus, Plaintiffs posit that this document is a forgery.

### *ii.* Defendant's perjurious testimony and submission of forged evidence previously resulted in sanctions being imposed against him

Plaintiffs argue that since January 10, 2020, when the Court entered its Order, ECF No. [373] ("Objections Order"), affirming in part and reversing in part Judge Reinhart's sanctions order, ECF No. [277] ("Underlying Sanctions Order"), Defendant has continued to submit forgeries and lies in an effort to avoid compliance with Court orders related to producing a list of his bitcoin holdings. ECF No. [507] at 3. For context to evaluate Plaintiffs' assertions, the Court summarizes the Underlying Sanctions Order and the Objections Order.

---

[3] Florida Senate Bill No. 1300 of the 2013 Florida Senate reflects that the Florida Revised Limited Liability Company Act commenced as part of a bill filed in February 2013 and was approved by the Governor and enacted in June 2013. *See* https://www.flsenate.gov/Session/Bill/2013/1300 (last visited May 28, 2020).

1018

Case No.  18-cv-80176-BLOOM/Reinhart

On March 14, 2019, Judge Reinhart ruled that Plaintiffs were entitled to a list of Defendant's bitcoin holdings held by Defendant as of December 31, 2013, but granted Defendant leave to file a motion for protective order based on undue burden. *See* ECF No. [277] at 4-5 (citing ECF No. [124] at 18-23). In April 2019, Defendant filed his motion for protective order related to producing a list of his bitcoin holdings, representing to the Court that in 2011, he transferred ownership of all of his bitcoin into a blind trust, he is not a trustee or a beneficiary of the blind trust, and he does not know any of the public addresses that hold any of the bitcoin in the blind trust. *See id.* at 6 (citing ECF No. [155] at 2).[4]

Judge Reinhart denied Defendant's motion and ordered him to (1) provide a sworn declaration identifying the name and location of the blind trust, the name and contact information for the current trustee and any past trustees, and the names and contact information of any current or past beneficiaries; (2) produce all documents relating to the formation, administration, and operation of the blind trust; (3) produce all transactional records of the blind trust, including records reflecting the transfer of bitcoin into blind trust in or about 2011, and to swear to the authenticity of the documents; and (4) to execute all documents or other legal process necessary to effectuate the release of the documents in the trustee's control. *Id.* at 7-8 (citing ECF No. [166] at 4).

Defendant then submitted a sworn declaration in which he affirmed that he put bitcoin into the trusts and that he was both a trustee and a beneficiary of the supposedly blind trusts. *Id.* at 8 (citing ECF No. [222]). Specifically, in 2012, the Tulip Trust I was created and in 2014, the Tulip Trust II was created. *See* ECF No. [222]. Defendant also affirmed that he mined bitcoin during the

---

[4] These representations are contrary to his deposition testimony in which he denied putting bitcoin into a trust and denied putting any private keys into the Tulip Trust. *See* ECF No. [221] at 8-9.

1019

Case No. 18-cv-80176-BLOOM/Reinhart

years 2009 and 2010 directly into a trust located in Panama, and he transferred the encrypted files that control access to that bitcoin. *Id.* Additionally, he stated that "[a]ccess to the encrypted file that contains the public addresses and their associated private keys to the Bitcoin that I mined, requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock based on a Shamir scheme." *Id.* at ¶ 23. In his May 13, 2019 declaration, Defendant stated that the "electronic files that would be used to create the private keys to the Bitcoin that I mined . . . were transferred into Tulip Trust 1. The Bitcoin itself, however, has never been transacted." ECF No. [332-2].

Plaintiffs later filed a motion to compel Defendant to produce a list of his bitcoin holdings. Defendant conceded that he had not complied with Judge Reinhart's orders, but argued that compliance with impossible because the information necessary to comply with the orders was in Tulip Trust I in an encrypted file protected by a "Shamir's Secret Sharing Algorithm." ECF No. [204] at 5. In this configuration, a private encryption key is divided into multiple parts with the key shares then distributed to multiple individuals through the trusts. Defendant asserted that he could not decrypt the outer level of encryption because he did not have all of the necessary decryption keys. *Id.* Following a hearing on Plaintiffs' motion to compel, Judge Reinhart again ordered Defendant to "produce a complete list of all bitcoin he mined prior to December 31, 2013." ECF No. [277] at 10 (citing ECF No. [217]). Judge Reinhart also ordered Defendant to appear in person to show cause why he should not certify a contempt of court order to this Court. *Id.* An evidentiary hearing was later scheduled.

During the evidentiary hearing, Defendant testified it was impossible to comply with the Court's orders regarding his bitcoin holdings due to the Shamir Scheme implemented related to the encrypted file. ECF No. [373] at 9. Defendant testified that to decrypt the outer most layer of the encryption, he needed eight "key slices," but that he only had seven in his possession; thus, he

1020

Case No. 18-cv-80176-BLOOM/Reinhart

could not produce a list of his Bitcoin holdings even if he wanted to do so. *Id.* Steven Coughlan a/k/a Steve Shadders ("Shadders") also testified as to his efforts to apply the filter criteria to identify Defendant's bitcoin holdings. He provided a list of Defendant's supposed bitcoin holdings, ECF No. [266-1] ("Shadders List").[5] Dr. Edman also testified about alleged alterations to documents.

In the Underlying Sanctions Order, Judge Reinhart found that Defendant had not met his burden of proving that he was unable to comply with the Court's orders. ECF No. [277] at 16. Although he found that Shadder's testimony was "credible," *Id.* at 18, he did not find Defendant to be "someone who was telling the truth." *Id.* at 19. He added that Defendant's "conduct has prevented Plaintiffs from obtaining evidence that the Court found relevant to Plaintiffs' claim that Dr. Wright and David Kleiman formed a partnership to develop Bitcoin technology and to mine Bitcoin. Plaintiffs have also been prejudiced by not being able to try to trace the Bitcoin that was mined." *Id.* at 27-28. Further, he "found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony." *Id.* at 28. Judge Reinhart then imposed sanctions, including authorizing an award of attorneys' fees, striking certain affirmative defenses, and deeming the following facts as established: (1) Defendant and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine Bitcoin; (2) any Bitcoin-related intellectual property developed by Defendant prior to David Kleiman's death (the "partnership's Bitcoin") was the property of the partnership; (3) all bitcoin mined by Defendant prior to David Kleiman's death was property of the partnership when

---

[5] Shadders testified that he made a "mistake" or "error" when applying filter criteria, and the error "was in a quirk of the particular programming language that [he] used," which resulted in "2700" bitcoin addresses being included from a "range that would have otherwise been excluded." ECF No. [264] at 23-24.

Case No.  18-cv-80176-BLOOM/Reinhart

mined; and (4) Plaintiffs presently retain an ownership interest in the partnership's Bitcoin, and any assets traceable to them. *Id.* at 28-29 ("Deemed Facts").

After the Underlying Sanctions Order was entered, Defendant filed an Objection, ECF No. [311], in which he argued that the "algorithm necessary to generate a complete list of his Bitcoin public addresses is in an encrypted file that is protected by a Shamir encryption scheme. To unlock the encrypted file, Dr. Wright would need at least 8 of the 15 key slices, but he has only 7. His best friend, Dave Kleiman, set up a system whereby Dr. Wright would, at the earliest, start to receive the remaining key slices in January of 2020 by bonded courier, at which point, Dr. Wright would be able to comply with the Court's order. Dr. Wright is unable to circumvent this system to obtain the eighth key slice at an earlier date because he was not involved in setting up the courier system and because Dave Kleiman is no longer alive." ECF No. [311-] at 3-4 (internal citations omitted).

On January 10, 2020, the Court entered the Objections Order, ECF No. [373]. In that Order, the Court agreed that Defendant's conduct warranted sanctions. *See id.* at 14-18. The Court noted that it is "undisputed that the Defendant has failed to produce a list of his Bitcoin holdings and has failed to comply with the Magistrate Judge's discovery order." *Id.* at 15. It also "agree[d] with [Judge Reinhart's] credibility findings relating to Defendant." *Id.* The Court, similarly, observed that Defendant "readily admits that he knew it was 'impossible' to comply with the Court's discovery order but chose not to notify the Court or the parties of this fact." *Id.* at 18. Thus, the Court affirmed the Underlying Sanctions Order's award of attorneys' fees. *Id.* However, the Court vacated the order as to the sanctions regarding Deemed Facts and the stricken affirmative defenses because the Deemed Facts "do not specifically relate to the discovery issue that was pending before the Magistrate Judge," which caused that sanction to be improper. *See id.* at 20.

9

1022

Case No. 18-cv-80176-BLOOM/Reinhart

Notably, the Objections Order "question[ed] whether it is remotely plausible that the mysterious 'bonded courier' is going to arrive," but it agreed to "indulge" Defendant's request that he be afforded the opportunity to receive the remaining key slice to unlock the encrypted file and generate a list of his Bitcoin holdings. *See id.* at 21-22. Specifically, the Court ruled that "[i]n light of the Defendant's representations that the bonded courier is scheduled to arrive in January 2020, the Court will permit the Defendant through and including February 3, 2020, to file a notice with the Court indicating whether or not this mysterious figure has appeared from the shadows and whether the Defendant now has access to the last key slice needed to unlock the encrypted file. In the event this occurs, and further if the Defendant produces his list of Bitcoin holdings as ordered by the Magistrate Judge, then this Court will not impose any additional sanctions other than the ones discussed above. In the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information, which the Court has already founded directly relevant to their claims, the Court finds additional sanctions would be warranted." *Id.*

### iii. Post-Sanctions, Defendant submitted new lies and forgeries to the Court

Four days after the Objections Order was issued, Defendant filed a Notice of Compliance with Court's January 10, 2020 Order, ECF No. [376], in which he notified the Court that "a third party has provided the necessary information and key slice to unlock the encrypted file, and Dr. Wright has produced a list of his bitcoin holdings, as ordered by the Magistrate Judge[.]" *Id.* Plaintiffs state that Defendant also provided them with a list of 16,404 public addresses Defendant claimed were his list of Bitcoin holdings, *see* ECF Nos. [507-6] and [507-7] ("CSW Filed List"). According to Plaintiffs, Defendant's Notice of Compliance was an "egregious misrepresentation" because "no 'key slice' had been turned over as claimed, the encrypted file was never unlocked as claimed, and no bonded courier had ever arrived. Instead, Wright's wife requested a copy of

1023

Case No. 18-cv-80176-BLOOM/Reinhart

Wright's Bitcoin holdings from an alleged Kenyan lawyer who provided her with a *new* encrypted file that contained a list of Wright's Bitcoin holdings," thus making the notice a "clear attempt to deceive the Court." ECF No. [507] at 8 (citing ECF No. [507-8]). Additionally, Plaintiffs argue that the CSW Filed List is a forgery created after the Objections Order and that it does not constitute an accurate list of Defendant's Bitcoin holdings. *Id.*

First, according to Plaintiffs, four addresses on the CSW Filed List have been spent since July 2019 (one as recently as May 13, 2020), which could not occur under the set-up envisioned in Defendant's testimony in June 2019 that his bitcoin are locked away in a multi-level encrypted file, which he could not access. *Id.* at 9 (citing ECF No. [507-9]). "To be clear, it would be *impossible* to spend these bitcoin without access to the private keys Wright has testified unequivocally he still does not have access to." *Id.* Plaintiffs state that this is "incontrovertible evidence" that Defendant either "(i) submitted a fraudulent/incomplete list of his bitcoin as the CSW Filed List and/or (ii) he *does* have access to a list of his bitcoin and the private keys associated with them and is lying about and *hiding* that information to prevent Plaintiffs from using the list to prove a partnership, the amount of bitcoin at issue, and to eventually trace those assets." *Id.* They add that two of the bitcoin "transactions" that spent the bitcoin from the CSW Filed List also "simultaneously spent bitcoin that are not included on the CSW Filed List and sent them all to one recipient address." *Id.* In their view, "this strongly suggests that [] whomever has the private key to the bitcoin on the CSW Filed List (Wright) also controls bitcoin that are not on the CSW Filed List (Wright)." *Id.* (citing ECF No. [507-9]).

Second, Plaintiffs assert that the CSW Filed List is not an independent accounting record that "predates the sanctions order" but instead is a "recent fabrication derived from the Shadders list." *Id.* In support, they reference testimony Shadders previously provided about a "filter" used

1024

Case No. 18-cv-80176-BLOOM/Reinhart

to identify Defendant's bitcoin as having a "Nonce marker byte" between 0 and 58 and how an "error" or "mistake" in the Shadders List erroneously added in approximately 2,700 addresses where the Nonce marker byte was between 128 and 255 (the "Shadders Bug"). *Id.* (citing ECF No. [264] at 19-25). Plaintiffs state that the CSW Filed List "[i]nexplicably . . . contains 1749 entries where the Nonce marker byte falls between 128-255 – an exact replica of the Shadders Bug." *Id.* at 10. "In other words, it now includes bitcoin Shadders testified was *not* held by Wright." *Id.* According to Plaintiffs, the "unique method for how the Shadders Bug was introduced (a 'quirk' of the software Shadders used in 2019 that tells the computer how to interpret certain numbers) leads to the inescapable conclusion that the CSW Filed List is not a genuine record independently created in circa 2010 that coincidentally replicates the exact 'quirky' bug Shadders introduced nine years later in 2019, but is a list Wright created from the Shadders List in 2020 and submitted to Plaintiffs." *Id.*

Third, Plaintiffs maintain that the CSW Filed List's transaction IDs "provide irrefutable statistical evidence that it is not the result of someone having mined 16404 blocks on the bitcoin blockchain." *Id.* According to Plaintiffs, when data is plotted, the statistical distribution of the transaction IDs reflects "two large unnatural 'gaps'" with three Transaction IDs in each gap, which is statistically "less likely than the odds of winning the jackpot in the Powerball lottery 31 times in a row." *Id.* (citations omitted). Thus, Plaintiffs argue that the CSW Filed List is "clearly a fabrication" and likely created by "taking the Shadder's List, sorting it by Transaction ID, deleting two large swaths of addresses, and then resorting the list by block height to obfuscate the fraud." *Id.* at 11. They contend that contrary to Defendant's representations in his Notice of Compliance, ECF No. [376], "he has not heard from the 'bonded courier,'" he has "not opened the encrypted

1025

Case No. 18-cv-80176-BLOOM/Reinhart

file, and [he] has still *not produced a complete and accurate list of his bitcoin holdings*." ECF No. [507] at 11 (emphasis in original).

Fourth, in the Supplement, Plaintiffs represent that "someone anonymously posted a message" to a link in which the author signed it "with the private keys to 145 of the bitcoin addresses appearing on the CSW Filed List." ECF No. [541] at 1.[6] According to Plaintiffs, "whomever authored the message unequivocally possesses the private keys to the 145 bitcoin addresses" contained in the CSW Filed List because you "cannot sign a message in this way unless you have the private keys to those addresses." *Id.* at 2. Thus, they contend that while Defendant testified that each of these addresses were his own and part of his bitcoin holdings, and that the private keys for each are locked in a trust and inaccessible to him, in reality, the "person that *actually* controls the private keys to those addresses" posted a message thus "proving the addresses do not belong to" Defendant. *Id.* (emphasis in original). In their view, this anonymous message "further proves that the [CSW Filed List] is not an accurate listing of Wright's bitcoin, and that he is still hiding the true list from Plaintiffs and the Court." *Id.*

### *iv*.    **Defendant can open the encrypted file, but will not do so**

Plaintiffs assert that Defendant "knew" that they cannot access the encrypted files without his key slices, which slices Defendant "clearly already has as demonstrated by the (i) spending of over $1,600,000 worth of the allegedly lock up bitcoin and (ii) his comments to [a journalist] that he could 'have tanked the market anytime in the last 10 years and ran away laughing.'" ECF No. [507] at 13 (citation omitted). They claim that Defendant's "refusal to open the encrypted file strongly suggests he knows that its contents will include partnership records, support the existence

---

[6] The anonymous post stated that "Craig Steven Wright is a liar and a fraud. He doesn't have the keys used to sign this message . . . We are all Satoshi[.]" *See* ECF No. [541] at 1.

1026

Case No.  18-cv-80176-BLOOM/Reinhart

of a partnership between Wright and Dave Kleiman, and that the 820,200 bitcoin on the CSW Filed List (or other comparable amounts) belong to the partnership, as well as the blockchain related intellectual property created before Dave died." *Id.*

### *v.* **Defendant has obstructed discovery and Plaintiffs' efforts to prove their case**

Plaintiffs state that Defendant's alleged lies and forgeries have obstructed discovery "targeted at the core of the Satoshi Nakamoto partnership." *Id.* Specifically, they argue that Defendant "has not even attempted to access and collect the three email accounts that belonged to Satoshi Nakamoto" and "he has even not tried to access or collect the well-known Satoshi Nakamoto Bitcointalk forum account, thereby preventing Plaintiffs from obtaining known partnership records." *Id.* They add that Defendant has claimed that almost all communications between him and David Kleiman were through mediums that, conveniently, did not preserve a record, but that Defendant "has turned over numerous self-serving records of communications between himself and David Kleiman that are provable forgeries." *Id.* at 12.

For example, Plaintiffs assert that Defendant produced messages from a "Bitmessage" application purporting to be exchanges between himself and David Kleiman, but Bitmessage's creator testified that some of the messages predated the application's release and, therefore, he was "as certain as you could possibly be that they are forgeries." *Id.* (citing ECF No. [507-12]). Additionally, Defendant produced a file containing the private key that was necessary to send the messages from the Bitmessage account that was supposedly associated with David Kleiman. *Id.* Thus, Plaintiffs argue that Defendant "undeniably" had the ability to "send these messages" supposedly exchanged between him and David Kleiman. *Id.* Plaintiffs also point out inconsistent statements Defendant made regarding his May 2019 testimony that during 2009 and 2010, he mined bitcoin directly into a trust located in Panama. *Id.* Specifically, in August 2014, Defendant

1027

Case No. 18-cv-80176-BLOOM/Reinhart

reportedly told the ATO that he had mined bitcoin with David Kleiman into a Panama trust, *see* ECF No. [507-13] at 4), but when asked at his deposition in March 2020 if he ever mined bitcoin into a Panama trust, Defendant testified that he "did not mine Bitcoin into a Panama trust." *See* ECF No. [507-3] at 4.

Plaintiffs maintain that Defendant's alleged lies, forgeries, and deceptions have obstructed their ability to discover the scope and extent of the Satoshi Nakamoto partnership. ECF No. [507] at 12. They contend that Defendant's "refusal to open the encrypted file clearly supports an inference that it contains evidence of a partnership between Wright and Kleiman, that the 820,200 bitcoin identified belong to the partnership, as well as all blockchain based intellectual property created before Dave died." *Id.* at 13. They add that the record supports the inference that "true partnership records exist but have not been turned over," and that Defendant is "withholding authentic evidence of the partnership and attempting to supplant it with his forgeries." *Id.*

> ### *vi.* Defendant's conduct will continue to make a mockery of the judicial system

Because Defendant allegedly has engaged in so much misconduct showing "total disdain" for the judicial system that "they simply can't all be included" in the Motion, Plaintiffs set forth two "representative examples[.]" *Id.* First, despite being ordered to produce all trust documents, Defendant did not mention throughout 2019 the Tulip Trust III, a purported 2017 trust document that revoked all prior trusts and which controlled all of Defendant's assets. *Id.* Plaintiffs represent that Defendant produced this document in January 2020 "buried . . . in a production of 400 other documents[.]" *Id.* According to them, this document appears to replace all prior trust documents Defendant identified in response to Judge Reinhart's Order, which in turn means Defendant identified "obsolete documents and withheld the only operative trust document." *Id.* Yet, Plaintiffs contend that the Tulip Trust III is a recent forgery because although the document appears to show

1028

Case No.  18-cv-80176-BLOOM/Reinhart

that it was executed on July 7, 2017, it lists "JBruk Ltd (UK) (10859457)" as one of its assets, *see* ECF No. [507-14] at 17. That entity, however, was not incorporated until July 11, 2017, *see* ECF No. [507-15]. Accordingly, in their view, the Tulip Trust III could not have been executed on July 7, 2017 because "neither JBruk nor the corporate number assigned to it would have existed yet." ECF No. [507] at 13 (citing ECF No. [507-15]).

Second, days before the deposition of Defendant's wife, Ramona Watts, was to occur, she produced an email purporting to be from Watts to Defendant dated May 28, 2012. *See* ECF No. [507-16]. However, Plaintiffs represent that the "metadata demonstrates that it (i) contained a hidden timestamp from December 19, 2019 and was (ii) created/edited with a program that wasn't released until early 2013." ECF No. [207] at 14. Thus, this email too is a forgery.

Third, Plaintiffs state that "in an attempt to prevent Plaintiffs from relying on *any* of the documents he has produced, Wright has (somewhat ironically) asserted that an unspecified number of documents *he produced* are forgeries or were otherwise manipulated by hackers." *Id.* (citing ECF Nos. [507-3]; [507-17]). They also point out that Defendant provided conflicting testimony about whether he authored various emails. *See id.* (citing ECF No. [497] at 11).

### B.    SANCTIONS REQUESTED BY PLAINTIFFS

Plaintiffs now move for sanctions against Defendant based on the Court's inherent power to sanction parties that engage in litigation misconduct. "By repeatedly disregarding court orders, submitting fabricated evidence to Plaintiffs and the Court, lying under oath at deposition, at Court hearings, and through declarations, withholding relevant documents, and by repeatedly submitting misleading and false court filings," Plaintiffs contend that Defendant "has engaged in flagrant obstruction of the discovery process, caused unjustified and extreme delay, made egregious misrepresentations to Plaintiffs and the Court, and hindered Plaintiffs [sic] ability to prove its [sic]

16

1029

Case No. 18-cv-80176-BLOOM/Reinhart

case." ECF No. [507] at 17 (footnote omitted). Therefore, they believe Defendant's alleged misconduct "warrants the most serious sanction"—striking his Amended Answer and entering a default judgment.

According to Plaintiffs, Defendant's actions demonstrate sanctionable bad faith. First, they maintain that he supported all four of the dispositive motions he filed throughout the case "with perjured statements, forged evidence, or both." *Id.* Second, they stress that he has "repeatedly disregarded discovery orders," and that after all the hassle that resulted in sanctions against him, he only "pretended to comply with the Court's order to turn over a list of his bitcoin holdings" while withholding "the Tulip Trust III document for over six months before producing it in January 2020, without ever mentioning its existence (even though he was ordered to produce trust-related documents in May 2019)." *Id.* at 18. Third, they argue that Defendant "repeatedly submitted fabricated evidence to Plaintiffs and the Court over the course of discovery," including "mountains of forged documents (emails to/from Dave) to support his narrative in this case" and to avoid sanctions for refusing to provide his bitcoin list. *Id.*

Fourth, they contend that post-sanctions, Defendant "continued to fabricate key evidence including an email from his wife, a fake W&K LLC agreement, a fake family law settlement agreement, and the false CSW Filed List." *Id.* Additionally, he has "continued to lie directly to the Court" regarding his compliance with the Court's Order, such as by filing a "false Notice of Compliance indicating that he received the long awaited keyslice (he hadn't), he'd opened the encrypted file (he hadn't), and that he'd finally provided Plaintiffs with a true and correct list of his bitcoin (he hadn't)." *Id.* at 18-19. Fifth, he belatedly produced the Tulip Trust III document, and yet that document is inauthentic "because it either references entities that were not created (or owned by Wright) at the time of the document's purported creation, relied on software that did not

17

1030

Case No. 18-cv-80176-BLOOM/Reinhart

yet exist at the time of the document's purported creation, included font files that didn't exist at the time of creation, or digital forensics otherwise showed clear manipulation by" Defendant. *Id.* at 19. Further, they allege that Defendant's communications with Highsecured (whom Defendant claimed held approximately 700,000 bitcoin for him and spent at his direction) were manipulated, inauthentic, and Defendant "had the bitmessage private key to the purported Highsecured account enabling him to send messages as them (password to email account)." *Id.* (citing ECF Nos. [507-3]; [222], and [500-2]). Plaintiffs stress that it is "now apparent that—contrary to his *sworn* testimony—Wright can in fact access his Bitcoin holdings, even though the 'bonded courier' never arrived." *Id.* (emphasis in original).

Sixth, Defendant's deposition testimony has provided "irreconcilably inconsistent testimony, on essentially any matter that he was asked about twice, including key issues such as whether he and Dave mined bitcoin into a Panama trust or whether he typed certain emails." *Id.* at 19-20. Plaintiffs state that the alleged misrepresentations and discovery obstructions have "created delay after delay," and Defendant's "pervasive use of fabricated evidence" has "forced" Plaintiffs to obtain expert opinions that ordinarily would be "wholly unnecessary." *Id.* at 19. Therefore, Plaintiffs contend that default sanctions are appropriate against Defendant. Specifically, they contend that his "unrepentant pattern of lies and forgeries demonstrates his willful bad faith," and he has committed "numerous frauds upon the Court." *Id.* at 20-21. Further, his alleged misconduct has "prejudiced Plaintiffs in numerous ways," and "the evidence Wright has withheld, concealed, altered, and forged concerns *the key issues in this case*: whether Wright and David partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created. As a result, Plaintiffs have been deprived of *crucial*

1031

Case No. 18-cv-80176-BLOOM/Reinhart

*information* in support of their case." *Id.* at 21-22 (emphasis in original). They add that, overall, Defendant has made a "game of discovery" and hampered the truth-finding process. *Id.* at 22.

Plaintiffs argue that no lesser sanctions suffice because Defendant has already been sanctioned once before and since then, he has "continued to engage in the exact same egregious misconduct that got him sanctioned in the first place[.]" *Id.* They add that unless the Court intervenes, "there is every reason to expect that, at every chance, Wright will provide perjured testimony, create new forgeries, and support his positions with fabricated evidence." *Id.* at 23. However, they request that should the Court decline to enter default sanctions, the Court should pursue one of two options as alternative sanctions.

First, deem the following facts established: "(1) Dr. Wright and Dave [Kleiman] entered into a 50/50 partnership to develop blockchain-related intellectual property and mine bitcoin; (2) all bitcoin (and forked assets) included in the CSW Filed List is, and remains, property of the partnership; and (3) any such intellectual property developed by Wright prior to Dave's death is, and remains, property of the partnership." *Id.* at 24. According to Plaintiffs, Defendant's alleged misconduct has made it "extremely difficult to rely on any evidence produced by Wright in this action—including his own statements—to support any fact at issue in this litigation." *Id.* Thus, this alternative sanction "cures the wrongdoing." *Id.*

Second, as an alternative, Plaintiffs request the Court permit an adverse inference instruction as follows: "(1) Wright has committed perjury, produced fabricated evidence, and withheld relevant evidence with respect to whether (a) he and David were partners, (b) the activities of their partnership, and (c) the extent of the partnership's assets; and (2) the jury may, if it so chooses, properly infer from this misconduct that (a) Wright and David entered into a 50/50 partnership to develop blockchain-related intellectual property and mine bitcoin, (b) any such

1032

Case No.  18-cv-80176-BLOOM/Reinhart

intellectual property developed by Wright prior to Dave's death was property of the partnership, and (c) all bitcoin included in the CSW Filed List is property of the partnership." *Id.* at 24-25. Plaintiffs contend that each sanction requested bears a clear "nexus" to Defendant's misconduct.

## C.    DEFENDANT'S RESPONSE TO PLAINTIFFS' ALLEGATIONS

In response, Defendant asserts that the Motion "roll[s] out a parade of horrors detailing defendant's purported misconduct," yet Plaintiffs have not met their burden of proving by clear and convincing evidence that Defendant committed a fraud on the Court. ECF No. [551] at 2. Specifically, he maintains that Plaintiffs have failed to prove that "(1) defendant fabricated any evidence for this case, that he bribed the Court or a witness, (2) any supposedly false evidence goes to any 'linchpin' or critical issue in this case, (3) his counsel in this case was involved in any of the purported wrongdoing, and (4) defendant or his counsel at any time acted in bad faith, all of which plaintiffs are required to prove before this Court can deny defendant his Constitutionally-protected day in court. At most, what plaintiffs have done is argue that certain evidence—relating to collateral issues that have little, if anything to do with the actual merits of this case—is 'suspicious.' But 'suspicion is not enough.'" *Id.* (citation omitted).

Defendant raises four overarching arguments in support of denying the Motion. First, he asserts that Plaintiffs' arguments concerning Defendant's alleged misconduct should be addressed to the jury ("Defendant's Main Argument"). *See id.* at 3-25. Second, he contends that a large portion of the Motion functions as an untimely and inappropriate motion for reconsideration. *Id.* at 25. Third, he argues that Plaintiffs have waived the "new" purported discovery violations. *Id.* at 25-28. And fourth, he maintains that the Court already has rejected Plaintiffs' request for deemed facts and should do so again here. *Id.* at 29-30.

Case No. 18-cv-80176-BLOOM/Reinhart

> i.    *Defendant's main argument – no fraud on the court*

Defendant's Main Argument, at its core, is that Plaintiffs' allegations are not undisputed facts, they are not supported by admissible evidence, and Plaintiffs have not established those facts to be true. *Id.* at 3. Therefore, Defendant contends that the jury is the proper body to resolve any factual inconsistencies, and the Motion is thus "premature and unwarranted." *Id.* at 3-4. Nonetheless, Defendant argues that even if the Court could rule on the purported misconduct and even if Plaintiffs' allegations are true, "the severe sanctions [P]laintiffs seek are inappropriate because the alleged misconduct cannot constitute a fraud on the court[.]" *Id.* at 4.

First, Defendant submits that, as a general rule, creating fraudulent documents, making false statements, or committing perjury does not constitute a fraud on the court. *See id.* at 4-7. He argues that fraud on the court necessary to invoke a court's inherent power is fraud that is "directed to the judicial machinery itself" and not "fraud between the parties or fraudulent documents, false statements or perjury." *Id.* at 4-5 (citation omitted). Thus, while perjury and fabricated evidence "are evils that can and should be exposed at trial," fraud on the court instead "is limited to the more egregious forms of subversion of the legal process," which cannot necessarily be expected to be exposed by the normal adversary process. *Id.* at 5 (citations omitted).

Second, Defendant contends that the cases Plaintiffs rely upon are inapposite. Specifically, he asserts that the "select minority of cases" Plaintiffs use for the proposition that manufactured evidence or testimony is sufficient to impose a default judgment sanction are distinguishable because in those cases, "the manufactured evidence or testimony was made up by the party for the purposes of that litigation, it was relied on by the party in the litigation, and the false evidence played a pivotal and essential role in the party's defense or prosecution of the case." *Id.* at 7. In Defendant's view, those features "did not occur over here." *Id.*

21

1034

Case No.  18-cv-80176-BLOOM/Reinhart

Third, Defendant argues that Plaintiffs' theory that he purposefully manufactured documents to mislead the Court "makes no sense." *Id.* at 14. According to Defendant, Plaintiffs cannot explain why the appendix to the family law settlement contains Lynn Wright's signature, why her signature field has a blank spot on the W&K operating agreement, why Defendant would produce Bitmessage keys, or why he would forge emails that support Plaintiffs' case. *Id.* Additionally, he states that of the 1.9 million pages of documents he produced in this action, Plaintiffs have "identified an extremely small subset of documents that they claim are suspect." *Id.* at 15. He adds that many of the documents did not originate from his devices, and there is "ample evidence" that his computer systems were hacked. *Id.* In his opinion, he "cannot accept responsibility for every document that he has produced, especially when many of the nearly two million pages he has produced were not his own documents." *Id.*

Fourth, Defendant maintains that although Plaintiffs challenge that the alleged manufactured evidence goes to "key issues in this case," that is not so. In his view, there is "little evidence that [D]efendant manufactured evidence for the purposes of this litigation, that [D]efendant relied on the evidence in the litigation, or that the allegedly manufactured evidence played a pivotal and essential role in the [D]efendant's defense of the case[.]" *Id.* at 10-14. The Response proceeds to address each purported instance of manufactured evidence:

### a.    Tulip trust documents

Defendant contends that none of the Tulip Trust documents "have any bearing on whether there was a purported partnership with Dave Kleiman to mine bitcoin or develop intellectual property, which is what this case is actually about." *Id.* at 10. He adds that even if the Tulip Trust documents are forgeries, "they were not forged for the purposes of this litigation," and that

1035

Case No.  18-cv-80176-BLOOM/Reinhart

Plaintiffs' expert testified that Tulip Trust I and II documents were allegedly forged in 2014 or 2015. *Id.* (citing ECF No. [551-1] at 108:4-7).

### b.    Bitmessages and emails

Defendant asserts that the allegedly forged Bitmessages "primarily relate to the trust documents set up, not whether there was a partnership between defendant and Dave Kleiman." *Id.* at 10-11. He contends that "any minimal relationship that those messages may have to the partnership issue actually tends to support [P]laintiffs' theory of the case" and it "makes no sense" that he would "manufacture those documents" if they are "not helpful to him." *Id.* at 11. Similarly, he argues that while Plaintiffs claim many emails between Defendant and Dave Kleiman are forgeries, these emails support Plaintiffs' theory of the case that there was a partnership. *Id.* Thus, he posits that there is "no basis" for Plaintiffs to argue that Defendant manufactured evidence "to support his defenses or to prejudice [P]laintiffs' case." *Id.*

### c.    Email allegedly from Ramona Watts dated May 28, 2012

Defendant maintains that this allegedly forged email that Plaintiffs admit, if genuine, "appears to support Wright's story about keyslices, Dave, and trusts," ECF No. [507] at 14 (citing ECF No. [507-16]), has nothing to do with whether Defendant and Dave Kleiman partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created. ECF No. [551] at 11. Further, he adds that this email does not support Defendant's theory of the case, and there is "no evidence that defendant was involved in its creation, or that defendant intends to rely on that email at trial." *Id.* at 12.

### d.    Family law settlement

Defendant maintains that the allegedly forged appendix to Defendant's family law settlement "has nothing to do with the substantive issues in this case," and Defendant could not

1036

Case No.  18-cv-80176-BLOOM/Reinhart

have created this document "for the purposes of this litigation" because he did not have access to

the document since 2015. *Id.* Further, he notes that Defendant's former wife "authenticated the

document and twice testified that it was her signature on the document." *Id.* (citing ECF No. [488-

17] at 22:21-24:1; 98:13-16).

### e.    W&K's operating agreement

Defendant states that the allegedly fabricated W&K operating agreement "relates to

jurisdictional issues, not substantive issues," and Defendant has not relied on this document in his

dispositive motions. *Id.* He also contends that there is no evidence that this document is a "recent

forgery created for the purposes of this litigation[.]" *Id.*

### f.    Highsecured emails

Defendant contends that while Plaintiffs challenge that Defendant's communications with

Highsecured are "inauthentic," "the actual substance of those communications has nothing to do

with any purported partnership with Dave Kleiman." *Id.* (citing ECF No. [551-2]). In his view,

they are "innocuous emails" that do not relate to the central issues in this case, and Defendant has

not relied on them. *Id.*

### g.    Defendant's list of Bitcoin

Defendant argues that Plaintiffs have "fail[ed] to show how the list of bitcoin that

[D]efendant mined has any bearing on the purported partnership with Dave Kleiman to mine

bitcoin or to develop bitcoin-related intellectual property." *Id.* at 13. He notes that while Plaintiffs

have argued that a list of Defendant's bitcoin holdings is "crucial to the prosecution of their case,"

it is not possible to use the bitcoin holdings list to show that there was a partnership because

information recorded on the block chain "records non-personally identifiable control of each

Bitcoin amount," and the block chain records information about control, not ownership. *Id.* (citing

24

1037

Case No.  18-cv-80176-BLOOM/Reinhart

ECF No. [551-3]). Further, he argues that bitcoin containing a "Satoshi fingerprint" pattern cannot be used to prove Dave Kleiman was Satoshi Nakamoto because "mining is an anonymous activity" and there is "no way of knowing who mined that bitcoin." *Id.* (citing ECF No. [551-4]). Additionally, as to the CSW Filed List, Defendant contends that none of the evidence Plaintiffs present regarding this document is "conclusive of anything, or even admissible." *Id.* at 14. Thus, in his opinion, "Plaintiffs['] assertion that the correct list of bitcoin would enable them to prove all allegations in the complaint, including what bitcoin Dave Kleinman [sic] mined or owned, is baseless." *Id.*

### ii.    *Defendant's main argument – evidentiary hurdles*

Defendant maintains that even if the alleged misconduct is the type of misconduct that could constitute a fraud on the court, Plaintiffs fail to meet the evidentiary burden needed to impose sanctions. *Id.* at 15.

First, Defendant asserts that the clear and convincing evidence standard is used to determine whether Defendant engaged in purported misconduct that would warrant sanctions under a court's inherent power. *Id.* More than inconsistencies, suspicion, and contradictory statement are required to meet this evidentiary threshold. *Id.* at 16.

Second, he contends that the expert reports from Dr. Edman, Mr. Boedeker, and Mr. Antonopoulos, and the opinions contained therein are inadmissible hearsay and cannot meet the clear and convincing evidence standard. *Id.* He adds that the opinions expressed in these reports are the subject of his *Daubert* motion, ECF No. [500], and that if "given the opportunity to fully cross-examine the experts, defendant will undoubtably expose additional flaws in their opinions." *Id.* In his view, there is "no need to rush to judgment on an incomplete and hearsay riddled

1038

Case No.  18-cv-80176-BLOOM/Reinhart

'record,'" and if the expert opinions satisfy the *Daubert* standard, the jury should be the entity to weigh the evidence. *Id.* at 16-17.

Third, Defendant argues that any purported inconsistent statements (as a predicate for perjury) need to be viewed in light of his alleged cognitive disabilities, such as being on the autism spectrum. *Id.* at 24. According to Defendant, his expert, Dr. Klin, has "provided a closely reasoned opinion explaining how someone with defendant's diagnosis could be incorrectly perceived as having provided untruthful testimony." *Id.* at 25 (citing ECF No. [509-1] at 13-18).

Fourth, Defendant challenges that Plaintiffs' evidence as to the specific forgeries and purported misconduct is neither clear nor convincing. *Id.* at 17-24. The Response proceeds to show that "[n]ot every shadow is a monster," and that the evidence Plaintiffs rely upon are not "even forgeries in the first place[.]" *Id.* at 17.

### a.    Defendant's divorce settlement

Defendant states that while Plaintiffs argue that the June 2011 appendix to Defendant's family law settlement is a forgery, Plaintiffs have failed to establish that the appendix (which was not included in the Australian court file) should have been part of the 2013 court file. *Id.* He adds that the appendix is not a "court-facilitated settlement," and it was created when he and Lynn Wright separated, not in 2013 when they applied for a formal divorce. *Id.* He further states that while the divorce application provides that there were no binding family law agreements, that answer is contained in an "Other court cases" section and needs to be analyzed in that context. *Id.* at 18. Accordingly, Defendant posits that when he "answered 'No' it does not reflect that there are no binding family law agreements, but rather that there are no binding agreements entered into in connection with a court proceeding." *Id.* at 18 (emphasis omitted). In his view, because the 2011

26

1039

Case No.  18-cv-80176-BLOOM/Reinhart

settlement was not issued as part of a court case, "there was no reason why [he] should have listed it in the application." *Id.*

He contends that even if the settlement agreement needed to be listed on the application, its omission "doesn't necessarily mean that [the settlement agreement is] a forgery created for this litigation. It could be that he simply failed to properly fill out the form." *Id.* Defendant adds that even though Lynn Wright testified that she did not have a copy of the family law settlement, she authenticated the document, twice asserted that her signature was on it, and "common sense dictates that people don't always keep every scrap of paper from nearly a decade ago, especially when it could bring back painful memories, such as a divorce." *Id.* at 18-19. But, most importantly, Defendant states that Plaintiffs' theory "fully collapses" because the "DEFAUS" bates stamp on the appendix "establishes that the document was created prior to 2015 and that defendant didn't have access to the document since that date. In other words, it cannot possibly be a forgery created by defendant to defeat subject matter jurisdiction . . . unless, of course, plaintiffs maintain that defendant had the foresight to know that he would be sued in 2018 and would need such a document to defeat subject matter jurisdiction." *Id.* at 19.

**b.    Bitmessages**

Defendant argues that though the creator of Bitmessage, Johnathon Warren, testified that he was "as certain as you could possibly be that [certain messages] are forgeries," he also testified that a version of the bitcoin software could have been circulating on the dark web before the date the messages were sent, and that he kept a copy of the software running on an unprotected server. *Id.* (citing ECF No. [261-1] at 89:24-91:7; 104:16-105:22). Defendant contends, in any event, that Mr. Warren is not a forensic examiner and, thus, he has "no basis" to conclude that the allegedly forged Bitmessages are forgeries. *Id.*

1040

Case No. 18-cv-80176-BLOOM/Reinhart

### c.    Tulip Trust III

Defendant asserts that while the Tulip Trust III document claims to have been executed on July 7, 2017, yet lists JBruck Ltd (UK) (10859457) as an asset, which entity was not incorporated until July 11, 2017, Plaintiffs have "failed to establish that a corporation cannot have a corporate number prior to being incorporated, and they also have failed to establish that one cannot choose their own corporate number (and thus know in advance what the corporate number would be)." *Id.* at 20. He also contends that it is "not uncommon for people to sign documents without updating the dates throughout the document," and that "the mere fact that the document possibly was signed a few days after the date listed in the document does not mean that the document is a forgery, nor does it mean that it was created sometime after August 2019, as plaintiffs suggest." *Id.*

### d.    W&K operating agreement

Defendant argues that although the W&K operating agreement, allegedly executed in February 2011, references the Florida Revised Limited Liability Company Act, which was not enacted until June 2013, Plaintiffs "fail to consider that the 'Florida Limited Liability Company Act,' (*i.e.*, without the 'revised') did exist when the document purports to have been drafted." *Id.* (emphasis omitted). Thus, Defendant submits that it is "entirely possible that the document contains a miscite," and as such it is not clear and convincing evidence of fraud. *Id.* at 20-21.

### e.    Defendant's Notice of Compliance and the list of bitcoin addresses

Defendant argues that his Notice of Compliance provided Plaintiffs with "precisely the information they demanded—a list of what [Defendant] believes to be bitcoin that he mined prior to December 31, 2013." *Id.* at 21. He notes that "while the Notice of Compliance could have been clearer as to the exact circumstances of how defendant received the list of bitcoin, it does not follow that defendant intentionally set out to deceive this Court, especially when one considers

1041

Case No.  18-cv-80176-BLOOM/Reinhart

defendant's autism diagnosis." *Id.* Further, he contends that he "cleared up any resulting confusion" by virtue of his interrogatory responses providing a "detailed narrative" as to how he obtained his list of bitcoin addresses. *Id.* (citing ECF Nos. [404-1] and [507-8]). He additionally maintains that the CSW Filed List's alleged deficiencies, which document Plaintiffs conclude is an inaccurate list of his bitcoin holdings, do not meet the clear and convincing evidence standard.

First, he asserts that Plaintiffs' argument - that the CSW Filed List is a forgery because somebody spent the bitcoin in four addresses and included in the transaction bitcoin that are not contained on the list - reveals only that "somebody other than [D]efendant has access to some of the private keys of the bitcoin on [D]efendant's list." *Id.* at 22. In his view, this is "not a novel concept," and it is "entirely possible that the CSW Filed List inadvertently included some bitcoin that no longer belong to [D]efendant. That, of course, does not mean that the entire list is wrong or a forgery." *Id.* According to Defendant, "the list that he provided [P]laintiffs does not come from the encrypted file that he produced on August 27, 2019" but rather from the trust records "he obtained from his Kenyan lawyer." *Id.* at 22-23. He adds that this "response" also applies to the 144 bitcoin addresses listed in the Supplement. *Id.* at 23.

Second, Defendant contends that Plaintiffs' charge that the CSW Filed List is derived from the Shadders List because they both contain the same Shadder's Bug is misplaced because the Shadder's Bug is "a relatively common form of bug." *Id.* (citing ECF No. [551-4]). Further, Plaintiffs have not established that the Shadders Bug could not have been independently reproduced when the CSW Filed List was compiled. *Id.*

Third, Defendant asserts that Plaintiffs' claim that the CSW Filed List's "statistical evidence" that the transaction IDs are "not the result of someone having mined 16404 blocks on the bitcoin" is falsely premised on the transaction IDs needing to have a uniform distribution. *Id.*

1042

Case No. 18-cv-80176-BLOOM/Reinhart

According to Defendant, uniform distribution is "only relevant if one would expect (1) SHA 256 [hashing] to be uniformly randomly distributed, and (2) if one were not able to mine bitcoin in a manner to avoid certain Transaction IDs." *Id.* Regarding the former, Defendant asserts that Plaintiffs' expert relied on a Google search, "which isn't evidence of anything." *Id.* (citing ECF No. [500] at 21). Regarding the latter, Defendant states that one of Plaintiffs' different experts conceded that "one could adjust the bitcoin address or the Coinbase input to avoid certain transaction IDs." *Id.* (citing ECF No. [551-4]). Thus, "independent of the random uniformity (or lack thereof) of the SHA 256 algorithm, [P]laintiffs cannot establish that a list of bitcoin Transaction IDs must always be uniformly randomly distributed." *Id.*

Fourth, Defendant maintains that Plaintiffs' statement that the CSW Filed List does not contain every "known" Satoshi transaction does not present clear and convincing evidence "of anything," much less that the CSW Filed List is a forgery. *Id.* at 24. He adds that Plaintiffs "fail to consider that the trust may not have maintained records of spent bitcoin, and they also fail to consider that not every bitcoin was mined directly into the trust." *Id.* Further, he contends that Plaintiffs' theory that the CSW Filed List was "most likely created by . . . taking the Shadders List, sorting it by Transaction ID, deleting two large swaths of addresses, and then resorting the list by block height" is "demonstrably false[.]" *Id.*

   iii.  ***Much of the Motion is an untimely and inappropriate motion for reconsideration***

Defendant argues that the Motion "attempt[s] to rehash the same arguments" rejected by the Court in the Objections Order, and much of it is "nothing more than an untimely and inappropriate motion for reconsideration[.]" *Id.* at 25. He notes that "to the extent that [P]laintiffs are claiming that [D]efendant didn't produce a list of his bitcoin addresses, then this Court has

30

1043

Case No. 18-cv-80176-BLOOM/Reinhart

already determined that the sanction would be an instruction to the jury that [D]efendant has failed to provide that information." *Id.* (citing ECF No. [373] at 22; footnote omitted).

### iv. Plaintiffs have long waived the "new" purported discovery violation

Defendant asserts that his alleged discovery violations – (1) he did not "attempt to access and collect the three email accounts that belonged to Satoshi Nakamoto;" (2) he did not open an encrypted file; and (3) he purportedly changed his testimony about a Panama trust – do not support a sanctions award because Plaintiffs "are asking the wrong judge for the wrong remedy at the wrong time." *Id.* at 26. Specifically, he asserts that Plaintiffs should have filed a motion to compel "months ago," and thus "[a]ny arguments that [P]laintiffs had as to the Satoshi emails and the encrypted file have been waived long ago." *Id.* Even were that not so, he states that the premise of Plaintiffs' allegations is flawed.

First, he states that Plaintiffs fail to mention that Defendant did not log into accounts that he opened as Satoshi "because he no longer had access to those accounts." *Id.* (citing ECF No. [507-3]). Second, he contends that as to the encrypted file, Plaintiffs "offer no evidence that [D]efendant has access to it," and the "purported fact that some of the bitcoin listed on CSW Filed [L]ist moved or were signed simply demonstrates that someone other than [D]efendant has access to the private keys to some of the bitcoin." *Id.* at 27. In his view, this "does not mean that [D]efendant moved those bitcoins." *Id.* He adds that there is "absolutely no evidence" that the encrypted file "contains information that is relevant to [P]laintiffs' claims in this case," and that Plaintiffs merely speculate that it "contains evidence of a partnership, and that certain bitcoin belonged to the partnership along with bitcoin intellectual property." *Id.* Further, Defendant posits that Plaintiffs' theory "makes no sense" that he "would produce the purportedly incriminating

31

1044

Case No.  18-cv-80176-BLOOM/Reinhart

documents but refuse to produce (non-existent and supposedly) relevant documents on the encrypted file (that he doesn't have access to)." *Id.* at 27-28.

Third, Defendant asserts that his alleged inconsistencies regarding his testimony about mining bitcoin into a trust located in Panama is "clarified" by his testimony that "when he said 'I am mining,' it includes people who worked for certain companies who did the mining." *Id.* at 28 (citing ECF No. [551-7]). In his view, "there is no contradiction" between his testimony that he did and did not mine bitcoin into a trust in Panama. *Id.*

### v.    The Court previously rejected Plaintiffs' request for deemed facts

Defendant asserts that the "deemed facts" Plaintiffs seek as an alternative sanction are precisely the same Deemed Facts imposed in the Underlying Sanctions Order that the Court later reversed in the Objections Order. *Id.* at 29.[7] He states that "nothing has changed" to impose this sanction because there is "no nexus" between Defendant's alleged misconduct and the "deemed facts." *Id.*

### D.    PLAINTIFFS' REPLY

In their Reply, Plaintiffs make five primary arguments. *See generally* ECF No. [572]. First, they argue that imposing default sanctions will not violate Defendant's Seventh Amendment rights. *Id.* at 1. Second, they assert that Defendant has engaged in bad faith conduct that is sufficient to warrant default sanctions. In this respect, they acknowledge that while clear and convincing evidence of bad faith must be shown for default sanctions, fraud on the court need not be

---

[7] Defendant argues that the request for the "deemed facts" sanction is "little more than a back-door attempt" at a default judgment sanction because "the facts plaintiffs ask the court to deem establish[ed] would have the same effect as a default judgment in this case." ECF No. [551] at 29 n.20. In this regard, Defendant notes that while "non-dispositive issue-related sanctions only require proof by a preponderance of the evidence," because the "deemed facts would decide the central issues of the case, plaintiffs should be held to the higher, 'clear and convincing evidence' standard required for a default judgment." *Id.*

32

Case No.  18-cv-80176-BLOOM/Reinhart

demonstrated. *Id.* at 1-2. They further contend that Defendant's "linchpin" requirement does not exist; Defendant perpetrated a fraud on the court by repeatedly fabricating evidence, perjuring himself, and submitting a false notice of claim to avoid sanctions; Defendant's bad faith conduct is clear, pervasive, and ongoing; and Defendant fails to address his non-forgery related misconduct that merits default. *Id.* at 2-7. Third, Plaintiffs submit that they were prejudiced by Defendant's bad faith, and Defendant's argument that fabrications were immaterial or harmless "is absurd" *Id.* at 7. Specifically, they argue that Defendant fabricated evidence concerning pivotal issues and relied on that evidence to support his legal positions, and he cannot avoid default sanctions by claiming he did not fabricate evidence specifically for this litigation. *Id.* at 7-12. Fourth, they maintain that no lesser sanction will suffice because submitting Defendant's frauds to a jury is an inadequate remedy and an ineffective deterrent. *Id.* at 13-15. And finally, Plaintiffs argue that Defendant does not dispute the Court's authority to enter lesser sanctions. *Id.* at 15.

The Motion, accordingly, is ripe for consideration.

## II.    LEGAL STANDARD

The Court has an inherent power to sanction attorneys or parties to a case. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50-52 (1991). A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43. Such powers "must be exercised with restraint and discretion." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980). A district court's decision to impose sanctions under its inherent power is reviewed for an abuse of discretion. *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

The Eleventh Circuit has emphasized that "[t]he key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D.

33

1046

Case No.  18-cv-80176-BLOOM/Reinhart

Fla. 2005) (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001)); *see also Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("To exercise its inherent power a court must find that the party acted in bad faith."). "[T]he inherent power's bad faith standard narrows the range of conduct that can satisfy this higher threshold for sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1314-15 (11th Cir. 2010).

"Bad faith exists when the court finds that a fraud has been practiced upon it, or that the very temple of justice has been defiled, . . . or where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Allapattah*, 372 F. Supp. 2d at 1373 (citing *Chambers*, 501 U.S. at 45–46); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006) ("Bad faith can be found in several instances. First, bad faith may be found where the court finds that a . . . fraud has been practiced upon it, or that the very temple of justice has been defiled. . . . Second, bad faith may be found where a party delays or disrupts the litigation, or hampers the enforcement of a court order.") (internal modifications omitted); *Porton v. SP One, Ltd*, No. 6:15–CV–566–ORL, 2015 WL 1648893, at *2 (M.D. Fla. Apr. 13, 2015) ("The most severe sanction, dismissal with prejudice, may be appropriate when a plaintiff's recalcitrance is due to [willfulness], bad faith or fault."). "In determining whether sanctions should be awarded under the bad faith standard, 'the inquiry will focus primarily on the conduct and motive of a party, rather than on the validity of the case.'" *Barash*, 585 F. Supp. 2d at 1362 (quoting *Rothenberg v. Sec. Mgmt. Co., Inc.*, 736 F.2d 1470, 1472 (11th Cir. 1984)).

"The inherent powers doctrine is most often invoked where a party commits perjury or destroys or doctors evidence." *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1268–69 (S.D. Fla. 2007) (citing *Vargas v. Peltz,* 901 F. Supp. 1572, 1581–82 (S.D. Fla.

34

1047

Case No. 18-cv-80176-BLOOM/Reinhart

1995); *Chemtall, Inc. v. Citi–Chem, Inc.,* 992 F. Supp. 1390, 1410 (S.D. Ga.1998)). Further, when imposing sanctions pursuant to their inherent authority, courts require that the conduct or fraud be proven by clear and convincing evidence. *Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944178, at *2 (S.D. Fla. Mar. 17, 2016) (citing *Barash*, 585 F. Supp. 2d at 1365). "Clear and convincing evidence" is "evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue." *Friedman v. Schiano*, No. 16-CV-81975, 2017 WL 11487874, at *5 n.5 (S.D. Fla. Nov. 14, 2017), *aff'd*, 777 F. App'x 324 (11th Cir. 2019) (citations omitted).

Outright dismissal of a lawsuit, or entry of a default judgment, is a "particularly severe sanction, yet is within the court's discretion." *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1338 (S.D. Fla. 2007) (quoting *Chambers*, 501 U.S. at 45); *see also Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987) (noting that courts have "the inherent power to enter a default judgment as punishment for a defendant's destruction of evidence"). "Before the ultimate sanction of default judgment may be entered, this Court must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff[s] [were] prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the [goals of] punishment-and-deterrence[.]" *Telectron*, 116 F.R.D. at 131.

It is through these lenses that the Court considers the Motion and the parties' arguments.

## III.    DISCUSSION

Both parties agree that the entry of sanctions is within the Court's discretion, and that any such sanction would arise from the Court's inherent powers. Further, both parties agree that default sanctions can only be imposed upon clear and convincing evidence of bad faith.

35

1048

Case No.  18-cv-80176-BLOOM/Reinhart

Upon review of the record and careful consideration of the parties' briefings, the Court does not find that Plaintiffs have carried their burden to remove this case from the jury by striking Defendant's pleading and entering a default judgment as a sanction. To be sure, Plaintiffs depict unsettling issues that cast doubt regarding whether, since the Objections Order was entered in early January 2020, Defendant has committed perjury, produced forgeries, and engaged in judicial abuse. Further, the Court acknowledges  and certainly appreciates Plaintiffs' frustrations based on the events delineated in the briefings. However, these frustrations and doubts aside, significant factual disputes abound regarding the evidence presented, the role and importance of various pieces of evidence in the case, Defendant's intentions, and the credibility of witnesses. These determinations, and factual inferences and legal conclusions to be derived from them, are best suited for a jury to make as fact finder at trial, not for the Court to make.

For instance, as Plaintiffs note, Defendant's testimony has been glaringly inconsistent at numerous junctures. Defendant, however, stresses that he has been diagnosed as being on the autism spectrum, and thus his testimony needs to be evaluated in that light. ECF No. [551] at 24-25. *See Tarasewicz v. Royal Caribbean Cruises Ltd.*, No. 14-CIV-60885, 2016 WL 3944176, at *6 (S.D. Fla. Feb. 9, 2016), *report and recommendation adopted*, No. 14-CIV-60885, 2016 WL 3944178 (S.D. Fla. Mar. 17, 2016) ("Although Plaintiff's [cognitive] impairment does not explain every inconsistent statement, it undermines Defendants' argument that the inconsistencies were the product of a deliberate scheme to defraud the court."). Plaintiffs also assert that Defendant produced fabricated evidence during the course of this action, but Defendant counters that he has produced nearly two million pages of documents, including data from "well over 100 different media storage devices, many of which were used by former employees of [his] companies," and he contends that there is "ample evidence" that his computer systems were hacked. *Id.* at 15.

36

1049

Case No.  18-cv-80176-BLOOM/Reinhart

Similarly, although Plaintiffs challenge the veracity of the family law settlement, the Tulip Trust III, the W&K operating agreement, bitmessages, the CSW Filed List, and other documents, Defendant points to deficiencies in Plaintiffs' characterizations of the evidence and the claimed inconsistencies. *Id.* at 17-25.

Importantly, virtually all of the concerns raised as to the evidentiary matters at hand are fact-intensive, context-based, and require credibility determinations to resolve. They also rest on the Court making factual determinations that ultimately affect issues that go to the heart of this case. In other words, while the underlying determinations presented in the Motion ordinarily reside squarely within the provenance of a jury to decide at trial, Plaintiffs instead present them to the Court to sort out. In this regard, to warrant the "extreme" or "severe" sanction Plaintiffs request, which would remove this case from a jury trial, the clear and convincing evidence standard must be met. This is a formidable threshold, and the bad faith inquiry is not satisfied easily. Indeed, more than inconsistencies, contradictory statements, and suspicions is required to meet this standard. *See Tarasewicz*, 2016 WL 3944176. And "perjury and fabricated evidence do not constitute fraud upon the court, because they 'are evils that can and should be exposed at trial.'" *Leon v. M.I. Quality Lawn Maint., Inc.*, No. 10-20506-CIV, 2018 WL 6250529, at *12 (S.D. Fla. Nov. 29, 2018) (quoting *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985)). *See also Fahmy v. Sch. Bd. of Miami-Dade Cty.*, No. 09-23608-CIV, 2011 WL 13269611, at *3 (S.D. Fla. July 15, 2011) ("Given the extreme nature of dismissal as a sanction, the Eleventh Circuit Court of Appeals has held that fraud on the court does not generally encompass fraud between the parties, non-disclosure of material evidence, or perjury.") (citing *S.E.C. v. ESM Group, Inc.*, 835 F.2d 270 (11th Cir. 1988)).

37

1050

Case No. 18-cv-80176-BLOOM/Reinhart

In this setting and based on the record presented, Plaintiffs have not carried their burden to show that default sanctions are appropriate. Instead, they have laid the foundation for an overarching theme that Defendant, a "billionaire [mathematician], who stands to lose billions of dollars in this suit," "has run a risk/benefit analysis to determine that forgery and perjury is an 'affordable' in fact 'efficient,' mechanism to fight this case." ECF No. [507] at 23. The evidence and arguments Plaintiffs raise, in this regard, can be used to effectively persuade a jury, but they do not establish bad faith by clear and convincing evidence here. *See Bryant v. Troutman*, No. 3:05CV162-J-20MCR, 2006 WL 1640484, at *1-2 (M.D. Fla. June 8, 2006) (noting that the "fact that a party disputes his or her opponent's interpretation of the facts is not grounds for dismissal for fraud. . . . '[T]rials result from factual disputes. In these disputes, the facts on one side are, at best, less true and, at worse, false or fraudulent.' . . . to the extent [defendants] believe that Plaintiffs have been untruthful, Defendants will have ample opportunity to bring those untruths to light at trial") (citation omitted). Nor do they establish fraud on the court. *See Tarasewicz*, 2016 WL 3944176, at *4 ("[P]roving a fraud on the court requires 'clear and convincing evidence of an unconscionable plan designed to improperly influence the court in its decision.'") (quoting *Johnson v. Law Offices of Marshall C. Watson, PA*, 348 Fed.Appx. 447, 448 (11th Cir. 2009)). Here, Plaintiffs have aired longstanding grievances about Defendant's conduct throughout this case, but they have not shown clear and convincing evidence of an "unconscionable plan" designed to defraud the Court, most especially since the Objections Order was entered.

The Court, moreover, exercises its discretion and declines to impose Plaintiffs' suggested alternative lesser sanctions. For instance, the alternative Deemed Facts sanction is effectively dispositive of this case, and the Court agrees with Defendant that this "is little more than a back-door attempt at the same remedy" as default sanctions. ECF No. [551] at 29 n.29. Similarly,

1051

Case No.  18-cv-80176-BLOOM/Reinhart

although the Court previously left open the possibility that it would impose an adverse inference sanction under Rule 37(c)(1)(B) in the Objections Order, ECF No. [373] at 22, that was conditioned on Defendant not producing his list of bitcoin holdings. Since then, he purportedly has done so, subsequent discovery has taken place on that issue among many others, and dispositive motions and other pre-trial motions have been extensively briefed. Indeed, the parties have submitted voluminous filings encompassing hundreds of pages of briefings. As Defendant states, "Plaintiffs don't get to sit on their hands for months, wait for discovery to conclude, and then ask the Court to [sanction] [D]efendant because they believe [D]efendant failed to produce all the evidence to which they were entitled." ECF No. [551] at 26.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [507]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on June 24, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

39

1052

# TAB 611-14

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal)

representative of the Estate)

of David Kleiman, and W&K   ) Case No:

Info Defense Research, LLC, ) 9:18-cv-80176-BB/BR

        Plaintiffs,      )

        v.              )

CRAIG WRIGHT,          )

        Defendant.      )

- - - - - - - - - - -


CONFIDENTIAL


VIDEOTAPED DEPOSITION

JAMIE R. WILSON


Friday, November 8, 2019


Plaintiffs' Objections to Counters

Plaintiffs' Designations

Defendant's Objections

Defendant's Counter- Designations

Reported by:  Lori J. Goodin, RPR, CLR, CRR, RSA

California CSR #13959

Assignment No. 528739



```
                                                    Page 2

  1

  2

  3          The deposition of JAMIE WILSON was

  4   convened on Friday, November 8, 2019, commencing

  5   at 8:36 a.m., at the offices of

  6

  7          BOIES SCHILLER FLEXNER LLP

  8          1410 New York Avenue, Northwest

  9          Washington, D.C.  20005

 10

 11   before Lori J. Goodin, Registered Professional

 12   Reporter, Certified LiveNote Reporter, Certified

 13   Realtime Reporter, Realtime Systems Administrator,

 14   California CSR #13959, and Notary Public in and

 15   for the District of Columbia.

 16

 17

 18

 19

 20

 21

 22
```



```
                                                              Page 3
 1                        APPEARANCES
 2    For Plaintiffs:
          VELVEL FREEDMAN, Esquire
 3        ROCHE FREEDMAN
          200 South Biscayne Boulevard
 4        Suite 5500
          Miami, Florida  33131
 5        305-357-3861
          vel@rochefreedman.com
 6
      And Co-counsel:
 7        KYLE ROCHE, Esquire (via telephone)
          ROCHE FREEDMAN
 8        185 Wythe Avenue, F2
          Brooklyn, New York  11249
 9        929-457-0050
          kyle@rochefreedman.com
10
      And Co-counsel:
11        ANDREW S. BRENNER, Esquire
          BOIES SCHILLER FLEXNER LLP
12        11401 New York Avenue, Northwest
          Washington, D.C.  20005
13        202-237-2727
          abrenner@bsfllp.com
14
15    For Defendant:
          ZALMAN KASS, Esquire
16        BRYAN L. PASCHAL, Esquire
          JULIO PEREZ, Esquire (via video link)
17        RIVERO MESTRE
          565 Fifth Avenue
18        7th Floor
          New York, New York  10017
19        zkass@riveromestre.com
          bpaschal@riveromestre.com
20        jperez@riveromestre.com
21    ALSO PRESENT:
22        David Campbell, videographer
```



```
                                                      Page 4
1                        CONTENTS

   EXAMINATION BY                              PAGE

2  Mr. Freedman                               8, 168

   Mr. Paschal                                84

3

4                        EXHIBITS

   WILSON

5  EXHIBIT NO. DESCRIPTION                     PAGE

6  Exhibit 1   Mr. Wilson's resignation letters  18

7              10/23/2013

8              Defense Australia 108905-108908

9  Exhibit 2   E-mail from Wilson to Wright    24

10             9/20/2013, Defense 45496

11 Exhibit 3   Exhibit to Plaintiffs' complaint  32

12             Document 83-5

13 Exhibit 4   E-mail, Wright to Wilson        41

14             6/26/2013, Defense 28015

15 Exhibit 5   E-mail, Wright, cc Wilson       42

16             7/2/2013, Defense 266797

17 Exhibit 6   E-mail, Wright to Hardy,        44

18             cc Wilson, 10/9/2013

19             Defense 25094

20 Exhibit 7   E-mail, Wright, cc: Wilson      52

21             10/2/2013

22             Defense Australia 553926
```



Page 49

```
      1        Q.    Let me rephrase that.  Did you ever
AA
      2   come to understand what he meant by fate and

      3   other circumstances?

      4        A.    No.

      5              MR. PASCHAL:  Objection, form.

      6   BY MR. FREEDMAN:

      7        Q.    Did he ever tell you what fate and

      8   other circumstances meant?

      9        A.    No.  And I didn't ask the question

     10   either.

     11        Q.    Did he ever give you any more -- did

     12   Craig -- strike that.

     13              Did Craig ever give you any more
AA
L    14   color or explanation on what he meant by Dave was

     15   a "an essential part of this project"?

     16              MR. PASCHAL:  Objection, form.

AA   17              THE WITNESS:  Yes.  In that they
L    18         worked together.

     19              Now, I believed that Dave was the
AA
L    20         original start.  He started looking on the
S
F    21         Blockchain.  And then later on Craig joined

     22         it; it was a joint thing together, though.
```



Page 50

1    BY MR. FREEDMAN:

L       2        Q.    And did you form that belief through
F
BOL     3    statements Craig made to you?

        4        A.    Yes.

L       5        Q.    Okay.  When he refers to "this
F
S       6    project," did you take that to mean the mining of

        7    all of this Bitcoin?

        8        A.    Yes.

9        MR. PASCHAL:  Objection, form.

10    BY MR. FREEDMAN:

       11        Q.    How did you take the project to mean

       12    when he said Dave was an essential part of this,

L      13    of the, of this project?  How did you take "this

       14    project" to mean?

15        MR. PASCHAL:  Objection, form.

L      16        THE WITNESS:  It was the mining.

17    BY MR. FREEDMAN:

L      18        Q.    The mining of?

       19        A.    Bitcoin.

20        Q.    Okay.  Thank you.

       21        Do you see if you turn the page over

       22    to Defense 25095, do you see there is a graphic



1058

Page 139

1    encrypted file.  Do you recall that line of

2    questioning?

3          A.    Yes.

4          Q.    And he asked you several times?

5          A.    And was he able to get, and was he

6    not able to get access to it.

7          Q.    Let me break that down.

F        8          Do you know how Craig Wright
S        9    obtained Bitcoin?

        10          A.    Through mining.  With Dave Kleiman,

        11    that was my understanding.

        12          Q.    What is your understanding based on?

H        13          A.    From Craig saying that it was

        14    working with a great mate who was in the U.S.,

        15    Dave.  And they set up Bitcoin and that it was

        16    Hitoshi --

17          Q.    Were those the statements to you,

18    were there any other statements that you recall

19    right now?

20          A.    No.  No.

21          Q.    So, from those statements, you --

22    well, let me back up.



1059

Page 140

1           Craig Wright never told you that he

2    mined with Dave?

3           A.    Yes, he did.

4               MR. FREEDMAN:  Object to form.

5    BY MR. PASCHAL:

6           Q.    Well, when did he tell you that?

7           A.    Well that is how I knew all about

8    the Bitcoin and his wallets.

9           Q.    Mr. Wilson, I asked you a second ago

10   what were all of the statements that Mr. Craig

11   Wright made to you to make you think that.

12              You did not say that Craig Wright

13   said I mined Bitcoin with Dave.

14              MR. FREEDMAN:  Object to form.  You

15      are mischaracterizing.

16              MR. PASCHAL:  He did not say that.

17      That is why the live feed is helpful.

18              THE WITNESS:  You know, Dave, not

19      Dave, Craig, had been mining it for quite

20      some time.

21   BY MR. PASCHAL:

22           Q.    Well, let me ask you -- I'm sorry,



# TAB 611-20

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:9:18-cv-80176-BB/BR

-----------------------------------------
IRA KLEIMAN, as the personal        )
representative of the Estate of David )
Kleiman, and W&K Info Defense        )
Research, LLC                        )
                    Plaintiffs,.     )
                                     )
            v.                       )
                                     )
CRAIG WRIGHT                         )
                    Defendant.       )
-----------------------------------------

VIDEO-TAPED DEPOSITION OF

MR. ANDREW O'HAGAN

On

Tuesday March 17, 2020

At the offices of:
Simons Muirhead & Burton LLP
87-91 Newman St, Fitzrovia,
London W1T 3EY,
United Kingdom

taken by:
AMY COLEY, Court Reporter

Plaintiffs' Designations

Defendant's Objections

Defendant's Counter- Designations

Redacted-In black



1061

Page 2

```
 1                   A P P E A R A N C E S
 2
     For the Plaintiffs (via telephone):
 3
     BOIES SCHILLER FLEXNER LLP
 4   100 SE 2nd Street, Suite 2800
     Miami, Florida 33131
 5   Tel. 305-539-8400.
     Email: Abrenner@bsfllp.com.
 6
     By: Andrew S. Brenner, Esq.
 7
 8   ROCHE CYRULNIK FREEDMAN LLP
     200 S. Biscayne Blvd, Suite 5500
 9   Miami, Florida 33131
     Telephone: (305) 357-3861.
10   Email: Vel@rcfllp.com.
11   By: Velvel (Devin) Freedman, Esq.
12
     ROCHE CYRULNIK FREEDMAN LLP
13   99 Park Avenue, Suite 1910
     New York City, NY 10016
14   Email: Kyle@rcfllp.com.
     Email: Jdelich@rcfllp.com.
15
     By: Kyle W. Roche, Esq.
16   Joseph M. Delich, Esq.
17
     For the Defendant (via telephone):
18
     RIVERO MESTRE LLP
19   2525 Ponce de Leon Boulevard, Suite 1000
     Miami, Florida 33134
20   Phone: 305.445.2500
     E-mail: Arivero@riveromestre.com
21
     By: Amanda McGovern
22   Andrés Rivero, Esq.
     Julio Paez, Esq.
23
24
25
```



```
                                                      Page 3
 1
      For Mr. O'Hagan:
 2
      MILLER KORZENIK SOMMERS RAYMAN LLP
 3    Paramount Plaza, 1501 Broadway
      Suite 2015, New York, NY 10036
 4
      By David Koreznik, Esq.
 5    Terrence Keegan, Esq.
 6    English Counsel for Mr. O'Hagan:
 7    SIMONS MUIRHEAD & BURTON
      87-91 Newman St, Fitzrovia,
 8    London W1T 3EY, United Kingdom
 9    By Jude Bunting, Esq.
10
      Also present:
11
      Ms. Alison Green (The Examiner via Telephone)
12
      Martin Soames, Erica Henshilwood, Flora
13    Bezzenberger (Simons Muirhead & Burton)
14
      Amy Coley (Court Reporter on behalf of Magna Legal
15    Services)
16    Linda Fleet (Videographer on behalf of Magna Legal
      Services)
17
18
19
20
21
22
23
24
25
```



Page 82

1    that he has even attributed to Dr. Wright.

2              MR. BRENNER:  Ms. McGovern, you can

3    read it the way you would like to read it.  Let me

4    ask a follow-up question to you.

5    BY MR. BRENNER:

6         Q.    Mr. O'Hagan, I am on that same

7    sentence?

8         A.    Yes.

9         Q.    Do you see that?  Is it accurate

10   that Dr. Wright told you that Dave Kleiman was the

11   man that helped him do Satoshi's work?

12        A.    Yes.

13             MR. KORZENIK:  Object, he says -- I

14   am sorry, he says -- the man he says, sorry.

15   BY MR. BRENNER:

16        Q.    Let me ask it again, because we got

17   broken up.  Is it accurate, sir, that --

18   Mr. O'Hagan, is it accurate that Dr. Wright told

19   you that Dave Kleiman was the man that helped him

20   do Satoshi's work?

21        A.    It is what he said, yes.

22        Q.    Okay.  Reading on, it says:  "They

23   met online, they visited the same cryptography

24   forums and had interacted since 2003."  Is that

25   accurate?

H
L

L-H



1064

Page 88

```
 1          Q.     And that is an accurate statement
 2    of what Dr. Wright told you?
 3          A.     It is.
 4          Q.     Then it goes on to say, and again,
 5    in quotes, I believe, although my copy is a little
 6    up there, is the rest of that paragraph in quotes?
 7          A.     Yes.
 8          Q.     Okay, great.  My copy is a little
 9    unclear.  It says: "I did not really want people
10    to respond to me, there are a couple of reasons
11    for that.  I do not I think really would have sold
12    the idea to anyone.  If I come out originally as
13    Satoshi without Dave I do not think it would have
14    gone anywhere.  I have had too many conversations
15    with people who get annoyed because it is me."  Is
16    that accurate writing of what Dr. Wright told you?
17          A.     That is what he said.
18          Q.     If you go to the following page
19    which will be, I am going to direct you three
20    paragraphs into the next page ----
21          A.     Beginning?
22          Q.     So the paragraph begins with,
23    "I had brought rolls..."
24                 MR. BUNTING:  It is the same page.
25          A.     Okay, for us, same page, yes, I am
```

H
L



Page 89

1      there.

2                  MR. BRENNER:  Let me give a second

3      for folks to get there.

4                  MR. KORZENIK:  I am there.

5      BY MR. BRENNER:

6            Q.      Okay.  The only reason I directed

7      you to that paragraph is that at the end of that

8      paragraph it appears you have a quote from

9      yourself, do you see that?

10           A.      Yes.

11           Q.      And not asking -- the quote from

12     yourself, is you asked Dr. Wright, "Was there a

13     primary person doing the maths?"  Do you see that?

14           A.      Yes, I see that.

15           Q.      Do you see that, sir?

16           A.      Yes.

17           Q.      And that is a question you asked

18     Dr. Wright?

19           A.      It is.

20           Q.      And then the next paragraph has his

21     answer; correct?

22           A.      Yes.

23                  MS. McGOVERN:  Object to the form.

24     BY MR. BRENNER:

25           Q.      His answer is:  "Me.  Dave was not

H-L

H
L

H, L



Page 90

H
L

1    really a mathematician, what he did was make me

2    simplify it."  Do you see that?

3          A.      I do.

4          Q.      Is that an accurate statement of

5    what Dr. Wright told you, in response to your

6    question about the primary person doing the maths?

7                  MS. McGOVERN:  Object to the form;

8    leading.

H, L   9          A.      That is what he said.

10   BY MR. BRENNER:

11         Q.      Did we lose Mr. O'Hagan?

12         A.      No, I am still here.

13         Q.      You came off my screen.

14                 MR. BRENNER:  Does anyone else see

15   Mr. O'Hagan?

16                 MR. FREEDMAN:  I do see

17   Mr. O'Hagan.  The answer to that last question is,

18   "That is what he said."

19                 MR. BRENNER:  Okay.  The reason

20   I have lost Mr. O'Hagan is Ms. McGovern's

21   microphone appears to be the one active right now.

22   I can see ----

23                 MR. FREEDMAN:  Mr. Brenner, if you

24   right-click the video of Mr. O'Hagan -- sorry, if

25   you hover over the little screen, you can see



Page 99

1          A.     Yes.

2          Q.     Thank you.  To give context for the

3    quotes we are about to go through, in this

4    paragraph, are you reading from or have you been

5    provided an e-mail from Wright dated March 2008?

6          A.     Is your question did I have a copy

7    of that e-mail?

8          Q.     Yes, sir?

9          A.     I did.

10          Q.     And so the next quote, is that a

11    quote from the e-mail from Dr. Wright?

H-L

12          A.     Yes.

13          Q.     Okay, and that e-mail, is that

14    e-mail to Mr. Kleiman, Dave Kleiman?

15                MR. KORZENIK:  Objection.  What

16    does it say?

17                MR. BRENNER:  You would have to go

18    back -- okay.

19                MS. McGOVERN:  Same objection.

20    BY MR. BRENNER:

21          Q.     Let us read the quote then I will

22    ask you the question.  Are you quoting from the

H-L

23    e-mail, by the way?

24          A.     Yes.

25          Q.     The quote says:  "I need your help



1068

Page 100

H-L

```
 1   editing a paper I am going to release later this
 2   year.  I have been working on a new form of
 3   electronic money, bitcash, Bitcoin.  You are
 4   always there for me, Dave, I want you to be part
 5   of it all.  I cannot release it as me, GMX,
 6   Mr. Mail(?) and tour, I need your help and I need
 7   a version of me to make this work that is better
 8   than me."  Does that finish that quote?
 9          A.    Yes.
```

```
10          Q.    Is that a quote from an e-mail from
11   Dr. Wright to Dave Kleiman in March 12, 2008?
12                MR. KORZENIK:  Objection, with what
13   is the fact asserted here?
14                MR. BRENNER:  I am sorry, I did not
15   hear you.
16                MR. KORZENIK:  I am objecting to
17   it, I am saying we should stick with what -- with
18   the factual assertion within the article.
19                MR. BRENNER:  Yes, but I am
20   entitled to know what he is quoting.
21                MR. KORZENIK:  He can say it is
22   accurate, but he does not know the provenance of
23   the e-mail.  He knows what he looked at.
24                MR. BRENNER:  Fair enough.
25   BY MR. BRENNER:
```



Page 101

```
 1          Q.     From your review of that e-mail,
 2     the March 12, 2008 from Dr. Wright, from your
 3     review of that e-mail, who was that e-mail
 4     addressed to?
 5          A.     It was my understanding that that
 6     e-mail was from Dr. Wright to Dave Kleiman.  That
 7     is what he told me.
 8          Q.     Thank you.
 9          MR. KORZENIK:  I am just going to
10     object to going off the particular lines in the
11     article.  In other words, if the article says that
12     it comes from an e-mail from Wright or whoever
13     then we can confirm the accuracy of that.  But
14     I do not want to get into a discussion of what he
15     thinks, outside of confirming the particular
16     statement made in the article.
17          MR. BRENNER:  And that is fair
18     enough.  I am trying to give this some context.
19     If you read the paragraphs leading up to it, it is
20     clearly as the witness described, it is clearly
21     the e-mail to Mr. Kleiman, even within the e-mail
22     itself.  He has answered the question.
23     I understand what you are doing.  All I am trying
24     to do is not leave things unclear on the record.
25     I understand your objection and I will do my best
```

H



Page 144

1             MS. McGOVERN:  Objection to form.

2    This is below with respect to the ellipses, that

3    apparently suggest there are other things said

4    that are not there, so whether it is an accurate

5    quote is a statement that cannot be answered on

6    the record.

7             MR. BRENNER:  It does not sound

8    like a form of objection, but thank you.

9    BY MR. BRENNER:

10            Q.     It is accurate that Dr. Wright

11   said:  "It proves I have keys, other things we'll

12   be releasing will help, some people will believe

13   and some people won't and to tell you the truth

14   I don't really care."

15            A.     He said those words.

16            Q.     The next quote is from Mr.

17   Cellan-Jones.  He says:  "But you can say hand on

18   heart 'I am Satoshi Nakamoto.'"  Did I read that

19   right?

20            MS. McGOVERN:  Object to the form.

21            A.     You read it right, yes.

22   BY MR. BRENNER:

23            Q.     The next quote, is it accurate that

24   Dr. Wright said:  "I was the main part of it,

25   other people helped.  At the end of the day none



1071

Page 145

H
L

1  of this would have happened without Dave Kleiman,
2  without Hal Finney and without those who took over
3  like Gavin and Mike."  Is that accurate?
4       A.     That is what he said.

MCD

5       Q.     The next quote -- on my copy the
6  next page, a page and a third down, the paragraph
7  starts with, "Also at 8 a.m." it is right after
8  the long block work?
9       A.     Yes, I have it.

10              MR. BRENNER:  Folks, other counsel,
11  let me know if you are able to find it.
12              MS. McGOVERN:  I am not sure where
13  you are.
14              MR. BRENNER:  Sure.  So on the next
15  page there is a subheading called "life rights",
16  and in that section there is a paragraph and a
17  longish block quote.
18              MR. KORZENIK:  Yes.
19              MR. BRENNER:  The next paragraph
20  starts with, "Also at 8 a.m."
21              MR. KORZENIK:  Yes, got it.
22  BY MR. BRENNER:

H

23       Q.     Thank you.  Thank you.  In this
24  paragraph, to give context, this is -- I am in the
25  back part of the paragraph, the bottom half of the



# TAB 615

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No.  18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## <u>OMNIBUS ORDER</u>

      **THIS CAUSE** is before the Court upon Defendant's Motion for Summary Judgment, ECF

No. [487] ("Defendant's Motion"), and Plaintiffs' Motion for Partial Summary Judgment on

Defendant's Affirmative Defenses, ECF No. [498] ("Plaintiffs' Motion")[1] (collectively, the

"Motions"). The Court has considered the Motions, all supporting and opposing submissions (ECF

Nos. [526], [533], [560], and [561]),[2] the record in this case, the applicable law, and is otherwise

fully advised. For the reasons set forth below, Defendant's Motion is denied, and Plaintiffs' Motion

is granted in part and denied in part.

_____

[1] Plaintiffs' Motion was filed under seal. On May 12, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' Motion, ECF No. [493], and directed Plaintiffs to refile the Motion with redactions. *See* ECF No. [502]. On May 18, 2020, Plaintiffs' Motion was refiled with redactions. *See* ECF No. [511]. For ease of reference, the Court cites to ECF No. [498].

[2] Plaintiffs' response to Defendant's Motion was filed under seal, ECF No. [533], and Plaintiffs' reply in support of Plaintiffs' Motion was filed under seal, ECF No. [560]. On May 25, 2020, the Court denied Plaintiffs' motion to seal Plaintiffs' response, ECF No. [530], and directed Plaintiffs to refile the response with redactions. *See* ECF No. [538]. The Court similarly denied Plaintiffs' motion to seal their reply, ECF No. [563]. On June 1, 2020, Plaintiffs' response was refiled. *See* ECF No. [549]. For ease of reference, the Court cites to ECF No. [533]. On June 12, 2020, the Court ordered the Clerk of Court to unseal Plaintiffs' reply. *See* ECF No. [579].

1073

Case No.  18-cv-80176-BLOOM/Reinhart

**TABLE OF CONTENTS**

I.  **BACKGROUND AND MATERIAL FACTS**……………………………………………**3**

II.  **LEGAL STANDARD**……………………………………...................**25**

III.  **DISCUSSION**………………………………………………..............**28**

A.  **Defendant's Motion**………………………………………………**28**

    1.  ***Subject matter jurisdiction and Ira Kleiman's authority to file the action on behalf of W&K***……………………………………**32**

    2.  ***Statute of limitations***…………………………………...................**36**

        a.  A genuine dispute of material fact exists whether the alleged partnership ended in 2011…………………………………………...**40**

        b.  The Australian judgments did not trigger a statute of limitations commencing on November 6, 2013…………………………………**41**

    3.  ***Oral partnership and statute of frauds***………………………...................**52**

        a.  A genuine dispute of material fact exists whether Defendant and Mr. Kleiman entered into an oral partnership…………………………**54**

            i.  Plaintiffs' approach……………………………………**54**

            ii.  Defendant's approach…………………………………**57**

        b.  The statute of frauds does not bar claims based on the oral partnership…………………………………………………**62**

    4.  ***Preemption***……………………………………………… **64**

    5.  ***Fraud claim***…………………………………………………**68**

        a.  Fraud……………………………………………………**69**

        b.  Constructive fraud…………………………………………**74**

B.  **Plaintiffs' Motion**………………………………………………**77**

    1.  ***Accord and satisfaction, release, waiver, payment, set-off, and failure to mitigate damages***…………………………………………**77**

    2.  ***Estoppel***…………………………………………………**79**

    3.  ***Res judicata and collateral estoppel***…………………………………**83**

    4.  ***Statute of limitations and laches***…………………………………**85**

    5.  ***Good faith***…………………………………………………**86**

    6.  ***Unclean hands***…………………………………………………**87**

1074

Case No.  18-cv-80176-BLOOM/Reinhart

7.    *Statute of frauds* ............................................................................**90**

8.    *Personal jurisdiction* .....................................................................**92**

**CONCLUSION** ..................................................................................**93**

****************************

## I.    BACKGROUND AND MATERIAL FACTS

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68],[83], [87], [265], and [373]. The initial complaint was filed on February 14, 2018. ECF No. [1]. On January 14, 2019, Plaintiffs filed the operative Second Amended Complaint ("Complaint"), ECF No. [83]. The Complaint alleges that Defendant and David Kleiman ("David Kleiman" or "Mr. Kleiman") were former business partners that created Bitcoin[3] under the pseudonym Satoshi Nakamoto. Between 2008 and before David Kleiman's death in April 2013, the two allegedly worked together on Bitcoin, mining bitcoins and developing blockchain related intellectual property. Starting in 2008 through February 2011, they allegedly worked together as a partnership, and from February 2011 until Mr. Kleiman's death in 2013, they conducted their work through Plaintiff W&K Info Defense Research LLC ("W&K"). During this period, significant amounts of bitcoins allegedly were mined and acquired by Defendant and Mr. Kleiman and valuable intellectual property was developed. This lawsuit concerns a dispute over the ownership of bitcoins and Bitcoin-related intellectual property.

The Complaint alleges that following David Kleiman's death, Defendant perpetrated a fraudulent scheme to seize Plaintiffs' bitcoins and their rights to certain blockchain related intellectual property. This scheme included, among other things, producing fraudulent documents

---

[3] "Bitcoin" can refer to both a computer protocol and a unit of cybercurrency. The Court uses "Bitcoin" to refer to the particular cybercurrency system (like "the U.S. Dollar") and "bitcoin" to refer to the unit of exchange (like "dollars").

1075

Case No.  18-cv-80176-BLOOM/Reinhart

and forging David Kleiman's signatures on documents to purportedly show that David Kleiman transferred to Defendant bitcoins and intellectual property rights belonging to David Kleiman and W&K before David Kleiman's death. Since then, Defendant has taken sole ownership and control over the bitcoins and related intellectual property and refuses to return any bitcoins or intellectual property to either the estate or W&K. Plaintiffs seek relief against Defendant through various causes of action:[4] conversion (Count I); unjust enrichment (Count II); misappropriation (Count III); violation of the Defend Trade Secrets Act (Count IV); breach of fiduciary duty (Count V); breach of partnership duties of loyalty and care (Count VI); fraud (Count VII); constructive fraud (Count VIII); permanent injunction (Count IX); and civil theft (Count X).

On May 8, 2020, the parties filed the instant Motions and accompanying statements of material fact. *See* ECF Nos. [488] ("Def.'s SOMF") and [495] ("Pls.' SOMF").[5] The parties then filed responses to the Motions on May 22, 2020, *see* ECF Nos. [526] ("Defendant's Response") and [533] ("Plaintiffs' Response"),[6] and counterstatements of material facts. *See* ECF Nos. [531] ("Def.'s CSOMF") and [534] ("Pls.' CSOMF").[7] On June 2, 2020, the parties filed replies in

---

[4] On December 27, 2018, the Court dismissed with prejudice as time barred Plaintiffs' claims for misappropriation (Count III) and violation of the Defend Trade Secrets Act (Count IV) under a preceding version of the Complaint. *See* ECF No. [68].

[5] Plaintiffs' Statement of Undisputed Material Facts, ECF No. [495], was originally filed under seal. On May 25, 2020, the Court directed the Clerk of Court to unseal this filing. *See* ECF No. [539].

[6] Plaintiffs' Response was originally filed under seal. On June 1, 2020, Plaintiffs refiled this filing without redactions. *See* ECF Nos. [549] and [566].

[7] Plaintiffs' Opposing Statement of Material Facts, ECF No. [534], was filed under seal. On June 1, 2020, Plaintiffs refiled this filing with redactions. *See* ECF No. [550].

4

1076

Case No. 18-cv-80176-BLOOM/Reinhart

support of the Motions. *See* ECF No. [560] ("Plaintiffs' Reply")[8] and ECF No. [561] ("Defendant's Reply").

Defendant makes six primary arguments: (1) Plaintiffs' claims are time-barred, and the statute of limitations accrued no later than November 6, 2013; (2) Plaintiffs cannot establish that an oral partnership existed between Defendant and Mr. Kleiman, but even if there was such a partnership, it would be void for vagueness and claims based on it would be barred by the statute of frauds; (3) Plaintiffs' common law claims are preempted and displaced by Fla. Stat. § 688.008; (4) the Court lacks subject matter jurisdiction based on evidence of W&K's membership; (5) Ira Kleiman, Mr. Kleiman's brother and the estate's personal representative, lacked authority to file this action on behalf of W&K; and (6) Plaintiffs' fraud and constructive fraud claims cannot be established based on the record. *See generally* ECF No. [487].

Plaintiffs respond as follows: (1) their claims are not barred by the statute of limitations, and regardless their claims would be tolled by the doctrines of fraudulent concealment and equitable estoppel; (2) the record contains sufficient evidence to support the existence of a partnership under Florida law; (3) claims based on the alleged partnership are not barred by the statute of frauds; (4) Defendant fails to present any credible evidence that diversity jurisdiction is lacking, and supplemental jurisdiction should be exercised alternatively; (5) Ira Kleiman had authority to file this action on behalf of W&K; (6) Plaintiffs' fraud and constructive fraud claims are well supported by record evidence; and (7) Plaintiffs' claims are not preempted. *See generally* ECF No. [533]. Defendant replies that Plaintiffs' claims are time-barred, neither fraudulent

---

[8] Plaintiffs' Reply was originally filed under seal. On June 15, 2020, the Court directed the Clerk of Court to unseal this filing. *See* ECF No. [579].

Case No.  18-cv-80176-BLOOM/Reinhart

concealment nor equitable estoppel apply to toll the limitations period, there is no evidence of an oral partnership, and the statute of frauds applies. *See generally* ECF No. [561].

Plaintiffs seek summary judgment on each of Defendant's fourteen affirmative defenses: accord and satisfaction; release; waiver; payment; set-off; failure to mitigate damages; estoppel; res judicata and collateral estoppel; statute of limitations; laches; good faith; unclean hands; statute of frauds; and lack of personal jurisdiction. *See generally* ECF No. [498]. Defendant responds that Plaintiffs' claims are time-barred; laches and unclean hands bar Plaintiffs' claims for equitable relief; the statute of frauds applies; W&K's claims are barred by res judicata; Plaintiffs are judicially estopped and equitably estopped from asserting their claims; Defendant did not abandon his "Coin-Exch" defenses; and he is entitled to preserve his defense of lack of personal jurisdiction. *See generally* ECF No. [526]. Plaintiffs reply as follows: (1) the Court should deem admitted facts in their statement of material facts; (2) they are entitled to summary judgment on the Coin-Exch defenses; (3) Defendant's statute of limitations and laches defenses fail because of lack of evidentiary support, the doctrines of equitable estoppel and fraudulent concealment, Plaintiffs' claims are timely and, in any event, Defendant was not prejudiced by any delayed filing; (4) the statute of frauds defense fails; (5) Defendant's estoppel defense is legally unavailing; (6) Defendant cannot establish his res judicata defense because he forfeited any opposition to Plaintiffs' arguments that preclusion would defeat the ends of justice and the claims were not decided on the merits, res judicata cannot apply based on the Australian lawsuits given the lack of service of process, and Defendant's extrinsic fraud precludes applying res judicata; (7) Defendant's "new" unclean hands defense fails; (8) the personal jurisdiction defense cannot stand; and (9) summary judgment is warranted on Defendant's good faith defense. *See generally* ECF No. [560].

1078

Case No.  18-cv-80176-BLOOM/Reinhart

Based on the parties' statements and counterstatements of material facts,[9] along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

### A.    The relationship between David Kleiman and Defendant

In January and February 2013, Defendant referred to Mr. Kleiman as his "partner." Pls.' CSOMF at ¶ 51 (citing ECF Nos. [534-1]; [534-2]; [534-3]). Defendant considered Mr. Kleiman to be his "best friend." ECF Nos. [511-1] at 200:3; [534-4] at 140:14; 149:15-22; 193:7-9; 196:9-10; 198:2-5; 202:25-203:1. In January 2013, Defendant emailed Mr. Kleiman to ask, "I know you have been paying people from Bitcoin in your own wallet, is this enough to account for it all? It has been a shitload of work." Pls.' CSOMF at ¶ 142 (citing ECF No. [534-1] at 3).

Defendant told Ira Kleiman in May 2014 that he "did partner ;)" with David Kleiman. *Id.* at ¶ 89 (citing ECF No. [83-2]). Further, in May 2015, Defendant wrote an email to Michele Seven in which he stated that "[i]n the past, David Kleiman was my best friend and business partner." *Id.* at ¶ 90 (citing ECF No. [534-9] at 1). In that same email, Defendant stated that he had known Mr. Kleiman since the 1990s and they "have many shared secrets." *Id.* at ¶ 128 (citing ECF No. [534-9] at 1). He also texted Mark Ferrier in February 2013 that "my partner Dave and I have been

---

[9] In Plaintiffs' Opposing Statement of Material Facts, ECF No. [534], Plaintiffs asserted additional material facts, *see id.* at 12-26, in response to Def's SOMF. Defendant did not file a reply statement of material facts to Pls.' CSOMF in violation of Local Rule 56.1(a)(3) and 56.1(b)(3)(A). A party's failure to controvert an opposing statement of material facts deems those facts admitted. *See* L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]"). This is so even for purposes of a cross-motion for summary judgment. *See, e.g.*, *Franklin v. CitiMortgage, Inc.*, No. 1:15-CV-4396-LMM-WEJ, 2016 WL 11577288, at *1 n.1 (N.D. Ga. Sept. 8, 2016), *report and recommendation adopted*, No. 1:15-CV-4396-LMM-WEJ, 2016 WL 11577241 (N.D. Ga. Oct. 12, 2016); *Cohen v. DeKalb Cty. Sch. Dist.*, No. 1:09-CV-1153-WSD, 2012 WL 12948996, at *1 n.1 (N.D. Ga. June 26, 2012) (collecting cases). Thus, facts alleged in Pls.' CSOMF that Defendant failed to address with a reply statement of material fact are deemed admitted where they are otherwise supported by evidence in the record as are facts elsewhere that have not been controverted properly by a party.

1079

Case No. 18-cv-80176-BLOOM/Reinhart

working on something of a while now. . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back." *Id.* at ¶ 91 (citing ECF No. [534-3] at 2-3). He also told Australian police, in the context of a police investigation, that "[t]his is an idea that I had developed with my business partner David KLEINMAN [sic] (David) for a period of over a decade." *Id.* at ¶ 93 (citing ECF Nos. [534-11] at 4; [534-12] at 4; and [534-47] at 4).

When asked in a media training session whether he was "trying to claim all the credit" for Bitcoin or if Satoshi Nakamoto was instead a "combination of people and minds," Defendant responded that he "had a lot of help. In particular a friend of mine who died a few years ago, Dave Kleiman, gave me a lot of help[.]" *Id.* at ¶ 96 (citing ECF No. [534-13] at 1). In that same session, when asked how many bitcoins he mined, Defendant stated that he "mined quite a number and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." ECF No. [534-13] at 6. He also stated that "[h]ow many people were involved in Satoshi is probably a better question. That was two of us." *Id.* Defendant further stated that "Dave was a key part of everything that I did. Dave spoke as Satoshi," and he and Mr. Kleiman are Satoshi Nakamoto. *Id.* at 7. Additionally, when asked who created the pseudonym Satoshi, he stated "[m]ostly myself, and a little bit with Dave. Both of us acted. Dave was the nice version of Satoshi." *Id.* at 20.

In October 2013, Defendant wrote an email to Michael Hardy and others in which he stated, "David Reese and David Kleiman have both been essential parts of this project. . . . David Kleiman was my best friend." *Id.* at ¶ 100 (citing ECF No. [534-16] at 1). In March 2014, Defendant wrote an email to Ira Kleiman in which he stated "I will not take from Dave. I had an idea, but it would never have executed without Dave[.] Dave was my sounding board, he fixed my errors." *Id.* at ¶ 102 (citing ECF No. [534-17] at 3). Additionally, in an interview with the ATO, Defendant reportedly stated, "[w]hen we were starting originally, we looked at bitcoin value of probably $20

8

1080

Case No. 18-cv-80176-BLOOM/Reinhart

million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million." *Id.* at ¶ 104 (citing ECF No. [534-18] at 11). He also told the ATO that "[t]here was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies," and that the trust was set up as a "funding mechanism . . . for research." *Id.* at ¶¶ 105, 132 (citing ECF No. [534-18] at 7).

In April 2014, Defendant wrote to Ira Kleiman that the "Tax office know[s] that Dave and I have been working on this since 2008." *Id.* at ¶ 106 (citing ECF No. [83-20] at 1). He also wrote to Ira Kleiman in March 2014 that "I am not a team player. I am a terrible boss and slave driver, but with Dave I was far more." *Id.* at ¶ 108 (citing ECF No. [534-17] at 4). In May 2017, when Ira Kleiman asked Defendant if Mr. Kleiman had compiled the code for the first version of Bitcoin, Defendant replied, "Yes. We both played. Dave compiled. He never just used binaries." *Id.* at ¶ 111 (citing ECF No. [534-19]). Relatedly, in March 2014, Defendant told Ira Kleiman that Defendant "had math skills and some coding, that frankly was crud" but "Dave could edit his way through hell and back." *Id.* at ¶ 112 (citing ECF No. [534-17] at 4).

In November 2015, Defendant told Mr. Paige that reporters "ignored the stuff Dave and I did when he was alive. . . . Dave helped design the firm one and as you know did a fair amount of research with me. Most yet to be completed and published." *Id.* at ¶ 125 (citing ECF No. [83-8] at 13). He later wrote "[w]hen it all comes out, there is no way Dave will be left out. We need at least a year more." *Id.* at ¶ 125 (citing ECF No. [83-8] at 12). Defendant credited Mr. Kleiman with their shared work on "smart contracts." *Id.* at ¶ 126 (citing ECF No. [534-12]). In February 2014,

9

1081

Case No.  18-cv-80176-BLOOM/Reinhart

Defendant wrote an email to Mr. Conrad and Mr. Paige stating "Dave and I had a project in the US. He ran it there. We kept what we did a secret." *Id.* at ¶ 127 (citing ECF No. [534-24] at 3).

In April 2014, Defendant wrote to Ira Kleiman that he had "convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time." *Id.* at ¶ 152 (citing ECF No. [83-20] at 7). In June 2015, Ramona Watts (Defendant's wife) wrote to Ira Kleiman, stating "Craig and I have put our entire life savings into this business, as did Dave[.]" *Id.* at ¶ 147 (citing ECF No. [534-31] at 1).

Defendant and Mr. Kleiman shared control over the bitcoin private keys that were shared online. *Id.* at ¶ 149 (citing ECF Nos. [534-32] and [534-33] at 1). In April 2014, Defendant wrote to Ira Kleiman that "[i]n doing what we wanted to do, Dave and I arranged for the sale or [sic] around 500,000 BTC." *Id.* at ¶ 150 (citing ECF No. [534-26] at 1). Defendant told the ATO that "Dave has . . . an estate . . . and I wanted to make sure I didn't rip off his estate and just go, 'Ha ha, it's my software.'" ECF No. [534-18] at 42. Further, in a February 2019 blogpost, Defendant stated that "[i]n order to fund my work, Dave Kleiman and I sold code that was used in gaming illegal out of countries such as Costa Rica. David took the biggest risk because gambling is not illegal in Australia. Nothing he was able to earn in Panama was able to be repatriated legally in the USA." Pls.' CSOMF at ¶ 153 (citing ECF No. [534-34] at 4).

According to Plaintiffs, Satoshi Nakamoto is known to have communicated from at least two email addresses, Satoshi@vistomail.com and Satoshin@gmx.com. *Id.* at ¶ 154 (citing ECF No. [500-5]). In February 2014, Defendant wrote an email to Ira Kleiman stating that Mr. Kleiman "had the vistomail account" and Defendant "had the gmx one." *Id.* at ¶ 155 (citing ECF No. [534-

1082

Case No.  18-cv-80176-BLOOM/Reinhart

35] at 1). Defendant told James Nguyen that he and Mr. Kleiman "both posted from Satoshi account sometimes." *Id.* at ¶ 156 (citing ECF No. [534-16] at 197:34).

### B.    David Kleiman's experience

A declaration submitted by Mr. Kleiman in a Florida state court lawsuit stated that he is a "recognized computer security expert who has worked in the Information Technology sector since 1990. I specialize in computer forensics, data security, and analysis. I have been accepted to testify as a computer expert witness in the United States federal courts, Florida state courts, and United States military courts. I have also served as a court-appointed neutral expert on computer forensic matters. I am a former Florida Certified Law Enforcement Officer, and I have assisted law enforcement agencies in computer crime analysis. Additionally, I am a published author on the subjects of information security and computer forensics." ECF No. [488-12] at 15-16.

### C.    Trusts and bitcoin mining

In May 2012, Defendant wrote an email to Mr. Kleiman in which he stated that "we do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions[.]" *Id.* at ¶ 133 (citing ECF No. [83-13]). Defendant told the ATO that all of the assets of the Tulip trust were sourced from him and Mr. Kleiman. *Id.* at ¶ 134 (citing ECF No. [534-25] at 7). He also told the ATO that he and Mr. Kleiman had 1.1 million bitcoin, which was worth approximately $20 million but by "Dave's death, that had gone up to . . . $100 million." *Id.* at ¶ 135 (citing ECF No. [534-18] at 11).

In March 2011, Mr. Kleiman wrote an email to Defendant in which he stated, regarding profits and losses, "[a]re we ever going to get a wage on this? Just kidding I trust you." *Id.* at ¶ 140 (citing ECF No. [534-28]). Defendant told the ATO that Mr. Kleiman put bitcoin into a trust to fund their joint research activities. *Id.* at ¶ 141 (citing ECF No. [534-18] at 7). In November 2012,

11

1083

Case No.  18-cv-80176-BLOOM/Reinhart

Mr. Kleiman purportedly wrote a bitmessage to Defendant stating "you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust[.]" ECF No. [534-30] at 5. In May 2013, shortly after Mr. Kleiman died, Defendant emailed Mark Ferrier stating, "I have a trust overseas. I moved it and the mining process to Dave Kleiman when I had a few issues with the tax ppl [sic]." Pls.' CSOMF at ¶ 114 (citing ECF No. [534-20] at 2). He later wrote in an email to Mark Ferrier that he "had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin we created in the OS trust and companies[.]" *Id.* at ¶ 115 (citing ECF No. [534-20] at 2).

In a January 2014 LinkedIn message to Benjamin Wright, Defendant wrote, "Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead." *Id.* at ¶ 116 (citing ECF No. [534-21] at 1). Additionally, in an email from December 2012, Mr. Kleiman told Defendant that "[w]e only need one dormant and untraded company to sit as a[n] owner of the bitcoin we are mining into them." *Id.* at ¶ 117 (citing ECF No. [534-22] at 1). In April 2014, Defendant told his wife, his company's CFO, and the company's lawyer that "Dave mined all of this outside Australia" and "I was not the person doing the mining. Dave was." *Id.* at ¶ 118 (citing ECF No. [534-22] at 1).

In April 2014, Defendant wrote an email to Ira Kleiman stating that "Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already." *Id.* at ¶ 119 (citing ECF No. [83-20] at 3). Defendant also reportedly told the ATO that a "long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform . . . Dave and I had been friends and sort of partners that way for a long time." *Id.* at ¶ 120 (citing ECF No. [534-18] at 5). He told the ATO that he and Mr. Kleiman "had worked on a number of patents together . . . We

1084

Case No.  18-cv-80176-BLOOM/Reinhart

had been planning putting together an exchange platform that would allow us ….. or bitcoin." *Id.* at ¶ 121 (citing ECF No. [534-18] at 5).

Defendant told Australian law enforcement that the "idea conceived by David and me, was to develop a system that integrated Supervisory Control and Data Acquisition (SCADA) software and a Bitcoin exchange." *Id.* at ¶ 123 (citing ECF No. [534-11] at 5). He also wrote to Mark Ferrier in 2013 that "what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that] is property that can be atomically traded and loaned via the block chain," and solve how "a transaction could be issued potentially even after a confirmation if the block chain is reorganized." *Id.* at ¶ 124 (citing ECF No. [534-3] at 2).

### D.    The communications between Defendant and Ira Kleiman

On February 11, 2014, Defendant contacted Ira Kleiman's father, Louis Kleiman, by email stating as follows:

Hello Louis,

Your son Dave and I are two of the three key people behind Bitcoin . . .

If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.

Know also that Dave was a key part of an invention that will revolutionise the world . . .
I will talk to you again soon.

When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.

I will let you know when I am in the USA.

13

Case No. 18-cv-80176-BLOOM/Reinhart

ECF No. [83] at ¶ 133 (citing ECF No. [83-23]). On February 12, 2014, Louis Kleiman replied:

"After reviewing the information you sent, I want to thank you very much. . . . I look forward to

any information you can give me about my son DAVID. To me, he was alway's [sic] someone

special." Pls.' CSOMF at ¶ 76 (citing ECF No. [511-16]). Ira Kleiman took over corresponding

with Defendant after this because Louis Kleiman was elderly. ECF No. [83] at ¶ 134. In March

2014, Ira Kleiman wrote to Defendant that his "family is truly blessed to know you." ECF No.

[534-39] at 7.

> On April 23, 2014, Ira Kleiman wrote an email to Defendant stating as follows:
>
> Craig,
>
> Just as Dave believed in your vision and abilities, I share that same belief. There is
> no doubt in my mind that you are capable of achieving the goals you have set. And
> I am still in awe of your brilliance.
>
> However, since receiving the documents from the ATO and spending more time
> reviewing them, I feel like there are questionable discrepancies in the contracts
> between you and W&K such as Dave's signatures, his resignation, transfer of all
> accountable value, Uyen's role of Director, BAA projects, etc. No need to go into
> details.
>
> I can understand how you may have felt pressured to take actions to secure the
> business you and Dave started. And the last thing I want to do is stifle the growth
> of it. But I do believe we need to remedy the lopsided contractual exchange.

ECF No. [83-24] at 20. When asked, "you're saying that Craig made false statements and induced

you into doing certain things. What did he induce you into doing?[,]" Ira Kleiman stated "I guess

– well, I don't want to speculate. I don't know." ECF No. [488-13] at 164:14-19. In April 2014, in

response to an email from Ira Kleiman stating that "it appears clear to see a systematic transfer of

assets out of W&K back to you" and that Defendant "never mentioned any of the actions you were

taking against W&K prior to contacting us," Defendant wrote to Ira Kleiman that "[t]his was not

14

1086

Case No.  18-cv-80176-BLOOM/Reinhart

about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did

that action as accountants etc advised it was necessary." ECF No. [534-38] at 8-9.

In April 2014, Defendant further wrote to Ira Kleiman that "Dave died. I did the actions to

make sure the court signed off on what Dave and I planned." ECF No. [83-24] at 18. He also later

wrote, "I do not know what you have been led to believe. But I am not trying to take anything from

Dave's estate." *Id.* at 6. He also wrote to Ira Kleiman that "[t]he software Dave updated and which

I have transferred back in OUR company, and it is OURs as you are Dave's heir[.]" ECF No. [511-

8] at 1. According to Plaintiffs, Defendant promised to provide the estate with shares in a new

company he represented as having assets worth millions of dollars. Pls.' CSOMF at ¶ 81 (citing

ECF Nos. [511-2] at 50 and [511-8] at 7).

Defendant also wrote to Ira Kleiman that the "reason for the transfer is to use the R&D tax

credit on the value of the software Dave and I developed." Pls.' CSOMF at ¶ 137 (citing ECF No.

[83-20] at 18). Defendant wrote to Ira Kleiman stating that "Dave and I decided to start Coin-Exch

so that we could lock in some of the value. . . . We locked in the value of the software based on

the price of BTC then, which was less than now and if it was a year later we would have been

smart, but we took the option to cash out." *Id.* at ¶¶ 138, 148 (citing ECF No. [534-26] at 1).

Defendant stated in April 2014 that the idea of "locked in payments" was David Kleiman's

idea. ECF No. [511-8] at 8. In August 2015, Ira Kleiman wrote to Defendant that "I wish I could

believe that you have my best interest at heart . . . But after the long delays of promised payments

I was to receive each October and the strange offer to purchase my shares from a[n] undisclosed

investor, obviously I have my doubts." ECF No. [498-18] at 1. Defendant responded that "until

we sort out the ATO issues we just don't have any money to pay anyone. Unless we sort out the

ATO we are in a very difficult position, however frustrating this is for you[.]" *Id.* Defendant

1087

Case No.  18-cv-80176-BLOOM/Reinhart

stopped responding to Ira Kleiman's emails by October 9, 2015. Def.'s CSOMF at ¶ 51 (citing ECF No. [498-19] at 1).

**E.    David Kleiman's work papers and hard drives**

Ira Kleiman testified that during Thanksgiving dinner in 2009, David Kleiman told him that he was working to develop digital money and that it would be "bigger than Facebook," and he drew for him what would become the symbol for Bitcoin. ECF No. [488-13] at 14:8-22:5. He stated that David Kleiman's involvement in Bitcoin was "secretive" according to what Defendant told him. *Id.* at 17:3-8. Ira Kleiman further testified that Mr. Kleiman "told me in a very vague way that he was working on Bitcoin. He didn't specifically say Bitcoin so I could never go back and attach it to him. During those next 2010, 2011 if I had heard of Bitcoin I wouldn't have thought oh, that's what Dave was working on." 20:14-22. After the Thanksgiving dinner, Ira Kleiman did not talk with Mr. Kleiman about his statements made during that dinner. *Id.* at 22:6-23. After Mr. Kleiman's death, Ira Kleiman was appointed the personal representative of the Estate of David Kleiman. Pls.' CSOMF at ¶ 24.

On February 18, 2014, Ira Kleiman wrote an email to Defendant stating that he felt "nervous about making mistakes," and that he "very well could have already made some months ago by throwing away a bunch of Dave's papers and format[ted] drives that I couldn't access." ECF No. [488-14] at 261-262. He testified that after Mr. Kleiman died, he discarded "some papers and hard drives" and that he "first examined to see if there was anything on them" and once he found out that there was not, he formatted two hard drives. *Id.* at 44:20-45:3; 53:3-4. He stated that he did not find evidence of the digital currency that Mr. Kleiman said would be bigger than Facebook before he formatted and threw those papers away. *Id.* at 45:5-8. He testified that the

16

1088

Case No. 18-cv-80176-BLOOM/Reinhart

papers he threw out "didn't look relevant to keeping," *id.* at 48:10-14, and that "a lot of the stuff [he] threw out could have just been like junk mail," such as advertisements. *Id.* at 49:13-17.

Regarding the two formatted drives, Ira Kleiman stated he was "concerned" because he was using them for his own personal uses, which uses occurred following Mr. Kleiman's death until after the lawsuit was filed. *Id.* at 53:6-54:23. He further testified that he "guess[ed]" "part of" the reason he stopped using the devices is because he was concerned it would appear that he was trying to delete things. *Id.* at 55:17-22. According to Nicholas Chambers, the formatting that occurred on the hard drives after Mr. Kleiman's death permanently overwrote data previously existing on them and rendered the data unrecoverable. ECF No. [488-15] at ¶ 45.

### F.    Australian lawsuits

In July and August 2013, Defendant filed two lawsuits against W&K after Mr. Kleiman died. Pls.' CSOMF at ¶¶ 52-53 (citing ECF Nos. [83-11]; [511-1]; [534-4]). Defendant filed two claims in New South Wales Supreme Court in Australia against W&K for approximately $28 million each. ECF No. [83] at ¶ 117 (citing ECF No. [83-11]). Defendant's employee, Jamie Wilson, signed two papers in August 2013 purportedly on behalf of W&K consenting to a transfer of all W&K's assets to Defendant. Pls.' CSOMF at ¶ 54 (citing ECF Nos. [83-19] and [511-9] at 68:15-69:21). The Consent Orders do not purport to transfer any bitcoin. *Id.* at ¶ 57 (citing ECF No. [83-19]). The Consent Orders reflect "consent" by W&K and Defendant to the entry of judgment against W&K. ECF No. [83-19] at 2, 4. Mr. Wilson testified that he was never a director, shareholder, or officer of W&K. ECF No. [498-9] at 33:9-16. When presented with a copy of an affidavit Defendant submitted in the Australian court proceeding stating that there had been an August 2013 meeting where it was moved that Mr. Wilson would "act as a director for purposes of consenting to orders and the company to be wound down," Mr. Wilson testified that "[t]his is

Case No.  18-cv-80176-BLOOM/Reinhart

my first knowledge that I was acting as a director of the U.S. company." *Id.* at 69:22-70:10. He further stated that "[t]his is my first that I am being made aware that I was a director of the LLC company." *Id.* at 71:8-12.

In a court hearing on October 31, 2013, Defendant informed the Australian Registrar that he owned 51% percent of the shares of W&K. ECF No. [498-10] at 1. He also stated that "[w]e have actually taken control of the accounts and whatever else, which we've got stat decs for that, so effectively this is a formality because we have actually – the company has controlled all of the accounts now." *Id.* at 2. In a court hearing held on November 6, 2013, Defendant told the Registrar that he is "now the sole shareholder in an American company," and that he "own[s] all the shares over here and want[s] to bring everything back in." ECF No. [498-11] at 1. Judgments were then entered in the Australian court proceedings on November 6, 2013 reflecting the Consent Orders. ECF No. [83-22]. Specifically, the November 6, 2013 "Supreme Court of NSW Record of Proceedings" state that money judgments were entered in favor of Defendant and that it is "the agreement of the parties that [Craig Wright] will accept the transfer of intellectual property held by the plaintiff [Craig Wright] in full satisfaction of the judgment." *Id.* at 4-5, 8. The transcript from the November 6, 2013 hearing reflects that the entry of orders brought the Australian court proceedings "to a conclusion." ECF No. [498-11] at 2.

Mr. Conrad testified that Mr. Kleiman would use a "Drop Box . . . for his business and I guess personal items[.]" ECF No. [488-2] at 26:3-9 (the "Mailbox"). The Mailbox address was 4371 Northlake Blvd., Palm Beach, FL 33410. *Id.* According to Plaintiffs, W&K used a different address for service of process. *See* Pls.' CSOMF at ¶ 29 (citing ECF No. [83-3] at 2). W&K is a Florida limited liability company. ECF No. [83-3]. Zachary Eisner, W&K's corporate representative, testified that 4371 Northlake Blvd. is a "UPS store." [498-13] at 104:5-6. On

18

1090

Case No.  18-cv-80176-BLOOM/Reinhart

October 9, 2010, David Kleiman sent an email to Ira Kleiman and others that included the Mailbox address in his signature block. Pls.' CSOMF at ¶ 31. The Articles of Incorporation for W&K listed 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410 as the "mailing address of the Limited Liability Company." ECF No. [83-3] at 2. The "street address" for W&K was listed as 3119 Contego Lane, Palm Beach Gardens, FL 33418. *Id.* Further, Mr. Kleiman was listed as the registered agent for W&K, and the registered agent's address was listed as 3119 Contego Lane, Palm Beach Gardens, FL 33418. *Id.*

In Australia,[10] Defendant testified by affidavit that in July 2013, W&K was served by mailing a copy of the Statement of Claim to 437l Northlake Blvd. #314, Palm Beach Gardens, FL 33410. Pls.' CSOMF at ¶ 58 (citing ECF No. [83-4] at 4). He also testified that in July 2013, W&K was served by leaving a copy of the Statement of Claim at W&K's registered address for service of 3119 Contego Lane, Palm Beach Gardens, FL 33410. *Id.* In August 2013, in two documents titled Acknowledgement of Liquidated Claim from the Australian court proceedings, Defendant

---

[10] Australian attorney, Gordon Grieve, submitted an affidavit in this lawsuit stating that "[w]here a court process is required to be served outside Australia the document need not be served personally so long as the document is otherwise served in accordance with the laws of service applicable in the foreign jurisdiction in which service is to take place." ECF No. [33-1] at ¶ 49. He also stated that "where the method of service is not effective under the local law, this may affect the recognition of the Australian judgment in that jurisdiction." *Id.* at ¶ 50. Further, he stated that "[g]enerally, an Australian party commencing proceedings has to apply to the Supreme Court Registrar for service under the Hague Service Convention." *Id.* at ¶ 52. He added that "[t]his request is subject to certain mandatory form requirements. In particular, the litigant must include the following: a. model letter of request; b. Summary of Documents to be Served; c. Certificate of Service for the foreign court to complete; d. documents to be served; e. certified translations where necessary and f. an undertaking as to costs." *Id.* at ¶ 53.

Mr. Grieve stated that, if satisfied, the Registrar will sign the request for service abroad and the documents are to be forwarded to the designated Central Authority. *Id.* at ¶ 54. He further stated that the Central Authority will then make arrangements for service, and the Central Authority will then remit a Certificate of Service back to the Australian Registrar advising that service has or has not been effectuated. *Id.* at ¶¶ 55-56. Defendant asserts that service through the Central Authority is not the only acceptable method of service under the Hague Convention. Def.'s CSOMF at ¶ 31.

1091

Case No. 18-cv-80176-BLOOM/Reinhart

listed his Australian address as the "[a]ddress for service" for W&K, and he is labeled as W&K's "Director/Australian Agent." *Id.* at ¶ 59 (citing ECF Nos. [83-30] at 3 and [534-5] at 11). The documents also reflect that Defendant acknowledged that he is the "legal agent and representative" for W&K, the defendant in those proceedings. ECF No. [83-30] at 2, 4.

A Notice of Listing in one of the Australian lawsuits reflects that it was addressed to W&K at 4371 Norhtlake [sic] Blvd 314, Palm Beach, FL 33410. ECF No. [488-2] at 54. The Notice of Listing is dated September 3, 2013 and was issued in the case styled *Craig Steven Wright v W & K Info Defense Research LLC*. *Id.* The document states that "[t]he matter is listed for Directions (Common Law Register) on 30/10/2013 at 9:00 AM, Supreme Court – Civil, Supreme Court Sydney Court 9C Queens Square Sydney," and noted that "[i]f you do not appear at Court, this matter may be dealt with in your absence." *Id.* The Notice of Listing also stated that "[l]isting details for cases" are "published on the internet . . . on the afternoon before the case is listed." *Id.* The notice letter did not include a summons, a statement of claim, a notice of the alleged scope and grounds of jurisdiction, or the right to challenge service. Pls.' CSOMF at ¶ 61 (citing ECF No. [488-2] at 54). Mr. Eisner testified that the Notice of Listing was received at W&K's mailing address listed on its Articles of Incorporation, but W&K was not served with process. *Id.* at 107:12-18.

The Notice of Listing was received by Mr. Conrad, Mr. Kleiman's partner in Computer Forensics, LLC. Pls.' CSOMF at ¶ 67 (citing ECF No. [488-2] at 25:25-26:2). Mr. Conrad was not the registered agent for W&K and he was not authorized to accept service on W&K's behalf. *Id.* at ¶ 68 (citing ECF No. [83-3]). Mr. Conrad testified that he did not recall any conversations where he told Ira Kleiman about the Australian court document. *Id.* at ¶ 70 (citing ECF No. [488-2] at 26:19-21). Mr. Conrad testified that he recalled receiving the document and handwriting the

20

1092

Case No. 18-cv-80176-BLOOM/Reinhart

received date (October 10, 2013) on it with a Sharpie pen because "it looked like some sort of legal proceeding that was being instituted so [he] felt like it was important to document exactly when [he] received it[.]" ECF No. [488-2] at 25:20-26:17.

Ira Kleiman testified in a declaration that he never received service of process for any of the Australian lawsuits. ECF No. [50-1] at 2. He also testified that he first became aware of the claims Defendant filed in Australia on April 15, 2014 when he was contacted by the Australian Tax Office ("ATO"). ECF No. [50-1] at 2; *see also* ECF No. [83-20] at 18. Plaintiffs state that Mr. Kleiman's estate was not a party to the two consent proceedings filed by Defendant against W&K in Australia; however, Defendant asserts that W&K was served at Mr. Kleiman's mailing address. Def.'s CSOMF at ¶¶ 7, 22 (citing ECF No. [488] at ¶¶ 33-34).

Mr. Conrad testified that he had never heard of W&K until he received the Notice of Listing. Pls.' CSOMF at ¶¶ 64-65, 69 (citing ECF Nos. [488-2] at 26:6-9, 34:1-3). Mr. Paige stated that he first learned about W&K (based on the Notice of Listing) "[w]hen it showed up in a mailbox that was used by the company, Computer Forensics, LLC" in 2013. ECF No. [488-1] at 26:7-27:7, 41:6-13, 43:22-44:13, 115. He testified that the first communications he had with Ira Kleiman about W&K generally, and specifically about the Australian court notice, were in March 2016. Pls.' CSOMF at ¶ 72.

Ira Kleiman was not aware of W&K's existence until he learned about it from Defendant in 2014. *Id.* at ¶ 73 (citing ECF No. [488-14] at 33:3-4, 126:25-127:13, 144:8-10). He did not learn about the Australian Notice of Listing until 2016 when Mr. Paige first mentioned it to him. *Id.* at ¶ 74 (citing ECF No. [488-1] at 43:22-44:13, 115). Ira Kleiman was informed by Mr. Paige in late March 2016 that the "original court mailing about WK" had been located, and Ira Kleiman asked Mr. Paige if he could "keep that letter and envelope in a safe place" so that he could "check it out

21

1093

Case No.  18-cv-80176-BLOOM/Reinhart

sometime." ECF No. [488-1] at 115-17. In May 2014, Mr. Paige communicated with Ira Kleiman and asked him to take over control of the Mailbox and pay for its renewal, but Ira Kleiman declined to do so. *Id.* at 123-24.

On March 28, 2014, nearly a year after Mr. Kleiman died, W&K was reinstated by Uyen Nguyen. Pls.' CSOMF at ¶ 79 (citing ECF Nos. [83] at ¶ 139; [534-7]). Ms. Nguyen removed Mr. Kleiman as the registered agent for W&K and listed herself. ECF No. [534-7].

### G.    Ownership of W&K and Lynn Wright's testimony

Mr. Eisner testified that the only individuals who have ever been members of W&K are David Kleiman and Ira Kleiman, after Mr. Kleiman died. Pls.' CSOMF at ¶ 158 (citing ECF No. [498-13] at 91:19-21). Lynn Wright is Defendant's ex-wife. ECF No. [488-17] at 9:4-5. Defendant first testified that Ms. Wright held shares in W&K at his June 28, 2019 deposition. ECF No. [239] at 1-2. Defendant and Ms. Wright's divorce settlement is a document labeled as an "appendix" purporting to be a "family law settlement" between them from June 2011 and which mentions both of them having an interest in W&K. Pls.' CSOMF at ¶ 159 (citing ECF No. [488-17] at 147). Defendant testified in June 2019 that the divorce settlement did not deal with any blockchain intellectual property and only "indirectly" dealt with Bitcoin assets. *Id.* at ¶ 163 (citing ECF No. [534-37] at 408:9-11, 413:13-16). However, the "family law settlement" addresses "[a]ny and ALL Bitcoin, private keys, trusts and software associated with Bitcoin" and "any and all IP . . . including . . . . Bitcoin." *Id.* at ¶ 164 (citing ECF No. [488-17] at 148).

Ms. Wright testified that she is a shareholder of W&K. *Id.* at 22:14-15. She testified that she "knew [she] had had some interest in" W&K and that she "didn't have any concerns" about her ownership in W&K because she "didn't think" the shares were worth anything. *Id.* at 28:17-29:25. She denied that Ira Kleiman or anyone from Mr. Kleiman's estate had contacted her about

22

1094

Case No. 18-cv-80176-BLOOM/Reinhart

her shares in W&K after Mr. Kleiman died. *Id.* at 30:2-5. When asked when she obtained ownership in W&K, Ms. Wright stated that she "guess[ed]" it was when Mr. Kleiman and Defendant started discussions on putting "tenders in" and at that point, "there was the three of us that were still working on it." *Id.* at 98:1-7.

Ms. Wright testified that she does not have any documentation, outside the divorce settlement, related to ownership in W&K. *Id.* at 98:9-12. When asked if she still has ownership in W&K, she testified that she "guess[es] that [she] still [has] some interest in it[.]" *Id.* at 98:22-99:1. Her "basis" for assuming that she has ownership in W&K is that as far as she knows, "nothing has changed" from her "divorce settlement," which purportedly granted to her 50% of Defendant's shares in W&K. *Id.* at 23:18-24:7; 28:17-29:12; 99:2-5. *See also id.* at 147-48. However, Ms. Wright also testified that she declared bankruptcy in 2011 (finalized in January 2012), and as part of the bankruptcy, she had to list the assets she personally owned, but she did not list W&K as one of those assets "because everything had been handed back to [Defendant]" *Id.* at 105:3-18.

According to Plaintiffs, the June 2011 "family law settlement," ECF No. [488-17] at 147-48, is not included in the Australian federal Magistrates Court record, and the court file revealed that Defendant and Ms. Wright applied for divorce in 2013, which application listed "no" to the question whether "there are any . . . binding agreements . . . about family law . . . involving any of the parties" listed on the application. Pls.' CSOMF at ¶¶ 40, 160 (citing ECF No. [507-1] at 7). Ms. Wright testified that she did not have a copy of the "family law settlement" until approximately a week before her deposition when Defendant's counsel sent it to her by email. ECF No. [488-17] at 126:22-128:11. Defendant testified on June 28, 2019 that he did not have a copy of the agreement. ECF No. [534-37] at 409:11-15.

23

1095

Case No.  18-cv-80176-BLOOM/Reinhart

On March 3, 2020, Defendant produced a document he claimed he received from Ms. Wright's external devices that purported to be W&K's operating agreement, which identified Ms. Wright as a member of W&K and which was purportedly signed by Defendant and Mr. Kleiman. Pls.' CSOMF at ¶ 167 (citing ECF Nos. [507-2] and [511-1] at 177:23-25) ("W&K Operating Agreement"). The W&K Operating Agreement reflects that it was purportedly executed on February 15, 2011. *Id.* at ¶ 168. Defendant has previously sworn that he was never an owner, director, member, shareholder, employee or representative of W&K. ECF Nos. [12-2] at ¶ 12; [242-1] at 219:10-23; 287:16-18.

Ms. Wright testified that, at the time of her deposition, she was financially dependent on Defendant. *Id.* at 69:13-23, 70:3-5. She also testified that she previously complied with requests from Defendant because she did not "want to run the risk of him saying, 'I will just stop giving you the money," *id.* at 111:22-112:2, and she acknowledged that she had falsely confessed to a speeding infraction committed by him. *Id.* at 115-16. Ms. Wright stated that after she and Defendant separated in November 2010, she "rarely communicated" with Defendant, and she does not recall discussing business dealings with him after the separation. *Id.* at 91:3-16.

## H.    Intellectual property at issue

When asked to identify with specificity all intellectual property that Plaintiffs claims belongs to David Kleiman or his estate, they responded as follows:

> Based on information available to Plaintiffs today, however, Plaintiffs believe that the estate and/or W&K have an ownership interest in source code, compiler code, Machine Language (MASM/NASM), algorithms, manuals, trademarks, pending patents, granted patents, and other external filings associated with the following IP items:
>    1.   A metered payments system;
>    2.   Software derivative markets & information security risk systems;
>    3.   Software assurance marketplace;
>    4.   Software assurance through economic measures and anti-fraud system;
>    5.   Risk quantification system (for financial modeling in Bitcoin)

1096

Case No. 18-cv-80176-BLOOM/Reinhart

    6. SCADA measurements suite of software; and

    7. Scriptable money.

More generally, Plaintiffs believe that the Defendant has taken intellectual property belonging to the estate and W&K that was created by Dave and Craig's partnership through research Dave Kleiman conducted with Craig Wright that was not completed or published as of 2015. Further discovery is needed to uncover the exact nature of this intellectual property, including discovery to uncover the exact nature of the 6,000,000 lines of code the Defendant has admitted David Kleiman created.

Furthermore, Plaintiffs believe they hold an interest in the security, banking, and automation intellectual property distributed to Cloudcroft, Hotwire, and Coin-Exch. Finally, Plaintiffs believe they hold an interest in the intellectual property, source code, algorithms, and patentable materials claimed by DeMorgan which relates to the development of smart contract and Blockchain based technologies and the commercialization of Blockchain and smart contract system research.

ECF No. [488-14] at 293-94.

## II.    LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility

1097

Case No. 18-cv-80176-BLOOM/Reinhart

determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the

1098

Case No. 18-cv-80176-BLOOM/Reinhart

non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct. 11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is

27

1099

Case No. 18-cv-80176-BLOOM/Reinhart

under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331). In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.* Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

Through this lens, the Court considers the Motions and the parties' arguments.

## III.    DISCUSSION

### A.    Defendant's Motion

Defendant moves for summary judgment on six grounds. First, he contends that Plaintiffs' claims are time-barred. ECF No. [487] at 3-4. In his view, Plaintiffs were timely served with process in the Australian lawsuits in accordance with the Hague Convention because the September 3, 2013 Notice of Listing was received in Mr. Kleiman's mailbox in October 2013. *Id.* Defendant contends that this "forecloses any possibility that those lawsuits were 'fraudulently concealed' to toll the statute of limitations, rendering all but one of [P]laintiffs' claims time-barred." *Id.* at 3. He asserts that Plaintiffs' claims accrued no later than November 6, 2013 when the Australian judgments were entered, *id.* at 9-10, and the undisputed facts negate tolling the statute of limitations. *Id.* at 11-15. In particular, he maintains that there is no evidence that he

Case No. 18-cv-80176-BLOOM/Reinhart

engaged in "active and willful concealment" of Plaintiffs' claims, and Plaintiffs did not "exercise reasonable care and diligence" in seeking to discover facts that form the basis of their claims. *Id.*

Second, Defendant challenges that Plaintiffs cannot establish that he and Mr. Kleiman had an oral partnership to mine bitcoin between 2008 and 2011. *Id.* at 4. According to Defendant, any claims based on the alleged partnership are time barred, violate the statute of frauds because there is no writing memorializing the purported three-year partnership, and fail for indefiniteness because no essential terms of the partnership have been evidenced. *Id.* He further argues that a theory that he and Mr. Kleiman worked on a "secretive" project is unavailing because Plaintiffs "may not bring an action claiming that a dead man told them he had a 'secret' three-year, oral contract with" Defendant. *Id.* at 5; *see also id.* at 15-20.

Third, he asserts that the Court previously dismissed with prejudice Plaintiffs' claims for misappropriation of trade secrets under Florida's Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et. seq.*, ("FUTSA"), and violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832 ("DTSA") because they were time barred. *Id.* at 5 (citing ECF No. [68] at 33). According to Defendant, the "only purportedly stolen intellectual property [P]laintiffs have identified is 'blockchain based technologies and smart contracts,' which is also what they alleged to be their trade secrets." *Id.* (internal citation omitted). Thus, he posits that because "the intellectual property at issue in all of [P]laintiffs' claims is their purported trade secrets, and all underlying facts of their trade secret claims are the same as those of their remaining claims, FUTSA preempts [P]laintiffs' remaining claims, which requires summary judgment to be granted." *Id. See also id.* at 20-22 (arguing that Fla. Stat. § 688.008 displaces and preempts Plaintiffs' common law claims that are based on the dismissed trade secret claims).

1101

Case No.  18-cv-80176-BLOOM/Reinhart

Fourth, Defendant maintains that this Court lacks subject matter jurisdiction because the record evidence concerning W&K's membership establishes that there is no complete diversity among the parties due to Ms. Wright's alleged membership in W&K. *Id.* at 5-6, 22-24.

Fifth, Defendant contends that "in light of Ms. Wright's uncontroverted testimony that she has an ownership interest in W&K, [Ira Kleiman] lacked the authority to file this action on behalf of W&K without her consent." *Id.* at 6. Indeed, he asserts that Ira Kleiman's actions in reinstating W&K to file this lawsuit is an *ultra vires* act and is, therefore, void. *Id.*; *see also id.* at 24.

Finally, he argues that even if Plaintiffs' fraud and constructive fraud claims were not preempted and time barred, the record establishes that summary judgment is warranted in his favor. *Id.* at 6. Specifically, he asserts that Defendant's alleged statements regarding possible future acts do not constitute fraud, Plaintiffs did not rely on any of his alleged statements, and there are no damages. *Id.* at 6-7, 24-30.

In response, Plaintiffs contend that "[a]t every turn, [Defendant's] motion distorts the law, ignores the evidence, and generally tries to leverage his various frauds and lies in an attempt to prevail. It should be denied in its entirety." ECF No. [533] at 4. They make seven overarching arguments.

First, Plaintiffs argue that their claims are not barred by the statute of limitations. *Id.* Specifically, they maintain that Defendant's claim that the alleged partnership dissolved in 2011 is unsupported by the record; Defendant's argument that the claims accrued in 2013 is unavailing; and regardless, Plaintiffs claims would be tolled under the doctrines of fraudulent concealment or equitable estoppel. *Id.* at 4-12. Second, they contend that Defendant is not entitled to summary judgment on the partnership claims. In particular, they contend that (1) there is sufficient evidence of Defendant and Mr. Kleiman's relationship as a whole to support the formation of a partnership

Case No. 18-cv-80176-BLOOM/Reinhart

under Florida law; (2) there is sufficient evidence of a "common purpose" for the partnership, of a joint proprietary property interest, of a right to share profits and a duty to share losses, and of joint control to create a genuine dispute of material fact about the existence of the partnership; and (3) the cases Defendant cites bear no resemblance to the record here. *Id.* at 15-25.

Third, they argue that the alleged partnership is not barred by the statute of frauds. *Id.* at 25-26. Fourth, Plaintiffs maintain that Defendant's "continued attack on subject matter jurisdiction still fails to present any credible evidence that diversity is lacking." *Id.* at 26. In this regard, they argue that the Court previously held that Defendant "failed to present any *credible* evidence showing that" Lynn Wright was a member of W&K, *id.* (emphasis in original); Defendant has still not offered credible evidence that diversity is lacking; even if all indicia of fraud is ignored, Ms. Wright's testimony and documents fail to meet Defendant's burden of production for a factual attack because they do not reflect the membership of W&K at the time of filing; and this Court should exercise supplemental jurisdiction regardless. *Id.* at 26-32. Fifth, they contend that Ira Kleiman had authority to file this action on behalf of W&K. *Id.* at 33. Sixth, they assert that "overwhelming evidence" supports their fraud claims. *Id.* at 33-38. Finally, they allege that Plaintiffs' claims are not preempted. Specifically, they argue that Defendant waived his FUTSA preemption defense, and even if he had not, FUTSA does not displace or preempt the instant claims. *Id.* at 38-43.

In reply, Defendant contends that Plaintiffs' claims are time barred, their fraudulent concealment or equitable estoppel theories are unavailing, and there was no meeting of the minds and no evidence of an oral partnership. *See generally* ECF No. [561].

1103

Case No. 18-cv-80176-BLOOM/Reinhart

Defendant's Motion, accordingly, is ripe for consideration. Because Defendant argues that the Court lacks subject matter jurisdiction over this action, the Court will address that issue first and then turn to the remaining issues.

### 1. *Subject matter jurisdiction and Ira Kleiman's authority to file the action on behalf of W&K*

The Court previously entered an Order denying Defendant's motion for judgment on the pleadings in which he maintained that the Court lacked subject matter jurisdiction, in part, because Lynn Wright was supposedly a member of W&K. ECF No. [265] ("August 2019 Order"). After a hearing and briefings on that motion, the Court determined that Defendant "failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K." *Id.* at 3 (emphasis in original). *See also id.* at 9-10.

According to Defendant, the August 2019 Order "did not apply Eleventh Circuit precedent, which holds that the citizenship of a limited liability company ('LLC') is the citizenship of each of its members, and that each must be diverse from parties on the other side of the action, or diversity is lacking." ECF No. [487] at 22.[11] He argues that although the Court previously ruled that complete diversity exists, the Court should "revisit" this issue and "consider the uncontroverted testimony" of Ms. Wright, an Australian citizen and alleged member of W&K, generated since then. *Id.* at 5-6, 24. Defendant represents that Ms. Wright was "directly involved

---

[11] The Court rejects this argument as baseless. First, the August 2019 Order expressly noted that "[i]n analyzing diversity, the citizenship of a limited liability company is determined by the citizenship of its members. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (requiring all LLC members to be diverse from all opposing parties)." *Id.* at 3. The Court also stated that for "purposes of diversity jurisdiction, it is the citizenship of an LLC's members—not its managers—that is relevant." *Id.* at 8. Likewise, the Court stated that as "a limited liability company, W&K's citizenship is determined by the citizenship of its members." *Id.* at 11. Second, to the extent the August 2019 Order was "incorrect," as Defendant contends, ECF No. [487] at 22, he failed to seek reconsideration of that Order.

32

1104

Case No. 18-cv-80176-BLOOM/Reinhart

in creating W&K. She has no reason to lie for Dr. Wright, given their divorce, and her testimony is corroborated by their divorce decree in Australia, her correspondence with [Mr. Kleiman] and Dr. Wright, and correspondence with the U.S. Department of Homeland Security. She testified that she has an ownership interest in W&K, and her testimony is uncontroverted." *Id.* at 5. Defendant further asserts that Plaintiffs' "only purported 'evidence' of W&K's members is its articles of incorporation, which evidences nothing, because 'Florida law does not require LLCs to publicly disclose their members.'" *Id.* at 23 (citation omitted). He adds that Florida's Division of Corporations "affirmatively instructs LLCs to not list their members in their articles of incorporation." *Id.* at 24 (emphasis omitted).

Plaintiffs respond that since the August 2019 Order was entered, Defendant still fails to offer any "credible evidence" that diversity is lacking. ECF No. [533] at 27. In their view, Defendant and Ms. Wright's divorce settlement is a forgery and, notably, it was not included in the Australian court file. *Id.* at 27-28. They add that Ms. Wright has a strong motive to lie for Defendant, and she has done so in the past. *Id.* at 28-29. Plaintiffs assert, additionally, that other testimony by Ms. Wright and "clearly forged documents [Defendant] claims he received from her strongly suggest that she was never a member of W&K and lacks any real knowledge of W&K's membership." *Id.* at 29. They point to the W&K Operating Agreement, which they assert is a "boldfaced forgery that contains anachronisms which could not possibly exist if the document was genuine." *Id.* They argue that forgeries and unreliable witness testimony do not meet the burden of production for a factual attack on diversity. *Id.* at 29-30.

Plaintiffs further argue that even if all the supposed "indicia of fraud is ignored, Ms. Wright's testimony and documents still fail[] to meet [Defendant's] burden of production for a factual attack because it does not reflect the membership of W&K at the time of filing." *Id.* at 30.

1105

Case No. 18-cv-80176-BLOOM/Reinhart

According to Plaintiffs, even if the June 2011 divorce settlement and Ms. Wright's testimony are "taken at face value," she was not a member of W&K at the time the lawsuit was filed because she testified that she declared bankruptcy in 2011, which was finalized in January 2012, and she did not list W&K as one of her assets "because everything had been handed back to" Defendant. *Id.* (citing ECF No. [488-17] at 105:3-18). Thus, they state the evidence "at most" shows that "Ms. Wright held shares in W&K that she transferred to [Defendant] prior to January 2012." *Id.* Plaintiffs additionally argue that the Court should exercise supplemental jurisdiction if it determines that diversity jurisdiction is lacking. *Id.* at 30-32.

Upon review and consideration, the Court does not find a basis to disturb its prior conclusion from the August 2019 Order that Defendant has failed to present credible evidence that Ms. Wright was a member of W&K. Placing aside her supposed role in W&K, knowledge of the business, or motives (which issues are disputed by the parties), assuming *arguendo* that Ms. Wright was in fact a member of W&K, the record reflects conflicting testimony from her regarding whether she was a member at the time the lawsuit was initiated. For instance, although she testified that she is a shareholder in W&K, ECF No. [488-17] at 22:14-15, she also "guessed" she still has "some interest" in W&K because "as far as [she] know[s]," "nothing has changed" from the June 2011 divorce settlement. *Id.* at 98:22-99:5. However, she also testified that she did not list W&K as one of her assets during her bankruptcy because "everything had been handed back" to Defendant prior to January 2012. *Id.* at 105:3-18. Further, her 2013 divorce application does not contain the purported divorce settlement agreement, ECF No. [507-1], and she additionally stated that she does not have any documentation, apart from the divorce settlement, related to ownership in W&K. ECF No. [488-17] at 98:9-12.

1106

Case No.  18-cv-80176-BLOOM/Reinhart

Mr. Eisner, W&K's corporate representative, separately testified that the only individuals

who have ever been members of W&K are David Kleiman and Ira Kleiman, after Mr. Kleiman

died. ECF No. [498-13] at 91:19-21. Based on the foregoing, the Court agrees with Plaintiffs that

Defendant has presented "the same type of evidence it considered when it denied Defendant's

motion for judgment on the pleadings." ECF No. [533] at 30. The Court, accordingly, concludes

that subject matter jurisdiction is not lacking. But even if diversity jurisdiction was potentially

insufficient, the Court agrees with Plaintiffs that the exercise of supplemental jurisdiction would

be appropriate. *Id.* at 30-32. Defendant's Motion, therefore, is denied on this point.[12]

Likewise, the Court rejects Defendant's argument that Ira Kleiman lacked the authority to

file this action on behalf of W&K without Ms. Wright's consent, which in his view requires

dismissal of W&K's claims. ECF No. [487] at 24. This argument is predicated entirely on "Ms.

Wright's uncontroverted testimony that she has an ownership interest in W&K[.]" *Id.* at 6, 24.

However, as noted, her testimony is controverted. Additionally, Defendant provides no evidence

that Ira Kleiman knew or should have known that she held ownership in W&K before filing this

suit.

_____

[12] On August 4, 2020, Plaintiffs moved for leave to supplement the record with a Verified Petition
filed by Ms. Wright in Florida state court on July 16, 2020, which reportedly represents that in
December 2012, she transferred 100% of her interests in W&K to Craig Wright R&D, which later
changed its name to Tulip Trust, but that as of July 10, 2020, she is a current owner of W&K. ECF
Nos. [612] and [612-1]. Thus, Plaintiffs maintain that if Ms. Wright's sworn allegations in the state
court action are to be believed, she "by her own admission, had no ownership interest in W&K at
the time this lawsuit was filed" and "[s]ince diversity jurisdiction is determined at the time of
filing, Ms. Wright's verified state court petition directly contradicts her deposition testimony and
mandates denial of the Defendant's motion for summary judgment based on a lack of jurisdiction."
ECF No. [612] at 2. Because the Court concludes that subject matter jurisdiction is not lacking
based on the existing record, the Court denies Plaintiff's motion to supplement as moot.

Case No. 18-cv-80176-BLOOM/Reinhart

2.    *Statute of limitations*

This Court previously entered an Order denying in part Defendant's motion to dismiss in which he argued that all of Plaintiffs' claims were barred by the statute of limitations. *See* ECF No. [68] at 28-33 ("December 2018 Order"). In the December 2018 Order, the Court noted that it "agree[d] that the wrong accrual date related to these claims has been identified by the Defendant and that Plaintiffs have alleged facts sufficient to demonstrate that under the doctrine of fraudulent concealment, the statute of limitations could have been tolled." *Id.* at 29-30. The Court explained that, at that stage, it was required to assume as true Plaintiffs' allegations that it became aware of facts giving rise to their claims in April 2014. *Id.* at 31. However, the Court also stated that "[i]f, during discovery, it becomes apparent that Plaintiffs became aware of the Defendant's conduct more than four years before the filing of the instant action, Defendant may raise the statute of limitations issue again in a motion for summary judgment." *Id.*

Defendant now argues that Plaintiffs' claims are time-barred. ECF No. [487] at 3-4, 7. Specifically, he contests that to the extent Mr. Kleiman's estate's claims rely on a purported oral partnership, any cause of action arising from it accrued in 2011 and is barred by a four-year statute of limitations. *Id.* at 7-8. In Defendant's view, the alleged partnership dissolved in 2011, and therefore, any claims related to the partnership expired in 2015. *Id.* He adds that the "very latest date on which any of [P]laintiffs' causes of action could possibly have accrued was November 6, 2013," which is when the Australian court judgments were entered. *Id.* at 8. Because Plaintiffs filed suit in February 2018, Defendant maintains that every claim is barred except for civil theft (Count X), which has a five-year limitations period. *Id.* He further asserts that Plaintiffs had "actual, timely notice of the Australian lawsuits on October 10, 2013, when they received service of process sent by the Australian court." *Id.* at 9.

36

1108

Case No. 18-cv-80176-BLOOM/Reinhart

Defendant argues that Plaintiffs' claims "boil down to the assertion that Dr. Wright stole bitcoin and intellectual property . . . through three purportedly forged contracts that were submitted in the Australian lawsuits, which were reduced to judgment on November 6, 2013." *Id.* Therefore, he posits that Counts I, II, V, VI, VII, and VIII are barred by a four-year limitations period. *Id.* at 10. Additionally, he asserts that the undisputed facts negate tolling the statute of limitations and that the doctrine of "fraudulent concealment" does not apply. *Id.* at 11 (citing *Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017)). In this respect, he makes a two-fold argument: there is no evidence that Defendant engaged in "active and willful concealment" of their claims, and Plaintiffs failed to "exercise reasonable care and diligence in seeking to discover the facts that form the basis of the[ir] claim[s]." *Id.* at 11-15.

Regarding the former, he maintains that Plaintiffs "cannot rely on the allegation that Dr. Wright concealed the existence of the Australian lawsuits, because they were timely served with process in them[.]" *Id.* at 11 (emphasis omitted). In his view, service was perfected on W&K under the Hague Convention when the Notice of Listing was received in Mr. Kleiman's mailbox on October 10, 2013, and thus, Plaintiffs "had actual, timely notice of the Australian lawsuits[.]" *Id.* at 12. He adds that Ira Kleiman's refusal to take over control of the mailbox was "willful blindness," and that Plaintiffs' claim that Defendant did not "'tell them' about the Australian lawsuits is irrelevant" because the "Supreme Court of New South Wales told them, though valid service of process that was made and acknowledged." *Id.* at 13 (emphasis omitted). Regarding the latter, Defendant contends that Ira Kleiman failed to exercise reasonable care and diligence as a matter of law by failing to check the mailbox, refusing to accept his fiduciary duty to check the mailbox, and by "indiscriminately destroy[ing]" David Kleiman's work papers and permanently erasing some of his hard drives. *Id.* at 14.

37

Case No.  18-cv-80176-BLOOM/Reinhart

In response, Plaintiffs contend that Defendant's Motion "primarily rehashes the same arguments this Court rejected in its denial of [Defendant's] motion to dismiss. To the limited extent [Defendant's] motion makes new arguments, they fail factually and legally." ECF No. [533] at 4. They make three primary arguments. First, Plaintiffs argue that Defendant's claim that the alleged partnership dissolved in 2011 is unsupported by the record. They argue that the record evidence demonstrates that the partnership lasted "well beyond 2011." *Id.* Second, they maintain that Defendant's argument that their claims accrued in November 6, 2013 when the Australian lawsuit concluded is "as audacious as it is meritless" because, effectively, Defendant "argues to this Court that the onus was on the Kleiman family to uncover his fraudulent 'consent judgment' scheme in real time if they wanted to reclaim what was stolen." *Id.* at 5. In their view, the Consent Judgments[13] are fraudulent, and while those judgments address the purported consent of transfers of intellectual property, they "cannot have any bearing on the accrual of Plaintiffs' claims for stolen bitcoin" because those judgments did not address bitcoins. *Id.* at 5-6.

Additionally, they assert that the Consent Judgments did not start the clock on Plaintiffs' intellectual property claims. *Id.* at 6-9. Specifically, they contend that the Notice of Listing was not legal process; it was not validly served under the Hague Convention or otherwise; it was not sent to the registered agent address designated for service of process by W&K; and "all this is beside the point, because the uncontradicted evidence is that Ira Kleiman did not see the 'notice of listing' until 2016, and therefore it cannot have caused Plaintiffs to 'become aware' of the consent judgments 'more than four years before the filing of the instant action.'" *Id.* at 6. Further, they

---

[13] Plaintiffs alternatively refer to the Consent Orders, ECF No. [83-19], as the "Consent Judgments." *See* ECF No. [533] at 5. The actual judgments entered in Australia are reflected in ECF No. [83-22]. However, these judgments are substantively identical to the Consent Orders regarding the terms of the judgments/orders.

1110

Case No.  18-cv-80176-BLOOM/Reinhart

argue that Defendant's "willfully blind" accusation against Ira Kleiman is "baseless," "makes no sense and is devoid of legal or evidentiary support." *Id.* at 10-11.

Third, Plaintiffs argue that regardless of whether their claims accrued on or before November 6, 2013, the claims "would still survive because the statute of limitations should be tolled based on [Defendant's] fraudulent concealment or equitable estoppel." *Id.* at 11-15. According to Plaintiffs, Defendant's "fraudulent scheme to cover up his theft, coupled with his post-theft fraudulent representations to the Kleiman family, undoubtedly rises to the level of 'willful concealment' necessary to show fraudulent concealment, and that same conduct both 'lull[ed Ira Kleiman] into a disadvantageous legal position' and was directly 'responsible for the tardiness of the filing,' if any. Because his 'behavior caused [Ira Kleiman] to delay filing suit,' [Defendant] would also be 'equitably estopped from raising the statute of limitations to bar [Ira Kleiman]'s claim.'" *Id.* at 12 (internal citations omitted).

In reply, Defendant maintains that Plaintiffs "continue to demand reversible error and bad law, arguing that their claims are not time-barred[.]" ECF No. [561] at 1. According to Defendant, the indisputable evidence shows that W&K was timely served with valid process in the Australian lawsuits on October 10, 2013, yet Plaintiffs "sat on their hands for more than four years, then filed this untimely action, whose only path to this Court required them to falsely swear that they were 'prevented' from appearing in the Australian Lawsuits, when the indisputable evidence shows they were timely served, told where and when to appear, urged to appear, and warned that their interests might be affected in their absence if they chose not to appear. They chose not to appear." *Id.* He adds that Plaintiffs "frivolous[ly] attempt to invoke the 'delayed discovery rule' to postpone accrual of their claims until March 2016, when they falsely claim to have first learned that W&K even existed[.]" *Id.* at 2. Defendant further contends that Plaintiffs' "lame name games" in

1111

Case No.  18-cv-80176-BLOOM/Reinhart

referring to the alleged partnership as the "Satoshi Nakamoto Partnership" supports his arguments that their claims are time barred because Plaintiffs "have conceded that 'Satoshi Nakamoto' stopped bitcoin mining in 2011." *Id.* at 4.[14] Thus, he states that the record establishes that the estate's partnership claim accrued in February 2011, and that W&K's claims accrued when the Australian judgments were entered in November 2013. *Id.* at 5. Defendant additionally asserts that Plaintiffs' arguments regarding fraudulent concealment and equitable estoppel are unavailing. *Id.* at 5-8.

> **a.    A genuine dispute of material fact exists whether the alleged partnership ended in 2011**

Defendant argues that the alleged partnership between Defendant and Mr. Kleiman terminated in February 2011, and thus, the estate's claims based on that partnership are time-barred. *See* ECF Nos. [487] at 7-8 and [561] at 3-5. He cites to allegations in the Complaint that, in his view, establish that the partnership ended in 2011. *See, e.g.*, ECF No. [83] at ¶¶ 67, 197. Plaintiffs respond that the Complaint's allegations do not represent that the partnership ended in 2011 but rather "demarcate[] an initial phase of the partnership that existed prior to when it began to operate, at least in part, through W&K." ECF No. [533] at 4 (citing ECF No. [83] at ¶¶ 67, 68). Regardless of the allegations' characterization, Plaintiffs have produced evidence that the alleged partnership continued beyond 2011. *See* ECF Nos. [534-1] at 3; [534-2] at 15; [534-3] at 2-3. For

---

[14] Defendant provides no record citation to support this statement. Instead, his brief simply says "*see* D.E. [I.K. depo]." ECF No. [561] at 4. This is patently insufficient. The Court will not scour the record to search for this supposed statement, especially where Defendant attaches two depositions from Ira Kleiman, not one, to his Statement of Material Facts. *See* ECF Nos. [488-13] and [488-14]. *See also Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("Judges are not like pigs, hunting for truffles buried in briefs.") (internal quotations omitted). "[D]istrict court judges are not required to ferret out delectable facts buried in a massive record."  *Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

1112

Case No. 18-cv-80176-BLOOM/Reinhart

instance, a February 23, 2013 message from Defendant to Mark Ferrier reflects that Defendant stated, "my partner Dave and I have been working on something of a while now." *Id.* at ECF No. [534-3] at 2. Accordingly, a genuine dispute exists whether the alleged oral partnership actually ended in February 2011 or if it continued after that point. The Court, therefore, rejects Defendant's argument that the estate's claims are barred by a statute of limitations that expired in 2015.

> **b.    The Australian judgments did not trigger a statute of limitations commencing on November 6, 2013**

Defendant argues that the "very latest" date that any of Plaintiffs' causes of action could have accrued was November 6, 2013, when the Australian judgments were entered. ECF No. [487] at 8. In his view, because the Notice of Listing was mailed to Mr. Kleiman's mailbox and was received on October 10, 2013 by Mr. Conrad, Plaintiffs had "actual, timely notice of the Australian lawsuits" and all their claims except civil theft are time barred. *Id.* at 9-10. Upon review of the record and the parties' briefings, the Court cannot conclude as a matter of fact and law that November 6, 2013 triggered the relevant statutes of limitations.

First, as Plaintiffs demonstrate, the Consent Judgments do not purport to transfer bitcoin but rather only intellectual property from W&K to Defendant. *See* ECF Nos. [83-19] at 2, 4; and [488-22] at 4-5, 8. The Complaint, in this regard, seeks a return of allegedly stolen bitcoin not just intellectual property. *See* ECF No. [83] at ¶¶ 171, 197, 202, 209, 215 and "wherefore" clauses following ¶¶ 172, 196, 214. The Australian lawsuits, consequently, did not start the clock on claims to the extent they seek a return of bitcoins.

Second, the Australian lawsuits' judgment date does not trigger the statute of limitations otherwise for claims seeking a return of intellectual property. Specifically, in July and August 2013, Defendant instituted the Australian lawsuits against W&K by filing two separate Statement of Claims. ECF No. [83-11]. Later, in August 2013, Defendant filed an Acknowledgement of

41

1113

Case No.  18-cv-80176-BLOOM/Reinhart

Liquidated Claim in each of those cases in which he acknowledged that he was the "legal representative and representative" for W&K, he was W&K's "Director/Australian Agent," and he listed his Australian address as W&K's address. *See* ECF No. [83-30]. That document reflected the "address for service" for W&K as an Australian address. *Id.* at 3, 5. Nonetheless, Defendant submitted an affidavit to the Australian court dated October 31, 2013 in which he stated that in July 2013—before W&K's "address for service" was changed to an Australian address—a Statement of Claim was "served" on W&K by "leaving it" at 3119 Contego Lane, Palm Beach Gardens, FL 33410 and by "mailing it" to 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410. ECF No. [83-4] at 4.

The record, however, does not reflect that any Statement of Claim from either lawsuit was received at either of these addresses. Instead, the record shows only that a Notice of Listing from one of the two lawsuits was received at 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410 by Mr. Conrad of Computer Forensics LLC. *See* ECF Nos. [488-2] at 25-26, 54-55. That address is a drop box at a UPS store, and it was used by both Mr. Kleiman and by Computer Forensics LLC. ECF Nos. [488-1] at 26-27, 41, 43-44, 115; [498-13] at 104:5-6. Mr. Conrad was not W&K's registered agent, and W&K's registered agent's address based on the Articles of Incorporation was 3119 Contego Lane, Palm Beach Gardens, FL 33410, not 4371 Northlake Blvd. #314, Palm Beach Gardens, FL 33410. *See* ECF No. [83-3]. Therefore, on this basis alone, the record reflects that Mr. Conrad, who was not authorized to act on W&K's behalf, received the Notice of Listing without any accompanying statement of claim in a shared mailbox, which mailbox address was not listed as W&K's registered agent's address. Thus, the mere fact that one document from one of the two Australian lawsuits was ultimately received in a mailbox linked to

42

1114

Case No. 18-cv-80176-BLOOM/Reinhart

Mr. Kleiman and W&K (at the wrong address) and collected by a non-W&K affiliated individual does not dictate that W&K was served in October 2013.

More problematic is that even if that address could be used for service of legal documents against W&K, Defendant has not produced sufficient evidence for the Court to conclude that the Notice of Listing itself constituted legal process for purposes of service under Australian law[15] (or even American law). According to Rule 6.2, New South Wales Uniform Civil Practice Rules ("UCPR"), service of process requires the delivery of a summons or the statement of claim, and the "originating process" that is served must also include a court seal, a case number, and a listing date. *See* https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part6/div2. Additionally, Rule 11.7 of the UCPR directs that if "a person is to be served outside of Australia with an originating process, the person must also be served with a notice in the approved form informing the person of—(a) the scope of the jurisdiction of the court in respect of claims against persons who are served outside Australia, and (b) the grounds alleged by the plaintiff to found jurisdiction, and (c) the person's right to challenge service of the originating process or the jurisdiction of the court or to file a conditional appearance." *See id.* at https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part11/div1a/rule11.7.

Here, the Notice of Listing is a one-page document that does not contain a summons, a statement of claim, a notice of the alleged scope and grounds of jurisdiction, or even a statement of the right to challenge service. ECF No. [488-2] at 54. It, thus, appears facially insufficient under Australian law (and American law) to act as legal process. To be sure, the document reflects a court seal, a case number, a date and time when the "matter is listed for Directions," and it sets

---

[15] On May 8, 2020, Plaintiffs filed a Notice of Intent to Raise an Issue of Australian Law, ECF No. [501], related to issues concerning service of process under Australian law.

Case No. 18-cv-80176-BLOOM/Reinhart

forth three bullet points for "[l]isting details" for cases, including by checking an online link "on the afternoon before the case is listed." *Id.* But none of those components, based on this document alone, apprise the recipient or this Court about the nature of the lawsuit, the underlying issues in that case, the grounds for jurisdiction, or the specific motion or matters to be decided by the court in October 2013. Further, such a document only provides limited information about one of the two lawsuits. Indeed, the other lawsuit's existence remains entirely unknown even with this document. Accordingly, even if the Australian judgments could otherwise commence the statute of limitations in this case, the Court cannot conclude that this document would satisfy that trigger.

Although these issues alone provide sufficient grounds to deny Defendant's Motion on this point, the Court also finds Defendant's argument that service was perfected under the Hague Convention unconvincing. Article 10(a) states that "[p]rovided the State of destination does not object, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad[.]" *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017). In *Water Splash*, the Supreme Court held that while the Hague Convention does not prohibit service by mail, "this does not mean that the Convention affirmatively authorizes service my mail." *Id.* at 1513 (emphasis omitted). "In other words, in cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Id.* (vacating and remanding for a determination whether the law of the issuing state, Texas, authorized service by mail).

The parties appear to agree that the United States, the receiving state, has not objected to service by mail. However, they disagree whether the second prong of the *Water Splash* test is met. Australian law controls this determination because it is the issuing state and the jurisdiction where

44

1116

Case No. 18-cv-80176-BLOOM/Reinhart

the Australian lawsuits were pending. *See id.* Rule 11.8AC of the UCPR provides that a "document to be served outside Australia need not be personally served on a person so long as it is served on the person in accordance with the law of the country in which service is effected." https://www.legislation.nsw.gov.au/#/view/regulation/2005/418/part11/div1a/rule11.8ac. In this instance, that would be the United States. Although the Federal Rules of Civil Procedure permits service by mail on an international defendant outside the United States, *see* Fed. R. Civ. P. 4(f), there is no corresponding provision authorizing service on a domestic defendant by mail. *See id.* at Rule 4(e) (setting forth the manners of service, which includes "following state law" for service). *See also* Fla. Stat. §§ 48.031; 48.062. Thus, the Court does not agree that service was perfected under the Hague Convention.

Nonetheless, even if Rule 4(f) could apply to serving a domestic defendant by mail, service under that method still requires confirmed proof of service for the court. *See TracFone Wireless, Inc. v. CNT Wireless LLC*, No. 1:19-CV-24325-DPG, 2019 WL 5863911, at *3 (S.D. Fla. Nov. 8, 2019) ("The Court agrees that service by international mail or FedEx is appropriate on the Canadian parties under Rule 4(f)(1) and Article 10(a) of the Convention . . . But to safeguard the provisions of Rule 4(f), the delivery service must require a signed receipt or email delivery confirmation (or substantially equivalent documents) as proof that service has been effectuated. *See* Fed. R. Civ. P. 4(f)(2)(C)(ii) (noting that if not prohibited by federal law or the foreign country's law, service may be made by 'using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt') & 4(f)(2)(D) (noting that service may be completed 'by other means not prohibited by international agreement, as the court orders')."). Here, the record does not reflect a return receipt or any similar proof of service for the Australian court that the Notice of Listing was received in Florida at the proper address. Instead,

45

1117

Case No. 18-cv-80176-BLOOM/Reinhart

Mr. Conrad, unaffiliated with W&K, received the document and wrote the date of October 10, 2013 on the envelope. Yet his collection of W&K's mail was not even confirmed in Australia. Therefore, even if the Notice of Listing constituted legal process and even if it was sent to the proper address and received by the proper party, it would not constitute perfected service on W&K under the Hague Convention based on this record.

Regardless of the foregoing, the Court agrees with Plaintiffs that the instant record reflects a genuine dispute as to whether the statute of limitations could be tolled by the doctrines of fraudulent concealment or equitable estoppel. As an initial matter, whether the statute of limitations is tolled based on a defendant's alleged fraudulent concealment is a question of fact for a jury to decide. *See Razor Capital*, 2017 WL 3481761, at *4 ("Whether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact.") (citing *Walker v. Dunne*, 368 So. 2d 640, 641 (Fla. 3d DCA 1979) (reversing summary judgment because there was a factual issue whether defendant's conduct tolled the statute of limitations, and noting that the trial court "should have left the questions to the trier of fact")). "Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontr[o]verted proof of a 'smoking gun'. Viewing all the circumstances, a reasonable fact finder will have to hear all the evidence, weigh it and draw all reasonable inferences therefrom, and judge a witness' credibility prior to determining such issues." *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1555 (S.D. Fla. 1990), *opinion amended on reconsideration in other parts*, 741 F. Supp. 220 (S.D. Fla. 1990). "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined [at] trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991).

46

Case No.  18-cv-80176-BLOOM/Reinhart

Florida law permits the tolling of a statute of limitations "when a plaintiff alleges fraudulent concealment." *Razor Capital*, 2017 WL 3481761, at *4; *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment.") (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811- 12 (Fla. 4th DCA 1995)); *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) ("[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him for discovering his injury."); *Vargas By & Through Vargas v. Glades General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990) ("[T]he courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts; it is a doctrine to prevent the court from participating in the fraud of the defendant."). Similarly, "[e]quitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position. . . . It is well settled in Florida and other jurisdictions that the statutes of limitation can be deflected by the doctrine of equitable estoppel. This proposition is supported by vast precedent from this Court, Florida district courts of appeal, and federal courts." *Fla. Dep't of Health & Rehab. Servs. v. S.A.P*, 835 So. 2d 1091, 1096–98 (Fla. 2002)) (footnotes omitted); *see also Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001) ("Equitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct. The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct. Equitable estoppel thus functions as a shield, not a sword, and operates against the wrongdoer, not the victim.").

47

1119

Case No. 18-cv-80176-BLOOM/Reinhart

To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital*, 2017 WL 3481761 at *4. Fraudulent concealment "goes beyond mere non-disclosure, and must constitute active and willful concealment." *Id.* at *5 (citation omitted). Based on the record, the Court concludes that Plaintiffs have presented genuine issues of fact for this doctrine to apply.

Regarding the first element, as noted, the Court rejects Defendant's argument that Plaintiffs were served with process in the Australian lawsuits based on the Notice of Listing or that the estate "indisputably" "knew or had reason to know of those lawsuits when they were commenced and while they were pending." ECF No. [487] at 12. The record reflects that Ira Kleiman was not aware of the Australian lawsuits until April 2014 when he was contacted by the ATO. *See* ECF No. [50-1] at 2. *See also* ECF No. [488-14] at 33:3-4, 126:25-127:13, 144:8-10 (Ira Kleiman's testimony that he first learned about W&K from Defendant, which was after February 2014). Against this backdrop, the record further reflects that Defendant listed his address in Australia as the "address for service" for W&K in August 2013 even though W&K's Florida Articles of Incorporation provided otherwise, and in March 2014, Mr. Kleiman was removed as W&K's registered agent by Ms. Nguyen, an individual affiliated with Defendant. ECF No. [534-7]. There are thus facts supporting the notion of active concealment.

Plaintiffs have further provided grounds for a jury to determine that contracts purportedly signed by Mr. Kleiman were forged or were otherwise inauthentic. *See* ECF No. [534-6]. *See also* ECF No. [83-20] at 17-18 ("And the contract . . . is signed the same month of his death and without his real signature. Nor do I believe it to be a digital signature. It doesn't even come close to his

1120

Case No. 18-cv-80176-BLOOM/Reinhart

handwriting. That is obviously a females [sic] signature. Things just don't make sense."). Moreover, the record reflects that Mr. Wilson, who signed the Consent Orders purportedly on behalf of W&K consenting to transfer all of W&K's assets to Defendant, testified that he was never a director, shareholder, or officer of W&K. ECF No. [498-9] at 33:9-16. When presented with a copy of an affidavit Defendant submitted in the Australian court proceeding stating that there had been an August 2013 meeting where it was moved that Mr. Wilson would "act as a director for purposes of consenting to orders and the company to be wound down," Mr. Wilson testified that "[t]his is my first knowledge that I was acting as a director of the U.S. company." *Id.* at 69:22-70:10. He further stated that "[t]his is my first that I am being made aware that I was a director of the LLC company." *Id.* at 71:8-12.

In April 2014, Ira Kleiman wrote to Defendant that "since receiving the documents from the ATO and spending more time reviewing them, I feel like there are questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value, Uyen's role of Director, BAA projects, etc." ECF No. [83-24] at 20. Ira Kleiman later wrote to Defendant that "[t]he information I have to work with is what you have told me and the documents from the ATO office. From those documents it appears clear to see a systematic transfer of assets out of W&K back to you. Up until April 15 I was a complete believer in what you were telling me. But you never mentioned any of the actions you were taking against W&K prior to contacting us." ECF No. [83-20] at 18. Defendant responded that "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." *Id. See also* ECF No. [498-20] at 149 ("[A]t first I really bought into the stuff he was telling me. When I saw the video of Craig crying on that video he made after Dave died, he sounded so sincere. It seemed like he really cared about Dave and now he was contacting us to look out for his family. But that first

49

1121

Case No. 18-cv-80176-BLOOM/Reinhart

impression of him was short lived. Over time, he revealed his true intentions which were to turn W&K into just W."). Genuine issues of material fact exist regarding active and willful concealment by Defendant.

Regarding the second element, the record additionally contains evidence which could allow a jury to find that Defendant lulled Plaintiffs into inaction by promising multimillion-dollar future payments or by assuring the Kleimans that he only wanted to protect their interests. For instance, in February 2014 Defendant wrote that he "do[es] not seek anything other than to give you information about your son . . . I will also help you recover what Dave owned." ECF No. [83-23]. By April 2014, he told Ira Kleiman that "Dave['s] estate is only worth 12 million IF you want to cash out right now. IF you stay, you get the value AND the shares. I will list these in coming years and THEN they are worth more." *Id.* at 7. He also wrote to Ira Kleiman that he does "not know what you have been led to believe. But I am not trying to take anything from Dave's estate." *Id.* at 6. He further told Ira Kleiman that the "software Dave updated and which I have transferred back in OUR company . . . is OURs as you are Dave's heir[.]" *Id.* at 2. Additionally, the record reflects that after having promised payments of millions of dollars each October beginning in 2014, no such payments were made. Indeed, by August 2015, Ira Kleiman wrote to Defendant that "I wish I could believe that you have my best interest at heart as I was first led to believe in your early emails. But after the long delays of promised payments I was to receive each October . . . obviously I have doubts. It certainly seems like I am not wanted as part of this venture[.]" *See* ECF No. [511-18] at 1. In response, Defendant wrote that "until we sort out the ATO issues we just don't have any money to pay anyone." *Id.*

Similarly, regarding the third element, the record reflects evidence from which a jury could find that Plaintiffs exercised reasonable care and diligence in seeking to discover the facts that

50

1122

Case No.  18-cv-80176-BLOOM/Reinhart

form the basis of their claims. First, contrary to Defendant's assertion that Ira Kleiman was "willfully blind" in not checking Mr. Kleiman's mailbox following his death, Defendant has not cited to evidence in the record indicating that Ira Kleiman should have checked that mailbox in October 2013, or that he specifically knew Mr. Kleiman had that mailbox during that time. Indeed, an email from Mr. Kleiman to others, including Ira Kleiman, which listed the Mailbox address in the signature block, discussed organizing a BBQ, and that email was from October 2010. ECF No. [488-16]. And, as noted, the record shows that the estate had never heard of W&K or the Australian lawsuits until 2014. Further, Ira Kleiman's communication in May 2014 with Mr. Paige in which he declined to take control of the Mailbox and pay for its renewal, ECF No. [488-1] at 123-24, was months after the Notice of Listing had been sent and after the Australian judgments had been entered. Defendant, thus, fails to show how Ira Kleiman's "refusal" to take over the Mailbox in May 2014, ECF No. [487] at 13, evidences the estate's supposed "willful blindness" to seek out facts.[16]

Additionally, although the record shows that Ira Kleiman threw out some of Mr. Kleiman's papers and reformatted some hard drives, Ira Kleiman testified that he "first examined [the hard drives] to see if there was anything on them and once I found out that there wasn't," he formatted them. ECF No. [488-14] at 44:20-45:3; 53:3-4. He also testified that before he threw out Mr. Kleiman's papers, he did not find evidence related to digital currency. *Id.* at 45:5-8. Further, he testified that the papers he threw out included "junk mail" and materials that "didn't look relevant to keeping." *Id.* at 48:10-14, 49:13-17. Thus, the Court does not agree that Ira Kleiman's actions

---

[16] In any event, "whether a defendant has been willfully blind will depend on the circumstances and, like intent itself, will generally be a question of fact for the factfinder after trial." *Chanel, Inc.*, 931 F.2d at 1476 (footnote omitted).

51

1123

Case No. 18-cv-80176-BLOOM/Reinhart

establish that Plaintiffs failed to exercise reasonable care and diligence related to seeking out facts that could form the basis for their claims.

Accordingly, the Court does not find, as a matter of law, that the statute of limitations was triggered in November 2013 and that Plaintiffs' claims are untimely. But even if their claims accrued at that time, in viewing the evidence in a light most favorable to Plaintiffs as the non-moving party, a trier of fact could still find that Defendant's conduct could lead to the application of the doctrines of fraudulent concealment and equitable estoppel to bar a statute of limitations defense. *See, e.g.*, *Razor Capital*, 2017 WL 3481761; *Acoustic Innovations, Inc. v. Schafer*, 976 So. 2d 1139, 1144 (Fla. 4th DCA 2008). Therefore, Defendant's Motion is denied on this point.

### 3.    *Oral partnership and statute of frauds*

In the December 2018 Order, the Court previously rejected Defendant's argument that Plaintiffs failed to allege a partnership between Defendant and Mr. Kleiman. ECF No. [68] at 10-13. As part of that Order, the Court also rejected his statute of frauds argument because "the Court cannot, as a matter of law, conclude that the terms of the oral partnership agreement, as pled, originally contemplated an agreement to be performed beyond one year." *Id.* at 12 n.1. Defendant now argues that Plaintiffs cannot establish that he and Mr. Kleiman had an oral partnership because there is no written proof of a partnership nor evidence of the alleged partnership's terms. ECF No. [487] at 15. He further adds that any partnership claims would be barred by Florida's statue of frauds because the partnership lasted over three years. *Id.*

Plaintiffs respond that Defendant's argument that there is no evidence of a partnership is "as baseless as it is shameless." ECF No. [533] at 15. They assert that there is sufficient evidence of Defendant and Mr. Kleiman's relationship as a whole to support the formation of a partnership under Florida law. *Id.* at 15-18. In this respect, they assert that to evaluate whether a partnership

1124

Case No. 18-cv-80176-BLOOM/Reinhart

existed, Florida law examines the parties' relationship as a whole rather than by assessing discrete elements in isolation. *Id.* at 15-16. In their view, the evidence squarely shows that a partnership existed based simply on Defendant's own statements and characterizations of his relationship with Mr. Kleiman. *Id.* at 17-18. Nonetheless, they maintain that "even if separate evidence is required regarding the particular elements of partnership Defendant lists in his motion, there is abundant evidence for each one." *Id.* at 18. Specifically, Plaintiffs contend that there is sufficient evidence of (1) a "common purpose" for the partnership; (2) a joint proprietary property interest; (3) a right to share profits and a duty to share losses; and (4) joint control, all of which are sufficient to create a genuine dispute of material fact about the existence of the alleged partnership. *Id.* at 19-24. They also contend that the cases Defendant cites are inapplicable. *Id.* at 25. Finally, Plaintiffs argue that the alleged partnership is not barred by the statute of frauds, even though the partnership lasted longer than one year, because there is no evidence that the partnership would have necessarily lasted longer than one year or that Defendant and Mr. Kleiman agreed to a fixed-duration partnership longer than one year. *Id.* at 25-26.

In reply, Defendant maintains that given the nature of Bitcoin and the multi-year project inherent in developing it, the statute of frauds applies to bar Plaintiffs' claims. ECF No. [561] at 8-9. Additionally, Defendant contends that even if the statute of frauds does not apply, the oral partnership "would fail for indefiniteness because [P]laintiffs could never prove any of its essential terms." *Id.* at 9. Upon consideration of the record and the parties' briefings, the Court concludes that a genuine dispute of material fact exists whether there was an underlying partnership between Mr. Kleiman and Defendant, and that the statute of frauds does not apply.

1125

Case No. 18-cv-80176-BLOOM/Reinhart

### a.   A genuine dispute of material fact exists whether Defendant and Mr. Kleiman entered into an oral partnership

The parties dispute what is sufficient to establish a partnership under Florida law. Defendant contends that a showing of four specific elements is required while Plaintiffs contend that a holistic examination of the parties' relationship without specific proof of all of the individual elements can establish a partnership. The Court need not expressly resolve which suggested approach is correct[17] because under either analysis, Plaintiffs have demonstrated a genuine dispute of material fact that a partnership existed between Defendant and Mr. Kleiman.

### i.   Plaintiffs' approach

In citing to the Florida Revised Uniform Partnership Act, Fla. Stat. § 620.81002 *et seq.*, Plaintiffs contend that "current Florida law looks at the parties' relationship as a whole, rather than each element in isolation" to determine whether a partnership exists. ECF No. [533] at 15-16. Specifically, Fla. Stat. § 620.8202(1), provides that an "association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." *Id.* Further, "joint property, common property, or part ownership does not, by itself, establish a partnership, even if the co-owners share profits made by the use of the property," and "sharing of gross returns does not, by itself, establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived." *Id.* at Fla. Stat. § 620.8202(3)(a)-(b). However, a "person who receives a share of the profits of a business is presumed to be a partner in the business," unless the profits were received in payment of rent, among other things. *Id.* at Fla. Stat. § 620.8202(3)(c). *See also* Fla. Stat. § 620.8401(2), (6)

---

[17] In Defendant's Reply, ECF No. [561], he does not address the cases and authorities Plaintiffs cite on pages 15-16 of Plaintiffs' Response, ECF No. [533], other than to reargue that Plaintiffs must establish "every element of a purported oral partnership" in order to survive summary judgment.

54

Case No. 18-cv-80176-BLOOM/Reinhart

(noting that under the Revised Uniform Partnership Act, "[e]ach partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits" and "[e]ach partner has equal rights in the management and conduct of the partnership business"). Plaintiffs add that Florida standard jury instruction 401.14(d), which addresses vicarious liability in negligence actions, provides that a "partnership exists when two or more persons join together or agree to join together in a business or venture for their common benefit, each contributing property, money or services and each having an interest in any profits." *Id.*[18]

Here, the record reflects numerous instances in which Defendant stated that he and David Kleiman were partners. *See, e.g.*, ECF Nos. [83-2] at 2 (Defendant informing Ira Kleiman that he and Mr. Kleiman "did partner ;)"); [534-3] at 2-3 ("my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . [my] business partner died a few days back"); [534-9] at 1 ("In the past, David Kleiman was my best friend and business partner . . . we have many shared secrets"); [534-11] at 4 ("This is an idea that I had developed with my business partner David KLEINMAN [sic] (David) for a period of over a decade."); [534-34] at 4 ("In order to fund my work, Dave Kleiman and I sold code[.]"). Based on these statements alone, a fact finder could conclude that a partnership existed involving Mr. Kleiman and Defendant.

The record reflects further evidence from which the existence of a partnership can be determined. For example, Defendant wrote to Louis Kleiman in 2014 that Mr. Kleiman and Defendant "are two of the three key people behind Bitcoin" and that Mr. Kleiman "was a key part of an invention that will revolutionise the world." ECF No. [83-23]. Similarly, when asked how

---

[18] The Court notes that pattern jury instructions, "[a]lthough generally considered a 'valuable resource,'" are not binding. *See United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007).

Case No.  18-cv-80176-BLOOM/Reinhart

many bitcoins he mined, Defendant stated that he "mined quite a number and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." ECF No. [534-13] at 6. He also stated that "[h]ow many people were involved in Satoshi is probably a better question. That was two of us." *Id.* Defendant further stated that "Dave was a key part of everything that I did. Dave spoke as Satoshi," and he and Mr. Kleiman are Satoshi Nakamoto. *Id.* at 7. Likewise, when asked who created the pseudonym Satoshi, he stated "[m]ostly myself, and a little bit with Dave. Both of us acted. Dave was the nice version of Satoshi." *Id.* at 20. *See also* ECF Nos. [534-16] at 1 ("David Reese and David Kleiman have both been essential parts of this project."); [534-17] at 3 ("I had an idea, but it would never have executed without Dave[.] Dave was my sounding board, he fixed my errors.").

        Additionally, the record reflects that Mr. Kleiman wrote an email to Defendant, regarding a financial statement, asking, "[a]re we ever going to get a wage on this? Just kidding I trust you." ECF No. [534-28]. Further, Mr. Kleiman purportedly wrote a bitmessage to Defendant stating "you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust[.]" ECF No. [534-30] at 5. Likewise, Defendant informed the ATO that "[t]here was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies," and that the trust was set up as a "funding mechanism . . . for research." ECF No. [534-18] at 7. He also stated that "[w]hen we were starting originally, we looked at bitcoin value of probably $20 million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million." *Id.* at 11.

1128

Case No. 18-cv-80176-BLOOM/Reinhart

Based on the foregoing, a fact finder can conclude that Mr. Kleiman and Defendant worked together as an "association of two or more persons to carry on as co-owners of a business for profit." *See* Fla. Stat. § 620.8202(1).

### ii.    Defendant's approach

Defendant argues that Florida law requires the express showing of specific elements to establish a partnership. Both parties acknowledge that the Eleventh Circuit has followed this approach. *See Williams v. Obstfeld*, 314 F.3d 1270 (11th Cir. 2002). In *Williams*, that court explained as follows:

> Under Florida law, a joint venture is a form of partnership, and both types of entities are generally governed by the same rules of law. *Kislak v. Kreedian*, 95 So.2d 510, 514 (Fla. 1957); *see also Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein*, 872 F.2d 1536, 1539 n. 3 (11th Cir. 1989) ("[I]n general, the law governing partnerships is applicable to joint ventures."). A partnership is created only where "both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business." *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. Dist. Ct. App. 1997). A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control. *Pinnacle Port*, 872 F.2d at 1539; *Kislak*, 95 So. 2d at 515. Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing. *See Kislak*, 95 So. 2d at 517; *Dreyfuss*, 701 So. 2d at 439; *Austin v. Duval County Sch. Bd.*, 657 So. 2d 945, 948 (Fla. Dist. Ct. App. 1995).

*Id.* at 1275–76. Defendant argues that because there is no written partnership agreement, Plaintiffs bear the "'burden of establishing the existence of such contract, including all of its essential elements,' which 'is indeed, as it should be, a heavy and difficult one.'" ECF No. [487] at 15 (citation omitted). In this regard, he maintains that Plaintiffs cannot establish the existence of a partnership because none of the four elements listed above are satisfied. The Court disagrees.

1129

Case No.  18-cv-80176-BLOOM/Reinhart

Regarding the first element, a common purpose, Defendant maintains that no evidence shows that the purpose of the alleged oral partnership was to mine bitcoin and create bitcoin-related intellectual property. *Id.* at 16. In his view, "not a single witness or document would show that the purported oral partnership's purpose had anything to do with bitcoin[.]" *Id.* As support, he contends that the people closest to David Kleiman "will all testify that [Mr. Kleiman] never mentioned bitcoin, never said he was working on bitcoin or bitcoin-related intellectual property, and never said he was in a partnership with Dr. Wright." *Id.* Plaintiffs respond that the record is "replete" with "substantial evidence that Defendant and Dave Kleiman formed a partnership for the common purpose of creating Satoshi Nakamoto, inventing Bitcoin, mining bitcoin, and developing related intellectual property." ECF No. [533] at 19.

For instance, they cite the following evidence: ECF No. [83-20] at 1 ("The Tax office know[s] that Dave and I have been working on this since 2008."); *Id.* at 3 ("Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code."); ECF No. [83-6] at 2 ("I have attached a little more of what we did together."); ECF No. [534-17] at 4 ("I had math skills and some coding, that frankly was crud . . . Dave could edit his way through hell and back. I am not a team player. I am a terrible boss and slave driver, but with Dave I was far more. Satoshi was a team. Without the other part of that team, he died."); *Id.* at 3 ("I had an idea, but it would never have executed without Dave[.]"); ECF No. [534-19] (when asked if Mr. Kleiman had compiled the code for the first version of Bitcoin, Defendant stated "Yes. We both played. Dave compiled"); ECF No. [534-20] at 2 ("I have a trust overseas. I moved it and the mining process to Dave Kleiman when I had a few issues with the tax ppl [sic]."); *Id.* ("I had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin we created in the OS trust and companies[.]"); *Id.* at [534-22] at 1 ("We only need one dormant and

58

1130

Case No. 18-cv-80176-BLOOM/Reinhart

untraded company to sit as a[n] owner of the bitcoin we are mining into them."); *Id.* ("Dave mined all of this outside Australia . . . I was not the person doing the mining. Dave was."); ECF No. [534-21] at 1 ("Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead."); ECF No. [534-18] at 5 ("A long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform . . . Dave and I had been friends and sort of partners that way for a long time."); *Id.* (Defendant and Mr. Kleiman "had worked on a number of patents together . . . We had been planning putting together an exchange platform that would allow us ….. or bitcoin. The idea would be to perform an alternative reserve currency, that's what we are trying to do"). *Id.* at ¶ 121 (citing ECF No. [534-18] at 5); ECF No. [534-3] at 2 ("what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that] is property that can be atomically traded and loaned via the block chain," and solve how "a transaction could be issued potentially even after a confirmation if the block chain is reorganized"). Based on the foregoing evidence, the Court finds a genuine dispute of material fact exists regarding the common purpose element.

Regarding the second element, joint proprietary interest in the subject matter, Defendant argues that there is no evidence of joint ownership, thus precluding this element. ECF No. [487] at 17. He also adds that Mr. Kleiman's estate previously alleged in a state court lawsuit against Computer Forensics LLC, Mr. Conrad, and Mr. Paige that "David Kleiman created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics." *Id.* (quoting ECF No. [144-5] at ¶ 32). In response, Plaintiffs argue that any purportedly

59

1131

Case No.  18-cv-80176-BLOOM/Reinhart

inconsistent statement made in a separate state court proceeding against different defendants for the return of any bitcoin owned by Mr. Kleiman to the extent such was in their possession is irrelevant here. ECF No. [533] at 22. They also state that Defendant and Mr. Kleiman "had a joint interest in the financial benefits and profits generated by the combination of their resources and services." *Id.* at 21 (citation omitted). They cite to the following evidence: ECF No. [534-18] at 7 ("There was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies[.]"); ECF No. [83-13] ("We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions[.]"); ECF No. [511-8] at 1 ("The software Dave updated and which I have transferred back in OUR company . . . is OURs as you are Dave's heir[.]"); ECF No. [83-20] at 18 (regarding the transfer of assets out of W&K, the "reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed"). Based on the foregoing, the Court finds a genuine dispute of material fact exists regarding the joint proprietary interest element.

Regarding the third element, the right to share profits and duty to share losses, Defendant contends that there is no evidence that Defendant and Mr. Kleiman agreed to share profits nor evidence as to distribution of profits. ECF No. [487] at 17. He adds that there is no evidence of sharing losses or liabilities. *Id.* at 18. Plaintiffs, in response, argue that record evidence shows that Defendant and Mr. Kleiman agreed to share profits and losses. For instance, they cite the following: ECF No. [534-26] at 1 ("Dave and I decided to start Coin-Exch so that we could lock in some of the value. . . . We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smart, but we took the

1132

Case No.  18-cv-80176-BLOOM/Reinhart

option to cash out."); ECF No. [534-18] at 7 (Defendant informing the ATO that Mr. Kleiman put

bitcoin into a trust to fund their joint research activities); ECF No. [534-1] at 3 ("I know you have

been paying people from Bitcoin in your own wallet, is this enough to account for it all? It has

been a shitload of work."); ECF No. [534-28] ("Are we ever going to get a wage on this? Just

kidding I trust you."); ECF No. [534-30] at 5 ("you funded the trust when Bitcoin was worth hardly

anything, but we have all put all we have into this. So the gain is not yours, it remains with the

trust[.]"); ECF No. [534-31] at 1 ("Craig and I have put our entire life savings into this business,

as did Dave[.]"); ECF No. [534-2] at 15 (Mr. Kleiman writing to Defendant that "I think I lost

money. At times I wonder if it is worth it. We have done deals together for years and we have

nothing but code to show for it all."); ECF No. [83-20] at 7 (Defendant writing to Ira Kleiman that

he had "convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could

take some of the R&D money that comes as a rebate on what has been expended and we could

both spend a little time on us time"). In viewing this evidence in a light most favorable to Plaintiffs

as the non-moving party, the Court finds a genuine dispute of material fact exists regarding the

right to share profits and duty to share losses element.

As to the fourth element, joint control or right of control, Defendant contends that there is

no evidence that Defendant and Mr. Kleiman "had joint control over anything in this case, let alone

each other's bitcoin. Nor do they have any evidence that [Mr. Kleiman] and Dr. Wright had the

authority to 'bind one another' to anything." ECF No. [487] at 18-19. Plaintiffs, in response,

maintain that there is "abundant evidence" that Defendant and Mr. Kleiman "shared control over

the partnership's email accounts and assets, and that each of them influenced decisions about what

to do with the partnership and its assets." ECF No. [533] at 23. For instance, regarding shared

control over the partnership assets, they cite an email from Defendant stating that "Dave and I

1133

Case No.  18-cv-80176-BLOOM/Reinhart

decided to start Coin-Exch so that we could lock in some of the value" and that they "took the option to cash out." ECF No. [534-26] at 1. *See also* ECF No. [83-20] at 7 ("I convinced [Mr. Kleiman] that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time"). They also cite evidence of shared control over bitcoin private keys. ECF Nos. [534-26]; [534-32]; [534-33]. They further cite evidence of joint control over the partnership's software. ECF No. [534-18] at 42 ("Dave has . . . an estate . . . and I wanted to make sure I didn't rip off his estate and just go, 'Ha ha, it's my software.'").

Plaintiffs also note that Defendant stated "Dave Kleiman and I sold code . . . David took the biggest risk . . . Nothing he was able to earn in Panama was able to be repatriated legally in the USA." ECF No. [534-34] at 4. Further, regarding emails, they put forth evidence of two email addresses linked to Satoshi Nakamato, Satoshi@vistomail.com and Satoshin@gmx.com, and Defendant stating that Mr. Kleiman "had the vistomail account" and Defendant "had the gmx one." ECF No. [534-35] at 1. Defendant told James Nguyen that he and Mr. Kleiman "both posted from Satoshi account sometimes." ECF No. [534-16] at 197:34. Based on the foregoing and viewing all the evidence in a light most favorable to Plaintiffs as the non-moving party, the Court finds a genuine dispute of material fact exists regarding the joint control or right of control element. Accordingly, the Court denies Defendant's Motion on the grounds that there is insufficient evidence of a partnership.

**b.    The statute of frauds does not bar claims based on the oral partnership**

The statute of frauds states, in pertinent part, that "[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise . . . shall be in writing and signed by the party to be charged

1134

Case No.  18-cv-80176-BLOOM/Reinhart

therewith[.]" Fla. Stat. § 725.01. In *Browning v. Poirier*, 165 So. 3d 663 (Fla. 2015), the Florida

Supreme Court explained the statute of frauds' application as follows:

> It is well settled that the oral contracts made unenforceable by the statute because they are not to be performed within a year include only those which *cannot* be performed within that period. A promise which is not likely to be performed within a year, and which in fact is not performed within a year, is not within the statute if at the time the contract is made there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year. 9 *Williston on Contracts* § 24:3 (4th ed. 2011) (emphasis in original) (footnotes omitted).
>
> Stated otherwise, judging from the time the oral contract of indefinite duration is made, if the contract's full performance is possible within one year from the inception of the contract, then it falls outside the statute of frauds. *See Acoustic Innovations, Inc. v. Schafer*, 976 So.2d 1139, 1143 (Fla. 4th DCA 2008); *Wilcox v. Lang Equities, Inc.*, 588 So.2d 318, 320 (Fla. 3d DCA 1991); *Gulf Solar, Inc. v. Westfall*, 447 So.2d 363, 366 (Fla. 2d DCA 1984); *but see LynkUs Commc'ns, Inc. v. WebMD Corp.*, 965 So.2d 1161, 1165 (Fla. 2d DCA 2007); *Khawly v. Reboul*, 488 So.2d 856, 858 (Fla. 3d DCA 1986).

*Id.* at 665-66 (emphasis in original). *See also Alpha Data Corp. v. HX5, L.L.C.*, 139 So. 3d 907,

909–10 (Fla. 1st DCA 2013) ("The general rule is that the Statute of Frauds bars enforcement of

oral contracts which by their terms are not to be performed within a year. The fact that a contract

may not be performed within a year does not bring it within the statute. 'In other words, to make

a parol contract void, it must be apparent that it was the understanding of the parties that it was not

to be performed within a year from the time it was made.' Contracts for an indefinite period

generally do not fall within the Statute of Frauds.") (quoting *Yates v. Ball*, 132 Fla. 132, 181 So.

341, 344 (1937)).

Defendant has not presented evidence for the Court to conclude as a matter of law that the

statute of frauds bars Plaintiffs' claims. In fact, Defendant's argument is premised not on actual

record evidence but instead on the Complaint's allegation that the partnership lasted from 2008

until February 2011. ECF No. [487] at 4, 19 (citing ECF No. [83] at ¶ 67). In this regard, Defendant

1135

Case No.  18-cv-80176-BLOOM/Reinhart

inaccurately maintains that Plaintiffs "expressly alleged that this purported oral partnership was intended to last three years[.]" *Id.* at 4. The Complaint makes no such allegation.[19] That the Complaint alleges the mere fact that the alleged partnership lasted longer than one year is not dispositive of whether the statute of frauds applies. Rather, the salient issue is whether at the time of entering into the partnership, full performance within one year was not possible. Defendant fails to produce evidence that the alleged partnership was agreed to last for any particular duration much less a fixed duration longer than one year. Nor has he produced evidence that the parties intended the partnership to last longer than one year from the time of entering into the agreement. Similarly, he has not produced evidence demonstrating that full performance of the partnership within one year was impossible. Accordingly, the Court rejects Defendant's argument that the statute of frauds bars Plaintiffs' claims. Defendant's Motion is thus denied on this point.

### 4.    Preemption

In the December 2018 Order, the Court dismissed with prejudice Plaintiffs' claim for misappropriation of trade secrets under FUTSA because of a time bar. ECF No. [68] at 31-33. Defendant now contends that pursuant to Fla. Stat. § 688.008, all state-law claims based on misappropriation of trade secrets are displaced or preempted by FUTSA. ECF No. [487] at 20 (citing Fla. Stat. § 688.008 (providing that FUTSA "displace[s] conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret," but FUTSA does not affect "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret" or "[o]ther civil remedies that are not based upon misappropriation of a trade secret")).

---

[19] The Complaint alleges that "[t]he exact structure of their joint mining activities, intellectual property development, and 'partnership' from c. 2008 until February 2011 requires discovery to fully reveal." ECF No. [83] at ¶ 67.

1136

Case No. 18-cv-80176-BLOOM/Reinhart

Defendant argues that other torts involving the same underlying factual allegations as a claim for trade secret misappropriation are preempted. *Id.* (citation omitted). In his view, the "only purportedly stolen intellectual property [P]laintiffs have identified is 'blockchain based technologies and smart contracts,' which is also what they alleged to be their trade secrets." *Id.* at 5. *See also id.* at 21. He, thus, maintains that because Plaintiffs' "purported trade secrets are their purported intellectual property, FUTSA pre-empts their remaining claims—except their claim for civil theft—because they are based on the 'same underlying factual allegations,' and there are no 'material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim." *Id.* at 21 (citation omitted). Defendant adds that Plaintiffs have previously represented that their state claims are related to the federal DTSA claim and have a "common nucleus of operative fact," which "admission requires granting summary judgment on the other claims[.]" *Id.* (citing ECF No. [159] at 11).

In response, Plaintiffs argue that Defendant's FUTSA preemption defense is waived because Defendant did not raise it as one of his affirmative defenses. ECF No. [533] at 38-40. According to them, Defendant's assertion of this defense at this time is "undoubtedly" prejudicial because Defendant "sat on this defense," which "could have easily been asserted [] two years ago," and his failure to assert this defense resulted in Plaintiffs not "seek[ing] to tailor discovery in any way toward obtaining information relevant to the defense[.]" *Id.* at 39. They argue that even if the FUTSA preemption defense was not waived, it would not bar any of the remaining claims. *Id.* Specifically, they assert that Counts I, II, V-VIII are not preempted by FUTSA because they are not based upon misappropriation of a trade secret, and they seek a return of allegedly stolen bitcoin. *Id.* at 40. They add that Defendant fails to show that the alleged wrongdoing in those counts is not

65

1137

Case No.  18-cv-80176-BLOOM/Reinhart

materially separate and distinct from their FUTSA claim. *Id.* at 40-43. Further, they contend that

Count VI arises from a contractual relationship and is thus exempt from FUTSA. *Id.* at 43.

Upon review of the record and consideration of the parties' briefings, the Court agrees with

Plaintiffs that Defendant's FUTSA preemption arguments fail. First, the Court concludes that this

defense was waived because it was not timely asserted. "Preemption is an affirmative defense that

usually must be raised in an answer or other responsive pleading and, if not so raised, the defense

is considered waived." *Small v. Amgen, Inc.*, No. CV 2:12-476-FTM29-CM, 2016 WL 4942078,

at *2 (M.D. Fla. Jan. 25, 2016) (citing *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th

Cir. 2010)). In Defendant's Amended Answer filed in January 2019, he did not raise a FUTSA

defense or preemption defense. ECF No. [87]. The "Eleventh Circuit has only provided a narrow

window to raise affirmative defenses during summary judgment." *Am. Auto. Ins. Co. v. Quality

Plastering & Stucco, Inc.*, No. 611CV1767ORL22DAB, 2013 WL 12149411, at *6 (M.D. Fla.

June 26, 2013). Specifically, the Court "'may consider an affirmative defense' not appearing in

the answer, 'if the plaintiff has suffered no prejudice from the failure to raise the defense in a

timely fashion.'" *Id.* (quoting *Miranda De Villalba v. Coutts & Co. (USA) Int'l*, 250 F. 3d 1351,

1353 (11th Cir. 2001)). Here, the Court finds that raising this defense at this "eleventh hour" after

two years of extensive discovery is improper and prejudicial. *See, e.g.*, *Britt Green Trucking, Inc.

v. FedEx Nat., LTL, Inc.*, No. 8:09-CV-445-T-33TBM, 2014 WL 3417569, at *12-13 (M.D. Fla.

July 14, 2014) (rejecting argument that raising preemption defense at summary judgment was not

prejudicial where defendant, after years of litigating, "waited until the eleventh hour to bring this

issue to the attention of Plaintiffs and this Court").

Second, even if the preemption defense was timely asserted and not waived, it is still

deficient. As Plaintiffs relay, Counts I, II, and V-VIII seek as part of their relief a return of bitcoins

66

1138

Case No. 18-cv-80176-BLOOM/Reinhart

allegedly stolen by Defendant. FUTSA, however, "does not affect . . . [o]ther civil remedies that are not based upon a misappropriation of a trade secret." Fla. Stat. § 688.008(2)(b). Defendant has made no showing that bitcoins are a trade secret, and in fact he represents that the "trade secrets are the purported intellectual property." ECF No. [487] at 21. The Court, therefore, concludes that even if FUTSA could apply, it would not displace Plaintiffs' claims to the extent they do not involve misappropriation of trade secrets, *i.e.*, recovery of misappropriated bitcoins. *See Pelfrey v. Mahaffy*, No. 17-CV-80920, 2018 WL 3110797, at *3 (S.D. Fla. Feb. 7, 2018) (conversion claim alleging identical misconduct as FUTSA misappropriation claim preempted only "to the extent" it alleges theft of the same trade secrets asserted in the misappropriation claim). In other words, it would act only as a partial preemption of those claims at most if the defense was viable.

Relatedly, Count VI, breach of partnership duties of loyalty and care, arises from a contractual relationship, and is thus exempted from FUTSA preemption. *See* Fla. Stat. § 688.008(2)(a); *Allied Portables, LLC v. Youmans*, No. 2:15-CV-294-FTM-38CM, 2016 WL 259548, at *3 (M.D. Fla. Jan. 21, 2016) ("FUTSA preempts all claims, other than claims *ex contractu*, based on misappropriation of trade secrets."); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005) ("Breach of an oral agreement sounds in contract and is therefore excepted from the preemptive effect of FUTSA."); *see also ThinkLite LLC v. TLG Sols., LLC*, No. 16-24417-CIV, 2017 WL 5972888, at *4 (S.D. Fla. Jan. 31, 2017) (denying preemption of claim for breach of good faith and duty of loyalty because it is based on "contractual and confidential-relationship duties and actions other than misappropriation of trade secrets").

Additionally, this Court has stated that "[t]o determine whether allegations of trade-secret misappropriation preempt a plaintiff from sufficiently pleading a separate, but related tort, the

Case No.  18-cv-80176-BLOOM/Reinhart

Court must evaluate 'whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008.' Thus, 'a plaintiff's separate tort claim is preempted by FUTSA if there is no 'material distinction' between the plaintiff's FUTSA claim and the other allegation." *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294–95 (S.D. Fla. 2018) (internal citations omitted); *see also XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016) ("In order to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be *material distinctions* between the allegations comprising the additional torts and the allegations supporting the FUTSA claim.") (emphasis in original; citation omitted).

To conduct the FUTSA analysis, the Court must "compare the allegations of the [allegedly preempted] claim and the FUTSA claim to determine if the allegations are separate and distinct." *XTec*, 183 F. Supp. 3d at 1263 (denying preemption because even though there were "substantially similar allegations," a difference in the "*manner* in which" property was misappropriated renders a claim materially distinguishable) (emphasis in original). Defendant has failed to make this showing other than to note generally that Plaintiffs previously made a one-sentence statement in a brief regarding supplemental jurisdiction that their claims shared a common nucleus of operative fact with the DTSA claim. This limited showing does not suffice for preemption purposes. But in any event, the Court agrees with Plaintiffs that the claims at issue are materially distinct from the FUTSA claim. *See* ECF No. [533] at 41-42. Accordingly, Defendant's Motion is denied on this point.

### 5.    *Fraud claims*

Defendant argues that summary judgment is warranted on Plaintiffs' fraud and constructive fraud claims, Counts VII and VIII. Specifically, he contends that the common law fraud claim

Case No.  18-cv-80176-BLOOM/Reinhart

cannot proceed because "(1) Dr. Wright's alleged misstatements are not promises but a 'prediction

of future events;' (2) [P]laintiffs never had a 'right to rely on the [alleged] representations; and (3)

the alleged statements did not induce [P]laintiffs to do anything that caused them damages." ECF

No. [487] at 25 (internal citations omitted). He adds that the constructive fraud claim fails because

there is no evidence that Defendant was a fiduciary to Plaintiffs, and Ira Kleiman has been

adversarial with him since February 2014. *Id.* at 30. The Court will address each count separately.

> **a.    Fraud**

"An aggrieved party proves common law fraud by establishing that: (1) the opposing party

made a misrepresentation of a material fact, (2) the opposing party knew or should have known

the falsity of the statement, (3) the opposing party intended to induce the aggrieved party to rely

on the false statement and act on it, and (4) the aggrieved party relied on that statement to his or

her detriment." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 595 n.2 (Fla. 2013). *See also*

*Pitts Sales, Inc. v. King World Prods., Inc.*, 383 F. Supp. 2d 1354, 1362–63 (S.D. Fla. 2005)

("Under Florida law, the essential elements of a cause of action for fraud are: (1) a false statement

of fact; (2) known by the defendant to be false at the time it was made; (3) made for the purpose

of inducing the plaintiff to act in reliance thereon; (4) action by the plaintiff in reliance on the

correctness of the representation; and (5) resulting damage or injury.") (citations omitted).

"Generally, the fraudulent statement must concern a past or existing fact." *Gemini*

*Investors III, L.P. v. Nunez*, 78 So. 3d 94, 97 (Fla. 3d DCA 2012). "However, if the plaintiff can

demonstrate that the person promising future action does so with no intention of performing or

with a positive intention not to perform, such a promise may also constitute a fraudulent

misrepresentation." *Prieto v. Smook, Inc.*, 97 So.3d 916, 917–18 (Fla. 4th DCA 2012)

(quoting *Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001)); *See also Wadlington v.*

1141

Case No. 18-cv-80176-BLOOM/Reinhart

*Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632–33 (Fla. 4th DCA 2005) (explaining that "'where the promise to perform a material matter in the future is made without any intention of performing or made with the positive intention not to perform' a cause of action for fraud may proceed to a jury," and noting that these issues "are questions of fact to be determined by a jury"). "As a general rule, it is a matter for the jury to determine if an intentional misrepresentation has been made. In fraud cases, summary judgment is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." *Wadlington*, 907 So. 2d at 633 (citations omitted).

Further, "[f]raud also includes the intentional omission of a material fact." *Ward v. Atl. Sec. Bank*, 777 So. 2d 1144, 1146 (Fla. 3d DCA 2001). "[N]ondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact." *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA 1961). Even if "a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985). "The classic illustration of fraud is where one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation[.]" *Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. 3d DCA 1980) (citations omitted). "Fraud may be proven by showing a series of distinct acts, each of which may be a badge of fraud and when taken together as a whole, constitute fraud." *Allen v. Tatham*, 56 So. 2d 337, 339 (Fla. 1952).

Defendant first argues that his alleged statements regarding possible future acts cannot constitute actionable fraud as a matter of law because "fraud cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." ECF No. [487] at 25

70

1142

Case No. 18-cv-80176-BLOOM/Reinhart

(citation omitted). According to him, Plaintiffs "cannot rely on Dr. Wright's alleged statements regarding the future value of shares of a start-up company, whether those shares could be sold in the future, or whether the Estate could in the future participate in a start-up company, because they were mere hopeful predictions of possible future events" and they were "mere puffery." *Id.* at 25-26.

Plaintiffs respond that their fraud claim is not based primarily on promised future action, and Defendant's alleged fraud started well before February 2014, including by "altering and falsifying documents for the purpose of taking Dave's/W&K's property." ECF No. [533] at 33-34. For instance, they maintain that after Mr. Kleiman died, and "aware that Dave's estate had no knowledge of W&K or Dave's work with [Defendant] on bitcoin," Defendant enacted a "scheme to take sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K," which involved fabricated documents, false statements, fake emails, half-truths, and non-disclosures of material information. *Id.* at 34-35. They add that even Defendant's promises of future action are actionable fraud because Defendant "made these promises with no intention of performing, and, independently, because he had superior knowledge of the subject matter and knew what he was saying was false." *Id.* at 34; *see also Mejia*, 781 So. 2d at 1177 (recognizing exceptions to the general rule that fraud may not be based on statements of opinion or promises of future action, including "[w]here the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false," and where "the person promising future action does so with no intention of performing or with a positive intention not to perform").

1143

Case No. 18-cv-80176-BLOOM/Reinhart

Upon consideration, the Court rejects Defendant's argument that his statements regarding possible future acts could not constitute actionable fraud as a matter of law. Plaintiffs invoke theories of liability that permit a jury to find fraud based on future-oriented promises and actions that were never intended to be performed. Additionally, they have produced evidence that could support such a finding, including Defendant's promises to pay the estate $10 million by October 2014, which were not fulfilled. ECF Nos. [511-8] at 14; [511-18] at 1. More importantly, this determination is a factual dispute for a jury to decide and is inappropriate for resolution at this juncture. *See, e.g.*, *Wadlington*, 907 So. 2d at 633 (citing cases); *Tew*, 728 F. Supp. at 1555.

Defendant next argues that Plaintiffs did not rely, and had no right to rely, on any of his alleged statements. ECF No. [487] at 26. First, he asserts that Plaintiffs' claim that his statements caused them to not challenge his legal claims in the Australian lawsuits is unavailing. Those proceedings terminated in November 2013, yet he contacted them in February 2014, Ira Kleiman had a lawyer at that time, and there was no confidential relationship between the two in February 2014. *Id.* at 26-27. Second, he maintains that Plaintiffs cannot rely on the allegedly forged contracts because Ira Kleiman purportedly "questioned those contracts the very first time he saw them." *Id.* at 27. In this respect, he contends that Plaintiffs were in an "adversarial relationship" with him in February 2014, and they even have "work product" from that time. *Id.* Third, he argues that Plaintiffs' claim that they failed to secure the bitcoin and intellectual property they purportedly owned due to his statements is "impossible" given that he merely advised the Kleimans to preserve Mr. Kleiman's devices, and Ira Kleiman "destroyed" David Kleiman's work papers and hard drives. *Id.* at 27-28. Finally, he asserts that as for Mr. Kleiman's devices that were not destroyed or overwritten, Defendant recommended to Ira Kleiman that he give them to Mr. Paige and Mr. Conrad but Ira Kleiman never followed that recommendation. *Id.* at 28.

1144

Case No.  18-cv-80176-BLOOM/Reinhart

Plaintiffs respond that "[e]ven with respect to the post-2014 February emails, Plaintiffs had a 'right to rely' and did rely on [Defendant's] false statements, half-truths, non-disclosures, and promises of future action he had no intention of performing." ECF No. [533] at 35. They state that Defendant misstates the law, but regardless, "he cannot under the cover of law be permitted to retain the fruits of perfidy" where he has "tricked and deceived and dealt fraudulently" with those whom he owed fiduciary duties, Mr. Kleiman's estate. *Id.* at 35-36 (quoting *McLeod v. Gaither*, 113 So. 687, 688 (Fla. 1927)). Moreover, they contest Defendant's characterization of events. *Id.*

Upon review, the Court does not agree that the record establishes as a matter of law that Plaintiffs could not rely on Defendant's statements and representations. First, even though Defendant reached out to Plaintiffs several months after the Australian lawsuits concluded and Ira Kleiman expressed some suspicions in April 2014 regarding certain documents, that does not foreclose the possibility that Plaintiffs did not later timely challenge those judgments in Australia because of Defendant's statements. For instance, the record reflects that Defendant wrote to Ira Kleiman that after Mr. Kleiman died, "I did the actions [in Australia] to make sure the court signed off on what Dave and I planned," "[t]his was not about screwing Dave or his estate . . . I did that action as accountants etc. advised it was necessary," and "I am not trying to take anything from Dave's estate." ECF No. [83-24] at 6, 18. Second, although Ira Kleiman had counsel in February 2014, that does not support the proposition that the Kleimans are consequently barred from relying on Defendant's statements. Likewise, although Defendant asserts that the parties were "antagonistic" in February 2014, the record reflects that Ira Kleiman wrote to Defendant in March 2014 that his "family is truly blessed to know you." ECF No. [534-39] at 7. Third, as Plaintiffs note, even if Ira Kleiman was potentially negligent by not preserving Mr. Kleiman's devices or by not turning over the devices to Mr. Paige and Mr. Conrad, that does not preclude a fraud claim.

1145

Case No. 18-cv-80176-BLOOM/Reinhart

*See, e.g.*, *Cruise v. Graham*, 622 So. 2d 37, 40 (Fla. 4th DCA 1993) ("the defrauder should not be shielded by his victim's negligence") (citation omitted); *Cont'l Cas. Co. v. Cura Grp., Inc.*, No. 03-61846-CIV, 2005 WL 8155321, at *33 (S.D. Fla. Apr. 6, 2005) (comparative negligence is not a defense to "fraud-based torts").

Defendant next argues that Plaintiffs' purported reliance did not cause damages, and thus the fraud claim fails for lack of actual damages. ECF No. [487] at 28-29. In response, Plaintiffs maintain that Defendant has "stolen" and "deprived" them of assets worth "billions of dollars." ECF No. [533] at 37. For instance, they note that Defendant and Mr. Kleiman/W&K mined approximately 1.1 million bitcoins together, ECF No. [534-18] at 11, and that Defendant has even admitted that he "was not the person doing the mining. Dave was." *See* ECF No. [534-22] at 1. Plaintiffs add that the value of a bitcoin is determinable as is the value of misappropriated intellectual property. ECF No. [533] at 37. For instance, the "W&K Source" "software package" is valued between $126 million and approximately $304 million AUD. *Id.* Upon review, the Court rejects Defendant's argument that Plaintiffs have not been damaged by his alleged fraud.

### b. Constructive fraud

Under Florida law, constructive fraud occurs "when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3d DCA 2003). It "may be based on a misrepresentation or concealment, or the fraud may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding party." *Id.* The Florida Supreme Court has "characterized a fiduciary relationship in the following manner: [t]he relation and duties involved need not be legal; they may be moral, social, domestic, or personal." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). A fiduciary or confidential relationship exists where "confidence is reposed by one party and a trust is accepted

Case No.  18-cv-80176-BLOOM/Reinhart

by the other, or where confidence has been acquired and abused." *Id.* The origin of the confidence

is immaterial. *See Id.* Thus, "[t]he term 'fiduciary or confidential relation' is a very broad one."

*Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179 (quoting *Quinn v. Phipps*, 113 So. 419, 420 (Fla.

1927)). Constructive fraud, therefore, is "simply a term applied to a great variety of transactions

which equity regards as wrongful, to which it attributes the same or similar effects as those which

follow from actual fraud, and for which it gives the same or similar relief as that granted in cases

of real fraud." *Id.* (citation omitted).

Moreover, to state a claim for breach of a fiduciary or confidential relationship, "a party

must allege some degree of dependency on one side and some degree of undertaking on the other

side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat. Bank of Fla., N.A.*,

622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. ISCA Corp.*, 717 F.

Supp. 1537, 1541 (S.D. Fla. 1989)). "The fact that one party places trust or confidence in the other

does not create a confidential relationship in the absence of some recognition, acceptance or

undertaking of the duties of a fiduciary on the part of the other party." *Lanz v. Resolution Trust

Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991). Additionally, constructive fraud "will not lie where

the parties are dealing at arms-length because there is no duty imposed on either party to protect

or benefit the other." *Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179.

According to Defendant, Plaintiffs' claim for constructive fraud fails because there "is not

even a scintilla of evidence suggesting that Dr. Wright was a fiduciary to [P]laintiffs," there was

an "adversarial relationship" as of February 2014, and there is no evidence that Ira Kleiman was

the "weaker party." ECF No. [487] at 30. In response, Plaintiffs maintain that the record supports

a finding that Defendant and Mr. Kleiman were partners, and that while "'weakness' is not an

element of a constructive fraud claim," "Defendant was the only person with knowledge of Dave's

1147

Case No.  18-cv-80176-BLOOM/Reinhart

bitcoin activities; Ira knew nothing and depended on Defendant to fully inform him of the facts." ECF No. [533] at 38.

Upon review, the Court find Defendant's arguments unpersuasive. As noted, the record reflects evidence for a jury to find that Defendant and Mr. Kleiman entered into a partnership. Partners and joint venturers owe fiduciary duties to each other. *See, e.g.*, *Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So. 2d 459, 462 (Fla. 3d DCA 2004) (explaining that "[r]egarding the general duties and obligations of joint adventurers toward each other, they, like co-partners owe to one another . . . the duty of the finest and highest loyalty") (citing *Donahue v. Davis*, 68 So. 2d 163, 171 (Fla. 1953)); *Grossman v. Greenberg*, 619 So. 2d 406, 408 (Fla. 3d DCA 1993). While the death of a partner normally terminates the partnership, a "surviving partner's fiduciary obligations extend to the deceased partner's heirs and beneficiaries." *Matter of Estate of Thomas*, 532 N.W.2d 676, 684 (N.D. 1995) (collecting cases).

The "rationale underlying this rule is based upon the surviving partner's superior knowledge: 'A surviving partner does not deal at arms-length with the heirs of a deceased partner, but must make an open and full disclosure to them. The heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the extent of the partnership property or information about the amount of business done or the value of the partnership. Thus, in regard to the deceased partner's interest in the partnership, the surviving partners are treated in equity as trustees of the decedent's representatives.'" *Id.* (quoting 59A Am. Jur. 2d Partnership § 1147 (1987)) (footnotes omitted); *see also Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3d DCA 1970) (noting that "if the surviving or remaining partners continue the partnership business with the partnership assets they are required to account to the withdrawing or deceased partner's estate . . . [and] they act as trustees").

1148

Case No.  18-cv-80176-BLOOM/Reinhart

The record reflects evidence from which a jury could conclude that Defendant enacted a scheme against Plaintiffs, abuse of a confidential or fiduciary relationship, and that Plaintiffs were the "weaker party" in their dealings with him. *See, e.g.*, ECF Nos. [83-20] ("The information I have to work with is what you have told me and the documents from the ATO office."); [511-18] at 1 ("The frustrating part is not know what to believe. One moment I am told that you received funding for the next 5 years and are able to get back to work on building the business. And then the next second I am told there is no progress being made with the business because all your focus is on resolving the ATO disputes."). Accordingly, the Court rejects Defendant's assertion that Count VIII fails.

As set forth above, Defendant's Motion is denied on all grounds. The Court now turns to Plaintiffs' Motion, which contains certain overlapping issues.

### B.    Plaintiffs' Motion

Plaintiffs move for summary judgment on each of the fourteen affirmative defenses raised by Defendant in his Amended Answer, ECF No. [87].[20] According to Plaintiffs, the affirmative defenses fall into eight general categories. ECF No. [498] at 3. The Court will address each affirmative defense and the parties' arguments.

> ### 1.    *Accord and satisfaction, release, waiver, payment, set-off, and failure to mitigate damages*

Plaintiffs assert that the "Coin-Exch" defenses, Affirmative Defenses 4, 5, 6, 7-1, 7-2, and 8-1, were abandoned by Defendant and are contrary to law. *Id.* at 5. These defenses purportedly relate to Plaintiffs' alleged shares in Coin-Exch. *Id.* According to Plaintiffs, Defendant

---

[20] Defendant mislabels the numbering of several of his affirmative defenses. For instance, he asserts two "seventh" and "eighth" affirmative defenses. Accordingly, for purposes of this motion, set-off is Affirmative Defense 7-1, waiver is Affirmative defense 7-2, failure to mitigate is Affirmative Defense 8-1, and estoppel is Affirmative Defense 8-2.

Case No.  18-cv-80176-BLOOM/Reinhart

"abandoned" these affirmative defenses during his March 18, 2020 deposition where he "repeatedly disclaimed having provided Plaintiffs with shares of Coin-Exch in exchange for a release of any claims." *Id.* at 6. In support, they cite Defendant's testimony that in response to a question if he "ever [told] Ira that he would be releasing you from claims if he accepted shares in Coin-Exch," Defendant stated "[n]o, I never made any such thing." *Id.* (quoting ECF No. [498-1] at 227:23-228:1). Likewise, when asked if he "ever [told] Ira that he would be waiving any claims against you if he accepted shares in Coin-Exch," Defendant responded, "[n]o, I did not say anything like that." *Id.* (quoting ECF No. [498-1] at 228:2-6). Plaintiffs add that Defendant has not produced evidence to support these defenses. *Id.* at 6-11.

In response, Defendant asserts that he did not abandon his Coin-Exch defenses. ECF No. [526] at 20. In his view, Plaintiffs have alleged that they suffered damages because of Defendant's promises of shares in a start-up company called Coin-Exch., Ira Kleiman received shares in that company, and thus, Plaintiffs "may not now claim he was damaged for not receiving those shares." *Id.* (emphasis omitted). In reply, Plaintiffs maintain that Defendant's arguments fail. First, they assert that Defendant has failed to put forth evidence showing that the receipt of shares in Coin-Exch was conditional on the release of Plaintiffs' claims or was intended as payment for those claims. ECF No. [560] at 5. Second, they assert that Defendant's representation that Plaintiffs have alleged damages from not receiving the Coin-Exch shares "is just untrue." *Id.* Specifically, they assert that they "have never sought damages relating to shares in the defunct and fraudulent Coin-Exch," and that allegations in the Complaint regarding Coin-Exch shares serve only to support the "many frauds designed to lull Ira Kleiman into believing that [Defendant] was trying to help the Kleiman family, not steal from it." *Id.* (citing ECF No. [83] at ¶¶ 202, 209).

1150

Case No. 18-cv-80176-BLOOM/Reinhart

Upon review, the Court finds no genuine dispute that these defenses fail. Defendant has not cited to any evidence in support of these defenses nor has he produced evidence to contradict his own deposition testimony. Likewise, the underlying "Transfer of Shares" document signed by Ira Kleiman and Defendant, ECF No. [498-7], does not include a statement that the shares were provided as part of an agreement, that they would constitute accord and satisfaction, or release claims that Plaintiffs assert in this case. Moreover, Defendant does not address any of the cases Plaintiffs cite nor does he attempt to refute their arguments regarding these defenses' insufficiencies. Therefore, Plaintiffs' Motion is granted on these defenses.

### 2. *Estoppel*

Defendant asserts the affirmative defense of "estoppel." ECF No. [87] at 34. This defense states that "Plaintiffs are estopped from asserting their claims of fraud against Dr. Wright because they were aware of the Australian Taxation Office investigation, as well as the New South Wales lawsuit against W&K Info Defense Research, LLC, no later than April 2014, and took no action in those proceedings that are in any way consistent with the allegations they now make about those proceedings in this action." *Id.* Plaintiffs challenge that it is "unclear" if Defendant claims equitable or judicial estoppel, but regardless there is no evidence to support either estoppel theory. ECF No. [498] at 12. Specifically, they contend that the judicial estoppel[21] defense fails as a matter of law for three reasons. First, it cannot apply to the estate because it was not a party to either the Australian court proceedings or to the ATO investigation. *Id.* Further, as to W&K, they claim it

---

[21] "The Eleventh Circuit employs a two-prong test in applying the [judicial estoppel] doctrine: (1) whether 'the party took an inconsistent position under oath in a separate proceeding'; and (2) whether the 'inconsistent positions were calculated to make a mockery of the judicial system.'" *Apex Toxicology, LLC v. United Healthcare Ins. Co.*, No. 17-61840-CIV, 2018 WL 3199250, at *1 (S.D. Fla. June 29, 2018) (citing *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017)).

1151

Case No. 18-cv-80176-BLOOM/Reinhart

too was not a party to the ATO investigation and it was not properly served in the lawsuits. *Id.* at

12-13. Second, they argue that Plaintiffs did not take an "inconsistent position" in any proceedings,

they had no standing to do anything in the ATO investigation, and the Australian proceedings were

closed by the time they learned of them. *Id.* at 13. They add that any positions Defendant took on

behalf of W&K in the Australian lawsuits is not, in fact, the actual position of W&K. *Id.* at 13-14.

Finally, even if there was any evidence of some inconsistent position Plaintiffs took under oath,

there is no evidence that it was "calculated to make a mockery of the judicial system." *Id.* at 15

(citation omitted). Regarding equitable estoppel,[22] they assert that Plaintiffs' alleged failure to

"take action" in the ATO investigation or Australian proceedings does not constitute actionable

misrepresentation nor can Defendant show that either Plaintiff had a duty to "take action" in the

ATO investigation or court proceedings. *Id.* Further, they contend that there is no evidence that

Defendant relied on Plaintiffs' inaction, that this supposed reliance caused a detrimental change in

his position, or that Plaintiffs reasonably anticipated that he would rely on their inaction. *Id.* at 16.

In response, Defendant contends that Plaintiffs are judicially estopped from asserting their

claims "for at least three reasons." First, he notes that Ira Kleiman filed a state court action (not

against Defendant) alleging that "whatever bitcoin [Dave Kleiman] supposedly mined were his

personal property, not the property of any purported oral partnership, as alleged here." ECF No.

[526] at 18. Second, Plaintiffs, in making an argument related to supplemental jurisdiction,

"expressly argued that their trade-secret allegations share a common nucleus of operative fact with

---

[22] "Equitable estoppel requires that Defendants prove: (1) [the plaintiff] misrepresented material facts; (2) [plaintiff] was aware of the true facts; (3) [plaintiff] intended that the misrepresentation be acted on or had reason to believe that Defendants would rely on the misrepresentation; (4) Defendants did not know, nor should they have known the true facts; and (5) Defendants reasonably and detrimentally relied on the misrepresentation." *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1376 (S.D. Fla. 2014).

1152

Case No.  18-cv-80176-BLOOM/Reinhart

their remaining claims." *Id.* And third, Plaintiffs are "equitably estopped" because for "six and a half (6 ½) years since the Australian judgments, [P]laintiffs haven't lifted a finger to undo them." *Id.* at 19. Thus, he asserts that the Court "should not reward their affirmative choice to sit on their hands instead of ever appearing in the Australian court to contest its judgments." *Id.*

In reply, Plaintiffs argue that Defendant's three points are unsupported by the evidence and are legally insufficient. ECF No. [560] at 13. First, they contend that the state court litigation is distinct from this case as it involved different parties (different defendants and W&K was not a party), and there are no inconsistencies regarding the estate's positions in this case and that one. *Id.* at 13-14, n.12. Indeed, they claim that the "only reference to 'bitcoin' in that [state court] case was a request that, '[t]o the extent' the defendants in that action had any of David's bitcoin, that they be enjoined from converting it to their own use." *Id.* at 14 n.12 (citation omitted). They add "[i]ronically, it was [Defendant] who suggested to Ira [Kleiman] that David may have had devices that contained bitcoin. The remainder of the suit was a request for David's fair share of Computer Forensics, LLC's profits." *Id.* (internal citation omitted). Second, they maintain that Defendant does not contest that estoppel from the Australian proceedings cannot apply to the estate as a non-party, and it is "mind-boggling" to argue that W&K took inconsistent positions in the court proceedings because "W&K did not take any positions in the lawsuits." *Id.* at 14 (emphasis omitted). Third, they argue that Defendant cannot attempt to insert a FUTSA preemption defense based on a "common nucleus of operative fact" to argue for estoppel. *Id.* at 14-15.

Upon review of the record and consideration of the parties' arguments, the Court agrees with Plaintiffs that this defense fails. Regarding judicial estoppel, Defendant must establish that "the party took an inconsistent position under oath in a separate proceeding," and that "these inconsistent positions were 'calculated to make a mockery of the judicial system.'" *Slater*, 871

1153

Case No.  18-cv-80176-BLOOM/Reinhart

F.3d at 1181. In this case, Defendant focuses on Ira Kleiman's and the estate's state court lawsuit against Computer Forensics LLC and Mr. Conrad and Mr. Paige. ECF No. [488-1] at 97-112. However, Defendant fails to present evidence to show that Plaintiffs in this case are judicially estopped based on positions taken in that lawsuit. First, W&K is not a party to that lawsuit, so it cannot be judicially estopped as a matter of law. Second, that lawsuit was brought against Computer Forensics, LLC and Mr. Kleiman's former business partners relating to Mr. Kleiman's ownership interests in that company and the alleged conversion of certain property, including websites and a smartphone, that purportedly belonged to Mr. Kleiman.

To be sure, in seeking a permanent injunction against all the defendants, that lawsuit alleges that Mr. Kleiman "created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics" and that "[t]o the extent that Computer Forensics, Paige, or Conrad have retained any bitcoin wallets that were the personal property of David Kleiman, Computer Forensics should be enjoined from monetizing, transferring or otherwise converting such bitcoin to its use of [sic] or the use of its principals or third parties." *Id.* at 104-05. However, while Defendant argues that these allegations invoke judicial estoppel, he fails to put forward evidence demonstrating that the allegations in that lawsuit are "inconsistent" with the claims in this case. But more importantly, he fails to produce evidence that the estate's supposedly inconsistent positions were calculated "to make a mockery of the judicial system." Additionally, the Court has already rejected Defendant's FUTSA preemption arguments. Accordingly, Plaintiffs' Motion is granted as to the judicial estoppel defense.

Regarding equitable estoppel, Defendant contends that "for six and a half (6 1/2) years since the Australian judgments, [P]laintiffs haven't lifted a finger to undo them." ECF No. [526] at 19. He adds that Plaintiffs were served and were "obviously under a duty to respond" and they

1154

Case No. 18-cv-80176-BLOOM/Reinhart

"failed to respond at their peril[.]" *Id.* The Court is unconvinced. As noted, Defendant has not

demonstrated that Plaintiffs were properly served in those lawsuits, the estate was not a party to

those actions, and Defendant fails to satisfy the elements of equitable estoppel. *Buccellati*, 5 F.

Supp. 3d at 1376 ("Equitable estoppel requires that Defendants prove: (1) [the plaintiff]

misrepresented material facts; (2) [plaintiff] was aware of the true facts; (3) [plaintiff] intended

that the misrepresentation be acted on or had reason to believe that Defendants would rely on the

misrepresentation; (4) Defendants did not know, nor should they have known the true facts; and

(5) Defendants reasonably and detrimentally relied on the misrepresentation."). Accordingly,

Plaintiffs' Motion is granted on this defense.

### 3. *Res judicata and collateral estoppel*

In the December 2018 Order, the Court previously rejected Defendant's arguments that

Plaintiffs' claims were barred by the doctrines of res judicata and collateral estoppel. ECF No. [68]

at 13-15. Specifically, the Court could not conclude that the Australian judgments operated as a

judgment on the merits, which element is required to successfully assert these defenses. *Id.*

Likewise, the Court noted that res judicata does not apply "when its application would defeat the

ends of justice," and based on the pleading's allegations, "it would be an injustice to the Plaintiffs

to allow the doctrine of res judicata to be invoked." *Id.* at 15.

Plaintiffs now argue that the Court "should grant summary judgment to Plaintiffs on this

defense for the same reasons it previously rejected the defense: the consent orders in the Australian

Court Proceedings are void for lack of valid service, the claims or issues in this case were not

decided on the merits in those proceedings, and application of res judicata or collateral estoppel

would defeat the ends of justice." ECF No. [498] at 16. Likewise, they assert that preclusion

"cannot apply because of extrinsic fraud by Defendant in the Australian Court Proceedings." *Id.*

Case No. 18-cv-80176-BLOOM/Reinhart

*See also id.* at 16-22. Defendant responds, without addressing all of Plaintiffs' arguments or this Court's December 2018 Order, that res judicata applies[23] because W&K was properly served under the Hague Convention and there was no extrinsic fraud. In reply, Plaintiffs contend that summary judgment is proper because he does not challenge two independent bases for rejecting these defenses, including that the Australian judgments were not decided on the merits or that preclusion would defeat the ends of justice; res judicata does not apply where W&K was not served with process during those proceedings; and Defendant's extrinsic fraud precludes res judicata. ECF No. [560] at 15-16.

"In determining whether an action is barred by res judicata, a federal court applies the law of the state in which it sits." *Laskar v. Peterson*, 771 F.3d 1291, 1299 (11th Cir. 2014). "The doctrine of res judicata applies when four identities are present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) identity of the quality of the persons for or against whom the claim is made." *Topps v. State*, 865 So. 2d 1253, 1255 (Fla. 2004). Additionally, "it is clear that a decision on the merits must have been made before res judicata becomes applicable[.]" *Id.* at 1256. Defendant has not shown that the instant claims are barred by res judicata. Not only has Defendant failed to demonstrate that any of the elements above are satisfied, he cannot do so as a matter of law. The estate was not a party to the Australian proceedings, the causes of action in those lawsuits and here are not identical, the relief requested in this action is different, and there was no judgment on the merits in those cases. Accordingly, Plaintiffs' Motion is granted on this defense.

---

[23] Defendant also makes no argument regarding collateral estoppel. Indeed, his response is dedicated only to res judicata. *See* ECF No. [526] at 2-3, 17-18. The Court, therefore, finds that Defendant has abandoned this defense and forfeited this point. *See Anderson v. Branch Banking and Tr. Co.*, 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015) (collecting cases).

1156

Case No. 18-cv-80176-BLOOM/Reinhart

**4.      Statute of limitations and laches**

Plaintiffs argue that the Court previously rejected the statute of limitations argument in the December 2018 Order and that it should do so again here because there is no record evidence that the date of the Australian court judgments changed or that "Plaintiffs were aware of Defendant's conduct underlying their claims more than four years prior to the filing of this lawsuit." *Id.* at 22. Further, they contend that "[a]lthough the Court need not reach the issue, the record evidence also demonstrates that the statute of limitations was tolled until October 2015 because of Defendant's own misconduct" under the doctrine of fraudulent concealment or equitable estoppel. *Id.* at 23-24. They add that the record contains "irrefutable evidence" of Defendant's deception, "including obstructive behavior that has continued during this case, which was specifically aimed at defrauding the Estate and W&K and preventing discovery of Plaintiffs' claims." *Id.* at 23. Plaintiffs maintain that the laches[24] defense fails "for similar reasons" and that laches does not apply if the limitations period has not run or has been tolled. *Id.* at 25. *See also Briggs v. Estate of Geelhoed ex rel. Johnson*, 543 So. 2d 332, 334-35 (Fla. 4th DCA 1989) (laches did not apply where statute of limitations was tolled). They likewise add that Defendant has not provided evidence that he has been prejudiced or detrimentally relied on any inaction by Plaintiffs. *Id.*

In response, reciting substantially identical arguments asserted in his motion, Defendant maintains that Plaintiffs' claims are time-barred and that the latest date that the claims accrued was November 6, 2013, when the Australian judgments were entered, thus making all but one claim

---

[24] "Laches has four elements: (1) conduct on the part of the defendant giving rise to the situation of which the complaint is made; (2) failure of the plaintiff to assert his or her rights by suit, even though the plaintiff has had knowledge of the defendant's conduct and has been afforded the opportunity to institute suit; (3) lack of knowledge on the defendant's part that the plaintiff would assert the right on which he or she bases the suit; and (4) injury or prejudice to the defendant in the event relief is accorded to the plaintiff or the suit is held not to be barred." *Dep't of Revenue ex rel. Thorman v. Holley*, 86 So. 3d 1199, 1203 (Fla. 1st DCA 2012).

1157

Case No. 18-cv-80176-BLOOM/Reinhart

time-barred by approximately three months. ECF No. [526]. In support, Defendant argues that the delayed discovery doctrine does not apply, there is no evidence of fraudulent concealment to toll the statutes of limitations, equitable estoppel does not apply to save the claims, and laches bars Plaintiffs' claims for equitable relief. *Id.* at 4-15. In reply, Plaintiffs assert that Defendant's opposition "fails because it depends on facts not supported by the undisputed record." ECF No. [560] at 5. They add that the statute of limitations defense lacks evidentiary support, equitable estoppel and fraudulent concealment apply to bar a statute of limitations defense, and the laches defense fails because the claims are not time barred and Defendant presents no evidence of prejudice from any delay. *Id.* at 5-12.

Upon review and consideration, and as set forth in the analysis on Defendant's Motion, the parties present a genuine dispute regarding whether the limitations periods are tolled by the doctrines of fraudulent concealment and equitable estoppel. Accordingly, Plaintiffs' Motion is denied on these defenses.

### 5.    *Good faith*

Defendant's third affirmative defense, good faith, asserts that "[t]o the extent Plaintiffs allege that the 2011 Intellectual Property License Funding Agreement, the 2012 Deed of Loan, and the 2013 Contract for the Sale of Shares of Company Owning Business ('the Contracts') are unenforceable, Dr. Wright acted in good faith to effectuate David Kleiman's intent after David Kleiman's death." ECF No. [87] at 33.

Plaintiffs argue that this defense is legally and factually unsupportable. ECF No. [498] at 2. They add that "no case support[s] the proposition that a Defendant's own self-serving, after-the-fact statements that the opposing party would have been supportive can create a disputed issue of material fact for a good faith defense. Indeed, no authority that Plaintiffs are aware of remotely

86

Case No. 18-cv-80176-BLOOM/Reinhart

suggests that a fraudulent contract is valid so long as the defendant claims that he believes in 'good faith' he is effectuating the intent of the person whose signature he forged." *Id.* at 26. Defendant did not address his good faith affirmative defense in his response to Plaintiffs' Motion, ECF No. [526]. Accordingly, the Court agrees with Plaintiffs that Defendant has forfeited this defense. *See, e.g.*, *Pac. Employers Ins. Co. v. Wausau Bus. Ins. Co.*, 508 F. Supp. 2d 1167, 1174 (M.D. Fla. 2007) ("The other affirmative defenses that Defendants failed to support in the Response are waived and are no longer before the Court.") (citing *Gilbert v. Walt Disney Parks and Resorts, LLC*, 2005 WL 1863367, *7 (Aug. 3, 2005) (failure to respond to claim in an opposition memorandum results in the claim being waived)). Summary judgment in Plaintiffs' favor is granted on this defense.

### 6.    *Unclean hands*

Defendant's ninth affirmative defense, unclean hands and illegality, states that "Plaintiffs' claims are barred by the doctrine of unclean hands because, inter alia, Ira Kleiman, as the representative of David Kleiman's estate, manipulated his dead brother's estate to avoid payment of taxes and violated various laws, including, but not limited to, Florida and foreign laws that protect against the invasion of privacy and the misuse of private, personal, or confidential information." ECF No. [87] at 34-35.

"For a defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct." *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993) (internal citation omitted). "[C]ourts require the connection between the unclean-hands conduct and the

Case No. 18-cv-80176-BLOOM/Reinhart

matter in litigation to be very close." *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 11233137, at \*3 (S.D. Fla. June 26, 2015) (granting summary judgment to plaintiff on unclean hands defense because the alleged misrepresentation was not directly related to the lawsuit). *See also Freestream Aircraft USA Ltd. v. Chowdry*, No. 16-CV-81232, 2018 WL 1309921, at \*3 (S.D. Fla. Mar. 12, 2018) ("[W]e're talking *really* directly related . . . It is, in essence, the reason for the lawsuit.") (emphasis in original; citation omitted).

Plaintiffs argue that this defense is lacking because the alleged bad acts, avoiding estate taxes and violating privacy laws, are "entirely unrelated" to their claims, and there is no evidentiary support that Defendant was harmed by the purported misconduct. ECF No. [498] at 26-28. Curiously, although not asserted as an affirmative defense, the Defendant responds that Ira Kleiman destroyed David Kleiman's papers and hard drives, and that this conduct is "a casebook paradigm of unclean hands. He destroyed key evidence and may well be sitting on key evidence that he refuses even to attempt to access." ECF No. [526] at 19.[25] In reply, Plaintiffs assert that Defendant's response "presents a new, speculative account of his unclean hands defense, abandoning both grounds for the defense alleged in his answer." ECF No. [560] at 16. According to Plaintiffs, Defendant fails to satisfy both elements to assert this defense, he waived the newfound arguments by not asserting them in the Amended Answer and Plaintiffs are prejudiced by it, and there is no evidence that anything in the mail disposed of by Ira Kleiman or on the hard drives creates a disputed material fact. ECF No. [560] at 16-17.

---

[25] Defendant does not cite any facts in particular to substantiate his assertions. His claim that Ira Kleiman "took possession of [Mr. Kleiman's] belongings, threw away his papers, erased two of his hard drives, and now admits that he never sought professional help to access [Mr. Kleiman's] other devices or several of his email accounts" references "Def. SMF ¶_" and not any record evidence. *See* ECF No. [526] at 19.

Case No. 18-cv-80176-BLOOM/Reinhart

Upon review, the Court concludes that this defense fails. Defendant has not raised any genuine issue of fact as to the actual delineated theories underlying this affirmative defense—avoiding estate taxes and violation of privacy laws—as set forth in the Amended Answer, ECF No. [87] at 34-35. Indeed, Defendant's response to Plaintiffs' Motion focuses exclusively on alleged wrongdoing unrelated to tax evasion and privacy invasion, and not pleaded as an affirmative defense. Defendant neither cites evidence nor raises arguments in support of his actual defense. Therefore, he fails to present a genuine dispute of material fact as to either element of the unclean hands defense under *Calloway*, and summary judgment, accordingly, is warranted in Plaintiffs' favor. The Court, similarly, exercises its discretion and will not apply the unclean hands doctrine to bar equitable claims on grounds not actually pled in Defendant's pleading. *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir. 1983) (explaining that "[a]pplication of the equitable doctrine of unclean hands lies within the sound discretion of the district court").

The failure to plead an affirmative defense generally results in a waiver of that defense. *Latimer*, 601 F.3d at 1239. Just as a party may not amend a pleading through a response brief, it may not avoid waiver of an affirmative defense by belatedly raising it in response to a summary judgment motion. *See Gottlieb & Gottlieb, P.A. v. Crants*, 657 F. App'x 920, 923 (11th Cir. 2016) (holding that district court did not abuse its discretion in determining that defendant waived an affirmative defense that was raised in an opposition to plaintiff's motion for summary judgment) (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (concluding that a party may not amend a pleading "through argument in a brief opposing summary judgment")). *See also Keybank Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888–89 (11th Cir. 2014) ("When an affirmative defense initially was raised pursuant to a summary judgment motion, we determined

1161

Case No. 18-cv-80176-BLOOM/Reinhart

that the defendant's 'failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense.'"). This is all the more so where, as here, Defendant's one-paragraph response fails to cite specifically to any actual record evidence supporting this newly asserted defense. Accordingly, Plaintiff's Motion is granted on the unclean hands defense.

### 7.    *Statute of frauds*

Plaintiffs maintain that Defendant's statute of frauds affirmative defense is legally and factually inapplicable. They argue that the "the fact the partnership lasted more than a year is not the relevant consideration. Instead, Courts must determine whether, at the time of formation, 'performance is possible within one year from the inception of the contract[.]'" ECF No. [498] at 28 (citation and emphasis omitted). If so, the contract falls outside the statute of frauds. *Id.* They note that there is no evidence that the alleged partnership "to create and mine Bitcoin necessarily required performance lasting more than one year," and "[a]t best, this was an oral contract for an indefinite time which is not barred by the Statute of Frauds." *Id.* at 29 (citation omitted).

Defendant responds that a "purported oral contract allegedly intended to last three years, which also is alleged to have lasted three years, violates Florida's statute of frauds, period, full stop." ECF No. [526] at 15. He also argues that there is no evidence that any bitcoin allegedly mined by Satoshi Nakamoto ever moved on the blockchain over the last nine years. *Id.* at 16. Because of this, he theorizes that the purported partners "also had to have had an oral agreement to not access the bitcoin for more than a year, which also would require dismissal of this claim for violating the statute of frauds." *Id.* In reply, Plaintiffs maintain that there "is still no evidence supporting an intent for a partnership to last for a definite period longer than one year, or that performance of the partnership agreement was impossible within one year." ECF No. [560] at 12. They also assert that there is no evidence that Defendant and Mr. Kleiman made any agreement to

90

1162

Case No.  18-cv-80176-BLOOM/Reinhart

not access mined bitcoin as part of forming their partnership, but even if there was such an agreement formed at a later date, that would not render the earlier-formed relationship unenforceable. *Id.* at 13.

Upon review and consideration, and for the reasons explained above regarding Defendant's Motion, Defendant has not presented record evidence supporting this defense other than a mischaracterization of the SAC's allegation, ECF No. [83] at ¶ 67, as to the parties' supposed intent for the alleged partnership's duration. In particular, Plaintiffs have shown the absence of evidence that full performance of the partnership within one year was impossible or that the parties intended the partnership to last for a particular duration especially one lasting longer than one year. Plaintiffs have, thus, discharged their burden on this defense. *See Electro Med. Assocs. v. Aetna Life Ins. Co.*, No. 8:09-CV-39-T-27AEP, 2010 WL 11508047, at *1 (M.D. Fla. May 17, 2010) ("The primary question raised by the parties is what evidence, if any, is Plaintiff required to submit when moving for partial summary judgment on Defendants' affirmative defenses. Because Defendants bear the burden of proof on their affirmative defenses, Plaintiff can simply point to the lack of supporting evidence. Plaintiff did so, but Defendants failed to submit any record evidence to establish several defenses. As to those defenses, the motion is due to be granted."). *See also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (where a summary judgment motion relates to issues on which the non-moving party will bear the burden of proof at trial, "the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility" but rather "the moving party simply may show [] -that is, point[] out to the district court-that there is an absence of evidence to support the non-moving party's case") (emphasis in original; citation omitted); *Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1264 (11th Cir. 2001)

1163

Case No. 18-cv-80176-BLOOM/Reinhart

(the "burden is on defendant to adduce evidence supporting affirmative defenses, not upon movant to negate its existence") (citing *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1090–91 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir.1991)).

To avoid summary judgment, Defendant is required to either "show that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion" or submit "additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Fitzpatrick*, 2 F.3d at 1116-17. Defendant did neither. Accordingly, because Plaintiffs have carried their initial burden and Defendant fails to demonstrate a genuine issue of material fact regarding the statute of frauds, Plaintiffs are entitled to judgment as a matter of law on this defense.

### 8. *Personal jurisdiction*

Defendant's eleventh affirmative defense provides that the Court "lacks personal jurisdiction over Dr. Wright under Fla. Stat. § 48.193(1)(a). Dr. Wright never performed any relevant act while physically in the state of Florida, nor any tortious act causing injury in the state of Florida, and does not possess minimum contacts with the state of Florida from which Plaintiffs' claims arise or to which they relate." ECF No. [87] at 35. In the December 2018 Order, the Court previously rejected Defendant's argument that the Court lacked personal jurisdiction. ECF No. [68] at 27-28.

Plaintiffs argue that the record supports the exercise of personal jurisdiction over Defendant because the alleged injuries occurred in Florida, Plaintiffs are located in this state, Defendant affirmed in the Australian proceedings that he conducted business with Mr. Kleiman in Florida, and the claims arise out of Defendant's alleged misappropriation of Mr. Kleiman and W&K's assets. ECF No. [498] at 29-30. Defendant responds that he "has the right to, and does,

1164

Case No.  18-cv-80176-BLOOM/Reinhart

preserve this argument for appeal." ECF No. [526] at 20. Plaintiffs reply that Defendant "does not

oppose summary judgment on his personal jurisdiction defense, but rather just wants to preserve

it for appeal." ECF No. [560] at 17. They add that "summary judgment is appropriate because the

record still supports the Court's denial of [his] motion to dismiss on personal jurisdiction." *Id.*

Upon review, Defendant presents no record evidence to support a defense that the Court

lacks personal jurisdiction over him. Nor does he otherwise dispute Plaintiffs' facts supporting the

exercise of personal jurisdiction. Accordingly, Plaintiffs' Motion is granted on this defense.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  Defendant's Motion, **ECF No. [487]**, is **DENIED;**

2.  Plaintiff's Motion, **ECF No. [498]**, is **GRANTED IN PART AND DENIED IN PART**.

3.  Plaintiff's Motion for Leave to Supplement Record on Defendant's Pending Motion for Summary Judgment, **ECF No. [612]**, is **DENIED AS MOOT.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 18, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

93

1165

# TAB 623

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al.*,

     Plaintiffs,

v.

CRAIG WRIGHT,

     Defendant.

_____/

<u>**OMNIBUS ORDER**</u>

    **THIS CAUSE** is before the Court upon Defendant's Motion *in Limine*, ECF No. [490] ("Defendant's Motion"), and Plaintiffs' Omnibus Motion *in Limine*, ECF No. [497] ("Plaintiffs' Motion")[1] (collectively, "Motions"). The Court has considered the Motions, all supporting and opposing submissions (ECF Nos. [523], [525],[2] [552], and [558][3]), the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendant's Motion is granted in part, and Plaintiffs' Motion is granted in part.

_____

[1] Plaintiffs' Motion was filed under seal. On May 18, 2020, Plaintiffs' Motion was refiled with redactions. *See* ECF No. [510]. For ease of reference, the Court cites to ECF No. [497].

[2] Plaintiffs' response to Defendant's Motion was filed under seal, ECF No. [525]. On June 1, 2020, Plaintiffs refiled their response. ECF No. [547]. For ease of reference, the Court cites to ECF No. [525].

[3] Plaintiffs' reply in support of Plaintiffs' Motion was filed under seal, ECF No. [558]. On June 10, 2020, the reply was refiled with redactions, *see* ECF No. [574], but Plaintiffs' reply was later ordered unsealed. *See* ECF No. [579]. For ease of reference, the Court cites to ECF No. [558].

Case No. 18-cv-80176-BLOOM/Reinhart

## I.      BACKGROUND

The Court assumes the parties' familiarity with the general factual allegations and nature of this case. *See, e.g.*, ECF Nos. [68]; [83]; [87]; [265]; [373]. Defendant's Motion seeks to preclude Plaintiffs from presenting evidence regarding the following at the upcoming trial:

1.  Motion *in Limine* Issue #1: Judicial statements about Defendant's credibility; and

2.  Motion *in Limine* Issue #2: Evidence relating to the Australian Tax Office's ("ATO") audits of non-party Australian companies.

Similarly, Plaintiffs' Motion seeks to preclude Defendant from presenting arguments and evidence at trial regarding the following:

1.  Motion *in Limine* Issue #1: Evidence or testimony about Ira Kleiman's sibling-relationship with his brother, Dave Kleiman ("Mr. Kleiman");

2.  Motion *in Limine* Issue #2: Evidence or testimony from Defendant contradicting judicially admitted documents;

3.  Motion *in Limine* Issue #3: Selective and *ad hoc* testimony from Defendant claiming that his computers were hacked or that his documents were forged;

4.  Motion *in Limine* Issue #4: Preclude Defendant's use of late-disclosed documents;

5.  Motion *in Limine* Issue #5: Testimony from Defendant that Mr. Kleiman committed suicide;

6.  Motion *in Limine* Issue #6: Evidence or testimony related to Mr. Kleiman's social habits and alleged drug use; and

7.  Motion *in Limine* Issue #7: Evidence or testimony related to Defendant's alleged childhood trauma.

The Court will address each Motion in turn.

1167

Case No. 18-cv-80176-BLOOM/Reinhart

## II.    LEGAL STANDARD

"In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Id.* "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769-Orl-22DAB, 6:07-cv-15733-Orl-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Likewise, "[i]n light of the preliminary or preemptive nature of motions *in limine*, 'any party may seek reconsideration at trial in light of the evidence actually presented and shall make contemporaneous objections when evidence is elicited.'" *Holder v. Anderson*, No. 3:16-CV-1307-J-39JBT, 2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018) (quoting *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01CV545FTM-29DNF, 2004 WL 4054843, at *1 (M.D. Fla. July 22, 2004)); *In re Seroquel Prod. Liab. Litig.*, 2009 WL 260989, at *1 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*." (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989))).

Evidence is admissible if relevant, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence. Fed. R. Evid. 401, 402; Advisory Comm. Notes, Fed. R. Evid. 401 ("The standard of probability under the rule is 'more probable than it would be without the evidence.'"); *United States v. Patrick*, 513 F. App'x 882, 886 (11th Cir. 2013). A district court may exclude relevant evidence under Rule 403 if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

1168

Case No. 18-cv-80176-BLOOM/Reinhart

of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *Patrick*, 513 F. App'x at 886 (citing *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011); *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)). Rule 403's "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). The movant has the burden to demonstrate that the evidence is inadmissible. *Gonzalez*, 718 F. Supp. 2d at 1345.

### III.    DISCUSSION

#### A.    Defendant's Motion

##### i.    *Prior judicial statements*

Defendant requests the Court "exclude at trial any mention of any prior judicial statements about his credibility." ECF No. [490] at 1. His request applies to statements made by this Court, by Magistrate Judge Reinhart, and by the ATO. *Id.* at 1-3. *See also* ECF No. [552] at 1 ("Dr. Wright simply seeks to exclude reference to *prior* comments about his credibility that have been made by this Court and Magistrate Judge Reinhart[.]") (emphasis in original). According to Defendant, he "will not have a fair trial—and due process will be denied—if the jury heard judicial comments (including this Court's prior comments) about his credibility. It is wholly within the jury's province as fact finder to assess the credibility of witness testimony and weigh the evidence." ECF No. [490] at 2. In Defendant's view, comments concerning his credibility will sway the views of the jury, cause him prejudice, and in the case of Judge Reinhart's statements would be "akin to allowing him to testify at trial[.]" *Id.* at 3.[4]

---

[4] Defendant focuses particularly on certain statements made in Judge Reinhart's August 27, 2019

4

1169

Case No. 18-cv-80176-BLOOM/Reinhart

Plaintiffs respond that a trial judge is authorized to comment on the evidence and the credibility of witnesses, and the Motion is simply "an attempt by Defendant to ensure that his numerous misdoings, which have occurred repeatedly since the commencement of this action (and continue unabated), will have no impact nor make any appearance at this trial." ECF No. [523] at 2-3. Plaintiffs argue that Defendant is an "adjudicated perjurer who has proffered evidence and testimony that this Court has found to be incredible." *Id.* at 6. In their view, "[c]autioning the jury when Defendant offers testimony previously found to be perjurious, or when he relied on documents that have been forged or fraudulently manipulated, is firmly within this Court's power and any such commentary will not usurp the jury's role in determining credibility. Rather, it will safeguard the assumption that the jury's findings are a result of accurate and well-considered evidence." *Id.* They conclude that Defendant's Motion is not a "means to protect the fact finding function of the jury" but in reality is an effort to "chill[] the Court's power to monitor the jury's consumption of accurate evidence." *Id.*

Upon review and consideration, the Court finds Defendant's Motion as to prior judicial statements to be warranted in part. As an initial matter, "[m]otions in limine should be limited to specific pieces of evidence and not serve as reinforcement regarding the various rules governing trial, or (re)-addressing substantive motions such as motions for summary judgment." *Ctr. Hill Courts Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, No. 19-CV-80111, 2020 WL 496065, at *2 (S.D. Fla. Jan. 30, 2020) (citation omitted). A district court may deny a motion in limine when it "lacks the necessary specificity with respect to the evidence to be excluded." *Id.* (citation omitted). Here, Defendant's request broadly encompasses statements purportedly made by the ATO—which Defendant has not specifically identified or otherwise described—and certain filings entered by

---

Order on Plaintiffs' Motion to Compel, ECF No. [277] at 19-20.

1170

Case No. 18-cv-80176-BLOOM/Reinhart

this Court and by Judge Reinhart.[5] Because the ATO statements are only mentioned in the abstract, the Court denies the Motion as to the ATO comments.

As to prior comments made by Judge Reinhart and this Court, the Court agrees with Defendant that certain of these statements reflected in the filings at issue present a considerable danger of unfair prejudice and should be excluded. For instance, Defendant seeks to exclude the following statements made by Judge Reinhart in his August 27, 2020 Order:

> During his testimony, Dr. Wright's demeanor did not impress me as someone who was telling the truth. When it was favorable to him, Dr. Wright appeared to have an excellent memory and a scrupulous attention to detail. Otherwise, Dr. Wright was belligerent and evasive. He did not directly and clearly respond to questions. He quibbled about irrelevant technicalities. When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence.
>
> Sadly, Dr. Wright does not write on a clean slate. As Judge Bloom recently noted in denying Dr. Wright's Motion for Judgment on the Pleadings, Dr. Wright has taken directly conflicting factual positions at different times during this litigation. DE 265 at 10 ("[T]he record is replete with instances in which the Defendant has proffered conflicting sworn testimony before this Court.). As discussed below, that behavior continued before me. D.E. 277 19-20.

*Id.* at [277] at 19-20.

Judge Reinhart's comments in his August 27, 2020 Order, which squarely attack Defendant's credibility—a key feature in this case—in specific and forceful ways are "strongly worded comment[s] by the court" "questioning the defendant's credibility" that "may well

---

[5] In the reply, Defendant identifies five public filings from this Court's docket that contain "prior comments about his credibility," which comments he seeks to exclude: (i) ECF No. [265], the Court's August 15, 2019 Order on Defendant's motion for judgment on the pleadings; (ii) ECF No. [277], Judge Reinhart's August 27, 2019 Order on Plaintiffs' Motion to Compel; (iii) ECF No. [373], the Court's January 10, 2020 Order on Defendant's objection to Magistrate Order "deeming" certain facts established and "striking" certain affirmative defenses; (iv) ECF No. [420], Judge Reinhart's March 9, 2020 Order on Discovery; and (v) ECF No. [454], the Court's April 13, 2020 Order on Defendant's objection to Magistrate Order on discovery.

6

1171

Case No. 18-cv-80176-BLOOM/Reinhart

overbear the jury's ability to make independent fact findings." *United States v. Anton*, 597 F.2d

371, 374 (3d Cir. 1979). For instance, Defendant was characterized in that Order as someone who

"does not write on a clean slate" and whose demeanor "did not impress me as someone who was

telling the truth." ECF No. [277] at 19-20. Additional prior statements that reflect upon

Defendant's credibility include the following:

> "Dr. Wright's story not only was not supported by other evidence in the record, it
> defies common sense and real-life experience. . . He is a latter-day Dr. Frankenstein
> whose creation turned to evil when hijacked by drug dealers, human traffickers,
> and other criminals. . . . If the courier does not appear, Dr. Wright has lost his ability
> to access billions of dollars worth of bitcoin, and he does not care. Inconceivable.
> . . . Dr. Wright had many reasons not to tell the truth. . . . I have found that Dr.
> Wright intentionally submitted fraudulent documents to the Court, obstructed a
> judicial proceeding, and gave perjurious testimony. No conduct is more antithetical
> to the administration of justice."

ECF No. [277] at 19-20, 28.

> "Oh! What a tangled web we weave when first we practice to deceive. . . . Indeed,
> the Court notes that the Defendant has made *several conflicting statements*
> regarding even his own ownership of W&K. . . . Defendant has failed to present
> any *credible* evidence showing that any of the parties he suggests are *members* of
> W&K. . . . Unfortunately, the record is replete with instances in which the
> Defendant has proffered conflicting sworn testimony before this Court. In weighing
> the evidence, the Court simply does not find the Defendant's testimony to be
> credible."

ECF No. [265] at 4-5, 10 (emphasis in original) (August 15, 2019 Order on judgment on the

pleadings).

> "The Court has also reviewed the transcripts from the Evidentiary Hearing held by
> Judge Reinhart and agrees with his credibility findings related to Defendant.
> Indeed, in answering opposing counsel's questions, the Defendant was evasive,
> refused to give and interpret words in their very basic meanings, was combative,
> and became defensive when confronted with previous inconsistencies."

ECF No. [373] at 15 (January 10, 2020 Order on Defendant's objections).

> "Particularly given my prior finding that Dr. Wright has produced forged
> documents in this litigation, I decline to rely on this kind of document, which could
> easily have been generated by anyone with word processing software and a pen. . . .

1172

Case No. 18-cv-80176-BLOOM/Reinhart

> I give no weight to sworn statements of Dr. Wright that advance his interests but that have not been challenged by cross-examination and for which I cannot make a credibility determination. I have previously found that Dr. Wright gave perjured testimony in my presence."

ECF No. [420] at 6 (March 9, 2020 Order on discovery).

> "[T]he Court is puzzled by Defendant's apparent argument that Judge Reinhart must blindly accept items produced by Defendant such that Judge Reinhart cannot rely on his past experiences with Defendant in this litigation (including his history of providing forged materials and giving perjured testimony) in evaluating whether Defendant has carried his burden as to privilege."

ECF No. [454] at 9 (April 13, 2020 Order on Defendant's objections).

Although both parties agree that judges are permitted to examine evidence and comment on witness credibility at trial, strict limitations govern such judicial commentary.

> This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided[.]'

*Quercia v. United States*, 289 U.S. 466, 470 (1933).

As in *Quercia*, the statements at issue are "of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." *Id.* at 472. While the Court does not agree that the admission of prior judicial statements in this case is "akin" to allowing Judge Reinhart or this Court to testify at trial, the statements are likely to influence the jury to the extent that a cautionary jury instruction will not adequately cure potential prejudice. *See, e.g.*, *Anton*, 597 F.2d at 375 (explaining that jury

8

1173

Case No. 18-cv-80176-BLOOM/Reinhart

instruction was insufficient "to overcome the effect on the jurors of the judge's strongly worded statement that [defendant] was devoid of credibility" and noting that "[w]here a court has expressed its opinion on a pivotal issue in the case, and has expressed that opinion in a strong, unequivocal and one-sided fashion, abstract instructions regarding the jury's role as fact finder are not a sufficient remedy"); *United States v. Cisneros*, 491 F.2d 1068, 1074-76 (5th Cir. 1974)[6] (explaining that a court "must in no way trespass on the jury's functions and responsibilities, among the most important of which . . . is the right to assess credibility in finding the facts," and determining that jury instruction was inadequate remedy where the "credibility issues before the jury were close, difficult, and extremely important" and the judicial comments were "too harmful to be cured"); *United States v. Fischer*, 531 F.2d 783, 786-87 (5th Cir. 1976) (determining that judge's remarks about defense witnesses' credibility constituted reversible error where witness credibility was a "decisive issue" in the case); *see also Georgou v. Fritzshall*, No. 93 C 997, 1995 WL 248002, at *4 (N.D. Ill. Apr. 26, 1995) (noting that a "judge's testimony is likely to bear additional weight in the mind of jurors because of his position and authority, and because it automatically bears the imprimatur of character, credibility and reliability emanating from the judge's position") (internal citations omitted). Accordingly, Defendant's Motion as to issue #1 is granted as to the prior judicial statements reflected above in the filings at issue. Only these portions of the public filings are excluded.

*ii.*     Australian Tax Office's audits

Defendant requests the Court to exclude evidence "relating to the Australian Tax Office's audits of non-party Australian companies." ECF No. [490] at 3. According to Defendant, "[a]ll

---

[6] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

1174

Case No. 18-cv-80176-BLOOM/Reinhart

issues in this case relate to whether the late [Mr. Kleiman] and [Defendant] were in a partnership to mine bitcoin and develop bitcoin-related intellectual property. None of the issues in this case concern the ATO's audits of non-party Australian companies." *Id.* at 3-4. He makes four arguments for excluding evidence of ATO audits. First, ATO tax documents are "wholly irrelevant" and "have nothing to do" with an alleged partnership to mine bitcoin or to develop bitcoin-related intellectual property. *Id.* at 4, 6-7. Second, even if the materials are relevant, they would be inadmissible under Rule 403, Fed. R. Evid., due to confusion of issues, unfair prejudice, and misleading the jury. *Id.* at 4-5, 7-8. Third, the ATO tax documents are hearsay documents for which no exception applies. *Id.* at 5-6, 8-9. Finally, certain of the tax documents were "illegally obtained" and the documents cannot be authenticated. *Id.* at 6, 9. *See also* ECF No. [552] at 3 (arguing that admission of ATO documents will "create a very complex trial-with-a-trial about Australian tax audits and tax issues").

Plaintiffs respond that the ATO evidence largely consists of documents "provided by the Australian government to [Defendant] and subsequently produced by [Defendant] in this action." ECF No. [525] at 7 (emphasis omitted). According to Plaintiffs, ATO materials "not only provide[] the necessary context for Plaintiffs' claims, but also include[] a trove of relevant admissions from [Defendant] concerning his partnership with Dave Kleiman. These highly probative admissions—made to the Australian government in the course of its investigation—are not hearsay and are plainly admissible. The rest of the ATO Evidence is likewise admissible, as it directly supports Plaintiffs' fraud and IP-related claims and provides the jury with the information that it needs to understand [Defendant's] conduct and key evidence in this action." *Id.* Plaintiffs argue four main points. First, ATO evidence is relevant to resolving key issues in this case. *Id.* at 11-15. In their view, "many facts in this case would make little sense without the context that the ATO Evidence

10

1175

Case No. 18-cv-80176-BLOOM/Reinhart

provides." *Id.* at 14. Second, the probative value of the ATO evidence outweighs any unfair prejudice. *Id.* at 15-18. Third, the ATO evidence is not inadmissible hearsay. *Id.* at 18-20. And fourth, the ATO evidence can be authenticated. *Id.* at 20-22.

Upon consideration, the Court concludes that Defendant has not carried his burden to demonstrate that ATO materials—which particular evidence Defendant has not specifically identified but instead generally refers to as "tax documents"—should be excluded writ large. To begin, the Court does not agree that *all* materials associated with the ATO investigation are irrelevant. "The standard of what constitutes relevant evidence is a low one: evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. La Rosa*, 236 F. App'x 584, 588 (11th Cir. 2007) (citation omitted). As noted by Plaintiffs, ATO evidence implicates matters connected to W&K's alleged transfer of intellectual property in Australia to Defendant, statements regarding the business relationship between Mr. Kleiman and Defendant, bitcoin mining and intellectual property development, Defendant's alleged fraud, post-February 2014 communications between the parties, and it provides context and fullness for the jury to understand and evaluate evidence. ECF No. [525] at 7-15. Therefore, while Defendant challenges that the "lion's share of the thousands of tax documents produced in this case is wholly irrelevant to this action," at least certain of the unidentified materials do not fall within that class.

Further, the Court is unconvinced that ATO materials—again, in the abstract—are so prejudicial, confusing, or misleading that Rule 403 should bar their admission. Rule 403 is an "extraordinary remedy" that should be invoked "sparingly, and the balance should be struck in favor of admissibility." *Patrick*, 513 F. App'x at 886. Against this backdrop, even assuming that ATO materials carry some prejudicial aspect, Defendant has not demonstrated that the potential

11

1176

Case No. 18-cv-80176-BLOOM/Reinhart

danger of such prejudice substantially outweighs its probative value. Likewise, Defendant has not

persuaded the Court that admitting ATO evidence would lead to litigation of collateral issues. As

Plaintiffs' maintain in their response, they "do not intend to relitigate the issue of whether

[Defendant's] companies 'were entitled to tax offsets.'" ECF No. [525] at 18. Rather, according

to Plaintiffs, materials from the ATO are intended to "complete the story" and put into context the

nature of why Defendant engaged in certain alleged actions. *See id.* at 13-14, 16-17. *See also*

*United States v. Battle*, 473 F. Supp. 2d 1185, 1198-99 (S.D. Fla. 2006) (rejecting Rule 403

exclusion argument where the evidence "gives the jury the necessary context for understanding

the full evolution and extent of" defendant's schemes); *United States v. Howard*, No. CRIM. 12-

0043-KD, 2012 WL 1970268, at *3 (S.D. Ala. June 1, 2012) (collecting Eleventh Circuit cases

and rejecting Rule 403 exclusion argument "particularly in light of the decisional authority . . .

touting the importance of allowing the Government to complete the story of the crime even when

that story works prejudice on the defendant").

    The Court, separately, cannot conclude at this juncture that ATO evidence is inadmissible

hearsay meeting no exception where the Court does not have the specific ATO evidence to

consider. Notably, Defendant represents that the "vast majority" of ATO materials "contain

multiple layers of hearsay, for which there is no exception." ECF No. [490] at 5. Not only does

that imply that at least some of the ATO materials do not contain hearsay or hearsay for which an

exception applies, Defendant's argument that his alleged party admissions, such as correspondence

between him and the ATO, ECF No. [490] at 8, is hearsay is unavailing. *See* Fed. R. Evid.

801(d)(2) (a statement is not hearsay if it is "offered against an opposing party" and "was made by

the party in an individual or representative capacity" or "is one the party manifested that it adopted

or believed to be true"). While certain ATO materials ultimately may not be admissible, the Court

12

1177

Case No. 18-cv-80176-BLOOM/Reinhart

is unwilling on this record to find that all ATO evidence is inadmissible hearsay. The same holds true for Defendant's assertion that ATO documents cannot be authenticated.

While Defendant argues that "some" documents were "somehow illegally obtained and then published on an internet tabloid website," that does not mean that the evidence cannot be authenticated. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). And merely because Defendant "denies" that transcripts "accurately reflect the discussions in the meetings" does not support the proposition that the transcripts cannot be authenticated. Indeed, although Defendant challenges that "[t]here is no evidence that the company that prepared them (Auscript) requested and received input from either the ATO or others present at the meeting to confirm the accuracy of the transcripts," ECF No. [490] at 9, Plaintiffs have produced an email chain involving Defendant and the ATO in which a request was made to review the transcript and minutes and advise of "any errors or omissions," and Defendant himself noted a transcription error where the word "chords" was used rather than "cores." ECF No. [525-11]. Accordingly, Defendant's Motion as to issue #2 is denied. The parties may address the specific evidence and objections to ATO evidence, as appropriate, when they arise at trial.

## B.    Plaintiffs' Motion

### i.    *Motion in limine issue #1*

Plaintiffs request the Court exclude testimony about Ira Kleiman's sibling-relationship with his brother, Mr. Kleiman. ECF No. [497] at 4-7. According to Plaintiffs, Defendant "will seek to portray the brothers as estranged or otherwise not close," and Defendant may put forth evidence that Mr. Kleiman was adopted. *Id.* at 4. Plaintiffs assert that Ira Kleiman's relationship with his

13

1178

Case No. 18-cv-80176-BLOOM/Reinhart

brother or with the Kleiman family is irrelevant to the issues in dispute in this lawsuit. In particular,

they argue that Ira Kleiman was appointed the personal representative of Mr. Kleiman's estate, he

is not a party to this suit in a personal capacity, his first-hand knowledge of relevant facts regarding

Mr. Kleiman's work with Defendant while alive is limited, and the facts that Ira Kleiman has "the

most personal knowledge, namely his conversations with Dr. Wright, all occurred after Dave

[Kleiman] died." *Id.* at 4-5. In Plaintiff's view, Defendant endeavors to "paint Ira [Kleiman] as an

underserving Plaintiff because he was not close to his brother, didn't see him 'enough,' and

therefore doesn't 'deserve' the massive wealth his brother accumulated with Dr. Wright. However,

this is not a wrongful death suit, and Ira [Kleiman] is not seeking damages for the loss of his

brother. Instead, Ira [Kleiman] is fulfilling his legal obligation as Personal Representative to

marshal the assets of [Mr. Kleiman's] estate. The fact that those monies will ultimately flow to Ira

[Kleiman] as a beneficiary of the estate does not put his relationship with his brother at issue." *Id.*

at 6. They add that any probative value of such evidence is substantially outweighed by the danger

of unfair prejudice, confusion of issues, and misleading the jury. *See also* ECF No. [558] at 4

(arguing that "at a minimum" the Court should "exclude all post-2009 evidence of their

relationship").

Defendant responds that the Kleiman siblings had a "very acrimonious relationship" and

evidence regarding that relationship is "directly relevant to the reason why Ira [Kleiman], Dave's

estate's personal representative, haphazardly destroyed [Mr. Kleiman's] data and documents

which, if [P]laintiffs' theory of this case is to be believed, could have contained the proof necessary

for [P]laintiffs' claims, or more likely, contained just the opposite." ECF No. [523] at 1. Defendant

states that while Plaintiffs contend that Mr. Kleiman's alleged involvement in Bitcoin and

developing related intellectual property was secretive and kept from family and friends, Plaintiffs

Case No. 18-cv-80176-BLOOM/Reinhart

"ignore a key piece of evidence," which is that Mr. Kleiman and Ira Kleiman had a conversation on Thanksgiving in 2009 in which Mr. Kleiman made comments suggesting that he was developing Bitcoin with another person. *Id.* at 10-11. In Defendant's view, this alleged conversation is "*the only evidence*" Plaintiffs have to substantiate their claims apart from what Defendant provided them, and thus the Kleimans' relationship is "highly probative" and "essential" to his defense. *Id.* at 11 (emphasis in original).

The Court agrees in part with Plaintiffs. While evidence related to the alleged 2009 Thanksgiving dinner conversation is relevant to whether Mr. Kleiman was involved in Bitcoin and working with Defendant, post-2009 relationship evidence has little bearing, if any, on material issues in dispute in this case. Ira Kleiman is not a party to this lawsuit in his personal capacity, Defendant has presented no evidence that Ira Kleiman destroyed any of Mr. Kleiman's items predicated on a "motive" connected to the Thanksgiving dinner conversation, ECF No. [523] at 11, or that relevant evidence was destroyed;[7] and the quality of the siblings' relationship does not make Plaintiffs' claims or Defendant's defenses more or less probable. Indeed, whether Ira Kleiman visited his brother at the hospital, spoke to him infrequently, or whether Mr. Kleiman mentioned Ira Kleiman to others has limited probative value but substantial capacity to cause undue prejudice.

These matters raise significant concerns that the jury will "make a decision in this case premised on how 'good' of a brother Ira [Kleiman] was or whether [he] 'deserves' Dave [Kleiman's] fortune – instead of basing their decision on the facts and merits of the case." ECF

---

[7] Plaintiffs note that Ira Kleiman testified that, following Mr. Kleiman's death, he "only (1) 'discard[ed] some papers' that 'didn't look relevant to keeping' like 'junk mail,' and (2) reformatted two devices that did not have anything on them." ECF No. [558] at 4 n.3 (citations omitted).

15

1180

Case No. 18-cv-80176-BLOOM/Reinhart

No. [497] at 7. *See* Fed. R. Evid. 403 advisory committee's notes (1972) (unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). Accordingly, Plaintiff's Motions as to issue #1 is granted. Evidence about Ira Kleiman's sibling-relationship with Mr. Kleiman is excluded except as to the Thanksgiving Day 2009 dinner conversations.

### ii.    *Motion in limine issue #2*

Plaintiffs next seek to preclude Defendant from "contradicting judicially admitted documents." ECF No. [497] at 7-12. In particular, they "request an order precluding [Defendant] from contradicting the plain meaning of the documents that come from him, were drafted by him, or were signed by him and which he judicially admitted, 'speak for themselves' in his Answer." *Id.* at 12.[8] They maintain that Defendant, in his Amended Answer, ECF No. [87], to the Second Amended Complaint, ECF No. [83] ("SAC"), stated that numerous documents referenced in the SAC "speak for themselves,"[9] and therefore the Court "should hold [Defendant] to his admission" because "[c]ommon sense says that if a document says it is from Craig Wright, and that document speaks for itself, then that document is, indeed, from Craig Wright." ECF No. [497] at 9. Plaintiffs conclude that once Defendant stated that a document "speaks for itself," Defendant "cannot later

---

[8] Plaintiffs' request refers to the following documents: ECF Nos. [83-2]; [83-4]; [83-5]; [83-6]; [83-7]; [83-8]; [83-10]; [83-11]; [83-13]; [83-14]; [83-15]; [83-19]; [83- 20]; [83-23]; [83-24]; [83-26]; [83-27]; [83-28]; [83-30]; [83-31]; [83-32].

[9] Defendant's answer generally contained the following language:

> The allegations in paragraph [x] of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

ECF No. [87] at ¶ 55.

16

1181

Case No. 18-cv-80176-BLOOM/Reinhart

elect to speak for it and say, for example, that while it says it came from me – it actually didn't, or while it bears my signature – it actually doesn't." *Id.* at 12. *See also* ECF No. [558] at 8-9 (arguing that while the Court has discretion to allow Defendant to amend his pleading to rephrase his answers, it should not do so).

In response, Defendant contends that the Court should not find that his answers to the SAC constitute a "judicial admission," but even if they were admissions, they do not go as far as Plaintiffs request. ECF No. [523] at 3. He makes three points. First, the mere statement that a document "speaks for itself" is not a judicial admission because it is not an express concession of a fact, it is not clear and unequivocal, nor does it act as a "deliberate voluntary waiver" that expressly concedes for trial purposes the truth of the alleged fact. *Id.* at 4 (citations omitted). Second, even if the statement is a judicial admission, Plaintiffs misconstrue the import of that statement. Specifically, rather than admitting that the document is authentic, its contents are true, or that Plaintiffs' interpretation of the "plain meaning" of the document controls, all that the statement "admits" in the context of Defendant's pleading is that the "words appear in the document that [P]laintiffs rely on" in the SAC. *Id.* at 7. Finally, were the Court inclined to consider any remedy, it should be to permit Defendant to amend his answer given that he will otherwise suffer "great prejudice" and be "effectively prohibit[ed] [] from testifying about emails and documents that [P]laintiffs maintain were drafted and sent" by him. *Id.*

Upon review, the Court does not agree with Plaintiffs that Defendant's statement that a document "speaks for itself" constitutes a judicial admission that binds Defendant to the authenticity, veracity, and supposed plain meaning of each document. The pleading's statement invokes none of these qualities other than generally noting that the allegation at issue is based on an email or document that "speaks for itself" but for which Defendant "denies any erroneous,

17

1182

Case No. 18-cv-80176-BLOOM/Reinhart

incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it." Although Defendant did not expressly deny the referenced allegation in the SAC in and of itself, the very first sentence of the Amended Answer explicitly stated that Defendant "denies each and every allegation" in the SAC "[e]xcept to the extent expressly admitted here." ECF No. [87] at 1. Further, Defendant's pleading stated that he "does not admit the accuracy, validity, admissibility, or appropriateness of any of the [e]xhibits to the" SAC. *Id.*

Plaintiffs do not cite any binding authorities holding that an answer that a document "speaks for itself" is a judicial admission much less one that admits that the document is authentic, accurate, and subject to the meaning reflected on document's face. In fact, the only in-circuit authority Plaintiffs cite, while decrying the use of this phrase, nonetheless permitted leave to amend while commenting that the statement that a "document speaks for itself" "did not really admit anything." *F.D.I.C. v. Stovall*, No. 2:14-CV-00029-WCO, 2014 WL 8251465, at *12 (N.D. Ga. Oct. 2, 2014). Moreover, the Court does not agree that this response functions as a judicial admission. *See Lawrence v. United States*, No. 8:11-CV-2735-T-17, 2012 WL 9491751, at *2 (M.D. Fla. Oct. 3, 2012) (accepting "as sufficient" the response that a document "speaks for itself" but noting that "going forward" such a response "may not suffice"); *Pushko v. Klebener*, No. 3:05-CV-211-J-25HTS, 2008 WL 10505502, at *2 (M.D. Fla. Mar. 31, 2008) ("If Defendants did admit or deny the exhibit, the question arises: What are they admitting or denying? One could reasonably conclude that such short and plan averments are simply directed to whether the exhibits are in fact attached as alleged in the complaint; another could reasonably conclude that the averments were directed to the authenticity of the documents; and yet another could reasonably conclude that Defendants were admitting or denying the substance of the exhibits. Defendants' response that 'the exhibit speaks for itself' seems a reasonable response to Plaintiffs' allegations that such

18

1183

Case No. 18-cv-80176-BLOOM/Reinhart

exhibits are attached. At most, the Court will interpret Defendants' failure to use Rule 8's language

as an admission that the exhibits are, in fact, attached to the Complaint as Plaintiffs allege.");

*Agrelo v. Meloni Law Firm*, No. 14-21192-CIV, 2017 WL 10636451, at *1 (S.D. Fla. Sept. 22,

2017) (refusing to deem as admitted response that stated that document "speaks for itself" and

which also denied allegations, but requiring amendment "to clarify the ambiguity" raised);

*Westgate Fin. Corp. v. Cotswold Indus., Inc.*, No. 1:09-CV-2627-WSD, 2009 WL 10211922, at

*5 (N.D. Ga. Dec. 31, 2009) (denying motion to strike portions of answer where the responses

contained the phrase "the document speaks for itself" along with admissions and denials of

allegations).[10]

      A judicial admission "is a statement by a party or its counsel that removes a factual issue

from dispute in a litigation and binds both parties on trial and appeal. To be binding, a judicial

---

[10] Plaintiffs' non-circuit authorities involving responses that a "document speaks for itself" are
distinguishable. For instance, in *Charleston v. Salon Secrets Day Spa, Inc.*, No. CIV.A. 08-5889,
2009 WL 1795529, at *1 (E.D. Pa. June 24, 2009), the defendant expressly conceded that when it
stated the "document speaks for itself," "this is equivalent to an admission," and the court granted
leave to amend. In *In re Cotter*, No. 08-12504 NLW, 2011 WL 5900811, at *8 (Bankr. D.N.J. Oct.
24, 2011), the court deemed admitted the defendant's responses as to the information in the
documents rather than striking the answer because the debtor did not allege any prejudice or harm
from the responses that the "document speaks for itself" and defendant explained that its response
was "merely attempting to respond to Debtor's legal conclusions that were masquerading as factual
assertions in the Complaint." And in *Graham Eng'g Corp. v. Adair*, No. 1:16-CV-2521, 2018 WL
1907063, at *2 (M.D. Pa. Apr. 23, 2018), which relied on *Charleston* and *In re Cotter*, the court
found defendant's responses "unduly burden[ed]" plaintiff with the "task of speculating as to
which specific document [defendant] refers and what allegation he denies" because none of the
complaint's allegations "explicitly or implicitly refer to documents, rendering [defendant's]
responses ambiguous." Finally, in *Kurz-Kasch, Inc. v. Holtzberg*, No. CIV. 05-519 (GEB), 2006
WL 561918, at *3 (D.N.J. Mar. 7, 2006), the defendants "admitted to execution of the promissory
note in stating that the promissory note speaks for itself" where one defendant "conceded that he
signed the note, received the money, and acknowledged that he is liable for repayment" in action
for default on a promissory note. Here, by contrast, Defendant does not concede that his responses
were equivalent to an admission, the responses are tied to specific documents, and he explicitly
denied "any erroneous, incomplete, or out-of-context characterization of [the document], and any
inaccurate inferences or conclusions derived from it." Thus, to the extent Defendant admitted
anything, it was not as to the documents' authenticity, interpretation, or correctness.

1184

Case No. 18-cv-80176-BLOOM/Reinhart

admission must be 'unequivocal' and 'unambiguous.' Judicial admissions 'must be statements of fact that require evidentiary proof, not statements of legal theories.'" *Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1233 (M.D. Fla. 2018) (internal citations omitted); *Reynolds v. Roberts*, 202 F.3d 1303, 1318 n.24 (11th Cir. 2000) (noting that judicial admissions must be "deliberate, clear, and unequivocal") (citation omitted). Indeed, "'judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' 'A statement must be 'deliberate, clear, and unambiguous' to be considered a judicial admission. In order to satisfy these elements, the statement in context must amount to an express concession of a fact. 'Because of their binding consequences, judicial admissions generally arise only from deliberate voluntary waivers that expressly concede an alleged fact.'" *In re Kattouah*, 452 B.R. 604, 608 (E.D. Mich. 2011) (internal citations omitted; ellipses omitted) (finding no abuse of discretion in rejecting argument that debtor's response was a binding judicial admission where debtor's response was "inartfully drafted" but not "deliberate, clear, or unambiguous" regarding property's value).

Here, there is no deliberate, clear, and unambiguous admission by Defendant that the emails and other documents referenced in the SAC are accurate, authentic, or otherwise subject to Plaintiffs' interpretation. Instead, the response admitted only that the words reflected in the exhibit appear in the document at issue. *See Pushko*, 2008 WL 10505502, at *2. The Amended Answer does not operate so broadly under the present circumstances to "admit" as unchallenged the documents' validity, meaning, and accuracy.

In any event, "[e]ven if a statement is an admission, the trial court has 'broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases.'" *In re Kattouah*, 452 B.R. at 608 (noting that inadvertence, mistake, and internal contradictions are grounds for

20

Case No. 18-cv-80176-BLOOM/Reinhart

relief from an admission). The Court agrees with Defendant that deeming his statements as binding admissions, as Plaintiffs seek, is unduly harsh. This is all the more so as Plaintiffs deposed Defendant "on multiple occasions as to the authorship and contents of certain documents that 'speak for themselves,'" and if Defendant had "judicially admitted the authenticity of those documents and the veracity of the statements contained within them, then there would have been no need" to ask him questions about the documents. ECF No. [523] at 5-6. *See Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) ("[F]acts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them."). Plaintiffs' Motion as to issue #2 is denied.

### iii. Motion in limine issue #3

Plaintiffs request the Court preclude Defendant from "selectively claiming his computers were hacked or his documents were forged." ECF No. [497] at 12. They maintain that while Defendant has produced a large volume of documents in discovery, Defendant asserts that certain documents are "'hacked,' 'forged,' or otherwise inauthentic." *Id.* at 13. According to Plaintiffs, they face a trial by ambush because they do not know "which of the hundreds of thousands of documents Dr. Wright has produced . . . will suddenly and without warning, [be] disavow[ed] as the result of hacking, forgery[.]" *Id.* at 14. Plaintiffs request either (i) the Court preclude Defendant from claiming that his computers were hacked or that his signatures were forged, or alternatively, (ii) compel Defendant to disclose "at least 30 days before trial, all documents he has produced that he claims are the result of hacking, are forged, or are otherwise inauthentic, with a detailed and sworn explanation for who, how, when, and why this hacking occurred." *Id.* at 17. *See also* ECF No. [558] at 9 (arguing that "basic fairness" demands that either Defendant be precluded from

21

1186

Case No. 18-cv-80176-BLOOM/Reinhart

testifying that he was hacked or that he be compelled to identify the allegedly hacked evidence in advance of trial).

Defendant responds that Plaintiffs' Motion does not cite cases "support[ing] their extraordinary request," and that there is "ample evidence" supporting his testimony that he was hacked. ECF No. [523] at 8. In particular, (i) "private and privileged communications that appear to be between [D]efendant and his Australian counsel were obtained by a 'hacker' and posted online;" (ii) there are "many documents" pre-dating the lawsuit discussing a hack of Defendant's computers, *see* ECF Nos. [523-1] and [523-2]; (iii) a forensic document examiner opined that certain documents contain a forged version of Defendant's signature; and (iv) testimony from Jimmy Nguyen that Defendant informed him that he had been hacked by "former disgruntled employees, staff" and that hacking was an issue in his case with the ATO, ECF No. [523-3]. According to Defendant, Plaintiffs have known for "at least a year" that Defendant had been hacked, and the jury is positioned to give whatever weight it wants to Defendant's evidence regarding hacking. ECF No. [523] at 9.

The Court does not find the relief requested in Plaintiffs' Motion as to issue #3 to be warranted. It is up to the jury to evaluate the plausibility of Defendant's hacking claims, to assess the extent of evidence in support of it, and to weigh such evidence (whether it be Defendant's sole testimony or corroborating evidence) against the rest of the evidence presented. In this regard, the Court notes that Defendant has produced evidence from individuals, including Ira Kleiman, discussing potential hacking of Defendant's computers. *See* ECF No. [523-1] (email from Ira Kleiman to Defendant stating that "[t]here is a reporter going around town talking to everyone Dave [Kleiman] knows. He says an anonymous source (disgruntled employee of yours or hacker) provided him with documents between you and Dave [Kleiman].") ; ECF No. [523-2] (email from

22

1187

Case No. 18-cv-80176-BLOOM/Reinhart

Patrick Paige to Kimon Andreou about Mr. Kleiman's alleged involvement in Bitcoin and noting that "[w]e've been sitting on this since last year after Dave [Kleiman's] death . . . Didn't have enough proof until someone hacked [Defendant's] email"). Therefore, Plaintiffs are incorrect to state that Defendant's hacking claims have no foundation.

Additionally, the Court rejects the assertion that Plaintiffs are subject to a trial by ambush or allowing Defendant's alleged "'hacking' and forgery gambits to proceed is a threat to the integrity of the [judicial] system." ECF No. [497] at 17. As Defendant rightly points out, Plaintiffs have probed Defendant's claims of hacking during discovery, including Defendant's and Mr. Nguyen's depositions, ECF Nos. [497-11]; [523-3], and the defense is not newly-asserted. Should Defendant wish to proceed with such a defense, he carries the same risk that all litigants face in a jury trial of needing to put forth a convincing, coherent, and credible claim. Against this backdrop, the adversarial system exists to expose weak defenses, shaky theories, and less-than-credible assertions. Plaintiffs provide no basis to demonstrate that they are prejudiced and unable to prepare for any evidence put forth concerning alleged hacking or forgery. Plaintiffs' Motion as to issue #3 is denied.

### iv.    Motion in limine issue #4

Plaintiffs represent that Defendant produced nearly 2000 pages of documents after his deposition and the expert discovery cutoff. They now seek an Order either (i) precluding Defendant from using those materials at trial; or (ii) requiring Defendant "to sit for an additional deposition so Plaintiffs may explore the newly disclosed information, after which Plaintiffs should be entitled to update their expert disclosures if necessary." ECF No. [497] at 17. In particular, the Court's scheduling order, ECF No. [441], set April 10, 2020 as the deadline for the parties to disclose expert witness summaries or reports, April 17, 2020 as the deadline to exchange rebuttal expert

23

1188

Case No. 18-cv-80176-BLOOM/Reinhart

reports or summaries, and May 1, 2020 as the cutoff for all fact and expert discovery. Plaintiffs

maintain that Defendant was deposed in mid-March 2020, but three of his document productions

occurred on March 25, 2020, April 6, 2020, and April 24, 2020. ECF No. [497] at 18. According

to Plaintiffs, they have identified "significant red flags" with some of the materials produced, and

they assert that due to the "late production," they are unable to use written or oral discovery to

probe the documents' content and reliability. *Id.* at 18-19; ECF No. [558] at 11-12.

Defendant responds that the Court should not preclude Defendant's use of "timely"

disclosed documents. ECF No. [523] at 12. He contends that Plaintiffs "fail to cite to any law or

caselaw that would support" the requested remedies. *Id.* He argues that Plaintiffs overlook the

nearly two million documents he produced prior to May 1, 2020, and Plaintiffs themselves

produced "critical documents" up to two hours and twenty-one minutes before the close of

discovery, *id.* (citing ECF No. [523-8]), and produced over sixty thousand pages of documents

after their depositions. *Id.* According to Defendant, the existence of the supposedly belated files

was "no secret" because he informed Plaintiffs at his deposition that he had recently gained access

to the files, he was asked questions about the files at the deposition, but Plaintiffs did not follow

up after about the records or demand an immediate production. *Id.* at 13.

The Court finds Plaintiffs' Motion as to issue #4 to be unavailing. Contrary to Plaintiffs'

representation, the materials Defendant produced were not untimely. They were all produced

before May 1, 2020, and as Judge Reinhart stated during the January 2, 2020 discovery hearing,

Plaintiffs "have asked for a lot in this case" and have been "given a lot[.]" ECF No. [497-17].

Although Plaintiffs now challenge that they have been "handcuffed" by Defendant's rolling

production, they did not seek to compel production of the documents following Defendant's March

2020 deposition, despite inquiring about the materials nor did they file a motion with the Court

24

1189

Case No. 18-cv-80176-BLOOM/Reinhart

demanding an immediate production at any time prior to the close of discovery. Likewise, even though Plaintiffs point out that, from their perspective, they have identified "red flags"[11] with the materials (which suggests that they are not so prejudiced in their ability to use the documents at trial or in their trial preparation), exclusion of the evidence or requiring *another* deposition of Defendant is not warranted. Indeed, as Defendant points out, Plaintiffs have not cited any authority supporting their requests. The record reveals that both parties exchanged voluminous amounts of materials after depositions and even right up to the discovery cutoff deadline. Plaintiffs' Motion as to issue #4, accordingly, is denied.

*v.*    ***Motion in limine issue #5***

Plaintiffs next seek to preclude Defendant from putting forth any evidence or testimony that Mr. Kleiman committed suicide. ECF No. [497] at 21. According to them, Defendant has made "unsolicited, unsubstantiated, and provably wrong" statements that Mr. Kleiman committed suicide as a "purposeful attempt to malign Dave[] [Kleiman's] memory[.]" *Id.* at 20. They maintain that this statement is both irrelevant to the issues in this case and is "directly contrary" to the autopsy report that listed Mr. Kleiman's cause of death as coronary artery disease and his manner of death as "natural." *Id.* (citing ECF No. [497-19]). *See also* ECF No. [558] at 5 (arguing that Defendant is a "lay witness and incompetent to testify about the cause of [Mr. Kleiman's] death," his testimony is irrelevant because the circumstances of Mr. Kleiman's death are not at issue, and any relevance would be substantially outweighed by prejudice).

---

[11] Plaintiffs cite no authority supporting their contention that Defendant's alleged failure to address their "red flag" concerns in his response to Plaintiffs' Motion somehow means that he has admitted that "much of this evidence was, in fact, fabricated by [Defendant], or his wife[.]" ECF No. [558] at 11. Plaintiffs dedicate two sentences to the "red flags" they identified, ECF No. [497] at 18, and their threadbare descriptions that an unidentified document "appears to be unsupported by MYOB's export function" or contains metadata reflecting a different law firm does not justify the conclusion that any document is fabricated let alone by specific individuals.

25

Case No. 18-cv-80176-BLOOM/Reinhart

Defendant responds that evidence surrounding Mr. Kleiman's release from the VA hospital in March 2013 demonstrates that Mr. Kleiman intended to commit suicide by discontinuing his medical treatments. ECF No. [523] at 14. He adds that in the month leading up to Mr. Kleiman's death, Mr. Kleiman "did nothing to distribute the fortune [P]laintiffs claim[] they are entitled to, nor to inform anyone, including his brother Ira [Kleiman] . . . of the keys necessary to access his bitcoin wallet." *Id.* In his view, Mr. Kleiman's failure to transfer those keys "or in any way preserve his assets" is "inconsistent with the state of mind of someone who allegedly obtained and owned hundreds of millions of dollars' worth of bitcoin." *Id.* Accordingly, Defendant asserts that evidence related to Mr. Kleiman's supposed suicide is relevant to whether Mr. Kleiman was a co-inventor of Bitcoin and whether he had a "treasure trove" of bitcoin intended for his estate. *Id.*

Upon review, the Court agrees with Plaintiffs as to issue #5. While Mr. Kleiman's abilities to mine bitcoin and develop intellectual property up until his death are relevant matters, the cause of his death is irrelevant. Indeed, whether Mr. Kleiman died of natural causes (as demonstrated by medical records) or by his own actions (as theorized by Defendant) has no bearing on his alleged pre-death business relationship and dealings with Defendant. It is undisputed that Mr. Kleiman passed away. His purported desire to end his life, even if true, does not weaken the veracity of Plaintiffs' claims. Moreover, while Defendant posits that Mr. Kleiman "surely . . . would have known that without passing on those keys, which only he could have known about, his supposed fortune would have been lost forever at his death," ECF No. [523] at 14, none of this speculation on Defendant's part makes any material issue in this case any more or less probable. Accordingly, Plaintiffs' Motion on this point is granted.

26

1191

Case No. 18-cv-80176-BLOOM/Reinhart

### vi.    Motion in limine issue #6

Plaintiffs request an order precluding Defendant from presenting evidence or testimony regarding Mr. Kleiman's drug use and social habits. ECF No. [497] at 21. In their view, evidence about Mr. Kleiman's alleged drug use, visits to strip clubs, and his dating life are irrelevant and, even if relevant, substantially outweighed by the danger of unfair prejudice. *Id. See also* ECF No. [558] at 5 (arguing that even if Mr. Kleiman had drugs in his system when he died, there is "no evidence that it impacted, in any way, the question of whether he and [Defendant] had a joint business relationship").

Defendant responds that Plaintiffs' "attempt to whitewash Dave Kleiman's character and sanitize his actions" will "distort the truth." ECF No. [523] at 1-2. He maintains that Mr. Kleiman's "habits" are at issue, and he should have the right to present evidence related to Mr. Kleiman's "significant financial distress towards the end of his life," his history of being a spendthrift, substance abuse issues, and even domestic violence episodes. *Id.* at 15. He adds that evidence of Mr. Kleiman's drug use and social habits is "highly probative as to whether [Mr. Kleiman] was in fact a co-developer of bitcoin," and bears directly on Plaintiffs' own portrayal of Mr. Kleiman. *Id.* at 16.

The Court agrees in part with Plaintiffs. Although Mr. Kleiman's ability to mine bitcoin and develop intellectual property when he was hospitalized and released is relevant (including potential impacts caused by medications or drugs), the Court fails to see how Mr. Kleiman's "habit" of visiting adult clubs has any relevance to this dispute. *Hall v. Mayor Aldermen of City of Savannah, Ga.*, No. 403CV248, 2005 WL 8156263, at *3 (S.D. Ga. Oct. 3, 2005) (excluding evidence that defendant work off-duty hours at a strip club as "too irrelevant and prejudicial" in sexual harassment lawsuit). It clearly carries overt prejudicial overtones with no discernible

27

1192

Case No. 18-cv-80176-BLOOM/Reinhart

probative force. The Court, separately, does not agree with Plaintiffs that all evidence of

Defendant's "social habits," including his dating life, are irrelevant and unduly prejudicial. Certain

aspects of Mr. Kleiman's "dating life" are relevant, such as potential discussions he may have had

with his girlfriend about his alleged work with Defendant or his alleged involvement with creating

Bitcoin. Those items have a tendency to make the claims or defenses in this case more or less

probable. However, Mr. Kleiman's supposed domestic violence episodes are irrelevant to any

material issue in this case and are unduly prejudicial, especially as they reportedly involve

throwing hot oil and a sharp knife at Mr. Kleiman's girlfriend. Accordingly, Plaintiff's Motion as

to issue #6 is granted in part and denied in part.

### vii.    Motion in limine issue #7

Plaintiffs seek to exclude testimony or references to alleged abuse and traumatic events

Defendant suffered during his childhood. ECF No. [497] at 21. Plaintiffs contend that these matters

are irrelevant and are highly prejudicial. In their view, matters related to Defendant's childhood

have no relevance to matters involving Defendant's actions as an adult, and they have "potential

to influence the jury to make decisions based on sympathy rather than on the pertinent facts

germane to the issues of this case." *Id.* at 21-22. *See also* ECF No. [558] at 6 (arguing that

Defendant's alleged childhood trauma has no bearing on his alleged Autism Spectrum Disorder

diagnosis).

Defendant responds that his character has been put at issue, and he intends to offer evidence

of his childhood trauma to "place his character in context and explain his conduct, both before and

during this litigation, including his disappearance as Satoshi Nakamato in 2010, which was brought

on by [D]efendant's discovery that his creation – bitcoin – had been used to facilitate abuse similar

to what he had suffered as a child." ECF No. [523] at 17. According to Defendant, this evidence

28

1193

Case No. 18-cv-80176-BLOOM/Reinhart

is "highly probative and is not substantially outweighed by the potential prejudice to [P]laintiffs[.]" *Id.*

Upon consideration, the Court agrees with Plaintiffs that Defendant's alleged childhood trauma is irrelevant to issues in dispute in this case. Indeed, his childhood trauma is "absolutely not" even a contributing cause to his autism diagnosis, which itself is offered to place Defendant's trial testimony and evidence into a proper context for a jury. *See* ECF No. [497-22]. As an initial matter, none of the SAC's underlying allegations took part during Defendant's childhood, concern issues relating to childhood abuse, nor implicate either general or specific instances of abuse Defendant may have endured. Nor do any of Plaintiffs' claims regarding Defendant's relationship with Mr. Kleiman become lessened in any way by events that happened at some point during Defendant's childhood. In this respect, Defendant offers at most a highly attenuated connection between his childhood traumas and his alleged adult-era disappearance as Satoshi Nakamoto in 2010 because he "discovered" that Bitcoin "facilitate[d] abuse similar to what he suffered as a child." ECF No. [523] at 17. Even accepting the latter's premise that Bitcoin somehow enabled abuse by others, Defendant's personal experiences with childhood trauma are of no consequence to resolving material disputes in this case. Accordingly, Plaintiffs' Motion as to issue #7 is granted.

## IV.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion, **ECF No. [490]**, is **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' Motion, **ECF No. [497]**, is **GRANTED IN PART AND DENIED IN PART** as set forth above.

29

1194

Case No. 18-cv-80176-BLOOM/Reinhart

**DONE AND ORDERED** in Chambers at Miami, Florida, on November 17, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

30

1195

# TAB 794

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K INFO DEFENSE RESEARCH, LLC | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT | |
| *Defendant.* | |

### REQUEST FOR ADVERSE INFERENCE JURY INSTRUCTION OR, <u>ALTERNATIVELY, JUDICIAL ADMISSION JURY INSTRUCTION</u>

Throughout this litigation, Plaintiffs Ira Kleiman as personal representative of the Estate of David Kleiman and W&K Info Defense Research, LLC ("Plaintiffs") have found attempts to prove their case hindered by Defendant Craig Wright's lies and obfuscation, violations of Court orders, and forgeries. Defendant's misconduct has continued during trial and may have given the jury a misleading impression of the evidence supporting Plaintiffs' claims. Defendant has even walked away at trial from his own repeated representations to Plaintiffs and to the Court in response to Court orders about his bitcoin holdings. Plaintiffs request that the Court provide the jury with instructions tied to Defendant's misconduct in this case regarding: (1) his bitcoin holdings, and (2) spoliation.[1]

---

[1] The text of the spoliation jury instruction attached as Exhibit B is identical to the spoliation instruction submitted with Plaintiffs' proposed jury instructions (ECF No. [618] at 37), and is included here for the Court's convenience and to identify the evidence from trial supporting its use.

1

1196

I.    **BACKGROUND**[2]

A.  **Defendant's Continued Misrepresentations About His Bitcoin Holdings.**

A great deal of time and effort has been dedicated by Plaintiffs and the Court (both Your Honor and Magistrate Judge Reinhart) in this litigation to identifying Defendant's bitcoin holdings, and Defendant's account has shifted significantly over time. As detailed below, the Court previously denied a request for an adverse inference instruction on this issue based on Dr. Wright's representation (through counsel) certifying that he had provided Plaintiffs with a list of "his bitcoin holdings." See P446, now in evidence. However, at trial he has disavowed that certification. Accordingly, the Court should issue the adverse instruction previously contemplated.

The history of Dr. Wright's statements on this issue is convoluted. Initially, Defendant represented that he could not identify his own bitcoin holdings because he needed to wait for a mysterious "bonded courier" to arrive in January 2020. Nonetheless, he repeatedly represented that he mined at least through Block 70 in the blockchain. ECF No. [211], at 3–5. In part because Defendant asserted that a bonded courier was coming with the information necessary to identify his holdings, the Court reversed issue sanctions entered against Defendant for not complying with a Court Order to produce his list of bitcoin (ECF No. [217] but ordered him to file a notice of compliance with the order to produce a list of his bitcoin holdings by February 3, 2020. ECF No. [373]. The Court explained that "[i]n the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information, which the Court has already found[] directly relevant to their claims, the Court finds additional sanctions would be warranted. Specifically, pursuant Rule

---

[2] Plaintiffs focus in this background section on new evidence of misconduct supporting their requested adverse inference jury instructions, and incorporate by reference the fuller history of Defendant's misconduct in this case that Plaintiffs set forth in their Omnibus Sanctions Motion, ECF No. [507].

1197

37(c)(1)(B), the Court will inform the jury of Defendant's failure to disclose the information sought by the Plaintiffs." *Id.* at 22. On January 14, 2020, Defendant filed a notice of compliance that he had "produced a list of his bitcoin holdings, as ordered by the Magistrate Judge, to plaintiffs today." ECF No. [376].[3] He nonetheless assured Plaintiffs that this list was authentic. *See* Dr. Craig Wright's Suppl. Response to Plaintiffs' Interrogatories at 2 (March 12, 2020) (stating that "[t]he receipt of these documents and my inspection of them allowed me to recognize the authenticity of the other documents, including the list of bitcoin public addresses"). In denying Plaintiffs' subsequent motion for default sanctions, the Court explained that it had "previously left open the possibility that it would impose an adverse inference sanction . . . conditioned on Defendant not producing his list of bitcoin holdings" but would decline to impose an adverse inference sanction because Defendant had by then produced such a list. ECF No. [595], at 39.

At trial, however, Defendant refused to acknowledge that the list he previously certified was accurate, claiming now that only the first 15 blocks (750 bitcoin) are his and that the remainder on the list are his company's bitcoin (or perhaps his wife's). Specifically he testified:

> Q.    And you eventually produced such a list that you claimed were your Bitcoin; isn't that correct Dr. Wright?
>
> A.    That is not correct.
>
> Q.    Vs. Ms. Vela can you please put up P554 for just the witness and counsel. Do you recognize this Exhibit Dr. Wright? A. It looks like a file that I forwarded.
>
> Q.    Dr. Wright is this the list you provided in response to the Court's order?
>
> A.    I responded with everything I received. The original list that I gave of only the first 15 address addresses is the -- basically what I mined as me. So I've done both. Blocks 1 to 15 are the addresses that Craig Wright with mined as Craig Wright. In full, in completion, the end. On top of that, I've sent

---

[3] The number of bitcoin identified in that list was approximately 300,000 less than the evidence shows he mined with Dave Kleiman.

3

other files as well.

Q.      Is this the list that you provided to satisfy the Court's order that you identify
        the Bitcoin you mined before December 31st, 2013?

A.      No. The list of the first 15 addresses is the list of Bitcoin I mined as Craig
        Wright, the Defendant. This is another list that I was given I'm not a trustee
        –

Q.      So you -- sorry please finish?

A.      So I've given every file I've received. I've given every computer for staff
        members at the time. I've given computers for my accountants at the time.
        I have not checked them. I have not validated them. I have not verified them.
        I get something, I hand it to my lawyers and to give into the case. That is
        my duty. I take my duty seriously.

Trial Tr. Day 7 at 149:3–150:12. In addition, in response to the question "Dr. Wright you claim

you mined the bitcoin on this list by yourself without Dave; isn't that correct?," Defendant

responded "No, I did not." *Id.* at 155:7-9. And then, on the following trial day, Defendant testified:

Q.

MR. FREEDMAN: Okay. Then let's publish P446 also, please.

Q.      Dr. Wright, this filing that was filed on your behalf says Dr. Wright notifies
        the Court that the third party has provided the necessary information and
        key slice to unlock the corporate repped file and Dr. Wright has produced a
        list of his Bitcoin holdings as ordered by the magistrate judge to Plaintiffs
        today. Do you see that?

A.      Yes. And as I specified, the first 15 were mine. The others were corporate.
        So I have testified and I stick by the fact the first 15 are mine. I agree. The
        others belong to the company. I don't know which ones belong to the
        company. I testified and I stand by it the first 15 are mine.

Q.      Is it your Bitcoin holdings or is it not your Bitcoin holdings?

A.      The first 15 are my Bitcoin hol[d]ings. The first 15.

Trial Tr. Day 9 PM (Rough) at 30:5-31:11 ("Q"); *id.* at 32:1–3.

        Plaintiffs also recently discovered that Defendant distanced himself from the list of his

bitcoin holdings that he filed in this Court in connection with certain ongoing U.K. judicial

4

1199

proceedings, making statements inconsistent with his representations to this Court and Plaintiffs. *See* First Witness Statement of Dr Craig Steven Wright, *Tulip Trading Limited and Bitcoin Ass'n for BSV*, Claim No. BL-2021-000313 (U.K. High Court of Justice, filed Apr. 29, 2011), at 25 (representing that he "did not personally collate the list" of Bitcoin holdings submitted to the Court" and "the purpose of the list was not to assert ownership over all of those addresses."); *id.* at 14 (representing that he has the private keys to his Bitcoin holdings at his home and could have accessed the holdings if he had wanted to). A copy of Defendant's filing in the U.K. is attached as Exhibit C.

An adverse inference instruction is warranted.

**B. Defendant's Reliance on Fraudulent Documents.**

With their proposed jury instructions, Plaintiffs submitted a proposed spoliation of evidence instruction. ECF No. [618], at 37. That instruction is warranted based on the overwhelming evidence admitted at trial regarding Defendant's forgeries and spoliation of evidence. *See, e.g.*, P240 (Letter from Australian counsel terminating representation based on "serious questions about the integrity of documents provided by Dr Craig Wright, both to [his] office and to the Australian Taxation Office"); P637, ¶¶ 52–53. 101 (Defendant forged contracts with W&K) and pp. 118–32 (chart of Defendant's "discrepancies," including false statements and forged/altered documents at issue in this case); *see also id.*, ¶¶ 12 n.14 (Defendant "admitted to backdating several documents" involving Coin-Exch), 111 (finding documents submitted by Defendant were a "sham"), 115 (finding Defendant submitted documents as "disguise for either difference transactions, or no transactions"); P795, ¶¶ 220–23 (discussing "numerous anomalies and inconsistencies" in the evidence presented by Defendant and his agents, concluding contract with W&K "amounts to a sham," and finding that Defendant "fabricated" electronic evidence in connection with Dave Kleiman and W&K), 227 ("documentation was created by [Defendant] in

5

1200

order to fraudulently decide the ATO and support [his] false and misleading statements"), 228.8 (forgery of Dave Kleiman's signature), 228–29 (discussing "inconsistencies and anomalies relating to" purported contract with W&K); P30, ¶¶ 267-68 (forgeries of David Kleiman's signature); P565, ¶¶ 21.1, 38.1 (finding Defendant made false or misleading statements involving W&K), 38.7 (finding emails produced by Defendant were "false or doctored" and questioning "the veracity and genuineness" of other electronic communications, including Bitmessages), 68 and 74-78 (finding documents and statements by Defendant relating to W&K "false or misleading"); P604 & P605, ¶¶ 176-77 ("In the present case there are numerous anomalies and inconsistencies in the purported agreement between [Defendant] and W&K that lead us to conclude that no liability arose from it.")

Testimony at trial further confirms that Defendant forged and spoliated evidence in this case. *See* Trial Tr. (Dr. Edman) Day 9 PM (Rough) at 43:15–25, 45:25–46:6, 47:4-7 (P823 is a forgery), 56:13–18 (no evidence anyone other than Defendant forged P823), 56:20–25 (no evidence any of forgeries created by anyone but Defendant); Trial Tr. (Dr. Edman) Day 10 PM (Rough) at 14:11-13 (P546 is a forgery), 19:3-14 (P135 is a forgery), 22:16-18 (P55 is a forgery), 26:25–27:4 (P452 is a forgery), 34:9-16 (P807 is a forgery), 41:25–43:2 (P808 is a forgery), 51:4–10 and P822 (Defendant swearing to authenticity of documents submitted to Court that are forgeries), 51:17–24 (P35 is a forgery), 73:15–17 (P538 is a forgery), 82:14–17 (P36 is a forgery). In addition to the several documents he specifically discussed with the jury, Dr. Edman testified that he had identified approximately 25-30 additional forgeries Defendant produced in this case. *Id.* at 86:16–25.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 37(c)(1)(B) provides that if a party fails to provide documents or information, "the court, on motion and after giving an opportunity to be heard: . . .

6

1201

(B) may inform the jury of the party's failure." An "adverse inference makes a finding or imposes a rebuttable presumption that the missing evidence would have been unfavorable to the party engaging in the misconduct." *Fed. Trade Comm'n v. First Universal Lending, LLC*, 773 F. Supp. 2d 1332, 1352 (S.D. Fla. 2011). "There are different types of adverse inferences: (1) a jury may be instructed that certain facts are deemed admitted and must be accepted as true; (2) the Court may impose a mandatory, albeit rebuttable, presumption; or (3) the jury must presume that the lost evidence is relevant and favorable to the innocent party, but also consider the spoliating party's rebuttal evidence, and then decide whether to draw an adverse inference." *Penick v. Harbor Freight Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1295 (S.D. Fla. 2020) (Bloom, J.) (quotation marks omitted).

"A jury instruction on spoliation of evidence is required 'only when the absence of that evidence is predicated on bad faith.'" *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997)). No showing of malice is required for a spoliation instruction. *See, e.g.*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

## III.    ARGUMENT

### A.    The Court Should Instruct the Jury On Defendant's Bitcoin Holdings.

The Court should provide the jury with an instruction to address the prejudice created by Defendant's apparent failure to produce a list of his complete bitcoin holdings as ordered by the Court.

As the Court held in its January 10, 2020 order, Defendant's bitcoin holdings is "directly relevant to" Plaintiffs' claims, and the appropriate sanction for this clearly willful failure to produce that information is to "inform the jury of the Defendant's failure to disclose the information sought by the Plaintiffs." ECF No. [373], at 22 (citing Fed. R. Civ. P. 37(c)(1)(B)).

7

1202

The Court may appropriately instruct the jury that the evidence shows identification of at least 1,100,111 bitcoin held by Defendant as of April 26, 2013. *See* Exhibit A at 1. Defendant has acted in bad faith to obscure his bitcoin holdings from this Court, the jury, and Plaintiffs to try to gain an unfair advantage. It is therefore appropriate for the Court to instruct the jury that it can believe Defendant's own representation that he mined more than 1.1 million bitcoin with Dave Kleiman, notwithstanding his failure to identify the entirety of those holdings. *See, e.g.*, *Penick*, 481 F. Supp. 3d at 1295

At a minimum, the Court should alternatively hold Defendant to his representations to the Court in his Notice of Compliance, ECF No. [376], and the Court should instruct the jury that Defendant certified that he holds at least the 820,200 bitcoin in his filed list, and instruct the jury to accept Defendant's judicial admission on that point as true. *See* Exhibit A at 2 (alternative instruction).

### B. The Court Should Instruct the Jury On Defendant's Spoliation Of Evidence,

Particularly in light of Dr. Edman's unrebutted testimony at trial, it is clear that the spoliation instruction proposed by Plaintiffs in the Joint Proposed Jury Instructions, ECF No. [618], at 37, is needed. The evidence shows Defendant altered evidence in this case to frustrate Plaintiffs' discovery and presentation of evidence, and to support his defense against Plaintiffs' claims. Plaintiffs have attached this instruction as Exhibit B, adding citations to the trial transcript in support.

A spoliation instruction "is required 'only when the absence of that evidence is predicated on bad faith.'" *Cox*, 351 F. App'x at 383 (quoting *Bashir*, 119 F.3d at 931). Florida district courts regularly instruct juries on spoliation, even when there is no direct evidence of the destruction or alteration of evidence, and even when there is no evidence of malice. *Austrum v. Fed. Cleaning Contractors, Inc.*, 149 F. Supp. 3d 1343, 1351 (S.D. Fla. 2016); *see Penick v. Harbor Freight*

8

*Tools, USA, Inc.*, 481 F. Supp. 3d 1286, 1295–96 (S.D. Fla. 2020); *Wilsey v. NCL (Bahamas) Ltd.*, 2017 WL 7803804, at *3 (S.D. Fla. Nov. 3, 2017); *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746–47 (N.D. Ala. 2017); *Smith v. Sohaan Dev., Inc.*, No. 2013 WL 5720163, at *4 (M.D. Fla. Oct. 1, 2013); *St. Cyr v. Flying J Inc.*, 2007 WL 1716365, at *5 (M.D. Fla. June 12, 2007).

As discussed in the Background section above, the evidence in this case—particularly the evidence related to the ATO proceedings and the trial testimony from Dr. Edman—demonstrates that Defendant has manipulated the record in this case to favor himself. Plaintiffs' proposal of a rebuttable presumption that the forgeries were done to support Defendant's case leaves Defendant free to argue and point to any contrary evidence. The permissive inference proposed by Plaintiffs is the mildest available adverse inferences and is appropriate here. *See, e.g.*, *Penick*, 481 F. Supp. 3d at 1295.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court give the jury one of the two instructions attached as Exhibits A, and give the spoliation instruction attached as Exhibit B.

Dated:  November 20, 2021

Respectfully submitted,

By: */s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman
**ROCHE FREEDMAN LLP**
200 S. Biscayne Blvd.
Suite 5500 Miami, Florida 33131
vel@rcfllp.com

9

1204

Kyle W. Roche
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, New York 10016
kyle@rcfllp.com

Andrew S. Brenner
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Maxwell V. Pritt
Alexander J. Holtzman
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, Floor 41
San Francisco, CA 94104
mpritt@bsfllp.com
aholtzman@bsfllp.com

*Counsel to Plaintiffs Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman and W&K Info Defense*
*Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 20, 2021 a true and correct copy of the foregoing

was filed with CM/ECF, which caused a copy to be served on all counsel of record.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

10

1205

# TAB 794-1

# EXHIBIT A

**Bitcoin Holdings**

      Defendant failed to produce certain evidence in this case in connection with the amount of bitcoin that he held as of April 26, 2013. He was required to do so. You may therefore assume that the evidence shows identification of at least 1,100,111 bitcoin held by Defendant as of April 26, 2013.

—————————————

Authorities:

Fed. R. Civ. P. 37(c)(1)(B); ECF [373], at 22 ("In the event the bonded courier does not arrive, and the Plaintiffs are not given access to this information, which the Court has already found[] directly relevant to their claims, the Court finds additional sanctions would be warranted. Specifically, pursuant Rule 37(c)(1)(B), the Court will inform the jury of Defendant's failure to disclose the information sought by the Plaintiffs."); ECF No. [217]; ECF No. [376]; ECF No. [595], at 39 (denying Plaintiffs' motion for default sanctions on the grounds that "the Court previously left open the possibility that it would impose an adverse inference sanction under Rule 37(c)(1)(B) in the Objections Order, ECF No. [373] at 22, that was conditioned on Defendant not producing his list of bitcoin holdings" and Defendant had apparently done so as of the Court's order); Trial Tr. Day 7 PM (Rough) at 39:1–15, 44:10–12; Trial Tr. Day 9 PM (Rough) at 30:5–31:11, 32:1–3; First Witness Statement of Dr Craig Steven Wright, *Tulip Trading Limited and Bitcoin Ass'n for BSV*, Claim No. BL-2021-000313 (U.K. High Court of Justice, filed Apr. 29, 2011), at 14, 25.

GIVEN                             ————————————————

GIVEN AS MODIFIED      ————————————————

WITHDRAWN             ————————————————

GRANTED                ————————————————

DENIED                  ————————————————

1207

### Bitcoin Holdings [ALTERNATIVE]

One of the issues in this case is the amount of bitcoin Dr. Wright holds. Through his counsel, as reflected in P446, Dr. Wright has previously certified to the Court that he holds 820,200 bitcoin. The list of that bitcoin is in also in evidence (*see* P554). Although Plaintiffs claim that Dr. Wright holds at least 1.1 million bitcoins, and that Plaintiffs are entitled to half of them, I am instructing you that you must accept as true that Dr. Wright holds at least 820,200 bitcoin.

_____

Authorities:

ECF No. [446] (Notice of Compliance); ECF No. 554 (Defendant's certified list of bitcoin holdings); *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); *Harrell v. United States*, No. 16-cv-284, 2020 WL 619580, at \*15 (M.D. Fla. Feb. 10, 2020), *appeal dismissed*, 2020 WL 3968274 (11th Cir. June 22, 2020); *Tri-Lady Marine, Ltd. v. Bishop Mechancial Servs.*, LLC, 2018 WL 10466997, at \*4 (S.D. Fla. Sept. 20, 2018), *aff'd sub nom. Tri-Lady Marine, Ltd. v. Bishop Mech. Servs., LLC*, 763 F. App'x 882 (11th Cir. 2019); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1349 (M.D. Fla. 2014); *see also Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1233 (M.D. Fla. 2018); *Reynolds v. Roberts*, 202 F.3d 1303, 1318 n.24 (11th Cir. 2000) (judicial admissions are "deliberate, clear, and unequivocal").

GIVEN                          _____
GIVEN AS MODIFIED              _____
WITHDRAWN                      _____
GRANTED                        _____
DENIED                         _____

1208

# TAB 794-2

# EXHIBIT B

## Spoliation[1]

The plaintiffs allege that the defendant is responsible for the spoliation and fabrication of evidence. The term "spoliation" refers to the intentional destruction, alteration, fabrication, or concealment of evidence. You may consider whether the defendant intentionally concealed, altered, fabricated, or destroyed evidence. If you decide that he did so, you may decide that the evidence would have been unfavorable to him.

_____

Authorities:

Judicial Council of California Civil Jury Instructions, Instruction 204 (2017 ed.); Order, ECF [No. 595], at 37 (concluding that the issues raised in Plaintiffs' Sanctions Motion should be for the jury to decide); *see Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 n.9 (11th Cir. 2005) (court concluded spoliation instruction was too weak and entered default for destruction of evidence as a matter of law); *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) ("A jury instruction on spoliation of evidence is required 'only when the absence of that evidence is predicated on bad faith.'" (quoting *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997))); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009); Trial Tr. (Dr. Edman) Day 9 PM (Rough) at 43:15–25, 45:25–46:6, 47:4-7 (P823 is a forgery), 56:13–18 (no evidence anyone other than Defendant forged P823), 56:20–25 (no evidence any of forgeries created by anyone but Defendant); Trial Tr. (Dr. Edman) Day 10 PM (Rough) at 14:11–13 (P546 is a forgery), 19:3–14 (P135 is a forgery), 22:16–18 (P55 is a forgery), 26:25–27:4 (P452 is a forgery), 34:9-16 (P807 is a forgery), 41:25–43:2 (P808 is a forgery), 51:4–10 and P822 (Defendant swearing to authenticity of documents submitted to Court that are forgeries), 51:17–24 (P35 is a forgery), 73:15–17 (P538 is a forgery), 82:14–17 (P36 is a forgery), 86:16–25 (Dr. Edman identified approximately 25–30 additional forgeries in this case); P240 (Letter from Australian counsel terminating representation based on "serious questions about the integrity of documents provided by Dr Craig Wright, both to [his] office and to the Australian Taxation Office"); P637, ¶¶ 52–53, 101 (Defendant forged contracts with W&K) and pp. 118–32 (chart of Defendant's "discrepancies," including false statements and forged/altered documents at issue in this case); *see also id.*, ¶¶ 12 n.14 (Defendant "admitted to backdating several documents" involving Coin-Exch), 111 (finding documents submitted by Defendant were a "sham"), 115 (finding Defendant submitted documents as "disguise for either difference transactions, or no transactions"); P795, ¶¶ 220–23 (discussing "numerous anomalies and inconsistencies" in the evidence presented by Defendant and his agents, concluding contract with W&K "amounts to a sham," and finding that Defendant "fabricated" electronic evidence in connection with Dave Kleiman and W&K), 227 ("documentation was created by [Defendant] in order to fraudulently decide the ATO and support [his] false and misleading statements"), 228.8 (forgery of Dave Kleiman's signature), 228–29 (discussing "inconsistencies and anomalies relating to" purported contract with W&K); P30, ¶¶ 267–68 (forgeries of David Kleiman's

_____

[1] This proposed instruction has not changed since it was submitted as part of the parties' joint submission of instructions. The Authorities have been supplemented with record evidence at trial.

1

1210

signature); P565, ¶¶ 21.1, 38.1 (finding Defendant made false or misleading statements involving W&K), 38.7 (finding emails produced by Defendant were "false or doctored" and questioning "the veracity and genuineness" of other electronic communications, including Bitmessages), 68 and 74-78 (finding documents and statements by Defendant relating to W&K "false or misleading"); P604 & P605, ¶¶ 176–77 ("In the present case there are numerous anomalies and inconsistencies in the purported agreement between [Defendant] and W&K that lead us to conclude that no liability arose from it.").

GIVEN
GIVEN AS MODIFIED    _____
WITHDRAWN    _____
GRANTED    _____
DENIED    _____

2

1211