## 22-11150

# United States Court of Appeals

*for the*

# Eleventh Circuit

———

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

———

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME SEVEN

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

## TABLE OF CONTENTS

**VOLUME I:**

**TAB DS –** District Court Docket Sheet .................................................................. 1

**TAB 1 –** Complaint
      Filed February 14, 2018 ................................................................. 53

Exhibit to Motion to Dismiss the Complaint
      Filed April 16, 2018:

      **TAB 12-2 –** Exhibit B, Declaration of Craig Wright ................................... 91

**TAB 24 –** Amended Complaint and Jury Demand
      Filed May 14, 2018 ....................................................................... 97

Exhibit to Motion to Dismiss Amended Complaint
      Filed June 15, 2018:

      **TAB 33-3 –** Exhibit C, Declaration of Craig Wright ................................. 150

**TAB 80 –** Answer to Amended Complaint
      Filed January 10, 2019 ............................................................... 157

**TAB 83 –** Second Amended Complaint and Jury Demand
      Filed January 14, 2019 ............................................................... 191

**VOLUME II:**

      **TAB 83-1 –** Exhibit 1 ............................................................... 240

      **TAB 83-2 –** Exhibit 2 ............................................................... 336

      **TAB 83-3 –** Exhibit 3 ............................................................... 341

      **TAB 83-4 –** Exhibit 4 ............................................................... 344

      **TAB 83-5 –** Exhibit 5 ............................................................... 449

## VOLUME III:

**TAB 83-6** – Exhibit 6 ................................................................. 460

**TAB 83-7** – Exhibit 7 ................................................................. 463

**TAB 83-8** – Exhibit 8 ................................................................. 468

**TAB 83-9** – Exhibit 9 ................................................................. 482

**TAB 83-10** – Exhibit 10 ............................................................. 494

**TAB 83-11** – Exhibit 11 ............................................................. 509

**TAB 83-12** – Exhibit 12 ............................................................. 524

**TAB 83-13** – Exhibit 13 ............................................................. 566

**TAB 83-14** – Exhibit 14 ............................................................. 568

**TAB 83-15** – Exhibit 15 ............................................................. 573

**TAB 83-16** – Exhibit 16 ............................................................. 583

**TAB 83-17** – Exhibit 17 ............................................................. 585

**TAB 83-18** – Exhibit 18 ............................................................. 587

**TAB 83-19** – Exhibit 19 ............................................................. 595

**TAB 83-20** – Exhibit 20 ............................................................. 600

**TAB 83-21** – Exhibit 21 ............................................................. 622

**TAB 83-22** – Exhibit 22 ............................................................. 632

**TAB 83-23** – Exhibit 23 ............................................................. 640

**TAB 83-24** – Exhibit 24 ............................................................. 643

**TAB 83-25 –** Exhibit 25 ........................................................ 665

**TAB 83-26 –** Exhibit 26 ........................................................ 667

**TAB 83-27 –** Exhibit 27 ........................................................ 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 ........................................................ 684

**TAB 83-29 –** Exhibit 29 ........................................................ 693

**TAB 83-30 –** Exhibit 30 ........................................................ 700

**TAB 83-31 –** Exhibit 31 ........................................................ 705

**TAB 83-32 –** Exhibit 32 ........................................................ 707

**TAB 83-33 –** Exhibit 33 ........................................................ 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019 ........................................................ 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019 ........................................................ 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ........................................................ 757

**TAB 144-6 –** Exhibit F ........................................................ 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019 ........................................................ 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019 ........................................................ 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
Filed June 14, 2019 .................................................................. 780

**TAB 222 –** Redacted Declaration of Craig Wright
Filed June 20, 2019 .................................................................. 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
Filed July 2, 2019 .................................................................... 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
Filed July 9, 2019

    **TAB 242-2 –** Exhibit 2 ................................................... 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
Filed August 15, 2019 ............................................................. 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
Filed August 27, 2019 ............................................................. 816

    **TAB 277-1** – Exhibit 1 ................................................... 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed November 25, 2019 ........................................................ 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright, 4/4/19
Filed November 26, 2019 ........................................................ 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order "Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
Filed December 16, 2019 ......................................................... 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's Motion to Compel
Filed January 10, 2020 ............................................................. 918

iv

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020 Order
> Filed January 14, 2020 ................................................................ 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
> Filed May 8, 2020 .................................................................... 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
> Filed May 18, 2020 .................................................................. 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in Limine
> Filed May 22, 2020 .................................................................. 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus Motion for Sanctions
> Filed May 27, 2020 .................................................................. 991

> **TAB 541-1** – Exhibit 1 ................................................................ 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
> Filed June 2, 2020 .................................................................. 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
> Filed June 24, 2020 ................................................................ 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
> Filed August 3, 2020

> **TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson, November 8, 2019 ................................................................ 1053

> **TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan, March 17, 2020 ................................................................ 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
> Filed September 21, 2020 ........................................................ 1073

v

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
    Filed November 18, 2020 ........................................................... 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
    Filed November 20, 2021 ........................................................... 1196

    **TAB 794-1**– Exhibit A ........................................................... 1206

    **TAB 794-2**– Exhibit B ........................................................... 1209

**VOLUME VII:**

    **TAB 794-3**– Exhibit C ........................................................... 1212

**TAB 800-1 –** Court's Instructions to the Jury
    Filed November 22, 2021 ........................................................... 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
    Filed December 16, 2021

    **TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi ........................................................... 1264

    **TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

    **TAB 829-30 –** Exh. P122 – email chain ................................................. 1272

    **TAB 829-41 –** Exh. P149 – email chain ................................................. 1276

    **TAB 829-48 –** Exh. P161 – email chain ................................................. 1278

    **TAB 829-55 –** Exh. P189 – email chain ................................................. 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
    Filed December 20, 2021........................................................... 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
Filed December 20, 2021............................................................ 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
Filed December 20, 2021............................................................ 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
Filed December 20, 2021............................................................ 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
Filed December 20, 2021............................................................ 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
Filed December 20, 2021............................................................ 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
Filed December 20, 2021............................................................ 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
Filed January 4, 2022................................................................ 1342

    **TAB 861-1** – Exhibit A .......................................................... 1357

    **TAB 861-2** – Exhibit B .......................................................... 1391

    **TAB 861-3** – Exhibit C .......................................................... 1398

    **TAB 861-4** – Exhibit D .......................................................... 1403

    **TAB 861-5** – Exhibit E .......................................................... 1409

    **TAB 861-6** – Exhibit F........................................................... 1417

    **TAB 861-7** – Exhibit G .......................................................... 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's Motion for a New Trial
        Filed January 18, 2022 ................................................................................. 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed January 31, 2022

        **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright, August 11, 2014 ......................................................................................... 1446

        Exh. P173 – Transcript of Interview with Craig Wright, August 18, 2014 ......................................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
        Filed February 17, 2022

        **TAB 885-9 –** Exh. P464 – Redacted email chain ................................... 1538

**TAB 887 –** Order on Motion for New Trial
        Filed February 28, 2022 ........................................................................... 1652

**TAB 889 –** Amended Final Judgment
        Filed March 9, 2022 ................................................................................. 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
        Filed February 24, 2020 ........................................................................... 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 ................................................................. 1673

**TAB 507-1 –** Exhibit 1 ........................................................... 1701

**TAB 507-8 –** Exhibit 8 ........................................................... 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List

Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ...................................................... 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes ................................ 1717

Exh. D102 – Excerpt of Progress Notes .................................. 1719

**TAB CS –** Certificate of Service

# TAB 794-3

Applicant/Claimant
CS Wright
1st
Exhibit CSW1
29 April 2021

CLAIM NO. BL-2021-000313

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
BUSINESS LIST (ChD)

B E T W E E N:

TULIP TRADING LIMITED
(a Seychelles company)

Applicant/
Claimant

and

(1) BITCOIN ASSOCIATION FOR BSV
(a Swiss verein)
(2) WLADIMIR VAN DER LAAN
(3) JONAS SCHNELLI
(4) PIETER WUILLE
(5) MARCO FALKE
(6) SAMUEL DOBSON
(7) MICHAEL FORD
(8) CORY FIELDS
(9) GEORGE DOMBROWSKI
(10)    MATTHEW CORALLO
(11)    PETER TODD
(12)    GREGORY MAXWELL
(13)    ERIC LOMBROZO
(14)    ROGER VER
(15)    AMAURY SÉCHET
(16)    JASON COX

Respondents/
Defendants

FIRST WITNESS STATEMENT OF DR CRAIG STEVEN WRIGHT

1212

I, **DR. CRAIG STEVEN WRIGHT** of 21 Harebell Hill, Cobham, KT11 2RS, state as follows:

1.     I am one of the ultimate beneficial owners of the Applicant/Claimant, Tulip Trading Ltd ("**TTL**").  I am authorised to make this witness statement on TTL's behalf in support of its applications for: a) service out of the jurisdiction of the Claim Form, Particulars of Claim ("**PoC**") and other documents; and b) service by alternative methods ("**Application**").

2.     This statement has been prepared following discussions with TTL's solicitors (who are also my solicitors) over the telephone and via video-conferencing facilities.  In making this statement I do not intend, and shall not be deemed, to waive privilege in any respect.

3.     The facts and matters set out in this statement are within my own knowledge unless otherwise stated, and I believe them to be true.  Where I refer to information supplied by others, the source of the information is identified; facts and matters derived from other sources are true to the best of my knowledge and belief.

4.     I have read the PoC and I confirm that the facts stated in it are true.  I have also read the witness statement of Oliver James Cain ("**Cain 1**") and, to the extent facts and matters in that document are within my knowledge, I agree with them (although I would not have phrased some of the points in the same way). I have used defined terms used in both those documents.

5.     There is now produced and shown to me a paginated bundle of true copy documents marked "CSW1".  References in the form [**CSW1/XX**] are to pages in that exhibit.

*Structure of this witness statement*

6.     This witness statement is divided into five sections, as follows:

a.     In Section A, I describe my qualifications, background and the creation of Bitcoin.

1

b.  In section B, I describe the digital assets at issue.

c.  In Section C, I explain that the private keys to the addresses holding the digital assets that were stolen during a hack of my personal computer, such that I have been deprived of control of those digital assets.

d.  In Section D, I explain why the Developers can and should take the action proposed by TTL.

e.  In Section E, I make disclosures which I am advised to make by way of full and frank disclosure.

## Section A: My qualifications, background and the creation of Bitcoin

*My Qualifications*

7.  I have eight Masters' degrees (soon to be nine) and two doctorates, including a PhD in computer science and economics from Charles Sturt University, Australia. I am currently studying for a further 21 degrees. I have received no fewer than 60 professional commendations or certifications.[1]

8.  These various qualifications and achievements span a number of fields, from Networking Systems Administration to International Commercial Law. However, most relate to mathematics, economics or computer science – all fields in which I have been professionally involved.

---

[1] By way of example (three out of more than 60), I refer to the following: (1) I was a certified information systems security professional [**CSW1/1**] by the International Information Systems Security Certification Consortium ("**ISC**"); (2) I was certified by the ISC as an Information Systems Security Architecture Professional [**CSW1/2**]; and (3) between 2005 and 2009 I was certified by the Information Systems Audit and Control Association as an Information Systems Auditor [**CSW1/3**].

2

*My background*

9.  I am a citizen of Australia and Antigua and Barbuda, but since 2015 I have been permanently resident in the United Kingdom, where I live with my wife and two of our children. When eligible, I intend to obtain citizenship of the United Kingdom.

10. I have more than 25 years' experience in the fields of information technology, forensics and security and was previously a lecturer and researcher in computer science at Charles Sturt University. I have authored many articles, academic papers and books, and spoken publicly at conferences on IT, security, Bitcoin and other topics relating to digital currencies and blockchain technologies.

11. I have held senior executive positions with companies focused on digital currency, digital forensics, and IT security. Among my positions, I was between approximately 2009-2012 the vice president of the Centre for Strategic Cyberspace and Security Science with a focus on collaborating with government bodies in securing cyber systems. I also worked between approximately 1996-1997 on systems that protected the Australian Stock Exchange, and have trained Australian government and corporate departments in SCADA (security, cyber warfare, and cyber defence). In one of my early sector focuses, I helped design the architecture for the world's first online casino (Lasseter's Online in Australia, between approximately 2001-2006) and advised Centrebet on security and control systems.

12. I am presently the Chief Scientist of nChain Limited, a role I have had since around September/October 2015.

13. nChain Limited is the research and development arm of the nChain group of companies ("**nChain**"), which I helped establish in 2015. nChain develops blockchain technologies and aims to leverage global trade through blockchain-driven solutions, with the ultimate mission to provide the world, and most especially the business world, with a truly universal secure database. nChain has undertaken research and development for some of the largest global enterprises, as well as in its own right. In addition to creating proprietary products, nChain supports the BSV community by

3

creating open-source, royalty-free software tools that help to accelerate blockchain technology.

14. In effect, nChain is the vehicle through which I have developed my intellectual property ("**IP**") in blockchain technology since the end of 2015 (and into which I intend to create future IP). Presently, nChain holds 173 granted Patents worldwide, which all derive from my creations and I am therefore the inventor or co-inventor of all its Patents. My first Patent was granted in 2014 in my own name (following an initial application in October 2011).[2] It relates to the use of cryptography in operating a register and has been cited by (among others) Winklevoss LP, LLC in relation to its patents for stable value digital assets (I understand Winklevoss LP, LLC to be one of the corporate vehicles of billionaire BTC investors Cameron and Tyler Winklevoss).

*Creation of Bitcoin*

15. I am also, under the pseudonym "Satoshi Nakamoto", the creator of Bitcoin.

16. Specifically:

a. Between 2007 and October 2008, I researched and then authored a White Paper entitled *"Bitcoin: A Peer-to-Peer Electronic Cash System"*, which, on 31 October 2008, I publicly released for the first time by uploading it onto the internet under the pseudonym 'Satoshi Nakamoto' (**"the White Paper"**).[3] My interest in digital currency arose from my work in digital security. The idea of electronic cash was not new, but Bitcoin (unlike previous forms of electronic cash) provided the security of the Blockchain to permanently record transactions and therefore protect against fraud.

---

[2] Wright, C and Wilson, J (2014) *Registry* (Australia Patent No. AU2013201602B2), Australia Patent Office, http://pericles.ipaustralia.gov.au/ols/auspat/applicationDetails.do?applicationNo=2013201602.

[3] This is an exhibit to Mr Cain's witness statement [**OJC1/1/1**].

4

b.     On 9 January 2009, acting under my pseudonym, I released the first version of the Bitcoin software, which I had also written.

c.     I created Bitcoin in 2008 and, prior to its release, I consulted with a number of close friends and relatives, primarily in relation to the wording of parts of the White Paper (those people included Dave Kleiman and my uncle Don Lynam). Dave Kleiman died in April 2013 and the relationship between us is currently the subject of litigation in Florida, brought by Dave's estate ("**Florida Proceedings**"). A trial was set down in that case for June 2021, but it has been delayed (due to scheduling as a result of COVID-19) until probably the autumn of 2021. I deny almost all of the allegations made by Dave's estate and, given the impending trial, I will say little about them. For the avoidance of any doubt, Dave Kleiman had no interest or entitlement to the Bitcoin in the 12ib7 and 1Feex Addresses (which was purchased, not mined).

17.     In or around April 2011, I handed over management of the Bitcoin code base (used in the Software), and the related access to and control of the Bitcoin source code repository, to a developer named Gavin Andresen, who took over management of the software maintenance from me. I did this because I had a lot of other things going on in my life at the time. I had created a protocol for Bitcoin that was not to be changed at its core and, as such, the primary task for Mr Andresen was to make sure the software was kept up to date (rather than make significant changes).

*Bitcoin after my involvement*

18.     Following initial release of the software, other developers were also involved in the further development of Bitcoin. Some of these developers did not necessarily agree with my vision for Bitcoin (I refer to all the present developers, who are Defendants, as "**Developers**"). Among other things, some people saw potential value in Bitcoin's use for criminal activity and in particular the so-called "Dark Web" (which was not my original intention). Some of these developers are Defendants to this claim. I return to this point below.

5

1217

19.     In December 2015, two online magazines, Wired and Gizmodo, published articles naming me as the creator of Bitcoin.  In May 2016, while I denied much of what had been written about me, I did confirm that the part of the stories about me being Satoshi were true.

20.     Around this time, Mr Andresen also confirmed publicly that I was Satoshi; however, as a consequence of having done so, he was marginalised and locked out of the Bitcoin.org website, which was the website used for the development of Bitcoin, by the other developers (see further at paragraph [84] below).  From that stage, neither Mr Andresen nor I could realistically contribute to the development of Bitcoin and a vicious campaign began against me to discredit me as being Satoshi Nakamoto.

21.     I believe that many of the developers reacted in this way because they saw potential for the use of Bitcoin to enable criminal activity, including the use of the "Dark Web" in particular (a subset of the internet which is intentionally hidden and can only be accessed using special software, and is used by drug dealers and child pornographers among others).

22.     When I wrote the White Paper, it did not contain any reference to the legal obligations incumbent on developers but that does not mean that there are none.  It was outside the scope of the White Paper, which was only ever intended by me to be an outline of how Bitcoin worked.

23.     For example, when I launched Bitcoin, I was working on the implementation of "alert" and "recovery" systems, which I hoped would allow for, among other things, the recognition of freezing orders.  I had already referred in section 8 of the White Paper to a potential strategy whereby nodes identify "alerted" transactions .  In 2010, I implemented the alert key, although I still had not fully determined how it would best work.  However, there were problems with it principally because it did not link into individual nodes (at the time, unlike now, nodes were very small).  Despite this, I am confident that this functionality could have been developed fully and implemented over time.  Instead, it was disabled by the then-developers, and no further action has

6

been taken in respect of it or similar functionality introduced. I believe those developers took that position because such functionality does not fit with their "decentralised" view of Bitcoin (which is not decentralised at all). It also furthered their goal of Bitcoin sitting outside the law and governmental regulation, which is not what I wanted.

24.   Only BSV is Bitcoin, as only it uses the original protocol. For the avoidance of doubt, BTC is not Bitcoin. It follows therefore that I support the First Defendant's stewardship of BSV, but there is no difference between my claim against the First Defendant, on the one hand, and the other 15 Defendants on the other hand. It is also only BSV which is effective for use as digital cash (rather than a store of value – sometimes referred to as "digital gold" -- which BTC has become).

25.   There are many people who have publicly stated that I am not Satoshi Nakamoto and did not create Bitcoin. Many of those same people have falsely accused me of being a "fraud" and of academic plagiarism, a matter I address in section E of this witness statement. Many of those people also aggressively attack me on Twitter and other social media forums, as I have already explained.

*The myth of decentralisation*

26.   I do not accept that BTC is "decentralised" in any sense of the word.[4] In theory, the software code used on the network could be developed by anyone, but effecting changes to the software on an ongoing basis requires some form of structure (e.g. to ensure there are no software bugs, make necessary upgrades to the software and ensure a consistent approach for the direction of the network). This is why the operation of the Bitcoin blockchain (and the blockchain of other networks, i.e. BTC) is not decentralised. The developers control the software and therefore the network. This is not what the developers want the public to believe. Many developers also appear to work on the basis that "decentralisation" means being above the law or resistant to

---

[4] It is also wrong to say that Bitcoin has no "Issuer" since all the 21 million Bitcoin were issued by me (as Satoshi Nakamoto) when I created Bitcoin.

censorship. In particular, those developers refuse to acknowledge that they act effectively as a partnership (as I explain, next) and, because they are located in various countries around the world, they appear to think that they and BTC are above the law. This is not the case.

27.    As I mentioned, it is my belief that the BTC developers (and the BTC Developers in this case) are essentially a partnership. They work in concert with one another to maintain the software and network, they have a common purpose and earn income from undertaking that common purpose. I would expect them to support each other and have a common position in most respects. I am also aware that these BTC developers deliberately keep aspects of their operation secret so as to further the myth of "decentralisation". The BTC website refers to various chat forums for "Development" (as referred to by Mr Cain), but I understand that much important business between the BTC Developers is discussed in a private chat forum called "Dragons Den", which is not publicly accessible.

28.    It is well known that the Developers work together on BTC development with, and are funded by, organisations such as Blockstream Inc (which was founded by Gregory Maxwell and Peter Wuille, among others) and Chaincode Labs.[5] Some of the BTC Developers work full time on BTC and earn income by way of so-called "grants" or "sponsorship" from interested parties. I agree with Mr Cain's summary of the BTC Developers' involvement with BTC[6] and, for the reasons he states and the reasons above, I believe that each of the BTC Developers has considerable influence over the development of BTC and the BTC network.

29.    Mr Ver's lawyers suggest that I am bringing this proceeding to intimidate developers and many of the developers say the same thing on Twitter. That is absolute nonsense. I am no more capable of intimidating developers than they are of me. Mr Cain rightly notes that Mr Ver is a multi-millionaire. I cannot speak to the circumstances of all the

---

[5] For example, I refer to the articles such as Lopp, J *Who Controls Bitcoin Core?* Article on blogg.lopp.net [**CSW1/4**] and van Id, J *Has Blockstream hijacked Bitcoin?* Article on www.medium.com [**CSW1/16**].

[6] Cain 1, [54]-[57].

other developers, but I know that many of them have been involved in BTC for several years and I expect would have substantial resources with which to defend this claim.

30.    Moreover, I believe funding will almost certainly exist for the Developers. By way of example, an organisation called the "Open Crypto Alliance" has been formed with the expressed purpose of fighting "patent pick pockets" and "patent trolls" (in other words parties who did not actually create the inventions they seek to patent). However, as far as I can tell, their main purpose is to fight nChain's patent applications (they do little to hide their true purpose, as I am the main feature of their website).[7] Furthermore, recently, a "complimentary" [sic] organisation[8] (in the words of the Open Crypto Alliance), the Crypto Open Patent Alliance, brought an action in the English Court against me to prevent me from claiming copyright in the Bitcoin Whitepaper which I authored (and has nothing to do with Patents). I expect this organisation would also fund any claim against me or defend a claim brought by me that relates to digital assets, Bitcoin, BTC or the Blockchain.

31.    In this context, I simply do not believe that any of the Defendants would be "intimidated" by the prospect of litigation (regardless of whether that is my purpose – which it is not).

**Section B:  TTL's digital assets**

*Introduction*

32.    I was the victim of hacking on my home computer network, which occurred on or around 5 February 2020. I describe the hack in more detail in paragraphs [52] to [58] below. The hackers have not been identified.

33.    Among the information taken during the hack are the private keys necessary to access approximately 111,000 unsplit Bitcoin recorded at two different addresses,

---

[7] Open Crypto Alliance website (*www.opencryptoalliance.org*) – Homepage (extract) [**CSW1/24**].

[8] Open Crypto Alliance website (*www.opencryptoalliance.org*) - FAQs [**CSW1/25**].

1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF (and the BCH equivalent of this address, 1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uf, both together referred to as "**1Feex**") and 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr ("**12ib7**") (together, "**Addresses**"). The digital assets in the 1Feex and 12ib7 Addresses are owned by TTL. At the time of the hack the digital assets in these addresses were worth approximately £900m.

*TTL*

34.    TTL is a limited liability company incorporated under the laws of the Republic of Seychelles. It is a holding company for the Bitcoin in the Addresses, which were purchased during the initial phase of Bitcoin (i.e. prior the airdrops). I also have significant other holdings in Bitcoin/digital assets (beneficially in most cases), well in excess off the amounts at issue in this claim, but those other holdings are not owned by TTL.

35.    The ultimate beneficial owners of TTL are my wife, me and our children (two of whom live in England and one in Australia). The relevant trusts to which the shares in TTL are subject are governed by English law.

36.    Because TTL is a holding company, it has no customers or bank account. It does not file accounts or tax returns. Its main asset is the Bitcoin in the Addresses, which I could control using the keys located on my computer at my home in Surrey (as I explain below). I therefore control the affairs of TTL in England.

*TTL's ownership of the digital assets in the Addresses*

37.    The digital asset holdings in the Addresses pre-date the so-called "forks" that led to copies being made of the original Blockchain. It is a common misconception that "forks" in the Blockchain gave rise to the various copies.[9] "Forks" happen naturally

---

[9] For all Blockchains except for the original Blockchain (i.e. for what is now BSV), the Blockchain was created by copying the pre-existing Blockchain, but applying different software instructions thereafter (and, accordingly, save for BSV, references (if any) in this witness statement to "Bitcoin" should be read as a reference to "so-called Bitcoin" as the developers had no permission to copy the original Blockchain).

whereas what occurred to create BTC, BCH and BCH ABC was the result of deliberate changes by developers to the software used to support the network. A more accurate term is "airdrop" because copies of the existing Blockchain are copied and used with new software. The effect of this means that the holdings can be spent independently on each and all of the BTC, BCH, BCH ABC and BSV blockchains.

38.   By around the date of this statement, the value of the digital assets in the two Addresses had increased to approximately £4.5 billion. The holdings are broken down as follows:[10]

| Holding | Value in BTC[11] | Value in BCH[12] | Value in BCH ABC[13] | Value in BSV[14] | Aggregate Total |
|---|---|---|---|---|---|
| 1Feex: 79,957 of each ("**1Feex**") | £3.16bn | £53.8m | £1.9m | £17.3m | £3.23bn |
| 12ib7: 31,000 of each ("**12ib7**") | £1.22bn | £20.9m | <£1m | £6.7m | £1.75bn |
| **Total** | **£4.38bn** | **£74.6m** | **£2.6m** | **£24m** | **£4.49bn** |

39.   The 1Feex was originally purchased in February 2011. The purchase was funded by Liberty Reserve Dollars (a form of digital currency used at the time, which I had received for my work for online casinos), through an online Russian exchange, WMIRK. I approached the exchange and asked them how much Bitcoin I could buy

---

[10] Figures are rounded.

[11] Calculated using BTC:USD on 20 April 2020 - $55,225.37 and USD:GBP – 0.7155.

[12] Calculated using BCH:USD on 20 April 2020 - $940.47 and USD:GBP – 0.7155.

[13] Calculated using BCHA:USD on 20 April 2020 - $32.98 and USD:GBP – 0.7155.

[14] Calculated using BSV:USD on 20 April 2020 - $302.41 and USD:GBP – 0.7155.

with my Liberty Reserve Dollars (which I had been accumulating since 2005 and the exact amount of which I cannot recall), which is how the quantity was arrived at. I do not know from whom the exchange purchased the Bitcoin or what its procedures were for doing so. However, the Bitcoin was delivered on 1 March 2011, as the Blockchain record shows.[15] The purchase of the Bitcoin is evidenced by a contemporaneous purchase order (the **"Purchase Order"**), that was prepared by my then wife, Lynn (Wright).[16]

40.     One of the reasons for my decision to buy the Bitcoin that was transferred to 1Feex and 12ib7 was because I had significant holdings of Liberty Reserve Dollars (as I have described above), which could only be spent in a limited number of places. Whilst Liberty Reserve Dollars may theoretically have been pegged to the US$, they were only as valuable as what they can be exchanged for.

41.     As far as I recall, I instructed the exchange (WMIRK) by telephone to buy the Bitcoin using my Liberty Reserve Dollars, but, having done so, I left the rest of the transaction to Lynn.

42.     As I have explained, the Bitcoin that was transferred to the Addresses was purchased and held on trust. It now belongs to TTL subject to the terms of a trust known as the Tulip Trust.

43.     I am aware that there have been rumours and speculation that TTL does not own the 1Feex Address and some individuals have even asserted that they own the 1Feex Address.

---

[15] At [**CSW1/27**] is an extract of the Blockchain for the 1Feex Address. It shows all transactions in and out of the Addresses other than the "dust" payments I have referred to above. The payment into the 1Feex Address on 1 March 2011 is at [**CSW1/38-39**].

[16] Exhibit [**OJC1/2/175**] to Cain 1.

12

44.    In that regard:

   a. It is alleged that the 1Feex coins were stolen in 2011 from a Japanese digital asset exchange called Mt Gox and even that I was responsible for such theft. This is not true. As I have explained, the 1Feex coins were purchased from a third party in exchange for Liberty Reserve dollars in late February 2011, and transferred into the 1Feex Address on 1 March 2011.[17] The well-publicised hack of Mt Gox took place later in June 2011. I had nothing to do with the hack or any other alleged earlier hacks. Mt Gox has been in liquidation since 2014 and neither the liquidator nor the Japanese police have contacted me regarding the coins in the 1Feex address despite the fact that TTL's ownership of the 1Feex Address has been public knowledge since 2018. I also made a public statement on this matter on 16 June 2020 where I referred to all the above matters.[18]

   b.    On 4 November 2020, I became aware that an individual from the USA by the name of Chadwick Austin wrote to U.S. District Judge Bloom (who is hearing the Florida Proceedings) to assert that he was the rightful owner of the 1Feex address. However, he has not pursued his claim and my solicitors have responded to it in detail.

   c.    Furthermore, as Mr Cain has described, my solicitors receive emails from time to time asserting claims to ownership by third parties but none appear credible (some seem nonsensical) and none have provided any evidence. I have nothing to add to Mr Cain's evidence in that respect.

45.    I do not recall the reasons for the transactions in and out of the 12ib7 address or who the transactions were with.

---

[17] See footnote 15, above.

[18] Craig Wright Statement on the missing Mt. Gox Bitcoin (*https://coingeek.com/craig-wright-statement-on-the-missing-mt-gox-bitcoins/*) [**CWS1/40**].

13

1225

46.     The Addresses also contain other digital assets which have been gifted to TTL by various users over the years.  These payments are referred to as "dust" payments, whereby small amounts of Bitcoin or other digital assets are transferred to an address. This is commonplace and is to be expected.  Dust payments frequently are made to addresses, often because the paying party wants to track activity on the address and/or link that address to other addresses.  Dust payments often are used as a preliminary step in seeking to perpetrate a phishing attack or even in order to ascertain whether the paying party can find information that will allow the paying party to blackmail the owner of the address in question.

*The private keys to TTL's digital assets were stored on my personal computer*

47.     The private keys required to control and spend the Bitcoin and other digital assets in the Addresses were contained in encrypted wallet.dat files contained in a password protected RAR file stored on my computer at my home in Surrey.  The password to the protected RAR file was contained in a digital password safe known as KeePass. The RAR file and KeePass were also stored in and synced with two cloud storage services, OneDrive and Google Cloud.  I had not turned my mind to the fact that hackers might delete both copies effectively due to the syncing process (and, in any event, although the assets were worth around £1bn at the time of the hack, that was (and is) only a portion of my overall holding in digital assets). Furthermore and in any event, the private keys are just that: private keys.  The loss of private keys does not mean that ownership is lost.  The ownership of the digital assets remains with the owner even if the private keys are stolen and I believe that control over that property can be restored in the way that I am asking the court to do in this case.

48.     I had not accessed the wallet.dat files for the Addresses for many years prior to the hack, and in consequence I cannot now be certain about the precise mechanism for opening the files.  The assets in the Address are an investment (one of many investments held beneficially for myself and my family).  I had no cause to access the files and had not done so (as I have said) for many years, but I could have done so if I had wanted to.

14

49.    I do recall that there was an additional security measure in place to protect access to the wallet.dat files in that I had set up a scheme of algorithmic masking (a complex method of hiding original data with modified content generated by an algorithm) which protected the mechanism for opening the files. I stored notes in KeePass which were sufficient to remind me of the scheme of algorithmic masking used and the data that I needed to collect in order to pass through those schemes.

50.    As and when I would have wanted to exercise control over the digital assets in the Addresses on behalf of TTL (for example by spending them), I would have done this on my computer at home in Surrey using the private keys and other information held on that computer.

**Section C:  The hack of my computer and my loss of control over TTL's digital assets**

*The hack of my computer system*

51.    At approximately 12.30pm on Saturday 8 February 2020, I accessed an Electrum Bitcoin Wallet (the **"Electrum Wallet"**) of mine, which contained Bitcoin belonging to my wife and me, which was different to and separate from the digital assets in the 1Feex and 12ib7 Addresses. I did this to check that I had received a regular monthly payment in digital assets. Upon doing this, I observed that the expected payment had been received but I also noticed three further transactions, two of them substantial, which neither I nor my wife had actioned, in which all of the digital assets in the Electrum Wallet had been transferred out at 7:46 AM on 5 February 2020. [**CSW1/42**]

52.    I knew at this point that my computer systems had been hacked -- there was no other explanation as to why the Bitcoin in the Electrum Wallet could have been transferred. I was therefore very concerned by this and so I immediately investigated what had happened, what had been taken and what had not been taken.

53.    I was unable to locate a record as to which files had been accessed and/or wiped during the hack as the system logs had been erased.

15

1227

54.    The transfers can only have been made using the seed phrase to the Electrum Wallet
which was stored in Keepass. Other than the loss of the BSV in the Electrum Wallet,
which had a value of approximately £1.1m at the time of the theft, I discovered that
the following had been taken:

a.    The RAR file containing the wallet.dat files for the 1Feex and 12ib7 Addresses
and the KeePass data.

b.    0.333 BTC, with a value at the time of approximately £2,500, which was held
on the FloatSV digital asset exchange. The BTC in this account was jointly
held by my wife and me. A screen-print from the "Withdrawal History" of my
account with the FloatSV exchange at **[CSW1/43]** shows the transfer of the
BTC out of the wallet at 7.14 PM on 5 February 2020.

c.    A large number of white papers (my best estimate is approximately 50) and
associated research data related to my work in preparing valuable patent
applications contained in 37GB of files that were wiped from my OneDrive
and Google Cloud drives.

55.    My documents were stored in OneDrive as well as the Google Cloud, but
unfortunately as both OneDrive and the Google Cloud were synced with my computer,
the data was lost in each location when it was deleted from one location.

56.    The BSV stolen from my Electrum Wallet and the BTC stolen from the FloatSV
exchange have been dissipated.

57.    Following my discovery of the hack, I wiped the hard drives of my computers. This
may appear odd to some people, but I did so because I did not know how the hackers
obtained access to my computer. I have been the subject of cyber-attacks for many
years. It was also critical to me to get my systems up and running without undue
delay. My computer contained a great deal of confidential information (among other
things). I wiped my hard drive to in order to ensure all malware and other threats were

1228

removed from my network and it was simply not practicable to take a copy of any of these drives.

58.    I believe that it is highly likely that the hackers retained copies of the large volume of data that they deleted from my systems during the hack rather than simply deleting the files. This is because (i) data taken during the hack was used to steal the digital assets in the Electrum Wallet and my FloatSV account, which indicates the intention was theft as well as destruction of data, and (ii) I believe that the hackers are highly likely to have known that my data included valuable information such that it would be unlikely that they would delete it without retaining a copy.

*TTL's and my loss of control over the digital assets*

59.    The result of the deletion of my files is that TTL and I have lost the ability to control the digital assets in the Addresses. No-one else had access to the private keys and related data held on my personal computer. The theft meant that I have been deprived of the files containing the private keys and the information stored in KeePass which I needed in order to remind me of the scheme of algorithmic masking used and the data that I needed to collect in order to pass through those schemes and thereby be able to control the digital assets on behalf of TTL.

60.    The digital assets in the Addresses have not been moved as at the date of this statement, as can be seen from the Blockchain records for 1Feex at [**CSW1/27**] and for 12ib7 at [**CSW1/44**].[19] I believe that this must be for one or more of three reasons. First, because the hackers have not yet been able to access the private keys contained within the wallet.dat files because of the algorithmic masking in place. Secondly, it is not obvious from the description of the data contained in the KeePass application that it relates to the Addresses, so the hackers may not have realised what they have got, or which data relates to those addresses. Thirdly, it may be that the hackers have cracked the algorithmic masking but are waiting for attention to move away from me

---

[19] As explained above (footnote 15), these extracts show all transactions in and out of the Addresses other than the "dust" payments I have referred to above.

so that they can move the 1Feex and 12ib7 coins without arousing suspicion. It is now known publicly that TTL cannot access the digital assets in the Addresses and so the hackers may well feel confident in biding their time. Letters sent by my solicitors to certain Defendants, which referred to the hack and loss of control over the digital assets in the Addresses, were published on Twitter in June 2020.[20] I expect that, from that time, the hackers would have understood the underlying value of the data they had stolen.

61.     In order to be able to transfer the digital assets out of the Addresses, the hackers would need to use specialised powerful computers to defeat the algorithmic masking in place. I estimated at the time of the hack that it would take between one and six months to defeat the masking, mainly depending upon the degree of sophistication of the computer systems available to the hackers. However, as the hackers may not yet have realised what the files contain or they have been trying to crack other files first, it is impossible to predict when they might be able to gain access to the wallet.dat files relating to the Addresses. As explained above, it may be that they already have the necessary access but are waiting to make the transfer.

*Police investigation and possible method of hacking*

62.     I reported the hack to the Surrey Police as soon as I discovered the hack. I was provided with a crime reference number of 45200015992 by email ([**CSW1/67**]). Subsequently, on 8 April 2020, I was contacted by Ms Aisling Martin of the Cyber Crime Team of the South East Regional Organised Crime Unit, who informed me that they were responsible for investigating the crime.

63.     The Police investigation is ongoing and, to date, the hackers' identity remains unknown. I am assisting the Police with their investigation.

---

[20] Arthur van Pelt Twitter at [**CSW1/65**] (Mr van Pelt is a pro-BTC commentator who makes regular posts opposed to me. He was not an addressee of the letter.).

64.    Although I cannot be sure how the hacking occurred, I suspect that it was through (in combination, among other things) a wireless router which I found located in a discreet location in my home, and which does not belong to my family or me. I believe that it must have been planted there by the hackers, either when tradesmen were in our home or by breaking in. This is being considered by the Police and me in the context of the ongoing investigation.

**Section D: Developers can and should take the steps requested by TTL**

65.    I have been asked to explain why it is possible for the Developers to take the steps requested by TTL.

66.    Those who say it cannot be done say that Bitcoin and the other digital assets involved in these proceedings are "encrypted" in order to give the impression that they would not be able to restore the control over digital assets in this way. That is totally wrong. Whilst digital algorithms are used in order to generate public and private keys and enable the use of digital signatures to sign-off transactions, and users may use encryption as a method of securely storing their private keys, the Blockchain is not encrypted - nor are records of transactions in Bitcoin stored on the Blockchain. It is therefore wrong to describe Bitcoin, or any of the other networks, as encrypted, or as a cryptocurrency.

67.    Therefore, it is wrong to say that Bitcoin or other digital assets can only be transferred using the private key to the digital assets which are the subject of this case. There is nothing to stop the developers from including a patch to the computer code which operates the network to enable control of the asset to be returned to the rightful owner. This could be as simple as creating a new address and transferring the Bitcoin or digital assets to that address.

68.    It is not technically difficult to code such a patch. In fact, it is very easy. By way of comparison, I note that nChain is presently working on much more complex technology (by way of modification to the existing "Client software", i.e. the software used to support each network). This new software would enable an individual with a

court order confirming their ownership of digital assets to regain control of their digital assets. However, the new software is still under development and, when completed, would require a significant modification to the existing Client software. In contrast, the creation of a new address and transfer of the Bitcoin or digital assets to that address, as suggested in paragraph [67], requires very little effort by Developers.

**Section E: Full and Frank disclosure**

*Context*

69.    In this section I set out factual matters that I understand may be relevant to my duty of full and disclosure, along with the matters set out by Mr Cain.

70.    At the outset, I repeat that I am a controversial figure in the Bitcoin community. I promote BSV, because it is the only true Bitcoin. I also strongly oppose the way in which the BTC community (in particular) have taken certain concepts from the White Paper and manipulated their meaning. As I have set out above, they claim that BTC is "decentralised" in order to hide the true administrative structure behind BTC. Many (albeit I accept not all) of these people want to use BTC for illegitimate purposes and others are simply anarcho-capitalists who are seeking to avoid the rule of law and are against the role fulfilled by Government. Those people hate me with a passion and have an aggressive campaign against me labelling me a "liar" and a "fraud". They have trawled through my past to find as many examples as possible of perceived failures or inaccuracies on my part (or the part of my agents), and publicly shame me as a "faketoshi". From time to time, I have commenced defamation proceedings in relation to such allegations, which have not resulted in any findings that I am or am not Satoshi.

71.    I admit that I sometimes use strong language and that I did, in an angry moment, suggest that I would bankrupt the developers through litigation. I suffer from Autism Spectrum disorder (also known as Asperger's Syndrome) as Mr Cain explains in his witness statement, which means that I sometimes communicate in a more aggressive manner than other people, especially in response to the developers whose positions I

20

strongly disagree with, and which are often intended to attack me. I still have very strong views about the Developers, especially the BTC Developers, for the reasons I have described, but my motivation in bringing the proceedings is not to attack the Developers personally. As I have already explained, even if I wanted to do that, I could not hope to succeed as they are part of a well-funded network. I regret making that statement as it has provided the Developers with another narrative to oppose me.

72.   My detractors give as good as they get. There are numerous articles and internet posts every day about me being a "fraud" and a "liar" and these articles tend to reference one another and build upon the ever-growing assertion that I am fraudulently claiming to be Satoshi Nakamoto.

73.   I have never forged documents. I have been asked to address various points alleged by the Australian Tax Office ("**ATO**") during their audits of certain Australian companies. I have done my best to respond to specific allegations made by the ATO (using their Reasons for Decision in respect of Denariuz Pte Ltd ("**Denariuz**") ("**Reasons Document**") as an example of their various allegations).[21]  My responses are at paragraph [88] and following, below.

*Purchase Order*

74.   There are certain discrepancies in the Purchase Order, which are referred to by Mr Cain. I do not specifically recall the creation of the Purchase Order. I believe that it was created by my former wife, Lynn, who administered our accounts at the time. I believe that because I found it in our accounting records, for which she was responsible.   She is also shown as the author on the metadata. For the avoidance of doubt, I did not create this document.

75.   I do not know for sure why the market price for Bitcoin is not the same as on the Purchase Order. I have already explained (paragraph [40] above) that the Bitcoin was purchased with Liberty Reserve Dollars, not US Dollars, and the value of Liberty

---

[21] Exhibit [**OJC1/3/485**] to Cain 1.

Reserve Dollars was substantially less than the equivalent amount in US Dollars. I believe that was likely to be the case, among other reasons because of the relatively low volume of Liberty Reserve Dollars that was traded at the time, since few people accepted the currency and because it was particularly difficult to spend large amounts of the currency. I believe that this was why the actual purchase price per Bitcoin in Liberty Reserve Dollars was substantially different from the US Dollar value listed in price indices at that time. Furthermore, prices at the time were volatile (and therefore not necessarily accurate at any particular time) and/or the figures might have been erroneous. I also doubt that the WMIRK exchange would require a Purchase Order in that particular form to effect a transaction like this. The document may have been sent separately by Lynn to the exchange, or indeed it may not have been sent at all (i.e. it might be a record of an order placed over the telephone).

*Accounting Records*

76.    I have read Mr Cain's witness statement in relation to apparent inconsistencies in the accounting records relating to the Addresses. However, I see no inconsistency in the accounting records - the Craig Wright R&D Trust became the Tulip Trust and both TTL and Wright International Investments Ltd are companies whose shares are held within the Tulip Trust. The Bitcoin in the Addresses is now held by TTL as I have described above, and subject to the same trust, albeit my family members are now also beneficiaries.

*Lack of email records*

77.    I have been asked why I do not have email records relating to the purchase of the Addresses. I cannot say for sure that email records ever existed for the purchase. If they did, I doubt they would have been retained as important documents (since 2011) among other reasons because: a) TTL has accounting records; and b) I had the private keys on my computer and backed up on two cloud-based servers. Furthermore, since 2011, I have moved several times, including from Australia to England, and have lost considerable amounts of electronic data in that time. I have also lost control of

1234

electronic data belonging to various Australian companies from time to time. For example, Hotwire Pre-emptive Intelligence Pty Ltd was temporarily in receivership during 2013 and we were locked out of its premises. Although I regained control of the company, we lost access to its computer systems. Furthermore, I ceased to be a director of the various companies in 2015 and, eventually, many of those companies were put into administration or have otherwise been wound up (meaning I do not now have access to a full set of their electronic data).

*Statutory Declaration(s)*

78.    I am aware of allegations concerning forgery of a Statutory Declaration, one of which was used as an exhibit by Dave's estate in the Florida Proceedings. I recall that I obtained a Statutory Declaration from my solicitor to prove ownership of Bitcoin in my control but I do not recall for what specific purpose (i.e. to whom it was intended to be provided). I would not have forged any of these documents.

79.    The ATO alleged that, if the relevant addresses could be controlled by me from my mobile phone or my computer's wallet software, the private keys would have been required to input the addresses into the wallet software, so that the Statutory Declaration could not have been made at all. I presume the ATO meant to say that I could not have demonstrated control to Mr D'Emilio of all five Addresses at one time. I agree that private keys would be required to control (i.e. transfer) Bitcoin in the Addresses. This appears to be a pedantic point about the wording of the Statutory Declaration (i.e. whether I showed Mr D'Emilio each address separately or all at once). As I have said, I recall obtaining a Statutory Declaration to prove control of Bitcoin Addresses, but I cannot recall its precise purpose. However, I do recall showing Mr D'Emilio that I could control the Bitcoin in each address by entering the private keys one by one. I know this because I was careful to delete the private keys, as the keys were company property and I did not have authority to retain them on my phone. I also recall that the Statutory Declaration was made in 2013. By 2014, the digital assets in the Addresses and many other addresses were held outside Australia. It would not have been sensible or appropriate for me to demonstrate control over

23

those addresses at that time from within Australia, as doing so might have had tax consequences and I did not have permission to do that.

*Alleged fraudulent documents disclosed in the Florida Proceedings (and similar allegations)*

80.   In the Florida Proceedings, as required under United States Federal Civil Procedure, I have produced over 226,000 documents. I understand that the Plaintiffs have challenged less than 1% of the documents produced. Many of the documents challenged come from electronic sources such as company servers to which others had access, many came from third parties and many came from electronic devices in the exclusive possession of the ATO since December 2015. I am unaware of how the ATO imaged or processed the materials on its electronic devices.

81.   I address the ATO's allegations separately (paragraph [88] and below).

82.   It is also alleged by Mr Ver's lawyers that I used hacking as a convenient excuse in that case to explain an apparently forged document. As I have explained, I have never forged documents and therefore, in the Florida Proceedings (referred to by Mr Ver's lawyers), I was speculating as to how the document was on my computer system. I am regularly subject to hacking attempts and I stand by the possibility that a forged document may have been put on my computer by a hacker or through other unauthorised access.

83.   In this case, I am not alleging that any documents were put on my computer. Quite the opposite - they were stolen and/or deleted.

84.   I also note the irony that I am being accused of "inventing" a hack. That is precisely what the then-BTC developers (including the Second, Fourth, Eleventh and Twelfth Defendants) did when they removed Gavin Andresen's site access right after he acknowledged me as Satoshi.[22]

---

[22] This is well documented. See for example the following articles: (1) Cush, A *Gavin Andresen: I Was Not Hacked, and I Believe Craig Wright Is Satoshi* (article on *www.gizmodo.com*) [**CSW1/70**]; (2) Das, A *Bitcoin*

24

85.    Finally, as part of the Florida Proceedings, I was ordered to produce a list of Bitcoin addresses under my control. I did not personally collate this list. The list identified 16,405 mined Bitcoin addresses and disclosed them to the Court. Furthermore, the purpose of the list was not to assert ownership over all of those addresses. It was to comply with the Florida Court Order requiring disclosure.

86.    For the purposes of the Florida Proceedings, Dave's estate has assumed I am Satoshi. The claim by his estate seeks an interest in other Bitcoin that I own, which (as I have described) is significant.

87.    I say no more about the Florida Proceedings other than that I deny the allegations made by Dave's estate.

*ATO allegations*

88.    I have been asked to respond to specific allegations made by the ATO in relation to companies associated with me in the period 2009-2015.

89.    I do not have a strong recollection of the various tax audits, other than the few points I make below. I resigned as a director of the various companies in 2015 because I believed that the ATO had a vendetta against me and that was affecting the way that it was handling the audits. I tried to have as little to do with them as possible.

90.    Initially, relations between the ATO and me were not so bad and I had been interested in openly discussing with them the taxation treatment of digital assets and electronic cash. In that context, in 2013 I had provided the ATO with a list of the various Bitcoin addresses under my control. It would have made no sense for me to have done that, if I did not control those addresses. That is because ownership of the addresses would have given rise to a significant capital gains tax liability upon realisation of any digital assets held in the addresses.

*Core Dev Gavin Andreson's GitHub Commit Access Removed* (article on *www.ccn.com*) [**CSW1/72**]; and (3) O'Connell, J *Andresen's Commit Access Hangs in Balance Following Wright Exit* (article on *www.bitcoinist.com*) [**CSW1/75**].

25

1237

91.    I recall attending interviews with the ATO, but most of the documentary material was provided by company staff, internal and external accountants and the companies' lawyers. I was surprised to see various allegations referring to "Dr Wright" in the ATO Reasons Document for the simple reason that I had very little to do with the provision of documents to the ATO.

92.    I was extremely surprised to see that Denariuz had apparently claimed a capital loss in relation to the value of an equitable interest in Bitcoin. My clear recollection is that the audits related to tax credits for Research & Development ("R&D") and had nothing to do with Bitcoin value. On further investigation, the accounts for Denariuz actually record a foreign currency loss.[23] It is not clear to me why the Reasons Document refers to a claim for capital losses for an equitable interest in Bitcoin. The analysis on this point on pages 56-57 of the Reasons Document do not refer to any taxpayer submissions.

93.    I am clear about this particular point because the value of Bitcoin increased between July 2013 and June 2014 and it does not make sense to have claimed a capital loss.

94.    The ATO alleged that I could have used the "message sign" function to show control of the Addresses. I chose not to do so (or to procure anyone else to do so) for tax reasons because, by the time that request was made to me, the assets in the Address (and other addresses) were outside Australia.

95.    I was not responsible for the taxpayers' decisions not to challenge the ATO decisions because I was not a director by that time. In any event, the taxpayers were, in part as a result of the decisions, put into administration by the ATO. I understand that the ATO was keen to find grounds to take a derivative action against me for fraudulent conduct but had no grounds to, and did not, do so.

---

[23] Denariuz Pty Ltd Corporation Tax Return (year 2014) **[CSW1/78]** and Denariuz Pty Ltd – Profit & Loss (1 July 2013 to 30 June 2014) **[CSW1/91]**. The letter referred to in the ATO Reasons Document at paragraph [35] (footnote 25) also refers to the claim for foreign currency losses: Letter dated 1 April 2015 from Alan Ellis to ATO **[CSW1/121]**.

26

96.    Testament to the ATO's aggressive approach is the fact that they pressured AusIndustry (the Government entity with responsibility for administering the Industry Research and Development Act 1986 ("**IRDA**")) into retrospectively revoking the taxpayers' registration under IRDA, which would ordinarily give rise to an R&D credit for tax purposes. In other words, the ATO's conclusion in paragraph [6] of the Denariuz Reasons Document (i.e. that Denariuz was not registered under IRDA) is only true because the ATO requested AusIndustry to *de-certify* Denariuz's prior registration (as referred to in paragraphs [47] and [48] of the Reasons Document).

*Academic plagiarism*

97.    I have been accused of plagiarising material, including for the purposes of my LLM dissertation and PhD thesis (at Northumbria and Charles Sturt universities respectively).[24]  I believe that these accusations were generated primarily by an anonymous blogger using the pseudonym "Paintedfrog". The ideas and research in my degrees are my own and both universities investigated the allegations fully (Charles Sturt actually removed access to my thesis during its investigation) and then confirmed that they were not taking any further action.

98.    I did not plagiarise other people's work when preparing these texts. Broadly speaking my response to the allegations are (among other things) (i) a number of the alleged examples of plagiarism concern common terms or common words, for which I say it is not necessary to credit other authors; (ii) a number of the alleged examples of plagiarism concern graphs and diagrams, which I say are commonly used and therefore that it is not necessary to credit other authors; (iii) in some cases I was asked by the academic institution to reduce the size of my thesis and that led to me omitting footnotes and references to other authors; and (iv) I was not trying to claim credit for basic and/or foundational concepts.

---

[24] *Craig Wright's LLM Dissertation is Full of Plagiarism* (article by "Painted Frog" on www.medium.com) [**CSW1/122**].

27

1239

*Nodes would not cause a fork*

99.    Mr Cain has described the so-called DAO hack,[25] which led to a fork in the Ethereum network.

100.    Firstly, to be clear, nodes/miners do not control the network and there is no consensus mechanism in relation to the protocols that govern the various Blockchains (the "consensus mechanism" which is present relates to the selection of transactions). The developers set the rules and the miners have to comply with those rules – the miners are not involved in the creation of those rules. In other words, they normally follow the instructions of developers.

101.    Accordingly, a fork is highly unlikely in relation to the networks at issue in the Claim. Nodes need to run the Client software, which needs to be regularly updated. The only way I foresee a fork occurring is if the group of developers split into effectively "compliant" and "non-compliant" groups (i.e. a group of developers runs software that does not contain the updated address details to give effect to any Court Order). While this is possible, I consider it unlikely, especially considering many Developers are located in countries such as the United States, New Zealand and Australia, which could be expected to follow similar principles as English law and/or in which recognition of an English Judgment may be possible.

*Summary*

102.    As I have described: a) TTL is the owner of the Bitcoin and other digital assets in the Addresses; b) TTL lost control of that Bitcoin and other digital assets when the private keys were stolen during a hack of my computer in my home in Surrey; and c) prior to the hack, I controlled (or would have controlled) the Bitcoin in those Addresses from my home.

---

[25] Cain 1, [207].

**Statement of truth**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed .................................................

**DR. CRAIG STEVEN WRIGHT**

Date .................................................

29

1241

# TAB 800-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, as Personal Representative
of the Estate of David Kleiman, and W&K
INFO DEFENSE RESEARCH, LLC,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

**COURT'S INSTRUCTIONS TO THE JURY**

Members of the jury:

It is my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, which are

called deliberations.

Case No. 18-cv-80176-BLOOM/Reinhart

**The Duty to Follow Instructions – Corporate Party Involved**

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it—even if you do not agree with the law—and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a limited liability company is involved as a party must not affect your decision in any way. A company—like all other persons—stand equal before the law and must be dealt with as equals in a court of justice. When a company is involved, of course, it may act only through people as its employees; and, in general, a company is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

**Consideration of Direct and**

**Circumstantial Evidence; Argument of Counsel; Comments by the Court**

As I said before, you must consider only the evidence that I have admitted in the case.

Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and is not binding on you. You should not assume from anything I have said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence, you may use reasoning and common sense to make deductions and reach conclusions. You should not be concerned about whether the evidence is direct or circumstantial.

2

1243

Case No. 18-cv-80176-BLOOM/Reinhart

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

### Credibility of Witnesses

When I say you must consider all the evidence, I do not mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part.

The number of witnesses testifying concerning a particular point does not necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

### Impeachment of Witnesses Because of Inconsistent Statements

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask yourself whether there was evidence that at some other time a witness

3

1244

Case No. 18-cv-80176-BLOOM/Reinhart

said or did something, or did not say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake does not mean a witness was not telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or an unimportant detail.

## Expert Witness

When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is permitted to state an opinion about the matter. This person is referred to as an "expert witness." As with any other witness's testimony, you must decide for yourself whether to rely upon an experts' opinion. The expert witnesses who testified in this case did so to assist you in reaching a decision about these issues.

The testimony of these expert witnesses might have conflicted. You must remember that you are the sole trier of the facts, and their testimony relates to questions of fact. The way you resolve these conflicts is the same way that you decide other fact questions and the same way you decide whether to believe ordinary witnesses. You may give the testimony of each expert witness the weight you think it deserves in light of all the evidence.

## Responsibility for Proof – Plaintiffs' Claims

Plaintiff Ira Kleiman, on behalf of the Estate of David Kleiman, has asserted claims against Defendant Dr. Craig Wright, or "Dr. Wright," of breach of partnership, conversion, civil theft, fraud, constructive fraud, and unjust enrichment. Plaintiff W&K Info Defense Research, LLC, or "W&K," has asserted claims against Defendant Dr. Craig Wright for conversion, civil theft, fraud,

Case No. 18-cv-80176-BLOOM/Reinhart

constructive fraud, breach of fiduciary duty, and unjust enrichment. In this case, it is the responsibility of the Plaintiffs to prove all but one of their claims by a "preponderance of the evidence." The Plaintiffs must prove their civil theft claims by clear and convincing evidence. This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the Plaintiffs' claim is more likely true than not true.

Since there is more than one claim involved, you should consider each claim separately.

In deciding whether any fact has been proven by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them, along with facts stipulated by the parties.

If the proof fails to establish any essential part of Ira Kleiman or W&K's claims by a preponderance of the evidence, you should find for Dr. Craig Wright as to that particular claim.

In addition, Plaintiffs have the burden of proving their civil theft claims by clear and convincing evidence. This is a higher standard of proof than the preponderance of the evidence standard and requires that the Plaintiffs prove that the claim is highly probable or reasonably certain, not merely more likely true than not true.

In deciding whether any fact has been proven by clear and convincing evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them, along with facts stipulated by the parties.

If the proof fails to establish any essential part of Ira Kleiman or W&K's civil theft claim by clear and convincing evidence, you should find for Dr. Craig Wright as to that particular claim.

Case No. 18-cv-80176-BLOOM/Reinhart

**Responsibility for Proof – Defendant's Affirmative Defenses**

In this case, the Defendant Dr. Craig Wright asserts the affirmative defenses of statute of limitations and laches. Even if Ira Kleiman or W&K prove their claims, the Defendant Dr. Craig Wright can prevail on that claim if he proves an affirmative defense to that claim by a preponderance of the evidence.

Since more than one affirmative defense is involved, you should consider each one separately. However, you should consider each affirmative defense only as to the claim or claims to which it is directed.

I caution you that the Defendant Dr. Craig Wright does not have to disprove the Plaintiffs' Ira Kleiman and W&K's claims, but if the Defendant Dr. Craig Wright raises an affirmative defense, the only way he can prevail on that specific defense is if he proves that defense by a preponderance of the evidence. Similarly, if the proof fails to establish an essential part of any of the Defendant's affirmative defense**s** by a preponderance of the evidence, you should find against the Defendant Dr. Craig Wright on that affirmative defense.

**Stipulations**

Sometimes the parties have agreed that certain facts are true. Such an agreement is called a stipulation. You must treat these stipulated facts as proved for this cause. The stipulated facts are:

1. Plaintiffs filed this action on February 14, 2018.

2. The Plaintiffs in this case are Ira Kleiman as the personal representative of the Estate of David Kleiman and W&K Info Defense Research LLC ("W&K").

3. Ira Kleiman is David Kleiman's brother and he serves as the personal representative of David Kleiman's estate.

4. David Kleiman was a resident of Florida at all material times.

6

1247

Case No. 18-cv-80176-BLOOM/Reinhart

5. On February 14, 2011, W&K was formed as a Florida Limited Liability Company.

6. Dr. Craig Wright is an Australian citizen.

7. The Bitcoin whitepaper was publicly released on October 31, 2008, under the pseudonym Satoshi Nakamoto.

8. Ira Kleiman opened an estate proceeding related to David Kleiman in the Circuit Court for Palm Beach County (the "Probate Proceeding").

### Definition of a Limited Liability Company

Plaintiff W&K is a limited liability company. A limited liability company, or LLC, is a business structure whereby the owners are not personally liable for the company's debts or liabilities. An LLC combines some characteristics of a corporation with those of a partnership. LLCs are managed by their members unless explicitly stated otherwise in an operating agreement or formation document.

### Judicial Notice Regarding Currency Exchange Rate

The Rules of Evidence allow me to accept facts that no one can reasonably dispute. The law calls this "judicial notice." There is some evidence in the record referring to currencies other than the U.S. Dollars. I have accepted the following currency exchange rates as proved:

- On April 2, 2014, the exchange rate for U.S. Dollars to Australian Dollars was 0.9236 U.S. Dollars per Australian Dollar;

- On November 13, 2014, the exchange rate for U.S. Dollars to Australian Dollars was 0.8730 U.S. Dollars per Australian Dollar; and

- On October 20, 2016, the exchange rate for U.S. Dollars to British Pounds was 1.2256 U.S. Dollars per British Pound.

You must accept these exchange rates as true for this case.

1248

Case No. 18-cv-80176-BLOOM/Reinhart

**<u>Use of Demonstrative Exhibits</u>**

Certain demonstrative exhibits, such as charts and diagrams have been shown to you. Those charts and diagrams are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.

**<u>Partnership – Breach</u>**

The Estate of David Kleiman has brought a claim against Dr. Craig Wright for breach of partnership. Specifically, the Estate of David Kleiman claims that David Kleiman and Dr. Craig Wright formed a partnership to develop the original Bitcoin protocol, to mine bitcoin, and to develop related blockchain technology. The Estate further alleges that no assets of the partnership were distributed to it after David Kleiman's death. Dr. Craig Wright does not dispute that no assets were distributed. Instead, he claims that there was no partnership and therefore no distribution was required.

Accordingly, you will be asked to determine two questions on this claim:

1. Whether there was a partnership between David Kleiman and Dr. Craig Wright, and whether Dr. Craig Wright breached his duties to the partnership? And, if so;

2. What portion of the partnership's assets are now owed to the Estate of David Kleiman?

**<u>Partnership – Defined</u>**

A "partnership" means an association of two or more persons to carry on as co-owners of a business for profit. A partnership, based on a written or oral agreement, must include each of the following elements:

1. A common purpose;

2. A joint proprietary interest in the subject matter or purpose of the partnership;

3. The right to share profits and the duty to share losses; and

8

1249

Case No. 18-cv-80176-BLOOM/Reinhart

    4.   Joint control or right of control over the partnership.

Plaintiffs must prove each of these elements by a preponderance of the evidence to establish the existence of a partnership.

### Partnership – Assets

If you find that there was a partnership between David Kleiman and Dr. Craig Wright, you will then have to determine the assets of that partnership, and what share of those assets belonged to David Kleiman, and are now owed to his Estate.

On the issue of determining the respective parties' ownership share in the partnership, I instruct you that in the absence of a contrary agreement among the partners, the partners in a partnership are entitled to share equally in the assets and profits of the partnership.

Further, on the issue of what assets are owed to the Estate of David Kleiman, I instruct you that if rather than winding up the partnership's business following the death of his partner, the surviving partner continues the partnership business with partnership assets, then the surviving partner acts as a trustee for the deceased partner. As a trustee, the surviving partner is required to administer the portion of the partnership assets belonging to the deceased partner solely in the interests of the deceased partner's estate, and not the interests of the surviving partner. The surviving partner must administer the partnership assets belonging to the deceased partner as a prudent person would in light of the circumstances, exercising reasonable care, skill, and caution.

Furthermore, the surviving partner is required to account to the deceased partner's estate and provide a list of the partnership assets to the deceased partner's heirs. The rationale underlying the rule is based upon the surviving partner's superior knowledge: A surviving partner does not deal at arms-length with the heirs of a deceased partner but must make an open and full disclosure to them. The heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the

1250

Case No. 18-cv-80176-BLOOM/Reinhart

extent of the partnership property or information about the amount of business done or the value of the partnership.

## **Partnership – Duties**

Partners in a partnership owe duties to each other and to the partnership. These duties include a duty of care, a duty of loyalty, and an obligation of good faith and fair dealing.

Under the duty of care, a partner must not engage in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

Under the duty of loyalty, a partner must account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

A partner must discharge his duties to the other partner and to the partnership, and act in a manner that does not frustrate the agreed common purpose of the parties and deprive the other party of the benefits of the agreement.

## **Fiduciary Duty**

W&K has asserted a claim for breach of a fiduciary duty against Dr. Craig Wright. W&K claims that Dr. Craig Wright breached his fiduciary duties by fraudulently procuring a judgment against it in Australia following David Kleiman's death, using that judgment to claim ownership over W&K's assets, and then using those assets for his benefit.

There are two issues for your determination on this claim:

    1.  Did Dr. Craig Wright owe a fiduciary duty to W&K? And, if so;

    2.  Did he breach that duty?

On the first issue, whether Dr. Craig Wright owed W&K a fiduciary duty, W&K must prove

10

1251

Case No. 18-cv-80176-BLOOM/Reinhart

the following by a preponderance of the evidence:

1. A relationship existed between W&K and Dr. Craig Wright;

2. Dr. Craig Wright was in a position of trust with respect to the W&K's financial or property interests; and

3. Dr. Craig Wright accepted that trust.

### Fiduciary Duty – Breach

If you find that Dr. Craig Wright owed a fiduciary duty to W&K, you will then consider the issue of whether he breached that duty.

A fiduciary duty imposes a duty to act with the utmost good faith in the best interests of the company. This includes the duty to refrain from self-dealing, the duty of loyalty, the duty to disclose material facts, and the overall duty not to take unfair advantage and to act in the best interest of the company.

To prove a breach of a fiduciary duty, W&K must show:

1. That Dr. Craig Wright breached a fiduciary duty by misappropriating W&K's intellectual property; and

2. That this breach was a legal cause of damages to W&K.

### Conversion

The Estate of David Kleiman and W&K have asserted claims for conversion against Dr. Craig Wright. They claim that Dr. Craig Wright wrongfully exercised control over the property of David Kleiman and the property of W&K.

Conversion means a distinct act of control wrongfully asserted over another's personal property in a manner that is inconsistent with the other's right to that property. There are a number of ways that conversion can occur, such as intentionally dispossessing another of the property, using

11

1252

Case No. 18-cv-80176-BLOOM/Reinhart

the property without authority, or disposing of the property by selling, pledging, gifting, or leasing it.

To prevail on their claim of conversion, the Plaintiffs must each prove the following by a preponderance of the evidence:

1. Dr. Craig Wright wrongfully asserted dominion or ownership over certain property;

2. This property belonged to the Estate of David Kleiman and/or W&K, respectively; and

3. Dr. Craig Wright's action was inconsistent with the ownership or right to possess the property by the Estate of David Kleiman and/or W&K.

### Civil Theft

The Estate of David Kleiman and W&K have asserted claims for civil theft against Dr. Craig Wright. The Plaintiffs must prove the following by clear and convincing evidence:

1. Dr. Craig Wright obtained, used, or attempted to obtain or use the Estate of David Kleiman's, W&K's, or the partnership's property;

2. With the criminal intent to deprive the Estate of David Kleiman, W&K, or the partnership, either temporarily or permanently, of that property or a benefit from that property; and

3. Dr. Craig Wright's actions were a legal cause of damages to the Estate of David Kleiman or W&K.

### Unjust Enrichment

The Estate of David Kleiman and W&K have asserted claims of unjust enrichment against Dr. Craig Wright. To prevail on their claims of unjust enrichment, the Estate of David Kleiman and/or W&K must prove the following by a preponderance of the evidence:

1. David Kleiman and/or W&K conferred a benefit on Dr. Craig Wright;

Case No. 18-cv-80176-BLOOM/Reinhart

2. That Dr. Craig Wright voluntarily accepted and retained that benefit; and

3. It would be inequitable or unfair for Dr. Craig Wright to retain the benefit without paying the value of the benefit to the Estate of David Kleiman and/or W&K.

### Fraud

The Estate of David Kleiman and W&K have alleged claims against Dr. Craig Wright for fraud. To prevail on their claims of fraud, the Plaintiffs must prove the following by a preponderance of the evidence:

1. Dr. Craig Wright made a false statement or omission of a material fact;

2. That he knew the statement was false at the time it was made;

3. Dr. Craig Wright intended that David Kleiman, Ira Kleiman, or W&K would rely on the false statement or omission;

4. David Kleiman, Ira Kleiman, or W&K relied on the false statement or omission; and

5. The false statement or omission caused damage to the Estate of David Kleiman or W&K.

### Constructive Fraud

The Estate of David Kleiman and W&K have asserted claims for constructive fraud against Dr. Craig Wright. For the Plaintiffs to prevail on their constructive fraud claims, they must prove the following by a preponderance of the evidence:

1. A relationship of trust and confidence existed between one or more of the Plaintiffs and Dr. Craig Wright;

2. Dr. Craig Wright took advantage of this relationship of trust and confidence; and

3. Proximately caused one or more of the Plaintiffs to suffer damages.

13

1254

Case No. 18-cv-80176-BLOOM/Reinhart

## <u>Affirmative Defenses</u>

If you find that the Estate of David Kleiman and W&K have proven, by a preponderance of the evidence, one or more of their claims against Dr. Craig Wright, then you shall next consider the affirmative defenses raised by Dr. Craig Wright. In this case, Dr. Craig Wright asserts the affirmative defenses of statute of limitations and laches and contends that the claims asserted by the Plaintiffs have not been filed timely and, as a result, those claims are barred.

Even if the Plaintiffs prove their claims by a preponderance of the evidence, or by clear and convincing evidence for civil theft, the Defendant can prevail in this case if he proves an affirmative defense by a preponderance of the evidence. When more than one affirmative defense is involved, as it is here, you should consider each one separately.

## <u>Affirmative Defense – Statute of Limitations</u>

The statute of limitations requires the Plaintiffs to commence their lawsuit within a certain time period as prescribed by law. The Defendant's statute of limitations defense is directed at each of the Plaintiffs' claims, except the civil theft claim. As such, you should not consider the statute of limitations affirmative defense as to Plaintiffs' civil theft claim. The Plaintiffs' remaining claims each have a four-year statute of limitations. This lawsuit was filed on February 14, 2018. Accordingly, to prevail on the statute of limitations affirmative defense, the Defendant must prove by a preponderance of the evidence that the Plaintiffs' claims, excluding the civil theft claim, accrued before February 14, 2014.

A cause of action "accrues" when the Plaintiffs discover or should have discovered through the exercise of reasonable care and diligence the facts establishing the elements of a cause of action.

If you find by a preponderance of the evidence that Defendant has proven that one or more of Plaintiffs' claims accrued before February 14, 2014, then you must find in favor of the Defendant.

14

Case No. 18-cv-80176-BLOOM/Reinhart

If, however, you find that the preponderance of the evidence does not support Defendant Dr. Craig Wright's statute of limitations affirmative defense, you must find against him on this affirmative defense.

### Fraudulent Concealment

An exception to the statute of limitations affirmative defense is the doctrine of "fraudulent concealment"—where a Plaintiff alleges that a Defendant engaged in willful concealment of the claim or cause of action using fraudulent means. Such fraudulent actions will delay the beginning of the limitation period until the Plaintiff either knows or should have known that the Plaintiff suffered damages.

You will only consider the fraudulent concealment exception if you find that Defendant has proven his statute of limitations affirmative defense. The Defendant's statute of limitations affirmative defense cannot succeed if the Defendant fraudulently concealed his misconduct.

To prove fraudulent concealment, the Estate of David Kleiman or W&K must prove by a preponderance of the evidence:

1. Dr. Craig Wright fraudulently concealed the causes of action from the Estate of David Kleiman and W&K until at least February 14, 2014; and

2. The Estate of David Kleiman or W&K exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim.

Fraudulent concealment goes beyond a Defendant's mere non-disclosure of a fact, it must constitute active and willful concealment of a material fact where the Plaintiffs did not have the equal opportunity to become apprised of the fact. Plaintiffs bear the burden of establishing by a preponderance of the evidence that fraudulent concealment should be applied.

Ira Kleiman and W&K claim that their claims were timely filed. In the alternative, Plaintiffs

15

1256

Case No. 18-cv-80176-BLOOM/Reinhart

contend that the commencement of the statutes of limitations for their claims should be delayed because Dr. Craig Wright fraudulently concealed their claims.

Dr. Craig Wright denies that fraudulent concealment should apply because there is no evidence that he actively and willfully concealed any of Plaintiffs' purported claims.

### Affirmative Defense – Laches

Laches is an equitable doctrine that prevents the Estate of David Kleiman and W&K from recovering damages on their claims if they have inexcusably delayed asserting their claims and the delay has caused undue hardship to Dr. Craig Wright. To prevail on his affirmative defense of laches, the Defendant must prove by a preponderance of the evidence:

1. A delay in the Plaintiffs' assertion of their claims;

2. That the delay was inexcusable; and

3. That the delay caused the Defendant undue prejudice.

If you find by a preponderance of the evidence that Plaintiffs have inexcusably delayed bringing their claims, which caused undue prejudice to the Defendant, then you must find in favor of the Defendant.

If, however, you find that the preponderance of the evidence does not support Defendant Dr. Craig Wright's laches affirmative defense, you must find against him on this affirmative defense.

### Damages

If you find for the Estate of David Kleiman and/or W&K on any of its claims, you must consider the matter of damages. Generally, you should award an amount of money that the preponderance of the evidence shows will fairly and adequately compensate the Estate of David Kleiman and/or W&K for its damages. If you find for the Estate of David Kleiman or W&K on civil theft, you should award the Estate of David Kleiman or W&K an amount of money, if any, that the

16

Case No. 18-cv-80176-BLOOM/Reinhart

clear and convincing evidence shows are the actual damages sustained by the Estate of David Kleiman or W&K.

You should consider the following types of damages:

### Compensatory Damages

That amount of money you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for the Plaintiff's damages caused by the Defendant.

### Damages for the Estate's Interest in Partnership

If you find that David Kleiman and Dr. Craig Wright, had a partnership, you will be asked to determine the value of the assets of the partnership that correspond to David Kleiman's partnership interest, which would now belong to his Estate. As I explained earlier, absent a contrary agreement, the assets of a partnership are to be divided equally among partners. Because the assets of the partnership were never distributed to David Kleiman or his Estate at the time of his death, the damages you should award should be based on the present value of any bitcoin and/or intellectual property you find was part of the partnership.

First, you will be asked to determine the quantity of any bitcoin, if any, owned by the partnership. You will then be asked to decide the current value of that bitcoin and award the Estate 50% of that value unless you find that there was a different amount agreed upon by David Kleiman and Dr. Craig Wright, in which case you should adjust the portion you award to the Estate of David Kleiman to reflect the amount you have decided.

Second, you will be asked to determine the intellectual property, if any, owned by the partnership. You will then be asked to determine the current value of the intellectual property and award the Estate 50% of that value unless you find that there was a different amount agreed upon by David Kleiman and Dr. Craig Wright, in which case you should adjust the portion you award to the

17

Case No. 18-cv-80176-BLOOM/Reinhart

Estate of David Kleiman to reflect the amount you have decided.


### Damages for Conversion

If you find for the Estate of David Kleiman or W&K on conversion, you should award the Estate of David Kleiman or W&K the quantity of assets, if any, you determine were converted and the value of those assets. Plaintiffs are entitled to the highest value of the assets between the time of conversion and the date of your verdict.

### Damages for Civil Theft

If you find for the Estate of David Kleiman and/or W&K on their claims of civil theft, you should award the Estate of David Kleiman or W&K an amount of money, if any, that the clear and convincing evidence shows are the actual damages sustained by the Estate of David Kleiman or W&K. Plaintiffs are entitled to the highest value of the assets between the time of conversion and the date of your verdict.

### Damages for Fraud and Constructive Fraud

If you find for the Estate of David Kleiman and/or W&K on either fraud or constructive fraud, you should award the Estate of David Kleiman or W&K the amount of any damages calculated as of the time the Defendant committed the fraud or the constructive fraud.

### Damages for Breach of Fiduciary Duty

If you find for W&K on its claim for breach of fiduciary duty, you should award W&K the amount of any damages, if any, calculated as of the time the Defendant breached his fiduciary duty to W&K.

### Damages for Unjust Enrichment

If you find for the Estate of David Kleiman and/or W&K on their claims for unjust

18

1259

Case No. 18-cv-80176-BLOOM/Reinhart

enrichment, then they are entitled to an amount of money equal to the value of the benefit conferred upon the Defendant and attributable to his wrongdoing.

### Punitive Damages

If you find for the Estate of David Kleiman or W&K on their conversion, fraud, and/or constructive fraud claims, you must decide whether to award punitive damages in addition to any compensatory damages awarded. Punitive damages are warranted against Dr. Craig Wright if you find by clear and convincing evidence that he engaged in intentional misconduct or gross negligence, which was a substantial cause of damage to the Estate of David Kleiman or W&K. Under those circumstances you may, in your discretion, award punitive damages against Dr. Craig Wright. If clear and convincing evidence does not show such conduct by Dr. Craig Wright, punitive damages are not warranted against him.

"Intentional misconduct" means that Dr. Craig Wright had actual knowledge of the wrongfulness of the conduct and that there was a high probability of injury or damage to the Estate of David Kleiman or W&K and, despite that knowledge, the Defendant intentionally pursued that course of conduct, resulting in injury or damage.

"Gross negligence" means that the Defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

If you decide that punitive damages are warranted against the Defendant, then you must decide the amount of punitive damages, if any, to be assessed as punishment against the Defendant and as a deterrent to others. This amount would be in addition to any compensatory damages you award to the plaintiffs. In making this determination, you should consider the following:

1260

Case No. 18-cv-80176-BLOOM/Reinhart

1. The nature, extent, and degree of misconduct and the related circumstances, including the following:

   a. Whether the wrongful conduct was motivated solely by unreasonable financial gain;

   b. Whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the Defendant;

   c. Whether, at the time of damage, the Defendant had a specific intent to harm a Plaintiff and the conduct of the Defendant did in fact harm a Plaintiff;

2. The financial resources of the Defendant.

   You may, in your discretion, decline to assess punitive damages.

### Note-Taking

You've been permitted to take notes during the trial. Most of you—perhaps all of you—have taken advantage of that opportunity.

You must use your notes only as a memory aid during deliberations. You must not give your notes priority over your independent recollection of the evidence. And you must not allow yourself to be unduly influenced by the notes of other jurors.

I emphasize that notes are not entitled to any greater weight than your memories or impressions about the testimony.

### Duty to Deliberate

In your deliberations, you will consider and decide distinct claims and affirmative defenses. Although these claims and affirmative defenses had been tried together, each is separate from the others, and each party is entitled to have you separately consider each claim and affirmative defense as it affects that party. Therefore, in your deliberations, you should consider the evidence as it relates to each claim and affirmative defense separately, as you would had each claim and affirmative

20

1261

Case No. 18-cv-80176-BLOOM/Reinhart

defense been tried before you separately.

Of course, the fact that I have given you instructions concerning the issue of the Plaintiffs Ira Kleiman's and W&K's damages should not be interpreted in any way as an indication that I believe that the Plaintiffs should, or should not, prevail in this case.

You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or biases.

Your verdict must be unanimous—in other words, you must all agree. Your deliberations are secret, and you will never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.

You must discuss the case with one another and try to reach an agreement. While you are discussing the case, do not hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you are judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case.

**Election of a Foreperson – Explanation of Verdict Form**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience. The verdict form contains questions and directions for answering them. In answering the questions, you must apply the law in these instructions to the facts that were proven by the evidence. You may also refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

21

1262

Case No. 18-cv-80176-BLOOM/Reinhart

The questions are organized by claim, first asking whether you find the Defendant liable for the particular claim. If your answer to the first question is yes, you are then instructed to answer further questions, asking you to identify which Plaintiffs have proven their claims and the amount of damages to be awarded to each Plaintiff. You will then consider the Defendant's affirmative defenses and whether they bar or preclude certain claims. Finally, you will consider whether punitive damages are appropriate as to certain claims.

You must all agree on each answer before you complete the verdict form. After you reach a verdict, your foreperson should be designated to complete the verdict form by inserting all necessary answers in the form.

*[Explain verdict form]*

Take the verdict form with you to the jury room. When you have all agreed on the verdict, your foreperson must fill in the form, sign it, and then date it. Then you will return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me, and I will respond as promptly as possible—either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

22

1263

# TAB 828-3

# **K** THE KARP LAW FIRM

### *A Professional Association*

Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning

*Please Reply to:*
*Palm Beach Gardens*

**JOSEPH S. KARP**
Florida Certified Elder Law Specialist
Certified Elder Law Attorney, Natl. Elder Law Foundation
Member, FL & NY Bar

**ADMINISTRATOR**
Audrey L. Yeager, CP

**GENNY BERNSTEIN**
Florida Certified Elder Law Specialist
**GINA GRANDINETTE**
**ADELE SMALL HARRIS**
**CHAD L. STESKAL, LL.M.**

Of Counsel
**RACHEL GOLDSTEIN ZETOUNI**

June 18, 2015

Department of the Treasury
Attn: Mr. Michael Tosi
1111 Constitution Ave, NW M4-331
Washington, DC 20224

RE:    Case #362215

Dear Mr. Tosi:

I am writing on behalf of Ira Kleiman. I represent him with regard to any affairs of the Estate of David Kleiman.

I would like to respond to your letter dated May 20th as best as we can to provide you with complete information as we know it.

Ira is David's brother. He had limited ████████ personal knowledge as to David's financial affairs throughout David's life. Most particularly, prior to January 1 , 2012 through David's date of death of April 26, 2013. David spent most of his time in the VA Hospital in Miami ████ ███████████████████████████ At no time did Ira ever discuss David's financial affairs with him and was never aware of them. His only knowledge was that David was financially strapped and had limited resources.

I am enclosing a copy of David's will which was filed with the court as required. The only probate documents which were done were done under Florida Law to reimburse David's father for the compensation for the funeral. There was no formal probate proceeding whatsoever. The reason for this was quite simple. After checking records, David was deep in debt and had outstanding mortgages and liens on his home which exceeded his potential assets and it made no sense.

Dr. Wright Ex.
**D008**

---

Quantum Park, Suite 203
2500 Quantum Lakes Drive
Boynton Beach, FL 33426
(561) 752-4550  Fax: (561) 625-0060

2875 PGA Boulevard, Suite 100
Palm Beach Gardens, FL 33410-2910
(561) 625-1100  Fax: (561) 625-0060
**(Main Office)**

Seacoast Banking Centre
Suite 102
1100 S. W. St. Lucie West Boulevard
Port St. Lucie, FL 34986
(772) 343-8411  Fax: (561) 625-0060

E-mail: klf@karplaw.com  ▪  On the web: www.karplaw.com  ▪  Out of area toll-free: (800) 893-9911

KARP_00000052

Letter dated June 18, 2015
Page 2

With regard to W&K LLC or bitcoins, Ira had no personal knowledge of any of this, and has no proof or evidence of what bitcoins David may own or any information. Although, he did hear from Dr. Craig Steven Wright that David did have an interest in Bitcoins, Dr. Wright was totally unaware of how to locate them, identify them or track them. Ira has taken no formal steps to do that himself, either.

Ira has no personal knowledge of any trusts that David may have had and never heard any of it from David. Dr. Wright has communicated with Ira at Dr. Wright's initiation.

With regard to any dealings with Dr. Craig Steven Wright, the only information Ira has is that information which was transmitted by Dr. Wright. He never heard of Dr. Wright from David, nor in cleaning up David's papers or affairs were anything located which indicated Dr. Wright, bitcoins, or any of the business dealings that he may have had with Dr. Wright. The only indications that he would have of any agreements between David and Dr. Wright, or W&K LLC would have been transmitted to him by Dr. Wright. He has no independent recollection of any of the documents or transmissions that were provided. Those records have not been destroyed by him and would be available if required to provide same.

With regard to the financial statements of W&K LLC, again, if they exist, he believes he may have received some and they would, too, have been attached to emails which he received. If you can advise of the legal requirement to provide same, he shall. He does not mean to be obstructive, but he wishes to ensure he is doing everything he is required to do. If you contact me we may discuss this so that we can facilitate the turning over of the information.

With regard to anything with W&K LLC's business activities, again, any information that Ira has would not be as a result of any source other than Dr. Wright. There were no records left by David that which Ira was aware, nor did Ira receive any other third party confirmation other than questions raised by the Australian authorities several years ago.

Once again, with regard to consent orders and transfers, Ira has not gone through all of the paperwork for a long period of time and has no independent recollection of what they say and again, would be willing to provide them appropriately. Please understand Ira's position. He is not the executor of David's estate. He was designated as the personal representative, but no probate occurred, and he did not open up an estate. The reason no estate was opened up is the information that was had, at the time, was that David had only debts and a homestead property which was mortgaged in excess of its fair market value and had also outstanding obligations to its homeowners association. There may have been other minor assets which were not worth pursuing under the circumstances.

Any information that Ira received was initiated by contact by Dr. Wright to Ira, whom he had never heard of before David's death and had been contacted by Dr. Wright.



THE KARP LAW FIRM   *A Professional Association*
Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning
E-mail: klf@karplaw.com • On the web: www.karplaw.com • Out of area toll-free: (800) 893-9911

KARP_00000053

Letter dated June 18, 2015
Page 3

Again, there is no desire to impede any appropriate investigation. In fact, if it could be found that David was entitled to significant assets, bitcoins or otherwise, Ira would be the ultimate beneficiary even after any taxes and other obligations so he looks forward to assisting you, especially if it can assist him.

Very truly yours,

JOSEPH S. KARP

JSK/jjm

cc:    Ira Kleiman

**THE KARP LAW FIRM**    *A Professional Association*
Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning
E-mail: klf@karplaw.com • On the web: www.karplaw.com • Out of area toll-free: (800) 893-9911

1266

KARP_00000054

# TAB 828-11

50 2013 CP 0 0 5 0 6 0 XXXX NB

**COPY**

NORTH COUNTY CIVIL DIV.
ORIGINAL RECEIVED

OCT 2 5 2013

SHARON R. BOCK
CLERK & COMPTROLLER
PALM BEACH COUNTY

**FILE ORIGINALS AND RETURN STAMPED COPIES TO**



This

**LAST WILL**

prepared for

**DAVID ALAN KLEIMAN**

**THE KARP LAW FIRM**
**A Professional Association**

| Palm Beach Gardens | Boynton Beach | Port St. Lucie |
|---|---|---|
| (561)625-1100 | (561)752-4558 | (772)343-8411 |
| (800)893-9911 | (800)893-9911 | (800)893-9911 |

c The Karp Law Firm, P. A.
All Rights Reserved

Will 07-30-03.max

**Joint Exhibit**
**J022**

KARP_00000140

# Last Will

## of

# DAVID ALAN KLEIMAN

I, DAVID ALAN KLEIMAN, residing in Palm Beach County, Florida, do hereby make, publish and declare this to be my Last Will and Testament, and do hereby revoke any and all former Wills and Codicils heretofore made by me.

**FIRST:** I direct that my Personal Representative, hereinafter named, pay all my just debts and funeral expenses as soon after my death as may be practicable.

**SECOND:** In the event that, at the time of my death, I am the owner, or co-owner of any real estate, insurance settlement, bank account, government bond, or security or instrument of indebtedness (whether issued by a private corporation, a government, a governmental agency, or an individual) which is registered or issued in the names of myself and another person or persons as tenants by the entirety or as joint tenants with right of survivorship, or which is registered or issued in my name but is payable to or apparently payable to a named beneficiary on my death, I declare it to be my intention that all my right, title, and interest in any such property shall immediately pass to the joint owner, co-owner, or beneficiary named in any instrument pertaining to such property, whether or not my right, title or interest in any such property would, by operation of law upon my death, vest in or pass to such surviving person. I make this provision in order to eliminate any doubt or question as to the right of any such person apparently entitled thereto to succeed to the full possession and ownership of such property upon my death, and to provide for the possible contingency of an ineffective attempt to create a joint tenancy, with right of survivorship, or an estate by the entirety.

**THIRD:** In the event that any devisee shall die with me in a common accident or disaster or under such circumstances as may make it impossible or difficult to determine which of us died first, or within thirty days after my death, then I direct that said devisee shall be conclusively deemed not to have survived me.

**FOURTH:** I give certain items of the tangible personal property owned by me at the time of my death in the manner described in the last dated writing made for this purpose and signed by me that is in existence at the time of my death.

1

KARP_00000140

KARP_00000141

1268

FIFTH:  I give and devise to my brother, IRA STEVEN KLEIMAN, all of the rest, residue and remainder of my estate, of whatsoever kind and wheresoever situate, which I may own or have the right to dispose of at the time of my death, to be his absolutely and forever.

SIXTH:  In the event that my brother, IRA STEVEN KLEIMAN, shall predecease me, or shall be deemed not to have survived me in accordance with the provisions of Paragraph THIRD, then all of the rest, residue and remainder of my estate, of whatsoever kind and wheresoever situate, which I may own or have the right to dispose of at the time of my death, I give and devise to my parents, LOUIS L. KLEIMAN and REGINA KLEIMAN, OR THE SURVIVOR.  In the event that both of my parents, LOUIS L. KLEIMAN and REGINA KLEIMAN, should predecease me, then I give and devise the rest, residue and remainder of my estate to JOSEPH S. KARP and DEBORAH C. KARP, OR THE SURVIVOR, per stirpes.

I recognize that JOSEPH S. KARP is my attorney and I asked him to draft this Last Will. However, he has been a lifelong friend of my family, and has known my mother since his birth.

SEVENTH: For reasons known unto myself, I make no provision herein this Last Will for my brother, LEONARD KLEIMAN.

EIGHTH:  If any principal of my estate shall become distributable to a minor, my Personal Representative may, in his or her absolute discretion, pay over such principal at any time to the Guardian of the Property of such minor, or retain the same for such minor during minority.  In the case of such retention, my Personal Representative may apply such principal and the income therefrom to the support, maintenance and education of such minor, either directly or by payments to the Guardian of the Property or Person of such minor, or to be the person with whom such minor may reside, and the receipt of any such Guardian or person shall become a complete discharge to my Personal Representative who shall not be bound to see to the application of any such payment. Any unapplied principal and income shall be paid over to such beneficiary upon attaining the age of majority, or if he or she shall die before attaining the age of majority, to his or her estate. In holding any funds for any minor, my Personal Representative shall have all the powers and discretion hereinafter conferred upon him or her.

NINTH: I hereby nominate and appoint my brother and my mother, IRA STEVEN KLEIMAN and REGINA KLEIMAN, OR THE SURVIVOR, Co-Personal Representatives of my Estate. In the event both IRA STEVEN KLEIMAN and REGINA KLEIMAN fail, refuse or are unable to act as Personal Representatives, then the following person shall serve as Successor Personal Representative:

JOSEPH S. KARP

I direct that none of them shall be required to furnish bond or other surety for the faithful performance of his or her duties hereunder.

2

Will 07-30-03.max

KARP_00000140

KARP_00000142

1269

TENTH.  The personal representatives named in this Will, and their successors and parties serving in their stead, shall be governed by the provisions of Sections 733.612 and 737.402 and Chapter 738, Florida Statutes, that are not in conflict with this instrument, and shall have all additional powers and protection granted by statute to them and to trustees at the time of application that are not in conflict with this instrument. In addition and not in limitation of any common-law or statutory authority, and without application to any court, they also shall have the powers and responsibilities described below to be exercised in their absolute discretion.

ELEVENTH:  I hereby authorize my Personal Representative, with respect to my estate, in his or her sole and absolute discretion, to retain any property in my estate; to sell any real or personal property of my estate for cash or on credit, at public or private sale, or to exchange any such property for other property; to collect, pay, contest, compromise, or abandon claims of or against my estate; to execute contracts, conveyances, and other instruments; to make any distribution or division of my estate in cash or in kind or both; and to execute and to deliver any and all instruments which he or she may deem advisable to carry out any of the foregoing powers.  All of the foregoing powers may be exercised without leave of court.

TWELFTH:  Throughout this Will, the masculine gender shall be deemed to include the feminine, and the singular the plural, and vice versa.

I signed this, my last will, on __July 30, 2003__.

DAVID ALAN KLEIMAN

Signed, sealed, published and declared to be as and for his Last Will and Testament, by the above-named Testator, in our presence, who at his request, in his presence, and in the presence of each other, have hereunto subscribed our names as attesting witnesses at Palm Beach Gardens, Florida, on July 30, 2003.

Business Address:  2875 PGA Boulevard, Ste. 100
Palm Beach Gardens, FL 33410

Business Address:  2875 PGA Boulevard, Ste. 100
Palm Beach Gardens, FL 33410

Business Address:  2875 PGA Boulevard, Ste. 100
Palm Beach Gardens, FL 33410

3

Will 07-30-03.max

KARP_00000140

KARP_00000143

1270

STATE OF FLORIDA             )

                          SS

COUNTY OF PALM BEACH    )

I, DAVID ALAN KLEIMAN declare to the officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my will.

_____ , Testator

DAVID ALAN KLEIMAN

We, ___ Marcia J. Varney ___ (Witness) and *Beverley Brownlee* (Witness) have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared the instrument to be the Testator's will and signed it in our presence and that we each signed the instrument as a witness in the presence of the Testator and of each other.

_____
Witness

_____
Witness

Acknowledged and subscribed before me by DAVID ALAN KLEIMAN, the Testator, who is personally known to me or who has produced _____ as identification, and sworn to and subscribed before me by ___ Marcia J. Varney ___ (Witness) who is personally known to me or who has produced _____ as identification and *Beverly Brownlee* (Witness) who is personally known to me or who has produced _____ , as identification, and subscribed by me in the presence of the Testator and the subscribing witnesses, all on July 30, 2003.

_____
Notary Public

Notary Seal

My commission expires: _____

[Notary stamp: LAURA E. AHLERS, My Comm. Exp. 5/18/05, ... DD 006618 ... Other I.D.]

4

Will 07-30-03.max

KARP_00000140

KARP_00000144

1271

# TAB 829-30

**P-122**

Case No. 9:18-CV-89176-BB

| | |
|---|---|
| **From:** | Craig S Wright [craig@rcjbr.org] |
| **Sent:** | 2/17/2014 12:33:11 PM |
| **To:** | 'Patrick Paige' [patrick@computerforensicsllc.com] |
| **Subject:** | RE: Difficult |

He had vistomail accounts.
I have no idea of what the details in Belize were.

The number would be related to the account.

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Monday, 17 February 2014 11:53 AM
**To:** Craig Wright
**Subject:** RE: Difficult

Any users names, email addresses etc. that we may be unaware of in association with the activities DK used? In regards to the account you listed, have you made any inquiries or try to contact them? Any information on the name of the bank? Is the number listed an account number?

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Sunday, February 16, 2014 3:41 PM
**To:** Patrick Paige
**Subject:** RE: Difficult

I do not have a lot to give you. These may help:

- W&K Info Defense Research LLC
- GICSR Trust
- 274997114
- TTA-1-14

Locations
- Belize

It is not much, but then Dave always did things his way.

Regards,
…
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

  

DEFAUS_00112977

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Monday, 17 February 2014 1:01 AM
**To:** Craig Wright
**Subject:** RE: Difficult

What about accounts and location DK had etc.?  I thought you were going to put a list together.

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Saturday, February 15, 2014 8:04 PM
**To:** Patrick Paige; Ira K
**Subject:** RE: Difficult

Well, preservation is first. The thing with a BTC address is that it will never disappear and if I am right will appreciate over time

…

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914
http://www.rcjbr.org

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Sunday, 16 February 2014 10:59 AM
**To:** Craig Wright
**Subject:** RE: Difficult

Hey Craig, what's the plan... any progress?

*Patrick Paige* EnCE SCERS
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*
*Office: 561.404.3074*
*Cell: 561.818.9208*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Friday, February 14, 2014 12:20 AM
**To:** Patrick Paige
**Subject:** RE: Difficult

DEFAUS_00112978

You will have it tomorrow

On 14/02/2014 4:06 pm, "Patrick Paige" <patrick@computerforensicsllc.com> wrote:

Hi Craig... I spoke to Dave's brother who is going to let me examine DK's laptop and thumb drives. Were you able to put together a list of what we should look for? Also I and Carter would like to see what information you have that confirms the news you shared with me. As close friends of DK we would love to hear the story of how this all played out. Talk soon

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Wednesday, February 12, 2014 2:28 PM
**To:** Patrick Paige; Carter Conrad
**Subject:** RE: Difficult

I will try calling again later. My number is +61 417 683 914

Dave could have some paper wallets, but he was careful. He would have had some way to recover. It would also have been cryptic.

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914
http://www.rcjbr.org

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Thursday, 13 February 2014 1:06 AM
**To:** Craig Wright; Carter Conrad
**Subject:** RE: Difficult

Hi Craig,

Dave was also my best friend and like a brother to me. ███████████
███████████ He mentioned Bitcoins to me a while ago, but we never discussed it in depth. The issue would be that all his hard drives were encrypted including his cell phone. Do the wallets only exist on Dave's computers or are there backups somewhere else? Also "The amount DK mined is far too large to email." Please clarify.

*Patrick Paige* EnCE SCERS
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*
*Office: 561.404.3074*
*Cell: 561.818.9208*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any*

DEFAUS_00112979

*dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Wednesday, February 12, 2014 5:21 AM
**To:** Carter Conrad; Patrick Paige
**Subject:** Difficult

Hello,

I know both of you knew Dave and trusted him.

Dave and I had a project in the US. He ran it there. We kept what we did secret.

The company he ran there mined Bitcoin. I do not believe there has been anything of this in the estate, but I also know his father is not IT literate. I would ask that if you know of any of his computers, that you help ensure that any wallet.dat files he has are saved. I know that is a long time, but I had thought Dave would have planned more for the end, but he did not always do that.

The amount DK mined is far too large to email. I know this is cryptic and I know I gave Dave the shits with this and some of the things we did in WK, but he was my best friend and I am not sure where else to contact.

I am not looking for anything, just that Dave's estate gets what was in it. I do not want any of it at all. Please note, I am not seeking anything in this, but I want his family taken care of.

Talk soon,

…

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914

http://www.rcjbr.org

<<…>>   <<…>>   <<…>>

DEFAUS_00112980

# TAB 829-41

**P-149**

Case No. 9:18-CV-89176-BB

| | |
|---|---|
| **From:** | Craig S Wright [craig@rcjbr.org] |
| **Sent:** | 4/2/2014 9:20:52 AM |
| **To:** | John Chesher [john.chesher@hotwirepe.com]; 'Andrew Sommer' [asommer@claytonutz.com] |
| **CC:** | Ramona Watts [ramona.watts@hotwirepe.com] |
| **Subject:** | RE: UK - design by human |

**EXHIBIT**

DEFAUS 01859475

Hello,
We have the email from Dave below.

This was from Dec 2012. The simple answer is that we have and control the company completely now. The screenshot is the site in Oct 22rd 2012, so Dave had been there at that point.

There was a risk from Oct 2012 when Dave reserved this and before it was paid for, but we have control fully. The main thing here is that Dave mined all of this outside Australia and even if we had managed to screw this and somehow lose control of the company, we would still have been using overseas rights to BTC.

I was not the person doing the mining. Dave was.

Regards,
Craig

-----Original Message-----
From: dave@davekleiman.com
Sent: Saturday, 16 December 2012 15:28 PM
To: Craig S Wright
Subject: Re: Brits
-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA1

No need. There are several others from October if we come into any issues, but we only need one. Your trust is in the Seychelles and you want to have noting known of mine in P, so it should all be good.

We only need one dormant and untraded company to sit as a owner of the bitcoin we are mining into them. I am assuming you do not want WKID to be a director, the brits do allow this.

Dave
-----BEGIN PGP SIGNATURE-----
Version: GnuPG v2.0.17 (MingW32)

iQGcBAEBAgAGBQJTEsBkAAoJEAQV5sviP8wtetYMAKzl1FqA9m8TApIlEEUO5Vwc
B93d7dntvZUQWXROscPj8rpeyY6RcaHbZdIKHgrv1/eRtgX9jqdONnbIRBZ9BeQb
2obcl/yJ3KFhIqrkCqtI8/P1xy1TKaEeM7Va5O4YUh+sI6YbyEfm/ADYddHtyMQ4
NVJNyWtKeEdVvkQYdUiygzckeP8reLc6LwC2BFWDTU12ZO9B0OmV7hui2u6CPaBZ
7H5bz292b5xRD0VjFp3kb0xTGEqzLz5PKGsoOTEwgSwU82+JH0tHzOJB81IHqv67
0XVLFkCmlg/7G6vqcjfh7/0ULdppfIhVOtSAFb5zJgL/3rvimBynETJLGbFatAnm
FNwyBTLr9gXzyW7TAqcV5ahxj7P3MGPgmu0U05J24d572hnkgT+RzVVBBpiPFc+Z
pIKXYaSxg3+jtXsDdIBBzIamD0xC1OU/0ezlkotxE0E63Y713BaTN5UT9r74C3Nl
wxn1V58JofF65xahsB8zSdo+B43YS5dnbYuh9ix3oA==
=xvHo
-----END PGP SIGNATURE-----

1276

-----Original Message-----
From: Craig S Wright [mailto:craig.wright@information-defense.com]
Sent: Saturday, 15 December 2012 1:02 PM
To: 'dave kleiman'
Subject: Brits

Dave,
We have 08248988 held and reserved at CFS. Should be grab another as a backup, at least hold or reserve one?

Craig



DEFAUS_01859476

1277

# TAB 829-48

P-161
Case No. 9:18-CV-89176-BB

**From:** Craig S Wright [A]
**Sent:** 4/24/2014 11:26:35 AM
**To:** 'Ira K' [clocktime2020@gmail.com]
**Subject:** RE: Questions

1      We will have  the first bank that is completely open and transparent.
       I will send details of it this weekend. I have not sent an NDA, but as you are a major shareholder I am making the assumption that you are not silly enough to disclose it.

2      No, they are linked.

3      Ripple is a fraud.
       Governments will not relinquish control and will leave a system that allows them to debase the currency.
       Risks – many and this is what we are working on solving now. Hence the money in research. More soon.
Advantages – true transparency – not like Mt Gox, but you hold and trade your own BTC. You always know it is real

4      Way too dangerous and too many downsides.
       We want to have this as a real company. Satoshi is just seen as a hacker
       To be a Businessman, I cannot also be Satoshi

5      I have stopped mining.
       When Dave died, I lost the ability to access all of this. Then, it is also not as cost effective to mine now as it was.


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Thursday, 24 April 2014 11:19 AM
**To:** Craig S Wright
**Subject:** Re: Questions

I have a list of more questions.

If Andrew is able to answer them you could just forward it to him.


1.) What is it about your banking software that is so important/unique that
will make Coin-Exch better than what already exists?

2.) Is it possible for Coin-Exch to fail and Denariuz to succeed?
Or is their survival connected?

3.) Who are the main competitors in this field?  Does a system like
Ripple pose a threat?  http://www.businessinsider.com.au/ripple-profile-2014-3
They eliminate the need for mining and allow people to receive money
using any currency they choose plus transactions are confirmed in seconds.

* What about governments rolling out their own crypto-currencies such as Iceland's Auroracoin?

* What are the risks?  Any potential Achilles' heel for Bitcoin/Coin-Exch?

* What advantages will Coin-Exch have over existing exchanges and foreseeable newer one's?

DEFAUS_00628077

4.) Would revealing yourself as Satoshi ever become advantageous?
If people knew you were attached to Coin-Exch I imagine it
would easily attract investors along with tons of free publicity.

5.) How many bitcoins per month is the existing mining operation generating?
If Dave's estate holds a stake in this, then holding on for the long term
with Coin-Exch sounds less risky.

Thanks,
Ira


On Wed, Apr 23, 2014 at 8:58 PM, Craig S Wright <craig@rcjbr.org> wrote:

http://www.asic.gov.au/company-officeholders


http://asic.gov.au/asic/ASIC.NSF/byHeadline/Directors-and-financial-reporting


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Thursday, 24 April 2014 10:56 AM
**To:** Craig S Wright
**Subject:** Re: Questions


Thanks for the spreadsheet.


If I choose the director position, what are my responsibilities?


Ira


On Wed, Apr 23, 2014 at 6:16 PM, Craig S Wright <craig@rcjbr.org> wrote:

Spread sheet as promised.


Now, the other option is to become a director. This will also have a payment. Then, we will need to start up in the US.
You could help here as well if you are interested. These are ways to earn payment without share sacrifices.

DEFAUS_00628078

There are 21,500,000 FOU (founder) class shares. These have a casting vote etc.

Dave's estate has 10,500,000 of these issued to it..

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 7:37 PM
**To:** Craig S Wright
**Subject:** Re: Questions

i'd better get some sleep.. it's 5:30am here.

goodnight.

On Wed, Apr 23, 2014 at 5:35 AM, Ira K <clocktime2020@gmail.com> wrote:

alright, thank you.

On Wed, Apr 23, 2014 at 5:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira, when I offered to tell you everything and involve you, I was serious.

I have told the solicitor (attorney) that you are able to ask anything. I do mean that.

Not just half-truths that others with agendas will state, but ANYTHING.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 7:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions

DEFAUS_00628079

alright, thanks for explaining things.

On Wed, Apr 23, 2014 at 5:31 AM, Craig S Wright <craig@rcjbr.org> wrote:

You will have it in the morning.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 7:30 PM
**To:** Craig S Wright
**Subject:** Re: Questions

yes, thanks.

On Wed, Apr 23, 2014 at 5:29 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will put a spread sheet together that lets you see the impact of taking money early vs later tomorrow if this is OK?

Yearly amounts

500k, 1mill,... ,4 million.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 7:20 PM
**To:** Craig S Wright
**Subject:** Re: Questions

Would it be possilbe to sell just 1 year of my holdings and keep the rest?

On Wed, Apr 23, 2014 at 5:15 AM, Craig S Wright <craig@rcjbr.org> wrote:

And if it does work (and I believe it will) we change the world in a manner that has not been seen for a long time – even more than the Internet

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 7:05 PM

DEFAUS_00628080

**To:** Craig S Wright
**Subject:** Re: Questions

If I stay the course Dave's estate is guaranteed 8 million in 2016?

or is that with risk?

On Wed, Apr 23, 2014 at 4:58 AM, Craig S Wright <craig@rcjbr.org> wrote:

He ran W&K

Uyen only started to help in Dec 2012 and we never completed moving things.

I moved everything in 2011 to Dave as I needed the development to be at "arms length". I could not be directly involved in it

I thought Dave would live forever. I know, a bad error.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 6:52 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Why did you choose to let him hold a seperate bitcoin wallet that you didn't have access to?

I thought all these assets belonged to W&K.

On Wed, Apr 23, 2014 at 4:46 AM, Craig S Wright <craig@rcjbr.org> wrote:

Denariuz will license from Coin-Exch.

DEFAUS_00628081

The license will be paid is shares and the company will be owned by Coin-Exch over time. Trying to do it in a manner that is internationally tax advantageous.

Basically, I am not avoiding tax, but trying to make sure that we create a structure like Google uses to make the amount we pay as small as possible.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 6:45 PM
**To:** Craig S Wright
**Subject:** Re: Questions

and Denariuz?

On Wed, Apr 23, 2014 at 4:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been led to believe. But I am not trying to take anything from Dave's estate.

The eLearning program is to create a new form of MooC. The idea is to have large scale adaptive learning to the world. Nearly free.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 6:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions

I'm certainly not going to do anything to stifle the growth of the business you and he worked

so hard at.

On Wed, Apr 23, 2014 at 4:14 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I have sold all the BTC that I plan to sell for now. In doing what we wanted to do, Dave and I arranged for the sale or around 500,000 BTC so that we could have access to Core Banking software. The rest that I hold are in trust. The terms

DEFAUS_00628082

of that trust are not met as yet and hence if I was to break it, I would also cause the tax liability to fall and that would result in over 50% of the total being owed in taxes – a result that would drop the price to about nothing and leave nothing. I will not do that. I will not collapse years of work for anyone or anything.

Dave and I decided to start Coin-Exch so that we could lock in some of the value. When we started planning this, it was late 2012. We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smarter, but we took the option to cash out. That was Dave. If we had waited even 3 months the value would have been 5 times more.

No, I am not doing this as I think it is going to make me a trillionaire. I am working to make a system that is fraud resistant. One that does not allow printing money and fractional reserve banking. No inflation and no federal reserve BS.

If you read the terms of the Judgement from the court, I did not receive Dave's Bitcoin. I accepted the software Dave was developing for me. We had already exchanged this before he died. It is software that I started working on in 2003. Dave completed it for me after we split things up. He did this contracting other people.

I locked in the R&D amounts based on Dave's convincing me that was best. I am willing to take risks far more than him, but to me, this will work or I will die trying.

I thought Dave just wanted to have some time to work less. That he was planning on taking some time off and doing some relaxing and travel. He told me repeatedly that he was fine. He said the VA Hospital was covered as he was a vet. He said that he was all good. He wanted some cash to be able to do some other things he planned and we did talk about the exoframe idea. I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time.

I told him again and again that the wait is worth it. I gave him the figures and stated that he could have sold the amount I would leave him with. I wanted the software. That is what this is and always was about for me. With it, I can complete what I have worked on for 11 years now.

My eggs are not all in one basket. They are now tied to the Research funding as well.

I did the court action to ensure that the value was accepted. Not to force you, the estate etc into giving me anything, but to ensure I had a value against the software that I had received already.

DEFAUS_00628083

1284

I assume you know nothing of how Dave funded W&K?

I sell myself to gaming companies. I am a security professional, cryptographer and programmer. I wrote software and designed systems that created and became Lasseter's OnLine Casino. I worked with Playboy Casino. I did coding for Centrebet, Sporting Bet, BetLife etc.

In 2010 I gave the source code for a good number of online casinos to Dave. Hence Panama. I put him in contact with the people at Playboy. He used this code to fund the work, research etc.

I have files of Dave's that I cannot access now. These are TrueCrypt partitions. We held backups for the other, but no passwords. I cannot access these. If I cannot finds a key or a password on these, I do not believe that I can on yours. Dave was smarter than I was in some ways. He broke his wallets into many 50BTC sized addresses. I left several large addresses that are not easy to move without making the world notice.

Dave estate is only worth 12 million IF you want to cash out right now.

IF you stay, you get the value AND the shares.

I will list these in coming years and THEN they are worth more.

"Craig's worth valued at $500 million"

There is a trust as I noted. Less than 200,000 Bitcoin remain. We need 100,000 to make the bank idea work. I cannot touch these yet even if I want to. And right now, I do. That stated, I will not move more now in any event. Dave held more and MtGox held some. I see both those sources as lost. Dave's drives are a one day possible. Each year, it is possible to crack more than double the key length that was previously possible. What I know of Dave's passwords places them at around 80 bits. We can expect them to be worth trying to crack in 10-12 years. Spending the next 5 years on this is going to cover 5-10% of the possibilities at a large cost. This is how crypto works.

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.

- Intellectual Property, design, codes etc

- Research claims

DEFAUS_00628084

If we reinvest the Research rebates, we get 45% back in the following year. The program has been approved for three years and locked in using an advance finding. This means, if we take the existing spend, we will get the following each October:

- 2014    $12 million base

- 2015    $12 million base plus the 45% from 2014 reinvested = 17.4 million

- 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million

That comes to around $50 million cash over three years. Of this, I will drive 30 million back into the company and leave the last return as a wait and see if this all fails.

In 2016, Dave's estate gets 8 Million PLUS still has a share of the company.

IF you want, I will arrange that you can pull out. In this case, the following occurs:

- 2014    $12 million base – 4 million to Dave's Estate  after costs plus 4 million from share sale (well I will try).

- 2015    $12 million base plus the 45% from 2014 remaining million reinvested = 17.4 million and 4 million to Dave's Estate  after costs.

- 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million with 4 million to Dave's Estate  after costs.

Here, in 2014, 2015 and 2016 the estate gets $4 million a year, but that is it.

If you do the latter option – I will raise funds to cover the shortfall using your shares, so I end in the same position expenditure wise.

You can be a part of it and get paid. I offered this already.

You are talking of greed to me. Right now, I have told you that you can cash out at 4 million a year for three years or see where this goes and have a payment of over 8 million plus a large share of what will be a listed company. That is with risk. 12 Million without.

W&K used my software to fund everything.

DEFAUS_00628085

If you think I will give up the software I have received from this and pull what Dave and I have worked years to put together you are mad. I will make this open source before I end it. If that happens, nobody makes anything. Not me, not you , no one.

I am working on this no matter what. The amounts are locked in ONLY because of Dave. He wanted certainty. He wanted to make sure we had something now. I did this and have structured it so that we have this money now. We did this early and the increase in BTC has been a loss really.

The software (including banking software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116.

IF Dave and I did not start this when we did and waited 6 months (not that Dave could have) we could have used 10% of the Bitcoin we held to do this. So, NO I will not move more now. If you get access to Dave's drives, then you can move those. I am not in a rush. In the next few months, the company will get money in AUD$ and I will STILL not be taking it other than to repay bills used in this process.

When Dave and I planned this, the ENTIRE holding, his, mine and that in trust was worth 20 million.

What Craig is worth in 10 years is up in the air, but I WILL drive 99% of this (my share) back into the project. What you do is your choice. I will negotiate this, I will allow you to work with it as Dave's heir, but I WILL NOT give it up.

So Ira, the simple thing is do you want to be a part of it or to be paid out. I have spent the money. If you want, fight me and have a copy of software that will be of little use without the parts we have completed since.

ALL I have is in this. EVERYTHING. If you want to not be a part, then I will provide Dave's estate with its due. If you want to be a small part, then be a small part, if you want to be all in, then work as if you are.

There are no other options. Unless you can access Dave's drive, then the BTC Dave held remain locked away. The ones I spent in doing this are spent and there is NO way to unspend them. The ones in trust are there for a purpose and I selected a jurisdiction that cannot be forced to give them over. Not even if the US government tries to make me.

DEFAUS_00628086

So, as I have been saying, do you want to be a part of this? This is either as a silent shareholder or as a director. I have offered both. Or do you want to argue the point? There is no more to get and if you know my history, I will make sure that everything ends up completely worthless before I lose what I am doing.

Ave did not want to ta $4million a year from this. He wanted something to live on. He never asked for more. I am not taking that much, but that is YOUR choice. There are options, but one thing I will not do is give over the software or end this.

Dave bullshitted me about how he was doing and worked himself ragged. He lied to me about what he needed. There is NO WAY that I am stopping this now. I owe this to Dave and I will NOT give it up even to make Ramona's life simpler and I love her.

So, do you wan to know more and be involved or do you want to argue it and I will end up making it completely open source if I lose and then in place of the share I agreed with Dave you can have 100% of $0.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 3:38 PM

**To:** Craig Wright
**Subject:** Re: Questions

Please explain to me what is stopping you from selling some?

Just because you think it will be worth trillions?

On Wed, Apr 23, 2014 at 1:37 AM, Ira K <clocktime2020@gmail.com> wrote:

It's not a matter of not believing in your abilities.  I absolutely do.

But that doesn't mean something shouldn't be taken off the table.

Just like trading stocks, you have to know when to take a profit

DEFAUS_00628087

and let the rest ride.  No need for all eggs in one basket.

On Wed, Apr 23, 2014 at 1:33 AM, Craig Wright <craig@rcjbr.org> wrote:

And yes. Worst case

On 23/04/2014 3:31 pm, "Ira K" <clocktime2020@gmail.com> wrote:

I am trying.  But from what I understand so far, you are placing his value

in a gambled situation and worst case scenario, 12 million?

On Wed, Apr 23, 2014 at 1:28 AM, Craig Wright <craig@rcjbr.org> wrote:

Before you go off on rash paths.... Try ans understand what. Is therre

On 23/04/2014 3:24 pm, "Ira K" <clocktime2020@gmail.com> wrote:

54k of coins could be mined in a few months with your operation if you still have it running.

Or your new venture's success will recoup this payment.

On Wed, Apr 23, 2014 at 1:20 AM, Ira K <clocktime2020@gmail.com> wrote:

I don't understand your hesitancy.  You know he was worth the amount I am asking.

On Wed, Apr 23, 2014 at 1:19 AM, Ira K <clocktime2020@gmail.com> wrote:

I told you, I don't want to end up on the same sword as Dave.

He had faith.  It doesn't always pan out.

On Wed, Apr 23, 2014 at 1:18 AM, Craig Wright <craig@rcjbr.org> wrote:

Then have faith

On 23/04/2014 3:17 pm, "Ira K" <clocktime2020@gmail.com> wrote:

He is worth more than that.

1289

DEFAUS_00628088

On Wed, Apr 23, 2014 at 1:16 AM, Craig Wright <craig@rcjbr.org> wrote:

Then take the 12 million and go

On 23/04/2014 3:12 pm, "Ira K" <clocktime2020@gmail.com> wrote:

Look where it got Dave by holding on for too long.

Timing is Everything.


On Wed, Apr 23, 2014 at 1:11 AM, Craig Wright <craig@rcjbr.org> wrote:

We locked them into cash payment s

On 23/04/2014 3:09 pm, "Ira K" <clocktime2020@gmail.com> wrote:

I simply want the fair share that Dave earned.

You told me you guys had 1 million bitcoins between you.


I was only asking for 54,910. and you could keep all

his drives which may contain more.


On Wed, Apr 23, 2014 at 1:04 AM, Craig S Wright <craig@rcjbr.org> wrote:

Would you prefer to know what you own or to argue it


You want assets list, balance sheets etc, then ask. You ARE a major shareholder.


You want to be a director and know it intimately – ask I have offered


You want to pull out – then do so and I will pay you out based on what Dave and I had been arranging.


If you want to stay, then do so and come to know more of what Dave and I did.

DEFAUS_00628089

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:56 PM

**To:** Craig S Wright
**Subject:** Re: Questions

"You have the 40% of the refunds – I get any upside."

Can you explain that to me?

On Wed, Apr 23, 2014 at 12:54 AM, Craig S Wright <craig@rcjbr.org> wrote:

In 10 years I believe this will be 100 times bigger.

But I am serious, if you want to cash out, I will arrange something on the cash

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:54 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Why not take some off the table?

On Wed, Apr 23, 2014 at 12:53 AM, Craig S Wright <craig@rcjbr.org> wrote:

You agree to that – I will have the lawyers draft something for you to have reviewed

I have NOT cashed out

1291

DEFAUS_00628090

I will not

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:51 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I am open to arranging distribution of 10 million a year for 3 years,

but not through a new untested business that you just stated "worst

case scenarios 4 million".

On Wed, Apr 23, 2014 at 12:48 AM, Craig S Wright <craig@rcjbr.org> wrote:

This is WHY wed the software transfer!

It locked in payments starting in Oct this year of 10 million a year for 3 years – get it now!

That was Dave – his idea

We turn the BTC into R&D grants as cash!

YOU ARE his estate – I have added you!

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:47 PM

**To:** Craig S Wright
**Subject:** Re: Questions

DEFAUS_00628091

Dave would prefer to lock in secured gains that have already been made.

On Wed, Apr 23, 2014 at 12:46 AM, Ira K <clocktime2020@gmail.com> wrote:

There could be a new alternate crypto-currency that comes out and steals the thunder from Bitcoin

and the new business goes bankrupt.

On Wed, Apr 23, 2014 at 12:44 AM, Ira K <clocktime2020@gmail.com> wrote:

It wouldn't matter if I had 100%.  What if the business doesn't fly?

On Wed, Apr 23, 2014 at 12:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira – look at the balance sheet – you have 40% of the total worth in it

Do you get that?

NOT 10%

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:41 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I understand, but that is water under the bridge.  We can't do anything about that now.

But we can provide his estate with fair compensation for his assistance.  If he was

50% partner, or even 33% partner.. he would deserve more than 10% in a unproven

business and undisclosed coins.

DEFAUS_00628092

On Wed, Apr 23, 2014 at 12:38 AM, Craig S Wright <craig@rcjbr.org> wrote:

One issue that you have been fed half-truths on.

And yes, there is a lot that is messy from the time. I had no idea Dave was as sick as he was. He told me he was on top of it all. I believed him.

He said it was just a small operation and he would be up again soon, that we would present a paper in June that year. So, yes, lots that was missed.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:35 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Like I said, that is just one issue.. there are so many more.

On Wed, Apr 23, 2014 at 12:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Check:

- Otto

- Otto Maurer

It is the font

Mine is an image

All that makes it a signature is PGP

DEFAUS_00628093

1294

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:30 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't matter if you create a new font from scratch that looks exactly like the one on the contract.

Each contract has signatures with variations.  It is crystal clear to see.

On Wed, Apr 23, 2014 at 12:23 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will need to dig through old emails and documents, but I can show it is a PDF type font.

http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/adobe-acrobat-xi-esign-pdf-file-tutorial-ue.pdf

That will take time and I will need to look up what font was in there when Dave did this. I will also dig up the PGP signature for you. Dave's public key is out there on the web if you want to validate it.

I assume you know that Dave would not give ANYONE his private key — that includes me.

Andrew is a partner at Clayton Utz. I do not believe he will lie- for all people say about lawyers (sorry Andrew). Ask him — he has received the PGP singed versions.

http://www.claytonutz.com/

I will put all this together for you by the weekend. I will show the font (as noted I need to check what it was as I do not know what Dave's system defaulted to. I am really sorry you have been lead to believe this is something more than it was, but will this help?

Craig

DEFAUS_00628094

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:15 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't look like a type font.

There are 2 seperate contracts with the same style handwriting, but with slight variations.

On Wed, Apr 23, 2014 at 12:13 AM, Craig S Wright <craig@rcjbr.org> wrote:

Yes.

The PGP key is the signature.

The PDF just adds it.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:10 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Are you saying that the signature was just computer generated, a type font?

Ira

On Wed, Apr 23, 2014 at 12:05 AM, Craig S Wright <craig@rcjbr.org> wrote:

1296

DEFAUS_00628095

The document was signed using PGP. That is the digital signature. The other was a PDF thing that gets applied. It was and never was handwritten. The signature is the PGP signing.

Dave's interest is in founder shares in Coin-Exch.

The sale of the software and its use leads to an Research & Development refund into the company. Coin-Exch receives the moved the software and uses it for an R&D claim. That is why it was done. This is 45% of the expense.

That is what is obtained from this. That is what the ATO do not like.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 1:59 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

It's not about information that they fed me.  It's about contracts that you signed and agreements that don't seem logical.

I don't understand why Dave would make that agreement with you for a business divorce.  Why would a successful

partnership suddenly seperate and leave one partner with everything of accountable value and the other(Dave) with

only 10% in a future venture and a undisclosed amount of Bitcoins?  And the contract (CEWK01 and CEWK03) is

signed the same month of his death and without his real signature.  Nor do I believe it to be a digital signature.

1297

DEFAUS_00628096

It doesn't even come close to his handwriting  That is obviously a females signature.   Things just don't make sense.

Ira

On Tue, Apr 22, 2014 at 11:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

Dave died. I did the actions to make sure that the court signed off on what Dave and I planned.

The reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed.

"I thought you appreciated Dave's contribution. "

More than I could express. This was not about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did that action as accountants etc advised it was necessary.

I think they have mislead you as to what this is about. There is no GST (tax) on the software Dave transferred, but it is being used by the ATO as an excuse to try and not pay other amounts that are owed.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 1:37 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

The information I have to work with is what you have told me and the documents from the ATO office.

DEFAUS_00628097

From those documents it appears clear to see a systematic transfer of assets out of W&K back to you.

Up until April 15 I was a complete believer in what you were telling me.  But you never mentioned any of the actions you were taking against W&K prior to contacting us.

We could start by going step by step through the questionaire the ATO sent me.  But I really didn't think you would want to get into those details.  I thought you appreciated Dave's contribution.  Helping you get the government funding to start it all, etc.

If you have more information that I'm missing you are more than welcome to email it to me.

Regards,

Ira

On Tue, Apr 22, 2014 at 11:02 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been told, but I think there is a need to go into detail.

Andrew (CC'd) is a tax partner with Clayton Utz. I am happy for you to ask him anything. This is permission for that. I am sure he will give better truth than the tax office. At least more of it and without filtering things.

DEFAUS_00628098

1299

Dave signed electronically. I have not ever stated that these are his. If I had wanted to do that I would have dug up copies from the old company filings. The ATO and the court had the digitally signed documents. There is a wrapper as the signature.

Dave held his BTC, not me for him.

I do not know what Dave's resignation is. You mention a resignation, I do not know of one. I know what we planned – I not know all of what was occurring in WK.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 11:49 AM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

Just as Dave believed in your vision and abilities, I share that

same belief.   There is no doubt in my mind that you are capable of

achieving the goals you have set.  And I am still in awe of your brilliance.

However, since receiving the documents from the ATO and spending more time

reviewing them, I feel like there are questionable discrepancies in the

DEFAUS_00628099

contracts between you and W&K such as Dave's signatures, his resignation,

transfer of all accountable value, Uyen's role of Director, BAA projects, etc.

No need to go into details.

I can understand how you may have felt pressured to take actions to secure

the business you and Dave started.  And the last thing I want to do is

stifle the growth of it.  But I do believe we need to remedy the lopsided

contractual exchange.

As the Executor for the Estate of the Director at W&K I propose we

reach an agreement that Dave himself would approve.

Good sir, my request equates to peace and prosperity for all:

1. Return 17% of the 323k bitcoins to Dave's estate.

2. Retain only half our current holdings in Coin-Exch.

3. Remain friends that avoid all taxing troubles henceforth.

And I would still welcome you to attempt gaining access to Dave's drives.

If you are able to find his bitcoin files I would gladly give you half

and invest Dave's other half into your new business.

Sincerely,

Ira

On Tue, Apr 15, 2014 at 9:41 PM, Ira K <clocktime2020@gmail.com> wrote:

Sure, that sounds good to me.

1301

DEFAUS_00628100

Thanks.


On Tue, Apr 15, 2014 at 9:28 PM, Craig S Wright <craig@rcjbr.org> wrote:

I would love you to be involved.


How about we add you once we get the tax audit out of the way and also get directors insurance for you?


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 16 April 2014 11:17 AM

**To:** Craig S Wright
**Subject:** Re: Questions


Honestly I don't know.  I'm not sure what obligations must be met as a director?

If it jallows me to follow what's going on in the business, that would be interesting.

But if you feel it's in my best interest not to be involved with it because it might expose

me to legal liablilities, then I will certainly understand.


Thanks,

Ira




On Tue, Apr 15, 2014 at 8:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Hi Andrew,

Can you help Ira with this please.


1302

DEFAUS_00628101

It is hostile everywhere right now. That stated, Dave

...

[Message clipped]

DEFAUS_00628102

# TAB 829-55

P-189
Case No. 9:18-CV-89176-BB

**From:** Craig S Wright [Craig S Wright]
**Sent:** 2/4/2015 12:55:01 AM
**To:** Ramona Watts
**Subject:** FW: ATO Game
**Attachments:** image002.jpg

Email to Hardy

**From:** Craig S Wright
**Sent:** Monday, 27 January 2014 4:53 PM
**To:** Hardy, Michael
**Cc:** Sommer, Andrew; 'Ramona Watts'
**Subject:** ATO Game

Hello Michael,

Right now, it seems to me that there is a game at the ATO designed to drive me out. If a company I am involved with but not director of lodges a claim, it is withheld. If I lodge a claim, it is withheld. It does not make any difference that the times have been exceeded. I am treated differently than all the other BTC companies. There are several filing BAS returns and not a one has been audited or made to pay GST on Bitcoin.

The Bitcoin I control was mined in the US for a foreign trust and company that was setup following the Information Defense incident and prior to the reversal of the found-less "recklessness" claim made against me. All I had was transferred out of Australia when the ATO deemed it worthless in 2010.

I have a loan based on BTC from that entity into Australia. BTC has appreciated. That makes the loan and loss larger. If I just used this, I would not pay tax in this country ever again. This is not what I am trying to achieve.

What I have been seeking is to repatriate this and pay capital gains under the normal company rate. We have around 50 jobs that are at risk right now and this does not account for the plans to double that.

Right now, I am seeing fewer and fewer opportunities for continuing in Australia. I am trying to work to build a business and create employment in Australia. What I see resulting is a legal battle where the ATO will end up having to pay me but where I more everything overseas losing jobs and revenue for the country.

I will try and talk to you tomorrow.

Regards,

**Dr. Craig S Wright GSE LLM**
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com



# TAB 837

1

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
                  CASE NO. 9:18-cv-80176-BB
 3
      IRA KLEIMAN, as the personal representative
 4    of the Estate of David Kleiman, and W&K Info
      Defense Research, LLC,
 5
                Plaintiffs,                  November 1, 2021
 6                                           9:01 a.m.
              vs.
 7
      CRAIG WRIGHT,
 8
                Defendant.                   Pages 1 THROUGH 273
 9    _____
10                 TRANSCRIPT OF TRIAL DAY 1
               BEFORE THE HONORABLE BETH BLOOM
11               UNITED STATES DISTRICT JUDGE
                    And a Jury of 10
12
      Appearances:
13    FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
                           DEVIN FREEDMAN, ESQ.
14                         KYLE ROCHE, ESQ.
                           200 South Biscayne, Suite 5500
15                         Miami, Florida 33131

16                         BOIES SCHILLER & FLEXNER
                           ANDREW BRENNER, ESQ.
17                         STEPHEN N. ZACK, ESQ.
                           100 Southeast 2nd Street, Suite 2800
18                         Miami, Florida 33131

19    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
                           ANDRES RIVERO, ESQ.
20                         JORGE MESTRE, ESQ.
                           AMANDA M. MCGOVERN, ESQ.
21                         MICHAEL A. FERNANDEZ, ESQ.
                           2525 Ponce de Leon Boulevard, Suite 1000
22                         Coral Gables, Florida 33134

23    COURT REPORTER:      Yvette Hernandez
                           U.S. District Court
24                         400 North Miami Avenue, Room 10-2
                           Miami, Florida 33128
25                         yvette_hernandez@flsd.uscourts.gov
```

1305

2

1                          I N D E X

2     Certificate ....................................    273
      Voir Dire ......................................     18
3     Jury sworn .....................................    172
      Preliminary jury instructions ..................    173
4     Plaintiff opening statement ....................    183
      Defense opening statement ......................    212

5

6

7                        W I T N E S S

8     ON BEHALF OF THE PLAINTIFF:                        PAGE
      ANDREAS M. ANTONOPOULOS
9     DIRECT EXAMINATION BY MR. ROCHE                     239

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1306

```
1    comfort break.  The court security officer will take you into

2    the jury room.  We have two restrooms in the back.  And I'll

3    see you back here in 20 minutes, at 3:15, please.

4        (Jury not present, 2:57 p.m.)

5            THE COURT:  All right.  I'll see you back here at

6    3:15.

7            MR. RIVERO:  Your Honor, may I raise one issue before

8    the break?

9            THE COURT:  Yes, sir.

10           MR. RIVERO:  Yes.  Thank you, Judge.  I did not object

11   other than on the specific demonstrative issue.

12           THE COURT:  You can go ahead and have a seat, counsel.

13           MR. RIVERO:  Although I believe much of the opening

14   went far beyond what is ordinary in an opening, we didn't raise

15   that issue.

16           But Judge, the Plaintiffs have squarely injected the

17   relationship between Ira Kleiman and his deceased brother,

18   including the sharing of a memory -- "I want to share a memory

19   about my dead brother" and the Thanksgiving Day story, which

20   there was a ruling by the Court that we could not comment on

21   the relationship between the brothers.

22           But Judge, I think, frankly, this is only the opening

23   saga.  Their intention is -- and I think the Court will see

24   already, their intention is to build up that relationship to

25   increase the credibility of Ira Kleiman as to the only evidence
```

1    during David Kleiman's lifetime that he ever said anything to

2    anyone about this supposed partnership.

3          My request to the Court is that we should be permitted

4    to comment on and bring out evidence about the credibility of

5    that relationship and those statements.

6          MR. ROCHE:  Your Honor, may I respond?

7          THE COURT:  Mr. Roche?

8          MR. ROCHE:  I don't have Your Honor's motion in limine

9    ruling in front of me, but I've read it many times.  Your

10   ruling stated that what was excluded was everything that

11   happened after the Thanksgiving dinner.

12         I was very careful in my opening to only reference

13   Dave, the individual, and that Thanksgiving dinner.  We did not

14   open the door to anything discussing Ira and Dave's

15   relationship.  Certainly nothing after 2009.

16         THE COURT:  All right.  Well, let me state what's

17   elementary, and that is this is an opening statement.  This is

18   not the evidence in the case.  I'm certainly not going to

19   address any anticipated intentions.

20         With regard to opening the door, we will address it at

21   the time that the door is actually opened.

22         MR. RIVERO:  Thank you, Your Honor.

23         THE COURT:  I'll see you back here at 3:15.

24     (Recess from 3:00 p.m. to 3:13 p.m.)

25         THE COURT:  All right.  Welcome back.

# TAB 838

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 118 of 247
Case 9:18-cv-80176-BB    Document 838    Entered on FLSD Docket 12/20/2021    Page 1 of 282

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
                   CASE NO. 9:18-cv-80176-BB
 3
      IRA KLEIMAN, as the personal representative
 4    of the Estate of David Kleiman, and W&K Info
      Defense Research, LLC,
 5
              Plaintiffs,              November 2, 2021
 6                                     9:59 a.m.
                vs.
 7
      CRAIG WRIGHT,
 8
              Defendant.               Pages 1 THROUGH 197
 9    _____
                 TRANSCRIPT OF TRIAL DAY 2
10           BEFORE THE HONORABLE BETH BLOOM
               UNITED STATES DISTRICT JUDGE
11                  And a Jury of 10

12    Appearances:
      FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
13                         DEVIN FREEDMAN, ESQ.
                           KYLE ROCHE, ESQ.
14                         200 South Biscayne, Suite 5500
                           Miami, Florida 33131
15
                           BOIES SCHILLER & FLEXNER
16                         ANDREW BRENNER, ESQ.
                           STEPHEN N. ZACK, ESQ.
17                         100 Southeast 2nd Street, Suite 2800
                           Miami, Florida 33131
18
      FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                         ANDRES RIVERO, ESQ.
                           JORGE MESTRE, ESQ.
20                         AMANDA M. MCGOVERN, ESQ.
                           MICHAEL A. FERNANDEZ, ESQ.
21                         ZALMAN KASS, ESQ.
                           2525 Ponce de Leon Boulevard, Suite 1000
22                         Coral Gables, Florida 33134

23    COURT REPORTER:      Yvette Hernandez
                           U.S. District Court
24                         400 North Miami Avenue, Room 10-2
                           Miami, Florida 33128
25                         yvette_hernandez@flsd.uscourts.gov
```

2

```
 1                          I N D E X

 2      Certificate....................................    197

 3                        W I T N E S S

 4      ON BEHALF OF THE PLAINTIFF:                       PAGE

 5      ANDREAS ANTONOPOULOS
        CONTINUED DIRECT EXAMINATION BY MR. ROCHE           7
 6      CROSS-EXAMINATION BY MR. RIVERO                     37
        REDIRECT EXAMINATION BY MR. ROCHE                  111
 7
        ROBERT RADVANOVSKY
 8      (via video deposition)                            120

 9      PATRICK PAIGE
        DIRECT EXAMINATION BY MR. FREEDMAN                122
10      CROSS-EXAMINATION BY MR. MESTRE                   175
        REDIRECT EXAMINATION BY MR. FREEDMAN              185
11
        GAVIN ANDRESEN
12      (via video deposition)                            186

13                         E X H I B I T S

14      EX. NO.:                         OFFERED   ADMITTED
        Defendant's 408                      54        54
15      Defendant's 398                      69        70
        Defendant's 005                     143       143
16      Defendant's 042                     150       150
        Plaintiff's 122                     155       155
17      Joint     045                       160       160
        Plaintiff's 717                     164       165
18      Plaintiff's 696                     169       169
        Defendant's 425                     183       183
19

20

21

22

23

24

25
```

1310

```
1    what Paragraph 45 actually asks for is to enjoin you personally

2    from using any Bitcoin that was the property of David Kleiman;

3    isn't that right?

4    A.  Yes.

5    Q.  Did you know Mr. Kleiman before he sued you?

6    A.  I was aware he had a brother.

7    Q.  Do you recognize him here?

8    A.  I don't believe he's here.

9         MR. MESTRE:  Your Honor, may I have a moment to confer

10   with my co-counsel?

11        THE COURT:  Certainly.

12    (Pause in proceedings.)

13        THE COURT:  Mr. Mestre?

14        MR. MESTRE:  Just a few more questions.  Thank you,

15   Your Honor.

16   BY MR. MESTRE:

17   Q.  Did David Kleiman ever ask you to mine Bitcoin?

18   A.  No.

19   Q.  So you knew David Kleiman for about 20 years.

20   A.  Yeah.  I believe it was about 20 years.

21   Q.  During that time, how many times did you hear of Ira

22   Kleiman?

23   A.  I can't really recall of any offhand, other than he had a

24   brother.

25   Q.  So Mr. Freedman asked you about this claim.  Have you read
```

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 121 of 247
Case 9:18-cv-80176-BB   Document 838   Entered on FLSD Docket 12/20/2021   Page 185 of 282

185

```
 1    the complaint in this case?

 2    A.  No.

 3    Q.  Do you know anything about the facts alleged in the

 4    complaint in this case?

 5    A.  Not really.

 6            MR. MESTRE:  I have no further questions, Your Honor.

 7            THE COURT:  All right.  Any redirect?

 8                    REDIRECT EXAMINATION

 9    BY MR. FREEDMAN:

10    Q.  Mr. Paige, who is the only person who ever told you there

11    were Bitcoin on these devices?

12    A.  What was the question again?

13    Q.  Who is the only person who ever told you that there were

14    Bitcoin on these devices?

15            MS. MCGOVERN:  Objection.  Foundation.  Lack of

16    foundation.

17            THE COURT:  Overruled.

18            THE WITNESS:  Craig Wright.

19            MR. FREEDMAN:  No further questions, Your Honor.

20            THE COURT:  All right.

21            Ladies and Gentlemen, if you'll just raise your hand

22    if you do have a question, so this way we can give you the time

23    to write your question down.

24            Is there anyone that has a question for the witness,

25    Mr. Paige?
```

# TAB 839

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                    CASE NO. 9:18-cv-80176-BB
 3
      IRA KLEIMAN, as the personal representative
 4    of the Estate of David Kleiman, and W&K Info
      Defense Research, LLC,
 5
              Plaintiffs,                    November 3, 2021
 6                                           9:42 a.m.
 7            vs.

      CRAIG WRIGHT,
 8
              Defendant.                     Pages 1 THROUGH 193
 9    _____

10                    TRANSCRIPT OF TRIAL DAY 3
                  BEFORE THE HONORABLE BETH BLOOM
11                 UNITED STATES DISTRICT JUDGE
                        And a Jury of 10
12
      Appearances:
13
      FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
14                         DEVIN FREEDMAN, ESQ.
                           KYLE ROCHE, ESQ.
15                         200 South Biscayne, Suite 5500
                           Miami, Florida 33131
16
                           BOIES SCHILLER & FLEXNER
17                         ANDREW BRENNER, ESQ.
                           STEPHEN N. ZACK, ESQ.
18                         100 Southeast 2nd Street, Suite 2800
                           Miami, Florida 33131
19

20    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
                           ANDRES RIVERO, ESQ.
21                         JORGE MESTRE, ESQ.
                           AMANDA M. MCGOVERN, ESQ.
22                         MICHAEL A. FERNANDEZ, ESQ.
                           ZALMAN KASS, ESQ.
23                         2525 Ponce de Leon Boulevard, Suite 1000
                           Coral Gables, Florida 33134
24

25
```

1313

2

```
 1    Appearances continued:

 2    FOR JOHN DOE:        GLASER WEIL
      (Via Zoom)           PATRICIA L. GLASER, ESQ.
 3                         RICHARD BUCKNER, ESQ.
                           10250 Constellation Boulevard, 19th Floor
 4                         Los Angeles, California 90067

 5                         STEARNS WEAVER MILLER
                           DARRELL PAYNE, ESQ.
 6                         150 West Flagler Street, Suite 2200
                           Miami, Florida 33130
 7
      COURT REPORTER:      Yvette Hernandez
 8                         U.S. District Court
                           400 North Miami Avenue, Room 10-2
 9                         Miami, Florida 33128
                           yvette_hernandez@flsd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1314

```
 1            THE COURT:  Certainly.

 2        (Pause in proceedings.)

 3            MR. BRENNER:  Mr. Kleiman, I have no further questions

 4    at this time.  Please give the same responsiveness to

 5    Mr. Rivero.

 6            THE COURT:  Cross-examination.

 7            MR. RIVERO:  Thank you, Your Honor.

 8        (Pause in proceedings.)

 9            MR. RIVERO:  May it please the Court, counsel.

10                         CROSS-EXAMINATION

11    BY MR. RIVERO:

12    Q.  Mr. Kleiman, this is a chart -- you were here for opening;

13    isn't that right?  You were here for opening, were you not,

14    Mr. Kleiman?

15    A.  Yes.

16    Q.  This is the chart your counsel used during opening,

17    correct?

18    A.  Yes.

19    Q.  You spoke a lot, sir, here on your direct examination about

20    the period 2013 to 2018, did you not?

21    A.  Yes.

22    Q.  All right.  You spoke very little -- if I remember

23    correctly, the only thing you commented on in the period

24    between 2008 and April of 2013 is Thanksgiving Day 2009; isn't

25    that right?
```

```
 1    A.  Yes.

 2    Q.  Okay.  And that was a -- that was November 26th, 2009,

 3    right?

 4    A.  Correct.

 5    Q.  Okay.  And you know that date because that's the last day

 6    you saw your brother in life, correct?

 7              MR. BRENNER:  Objection.  May we approach?

 8              MR. RIVERO:  Judge, I'll --

 9              THE COURT:  The objection is overruled at this point.

10    BY MR. RIVERO:

11    Q.  Sir?

12    A.  I'm not exactly certain if that's the very last day.  But

13    that's the -- I guess the best memory of last seeing him.  I

14    may have seen him other times after that, but I just don't

15    recall it.

16    Q.  Sir, your testimony under oath and your best memory is that

17    that was the last day you saw your brother in life, is it not?

18              MR. BRENNER:  Same objection, Your Honor.

19              THE WITNESS:  Like I said, I'm not certain that that

20    was --

21              THE COURT:  The objection is noted.  It's overruled at

22    this point.

23              THE WITNESS:  I could have possibly seen him other

24    days.

25
```

151

```
1    BY MR. RIVERO:

2    Q.  I will return to that subject and show you your testimony,

3    Mr. Kleiman, but I have another point to make at this time.

4         Sir, you say that on that day your brother drew a symbol

5    like this.  Like this one.  You just talked about it before the

6    jury, right?

7    A.  Yes.

8    Q.  Okay.  I'm going to make it larger and make sure you agree

9    with me.

10              MR. BRENNER:  (Inaudible.)

11              THE COURT:  I'm sorry.  We can't hear you.

12              MR. BRENNER:  May I just move, so I can see?

13              THE COURT:  Yes.  Of course.

14              MR. BRENNER:  Where's the best place to go?

15              THE COURT:  Well, it may be easier, Mr. Rivero, if you

16    can just move it a little bit back, so all counsel can see the

17    easel.

18              MR. RIVERO:  I will.  And Judge, I'm not going to use

19    it extensively, but I'll move it definitely --

20              THE COURT:  But you are using it.  So if you wouldn't

21    mind.

22              MR. RIVERO:  And in fact, Judge, just to be fair, I'll

23    show Plaintiffs' counsel their chart from opening to make sure

24    that they are able to remember what they wrote.

25              MR. BRENNER:  Thank you, sir.
```

1317

# TAB 840

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 129 of 247
Case 9:18-cv-80176-BB   Document 840   Entered on FLSD Docket 12/20/2021   Page 1 of 405

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH DIVISION
                      CASE NO. 9:18-cv-80176-BB
 3

     IRA KLEIMAN, as the personal representative
 4   of the Estate of David Kleiman, and W&K Info
     Defense Research, LLC,
 5
               Plaintiffs,                 November 4, 2021
 6                                         9:43 a.m.

 7        vs.

     CRAIG WRIGHT,
 8
               Defendant.                  Pages 1 THROUGH 293
 9   _____
                 TRANSCRIPT OF TRIAL DAY 4
10           BEFORE THE HONORABLE BETH BLOOM
                UNITED STATES DISTRICT JUDGE
11                 And a Jury of 10
     Appearances:
12   FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
                          DEVIN FREEDMAN, ESQ.
13                        KYLE ROCHE, ESQ.
                          200 South Biscayne, Suite 5500
14                        Miami, Florida 33131

15                        BOIES SCHILLER & FLEXNER
                          ANDREW BRENNER, ESQ.
16                        STEPHEN N. ZACK, ESQ.
                          SAMANTHA LICATA, ESQ.
17                        100 Southeast 2nd Street, Suite 2800
                          Miami, Florida 33131
18
     FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                        ANDRES RIVERO, ESQ.
                          JORGE MESTRE, ESQ.
20                        AMANDA M. MCGOVERN, ESQ.
                          ZALMAN KASS, ESQ.
21                        2525 Ponce de Leon Boulevard, Suite 1000
                          Coral Gables, Florida 33134
22
     COURT REPORTER:      Yvette Hernandez
23                        U.S. District Court
                          400 North Miami Avenue, Room 10-2
24                        Miami, Florida 33128
                          yvette_hernandez@flsd.uscourts.gov
25
```

2

```
 1                    I N D E X

 2     Certificate...................................    293

 3                  W I T N E S S

 4     ON BEHALF OF THE PLAINTIFF:                      PAGE

 5     IRA KLEIMAN
       CONTINUED CROSS-EXAMINATION BY MR. RIVERO          15
 6

 7                  E X H I B I T S
       EX. NO.:                            OFFERED   ADMITTED
 8     Plaintiffs' 420                        35        35
       Defendant's  18                        64        65
 9     Defendant's  19                        72        72
       Defendant's 301                        79        79
10     Defendant's 302                        83        83
       Defendant's 303                        85        85
11     Defendant's 481                        92        92
       Defendant's 396                        92        93
12     Defendant's  58                        95        95
       Defendant's  15                        97        97
13     Defendant's 257                       101       101
       Joint       103                       106       107
14     Defendant's 284                       108       109
       Defendant's 489                       116       116
15     Joint        31                       119       119
       Plaintiffs'   2                       121       122
16     Defendant's 161                       129       130
       Defendant's  10                       137       137
17     Joint         1                       139       140
       Defendant's  11                       142       142
18     Plaintiffs' 424                       148       149
       Defendant's  67                       152       153
19     Defendant's 252                       165       165
       Joint        21                       168       168
20     Defendant's   8                       171       172
       Defendant's 256                       205       206
21     Defendant's  40                       210       210
       Joint        99                       212       212
22     Joint        98                       219       219
       Joint        97                       221       222
23     Defendant's 357                       238       239
       Defendant's 359                       242       242
24     Defendant's 360                       243       244
       Plaintiffs' 157                       247       248
25
```

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

1319

23

```
 1    A.  No.  I know that --
 2    Q.  You know it was New Liberty who proposed --
 3          MR. BRENNER:  He's trying to answer the question --
 4    objection.  The witness is trying to --
 5          THE COURT:  Give the witness an opportunity to answer
 6    the question, please.
 7          THE WITNESS:  I know who the New Liberty person is,
 8    yes.
 9    BY MR. RIVERO:
10    Q.  You know the person who proposed this was New Liberty?
11    A.  I mean, now I know of him, yes.
12    Q.  Right.
13          The last time you spoke to David Kleiman in life was in
14    2009, right?
15    A.  Correct -- well, no, no.  Actually, I shouldn't say that.
16    Q.  I said that the wrong way.
17    A.  That's the last time I recall seeing him.
18    Q.  Are you finished, Mr. Kleiman?
19    A.  Yes.
20    Q.  Let me restate the question.
21          The last time you saw your brother in person was in 2009?
22          MR. BRENNER:  Your Honor, just renew the objection
23    from yesterday on this issue.
24          THE COURT:  I'm sorry.  The objection is?
25          MR. BRENNER:  It violates an order of the Court.
```

24

```
 1          THE COURT:  Sustained.
 2   BY MR. RIVERO:
 3   Q.  Now, sir, I want to be very clear about some testimony you
 4   gave yesterday.  There isn't any email anywhere from a friend
 5   of David Kleiman's that says that they had any conversation
 6   like the one you had with David Kleiman, the turkey-talk; isn't
 7   that right?
 8   A.  Did you receive the new email that they produced to you
 9   last night?
10   Q.  Oh, I have it, sir, but I want to be real clear.  Nobody
11   says they had such a conversation with David Kleiman except for
12   you?
13   A.  I don't agree with that.
14   Q.  All right, sir.  Do you understand that Patrick Paige has
15   already testified here?
16   A.  Yes.
17   Q.  And you know that Patrick Paige testified that he never
18   talked with David Kleiman about Bitcoin or anything to do with
19   it?
20   A.  That's also not correct.
21   Q.  Okay.  So then that's your testimony.
22   A.  No.  I can show the email where Patrick says that Dave did
23   discuss Bitcoin with him.
24   Q.  Sir, we're going to -- I want to -- we've already heard
25   from Patrick Paige.  I don't need -- I'm not asking you your
```

1321

```
 1    BY MR. RIVERO:

 2    Q.  So sir, do you see that this is David Kleiman's account

 3    transcript?

 4    A.  Yes.

 5    Q.  And this is an IRS official document, sir?

 6    A.  Yes.

 7          MR. RIVERO:  Judge, I move the admission of

 8    Defendant's 302.

 9          MR. BRENNER:  No objection, Your Honor.

10          THE COURT:  Admitted into evidence.

11      (Defendant's Exhibit 302 received into evidence.)

12          MR. RIVERO:  Mr. Shah, the same process.  If you would

13    show the jury the bottom part, which is going to show the

14    adjusted gross income.

15    BY MR. RIVERO:

16    Q.  And we had kind of seen this when you saw the tax return

17    which reported for 2011, is a adjusted gross income of $13,105,

18    right?

19    A.  Yes.

20    Q.  That's a really serious drop in the gross income, right?

21    A.  Yes.

22    Q.  Yeah.  By this time, he was hospitalized?

23    A.  What was the date again?

24    Q.  Well, it's the 2011 return.

25    A.  Oh, okay.  Yes.  I believe he was, yes.
```

84

```
 1    Q.  You never saw him in the hospital?

 2    A.  No.

 3    Q.  But you know he was in the hospital?

 4    A.  Yes.  I continued a lot of communications through email and

 5    through telephone.

 6    Q.  Now, you live in Palm Beach, right?

 7    A.  Palm Beach Gardens, yes.

 8    Q.  Palm Beach Gardens, okay.

 9        So his income really dropped off, right?

10    A.  Yes.

11          MR. RIVERO:  Can we go to the top and look at this

12    other section.

13    BY MR. RIVERO:

14    Q.  But it looks like he had managed to pay down some of the

15    debt to the IRS and it was -- he was -- gotten it down to

16    $3,246.10, right?

17    A.  Yes.

18          MR. RIVERO:  Okay.  Let's look at Defendant's 303.

19    BY MR. RIVERO:

20    Q.  I may have said -- you know, this is the tax period --

21          MR. RIVERO:  I may have said that wrong, Your Honor,

22    if I said -- I may have referred, just to clarify for the jury

23    and the Court -- if I said as to the previous one it was

24    2000 -- anything other than 2010, I meant 2010.

25          Now we'll talk about 2011.
```

1323

```
 1              MR. BRENNER:  Your Honor --

 2              THE COURT:  I'm sorry?

 3              MR. BRENNER:  Your Honor, may we take that down for

 4     one moment and approach?

 5              THE COURT:  It's in evidence, sir.

 6              You may continue.

 7     BY MR. RIVERO:

 8     Q.  Mr. Kleiman --

 9              MR. RIVERO:  Judge, may I proceed?

10              THE COURT:  You may.

11     BY MR. RIVERO:

12     Q.  Mr. Kleiman --

13              MR. RIVERO:  Mr. Shah, if you could highlight the

14     first two sentences of Paragraph 3.

15     BY MR. RIVERO:

16     Q.  "Ira is David's brother.  He had limited contact and

17     personal knowledge as to David's financial affairs throughout

18     David's life."  Correct?

19     A.  Correct.

20              MR. BRENNER:  Your Honor, I have to ask to approach.

21              THE COURT:  I'm sorry?

22              MR. BRENNER:  I have to ask to approach, Your Honor,

23     and ask that it be taken down during the sidebar.

24              THE COURT:  All right.  If we can take it down for a

25     moment.
```

1              (At sidebar on the record.)

2              MR. BRENNER:  Your Honor, I'm doing the best I can --

3    so I get a document on my screen.  Here's the problem:  You

4    have an order on a motion in limine.

5              THE COURT:  I do.

6              MR. BRENNER:  And I expect -- I expect that I and

7    counsel would try to police that and not put things in front of

8    the jury they know violate that order.

9              And that is the exact issue Your Honor ruled on in the

10   order.  And I missed it because it's going quick and it's --

11   whatever.  I don't have it in advance on the list.  They didn't

12   have to provide me a list in advance, but I think I can rely on

13   that no one's going to try to violate a court order.

14             So I made a mistake.  I didn't see it, but it just is

15   a clear violation.  It should have never happened.

16             MR. RIVERO:  Judge, I don't agree.  I think what this

17   does is establish the basis for personal knowledge.  It's not

18   about trying to say anything about -- in fact, I haven't talked

19   about --

20             THE COURT:  It certainly talks about the sibling

21   relationship.  That was directly what the Court ruled upon with

22   regard to the motion in limine.  I saw that at the same time

23   that you saw that, Mr. Brenner.

24             But you should know the exhibits.  It's not for the

25   Court to tell you.  The expectation is that you understand the

175

```
 1    exhibit before you agree to allow it into evidence.  It's now

 2    in evidence.

 3            MR. BRENNER:  Your Honor, I absolutely agree.  It's

 4    not up to the Court.  I absolutely agree.  It's my mistake.

 5            But I also agree -- I also believe that it is

 6    incumbent -- I mean, it's not that it's a close call.  This one

 7    says:  "Never visited his brother in the hospital" --

 8            THE COURT:  It does.  It does.

 9            MR. BRENNER:  That's directly on point.

10            MR. RIVERO:  No, it doesn't, Judge.

11            THE COURT:  It does.

12            MR. RIVERO:  Judge, it says they didn't have contact.

13            THE COURT:  No.  No.  No.  It said he never -- I read

14    it.  It says precisely that.

15            MR. BRENNER:  So, Your Honor, if you're going to hold

16    me to my error, I understand.  You're right.  At the end of the

17    day, it's my error.  But I don't know how that error happens.

18    I don't know how this document ever gets put up without -- in a

19    non-redacted form.

20            Just like in the exhibit I brought today.  I know it

21    has issues that need to be redacted.

22            THE COURT:  Listen, I mean, if that fact is not

23    pertinent to what you're seeking to show Mr. Kleiman, then the

24    most important part is to not violate the Court's order.

25            And inadvertent or not, sloppy or not, whatever the
```

1326

1    issue may have been -- I suspect it's inadvertent.  There's

2    many documents.

3          I would suggest that as officers of the court that we

4    agree to redact that portion before it's further shown to the

5    jury.  The exhibit will be in evidence, but those portions --

6    as it appears that your technician is able to clearly do -- he

7    can take out those portions.

8          MR. RIVERO:  Judge, what I would ask is -- we'll do

9    that now, but I would ask the Court to permit us to address

10   this because Mr. Kleiman has repeatedly put at issue whether he

11   had the ability to observe what was going on, and he said

12   things about his personal knowledge about the circumstances --

13         THE COURT:  Well, if you believe that he said anything

14   to open the door with regard to the sibling relationship, he

15   has not.

16         MR. RIVERO:  Judge, no.  No.  What I'm saying is as to

17   the ability to observe events.  For example, if there was a

18   statement at the Thanksgiving dinner that his brother was

19   creating something bigger than Facebook, it is not credible

20   that he had no contact with him.

21         THE COURT:  But you've exhausted that area of inquiry.

22   You've asked him about the Thanksgiving dinner.  You've asked

23   him whether he ever had any other conversations.  You've

24   already gone through that.

25         I'm talking specifically about the two sentences that

# TAB 841

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 140 of 247
Case 9:18-cv-80176-BB   Document 841   Entered on FLSD Docket 12/20/2021   Page 1 of 252

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 WEST PALM BEACH DIVISION
                 CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
              Plaintiffs,                November 5, 2021
 6                                       9:58 a.m.
 7         vs.

    CRAIG WRIGHT,
 8
              Defendant.                 Pages 1 THROUGH 182
 9  _____
                TRANSCRIPT OF TRIAL DAY 5
10          BEFORE THE HONORABLE BETH BLOOM
               UNITED STATES DISTRICT JUDGE
11                 And a Jury of 10
    Appearances:
12  FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
                         DEVIN FREEDMAN, ESQ.
13                       KYLE ROCHE, ESQ.
                         200 South Biscayne, Suite 5500
14                       Miami, Florida 33131

15                       BOIES SCHILLER & FLEXNER
                         ANDREW BRENNER, ESQ.
16                       STEPHEN N. ZACK, ESQ.
                         SAMANTHA LICATA, ESQ.
17                       100 Southeast 2nd Street, Suite 2800
                         Miami, Florida 33131
18
    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                       ANDRES RIVERO, ESQ.
                         JORGE MESTRE, ESQ.
20                       AMANDA M. MCGOVERN, ESQ.
                         MICHAEL A. FERNANDEZ, ESQ.
21                       ZALMAN KASS, ESQ.
                         2525 Ponce de Leon Boulevard, Suite 1000
22                       Coral Gables, Florida 33134

23  COURT REPORTER:      Yvette Hernandez
                         U.S. District Court
24                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
25                       yvette_hernandez@flsd.uscourts.gov
```

2

1                    **I N D E X**

2    Certificate...................................          182

3                 **W I T N E S S**

4    **ON BEHALF OF THE PLAINTIFF:**                         PAGE

5    IRA KLEIMAN
     CONTINUED CROSS-EXAMINATION BY MR. RIVERO               18
6    REDIRECT EXAMINATION BY MR. BRENNER                     129

7    JONATHAN WARREN
     (via video deposition)                             170 & 174
8
     DEBORAH KOBZA
9    (via video deposition)                                 174

10

11                  **E X H I B I T S**

     **EX. NO.:**                               OFFERED   ADMITTED
12   Plaintiffs' 139                              38         39
     Defendant's  30                              43         43
13   Defendant's  59                              44         44
     Defendant's  72                              44         45
14   Defendant's  73                              46         46
     Joint        12                              48         48
15   Defendant's  75                              52         52
     Defendant's  78                              58         58
16   Joint        13                              61         61
     Defendant's  80                              72         72
17   Defendant's  82                              76         76
     Defendant's  83                              79         80
18   Defendant's  84                              80         80
     Defendant's  88                              81         81
19   Defendant's 171                              83         83
     Defendant's 173                              85         85
20   Defendant's 174                              89         89
     Defendant's 175                              89         89
21   Defendant's 176                              89         89
     Defendant's 177                              89         89
22   Defendant's 245                              91         91
     Defendant's 246                              91         92
23   Defendant's 247                              92         92
     Defendant's 248                              95         95
24   Defendant's 249                              96         96
     Defendant's 250                              96         96

25

1329

```
 1            THE COURT:  Okay.  We can bring in the jury.
 2        (Before the Jury, 11:44 a.m.)
 3            THE COURT:  All right.  Welcome back, Ladies and
 4    Gentlemen.
 5            Please be seated.
 6            And we'll continue with the cross-examination.
 7    BY MR. RIVERO:
 8    Q.  Mr. Kleiman, before I come back to these email exchanges
 9    between your brother and Craig Wright, I just want to talk with
10    you about one other subject and that is your telephone
11    communications with David Kleiman.
12        Would you agree with me that between March 12 and
13    April 7th, 2013, on the cell phone at least, you spoke with
14    David Kleiman six times?
15    A.  What time again?
16    Q.  This is between -- this is in the last year, the last 13
17    months of your brother's life.
18            MR. BRENNER:  Objection, Your Honor.  Subject to court
19    order.
20            THE COURT:  The objection is sustained.
21            MR. RIVERO:  I'll move on.
22    BY MR. RIVERO:
23    Q.  Sir, would you agree with me that David Kleiman's telephone
24    voice messages from March 12, 2012 to February 19, 2013 contain
25    voice mails left for David Kleiman?
```

# TAB 843

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 144 of 247
Case 9:18-cv-80176-BB   Document 843   Entered on FLSD Docket 12/20/2021   Page 1 of 346

1

```
 1                IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                    CASE NO. 9:18-cv-80176-BB
 3
      IRA KLEIMAN, as the personal representative
 4    of the Estate of David Kleiman, and W&K Info
      Defense Research, LLC,
 5
              Plaintiffs,                    November 9, 2021
 6                                           10:09 a.m.
              vs.
 7
      CRAIG WRIGHT,
 8
              Defendant.                     Pages 1 THROUGH 247
 9    _____
                   TRANSCRIPT OF TRIAL DAY 7
10             BEFORE THE HONORABLE BETH BLOOM
                 UNITED STATES DISTRICT JUDGE
11                   And a Jury of 10

12    Appearances:
      FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
13                         DEVIN FREEDMAN, ESQ.
                           KYLE ROCHE, ESQ.
14                         200 South Biscayne, Suite 5500
                           Miami, Florida 33131
15
                           BOIES SCHILLER & FLEXNER
16                         ANDREW BRENNER, ESQ.
                           STEPHEN N. ZACK, ESQ.
17                         STEPHEN LAGOS, ESQ.
                           100 Southeast 2nd Street, Suite 2800
18                         Miami, Florida 33131

19    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
                           ANDRES RIVERO, ESQ.
20                         JORGE MESTRE, ESQ.
                           AMANDA M. MCGOVERN, ESQ.
21                         ZALMAN KASS, ESQ.
                           2525 Ponce de Leon Boulevard, Suite 1000
22                         Coral Gables, Florida 33134

23    COURT REPORTER:      Yvette Hernandez
                           U.S. District Court
24                         400 North Miami Avenue, Room 10-2
                           Miami, Florida 33128
25                         yvette_hernandez@flsd.uscourts.gov
```

1                         **I N D E X**

2    Certificate....................................      247

3                    **W I T N E S S**
     **ON BEHALF OF THE PLAINTIFF:**                     PAGE

4
     CRAIG WRIGHT
5    CONTINUED DIRECT EXAMINATION BY MR. FREEDMAN          6

6                   **E X H I B I T S**
     **EX. NO.:**                              OFFERED   ADMITTED

| | OFFERED | ADMITTED |
|---|---|---|
| Plaintiffs' 127 | 13 | 13 |
| Plaintiffs' 212 | 22 | 22 |
| Plaintiffs' 112 | 25 | 25 |
| Plaintiffs' 173 | 31 | 31 |
| Plaintiffs' 742 | 33 | 33 |
| Plaintiffs' 320 | 35 | 35 |
| Plaintiffs' 607 | 41 | 41 |
| Joint     14 | 43 | 43 |
| Plaintiffs' 045 | 51 | 51 |
| Plaintiffs' 381 | 59 | 59 |
| Plaintiffs' 853.1 | 64 | 65 |
| Plaintiffs' 117 | 66 | 66 |
| Plaintiffs' 119 | 77 | 77 |
| Plaintiffs' 864 | 81 | 81 |
| Plaintiffs' 865 | 86 | 86 |
| Plaintiffs' 591 | 99 | 99 |
| Plaintiffs' 042 | 101 | 101 |
| Plaintiffs' 048 | 103 | 104 |
| Plaintiffs' 290 | 112 | 113 |
| Plaintiffs' 823 | 119 | 119 |
| Plaintiffs' 333 | 133 | 133 |
| Plaintiffs' 129 | 146 | 146 |
| Plaintiffs' 446 | 150 | 151 |
| Plaintiffs' 554 | 153 | 153 |
| Joint    120 | 160 | 160 |
| Plaintiffs' 822 | 182 | 182 |
| Plaintiffs' 035 | 185 | 185 |
| Plaintiffs' 036 | 186 | 186 |
| Plaintiffs' 518 | 191 | 191 |
| Joint      14 | 196 | 196 |
| Plaintiffs' 522 | 205 | 205 |
| Plaintiffs' 523 | 212 | 212 |
| Plaintiffs' 091 | 221 | 222 |
| Plaintiffs' 633 | 223 | 223 |

1332

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 146 of 247
Case 9:18-cv-80176-BB    Document 843    Entered on FLSD Docket 12/20/2021    Page 152 of 346

152

```
 1    A.  I do.

 2    Q.  "Dr. Wright files this notice of compliance with this

 3    Court's order dated January 10th, 2020."

 4         Do you see that, Dr. Wright?

 5    A.  I do.

 6    Q.  "Specifically, Dr. Wright notifies the Court that a third

 7    party has provided the necessary information and key slices to

 8    unlock the encrypted file.  And Dr. Wright has produced a list

 9    of his Bitcoin holdings as ordered by the Magistrate Judge to

10    Plaintiffs today."

11         Do you see that, Dr. Wright?

12    A.  I do.

13              MR. FREEDMAN:  Ms. Vela, can you --

14    BY MR. FREEDMAN:

15    Q.  And, Dr. Wright, do you see where it says on the bottom:

16    "Rivero Mestre"?

17    A.  I do.

18    Q.  Those are your lawyers at this table?

19    A.  They are.

20              MR. FREEDMAN:  Can you go to the next page, please.

21    BY MR. FREEDMAN:

22    Q.  Signed by Mr. Rivero himself and Ms. McGovern, right?

23              MS. MCGOVERN:  Objection, Your Honor.  This is

24    unnecessary with respect to --

25              THE COURT:  Sustained.
```

1333

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 147 of 247
Case 9:18-cv-80176-BB   Document 843   Entered on FLSD Docket 12/20/2021   Page 153 of 346

153

```
1           MR. FREEDMAN:  Ms. Vela, can you take it down.

2    Ms. Vela, can you put back up P554.

3    BY MR. FREEDMAN:

4    Q.  Dr. Wright, does this help refresh your recollection that,

5    in fact, this is the list of Bitcoin you produced in response

6    to the Court's order?

7    A.  That contains the list of the first 15 addresses which are

8    the list of Bitcoin I mined.  Lines number 2 to 16 are it.

9    Q.  What's the rest of the list for, Dr. Wright?

10   A.  Company assets.

11   Q.  Whose company, Dr. Wright?

12   A.  It's owned by my wife.

13          MR. FREEDMAN:  Your Honor, Plaintiffs would offer P554

14   into evidence.

15          MS. MCGOVERN:  No objection, Your Honor.

16          THE COURT:  Admitted into evidence.

17      (Plaintiffs' Exhibit 554 received into evidence.)

18   BY MR. FREEDMAN:

19   Q.  Dr. Wright, we have your list of 1,600 -- sorry -- 16,404

20   public addresses.

21          MR. FREEDMAN:  Ms. Vela, can you bring us to Page 208.

22          Can you zoom in on the left-hand side so we can see

23   the number of rows with the public addresses on the left-hand

24   side, please.

25
```

```
 1    BY MR. FREEDMAN:

 2    Q.  And you see 16,405 is filled because the first line says it

 3    is the key of what everything is, the public address, and the

 4    row number?

 5    A.  That's not a public address.

 6    Q.  Dr. Wright, do you see it says:  "16,405"?

 7    A.  I do.

 8    Q.  So it is --

 9          MR. FREEDMAN:  Ms. Vela, can you zoom back out and go

10    to page 1 again.  And can you zoom in on Column D which are the

11    public addresses.

12    BY MR. FREEDMAN:

13    Q.  Are those public addresses, Dr. Wright?

14    A.  I would have to verify, but they appear to be.  They're in

15    standard Bitcoin Number 1 format.

16    Q.  Dr. Wright, each and every one of these Bitcoin addresses

17    at the time you produced this list had 50 Bitcoin in it,

18    correct?

19    A.  I couldn't tell you.

20    Q.  Dr. Wright, what is one thousand -- sorry -- 16,404 times

21    50?

22          MS. MCGOVERN:  Objection, Your Honor.

23    BY MR. FREEDMAN:

24    Q.  It's not a test, Dr. Wright.  It's --

25          THE COURT:  Sustained.
```

# TAB 851

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
                  CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,                November 23, 2021
 6                                     9:26 a.m.
 7          vs.

    CRAIG WRIGHT,
 8
            Defendant.                 Pages 1 THROUGH 192
 9  _____

10            TRANSCRIPT OF TRIAL DAY 15
           BEFORE THE HONORABLE BETH BLOOM
11            UNITED STATES DISTRICT JUDGE
                 And a Jury of 10
12
    Appearances:
13  FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
                        DEVIN FREEDMAN, ESQ.
14                      KYLE ROCHE, ESQ.
                        200 South Biscayne, Suite 5500
15                      Miami, Florida 33131

16                      BOIES SCHILLER & FLEXNER
                        ANDREW BRENNER, ESQ.
17                      STEPHEN N. ZACK, ESQ.
                        STEPHEN LAGOS, ESQ.
18                      100 Southeast 2nd Street, Suite 2800
                        Miami, Florida 33131
19

20  FOR THE DEFENDANT:  RIVERO MESTRE, LLP
                        ANDRES RIVERO, ESQ.
21                      JORGE MESTRE, ESQ.
                        AMANDA M. MCGOVERN, ESQ.
22                      MICHAEL A. FERNANDEZ, ESQ.
                        ZALMAN KASS, ESQ.
23                      AMANDA L. FERNANDEZ, ESQ.
                        2525 Ponce de Leon Boulevard, Suite 1000
24                      Coral Gables, Florida 33134

25
```

2

```
 1    APPEARANCES CONTINUED:

 2
      COURT REPORTER:      Yvette Hernandez
 3                         U.S. District Court
                           400 North Miami Avenue, Room 10-2
 4                         Miami, Florida 33128
                           yvette_hernandez@flsd.uscourts.gov
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1337

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 152 of 247
Case 9:18-cv-80176-BB    Document 851    Entered on FLSD Docket 12/20/2021    Page 8 of 293

8

```
 1    take out:  "Must constitute."

 2            THE COURT:  All right.

 3            MR. BRENNER:  "Active and willful concealment of a

 4    material fact," and then the word "where" should become

 5    "unless."

 6            THE COURT:  "Unless."  All right.

 7            MR. BRENNER:  And then the rest of the sentence is:

 8    "Unless the plaintiffs did not have the equal opportunity to

 9    become apprised of the fact."

10            And if I could just read it from beginning to end, to

11    make sure we're ...

12            THE COURT:  After one and two, it should state:

13    "Fraudulent concealment goes beyond a defendant's mere

14    non-disclosure of a fact.  It requires active and willful

15    concealment of a material fact, unless the plaintiffs did not

16    have the equal opportunity to become apprised of the fact."

17            MR. BRENNER:  I believe that is correct.

18            THE COURT:  All right.  What other changes?

19            MR. BRENNER:  So on the -- Your Honor, may I approach

20    and hand something up?  May I approach to hand something up?

21    Because it will be easier to follow the instruction.

22            THE COURT:  Certainly.

23        (Pause in proceedings.)

24            THE COURT:  All right.  And the next change that the

25    parties have agreed to?
```

1338

1          MR. BRENNER:  Your Honor, we're now focused on the

2    instruction on partnership defined on Pages 8 and 9.  And so

3    the record is clear, what I've handed to Your Honor is a --

4    sort of a one-page bullet point of what I'm going to ask for,

5    and then the second page has the proposed changes.  I have

6    given this to Defense counsel.  I'm confident they will not

7    agree.  So -- but I did hand it to them when I got here this

8    morning.

9          So here's what happened, Judge:  You had an original

10   instruction on partnership defined, and then yesterday evening

11   you sent out a revised instruction.  And here's our concern:

12   What appears to have happened is you've added, based on -- what

13   I must presume is based on the Williams v. Obstfeld case.

14          THE COURT:  That's right.

15          MR. BRENNER:  You added certain elements.  And what

16   our concern is, in adding those elements, you did not also add

17   the elements that -- the fact that RUPA, which is controlling,

18   also presumes, in the absence of agreement, some of those same

19   elements.  So now we have an instruction that added elements,

20   but then doesn't add the presumptions that RUPA provides.

21          So we obviously would go back -- would ask that we go

22   back to our original instruction.  But if not, I think this

23   instruction needs certain additional language, which is what

24   I've given to you on the second page that I handed up to the

25   Court.  And the additional language is in bold.  So that's our

```
 1      request.
 2            We object to the new instruction and ask either to go
 3      back to the old one or to add this new language, which I'm
 4      happy to file what I've handed up to the Court so it's part of
 5      the court record.
 6            THE COURT:  But you would agree that the four factors
 7      of the elements are appropriate to instruct the jury.
 8            MR. BRENNER:  No.  I believe that Williams is
 9      pre-RUPA.  And so I don't agree.  But our position is if Your
10      Honor's going to do those elements, we believe it's appropriate
11      to also instruct on the presumptions according to RUPA.
12            THE COURT:  Okay.  A response?
13            MS. FERNANDEZ:  Thank you, Your Honor.  Amanda
14      Fernandez on behalf of Dr. Wright.
15            As to the fraudulent concealment, we are in agreement
16      that, for those changes, that's fine.
17            As to the definition of partnership, we disagree that
18      the elements that were added by Your Honor should be removed.
19      We did cite two cases post-RUPA that still require those
20      elements, such as Dreyfuss and Rafael -- and the Roca case, 856
21      So.2d 1.  We are fine with including the bold language that
22      states whether or not the persons intend to form a partnership.
23      We agree that that is what the statute states.
24            THE COURT:  And as to the assets?
25            MS. FERNANDEZ:  Would you like to argue that first
```

1340

```
 1    or --

 2            MR. BRENNER:  Yeah.  I think I did because I gave Her

 3    Honor this paper.  So ...

 4            MS. FERNANDEZ:  As to the partnership assets, we would

 5    disagree as to the first part of the bold language and the

 6    losses of the partnership.  The statute language, which is

 7    620.8401, states -- we would say that we should use the exact

 8    language from the statute, which should be:  "Is chargeable

 9    with a share of partnership losses in proportion to partner's

10    share of profits."

11            And as to the rest of the language, we were fine with

12    that addition.  "In addition, in the absence of contrary

13    agreement among the partners, each partner has equal rights in

14    the management and conduct of the partnership business," as

15    that is what the statute says, Your Honor.

16            THE COURT:  Okay.  Are there any others?

17            MR. BRENNER:  Your Honor, I think you made it clear,

18    but just for the record, when you said you ruled on objections,

19    I take it from your instructions you've also -- or should I

20    take it that you have denied the Plaintiffs' motion for

21    judgment as a matter of law on the laches and statute of

22    limitations defenses?

23            THE COURT:  That is correct.  It's a question of fact.

24            MR. BRENNER:  Okay.  So we have nothing further other

25    than to restate all our prior objections and submissions and
```

# TAB 861

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

     *Plaintiffs,*

v.

CRAIG WRIGHT

     *Defendant.*

CASE NO.:  9:18-cv-80176-BB

### THE ESTATE OF DAVID KLEIMAN'S MOTION FOR A NEW TRIAL BASED ON VIOLATIONS OF ORDER EXCLUDING SIBLING RELATIONSHIP EVIDENCE

Plaintiff Ira Kleiman, as the personal representative of the Estate of David Kleiman (referred to herein as the "Estate"), hereby files this Motion for New Trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, and states as follows:

In preparing for trial, the Estate anticipated Defendant would try to inject Ira Kleiman's relationship with his brother David Kleiman into the trial as an attempt to persuade the jury that the Estate should not recover because Ira Kleiman (the Estate's personal representative and beneficiary) was somehow undeserving.

Understanding the potency and prejudice of this issue, the parties vigorously litigated Defendant's ability to make these improper arguments in pretrial motions in limine. The Court, after full briefing, excluded evidence about the brothers' relationship except as to dinner conversations on Thanksgiving Day 2009.

As detailed below, Defendant tried to evade the Court's ruling throughout trial and when that failed, simply violated it. Repeatedly.

Immediately after Plaintiffs' opening statement, Defendant's counsel asserted that Plaintiffs had opened the door to evidence and argument about the brothers' relationship. Ignoring the Court's confirmation that no door had been opened and that evidence on this issue was still excluded pursuant to the Court's prior Order, Defendant's counsel nevertheless repeatedly injected the issue into the trial. Counsel twice raised the issue at the start of Ira Kleiman's cross-examination – pointing out that 2009, *i.e.*, over three and a half years before David's passing, was

1

1342

the last time Ira had seen his brother in person. This pattern continued thereafter. In fact, Defendant inappropriately focused the jury's attention on the brothers' relationship more than ten times during trial.

Defendant's wrongdoing, and the prejudice caused to the Estate, is further exacerbated because the Estate followed the rules. Specifically, cognizant of the Court's order, Plaintiffs presented no evidence about the favorable relationship between the brothers apart from the Thanksgiving dinner conversation. Accordingly, the only evidence the jury heard on this issue was from the Defendant. Defendant's efforts to inject this issue into the trial were not lost on the jury. Indeed, a prominent legal media outlet secured an interview with a juror, who related that (as anticipated by the parties and the Court) the sibling relationship *did* affect the jury's verdict.

Defendant's repeated and fruitful misconduct in injecting this excluded issue into the trial warrants a new trial on the Estate's claims. No new trial is sought or required on W&K Info Defense Research LLC's claims, which were not affected by the sibling relationship issue.

## BACKGROUND

Before trial, the Estate expected Defendant would seek to inject the purported nature of the relationship between Ira and David Kleiman into trial, despite the highly prejudicial nature of this evidence and lack of any probative value. ECF No. [510], at 4–7. To that end, Plaintiffs moved in limine to exclude it. In doing so, Plaintiffs identified examples of objectionable questions asked of Ira Kleiman and others in their depositions, including questions about whether Ira had visited David in the hospital and the last time Ira saw David. *Id.* at 5–6; *id.* Exs. 1, 2, 3. Plaintiffs explained that the lack of any probative value in evidence about the sibling relationship (*id.* at 4–5) and the prejudice its introduction would cause demonstrated Defendant was improperly attempting to use this evidence to paint Ira as underserving. *Id.* at 6–7 ("Such evidence would severely prejudice Plaintiffs in front of a jury that may make a decision in the case premised on how 'good' of a brother Ira was or whether Ira 'deserves' Dave's fortune – instead of basing their decision on the facts and merits of the case."). Finally, Plaintiffs pointed out that it was essential to exclude this evidence before trial because "the harm done by allowing the [testimony or evidence about the purported nature of the sibling relationship would] not be erased from the minds of the jury by an objection or curative instruction." *Id.* at 7. Indeed, forcing Plaintiffs to object would only exacerbate the prejudice. Defendant opposed Plaintiffs' Motion in Limine on this issue. ECF No. [523], at 10–12.

2

1343

The Court granted the Motion in Limine as to this issue and held that "[e]vidence about Ira Kleiman's sibling-relationship with Mr. Kleiman is excluded except as to the Thanksgiving Day 2009 dinner conversations." ECF No. [623], at 16. The Court held that "the quality of the siblings' relationship does not make Plaintiffs' claims or Defendant's defenses more or less probable." *Id.* at 15. "Indeed, **whether Ira Kleiman visited his brother at the hospital**, **spoke to him infrequently**, or **whether Mr. Kleiman mentioned Ira Kleiman to others** ha[d] limited probative value but substantial capacity to cause undue prejudice." *Id.* (emphasis added) (quoting Plaintiffs' motion in limine that the excluded "matters raise[d] significant concerns that the jury w[ould] 'make a decision in this case premised on how "good" of a brother Ira [Kleiman] was or whether [he] "deserves" Dave [Kleiman's] fortune – instead of basing their decision on the facts and merits of the case'").

Despite the clarity of the Court's order, Defendant violated it several times during the trial. Counsel first tried to inject the sibling relationship issue in opening statements, arguing to the Court that Plaintiffs had opened the door to its introduction, a view the Court rejected. Trial Tr. Day 1 at 210:16–211:21. Undeterred, defense counsel asked Ira Kleiman twice in the very first moments of his cross-examination (his fourth and fifth questions) to confirm that the Thanksgiving Day dinner in 2009 was the "last day [Ira] saw his brother in life." While the Estate immediately objected, the objections were overruled and the Estate's request for sidebar was denied:

> Q. All right. You spoke very little -- if I remember correctly, the only thing you commented on in the period between 2008 and April of 2013 is Thanksgiving Day 2009; isn't that right?
> A. Yes.
> Q. Okay. And that was a -- that was November 26th, 2009, right?
> A. Correct.
> **Q. Okay. And you know that date because that's the last day you saw your brother in life, correct?**
> MR. BRENNER: Objection. May we approach?
> MR. RIVERO: Judge, I'll --
> THE COURT: The objection is overruled at this point.
> BY MR. RIVERO:
> Q. Sir?
> A. I'm not exactly certain if that's the very last day. But that's the -- I guess the best memory of last seeing him. I may have seen him other times after that, but I just don't recall it.
> **Q. Sir, your testimony under oath and your best memory is that that was the last day you saw your brother in life, is it not?**
> MR. BRENNER: Same objection, Your Honor.

3

1344

> THE WITNESS: Like I said, I'm not certain that that was --
> THE COURT: The objection is noted. It's overruled at this point.
> THE WITNESS: I could have possibly seen him other days.

Trial Tr. Day 3 at 149:22–150:24 (emphasis added) (relevant excerpts of the trial transcripts are attached as Exhibit A).

The cross examination of Ira Kleiman continued the next day. Defense counsel circled back to this forbidden issue twice more, again twice asking Ira whether Thanksgiving 2009 was the last time he saw David in person. Only then was a renewed objection to the question sustained:

> **Q. Right. The last time you spoke to David Kleiman in life was in 2009, right?**
> A. Correct -- well, no, no. Actually, I shouldn't say that.
> Q. I said that the wrong way.
> A. That's the last time I recall seeing him.
> Q. Are you finished, Mr. Kleiman?
> A. Yes.
> **Q. Let me restate the question. The last time you saw your brother in person was in 2009?**
> MR. BRENNER: Your Honor, just renew the objection from yesterday on this issue.
> THE COURT: I'm sorry. The objection is?
> MR. BRENNER: It violates an order of the Court.
> THE COURT: Sustained.

Trial Tr. Day 4 at 23:12–24:1 (emphasis added). The need for the Estate to object itself brought attention to the issue of the sibling relationship in a way that the Motion in Limine and resulting Order was meant to prevent.

A bit later on that same day, Counsel violated the Motion in Limine Order again and asked Ira a question the Court had expressly forbidden:

> **Q. You never saw him in the hospital?**
> A. No.

Trial Tr. Day 4 at 84:1–2 (emphasis added); *compare* ECF No. [623], at 16 ("Indeed, **whether Ira Kleiman visited his brother at the hospital** . . . has limited probative value but substantial capacity to cause undue prejudice.").

Counsel used every opportunity to suggest to the jury, in violation of the Court's order, that there was an estrangement between David and Ira. For example, although probative of no claim or defense in the case, counsel had Ira confirm that he didn't find out Dave had died until days after, he'd passed away and his body has been found:

> **Q. All right. To be clear, just to make this crystal clear, you**

4

1345

**didn't learn of Dave's death until a few days after his body was found?**
    A. Yes.
    **Q. And he -- you don't know the exact date, but he had died some**
**days before?**
    A. I believe so.

Trial Tr. Day 4 at 135:22–136:3 (emphasis added).

    Plaintiffs expected Defendant's counsel to redact portions of otherwise admissible exhibits that violated the Court's orders (as Plaintiffs did), but notably—they did not. Instead, defense counsel specifically highlighted portions of an exhibit the Court held violated its order on the motion in limine regarding the brothers' relationship, and later ordered that portion redacted (*see* ECF No. [828-3]):

    Q. Mr. Kleiman --
    **MR. RIVERO: Mr. Shah, if you could highlight the first two**
**sentences of Paragraph 3**.
    BY MR. RIVERO:
    **Q. "Ira is David's brother. He had limited contact and personal**
**knowledge as to David's financial affairs throughout David's life."**
**Correct?**
    A. Correct.
    MR. BRENNER: Your Honor, I have to ask to approach.
    THE COURT: I'm sorry?
    MR. BRENNER: I have to ask to approach, Your Honor, and ask
that it be taken down during the sidebar.
    THE COURT: All right. If we can take it down for a moment.

Trial Tr. Day 4 at 173:13–25 (emphasis added). Defendant's counsel also showed the jury—unredacted—portions of the exhibit stating that "**Ira never saw [David] at the hospital**" and "**may have seen David one time when David took a leave from the hospital,**" both of which were later redacted as inconsistent with the Motion in Limine Order. *Compare* D008 (emphasis added), *with* ECF No. [828-3].

    The next day, Defendant's counsel took the opportunity to, once again, improperly insinuate that Ira did not speak with David as frequently as a deserving brother should during the last year of David's life:

    BY MR. RIVERO:
    Q. Mr. Kleiman, before I come back to these email exchanges
between your brother and Craig Wright, I just want to talk with you about
one other subject and that is your telephone communications with David
Kleiman. **Would you agree with me that between March 12 and April**
**7th, 2013, on the cell phone at least, you spoke with David Kleiman six**

5

1346

**times?**
    A. What time again?
    **Q. This is between -- this is in the last year, the last 13 months of your brother's life.**
    MR. BRENNER: Objection, Your Honor. Subject to court order.
    THE COURT: The objection is sustained.
    MR. RIVERO: I'll move on.

Trial Tr. Day 5 at 68:7–21 (emphasis added).

Defense counsel's inappropriate attempts to violate the Court's Motion in Limine Order permeated not just their actual questions to Ira on cross examination, but also extended to using argument on admissibility of an exhibit in open court improperly to suggest to the jury that there was a lack of communication between David and Ira in the last year of David's life:

    **MR. RIVERO: Judge, it's the absence of voice mails and that is highly relevant.**
    MR. BRENNER: Yeah, Judge. And also, understand, subject to the Court's order, too.
    THE COURT: Yeah. That's where -- the objection is sustained.

Trial Tr. Day 5 at 70:16–71:3 (emphasis added).

The misconduct was not constrained to the cross-examination of Ira Kleiman because counsel also asked Patrick Paige about whether he had heard from David about Ira over the course of the relationship between Paige and David, again violating a specific direction the Court provided in its Motion in Limine Order:

    Q. So you knew David Kleiman for about 20 years.
    A. Yeah. I believe it was about 20 years.
    **Q. During that time, how many times did you hear of Ira Kleiman?**
    **A. I can't really recall of any offhand, other than he had a brother.**

Trial Tr. Day 2 at 184:19–24 (emphasis added).

Unlike Defendant, the Estate was careful not to introduce evidence about the sibling relationship, which would have revealed that the relationship Defendant's attorneys tried to paint as estranged was a multifaceted relationship with strong positive aspects as well. For example, Ira Kleiman was very often in touch with David Kleiman while the latter was in the hospital, including more than 100 phone calls between the two just during David's final hospitalization. *See, e.g.*, P721. And Plaintiffs did not highlight how David's decision to make Ira the sole beneficiary of his estate, his personal representative, and his healthcare proxy likewise reflects positively on the

6

1347

relationship between the brothers. *See* JE22 at 3 (will naming Ira Kleiman as personal representative of the estate and sole beneficiary); D99 at 787; D102 at 25, 173 ("According to Mr. Kleiman, his brother Ira is his health care surrogate."), 184 (same), 274 ("Mr. Kleiman appointed his brother Ira Kleiman, as his health care surrogate."), 277. Nor did Mr. Kleiman testify that he also listed his brother as a beneficiary of his own estate. The Estate was punished, in effect, by its compliance with the Court's order in not introducing the positive aspects of David and Ira's relationship while Defendant disregarded that ruling.

These violations were salient, and not subtle. For example, the sibling relationship was extensively explored in media coverage of the trial. An article on Yahoo!, for example, reported that "Andres Rivero, lead counsel for Wright's defense, focused his cross-examination of Ira on his strained relationship with his brother Dave before the latter's death, in an attempt to depict Ira as purely motivated by financial gain." *See* Cheyenne Ligon, *Day 4 of Kleiman v. Wright: Craig Wright's Testimony Delayed*, Yahoo!, Nov. 4, 2021, https://www.yahoo.com/now/day-4-kleiman-v-wright-235110145.html (attached as Exhibit B).

Defense counsel's inappropriate suggestions about the sibling relationship were clearly noticed by the media present in the courtroom. One article related that "despite living only a few miles apart, that Thanksgiving dinner was the last time the brothers ever saw each other face-to-face. . . . Ira's disinterest in Dave's welfare seems to have been matched only by his disinterest in (a) preserving the integrity of Dave's digital devices . . . ." Steven Stradbrooke, *Ira Kleiman Serves Up a Bitcoin Turkey in Wright Lawsuit Testimony*, Coingeek, Nov. 5, 2021, https://coingeek.com/ira-kleiman-serves-up-a-bitcoin-turkey-in-wright-lawsuit-testimony/.[1] Another article suggested that cross-examination of Ira "showed that Ira Kleiman did not really know his brother Dave that well and that he had little to no knowledge of the matters going on in Dave's life until after he passed away." Patrick Thompson, *Kleiman v Wright Day 4 Recap: What Ira Kleiman Knew About Dave Kleiman*, Coingeek, Nov. 5, 2021, https://coingeek.com/kleiman-v-wright-day-4-recap-what-ira-kleiman-knew-about-dave-kleiman/. And it quoted a portion of an exhibit specifically excluded by the Court, suggesting the exhibit was visible to the jury for long enough for a juror

---

[1] Plaintiffs attach the full Coingeek articles, which discuss the sibling relationship at even greater length, as Exhibit C through Exhibit F. The sibling relationship was also highlighted in videos released by Coingeek about the trial. Coingeek, *Kleiman vs Wright*, YouTube, https://www.youtube.com/playlist?list=PLTpDsXEwfAQqeKnLhhKMq4blGCqX_ecoY (last visited Jan. 4, 2022).

(like the reporter) to copy down the prejudicial portion. *Id.* ("'He [Ira] had limited contact and personal knowledge of David's financial affairs throughout Dave's life,' wrote Ira Kleiman's lawyer Joseph Karp in a letter to the Director of Treasury."). Another article explained that "the defense" had "emphasized" in cross-examining Ira "that Ira did not actually know much about critical issues or issues of importance in his brother's life." Patrick Thompson, *Ira Kleiman Shows Up on Day 3 of Kleiman v Wright Trial*, Coingeek, Nov. 4, 2021, https://coingeek.com/ira-kleiman-shows-up-on-day-3-of-kleiman-v-wright-trial/. Yet another article stated that "despite Dave's health declining steeply from then until his death in 2013, Ira never visited Dave in hospital. Nor did he ask or attempt to find out about what became of Dave's world-changing project of digital money, which Ira undoubtedly should have found at odds with Dave's predicament and apparent poverty. Ira Kleiman didn't seem to mind." Jordan Atkins, *Satoshi Nakamoto Trial, the Biggest Revelations From Week 1 of Kleiman v Wright*, Coingeek, Nov. 6, 2021, https://coingeek.com/satoshi-nakamoto-trial-the-biggest-revelations-from-week-1-of-kleiman-v-wright/.[2]

Following trial, Law360 secured an interview with one of the ten jurors who served on the case. That interview confirmed the obvious, confirmed what the Estate was concerned about all along, and confirmed the Court was correct in excluding these highly prejudicial comments from trial.

Defendant's violations of the Court's Motion in Limine Order impacted the consideration of the evidence and affected the verdict. *See* Carolina Bolado, *No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360*, Law360, Dec. 23, 2021, https://www.law360.com/articles/1451020/no-proof-bitcoin-inventor-owed-friend-juror-tells-law360 (attached as Exhibit G). The article explained that Ira's failure to visit Dave in the hospital affected their decision: "In three years he didn't go to the hospital?" the juror said. 'That clouded my view as far as what the actual record stated.'" *Id.*

## LEGAL STANDARDS

"The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was such as to impair gravely the calm and dispassionate consideration of the case by the jury." *BankAtlantic v. Blythe Eastman Paine*

---

[2] If one of these publications made its way to the jury, that would of course also be extremely prejudicial to Plaintiffs and would independently be the basis of a new trial.

*Webber*, 955 F.2d 1467 (11th Cir. 1992). Relevant factors in making the determination of whether a new trial is necessary include "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial." *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1160 (11th Cir. 1986) (vacating a judgment and remanding for a new trial based on two impermissible questions from counsel and five references to the unfairly prejudicial issue in the apparent absence of a pretrial ruling on the issue).

## ARGUMENT

A new trial is necessary on the Estate's claims because defense counsel repeatedly violated the Court's order, the issues in dispute were close, the violations were prejudicial, and counsel intentionally elicited the information and focused on it during the trial. A partial (rather than full) retrial is appropriate because defense counsel's comments and questions on the sibling relationship targeted the Estate, not W&K.

### I.    Counsel's Violations Prejudiced the Estate and Require a New Trial.

Counsel for Defendant's many violations strongly prejudiced the Estate and warrant a new trial for at least five reasons: (1) the references to the sibling relationship suggested an improper basis for decision; (2) counsel made several references to the sibling relationship; (3) early objections to impermissible sibling relationship lines of questioning were overruled; (4) the Estate could not correct misleading aspersions Defendant cast on the sibling relationship; and (5) there is direct information here suggesting the prejudicial effect of the improper comments on the jury's decision.

As predicted by Plaintiffs' Motion in Limine, the more than ten references to the relationship between David and Ira Kleiman by counsel for Defendant improperly suggested to the jury that the sibling relationship was a valid consideration in deciding the Estate's claims. "While [the Eleventh Circuit has] recognize[d] that a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath," as Defendant's counsel did here. *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983). "'Verdicts based on unfettered and subjective notions of 'morality' and 'justice' 'are lawless, a denial of due process and constitute an exercise of erroneously seized power.'" *In re Engle Cases*, 3:09-CV-10000-J-32, 2009 WL 9119991, at *18 (M.D. Fla. Nov. 27, 2009) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)).

9

1350

A new trial on the Estate's claims is appropriate. For example, in *Christopher v. Florida*, 449 F.3d 1360, 1365 (11th Cir. 2006), the Eleventh Circuit affirmed the district court's grant of a new trial when plaintiff's counsel "ignored the court's earlier grant of qualified immunity to defendants for all alleged acts other than an intentional blow to the head" by injecting argument which "was a clear invitation to the jury" to ignore the court's prior holding. *Id.* at 1366. In *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990), the Eleventh Circuit affirmed the district court's grant of a new trial when counsel impermissibly referred to other litigation that the court had excluded. *Id.* at 676. And in *Goodman v. Safeco Insurance Co. of Illinois*, No. 8:13-CV-2641-T-30EAJ, 2015 WL 898696 (M.D. Fla. Mar. 3, 2015), the court held that the defendant was "entitled to a new trial" based on a comment by the plaintiff's counsel that "encouraged the jury to decide the case not on the merits, but on the idea that the insurance company would be cheating an innocent and injured third party" because the reference "had no probative value, invited the jury to ignore the law, and was highly prejudicial." *Id.* at *4.

The at least ten violations here are more numerous than those in cases holding a new trial was appropriate. Several cases granting new trials involve just a single violation, to which the opposing counsel did not object. *See McWhorter*, 906 F.2d at 677 (single violation in closing argument to which the opposing party did not object); *Chistopher*, 449 F.3d at 1365 (same); *Goodman*, 2015 WL 898696, at *4 (same). Here, counsel made at least ten improper references to the sibling relationship, and Plaintiffs' counsel objected to many violations. Defendant's counsel raised the excluded issue by the fourth question in the cross-examination of Ira Kleiman (12 transcript lines into the cross-examination), making clear that Defendant had a premeditated plan to raise the issue. The timing, number, and manner of references shows that Defendant intentionally elicited the evidence about the relationship between David and Ira and meant to focus the jury's attention on the issue.[3]

---

[3] Subjective intent by a party to violate the Court's orders is not the relevant factor. *See Aetna*, 803 F.2d at 1160 (explaining "Aetna's counsel clearly intended to have this evidence come before the jury" without evidence of subjective intent to violate a court order); *see also Chistopher*, 449 F.3d at 1365–66 (no analysis of subjective intent to violate the court's orders); *McWhorter*, 906 F.2d at 677 (same); *Goodman*, 2015 WL 898696, at *4–5 (same). Instead, the relevant factor is whether counsel intentionally elicited the information, which Defendant's counsel repeatedly did here, as opposed to a third party or hostile witness gratuitously introducing the evidence in response to an unrelated question.

10

1351

The prejudice to the Estate was amplified by the overruling of early objections to Defendant's counsel raising the issue of the sibling relationship. The court in *Castle v. Thompson*, No. 2:07-CV-0104-WCO, 2010 WL 11507513 (N.D. Ga. Mar. 22, 2010), *aff'd sub nom. Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194 (11th Cir. 2011), recognized that the "court's error in allowing the introduction evidence at trial that had previously been ruled inadmissible, along with plaintiff's counsel's abuse of evidentiary rulings, likely affected the jury's verdict, as well as its award of punitive damages." *Id.* at *6 (conditionally granting the new trial motion because the "error on the part of the court created prejudice against the defendants"). *Soltero v. Swire Dev. Sales, Inc.*, No. 08-20260-CIV, 2010 WL 11506701 (S.D. Fla. Apr. 19, 2010), *aff'd*, 485 F. App'x 377 (11th Cir. 2012), similarly awarded a new trial on punitive damages based on comments by counsel contrary to court rulings despite attempted curative statement and citing as one basis that an initial objection was erroneously overruled. *Id.* at *12.

"As many cases have noted, the Court cannot 'unring a bell;' once the jury hears improper testimony or argument, it is presumed that it may rely upon it in its deliberation." *Goodman v. Safeco Ins. Co. of Illinois*, No. 8:13-CV-2641-T-30EAJ, 2015 WL 898696, at *5 (M.D. Fla. Mar. 3, 2015). And "repeated exposure of a jury to prejudicial information" diminishes the effectiveness of even sustained objections. *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977) ("'[Y]ou can throw a skunk into the jury box and instruct the jurors not to smell it, but it doesn't do any good.'"); *see Singh v. Caribbean Airlines Ltd.*, 13-CV-20639, 2014 WL 4101544, at *1 (S.D. Fla. Jan. 28, 2014) ("In resolving evidentiary disputes before trial, motions in *limine* avoid the need to 'unring the bell' once inadmissible evidence has been presented to the jury.").

On top of the irremediable unfair prejudice from these violations, Plaintiffs—abiding by the Court's order—did not have the opportunity to correct the misrepresentations made to the jury about the brothers' relationship. Had the Court ruled that the brothers' relationship was probative and admissible, Plaintiffs could have presented evidence of the more than 100 phone calls between Ira and David just during David's final hospitalization. *See, e.g.*, P721. And Plaintiffs could have presented documentary and witness evidence and argued to the jury about how David's decisions to make Ira the sole beneficiary of his estate, his personal representative, and his healthcare proxy likewise reflect positively on the relationship between the brothers. *See* JE22 at 3 (will naming Ira Kleiman as personal representative of the estate and sole beneficiary); D99 at 787; D102 at 25, 173 ("According to Mr. Kleiman, his brother Ira is his health care surrogate."), 184 (same), 274

11

1352

("Mr. Kleiman appointed his brother Ira Kleiman, as his health care surrogate."), 277. But the Court rightly excluded evidence on this issue altogether (except for the Thanksgiving dinner). Plaintiffs abided by this Order. Defendant indisputably did not. As a result, the Estate was prejudiced.

The factual issues on the Estate's claims were, without question, at least close. *See Aetna*, 803 F.2d at 1160 (identifying closeness of facts as a factor in whether a new trial is appropriate). As the Court recognized in denying Defendant's broad Motions for Judgment as a Matter of Law brought at the close of Plaintiffs' case and at the close of evidence, a reasonable jury could find for the Estate on its claims. *See* ECF No. [796]. For example, the evidence of a partnership in this case included numerous statements by Defendant, himself, about a partnership with David Kleiman to develop and mine bitcoin. *See, e.g.*, P097 at 1; P117; P167 at 2; P172 at 7; P200 at 1; P439 at 4; P459 at 1–2; P464 at 5. The jury deliberated across seven days (over a 13-day period), including for four days after declaring itself deadlocked and receiving an *Allen* charge (ECF No. [813]).

Unlike the typical case granting a new trial in which the effect of a violation of a court's order on the jury's deliberations is unclear, the Law360 article provides information that Defendant's violation of the Court's Order mattered, which further supports the request for a new trial. In *McWhorter*, the presence of less direct information than is present here about the prejudicial effect of the violation—in that case a jury message that it had not received the exhibit violating the court's orders—supported the granting of a new trial because it made it more likely that the violation had affected the outcome. *See McWhorter*, 906 F.2d at 677 (holding that the new trial was appropriate "particularly in light of the jury's message that it had not received Exhibit 24"); *see id.* ("the jury noticed that the *Post–Herald* complaint was not included in the exhibits"). Here, the impression by the juror interviewed by Law360 that "'[i]n three years [Ira] didn't go to the hospital'" to visit David "'clouded [the juror's] view as far as what the actual record stated.'" Bolado, *No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360*.[4] Law360 is an independent media outlet without a stake in the outcome of this litigation. Thus, the available information about the prejudice from these violations by Defendant is more direct than in cases

---

[4] Counsel for Plaintiffs has heeded the Court's instruction to not contact any of the jurors. As far as Plaintiffs are aware, the Law360 article provides the only direct information about the effect of Defendant's violations of the Court's Motion in Limine Order on the verdict.

granting a new trial (*see, e.g.*, *Christopher*, 449 F.3d at 1367 (no apparent evidence about influence on the jury); *McWhorter*, 906 F.2d at 677 (only circumstantial available information that the excluded issue influenced the jury)), and more trustworthy than in a case in which counsel for a party has secured an interview with a juror.

The media coverage during the trial described above shows that the introduction of David and Ira's relationship by Defendant was potent. As the Yahoo! article explained, the relationship came across as a focus of Defendant's cross-examination of Ira, the witness who Defendant examined for by far the longest time and a central witness by all accounts. And the issue's particular coverage across articles and videos suggests the unfairly prejudicial line of inquiry was significantly highlighted at trial and improperly beneficial to Defendant.

## II.    The Violations Here Are Particularly Problematic and More Likely to Be Intentional Given the Court's Pretrial Exclusion Order.

That the prejudicial comments and questions here were violations by counsel of pretrial evidentiary rulings further supports granting a new trial because the misconduct undermines the court's authority and is more likely to be intentional and avoidable. Both *Christopher* and *McWhorter* recognized the fact that the prejudicial comments violated a previous court order as independently supporting a new trial. *See Christopher*, 449 F.3d at 1367 (A "district court's grant of a new trial serve[s] to protect the rights of Defendants and to *vindicate the authority of the court*." (emphasis in original)); *McWhorter*, 906 F.2d at 677 ("Trial counsel's closing argument was in direct violation of the district court's ruling and was thus highly improper."). Other circuits have expressed the same view that violations of previous court orders particularly support a request for a new trial. *See Adams Laboratories, Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1226 (7th Cir. 1985) (counsel's reference to excluded evidence in direct contravention of the district court's order constituted prejudicial error); *Brown v. Royalty*, 535 F.2d 1024, 1028 (8th Cir. 1976) (repeated, deliberate reference to evidence excluded by district court is clear misconduct and grounds for new trial). Here, counsel's at least ten violations of the Court's pretrial exclusion of sibling relationship evidence other than Thanksgiving 2009 reflect far more violations than in either *Christopher* or *McWhorter*, both affirming the granting of a new trial.[5]

---

[5] In affirming a district court's decision to deny a new trial motion, *Sorenson v. Raymond*, 532 F.2d 496 (5th Cir. 1976), made clear the gravity of even a single violation of a court's prior

13

1354

## CONCLUSION

For the foregoing reasons, the Court should grant a new trial on the Estate's claims.

Dated:  January 4, 2022

Respectfully submitted,

By: */s/ Devin "Vel" Freedman*
Andrew S. Brenner
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Maxwell V. Pritt
Alexander J. Holtzman
**BOIES SCHILLER FLEXNER LLP**
44 Montgomery Street, Floor 41
San Francisco, CA 94104
mpritt@bsfllp.com
aholtzman@bsfllp.com

Velvel (Devin) Freedman
**ROCHE FREEDMAN LLP**
1 SE 3rd Ave
Suite 1240 Miami, Florida 33131
vel@rochefreedman.com

Kyle W. Roche
**ROCHE FREEDMAN LLP**
99 Park Avenue, 19th Floor
New York, New York 10016
kyle@rochefreedman.com

*Counsel to Plaintiff Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman*

---

order. After counsel asked a question of a witness in violation of a previous order against introducing evidence of possible drug use by a party, "the trial judge immediately instructed the jury to disregard the question, making no further explanation to the jury only because appellants' counsel asked him not to." *Id.* at 500. Because "the question elicited no damaging information," the court could not say that "the prejudicial question made the proceeding so manifestly unfair that the trial judge abused his discretion in refusing to grant a new trial." *Id.* The repeated violations here did elicit damaging information and did prejudice the outcome.

1355

**S.D. FLA. L.R. 7.1 CERTIFICATION**

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Ira Kleiman as the personal representative of the Estate of David Kleiman conferred with Defendant's counsel who opposes the relief sought herein.

/s/ Andrew Brenner
Andrew S. Brenner, Esq.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 4, 2022 a true and correct copy of the foregoing was filed with CM/ECF, which caused a copy to be served on all counsel of record.

/s/ Devin "Vel" Freedman
Devin "Vel" Freedman, Esq.

15

1356

# TAB 861-1

# EXHIBIT A

1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 WEST PALM BEACH DIVISION
               CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,              November 1, 2021
 6                                   9:01 a.m.
            vs.
 7
    CRAIG WRIGHT,
 8
            Defendant.              Pages 1 THROUGH 273
 9  _____

10              TRANSCRIPT OF TRIAL DAY 1
           BEFORE THE HONORABLE BETH BLOOM
11            UNITED STATES DISTRICT JUDGE
                 And a Jury of 10
12
    Appearances:
13  FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
                        DEVIN FREEDMAN, ESQ.
14                      KYLE ROCHE, ESQ.
                        200 South Biscayne, Suite 5500
15                      Miami, Florida 33131

16                      BOIES SCHILLER & FLEXNER
                        ANDREW BRENNER, ESQ.
17                      STEPHEN N. ZACK, ESQ.
                        100 Southeast 2nd Street, Suite 2800
18                      Miami, Florida 33131

19  FOR THE DEFENDANT:  RIVERO MESTRE, LLP
                        ANDRES RIVERO, ESQ.
20                      JORGE MESTRE, ESQ.
                        AMANDA M. MCGOVERN, ESQ.
21                      MICHAEL A. FERNANDEZ, ESQ.
                        2525 Ponce de Leon Boulevard, Suite 1000
22                      Coral Gables, Florida 33134

23  COURT REPORTER:     Yvette Hernandez
                        U.S. District Court
24                      400 North Miami Avenue, Room 10-2
                        Miami, Florida 33128
25                      yvette_hernandez@flsd.uscourts.gov
```

2

1                          I N D E X

2    Certificate .................................... 273
     Voir Dire ...................................... 18
3    Jury sworn ..................................... 172
     Preliminary jury instructions .................. 173
4    Plaintiff opening statement .................... 183
     Defense opening statement ...................... 212

5

6

7                       W I T N E S S

8    ON BEHALF OF THE PLAINTIFF:                    PAGE
     ANDREAS M. ANTONOPOULOS
9    DIRECT EXAMINATION BY MR. ROCHE                   239

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1359

1    comfort break.  The court security officer will take you into

2    the jury room.  We have two restrooms in the back.  And I'll

3    see you back here in 20 minutes, at 3:15, please.

4        (Jury not present, 2:57 p.m.)

5            THE COURT:  All right.  I'll see you back here at

6    3:15.

7            MR. RIVERO:  Your Honor, may I raise one issue before

8    the break?

9            THE COURT:  Yes, sir.

10           MR. RIVERO:  Yes.  Thank you, Judge.  I did not object

11   other than on the specific demonstrative issue.

12           THE COURT:  You can go ahead and have a seat, counsel.

13           MR. RIVERO:  Although I believe much of the opening

14   went far beyond what is ordinary in an opening, we didn't raise

15   that issue.

16           But Judge, the Plaintiffs have squarely injected the

17   relationship between Ira Kleiman and his deceased brother,

18   including the sharing of a memory -- "I want to share a memory

19   about my dead brother" and the Thanksgiving Day story, which

20   there was a ruling by the Court that we could not comment on

21   the relationship between the brothers.

22           But Judge, I think, frankly, this is only the opening

23   saga.  Their intention is -- and I think the Court will see

24   already, their intention is to build up that relationship to

25   increase the credibility of Ira Kleiman as to the only evidence

1    during David Kleiman's lifetime that he ever said anything to

2    anyone about this supposed partnership.

3        My request to the Court is that we should be permitted

4    to comment on and bring out evidence about the credibility of

5    that relationship and those statements.

6        MR. ROCHE:  Your Honor, may I respond?

7        THE COURT:  Mr. Roche?

8        MR. ROCHE:  I don't have Your Honor's motion in limine

9    ruling in front of me, but I've read it many times.  Your

10   ruling stated that what was excluded was everything that

11   happened after the Thanksgiving dinner.

12       I was very careful in my opening to only reference

13   Dave, the individual, and that Thanksgiving dinner.  We did not

14   open the door to anything discussing Ira and Dave's

15   relationship.  Certainly nothing after 2009.

16       THE COURT:  All right.  Well, let me state what's

17   elementary, and that is this is an opening statement.  This is

18   not the evidence in the case.  I'm certainly not going to

19   address any anticipated intentions.

20       With regard to opening the door, we will address it at

21   the time that the door is actually opened.

22       MR. RIVERO:  Thank you, Your Honor.

23       THE COURT:  I'll see you back here at 3:15.

24   (Recess from 3:00 p.m. to 3:13 p.m.)

25       THE COURT:  All right.  Welcome back.

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 178 of 247
Case 9:18-cv-80176-BB   Document 861-1   Entered on FLSD Docket 01/04/2022   Page 6 of 34

273

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5          I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 1st

 9    day of November, 2021, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13    1 - 273.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 10th day of November, 2021.

16

17                    /s/Yvette Hernandez
                      Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                    400 North Miami Avenue, 10-2
                      Miami, Florida 33128
19                    (305) 523-5698
                      yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 179 of 247
Case 9:18-cv-80176-BB    Document 861-1    Entered on FLSD Docket 01/04/2022    Page 7 of 34

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 WEST PALM BEACH DIVISION
               CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
              Plaintiffs,              November 2, 2021
 6                                     9:59 a.m.
 7        vs.

    CRAIG WRIGHT,
 8
              Defendant.              Pages 1 THROUGH 197
 9  _____

                TRANSCRIPT OF TRIAL DAY 2
10          BEFORE THE HONORABLE BETH BLOOM
              UNITED STATES DISTRICT JUDGE
11               And a Jury of 10

12  Appearances:
    FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
13                       DEVIN FREEDMAN, ESQ.
                         KYLE ROCHE, ESQ.
14                       200 South Biscayne, Suite 5500
                         Miami, Florida 33131
15
                         BOIES SCHILLER & FLEXNER
16                       ANDREW BRENNER, ESQ.
                         STEPHEN N. ZACK, ESQ.
17                       100 Southeast 2nd Street, Suite 2800
                         Miami, Florida 33131
18
    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                       ANDRES RIVERO, ESQ.
                         JORGE MESTRE, ESQ.
20                       AMANDA M. MCGOVERN, ESQ.
                         MICHAEL A. FERNANDEZ, ESQ.
21                       ZALMAN KASS, ESQ.
                         2525 Ponce de Leon Boulevard, Suite 1000
22                       Coral Gables, Florida 33134

23  COURT REPORTER:      Yvette Hernandez
                         U.S. District Court
24                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
25                       yvette_hernandez@flsd.uscourts.gov
```

2

**I N D E X**

Certificate.................................... 197

**W I T N E S S**

**ON BEHALF OF THE PLAINTIFF:**                              PAGE

ANDREAS ANTONOPOULOS
CONTINUED DIRECT EXAMINATION BY MR. ROCHE              7
CROSS-EXAMINATION BY MR. RIVERO                       37
REDIRECT EXAMINATION BY MR. ROCHE                    111

ROBERT RADVANOVSKY
(via video deposition)                               120

PATRICK PAIGE
DIRECT EXAMINATION BY MR. FREEDMAN                    122
CROSS-EXAMINATION BY MR. MESTRE                       175
REDIRECT EXAMINATION BY MR. FREEDMAN                  185

GAVIN ANDRESEN
(via video deposition)                               186

**E X H I B I T S**

| EX. NO.: | OFFERED | ADMITTED |
|---|---|---|
| Defendant's 408 | 54 | 54 |
| Defendant's 398 | 69 | 70 |
| Defendant's 005 | 143 | 143 |
| Defendant's 042 | 150 | 150 |
| Plaintiff's 122 | 155 | 155 |
| Joint     045 | 160 | 160 |
| Plaintiff's 717 | 164 | 165 |
| Plaintiff's 696 | 169 | 169 |
| Defendant's 425 | 183 | 183 |

1364

184

1    what Paragraph 45 actually asks for is to enjoin you personally

2    from using any Bitcoin that was the property of David Kleiman;

3    isn't that right?

4    A.  Yes.

5    Q.  Did you know Mr. Kleiman before he sued you?

6    A.  I was aware he had a brother.

7    Q.  Do you recognize him here?

8    A.  I don't believe he's here.

9         MR. MESTRE:  Your Honor, may I have a moment to confer

10    with my co-counsel?

11         THE COURT:  Certainly.

12    (Pause in proceedings.)

13         THE COURT:  Mr. Mestre?

14         MR. MESTRE:  Just a few more questions.  Thank you,

15    Your Honor.

16    BY MR. MESTRE:

17    Q.  Did David Kleiman ever ask you to mine Bitcoin?

18    A.  No.

19    Q.  So you knew David Kleiman for about 20 years.

20    A.  Yeah.  I believe it was about 20 years.

21    Q.  During that time, how many times did you hear of Ira

22    Kleiman?

23    A.  I can't really recall of any offhand, other than he had a

24    brother.

25    Q.  So Mr. Freedman asked you about this claim.  Have you read

1365

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 182 of 247
Case 9:18-cv-80176-BB    Document 861-1    Entered on FLSD Docket 01/04/2022    Page 10 of 34

197

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                 C E R T I F I C A T E

 5         I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 2nd

 9    day of November, 2021, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13    1 - 197.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 11th day of November, 2021.

16

17              /s/Yvette Hernandez
                Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18              400 North Miami Avenue, 10-2
                Miami, Florida 33128
19              (305) 523-5698
                yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 183 of 247
Case 9:18-cv-80176-BB   Document 861-1   Entered on FLSD Docket 01/04/2022   Page 11 of 34

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                       WEST PALM BEACH DIVISION
                         CASE NO. 9:18-cv-80176-BB
 3
      IRA KLEIMAN, as the personal representative
 4    of the Estate of David Kleiman, and W&K Info
      Defense Research, LLC,
 5
                  Plaintiffs,                   November 3, 2021
 6                                              9:42 a.m.
              vs.
 7
      CRAIG WRIGHT,
 8
                  Defendant.                   Pages 1 THROUGH 193
 9    _____

10                    TRANSCRIPT OF TRIAL DAY 3
                    BEFORE THE HONORABLE BETH BLOOM
11                  UNITED STATES DISTRICT JUDGE
                         And a Jury of 10
12
      Appearances:
13
      FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
14                         DEVIN FREEDMAN, ESQ.
                           KYLE ROCHE, ESQ.
15                         200 South Biscayne, Suite 5500
                           Miami, Florida 33131
16
                           BOIES SCHILLER & FLEXNER
17                         ANDREW BRENNER, ESQ.
                           STEPHEN N. ZACK, ESQ.
18                         100 Southeast 2nd Street, Suite 2800
                           Miami, Florida 33131
19

20    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
                           ANDRES RIVERO, ESQ.
21                         JORGE MESTRE, ESQ.
                           AMANDA M. MCGOVERN, ESQ.
22                         MICHAEL A. FERNANDEZ, ESQ.
                           ZALMAN KASS, ESQ.
23                         2525 Ponce de Leon Boulevard, Suite 1000
                           Coral Gables, Florida 33134
24

25
```

2

```
 1    Appearances continued:

 2    FOR JOHN DOE:       GLASER WEIL
      (Via Zoom)          PATRICIA L. GLASER, ESQ.
 3                        RICHARD BUCKNER, ESQ.
                          10250 Constellation Boulevard, 19th Floor
 4                        Los Angeles, California 90067

 5                        STEARNS WEAVER MILLER
                          DARRELL PAYNE, ESQ.
 6                        150 West Flagler Street, Suite 2200
                          Miami, Florida 33130

 7
      COURT REPORTER:     Yvette Hernandez
 8                        U.S. District Court
                          400 North Miami Avenue, Room 10-2
 9                        Miami, Florida 33128
                          yvette_hernandez@flsd.uscourts.gov
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1368

3

1

**I N D E X**

2

Certificate.................................... 193

3

4

**W I T N E S S**

5

**ON BEHALF OF THE PLAINTIFF:**                              PAGE

6

JAMIE WILSON
(via video deposition)                                    20

7

JIMMY NGUYEN
8   (via video deposition)                              20 & 21

9

IRA KLEIMAN
DIRECT EXAMINATION BY MR. BRENNER                          24
10  CROSS-EXAMINATION BY MR. RIVERO                          149

11

12

**E X H I B I T S**

**EX. NO.:**                                     OFFERED    ADMITTED
13  Joint      2022                                 32         32
    Plaintiffs'  863                                36         36
14  Plaintiffs'  867                                41         41
    Plaintiffs'  120                                45         45
15  Plaintiffs'  138                                51         51
    Plaintiffs'  862                                61         62
16  Plaintiffs'  156                                73         73
    Plaintiffs'  164                                85         85
17  Plaintiffs'  105                                88         88
    Plaintiffs'  509                                89         89
18  Plaintiffs'  709                                89         90
    Plaintiffs'  710                                90         90
19  Plaintiffs'  161                                94         94
    Plaintiffs'  564                               126        127
20  Plaintiffs'  731                               133        133
    Defendant's  285                               138        138
21  Plaintiffs'  133                               139        139
    Plaintiffs'  733                               143        144

22

23

24

25

1369

1          THE COURT:  Certainly.

2      (Pause in proceedings.)

3          MR. BRENNER:  Mr. Kleiman, I have no further questions

4    at this time.  Please give the same responsiveness to

5    Mr. Rivero.

6          THE COURT:  Cross-examination.

7          MR. RIVERO:  Thank you, Your Honor.

8      (Pause in proceedings.)

9          MR. RIVERO:  May it please the Court, counsel.

10                     CROSS-EXAMINATION

11   BY MR. RIVERO:

12   Q.  Mr. Kleiman, this is a chart -- you were here for opening;

13   isn't that right?  You were here for opening, were you not,

14   Mr. Kleiman?

15   A.  Yes.

16   Q.  This is the chart your counsel used during opening,

17   correct?

18   A.  Yes.

19   Q.  You spoke a lot, sir, here on your direct examination about

20   the period 2013 to 2018, did you not?

21   A.  Yes.

22   Q.  All right.  You spoke very little -- if I remember

23   correctly, the only thing you commented on in the period

24   between 2008 and April of 2013 is Thanksgiving Day 2009; isn't

25   that right?

 1   A.  Yes.

 2   Q.  Okay.  And that was a -- that was November 26th, 2009,

 3   right?

 4   A.  Correct.

 5   Q.  Okay.  And you know that date because that's the last day

 6   you saw your brother in life, correct?

 7           MR. BRENNER:  Objection.  May we approach?

 8           MR. RIVERO:  Judge, I'll --

 9           THE COURT:  The objection is overruled at this point.

10   BY MR. RIVERO:

11   Q.  Sir?

12   A.  I'm not exactly certain if that's the very last day.  But

13   that's the -- I guess the best memory of last seeing him.  I

14   may have seen him other times after that, but I just don't

15   recall it.

16   Q.  Sir, your testimony under oath and your best memory is that

17   that was the last day you saw your brother in life, is it not?

18           MR. BRENNER:  Same objection, Your Honor.

19           THE WITNESS:  Like I said, I'm not certain that that

20   was --

21           THE COURT:  The objection is noted.  It's overruled at

22   this point.

23           THE WITNESS:  I could have possibly seen him other

24   days.

25

1371

```
 1    UNITED STATES OF AMERICA        )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5            I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 3rd

 9    day of November, 2021, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12            I further certify that this transcript contains pages

13    1 - 193.

14            IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 11th day of November, 2021.

16

17                    /s/Yvette Hernandez
                      Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                    400 North Miami Avenue, 10-2
                      Miami, Florida 33128
19                    (305) 523-5698
                      yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```

USCA11 Case: 22-11150   Document: 41-7   Date Filed: 09/07/2022   Page: 189 of 247
Case 9:18-cv-80176-BB   Document 861-1   Entered on FLSD Docket 01/04/2022   Page 17 of 34

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 WEST PALM BEACH DIVISION
                 CASE NO. 9:18-cv-80176-BB
 3

    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,                 November 4, 2021
 6                                      9:43 a.m.
            vs.
 7
    CRAIG WRIGHT,
 8
            Defendant.                  Pages 1 THROUGH 293
 9  _____
               TRANSCRIPT OF TRIAL DAY 4
10        BEFORE THE HONORABLE BETH BLOOM
             UNITED STATES DISTRICT JUDGE
11              And a Jury of 10
    Appearances:
12  FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
                        DEVIN FREEDMAN, ESQ.
13                      KYLE ROCHE, ESQ.
                        200 South Biscayne, Suite 5500
14                      Miami, Florida 33131

15                      BOIES SCHILLER & FLEXNER
                        ANDREW BRENNER, ESQ.
16                      STEPHEN N. ZACK, ESQ.
                        SAMANTHA LICATA, ESQ.
17                      100 Southeast 2nd Street, Suite 2800
                        Miami, Florida 33131
18
    FOR THE DEFENDANT:  RIVERO MESTRE, LLP
19                      ANDRES RIVERO, ESQ.
                        JORGE MESTRE, ESQ.
20                      AMANDA M. MCGOVERN, ESQ.
                        ZALMAN KASS, ESQ.
21                      2525 Ponce de Leon Boulevard, Suite 1000
                        Coral Gables, Florida 33134
22
    COURT REPORTER:     Yvette Hernandez
23                      U.S. District Court
                        400 North Miami Avenue, Room 10-2
24                      Miami, Florida 33128
                        yvette_hernandez@flsd.uscourts.gov
25
```

2

```
 1              I N D E X

 2    Certificate................................    293

 3              W I T N E S S

 4    ON BEHALF OF THE PLAINTIFF:                  PAGE

 5    IRA KLEIMAN
      CONTINUED CROSS-EXAMINATION BY MR. RIVERO      15
 6

 7              E X H I B I T S

      EX. NO.:                          OFFERED  ADMITTED
 8    Plaintiffs' 420                       35        35
      Defendant's  18                       64        65
 9    Defendant's  19                       72        72
      Defendant's 301                       79        79
10    Defendant's 302                       83        83
      Defendant's 303                       85        85
11    Defendant's 481                       92        92
      Defendant's 396                       92        93
12    Defendant's  58                       95        95
      Defendant's  15                       97        97
13    Defendant's 257                      101       101
      Joint       103                      106       107
14    Defendant's 284                      108       109
      Defendant's 489                      116       116
15    Joint        31                      119       119
      Plaintiffs'   2                      121       122
16    Defendant's 161                      129       130
      Defendant's  10                      137       137
17    Joint         1                      139       140
      Defendant's  11                      142       142
18    Plaintiffs' 424                      148       149
      Defendant's  67                      152       153
19    Defendant's 252                      165       165
      Joint        21                      168       168
20    Defendant's   8                      171       172
      Defendant's 256                      205       206
21    Defendant's  40                      210       210
      Joint        99                      212       212
22    Joint        98                      219       219
      Joint        97                      221       222
23    Defendant's 357                      238       239
      Defendant's 359                      242       242
24    Defendant's 360                      243       244
      Plaintiffs' 157                      247       248

25
```

Yvette Hernandez, Official Court Reporter

400 North Miami Avenue, 10-2

Miami, Florida 33128

(305) 523-5698

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 191 of 247
Case 9:18-cv-80176-BB   Document 861-1   Entered on FLSD Docket 01/04/2022   Page 19 of 34

3

1                          **E X H I B I T S** (Continued)

2       **EX. NO.:**                                    OFFERED    ADMITTED
        Joint      48                                    253        253
3       Defendant's 289                                  254        254
        Joint      49                                    255        255
4       Defendant's  45                                  256        257
        Joint      31                                    257        257
5       Defendant's  46                                  263        263
        Defendant's 488                                  270        270

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A.  No.  I know that --

 2    Q.  You know it was New Liberty who proposed --

 3              MR. BRENNER:  He's trying to answer the question --

 4    objection.  The witness is trying to --

 5              THE COURT:  Give the witness an opportunity to answer

 6    the question, please.

 7              THE WITNESS:  I know who the New Liberty person is,

 8    yes.

 9    BY MR. RIVERO:

10    Q.  You know the person who proposed this was New Liberty?

11    A.  I mean, now I know of him, yes.

12    Q.  Right.

13        The last time you spoke to David Kleiman in life was in

14    2009, right?

15    A.  Correct -- well, no, no.  Actually, I shouldn't say that.

16    Q.  I said that the wrong way.

17    A.  That's the last time I recall seeing him.

18    Q.  Are you finished, Mr. Kleiman?

19    A.  Yes.

20    Q.  Let me restate the question.

21        The last time you saw your brother in person was in 2009?

22              MR. BRENNER:  Your Honor, just renew the objection

23    from yesterday on this issue.

24              THE COURT:  I'm sorry.  The objection is?

25              MR. BRENNER:  It violates an order of the Court.
```

24

```
 1          THE COURT:  Sustained.
 2    BY MR. RIVERO:
 3    Q.  Now, sir, I want to be very clear about some testimony you
 4    gave yesterday.  There isn't any email anywhere from a friend
 5    of David Kleiman's that says that they had any conversation
 6    like the one you had with David Kleiman, the turkey-talk; isn't
 7    that right?
 8    A.  Did you receive the new email that they produced to you
 9    last night?
10    Q.  Oh, I have it, sir, but I want to be real clear.  Nobody
11    says they had such a conversation with David Kleiman except for
12    you?
13    A.  I don't agree with that.
14    Q.  All right, sir.  Do you understand that Patrick Paige has
15    already testified here?
16    A.  Yes.
17    Q.  And you know that Patrick Paige testified that he never
18    talked with David Kleiman about Bitcoin or anything to do with
19    it?
20    A.  That's also not correct.
21    Q.  Okay.  So then that's your testimony.
22    A.  No.  I can show the email where Patrick says that Dave did
23    discuss Bitcoin with him.
24    Q.  Sir, we're going to -- I want to -- we've already heard
25    from Patrick Paige.  I don't need -- I'm not asking you your
```

84

```
 1    Q.  You never saw him in the hospital?

 2    A.  No.

 3    Q.  But you know he was in the hospital?

 4    A.  Yes.  I continued a lot of communications through email and

 5    through telephone.

 6    Q.  Now, you live in Palm Beach, right?

 7    A.  Palm Beach Gardens, yes.

 8    Q.  Palm Beach Gardens, okay.

 9         So his income really dropped off, right?

10    A.  Yes.

11            MR. RIVERO:  Can we go to the top and look at this

12    other section.

13    BY MR. RIVERO:

14    Q.  But it looks like he had managed to pay down some of the

15    debt to the IRS and it was -- he was -- gotten it down to

16    $3,246.10, right?

17    A.  Yes.

18            MR. RIVERO:  Okay.  Let's look at Defendant's 303.

19    BY MR. RIVERO:

20    Q.  I may have said -- you know, this is the tax period --

21            MR. RIVERO:  I may have said that wrong, Your Honor,

22    if I said -- I may have referred, just to clarify for the jury

23    and the Court -- if I said as to the previous one it was

24    2000 -- anything other than 2010, I meant 2010.

25            Now we'll talk about 2011.
```

1378

135

```
 1              THE COURT:  You want to now introduce Joint Exhibit

 2     60?

 3              MR. RIVERO:  60.  Yes.  Yes.

 4              THE COURT:  All right.  Let's make sure the screen

 5     reflects -- this is Joint Exhibit 50 and -- or 60?

 6              MR. RIVERO:  60, yes.  Thank you.

 7              THE COURT:  And once that's verified, Mr. Brenner,

 8     it's a joint exhibit and --

 9              MR. BRENNER:  Yeah.  Again, I don't know how to do

10     it --

11              THE COURT:  This says D205.  Can we reflect Joint 60,

12     please.

13          (Pause in proceedings.)

14              MR. RIVERO:  Your Honor, I am going to move to another

15     subject and make sure that over the lunch hour we are exactly

16     clear on our exhibit numbers, although that was not my plan.

17     But I, again, apologize to everyone and we will have this

18     straightened out by the time we're back after the lunch hour.

19              So let me go to something else.  I really do

20     apologize.

21     BY MR. RIVERO:

22     Q.  All right.  To be clear, just to make this crystal clear,

23     you didn't learn of Dave's death until a few days after his

24     body was found?

25     A.  Yes.
```

1379

```
 1    Q.  And he -- you don't know the exact date, but he had died

 2    some days before?

 3    A.  I believe so.

 4    Q.  Sir, you got a copy of what I'm going to show you now as

 5    Defense 10.

 6            MR. RIVERO:  If Mr. Shah could show that to you, to

 7    Mr. Brenner, and to the Court.

 8    BY MR. RIVERO:

 9    Q.  You got a copy of this, did you not?

10    A.  I think you're talking about what was sent to my brother's

11    office, his UPS -- like his PO box address.

12    Q.  Okay, sir.

13    A.  But this is what Patrick Paige received?  Is that what

14    you're taking about?

15    Q.  Well, let's start there.  Patrick Paige definitely received

16    this, right?

17    A.  Yes.

18    Q.  And then Patrick Paige handed it to you?

19    A.  I think it was -- I don't recall the date.  This is

20    sometime in 2014, when I asked him if he ever found any

21    documents about W&K.  And then like the next day or two, he

22    emailed me this.

23    Q.  All right, sir.  So you got it from Patrick Paige.  Let's

24    just establish that you received this from Patrick Paige,

25    right?
```

```
 1              MR. BRENNER:  Your Honor --

 2              THE COURT:  I'm sorry?

 3              MR. BRENNER:  Your Honor, may we take that down for

 4     one moment and approach?

 5              THE COURT:  It's in evidence, sir.

 6              You may continue.

 7     BY MR. RIVERO:

 8     Q.  Mr. Kleiman --

 9              MR. RIVERO:  Judge, may I proceed?

10              THE COURT:  You may.

11     BY MR. RIVERO:

12     Q.  Mr. Kleiman --

13              MR. RIVERO:  Mr. Shah, if you could highlight the

14     first two sentences of Paragraph 3.

15     BY MR. RIVERO:

16     Q.  "Ira is David's brother.  He had limited contact and

17     personal knowledge as to David's financial affairs throughout

18     David's life."  Correct?

19     A.  Correct.

20              MR. BRENNER:  Your Honor, I have to ask to approach.

21              THE COURT:  I'm sorry?

22              MR. BRENNER:  I have to ask to approach, Your Honor,

23     and ask that it be taken down during the sidebar.

24              THE COURT:  All right.  If we can take it down for a

25     moment.
```

1381

```
1   UNITED STATES OF AMERICA      )

2   ss:

3   SOUTHERN DISTRICT OF FLORIDA  )

4              C E R T I F I C A T E

5          I, Yvette Hernandez, Certified Shorthand Reporter in

6   and for the United States District Court for the Southern

7   District of Florida, do hereby certify that I was present at

8   and reported in machine shorthand the proceedings had the 4th

9   day of November, 2021, in the above-mentioned court; and that

10  the foregoing transcript is a true, correct, and complete

11  transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13  1 - 293.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15  Miami, Florida this 12th day of November, 2021.

16

17              /s/Yvette Hernandez
                Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18              400 North Miami Avenue, 10-2
                Miami, Florida 33128
19              (305) 523-5698
                yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```

1382

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 199 of 247
Case 9:18-cv-80176-BB    Document 861-1    Entered on FLSD Docket 01/04/2022    Page 27 of 34

1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
                 CASE NO. 9:18-cv-80176-BB
 3

    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,                 November 5, 2021
 6                                      9:58 a.m.
 7          vs.

    CRAIG WRIGHT,
 8
            Defendant.                  Pages 1 THROUGH 182
 9  _____
                TRANSCRIPT OF TRIAL DAY 5
10          BEFORE THE HONORABLE BETH BLOOM
               UNITED STATES DISTRICT JUDGE
11                 And a Jury of 10
    Appearances:
12  FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
                         DEVIN FREEDMAN, ESQ.
13                       KYLE ROCHE, ESQ.
                         200 South Biscayne, Suite 5500
14                       Miami, Florida 33131

15                       BOIES SCHILLER & FLEXNER
                         ANDREW BRENNER, ESQ.
16                       STEPHEN N. ZACK, ESQ.
                         SAMANTHA LICATA, ESQ.
17                       100 Southeast 2nd Street, Suite 2800
                         Miami, Florida 33131
18
    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                       ANDRES RIVERO, ESQ.
                         JORGE MESTRE, ESQ.
20                       AMANDA M. MCGOVERN, ESQ.
                         MICHAEL A. FERNANDEZ, ESQ.
21                       ZALMAN KASS, ESQ.
                         2525 Ponce de Leon Boulevard, Suite 1000
22                       Coral Gables, Florida 33134

23  COURT REPORTER:      Yvette Hernandez
                         U.S. District Court
24                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
25                       yvette_hernandez@flsd.uscourts.gov
```

2

```
 1                         I N D E X

 2     Certificate....................................    182

 3                    W I T N E S S

 4     ON BEHALF OF THE PLAINTIFF:                        PAGE

 5     IRA KLEIMAN
       CONTINUED CROSS-EXAMINATION BY MR. RIVERO           18
 6     REDIRECT EXAMINATION BY MR. BRENNER                 129

 7     JONATHAN WARREN
       (via video deposition)                        170 & 174
 8
       DEBORAH KOBZA
 9     (via video deposition)                             174

10

11                    E X H I B I T S
       EX. NO.:                          OFFERED   ADMITTED
12     Plaintiffs' 139                      38         39
       Defendant's  30                      43         43
13     Defendant's  59                      44         44
       Defendant's  72                      44         45
14     Defendant's  73                      46         46
       Joint        12                      48         48
15     Defendant's  75                      52         52
       Defendant's  78                      58         58
16     Joint        13                      61         61
       Defendant's  80                      72         72
17     Defendant's  82                      76         76
       Defendant's  83                      79         80
18     Defendant's  84                      80         80
       Defendant's  88                      81         81
19     Defendant's 171                      83         83
       Defendant's 173                      85         85
20     Defendant's 174                      89         89
       Defendant's 175                      89         89
21     Defendant's 176                      89         89
       Defendant's 177                      89         89
22     Defendant's 245                      91         91
       Defendant's 246                      91         92
23     Defendant's 247                      92         92
       Defendant's 248                      95         95
24     Defendant's 249                      96         96
       Defendant's 250                      96         96

25
```

1384

3

1                    **E X H I B I T S** (Continued)

2    **EX. NO.:**                              OFFERED    ADMITTED
     Defendant's 251                              96          96
3    Defendant's 319                              97          97
     Defendant's 326                             100         100
4    Defendant's 329                             100         100
     Defendant's 330                             101         101
5    Defendant's 335                             101         102
     Defendant's 336                             104         104
6    Defendant's 337                             104         104
     Defendant's 338                             105         105
7    Defendant's 339                             106         106
     Defendant's 341                             107         107
8    Defendant's 342                             109         110
     Defendant's 343                             110         110
9    Defendant's 344                             111         111
     Defendant's 345                             111         112
10   Defendant's 346                             112         112
     Defendant's 348                             112         112
11   Defendant's 350                             113         113
     Defendant's 352                             114         114
12   Defendant's 353                             114         115
     Defendant's 354                             115         115
13   Defendant's 356                             116         116
     Defendant's 360                             116         116
14   Defendant's 361                             117         117
     Defendant's 362                             117         117
15   Defendant's 363                             117         117
     Defendant's 380                             119         119
16   Defendant's 389                             119         119
     Joint         32                            119         120
17   Joint         34                            119         120
     Joint         35                            119         120
18   Joint         52-55                         119         120
     Joint         57                            119         120
19   Joint         58                            119         120
     Joint         60                            119         120
20   Joint         61                            120         121
     Joint         62                            120         121
21   Joint         96-98                         120         121
     Joint        124                            120         121
22   Defendant's 340                             125         125
     Defendant's 351                             127         128
23   Plaintiffs' 767                             132         133
     Plaintiffs' 160                             145         145
24

25

Yvette Hernandez, Official Court Reporter
400 North Miami Avenue, 10-2
Miami, Florida 33128
(305) 523-5698

1385

USCA11 Case: 22-11150    Document: 41-7    Date Filed: 09/07/2022    Page: 202 of 247
Case 9:18-cv-80176-BB    Document 861-1    Entered on FLSD Docket 01/04/2022    Page 30 of 34

68

```
 1              THE COURT:  Okay.  We can bring in the jury.

 2         (Before the Jury, 11:44 a.m.)

 3              THE COURT:  All right.  Welcome back, Ladies and

 4    Gentlemen.

 5              Please be seated.

 6              And we'll continue with the cross-examination.

 7    BY MR. RIVERO:

 8    Q.  Mr. Kleiman, before I come back to these email exchanges

 9    between your brother and Craig Wright, I just want to talk with

10    you about one other subject and that is your telephone

11    communications with David Kleiman.

12         Would you agree with me that between March 12 and

13    April 7th, 2013, on the cell phone at least, you spoke with

14    David Kleiman six times?

15    A.  What time again?

16    Q.  This is between -- this is in the last year, the last 13

17    months of your brother's life.

18              MR. BRENNER:  Objection, Your Honor.  Subject to court

19    order.

20              THE COURT:  The objection is sustained.

21              MR. RIVERO:  I'll move on.

22    BY MR. RIVERO:

23    Q.  Sir, would you agree with me that David Kleiman's telephone

24    voice messages from March 12, 2012 to February 19, 2013 contain

25    voice mails left for David Kleiman?
```

```
 1    A.  It may have.

 2    Q.  All right.  Let me show you what's been marked as

 3    Defendant's 429.

 4              MR. RIVERO:  But not for publication to the jury yet.

 5              And it's a lengthy exhibit, so if you would show it --

 6    Mr. Shah, if you would just page through for counsel.

 7        (Pause in proceedings.)

 8              MR. RIVERO:  Judge, I don't know if counsel have seen

 9    enough or if they need to see every page.

10              MR. BRENNER:  Unfortunately --

11              MR. RIVERO:  You can keep going, Mr. Shah.

12              MR. BRENNER:  No.  No.  Unfortunately, this was not on

13    the list that we were given to review over the break.

14              But I do have an objection to this.  I've seen enough

15    to know that I have an objection.

16              MR. RIVERO:  Okay.  Judge, I guess what I would like

17    to ask, then, Mr. Kleiman -- could we go to the top, Mr. Shah.

18              Just to explain to counsel, this is a different topic.

19    I'm going to be coming back to the other topic, but I wanted to

20    get this out of the way.  It's only one exhibit.

21    BY MR. RIVERO:

22    Q.  Sir, is this a document produced by your side in this

23    litigation?

24    A.  It looks to be.

25    Q.  And you are the personal representative of your brother's
```

1387

70

```
 1   estate?

 2   A.  Yes.

 3   Q.  And this is an email concerning records from TelTech

 4   Systems to the estate of David Alan Kleiman?

 5   A.  Yes.

 6   Q.  All right.  And you produced this in this litigation, as

 7   you can see at the bottom of Page 1.

 8   A.  Yes.

 9           MR. RIVERO:  Judge, I would move the admission of

10   Defendant's 429.

11           MR. BRENNER:  Objection.  Hearsay, Your Honor.

12           THE COURT:  Is that the sole basis, is hearsay?

13           MR. BRENNER:  Hearsay and relevance, Your Honor.

14           THE COURT:  Are there specific voice mails that you

15   wish to focus on?

16           MR. RIVERO:  Judge, it's the absence of voice mails

17   and that is highly relevant.

18           MR. BRENNER:  Yeah, Judge.  And also, understand,

19   subject to the Court's order, too.

20           THE COURT:  Yeah.  That's where -- the objection is

21   sustained.

22           MR. RIVERO:  Well, Judge, then I guess I would want to

23   show specific entries, in that event.  But I'm not sure I

24   understand -- Judge, if I could just understand.  I didn't

25   understand what the objection was.
```

1388

71

```
 1              THE COURT:  With regard to certain communications --
 2    that's why I'm -- the objection is sustained.  If you want to
 3    ask Mr. Kleiman about -- the objection is sustained.
 4              MR. RIVERO:  Okay.  Thank you, Judge.
 5              THE COURT:  So let's continue.
 6              MR. RIVERO:  All right.  I'll continue.
 7              All right.  Let's take that down, Mr. Shah.
 8    BY MR. RIVERO:
 9    Q.  Okay.  Let's go back to the series of documents we were
10    talking about before the break.
11       Sir, I just want to make sure that -- you don't know of any
12    message received by your brother about Bitcoin at any time in
13    the last 13 months of his life on his telephone voice mails?
14    A.  Not to my knowledge, no.
15    Q.  Okay.  So going --
16              MR. RIVERO:  Mr. Shah, if you would put up
17    Defendant's 80.
18              MR. BRENNER:  8-0?
19              MR. RIVERO:  8-0.
20              Judge, I don't know if there's a position from the
21    Plaintiff on this.  We would move its admission.
22              THE COURT:  Is there any objection?
23              MR. BRENNER:  I'm sorry.  He said -- I didn't hear him
24    say "we move."  We object to this particular document on
25    hearsay.
```

1389

182

1      UNITED STATES OF AMERICA      )

2      ss:

3      SOUTHERN DISTRICT OF FLORIDA  )

4                      C E R T I F I C A T E

5           I, Yvette Hernandez, Certified Shorthand Reporter in

6      and for the United States District Court for the Southern

7      District of Florida, do hereby certify that I was present at

8      and reported in machine shorthand the proceedings had the 5th

9      day of November, 2021, in the above-mentioned court; and that

10     the foregoing transcript is a true, correct, and complete

11     transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13     1 - 182.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15     Miami, Florida this 14th day of November, 2021.

16

17               /s/Yvette Hernandez
                 Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18               400 North Miami Avenue, 10-2
                 Miami, Florida 33128
19               (305) 523-5698
                 yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25

1390

# TAB 861-2

# EXHIBIT B

USCA11 Case: 22-11150     Document: 41-7     Date Filed: 09/07/2022     Page: 209 of 247

1/1/22, 3:38 PM     Case 9:18-cv-80176-BB     Document 801-1 Entered on FLSD Docket 01/04/2022     Page 2 of 7
Day 4 of Kleiman v. Wright: Craig Wright's Testimony Delayed



yahoo!          Sign in     M

✉ Mail     News     Finance     Sports     Entertainment     Life     COVID-19     Shopping     Tech Tips     Yahoo Plus

DUO ECG + Digital Stethoscope
Combined ECG & stethoscope helps clinicians gain unprecedented insight into cardiac function.

View Now

coindesk

# Day 4 of Kleiman v. Wright: Craig Wright's Testimony Delayed

**Cheyenne Ligon**
*November 4, 2021 · 2 min read*



DUO ECG + Digital Stethoscope
Combined ECG & stethoscope helps clinicians gain unprecedented insight into cardiac function.

Order Now

MIAMI — Craig Wright – the Australian computer scientist best known for his widely disputed claim to be Satoshi Nakamoto, the pseudonymous creator of Bitcoin – is now expected to testify in a Miami court on Monday.

**TRENDING**

1. New laws take effect across US on abortion, policing, taxes

1392





| Mail | News | Finance | Sports | Entertainment | Life | COVID-19 | Shopping | Tech Tips | Yahoo Plus |

Anthony

- However, Wright's defense team's questioning of Ira Kleiman, the plaintiff in the case, went all day Thursday and is expected to spill over into late Friday morning.

- After Kleiman's testimony wraps, the plaintiffs are expected to introduce pre-taped video testimony from two witnesses, including Wright's ex-wife, Lynn Wright.

- Kleiman is suing Wright for what he alleges to be his brother Dave's share of proceeds derived from business arrangements between the two men, including intellectual property and bitcoin that Ira says they mined together.

- Ira based these claims on information he received from Wright and others following Dave's death in April 2013, as well as emails and other documents.

- However, it is unclear whether Wright has access to any of the alleged 1.1 million bitcoin (which would be worth over $67 billion).

- Much of it is in wallets associated with Nakamoto and other sources, but Wright has never been willing or able to demonstrate he controls the wallets of Bitcoin's creator.

- Andres Rivero, lead counsel for Wright's defense, focused his cross-examination of Ira on his strained relationship with his brother Dave before the latter's death, in an attempt to depict Ira as purely motivated by financial gain.

- The defense also sought to downplay Dave's purported role in the conception of Bitcoin by establishing a timeline of his poor physical health in 2008, the year the Bitcoin white paper was published.

- Under cross-examination by Rivero, Kleiman said he erased and overwrote data on all but one of the 14 devices that were recovered among David's belongings, and threw another away. The defense argues that if Dave had any bitcoin or other information and Ira couldn't find it, that's his fault.

4. 'Crazy' omicron surge could peak soon, but the virus is unpredictable as the pandemic enters its third year

5. T-Pain Sends Internet Into a Frenzy with Post About How Many Song Streams It Takes an Artist to Earn $1

1393

# yahoo!

Sign in

M

✉ Mail    News    Finance    Sports    Entertainment    Life    COVID-19    Shopping    Tech Tips    Yahoo Plus

Our goal is to create a safe and engaging place for users to connect over interests and passions. In order to improve our community experience, we are temporarily suspending article commenting

## LATEST STORIES

**Astrology.com**

**The Sky Today, January 1, 2022**

Earth is, simply put, a ball of confusion these days for most of us—from its pandemics to its politics and everything in between. Fortunately, we can find clarity simply by looking...

4m ago

**The Wrap**

**Here's What's New on Netflix in January 2022**

New year, new Netflix watchlist

6m ago

Ad · Legacy Research    •••

**Major Crypto Event - Days Away. Are You Prepared?**

"This could be the most profitable event in crypto history. And it only happens once. If you miss it, there are no second chances."

**GlobeNewswire**

**ChildCare Education Institute Offers No-Cost Online Course on Reducing Exclusionary Discipline in Early**

ChildCare Education Institute Offers No-Cost Online Course on Reducing Exclusionary Discipline in Early Childhood Education ChildCare Education Institute® (CCEI), an online...

6m ago

**PR Newswire**

**It's 'Lights Out' for the ROKiT Racing Star F4 Esports Programme!**

Free to enter and free to play, the ROKiT Racing Star F4 Esports Programme is now open for UK-resident 14 and 15 year old's offering the chance to win one of two fully-funde...

6m ago

**BBC**

**South Africa holds state funeral for Archbishop Desmond Tutu**

The funeral for the anti-apartheid campaigner is taking place in St George's Cathedral in Cape Town.

8m ago

Shop Now

1394

# yahoo!

Sign in    M

Mail    News    Finance    Sports    Entertainment    Life    COVID-19    Shopping    Tech Tips    Yahoo Plus

The Standard-Times

**Calling all readers: Submit your lists by Jan. 3 for the BookLovers Century Club**

BookLovers columnist Lauren Daley looks to highlight what were reading in 2021.

11m ago

The Independent

**Vaishno Devi: 12 dead and dozens injured in stampede at Indian temple on New Year's Day**

Stampede was triggered by huge rush of devotees who reportedly entered shrine without permission slips

21m ago

BBC

**Kim Jong-un: North Korea to focus on economy in 2022**

Kim Jong-un says the faltering economy will be the national priority as he marks 10 years in power.

25m ago

Ad • PlayJunkie    ···

**Actor Posed With A Fan Without Knowing Who She Is**

Modern Family' Star Posed With A Fan But Didn't Notice She Was A Bigger Star

Storyful

**Destructive Tornado Touches Down In Covington, Georgia**

A confirmed tornado wreaked havoc in the city of Covington, Georgia, flipping cars and causing minor injuries as it touched down on the evening of Friday, December 31.The...

26m ago

Reuters

**Japan PM pledges 2022 will be year of "summit diplomacy" in New Year address**

Japan's Prime Minister Fumio Kishida said on Saturday he would refocus his efforts on foreign policy and pledged to make 2022 the year of diplomacy, in a New Year statement...

26m ago

The Independent

**Covid news - live: WHO chief says pandemic could be ended this year if world works together**

Follow the latest updates below

28m ago

1395

# yahoo!

Mail · News · Finance · Sports · Entertainment · Life · COVID-19 · Shopping · Tech Tips · Yahoo Plus

**Sign in**          M

**GlobeNewswire**

**NIO Inc. Provides December, Fourth Quarter and Full Year 2021 Delivery Update**

Company Achieved New Quarterly Record and Delivered a Total of 91,429 Vehicles in 2021NIO delivered 10,489 vehicles in December 2021, increasing by 49.7% year-over-year NIO delivered 25,034 vehicles in the three months ended December 2021, increasing by 44.3% year-over-yearNIO delivered 91,429...

29m ago



**CBSTV Videos**

**Chris Janson Performs "Buy Me A Boat" At New Year's Eve Live: Nashville's Big Bash**

Chris Janson performs "Buy Me A Boat" on the CBS Special New Year's Eve Live: Nashville's Big Bash. Stream now on Paramount+.

30m ago

**KFSN – Fresno**

**Fresno Street Eats hosts New Year's Eve Block Party**

Crowds of people came out to celebrate with craft beers and tasty food at the Fresno Street Eats New Year's Eve Block Party.

34m ago

Ad • Guardio                    •••

**Chrome Users? Protect Your Browser in 30 Seconds.**

Click to Check Your Chrome now! Download Guardio to Scan & Protect Your Browser from Popups, Phishing, Malware & Other Threats.

**STYLECASTER**

**Here's How to Watch 'Harry Potter: Return to Hogwarts' to See the Magical 20th Anniversary**

Potterheads, grab some tissues because this "Harry Potter" reunion is emotional.

35m ago

**USA TODAY**

**Grocery stores open New Year's Day: Hours for Wegmans, Hy-Vee, Kroger, Whole Foods and more**

Many grocery stores have reduced hours New Year's Day, but some are open normal hours. Aldi, Trader Joe's, Sam's Club and Costco are closed Saturday.

36m ago

**Storyful**

**Snow Blankets Boulder After Strong Winds and Wildfires Wreak Havoc**

A winter storm brought snow to parts of Boulder County, Colorado, on December 31, only one day after intense winds fuelled destructive wildfires across the county.This footage,...

37m ago



1396

1/1/22, Case 9:18-cv-80176-BB    Document 881-6 Kleiman v Wright on Yahoo! Entered on FLSD Docket 01/04/2022    Page 7 of 7



**BBC**

**Betty White: Biden leads tributes for Golden Girls actress**

The long-time Hollywood star died on Friday at the age of 99 after an eight-decade film and TV career.

37m ago

**KGO – San Francisco**

**Subdued New Year's Eve celebrations in San Francisco**

"People need to be reminded that there's a reason to celebrate."

42m ago

**KERO - Bakersfield Scripps**

**Looking back at the top local stories of 2021 on 23ABC**

Tragedies, COVID-19, and News you can use: here's a look back at some of the top stories that you were reading on our website.

45m ago

1397

# TAB 861-3

# EXHIBIT C

NEWS        CONFERENCES        BITCOIN 101        VENTURES



BUY BSV



Home » Editorial » Ira Kleiman serves up a Bitcoin turkey in Wright lawsuit testimony

**EDITORIAL**   5 NOVEMBER 2021

Steven Stradbrooke 

# Ira Kleiman serves up a Bitcoin turkey in Wright lawsuit testimony

Alongside his Thanksgiving turkey, Ira Kleiman may have served himself a side dish of perjury in the Kleiman v Wright civil lawsuit against Bitcoin creator Dr. Craig Wright.

On Wednesday, Ira Kleiman appeared in a Florida federal court to offer testimony supporting his civil case against Dr. Wright, whom Ira accuses of improperly purloining hundreds of thousands of BTC tokens (worth tens of billions of dollars) that Ira claims his late brother Dave Kleiman mined in partnership with Wright.

Dr. Wright has acknowledged that Dave helped him edit the Bitcoin white paper ahead of its 2008 release, but denies that he and Dave ever had a formal partnership to mine BTC. Dr. Wright has also accused Ira of irresponsibly handling Dave's tech gear following the latter's death, including Ira's wiping of digital devices on which the private keys to significant caches of BTC could conceivably have been stored.

There's much to be critical about in Ira's actions following Dave's April 2013 death, including giving some of Dave's hard drives to Patrick Paige, Dave's partner in a forensic computer business, based on Paige's claims that they contained data related to the business. Ira doesn't appear to have inspected the drives to ascertain their contents before handing them to Paige. Ira later attempted to sue Paige to recover these drives but failed to secure their return.

Equally baffling is Ira's decision to effectively overwrite several of Dave's hard drives seemingly without care for whatever existing information might be permanently compromised. In his testimony to the court this week, Ira admitted tossing one drive in the trash because "it never powered on."

Within months of Dave's death, Ira had already formatted two of Dave's d
were looking for a computer for my wife to use." Asked by Andrew Brenne
plaintiffs, whether he had "any memory of ever deleting any of the stuff th
Ira replied "I don't believe so, no."

However, during extended cross-examination Thursday by Wright's attorn
erased or overwritten nearly all of Dave's drives despite knowle
contained therein. Rivero also got Ira to admit that he'd lied when he clair
deposit box, instead leaving the drives piled in a backpack in Ira's residenc

NEVER MISS AN UPDATE AGAIN

First Name

Last Name

Email Address*

Yes, I want to receive updates via email*
◯ Newsletters, Conferences and Events
◯ Newsletters Only

SUBSCRIBE NOW

We use cookies to ensure that we give you the best experience on our website. If you continue

Ok

1399

12/31/21, 11:52 PM

BUY BSV

conversation Ira claims to have had with Dave at a Thanksgiving dinner at their father's home in 2009. Once the plates had been cleared away and with all the other guests out of earshot, Ira claims Dave revealed that he was involved in a "digital money" project that would ultimately be "bigger" than Facebook.

Ira further claimed that Dave then took a business card from his wallet and "drew a 'B' with a line or two through it, and commented on how 'we' were working on a logo" for this unspecified digital money project. Dave allegedly said he was working with "a relatively wealthy foreign man" that Ira took as a reference to a formal partnership.

But Ira's timeline for Dave's alleged description of the Bitcoin logo doesn't match the official record. At the time of that November 26, 2009, dinner, the Bitcoin logo was simply the letters 'BC' on a gold-coin backdrop. It wasn't until February 24, 2010—three months after Thanksgiving—that the logo was changed to include two vertical strokes protruding from both the top and bottom of a capital 'B'.

This change may have been in response to a February 5, 2010 suggestion by a forum member known as NewLibertyStandard, who proposed the Bitcoin community "adopt the Thai baht currency symbol, ฿, as the official bitcoin currency symbol." Asked Thursday (under oath) if Ira had any evidence that his brother was behind the NewLibertyStandard identity, Ira admitted he had nothing.

When Rivero pointed out that the logo Ira was referencing "was not the logo for Bitcoin" at the time of the Thanksgiving dinner, Ira could only state that Dave had previously sought Ira's help "to create, like, logos for him ... so at the time I thought maybe he was asking me ... 'we're working on a logo check this out.'"

**The investment path not taken**

Ira can't say for sure what Dave's intentions were in showing him this mysterious 'B,' as Ira doesn't appear to have asked Dave any follow-up questions whatsoever. And if Dave ever mentioned the word 'Bitcoin,' Ira doesn't remember it. Not at this dinner, nor at any other point in their lives.

Dave also doesn't appear to have made any full court press to convince his brother of the financial opportunity at hand. While Wright was pushing relatives and friends to get involved in Bitcoin mining while the block reward was high and the difficulty was low, Dave evidently didn't advise Ira to expend some minor CPU labors in the possibility of a major payday down the road.

Dave also apparently didn't suggest that Ira simply buy some Bitcoin tokens while they were still relatively worthless. This, despite Ira admitting on the stand that he and his brother "had lots of email exchanges about different stocks," including Dave's recommendations that Ira buy shares in a variety of tech

Ira confirmed Dave's lack of effort to get his family on the Bitcoin bandwa
wondered "why the heck didn't [Dave] tell us to buy some [Bitcoin] when

**Stuff this turkey**

That Thanksgiving dinner would seemingly have offered the perfect oppo
opportunity of a lifetime. That is, if the brothers had actually discussed Bi
simply something Ira conjured out of thin air in order to justify his pursuit

NEVER MISS AN UPDATE AGAIN

First Name

Last Name

Email Address*

Yes, I want to receive updates via email*
○ Newsletters, Conferences and Events
○ Newsletters Only

SUBSCRIBE NOW

We use cookies to ensure that we give you the best experience on our website. If you continue

Ok

1400

NEWS    CONFERENCES    BITCOIN 101    VENTURES

BUY BSV

many conversations Ira may now wish he'd had with Dave before his death. Those conversations can never happen now, but the chance to score some ill-gotten gains remains. So pass the gravy...

Check out all of the CoinGeek special reports on the [Kleiman v Wright YouTube playlist](#).

**New to Bitcoin? Check out CoinGeek's [Bitcoin for Beginners](#) section, the ultimate resource guide to learn more about Bitcoin—as originally envisioned by Satoshi Nakamoto—and blockchain.**

TAGGED

BITCOIN    BITCOIN BILLIONS    BITCOIN WHITEPAPER    DAVE KLEIMAN    DR. CRAIG WRIGHT    IRA KLEIMAN    KLEIMAN V WRIGHT    LAWSUIT

SATOSHI NAKAMOTO



LATEST NEWS



EDITORIAL    31 DECEMBER 2021

**The winner of 2022: BitCoin Satoshi Vision [$BSV]**

This is BSV's year, 2022. If you want to avoid the pitfalls of our current bubblicious over-priced stock market and even frothier "cryptos," yet still invest in something with upside, focus your research gaze toward BSV.

EDITORIAL    2

**The stage i**

The technolog cases by at lea the genetics

NEVER MISS AN UPDATE AGAIN

First Name

Last Name

Email Address*

Yes, I want to receive updates via email*
○ Newsletters, Conferences and Events
○ Newsletters Only

SUBSCRIBE NOW

We use cookies to ensure that we give you the best experience on our website. If you continue

Ok

1401

NEWS    CONFERENCES    BITCOIN 101    VENTURES

BUY BSV





EDITORIAL    30 DECEMBER 2021

**The dream of Bitcoin**

At this point, production of applications that can only be built using the Bitcoin technology are necessary for Bitcoin to succeed. Tokens and NFTs are great, but to preserve true value over time they need projects and constant innovation behind them.

EDITORIAL    30 DECEMBER 2021

**Craig Wright, Bitcoin SV and 2022: Liability activated**

Satoshi is back and is stewarding Bitcoin again. This is not about pumping the price of Bitcoin SV to a reasonable level (which might happen in and by itself from now on), but bringing order into chaos.





## COINGEEK NEWSLETTERS

First Name                    Last Name

Email Address

Yes, I want to receive updates via email*

○ Newsletters, Conferences and Events

○ Newsletters Only

SUBMIT

## NEVER MISS AN UPDATE AGAIN

ABOUT US    ABOUT CALVIN AYRE    OUR TEAM    ADVERTISING

First Name

Last Name

Email Address*

Yes, I want to receive updates via email*
○ Newsletters, Conferences and Events
○ Newsletters Only

SUBSCRIBE NOW

We use cookies to ensure that we give you the best experience on our website. If you continue

Ok

1402

# TAB 861-4

# EXHIBIT D



Home » Business » Kleiman v Wright Day 4 recap: What Ira Kleiman knew about Dave Kleiman

| **BUSINESS** 5 NOVEMBER 2021 | Patrick Thompson  |

## Kleiman v Wright Day 4 recap: What Ira Kleiman knew about Dave Kleiman

What did Ira Kleiman *really* know about his brother Dave Kleiman? On Day 4 of the Kleiman v Wright trial, defense counsel Andres Rivero picked up where he left off from the previous day and continued to cross examine Ira Kleiman.

Ira Kleiman is the personal representative of the estate of Dave Kleiman as well as the individual who brought this lawsuit against Dr. Craig Wright. Ira Kleiman claims that Dr. Wright and Dave Kleiman formed a partnership that mined 1.1 million BTC together, that Dr. Wright stole Dave Kleiman's half of that 1.1 million BTC—worth roughly $69 billion— shortly after Dave passed away, and that therefore, the Kleiman estate should be entitled to half of that 1.1 million cache...But did Dave Kleiman even have any bitcoin?

"Knowing my brother, if there was more than $1,000 in the account [Bitcoin wallet] he would have sold it," Kleiman said.

Thursday's cross-examination showed that Ira Kleiman did not really know his brother Dave that well and that he had little to no knowledge of the matters going on in Dave's life until after he passed away.

"He [Ira] had limited contact and personal knowledge of David's financial affairs throughout Dave's life," wrote Ira Kleiman's lawyer Joseph Karp in a letter to the Director of Treasury.

Even outside of his financial matters, Ira did not have a good grasp on what had significance to his brother; Ira knew his brother Dave was a specialist when it came to computers and knew that his brother had published papers, yet one of the first things Ira did when he took possession of the Dave Kleiman estate was throw out the many papers he found lying around Dave's house, give away Dave's cellphone and some of his computer items, and he even reformatted a few of Dave's hard drives.

Ira was not even aware that Dave owned Bitcoin until Dr. Wright contacted him after Dave's death letting Ira know that he—Dr. Wright, a good friend of Dave Kleiman—had the impression that Dave could be the owner of a significant amount of Bitcoin. But other than Dr. Wright mentioning this suspicion to Ira regarding Dave's potential personal Bitcoin ownership, there is no evidence or proof that would have given Ira the notion that Dave was the owner of a Bitcoin wallet.

"I very well could have already made some mistakes months ago by throwing away a bunch of Dave's papers and

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we w l assume that you are happy with it.

Ok

1404



An email written by Ira Kleiman was produced as evidence in court today, which read, "I still get calls each day from Dave's debt collectors...we got a summons from his bank a couple of weeks ago, it says he took out loans against his home and owes $560,000."

Ira Kleiman did not begin to aggressively hunt for Dave's Bitcoin until he became the personal representative of the estate and therefore became responsible for his brother's debt.

It's also worth noting that Ira Kleiman would be heavily rewarded financially if it turns out that his late-brother Dave Kleiman was the owner of a large number of accessible Bitcoin.

**But were they business partners?**

We must remember that the question at the core of this court case is: "Did Dave Kleiman and Dr. Craig S. Wright have a partnership that mined 1.1 million Bitcoin together?"

Beyond one email sent from Dr. Wright to Kleiman requesting help editing a paper about what he said would be a revolutionary idea that he was referring to as 'bit cash, 'bit coin,' Dave Kleiman and Dr. Wright never talked about Bitcoin via email.

No evidence has been produced that would make an individual believe that Dr. Wright and Dave Kleiman had a partnership when it came to Bitcoin mining. However, the two did have a partnership over other work-related matters.

Dave Kleiman and Dr. Wright launched W&K Defense LLC as a legally recognized business in the state of Florida. The official state documents of formation were introduced as evidence in the court and so were tax returns from W&K Defense LLC. There are email correspondences between Dave and Dr. Wright regarding W&K defense LLC business matters, a clear division of labor between the two partners (Dr. Wright and Dave Kleiman) at that company (W&K Defense LLC). They filed their taxes yearly with the IRS (although the record reflects that they did not pay their taxes in the first two years of operation).

That being said, both Dave Kleiman and Dr. Wright clearly know how to establish legitimate business entities and partnerships; and you would think that they would establish these entities any time they were partnering over business matters.

**In summary**

What was most memorable about day 4 of the trial was that Dave and Dr. Wright *never* talked about Bitcoin via email correspondence other than in one instance where Craig asked Dave to help him edit a paper about 'bit cash, bit coin.'

Dave Kleiman and Dr. Wright created legitimate non-Bitcoin business partnerships in the past and had very clear and detailed correspondence about the business matters taking place within that registered entity (W&K Defense LLC)—but they did not have any sort of documentation or agreement like this for any Bitcoin-related matters.

What also stuck out was how little Ira Kleiman knew about his brother, his financial situation, and what Dave found significant in his life. Dave had a lot of debt that Ira did not learn of until he took control of Dave Kleiman's estate and Ira

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we w l assume that you are happy with it

Ok

1405



Watch our Day 4 Special Report from the Kleiman v Wright trial here:

Check out all of the CoinGeek special reports on the Kleiman v Wright YouTube playlist.

**New to Bitcoin? Check out CoinGeek's Bitcoin for Beginners section, the ultimate resource guide to learn more about Bitcoin—as originally envisioned by Satoshi Nakamoto—and blockchain.**

TAGGED

BITCOIN   BITCOIN BILLIONS   BITCOIN WHITEPAPER   DAVE KLEIMAN   DR. CRAIG WRIGHT   IRA KLEIMAN   KLEIMAN V WRIGHT   LAWSUIT

SATOSHI NAKAMOTO



We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1406



BUSINESS    31 DECEMBER 2021

### 2021 year in review: Bitcoin comes of age in Africa

2021 had it all in Africa for digital currencies—adoption soared by 1,200% as Kenya led global P2P trades, but there was the bad as well, like a $3.8B scam.

BUSINESS    31 DECEMBER 2021

### Where is my BTC? El Salvador residents mysteriously losing money from Chivo wallets

The latest blow to the BTC circus in El Salvador is the mysterious loss of funds from the state-issued Chivo wallets, which the vocal president is quiet about.





BUSINESS    31 DECEMBER 2021

### Nationalist organization in India calls for Bitcoin ban as gov't further delays regulation

The Swadeshi Jagran Manch says Bitcoin must be banned or it could pose great danger to the financial market, but parliament is putting off regulations for now.

BUSINESS    30 DECEMBER 2021

### BitMEX exec Greg Dwyer trial delayed until October 2022

Greg Dwyer has been charged alongside BitMEX founders Arthur Hayes, Ben Delo, and Samuel Reed, who have already surrendered to U.S. authorities and stand to face up to five years behind bars.





## COINGEEK NEWSLETTERS

First Name

Last Name

Email Address

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1407

12/31/21, 11:58 PM



We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

×

1408

# TAB 861-5

# EXHIBIT E



NEWS          CONFERENCES          BITCOIN 101          VENTURES

BUY BSV



Home » Business » Ira Kleiman shows up on Day 3 of Kleiman v Wright trial

**BUSINESS**   4 NOVEMBER 2021                                              **Patrick Thompson** 

# Ira Kleiman shows up on Day 3 of Kleiman v Wright trial

Ira Kleiman (pictured above), Dave Kleiman's brother and the personal representative of the estate of Dave Kleiman, took the stand on Day 3 of the Kleiman vs. Wright trial. And although it's already the third day in the proceedings, this was only Kleiman's second time appearing in court.

The day began with a video deposition of Jamie Wilson, an Australian-based accountant that was the director and CFO of many of Dr. Craig Wright's companies. In his examination, lawyers for the plaintiffs asked Wilson questions on what he knew about Dr. Wright due to the relationship they had formed over business matters.

A core issue in this court case is whether Dr. Wright has a large amount of Bitcoin, and Wilson said he had seen evidence that Dr. Wright was in a possession of a significant amount of Bitcoin. Email evidence was produced in court, specifically an email from Dr. Wright that said, "He [Craig] got coins through fate and other circumstances."

Wilson went on to say that he believes Dr. Wright had over 1 million BTC, that he knew Dr. Wright was very good friends with Dave Kleiman, and that Dr. Wright's behavior changed when Kleiman died.

"What made me uncomfortable was the change in habits and how he ran his business," said Wilson. So much so, that Wilson said he resigned as director and CFO in 2013.

It's important to note that Wilson appears to have a chip on his shoulder, is holding a grudge and has a score to settle from these past business matters. Wilson was the director and CFO of Dr. Wright's companies for a short period of time and was listed as the second highest paid employee at the companies. Wilson told the jury that he never received any payment from these companies. When Ira Kleiman brought a lawsuit against Dr. Wright, Wilson reached out to Kleiman's lawyers congratulating them on their effort to take down Dr. Wright.

"Craig had set up three companies, but my trouble was...where I didn't feel comfortable with Craig was his change in attitude. He went from a developer that wore hoodies to a guy that wore flash suits and expensive watches," Wilson said.

"I didn't understand where the funding was coming from.... I thought to myself, this looks like fraud, and I want nothing to do with it."

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1410

NEWS        CONFERENCES        BITCOIN 101        VENTURES

BUY BSV

**Second video deposition**

The plaintiffs went on to play a video deposition of Jimmy Nguyen, founding president of Bitcoin Association. Nguyen was asked many questions about nChain, and if Dr. Wright has told him any information about private keys being locked. The plaintiffs were looking to learn as much as they could about the intellectual property nChain owns and what it is valued at, but Nguyen said he doesn't know the details of the intellectual property deals and valuations and said he was only aware of them at a very high level since he was not present when nChain was formed.

The clincher came at the very end of Nguyen's deposition, when the plaintiffs played a video interview of Nguyen where he says that Satoshi was a group of people.

"Craig was the primary creator," stated Nguyen in the video interview. "But had help, like the evidence you (the plaintiff) previously showed where Craig said he had help posting online as Satoshi."

Nguyen notes he was being coy in the video interview to get its viewers interested in attending a CoinGeek Conference to learn the true identity of Satoshi.

**Ira Kleiman takes the stand**

After Nguyen's deposition, Ira Kleiman took the stand and was the first and last in-person witness of the day. Ira Kleiman is believed to be a crucial witness in the case as it was he who brought the case against Dr. Wright. Ira believes Dr. Wright had formed a partnership with his brother Dave Kleiman which mined 1.1 million BTC together. Ira Kleiman is accusing Dr. Wright of stealing Dave Kleiman's half of the 1.1 million cache upon Dave's death, and therefore the Kleiman estate should be entitled to half of that 1.1 million bitcoin.

During Kleiman's testimony, many emails between Dr. Wright and Ira Kleiman were produced as evidence.

"Can I ask you if Dave played a part in writing the original PDF under the Asian alias," Ira Kleiman asked Dr. Wright in an email.

To which Dr. Wright responded, "I cannot say much right now, but yes, Dave was involved in that PDF, he had the Vistomail account, I had the GMX one."

The plaintiffs also discussed the ownership of assets. A big point of contention for the plaintiffs was that W&K Defense LLC, a company that Dr. Wright and Dave Kleiman started together, was terminated at a point in time but reopened by a new director, Uyen Nguyen, shortly after Dave passed away. They claimed that many of the assets were then transferred to Dr. Wright when the company was reopened.

"I feel like there are questionable discrepancies in the contracts between you and W&K, such as Dave's signature, his resignation, transfer of all accountable value, Uyen's role of director, BAA projects, etc., no need to go into detail," Ira Kleiman wrote to Dr. Wright in an email.

The plaintiff's legal team went on to emphasize the discrepancy in signature, hoping to indicate the transfer of assets was fraudulent.

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1411

NEWS          CONFERENCES          BITCOIN 101          VENTURES

BUY BSV

"Dave was smarter than I was in some ways, he broke his BTC in many 50BTC sized wallets. I had a few wallets with large amounts of BTC, which is not easy to move without making the world notice," Dr. Wright wrote in one of his emails to Ira Kleiman.

"Craig mentioned possibly sending someone here to retrieve the encrypted Keys," Ira wrote in an email to Uyen.

Without a doubt, the deposition from Jamie Wilson and the examination of Patrick Paige indicate that both Dr. Wright and Dave Kleiman most likely owned a very large sum of Bitcoin.

To end their examination of Kleiman, Freedman introduced a piece of evidence into court—an email from May 20, 2014, from Dr. Wright to Dave that said, "We did partner." It was not clear what they partnered over or if this partnership existed at the time that the 1.1 million Bitcoin were mined.

**The cross examination**

Defense lawyer Andres Rivero brought the day to a close with a 45-minute cross examination of Ira Kleiman.

"You claim that Dave and Craig had a 50/50 partnership to invent Bitcoin," River said.

The lawyer noted that Dave never showed Ira Kleiman a business partnership document or shared details with Ira regarding a business partnership existing—and Ira confirmed that this is true.

Rivero went on to ask if there were any partnership papers or writing that reflected a partnership formation or details of a partnership, to which Ira answered: "It was a verbal agreement."

"You have a will from Dave that does not mention Bitcoin," Rivero said.

"That is right," Ira replied.

"He never said the word Bitcoin to you, the word Satoshi to you, the word Craig Wright to you, the words W&K to you," Rivero said.

To which Ira confirmed was true before the court session ended for the day.

Once again, the defense's arguments stress that no written or formal partnership agreement existed between Dr. Wright and Dave Kleiman at the time the 1.1 million Bitcoin were mined and that there is no evidence of theft taking place despite Ira Kleiman's accusations.

**Conclusion**

Day 3 of the Kleiman v Wright trial was much slower than the first two days. I'd say that was because a majority of the depositions were virtual rather than in person. The big takeaway from today's first deposition is that Dr. Wright has a very large amount of Bitcoin that Wilson has claimed to see in Dr. Wright's account and that Dr. Wright allegedly

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1412

Ira Kleiman that Dave was a good friend and played a role in launching Bitcoin. That Kleiman has an issue with W&K being restarted after Kleiman's death and some of the business transactions that took place in that company once Dave passed, he believes some of those transactions were fraudulent and unrightfully gave Dr. Wright ownership of the company's assets.

When cross-examined, the defense emphasized that there is no writing or documentation that indicates Dave Kleiman and Dr. Wright had a partnership, that Dave had never even said the word Bitcoin to his brother Ira while Dave was living, and that Ira did not actually know much about critical issues or issues of importance in his brother's life.

Tomorrow should be a more exciting day as the defense finishes cross-examining Kleiman, the events that we saw today are setting the stage for something bigger.

CoinGeek will feature Kurt Wuckert Jr. in daily recap coverage which will be livestreamed on a daily basis at 6:30 p.m. EST on our YouTube Channel.

Watch our Day 1 Special Report from the Kleiman v Wright trial here:

Watch our Day 2 Special Report from the Kleiman v Wright trial here:

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1413



NEWS        CONFERENCES        BITCOIN 101        VENTURES

BUY BSV

*New to Bitcoin? Check out CoinGeek's* **_Bitcoin for Beginners_** *section, the ultimate resource guide to learn more about Bitcoin—as originally envisioned by Satoshi Nakamoto—and blockchain.*

TAGGED

BITCOIN      BITCOIN BILLIONS      BITCOIN WHITEPAPER      DAVE KLEIMAN      DR. CRAIG WRIGHT      IRA KLEIMAN      JAMIE WILSON      JIMMY NGUYEN

KLEIMAN V WRIGHT      LAWSUIT      SATOSHI NAKAMOTO



LATEST NEWS



We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1414

NEWS        CONFERENCES        BITCOIN 101        VENTURES

BUY BSV




2021 had it all in Africa for digital currencies—adoption soared by 1,200% as Kenya led global P2P trades, but there was the bad as well, like a $3.8B scam.

### losing money from Chivo wallets

The latest blow to the BTC circus in El Salvador is the mysterious loss of funds from the state-issued Chivo wallets, which the vocal president is quiet about.



BUSINESS    31 DECEMBER 2021

### Nationalist organization in India calls for Bitcoin ban as gov't further delays regulation

The Swadeshi Jagran Manch says Bitcoin must be banned or it could pose great danger to the financial market, but parliament is putting off regulations for now.



BUSINESS    30 DECEMBER 2021

### BitMEX exec Greg Dwyer trial delayed until October 2022

Greg Dwyer has been charged alongside BitMEX founders Arthur Hayes, Ben Delo, and Samuel Reed, who have already surrendered to U.S. authorities and stand to face up to five years behind bars.



## COINGEEK NEWSLETTERS

First Name

Last Name

Email Address

Yes, I want to receive updates via email*

○ Newsletters, Conferences and Events

○ Newsletters Only

SUBMIT

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1415

12/31/21, 11:53 PM

NEWS        CONFERENCES        BITCOIN 101        VENTURES

BUY BSV

We use cookies to ensure that we give you the best experience on our website. If you continue to use this site we will assume that you are happy with it.

Ok

1416

# TAB 861-6

# EXHIBIT F



Home » Business » Satoshi Nakamoto trial, the biggest revelations from week 1 of Kleiman v Wright

| BUSINESS  6 NOVEMBER 2021                                    Jordan Atkins 

## Satoshi Nakamoto trial, the biggest revelations from week 1 of Kleiman v Wright

Week one of the Satoshi Nakamoto trial of the century is in the books. The entire week was taken up by the plaintiff's case-in-chief, and some of the case's most vital characters took the stand. As such, it was a highly revealing week. Here are the most telling developments—and what they mean for the rest of Kleiman v Wright trial.

**Dave Kleiman was in desperate need of money before his death**

Dave Kleiman has been a looming presence at trial so far. After all, Ira Kleiman is only here in his capacity as representative of Dave's estate, and the question at issue can be put simply as whether or not the invention of Bitcoin was the product of a partnership between Dr. Wright and Dave Kleiman or whether it was Dr. Wright alone.

The type of person Dave Kleiman was is important. After all, according to Ira, the man was a 50-50 Satoshi Nakamoto partner in one of the most groundbreaking inventions ever made, so the parties predictably would want to examine whether he's the kind of person that was in a position for that to make sense. This is particularly so considering there is no evidence of the alleged partners ever discussing Bitcoin or the Bitcoin white paper.

Ira said as much under cross examination.

Q: You said there was no treasure in Dave's estate, but now you think that Dave was Satoshi?

A: Yes.

Q: You had a hard time believing at first that Dave was Satoshi?

A: Correct.

Q: You never saw Dave do software activities?

A: No.



1418



The jury heard how Dave had maxed out multiple credit cards before his death, was selling personal possessions for cash—including his air conditioner and wheelchair—and had taken out loans against his home. An email written by Ira Kleiman was shown which revealed that Dave's bank was chasing his estate for $560,000. Ira also admitted that he gave his share of an unspecified inheritance to Dave.

On cross examination, Andrew Rivero also took Ira and the journey through Dave's tax returns. In the period that Dave should have been [mining Bitcoin](#), he reported no costs at all.

Despite being destitute and clearly in need of money, Dave never once did anything that would suggest he was trying to access or sell a fortune of Bitcoin he believed he was owed—a strange course of action for one half of the wealthiest business partnership ever created.

**Dave Kleiman and Craig Wright never emailed one another about Bitcoin**

We also saw a relatively vivid picture painted of the nature of the relationship between Dr. Wright and Dave Kleiman. It mostly came on the defense's cross examination of Ira: Andres Rivero walked Ira and the jury through a timeline of emails between Dr. Wright and Dave.

They portrayed a highly communicative working relationship whenever the two would align on a project. This included detailed emails setting out who would do what tasks, regular check-ins from both parties to assess the progress being made and jubilation upon completion.

Rivero made this obvious for the jury when questioning Ira. After showing examples of Dave Kleiman and Dr. Wright congratulating and keeping one another up to date with their work (for example, one email showed Dave Kleiman congratulation Dr. Wright for completing a master's degree), Rivero and Ira have the following exchange:

Q: So he's congratulating Craig Wright on getting a master's, right?

A: Yes.

Q: But, sir, we don't see any email where the congratulate each other for the Bitcoin white paper from Halloween until November 27th?

A: No. I haven't seen it.

Q: And you don't know of such a congratulatory email, like we saw on [the Data Wipe Fallacy paper both Dr. Wright and Dave worked on]?

A: No.

In a case with so little direct evidence, the absence of evidence is often the best substitute. Rivero is painting the picture that for the two to not discuss their world-changing Bitcoin project is a significant departure from their normal working relationship.

The only email between Dave and Craig that could be argued to concern Bitcoin was one sent some months before the



1419



Unfortunately, records of W&K are particularly limited, because since Ira reinstated the company in 2018 and installed himself as its authorized agent, not a single tax return has been filed relating to the company. Ira Kleiman is currently being sued by Lynne Wright to declare he never had the authorization to reinstate W&K.

**Dr. Wright not the only one of Dave Kleiman's best friends to be sued by Ira**

After a brief appearance in court on the opening day of trial, Ira Kleiman was a no-show on day two, the first full day of substantive witness examination.

He returned on Wednesday to begin his deposition, and the jurors got the first real impression of the instigator of this lawsuit.

Perhaps the most telling detail shown to the jury was the fact that Dr. Wright is far from the only one of Dave Kleiman's best friends to be sued by Ira over misappropriated Bitcoin.

On Thursday, Rivero asked Ira about other attempts of his to get a hold of Bitcoin via litigation. We know from Ira's deposition that he had sued Patrick Paige and Carter Conrad, Dave's two other best friends, to try and recover Bitcoin which he says was Dave's. That suit was dropped, but Rivero's questioning on cross-examination was still revealing.

Q: When was this suit dropped?

A: I don't remember.

Q: Did it overlap with this suit?

A: I don't remember.

Q: Do you make allegations lightly?

A: No.

Q: You were maintaining multiple suits claiming multiple of Dave's friends [had Bitcoin belonging to Dave]?

A: Yes.

Q: You sued *all* of Dave's best friends?

A: Yes.

Just as revealing about Ira is his testimony about Thanksgiving in 2009. The jury heard how the last time Dave and Ira Kleiman met one another was at that dinner. It's here that Dave supposedly told the only other living soul about his collaboration with Dr. Wright on the invention of Bitcoin, telling him he was working on creating digital money, a project bigger than Facebook, with a wealthy foreign man. And despite Dave's health declining steeply from then until his

1420



**New to Bitcoin? Check out CoinGeek's *Bitcoin for Beginners* section, the ultimate resource guide to learn more about Bitcoin—as originally envisioned by Satoshi Nakamoto—and blockchain.**

TAGGED

BITCOIN    BITCOIN BILLIONS    BITCOIN WHITEPAPER    DAVE KLEIMAN    DR. CRAIG WRIGHT    IRA KLEIMAN    KLEIMAN V WRIGHT    LAWSUIT

SATOSHI NAKAMOTO



LATEST NEWS



BUSINESS    31 DECEMBER 2021

**2021 year in review: Bitcoin comes of age in Africa**

2021 had it all in Africa for digital currencies—adoption soared by 1,200% as Kenya led global P2P trades, but there was the bad as well, like a $3.8B scam.



BUSINESS    31 DECEMBER 2021

**Where is my BTC? El Salvador residents mysteriously losing money from Chivo wallets**

The latest blow to the BTC circus in El Salvador is the mysterious loss of funds from the state-issued Chivo wallets, which the vocal president is quiet about.



1421



BUSINESS   31 DECEMBER 2021

**Nationalist organization in India calls for Bitcoin ban as gov't further delays regulation**

The Swadeshi Jagran Manch says Bitcoin must be banned or it could pose great danger to the financial market, but parliament is putting off regulations for now.

BUSINESS   30 DECEMBER 2021

**BitMEX exec Greg Dwyer trial delayed until October 2022**

Greg Dwyer has been charged alongside BitMEX founders Arthur Hayes, Ben Delo, and Samuel Reed, who have already surrendered to U.S. authorities and stand to face up to five years behind bars.







1422

# TAB 861-7

# EXHIBIT G



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360

By **Carolina Bolado**

Law360, Miami (December 23, 2021, 3:02 PM EST) -- The estate of computer forensics expert Dave Kleiman had only two jurors on its side in its attempt to get bitcoins from self-professed bitcoin inventor Craig Wright, who had the support of the remaining members of the jury over six days of deliberations, according to one of the jurors.

Attorneys for Ira Kleiman, who represents his brother's estate, couldn't come up with enough evidence to convince the jury that Dave Kleiman was involved in developing the technology or mining bitcoins, according to the juror, who asked to remain anonymous.

"They never proved to me without a shadow of a doubt that he was involved in bitcoin in any way," the juror said. "Everybody said he wasn't a miner, he wasn't a coder. I just felt like he may have written papers for Dr. Wright, and that's where their friendship was."

Jurors deliberated for more than a week, as the two holdouts in Kleiman's camp pored through all the evidence, according to the juror.

"They finally realized there was no positive connection with bitcoin," the juror said. "That's when they agreed that as far as liability towards bitcoin, there was none."

Eventually, the jury came back with a **win for Wright** on six of the seven claims in the suit. The jury awarded W&K Info Defense Research LLC — the company that Dave Kleiman and Wright started in 2011 — $100 million on a count of conversion for the intellectual property moved by Wright from the company to his own entities.

The juror said everyone agreed early on that Wright was liable for conversion of intellectual property, but they were split primarily on whether the estate was owed any of the 1.1 million bitcoins at issue in the case. The bitcoins, which are worth almost $50 billion today, were mined by Satoshi Nakamoto, the pseudonymous author of the October 2008 white paper that described a "peer-to-peer version of electronic cash" that would later become bitcoin. The Australian-born Wright claims to be Nakamoto.

During the course of the three-week trial, attorneys for Ira Kleiman said Wright repeatedly referred to Dave Kleiman as his business partner **after his death** and told Ira Kleiman that his brother had been a key part in the creation of bitcoin. But Ira Kleiman said Wright changed his story once the lawsuit was filed and began saying Dave Kleiman had been no more than a good friend.

Wright testified that, at most, Dave Kleiman helped clean up the grammar on the bitcoin white paper. Wright said Dave Kleiman was **not a coder** and never helped create the bitcoin code or debug it.

The juror said that the personalities of Dave Kleiman and Wright did not play a significant role in the verdict, and that they looked strictly at the evidence in the computer exhibit the court gave them.

But the juror did not warm to Ira Kleiman because he did not testify about visiting his brother at the hospital when he was ill. Dave Kleiman used a wheelchair and was in and out of the hospital continually with serious health problems in the years leading up to his death in 2013. The parties were barred from discussing the brothers' relationship, according to a pretrial order from U.S. District Judge Beth Bloom.

"In three years he didn't go to the hospital?" the juror said. "That clouded my view as far as what the actual record stated."

The evidence presented by the defense on Ira Kleiman's decisions to **reformat the hard drives** found at his brother's house also stuck with the juror, who said that "gave me an idea that he was trying to hide something."

The juror was impressed by Wright, who was on the stand for several days, and found the testimony by the defense's **autism expert** particularly interesting. The expert was put on the stand to explain how Wright's statements could be misconstrued because of his autism, which often makes it difficult for others to understand him.

"For Dr. Wright to have the tunnel vision that he had toward seeking education and getting all the degrees that he got, that just really amazed me," the juror said.

When asked about documents produced by Wright that the plaintiffs demonstrated were forged, the juror said there was "a lot of ambiguity in that" and no "concrete proof" that the signatures on the documents were not valid.

"I'm not surprised by this description of the jury's work because they were very careful, and that's why they reached the right result," Wright's attorney Andrés Rivero told Law360.

Ira Kleiman sued Wright in February 2018, claiming that after his brother's death, Wright schemed to steal 1.1 million bitcoins and intellectual property related to bitcoin software. Ira Kleiman argued that Wright breached an oral partnership agreement to mine bitcoins and develop bitcoin-related technology when he cut Dave Kleiman out of any assets from the partnership, which Wright maintains did not exist.

At trial, Ira Kleiman presented evidence of two suits Wright filed against W&K in Australian court after Dave Kleiman's death, seeking $56 million. In those suits, Wright said he and Dave Kleiman each owned 50% of W&K. He eventually got consent judgments against the company and used them to transfer its intellectual property assets to his own entities in Australia.

Ira Kleiman's team also showed jurors emails, text messages and other communications between Wright and others in which Wright referred to Dave Kleiman as his partner.

Wright's attorneys, on the other hand, pointed to the complete lack of communications between Wright and Dave Kleiman discussing plans to develop or mine bitcoin.

An attorney for Ira Kleiman declined to comment.

Ira Kleiman is represented by Devin "Vel" Freedman, Joseph M. Delich, Kyle Roche, Constantine Philip Economides and Stephen Lagos of Roche Freedman LLP, and Andrew Scott Brenner, Maxwell V. Pritt, Laselve Elijah Harrison and Stephen N. Zack of Boies Schiller Flexner LLP.

Wright is represented by Andrés Rivero, Amanda Marie McGovern, Jorge A. Mestre, Michael A. Fernández, Alan H. Rolnick, Daniela Tenjido Sierra, Schneur Zalman Kass and Zaharah R. Markoe of Rivero Mestre LLP.

The case is Kleiman v. Wright, case number 9:18-cv-80176, in the U.S. District Court for the Southern District of Florida.

--Editing by Adam LoBelia.

All Content © 2003-2022, Portfolio Media, Inc.

1425