**22-11150**

# United States Court of Appeals
## *for the*
# Eleventh Circuit

---

IRA KLEIMAN, as the Personal Representative of the Estate of David Kleiman,

*Plaintiff/Appellant,*

– v. –

CRAIG WRIGHT,

*Defendant/Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 9:18-cv-80176-BB
(Hon. Beth Bloom)

## APPELLANT'S APPENDIX – VOLUME EIGHT

ANDREW BRENNER
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Avenue, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

DEVIN (VELVEL) FREEDMAN
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
(305) 753-3675
vel@rochefreedman.com

KYLE W. ROCHE *(Pro Hac Vice)*
ROCHE FREEDMAN LLP
99 Park Avenue, Suite 1910
New York, New York 10016
kyle@rochefreedman.com

*Counsel for Plaintiff/Appellant*

---

# TABLE OF CONTENTS

**VOLUME I:**

**TAB DS –** District Court Docket Sheet .................................................................. 1

**TAB 1 –** Complaint
      Filed February 14, 2018 .................................................................. 53

Exhibit to Motion to Dismiss the Complaint
      Filed April 16, 2018:

      **TAB 12-2 –** Exhibit B, Declaration of Craig Wright .................................. 91

**TAB 24 –** Amended Complaint and Jury Demand
      Filed May 14, 2018 .................................................................. 97

Exhibit to Motion to Dismiss Amended Complaint
      Filed June 15, 2018:

      **TAB 33-3 –** Exhibit C, Declaration of Craig Wright ................................. 150

**TAB 80 –** Answer to Amended Complaint
      Filed January 10, 2019 ............................................................. 157

**TAB 83 –** Second Amended Complaint and Jury Demand
      Filed January 14, 2019 ............................................................. 191

**VOLUME II:**

      **TAB 83-1 –** Exhibit 1 .............................................................. 240

      **TAB 83-2 –** Exhibit 2 .............................................................. 336

      **TAB 83-3 –** Exhibit 3 .............................................................. 341

      **TAB 83-4 –** Exhibit 4 .............................................................. 344

      **TAB 83-5 –** Exhibit 5 .............................................................. 449

## VOLUME III:

**TAB 83-6 –** Exhibit 6 ................................................................. 460

**TAB 83-7 –** Exhibit 7 ................................................................. 463

**TAB 83-8 –** Exhibit 8 ................................................................. 468

**TAB 83-9 –** Exhibit 9 ................................................................. 482

**TAB 83-10 –** Exhibit 10 ............................................................. 494

**TAB 83-11 –** Exhibit 11 ............................................................. 509

**TAB 83-12 –** Exhibit 12 ............................................................. 524

**TAB 83-13 –** Exhibit 13 ............................................................. 566

**TAB 83-14 –** Exhibit 14 ............................................................. 568

**TAB 83-15 –** Exhibit 15 ............................................................. 573

**TAB 83-16 –** Exhibit 16 ............................................................. 583

**TAB 83-17 –** Exhibit 17 ............................................................. 585

**TAB 83-18 –** Exhibit 18 ............................................................. 587

**TAB 83-19 –** Exhibit 19 ............................................................. 595

**TAB 83-20 –** Exhibit 20 ............................................................. 600

**TAB 83-21 –** Exhibit 21 ............................................................. 622

**TAB 83-22 –** Exhibit 22 ............................................................. 632

**TAB 83-23 –** Exhibit 23 ............................................................. 640

**TAB 83-24 –** Exhibit 24 ............................................................. 643

**TAB 83-25 –** Exhibit 25 ............................................................... 665

**TAB 83-26 –** Exhibit 26 ............................................................... 667

**TAB 83-27 –** Exhibit 27 ............................................................... 675

**VOLUME IV:**

**TAB 83-28 –** Exhibit 28 ............................................................... 684

**TAB 83-29 –** Exhibit 29 ............................................................... 693

**TAB 83-30 –** Exhibit 30 ............................................................... 700

**TAB 83-31 –** Exhibit 31 ............................................................... 705

**TAB 83-32 –** Exhibit 32 ............................................................... 707

**TAB 83-33 –** Exhibit 33 ............................................................... 709

**TAB 87 –** Amended Answer to Second Amended Complaint
Filed January 28, 2019 ................................................................. 711

**TAB 127 –** Joint Discovery Memorandum
Filed March 24, 2019 ................................................................... 747

Exhibits to Motion for Judgment on the Pleadings for Lack of Subject Matter
Jurisdiction
Filed April 15, 2019

**TAB 144-1 –** Exhibit A ............................................................... 757

**TAB 144-6 –** Exhibit F ............................................................... 758

**TAB 154 –** Notice of Withdrawing Exhibit
Filed April 18, 2019 ..................................................................... 759

**TAB 159 –** Plaintiff's Memorandum in Opposition to Defendant's Motion for
Judgment on the Pleadings for Lack of Subject Matter Jurisdiction
Filed April 28, 2019 ..................................................................... 761

**TAB 217 –** Order on Plaintiff's Motion to Compel
    Filed June 14, 2019 ..................................................................... 780

**TAB 222 –** Redacted Declaration of Craig Wright
    Filed June 20, 2019 ..................................................................... 785

**TAB 236 –** Excerpt of Transcript of Evidentiary Hearing, 6/28/19
    Filed July 2, 2019 ....................................................................... 789

Exhibit to Motion for Leave to File Exhibits to Supplemental Record
    Filed July 9, 2019

    **TAB 242-2 –** Exhibit 2 .............................................................. 794

**TAB 265 –** Order Denying Motion for Judgment on the Pleadings
    Filed August 15, 2019 ................................................................ 804

**TAB 277 –** Order on Plaintiff's Motion to Compel
    Filed August 27, 2019 ................................................................ 816

    **TAB 277-1** – Exhibit 1 .............................................................. 845

**TAB 311 –** Dr. Craig Wright's Objection to Magistrate Order "Deeming" Certain
Facts Established and "Striking" Certain Affirmative Defenses
    Filed November 25, 2019 ........................................................... 849

**TAB 312-1 –** Excerpt of Redacted Deposition Transcript of Craig Steven Wright,
4/4/19
    Filed November 26, 2019 ........................................................... 878

**VOLUME V:**

**TAB 332 –** Plaintiff's Response to Defendant's Objection to Magistrate Order
"Deeming" Certain Facts Established and "Striking" Certain Affirmative Defenses
    Filed December 16, 2019 ............................................................ 883

**TAB 373 –** Order Affirming in Part and Reversing in Part Order Re: Plaintiff's
Motion to Compel
    Filed January 10, 2020 ............................................................... 918

iv

**TAB 376 –** Craig Wright's Notice of Compliance with Court's January 10, 2020 Order
>    Filed January 14, 2020 ................................................................. 941

**TAB 488-17 –** Excerpt of Deposition Transcript of Lynn Carroll Wright, 1/13/20
>    Filed May 8, 2020 ....................................................................... 943

**TAB 510 –** Plaintiff's Omnibus Motion in Limine
>    Filed May 18, 2020 ..................................................................... 949

**TAB 523** – Dr. Craig Wright's Opposition to Plaintiff's Omnibus Motion in Limine
>    Filed May 22, 2020 ..................................................................... 973

**TAB 541 –** Notice of Supplemental Evidence Supporting Plaintiff's Omnibus Motion for Sanctions
>    Filed May 27, 2020 ..................................................................... 991

>    **TAB 541-1** – Exhibit 1 ............................................................. 994

**VOLUME VI:**

**TAB 558** – Plaintiff's Reply in Support of His Omnibus Motion in Limine
>    Filed June 2, 2020 .................................................................... 1001

**TAB 595 –** Order Denying Plaintiff's Omnibus Sanctions Motion
>    Filed June 24, 2020 .................................................................. 1014

Notice by Craig Wright, Joint Notice of Filing Deposition Designations
>    Filed August 3, 2020

>    **TAB 611-14 –** Excerpt of Deposition Transcript of Jamie R. Wilson, November 8, 2019 .............................................................. 1053

>    **TAB 611-20 –** Excerpt of Deposition Transcript of Andrew O'Hagan, March 17, 2020 ..................................................................... 1061

**TAB 615 –** Omnibus Order Denying Motion for Summary Judgment
>    Filed September 21, 2020 .......................................................... 1073

**TAB 623 –** Omnibus Order Granting in Part and Denying in Part Defendant's Motion in Limine
Filed November 18, 2020 ........................................................................ 1166

**TAB 794 –** Request for Adverse Inference Jury Instruction or, Alternatively, Judicial Admission Jury Instruction
Filed November 20, 2021 ........................................................................ 1196

    **TAB 794-1**– Exhibit A ........................................................................ 1206

    **TAB 794-2**– Exhibit B ........................................................................ 1209

**VOLUME VII:**

    **TAB 794-3**– Exhibit C ........................................................................ 1212

**TAB 800-1 –** Court's Instructions to the Jury
Filed November 22, 2021 ........................................................................ 1242

Exhibits to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
Filed December 16, 2021

    **TAB 828-3 –** Exh. D008 – Redacted Letter from Karp Law Firm to Mr. Tosi ................................................................................................ 1264

    **TAB 828-111 –** Exh. JE22 – Will Prepared for David Alan Kleiman .... 1267

    **TAB 829-30 –** Exh. P122 – email chain ................................................ 1272

    **TAB 829-41 –** Exh. P149 – email chain ................................................ 1276

    **TAB 829-48 –** Exh. P161 – email chain ................................................ 1278

    **TAB 829-55 –** Exh. P189 – email chain ................................................ 1304

**TAB 837 –** Excerpt of Transcript of Trial (Day 1), 11/1/21
Filed December 20, 2021........................................................................ 1305

**TAB 838 –** Excerpt of Transcript of Trial (Day 2), 11/2/21
Filed December 20, 2021 ............................................................. 1309

**TAB 839 –** Excerpt of Transcript of Trial (Day 3), 11/3/21
Filed December 20, 2021 ............................................................. 1313

**TAB 840 –** Excerpt of Transcript of Trial (Day 4), 11/4/21
Filed December 20, 2021 ............................................................. 1318

**TAB 841 –** Excerpt of Transcript of Trial (Day 5), 11/5/21
Filed December 20, 2021 ............................................................. 1328

**TAB 843 –** Excerpt of Transcript of Trial (Day 7), 11/9/21
Filed December 20, 2021 ............................................................. 1331

**TAB 851 –** Excerpt of Transcript of Trial (Day 15), 11/23/21
Filed December 20, 2021 ............................................................. 1336

**TAB 861 –** The Estate of David Kleiman's Motion for a New Trial Based on
Violations of Order Excluding Sibling Relationship Evidence
Filed January 4, 2022 ............................................................... 1342

    **TAB 861-1** – Exhibit A ........................................................... 1357

    **TAB 861-2** – Exhibit B ........................................................... 1391

    **TAB 861-3** – Exhibit C ........................................................... 1398

    **TAB 861-4** – Exhibit D ........................................................... 1403

    **TAB 861-5** – Exhibit E ........................................................... 1409

    **TAB 861-6** – Exhibit F ........................................................... 1417

    **TAB 861-7** – Exhibit G ........................................................... 1423

**VOLUME VIII:**

**TAB 869 –** Dr. Craig S. Wright's Opposition to the Estate of David Kleiman's Motion for a New Trial
      Filed January 18, 2022 .............................................................. 1426

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
      Filed January 31, 2022

      **TAB 878-3 –** Exh. P172 – Transcript of Interview with Craig Wright, August 11, 2014 ....................................................................... 1446

      Exh. P173 – Transcript of Interview with Craig Wright, August 18, 2014 ....................................................................... 1492

Exhibits to Notice by Craig Wright re Exhibit List, Second Supplemental Joint Notice of filing Admitted Exhibits
      Filed February 17, 2022

      **TAB 885-9 –** Exh. P464 – Redacted email chain ................................... 1538

**TAB 887 –** Order on Motion for New Trial
      Filed February 28, 2022 ........................................................... 1652

**TAB 889 –** Amended Final Judgment
      Filed March 9, 2022 ................................................................ 1662

**TAB CS –** Certificate of Service

**SEALED VOLUME**

**VOLUME IX:**

**TAB 404-1 –** Craig Wright's Confidential Response to Plaintiff's Interrogatory
      Filed February 24, 2020 ........................................................... 1663

**TAB 507 –** Plaintiff's Omnibus Sanctions Motion

Filed May 15, 2020 .................................................................... 1673

**TAB 507-1 –** Exhibit 1 ........................................................... 1701

**TAB 507-8 –** Exhibit 8 ........................................................... 1709

Exhibit to Notice by Ira Kleiman, W&K Info Defense Research, LLC re Exhibit List
    Filed December 16, 2021

**TAB 828-3 –** Exh. D008 – Unredacted Letter from Karp Law Firm to Mr. Tosi, 6/18/15 ........................................................ 1714

Sealed Exhibits filed December 17, 2021

**TAB 834 –** Exh. D099 – Excerpt of Progress Notes ................................ 1717

Exh. D102 – Excerpt of Progress Notes .................................... 1719

**TAB CS –** Certificate of Service

# TAB 869

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       plaintiffs,

v.                                                        **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

       defendant.

_____/

## DR. CRAIG S. WRIGHT'S OPPOSITION
## TO THE ESTATE OF DAVID KLEIMAN'S MOTION FOR NEW TRIAL

1426

## I.    INTRODUCTION

After a complex, three-week trial, one of the plaintiffs, the Estate of David Kleiman (the "Estate") demands a new trial because of ten questions that allegedly "explored the relationship" between Ira and David Kleiman in "violation" of the Court's interlocutory order on a Motion *in Limine*. D.E. 623 (the "Order"). Plaintiff failed to object to five of these ten questions, failed to object when they were answered, never moved to strike or for a curative instruction, and thereby waived altogether any assignment of error. Plaintiff did object to five of the ten questions. Two of its objections were overruled, and, as it did with the five questions where it sat on its hands, plaintiff never moved to strike the answers or for a curative instruction. That leaves three questions to which plaintiff objected and its objections were sustained. Those questions were not answered, and no evidence came in at all, because questions are not evidence. Thus, we begin with the mundane, but incontrovertible, observation that plaintiff has no basis for assigning any "error" to the three questions that were not answered.

As for the seven questions that were answered, plaintiff waived any assignment of error as to the five where it sat on its hands and failed to object, or to move to strike the answers, or for a curative instruction.  *Collins v. Wayne Corp.*, 621 F.2d 777, 785–86 (5th Cir. 1980) ("To hold otherwise "would permit counsel to sit silently when an error is committed at trial with the hope that they will get a new trial because of that error if they lose."). That leaves two questions as to which plaintiff objected and its objections were overruled. Allowing answers to those two questions was within the Court's discretion. Just as the Court had discretion to determine a category of exclusion on a motion *in limine*, it necessarily possessed *a priori* discretion to make a court's traditional and time-honored, *ad hoc* determination of "the relevance and admissibility of any given piece of evidence" when offered at trial. *ML Healthcare Servs., LLC v. Publix Super Mkts., Inc.*, 881 F.3d 1293, 1297 (11th Cir. 2018) (quoting *U.S. v. Clay*, 832 F.3d 1259, 1314 (11th Cir. 2016)). After all, motions *in limine* are a mere procedural convenience, aimed at streamlining trials and promoting efficiency. *Ins. House, Inc. v. Ins. Data Processing, Inc.*, 2009 WL 10670469, at *2 (N.D. Ga. 2009), *aff'd*, 367 F. App'x 1 (11th Cir. 2010) (citing *Carofino v. Forester*, 450 F. Supp. 2d 257, 270 (S.D.N.Y. 2006) ("The purpose of a motion in limine is to streamline the trial process by making advance rulings on evidentiary issues definitely set for trial to avoid interrupting the trial with lengthy argument."). They are, by definition, interlocutory and subject to modification throughout trial. *Id.* ("A district court may adjust its

1

1427

ruling on a motion in limine during the course of the trial." (citing *Farfaras v. Citizens Bank & Trust of Chicago*, 433 F.3d 558, 565 (7th Cir. 2006))).

Thus, even if it reasonably could be argued (it can't) that the Court's decision to admit seven answers "violated" its own interlocutory, modifiable Order on the Motion *in Limine*, plaintiff had two options when answers were given. Its first option was to object to what it now hypothesizes was a "*de facto* modification *sub silentio*" of the interlocutory Order as an abuse of discretion. Plaintiff did not object. Even if it had objected, this argument would have been frivolous, because the relationship between the brothers was directly relevant and "excluded" only pursuant to Fed. R. Evid. 403. The Court had discretion to decide on the spot that the probative value of the answers to those limited questions outweighed any potential prejudice.

Plaintiff's second option was the lawyer's traditional and time-honored, *ad hoc* objection to admission of evidence when offered, either before or after the questions were answered. Plaintiff didn't object on this basis, either, as to five of the questions (and seven of the answers). As noted above, the Court had discretion to decide on the spot that the probative value of the particular answers to these particular limited questions outweighed any potential prejudice.

The Court had discretion to allow these seven answers into evidence. Moreover, plaintiff's failure at trial to object, move to strike the answers or for a curative instruction, or object to their belatedly hypothesized "modification" of the Court's interlocutory Order on the Motion *in Limine*, waived its claim to any assignment of error, let alone a new trial.

Further, plaintiff's motion for new trial [D.E. 861] (the "Motion") cannot be granted because it wholly fails to demonstrate that (1) the district court committed error, which (2) affected the plaintiff's substantial rights or caused substantial prejudice, such that (3) the error was not merely harmless. *E,g.*, *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). Because no abuse of discretion has been (or could have been) shown to have been committed by the Court, plaintiff's Motion fails at the very first step, and there is no basis to hypothesize about prejudice or harm. Nonetheless, its Motion is loaded with unsupported assertions of supposed harm from the challenged questions. As a matter of law and logic, those assertions cannot even properly be considered, because ***there was no error by the Court***.

However, to protect the record and avoid waiver – like remembering to object at trial to the admission of evidence – we will address plaintiff's hypothetical assertions of prejudice and harm after disposing of its ill-founded "error" theories.

2

1428

## II.    ARGUMENT

### A.    There was No Violation of the Order on the Motion *in Limine*

The Court entered an Order on plaintiffs' Motion *in Limine* to exclude evidence of the "sibling relationship" between Ira and David Kleiman, except for testimony about a supposed conversation the two had at Thanksgiving in 2009. Order at 16. The Order says it did so to address plaintiffs' concern that the "jury will make a decision in this case premised on how good of a brother Ira [Kleiman] was or whether [he] deserves Dave [Kleiman's] fortune – instead of basing their decision on the facts and merits of the case." Order at 15. The Estate now argues that ten questions asked by Dr. Wright's counsel "violated" the interlocutory Order on the Motion *in Limine*. As noted above, these questions fall into three categories: five questions to which plaintiff failed to object, three questions as to which the Court sustained objections, and two questions as to which the Court overruled plaintiff's objections.

#### 1.    *The Estate Waived Its Objections by Failing to Object at Trial*

As grounds for a new trial, plaintiff cites five questions as to which *it sat on its hands, never objected, never moved to strike the answers, and never asked for a curative instruction*:

> Q. Right. The last time you spoke to David Kleiman in life was
> in 2009, right?
> A. Correct -- well, no, no. Actually, I shouldn't say that.
> Q. I said that the wrong way.
> A. That's the last time I recall seeing him.
> Q. Are you finished, Mr. Kleiman?
> A. Yes.

Motion at 4 (citing Trial Tr. Day 4 at 23:12–19).

> Q. You never saw him in the hospital?
> A. No.

Motion at 4 (citing Trial Tr. Day 4 at 84:1–2).

> Q. All right. To be clear, just to make this crystal clear, you didn't learn of Dave's
> death until a few days after his body was found?
> A. Yes.
> Q. And he -- you don't know the exact date, but he had died some
> days before?
> A.  I believe so.

Motion at 4-5 (citing Trial Tr. Day 4 at 135:22–136:3).

> Q. Mr. Kleiman --
> MR. RIVERO: Mr. Shah, if you could highlight the first two
> sentences of Paragraph 3.

3

> BY MR. RIVERO:
> Q. "Ira is David's brother. He had limited contact and personal
> knowledge as to David's financial affairs throughout David's life."
> Correct?
> A. Correct.
> MR. BRENNER: Your Honor, I have to ask to approach.
> THE COURT: I'm sorry?
> MR. BRENNER: I have to ask to approach, Your Honor, and ask
> that it be taken down during the sidebar.
> THE COURT: All right. If we can take it down for a moment.[1]

Motion at 5 (citing Trial Tr. Day 4 at 173:12–25).

> Q. So you knew David Kleiman for about 20 years.
> A. Yeah. I believe it was about 20 years.
> Q. During that time, how many times did you hear of Ira
> Kleiman?
> A. I can't really recall of any offhand, other than he had a
> brother.

Motion at 6 (citing Trial Tr. Day 2 at 184:19–24).

The Federal Rules of Evidence make it crystal clear that a party must object *during trial*[2]
to preserve a claim of error for appeal:

> (a) Preserving a Claim of Error: A **party may claim error in a ruling** to
> admit or exclude evidence **only if** the error affects a substantial right of the
> party and:
> > (1) if the ruling admits evidence, **a party, on the record:**
> > > (A) **timely objects or moves to strike; and**
> > > (B) states the specific ground, unless it was apparent from the
> > > context.

Fed. R. Evid. 103(a)(1) (emphasis added). The record excerpts above show that plaintiff *did not*
*object during trial to these questions*, did not move to strike the answers, and did not ask for a
curative instruction, which definitively waived any claimed error in admitting the evidence.

---

[1] Dr. Wright notes that D008 (the exhibit taken down that was being shown to the jury) had been
on Dr. Wright's exhibit list from day one, but the Estate never objected to it on the theory that it
purportedly violated the Order on the Motion *in Limine*. *See* D.E. 641-1, 669-1, 725-1, 731-1,
737-1, and 756-1. This stands in contrast to other exhibits, such as D252 and D255 where
plaintiffs did object with a "MIL." *Id.*

[2] This should come as no surprise to the Estate. The same Order that the Estate claims Dr. Wright
violated states: "[i]n light of the preliminary or preemptive nature of motions in limine, 'any
party may seek reconsideration at trial in light of the evidence actually presented and **shall make**
**contemporaneous objections when evidence is elicited.**" D.E. 623 at 3 (emphasis added)
(citing *Holder v. Anderson*, 2018 WL 4956757, at *1 (M.D. Fla. 2018)).

The "object or waive" rule remains applicable where solicited testimony violates a motion *in limine*.[3] *E.g.*, *Collins v. Wayne Corp.*, 621 F.2d 777, 785–86 (5th Cir. 1980)[4] (An "objection is required to preserve error when an opponent, or the court itself, violates a motion *in limine* that was granted.");[5] *U.S. v. Roenigk*, 810 F.2d 809, 815 (8th Cir. 1987) ("[A] motion *in limine* does not preserve error for review. A party whose motion *in limine* has been overruled must object when the error the party sought to prevent is about to occur at trial."); *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 395 n.7 (3d Cir. 1999) ("Because [the plaintiff] prevailed on the motion *in limine* to limit [the defendant's] arguments, her counsel had an obligation to renew his objection once he thought [the defendant] had violated this ruling."). To hold otherwise "would permit counsel to sit silently when an error is committed at trial with the hope that they will get a new trial because of that error if they lose." *Collins*, 621 F.2d at 785–86.[6]

Undeterred, the Estate spills much ink discussing the purported evidence it claims it would have introduced at trial to show that David and Ira Kleiman had a close relationship.

---

[3] These questions did not "explore" the relationship between the brothers, but served to establish Ira's lack of personal knowledge as to David's finances and relevant time periods, including when David Kleiman died and the Estate was formed. Additionally, as will be shown below, establishing the last time the brothers spoke was critical to demonstrating the implausibility of plaintiff's Thanksgiving 2009 story. Further, Dr. Wright had a duty to preserve on the record his objections to the Order on the Motion *in Limine*, just as the Estate had a duty to object to questions they found objectionable at trial. *U.S. v. Estes*, 994 F.2d 147, 149 (5th Cir. 1993) (affirming "the district court's ruling on the motion in limine" because the defendant didn't "attempt[] to offer evidence of the conviction at trial to preserve this issue for appeal"); *Collins*, 621 F.2d at 781 ("Error may not be predicated upon a ruling which . . . excludes evidence unless . . . the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." (citing Fed. R. Evid. 103(a)(2))).

[4] *Collins* is binding precedent because former Fifth Circuit decisions rendered prior to October 1, 1981, are binding on courts of the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[5] Unsurprisingly, recent decisions of courts in this District and Circuit cite this bedrock principle. *E.g.*, *City of S. Miami v. Desantis*, 2020 WL 7074644, at *5 (S.D. Fla. 2020) (Bloom, J.) ("Generally, a party must object to preserve error in the admission of testimony, even when a party or a court violates an *in limine* ruling."); *Vigneulle v. Tahsin Indus. Corp., USA*, 2019 WL 4409220, at *1 n.1 (N.D. Ala. 2019) (same).

[6] The Estate is familiar with such tactics. At the conclusion of discovery, plaintiffs asked the Court to impose sanctions, arguing that not all documents were produced. The Court denied this request, stating that "[p]laintiffs don't get to sit on their hands for months, wait for discovery to conclude, and then ask the Court to [sanction] [D]efendant because they believe [D]efendant failed to produce all the evidence to which they were entitled." D.E. 595 at 39 (brackets in original).

Motion at 6-7. So what? Nothing stopped it from proffering that evidence. The time for plaintiff to have made any such arguments was at trial, after timely objections on the record—not a month after the trial ended. *E.g.*, *Collins*, 621 F.2d at 785 ("Had plaintiffs' counsel promptly objected to the violations of the motion *in limine* in this case, the trial court could have either avoided the violations or given an instruction to cure any harm suffered by the plaintiffs."). Moreover, the Estate *actually did introduce much of that "evidence" at trial*,[7] and some of it could not have been introduced at trial because it violated the Court's discovery deadlines.[8]

One need not look hard to find cases where courts in the Eleventh Circuit have denied motions for new trial in circumstances such as those the Estate claims existed here.[9] In *Frederick v. Kirby Tankships, Inc.*, the court excluded certain video testimony in ruling on a motion *in limine*, yet the plaintiff "played [] videotaped testimony without excising the testimony on the spilled oil, and thus, the jury heard the inadmissible evidence." 205 F.3d 1277, 1285 (11th Cir. 2000). The Eleventh Circuit affirmed denial of a new trial motion, because the defendant "did not make a timely objection" by "not object[ing] until after the videotape testimony was played." *Id.*

Similarly, in *ML Healthcare Servs.*, the defendant solicited testimony "inconsistent with the contours of the district judge's limited ruling" on a motion *in limine* to limit evidence regarding collateral sources. 881 F.3d at 1304–05. The Eleventh Circuit held that this did not "constitute reversible error," because "Plaintiff did not object when the statements were made at

---

[7] The Estate claims it would have introduced evidence that "Ira Kleiman was very often in touch with David Kleiman while the latter was in the hospital," but Ira Kleiman *did testify to that* at trial. Motion at 6; *cf.* Trial Tr. Day 3 at 150:5-25 (Although Thanksgiving 2009 was his "best memory of last seeing [David]," he "may have seen him other times after that."); Trial Tr. Day 4 at 23:13-17 (testifying that Thanksgiving 2009 was not the last time he spoke to David). Plaintiff also argues that it would have highlighted "David's decision to make Ira the sole beneficiary of his estate [and] his personal representative," but Ira Kleiman testified to those facts on direct examination. Motion at 11; *cf.* Trial Tr. Day 3 at 35:5-23.

[8] The Estate claims it would have introduced call logs (P721) showing that Ira and David Kleiman spoke many times when David was in the hospital. This assertion is false. Plaintiffs could not have introduced any such call logs because they never produced them in discovery. *See* email from Z. Marco to J. Delich attached as **Exhibit A** (confirming that P721 was first produced on August 11, 2021); D.E. 382 ("[A]ll discovery, including fact and expert discovery, shall be completed" by May 1, 2020.).

[9] This next argument assumes *arguendo* that the Order on the Motion *in Limine* was "violated," which Dr. Wright does not concede. As demonstrated above, the questions at issue were not asked for an improper purpose.

6

trial, as required to preserve the issue for appeal under Federal Rule of Evidence 103." *Id.* at 1305 (citing *U.S. v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015)). Finally, in *Younger v. Experian Info. Sols., Inc.*, the district court granted a motion *in limine* excluding evidence of "other lawsuits, verdicts, investigations, complaints or similar actions . . . ." 2019 WL 1296256, at *4 (N.D. Ala. 2019), *aff'd in part, vacated in part and remanded*, 817 F. App'x 862 (11th Cir. 2020). At trial, plaintiffs introduced an "Assurance of Voluntary Compliance" that the defendant had entered into with 31 states' attorneys general. *Id.* at *3. The court denied defendant's new trial motion because defendant "did not cite the order *in limine* as grounds for objection until after the close of evidence, at a sidebar during Plaintiff's closing argument." *Id.* at *5. If a sidebar during closing argument is too late, the Estate's motion 28 days after trial surely is, too.

**2.**    *Questions are Not Evidence*

Having disposed of the five questions that plaintiff never objected to, we now turn to three questions as to which the Court *sustained* plaintiff's objections, as to which no answers were given and no evidence adduced:

> Q. Let me restate the question. The last time you saw your brother in person was in 2009?
> MR. BRENNER: Your Honor, just renew the objection from yesterday on this issue.
> THE COURT: I'm sorry. The objection is?
> MR. BRENNER: It violates an order of the Court.
> **THE COURT: Sustained.**

Motion at 4 (emphasis added) (citing Trial Tr. Day 4 at 23:20–24:1).

> Q. Mr. Kleiman, before I come back to these email exchanges between your brother and Craig Wright, I just want to talk with you about one other subject and that is your telephone communications with David Kleiman. Would you agree with me that between March 12 and April 7th, 2013, on the cell phone at least, you spoke with David Kleiman six times?
> A. What time again?
> Q. This is between -- this is in the last year, the last 13 months of your brother's life.
> MR. BRENNER: Objection, Your Honor. Subject to court order.
> **THE COURT: The objection is sustained.**
> MR. RIVERO: I'll move on.

Motion at 5-6 (emphasis added) (citing Trial Tr. Day 5 at 68:7–21).

> MR. RIVERO: Judge, it's the absence of voice mails and that is highly relevant.
> MR. BRENNER: Yeah, Judge. And also, understand, subject to the

1433

Court's order, too.

**THE COURT: Yeah. That's where -- the objection is sustained.**

Motion at 6 (emphasis added) (citing Trial Tr. Day 5 at 70:16–21).

These three (unanswered) questions cannot be grounds for a new trial because *questions are not evidence*.[10] As the Court instructed the jury on the first day of trial:

> [**T**]**he lawyers' questions and objections are not evidence**. Only the witnesses' answers are evidence. Do not decide that something is true just because a lawyer's questions suggests it is. For example, a lawyer may ask a witness: "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did, unless the witness agrees with it.

Trial Tr. Day 1 at 174:18–24 (emphasis added).

Further, because the Court *sustained* objections to these three questions, there could be no "error" here, because *no evidence was admitted*. This is expressly stated in the advisory committee's note to Fed. R. Evid. 103's 2000 amendment:

> Even where the court's ruling [on a motion in limine] is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered. If the court changes its initial ruling, or if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal. **The error, if any, in such a situation occurs only when the evidence is offered and admitted**.

Fed. R. Evid. 103 advisory committee note to 2000 amendment (emphasis added) (citing *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc*., 896 F.2d 949, 956 (5th Cir. 1990); *Roenigk*, 810 F.2d at 809). *Accord ML Healthcare Servs.*, 881 F.3d at 1305 ("The error, if any, in such a situation occurs only when the evidence is offered and admitted."); *Scott v. Dunnam*, 2016 WL 1452413 (S.D. Ga. 2016) (new trial not warranted where counsel violated prior order by asking "plaintiff whether he loves his children, including and especially one of his daughters," because the "Court interrupted defense counsel's line of questioning before any improper evidence or comment could be presented to the jury.").

Further, the Court also instructed the jury that "when I sustain an objection to a question, **you must ignore the question** and not guess what the answer might have been." Trial Tr. Day 1

---

[10] Further, those questions didn't even implicate the Order on the Motion *in Limine*. Their purpose was not to show that the brothers were estranged, but to show that David Kleiman was not working on Bitcoin and the Thanksgiving 2009 story was untrue, because the brothers never again spoke about Bitcoin and there were no references to it in David Kleiman's voicemails.

1434

at 175:9–11 (emphasis added). And "[w]e always presume that a jury follows its instructions." *U.S. v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021); *U.S. v. Brown*, 983 F.2d 201, 203 (11th Cir. 1993) ("[J]uries can be trusted to follow the trial court's instructions."). As such, to the extent an attorney's questioning could constitute "error" (it can't), any such error was cured by the Court's instruction that the jury should disregard questions when an objection is sustained. *U.S. v. Gallardo*, 977 F.3d 1126, 1138 (11th Cir. 2020) ("When the district court gives a curative instruction, we presume that the jury followed it.").

### 3. *The Court Had the Power and Discretion to Overrule Plaintiff's Objections*

Lastly, plaintiff argues that the Court "violated" its Order on the Motion *in Limine* when it overruled plaintiff's objections to two questions Dr. Wright's counsel asked at trial, as follows:

> Q. All right. You spoke very little -- if I remember correctly, the
> only thing you commented on in the period between 2008 and April of 2013
> is Thanksgiving Day 2009; isn't that right?
> A. Yes.
> Q. Okay. And that was a -- that was November 26th, 2009, right?
> A. Correct.
> Q. Okay. And you know that date because that's the last day you
> saw your brother in life, correct?
> MR. BRENNER: Objection. May we approach?
> MR. RIVERO: Judge, I'll --
> **THE COURT: The objection is overruled at this point.**
> BY MR. RIVERO:
> Q. Sir?
> A. I'm not exactly certain if that's the very last day. But that's the --
> I guess the best memory of last seeing him. I may have seen him other times
> after that, but I just don't recall it.
> Q. Sir, your testimony under oath and your best memory is that that was the last
> day you saw your brother in life, is it not?
> MR. BRENNER: Same objection, Your Honor.
> THE WITNESS: Like I said, I'm not certain that that was –
> **THE COURT: The objection is noted. It's overruled at this point.**
> THE WITNESS: I could have possibly seen him other days.

Motion at 3-4 (emphasis added) (citing Trial Tr. Day 3 at 149:22–150:24).

Even if those questions had been inconsistent with the interlocutory Order on the Motion *in Limine* (they were not, as we demonstrate below), that Order was interlocutory and subject to revision and reversal at any time throughout trial. *E.g.*, *Lopez v. Allstate Fire & Cas. Ins. Co.*, 2015 WL 11216748 (S.D. Fla. 2015). The Court, which had discretion to decide a category of

9

exclusion on the Motion *in Limine*, necessarily had discretion to decide "the relevance and admissibility of any given piece of evidence" when offered at trial. *ML Healthcare Servs.,* 881 F.3d at 1297. The Order was interlocutory and subject to modification throughout trial, particularly as to individual pieces of evidence. *Lopez*, 2015 WL 11216748, at *1; *Stewart v. Hooters of Am., Inc.*, 2007 WL 1752873, at *1 (M.D. Fla. 2007) ("A Motion *In Limine* presents a pretrial issue of admissibility of evidence that is likely to arise at trial, and as such, the order, like any other interlocutory order, remains subject to reconsideration by the court throughout the trial.").

Thus, the Court plainly had discretion to overrule plaintiff's two objections in light of the evidence that had been introduced, and decide that those two questions did not upset the balancing test of Rule 403, even if that might have amounted to a "modification" of the Order (it did not). *E.g., Ins. House,* WL 10670469, at *2 ("A district court may adjust its ruling on a motion *in limine* during the course of the trial."). In fact, plaintiff already had "violated" the Order by introducing self-serving evidence of the brothers' relationship when it had Ira Kleiman testify on direct that David Kleiman had appointed him as his personal representative and left the proceeds of the estate to him. *See, e.g.*, Trial Tr. Day 3 at 35:5-23.

Further, the purpose of these two questions was not to elicit testimony that would have violated the Order. On direct, Ira Kleiman had testified that at a 2009 Thanksgiving dinner, his brother purportedly said he was working on a digital currency with a wealthy foreigner, and drew a "logo" of a B with one line through it. This logo did not exist as of Thanksgiving 2009, and it was essential to Dr. Wright's defense to call that testimony into doubt, because *this was only time that David Kleiman allegedly told anybody that he was working on Bitcoin*. Thus, by having Ira Kleiman confirm that Thanksgiving 2009 was the last time he saw his brother, Dr. Wright sought to prevent him from modifying his testimony and claiming that his brother drew the purported Bitcoin logo at a later date. Accordingly, the questions objected to were asked for a proper purpose, not to improperly influence the jury, and did not "violate" the Order.

Moreover, the testimony that was elicited actually *demonstrated the existence of a relationship (and not estrangement) between the brothers*. In response to both questions, Ira Kleiman testified that he might have seen his brother at other times and days, after the 2009 Thanksgiving dinner. Trial Tr. Day 3 at 150:12-15, 23-24. Accordingly, the evidence that actually was admitted favored the Estate and did not run afoul of the Order, *which was aimed at*

*excluding testimony showing that the brothers were estranged*. Order at 13-16. Finally, plaintiff

failed to move to strike the answers to these two questions, or to move for a curative instruction,

evidently waiting for an adverse verdict to decide to argue that they were somehow unduly

prejudicial.

> **B.     Even if Plaintiff Could Have Demonstrated Any Error in Admitting the
> Answers to Two Questions to Which It Objected at Trial, or the Answers
> to Five Questions to Which It Did Not Object, or as to Three Questions
> Where its Objections Were Sustained, Such Error Would Have Been
> Harmless, and a New Trial Never Could be Ordered**

Plaintiff demands a new trial based on purported prejudice resulting from ten questions at

trial. It waived claiming error as to five of them by failing to object at trial. Its objections to three

other questions were sustained, so they weren't answered, and questions are not evidence. That

leaves two questions as to which plaintiff's objections at trial were overruled, which were then

answered, after which plaintiff neither moved to strike nor asked for a curative instruction. Even

assuming *arguendo* that the Court (impossibly) abused its discretion by admitting answers to two

questions over plaintiff's objections and five others where plaintiff sat on its hands, or by

***sustaining*** plaintiff's objections to three questions that ***were not*** answered, such error could not

have been more than harmless.

However, to protect the record and avoid waiver, much like making a timely objection at

trial to the admission of evidence, we next demonstrate the lack of merit to the Estate's

unsupported fable of purported prejudice from the ten questions.[11] Plaintiff's new trial motion

may not be granted unless it demonstrates that (1) the district court committed error that (2)

affected plaintiff's substantial rights or caused substantial prejudice, so that (3) the error was not

merely harmless. *Vanguard Research, Inc.*, 378 F.3d at 1162; *Scott*, 2016 WL 1452413 at *4.

We demonstrated above that no error occurred, but even assuming *arguendo* that plaintiff's

---

[11] We again note that there can be no error in the Court's *sustaining plaintiff's objections* to three
of the ten challenged questions, because questions are not evidence. If plaintiff had been
concerned about "prejudice" from questions, it could have moved to strike them. It wasn't and
didn't. It also could have moved to strike the answers to the seven questions that were answered,
but didn't do that either. It also failed to ask for a curative instruction. Plaintiff's conduct at trial
demonstrates that no substantial prejudice could have resulted from the questions or the answers,
because plaintiff was oblivious to such alleged consequences until *weeks after* the verdict was
rendered.

1437

motion had identified any "error" regarding its ten challenged questions, such error would have been harmless.

Plaintiff's motion did not identify any substantial right[12] that could have been prejudiced by the ten questions or answers to seven of them, did not demonstrate that they were a point of emphasis at trial, let alone that they affected its outcome. No substantial prejudice could have occurred, even assuming *arguendo* that there was error (there wasn't) as to the ten questions.

### 1. Even Assuming <u>Arguendo</u> That It Could Have Been Error to Admit Answers to Seven Of The Ten Challenged Questions, The Evidence Was Cumulative and Any Error Would Have Been Harmless

Even assuming *arguendo* that it could have been an abuse of discretion to admit answers to seven of the ten questions (it plainly wasn't), the improper admission of cumulative evidence is harmless. *E.g.*, *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 307 (5th Cir. 1978). Here, there was extensive other evidence in the record (some proffered by plaintiff) of a limited relationship between the brothers. *E.g.*, *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002) (Any error in admitting evidence of the parties' wealth was harmless "because there was a considerable amount of admissible evidence at trial allowing the jury to determine that both ISL and Levy were wealthy parties."); *Lockley v. Deere & Co.*, 933 F.2d 1378, 1389 (8th Cir. 1991) (Counsel's statement about defendant's sales did not support a new trial where "Deere is a well-known national company, [and] the jury was probably already aware of the wealth disparity between the parties."); *Mahaska Bottling Co., v. PepsiCo,* 2020 WL 10506243, at *9 (S.D. Iowa 2020), *aff'd sub nom*, *Mahaska Bottling Co., v. Bottling Grp., LLC*, 6 F.4th 828 (8th Cir. 2021)

---

[12] The failure to exclude evidence under Rule 403 does not implicate substantial rights. In *Bronzino v. Dunn*, the defense improperly suggested "character evidence" and "propensity reasoning" in its opening statement, by arguing that:

> [Plaintiff is] not a good man. He has a criminal record. He has no real source of income. Tenth grade dropout. He said that he worked for somebody. He says he worked for somebody, but didn't file income tax for seven years. . . . You have to look at the credibility of [the plaintiff]. He doesn't reveal the truth to his doctors. He's a harden[ed] criminal. Let's face it. He's an armed robber[ ]. He's a drug dealer. The facts show—the evidence will show that he has not learned his lesson. He's still dealing drugs.

558 F. App'x 613, 617–18 (6th Cir. 2014). On appeal, the Sixth Circuit held that this improper diatribe did not violate the plaintiff's substantive rights. *Id.* This is a strict standard that the Estate could not satisfy, even if there actually had been any error regarding the ten questions.

("[C]ounsel's references to PepsiCo's size did not cause prejudice to PepsiCo. PepsiCo's prominence in the food and beverage industry is public knowledge, and the jury could easily infer from other evidence at trial that PepsiCo was a large, multinational firm.").

Despite testifying for an entire day on direct examination, Ira Kleiman never said anything about seeing his brother during David's lifetime—except for the 2009 Thanksgiving dinner. He also did not testify to visiting his brother in the hospital. This lack of testimony demonstrated that they were not close. Further, Ira also volunteered testimony that they never discussed David's lengthy hospitalizations and health issues, as one would reasonably expect brothers to do:

> Q. Your brother knew that he was not in good health?
> A. He didn't really have those kind of discussions with me.
> I'm not exactly sure – you know, he didn't mention s
> pecifically like what kind of health condition he was in.
> Q. Your brother was hospitalized almost every day of the last two
> years of his life in the VA hospital here in Miami, was he not?
> A. Yes. But I'm just saying he didn't really discuss that
> kind of stuff with me.

Trial Tr. Day 3 at 176:18–177:1.

In stark contrast, David Kleiman's best friend, Kimon Andreou, testified that he visited David daily in the hospital and spoke to him every day. He also testified at length about their text messages, which discussed David's personal life, including his health issues. Trial Tr. Day 12 at 99:3–16; 110:6-19. The marked contrast in testimony was obvious and compelled the reasonable conclusion that the brothers had a limited relationship.[13] As such, even if there had been any error in admitting the seven answers to the ten questions (there wasn't), that evidence was cumulative, and any error would have been harmless.

### 2. The Verdict As To W&K's Claims Demonstrates That the Jury Did Not Use the Challenged Evidence For an Improper Purpose

Because the jury awarded no bitcoin-related damages to either of the plaintiffs, its verdict conclusively demonstrates that the allegedly "improper" admission of cumulative evidence

---

[13] This is not a case where an order on a motion *in limine* excluded a criminal conviction that would not otherwise be obvious to the jury. The natural import of excluding evidence of the Kleiman brothers' relationship was to influence the jury to conclude that they had no relationship. Further, if plaintiff actually had boxes of admissible evidence showing that the brothers indeed had a close relationship (as they argue in their Motion), it might have been a good idea to introduce that evidence, rather than moving to exclude it.

13

1439

consistent with Ira Kleiman's own testimony about the brothers' relationship did not prejudice the Estate. Why is this? First, the Estate argues that this evidence only could have affected the Estate, on the theory that Dr. Wright's "counsel's comments and questions on the sibling relationship targeted the Estate, not W&K." Motion at 9. As such, whether the so-called "relationship evidence" had any effect on the outcome can be assessed by comparing the verdicts for the two plaintiffs.

The jury awarded no bitcoin-related damages either to the Estate or to W&K, and if plaintiff's "relationship evidence" theory were correct, W&K should have recovered such damages even if the Estate did not. This means there must have been something other than the "relationship evidence" that caused the jury to reject all of W&K's bitcoin-related damages claims.[14] No speculation is necessary, however, because the Law 360 article the Estate relies on[15] suggests that plaintiffs failed to prove David Kleiman was a bitcoin miner, much less a bitcoin coder, and this failure of proof applied equally to the claims of W&K and the Estate:

> '**They never proved to me** without a shadow of a doubt that **he was involved in bitcoin in any way**,' the juror said. '**Everybody said he wasn't a miner, he wasn't a coder**. I just felt like he may have written papers for Dr. Wright, and that's where their friendship was.'
> Jurors deliberated for more than a week, as the two holdouts in Kleiman's camp pored through all the evidence, according to the juror.
> '**They finally realized there was no positive connection with bitcoin**,' the juror said. '**That's when they agreed that as far as liability towards bitcoin, there was none**.'

Carolina Bolado, *No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360*, Law360 (Dec. 23, 2021), https://www.law360.com/articles/1451020/ no-proof-bitcoin-inventor-owed-friend-juror-tells-law360 [D.E. 861-7 at 1] (emphasis added). In short, the jury awarded no bitcoin-related damages to the Estate because it failed to prove its claims, not because jurors

---

[14] It wasn't for plaintiffs' lack of trying that the jurors rejected W&K's bitcoin-related claims. The trial transcript is littered with plaintiffs' assertions that W&K mined bitcoin. *E.g.*, Trial Tr. Day 2 at 156:18-157:10; Trial Tr. Day 3 at 43:8-44:8, 78:2-10, 81:4-15, 91:8-23, 92:7-93:1, 94:22-95:19, 175:13-15; Trial Tr. Day 5 at 160:21-161:25.

[15] News articles are not grounds for overturning a jury verdict. *U.S. v. Blackwell*, 459 F.3d 739, 769–70 (6th Cir. 2006); *U.S. v. Salesman*, 2010 WL 1855848, at *1 (S.D. Fla. 2010). However, if and to the extent the Court even considers the article, it should be considered in assessing Dr. Wright's Opposition as well as plaintiff's Motion.

wanted to punish Ira for "abandon[ing] his brother in his time of need," in purported "violation" of an interlocutory order on a Motion *in Limine. See* D.E. 512 at 7; D.E. 623 at 15.[16]

### C.    The Cases the Estate Relies on are Wholly Inapposite

Throughout its Motion, plaintiff makes scurrilous personal attacks and unfounded claims of "counsel misconduct." This shameful tactic includes urging the Court to rely on irrelevant decisions such as *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990) (cited nine times in the Motion), *Christopher v. Florida*, 449 F.3d 1360, 1365 (11th Cir. 2006) (cited five times in the Motion), and *Goodman v. Safeco Ins. Co. of Illinois*, 2015 WL 898696 (M.D. Fla. 2015) (cited four times in the Motion). In every one of those cases, counsel urged the jury to consider impermissible evidence for an improper purpose during closing argument.[17]

Even assuming *arguendo* that the Court abused its discretion by improperly admitting evidence here (which did not and could not have happened), Dr. Wright's counsel never urged the jury in closing argument to consider such evidence for an improper purpose (e.g., that it should not award the Estate damages because Ira Kleiman was undeserving). *Accord ML Healthcare Servs., LLC*, 881 F.3d at 1306 (affirming judgment because "Defendant did not

---

[16] The Estate relies on a cryptic sentence from the Law 360 article, but that sentence does not support its argument that the jurors used any so-called "relationship evidence" for an improper purpose. The juror is quoted as saying: "'In three years he didn't go to the hospital?'. . . . 'That clouded my view as far as what the actual record stated.'" Motion at 8. The juror did not say that he or she punished Ira Kleiman for not visiting his brother in the hospital (which might have been improper). Instead, the juror said only that it "clouded [his or her] view" of the record. In other words, this juror may have discounted the probative value of certain unidentified evidence. For example, the juror might properly have discounted the value of Ira Kleiman's "relationship" testimony that his brother broke a purported vow of silence at Thanksgiving 2009 to tell him about a secret Bitcoin project he was working on, when he never did so when his best friend visited him daily in the hospital (which would have been a proper use of the testimony).

[17] In *McWhorter*, the improper purpose was to show that the plaintiff's firing was retaliatory, which is what plaintiff's counsel did in closing, arguing that plaintiff's failure to participate in a lawsuit "[was] the motive for all of this . . . . Let's fire Hank." 906 F.2d at 676. In *Christopher*, the improper purpose was inviting a violation of defendant's qualified immunity by arguing that defendant could be liable for anything other than a blow to the head, which plaintiff's counsel did in closing, arguing that the defendant could be liable for other injuries and plaintiff need not "prove a specific blow to the head." 449 F.3d at 1365-66. In *Goodman*, the improper purpose was invoking sympathy for a co-plaintiff injured in a car accident in order to find insurance coverage. That is exactly what plaintiff's attorney did in closing, arguing that the insurer was trying to cheat Goodman and that "I hope that you find Goodman's injuries are worthy of compensation." 2015 WL 898696, at *4.

1441

directly argue that the jury should diminish any damages []; it only provided the context of ML Healthcare's payment arrangement and implied that ML Healthcare, rather than Plaintiff, was at risk in the lawsuit."); *Cox v. Target Corp.*, 351 F. App'x 381, 383 (11th Cir. 2009) ("[T]he court did not abuse its discretion in denying [plaintiffs'] motion for a new trial" because, although defendant introduced evidence that plaintiff had sued over a "previous fall at another retail store," defendant "did not violate the court's order by suggesting that Cox was litigious."); *Younger v. Experian Info. Sols., Inc.*, 2019 WL 1296256, at *5 (N.D. Ala. 2019), *aff'd in part, vacated in part and remanded*, 817 F. App'x 862 (11th Cir. 2020) (distinguishing *McWhorter* because there, "plaintiff's counsel spoke to this [impermissible] theory during closing" and "encouraged the jury to consider [the impermissible] exhibit corroborating that theory").

Further, in the cases plaintiff travels on, there was no proper use for the evidence at issue, and it could only be (and was) used to invite the jury to decide the case on an improper basis. *E.g.*, *Goodman*, 2015 WL 898696, at *4 (Counsel's "statement encouraged the jury to decide the case not on the merits, but on the idea that the insurance company would be cheating an innocent and injured third party. It had no probative value, invited the jury to ignore the law, and was highly prejudicial."). In contrast, here there were a number of proper purposes for the challenged evidence, including establishing the date and implausibility of the Thanksgiving dinner story, when David Kleiman died, when the Estate was opened, and Ira Kleiman's lack of personal knowledge as to David Kleiman's finances.

Moreover, in the cases plaintiff cites, the improper evidence and argument were central to the case and likely to influence its outcome. *See, e.g.*, *XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1271 n.15 (S.D. Fla. 2016) (distinguishing *McWhorter* because the "inadmissible facts were central to the case—evidence that the defendant fired the plaintiff because he refused to cooperate with the defendant in an ongoing lawsuit."). Here, the central issue for the jury in plaintiff's case was whether there was an oral partnership between Dr. Wright and David Kleiman to mine bitcoin and develop intellectual property. The purportedly improper evidence regarding David Kleiman's relationship with his brother had no direct connection to those central issues.

Finally, in plaintiff's cited cases there was no effective jury instruction to counter an impermissible closing argument (which didn't even occur here). In *McWhorter* and *Goodman*, the court gave no curative instruction, and in *Christopher* the jury instruction was ineffective

16

because it did not instruct the jury that they should not consider the improper argument. *See* 449

F.3d at 1367, n.8 (The ineffective jury instruction "was only one sentence: 'Plaintiff claims that

one of the Defendants struck him on the head, causing injury,'" and "did not express that liability

had to be tied to Plaintiff's establishing by evidence that he had suffered a blow to the head."import).

Here, in marked contrast, the Court issued multiple jury instructions to counter any purportedly

impermissible evidence. The Court instructed the jury as follows:

> Your decision must be based only on the evidence presented here. You must not be
> influenced in any way by either sympathy for or prejudice against anyone.
>
> ***
>
> You must decide the case solely on the evidence and the law before you and must
> not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy,
> or biases.

Trial Tr. Day 15 at 20:9–11; *Id.* at 44:12-15. Thus, there was little risk that the jury would use the

evidence for an improper purpose. *See Cephus v. CSX Transp., Inc.*, 771 F. App'x 883, 895 (11th

Cir. 2019) (It was not an abuse of discretion to deny new trial motion, because "although we find

that counsel's remarks were improper," the "district court did instruct the jury before its

deliberations that it "must not award any damages by way of punishment or through sympathy.").

 Thus, plaintiff's principal cases are inapposite and easily distinguished.[18] Instead, the

Court should apply and follow the binding Eleventh Circuit decisions in *Frederick*, 205 F.3d

---

[18] Plaintiff's other cited cases also are inapposite and irrelevant. *See Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1156 (11th Cir. 1986) (no proper use for statement that defendant "faced charges of pimping, pandering, possession of drugs, and distribution of drugs"); *U.S. v. Trujillo*, 714 F.2d 102, 105–06 (11th Cir. 1983) (counsel encouraged jury to ignore the law); *In re Engle Cases*, 2009 WL 9119991, at *18 (M.D. Fla. 2009) (same); *Soltero v. Swire Dev. Sales, Inc.*, 2010 WL 11506701, at *11 (S.D. Fla.  2010) (Plaintiff improperly referred "to the assets or wealth, of the other Swire entities," arguing that "even $10 million in punitive damages is chickenfeed to Swire."); *Castle v. Thompson*, 2010 WL 11507513, at *6 (N.D. Ga. 2010) (Plaintiffs repeatedly introduced evidence on claims where "[d]efendants had already received summary judgment, impermissibly expanding the scope of the case."); *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1307–08 (5th Cir. 1977) (After assuring the court "four times" that "he would not bring up [the impermissible purpose] in his final argument," counsel did so.); *Adams Lab., Inc. v. Jacobs Eng'g Co.*, 761 F.2d 1218, 1220 (7th Cir. 1985) (Plaintiff "violated an earlier district court order prohibiting any mention of [plaintiff's] financial plight" by arguing in opening that plaintiff was "a small company with little wealth in comparison to the stature and wealth that [the defendant] enjoyed in the industry."); *Brown v. Royalty*, 535 F.2d 1024, 1026-27 (8th Cir. 1976) (After the court excluded evidence that defendant never received a ticket, in closing argument, defendant argued that "there was no evidence that [the defendant] had been guilty of negligence, that he had violated an ordinance or anything of the sort.").

1443

1277, *ML Healthcare Servs.*, 881 F.3d 1293, and *Cox*, 351 F. App'x 381, in rejecting plaintiff's motion.

At bottom, even assuming *arguendo* that the Court somehow abused its discretion in allowing answers to five questions to which plaintiff didn't object, three questions that were not answered because it sustained plaintiff's objections, and answers to two questions where it overruled plaintiff's objections, plaintiff could not (and did not) show that any of this evidence was used for an improper purpose, let alone that the admission of this evidence affected plaintiff's substantial rights or caused it substantial prejudice. Any hypothesized error here was plainly harmless, and plaintiff's motion should be denied. *Vanguard Research, Inc.*, 378 F.3d at 1162.

## III.    CONCLUSION

Just as the Court had discretion to use the administrative convenience of an interlocutory order on a motion *in limine* to exclude a category of evidence under Rule 403, it had *a priori* discretion to determine the admissibility of the particular challenged evidence when it was offered at trial, whether that be characterized as *ad hoc* balancing under Rule 403 or a "modification" of the Court's interlocutory Order. The Court plainly did not abuse its discretion in dealing with plaintiff's ten challenged questions, and did not commit any error. But even if any error had been committed, it was harmless, because it did not affect plaintiff's substantial rights or cause substantial prejudice. In sum, and for all of the good and sufficient reasons stated above, the Court should deny the Estate's motion for a new trial.

Dated: January 18, 2022                    Respectfully submitted,

                                           By: s/ Andres Rivero
                                           ANDRES RIVERO
                                           Florida Bar No. 613819
                                           JORGE A. MESTRE
                                           Florida Bar No. 088145
                                           AMANDA MCGOVERN
                                           Florida Bar No. 964263
                                           ALAN H. ROLNICK
                                           Florida Bar No. 715085
                                           SCHNEUR KASS
                                           Florida Bar No. 100554

                                           RIVERO MESTRE LLP

18

1444

2525 Ponce de Leon Boulevard,
Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: jmestre@riveromestre.com
Email: amcgovern@riveromestre.com
Email: arolnick@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

**<u>CERTIFICATE OF SERVICE</u>**

I CERTIFY that on January 18, 2022, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Andres Rivero*

1445

# TAB 878-3

**P-172**

Case No. 9:18-CV-89176-BB

**AUSCRIPT AUSTRALASIA PTY LIMITED**

ABN 72 110 028 825

**AUSCRIPT**

FASTER, BETTER EVIDENCE DELIVERY SINCE 1921

Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)    **F:** 1300 739 037
**E:** clientservices@auscript.com.au    **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT SENSITIVE

O/N H-429401

**AUSTRALIAN TAXATION OFFICE**

**RECORD OF INTERVIEW**

| | |
|---|---|
| **INTERVIEWER:** | **GREG O'MAHONEY** |
| **INTERVIEWEE:** | **CRAIG Wright** |
| **CONDUCTED AT:** | **ATO OFFICE** |
| **DATE:** | **11 AUGUST 2014** |
| **TIME:** | |

**TRANSCRIBED BUT NOT RECORDED BY**
**AUSCRIPT AUSTRALASIA PTY LIMITED**

Wright 11.08.14

Transcript Sensitive

## Interview conducted with Craig Wright

On the 11th August 2014

Australian Taxation Office

INSERT CORRECT ADDRESS

Interviewers: Greg O'Mahoney, Andrew Sommers.

| | | |
|---|---|---|
| | O'Mahoney | Thank you. I will start with the formalities. I think the interview of Dr Wright, it's informal, notwithstanding that it's been recorded and it's set down for two afternoons – today 11 August and 18 August. I can indicate, Dr Wright – and don't hold me to this – but the way I was envisaging approaching the interview was to, today, deal with matters on a fairly high level and then next week take up some more discrete lines of questioning about some of the matters touched on today. And, I guess, to start, the first question turns on your background and experience. Would you mind telling us a little bit about your commercial background and experience? |
| | Wright | Commercial or medical or generally? |
| | O'Mahoney | Well, let's start with academic and move to the commercial. |
| | Wright | Bascially, I have been in university since I left high school. I collect qualifications. Currently, I have around 200 vocational qualifications in my particular field, plus a number that aren't. Double digits on degrees. I'm qualified in everything from IT law and economics to the main areas I'm involved in which is IT, so programming, photography, security, whatever else. I'm the only person globally to have achieved a GSE through all three different streams – GSE being Global Security Expert from the SANS Institute, GSE being considered generally the highest security certification you can get. In those other SANS ones, at one stage I had every single qualification. I haven't maintained every single one of them because they're not all relevant anymore, and there's only so much time that I can actually work and do other things with. |

Also qualified in things like statistics. My paper – my master's was ..... analysis; basically looking at ..... time series, time series in economic markets and whatever else, predictions and monitoring data to do with economic systems. In economics, it's to do with banking finance and monetary policy. IT generally, I started programming predominantly in C and Assembly. Also do Java and other languages but I still prefer C and other such languages. I'm qualified in a number of operating systems, everything from Windows and whatever else were also taught, up to post graduate level. I stopped that recently as the time over the last year with everything hasn't allowed me to. Once we get everything sorted, apart from businesses or business, I will also get back to teaching ..... electric.

I present at a number of international conferences. I have presented ..... such as neural networking, artificial intelligence. That's what most of my research at the moment is looking in the commercialisation of agents, the small bits of software code designed to ..... a task. The way I do those is looking at evolutionary systems and these are things like swarm particles – PSOs where you have lots of small bits of code that compete, and the nature of that is to have a system where the surviving code gets more resources if it's better at

---

CONFIDENTIAL    DEFAUS_00068666

1447

Interview Conducted with Craig Wright

|  |  |  |
|---|---|---|
|  |  | doing a particular task, and then each of the other bits of code – so over large volumes of energy and a set of problems that are mathematically infeasible, doing ..... mathematics so things like travelling salesman problems and online contracting and that sort of thing. |
| 5 |  | So the idea is to gather all the things into a block chain and other such mechanisms so that you can have a smart contract where it is effectively infeasible to get out of things as long as the contract is set up correctly beforehand.  It also allows a non-debt-leveraged type of system so that you |
| 10 |  | have, I guess, the use of money where you can guarantee that there is a, frankly, non-fraudulent use of bank funds.  That is, a bank can't lend what it doesn't actually have in capital or investment, etcetera, so the current issue we all have in our banking system, people basically take money – a loan out for something such as someone going on a holiday or whatever else, which is |
| 15 |  | fine if you are doing capital invested in the bank itself, but when you are taking that leverage past the bank, there's no decent scrip that the bank can sell.  So part of the idea of what we are doing in a block chain is then taking that, so that you actually have to have a real contract with real asset bases and investors in the bank can lose money, and when they do that, but not a good ..... |
| 20 | O'Mahoney | Can I – can we just pause there and perhaps have a little bit – to some extent we've anticipated some questions that I will be asking you.  Just getting back to your university qualifications, you said that you had hit double digits.  Can you tell us which degrees you have graduated in? |
|  | Wright | Masters in Law, Masters in Statistics, IT Masters in Networking Systems |
| 25 |  | Administration, IT Masters in – Master of Science - - - |
|  | O'Mahoney | Are they all from the same university? |
|  | Wright | No. |
|  | O'Mahoney | No.  So - - - |
|  | Wright | Some US, some Australian, some British. |
| 30 | O'Mahoney | Okay.  The Masters of Law? |
|  | Wright | Northumbria, UK. |
|  | O'Mahoney | Okay.  And the Masters of Science? |
|  | Wright | That's SANS Institute, USA. |
|  | O'Mahoney | And the Masters of Statistics? |
| 35 | Wright | Newcastle. |
|  | O'Mahoney | And, I think, did you say Masters of Systems - - - |
|  | Wright | Administration? |
|  | O'Mahoney | Yes. |
|  | Wright | Charles Sturt University.  I got a number at Charles Sturt University. |
| 40 | O'Mahoney | All right.  Any other degrees in universities? |
|  | Wright | Sorry? |
|  | O'Mahoney | Any other degrees in universities? |
|  | Wright | Yes. |
|  | O'Mahoney | Which ones? |

Page 2 of 45

CONFIDENTIAL

1448

DEFAUS_00068667

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| 5 | Wright | Well, in theory I have finished my second degree and second doctorate, PhD, from Charles Sturt University but I have to actually send in the bound document. So I have got the pass and whatever else but I have to pull my finger out and get it printed and whatever else, but I have got the, you know, pass type of thing. I have got weird and wonderful things. I got church – so I've got theology; I have got – that is really ..... |
| | O'Mahoney | No. |
| 10 | Wright | .... I've got Masters in Networking Systems Administration; Master of Information Systems Security. |
| | O'Mahoney | Where was that from? |
| | Wright | Charles Sturt University. |
| | O'Mahoney | That's fine. If you think of more as we go through, just mention them to us. |
| | Wright | There's quite a number. Unfortunately, I forget how many I've actually got. |
| 15 | O'Mahoney | But to have some – to get some picture of your career profile, it sounds like you have been in and out of university, if you like, and studying for a substantial part of your life. |
| | Wright | Until recently, I have never been out of university. |
| | O'Mahoney | All right. More in than out. |
| 20 | Wright | And worked and been in uni at the same time. |
| | O'Mahoney | Yes. Okay. |
| | Wright | Well, since I first ..... end of the 80s, 90s, I have just been in university. |
| | O'Mahoney | What was your first job? |
| | Wright | My first job? |
| 25 | O'Mahoney | Yes. |
| | Wright | I was – well, did you want before I left uni or - - - |
| | O'Mahoney | Upon graduating from your first university degree? |
| 30 | Wright | That would be after the air force and that would be, thus, when I went to WPA; that then became Corporate Express. WPA, I was a system administrator doing logistics and all the systems ..... computers that valuable so they also had me doing logistics work. |
| | O'Mahoney | And did you have a number of positions within, sort of, the systems administration over a period of time? |
| 35 | Wright | I went from systems administration at Corporate Express to – I headed up the corporate area in OzEmail, when I ..... connections with corporates, so large connections ..... connectivity. From there I went to the Australian Stock Exchange. I was the security manager there. I went ..... basically pursuant ..... Australian Stock Exchange. |
| | O'Mahoney | When was that? |
| 40 | Wright | That was in 1996. |
| | O'Mahoney | Yes. |

CONFIDENTIAL

1449

DEFAUS_00068668

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | From there, I started a company to do security consulting, etcetera. ASX became one of my first clients. I picked up – I started picking up gambling companies at that stage, some companies ..... else. |
| 5 | O'Mahoney | Just pausing there, when was it that you first established a company that you ran? |
| | Wright | The business was in 1997 and then it was transformed into a company shortly after that. |
| | O'Mahoney | Right. Which company was that? |
| | Wright | ..... |
| 10 | O'Mahoney | And since that time, have – more or less, has there been a case that you have been running companies for yourself? |
| | Wright | Predominantly, yes. |
| | O'Mahoney | And during that time you have been, I think it's fair to say, a director of a number of companies? |
| 15 | Wright | Yes. |
| | O'Mahoney | What, since first -- can you remember the time at which you first became a company director – was it around that time, '96,'97? |
| | Wright | '98 or something like that. |
| 20 | O'Mahoney | '98. And since that time, roughly, how many companies would you have been a director of? |
| | Wright | Double digits. |
| | O'Mahoney | Okay. Double digits. And, at the moment, is your occupation that of company director/entrepreneur/ - how would you characterise your current profession? |
| | Wright | So company director in part, entrepreneur, photographer, forensic specialist. |
| 25 | O'Mahoney | All right. Let's focus in on one of those companies, Coin Exchange. We know that it was incorporated in April of 2013. Was it the case that it traded immediately upon becoming incorporated? |
| | Wright | We actually started developing products before it became incorporated. |
| 30 | O'Mahoney | Okay. Well, if you wouldn't mind, could you tell us a little bit about the circumstances of the incorporation of Coin Exchange. |
| | Wright | What do you mean by that? |
| | O'Mahoney | How did it come about that Coin Exchange came to be incorporated? |
| 35 | Wright | A long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform, particularly in Australia. We had been developing product etcetera for a number of years beforehand. Dave and I had been friends and sort of partners that way for a long time. We had worked on a number of patents together, everything from using electron microscope to ..... recover data from hard drives that had been wiped, to one-time Windows logins and similar types. We worked on some books together |
| 40 | | and he acted, well, as my editor ..... myself. |
| | | We had been planning putting together an exchange platform that would allow us ..... or bitcoin. The idea would be to perform an alternative reserve currency, that's what we are trying to do. I have jumped ahead of myself. Probably replacing the US dollar. The idea being that you have exchanges in |

Page 4 of 45

CONFIDENTIAL

DEFAUS_00068669

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | | different countries, such as Britain, Australia, wherever else. We could use that to instantaneously do forex transactions at immensely low rates and far quicker than the resource ..... at the moment, but also tied to the old title to Smart Property and it would ..... all contracts in reverse ..... researching at the moment is oil contracts and this and that to ..... with automated assistance. |
| 5 | O'Mahoney | Okay. We might come to that. You said earlier that you and Mr Kleiman had been developing product for some time. |
| | Wright | Yes. |
| | O'Mahoney | Prior to the incorporation of Coin Exchange. |
| 10 | Wright | Yes. |
| | O'Mahoney | What – how long have you been working with Mr Kleiman? Were they products that ultimately became the subject of business done by Coin Exchange? |
| | Wright | Some of them, yes. Not all. |
| 15 | O'Mahoney | And how long have they been in the pipeline for? |
| | Wright | Since I knew Mr Kleiman. |
| | O'Mahoney | And is this the case: that the Coin Exchange was established to corporatise, if you like, ideas that you and he had been working on for a substantial period of time? |
| 20 | Wright | Certain parts of it, yes, along with bitcoin areas. So we had been working on those sort of areas; I had been doing research into ..... places, into online contracting etcetera, the nomination systems in order to exploit that a lot more than we had been doing at the time - - - |
| | O'Mahoney | Was this your first venture with Mr Kleiman. |
| 25 | Wright | No. |
| | O'Mahoney | Well, what other ventures had you done with him? |
| | Wright | We were involved with WK Info Defence but I wasn't actually actively managing any of that. Dave ran all that over in the US. |
| | O'Mahoney | Can you say that again? WK? |
| 30 | Wright | WK Information |
| | O'Mahoney | Defence. |
| | Wright | Research LLC. |
| | O'Mahoney | And that was a company that you say Mr Kleiman was running out of the - - - |
| | Wright | US. |
| 35 | O'Mahoney | US. And had you been involved in that company? |
| | Wright | I have been involved subsequently. I mean, I was there but day-to-day, not at all. |
| | O'Mahoney | When you say you were there, what do you mean by that? |
| | Wright | I would do coding, trying to work out solutions to problems that we had. |
| 40 | O'Mahoney | Were you – was that before founding Coin Exchange? |
| | Wright | Yes. |

CONFIDENTIAL

DEFAUS_00068670

1451

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | And roughtly how long were you there, that is, at the WK Info Defence? |
| | Wright | The exact time we started it, I don't remember, but it was around 2010 some time that we started putting everything together for a 2011 incorporation. |
| 5 | O'Mahoney | And what is it that WK Info Defence, what's its business or enterprise? |
| 10 | Wright | The idea came about because I didn't trust the Tax Office here. I had had a number of run-ins because of Information Defence Australia and Integyrs that I had set up over here. Those companies – well, although I'd spent lots of money and around 500 computers ..... research to bitcoin mining ..... considered ..... by the ATO, so everything I had I moved over at a nominal rate, which was based on what it was worth at the time, into a trust and everything over there because back then I believed bitcoin was worth a lot of money. |
| | O'Mahoney | What was the trust that was established? |
| 15 | Wright | There was one in Panama that I don't have all the details of. |
| | O'Mahoney | What's it called? |
| | Wright | Don't know all the details. I don't know. |
| | O'Mahoney | Or any details. |
| | Wright | I know there's a trust in Panama that's set up. |
| 20 | O'Mahoney | When was that set up? |
| | Wright | In probably '11. |
| | O'Mahoney | And were you involved in establishing it? |
| | Wright | No. |
| | O'Mahoney | Was it set up to your benefit? |
| 25 | Wright | It is set up for the benefit of the research I'm doing. |
| | O'Mahoney | All right. And - - - |
| | Wright | All of this is to fund all the things I'm doing. |
| 30 | O'Mahoney | Okay. I guess, just by way of background, tell us about – we won't hold you to every detail of that trust, but just tell us a little bit about the trust in Panama that was established? |
| | Wright | There was a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being that we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies we have there. |
| 35 | O'Mahoney | So was it the case that the trust in Panama was set up as a funding mechanism? |
| | Wright | For research, yes. |
| | O'Mahoney | And for research that you were doing with Mr Kleiman? |
| | Wright | That Mr Kleiman was doing and myself as well, yes. |
| 40 | O'Mahoney | All right. And you mentioned that courtesy of the experience you had with the tax authorities here, you moved offshore, you moved things offshore. You mentioned the trust in Panama. What other steps did you take to that end? |

Page 6 of 45

CONFIDENTIAL

1452

DEFAUS_00068671

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | What do you mean by what other steps? |
| 5 | O'Mahoney | Well, you mentioned before that, courtesy of that story that you had with the Commissioner, that you -- that in the context of discussing that, you talked about the trust in Panama. Also, we were talking about WK Info Defence. |
| | Wright | Mm. |
| | O'Mahoney | Was it the case that your involvement in that entity occurred because, as I think you indicated earlier, you wanted to move things offshore, you wanted to - - - |
| 10 | Wright | Yes. |
| | O'Mahoney | - - - work offshore. |
| | Wright | Everything would have been in Australia the whole time if it wasn't for the fact that I ended up having to fight to not be bankrupt for expenditure that I actually made. |
| 15 | O'Mahoney | Right. And did you invest in WK Info Defence? |
| | Wright | More indirectly than directly. |
| | O'Mahoney | What does that mean? |
| 20 | Wright | At the time we got a lot of payments from people I'd worked with in the past. Playboy Gaming and other people that I still do work for, basically in the gambling field. I do a lot of statistical work, validating algorithms, etcetera, and I also do a lot of work validating ..... the house wins, and I get paid for that and rather than me getting paid for that, the entity got paid for that. |
| | O'Mahoney | The entity being WK Info Defence? |
| | Wright | Yes. |
| 25 | O'Mahoney | All right. As at April 2013 when Coin Exchange was established, how many other companies were you -- did you control at that time? |
| | Wright | In Australia or overseas as well? |
| 30 | O'Mahoney | In fact, we will come to that in a moment. Could you just tell us in broad terms about the commercial objectives of Coin Exchange, when it was established; what did it set out to do? |
| | Wright | Promote bitcoin and become a universal exchange platform, make bitcoin money, make bitcoin the default reserve currency globally. |
| | O'Mahoney | And at that time - we will come back to that - there were, I take it, other entities that you controlled? |
| 35 | Wright | Yes. |
| | O'Mahoney | And did -- were there other entities that you controlled that sought to bring about the same kinds of objectives that you have just outlined? |
| | Wright | No. I've got different objectives for the other ones. |
| | O'Mahoney | There was no overlap? |
| 40 | Wright | There was always an overlap. |
| | O'Mahoney | Well, tell us about the other entities. |

Page 7 of 45

CONFIDENTIAL

DEFAUS_00068672

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Cloudcroft I had given to my ex-wife as a settlement and in her bankruptcy I ended up getting it back. I was still doing work – I never intended it going back to me, but it is to do with a security platform that ..... building based upon the use of the cryptographic protocols within bitcoin. The idea there is that it integrates with honeynets and IPv6 such that you monetise the internet. |
| 5 | O'Mahoney | All right. And that's one. What was another entity that you controlled at the time that had overlap. |
| | Wright | ..... is to do with forensic work and other such things. |
| | O'Mahoney | What does that mean? Forensic work? |
| 10 | Wright | IT forensics, analysis of packet streams, analysis of other such things. |
| | O'Mahoney | What's a packet stream? |
| | Wright | The flow of information over the wire. So TCP/IP, analysis of data on hard drives, creating programs, and other such things to analyse the ..... |
| | O'Mahoney | Okay. |
| 15 | Wright | Graphic photography, etcetera. On top of that, I also did some paid and unpaid work for Federal Police, including training and other such things, and other areas of the Australian Government to the IPv6. |
| | O'Mahoney | Who engaged you from the Federal Police? |
| 20 | Wright | That was down in Canberra. I would need to dig up particular names of people. I forget them. |
| | O'Mahoney | That's fine. You have mentioned Cloudcroft, Penontacript. What other companies did you control as at April 2013 that there would have been some overlap with Coin Exchange. |
| | Wright | With - ..... |
| 25 | O'Mahoney | ..... |
| | Wright | Yes. That's probably better. |
| | O'Mahoney | Okay. Well, off the top of your head now, can you think of other entities you controlled at that time? |
| | Wright | That I controlled or - - - |
| 30 | O'Mahoney | Were involved in the management of. |
| | Wright | The management of was only in Australia. I think they're the main ones at that stage. Others came after that, shortly - - - |
| 35 | O'Mahoney | Well, I guess to be clear, can you, off the top of your head now, can you think of, at that time, other companies that you had any connection with – as a shareholder, as an investor, as a worker, that would have had some overlap with the activities of - - - |
| | Sommers | I think – I think you have asked that question about three times and I think my client has said he would like to check his records and to get - - - |
| | O'Mahoney | For sure. No, I – that's why I - - - |
| 40 | Sommers | Yes. No, no. |
| | O'Mahoney | - - - prefaced it with "off the top of your head". We appreciate that. Can we then turn to this, that I want to understand, when Coin Exchange was established, you were its sole director. Is that right? |

Page 8 of 45

CONFIDENTIAL

DEFAUS_00068673

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | And you were also its secretary? |
| 5 | Wright | Well, only by default. I'm generally not a secretary of anything but ..... director - - - |
| | O'Mahoney | No. I appreciate that. And is it the case that – were there any other employees – or were there any employees of the company on founding? |
| | Wright | There were people being used as contractors. |
| | O'Mahoney | And who are they? |
| 10 | Wright | Just Ignatius Payne, Dave Kleiman was going to be a director of the company and also an employee. Glenn, over in the US, was involved and other people would have been involved as well. |
| | O'Mahoney | And was research done - in establishing Coin Exchange, was – had you done some work on the business model that you wanted to put into place? |
| 15 | Wright | Yes. |
| | O'Mahoney | And are there documents evidencing that work that you did? |
| | Wright | Some. |
| | O'Mahoney | What sorts of documents? |
| 20 | Wright | Documents about going into – having an international banking exchange; talks with AusIndustry about forward planning; some of the AusIndustry plans. Research documents, documents to do with different PSOs I was setting up, which was ..... Agents, of course, and - - - |
| 25 | O'Mahoney | Are there strategy – would there be any strategy-type documents that would speak to, I guess, the business model that the company was seeking to achieve? |
| | Wright | Not probably in the way you're looking at, as in a formal business plan, no. None of this is going to a formal business. |
| | O'Mahoney | Okay. |
| | Wright | If I had my way, formal business would never exist ever again. |
| 30 | O'Mahoney | All right. What about something more basic like budget-type documents, company financial forecasts or documents - - - |
| | Wright | We don't have any forecasts, even now. |
| | O'Mahoney | Right. Okay. |
| 35 | Wright | We don't seek to make any profit, and in the future we won't be able to provide the spending money. |
| | O'Mahoney | All right. But budgets can cover that as well. At the time of founding the company, were there documents that evidenced the likely expenditure or projected expenditure? |
| 40 | Wright | I have guesstimates which keep changing. I guesstimate I will need to spend 500 to 600 million dollars to do what I want to do. |
| | O'Mahoney | Would there be documents that were in existence at the time of establishing the company that speak to those guesstimates? |

Page 9 of 45

CONFIDENTIAL

DEFAUS_00068674

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | No. I thought it would be a lot less. I thought everything would be a lot less. |
| | O'Mahoney | Right. Whatever you thought it would be at the time, would there be documents that evidence - - - |
| 5 | Wright | There's documents evidencing that I thought maybe $30 million. |
| | O'Mahoney | Okay. |
| | Wright | I was way wrong. |
| | O'Mahoney | And tell us this, that on founding the company, Coin Exchange, what was its financial position in the – I guess, let's just focus on the early couple of months of its existence? |
| 10 | | |
| | Wright | When we were starting originally, we looked at a bitcoin value of probably $20 million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million. |
| | O'Mahoney | So, sorry, can you just explain that – when you say bitcoin's value, $20 million. |
| 15 | | |
| | Wright | Bitcoin was going from practically nothing to over a $1000 profit, around 600 ..... At the start of this, we had 1.1 million bitcoin. |
| | O'Mahoney | 1.1 million bitcoin. And is that really how the company was funded on establishment? |
| 20 | Wright | And it's - - - |
| | Sommers | It's the - - - |
| | O'Mahoney | The trust etcetera. |
| | Sommers | - - - but did Coin Ex have 1.1 million bitcoin. |
| | O'Mahoney | No. |
| 25 | Sommers | Right. Greg – Greg - you need to be precise with your answers about – Greg is asking about Coin Ex? |
| | Wright | No, the trusts had available bitcoin. That was then going to be loaned into the other company. |
| 30 | O'Mahoney | Okay. Well, how was – on founding how was the company funded, that is Coin Exchange? |
| | Wright | On founding? |
| | O'Mahoney | On its being founded, established? |
| | Wright | We had assets that were being brought in from Panama, software etcetera. |
| 35 | O'Mahoney | Okay. Well, I will get you to flesh that out. What were the assets being brought in from Panama? |
| | Wright | Bitcoin and software. |
| | O'Mahoney | Okay. Starting with the bitcoin, what – what was the bitcoin that was brought in from Panama? |
| 40 | Wright | I would need to look at the actual figures. I can't remember off the top of my head. |
| | O'Mahoney | Do you have a rough idea of the value of that Bitcoin? |

CONFIDENTIAL

DEFAUS 00068675

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Not on day 1. I think if you look at the – I don't remember. It's whatever in the accounting system. |
| 5 | O'Mahoney | All right. Was it valued in the hundreds of thousands, the millions, the tens of millions – can you speak to. |
| | Wright | The tens of millions. |
| | O'Mahoney | Tens of millions. And, but where was that brought in from in Panama? |
| | Sommers | Just to be clear, Greg is asking was bitcoin brought in from Panama? |
| | Wright | No. Because I - - - |
| 10 | Sommers | You need to be precise - - - |
| | Wright | We never physically took bitcoin over, which was ..... trust ..... after in the first instance with the ATO. |
| 15 | O'Mahoney | Okay. So – so when you say that part of the funding of this company on establishment was bitcoin brought in from Panama, what do you mean by that? |
| | Wright | The rights to bring Bitcoin from overseas. |
| | O'Mahoney | And you say that – you say that that was part of the funding of the company when it was established? |
| | Wright | Yes. |
| 20 | O'Mahoney | How does that work? |
| | Wright | Sorry. What do you mean how does that work? You have the right to ..... something. |
| 25 | O'Mahoney | Well, just thinking out loud when you establish a company, one thing it does is spend money, whether it's a corner shop, a tennis couching clinic or something more substantial than that. I just want to understand how do those rights contribute to the funding of this company. How – you've referred to rights brought in from Panama. How did that – how did those rights enable the company to invest or spend money? |
| | Wright | Well, between Panama and the Seychelles I had a number of - - - |
| 30 | Sommers | Why don't you give Greg an example of one of the ways in which the companies, not necessarily Coin Ex, has transacted – Greg is coming from presupposition of spending money, but transacted using those rights. |
| 35 | Wright | All right. I have a right to call on Bitcoin that's held overseas. I'm doing a deal where I want software. I basically go to the trust and I have – I sign over and say please transfer these rights and hence – and if they're called on, the Bitcoin that's held overseas. |
| | O'Mahoney | So you transfer rights to someone you are dealing with? |
| | Wright | Yes. |
| 40 | O'Mahoney | And when you say "if those rights are called upon" – well, we will come back to that. I think I will need some more clarity on that. But at any rate, you say that there were two things brought in from Panama. One was Bitcoin, and you've spoken - - - |
| | Wright | More rights to. |

CONFIDENTIAL

DEFAUS_00068676

1457

Interview Conducted with Craig Wright

| | O'Mahoney | - - - of those rights.  The other you said was software. |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | What was the software that was brought in from Panama? |
| 5 | Wright | The software was, well, a whole lot of code that we had been writing around Bitcoin basically since 2008, and also on top of that, let's see, there was stuff to do with gaming companies ..... in my history of work with ..... I built ..... platform there and also worked with a number of other gaming industries including ..... gaming, etcetera, who were going to be run out of Australia, but after ..... casinos, they went back overseas. |
| 10 | O'Mahoney | Does that software have a name or a title? |
| | Wright | There were a number of titles for it.  There were little bits for things like Texas hold'em poker and there is online casino software and there is logistical software for ..... things and – there's lots of names - - - |
| | O'Mahoney | Okay. |
| 15 | Wright | - - - for individual parts. |
| | O'Mahoney | And are there documents that evidence the transfer of that software into Coin Exchange at around the time of that company being established? |
| | Wright | Yes. |
| | O'Mahoney | What sorts of documents? |
| 20 | Wright | Ones that the ATO has already gotten.  We did a consignment of rights to the ownership of the software from myself to the trust to Coin Ex and to Hotwire and other companies ..... setting them up. |
| 25 | O'Mahoney | All right.  And the other source of funding, the Bitcoin rights that you've referred to, are there – I'm talking about contemporaneous documents at the time of establishing Coin Exchange.  Are there documents that evidence that interest as a funding source for the company? |
| | Wright | What do you mean?  Sorry. |
| 30 | O'Mahoney | Well, from – are there documents in existence from the time that Coin Exchange was set up that indicate that one of its funding sources was what you've referred to as the interest in Bitcoin? |
| | Wright | The emails to the ATO. |
| | O'Mahoney | From that time.  From the time that Coin Exchange was set up? |
| | Wright | Yes. |
| | O'Mahoney | All right. |
| 35 | Wright | That's before I .....  I had to go through layers and layers of ATO people and basically say this is what I've got, these – what do I do. |
| | O'Mahoney | Okay.  We will come back to that. |
| | Wright | How do I transfer software business ..... |
| 40 | O'Mahoney | All right.  We will come back to that.  Can I start by, I guess, a more specific matter.  The – obviously the dispute needs no introduction.  It centres on a number of claimed ITCs that Coin Exchange had claimed. |
| | Wright | ITC?  Sorry. |

CONFIDENTIAL    DEFAUS_00068677

1458

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | Input tax credits. And I should have said at the outset, if any of the questions I ask, like that as an example, that you don't understand, feel free to ask for clarification at any point. But I just want to be clear about – the transactions in issue were between Coin Exchange and the Wright Family Trust with DeMorgan as its trustee. If you don't mind for simplicity, I might - - - |
| 5 | | |
| | Wright | No. DeMorgan was the name of the trust. |
| | O'Mahoney | Sorry? |
| | Wright | That was the name. |
| 10 | O'Mahoney | DeMorgan – I just say that because I want to refer to it as DeMorgan in a shorthand way, if you don't mind. |
| | Wright | That's fine. |
| | O'Mahoney | That's - - - |
| | Wright | That is correct ..... |
| 15 | O'Mahoney | That's what I'm referring to. Could you tell us a little bit about the circumstances in which DeMorgan was established? |
| | Wright | I created the trust so that I could do everything through a trust. |
| | O'Mahoney | And when did you create the trust? |
| | Wright | 2013. |
| | O'Mahoney | Yes. |
| 20 | Wright | It should have been earlier, but ..... |
| | O'Mahoney | And when you say put everything through a trust, what do you mean by everything? |
| | Wright | Any of the rights to Bitcoin, any of the software, anything that was basically going to move into the other entities. |
| 25 | O'Mahoney | And what are the activities of DeMorgan? |
| | Wright | Managing the distribution of those things and just being a family trust and holding rights to companies. |
| | O'Mahoney | Yes. It has investments; do – is that you would view it? |
| | Wright | Yes. |
| 30 | O'Mahoney | As a trust that had certain investments. The – were you – what – you were obviously involved in setting up the trust. Was anyone else involved in establishing it? |
| | Wright | Yes. |
| | O'Mahoney | Who else? |
| 35 | Wright | Dianne Pinder. She's a lawyer at Lloyds up in Brisbane. She did a crap job, but ..... |
| | O'Mahoney | All right. Well, hopefully she never sees this transcript. The – tell me this - - - |
| | Wright | ..... |
| 40 | O'Mahoney | Tell me this, apart from legal advice, was anyone else involved in establishing the trust? |
| | Wright | Jamie Wilson. |

Page 13 of 45

CONFIDENTIAL

DEFAUS_00068678

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | And who is he? |
| 5 | Wright | He was meant to be an accountant for the group, except he ended up running off over to New York and trying to sell everything I owned beneath me, so ..... interested parties in Bitcoin and they will sell it for a really good price, which at the time was about 180 ..... after all, it's just a ..... and ..... spoke to me, the bastard. |
| | O'Mahoney | Okay. And did this entity, DeMorgan, apart from Jamie – apart from Mr Wilson, was there anyone else involved in its establishment? |
| | Wright | My partner. |
| 10 | O'Mahoney | Who was at the time? |
| | Wright | Well, was my fiancé at the time and is now my wife. |
| | O'Mahoney | Okay. And what is her name? |
| | Wright | ..... |
| | O'Mahoney | And who controls the activities of the trust? |
| 15 | Wright | Predominantly myself. |
| | O'Mahoney | You said predominantly. Who else exercises control in respect to the trust? |
| | Wright | Well, I don't do anything sort of large or material without talking to my wife. |
| | O'Mahoney | And - - - |
| | Wright | ..... |
| 20 | O'Mahoney | And tell me this: apart from – we know that this dispute centres on certain transactions that are said to have occurred between DeMorgan and Coin Exchange. Tell us more broadly about the activities of the – of DeMorgan. What other entities, who else has it transacted with? |
| | Wright | All the different companies ..... |
| 25 | O'Mahoney | All right. If you wouldn't mind summarising them for us. |
| | Wright | Hotwire Pre-Emptive Intelligence Pty Limited, Denarius, Integyrs – do you have a list? All of the ones that are being ..... |
| | Sommers | You can ..... the ones you remember. I mean, we're – I mean, Greg - - - |
| | Wright | There's a pile of them. |
| 30 | Sommers | If Greg wants a list, there are numerous lists of them. I think he wants - - - |
| | Wright | Okay. Yes. |
| | Sommers | - - - you to talk about them. |
| | O'Mahoney | Yes. |
| | Wright | I can talk about them – if you mention them, I can tell you what they are. |
| 35 | O'Mahoney | Okay. Well, that's helpful. You've mentioned seven or eight. You said there were – you thought – you think might have been seven or eight. You've mentioned four. Any others off hand that you can recollect? Entities that DeMorgan transacted with. |
| | Wright | Well, I transacted with ..... I'm sure Andrew ..... DeMorgan - - - |
| 40 | O'Mahoney | Well, no. I can short circuit this. It's not a memory test. Is this the case: that DeMorgan only really transacted with entities that you controlled?** |

Page 14 of 45

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | And - - - |
| 5 | Wright | The idea was just to have it sit there and I put everything into DeMorgan then distribute it out, get the capitalisation into there, eventually I fix it up so that instead of being a trustee, DeMorgan – I'm trustee but DeMorgan has the – the real ownership for each of the – the different shareholdings and ..... |
| | O'Mahoney | Can I get you to unpack that a little bit, because that's something I want to understand. You said that you – that the idea was that everything would be put into DeMorgan. That was the first step. |
| 10 | Wright | Yes. |
| | O'Mahoney | Can we just start on that step. Because I just want to understand the general nature of the commercial enterprise. What do you mean by that? |
| 15 | Sommers | Can I just clarify – I'm not seeking to ..... your questioning, if you discuss – maybe if you discuss the licenses from DeMorgan and the IP transactions from DeMorgan to the respective entities and the ownership and the reverting ownership, that may assist Greg in ..... |
| 20 25 | Wright | Okay. Well, the idea was to ensure that I protect my intellectual property so that I can put everything into one big pool and then distribute it where it needs to go based on what each individual entity is actually going to be doing. Coin Ex is an exchange type platform. Denariuz being a banking type platform and ..... reserve bank were you have to actually have capital reserves to own them ..... Bitcoin. Integyrs would be the commercialisation of a .....system. Hotwire was there to actually commercialise, do research, etcetera. Interconnected Research was set up as an RSP, which is ..... consulting ..... registered as Australia's first and only cryptocurrency consulting ..... registered ..... The idea being I take all of the different bits of software that I have and then I can start – this is my list of software, plus the other bits I've bought, and then I can distribute them out where they need to go. |
| | O'Mahoney | Okay. |
| 30 | Wright | So I can focus each entity on what it needs to do. |
| | O'Mahoney | So unpacking that to look at this first step of putting what you say – all of your intellectual property into this entity - - - |
| | Wright | Yes. |
| | O'Mahoney | Tell us about that process. How did you bring that about? |
| 35 | Wright | Well, I sold from me to the trust and then the trust to the entities. |
| | O'Mahoney | And what was the – the value of the transactions from you to the trust? The total value. Ie, which – I think if I'm understanding, the total value of all the intellectual property that you put into the trust. |
| | Wright | ..... 120 million. |
| 40 | O'Mahoney | Okay. So there was something like $120 million worth of intellectual property transferred into the trust from you? |
| | Wright | Yes. Some of which was external and some was mine. It was ..... |
| | O'Mahoney | But by external do you mean that the trust purchased some other intellectual property that wasn't yours? |
| 45 | Wright | I purchased stuff and then put it into the trust. |

Page 15 of 45

CONFIDENTIAL

DEFAUS 00068680

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | Okay. Did the trust acquire any intellectual property other than from you? |
| | Wright | No. I – I acquired it, I sold it to the trust and the trust broke up and distributed all the bits into the ..... |
| 5 | O'Mahoney | Okay. And looking at this acquisition by the trust, you say the total value was roughly $120 million. How is that valuation arrived at? |
| | Wright | The stuff I got from the banking and whatever else was how much they paid, and the other was based on – well, what had been put in from other entities overseas, such as ..... etcetera. |
| 10 | O'Mahoney | And the – the intellectual property that was transferred into the trust with this value of $120 million, did you – how were you paid for that? Did you become a $120 million richer? |
| | Wright | Well, I had a loan to a trust overseas. And then - - - |
| | O'Mahoney | Can you tell us about that loan to the trust overseas? |
| 15 | Wright | Well, basically there's a loan document. I get a loan of Bitcoin, which is still overseas, but is used to distribute those rights into the payments. |
| | O'Mahoney | Okay. I'm going to need to understand that. And apologies. It might be that I'm being slow, but it sounds like this was** a substantial set of transactions that - - - |
| | Wright | Yes. |
| 20 | O'Mahoney | - - - involved populating the trust, if you like, with this intellectual property |
| | Wright | Yes. |
| | O'Mahoney | Or selling to the trust this intellectual property with this value of $120 million. I just want to understand how did you receive that consideration, the $120 million? That's a large sum of money. How did it come to end up in your pocket? |
| 25 | | |
| | Wright | I get an assignment of rights to Bitcoin held overseas, which is done against a loan. I mean, I had set up conditions ..... trust services and ..... the expenses ..... promotion of Bitcoin and promotion of cryptocurrencies and the research. And so - - - |
| 30 | O'Mahoney | Can I just pause there because I want to understand this. When you say you were assigned the rights to Bitcoin overseas - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - is this the case, that there was a pile of Bitcoin or a pool of Bitcoin overseas with a value of approximately $120 million, and as part of these transactions you were assigned rights to that pot of Bitcoin, if you like? |
| 35 | | |
| | Wright | I was assigned to part of that pot of Bitcoin. |
| | O'Mahoney | So what percentage of that pot of Bitcoin was assigned to you? |
| | Wright | Probably ..... |
| 40 | O'Mahoney | So does that mean that the total value of this pot of Bitcoin was about $240 million? |
| | Wright | Well - - - |
| | Sommers | Well, maybe if you ..... through this process by which the company's ..... capitalised. The company has paid the trust for their assignments and the trust paid you for this time. |

Page 16 of 45

1462

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Yes. |
| | Sommers | And it has been that way and so it's a bit – perhaps a bit clearer. |
| | Wright | Do you have a whiteboard? |
| | O'Mahoney | I don't. |
| 5 | Wright | No. |
| | O'Mahoney | But I've got an eager ear. Could I say this - - - |
| | Wright | Can I draw some diagrams and - - - |
| | O'Mahoney | Yes. No, I'm happy for you to assist but it's – really, for the purposes of the interview, we're going to be relying on the transcript. I just want to understand this. |
| 10 | | |
| | Wright | Well, could I get you a diagram that you could add to the transcript? |
| | O'Mahoney | Yes. No, no, certainly, but - - - |
| | Wright | If we can do that because I'm more a putting down diagrams person than trying to explain it. |
| 15 | O'Mahoney | Happy to do that but I do want to understand this, that it does seem that we're on common ground when we say there was a pool of Bitcoin out there or a pot of Bitcoin. And I think you indicated that you were given an interest of 50 per cent of that pot of Bitcoin. Is that correct? |
| | Wright | ..... |
| 20 | Sommers | No, I think that that's the miscommunication. So I don't think Dr Wright said that there was a 50 per cent interest in that pot of ....., no. |
| | Wright | Yes, it's not a – it's a loan of a number of Bitcoin. |
| | O'Mahoney | All right. Well, I just want to understand. I thought you did say the figure "50 per cent." But put that to one side. I - - - |
| 25 | Wright | The entirety would be around 50 per cent of the entire pot. I haven't spent all of that but - - - |
| | O'Mahoney | All right. But does that suggest that the entire pot is worth about $240 million? |
| | Wright | Not anymore. |
| | O'Mahoney | Okay. But was it at the relevant point in time? |
| 30 | Wright | At one point in time, yes. |
| | O'Mahoney | I did – where did that pot, that Bitcoin sit? |
| | Wright | In the Seychelles. The server was physically in Donchester. |
| | O'Mahoney | Conchester? |
| | Wright | Doncaster. |
| 35 | O'Mahoney | Don - - - |
| | Wright | Over in Britain. And backup servers in Seychelles and Singapore. |
| | O'Mahoney | And - - - |
| | Sommers | So we get into difficult questions when you ask things like where did you ..... |

Page 17 of 45

CONFIDENTIAL

DEFAUS_00068682

1463

Interview Conducted with Craig Wright

| | O'Mahoney | No, no, I appreciate that. But we need some reference point, some ..... But this pot of Bitcoin that, at one point in time, was worth $240 million, it was – partly, it existed by reference to Donchester, I think you said? |
| | Wright | Yes. |
| 5 | O'Mahoney | And, partly, by reference to the Seychelles. |
| | Wright | Yes. |
| | O'Mahoney | And, partly, by reference to Singapore. |
| | Wright | Yes. |
| 10 | O'Mahoney | And is that pot of Bitcoin – are there documents in existence at the time that would speak to that $240 million? |
| | Wright | You can check the value against the number of Bitcoin and do a calculation on the market value at any point in time, yes. |
| | O'Mahoney | How many Bitcoin were there? |
| | Wright | That I had a loan of or - - - |
| 15 | O'Mahoney | No, that were part of this pot. |
| | Wright | The entire pot? |
| | O'Mahoney | Yes. |
| | Wright | 1.1 million. |
| 20 | O'Mahoney | And you had a – as part of this set of transactions where intellectual property was transferred into the trust, the DeMorgan Trust, you acquired a 50 per cent interest in that pot. |
| | Wright | Took 650,000 Bitcoins up to ..... |
| | O'Mahoney | Okay. So your interest was 650,000 Bitcoin which was approximately 50 per cent of that pot. |
| 25 | Wright | A little bit more. |
| 30 | O'Mahoney | And you've mentioned a few times a loan. I could understand this, that on the transferring of valuable assets into a trust you have transferred to you an interest in Bitcoin with X value, wherever they exist in the world. You – I don't understand how the loan fits in. Can you explain how that formed part of the consideration you received? |
| | Sommers | Sorry, just to be clear, what are you asking? I don't understand the question. |
| | O'Mahoney | Because I don't know exactly what the loan refers to. You've said a few times about - - - |
| | Wright | Yes, the loan from an entity in Seychelles. |
| 35 | O'Mahoney | Can you explain that. |
| | Sommers | There's a deed of loan - - - |
| | Wright | There's a deed of loan. |
| 40 | Sommers | - - - by a trustee who holds a number of Bitcoin and that deed of loan document is a loan from that trust deed to Dr Wright of Bitcoin in the sum of 650,000 Bitcoin. |
| | O'Mahoney | But you have – if the value of the ..... that has been transferred to the trust - - - |

Page 18 of 45

CONFIDENTIAL                                                                    DEFAUS_00068683

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Sommers | Yes. |
| | Wright | That's - - - |
| 5 | Sommers | No, you're jumping around between different things.  So that's the loan.  You asked a question about what's the loan. |
| | O'Mahoney | I was wondering how that - - - |
| | Sommers | That's the loan. |
| | O'Mahoney | - - - factored in. |
| | Sommers | And then it – now explained - - - |
| 10 | Wright | So I used the rights to the Bitcoin to basically buy and sell between the entities.  So - - - |
| | O'Mahoney | Can you explain that? |
| | Wright | I will do it with all things I can move around.  Apples and oranges. |
| | O'Mahoney | If you can - - - |
| 15 | Wright | I have to do it like this. |
| | O'Mahoney | I mean, if you can do it by the use of words that's certainly going to be the most - - - |
| | Wright | I can do maths.  I can do whatever else.  Use of words is not my speciality. |
| 20 | O'Mahoney | I appreciate that but one of the issues we've got is that the transcriber won't pick up, sort of, movement of fruit on a table.  So, I mean, I'm grateful for that sort of visual indication but we are going to have to, as best we can, reduce to words what we're talking about.  So the question is how is it that – you've just outlined a modus operandi of the use of this interest in Bitcoin. |
| | Wright  . | .... All right.  So used – put a right to Bitcoin into one of the entities as capital. |
| 25 | O'Mahoney | Yes. |
| | Wright | Pay it back to buy the goods.  So the internal things where it's just software that I haven't purchased externally is just a wash transaction.  I pay for it, I swap it.  It all equals zero and it all works out.  The only ones where there's any real difference are where there's an external party and Bitcoin have left and gone off to pay someone else. |
| 30 | | |
| | O'Mahoney | Yes, and that's – does that happen from time to time? |
| | Wright | Yes. |
| 35 | O'Mahoney | But to understand this, I mean, it's a big picture question, I guess.  At one point in time you received this consideration, $120 million for – roughly for intellectual property that you transferred to this trust. |
| | Wright | Yes. |
| | O'Mahoney | And you say that your consideration for that was an interest in roughly 650,000 Bitcoin.  Is that correct? |
| | Wright | No. |
| 40 | Sommeres | No.  No one said that the entire 650,000 Bitcoin were transacted.  That was the – you asked about the loan. |

Page 19 of 45

CONFIDENTIAL

DEFAUS_00068684

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | Yes. |
| | Sommers | That's the pool and, on top of which, a number of Bitcoin were transacted not equal to that. |
| | O'Mahoney | Okay. I'm sorry, I misunderstood. I thought there was a pool of 1.1 million. |
| 5 | Wright | ..... |
| | Sommers | There's a pool, there's a loan of a subset of that 1.1 million and then a further subset of that 650 is being dealt with in relation to the capitalisation of the companies and the companies' spending money acquiring the IP. |
| 10 | O'Mahoney | All right. Well, okay, I'm grateful for that clarification. We will come back to it. Tell me this, that the – you were describing earlier the process whereby assets were transferred into the trust and we've been speaking about the consideration that you received for those assets. Then I think – correct me if I'm wrong – you said something like the idea was we put everything into the trust or I put everything into the trust and then distribute out from that trust. |
| 15 | Wright | All the software, yes. |
| | O'Mahoney | That's what I was going to ask. So can you tell us about that second phase, the distributing out. What do you mean by that? |
| 20 | Wright | There are millions of ..... code. I've split up ownership of parts of those different entities. Each of those are focussed on different areas, some to do with security around the Blockchain, some are to do with the exchange of that ....., some are to do with the banking. Andrew, a few of the ATO people have seen it but I own a ..... software and platform at the moment. And one that we've been able to alter so that we can use it on the Blockchain which really ..... couldn't do with, well, billion dollar companies being able to, ultimately, ..... worked. So part of all that and that failing and whatever else, I've gone out and bought everything I needed to create my own. |
| 25 | | |
| 30 | O'Mahoney | Okay. And so is this the case, that there's a lot of software and a lot of IP that, at one point in time, you say, was the property of the trust and that that has been distributed to various companies that you control, based on what those companies do and what the relevant IP is. |
| | Wright | Yes, yes. |
| | O'Mahoney | Is that a - - - |
| | Wright | ..... each one individually. |
| 35 | Sommers | How was it distributed because I think Greg is going down a path about the word "distributed" which I don't think has explained how it was distributed. |
| 40 | Wright | We did an assignment. So there's a contract where we bought and sold all of the software listing which bits were given to each particular entity. And then we capitalised each of the companies. So out of the pool, we've got the rights to Bitcoin into something like Coin Ex and then Coin Ex buys back the rights to the particular bit of intellectual property. |
| | O'Mahoney | Are there sort of documents that have been created in respect of the trust that would evidence the total or the global amount of IP or software that the trust had transferred to it at a point in time? |
| | Wright | Yes, yes. |
| 45 | O'Mahoney | And are there documents evidencing the specific transfers from the trust to these various entities or - - - |

Page 20 of 45

DEFAUS_00068685

1466

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Each of those have been given to the Tax Office. |
| | O'Mahoney | - - - discrete software. |
| 5 | Wright | And even before any of this, back in the '12/13 year, I approached the Tax Office to get a BDR.  My comment was, first, can I get around doing GST on these transactions because, apart from the external ....., what I wanted to do was just say, look, I don't have the same shareholding in each of these things but they're all a wash transaction.  Can I just do it with no GST because it all works out at zero in the end?  And the comment from the Tax Office was no and they gave me a BDR saying you have to put tax on any transaction. |
| 10 | O'Mahoney | Can you explain what you mean by "wash transaction?" |
| | Wright | It equals zero at the end of the day, it - - - |
| | O'Mahoney | In what sense? |
| | Wright | There's a plus and a minus for GST and the plus and the minus are exactly equal. |
| 15 | O'Mahoney | And is that - - - |
| | Wright | One party owes, one party doesn't, and they're all related anyway. |
| | O'Mahoney | Well, is that - well, that's what I was coming at.  Is it that you say that it's that zero type transaction or wash transaction in the context of entities that are related - - - |
| 20 | Wright | Yes. |
| | O'Mahoney | - - - transacting with one another. |
| | Wright | Yes. |
| | O'Mahoney | All entities that you control. |
| | Wright | Yes. |
| 25 | O'Mahoney | And tell me this, that – focussing in on, I guess, the present dispute.  We know that there were a number of invoices issued by DeMorgan to Coin Exchange on 1 July 2013. |
| | Wright | Yes. |
| 30 | O'Mahoney | Can you tell us about the circumstances in which those invoices came to be issued? |
| | Wright | We set up how we were going to distribute the software, what the payment schemes are and plans and issued invoices against that. |
| | O'Mahoney | And when you say "we," who was that? |
| | Wright | Myself and other people who were involved with all of this. |
| 35 | O'Mahoney | Who were? |
| | Wright | Involved with running the companies. |
| | O'Mahoney | Yes, but - - - |
| 40 | Wright | Initially, Jamie Wilson but we had a falling out.  He still owns 15 per cent of the original company and the patent that I failed at .....  Ramona is involved, other people were involved as well. |
| | O'Mahoney | So both Jamie and Ramona would have been involved in, what, the issuing of these invoices? |

Page 21 of 45

CONFIDENTIAL

1467

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Yes. I actually stepped out from one side because the coin – like, for Hotwire and things I didn't sign as a Hotwire director because then, if I'm a Hotwire director, I didn't want the conflict type thing. So I signed for the trust and Jamie and Ramona signed for the company or Coin Ex, at this stage, was Jamie. |
| 5 | | |
| | O'Mahoney | In circumstances where you didn't want to be signing, if you like, on both sides of the ledger. |
| | Wright | Yes. |
| | O'Mahoney | Both sides of the ..... |
| 10 | Wright | Yes. I thought it was better if I stepped back and acted on one side rather than both. |
| | O'Mahoney | So who prepared the invoices? Who would have drafted them? |
| | Wright | Jamie, and they were a bloody mess and we had to redo ..... |
| | O'Mahoney | Okay. We will come back to that. But Jamie prepared them, what, on your instructions? |
| 15 | | |
| | Wright | Well, he was the finance person ..... for the ..... he was going to be ..... CFO. |
| | O'Mahoney | For DeMorgan? |
| | Wright | No. Not for DeMorgan. |
| | O'Mahoney | All right. |
| 20 | Wright | For the companies. But he ran – he was going to run all the accounts and everything for it. |
| | O'Mahoney | Okay. But who from DeMorgan issued these invoices? |
| | Wright | I issued the invoices ..... DeMorgan. |
| | O'Mahoney | You did? I thought you said that Jamie did and he got it wrong and you had to redo them. |
| 25 | | |
| | Wright | Yes. I ended up redoing them because Jamie – his wife and himself, well, I think they're now divorced. I don't know ..... they've separated around that time and didn't realise ..... big mess and he didn't end up doing half the things he was meant to do. |
| 30 | O'Mahoney | Okay. So to be clear, is this the case, that in the first instance, the invoices ..... prepared by Jamie, you weren't happy with them, you edited them, they needed quite a bit of fixing? |
| | Wright | Yes. |
| 35 | O'Mahoney | It sounds like. Tell us about anyone else who would have contributed to the original preparation of these invoices. |
| | Wright | The original? |
| | O'Mahoney | Yes. |
| | Wright | No one else. |
| 40 | O'Mahoney | No. Did Jamie prepare the invoices on instruction from you in the first instance? |
| | Wright | Well, yes. |
| | O'Mahoney | And what were your - - - |

Page 22 of 45

CONFIDENTIAL    DEFAUS_00068687

Interview Conducted with Craig Wright

| | Wright | And he wasn't part of the trust. |
|---|---|---|
| | O'Mahoney | And what were your instructions to him? |
| | Wright | Basically prepare the invoices. |
| | O'Mahoney | You would have to say a little bit more than that. |
| 5 | Wright | Well, yes, I but I don't remember exactly what I said. |
| | O'Mahoney | No. |
| | Wright | We had - - - |
| | O'Mahoney | But we don't live in la la land. We're not expecting you to remember word for word, but the substance of what was said. |
| 10 | Wright | We had contracts. |
| | O'Mahoney | Yes. |
| | Wright | And assignment documents. And along those contracts and assignment documents ..... invoices. |
| 15 | O'Mahoney | Okay. The – and is this the case, that those invoices were issued – tell me this, that they were prepared by Jamie. When were they issued to Coin Exchange? Or how were they I guess is more relevant. We know - - - |
| 20 | Wright | Well, we set up everything as zero and you just click a button and it goes from one zero account to another zero account. So we have different accounts ..... and, electronically, invoices are transmitted over the internet to another system on the internet. |
| | O'Mahoney | All right. If I - - - |
| | Wright | I don't ..... if I don't have to. |
| | O'Mahoney | No. Okay. Yes. |
| | Wright | As you're probably aware from the past ..... |
| 25 | O'Mahoney | If I sent an invoice over email, there's a record of the date that I send the invoices, a documentary trail, if you like. You can create a picture of when it was sent. Is there such a record here in respect of these invoices? |
| | Wright | Ones where they've been sent and fixed and deleted ..... yes. |
| 30 | O'Mahoney | Is this the case that after the invoices were first issued, they were subject to further editing? |
| | Wright | Yes. |
| | O'Mahoney | And what was the nature of the further editing? |
| 35 | Wright | After Jamie disappeared beginning of October ..... contact ..... John Chesher ..... in the past. John said, "There's errors here. Fix them." And then we were talking ..... the Australian Tax Office and they said, "No. Things have to be this way," so we did them. And - - - |
| | O'Mahoney | Okay. |
| | Wright | Basically going backwards and forwards, trying to get what everyone wanted as being correct. |
| 40 | O'Mahoney | Okay. Just unpacking that. Firstly, I think, where there was some input from John Chesher. Tell us about that input. |
| | Wright | What do you mean? Sorry. |

Page 23 of 45

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | Well, what was his input? He obviously – I think you indicated he had some problems with the invoices. What were those problems? |
| | Wright | Dates. |
| | O'Mahoney | Okay. What did he say? |
| 5 | Wright | I had predone – because they were for 12 month periods, I had actually pre-done things before when they ..... so we had finalised transferring software on 15 July. Because it was a 12 month contract, I've just done it from 1 July ..... because it's a 12 month contract anyway. For the whole year, I just dated the thing when I ..... and tried to get it ..... the first time as of the 1st. And John said you can't do that. You've got to ..... the other or you've got to ..... it this way, so - - - |
| 10 | | |
| | O'Mahoney | All right. |
| | Wright | Dates were a big issue, which I still can't see as the problem because it's still in the relevant period, etcetera, etcetera ..... |
| 15 | O'Mahoney | And you were saying that there was some further input from the Commissioner for the Tax Office. |
| | Wright | Yes. |
| | O'Mahoney | What was that – were changes made following that input? |
| | Wright | Yes. Everything was totally redone. |
| 20 | O'Mahoney | Okay. |
| | Wright | That's where Andrew and everything was involved. I stepped back totally, and Andrew and John and everyone went back and forwards, having me pull out my hair, and saying this is how it has got to be now. And the values all worked out the same except ..... - - - |
| 25 | O'Mahoney | Okay. Well - - - |
| | Wright | Different ways of doing it. I won't even go there because I have no idea. All they – all I know is Andrew and John and everyone else went back and forwards, pulling apart the things and redoing it all ..... |
| 30 | O'Mahoney | All right. Well, can I ask this, Dr Wright. To the best of your understanding, what changes were made to the invoices following input from the Commissioner? |
| | Wright | How we ..... GST. So the actual value after everything cancelled out is exactly the same, so I don't – I still don't see the point of it. |
| 35 | O'Mahoney | Okay. The point of it is one thing. But I just want to understand, in the first instance, what changes were made to the invoices following input from the Commissioner? |
| | Wright | I don't really know or understand. I know that it was reissued and Andrew and John did a whole lot of ..... things and John came back and he did invoices and he reissued everything and put it back onto the system. And the amounts were exactly the same, so I didn't complain. |
| 40 | | |
| | O'Mahoney | All right. One feature of the invoices - if you like, there are a number of invoices all dated 1 July 2013 and they add up to, I think, $38,170,000 or thereabouts. Tell us this, what were the circumstances that resulted in multiple invoices being issued in the amounts that they were, i.e. a number of invoices for $5.445 million and a larger invoice for $10.945 million? |
| 45 | | |

Page 24 of 45

CONFIDENTIAL

1470

DEFAUS_00068689

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Sorry. From who to whom are these invoices? |
| | O'Mahoney | The invoices from DeMorgan to Coin Exchange. |
| 5 | Wright | That was to do with the conditions in the software distribution contract, which I don't know if we have got a copy there but they have got copies of it. |
| | O'Mahoney | Well, I want – so you say there's a contract that will – that breaks down - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - each of these amounts? |
| | Wright | Yes. |
| 10 | O'Mahoney | And that each of these amounts is reflected, what, in a - - - |
| | Wright | Payment schedule. |
| | Sommers | Payment schedule. |
| | O'Mahoney | In a payment schedule. |
| | Wright | Yes. |
| 15 | O'Mahoney | All right. Normally, when you think of – when you say payment schedule, that in my mind normally invokes sort of staggered timing. These were all invoices issued on the same day. What do you mean by payment schedule? |
| | Wright | They were issued on the same day but if you read the conditions for each period - - - |
| 20 | O'Mahoney | Yes. |
| | Wright | Because work was going to be ongoing over that period using that software. |
| | O'Mahoney | But looking at the – on the face of the invoices, they all are framed in, I think I'm right in saying, more or less identical terms: software sales-prepaid 2014 to 15, software licence. |
| 25 | Wright | …... numbers. |
| | O'Mahoney | There's - like in terms of - - - |
| | Wright | Invoice numbers. |
| | O'Mahoney | In terms of the description, I can put - - - |
| | Wright | In terms of the invoice numbers. |
| 30 | O'Mahoney | The invoice numbers are different but I am just talking about on the face of what's described as the sale, if you like, or the supply. If I just show you them, is there anything on the face of those invoices that you could direct us to that would explain what specifically was the subject of each in terms of the relevant supply? |
| 35 | Wright | Well, not much in the invoices because it is some – it's the contract that actually does anything, and I think one of these was cancelled anyway ….. double-check on the system but I think invoice 6 and 10 basically ended up with the same thing. And then you will notice 5 is 13, 14 and then the other was 14, 15. |
| 40 | O'Mahoney | I'm grateful for that. But when you say that an invoice was cancelled, what were the circumstances of that? |
| | Wright | It was cancelled because it was incorrect and another one was issued. |

Page 25 of 45

CONFIDENTIAL

DEFAUS_00068690

1471

Interview Conducted with Craig Wright

| | O'Mahoney | In what way was it incorrect? |
|---|---|---|
| | Wright | I don't remember all the details. I think it might have been double-issued or something like that or whatever else. All I know is there is a schedule in the contract and that schedule is what dictates the invoices and which periods they cover. |
| 5 | | |
| | O'Mahoney | And apart from the contract, are there any other documents that were created around these transactions? |
| | Wright | Yes. |
| 10 | O'Mahoney | Emails – what sorts of documents? |
| | Wright | There's emails of course. There's all the emails back in - at which point do you want to talk about? |
| | O'Mahoney | Well, at around the time that this – these transactions totalling $38.1 million are said to have occurred. What sorts of documents beyond the contract and the invoices do you say evidence those transactions? |
| 15 | | |
| | Wright | There's an assignment of the transaction. There's the details in the Supreme Court of the software. There's the – what do you call it – the sale for the actual external software that was purchased. |
| | Sommers | ….. as between – are you asking between the Wright Family Trust - - - |
| 20 | O'Mahoney | That's right. Between - - - |
| | Sommers | And Coin Exchange. |
| | O'Mahoney | The two parties to the transaction. |
| | Wright | Well, purely that, there's just a couple of emails and the contracts. I mean, I don't see why I would have more than that. It's myself running a company and myself running a trust. I documented it all in contracts. I documented the schedules. I'm not going to send emails back and forwards to myself going, "Hey Craig, I'm doing this." "Yes, Craig, that's a good idea." "Hey Craig, what do you think if I do that?" |
| 25 | | |
| 30 | O'Mahoney | The – tell me this, that in terms of the receipt of these invoices, on any view of it, the supplies they are said to reflect were valuable - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - with a total value of about $38 million. How was it that the value of said supplies was arrived at? |
| 35 | Wright | As I said before, the combination of input plus predominantly a number of lines of code, standard ….. valuations, which was used in the US all the time. And I have got ATO documents saying that it was used by – that it's a ….. valuation by the Australian Stock Exchange. I have got ….. ATO. I have got training presentations from the ATO that say this is one way of valuing software, hence used COCOMO. I had an independent FCA chartered accountant go over the figures I used and came back with, "That's too aggressive, you should set that lower," all those sort of things. |
| 40 | | |
| | O'Mahoney | And how was it that at this stage in its corporate live Coin Exchange was in a position to acquire such valuable supplies? |
| | Wright | Because I have rights to Bitcoin and I capitalised the entity. |
| 45 | | |

Page 26 of 45

CONFIDENTIAL

DEFAUS_00068691

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | Okay. The – we will come back to that but can I ask this, that we – that obviously the subject of these supplies was software. In terms of the mechanics of what's reflected on the invoice it says here, "Due date 15 August 2015," on – I think on - - - |
| 5 | Wright | Yes. |
| | O'Mahoney | - - - one of the invoices and 15 August 2014 on another, 15 August 2013 - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - on another. What are those due dates referable to? |
| 10 | Wright | There were a number of milestones in taking some of the software and updating it and converting it and moving it so that it was more usable for what we want in each of the companies. |
| | Sommers | In clause 11 of appendix 1 ..... |
| | O'Mahoney | Yes. That's what I wanted to clear. In your mind, is that a reflection of the date by which payment was due? |
| 15 | Wright | Due, yes. |
| | O'Mahoney | Due. Okay. |
| | Wright | It's sort of due when the particular task, activities and whatever else had been completed. |
| 20 | O'Mahoney | All right. The – I will come back to this. I mean, you have mentioned the issue – that there being an issue of the date. One of the interesting or threshold issues, as I'm sure you will appreciate in this dispute, is that the date of registration of DeMorgan in terms of its ABN. We know – we have got pretty clear information that it was registered on 26 August 2013. Are you able to tell us how it came to be that in those circumstances, DeMorgan was issuing invoices - - - |
| 25 | | |
| | Wright  . | .... DeMorgan ..... - - - |
| | O'Mahoney | I've just got to get the question out clearly before you answer it. Are you able to tell us how, in those circumstances, DeMorgan was issuing invoices as at 1 July 2013? |
| 30 | Wright | The trust was formed in June 2013. What happened was Dianne was meant to - or ..... both or one or the other ..... can send it off to the ATO when they set up the trust. What they ended up doing was just giving ..... trust and ..... - - - |
| 35 | O'Mahoney | I think – I think what ..... example is were those documents issued on 1 July 2013? |
| | Wright | No. |
| | O'Mahoney | Well, no, actually. The question was can you explain to us how it came to be in those circumstances of DeMorgan being registered in August – on 26 August 2013. How did it come to be that the invoices were issued on 1 July? |
| 40 | Wright | ..... the contract was signed in August – end of – after the trust had been registered. What I ended up doing was filling out an invoice that said ..... period, because that's what it was meant to be. The trust that actually formed on 1 June, so after filling out the contract – I think it was the 26th, or something like that, of August – I had the contract, but the invoices for the contract signed as of that ..... date, because I thought that's what I'm meant to do. It's still the same GST period. I didn't think it would be a problem. I thought the |
| 45 | | |

Page 27 of 45

CONFIDENTIAL

1473

Interview Conducted with Craig Wright

|  |  | correct way, being what we're talking about, was, for the whole period, was to have a ..... with that date, which was my mistake; I should have invoiced them for the whole period from the date that I had them. Jamie, who was the CPIE, just disappeared all the time – didn't get ..... |
|---|---|---|
| 5 | O'Mahoney | Was Jamie involved in this, what I think you've referred to as backdating? |
|  | Wright | I ended up doing the backdating because I thought it was correct. |
|  | O'Mahoney | When did you do the backdating? |
|  | Wright | When I set them – when I tried fixing up the invoices. |
|  | O'Mahoney | And who else was involved in the backdating? |
| 10 | Wright | Just me. |
|  | O'Mahoney | And to backdate something – the – the suggestion is there was already date. Had Jamie arrived at the original date? |
|  | Wright | Jamie went with ..... |
|  | O'Mahoney | But he obviously arrived at the original date? |
| 15 | Wright | Yes. |
|  | O'Mahoney | And did he do that on instruction from you? |
|  | Wright | Well, he did it on instruction from the contracts. |
|  | O'Mahoney | And when did – as best you recollect, when was Jamie's version of the invoice created, or invoices? |
| 20 | Wright | The proper ones that we ended up with in the system, whatever the date is on the contracts, it would have been the day after that ..... August. |
|  | O'Mahoney | All right. The – the – the software that was being supplied, I think it falls into two categories – and you will have forgive me; I don't share your technical expertise, so I'm going to need a little bit of enlightenment. |
| 25 | Wright . | .... |
|  | O'Mahoney | Okay. I'm sure it does, and maybe I've oversimplified it, but - - - |
|  | Wright | Yes. |
|  | O'Mahoney | - - - certainly from my reading of the brief materials, it indicates that, broadly, there was some software that was associated with Seimens. Is that correct? |
| 30 | Wright | Yes. That's so. |
|  | O'Mahoney | And some other software that as associated with an entity Albaraka. |
|  | Wright | That's the external software, not the internal software. Yes. |
|  | O'Mahoney | All right. Well, can we just go through them one at a time. |
| 35 | Wright | That's the predominant software. There's also a number of other small parts of software in the contract ..... the two large ..... external contractor were those two. |
|  | O'Mahoney | All right. Well, can we just go through them one at a time. Starting with Seimens Software, tell us about that. |
| 40 | Wright | Seimens Software is mine automation software, or ..... automation software. Basically what we're doing is it's a sort of ..... software designed to run and automate anything from a factory to a mine ..... else. As I've been saying, what I want to do is take a number of ..... and automate them. So I want to do |

Page 28 of 45

CONFIDENTIAL

DEFAUS_00068693

Interview Conducted with Craig Wright

something that will work on the block chain and automate the payment ..... I wanted to actually have a set budget, and the budget is prepaid, and that ..... based on use, will actually distribute payment to the energy grid based on different times, etcetera, like that and negotiate itself. So my Seimens
5          Software – well, what it's actually used for is creating ..... if you look at the things that have been – ..... mine and everything like that at the moment, it is becoming profitable for iron ore because they have less people. So they're automating all these machines that go down underground, and they're effectively robots that are pre-programmed to do certain things. I want to take
10         that and monetize it, so we build it directly into the block chain, and we have all this automation software, and then we have it built into everything you can think of, whether it's home appliances, whether it's light bulbs, computers, internet access – so, per packet on internet access would be micro payments, and then we could also have it so that it controls the device based on what's
15         actually out there, whether there are other sensors in here. So, for instance, if it senses selected people in the room versus a large meeting versus a small one - - -

O'Mahoney   Okay.

Wright      The ..... would turn on and off depending on the time of day and ambient light.
20         If it can sense a particular person – so you have an RFID tag or something else – and it knows that – it starts to learn over time that you like a brighter room, it will do that but in a way that can be billed back automatically to the owner of the project.

O'Mahoney   So is it the case that, in part, the software is directed towards energy
25         efficiency?

Wright      In part, yes.

O'Mahoney   And, in part, it's directed towards - - -

Wright  .   ....

O'Mahoney   - - - convenience – user convenience, user amenity.

30         Wright      And also user pace.

O'Mahoney   User pace? All right.

Wright      Yes.

O'Mahoney   A way of charging users.

Wright      Eventually, I mean, to take it to the ultimate extreme, if you commercialised
35         roads – they have governments ..... you take the road, get rid of local councils, because they suck, and you actually then give ownership to a section of road or road, or whatever else, to individuals who can then trade and distribute that based on smart property contracts. As people go up the road, you could have something like you have the tolls systems now where it's an automated
40         payment, and that automated payment goes towards the maintenance and control of the road. So if you have a suburban road, people could limit the amount of traffic by increasing how much it's going to cost to go on the road.

So if you don't want people going up your road, the same as a strata-type thing, everyone gets together, they vote based on, you know, holdings in the
45         block chain, and say, "We are going to charge $10 for everyone to go up the road unless you happen to be a resident, in which case you get this much free access and this much paid." That can then be tied to contractual obligations to maintain the road. So the road itself can actually have contractual

CONFIDENTIAL

DEFAUS_00068694

1475

Interview Conducted with Craig Wright

|  |  |  |
|---|---|---|
|  |  | obligations so that if a certain number of people then do things like Twitter in and say, you know, "Hey, there's a pothole" - - - |
|  | O'Mahoney | Yes. |
|  | Wright | - - - "and they fixed it and it's automated and" - - - |
| 5 | O'Mahoney | I understand the concept. I understand. Thank you for that explanation. Tell me this, how is it that this line of software or this type of software is identified by reference to Seimens? |
|  | Wright | Seimens have an automation and control suite. |
| 10 | O'Mahoney | What does that mean? Is Seimens responsible for some of the intellectual property that has gone into this software? |
|  | Wright | Yes. I'm pulling it apart and reverse engineering it. |
|  | O'Mahoney | Okay. But pulling apart what is effectively, in the first instance, a Seimens' product; is that right? |
|  | Wright | Yes. |
| 15 | O'Mahoney | And - - - |
| 20 | Wright | Under Australian law there is no – it's not like the Digital Millennium Copyright Act in the US where ….. be breaking the law by pulling apart the software. Here in Australia, I can actually reverse engineer and recreate. So what I am doing is taking something where I don't have source code or anything like that, and if you will look at some of my skill sets, I taught reverse engineering ….. particularly from a malware point of view but from other points of view as well. So I could take a piece of compiled code, where there's no documentation, and I can - - - |
|  | O'Mahoney | Back engineer it or reverse engineer it. |
| 25 | Wright | Back engineer it back into something that is usable. |
|  | O'Mahoney | All right. |
|  | Wright | And recreate my own version. |
| 30 | O'Mahoney | Tell us this, just focusing on this Seimens' software. For the Seimens' software to have been the subject of this transaction between Coin Exchange and DeMorgan, it must have at some point in time been the – well, it's - obviously it was at some point in time, you say, the property of DeMorgan. DeMorgan had to have acquired it to sell it. |
|  | Wright | Yes. |
| 35 | O'Mahoney | That's simple enough. DeMorgan, I think you say, acquired the software from you? |
|  | Wright | Yes. |
|  | O'Mahoney | Specifically this Seimens' software, can we just go through how – for DeMorgan to have acquired it from you, you had to have had it at some stage. So if we could start at the beginning |
| 40 | Wright | I did a - - - |
|  | O'Mahoney | Let me finish the question, and I'm sorry it's a long-winded one. Dr Wright, how did you first acquire this Seimens' software? |

CONFIDENTIAL

1476

DEFAUS_00068695

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | I dealt with a company called MJF and they ..... turned out to be a rather dodgy fellow called Mark Ferrier, who said – he could get me access to the software. |
| | O'Mahoney | Okay. |
| 5 | Wright | I purchased it from him. I then sold it into the trust – in the trust and split up the bits and sold them. |
| | O'Mahoney | All right. So let's just start – what is MJF? |
| | Wright | MJF is the only company I know with no directions in Australia at the moment ..... removed Mark. |
| 10 | Sommers | I think ..... was somewhat more limited. |
| | O'Mahoney | It was. That's a fascinating description. It sounds like a bus without a driver, but – MJF – – – |
| | Wright | Worse than that. |
| | O'Mahoney | What do you know about MJF? |
| 15 | Wright | Now or then? |
| | Sommers | Yes. That's the important distance. |
| | Wright | Now, a lot more than I knew then. |
| | O'Mahoney | Well – okay. How about we work up to MJF. Let's start with – I just want to understand how you came to acquire the Seimens software. You mentioned this figure – this character, Mark Ferrier. You met him at a mining conference. |
| 20 | Wright | Yes. |
| | O'Mahoney | What was the mining conference? |
| | Wright | One of them. I speak at lots of conferences. I can't remember. |
| | O'Mahoney | You can't remember which one. Can you remember, roughly, when it was? |
| 25 | Wright | End of – I would have to look at my ..... |
| | Sommers | There's an entire breach of ..... |
| | Wright | I've got a new phone. I kept my old phone because I got the SMSs and everything from – from Mr Ferrier. So what I've done is I've – I've bought a new phone totally, so that I could put the old phone there and leave all the evidence untouched. |
| 30 | | |
| | O'Mahoney | Okay. But – no one is holding you to precise dates. But as you best recollect, when was it that you first met Mark Ferrier? |
| | Wright | End of 2012, beginning of 2013. We started dealing properly in beginning of – like January, February 2013. |
| 35 | O'Mahoney | All right. So early 2013. |
| | Wright | Yes. |
| | O'Mahoney | Was he – was he also presenting at this conference? |
| | Wright | No. |
| | O'Mahoney | Was he attending? |
| 40 | Wright | Yes. |
| | O'Mahoney | And – and does he have an interest in the mining sector? |

Page 31 of 45

CONFIDENTIAL

DEFAUS_00068696

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | And at the conference you had a conversation with him about business opportunities. |
| 5 | Wright | He came up to me, actually, after I had been talking, because I had been talking about automation and I had been talking about all these different things, and I sort of let people know that I was ….. |
| | O'Mahoney | Okay. And is this the case – did he pitch an idea to you? |
| | Wright | Yes. |
| 10 | O'Mahoney | And what did he say? Again, I'm not going to hold you to a word-for-word account, but just tell us about this interaction. What did he say, as you recollect, and what did you say? |
| 15<br><br>20 | Wright | I know he came across – all right. Can we just say there is allocution Mark and there is low, down and dirty Mark. There are two versions – or at least two versions of Mark, as other people ….. found out as well. I was dealing at that stage with the refined Mark whose father was Ian Ferrier and had a background in mining and financing and all these things. Talked a really good game and told me how he could get access to software and things like that that I wanted. Not straight away. Not day 1. We built up a little bit of a rapport first. I told him – asked me about what I wanted. Really interested in what I was doing. I mean – so as I – as I ….. I can rant and rave on about that stuff. |
| | O'Mahoney | But did you and Mark start speaking on an ongoing basis? |
| | Wright | Yes. |
| | O'Mahoney | And in the course of those discussions – – – |
| 25 | Wright | Mostly Skype, SMS, some emails. |
| | O'Mahoney | Some emails. Some SMS. |
| | Wright | Yes. |
| | O'Mahoney | And you've got – you've kept some of those, I take it. |
| 30 | Wright | I actually got a new phone** so that I could keep the other phone and just put it aside and ….. |
| | O'Mahoney | So yes. |
| | Wright | Yes. |
| | O'Mahoney | And is this the case, in the course of those discussions, he pitched to you the idea of you acquiring some – we will call it the Siemens software. |
| 35 | Wright | Well, he had asked me what I wanted and things like this, and I – in talking about automation software and I was there at the conference for that, and he then said he could get hold of this software from Siemens. |
| | O'Mahoney | And did he put that to you as a potential investment? |
| | Wright | He said he could sell it to me. |
| 40 | O'Mahoney | He told you he could get hold of it. |
| | Wright | Yes. |
| | O'Mahoney | Did he tell you that he owned it? |
| | Wright | No. |

Page 32 of 45

CONFIDENTIAL

DEFAUS_00068697

1478

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | So he was indicating that he could source it. |
| | Wright | Yes. |
| | O'Mahoney | And did he explain how he could do that? |
| | Wright | Not at first, no. |
| 5 | O'Mahoney | Did he at any point in time? |
| | Wright | My problem was I didn't have cash, I had Bitcoins, which he said he could source someone else who would take the Bitcoin and for the Bitcoin he could give me the software. |
| 10 | O'Mahoney | All right. And he – did he explain to you how he could source it at any point in time, this software? |
| | Wright | No. I didn't ask. |
| | O'Mahoney | You didn't ask. Because I asked you that a minute ago and you said not at first, but I thought you might be about to say that later on he explained how it came to be that he was able to source this software. |
| 15 | Wright | Not the Siemens software. |
| | O'Mahoney | No. Okay. |
| | Wright | I just assumed that he was as successful as he made out. |
| | O'Mahoney | All right. |
| | Wright | He talks a really good game when he wants to. |
| 20 | O'Mahoney | Was he indicating that he was working for Siemens or that he had a relationship with Siemens? |
| | Wright | No. He was a mining contractor. He was dealing with a company called Paynes Find Gold. |
| | O'Mahoney | Paynes Find Gold. |
| 25 | Wright | Yes. |
| | O'Mahoney | Yes. |
| | Wright | And - - - |
| | O'Mahoney | How do you spell that? |
| | Wright | P-a-y-n-e-s Find Gold. |
| 30 | O'Mahoney | Okay. And what, in that context he raised the ability to source this software. |
| | Wright | Yes. |
| | O'Mahoney | Is that right? |
| | Wright | He said he knew a lot of people with money apart from himself; his father and all the rest. He said he had about $5million in trust that he had father had set up, and other money. He gave me a whole lot of contacts, mostly of the porn industry. The porn industry has money. Like the guy from the adultshop or whatever it was ..... he had. |
| 35 | | |
| | O'Mahoney | He shared with you some contacts, but specifically on this Siemens software, he indicated he could source it for you. |

Page 33 of 45

CONFIDENTIAL

1479

DEFAUS_00068698

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Well, he did a mining contract so what he was involved with was setting up and doing mining contracts, and mining contracts these days are more and more software, hardware, little robots. |
| 5 | O'Mahoney | And how did it progress from there? It was a topic of discussion; he raised it, he pitched an idea. Tell us about how the transaction occurred. |
| | Wright | We went back and forwards for a while because it was bloody expensive. |
| | O'Mahoney | The software was? |
| | Wright | Yes. |
| | O'Mahoney | Did he tell you what the price of it would be? |
| 10 | Wright | Yes. |
| | O'Mahoney | What did he say? |
| | Wright | I can't remember but it was in the order of about $5.5 million for everything I wanted. ..... |
| 15 | O'Mahoney | Did – and you, I presume, to get a figure like that, had to be pretty clear with him about what you wanted. |
| | Wright | Yes. |
| | O'Mahoney | Did you reduce that to writing? |
| | Wright | We talked and Skyped and other things, so I've got records in Skype. |
| 20 | O'Mahoney | But thinking about that, that's a lot of money for software. You wouldn't, I don't think, want to leave too much to chance. Did you reduce to writing what you required? |
| | Wright | Yes, everything in the Siemens suite. |
| | O'Mahoney | Everything in the Siemens suite. |
| | Wright | Yes. ..... |
| 25 | O'Mahoney | Did you list out what that meant to you? |
| | Wright | We talked over Skype about it. It's the full suite of software in that area and there's like quite a list, etcetera. |
| | O'Mahoney | Is it – when you say a full suite of software, is it readily identifiable as a suite? |
| | Wright | There are a number of suites, yes. |
| 30 | O'Mahoney | Does this suite have a particular name? |
| | Wright | Yes. I would need to look at the particular things but at the moment I can't remember. |
| | O'Mahoney | And at any rate - - - |
| | Wright | There's a number of different things. |
| 35 | O'Mahoney | Okay. At any rate he mentioned this $5.5 million figure. |
| | Wright | Mmm. |
| 40 | O'Mahoney | One – I mean, I've been involved in a number of IP cases and software-type cases, and one of the issues that invariably comes up is that of licensing, whether or not particular software is licensed, whether it's low value or high value. What discussions did you have about the licensing of this software? |
| | Wright | I wanted licensed software. |

Page 34 of 45

CONFIDENTIAL

1480

DEFAUS_00068699

Interview Conducted with Craig Wright

| | O'Mahoney | And you made that clear to him? |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | And he said to you he would make sure that it was? |
| 5 | Wright | Yes, and I eventually got a licence code in my name, so I'm assuming it's in my name, that it's – there's not another Craig S. Wright out there, that it's just reflected from. |
| | O'Mahoney | How long did the negotiations go for in respect of the Siemens software between you and Mr Ferrier? |
| | Wright | It wasn't much at first, probably three months. |
| 10 | O'Mahoney | That's - - - |
| | Wright | ….. the other software – the other software at the same time. We were sort of mashed together. |
| | O'Mahoney | Okay. And in the course of that – those negotiations, did you ever negotiate in writing with him? |
| 15 | Wright | Skype. |
| | O'Mahoney | Skype's not in writing last time I checked. |
| | Wright | Tape. |
| | O'Mahoney | So there was some messaging within Skype? |
| | Wright | Yes. |
| 20 | O'Mahoney | And is that recorded? Would you have records of that? |
| | Wright | Yes. I believe I've given two keeper copies - - - |
| | Sommers | We've got some. We'll get them up to the Tax Office. |
| | O'Mahoney | Yes. And tell me this, that – when you formally reached agreement with Mr Ferrier, was that person to person? Did you reach agreement with him in person? |
| 25 | | |
| | Wright | No. |
| | O'Mahoney | How did that agreement occur? |
| | Wright | Over Skype. |
| | O'Mahoney | Over Skype? |
| 30 | Wright | Over Skype. |
| | O'Mahoney | Face to face in a virtual sense. |
| | Wright | Yes. |
| | O'Mahoney | And you mentioned earlier the entity MJF. |
| | Wright | Yes. |
| 35 | O'Mahoney | And we hit a bit of a roadblock, courtesy of my questioning about that. Tell us about how MJF fitted in to this. |
| | Wright | Well, MJF was the company that we were dealing with. Mr Ferrier was the director at the time of that. He has now been – I don't know what you would call it, "undirected". ASIC - - - |
| 40 | O'Mahoney | He has been disqualified, has he? |

Page 35 of 45

CONFIDENTIAL

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | I don't know why - - - |
| | Sommers | I don't know that he has been disqualified but he's no longer the registered ..... |
| | O'Mahoney | Holding that office. Okay. But - - - |
| 5 | Wright | And he can't get back as holding that office. I don't know what that would be called. |
| | O'Mahoney | Did you deal with any one else from MJF in respect of this transaction? |
| | Wright | I emailed some other people. |
| | O'Mahoney | Who? |
| 10 | Wright | I can't remember their names. |
| | O'Mahoney | Did you speak to anyone else? |
| | Wright | No. |
| | O'Mahoney | Did anyone else on your behalf - - - |
| 15 | Wright | I did speak to one other person briefly. I can't remember her name. It was ..... |
| | O'Mahoney | Did anyone else on your behalf negotiate with Mr Ferrier in respect of this transaction? |
| | Wright | No. |
| 20 | O'Mahoney | And on obtaining or entering into this transaction, how was the software actually transferred? |
| | Wright | What we did was – the way I – well, I wasn't going to give that much money without my licences so we did an escrow-type deal where I get access to the software and then they get access to the rest of the key to access the Bitcoin. So - - - |
| 25 | O'Mahoney | So you paid - - - |
| | Wright | I validated the software, they got the key. |
| | O'Mahoney | All right. So you  - - - |
| 30 | Wright | And that was done over Bitmessage so that the – Bitmessage is a block chain based messaging service, like email or Skype or something like that, but actually built into Bitcoin. |
| | O'Mahoney | Designed to ensure a simultaneous exchange? |
| | Wright | Well, no, it's designed to do a message that is secure encrypted and all the rest, but it can be used to do a simultaneous exchange. |
| | O'Mahoney | All right. I just want to understand. Was the $5.5 million paid via Bitcoin? |
| 35 | Wright | The value of what – yes, the consideration was in rights to Bitcoin. |
| | O'Mahoney | And rights to how many Bitcoin? |
| | Wright | I would need to double-check that. It was on the invoice, etcetera. I can't remember. |
| 40 | O'Mahoney | And was there negotiations along the lines of how Mr Ferrier was to get paid? Were there other payments mechanisms contemplated? |

Page 36 of 45

CONFIDENTIAL

DEFAUS_00068701

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | Well, I was only paying him by Bitcoin and he said he didn't want Bitcoin.  It was going to go to someone else who was going to distribute it in money. |
| | O'Mahoney | All right.  And – but you agreed on this mechanism of payment. |
| | Wright | Yes. |
| 5 | O'Mahoney | Interest in Bitcoin, transferring that.  The other part of the software, the AlBaraka, if we could call it that ….. |
| | Wright | It was all done at the same time so it was - - - |
| | O'Mahoney | I appreciate that.  What was that software? |
| | Wright | A core banking platform. |
| 10 | O'Mahoney | And what was the value of that? |
| | Wright | That was the majority of that transaction.  That was – I can't remember exactly, but probably 25 or 30 million. |
| | O'Mahoney | All right.  And you – how did you understand that Mr Ferrier was able to source that software? |
| 15 | Wright | He told me how he knew a whole lot of Arabs at first and all the rest.  I had been talking about the fact that the ideal for me would be basically a Arabic-type banking platform, because Bitcoin is inflationary, so there's not the typical interest model.  It's actually inverted.  So I was looking for something along those lines.  Core banking software is hard to get hold of, to say the least.  The deal I was doing with Temenos, just to have them – their software, I didn't own any of it, was going to cost us probably 10 or 11 million dollars, which we went down the track ….. except we ended up getting out of that because they couldn't deliver.  So simultaneously we were doing that and the other one ….. |
| 20 | | |
| 25 | O'Mahoney | And did he mention to you a particular source of this software, the AlBaraka software? |
| | Wright | He told me AlBaraka but - - - |
| | O'Mahoney | What did he say about AlBaraka? |
| | Wright | He can get me the software from it. |
| 30 | O'Mahoney | And who did he indicate AlBaraka was? |
| | Wright | AlBaraka are a big global bank in places like Egypt and Saudi Arabia and - - - |
| | O'Mahoney | And are - - - |
| | Wright | - - - Turkey and they've got a website. |
| | O'Mahoney | Again, there were negotiations about price in respect of this transaction. |
| 35 | Wright | Mmm. |
| | O'Mahoney | And - - - |
| | Wright | As to that one I just ….. it wasn't much of a negotiation. |
| | O'Mahoney | Were you happy to accept the price that he wanted? |
| 40 | Wright | Do you know how much the Commonwealth Bank spent upgrading their core banking software last year alone? |
| | O'Mahoney | No, I don't, but - - - |
| | Wright | Around 650 million. |

Page 37 of 45

CONFIDENTIAL

DEFAUS_00068702

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | All right. |
| | Wright | Do you know ANZ spent nearly as much? |
| 5 | O'Mahoney | No, no. I appreciate your point, a lot of money is spent on banking IT, I just want to -- I mean, in the context of -- I think you would agree this was a big transaction for yo. |
| | Wright | Yes. |
| | O'Mahoney | That 25 to 30 million dollars was a lot of money for you at this time. |
| | Wright | Yes. And I would have sold my mother to get that software. |
| | O'Mahoney | All right. Well - - - |
| 10 | Wright | I don't ….. my mother. |
| | O'Mahoney | Okay. Tell us this, though, was it the case you were just happy -- you were happy to accept the price he wanted? Were there no negotiations as to price? |
| | Wright | It was more on the Siemens software. |
| | O'Mahoney | All right. |
| 15 | Wright | But yes, I was slavering and drooling at being able to get core banking software. |
| 20 | O'Mahoney | There are - in the materials that I've read to you there's certainly at least a document indicating that there was an agreement reached between AlBaraka and Hotwire regarding the software. Are you able to -- and it does seem to indicate that at least at one point in time Hotwire had obtained and - - - |
| | Wright | Well, I was setting up Hotwire to put some of the software into. |
| 25 | O'Mahoney | Just let me finish, because I want to give this question some context. There does seem to be some documentary evidence indicating that at one point in time Hotwire had acquired this software, the AlBaraka software. Are you able to point to any documents evidencing a transfer of that software from Hotwire to you? |
| | Sommers | Sorry, just to approach on that, are you saying that there's a document evidencing this software went to Hotwire, or that there was an agreement between AlBaraka and Hotwire for the software? |
| 30 | O'Mahoney | The latter, an agreement between those - - - |
| | Sommers | Well, that's not what you said. You said the …… |
| 35 | O'Mahoney | Okay. Apologies. I will be absolutely clear, and I'm grateful for that clarification. The document I've seen is an agreement between AlBaraka and Hotwire in respect of the software, and it indicates, certainly on my review of it, that it does seem that it was contemplating a transfer of the software to Hotwire. I'm not - - - |
| 40 | Wright | That's where I -- that's where I'm saying I was going to put the software. How I actually did it was probably a bit messy. The idea was it comes to me, goes to the trust, gets distributed and then Hotwire was going to pull it apart and do what it needs to do. |
| | O'Mahoney | Is this the case, was the software at one point in time obtained by Hotwire and then transferred to you? |

Page 38 of 45

CONFIDENTIAL

DEFAUS_00068703

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| Wright | No. It was obtained – I physically got it – ideologically got it, couldn't really physically get a copy for this software and download it. I got a copy of it and the resource code and I transferred that. | |
| O'Mahoney | All right. And so - - - | |
| 5 Wright | I probably made a big mess of it because I was – when it came to the core banking software I should have taken more time to make sure things were documented properly and all the rest, but all I cared about was I wanted it and I wanted it now. | |
| 10 O'Mahoney | So why was there an agreement between AlBaraka and Hotwire? What was that in respect of? | |
| Wright | Because eventually ….. were going to end up getting a good chunk of it in Hotwire. So when I was talking with Mark about this, this is where I'm saying I'm going to be putting it so I didn't really think about how the contract was sort of formulated for the distribution. I knew I'm paying for this. I'm going to get what I want and that's, then I put as much effort into making sure our documents were processed properly. | |
| 15 | | |
| O'Mahoney | Was it not the case that Hotwire entered into this agreement? | |
| Wright | Well, I entered into the agreement. | |
| O'Mahoney | Did Hotwire? | |
| 20 Wright | Well, Hotwire wasn't actually set up. Hotwire was being set up. I was setting up a company that was going to have this so Hotwire was in development, you might say, when this happened. In May of 2013, Hotwire didn't exist. It was planned. I hadn't filled out all the forms, I hadn't got….. but I said this is the company I'm setting up and this is where I'm going to put it. | |
| 25 O'Mahoney | All right. And do you say that for this software acquisition that there was, it was funded by way of Bitcoin? Is that right? | |
| Wright | Rights to, yes. | |
| O'Mahoney | Yes, so you paid for this software by way of rights to Bitcoin? | |
| Wright | Yes, which were then used to distribute the…… | |
| 30 O'Mahoney | And are there documents evidencing the transfer of those rights? | |
| Wright | Yes. | |
| O'Mahoney | Between you and Mr Ferrier? | |
| Wright | Yes. | |
| O'Mahoney | And did you have rights to Bitcoin with that sort of value? | |
| 35 Wright | Yes. | |
| O'Mahoney | The 5.5 plus $30 million? | |
| Wright | More. | |
| O'Mahoney | You had more than that? And are there documents showing that those rights have been transferred? | |
| 40 Wright | Yes. | |
| O'Mahoney | I've also seen some documents indicating that – in fact, I will come back to that. | |

Page 39 of 45

CONFIDENTIAL

DEFAUS_00068704

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | It's not just the rights transfer any more. The actual Bitcoin had been transferred. |
| | O'Mahoney | Well, I was going to ask you. Has Bitcoin been transferred as consideration for those transactions? |
| 5 | Wright | Overseas, yes. |
| | O'Mahoney | That's correct? |
| | Wright | Yes, not in Australia but from overseas, yes. |
| 10 | O'Mahoney | All right. And moving to another acquisition, and I think we're set to finish at 6.30. Is that right? So we've only got a few minutes to go. Another acquisition involved Coin Exchange for purchasing software from you through an entity, W & K. Can you tell us about that? |
| | Wright | Well, I didn't really purchase. |
| | O'Mahoney | Of K, well, tell us about your understanding of that transaction to the extent of it exists. |
| 15 | Wright | I had an agreement with Dave. We were going to transfer software into our, into the entity we were creating here in Australia. |
| | O'Mahoney | This is Mr Kleiman? |
| | Wright | Yes. I had set up a company. Everything was going – I hadn't heard from Dave in a little bit. Next thing I find out he is dead. |
| 20 | O'Mahoney | All right. |
| | Wright | So with 90 per cent of it going through everything and moving everything and doing all the bits and pieces and he died. |
| | O'Mahoney | So you and he were negotiating for the purchase, negotiating in respect of this. |
| 25 | Wright | We weren't negotiating, we were…..partners for years so didn't really negotiate it. This is what we're doing. We talked to each other about it. |
| | O'Mahoney | About acquiring Softwerk? |
| | Wright | No, we al-, Dave already had the software. |
| | O'Mahoney | Okay. What was his software? |
| 30 | Wright | Everything from financial software for the kind of…..chain to gambling software. |
| | O'Mahoney | And Coin Exchange was looking to buy that software? |
| | Wright | We were going to capitalise it into Coin Exchange. |
| | O'Mahoney | What does that mean? |
| 35 | Wright | It was going to be used as part of setting up Coin Exchange. |
| | O'Mahoney | It was going to be transferred to Coin Exchange? |
| | Wright | Yes. |
| | O'Mahoney | And did that ever occur? |
| | Wright | Yes. |
| 40 | O'Mahoney | How did it occur? |

Page 40 of 45

CONFIDENTIAL

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | Wright | I ended up going through the filing of New South Wales Supreme Court and going, these are the contracts, Dave is head.  Basically, this is the value and getting them to put their stamp on it. |
| 5 | O'Mahoney | I've noted those proceedings.  Can you just, in a broad sense, summarise how they came about?  Was this the case that you had an understanding or an agreement with Mr Kleiman who passed away. |
| | Wright | Yes. |
| | O'Mahoney | And that on the back of his death, you sought to give effect to that agreement? |
| 10 | Wright | Yes. |
| | O'Mahoney | And was it the case that there was some opposition to that from somebody? No? |
| | Wright | No. |
| 15 | O'Mahoney | But you moved the court for relief, you moved the court for declaratory relief in respect of that agreement? |
| | Wright | Effectively, I believe that was at the….. |
| | O'Mahoney | But I just want to un-, I just --- |
| 20 | Wright | I wanted to make sure that everything was totally legal and all the rest.  Dave has other, he's got an estate who Andrew has been dealing with and I wanted to make sure I didn't rip off his estate and just go, "Ha ha, it's my software".  I wanted to make sure everything was done legally and above-board so that Dave's heirs get this software which was being more painful than it should be. |
| | O'Mahoney | What was the value of that software? |
| | Sommers | Are you asking what's the --- |
| 25 | Wright | The two lots, I think, were, it totals 56 million. |
| | O'Mahoney | And had you negotiated for that software to be transferred to Coin Exchange with him before he died? |
| | Wright | Yes, we had been, we had contracts over east. |
| | O'Mahoney | And had you reached a rough agreement as to price with him? |
| 30 | Wright | How it was going to occur, yes. |
| | O'Mahoney | Yes.  And was that the figure 56 million-odd that was being discussed? |
| | Wright | Yes. |
| | O'Mahoney | And how was he to be paid for that? |
| 35 | Wright | Dave had already been paid in some right to Bitcoin and whatever else at the time plus there were a number of loans…..that he had taken out….. so….. |
| | O'Mahoney | A number of loans.  What – you leant him money? |
| | Wright | I didn't, no. |
| | O'Mahoney | But is it the case that $56 million of value was transferred to him in respect of this software? |
| 40 | Sommers | Sorry, just to clarify, no money was transferred.  The value was transferred to Mr Kleiman because he passed away? |

Page 41 of 45

CONFIDENTIAL

1487

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | He passed away. Well, was anything paid for this software before or after his death? |
| | Wright | Yes. |
| | O'Mahoney | And is that the figure of 56 million? |
| 5 | Wright | No. |
| | O'Mahoney | What was the figure that was paid for it? |
| | Wright | Well, I had an interest in 50 per cent of the company, W & K. I didn't run it or anything like that but an interest in that. |
| | O'Mahoney | Yes? |
| 10 | Wright | And there were loans associated with the research and everything we had done beforehand that were sourced from people.....some of the Bitcoin went to pay off. |
| | O'Mahoney | So what was paid? |
| | Wright | Loans..... |
| 15 | O'Mahoney | Loans? But when you say loans were paid, what was acquired? |
| | Wright | Yes. What do you mean what was acquired? |
| | O'Mahoney | Well, the transaction involving what we've been discussing with Mr Kleiman and W & K, what was the transaction that all that resulted in? |
| | Wright | Software came into my possession and --- |
| 20 | O'Mahoney | When you say "your possession," Coin Exchange's possession? |
| | Wright | Well, me the trust holder.....into put into Coin Ex. |
| | O'Mahoney | Okay, so it came into your – so that's what came your way – software. |
| | Wright | It came my way and the trust was sort of being formulated, hadn't been, so.....at that stage. |
| 25 | O'Mahoney | And what went the opposite way for that part of this exchange? What consideration did you pay? |
| | Wright | Rights to Bitcoin left to people in Panama. |
| | O'Mahoney | In what amount? |
| 30 | Wright | I don't remember the exact amount but we're talking 50 per cent of that amount. |
| | O'Mahoney | And who were the people in Panama? |
| | Wright | People in the gaming industry there. |
| | O'Mahoney | .....named? |
| | Wright | Named? |
| 35 | O'Mahoney | Was it --- |
| 40 | Sommers | Sorry, just – I'm just trying to be clear here. The Supreme Court proceedings established that – I thought they established that there was a debt to you from W & K that software was transferred to you and I thought the wash-up of those proceedings were that you effectively released W & K from the debts that it owed you. |
| | Wright | Yes..... |

Page 42 of 45

CONFIDENTIAL

DEFAUS_00068707

1488

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| Sommers | I think that's where ….. the, what value moved from you to W & K, was that the forgiveness of those debts that were established in the Supreme Court proceeding? | |
| Wright | Yes. | |
| O'Mahoney | How did those debts come about? | 5 |
| Wright | Basically, because a number of gaming entities in Panama had funded some of our research. | |
| O'Mahoney | And --- | |
| Sommers | And when you say "our" you mean the research that was being done by W & K? | 10 |
| Wright | Yes. | |
| O'Mahoney | Are there documents evidencing those debts, the creation of them? | |
| Wright | Not that I have, no. | |
| O'Mahoney | Why not? | |
| Wright | Because Dave's hard drives are encrypted and no one can get access to them. | 15 |
| O'Mahoney | So these debts are in the tens of millions of dollars? | |
| Wright | Yes. | |
| O'Mahoney | And you, there's not a single document you could point us to that would evidence them? | 20 |
| Wright | Not ….. | |
| O'Mahoney | Do you, it wasn't important to you to have a document evidencing debts of that amount? | |
| Wright | I would like to have documents evidencing all of that. None of it was done in Australia; nothing ever happened in Australia; no entity from Australia was ever involved directly with any of that. | 25 |
| O'Mahoney | I just appreciate that. I'm just thinking out loud. I mean, if I was owed that sort of money I would be pretty keen to have it recorded. You took no steps? | |
| Wright | It was recorded. They had all the documents. | |
| O'Mahoney | In a way that was accessible to me. Did you take any steps to achieve that? | 30 |
| Wright | I did ….. accessible to me because ….. trust these guys all the time. | |
| O'Mahoney | Officers of the Commissioner? | |
| Wright | Tax officers. | |
| O'Mahoney | Can I ask is it – it might be a good question to finish up on. Looking at the pleadings, did you give instructions in respect of the Supreme Court proceedings? | 35 |
| Wright | What do you mean? | |
| O'Mahoney | Well, it was discussed what the proceedings sought to bring about and that was, we don't need to revisit it, but I take it you were instructing lawyers about those proceedings, prosecuting those proceedings, bringing them about. Is that correct? | 40 |
| Wright | No. | |

Page 43 of 45

CONFIDENTIAL

1489

DEFAUS_00068708

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | O'Mahoney | So who was instructing the lawyers? |
| | Wright | I just did it. |
| | O'Mahoney | You did it yourself? |
| | Wright | Yes. |
| 5 | O'Mahoney | Okay. Looking at those, the pleading documents in those proceedings, and if I'm using language that you want me to explain, please do – they indicate that the relevant software had been used by a number of software entities, including the United States military, an entity, DHS, and there's some reference in some materials I've seen to the Department of Homeland Security |
| 10 | Wright | Mm. |
| | O'Mahoney | Do you say that that is the case, that the software was used by those entities? |
| 15 | Wright | Before Dave died, we had gone down the path of getting funding for all of that stuff to be used. SWAMP and other such things are being issued for that. I wasn't involved at all and I don't – Dave was actually a lot sicker than he let on. I didn't realise he was actually ill at all other than - I mean, he'd been in and out of hospital the whole time I've known him because of medical problems from ..... a long, long time ago. And no one knew how bad it actually was with Dave, and it was not expected that he would be dead. He's only a few years older than me and - - - |
| 20 | O'Mahoney | I guess, to wind it up, by way of background, was it the case that part of the value of what was – or this software was, that it had been used by these entities: DHS, US military. |
| 25 | Wright | No, it was more – the value was – well, if he had lived, then we were hoping to make - AusIndustry has the scheme here. US Government, DAPA and all the rest actually paid for research. Dave was a US vet and a number of other things, that make it more likely that you can get that funding, and all of us had been in ..... when Bitcoin wasn't worth so much. So, at that stage, we knew we would need a lot more than we had to keep our research going, so we were trying to get every source we could. |
| 30 | O'Mahoney | The Commissioner has done quite a bit of investigative work, if you like, into those alleged contracts and arrangements and it seems that – and I'm sure this has been indicated to you, that there were no such contracts or this software was not being used by US military, Department of - - - |
| 35 | Wright | I don't know what was being done. Dave ran that himself. I know we had applied. I know he should have gone through with it. I don't know where it got to and I don't know why he didn't. The only thing I can - - - |
| | O'Mahoney | But Dave wasn't giving instructions in the Supreme Court proceedings. That has to be corrected, doesn't it? |
| | Wright | No; he was dead. |
| 40 | O'Mahoney | So, are you able to indicate - - - |
| 45 | Wright | My indication was that he had filed for the DHS plan; that all the information was in; that it was progressing and I have nothing else saying that he didn't go down that path. I don't know why he didn't complete it. I don't know why ..... happened other than he was in hospital a lot. So all I know is that he had gone down that path, you know, to get funding. What I've found out since was that Dave had actually – he hadn't got all the funding he wanted and Bitcoin wasn't worth so much at that stage, before he died. When he was not in |

Page 44 of 45

CONFIDENTIAL

Interview Conducted with Craig Wright

| | | |
|---|---|---|
| | | hospital, the total value was in the order of $2 a Bitcoin and he had hocked his house, hocked everything else and he was in debt by probably $2 million. |
| | O'Mahoney | Okay. Well, I'm grateful for that. We might leave it there and I will just note for the record, it is now 6.34 on 11 August 2014 and we will be reconvening, a week from today, 18 August. Thank you very much, Dr Wright. |

5

Page 45 of 45

CONFIDENTIAL

DEFAUS_00068710

1491

# TAB 878-3

P-173
Case No. 9:18-CV-89176-BB

EXHIBIT
Defense 560317

**AUSCRIPT AUSTRALASIA PTY LIMITED**
ABN 72 110 028 825



FASTER, BETTER EVIDENCE DELIVERY SINCE 1921

Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003
**T:** 1800 AUSCRIPT (1800 287 274)    **F:** 1300 739 037
**E:** clientservices@auscript.com.au    **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT SENSITIVE

O/N H-431147

**AUSTRALIAN TAXATION OFFICE**

**RECORD OF INTERVIEW**

| | |
|---|---|
| **INTERVIEWER:** | **GREG O'MAHONEY** |
| **INTERVIEWEE:** | **CRAIG WRIGHT** |
| **ALSO PRESENT:** | **ANDREW SOMMERS** |
| **CONDUCTED AT:** | **ATO OFFICE** |
| **DATE:** | **MONDAY, 18 AUGUST 2014** |
| **TIME:** | **4.31 PM** |

**TRANSCRIBED BUT NOT RECORDED BY
AUSCRIPT AUSTRALASIA PTY LIMITED**

WRIGHT, 18.8.14

Transcript Sensitive

# Interview conducted with Craig Wright

On the 18TH August 2014

Australian Taxation Office

Interviewers: Greg O'Mahoney

| | | |
|---|---|---|
| 5 | | |
| | O'Mahoney | For the record it's Greg O'Mahoney at 4.31 on Monday, 18 August 2014 reconvening the interview of Dr Wright. Thank you for coming back, Dr Wright. Could I start, Dr Wright, by saying this: you will remember last week there was a number of questions and answers about the supplies that are the subject of this dispute - - - |
| 10 | | |
| | Wright | Yes. |
| | O'Mahoney | - - - the ITCs that have been claimed. There is a few discrete questions about those that I will come back to in the course of today. Could we move on to the different question of consideration, and I think you would appreciate that's an important part of this dispute, and could I start with, I guess, the basic question of how were these supplies paid for by Coin Exchange? |
| 15 | | |
| | Wright | What do you mean "how were they ….. paid for by Coin Exchange"? |
| | O'Mahoney | Well, what was - the position is, as I understand it, that it's asserted that Coin Exchange made some acquisitions and I think it's also asserted that consideration was paid in respect of those acquisitions. |
| 20 | | |
| | Wright | Mm. |
| | O'Mahoney | We just want to understand what was the consideration, how were these acquisitions paid for, in other words. |
| | Wright | Well, there were transfer of rights, as we discussed several times, so software, as in rights to use, etcetera, etcetera, on one side, rights to claim ….. on the other. |
| 25 | | |
| | O'Mahoney | So it's clear that you say software flowed one way, that was one part of the exchange. |
| | Wright | Mm. |
| 30 | O'Mahoney | I guess I want to focus in on the other flow, that the consideration going the other way. Can you just explain that, the flow of rights to bitcoin. What does that mean? |
| | Wright | The right to call on a number of bitcoin. |
| | O'Mahoney | Okay. When you say "the right to call on", what do you mean by that? |
| 35 | Wright | A legal right to have a number of bitcoin in a wallet aside. |
| | O'Mahoney | A legal right to have? How does that differ from actually using bitcoin, paying by way of bitcoin for acquisition? |
| | Wright | bitcoin is something in a ledger, so it's - I can have a right to cash in a bank and not have the actual cash. |
| 40 | O'Mahoney | So is this the case, because I just want to apply that answer to a non-bitcoin situation, is it analogous to this: say you had a pool of gold bars or a pool of cash in a bank, that the consideration was the transfer of an interest or a right to, an interest in or a right to, those gold bars or that cash. Is that - - - |
| | Wright | That's fairly much it, yes. |

Page 1 of 45

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | And how does that work?  The entity that acquires the interest, what is it in a position to do with that interest? |
| | Wright | If I have a right to gold bars held in a Suisse bank account, such as a gold certificate, what does that entail me, enable me to do?  I can transfer rights. |
| 5 | O'Mahoney | All right.  So is that one way of saying that on the gold bar scenario that the person who has the interest transferred to him or her is able to actually call upon them, actually take possession of them or use them;  is that what you mean? |
| 10 | Wright | Within certain sort of conditions, whatever else.  If you're talking gold bars, then it would depend on whether you have a numbered or an unnumbered certificate. |
| | O'Mahoney | Okay.  Can we focus on bitcoin.  What does the person who receives the transfer of these rights, what position is that entity or he or her in, in respect of the bitcoin? |
| 15 | Wright | You have a right to call on or arrange to be transferred or whatever else a number of bitcoins held overseas. |
| | O'Mahoney | Does that include a right to useless that bitcoin as, I guess, a currency going forward? |
| 20 | Wright | As a currency, yes.  The terms were sort of set originally which involved it being currency, unless it's overseas. |
| | O'Mahoney | Just as an aside on that point, one thing that my research, which is incredibly brief compared to your, in relation to crypto currency has revealed is this, that bitcoins have in their history been very, very volatile in terms of their value.  Is that a fair assessment? |
| 25 | Wright | So is the Australian dollar, so is gold. |
| | O'Mahoney | Well, except currencies ..... currencies in gold ..... currencies have volatility as well, but in a relative sense the volatility of bitcoin is quite extraordinary compared to ..... currencies;  would you accept that? |
| 30 | Wright | Zimbabwe dollar, one Zimbabwe dollar can't even buy you a grain of sand at the moment.  I believe the typical currency note is now in the hundred trillion dollars in Zimbabwe dollars. |
| | O'Mahoney | And equally you could cite the example of the Argentinian peso after Argentina's default, but let's talk in general terms. |
| | Wright | Equally, one ounce of gold in the US was a dollar just a hundred years ago. |
| 35 | O'Mahoney | Okay.  But I'm talking more day-to-day, week-to-week, month-to-month volatility, around I accept that in currencies there are in our lifetimes - - - |
| | Wright | The ..... the whatever else. |
| | O'Mahoney | - - - extraordinary - if I could just finish - there are some extraordinary moves and fluctuations in currencies.  Do you accept that bitcoin does have a volatility that is quite extreme relative to most currencies? |
| 40 | Wright | No.  Actually, most currencies would be - I mean, there's over 120 different currencies in the world, and bitcoin is probably about 30th on volatility. |
| | O'Mahoney | In the last 10 years what has been the highest value of bitcoin and the lowest? |

CONFIDENTIAL

DEFAUS_00560319

1494

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Approximately $120, and the lowest, but that's a bad analogy, that's like saying - all right, that's the old statistical joke - my head is in the oven, my foot is in a fridge and on average the temperature is good. |
| | O'Mahoney | So what's the lowest point? |
| 5 | Wright | It started and it has increased. We're talking about something that started from zero value because I couldn't even buy a pizza with it back when I had these things, hence why you guys called it a hobby ….. |
| 10 | O'Mahoney | Just so that we have a clear picture, we're talking about a valuation spread that, I mean, might be from zero and I appreciate that that's a starting point and it's not really a realistic low point, if you like, it was an ….. currency at that point in time, but is that really the ultimate spread, about $120, from very, very low numbers to 120? |
| | Wright | If I'm right, the ultimate spread will be about 10 million dollars per bitcoin. |
| | O'Mahoney | Okay. Which speaks to a very large level of volatility. |
| 15 | Wright | No. It speaks to the growth of a new currency. |
| | O'Mahoney | One issue that just arises, and as I said it's a side point, but when using bitcoin as a form of consideration for substantial transactions, is there a degree of concern about the value of them, the fluctuating value of them? |
| 20 | Wright | There's an issue with using American dollars in that way. You're not going to get me to say that it's not a currency because it is volatile when it has got 90 other currencies that are actually more volatile than it. I mean - - - |
| | O'Mahoney | I have to say, you're a student in bitcoin. I have looked at the charts in bitcoin and I have looked at the charts of the major global currencies - - - |
| | Wright | It's an exponential growth. |
| 25 | O'Mahoney | - - - in the last few years and I have to say if you're saying that the volatility is analogous to major currencies, the charts will speak for themselves, and I don't want to take any more time looking at that. It was just a question about how you accommodate that kind of volatility when you are using bitcoin - - - |
| | Wright | It's exponential growth. |
| 30 | O'Mahoney | - - - in this consideration. |
| | Wright | It is not going down all the time; it is going up. A year ago at this time it was around $1.36. |
| | O'Mahoney | All right. |
| | Wright | So now it is around the $500 mark. It is going up and there are - - - |
| 35 | O'Mahoney | So you say in the last few years it has gone from - one bitcoin has gone from $1.36 - - - |
| | Wright | No, 136. |
| | O'Mahoney | 136 to - - - |
| | Wright | Around 500. |
| 40 | O'Mahoney | 500. |
| | Wright | Which is ….. a little bit at the moment. |
| | O'Mahoney | Can I ask this, that last week we spoke about Coin Exchange being part of a group. |

CONFIDENTIAL

DEFAUS_00560320

1495

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Mm. |
| | O'Mahoney | A group of entities that you controlled that tend to interact with one another commercially. |
| | Wright | Yes. |
| 5 | O'Mahoney | Remember we discussed that, and I want to understand this, how many entities are there within the group that use this funding mechanism, this - - - |
| | Wright | All of them. |
| | O'Mahoney | All of them?  Okay.  So that is seven or eight entities that use - - - |
| | Wright | Yes. |
| 10 | O'Mahoney | Do they all use as consideration the same rights to bitcoin in the same source, from the same source;  ie, the same trust? |
| | Wright | The same group source, yes. |
| 15 | O'Mahoney | Yes.  So that that Seychelles trust, I think we called it that in shorthand last week, that Seychelles trust is really the funding source for seven or eight entities.  They each are able to transact - - - |
| | Wright | There is a loan that has been ….. to that, yes. |
| | O'Mahoney | All right.  But each of those seven or eight entities transact using rights to bitcoin held by that trust? |
| | Wright | The bitcoin held by that trust, yes. |
| 20 | O'Mahoney | Can I ask this before I dig into the specifics of how that works, can you tell us what you know about the Seychelles trust? |
| | Wright | I know it's a trust in the Seychelles, I know the people who were involved in setting it up, I know I was involved in part and I know why. |
| 25 | O'Mahoney | Okay.  Can we unpack that.  A trust in the Seychelles, who apart from you was involved in setting it up? |
| | Wright | Dave Kleiman. |
| | O'Mahoney | Who else? |
| | Wright | Wen. |
| | O'Mahoney | Wen. |
| 30 | Wright | Wen Nguyen. |
| | O'Mahoney | Okay.  Wen, Wen Nguyen.  Who else? |
| | Wright | Tim, and I can't remember his last name off the top of my head, and I don't remember the - but I've got - I couldn't tell the other people off the top of my head. |
| 35 | O'Mahoney | Are there many other people? |
| | Wright | No.  But you guys have been sent their names before. |
| | O'Mahoney | And Tim, tell us about him, what does he do? |
| | Wright | He worked for Playboy Gaming. |
| | O'Mahoney | Playboy Gaming being? |
| 40 | Wright | Playboy Gaming. |

CONFIDENTIAL

DEFAUS_00560321

1496

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | What does it do? |
| | Wright | Casinos. |
| | O'Mahoney | Online casinos? |
| | Wright | ….. |
| 5 | O'Mahoney | Okay. It's a ….. in the gaming industry? |
| | Wright | Yes. |
| | O'Mahoney | And how do you know Tim? |
| | Wright | I was involved with possibly setting up a casino in Australia back for over a decade ago now, about Senator Olsten kyboshed everything. |
| 10 | O'Mahoney | All right. And so they're the names of the people involved in it. Can you tell us about how it came to be created, the circumstances, if you could just talk us through the circumstances of the trust establishment? |
| 15 | Wright | Basically, I had a lot of bitcoin. It was transferred over to be overseas for a consideration of $5000. Basically because - which was actually higher than the market value at the time. The $5000 - you know, the whole of the bitcoin that I transferred ….. to even $5000. The reason being the ATO wanted to call it all a hobby and whatever else and were trying to bankrupt me and I was getting divorced from my wife. I negotiated that I keep these, she could have the business, which she didn't actually go anywhere after she did it, but anyway. |
| 20 | | |
| | O'Mahoney | Was it your decision to set it up in the jurisdiction of the Seychelles? |
| | Wright | Yes. |
| | O'Mahoney | And how did these other individuals, Mr Kleiman, Nguyen - it's Ms Nguyen, isn't it? |
| 25 | Wright | Yes. |
| | O'Mahoney | And Tim, whose last name we can't remember, how did they come to be involved? |
| | Wright | Well, I talked to Dave and said, "Look, please do this. I know it has value eventually. Take it over." |
| 30 | O'Mahoney | When you say you know it "has value eventually", what do you mean by that? |
| | Wright | I've always believed in bitcoin. I still tell you that it will be at least one - one bitcoin 10 million dollars. |
| | O'Mahoney | All right. |
| | Wright | And that's probably a low estimate. |
| 35 | O'Mahoney | Okay. I appreciate you're very bullish on the prospects of ….. as a currency. Focusing - - - |
| | Wright | Not just that. I think it will replace the internet or replace smart currency, it will replace contracting, many things that you don't know yet. |
| 40 | O'Mahoney | All right. Focusing not so much on bitcoin as an alternate currency and potential source of future value, but on the trust structure, how did it come to be that the trust structure was settled upon? |
| | Wright | The idea was the trust was set up to promote bitcoin to ensure when things became valuable that it was there for the sole reason of promoting it as a |

CONFIDENTIAL

DEFAUS_00560322

1497

Interview Conducted with Craig WRIGHT

|   | | |
|---|---|---|
| | | currency and, in particular, doing anything possible to promote it as a replacement currency to fiat. |
| | O'Mahoney | So was that really the remit of the trust to promote and advance bitcoin? |
| | Wright | Yes. |
| 5 | O'Mahoney | And how does it go about doing that? |
| | Wright | It's investing in the research I'm doing that will take all of this into something new. |
| | O'Mahoney | And how is it so investing? |
| | Wright | I'm building a super computer at the moment. |
| 10 | O'Mahoney | Can you explain how it is that the trust is investing in that super computer? |
| | Wright | Overseas interest in bitcoin pays people who are bullish on bitcoin, and there are people out there who are. |
| | O'Mahoney | And, what, the trust makes an allocation, does it, each year to entities like that? |
| 15 | Wright | No ….. the loan. |
| | O'Mahoney | The trust lends money to - - - |
| | Wright | To me. |
| | O'Mahoney | - - - to you in ways that help you promote bitcoin? |
| | Wright | Yes. |
| 20 | O'Mahoney | Or entities that you control? |
| | Wright | Yes. |
| | O'Mahoney | And tell us about the structure of the trust in materials of its - well, who controls the trust? |
| 25 | Wright | Partly Wen and partly other people.  I can't remember the names.  You guys have got the list.  It's in answers I've given.  I can't remember all the names off the top of my head. |
| | O'Mahoney | But in terms of practical control, is it not the case that you control the trust? |
| 30 | Wright | No.  I can't control the trust.  I put terms, conditions, everything like that, how it had to be done when I had Dave set it up.  So I don't control it; I can act within bounds. |
| | O'Mahoney | So how did it come to be that - are all the assets of the trust, they were originally sourced from you? |
| | Wright | And Dave. |
| | O'Mahoney | And David. |
| 35 | Wright | Yes. |
| | O'Mahoney | And what was the rationale for putting those assets within a trust structure that you wouldn't or David wouldn't have control over? |
| | Wright | What do you mean "David wouldn't have control over"? |
| 40 | O'Mahoney | Well, just if you think about, if one has assets, to put them into a structure that one can't control, I just want to understand the rationale behind that. |
| | Wright | I don't want temptation myself. |

CONFIDENTIAL

DEFAUS_00560323

1498

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
| | O'Mahoney | So it's a sort of a self-discipline? |
| | Wright | In a way, yes. This is going to be spent on bitcoin. If it makes a billion dollars, it will be spent on bitcoin. Not buying a yacht, not buying whatever else. My research and replacing fee of currency. That's what it's doing. |
| 5 | O'Mahoney | Who are the beneficiaries of the trust? Who stand to benefit from that kind of profitability? |
| | Wright | The world. The world. Every single person, apart from government, and in a way government because it will stop debt financing. |
| | O'Mahoney | You appreciate that a trust has beneficiaries. |
| 10 | Wright | Yes. |
| | O'Mahoney | Who are the beneficiaries of this trust? |
| | Wright | I have a loan. |
| | O'Mahoney | And you are? |
| | Wright | Sorry? |
| 15 | O'Mahoney | What does that mean? |
| | Wright | Well, I've got a loan. That doesn't mean that I'm a beneficiary per se. |
| | O'Mahoney | All right. What does your loan have to do with your relationship to the trust? |
| | Wright | The end goal of this trust is promotion of bitcoin. |
| 20 | O'Mahoney | But I just want to appreciate - I appreciate that its remit, as you say, is to advance bitcoin and that you say a lot of people stand to benefit from that. Specifically, the beneficiaries of this trust, who are they? |
| | Wright | I don't know exactly. |
| | O'Mahoney | Is that right? |
| | Wright | Yes. |
| 25 | O'Mahoney | How is it that you don't know? |
| | Wright | I told Dave not to tell me all the details. |
| | O'Mahoney | Why would you request that? |
| | Wright | Because I didn't trust these guys. |
| | O'Mahoney | "These guys" meaning? |
| 30 | Wright | Meaning the people who said, "You've got too many degrees. Therefore, you can't claim education any more as an expense", even though it's a valid deduction; for people who said my buying 500 computers was a hobby; for people who said my laying fibre cable in a rural environment was a hobby; for people who complained when I spent a million dollars on computing services and whatever else, that it was a hobby; for people who said all of this. |
| 35 | | |
| | O'Mahoney | Sorry, is the short answer to that question officers of the Commissioner of Taxation? |
| | Wright | Sorry, what do you mean, sorry? |
| 40 | O'Mahoney | Well, you keep referring to "the people". I just want to understand who they are? |

CONFIDENTIAL

DEFAUS_00560324

1499

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Well, yes. I didn't trust them at the time because I went forth, I asked them questions, I said, "How do I do these sort of things?" I got instructions in writing about how I transmit and transfer stuff between myself and the company I was setting up, being told I had to put GST on it and then I end up basically having to fight for the next several years on what I was told to do, and the same here is I went to you guys and did a PBR and got a formal private ruling saying this is what I have to do and basically give everything to everyone, say "These are my wallets", get stat decs along those lines, go to the Tax Office say, "Look, this is what I want to do", and yet end up being pulled apart again. |
| | O'Mahoney | In part of that answer you referred to having to charge GST in respect of transactions between entities you controlled. |
| | Wright | Yes. |
| | O'Mahoney | Was that a source of annoyance or frustration for you? |
| | Wright | It would have been much easier just to do a transaction without all the GST, yes. |
| | O'Mahoney | Why do you say that? |
| | Wright | Because if it's a negative and a positive cancelling each other, then no one wins, and it's a situation where you pay five million dollars and collect five million dollars. I mean, it's only the external stuff that matters and I tried to explain that to people and they said, "No. You have to do it this way. This is how it works", so yes, I would much prefer not having to do a pop-up plus and minus on GST on entities and when there's no net difference. |
| | O'Mahoney | When you say that people told you, you have to do it that way, are you talking about officers of the Commissioner? |
| | Wright | Yes. |
| | O'Mahoney | Did you have accountants who were advising you in respect of GST liability? |
| | Wright | Yes. |
| | O'Mahoney | And they weren't saying that to you? |
| | Wright | Well, actually, people like Andrew have now - as a lawyer have said I can do it different ways. No one told me that I could do an agency agreement where I have absolute get out of the tax. |
| | O'Mahoney | When you say "different ways", can you flesh that out a bit? What are these different ways? |
| | Wright | Andrew would have to explain that one to you. I pay an expensive lawyer to write out documents that say GST neutral, so get him to explain it. |
| | O'Mahoney | Okay. But one example you just gave there was an agency agreement to get out of the tax. |
| | Wright | But it's not get out of the task; it is a zero. A hundred thousand, a hundred thousand; plus a hundred, minus a hundred. |
| | O'Mahoney | All right. |
| | Wright | There's no getting out of paying tax. |
| | O'Mahoney | Coming back to the structure of this trust, is this a fair summary of the position: you've transferred valuable assets to the trust. |

Page 8 of 45

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | I valued all of that at $5000 which was actually $500 more than the market value of everything at the time. |
| O'Mahoney | Assets of some value to the trust? |
| Wright | Yes. |
| O'Mahoney | That trust has been used as a funding source for seven or eight entities that you control? |
| Wright | Yes. |
| O'Mahoney | Over a sustained period of time? |
| Wright | Yes. Via loans, yes. |
| O'Mahoney | And you say that you are not aware of who the other beneficiaries of the trust are. |
| Sommers | I don't think Dr Wright used the term "other beneficiaries". Dr Wright said he didn't know who the beneficiaries were full stop. |
| O'Mahoney | You say that you don't know in those circumstances who the beneficiaries of the trust are? |
| Wright | I know that I can call on bitcoin. |
| Sommers | Pursuant to the loan. |
| Wright | Mm. |
| O'Mahoney | So that just strikes me as odd. I'm just speaking out loud, thinking out loud, Dr Wright. Is that the case, that you do not know request who the beneficiaries of the trust are? |
| Wright | "Know" is a different word than "suspect". |
| O'Mahoney | All right. Well, why don't we start with "suspect" and move to "know"? |
| Sommers | Greg, can I just stop you there because I'm struggling to join the dots between this particular line of questioning and the entitlement of ..... tax credits. |
| O'Mahoney | Well, we can here pause if you want and discuss that, but I can assure you that it's part of the factual landscape that the Commissioner has to investigate to satisfy itself of the claims that are asserted, and I think for good reason. It's at the heart of the consideration that is alleged to have been paid here to understand what is the structure that held the bitcoin that rights to which or an interest in which was transferred as part of the said consideration. |
| Sommers | Just to clarify, none of the assets of the trust have been contended that they formed part of the consideration for any of these transactions. |
| O'Mahoney | I appreciate that. An interest is transferred or rights to. |
| Sommers | No. If I can finish. |
| O'Mahoney | Yeah. |
| Sommers | It's only the rights that Dr Wright held pursuant to the deed of loan executed by the trust over the 650,000 bitcoin that were the subject of that deed of loan that had been contended that the dealings in those rights - that those bitcoin held outside the trust were transacted. Therefore, what is in the trust, the beneficiaries of the trust and so on, are entirely irrelevant to the transactions that have taken place because it's only the bitcoin that was the subject of the deed of loan that have been transacted. |

Page 9 of 45

CONFIDENTIAL

1501

DEFAUS_00560326

Interview Conducted with Craig WRIGHT

| | O'Mahoney | Well, I can safely say that there is a relevance that there are lines of inquiry that the Commissioner is pursuing that would make the structure/nature of the trust very relevant. I don't really want to go through what they are. |
|---|---|---|
| 5 | Sommers | Well, I've been told, and Mr ..... have made it clear to me the nature of this and these discussions related only to the GST audit. |
| | O'Mahoney | No. That's true. That's absolutely right. |
| | Sommers | And consequently I can't see the connection. |
| 10 | O'Mahoney | Well, can I say this, I'm almost through the questioning on the trust. There's two or three more questions to go. If you think that we're dwelling on it for too long, could you mention that, but if you don't mind I will ask two or three more questions and move on. |
| | Sommers | Sure. |
| | O'Mahoney | If you're happy with that. Can I ask Dr Wright, who do you suspect to have been the beneficiaries of the trust? |
| 15 | Sommers | I wouldn't answer that. It's entirely irrelevant. |
| | O'Mahoney | Who do you know to be the beneficiaries? |
| | Wright | I don't know. I told you that one; I suspect. |
| | O'Mahoney | Okay. So you don't know who any of the beneficiaries of the trust are? |
| | Wright | No. |
| 20 | O'Mahoney | And you say that is because you asked Mr Kleiman not to tell you? |
| | Wright | Yes. |
| | O'Mahoney | Can you just recall for us that conversation? Obviously, it's not a memory test, but to the best of your recollection what did you say and what did he say? |
| 25 | Wright | Andrew has seen some of the emails. Do you want the full or do you want the nice version? |
| | O'Mahoney | Full. |
| 30 | Wright | There was a lot of swearing and a lot of abuse at the ATO. I called a lot of people a lot of names and occasionally we talked about the trust. There was a lot about Mr Westwood, there were a lot of - I was rather frustrated at the time comments and, basically ..... whatever we were doing, take this off to ..... and we will do this overseas any way we can and make sure that we set it up so that, well, at the end of the day we ..... we wanted. |
| | O'Mahoney | All right. Could I ask Mr Nguyen or Ms Nguyen you mentioned before. |
| | Wright | Mm. |
| 35 | O'Mahoney | Apologies if I haven't pronounced her name correctly. On the trust document she's identified by reference to Design by Human, a company. What do you know about that company? |
| | Wright | Just the - I've now taken it over and whatever else. It was reserved by Dave in 2012. I don't know why he did Design by Human. |
| 40 | O'Mahoney | We've got some information that as at mid-2013 it was more or less a dormant shelf company. |
| | Wright | It's still basically a dormant shelf company. |

CONFIDENTIAL

DEFAUS_00560327

1502

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | It is.  Do you know how it came to be that a person purporting to be or how that entity came to be involved in settling a deed document? |
| | Wright | A shelf company can settle a deed document as far as I know. |
| 5 | O'Mahoney | And we've also got some information that Ms Nguyen was not at that time either a director or a shareholder of that company.  Do you know how it came to be that there was that association asserted between Ms Nguyen and Design by Human? |
| 10<br><br>15 | Wright | I know that our accounting practices in the group have not been the best.  I know that we haven't filed things correctly.  I know Dave didn't, I know I haven't, I know Nguyen hasn't.  I know we're doing our best to try and fix things.  I know that I'm paying lots of money to KPMG and accountants and Andrew and everyone like that to basically go away with these things and I know things are still a mess.  I know that we've had board notes that haven't been filed with ASIC correctly.  I know that we've had lots of these sort of things.  My speciality isn't as a company secretary or anything like that.  Nguyen's ….. from ….. she was still young and - - - |
| | O'Mahoney | What's Ms Nguyen's involvement in the group? |
| 20 | Wright | She was involved back from around 2011 with us.  She wanted to learn, wanted to do whatever.  I involved her because anything she could do she would. |
| | O'Mahoney | Is Design by Human a company that you consider to be part of the group? |
| | Wright | Part of the current group?  Yes. |
| | O'Mahoney | Was it part of the group as at mid-2013? |
| | Wright | Mid-2013, yes. |
| 25 | O'Mahoney | And there's reference no document to another entity, Permanent Success.  Is that another company that you know of? |
| | Wright | Yes. |
| | O'Mahoney | Is that also a company that was part of the group? |
| | Wright | Yeah, but it's not really doing anything. |
| 30 | O'Mahoney | It's a dormant company, is it? |
| | Wright | Yeah. |
| | O'Mahoney | A sort of shelf company? |
| | Wright | Just holding assets. |
| | O'Mahoney | The Craig Wright RND has an entity.  What does it do? |
| 35 | Wright | Well, that's me, effectively. |
| | O'Mahoney | Is that a company that you really control for your own benefit? |
| | Wright | It's a business.  Me. |
| | O'Mahoney | Yes.  Okay. |
| | Sommers | The ABN belongs to Dr Wright as an individual. |
| 40 | O'Mahoney | Okay.  And broadly, you don't need to go into the detail of this, but broadly what does it do as an entity? |
| | Wright | I do research. |

CONFIDENTIAL

1503

DEFAUS_00560328

Interview Conducted with Craig WRIGHT

|  | O'Mahoney | All right. And does it transact? |
|---|---|---|
|  | Wright | Yes. |
|  | O'Mahoney | Is it an entity that pays you, is it an entity that you use to invest? |
|  | Wright | It's my business. |
| 5 | O'Mahoney | Okay. |
|  | Sommers | I don't think you understood. It's Dr Wright individually. It's not - for some reason it has the nomenclature Craig Wright RND, but it is Dr Wright individually. |
|  | O'Mahoney | All right. |
| 10 | Wright | Yeah. It's just a business name associated with me individually. |
|  | O'Mahoney | Okay. And just one point of clarification. Reviewing the transcript from last week, there was a number of references in the transcript to a trust that was set up in Panama. |
|  | Wright | Mm. |
| 15 | O'Mahoney | Can you tell me what that trust is? |
|  | Wright | No. |
|  | O'Mahoney | You know nothing about it? |
|  | Wright | I know that it's there and I know that, but I don't know all the details. It's all on Dave's hard drive and we can't do anything. |
| 20 | O'Mahoney | What is its connection to the business activities of the group? |
|  | Wright | It was involved with funding things in WNK and ….. research. |
|  | O'Mahoney | In WNK? |
|  | Wright | Yes. |
|  | O'Mahoney | And how did that come about? |
| 25 | Wright | I don't know. |
|  | O'Mahoney | What do you know about it? |
|  | Wright | I know that it was there and I know that Dave was involved with a few people I know of in Panama and Cost Arica. |
|  | O'Mahoney | And who are they? |
| 30 | Wright | They're people from the gaming industry. |
|  | O'Mahoney | Do you know their names? |
|  | Wright | They're on the list I've sent. |
|  | O'Mahoney | Okay. And is there an ongoing association between group entities and that trust? |
| 35 | Wright | I don't know. I don't know that trust. |
|  | O'Mahoney | But you know the group entities? |
|  | Wright | I know people who have dealt with Dave. |
|  | O'Mahoney | I just want to be clear based on knowledge of the entities within the group, do they have a connection with this Panama trust? |
| 40 | Wright | I don't know. Well, my entities in the group - or, sorry - - - |

CONFIDENTIAL

DEFAUS_00560329

1504

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | We've been talking about seven or eight entities that - - - |
| | Wright | I have nothing - I have nothing more to do with the Panama trust.  I have no idea about it. |
| 5 | O'Mahoney | Okay.  So the seven or eight entities that you control that we've referred to as "the group", to the best of your knowledge they don't have any connection with this Panama trust? |
| | Wright | Not directly.  They have a connection to WNK and WNK has a connection to the trust, if you can put that together. |
| 10 | O'Mahoney | Okay.  Well, we might come back to that.  I've got a few questions I want to ask you about WNK.  Getting back to the operation of the group as a whole, this is an important point, that if it is the case that seven or eight entities, satellite entities within the group, are using the same trust as a funding source - - - |
| | Wright | The same loans from me. |
| 15 | O'Mahoney | I appreciate, the same loans from you, but all by reference to the same trust as a funding source, in the context of the group, courtesy of that single funding source, it must have had finite resources, it must have had limited spending capacity.  What records were kept that would reflect how much was left to be able to be used as consideration from that funding source? |
| 20 | Wright | From the trust or the loan or? |
| | O'Mahoney | Well, just what records were kept to indicate how much was left within the funding source? |
| | Wright | You mean the loan? |
| | O'Mahoney | Yes. |
| 25 | Wright | There's all the accounting records ….. else. |
| 30 | O'Mahoney | But one thing that has occurred to me is that all these entities are really transacting by reference to the same - or using consideration from the same funding source.  One important thing would be to have a global picture of how depleted the interest is that can be transferred, what is left, what is already expended.  Are you saying that there are records that exist that show - would paint that kind of picture? |
| | Wright | We've got all the Zero account - like, we use Zero as an accounting source and we've got all the accounting records. |
| 35 | O'Mahoney | So is it through those Zero accounting records that you say that you're able to satisfy yourself about what the spending capacity of an individual entity was at any given point in time? |
| | Wright | Yes. |
| | O'Mahoney | And what did they reveal to you, those records? |
| 40 | Sommers | You might need to tie that question down a little bit.  That's a very large question.  What do the accounting records represent? |
| | O'Mahoney | Okay.  But in the context of those records being what pointed out to you was the spending capacity of the group entities, can you explain to us what was it about those records that so enlightened you, that made you aware of what was left to spend? |
| 45 | Wright | Accounting records ….. |

Page 13 of 45

CONFIDENTIAL

DEFAUS_00560330

1505

Interview Conducted with Craig WRIGHT

| | O'Mahoney | Were there global accounting records that were kept that would show the picture of the whole funding source, how much had been sent? |
|---|---|---|
| 5 | Wright | Of course not. I mean, each company goes into each individual one. I don't then do a - this is tied that way type thing. I do it the way that standard accounting practices have been told to me to do and I'm hiring an accountant at the moment and I'm getting another one and I've got KPMG and this much goes in there, this much goes in there, this much goes in there. The trust has that. I mean, there are set bloody records. There's different entities, this one, this one, this one, and it's not how much this - in an in globo type thing I have to spend because once it's been transferred there, it's owned by there. |
| 10 | | |
| | O'Mahoney | Yeah. I appreciate that. Could I maybe frame the question - - - |
| | Wright | So there's not any how much in globo. If I'm part owner of a hundred different companies and I pay them with cash, then quite simply, I don't get to go and in globo I have this much to spend. |
| 15 | O'Mahoney | No, but Dr Wright, imagine this scenario. Imagine we've got eight companies drawing upon a single funding source called of gold bars that are all using the same funding source to - - - |
| | Wright | They don't have the same funding source. They have a capitalisation that we put into them. |
| 20 | O'Mahoney | Just let me finish pause it's - I'd just be interested in your thoughts about this. They're all drawing upon the same funding source. |
| | Wright | No. They're not. They're capitalised individually. Each company is capitalised individually. |
| 25 | O'Mahoney | But is, I think you accepted earlier, when transacting, is using the same funding source for consideration. I thought you said that. |
| | Wright | There is a pool of rights. |
| 30 | O'Mahoney | Yes, okay, but just bear with me on this. I just want to run this by you. If seven or eight-related companies are all drawing upon one pile of gold bars to transact with the world at large or with one another, one issue that would arise is the potential for double-dipping, the potential that multiple companies are - - - |
| | Wright | No. There's not. |
| | O'Mahoney | Just let me finish. |
| | Wright | No, no. No. I know what you're saying. |
| 35 | O'Mahoney | Are transacting on the basis of the same store value. |
| | Wright | But, look, they're issued a number of them. They start with that, they get capitalised into them. There's no double-dipping. There's no double-dipping into an accounting system like that. I'm not going to - - - |
| | O'Mahoney | But how could you be - - - |
| 40 | Wright | No. I disagree. There is no double-dipping. |
| | O'Mahoney | How could you be satisfied that there wasn't double-dipping if you couldn't paint a global picture? |
| 45 | Wright | Balls if I have a ledger, I don't get to write it off twice. I don't care whether it's dollars or widgets or grain or bitcoin or books. I do it once and it's in a ledger once. I have an initial allocation. I capitalise it into the second one. If I put |

Page 14 of 45

CONFIDENTIAL

DEFAUS_00560331

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
| 5 |  | 20,000 in here, then I have 20,000 to use. If the first thing says - say we start off with 100,000 hand I go, 20, 20, 20, 20 and whatever else, then this one eventually goes down to zero and that one goes 20, 20, 20, 20, 20. There's no bloody dipping. It's quite simple. You have that goes to there. It's not double-dip because they go from there to there. |
|  | O'Mahoney | Okay. |
|  | Wright | The same whether it's cash, strawberries, grain, cars, anything. |
|  | O'Mahoney | Dr Wright, let me comment it this way: as at mid-2013 what was the maximum spending capacity of the group? |
| 10 | Wright | What do you mean "the maximum spending capacity"? |
|  | O'Mahoney | How much did the group - we've established that it relied upon the same funding source - how much did it have to spend? |
|  | Wright | 650 million. |
|  | O'Mahoney | 650 million dollars? |
| 15 | Wright | Approximately. If you look at the value of bitcoin and the amount transferred. |
|  | O'Mahoney | And what would be the best document for us to look at to see that? |
|  | Wright | When you look at the loan document, the amount transferred, you can look at the - just go to xe.com, have a look at what it's actually valued at and it's on a public website. |
| 20 | O'Mahoney | So just be clear, just be clear, the spending capacity of the group was 650 million dollars as at mid-2013. That's your recollection? |
|  | Wright | Yes. |
|  | O'Mahoney | And as transactions were entered into it, presumably, that spending compassion decreased; is that true? As transactions are entered into - - - |
| 25 | Wright | External transactions, yes. |
|  | O'Mahoney | But not internal ones? I'm just wondering why you made that distinction. |
|  | Wright | Well, because if I paid ….. |
|  | Sommers | ….. |
|  | Wright | You said the group, okay. |
| 30 | Sommers | You did say group. |
|  | Wright | If I go from group to group, then the group doesn't change. There's no bloody double spending here. Don't try and catch me with that bullshit because, look - - - |
|  | Sommers | ….. |
| 35 | O'Mahoney | Dr Wright, there's no one trying to catch you with anything. I'm trying to ask questions that enable clarification and - - - |
|  | Wright | If it goes from group to group and you're saying does the group change? No. That simple. |
|  | Sommers | So an intragroup transaction doesn't deplete the resources of the group taken as a whole. |
| 40 |  |  |
|  | O'Mahoney | No. |
|  | Sommers | That's all Dr Wright is saying, I think. |

CONFIDENTIAL

DEFAUS_00560332

1507

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | Okay. |
| | Sommers | Whereas an extra-group transaction, a group transaction from a group member to an external party will deplete the sources of the group. |
| 5 | O'Mahoney | And, in any event, is the net effect is that at any point in time there's no record that could paint a picture of the financial position of the trust and show how much has already been spent by way of interest transfer? |
| | Wright | Are we talking - - - |
| | Sommers | The trust or the loan? |
| | Wright | - - - the trust or the loan? |
| 10 | O'Mahoney | The loan, the funding mechanism. |
| | Sommers | So Greg is asking at any point in time could you identify how much was left of the loan that was unexpended? |
| | Wright | Of course I could. I go and I look at the accounting sources and I have I go - I add it up. |
| 15 | O'Mahoney | All right. Was there a record of that? |
| | Wright | Yes. |
| | O'Mahoney | There was? |
| | Wright | Yes. |
| 20 | Sommers | Is there a single document or is it able to be aggregated out of the Zero records? |
| | Wright | I have a set of ledgers, not a single ledger. Each individual entity in the group has its own ledger. |
| | O'Mahoney | All right. I mentioned earlier that consideration, I think you understand, is an important part of the dispute. |
| 25 | Wright | Mm. |
| | O'Mahoney | Whether or not there was consideration. |
| | Sommers | Actually, I would say it's entirely irrelevant. |
| | O'Mahoney | All right. |
| 30 | Sommers | And we've made this submission to the Commissioner on the basis that they're accruals-based taxpayers and provision of the consideration has nothing to do with their ability ….. the provision ….. has nothing to do with their ability to claim an input tax credit. So I would like you to bear that in mind. |
| | O'Mahoney | Certainly, and that's a point on which minds might differ, but can I ask this - - - |
| 35 | Sommers | I beg your pardon? |
| | O'Mahoney | I said that's a point on which mind might differ. |
| | Wright | How? |
| | O'Mahoney | As to whether or not consideration is an issue - - - |
| | Wright | How? |
| 40 | O'Mahoney | - - - in this dispute. |
| | Wright | How? |

CONFIDENTIAL

DEFAUS_00560333

1508

Interview Conducted with Craig WRIGHT

| | O'Mahoney | Well, I want to ask you a question that just is quite specific. You have been asked some questions by the Commissioner about how these transactions were paid for; is that correct? |
|---|---|---|
| | Wright | Yes. |
| 5 | O'Mahoney | And in answering those questions you've sought to give honest accounts. |
| | Wright | Yes. |
| 10 | O'Mahoney | Could I just show you one document that I've been shown which is - I guess it could be summarised as a Q & A type document and it's titled "Items for Clarification". I will just show you the document. If I could draw your attention, I've got it marked here. It's question 1 and the answer to question 1. I should just read it onto the record. The question is, "Coin Exchange claim GST credits on the DeMorgan invoices totalling 38-odd million dollars. The tax invoices stated that they were paid. When and how were they paid? If paid by bitcoin, how did Coin Exchange obtain the bitcoins?" and the answer on this page is, "Coin Exchange received bitcoin as a shareholder capital subscription event. Payment details are in Zero. They are paid in bitcoin. This is reflected in the total equity for the company. The sale follows the format I was instructed in writing by the ATO to use. The IP transfer is for banking software sold from Baraka." Do you want to just have a quick look at that document? |
| | Wright | Mm. Is that answer correct? |
| 25 | Wright | It's one way of putting it. It's not the full thing. It doesn't go into the exact details of all of that. It doesn't go into how the transactions occurred and it doesn't go into the rights and issues and whatever else which got drilled down into again and again and again. |
| | O'Mahoney | But there's no mention in that answer at all, correct me if I'm wrong, of rights of loans of equitable interest; is that right? |
| | Wright | How I did a loan - - - |
| | Sommers | What daylight is this ….. |
| 30 | O'Mahoney | I will get instructions on that. Do we have - do we know the date that was - - - |
| | Wright | I can find them for you ….. |
| | Sommers | Every date's our - my concern in relation to this is this is a document that was prepared and answered by Dr Wright without the benefit of legal advice. |
| | O'Mahoney | Okay. |
| 35 40 45 | Sommers | It wasn't until the meeting we had in February in 52 Goulburn Street where I represented Dr Wright that we were aware of the difference in the way in which transactions had occurred, the difference between what Dr Wright saw as transactions involving bitcoin and the way in which they were actually done, and it was at that meeting I became - well, prior to that meeting, and we sought to explain it to the Commissioner at that meeting, attempted by ….. and Mr Lieske that, actually, there had been a difference in the way in which transactions had been explained in the past and the way in which we now saw them, and we were quite upfront and honest in relation to that difference, and following that meeting Mr Cheshire and Mr Miller here were tasked with ….. by Mr Lieske for the Commissioner were tasked with the process of - this is our understanding of the transactions having now got the benefit of legal advice in relation to them, let's have an impact in relation to business activity statements. So we have been through this at considerable length ….. |

CONFIDENTIAL

1509

DEFAUS_00560334

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | No. I appreciate that. |
| | Sommers | - - - transcript in relation to that February meeting. |
| | O'Mahoney | I appreciate that. |
| 5 | Sommers | We were quite clear in relation to there had been a change in the way in which we had seen the transaction. So this evolution in the thinking is neither new nor is it novel in relation to this particular matter - - - |
| | Wright | ..... |
| 10 | Sommers | - - - and the difference, as I explained at that meeting, was if you see bitcoin as money, as currency, transacting in equitable rights in relation to currency is, you know, in many ways the same as dealing in money in the sense that you're moving around a company sharing the common bank account. It's no different in Dr Wright's mind to a group of companies sharing a common bitcoin wallet, but in reality there was no transfer in relation to the bitcoin from one wallet to another. In those circumstances where there is no movement of bitcoin from one wallet to another, it's difficult to see there has been a "payment in bitcoin". |
| 15 | | |
| | O'Mahoney | So - - - |
| | Sommers | So I'm not quite sure the point of going back to a document that specifically predates - - - |
| 20 | O'Mahoney | I just want to - - - |
| | Sommers | - - - a disclosure to the Commissioner about the way in which the transactions have been treated and the difference in the evolution on that thinking. |
| | O'Mahoney | But the point is, I guess, to ask Dr Wright for some explanation as to the inconsistency, and it's only - - - |
| 25 | Sommers | ..... |
| | Wright | Because I call it money. |
| | Sommers | I think there's ..... |
| | Wright | I keep calling it money; I call fiat crap. |
| 30 | Sommers | I think there's an explanation to that inconsistency on the record in relation to that February meeting, and I would refer you to that. |
| | O'Mahoney | Right. I appreciate that. The - - - |
| | Wright | I keep saying that - - - |
| | Sommers | Craig - - - |
| | Wright | Sorry. |
| 35 | O'Mahoney | If I could ask this: beyond what has just been said, Dr Wright, are there any other reasons why there was no mention made at this stage of the interest, the equitable interest that was transferred - - - |
| | Wright | What's it got to do with GST? |
| | O'Mahoney | - - - for the consideration. |
| 40 | Wright | What's it got to do with GST? |
| | O'Mahoney | I just want to understand - - - |
| | Wright | I was being queried on GST. |

CONFIDENTIAL

1510

DEFAUS_00560335

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | - - - there's just no mention here to - - - |
| | Wright | What has it got to do with GST? In I get a loan from a bank and fund things, what does it have to do with GST? |
| 5 | O'Mahoney | I'm just trying to understand this answer, Dr Wright, and I don't think that's responsive. |
| 10 | Wright | Well, no. I get a loan. I have money in the ledger that is my bank account, because it's not actually money, it's a ledger. I have to pay back that loan and have interest. I buy something with the money that is now in the ledger that is my bank account using my credit card. It is consideration. Do I go to you and go, "Oh, well, actually, I funded this using a loan and paid interest" for a GST query. Where do I get that - I'm sorry, you keep saying that, basically, this is something separate. I call bitcoin money. I don't care whether you do or not. It is. |
| 15 | O'Mahoney | Out of fairness to you, can I put this to you: is it the case that the position, that your position in terms of how payments were made for the relevant supplies changed following modification from the Commissioner of the Commissioner's position as to the tax consequences of using bitcoin - - - |
| | Wright | No. |
| | O'Mahoney | - - - as consideration? All right. |
| 20 | Wright | It was always set up so that bitcoin would never come into Australia until there was a tax position. I had been approaching people in the ATO not just - for ages before that. I slowly worked my way up to dealing with Michael Hardy. I'd been trying to get all this dealt with, with him. |
| | O'Mahoney | Okay. |
| 25 | Sommers | And there's an annotation on the deed of loan to that effect. |
| | O'Mahoney | Tell me this: when these entities transact with one another using the consideration that you've referred us to, how is it reflected in the books and records of the individual entities? How is this, the consideration, reflected in the books and records of the separate entities, the financial accounts? |
| 30 | Wright | With rights to a bitcoin wallet and we distribute. We pay invoice and it all gets matched up. |
| | O'Mahoney | And in practice what has happened to those rights? |
| | Wright | Sorry, what do you mean by "what has happened to those rights"? |
| 35 | O'Mahoney | Well, if I - let's just say I'm running a business and I sell a whole lot of cricket bats for cash and I obtain that cash and with that cash I might reinvest it in the business, I might expend it on any number of things. The interest that is transferred, how is it being used, if at all? Well, what's being done with the consideration? |
| | Wright | Into the companies. |
| 40 | O'Mahoney | Yeah. |
| 45 | Wright | Well, first of all, we capitalised so that we had the shareholding done for each of the entities. It's not just me. That's why the knock-on thing, they're all different. We put in the value of the software that we purchased, the main bit being the external stuff, and at the moment - and Andrew is working on how I distribute this one without getting into this sort of problem at the moment that we have, which is I've been buying a whole lot of computer equipment. |

Page 19 of 45

CONFIDENTIAL

DEFAUS_00560336

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | All right, but - - - |
| | Wright | And the current way, Andrew's task is to try and figure out some sort of agency agreement in the trust to each of the things so that there's no GST transmitted internally in the group which I would have loved to have done the first time and not had all this problem. I mean, the idea was not to have to go negative, positive or anything like that. It was just to capitalise the damn things. |
| | O'Mahoney | Can I just ask what you mean by that? The first part of that answer you gave immediately before then was you said "the first thing we did was capitalise them", or you used the word "capitalise". What do you mean when you use that word? |
| | Wright | What do you mean? What do you mean "capitalise"? "Capitalise" is a fairly standard word. It's put the value of capital in. |
| | O'Mahoney | Well, in talking about what was done with the consideration, how does that word "capitalise" apply? |
| | Wright | I issue - say I have a 10 million dollar capitalisation, I issue something to the value of 10 million dollars to a particular entity. |
| | O'Mahoney | And is that what you did? |
| | Wright | Yes. |
| | O'Mahoney | And did Coin Exchange, did the entities that transacted with Coin Exchange do that? |
| | Wright | Yes. |
| | Sommers | ….. when - stop, rewind. When you say the entities that transacted with Coin Exchange, do you mean the shareholders or do you mean the company, the contracting parties? |
| | O'Mahoney | It's just not clear to me what is done with - when you say the consideration is used to capitalise bit, to inject funds into - - - |
| | Wright | Yes. |
| | O'Mahoney | Do you mean that? Okay. So how does that - - - |
| | Wright | Shareholders put funds in companies. |
| | O'Mahoney | All right. So I understand that and I certainly understand the idea of capitalising, using capital to improve the financial position of a company. How does the transfer of this equitable interest in bitcoin achieve that? |
| | Wright | It has value. You're losing me. I mean - - - |
| | O'Mahoney | Well, how - - - |
| | Wright | - - - bitcoin is money. You can argue all you want. It is money. |
| | O'Mahoney | Okay, but how is it that having received this equitable interest in bitcoin, how is it that a company is able to strengthen its capital position? |
| | Sommers | Sorry, are you saying that you don't accept that the equitable interest in the bitcoin is an asset? |
| | O'Mahoney | Well, I'm just curious to hear from Dr Wright about how it is that this interest is able to capitalise as you say, the company. |
| | Wright | If I have the right to gold bars and I transmit for shares, then I've capitalised a company. |

Line numbers in left margin: 5, 10, 15, 20, 25, 30, 35, 40

CONFIDENTIAL

1512

DEFAUS_00560337

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| 5 | O'Mahoney | Right.  Tell us this, the - I will ask you some questions now about the entity WNK, and we touched upon this a little bit last week.  There's a number of questions that arise in my mind in respect of WNK, and I will just go through them one-by-one.  The first is I understand from the Supreme Court proceeding pleadings that we discussed last week that there's reference in there to a transaction between yourself and WNK that occurred in something like January of 2009. |
| | Wright | Yeah. |
| | O'Mahoney | That occurred in the financial year that - - - |
| 10 | Wright | Well, not January 2009.  That's incorrect. |
| | O'Mahoney | All right, that occurred sometime in 2009.  I don't think the specific date is important. |
| | Wright | I think it is. |
| 15 | O'Mahoney | Well, not in this sense.  We've got some information that WNK wasn't in existence at that time.  How is it possible that prior to its - - - |
| | Wright | The transactions happened after the ATO issues, so that was 2010/11. |
| | O'Mahoney | I have seen in the pleadings some reference to some early transfers involving WNK that date back to 2009. |
| | Wright | And my pleadings probably are incorrect in a few places. |
| 20 | O'Mahoney | But you gave instruction in respect of those pleadings. |
| | Wright | I wrote those pleadings. |
| | O'Mahoney | Right. |
| | Wright | I told you that last week. |
| | O'Mahoney | Okay. |
| 25 | Wright | And, no, I'm not professional qualified as a barrister and I don't do good pleadings all the time. |
| | O'Mahoney | No.  I know, but - - - |
| 30 | Wright | It was meant to be a non-hostile-type thing where the value of a contract that was signed just days before someone died was meant to be finalised.  That was it. |
| | O'Mahoney | All right. |
| | Wright | If David died a week later, it would have been finalised, and - - - |
| | O'Mahoney | Was it part of the problem that his illness was very sudden and his death was quite sudden;  is that - - - |
| 35 | Wright | His death was very sudden, yes. |
| | O'Mahoney | But had he been ill for some time? |
| | Wright | In all the time I've known him, but I didn't expect him to die. |
| | O'Mahoney | No.  I appreciate that. |
| 40 | Wright | I mean, he was in a wheelchair the whole time, and bloody lied and said how well he was doing and everything like that.  "Oh, I'm just going to hospital for X, Y, Z.  Oh, I will be out again soon", and he was still working in the damn hospital, so what am I meant to think. |

Page 21 of 45

1513

DEFAUS_00560338

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | Yeah. Okay. So when we see in the pleadings references to WNK transfer - a transfer involving WNK in 2009, which is prior to its inception, how are we to - I appreciate you're not legally trained, but how does one reasonably look at the assertion that an entity transacted prior to its existence? |
| 5 | Wright | You look at the emails and everything like that, that I had as supporting documents that deal with the transfers, the ones between myself and Dave, and look at the dates there. |
| 10 | O'Mahoney | All right. Moving on to another point of connection with WNK, there have been representations made to the Commissioner, as I understand it, that there were transfers of interests from WNK to you and then from you to DeMorgan in July 2013. Does that accord with your recollection? |
| | Wright | Yeah. I put everything to myself and then to the trust. The trust wasn't set up correctly and whatever else at first, so none of that happened as smoothly as I would have liked. |
| 15 | O'Mahoney | Okay. And by "everything' I think you mean IP sort of the software? So in the first instance it's transferred from WNK to you, and I think the date for that, that we've been given is 9 July 2013, and some days later there's a transfer from yourself to DeMorgan? |
| | Wright | Sometime in that quarter, yes. |
| 20 | O'Mahoney | Okay. Now, the first point is - - - |
| | Wright | It was meant to actually happen at the beginning of that year, but - - - |
| | O'Mahoney | Okay. |
| | Wright | - - - with Dave dying and all the rest ….. |
| | O'Mahoney | It was delayed. |
| 25 | Wright | Yeah. |
| | O'Mahoney | We might come back to that. The first question I want to ask you about this is the information we have which does appear to be pretty solid is that as at July 2013 WNK had actually been dissolved. It had been subject of - - - |
| 30 | Wright | Administratively dissolved because it hadn't paid a fee. The same as if I don't pay it to ASIC, that is - was paid subsequently and that is all forgotten. Basically Florida law is you don't pay your fee on time you're gone. You pay your fee and even if it's late, and the companies existed as if it never disappeared. It is not like it has been struck off here in Australia as in ASIC have made it a deregistered company. It's not the same thing. And I'm not an expert in Florida company law and I didn't go into what Dave was doing with the company and how well he was managing or anything like that. Wen didn't even know she needed to bloody pay things or file anything. |
| | O'Mahoney | Did you have the connection with WNK? |
| | Wright | Yes. |
| 40 | O'Mahoney | What were your points of connection with it? |
| | Wright | I was a shareholder and I was a friend of Dave's. |
| | O'Mahoney | And you were a shareholder at the time at which it became administratively dissolved? |
| | Wright | Yes. And no, I wasn't informed. |
| 45 | O'Mahoney | You weren't informed? |

Page 22 of 45

CONFIDENTIAL

1514

DEFAUS_00560339

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | No. At any point. |
| | O'Mahoney | When do you say you became aware that there was this issue? |
| 5 | Wright | When you guys basically ….. Tax Office said, "Ah-ha, it's been administratively dissolved", and then I called Wen and went, "Do you realise you have to pay the corporate fees?" and she went, "What does that mean?" |
| | O'Mahoney | And - - - |
| | Wright | And then I said, "Well, we're going to put you through a director's course." |
| | O'Mahoney | And do you say that you've been told that or you understand that companies that are administratively dissolved in Florida are able to transact? |
| 10 | Wright | Any transaction that they've done is considered valid as long as the ….. has been reinstated. |
| | O'Mahoney | And what's given you that understanding? |
| | Wright | People from Sunbiz. |
| | O'Mahoney | What's Sunbiz? |
| 15 | Wright | Sunbiz is the equivalent of ASIC in Florida. |
| | O'Mahoney | And tell us this: that's the first part of that, I guess, transfer, set of transfers, the transfer from WNK to you, and then we know about the transfer from you to DeMorgan some days later in July of 2013. The curious thing about that latter transfer is - and I'm sure you're aware of this - that that transfer predates the establishment of the trust and the registration. |
| 20 | Wright | No. It predates the registration of the trust. |
| | O'Mahoney | The registration of the business. When you say it doesn't predate the establishment of the trust, what do you say is the date of the establishment of the trust? |
| 25 | Wright | Properly established or initially made a mess of? |
| | O'Mahoney | Okay. Well, let's go through both of those. |
| | Wright | Initially it should have been back in June. |
| | O'Mahoney | June of which year? |
| | Wright | 2013. |
| 30 | O'Mahoney | Okay. So you say the trust should have been established about a month before this transaction? |
| | Wright | Yes. It was finally done correctly and fixed in late September. |
| | O'Mahoney | Okay. And why do you say it should have been established then? |
| | Wright | Because I paid lawyers to establish a mere trust. |
| 35 | O'Mahoney | Who did you pay? |
| | Wright | Lloyds. |
| | O'Mahoney | And with what? Did you give them specific instructions to have a trust established as at June 2013? |
| | Wright | I wanted it as soon as possible. |
| 40 | O'Mahoney | When did you give those instructions? |
| | Wright | I first talked to them in June 2013. |

CONFIDENTIAL

1515

DEFAUS_00560340

Interview Conducted with Craig WRIGHT

|   | | |
|---|---|---|
| | O'Mahoney | Say that again? |
| | Wright | June 2013 ask when I first started talking. |
| | O'Mahoney | When you first started talking, when did you give specific instructions about establishing a trust? |
| 5 | Wright | Off the top of my head, I don't know. |
| | O'Mahoney | Would you have documents indicating - I think you've indicated that you - it should have been established in June of 2013 pursuant to instructions you gave. |
| 10 | Wright | I've got documents to Jamie Wilson bitching about the fact that it wasn't set up correctly. |
| | O'Mahoney | Okay, but what about - would you have any documents that show that you gave instructions for a trust to be established by June 2013? |
| | Wright | I didn't say by June - - - |
| | O'Mahoney | Or during. |
| 15 | Wright | I said - I said I want to set up a trust. |
| | O'Mahoney | Okay. Wanting something is one thing, I think you would appreciate, and having it happen is another. When - - - |
| | Wright | Yes. But if I go to a lawyer and say, "I want you to set me up a trust", I'd generally expect that it will happen. |
| 20 | O'Mahoney | All right. And I'm just asking would you have the records that indicate when you wanted that to happen by? |
| | Wright | As soon as they could. |
| | O'Mahoney | It was the instructions ..... more specific than that? |
| | Wright | No. I didn't say set me up one on 13 June or anything like that. I just said - - - |
| 25 | O'Mahoney | Okay. And when did they set up the trust? |
| | Wright | The first iteration was in July; the second iteration, and that was the crap document - - - |
| | O'Mahoney | Which document is that? |
| 30 | Wright | It was a trust deed that was wrong, all the names were wrong, everything else walls wrong. It came back in August. |
| | O'Mahoney | Who was named in that trust deed? |
| | Wright | I can't remember. |
| | O'Mahoney | You say the names were wrong. |
| | Wright | There was no mention of my current wife or anything like this that I wanted. |
| 35 | O'Mahoney | Okay. So the names of the actual parties to the trust were wrong? |
| | Wright | Yes. |
| | O'Mahoney | And how does that come about? |
| | Wright | Jamie was useless. I left Jamie in charge to do some things and Jamie, God knows what the fuck he did. Excuse the language. |
| 40 | O'Mahoney | All right. |

CONFIDENTIAL

DEFAUS_00560341

1516

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I have a bit of animosity with Jamie, as you might guess. |
| | O'Mahoney | And you say this, that the wrong names were plugged into that trust; is that right? |
| | Wright | Yes. |
| 5 | O'Mahoney | And when was the actual trust established? |
| | Wright | In September. |
| | O'Mahoney | So, again, we've got this issue, and I would be grateful for your input on it, how is it that a transfer of significant value was made to a trust prior to its establishment and registration? |
| 10 | Wright | The transfer didn't actually occur until September. |
| | O'Mahoney | Well, I - - - |
| | Wright | They were - I mean - - - |
| | O'Mahoney | I'm pretty sure I've seen - - - |
| | Wright | - - - the actual - - - |
| 15 | O'Mahoney | Sorry, I - - - |
| | Wright | If you look at the things, the actual transfer happened in September. It was backdated. It was meant to happen in the beginning, so the actual transfer happened when everything was there, but if you look at the logs and everything like that in Zero, it all says when it actually occurred, which was - I don't remember the exact date, but in September. I didn't really care because it was still the same quarter. I mean, yes, Andrew and everyone calls me up and says, "No. You can't do that", but at the end of the day I don't see why it's such a big issue because July, August, September, it's the same GST reporting quarter. So the fact that I've got something in Zero that's not actually totally correct - yes, it's a muck up and, yes, I'm trying to do thick better now. I don't do any accounts any more. I don't do any of the legal things. He does the bloody contract management now. I don't do any of that. I'm looking at paying bloody two million dollars a year to KPMG to go through these things so that I don't mess it up any more. That's what I'm doing. Instead of running my bloody business and actually doing my research, I'm spending my time administratively for half my time trying to make sure the ls are dotted and whatever else when it makes no difference. I know everyone gets upset. You say a difference. It's me - something I did to something I did where it cancels out. These ones we're talking about are all zero value. |
| 35 | O'Mahoney | So just to be clear on that, Dr Wright, do you say that if a company or a trust was established on 16 July 2014, say, it wouldn't make any difference if it was 16 July or 16 August or 16 September? |
| | Wright | If I back - no. If the actual thing happened after the thing really existed and we put a backdated invoice, I don't see why it matters. It's still in the same quarter. It makes no difference to you guys. I know you're being pedantic and you're - - - |
| | O'Mahoney | But is that what you say happened here, that there was a backdated invoice? |
| | Wright | Yes. I can show you that in Zero. |
| | O'Mahoney | And by "backdated" you mean - - - |
| 45 | Wright | I meant I covered the whole period for the year. It was meant to be a year, so I made it 1 July and put "1 July" on the thing because Jamie had fucked it up |

CONFIDENTIAL                                                                DEFAUS_00560342

1517

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
| | | and I went in and changed it and tried to make it correct, and I made a fuck up and I've done that many times and this is why I'm not touching accounts any more, why I have a professional accountant working for me who does all this now, why I have him as my contract management person. |
| 5 | O'Mahoney | Okay.  No.  But, Doctor, just to focus, that it's certainly been asserted to the Commissioner that this three-way transfer started on 9 July, WNK to you, then proceeded on 16 July, you to DeMorgan.  Do you accept that - - - |
| 10 | Wright | The actual thing didn't finalise in the Court until after that.  The court said will occur by 30 September, and the actual final date, if you like on it, didn't happen until after that. |
| | O'Mahoney | So can you explain how it is that the Commissioner has been told that both of these transfers occurred in July? |
| | Wright | I did the thing and put an invoice that said July. |
| 15 | O'Mahoney | That is clear, but how is it that it has been said to the Commissioner that these transactions occurred in July? |
| | Wright | Because I still see that's not a problem.  You guys do. |
| | O'Mahoney | So you think dates are just fungible, that ….. |
| 20 | Wright | No.  I think it's all in the same period.  I think the trust wasn't registered for GST, but it ended up in that same period being registered for GST, so it transacted in that.  So, yes, I consider this isn't an issue because no one has been ripped off anything.  No one is out of any money.  I mean, at the end of the day it's a transaction where it zeros out for these ones. |
| | O'Mahoney | So you would say it's a net sum gain? |
| | Wright | Net zero. |
| 25 | O'Mahoney | Okay. |
| 30 | Wright | And I don't think that was a problem.  I mean, I was already planning it before then, I was planning the trust, I was planning everything else.  I went to the ATO and told them that I was planning all of this, actually months before, and that's how I got the PBR.  So it's not like I've gone and tried after the fact to hide anything.  I went to the Commissioner and said, "Look, this is what I've got", and they went through everything about how I'm doing it before they gave me the damn thing. |
| 35 | O'Mahoney | But what has happened in that process, Dr Wright, in fairness, is that you've gone to the Commissioner and said that two transfers occurred in July of 2013.  The Commissioner has looked at those transfers and seen that the second one predated the existence of one of the parties to the transactions.  You can see the issue that arises. |
| | Wright | Then I will change the date on the invoice to actually when it occurred, which is in September, which is the same quarter which makes no difference. |
| 40 | O'Mahoney | Okay.  I will just give you just one more opportunity to answer.  You say that, but why was it that it was said that both of these transfers occurred in July of 2013? |
| | Wright | Because I'd planned to have them transferred then. |
| | O'Mahoney | So was it aspirational recording of dates? |
| 45 | Wright | If I have a trust - I mean, a trust can be in common law set up because I go and say did, "I set up a trust with you."  From a common law point of view a |

Page 26 of 45

1518

DEFAUS_00560343

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 |  | trust doesn't need to be registered for GST or anything like that. The fact that I've been mucking around with a group of lawyers who couldn't get the damn thing right, and it was done in the same quarter, I don't see why that should be a big issue. Why are we doing a - why are we wasting so much time on a zero sum thing? |
|  | O'Mahoney | Let's move to another issue, Dr Wright. Last week we spoke about the software from Siemens. |
|  | Wright | Yes. |
| 10 | O'Mahoney | And you indicated that it was - there was specific types or classes of software that related to - there was within the Siemens software, there were different - I can't remember the word you used, you might be able to assist he, but "suites" of software, I think, might have been the word that was used. |
|  | Wright | ….. I can't remember ….. |
| 15 | O'Mahoney | Different suites of software. Can you remember - do you know the names of the suites of software? |
|  | Wright | Do you remember how many pages there were, Andrew? |
|  | O'Mahoney | If the answer is "no", Dr Wright, the answer is no, but I'm asking the question: do you know the names of those suites? |
| 20 | Sommers | I don't understand. The names of the suites of all Siemen software or the names - - - |
|  | O'Mahoney | No. The ones that we were discussing last week - - - |
|  | Sommers | The ones were required. |
|  | O'Mahoney | - - - that were acquired. Yeah. |
| 25

30 | Wright | The exact Siemens names, no, but I gave a list to the ATO. You had a forensic auditor come out. A guy who has got a really good reputation for this sort of stuff, and sat down with me and basically looked at all the - he looked at the licencing that was in my name. Yes, I guess there's also a possibility that there could be another Craig S Wright out there who has bought a big whack of Siemen software and I could have just happened to have also had his - - - |
|  | O'Mahoney | Okay. The software itself, have you taken steps to ensure that it's licenced? |
|  | Wright | Did we go through this? I sat down with the ATOs forensic person and logged into the Siemens site and downloaded software based on my licence in front of them. |
| 35 | O'Mahoney | But has it become an issue for you whether or not you did obtain licenced software? |
|  | Wright | It's in my name. I don't really care. If there's another Craig S Wright who was licenced for all the stuff I had, exactly, and I got issued his licence, I would find that a remarkable coincidence. |
| 40 | O'Mahoney | Is there no dispute between you and Mr Ferrier in respect of - - - |
|  | Wright | Of course there's a dispute. |
|  | O'Mahoney | Okay. What's the nature of that dispute? |
|  | Wright | He didn't give me my bloody gold. |
|  | O'Mahoney | Gold? |

CONFIDENTIAL

1519

DEFAUS_00560344

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | Yes. |
| O'Mahoney | Was that in respect of these transactions? |
| Wright | No. |
| Sommers | No. It's got nothing to do with the Coin Exchange. |
| 5 | O'Mahoney | All right. |
| | Wright | He owed me 20 million dollars of fricking gold and he fricking scarpered. |
| | O'Mahoney | Okay. All right. There's no dispute between you and him, I take it, as to whether or not you acquired software that was licenced. |
| | Wright | It works. |
| 10 | O'Mahoney | It works, but that's a different answer to - - - |
| | Wright | I can log into Siemens and ….. |
| | O'Mahoney | No, no. Is there a dispute between you and Mr Ferrier as to whether or not you acquired software that was licenced? |
| | Wright | No. |
| 15 | O'Mahoney | Last week you said that there were some negotiations. Last week you said - I asked you whether the negotiations with Mr Ferrier in respect of said software were reduced to writing, you might recall, and I think an answer was given that there was Skyping involved, that there was some negotiation over Skype, and I learnt from you that you can actually write whilst Skyping. There is a messaging service on Skype, and I have seen some documents that reflect the discussions you've referred to between yourself and Mr Ferrier. Unfortunately, I've also learnt in the last week that when you print out Skype messaging documents they go over pages and pages and makes it very, very difficult to - - - |
| 20 | | |
| 25 | Wright | Yes. They don't ….. |
| | O'Mahoney | - - - read. Could I just get you to look at the most legible of the documents I was able to print out. If you could just cast your eye over that. |
| | Wright | What am I looking at, sorry? |
| | O'Mahoney | Just the text, I guess. |
| 30 | Wright | My spelling errors or - - - |
| | O'Mahoney | No. It's not a spelling test. |
| | Wright | Okay. |
| | O'Mahoney | It's just this one, have a quick look at it. |
| | Wright | I can do better when I - anyway. |
| 35 | O'Mahoney | Does that accord with your memory? Are they examples of the negotiations and the discussions you were having? |
| | Wright | They look like some of my Skype things that I had - - - |
| | O'Mahoney | With Mr Ferrier. |
| 40 | Wright | I had - I mean, can I say that you altered any of them? I don't believe that would be the case. I - they look about right. |
| | O'Mahoney | Okay. |

Page 28 of 45

CONFIDENTIAL

DEFAUS_00560345

1520

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I haven't memorised my Skype communications with Mr Ferrier. |
| 5 | O'Mahoney | No.  The only thing that occurs to me just reading through the Skype documents that I've looked at is that when one thinks for the values of the transactions that occurred, is it really the case, Dr Wright, that they were the only written records, that these Skype exchanges are the only written records of the negotiations between you and him? |
| | Sommers | Negotiations or the agreement? |
| | O'Mahoney | The negotiations. |
| 10 | Wright | Why would I need written records other than this for negotiations?  You put things in a contract at the end. |
| | O'Mahoney | All right.  And - - - |
| | Wright | I don't do that now.  Even buying a house I don't do it in writing. |
| | O'Mahoney | There was nothing more formal than these exchanges on Skype that was reduce today writing? |
| 15 | Wright | What's ….. this is evidence. |
| | O'Mahoney | No.  I'm just asking.  And the actual agreement that was reached as well between you and Mr Ferrier, to what extent was that reduced to writing? |
| | Wright | It was a contract. |
| | O'Mahoney | But were there drafts of the contract? |
| 20 | Wright | Most likely. |
| | O'Mahoney | Do you have - - - |
| | Wright | Did I keep all the drafts?  No.  I don't now.  Why would I keep drafts of contracts?  I don't keep Andrew's stuff in draft either. |
| | O'Mahoney | Looking - - - |
| 25 | Wright | I keep the one that actually matters.  I mean, what happens if I go to court with a draft contract?  Will the judge look at it? |
| | O'Mahoney | All right. |
| | Wright | No.  I'm - it's a question for you.  Will a judge look at a draft contract? |
| 30 | O'Mahoney | Unfortunately, Dr Wright, I get to ask the questions and you get to answer them today, but can I show you this summary.  That's a summary that's a little neater to read of the Skype exchanges that we've got before you will.  Just looking at that, one thing that strikes me is it's not clear at all, and it might be to you looking at those words.  It's not clear to me that it was clear to either of you what was actually the subject of the negotiation, exactly what software was the purchase of which was being negotiated.  Am I wrong about that? |
| 35 | | |
| | Wright | That's why there's voice call, voice call, voice call, voice call, voice call as well. |
| | O'Mahoney | Okay. |
| | Wright | We spoke to each other. |
| 40 | O'Mahoney | Okay.  And - - - |
| | Sommers | Perhaps you could explain to me what the point of this is.  I mean, can we short-cut this by asking Dr Wright, "Did you get the software you wanted?" - - - |

Page 29 of 45

CONFIDENTIAL

DEFAUS_00560346

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | Well - - - |
| | Sommers | Because I'm not quite sure - - - |
| | Wright | Yes. I did. |
| | Sommers | - - - what the point of - - - |
| 5 | O'Mahoney | I want to explore the extent to which the transaction occurred, and that is ultimately the question I'm coming to, and we're pretty well there. I mean, I just wanted to do the groundwork in terms of what consisted of the negotiations, to what extent were they reduced to writing? It sounds like there was certainly an ultimate contract, maybe some drafts, but you haven't kept them, I think, was your answer, and then - - - |
| 10 | | |
| | Wright | How do I deal with you most of the time, Andrew? In even big things? Andrew is doing a big contract thingy, whatever, agency agreement for me now, and most of it is, "These are my details, do it." |
| | O'Mahoney | Okay. |
| 15 | Wright | And Andrew might have a whole lot of documents, but - - - |
| | O'Mahoney | All right. Well, was there any issue - - - |
| | Sommers | ….. |
| | O'Mahoney | Yeah, that's right. They are privileged literally. Tell me this: was there any issue with the software that you obtained from Mr Ferrier? |
| 20 | Wright | It works. I don't have an issue with it now. It's still working. I demonstrated that to the ATO. I downloaded it in front of them. I went through a licencing process. I gave them licences. I don't - - - |
| | O'Mahoney | And you're satisfied that it is legally licensed software? |
| 25 | Wright | I'm satisfied that it's working, that there's a licence and I can log into the site and download. |
| | O'Mahoney | But two parts of - - - |
| | Wright | If I go to Microsoft - - - |
| 30 | O'Mahoney | Two parts of that answer are about things that have nothing to do with licensing. It's a simple question. Are you satisfied that you've got a legal licence to the software that you obtained from - - - |
| | Sommers | The way in which my client would answer the question is he has no reason to doubt the veracity of the licence that he has. He has logged into the site. It comes up with his name with the access codes that were given as part of the transaction. |
| 35 | O'Mahoney | And how is that licence recorded? If I buy a Microsoft product I get a very silvery Microsoft - - - |
| | Wright | No. That's a home user. We have volume licensing at work. I have a website, I log in and it's recorded with my name and the licences on the website and it's the same. |
| 40 | O'Mahoney | And pardon my ignorance, but is there a register, for example, of Siemens software that would show you as the licence - as - - - |
| | Wright | How can you ask my client to answer that question? |
| | O'Mahoney | Well, he might know. |

Page 30 of 45

CONFIDENTIAL

DEFAUS_00560347

1522

Interview Conducted with Craig WRIGHT

| | Wright | I've never worked for Siemens. |
|---|---|---|
| | O'Mahoney | No. It didn't come as a suggestion that you did. |
| 5 | Wright | I know I can go to their website, I can log in with a valid use your name and password that is Craig.Wright and my password and I can bring up something that says me and my address and my phone number and I can get a list of software and I can click any of it and I can download it, but I can put my details right in there and install it. That's why I care. |
| | O'Mahoney | But you know that - I mean, you know that from ordinary use of computers that the ability to log-in to something to something, I mean, I log into - - - |
| 10 | Wright | No, no, no, no. |
| | O'Mahoney | - - - subscription services. |
| | Wright | I know from - - - |
| | O'Mahoney | It doesn't mean that I'm a legitimate subscriber. |
| | Wright | No. That's bullshit. |
| 15 | O'Mahoney | In what way? |
| | Wright | I cannot ordinarily go to Microsoft and just log-in and download a copy of Office without paying for it. I'm well versed in security. Don't give me that crap. |
| | O'Mahoney | No, but - - - |
| 20 | Wright | You cannot go to a random site - I can't go to the ATO and just pick a random tax person and get all their details. I get a log-in to a third party site. |
| | O'Mahoney | But what facilitates, Dr Wright, what facilitates the ability to download it? Is it putting a code in, is it putting a password in or what it? |
| | Wright | User name, password. |
| 25 | O'Mahoney | All right. Well, let's just say everyone in this room are subscribers to a subscription service, say, an investor letter, but it is the case that people not in this room could plug in the user name and the password who are not legitimate subscribers. Do you accept that? |
| 30 | Wright | So you're saying that a random person out there with a user name Craig.Wright who logs in and gets my address, my phone number, which your guys have verified, I sat there with multiple ATO people on multiple occasions and logged in to Siemens and came up with - and showed them my address, my site - - - |
| 35 | O'Mahoney | Can I ask this: did you seek advice during this transaction to ensure that you were getting a licence, licenced software? |
| | Wright | I don't do that. I negotiated last year a group thing with Microsoft that was worth about a million dollars and I didn't go to Andrew and get advice on that one. |
| 40 | O'Mahoney | Because I've done some research during the week and there does seem to be an issue globally of people acquiring unlicensed software. |
| | Wright | No, no. You're talking about going to a tour site and downloading something illegal that has been cracked. I'm talking about going to Siemens, the manufacturer - - - |
| | O'Mahoney | And you say that's what you've done? |

Page 31 of 45

CONFIDENTIAL

DEFAUS_00560348

1523

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | Okay. |
| | Wright | In front of your - their people. |
| | O'Mahoney | Okay. |
| 5 | Sommers | And provided screen dumps of the log-ins with it. |
| | O'Mahoney | Okay.  Well, we know that it works. |
| | Wright | Andrew was actually.  What did it say? |
| | O'Mahoney | I was just - I was wanting to probe you on - - - |
| | Sommers | Greg's not interested in my answer. |
| 10 | O'Mahoney | We know that it works.  I was just wanting to probe you on whether or not it is properly licensed and I don't think we can take that much further, frankly. |
| | Wright | As far as I'm concerned, it's properly licensed.  I went to the Siemens site.  If someone had some dealing with a third party - I mean, the only way I can see this not being properly licensed is if Siemens in Germany had someone who had a relationship with Mr Ferrier and illegitimately licensed or gave me a licence to their site and a back door. |
| 15 | | |
| | O'Mahoney | I thought you said last week that you had some concerns now about Mr Ferrier's back story; is that right? |
| | Wright | Yes, but I don't know about the software.  I got my software. |
| 20 | O'Mahoney | Okay.  Those concerns haven't made you concerned about whether or not it was actually a legal licence that you obtained? |
| | Wright | I can log in to a third party - - - |
| | O'Mahoney | There's no doubt it works. |
| | Wright | - - - site - - - |
| 25 | O'Mahoney | You've made that clear, Dr Wright. |
| | Wright | - - - and it works. |
| | O'Mahoney | It works.  We've established that. |
| | Wright | That's what I get.  I mean, I am a buyer in good faith.  It works. |
| | O'Mahoney | All right. |
| 30 | Wright | That's all I care.  I have a cryptographic key that works and gives me access.  If some sort of nefarious deal was done between an employee of Siemens, for instance, and Mr Ferrier, that didn't involve Siemens, then that's not my problem, I don't really give a rat's. |
| | O'Mahoney | Do you know anything about such - - - |
| 35 | Wright | No.  I don't.  I'm just giving a hypothetical. |
| | O'Mahoney | All right.  Now, looking at another issue, which is the IP licence agreement between you as licensor and coin Exchange as licensee, I think it's dated 22 August 2013 - - - |
| 40 | Wright | The first one or the second one?  The first one was a messed up one and then there was a resigned one where it was meant to go through the trust. |
| | O'Mahoney | I'm interested in the one dated 22 August 2013. |

Page 32 of 45

CONFIDENTIAL

1524

DEFAUS_00560349

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I can't remember which is which. They're both the same date as far as I know. |
| | O'Mahoney | Okay. Well, let's just talk about them in globo. Tell us about the circumstances that gave rise to that licence agreement. |
| 5 | Wright | Software put into company. |
| | O'Mahoney | Which software? |
| | Wright | The banking software and some of - there's a list. I can't remember which bits I distributed to which things off the top of my head. There are hundreds of bits of software - - - |
| 10 | O'Mahoney | Okay. But some banking software? |
| | Wright | - - - and I have given it - sorry? |
| | O'Mahoney | Some banking software? |
| | Wright | The list has been given. I am not memorising which business software I've given where. What I have is a series of documents saying where they are. |
| 15 | O'Mahoney | And did the company pay you - what consideration flowed in respect of this licence agreement? |
| | Wright | That's where rights came into it. |
| | O'Mahoney | All right. And what was the value of the agreement? |
| | Wright | Over the period it was in the order of 30 something million dollars or whatever. |
| 20 | O'Mahoney | For that consideration paid by way of - correct me if I'm wrong - rights to bitcoin? |
| | Wright | Yes. |
| | O'Mahoney | And by reference to the Seychelles trust that we've spoken about before; is that right? |
| 25 | Wright | The loan via, yes. |
| | O'Mahoney | Yes. Can you tell us when you say "the loan via", what does that mean to you? |
| | Wright | Are we going to say this again and again and again? |
| | Sommers | I believe so. Let's just press on. |
| 30 | Wright | I made a loan to a trust that I helped put stuff into in the first place. |
| | Sommers | You mean the wrong way around. |
| | Wright | I got - I mean, I had a loan given to me or what did the - however we want to say - the trust gave me right to access bitcoin. I have to repay it. How do the hell do I say that in loans? |
| 35 | Sommers | I know. |
| | O'Mahoney | And in relation to this IP licence agreement or agreements, were there negotiations between the licensor and the licensee? |
| | Wright | Did I negotiate myself? |
| 40 | O'Mahoney | I thought that was going to be your answer. I'm asking the question. Would there be any documents recording any negotiations in respect to that agreement? |

Page 33 of 45

CONFIDENTIAL

DEFAUS_00560350

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I did it at value. |
| | O'Mahoney | And how did you obtain an understanding of value? |
| 5 | Wright | Okay. For the stuff in what do you call it - WNK - then that was done by getting an analysis of the software, as in this is how many lines, this is how it's distributed, etcetera. That was then costed on standard accounting processes where I said treat it as high risk because it's ATO and the accountant comes back and goings, "That's too high, that's too high, that's too high, that's too high", and I reduced it. The original calculation was actually higher and I reduced the value until it was, "Yep, that's right, yep, that's right, yep, that's right" from an FCA, and that was actual. The other was at cost. It cost me this much, I transferred it for the same with over the years $100,000 or so handling fee maintenance or whatever else for the trust. |
| | O'Mahoney | Would there be any documents evidencing that valuation process? |
| | Wright | Yeah. You guys have - the ATOs of got it. |
| 15 | O'Mahoney | Did you engage anyone to value it or retain anyone's services to assist in putting a figure on the value of the software? |
| | Wright | Did I engage? |
| | O'Mahoney | Yeah. Engage in one? |
| | Wright | I got someone to do it. |
| 20 | O'Mahoney | Who was that? |
| | Wright | Well, I started with going over the COCOMO method and I spoke with my former boss and - former partner of EDO, Alan Granger, and discussed is this right and then we put together documents to do with the valuations. |
| | O'Mahoney | Where does Mr Granger work? |
| 25 | Wright | He's an accountant. He does his own stuff. |
| | O'Mahoney | Private practice? |
| | Wright | Yeah. |
| | O'Mahoney | And was he a former boss of yours? |
| | Wright | Yes. |
| 30 | O'Mahoney | And did he have - just describe for us in broad terms the input he had into the valuation process? |
| | Wright | He told me my initial figures were too high, too high, too high. Basically not that there's not many lines of code, but be less aggressive, treat it this way, that sort of stuff. |
| 35 | O'Mahoney | All right. And why were you so interested in valuation? |
| 40 | Wright | I wanted to transfer it into my companies. I wanted to get it right. It wasn't about tax. The tax for GST works out neutral. I just wanted to make sure the thing was right because I've got other shareholders who have smaller - I mean, not as large as mine, but I wanted to make sure I wasn't ripping anyone off. I've already got enough issues with small shareholders who are complaining that they're not getting enough and all the rest. |
| | O'Mahoney | Okay. |
| | Wright | So it wasn't a tax thing; it was making sure that the value of what I was putting into the companies was adequate so that I didn't rip-off the taxpayer - |

CONFIDENTIAL

1526

DEFAUS_00560351

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | the shareholders, that I didn't value it too high so that they would come back to me and go, "Oh, you're trying to share and dilute our shareholding." That's what it was all about. |
| 5 | O'Mahoney | You mentioned before the COCOMO method of valuation. Is that an accepted way of - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - valuing software? |
| 10 | Wright | Yes. I've - I pulled down things from the ATO training site. I have a friend whose IT manager in the ATO and I've also been to IT conferences by the ATO where that is listed. I've also got a number of internal documents from the ATO that I don't care what you do, I won't tell where I got them from, that say that it's valid. |
| 15 | O'Mahoney | All right. Well, I will ignore that cryptic final part of that answer, but focusing on the earlier parts of it, you mentioned a friend. Is it the case that a friend assisted you in the application of this COCOMO method? |
| | Wright | A number of people have assisted me. |
| | O'Mahoney | But in respect of this transaction, this licence agreement, did you have the input of a few other people? |
| | Wright | I had other people help me work on it, yes. |
| 20 | O'Mahoney | And who are they? |
| | Wright | Well, I don't actually call them a friend any more, Steve McLachlan. He got upset because he was going to be a shareholder and wasn't getting enough. |
| | O'Mahoney | Okay. And who else? |
| 25 | Wright | And then Jamie Wilson was also involved in some of it and I had a falling out with him because he also wanted to run off and sell all my bloody rights to bitcoins and everything like that. |
| | O'Mahoney | Anyone else? |
| 30 | Wright | Then there's other people involved in the companies now and it has been reworked and whatever else and checked, so Allan Peterson. I don't know, probably 10 other people. |
| | O'Mahoney | Okay. In respect of this specific transaction, this licence agreement, would there be any documents recording either you or the people that you've referred to applying this COCOMO method to come up with a valuation? |
| | Wright | I've got the COCOMO method. It's fairly simple, actually. |
| 35 | O'Mahoney | No, no, no. I'm not so much worried about what the method is. Time, I'm sure, won't permit you to describe it, but I'm more interested in would there be - - - |
| | Wright | It's a website. |
| | O'Mahoney | Okay. |
| 40 | Wright | You fill in the number of lines of code, which is not something that you get to lie about. It's how many lines are there. This many. You put in the figures and it spits out their analysis. |
| | O'Mahoney | This is really simply quantitative, it just comes down to. |
| | Wright | Yeah. |

Page 35 of 45

CONFIDENTIAL

DEFAUS_00560352

1527

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | Does that strike you as a funny way to value? |
| | Wright | Software?  No.  It's the - - - |
| | O'Mahoney | Does it have regard at all to the content of the coding? |
| | Wright | The type of coding, yes. |
| 5 | O'Mahoney | How does it do that? |
| | Wright | You have to put down what it is.  Like, if it's ….. coding, whatever else, but that's still a factual matter, is it this or is it, so - - - |
| 10 | O'Mahoney | Okay.  Well, I will come back to the question.  Will there be any documents recording anyone applying this valuation method, yourself included, to this licence agreement? |
| | Wright | Yes. |
| | O'Mahoney | And what documents, what are those documents? |
| | Wright | There are spreadsheets and there are - there's all the stuff how it got - - - |
| | O'Mahoney | Showing calculations? |
| 15 | Wright | Yeah. |
| | O'Mahoney | Showing - - - |
| | Wright | Showing how many lines of code, what kind of code it is.  All that's documented. |
| 20 | O'Mahoney | All right.  And looking at the actual agreement itself, it provides for the licensor having a right to certain intellectual property as software and it makes reference to clear title or title in the relevant software passing upon judgment in the Supreme Court proceedings.  Does that accord with your recollection? |
| | Wright | Yes. |
| | O'Mahoney | And one - - - |
| 25 | Wright | The exact terms I don't remember. |
| | O'Mahoney | Okay, but one curious feature of this is the Supreme Court proceedings didn't have judgment occur, if you like, or handed down until 6 November 2013. |
| | Wright | But the judgment was also that it would be applied as of 30 September. |
| 30 | O'Mahoney | All right, but can I ask you this question:  how is it that an agreement dated 22 August 2013 can in making provision for certain rights, how can it make reference to a judgment that has not occurred at that time? |
| | Wright | We thought it would happen earlier and the judgment said to be applied as of 30 September, so - - - |
| | O'Mahoney | But the judgment doesn't exist as at the date of this licence agreement. |
| 35 | Wright | Well, you tell the Supreme Court that they can't say 30 September. |
| | O'Mahoney | No.  I understand that - - - |
| | Wright | The Supreme Court gave me a judgment that said I had to apply it by 30 September. |
| | O'Mahoney | But the relevant judgment was dated 6 November 2013. |
| 40 | Wright | That judgment on that date said I had to apply it as of 30 September. |

CONFIDENTIAL

DEFAUS_00560353

1528

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | Okay. So I appreciate that that judgment may have made orders that affected the situation prior to the date of the judgment. My question is how did it come to be that the actual agreement makes provision for - - - |
| | Wright | I already had the software. |
| 5 | O'Mahoney | - - - the transfer of rights by reference to a judgment that hasn't even - - - |
| | Wright | I already had the software, I already had a contract. |
| | O'Mahoney | - - - appeared? |
| 10 | Wright | I already had the physical - like, the copy of the software on the disk. I already had all of that. As far as I was concerned, it was mine, the judgment was there to finalise and make sure that there was nothing wrong, and yes, it ended up being bloody messy and yes, I got a judgment on 6 November that says backdated to the 30th and, no, I'm not going to argue with the New South Wales Supreme Court and say, "No. Actually, it should be the next quarter and I will update my document." |
| 15 | O'Mahoney | Did the agreement definitely exist before the judgment was handed down? |
| | Wright | Yes. It was given to the court. |
| | O'Mahoney | And there's no other explanation for how it is that reference was made to a judgment that wasn't in existence as at the date of the agreement? You've given - that's the total of the explanation? |
| 20 | Wright | I was doing an agreement with myself and other parties in the organisation that I was setting up. We said we were going to do this. It was - I thought it would happen much quicker. I thought because everyone was interested when and all the rest from the other side and mine in getting this thing stamped and done, that it would happen quickly. I was wrong. The Supreme Court doesn't move as quick as I want, the Supreme Court doesn't issue things the way I want. I'm sorry, but I realised that one. Did I issue documents that then said the other? Yes. Did I have the software? Yes. Did I value them in a conservative manner? Yes. Could they be costed as more? Yes. Does it really matter from GST point of view? No, because if it was a hundred million dollars, it would be 10 million dollars each way and it would still work out at zero. |
| 25 | | |
| 30 | | |
| | Sommers | Sorry, Greg, could I just clarify? The reference in the IPD you've assigned to the statement of claim lodged in the Supreme Court, you're asking how is it that it refers to that - - - |
| 35 | O'Mahoney | A provision is made - - - |
| | Sommers | - - - and it predates judgment. |
| 40 | O'Mahoney | It does. Provision is made for the passing of title upon judgment in the Supreme Court proceedings and it's just in circumstances where the judgment is unknown, the date of that is unknown. I just want to understand if there was an issue - - - |
| | Sommers | But you are satisfied that the document was - the document is dated the date that is after the proceedings were commenced. The proceedings had been commenced ….. |
| | O'Mahoney | There's no doubt about that. |
| 45 | Sommers | ….. |
| | O'Mahoney | Absolutely. Yeah. |

CONFIDENTIAL                                                          DEFAUS_00560354

1529

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommers | So you're note ….. |
| | O'Mahoney | Certainly. I appreciate - - - |
| | Wright | And I'd given the document to the ATO - - - |
| | O'Mahoney | - - - the proceedings were on foot. |
| 5 | Wright | - - - in September. |
| | O'Mahoney | No. I appreciate the proceedings were on foot. Just a few final questions, but - - - |
| | Wright | I'd given the document to the ATO in September. |
| 10 | O'Mahoney | Okay. A few final questions to round down. Did you ever register a domain name with AlBaraka in it? |
| | Wright | I didn't, no. |
| | O'Mahoney | Did someone you know? |
| | Wright | Not that I know. Why? |
| 15 | O'Mahoney | Do you have the actual wording? Okay. We have some information that a domain name was registered, that is a variant of or precisely AlBaraka.Asia. Does that ring any bells? |
| | Wright | No. |
| | O'Mahoney | All right, then. If that potentially had nothing to do with you - tell me this, Mr - - - |
| 20 | Wright | What's the ….. I have known that one in AlBaraka.TR as well, but why - what - - - |
| | O'Mahoney | AlBaraka.TR? |
| | Wright | Yes. |
| | O'Mahoney | Have you had any involvement in that domain name? |
| 25 | Wright | I've been emailing to them. |
| | O'Mahoney | All right. Around who is AlBaraka.TR? |
| | Wright | AlBaraka in Turkey as far as I know. The website comes up as Turkey. |
| | O'Mahoney | And what do you know about AlBaraka in Turkey? |
| | Wright | They're a mid-sized Islamic bank based in Turkey. I mean - - - |
| 30 | O'Mahoney | Have you had any involvement in corresponding with AlBaraka outside of that? |
| | Wright | I know other people that have. I've ….. others at work have been dealing with them. |
| | O'Mahoney | Okay. And who else at work has been dealing with this AlBaraka Turkey? |
| 35 | Wright | A number of former employees. Alan Peterson has been. |
| | O'Mahoney | And to what end? |
| | Wright | Making sure we got the software first of all, making sure that we were able to install it. |
| 40 | O'Mahoney | So is this the case, that AlBaraka has provided some sort of ongoing assistance with using or installing the software? |

Page 38 of 45

CONFIDENTIAL

1530

DEFAUS_00560355

Interview Conducted with Craig WRIGHT

| | Wright | Yes. |
|---|---|---|
| | O'Mahoney | And officers of the bank have done that? |
| | Wright | I'm assuming their officers of the bank. |
| | O'Mahoney | Why do you say that? |
| 5 | Wright | Because everyone keeps coming up with the - who are these - I mean, it worked. I got my software. No, I didn't check any further. |
| | O'Mahoney | Do you have any reason to doubt that you've been - that these people at your end have been dealing with officers from AlBaraka? |
| | Wright | Not until you guys got involved. |
| 10 | O'Mahoney | Well, can I say this, Dr Wright, that we've got some information that an entity with AlBaraka in it has a connection to a site, an office in Istanbul, an office - a commercial address in Istanbul and further inquiries have revealed that looking into that commercial address in Istanbul it is a Servcorp office. Now, you might not know what that means, but Servcorp is a company that - - - |
| 15 | Wright | I know Servcorp. I've used them over here at one stage, but not ….. |
| | O'Mahoney | To be clear on that for the transcript, Servcorp is a company that specialises in virtual offices. |
| | Wright | Mm. |
| | O'Mahoney | That post-modern concept, and tell us this: do you know anything about that? |
| 20 | Wright | No. I don't. |
| | O'Mahoney | Because the reason I ask is we've also got credit card information of yours, credit card records, showing debt that you have paid, you have made payments to Servcorp Istanbul. What do you know about that? |
| | Wright | I don't know anything about that. I know I've gone through a few credit cards. |
| 25 | O'Mahoney | You don't know anything at all about any payments that you've made to Servcorp Istanbul? |
| | Wright | I don't know half my accounts. |
| | O'Mahoney | All right, but would you have had any reason at any point in time to have made payments to Servcorp Istanbul? |
| 30 | Wright | No. |
| | O'Mahoney | No? |
| | Wright | Never. What card was that made on? |
| | O'Mahoney | I don't know any more specific details at this stage, but I just wanted to ask you - - - |
| 35 | Wright | Can you get me details ….. |
| | O'Mahoney | I'm sure we can. No, no, we certainly can. |
| | Wright | I know if it was Penoptocript that card was canned on me because it was reported as stolen by the bank. |
| | O'Mahoney | All right. Time will time. |
| 40 | Wright | I don't know what that meant. |
| | O'Mahoney | What is Penoptocript? |

CONFIDENTIAL

1531

DEFAUS_00560356

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | A company ….. |
| | O'Mahoney | Say that again? |
| | Wright | A company of mine. |
| | O'Mahoney | And what does it do? |
| 5 | Wright | Another research thing. I do research, I do everything else. |
| | O'Mahoney | And how did it come to be the guarantor of the Seychelles trust? |
| | Wright | It was involved back when it was first set up with certain rights in there. I don't know anything other than it's meant to be there for Dave and all the rest. |
| | O'Mahoney | And have you spoken personally to anyone from AlBaraka? |
| 10 | Wright | I spoke to people who I believe worked for AlBaraka. |
| | O'Mahoney | And what made you believe that? |
| | Wright | I got my software. |
| | O'Mahoney | Just that? Do you know the names of those people? |
| 15 | Wright | No. Off the top of my head I can't, but I - I've got some details, but I don't even want to try and pronounce them. |
| | O'Mahoney | All right. Would you have any sort of written records of communication with anyone from - - - |
| | Wright | Yes. I do. |
| | O'Mahoney | - - - AlBaraka? |
| 20 | Wright | Yes. |
| | O'Mahoney | And what would those records be directed towards? |
| | Wright | Emails and things. What do you mean? |
| | O'Mahoney | Yeah, emails dealing with what? |
| 25 | Wright | Dealing with getting the software and downloading it and things and payment and stuff like that. |
| | O'Mahoney | And was a licence transferred with the AlBaraka software? |
| | Wright | Not per se, no, because it's source code. |
| | O'Mahoney | So it's not licensed software? |
| | Wright | That's not correct in what you're saying. It is source code. |
| 30 | O'Mahoney | And is it the case that inherently source code cannot attract a licence or be licensed. Is that - - - |
| | Wright | Well, we got the contract for it and, I mean, it's not like I put in a licensed string. I don't know how I explain this to you, but - - - |
| | O'Mahoney | Well, let me - - - |
| 35 | Wright | - - - it's the source code. |
| | O'Mahoney | - - - ask the question this way: can you obtain licensed source code? |
| | Wright | I have a licence to use that source code. If you're talking about a licence string, that's not the same thing. |
| 40 | O'Mahoney | Okay, but in the abstract, can you obtain licensed source code just generally? Is it possible? |

CONFIDENTIAL

1532

DEFAUS_00560357

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | Yes. | |
| O'Mahoney | Okay.  And in respect of this AlBaraka transaction, the source code that was acquired, was it licensed? | |
| Wright | I believe so, yes. | |
| 5 | O'Mahoney | What causes you to believe that? |
| Wright | I've got a contract saying I get the stuff which is a licence. | |
| O'Mahoney | And is provision made in the contract, does it represent that it is licensed? | |
| Wright | Licence, licence string.  You use the same word;  they're not the same thing. | |
| O'Mahoney | What does "licence string" mean? | |
| 10 | Wright | Like, when you put in a compiled version of a software, an activation code. |
| O'Mahoney | And is that a mechanism, what, for activating a licence? | |
| Wright | Activating a right to use.  A "licence" is a legal term, as you well know. | |
| O'Mahoney | Okay.  No, no - - - | |
| Wright | I have a right to use source code. | |
| 15 | O'Mahoney | All right.  Well, we're almost finished.  You make this distinction.  Do you say that the contract reflects you acquiring a licensed string? |
| Wright | No. | |
| O'Mahoney | No?  Does it reflect you - - - | |
| Wright | It's not a license string;  it's a right to use source code. | |
| 20 | O'Mahoney | All right, but do you say you've got a licence to the software now? |
| Wright | Not a licence;  I'm licensed.  I have a right to use the source code. | |
| O'Mahoney | All right.  And is there any issue about whether or not there is a licence?  Are you involved in any dispute, for example, about whether or not - - - | |
| Wright | No. | |
| 25 | O'Mahoney | - - - you've obtained licensed software? |
| Wright | No.  No one has come back to me and said, "No.  This isn't licenced."  I have the software, the ATO have come out and had a look at it, I've demonstrated it, I've got it working and showed them, I compiled it and had it rung and it has been seen by people.  I've pulled apart source code. | |
| 30 | O'Mahoney | And is AlBaraka - as you understand it, is AlBaraka something of a banking pioneering when it comes to crypto currency? |
| Wright | They're an Islamic bank.  The reason I wanted someone from an Islamic bank is they don't do interest. | |
| O'Mahoney | All right. | |
| 35 | Wright | Bitcoin is deflationary.  It means it has to be treated differently. |
| O'Mahoney | In that context have you ever approached the Abu Dhabi Commercial Bank, EFG, Homez, any other Arabic-type banks to obtain software from them? | |
| Wright | They don't actually have their own software. | |
| O'Mahoney | Is that right? | |
| 40 | Wright | As far as I know. |

CONFIDENTIAL

1533

DEFAUS_00560358

Interview Conducted with Craig WRIGHT

|  | O'Mahoney | Okay. |
|---|---|---|
|  | Wright | Most of those use ….. or others indirectly, so - - - |
|  | O'Mahoney | Okay, but we know - do you say that ultimately what was acquired - - - |
| 5 | Wright | I've tried to speak to other people about some of these things and getting copies. |
|  | O'Mahoney | Who else have you approached to acquire software from an Arabic bank or Islamic bank? |
|  | Wright | I've spoken to people I know through LinkedIn and Facebook who work in these areas. |
| 10 | O'Mahoney | Okay.  And who are they?  Who are those people? |
|  | Wright | Jamal something.  I would have to look through my list. |
|  | O'Mahoney | Would your records have those names? |
| 15 | Wright | Probably not.  I mean, I'd have names in Facebook and things like that, but I don't remember exactly what my conversations were about them or anything like that.  I didn't keep them because I didn't get it. |
|  | O'Mahoney | But having decided that you were interested in acquiring software from an Islamic bank, what steps did you take to look at different Islamic banks that might be a source of software? |
| 20 | Wright | I got told I could get something that suited everything I wanted, I looked into what their software was.  It worked. |
|  | O'Mahoney | Okay, but you did mention before there's some contacts on LinkedIn and so forth that - - - |
|  | Wright | Yes.  I looked at - - - |
|  | O'Mahoney | - - - presented some other opportunities. |
| 25 | Wright | Yeah. |
|  | O'Mahoney | What - - - |
|  | Wright | I'd even looked at non-Islamic banks. |
|  | O'Mahoney | All right, but what were some other Islamic bank opportunities that you looked at? |
| 30 | Wright | I have to tell you after I looked at my notes. |
|  | O'Mahoney | And would your notes also reveal the people that presented them to you or that - - - |
|  | Wright | No. |
|  | O'Mahoney | Can you recall anyone - - - |
| 35 | Wright | I didn't care about - - - |
|  | O'Mahoney | - - - that you discussed your interest? |
|  | Wright | Not off the top of my head, no.  I didn't really care about the people.  I still don't.  What I care about is getting this - the code. |
|  | O'Mahoney | Okay. |
| 40 | Wright | I care about my code.  I care about the other stuff.  I want source code. |

Page 42 of 45

CONFIDENTIAL

DEFAUS_00560359

1534

Interview Conducted with Craig WRIGHT

| | O'Mahoney | But I think, as I understand it, this code is particularly interesting to you because it comes from an Islamic bank and we spoke last week about that. |
|---|---|---|
| | Wright | Yes. |
| | O'Mahoney | The interest dynamics at play in - - - |
| 5 | Wright | Yes. |
| | O'Mahoney | - - - the Islamic world that I'm aware of. Are there any records that reflect you seeking out such software from any other such bank? |
| 10 | Wright | I negotiated with - well, not such software. I've negotiated with people like Temanos in the last year trying to get something that bloody works. There was Rubic and others. I mean - - - |
| | O'Mahoney | So the answer is "no", is it, that at the time of the AlBaraka acquisition you couldn't show any other documents reflecting that this - - - |
| | Wright | I've spoken to other people. |
| 15 | O'Mahoney | But I'm just trying to dig into that a little bit. You can't name the people, I think I'm right in saying, you can't name anyone? |
| | Wright | I don't know. I would need to go through and look at my LinkedIn and Facebook profiles and see who I was talking to at the time, etcetera. I don't remember - - - |
| | O'Mahoney | You mentioned a Jamal. Do you know Jamal's last name? |
| 20 | Wright | I would have to look at Facebook and tell you. |
| | O'Mahoney | Okay. And you might be able to do that? |
| | Wright | Yes. |
| | O'Mahoney | And would there be any written documents reflecting this search - - - |
| | Wright | No. |
| 25 | O'Mahoney | - - - or the efforts to - - - |
| | Wright | There's only my notes on the different softwares. I mean, I've got searches on different core banking platforms and things like that, but I don't really care about the people I get it from. I'm sorry if that sound callous or whatever else. I don't. I give a shit about my code. I don't care about the people. |
| 30 | O'Mahoney | All right. Just one moment. I will just very quickly - does anyone have any other questions they would like me to ask Dr Wright? No? You look like you might have - - - |
| | .......... | Perhaps just an understanding ..... Dr Wright, that he spoke with other providers such as Rubic and something starting with T - - - |
| 35 | Wright | Temanos. |
| | .......... | Temanos. Thank you. |
| | O'Mahoney | Yes. Could - just say a little bit about that. |
| 40 | .......... | Well, just to understand why there's a need to engage those parties if you already had the AlBaraka software ..... whether there was a deficiency in that software and so on. |
| | O'Mahoney | Okay. Just in case that hasn't been picked up by the microphone, the questions along these lines, Dr Wright, that you've mentioned approaching Rubic and Temanos - - - |

Page 43 of 45

CONFIDENTIAL

DEFAUS_00560360

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Mm. |
| | O'Mahoney | - - - in the context of talking about the AlBaraka software. |
| | Wright | Mm. |
| 5 | O'Mahoney | What gave rise to those approaches?  Was it, for example, that there was a deficiency in the software? |
| | Wright | There's a deficiency in every software in that it doesn't handle bitcoin properly. |
| | O'Mahoney | Okay.  Let's focus on this one - - - |
| | Wright | What I - - - |
| | O'Mahoney | - - - this particular software. |
| 10 | Wright | I am talking about this particular software. |
| | O'Mahoney | Okay. |
| | Wright | All of it doesn't do everything I want.  What I need to do is understand the whole banking process, and strangely enough, no bank will let me sit down and reverse engineer their code with them. |
| 15 | Sommers | What was the particular advantage you saw from Rubic and why was the Rubic software unsuitable? |
| | Wright | They were supposed to teach me how it worked. |
| | Sommers | And - - - |
| | O'Mahoney | And who was your point of contact there? |
| 20 | Wright | Roger Manu. |
| | O'Mahoney | M-a-n-u? |
| | Wright | I would have to check that.  I don't remember how I spelt his name. |
| | O'Mahoney | All right.  Around what - - - |
| | Wright | We had a contract with them, they fucked up and didn't deliver. |
| 25 | O'Mahoney | Okay.  And what about the Temanos?  Who was your contact there? |
| | Wright | I don't remember his name.  I can get it to you. |
| | O'Mahoney | And would there be documents - - - |
| | Wright | I'm not a people person. |
| 30 | O'Mahoney | Okay.  Would there be documents evidencing your interaction with those two entities in respect to the AlBaraka - - - |
| | Wright | Yes. |
| | O'Mahoney | - - - software? |
| | Wright | No. |
| | O'Mahoney | "Yes" or "no"? |
| 35 | Wright | Yes, interactions with them;  no to AlBaraka software.  They didn't know - I mean, I didn't tell any of them about the other things.  I didn't want to because it was competition with what they were doing.  Temanos didn't want me - Rubic didn't want me to build my own;  they wanted to control things and sandbox it.  What I wanted to do was build my own, my own core banking platform built on bitcoin.  That's what I'm doing. |
| 40 | | |

CONFIDENTIAL

DEFAUS_00560361

1536

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | O'Mahoney | And is that - will that be, to your mind, the first such bitcoin bank, if you like? |
| | Wright | Yes. |
| | O'Mahoney | I just in doing some searches during the week have revealed that there do seem to be some bitcoin ATMs already in existence.  Are they - - - |
| 5 | Wright | ATMs, not banks. |
| | O'Mahoney | So there's a difference? |
| 10 | Wright | It's not a - yes, a very big difference.  It's a depository, a full online banking platform.  Being able to go and get a print-out of a QR code at a machine is not the same as having loans and having banking platforms that allow you to transfer money, that allow you to invest.  That all the stuff - if you look at what NetBank does on Commonwealth Bank, all of that, that's what I want to build into bitcoin. |
| | O'Mahoney | All right. |
| 15 | Sommers | There are detailed contracts with Rubic and there was a dispute in relation to Rubic where we were unable to act because of a conflict and so there are separate proceedings and so - - - |
| | O'Mahoney | All right, yeah. |
| | Sommers | - - - Dr Wright through his other lawyers can provide you with that detail if you need it. |
| 20 | O'Mahoney | All right, then. |
| | Wright | And, yes, our contract there was fucked up too.  We didn't involve everyone in the beginning.  It was a contract, it was drafted, we got screwed on it. |
| | O'Mahoney | All right.  Well - - - |
| | Wright | Like many other ones I've done. |
| 25 | O'Mahoney | - - - thank you, Dr Wright.  That concludes the questioning and for the record it's now 6.29 and that will be the end of the interview.  Thank you. |

CONFIDENTIAL

1537

DEFAUS_00560362

# TAB 885-9

**P-464**

Case No. 9:18-CV-89176-BB

| | |
|---|---|
| **From:** | Craig S Wright [Craig S Wright] |
| **Sent:** | 9/22/2014 10:19:24 AM |
| **To:** | Kathryn Unger <unge1kat@police.nsw.gov.au> |
| **CC:** | Sommer, Andrew <asommer@claytonutz.com>; Ramona Watts |
| **Subject:** | RE: Statement |
| **Attachments:** | Statement - WRIGHT.docx; Draft witness proofing.docx; 1.pdf; 2.pdf; 3.pdf; 4.pdf; 5.pdf; 6.pdf; 7.pdf; 8.pdf; 9.pdf; 10.pdf; 11.pdf; 12.pdf; 13.pdf; 14.pdf; 15.pdf; 16.pdf; 17.pdf; 18.pdf; 19.pdf; 20.pdf; 21.pdf; 22.pdf; 23.pdf; 24.pdf; 25.pdf; 26.pdf; 27.pdf; 28.pdf; 29.pdf; 30.pdf; 31.pdf; 32.pdf; 33.pdf; 34.pdf; 35.pdf; 36.pdf; 37.pdf; 38.pdf; 39.pdf; 40.pdf |

I have attached the draft for review with the attachments.

Thanks
Craig

**From:** Kathryn Unger [mailto:unge1kat@police.nsw.gov.au]
**Sent:** Tuesday, 16 September 2014 11:54 AM
**To:** Craig S Wright
**Subject:** Statement

Hi Craig,

Apologies for the late reply to your statement infiormtion. It's been crazy here and I have been doing your statement little by little each week, but I haven't forgotten about you at all. I am putting through a report this week to get some assistance from the NSW Fraud Squad who are able to get more information in regards to Bitcoin and hopefully they will get the ball rolling a bit quicker than I can here.

I have attached a copy of your statement so you can have a look at. You will see the parts in red which I will get you to answer and send it back to me. No rush but it will help with the report I will send to the Fraud squad.

If you want to add anything just let me know.

Regards,

Kathryn Unger
Hornsby Detectives
Kuring-Gai LAC
PH: (02) 9476 9795

---

This email and any attachments may be confidential and contain privileged information. It is intended for the addressee only. If you are not the intended recipient you must not use, disclose, copy or distribute this communication. Confidentiality or privilege are not waived or lost by reason of the mistaken delivery to you. If you have received this message in error, please delete and notify the sender.

---



**NSW POLICE FORCE**                                                    **P190A**

Version 4.3 (01/2014)

# Witness Details Cover Page

| Witness Personal Details | |
|---|---|
| Title: | Mr |
| Family Name: | WRIGHT |
| Given Names: | Craig |
| Date of Birth: | 23 Oct 1970 |
| Place of Birth: | Brisbane, Australia |
| Country of Birth: | Australia |
| Gender: | Male |
| CNI Number: | |
| **Witness Home Details** | |
| Home Address: | 43 St John Ave |
| Suburb/Town: | Gordon |
| City: | Sydney |
| State: | NSW |
| Postcode: | 2072 |
| Country: | Australia |
| Home Telephone: | |
| Mobile Telephone: | 0417683914 |
| E-mail Address: | Craig.wright@hotwirepe.com / craig@rcjbr.org |
| **Witness Work Details** | |
| Occupation: | Director/ Researcher |
| Company: | Panopticrypt |
| Branch/Section: | |
| Work Address: | 502 / Level 5, 32 Delhi Rd |
| Suburb/Town: | North Ryde |
| City: | Sydney |
| State: | NSW |
| Post Code: | 2113 |
| Work Country: | Australia |
| Work Telephone: | 02 9188 2050 |
| **Statement Details** | |
| Time Statement Taken: | |
| Date Statement Taken: | July 2014 |
| In the matter of: | Police v FERRIS |
| Statement Taken By: | Kathryn UNGER |
| Place Statement Taken: | Hornsby Police Station |

**NOTE: FOR PROSECUTION USE ONLY**

CONFIDENTIAL

DEF_01597543



| NSW POLICE FORCE | P190A |
|---|---|
| | Version 4.3 (01/2014) |

# STATEMENT OF A WITNESS

| In the matter of: | Police v FERRIS |
|---|---|
| Place: | Hornsby Police Station |
| Date: | July 2014 |

| Name: | Craig WRIGHT |
|---|---|

**STATES:**

1.  This statement made by me accurately sets out the evidence that I would be prepared, if necessary, to give in court as a witness. The statement is true to the best of my knowledge and belief and I make it knowing that, if it is tendered in evidence, I will be liable to prosecution if I have wilfully stated in it anything that I know to be false, or do not believe to be true.

2.  I am 43 years of age.

3.  I am the major (largest shareholder) of Hotwire Pre-Emptive Intelligence Pty Ltd (Panopticrypt, DeMorgan). I have managed this company for 1.5 years through the trust company Panopticrypt (which I have been CEO of since 2011). It is a software development and research company that is a part of a larger group of companies.

4.  Prior to February 2013, I attended a conference in Melbourne on Mining and Security. I was a speaker on this and related topics in around 6-8 separate conferences within a six (6) month period between Sept 2012 and February 2013. I attended these conferences as I was invited to attend to give a presentation about security and automation of the mining industry. At one point, I discussed how mining contracts and mining equipment could be linked by a "block chain". A block chain is a "triple entry ledger" (See http://iang.org/papers/triple_entry.html). There were approximately 60 to 100 people at the conference. I was talking at up to 16 conferences a year as a result of my research and publications. I spoke for approximately an hour at each conference. After my presentation, the conference had a morning tea break. At some point during the break an individual approached me.

Witness: _____   Signature: _____
Constable Kathryn UNGER                      Craig WRIGHT
Hornsby Police Station                        Hornsby Police Station
July 2014                                     July 2014

Page 1 of 14

CONFIDENTIAL

DEF_01597544

1540

**Statement of**   Craig WRIGHT
**In the matter of**   Police v FERRIS

5. This person was male, Caucasian, had blue eyes and short "dirty" blonde hair. He had no facial hair, and a round face. He would be approximately six foot and one inches tall. I recall that he was wearing a suit and tie because he stood out from the crowd who were mostly dressed in casual attire. This man said words to the effect of;

   "*This is all good, but how can it help me?*"

6. In response to his question I explained my interest in Bitcoin and automation. I evangelise Bitcoin and security in general and most conversations I had at this point involve one or both of these topics. I cannot recall the precise words that I said, but I remember that I spoke for about five minutes about how I think Bitcoin and automation is going to transform the world.

   He said; "*I am Mark Ferrier*"

   I said; "*I am Craig Wright*"

   Mark said; "*Would you be interested in chatting some more?*"

   I said; "*What would you like to chat about?*"

   Mark said; "*About how this could help me. I am heavily involved in mining and finance of mining.*"

   I said; "*Great.*"

7. I noted to the person who had called themselves Mark Ferrier that I was looking at obtaining automation software and was interested. I handed Mark my business card. I cannot recall if he gave me his business card.

   Mark said; "*Do you mind if I contacted you by Skype*"

   I said; "*No, in fact I would prefer it*".

8. I have always preferred communicating with friends and clients online. At this time I thought that Skype kept a record of all messages for about a year. It was only in or around October 2013 that I was informed that following Microsoft's purchase of Skype, records were only retained for approximately three months. I had thought I had lost the records at first, but I

Witness: _____         Signature: _____
Constable Kathryn UNGER                                   Craig WRIGHT
Hornsby Police Station                                        Hornsby Police Station
July 2014                                                          July 2014

Page 2 of 14

CONFIDENTIAL

**Statement of**   Craig WRIGHT
**In the matter of**   Police v FERRIS

managed to restore a backup from this time and have the Skype logs from between Feb 2013 and July 2013 on by laptop, but not those of my mobile phone.

9. At the end of February, I cannot recall the exact date, I was contacted a person using the Skype Profile "Mark Ferrier". I was contacted by him directly on 23rd Feb 2013. I cannot recall what was said. Mark Ferrier contacted me as he wanted to know if I was still interested in mining software we had discussed at a conference. I was seeking to obtain licenses for large scale automation software as this is integral to my continuing research.

10. Before the end of February, I had a Skype text conversation with "Mark Ferrier" in words to the effect of;

> Mark;     *"Are you still looking at purchasing automation software?"*
>
> I said;     *"I definitely am"*

12. Within 48 hours of the text message conversation, I was called by Mark on my Skype listed number (02) 80037553. I asked Mark for his email address so I could contact him. On 3 March 2013, I received an email on my account craig@rcjbr.org from markferrier@hotmail.com . The email read "This is mine". A copy of this email is marked '**ANNEXURE B**'.

13. Between March and April 2013, I had a number of communications with Mark via Skype. This included voice calls, but was mostly by text. In the course of our conversations I discussed with Mark the concept of a "Bitcoin exchange" by which smart contracts would be connected. This is an idea that I had developed with my business partner David KLEINMAN (David) for a period of over a decade.

14. A Bitcoin exchange is a means of creating a market place for Bitcoin. Smart contracts can be explained as a form of artificial intelligence software constructed as a series of linked automata. These act to complete a contract or set of instructions such as payment terms.

15. I first met David in 1998/1999. We were both HTCC members. We had a common interest in digital/computer forensics and law enforcement and co-wrote a number of papers on crime prevention and digital forensics. David was based in Florida, United States of America.

Witness: _____     Signature: _____
      Constable Kathryn UNGER                  Craig WRIGHT
      Hornsby Police Station                    Hornsby Police Station
            July 2014                          July 2014

CONFIDENTIAL                                         DEF_01597546

**Statement of**   Craig WRIGHT
**In the matter of**   Police v FERRIS

16. The High Tech Crime Consortium is a 501(c) (3) non-profit organization founded in 1998. It is a professional organization that assists law enforcement and corporate investigators to obtain the knowledge and skills needed to combat 21st Century crime where the use or abuse of digital technology is an element of an offense. Members of HTCC comprise an international cadre of professionals experienced in detection and investigation of digital crime and forensic examination of digital evidence, practitioners of international, federal, and state criminal law, digital forensic software development or information management and security.

17. The idea conceived by David and me, was to develop a system that integrated Supervisory Control and Data Acquisition (SCADA) software and a Bitcoin exchange. I had a strong interest in SCADA systems, and had published a Book on the topic that was released in February 2013 (see http://www.crcpress.com/product/isbn/9781466502260).

18. SCADA systems include hardware and software components. The software gathers data in real time from remote locations, and feeds that data into a computer that has SCADA software installed. The computer then processes the data and presents it in a timely manner. That data may then be used to control equipment and conditions. I explained to Mark my interest in SCADA systems and how they operated. In response, Mark said words to the effect of:

> "*MJF Mining is a multi-million dollar contractor and supplier for the mining industry… what you are talking about is of interest to me, because automated services would be valuable within the mining industry*"

19. I told Mark that he was correct - there was scope for the application of SCADA systems to the mining industry. I explained that SCADA is currently used in power plants, oil and gas refining, telecommunications, transportation, and waste and water control. I informed him that Siemens had a SCADA system, as did a number of other "mining people" such as BHP. I also told Mark that the threshold problem for David and I was obtaining access to SCADA software. We did not want to approach Siemens directly, because we intended to review the software to assist us in writing our own programs. We knew that Siemens would not permit this. In response, Mark said words to the effect:

> "*That is interesting. We should probably talk more*".

Witness: _____       Signature: _____
Constable Kathryn UNGER                                     Craig WRIGHT
Hornsby Police Station                                          Hornsby Police Station
July 2014                                                            July 2014

Page 4 of 14

CONFIDENTIAL                                                                            DEF_01597547

1543

**Statement of**    Craig WRIGHT
**In the matter of**    Police v FERRIS

20. Following that discussion, Mark contacted me approximately one week later by Skype and said words to the effect of:

"*If I could get hold of this SCADA software, what could you give me*".

21. I was excited by the prospect of obtaining the software. I told Mark that the only way in which I would be able to finance the deal would be by paying in Bitcoin that Dave and I held. Mark told me he would get back to me where he contacted me before the end of March, saying he could obtain the Siemens SCADA software, and would accept payment in the form of Bitcoin.

22. In early April 2013, I discussed with David the proposed contract with Mark Ferrier. At around this time we decided that we would do business in Australia, and register our company "Coin Exch Pty Ltd". See:
http://abr.business.gov.au/SearchByAbn.aspx?SearchText=31+163+338+467

23. At this point in time, I understood that Mark was able to obtain the Siemens software for me. Having sourced the Siemens software, I asked Mark whether he would also be able to obtain banking software. The system proposed by David and I, and to be operated by Coin-Exch Pty Ltd, was to integrate a Bitcoin exchange with the SCADA software.  The establishment of a bitcoin exchange would require banking software.

24. I received the software in July/August when the first payments had been completed. There is no dispute as to the receipt of the software. The software has been demonstrated and shown to the ATO and others including Commonwealth Government forensic experts.

25. At this point in time I did not have any serious concerns as to the integrity of Mark Ferrier. Mark had obtained Siemens Software for me, and from what I understood I would not pay for the software until I was provided with a copy of it. There seemed minimal risk in the transaction. I have received the Siemens Software. This is not in dispute.

26. I also gave weight to items of personal information Mark had disclosed to me in the course of our discussions. He had mentioned that his father was Ian Ferrier, a well-respected insolvency specialist, and that he had "trust fund" set up by his father. Mark told me that he was working in Subiaco, Perth at the time, but lived in Paddington in Brisbane. As I understood these were

Witness: _____    Signature: _____
Constable Kathryn UNGER                      Craig WRIGHT
Hornsby Police Station                       Hornsby Police Station
July 2014                                    July 2014

Page 5 of 14

CONFIDENTIAL                                           DEF_01597548

1544

**Statement of**    Craig WRIGHT
**In the matter of**    Police v FERRIS

good suburbs of the respective States.  Mark had also lead me to understand that his company,  MJF Mining Services WA Pty Ltd, was a company that did multi-million dollar deals all the time, and I had no reason to doubt what he told me.

27.  On 5 April 2013, I conducted an ASIC search in respect of MJF Mining. That search identified Mark Ferrier as the sole Director and Secretary of MJF Mining, and the only shareholder. The search did not disclose any information of concern. A copy of this ASIC search is marked **'ANNEXURE B'.**

28.  On 26 April 2013, David died. I was notified of this by an email from a colleague dated 30 April 2013. The death of David was a shock. It did not, however, distract me from the goal of setting up a Bitcoin exchange.

29.  On 3 May 2013, I received an email in my account craig@rcjbr.org  from Markferrier@hotmail.com. It stated:

> "*Mate.That stuff you have been seeking. I have an answer. I know some guys who I have been dealing with in finance that can help with accessing that software you want*".

30.  I understood his reference to "stuff" to mean the banking software I discussed with him in April 2013. A copy of this email is marked **'ANNEXURE C'.**

31.  In mid-May 2013, I had a telephone conversation with Mark. He told me that he had contacts within the Dallah Al-Baraka Group who could sell the banking software to me. He also raised the idea that in addition to the contract for purchase of the Siemens and Al-Baraka software I purchase some gold. He said words to the effect of:

> "*I am negotiating a deal with mining people in Western Australia and I can get you some gold…*"

32.  In making this suggestion Mark alluded to the volatility in value of bitcoin. He said words to the effect of:

Witness: _____    Signature: _____
Constable Kathryn UNGER                      Craig WRIGHT
Hornsby Police Station                           Hornsby Police Station
July 2014                                    July 2014

Page 6 of 14

CONFIDENTIAL

1545

DEF_01597549

**Statement of**  Craig WRIGHT
**In the matter of**  Police v FERRIS

> *"Mate, you don't know that Bitcoin is going to work. It is volatile. You should diversify in gold.... If you bundle the transaction into one - the Siemens software, Al-Baraka software and the gold, my Dad, Ian Ferrier, will give you free valuation advice on your companies."*

33. What I understood from Mark's proposal was that in return for him transferring me the Siemens Software, Al-Baraka software and the gold, I would transfer him a large number of Bitcoin. Mark would then act as an agent with the Bitcoin, and transfer it to the relevant parties as payment. I did not know how much he would get paid, but I knew he would get a cut.

34. On 13 May 2013, I conducted a search of the ASIC database in respect of MJF Mining. A copy of the ASIC extract is marked **Annexure 6**.

35. On 17 May 2013, I received an email in my account craig@rcjbr.org from markferrier@hotmail.com with subject line "Golden". It stated:

> *"My lawyer will get a contract to you soon and we can set a price in that funny money you think has value. Look, if it works, we are set. I do think you need to consider that other offer. These clowns are serious and I can get a great deal here. I will sell you the gold to enable you to get a start in the real world and you get me the bitcoin thing.*
>
> *I am not one for this, but as long as the Arabs are willing to get money to me, I will get gold to you. We should talk more on Skype. I know that you will come around. Software has no substance, gold is something you can hold and nothing stops you doing both.*
>
> *Ma."*

36. I understood his reference to:

"funny money" to be Bitcoin;

"the Arabs" to be Al-Baraka;

Witness: _____     Signature: _____
Constable Kathryn UNGER            Craig WRIGHT
Hornsby Police Station             Hornsby Police Station
July 2014                 July 2014

Page 7 of 14

CONFIDENTIAL                         DEF_01597550

**Statement of**  Craig WRIGHT
**In the matter of**  Police v FERRIS

"the clowns" to be his mining interest in Western Australia. Mark had not disclosed the identity of this mining interest. He did, however, say words to the effect of:

*"although the company has previously had some bad publicity, they have recently been taken over by new bosses so everything will be okay".*

A copy of this email is marked '**ANNEXURE C**.'

37. At this point in time I did not conduct any further due diligence in respect of Mark or MJF Mining. It had come to my attention, I do not know how, that Mark had previously had a company which had failed. As he had not been disqualified for his conduct, I did not consider this to be of concern.

38. Between 17 May 2013 and 23 May 2013, I cannot recall the exact date, I had a Skype conversation with Mark. This was the first time that we discussed the amount of Bitcoin I would transfer to him, in exchange for the Siemens software, Al-Baraka software and gold. In this conversation Payne's Finds Gold was identified as the "mining interest".

39. Following this conversation, I gave Mark access to a Bitcoin "wallet" so he could see the value of Bitcoin I had. A Bitcoin wallet is a set of cryptographic keys that access the ledger and hence the value of the recorded Bitcoin balance. There is a separate document attached that explains Bitcoin and the wallets. At the time of having this conversation, Bitcoin was valued at approximately $120 - $140 per Bitcoin [The values are determined on market and we have a value at the time from Xe.com]. I was excited at the prospect of obtaining the Siemens software and Al-Baraka software that I told him I was willing to give him about 50% of my Bitcoin wallet. In May 2013, my Bitcoin wallet would have been worth approximately $100 million.

40. I understand that Mark took this offer to Al-Baraka who said that they could give me more platforms and modules of the software if I offered more money. I was excited by this prospect, and offered more Bitcoin. I did not turn my mind as to how the Bitcoin would be apportioned between Siemens and Al-Baraka. That was of no interest of me.

Witness: _____          Signature: _____
Constable Kathryn UNGER                                     Craig WRIGHT
Hornsby Police Station                                            Hornsby Police Station
July 2014                                                                July 2014

Page 8 of 14

CONFIDENTIAL                                                                           DEF_01597551

1547

**Statement of** Craig WRIGHT
**In the matter of** Police v FERRIS

41. On 22 - 23 May 2013, I received a series of emails in my account craig@rcjbr.org from markferrier@hotmail.com relating to the transaction. Mark was touting his skill and connections and that he could complete the deal. A copy of this email correspondence is marked **'ANNEXURE**

42. On 1 June 2013, I received an email in my account craig@rcjbr.org from markferrier@hotmail.com. The email was to prompt me into completing the deal. It stated:

> "*If you can get it witnessed and back before Monday close we are in business*
>
> *Popal wants to go public so some pressure on this end*
>
> *Ma*"

43. I understood this email to mean that Mark required the Contract for the purchase of the Siemens software, Al-Baraka software and Paynes Find Gold options (**Contract**) to be returned by 3 June 2013. A copy of this email is marked **'ANNEXURE .**

44. At the time of receiving this email, I did not have a copy of the Contract. I contacted Mark Ferrier by Skype to request a copy. He subsequently "shared" the Contract by Skype. The Contract is titled "Contract for Sale of Personalty". I thought it was strange that the Contract was expressed in these terms. I raised this with Mark. In response, he said words to the effect of:

> "*It is just what the lawyers require*".

A copy of the Contract provided to me is marked **'ANNEXURE**

45. On 1 June 2013, I accessed website http://www.goldnewsworldwide.com/lag/operations/ which stated the following:

> "*Paynes Find Gold (ASX - PNE) will soon provide an operations update and has placed its shares into an ASX trading halt while it prepares the announcement*".

Witness: _____    Signature: _____
　　　　 Constable Kathryn UNGER　　　　　　　　　　 Craig WRIGHT
　　　　 Hornsby Police Station　　　　　　　　　　　 Hornsby Police Station
　　　　 July 2014　　　　　　　　　　　　　　　　　 July 2014

Page 9 of 14

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　 DEF_01597552

1548

**Statement of**  Craig WRIGHT
**In the matter of**  Police v FERRIS

46. On 2 June 2013, I received an email in my account craig@rcjbr.org from markferrier@hotmail.com subject line "Letter". Attached to this email was a confirmation letter stating that, amongst other things:

> "*We will issue the license agreement and finalize the contract payment upon satisfactory completion of company registration*".

A copy of this correspondence is marked '**ANNEXURE** .

47. On 11 June 2013, I conducted an ASIC search of MJF Mining. A copy of this extract is marked '**ANNEXURE** . I conducted a search after the Contract had been executed as my lawyers and accountants have been told to maintain records. I did this each time as a double check as it was a large amount of money.

48. On 1 July 2013, I received an email in my account craig@rcjbr.org from mark@mjfminingservices.com. Attached to that email was Tax Invoice 0B0188 issued by "MJF Contracting" (First Invoice). The First Invoice specified that I was to pay $AU 38,830,000.00 by 15 August 2013, and related to the supply of the Siemens Software, Al-Baraka Software, Gold and Bitcoin. A copy of this correspondence is marked '**ANNEXURE**

49. On 9 August 2013, I conducted a Dun & Bradstreet search in respect of MJF Mining. I noted that Mark Ferrier was listed as the sole Director and Secretary. A copy of the Dun & Bradstreet report is marked '**ANNEXURE**

50. On 15 August 2013, I received an email in my account craig@rcjbr.org from accounts@mjfminingservices.com subject line "Receipt". This email stated that:

> "*We will process a transfer tomorrow and as long as the first account settles in the timeframe as promised we will proceed*".

A copy of this email is marked '**ANNEXURE**

51. On 16 August 2013, I received an email in my account craig@rcjbr.org from accounts@mjfminingservices.com subject line "Receipt". This email stated that:

Witness: _____     Signature: _____
Constable Kathryn UNGER                                      Craig WRIGHT
Hornsby Police Station                                            Hornsby Police Station
July 2014                                                                July 2014

Page 10 of 14

DEF_01597553

**Statement of**   Craig WRIGHT
**In the matter of**   Police v FERRIS

*"The client has confirmed the transaction and the confirmation process. We will arrange finalising this and completing the transactions".*

A copy of this email is marked **'ANNEXURE**

52. On 20 August 2013, I received a Skype text message from Mark Ferrier telling me to use email address mjf@mjfminingservices.com. This was noted to be the primary email for the company rather than his personal email with Hotmail. A copy of this email is marked **'ANNEXURE**

53. On 22 August 2013, I received an email in my account craig@rcjbr.org from markferrier@hotmail.com in which Mark requested the "key" [this a reference to the software key – it is used to unlock and access the code]. This was used to transfer the ownership of the Bitcoin and hence consideration. A copy of this email is marked **'ANNEXURE**

54. On 24 August 2013, I received an email in my account craig@rcjbr.org from markferrier@hotmail.com relating to the transaction. Mr Ferrier stated that Gold had more value that Bitcoin and that they would start mining soon. A copy of this email is marked **'ANNEXURE**

55. On 25 August 2013, I received "Tax Invoice Dallah" for the specified sum of $20,311,471.84 relating to the supply of the Al-Baraka software (Second Invoice). The Second Invoice specified that payment was by 30 September 2013. A copy of this Invoice is marked **'ANNEXURE**. The accounts and an excel spreadsheet titled 'Core Software' that shows 135,100.10 were transferred on 15 September 2013 as well as the transaction details are available as evidence.

56. On 30 August 2013, I paid MJF Mining the sum of 245,103.89 Bitcoins, which was the equivalent of  $AU 38,830,000.00, being the sum specified in the First Invoice . A copy of the confirmation of Transaction Payment is marked **'ANNEXURE**

57. On 15 September 2013, I transferred 135,100.10 Bitcoins in consideration. A copy of an excel spreadsheet titled "Core Software Invoice" is marked **Annexure 23**.

58. On 1 October 2013, Paynes Find Gold Limited advised that it had formally terminated its Mining Services Agreement with MJF Mining. A copy of the Operations Update issued by Executive Director Carl Popal is marked **'ANNEXURE**. I became aware of this on the third week of Oct – I

Witness: _____       Signature: _____
      Constable Kathryn UNGER                              Craig WRIGHT
      Hornsby Police Station                               Hornsby Police Station
      July 2014                                            July 2014

Page 11 of 14

CONFIDENTIAL                                                    DEF_01597554

1550

**Statement of** Craig WRIGHT
**In the matter of** Police v FERRIS

was informed by Mr Popal of PFG that they did not trust Mr Ferrier and saw "issues" with the agreement between PFG and MJF.

59. On 10 October 2013, I conducted an ABN search for MJF Mining's ABN "65 160 509 204". A copy of the ABN search result is marked '**ANNEXURE.** I conducted this search as I was checking the address to contact Mr Ferrier who had been unresponsive as I was not able to get a hold of them and was trying everything I could.

60. On 12 October 2013, I received an email from Markferrier@hotmail.com attaching the username to access to Al-Baraka Software. A copy of this email is marked '**ANNEXURE**

61. It has subsequently been brought to my attention that Mark Ferrier had been extradited to Queensland at this time. A copy of a news article confirming this is marked '**ANNEXURE**

62. On 13 and 17 October 2013, I conducted ASIC Company searches for MJF Mining. These searches confirmed that Mark Ferrier was still listed as the sole director and secretary of MJF Mining, and the only shareholder. A copy of these Company Extracts are marked '**ANNEXURE**

I conducted searches on these two dates as I was concerned. I was not aware at this point that Mark had been extradited from Perth in September. I was not able to get on to MJF at all. I received no further correspondence from Mark following 12 October 2013.

63. On 10 November 2013, I conducted a search of the ASIC database in respect of MJF Mining. A copy of this search is marked '**ANNEXURE**

64. On 13 November 2013, I conducted a search of the ABN database in respect of ABN "65 160 509 204". The search results confirmed that MJF Mining remained "active". A copy of this search is marked '**ANNEXURE**

65. On 19 November 2013, I commenced Supreme Court proceedings 2013/348577 against MJF Mining. These proceedings were commenced by of Statement of Claim, a copy of which is marked '**ANNEXURE**

Witness: _____     Signature: _____
Constable Kathryn UNGER                         Craig WRIGHT
Hornsby Police Station                              Hornsby Police Station
July 2014                                            July 2014

Page 12 of 14

CONFIDENTIAL                                                    DEF_01597555

1551

**Statement of** Craig WRIGHT
**In the matter of** Police v FERRIS

66. On 19 November 2013 at 1:09pm, I caused a copy of the Statement of Claim in the Supreme Court proceedings to be sent by email to accounts@mjfminingservices.com. A copy of this email is marked '**ANNEXURE**

67. On 25 November 2013, I wrote to mark@mjfminingservices.com saying:

> "Is anyone there?"

I did not receive a response to this email.

68. On 18 December 2013 at 08:10 am, I received an email from accounts@mjfminingservices.com in response to my email dated 19 November 2013. The email acknowledged receipt of the statement of claim but stated that Mark Ferrier was not available. I responded to this email at 11:21 am that day. A copy of this correspondence is marked '**ANNEXURE**

69. On 18 December 2013 at 11:32 am, I wrote to mjf@mjfminingservices.com and mark@mjfminingservices.com. saying:

> *Hello Mark, It has become imperative that you contact us urgently. If we are not contacted before the end of the month we will have to look at appointing receivers. Regards."*

I have not received a response to this email. A copy of this email is marked '**ANNEXURE**

70. On 19 December 2013, I commenced Federal Court proceedings NSD2577/2013 against MJF Mining. These proceedings were commenced by way of Originating Application and Statement of Claim, copies of which are marked '**ANNEXURE**

71. On 19 December 2013 at 11.49 am, I caused a copy of the Statement of Claim and Originating Application in the Federal proceedings to be sent by email to accounts@mjfminingservices.com.

72. At 4:40pm, I received an email from accounts@mjfminingservices.com stating, amongst other things, that:

> *"We note that we cannot accept service and reject this as we do not desire to act on a matter whilst an authorised officer of the company is indisposed.*

Witness: _____    Signature: _____
Constable Kathryn UNGER                              Craig WRIGHT
Hornsby Police Station                               Hornsby Police Station
July 2014                                           July 2014

Page 13 of 14

CONFIDENTIAL                                    DEF_01597556

1552

**Statement of**   Craig WRIGHT
**In the matter of**   Police v FERRIS

*We will contact you when Mark is back. We will not accept further*

*correspondence regarding this matter before this.*

*Accounts."*

A copy of this correspondence is marked '**ANNEXURE**

73. On 21 December 2013, I conducted an ASIC search in respect of MJF Mining. The search
results disclosed that Mark Ferrier was no longer the Director or Secretary of MJF Mining. A
copy of the ASIC Company Search Results are marked '**ANNEXURE**

74. On 29 December 2013, I conducted an ASIC search respect of MJF Mining. The search results
confirmed that Mark Ferrier was no longer the Director or Secretary of MJF Mining. A copy of
the ASIC Company Search Results are marked '**ANNEXURE**

Witness: _____        Signature: _____

   Constable Kathryn UNGER                        Craig WRIGHT
   Hornsby Police Station                          Hornsby Police Station
   July 2014                                         July 2014

Page 14 of 14

CONFIDENTIAL                                                    DEF_01597557

1553

Document withheld for Privilege

CONFIDENTIAL

DEF_01597558

CONFIDENTIAL

DEF_01597559

**craig Wright**

| | |
|---|---|
| **From:** | Mark Ferrier <markferrier@hotmail.com> |
| **Sent:** | Monday, 4 March 2013 3:34 PM |
| **To:** | craig@rcjbr.org |
| **Subject:** | FW: The email address |

This is mine

*I was in Brisbane.*

1



**ASIC**
Australian Securities & Investments Commission

# Current & Historical Company Extract



**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 05 April 2013 AEST 05:31:08 PM

This extract contains information derived from the Australian Securities and Investments Commission's (ASIC) database under section 1274A of the Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.

DEF_01597561

Current & Historical Company Extract

MJF MINING SERVICES WA PTY LTD
ACN 160 509 204

| Organisation Details | Document Number |
|---|---|
| **Current Organisation Details** | |

|  |  |  |
|---|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2013 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| Address Details | Document Number |
|---|---|
| **Current** | |

|  |  |  |
|---|---|---|
| Registered address: | 'Central Plaza One' Level 30,  345 Queen Street, BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |

| Officeholders and Other Roles | Document Number |
|---|---|
| **Director** | |

|  |  |  |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Secretary**

|  |  |  |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Share Information**

**Share Structure**

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|---|---|---|---|---|---|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

**Members**

Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty

05 April 2013 AEST 05:31:08 PM                                                                                      1

DEF_01597562

1558

Current & Historical Company Extract                    MJF MINING SERVICES WA PTY LTD
                                                        ACN 160 509 204

members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name:    MARK FERRIER
Address:    14 Plunkett Street,  PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

### Documents

Note: Where no Date Processed is shown, the document in question has not been processed. In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C  Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

***End of Extract of 2 Pages***

05 April 2013 AEST 05:31:08 PM                                                      2

DEF_01597563

1559

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Sunday, 2 February 2014 9:04 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Subject:** | FW: Dave Kleiman |

...

Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914
http://www.rcjbr.org

  

**From:** Carter Conrad [mailto:carter@computerforensicsllc.com]
**Sent:** Tuesday, 30 April 2013 1:23 AM
**To:** Patrick Paige
**Cc:** Bill Long; Greg Kelley; Craig Ball; Matthew Shannon; Jerry Hatchett; Eric Robi; Greg Freemyer; Paul Henry; Craig S. Wright; Scott Moulton'; Wayne Marney; Bob Bell; Bill Dean; Kimon Andreou; Greg Kelley
**Subject:** Dave Kleiman

As close friends of Dave, Patrick and I wanted to let you know in advance of any general posting that we have lost a dear friend and colleague...
As most of you are aware Dave was battling an infection from 2010, and had never fully recovered in the 2 ½+ years that followed.
Dave died in his home in Palm Beach Gardens of, what is being told to us, natural causes.
At this time no further details are available, although there are plans for a memorial, and these will be pasted on as they become available.


Carter V Conrad, Jr
Computer Forensics, LLC
1880 N. Congress Avenue, Suite 333
Boynton Beach, Florida 33426
Phone: (561) 404-3074
Cell: (561) 502-3935


www.ComputerForensicsLLC.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

1

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Friday, 31 January 2014 10:14 AM |
| **To:** | McCaughan, Alexandra |
| **Cc:** | John Chesher; Slater, Jonathan; Mavrakis, Nicholas |
| **Subject:** | RE: |

| | |
|---|---|
| 1 | Planned this weekend |
| 2 | Planned this weekend |
| 3 | I will bring this in. |
| 4 | Looking for it – as John |
| 5 | Next Email |
| 6 | Planned this weekend |
| 7 | See below,      Planned this weekend |
| 8 – 9 | Planned this weekend |
| 10 | Next email |
| 11 | Planned this weekend |
| 12 | I can still access the site right now. |
| 13 | sent. ttp://www.whois.com/whois/mjfminingservices.com |
| | It is a private registration, but he did it as Mark James and it remains his. |
| | He has not tried to retain it. |

7        See
https://www.google.com/search?q=dave+kleiman&oq=dave+kleiman&aqs=chrome..69i57j0l5.3828j0j4&sourceid=chrome&espv=210&es_sm=93&ie=UTF-8

# Dave Kleiman

- Dave Kleiman was a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events. Wikipedia
- ● **Born:** 1967, United States of America
- **Died:** April 26, 2013, Palm Beach Gardens, Florida, United States
- **People also search for:** Eoghan Casey, Peter Gutmann, Dan Farmer

**From:** McCaughan, Alexandra [mailto:amccaughan@claytonutz.com]
**Sent:** Thursday, 30 January 2014 3:39 PM
**To:** Craig S Wright
**Cc:** John Chesher; Slater, Jonathan; Mavrakis, Nicholas
**Subject:**

Dear Craig

Thank you for your time today.

As discussed, we would be grateful if you could provide us with copies of the following:

1. any communication between you and Mark Ferrier (**Ferrier**) between February 2013 and January 2014;
2. any document that will confirm your attendance at the mining conference in Melbourne in February 2013 (including the paper you presented, invitation to speak, invoices etc);
3. the business card you would have provided to Ferrier at the Melbourne conference;
4. the business card Ferrier may have provided to you (if you are able to locate one);
5. a short explanation (in plain language) of the type of software that you were interested in obtaining from Ferrier in respect of the automation of the mining industry;
6. a record of the ASIC or Dun and Bradstreet search conducted in respect of MJF Mining by you in March 2013 and May 2013;
7. confirmation of the date that your business partner, David Kleiman died, and any communications with David that might refer to what you had discussed with Ferrier;

1

8. email from you to Ferrier, attaching the signed contract;
9. email from Ferrier (you think from email accounts@mjfmining.com) attaching Invoices dated 1 July 2013 and 15 August 2013;
10. ASX search conducted by you in or around May/June/July 2013 for Paynes Find Gold;
11. Transaction Payment record in respect of the Invoice issued 15 August 2013 for $20,311,571.84 AUD;
12. record of the Skype conversation between you and Ferrier on 12 October 2013 attaching your password to access the Al-Baraka Bank software (if you can still access it); and
13. any record of a "whois" search conducted by you in respect of Ferrier.

In addition, it would be helpful if you could "trace" each bitcoin that was transferred under the contract and identify where it has been "cashed in". As we explained this morning, this will demonstrate to the Court that you have performed your aspect of the contract.

Finally, if there is any other information which you locate that you may think is of relevance, please provide us with a copy.

Kind regards

**Alexandra McCaughan, Lawyer**
**Clayton Utz**
Level 15, 1 Bligh Street, Sydney NSW 2000 Australia | D +61 2 9353 4727 | F +61 2 8220 6700
amccaughan@claytonutz.com

www.claytonutz.com

Please consider the environment before printing this e-mail

This email is confidential. If received in error, please delete it from your system.

2

CONFIDENTIAL

DEF_01597566

1562

## craig Wright

| | |
|---|---|
| **From:** | Mark Ferrier <Markferrier@hotmail.com> |
| **Sent:** | Friday, 3 May 2013 10:41 AM |
| **To:** | craig@rcjbr.org |
| **Subject:** | FW: New |

Mate
That stuff you have been seeking. I have an answer. I know some guys who I have been dealing with in finance that can help with accessing that software you want.

MJF

*[handwritten notes]*

In Sydney

Meetings with College of Law.

In Class.

Need - 02 June - RCJBR?
Email with letter.

(x3)

- Aug 22-24 ?    (22)
Email Re Exchange.

- 24th. Finalise + Supply.

1



A S I C
Australian Securities & Investments Commission

Australian Company

MJF MINING SERVICES WA PTY LTD
ACN 160 509 204

Extracted from ASIC's database at AEST 10:11:14 on 13/05/2013

| Company Summary | |
|---|---|
| Name: MJF MINING SERVICES WA PTY LTD | |
| ACN: 160 509 204 | |
| ABN: 65 160 509 204 | |
| Registration Date: 25/09/2012 | |
| Next Review Date: 25/09/2013 | |
| | |
| Status: Registered | |
| Type: Australian Proprietary Company, Limited By Shares | |
| Locality of Registered Office: Brisbane QLD 4000 | |
| Regulator: Australian Securities & Investments Commission | |

Further information relating to this organisation may be purchased from ASIC.

13/05/2013 AEST 10:11:14          1

DEF_01597568

1564

**craig Wright**

| | |
|---|---|
| **From:** | Mark Ferrier <markferrier@hotmail.com> |
| **Sent:** | Friday, 17 May 2013 9:22 AM |
| **To:** | craig@rcjbr.org |
| **Subject:** | Golden |

My lawyer will get a contract to you soon and we can set a price in that funny money you think has value.

Look, if this works, we are all set. I do think you need to consider that other offer. These clowns are serious and I can get a great deal here. I will sell you the gold to enable you to get a start in the real world and you get me the bitcoin thing.

I am not one for this, but as long as the arabs are willing to get money to me, I will get gold to you. We should talk more on Skype. I know that you will come around. Software has no substance, gold is something you can hold and nothing stops you doing both

4a

*Meeting Deloittle.*

*-Tony.*

1

CONFIDENTIAL

1565

DEF_01597569

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Thursday, 30 January 2014 11:06 AM |
| **To:** | McCaughan, Alexandra |
| **Subject:** | Fwd: Golden |

---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 18/05/2013 2:34 pm
Subject: Golden
To: <craig@rcjbr.org>
Cc:

My lawyer will get a contract to you soon and we can set a price in that
funny money you think has value.

Look, if this works, we are all set. I do think you need to consider that
other offer. These clowns are serious and I can get a great deal here. I
will sell you the gold to enable you to get a start in the real world and
you get me the bitcoin thing.

I am not one for this, but as long as the arabs are willing to get money
to me, I will get gold to you. We should talk more on Skype. I know that
you will come around. Software has no substance, gold is something you can
hold and nothing stops you doing both

Mark

1

CONFIDENTIAL

DEF_01597570

1566

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Monday, 3 February 2014 6:34 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Cc:** | Ramona Watts |
| **Subject:** | FW: Beer and congrats |

More to come.

**From:** Craig S Wright
**Sent:** Monday, 3 February 2014 6:12 PM
**To:** Craig S Wright
**Subject:** RE: Beer and congrats

**From:** "MArk -ferrier" [markferrier@hotmail.com]
**Sent:** Thursday, 23 May 2013 6:09 PM
**To:** 'Craig S Wright'
**Subject:** RE: Beer and congrats

No prob,lem mate. You think others may find you have shit overseas. Me mate Clive could help you there.
mark

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, 23 May 2013 6:06 PM
**To:** 'Mark Ferrier'
**Subject:** RE: Beer and congrats

Let us take this to Skype. Text is good, but too much said in email already.

Craig

**From:** "MArk -ferrier" [markferrier@hotmail.com]
**Sent:** Thursday, 23 May 2013 6:02 PM
**To:** 'Craig S Wright'
**Subject:** RE: Beer and congrats

Mate
You have me all wrong

Just look at what I have. Why would you not want it to. Y9u told me you like boating. For all me issues I pull all sorts on my squadron

fuck up or not, she hasd pulling power with her Volvos. Get you on there with my mate clive and you can spout your crap about wine and funny money lol

what the fuck good is this shit of yours without a way to get tits and ass

mark

1

DEF_01597571

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, 23 May 2013 5:52 PM
**To:** 'MArk -ferrier'
**Subject:** RE: Beer and congrats

Well, you get paid. The guys you have arranged get paid. You have cash, they have what they want. I have my code.

If this works, we all win. I had Dave mine the Bitcoin overseas and all it has cost is sunk. I cannot miss what I never have. I have never touched the Bitcoin we created in the OS trust and companies and what I care about is making something more.

Craig

**From:** "Mark Ferrier" <markferrier@hotmail.com>
**Sent:** Thursday, 23 May 2013 5:41 PM
**To:** 'Craig S Wright'
**Subject:** RE: Beer and congrats

Your loss mate
If it was me, I would be finding a way to do what you want without letting othes in

mark

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, 23 May 2013 5:38 PM
**To:** 'Mark Ferrier'
**Subject:** RE: Beer and congrats

Well, nothing is really here.
I understand that you are not keeping any Bitcoin, just payment in cash – so it comes from overseas and stays overseas.

I just want to do things here

**From:** "Mark Ferrier" <markferrier@hotmail.com>
**Sent:** Thursday, 23 May 2013 5:10 PM
**To:** 'Craig S Wright'
**Subject:** RE: Beer and congrats

So why even do it here

mark

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, 23 May 2013 5:09 PM
**To:** 'Mark Ferrier'
**Subject:** RE: Beer and congrats

I have a trust overseas. I moved it and the mining process to Dave Kleiman when I had a few issues with the tax ppl.

I still do not trust them, but I do want to do things inoz.

2

CONFIDENTIAL

1568

DEF_01597572

**From:** "Mark Ferrier" <markferrier@hotmail.com>
**Sent:** Thursday, 23 May 2013 5:07 PM
**To:** 'Craig Wright'
**Subject:** RE: Beer and congrats


Craig
So tell me where you got this stuff.

mark ferrier


**From:** Craig Wright [mailto:craig@rcjbr.org]
**Sent:** Thursday, 23 May 2013 5:04 PM
**To:** 'Mark Ferrier'
**Subject:** RE: Beer and congrats


I will start to send the addresses and get you the private keys. I hope you understand that with this value transaction I need to see the code before I release everything.

C


---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 23/05/2013 2:34 pm
Subject: Beer and congrats
To: <craig@rcjbr.org>
Cc:

You are good for it so it seems and these guys are waiting. I have a gret feeling about this. Once this is done and the Payne deal closes, we are going to have a long profitable friendship. You do what you do and I will sell it

Mark

3

CONFIDENTIAL

1569

DEF_01597573

## craig Wright

| | |
|---|---|
| **From:** | Mark Ferrier <markferrier@hotmail.com> |
| **Sent:** | Saturday, 1 June 2013 11:12 AM |
| **To:** | craig@rcjbr.org |
| **Subject:** | FW: The email address |

If you can get it witnessed and back before Monday close we are in business

Popal wants to go public so some pressure on this end

Ma

NSW Bar Prep UTS.
Exam.

1

CONFIDENTIAL

DEF_01597574

1570

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Thursday, 30 January 2014 11:10 AM |
| **To:** | McCaughan, Alexandra |
| **Subject:** | Fwd: FW: The email address |


---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 02/06/2013 2:34 pm
Subject: FW: The email address
To: <craig@rcjbr.org>
Cc:

If you can get it witnessed and back before Monday close we are in business

Popal wants to go public so some pressure on this end

Mark

1

CONFIDENTIAL

1571

DEF_01597575

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Thursday, 30 January 2014 11:10 AM |
| **To:** | McCaughan, Alexandra |
| **Subject:** | Fwd: FW: The email address |

---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 02/06/2013 2:34 pm
Subject: FW: The email address
To: <craig@rcjbr.org>
Cc:

If you can get it witnessed and back before Monday close we are in business

Popal wants to go public so some pressure on this end

Mark

1

CONFIDENTIAL

DEF_01597576

1572



**Mark Ferrier** ▾

+61 422 199 710 (Mobile)

you should have the contract in email.

01-06-2013, 23:54

you meeting me

18-06-2013, 12:41

Please call

13-07-2013, 20:33

use mjf@mjfminingservices.com

20-08-2013, 00:33

Skype me when you get it

23-08-2013, 18:24

Add text



CONFIDENTIAL

DEF_01597577

1573

# CONTRACT FOR THE SALE OF PERSONALTY

**PARTIES**

**MJF MINING SERVICES WA PTY LTD**
**ABN 65 160 509 204**
(Vendor)

**AND**

**Craig S Wright**
**Craig Wright R&D**
**ABN 97 481 146 384**
(Purchaser)

Ref: OB0188

CONFIDENTIAL

DEF_01597578

1574

**THIS AGREEMENT** dated 03 day of June 2013

**BETWEEN**

    Mark Ferrier of MJF Mining Services WA Pty Limited

                      (Vendor)

And

    Craig S Wright of Craig S Wright R&D

                  (Purchaser)


**RECITALS**

**A.**    The vendor is the owner of the chattels itemized in the schedule hereto and has agreed to sell them to the purchaser who has agreed to buy them on the terms and conditions below.

**B.**    The Purchaser is to form a company and provide details for invoicing and tax purposes in the first month of the 2013-2014 financial year.


**OPERATIVE PART**

**1.**    **Interpretation**

    This agreement is governed by the laws of the state of WA, and the parties, submit to the non-exclusive jurisdiction of the courts of that state.


    In the interpretation of this agreement:

(a)    References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under the legislation;

(b)    Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or agreements also mean those documents or agreement as changed, novated or replaced, and words denoting one gender include all genders;

(c)    Grammatical forms of defined words or phrases have corresponding meanings;

(d)    Parties must perform their obligations on the dates and times fixed by reference to the capital city of the state of WA;

(e)    Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

Page 1 of 5

CONFIDENTIAL

1575

DEF_01597579

(f)   If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g)   References to a party are intended to bind their executors, administrators and permitted transferees; and

(h)   Obligations under this agreement affecting more than one party bind them jointly and each of them severally.

2.   The vendor sells and purchaser buys the personalty at the price described in the schedule.

3.   The purchaser has inspected the chattels and is satisfied as to their state of repair and operational condition and will make no objection in relation thereto.

4.   Completion of the sale and purchase shall take place on or before the day specified in the schedule.

5.   On completion the vendor will deliver to the purchaser the subject chattels in the state of repair that they were in at the time of inspection of them by the purchaser in exchange for a bank cheque in favour of the vendor or as they may direct for the balance of the price.

6.   Completion will take place at the location specified in the schedule.

7.   Failure of either party to complete the transaction on or before the due date shall be a default entitling the other party to terminate this contract.

8.   The purchaser shall on the signing hereof pay to the vendor a deposit being 10% of the price which sum shall only be refunded in the event of default by the vendor in performing this contract.

9.   The vendor warrants that the items listed in the schedule are the sole and absolute property of the vendor free of all encumbrances whether by way of pledge, charge, hire purchase, security agreement, or other encumbrance.

Page 2 of 5

CONFIDENTIAL                                            DEF_01597580

10. The goods are agreed to be paid in a form of the exchange of "Bitcoin" wallets at an agreed involved rate set at an Australian Dollar exchange value at the time of invoicing.

11. **Notices**

A communication required by this agreement, by a party to another, must be in writing and may be given to them by being:

(a) Delivered personally; or

(b) Posted to their address specified in this agreement, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c) Sent using Skype; or

(d) Sent by email to their email address, when it will be treated as received on that day.

12. **Counterparts**

This agreement may be executed in any number of counterparts each of which will be an original but such counterparts together will constitute one and the same instrument and the date of the agreement will be the date on which it is executed by the last party.

13. **Costs**

Each party will pay their own costs in relation to this agreement.

## SCHEDULE

| List of Chattels: | Siemens control software |
|---|---|
|  | • Mining automation software |
|  | • No warranty as to use |
|  | • For development in systems automation |
|  | Supply of Microfinance Software |
|  | • Developed by Dallah Al-Baraka |
|  | • Full use and source code provided |
|  | • No restrictions on deployment or development |
|  | Gold options |
|  | • Supply of unrefined gold in granular format |
|  | • 1,250 ounces in total |

Page 3 of 5

CONFIDENTIAL

DEF_01597581

1577

| | • Jan 2015 for delivery from Payne Finds Gold Mine |
|---|---|
| Price: | $35,250,000 (Ex GST) |
| Date of completion: | March 2016 |
| Place of completion: | On delivery of Gold in granular form from Payne Mines |

Page 4 of 5

CONFIDENTIAL

DEF_01597582

1578

**SIGNED AS AN AGREEMENT**

Vendor

Signature _____ Mark J Ferrior _____

Name of witness
Address of witness  Perth WA
Capacity of witness  Solicitor

Purchaser

Signature

Name of witness
Address of witness          MARY GILLIES
Capacity of witness          Reg No 115952
                          Justice of the Peace in and for the
                          State of New South Wales

Ku·ring·gai Council
818 Pacific Highway, Gordon.
Locked Bag 1056, Pymble, NSW 2073
ABN 86 408 856 411

Page 5 of 5

CONFIDENTIAL                                            DEF_01597583

1579

1/6/2013                                Operations | Daily Gold News Worldwide

Daily Gold News Worldwide



## operations

### Paynes Find Gold to provide operations update

May 31, 2013      Velo      Gold News,      0

Tweet

8+1   0
Share

Paynes Find Gold (ASX: PNE) will soon provide an operations update and has placed its shares into an
ASX trading halt while it prepares the announcement.

announcement, operations, Paynes Find Goldfield, trading halt

### Recent Posts

Alluring Gold Rush

Gold price is a killer 22 – 31 May 2013, and as indicato

Tighter controls sought for gold merchants

A good week for gold despite Friday's fall

Central bank buying not enough to reverse gold's slide, analyst could

### Recent Comments

How To Sell Your Gold For Quick Cash Solutions, Gold and Silver Store Program on

DEF_01597584

1580

1/6/2013        Operations | Daily Gold News Worldwide

Whole Throughout This Complete Expose
Covering Vital Variables | How To Sell Your
Gold For Cash on Gold deal rises as dollar
rises ahead of US data

How To Sell Your Gold For Cash Page
Scrutinizes Gold and Silver Stock Investment
Window Throughout This Complete Expose
Covering Vital Variables | How To Sell Your
Gold For Cash on Should investors still
believe in gold?

How To Sell Your Gold For Cash Page
Scrutinizes Gold and Silver Stock Investment
Window Throughout This Complete Expose
Covering Vital Variables | How To Sell Your
Gold For Cash on Europe pushed Gold price
down

How To Sell Your Gold For Cash Page
Scrutinizes Gold and Silver Stock Investment
Window Throughout This Complete Expose
Covering Vital Variables | How To Sell Your
Gold For Cash on Gold price gains, on China
demand, ETF outflows persist

Latest Gold News / Wall Street Stocks on
Gold rally for a sixth day

## Archives

June 2013

May 2013

April 2013

March 2013

February 2013

## Categories

Gold News

Today Gold Prices

## Meta

Register

Log in

Entries RSS

Comments RSS

WordPress.org

Powered by WordPress Designed by Bazahotelpt

DEF_01597585

1581

**John Chesher**

| | |
|---|---|
| **From:** | John Chesher <john.chesher@hotwirepe.com> |
| **Sent:** | 05 January 2014 15:43 |
| **To:** | jchesher@bigpond.net.au |
| **Subject:** | Fwd: Letter |
| **Attachments:** | MJFF.pdf; ATT00001.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Craig S Wright" <craig@rcjbr.org>
> **To:** "John Chesher" <john.chesher@hotwirepe.com>
> **Subject: FW: Letter**
>
> Last email - these are all I have that matches what we need
>
> -----Original Message-----
> From: Mark Ferrier [mailto:markferrier@hotmail.com]
> Sent: Sunday, 2 June 2013 2:34 PM
> To: craig@rcjbr.org
> Subject: Letter
>
> The agreement is accepted and will be finalised once the company details are supplied. The confirmation letter is attached.
>
> Mark

1

CONFIDENTIAL

DEF_01597586

Mark Ferrier
MJF Mining Services
14 Plunkett Street,
PADDINGTON QLD 4064
June 1, 2013

Craig Wright
Craig Wright R&D
PO Box 558
Gordon NSW 2072

Dear Craig,

We are pleased to inform you that we accept the deal for the Bitcoin exchange for the consolidation software
and automation system. Our client wishes to proceed with the deal. The conditions imposed by on this are:

- This deal is to remain private and confidential
- No publication of the Al Baraka or Dallah name nor involvement will be allowed for any purpose
- The value of the contract is set for the agreed amount of Bitcoin no matter what occurs in the market

According to the terms of the agreement we expect you to finalize the formation of the holding company
immediately upon receipt of this letter, and to complete work no later than 03 June 2013. We will issue the
license agreement and finalize the contract payment upon satisfactory completion of company registration.

We look forward to working with you.

Sincerely,

Mark Ferrier

Mark Ferrier
mjf@mjfminingservices.com

CONFIDENTIAL

DEF_01597587



**ASIC**
Australian Securities & Investments Commission

# Current & Historical Company Extract

**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 11 June 2013 AEST 12:09:01 PM

This extract contains information derived from the Australian Securities and Investments Commission's (ASIC) database under section 1274A of the Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.

EXTRACT

DEF_01597588

1584

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

| Organisation Details | Document Number |
|---|---|
| **Current Organisation Details** | |

|  |  |  |
|---|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2013 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| Address Details | Document Number |
|---|---|
| **Current** | |

|  |  |  |
|---|---|---|
| Registered address: | 'Central Plaza One' Level 30,  345 Queen Street,  BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |

| Officeholders and Other Roles | Document Number |
|---|---|
| **Director** | |

|  |  |  |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |
| **Secretary** | | |
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

| Share Information |
|---|
| **Share Structure** |

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|---|---|---|---|---|---|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

| Members |
|---|
| Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty |

11 June 2013 AEST 12:09:01 PM                                                     1

1585

DEF_01597589

Current & Historical Company Extract

MJF MINING SERVICES WA PTY LTD
ACN 160 509 204

members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name:    MARK FERRIER
Address:    14 Plunkett Street,  PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

### Documents

Note: Where no Date Processed is shown, the document in question has not been processed.  In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C  Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

***End of Extract of 2 Pages***

11 June 2013 AEST 12:09:01 PM

2

DEF_01597590

1586

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Monday, 3 February 2014 2:12 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Cc:** | Ramona Watts |
| **Subject:** | FW: Invoice |
| **Attachments:** | MJF0.jpg |

I have more, it just takes time to find.

**From:** mark@mjfminingservices.com
**Sent:** Monday, 1 July 2013 2:10 PM
**To:** 'Craig Wright'
**Subject:** Invoice

The invoice is attached.

Please remember the conditions and requirements to maintain privacy.

When this is verified, we can move on the next stage.

Accounts

1

CONFIDENTIAL    DEF_01597591

1587

# MJF Contracting

Level 28, 140 St Georges Terrace
Perth,
WA 6000



**TAX Invoice OB0188**

| Date | To | Ship To |
|---|---|---|
| July 1, 2013 | Craig Wright R&D<br>PO Box 558<br>Gordon NSW 2072 | Same as recipient |

## Instructions

You are to supply your company information when the contract is ready for provision.
As per agreement and discussion. Payment set in Bitcoin valued as agreed market average.

| Quantity | Description | Unit Price | Total |
|---|---|---|---|
| 20 | Valuations Services by Ferrier<br>Completed at a daily rate<br>Prepayment for March 2014 | 2,500 | 50,000.00 |
| 1 | Supply of Automation Software –<br>See agreement<br>Update and installation of Siemens<br>control software for systems control<br>for up to 2,048 cores | 5,000,000 | 5,000,000.00 |
| 1 | Agreement to supply Microfinance<br>software and Accounting packages<br>Integration and support<br>Developed in conjunction with<br>Dallah Al-Baraka Group (SA) | 11,500,000 | 11,500,000.00 |
| 15,000 | Exchange of BTC for Gold options.<br>Price per ounce<br>Set for 2015 as a pre-payment<br>Delivered after mining commences<br>From Payne mine | 1,250 | 18,750,000.00 |

| | | |
|---|---|---|
| | Subtotal | 35,300,000.00 |
| | GST | 3,530,000.00 |
| | Shipping & Handling | 0 |
| | **Total Due By 8.15.2013** | **$AU 38,830,000.00** |

Thank you for your business!

Tel: 08 9278 1438
ABN: 65 160 509 204

Email: markferrier@hotmail.com
Web: http://www.mjfminingservices.com/

CONFIDENTIAL

DEF_01597592

1588

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Tuesday, 4 February 2014 9:13 AM |
| **To:** | Mavrakis, Nicholas; McCaughan, Alexandra; Slater, Jonathan |
| **Cc:** | ramona.watts@hotwirepe.com |
| **Subject:** | FW: MJF MINING SERVICES WA PTY LTD |
| **Attachments:** | Report.html; DB Report.pdf |

Please note the date:
09 Aug 2013

This is the earliest one.

...
Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA
RCJBR.org
Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

-----Original Message-----
From: Current - Dun & Bradstreet Report Delivery
[mailto:Rpt-Del@dnb.com.au]
Sent: Friday, 09 August 2013 7:15 PM
To: craigswright@acm.org
Subject: MJF MINING SERVICES WA PTY LTD

Thank you for your credit report enquiry with Dun & Bradstreet, the
world's leading source of commercial information and insight on
businesses.

Please find attached the report for
MJF MINING SERVICES WA PTY LTD

Details of your request:

Report Subject: MJF MINING SERVICES WA PTY LTD

DUNS: 747233091

This report was requested by Mr. Craig Wright on Aug 09 2013  7:14PM

Businesses rely on D&B in order to decide with confidence. The D&B report
suite provides a range of reports for low, medium and high risk decisions.
For the complete picture of your customers and prospects D&B offers the
D&B Report, the most comprehensive report available today.

Visit us at www.dnb.com.au for more information on D&B's products and
services.

This is post-only mailing. Replies to this message are not monitored or
answered. If you have an enquiry please contact customerservice@dnb.com.au

1

CONFIDENTIAL                                                                 DEF_01597593

1589

2/4/2014      Report

| **D&B** Decide with Confidence | **Financial Risk Report** |
|---|---|

## MJF MINING SERVICES WA PTY LTD

| | |
|---|---|
| Status: | Registered |

Print this report

| | |
|---|---|
| DUNS: | 74-723-3091 |
| ACN: | 160509204 |
| ABN: | 65160509204 |
| | |
| ABN Issue Date: | 25 Sep 2012 |
| ASIC Extract Date: | 09 Aug 2013 15:14:00 |
| Founded: | 2012 |
| | |
| Industry SIC Codes: | 0000 - Undetermined |
| Rating: | -- |

### Summary Company Information

| | | | | |
|---|---|---|---|---|
| Court Actions: | 0 | Past Enquiries: | 2 |
| Collections: | 0 | Director(s): | 1 |
| Defaults: | 0 | Adverse Director Experiences: | 0 |
| Registered Charges: | 0 | Director Alerts: | 0 |
| Trade References: | 0 | | |

### Incorporation

| | |
|---|---|
| State: QLD | Date Incorporated: 25 Sep 2012 |
| Type: Australian Proprietary Company | Status: Registered |
| Class: Limited By Shares | |
| Sub Class: Proprietary Company | |
| Name Start: 25 Sep 2012 | |
| ASIC Review Date: 25 Sep 2013 | |

### Head Office

14 PLUNKETT STREET
PADDINGTON
QLD 4064

### Registered Office

| | |
|---|---|
| Address: | 'CENTRAL PLAZA ONE' LEVEL 30 |
| | 345 QUEEN STREET |
| | BRISBANE |
| | QLD 4000 |
| Start Date: | 25 Sep 2012 |

### Principal Place Of Business

| | |
|---|---|
| Address: | 14 PLUNKETT STREET |
| | PADDINGTON |
| | QLD 4064 |
| | |
| Start Date: | 25 Sep 2012 |

Credit & Risk Analysis

### Dynamic Risk Score

The Dynamic Risk Score uses a statistically valid model derived from the Dun and Bradstreet database to predict the likelihood of financial distress during the next 12 months.

| Low | Moderate | Significant |
|---|---|---|

file:///C:/Users/Craig/Desktop/Report.html

1/4

CONFIDENTIAL      DEF_01597594

1590

2/4/2014                                                                                              Report

| Relative Risk: **High** | Recommend: **Review Terms and monitor** |
|---|---|

| | |
|---|---|
| Dynamic Risk Score | **1377** |
| Probability of Experiencing Financial Distress | **1.37%** |
| | |
| Industry Average | **1476** |
| Probability of Experiencing Financial Distress | **0.25%** |

A Score of 1377 indicates that the subject has a High risk of experiencing financial distress during the next 12 months and has a score that is the same as or better than 8% of all records in the Dun & Bradstreet database .

Scores are updated the day new information enters the company's file.

### Key Influencing Factors

- No evidence of adverse information for this firm exists in the D&B database.
- Financial Statement information is unavailable in the D&B database.
- Payment information (of $100 or more) is unavailable in the D&B database within the past 12 months.
- No evidence of adverse information against the director(s) of this firm exists in the D&B database.
- Directorship characteristics indicate a potentially higher risk of financial distress.
- The age of this firm indicates a potentially higher risk of financial distress.

### Dynamic Risk Score Trend

The statistical historical DRS and industry average scores have been computed from information available in the Dun and Bradstreet database as at the last day of each month.



file:///C:/Users/Craig/Desktop/Report.html

CONFIDENTIAL

DEF_01597595

1591

2/4/2014                                                                        Report

| Key to Scores | | | |
|---|---|---|---|
| Score Range | Distress Probability | Relative Risk Level | Dun and Bradstreet Recommendation |
| 1566-1730 | 0.04 | Minimal | Extend Terms to encourage growth |
| 1532-1565 | 0.08 | Very Low | Extend Terms to encourage growth |
| 1497-1531 | 0.12 | Low | Extend Terms |
| 1428-1496 | 0.31 | Average | Extend Terms |
| 1389-1427 | 0.81 | Moderate | Extend Terms and monitor |
| **1359-1388** | **1.41** | **High** | **Review Terms and monitor** |
| 1312-1358 | 2.44 | Very High | Review Terms and monitor closely |
| 1001-1311 | 11.94 | Severe | C.O.D |

## Directors

| | |
|---|---|
| Name: | MARK , FERRIER |
| Appointment Date: | 25 Sep 2012 |
| Date of Birth: | 19 Dec 1975 - SYDNEY , NSW |
| Address: | 14 PLUNKETT STREET |
| | PADDINGTON |
| | QLD 4064 |

## Directors Background

A check of internal records shows no court actions against the directors.

## Company Secretary

| | |
|---|---|
| Name: | MARK , FERRIER |
| Appointment Date: | 25 Sep 2012 |
| Date of Birth: | 19 Dec 1975 |
| Address: | 14 PLUNKETT STREET |
| | PADDINGTON |
| | QLD 4064 |

## History

## Shares

### Structure

| | | |
|---|---|---|
| Class: | | ORD (ORDINARY SHARES ) |
| Number of Shares Issued | : | 120 |
| Total Paid on Shares Issued | : | $120.00 |

### Holdings

**Major Shareholders:**

ORDINARY SHARES

| Name of Shareholder | Location | No. Held | % Held |
|---|---|---|---|
| MARK FERRIER | 14 PLUNKETT STREET PADDINGTON QLD 4064 | 120 | 100.00 |
| Beneficially Held: No | Paid: Yes | | |

Note: For each class of shares issued by a proprietary company, ASIC records the details of the twenty members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

### Past Enquiries

| Enquiry Date | Enquiring Organisation | Enquiry Type | Amount |
|---|---|---|---|
| 21 Jun 2013 | LINCOM PACIFIC EQUIPMENT PTY L | | Not |

CONFIDENTIAL                                                    DEF_01597596

1592

2/4/2014                                                                    Report

| | | |
|---|---|---|
| 27 May 2013 | LINCOM PACIFIC EQUIPMENT PTY L | Not Specified |

CURRENCY: All monetary amounts quoted in this report are shown in AUSTRALIAN DOLLARS unless otherwise stated.

| Collection Status | Description |
|---|---|
| Paid in full | Account paid in full - Closed |
| Partial Paid | Debt is partially paid |
| Legal Action | Account is in legal action |
| Dispute | Debtor is in dispute with creditor |
| Closed | Collection service ceased |
| In progress | Collection is in progress |

| End of Report |
|---|

CONFIDENTIAL

DEF_01597597

1593

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Monday, 3 February 2014 1:40 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Cc:** | Ramona Watts |
| **Subject:** | RE: SOC |

**From:** accounts@mjfminingservices.com [mailto:accounts@mjfminingservices.com]
**Sent:** Thursday, 15 August 2013 10:36 PM
**To:** Craig S Wright
**Subject:** Reciept

Hello,
We have accepted and verified the private keys sent to us below.



```
                        zCea
                        k5nq
                    XwXy
                        WJYm
                        alK
                        Bqkv
                        xiEY
                        9fE9
                        nLkN
```

We will process a transfer tomorrow and as long as the first account settles in the timeframe as promised we will proceed.

We remind you that this process is to maintain the utmost secrecy.

Regards,
Accounts

1





CONFIDENTIAL

DEF_01597599

**Date**

Sunday, 15 September 2013

https://blockchain.info/tx
https://blockchain.info/tx

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Monday, 3 February 2014 1:54 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Cc:** | Ramona Watts |
| **Subject:** | FW: Reciept |

**From:** accounts@mjfminingservices.com [mailto:accounts@mjfminingservices.com]
**Sent:** Friday, 16 August 2013 23:40 AM
**To:** Craig Wright
**Subject:** Reciept

The client has confirmed the transaction and the confirmation process.

We will arrange finalising this and completing the transactions.

We will discuss some questions on Skype. Does the transaction always result in altered addresses and is this to maintain secrecy as promised? What are these messages that appear and why are small amounts sent to these addresses?

Does a transaction fee need to be paid and how does one make the fee smaller and still ensure confirmation?

MJF

**From:** Craig S Wright
**Sent:** Friday, 16 August 2013 07:15 AM
**To:** accounts@mjfminingservices.com [mailto:accounts@mjfminingservices.com]
**Subject:** RE: Reciept

Awaiting your confirmation.
CSW

**From:** accounts@mjfminingservices.com [mailto:accounts@mjfminingservices.com]
**Sent:** Thursday, 15 August 2013 10:36 PM
**To:** Craig S Wright
**Subject:** Reciept

Hello,
We have accepted and verified the private keys sent to us below.



1

CONFIDENTIAL

DEF_01597601

We will process a transfer tomorrow and as long as the first account settles in the timeframe as promised we will proceed.

We remind you that this process is to maintain the utmost secrecy.

Regards,
Accounts

CONFIDENTIAL

1598

DEF_01597602





**Date**

Thursday, 15 August 2013

Pay to address from Multiple

9bae

Friday, 30 August 2013

dd5d



**Mark Ferrier** ▾

+61 422 199 7.8 (Mobile)

you should have the contract in email.

01-06-2013, 23:54

you meeting me

18-06-2013, 12:41

Please call

13-07-2013, 20:33

use mjf@mjfminingservices.com

20-08-2013, 00:33

Skype me when you get it

23-08-2013, 18:24

Add text



CONFIDENTIAL

DEF_01597605

1601

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Thursday, 30 January 2014 11:11 AM |
| **To:** | McCaughan, Alexandra |
| **Subject:** | Fwd: time for a beer |

---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 22/08/2013 5:11 am
Subject: time for a beer
To: <craig@rcjbr.org>
Cc:

You unlock the software repos, you send the last of the key. Ask anyone, I am the best at my part so all is done ionce you get me that key

So mate, who knows you have this shit?

MJF

1

CONFIDENTIAL

1602

DEF_01597606

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Thursday, 30 January 2014 11:11 AM |
| **To:** | McCaughan, Alexandra |
| **Subject:** | Fwd: Delvgered |

---------- Forwarded message ----------
From: "Mark Ferrier" <markferrier@hotmail.com>
Date: 24/08/2013 1:34 pm
Subject: Delvgered
To: <craig@rcjbr.org>
Cc:

It is done. Now we get to something of substance. The numbers may be
wanted for now, but gold is always in demand.

Can you tell me what it is you want with automation software and Banking
Consolidation? You know noone will want to deal with a arab bank in oz.
Then, your game I guess

We will let you know when we start mining

Mark

1

CONFIDENTIAL

DEF_01597607

# Tax Invoice Dallah

## MJF Contracting

Level 28, 140 St Georges Terrace
Perth,
WA 6000



Date

August 15, 2013

Craig Wright R&D
PO Box 558
Gordon NSW 2072

Same as recipient

Instructions

Core software per alBaraka contract

| Quantity XBT | Description | Unit Price | Total |
|---|---|---|---|
| 26,464.00 | Commitment Fee | 3,978,699.29 | 4,376,569.22 |
| 50,522.00 | Implementation Fee | 7,505,671.30 | 8,355,238.43 |
| 27,667.00 | Data Conversion Fee | 4,159,562.92 | 4,575,519.21 |
| 7,090.00 | Training Fee | 1,052,406.85 | 1,157,647.54 |
| 11,165.30 | Agent Fee | 1,678,634.04 | 1,846,497.44 |

|  |  |
|---|---|
| Subtotal | 18,464,974.40 |
| GST | 1,846,497.44 |
| Shipping & Handling | NA |
| Total Due By 9.30.2013 | AUD 20,311,471.84 |

business!

Tel 08 9278 1438
ABN 65 160 509 204

markferner@hotmail.com
http://www.mjfmningservices.com



**Core Software Invoice**



**Address**

**BTC Amount**

 BTC

**Address**
Issue of off Block Key Transfer.


Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.
Issue of off Block Key Transfer.


Initial Seed Transaction to validate BTC
Final Transfer to complete.

CONFIDENTIAL

DEF_01597611

**Date**

Sunday, 15 September 2013

https://blockchain.info/tx/
https://blockchain.info/tx/

CONFIDENTIAL

DEF_01597612

1608

CONFIDENTIAL

DEF_01597613



PAYNES FIND GOLD LIMITED

Registered Office:
Ground Floor, 1 Havelock Street
WEST PERTH WA 6005
Phone: +61 8 9485 5220
Fax: + 61 8 9534 2400
Principal Place of Business:
Level 2, 41-43 Ord Street
WEST PERTH WA 6005
Phone: + 61 8 9481 3992
Fax: + 61 8 9481 5666
ABN: 45 141 450 624

1 October 2013

The Manager
Company Announcements
Australian Securities Exchange Limited
Level 6, 20 Bridge Street
Sydney NSW 2000

By e-lodgement

## OPERATIONS UPDATE

Paynes Find Gold Limited (**"Paynes Find"** or "the Company") (**ASX:PNE**) advises that it has not been able to conclude a revised Mining Services Agreement with MJF in respect of ongoing negotiations previously announced and has formally terminated the agreement. The Company is currently in discussions with other third party contractors in respect of commencing operations on a profit share arrangement.

For and on behalf of the Board.

**Carl Popal**
**Executive Director**

For further information please contact:
Carl Popal
Director
T: + 61 8 9481 3992

1610



## Current details for ABN: 65 160 509 204

### ABN details

| | |
|---|---|
| **Entity name:** | MJF MINING SERVICES WA PTY LTD |
| **ABN status:** | Active from 25 Sep 2012 |
| **Entity type:** | Australian Private Company |
| **Goods & Services Tax (GST):** | Registered from 25 Sep 2012 |
| **Main business location:** | WA 6000 |

### ASIC registration - ACN or ARBN

160 509 204 View record on the ASIC website

### Deductible gift recipient status

Not entitled to receive tax deductible gifts

Disclaimer
This extract is based on information supplied by businesses to the Registrar of the Australian Business Register.
Neither the Registrar nor the Australian Government guarantee this information is accurate, up to date or
complete. You should consider verifying this information from other sources.

**ABN last updated:** 26 Sep 2013                **Record extracted:** 10 Nov 2013

DEF_01597615

1611



## Historical details for ABN: 65 160 509 204

### ABN details

| Entity name | | From | To |
|---|---|---|---|
| MJF MINING SERVICES WA PTY LTD | | 25 Sep 2012 | (current) |
| **ABN Status** | | **From** | **To** |
| Active | | 25 Sep 2012 | (current) |
| **Entity type** | | | |
| Australian Private Company | | | |
| **Goods & Services Tax (GST)** | | **From** | **To** |
| Registered | | 25 Sep 2012 | (current) |
| **Main business location** | | **From** | **To** |
| WA 6000 | | 26 Sep 2013 | (current) |
| WA 6008 | | 19 Sep 2013 | 26 Sep 2013 |
| WA 6008 | | 12 Sep 2013 | 19 Sep 2013 |
| WA 6160 | | 21 Aug 2013 | 12 Sep 2013 |
| QLD 4064 | | 29 Oct 2012 | 21 Aug 2013 |
| QLD 4064 | | 26 Sep 2012 | 29 Oct 2012 |
| QLD 4068 | | 25 Sep 2012 | 26 Sep 2012 |

### ASIC registration - ACN or ARBN

160 509 204 View record on the ASIC website

### Deductible gift recipient status

Not entitled to receive tax deductible gifts

Disclaimer
This extract is based on information supplied by businesses to the Registrar of the Australian Business Register. Neither the Registrar nor the Australian Government guarantee this information is accurate, up to date or complete. You should consider verifying this information from other sources.

**ABN last updated:** 26 Sep 2013                    **Record extracted:** 10 Nov 2013

DEF_01597616

1612



Thank You... - Message (HTML)

MESSAGE

Thank You...

To    Craig S Wright

Sat 12/10/2013 1:01 AM

Mark Ferrier <Mark.ferrier@hotmail.com>

Your account for the download of the software is listed below.

Direct URL for your download
http://cp-an-2.e-delivery.albaraka-bank.asia.
cPanel Login Details
You can access your Cpanel account directly as follows.
cPanel URL    http://cp-an-2.e-delivery.albaraka-bank.asia/cpanel

Username    albaraj96
Password    ********

Change Password

Top of Form

Bottom of Form

Mark Ferrier LinkedIn Recommendations

CONFIDENTIAL

DEF_01597617

1613

# THE AUSTRALIAN

# Insolvency expert's son held for fraud

ADAM SHAND THE AUSTRALIAN SEPTEMBER 27, 2013 12:00AM

**THE 37-year-old son of Ian Ferrier, one of Australia's most prominent insolvency specialists, has been arrested in Perth after an alleged year-long fraud spree in Western Australia that netted more than $500,000.**

Mark James Ferrier's alleged victims included hotels, aviation and mining companies, lawyers, old school mates and vehicle and heavy equipment distributors as he purported to be a successful mining consultant and contractor setting up business.

Mr Ferrier was arrested by fraud squad detectives on Wednesday morning and is expected to be extradited to Queensland.

He has been on the run since November 2011, and it is understood he has been using aliases, including Mark James Montiford-O'Brien.

Ian Ferrier, chairman of BRI Ferrier, said he was unaware that his son had been arrested as he had not had contact with him in recent years.

Mr Ferrier said he had been told recently his son had used his name to win the confidence of his alleged targets. "It's all very disappointing to hear of this," he said.

Mark Ferrier set up MJF Mining Contractors, under his own name, which struck a deal with listed miner Paynes Find Gold in June. Under the deal, Mr Ferrier would upgrade mining and processing operations at Paynes Find's mine 400km northeast of Perth in return for 50 per cent of the gold recovered.

The company's shares shot up more than 300 per cent after the announcement amid higher than normal trading volume in the junior miner's stock.

Paynes Find Gold chief executive Carl Popal alleged the company had been deceived by Mr Ferrier but stressed that no directors or related parties had traded in the stock. "This is so unbelievable. He sat in front of geologists, lawyers and the board as we did the deal," Mr Popal said.

Using the agreement with Paynes Find, Mr Ferrier allegedly convinced several companies and individuals to work for, and supply equipment to, MJF Mining Contractors on good faith that they would be paid. To date, none of these companies has been paid, according to one of Mr Ferrier's alleged victims.

Mr Ferrier created a lifestyle on his Facebook profile, posting photographs of a luxury residence, a motor cruiser, various trucks and heavy equipment that he claimed to own. "In reality, he had nothing. He didn't even own a car or hold a driver's licence," alleged a former associate, who declined to be named.

DEF_01597618

1614



# Son of solvency expert investigated for fraud

*Updated Fri 27 Sep 2013, 4:40pm AEST*

**The son of one of Australia's most prominent solvency experts is being investigated for fraud in Perth.**

Police say 38-year-old Mark James Ferrier, the son of Ian Ferrier, was arrested in the Perth suburb of Subiaco on Wednesday.

They say he will be extradited to Queensland tomorrow morning, to face court for breaching his parole conditions.



**PHOTO:** WA police arrested the man in the Perth suburb of Subiaco. (ABC)

**MAP:** Perth 6000

Police in Perth say Mr Ferrier is also being investigated over allegations he defrauded a number of groups, including mining companies in Perth.

The allegations relate to his consultancy business, MJF Mining Contractors.

It's believed the fraud allegations involve a sum of money of up to $500,000.

WA police say they expect to extradite Mr Ferrier back to Perth once his Queensland charges have been dealt with.

**Topics:** fraud-and-corporate-crime,  perth-6000,  qld

*First posted Fri 27 Sep 2013, 1:00pm AEST*



**ASIC**
Australian Securities & Investments Commission

# Current & Historical Company Extract

**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 13 October 2013 AEST 07:28:50 PM

This extract contains information derived from the Australian Securities and Investments Commission's (ASIC) database under section 1274A of the Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.



DEF_01597620

1616

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

| Organisation Details | Document Number |
|---|---|

**Current Organisation Details**

|  |  |  |
|---|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2014 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| Address Details | Document Number |
|---|---|

**Current**

|  |  |  |
|---|---|---|
| Registered address: | 'Central Plaza One' Level 30, 345 Queen Street, BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 14 Plunkett Street, PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |

| Officeholders and Other Roles | Document Number |
|---|---|

**Director**

|  |  |  |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street, PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Secretary**

|  |  |  |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street, PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Share Information**

**Share Structure**

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|---|---|---|---|---|---|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

**Members**

Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty

13 October 2013 AEST 07:28:50 PM                                                    1

DEF_01597621

1617

Current & Historical Company Extract

MJF MINING SERVICES WA PTY LTD
ACN 160 509 204

members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name: MARK FERRIER
Address: 14 Plunkett Street, PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

**Documents**

Note: Where no Date Processed is shown, the document in question has not been processed. In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C  Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

***End of Extract of 2 Pages***

13 October 2013 AEST 07:28:50 PM

2

DEF_01597622



ASIC
Australian Securities & Investments Commission

# Current & Historical Company Extract

**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 17 October 2013 AEST 11:18:42 AM

This extract contains information derived from the Australian Securities and Investments Commission's (ASIC) database under section 1274A of the Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.



DEF_01597623

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

| Organisation Details | Document Number |
|---|---|
| **Current Organisation Details** | |

| | | Document Number |
|---|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2014 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| Address Details | Document Number |
|---|---|
| **Current** | |

| | | Document Number |
|---|---|---|
| Registered address: | 'Central Plaza One' Level 30,  345 Queen Street, BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |

| Officeholders and Other Roles | Document Number |
|---|---|
| **Director** | |

| | | Document Number |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Secretary**

| | | Document Number |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |

**Share Information**

**Share Structure**

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|---|---|---|---|---|---|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

**Members**

Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty

17 October 2013 AEST 11:18:42 AM                                                                    1

DEF_01597624

1620

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD
ACN 160 509 204**

members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name:   MARK FERRIER
Address:   14 Plunkett Street, PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

**Documents**

Note: Where no Date Processed is shown, the document in question has not been processed. In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

***End of Extract of 2 Pages***

17 October 2013 AEST 11:18:42 AM

2

DEF_01597625

1621



**ASIC**
Australian Securities & Investments Commission

Australian Company

MJF MINING SERVICES WA PTY LTD
ACN 160509204

Extracted from ASIC's database at AEST 19:57:14 on 10/11/2013

| Company Summary | |
|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD |
| ACN: | 160509204 |
| ABN: | 65 160 509 204 |
| Registration Date: | 25/09/2012 |
| Next Review Date: | 25/09/2014 |
| | |
| Status: | Registered |
| Type: | Australian Proprietary Company, Limited By Shares |
| Locality of Registered Office: | BRISBANE QLD 4000 |
| Regulator: | Australian Securities & Investments Commission |

Further information relating to this organisation may be purchased from ASIC.

DEF_01597626

1622

**ABN Lookup**
An Australian Government Initiative

## Historical details for ABN: 65 160 509 204

### ABN details

| Entity name | From | To |
|---|---|---|
| MJF MINING SERVICES WA PTY LTD | 25 Sep 2012 | (current) |

| ABN Status | From | To |
|---|---|---|
| Active | 25 Sep 2012 | (current) |

**Entity type**

Australian Private Company

| Goods & Services Tax (GST) | From | To |
|---|---|---|
| Registered | 25 Sep 2012 | (current) |

| Main business location | From | To |
|---|---|---|
| WA 6000 | 26 Sep 2013 | (current) |
| WA 6008 | 19 Sep 2013 | 26 Sep 2013 |
| WA 6008 | 12 Sep 2013 | 19 Sep 2013 |
| WA 6160 | 21 Aug 2013 | 12 Sep 2013 |
| QLD 4064 | 29 Oct 2012 | 21 Aug 2013 |
| QLD 4064 | 26 Sep 2012 | 29 Oct 2012 |
| QLD 4068 | 25 Sep 2012 | 26 Sep 2012 |

### ASIC registration - ACN or ARBN

160 509 204 View record on the ASIC website

### Deductible gift recipient status

Not entitled to receive tax deductible gifts

Disclaimer

This extract is based on information supplied by businesses to the Registrar of the Australian Business Register.
ther the Registrar nor the Australian Government guarantee this information is accurate, up to date or
.mplete. You should consider verifying this information from other sources.

**ABN last updated:** 26 Sep 2013          **Record extracted:** 13 Nov 2013

DEF_01597627

1623

Form 3B (version 4)
UCPR 6.2

## STATEMENT OF CLAIM

**COURT DETAILS**

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division / Common Law |
| List | General |
| Registry | Sydney |
| Case number | |

**TITLE OF PROCEEDINGS**

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| | **Craig Wright R&D** |
| Defendant | **MJF Mining Services Pty Ltd** |
| | **(ABN 65 160 509 204)** |

**FILING DETAILS**

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

**TYPE OF CLAIM**

Mercantile Law - Sale of Goods and Services – Contractual Dispute
Liquidated claim

CONFIDENTIAL

DEF_01597628

1624

**RELIEF CLAIMED**

1      That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ 59,141,471.00 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ 59,142,504.00** |

**PLEADINGS AND PARTICULARS**

1      The defendant entered into a contract to provide services and unrefined gold to the plaintiff. The defendant paid for the invoiced amount in August 2013.

2      The delivery of gold was based on an agreement with Payne Finds Gold Ltd (Payne) to mine the holdings where the defendant would retain 50% of the gold recovered. The agreement with Payne was singed in June 2013.

3      The amount was invoiced and paid under Invoice Number OB0188.

4      The agreement with Payne was terminated in Sept 2013.

5      The agreement stated that valuation services from Ian Ferrier would be supplied. Ian Ferrier has denied that Mark Ferrier is his agent for this agreement.

6      As the agreement with Payne has ended, the defendant cannot supply the contracted quantity of gold as agreed.

7      The payment was issued in Bitcoin. The number of Bitcoin transferred was 245,103.89. The amount associated with the unsupplied valuation services and gold is 118354.312 Bitcoin.

8      The value of Bitcoin at filing is.AUD 659.643.

9      The contract included GST.

10      The total value of Bitcoin against the unfulfilled part of the contract at present is valued at market at $84,425,743.

11      The contract is capped at the value on the payment date. This comes to $59,141,471 AUD including GST.

12      The defendant has not returned calls or correspondence since Sept 2013.

CONFIDENTIAL    DEF_01597629

13    The material terms of the purchase contract were:

    a.  The Plaintiff was the purchaser

    b.  The Defendant was the Vendor

    c.  Completion was to take place based on a third party agreement with Payne
        that has terminated.

    d.  That in the event that the Purchaser breached the contract, the Seller could
        either affirm or terminate the contract with a full return of value.

14    The contract stated that a breach would lead to liquidated damages to the amounts
     stated as the project limits.

15    The defendant is unable to complete its responsibilities due to the ending of the
     agreement with Payne and the failure to contract Ian Ferrier for accounting services.

16    The total liquidated debt is capped at a liquidated amount of $59,141,471.

17    The plaintiff claims:

Debt of $ 59,141,471.

Interest pursuant to section 100 Civil Procedure Act 2005 from 18 Nov 2013 to
judgement.

## SIGNATURE

I acknowledge that court fees may be payable during these proceedings.  These fees may
include a hearing allocation fee.

Signature

Capacity                         Plaintiff

Date of signature

CONFIDENTIAL

DEF_01597630

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**
- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.
- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.
- The court registry for limited procedural information.

You can respond in one of the following ways:

1      **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

2      **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed.  If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.
- Filing an acknowledgement of the claim.
- Applying to the court for further time to pay the claim.

3      **If money is claimed, and you believe you owe part of the money claimed,** by:

- Paying the plaintiff that part of the money that is claimed.
- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |

CONFIDENTIAL

DEF_01597631

**#AFFIDAVIT VERIFYING**

Name                Craig Steven Wright

Address             43 St Johns Ave Gordon NSW 2072

Occupation          Lecturer/Director

Date                18 Nov 2013

I say on oath:

1        I am the plaintiff.

2        I believe that the allegations of fact in the statement of claim are true.

SWORN at *Sydney*

Signature of deponent    _____

Name of witness          Craig Steven Wright

Address of witness       *ASTRID LODENS*
                         *(refer stamp)*

Capacity of witness          Justice of the peace

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1        #I saw the face of the deponent. [OR, delete whichever option is inapplicable]
         ~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2        ~~#I have known the deponent for at least 12 months. [OR, delete whichever option is inapplicable]~~
         #I have confirmed the deponent's identity using the following identification document:

                         *New Drivers Licence .*
         _____
         Identification document relied on (may be original or certified copy) †

Signature of witness     _____

Note:  The deponent and witness must sign each page of the affidavit.  See UCPR 35.7B.

*19/4/13*

ASTRID LODENS
Justice of the Peace Registration 146947
In and for the State of New South Wales, Australia
21/163 Majors Bay Rd
Concord NSW 2137

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]

CONFIDENTIAL                                        DEF_01597632

1628

## #PARTY DETAILS

### PARTIES TO THE PROCEEDINGS

**Plaintiff**

Craig Steven Wright

**Defendant**

MJF Mining Services Pty Ltd

Level 28, 140 St Georges Tce

Perth

WA 6000 [Defendant]

### FURTHER DETAILS ABOUT PLAINTIFF[S]

**Plaintiff**

Name                          Craig Steven Wright

Address                       43 St Johns Ave

                              Gordon NSW 2072

**Contact details for plaintiff acting in person or by authorised officer**

Address for service           as above

Telephone                     0417 683 914

Email                         craigswright@acm.org

### DETAILS ABOUT DEFENDANT

**Defendant**

Name                          MJF Mining Services Pty Ltd

Address                       Level 28, 140 St Georges Tce

                              Perth WA 6000

CONFIDENTIAL

DEF_01597633

This and the following .................. pages is the
exhibit marked "........." referred to in the
Affidavit of Craig Steven Wright sworn the
..........15.......... day of .... January .... 2014 ....

                                    Justice of the Peace/Solicitor



**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig Wright <craig@rcjbr.org> |
| **Sent:** | Sunday, 2 February 2014 8:48 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Subject:** | FW: Hello, |

...

**From:** Craig S Wright [mailto:craig@rcjbr.org]
**Sent:** Monday, 25 November 2013 4:10 PM
**To:** mark@mjfminingservices.com
**Subject:** Hello,

Is anyone there?

1

CONFIDENTIAL

1631

DEF_01597635

Affidavit of Craig Steven Wright sworn the
......15.............day of....January...2014



.................................................
Justice of the Peace/Solicitor

----- Reply message -----
From: "Craig S Wright"
To: "accounts@mjfminingservices.com" <accounts@mjfminingservices.com>
Subject: RE: SOC
Date: Wed, Dec 18, 2013 11:21

Hello,
Please note we will be pursuing action with or without Mark's involvement.

Craig

----- Reply message -----
From: "accounts@mjfminingservices.com" <accounts@mjfminingservices.com>
To: "Craig S Wright" <craig.wright@hotwirepe.com>
Subject: SOC
Date: Wed, Dec 18, 2013 08:10

Hello,
We acknowledge receipt of the Statement of Claim, but ask for more time and that you reconsider the agreement.

Mark has been seeking alternatives and all agreements due in the coming year will be honoured. We appoligise for the delays, but as you may understand, Mark has been busy with travel and will not be back in the office before next year. Mark has been in South Africa and Central Western Australia, and both locations are outside of phone contact.

The setback with Payne Finds is only a short term setback and will be shortly rectified. As you may know, Carl is not a patient man and has squandered this opportunity.

We ask that you hold off on any further actions until Mark can deal with these personally.

Regards,
Accounts

8

DEF_01597636

**McCaughan, Alexandra**

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Sunday, 2 February 2014 9:27 PM |
| **To:** | John Chesher; McCaughan, Alexandra; Slater, Jonathan; Mavrakis, Nicholas |
| **Subject:** | FW: Urgent contact |
| | |
| **Importance:** | High |

**From:** Craig S Wright
**Sent:** Wednesday, 18 December 2013 11:32 AM
**To:** mjf@mjfminingservices.com; mark@mjfminingservices.com
**Cc:** John Chesher
**Subject:** Urgent contact
**Importance:** High

Hello Mark,
It has become imperative that you contact us urgently.

If we are not contacted before the end of the month we will have to look at appointing receivers.

Regards,

—————————————————
**Dr. Craig S Wright GSE LLM**
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com



1

1633

**IN THE FEDERAL COURT OF AUSTRALIA (FCA)**
**NEW SOUTH WALES REGISTRY - FEDERAL COURT OF AUSTRALIA**
**GENERAL DIVISION** No: NSD2577/2013

### NOTICE OF FILING AND HEARING

This application was filed electronically in the FEDERAL COURT OF AUSTRALIA (FCA) on
19/12/2013.

### DETAILS OF FILING

| | |
|---|---|
| **Document Lodged:** | Originating Application - Form 15 - Rule 8.01(1) |
| **File Number:** | NSD2577/2013 |
| **File Title:** | Craig Steven Wright v MJF Mining Services WA Pty Ltd ACN 160 509 204 |
| **District Registry:** | NEW SOUTH WALES REGISTRY - FEDERAL COURT OF AUSTRALIA |
| **Reason for Listing:** | First Directions |
| **Time and date for hearing:** | 05/02/2014, 9:30 AM |
| **Place:** | Court Room 22A, Level 17 Law Courts Building Queen's Square, Sydney |



Dated: 19/12/2013                    Registrar

+------------------------------------------------------------------+
|                            **NOTES**                             |
|                                                                  |
| 1. This Notice forms part of the application and contains        |
|    information that might otherwise appear elsewhere in the      |
|    application. The Notice must be included in the application    |
|    served on each party to the proceeding.                       |
| 2. The 'reason for listing' is descriptive and does not limit    |
|    the issues that might be dealt with, or orders that might be  |
|    made, at the hearing.                                         |
+------------------------------------------------------------------+

DEF_01597638

Form 15
Rules 8.01(1); 8.04(1)

## Originating application

No.          of 20
Federal Court of Australia

District Registry: NSW

Division: CONSUMER PROTECTION ACTION

**Craig Steven Wright**
Applicant
**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**
Respondent

To the Respondent
The Applicant applies for the relief set out in this application.

The Court will hear this application, or make orders for the conduct of the proceeding, at the time

and place stated below. If you or your lawyer do not attend, then the Court may make orders in

your absence.

You must file a notice of address for service (Form 10) in the Registry before attending Court or

taking any other steps in the proceeding.

| **Time and date for hearing:** |
| **Place:** |

The Court ordered that the time for serving this application be abridged to
Date:

Signed by an officer acting with the authority
of the District Registrar

| Filed on behalf of (name & role of party) | **The applicant** |
| Prepared by (name of person/lawyer) | **Craig Steven Wright** |
| Law firm (if applicable) | |
| Tel | **0417 683 914** | | Fax | |
| Email | **Craig.wright@hotwirepe.com** | |
| **Address for service** (include state and postcode) | **Unit 502, Level 5, 32 Delhi Road, North Ryde NSW 2113** |

DEF_01597639

2

**Details of claim**

On the grounds stated in the statement of claim, accompanying affidavit or other document prescribed by the Rules, the Applicant claims:

1.     Reimbursement for the value paid for the supply to the market value of $84,425,743.00 including GST $7,675,067.55

2.     Interest at the rate prescribed in rule 26.01 of the Federal Court Rules.

**Applicant's address**

The Applicant's address for service is:

Place: Suite 502 / Level 5, 32 Delhi Road North Ryde, NSW 2113

Email: craig.wright@hotwirepe.com

The Applicant's address is Suite 502 / Level 5, 32 Delhi Road North Ryde, NSW 2113.

**Service on the Respondent**

It is intended to serve this application on all Respondents.

Date: 19 December 2013

Signed by Craig Steven Wright Applicant

DEF_01597640

**IN THE FEDERAL COURT OF AUSTRALIA (FCA)**
**NEW SOUTH WALES REGISTRY - FEDERAL COURT OF AUSTRALIA**
**GENERAL DIVISION**                                    **No: NSD2577/2013**

### NOTICE OF FILING

This document was filed electronically in the FEDERAL COURT OF AUSTRALIA (FCA) on 19/12/2013.

### DETAILS OF FILING

| | |
|---|---|
| **Document Lodged:** | Statement of Claim - Form 17 - Rule 8.06(1)(a) |
| **File Number:** | NSD2577/2013 |
| **File Title:** | Craig Steven Wright v MJF Mining Services WA Pty Ltd ACN 160 509 204 |
| **District Registry:** | NEW SOUTH WALES REGISTRY - FEDERAL COURT OF AUSTRALIA |

Dated: 19/12/2013                                  Registrar

---

**Note**

This Notice forms part of the document and contains information that might otherwise appear elsewhere in the document. The Notice must be included in the document served on each party to the proceeding.

---

DEF_01597641

## Statement of claim

Federal Court of Australia

Registry: **Sydney**

File number: (P) _____

**Craig Steven Wright**

Applicant

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

Respondent

1.   At all material times the respondent was a corporation registered in the State of Western Australia.

2.   The respondent and its employees entered into and received payment for a contract to provide unrefined gold from the Payne Finds Gold mine to the Applicant ("the Agreement").
     <u>Particulars</u>
     Signed letter of offer of Mark Ferrier dated 02 June 2013
     Contract for the provision of Gold dated 03 June 2013

3.   The applicant paid the invoice including GST. The exchange was made as a transfer of 118,669.924 Bitcoin from the applicant to the respondent.
     <u>Particulars</u>
     Payment particulars and accounts

4.   The payment value applied to the contract comes to a current value of $84,425,743.00 AUD including a GST component of 7,675,067.55. This is based on the value of good paid for the supply of the unrefined gold at market value. The original supply has been valued at market rate.
     <u>Particulars</u>
     Currency value from Xe.com, transaction lists (supplied to the ATO and audited) and accounts

DEF_01597642

5.   The respondent had an agreement to farm gold with Paynes Find Gold (ASX: PNE) that
     provided it with 50% of recovered gold deposits.
     Particulars
     Announcement from the ASX from (ASX: PNE) dated 04 June 2013

6.   The provided it with 50% of recovered gold deposits.
     Particulars
     Announcement from the ASX from (ASX: PNE) dated 04 June 2013

7.   It was a term of the Agreement that unrefined gold would be supplied from a particular
     mine. The agreement with the owner of the mine has cancelled any agreement with the
     respondent.
     Particulars
     Announcement from the ASX from (ASX: PNE) dated 01 October 2013

8.   The Agreement with the respondent included valuation and accounting services to be
     supplied by Ian Ferrier.  Ian Ferrier stated that he never had any agreement to supply
     services
     Particulars
     The agreement terms and the invoices

9.   Ian Ferrier stated that he never had any agreement to supply services and had not been in
     contact with Mark Ferrier for some time. So such, the services where sold under false
     pretences.

10.  On Friday, 06 December 2013 the applicant was issued with NSW Police report number E
     53233272 where the director of the respondent was noted as being investigated for fraud
     and other deceptive conduct.

11.  On 30 November 2013 the applicant was informed from a contact in the Australian Federal
     Police that the director of the respondent (Mark James Ferrier) was a former felon on bail
     and was not eligible to act as a director.

12.  On 27 September 2013, the respondent was reported to have been extradited by police for
     trial on fraud charges.
     Particulars
     Article from the Australian Newspaper dated 27 September 2013 and first read on 17
     October 2013 by the applicant

DEF_01597643

13.    On 17 October 2013 the applicant started to attempt to contact the respondent.
       <u>Particulars</u>
       Emails and Phone records.

14.    On 18 December 2013, the applicant was contacted through an email address associated
       with the respondent
       (a) asking for time to negotiate an alternate agreement, and
       (b) stating that the respondent was in an area that does not have phone coverage
       <u>Particulars</u>
       The email communications.

15.    The respondent through its sole director (Mark James Ferrier) did not notify the applicant
       of the failure to have enacted a binding contract with Paynes Find Gold and accepted
       payment from the applicant using deceptive conduct and fraudulent statements.

16.    The applicant was notified that the contract between the respondent and the owner of the
       Gold deposits was cancelled and that the gold could not be supplied from the respondent
       as was agreed on 17 October 2013.
       <u>Particulars</u>
       Signed letter of Carl Popal from Payne Finds dated 01 October 2013

17.    And the applicant claims
       (a) reimbursement for the value paid for the supply to the market value of $84,425,743.00
       including GST $7,675,067.55
       (b) interest on (a) at the rate prescribed in rule 26.01 of the Federal Court Rules.

Date: 19 December 2013

Signed by Craig Steven Wright Applicant

~~This pleading was prepared by [Name], lawyer~~

DEF_01597644

1640

### Certificate of lawyer

I [name of lawyer] certify to the Court that, in relation to the statement of claim filed on behalf of the Applicant, the factual and legal material available to me at present provides a proper basis for each allegation in the pleading.

Date: [eg 18 June 20..]

Signed by [Name of lawyer]
Lawyer for the Applicant

| | |
|---|---|
| Filed on behalf of (name & role of party) | **The applicant** |
| Prepared by (name of person/lawyer) | **Craig Steven Wright** |
| Law firm (if applicable) | |
| Tel    **0417 683 914** | Fax |
| Email    **Craig.wright@hotwirepe.com** | |
| **Address for service** (include state and postcode) | **Unit 502, Level 5, 32 Delhi Road, North Ryde NSW 2113** |

DEF_01597645



Re FCA action pending - Message (HTML)

FILE   MESSAGE

Ignore | Delete | Reply Reply Forward More | Meeting IM More | To Manager Team Email FCA | Move Rules OneNote Actions | Mark Unread Categorize Follow Up | Translate | Find Related Select | Zoom

Delete | Respond | Quick Steps | Move | Tags | Editing | Zoom

Thu 19/12/2013 4:39 PM

**accounts@njfminingservices.com**

Re: FCA action pending

To    Craig S Wright;    njf@njfminingservices.com
Cc    John Chesher

You forwarded this message on 19/12/2013 4:40 PM.
This message was sent with High importance.
If there are problems with how this message is displayed, click here to view it in a web browser.

To whom it may concern,

Re your correspondence, we note that this has been received by email but that the director is not available. We do appoligise, but Mark will not be back before the hearing date and cannot hence receive this document.

We note that we cannot accept service and reject this as we do not desire to act on a matter whist the authorised officer of the company is indisposed.

We will contact you when Mark is back. We will not accept further correspondence regarding this matter before this.

Accounts

On December 18, 2013 at 11·49 PM Craig S Wright <craig.wright@hotwirepe.com> wrote:

Hello,

Due to the inability to contact the director of your company and the repeated requests, we have filed in the Federal Court.

The stamped documents are attached. These will be served to you today in the following manner:

•  Fax
•  Email
•  Registered post (Both to Qld and WA)

We regret taking this action, but have been left no choice.

Regards,

Dr. Craig S Wright GSE LLM
Chief Executive Officer

accounts@njfminingservices.com SOC

CONFIDENTIAL

DEF_01597646

1642

**John Chesher**

| | |
|---|---|
| **From:** | accounts@mjfminingservices.com |
| **Sent:** | Thursday, 19 December 2013 4:39 PM |
| **To:** | Craig S Wright; mjf@mjfminingservices.com |
| **Cc:** | John Chesher |
| **Subject:** | Re: FCA action pending |
| | |
| **Importance:** | High |

To whom it may concern,
Re your correspondence, we note that this has been received by email but that the director is not available.
We do appoligise, but Mark will not be back before the hearing date and cannot hence receive this
document.

We note that we cannot accept service and reject this as we do not desire to act on a matter whist the
authorised officer of the company is indisposed.

We will contact you when Mark is back. We will not accept further correspondence regarding this matter
before this.

Accounts

On December 18, 2013 at 11:49 PM Craig S Wright <craig.wright@hotwirepe.com> wrote:

Hello,
Due to the inability to contact the director of your company and the repeated requests, we have filed in the
Federal Court.

The stamped documents are attached. These will be served to you today in the following manner:

- Fax
- Email
- Registered post (Both to Qld and WA)

We regret taking this action, but have been left no choice.

Regards,

**Dr. Craig S Wright GSE LLM**
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com

1

CONFIDENTIAL

DEF_01597647



**ASIC**
Australian Securities & Investments Commission

# Current & Historical Company Extract



**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 21 December 2013 AEST 05:09:38 PM

This extract contains information derived from the Australian Securities and
Investments Commission's (ASIC) database under section 1274A of the
Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.

DEF_01597648

1644

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**

**ACN 160 509 204**

| Organisation Details | | Document Number |
|---|---|---|
| **Current Organisation Details** | | |
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2014 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| Address Details | | Document Number |
|---|---|---|
| **Current** | | |
| Registered address: | 'Central Plaza One' Level 30,  345 Queen Street, BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 'Info Received Address May Be Invalid,  7/11/2013',  14 **plunkett Street,  PADDINGTON QLD 4064 | 028793476 |
| Start date: | UNKNOWN | |
| **Historical** | | |
| Principal Place Of Business address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Cease date: | UNKNOWN | |

| Officeholders and Other Roles | | Document Number |
|---|---|---|
| **Previous Director** | | |
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |
| Cease date: | 25/09/2012 | |
| **Previous Secretary** | | |
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |
| Cease date: | 25/09/2012 | |

**Share Information**

**Share Structure**

DEF_01597649

1645

Case 9:18-cv-80176-BB    Document 885-9    Entered on FLSD Docket 02/17/2022    Page 108 of
114

Current & Historical Company Extract

MJF MINING SERVICES PTY LTD

**ACN 160 509 204**

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|-------|-------------|---------------|-------------------|---------------------|-----------------|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

### Members

Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name: MARK FERRIER
Address: 14 Plunkett Street, PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

### Documents

Note: Where no Date Processed is shown, the document in question has not been processed. In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C  Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

Note: Where the expression 'Unknown' is shown, the precise date may be available from records taken over on 1 January 1991 and held by ASIC in paper or microfiche.

**\*\*\*End of Extract of 2 Pages\*\*\***

21 December 2013 AEST 05:09:38 PM

2

DEF_01597650



WHOIS

### mjfminingservices.com registry whois

Updated 1 second ago - Refresh

Domain Name: MJFMININGSERVICES.COM
Registrar: NETWORK SOLUTIONS, LLC.
Whois Server: whois.networksolutions.com
Referral URL: http://www.networksolutions.com/en_US/
Name Server: NS1.DNS.COM
Name Server: NS2.DNS.COM
Status: clientTransferProhibited
Updated Date: 24-nov-2013
Creation Date: 15-oct-2012
Expiration Date: 15-oct-2014



.WS @ $8.88 $19.88

### mjfminingservices.com registrar whois

Updated 1 second ago

The data in Networksolutions.com's WHOIS database is provided to you by
Networksolutions.com for information purposes only, that is, to assist you in
obtaining information about or related to a domain name registration
record. Networksolutions.com makes this information available "as is," and
does not guarantee its accuracy. By submitting a WHOIS query, you
agree that you will use this data only for lawful purposes and that,
under no circumstances will you use this data to: (1) allow, enable,
or otherwise support the transmission of mass unsolicited, commercial
advertising or solicitations via direct mail, electronic mail, or by
telephone, or (2) enable high volume, automated, electronic processes
that apply to Networksolutions.com (or its systems). The compilation,
repackaging, dissemination or other use of this data is expressly
prohibited without the prior written consent of Networksolutions.com.
Networksolutions.com reserves the right to modify these terms at any time.
By submitting this query, you agree to abide by these terms.

Domain Name: MJFMININGSERVICES.COM
Registry Domain ID:
Registrar WHOIS Server: whois.networksolutions.com
Registrar URL: http://www.networksolutions.com/en_US/
Updated Date: 2013-11-24T00:00:00Z
Creation Date: 2012-10-15T00:00:00Z
Registrar Registration Expiration Date: 2014-10-15T00:00:00Z
Registrar: NETWORK SOLUTIONS, LLC.
Registrar IANA ID: 2
Registrar Abuse Contact Email: **abuse**@web.com
Registrar Abuse Contact Phone: 1-800-333-7680
Reseller:
Domain Status: clientTransferProhibited
Registry Registrant ID:
Registrant Name: Ferrier, Mark James
Registrant Organization:
Registrant Street: ATTN insert domain name here care of Network Solutions PO Box 459
Registrant City: Drums
Registrant State/Province: PA
Registrant Postal Code: 18222
Registrant Country: US
Registrant Phone: 570-708-8780
Registrant Phone Ext:
Registrant Fax:
Registrant Fax Ext:
Registrant Email:
Registry Admin ID:
Admin Name: Ferrier, Mark James
Admin Organization: null
Admin Street: ATTN insert domain name here care of Network Solutions PO Box 459
Admin City: Drums
Admin State/Province: PA
Admin Postal Code: 18222
Admin Country: US
Admin Phone: 570-708-8780
Admin Phone Ext:
Admin Fax:
Admin Fax Ext:
Admin Email: **ap5un47b5z8**@networksolutionsprivateregistration.com
Registry Tech ID:
Tech Name: Ferrier, Mark James
Tech Organization: null
Tech Street: ATTN insert domain name here care of Network Solutions PO Box 459
Tech City: Drums
Tech State/Province: PA
Tech Postal Code: 18222
Tech Country: US

**Hot Deals!**





# Web Hosting

Host
Unlimited
Domains

Starts @
$7.88
per month



✔ Unlimited Disk Space
✔ Unlimited Data transfer
✔ Unlimited Databases
✔ Unlimited Email Accounts
✔ 30 Day Money Back Guarantee

View Plan

Tech Phone: 570-708-8780
Tech Phone Ext:
Tech Fax:
Tech Fax Ext:
Tech Email: **sp5un47b5z8**@networksolutionsprivateregistration.com
Name Server: NS1.DNS.COM
Name Server: NS2.DNS.COM
DNSSEC:
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/
>>> Last update of whois database: Tue, 24 Dec 2013 05:09:53 UTC <<<

This listing is a Network Solutions Private Registration. Mail
correspondence to this address must be sent via USPS Express Mail(TM) or
USPS Certified Mail(R), all other mail will not be processed. Be sure to
include the registrant's domain name in the address

## related domain names

networksolutions.com    dns.com    web.com    networksolutionsprivateregistration.com    internic.net

DEF_01597652

1648



ASIC
Australian Securities & Investments Commission

# Current & Historical Company Extract

**Name:** MJF MINING SERVICES WA PTY LTD
**ACN:** 160 509 204

Date/Time: 29 December 2013 AEST 12:10:47 PM

This extract contains information derived from the Australian Securities and Investments Commission's (ASIC) database under section 1274A of the Corporations Act 2001.

Please advise ASIC of any error or omission which you may identify.



DEF_01597653

1649

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

| **Organisation Details** | **Document Number** |
|---|---|
| **Current Organisation Details** | |

| | | |
|---|---|---|
| Name: | MJF MINING SERVICES WA PTY LTD | 1E8752650 |
| ACN: | 160 509 204 | |
| ABN: | 65160509204 | |
| Registered in: | Queensland | |
| Registration date: | 25/09/2012 | |
| Next review date: | 25/09/2014 | |
| Name start date: | 25/09/2012 | |
| Status: | Registered | |
| Company type: | Australian Proprietary Company | |
| Class: | Limited By Shares | |
| Subclass: | Proprietary Company | |

| **Address Details** | **Document Number** |
|---|---|
| **Current** | |

| | | |
|---|---|---|
| Registered address: | 'Central Plaza One' Level 30,  345 Queen Street, BRISBANE QLD 4000 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Principal Place Of Business address: | 'Info Received Address May Be Invalid,  7/11/2013',  14 **plunkett Street,  PADDINGTON QLD 4064 | 028793476 |
| Start date: | UNKNOWN | |

**Historical**

| | | |
|---|---|---|
| Principal Place Of Business address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | 1E8752650 |
| Start date: | 25/09/2012 | |
| Cease date: | UNKNOWN | |

| **Officeholders and Other Roles** | **Document Number** |
|---|---|
| **Previous Director** | |

| | | |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |
| Cease date: | 25/09/2012 | |

**Previous Secretary**

| | | |
|---|---|---|
| Name: | MARK FERRIER | 1E8752650 |
| Address: | 14 Plunkett Street,  PADDINGTON QLD 4064 | |
| Born: | 19/12/1975, SYDNEY, NSW | |
| Appointment date: | 25/09/2012 | |
| Cease date: | 25/09/2012 | |

**Share Information**

**Share Structure**

29 December 2013 AEST 12:10:47 PM

1

1650

DEF_01597654

Current & Historical Company Extract

**MJF MINING SERVICES WA PTY LTD**
**ACN 160 509 204**

| Class | Description | Number issued | Total amount paid | Total amount unpaid | Document number |
|-------|-------------|---------------|-------------------|---------------------|-----------------|
| ORD | ORDINARY SHARES | 120 | 120.00 | 0.00 | 1E8752650 |

**Members**

Note: For each class of shares issued by a proprietary company, ASIC records the details of the top twenty members of the class (based on shareholdings). The details of any other members holding the same number of shares as the twentieth ranked member will also be recorded by ASIC on the database. Where available, historical records show that a member has ceased to be ranked amongst the top twenty members. This may, but does not necessarily mean, that they have ceased to be a member of the company.

Name: MARK FERRIER
Address: 14 Plunkett Street, PADDINGTON QLD 4064

| Class | Number held | Beneficially held | Paid | Document number |
|-------|-------------|-------------------|------|-----------------|
| ORD | 120 | no | FULLY | 1E8752650 |

**Documents**

Note: Where no Date Processed is shown, the document in question has not been processed. In these instances care should be taken in using information that may be updated by the document when it is processed. Where the Date Processed is shown but there is a zero under No Pages, the document has been processed but a copy is not yet available.

| Date received | Form type | Date processed | Number of pages | Effective date | Document number |
|---------------|-----------|----------------|-----------------|----------------|-----------------|
| 25/09/2012 | 201C  Application For Registration As A Proprietary Company | 25/09/2012 | 3 | 25/09/2012 | 1E8752650 |

Note: Where the expression 'Unknown' is shown, the precise date may be available from records taken over on 1 January 1991 and held by ASIC in paper or microfiche.

**\*\*\*End of Extract of 2 Pages\*\*\***

29 December 2013 AEST 12:10:47 PM                                                     2

1651

DEF_01597655

# TAB 887

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176-BLOOM/Reinhart**

IRA KLEIMAN, *et al.*,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

<u>**ORDER ON MOTION FOR NEW TRIAL**</u>

**THIS CAUSE** is before the Court upon the Estate of David Kleiman's ("Estate") Motion for a New Trial Based on Violations of Order Excluding Sibling Relationship Evidence, ECF No. [861] ("Motion"). Defendant Craig Wright ("Defendant") filed an Opposition to the Motion, ECF No. [869] ("Response"), to which Plaintiff filed a Reply, ECF No. [875] ("Reply"). The Court has carefully reviewed the Motion, all opposing and supporting materials, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

**I. BACKGROUND**

The Court assumes the parties' familiarity with the general factual allegations and evidence presented at the trial. On February 14, 2018, the Estate and W&K Info Defense Research, LLC ("W&K") (collectively, "Plaintiffs") initiated this action concerning a dispute over the ownership of bitcoins and bitcoin-related intellectual property. On January 14, 2019, Plaintiffs filed the operative Second Amended Complaint ECF No. [83] ("Complaint"), asserting the following claims for relief: conversion (Count I); unjust enrichment (Count II); misappropriation (Count III); violation of the Defense of Trade Secrets Act (Count IV); breach of fiduciary duty (Count V);

1652

Case No. 18-cv-80176-BLOOM/Reinhart

breach of partnership duties of loyalty and care (Count VI); fraud (Count VII); constructive fraud (Count VIII); permanent injunction (Count IX); and civil theft (Count X).[1]

Following a 21-day jury trial commencing on November 1, 2021, the jury returned a verdict solely in favor of W&K as to its conversion claim against Defendant. ECF No. [812]. As to this claim, the jury awarded W&K $100,000,000.00. *Id.* On December 7, 2021, the Court entered Final Judgment reflecting the jury's award. ECF No. [814]. The Estate now moves for a new trial on its claims pursuant to Rule 59 of the Federal Rules of Civil Procedure. *See generally* ECF No. [861]. The Estate argues that notwithstanding the Court's Order on Motion *in Limine* excluding evidence about Ira Kleiman's relationship with his brother David Kleiman, except as to the siblings' dinner conversation on Thanksgiving Day 2009, Defendant "inappropriately focused the jury's attention on the brothers' relationship more than ten times during trial." *Id.* at 1-2; *see also* ECF No. [623] ("Order").[2]

The Estate maintains that: (1) the references to the sibling relationship suggested to the jury that the relationship between David and Ira Kleiman was a valid consideration in deciding the Estate's claims; (2) defense counsel made several references to the sibling relationship; (3) the Court overruled the Estate's objections to defense counsel's questioning on the sibling relationship; (4) the Estate could not correct misleading aspersions that Defendant cast on the sibling relationship; and (5) there is direct information demonstrating that Defendant's violation

---

[1] On December 27, 2018, the Court dismissed with prejudice as time barred Plaintiffs' claims for misappropriation (Count III) and violation of the Defense of Trade Secrets Act (Count IV) under a preceding version of the Complaint. *See* ECF No. [68].

[2] In the Order, the Court held that "[e]vidence about Ira Kleiman's sibling-relationship with [David] Kleiman is excluded except as to the Thanksgiving Day 2009 dinner conversations." ECF No. [623] at 16. The Court explained that the "post-2009 relationship evidence has little bearing, if any, on material issues in dispute in this case" and that evidence regarding "whether Ira Kleiman visited his brother at the hospital, spoke to him infrequently, or whether [David] Kleiman mentioned Ira Kleiman to others had limited probative value but substantial capacity to cause undue prejudice." *Id.* at 15.

2

Case No. 18-cv-80176-BLOOM/Reinhart

of the Order affected the jury's deliberations. ECF No. [861] at 9-12. Defendant opposes the Motion. *See generally* ECF No. [869].

## II. LEGAL STANDARD

Among other relief, a court may grant a new jury trial under Rule 59 "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). For instance, a party may assert that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Thus, a motion for new trial should be granted "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Brown v. Sheriff of Orange Cnty., Fla.*, 604 F. App'x 915 (11th Cir. 2015) (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001)); *see Tucker v. Hous. Auth. of Birmingham Dist.*, 229 F. App'x 820, 826 (11th Cir. 2007) ("[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence.").

"[G]ranting motions for new trial touches on the trial court's traditional equity power to prevent injustice and the trial judge's duty to guard the integrity and fairness of the proceedings before [her]." *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 237 F. App'x 423, 424 (11th Cir. 2007) (quoting *Christopher v. Florida*, 449 F.3d 1360, 1366 n.4 (11th Cir. 2006)). Ultimately, "motions for a new trial are committed to the discretion of the trial court." *Montgomery v. Noga*, 168 F.3d 1282, 1295 (11th Cir. 1999); *Steger v. General Elec. Co.*, 318 F.3d 1066, 1081 (11th Cir. 2003) (citing *Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1503 (11th Cir. 1985)) ("A district court is permitted wide discretion in considering a motion for new trial based on an erroneous jury instruction.").

3

1654

Case No. 18-cv-80176-BLOOM/Reinhart

### III. DISCUSSION

The Estate argues that a new trial is warranted based upon the misconduct of defense counsel in violating the Court's Order. *See generally* ECF No. [861]. The Estate maintains that the parties vigorously litigated, in pretrial motions *in limine*, Defendant's ability to inject Ira Kleiman's relationship with his brother David Kleiman into the trial as an attempt to persuade the jury that the Estate should not recover because Ira was somehow undeserving. *Id.* at 1. Yet, according to the Estate, despite the Court's exclusion of evidence about the brothers' relationship, except for the Thanksgiving Day 2009 conversation, "Defendant inappropriately focused the jury's attention on the brothers' relationship more than ten times during trial." *Id.* at 2; *see also* ECF No. [838] at 184:19-24; ECF No. [839] at 149:22-150:24; ECF No. [840] at 23:12-24:1, 84:1-2, 135:22-136:3, 173:13-25; ECF No. [841] at 68:7-21, 70:16-21.

The Estate maintains that a new trial on its claims is necessary and, in support, raises five overarching arguments. First, "the more than ten references to the relationship between David and Ira Kleiman by counsel for Defendant improperly suggested to the jury that the sibling relationship was a valid consideration in deciding the Estate's claims." ECF No. [861] at 9. Second, "[t]he timing, number, and manner of references shows that Defendant intentionally elicited the evidence about the relationship between David and Ira and meant to focus the jury's attention on the issue." *Id.* at 10. Third, "[t]he prejudice to the Estate was amplified by the overruling of early objections to Defendant's counsel raising the issue of the sibling relationship." *Id.* at 11. Fourth, "Plaintiffs— abiding by the Court's order—did not have the opportunity to correct the misrepresentations made to the jury about the brothers' relationship." *Id.* Fifth, a legal media outlet secured an interview with a juror, who related that "'[i]n three years [Ira] didn't go to the hospital' to visit David 'clouded [the juror's] view as far as what the actual record stated.'" *Id.* at 12 (alterations in original) (quoting ECF No. [861-7] at 3).

4

1655

Case No. 18-cv-80176-BLOOM/Reinhart

In response, Defendant maintains that a new trial is not warranted, challenging each of the ten references to the siblings' relationship that forms the basis of the Estate's Motion. *See generally* ECF No. [869]. First, Defendant argues that the Estate waived any claimed error in admitting evidence as to five questions because it "never objected, never moved to strike the answers, and never asked for a curative instruction[.]" *Id.* at 5 (emphasis omitted) (citing ECF No. [840] at 23:12-19, 84:1-2, 135:22-136:3, 173:12-25; ECF No. [838] at 184:19-24). Second, as for the three questions to which the Court sustained the Estate's objections, *see* ECF No. [840] at 23:20-24:1; ECF No. [841] at 68:7-21, 70:16-21, Defendant argues that "[t]hese three (unanswered) questions cannot be grounds for a new trial because questions are not evidence." ECF No. [869] at 9 (emphasis omitted). Third, as for the two remaining questions to which the Court overruled the Estate's objections, *see* ECF No. [839] at 149:22-150:24, Defendant argues that "the Court plainly had discretion to overrule [the Estate's] two objections in light of the evidence that had been introduced, and decide that those two questions did not upset the balancing test of Rule 403, even if that might have amounted to a 'modification' of the Order (it did not)." ECF No. [869] at 11.

In the alternative, Defendant maintains that even if there was an error regarding any of the ten challenged references, the evidence was cumulative and therefore harmless. *Id.* at 12-16. According to Defendant, "there was extensive other evidence in the record (some proffered by [the Estate] of a limited relationship between the brothers." *Id.* at 13. Specifically, the lack of testimony from Ira Kleiman about seeing David Kleiman "demonstrated that they were not close" and "Ira also volunteered testimony that they never discussed David's lengthy hospitalizations and health issues, as one would reasonably expect brothers to do[.]" *Id.* at 14 (citing ECF No. [839] at 176:18-177:1. On the other hand, Kimon Andreou, David Kleiman's best friend, "testified that he visited David daily in the hospital and spoke to him every day" and "testified at length about their text messages, which discussed David's personal life, including his health issues." *Id.* (citing ECF No.

5

Case No. 18-cv-80176-BLOOM/Reinhart

[848] at 99:3-16, 110:6-19). Additionally, Defendant maintains that because "[t]he jury awarded no bitcoin-related damages either to the Estate or to W&K . . . there must have been something other than the 'relationship evidence' that caused the jury to reject all of W&K's bitcoin-related damages claims." *Id.* at 15. Further, Defendant avers that even "the Law 360 article the Estate relies on[] suggests that [P]laintiffs failed to prove David Kleiman was a bitcoin miner, much less a bitcoin coder, and this failure of proof applied equally to the claims of W&K and the Estate[.]" *Id.* (footnote omitted) (citing ECF No. [861-7] at 2).

"The standard for determining whether a jury verdict should be set aside as a result of misconduct of counsel is whether the conduct was 'such as to impair gravely the calm and dispassionate consideration of the case by the jury.'" *Bank Atlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1474 (11th Cir. 1992) (citation omitted). In making this determination, courts "look to the entire argument, the context of the remarks, the objection raised, and the curative instruction[.]" *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988) (citation omitted).

Upon review of the record and consideration of the parties' briefings, the Court finds the Estate's arguments are unpersuasive and insufficient to warrant a new trial. First, the Court highlights that the Estate failed to object at trial to many of the questions with which it now takes issue, ECF No. [838] at 184:19-24; ECF No. [840] at 84:1-2, 135:22-136:3. *See Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1285 (11th Cir. 2000) ("Generally, a party must object to preserve error in the admission of testimony, even when a party or a court violates an in limine ruling."); *see also ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1305 (11th Cir. 2018) ("A motion *in limine* may preserve an objection when the district court has 'definitively' ruled on the matter at issue . . . But 'if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error for appeal.'"

6

1657

Case No. 18-cv-80176-BLOOM/Reinhart

(internal citation omitted) (quoting Fed. R. Evid. 103 advisory committee's note to the 2000 Amendments))).

Additionally, the Estate did not move to strike any testimony elicited regarding the brothers' sibling relationship, nor did it request a curative instruction at any point during the lengthy 21-day jury trial.[3] *See* ECF No. [838] at 184:19-24; ECF No. [839] at 149:22-150:24; ECF No. [840] at 23:12-24:1, 84:1-2, 135:22-136:3, 173:13-25; ECF No. [841] at 68:7-21, 70:16-21. Under these circumstances, the Court concludes that the Estate's failure to raise a contemporaneous objection, move to strike any testimony, or seek a curative instruction effectively waived its ability to raise any objection post-trial on the basis that Defendant's questions and/or the testimony Defendant elicited were unduly prejudicial. As such, "any prejudice suffered by [the Estate] is due to [it's] own failure to bring the matter to the Court's attention in a timely manner before the jury's verdict." *Barragan v. LCT Transp. Servs., Inc.*, No. 00-2040-CIV, 2002 WL 32248046, at *2 (S.D. Fla. Mar. 15, 2002), *aff'd sub nom. Barragan v. LCT Transp.*, 65 F. App'x 713 (11th Cir. 2003); *see also* ECF No. [623] at 3 ("[i]n light of the preliminary or preemptive nature of motions *in limine*, 'any party may seek reconsideration at trial in light of the evidence actually presented and shall make contemporaneous objections when evidence is elicited.'" (citations omitted)).

Nonetheless, even if the Court were to assume that the Estate preserved any claim of error as to references of the brothers' sibling relationship, the Court is not persuaded that Defendant's

---

[3] The Court notes that while the Estate takes issues with three questions to which the Court sustained its objections, *see* ECF No. [840] at 23:20-24:1; ECF No. [841] at 68:7-21, 70:16-21, the Court instructed the jury at the outset of trial that "the lawyers' questions and objections are not evidence. Only the witnesses' answers are evidence." ECF No. [837] at 174:18-19. The Court further instructed the jury that "when I sustain an objection to a question, you must ignore the question and not guess what the answer might have been." *Id.* at 175:9-11. *See United States v. Colston*, 4 F.4th 1179, 1192 (11th Cir. 2021) ("We always presume that a jury follows its instructions." (citing *United States v. Brown*, 983 F.2d 201, 202 (11th Cir. 1993))).

7

Case No. 18-cv-80176-BLOOM/Reinhart

purported misconduct was so prejudicial as to warrant a new trial. As Defendant correctly argues,

there was other evidence in the record demonstrating a limited relationship between Ira and David

Kleiman. Indeed, Ira Kleiman voluntarily testified that he and David Kleiman did not discuss

David's lengthy hospitalizations or serious health conditions:

> Q. Your brother knew that he was not in good health?
>
> A. He didn't really have those kind of discussions with me. I'm not exactly sure -- you know, he didn't mention specifically like what kind of health condition he was in.
>
> Q. Your brother was hospitalized almost every day of the last two years of his life in the VA hospital here in Miami, was he not?
>
> A. Yes. But I'm just saying he didn't really discuss that kind of stuff with me.

ECF No. [839] at 176:18-177:1. Conversely, Kimon Andreou, David Kleiman's best friend,

testified extensively about their text messages discussing David's personal life and health issues.

ECF No. [848] at 110:6-114:14, 117:8-122:10.

Moreover, the Law360 article the Estate relies upon does not support its position that the

references of the siblings' relationship affected the jury's verdict. Rather, the quotes contained in

the article demonstrate that Plaintiffs failed to prove that David Kleiman mined or coded bitcoin:

> '*They never proved to me without a shadow of a doubt that he was involved in bitcoin in any way*,' the juror said. '*Everybody said he wasn't a miner, he wasn't a code*r. I just felt like he may have written papers for Dr. Wright, and that's where their friendship was.' Jurors deliberated for more than a week, as the two holdouts in Kleiman's camp pored through all the evidence, according to the juror. 'They finally realized there was no positive connection with bitcoin,' the juror said. '*That's when they agreed that as far as liability towards bitcoin, there was none*.'

*See* ECF No. [861-7] at 2 (emphasis added). As such, the Court can hardly conclude that the jury

awarded no bitcoin-related damages because of the Defendant's references to the brothers' sibling

relationship. Rather, based upon the record in this case, the jury failed to award damages to the

Estate on any of its claims due to the Estate's failure to meet its burden of proof at trial, not

Defendant's purported misconduct.

1659

Case No. 18-cv-80176-BLOOM/Reinhart

Lastly, the Court is not persuaded that the principal authority cited by the Estate supports its position that a new trial is warranted. *See Christopher v. Florida*, 449 F.3d 1360, 1365 (11th Cir. 2006) (affirming district court's grant of new trial where, among other factors, "Plaintiff's counsel's improper closing argument prejudiced the substantial rights of Defendants by taking away from Defendants the benefits of the partial summary judgment they had won before trial and by incorrectly expanding the grounds for liability at trial to include grounds ruled out by the court."); *McWhorter v. City of Birmingham*, 906 F.2d 674 (11th Cir. 1990) (same, where counsel argued an excluded theory "in the rebuttal portion of [his] argument, immediately before the jury began to deliberate; defense counsel had no opportunity to respond to these claims; and the jury noticed that" a document referenced during closing, which was based on the excluded theory and not admitted into evidence, "was not included in the exhibits."); *Goodman v. Safeco Insurance Co. of Illinois*, No. 8:13-cv-2641-T-30EAJ, 2015 WL 898696 (M.D. Fla. Mar. 3, 2015) (granting motion for new trial where counsel's commentary during closing argument "encouraged the jury to decide the case not on the merits, but on the idea that the insurance company would be cheating an innocent and injured third party.").

Here, Defendant never urged the jury at any point during trial, let alone during closing argument, to decide the Estate's claims on an improper basis—namely, that the siblings were estranged, and Ira Kleiman was, therefore, undeserving. Rather, the Court can ascertain several proper purposes for the challenged evidence. This includes establishing the implausibility of the Thanksgiving Day 2009 conversation, relevant dates, and Ira Kleiman's personal knowledge of David Kleiman's finances. Moreover, the jury was properly instructed that their decision must be based on the actual evidence presented and they must not be influenced by any sympathy or prejudice toward against any party. *See* ECF No. [851] at 20:9-11 ("Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy

9

1660

Case No. 18-cv-80176-BLOOM/Reinhart

for or prejudice against anyone."); *see also id.* at 44:12-15 ("You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or biases."); *see also Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 898 (11th Cir. 2011) ("We presume that juries follow the instructions given to them." (quoting *United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011))).

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that the Motion, **ECF No. [861]**, is **DENIED** consistent with this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 28, 2022.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

10

1661

# TAB 889

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al*.,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

### AMENDED FINAL JUDGMENT

**THIS CAUSE** is before the Court following entry of the Final Judgment, ECF No. [814], and Order on Motion to Amend Final Judgment, ECF No. [888] ("Order"). Pursuant to Rule 58, and for the reasons set forth in the Court's Order, it is **ORDERED AND ADJUDGED** as follows:

1. Judgment is entered in favor of Plaintiff W&K Info Defense Research, LLC, as to its claim against Defendant Craig Wright for Conversion in the amount of $100,000,000.00, for which sum let execution issue.

2. Consistent with the Court's Order, ECF No. [888], prejudgment interest shall be awarded in the amount of **$43,132,492.48** pursuant to Florida Statute § 55.03.

3. The Court reserves jurisdiction to award attorneys' fees and costs.

4. Post-judgment interest shall accrue on this Judgment pursuant to 28 U.S.C. § 1961.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 9, 2022.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record

1662

# TAB CS

## CERTIFICATE OF SERVICE

I hereby certify that on September 7, 2022, 2 copies of the appendix were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

David J. Smith
Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

On this same date, a copy of the public volumes of the appendix was served on all counsel of record via CM/ECF and a copy of the sealed volume 9 of the appendix was served on the following via third party commercial carrier for delivery within three days:

Andres Rivero
Amanda L. Fernandez
Allison Henry
Robert J. Kuntz, Jr.
Amanda McGovern
Jorge A. Mestre
Alan H. Rolnick
Daniela T. Sierra
Rivero Mestre, LLP
2525 Ponce de Leon Blvd., Ste. 1000
Coral Gables, FL 33134

Michael A. Fernandez
Rivero Mestre, LLP
565 5th Ave., 7th Floor
New York, NY 10017

Schneur Kass
4821 NW 65th St.
Lauderhill FL 33319

*/s/ Robyn Cocho*
Counsel Press

Filing and service were performed by direction of counsel.