IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME I OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
    FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA McGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

| TAB NO. | DESCRIPTION |
|---------|-------------|
| 210 | Plaintiffs' Motion to Compel Defendant to Comply with this Court's Orders Directing Him to Produce a List of the Bitcoins He Held as of December 31, 2013 |
| 429 | Order Granting in Part and Denying in Part Plaintiffs' Corrected Motion for Attorneys' Fees (DE 346), filed March 17, 2020 |
| 618 | Joint Proposed Jury Instructions, filed September 29, 2020 |
| 802-1 | Exhibit A to Defendant's Opposition to Motion for a New Trial (DE 861) — Final Jury Instruction Objections |
| 829 | Email from Craig S. Wright to Dave Kleiman, dated March 12, 2008 |
| 837 | Trial Transcript Day 1, dated November 1, 2021 |
| 838 | Trial Transcript Day 2, dated November 2, 2021 |
| 839 | Trial Transcript Day 3, dated November 3, 2021 |
| 840 | Trial Transcript Day 4, dated November 4, 2021 |
| 841 | Trial Transcript Day 5, dated November 5, 2021 |
| 842 | Trial Transcript Day 6, dated November 8, 2021 |
| 843 | Trial Transcript Day 7, dated November 9, 2021 |
| 845 | Trial Transcript Day 9, dated November 15, 2021 |

| TAB NO. | DESCRIPTION |
|---------|-------------|
| 846 | Trial Transcript Day 10, dated November 16, 2021 |
| 847 | Trial Transcript Day 11, dated November 17, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 850 | Trial Transcript Day 14, dated November 22, 2021 |
| 851 | Trial Transcript Day 15, dated November 23, 2021 |
| 861 | Law360 Article entitled, "No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360" |
| 877 | Joint Notice and Request for Judicial Ruling on Proposed Redactions to Admitted Trial Exhibits, filed January 31, 2022 |

**210**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* |  |
| v. |  |
| CRAIG WRIGHT, |  |
| *Defendant.* |  |

## PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO COMPLY WITH THIS COURT'S ORDERS DIRECTING HIM TO PRODUCE A LIST OF THE BITCOINS HE HELD AS OF DECEMBER 31, 2013

`

Plaintiffs respectfully request the Court compel Defendant ("Craig") to comply with this Court's March 14, 2019 and May 3, 2019 Orders (i) directing him to produce a list of the bitcoins he held as of December 31, 2013 and (ii) denying his motion for protective order not to produce that list.

In Plaintiffs first set of interrogatories, served on July 26, 2018, Plaintiffs requested that Craig "[i]dentify the . . . public addresses for any cryptocurrency that . . . you possess the private keys to." (ECF No. 92-2 at 8.). Of course, this discovery goes to the heart of Plaintiff's case – and it is discovery that Craig has tried at all costs to avoid.

On March 14, 2019 this Court specifically ordered Craig to comply with this discovery request, although the Court did limit the time scope of the request to bitcoin Craig owned as of December 31, 2013.[1] (ECF No. [145-5] at 21-24.) Specifically, the Court ordered Craig to produce a list of his Bitcoin holdings as of that date so that Plaintiffs could trace these coins forwards. (*Id.* at 18, 21-24.) The Court further ordered Craig to produce this list before his deposition or else move for a protective order. (*Id.* at 28.) Craig ignored that order thereby preventing Plaintiffs' from questioning him about the list at his deposition.

Nearly nine months after Plaintiffs' initial request and after four discovery hearings before this Court, Craig finally moved for a protective order where he claimed *for the first time* that he "transferred ownership of all his Bitcoin into a blind trust" in 2011. (ECF No. [156] at 2.) Craig's motion requested the Court reconsider its order directing him to identify all his pre-2014 bitcoin because he didn't have that information anymore. (*Id.* at 1.)

On May 3, 2019, this Court rejected Craig's motion, holding that "[a]lthough he makes the conclusory statement that it would be unduly burdensome to produce a list of his bitcoin holdings

---

[1] Dave Kleiman died in April 2013.

as of December 31, 2013, this conclusion is not supported by the facts." (ECF No. [166] at 2.) The

Court also identified a fatal flaw in Craig's argument that it wasn't possible to produce this list,

because he could obtain it "from the trustee of the blind trust."  (*Id*. at 3.). The Court held that

while Craig claimed he could not provide a list of his pre-2014 bitcoin, this "evidence can be

obtained through other means, which the Court will authorize Plaintiffs to use." (*Id*.). The Court

then ordered Craig to "produce all transactional records of the blind trust, including but not limited

to any records reflecting the transfer of bitcoin into the blind trust in or about 2011." (*Id.* at 4.)

After Craig moved for more time to comply with the order, the Court stated "I'll give you to [May]

25th to get me all transactional documents and in particular, the documents showing the transfer

that occurred in 201.  Because once again, it is facially not credible to me that your client has no

record of transferring 70 or more bitcoin to somebody else."  (Ex. 1, at 14-15.)

        In response to the Court's order, Craig produced two sworn statements, copies of various

trust instruments, and a statement from the purported trustee re-attaching a trust instrument. The

trust instruments purport to show that Craig transferred 1,100,111 bitcoin (worth ~$9.3 billion

today) to Dave in June of 2011. Craig's sworn statements and trust instruments then claim that

"[i]n October 2012 a formal trust document was executed." This trust document purports to show

that 821,050 bitcoin (worth ~$7 billion today) was paid to the trustee in October 2012. But besides

simply stating these astronomical numbers of bitcoin transferred, none of Craig's statements or

trust documents identify the specific bitcoin addresses transferred into the blind trusts, nor has he

produced any accounting records of what the trusts have done with the massive fortune of bitcoins

since their alleged transfer in 2011.[2] As Craig has stated many times, bitcoin's public ledger

---

[2] Craig did produce 3-4 invoices that purportedly "reflects the use of rights to Bitcoin controlled by Tulip Trust I, but held by third parties, and used to fund companies in Australia." But all but one of these invoices are in fiat currency, one is for 60K bitcoin, and none show an actual transfer of any bitcoin on the blockchain.

tracking the movement of every bitcoin in existence is an "immutable evidence trail."[3] Thus, his alleged inability to identify the digital fortune of billions of dollars-worth of bitcoin he purportedly transferred into the blind trust is not credible; it's a yet another transparent attempt by Craig to deprive Plaintiffs of using this immutable evidence trail to prove their case.

Craig's refusal to comply with this Court's orders to produce the record of his pre-2014 bitcoin holdings is particularly problematic because the "Discretionary Trust Deed" Craig produced under a sworn statement of authenticity states that all the bitcoin held by the trust were "mined from the period between January 2009 and August 2010," *i.e.,* the exact period of time Plaintiffs allege Craig and Dave formed the Satoshi Nakamoto partnership to, *inter alia*, mine and own a fortune of bitcoin. In short, Craig's litigation strategy to date entails stonewalling the discovery process to frustrate Plaintiffs' ability to prove their case.[4]

On May 31, 2019, counsel held a telephonic meet and confer to discuss the deficiency in Craig's production. Incredulously, Craig's counsel claimed that the Court's order compelling the production of "all transactional records . . . including but not limited to any records reflecting the transfer of bitcoin into the blind trust in or about 2011," did not require them to produce records indicating which bitcoin public addresses were in fact transferred into the trust. This reading of the Court's order is as inconceivable as Craig's claim that he does not have a record of the roughly 7-9 billion dollars of bitcoin he transferred into the trust.

---

[3] *See e.g.* Craig Wright, *Immutable Evidence*, Medium (February 16, 2019), https://medium.com/predict/immutable-evidence-386b60a33123 (Craig Wright writing that "*Bitcoin is simply an immutable evidence trail*") (emphasis in original).)

[4] Dr. Wright has also failed to produce documents related to the "administration and operation of the blind trust." (ECF No. [166] at 4.)

4

Craig's obstructionism must end; he cannot simply ignore this Court's direct Orders to effectuate his stonewalling strategy. The Federal Rules of Civil Procedure prohibit these litigation tactics.

Rule 37 provides that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). "Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and insure the integrity of the discovery process." *Gratton v. Great American Communications*, 178 F.3d 1373, 1374 (11th Cir. 1999) (citing *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982)). Similarly, federal courts have inherent power to sanction parties and attorneys who act in bad faith when refusing to comply with the discovery process. *Quantum Communications v. Star Broadcasting*, 473 F. Supp. 2d 1249, 1268 (S.D. Fla 2007) (citing *Chambers v. NASCO*, Inc., 501 U.S. 32, 43-51 (1991)).

While courts have broad discretion to craft sanctions as they see necessary, Rule 37(b)(2)(A) enumerates certain actions that a district court is empowered to sanction a party with upon refusing to comply with a discovery order. These numerated sanctions include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(a).

Plaintiffs have incurred great expense to compel Craig to provide a listing of his public bitcoin wallets as of December 31, 2013. And while Plaintiffs defer to this Court's judgment as to the appropriate sanction for this conduct, Plaintiffs respectfully request the Court enter an Order providing the following relief to insure the "integrity of the discovery process" *Gratton*, 178 F.3d at 1374:

1.  By June 15, 2019, Craig shall provide a sworn statement identifying the public addresses of the 1,100,111 bitcoin and 821,050 bitcoin transferred into the respective tulip trusts.

2.  By June 20, 2019, Craig shall provide all transactional records and communications related to the trusts from inception to date, along with any all documents and communications related to the administration and operation, of the blind trust and swear to their authenticity.

3.  After the production above, Craig is to sit for a five-hour deposition during which time Plaintiffs are entitled to ask any questions about the trusts and the bitcoins held by those trusts.

Finally, to ensure that Craig's stonewalling stops, Plaintiffs request that the Court's order include a warning that Craig's failure to comply with any part of this order will result in a sanction, pursuant to Rule 37(b)(2)(A) in which Craig is forced to admit Plaintiffs' allegation that the 1,100,111 bitcoin referred to in the Tulip Trust document is joint property belonging equally to both Dave Kleiman and Craig Wright.

**S.D. FLA. L.R. 7.1 CERTIFICATION**

Pursuant to S.D. Fla. L.R. 7.1(a)(3), counsel for Plaintiffs conferred with counsel for Defendant who opposes the relief requested.

Dated: June 11, 2019

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:   (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal
Representative of the Estate of David Kleiman
and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 11, 2019, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being

served this day on all counsel of record via transmission of Notices of Electronic Filing generated

by CM/ECF.

*/s/ Velvel (Devin) Freedman*
VELVEL (DEVIN) FREEDMAN

**429**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  18-80176-CV-Bloom/Reinhart

IRA KLEIMAN, and
W&K INFO RESEARCH, LLC,

                        Plaintiffs,

v.

CRAIG WRIGHT,

                        Defendant.

_____/

**<u>ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' CORRECTED MOTION FOR ATTORNEYS' FEES (DE 346)</u>**

Former House Speaker Tip O'Neill famously pronounced that all politics is local.[1]

Locality also matters for weather, linguistic dialects, real estate prices, and topological

manifolds.[2]  So, too, with attorney's fees.

After protracted litigation over production of documents identifying Dr. Wright's bitcoin

holdings, I granted Plaintiffs' Motion to Compel [DE 197, 210] and denied Dr. Wright's Motion

for Protective Order [DE 155].  *See generally* DE 166, 277.  I granted Plaintiffs leave to seek

attorneys' fees associated with litigating these two motions.  DE 277 at 28.[3]  Plaintiffs have now

---

[1] https://www.brainyquote.com/quotes/thomas_p_oneill_212119.

[2] "A manifold is a topological space that is locally Euclidean (i.e., around every point, there is
a neighborhood that is topologically the same as the open unit ball in R$^n$). To illustrate this idea,
consider the ancient belief that the Earth was flat as contrasted with the modern evidence that it
is round. The discrepancy arises essentially from the fact that on the small scales that we see, the
Earth does indeed look flat. In general, any object that is nearly 'flat' on small scales is a
manifold." Rowland, Todd. "Manifold." From *MathWorld*--A Wolfram Web Resource, created
by Eric W. Weisstein. http://mathworld.wolfram.com/Manifold.html.

[3] As relevant to the issues presented here, the District Court affirmed my Order.  DE 373
(reversing other sanctions).

filed a motion for attorneys' fees, which the District Court referred to me for appropriate disposition. DE 306.[4]  Plaintiffs request a total of $658,581.78, comprising $592,558.00 for attorneys' fees and $66,023.78 for expenses. DE 346 at 7-8.[5]

### 1.      Calculation of Attorneys' Fees: the Lodestar Method

In calculating attorney fee awards, courts use the lodestar method, whereby a reasonable fee award is "properly calculated by multiplying the number of hours reasonably expended times a reasonable hourly rate." *ACLU of Ga. v. Barnes*, 168 F.3d 423, 427 (*citing Blum v. Stenson*, 465 U.S. 886, 888 (1994)). This "lodestar" may then be adjusted for the results obtained. *See Barnes*, 168 F.3d at 427 (*citing Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994)).[6]

---

[4]    Under 28 U.S.C. § 636(b)(1)(A) and Rule 72(a) of the Rules of Civil Procedure, I have the authority to enter a final order on Plaintiffs' Motion for Attorneys' Fees and Costs sought under Rule 37(a) because it is not case-dispositive. *See Collar v. Abalux, Inc.*, No. 16-20872-CIV, 2018 WL 3328682, at *13-14 (S.D. Fla. July 5, 2018) (J. Goodman) ("magistrate judges have jurisdiction to enter sanctions orders for discovery failures that do not strike claims, completely preclude defenses, or generate litigation-ending consequences"); *Textron Fin. Corp. v. RV Having Fun Yet, Inc.*, No. 3:09CV2-J-34TEM, 2010 WL 1038503, at *6 (M.D. Fla. Mar. 19, 2010) ("the Court notes that the Motion to Compel and the Motion for Sanctions are both matters within the authority of the Magistrate Judge to determine, without the need to submit a recommendation to this Court").

[5] Defendant contends that Plaintiffs' motion for fees "should be outright denied" for failure to comply with the requirements of Local Rule 7.3. DE 324 at 2-3. However, "it is not mandatory that the Court deny the Motion for this alleged non-compliance. This is especially true, where . . . the party seeking denial of the Motion has identified no prejudice suffered from the alleged local rules violation." *Kowalski v. Jackson Nat. Life Ins. Co.*, No. 12-60597-CIV, 2014 WL 4101567, at *4 (S.D. Fla. Aug. 20, 2014) (J. Cohn) (court declined to deny motion for attorneys' fees based on non-compliance with Rule 7.3). Defendant has not alleged any prejudice stemming from Plaintiffs' non-compliance, and I decline to deny Plaintiffs' motion on this basis.

[6]  In computing the lodestar amount, courts should consider: (1) the time and labor required, the novelty, complexity, and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee, or rate of fee, customarily charged in the locality for legal services of a comparable or similar nature; (4) the significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained; (5) the time limitations imposed by the client or by the

The reasonable hourly rate is defined as the "prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Barnes*, 168 F.3d at 436 (*quoting Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1999)). "Generally, the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed . . .'" *Procaps S.A. v. Patheon Inc*., No. 12-24356-CIV, 2013 WL 6238647, at \*12 (S.D. Fla. Dec. 3, 2013) (J. Goodman) (quoting *ACLU of Georgia v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999)). The fee applicant bears the burden of establishing the claimed market rate. *See Barnes*, 168 F.3d at 427.

The Court must consider "what a reasonable, paying client would be willing to pay," bearing in mind "*all* of the case-specific variables that . . . courts have identified as relevant to the reasonableness of attorney's fees," including the *Johnson* factors. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184, 190 (2d Cir. 2008) (court must "step[] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively") (emphasis in original). In addition, the Court may consider prior hourly rates awarded to other attorneys of similar experience in the community and also the Court's own knowledge of the rates charged by local practitioners. *See McDonald ex rel. Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 96-97

---

circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and (8) whether the fee is fixed or contingent. *Wachovia Bank v. Tien,* No. 04-20834, 2015 WL 10911506, at \*1 (S.D. Fla. Apr. 7, 2015) (J. Valle) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974) (listing nearly identical factors to consider in determining a reasonable attorney's fee)).

(2d Cir. 2006) ("A district court may also use its knowledge of the relevant market when determining the reasonable hourly rate."). *See also Norman*, 836 F.2d at 1303 ("[t]he court . . . is itself an expert on the question [of fees] and may consider its own knowledge and experience concerning reasonable and proper fees . . .").

As to the type of evidence that the fee claimant should produce in support of a fee claim, in *Barnes*, the Eleventh Circuit stated,

> The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates. That burden includes supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate. Further, [ ] counsel should have maintained records to show the time spent on the different claims, and the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity.

168 F.3d at 427 (citations and quotations omitted).

In submitting a request for attorney's fees, fee applicants are required to exercise "billing judgment." *Barnes*, 168 F.3d at 428 (*quoting Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). If fee applicants do not exercise billing judgment by excluding "excessive, redundant, or otherwise unnecessary" hours, which are hours "that would be unreasonable to bill to a client and therefore to one's adversary *irrespective of the skill, reputation or experience of counsel*," the court must exercise billing judgment for them. *See Barnes*, 168 F.3d at 428 (*quoting Norman*, 836 F.2d at 1301 (*emphasis in original*)).

**2.   Calculating the Loadstar**

A.  Requested Hourly Rates by Plaintiffs' Counsel

Vel Freedman:  Mr. Freedman was admitted to the Florida Bar in 2012.  As relevant here, he was Counsel at Boies Schiller Flexner LLP until co-founding the firm of Roche Cyrulnik Freedman in August 2019.  He seeks an hourly rate of $900.

Kyle Roche:  Mr. Roche was admitted to the New York bar in September 2017.[7]  DE 4 (*pro hac vice* motion).  He was an associate at Boies Schiller Flexner LLP until co-founding the firm of Roche Cyrulnik Freedman in August 2019.  He seeks an hourly rate of $690.

Andrew Brenner:  Mr. Brenner was admitted to the Florida bar in 1993.  He is the head of litigation and co-Administrative Partner of the Miami office of Boies Schiller Flexner LLP.  He seeks an hourly rate of $1050.

Stephen Lagos:  Mr. Lagos was admitted to the New York bar in 2019.  He was an associate at Boies Schiller Flexner LLP before joining Roche Cyrulnik Freedman LLP.  DE 400.  He seeks an hourly rate of $610.

I find all these rates to be excessive.  I am personally familiar with the hourly rates charged by the top civil litigators in Palm Beach County.  Those rates range between $600 and $700 per hour.  By way of example, in 2018, a senior partner from the West Palm Beach office of a national firm of over 1000 lawyers, who was admitted to the Florida Bar in 1987, charged $670 per hour for a highly contentious complex civil litigation in Palm Beach Circuit Court.  An associate with 9 years of experience charged $440 per hour in the same case.  *See FD Destiny, LLC, et. al. v. AVP Destiny, LLC, et. al.,* No. 502009-CA-029903 (Final Judgment of Attorneys' Fees and Costs, Jan. 5, 2018).  I am aware that two former Presidents of the Florida Bar whose offices and law practices are in Palm Beach County and who charge between $600 and $625 per hour for complex civil litigation in state and federal court in West Palm Beach.  The highest rate billed in Palm Beach County is approximately $850 per hour for high-stakes "bet the company" litigation.  *See Lauth v. International Data Management,* No. 2010 CA 27629 (Order awarding attorney fees, Oct. 13, 2015).  *See also Procaps S.A.*, 2013 WL 6238647, at *13 (court found

---

[7]http://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=%2Fdtv7t9%2FOk0tZ5HNycBoAw%3D%3D

rates requested were "well above those used in South Florida by attorneys practicing sophisticated commercial litigation").

I find the following rates to be reasonable:

Mr. Brenner          $675 per hour

Mr. Freedman:        $500 per hour

Mr. Roche:           $350 per hour

Mr. Lagos:           $300 per hour

> B.   Reasonable Hours

I authorized Plaintiffs to seek attorneys' fees related to "filing and litigating" (1) Dr. Wright's April 18, 2019, Motion for Protective Order (DE 155), which was denied on May 3, 2019 (DE 166), and (2) Plaintiffs' June 3, 2019, Motion to Compel (DE 197, 210), which was granted on August 27, 2019 (DE 277). To the extent Plaintiffs' motion seeks reimbursement for time counsel spent on tasks beyond the scope of my order (*i.e.,* for unspecified document review and preparing for Defendant's deposition), these fees will not be included in my award.

> *(i)*   *The Motion for Protective Order*

Plaintiffs seek payment for 12.7 hours to prepare a response to Defendant's Motion for a Protective Order. The response was filed on April 29, 2019, at 6:12 p.m.; it comprised 6 pages of substantive arguments, a signature page, and two two-page email attachments. DE 162, 183.

I find that 12.7 hours to prepare this Motion response was excessive. It appears that another lawyer ("R. Keefe") prepared the first draft and submitted it to Mr. Roche on April 21. Mr. Roche spent 3.8 hours on April 21 and 24 reviewing the draft. On April 27 and 28, Mr. Freedman devoted 5.0 hours of "attention to bitcoin motion." Finally, Mr. Freedman billed 2.5 hours on April 29, 2019, for "Attention to drafts of all pending motions and review of

O[pposing] C[ounsel] filing in preparation of same." DE 308-1 at 2.[8]  On the same day, Mr. Brenner billed 1.2 hours for revising the draft pleading and "communications with team re: same."

It was not reasonable to have three lawyers involved to this extent to review a draft a relatively straight-forward pleading. *See Procaps S.A.*, 2013 WL 6238647, at *16 (court imposed reduction where "an entire team of attorneys worked on the discovery dispute and . . . some of the time spent was inefficiently incurred"). The legal issue presented was whether Dr. Wright's motion met the Rule 26(c) standard for "undue burden." I find that Mr. Roche's 3.8 hours to review and revise a first draft is reasonable for a lawyer of his experience level. I find that Mr. Brenner's expenditure of 1.2 hours to finalize a pleading and to communicate his changes to other lawyers was also reasonable. I do not find that Mr. Freedman spending 7.5 hours reviewing and revising a draft previously edited by Mr. Roche is reasonable. Accordingly, using the reduced rates listed above, I will award $2,140.00 for the work on this response.

(ii)     *The Motion to Compel*

On June 3, Plaintiffs filed their motion to compel the trust documents and testimony regarding them from Defendant. The motion consists of 5 pages detailing the history of the parties' discovery disputes and presenting substantive arguments. DE 197, 210. The motion also attaches a transcript from an earlier hearing. Despite the brevity of this motion and the 46-minute oral argument held on June 11, Plaintiffs' counsel billed approximately 62 hours to prepare this motion and attend the hearing. I find this to be excessive.

---

[8] At that time, there was a pending motion for Judgment on the Pleadings filed by the Defendant, and to which Plaintiff had responded on April 28. DE 144, 159. There was also a pending motion by Plaintiffs to re-open Dr. Wright's deposition (DE 157), to which Dr. Wright responded on April 29. DE 160.

For example, on May 18, Mr. Lagos spent 7.4 hours drafting this motion and between May 21 and 22, he spent 16.6 hours compiling a table of cases where courts imposed default sanctions. On May 27, Mr. Lagos spent 4.5 hours editing his draft of the motion. On June 3, Mr. Roche spent 7 hours "finaliz[ing]" the motion, and on June 8, Mr. Roche has another billing entry showing 4.2 hours for "finaliz[ing] motion for sanctions," which presumably was to prepare a redacted version of the sealed motion for filing. On June 10, Mr. Roche spent 3.5 hours drafting an outline for the next day's hearing on the motion to compel and Mr. Freedman spent 4 hours preparing for the hearing. On June 11, Mr. Roche billed 6.8 hours and Mr. Freedman 8.7 hours to prepare for and attend the hearing which lasted only 46 minutes. *See* Minute Entry at DE 213. I recognize that there is

> nothing inherently unreasonable about a client having multiple attorneys[, a]nd it is certainly not unusual in a major lawsuit like this one for law firms to assign a team of attorneys, ranging from senior partners to junior associates, to the case. But when multiple attorneys are involved in representing one client in litigation, there is always the risk of inherent inefficiencies. Thus, in order to recover time for multiple attorneys, the fee applicant bears the burden of showing that the time spent by those attorneys reflects the distinct contribution of each lawyer to the case . . .

*Procaps S.A.*, 2013 WL 6238647, at *16 (citing *Barnes*, 168 F.3d at 432). Accordingly, hours billed by multiple attorneys working on the same task where the invoices do not reflect distinct contributions by each lawyer, must be reduced. Given that only Mr. Freedman presented argument at the hearing, I will award the following hours at the reduced rates: Mr. Lagos – 15 hours; Mr. Freedman – 8 hours. This results in a total of $8,500.00 for preparing the motion to compel and attendance at the June 11 hearing.[9]

---

[9] Like Judge Goodman in *Procaps S.A. v. Patheon Inc*., I am "not faulting [Plaintiffs'] attorneys for being comprehensive and exceptionally diligent. While [Plaintiffs] certainly free to pay its own attorneys full rack rates for a full-court press litigation effort, 'courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive

8

There are also several entries by Plaintiffs' counsel that include block billing for a variety of tasks and provide no breakdown of the time spent on each. "'[B]lock billing' . . . is the disfavored practice of including multiple distinct tasks within the same time entry without specifying the amount of time spent on each task." *TYR Tactical, LLC v. Productive Prod. Enter., LLC*, No. 15-CIV-61741, 2018 WL 3110799, at *11 (S.D. Fla. Apr. 11, 2018) (J. Valle) (finding a fee reduction appropriate where counsel's practice of block billing made it "impossible" for the court to ascertain how much time was spent on each task).

For example, on June 12, Mr. Roche billed 11.2 hours for meeting with Plaintiffs' expert (Dr. Edman) to prepare for his direct examination and also for "coordinat[ing]" with Mr. Brenner regarding the outline for Defendant's deposition. Mr. Roche billed 9.8 for a similar entry on June 13. On June 14, Mr. Roche billed 8.4 hours preparing an outline for the direct examination of Dr. Edman and also for "coordinat[ing] with billing on transcript; coordinat[ing] with Brenner on depo outline." On June 20, Mr. Roche billed 12.4 hours preparing for the evidentiary hearing on Plaintiffs' motion to compel and also for drafting a motion to videotape Defendant's deposition. While the tasks associated with preparing for the evidentiary hearing may have generated fees for which Plaintiffs are entitled to reimbursement, the other tasks included in these billing entries are not sufficiently related to the two motions for which I am awarding fees. Therefore, a fee reduction is warranted. I will credit 20 hours to Mr. Roche for his time between June 12-20 at his reduced rate, totaling $7,000.00

(iii)    *The Evidentiary Hearing*

On June 11, 2019, I granted Plaintiffs' motion to compel (DE 197, 210) and ordered Defendant to produce, within one week, a list of the public addresses of the all the bitcoin he

---

fees and expenses are not awarded as it is to see that an adequate amount is awarded.'" *Procaps S.A.*, 2013 WL 6238647, at *16 (quoting *Barnes*, 168 F.3d at 428).

mined before December 31, 2013, in accordance with my prior orders.  DE 212.  In the event

Defendant failed to produce the list by the deadline, I advised the parties that I would conduct a

Show Cause evidentiary hearing for Defendant to explain his non-compliance.  *Id.*  Defendant

failed to provide the list by the deadline and so on June 14, I ordered Defendant to appear in

person at a contempt hearing on June 28.  DE 217.  The hearing was held over the course of three

days as follows: June 28, 2019 for 4 hours and 50 minutes; August 5, 2019 for 6 hours; and

August 26, 2019 for 2 hours and 30 minutes.

In preparation for the June 28th hearing, Mr. Lagos billed 14.2 hours.  Mr. Roche billed

95.5 hours, although many of these billing entries contain block billing.  Mr. Freedman billed 83

hours, although his entries also contain block billing and include time spent on tasks related to

Defendant's deposition, which I decline to include in my fee award.  I will reduce their time as

follows: Mr. Lagos – 12 hours; Mr. Roche – 30 hours; Mr. Freedman – 30 hours.  This amounts

to $29,100.00 in fees to prepare for the evidentiary hearing.[10]

Mr. Roche, Mr. Freedman and Mr. Brenner collectively billed 33.7 hours on June 28 for

travel to and attendance at the evidentiary hearing, as well as preparation time.  Because

counsel's appearance at the contempt hearing was necessitated by Defendant's misconduct, I will

award fees for the attorneys' travel time to and from Miami to West Palm Beach.  *See Gilbert v.

Am. Standard, Inc.,* No. 506-CV-51 CAR, 2007 WL 1615138, at *1 (M.D. Ga. June 4, 2007)

(including attorney's travel time to and from hearings in Rule 37 sanctions award).  However, I

find that the attendance of three attorneys at the hearing was excessive.  Given that Mr.

Freedman and Mr. Roche were primarily responsible for preparing for the hearing, I will limit

Plaintiffs' recovery to their fees in the amount of $10,270.00 for the June 28 evidentiary hearing.

---

[10]   Mr. Brenner's time during this period was primarily spent preparing for Defendant's deposition and so his time will be stricken from the fee award.

Between July 1 and August 4, Mr. Brenner spent 34.6 hours preparing for the continuation of the evidentiary hearing. His billing entries do not provide any detail and consist primarily of "[a]ttention to preparation for continuation of evidentiary hearing." Normally, this lack of specificity for the tasks performed, would result in his time being stricken. However, given that Mr. Brenner conducted the cross-examination of Defendant's expert, I will credit 15 hours of his preparation time, amounting to $10,125.00.

In the four days between August 1 and 4, Mr. Roche billed 62.5 hours preparing for the continued hearing. During the same four days Mr. Freedman billed 52.4 hours.[11] I find the hours are excessive and redundant and that these billing entries lack the specificity necessary for me to assess the reasonableness of the time spent. Therefore, I will reduce the time they spent preparing for the second day of the evidentiary hearing as follows: Mr. Roche – 30 hours ($10,500.00); Mr. Freedman – 10 hours ($5,000.00), for a total of $25,625.00 in fees to prepare for the August 5 hearing. *See League of Women Voters of Fla. v. Browning*, No. 06-21265-CIV, 2008 WL 5733166, at *12 (S.D. Fla. Dec. 4, 2008) (J. O'Sullivan) (imposing 30% reduction because counsel's "time entries are vague . . . [and] do not provide the Court with sufficient information to determine whether such entries are duplicative or excessive").[12]

For their appearance at continuation of the hearing on August 5, Mr. Brenner, Mr. Roche and Mr. Freedman collectively billed 44.2 hours. Again, I find that the presence of three

---

[11]  Mr. Lagos spent 2.7 hours helping to prepare for the continued hearing. Given his minimal involvement in this stage of the case, I will deduct his time from the fee award.

[12]  "When a trial court is confronted with a fees request which demonstrates billing inefficiencies, it is appropriate to make an 'overall reduction' in the fees award by adopting an across-the-board percentage reduction." *Procaps S.A.*, 2013 WL 6238647, at *16 (quoting *MKT Reps S.A. De C.V. v. Standard Chartered Bank Int'l (Americas) Ltd.*, No. 10–22963–CIV, 2013 WL 1289261, at *12 (S.D. Fla. Mar. 28, 2013) (J. O'Sullivan) (imposing 20% reduction after reducing the hourly billing rates)).

attorneys at this hearing constitutes over-staffing and will limit Plaintiffs' recovery to the time spent by Mr. Brenner, who cross-examined Defendant's expert, and Mr. Roche, who conducted the direct examination of Plaintiffs' expert. This results in a total of $12,420.00 for the continued hearing on August 5.

In preparation for the final day of the hearing on August 26, it appears from the billing records that Mr. Brenner was primarily responsible for drafting Plaintiffs' closing arguments. He billed 16.6 hours for this task, which I will credit in the fee award. However, I decline to include in the award the 31.7 hours billed by Mr. Roche for assisting him. Mr. Freedman billed 32.5 hours to prepare for closing arguments through August 25, and an additional 18 hours on August 26 related to preparing and presenting his one-hour argument to the Court. I find his time to be excessive and reduce it to 15 hours. This results in a total of $18,705.00 for the final day of the hearing.

### 3.  Reasonable Expenses

When a court imposes monetary sanctions under Rule 37, it is not limited to the taxable costs enumerated in 28 U.S.C. § 1920. Rather, "when a court sanctions a party for failure to comply with a court order, pursuant to Rule 37(b), the Federal Rules of Civil Procedure Rule require the court to order the sanctioned party . . . 'to pay the reasonable expenses, including attorney's fees, caused by the failure.'" *B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.*, No. 1:09-CV-00211-MP-GRJ, 2011 WL 6151507, at *3 (N.D. Fla. Nov. 1, 2011), report and recommendation adopted, No. 1:09CV211-MP-GRJ, 2011 WL 6152082 (N.D. Fla. Dec. 12, 2011) (citing Fed. R. Civ. P. 37(b)(2)(C)).

As Defendant notes, "[t]he vast majority of the costs" Plaintiffs seek ($53,983.69) are "related to plaintiffs' expert, [D]r. Edman." Defendant objects to these expenses because "the

invoice contains no information as to the work [he] actually performed . . ."  DE 324 at 9.

Plaintiffs' respond that "Dr. Edman prepared for and was present at the courthouse for the June

28th evidentiary hearing.  Since he was not reached [for testimony] that day, he prepared again

for the August 5th hearing."  DE 347 at 10.

I am aware that Dr. Edman's assistance was vital to Plaintiffs' presentation at the

contempt hearing, however, I agree that it is difficult to assess Dr. Edman's fees because no

information is provided regarding his hourly rate or how he spent his time.  Without this

information, I am compelled to reduce his fees.  I find that $40,000.00 constitutes a reasonable

expense for the expert fees associated with this contempt hearing.  Given that these are the only

expenses to which Defendant specifically objects, the remaining expenses will be awarded.

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Attorneys' Fees and Costs (DE 346) is

**GRANTED IN PART** and **DENIED IN PART.**   By **March 30, 2020,** Defendant shall

reimburse Plaintiffs as follows:

| | |
|---|---|
| Attorneys' Fees: | $113,760.00 |
| Expenses: | $ 52,040.09 |
| **Total:** | **$165,800.09** |

**DONE AND ORDERED** in Chambers this 16th day of March, 2020 at West Palm

Beach in the Southern District of Florida.

BRUCE REINHART
United States Magistrate Judge

13

**618**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                    **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/


**JOINT PROPOSED JURY INSTRUCTIONS**

      Plaintiffs Ira Kleiman, as the personal representative of the Estate of David Kleiman, and

W&K Info Defense Research, LLC, and Defendant Craig Wright respectfully submit the following

joint proposed jury instructions. The parties reserve the right to amend, supplement, or modify

these Proposed Jury Instructions as the case proceeds.

      Where the parties do not agree on a proposed instruction, that instruction is set forth in

bold type. Instructions proposed only by Plaintiffs are underlined. Instructions proposed only by

Defendant are italicized.

*PRELIMINARY INSTRUCTION TO BE GIVEN TO THE ENTIRE PANEL BEFORE JURY SELECTION*

*It is important that you discharge your duties without discrimination, meaning that bias regarding the race, color, religious beliefs, national original, sexual identity, disability, or gender of the plaintiffs, defendant, any witnesses, and the lawyers should play no part in the exercise of your judgment throughout the trial.*

*Accordingly, during this voir dire, the questionnaire I have asked you fill out and return, and the jury selection process, I [the lawyers] may ask questions [or use demonstrative aids] related to the issues of bias and unconscious bias.*

_____

Authorities:

W.D. Wash., Crim. Jury Instr.—Implicit Bias (modified).

GIVEN                          _____
GIVEN AS MODIFIED              _____
WITHDRAWN                      _____
GRANTED                        _____
DENIED                         _____

## <u>General Preliminary Instruction</u>

Members of the Jury:

Now that you've been sworn, I need to explain some basic principles about a civil trial and your duty as jurors. These are preliminary instructions. I'll give you more detailed instructions at the end of the trial.

<u>The Jury's duty:</u>

It's your duty to listen to the evidence, decide what happened, and apply the law to the facts. It's my job to provide you with the law you must apply—and you must follow the law even if you disagree with it. ***You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or biases, including unconscious bias. Unconscious biases are stereotypes, attitudes or preferences that people may consciously reject but may be expressed without conscious awareness, control or intention. Like conscious bias, unconscious bias too can affect how we evaluate information and make decisions.***

<u>What is evidence:</u>

You must decide the case only on the evidence presented in the courtroom.

Evidence comes in many forms. It can be testimony about what someone saw, heard, or smelled. It can be an exhibit or a photograph. It can be someone's opinion.

Some evidence may prove a fact indirectly. Let's say a witness saw wet grass outside and people walking into the courthouse carrying wet umbrellas. This might be indirect evidence that it rained, even though the witness didn't personally see it rain. Indirect evidence like this is also called "circumstantial evidence"—<u>**simply a chain**</u> *a set* of circumstances that tends to prove a fact.

As far as the law is concerned, it makes no difference whether evidence is direct or indirect. You may choose to believe or disbelieve either kind. Your job is to give each piece of evidence whatever weight you think it deserves.

<u>What is not evidence:</u>

During the trial, you'll hear certain things that are not evidence and you must not consider them.

First, the lawyers' statements and arguments aren't evidence. In their opening statements and closing arguments, the lawyers will discuss the case. Their remarks may help you follow

3

each side's arguments and presentation of evidence. But the remarks themselves aren't evidence and shouldn't play a role in your deliberations.

Second, the lawyers' questions and objections aren't evidence. Only the witnesses' answers are evidence. Don't decide that something is true just because a lawyer's question suggests that it is. For example, a lawyer may ask a witness, "You saw Mr. Jones hit his sister, didn't you?" That question is not evidence of what the witness saw or what Mr. Jones did – unless the witness agrees with it.

There are rules of evidence that control what the court can receive into evidence. When a lawyer asks a witness a question or presents an exhibit, the opposing lawyer may object if he or she thinks the rules of evidence don't permit it. If I overrule the objection, then the witness may answer the question, or the court may receive the exhibit. If I sustain the objection, then the witness cannot answer the question, and the court cannot receive the exhibit. When I sustain an objection to a question, you must ignore the question and not guess what the answer might have been.

Sometimes I may disallow evidence—this is also called "striking" evidence—and order you to disregard or ignore it. That means that you must not consider that evidence when you are deciding the case.

I may allow some evidence for only a limited purpose. When I instruct you that I have admitted an item of evidence for a limited purpose, you must consider it for only that purpose and no other.

Credibility of Witnesses:

To reach a verdict, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it, or none of it.

When considering a witness's testimony, you may take into account:

- the witness's opportunity and ability to see, hear, or know the things the witness is testifying about;

- the witness's memory;

- the witness's manner while testifying, ***including limitations caused by disability, if any***;

- any interest the witness has in the outcome of the case;

- any bias or prejudice the witness may have;

- any other evidence that contradicts the witness's testimony;
- the reasonableness of the witness's testimony in light of all the evidence; and
- any other factors affecting believability.

At the end of the trial, I'll give you additional guidelines for determining a witness's credibility.

**Description of the case:**

**The plaintiffs in this case are Ira Kleiman, as the personal representative of the estate of David Kleiman, which I will refer to as the "Estate of David Kleiman," and W&K Info Defense Research, LLC, which I will refer to as "W&K." The defendant is Craig Wright.**

**Plaintiffs allege that David Kleiman and Craig Wright entered into a partnership to develop and release the original Bitcoin protocol, to mine bitcoin, and to develop blockchain-related intellectual property. Plaintiffs also allege that after David Kleiman died, the defendant wrongfully took the partnership's assets, namely bitcoin and blockchain related intellectual property, and David kept them for himself." The Estate of David Kleiman seeks to recover their share of those assets in this lawsuit. Plaintiffs further allege that the defendant wrongfully seized control of a Florida company owned by David Kleiman, W&K, and wrongfully took its assets after David Kleiman died, including intellectual property.**

**Craig Wright, the defendant, denies he had a partnership with David Kleiman. Defendant further denies that he wrongfully took assets belonging to W&K. The defendant also raises legal defenses to some of plaintiffs' claims.**

Conduct of the Jury:

While serving on the jury, you may not talk with anyone about anything related to the case. You may tell people that **you are** *you're* a juror and give them information about when you must be in court. But you must not discuss anything about the case itself with anyone. You ***shouldn't*** **should not** even talk about the case with each other until you begin your deliberations. You want to make sure **you have** *you've* heard everything—all the evidence, the lawyers' closing arguments, and my instructions on the law—before you begin deliberating. You should keep an open mind until the end of the trial. Premature discussions may lead to a premature decision.

In this age of technology, I want to emphasize that in addition to not talking face-to-face with anyone about the case, you must not communicate with anyone about the case by any other means. This includes e-mails, text messages, phone calls, and the Internet, including social-

networking websites and apps such as Facebook, Instagram, Snapchat, YouTube, ***Slack,
Linkedin, Tik Tok, Reddit,*** **and** *or* Twitter. You may not use any similar technology of social
media, even if I have not specifically mentioned it here.

You must not provide any information about the case to anyone by any means
whatsoever, and that includes posting information about the case, or what you are doing in the
case, on any device or Internet site, including blogs, chat rooms, social websites, or any other
means.

You also **should not** *shouldn't* Google or search online or offline for any information
about the case, the parties, or the law. Don't read or listen to the news about this case, visit any
places related to this case, or research any fact, issue, or law related to this case. The law forbids
the jurors to talk with anyone else about the case and forbids anyone else to talk to the jurors
about it. It's very important that you understand why these rules exist and why **they are** *they're*
so important. You must base your decision only on the testimony and other evidence presented in
the courtroom. It is not fair to the parties if you base your decision in any way on information
you acquire outside the courtroom, ***which is not evidence***. **For example** *In addition*, the law
often uses words and phrases in special ways, so it's important that any definitions you hear
come only from me and not from any other source. Only you jurors can decide a verdict in this
case. The law sees only you as fair, and only you have promised to be fair—no one else is so
qualified.

Taking Notes:

**If you wish, you may** *During the trial, you must* take notes to help you remember what
the witnesses said. **If you do take notes, please** *Please* don't share them with anyone until you
go to the jury room to decide the case. Don't let note-taking distract you from carefully listening
to and observing the witnesses. When you leave the courtroom, you should leave your notes
hidden from view in the jury room. **Whether or not you take notes** *Regardless of the notes you
have taken*, you should rely on your own memory of the testimony. Your notes are there only to
help your memory. They're not entitled to greater weight than your memory or impression about
the testimony.

Course of the Trial:

Let's walk through the trial. First, each side may make an opening statement, but they don't have to. Remember, an opening statement **is not** *isn't* evidence, and it's not supposed to be argumentative; it's just an outline of what that party intends to prove.

Next, **the Estate of David Kleiman and W&K** *plaintiffs* will present their witnesses and ask them questions. After **the plaintiffs** *they* question **the** *a* witness, **the** defendant may ask the witness questions—this is called "cross-examining" the witness. Then **Craig Wright** *defendant* will present his witnesses, and **the** plaintiffs may cross-examine them. You should base your decision on all the evidence, regardless of which party presented it.

After all the evidence is **in** *presented*, the parties' lawyers will make their closing arguments to summarize and interpret the evidence for you, and I will then give you instructions on the law.

**You will** *You'll* then go to the jury room to deliberate.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, 1.1 (2020); Model 9th Cir. Crim. Instr. 1.1 (modified); W.D. Wash., Crim. Jury Instr.—Implicit Bias.

GIVEN                               _____
GIVEN AS MODIFIED                   _____
WITHDRAWN                           _____
GRANTED                             _____
DENIED                              _____

## Description of the Case

*This is a civil case. To help you follow the evidence, I'll summarize the parties' positions. Plaintiffs are Ira Kleiman, on behalf of the Estate of Dave Kleiman, and W&K Info Defense Research LLC. Dr. Craig Wright is the defendant.*

*Ira Kleiman alleges that from about 2008 through February of 2011, the late Dave Kleiman and Dr. Wright formed an oral partnership to create and mine bitcoins and develop Bitcoin-related intellectual property. Ira Kleiman further alleges that Dr. Wright wrongfully took Dave Kleiman's share of the oral partnership's bitcoins and intellectual property. Ira Kleiman alleges several claims for relief against Dr. Wright: claims for breach of fiduciary duty, breach of partnership duties of loyalty and care, civil theft, conversion, unjust enrichment, fraud, constructive fraud, and permanent injunction.*

*Ira Kleiman alleges that after that oral partnership ended in February of 2011, Dave Kleiman created W&K, with Dr. Wright allegedly having some ownership interest in that company. W&K alleges that it mined bitcoins and created Bitcoin-related intellectual property, and that Dr. Wright wrongfully took Dave Kleiman's share of W&K's bitcoins and Bitcoin-related intellectual property. W&K alleges several claims for relief against Dr. Wright: claims for breach of fiduciary duty, civil theft, conversion, unjust enrichment, fraud, constructive fraud, and permanent injunction.*

*Dr. Wright denies these allegations because there he did not have a partnership with Dave Kleiman to create Bitcoin, mine bitcoins together, or develop Bitcoin-related intellectual property together, and Dave Kleiman was never involved in creating the Bitcoin software code or developing Bitcoin-related intellectual property. Dr. Wright also denies the allegations made by W&K. In addition to denying plaintiffs' claims, Dr. Wright also has the following affirmative defenses: statute of limitations, laches, statute of frauds, payment, set-off, failure to mitigate damages, waiver, res judicata, estoppel, accord and satisfaction, and unclean hands. I will instruct you about these affirmative defenses later.[1]*

*I will be instructing you on the law and facts the plaintiffs and defendant must prove for each claim or affirmative defense at the appropriate moment.*

---

[1] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, 1.1 (2020).

GIVEN                           _____
GIVEN AS MODIFIED               _____
WITHDRAWN                       _____
GRANTED                         _____
DENIED                          _____

**Burden of Proof**

**(Plaintiffs propose giving this instruction where it appears in the Eleventh Circuit Pattern Jury Instructions, as part of Instruction 1.1, between Description of the Case and Taking Notes.)**

**As to most of their claims, the plaintiffs have the burden of proving their case by what the law calls a "preponderance of the evidence." That means they must prove that, in light of all the evidence, what they claim is more likely true than not. So, if you could put the evidence favoring the plaintiffs and the evidence favoring the defendant on opposite sides of balancing scales, the plaintiffs need to make the scales tip to their side. If the plaintiffs fail to meet this burden, you must find in favor of the defendant. The plaintiffs also bring claims for civil theft. Those claims require a higher burden of proof, which I will instruct you on later in these instructions.**

*Plaintiffs have the burden of proving their claims. Depending on the claim, plaintiffs must either prove their claims by what is called a preponderance of the evidence or by what is called clear and convincing evidence. I am going to instruct you about two these burdens of proof now. Later, I will instruct you about the claims in this case and tell you what burden of proof applies to each claim.*

**To decide whether any fact has been proved by a preponderance of the evidence, you may – unless I instruct you otherwise – consider the testimony of all witnesses, regardless of who called them, and all exhibits that the court allowed, regardless of who produced them. After considering all the evidence, if you decide a claim or fact is more likely true than not, then the claim or fact has been proved by a preponderance of the evidence.**

**Sometimes a party has the burden of proving a claim or defense by clear and convincing evidence. This is a higher standard of proof than proof by a preponderance of the evidence. It means the evidence must persuade you that the claim or defense is highly probable or reasonably certain. This is the standard that applies to the plaintiffs' civil theft claims. The preponderance of the evidence standard applies to the plaintiffs' other claims.**

*Preponderance of the Evidence:*

*For a claim that plaintiffs have the burden of establishing by a preponderance of the evidence, plaintiffs must prove that what they allege is more likely true than not true. To say it differently: if you were to put the evidence favorable to plaintiffs and the evidence favorable to defendant on opposite sides of a scale, plaintiffs would have to make the scales tip to their side.*

*To decide whether any fact has been proved by a preponderance of the evidence, you may—unless I instruct you otherwise—consider the testimony of all witnesses, regardless of who called them, and all exhibits that the court allowed, regardless of who produced them. If you find after considering all the evidence that a claim or fact is more likely true than not true, then the claim or fact has been proven by a preponderance of the evidence. If plaintiffs fail to carry this burden, then you must return a verdict in favor of defendant.*

*<u>Clear and Convincing Evidence:</u>*

*The clear and convincing evidence standard that you must apply is a higher standard than the preponderance of the evidence standard. For a claim that plaintiffs have the burden of establishing by clear and convincing evidence, plaintiffs must prove that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*

*<u>Affirmative Defenses:</u>*

On certain issues, called "affirmative defenses," **the** defendant has the burden of proving the elements of a defense by a preponderance of the evidence. **I will** ***I'll*** instruct you on the facts that the defendant must prove for any affirmative defense. After considering all the evidence, if you decide that the defendant has successfully proven that the required facts are more likely true than not **true**, the affirmative defense **is** ***has been*** proved.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, 1.1; Burden of Proof 1.2 (2020)

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

### **Stipulations**

Sometimes the parties have agreed that certain facts are true. **This** *Such an* agreement is called a stipulation. You must treat **these** *stipulated* facts as proved for this case.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Stipulations 2.1 (2020).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

<u>**Judicial Admissions**</u>

  <u>**I have held that certain statements by the defendant, Craig Wright, in this case**</u>
<u>**constitute judicial admissions. They are:**</u>

  <u>**[List Judicial Admissions Ordered by the Court]**</u>

  <u>**Judicial admissions are binding and conclusive to establish the facts so admitted.**</u>
<u>**There is no need for the plaintiffs to put on evidence of these facts established by judicial**</u>
<u>**admission.**</u>

_____

Authorities:

*Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); *Harrell v. United States*, No. 2:16-cv-284-FtM-29MRM, 2020 WL 619580, at \*15 (M.D. Fla. Feb. 10, 2020), *appeal dismissed*, No. 20-11373-G, 2020 WL 3968274 (11th Cir. June 22, 2020); *Tri-Lady Marine, Ltd. v. Bishop Mechancial Servs.*, LLC, No. 16-62467-CIV, 2018 WL 10466997, at \*4 (S.D. Fla. Sept. 20, 2018), *aff'd sub nom. Tri-Lady Marine, Ltd. v. Bishop Mech. Servs., LLC*, 763 F. App'x 882 (11th Cir. 2019); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1349 (M.D. Fla. 2014).

GIVEN        _____
GIVEN AS MODIFIED  _____
WITHDRAWN      _____
GRANTED       _____
DENIED        _____

**<u>Jury Questions</u>**

During this trial, you may submit questions to a witness after the lawyers have finished their own questioning. Here is how the procedure works: After each witness has testified, and the lawyers have asked all their questions, I'll ask if any of you have questions. If you have a question, write it down and give it to the court staff.

You may submit a question for a witness only to clarify an answer or to help you understand the evidence. Our experience with juror questions indicates that jurors rarely have more than a few questions for any one witness, and there may be no questions at all for some witnesses.

If you submit a question, the court staff will give it to me, and I'll share your questions with the lawyers in the case. If the rules of evidence allow your question, one of the lawyers or I will read your question to the witness. I may modify the form or phrasing of a question so that it's allowed under the evidence rules.

Sometimes, I may not allow the questions to be read to the witness, either because the law does not allow it or because another witness is in a better position to answer the question. If I **<u>can't</u>** *don't* allow the witness to answer a question, you must not draw any conclusions from that fact or speculate on what the answer might have been.

Here are several important things to keep in mind about your questions for the witnesses:

- First, you must submit all questions in writing. Please don't ask any questions aloud.

- Second, the court can't re-call witnesses to the stand for additional juror questions. If you have a question for a particular witness, you must submit it when I ask.

- Finally, because you should remain neutral and open-minded throughout the trial, you should phrase your questions in a way that doesn't express an opinion about the case or a witness. You must keep an open mind until you've heard all the evidence, the closing arguments, and my final instructions on the law.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Jury Questions 1.4 (2020).

GIVEN                                        _____
GIVEN AS MODIFIED                 _____
WITHDRAWN                            _____

GRANTED                              _____

DENIED                              _____

### *Interim Statements, Generally*

*At times during the trial, the lawyers will address you. You'll soon hear the lawyers' opening statements, and at the trial's conclusion you'll hear their closing arguments. Sometimes the lawyers may choose to make short statements to you, either to preview upcoming evidence or to summarize and highlight evidence they just presented. These statements and arguments are the lawyers' views of the evidence or of what they anticipate the evidence will be. They are not evidence.*

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Interim Statements 1.5 (2020).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

### **Expert Witness**

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon*, or give any weight to*, the opinion.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Expert Witness 3.6.1 (2020).

GIVEN
GIVEN AS MODIFIED                    _____
WITHDRAWN                            _____
GRANTED                              _____
DENIED                               _____

**<u>Use of Depositions</u>**

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

The deposition of [name of witness], taken on [date], is about to be presented to you [by video/by reading the transcript]. Deposition testimony is entitled to the same consideration as live testimony, and you must ***evaluate and*** judge it as if the witness was testifying in court.

**<u>Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.</u>**

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Trial Instructions: Use of Depositions 2.2 (2020).

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

## Use of Recorded Conversations and Transcripts

Now you're going to hear [a] recorded conversation[s]. This is proper evidence for you to consider. Please listen to it very carefully. I'm going to allow you to have a transcript of the recording [prepared by name of preparer] to help you identify speakers and guide you through the recording. But remember that it is the recording that is evidence – not the transcript. If you believe at any point that the transcript says something different from what you hear on the recording, disregard that portion of the transcript and rely instead on what you hear.

**[In this case, there are two transcripts because there is a difference of opinion about what is said on the recording. You may disregard any portion of one or both transcripts if you believe they reflect something different from what you hear on the recording. It's what you hear on the recording that is evidence – not the transcript.]**

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Interim Statements 2.3 (2020).

GIVEN                               _____
GIVEN AS MODIFIED        _____
WITHDRAWN                   _____
GRANTED                         _____
DENIED                             _____

## <u>Interim Statement</u>

*At the beginning of the trial, I told you that the lawyers might make short statements previewing upcoming evidence or summarizing and highlighting evidence that they already presented. Right now, [Mr./Ms.] [name of attorney] is going to make a short statement. Please remember that the statement you are about to hear—like all statements by the lawyers—is [Mr./Ms.] [name of attorney]'s view of the evidence or of what [he/she] anticipates the evidence will be, but isn't itself evidence.*

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Interim Statements 2.4 (2020).

GIVEN                                    _____
GIVEN AS MODIFIED                _____
WITHDRAWN                          _____
GRANTED                              _____
DENIED                                 _____

### *Judicial Notice*

*The rules of evidence allow me to accept facts that no one can reasonably dispute as true. The law calls this "judicial notice." I've accepted [state the fact that the court has judicially noticed] as proved even though no one introduced evidence to prove it. You must accept it as true for this case.*

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Judicial Notice 2.5 (2020).

GIVEN
GIVEN AS MODIFIED                    _____
WITHDRAWN                            _____
GRANTED                              _____
DENIED                               _____

## **Use of Demonstratives**

*Certain [describe demonstrative exhibit, e.g., models, diagrams, devices, sketches] have been shown to you. Those [short description] are used for convenience and to help explain the facts of the case. They are not themselves evidence or proof of any facts.*

_____

Authorities:

*See U.S. v. Wood*, 943 F.2d 1048, 1053-54 (9th Cir. 1991) (citing *U.S. v. Soulard*, 730 F.2d 1292, 1300 (9th Cir. 1984)); *see also* JURY INSTRUCTIONS COMMITTEE OF THE NINTH CIRCUIT, A MANUAL ON JURY TRIAL PROCEDURES § 3.10.A (2013).

GIVEN                             _____
GIVEN AS MODIFIED     _____
WITHDRAWN            _____
GRANTED               _____
DENIED                 _____

## Jury Instruction No. 11: Use of Interrogatories

You'll now hear answers that [name of party] gave in response to written questions the other side submitted. The questions are called "interrogatories." Before the trial, [name of party] gave the answers in writing while under oath.

You must consider [name of party]'s answers to as though [name of party] gave the answers on the witness stand.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Use of Interrogatories 2.6 (2020).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

## <u>In-Trial Instructions on News Coverage</u>

Reports about this trial may appear in the media. The reporters may not have heard all the testimony as you have, may be getting information from people who are not under oath and subject to cross examination, may emphasize an unimportant point, or may simply be wrong.

You must not read, listen to, or watch anything about this trial. It would violate your oath as a juror to decide this case on anything other than the evidence presented at trial and on your own common sense. You must decide this case exclusively on the evidence you receive here in court.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Interim Statements 2.7 (2020).

GIVEN
GIVEN AS MODIFIED            _____
WITHDRAWN                    _____
GRANTED                      _____
DENIED                       _____

## <u>COURT'S INSTRUCTIONS TO THE JURY</u>

Members of the jury:

**<u>It is</u>** *It's* my duty to instruct you on the rules of law that you must use in deciding this case.

When I have finished you will go to the jury room and begin your discussions, **<u>also</u>** *which is sometimes* called deliberations.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Basic Instructions: Introduction 3.1 (2020).

GIVEN                                    _____
GIVEN AS MODIFIED            _____
WITHDRAWN                       _____
GRANTED                             _____
DENIED                               _____

25

**<u>The Duty to Follow Instructions – Corporate Party Involved</u>**

<u>Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.</u>

<u>You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.</u>

<u>The fact that a limited liability company is involved as a party must not affect your decision in any way. A company and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a company is involved, of course, it may act only through people as its employees; and, in general, a company is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.</u>

_____

Authorities:

11th Circuit Civil Pattern Jury Instruction 3.2.2; Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 1–2.

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

**Consideration of Direct and**
**Circumstantial Evidence; Argument of Counsel; Comments by the Court**

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But anything the lawyers say is not evidence and isn't binding on you. You **should not** *shouldn't* assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I **may have** said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You **should not** *shouldn't* be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Consideration of Direct and Circumstantial Evidence; Argument of Counsel; Comments by the Court 3.3 (2020).

GIVEN           _____
GIVEN AS MODIFIED   _____
WITHDRAWN       _____
GRANTED        _____
DENIED         _____

### Credibility of Witnesses

When I say you must consider all the evidence, I **do not *don't*** mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part.

*You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy or biases, including unconscious bias. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject, but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions. You must avoid bias, conscious or unconscious, based on the witness's race, color, religious beliefs, national origin, sexual orientation, gender identity, disability, or gender in your determination of credibility.* The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness, I suggest that you ask yourself a few questions:

1. Did the witness impress you as one who was telling the truth?
2. Did the witness have any particular reason not to tell the truth?
3. Did the witness have a personal interest in the outcome of the case?
4. Did the witness seem to have a good memory?
5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?
6. Did the witness appear to understand the questions clearly and answer them directly?
7. Did the witness's testimony differ from other testimony or other evidence?

---

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Credibility of Witnesses 3.4 (2020); 9th Cir. Crim. Instr. 1.1 (modified); W.D. Wash., Crim. Jury Instr.—Implicit Bias.

GIVEN                                   _____
GIVEN AS MODIFIED              _____

WITHDRAWN                          _____

GRANTED                           _____

DENIED                            _____

**Impeachment of**
**Witnesses Because of Inconsistent Statements**

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. **And** *Also* ask yourself whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or an unimportant detail.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Impeachment of Witnesses Because of Inconsistent Statements 3.5.1 (2020).

GIVEN                              _____
GIVEN AS MODIFIED        _____
WITHDRAWN                   _____
GRANTED                        _____
DENIED                           _____

## **Responsibility for Proof—Plaintiffs' Claims**

In this case it is the responsibility of **the Estate of David Kleiman and W&K Info Defense Research, LLC, or "W&K,"** *the party bringing any claim* to prove every essential part of **their** *his or her* claims **by a "preponderance of the evidence," except for the civil theft claims, which they must prove by clear and convincing evidence.** *to the standard of proof that applies. For some of their claims, plaintiffs must prove their allegations by a "preponderance of the evidence." For plaintiffs' civil theft claim, they must prove their allegations by clear and convincing evidence*. This is sometimes called the "burden of proof" or the "burden of persuasion."

Preponderance of Evidence:

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that the plaintiffs' claim is more likely true than not true.

If the proof fails to establish **an** *any* essential part of any of plaintiffs' claims *or contentions* by a preponderance of the evidence, you should find against plaintiffs as to **that claim** *the particular claim or contention*.

*Since there is more than one claim involved, you* **You** should consider each claim separately. *You should also understand that each plaintiff must prove each of their claims separately.*

In deciding whether any fact has been proven by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them, along with facts stipulated by the parties **and the judicial admissions ordered by me.**

*If the proof fails to establish any essential part of any of Ira Kleiman or W&K's claims by a preponderance of the evidence, you should find for Dr. Wright as to that particular claim.*

*Clear and Convincing Evidence:*

*Plaintiffs have the burden of proving their civil theft claim by clear and convincing evidence. The clear and convincing standard that you must apply is a higher standard than the preponderance of the evidence standard and requires that the plaintiff prove that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such*

*weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*

*If the proof fails to establish any essential part of Ira Kleiman or W&K's civil theft claim by clear and convincing evidence, you should find for Dr. Wright as to that particular claim.*

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, 1.2; Responsibility for Proof – Plaintiff's Claims – Preponderance of the Evidence 3.7.1 (2020).

GIVEN                                    _____
GIVEN AS MODIFIED              _____
WITHDRAWN                          _____
GRANTED                               _____
DENIED                                   _____

**Responsibility for Proof – Plaintiffs' Claims –**
**Clear and Convincing Evidence**

**Plaintiffs must prove the elements of their civil theft claims by clear and convincing evidence.**

**This is a higher standard of proof than proof by a preponderance of the evidence. It means the evidence must persuade you that the claim is highly probable or reasonably certain.**

**If the proof fails to establish an essential part of a plaintiff's civil theft claim by clear and convincing evidence, you should find for the defendant as to that claim.**

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases 3.7.1, 1.2.

GIVEN                                   _____
GIVEN AS MODIFIED              _____
WITHDRAWN                         _____
GRANTED                             _____
DENIED                                _____

33

**Responsibility for Proof—**
**<u>Affirmative Defenses—Preponderance of the Evidence</u>**

In this case, **the defendant** *Dr. Wright* asserts the affirmative defenses of *statute of frauds,* statute of limitations*, estoppel*, **and** laches*, waiver, release, good faith, payment, set-off, failure to mitigate damages, unclean hands, res judicata and collateral estoppel.*[2] Even if **the Estate of David Kleiman or** *Ira Kleiman and* W&K prove **a claim** *their claims*, **the defendant** *Dr. Wright* can prevail **on that claim** *in this case* if he proves an affirmative defense **to that claim** by a preponderance of the evidence.

**<u>When more than one affirmative defense applies to a claim</u>** *Since more than one affirmative defense is involved*, you should consider each one separately. **<u>However, you should consider each affirmative defense only as to the claim of claims to which it is directed.</u>**

I caution you that **the defendant** *Dr. Wright* does not have to disprove **the plaintiffs'** *Ira Kleiman and W&K's* claims, but if **the defendant** *Dr. Wright* raises an affirmative defense, the only way he can prevail on that specific defense is if he proves **it** *that defense* by a preponderance of the evidence. Similarly, if the proof fails to establish an essential part of any of the defendant's affirmative defense**s** by a preponderance of the evidence, you should find against the defendant on that affirmative defense.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Responsibility for Proof – Affirmative Defenses – Preponderance of the Evidence 3.7.2 (2020).

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

_____

[2] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

## **Expert Witness**

**When scientific, technical, or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.**

**But that does not mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.**

_____

Authorities:

11th Circuit Civil Pattern Jury Instruction 3.6.1; Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 4–5.

GIVEN                              _____
GIVEN AS MODIFIED         _____
WITHDRAWN                    _____
GRANTED                         _____
DENIED                            _____

**Spoliation**

*Dr. Wright claims that Ira Kleiman, as the personal representative of the estate of Dave Kleiman, engaged in spoliation of evidence. The term "spoliation" refers to a party's failure to preserve evidence. A party has a duty to preserve evidence when litigation is reasonably foreseeable and that duty continues after a lawsuit is filed. Therefore, Ira Kleiman had a duty to preserve evidence when this case was "reasonably foreseeable," and that duty continued when he filed this case on February 14, 2018.*

*Dr. Wright claims that Ira Kleiman destroyed or otherwise caused Dave Kleiman's papers and computer hard drives to be unavailable, while they were within his possession, custody, or control. Dr. Wright further claims that Dave Kleiman's papers and hard drives would have been material in deciding disputed issues in this case, including whether there was an oral partnership between Dave Kleiman and Dr. Wright to mine bitcoins and develop bitcoin-related intellectual property.*

*If you determine that Ira Kleiman engaged in spoliation of evidence, then you may, but are not required to, infer that this evidence would have been unfavorable to Ira Kleiman. You may consider this, together with the other evidence, in determining the issues of the case.*

———————————————

Authorities:

Fla. Standard Jury Instructions in Civil Cases, Failure to Maintain Evidence or Keep a Record 301.11; *Graff v. Baja Marine Corp.*, 310 Fed. Appx. 298, 310 (11th Cir. 2009); *In Matter of Complaint of Bos. Boat III, LLC*, 310 F.R.D. 510, 515 (S.D. Fla. 2015); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 2018 WL 4856767, at *2 (N.D. Fla. 2018); *McBride v. Coca-Cola Refreshments, USA, Inc.*, 2012 WL 12915435 (M.D. 2012); *Kraft Reinsurance Ireland, Ltd. v. Pallets Acquisitions, LLC*, 845 F. Supp. 2d 1342, 1358 (N.D. Ga. 2011).

GIVEN                              _____
GIVEN AS MODIFIED       _____
WITHDRAWN                  _____
GRANTED                        _____
DENIED                            _____

**<u>Spoliation</u>**

**<u>The plaintiffs allege that the defendant is responsible for the spoliation and fabrication of evidence. The term "spoliation" refers to the intentional destruction, alteration, fabrication, or concealment of evidence. You may consider whether the defendant intentionally concealed, altered, fabricated, or destroyed evidence. If you decide that he did so, you may decide that the evidence would have been unfavorable to him.</u>**

_____

Authorities:

Judicial Council of California Civil Jury Instructions, Instruction 204 (2017 ed.); Order, ECF [No. 595], at 37 (concluding that the issues raised in Plaintiffs' Sanctions Motion should be for the jury to decide); *see Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 n.9 (11th Cir. 2005) (court concluded spoliation instruction was too weak and entered default for destruction of evidence as a matter of law).

GIVEN                    _____
GIVEN AS MODIFIED        _____
WITHDRAWN                _____
GRANTED                  _____
DENIED                   _____

## Duty to Deliberate

**(Plaintiffs propose to instruct the jury on Duty to Deliberate and Election of Foreperson at the end of the jury instructions, following the instructions on claims, affirmative defenses, and damages, not at the beginning of the post-trial instructions.)**

*In your deliberations, you will consider and decide distinct claims and affirmative defenses. Although these claims and affirmative defenses had been tried together, each is separate from the others, and each party is entitled to have you separately consider each claim and affirmative defense as it affects that party. Therefore, in your deliberations, you should consider the evidence as it relates to each claim and affirmative defense separately, as you would had each claim and affirmative defense had been tried before you separately.*

Of course, the fact that I have given you instructions concerning the issue of **the plaintiffs'** *Ira Kleiman's and W&K's* damages should not be interpreted in any way as an indication that I believe that **the plaintiffs** *they* should, or should not, prevail in this case.

*You must decide the case solely on the evidence and the law before you and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy or biases, including unconscious bias. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject, but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions.*

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors.

So*,* you must discuss the case with one another and try to reach an agreement. While **you are** *you're* discussing the case, **do not** *don't* hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But **do not** *don't* give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest **is** *and duty are* to seek the truth from the evidence in the case.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases, Duty to Deliberate When Only the Plaintiffs Claim Damages 3.8.1 (2020); Model 9th Cir. Crim. Instr. 1.1 (modified); W.D. Wash., Crim. Jury Instr.—Implicit Bias.

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

## **Election of a Foreperson—Explanation of Verdict Form**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

*[Explain verdict]*

Take the verdict form with you to the jury room. When **you have** *you've* all agreed on the verdic*t*s, your foreperson must fill in the form, sign and date it. Then **you will** *you'll* return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer*, who will bring it to me*. **The court security officer will bring it to me, and** I'll respond as promptly as possible—either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

_____

Authorities:

11th Cir. Pattern Jury Instr. Civil Cases. Election of a Foreperson, Explanation of Verdict Form 3.9 (2020).

GIVEN                                  _____
GIVEN AS MODIFIED          _____
WITHDRAWN                      _____
GRANTED                            _____
DENIED                               _____

## *Definition of an Oral Partnership*

*Ira Kleiman claims that Dr. Wright and David Kleiman entered into an oral partnership to mine bitcoins and develop Bitcoin-related technology. Ira Kleiman alleges that this oral partnership lasted from sometime in 2008 until February of 2011. Again, Dr. Wright denies that such an oral partnership existed.*

*Under Florida law, an oral partnership may exist when two or more persons join together in a business or venture. Although not based on a written contract, an oral partnership must include each of the following elements, the specifics of which are known and agreed to by each partner:*

*(1) a common purpose;*

*(2) a joint proprietary interest in the subject matter or purpose of the oral partnership;*

*(3) the right to share profits and the duty to share losses; and*

*(4) joint control or right of control over the oral partnership.*

*Plaintiffs must prove each of these elements by a preponderance of the evidence to establish the existence of an oral partnership.*

_____

Authorities:

*Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002); *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 438-39 (Fla. 3d DCA 1997).

GIVEN                                    _____
GIVEN AS MODIFIED              _____
WITHDRAWN                          _____
GRANTED                               _____
DENIED                                   _____

41

**<u>Partnership – Breach</u>**

**The Estate of David Kleiman has brought a claim against the defendant for breach of partnership. Specifically, the Estate claims that David Kleiman and Craig Wright formed a partnership to develop the original Bitcoin protocol, to mine bitcoin, and to develop related blockchain technology. The Estate further alleges that no assets of the partnership were distributed to it after David Kleiman's death. The defendant does not dispute that no assets were distributed. Instead, he claims that there was no partnership and therefore no distribution was required.**

**Accordingly, you will be asked to determine two questions on this claim:**

1) **Whether there was a partnership between David Kleiman and the defendant, and whether the defendant breached his duties to the partnership? And, if so;**

2) **What portion of the partnership's assets are now owed to the Estate of David Kleiman?**

_____

Authorities:

Fla. Stat. §§ 620.8202, 620.8401; Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 15–16.

GIVEN                          _____
GIVEN AS MODIFIED              _____
WITHDRAWN                      _____
GRANTED                        _____
DENIED                         _____

**Partnership – Defined**

**On the first question, I instruct you that a "partnership" means an association of two or more persons to carry on as co-owners of a business for profit. It is not necessary for the Estate of David Kleiman to prove that David Kleiman and Craig Wright even intended to form a partnership. Instead, the Estate of David Kleiman must prove by a preponderance of the evidence that David Kleiman and Craig Wright had an association to carry on as co-owners of a business for profit.**

_____

Authorities:

Fla. Stat. § 620.8202 ("Except as otherwise provided in subsection (2), the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."); *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1090 (Fla. 2008) ("Under Florida's Revised Uniform Partnership Act . . . a person who receives a share of the business's profits is presumed to be a partner, unless the profits were received in payment of rent, among other things."); *Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 6 (Fla. 4th DCA 2003) (finding the existence of partnership based on the sharing of profits among the parties); Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 15–16; Florida Standard Jury Instructions in Civil Cases 401.14(d) ("A partnership exists when two or more persons join together or agree to join together in a business or venture for their common benefit, each contributing property, money or services and each having an interest in any profits."); 1 Florida Forms of Jury Instruction § 13.03 cmt. (2020); Derrick Hibbard, Bus. Litig. in Fla. § 18.2 (10th ed. 2020) ("if there is no partnership agreement, the Act [RUPA] will control").

GIVEN                               _____
GIVEN AS MODIFIED                   _____
WITHDRAWN                           _____
GRANTED                             _____
DENIED                              _____

43

**<u>Partnership – Assets</u>**

**<u>If you find that there was a partnership between David Kleiman and Craig Wright, you will then have to determine the assets of that partnership, and what share of those assets belonged to David Kleiman, and are now owed to his Estate.</u>**

**<u>On the issue of determining the respective parties' ownership share in the partnership, I instruct you that in the absence of a contrary agreement among the partners, the partners in a partnership are entitled to share equally in the assets and profits of the partnership.</u>**

**<u>Further, on the issue of what assets are owed to the Estate of David Kleiman, I instruct you that if rather than winding up the partnership's business following the death of his partner, the surviving partner continues the partnership business with partnership assets, then the surviving partner acts as a trustee for the deceased partner. As a trustee, the surviving partner is required to administer the portion of the partnership assets belonging to the deceased partner solely in the interests of the deceased partner's estate, and not the interests of the surviving partner. The surviving partner must administer the partnership assets belonging to the deceased partner as a prudent person would in light of the circumstances, exercising reasonable care, skill, and caution.</u>**

**<u>Furthermore, the surviving partner is required to account to the deceased partner's estate and provide a list of the partnership assets to the deceased partner's heirs. The rationale underlying the rule is based upon the surviving partner's superior knowledge: A surviving partner does not deal at arms-length with the heirs of a deceased partner but must make an open and full disclosure to them. The heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the extent of the partnership property or information about the amount of business done or the value of the partnership.</u>**

---

Authorities:

Fla. Stat. §§ 620.8202 (defining formation of partnership), 620.8401(2) ("Each partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits."), 620.8404 (fiduciary duties of partner), 620.8807 (settlement of accounts and dissolution), 736.0802 (trustee duty of loyalty), 736.0804 (prudent administration by trustee); *Matter of Estate of Thomas*, 532 N.W.2d 676, 684 (N.D. 1995); *Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3d DCA 1970) (duties to account and act as

trustee for deceased partner's estate); *Hilgendorf v. Denson*, 341 So. 2d 549, 551 (Fla. 1st DCA 1977) (same); Omnibus Order, ECF No. [615], at 76; Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 15–16; *Account*, Black's Law Dictionary (11th ed. 2019); 24 Fla. Jur. P'ship § 175; 40 Am. Jur. P'ship § 368.

GIVEN                                   _____

GIVEN AS MODIFIED                       _____

WITHDRAWN                               _____

GRANTED                                 _____

DENIED                                  _____

## **Partnership – Duties**

**Partners in a partnership owe duties to each other and to the partnership. These duties include a duty of care, a duty of loyalty, and an obligation of good faith and fair dealing.**

_____

Authorities:

Fla. Stat. §§ 620.8404(1), 620.8404(4).

GIVEN
GIVEN AS MODIFIED       _____
WITHDRAWN       _____
GRANTED       _____
DENIED       _____

**<u>Partnership – Duty of Care</u>**

**<u>Under the duty of care, a partner must not engage in grossly negligent or reckless</u>**

**<u>conduct, intentional misconduct, or a knowing violation of law.</u>**

_____

Authorities:

Fla. Stat. § 620.8404(3).

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

**Partnership – Duty of Loyalty**

**Under the duty of loyalty, a partner must account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.**

_____

Authorities:

Fla. Stat. § 620.8404(2).

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

### **Partnership – Obligation of Good Faith and Fair Dealing**

**A partner must discharge his duties to the other partner and to the partnership, and act in a manner that does not frustrate the agreed common purpose of the parties and deprive the other party of the benefits of the agreement.**

_____

Authorities:

Fla. Stat. § 620.8404(4); *Mount Sinai Med. Ctr. of Greater Miami, Inc. v. Heidrick & Struggles, Inc.*, 329 F. Supp. 2d 1309, 1313 (S.D. Fla. 2004), *aff'd*, 188 F. App'x 966 (11th Cir. 2006).

GIVEN                            _____
GIVEN AS MODIFIED                _____
WITHDRAWN                        _____
GRANTED                          _____
DENIED                           _____

## Fiduciary Duty to W&K Info Defense Research, LLC

**W&K claims that the defendant breached his fiduciary duties to it by fraudulently procuring a judgment against it in Australia following David Kleiman's death, using that judgment to claim ownership over W&K's assets, and then using those assets for his benefit.**

**There are two issues for your determination on this claim:**

1. **Did Craig Wright owe a fiduciary duty to W&K? If so;**

2. **Did he breach that duty?**

**On the first issue, whether Craig Wright owed W&K a fiduciary duty, W&K must prove the following by a preponderance of the evidence:**

1. **A relationship existed between W&K and the defendant;**

2. **The defendant was in a position of trust with respect to the W&K's financial or property interests; and**

3. **The defendant accepted that trust.**

---

Authorities:

Florida Standard Jury Instructions for Contract and Business Cases 451.4; *Silver v. Countrywide Home Loans, Inc.*, 760 F. Supp. 2d 1330, 1338 (S.D. Fla. 2011) (citing *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)), *aff'd*, 483 F. App'x 568 (11th Cir. 2012).

GIVEN                                       _____
GIVEN AS MODIFIED                _____
WITHDRAWN                            _____
GRANTED                                  _____
DENIED                                      _____

## Breach of Fiduciary Duty to W&K Info Defense Research, LLC

**If you find that Craig Wright owed a fiduciary duty to W&K, you will then consider the issue of whether he breached that duty.**

**A fiduciary duty imposes a duty to act with the utmost good faith in the best interests of the company. This includes the duty to refrain from self-dealing, the duty of loyalty, the duty to disclose material facts, and the overall duty not to take unfair advantage and to act in the best interest of the company.**

**To prove a breach of a fiduciary duty, W&K must show:**

    1) **That the defendant breached a fiduciary duty by misappropriating W&K's intellectual property, bitcoin, and/or forked assets; and**

    2) **That this breach was a legal cause of damages to W&K.**

_____

Authorities:

Florida Pattern Jury Instructions for Contract and Business Cases 451.5, 451.10; *Pediatric Nephrology Assocs. of S. Fla. v. Variety Children's Hosp.*, 226 F. Supp. 3d 1346, 1356 (S.D. Fla. 2016); *Gracey v. Eaker*, 837 So. 2d 348 (Fla. 2002).

GIVEN                       _____

GIVEN AS MODIFIED    _____

WITHDRAWN          _____

GRANTED              _____

DENIED                _____

## <u>Definition of a Limited Liability Company</u>

*A limited liability company, or LLC, is a business structure whereby the owners are not personally liable for the company's debts or liabilities. An LLC combines some characteristics of a corporation with those of a partnership. LLCs are managed by their members unless explicitly stated otherwise in an operating agreement or formation document.*

*An LLC that has been administratively dissolved continues in existence but may only carry on activities necessary to wind up its activities and affairs, liquidate and distribute its assets, and notify claimants.*

_____

Authorities:

Fla. Stat. §§ 605.0304(1), 605.0407(1)(a); Fla. Stat. § 605.0714; *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1089 (Fla. 2008).


GIVEN                                    _____
GIVEN AS MODIFIED              _____
WITHDRAWN                        _____
GRANTED                              _____
DENIED                                _____

### *Conversion*

*Ira Kleiman claims that Dr. Wright is responsible for the conversion, or wrongful taking, of bitcoins and Bitcoin-related intellectual property that belonged to the alleged oral partnership between Dave Kleiman and Dr. Wright, which allegedly existed from sometime in 2008 through February 2011.*

*W&K, which was formed in February 2011 and administratively dissolved in 2012, claims that Dr. Wright is responsible for the conversion, or wrongful taking, of bitcoins and Bitcoin-related intellectual property that belonged to it.*

*Conversion means a distinct act of control wrongfully asserted over another's personal property in a manner that is inconsistent with the other's right to that property. There are a number of ways that conversion can occur, such as intentionally dispossessing another of the property, using the property without authority, or disposing of the property by selling, pledging, gifting, or leasing it.*

*Structure of Claim:*

*To establish this claim, the Ira Kleiman and W&K must each prove, by a preponderance of the evidence, that:*

*(1) Dr. Wright wrongfully asserted dominion over bitcoins and intellectual property;*

*(2) This property belonged to Dave Kleiman's estate and W&K, respectively; and*

*(3) Dr. Wright's action was inconsistent with the estate's or W&K's ownership.*

*Also, in an action for conversion of money, such as bitcoins, the money must be specific money that is capable of identification and not simply a general assertion over an amount of money owed.*

*If you find that Ira Kleiman and W&K failed to prove, by a preponderance of the evidence, each element of conversion, you must return a verdict in favor of Dr. Wright. On the other hand, if you find for one or both of the plaintiffs on the claim of conversion, you will then consider the issue of the amount of money damages to be awarded to Ira Kleiman and W&K, separately. The damages must be the specific bitcoins and intellectual property that plaintiffs have identified, rather than just a general claim for an amount of bitcoins or unspecified intellectual property.*

*__Punitive Damages:__*

*Under Florida law, you may also award punitive damages for a conversion claim. An award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto, or $500,000.*

*Punitive damages are a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment—not merely compensation—must be imposed to prevent similar conduct in the future.*

*You may only award punitive damages if you determine, based on clear and convincing evidence, that Dr. Wright personally committed intentional misconduct or gross negligence, which was the proximate cause of the plaintiffs' loss.*

*"Intentional misconduct" means that Dr. Wright had actual knowledge of the wrongfulness of his conduct and the high probability that injury to Dave Kleiman's estate and W&K would result and, despite that knowledge, intentionally pursued that course of conduct. "Gross negligence" means that the conduct was so reckless that it constituted a conscious disregard or indifference to the life, safety, or rights of Dave Kleiman's estate and W&K. Please remember that the clear and convincing evidence standard that you must apply is a higher standard than the preponderance of the evidence standard, and requires you to conclude that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*



Authorities:

*Joe Hand Promotions, Inc. v. Creative Enter., LLC*, 978 F.Supp.2d 1236, 1241 (M.D. Fla. 2013) (quoting *Joe Hand Promotions, Inc. v. Hart*, 2012 WL 1289731, *2-3 (S.D. Fla. 2012));*BDO Seidman, LLP v. Banco Espirito Santo Int'l*, 38 So. 3d 874, 876 (Fla. 3d DCA 2010); *Warshall v. Price*, 629 So.2d 903, 904 (Fla. 4th DCA 1993); *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595 (M.D. Fla. 1991); Fla. Stat. §§ 768.72; Florida Standard Jury Instructions in Civil Cases, Personal Injury and Property Damages: Introduction 501.1(b); Punitive Damages – Non-Bifurcated Procedure 503.2, August 29, 2019.

GIVEN                                      _____

GIVEN AS MODIFIED                          _____

WITHDRAWN                                  _____

GRANTED                                    _____

DENIED                                     _____

**<u>Conversion</u>**

**<u>The Estate of David Kleiman and W&K bring a claim for conversion against the defendant. They claim that the defendant wrongfully exercised control over the property of David Kleiman and the property of W&K.</u>**

**<u>A successful claim for conversion requires the Estate of David Kleiman or W&K to prove the following by a preponderance of the evidence:</u>**

1) **<u>An act of dominion or ownership wrongfully asserted by the defendant;</u>**

2) **<u>Over property of the partnership, the Estate of David Kleiman, or W&K;</u>**

3) **<u>Inconsistent with their ownership or right to possess that property.</u>**

_____

Authorities:

*Joe Hand Promotions, Inc. v. Hart*, No. 11-80971-CIV, 2012 WL 1289731, at *2 (S.D. Fla. Apr. 16, 2012); *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 500 (Fla. 3d DCA 1994); *Warshall v. Price,* 629 So. 2d 903, 904 (Fla. 4th DCA 1993), *rev. denied*, 641 So. 2d 1346 (Fla. 1994); *Shelby Mutual Ins. v. Crain Press*, 481 So.2d 501, 503 (Fla. 2d DCA 1985); 12 Fla. Jur 2d Conversion and Replevin § 1 (2d ed. 2020).

GIVEN
GIVEN AS MODIFIED       _____
WITHDRAWN       _____
GRANTED       _____
DENIED       _____

## Civil Theft

**The Estate of David Kleiman and W&K bring a claim for civil theft against the defendant. A successful claim for civil theft requires that the plaintiffs prove the following by clear and convincing evidence:**

1) **The defendant obtained, used, or attempted to obtain or use the Estate of David Kleiman's, W&K's, or the partnership's property;**

2) **With the criminal intent to deprive the Estate of David Kleiman, W&K, or the partnership (either temporarily or permanently) of that property or a benefit from that property; and**

3) **The defendant's actions were a legal cause of damages to the Estate of David Kleiman or W&K.**

---

Authorities:

Fla. Stat. §§ 772.11, 812.014; Florida Pattern Jury Instructions for Civil Cases 411.5; Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 19; *Heldenmuth v. Groll*, 128 So. 3d 895, 896 (Fla. 4th DCA 2013).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

**Unjust Enrichment for the Estate of David Kleiman and W&K**

**A successful claim for unjust enrichment requires that the Estate of David Kleiman and/or W&K prove by a preponderance of the evidence that:**

1) **David Kleiman and/or W&K conferred a benefit on the defendant;**

2) **That the defendant voluntarily accepted and retained that benefit; and**

3) **It would be inequitable or unfair for the defendant to retain the benefit without paying the value of the benefit to the Estate of David Kleiman and/or W&K.**

---

Authorities:

*Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1242 (Fla. 2004); *Swafford v. Schweitzer*, 906 So. 2d 1194, 1995 (Fla. 4th DCA 2005); *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 992 (Fla. 4th DCA 2003); Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 19; *Kozyrev v. Ponomarenko*, No. 0:19-cv-60497-BB (S.D. Fla. Mar. 6, 2020), ECF No. [141], at 12.

GIVEN                                    _____
GIVEN AS MODIFIED                 _____
WITHDRAWN                          _____
GRANTED                              _____
DENIED                                 _____

**Fraud**

**The Estate of David Kleiman and W&K have alleged claims against the defendant for fraud. For the plaintiffs to prevail on their fraud claims, they must prove the following by a preponderance of the evidence:**

1) **The defendant made a false statement or omission concerning a material fact;**

2) **That he either knew was false, or made it despite not knowing whether it was true or false;**

3) **The defendant intended that David Kleiman, Ira Kleiman, or W&K would rely on the false statement or omission;**

4) **David Kleiman, Ira Kleiman, or W&K relied on the false statement or omission; and**

5) **The false statement or omission caused damage to the Estate of David Kleiman or W&K.**

_____

Authorities:

Florida Pattern Jury Instruction 409.7 (modified); Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 17; *Philip Morris USA, Inc. v. Chadwell*, ___ So. 3d ___, No. 3D19-239, 2020 WL 2892407, at *6 (Fla. 3d DCA June 3, 2020); *Poliakoff v. Nat'l Emblem Ins. Co.*, 249 So. 2d 477, 478 (Fla. 3d DCA 1971).

GIVEN                                   _____
GIVEN AS MODIFIED              _____
WITHDRAWN                          _____
GRANTED                               _____
DENIED                                   _____

### *Breach of Fiduciary Duties*

*Ira Kleiman, as personal representative for the estate of Dave Kleiman, and W&K claim that Dr. Wright breached fiduciary duties owed to each of them. I will now explain how this claim is structured. Under Florida law, there are three elements, which I will explain to you, that must be proved in order to find there was a breach of fiduciary duty, These elements are that:*

*(1) a fiduciary duty existed;*

*(2) that duty was breached; and*

*(3) the plaintiffs suffered damages that were proximately caused by that breach.*

### Fiduciary Duty

*A "fiduciary" duty exists when one person places special trust and confidence in another person who knowingly accepts that trust and confidence and thereafter undertakes to act on behalf of the other party. In other words, a fiduciary duty is an obligation to act in the best interest of another party. A mere friendship, alone, is not sufficient to establish a fiduciary relationship. Some examples of relationships involving a fiduciary duty include attorney/client, trustee/beneficiary, and corporate board member/company shareholders. If a relation of trust and confidence exists between the parties (that is to say, where special trust and confidence is reposed by one party in another, who accepts it, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.*

### Breach of Fiduciary Duty

*When someone has a duty to act in the best interest of another party, but intentionally, recklessly, or grossly negligently acts contrary to that obligation, it is called a breach of fiduciary duty.*

*If plaintiffs prove that Dr. Wright owed them a fiduciary duty, to prove a breach of that duty, they must demonstrate that Dr. Wright committed one or more of the following acts:*

*1. A violation of the criminal law, unless Dr. Wright had a reasonable cause to believe his conduct was lawful or had no reasonable cause to believe his conduct was unlawful;*

*2. A transaction from which the manager or member of the limited liability company derived an improper personal benefit, directly or indirectly;*

*3. In a proceeding by or in the right of the limited liability company, to procure a judgment in its favor, or by or in the right of a member, in conscious or willful disregard of the best interests of the limited liability company; or*

*4. In a proceeding by or in the right of someone other than the limited liability company or a member, to commit an act or omission in bad faith, or with malicious purpose, or recklessly, or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The term "recklessness" means acting or failing to act in conscious disregard of a risk known or so obvious it should have been known, and a risk so great as to make it highly probable that harm would proximately result from the act or failure to act.*

*The circumstances set forth above are not exclusive and do not preclude the existence of other circumstances in which a manager of a manager-managed limited liability company or a member in a member-managed limited liability company will be deemed to have breached a fiduciary duty.*

### *Damages Proximately Caused by the Breach*

*The breach of fiduciary duty must be the proximate cause of the damage. For an act or course of dealing to be the proximate cause of damage, it must be proved that the act or course of dealing played a substantial part in producing the injury or damage, that if such conduct hadn't occurred, the injury or damage would not have occurred, and that the injury or damage was the necessary or proximate result of the act or course of dealing.*

*If you find that Ira Kleiman and W&K did not carry their burden of proving all the elements of a breach of fiduciary duty claim that I have just explained to you, then you must return a verdict in favor of Dr. Wright.*

*On the other hand, if you find that Ira Kleiman, on behalf of the estate of Dave Kleiman, or W&K proved, by a preponderance of the evidence, that Dr. Wright owed them a fiduciary duty and breached that fiduciary duty, and that the breach was the proximate cause of their claimed damages, then you will next consider the issue of the amount of compensatory money damages to be awarded to the plaintiffs. You may award each plaintiff you find in favor of only those damages shown to be proximately caused by Dr. Wright's breaches. The dollar amount of any damages must be calculated based on all the evidence presented to you and must serve as a remedy for the plaintiffs' losses.*

_____

Authorities:

*Quinn v. Phipps*, 93 Fla. 805, 811, 113 So. 419, 421 (1927); *Cassedy v. Alland Inv. Corp.*, 128 So. 3d 976, 978 (Fla. 1st DCA 2014); *Crusselle v. Mong*, 59 So. 3d 1178, 1181 (Fla. 5th DCA 2011); *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002); Florida Standard Jury Instructions in Civil Cases, Breach of Fiduciary Duty: Legal Cause 451.6(a), August 29, 2019.

GIVEN                               _____
GIVEN AS MODIFIED        _____
WITHDRAWN                   _____
GRANTED                         _____
DENIED                            _____

## *Breach of Partnership Duties of Loyalty and Care*

*Ira Kleiman, as personal representative of the estate of Dave Kleiman, alleges that Dr. Wright breached duties of loyalty and care owed to Dave Kleiman as partners in an oral partnership. Under Florida law, partners owe the fiduciary duties of loyalty and care to each other and to the partnership. I will break down the definition of these two duties for you.*

### *Duty of Loyalty*

*The duty of loyalty requires partners to: (1) account to the partnership, and hold for it as trustee, the property, profit or benefit derived by the partner for that partnership; (2) refrain from dealing with the partnership as a person having an interest adverse to the partnership; and (3) refrain from competing with the partnership.*

### *Duty of Care*

*The duty of care is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law. Gross negligence is an indifference to duty amounting to actions that are outside the bounds of reason. In other words, gross negligence consists of conduct so reckless or wanting in care that it constitutes a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.*

### *Claim of Breach of Duties of Loyalty and Care*

*To prevail on this claim, Ira Kleiman, as personal representative of Dave Kleiman's estate, must prove:*

*(1) that Dr. Wright owed Dave Kleiman duties of loyalty and care as partners in an oral partnership;*

*(2) that Dr. Wright intentionally, recklessly, or grossly breached his duty of loyalty and care by one of the abovementioned acts; and*

*(3) that Dr. Wright's breaches are the proximate cause of Ira Kleiman's damages.*

*If you find that Ira Kleiman failed to carry his burden of proving that an oral partnership existed, or that Dr. Wright did not owe Dave Kleiman duties of loyalty and care, or that Dr. Wright owed but did not breach such duties of loyalty and care, or that Ira Kleiman's damages were not the proximate result of a breach by Dr. Wright, then you must return a verdict in favor of Dr. Wright.*

*If, on the other hand, you find that Ira Kleiman proved, by a preponderance of the evidence, that an oral partnership existed, that Dr. Wright owed Dave Kleiman the duties of loyalty and care, that Dr. Wright breached those duties, and that Dr. Wright's breaches were the proximate cause of Ira Kleiman's damages, then you must return a verdict against Dr. Wright for the appropriate claim or claims, and next consider the issue of the amount of money damages to be awarded to the estate of Dave Kleiman.*

<u>*Compensatory Damages:*</u>

*Compensatory damages are those damages shown to be legally (or proximately) caused by Dr. Wright's wrongful action. The dollar amount of any such damages must be calculated based on all the evidence presented to you and must serve as a remedy for losses, if any, suffered by the estate of Dave Kleiman.*

_____

Authorities:

Fla. Stat. § 620.8404.

GIVEN                                   _____
GIVEN AS MODIFIED             _____
WITHDRAWN                          _____
GRANTED                             _____
DENIED                               _____

### *Constructive Fraud*

*Constructive fraud is similar to a breach of fiduciary duty claim, in that it occurs when a duty under a confidential or fiduciary relationship has been intentionally breached. It can also occur where an unconscionable advantage has been taken. Constructive fraud may be based on intentional misrepresentation or concealment, or may consist of taking an improper advantage of the fiduciary relationship at the expense of the confiding, or weaker, party. Constructive fraud does not apply where the parties are dealing at arms-length, because there is no duty imposed on either party to protect or benefit the other.*

*Structure of Claim:*

*In order to recover on this claim, plaintiffs must prove:*

*(1) the existence of a relationship of trust and confidence;*

*(2) that the defendant intentionally took unlawful advantage of that position of trust in order to benefit himself; and*

*(3) that plaintiffs were injured as a proximate result of the misconduct.*

*The existence of a fiduciary or confidential relationship is often evidenced by some degree of dependency on one side, and some degree of undertaking on the other side to advise, counsel, and protect the weaker party.*

*Ira Kleiman and W&K allege that Dr. Wright invited them to trust him as their fiduciary, which they then did, and that Dr. Wright violated that duty by taking advantage of their trust to make false statements and committed other unlawful acts against them, including lying about transferring bitcoins and intellectual property that belonged to them, failing to disclose that he was pursuing judgments against W&K in Australia, and that he'd assumed control over W&K and its assets as well as the estate's assets. To prevail on this claim, plaintiffs must prove that Dr. Wright had a fiduciary duty to them and unlawfully abused their trust, thus taking an improper and unconscionable advantage of that fiduciary relationship to benefit himself.*

*If you find that Ira Kleiman and W&K did not carry their burden of proving, by a preponderance of the evidence, each of the elements of a constructive fraud claim, then you must return a verdict in favor of Dr. Wright. If you find that Ira Kleiman and W&K proved, by a preponderance of the evidence, all the elements of this claim, then you must find against Dr. Wright and next consider the issue of the amount of damages to be awarded to the plaintiffs.*

*Compensatory Damages:*

> *Compensatory damages are those damages shown to be proximately caused by Dr. Wright's wrongful conduct. Proximate causation essentially consists of two requirements: cause in fact and foreseeability. The dollar amount of any such damages must be calculated based on all the evidence presented to you and must serve as a remedy for losses, if any, suffered by Dave Kleiman and W&K.*

*Punitive Damages:*

> *Under Florida law, you may also award punitive damages for a constructive fraud claim. An award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto, or $500,000.*

> *Punitive damages are a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment—not merely compensation—must be imposed to prevent similar conduct in the future. You may only award punitive damages if you determine, based on clear and convincing evidence, that Dr. Wright personally committed intentional misconduct or gross negligence, which was the proximate cause of the plaintiffs' loss.*

> *"Intentional misconduct" means that Dr. Wright had actual knowledge or reason to know of the wrongfulness of his conduct and the high probability that injury to Dave Kleiman and W&K would result and, despite that knowledge, intentionally or recklessly pursued that course of conduct. "Gross negligence" means conduct that was not only negligent, but so extremely careless that it constituted a conscious disregard for the life, safety, or rights of Dave Kleiman and W&K. Please remember that the clear and convincing evidence standard that you must apply is a higher standard than the preponderance of the evidence standard and requires you to conclude that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*

_____

Authorities:

BDO Seidman, LLP v. Banco Espirito Santo Int'l, 38 So. 3d 874, 876 (Fla. 3d DCA 2010); *Beers v. Beers*, 724 So.2d 109, 116-17 (Fla. 5th DCA 1998); *Wishinsky v. Choufani*, 278 So. 3d 803, 805 (Fla. 5th DCA 2019); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp.

2d 1170, 1179 (M.D. Fla. 2005); Fla. Stat. §§ 768.72; Florida Standard Jury Instructions in Civil Cases, Personal Injury and Property Damages: Introduction 501.1(b); Punitive Damages – Non-Bifurcated Procedure 503.2, August 29, 2019.


GIVEN                                        _____
GIVEN AS MODIFIED                            _____
WITHDRAWN                                    _____
GRANTED                                      _____
DENIED                                       _____

## **Constructive Fraud**

**The Estate of David Kleiman and W&K have alleged claims against the defendant for constructive fraud. For the plaintiffs to prevail on their constructive fraud claims, they must prove the following by a preponderance of the evidence:**

1) **A relationship of trust and confidence existed between one or more of the plaintiffs and Craig Wright;**

2) **Wright took advantage of this relationship of trust and confidence; and**

3) **Proximately caused one or more of the plaintiffs to suffer damages.**

_____

Authorities:

*Wishinsky v. Choufani*, 278 So. 3d 803, 805 (Fla. 5th DCA 2019), *reh'g denied* (Sept. 16, 2019).

GIVEN                                      _____
GIVEN AS MODIFIED          _____
WITHDRAWN                       _____
GRANTED                            _____
DENIED                               _____

## *Civil Theft*

### *"Clear and Convincing Evidence" Burden of Proof:*

*Ira Kleiman and W&K claim that Dr. Wright committed civil theft. This claim requires the "clear and convincing evidence" burden of proof. Please remember that the clear and convincing evidence standard you must apply is a higher standard than the preponderance of the evidence standard and requires you to conclude that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*

### *Structure of Claim:*

*Under Florida law, the elements of civil theft require plaintiffs to establish by clear and convincing evidence that:*

*(1) the defendant knowingly obtained or used, or attempted to obtain or use, plaintiffs' property;*

*(2) with criminal intent; that is, with the intent to temporarily or permanently deprive plaintiffs of their property; and if so,*

*(3) that the defendant's wrongful conduct was the proximate cause of injury or damage to plaintiffs.*

*A party's wrongful conduct is the proximate cause of injury or damage if it directly and in natural and continuous sequence produces or contributes substantially to producing the injury or damage, so that it can reasonably be said that that if such conduct hadn't occurred, the injury or damage would not have occurred, and that the injury or damage was the necessary or proximate result of the conduct.*

*To recover on this claim, Ira Kleiman, on behalf of the estate of Dave Kleiman, and W&K must prove that:*

*(1) Dr. Wright intentionally took bitcoins and intellectual property that belonged to the plaintiffs, and did so with criminal intent;*

*(2) Dr. Wright intended to permanently deprive the plaintiffs of their property; and*

*(3) Dr. Wright's actions were the legal cause of injury to the plaintiffs.*

*If you find that Ira Kleiman and W&K failed to prove by clear and convincing evidence each element of civil theft, you must return a verdict in favor of Dr. Wright. If you find for Ira*

*Kleiman or W&K on these claims, you will then consider the issue of the amount of money damages to be awarded to each plaintiff.*

*Civil Theft Damages:*

*You may award the plaintiffs only actual damages shown to be proximately caused by Dr. Wright's wrongful conduct. Damages are the proximate result of the wrongful act of another, if you find from clear and convincing evidence that if the wrongful conduct had not occurred, the damages would not have occurred, and that the damages were the necessary or proximate result of the wrongful conduct. The amount of damages cannot be based on speculation or guesswork. The amount of any damages must be calculated based on all the evidence presented to you and must serve as a remedy for the plaintiffs' losses, if any, and not a punishment for Dr. Wright's conduct.*

_____

Authorities:

Fla. Stat. § 772.11, Florida Standard Jury Instructions in Civil Cases, Civil Theft: Legal Cause 411.4(a); Issues on Claim 411.5(a), Burden of Proof on Claim 411.6; Civil Theft Damages 411.7, August 29, 2019; *R.J. Reynolds Tobacco Co. v. Gafney*, 188 So. 3d 53, 58 (Fla. 4th DCA 2016).

GIVEN                             _____
GIVEN AS MODIFIED        _____
WITHDRAWN                   _____
GRANTED                        _____
DENIED                           _____

## *Fraud*

### *Structure of Claim:*

*Ira Kleiman and W&K claim Dr. Wright committed fraud. Under Florida law, there are four requirements to establish a claim for fraud:*

*(1) a false statement or representation concerning a material fact;*

*(2) the representor's knowledge that the representation is false;*

*(3) the representor's intention that the representation induce another to act on it; and*

*(4) resulting injury to the party acting in reasonable reliance on the representation.*

*Plaintiffs allege that Dr. Wright made fraudulent statements concerning material facts on which Ira Kleiman and W&K reasonably relied, which caused them damage.*

*If you find that Ira Kleiman and W&K did not carry their burden of proving, by a preponderance of the evidence, each of the four elements of a fraud claim, then you must return a verdict in favor of Dr. Wright. If, on the other hand, you find that Ira Kleiman and W&K proved their fraud claims by a preponderance of the evidence, then you must return a verdict against Dr. Wright for the appropriate claim or claims, and next consider the issue of the amount of money damages to be awarded to the plaintiffs.*

### *Compensatory Damages:*

*Compensatory damages are those damages shown to be proximately caused by Dr. Wright's wrongful conduct. The dollar amount of any such damages must be calculated based on all the evidence presented to you and must serve as a remedy for losses, if any, suffered by Dave Kleiman and W&K.*

*Punitive Damages:*

      *Under Florida law, you may also award punitive damages for a fraud claim. An award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto, or $500,000.*

      *Punitive damages are a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment—not merely compensation—must be imposed to prevent similar conduct in the future.*

      *You may only award punitive damages if you determine, based on clear and convincing evidence, that Dr. Wright personally committed intentional misconduct or gross negligence, which was the proximate cause of the plaintiffs' loss.*

      *"Intentional misconduct" means that Dr. Wright had actual knowledge or reason to know of the wrongfulness of his conduct and the high probability that injury to Dave Kleiman and W&K would result and, despite that knowledge, intentionally or recklessly pursued that course of conduct. "Gross negligence" means that the conduct was so reckless that it constituted a conscious disregard or indifference to the life, safety, or rights of Dave Kleiman and W&K. Please remember that the clear and convincing evidence standard that you must apply is a higher standard than the preponderance of the evidence standard and requires you to conclude that the claim is highly probable or reasonably certain, not merely more likely true than not true. Clear and convincing evidence is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.*

---------------------------------

Authorities:

*BDO Seidman, LLP v. Banco Espirito Santo Int'l*, 38 So. 3d 874, 876 (Fla. 3d DCA 2010); *Townsend v. Morton*, 36 So. 3d 865, 868 (Fla. 5th DCA 2010) (quoting *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985)); Florida Standard Jury Instructions in Civil Cases, Punitive Damages – Non-Bifurcated Procedure 503.2, August 29, 2019.

GIVEN                       _____
GIVEN AS MODIFIED    _____
WITHDRAWN            _____
GRANTED                _____

DENIED                                        _____

### *Unjust Enrichment*

*Ira Kleiman and W&K allege that Dr. Wright unlawfully benefitted from bitcoins and intellectual property that he misappropriated for himself. Under Florida law, Ira Kleiman and W&K may seek damages, including all monies and properties Dr. Wright obtained by his wrongful conduct.*

*Structure of Claim:*

  *To establish the elements of a cause of action for unjust enrichment under Florida law, plaintiffs must prove that:*

    *(1) plaintiffs conferred a benefit on the defendant, who had knowledge for the benefit;*

    *(2) defendant voluntarily accepted and retained the benefit conferred; and*

    *(3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value of it.*

  *To prevail on this claim, Ira Kleiman, on behalf of Dave Kleiman's estate and W&K must prove that:*

    *(1) they conferred benefits on Dr. Wright;*

    *(2) Dr. Wright accepted these benefits and retained them; and*

    *(3) it would be inequitable for Dr. Wright to not compensate the plaintiffs for the value obtained.*

  *If you find that Ira Kleiman and W&K failed to prove, by a preponderance of the evidence, each element of their unjust enrichment claim, you must return a verdict in favor of Dr. Wright. On the other hand, if you find for either or both of the plaintiffs on this claim, you will then consider the issue of the amount of damages in the form of equitable relief to be awarded to the plaintiffs.*

*Equitable Relief:*

  *Under Florida law, in an unjust enrichment claim, when the defendant has acted in conscious disregard of the plaintiffs' rights, the whole of the resulting gain is treated as unjust enrichment, even though the defendant's gain may exceed both (i) the measurable injury to the claimant, and (ii) the reasonable value of a license authorizing the defendant's conduct. The dollar amount of any such damages must be calculated based on all the evidence presented to you and may not be based on speculation.*

_____

Authorities:

*State Farm Mut. Auto. Ins. Co. v. Medical Service Center of Fla.*, 103 F. Supp. 3d 1343, 1355 (S.D. Fla. 2015); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693 (Fla. 3d DCA 2018); *Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 85 So. 3d 1112, 1115 (Fla. 4th DCA 2012).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

### *Affirmative Defenses[3]*

*If you find that Ira Kleiman and W&K have proven, by a preponderance of the evidence, one or more of their claims against Dr. Wright, then you shall next consider the defenses raised by Dr. Wright.*

*Under Florida law, an "affirmative defense" is any defense that assumes a civil complaint's alleged claim to be valid but raises other facts that, if true, would attack plaintiffs' legal right to bring the claim, or establish a valid excuse or justification for the defendant's challenged conduct. Even though the defendant concedes the legal sufficiency of the alleged claim(s), an affirmative defense is something that, if proven, will reduce or eliminate plaintiffs' recovery on a claim even if they successfully established it.*

*Dr. Wright is asserting several affirmative defenses, each of which you must carefully consider. I caution you that Dr. Wright does not have to disprove Ira Kleiman's or W&K's claims, but to prevail on any affirmative defense he must prove the defense by a preponderance of the evidence. An affirmative defense is proved if you find, after considering all evidence in the case, that Dr. Wright has proved that the required facts are more likely true than not true.*

---

Authorities:

*Long v. Baker*, 37 F. Supp. 3d 1243, 1250 (M.D. Fla. 2014) (citing *State v. Cohen,* 568 So.2d 49, 51–52 (Fla.1990)., 568 So. 2d 49, 51–52 (Fla.1990); 11th Cir. Pattern Jury Instr. Civil Cases, Responsibility for Proof – Affirmative Defense – Preponderance of the Evidence 3.7.2, (2020)

GIVEN                                      _____
GIVEN AS MODIFIED                          _____
WITHDRAWN                                  _____
GRANTED                                    _____
DENIED                                     _____

---

[3] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

### *Affirmative Defense—Statute of Limitations*

*A statute of limitations is a time period set by legislation, during which affected parties must take action to enforce their rights or seek redress after injury or damage. The time periods vary depending on the claim, and there are rules for determining when the clock begins to run on a claim.*

*Under Florida law, all of plaintiffs' claims, except their claim for fraud and constructive fraud, accrue when the last element of the claim occurs. I will discuss the accrual date for each of plaintiffs' causes of action and the time period in which the claim must have been made:*

*Conversion: The statute of limitations applicable to conversion is four years and begins to run at the time of the conversion;*

*Unjust Enrichment: The statute of limitations applicable to unjust enrichment is four years, and the cause of action accrues when the unjust enrichment occurs;*

*Breach of Fiduciary Duty: The statute of limitations applicable to breach of fiduciary duty is four years, and the cause of action accrues as soon as plaintiffs suffer damages proximately resulting from the breach.*

*Breach of Partnership Duties of Loyalty and Care: The statute of limitations applicable to breach of partnership duties of loyalty and care is four years, and the limitations period begins to run as soon as thee partnership suffered damages proximately resulting from the breach.*

*Fraud: The statute of limitations applicable to fraud is four years, and the limitations period begins to run as soon as plaintiffs either knew or should have known that they were injured by defendant's misrepresentations or omissions.*

*Constructive Fraud: The statute of limitations applicable to constructive fraud claims is four years, and the limitations period begins to run as soon as plaintiffs either knew or should have known that they were harmed by defendant's actions.*

*Civil Theft: The statute of limitations applicable to civil theft is five years and begins to run at the time of the theft.*

*Plaintiff Ira Kleiman filed this case on February 14, 2018. Ira Kleiman alleges the existence of an oral partnership from around 2008 to around February of 2011. Dr. Wright argues that Ira Kleiman's claims on behalf of the estate of Dave Kleiman had to have accrued*

77

*when the alleged oral partnership was concluded in February of 2011. Therefore, Dr. Wright argues that the statute of limitations for the bulk of Ira Kleiman's claims expired in February of 2015, four years after the partnership ended, and that plaintiffs' civil theft claim expired in February of 2016.*

*W&K was formed in 2011 and was administratively dissolved in 2012, which is when its claims, if any, accrued. Therefore, W&K's civil theft claim expired in 2017, and the remainder of its claims expired in 2016.*

### *Fraudulent Concealment*

*An exception to the statute of limitations is the doctrine of "fraudulent concealment"—where a plaintiff alleges that a defendant engaged in willful concealment of the claim or cause of action using fraudulent means. Such fraudulent actions will delay the beginning of the limitation period until the plaintiff either knows or should know that they suffered damages.*

*To show fraudulent concealment, a plaintiff must show:*

*(1) successful concealment of the cause of action;*

*(2) fraudulent means to achieve that concealment; and*

*(3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim.*

*Furthermore, fraudulent concealment goes beyond a defendant's mere non-disclosure of a fact, it must constitute active and willful concealment. Plaintiffs bear the burden of establishing by a preponderance of the evidence that fraudulent concealment should be applied.*

*Ira Kleiman and W&K claim that the start date for the statutes of limitations for their claims should be been delayed because Dr. Wright fraudulently concealed their claims. To prevail on these theories, they must show that they acted reasonably and diligently in discovering the existence of their claims, and that Dr. Wright actively and willfully concealed each claim from them by use of fraudulent means.*

*Dr. Wright denies that fraudulent concealment should apply because there is no evidence that he actively and willfully concealed any of plaintiffs' purported claims.*

*Moreover, Dr. Wright argues that even if fraudulent concealment applies, the latest date on which any of plaintiffs' causes of action could possibly have accrued was on October 10, 2013, when plaintiffs received timely notice of the Australian lawsuits against W&K, in*

*which judgment was entered on November 6, 2013. Plaintiffs commenced this case more than four years after that judgment was entered, and all but plaintiffs' claim for civil theft are time-barred as a result.*

_____

Authorities:

Florida Standard Jury Instructions—Contract and Business Cases, Affirmative Defense – Statute Of Limitations 416.32 (last visited June 5, 2020); Fla. Stat. § 772.17; Fla. Stat. § 95.11(3); *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002); *Raie v. Cheminova, Inc.,* 336 F.3d 1278, 1282 n.1 (11th Cir. 2003); *Razor Capital, LLC v. CMAX Fin. LLC*, 2017 WL 3481761, at *4 (S.D. Fla. 2017); *Patten v. Winderman*, 965 So. 2d 1222, 1224 (Fla. 4th DCA 2007) (citing *Hearndon v. Graham*, 767 So. 2d 1179, 1184 (Fla. 2000)); *Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1260 (S.D. Fla. 1994).

GIVEN                                  _____
GIVEN AS MODIFIED                      _____
WITHDRAWN                              _____
GRANTED                                _____
DENIED                                 _____

**Affirmative Defense: Statute of Limitations**

**The statute of limitations requires a plaintiff to commence his lawsuit within a certain time period as prescribed by law. The defendant's statute of limitations defense is directed at all of the plaintiffs' claims, except the civil theft claim, which means that the statute of limitations cannot affect the plaintiffs' civil theft claim. The plaintiffs' remaining claims each have a four-year statute of limitations. This lawsuit was filed on February 14, 2018. Accordingly, to prevail on this statute of limitations affirmative defense, the defendant must prove that the plaintiffs' claims (other than civil theft) accrued before February 14, 2014. However, even if the defendant has proved that, his statute of limitations defense would still fail if the delay in filing suit was caused by Wright, as I will instruct you now.**

_____

Authorities:

Fla. Stat. § 95.031; *Allapattah Servs., Inc., v. Exxon Corp.*, No. 91-cv-00986 (S.D. Fla. Feb. 15, 2001), ECF No. [1387]; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003*), aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005); *Yoder v. Kuvin*, 785 So. 2d 679, 681 (Fla. 3d DCA 2001); *Goodwin v. Sphatt*, 114 So. 3d 1092, 1094–95 (Fla. 2d DCA 2013).

GIVEN

GIVEN AS MODIFIED  _____

WITHDRAWN  _____

GRANTED  _____

DENIED  _____

## Fraudulent Concealment of Timing Defenses

**You will only consider this exception if you find that defendant has proved his statute of limitations defense. The defendant's statute of limitations defense cannot succeed if he fraudulently concealed his misconduct. This exception to the statute of limitations is called fraudulent concealment.**

**To prove fraudulent concealment, the Estate of David Kleiman or W&K must show (1) the defendant fraudulently concealed the causes of action from the Estate of David Kleiman and W&K until at least February 14, 2014; and (2) the Estate of David Kleiman or W&K exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim.**

---

Authorities:

*Razor Capital, LLC v. CMAX Fin. LLC*, No. 17-cv-80388-KAM, 2017 WL 3481761, at *5 (S.D. Fla. Aug. 14, 2017); *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 812 (Fla. 4th DCA 1995).[4]

GIVEN                           _____
GIVEN AS MODIFIED               _____
WITHDRAWN                       _____
GRANTED                         _____
DENIED                          _____

---

[4] Plaintiffs also have an equitable estoppel defense to the application of the statute of limitations, which they believe is properly determined by the Court and so have not included in these proposed instructions.

### *Affirmative Defense—Statute of Frauds*[5]

*The Statute of Frauds is a legal rule that requires certain contracts to be written and properly executed in order to prevent perjury and fraud.*

### *Structure of Defense:*

*Under Florida law, any agreement to perform an activity that the parties expected to take longer than one year must be reduced to writing in order to be enforceable, and this document must be signed by the party expected to perform the activity. In this case, Ira Kleiman alleges that Dave Kleiman and Dr. Wright had an oral partnership from 2008 to 2011. There is no written partnership contract, and Dr. Wright alleges that if an oral partnership had existed, claims regarding it would be unenforceable under Florida's Statute of Frauds because the alleged purpose of the partnership and the circumstances of its alleged operation show the parties' understanding that the work was not intended to be performed within one year. Thus, the lack of a written partnership agreement bars claims regarding the alleged partnership, and Ira Kleiman may not recover damages allegedly caused by and resulting from the alleged existence of an oral partnership between Dave Kleiman and Dr. Wright.*

*If you find, by a preponderance of the evidence, that Dave Kleiman and Dr. Wright had an oral partnership, and that at its inception they intended it to last for more than one year, then Ira Kleiman's oral partnership claims are barred by the Statute of Frauds, and you must find for Dr. Wright on this affirmative defense.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's Statute of Frauds defense, you must find against him on this defense.*

_____

Authorities:

Fla. Stat. § 725.01; *Chernys v. Standard Pac. of S. Fla., G.P. Inc.*, 2010 WL 11504280, at *4 (S.D. Fla. 2010).

GIVEN                                    _____

_____

[5] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

GIVEN AS MODIFIED            _____

WITHDRAWN                   _____

GRANTED                     _____

DENIED                      _____

### *Affirmative Defense—Laches*

*Laches is a doctrine asserted as a defense, which requires proof of (1) lack of diligence by the plaintiffs in bringing their claims, and (2) prejudice to defendant. Dr. Wright asserts the defense of laches based on the plaintiffs' failure to bring this suit until February 2018, more than four years after Dave Kleiman's death in April 2013, seven years after the alleged oral partnership had ended, and six years after W&K was administratively. Dr. Wright asserts that this delay prejudiced him from presenting a fair defense because evidence has disappeared, been destroyed by plaintiffs, lost, or is no longer accessible, because witnesses have died, disappeared or are no longer available, and because witnesses' memories have faded and are unreliable because of the passage of time. If you find by a preponderance of the evidence that plaintiffs lacked diligence in bringing their claims, which caused prejudice to the defendant, then you must find in favor of the defendant.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's laches defense, you must find against him on this defense.*

———————————————

Authorities:

*Monroe Cty. v. Carter*, 41 So. 3d 954, 957 (Fla. 3d DCA 2010); *Garcia v. Guerra*, 738 So.2d 459 (3d DCA 1999); *Dean v. Dean*, 665 So. 2d 244, 247 (Fla. 3d DCA 1995).

GIVEN                                     ———————————————————
GIVEN AS MODIFIED               ———————————————————
WITHDRAWN                           ———————————————————
GRANTED                               ———————————————————
DENIED                                  ———————————————————

**<u>Affirmative Defense: Laches</u>**

**<u>Laches is an equitable doctrine that prevents the Estate of David Kleiman and W&K</u>**

**<u>from recovering damages on their claims if they have inexcusably delayed asserting those</u>**

**<u>claims and the delay has caused undue hardship to the defendant. To prevail on his defense</u>**

**<u>of laches, the defendant must separately prove (1) a delay in the plaintiffs' assertion of their</u>**

**<u>claims; (2) that the delay was inexcusable; and (3) that the delay caused the defendant undue</u>**

**<u>prejudice.</u>**

_____

Authorities:

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-cv-61490 (S.D. Fla. May 13, 2011), ECF No. [215]; *Bowe v. Pub. Storage*, No. 14-cv-21559-UU, 2015 WL 11233137, at *2 (S.D. Fla. June 26, 2015); *Briggs v. Estate of Geelhoed ex rel. Johnson*, 543 So. 2d 332, 334 (Fla. 4th DCA 1989).

GIVEN                             _____
GIVEN AS MODIFIED          _____
WITHDRAWN                   _____
GRANTED                       _____
DENIED                         _____

### *Affirmative Defense—Payment[6]*

*Dr. Wright asserts that Ira Kleiman's and W&K's claims are barred, in whole or in part, by the affirmative defense of "payment."*

### *Structure of Defense:*

*The affirmative defense of "payment" is commonly defined as "delivery and acceptance of money or its equivalent in discharge of an obligation." In this case, Dr. Wright states that Ira Kleiman and W&K received payment in the form of shares in an Australian company called Coin-Exch, as compensation for rights of Dave Kleiman and W&K.*

*If you find Dr. Wright proved by a preponderance of the evidence that Ira Kleiman and W&K received and accepted shares in Coin-Exch as a payment in exchange for their rights, then you must determine whether that payment for those rights was a full or only partial payment, which would be set off against any damages you may find.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's defense, then you must find against him for this defense.*

---

Authorities:

*Dirico v. Redland Estates, Inc.*, 154 So. 3d 355, 358 (Fla. 3d DCA 2014) (quoting *Enriquillo Export & Import, Inc. v. M.B.R. Indus., Inc.*, 733 So.2d 1124, 1126 (Fla. 4th DCA 1999)).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

---

[6] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

### *Affirmative Defense—Set-Off*[7]

**Structure of Defense:**

*Set-off is an equitable doctrine by which a defendant acknowledges the justice of the plaintiffs' demand on the one hand, but on the other sets up a demand of his own to counterbalance it either in whole or in part. Under this doctrine, a defendant may set-off moneys owed to a plaintiff against moneys received by the plaintiff from the defendant, with the result that the offsetting amounts are cancelled and the defendant is obligated to pay plaintiff only the net amount, if any.*

*Dr. Wright states that Ira Kleiman and W&K's claims are barred, in whole or in part, by the doctrine of set-off because Ira Kleiman accepted shares in Coin-Exch.*

*If you find that Dr. Wright has proved this defense by a preponderance of the evidence, then you should determine the value the plaintiffs received from Dr. Wright, and reduce any damages awarded to them by that amount.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's defense, then you must find against him for this defense.*

------------------------

Authorities:

*Lowden v. Northwestern Nat'l Bank & Trust Co.,* 298 U.S. 160 (1936); *S.E.C. v. Elliott,* 953 F.2d 1560, 1572 (11th Cir. 1992);  *Peacock Hotel, Inc. v. Shipman,* 138 So. 44, 47 (Fla. 1931).


GIVEN
GIVEN AS MODIFIED                   _____
WITHDRAWN                           _____
GRANTED                             _____
DENIED                              _____

------------------------

[7] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

*Affirmative Defense—Good Faith*[8]

*Structure of Defense:*

   *Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.*

   *Dr. Wright raises the affirmative defense of good faith against Ira Kleiman's and W&K's claims. Dr. Wright asserts that with regard to W&K, he acted in good faith to carry out his--and Dave Kleiman's-- mutual intent to create a company in Australia, Coin-Exch, and for each to have shareholding in that company. Dr. Wright asserts he carried through on that intent through the Australian court proceedings against W&K and by providing shares in Coin-Exch to Louis and Ira Kleiman as the beneficiaries of Dave Kleiman's estate.*

   *If you find that Dr. Wright has proved, by a preponderance of the evidence, that he acted in good faith, then you should find for Dr. Wright on this defense, and reduce any damages owed to Ira Kleiman and W&K either partially or wholly.*

   *If, however, you find that the preponderance of the evidence does not support Dr. Wright's defense, then you must find against him on this defense.*

––––––––––––––––––––

Authorities:

*Luzinski v. Gosman (In re Gosman)*, 2005 Bankr. LEXIS 3183, at *52 (Bankr. S.D. Fla. 2005).

GIVEN                                          _____
GIVEN AS MODIFIED                   _____
WITHDRAWN                            _____
GRANTED                                  _____
DENIED                                    _____

––––––––––––––––––––

[8] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

<u>*Affirmative Defense—Failure to Mitigate Damages*[9]</u>

*Dr. Wright raises an affirmative defense in which he claims Ira Kleiman and W&K failed to mitigate any damages they suffered. Plaintiffs had a duty of care to themselves to mitigate their alleged damages. This duty is sometimes said to derive from the doctrine of avoidable consequences, which commonly applies in contract and tort actions, and prevents a party from recovering damages that the injured party could have reasonably avoided. The injured party, however, is only accountable for ameliorative actions that could have been accomplished through "ordinary and reasonable care," without requiring undue effort or expense.*

<u>*Structure of Defense:*</u>

*Under Florida Law, if a plaintiff can, through the exercise of reasonable care, prevent or mitigate damages resulting from a defendant's wrongful acts, it is the plaintiff's duty to do so. Thus, a plaintiff cannot recover damages that he or she could reasonably have prevented. Here, Dr. Wright alleges that Ira Kleiman declined opportunities to sell the shares in Coin-Exch that Dr. Wright had given him, which would have mitigated his damages. Dr. Wright claims that because selling the shares to mitigate damages was an ordinary and reasonable act Ira Kleiman could have taken, any damages awarded to Ira Kleiman should be reduced by the amount that was offered for the shares.*

*Dr. Wright also argues that Ira Kleiman and W&K failed to mitigate their damages because Ira Kleiman erased and overwrote many of Dave Kleiman's hard drives and threw away his papers, thereby destroying information that could have given him and W&K access to any bitcoins that Dave Kleiman had.*

*If you find that Dr. Wright has proved, by a preponderance of the evidence, that Ira Kleiman failed to mitigate his damages when he received monetary offers for his shares in Coin-Exch, but failed to capitalize on those opportunities, then you should find for Dr. Wright on this defense, and should reduce any damages owed to Ira Kleiman, as the representative of the estate of Dave Kleiman and W&K accordingly.*

---

[9] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

*If you find that Dr. Wright has proved, by a preponderance of the evidence, that Ira Kleiman has failed to mitigate his damages by maintaining Dave Kleiman's papers and electronic devices, then you should find for Dr. Wright in this defense, and should reduce any damages owed to Ira Kleiman, as the representative of the estate of Dave Kleiman and W&K accordingly.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's defense, then you must find against him on this defense.*

---------------------------

Authorities:

*Schwartz v. NMS Indus., Inc*., 575 F.2d 553, 556 (5th Cir. 1978); *Sys. Components Corp. v. Florida Dept. of Transp.*, 14 So. 3d 967, 982 (Fla. 2009); *Maxfly Aviation, Inc. v. Gill*, 605 So.2d 1297, 1300 (Fla. 4th DCA 1992); *Winter v. Am. Auto. Ass'n*, 149 So. 2d 386, 387 (Fla. 3d DCA 1963); *Air Caledonie Intern. v. AAR Parts Trading, Inc.*, 315 F. Supp. 2d 1319, 1337 (S.D. Fla. 2004).

GIVEN                             _____
GIVEN AS MODIFIED          _____
WITHDRAWN                    _____
GRANTED                        _____
DENIED                          _____

<u>*Affirmative Defense—Unclean Hands*[10]</u>

*Dr. Wright raises the affirmative defense of "unclean hands" against Ira Kleiman and W&K. "Unclean hands" is a defense that limits a plaintiff's ability to recover on a claim when he has defrauded and harmed a defendant with respect to the matter in litigation, however improper may have been the behavior of the defendant.*

<u>*Structure of Defense:*</u>

*For a defendant to successfully avail himself of the doctrine of unclean hands, he must demonstrate:*

*(1) that the plaintiff's wrongdoing is directly related to the claim against which it is asserted; and*

*(2) that the defendant was damaged by the plaintiff's conduct.*

*Dr. Wright states that, by discarding and destroying Dave Kleiman's belongings, including in erasing and overwriting Dave Kleiman's electronic devices, Ira Kleiman has unclean hands. Dr. Wright states that he has been harmed by the destruction and disposal of digital information and devices that that could have contained key evidence about the matters alleged by the plaintiffs in this litigation. Further, Dr. Wright states that Ira Kleiman may have disposed of the private keys to any of Dave Kleiman's bitcoins on those electronic devices, which would have ended the dispute that is at issue in this litigation. Thus, Ira Kleiman brought this suit with "unclean hands."*

*Moreover, Ira Kleiman failed to sell shares in Coin-Exch and misrepresented to the probate court that the estate had not received any assets, even though he had received shares in Coin-Exch. He also failed to disclose to the probate court that his claims that Dave Kleiman owned bitcoins and Bitcoin-related intellectual property, individually and through W&K.*

*Finally, Ira Kleiman made a number of misrepresentations to the Internal Revenue Service, including that the estate had no assets despite having received shares in Coin-Exch, and despite his claims that Dave Kleiman owned bitcoins and Bitcoin-related intellectual property, individually and through W&K.*

---

[10] The Court has granted summary judgment in favor of plaintiffs on several of Dr. Wright's affirmative defenses. *See* D.E. 615. However, in an abundance of caution, Dr. Wright includes jury instructions for those affirmative defenses for appellate purposes.

*If you find that Dr. Wright has proved, by a preponderance of the evidence, that Ira Kleiman's actions meet the requirements for an affirmative defense of "unclean hands," then you should find for Dr. Wright in this defense, and reduce any damages owed to Ira Kleiman and W&K either partially or wholly.*

*If, however, you find that the preponderance of the evidence does not support Dr. Wright's defense, then you must find against him on this defense.*

_____

Authorities:

*Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993); *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *Cong. Park Office Condos II, LLC v. First-Citizens Bank & Tr. Co.*, 105 So. 3d 602, 609–10 (Fla. 4th DCA 2013); *Dawes-Ordonez v. Forman*, 2009 WL 3273898, at *2 (S.D. Fla. Oct. 9, 2009) (citing *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993)).

GIVEN                           _____
GIVEN AS MODIFIED              _____
WITHDRAWN                      _____
GRANTED                        _____
DENIED                         _____

**<u>Damages – Plaintiff</u>**

**<u>If you find for the plaintiffs on any of their claims, you must consider the matter of damages. Generally, you should award an amount of money that will fairly and adequately compensate the Estate of David Kleiman and W&K for their damages. You should consider the following types of damages, some of which are only sought for certain claims as identified in the verdict form you will receive:</u>**

1) **<u>Compensatory damages;</u>**

2) **<u>Statutory damages; and</u>**

3) **<u>Punitive damages.</u>**

_____

Authorities:

Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 31; Jury Instructions, *Kozyrev v. Ponomarenko*, No. 0:19-cv-60497-BB (S.D. Fla. Mar. 6, 2020), ECF No. [141], at 13.

GIVEN                             _____
GIVEN AS MODIFIED       _____
WITHDRAWN                   _____
GRANTED                        _____
DENIED                            _____

**<u>Compensatory Damages</u>**

      **<u>Compensatory damages are the amount of money that you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for all of the Estate of David Kleiman's damages and W&K's damages caused by the defendant.</u>**

_____

Authorities:

Court's Instructions to the Jury, *Balthazar Mgmt., LLC v. Beale Street Blues Co.*, No. 9:17-cv-81214-BB (S.D. Fla. Dec. 4, 2018), ECF No. [328], at 31; Jury Instructions, *Kozyrev v. Ponomarenko*, No. 0:19-cv-60497-BB (S.D. Fla. Mar. 6, 2020), ECF No. [141], at 12.

| | |
|---|---|
| GIVEN | _____ |
| GIVEN AS MODIFIED | _____ |
| WITHDRAWN | _____ |
| GRANTED | _____ |
| DENIED | _____ |

**Damages for the Estate's Interest in Partnership**

**If you find that David Kleiman and the defendant, Craig Wright, were in a partnership, you will be asked to find the value of the assets of the partnership that correspond to David Kleiman's partnership interest, which would now belong to his Estate. As I explained earlier, absent a contrary agreement, the assets of a partnership are to be divided equally among partners. Because the assets of the partnership were never distributed to David Kleiman or his Estate at the time of his death, the damages you should award should be based on today's value of the bitcoin, forked assets, and intellectual property you find was part of the partnership.**

**First, you will be asked to determine the quantity of bitcoin owned by the partnership. You will then be asked to decide the current value of that bitcoin, and award the Estate 50% of that value unless you find that there was a different specific split agreed to by David Kleiman and Craig Wright, in which case you should adjust the portion you award to the Estate of David Kleiman to reflect the specific split you have decided.**

**Second, you will be asked to determine the quantity of the forked assets owned by the partnership. You will then be asked to determine the current value of those forked assets, and award the Estate 50% of that value unless you find that there was a different specific split agreed to by David Kleiman and Craig Wright, in which case you should adjust the portion you award to the Estate of David Kleiman to reflect the specific split you have decided.**

**Third, you will be asked to determine the intellectual property owned by the partnership. You will then be asked to determine the current value of the intellectual property, and award the Estate 50% of that value unless you find that there was a different specific split agreed to by David Kleiman and Craig Wright, in which case you should adjust the portion you award to the Estate of David Kleiman to reflect the specific split you have decided.**

**Because the assets of the partnership were never distributed to David Kleiman or his Estate at the time of his death, the defendant is considered to have acted as a trustee for the Estate of David Kleiman and was required to administer the portion of the partnership assets belonging to the deceased partner solely in the interests of the deceased partner's estate, and not the interests of the defendant. The defendant had to have administered the partnership**

**assets belonging to the Estate of David Kleiman as a prudent person would in light of the circumstances, exercising reasonable care, skill, and caution. Accordingly, it is your job to determine if an additional amount of damages to the Estate is warranted based on the defendant's failure to properly manage the assets of the partnership following David Kleiman's death in breach of his duties.**

_____

Authorities:

*Stephens v. Orman*, 10 Fla. 9 (1862); *Hilgendorf v. Denson*, 341 So. 2d 549, 551 (Fla. 1st DCA 1977) (same); *Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3d DCA 1970); *Wiese v. Wiese*, 107 So. 2d 208 (Fla. 2d DCA 1958); 24 Fla. Jur. P'ship § 175; 40 Am. Jur. P'ship § 368; 55 A.L.R.2d § 3, p. 1400); *Matter of Estate of Moore*, 918 N.W.2d 69, 74 (N.D. 2018).

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

**Plaintiffs reserve the right to ask for an award of the bitcoin and forked assets to the Estate of David Kleiman and W&K. It is appropriate for the Estate to receive the bitcoin and forked assets as a remedy given that cryptocurrencies are commodities under the Commodities Futures Trading Act. See Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc., 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (holding that a cryptocurrency was sufficiently alleged to be a commodity under the Commodities Futures Trading Act). One expert has observed that, "[g]iven that decision, the return of the bitcoin or any other cryptocurrency itself will likely be favored instead of a contested and expensive battle over when and how a digital asset should be valued." Steven Harras, In Absence of Guidance, Judges Decide Handling of Bitcoin in Bankruptcy, CQ Roll Call, 2020 WL 414618 (Jan. 27, 2020).**

**<u>Conversion Damages</u>**

**<u>If you find for the Estate of David Kleiman or W&K on conversion, you will
determine the quantity of assets converted and the value of those assets. Plaintiffs are entitled
to the highest value of the assets between the time of conversion and the date of your verdict.</u>**

_____

Authorities:

*Moody v. Caulk*, 14 Fla. 50, 52–53 (1872); *Haddad v. Cura*, 674 So. 2d 168, 169 (Fla. 3d DCA 1996); 2 Florida Forms of Jury Instruction § 61.35 cmt. (2020); *see also Wright v. Skinner*, 16 So. 335 (Fla. 1916); *Skinner v. Pinney*, 19 Fla. 42, 51 (1882); *Foley v. Dick*, 436 So. 2d 139, 141 (Fla. 2d DCA 1983).

GIVEN                         _____
GIVEN AS MODIFIED            _____
WITHDRAWN                    _____
GRANTED                      _____
DENIED                       _____

**<u>Civil Theft Damages</u>**

**<u>If you find for the Estate of David Kleiman or W&K on civil theft, you should award the Estate of David Kleiman or W&K an amount of money, if any, that the clear and convincing evidence shows are the actual damages sustained by the Estate of David Kleiman or W&K.</u>**


_____
Authorities:

Florida Pattern Civil Jury Instruction 411.7.

GIVEN                                    _____
GIVEN AS MODIFIED               _____
WITHDRAWN                          _____
GRANTED                              _____
DENIED                                 _____


**<u>It is Plaintiffs' position that the statutory trebling of these damages should be done by the Court and be reflected in the Final Judgment entered in accordance with the jury's verdict.</u>**

**<u>Unjust Enrichment Damages</u>**

**<u>If you find for the Estate of David Kleiman or W&K on their claims for unjust enrichment, then they are entitled to an amount of money equal to the value of the benefit provided to the defendant attributable to his wrongdoing. The plaintiffs are entitled to the full benefit conveyed on the defendant even if that amount exceeds the damages the plaintiffs have sustained.</u>**

_____

Authorities:

*Tooltrend, Inc. v. CMT Utensili, SRL*, 198 F.3d 802, 807 n.5 (11th Cir. 1999) (for unjust enrichment, the expectation of compensation is "measured in terms of the benefit to the owner, not the cost to the provider"); *Bailey v. St. Louis*, 268 So. 3d 197, 202 (Fla. Dist. Ct. App. 2018) ("the measure of damages for disgorgement is not the profits the appellants might have made absent the wrongdoing—the measure of damages for conscious wrongdoing is the appellees' 'net profit attributable to the underlying wrong.'" (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011))), *review denied*, No. SC19-698, 2019 WL 7169115 (Fla. Dec. 23, 2019); *Kane v. Stewart Tilghman Fox & Bianchi, P.A.*, 85 So. 3d 1112, 1115 (Fla. 4th DCA 2012); *Levine v. Fieni McFarlane, Inc.*, 690 So. 2d 712, 713 (Fla. 4th DCA 1997) ("[I]t was the benefit to the owner, not the cost to the improver, which would be the basis for an award in an unjust enrichment case."); Restatement (Third) of Restitution & Unjust Enrichment § 3 cmt. c. (2011) ("When the defendant has acted in conscious disregard of the claimant's rights, the whole of the resulting gain is treated as unjust enrichment, even though the defendant's gain may exceed both (i) the measurable injury to the claimant, and (ii) the reasonable value of a license authorizing the defendant's conduct.").

GIVEN                                    _____
GIVEN AS MODIFIED                        _____
WITHDRAWN                                _____
GRANTED                                  _____
DENIED                                   _____

**Punitive Damages**

If you find for the Estate of David Kleiman or W&K on their conversion, fraud, and/or constructive fraud claims, you must decide whether to award punitive damages as well. Punitive damages are warranted against the defendant if you find by clear and convincing evidence that he was guilty of intentional misconduct or gross negligence, which was a substantial cause of damage to the Estate of David Kleiman or W&K. Under those circumstances you may, in your discretion, award punitive damages against the defendant. If clear and convincing evidence does not show such conduct by the defendant, punitive damages are not warranted against him.

"Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and that there was a high probability of injury or damage to the Estate of David Kleiman or W&K and, despite that knowledge, the defendant intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

If you decide that punitive damages are warranted against the defendant, then you must decide the amount of punitive damages, if any, to be assessed as punishment against the defendant and as a deterrent to others. This amount would be in addition to any compensatory damages you award to the plaintiffs. In making this determination, you should consider the following:

1) The nature, extent, and degree of misconduct and the related circumstances, including the following:

   a. Whether the wrongful conduct was motivated solely by unreasonable financial gain;

   b. Whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the defendant;

   c. Whether, at the time of damage, the defendant had a specific intent to harm a plaintiff and the conduct of the defendant did in fact harm a plaintiff;

2) The financial resources of the defendant.

You may, in your discretion, decline to assess punitive damages.

_____

Authorities:

Florida Pattern Civil Jury Instruction 503.2; Joint Proposed Jury Instructions, *Hall v. Sargeant*, No. 18-cv-80748-RKA (S.D. Fla. Mar. 13, 2020), ECF No. [407], at 73–74.

GIVEN                              _____
GIVEN AS MODIFIED                  _____
WITHDRAWN                          _____
GRANTED                            _____
DENIED                             _____

## Jury Instruction No. 39: Closing Instruction

*Ladies and gentlemen, on behalf of the parties, lawyers and the people of the Southern District of Florida, I wish to thank you for your time and consideration of this case.*

*I also wish to advise you of some very special privileges enjoyed by jurors.*

*No juror can be required to talk about the discussions that occurred in the jury room, except by court order. For many centuries, our society has relied upon juries for consideration of difficult cases. We have recognized for hundreds of years that a jury's deliberations, discussions and votes should remain their private affair as long as they wish it. Therefore, the law gives you a unique privilege not to speak about the jury's work.*

*The lawyers and their representatives are not permitted to initiate any communication with you about the trial. You also have the right to refuse to speak with anyone. A request may come from those who are simply curious, such as reporters or news agencies, and requests from internet blogs, chatrooms, electronic devices, social-media websites, or by any other means, or from those who might seek to find fault with you. It will be up to you to decide whether to preserve your privacy as a juror.*

*[In discharging the jury, the court should advise them of their further responsibilities, if any.]*

_____

Authorities:

Florida Standard Jury Instructions in Civil Cases, Instruction Upon Discharge of Jury 801.4, August 29, 2019.

GIVEN                                   _____
GIVEN AS MODIFIED            _____
WITHDRAWN                       _____
GRANTED                             _____
DENIED                                _____

| | |
|---|---|
| *Counsel to Plaintiffs Ira Kleiman as Personal Representative of the Estate of David Kleiman and W&K Info Defense Research, LLC* <br><br> By: */s/ Andrew S. Brenner* <br> Andrew S. Brenner, Esq. <br> Florida Bar No. 978663 <br> BOIES SCHILLER FLEXNER LLP <br> 100 SE 2nd Street, Suite 2800 <br> Miami, Florida 33131 <br> abrenner@bsfllp.com <br><br> Velvel (Devin) Freedman, Esq. <br> ROCHE CYRULNIK FREEDMAN LLP <br> 200 S. Biscayne Blvd. <br> Suite 5500 Miami, Florida 33131 <br> vel@rcfllp.com <br> nbermond@rcfllp.com <br><br> Kyle W. Roche, Esq. <br> Joseph M. Delich <br> ROCHE CYRULNIK FREEDMAN LLP <br> 99 Park Avenue, 19th Floor <br> New York, New York 10016 <br> kyle@rcfllp.com <br> jdelich@rcfllp.com | *Attorneys for Dr. Craig Wright* <br><br> RIVERO MESTRE LLP <br> 2525 Ponce de Leon Boulevard <br> Suite 1000 <br> Miami, Florida 33134 <br> Telephone: (305) 445-2500 <br> Fax: (305) 445-2505 <br> Email: amcgovern@riveromestre.com <br> Email: arivero@rivermestre.com <br> Email: zkass@riveromestre.com <br> Email: zmarkoe@riveromestre.com <br> Email: receptionist@riveromestre.com <br><br> By: /s/ Amanda McGovern <br> AMANDA MCGOVERN <br> Florida Bar No. 964263 <br> ANDRES RIVERO <br> Florida Bar No. 613819 <br> SCHNEUR KASS <br> Florida Bar No. 100554 <br> ZAHARAH MARKOE <br> Florida Bar No. 504734 |

## CERTIFICATE OF SERVICE

I certify that on September 29, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

 /s/ *Amanda McGovern*
AMANDA MCGOVERN

**802-1**

# EXHIBIT A

<u>Partnership Defined</u> (pp. 8-9)

- These new elements are from *Williams v. Obstfeld*, 314 F.3d 1270 (11th Cir. 2002).

    - But *Williams* involved a **pre**-RUPA partnership – the lawsuit was filed in 1997 regarding pre-1997 conduct and RUPA was enacted 1996 and applied until 1998 only to partnerships formed after the passage of RUPA.

    - *Williams* doesn't event mention RUPA; that's because it didn't affect the finding of whether there was a partnership.  Instead, it relies entirely on the pre-RUPA *Dreyfuss* case, which was distinguished in *Rafael J. Roca*, 856 So.2d 1, 6 (Fla. 4th DCA 2003).

- In light of RUPA, the elements Defendant argues are no longer appropriate because of RUPA's defaults:

    - The concepts of a shared common purpose or shared proprietary interest are subsumed by RUPA's statutory definition of a partnership, which was the Court's original instruction: "Except as otherwise provided in subsection (2), the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." Fla. Stat. 620.8202(1).

    - Sharing of profits and duty to share losses:

        - "Each partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits." Fla. Stat. 620.8401(2).

    - Joint control or right of control:

        - "Each partner has equal rights in the management and conduct of the partnership business." Fla. Stat. 620.8401(6).

If the Court is going to keep the new instruction, we would ask that the court include that you don't have to intend to form a partnership—Florida Statutes 620.8202(1)—and the relevant RUPA defaults on sharing of profits and losses and joint control in Florida Statutes 620.8201(2) and (6).

Addition of RUPA and RUPA Defaults:

1. To **Partnership – Defined**, at pp. 8-9

The first sentence on p. 8 should be:  "A 'partnership' means an association of two or more persons to carry on as co-owners of a business for profit**, whether or not the persons intend to form a partnership**."

2. To **Partnership – Assets**, at p. 9

On the issue of determining the respective parties' ownership share in the partnership, I instruct you that in the absence of a contrary agreement among the partners, the partners in a partnership are entitled to share equally in the assets and profits of the partnership**, and the losses of the partnership.  In addition, in the absence of a contrary agreement among the partners, each partner has equal rights in the management and conduct of the partnership business.**

**829**

**From**:        Craig S Wright [craig@rcjbr.org]
**Sent**:        3/12/2008 6:39:15 PM
**To**:          Dave Kleiman [dave@davekleiman.com]
**Subject**:     FW: Defamation and the diffculties of law on the Internet.


I need your help editing a paper I am going to relase later this year. I
have been working on a new form of electronic money. Bit cash, Bitcoin...

You are always there for me Dave. I want you to be a part of it all.

I cannot release it as me. GMX, vistomail and Tor. I need your help and I
need a version of me to make this work that is better than me.

Craig


-----Original Message-----
From: dave kleiman [mailto:dave@davekleiman.com]
Sent: Wednesday, 12 March 2008 6:25 PM
To: security-basics@securityfocus.com
Subject: RE: Defamation and the diffculties of law on the Internet.

Hats off to you Craig,


Sometimes you amaze me....I literally today just took on a case today
dealing exactly with this, you are making my life easy as I am gathering
(with your permission) this information you have provided for my client's
review.
When this becomes public record, I will post-up the results.

I will take any more information on this subject with great enthusiasm and
appreciation, as always!!!

By the way, for those of you who have never asked for Craig's help, you do
not know what you are missing.
I have asked his research assistance more than once. One particular time it
was dealing with abilities of cookies on the server side, when I awoke the
next morning, I had 100's of pages and links of information on that subject,
and variations and ideas I had not even or forgotten to consider (e.g. web
bugs). Why did he help, for no other than reason than he just likes to
research information, and possibly considers me a friend from afar. He
probably had as much fun reading up on the subject as did.
And along with all the technical details he included this:

Cookie Recipe Ingredients:
125 grams butter
50 grams caster sugar
60 grams brown sugar
1 large egg
1 teaspoon vanilla essence/extract
125 grams of plain flour
1/2 teaspoon salt
1/2 teaspoon bicarbonate of soda
250 grams of chocolate (Dark is best for this)
1/2 cup coarsely chopped almonds

Method: Turn your oven on to preheat at 180 degrees Celsius (about 350
degrees Fahrenheit, gas mark 4). Remember to take your grill pan out first.
Now get some baking trays ready (if they're not non-stick then you better
line them or grease them).....................Hey Presto! The world's BEST
cookies, in the comfort of your own home.

In the midst of this data exchange I casually mentioned that one day, when I
was in the position to not have to work so much, I would return to school
and my dream degrees in Cosmology and Astrophysics. Of course, the next day
I had links to every online study available for those degrees, with a "why
wait wink."


Further, it amazes me how Craig has a Blog helping to understand the rights
of US based Digital Forensic Examiners:

**P2**

DEFAUS_00081546

http://gse-compliance.blogspot.com/2008/01/texas-pi-fud.html
And he is based in AU. He simply cares enough about the cause and the
industry to help, it has no direct affect on him if US DFEs are required to
have PI licenses!!


People of the past considered "Loons":
(Feynman, Hawking, Sagan, da Vinci, Einstein, Columbus, everyone associated
with Monty Python and the Holy Grail:
Black Knight: Right, I'll do you for that!
King Arthur: You'll what?
Black Knight: Come here!
King Arthur: What are you gonna do, bleed on me?
Black Knight: I'm invincible!
King Arthur: ...You're a loony.
.......you get the picture)


Yep Craig is a Junkie; a Knowledge Junkie!!!!

For those of you who have nothing good to say; why say anything?

Dave


Respectfully,

Dave Kleiman - http://www.davekleiman.com
4371 Northlake Blvd #314
Palm Beach Gardens, FL 33410
561.310.8801




        -----Original Message-----
        From: listbounce@securityfocus.com
        [mailto:listbounce@securityfocus.com] On Behalf Of Craig Wright
        Sent: Tuesday, March 11, 2008 17:15
        To: 'Simphiwe Mngadi'; security-basics@securityfocus.com
        Subject: RE: Defamation and the diffculties of law on the Internet.


        SANS had "Police Decline to Intervene in Libellous Bebo Page Case
        (March 7 & 8, 2008" in Newsbytes Vol 10.20.

        This refers to:

        http://technology.timesonline.co.uk/tol/news/tech_and_web/the_web/ar
        ticle3498888.ece
        http://www.dailyrecord.co.uk/news/newsfeed/2008/03/07/web-of-lies-
        86908-20342677/
        http://www.telegraph.co.uk/news/main.jhtml?xml=/news/2008/03/07/nbeb
        o107.xml

        Actually, content control IS an aspect of security and compliance. I
        may have been a little angry when writing, but I am far from
        perfect.

        I have taken and updated a little something for the list based on
        responses I have received over the years. Liability against an
        Intermediary, whether in the traditional view of ISP and ICP as well
        as that of employers and other parties remains a risk.

        Extrusion filters seem to be something that is not considered, not
        by most organisations and not unfortunately by many of the list.
        There is more than filtering for attacks. This is surprising as many
        standards and regulations require that specific information is
        filtered. PCI-DSS, HIPAA and a raft of legislation specifies that
        organisation setup the capability to monitor both incoming and
        outgoing traffic. This is not port based, but rather a capability to
        monitor and filter (or at the least act on) content.

        I oversee the information gathering for many more companies than I
        actually audit myself (being an audit manager for an external audit
        firm). In 1,412 firms I have been to or reviewed information for, I

DEFAUS_00081547

have collected a number of statistics over the years.
    231    (or 16.4%) have some content management
    184    (13.0%) have NO egress filters - Nothing at all. No
ports Nothing.
    734    (52.0% have a disclaimer on email that is barely
adequate legally)
    210    (14.8% have a legally valid privacy
policy/disclaimer on their web sites)
    15    (1.06% check Google or other places for information
on their references)

In Scheff v Bock (Susan Scheff and Parents Universal Experts, Inc.
v. Carey Bock - Florida USA, 2006, Case No. CACE03022837) a Florida
jury awarded Sue Scheff US$11.3 million costs and damages over
recurrent blog postings. A former acquaintance accused her of being
a crook, a con artist and a fraudster (as a side note the same laws
apply in Au).
See http://www.citmedialaw.org/threats/scheff-v-bock

In principle, defamation consists of a false and unprivileged
statement of fact that is harmful to the reputation o f another
person which is published "with fault". That is  means that it is
published as a result of negligence or malice. Different laws define
defamation in specific ways that differ slightly, but the gist of
the matter is the same. Libel is a written defamation; slander is a
verbal defamation.

Some examples:
Libellous (when false):
    Charging someone with being a communist (in 1959)
    Calling an attorney a "crook"
    Describing a woman as a call girl
    Accusing a minister of unethical conduct
    Accusing a father of violating the confidence of son

Not-libellous:
    Calling a political foe a "thief" and "liar" in chance
encounter (because hyperbole in context)
    Calling a TV show participant a "local loser," "chicken
butt" and "big skank"
    Calling someone a "bitch" or a "son of a bitch"
    Changing product code name from "Carl Sagan" to "Butt Head
Astronomer"
See http://w2.eff.org/bloggers/lg/faq-defamation.php for details.

So let us do the Math. Let us take a case of 0.1% (or 1 in a
thousand) employees (and the number is in reality higher then this)
posting from their place of work a defamatory post. 83.6% of
companies (based on figures above) will not detect or stop anything.
Less check at all.

Let us take an average US litigation cost for defamation of $182,500
(taking cases won from 96 to current in Au, UK and US) Also see
"Rethinking Defamation" by DAVID A. ANDERSON of the University of
Texas at Austin - School of Law.
(http://papers.ssrn.com/sol3/papers.cfm?abstract_id=976116#PaperDown
load).

So if we take a decent sized company of 5,000 employees, we have an
expectation of 4 incidents per annum that in coming years would be
expected to make it to court. Employers are vicariously liable for
many of these actions. In the past, employers and ICP's have not
been targeted, but this is changing. The person doing the act is
generally not one with the funds to pay out the losses. The employer
is. Thus the ability to co-join employers will increase these types
of actions.

Facebook, blogs and other accesses will only make this worse in
coming years.

So what does this mean? Well in the case of our hypothetical
employer, there is an expected annualised loss of $788,400 US in
coming years. The maximum expected payout would be $50,000,000 US.
It is unlikely that the individual making the claim will be able to
pay the cost of losing, so the employer will more and more be added
to be suit.

Now, I am in no way affiliated with ANY content management software,

DEFAUS_00081548

but I see this as a necessary evil. This would could as an effective
corporate governance strategy, lowering the potential liability of
the employer.

In my experience, the costs of the software and the management are
going to add to less then the potential. With the recent win in
Scheff v Bock, this is only going to increase.

Civil Liability
The conduct of both agents and employees can result in situations
where liability is imposed vicariously on an organisation through
both the common law[i] and by statute.[ii] The benchmark used to
test for vicarious liability for an employee requires that the deed
of the employee must have been committed during the course and
capacity of their employment under the doctrine respondeat superior.
Principals' liability will transpire when a `principal-agent'
relationship exists. Dal Pont[iii] recognises three possible
categories of agents:

(a) those that can create legal relations on behalf of a principal
with a third party;
(b) those that can affect legal relations on behalf of a principal
with a third party; and
(c) a person who has authority to act on behalf of a principal.

Despite the fact that a party is in an agency relationship, the
principal is liable directly as principal as contrasting to
vicariously, "this distinction has been treated as of little
practical significance by the case law, being evident from judges'
reference to principals as vicariously liable for their agents'
acts"[iv]. The consequence being that an agency arrangement will
leave the principle directly liable rather then liable vicariously.

The requirement for employees of "within the scope of employment" is
a broad term without a definitive definition in the law, but whose
principles have been set through case law and include:
where an employer authorises an act but it is performed using an
inappropriate or unauthorised approach, the employer shall remain
liable[v];

the fact that an employee is not permitted to execute an action is
not applicable or a defence[vi]; and the mere reality that a deed is
illegal does not exclude it from the scope of employment[vii].

Unauthorised access violations or computer fraud by an employee or
agent would be deemed remote from the employee's scope of employment
or the agent's duty. This alone does not respectively absolve the
employer or agent from the effects of vicarious liability[viii].
Similarly, it remains unnecessary to respond to a claim against an
employer through asserting that the wrong committed by the employee
was for their own benefit. This matter was authoritatively settled
in the Lloyd v Grace, Smith and Co.[ix], in which a solicitor was
held liable for the fraud of his clerk, albeit the fraud was
exclusively for the clerk's individual advantage. It was declared
that "the loss occasioned by the fault of a third person in such
circumstances ought to fall upon the one of the two parties who
clothed that third person as agent with the authority by which he
was enabled to commit the fraud"[x]. Lloyd v Grace, Smith and
Co.[xi] was also referred to by Dixon J in the leading Australian
High Court case, Deatons Pty Ltd v Flew[xii]. The case concerned an
assault by the appellant's barmaid who hurled a beer glass at a
patron. Dixon J stated that a servant's deliberate unlawful act may
invite liability for their master in situations where "they are acts
to which the ostensible performance of his master's work gives
occasion or which are committed under cover of the authority the
servant is held out as possessing or of the position in which he is
placed as a representative of his master"[xiii].

Through this authority, it is generally accepted that if an employee
commits fraud or misuses a computer system to conduct an illicit
action that results in damage being caused to a third party, the
employer may be supposed liable for their conduct. In the case of
the principles agent, the principle is deemed to be directly liable.

In the context of the Internet, the scope in which a party may be
liable is wide indeed. A staff member or even a consultant (as an
agent) who publishes prohibited or proscribed material on websites
and blogs, changes systems or even data and attacks the site of

another party and many other actions could leave an organisation liable. Stevenson Jordan Harrison v McDonnell Evans (1952)[xiv] provides an example of this type of action. This case hinged on whether the defendant (the employer) was able to be held liable under the principles of vicarious liability for the publication of assorted "trade secrets" by one of its employees which was an infringement of copyright. The employee did not work solely for the employer. Consequently, the question arose as to sufficiency of the "master-servant" affiliation between the parties for the conditions of be vicarious liability to be met. The issue in the conventional "control test" as to whether the employee was engaged under a "contract for services", against a "contract of service" was substituted in these circumstances with a test of whether the tort-feasor was executing functions that were an "integral part of the business" or "merely ancillary to the business". In the former circumstances, vicarious liability would extend to the employer. Similarly, a contract worker acting as web master for an organisation who loads trade protected material onto their own blog without authority is likely to leave the organisation they work for liable for their actions.

In Meridian Global Funds Management Asia Limited v Securities Commission[xv], a pair of employees of MGFMA acted without the knowledge of the company directors but within the extent of their authority and purchased shares with company funds. The issue lay on the qualification of whether the company knew, or should have known that it had purchased the shares. The Privy Council held that whether by virtue of the employees' tangible or professed authority as an agent performing within their authority[xvi] or alternatively as employees performing in the course of their employment[xvii], both the actions, oversight and knowledge of the employees may well be ascribed to the company. Consequently, this can introduce the possibility of liability as joint tort-feasors in the instance where directors have, on their own behalf, also accepted a level of responsibility[xviii] meaning that if a director or officer is explicitly authorised to issue particular classes of representations for their company, and deceptively issues a representation of that class to another resulting in a loss, the company will be liable even if the particular representation was done in an inappropriate manner to achieve what was in effect authorised.

The degree of authority is an issue of fact and relies appreciably on more than the fact of employment providing the occasion for the employee to accomplish the fraud. Panorama Developments (Guildford) Limited v Fidelis Furnishing Fabrics Limited[xix] involved a company secretary deceitfully hiring vehicles for personal use without the managing director's knowledge. As the company secretary will customarily authorise contracts for the company and would seem to have the perceptible authority to hire a vehicle, the company was held to be liable for the employee's actions.

Criminal Liability
Employers can be held to be either directly or vicariously liable for the criminal behaviour of their employees.

Direct liability for organisations or companies refers to the class of liability that occurs when it permits the employee's action. Lord Reid in Tesco Supermarkets Limited v Nattrass[xx] formulated that this transpires when someone is "not acting as a servant, representative, agent or delegate" of the company, but as "an embodiment of the company"[xxi]. When a company is involved in an action, this principle usually relates to the conduct of directors and company officers when those individuals are acting for or "as the company". Being that directors can assign their responsibilities, direct liability may encompass those employees who act under that delegated authority. The employer may be directly liable for the crime in cases where it may be demonstrated that a direct act or oversight of the company caused or accepted the employee's perpetration of the crime.

Where the prosecution of the crime involves substantiation of mens rea[xxii], the company cannot be found to be vicariously liable for the act of an employee. The company may still be found vicariously liable for an offence committed by an employee if the offence does not need mens rea[xxiii] for its prosecution, or where either express or implied vicarious liability is produced as a consequence of statute. Strict liability offences are such actions. In strict liability offences and those that are established through statute to

DEFAUS_00081550

apply to companies, the conduct or mental state of an employee is ascribed to the company while it remains that the employee is performing within their authority.

The readiness on the part of courts to attribute criminal liability to a company for the actions of its employees seems to be escalating. This is demonstrated by the Privy Council decision of Meridian Global Funds Management Asia Ltd v Securities Commission[xxiv] mentioned above. This type of fraudulent activity is only expected to become simpler through the implementation of new technologies by companies. Further, the attribution of criminal liability to an organisation in this manner may broaden to include those actions of employees concerning the abuse of new technologies.

It is worth noting that both the Data Protection Act 1998[xxv] and the Telecommunications (Lawful Business Practice)(Interception of Communications) Regulations 2000[xxvi] make it illegal to use equipment connected to a telecommunications network for the commission of an offence. The Protection of Children Act 1978[xxvii] and Criminal Justice Act 1988[xxviii] make it a criminal offence to distribute or possess scanned, digital or computer-generated facsimile photographs of a child under 16 that are indecent. Further, the Obscene Publications Act 1959[xxix] subjects all computer material making it a criminal offence to publish an article whose effect, taken as a whole, would tend to deprave and corrupt those likely to read, see or hear it. While these Acts do not of themselves create liability, they increase the penalties that a company can be exposed to if liable for the acts of an employee committing offences using the Internet.

[i] Broom v Morgan [1953] 1 QB 597.
[ii] Employees Liability Act 1991 (NSW).
[iii] G E Dal Pont, Law of Agency (Butterworths, 2001) [1.2].
[iv] Ibid [22.4].
[v] Singapore Broadcasting Association, SBA's Approach to the Internet, See Century Insurance Co Limited v Northern Ireland Road Transport Board [1942] 1 All ER 491; and Tiger Nominees Pty Limited v State Pollution Control Commission (1992) 25 NSWLR 715, at 721 per Gleeson CJ.
[vi] Tiger Nominees Pty Limited v State Pollution Control Commission (1992) 25 NSWLR 715.
[vii] Bugge v Brown (1919) 26 CLR 110, at 117 per Isaacs J.
[viii] unreported decision in Warne and Others v Genex Corporation Pty Ltd and Others -- BC9603040 -- 4 July 1996.
[ix] [1912] AC 716
[x] [1912] AC 716, Lord Shaw of Dunfermline at 739 [xi] [1912] AC 716 [xii] (1949) 79 CLR 370 at 381 [xiii] Ibid.
[xiv] [1952] 1 TLR 101 (CA).
[xv] [1995] 2 AC 500
[xvi] see Lloyd v Grace, Smith & Co. [1912] AC 716 [xvii] see Armagas Limited v Mundogas S.A. [1986] 1 AC 717 [xviii] Demott, Deborah A. (2003) "When is a Principal Charged with an Agent's Knowledge?" 13 Duke Journal of Comparative & International Law. 291 [xix] [1971] 2 QB 711 [xx] [1972] AC 153 [xxi] ibid, at 170 per Lord Reid [xxii] See Pearks, Gunston & Tee Limited v Ward [1902] 2 KB 1, at 11 per Channell J, and Mousell Bros Limited v London and North-Western Railway Company [1917] 2 KB 836, at 843 per Viscount Reading CJ.
[xxiii] See Mousell Bros Limited v London and North-Western Railway Company [1917] 2 KB 836, at 845 per Atkin J.
[xxiv] [1995] 2 AC 500.
[xxv] Data Protection Act 1998 [UK]
[xxvi] Telecommunications (Lawful Business Practice)(Interception of Communications) Regulations 2000 [UK] [xxvii] Protection of Children Act 1978 [UK] [xxviii] Protection of Children Act 1978 and Criminal Justice Act 1988 [UK] [xxix] Obscene Publications Act 1959 [UK]

Regards,
Craig Wright (GSE-Compliance)


Craig Wright
Manager of Information Systems

Direct : +61 2 9286 5497
Craig.Wright@bdo.com.au
+61 417 683 914

DEFAUS_00081551

BDO Kendalls (NSW)
Level 19, 2 Market Street Sydney NSW 2000
GPO BOX 2551 Sydney NSW 2001
Fax +61 2 9993 9497
http://www.bdo.com.au/

DEFAUS_00081552

**837**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                   WEST PALM BEACH DIVISION
                  CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,              November 1, 2021
 6                                   9:01 a.m.
            vs.
 7
    CRAIG WRIGHT,
 8
            Defendant.              Pages 1 THROUGH 273
 9  _____

10               TRANSCRIPT OF TRIAL DAY 1
              BEFORE THE HONORABLE BETH BLOOM
11               UNITED STATES DISTRICT JUDGE
                    And a Jury of 10
12
    Appearances:
13  FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
                        DEVIN FREEDMAN, ESQ.
14                      KYLE ROCHE, ESQ.
                        200 South Biscayne, Suite 5500
15                      Miami, Florida 33131

16                      BOIES SCHILLER & FLEXNER
                        ANDREW BRENNER, ESQ.
17                      STEPHEN N. ZACK, ESQ.
                        100 Southeast 2nd Street, Suite 2800
18                      Miami, Florida 33131

19  FOR THE DEFENDANT:  RIVERO MESTRE, LLP
                        ANDRES RIVERO, ESQ.
20                      JORGE MESTRE, ESQ.
                        AMANDA M. MCGOVERN, ESQ.
21                      MICHAEL A. FERNANDEZ, ESQ.
                        2525 Ponce de Leon Boulevard, Suite 1000
22                      Coral Gables, Florida 33134

23  COURT REPORTER:     Yvette Hernandez
                        U.S. District Court
24                      400 North Miami Avenue, Room 10-2
                        Miami, Florida 33128
25                      yvette_hernandez@flsd.uscourts.gov
```

1                            **I N D E X**

2   Certificate ....................................  273
    Voir Dire ......................................   18
3   Jury sworn .....................................  172
    Preliminary jury instructions ..................  173
4   Plaintiff opening statement ....................  183
    Defense opening statement ......................  212

5

6

7                    **W I T N E S S**

8   **ON BEHALF OF THE PLAINTIFF:**                     PAGE
    ANDREAS M. ANTONOPOULOS
9   DIRECT EXAMINATION BY MR. ROCHE                     239

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1        (Call to order of the Court, 9:01 a.m.)
2             THE COURT:  All right.  Let's go ahead and call the
3    case and we can get started.
4             COURTROOM DEPUTY:  Calling Civil Case Number 18-80176,
5    Ira Kleiman v. Craig Wright.
6             Counsel, please state your appearances for the record,
7    starting with Plaintiffs' counsel.
8             MR. FREEDMAN:  Good morning, Your Honor.  Vel Freedman
9    for the Plaintiffs.
10            THE COURT:  Hi.  Good morning.
11            MR. BRENNER:  Good morning, Your Honor.  Andrew
12   Brenner for the Plaintiffs.
13            THE COURT:  Good morning.
14            MR. ROCHE:  Good morning, Your Honor.  Kyle Roche for
15   the Plaintiffs.
16            THE COURT:  Good morning.
17            MR. ZACK:  Good morning, Your Honor.  Steven Zack for
18   the Plaintiffs.
19            THE COURT:  Good morning.
20            MR. BRENNER:  Your Honor, we have with us Tibor Nagy,
21   who is going to help with this part of the process, and Steve
22   Patterson.
23            THE COURT:  All right.  Good morning to each of you.
24            Are we waiting for anyone else on behalf of the
25   Plaintiffs?
```

```
1              MR. FREEDMAN:  No, Your Honor.

2              THE COURT:  All right.

3              On behalf of the Defendants.

4              MR. RIVERO:  Good morning, Your Honor.  Andres Rivero

5    for Dr. Wright.

6              THE COURT:  Good morning.

7              MS. MCGOVERN:  Good morning, Your Honor.  Amanda

8    McGovern for Dr. Wright.

9              THE COURT:  Good morning.

10             MR. MESTRE:  Good morning, your Honor.  Jorge Mestre

11   for Dr. Wright.

12             THE COURT:  Good morning.

13             MR. FERNANDEZ:  Good morning, Your Honor.  Michael

14   Fernandez for Dr. Wright.

15             THE COURT:  Good morning.

16             MR. RIVERO:  And Judge, with us we have Mark Gerard

17   and Mark Linder, who will be assisting in jury selection.

18             THE COURT:  All right.  Good morning to each of you.

19             As you had requested through the courtroom deputy, we

20   did remove the Plexiglas.  We are going to stress that we are

21   following CDC guidelines.

22             And as I stated to the attorneys previously, let me

23   restate on the record that if you are fully vaccinated and you

24   feel comfortable, you are permitted to take your mask off while

25   you are addressing the Court, while you are addressing the
```

1  jurors, or while you are addressing a witness.

2        With regard to the jurors, as you have learned, in

3  order to improve our opportunity to select a jury of 10, I have

4  elected to make use of the jury box.  And that is, as you can

5  see from the blue Xs, that we have measured three feet to

6  maintain social distancing.

7        We will have 20 in the gallery.  And we will have 10

8  prospective jurors in the jury box.  We will have 10 remaining

9  that will be on the fifth floor in the jury room in the event

10  that we need those additional 10 jurors.

11        As you may be aware, there is an overflow media room

12  located on the 8th floor in South 48 for audio only.  I know

13  the courtroom deputy did stress to you that the microphones are

14  always hot until you activate the button and ensure that it is

15  turned off if you are having discussions.

16        With regard to comfort, let me stress comfort.  We

17  have two restrooms.  And I know those of you that had a tour of

18  the jury room, note that there are two restrooms right outside

19  adjacent to the jury room.  We also have two restrooms across

20  the hall.

21        I would suggest that when we take breaks that the

22  jurors, since we obviously have many more jurors -- that the

23  jurors assemble outside and use those bathrooms.  And then when

24  we take a break, the court security officer, Officer Campbell,

25  will assist you to use the restrooms here.

1          As well, during the course of the trial, I bring in

2     coffee or tea and I have water.  I want you to feel

3     comfortable.  If you want to bring in something to drink, you

4     can certainly do so.

5          Let me also state that we will take a break in the

6     morning.  We will always take a one-hour recess for lunch.  And

7     we will take a break in the afternoon.  And because we have so

8     many individuals, our break will be 15 minutes to allow

9     everyone to have a sufficient comfort break.

10          The jurors will be given bags and the bags will

11     include a disposable microphone cover.  Each of you have a

12     disposable microphone cover.  And I would ask that at the

13     conclusion of the day, since we will have matters to attend to

14     in the mornings from 9:00 to 10:00, that you just take the

15     microphone cover and just discard of the cover.

16          As well, as we talked about, the jurors will also have

17     the masks that are clear for their use.  A lot of this will

18     depend upon the jurors' vaccination status and their comfort.

19     But if they feel comfortable, just so that you're able to see

20     their face completely while you're questioning them, I will ask

21     them if they feel comfortable to take off their cloth mask and

22     use this mask during the proceeding.

23          I know that your proposed jury instructions did

24     include note-taking.  I think someone actually suggested that

25     there be no note-taking.

1          So let me state that I am going to permit the jurors

2     to take notes.  And I will give them the appropriate cautionary

3     instruction with regard to the weight to be given.

4          As well, since this is a civil case, unless there is

5     an objection, I believe that the jurors should have the

6     opportunity to question each of the witnesses after the

7     attorneys have concluded.

8          Is there any objection to that?

9          MR. FREEDMAN:  No objection, Your Honor.

10         MR. RIVERO:  No, Your Honor.

11         THE COURT:  At the time that I do introduce you, that

12    is, that the attorneys will now have an opportunity to

13    introduce themselves, I would like you to have the opportunity

14    to introduce yourselves and your team.

15         So I'll turn, if that's appropriate, to Mr. Freedman,

16    and to Mr. Rivero.  And then each of you can introduce your

17    respective members of your team.

18         As well, I am going to let the jury know the witnesses

19    that may testify at this trial.  So I'm going to, again, turn

20    to you, Mr. Freedman, and then to Mr. Rivero.  So if you will

21    be prepared to have the list of witnesses and a brief

22    background in terms of where they may be working or where

23    they're located so that if it's a common name, the jurors have

24    the opportunity to associate whether they have any familiarity.

25         As well, with regard to your joint stipulated facts,

1    which is ECF 616, as we get into the trial, if you will let me

2    know when you would like those to be read.

3         I believe that I have addressed each of the issues.

4         I also do want to advise you, we have two courtroom

5    deputies this morning, we have Liz Gariazzo, as you have met,

6    and we have Alex Rodriguez that will also be assisting us.

7         We are waiting for the jurors to complete their

8    questionnaires.  You will be given a copy of the answers of the

9    12 questions.  I will certainly ask them some preliminary

10   questions.  And then, as we discussed, I will turn the

11   questioning over to the attorneys.

12        Are there any issues that we need to address before we

13   get started?

14        MR. BRENNER:  Just a couple housekeeping matters.

15        One, we were asked to report to Your Honor about the

16   vaccination status of Mr. Kleiman, and he is, in fact -- we

17   have been told he's had his second vaccine.

18        THE COURT:  And where is Mr. Kleiman?

19        MR. BRENNER:  He'll be here for openings.

20        THE COURT:  So do we need to wait for him?

21        MR. BRENNER:  To do voir dire, we do not.  Just so I'm

22   clear -- I think I'm clear, but I'll ask it to remove all

23   doubt -- we're going to be questioning the panel as if it's a

24   panel of 30?  I mean, the whole panel's going to be questioned

25   at the same time?

```
1              COURTROOM DEPUTY:  That correct.

2              MR. BRENNER:  Okay.  And -- okay.  So I guess the

3     lawyers will be free to be in this well, turn that way and that

4     way?

5              THE COURT:  So let's talk about the podium.  Because

6     the podium is tied to the electrical outlet.  So there's not

7     much movement of that podium.  With that said, I'm going to

8     give you the flexibility to be in the well and to move about.

9     You have the lavaliers for your use.

10             MR. BRENNER:  Yes.

11             THE COURT:  So I would suggest that if you want to sit

12    at your table, because you're taking notes, you can certainly

13    do so.  And I'll let the jurors know not to be offended, the 10

14    in the box, that the attorneys will be questioning all of the

15    jurors.  You have the seating charts.

16             And let me state again, to my right, looking out, will

17    be 1 through 12; to the left of the gallery will be 13 through

18    20; and then we will have jurors 21 to 30 that will be seated

19    in the box.  And that will be the placement of the jurors once

20    we select our 10.

21             MR. BRENNER:  And the ones in the box, the numbering,

22    which is closest to you?

23             THE COURT:  20 -- and you should -- Liz, did we give

24    the -- you should have a seating chart for your use.  All

25    right.  So it would be 21 to 30.  So the 21 would be on the
```

1    first row closest to you.

2            MR. BRENNER:  Oh, closest to us.

3            THE COURT:  30 would be on the second row closest to

4    me.

5            MR. BRENNER:  Okay.

6            MR. RIVERO:  I'm sorry, Judge.  Just to avoid

7    confusion for me, 12 through 1 would be in this area?

8            THE COURT:  So -- that's right.  That's -- to my right

9    is 1 to 12.  And if you can see, the benches have been marked

10   and the extra chair.  We have skipped a row.  As you've

11   requested, we skipped the first row so that you can place your

12   items.

13           Let me also state that, since we will be together for

14   quite some time, we have given you each of the conference rooms

15   and you can place your items in there, in the -- during the

16   course of the day and at night.  They will be locked and

17   secure.

18           Let me also emphasize that during this month, we will

19   have other matters that we'll need to attend to and that will

20   also include some criminal matters and there will be defendants

21   that will be coming through, along with members of the US

22   Marshals Service.

23           So I would suggest that if there are items that you

24   don't want to have placed where you're not comfortable, that

25   you can use that first row, if they're large items, or, once

1    again, you can place them in the conference room so that they

2    can be secure.

3           But I would ask at the end of the day, since each day,

4    with the exception of today, we will be meeting at 10:00, that

5    you make sure, particularly on this side, but certainly on our

6    criminal cases we'll have several prosecutors and agents over

7    on this side, so if you'll just move the items.

8           Do we have any issues with regard to the electronics?

9    Is everyone all hooked up?  We have any issues beforehand?

10          MR. BRENNER:  Your Honor, the Plaintiffs -- your court

11   staff accommodated us.  We came in and we think we know what

12   we're doing with the electronics, so I think we're good for

13   now.

14          THE COURT:  All right, then.

15          With regard to the schedule, I will advise the jurors

16   that the case will take three weeks to try, that we anticipate

17   that we will be done on the Tuesday before the Thanksgiving

18   holiday.  I will say that because I want to address any great

19   personal hardships.

20          As we know, this trial may take longer.  And once we

21   have secured our 10, then, to the extent that we proceed after

22   that Tuesday, which is November 23rd, then we will have a

23   further discussion with regard to a schedule.

24          And let me make sure that -- does everyone have the

25   randomized list of the 30 jurors?

```
 1           MR. FREEDMAN:  I don't think so, Your Honor.
 2           MR. RIVERO:  No, Your Honor.  We have not received a
 3      list, that we know of.
 4           THE COURT:  Okay.  Scott, I'm not sure -- is Liz
 5      outside?  Can we have Liz or Alex give a copy of the randomized
 6      list to the attorneys?
 7           MR. BRENNER:  Your Honor, is it okay, since the vast
 8      majority of the jury is here, if we move the furniture over
 9      here for voir dire?
10           THE COURT:  Yeah.  Why don't you go ahead and turn
11      your chairs, if you feel more comfortable, so that you're
12      facing the gallery.
13           Tal, can we make copies for the attorneys of this
14      list?  Do we have an extra list?
15           THE COURT:  Hold on one second.
16        (Pause in proceedings.)
17           THE COURT:  Yes -- back on the record.
18           Yes, Mr. Brenner?
19           MR. BRENNER:  So we had discussed with the Court and
20      agreed that we would have three strikes for a panel of 20.  And
21      now we have a panel of 30.  What's --
22           THE COURT:  You have three strikes for a panel of 30.
23           MR. BRENNER:  Okay.
24           THE COURT:  I mean, unless you're advising,
25      Mr. Brenner, that your respective clients are not aligned, but
```

1    it would appear that the two Plaintiffs are aligned in this

2    case.

3          MR. BRENNER:  No.  That was not the issue at all.  So

4    we're still aligned.

5          THE COURT:  All right.  Thank you.

6       (Pause in proceedings.)

7          THE COURT:  Okay.

8          All right.  Let me address -- back on the record.

9          As I was hoping would not be the case, we do have at

10   least one juror that is not vaccinated, one -- and you will be

11   receiving the answers to the questionnaires, but as I advised,

12   the jury pool has asked the jurors whether they are fully

13   vaccinated.  And at this point, there are -- there are five

14   that are unvaccinated.  One has refused to answer because of

15   medical privacy.

16         So with that understanding, we are going to require

17   that the jurors wear their masks at all times, they maintain

18   social distancing, but I want to make sure that you are

19   comfortable that we do have unvaccinated individuals as part of

20   the panel.

21         MR. RIVERO:  Judge, may I ask, is that five of the 30?

22         THE COURT:  I can advise you -- and you'll receive a

23   copy, but just for your purposes, Juror Number 1, Juror

24   Number 9, Juror Number 13, Juror Number 23, Juror Number 26,

25   and Juror Number 28.

1          MR. RIVERO:  Judge, may I inquire which one is the

2     refuse to answer?

3          THE COURT:  Juror Number 28.

4          MR. RIVERO:  Thank you, Judge.

5          MR. BRENNER:  Judge, on behalf of the --

6          THE COURT:  If you can just be close to the microphone

7     or put it on -- yes.

8          MR. BRENNER:  If I get close to this, should I just

9     turn this one off or it doesn't matter?  I don't want to get

10     feedback.

11          I was trying to catch up, Judge, to what you were

12     saying.  I think, on behalf of the Plaintiffs, we would -- we

13     prefer not to have unvaccinated people in the pool.  If Your

14     Honor is asking if we object, that's our preference, but that's

15     our position.

16          I don't know the legal reason for this.  This is all

17     new to all of us, but it's five or six, right?  It's five plus

18     one, five plus one not answering?

19          THE COURT:  That's correct.

20          MR. BRENNER:  So I think with 24 jurors, we will have

21     enough to seat a panel, seat a jury, but that's the Plaintiff's

22     position.

23          MR. RIVERO:  Judge, our position is that that's not a

24     basis.

25          THE COURT:  Okay.  I need the attorneys to get the

```
 1    questionnaires.  Are we making copies?

 2            All right.  So then with regard to having them in the

 3    pool, they're going to be in the pool.  The question is how we

 4    accommodate the attorneys.  Because I did advise if you feel

 5    comfortable, you're permitted to take your mask off.  And I

 6    don't know if your comfort level has been diminished because of

 7    that.

 8            So I share that with you, it's obviously reflected on

 9    the questionnaires, and you just need to act accordingly with

10    regard to --

11            MR. BRENNER:  Sure.

12            THE COURT:  -- social distancing and masking and

13    protecting yourselves.

14            With regard to your decision relating to keeping them

15    on as jurors to be sworn, I think we should see where we are.

16            MR. BRENNER:  Thank you.

17            MR. RIVERO:  Judge, just to state our position.  We

18    don't agree they should be automatically excluded.  I hope the

19    Court can understand me through the mask.  But we don't agree

20    they should be automatically excluded.  And we'll see -- I

21    understand what the Court's ruling is.

22            THE COURT:  Let's see where we are with regard to

23    selection.

24            MR. BRENNER:  Sure.  Thank you.

25            MR. RIVERO:  Your Honor, may I ask -- because I think
```

1    the court reporter was having difficulty understanding me, and

2    I think you are too.  So I'm not sure if this is close enough.

3              Is it better if this is closer?

4              THE COURT:  Yes.  Much better.

5              MR. RIVERO:  Thank you.

6              THE COURT:  As you know, the most important part of

7    this trial is an accurate record.  And Yvette Hernandez is our

8    court reporter; she will let you know if you are speaking too

9    fast.  She will also communicate whether she's not able to hear

10   you, whether it's because of the mask or your microphone is not

11   turned on.  So just make sure that when you are speaking that

12   you are close to a microphone.

13        (Pause in proceedings.)

14             MR. BRENNER:  Judge, do I have a minute for a quick

15   comfort break?

16             THE COURT:  Yes, of course.  But I would suggest that

17   if you are going to take a comfort break, since we are bringing

18   up the jurors, that you use the restroom back here.

19             Do we have the court security officer?

20             Tal, can you do me a favor?  Can you ask Scott to

21   escort Mr. Brenner to -- or do you want to just show him where

22   the restroom is?

23             Thank you.

24        (Pause in proceedings.)

25             MR. ROCHE:  Your Honor, do we have any extra of the

```
1   jury packets, of the questionnaire?

2         THE COURT:  Do we have additional questionnaires?

3         MS. MCGOVERN:  If I could ask for one as well.

4         Thank you.

5         THE COURT:  Okay.  Perfect.  If you could provide one

6   to Ms. McGovern and one to Mr. Roche.

7         MR. ROCHE:  Can you hear me better now if I turn on

8   the mic?

9         COURT REPORTER:  Yes.  Thank you.

10        MR. ROCHE:  Okay.  Got it.  I'll make sure I do that.

11      (Pause in proceedings.)

12        COURT SECURITY OFFICER:  Judge, the jury's lined up

13  and ready to come in.

14        THE COURT:  All right.  Do the attorneys need a few

15  more moments or are we ready to proceed?

16        MR. BRENNER:  The Plaintiffs are ready, Your Honor.

17        MR. RIVERO:  We're ready, Judge.

18      (Pause in proceedings.)

19        THE COURT:  All right.  And just for the record, there

20  were two individuals -- I'm not certain if they were affiliated

21  with the media.  But let me state that the courtroom will

22  remain open at all times.  However, we are in the midst of a

23  pandemic and as we can see, we have approximately, just given

24  the size of the courtroom, 24 seats that are available.  It

25  will be on a first come, first served basis since we do have an
```

1    overflow for the media with audio only.

2            However, because we are selecting the jury, and we

3    need to use the entire courtroom, my courtroom deputy is

4    advising that temporarily we will need all of the seats.  So I

5    do wish to advise you of that fact.  But the courtroom will

6    remain open at all times for the public.

7            All right.  If the parties are ready to proceed, Liz,

8    we can bring them in as they are lined up.

9            COURTROOM DEPUTY:  Are we ready?

10           THE COURT:  We are.

11       (Before the panel, 9:38 a.m.)

12           THE COURT:  Hi.  Good morning to everyone.

13           Liz, are we ready to swear in the jurors?

14       (Pause in proceedings.)

15           COURTROOM DEPUTY:  Give me one second, Judge.

16           THE COURT:  All right.  Certainly.

17       (Pause in proceedings.)

18           COURTROOM DEPUTY:  If all the jurors would please

19   rise.  Will you raise your right hand for me.

20       (Panel sworn.)

21           THE COURT:  All right.  Thank you, Liz.  All answering

22   in the affirmative.

23           Go ahead and have a seat.

24           Good morning, Ladies and Gentlemen.  It's good to see

25   each of you.  And I thank you for your patience.  I know that

1    some of you were here very early this morning.

2              You were given a goody bag and let me just orient you

3    to the goody bag.  There is a disposable microphone cover for

4    your use.  If you are answering questions, I would ask that you

5    use the microphone cover and then discard it at the conclusion

6    of the jury selection process.

7              My name is Beth Bloom.  I am a district judge of the

8    United States District Court for the Southern District of

9    Florida.  And on behalf of all of the judges, I want to welcome

10   you to the Wilkie D. Ferguson Jr. Federal Courthouse.

11             I appreciate your presence, especially during this

12   pandemic.  And we are fully aware that many of you have

13   personal and professional matters to attend to that you had to

14   put aside to serve as a juror here in federal court.

15             Jury service is not always convenient, but I hope that

16   you realize, other than military service, service on a jury is

17   the most important service that you can provide to your

18   country.

19             At this time, I would like to recognize and ask that

20   you stand, those individuals that are serving or have served in

21   our military and have served us on behalf of our country.

22             Mike Cassidy, Alden Barnett, Pedro Cabrera, Michael

23   Weber, and Berry Sampson.  If you will stand to be recognized.

24   Thank you for your service.

25             The right to a trial by jury is one of our most

20

1    cherished constitutional rights.  And whether it's a criminal

2    case, where one is accused of committing a crime, or a civil

3    case, in which there is a dispute between the parties, we each

4    have a right to have the case heard and decided by a completely

5    impartial group of our fellow citizens serving on a jury.  The

6    duty is just as sacred when the trial is a civil case as the

7    one here today.

8        I hope that when you do finish your term of service,

9    if you are selected, that that term will be interesting,

10   challenging, and informative, as well as a satisfaction that

11   will come from a job well done.

12       So let me give you a brief overview of the jury

13   selection process.  And just with a show of hands, how many of

14   you have served on a jury before, whether a grand jury, federal

15   or state court?

16       Okay.  So some of you have, so you know the experience

17   and you know the process.  So let me just explain it once

18   again.

19       Each of you have been found to have the requisite

20   qualifications to serve as a juror of this court.  No one

21   should avoid fulfilling this obligation, except for the most

22   pressing circumstances and a great personal hardship.  The

23   demand on your time for this jury duty will not be unreasonable

24   or unduly prolonged and every effort will be made to see that

25   your time is not wasted.

1        You have been placed in random order.  And there are

2    30 of you that are here; 20 of you in the gallery, 10 of you

3    here in the jury box.  And we have made sure that we have

4    maintained the requisite social distancing.

5        And let me state that we are following CDC guidelines.

6    So to the extent that you are fully vaccinated, and you feel

7    comfortable, you are permitted to take your mask off in

8    answering a question that I may have or the attorneys may have.

9    And I would ask that you maintain your masks at all other

10   times.

11       You have been placed under oath.  And I will ask those

12   of you that have already been placed under oath -- and all of

13   you have -- a series of questions as to your qualifications to

14   serve as jurors in this particular case.

15       Voir dire, or voir dire as it is sometimes called,

16   means to speak the truth.  And under your oath as a prospective

17   juror, you have agreed to truthfully answer questions

18   concerning your qualifications.

19       I want you to understand that this questioning is not

20   for the purpose of prying into your personal affairs.  It is

21   only for the purpose of determining if your decision in this

22   case would in any way be influenced by opinions which you now

23   hold or by some personal experience or special knowledge that

24   you may have concerning the subject matter to be tried.

25       The object is to obtain a jury that will impartially

22

```
1    try the issues of this case upon the evidence and the law
2    presented in this courtroom without being influenced by any
3    other factors.
4            Now, let me state that there may be a question that is
5    asked that is a little too personal.  And -- because we're
6    asking about each of you, all you need to do is just raise your
7    hand, let me know, and when we take a break, we will take your
8    response outside the presence of your fellow prospective jurors
9    and just with the attorneys and myself.
10           The purpose of this questioning is to make sure that
11   those who are finally selected to sit on this jury are the most
12   impartial persons available in relation to the issues being
13   tried in this case.
14           And when I finish my questioning, the attorneys will
15   be allowed to follow up with their questions.  And when the
16   questioning is completed, the attorneys will be given a chance
17   to review their notes and we will then take a short recess so
18   that, together with the attorneys, we can have a discussion and
19   the jurors are selected.  If you are not selected, please don't
20   take it personally; it's part of the jury selection process.
21           Now, if you are selected and seated on this jury, you
22   will normally be expected to be here by 9:30 in the morning.
23   We will take one break in the morning, a one-hour lunch break,
24   and one break in the afternoon.  And I anticipate that we will
25   conclude by 5:00 p.m.
```

```
 1          An exception to that may occur if we're in the middle

 2   of a witness's testimony, or the case is finished during the

 3   afternoon and you are asked to retire to deliberate upon a

 4   verdict.

 5          We anticipate that this trial will last approximately

 6   three weeks.  It will conclude by the Tuesday before

 7   Thanksgiving, by November 23rd.

 8          Now, does the schedule that I have given you present a

 9   great personal hardship for anyone?

10          If so, please raise your hand.

11          All right.  And this is Juror Number -- we'll begin

12   over here.  Juror Number 2, Mr. Cassidy.

13          Yes, sir.

14          PROSPECTIVE JUROR:  I have a docket that I manage for

15   the US Government and three weeks would kill me.

16          THE COURT:  All right.  And -- sir, but you are

17   employed by the US Government?

18          PROSPECTIVE JUROR:  Yeah. I'm a DHS ICE employee.  I'm

19   a deportation officer.

20          THE COURT:  All right, sir.  And I understand that we

21   all have jobs that are important, and it is hard to juggle that

22   time, but you are employed by the US Government.

23          PROSPECTIVE JUROR:  Correct, yeah.

24          THE COURT:  We'll be starting later in the morning and

25   there will be an opportunity during the Veterans holiday -- we
```

1    will not be in session, and as I stated, we will conclude by

2    the Tuesday before Thanksgiving.

3        So I do recognize that your job is an important one

4    and one where you need to be at work, but as I stated -- and

5    you know as a member of the military -- that this call to jury

6    duty is one of our most sacred constitutional rights.

7        So I appreciate you bringing that to the Court's

8    attention, Mr. Cassidy.

9        PROSPECTIVE JUROR:  Thank you.

10       THE COURT:  Is there anyone else that has a great

11   personal hardship that may affect you for serving on this jury?

12       And I believe -- is that Mr. Horne?

13       PROSPECTIVE JUROR:  Yes.

14       THE COURT:  Yes, Mr. Horne.

15       PROSPECTIVE JUROR:  Yes.  I do -- I do freelance

16   marketing.  Basically, I work for myself.  So yeah, three weeks

17   would be kind of long.

18       THE COURT:  Yes.  And Mr. Horne, could you freelance

19   during the morning while we're not in session and in the

20   evening and during the holiday periods?

21       PROSPECTIVE JUROR:  No.  With the particular client I

22   have right now, I have to basically be on site.

23       THE COURT:  And when you say that you're working for

24   yourself, you're self-employed, you pay yourself or are you --

25       PROSPECTIVE JUROR:  I work for clients.  The

25

 1   particular client I have right now is in the Doral area.  And

 2   like I said, I work on site.

 3          THE COURT:  All right.  And can you advise the Court,

 4   during the next three-week period, are you required to be on

 5   site?

 6          PROSPECTIVE JUROR:  Yes.

 7          THE COURT:  And are you able to delay that on-site

 8   appearance?

 9          PROSPECTIVE JUROR:  I wouldn't get paid, basically.

10          THE COURT:  I understand.

11          All right.  Thank you, Mr. Horne.

12          Is there anyone else, Ladies and Gentlemen, that has a

13   great personal hardship?  And we'll first start over to my

14   right in the gallery.

15          Anyone else?

16          All right.  Then we're going to go to my left.

17          All right.  And no one over to the left.

18          All right.  And now we're over in the jury box, and we

19   have Mr. Escobedo.

20          Yes, sir.

21          PROSPECTIVE JUROR:  Good morning.

22          THE COURT:  Good morning.

23          PROSPECTIVE JUROR:  I am a critical employee for

24   airlines.  And my company was even harassing me on weekends

25   because I was supposed to operate a flight at midnight today.

```
 1   So they gave me five days and they say in five days check with

 2   them.  So three weeks I think is ...

 3              THE COURT:  And is this -- what's the name of the

 4   security --

 5              PROSPECTIVE JUROR:  It's not.  It's an airline.  It's

 6   called Coletta Airline.  It's based out of Michigan.

 7              THE COURT:  All right.  And do you receive a salary

 8   through Coletta?

 9              PROSPECTIVE JUROR:  I receive a salary.

10              THE COURT:  Are there more than 10 employees with

11   Coletta?

12              PROSPECTIVE JUROR:  Oh, yes.

13              THE COURT:  All right, sir.  And did you advise that

14   you received a summons?

15              PROSPECTIVE JUROR:  I advised them September 29.  They

16   say:  "Okay.  Okay."

17              First, they assigned me on a trip 4:00 this morning,

18   and I kept calling on weekend.  It was a very stressful time

19   for me.  Because they kept saying:  "No.  No.  As soon as you

20   find out, let us know."

21              And I said:  "I cannot do that, because by the time I

22   find out, it's too late for me to go over to Cincinnati.  So

23   you got to remove me out of the trip."

24              And then they finally did it, but they told me that I

25   have to call this morning through the HR and the chief pilot's
```

```
1    office.  First I called the scheduling department and I told
2    them:  "Do you still want me to call HR?  Because I will talk
3    to the Judge."
4              They said:  "No.  No.  We give you by Friday.  By
5    Friday, you have to be back."
6              THE COURT:  Okay.  And Mr. Escobedo, just so that you
7    know -- and I'm not just saying this to you, but anyone else
8    for --
9              PROSPECTIVE JUROR:  I understand.
10             THE COURT:  I will make sure that you receive from my
11   office a letter advising, if you are selected to serve --
12             PROSPECTIVE JUROR:  Okay.
13             THE COURT:  -- that you have been selected.
14             PROSPECTIVE JUROR:  That's all.
15             THE COURT:  Of course.  And your benefits, your
16   rights, and your salary will be protected.  Thank you, sir.
17             PROSPECTIVE JUROR:  Thank you, ma'am.
18             THE COURT:  Is there anyone else that has a great
19   personal hardship?
20             We're here in the jury box.
21             Mr. Sampson?
22             PROSPECTIVE JUROR:  Yes.  I'm not sure if this
23   qualifies, but I've been living in Tampa for the past two
24   months and I just received like a couple of bags of mail.  And
25   apparently even today -- I have got more than one --
```

```
1              THE COURT:  All right.  So you now live in Tampa,
2     Florida, sir?
3              PROSPECTIVE JUROR:  Yes.
4              THE COURT:  All right.  And when did you move to
5     Tampa?
6              PROSPECTIVE JUROR:  It was in September.
7              THE COURT:  All right.  Thank you, sir.
8              Is there anyone else that has a great personal
9     hardship with the schedule that I have given?
10             All right.  Ladies and Gentlemen, each of you were
11    kind enough to complete a juror questionnaire.  At this time,
12    I'm going to ask that you take out the questionnaire and review
13    the questions and answers once again.
14             Copies of your completed questionnaires have been
15    provided to the attorneys.  I have a copy as well.  And we will
16    each be relying upon your true and complete answers.  So please
17    take the time to review the question and your answer and raise
18    your hand if there are any changes that you would like to make
19    to the questionnaire.
20             And if there are any changes, if you will raise your
21    hand and we'll make note of those changes.
22             Is there anyone that would like to add, alter, amend,
23    make any changes whatsoever to the answers that you have given
24    now rereading the questions?
25         (Pause in proceedings.)
```

29

1         THE COURT:  Giving a few more minutes, if you will

2     raise your hand.

3         Seeing no hands raised.

4         In order that you will know the court personnel with

5     whom you'll be working and their respective duties, I'd like to

6     introduce them to you at this time.

7         The courtroom deputy is Elizabeth Gariazzo.  The

8     courtroom deputy serves as the Court's administrator in the

9     courtroom.

10        The court reporter is Yvette Hernandez.  She

11    transcribes and takes down everything that is said in the

12    courtroom, including the statements I am now making, the

13    questions that will be asked of you, the answers, and all other

14    matters in this case.  So it's important that you respond not

15    with a nod or a shake of the head, but with your voice, so that

16    Ms. Hernandez is able to ensure that we have an accurate

17    record.

18        And our official court security officer is Officer

19    Scott Campbell.  He enforces the Court's orders and is in

20    charge of you, the jury, while we are away from the courtroom.

21        If at any time you want to ask about any matters

22    touching upon your personal welfare, apart from the case that's

23    being tried, you should speak to Officer Campbell.  The court

24    security officer will, if necessary, arrange for me to hear you

25    on that matter.

30

```
1              Do any of you know me or any of the court personnel?

2              If so, please raise your hand.

3              Seeing no hands raised.

4              I would like to officially call this case.  As I

5    stated, this is a civil case and it is styled Ira Kleiman, as

6    personal representative of the estate of David Kleiman, and W&K

7    Info Defense Research, LLC, Plaintiffs, v. Craig Wright,

8    Defendant.

9              At this time, I'd like the attorneys to introduce

10   themselves and their respective clients.

11             We'll begin first on behalf of the Plaintiffs.

12             MR. FREEDMAN:  Good morning, Ladies and Gentlemen.  My

13   name is Vel Freedman.  With me at counsel's table is Andrew

14   Brenner, Kyle Roche, Steve Patterson, Steven Zack, and Tibor

15   Nagy.  And we represent the Plaintiffs in this action.

16             THE COURT:  And are the Plaintiffs ready to proceed to

17   trial?

18             MR. FREEDMAN:  We are, Your Honor.

19             THE COURT:  Thank you.

20             On behalf of the Defendant.

21             MR. RIVERO:  Good morning, Ladies and Gentlemen.  My

22   name is Andres Rivero.  And together with Amanda McGovern,

23   Jorge Mestre, and Michael Fernandez, we will be representing

24   Dr. Craig Wright.  And we have present with us at counsel table

25   Mark Gerard and Mark Linder.
```

31

```
1              THE COURT:  Thank you, Mr. Rivero.

2              And is the Defendant ready to proceed to trial?

3              MR. RIVERO:  Yes, we are, Your Honor.

4              THE COURT:  Thank you, sir.

5              Now, Ladies and Gentlemen, do any of you know the

6    attorneys or any of the parties in this action?

7              If so, please raise your hand.

8              Seeing no hands raised.

9              I will now read a summary of the case.  Please listen

10   carefully.

11             "The Plaintiffs in this case are Ira Kleiman, as the

12   personal representative of the estate of David Kleiman, and W&K

13   Info Defense Research, LLC.  The Defendant is Craig Wright.

14             "The Plaintiffs allege that David Kleiman and Craig

15   Wright entered into a partnership to develop and release the

16   original Bitcoin protocol to mine Bitcoin and develop

17   blockchain-related intellectual property.

18             "Plaintiffs allege further that after David Kleiman

19   died, Craig Wright wrongfully took David Kleiman's share of the

20   partnership's Bitcoin and blockchain-related intellectual

21   property and has refused to provide it to his estate.

22             "Plaintiffs seek to recover those assets in this

23   lawsuit.

24             "Plaintiffs further allege that W&K, which David

25   Kleiman was the owner of, developed blockchain-related
```

32

1    intellectual property.  They allege that after David Kleiman

2    died, the Defendant initiated proceedings in Australia through

3    which he gained control over all of W&K's intellectual

4    property.

5         "Plaintiffs allege that Craig Wright has likewise

6    refused to return that intellectual property to W&K.  And W&K

7    seeks return of its intellectual property.

8         "Craig Wright denies that he had a partnership with

9    David Kleiman to create or mine Bitcoin or to develop

10   Bitcoin-related intellectual property.

11        "Craig Wright further denies that he wrongfully took

12   or stole Bitcoins or intellectual property that belonged to

13   either Plaintiff.

14        "Craig Wright has raised affirmative defenses based on

15   the allegation that Plaintiffs' claims were filed too late."

16        Now, Ladies and Gentlemen, do any of you know anything

17   about this case, either through your own personal knowledge or

18   by discussion with anyone else or by reading or hearing about

19   it in any of the news media?

20        If so, please raise your hand.

21        Seeing no hands raised.

22        Ladies and Gentlemen, is there anything about the

23   nature of this case that would in any way prevent you from

24   serving as a fair and impartial juror?

25        If so, please raise your hand.

1          Seeing no hands raised.

2          Now we will turn to the possible witnesses in this

3    trial.  And I will ask the attorneys to read to you the names

4    and a brief background of possible witnesses who may testify in

5    this case.

6          If you know or think you know any of these individuals

7    in any capacity, I'm going to ask that you hold raising your

8    hand until all of the names are given to you and then advise

9    whether you have any familiarity with any of the witnesses.

10         We'll first start on behalf of the Plaintiff.

11         Mr. Freedman.

12         MR. FREEDMAN:  In this action, the Plaintiffs may call

13    the following witnesses:  Gavin Andresen.  Gavin Andresen

14    resides in Amherst, Massachusetts, and is a software developer.

15    He is currently an entrepreneur in residence at the University

16    of Massachusetts in data sciences department.  He was the chief

17    scientist of the Bitcoin Foundation for several years.

18         Plaintiffs may also call Deborah Kobza.  Deborah Kobza

19    resides in St. Augustine, Florida.  She was the founder of the

20    Global Institute of Cybersecurity + Research, otherwise known

21    as GICSR.  She's also been employed by the National Credit

22    Union and the International Association of Certified ISAOs.

23         Plaintiffs may also call Jimmy Nguyen.  Jimmy Nguyen

24    resides in Seattle, Washington.  Mr. Nguyen is currently the

25    president of the Bitcoin Association.  He is a former officer

1  of nChain Group and Mr. Nguyen is also an attorney that has

2  practiced law at several law firms in California.  He also

3  started a company called New Win Digital in West Hollywood,

4  California, and has served as a board member of Centbee and

5  TAAL Distributed Information Technologies.

6       Plaintiffs may also call Andrew O'Hagan, who resides

7  in London in the United Kingdom.  He is a Scottish novelist and

8  author as well as an editor-at-large of the London Review of

9  Books and Esquire Magazine.  He's currently the visiting

10  professor of writing at King's College London.

11       Plaintiffs may also call Patrick Paige.  Patrick Paige

12  resides in West Palm Beach, Florida.  He is an owner and

13  operator of Computer Forensics, LLC, a Florida limited

14  liability company, which was formed in 2012 with Carter Conrad

15  and David Kleiman.

16       Plaintiffs may also call Robert Radvanovsky.

17  Mr. Radvanovsky resides in Chicago.  He is a cybersecurity

18  researcher and he owns and operates an organization called

19  Infracritical.

20       Plaintiffs may also call Brendan Sullivan, who resides

21  in New York.  He is a journalist for Modern Consensus.

22       May also call Jonathan Warren, who resides in

23  Brooklyn, New York.  He's the creator of an app called

24  Bitmessage.  Mr. Warren is one of the founders of a company

25  called High Side, Incorporated, and was previously employed by

155

```
1    Coin Apex and BitInstant.

2           Plaintiffs may also call Jimmy Wilson -- Jamie Wilson.

3    Jaime Wilson resides in Australia.  He is the founder of Your

4    Digital File and was formerly involved with Hotwire Preemptive

5    Intelligence Propriety Limited and Coin-Exch. Propriety Limited

6    in Australia.

7           Plaintiffs may also call some experts in this case.

8    Those experts would be Andreas Antonopoulos.  Mr. Antonopoulos

9    resides in Wyoming.  He has worked in Bitcoin and open

10   blockchains since 2012 and Mr. Antonopoulos is a teaching

11   fellow at the University of Nicosia and works for the Chicago

12   Mercantile Exchange.

13          Another expert Plaintiffs may call is Stefan Boedeker.

14   Mr. Boedeker resides in California and is a managing director

15   at Berkeley Research Group where he focuses on the application

16   of economic statistical and financial models.

17          Plaintiffs may also call Dr. Matthew Edman.  Dr. Edman

18   is the director in the cybersecurity and investigations

19   practice at Berkeley Research Group in New York.  Prior to

20   joining Berkeley Research Group, he was the lead cybersecurity

21   engineer at the MITRE Corporation.

22          Finally, Plaintiffs may also call Dr. Robert Leonard.

23   Dr. Leonard resides in New York.  He is a professor of

24   linguistics at Hofstra University in New York.

25          THE COURT:  Thank you, Mr. Freedman.
```

36

```
1              On behalf of the Defendant.

2              Ms. McGovern.

3              MS. MCGOVERN:  Good morning.  Dr. Craig Steven Wright

4      may call the following witnesses at trial:  First, Dr. Wright

5      will call Dr. Craig Steven Wright.  Dr. Wright is -- was born

6      in Australia and currently resides in the United Kingdom.

7      Dr. Wright is the inventor of Bitcoin.

8              Dr. Wright will also call Ira Kleiman.  Ira Kleiman is

9      the Plaintiff in this action.  He is also the brother of David

10     Kleiman.

11             Dr. Wright will also call Dr. Ami Klin.  Dr. Ami Klin

12     is the director of the Center of Autism, the Marcus Center of

13     Autism, in Atlanta.

14             Dr. Wright may also call Conrad -- Carter Conrad.

15     Carter Conrad resides in West Palm Beach.  He is the owner of a

16     company called Computer Forensics.  He is the former partner of

17     David Kleiman.

18             Dr. Wright may also call Mr. Joseph Karp.  Mr. Joseph

19     Karp was Dave Kleiman's family friend and trusted estates

20     lawyer.  Mr. Karp resides in Palm Beach Gardens, Florida.

21             Dr. Wright may also call David Kuharcik.  David

22     Kuharcik is David Kleiman's former accountant.  He has offices

23     located in North Palm Beach, Florida.

24             Dr. Wright may also call Donald Lyman.  Donald Lyman

25     resides in Victoria, Australia and is Dr. Wright's uncle.
```

1        Dr. Wright may also call the corporate representative

2   or the records custodian of the VA hospital, the Veterans

3   hospital in Miami where Dave Kleiman was hospitalized for

4   nearly the last two years of his life.

5        Dr. Wright may also call Lynn Wright.  Lynn Wright is

6   Dr.  Wright's former wife.  She also resides in Australia.

7        Dr. Wright may also call Ramona Watts.  Ramona Watts

8   is Dr. Wright's current wife.  She's originally from Singapore

9   and she resides with Dr. Wright in the United Kingdom.

10        Dr. Wright may also call the following expert

11   witnesses in addition to Dr. Ami Klin:

12        Nicholas Chambers.  Nicholas Chambers is a senior vice

13   president in the Investigations, Disputes & Risk practice at

14   AlixPartners in Washington, DC.

15        Dr. Wright may also call William Choi, C-H-O-I.

16   William Choi is the managing director at AlixPartners in

17   San Francisco, California.

18        Dr. Wright may also call Dr. Stewart MacIntyre.

19   Dr. MacIntyre is the director of medicine who works at Mercy

20   Hospital in Miami, Florida.

21        Dr. Wright may also call Kevin Madura.  Kevin Madura

22   is the senior vice president at Global Cybersecurity Practice

23   Group in AlixPartners.

24        And finally, Dr. Wright may call William Nicholson.

25   Mr. Nicholson is the principal partner and chief compliance

38

```
1     officer of Heritage Capital Group in Jacksonville, Florida.
2             THE COURT:  All right.  Thank you, Ms. McGovern.
3             Ladies and Gentlemen, you have heard the list and a
4     brief background of the possible witnesses.  Do any of you know
5     any of them?
6             If so, please raise your hand.
7             Seeing no hands raised.
8             Ladies and Gentlemen, there are 30 of you here today.
9     Do any of you know anyone else on the prospective panel?
10            If so, please raise your hand.
11            Seeing no hands raised.
12            Do any of you have any physical impairment that we
13    will need to accommodate if you are selected as a juror, such
14    as a hearing or sight difficulty or a specific medical
15    condition?
16            If so, please raise your hand.
17            Seeing no hands raised.
18            Is there anyone that does have a medical condition
19    that may affect you for sitting for longer than a 30-minute
20    period?
21            If so, please raise your hand.
22            Seeing no hands raised.
23            Is there anyone who is now taking medication that may
24    make you sleepy or groggy?
25            If so, please raise your hand.
```

39

```
1              Seeing no hands raised.
2              Is there anyone who lives outside of the Southern
3    District of Florida?  The Southern District of Florida extends
4    from Fort Pierce to Key West.
5              Is there anyone that has lived here but has moved over
6    the past year and you no longer live in the Southern District
7    of Florida?
8              And I know, Mr. Sampson, you advised that you live in
9    Tampa.
10             Is there anyone else that has moved outside of the
11   Southern District of Florida?
12             If so, please raise your hand.
13             Seeing no hands raised.
14             Is there anyone who has been convicted of a felony
15   offense and your civil rights have not been restored?
16             If so, please raise your hand.
17             Seeing no hands raised.
18             All of the evidence you will consider in this case
19   will come from this courtroom.  And one of the things that that
20   means is that during the course of the trial, you cannot
21   discuss this case among yourselves until the very end, but you
22   also cannot discuss what is going on in court with anyone else.
23             During the trial, you must not conduct any independent
24   research about this case, the matters in the case, and the
25   individuals or corporations involved in the case.  In other
```

1    words, you should not consult dictionaries, reference

2    materials, search the Internet, websites, blogs, or any other

3    electronic means in order to obtain outside information.

4           Many of you have Smartphones, tablets, or other

5    electronic devices, which you use to communicate with every

6    day.  You also must not talk to anyone about this case or use

7    those tools to communicate electronically with anyone in this

8    case.  That includes your family and friends.  You may not

9    communicate with anyone about the case on your cell phone,

10   through email, text message, Twitter or through blogging or any

11   chat rooms.

12          You should not communicate with anyone through any

13   social networking websites.  And if you do, the case will have

14   to be retried.  It's a serious violation.

15          Is there anyone who knows themselves and just cannot

16   go through this trial without using social media to discuss the

17   case?

18          If so, please raise your hand.  You're in the best

19   position to know yourself.  Is there anyone that feels that

20   they would be compelled to talk about this case either in

21   person or through any electronic means?

22          Seeing no hands raised.

23          Is there anyone who is not willing to abide by the

24   Court's instructions and not discuss this case until you go

25   into the jury room to begin your deliberations?

1          If so, please raise your hand if you are not willing

2     to follow that instruction.

3          Seeing no hands raised.

4          We have discussed the anticipated schedule.  Given the

5     anticipated length of the trial -- I know that I have asked you

6     about great personal hardships.  Is there any other reason why

7     you believe that you could not serve?  For example, if you have

8     scheduled vacations within that time frame or you have a

9     pre-planned work assignment.  Now's the time to tell me.

10    Sometimes I'll ask and there's no response until after the

11    juror is selected.  So now is the time to speak up.

12         Is there anyone that has plans that you have already

13    made that you cannot set aside?

14         All right.  We'll start over here to my right.

15         And that is Ms. Coffie.

16         PROSPECTIVE JUROR:  Yes.  I have a son with autism and

17    I have to take him back and forth to school.  And I have

18    another son who just had surgery; his appointment is Wednesday.

19    I have to take him to his doctor's appointment.  He had his

20    naval restored.  So ...

21         THE COURT:  All right.  And let's first talk about

22    your first child.

23         When do you need to bring him to school?  What time in

24    the morning?

25         PROSPECTIVE JUROR:  He has to be there at 9:00.

```
1            THE COURT:  All right.  So would that prevent you from

2       being here, say, by 9:30, 10:00, the latest?

3            PROSPECTIVE JUROR:  I stay in Miami Gardens.  Miami

4       Gardens.  So that's going to be about a 30-minute commute.

5            THE COURT:  All right.  So taking your son to school

6       the time that he's required to be there, would that prevent you

7       from being here, say, 9:30 or 10:00?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  Well, how long would it take you to get

10      from the school here to the courthouse?

11           PROSPECTIVE JUROR:  It takes me about 30 minutes.

12           THE COURT:  All right.  So you could be here by 10:00.

13           PROSPECTIVE JUROR:  Yeah.

14           THE COURT:  Okay.  All right.  And let's talk about

15      the Wednesday appointment.  What time is the Wednesday

16      appointment?

17           PROSPECTIVE JUROR:  It's at 4:00.

18           THE COURT:  All right.  4:00 p.m.  So if we were to

19      accommodate that time, would you otherwise be able to serve?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Okay.  Thank you, Ms. Coffie.

22           Is there anyone else that has a vacation or something

23      that has been scheduled that you're not able to get around

24      and -- let's talk about it.

25           All right.  And that's on the -- to my left.  In the
```

```
1    gallery.  And that is -- is that Mr. Garcia?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  Yes, sir.

4            PROSPECTIVE JUROR:  Hi.  Good morning.  Next weekend,

5    I have a vacation planned already like two months ago, for

6    memorial -- Veterans weekend.

7            THE COURT:  All right.  So when would you be leaving?

8            PROSPECTIVE JUROR:  The Thursday.

9            THE COURT:  All right.  So we would not be in session

10   on Veterans Day.  So that would --

11           PROSPECTIVE JUROR:  I know.  But I'm talking about

12   Friday; it's a long weekend.

13           THE COURT:  Right.

14           All right.  So you're leaving on Thursday, the 11th,

15   and then you'll be gone for that long weekend?

16           PROSPECTIVE JUROR:  Yes.

17           THE COURT:  All right.  Would you be able to serve on

18   Monday, the 15th?

19           PROSPECTIVE JUROR:  Oh, yeah.

20           THE COURT:  Okay.  All right.  So that vacation, if we

21   were to not have court for Veterans Day, or the day after, then

22   that would not pose a problem, right?

23           PROSPECTIVE JUROR:  Oh, okay.  Yeah.

24           THE COURT:  Okay.  Thank you, sir.

25           Is there anyone else?
```

```
1              THE COURT:  And that is Ms. Painter?

2              PROSPECTIVE JUROR:  Correct.

3              So I have a vacation that's already booked and paid.

4    And it's the last week of November, so it would affect that

5    Monday and Tuesday, the 22nd and 23rd, I believe.

6              THE COURT:  So the 22nd and 23rd?

7              PROSPECTIVE JUROR:  Right.

8              THE COURT:  So you're on vacation that -- and it

9    starts the 22nd?

10             PROSPECTIVE JUROR:  Well, we will be heading up that

11   weekend before.  But, yeah.

12             THE COURT:  Oh, you would be heading up the weekend

13   before, so the 21st.

14             PROSPECTIVE JUROR:  Right.

15             THE COURT:  And are you driving?

16             PROSPECTIVE JUROR:  Yeah.

17             THE COURT:  All right.  So when you speak of the

18   vacation, would you be able to perhaps delay the vacation until

19   after the 23rd?

20             PROSPECTIVE JUROR:  Possibly.

21             THE COURT:  Okay.  All right.  Thank you, Ms. Painter.

22             And just let me just make sure the record's clear.

23   Where would you be driving to?

24             PROSPECTIVE JUROR:  Orlando.

25             THE COURT:  All right.  Thank you.  Appreciate it.
```

```
1                Is there anyone else?

2                And we -- we're now moving over to the jury box.

3                And yes, Mr. Sampson.

4                PROSPECTIVE JUROR:  Tampa.  Me living in Tampa back

5     and forth would cause an issue.

6                THE COURT:  Thank you, sir.  Appreciate that.

7                Anyone else?

8                And that's Ms. Jones?

9                PROSPECTIVE JUROR:  You said vacations.  Did you say

10    anything about appointments?

11               THE COURT:  Yes.  What appointments do you have?

12               PROSPECTIVE JUROR:  I have two appointments this

13    afternoon scheduled.

14               THE COURT:  And what time are they scheduled?

15               PROSPECTIVE JUROR:  One at 2:00 and one at 3:00.

16               THE COURT:  Are those work-related appointments?

17               PROSPECTIVE JUROR:  No.  Doctor's appointments.

18               THE COURT:  Doctor's appointments.

19               All right.  Would that be -- the only hardship would

20    be this afternoon at 2:00 and 3:00?

21               PROSPECTIVE JUROR:  And I have one appointment on the

22    12th in the morning.

23               THE COURT:  All right.  And we would not be in session

24    on the 12th.

25               All right.  Thank you.  Thank you, Ms. Jones.
```

46

```
1            Anyone else?
2            THE COURT:  All right.  Ms. McCrimmon.
3            PROSPECTIVE JUROR:  Hi, Your Honor.  Good morning,
4    Your Honor.  Good morning.  I am a substitute teacher,
5    employed.  And I just wanted to know if I will be compensated
6    for my time if selected.
7            THE COURT:  You're employed by Miami-Dade County?
8            PROSPECTIVE JUROR:  Uh-huh.  Yes.
9            THE COURT:  All right.  Yes.  We'll give you a letter
10   that you can provide to the principal.
11           PROSPECTIVE JUROR:  Thank you.
12           THE COURT:  Okay.  Did we -- oh, we have one
13   gentleman.  Mr. Escobedo.
14           Hold on, sir.  Let's wait for the microphone.
15           PROSPECTIVE JUROR:  You say that the 11th you'll be
16   off.  That's --
17           THE COURT:  That's correct.  That's a court holiday.
18           PROSPECTIVE JUROR:  Okay.
19           THE COURT:  Okay.  Anyone else?
20           Are we back to Mr. Garcia?
21           PROSPECTIVE JUROR:  Yes.  I forget telling you.  I
22   working for Miami-Dade County.  And they require also the
23   letter from --
24           THE COURT:  All right.  And if you are selected, we
25   will certainly provide you a letter to your employer.
```

1          Anyone else?

2          And Ladies and Gentlemen, is there any reason that you

3   have not given to the Court why you could not give this case

4   your undivided attention and render a fair and impartial

5   verdict?

6          If so, please raise your hand.

7          I want to refer back to your questionnaire.  Some of

8   you answered Question 12, which asks:  "Is there anything in

9   your background or personal feelings that might affect your

10  ability to be fair and impartial to both sides?"

11         And we will first start with Juror Number 2,

12  Mr. Cassidy.

13         Mr. Cassidy, you stated:  "Federal law enforcement

14  officer." Do you believe that that would have an effect on your

15  ability to serve as a fair and impartial juror?

16         PROSPECTIVE JUROR:  No, ma'am.  I just wanted to let

17  them know.

18         THE COURT:  Of course.  Thank you, sir.  Appreciate

19  that.

20         And then continuing with Juror Number 8, Garrett

21  Horne.

22         Mr. Horne, you stated you worked as a probation

23  officer for DJJ, the Department of Juvenile Justice.

24         Do you believe that would have an effect on your

25  ability to serve as a fair and impartial juror in this case?

```
 1              PROSPECTIVE JUROR:  No.  I just put that there to let

 2      the Court know that I have worked with several attorneys and

 3      judges -- none in this courtroom.  But, you know, it did come

 4      up when I was a juror for county court.

 5              THE COURT:  Now, would that have an effect on your

 6      ability to work with these attorneys and this judge?

 7              PROSPECTIVE JUROR:  No.  As I said, I don't know any

 8      of these guys.  But in county court, I knew some of the judges,

 9      some of the attorneys and the judge.

10              THE COURT:  All right.  Thank you, sir.

11              Juror Number 12.  And that is Elizabeth Fabelo.

12              Ms. Fabelo, you stated:  "It depends."

13              Is there anything within your background or personal

14      feelings that would affect your ability to be fair and

15      impartial?

16              PROSPECTIVE JUROR:  I just put that because it had to

17      do with something with a person or somebody getting hurt or

18      killed, I would have a problem with that.

19              THE COURT:  All right.  And that is not this type of a

20      case.  The Court did read a summary of the case.  Would it have

21      any effect on your ability to serve as a fair and impartial

22      juror?

23              PROSPECTIVE JUROR:  (No verbal response.)

24              THE COURT:  Ms. Fabelo, I didn't hear your answer.

25              PROSPECTIVE JUROR:  No.
```

```
1              THE COURT:  All right.  Thank you.

2          And Juror Number 26.  And that is Mr. Francois.

3          Mr. Francois, you stated:  "No, but I am just an

4     emotional -- that can affect my ability."

5          I just want to make sure:  Is there anything about

6     this case that would have an effect on your ability to serve as

7     a fair and impartial juror?

8              PROSPECTIVE JUROR:  No.  I just thought it was a

9     criminal case.  So that's why.

10             THE COURT:  All right.

11         So is there anything in your background or personal

12    feelings that would affect your ability to serve as a fair and

13    impartial juror in this case?

14             PROSPECTIVE JUROR:  No.  But can I talk to you in

15    private?

16             THE COURT:  You want to talk in private?  Certainly,

17    sir.  When we take a recess, then we'll certainly do that,

18    Mr. Francois.

19          All right.  And then, finally, Juror Number 30,

20    Mr. Sampson.  And I think you have answered the question.

21          All right.  Now, I have very specific questions that I

22    would like to ask each of you.  And that is:  Please raise your

23    right hand if you have ever worked in computer forensics.

24             PROSPECTIVE JUROR:  Yeah.  Good morning.  I work for

25    Marriott international hotels.
```

50

```
1              THE COURT:  Let me make sure.  This is Mr. Lemus?

2              PROSPECTIVE JUROR:  Correct.

3              THE COURT:  Yes, sir.

4              PROSPECTIVE JUROR:  Correct.  So I work with Marriott

5    international hotels and I work in computers.  And we do a

6    little bit of forensics.  For example, when an employee leaves,

7    we need to get their email or certain things.  I have to work

8    on that.

9              THE COURT:  All right, sir.  Thank you.

10             Is there anyone else?

11             Is there anyone that has ever been in a business

12   partnership?

13             If so, please raise your hand.

14             Okay.  We'll first start to my right.

15             And I just want to make sure -- is that Ms. Rozansky?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Yes.

18             PROSPECTIVE JUROR:  Hi.  So can you hear me?

19             THE COURT:  Yes.

20             PROSPECTIVE JUROR:  So I had a media platform, food

21   and beverage, with a partner.  It was a limited liability and

22   we ended up parting ways and I bought her out, but I did have a

23   business partnership.

24             THE COURT:  And how long ago did you part ways?

25             PROSPECTIVE JUROR:  About six years.
```

51

```
1              THE COURT:  And was the parting of ways amicable?
2              PROSPECTIVE JUROR:  Yes.
3              THE COURT:  Is there anything else that you would like
4    to share about the partnership?  How long was the partnership?
5              PROSPECTIVE JUROR:  The partnership was probably three
6    years.
7              THE COURT:  And can you tell me the nature of the
8    business?
9              PROSPECTIVE JUROR:  Yeah.  It's actually a food blog.
10   So website, social media.  But that includes partnerships with
11   brands, with spirits, with all types of, you know, restaurant
12   groups and things of that nature.
13             THE COURT:  Thank you, Ms. Rozansky.
14             Is there anyone else that has ever been in a business
15   partnership?
16             If so, please raise your hand.
17             And we're moving from the right over to the left.
18             And that is Mr. Weber?
19             PROSPECTIVE JUROR:  Yes, ma'am.
20             Yeah, in 2014, my partner and I sold our cold storage
21   warehouse business.
22             THE COURT:  Was your parting amicable?
23             PROSPECTIVE JUROR:  Yes, ma'am.
24             THE COURT:  All right.  And for how long a time did
25   you have this partnership?
```

52

```
1              PROSPECTIVE JUROR:  About 10 years.
2              THE COURT:  All right.  Thank you, sir.
3              Is there anyone else?
4              THE COURT:  I believe Ms. Bruguez.
5              Yes.
6              PROSPECTIVE JUROR:  Yes, ma'am.  I still have it.  So
7    I'm currently in a partnership.
8              THE COURT:  And what type of business is it?
9              PROSPECTIVE JUROR:  It's a cleaning company.  We do
10   commercial cleaning for hotels.
11             THE COURT:  And for how long a period of time have you
12   had this partnership?
13             PROSPECTIVE JUROR:  Been around five years --
14             THE COURT:  Okay.
15             PROSPECTIVE JUROR:  -- more or less.
16             THE COURT:  Thank you, Ms. Bruguez.
17             PROSPECTIVE JUROR:  You're welcome.
18             THE COURT:  Is there anyone else?
19             Is there anyone that has had any formal education or
20   special training in the areas of either law, computer science,
21   computer or Internet security, mathematics, engineering,
22   cryptography, or business partnerships?
23             If so, please raise your hand.
24             THE COURT:  Yes.  And that's Juror Number 1,
25   Mr. Matherne.
```

```
 1              PROSPECTIVE JUROR:  Yes.  I have experience in
 2    manufacturing engineering.  That's all.  Nothing computer
 3    related.
 4              THE COURT:  All right.  Thank you, sir.
 5              And we're over to the left.  And that is Mr. Lemus.
 6              PROSPECTIVE JUROR:  Yeah.  Computer science.  And I
 7    have a little bit of training in forensics and that kind of
 8    stuff.
 9              THE COURT:  All right.  Thank you, sir.
10              Is there anyone else?
11              Still on the left.
12              And is that Mr. Lopez-Loyola?
13              PROSPECTIVE JUROR:  Yes.  How you doing?
14              I work as a network administrator for Miami-Dade
15    Public Schools.  I take care of two schools.  I have a middle
16    school and elementary and I also rotate on a needed basis.  But
17    I usually take care of the whole infrastructure and whatever is
18    needed for software and hardware base.
19              THE COURT:  Thank you, sir.
20              Anyone else?
21              THE COURT:  And we're over to the jury box.
22              And that is Ms. McCrimmon?
23              PROSPECTIVE JUROR:  Yes.  Hello, Your Honor.
24              I -- in like, it was about -- like a paid internship.
25    I basically learned under Attorney Andrew Sherman, Dean of Law
```

54

1    for California School of Law.  It was a very -- very

2    interesting experience, but I realized the field is not for me.

3    I commend people who are in the field very much so.

4            THE COURT:  Thank you, Ms. McCrimmon.

5            PROSPECTIVE JUROR:  Thank you.

6            THE COURT:  Is there anyone else?

7            Over here in the jury box?

8            All right.  Please raise your hand if you have any

9    familiarity or experience with cryptocurrencies or digital

10   cash, such as Bitcoin, Ethereum, Ripple, Litecoin, or any

11   cryptocurrency.

12           If so, please raise your hand.

13           THE COURT:  And we're over here to the left and that

14   is -- let me make sure that -- this is Mr. Lopez-Loyola?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Yes, sir.

17           PROSPECTIVE JUROR:  Now, by the question, do you mean

18   if I ever -- for example, because I have bought and I have sold

19   before.  Is that what the question includes too?

20           THE COURT:  Well, I asked for familiarity or

21   experience.  But does your experience include the buying or

22   selling?

23           PROSPECTIVE JUROR:  Yeah.  I currently hold a few of

24   the crypto coins.  I mean, I don't think they're really any --

25   I don't think they're a really good investment.  But yeah, I do

55

```
1    hold a few of them.

2              THE COURT:  So you hold crypto coins?

3              PROSPECTIVE JUROR:  Yes.  I had -- I sold and I bought

4    before.

5              THE COURT:  Is that the cryptocurrency; it's called

6    crypto coins?

7              PROSPECTIVE JUROR:  I had Bitcoins and I had Ethereum

8    before.  And I also had some of the more fewer -- like not some

9    of the more popular ones.

10             THE COURT:  What do you have now, sir?

11             PROSPECTIVE JUROR:  Right now I have -- I have to see

12   my -- but I have Bitcoins.  A few, not much.  And I have the

13   new one, which is one of the popular ones that are going up.

14             THE COURT:  All right.  Now, as I read to you this

15   morning, sir, this case involves an allegation that there was a

16   partnership that involves the Bitcoin protocol --

17             PROSPECTIVE JUROR:  Uh-huh.

18             THE COURT:  -- and Bitcoin.

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Would your ownership or involvement in

21   different cryptocurrencies, including Bitcoin, have any effect

22   on your ability to serve as a fair and impartial juror?

23             PROSPECTIVE JUROR:  It shouldn't.  But I mean, to tell

24   you the truth, I think most of the cryptocurrencies are kind of

25   like a scam anyway.  So I don't think they have any value
```

1    anyway.  I mean, I hold it because there's money to be made on

2    it --

3         THE COURT:  So do you believe that your opinion may

4    have an effect on your ability to serve as a fair and impartial

5    juror in this case?

6         PROSPECTIVE JUROR:  Probably.  But I don't know.  I

7    don't know.  It depends on what it -- whatever the case goes

8    through.

9         THE COURT:  All right.  But do you have some

10   hesitation, Mr. Lopez-Loyola?

11        PROSPECTIVE JUROR:  Yeah.

12        THE COURT:  All right.  Thank you, sir.

13        PROSPECTIVE JUROR:  Regarding the matter, yeah.

14        THE COURT:  Thank you, sir.

15        PROSPECTIVE JUROR:  Thank you.

16        THE COURT:  Is there anyone else that has any

17   familiarity or experience, and that would include the buying or

18   selling?

19        And we are over to -- I just want to start -- make

20   sure we have everybody over to the right.  And that's

21   Mr. Horne?

22        PROSPECTIVE JUROR:  Yeah.  I just want a

23   clarification, really.  I've invested in companies that deal

24   with Bitcoin, like Tesla and SI, silver investments.  Is

25   that -- I don't know -- relevant or whatever?

57

```
1              THE COURT:  Well, when you ask:  "Is that relevant,"
2    let me ask you, Mr. Horne.  I did advise you of what the issues
3    are in this case.  Do you believe that it would be relevant to
4    the extent that it may have an effect on your ability to be
5    fair and impartial?
6              PROSPECTIVE JUROR:  No.  For me, it was just an
7    investment.
8              THE COURT:  All right, sir.
9              PROSPECTIVE JUROR:  You know, I mean, no.  It wouldn't
10   affect me.
11             THE COURT:  All right.  Thank you, Mr. Horne.
12             Is there anyone else over here to the right and then
13   we'll move over to the left?
14             And I think -- all right.  We have Mr. Lemus.
15             PROSPECTIVE JUROR:  Yes.  I have a very close friend
16   that is very, very involved in that.  I mean, he constantly
17   talks about it, buying the Bitcoin and doing that mining and
18   all that stuff.  I'm not very familiar with it, but I just
19   wanted to share it.
20             THE COURT:  And would your relationship with your
21   close friend and the knowledge that you have gained from your
22   close friend have any effect on your ability to serve as a fair
23   and impartial juror in this case?
24             PROSPECTIVE JUROR:  I wouldn't think so, but -- yeah,
25   I wouldn't think so, no.
```

58

```
1            THE COURT:  And when you say:  "I wouldn't think so,"
2    I just want to share with everyone an example -- because we as
3    human beings -- we speak in conditional terms.  If you were to
4    board a plane at the Miami International Airport, and you saw
5    the pilot as you were walking in, and you said hello to her,
6    and you said:  "Can you get me safely to Miami," and her
7    response was:  "I think so," you would not have a lot of
8    confidence in that pilot.
9            So let me ask the question again, Mr. Lemus, because
10   we do speak in conditional terms as human beings, but our goal
11   is to select fair and impartial jurors.  And if your
12   relationship with your close friend, who's actively involved in
13   the world of buying or selling or just the experience with
14   regard to cryptocurrency -- we need to know.
15           So would it have any effect on your ability to serve
16   as a fair and impartial juror in this case?
17           PROSPECTIVE JUROR:  I'm going to answer no, in that
18   case.
19           THE COURT:  All right.  Is there any hesitation on
20   your part, Mr. Lemus?
21           PROSPECTIVE JUROR:  I mean, hesitation, yes, for sure.
22   Otherwise, I wouldn't be bringing it to your attention.  But I
23   want to be smart and say I wouldn't let that affect my
24   judgment.
25           THE COURT:  Do you have any hesitation, sir?
```

59

```
1              PROSPECTIVE JUROR:  No.

2              THE COURT:  All right.  Thank you, sir.

3              COURT SECURITY OFFICER:  One more back here, Judge.

4              THE COURT:  And I just want to make sure.  This is

5    Ms. Painter?

6              PROSPECTIVE JUROR:  Correct.

7              THE COURT:  Yes.

8              PROSPECTIVE JUROR:  I just wanted to mention my

9    husband purchased -- has Bitcoin.  So I also work at a

10   financial planning firm and it's discussed.  But I don't think

11   it would impair my judgment.

12             THE COURT:  All right.  So your husband purchased,

13   which I'm assuming that you own as well?

14             PROSPECTIVE JUROR:  I guess in a way.

15             THE COURT:  Well, are you still married?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  All right.  So do you believe that your

18   husband's purchase and your ownership of Bitcoin would have any

19   effect on your ability to serve as a fair and impartial juror

20   in this case?

21             PROSPECTIVE JUROR:  No.

22             THE COURT:  Is there any hesitation on your part,

23   Ms. Painter?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  All right.  Thank you.
```

60

```
 1              COURT SECURITY OFFICER:  One more, Judge.
 2              PROSPECTIVE JUROR:  I would like to share.
 3              THE COURT:  Mr. Garcia?
 4              PROSPECTIVE JUROR:  Yes.
 5              THE COURT:  Yes, sir.
 6              PROSPECTIVE JUROR:  Also, my brother, we are very
 7    close and he buy and selling Bitcoins.
 8              THE COURT:  And sir, would that have -- your brother
 9    buying and selling Bitcoin, would that have an effect on your
10    ability to serve as --
11              PROSPECTIVE JUROR:  I don't think so.
12              THE COURT:  Let me just ask the question.  I
13    apologize.  It's my fault.
14              Would the fact that your brother buys and sells
15    Bitcoin -- would that have any effect on your ability to serve
16    as a fair and impartial juror?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  Thank you, sir.
19              All right.  Now we're moving over to the jury box.
20              THE COURT:  And that is Mr. Escobedo.
21              PROSPECTIVE JUROR:  Yes.  I read about it.  I don't
22    know any Bitcoins.  I have friends that own the Bitcoins.  I
23    think it's a scam and it's used by a lot of shady people.  So I
24    feel like I have a hard time kind of participating and being
25    impartial in this.
```

```
 1              THE COURT:  All right.  So you have strong feelings.
 2    And do you believe those feelings would have an effect on your
 3    ability to serve as a fair and impartial juror in this case?
 4              PROSPECTIVE JUROR:  Yes, ma'am.
 5              THE COURT:  All right.  Thank you, sir.
 6              Is there anyone else here in the jury box?
 7              THE COURT:  Yes, Mr. -- and let me make sure -- is it
 8    Mr. Moder?
 9              PROSPECTIVE JUROR:  Yes.
10              THE COURT:  Yes, sir.
11              PROSPECTIVE JUROR:  Yeah.  About six years ago, my
12    neighbor talked to me about buying a Bitcoin machine with him.
13    And we did, and we mined a couple of them and that was about
14    the extent of it.
15              THE COURT:  Do you still own the Bitcoin?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  Do you believe that that experience would
18    have an effect on your ability to serve as a fair and impartial
19    juror in this case, sir?
20              PROSPECTIVE JUROR:  No.
21              THE COURT:  All right.  Thank you.
22              Is there any hesitation on your part?
23              PROSPECTIVE JUROR:  No.
24              THE COURT:  All right.  Thank you, sir.
25              All right.  And that's Ms. Gallian Oubrar?
```

62

```
 1              PROSPECTIVE JUROR:  Yes.
 2              I just wanted to mention I have a small investment in
 3       the stock market in a cryptocurrency, not Bitcoin.
 4              THE COURT:  Would that investment have any effect on
 5       your ability to serve as a fair and impartial juror in this
 6       case?
 7              PROSPECTIVE JUROR:  No, it would not.
 8              THE COURT:  All right.  Thank you.
 9              Okay.  And we -- Ms. -- yes, Ms. Charles?
10              PROSPECTIVE JUROR:  My husband has a company that --
11       funding account.  And I think I have somebody -- about
12       US-something.  Like, I don't remember the full name of the
13       thing, but I know he's doing -- a couple of those like
14       businesses.
15              THE COURT:  He has a company that has a funding
16       account?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  All right.  So is the funding account
19       involved in --
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  -- in Bitcoin or other cryptocurrency?
22              PROSPECTIVE JUROR:  Yes.
23              THE COURT:  Do you own any of that?
24              PROSPECTIVE JUROR:  I think I have something.
25       Robinhood, something like that.  My daughter download it.
```

1          THE COURT:  All right.

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Now, do you believe that that ownership

4     would have an effect on your ability to serve as a fair and

5     impartial juror in this case?

6          PROSPECTIVE JUROR:  I don't know yet.

7          THE COURT:  Okay.  Well, this would be the time to

8     know, Ms. Charles.  In other words, you have some ownership

9     because of your husband.  Your husband has a company, and you

10    believe that there is some ownership because of your husband.

11         Do you believe that that ownership would affect you in

12    this case?  Would it have any effect on your ability to be fair

13    and impartial?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  All right.  And I thank you for your

16    candor.

17         Ladies and Gentlemen, there are no right or wrong

18    answers.  The only answer is the honest answer based on your

19    feeling, your experience, in the particular area.

20         So I appreciate that, Ms. Charles.

21         Ms. -- and this is Ms. McCrimmon?

22         PROSPECTIVE JUROR:  Yes, Your Honor.

23         Hi.  Just to keep it transparent and honest, I do have

24    a friend who likes to invest in cryptocurrency very much so.

25    That would not affect my impartiality in the case.  However, I

```
1    do want to say I do have strong feelings against digital

2    currency.

3            THE COURT:  You have strong feelings against digital

4    currency?

5            PROSPECTIVE JUROR:  Correct.

6            THE COURT:  And do you believe that that feeling would

7    be part of this case or would you be able to set aside that

8    feeling?

9            PROSPECTIVE JUROR:  I could set it aside.  I just want

10   to say everything.  I want to be completely transparent.  Yeah.

11           THE COURT:  Right.  So you have a strong feeling

12   against digital currency.  And I just want to make sure that I

13   explore that a little bit.

14           Would you be able to set aside that strong feeling and

15   render a decision based solely on the facts as you find them to

16   be and the law that I instruct you on?

17           PROSPECTIVE JUROR:  Absolutely.

18           THE COURT:  Would that feeling have any effect at all

19   on your ability to serve as a fair and impartial juror?

20           PROSPECTIVE JUROR:  No.  The reason I mention it is

21   because I do express myself on social media very much so

22   against it.  I just want to be transparent.

23           THE COURT:  Thank you, Ms. McCrimmon.  I appreciate

24   that.

25           Is there anyone else, Ladies and Gentlemen?
```

65

```
 1              Is there anyone here that's been part of the creation
 2     of any type of intellectual property?
 3              If so, please raise your hand.
 4              Seeing no hands raised --
 5              COURT SECURITY OFFICER:  Right here, Judge.
 6              THE COURT:  Oh.  My apologies.
 7              Yes.  Ms. McCrimmon?
 8              PROSPECTIVE JUROR:  Hello, Your Honor.  I'm a local
 9     artist.  So I do consider my work intellectual property.
10              THE COURT:  All right.  Thank you.  Of course.  Thank
11     you.
12              PROSPECTIVE JUROR:  No LLC yet or anything, but ...
13              THE COURT:  But you are a local artist.  I appreciate
14     that.
15              PROSPECTIVE JUROR:  Thank you.
16         (Pause in proceedings.)
17              THE COURT:  All right.  Ladies and Gentlemen, I'm
18     going to turn the questioning over to counsel.  But so that we
19     do not interrupt the attorneys' questioning, I think it may be
20     appropriate at this time for us to take a comfort break.
21              So since we are taking a comfort break, let me just
22     advise you of the following:  You're not to discuss the facts
23     of this case with anyone.  You're not to speak either directly
24     or indirectly.
25              I'm going to ask that you come back into the courtroom
```

66

```
 1    lined up in the same manner that you came in before.  So please

 2    remember the person in front of you and behind you.

 3          We are going to take a 15-minute recess.  If everyone

 4    will look at their watch, that means that at 11:00 I do hope

 5    that you will come back into the courtroom.

 6          There are two restrooms across the hall.  There's also

 7    restrooms on each of the floors.  So we'll see you back here at

 8    11:00.  And if you'll be lined up outside because we cannot get

 9    started unless all of you are back.  All right?

10       (Panel not present, 10:44 a.m.)

11          THE COURT:  All right.  Before we recess, can you

12    remind me, did we agree on 60 minutes for opening statement or

13    60 minutes on the voir dire?

14          MR. BRENNER:  Your Honor, we agreed to 60 minutes for

15    voir dire, 45 for opening.

16          THE COURT:  All right.  Let us hope that the attorneys

17    will conclude their questioning of the jurors by -- if you need

18    an hour, then that's going to take us -- I'd like to not break

19    up -- I'll keep the jury here until we conclude the

20    questioning.

21          If you would be agreeable to 45 minutes each, then we

22    could take a lunch break earlier, and then use a portion of the

23    lunch break to select the jury.

24          Would that be amenable to both sides, since I have

25    asked some of the questions that you have proposed?
```

```
1          MR. BRENNER:  Your Honor, I will commit to the Court
2    that I will try.  If it were just 20, I would have just said
3    yes.  But now we have 30, it's -- but I will commit to -- I
4    don't want to waste the jury's time and Your Honor did ask a
5    bunch of questions that I think both sides had proposed.
6          THE COURT:  I don't think you need to spend any time
7    with Berry Sampson because he is not in this district.  So he's
8    not qualified to serve as a juror in the Southern District.
9          MR. BRENNER:  Your Honor, can I raise one other really
10   brief issue?
11         When -- when we were introducing the witnesses and
12   Defendant got up to introduce the witnesses, the first words
13   out of Ms. McGovern's mouth were -- she -- that they may call
14   Craig Wright.  And she identified him, quote, as "the inventor
15   of Bitcoin."
16         It's an interesting way to introduce the witness,
17   since it's the central issue in the case that we claim he's a
18   co-inventor of Bitcoin.
19         THE COURT:  All right.  I don't want to get into the
20   intricacies of this case.
21         MR. BRENNER:  Okay.
22         THE COURT:  The trial hasn't even started.  So at this
23   point, I recognize that that was the introduction and there's
24   no need to go back.
25         Anything further?
```

```
1              MR. BRENNER:  Nothing further from the Plaintiffs.
2              THE COURT:  All right.  Then I'll see you back here at
3    11:00.
4              Anything further from the Defendant?
5              MR. RIVERO:  No, Your Honor.
6              THE COURT:  All right.
7         (Recess from 10:47 a.m. to 11:00 a.m.)
8              THE COURT:  All right.  Welcome back.  Let's wait for
9    everyone to come into the courtroom.
10        (Pause in proceedings.)
11             COURT SECURITY OFFICER:  Ready to bring in the jury,
12   Judge?
13             THE COURT:  Both sides ready to proceed?
14             MR. RIVERO:  Yes, Your Honor.
15             MR. BRENNER:  Yes, Your Honor.
16             THE COURT:  Okay.
17        (Before the panel, 11:01 a.m.)
18             THE COURT:  All right.  Welcome back, Ladies and
19   Gentlemen.  Please be seated.
20             Thank you for your patience and cooperation.
21             We will now begin questioning by the attorneys.
22             First, on behalf of the Plaintiffs.
23             MR. BRENNER:  Thank you, Your Honor.
24             Thank you, Your Honor.  May it please the Court,
25   counsel.
```

69

```
1          Hello.  My name is Andrew Brenner.  And with my

2    colleagues we represent the Plaintiffs in this case, which are

3    the estate of Dave Kleiman and W&K -- you'll hear W&K Info

4    Defense Research.  You'll hear it referred to as W&K.

5          I'm going to try to be efficient with your time.  The

6    Judge covered a lot of the topic areas that I was going to.

7    And I'm just going to follow up on some things.

8          Let me first just amplify a couple things the Judge

9    talked about.  The process we're about to engage in is called

10   voir dire.  I apologize.  I'll have my back to you-all

11   sometimes as I'm addressing them and vice versa, okay?  And I

12   mean no disrespect by that.

13         As the Judge said, the process of voir dire is

14   translated to speak the truth.  And as the Judge says, there's

15   only one right answer and that right answer is always the truth

16   and there's no wrong answer.

17         And I would just say the only other wrong answer is --

18   other than not being the truth, is just not answering at all.

19   Because Mr. Rivero will be asking questions, I believe, and I'm

20   asking questions.  And we just want to know about you.

21         I promise you, there is nothing you will say that is

22   going to offend us, make us feel bad.  If you say -- you're one

23   of these people:  "I don't like lawyers," I've heard it before.

24   No big deal.  But if we don't know, if we don't hear from you,

25   we're not able to get a fair and impartial jury, and that's
```

70

```
 1    what all of us want and that's what the Court wants.

 2            The Judge told you, and I'll just repeat, if I ask you

 3    anything that requires you or you think may require you to talk

 4    about something you don't feel like talking about in front of a

 5    group full of people you haven't met, then just raise your hand

 6    and the Judge said she will accommodate that at another time.

 7            So I'm going to ask a series of group questions.  And

 8    then I'll follow up with some folks individually.  And there

 9    will be times when I ask you to raise your hand.  If you would

10    just keep them up long enough that I can get my notes and my

11    team can help me and then we can make sure we get to everyone.

12            Let me start with this one:  How many people, when

13    they got the summons, immediately started calling their

14    friends, telling their wives, their husbands, their sons, their

15    daughters:  "I got the greatest news today.  I get to go serve

16    on a federal jury"?

17            Raise your hands.

18            Yes.  Excellent.  I'm going to try to get your names

19    on my map.

20            You are -- am I pronouncing this -- Tercero.  Did I

21    get that right?

22            PROSPECTIVE JUROR:  Yes.

23            MR. BRENNER:  All right.  So you were excited about

24    that?

25            PROSPECTIVE JUROR:  Yeah.
```

```
 1              MR. BRENNER:  What about it?

 2              PROSPECTIVE JUROR:  I've always wanted to serve on a

 3      jury.  So I got pretty excited that I finally got called to

 4      jury duty.

 5              MR. BRENNER:  Well, I've asked that question to a lot

 6      of juries and I think you're my first to raise their hand and

 7      say they're excited.  I know I appreciate it.  I'm sure

 8      Dr. Wright's counsel appreciates it.  I'm sure the Court

 9      appreciates it.

10              THE COURT:  I do.

11              MR. BRENNER:  So that's fantastic.

12              Now, the rest of you, all right, you weren't super

13      excited about it.  I get it.  But you showed up.  Okay?  And

14      unfortunately, a lot of folks don't.  They come up with

15      excuses.  And we live in a great country and our country

16      doesn't ask that much of us.  But one of the things it asks of

17      us is to serve on juries.

18              And in a criminal case, which this is not -- and I'm

19      going to talk a little bit about the difference in the burden

20      of proof.  In a criminal case, a man or woman's liberty is at

21      stake often and it's critically important -- our founding

22      fathers said that it's critically important that they be judged

23      by a jury of their peers.  But in civil cases, the constitution

24      does the same thing.

25              And we have to have an ability to solve all disputes
```

72

1    civilly.  And you guys are the bulwark for that.  You and you

2    alone, I believe the Judge will tell you this at the end of the

3    case for those of you who get to serve -- and I say "get to

4    serve" because I do think, although you may not know it now, it

5    will be a rewarding experience and you will feel good about

6    yourselves.

7             But you will be the judges of facts.  You will judge

8    the case.  And we trust you to do that.  So I think the Judge

9    started with it and I'll say it again.  Just simply thank you.

10   Thank you for coming.  Thank you for participating in this

11   process.  Thank you for being forthright with me, which I'm

12   sure you will do, and also with Mr. Rivero.  It's very

13   important.

14            Now, I mentioned a criminal and civil trial.  One of

15   the differences in a civil trial is the burden of proof is

16   different.  So in a criminal trial, when someone's liberty is

17   at stake, the state or the government -- in this case, in the

18   federal courthouse, the United States Government has to prove

19   their case beyond a reasonable doubt.  Is everyone familiar

20   with that from TV shows or otherwise?

21            Yes?

22            Okay.  In a civil case, it's different.  It's a

23   different standard.  And it's -- I don't want to get into the

24   legal terms, but it's, essentially, is one side more

25   believable, is one side more persuasive.

```
1              Does everyone understand the difference in the burden

2      of proof in a criminal case and in a civil case?

3              Everyone?

4              Everyone?

5              No?

6              Okay.  You are Mr. Moder.  Did I pronounce that right?

7              PROSPECTIVE JUROR:  Moder.

8              MR. BRENNER:  Moder.  Thank you.

9              Okay.  Sir, from my explanation, was it confusing to

10     you?

11             PROSPECTIVE JUROR:  I just -- I didn't hear it very

12     clearly because you're facing that way.

13             MR. BRENNER:  Sure.  Sure.  Thank you.

14             By the way, if I do that, which I will, because I'll

15     be talking in two different directions, if you don't hear me,

16     just give me a holler or raise your hand.

17             The burden of proof in a civil case is a preponderance

18     of the evidence.  It's which side weighted the scale a little

19     more than the other.  And in criminal cases, because someone's

20     liberty is at stake, it's a much higher standard.

21             Do you understand that now?

22             PROSPECTIVE JUROR:  Yes.

23             MR. BRENNER:  Is anyone here going to have difficulty

24     applying whatever standard -- the standard of proof the Judge

25     instructs you on?  Anyone?
```

74

```
 1              The Judge talked about "fair and impartial" and I want
 2    to talk about that a bit.  So who here is an unfair person?
 3              No one?
 4              Of course not.  Of course not.  We all think we're
 5    fair.  And we all are fair.  We all try to be fair in our
 6    personal lives, our professional lives.  But we're not all
 7    impartial, right?  Because impartial is something different.
 8              We all come into this courtroom with our own
 9    upbringing, our own education, our own cultural preferences,
10    all sorts of things, and it's impossible to just check all that
11    at the door.
12              Now, some of the stuff won't affect your evaluation of
13    the case and some might, and the Judge has asked you a little
14    bit about that.  But let me see if I can give you an example of
15    what I mean.  I'm going to pick on Mr. Cabrera.
16              Where is Mr. Cabrera?
17              PROSPECTIVE JUROR:  Yes, sir.
18              MR. BRENNER:  How are you, sir?
19              PROSPECTIVE JUROR:  Good.  Yourself?
20              MR. BRENNER:  I have never been better.
21              So let me ask you this:  On your questionnaire, you
22    told us that -- I think it's when you list your hobbies, you
23    said:  "Watching Boston teams."
24              PROSPECTIVE JUROR:  I omitted -- I'm sorry.  I meant
25    sports teams.  So --
```

75

```
 1              MR. BRENNER:  You meant sports teams.  You know, I
 2    thought that.  I was going to ask you that.  So you like Boston
 3    sports.  You're a Patriots fan?
 4              PROSPECTIVE JUROR:  Yes.  Absolutely.
 5              MR. BRENNER:  It's been a tough road.  It's tough to
 6    be a Patriots fan these last 20 years, I'm sure.
 7              PROSPECTIVE JUROR:  You know, I still can be happy
 8    with the six rings that they got.  So I'll be happy with that.
 9              MR. BRENNER:  Great win yesterday for the Patriots.
10    So you love the Patriots.  Love the Celtics too?  I know
11    Celtics fans are hardcore.
12              PROSPECTIVE JUROR:  All the teams.  All the Boston
13    teams.
14              MR. BRENNER:  All the teams.  Okay.
15              Did you grow up in Boston?
16              PROSPECTIVE JUROR:  I was actually born up there.  I
17    lived in Methuen, which is about 45 minutes north of Boston.
18              MR. BRENNER:  How long have you been down in South
19    Florida?
20              PROSPECTIVE JUROR:  Since about '89.
21              MR. BRENNER:  Okay.  So if -- let's just pick on
22    someone else.  We'll just make it up.  If you knew that
23    Mr. Adams -- where is Mr. Adams?  If you knew that Mr. Adams --
24    that's okay.  I'm going to talk to Mr. Cabrera.  I'm just
25    picking on Mr. Adams.
```

76

```
1          If you knew that Mr. Adams was a lifelong Dolphin
2     fan -- I am not saying he is, but if you knew that he is.  He
3     also happened to be a referee.  He told me he's fair already.
4     Would you be fine -- is he the right guy to referee the
5     Dolphin-Patriot game?
6          PROSPECTIVE JUROR:  If he's a referee?
7          MR. BRENNER:  Yeah.
8          PROSPECTIVE JUROR:  Yeah, he has to be, you know --
9          MR. BRENNER:  Right.  But he -- would the NFL probably
10    assign him to a game that doesn't involve the Dolphins if he's
11    a lifelong Dolphin fan?
12         Would you be happy if you knew -- would you be
13    comfortable if you knew that all of the referees on the field
14    that day were lifelong fans of the team your team was playing
15    or would you say:  "You know what?  Let's get some that don't
16    root for either team"?
17         PROSPECTIVE JUROR:  Oh, absolutely.  Definitely a
18    neutral referee.  That's the best type of referee you could
19    have.
20         MR. BRENNER:  Right.  And that's what we're looking
21    for here.  We're looking for neutral referees because only if
22    we have that does the system work.
23         It wouldn't be fair to my clients and it wouldn't be
24    fair to Dr. Wright if either side went in and the people were
25    already predisposed to the other side, not because they are not
```

```
 1   fair, but that they have something in their background which
 2   causes them to be like that.
 3           So could everyone commit to me that if at any point
 4   during the questioning today -- and you did it with the Judge,
 5   if you just think:  "God, the subject matter makes me a little
 6   bit more in favor of Dr. Wright or a little bit more in favor
 7   of the estate of Mr. Kleiman," will you promise to let us know?
 8           MR. BRENNER:  Yes?
 9           Yes, sir.  Let me get your name for the record.  This
10   is Mr. Cassidy, Juror Number 2.
11           Thank you, sir.
12           PROSPECTIVE JUROR:  You mentioned Mr. Kleiman's
13   brother passed in the VA hospital?
14           MR. BRENNER:  I don't -- I'm not supposed to answer
15   facts of the case, but Mr. Kleiman's brother was in a VA
16   hospital and he actually did not pass in the hospital.
17           PROSPECTIVE JUROR:  That will one hundred percent lean
18   me your way.
19           MR. BRENNER:  Okay.  And why is that, sir?
20           PROSPECTIVE JUROR:  Just because of my military
21   background and involvement in the VA.  My son's in the military
22   currently.
23           MR. BRENNER:  Okay.
24           PROSPECTIVE JUROR:  That's 100 percent.  I will not be
25   biased -- I mean, I will be biased in your direction just
```

78

```
1    because of that.  And I'm just being honest.

2              MR. BRENNER:  No.  No.  I appreciate your honesty.

3              Again, there's no right answer -- or there's no wrong

4    answer.  So if that's your personal belief, I appreciate you

5    sharing it with me.  Thank you.

6              PROSPECTIVE JUROR:  Yeah.

7              MR. BRENNER:  Can everyone commit to me that if -- for

8    example, that came up in Mr. Cassidy's mind -- that if

9    something comes up that causes you to think you may be

10   biased -- and again, bias is not unfair -- that you'll share it

11   with us or you'll share it with the Court?

12             Yes?  I have everyone's commitment for that?

13             Okay.  Thank you.

14             So one of the issues that Her Honor started with was

15   she asked about computers and computer software.  I want to ask

16   a little bit more specific question.  And that is with the term

17   "coding" as it relates to computers and computer software.  Is

18   anyone here familiar with the term "coding," C-O-D-I-N-G, as it

19   relates to computers and computer software?

20             Can you just raise your hands and I'll get a hand

21   count?  And then I promise I'm going to talk to all of you.

22             So we got Juror Number 1, Juror Number 2.  We got

23   Juror Number -- Mr. Horne; is that right?

24             PROSPECTIVE JUROR:  Yes, sir.

25             MR. BRENNER:  Juror Number 8.  Thank you, sir.
```

1          Juror Number 15; is that right?

2          PROSPECTIVE JUROR:  Yes, sir.

3          MR. BRENNER:  Okay.  Lopez-Loyola.

4          And 18.  Okay.

5          And on this side?

6          PROSPECTIVE JUROR:  I'm sorry.  You asked if we were

7     familiar with the term of "coding"?

8          MR. BRENNER:  With the term of "coding," yes.

9          PROSPECTIVE JUROR:  Yes, I am.

10         MR. BRENNER:  Okay.  Thank you, sir.

11         And we have Jurors Number 24 and 25, and we have Juror

12    Number 28, and we have Juror Number 21.  Did I get those right?

13         And I should have said this -- I'm not sure if they

14    said it in the jury room -- I don't have a mask on because I'm

15    speaking to you.  You can see all the lawyers have masks on

16    when they are not speaking.  If I'm making anyone feel

17    uncomfortable, I'll put a mask on.

18         Is anyone uncomfortable with me not having a mask on?

19         You're not comfortable?  Okay.  I will put a mask on.

20         Oh, everyone is comfortable?

21         Okay.  I -- probably a bad question.  Is anyone

22    uncomfortable with the fact that I don't have a mask on?

23         Okay.  You'll let me know if that changes, because I'm

24    happy to do it.

25         So Juror Number 1, Mr. should I try it -- Mr.

1    Matherne?

2            PROSPECTIVE JUROR:  Matherne.

3            MR. BRENNER:  Matherne?

4            PROSPECTIVE JUROR:  Yeah.

5            MR. BRENNER:  So we pronounce the T-H.

6            PROSPECTIVE JUROR:  Louisiana native.

7            MR. BRENNER:  Louisiana native.  Okay.  Good.  Good.

8            So tell me about your experience or your knowledge

9    about coding.

10           PROSPECTIVE JUROR:  Basically, just knowing that it's

11   programming, computer programming.  I mean -- as an engineer, I

12   started Fortran programming when I was in college.  And then I

13   learned basic programming on my own after college, and I'm

14   going to learn some more programming languages.  That's it.

15           MR. BRENNER:  Let me ask you a couple questions, if I

16   could.  I think you said you studied Fortran when you were in

17   college.

18           PROSPECTIVE JUROR:  Yes.

19           MR. BRENNER:  You did -- did you study another coding

20   language --

21           PROSPECTIVE JUROR:  Yeah.  Basic programming.

22           MR. BRENNER:  Basic programming, okay.

23           And then you said your plan is to --

24           PROSPECTIVE JUROR:  To learn some more.

25           MR. BRENNER:  I'm sorry?

```
 1              PROSPECTIVE JUROR:  Yeah.  Learn some more languages
 2    like Python, C++.  I want to learn those.
 3              MR. BRENNER:  C++.  Okay.
 4              And these are stuff you don't know now.  But you want
 5    to learn it because professionally you want to do it or just a
 6    passion or hobby for you?
 7              PROSPECTIVE JUROR:  No.  No.  Hobby.  It's like just
 8    dealing with -- I do some computer graphics, so C++ programming
 9    and Python would be useful for my graphics.
10              MR. BRENNER:  Got it.  In your professional life --
11    well, tell me what you do.  Tell me what you do.
12              PROSPECTIVE JUROR:  I was a manufacturing engineer.
13    I'm retired now, but ...
14              MR. BRENNER:  Oh, congratulations.
15              PROSPECTIVE JUROR:  Yeah.  Thank you.
16              MR. BRENNER:  And you have a lot of time to study
17    coding.
18              PROSPECTIVE JUROR:  Yeah.
19              MR. BRENNER:  I'd rather watch football.  But you
20    know, to each his own, right?
21              How long have you been retired?
22              PROSPECTIVE JUROR:  About a month.
23              MR. BRENNER:  Oh.
24              PROSPECTIVE JUROR:  Yeah.  I turned 62 recently.  So,
25    boom.
```

```
1              MR. BRENNER:  So I've asked this question before and

2       I'll ask you:  So is it what you thought it would be?

3              PROSPECTIVE JUROR:  Oh, yes.  Definitely.

4              MR. BRENNER:  Right.  I bet -- you're busy, I bet

5       right?

6              PROSPECTIVE JUROR:  What's that?

7              MR. BRENNER:  Are you busy?

8              PROSPECTIVE JUROR:  Oh, yeah.  I'm busy working on

9       things that I'd been wanting to work on forever.

10             MR. BRENNER:  That's what I've always been told, that

11      people get more busy when they retire, but you just do stuff

12      that you want to do.

13             When you were working, tell me what you did.  What did

14      your job entail?

15             PROSPECTIVE JUROR:  I was a manufacturing engineer,

16      working with Lockheed Martin on the Space Shuttle program when

17      I used to be in New Orleans, in Louisiana.

18             And then I came to Miami about 11 years ago and I

19      worked at an elevator manufacturing company, and then at an

20      aviation tooling company as an engineer, manufacturing

21      engineer.

22             MR. BRENNER:  Let me ask you a question.  If I said to

23      you:  "Sir, can you explain what 'coding' is," what would you

24      say?

25             PROSPECTIVE JUROR:  I would just say it's computer
```

1    programming, giving lists of instructions on, you know, how to

2    do things.

3            MR. BRENNER:  You told me what you studied in college

4    and a little after.  In your professional life, did you do

5    computer coding?

6            PROSPECTIVE JUROR:  No.  I never used it.

7            MR. BRENNER:  Okay.  And you want to dedicate some of

8    your retirement to learning about that?

9            PROSPECTIVE JUROR:  Yeah.  Because like I said, it

10   will work with some things that I'm planning on creating with

11   computer graphics.

12           MR. BRENNER:  Right.  I wish you luck with that.

13           PROSPECTIVE JUROR:  Thank you.

14           MR. BRENNER:  Thank you.

15           I want to talk to Mr. Horne.  You also answered about

16   coding.

17           PROSPECTIVE JUROR:  Yes.

18           MR. BRENNER:  Tell me what you know.

19           PROSPECTIVE JUROR:  Again, I'm in marketing.  So HTML,

20   CSS, basically for web design.

21           MR. BRENNER:  Okay.  Do you do your own coding ever?

22           PROSPECTIVE JUROR:  Yes.

23           MR. BRENNER:  Okay.  For -- as part of the business,

24   do you do it?

25           PROSPECTIVE JUROR:  With clients, I mostly update

64

1  websites.  I don't build them.  I just provide context.  But I
2  do know coding HTML, CSS, a few others.
3        MR. BRENNER:  Do you do it in your spare time?  Is
4  this a hobby, too, or just related to your work?
5        PROSPECTIVE JUROR:  I have my own website I, you know,
6  periodically update.  I guess you could say -- I don't know --
7  probably 30, 40 hours a year I spend coding, doing websites.
8        MR. BRENNER:  Thanks for sharing.
9        PROSPECTIVE JUROR:  Mostly updating, like I said.  Not
10  creating, but just updating.
11        MR. BRENNER:  So let me ask this:  How did you learn
12  how to do it?
13        PROSPECTIVE JUROR:  Which one, HTML?
14        MR. BRENNER:  Any.  Any.
15        PROSPECTIVE JUROR:  HTML, CSS I learned in grad
16  school.  A few others I picked up along the way.
17        MR. BRENNER:  What were you studying in grad school?
18        PROSPECTIVE JUROR:  Advertising.
19        MR. BRENNER:  Okay.  I would say -- when were you in
20  grad school?
21        PROSPECTIVE JUROR:  I started 2013.  I finished 2015.
22        MR. BRENNER:  Okay.  Great.
23        And did you -- where did you go to school for that?
24        PROSPECTIVE JUROR:  Academy of Art in San Francisco.
25        MR. BRENNER:  In San Francisco?

```
 1              And how long have you been down here?

 2              PROSPECTIVE JUROR:  I was born here.  I went there to

 3      work in grad school.  I came back 2015.

 4              MR. BRENNER:  Okay.  Great.  Well, welcome back.

 5              Let me ask you this:  In your questionnaire, I believe

 6      you said that you were a plaintiff in a lawsuit.  Did I get

 7      that right?

 8              PROSPECTIVE JUROR:  Yes.  2008.

 9              MR. BRENNER:  2008.  Is that something you're okay

10      talking about?

11              PROSPECTIVE JUROR:  Yeah.

12              MR. BRENNER:  Okay.  Then I'm going to ask you.

13              PROSPECTIVE JUROR:  I'm sorry?

14              MR. BRENNER:  I said:  "Then I'm going to ask you."

15      What was that about?

16              PROSPECTIVE JUROR:  Basically, it was a car -- moving

17      violation or whatever.  The driver, the other driver cut in

18      front of me.  Basically, the officer who wrote the police

19      report basically knew the other guy was at fault.  But he said,

20      you know, he couldn't decide or whatever.

21              So I had to take him to court to give -- you know, for

22      my deductible and damage to my vehicle.

23              MR. BRENNER:  Okay.  And that experience, was it in

24      the state court system or the federal court system?

25              PROSPECTIVE JUROR:  It was in civil court.
```

1        MR. BRENNER:  Civil court down the street?

2        PROSPECTIVE JUROR:  At the South Dade Civic Center.

3        MR. BRENNER:  Okay.  That experience of being a

4   plaintiff in a lawsuit, has that influenced your view

5   positively or negatively about lawsuits?

6        PROSPECTIVE JUROR:  No.

7        MR. BRENNER:  Okay.  Thank you.

8        There was someone earlier, I just need to look at my

9   notes, who said they would have a problem if this was an injury

10  lawsuit.  Who was that?

11       You.  Yes.  Thank you.

12       That's Ms. Fabelo.  Did I get that right?

13       PROSPECTIVE JUROR:  Yes.

14       MR. BRENNER:  So what do you mean by that?

15       PROSPECTIVE JUROR:  Well, I probably have problems

16  with people driving drunk.  So that's one of the -- I would not

17  be able to serve on anything like that.

18       MR. BRENNER:  So that's a perfect example.  If this

19  were a case with a drunk driver -- and it's not -- if it were,

20  you would have raised your hand and told the Judge or told me:

21  "This is not the right case for me"?

22       PROSPECTIVE JUROR:  Yes.

23       MR. BRENNER:  So just what about lawsuits in general

24  and -- so this -- you know, it's a civil lawsuit.  I said that

25  the criminal lawsuits have to do with money -- and excuse me --

```
1   with liberty.  And civil lawsuits, generally speaking, it's a

2   case for money damages.

3           Is that something that you have strong feelings about

4   one way or the other?

5           PROSPECTIVE JUROR:  (No verbal response.)

6           MR. BRENNER:  Okay.  You could be fair and impartial

7   in a case like that?

8           PROSPECTIVE JUROR:  Correct.

9           MR. BRENNER:  Thank you.

10          Let's go to Mr. Lemus.  Did I get that right?

11          PROSPECTIVE JUROR:  Yes.

12          MR. BRENNER:  How are you, sir?

13          PROSPECTIVE JUROR:  Good.  Thank you.

14          MR. RIVERO:  So you have a background in computers,

15  correct?

16          PROSPECTIVE JUROR:  Yeah.  I went to college for a

17  computer engineer.  I been working all my life in computers.

18  Work for Marriott International with all the systems we have in

19  the hotels.  I learned coding at school, at college, a little

20  bit ancient languages, computer languages --

21          MR. BRENNER:  Did you say "ancient"?

22          PROSPECTIVE JUROR:  Ancient, yeah.  Because they don't

23  exist anymore.  COBOL and a lot of languages that are obsolete

24  already.  Right now, I don't do coding anymore.  I mean,

25  it's --
```

68

```
 1          MR. BRENNER:  So in college -- excuse me.  In college,
 2    you learned coding, what you called ancient languages.  Did you
 3    do any coding after college?  Yourself do it?
 4          PROSPECTIVE JUROR:  No, not really.
 5          MR. BRENNER:  None of your jobs ever required you to
 6    do any coding?
 7          PROSPECTIVE JUROR:  I didn't like it very much.  And
 8    that's why.
 9          MR. BRENNER:  What didn't you like about it?
10          PROSPECTIVE JUROR:  I'm more in the engineering part,
11    the hardware, the physical parts of the computers and all that
12    stuff, than coding, I mean, doing -- sitting down doing that.
13          MR. BRENNER:  Right.  Did you study engineering in
14    college?
15          PROSPECTIVE JUROR:  Correct.
16          MR. BRENNER:  What kind of engineering?
17          PROSPECTIVE JUROR:  Computer engineering.
18          MR. BRENNER:  Oh, computer engineering.
19          PROSPECTIVE JUROR:  Yeah.
20          MR. BRENNER:  But you're more a hardware guy.
21          PROSPECTIVE JUROR:  Correct.  Exactly.
22          MR. BRENNER:  And then for Marriott, I know you said
23    it a couple times and I'm just not totally grasping what you do
24    for them.
25          PROSPECTIVE JUROR:  I'm management level now.  But I
```

1   manage a group of computer guys.  We set up all the computers,

2   all the systems in the different hotels.

3          MR. BRENNER:  Got it.

4          PROSPECTIVE JUROR:  Everything that has to do with the

5   service for the guests.

6          MR. BRENNER:  So I think you had a -- I'm pretty sure

7   you had a conversation with the Judge answering questions where

8   you were hesitant and you were not hesitant, and -- is that

9   right?

10         PROSPECTIVE JUROR:  Well, yeah, I mentioned my best

11  friend is into Bitcoin.

12         MR. BRENNER:  What does he do?

13         PROSPECTIVE JUROR:  I mean, he just invest a lot of

14  money on that.  And he's doing that data mining and all that

15  stuff.  So he's been -- he kind of picks my brain because I'm

16  in the field, in technology field, and he's trying to get me

17  involved in it.  But just --

18         MR. BRENNER:  So you have a big smile on your face,

19  which doesn't show up on the record.  So let me ask you

20  something, someone says -- you're saying to me:  "My friend

21  does a lot of this Bitcoin investing and mining."  And now you

22  tell me, what do you think about your friend doing that?

23         PROSPECTIVE JUROR:  What do I think?

24         MR. BRENNER:  Yeah.

25         PROSPECTIVE JUROR:  He's a young guy and he's smart.

```
 1    And I see people making a lot of money with this kind of
 2    technology and these kind of investments.  And I've seen a lot
 3    of other people that lose a lot of money, so I'm just not into
 4    it.
 5            MR. BRENNER:  So do you stay away from it because of
 6    the risk involved?
 7            PROSPECTIVE JUROR:  Because I consider myself an
 8    ignorant on it and don't get into reading and getting involved
 9    in that.  That's why.
10            MR. BRENNER:  Okay.  Thank you.
11            I'm going to turn around to this side of the room.
12            Mr. Moder, right?  I think I've got to wait for your
13    microphone.
14            All right.  How are you, sir?
15            PROSPECTIVE JUROR:  Good.
16            MR. BRENNER:  So when you were answering questions
17    from Judge Bloom, you said that you for a brief time had a --
18    if I get it wrong, you'll tell me, right -- what I wrote down
19    in handwriting that I can no longer read, you wrote down that
20    you had a partnership with a friend that involved mining
21    Bitcoin.
22            PROSPECTIVE JUROR:  I don't know if you would call it
23    a "partnership."  He was buying a -- it was a black box.  It
24    was a few grand.  And he asked me -- I know he knew a lot about
25    computers.  I really don't.  And he's a smart guy, so I did it
```

1  with him.  We did it for like eight months and then we sold the

2  machines.

3          MR. BRENNER:  Okay.  So let me ask you just a couple

4  of questions -- maybe a few.

5          The friend, good friend?  Close friend?  Not close

6  friend?  Business associate?  What was he?

7          PROSPECTIVE JUROR:  He bought the house across the

8  street from me.  And I now work for him.

9          MR. BRENNER:  Did you either then or now have a social

10 relationship outside of work?

11         PROSPECTIVE JUROR:  Yeah.

12         MR. BRENNER:  Okay.  Started as a neighbor and became

13 a friend?

14         PROSPECTIVE JUROR:  Yes.

15         MR. BRENNER:  Okay.  Good.

16         Then -- now I remember exactly what you said.  You

17 said that:  "We bought" -- I think then you called it a

18 "Bitcoin machine" when you were talking to Judge Bloom.

19         PROSPECTIVE JUROR:  Yeah.  A miner.

20         MR. BRENNER:  So it was a few thousand bucks, would

21 you say?

22         PROSPECTIVE JUROR:  Yes.

23         MR. BRENNER:  And who paid for that?

24         PROSPECTIVE JUROR:  I paid for mine; he paid for his.

25         MR. BRENNER:  Okay.  So you each paid for a machine.

1          And was it your understanding that whatever -- if your

2    machine -- why don't you explain just really briefly what

3    Bitcoin mining is.  Because it sounds like you know what it is.

4    Or not really?

5          PROSPECTIVE JUROR:  Alls I know about it -- like I

6    said, he know more about it and we were going to split whatever

7    happened.  So he had the knowledge and I had -- wanted to go

8    ahead and give it a shot.

9          MR. BRENNER:  Okay.

10          PROSPECTIVE JUROR:  From my understanding at the time

11    and now is it's a computer that does crunching of calculations

12    and you get paid for that.

13          MR. BRENNER:  You get paid in Bitcoin?

14          PROSPECTIVE JUROR:  Yeah.

15          MR. BRENNER:  Okay.  So you had this business with a

16    friend, partnership with a friend.  You guys each put money in

17    to buy a machine, what you called a Bitcoin machine, and you

18    guys -- if your machine hit, he was going to split the Bitcoin?

19    If his machine hit, you were going to split the Bitcoin?

20          PROSPECTIVE JUROR:  I think they were tied together.

21          MR. BRENNER:  They were tied together.  So whatever --

22    meaning it wasn't your Bitcoin or his Bitcoin; it was our

23    Bitcoin, right?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BRENNER:  Did you have -- and ultimately after

```
1    eight months, you sold the machine and stopped doing that?
2            PROSPECTIVE JUROR:  Yeah.  He told me that the
3    Bitcoin -- it was going to become exponentially harder to get
4    Bitcoins and the machines that we had were going to very
5    quickly lose value.  So before that happened, we sold them.
6            MR. BRENNER:  And about what year was this?
7            PROSPECTIVE JUROR:  I would say six years ago, seven
8    years ago.
9            MR. BRENNER:  Okay.  And did you have a written
10   agreement with him or was it just a handshake deal?
11           PROSPECTIVE JUROR:  No.  We trusted each other.
12           MR. BRENNER:  You trusted each other and when you
13   ultimately decided to -- I don't want to put words in your
14   mouth -- you ultimately decided to stop the partnership, was
15   there any problems or you just both honored the deal?
16           PROSPECTIVE JUROR:  Yeah.  I mean, we held onto the
17   Bitcoin.  I just kind of just forgot about it and he had them.
18           MR. BRENNER:  But do you have part of those?  Did you
19   take part of them?
20           PROSPECTIVE JUROR:  I sold mine.
21           MR. BRENNER:  You sold yours.  Got it.
22           And then the machines you sold and split the proceeds?
23           PROSPECTIVE JUROR:  We -- I sold them on eBay.
24           MR. BRENNER:  Okay.  And you guys split them?
25           PROSPECTIVE JUROR:  Yeah.
```

94

```
1              MR. BRENNER:  Okay.  Great.

2              So anything about that experience, or about Bitcoin

3   generally, caused you to have any hesitation about serving on a

4   case that has to do with some of those issues that the Judge

5   talked about?

6              PROSPECTIVE JUROR:  No.

7              MR. BRENNER:  Great.  Thank you.

8              Anyone else ever have a -- I don't -- just a business

9   with someone that you did by agreement with a friend or

10  colleague?  Anyone ever do that?

11             Yes, ma'am.  Let me just get your name for the record.

12  Maria Pinillos.

13             PROSPECTIVE JUROR:  Maria Pinillos.  Yes.

14             MR. BRENNER:  Thank you.  How are you?

15             PROSPECTIVE JUROR:  Fine.  Thank you.

16             And you?

17             MR. BRENNER:  Great.  I'm doing great.  So tell me

18  about that.

19             PROSPECTIVE JUROR:  As a composer and author

20  of songs -- I'm a songwriter -- of course, I have made

21  contracts with my partner, that I did the company records and

22  editorial.  And I know about the case, not because I know

23  exactly about computers, something like that, but you know, the

24  partnership with the company.

25             MR. BRENNER:  When you say you know about the case,
```

```
1    what do you mean by that?

2            PROSPECTIVE JUROR:  No.  The coins.  What you talking

3    about, the coin, the Bitcoins.

4            MR. BRENNER:  Okay.

5            PROSPECTIVE JUROR:  I don't know nothing about

6    Bitcoin, but partnership with the -- my companies of records.

7            MR. BRENNER:  Sure.

8            So you heard the Court talk about this is a case where

9    one side was saying there's a partnership and the other side

10   was saying there's not.  Did you hear that when she read you a

11   brief summary of the case?

12           PROSPECTIVE JUROR:  No.

13           MR. BRENNER:  Oh, you did not?  Okay.

14           Do you have any thoughts about that, generally, about

15   partnerships?

16           PROSPECTIVE JUROR:  Yeah.  About, generally, yeah.

17   Maybe I talk because when the -- we talk about if you have --

18   somebody have partnership with somebody else, I have my songs,

19   my company records.  And you know.

20           MR. BRENNER:  Do you -- do you have any -- do you

21   believe that the -- because you keep talking about company

22   records.  I just want to make sure I understand.

23           Do you believe that in order for there to be a

24   partnership you have to have records or can you have a

25   partnership --
```

```
 1              PROSPECTIVE JUROR:  No.  But the songs, because when

 2     we signed the song, for example, with the editorial, they have

 3     50 percent/50 percent --

 4              MR. BRENNER:  Uh-huh.

 5              PROSPECTIVE JUROR:  -- you know.  And they are

 6     partners.  They are going to put my music in the market and --

 7              MR. BRENNER:  Got it.

 8              PROSPECTIVE JUROR:  -- you know.

 9              MR. BRENNER:  Okay.  Got it.

10          Thank you.

11          Okay.  So Juror Number 24.  I'm going to --

12     Ms. Gallian Doubrar [sic]?

13              PROSPECTIVE JUROR:  Oubrar.

14              MR. BRENNER:  I'm sorry.  Can you say it again?

15              PROSPECTIVE JUROR:  Gallian Oubrar.

16              MR. BRENNER:  Oubrar.  Oubrar.  Okay.

17              PROSPECTIVE JUROR:  Yes.

18              MR. BRENNER:  How are you today?

19              PROSPECTIVE JUROR:  Fine.  Thank you.

20              MR. BRENNER:  So do you have any experience with -- I

21     don't want to use the word "partnership" -- just being in

22     business with someone else?

23              PROSPECTIVE JUROR:  No, I do not.

24              MR. BRENNER:  You do not.

25          What -- do you work for a living now?
```

```
1              PROSPECTIVE JUROR:  Yes.

2         MR. BRENNER:  And what do you do?

3              PROSPECTIVE JUROR:  I work for Florida International

4    University.  I'm a lab safety officer.

5         MR. BRENNER:  Tell me a little bit about what that --

6              PROSPECTIVE JUROR:  I have a biological background.

7    Right now, what I'm doing is basically inspecting our labs for

8    safety.

9         MR. BRENNER:  Okay.

10             PROSPECTIVE JUROR:  Making sure they're compliant.

11        MR. BRENNER:  And what's your educational background?

12             PROSPECTIVE JUROR:  Biology.  Bachelor's degree.

13        MR. BRENNER:  A master's degree?

14             PROSPECTIVE JUROR:  Bachelor's.

15        MR. BRENNER:  Oh, bachelor's.

16        Where did you go to school?

17             PROSPECTIVE JUROR:  University of Miami.

18        MR. BRENNER:  Any experience in any way with any

19   cryptocurrency or Bitcoin?

20             PROSPECTIVE JUROR:  I just have a son who seems to

21   like it and encouraged me to invest in the stock market a

22   little bit, in a very cheap one.

23        MR. BRENNER:  Okay.  Let me -- how old is your son?

24             PROSPECTIVE JUROR:  He's 32.

25        MR. BRENNER:  Okay.  And does he invest in --
```

98

```
1          PROSPECTIVE JUROR:  He invests in several areas and he
2     does like cryptocurrencies.
3          MR. RIVERO:  And he said:  "Mom, I got a great
4     investment for you"?  Is that how it went?
5          PROSPECTIVE JUROR:  We had a little bit of a
6     conversation because I really didn't know much about it.  And
7     he said he found one for 25 cents a share.  So I said:  "Hey,
8     okay."
9          MR. BRENNER:  How bad could it be, right?
10         PROSPECTIVE JUROR:  Yeah.
11         MR. BRENNER:  I'm not going to ask you at all about
12    the amount of money you invested.  It's none of my business.
13         But can I ask you this:  As far as it relates to your
14    other investments, how significant is your investment in crypto
15    or Bitcoin, in particular?
16         PROSPECTIVE JUROR:  Very small.
17         MR. BRENNER:  Very small.
18         And what about your son, same?
19         PROSPECTIVE JUROR:  Yeah.
20         MR. BRENNER:  What does he do for a living?
21         PROSPECTIVE JUROR:  He works actually here downtown
22    and in building management.
23         MR. BRENNER:  Okay.  What are your thoughts about
24    investing in Bitcoin?  I'm using Bitcoin as sort of a holder
25    for --
```

```
 1              PROSPECTIVE JUROR:  I don't know a lot about it.  But,
 2      I mean, it's interesting.  Like I said, I've heard both sides.
 3      But for me, it was just a way to get into the stock market to
 4      invest some money.  But I'm kind of neutral.
 5              MR. BRENNER:  Okay.  Thank you.
 6              So someone said earlier that they thought Bitcoin was
 7      a scam.  Who thinks Bitcoin is a scam?  Anyone over on my
 8      right?  Does anyone over here think Bitcoin is a scam?
 9              How about on the left?
10              I think you said it, right?  And what did you mean by
11      that?
12              PROSPECTIVE JUROR:  Obviously, this is my own opinion,
13      and it doesn't reflect anybody else.  But -- and it doesn't
14      include just Bitcoin.  I'm just talking in general,
15      cryptocurrency, all in general.
16              I mean, usually when you have people in social media
17      and they can just say something and everyone just rallies into
18      it.  And then after it dies out, it just goes down again.
19              MR. BRENNER:  Okay.
20              PROSPECTIVE JUROR:  When you have something so
21      unstable that doesn't really -- is not really backed up by
22      anything else -- like it's not a company you can see -- you
23      know, you can see money at the end of the quarter or anything
24      like that.  There's not really anything.  There's not even a
25      physical place for most of these.
```

100

```
 1              Cryptocurrencies, most of them come from other
 2      countries.  And as soon as they come in, they just go away
 3      because they usually just go around on social medias and videos
 4      and people just promote it.  And then when they get what they
 5      want, you know, it just goes down and everybody loses.
 6              I mean, people obviously make money because --
 7              MR. BRENNER:  Okay.  So it could be a bubble.
 8              PROSPECTIVE JUROR:  Yeah.
 9              MR. BRENNER:  Thank you so much, sir.
10              Anyone on this side of the room -- the same question I
11      asked to Ms. Gallian Oubrar -- think that Bitcoin is sort of
12      the currency of the future or cryptocurrencies -- digital
13      currencies are the currencies of the future?  Does anyone over
14      on the right side of the room think that.
15              No?
16              Okay.  How about on the left side of the room?
17              Okay.  Thank you.
18              And how about in the actual jury box?  Anyone feel
19      that way about Bitcoin?
20              You do?  Yes.  Let me get your name for the record.  I
21      know the Judge spoke with you a few times.  But to keep our
22      record clear, you're Ms. McCrimmon?
23              PROSPECTIVE JUROR:  Yes.
24              Hello.  Yeah.
25              MR. BRENNER:  Yes.
```

101

```
1              PROSPECTIVE JUROR:  Hello.

2              MR. BRENNER:  Hello.  How are you?

3              PROSPECTIVE JUROR:  I'm well.  How are you?

4              MR. BRENNER:  Great.  Thank you.

5              Tell me about that.  You think it's the -- Bitcoin is

6       the wave of the future or the currency of the future?

7              PROSPECTIVE JUROR:  I believe that cryptocurrency in

8       general, digital money, is going to be the future.  I

9       personally -- my personal opinion is I don't like that.

10             MR. BRENNER:  Okay.

11             PROSPECTIVE JUROR:  I wish we could go back to trade

12      and barter and artisan, you know, type things.  Respect to you

13      guys.  I personally just don't like it.  I'm like an old lady

14      in a millennial's body.

15             MR. BRENNER:  Got it.  I got it.

16             PROSPECTIVE JUROR:  So just being transparent.

17             MR. BRENNER:  So I would be remiss and upset with

18      myself if I didn't ask you what -- you do art, right?

19             PROSPECTIVE JUROR:  Yes.

20             MR. BRENNER:  So what kind of art do you do?

21             PROSPECTIVE JUROR:  3D mixed media art.  Very

22      Bohemian.

23             MR. BRENNER:  Oh.  Oh.

24             PROSPECTIVE JUROR:  Yes.

25             MR. BRENNER:  Fantastic.
```

162

```
 1            PROSPECTIVE JUROR:  Yes.  But I'm very happy to have
 2     friends who are well-versed in Bitcoin and crypto, just in case
 3     need be in the future.
 4            MR. BRENNER:  Right.  Right.
 5            Thank you.
 6            PROSPECTIVE JUROR:  Thank you.
 7            MR. BRENNER:  Thank you so much.
 8            Anyone else on that question?
 9            How about the opposite?  Anyone here think that
10     cryptocurrency or Bitcoin is just a wave and it's going to
11     disappear one day?  Anyone on the right side of the room
12     believe that?  Think that?
13            No?
14            Okay.  Anyone on the left side of the room think that?
15            Okay.  And what about back here?
16            PROSPECTIVE JUROR:  What's the question?
17            MR. BRENNER:  Anyone think that -- you know, sort of
18     the opposite of what I asked before, that Bitcoin's like the --
19     it's just going to go away, it's a fake.  It's going to
20     disappear.
21            Let me get your name for the record, sir.  You are
22     Mr. Escobedo?
23            PROSPECTIVE JUROR:  Yes.
24            MR. BRENNER:  Thank you, sir.
25            You think it may just go away?
```

1          PROSPECTIVE JUROR:  It's not that it's going to go

2     away.  But if you read the news, there's several countries that

3     are trying to ban the use of the cryptocurrency.  And the fact

4     is that most of the illegal activities hide behind that type of

5     currency.  So unless it gets some regulations on it, I don't

6     think they have a future on it.

7          MR. BRENNER:  Okay.  Great.  Thank you.

8          PROSPECTIVE JUROR:  That's why it's so valuable now

9     because it's on the shady side of the market.

10         MR. BRENNER:  Thank you, sir.  Thank you for sharing

11    that.

12         I'm now going to call on some people individually.  I

13    want to start with Ms. Rozansky.

14         I'll wait for you to get the mic, so I don't get

15    reprimanded again.

16         Okay.  How are you today?

17         PROSPECTIVE JUROR:  Good.  How are you?

18         MR. BRENNER:  I'm great.

19         So when you were talking to Judge Bloom, you mentioned

20    that you were in a food blog partnership.  I think you called

21    it an LLC.

22         PROSPECTIVE JUROR:  Yes.

23         MR. BRENNER:  And that LLC is a limited liability

24    company.

25         PROSPECTIVE JUROR:  Yeah.

1        MR. BRENNER:  Okay.  How many other people were owners

2  of that company -- owners of that business?

3        PROSPECTIVE JUROR:  Just two of us.

4        MR. BRENNER:  And the other person, was it a man or a

5  woman?

6        PROSPECTIVE JUROR:  A woman.

7        MR. BRENNER:  And was she a friend or you met her in

8  business?  What was her relationship?

9        PROSPECTIVE JUROR:  A colleague who became a friend.

10       MR. BRENNER:  Colleague who became a friend.  Still a

11  friend?

12       PROSPECTIVE JUROR:  Yeah.

13       MR. BRENNER:  Okay.  Great.

14       Now, is that the only time you've been in a business

15  with another person?

16       PROSPECTIVE JUROR:  I have another business now.  I'm

17  the only person who owns it, but I do have contractors.

18       MR. BRENNER:  Okay.  What's the business you have now?

19       PROSPECTIVE JUROR:  It's a marketing consulting firm.

20       MR. BRENNER:  Okay.  What kind of marketing consulting

21  firm?

22       PROSPECTIVE JUROR:  PR, social media, influencer

23  marketing, all that.

24       MR. BRENNER:  Okay.  On that, do you see a lot of

25  stuff about -- on social media, do you see a lot of stuff about

105

```
1    digital currencies?

2            PROSPECTIVE JUROR:  I really don't.  I play more in

3    the social media space.  I hear about it, but I'm not

4    well-educated on the topic.

5            MR. BRENNER:  You said it was an LLC.  Did that go out

6    of business?  What happened?

7            PROSPECTIVE JUROR:  No.  It's still -- I run both

8    businesses.  So the food blog is an LLC.  The other is an S

9    corp.

10           MR. BRENNER:  Did you have an LLC or written agreement

11   with your partner in the food blog business?

12           PROSPECTIVE JUROR:  She's no longer my partner.  But

13   yes, we did.

14           MR. BRENNER:  You did.  And tell me how detailed that

15   was.  Did it cover everything that could come up or was it one

16   of these sort of got a form and you guys both figured it out?

17           PROSPECTIVE JUROR:  It was probably somewhere in the

18   middle.  I mean, I have people who I trust in my corner who are

19   well-versed or better versed than I am.  So I've probably

20   checked most of the boxes, not all of them --

21           MR. BRENNER:  Okay.

22           PROSPECTIVE JUROR:  -- especially given that it's more

23   on social media.  So if people are a little bit more old school

24   on how they go about it, they may not understand all the social

25   things that could come up.
```

166

```
1        MR. BRENNER:  Right.  And what happened when things
2   came up that were not in the written LLC agreement?  Did you
3   guys just work it out or what happened?
4        PROSPECTIVE JUROR:  Yeah.  I mean, everything sort of
5   worked out until she moved.  So it was an amicable split.  I
6   ended up buying her out.  We got that in writing as well and it
7   was all fine.
8        MR. BRENNER:  So let me ask you about that.  So there
9   came a time where your friend needed to move and you guys
10  decided to split, to part ways?
11       PROSPECTIVE JUROR:  Yeah.
12       MR. BRENNER:  And you wanted to buy -- you bought her
13  out.  Did you -- the amount of the buyout, I don't want to know
14  the amount, but just the concept of it.
15       PROSPECTIVE JUROR:  Sure.
16       MR. BRENNER:  Was that something that you two had to
17  later work out because it wasn't in the original agreement?
18       PROSPECTIVE JUROR:  Yes.
19       MR. BRENNER:  Right.  So things came up that are not
20  in the original agreement, maybe the company got bigger or she
21  had to move, and then you guys -- did it work out, you think,
22  because you trusted each other?
23       PROSPECTIVE JUROR:  Yeah.  I think there was mutual
24  respect.  I think it was very much circumstantial and I don't
25  think any of us wanted to do wrong by the other.  So that's
```

107

```
1    why.
2           MR. BRENNER:  If she were here today, and I asked her
3    the same questions, do you think she would say the same thing?
4           PROSPECTIVE JUROR:  Yeah, I do.
5           MR. BRENNER:  That's fantastic.  That's fantastic.
6    Thank you for sharing that with me.
7           I'm just checking my notes.
8           Ms. Bruguez.
9           PROSPECTIVE JUROR:  Bruguez.
10          MR. BRENNER:  Bruguez.  Bruguez.  Bruguez.
11          How are you today?
12          PROSPECTIVE JUROR:  I'm doing well.  Thank you.  How
13   are you?
14          MR. BRENNER:  I'm doing great.  Thank you.
15          So I think you said you have had a partnership or a
16   business with someone.
17          PROSPECTIVE JUROR:  I have one currently, yeah.
18          MR. BRENNER:  I'm sorry.  I couldn't hear you.
19          PROSPECTIVE JUROR:  I currently have one, yes.
20          MR. BRENNER:  What kind of business is that?
21          PROSPECTIVE JUROR:  It's a cleaning company, so we do
22   commercial cleaning for hotels.
23          MR. BRENNER:  Right.  You said that.  I apologize.
24   For hotels, I think.
25          PROSPECTIVE JUROR:  Okay.  Yeah.
```

1          MR. BRENNER:  So to make sure that I understand it, is

2     it one of those things where a hotel or a hotel chain would

3     hire your business and you would supply the cleaning staff for

4     the hotel or --

5          PROSPECTIVE JUROR:  Yes.  That's correct.

6          MR. BRENNER:  That's how it works?

7          How did that hold up under COVID?  Was it bad?

8          PROSPECTIVE JUROR:  We had a couple that closed.  But

9     there were others that were open.  So the way that we worked is

10    they paid us right until COVID hit and then everybody just

11    stayed out, and if they had any debt they would recover now.

12         MR. BRENNER:  Okay.  Good.  I'm glad to hear that.

13         Did -- you have more than one partner in the business?

14         PROSPECTIVE JUROR:  It's me and a family friend.

15         MR. BRENNER:  Family friend.

16         So how long had you known this family friend before

17    you went into business together?

18         PROSPECTIVE JUROR:  For a while.  She's been working

19    with my mom for about 12 years.

20         MR. BRENNER:  Is she your mom's age?

21         PROSPECTIVE JUROR:  Yeah.

22         MR. BRENNER:  Okay.  And the company, is it a

23    corporation?  What is it as far as lawyer talk?

24         PROSPECTIVE JUROR:  It's more like a corporation,

25    yeah.  It's an Inc.

109

```
1              MR. BRENNER:  It's a what?

2              PROSPECTIVE JUROR:  Inc.

3              MR. BRENNER:  It's an Inc.  An incorporated.  Great.

4         Do you -- how do you guys decide how you're going to,

5    God forbid -- losses or gains, how do you guys deal with that?

6              PROSPECTIVE JUROR:  Everything is 50/50.  So we're

7    both basically -- on every document that has to be, we're both

8    together on it.  So it's just not her, it's not just me.

9    It's --

10             MR. BRENNER:  So you both sign checks --

11             PROSPECTIVE JUROR:  Yeah.

12             MR. BRENNER:  Okay.  Great.

13        And how did that come to be?  Is that just an

14   agreement that you guys had with each other?

15             PROSPECTIVE JUROR:  Yeah.  I mean, it's just to make

16   sure we're both covered in case of anything.

17             MR. BRENNER:  I'm sorry.  I cut you off.

18             PROSPECTIVE JUROR:  It's okay.

19             MR. BRENNER:  And do you have a piece of paper that

20   says:  "We're 50/50 partners," or that's just how you guys have

21   treated the business?

22             PROSPECTIVE JUROR:  It's just an agreement.  It's how

23   we treated it.

24             MR. BRENNER:  It's an oral agreement?

25             PROSPECTIVE JUROR:  Uh-huh.
```

110

```
 1                MR. BRENNER:  Do you trust her?

 2                PROSPECTIVE JUROR:  I do.

 3                MR. BRENNER:  You know what I'm going to say, if she

 4      were here, and I would ask her, what would she say?

 5                PROSPECTIVE JUROR:  She would say she does.

 6                MR. BRENNER:  How long have you guys been doing that

 7      together?

 8                PROSPECTIVE JUROR:  It's been about five years.

 9                MR. BRENNER:  And have you guys maintained also a

10      friendship through that?

11                PROSPECTIVE JUROR:  Yes.

12                MR. BRENNER:  Well, that's fantastic.

13      Congratulations.

14                PROSPECTIVE JUROR:  Thank you.

15                THE COURT:  Just a few minutes more, sir.

16                MR. BRENNER:  Thank you, Your Honor.

17                Mr. Weber.  Mr. Weber, how are you?

18                PROSPECTIVE JUROR:  I'm fine.  Thank you.

19                MR. BRENNER:  You told us -- or you told the Judge,

20      but I was listening, so I'll say it's us -- that you had a --

21      was it a cold storage business?

22                PROSPECTIVE JUROR:  A cold storage.

23                MR. BRENNER:  What is that?

24                PROSPECTIVE JUROR:  It's a warehouse that's

25      refrigerated.
```