22-11150

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

❖❖

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME VIII OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
   FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA MCGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

TAB NO.          DESCRIPTION

210          Plaintiffs' Motion to Compel Defendant to Comply
             with this Court's Orders Directing Him to Produce a
             List of the Bitcoins He Held as of December 31, 2013

429          Order Granting in Part and Denying in Part Plaintiffs'
             Corrected Motion for Attorneys' Fees (DE 346),
             filed March 17, 2020

618          Joint Proposed Jury Instructions,
             filed September 29, 2020

802-1        Exhibit A to Defendant's Opposition to Motion for a
             New Trial (DE 861) — Final Jury Instruction
             Objections

829          Email from Craig S. Wright to Dave Kleiman,
             dated March 12, 2008

837          Trial Transcript Day 1, dated November 1, 2021

838          Trial Transcript Day 2, dated November 2, 2021

839          Trial Transcript Day 3, dated November 3, 2021

840          Trial Transcript Day 4, dated November 4, 2021

841          Trial Transcript Day 5, dated November 5, 2021

842          Trial Transcript Day 6, dated November 8, 2021

843          Trial Transcript Day 7, dated November 9, 2021

845          Trial Transcript Day 9, dated November 15, 2021

| TAB NO. | DESCRIPTION |
|---|---|
| 846 | Trial Transcript Day 10, dated November 16, 2021 |
| 847 | Trial Transcript Day 11, dated November 17, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 850 | Trial Transcript Day 14, dated November 22, 2021 |
| 851 | Trial Transcript Day 15, dated November 23, 2021 |
| 861 | Law360 Article entitled, "No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360" |
| 877 | Joint Notice and Request for Judicial Ruling on Proposed Redactions to Admitted Trial Exhibits, filed January 31, 2022 |

**841**

**T**

USCA11 Case: 22-11150    Document: 38    Date Filed: 11/30/2022    Page: 5 of 254

**they... [33]**
128/10 130/5
130/13 130/15
130/20 130/25
131/3 131/3 135/11
149/12 149/13
149/14 149/14
150/9 150/11
155/24 156/14
156/15 158/1 158/4
158/6 158/20
159/19 159/24
159/24 160/3 160/5
160/6 160/7 170/3
173/10 179/5 179/6
**they're [13]**   14/6
28/17 28/18 43/15
43/19 56/24 66/20
67/18 75/1 108/16
112/16 121/19
178/7
**they've [1]**   73/19
**thing [21]**   27/19
31/4 43/16 56/1
57/19 60/2 60/19
74/21 75/6 82/5
87/22 99/22 100/24
103/17 114/4 141/5
141/6 154/11
164/21 167/11
172/18
**things [16]**   12/18
18/6 29/7 30/11
30/21 45/16 54/23
60/25 76/12 77/4
81/8 90/7 92/22
120/16 166/22
167/12
**things that [1]**
54/23
**think [66]**   10/24
12/9 12/10 13/3

13/7 13/13 13/25
20/5 20/8 21/7
20/15 20/22 21/17
21/21 24/15 24/15
28/25 28/25 30/2
30/10 46/18 48/3
49/3 49/5 49/16
62/13 64/21 65/4
73/12 73/14 75/16
81/12 89/25 91/19
94/4 95/8 95/8
99/15 108/12
118/14 119/17
121/24 125/13
125/15 126/14
131/5 131/18 136/5
136/10 136/24
141/2 141/21
144/11 144/14
144/20 151/25
153/15 153/16
158/6 159/6 160/5
161/20 167/7
169/12 170/16
170/19 171/2 175/6
176/19
**third [3]**   110/6
137/17 161/23
**this [349]**
**those [43]**   7/6
7/19 10/4 10/15
11/15 14/7 14/13
15/9 16/14 16/14
18/24 22/9 23/10
23/10 24/21 24/25
27/11 27/11 29/15
30/16 34/7 60/15
65/11 82/21 98/11
103/11 121/24
124/12 142/7
142/10 142/11
143/3 148/16 149/2
155/22 155/24
155/24 156/18
157/5 160/17

161/20 167/25
170/16
**thought [8]**   19/6
30/17 38/23 67/3
87/5 95/14 95/22
179/4
**thoughts [1]**   94/19
**thousand [1]**   15/3
**threats [2]**   60/5
81/8
**three [10]**   14/25
18/22 47/21 73/9
77/22 84/6 105/19
168/14 170/19
177/14
**three-day [1]**   73/9
**threw [4]**   29/14
30/5 30/17 30/20
**through [30]**   1/8
8/21 11/1 17/18
28/13 28/15 41/16
42/9 47/1 52/15
65/25 66/1 67/18
69/6 75/12 75/23
87/21 124/25
132/10 138/25
139/16 139/21
140/4 140/5 145/12
167/8 168/1 168/7
172/20 176/23
**throwing [2]**   29/3
29/5
**thrown [1]**   29/19
**thumb [1]**   142/13
**Thursday [3]**
129/14 130/3
175/24
**thus [2]**   116/4
176/23
**till [1]**   156/2
**time [70]**   5/3 9/13
14/15 17/9 17/19
20/14 21/17 21/23
25/20 26/23 28/25

**T**

USCA11 Case 22-11150 Document 15-8 Date Filed: 11/30/2022 Page 6 of 254

**time... [59]** 36/19
38/24 40/4 47/19
53/18 58/6 59/9
67/19 68/15 71/12
72/22 72/25 73/3
80/7 80/7 81/3
81/12 83/7 85/25
87/4 89/23 92/23
94/15 102/12 105/4
107/11 111/8 114/3
120/13 121/22
127/8 127/9 129/3
130/25 132/16
138/21 140/10
142/4 143/10 147/1
149/6 149/7 155/22
156/18 156/24
157/4 157/4 161/20
168/13 168/21
168/25 172/11
175/10 179/23
180/3 180/6 180/7
180/8 180/14
**timeline [1]** 102/7
**times [10]** 4/25
6/6 7/16 13/6
68/14 112/18 143/5
156/20 156/22
157/6
**timing [4]** 173/22
173/25 174/2 174/5
**tip [1]** 136/13
**tip-type [1]**
136/13
**tired [2]** 104/24
115/18
**Title [4]** 56/20
75/23 75/24 76/2
**today [8]** 29/9
99/23 99/24 144/12
156/2 161/21 174/6
175/15

**together [10]** 2/4
108/6 108/9 108/13
108/17 109/14
131/1 131/3
**told [20]** 11/3
14/11 20/19 21/22
31/15 33/11 36/7
39/14 67/18 120/16
125/10 127/4
133/25 134/24
135/11 137/10
161/23 166/15
178/19 179/10
**tomorrow [1]** 116/5
**tonight [1]** 61/1
**too [3]** 70/19
121/17 181/4
**took [10]** 5/16
10/5 17/6 28/25
99/23 146/4 146/16
149/10 157/9 158/7
**top [15]** 22/25
23/2 23/12 25/5
51/20 51/20 64/13
69/17 73/12 73/17
77/25 99/20 131/19
140/19 167/19
**topic [14]** 69/18
69/19 73/25 82/25
101/9 108/24 109/1
109/10 109/15
129/22 136/3 137/9
144/10 160/12
**topics [3]** 60/12
60/15 153/13
**totally [1]** 116/7
**touch [3]** 33/13
84/8 88/17
**tower [1]** 18/18
**track [1]** 77/1
**trading [4]** 20/20
21/9 21/12 136/13
**trail [2]** 10/8

12/10
**trailing [3]**
109/23 115/15
115/17
**transactions [1]**
172/19
**transcript [4]** 1/9
182/10 182/11
182/12
**transfer [1]** 34/8
**transformed [1]**
146/16
**transmittal [1]**
85/23
**transmitting [1]**
73/17
**Travelstar [1]**
25/7
**trial [3]** 1/9
14/14 168/19
**tried [4]** 18/24
19/1 19/2 19/4
**true [10]** 35/10
56/16 64/20 91/4
122/25 123/18
124/20 164/18
172/13 182/10
**TrueCrypt [3]**
27/24 27/25 31/14
**truly [1]** 180/1
**trust [15]** 9/2
31/17 31/18 31/19
35/8 38/2 38/6
128/23 172/17
172/19 172/25
173/6 173/9 173/10
173/15
**trusts [1]** 172/20
**truth [3]** 15/5
72/15 85/21
**try [8]** 11/17
16/14 20/7 22/8
31/14 169/19
169/21 170/7

USCA11 Case: 22-11150    Document: 18    Date Filed: 11/30/2022    Page: 7 of 254

**T**

**trying [3]**   36/3
159/10  160/9
**TTA [11]**   56/9
56/13  56/21  57/1
57/3  57/6  57/24
58/9  76/2  80/5
81/3
**TTA-09 [1]**   76/2
**TTA1 [2]**   57/21
77/24
**TTAs [1]**   164/7
**Tuesday [1]**   175/23
**turn [2]**   91/9
151/18
**turned [3]**   93/3
157/14  157/23
**turned-in [1]**   93/3
**turns [1]**   5/24
**Twitter [1]**   21/21
**two [37]**   6/23  7/24
11/20  23/4  23/10
23/10  24/1  24/25
25/5  25/22  33/24
47/11  50/9  73/9
73/9  77/22  88/9
108/3  111/16  116/5
118/3  123/6  127/11
137/24  146/8
146/10  146/11
146/17  158/16
159/3  161/10
161/20  163/10
163/19  167/8  168/2
177/24
**two-day [1]**   73/9
**two-way [1]**   123/6
**type [4]**   30/6
59/14  109/10
136/13

**U**

**U.S [1]**   1/23
**Uh [1]**   78/22

**Uh-huh [1]**   78/22
**ultimate [1]**   141/4
**ultimately [2]**
139/22  149/17
**unavailability [1]**
120/19
**unclear [1]**   13/14
**under [5]**   17/23
50/2  74/14  174/3
177/13
**underlying [1]**
171/21
**understand [27]**
5/7  8/19  17/7  29/2
29/12  31/8  35/1
40/11  44/24  50/24
55/24  56/2  70/18
70/24  70/24  70/25
78/6  99/5  122/19
122/21  123/4
132/11  141/12
147/13  161/13
167/24  180/5
**understanding [6]**
146/25  147/4  158/1
171/10  171/14
179/2
**understood [5]**
39/13  39/15  147/12
147/12  179/24
**undisclosed [1]**
35/5
**Unfortunately [2]**
69/10  69/12
**Uni [1]**   117/25
**UNITED [6]**   1/1
1/10  56/1  56/6
181/6  182/6
**unless [3]**   16/16
119/2  127/7
**unlikely [1]**   29/21
**unnecessary [1]**
30/18
**unquote [1]**   108/20

**unrelated [2]**   6/5
6/24
**until [9]**   6/7  8/3
8/5  8/7  8/16  31/23
34/11  102/8  118/21
**unusual [2]**   165/11
165/15
**up [63]**   10/20
12/11  31/10  31/23
32/15  34/11  36/18
47/17  50/7  50/25
52/25  54/24  55/19
60/3  62/5  62/10
62/12  71/16  76/23
77/4  77/12  77/13
77/18  82/4  82/8
86/5  90/10  90/18
93/7  95/9  95/13
95/14  95/15  95/20
98/4  98/8  99/1
101/2  109/7  116/6
116/24  131/16
135/4  136/2  136/23
136/24  143/14
145/4  150/18  152/4
152/14  153/25
156/1  156/7  157/12
160/1  160/19  162/3
166/6  166/7  166/25
167/1  175/2
**upon [3]**   7/2  21/19
177/2
**us [32]**   5/17  6/10
6/25  9/1  11/23
15/8  29/14  34/14
45/6  53/21  53/24
54/3  54/3  54/12
55/18  59/7  75/5
99/5  99/8  122/16
141/11  159/13
159/14  159/16
159/17  159/20
171/2  178/14
178/15  178/16

USCA11 Case: 22-11150    Document: 35-8    Date Filed: 11/30/2022    Page: 8 of 254

**U**

**us... [2]**  178/16
179/6
**US-based [1]**  99/5
**USA [1]**  161/5
**usable [1]**  60/4
**USBs [1]**  26/11
**use [13]**  16/6 16/7
19/3 19/4 28/11
40/17 48/11 59/16
107/22 113/19
128/14 138/14
179/5
**used [10]**  19/7
27/16 27/16 30/23
37/10 81/13 128/10
150/19 155/2 158/6
**uses [1]**  59/10
**using [5]**  14/15
92/12 93/23 113/18
127/5

**V**

**Valentine's [4]**
46/16 53/19 72/25
88/11
**valuable [3]**  18/24
29/23 31/16
**value [2]**  19/6
35/4
**various [2]**  155/2
164/4
**Vela [6]**  131/16
133/14 135/5
150/15 155/4 162/2
**vendor [2]**  50/2
53/24
**venture [1]**  35/5
**verbal [5]**  64/10
64/17 65/1 102/17
111/21
**version [1]**  168/1
**very [20]**  6/20
8/15 14/6 17/17

26/1 29/23 31/16
52/23 53/8 73/16
80/4 81/2 85/22
94/11 102/8 127/13
129/22 140/1 146/3
156/16
**vet [1]**  79/12
**veteran [7]**  54/8
78/2 78/8 78/23
78/25 79/4 79/6
**veteran's [1]**  54/6
**veteran-owned [1]**
78/2
**Veterans [1]**
175/25
**via [2]**  2/7 2/9
**video [14]**  2/7 2/9
169/6 170/8 170/15
170/21 171/15
171/16 174/20
174/22 174/25
175/2 176/19 177/5
**videos [1]**  176/22
**videotaped [1]**
178/4
**view [3]**  7/13 9/20
93/23
**violated [2]**  9/19
16/20
**virtue [1]**  16/8
**voice [5]**  68/24
68/25 70/14 70/16
71/13
**vs [1]**  1/6

**W**

**Wait [2]**  178/18
178/18
**waiting [1]**  127/11
**waive [2]**  8/22
15/8
**waiver [4]**  5/9
5/16 9/9 11/20
**wallets [3]**  149/5

149/22 154/24
**want [43]**  2/7
8/25 9/21 10/14
11/13 11/14 11/15
14/4 17/4 18/6
19/12 24/9 46/10
46/19 53/6 55/10
55/23 61/17 66/10
68/9 70/22 71/2
71/11 104/22
109/10 122/4
122/14 122/14
126/12 129/13
136/11 138/18
141/12 142/14
146/3 146/21
147/19 152/4 155/6
165/20 178/20
179/23
**want/need [1]**
55/23
**wanted [11]**  4/15
9/21 31/18 42/14
54/6 69/19 93/20
141/13 149/15
176/20 179/5
**wants [2]**  141/10
141/19
**WARREN [12]**  2/7
4/23 4/24 6/2 6/3
6/4 7/17 12/22
13/6 13/11 169/6
174/19
**Warren Brams [5]**
4/23 4/24 6/2 6/3
7/17
**was [208]**
**wasn't [8]**  10/1
40/6 73/7 98/20
99/14 154/23
173/13 174/9
**water [1]**  160/1
**way [37]**  6/19
17/17 20/7 24/16

**W**

**way... [33]**   41/16
47/19 48/17 51/14
62/16 64/9 64/11
67/24 69/20 74/8
82/17 82/19 82/24
83/1 83/24 85/3
87/10 95/5 100/4
111/20 117/25
118/14 123/6
130/22 137/25
140/4 140/5 151/24
153/9 153/10
153/10 156/8
172/21

**we [240]**

**we'd [1]**   177/23

**we'll [17]**   36/12
52/25 66/10 66/21
68/6 76/11 76/14
81/22 89/1 109/4
126/13 129/4 136/3
140/19 148/11
174/18 180/4

**we're [28]**   13/23
14/3 14/14 14/14
14/15 17/1 23/11
23/24 23/25 43/10
50/21 53/4 65/12
72/22 72/25 73/1
82/25 83/1 83/7
88/13 105/25
127/11 129/2
131/18 144/10
154/3 178/6 179/7

**we've [11]**   55/14
77/5 82/6 92/16
97/5 123/14 124/6
160/22 162/24
162/25 177/17

**website [3]**   55/2
55/11 74/19

**websites [2]**   54/25

148/25

**Wednesday [3]**   128/8
129/14 129/20
175/24

**week's [1]**   175/23

**weekend [7]**   175/16
176/6 176/9 180/7
180/12 180/25
181/3

**weeks [1]**   88/10

**Welcome [4]**   68/3
126/25 128/22
174/15

**well [41]**   4/12 5/6
5/7 5/19 7/1 12/17
13/3 14/3 15/25
23/4 28/12 32/5
33/17 52/15 57/11
60/5 63/11 64/15
65/12 70/22 73/7
84/2 85/16 86/3
88/4 95/22 103/5
103/17 107/2
111/15 117/22
134/3 137/17
140/19 143/15
146/24 156/7 174/2
176/3 179/18
180/18

**well-known [1]**
5/19

**went [4]**   18/17
35/10 138/25
139/21

**were [93]**   10/12
11/25 12/17 13/21
15/2 15/8 15/15
16/17 17/22 18/22
18/24 19/13 20/2
29/3 29/3 30/2
30/16 30/17 31/10
31/24 32/2 33/13
34/12 34/13 36/9
38/15 39/5 41/3

41/5 41/8 41/12
48/4 50/24
52/25 54/2 56/12
60/10 62/5 62/6
67/15 69/13 71/9
83/24 85/17 95/14
109/23 123/4 123/5
123/10 123/10
128/25 129/17
130/3 133/18
133/25 134/11
134/16 134/24
134/24 135/1
136/10 137/10
137/13 139/15
142/24 148/14
148/16 149/6
149/14 149/22
153/14 154/19
155/15 155/24
156/13 156/14
156/15 156/17
158/20 159/9 160/5
160/6 160/7 163/10
164/3 164/6 165/21
175/10 176/22
176/22 178/3 179/3

**weren't [4]**   19/5
25/19 78/13 147/2

**WEST [1]**   1/2

**Western [3]**   25/4
25/16 25/21

**what [148]**   7/23
9/16 10/11 10/16
12/7 12/24 13/12
14/10 19/2 21/17
21/22 21/23 23/16
23/24 24/4 26/2
26/25 27/21 29/25
30/6 31/24 32/22
33/7 33/11 34/9
34/12 34/15 35/20
36/1 36/11 39/12
39/13 39/15 40/16

**what... [114]**    41/8
41/19 43/10 44/24
47/15 48/14 50/5
53/11 53/22 55/8
56/18 59/4 59/15
60/1 60/9 61/6
64/5 64/6 64/23
66/20 68/15 69/16
70/25 72/16 73/5
73/8 74/5 75/15
80/7 81/5 84/12
85/19 85/20 87/2
87/6 87/22 87/23
89/24 90/12 92/19
93/9 95/15 97/3
98/10 99/3 101/5
103/11 105/25
107/15 107/19
109/10 111/15
118/7 118/14
120/22 127/19
129/24 130/19
132/4 132/13 134/3
134/15 135/9 138/3
138/6 140/7 141/16
142/9 142/24 143/3
143/25 144/3
146/15 146/24
147/4 147/11
147/11 147/12
147/12 149/19
150/3 150/6 150/11
154/18 154/19
156/13 158/19
158/24 159/11
160/22 161/2
161/23 162/7
162/22 162/23
163/13 163/14
164/10 165/3 165/4
165/7 165/7 165/9
166/4 166/19

167/15 167/18
167/24 177/12
177/15 178/12
178/19 179/22
180/8

**what's [10]**    5/21
10/25 15/23 18/18
24/19 32/5 69/2
156/2 165/16 174/5

**whatever [6]**    10/10
21/22 24/8 154/25
157/21 157/21

**whatsoever [2]**
8/16 55/16

**wheelchair [1]**
19/8

**when [52]**    5/20 6/7
9/2 9/5 9/10 9/12
18/17 21/17 23/25
27/15 27/16 27/20
27/23 28/6 29/14
30/11 39/14 41/18
53/15 56/12 57/11
57/11 72/25 74/8
90/23 95/14 101/5
133/25 134/24
137/10 140/1
140/25 140/25
144/7 149/12
149/21 151/5
151/17 156/24
157/9 157/22
157/23 160/24
161/2 162/18 163/5
170/16 170/19
172/15 178/24
179/1 179/25

**where [37]**    10/17
10/22 17/5 29/7
32/24 49/15 52/25
52/25 53/9 62/5
62/5 67/12 70/20
74/18 77/13 82/24
90/6 93/4 94/23

95/3 114/18 118/20
129/21 130/1
130/5 130/25 132/3
136/6 136/19
137/11 140/10
142/4 144/12
163/18 164/19
166/17 173/17

**WHEREOF [1]**    182/14

**whether [21]**    13/14
13/17 15/12 21/14
29/15 31/2 54/3
54/5 78/25 79/1
85/3 93/16 129/16
140/7 150/3 150/6
152/19 156/1 158/9
179/6 180/23

**which [36]**    7/2
10/18 12/16 13/8
16/8 19/13 19/18
22/24 23/10 23/10
30/19 46/12 52/16
56/9 78/2 85/22
87/24 109/1 117/24
124/11 125/9
141/21 147/23
150/11 150/21
152/5 153/20
153/25 159/7
160/20 162/3
165/10 165/14
168/1 173/2 179/13

**while [8]**    19/24
26/5 83/19 84/14
87/5 88/18 127/11
137/22

**whirlwind [1]**
118/11

**whitepaper [10]**
74/18 74/21 102/9
102/23 105/5
107/12 114/16
118/5 118/21 122/1

**who [34]**    5/19 9/2

**W**

**who... [32]**  13/6
13/11 13/11 31/17
40/3 63/9 94/15
98/11 124/24
129/21 130/17
131/21 131/23
133/8 133/8 140/20
145/15 146/7
146/13 146/25
146/25 147/4 147/5
149/7 151/13
158/13 160/9 161/1
161/13 169/6
171/11 172/4
**whoever [1]**  153/10
**whole [14]**  43/16
57/19 72/23 74/21
75/6 99/22 114/4
141/5 141/6 148/19
154/11 164/21
164/22 164/22
**whom [3]**  140/22
163/6 163/8
**why [19]**  7/7 10/13
15/21 28/21 35/1
35/2 52/15 54/2
65/12 65/13 71/2
98/12 110/13 136/7
136/7 149/12
151/15 153/22
175/11
**wife [3]**  19/3 63/1
160/15
**will [39]**  10/7
11/22 25/20 36/18
43/6 45/3 46/18
53/13 60/25 61/11
65/16 65/16 72/18
75/11 76/4 82/12
83/13 85/8 86/22
91/21 94/23 96/3
101/16 103/7 116/5

116/5 122/21
128/14 138/11 169/1
171/2 175/4 175/22
175/23 175/25
176/3 176/5 176/6
180/11
**willing [2]**  11/18
14/12
**Wipe [2]**  105/23
118/25
**wish [2]**  70/15
175/16
**withdrawing [1]**
178/7
**withdrawn [1]**  61/6
**within [7]**  5/7
11/23 15/18 36/8
38/5 172/16 175/20
**without [5]**  12/13
39/8 95/16 145/12
148/20
**witness [20]**  19/17
23/6 35/14 37/19
42/15 42/18 43/4
43/8 44/2 67/24
76/7 80/14 131/17
168/16 169/2 169/3
172/10 174/22
175/1 182/14
**witness's [1]**
84/22
**won't [1]**  158/24
**wonderful [1]**
176/6
**wondering [1]**
116/9
**word [2]**  59/16
148/20
**wording [1]**  142/12
**words [2]**  144/15
156/14
**work [16]**  6/4 6/5
9/15 16/24 24/6
30/8 30/14 30/16

33/11 45/17 90/7
120/20 128/24
130/19
**work-product [1]**
16/24
**worked [4]**  12/16
30/11 30/12 130/18
**working [7]**  109/14
116/8 130/20
130/25 131/3
163/14 169/15
**works [2]**  180/17
180/18
**world [3]**  79/1
108/19 141/13
**world's [1]**  21/8
**worth [2]**  155/20
172/19
**would [103]**  7/5
13/23 16/4 22/5
23/22 24/25 25/11
25/11 27/6 28/11
28/22 29/11 29/25
29/25 30/2 35/1
35/2 35/25 39/6
40/18 40/21 42/10
42/17 43/1 44/8
45/15 45/16 48/4
49/17 50/19 52/10
52/13 52/14 56/4
57/23 58/5 60/6
64/21 66/7 67/8
68/12 68/23 69/5
69/6 69/16 70/9
70/22 71/16 71/21
72/20 73/2 77/6
79/15 79/16 81/16
81/17 85/2 85/18
87/5 87/13 88/16
90/12 93/14 97/9
100/7 100/10 103/4
103/6 103/21
108/12 119/19

USGA11 Case 22-11150    Downloading-8[11]ate Filed: 91/30/20220 Page: 42 of 254/7

**W**

**would... [32]**
121/6 121/25
122/16 123/6
125/14 125/20
127/8 128/5 130/13
130/15 132/4 132/5
132/16 136/7
141/12 141/22
144/25 145/1
145/20 147/16
154/24 170/23
171/15 173/21
173/24 174/22
175/21 176/23
177/5 177/23 180/6
180/20

**would show [1]**
69/5

**wouldn't [8]**   29/2
31/21 84/1 84/10
93/22 109/16
112/20 136/11

**WRIGHT [202]**

**Wright's [17]**   7/4
12/2 41/13 63/1
87/11 93/7 132/10
133/19 138/20
139/3 139/23 144/6
156/3 157/14
157/17 158/9
160/13

**Wright.' [1]**
164/15

**write [10]**   46/20
103/18 103/19
108/5 108/8 108/11
108/12 130/1
167/10 168/22

**writes [10]**   10/19
46/25 49/16 50/1
50/12 77/22 95/4
116/1 117/22

120/18

**writing [11]**   92/13
96/20 98/7 102/23
103/4 103/4 103/22
108/16 113/12
117/18 121/1

**writings [1]**
107/23

**written [3]**   64/8
64/11 152/1

**wrong [7]**   19/14
19/15 20/5 40/7
88/14 95/20 135/21

**wrote [7]**   11/6
14/10 27/20 28/24
87/3 149/12 153/16

**Y**

**yeah [31]**   24/7
30/21 33/3 38/4
53/5 63/10 65/7
66/19 70/18 70/20
74/7 86/14 97/2
97/3 107/17 109/21
110/15 117/16
123/12 124/15
125/15 128/8
134/23 143/15
145/8 150/9 160/2
163/17 169/25
170/24 177/16

**year [6]**   4/20 10/9
14/8 68/16 88/14
116/4

**years [3]**   5/8 8/23
21/1

**Yep [1]**   98/10

**yes [356]**

**yesterday [15]**
4/16 4/22 6/3 6/7
8/3 8/17 13/11
26/4 27/15 56/13
57/3 64/1 102/7
178/13 179/3

**yet [8]**   49/23
92/20 93/4 94/14
130/16

**you [951]**

**you see [1]**   75/1

**you'll [5]**   10/3
17/2 67/23 113/23
128/18

**you're [18]**   6/19
6/21 8/21 25/14
35/8 40/13 47/25
99/24 163/22
163/23 164/10
164/25 165/17
165/20 167/3
167/10 167/15
180/23

**you've [6]**   7/1
55/16 63/16 143/11
144/20 174/3

**YouApp [1]**   47/1

**your [302]**

**yourself [1]**   155/8

**yvette [6]**   1/23
1/25 182/5 182/17
182/17 182/19

**Z**

**ZACK [1]**   1/16

**ZALMAN [2]**   1/21
171/12

**842**

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH DIVISION
                      CASE NO. 9:18-cv-80176-BB
 3
     IRA KLEIMAN, as the personal representative
 4   of the Estate of David Kleiman, and W&K Info
     Defense Research, LLC,
 5
               Plaintiffs,              November 8, 2021
 6                                      9:58 a.m.
            vs.
 7
     CRAIG WRIGHT,
 8
               Defendant.               Pages 1 THROUGH 255
 9   _____
                    TRANSCRIPT OF TRIAL DAY 6
10               BEFORE THE HONORABLE BETH BLOOM
                  UNITED STATES DISTRICT JUDGE
11                    And a Jury of 10

12   Appearances:
     FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
13                        DEVIN FREEDMAN, ESQ.
                          KYLE ROCHE, ESQ.
14                        JOSEPH M. DELICH, ESQ.
                          STEPHEN LAGOS, ESQ.
15                        200 South Biscayne, Suite 5500
                          Miami, Florida 33131
16
                          BOIES SCHILLER & FLEXNER
17                        ANDREW BRENNER, ESQ.
                          STEPHEN N. ZACK, ESQ.
18                        SAMANTHA M. LICATA, ESQ.
                          100 Southeast 2nd Street, Suite 2800
19                        Miami, Florida 33131

20   FOR THE DEFENDANT:   RIVERO MESTRE, LLP
                          ANDRES RIVERO, ESQ.
21                        AMANDA M. MCGOVERN, ESQ.
                          ZALMAN KASS, ESQ.
22                        2525 Ponce de Leon Boulevard, Suite 1000
                          Coral Gables, Florida 33134
23
     COURT REPORTER:      Yvette Hernandez
24                        U.S. District Court
                          400 North Miami Avenue, Room 10-2
25                        Miami, Florida 33128
                          yvette_hernandez@flsd.uscourts.gov
```

```
1                        I N D E X

2    Certificate.................................    255

3                   W I T N E S S
     ON BEHALF OF THE PLAINTIFF:                     PAGE
4    RAMONA WATTS
     (via deposition)                                  9
5
     ANDREW O'HAGAN
6    (via video deposition)                           83

7    CRAIG WRIGHT
     DIRECT EXAMINATION BY MR. FREEDMAN               86
8
                     E X H I B I T S
9    GOVERNMENT'S EX. NO.:              OFFERED   ADMITTED
     Plaintiffs' 748                      91          91
10   Plaintiffs' 459                     149         149
     Plaintiffs' 464                     158         158
11   Plaintiffs' 172                     167         167
     Plaintiffs' 200                     172         172
12   Plaintiffs' 439                     175         175
     Plaintiffs' 167                     178         178
13   Plaintiffs' 149                     188         188
     Plaintiffs' 189                     199         200
14   Plaintiffs' 305                     204         204
     Plaintiffs'  76                     213         213
15   Plaintiffs' 101                     214         214
     Plaintiffs' 102                     214         215
16   Plaintiffs'  43                     215         215
     Plaintiffs' 183                     216         217
17   Defendant's 221                     218         218
     Plaintiffs' 240                     218         223
18   Plaintiffs' 261                     223         223
     Plaintiffs' 299                     223         224
19   Plaintiffs' 332                     224         225
     Plaintiffs' 636                     225         226
20   Plaintiffs' 169                     226         227
     Plaintiffs'  51                     228         231
21   Plaintiffs'  54                     233         233
     Plaintiffs' 452                     233         233
22   Plaintiffs' 638                     240         241
     Plaintiffs' 403                     241         242
23   Plaintiffs' 457                     246         247
     Joint       114                     247         247
24   Plaintiffs'  75                     247         247
     Plaintiffs'  78                     247         247
25   Plaintiffs'  91                     247         247
```

1                    **E X H I B I T S** (Continued)

2    **EX. NO.:**                                      OFFERED    ADMITTED
     Plaintiffs'  92                                     247        247
3    Plaintiffs'  94                                     247        247
     Plaintiffs'  96                                     247        247
4    Plaintiffs'  97                                     247        247
     Joint         9                                     247        247
5    Plaintiffs' 291                                     247        247
     Plaintiffs' 305                                     247        247
6    Defendant's   3                                     247        247
     Joint         3                                     247        247
7    Joint        24                                     247        247
     Plaintiffs'  52                                     247        247
8    Plaintiffs'  53                                     247        247
     Plaintiffs'  57                                     247        247
9    Joint        10                                     247        247
     Joint        11                                     247        247
10   Plaintiffs'  33                                     247        247
     Plaintiffs' 349                                     247        247
11   Plaintiffs' 356                                     247        247
     Plaintiffs' 361                                     247        247
12   Plaintiffs' 392                                     247        247
     Plaintiffs' 405                                     247        247
13   Plaintiffs' 406                                     247        247
     Plaintiffs' 407                                     247        247
14   Plaintiffs' 408                                     247        247
     Plaintiffs' 410                                     247        247
15

16

17

18

19

20

21

22

23

24

25

```
1              (Call to order of the Court, 9:58 a.m.)
2              THE COURTROOM DEPUTY:  Calling Civil Case Number
3      18-80176, Ira Kleiman v. Craig Wright.
4              Counsel, please state your appearances for the record,
5      starting with Plaintiffs' counsel.
6              MR. FREEDMAN:  Good morning, Your Honor.  Vel Freedman
7      for the Plaintiffs.
8              MR. ROCHE:  Good morning, Your Honor.  Kyle Roche for
9      Plaintiffs.
10             MR. BRENNER:  Morning, Your Honor.  Andrew Brenner for
11     the Plaintiffs.
12             MR. ZACK:  Morning, Your Honor.  Stephen Zack for the
13     Plaintiffs.
14             MR. FREEDMAN:  Your Honor, we also have Stephen Lagos
15     for the Plaintiffs and Samantha Licata for the Plaintiffs, Joe
16     Delich for the Plaintiffs, as well as Mr. Ira Kleiman.
17             THE COURT:  All right.  Good morning to each of you.
18             MS. MCGOVERN:  Good morning, Your Honor.  Amanda
19     McGovern for the Defendant Craig Wright.  We also have Mr.
20     Zalman Kass for the Defendant Craig Wright, Amit Shah, who is
21     the IT for Craig Wright, Sara Gonzalez, who is our paralegal
22     for Craig Wright.  Of course, Dr. Wright is here as well.
23     Andres Rivero stepped out to the restroom.  He'll be right
24     back.
25             THE COURT:  And I see Mr. Rivero here as well.
```

```
1              Good morning to each of you.

2              I recognize that we were to make argument with regard

3     to the objections.  Let me ask -- and first let me apologize

4     that our criminal proceeding did take a little bit longer than

5     I anticipated.  However, would you be willing to stay this

6     afternoon, since I don't believe that any of the objections

7     relate to any of the testimony this morning?  Is that correct?

8              MR. BRENNER:  Sort of.  So the way we have been doing

9     the testimony so far, whether it's Plaintiffs' exhibits or

10    Defense exhibits, if they were part of the deposition we showed

11    them to the jury.  We'll do that again with Ms. Watts this

12    morning subject to the Court later when the exhibits formally

13    get admitted.  As far as this afternoon, I think that's fine.

14             I just wanted to give you a report on the meet and

15    confer.  Just really briefly.

16             THE COURT:  All right.  Certainly.

17             MR. BRENNER:  So Ms. McGovern and I had a productive

18    conversation Saturday, at which time the Defendant agreed to

19    withdraw objections to -- my count is it is 29 of the exhibits,

20    and then I went back and reviewed our exhibits.  I then

21    withdrew 10 of them.  So we're left with 32, maybe 33.

22    Ms. McGovern, she just has to confirm.  I believe one of those

23    has already been admitted.

24             So I have a list of those, which I sent to Ms.

25    McGovern last night, that should replace the list you had
```

1    before.  The first section says Continuing Dispute.  Those are

2    the documents that are still at issue.

3          THE COURT:  All right.  Why don't you provide the list

4    to Liz and then we can address that after court today.  Since

5    we do have all 10 jurors, it is 10:00, so I would like to

6    proceed and not waste their time.

7          MS. MCGOVERN:  Your Honor, if I could just say quickly

8    that we would simply like the opportunity to state our

9    objections to the remaining.

10          THE COURT:  Yes.  Of course.  Of course.

11          MS. MCGOVERN:  Perfect.

12          MR. BRENNER:  Can I approach, Your Honor?

13          THE COURT:  Yes.

14          Can you advise the witnesses that will be testifying

15    today?

16          MR. BRENNER:  Your Honor, we will start the day by

17    reading the deposition testimony of Ms. Ramona Watts, who is

18    Dr. Wright's wife.  Then we'll play the video deposition

19    testimony of Andrew O'Hagan.

20          It's always impossible to estimate exactly how long a

21    read is going to take.  My best estimate is somewhere between

22    an hour and 15 and an hour 30.  The video, I think, is 50, low

23    50s, is my recollection.  It's under an hour but more than 50.

24          Then we will put on Dr. Wright.  So that either is

25    going to be -- it should be right around the lunch hour.

1          THE COURT:  Okay.

2          MR. BRENNER:  Depending how things play out.

3          THE COURT:  All right.  Is there anything further we

4    need to address before we bring the jury in?

5          MS. MCGOVERN:  Your Honor, one quick thing.  I don't

6    know if it is helpful for recording this, but we don't have the

7    microphones that we had last week.

8          THE COURT:  Oh.  The lavaliers.

9          Alex, can we provide the attorneys with the lavaliers?

10         COURTROOM DEPUTY:  Of course.

11         MR. FREEDMAN:  Your Honor, one last thing.  I suspect,

12   though I may be wrong, that we might have a little bit more

13   people in attendance than usual.  It's a big day for the

14   Plaintiffs.  Could we just reserve either that first bench or

15   the second bench for the Plaintiffs' team?

16         THE COURT:  Do you want to just -- maybe we could let

17   the other court security officer that's coming just know not to

18   seat anybody there.

19         Thank you.

20         MR. FREEDMAN:  Thank you, Your Honor.

21         THE COURT:  All right.  Both sides, we have lavaliers

22   being handed out now.

23         Both sides ready to proceed?

24         MR. FREEDMAN:  Yes, Your Honor.

25         MR. BRENNER:  Yes, Your Honor.

1          THE COURT:  Okay.  Let's bring in the jury.

2      (Before the Jury, 10:03 a.m.)

3          THE COURT:  Good morning, Members of the Jury.

4          Please be seated, everyone.

5          It's so good to see each of you.  Thank you once again

6   for being so prompt.  I trust that each of you had a pleasant

7   weekend in this beautiful weather that we've been able to enjoy

8   and ready to get back to work.  Most importantly, I am glad to

9   see that everybody is here and is healthy, and we'll continue

10  with the Plaintiffs' case.

11         Go ahead and have a seat, everyone.

12         MR. FREEDMAN:  Good morning, Your Honor.  The

13  Plaintiffs are ready to call Ms. Ramona Watts, which will be

14  read deposition testimony.

15         THE COURT:  All right.  Is there someone that's going

16  to take the witness stand for that reading?

17         MR. FREEDMAN:  Yes, Your Honor.  Ms. Samantha Licata

18  will take the witness stand for Ms. Watts and Mr. Stephen Lagos

19  will be the lawyer asking the questions.

20         THE COURT:  Let me remind you, Ladies and Gentlemen,

21  that the deposition of Ramona Watts will be read.  Deposition

22  testimony is entitled to the same consideration as live

23  testimony.  You must evaluate and judge it as if the witness

24  were testifying in court.  Do not place any significance on the

25  behavior or tone or voice of any person reading the questions

```
 1    or the answers.
 2              MR. LAGOS:  May I begin, Your Honor?
 3              THE COURT:  Yes.  Of course.
 4              MR. LAGOS:  Thank you.
 5        (As read:)
 6    "Q.  Thank you, Ms. Watts.  Can you please state your full name
 7    for the record and spell your last name.
 8    "A.  I'm Ramona Watts.  W-A-T-T-S.
 9    "Q.  And, Ms. Watts, where is your permanent place of
10    residence?
11    "A.  Currently, I reside in Cobham, Surrey, in London.
12    "Q.  You are, in fact, married to Dr. Craig Wright?
13    "A.  I am.
14    "Q.  And how long have you two been married?
15    "A.  We were married in 2013.
16    "Q.  Okay.  When did you meet Dr. Wright?
17    "A.  At the end of 2010.
18    "Q.  When you met him, what were the circumstances in your
19    meeting?
20    "A.  We started as business associates in 2011.
21    "Q.  Okay.  Then sometime after that, obviously the
22    relationship changed and you ultimately got married in 2013?
23    "A.  Yes.
24    "Q.  And you have remained married since then?
25    "A.  Yes.
```

10

1    "Q.  Okay.  And it purports to be from Dr. Wright to

2    Ms. Nguyen, correct?"

3             MR. LAGOS:  Can you show Exhibit 4, please.

4             Thank you.

5             THE COURT:  Can everyone see it on your screen?

6             All right.

7       (Continued:)

8    "A.  I don't know.  I really don't know.  We had quite a few

9    problems in 2014.  We had our computers hacked, our personal

10   computers at home, and the computers in the office.  So quite

11   frankly, there are lots of emails back and forth even to me,

12   even from me, that were not mine.  We discovered that in 2014,

13   2015, I think.

14   "Q.  Do you believe what I have shown you as Exhibit 4, I

15   believe, is a hacked document?

16      "You can answer.

17   "A.  I really don't know.

18   "Q.  Okay.

19   "A.  As I said, I have reason to doubt many documents because

20   we were hacked so -- and I didn't write this one, so I really

21   don't know.

22   "Q.  Okay.  So let me go back to the trust formation, 2011.  Do

23   you know if there was a trust document drawn up at the time?

24   "A.  Yes.

25   "Q.  Was there?

1    "A.  Yes.  Definitely.

2    "Q.  Okay.  And did that -- that named you as a trustee,

3    correct?

4    "A.  Yes.

5    "Q.  Did it also name Dave Kleiman as a trustee?

6    "A.  No.  Dave Kleiman was never a trustee.

7    "Q.  Okay.  For the Tulip Trusts?

8    "A.  No.  Never.

9    "Q.  Did Dave, Dave Kleiman -- when I say Dave, I will try to

10   say Dave Kleiman.  Did Dave Kleiman hold any keys to any of the

11   Bitcoin?

12   "A.  To the Bitcoin, no.  He held keys, but they weren't to

13   Bitcoin.

14   "Q.  What were the keys to?

15   "A.  So he held key slices that were associated with -- it's

16   quite complicated.  So these are cryptographic keys, I believe.

17   They are key slices to a key.  And this key would actually open

18   electronic files.  So I know that Craig had tasked Dave with

19   sort of these key slices to be returned to him, but the key

20   slices were opening electronic files, and in the files there

21   were I think Craig's notes, algorithms, formula, that sort of

22   stuff.

23   "Q.  So Dave's keys were not to unlock any Bitcoin?

24   "A.  No."

25             THE COURT:  Can I ask both readers to just slow down

12

```
 1    if you could just a little bit.
 2            Thank you.
 3            MR. LAGOS:  Of course.  Thank you.
 4       (Continued:)
 5    "A.  Correct.  Dave's keys were not to unlock Bitcoin, no."
 6            MR. LAGOS:  Exhibit 5 was marked for identification.
 7       (Continued:)
 8    "Q.  Ms. Watts, do you have that in front of you?
 9    "A.  I do.
10    "Q.  That is a one-page document.
11       "Do you see that?
12    "A.  I do.
13    "Q.  Okay.  This one was in the documents I have given to you.
14    Actually, it was Watts 1, the first document.
15    "A.  Okay.
16    "Q.  Okay.  So this is -- first of all, is this an email that
17    you -- or a copy of an email that you wrote on or about May 28,
18    2012?
19    "A.  Frankly, it was eight years ago.  I'm looking at the date.
20    I don't recall the exact writing of it, but I am reading it now
21    and I recall the content definitely.  I don't recall writing it
22    then, but I recall having a huge fight with Craig in 2012 about
23    this exact topic.
24    "Q.  Okay.  So tell me what the fight was about.
25    "A.  I didn't understand what he was trying to do.
```

13

```
1    "Q.  What didn't you understand?

2    "A.  So in 2012, I was working two jobs.  We didn't have a lot

3    of money.  He was working day and night, and I was -- and it

4    was financially very difficult for us.  I had no idea really

5    what Bitcoin was all about.  We discussed the trust.  He said:

6    'You know, this is my life's work.  We're going to have -- make

7    sure there are certain rules to this trust so that the Bitcoin

8    can only be spent for certain things.'

9        "In 2012, here I am not being able to put decent food on

10   the table for my kids and I'm saying, you know:  'If there's

11   Bitcoin, why can't we just spend it?'

12   "Q.  Okay.  So in 2011, you were already the trustee for Tulip

13   Trust, which is holding shares in the company called Wright

14   International, which has a substantial amount of Bitcoin; is

15   that fair?

16   "A.  Yes.  It is fair.  But you have to understand that in 2011

17   I really didn't understand what Bitcoin was.  He said to me it

18   was some sort of digital cash and it was his thing and he said:

19   'This is, you know, something that we'll be using in the future

20   to fund other companies, to promote Bitcoin, to make it legal

21   again.'  Because it was used for nefarious purposes in 2011.

22   But in 2012, as I said, things were getting pretty desperate

23   and I said:  'Whatever it is that's in there, you know, you are

24   telling me you cannot touch it.  It's ridiculous.  So give me

25   some sort of explanation.'
```

14

```
1    "Q.  Let's go to the actual email.  Okay.

2    "A.  Yes.

3    "Q.  I'm going to focus on -- I guess it is technically the

4    third photograph that starts with the word 'so.'

5    "A.  Yes.

6    "Q.  Your understanding when you wrote this email was that

7    there was a lot of money in the trust and that Dave holds keys

8    and others do as well, correct?

9    "A.  But my understanding was wrong.  That's the thing.  So I

10   didn't actually understand.  I was just spewing out whatever I

11   felt at the time.  I was very angry.

12   "Q.  Okay.  At this point you thought your husband had money in

13   a trust, correct?

14   "A.  No.  I don't know what I thought.  To be honest with you,

15   I really don't know what I thought.  I just didn't understand.

16   I don't know if you have ever been in a fight with your wife,

17   but your wife, I am sure, will have said things that she

18   doesn't mean and doesn't understand, and that is exactly what

19   this is about.  He set me straight, though.  We had many, many

20   conversations after this, many more fights.

21   "Q.  Okay.  And how did he set you straight?

22   "A.  Well, he explained exactly what was going on.

23   "Q.  And he explained that --

24   "A.  Okay.  So he --

25   "Q.  Go ahead.
```

15

1  "A.  He explained that the keys that Dave had were actually

2  keys to -- they were key slices to another key, and if you had

3  all the key slices together, then you would have this one key,

4  this key that would be able to unlock an electronic file.  I

5  believe there were several of these, so there would be several

6  electronic files.

7      "He said in these electronic files there was his notes, all

8  his notes that he had written about Bitcoin.  So the start of

9  Bitcoin, how it started, why, the purposes behind it.  It had

10  formula and algorithms.  The formula and algorithms would allow

11  him to then calculate the private keys to the Bitcoin that was

12  in Wright International.

13  "Q.  At Wright International?

14  "A.  Basically what he was saying was that he didn't have

15  access to it because he didn't have the private keys.  Because

16  he and Dave had had an understanding where Dave had the keys to

17  the electronic file and so Craig didn't have the formula to

18  calculate the keys for the Bitcoin.  Then he said:  'And even

19  if I did, I couldn't do anything about it because it doesn't

20  fit the purpose of this trust.'

21  "Q.  Okay.  Let's talk about Dave Kleiman.  Did you ever meet

22  Dave Kleiman?

23  "A.  Not in person, no.

24  "Q.  Did you ever speak with Dave Kleiman?

25  "A.  Yes, I did.

16

```
 1    "Q.  Was that by telephone or by some sort of video connection,
 2    or both?
 3    "A.  I think mostly Skype.  I don't know if it was Skype, but
 4    yes, a video connection.
 5    "Q.  In your mind, you recall what he looks like?
 6    "A.  Yes.
 7    "Q.  Okay.  Dave Kleiman was a close friend of your husband's?
 8    "A.  Yes.  He was his best friend.
 9    "Q.  Was he a partner of your husband's?
10    "A.  In terms of work, no.
11    "Q. Is it your testimony that they did -- strike that.
12        "Did they work together?
13    "A.  I think so, yes.  I mean, Dave edited a lot of Craig's
14    papers.  I think they wrote a book together.  Yes, I think they
15    did.  They must have.  They wrote a book together.  I think
16    they wrote several books together, but I can't remember.
17    "Q.  So when you answered my question that they were not
18    partners in a work sense, what did you mean?
19    "A.  Well, I suppose it depends on what a partner means.  They
20    could have been.  I mean, I just said to someone the other day:
21    'Do you want to partner up and go to Costco and buy toilet
22    paper and split it up between us?'  Depends how you use the
23    word.
24    "Q.  The work that your husband and Mr. Kleiman did together
25    was not really analogous with going to Costco and buying toilet
```

1    paper, is it?

2    "A.  No, but I'm saying I use that word loosely.

3    "Q.  Okay.  Fair enough.

4    "A.  I use the word partner very loosely.

5    "Q.  They did work together on matters related to Bitcoin,

6    correct?

7    "A.  I don't think that the book they wrote together had

8    anything to do with Bitcoin.  I think it was more of a forensic

9    one, but I'm not sure.

10   "Q.  Go ahead.

11       That is not my question.  Not asking about the book.  I --

12   my question is, and I will try to be clear.  Your husband and

13   Dave did work together on matters relating to Bitcoin?

14   "A.  I don't know.  Can you be more specific?

15   "Q.  No, I cannot.

16   "A.  Well, then I cannot answer the question.

17   "Q.  Did your husband write the Bitcoin Whitepaper?

18   "A.  Yes, he did.

19   "Q.  Did Dave help him with that?

20   "A.  No, he didn't.

21   "Q.  How do you know that?

22   "A.  Craig told me.  When I met him in 2010, he said:  'I've

23   written something.  I have created something.  I've done

24   something.'  Plus, I have had many conversations with Dave.

25   "Q.  Maybe my word 'work' is bad.

18

```
 1        "Do you know if Dave helped edit the Bitcoin Whitepaper?
 2   "A.  I don't know if he edited it, no.  I don't know.
 3   "Q.  Sure.  Did he ever say to you that he had no involvement
 4   in Bitcoin?  Did Dave ever say that?
 5   "A.  Well, that would be a very strange thing to say to me.
 6   Hi, Ramona, I have no involvement in Bitcoin.
 7   "Q.  I agree.
 8   "A.  That would be a very strange thing to say to me.  No.
 9   "Q.  It would be great if I can remember it.  My question was:
10   Did Craig ever tell you why Dave would ask to hold key slices
11   related to the trust?
12   "A.  The key slices were not related to the trust at all.  The
13   key slices were related to electronic files that had Craig's
14   notes in it.  It had nothing to do with the trust.
15   "Q.  Okay.  So the key slices only were to files that included
16   Craig's notes?
17   "A.  Yes.
18   "Q.  And did those notes have anything to do with the ability
19   to access Bitcoin?
20   "A.  So those notes were the beginnings of Bitcoin and how he
21   had written it and why he had written it and all his research.
22   In those notes were the formulas and algorithms on how you
23   calculate private keys.
24   "Q.  Right, but in those notes was the ability to -- was it in
25   those notes the private keys to the Bitcoin that had been mined
```

19

1    that was now part of Wright International?

2    "A.  Those notes had nothing to do with private keys.  Those

3    notes were all his notes on how he created Bitcoin and all of

4    the research and all of the formula and algorithms.

5    "Q.  Did you witness Dr. Wright's receipt of the file

6    containing the public addresses?

7    "A.  Well, I received files.  I don't know what they were.  So

8    if there were public addresses in them, then he would have had

9    them.

10    "Q.  The truth is, you don't know if those files contained the

11    public addresses?

12    "A.  Mr. Brenner, do you know that my husband has Asperger's

13    and struggles a great deal, actually, to express himself and to

14    interpret himself?  I have troubles with him all the time.  I

15    have fights with him all the time.

16       "In the 10 years that we've been together, we used to fight

17    every day initially --

18    "Q.  Okay.

19    "A.  -- because he has an inability to express himself simply

20    and succinctly.  So sometimes when he writes things and

21    sometimes when he says things, it's not what we perceive it to

22    be; it is how he perceives it to be.  He is literal beyond

23    anything.  So if he thinks that I -- if he thinks that I knew

24    something just because he knew something, he would say that

25    exactly in this sort of case.

20

```
1        "We had so many troubles.  When he was supposed to pick a
2    child -- pick up a child and he didn't pick the child up
3    because of certain things that he said.  You're asking me to
4    interpret what he said.  I wasn't even a party to this.  I have
5    never read this before.  I am just telling the truth of what I
6    have seen and what I have heard.
7        "What I have seen and what I have sent or what I have not
8    sent, he really struggles with expressing himself correctly.  I
9    think that is probably why he gets into so many problems, with
10   me primarily, but everyone else.  He struggles with looking at
11   you in the eye when he talks to you.  It has taken me 10 years,
12   and I live with him -- it has taken me 10 years for him to look
13   me in the eye when he talks to me.
14   "Q.  Did any of the companies that you were a director of ever
15   use intellectual property that had been developed by W&K Info
16   Defense?
17   "A.  I don't recall.
18   "Q.  You don't recall or the answer is -- that is it, you don't
19   recall?
20   "A.  Yes.  I really don't remember.
21   "Q.  Do you know if W&K Info Defense ever had Bitcoin?
22   "A.  Well, I wasn't part of W&K.  So I actually really don't
23   know.
24   "Q.  Do you think -- do you know if your husband was ever
25   involved with W&K Info Defense?
```

21

```
 1    "A.  I don't know.
 2    "Q.  Do you know if Dave Kleiman was ever involved with W&K
 3    Info Defense?
 4    "A.  I think so, because I'm sure Craig had said that it was
 5    Lynn's company with Dave."
 6              MR. LAGOS:  Exhibit 8 was marked for identification.
 7       (Continued:)
 8    "Q.  When it says:  'IP deed of assignment,' do you understand
 9    that 'IP' means intellectual property?
10    "A.  I do.
11    "Q.  Do you recognize this document?
12    "A.  It's familiar.
13    "Q.  Okay.  Turn to Page 8 for me, please.
14    "A.  Yes.
15    "Q.  There are two signatures there, are there not?
16    "A.  Yes.
17    "Q.  The first signature, it purports to be from you.  Is that
18    your signature?
19    "A.  It looks like it is my signature.
20    "Q.  Then the second signature, I think it is fair to say it
21    purports to be Dr. Wright; is that correct?
22    "A.  That is what it says.
23    "Q.  Okay.  And you were signing on behalf of DeMorgan,
24    correct, as the assignor?
25    "A.  Yes.  It would say -- yes, that is right.
```

22

```
 1    "Q.  So you think this is another company you were an

 2    authorized signatory for?

 3    "A.  No.  I think this would be the representative of the Tulip

 4    Trust, but, as I said, because I don't have all the paperwork

 5    in front of me, I cannot confirm that.

 6    "Q.  Okay.  Whatever the company is you are signing on its

 7    behalf, correct?

 8    "A.  Yes.

 9    "Q.  And it is purporting to assign certain intellectual

10    property, correct?

11    "A.  Can you point me to the page where it says --

12    "Q.  It is Page 3.

13    "A.  Yes.

14    "Q.  Do you see that?

15    "A.  I do.

16    "Q.  It says that the assignor owns the intellectual property

17    and intellectual property rights in the core technology.

18        "Do you see that?

19    "A.  Yes.

20    "Q.  What is the core technology?

21    "A.  I don't recall what the actual core technology was.  It's

22    not described in here.  It's not in detail.

23    "Q.  Yes, it is.  Let's go to page -- unfortunately, these are

24    not page numbered.  It is the sixth page of the document.

25        "The core technology is defined there, correct?  It has to
```

23

```
1    do with certain banking technology?

2    "A.  Sure.  Okay.  Yes.

3    "Q.  If you go back to Page 3, please.  The assignee is

4    Coin-Exch. Party Limited?"

5            MS. LICATA:  I want to make sure we're not waiting on

6    a document.

7        (Pause in proceedings.)

8            MR. LAGOS:  Going to resume here.

9        (Continued:)

10   "Q.  If you go back to Page 3, please.  The assignee is

11   Coin-Exch. Party Limited?

12   A.  That's right.

13   "Q.  That is also a company that you were a director for?

14   "A.  Yes.

15   "Q.  Also a company that Dr. Wright was a director for?

16   "A.  I don't know if he was a director.  I know I was.

17   "Q.  Okay.  This assignment is dated -- if you look at the

18   front page, it is September 15th, 2013.  Do you see that?

19   "A.  Yes.

20   "Q.  And that also coincides -- so you know, it is the same

21   date that the signatures are -- same date at least typed on the

22   signature page.

23   "A.  Sure.

24   "Q.  So September 15th, 2013 is how long after Dave Kleiman

25   dies?
```

24

```
1    "A.  I don't remember when he died.  I know he died in 2013.

2    "Q.  You don't recall he died in April of 2013?

3    "A.  No.

4    "Q.  I represent to you, then, that he dies in April 2013.

5    "A.  Yes.

6    "Q.  This is five months later, right?

7    "A.  Sure.

8    "Q.  Let us see what the Wright Family Trust de Morgan,

9    whatever that company is -- let us see what it is claiming is

10   the IP that it holds.  Okay.

11       "Do you see that -- do you follow with me, that is what I'm

12   going to do with you?  Okay?

13   "A.  Okay.

14   "Q.  If you look at Paragraph 3B -- I'm sorry.  Page 3.

15   "A.  Yes.

16   "Q.  It says:  'the IP held in total by DeMorgan' -- describing

17   what IP de Morgan holds, correct?

18   "A.  Yes.

19   "Q. -- 'consists of source code, algorithms, and technical

20   materials that have been obtained by Craig Wright R&D.'

21       "Do you see that?

22   "A.  I do.

23   "Q.  That is your husband's company?

24   "A.  Craig Wright R&D, I don't know what it is.  It was a

25   company.  I'm not sure if it was his.  It was a company.
```

25

1    "Q.  You are not sure Craig Wright R&D is Craig Wright's

2    company?

3    "A.  They are all documented in corporate records, so there are

4    different assignments for different things.  I really don't

5    know.

6    "Q.  Okay.  Then it says -- it describes how Craig Wright R&D

7    obtained the IP, does it not?

8    "A.  It doesn't say that that is how it is obtained, but --

9    yes, it actually does:  'Obtained by Craig Wright R&D.'

10    "Q.  Yes.  It says it was obtained by Craig Wright from three

11    sources, Craig Wright R&D by three sources?

12    "A.  Yes.

13    "Q.  One of the sources we talked about earlier was MJF Mining

14    Services, correct?

15    "A.  That's right.

16    "Q.  That was something that was actually paid for using

17    Bitcoin, correct?

18    "A.  I believe so.

19    "Q.  Then there was a second purchase from MJF Mining Services,

20    also paid for using Bitcoin, correct?

21    "A.  You see, I don't know, because I wasn't involved with

22    these purchases.  So I actually don't know.

23    "Q.  Well, you were -- it actually is you.  You are the

24    authorized signatory for this document.  Are you not?

25    "A.  But I was not involved with the purchase of MJF Mining

26

```
 1   when he purchased -- when Craig Wright R&D purchased those,

 2   whatever he purchased from these people.

 3   "Q.  Let me rephrase it.  This is an assignment of certain IP

 4   by a company that you are the authorized signatory.

 5   "A.  That is correct.

 6   "Q.  Sure.  I'm just asking, in this assignment, when you're

 7   assigning intellectual property on behalf of de Morgan, did you

 8   confirm that you actually -- the company actually had what it

 9   was assigning?

10   "A.  I had our accountants do that.

11   "Q.  Okay.  And you were comfortable enough to sign your name

12   to it, correct?

13   "A.  Yes.

14   "Q.  Then the third place you got that de Morgan, got IP, was

15   from W&K Info Defense Research, LLC; is that right?

16   "A.  That's what it says here.  But as I said, we had financial

17   controllers and accountants at that time.  So I got a lot of my

18   advice from them.

19   "Q.  But you trust them, correct?

20   "A.  Of course I do.  Yes.

21   "Q.  Right.  And they confirmed to you that you have this IP to

22   assign it?

23   "A.  They did, yes.

24   "Q.  And they confirmed to you it was accurate that in part the

25   IP had been obtained from W&K Info Defense Research, LLC,
```

27

```
1    correct?
2    "A.  I believe so.  I'm not quite sure if this was actually
3    carried out.  That's the problem.
4        "We did a lot of -- there were lots of deeds and there were
5    lots of contracts and some of them were in draft form.  I'm not
6    sure if this was actually carried out, to be perfectly honest
7    with you.  I don't know.
8    "Q.  It was signed by two parties, correct?
9    "A.  Yes.
10   "Q.  Both parties to the contract, correct?
11   "A.  Yes.
12   "Q.  And you just don't know if the assignment actually took
13   place, correct?
14   "A.  I cannot confirm that it did.  I really cannot.  Unless I
15   actually saw some corporate documents that said it actually
16   occurred.
17   "Q.  When it was through or not, you have no reason to dispute
18   as of September 15th, 2013 DeMorgan, the Wright Family Trust,
19   was claiming IP that was once held by W&K Info Defense
20   Research, LLC, do you?
21   "A.  I don't know the details.  I really don't.  As I said, I
22   had my accountants, my financial controllers give me advice on
23   that.  So I don't know.
24   "Q.  My only question is:  Do you have any reason to dispute
25   the accuracy of this document?
```

28

1    "A.   Currently, I have a lot of reason to doubt, actually,

2    because I said to you before we had -- our computers were

3    hacked.  So I'm very jaded.  I really don't know what is real

4    and what's not anymore.

5    "Q.  So when was the computer hacked?

6    "A.   In 2014, we knew that our computer was hacked.  I don't

7    know whether it was hacked in 2013 or not.  But in 2014, we

8    were getting very, very strange messages.

9    "Q.  So you think it is possible that someone hacked your

10   computer, made a document, dated it to 2013, forged your

11   signature, forged Dr. Wright's signature, and therefore you

12   doubt the authenticity of this exhibit.  Is that your

13   testimony?

14   "A.   No.  I didn't say that at all.  You asked me whether I

15   doubt the authenticity of this document, and I really don't

16   know.  As I said, I really don't know.  It could be perfectly

17   valid and it might not be.  I do not know.  You are asking me

18   to tell the truth.  I am telling you the truth.

19   "Q.  Of course.  Putting aside the document, do you doubt that

20   various entities of which you were a director obtained IP once

21   held by W&K Information Defense?  Do you doubt that?

22   "A.   I don't know, because I don't have the actual records in

23   front of me.  If I did, if I could see the actual assignments

24   and if I knew that they were actually carried out, that is a

25   different story.  But I don't.

29

```
 1        "These are photocopies.  These are things that might -- I
 2    don't know who handed these ones in.  They could have been from
 3    our computers that were hacked.  So I don't know.  If I went
 4    straight directly to our corporate secretary, who could give me
 5    all the corporate records, then I could answer your question.
 6    "Q.  Who is your corporate secretary?
 7    "A.  In Australia.  I do not remember.  We had a corporate
 8    secretary in Brisbane.  I don't remember the names.
 9    "Q.  If I were sitting here and I wanted to know if this
10    document was authentic, are you telling me that you cannot
11    answer that question?
12    "A.  Yes.  I don't know.
13    "Q.  Are you telling me that you don't know who can answer that
14    question?
15    "A.  I don't know.
16    "Q.  Okay.  Let's look at another one.  Let's go to Tab 30.
17        "Are you there?
18    "A.  Yes.
19    "Q.  Do you recognize this document?
20    "A.  I recognize something similar to this.  Yes.
21    "Q.  Okay.  It is a document that is produced by a company
22    called Business Reports and Values, correct?
23    "A.  Yes.
24    "Q.  That was a company that was retained by entities you were
25    affiliated with to do evaluation of certain engineering,
```

1  correct?

2  "A.  That is right.

3  "Q.  The companies of which the valuations were being done, one

4  was called Cloudcroft; is that right?

5  "A.  Yes.

6  "Q.  You were a director of that company, correct?

7  "A.  I don't remember.

8  "Q.  Shall we call this Exhibit 9."

9        MR. LAGOS:  Exhibit 9 was marked for identification.

10     (Continued:)

11  "Q.  You don't recall whether you were a director of Cloudcroft

12  at any point?

13  "A.  So, Mr. Brenner, as I explained to you before, I was a

14  director of many companies over many years.  At some point I

15  was a director and at other points I wasn't a director of

16  different companies.  So you're asking me to recall now if I

17  was a director of a particular company seven years ago, eight

18  years ago.  I don't recall.  No.

19  "Q.  So my question may have been imprecise.  I'm not asking on

20  this date.  I'm asking at any point were you a contractor of

21  Cloudcroft?

22  "A.  I don't remember.  I was a director for many different

23  companies at many different times.

24  "Q.  If you turn to Page 7 of the document.  Do you see that?

25  "A.  I do.

31

```
 1    "Q.  Okay.  It says:  'the valuation report is concerned with

 2    valuing source code at the -- of four separate companies.'

 3       "Do you see that?

 4    "A.  Yes.

 5    "Q.  And that is consistent with your recollection that over

 6    the years you did valuations for various companies that you

 7    were involved with, correct?

 8    "A.  Yes, we did.

 9    "Q.  Let's see if the next paragraph refreshes your

10    recollection of whether you are a director.  It says:

11    'ownership and capital structure.'

12       "Do you see that?

13    "A.  Yes.

14    "Q.  It says:  'the controlling entity for the above, which is

15    the four companies, is DeMorgan, Limited.'

16       "Do you see that?

17    "A.  Yes.

18    "Q.  So these are four companies that were controlled by de

19    Morgan, Limited, correct?

20    "A.  That is correct.

21    "Q.  And those companies, the directors of those companies,

22    there is a grand total of two people, correct?

23    "A.  That is what it says here.

24    "Q.  One is Dr. Craig Steven Wright, correct?

25    "A.  That is what it says here, yes.
```

32

```
1    "Q.  And one is Ramona Watts.  That is you, correct?

2    "A.  That is what it says.

3    "Q.  Okay.  Let us look at -- give me one second.

4        "Turn to Page 15.  Are you there?

5    "A.  Yes.

6    "Q.  Okay.  Then it says that Hotwire purchased the package

7    relating to the Bitcoin banking system from that entity,

8    correct?

9    "A.  That is what it says here.

10   "Q.  You have no reason to dispute that, correct?

11   "A.  No, I don't.  But I don't know.

12   "Q.  If you go to the end of that page.  Do you see that?

13   "A.  Yes.

14   "Q.  The last paragraph?

15   "A.  Yes.

16   "Q.  It says -- in the last sentence it says:  'Hotwire will be

17   able to develop an internationally recognized Bitcoin banking

18   system based on the W&K ID software.'

19       "Do you have any reason to dispute the accuracy of that?

20   "A.  No.  I don't think so.  No.

21   "Q.  The next page is -- we finished Page 15.  We are on Page

22   16.  Okay?

23   "A.  Yes.

24   "Q.  That is a discussion of Cloudcroft, right?

25   "A.  Yes.
```

33

1    "Q.  It says it is an Australian company specializing in

2    developing and researching systems preventing cyber criminal

3    attacks, correct?

4    "A.  That is what it says, yes.

5    "Q.  Do you have any reason to dispute that?

6    "A.  I don't have all my company records on me.  So I don't

7    currently.  But if I did, it might be different.  I didn't

8    write this so I really don't know.

9    "Q.  Okay.

10   "A.  I do not know if it is accurate.

11   "Q.  If you go to the bottom of that page, where it describes

12   what percentage of the source code used by Cloudcroft is coming

13   from W&K.

14       "Do you see that?

15   "A.  Yes.

16   "Q.  And it says:  'w&K source accounted for 46 percent of the

17   source for Cloudcroft,' correct?

18   "A.  That is what it says.  I do not know what it means

19   exactly.  As I said, I didn't write this.

20   "Q.  Then it says at the end:  'w&K source will enable research

21   activities associated with a virtual universe.'

22       "Do you see that?

23   "A.  I see what it says.

24   "Q.  Any reason to dispute it?

25   "A.  As I said, I didn't write it.  So I don't know where it

34

1    came from.

2    "Q.  My question is:  Regardless of what the document says, do

3    you have any reason to dispute, based on you being a director

4    of de Morgan, Limited, which was the controlling entity of

5    Cloudcroft, the description that Cloudcroft was using -- was

6    obtaining 46 percent of its source share from W&K?

7    "A.  Well, I don't have the company records in front of me to

8    check, so I don't know.

9    "Q.  Let us go to the next one, which is Hotwire PE.

10   "A.  Uh-huh.

11   "Q.  That one you actually have better recollection because you

12   actually worked for that company too, correct?

13   "A.  I did.

14   "Q.  You were the people officer?

15   "A.  I was.

16   "Q.  What is that?

17   "A.  It's an HR role, really.

18   "Q.  Good name.

19       "It says:  'Hotwire PE accelerates early-stage

20   technological and scientific research programs creating

21   world-class solution platforms.'

22       "Do you see that?

23   "A.  Yes.

24   "Q.  Do you think that a fair description, at least on a

25   general basis, of what Hotwire was doing?

35

```
 1    "A.   That one, yes.  I would say it was, yes.

 2    "Q.   'The primary focus is on high-leverage automated systems

 3    with potential to change how the world operates on a day-to-day

 4    basis.'

 5       "Do you agree with that statement?

 6    "A.   I do.

 7    "Q.   You agree with that.  Do you understand and agree that

 8    that in part had to do with using Bitcoin?

 9    "A.   No, it does not say that.

10    "Q.   I'm not asking if it says that.  Do you understand that

11    'to change how the world operates on a day-to-day basis' was in

12    part relating to the use of crypto coin?

13    "A.   No.

14    "Q.   Then it says:  'working with both government and

15    commercial partners, the company seeks to leverage the

16    opportunities of a globally interconnected cyberspace, thereby

17    opening opportunities for commerce and trade.'

18       "Is that a fair description of what Hotwire was doing?

19    "A.   Yes.

20    "Q.   Okay.  Then if you can scroll down, it also allocates and

21    says that 32 percent of the source shares come from W&K.

22       "Do you see that?

23    "A.   Well, I don't know what it means.  As I said, I didn't

24    write this.

25    "Q.   Do you have any reason to dispute that?
```

36

```
 1    "A.  I don't have any company records in front of me so I
 2    cannot really say if this is accurate or not.
 3    "Q.  By the way, do you have any doubt -- the authenticity of
 4    this document?
 5    "A.  I don't know.
 6    "Q.  You don't know one way or another?
 7    "A.  I don't.
 8    "Q.  Okay.  Do you have an independent recollection of
 9    retaining Business Reports and Values for anything?
10    "A.  I know we did do something very similar.  It could very
11    well be this document.  I really don't know.  We did a
12    valuation, and I believe it was with -- is it BRV?  I think
13    that was one of the companies.  So I know we did a valuation.
14    I don't know if this was the final report.  I don't know if
15    there were several reports.  I don't know if this is a draft.
16    I don't know.
17    "Q.  Okay.  It is BRV, just for the record.  Business Reports
18    and Values.
19    "A.  Sure.  Yes.
20    "Q.  You recognize that company.  You just don't remember this
21    particular report?
22    "A.  I don't remember this particular report.  I remember
23    receiving reports from them.  I do not know whether it is this
24    one.  I don't know if this one is the first or the final or the
25    draft.  I don't know.
```

37

1     "This could be incorrect and we could have pulled them up

2     and said:  'Look, you know, this is wrong.  Do it again.'

3     Because a lot of times it was our accountant who actually dealt

4     with them, and if our accountant did not understand something

5     and sent something off, then it would not have been correct and

6     we would have had to correct them.

7     "Q.  Page 4.  I will keep going.  On the bottom of Page 17, it

8     says:  'w&K source will enable the creation of world-class

9     solution platforms in support to research activities undertaken

10    as part of Coin-Exch., CO1N, and Cloudcroft.'

11       "Do you see that?

12    "A.  I see that that was written, yes.

13    "Q.  Any reason to dispute it?

14    "A.  As I have said, again, and I will say it again, I do not

15    have any of my corporate records in front of me, so I cannot

16    check.  I do not know if this is a draft, first draft, second

17    draft, or the tenth draft.

18    "Q.  Okay.

19    "A.  Our accountants liaised with these people.  Our

20    accountants often made -- sometimes made mistakes or didn't

21    understand something.  They would come to us to check.  We

22    would then go with our corporate records, with our corporate

23    secretary, and say this is wrong or this is right.  But I would

24    then have all of my records in front of me so I could check.

25       "You are asking me to authenticate something and I have

```
 1   nothing to do -- and I have nothing in front of me to check.
 2   So I cannot do that.
 3   "Q.  Okay.  I'm not sure you have nothing, but let's see if
 4   this helps you.  Let's go to Page 23.
 5      "This is not a draft, is it, ma'am?  This is a signed
 6   document, isn't it?
 7   "A.  I can see a signature, but I do not know if it is a draft
 8   or not.
 9   "Q.  Let's go back again.  Go back to Page 7.  Do you see that?
10   Do you see that?  It is an evaluation of four companies.
11   Cloudcroft, Hotwire, Coin-Exch. and CO1N, correct?
12   "A.  That is what the document says.
13   "Q.  According to the document, those are all part of the
14   holding company and controlled by something called de Morgan
15   Limited, correct?
16   A.  Well, it is according to this document, that I didn't
17   write.  And as I said to you before, we have had many drafts of
18   different documents and have perhaps gone back and said:  'This
19   is not right' or 'This is incorrect.' I do not know if this is
20   the first draft or the final draft.
21   "Q.  Okay.  And you are identified as a director of DeMorgan,
22   Limited, correct?
23   "A.  I have always said that I am a director of DeMorgan, yes.
24   "Q.  Thank you.  Let's go back to Page 18 now.
25      This is Coin-Exch., correct?
```

39

```
 1    "A.  That is right.

 2    "Q.  This one clearly has to do with Bitcoin.  Does it?

 3    "A.  It was an exchange platform, so yes.

 4    "Q.  'Coin-Exch. will offer exchanges in trades between

 5    Australia dollars and Bitcoins,' correct?

 6    "A.  Yes.

 7    "Q.  'It will also offer trading products with the ability to

 8    exchange Bitcoin with other national currencies, commodities,

 9    and Bitcoin derivatives,' correct?

10    "A.  You see, this is what it says, but you understand that

11    Coin-Exch. never did that in the end.

12    "Q.  Okay.  Did I read it correctly?

13    "A.  You read it correctly, and the wording here is correct,

14    but it's not -- it did not actually do that in the end.  We did

15    not have the right staff.  We didn't have enough resources to

16    do it.  So a lot of what it says here in this document, they

17    are lovely words, but a lot of it didn't actually happen.

18    "Q.  Okay.  It say that Coin-Exch. is also using W&K source,

19    does it not?

20    "A.  That is what it says on this piece of paper.  I actually

21    don't even know if it is using it to source.  It says:  'source

22    share,' and I actually really do not understand that.  I don't

23    know what it means because I didn't write it.

24    "Q.  Okay.  Then the next -- at the end it says:  'w&K source

25    will enable the creating of a fast and stable trading platform,
```

40

1    trade Bitcoin as fundamental currency to buy and sell

2    traditional assets and securities,' correct?

3    "A.   That is what is written on this piece of paper.

4    "Q.   The last one is CO1N.  Am I pronouncing that right?

5    Because it is a number.

6        "Do you refer to it as CO1N?

7    "A.   It is CO1N, yes.

8    "Q.   This one, this company also had to do with Bitcoin, does

9    it not?

10   "A.   It does not have to do with Bitcoin.  This was a wallet

11   that we were trying to produce.

12   "Q.   'CO1N is offering an online scalable eWallet solution with

13   secure vault technology for the Bitcoin market,' correct?

14   "A.   It does not have to do with Bitcoin.

15   "Q.   Okay.  Has to do with Bitcoin wallets?

16   "A.   It is a wallet.  It is a Bitcoin wallet, yes.

17   "Q.   Yes, ma'am.  Again, the same thing, using W&K source,

18   correct?

19   "A.   I don't know.  I do not know what it means when it -- as

20   source share because I didn't write this.  I did not provide

21   the information for any of this.

22   "Q.   Okay.  It says:  'W&K source will enable the development

23   of transaction protocols and the rule-based algorithms to

24   significantly reduce transaction times and design novel

25   security protocols and encryption algorithms without

1    compromising transaction times or scalability.'

2        "Do you have any reason to dispute that?

3    "A.  I don't know whether this actually happened or not.  I

4    know that we never finished the wallet.  As with Coin-Exch., we

5    did have the resources and we did not have the people.  So I

6    can tell you that this was not finished.  It wasn't even half

7    done, I don't think, which is very disappointing because when

8    we started this, there was so much potential.

9    "Q.  At the very end there, there is a conclusion about the

10   valuation, is there not?  Page 23.  It is near the very end.

11   Not the very end.

12   "A.  That's right.

13   "Q.  For those four companies, it assigns the value of the

14   software, which used in part W&K source, at $378,475,713,

15   correct?

16   "A.  That is what is written there, but I do not understand

17   when it says using W&K source.  I did not provide the

18   information.  I don't know if any of this information is

19   correct.

20   "Q.  Ms. Watts, there came a time after Mr. Kleiman, Dave

21   Kleiman, passed away, that you had communications with Ira

22   Kleiman.  Do you recall that?

23   "A.  I do, yes.

24   "Q.  Do you know why Craig was reaching out to Louis?

25   "A.  Yes.

42

```
1    "Q.  Why is that?
2    "A.  Because Craig had offered Dave shares in -- I think it was
3    Coin-Exch., for Dave to do some work for Coin-Exch.  The work
4    was not done, though, because Dave actually died, but Craig
5    said that it was the right thing to do, to give it to his
6    father.
7    "Q.  So let me see if I can summarize that a little bit.  I
8    think you did a pretty good job.
9       "Before Dave died, it is your understanding that Dave was
10   going to do certain work for Coin-Exch. in exchange for shares
11   in that company?
12   "A.  Yes.  Well, it was not my understanding.  I mean, we were
13   all at a meeting.  So there was -- I cannot remember when we
14   had this meeting, but we had several people on board.  I do not
15   think it was other directors because I don't think there were
16   other directors at the time.  But we had -- I cannot remember
17   who they are now, but I recall having a Coin-Exch. meeting
18   where Dave was supposed to have done some work, yes.
19   "Q.  Okay.  Am I right in assuming that Dave was not physically
20   present at that meeting?
21   "A.  No.  He dialed in remotely.
22   "Q.  Do you recall at least part of his remuneration was going
23   to be shares in Coin-Exch.?
24   "A.  I do not even know if it was a remuneration, but yes, it
25   was an agreement that he would get shares in Coin-Exch. for
```

43

```
 1    certain work that he was supposed to have done.
 2    "Q.  You said that Dave died before the work was done, and I'm
 3    just making sure I understand.
 4        "Were the contracts done but the work was not completed yet
 5    or the contracts didn't get done before Dave died?
 6    "A.  I think the contract was actually done.
 7    "Q.  Okay.  And Dave, because -- whether it is because of his
 8    illness and ultimately his passing, or whatever else the
 9    reason, by the time he dies the work was not complete?
10    "A.  No, not at all.
11    "Q.  Was it started?
12    "A.  I do not think it was even started.
13    "Q.  And now to bring us back to where we were.  Your
14    understanding is Craig reached out to Louis, Louis Kleiman, to
15    make sure that he got the shares in Coin-Exch. that Dave was
16    supposed to get.
17    "A.  Well, not so much him, but Dave's estate, I suppose,
18    whoever was meant to get the shares.
19    "Q.  So we were talking about Exhibit 8.
20        "Thank you so much.
21        "This was the de Morgan IP deed of assignment.  Do you
22    recall that?
23    "A.  I recall you and I having a conversation about this.
24    "Q.  Sure.  That is all I'm asking at this point.
25        "Can you go to Page 3 of that document.
```

44

```
1    "A.  Yes.

2    "Q.  I'm focused on Paragraph D.  Do you see that?

3    "A.  Uh-huh.

4    "Q.  'it is noted that although the contract with W&K Info

5    Defense Research, LLC' -- that is what we've been referring to

6    as W&K, correct?

7    "A.  I don't know.  I do not know how many W&Ks there are.  I

8    really don't know.

9    "Q.  Okay.

10   "A.  I have noticed there are several, actually.  So there's a

11   W&K Information Defense Research, there's W&K ID.  Is there

12   just something called W&K?  I do not know of -- I'm sure they

13   are all separate.  I do not think they are all one entity.

14   "Q.  You don't think W&K ID is short for W&K Information

15   Defense?  That doesn't make sense to you?

16   "A.  I don't know.  I didn't set this up, so I don't know.

17   "Q.  Which one did you think was Dave and Lynn's company, then?

18   Which one are you talking about?

19   "A.  Definitely W&K.  But is it W&K Information Defense?  I'm

20   not sure it is W&K Information Defense.  I did not realize it

21   has a research and an LLC at the end, so I do not know.

22   "Q.  You don't know in this document if this is the one that is

23   a company associated with Dave Kleiman?

24   "A.  I can only assume because there's a W&K in there, but I do

25   not know.
```

45

1    "Q.  This document talks about a lawsuit that was filed against

2    W&K Information Defense.  A statement of claim.  I will use the

3    proper terminology.

4    "A.  Yes.

5    "Q.  You know that your husband brought a lawsuit or a

6    statement of claim against W&K Information Defense.  You know

7    that, don't you, ma'am?

8    "A.  I know that he did something.  I didn't realize it was a

9    lawsuit.  It is called a statement of claim, which is quite

10   different.

11   "Q.  Well, we can debate whether it is different.  What he did

12   was, is he made a claim in the courts in Australia saying that

13   W&K Information Defense owed him a whole lot of money, did he

14   not?

15   "A.  I don't know.  I wasn't there.

16   "Q.  This is your time.  What do you mean by you were not

17   there?

18   "A.  I was not there at the court with him.

19   "Q.  So as you sit here today, you do not know that your

20   husband brought a statement of claim against W&K Information

21   Defense for tens of millions of dollars?  That is something you

22   don't know?

23   "A.  I know that he brought a statement of claim against W&K.

24   "Q.  You know he got what is called a default judgment against

25   them, meaning he got the court to award him a tremendous amount

46

1   of money from W&K.  You know that, don't you, ma'am?

2   "A.  I know that he got a default judgment, yes.

3   "Q.  Ma'am, you know that based on that default judgment your

4   husband obtained all of the intellectual property that was

5   owned by W&K Information Defense; isn't that correct?

6   "A.  No, that is not correct at all.

7   "Q.  What is incorrect about it?

8   "A.  Well, my husband does a lot of things for the company or

9   through the company, with the company, so I don't have all the

10  details.  I know that he had a statement of claim and I know

11  that he had a default judgment and he hasn't gone into details

12  about everything else.

13  "Q.  But this is your company.  This is the Morgan Wright

14  Family Trust.  How did it get W&K Information -- how did your

15  company, DeMorgan, get W&K's intellectual property which you

16  are assigning in Paragraph 8?  How did they get it?

17  "A.  I don't know.  I don't have any economy records in front

18  of me.  If I did have it in front of me, I might be able to

19  tell you.  If I had access to my company's secretary and had

20  all of my records, I would be able to tell you.  You are just

21  telling me things now that supposedly happened and I do not

22  have any of those records.

23  "Q.  You do not know that?

24  "A.  Sorry.

25  "Q.  You do not know that.  This is something that you claim

47

```
1    not to have knowledge of, correct?

2    "A.  What exactly do I claim not to have knowledge about?

3    "Q.  That your husband and his companies got all of W&K's

4    intellectual property vis-a-vis a statement of claim he filed

5    in Australia.  You know that --

6    "A.  I said that I know he had a statement of claim and I know

7    that he had a default judgment.  Now, in the company records

8    there are so many assignments, there are so many different

9    assignments from different companies.  I couldn't say to you I

10   know this happened and I do not know this happened.  I really

11   couldn't.  If I could have access to my company secretary and

12   if I had everything directly from them, I would go through the

13   list and say:  'Oh, yes, this did happen because this was

14   accounted for,' or:  'that happened because that was accounted

15   for.'

16       "Now you are asking me if I do or do not know.  I don't

17   even know if I can answer that question because I do not have

18   any records in front of me.

19   "Q.  Ms. Watts, I just want to follow up on the very last thing

20   we were talking about, which is at -- or at least partly talk

21   about authentic and inauthentic documents.  Okay?

22   "A.  Sure.

23   "Q.  You made a reference a few times that if you could see

24   your corporate records you would be able to answer with better

25   clarity some of the things I have asked you today.  Is that
```

48

```
 1    true?
 2    "A.  I believe so, yes.
 3    "Q.  And you told me today that although you have referenced
 4    your corporate secretary on a few occasions, you do not know
 5    who that is, correct?
 6    "A.  I don't know the name of the corporate secretary.  They're
 7    in Brisbane.
 8    "Q.  Okay.  Do you know how to contact them?
 9    "A.  So my secretary used to do that.  My assistant used to do
10    that.  I could find a way of contacting my assistant, but I
11    haven't contacted her in five years.
12    "Q.  You haven't contacted your assistant in five years?
13    "A.  Yes.  This was the companies in Australia.
14    "Q.  As you sit here today, you would not know how to get in
15    contact with the corporate secretary that you have referenced;
16    is that fair?
17    "A.  I don't know.  I think I would have to try and find the
18    search -- I might be able to.  I don't know.  I haven't tried.
19    "Q.  Are you aware of any accusations that have ever been made
20    that DeMorgan, Limited submitted false documents to the
21    Australian Tax Office?  Are you familiar with that allegation?
22    "A.  I'm familiar that the Australian Tax Office might have
23    mentioned that.  But the thing is, we were actually hacked.  So
24    I would not be surprised if some of our stuff -- some of our
25    staff, excuse me, changed some of our documents.
```

```
 1    "Q.  Documents that were submitted by the Australian Tax

 2    Office?  Is it your testimony that if they were false, it was

 3    someone else that did it?

 4    "A.  Well, I certainly didn't do it.

 5    "Q.  What about your husband?

 6    "A.  He -- would doubt very much that he would have done

 7    something like that.

 8    "Q.  Who is Andrew Sommer?

 9    "A.  He was our lawyer in Australia.

10    "Q.  Do you trust him?

11    "A.  I don't know him personally.  He's a lawyer.

12    "Q.  Do you remember the name of his law firm?

13    "A.  Clayton Utz.

14    "Q.  Did they -- Clayton Utz represent DeMorgan, in connection

15    with -- well, did Clayton Utz ever represent de Morgan

16    Limited??

17    "A.  I do not know if he represented the companies.  I actually

18    really don't know the relationship, whether he represented

19    Craig personally or represented the companies.  It probably was

20    the companies.  I'm not sure which one in particular.

21    "Q.  Okay.  If you could go to Tab 32.  Let me know when you

22    are there.

23    "A.  Yes."

24         MR. LAGOS:  Exhibit 10 marked for identification.

25      (Continued:)
```

50

```
 1    "Q.  Ms. Watts, do you see what I have marked as Exhibit 10?

 2    "A.  I do.

 3    "Q.  Is that a letter from Clayton Utz?

 4    "A.  Yes.

 5    "Q.  Is it an authentic letter?

 6    "A.  I do not know, but I recognize it.

 7    "Q.  It is emailed to you, correct?

 8    "A.  Yes.

 9    "Q.  As a director of what company?

10    "A.  As a director of DeMorgan.

11    "Q.  It has your email address.  Was that your Hotwire email

12    address?

13    "A.  It was, but we worked across several companies, as I said

14    to you before.

15    "Q.  Sure.  I'm just saying that that was a correct email

16    address for you, right?

17    "A.  Yes.

18    "Q.  Does that refresh your recollection that Clayton Utz was

19    representing DeMorgan, Limited??

20    "A.  It does now, yes.

21    "Q.  Okay.  Very well.  Does it refresh your recollection that

22    at some point in time Clayton Utz determined that they could no

23    longer represent de Morgan Limited?

24    "A.  Yes.

25    "Q.  Did Clayton Utz determine that the documents that your
```

51

```
1   husband has submitted, both to its offices and to the
2   Australian Tax Office, has serious questions about their
3   integrity?
4   "A.  That's what it says here, but I also had a phone call with
5   Andrew because before he sent me this letter, he called me.
6   "Q.  And what did he tell you?
7   "A.  Pretty much the same as this letter, but he said:  'I was
8   going to send you this letter.'  He said that the ATO contacted
9   him saying that there were some documents that had been
10  modified.  He said he didn't believe Craig did it and all
11  because we had already told him that we had been hacked.  He
12  said:  'But I'm under instruction not to be able to represent
13  you because it does not look good for my company.'  He was
14  hugely apologetic.
15  "Q.  Right.  The company -- Clayton Utz was not only concerned
16  that there were questions about the integrity of documents
17  submitted to the Australian Tax Office, but also documents that
18  were submitted to the law firm, correct?
19  "A.  Well, that is not what he told me.  I know that it is what
20  is written here, and he said:  'I'll be sending you a letter
21  that's quite standard, and it's going to sound awful, but this
22  is my position because I have been told from the top.'
23  "Q.  Did your husband ever tell you that Dave Kleiman was his
24  partner?
25  "A.  He -- Craig has used the term partner very, very loosely.
```

52

1    "Q.  You can answer.

2    "A.  So as I said, Craig has used the term partner very, very

3    loosely.  I think he would consider his best friend his

4    partner.  Dave did a lot of editing for him.  I think he would

5    say:  'Hey, that is my partner who has edited my book for me.

6    We have written a book together.'  I think he would consider

7    that a partner too.  So it depends on what you mean by partner.

8    "Q.  Excuse me.  Did your husband ever tell you that Dave was

9    not his business partner?

10   "A.  Well, Craig never said to me, just to let you know:  'Dave

11   is not my business partner.'  He has never actually said that

12   to my face, no.

13   "Q.  Okay.  Let's talk about the -- sure.  I am just trying to

14   reset where we were.

15      "You told me earlier that there was a contact -- contract

16   sometime after Dave passed away between your husband and Louis

17   Kleiman where your husband was trying to get certain shares in

18   Coin-Exch. to Dave's estate after his death?

19   "A.  That is correct, yes.

20   "Q.  Okay.  Then at some point Ira became involved in the

21   negotiations.  You were not sure if it was between -- because

22   of his father dying, but at some point his father passes away

23   and Ira is involved in the negotiations?

24   "A.  That's correct.

25   "Q.  Explain to me, what were those negotiations?  What was

53

```
1   being negotiated?
2   "A.  I don't really have all the details.  I think it started
3   off with Craig saying:  'I've got -- your brother's got shares,
4   or to Dave's father it would be:  'Your son has shares in this
5   company and we'd like you to have that.'  I don't have all the
6   conversation in front of me.
7       "I think it got to a stage where Ira came in and said,
8   basically, if they were to sell it, how much.  I know we
9   offered Ira the directorship because Dave was also supposed to
10  be a director of Coin-Exch.  We had offered that to Ira and he
11  said:  'Well, I don't want that directorship.  How much is the
12  shares worth?  Can we sell it and can I have some money and
13  just make sure that I don't have to pay tax on it?'
14  "Q.  Okay.  When you and your husband were in contact with Ira
15  Kleiman, by that point, which we just went over in a previous
16  document -- by that point your husband had already filed his
17  statement of claim against W&K, correct?
18  "A.  I don't remember when he filed it and I don't remember
19  when we started talking to Ira.
20  "Q.  Okay.  Do you know when you were negotiating -- and I said
21  both you and your husband -- whether you were negotiating with
22  Ira, whether either of you told him there had been a statement
23  of claim filed against W&K in Australia?
24  "A.  I didn't.  Craig might have.  I don't know.
25  "Q.  In those discussions, were you or your husband asking Ira
```

54

1    for anything in return or were you just trying to give him

2    shares in a coin -- I'm going to ask that again.  It was a bad

3    question.

4        "I understood from a previous answer that the shares we're

5    talking about, that originally your husband wanted to get to

6    the estate through Louis Kleiman and then discussions with Ira

7    were shares in Coin-Exch.; is that right?

8    "A.  That's correct.

9    "Q.  When you spoke with Ira and communicated with Ira, both

10   you and your husband, were you asking anything from him in

11   exchange for giving him those shares?

12   "A.  I wasn't.  I don't know if Craig did.  I don't think he

13   did at all.

14   "Q.  You don't recall asking for his cooperation in the

15   Australian Tax Office proceeding?

16   "A.  Oh, I suppose at the end when they were asking questions,

17   I might have.  I don't remember.  I might have.

18   "Q.  Why did you and your husband need to negotiate with Ira if

19   you were just going to give him shares?  I don't understand the

20   negotiation.

21   "A.  Because he didn't actually want the shares.  So he wanted

22   the money.  So the negotiation was really how much is it worth.

23   So we offered him a figure.  He said that that was not enough.

24   We offered another figure, and he said:  'Well, that is not

25   enough.'  It was not shares that he wanted.  He wanted the

55

```
1    money and he wanted it right away.
2    "Q.  I'm asking about the negotiations.  I have the emails.  I
3    want to know what was taking place that I could not see in the
4    emails about those negotiations.
5    "A.  I think we had some Skype calls.  I just remember not
6    having a very good impression of Ira after some conversations I
7    had with him.
8    "Q.  That is great.  What was the sentiment?
9    "A.  He just wanted money and he wanted more money and more
10   money.  He wanted it now.  He didn't want to be a director.  He
11   wasn't interested in what Coin-Exch. was doing, and he was very
12   specific when he said:  'I don't want to pay tax.'  I remember
13   that because Craig was very, very, very angry when Ira said
14   that.
15   "Q.  Okay.  Anything else about the sentiment that you can
16   remember other than -- we will go through some emails that I
17   have, but anything else?
18   "A.  That was the final sentiment.  Initially, when we started,
19   it was very cordial and very pleasant."
20        MR. LAGOS:  Exhibit 12 was marked for identification.
21     (Continued:)
22   "Q.  Are you there?
23   "A.  I am.
24   "Q.  So if you go to the page that has 287 on the bottom.
25   "A.  Yes.
```

56

```
 1    "Q.  That is -- correct me if I am wrong, that is an email from
 2    you to your husband, correct?
 3    "A.  Yes.
 4    "Q.  Are you -- do you recall this email?
 5    "A.  As I said with the other ones, I don't recall writing that
 6    five years ago.  It looks familiar, though.
 7    "Q.  Is this an address to Ira -- is this a copy of something
 8    you had sent to Ira or a draft of what you were intending?
 9    "A.  I don't remember.
10    "Q.  You write:  'Currently, we are having major battles with
11    the tax office, ATO, the Australian Tax Office.'  That was a
12    correct statement, right?
13    "A.  Yes.
14    "Q.  'They,' meaning the tax office, 'do not believe that what
15    we have is viable.'
16       "Do you see that?
17    "A.  Uh-huh.
18    "Q.  'They do not see it as an enterprise,' right?
19    "A.  Yes.
20    "Q.  'They are arguing that the work Dave and Craig has been
21    doing is a hobby or purely academic research,' right?
22    "A.  Yes.
23    "Q.  'Dave and Craig were working together on the issues that
24    we are fighting out with the Australian Tax Office.'  Is that
25    not true?
```

57

```
 1    "A.  Well, Dave was working on Coin-Exch.  He was supposed to
 2    be working on Coin-Exch., and Coin-Exch. was one of the
 3    companies that the Australian Tax Office had audited.  So Dave
 4    was supposed to be setting up systems for Coin-Exch.  But --
 5    "Q.  The fight with the -- I'm sorry?
 6    "A.  But we only found out much later on that that wasn't done.
 7    I was under the assumption that Dave had been working on
 8    Coin-Exch.
 9    "Q.  Actually, the fight with the ATO was whether the mining of
10    Bitcoin was a hobby; isn't that true?
11    "A.  No.  No, because the fight with the ATO was with all of
12    the companies, with -- any of the companies were enterprises,
13    any of the research that was being done was an enterprise.
14    "Q.  Okay.  Go to the second page, which has an 88 at the
15    bottom.
16       "Just so we are clear, the only thing you have told me
17    before today, before right now, that Dave and Craig did
18    together in a business side was when Dave helped Craig edit
19    certain papers, right?
20    "A.  Yes.
21    "Q.  He helped him write a book, or was it more than one book?
22    "A.  I don't know.
23    "Q.  And he had this contract with Coin-Exch. which he ended up
24    not doing any work on, right?
25    "A.  That's right.  And I've just remembered one, that I wasn't
```

58

```
 1    any part of, but I remember Craig telling me that they either

 2    did or were supposed to do something with.  I think it was the

 3    Department of Defense in the U.S.  I was not involved with that

 4    one, but I remember Craig telling me about that.

 5         "So as I said, when you generalize things like that and

 6    say:  'Tell me everything,' I cannot always recall.  But if you

 7    ask me something very specific, I might be able to answer the

 8    question.

 9    "Q.  We'll each do our best.

10         "And the paragraph starts with 'currently we need to.'

11    This is either a draft of a communication to Ira or one that

12    was sent to Ira, or you are just not sure?

13    "A.  I cannot remember.

14    "Q.  The addresses of this, whether it was sent or not, is Ira,

15    correct?

16    "A.  Yes.

17    "Q.  You write:  'Craig and I' -- you were talking about

18    yourself, right?  'Craig and I have put our entire life savings

19    into this business'?

20    "A.  Yes.

21    "Q.  What business was that?

22    "A.  Everything, everything that we did.

23    "Q.  Then read the next three words.

24    "A.  As did Dave.

25    "Q.  Right.  Dave also put his entire life savings into the
```

59

```
1   business.  Isn't that what you wrote?

2   "A.  Dave was supposed to put the Bitcoin that he had into

3   Coin-Exch.  That was part of the deal as well.

4   "Q.  Okay.  When did you learn that he didn't?

5   "A.  I think it just wasn't there.  I don't know.  Craig had

6   told me that it wasn't and the accountant said that it wasn't

7   in there.  I don't know.

8   "Q.  It says:  'Craig and I have put our entire life savings

9   into this business, as did Dave.'  That is what you wrote,

10  correct?

11  "A.  Yes.  But as I said to you before, Dave was supposed to

12  put the Bitcoin that he had into Coin-Exch. and that is why he

13  got the shares, that and the work that he was supposed to have

14  done.  So that was the deal that was with Coin-Exch.

15  "Q.  And when he died -- I'm sorry.  Go on.

16  "A.  So the -- in order to capitalize the company, Craig put in

17  a lot of money or Bitcoin -- I'm not sure what he did there --

18  and Dave was supposed to put another bit.  We only found out

19  much later on from our accountants that that wasn't the case.

20  "Q.  Ma'am, is it your testimony that two years after Dave

21  died, you still didn't -- you were still waiting for his

22  Bitcoin to be deposited?  Is that your testimony?

23  "A.  No.  My -- my tell is that at the time we probably were

24  running eight companies and at that time we were being audited

25  constantly on the eight companies.  I don't know if you have
```

60

1    ever run several companies at a time before, Mr. Brenner.  It

2    is very stressful.  We worked long hours.  I had three children

3    that I did not see.  We had accountants after accountants.  I

4    was not responsible for the accounting.  I had financial

5    controllers and accountants who did that.  They would give me

6    the information.  If you have a new accountant or a new

7    financial controller, sometimes it takes them six months to

8    actually understand the accounts, especially when some of the

9    accounts involve Bitcoin.

10        "So if after two years Dave dies, my accountant comes and

11   says to me:  'By the way, in Coin-Exch., I just want to let you

12   know that there's X amount here,' and then I say:  'Oh, my God.

13   Is that what there is' -- we had at least eight companies,

14   perhaps even more.  At the same time, three children at home,

15   two of us, 50 staff, perhaps even more, being audited day and

16   night by the tax office.  I didn't sleep very much.  I worked

17   18-hour days.  So did my husband.

18   "Q.  All I am asking, ma'am, is two years after Dave Kleiman

19   died --

20   "A.  And I have answered your question, sir.

21   "Q.  May I finish my question?

22        "Two years after Dave Kleiman died, you were writing to his

23   brother telling him that his brother and Craig had both put

24   their life savings into their business.  Isn't that correct?

25   "A.  The information that I was given from my accountants at

1    that time -- and I believe I must have been on my third,

2    perhaps my fourth accountant, trying to run eight companies,

3    perhaps more, at that one time.  Mr. Brenner, if you try

4    working 18-hour days, if you do not have all the information

5    ahead of you --

6    "Q.  The answer is that, what you wrote, correct?

7    "A.  I'm sorry?

8    "Q.  The answer is that, what you wrote, correct?

9    "A.  The answer is I didn't have all the information at the

10   time.

11   "Q.  Easier.  Tab 7.  This is Exhibit 11.  This is a one-page

12   document, correct?

13   "A.  That is correct.

14   "Q.  So this is an email.  The top email is from Dr. Wright to

15   Calvin Ayre, Robert MacGregor, Stefan Matthews, and you,

16   Ms. Watts?

17   "A.  That is correct.

18   "Q.  The discussion in the email, although it is very short, is

19   talking about an email that had actually been sent about almost

20   two years prior, correct?

21   "A.  It looks like it, yes.

22   "Q.  Let's look at the one which is two years prior, which is

23   Dr. Wright to Carter and Patrick Paige.  Okay?

24   "A.  Okay.

25   "Q.  Your husband writes:  'I know both of you, Carter and

```
1    Patrick, knew Dave and trusted him,' right?
2    "A.   That is what is written here.  That is correct.
3    "Q.   Your husband writes:  'Dave and I had a project in the
4    U.S.'  What was that project, ma'am?
5    "A.   I didn't write this email.  I don't know.
6    "Q.   Okay.  You don't know what that -- project that is?
7    "A.   No.
8    "Q.   Okay.  It says:  'He ran it there,' meaning Dave ran it
9    there.  You don't know what is that referring to?
10   "A.   No.
11   "Q.   It says:  'We kept what we did secret.'
12       "Do you see that?
13   "A.   I see it.
14   "Q.   Do you know what your husband -- what project he had with
15   David in the U.S. that they were keeping a secret?
16   "A.   Well, I didn't write this email.
17   "Q.   I know you didn't write it.  I'm not asking if you wrote
18   it.  I am asking if you know what project he was saying he and
19   Dave had in the U.S. that they kept secret.
20   "A.   No.  I do not know.
21   "Q.   It says:  'the company he ran there,' and 'he' is meaning
22   Dave, correct?
23   "A.   I don't know who he means.
24   "Q.   'The company he ran there mined Bitcoin.'  Do you know
25   what company that your husband -- well, do you know of a
```

63

```
 1    company that Dave ran in the U.S. that mined Bitcoin?
 2    "A.  I do not.
 3    "Q.  If you go to the next paragraph, it says:  'The amount
 4    DK.'
 5        "Do you understand that to be a reference to Dave Kleiman?
 6    "A.  I would assume so, but I don't know.
 7    "Q.  'The amount DK mined is far too large to email.'
 8        "Do you see that?
 9    "A.  I see it.
10    "Q.  Does it refresh your recollection whether your husband
11    ever spoke with you about Dave mining Bitcoin?
12    "A.  No, he never did.
13    "Q.  Okay.  Now, it goes up at the top -- it actually -- this
14    email two years later comes to you, right?
15    "A.  That is what it looks like, yes.
16    "Q.  It says -- it is from your husband.  It says:  'The email
17    to Patrick is attached below,' correct?
18    "A.  That is what it says.
19    "Q.  It says:  'I said we mined.'
20        "You understood that your -- he was telling you that he
21    told Patrick that him and Dave mined Bitcoin, don't you, ma'am?
22    "A.  I don't.  I --
23    "Q.  But you understand -- I'm sorry.  Go ahead.
24    "A.  I really don't like to speculate what my husband meant
25    when he wrote something.  As I said to you before, he has
```

64

```
 1    Asperger's.  He really has trouble expressing himself.  So even

 2    if he writes an email to me, I'll need to see him to his face,

 3    get him after 10 years to look me in the eye and say:  'did you

 4    mean this?  Did you mean that?'  And half the time he says:

 5    'No, that is not what I mean.'

 6        "So are you asking me to speculate on something that he

 7    wrote, someone who has trouble expressing himself?  I wouldn't

 8    dare.  I don't know what he meant.

 9    "Q.  Then he says:  'Not that I was SN to Patrick.'

10        "Do you understand SN to be Satoshi Nakamoto?

11    "A.  I would assume so, but as I said, I don't remember this."

12            MR. LAGOS:  Exhibit 16 marked for identification.

13        (Continued:)

14    "Q.  This will be Exhibit 16.  A two-page document, ma'am?

15    "A.  I see that, yes.

16    "Q.  I'm going to start from the bottom and work my way up.

17    Okay?

18    "A.  Okay.

19    "Q.  You see on the top:  'You get all of this BN FYI,' right?

20    "A.  Yes.

21    "Q.  You were involved in discussions that your husband was

22    having with Patrick Paige, right?

23    "A.  No, I was never involved with Patrick Paige.

24    "Q.  He just wanted you to know about it?

25    "A.  I don't know.
```

65

```
 1    "Q.  Did you say:  'Why are you forwarding me these emails?

 2    Have nothing to do with this'?

 3    "A.  No.  I get a lot of forwarded emails.

 4    "Q.  Patrick Paige writes on the very bottom of the page --

 5    this is November 2015.  Do you see that?

 6    "A.  I do, yes.

 7    "Q.  'Hi, Craig.  How goes it?  Just wanted to touch base with

 8    you.  I got a call from a reporter who left a message asking

 9    about Dave and you.  I don't plan to call him back, but Carter

10    and I were curious if something is going on.'

11        "Do you see that?

12    "A.  Yes.

13    "Q.  Craig writes back -- Dr. Wright writes back -- again, I

14    think we have this Australian problem because it actually goes

15    back in a day, but I think it is clear he is responding.  He

16    says:  'Thanks for the heads up.  Reporters are always

17    trouble.'

18        "Do you see that?

19    "A.  Uh-huh.

20    "Q.  He says:  'They ignored the stuff Dave and I did when he

21    was alive.'

22        "Do you have any idea what your husband is referring to

23    about the stuff that he and Dave did?

24    "A.  No.  I have no idea.  I mean, I could only assume it is

25    about the books they wrote together.  Perhaps if they did some
```

66

```
 1    work with the Department of Defense.  I'm not sure if that was
 2    done.  I don't know.
 3    "Q.  Let us see if the rest of the email gives you a better
 4    idea of what is going on.
 5       "Then it says:  'I do not know what has started to interest
 6    them now.' Do you see that?
 7    "A.  Yes.
 8    "Q.  He says:  'The computer we were running made the top 20
 9    within the top 500 supercomputer list.  So this may be new.'
10       "Do you see that?
11    "A.  Uh-huh.
12    "Q.  You understand that supercomputers were used at that time
13    period to mine Bitcoin, correct?
14    "A.  But that is not all they were used -- because we had a
15    supercomputer too with Cloudcroft and it wasn't mining Bitcoin
16    at all.  The supercomputer for Cloudcroft was actually used for
17    research, and our developers used a lot of information that
18    came out of the supercomputer.  So no, I don't believe that at
19    all.  I think you can use a supercomputer for mining Bitcoin.
20    You can use a home computer for mining Bitcoin.  I use my home
21    computer all the time.  I've never mined Bitcoin.
22    "Q.  Your husband, when he responds to Patrick, he brings up
23    supercomputers, correct?
24    "A.  Yes.
25    "Q.  Okay.  What does Patrick write back?  The next email up.
```

67

```
1    He says:  'No problem.'  He is now talking about -- well, we
2    will read it.  He says:  'No problem.  I don't think it's about
3    computers.  He mentioned Bitcoin in his message.'
4        "He is talking about the message that he got from the
5    reporter, correct?
6    "A.  I assume.  I don't know.
7    "Q.  'Maybe they know something about yours and Dave's Bitcoin
8    involvement.'
9        "Does that now appear to you that this exchange between
10   Patrick and your husband is about Dave and Craig and Bitcoin?
11   "A.  I would hate to speculate because I wasn't on the email.
12   I wasn't a party to this email, so I don't know.
13   "Q.  It says:  'do you want me to return his call and feel him
14   out?'
15       "He is talking about the reporter, right?
16   "A.  I would assume so.
17   "Q.  Then it says, and this is Patrick writing to Dr. Wright:
18   'Are you guys close to releasing any information on Dave's
19   involvement in Bitcoin?'
20       "What is he talking about, Ms. Watts?
21   "A.  I have no idea, Mr. Brenner.
22   "Q.  Okay.  So let's go on.  None of this rings a bell.  It is
23   still your testimony that Dave had no involvement with your
24   husband regarding Bitcoin, correct?
25   "A.  Absolutely, yes.  I mean, it depends on what you say.  I
```

68

```
1   think you have to be very specific.  I know that Dave actually
2   did talk to people in the Bitcoin community about Bitcoin, but
3   I don't know what he did.
4   "Q.  Ma'am, are you denying that -- are you saying that you
5   know, under oath, that your husband did not mine Bitcoin with
6   Dave Kleiman?  Is that your testimony?
7   "A.  No.  My testimony is that my husband never told me that he
8   mined Bitcoin with Dave.  So I don't know that.
9   "Q.  You don't know one way or the other?
10  "A.  I have asked him before and he said he didn't.  So I do
11  not know because I wasn't there.  I cannot know something if I
12  wasn't there.
13  "Q.  So let us go to Tab 22."
14       MR. LAGOS:  Exhibit 17 was marked for identification.
15  (Continued:)
16  "Q.  This will be Exhibit 17.
17       "Okay.  Ms. Watts, do you have Exhibit 17 in front of you?
18  "A.  Uh-huh.
19  "Q.  So we are going to pick up the trail, then, on the bottom
20  of the first page.
21  "A.  Okay.
22  "Q.  So this is now your husband writing to -- by the way,
23  you're again cc'd on this whole trail, if you look at the top.
24       "Do you see that?
25  "A.  Yes.
```

```
 1     "Q.  So your husband writes back to Patrick Paige.  This is now

 2   a few days later.  I think we left off at November 19th or so.

 3   Now we are at November 23rd.

 4     "He says:  'Not yet.  We are in the process of finalizing

 5   some of the research.  I was hoping we could be at the point of

 6   the release before the reporters start sniffing.' And he signs

 7   it 'Craig.'

 8     "Do you see that?

 9   "A.  I do.

10   "Q.  That was him responding to the question at the end of the

11   email before when Patrick had asked if he should return the

12   call of the reporter and whether you guys were close to

13   releasing any information on Dave's involvement in Bitcoin.  So

14   you know where we are.  Okay?

15   "A.  Sure.

16   "Q.  Patrick writes back -- this is two days later.  He says:

17   'Okay.  That sounds good.'

18     "Do you see that?

19   "A.  Uh-huh.

20   "Q.  He says:  'I think we both know' -- he is writing to your

21   husband, Dr. Wright -- 'Dave was a genius when it came to

22   computers and I sure would like Dave to get the recognition for

23   his part, if any, in the development of Bitcoins.'

24     "Do you see that?

25   "A.  Uh-huh.
```

70

1    "Q.  'I realize there's a lot of things to consider releasing

2    this information, but my question is when.'  Okay?

3    "A.  Yes.

4    "Q.  Craig does not write back to Patrick next, does he?

5    "A.  I don't know.

6    "Q.  Okay.  Well, you will be able to tell by what it says.  He

7    says:  'Add Patrick to the list of knows,' K-N-O-W-S.  Correct?

8    "A.  Yes, that is what it says.

9    "Q.  Dr. Wright and yourself were both concerned about who knew

10   the truth about Dave's involvement in Bitcoin, correct?

11   "A.  That is incorrect.  We were very concerned about who knew

12   that Craig was Satoshi Nakamoto because at that time we had a

13   lot of reporters sniffing, knocking on our doors, asking

14   questions.  Craig did not want to be outed as the creator of

15   Bitcoin.

16   "Q.  Your understanding of this email is they are talking not

17   about Dave's involvement, they are talking about Craig as

18   Satoshi, correct?

19   "A.  Absolutely, because at that time we were very, very

20   concerned because there was reporters actually knocking on my

21   door and camping outside the house when I was living in Gordon.

22   So we were very concerned.

23   "Q.  The next line says:  'At least for now' -- well, it says:

24   'From what is below, it is clear that Dave had discussed with

25   him' -- you think that is Dave discussing with Craig?  Sorry.

```
 1   Discussing that Craig was Satoshi Nakamoto?
 2   "A.  I don't know.  I didn't write that.  So I don't know what
 3   meaning this has.
 4   "Q.  Then it says:  'At least for now, he also seems to be
 5   willing to not talk.'
 6      "That is Patrick not talking, correct?
 7   "A.  I assume so, but I didn't write that.  I don't know.
 8   "Q.  Then it says:  'But as Dave's friends, he will want to
 9   ensure that Dave is outed one day.'
10      "That is not talking about Craig being outed as Satoshi
11   Nakamoto, is it?
12   "A.  I didn't write that.
13   "Q.  Ma'am, I did not ask you if you wrote it.
14   "A.  But you are asking me to comment on an email that I did
15   not write.  You are asking me to speculate on what he meant and
16   I cannot do that because I didn't write it.
17   "Q.  Okay.  Are you telling me that when this email, that talks
18   about Dave being outed one day -- you think, as you just told
19   me, absolutely, that this email trail is about Craig or
20   Dr. Wright being outed as Satoshi Nakamoto.  That is still
21   absolutely your testimony, correct?
22   "A.  That is my testimony because I lived it, because I had
23   reporters camping at my door and because we were in discussions
24   of how Craig said:  'I do not want to come out as Satoshi
25   Nakamoto.'
```

72

```
1    "Q.  So let's go to the top email.  See if this clarifies for

2    you.  This is from Stefan Matthews to Dr. Wright, correct?

3    "A.  That is what it looks like, yes.

4    "Q.  Copying you, correct?

5    "A.  Correct.

6    "Q.  You guys -- it is an email about everyone needs to get

7    their story straight, correct?

8    "A.  I don't know what he meant exactly.  He does not say:

9    'Let's get our story straight.'

10   "Q.  Okay.  Well, let's look at what it does say.  It says:

11   'Let's talk on Monday about exactly what Dave's involvement

12   was.'

13       "Do you agree that Stefan Matthews is telling you that what

14   the concern is is not about whether Craig is Satoshi Nakamoto

15   and outed as such, the concern about -- is what are people

16   going to find out about Dave's involvement?

17       "Are you willing to say that that is what that means, or

18   not?

19   "A.  Well, I am not, because I don't know what he meant.

20   "Q.  Let's read what he says and let me know if you can read

21   that and you can agree with me, that what Stefan Matthews was

22   concerned about was that the three of you, Dr. Wright and

23   Stefan Matthews, get your story straight about Dave's

24   involvement.  Let's read it and then you tell me if that is

25   what those words mean to you, and you can tell me it doesn't
```

73

```
1    and that is fine.
2        "It says, and I quote:  'Let's talk on Monday about exactly
3    what Dave's involvement was to ensure that no conflicting views
4    on this come out.'
5        "Is that the way you interpret that sentence, the way I
6    characterized it?
7    "A.  Well, it is just how you have read it.  I can read it the
8    same way as how you read it.  So those are the words on the
9    page.
10   "Q.  What does that mean to you?
11   "A.  I would not know.  I would like to see Stefan in the face,
12   as I said, and say:  'What did you mean by that?'  I don't like
13   to speculate on what somebody else has written.
14   "Q.  If we could, Ms. Watts -- if we could go to -- let me ask
15   you, first of all, were you involved in the decision to
16   participate with Mr. O'Hagan in the writing of 'The Satoshi
17   Affair'?
18   "A.  It was not really a decision that I made.  It was sort of
19   pushed upon us.
20   "Q.  Okay.  You did meet with Mr. O'Hagan through his work on
21   that article, right?
22   "A.  I did.
23   "Q.  And you were forthright with him?
24   "A.  I spoke to him about many, many things, yes.
25   "Q.  Do you recall that one of the -- you have read The Satoshi
```

74

```
 1    Affair, have you not?
 2    "A.  No, I did not.
 3    "Q.  Really?
 4    "A.  Absolutely not.
 5    "Q.  Okay.  Do you understand that part of that article has to
 6    do specifically with your husband's relationship with Dave
 7    Kleiman?
 8    "A.  I didn't read the book.  I knew it was about Bitcoin.
 9    I -- really, it was more about what nChain, it was supposed to
10    to be.  This is what we were told.  It was supposed to be what
11    nChain was doing and the work that they were continuing.  It
12    was not so much -- apparently, there was a lot of information
13    about what happened in the past that I don't think was factual,
14    but I didn't read it.  I was told it was very much like a
15    tabloid.
16    "Q.  You had communications directly with Mr. O'Hagan in his
17    preparation for the article, did you not?
18    "A.  I did."
19         MR. LAGOS:  Exhibit 18 was marked for identification.
20       (Continued:)
21    "Q.  It is a one-page document?
22    "A.  Yes.
23    "Q.  Briefly take a look at this to orientate yourself with
24    what it is about.
25    "A.  Yes.
```

75

```
1    "Q.  You can see that Mr. O'Hagan was communicating with your

2    husband regarding information that could link Dr. Wright to the

3    invention of Bitcoin.

4        "Do you see that?

5    "A.  Yes.

6    "Q.  And if you go to the top of the page, there is an email

7    dated March 30th, 2016, at 5:34.

8    "A.  Yes.

9    "Q.  That is an email from Mr. O'Hagan, which was ultimately

10   forwarded to you.  I guess it is the next day.

11       "Do you see that?

12   "A.  I do.

13   "Q.  Now, Mr. O'Hagan writes -- we know he is writing at a

14   minimum to your husband.  It is unclear from this whether it is

15   to you also.  He writes:  'Thanks, Craig.'

16       "Do you see that?

17   "A.  Yes.

18   "Q.  'Please keep them coming.'

19       "Do you see that?

20   "A.  I do.

21   "Q.  He says:  'All papers and email and annotations.'

22       "The annotations he is referring to is that he could send

23   drafts of several things and he would give your husband an

24   opportunity to annotate, correct?

25   "A.  I don't know.
```

76

1    "Q.  Okay.  'All papers and emails and annotations that could

2    help me build a profile of what you have done.'

3        "Do you see that?

4    "A.  Yes.

5    "Q.  Then he says:  'The Dave stuff is practically non-existent

6    on paper.'

7        "Do you see that?

8    "A.  Uh-huh.

9    "Q.  He says:  'I understand you wiped a lot.'  Do you know

10   what that refers to?

11   "A.  Yes.  I know that Craig wiped a lot of his accounts when

12   the reporters started coming to our house.

13   "Q.  Okay.  So when you say:  'the reporters,' were these the

14   reporters associated with Mr. O'Hagan or some other reporters?

15   "A.  No.  They were -- I do not know where they were from.  I

16   think from Wired and Gizmodo and other places.  They were

17   camping outside our house asking all sorts of questions.

18   "Q.  And in order to protect information, your husband wiped

19   certain computers?

20   "A.  I don't know exactly what he did.  I know he wiped his

21   social media, because he had been posting a lot of things about

22   Bitcoin even from 2007, I think.  He had been writing a lot

23   about Bitcoin and he didn't want to be known as Satoshi.

24   "Q.  Then Andrew O'Hagan writes:  'I understand you wiped a

25   lot, but a final troll through your digital universe might give

77

```
 1    me something that connects the two of you.'
 2         "He is talking about Craig and Dave, correct?
 3    "A.  I don't know.
 4    "Q.  You don't know?
 5    "A.  Well, I didn't write it, so I don't know.  You can assume
 6    that, but I don't know that for sure.  You're asking me if it
 7    is right.  I don't know because I didn't write it.  I think you
 8    can assume it from here, but I don't know for sure.
 9    "Q.  He says:  'Something that connects the two of you
10    unarguably to the invention,' right?
11    "A.  That is what he says.
12    "Q.  He mentions the invention of Bitcoin, correct?
13    "A.  I don't know.
14    "Q.  Was Andrew O'Hagan writing about some other invention with
15    your husband?
16    "A.  No.  He was writing about -- well, as I said, he was
17    supposed to be writing about what nChain was doing.  So really
18    I'm not quite sure what he ended up writing about because I
19    didn't read it.  I was just told."
20         MR. LAGOS:  Exhibit 20 was marked for identification.
21      (Continued:)
22    "Q.  Okay.  Two-page document.  Do you see that?
23    "A.  I do.
24    "Q.  Okay.  If you look at the very last email on the second
25    page --
```

78

1    "A.  Yes.

2    "Q. -- that is an email from your husband to you, among other

3    people, correct?

4    "A.  Yes.

5    "Q.  Writing about a gentleman from a Wired magazine that is on

6    his trail?

7    "A.  Yes.

8    "Q.  He quotes what the Wired person said to him.  He says:

9    'We have some strong clues as to pseudonymous work.'

10       "Do you see that?

11   "A.  I do.

12   "Q.  Now, off the quote, your husband writes to you and others:

13   'I have removed anything so they will have trouble with proof.

14   I have even updated the Internet archive to delete this and

15   there is no old forensic history.'

16       "Do you see that?

17   "A.  I do.

18   "Q.  I will read the last sentence.  It says:  'I do not know

19   who the source they're working with is, but we may be able to

20   limit the exposure to a time that allows us to have the IP

21   locked down.'

22       "Do you see that?

23   "A.  Yes.  He also says at the beginning:  'He hints of quotes

24   from my work from 2006 in modeling risk.'  So he was talking

25   about the work that he -- and that's what I'm saying to you.

79

```
1   Craig was working on the creation of Bitcoin even 20 years ago,

2   but he really started to formalize it, I think, in early 2000.

3       "In 2006 -- I can't remember when he wrote his master's --

4   it became very apparent what he was working on was Bitcoin.  So

5   here he says:  'He hints at quotes of my work from 2006.'

6   Craig wanted to delete as much as he could of some of the work

7   he had done because he didn't want to be outed as Satoshi.

8   "Q.  Well, let's look at what he is trying to hide.  If you go

9   down to the next -- the bottom of the italicized paragraph,

10  this is -- he is quoting an email from Andy, from Wired

11  magazine, to him, correct?

12  "A.  I don't know.  It says:  'Andy' at the bottom, so I don't

13  know if it is a quote or he has copied it somewhere.  I don't

14  know.

15  "Q.  It has quotation marks around the whole thing, right?

16  "A.  Oh, yes.  I see quotation marks.

17  "Q.  The reporter is writing to him:  'Unlike that story' --

18  I'm about five paragraphs down.

19      "Do you see that?  'Unlike that story'?

20  "A.  Yes.

21  "Q.  'Unlike that story, I want to work with you on this piece

22  to get it right.  Beyond giving you the full credit you are due

23  for your work in developing Bitcoin, I want to talk deeply

24  about its innovation, starting from its origins to

25  incorporating a risk modeling/cost-benefit approach and Craig's
```

80

```
1   triple entry accounting idea, the first coins.'
2        "Is that what Craig was trying to cover up?
3   "A.  Definitely not.  I think he did actually ask Dave to help
4   him edit the whitepaper.  Whether or not Dave did, I do not
5   know.
6   "Q.  So does that refresh your recollection that one of the
7   things he edited for Craig may have been the whitepaper for
8   Bitcoin?
9   "A.  I said I think he did ask Dave to edit the whitepaper, but
10  whether or not he did it, I do not know."
11        MR. LAGOS:  Exhibit 22 was marked for identification.
12       (Continued:)
13  "Q.  This is an email.  Do you have any reason to dispute that
14  this is an email you sent in September 2015 to Stefan Matthews?
15  "A.  I don't recall it, but I have no reason to dispute that I
16  sent him an email.
17  "Q.  You wrote:  'WFT was established in August 2013.'
18        "Is WFT the Wright Family Trust?
19  "A.  Yes, it would be.
20  "Q.  Was that the Australian arm of the Tulip Trust?
21  "A.  Yes.  It's like an Australian representative of it.  It's
22  like a branch.
23  "Q.  Okay.  You say that:  'At that point Craig had purchased
24  software personally as well as had agreements around Bitcoin
25  rights for overseas trusts WII and Tulip Trading'?
```

81

```
1    "A.  That is correct.

2    "Q.  The Bitcoin we talked already.  The mined and the

3    purchased Bitcoin?

4    "A.  That is correct.

5    "Q.  You say:  'The information regarding the other two trusts

6    has not been disclosed to the ATO.'  What were the other two

7    trusts?

8    "A.  I believe it's these two that I wrote about, but I

9    actually don't remember.  As I said five years ago, I don't

10   remember.

11   "Q.  You write:  'CW,' which I assume is Craig Wright?

12   "A.  No, no.  Craig Wright R&D, which would be --

13   "Q.  Oh, I'm sorry.  You're right.  You're right.  'CW R&D sold

14   to WFT.'

15      So this is Craig Wright R&D sold to Wright Family Trust,

16   right?

17   "A.  Yes.

18   "Q.  Software, right?

19   "A.  Yes.

20   "Q.  Bitcoin rights?

21   "A.  Yes.

22   "Q.  And then it says:  'W&K software'?

23   "A.  Right.

24   "Q.  So by 2015, Craig Wright R&D had sold W&K software to

25   Wright Family Trust?
```

82

```
1    "A.  I don't remember.  I don't remember writing this email.

2    So I don't remember.

3    "Q.  You do recall that as a result of -- the result of the

4    Australia court proceedings that Craig Wright R&D obtained a

5    judgment for certain intellectual property and software from

6    W&K?

7    "A.  Was that the judgment that we talked about when we had the

8    default judgment?

9    "Q.  Yes.

10   "A.  Well, as I said when you asked me that question, I didn't

11   know what it was.  I knew that he had a court proceeding and I

12   knew he had a default judgment, but I didn't know what it was.

13   "Q.  You understood that he had got something out of that,

14   right?

15   "A.  Yes.

16   "Q.  You understand that he later sold it to WFT?

17   "A.  I believe he would have told me that at that time and

18   that's why if I did write this, I would have written that.  But

19   it was from information that he told me, yes."

20          THE COURT:  All right.  Thank you, both.

21          Ladies and Gentlemen, let's go ahead and take a

22   well-deserved 20-minute recess.

23       (Jury not present, 11:39 a.m..)

24          THE COURT:  Okay.  We'll have an hour before our lunch

25   break.  Is that going to take us through the next video
```

83

```
 1   deposition?
 2          MR. FREEDMAN:  It will, Your Honor.  I think the next
 3   video depo is 50 minutes exactly.
 4          THE COURT:  All right.  Perfect.  I'll see you back
 5   here in 20 minutes.
 6      (Recess from 11:40 a.m. to 11:59 a.m.)
 7          THE COURT:  All right.  Welcome back.
 8          Anything we need to take up before we bring in the
 9   jury?
10          MR. FREEDMAN:  Not from Plaintiffs, Your Honor.
11          MR. RIVERO:  Not from Defense, Your Honor.
12          THE COURT:  All right.  Let's bring in the jury.
13      (Before the Jury, 11:59 a.m.)
14          THE COURT:  All right.  Welcome back, Ladies and
15   Gentlemen.  Please be seated.
16          Plaintiffs' next witness.
17          MR. FREEDMAN:  Your Honor, the Plaintiffs call Andrew
18   O'Hagan by video deposition, taken on March 17th, 2020.
19      (Video played 12:00 p.m. - 12:53 p.m.)
20          MR. FREEDMAN:  Your Honor, the Plaintiffs' next
21   witness will be Dr. Wright.  So if it makes sense for the
22   Court, it might make sense to take lunch now and start after.
23          THE COURT:  Certainly.  This would be a good time for
24   us to take our one-hour lunch recess and I'll see you back here
25   at 1:55.  Have a pleasant lunch recess.
```

84

```
1        (Jury not present, 12:53 p.m.)

2              THE COURT:  All right.  Have a pleasant lunch.

3              MR. FREEDMAN:  Thank you, Your Honor.

4        (Recess from 12:53 p.m. to 1:54 p.m.)

5              THE COURT:  All right.  Welcome back.  I trust

6    everyone had a nice lunch.  Are we ready to continue?

7              MR. FREEDMAN:  Your Honor, just one thing before we

8    bring the jury back in.

9              THE COURT:  And go ahead and have a seat, if it's just

10   one thing.

11             MR. FREEDMAN:  Your Honor, during the course of

12   Mr. Rivero's cross-examination of Mr. Kleiman, there were a

13   number of objections that were sustained that touched on the

14   Court's motion in limine order forbidding questions about the

15   relationship between the siblings.  We'll deal with that and

16   its consequences at a later date, but right now the pressing

17   need is to make sure that Dr. Wright has been advised by

18   counsel not to discuss that during his examination and inject

19   that into the testimony.  So I just wanted to make sure that it

20   doesn't get brought up again.

21             THE COURT:  Ms. McGovern?

22             MS. MCGOVERN:  I'm sorry.  I had a difficult time

23   understanding.  I think what we're talking about is there's a

24   request for instruction regarding what Dr. Wright can and

25   cannot testify about with respect to the relationship between
```

```
1   Ira and his brother; is that right?

2           MR. FREEDMAN:  That is correct.

3           MS. MCGOVERN:  Your Honor, our position would be, I

4   think it would depend on what the question is.  If Mr. Freedman

5   opens the door and Dr. Wright has the ability to respond, there

6   are issues here where response to the question that involves

7   the relationship with the brother may be a logical response

8   that's necessary for a complete answer.  So I think we have to

9   take it up as we go, Your Honor.

10          THE COURT:  I tend to agree.  As the Court stated in

11  its motion in limine, the sibling relationship or lack of is

12  not relevant in this proceeding.  The Court did grant the

13  motion in limine, but let's see what question is asked.

14          All right.  I believe that Dr. Wright is aware of the

15  Court's ruling.  Is that correct, Ms. McGovern?

16          MS. MCGOVERN:  That is correct, Your Honor.

17          THE COURT:  If there's nothing further, I need a court

18  security officer to bring in the jury.

19      (Before the Jury, 1:56 p.m.)

20          THE COURT:  All right.  Welcome back, Members of the

21  Jury.  Please be seated.  I trust you had a pleasant lunch and

22  are ready to get back to work.  We are right on schedule.

23          If the Plaintiffs will call their next witness,

24  please.

25          MR. FREEDMAN:  Thank you, Your Honor.
```

86

```
1              The Plaintiffs call Dr. Craig Wright.

2              THE COURT:  Okay.

3          (Pause in proceedings.)

4              THE COURT:  Dr. Wright, good afternoon.  Let me ask

5    that as you step forward you remain standing, raise your right

6    hand to be placed under oath.

7          CRAIG WRIGHT, DEFENDANT, SWORN

8              COURTROOM DEPUTY:  Thank you.  Can you please state

9    your name and spell it for the record.

10             THE WITNESS:  My name is Dr. Craig Steven Wright.

11   C-R-A-I-G, S-T-E-V-E-N, Wright, W-R-I-G-H-T.

12             THE COURT:  You may have a seat, sir.

13             MR. FREEDMAN:  May it please the Court.

14                       DIRECT EXAMINATION

15   BY MR. FREEDMAN:

16   Q.  Good afternoon, Dr. Wright.

17   A.  Good afternoon.

18   Q.  Dr. Wright, I'm going to put on the screen what's already

19   been admitted into evidence as P164.  You let me know when you

20   see it up there.

21   A.  I see it.

22   Q.  Dr. Wright, this is an email from your email address

23   craig.wright@hotwirepe.com to Ira Kleiman, dated April 26th,

24   2014.  Do you see that?

25   A.  I see that.
```

67

```
1    Q.  And the subject is:  "Chronology of Craig Wright.docx."

2    And the attachment is also listed as chronology of Craig

3    Wright.docx." Do you see that?

4    A.  I see that.

5         MR. FREEDMAN:  Ms. Vela, could you please bring us to

6    the attachment of this email.

7    BY MR. FREEDMAN:

8    Q.  Dr. Wright, the title of this attachment is called:

9    "Chronology of Craig Wright, CSW."  Those are your initials,

10   sir, Craig Steven Wright?

11   A.  That is correct.

12   Q.  The title of this document is:  "Chronology of Craig

13   Wright, CSW, Activities and Transactions."

14       Let's go down to your activities and transactions in 2011.

15        MR. FREEDMAN:  Ms. Vela, if you would.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, in 2011, this chronology says that you send

18   Bitcoin overseas, then you found a company in the USA with Dave

19   Kleiman.  Do you see that?

20   A.  I see that.

21   Q.  It then says:  "The established was W&K Info Defense."  Do

22   you see that?

23   A.  Yes.

24   Q.  Dr. Wright, it does not say that you established a company

25   with Ms. Lynn Wright, does it?
```

88

 1   A.  There are no details in this document.

 2   Q.  Dr. Wright, then the document goes on to list three

 3   different things that W&K was set up to do.  It's set up to

 4   further statistical and risk mitigating algorithms.  Do you see

 5   that?

 6   A.  I see that.

 7   Q.  It was set up to develop some ideas around CBD learning

 8   methodologies.  Do you see that?

 9   A.  Yes.

10   Q.  And it was set up, Dr. Wright, to mine Bitcoin.  Do you see

11   that?

12   A.  Yes.

13   Q.  Dr. Wright, at the second-to-last-sentence you say:  "In

14   all, 1.1 million Bitcoin reverted to SQ in Seychelles

15   accounts."  Do you see that?

16   A.  I do.

17   Q.  Dr. Wright, in July of 2013, you caused your companies to

18   file a lawsuit against W&K in Australia.  Do you recall doing

19   that?

20   A.  I acted for Craig Wright R&D in filing a lawsuit, yes.

21   Q.  That was July of 2013?

22   A.  June or July.  I don't remember the exact date.  Sorry.

23        MR. FREEDMAN:  Ms. Vela, could you please bring up

24   what's in evidence as P710, and let's go to Page 131 of the

25   litigation file.

89

```
1    BY MR. FREEDMAN:
2    Q.  Do you see the file stamp up in the top right corner, Dr.
3    Wright, filed 25th of July, 2013?
4    A.  I do.
5    Q.  Does that help your remember that it was July 25th, 2013
6    when you filed a lawsuit against W&K?
7    A.  That's for the lodgement of the statement of claim.  There
8    was an earlier document.  The first statement would be a letter
9    being sent, and that follows --
10   Q.  I'm sorry.  Dr. Wright, I'm having trouble hearing you.
11           THE COURT:  Would you speak into the microphone, sir.
12           THE WITNESS:  You, first of all, send the letter
13   before action and then you follow up with the statement of
14   claim.
15   BY MR. FREEDMAN:
16   Q.  So you filed a lawsuit before July 25th, 2013 against W&K?
17   A.  No.  The statement of claim was before this date.
18   Q.  I'm sorry?
19   A.  The letter before action was before the statement of claim.
20   Q.  Okay.  Dr. Wright, July 25th, 2013, that's almost three
21   months to the day after Dave Kleiman dies.  Is that not
22   correct?
23   A.  That is correct.
24   Q.  And in that lawsuit, Dr. Wright, you made a claim against
25   W&K, correct?
```

90

```
1    A.  That is correct.

2    Q.  And now in this lawsuit, Dr. Wright, that same W&K is

3    making a claim against you?

4    A.  Not technically, no.

5    Q.  Okay.  Dr. Wright, are you unaware that I represent both

6    Ira Kleiman as the personal representative of the estate of

7    Dave Kleiman and W&K Info Defense Research, LLC?

8    A.  I'm aware that you have changed the ownership structure of

9    W&K. and I'm also aware that both my wife as trustee and also

10   Lynn Wright are suing you under W&K for falsification, yes.

11   Q.  Dr. Wright, W&K is a Plaintiff listed in this case?

12   A.  Yes.

13   Q.  Thank you.

14       And, Dr. Wright, in this case W&K is the Plaintiff suing

15   you.  In the case in Australia that's on your screen, you were

16   suing W&K, correct?

17   A.  No.  That is not correct.

18   Q.  All right.  Dr. Wright, in both the lawsuit in Australia

19   and the lawsuit here in the United States, that we're sitting

20   in this courtroom right now before this Judge and jury, you

21   filed sworn statements in both, correct?

22   A.  I filed sworn statements for myself and also for the

23   entity.  The entity as Plaintiff there is not me.  It is a

24   company named Craig Wright.

25   Q.  Dr. Wright, in this litigation --
```

91

```
 1              MR. FREEDMAN:  Ms. Vela, could you please bring up
 2    P748.  Show it just to Dr. Wright, please, and counsel.
 3    BY MR. FREEDMAN:
 4    Q.  Dr. Wright, I'd like you to look at the sworn declaration
 5    you filed in this case which should now be on your screen.
 6         Do you recognize this document?
 7    A.  Yes.  Is that the only page?
 8    Q.  No.  Would you like to see it?
 9              MR. FREEDMAN:  Ms. Vela, could you scroll through the
10    document for Dr. Wright.
11              THE WITNESS:  Yes.  That is my document.
12              MR. FREEDMAN:  Your Honor, at this point Plaintiffs
13    would offer P748 into evidence.
14              THE COURT:  Is there any objection?
15              MS. MCGOVERN:  No objection, Your Honor.
16              THE COURT:  Admitted into evidence.
17         (Plaintiffs' Exhibit 748 received into evidence.)
18              MR. FREEDMAN:  We can publish the document.
19              Thank you.
20    BY MR. FREEDMAN:
21    Q.  So, Dr. Wright, we're looking at the first page of your
22    declaration that you submitted in this lawsuit.  That's the
23    caption up in the top left corner.
24         Do you see that?
25    A.  I do.
```

92

```
1    Q.  And you start off saying:  "I, Craig Wright, declare under

2    penalty of perjury under the laws of United States of America

3    that the following is true and correct."

4         Do you see that?

5    A.  I said that.

6         MR. FREEDMAN:  Ms. Vela, could you bring us to PDF

7    Page 6, please.

8    BY MR. FREEDMAN:

9    Q.  And, Dr. Wright, here again that's your signature at the

10   bottom?

11   A.  Yes.

12   Q.  And you swear again at the end:  "I declare that the

13   foregoing is true and correct under penalty of perjury in

14   accordance with the laws of the United States of America."

15        Do you see that?

16   A.  Yes.

17        MR. RIVERO:  Ms. Vela, could you please bring us to

18   Paragraph 12, which will be on Page 26.

19        No.  In the same document that we're in.

20        Let's go back to P748, please, and let's go to

21   Paragraph 12.

22        Can we zoom in on Paragraph 12.

23        Can you zoom in on it, actually.

24        Thank you.

25
```

93

```
1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, in the sworn statement you submitted in this

3    litigation -- Dr. Wright, actually, let me take one step back.

4        Do you recall that you submitted this sworn statement in an

5    attempt to get this court to dismiss this case before this

6    Judge and jury would have an opportunity to rule on it?

7             MS. MCGOVERN:  Objection.  Relevance.

8             THE COURT:  Sustained.

9    BY MR. FREEDMAN:

10   Q.  Dr. Wright, do you recall submitting this sworn declaration

11   in this case?

12   A.  Yes.

13   Q.  And in Paragraph 12 of that declaration, you swore:  "I

14   have never been a director, member, shareholder" --

15            MR. FREEDMAN:  Ms. Vela, can you highlight

16   "shareholder" for me.

17   BY MR. FREEDMAN:

18   Q.  -- "officer, employee, or representative of W&K."

19        Do you see that?

20   A.  That is correct.

21   Q.  And, Dr. Wright, you were truthful when you submitted this

22   sworn statement to this Court, were you not?

23   A.  Yes.

24   Q.  Dr. Wright, that's not what you told the Australian court

25   when you sued W&K, is it?
```

94

1    A.  The suit was not by me.  It was by Craig Wright, the

2    company.  The number after it is an Australian business number.

3    So no, even though I used my name for the company.  Many people

4    do.

5         MR. FREEDMAN:  Ms. Vela, can you please bring up P710.

6         Let's go to Page 26.

7    BY MR. FREEDMAN:

8    Q.  Dr. Wright, the case -- we're back in our Australian

9    litigation -- the case is Plaintiff Craig Steven Wright, with

10   the ABN number like you mentioned, versus Defendant W&K Info

11   Defense Research.  Do you see that?

12   A.  Yes.  It's a trust account versus the company, not myself

13   personally.

14   Q.  Dr. Wright, the title of this document, across the top

15   says:  "Affidavit of Craig S. Wright."

16        Do you see that?

17   A.  Yes.  "As the representative of Craig Steven Wright."  I

18   know that becomes complex, but Craig Wright represented the

19   corporate Craig Wright.

20   Q.  Dr. Wright --

21        MR. FREEDMAN:  Can we go to Page 31.

22   BY MR. FREEDMAN:

23   Q.  Dr. Wright, you then signed the sworn affidavit.  Is that

24   your signature at the top?

25   A.  Yes.

95

1    Q.  And you affirmed it?

2    A.  I did.

3    Q.  It is not a company that affirmed it, Dr. Wright.  It's --

4    you personally signed it, did you not?

5    A.  As a representative of the company, Craig Wright signs for

6    corporate Craig Wright, yes.

7    Q.  So, Dr. Wright, we just saw that in the litigation here in

8    Florida that we're now standing in, you swore you were never a

9    shareholder of W&K, correct?

10   A.  That is correct.

11          MR. FREEDMAN:  Ms. Vela, can you bring us to Page 29

12   of the Australian affidavit.

13          And can you zoom in on Paragraph 23.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright, in Australia you submitted a sworn affidavit

16   that -- and I'm looking at the bottom of that paragraph -- the

17   shareholder of W&K Info Defense Research, LLC was Craig S.

18   Wright, 50 percent; David A. Kleiman, 50 percent.  Do you see

19   that?

20   A.  Yes.  I see that.

21   Q.  And, Dr. Wright, the reason you told the Australian court

22   that you are a shareholder of W&K was because you then

23   consented to judgment on behalf of W&K to transfer all of its

24   assets to you; isn't that correct?

25   A.  That is not correct.

96

```
1    Q.  All right.  Dr. Wright, let's take a look, a more detailed
2    look, at the Australian court lawsuits that you have filed
3    against W&K.
4              MR. FREEDMAN:  Ms. Vela, can you take those two
5    exhibits down, please.
6    BY MR. FREEDMAN:
7    Q.  Before we jump into the documents of the case, Dr. Wright,
8    you eventually obtained a judgment against W&K in Australia in
9    those two cases, did you not?
10   A.  There was a consent judgment forgiving and allowing all
11   companies to keep their original assets, forgiving all transfer
12   of assets and canceling transfers.  So that was the consent
13   order.
14   Q.  And, Dr. Wright, just so you know where I'm going with
15   this, I'm going to walk the jury through the various actions
16   you did in Australia and the steps you took to obtain those
17   judgments.  Okay?
18   A.  Yes.
19   Q.  Dr. Wright, you're aware, I'm sure, in this action, the
20   Plaintiffs contend that you used these actions to try and steal
21   W&K's assets, correct?
22   A.  You are contending that, yes.
23   Q.  And, Dr. Wright, Dave died on April 26th, 2013, right?
24   A.  Yes.  Well, actually before that, but he was found then.
25   Q.  And you first made contact with the Kleiman family nine and
```

97

```
 1   a half months later on February 2014, correct?
 2   A.  Not technically.  I contacted his fiancee, which I consider
 3   family.
 4          MR. FREEDMAN:  Ms. Vela, can you please bring up P710,
 5   and let's go to Page 131.
 6   BY MR. FREEDMAN:
 7   Q.  Dr. Wright, we looked at this document a little earlier.
 8   It is a statement of claim that you filed to initiate the
 9   lawsuit against W&K in Australia, correct?
10   A.  As I said, the letter before action is really the
11   initiation.  But yes, I filed the statement of claim.
12   Q.  And we looked at this.  Plaintiff is Craig Steven Wright,
13   with the ABN number after it.  The Defendant is W&K Info
14   Defense Research, LLC.  Do you see that?
15   A.  I do.
16   Q.  And it says it's:  "Filed for Craig S. Wright, the
17   Plaintiff."  You see that?
18   A.  Yes, I do.
19   Q.  And we've established this occurs three months after Dave
20   dies?
21   A.  Yes.
22   Q.  And in the lawsuit --
23          MR. FREEDMAN:  Ms. Vela, can you go to the next page
24   of the lawsuit, please.
25
```

98

```
1   BY MR. FREEDMAN:

2   Q.  In the lawsuit, at the very top --

3          MR. FREEDMAN:  Can we zoom in to the Relief Claim

4   section.

5   BY MR. FREEDMAN:

6   Q.  At the very top of this lawsuit, Dr. Wright, you're

7   claiming that the Defendant, that's W&K, pay the Plaintiff,

8   that's Craig Wright, your company, the total amount --

9          MR. FREEDMAN:  Sorry.  Can we publish this to the

10  jury?  It's in evidence.

11         THE COURT:  What is the exhibit number?  I can let you

12  know.

13         MR. FREEDMAN:  It's P710.  It's in evidence.  I

14  just --

15         THE COURT:  Yeah.  710 is in evidence.

16         MR. FREEDMAN:  I just don't know when we lost the

17  screen to the feed to the jury.

18         COURTROOM DEPUTY:  You need to -- I'm sorry.  Every

19  time you want to publish or you want something to be seen when

20  you change, just say so.  So we can keep up with you.

21         MR. FREEDMAN:  Sure.  Sorry.

22  BY MR. FREEDMAN:

23  Q.  Let's back up one more time, Dr. Wright, so the jury can

24  follow this along.

25         MR. FREEDMAN:  Ms. Vela, can you bring up the first
```

99

```
1    page of the lawsuit.

2    BY MR. FREEDMAN:

3    Q.  We'll do it quickly.

4        Statement of claim, Plaintiff Craig Steven Wright,

5    Defendant W&K Info Defense, filed for Craig S. Wright,

6    Plaintiff, on July 25th, 2013, three months after Dave died,

7    right?

8    A.  No.  Plaintiff is Craig Steven Wright, not Craig S. Wright.

9    There is a big difference there.  That's the corporate entity.

10   Not me.

11   Q.  Dr. Wright, you see the fourth highlight down on the

12   document?

13   A.  I do.

14   Q.  It says:  "Craig S. Wright, Plaintiff."  I'm just reading

15   from the document.

16   A.  Again, I had a business name filed under my name.  Many

17   people do.

18   Q.  Let's go to the next page, please, Dr. Wright.  So this is

19   where we were a moment ago.  This is the relief claim section.

20   It's the second page of the lawsuit.

21       In this lawsuit, Dr. Wright, you claim that the Defendant,

22   that's W&K, pay the Plaintiff, that's Craig Wright, your

23   company, the total amount claimed below, which is in this case

24   a little over $28 million, right?

25   A.  That's correct.
```

100

```
1          MR. FREEDMAN:  Ms. Vela, can you zoom out of that

2     again and let's go down to Paragraph 3.  Can we call that one

3     out, please.

4     BY MR. FREEDMAN:

5     Q.  Dr. Wright, the next thing -- one of the next things in the

6     lawsuit says:  "Is by contract dated 27th of October 2008, the

7     Defendant," that's W&K, "agreed to pay the Plaintiff," that's

8     you, "for property and consulting services to complete

9     research."

10         Do you see that?

11    A.  Yes.  That's an error.

12    Q.  It is an error, Dr. Wright, because you know and I know

13    that W&K was not formed until three years later, in February of

14    2011; isn't that right?

15    A.  Yes.  So that date is incorrect.

16    Q.  So I just want to make sure I understand what you're

17    saying.  You're saying you filed a $28 million lawsuit against

18    your deceased best friend's company and you got the contract

19    date wrong by three years?

20    A.  Yes.  There's a typo in the date.  So yes.

21    Q.  Then, Dr. Wright, after you filed this claim in July, you

22    then file another claim against W&K in August; is that correct?

23    A.  No.  Again, the other one was filed earlier, but it had to

24    be withdrawn and refiled.

25         MR. FREEDMAN:  Ms. Vela, can you please bring up P709.
```

101

```
 1              Let's go to Page 28.  This is also in evidence.
 2    BY MR. FREEDMAN:
 3    Q.  Dr. Wright, this is another statement of claim.  We've seen
 4    this -- looking document before, right?
 5    A.  Yes.
 6    Q.  It is one of the first documents that gets filed to
 7    initiate a lawsuit; is that correct?
 8    A.  Again, that's part of the initiation, but technically
 9    that's correct enough.
10    Q.  And again, filed by Craig Steven Wright with an ABN number
11    against W&K Info Defense Research, LLC?
12    A.  Yes.
13    Q.  Filed for Craig S. Wright, Plaintiff?
14    A.  Uh-huh.
15    Q.  And you see the official court stamp up at the top?
16    A.  I do.  Supreme Court of New South Wales.
17    Q.  And it says it's filed August 13th, 2013?
18    A.  That is correct.
19    Q.  This is the other lawsuit I was talking about.  There was
20    another statement of claim filed on August 13th, 2013, correct?
21    A.  Yes.  It was actually refiled.  But that's, again,
22    technically correct.
23              MR. FREEDMAN:  Ms. Vela, can you bring us to the
24    second page of the second lawsuit in Australia.
25
```

102

```
1    BY MR. FREEDMAN:

2    Q.  And in this lawsuit, like the other one, Dr. Wright, you're

3    seeking a significant amount of money from W&K.

4        In the relief claim section, you say that you want the

5    Defendant, that's W&K, to pay the Plaintiff, that's your

6    companies, the total amount claimed below, which is about 28

7    and a half million dollars?

8    A.  Again, technically incorrect because the action was

9    basically done in a consent where we forgave the debt.  So

10   technically you have to file this under Australian law for

11   public company groups.  That's what I did.  Then I forgave the

12   debt.

13   Q.  Dr. Wright, in total, between the two lawsuits we're

14   looking at, we just looked at, you were seeking in excess of

15   $56 million from W&K?

16   A.  No.  That's not correct.

17   Q.  Dr. Wright, let's go down to the next paragraph.

18        MR. FREEDMAN:  Ms. Vela, could you bring us to -- in

19   the Pleadings and Particulars section, can we take a look at

20   Paragraph 1.

21   BY MR. FREEDMAN:

22   Q.  Paragraph 1 says:  "Between 2011 and 2013 the Plaintiff,"

23   that's you and your company, "provided contract labor services

24   to the Defendant," that's W&K.  Right?

25   A.  Yes.
```

103

```
1            MR. FREEDMAN:  Ms. Vela, can you zoom out of that one
2    more time, and let's go to Paragraph 13 of the lawsuit.
3            Can you just call it out but not actually zoom in so
4    we can have the rest of it there.  Yes.
5            Thank you.
6    BY MR. FREEDMAN:
7    Q.  And, Dr. Wright, here you say that there was a contract.
8    The contract stated that a breach of the contract would lead to
9    a liquidated damages, which is a pre-agreed amount that has to
10   be paid, right?
11   A.  Yes.
12   Q.  And if the liquidated damages amount is not paid, then all
13   IP and systems return to the sole ownership of the Plaintiff.
14   That's you, right?
15   A.  That's not me.  That's the corporate entity, but yes.
16   Q.  Craig Wright, R&D, the company that bears your name, right?
17   A.  Yes.
18   Q.  So, Dr. Wright, if W&K doesn't pay, it has to return the IP
19   and its systems to your company?
20   A.  Technically, yes.  Except I forgave that.  So the
21   intellectual property remained with W&K.
22   Q.  Let's take a look at the next paragraph, Dr. Wright.
23       You provide some more detail about what that IP is in this
24   paragraph.  You say the IP from W&K that would return to your
25   sole ownership:  "The IP software and code used in the creation
```

104

1    of a Bitcoin system"?

2    A.  Yes.  It's an exchange system and banking software.

3    Q.  Dr. Wright, this is August 13th, 2013.  You've now filed

4    two lawsuits against W&K seeking over $56 million in

5    intellectual property, and the next thing you do is you file a

6    document six days later called an Acknowledgment of Liquidated

7    Claim; is that correct?

8            MS. MCGOVERN:  Objection.  Misstates the testimony.

9            THE COURT:  I'm sorry.  The basis of the objection?

10           MS. MCGOVERN:  Misstates the testimony that he just

11   provided.

12           THE COURT:  Overruled.

13           THE WITNESS:  No.  That's not correct.

14   BY MR. FREEDMAN:

15   Q.  All right.

16           MR. FREEDMAN:  Ms. Vela, can you please bring up 709,

17   Page 34.  Let's look at Page 245661.

18   BY MR. FREEDMAN:

19   Q.  And, Dr. Wright, that's the case where you were seeking to

20   obtain the intellectual property, software, and code used to

21   create Bitcoin?

22   A.  No.  This has nothing to do with the code creating Bitcoin.

23   A Bitcoin system is an exchange and banking software.

24   Q.  That's your testimony today.

25       Dr. Wright, at the top of this Acknowledgment of Liquidated

105

1   Claim, there's that little court stamp again and next to it is

2   a date filed August 19th, 2013, six days after August 13th,

3   2013, when you filed the second lawsuit, correct?

4   A.  Correct.

5   Q.  And, Dr. Wright, let's take a look at what this document

6   does.  First off, it's titled "Acknowledgement of Liquidated

7   Claim."  It's filed in the 5661 case number, and it's filed in

8   the case of Craig Steven Wright ABN v. W&K Info Defense

9   Research.

10  A.  Correct.

11  Q.  Do you see that?

12      All right.  Dr. Wright, the document says it's filed for

13  the Defendant.  That's W&K?

14  A.  The Defendant included Lynn Wright, who was a member, and

15  other people appointed.  So yes.

16  Q.  I'm sorry.  Dr. Wright, does the document say it's filed --

17  does the Defendant in this document -- is it listed as Lynn

18  Wright or is it listed as W&K Info Defense Research, LLC?

19  A.  There was an agreement between Lynn Wright and myself for

20  this.  So technically, yes, it was my wife Lynn.

21  Q.  Dr. Wright, all I asked you was:  Does the document say

22  Lynn Wright or does it say W&K Info Defense Research, LLC?

23  A.  It's the same.  But yes.

24  Q.  And this document, the Acknowledgement of Liquidated Claim,

25  it was filed on behalf of the Defendant, which this document

106

1    also says is W&K Info Defense, LLC, correct?

2    A.  It says Defendant, and for that was Dr. C. Wright.

3    Q.  That's right.

4         For some reason, Dr. Wright, the contact name for the

5    Defendant W&K is Dr. C. Wright.  Do you see that?

6    A.  That's correct.

7    Q.  Dr. Wright, that's your signature at the bottom of that

8    page, correct?

9    A.  Yes.

10   Q.  And here, Dr. Wright, you write in this document, in

11   Paragraph 1:  "I am the legal agent and representative of the

12   Defendant," meaning, I am the legal agent and representative of

13   W&K.  Isn't that correct?

14   A.  Yes.  Lynn appointed me and so did the other parties.

15             MR. FREEDMAN:  Ms. Vela, can you highlight the callout

16   that we've got, but put it back into the document -- I'm sure

17   that's the technical term, but -- and can you move it off to

18   the side.

19             Let's bring up Dr. Wright's sworn statement from the

20   Florida litigation, here.  I think that's P748.

21             And can we go to Paragraph 12.

22             And let's call out 12, please.

23             And can you move it up.

24   BY MR. FREEDMAN:

25   Q.  So in Australia, Dr. Wright, you're filing a document:

107

1    "I'm the legal agent and representative for W&K."  And in

2    Florida, in front of this Court, you swore that:  "I have never

3    been a representative of W&K."

4        Do you see that, Dr. Wright?

5    A.  I see what you're saying, yes.

6            MR. FREEDMAN:  Ms. Vela, can you put the Florida sworn

7    statement down again.

8            And can you get rid of it so we can focus back on the

9    Australian litigation.

10   BY MR. FREEDMAN:

11   Q.  So, Dr. Wright, you filed this Acknowledgment of Liquidated

12   Claim document --

13           MR. FREEDMAN:  Ms. Vela, can you show us the next

14   page.

15   BY MR. FREEDMAN:

16   Q.  The filing party of this document, Dr. Wright, is listed as

17   W&K Info Defense Research, LLC.  Do you see that?

18   A.  Yes.

19   Q.  It is not listed as Lynn Wright, correct?

20   A.  Doesn't need to be.  But that's correct.

21   Q.  And, Dr. Wright, you also said that the filing address for

22   W&K Info Defense Research, LLC, was located in Bagnoo, New

23   South Wales, Australia.  Do you see that?

24   A.  Yes.  My wife was at that property at the time.  That's

25   correct.

108

```
1    Q.  And you list in the contact details for the filing party,
2    the contact details for W&K, you list your email address at the
3    bottom "craig@integys.com."  Do you see that?
4    A.  Integrys.  Yes.
5    Q.  And you say in your filing to the Australian Court that the
6    capacity you have to act for W&K is because you are its
7    director/Australian agent.  Do you see that?
8    A.  Capacity, no.  I was representing the director, which was
9    Lynn Wright.
10   Q.  Dr. Wright, does the document say you were representing the
11   director or does it just say director?
12   A.  It says:  "Capacity."  I was filing under the action of the
13   director.
14   Q.  It says:  "Director," right, Dr. Wright?
15   A.  It says:  "Capacity to act."  I was acting under the
16   direction of the director.
17          MR. FREEDMAN:  Ms. Vela, can we please bring up
18   Dr. Wright's sworn statement in this Court, please.
19          Let's go to Paragraph 12 again.
20   BY MR. FREEDMAN:
21   Q.  Dr. Wright, your sworn statement to this Court:  "I have
22   never been a director of W&K."
23   A.  No.  I was the agent of the director.
24          MR. FREEDMAN:  Ms. Vela, can you put down the sworn
25   statement in this Court, please.
```

109

```
 1    BY MR. FREEDMAN:
 2    Q.  So, Dr. Wright, you filed this document, and let's see what
 3    it does.
 4          MR. FREEDMAN:  Ms. Vela, let's go to Page 1.
 5    BY MR. FREEDMAN:
 6    Q.  With this document, Dr. Wright, in Paragraph 2, you say:
 7    "I acknowledge" -- "I" meaning the Defendant -- "I acknowledge
 8    the whole of the amount claimed by the Plaintiff."
 9          Do you see that, Dr. Wright?
10    A.  I do.
11    Q.  So, Dr. Wright, in this case you are both the Plaintiff and
12    the Defendant; isn't that right?
13    A.  No, it's not.  I was representing Lynn Wright at the time
14    and also the other, the corporation.  So I was acting for both.
15    Both of them have documentation on that.
16    Q.  Dr. Wright, you were agreeing on behalf of W&K, a company
17    that you swore you never had authority to act for, you were
18    never its director, you were never a shareholder, that W&K owed
19    your company nearly $30 million in this one case; isn't that
20    correct?
21    A.  No.  That is not correct.
22          MR. FREEDMAN:  Ms. Vela, can you please bring back up
23    the Florida affidavit, the Florida sworn statement.
24    BY MR. FREEDMAN:
25    Q.  Dr. Wright, now in court today you're testifying that
```

110

```
1   Ms. Lynn Wright gave you authority to act on behalf of W&K,
2   correct?
3   A.  Yes, she did.
4         MR. FREEDMAN:  Ms. Vela, will you please bring us to
5   Paragraph 13 of Dr. Wright's sworn statement in this Court.
6   BY MR. FREEDMAN:
7   Q.  Dr. Wright, you swore to this Court:  "I have never
8   exercised authority or control over W&K, and I have never had
9   any right to exercise authority or control over W&K," didn't
10  you?
11  A.  Nor did I.  I was acting as authority for Lynn Wright.
12  Q.  Okay, Dr. Wright.
13        MR. FREEDMAN:  Ms. Vela, can you please bring down the
14  sworn statement in this Court.
15  BY MR. FREEDMAN:
16  Q.  Dr. Wright, I just want to dumb this down a little bit more
17  here to make sure you and I are on the same page.
18     You have now filed a document in the Australian court
19  saying:  "I'm standing in the shoes of W&K", and I'm saying:
20  "Yes, I owe Craig Wright R&D all this money."  Is that fair?
21  A.  No.  I was standing in the shoes of Lynn Wright, who was
22  standing in the shoes of W&K.
23  Q.  And, Dr. Wright, you do the exact same thing we just saw in
24  the first case you filed against W&K, don't you?
25  A.  No.  I forgave the company and left them with all
```

1    intellectual property.  If you look at the consent judgment,

2    that's what it says.

3           MR. FREEDMAN:  Ms. Vela, can you please bring up P710,

4    which is the other litigation, and let's go to Page 138.

5    BY MR. FREEDMAN:

6    Q.  This is another Acknowledgement of Liquidated Claim,

7    Dr. Wright, correct?

8    A.  Yes.

9    Q.  Filed the same day, August 19th, 2013?

10   A.  Correct.

11   Q.  This one is in the other case.  5983.

12          MR. BRENNER:  You have to ask for it to be published.

13          MR. FREEDMAN:  I'm sorry.  You're right.

14          Please publish this to the jury.  It's in evidence.

15          Okay.  Thank you for catching us there before we had

16   to do it again.

17   BY MR. FREEDMAN:

18   Q.  Acknowledgment of Liquidated Claim, August 19th, 2013, in

19   the other case, 5983, correct?

20   A.  Correct.

21   Q.  Craig Steven Wright ABN, W&K Info Defense Research, LLC.

22   Do you see that?

23   A.  I do.

24   Q.  Filed for the Defendant W&K.  Contact name, Dr. C. Wright.

25          MS. MCGOVERN:  Objection.  Asked and answered.

112

```
 1              THE COURT:  I'm sorry.  The basis of the objection?
 2              MS. MCGOVERN:  Asked and answered.
 3              THE COURT:  Overruled.
 4    BY MR. FREEDMAN:
 5    Q.  Dr. Wright, here again you swear -- sorry, Dr. Wright.
 6    Apologize.
 7         Is that your signature on the bottom?
 8    A.  Yes.
 9    Q.  And, Dr. Wright, here you write in the court filing:  "I am
10    the legal agent and representative for the Defendant W&K,"
11    correct?
12    A.  No.  Technically, I'm the agent for Lynn Wright, who is the
13    representative of the Defendant.
14    Q.  Dr. Wright, I'm not going to bring back up your sworn
15    statement where you swore you were never a representative of
16    W&K, but you recall it was there, correct?
17    A.  I was the representative of Lynn Wright, who was the
18    representative of W&K.  That is correct.
19    Q.  I'm sorry.  Dr. Wright, can you show me on this document
20    where it says Lynn Wright?
21    A.  There's a different area for that.  Sorry.  That's not this
22    document.
23    Q.  Okay.  Well, maybe your lawyers will show us that document.
24              MR. FREEDMAN:  Can you please put down that callout
25    please.
```

113

```
 1            And let's go to the next page, Ms. Vela.
 2    BY MR. FREEDMAN:
 3    Q.  The next page, again, Dr. Wright, the filing party is
 4    listed as W&K Info Defense.
 5    A.  Yes.
 6    Q.  You again list W&K's address as Australia?
 7    A.  Yes.
 8    Q.  You again list your capacity to act for the filing party as
 9    the director?
10    A.  No.
11    Q.  Again, in conflict with your sworn statement to this Court,
12    correct?
13    A.  No.
14    Q.  And you list the email address of W&K as craig@integyrs.com
15    correct?
16    A.  Integyrs.
17    Q.  Integyrs; is that correct?
18    A.  Yes.
19    Q.  So, Dr. Wright, you've now filed proof in both cases that
20    W&K owes you over $56 million?
21    A.  No.  They didn't owe me any money.  They owed a
22    corporation, and it was forgiven.
23    Q.  And you have done this, Dr. Wright, within months of the
24    passing of your best friend, Dave Kleiman?
25    A.  Yes.  Technically, as a listed -- well, a public company
```

114

1    group, I have to file everything.  I used to be an auditor.  I

2    filed the documents and then I forgave the debt.  So

3    technically, W&K would have owed this.  I forgave it.

4    Q.  We'll see what happens at the end of this court case,

5    Dr. Wright.

6        Dr. Wright, you never -- strike that.

7        Dr. Wright, you don't reach out at this time to tell Ira

8    Kleiman, the personal representative of Dave's estate, that you

9    have sued W&K, do you?

10   A.  I sent this document and the pre-documents.  But Dave told

11   me he had one brother, and that brother was dead, and that no

12   other person in his life existed.

13   Q.  Okay.  The same brother he nominated as PR, as personal

14   representative of his estate, left his entire estate to, he

15   told you that brother was dead?

16   A.  No.  Dave said he had one brother and that brother was

17   dead.

18   Q.  Okay.  So, Dr. Wright, instead of reaching out to the

19   estate of Dave Kleiman, the next thing you do in this lawsuit

20   is you file a consent judgment form, correct?

21   A.  No.  I'd already spoken to Dave's fiancee, who said that he

22   didn't have a brother, that that brother was dead.

23       MR. FREEDMAN:  Ms. Vela, can you please go to P709,

24   Page 26.

25

115

```
 1   BY MR. FREEDMAN:

 2   Q.  So, Dr. Wright, you've got a statement of claim filed, and

 3   this is which case we're in, the 5661 case.  That's the one

 4   seeking the IP from Bitcoin.

 5      You've got a claim filed.  We saw that.  You've got an

 6   Acknowledgement of Liquidated Claim with W&K saying:  I owe you

 7   all the money.

 8            MR. FREEDMAN:  Same -- sorry.  In evidence.

 9            Please publish it to the jury.

10   BY MR. FREEDMAN:

11   Q.  Dr. Wright, you've got a claim filed in Australia.  You

12   have got an Acknowledgement of Liquidated Claim saying W&K owes

13   you money.  So the next thing you do is you file a consent

14   order to get the Court to rubber-stamp the transfer, correct?

15   A.  No.

16   Q.  All right.  Well, let's see what this document is.  Again,

17   it is in the lawsuit of Craig Steven Wright v. W&K Info

18   Defense.  Right?

19   A.  Yes.

20   Q.  And it is filed for Craig S. Wright, the Plaintiff?

21   A.  Technically, yes.

22   Q.  And before we go into what the document does, let's see the

23   state of the document.  At the bottom, it bears your signature,

24   correct?

25   A.  Correct.
```

116

1   Q.  And that signature says the Plaintiff consents to the

2   order?

3   A.  Yes.

4          MR. FREEDMAN:  Let's go to the next page, please,

5   Ms. Vela.

6   BY MR. FREEDMAN:

7   Q.  On the next page of the document, it bears the signature of

8   somebody called J. Wilson.  Do you see that?

9   A.  Yes.  He was there in the court on the day.

10  Q.  Dr. Wright, we'll get back to whether Jamie Wilson was in

11  court that day, Dr. Wright.  But before we do, Jamie Wilson,

12  that's the same bald Australian man that the jury heard from

13  earlier today saying he had absolutely nothing to do with W&K;

14  isn't that correct?

15  A.  That's what he said.

16  Q.  And he here is signing for the Defendant, and it says the

17  Defendant W&K consents, right, Dr. Wright?

18  A.  That is correct.

19  Q.  And at the bottom of this document, Dr. Wright, there's a

20  seal and signature for the Court seal and the signature of the

21  judge to sign.

22      Do you see that?

23  A.  I see that.

24  Q.  That signature line is blank, Dr. Wright.  The Court has

25  not signed your consent order, correct?

117

1    A.   No.   The Court actually signed the consent order.

2    Q.   Not this one, right?

3    A.   Not that one, but it was signed.

4    Q.   We're going to get to when the Court eventually signs the

5    consent order, Dr. Wright, but stay with me.   Right now, this

6    one is not signed?

7    A.   This one is an unsigned copy.

8         MR. FREEDMAN:   Ms. Vela, can you bring us back to Page

9    1.   Let's see what the document is attempting to accomplish.

10   BY MR. FREEDMAN:

11   Q.   The terms of the order made by the Court by consent, one:

12   "Judgment in the sum of $28,534,000 in favor of the Plaintiff,"

13   right?

14   A.   Yes.

15   Q.   Two:   "No order as to costs"?

16   A.   Correct.

17   Q.   Three:   "The Court notes the agreement of the parties."

18   This document says:   "Agreed.   The Court notes the agreement of

19   the parties that the Plaintiff will accept the transfer of the

20   intellectual property held by the Plaintiff in full and final

21   satisfaction of the judgment."

22        Do you see that?

23   A.   I do.   Intellectual property created by Greyfog, an

24   Australian company, was retained.   Yes.

25   Q.   Dr. Wright, we covered the intellectual property here.   It

118

```
1   was the intellectual property used to create a Bitcoin system?

2   A.  No.  This is linked to Greyfog.  Greyfog was a venture

3   capital-funded organization started in 2009 for a combination

4   of SCADA and exchange products.

5   Q.  Doesn't say that on this document, does it, Dr. Wright?

6   A.  Not on this document, no.

7   Q.  And you do the same thing in the other case, don't you,

8   Dr. Wright?

9   A.  I closed down and basically had the Plaintiff and the

10  Defendant keep their rights, yes.

11          MR. FREEDMAN:  Ms. Vela, can you please bring up P709.

12  Let's go to Page 36.

13          And can we please publish it to the jury.

14          Sorry.  Can you zoom back out.

15          I got ahead of myself.  Page 26, not 36.

16  BY MR. FREEDMAN:

17  Q.  And there's our consent order again, Dr. Wright?

18  A.  Yes.

19  Q.  This is the other case -- sorry.  We did this case.

20          MR. FREEDMAN:  Let's do P710.  That's the other case.

21          And Page 138.

22          That's the acknowledgment of liquidated claim.  And

23  the consent order is on -- let me find it.

24          Got it up there.

25          All right.  Thank you.
```

119

```
1    BY MR. FREEDMAN:

2    Q.  This is the other case, the 5983 case, Dr. Wright, and

3    we're looking at the same document.  Consent order, Craig

4    Steven Wright, W&K Info Defense, filed for Craig S. Wright,

5    Plaintiff.  Signature is on the second page of this document.

6           MR. FREEDMAN:  Ms. Vela, can you bring us there.

7    BY MR. FREEDMAN:

8    Q.  Signed by you for Plaintiff, Plaintiff consents.  Signed by

9    Jamie Wilson, Defendant consents.

10   A.  Yes.

11   Q.  Not signed by the Court, correct?

12   A.  At this point, yes.

13   Q.  And back to the first page.  The terms of the order made by

14   consent are a judgment for 28.2 million.  No order as to costs.

15   The Court notes the agreement of the transfer of intellectual

16   property and the deed of transfer for the intellectual property

17   is to be complete.  Correct?

18   A.  Yes.

19   Q.  Dr. Wright, we saw the Court doesn't sign this order.  And

20   instead, you get an email from the Court Registrar on September

21   3rd, 2013, correct?

22   A.  I don't remember the exact date, but yes, we had to attend.

23          MR. FREEDMAN:  Ms. Vela, can you please bring up P709,

24   Page 36.

25
```

120

```
 1   BY MR. FREEDMAN:
 2   Q.  And so, Dr. Wright, this is an email from the Supreme Court
 3   of New South Wales.  Do you see on the bottom?
 4   A.  I see.
 5   Q.  And it's to Craig Wright -- craigswright@acm.org.
 6   A.  I see.
 7   Q.  And it says:  "Dear, Mr. Wright, please be advised that the
 8   consent order filed on 8/28/2013 was not dealt by registrar in
 9   chamber."
10       Do you see that?
11   A.  I see that.
12   Q.  And registrar is a type of judge, right?
13   A.  It's more like a magistrate.  But for simplicity sake, yes.
14   Q.  So the matter is now listed on October 20, 2013.  Do you
15   see that?
16   A.  I do.
17   Q.  That's because in Europe they flip the convention, right?
18   And in Australia they flip the convention.  And here we do
19   month, day, year, and there they go day, month, year.  Right?
20   A.  That's correct.  But I'd say you flip it.  But other than
21   that ...
22   Q.  Fair enough.  We flip it.  Okay.  We came second, so we
23   flip it.
24       So the matter is now listed for hearing on October 30th,
25   2013 at 9:00 a.m. by registrar's request, and all parties need
```

1    to be present in court that day.  Do you see that?

2    A.  I do.

3    Q.  Dr. Wright, you eventually attend this hearing and you ask

4    for the consent order to be entered, but the registrar

5    hesitates because the same person signs for the Plaintiff and

6    the Defendant; isn't that right?

7    A.  No.  The hesitation was the large amount.  And I also said

8    that there will be no transfer of money.  And the registrar

9    basically said, in front of everyone -- asked me why was I

10   forgiving a large amount of money in a company.  And I said:

11   "Because the company's not ever going to pay it.  So I'm

12   closing all of the contracts."

13   Q.  All right.  Well, let's take a look at the hearing

14   transcript, Dr. Wright.

15            MR. FREEDMAN:  I'm going to bring that up as P105,

16   which is already in evidence.

17   BY MR. FREEDMAN:

18   Q.  Dr. Wright, do you see in the top left corner you've got

19   the little Supreme Court of New South Wales, Common Law

20   Division?

21   A.  I see.

22   Q.  And you're before Registrar Bradford?

23   A.  I see.

24   Q.  And it's on Wednesday, 30th of October, 2013, the day you

25   were told to show up?

122

```
 1   A.  Yes.
 2   Q.  And it's for both cases.  We see both of them listed right
 3   up there.  You've got the 661 case and the 983 case, right?
 4   A.  Yes.
 5   Q.  And the transcript says that the Plaintiff, that's you,
 6   appeared in person, right?
 7   A.  Yes.
 8   Q.  And it says that there was no appearance for the Defendant?
 9   A.  That's correct.
10   Q.  You said earlier Jamie Wilson attended court that day,
11   didn't you?
12   A.  No.  I said he attended court.  There are other days.
13   Q.  There is another day, Dr. Wright.  We'll see if he attends
14   that day too.
15       So, Dr. Wright, you come up and your case is called, Case
16   Number 4951, and you see that's you talking, Plaintiff, right?
17   A.  Yes.
18   Q.  You say:  "Craig Wright, Plaintiff, 49 and 51, Registrar, I
19   also note that the sole other director from the U.S. of the
20   Defendant has died intestate."
21       Do you see that?
22   A.  Yes.
23   Q.  Dr. Wright, do you know what "intestate" means?
24   A.  Yes, I do.
25   Q.  What does "intestate" mean, Dr. Wright?
```

123

```
1   A.  As far as I knew, without will.  No one else could tell me
2   that he had any family.
3   Q.  Dr. Wright, you know that the jury in this case has seen
4   Dave Kleiman's will, right --
5   A.  Yes.  But I hadn't.
6   Q.  Okay.  So:  "The sole other director from the U.S. of the
7   Defendant has died intestate."  We all agree now that's wrong.
8   And then you say:  "Basically" --
9   A.  No, we don't.
10  Q.  Okay.
11      -- "basically there's been a shareholder's meeting held and
12  resolution to pass the matter has been obtained and the company
13  will be wound down straight after the matter."
14      Do you see that?
15  A.  Yes.
16  Q.  And the registrar says to you:  "What do you want done
17  today, Mr. Wright?"  And you say:  "Basically, just the orders
18  that we did by consent in the past and that they're approved."
19      Do you see that?
20  A.  I see that.
21  Q.  The registrar responds to you.  He says:  "I've got a copy
22  of two things.  You filed a statement of claim."
23  A.  Yes.
24  Q.  You say:  "That's correct."  Correct?
25  A.  Correct.
```

124

```
1    Q.  And then the registrar says back to you:  "Then there's an
2    acknowledgement of a liquidated claim that's been filed.  The
3    signature on that acknowledgment appears to be the signature
4    that's on the statement of claim for the Plaintiff."
5         Do you see that?
6    A.  I do.
7    Q.  So the registrar is saying:  "Why is the same person
8    signing for the Plaintiff and the Defendant, Dr. Wright?"
9    A.  That happens in corporations all the time.
10          MR. FREEDMAN:  Ms. Vela, can you scroll down for us.
11   BY MR. FREEDMAN
12   Q.  So in response to the registrar's question:  "Why is the
13   same person signing for the Plaintiff and the Defendant,"
14   Dr. Wright, you say:  "I am the sole director for the company
15   now."
16        You see that?
17   A.  Yes.
18   Q.  The same company that you swore to this Court you were
19   never a director of, didn't you, Dr. Wright?
20   A.  That's not what I was trying to say on that day.
21   Q.  Okay.  You say:  "I'm not a resident.  So I can't act and
22   take the company over there.  I had appointed another person.
23   I have 51 percent of the shares."
24   A.  Dot, dot, dot, "under control."  Yes.  There had been a
25   meeting with my wife, or ex-wife now.
```

125

1    Q.  "I have never been a shareholder of W&K."

2    A.  Control of 51 percent of the shares is not having shares.

3    A company, and my ex-wife, voting control is not the same as

4    having shares.

5    Q.  The registrar responds to you, Dr. Wright:  "Do you have

6    any evidence in relation to any of that before I sign a consent

7    judgment for $28 million, which at the moment I'm not prepared

8    to do?"

9        Do you see that?

10   A.  I do.

11   Q.  And in response to the Registrar's question of whether or

12   not you have any evidence for any of that, you say:  "No,"

13   correct?

14   A.  I say the full line.  But yes, that is correct.  There's

15   "no" in that.

16   Q.  "No, we don't have any evidence."

17       "What we actually just want" -- sorry -- "what we actually

18   want is just the intellectual property, which we actually

19   hold."

20       Do you see that?

21   A.  Yes.  The intellectual property that was transferred to be

22   improved that was never improved.  Correct.

23   Q.  And you already had copies of everything.  You just wanted

24   the legal stamp from the Court to transfer ownership, right?

25   A.  Having a copy is not the same as having legal rights.

126

```
1    Q.  I agree.
2         Then the registrar asked you:  "Who is the person that
3    signs the consent judgment on behalf of the Defendant?"  It
4    appears to be J. Wilson.
5         Do you see that?
6    A.  I do.
7              MR. FREEDMAN:  Let's scroll drown, please, Ms. Vela.
8    BY MR. FREEDMAN:
9    Q.  And you respond:  "J. Wilson was a director of my company
10   who was put in to act."  And there's a little bit more
11   back-and-forth.  And then right on line -- end of line 8 and 9,
12   you say:  Unfortunately, Mr. Kleiman died.
13        You see that?
14   A.  Yes.
15   Q.  And then, Dr. Wright, the registrar says to you:
16   "Mr. Wright, I think before I can enter these alleged consent
17   judgments, the Court is going to need some evidence in relation
18   to those matters.  How do you need to be able to do that?"  And
19   you say:  "What would you like?"  Right?
20   A.  Yes.
21   Q.  And the registrar says:  "I think you're going to have to
22   give some detailed affidavit evidence with regard to it, and
23   also evidence in relation to who exactly has authority to act
24   on behalf of this company and sign these documents," right?
25   A.  Yes.
```

127

```
 1    Q.  And you say:  "I can give you affidavit evidence today,"
 2    right?
 3    A.  Yes.
 4    Q.  And then he says:  "Well, what I might do, Dr. Wright, is
 5    stand them both over for, say, a week.  Can you file your
 6    affidavit evidence by then?"  Right?
 7    A.  Yes.
 8    Q.  You say:  "Yes.  Definitely." Then you say:  "We have
 9    actually taken control of the accounts and whatever else.
10    You've got stat decs for that.  So effectively, this is a
11    formality, because we have -- actually, the company has control
12    of all of the accounts now."
13         Do you see that?
14    A.  Yes.
15    Q.  So, Dr. Wright, you had already taken control over all of
16    W&K's accounts at this time?
17    A.  No.  I had received them from Lynn Wright and I had -- I
18    hadn't.  My corporation had taken control.
19    Q.  Including its Bitcoin accounts?
20    A.  No.  It didn't have any Bitcoin.
21    Q.  Dr. Wright, you see that line there where it says:  "We've
22    got stat decs for that"?
23    A.  Yes.
24    Q.  Statutory declarations?
25    A.  Yes.
```

128

```
1    Q.  I want you to remember that.  We're going to get back to

2    it.  Okay?

3    A.  Yes.  I think you're talking about D'Emilio.  Yes, I

4    remember those, but they're not those.

5    Q.  So, Dr. Wright, let's just go straight to it, then.

6           MR. FREEDMAN:  Ms. Vela, can you bring us to Page

7    26 -- you know what?  Actually, hold on.  Let's finish this

8    transcript, so we don't have to come back to it, and then we'll

9    go to 26.

10   BY MR. FREEDMAN:

11   Q.  So the registrar says to you:  "I'll make an order for that

12   to be filed by say the 5th and you come back before me on the

13   6th."  You say:  "Fine."  The registrar says:  "I'll stand

14   these matters over to 6th of November.  File your affidavit by

15   November 5th.  Thank you, Mr. Wright.  You're excused."

16   Correct?

17   A.  Correct.

18   Q.  All right.  So now, Dr. Wright, I said -- you took control

19   of W&K's Bitcoin accounts.  You said they had no Bitcoin

20   accounts?

21   A.  There is no such thing as a Bitcoin account the way you're

22   saying it, unless you're talking about Coinbase or something

23   else, which W&K never had.

24   Q.  And in that same sentence where you said that you have

25   taken control over all of W&K's accounts, you said you had
```

129

```
1    statutory declarations for it, didn't you?

2    A.  No.  I said accounts.  Accounts are financial accounts.

3    That is my MYOB and Xero accounting systems.

4           MR. FREEDMAN:  Ms. Vela, can you bring us back up to

5    Dr. Wright's statement about statutory declarations.

6    BY MR. FREEDMAN:

7    Q.  "We have taken control of the accounts and whatever else,

8    which we've got stat decs for that."

9           "That" meaning taking control of the accounts, right?

10   A.  Yes.  To get control of Xero, the accounting platform, Lynn

11   Wright had to sign a statutory declaration.  She did that.  We

12   took control of the accounting platform.

13   Q.  Dr. Wright, you did, in fact -- the registrar ordered you

14   to submit an affidavit.  You did, in fact, submit two

15   affidavits, and we're going to look at them in a minute.  We've

16   looked at one already.  But, Dr. Wright, within those

17   affidavits you submitted just one statutory declaration, didn't

18   you?

19   A.  I'm sorry?

20   Q.  In your affidavit that you filed, you told the Court you've

21   got stat decs for taking over the accounts.  You filed just one

22   statutory declaration.

23   A.  I'm sorry.  I'd have to see them.  I don't remember that

24   far back.

25           MR. FREEDMAN:  Ms. Vela, can you bring up P710, Page
```

130

```
1    62.
2              And, Ms. Vela, can you zoom in on the text, so we can
3    take a look at this.
4    BY MR. FREEDMAN:
5    Q.  Statutory declaration.  You see that?
6    A.  I see that.
7    Q.  You said accounts didn't mean Bitcoin accounts, right?
8    A.  Accounts doesn't mean Bitcoin accounts.
9    Q.  All right.  "I, Stephen D'Emilio, Level 32 Bligh Street,
10   Sydney, in the State of New South Wales, Solicitor" -- that's
11   what you call lawyers in Australia, right?
12   A.  They are a type of lawyer, yes.
13   Q.  -- "do solemnly and sincerely declare that I am the
14   solicitor acting for Mr. Craig Wright in Hotwire Preemptive
15   Intelligence.
16       "On October 2013, Mr. Wright came into my office and showed
17   me his HTC mobile phone.
18       "On the screen of the Wright mobile, I viewed and verified
19   the following Bitcoin wallet addresses.  List of addresses.
20       "I viewed the Bitcoin wallet addresses by scrolling down
21   the screen.  It appeared to me that if Mr. Wright wanted to, he
22   could control all of and make transactions in the Bitcoin
23   wallet addresses.
24       I make this solemn declaration conscientiously, believing
25   the same to be true and by virtue of the provision of the Oaths
```

```
 1    Act 1900.

 2         Do you see that?

 3    A.   I see that.

 4    Q.   That is the only statutory declaration you submitted with

 5    your affidavits yesterday in court; isn't that true?

 6    A.   I can't remember what I submitted, but you can't take over

 7    Bitcoin accounts with a stat dec.  Sorry.

 8    Q.   So your testimony here today is you told the registrar you

 9    took over the accounts.  You told the registrar you did it

10    through a statutory declaration.  The statutory declaration

11    lists only Bitcoin accounts, but you can't take over Bitcoin

12    accounts through a statutory declaration --

13    A.   The statutory --

14    Q.   -- is that correct?

15    A.   The statutory declaration lists Bitcoin addresses, not

16    accounts.  No.  It is not correct.

17    Q.   Okay.  Dr. Wright, the registrar tells you:  "Give me

18    affidavits."  And on November 4th, you filed two affidavits?

19    A.   About that, yes.  I don't remember the exact date.

20         MR. FREEDMAN:  Ms. Vela, can you please bring up P710.

21    Page 26.

22    BY MR. FREEDMAN:

23    Q.   We've looked at this affidavit already, Dr. Wright, have we

24    not?

25    A.   Quite possibly, yes.  I would have to look through it to
```

132

```
1    double-check, but I think so, yes.

2    Q.  Let's look at it in more detail.

3          MR. FREEDMAN:  Ms. Vela, can you bring us to Page --

4    sorry -- Paragraphs 3 and 4 of Page 27.

5          Let's zoom in there.

6          Ms. Vela, you missed the bottom totally, I think.

7    BY MR. FREEDMAN:

8    Q.  So on Paragraph 3 you say:  "The Defendants, W&K" -- your

9    firm, rather -- "The Defendant, W&K, is indebted to the

10   Plaintiff," that's your companies, "in respect to the balance,"

11   and you say the total down there is $28,743,000, correct?

12   A.  Yes.

13   Q.  And in the second case you say the Defendant is indebted to

14   the Plaintiff with respect to a balance of $29 million?

15   A.  Yes.  With the interest rate under the court amount, yes.

16         MR. FREEDMAN:  Ms. Vela, can you zoom out of that,

17   please, and go to Paragraph 12 on the next page.

18   BY MR. FREEDMAN:

19   Q.  Paragraph 12, Dr. Wright, you say that a contract was

20   formed in April of 2011.

21       Do you see that?

22   A.  I see that.

23         MR. FREEDMAN:  Ms. Vela, can you bring that down.

24   BY MR. FREEDMAN:

25   Q.  In 13 you say 300,000 Bitcoin and a series of software
```

133

```
1   projects were to be paid in 2013 as consideration for that
2   contract, right?
3   A.  Yes.
4        MR. FREEDMAN:  Ms. Vela, can you please bring up
5   Paragraph 13 for us.
6        Can you bring it into the middle of the screen.
7   BY MR. FREEDMAN:
8   Q.  Then you say:  "On February 2013, the agreement to pay
9   300,000 Bitcoin was noted in an email of Dave Kleiman to Craig
10  Wright."
11       Do you see that?
12  A.  I see that.
13  Q.  Then, Dr. Wright -- then you say that -- the email from
14  Dave Kleiman to Craig Wright noting the verbal agreement to
15  start a Bitcoin exchange based on the mined Bitcoin of
16  Mr. Kleiman.
17       Do you see what you affirmed in Australia?
18  A.  Yes.  That he was meant to mine after 2011, that's correct.
19  Q.  Dr. Wright, you do enter into verbal agreements with Dave
20  Kleiman, don't you?
21  A.  No.  Because it was noted in an email, which is text
22  afterwards.
23  Q.  But you entered into a verbal agreement.  Not only a verbal
24  agreement, Dr. Wright, but you entered into a verbal agreement
25  about Bitcoin with David Kleiman, didn't you?
```

154

1  A.  No, I did not, because it was a verbal agreement that was

2  noted in writing.

3  Q.  Dr. Wright, not only did you enter into a verbal agreement

4  about Bitcoin with Dave Kleiman, you entered into a verbal

5  agreement with Dave Kleiman about Bitcoin he mined, and you

6  affirmed it in Australia, didn't you?

7  A.  No.  As noted, it was Bitcoin that was transferred after

8  that date, and it was noted in an email.

9  Q.  An email.  We're going to get to what happened with your

10  emails later, Dr. Wright.

11      Okay.  In the meantime, let's go to the next affidavit.

12          MR. FREEDMAN:  Ms. Vela, could you please bring up

13  P710, Page 10.

14  BY MR. FREEDMAN:

15  Q.  This is the other affidavit, Dr. Wright.  Do you recognize

16  this affidavit?

17  A.  Yes.

18  Q.  Filed in the same case, Craig Steven Wright, W&K Info

19  Defense Research.  It's got both case numbers on it, right?

20  A.  Correct.

21          MR. FREEDMAN:  Ms. Vela, could you bring us to Page

22  12.

23  BY MR. FREEDMAN:

24  Q.  Like the other affidavit, Dr. Wright, you affirmed the

25  truth of this one too.  Isn't that correct somewhat?

155

```
 1    A.  Yes.

 2             MR. FREEDMAN:  Ms. Vela, could you bring us to Page

 3    11.

 4    BY MR. FREEDMAN:

 5    Q.  In Paragraph 3, Dr. Wright, you say that:  "The contract as

 6    settlement for the finance agreement is attached as Appendix

 7    A."

 8         So you attach a contract to this agreement?

 9    A.  Yes.  I know this is a typo, but yes, that's correct.

10    Q.  In Paragraph 4, Dr. Wright, you then say that t"he original

11    deal was agreed to be varied as a consequence of the sudden and

12    unexpected rise in the value of Bitcoin."

13         Do you see that?

14    A.  Yes.

15    Q.  Dr. Wright, let's take a look at this new contract that

16    Dave Kleiman supposedly electronically signed.

17             MR. FREEDMAN:  Ms. Vela, can you please bring us to

18    Page 14 of the court file.

19    BY MR. FREEDMAN:

20    Q.  Dr. Wright, the contract is dated April 2nd, 2013, correct?

21    A.  That's the date on it, yes.

22    Q.  24 days before Dave Kleiman dies, correct?

23    A.  Correct.

24    Q.  So let's take a look at the terms of this contract Dave

25    Kleiman supposedly electronically signed just three weeks
```

156

```
 1    before he dies.
 2        In Paragraphs B and C, Dr. Wright, you say -- before we do
 3    that --
 4            MR. FREEDMAN:  Sorry, Ms. Vela.
 5    BY MR. FREEDMAN:
 6    Q.  -- let's go through who this contract is between.
 7        Dave Kleiman of W&K Info Defense Research, LLC is the
 8    vendor.
 9    A.  Yes.
10    Q.  Craig Wright of Craig Wright R&D is the purchaser?
11    A.  Yes.
12    Q.  And the company is W&K Info Defense, correct?
13    A.  Yes.
14    Q.  In B and C, the company, Dr. Wright, which is W&K Info
15    Defense Research, is the owner of and conducts the business
16    known as Bitcoin mining, right?
17    A.  Yes, but it never conducted it.  But yes, it was to.
18    Q.  And software development research, right?
19    A.  Yes.
20    Q.  And, Dr. Wright, the vendor, that's Dave Kleiman of W&K,
21    right?
22    A.  Well, it's W&K.  So it's not Dave Kleiman.
23    Q.  I'm sorry.  Dr. Wright, can you take a look at the top of
24    the contract where it says the vendor is defined as Dave
25    Kleiman of W&K Info Defense, LLC?
```

157

```
1    A.   Yes.  But that is not Dave Kleiman.  It is Dave Kleiman

2    representing W&K.

3    Q.   So:  "The vendor, Dave Kleiman of W&K, has agreed to sell

4    to the purchaser," that's you, "to Craig Wright R&D, and the

5    purchaser," that's you, "has agreed to purchase the vendor's

6    shares for the price upon the terms set out hereunder."

7         So you were purchasing Dave Kleiman of W&K's shares in W&K,

8    correct?

9    A.   No.  Not just Dave Kleiman's.  The entire organization.

10   Q.   All right.  And in Paragraph F --

11        MR. FREEDMAN:  Ms. Vela, can you bring up F for us.

12   BY MR. FREEDMAN:

13   Q.   When you were buying the company, it was going to include

14   all of its software, research materials, and other aspects of

15   the business, right?

16   A.   Yes.

17        MR. FREEDMAN:  Ms. Vela, could you turn to the next

18   page.

19        And let's zoom in on Paragraphs 3 and 4, please.

20   BY MR. FREEDMAN:

21   Q.   Dr. Wright, Paragraphs 3 and 4 give us a good summary of

22   what happened in this contract:  "Hence, the vendor," that's

23   Dave Kleiman of W&K," will, in 3A, pay 250,500 Bitcoin on 30th

24   of April 2013," right?

25   A.   That's what it says.
```

```
1    Q.  It also says in G that:  "The vendor, Dave Kleiman of W&K,

2    will transfer any shares in W&K to the purchaser," that's you,

3    "by April 30th," right?

4    A.  Yes.

5    Q.  And although it's in the purchaser category 4, 4B is

6    actually an obligation of Dave Kleiman.  "The purchaser will

7    accept the vendor's 323,000 remaining mined Bitcoin."

8         Do you see that, Dr. Wright?

9    A.  Yes.

10   Q.  So as part of this contract --

11        MR. FREEDMAN:  Ms. Vela, can you highlight 4B, that

12   first sentence.

13   BY MR. FREEDMAN:

14   Q.  As part of this contract, Dr. Wright, Dave was going to

15   transfer you 250,000 Bitcoin, all his shares in W&K, and he was

16   going to transfer 323,000 Bitcoin, right?

17        MS. MCGOVERN:  Objection.  The document speaks for

18   itself.

19        THE COURT:  Overruled.  I'll allow it.

20   BY MR. FREEDMAN:

21   Q.  Right?

22   A.  That's what the document says.

23   Q.  Dr. Wright, 250,500 plus 323,000, that's about 570,000

24   Bitcoin.  That's half of 1.1 million Bitcoin the Plaintiffs are

25   claiming in this case?
```

159

```
1              MS. MCGOVERN:  I'm sorry.  I can't hear.  I can't hear
2    the question.
3              THE COURT:  Yes.  Let's restate the question, please.
4    BY MR. FREEDMAN:
5    Q.  Dr. Wright, 250,500, plus 323,000, that's about 570,000,
6    correct?
7    A.  Approximately.
8    Q.  Half of the 1.1 million the Plaintiffs are claiming in this
9    case?
10   A.  I'm not actually sure what the number the Plaintiffs are
11   claiming in this case is.  It's never been mentioned.
12   Q.  And, Dr. Wright, what does this contract say Dave Kleiman
13   gets in return for his half of the 1.1 million?  He gets -- I'm
14   in 4B -- a 49.5-percent stake in a new venture to be formed in
15   Australia?
16             MS. MCGOVERN:  Objection.  Misrepresents the document,
17   Your Honor.
18             THE COURT:  Overruled.
19             THE WITNESS:  It says what it says.
20   BY MR. FREEDMAN:
21   Q.  So he transfers you his half of the Bitcoin and he gets
22   less than half of a company that doesn't even exist.
23   A.  No.  It's not his Bitcoin, and that is a incorrect
24   misrepresentation.
25
```

140

```
1        MR. FREEDMAN:  Let's go to the last page of this
2   contract, Ms. Vela.  Take us to Page 21.
3        Let's go one more page over.
4   BY MR. FREEDMAN:
5   Q.  Dr. Wright, on the bottom, that's your signature executed
6   by Craig Wright R&D?
7   A.  Yes.  I have no reason to doubt it isn't.
8   Q.  Dr. Wright, is it your testimony today that that is Dave
9   Kleiman's signature?
10  A.  It's an electronic signature.  The best I can say is that
11  it is typed by Dave.
12  Q.  We saw emails between you and Ira earlier where you
13  admitted to Ira that this is a computer font, correct?
14  A.  Yes, it is.
15  Q.  Dr. Wright, you know this jury has seen Dave Kleiman's
16  electronic signature.  Do you know that?  Do you recall that?
17  A.  No.  Actually, they didn't.  What they saw was the
18  reference information for a signature, but the signature wasn't
19  attached.
20  Q.  Okay.
21        MR. FREEDMAN:  Ms. Vela, can you please bring up D005,
22  Page 16.  It's already in evidence.
23  BY MR. FREEDMAN:
24  Q.  Dr. Wright, you'll recall, since you were following
25  testimony, I'm sure, this is the Computer Forensics, LLC
```

141

1    operating agreement that Patrick Paige testified to.

2    A.  Yes.

3    Q.  And you'll recall Patrick Paige testified that this was

4    Dave Kleiman's digital signature, correct?

5    A.  That's what he said, but he's wrong.

6    Q.  Okay.  Dr. Wright, you see Dave Kleiman, a security expert,

7    his digital signature has a bunch of writing on the right-hand

8    side of it?

9    A.  No.  That's the PKI container.  That references what key is

10   being used to sign.  There will be a separate signature file

11   with this.  To be a signature, you need to attach the signature

12   file.  So this is a reference to what the file is.  You haven't

13   attached the file.

14   Q.  Do those signatures look anything alike, Dr. Wright?

15   A.  Patrick Paige and Carter Conrad do not have the same

16   signature.

17   Q.  Neither does Dave Kleiman, does he?

18   A.  No.  Patrick Paige and Dave Kleiman do not have the same

19   signature either.

20   Q.  Dr. Wright, you filed this affidavit on November 4th, and

21   two days later, on November 6th, you show back up to the

22   hearing the registrar told you to attend, correct?

23   A.  Yes.

24        MR. FREEDMAN:  Ms. Vela, can you please bring up the

25   registrar hearing on November 6th, P509, and it's also in

142

1   evidence.

2          We can take down the electronic signature of Dave

3   Kleiman.

4   BY MR. FREEDMAN:

5   Q.  Dr. Wright, again, a transcript from your case against W&K

6   in Australia in the Supreme Court of New South Wales, Common

7   Law Division.  You're now in front of acting Registrar Kenna.

8   That is not the Registrar Bradford that you were before on

9   October 30th, correct?

10  A.  Registrar Kenna is not Registrar Bradford.  That is

11  correct.

12  Q.  And again, both cases are being called.  You've got the

13  405661 case and you have got the 5983 case, correct?

14  A.  Both files are listed, yes.

15  Q.  And it says:  "The Plaintiff," that's you, "appeared in

16  person."

17  A.  Technically, no.  It is me representing the other.  So that

18  is an error.

19  Q.  So it says:  "No appearance of or for the Defendant."

20  A.  Yes.

21  Q.  Ms. Lynn Wright was not in court, Dr. Wright, correct?

22  A.  Lynn did not turn up, that is correct.

23  Q.  Any neither did Jamie Wilson?

24  A.  Jamie Wilson had been fired.

25  Q.  Dr. Wright, this hearing is called to order.  You come up.

143

```
 1   First thing you say:  "Registrar Craig Wright, W-R-I-G-H-T,"
 2   and acting Registrar Kenna says:  "So you've put in your
 3   affidavit."  You say:  "I have."
 4        Do you see that?
 5   A.  I see that.
 6   Q.  She asks you:  "Does this matter travel with matter 59 as
 7   well," because you've got two cases in front of her, correct?
 8   A.  Yes.
 9   Q.  And she says:  "In this matter, we've got some consent
10   orders in respect to the statement of claim," right?
11   A.  That's what it says, yes.
12   Q.  And you say:  "Yes."  And the registrar says the registrar
13   wanted more information before, and you jump in, right?
14   A.  Yes.
15   Q.  You say:  "Yes.  I'm now the sole shareholder in an
16   American company."  See that, Dr. Wright?
17   A.  Yes.  I was referencing the company DeMorgan in Delaware,
18   that I was also the sole shareholder of, that was to act for
19   this but couldn't.
20   Q.  So in a hearing about W&K, where you have submitted
21   affidavit evidence about the ownership of W&K -- we saw you
22   said you had 50 percent of W&K in that affidavit -- you're now
23   just telling the registrar about DeMorgan registered in
24   Delaware?
25   A.  Yes.  Unfortunately, I keep assuming people know what I
```

144

```
1   mean.

2   Q.  So it is your testimony today, Dr. Wright, that you did not

3   tell the registrar at the hearing that you were 51 percent

4   owner, submit an affidavit saying you were a 50 percent

5   shareholder, and now come, after you filed a contract showing

6   Dave Kleiman allegedly signing all of the shares of W&K to you,

7   claim that you are the sole shareholder of W&K.  That's not

8   what happened, correct?

9   A.  That is not what happened.

10  Q.  Okay.  And then you say:  "I can't act as a director over

11  there in the United States because of regulations," right?

12  A.  Yes.

13  Q.  "I own all the shares over here.  I want to bring

14  everything back in."  Right?

15  A.  Yes.

16  Q.  Still talking about DeMorgan, right?

17  A.  And other companies that I owned, yes.

18  Q.  The Australian Tax Office has been notified of all the

19  valuations and whatever else, right?

20  A.  Yes.  I was talking about the group of companies.  That's

21  correct.

22  Q.  "It's just a matter of, unfortunately, the director I have

23  over there died three days before settlement."

24      Do you see that?

25  A.  Yes.
```

145

```
1    Q.  Still talking about DeMorgan?

2    A.  No.  In this one we're talking about W&K.

3    Q.  Oh, so we're back to W&K now?

4    A.  Yes.

5    Q.  You just had a segue into DeMorgan for no reason, or was

6    there a reason?  Never mind.  I take that back.  Withdrawn.

7        Dr. Wright, you then say:  "So the contract has been done,

8    signed, and everything else," right?

9    A.  That's what it says.

10   Q.  And then you say:  "Most of the assets have been

11   transferred.  Some are in escrow."

12   A.  Yes.

13   Q.  So, Dr. Wright, you've already transferred most of W&K's

14   assets, hadn't you?

15   A.  No.

16   Q.  Then, Dr. Wright, the registrar says:  "Okay."  You say:

17   "Unfortunately, three days before settlement he passed away."

18   The registrar says:"  Yes.  Okay.  So let me just have a look

19   at your affidavit.  So the intellectual property has all been

20   transferred?"

21       You say --

22   A.  Yes.

23   Q.  -- "it has," right?

24   A.  That's correct.  The transfer had gone through correctly

25   and both parties now have full rights as originally stated.
```

1   Q.  And then you say:  "The main purpose is just to formalize

2   everything and make sure that nothing actually goes wrong or

3   happens later and whatever else"?

4   A.  Yes.

5        MR. FREEDMAN:  Ms. Vela, can you go to the next page.

6   BY MR. FREEDMAN:

7   Q.  You said the settlement didn't occur because Mr. Kleiman

8   dies.  And then the registrar says:  "In respect to the matter

9   56, I make the orders 1 through 4 of the consent order.  I know

10  this brings the matter to conclusion.  With respect to 59, 1

11  through 3 consent orders.  And I note that also brings the

12  matter to conclusion."

13     So now after you submitted your affidavits, that we've gone

14  through in detail, the registrar signs your consent orders,

15  correct?

16  A.  Yes.

17        MR. FREEDMAN:  So, Ms. Vela, you can take that down,

18  please.

19        Your Honor, I'm about to start a new section.  So if

20  now is a good time to take a break, that's fine.  If not, I'll

21  keep going.

22        THE COURT:  Ladies and Gentlemen, are we in need of a

23  comfort break at this time?

24        Normally, we'd take it at about 3:30, so why don't we

25  continue.

147

```
 1              MR. FREEDMAN:  Sure.
 2    BY MR. FREEDMAN:
 3    Q.  So, Dr. Wright, just so you know where I'm going with this,
 4    we've seen a lot of documents about Dave Kleiman -- sorry.
 5    Strike that.
 6         Dr. Wright, just so you know where I'm going, I'd like to
 7    take you through the evidence that the Plaintiffs are going to
 8    put on in this case about the fact that you and Dave Kleiman
 9    were partners to create and mine Bitcoin.  Okay?
10    A.  Yes.  I believe you are.
11              MS. MCGOVERN:  I just want to make an objection to the
12    extent that that's a statement on the record with respect to
13    what the evidence shows.
14              THE COURT:  The objection is sustained.
15    BY MR. FREEDMAN:
16    Q.  Dr. Wright, I'd like to show you a deposition clip from
17    your deposition that I believe we saw in opening.
18              MS. MCGOVERN:  Mr. Freedman, we object to the use of a
19    video clip of Dr. Wright, unless it's for purpose of
20    impeachment.
21              MR. FREEDMAN:  Your Honor, federal rules provide that
22    deposition of a party can be used for any purpose.
23              THE COURT:  It's a party.
24         You may.
25              MR. FREEDMAN:  Thank you.
```

148

```
 1        (Video played.)
 2   BY MR. FREEDMAN:
 3   Q.  That was after your deposition in April of 2019, correct?
 4   A.  Correct.
 5   Q.  After we filed this lawsuit, correct?
 6   A.  Yes.
 7   Q.  Let's look at what you said before we filed the lawsuit.
 8        To orient us, Dr. Wright, Dave dies in April 2013, right?
 9   A.  Yes.
10   Q.  While he was still alive, you had some dealings with
11   someone named Mark Ferrier?
12   A.  Yes, I did.
13   Q.  And Mark Ferrier was an Australian man that was acting as
14   an agent for parties trying to sell source code?
15            MS. MCGOVERN:  Objection.  Foundation.
16            THE COURT:  If the witness knows.
17            Overruled.
18            THE WITNESS:  Software, yes.
19   BY MR. FREEDMAN:
20   Q.  And you were communicating with him in February of 2013?
21   A.  I don't remember the exact date, but sometime around then.
22            MR. FREEDMAN:  Ms. Vela, can you please bring up P459.
23   Show it just to the witness and counsel.
24   BY MR. FREEDMAN:
25   Q.  Dr. Wright, do you recall this is a Skype chat between you
```

149

```
 1   and Mark Ferrier?

 2   A.  It's the text of a Skype chat, yes.

 3   Q.  And see it references Dave Kleiman?

 4   A.  Can you highlight, please.

 5   Q.  Sure.  Line 18 -- 17.

 6   A.  Yes.

 7           MR. FREEDMAN:  Your Honor, we'd offer P459 into

 8   evidence.

 9           MS. MCGOVERN:  Objection.  Hearsay.

10           THE COURT:  The objection is overruled.  I'll allow

11   it.

12       (Plaintiffs' Exhibit 459 received into evidence.)

13   BY MR. FREEDMAN:

14   Q.  Dr. Wright, one of the things you discussed with Mark

15   Ferrier was Dave Kleiman?

16   A.  Mentioned him.  I wouldn't say discussed.

17   Q.  And specifically you referenced your relationship with him?

18   A.  Yes.  We were forming a company together, and we had

19   already formed a company, basically, together.

20   Q.  And so on February 23rd, 2013 you Skype message Mark

21   Ferrier and you say:  "My partner Dave and I have been working

22   on something for a while now.  So I guess, how can you help

23   me?"

24       Do you see that?

25   A.  I see that.
```

150

```
 1    Q.  You talk a little bit more with him.  Conversation lulls

 2    off, and you pick back up your conversation with Mr. Ferrier a

 3    few months later, on April 10th, 2013, correct?

 4    A.  No.  We'd also communicated over other methods.

 5    Q.  Okay.  Well, your Skype log continues in --

 6          MR. FREEDMAN:  Ms. Vela, can you bring us down to line

 7    72.

 8          Actually, Ms. Vela, can you bring us back up to the

 9    highlighted one we were at a second ago.  That was line 15 or

10    17.

11          There we go.

12          So -- right.

13    BY MR. FREEDMAN:

14    Q.  So this is February 2nd, 2013.  And --

15          MR. FREEDMAN:  Now, Ms. Vela, please bring us to line

16    72, which will be April 10th, 2013.

17          And let's go a little bit above that.  No.  No.  Stay

18    where you are, Ms. Vela.

19          Thank you.

20    BY MR. FREEDMAN:

21    Q.  So Mr. Ferrier writes to you.  On line 66, he says:  "Mate,

22    the boat is back in the water.  F that frigging stuff."  You

23    said:  "I know what it is all for.  Should come and join us and

24    get wet."

25          And you say to him:  "Well, I do like boats, but I'm more
```

151

1  interested in just completing what we talked about.  If that

2  all works, let's see."  And he says:  "Your F'ing loss."

3      Do you see that, Dr. Wright?

4  A.  I see that.

5  Q.  Then you say to him:  "My partner does not like the water."

6      Do you see that?

7  A.  Yes.  That was referring to my wife.

8  Q.  It was.  But he misunderstood, right?  He said to you:  "I

9  thought he was in the States."

10  A.  Correct.

11  Q.  Mr. Ferrier thought you were talking about Dave?

12  A.  Yes.  So I had to correct him and say that the fellow

13  director of the company I was setting up was not the same

14  person.

15  Q.  Right, because you say:  "No, my partner," meaning your

16  romantic partner Ramona Watts, right?

17  A.  Yes.

18  Q.  Not "my business partner Dave"?

19  A.  Yes.  A director I would call business partner, but not

20  partnership.  Yes.

21  Q.  This is 16 days before Dave passes away?

22  A.  Yes, it was.  Well, actually, probably 14.

23  Q.  And then, Dr. Wright, Dave passes away on April 26th,

24  correct?

25  A.  I believe it was actually the 24th, but he wasn't found

152

1    until the 26th.

2    Q.  And then four days after he's found deceased in his home,

3    on April 30th, you're still communicating with Mark Ferrier?

4    A.  Yes.

5    Q.  And you're actually letting him know that Dave Kleiman

6    died?

7    A.  I mentioned it at some point, yes.

8    Q.  And you actually called Dave your business partner again,

9    right?

10   A.  Yes.  At that point I did.

11        MR. FREEDMAN:  Ms. Vela, can you bring us down to line

12   98, please.

13   BY MR. FREEDMAN:

14   Q.  He says to you:  "Where the F have you disappeared to?

15   Hey, are you going to answer?"  And then, Dr. Wright, can you

16   read what your response is to the jury on April 30th, 2013 on

17   line 100.

18   A.  (No verbal response.)

19   Q.  Let us know when you're ready, Dr. Wright.

20   A.  Line 100?

21   Q.  Yes, please.

22   A.  Yes.

23        "Sorry.  My best friend and business partner died a few

24   days back and I am in a class right now."

25   Q.  That was Dave Kleiman?

153

```
1    A.  That died, yes.

2    Q.  That was your business partner?

3    A.  Yes.  At this point he was.  He was technically shareholder

4    and also director of one of my companies.  Not a partnership,

5    but a partner in that way.

6    Q.  Dr. Wright, things don't go so well between you and Mark

7    Ferrier, do they?

8    A.  Eventually, no.  He didn't manage to complete a deal with

9    Payne.  Payne sued him.  No gold eventuated.

10   Q.  Eventually, your companies file a lawsuit against him?

11   A.  I don't know which entity filed a lawsuit.  But yes, we

12   sued him and we had a judgment.  He fled the country.  Yes.

13   Q.  And in fact, more than a lawsuit, Dr. Wright; you end up

14   filing a police report against him?

15   A.  With a number of other people, yes.

16   Q.  And you were seeking help from the police?

17   A.  Well, I wasn't seeking help.  I was reporting a crime.

18   Q.  You were being truthful with the police?

19   A.  Yes.

20          MR. FREEDMAN:  Ms. Vela, can you please bring up for

21   just the witness and opposing counsel P464.

22   BY MR. FREEDMAN:

23   Q.  Dr. Wright, do you recognize -- this is an email from you

24   to Katherine Unger of the New South Wales Police Department?

25   A.  I believe it was sent by my EA Angela, but I dictated it.
```

154

```
 1    So I don't want to try and sound flippant, but I dictate emails
 2    and my EA sends them sometimes.  But I ordered it, yes.
 3    Q.  And it says:  "I have attached" -- you're attaching a draft
 4    of your statement with various other attachments to them,
 5    right?
 6    A.  Yes.  She did that for me.
 7    Q.  Okay.  And would you have shared a draft of a statement
 8    with the police that you do not believe would have been
 9    accurate?
10    A.  I don't know.  It would have been corrected if not.  The --
11    it's possible, but I don't know.  I don't remember of any
12    corrections.
13              MR. FREEDMAN:  Counsel, I'm going to the deposition of
14    Dr. Wright, March 18th, 2021, Page 93, lines 7 through 10.
15    Take a look at that or --
16              MS. MCGOVERN:  Are you moving this one in?  No?
17              MR. FREEDMAN:  Sorry?
18              MS. MCGOVERN:  I just want to make sure.  Did you move
19    464?  Did you seek to move 464 into evidence?  Because we have
20    an objection.
21              MR. FREEDMAN:  Not yet.
22              MS. MCGOVERN:  Okay.  I'm sorry.  What did you say?
23              MR. FREEDMAN:  Can you go to Dr. Wright's deposition,
24    March 18th, 2021, lines 93-7 through 93-10.
25              MS. MCGOVERN:  Your Honor, with respect to the
```

155

1    deposition clips that are being played, we haven't seen them in

2    advance.  To the extent that there are objections that were

3    lodged during the deposition, we ask the Court for permission

4    to address those objections before being played for the jury.

5              THE COURT:  Certainly.  And is this one of those

6    portions?

7              MS. MCGOVERN:  I have not seen this clip.

8              MR. FREEDMAN:  It is one single question and one

9    single answer.  The answer constitutes three words.

10             MS. MCGOVERN:  I haven't had an opportunity to review

11   the deposition clip.

12             MR. FREEDMAN:  Your Honor, we're seeking to impeach

13   the last statement.

14             MS. MCGOVERN:  Could we have it re-read, Your Honor?

15   I don't --

16             THE COURT:  Let's give Ms. McGovern an opportunity to

17   review.  It Page 93, line 7.

18             MR. FREEDMAN:  Yes, through 10.

19        (Pause in proceedings.)

20             MS. MCGOVERN:  Looking at it now, Your Honor.

21        (Pause in proceedings.)

22             MS. MCGOVERN:  Apologize for the delay, Your Honor.

23   We're trying to pull it up right away.  If you would like, I

24   can just look at it with you, Vel, so we don't hold up the

25   jury.

156

```
 1            THE COURT:  Mr. Freedman, is this the April 4th, 2019?
 2            MR. FREEDMAN:  Sorry, Your Honor.  It's the March
 3    18th, 2021 deposition.
 4            THE COURT:  All right.  Thank you.
 5            MS. MCGOVERN:  Would you like me to take a look at it?
 6            Oh, perfect.  Perfect.  Perfect.
 7            Can I see the whole page, please?
 8        (Pause in proceedings.)
 9            MS. MCGOVERN:  Your Honor, I've read the testimony.
10    Could we have the question read back to the extent that it's
11    being used for impeachment, Your Honor?
12        (Question and answer read back.)
13            MS. MCGOVERN:  Your Honor, we object as improper
14    impeachment.
15            THE COURT:  Sustained.
16            Mr. Freedman, is this a good time for us to take our
17    recess?
18            MR. FREEDMAN:  Sure.
19            THE COURT:  All right.  Ladies and Gentlemen, let's
20    take a 10-minute recess.  I'll see you back here in 20 minutes.
21        (Jury not present, 3:28 p.m.)
22            THE COURT:  All right.  We're on a 20-minute recess.
23        (Recess from 3:28 p.m. to 3:50 p.m.)
24            THE COURT:  All right.  Welcome back.  Anything we
25    need to address before we bring the jury back?
```

157

```
1              MR. FREEDMAN:  Not for Plaintiff, Your Honor.

2              MS. MCGOVERN:  Not for the Defendant, Your Honor.

3              THE COURT:  All right.  Bring the jury back in.

4         (Before the Jury, 3:50 p.m.)

5              THE COURT:  All right.  Welcome back, Ladies and

6    Gentlemen.

7              Please be seated.

8              And we'll continue with the direct examination.

9              MR. FREEDMAN:  Ms. Vela, can you please bring back up

10   P464 for just the witness and opposing counsel.

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, we were looking at this document before we went

13   on a break.  It's an email attaching -- you had your EA send

14   with your draft witness statement.  I believe before the break

15   you said that there were no corrections to be made to it; is

16   that correct?

17   A.  I don't believe any have been made.  I don't know -- I

18   can't remember any.

19   Q.  Okay.

20             MR. FREEDMAN:  And, Ms. Vela, can you bring us to Page

21   5.

22   BY MR. FREEDMAN:

23   Q.  Do you see, Dr. Wright, in Paragraph 13 you mention Dave

24   Kleiman?

25   A.  13?
```

158

```
1            MR. FREEDMAN:  Ms. Vela, can you highlight the last
2     sentence there for Dr. Wright.
3            THE WITNESS:  Yes.  I can see that.
4            MR. FREEDMAN:  Your Honor, at this point, Plaintiff
5     will offer P464 into evidence.
6            MS. MCGOVERN:  No objection.
7            THE COURT:  Admitted into evidence.
8         (Plaintiffs' Exhibit 464 received into evidence.)
9            MR. FREEDMAN:  Ms. Vela, can you please bring us back
10    to the beginning of the page of the exhibit.
11    BY MR. FREEDMAN:
12    Q.  So, Dr. Wright, now that the jury can see the exhibit,
13    let's go back over it quickly one more time.
14        This is an email from yourself to Katherine Unger, who is a
15    detective with the New South Wales Police Department.  Do you
16    see the @police.nsw.gov.au?
17    A.  Yes.
18    Q.  And it attaches -- it says -- it's called statement.
19    A.  Yes.
20    Q.  The statement "Wright.docx draft witness proofing."  And
21    then you said:  "I have attached the draft for review with the
22    attachments."
23        Do you see that?
24    A.  I see that.
25            MR. FREEDMAN:  Ms. Vela, can you zoom back out,
```

159

1    please, and bring us to the first page of the witness

2    statement.

3         Next page, I believe.

4    BY MR. FREEDMAN:

5    Q.  So this is the witness details cover page?  We see here the

6    witness personal details, Mr. Wright, Craig.  There's your date

7    of birth, your home address.  Do you see that, Dr. Wright?

8    A.  I see all that, yes.

9    Q.  The statement at the bottom was taken by Katherine Unger of

10   the Hornsby Police Station.

11       Do you see that?

12   A.  Yes.  I've dealt with her a number of times for other

13   things as well.

14       MR. FREEDMAN:  Ms. Vela, can you please bring us to

15   Page 5 of the police statement and can you call out paragraph

16   13 Dr. Wright's statement to the police in Craig Wright Matter

17   of Police v. Ferrier.

18   BY MR. FREEDMAN:

19   Q.  Dr. Wright, in Paragraph 13, you say:  "Between March and

20   April 2013, I had a number of communications with Mark via

21   Skype."  Do you see that?

22   A.  I do.

23   Q.  Are you talking about Mark Ferrier?

24   A.  Yes.

25   Q.  And we saw some of those communications, right?

160

```
 1    A.  Yes.
 2    Q.  And you said:  "This included voice calls but was mostly by
 3    text"?
 4    A.  Primarily, there were some -- I can't remember the name of
 5    the app, but like WhatsApp but before WhatsApp.
 6    Q.  Now, you said:  "In the course of our conversations, I
 7    discussed with Mark the concept of a Bitcoin exchange by which
 8    smart contracts would be connected."
 9        Do you see that?
10    A.  I do.
11    Q.  Dr. Wright, can you please read for the jury the final
12    sentence of that paragraph that you submitted to the New South
13    Wales Police?
14    A.  "This is the idea that I had developed with my business
15    partner David Kleiman (David) for a period of over a decade."
16    Q.  So, Dr. Wright, the date of this is approximately 2014,
17    this statement, correct?
18    A.  Yes.
19    Q.  And so that means that in your statement to the police, you
20    said that this is an idea, "Bitcoin exchange by which smart
21    contracts would be connected" -- this Bitcoin concept is an
22    idea you've developed with your business partner Dave Kleiman
23    for a period of over a decade?
24    A.  That's not how it represents correctly, no.
25    Q.  And if you take ten years off of 2014, that means that you
```

161

1    have been working on this idea with your business partner Dave

2    Kleiman since approximately 2004?

3    A.  No.  The building of that was with a company called

4    DeMorgan but goes back to 1998 -- and Dave had nothing to do

5    with.  I was building for them and then Dave joined me.

6    Q.  Dr. Wright, Mark Ferrier and the police are not the only

7    people that you told Dave Kleiman was your business partner to;

8    isn't that correct?

9    A.  That is correct.

10   Q.  You also told your company's lawyer that Dave Kleiman was

11   your business partner, didn't you?

12   A.  Yes, in a variety of different contexts at times he had

13   been.

14          MR. FREEDMAN:  Ms. Vela, can you please bring up Page

15   24 of the witness statements.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, there is an email from Alexandra McCaughan, who

18   was with a law firm called Clayton Utz.  Do you see that?

19   A.  I do see that.

20   Q.  And she says:  "Dear, Craig, thank you for your time today.

21   As discussed, we would be grateful if you could provide us with

22   copies of the following."

23      Take a look at Number 7.  Can you read for the jury what

24   your lawyer wrote to you asking for in Number 7.

25   A.  "Confirmation of the date that your business partner David

162

| | |
|---|---|
| 1 | Kleiman died and any communications with David that might refer |
| 2 | to what you had discussed with Ferrier." |
| 3 | Q.  Dr. Wright, isn't it true that around the same time you |
| 4 | were telling New South Wales Police Department that Dave was |
| 5 | your business partner, you were saying the exact same thing to |
| 6 | the Australian Tax Office? |
| 7 | A.  No.  They are different time frames. |
| 8 | Q.  Just to reorient us, Dr. Wright.  Your companies were |
| 9 | seeking tens of millions of dollars in tax rebates from the |
| 10 | Australian Tax Office? |
| 11 | MS. MCGOVERN:  Objection.  Foundation. |
| 12 | THE COURT:  Sustained. |
| 13 | BY MR. FREEDMAN: |
| 14 | Q.  Dr. Wright, did there come a time when you filed for tax |
| 15 | refunds from the Australian Tax Office through your companies? |
| 16 | A.  No.  They're not tax refunds.  They are tax credits.  After |
| 17 | you get to $20 million in turnover, which we had more than, you |
| 18 | don't get the money back.  You get a credit that you can use |
| 19 | against tax. |
| 20 | Q.  And there came a time when you remember seeking those tax |
| 21 | credits from the Australian Tax Office? |
| 22 | A.  Yes.  Legally, as an auditor, it was my -- I had to |
| 23 | actually file those.  I was not allowed not to. |
| 24 | Q.  And the amount of those credits was in excess of $10 |
| 25 | million? |

163

1        MS. MCGOVERN:  Objection.  Foundation.

2        Could you -- I'm having a tough time hearing the

3   question.

4        THE COURT:  Move your mic up a little bit,

5   Mr. Freedman.

6        The objection is overruled.  I'll allow it.

7        THE WITNESS:  The value is not that amount.  It is an

8   offset against other tax.  So, for instance, if I had a tax

9   bill of $50,000, I could use an offset of $50,000 to reduce.

10  It's the same as if you have a receipt for money spent.

11  BY MR. FREEDMAN:

12  Q.  Dr. Wright, in connection with those refund or credit

13  applications, tax credits, the Australian Taxation Office

14  opened up audits across your various Australian companies; is

15  that correct?

16  A.  No.  The person you brought up, Andrew Miller, is indirect

17  taxation.  That is GST.  GST is like a sales tax, VAT.  The

18  Australian Tax Office wanted to put 10 percent tax on every

19  Bitcoin transaction.

20      There's a public ruling, which I guess is equivalent to a

21  Supreme Court ruling in America, that I brought between 2013

22  and 2014.  That ruled that Bitcoin is basically not taxable

23  under GST.  So the tax office were fighting that, and my

24  company funded the whole anti-GST thing and we had it

25  overturned.  So the tax office were pushing very, very hard to

164

1    ensure that GST was applied to every Bitcoin transaction.

2        So no, it's not an R&D thing.

3            MR. FREEDMAN:  All right.  Ms. Vela, can you please

4    put up P637 for the witness and opposing counsel only.

5    BY MR. FREEDMAN:

6    Q.  Dr. Wright, do you recognize this as a decision of the

7    Australian Taxation Office over various tax credits and refunds

8    that you had sought?

9    A.  I recognize this as a submission from the GAAR panel, which

10   is the General Anti-Avoidance Review Panel.

11       The way that I set up Bitcoin rights was stated to be a

12   violation of tax rules because it created a rapt entity of

13   Bitcoin that didn't have GST, even if Bitcoin had GST, and they

14   fought me over that.

15   Q.  And, Dr. Wright, in this decision, the Australian Taxation

16   Office talks about Dave Kleiman and Bitcoin?

17   A.  I don't remember.  I don't recall.

18           MR. FREEDMAN:  One second, Dr. Wright.

19       (Pause in proceedings.)

20           MR. FREEDMAN:  Your Honor, if I may have one moment.

21   I'm sorry.

22           THE COURT:  Certainly.

23           MS. MCGOVERN:  Your Honor, while this is going on,

24   would you mind terribly, lower -- thank you.

25           THE COURT:  There we go.

165

```
1              MS. MCGOVERN:  Thank you.

2         (Pause in proceedings.)

3    BY MR. FREEDMAN:

4    Q.  Dr. Wright, in the interest of time, we'll get back to this

5    document in a minute.

6         In the interim, as part of the -- I think we were on the

7    same page, that at some point in time the Australian Taxation

8    Office opened up audits across some of your companies in

9    relation to these tax issues, correct?

10   A.  Depends on what you consider tax issues.  They had a number

11   of reviews and some audits, yes.  Some concluded and some were

12   reopened later on.

13   Q.  And as part of those audits, you met with the Australian

14   Taxation Office and you gave them interviews; is that correct?

15   A.  That's not actually correct, no.

16   Q.  Did you have meetings with the tax office?

17   A.  I had meetings with the tax office and what you're calling

18   interviews, I guess.  We could call them interviews.  That's

19   not technically correct, but we can pretend that's the right

20   word.

21   Q.  And the Australian Taxation Office transcribed those

22   interviews?

23   A.  No, they did not.

24   Q.  And do you recall one interview taking place on August

25   11th, 2014?
```

166

```
 1   A.  Not off the top of my head, no.
 2            MR. FREEDMAN:  Ms. Vela, can you please bring up P172
 3   and just show it to the witness and counsel.
 4   BY MR. FREEDMAN:
 5   Q.  Dr. Wright, does this help refresh your recollection?
 6   A.  Yes.  I remember I was in a meeting and they gave the
 7   Auscript recording, but it was rejected because it was
 8   erroneous.
 9            MR. FREEDMAN:  And, Ms. Vela, can you go to Page 41 of
10   this document.
11   BY MR. FREEDMAN:
12   Q.  And, Dr. Wright, right at line 25, do you see the
13   document -- sorry.  Not line 25.
14            MS. MCGOVERN:  Object to the use of the document and
15   the contents of it before it's admitted into evidence, Your
16   Honor.
17            MR. FREEDMAN:  I am just trying to --
18            THE COURT:  Yes.  Just lay the foundation.
19            Overruled at this point.
20   BY MR. FREEDMAN:
21   Q.  Dr. Wright, do you see at line 17 there's a reference to
22   Dave Kleiman, and then you respond about that?
23   A.  I can see that someone mentioned Mr. Kleiman.  I can also
24   tell you that this was rejected because there were errors in
25   the document.  I can't tell you what the errors are anymore.
```

167

```
1    Q.  Dr. Wright, do you see at line 25 you make further

2    characterizations of your relationship with Dave Kleiman?

3    A.  No.  I can say what the document says, but that's not what

4    I said.

5            MR. FREEDMAN:  Your Honor, at this point Plaintiffs

6    would offer P172 into evidence.

7            MS. MCGOVERN:  Objection, Your Honor.  Hearsay.

8    Relevance.

9            THE COURT:  The objection is noted.  It's overruled.

10   It will be admitted into evidence.

11       (Plaintiffs' Exhibit 172 received into evidence.)

12           MR. FREEDMAN:  Ms. Vela, can you bring us to the first

13   page of the document, please.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright, do you see in the top right of this corner,

16   it's called -- there's the Auscript label in the top right

17   corner?

18   A.  Yes, I do.

19   Q.  And then the document says this is a transcript of

20   proceedings?

21   A.  Yes.  I can see what it says.

22   Q.  And it's "Australian Taxation Office Record of Interview."

23       Do you see that?

24   A.  I can see where it says that.

25   Q.  And the interviewer for the Australian Tax Office, his name
```

168

```
 1   was Greg O'Mahoney.  Do you see that?
 2   A.  Yes.
 3   Q.  And the interviewee is Craig Wright.
 4       Do you see that?
 5   A.  I do.
 6   Q.  And this interview took place at the Australian Taxation
 7   Office?  Do you see that, conducted at ATO Office?
 8   A.  I can see where it says that, but that never happened.
 9   Q.  And the date is listed as 11th of August, 2014.  Do you see
10   that?
11   A.  I can see that.
12   Q.  Dr. Wright, when you met with the Australian Tax Office --
13   well, let me take one step back.
14       The ATO, when I say ATO, you know I mean the Australian
15   Taxation Office, right?
16   A.  I do.
17   Q.  So the ATO is an arm of the Australian government, correct?
18   A.  They are the equivalent of the IRS over here, yes.
19   Q.  And were you truthful with the Australian Taxation Office?
20   A.  Yes, but this is not an interview record.
21           MR. FREEDMAN:  Okay.  Ms. Vela, can you bring us to
22   Page 41, please.
23   BY MR. FREEDMAN:
24   Q.  Dr. Wright, you see at the bottom it says Page 40 of 45.
25   It's a 45-page transcript?
```

169

```
1    A.  Yes.

2    Q.  At line 15, do you see it says:  "Wright"?

3    A.  Yes.

4    Q.  And that's you talking?

5    A.  No.  I have never been in any interview with just myself

6    and one other person at the tax office.  I've always had a

7    lawyer and an accountant.  So no.  This is not a correct

8    transcript.  And it was rejected.

9        MR. FREEDMAN:  Ms. Vela, can you bring us to the front

10   page of the transcript again.  And one more page over.

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, was your lawyer's name Andrew Sommer?

13   A.  Yes.

14   Q.  And do you see at the top of the line where it says:

15   "Interviewer, Greg O'Mahoney, Andrew Sommer"?

16   A.  Yes.

17   Q.  So your lawyer was present at this interview, wasn't he,

18   Dr. Wright?

19   A.  This wasn't the interview.  It's not a correct transcript.

20   I'm sorry.

21       MR. FREEDMAN:  Okay.  Ms. Vela, can you take that

22   down, please.

23       Let's go to Page 41 again, and can we highlight again

24   line 15 and down.

25
```

170

```
 1    BY MR. FREEDMAN:

 2    Q.  And at line 15, Dr. Wright, you say:  "I had an agreement

 3    with Dave.  We were going to transfer software into the entity

 4    we were creating here in Australia."  And Mr. O'Mahoney says:

 5    "This is Mr. Kleiman?"  And you respond:  "Yes.  I had set up a

 6    company.  Everything was going.  I hadn't heard from Dave in a

 7    little bit.  Next thing I find out he's dead."

 8         Do you see that?

 9    A.  I see that.

10    Q.  And he says:  "All right."  And then you say:  "So with 90

11    percent of it going through everything and moving everything

12    and doing all the bits and pieces and he died."  And Mr.

13    O'Mahoney says:  "So you and he were negotiating for the

14    purchase, negotiating in respect of this."

15         Do you see that?

16    A.  I see the document.

17    Q.  And then, Dr. Wright, you respond:  "We weren't

18    negotiating.  We were partners for years, so didn't really

19    negotiate it."

20    A.  This document is not an accurate transcript.  It was

21    rejected.  The tax office had sent it through as draft.  It was

22    rejected by our lawyers.  The tax office never came back with

23    another one.  So no, I did not say that.

24    Q.  Dr. Wright, you are aware that you have not produced a

25    single document to us in this litigation rejecting this
```

171

```
 1   transcript, aren't you?

 2   A.  I've told you I rejected this transcript before.  And it is

 3   not a sealed document.

 4           MR. FREEDMAN:  Ms. Vela, you can take that down.

 5           Thank you.

 6   BY MR. FREEDMAN:

 7   Q.  Dr. Wright, I want to fast-forward 10 months.  Let's go to

 8   May of 2015.  Okay?

 9   A.  (No verbal response.)

10   Q.  And that's two years after Dave dies and three years before

11   Dave's estate files this lawsuit, correct?

12   A.  About that, yes.

13   Q.  And in May of 2015 you were emailing someone named Michele

14   Seven.  Do you remember that?

15   A.  Yes.  She was trying to extort me.  Yes.

16   Q.  And you were telling her about Dave.  You remember that?

17   A.  No.  I wasn't the person doing the email.  It was handed

18   off to Uyen.

19   Q.  And --

20           MR. FREEDMAN:  Ms. Vela, can you please bring up P200.

21   And this is just for the witness and counsel, please.

22   BY MR. FREEDMAN:

23   Q.  Dr. Wright, do you see the email on the bottom here?  It's

24   from craig.wright@hotwirepe.com.

25   A.  I see the document.
```

172

```
1    Q.  It's to a michele.m7@gmail.com?

2    A.  I can see the document, but the person sending the email

3    was not me.  It was one of the people at my firm.

4    Q.  And, Dr. Wright, at the bottom right corner of the document

5    is a Bates label Defense Australia, meaning you produced this

6    document to us?

7    A.  Yes, but that doesn't mean it wasn't sent from one of my

8    other staff.

9    Q.  And do you see Dave Kleiman's name mentioned in the middle

10   of the document?

11   A.  I do.

12           MR. FREEDMAN:  Your Honor, we would offer P200 into

13   evidence.

14           MS. MCGOVERN:  Hearsay, Your Honor.  Objection.

15           THE COURT:  And the basis being?

16           MS. MCGOVERN:  He has not authenticated the document

17   as coming from him, and it's hearsay.

18           THE COURT:  All right.  Goes to its weight.  The

19   objection is overruled.  It would be admitted into evidence.

20       (Plaintiffs' Exhibit 200 received into evidence.)

21           MR. FREEDMAN:  Can we publish this to the jury,

22   please.

23   BY MR. FREEDMAN:

24   Q.  So, Dr. Wright, this is your email on the bottom?

25   May 20th, 2015, from Craig S. Wright,
```

173

```
 1    craig.wright@hotwirepe.com.

 2         We've seen that email address before, correct?

 3    A.  As I said before, this is not my email.  It's one used by

 4    the company.  It was used by my EA and other people.  It was

 5    the CEO's email.  So multiple people used this.

 6    Q.  And you say -- the email opens up with:  "You have watched

 7    my video on Dave."

 8         Do you see that?

 9    A.  I see the words, yes.

10    Q.  And you say:  "In the past" -- you know, Dr. Wright, why

11    don't you read that next sentence for the jury, up to that

12    period.

13              MR. FREEDMAN:  Ms. Vela, can you highlight just up to

14    the period, please.  "In the past" until the period.

15              Thank you.

16    BY MR. FREEDMAN:

17    Q.  Dr. Wright, go ahead and read what's written in your

18    email -- your email address message to Ms. Seven for the jury,

19    please.

20    A.  The text states:  "In the past, David Kleiman was my best

21    friend and business partner."

22    Q.  "So he died a couple years ago, but as I had known him

23    since the '90s we have many shared secrets."

24         Do you see that?

25    A.  I do.
```

174

```
 1    Q.  Okay.
 2            MR. FREEDMAN:  Ms. Vela, can you please bring up P439
 3    just for the witness and counsel.
 4    BY MR. FREEDMAN:
 5    Q.  Dr. Wright, do you recognize this as the book "Satoshi's
 6    Vision" that bears your name?
 7    A.  I do.
 8    Q.  And this book was compiled through various blog posts that
 9    you created?
10    A.  Yes.
11            MR. FREEDMAN:  Ms. Vela, can you bring us to Page 6.
12            Can you go back to the table of contents for me.  One
13    moment.
14            I guess my page there is off.
15            Can you -- Your Honor, one second.  I apologize.
16            THE COURT:  All right.
17        (Pause in proceedings.)
18            MR. FREEDMAN:  Okay.  Ms. Vela -- thank you.
19            Turns out computers are better at finding words than I
20    am.
21            Ms. Vela, Page 12 of this book, but just for counsel
22    and the witness, please.
23    BY MR. FREEDMAN:
24    Q.  Dr. Wright, do you see about halfway down --
25            MR. FREEDMAN:  Ms. Vela, can you highlight the
```

175

1    characterization of Dave Kleiman in Dr. Wright's book.

2          Thank you.

3    BY MR. FREEDMAN:

4    Q.  Do you see that, Dr. Wright?

5    A.  Yes, I do.

6          MR. FREEDMAN:  Your Honor, we offer P439 into

7    evidence.

8          MS. MCGOVERN:  Your Honor, this is an article by a

9    third party, and it's classic hearsay.

10         THE COURT:  This is not by Dr. Wright; is that

11   correct?

12         MR. FREEDMAN:  It is, Your Honor.  It's the book he

13   published and wrote under his name.

14         THE WITNESS:  I didn't publish it.

15         MR. FREEDMAN:  Your Honor, the first page it says:

16   "Satoshi" -- I mean, you can read it, Your Honor.  But it bears

17   his name on the very first page.

18         THE WITNESS:  I let them use the name, yes.

19         MR. FREEDMAN:  And I believe he just testified that

20   it's compiled from his own blog posts.

21         THE COURT:  The foundation has been laid.  The

22   objection is overruled.  It will be admitted into evidence.

23      (Plaintiffs' Exhibit 439 received into evidence.)

24         MR. FREEDMAN:  Ms. Vela, can you bring us back to Page

25   1, so the jury can see the cover of Dr. Wright's book.

176

1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, the book is entitled "Satoshi's Vision, the Art

3    of Bitcoin."

4        Do you see that?

5    A.  I do.

6    Q.  And on the bottom it bears your name, Craig Wright?

7    A.  It does.

8    Q.  And have you autographed copies of this book for people?

9    A.  Yes.  It is a compilation of many blog posts I made.  I

10   didn't do the compilation, but I agreed the person there, Paul,

11   could.  So the posts, to simplify this, are mine.

12        MR. FREEDMAN:  Ms. Vela, can you bring us to the posts

13   that appear on Page 12 of the book.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright --

16        MR. FREEDMAN:  Ms. Vela, can you highlight that again,

17   actually.

18   BY MR. FREEDMAN:

19   Q.  Dr. Wright, can you read the highlighted portion of your

20   book to the jury, please.

21   A.  Yes.

22      "In order to fund my work, my partner Dave Kleiman and I

23   sold code that was used in gaming out of countries such as

24   Costa Rica."

25        Would you like me to keep going?

```
 1    Q.  No.  That's okay.
 2         Dr. Wright, do you remember talking to an individual named
 3    Brendan Sullivan?
 4    A.  Not really.  I could hardly hear anyone over the phone, and
 5    he purported to be a different Brendan.  So ...
 6    Q.  And do you recall telling Brendan Sullivan that:  Dave
 7    died.  That was the worst day for me because I lost a friend
 8    and a partner"?
 9    A.  No.  But I would have said that.  I've said that many
10    times.
11    Q.  Dr. Wright, in May of 2014 you were emailing Ira Kleiman,
12    correct?
13    A.  I think I was still emailing him in May of 2014, yes.
14    Q.  You were discussing Dave's involvement with Bitcoin?
15    A.  I would have to look at what I discussed in that period.
16    Sorry.  I don't recall.
17         MR. FREEDMAN:  Ms. Vela, can you please bring up P167,
18    and can you go to the --
19    BY MR. FREEDMAN:
20    Q.  Dr. Wright, do you recognize this as an email between
21    yourself and Ira Kleiman?
22         MR. FREEDMAN:  Your Honor, is this document already in
23    evidence?  I don't recall.
24         THE COURT:  I'm sorry?
25         MR. FREEDMAN:  P167.
```

178

```
 1              THE COURT:  It is not in evidence.
 2              MR. FREEDMAN:  Not in evidence.
 3    BY MR. FREEDMAN:
 4    Q.  Dr. Wright, do you see this is an email between Ira Kleiman
 5    and Craig S. Wright?
 6    A.  I haven't seen the entire thing, but the front page looks
 7    familiar.
 8              MR. FREEDMAN:  Ms. Vela, can you show Dr. Wright --
 9    BY MR. FREEDMAN:
10    Q.  It's just another version of an email we've seen,
11    Dr. Wright, that discusses a Thanksgiving story.
12              MR. FREEDMAN:  Ms. Vela, can you show the next page to
13    the witness, please.
14              And the next page.
15              Is that the end of the document?
16              THE WITNESS:  Like I said, I've seen the email in
17    other emails -- the story in other emails.
18              MR. FREEDMAN:  Your Honor, we would offer P167 into
19    evidence.
20              MS. MCGOVERN:  No objection, Your Honor.
21              THE COURT:  Admitted into evidence.
22        (Plaintiffs' Exhibit 167 received into evidence.)
23    BY MR. FREEDMAN:
24    Q.  So, Dr. Wright, we've seen this email before a few times
25    through various witnesses in this case.  This is the "We did
```

179

```
 1    partner" email from yourself to Ira Kleiman.

 2         Do you recall this email?

 3    A.  I see the later bit, yes.

 4    Q.  So the email starts off from Ira Kleiman at the bottom of

 5    the first page saying that he would like to share a memory he

 6    had of Dave with you.  Do you see that?

 7    A.  Yes.

 8    Q.  He says:  "I don't recall him ever saying the word Bitcoin

 9    to me, but I do" --

10         MR. FREEDMAN:  And, Ms. Vela, can you bring up the

11    next page.

12    BY MR. FREEDMAN:

13    Q.  -- "have a memory where I think he told me he was working

14    on it," right?

15    A.  Yes.

16    Q.  "We were visiting at my dad's house for Thanksgiving, I

17    think for Thanksgiving, and I believe it was the first time he

18    met my daughter JiJi," right?

19    A.  I saw the story, yes.

20    Q.  And then he says:  "We started talking about how successful

21    Facebook had become, and I asked him if he was working on

22    anything interesting.  He told me he was making his own money.

23    I was like:  'What?  Are you making counterfeit money?' I

24    thought maybe he was up to something fishy.  And then he said

25    it was digital money, and he opened his wallet to show me
```

180

1    something like a business card with a logo on it."

2        Do you see that, Dr. Wright?

3    A.  I see the story, yes.

4    Q.  "He could not find it, so I think he just scribbled on the

5    back of the card a 'B' with the lines through it," right?

6    A.  Well, he couldn't have done that.  That was done by New

7    Liberty in February of 2010.  And later BitBoy, another person

8    who helped me on the forum, improved it.

9        There were three or four other people on the forum as well

10   who worked on the logos.  It was never Dave.  So this could not

11   have happened.  I didn't think about it at the time, but this

12   is fabricated.

13   Q.  Dr. Wright, I asked you if you saw the words on the paper.

14   Do you see that he said to you in 2014, shortly after you told

15   him you would help him find Dave's Bitcoin, that Dave scribbled

16   a "B" on a business card with the Bitcoin logo?

17       Do you see that?

18           MS. MCGOVERN:  I'm sorry.  I'm having a difficult time

19   hearing the question, Vel.

20           MR. FREEDMAN:  Sorry.  I'll try to speak higher.

21   BY MR. FREEDMAN:

22   Q.  Do you see the words on the paper:  "But he couldn't find

23   it so I think he just scribbled it on the back of the card, the

24   'B' with lines through it"?

25   A.  Yes.  I see that Ira was already fabricating things.

181

1    Q.  Okay.

2            MR. FREEDMAN:  Ms. Vela, can you go down, please.

3            Ms. Vela, can you just zoom out.

4    BY MR. FREEDMAN:

5    Q.  And Ira continues in his email.  He says:  "He also said he

6    was doing work with a rich foreign guy.  I asked him:  'How

7    rich is this guy?' He said something like:  'He's not super

8    rich, but he owns some properties.'"

9        Do you see that, Dr. Wright?

10   A.  I see that.

11           MR. FREEDMAN:  Ms. Vela, can you highlight the:  "He's

12   not super rich, but he owns some properties."

13           And can you put that email -- that page to the side,

14   and let's bring up the next page which contains Dr. Wright's

15   response.

16           Can you zoom in on Dr. Wright's response.

17   BY MR. FREEDMAN

18   Q.  So Ira's sending you an email you claim is a fabricated

19   story.  And, Dr. Wright, in response to his statement that Dave

20   Kleiman told him he was working with a rich, foreign man who is

21   not super rich but he owns some properties, you respond:  "The

22   properties were not magnificent, but I loved them.  In total, I

23   had a few cattle ranches and a farm up in Port Macquarie,

24   wonderful beaches, but underdeveloped, unlike Florida.  In

25   total, about 550 acres."

182

```
 1        Do you see that, Dr. Wright?
 2   A.  I see that.
 3   Q.  So Ira knew about properties.
 4   A.  That was public information.
 5   Q.  The email from Ira goes on.  He says:  "I replied to him
 6   saying:  'Why don't you partner with this guy?  With your
 7   brains and his money you guys could create the next big thing
 8   like Facebook.' Gave me a blank look and was silent, which I
 9   thought was unusual for Dave to stop talking.  Maybe he didn't
10   want to directly come out and say you guys were already
11   partners."
12        Do you see that?
13   A.  Yes.  Bitcoin had already been running for eleven months at
14   that stage.  So we weren't inventing anything.  It was running.
15   But I see it.
16   Q.  Doesn't say inventing in the email, Dr. Wright, does it?
17   A.  Effectively it does.
18        MR. FREEDMAN:  Ms. Vela, can you just highlight the
19   words:  "Maybe he didn't want to directly come out and say you
20   guys were already partners."
21   BY MR. FREEDMAN:
22   Q.  Dr. Wright, in response to Ira's question:  Maybe he didn't
23   want to directly come out and say you guys were already
24   partners," you respond with:  "We did partner."
25        Do you see that?
```

183

```
 1   A.  Yes.  After 2011, with first W&K, we set up a partnership
 2   in the way that you're saying, which was a corporate thing.
 3   Not a partnership.  And then later on with other corporations
 4   he was a director and a shareholder with me.  That is correct.
 5   We did partner.  Not in 2009.
 6   Q.  So to understand your testimony today, is it your testimony
 7   here now, that in an email where Ira relates to you a
 8   conversation he has with his brother in 2009, years before W&K
 9   was formed, about the Bitcoin logo and creating digital
10   currency, you respond that:  "We did partner," that something
11   has absolutely nothing to do with the creation of Bitcoin?
12   A.  Yes, in a provably false email, that I did not pay enough
13   attention to.  I got catfished by that man over there, and I
14   didn't respond very well.  Yes.
15   Q.  And then, Dr. Wright, Ira responds to you:  "I was
16   wondering if you were aware of any business cards ever being
17   printed with the Bitcoin logo on it."
18        Do you see that?
19   A.  Yes.
20   Q.  "I never found any in any belongings.  I wasn't sure if he
21   was opening his wallet to show me a Bitcoin business card or if
22   he just wanted to grab an existing card to draw the logo on the
23   back of it."
24        Do you see that?
25   A.  I do.
```

184

```
1    Q.  And then you respond:  "I will have to see what I can dig

2    up.  The old Bitcoin logo we did -- the old Bitcoin logo we

3    did -- is no longer used.  I have a copy somewhere."

4         Do you see that, Dr. Wright?

5    A.  Yes.  When I'm referring to "we," that was New Liberty,

6    BitBoy, and a few other people on the forum, and that's

7    actually public knowledge, and that was February 2010.

8    Q.  So you start the email off with the words "we did partner,"

9    referencing yourself and Dave Kleiman, and you finish the email

10   using the word "we" to refer to some completely different group

11   of people.  That's your testimony here today?

12   A.  Now you understand why my wife and I have fights, lots of

13   fights.

14   Q.  Because you don't tell the truth to your wife, too?

15        MS. MCGOVERN:  Objection, Your Honor.

16        THE COURT:  Sustained.

17   BY MR. FREEDMAN:

18   Q.  Dr. Wright, shortly after this email to Ira Kleiman you

19   sent another one.

20        MR. FREEDMAN:  Ms. Vela, can you zoom back in on the

21   right-hand side.

22   BY MR. FREEDMAN:

23   Q.  You say --

24        MR. FREEDMAN:  Well, actually, Ms. Vela, on the

25   left-hand side.  Can we please bring up P733.
```

185

```
1    BY MR. FREEDMAN:

2    Q.  This is a version of this email that's already in evidence,

3    Dr. Wright.  And it's got the same bottom with the Thanksgiving

4    story.

5    A.  Uh-huh.

6    Q.  And Ira says to you:  "I think the logo he drew for me only

7    had one line going through the 'B,' not two."  And you respond

8    with:  "Here you go.  This is the first of the first."  And you

9    submit a Bitcoin logo that "we did."  Right?

10   A.  The "we" -- yes, that was, as I said, public knowledge,

11   people on the forum.  It's well-known.

12   Q.  You say:  "The later version of the same."

13       Do you see that?

14   A.  Yes.  It was shortly after -- I think that was

15   February 10th of 2010.

16   Q.  And you show another one, right?

17   A.  I believe that one was maybe March 2010.

18   Q.  And then another one?

19   A.  That one would also be February 2010.  I think that was of

20   Joseph Vaughn Perling, New Liberty.

21   Q.  And you also attached another one, that link up at the top,

22   18pxbitcoinsign.svg.png.

23       MR. FREEDMAN:  Ms. Vela, show us the next page of that

24   document.

25
```

186

```
1   BY MR. FREEDMAN:

2   Q.  And then another one.

3   A.  Yes.  That one was -- I think that was the April -- or

4   April or May 2010 logo.

5           MR. FREEDMAN:  Ms. Vela, can you back out to the

6   previous page on the left side.

7   BY MR. FREEDMAN:

8   Q.  So shortly after sending this email, you followed up with

9   another one on the right-hand side.  Same chain.  You say:

10  "Neither of us were graphic artists."

11          Do you see that, Dr. Wright?

12  A.  Yes.

13  Q.  Also still not referring to you and Dave Kleiman?

14  A.  No.  In this one I'm actually referring to Dave.

15  Q.  Okay.  So then you admit that the versions of the Bitcoin

16  logo that you sent were created by you and Dave?

17  A.  No, I don't.  I said neither of us were graphic artists.

18  The first Bitcoin logo was the only one that I did, which is

19  the "BC" in a circle.  I thought it was actually quite good.

20  If you don't mind me swearing, I'm sorry, the direct quote is:

21  "It's complete shit."  I got told that and I changed it, or I

22  allowed other people to change it.

23  Q.  "Neither of us are graphic artists."  You typed that,

24  right, Dr. Wright?

25  A.  I did.
```

```
1    Q.  Dr. Wright, you have spent today testifying that when you
2    said:  "Partnership," you didn't mean partnership to mine
3    Bitcoin, right?
4    A.  There was never any partnership to mine Bitcoin.  Bitcoin
5    in the early days, it was basically a unilateral contract where
6    anyone would come to support the network, and the cost of
7    mining was ridiculously high.  This is part of my original tax
8    problem.  Lots of money, no value.
9    Q.  Dr. Wright, all I asked was:  You have spent the day
10   testifying that you did not partner with Dave Kleiman to mine
11   Bitcoin, correct?
12   A.  That's correct.
13   Q.  Well, let's look at what you said about Dave's mining
14   before the estate filed its lawsuit against you.  Okay?
15             MR. FREEDMAN:  Ms. Vela, can you please bring up P149.
16   BY MR. FREEDMAN:
17   Q.  Dr. Wright, do you recognize this as an email from yourself
18   to John Chesher, your accountant, Andrew Sommer, your lawyer,
19   and Ramona Watts, your wife?
20   A.  I recognize it, yes.
21   Q.  And it mentions Dave Kleiman.
22   A.  (No verbal response.)
23   Q.  Multiple times.
24   A.  I'd have to look at the person below because one of the
25   company directors was Dave.
```

188

1      Can I have a look?

2  Q.  Sure.

3      You see the email below, dave@davekleiman.com?

4  A.  I do, yes.

5          MR. FREEDMAN:  Your Honor, at this time Plaintiffs

6  offer P149 into evidence.

7          MS. MCGOVERN:  No objection, Your Honor.

8          THE COURT:  Admitted into evidence.

9      (Plaintiffs' Exhibit 149 received into evidence.)

10         MR. FREEDMAN:  Your Honor -- sorry.

11         Thank you.

12         THE COURT:  You may publish.

13         MR. FREEDMAN:  Thank you.

14 BY MR. FREEDMAN:

15 Q.  Dr. Wright, the email below from dave@davekleiman.com --

16 A.  Yes.

17 Q.  -- we're going to have Dr. Edman talk about that later.  I

18 want to focus on the email at the top.

19     Before I get there, is that an authentic email from Dave

20 Kleiman?

21 A.  I don't know.

22         MR. FREEDMAN:  Okay.  Ms. Vela, can you zoom into the

23 top -- the top email there.

24 BY MR. FREEDMAN:

25 Q.  Dr. Wright, now that the jury's looking at this email, I

189

```
 1   want to go through it again.
 2        This is an email from yourself to John Chesher, who was an
 3   accountant at your companies, right?
 4   A.  He was the CFO.
 5   Q.  Okay.  CFO of your companies, right?
 6   A.  (No verbal response.)
 7   Q.  And Andrew Sommer was your lawyer, right?
 8   A.  He was one of the lawyers, yes.
 9   Q.  And Ramona Watts, your wife?
10   A.  She was also a director and CPO.
11   Q.  And your wife?
12   A.  That, too, yes.
13   Q.  And these are all people you trust, Dr. Wright, correct?
14   A.  Definitely Ramona.  The others have varied over time.
15   Q.  Dr. Wright, in this email you write in the third paragraph:
16   "The main thing here is that Dave mined all of this outside
17   Australia."
18        Do you see that?
19   A.  I do.
20   Q.  And then, Dr. Wright, can you read the last line of your
21   email to Ms. Watts to the jury, please.
22   A.  Yes.
23        "I was not doing" -- I'm sorry.  "I was not the person
24   doing the mining.  Dave was."
25   Q.  You say:  "I was not the person doing the mining.  Dave
```

190

1    was.  Regards, Craig."

2    A.  That's what this says, yes.

3    Q.  Dr. Wright, you also told Mark Ferrier that Dave was doing

4    the mining, didn't you?

5    A.  Yes.  In reference to Testnet, that's correct.

6    Q.  And just to reorient us, Mark Ferrier, we discussed him

7    earlier.  He's the Australian gentleman you filed the police

8    report against, right?

9    A.  Yes.

10         MR. FREEDMAN:  Ms. Vela, can you please bring up P464.

11   It's already in evidence.

12         And let's go to Page 5 -- sorry.  Not Page 5.  Let's

13   go to Page 32.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright, to your police statement to the New South Wales

16   Police, you attached an email chain between you and Mark

17   Ferrier, did you not?

18   A.  I don't remember but could have.

19   Q.  See it on your screen?

20   A.  I see it, but as I said, my EA attached all of these

21   things.  So I'm assuming this is the correct one.

22         MR. FREEDMAN:  Ms. Vela, can you go to the next page,

23   please.

24   BY MR. FREEDMAN:

25   Q.  So this is the first email in the chain, Dr. Wright, and

191

1    it's entitled "Beer and Congrats."  It's from

2    markferrier@hotmail.com to craig@rcjbr.org.

3    A.  Yes.

4    Q.  And he says to you that:  "I have a great feeling about

5    this.  We are going to have a long and profitable friendship."

6        Do you see that?

7    A.  Unfortunately, yes.

8            MR. FREEDMAN:  And, Ms. Vela, can we go up to

9    Dr. Wright's response.  Just call that out so we don't have to

10   zoom in and out.

11   BY MR. FREEDMAN:

12   Q.  And --

13           MR. FREEDMAN:  Can you leave it at the bottom,

14   actually, Ms. Vela.

15   BY MR. FREEDMAN:

16   Q.  In response to Mark Ferrier's email, Dr. Wright, you say:

17   "I will start to send the addresses and get you the private

18   keys."

19       Do you see that?

20   A.  I do.

21   Q.  And you say, very reasonably:  "I hope you understand that

22   with this value transaction I need to see the code before I

23   release everything."  Right?

24   A.  Yes.  It was an escrowed transaction.

25   Q.  Okay.  And then --

192

```
 1          MR. FREEDMAN:  Ms. Vela, can you bring up the next

 2    email from Mark Ferrier.

 3    BY MR. FREEDMAN:

 4    Q.  So you say:  "I'll send you the private keys, but I need to

 5    see the source code."  And Mark Ferrier asks you:  "Craig, so

 6    tell me where did you get this stuff?"  Right?  "Tell me where

 7    you got this stuff," right?

 8    A.  Yes.

 9    Q.  All right.

10          MR. FREEDMAN:  Ms. Vela, can you leave the question

11    from -- I guess can you minimize the two callouts and let's

12    bring out the next page of the email side by side so we can

13    continue to follow the thread.

14          MS. MCGOVERN:  Could you please confirm the exhibit

15    number because we might have a confusion.

16          MR. FREEDMAN:  464.

17          MS. MCGOVERN:  Plaintiffs' 464.

18          MR. FREEDMAN:  P464.

19          MS. MCGOVERN:  Yes.  I think we have a difference in

20    exhibit numbers, Mr. Freedman.

21          MR. FREEDMAN:  Okay.  Can you take that down, please,

22    Ms. Vela, while we sort out the issue.

23          THE COURT:  Let me know when we're on the same page.

24          Plaintiffs' 464 is in evidence.

25          (Pause in proceedings.)
```

193

```
1          MS. MCGOVERN:  Okay.  Got it.

2          Yes.  We're good.

3          MR. FREEDMAN:  Okay.  Ms. Vela, can you please bring

4     it up.  We're now all on the same page.

5     BY MR. FREEDMAN:

6     Q.  So, Dr. Wright, let's just catch back up.

7        Mark Ferrier says:  "I have a great feeling about this.

8     We're going to have a long and profitable relationship."  You

9     say to him:  "I'll send you Bitcoin addresses and the Bitcoin

10    private keys."

11         MR. BRENNER:  It's not published to the jury.

12         MR. FREEDMAN:  Oh, sorry.  Ms. Vela, can we -- there

13    we go.

14         Okay.  Try again.

15    BY MR. FREEDMAN:

16    Q.  Mark Ferrier says:  "I have a great feeling about it."  You

17    say to him:  "I will send you the Bitcoin addresses and the

18    private keys."

19        That's how you control Bitcoin, right, Dr. Wright?  You

20    send Bitcoin with the private keys?

21    A.  That's one methodology, but it's not exclusive.  I don't

22    want to try and confuse people by going into all the different

23    ways.

24    Q.  Then in response, Mark Ferrier says to you:  "Tell me where

25    you got this from," this Bitcoin from?
```

1    A.  Uh-huh.

2    Q.  And Dr. Wright, on the next page --

3         MR. FREEDMAN:  Ms. Vela, can you call that out.

4    BY MR. FREEDMAN:

5    Q.  You say to Mark Ferrier -- in response to:  "Where did I

6    get this from," you say:  "I have a trust overseas.  I moved it

7    and the mining process to Dave Kleiman when I had a few issues

8    with the tax people."

9    A.  I have to apologize for my lack of clarity here.  There are

10   two different things, and I don't consider them the same.

11        There is something in Bitcoin called Testnet.  When I was

12   running those large computers, we were testing scaling.  Over

13   Testnet, you have what is like Bitcoin but it gets reset every

14   month or so.  So the Bitcoin all disappear.  I wasn't doing

15   that to earn Bitcoin.  It was to test the scaling of Bitcoin to

16   have millions of transactions a second.

17        So when I talk about the mining process, I'm talking about

18   CO1N, the supercomputer, the running of the computer system to

19   test scaling.

20   Q.  Can you pay with Bitcoin mining from Testnet, Dr. Wright?

21   A.  There was a very short period where someone tried to set

22   that up to do it, but luckily Gavin reset everything and

23   started a wiping process to make sure that never happened.

24   Q.  So Mark Ferrier -- you were saying you were going to pay

25   Mark Ferrier with Bitcoin.  He says where you got it from.  You

195

```
1   say:  "I moved the mining process to Dave Kleiman."  Correct?
2   A.  No.  Where I got all the things I was doing.  We were
3   talking to Mr. Ferrier about scaler software, banking software,
4   exchange software.  Where was I running the system to do this?
5   That's what I'm talking about.
6   Q.  Dr. Wright, your email says:  "I moved it and the mining
7   process to Dave Kleiman."
8       Do you see that?
9   A.  I do.
10  Q.  It doesn't say you moved the software, processes and stuff
11  to Dave Kleiman.  It says:  "I moved the mining process to Dave
12  Kleiman."
13  A.  Yes.  The only mining that is not-known is Testnet.  I
14  don't know if it's been explained adequately to the jury.  But
15  every single Bitcoin I've mined is public, and every one's
16  known.  There's no secret mining.
17      Every single -- actually, I lie.  I'm not trying to be --
18  99.98 percent of all mined Bitcoin from January 2011 on are
19  known.  The owners are known.  The mining pools are known.
20  There is no secret Bitcoin mining apart from that little .02
21  percent.
22      So when I say this, every single one of those is trackable.
23  If you had asked Mr. Antonopoulos, he would have explained
24  that.  They're all publicly known.  So the only not-known ones
25  are Testnet, and I was building on Testnet.
```

196

1    Q.  Dr. Wright, you're looking to pay with Bitcoin and you say:

2    "The mining process to Dave Kleiman."

3        Is that at least accurate?

4    A.  No.  The payment was to purchase Bitcoin, that I purchased

5    in 2011.  As I again said, if you look at all of the public

6    record -- see, the blockchain is an immutable ledger that is

7    public.  Everyone in the world can look at it.  So when you

8    look at those addresses, you can actually see when they're

9    purchased.  So if Mr. Freedman here wanted, he could bring this

10   up and say:  "This Bitcoin was purchased on March 2011," and he

11   could match it up with all of the account purchases that I did.

12       So there is no mined Bitcoin at that stage.  They were

13   mined earlier and put into other accounts.  All of that is

14   public record.  When I designed Bitcoin, I was working in an

15   audit firm and I wanted something that was publicly auditable.

16   That is absolutely the fundamental aspect of my invention.  So

17   no, that is incorrect, and provably easily so.

18   Q.  All right.  We'll see if you prove it, Dr. Wright.

19       MR. FREEDMAN:  Can we go to the top email, Ms. Vela.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, you have some back-and-forth with Mr. Ferrier

22   and then you send him another email, and in this one you say:

23   "If this works, we all win."

24       MR. FREEDMAN:  Ms. Vela, can you highlight the next

25   sentence.

197

```
 1    BY MR. FREEDMAN:

 2    Q.   "I had Dave mine the Bitcoin overseas and all it has cost

 3    is sunk."

 4         Do you see that, Dr. Wright?

 5    A.   Yes, I do.

 6    Q.   And then in the next sentence --

 7              MR. FREEDMAN:  Ms. Vela, can you highlight.

 8    BY MR. FREEDMAN:

 9    Q.   -- "I have never touched the Bitcoin we created in the

10    overseas trust."

11         Do you see that, Dr. Wright?

12    A.   Yes.

13    Q.   Dr. Wright, your statements to Mark Ferrier align with your

14    statements to the Australian Tax Office, don't they?

15    A.   Those are not my statements to the tax office.  I said that

16    before.  That's why that document was rejected by the tax

17    office.

18              MR. FREEDMAN:  Ms. Vela, can you please bring up --

19    BY MR. FREEDMAN:

20    Q.   I'm sorry.  Dr. Wright, have you produced --

21              MS. MCGOVERN:  I'm sorry.  I cannot hear the question.

22    BY MR. FREEDMAN:

23    Q.   Let me rephrase the question.

24         Actually, Dr. Wright, you have not produced a single

25    document in this litigation demonstrating that the Australian
```

198

1   Taxation Office rejected those transcripts; isn't that correct?

2   A.  No.

3   Q.  And isn't it correct, Dr. Wright, in fact, there are

4   documents in this litigation where you did correct certain

5   words that the tax office got wrong, like cords to course?

6          MS. MCGOVERN:  Objection.  Foundation.

7          THE COURT:  Overruled.  I'll allow it.

8       (Court reporter interruption.)

9          THE WITNESS:  I said:  "I corrected some parts and

10  then did not continue."

11  BY MR. FREEDMAN:

12  Q.  But there is no email or any document from the Australian

13  Taxation Office rejecting these transcripts; isn't that

14  correct?

15  A.  There doesn't need to be.  Because without the seal, it's

16  not a valid document.  It's like what you're saying with the

17  court document.  If no one seals the court document, it's a

18  piece of paper.  This is an invalid piece of paper.

19  Q.  And, Dr. Wright, there isn't a single document you've

20  produced from yourself rejecting the Australian Taxation Office

21  transcripts; isn't that correct?

22  A.  You have to accept the document.  I haven't accepted it.

23  If I don't accept it and they don't, it's not a valid document.

24          MR. FREEDMAN:  Ms. Vela, can you please bring up P189

25  and show it to the witness and counsel only, please.

199

```
 1    BY MR. FREEDMAN:
 2    Q.  Dr. Wright, do you recognize this as an email between
 3    yourself and Michael Hardy at the Australian Tax Office?
 4    A.  I recognize it as an email that I forwarded later to my
 5    wife of the original email, but for all purposes, yes.
 6    Q.  So, Dr. Wright, just to refresh where we were a moment ago,
 7    we just looked at various emails between you and Mark Ferrier
 8    saying you had Dave mine the Bitcoin, correct?
 9    A.  Again, that's not what I just said.
10    Q.  And now we have an email from you to the Australian
11    Taxation Office on January 27th, 2014 --
12            MR. FREEDMAN:  Ms. Vela, can you please highlight the
13    first sentence of the second paragraph.
14            Oh, and let's actually publish this to the jury, Your
15    Honor.  Sorry.
16    BY MR. FREEDMAN:
17    Q.  Dr. Wright --
18            MS. MCGOVERN:  I don't believe it's been admitted into
19    evidence.  Has it?
20            THE COURT:  No, it has not.
21    BY MR. FREEDMAN:
22    Q.  Dr. Wright, do you see where it says Bitcoin and where
23    Bitcoin was mined, in the third paragraph?
24    A.  I see:  "Mined in the U.S. for a foreign trust."
25            MR. FREEDMAN:  Your Honor, we offer P189 into
```

200

```
1    evidence.
2            MS. MCGOVERN:  I'm sorry.  I'm having a really tough
3    time hearing you, Mr. Freedman.  If you could just stay by the
4    microphone.
5            We object on hearsay and relevance grounds, Your
6    Honor.
7            THE COURT:  The objection is overruled.  I'll allow
8    it.  Admitted into evidence 189.
9        (Plaintiffs' Exhibit 189 received into evidence.)
10           MR. FREEDMAN:  Can we publish that, please, to the
11   jury.
12           THE COURT:  You may.
13   BY MR. FREEDMAN:
14   Q.  Dr. Wright, we're looking at an email from yourself to
15   Michael Hardy of the Australian Taxation Office, and in the
16   third paragraph down you say:  "The Bitcoin I control was mined
17   in the U.S."
18       Do you see that?
19   A.  I do.
20   Q.  Dr. Wright, between 2009 and the date of this email in
21   2014, you lived in Australia, didn't you?
22   A.  I did.
23   Q.  And between 2009 and the date of this email, Dave Kleiman
24   lived, until he passed, in the United States, did he not?
25   A.  He did.
```

201

```
1    Q.  Dr. Wright, the Australian Taxation Office are not the only

2    people that you told this to; isn't that correct?

3    A.  I didn't send this email to anyone else.

4    Q.  That's true.

5         MR. FREEDMAN:  Ms. Vela, can you please bring up P122,

6    which is already in evidence.

7         MS. MCGOVERN:  Your Honor, I believe this email

8    encapsulated P218, which was a stand-over objection.

9         THE COURT:  All right.  Let me look at 122.

10        MR. FREEDMAN:  P122.

11        MS. MCGOVERN:  I believe.  I believe.

12        THE COURT:  122 is admitted into evidence.

13        MS. MCGOVERN:  Thank you.

14        MR. FREEDMAN:  Okay.  And, Ms. Vela, can you bring us

15   to Page 4, and can you zoom in on Dr. Wright's email.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, we've seen this email before.  It's an email

18   from yourself to Carter Conrad and Patrick Paige.  Both friends

19   of Dave Kleiman.  Correct?

20   A.  They are both friends of Dave Kleiman, yes.

21   Q.  And we heard from Patrick Paige earlier in these

22   proceedings, did we not?

23   A.  We have heard from Patrick Paige, yes.

24   Q.  And just to remind you, Dr. Wright, we just looked at an

25   email from you to the Australian Taxation Office saying:  "The
```

202

```
 1    Bitcoin I control was mined in the U.S.," right?
 2    A.  That's a separate thing, but yes.
 3    Q.  Now, Dr. Wright, you write to Patrick Paige and Carter
 4    Conrad.  You say:  "Dave and I had a project in the U.S." --
 5    A.  Yes.  In 2012 on --
 6    Q.  Dr. Wright, I haven't finished the question.  If you could
 7    just let me --
 8           MS. MCGOVERN:  If you could please let Dr. Wright
 9    finish his statement before you ask the next question.
10           THE COURT:  Have you finished your answer?
11           Why don't you just ask the full question and then
12    we'll get the full answer.
13           MR. FREEDMAN:  Sure.
14    BY MR. FREEDMAN:
15    Q.  Dr. Wright, it says:  "Dave and I had a project in the U.S.
16    He ran it there.  We kept what we did secret."
17        Do you see that?
18    A.  Yes.  We had a project called CO1N, where I developed one
19    of the largest supercomputers in the world.  It made it to the
20    top 20 list.  And I didn't want people knowing that I was doing
21    that.  That was in 2012.
22    Q.  And the very next sentence, Dr. Wright, says:  "The company
23    he ran there mined Bitcoin."
24    A.  Yes.  It was running a Testnet version of that.  I have a
25    published paper on it.  We tested Bitcoin running in my company
```

203

```
 1    up to 340 gigabytes, which was around 1 million transactions a
 2    second.  The rate would enable that to be run at over a ten
 3    thousandth of a cent per transaction, enabling global commerce
 4    for people in the third world for a lot cheaper than it is now.
 5    Yes.
 6    Q.  And then you say in the next paragraph:  "The amount Dave
 7    Kleiman mined is far too large to email"?
 8    A.  That was my belief at the time.  That's a separate
 9    statement, separate paragraph.  When you start a separate
10    paragraph, it's a separate statement.
11        Now, I was led by Dave to believe that between when I told
12    him to start mining and when I stopped mining, he was.  I don't
13    know whether he did or not.  If he did, it would be large.
14    Q.  So it's your testimony here today that the first, second,
15    and third paragraphs are all related but the third and fourth
16    paragraphs, completely unrelated, right?
17    A.  That's not what I said.
18    Q.  Okay.  Dr. Wright, two years later you forward this exact
19    same email to your wife, Ramona Watts, don't you?
20    A.  I don't know.  Possibly.
21        MR. FREEDMAN:  Ms. Vela, can you please bring up P305.
22        And, Ms. Vela, can you zoom in on that so we can all
23    read it clearly, and this is just being shown so -- sorry.
24    It's not admitted into evidence.  Thank you.  Just show it to
25    counsel and the witness, please.
```

204

```
 1   BY MR. FREEDMAN:

 2   Q.  Dr. Wright, do you recognize the email we saw -- on the

 3   bottom is the email we were just looking at a moment ago,

 4   right?

 5   A.  Yes.

 6   Q.  And the email on top is an email from yourself to a few

 7   individuals, including Ramona Watts, your wife?

 8   A.  Yes.

 9   Q.  And you comment on the email below, including talking about

10   mining.  Do you see that?

11   A.  Yes.

12        MR. FREEDMAN:  Your Honor, Plaintiffs would offer P305

13   into evidence.

14        MS. MCGOVERN:  No objection.

15        THE COURT:  Admitted into evidence.

16   (Plaintiffs' Exhibit 305 received into evidence.)

17   BY MR. FREEDMAN:

18   Q.  So, Dr. Wright, now the jury sees the email.  We've seen

19   the email we were just looking at a moment ago where you said:

20   "Dave and I had a project in the U.S.  He ran it there.  We

21   kept what we did secret.  The company he ran there mined

22   Bitcoin."  That's February 12th, 2014.

23        Do you see that?

24   A.  I see that.

25   Q.  And now we're looking at an email from yourself to
```

205

 1   Ms. Watts and a few others on December 8th, 2015.  Just almost

 2   two years later.  Right?

 3   A.  I see that.

 4   Q.  And you say:  "The email to Patrick is attached below."

 5       Do you see that?

 6   A.  I do.

 7   Q.  You say:  "I said we mined."

 8       Do you see that?

 9   A.  Yes.

10   Q.  "Not that I was Satoshi Nakamoto, SN to Patrick."

11       Do you see that?

12   A.  Yes.  And to continue what I was saying before, as I said,

13   we mined on Testnet.  That is published.  The information is

14   available publicly.

15   Q.  So it is your testimony here today that all your comments

16   about Dave mining Bitcoin were about a worthless Bitcoin, the

17   Testnet version of Bitcoin?

18   A.  It's not worthless.  It gained information.  Information

19   has value.

20   Q.  Okay.  Is it worth $35 billion?

21   A.  No.

22          MR. FREEDMAN:  Ms. Vela, you can take that down,

23   please.

24   BY MR. FREEDMAN:

25   Q.  Dr. Wright, let's take a look at some other pre-litigation

206

```
1   statements you made about Dave mining.  Okay?
2   A.  Uh-huh.
3   Q.  John Chesher worked for you from about 2008 to 2015.
4   A.  2008 around -- it could have been -- I don't remember when
5   I closed Ridges Estate.  He was with me from when I closed a
6   company called Ridges Estate, which was before -- it could have
7   been 2007.  So it's a long time ago.  I'm just trying to
8   remember the exact date.  '7 or '8.  Yes.
9   Q.  And some of what you did was help the Australian Tax Office
10  investigation -- some of what he did, John Chesher did, was
11  help handle the Australian Tax Office investigations of your
12  Australian companies, correct?
13  A.  Again, I wouldn't put that correctly the way that you're
14  saying it.  He was -- it depends on what time frame you're
15  talking about, depends on what role he had.  So I can't
16  accurately answer that one without further information.  Sorry.
17  Q.  Did John Chesher handle the Australian Tax Office
18  investigations for you or your companies' behalf?
19  A.  That wasn't his role.
20      And when are you talking about?
21  Q.  Did he ever do some of that?
22  A.  John was a CFO of a company from 2013.  After we fired
23  Jaime, John was brought back in.  He was also involved with my
24  companies before 2011.  And some in the other period.  Not all.
25      So it depends on what you're talking about.  If you don't
```

1   give me more context, I can't answer that question.  I'm sorry.

2   Q.  I'm just asking whether or not John Chesher handled the

3   Australian Tax Office investigations for you or your companies'

4   behalf at any time.

5   A.  If that's the exact wording, then the answer would have to

6   be no.

7        MR. FREEDMAN:  Counsel, I'm going through the

8   deposition of Dr. Wright on April 4th, 2019, Page 104, lines 22

9   to 25.

10        Please don't play it.  Sorry.  Wait for Ms. McGovern

11   to take a look at the --

12        MS. MCGOVERN:  Mr. Freedman, what is the citation?

13        MR. FREEDMAN:  It is 104, 22 to 25.

14        MS. MCGOVERN:  Okay.  Thanks.

15     (Pause in proceedings.)

16        MS. MCGOVERN:  No objection.

17        MR. FREEDMAN:  Can you play the clip then, please,

18   Ms. Vela.

19     (Video played.)

20   BY MR. FREEDMAN:

21   Q.  And just before we pressed play, I asked you if there was

22   any point in time when John Chesher handled the Australian Tax

23   Office investigation for you or your clients' [sic] behalf, and

24   you said no.

25   A.  No, that's not what you said.

1    Q.   Okay.  Would you like to change your answer, Dr. Wright?

2    Was there any time when John Chesher handled the Australian Tax

3    Office investigation for you or your companies' behalf?

4         MS. MCGOVERN:  Objection.  Misstates his testimony.

5    He --

6         THE COURT:  Overruled.

7         THE WITNESS:  The way that you're saying it now -- I

8    said the exact phrasing you said was incorrect.  The second

9    phrasing is correct.

10   BY MR. FREEDMAN:

11   Q.   Why don't you tell the jury what is correct so we're all on

12   the same page.

13   A.   In 2009 there was an investigation into GST over Bitcoin.

14   In 2009, the companies' Information Defense and Integyrs had

15   John Chesher as the accountant.  During that time John

16   represented me in the Australian Tax Office.

17       I had claimed Bitcoin in June 2009 as an asset.  The tax

18   office said there is no value to this thing called Bitcoin; it

19   is a hobby.  I claimed expenses of $2.2 million in setting up

20   Bitcoin.  The tax office said it is a sham because this stuff

21   will be never worth anything.  John represented me.  We ended

22   up going to court.  In 2013, I finally got a judgment in our

23   favor.  That's why John wasn't my CFO, because he was working

24   on my tax affairs.

25       John was then taken back as CFO after we fired Jamie, in

209

1    end of October.  I don't remember the exact date.  I'm sorry.

2    Towards the end.  He then headed up as CFO of Hotwire.  He

3    handled the tax filings with the accountants.  He acted then on

4    behalf of the corporation and then also did other things in

5    behalf of myself.  That would be a more accurate

6    representation.

7    Q.  Okay.  And, Dr. Wright, your statement that the Bitcoin you

8    controlled was mined in the United States by Dave Kleiman lines

9    up with what John Chesher told the Australian Tax Office on

10   your behalf in 2014, does it not?

11   A.  No.  It does not the way you're saying it.

12       You're again confusing what everyone confuses, the

13   difference between very large computers that -- one very large

14   supercomputer, as you say, won't mine Bitcoin.  It will be the

15   equivalent of a $10,000 ASIC machine, even though it costs $20

16   million.  John is an accountant.  He also wouldn't know the

17   difference.  So that would be my answer.

18       MR. FREEDMAN:  Ms. Vela, can you please put up for the

19   witness and counsel P127.

20       THE COURT:  Mr. Freedman, just let me know when it

21   might be a good time for us to adjourn for the evening.

22       MR. FREEDMAN:  We can stop here, Your Honor, and I'll

23   just do a very, very quick refresh when we start to --

24       THE COURT:  All right.  Certainly.

25       Ladies and Gentlemen, it is 5:00.  We are going to

210

```
 1   adjourn for the evening.

 2        Thank you for being so prompt this morning.  I would

 3   ask that you again be here at 9:45 so we're ready to come into

 4   the courtroom at 10:00.

 5        Please remember you're not to discuss the case with

 6   anyone or permit anyone to speak with you.  Everything learned

 7   about this case is learned within the courtroom.  You're not to

 8   conduct any independent research.

 9        Have a pleasant evening.  I'll see you tomorrow

10   morning at 9:45.

11     (Jury not present, 5:01 p.m.)

12        THE COURT:  Dr. Wright, you may join your attorneys at

13   counsel table.

14        Go ahead and have a seat.

15        All right.  Let us proceed to the dispute with regard

16   to the exhibits that were referenced in the video depositions.

17        MR. BRENNER:  Judge, could I just have one minute to

18   grab my notes?

19        THE COURT:  Certainly.

20     (Pause in proceedings.)

21        THE COURT:  Do the attorneys need to take a comfort

22   break or are we ready to continue?

23        MS. MCGOVERN:  I can continue, Your Honor.

24        MR. BRENNER:  Oh, no.  Judge, I'm fine.  I'm just

25   grabbing my notes, though.
```

211

```
 1              THE COURT:  All right.

 2         (Pause in proceedings.)

 3              MR. BRENNER:  Thank you.

 4              MS. MCGOVERN:  Do you want to start just with your

 5    list so that we go exactly as you've given it to the Court?

 6              MR. BRENNER:  Sure, Judge.  The list that I tendered

 7    to Court staff this morning has the section titled "Continuing

 8    Dispute".  Your Honor, if it works for you, we can just go down

 9    the order starting by witness.

10              THE COURT:  We'll start with Wilson and we'll move to

11    Watts.

12              MR. BRENNER:  Do you have the physical copies of the

13    exhibits?

14              THE COURT:  I have.

15              MR. BRENNER:  You have it on the screen?

16              THE COURT:  No.  I only have the transcript.

17              MR. BRENNER:  Okay.  I have hard copies of the

18    documents or we can pull them up as we go through.

19              THE COURT:  Well, I'm referencing the documents

20    through the transcript.  So I'm going through each of them as

21    you're going to make argument.

22              MR. BRENNER:  Okay.  Okay.

23              MS. MCGOVERN:  Would you like me to state our

24    objections or do you want to --

25              THE COURT:  Yes.  I don't have a legal basis for any
```

1    of these objections.  So why don't you give me the legal basis

2    and then, as you're the proponent, Mr. Brenner, you can proceed

3    with argument.

4            MR. BRENNER:  Okay.  Thank you.

5            MS. MCGOVERN:  With respect to Exhibit 62, which is

6    Plaintiffs' 62, for Jamie Wilson we've objected on hearsay,

7    authentication.  During the testimony of Mr. Wilson, played by

8    videotape, he stated that he had never seen the document

9    before.  It's a contract for the sale of shares between Dave

10   Kleiman, Dr. Wright, W&K, dated April 2nd, 2013.  Our

11   objections are hearsay and authentication through this witness.

12           MR. BRENNER:  Your Honor, the exhibit is -- the cover

13   page is an email from Dr. Wright to his -- first he sends it to

14   himself.  Then he sends it to his wife, Ms. Watts, and Stefan

15   Matthews.  He attaches an exhibit that's in evidence.  There's

16   really nothing -- the whole back of that, starting at the ATO

17   letter -- I don't have the exhibit number in front of me -- but

18   it's the April 15th, 2014 letter from the ATO to Ira Kleiman.

19           THE COURT:  I understand, but as to this witness, how

20   has he laid the proper foundation for the admission of this

21   contract?

22           MR. BRENNER:  Your Honor, well, the contract's in.

23   I'll withdraw this particular exhibit.  It doesn't matter.

24           THE COURT:  All right.  The objection is sustained

25   with regard to P62.

213

```
1              Now we will move to 76.
2              MS. MCGOVERN:  Your Honor, we object.  This is an
3    email from Dr. Wright to Ramona Watts.  We've objected on
4    relevance and unduly prejudicial, Your Honor.
5              MR. BRENNER:  That was P76.  I don't have my notebook,
6    but an email from Dr. Wright --
7              THE COURT:  To Ramona Watts dated July 2nd, 2013.
8              MS. MCGOVERN:  Again, Your Honor, our objection is
9    with respect to this email coming through Jamie Wilson in the
10   videotaped deposition.
11             MR. BRENNER:  But the email is from Dr. Wright to
12   Ramona Watts about Jamie Wilson and cc'd to Jamie Wilson.  So
13   we don't -- I'm sorry.
14             MS. MCGOVERN:  Can I take a look at it?
15             MR. BRENNER:  Yes.  Of course.
16             THE COURT:  The objection is on grounds of hearsay and
17   relevance?
18             MS. MCGOVERN:  Yes.  Yes, it is, Your honor.
19             THE COURT:  The objection is overruled.  It would be
20   admitted into evidence.
21        (Plaintiffs' 76 received into evidence.)
22             THE COURT:  All right.  P101.
23             MS. MCGOVERN:  Oh, yes.  P101.  Your Honor, our
24   objection is hearsay, relevance, improper character evidence,
25   and unduly prejudicial.  It's hearsay because of the
```

214

```
1   attachment.  It's improper character evidence.  This is an

2   email from Dr. Wright to Ami Italia regarding a notification of

3   an audit, and dated October 12th, 2013.

4           MR. BRENNER:  Yes.  This is an email from Dr. Wright.

5   It's not hearsay.  It's to Jamie Wilson.  It's talking in part

6   about the statutory declarations and the ATO, which was just

7   talked about by Dr. Wright, and Jamie Wilson's alleged

8   involvement.

9           THE COURT:  Does the email reference what is attached?

10  Was that attached to Dr. Wright's email?

11          MR. BRENNER:  Yes.  It appears to be, Your Honor.

12          THE COURT:  All right.  The objection is overruled.

13  It will be admitted.

14      (Plaintiffs' 101 received into evidence.)

15          THE COURT:  102?

16          MS. MCGOVERN:  Your Honor, this is a resignation

17  letter from Jamie Wilson to Dr. Wright, dated October 23rd,

18  2013.  We object on hearsay and relevance grounds, Your Honor.

19          MR. BRENNER:  I mean, Dr. Wright just a few minutes

20  ago offered that Jamie Wilson was fired.

21          THE COURT:  Yes.  But I mean, what Dr. Wright may have

22  said makes no difference with regard to this witness, whether

23  at the time that it was offered through Jamie Wilson,

24  whether -- it was proper, whether it should be sustained on

25  grounds of hearsay and relevance, which were the two
```

215

```
1     objections.
2           MR. BRENNER:  Right.  Well, it's relevant because it
3     goes to what Jamie Wilson did or did not do and what he did or
4     did not know.  It's an email from Jaime Wilson to Craig Wright
5     and Ramona Watts, and it goes to show Dr. Wright's actions in
6     response to that.
7           THE COURT:  The objection is overruled.  It will be
8     admitted.
9        (Plaintiffs' Exhibit 102 received in evidence.)
10          THE COURT:  Let's move to Watts.  P43.
11          MS. MCGOVERN:  Your Honor, P43 is an email from Ramona
12    Watts to Dr. Wright regarding the trusts.  The objection is
13    authentication and hearsay.  Ramona Watts testifies that she
14    does not recall the document.  And it's hearsay because it's
15    coming in through Ramona Watts.
16          THE COURT:  Response?
17          MR. BRENNER:  Your Honor, in Ms. Watts' deposition she
18    seemed to claim not to remember a lot of things that were
19    written from her or to her.  I don't think that's any -- that's
20    a basis to deny authenticity.  That goes to the weight of the
21    evidence.
22          THE COURT:  Not its admissibility.  I agree.  The
23    objection is overruled.  It will be admitted.
24       (Plaintiffs' Exhibit 43 received in evidence.)
25          THE COURT:  P169.
```

216

```
1          MS. MCGOVERN:  Your Honor, P169 is a letter from

2    Dr. Wright to Uyen Nguyen regarding the CO1N deed loan of June

3    27th, 2014, and the objection is hearsay, relevance, and

4    authentication.

5          MR. BRENNER:  I have P169 is an email from Ramona

6    Watts to a lot of people.

7          THE COURT:  Craig Wright to Ms. Nguyen on the CO1N

8    deed of loan, dated June 27th.

9          MS. MCGOVERN:  2014.

10          MR. BRENNER:  Your Honor, can we come back to that?  I

11    have the wrong document in front of me.

12          THE COURT:  All right.

13          MS. MCGOVERN:  Your Honor, with respect to P183, this

14    is an email from Ramona Watts to Dr. Wright and Stefan

15    Matthews.  Our objection is hearsay, authentication, and

16    improper lay opinion.  It's hearsay because the valuations are

17    not conducted in the regular course of business.

18          At Page 6, there's an indication that it's being

19    prepared for regulatory purposes, and it's being offered for

20    the truth of the matter asserted.

21          MR. BRENNER:  Your Honor, it's a business record of

22    Dr. Wright and Ramona Watts' multiple businesses together.

23    It's not a draft report, as she testified to.  It's signed by

24    Lee Goldstein, from Business Reports Valuations, which she --

25    Business Reports and Values -- excuse me -- which she
```

217

1    acknowledged was someone that they had used to do valuations.

2    It's a business record.  It's not excluded as hearsay.

3            MS. MCGOVERN:  Your Honor, if I could just briefly

4    respond for the record.  The business record foundation was not

5    laid during her deposition.  It was not played during her

6    deposition, and our objection is --

7            THE COURT:  Who laid the foundation that it was a

8    business record?

9            MR. BRENNER:  I asked her in her deposition, which we

10   played today, that this was a company they used to do

11   valuations.  This is a report they received from them.

12           THE COURT:  All right.  The objection is overruled.

13   It will be admitted.

14       (Plaintiffs' Exhibit 183 received in evidence.)

15           THE COURT:  Can we move back to 169?

16           MR. BRENNER:  Looks like I need 30 more seconds.

17           MS. MCGOVERN:  All right.  Then 221.

18           Your Honor, with respect to 221, Your Honor, I

19   mistakenly referred to this during Dr. Wright's testimony.

20   This was sustained as to 218.  It's an email that was contained

21   within Plaintiffs' Exhibit 218.  This is an email from Ramona

22   Watts to Ira Kleiman regarding questions, dated June 23rd,

23   2015.  It's hearsay.

24           MR. BRENNER:  So, Your Honor --

25           MS. MCGOVERN:  I'm sorry.  I apologize.  It's being

218

1    admitted for the truth of the matter asserted.

2            MR. BRENNER:  Your Honor, as was testified both by Ira

3    Kleiman and by Ms. Watts, what happened here was -- and Your

4    Honor has seen testimony about Coin.Exch.

5            What happened was, there was extended negotiations

6    between Ira Kleiman and Craig Wright.  Then at some point Ira

7    told the story that those sort of devolved a bit, and Ramona --

8    or excuse me -- Ms. Watts then started acting on behalf of

9    Dr. Wright.  And she also testified that she's -- you know,

10   she's his business partner in all these businesses.

11           This is an extension of the communications between

12   Dr. Wright and Ira Kleiman.  It's just Ramona Watts is stepping

13   in the shoes.  Sometimes Dr. Wright's copied.  Sometimes he's

14   not.  But that was clearly her role, and she testified as such,

15   and Ira Kleiman did too.

16           THE COURT:  The objection is overruled.  It will be

17   admitted.

18       (Plaintiffs' Exhibit 221 received in evidence.)

19           MR. BRENNER:  So on 169, Judge, I'm showing a

20   different document than apparently you and Ms. McGovern are.

21   So I'm not sure what the discrepancy is.  I apologize.

22           Can I see what you have as 169?

23           MS. MCGOVERN:  I have it already written down here.

24           THE COURT:  All right.  Then let's move forward.  240.

25           MS. MCGOVERN:  Your Honor, with respect to 240, we

219

1    object on hearsay and unfairly prejudicial.  This is the

2    letter -- and I understand that Mr. Brenner is giving the

3    background on everything, but our objection is hearsay and

4    unfairly prejudicial for the following reason:  This is an

5    email from a corporate lawyer in Australia to Ms. Watts with

6    respect to the termination of the legal services through

7    which -- they are seeking to establish it for the purpose of

8    establishing that there was some wrongdoing in connection with

9    the termination of that relationship.

10           It's hearsay, and it's unfairly prejudicial.  Those

11   are our objections.

12           MR. BRENNER:  This is a letter from -- well, the email

13   is an email from Mr. Sommer, who was their attorney, to

14   Ms. Watts.  And then Ms. Watts forwards it to Craig Wright.  It

15   goes to the very issues in the case of the submission of false

16   information to the Australian Taxation Office.

17           Mr. Sommer is acting as an agent until -- after this

18   letter, he's no longer, perhaps.  And it's a business record of

19   the company, a business record of Wright's companies.

20           MS. MCGOVERN:  Your Honor -- apologize.

21           MR. BRENNER:  That's okay.

22           MS. MCGOVERN:  Your Honor, there's no foundation for

23   business record exception to the hearsay rule.  We disagree

24   that this is a case about the Australian tax authority's

25   proceedings against corporations in Australia.  This is a

1    partnership case in the United States between two individuals.

2              So it's unfairly prejudicial because that's exactly

3    what they're doing, is they're conflating the issues before the

4    jury and that's the purpose for it.  That's prejudicial and its

5    probative value does not --

6              THE COURT:  I'm trying to pull up 240 to see its

7    relevance with regard to the termination of engagement related

8    to DeMorgan.

9              MR. BRENNER:  Right.  This is the dealings with the

10   Australian Taxation Office.  As you heard Dr. Wright say,

11   DeMorgan was almost a holding company.  I think you may have

12   seen it in the testimony of Ms. Watts.  It was the company that

13   was holding all the stuff for like Coin-Exch. and -- CoinEx.

14             The two people that were the directors of that

15   company, as Ms. Watts testifies, were just Dr. Wright and

16   Ms. Watts.  Dr. Wright actually brought up DeMorgan today as --

17   I think he said when he was referring to the company, that we

18   believed that he was referring to W&K, that he was a

19   shareholder of in America, suddenly, it became DeMorgan.

20   That's the relevance.  DeMorgan is tied in with all of this.

21             Your Honor --

22             THE COURT:  I'm actually just looking at it in the

23   context of the deposition.

24             MS. MCGOVERN:  I think it is important, though, Your

25   Honor, for us to establish in the record that the DeMorgan

221

1   group of companies are Australian companies, formerly

2   established Australian companies, that ultimately went through

3   liquidation in Australia.  They were subject to proceedings

4   with the Australian Tax Office completely separate and apart

5   from the issues in this case.

6        We have raised this in this case before.  We've

7   addressed this issue in this case before.  Your Honor has

8   circumscribed the relevance of that tax proceeding to the

9   extent that there were issues raised regarding the parties or

10   the subject matter in this case.

11        What's happening in this trial, Your Honor, is that

12   suddenly the ATO has become a black cloud of credibility and of

13   conflated issues that are in fact in front of the jury.  So our

14   concern is very real that to the extent that the jury believes

15   that there is somehow established wrongdoing in connection with

16   an unrelated tax proceeding in Australia, that they somehow can

17   fill up the void of the absence of evidence in this case

18   regarding a legal partnership between Dr. Wright and Dave

19   Kleiman.  That's exactly what this does.

20        THE COURT:  And, Mr. Brenner, tell me how this is

21   relevant to what took place before the ATO.

22        MR. BRENNER:  Yes.  I don't think Ms. McGovern's

23   disputing -- perhaps, I'm not hearing it right.  I don't think

24   there's any dispute that the ATO proceedings that were

25   referenced here, so if you look at -- I'm looking at the letter

1    attachment to the email.  If you look at the second paragraph

2    of the letter from Mr. Sommer to Ms. Watts, it says:

3    "Information has been provided to our firm which raises serious

4    questions about the integrity of documents provided by

5    Dr. Craig Wright both to our office and to the Australian

6    Taxation Office.  We believe this information to be credible.

7    In these circumstances, we can no longer represent DeMorgan,

8    Limited in the disputes, and its subsidiaries, that it has with

9    the Australian Tax Office."

10        I believe this is the same taxation office proceedings

11   that we're dealing with in this case, and the same documents.

12        THE COURT:  Just give me one moment.  I'm having a

13   hard time opening up 240.  Just hold on.

14        MS. MCGOVERN:  I know you will, Your Honor, stop me if

15   I'm getting in the way of your looking at these documents, but

16   I do feel like this is an opportunity to clarify something

17   that's been very, very apparent in this trial, and that is

18   this:  The overbreadth of that statement that these are the

19   same documents that have to do with tax proceedings that went

20   on in Australia with a large number of companies that have to

21   do with the research and development credit have nothing to do

22   with the invention of Bitcoin or the mining of Bitcoin.

23        The Plaintiffs have made perfectly clear, perhaps for

24   the first time after four years, in front of the jury in their

25   opening statement that this is a case about one issue, and it

223

```
1   is a partnership to invent and mine Bitcoin.  That was not

2   before the ATO, and I do not believe even Mr. Brenner would say

3   that it is true.

4           THE COURT:  I disagree with regard to that

5   characterization.  It certainly is with regard to a

6   partnership, but those issues directly relate to that issue.

7           Looking at 240, I do agree that it is relevant, and

8   the objection is overruled.

9       (Plaintiffs' Exhibit 240 received into evidence.)

10          THE COURT:  261.

11          MS. MCGOVERN:  Your Honor, 261 is an email from Ramona

12  Watts to Stefan Matthews.  We've objected on hearsay grounds,

13  Your Honor, and relevance.

14          MR. BRENNER:  Again, Ms. Watts is not in this capacity

15  as the wife of Dr. Wright.  She's in the capacity as the

16  co-director of the company that's holding all of, what we

17  believe at a time -- I have got to be careful with my chain of

18  custody.  The W&K IP passed through several entities, including

19  DeMorgan.  It ultimately went through DeMorgan, and this is

20  what this is all about.  This is a direct admission of a party.

21          THE COURT:  The objection is overruled.  261 is

22  admitted.

23      (Plaintiffs' Exhibit 261 received into evidence.)

24          MS. MCGOVERN:  Your Honor, 299.

25          THE COURT:  All right.  And the objection.
```

224

```
1          MS. MCGOVERN:  Your Honor, we've objected to 299 on
2    hearsay grounds.  This is an email, the purpose for which
3    really is bolstering of Andrew O'Hagan and is otherwise
4    hearsay.  We've objected on hearsay grounds.  299.
5          MR. BRENNER:  The email is written by Dr. Wright.
6    It's not hearsay.
7          THE COURT:  The objection is overruled.  It will be
8    admitted into evidence.
9        (Plaintiffs' Exhibit 299 received in evidence.)
10         THE COURT:  All right.  332.
11         MS. MCGOVERN:  Your Honor, we've objected to 332 on
12   hearsay grounds.  Your Honor, this is an email, again, that has
13   to do with our objection to the documents related to the
14   Australian Tax Office.  I'll just state none of the companies
15   that were in front of the ATO have been sued in this proceeding
16   and the documents related to those proceedings are not relevant
17   here.  So it's relevance and hearsay, Your Honor.
18         MR. BRENNER:  Are we on 332?
19         MS. MCGOVERN:  Yes.
20         MR. BRENNER:  I don't think 332 has to deal with the
21   ATO.  332 has to deal --
22         THE COURT:  It's the email from Craig Wright to Andrew
23   O'Hagan.
24         MR. BRENNER:  Yes.  It has to deal with Dave being
25   part of the creation of Bitcoin.
```

225

```
1              MS. MCGOVERN:  I think there's an attachment to the

2       email, correct?

3              THE COURT:  Was it an attachment that --

4              MR. BRENNER:  No.  The attachment is referenced in the

5       email.  This is Dr. Wright's --

6              THE COURT:  How many pages is the email?

7              MR. BRENNER:  The email is one page.

8              MS. MCGOVERN:  Right.  But the attachment is another

9       20-some pages, I believe.

10             MR. BRENNER:  What the attachment is, Your Honor, just

11      to be clear, I believe it's Dr. Wright's annotations to the --

12      hold on.  I think --

13         (Pause in proceedings.)

14             MR. BRENNER:  Your Honor, at this point we will move

15      only in for now P332, the first page.

16             MS. MCGOVERN:  No objection, Your Honor.

17             MR. BRENNER:  Without the attachment.  If we want to

18      try to move the rest, we will come back to it.

19             THE COURT:  Just the one page.  Admitted into

20      evidence.

21         (Plaintiffs' Exhibit 332 received in evidence.)

22             MS. MCGOVERN:  Yes.  No objection, Your Honor.

23             THE COURT:  All right.  636.

24             MS. MCGOVERN:  636, Your Honor?

25             THE COURT:  Yes.
```

226

1              MS. MCGOVERN:  636 is an email from Stefan Matthews to

2      Dr. Wright, dated November 25th, 2015, and we have objected on

3      hearsay, Your Honor.

4              MR. BRENNER:  Well, Your Honor, the top one happens to

5      be the last in the chain.  This is a series of emails between

6      Dr. Wright himself and Patrick Paige, which Ms. Watts testified

7      to.  She admittedly did not acknowledge the words on the paper,

8      but this is the email exchange where they become concerned that

9      Patrick is one of the people that knows of Dave's involvement

10     and they try to get their story straight.  This is not hearsay.

11             MS. MCGOVERN:  Your Honor, we don't believe that

12     that's what it says.  We don't agree with the initial

13     attachment from Stefan to Dr. Wright.  It's hearsay.  But to

14     the extent that -- the balance of the email regarding Patrick

15     Paige can come in through Patrick Paige.

16             MR. BRENNER:  The last email on the top goes to the

17     state of mind of all those involved, which is they're sort of

18     getting their story straight.  So we believe the whole thing is

19     not hearsay and it's clearly relevant.

20             THE COURT:  The objection is overruled.

21         (Plaintiffs' Exhibit 636 received in evidence.)

22             THE COURT:  All right.  Can we go to 169?

23             MR. BRENNER:  Yes.  169 you have as a letter to Uyen

24     Nguyen?  Just so we're on the same page.  The June 27th, 2014?

25             MS. MCGOVERN:  Yes.

227

```
 1            MR. BRENNER:  Yes.  I think that's what it was used

 2    for, right?

 3            THE COURT:  Letter from Craig Wright to Uyen Nguyen.

 4            MR. BRENNER:  Yes.  So it's a letter from Craig

 5    Wright.  It's not hearsay and it's talking about Bitcoin.

 6            THE COURT:  The objection on grounds of hearsay and

 7    relevance?

 8            MS. MCGOVERN:  Yes, Your Honor.  We also object on

 9    authenticity because the part that begins at Page 74 of the

10    transcript wasn't part of the read-in.  So she goes on to

11    testify that she doesn't know whether this is or isn't a hacked

12    document starting at 89-10 and, therefore, we've also objected

13    on authenticity and foundation.

14            THE COURT:  Goes to its weight.  The objection is

15    overruled.  It will be admitted.

16        (Defendants' Exhibit 169 received in evidence.)

17            THE COURT:  All right.  Let's move to Warren.

18            MS. MCGOVERN:  Your Honor, the first document we have

19    in dispute is Plaintiffs' Exhibit 37.  We've objected on

20    hearsay and authenticity.  It's primarily a foundation

21    objection.  Your Honor, Warren is not a participant in any of

22    the Bitmessage conversations and cannot authenticate them and

23    doesn't have the knowledge or the foundation to identify or

24    testify about them.

25            MR. BRENNER:  Right.  Your Honor, this was the
```

228

1    witness, if you'll recall, who created the Bitmessage system

2    and then was shown various Bitmessages that were sent after --

3    or before the program was created.  So it's not for the truth

4    of the matter asserted in the Bitmessages; it's for the fact

5    that they are -- we contend, are forgeries by Dr. Wright.  I

6    think there's a bunch of those in this stack.

7         MS. MCGOVERN:  If I may respond, Your Honor.  Jonathan

8    Warren is the creator of Bitmessage.  I think his testimony was

9    clear that the creation of Bitmessage could have been made as

10   early as May 25th.  That's an issue that can be argued among

11   counsel.  But the purpose for these Bitmessages, Your Honor, is

12   to establish some sort of forgery or manipulation with respect

13   to the Bitmessage.  He has never seen them before, didn't know

14   about them.

15        THE COURT:  I agree.  The objection is sustained.

16        MS. MCGOVERN:  Your Honor, we have the same objection

17   with respect to Number 51.  It's exactly the same issue.

18   Again, not a participant in the messages and cannot put his

19   imprimatur on the manipulation of the purported forgery of

20   those Bitmessages.  The testimony should be limited to simply:

21   "This is when I invented it" and that's it.

22        MR. BRENNER:  Your Honor, on 37, the basis, it was

23   sustained on hearsay grounds?

24        THE COURT:  All right.  This is P51.  It states:

25   "Warren Deposition Exhibit, Plaintiffs' 11."  Is it Plaintiffs'

1    11, or is it --

2           MS. MCGOVERN:  Yes, Your Honor.  It's the exhibit for

3    Plaintiffs' 11 to the Warren deposition, but it's Plaintiffs'

4    51.

5           THE COURT:  All right.  But it's noted as 51.  So let

6    me just --

7           MS. MCGOVERN:  Correct.  We have the same objection

8    for 51, Your Honor.

9           THE COURT:  All right.  Was the witness able to --

10          MR. BRENNER:  Your Honor, again, I'm not sure what the

11   objection is.  It's not hearsay because it's not being offered

12   for the truth of the matter asserted.

13          All Jonathan Warren did is say -- he gave the facts.

14   The Defendant's position is his testimony is not credible

15   because someone could have found Bitmessage in a cupboard or it

16   was on the dark web.  We can argue that in front of the jury.

17   But the evidence itself and why it's admissible is Jonathan

18   Warren says:  "I created Bitmessage on X date," and then he was

19   asked to -- he was shown messages which are before that date.

20          THE COURT:  But that doesn't mean that every single

21   message after the creation of Bitmessage is automatically

22   admitted into evidence.

23          MR. BRENNER:  It's before.

24          THE COURT:  I'm sorry.  Before.  So the fact that

25   these communications and this spreadsheet was prepared or sent

230

```
1    before Bitmessage was created -- I'm not certain why all of

2    these exhibits are coming in.

3            MR. BRENNER:  Well, I don't --

4            THE COURT:  What are they coming in -- like what's the

5    purpose?  Is the purpose merely to show that it was created

6    before?

7            MR. BRENNER:  Right.

8            THE COURT:  And then you have an issue with the actual

9    exhibit.

10           MR. BRENNER:  No.  I guess maybe I was not clear.  The

11   purpose, it's not to bolster what Warren said.  Warren's giving

12   the fact -- let's just say January 1, 2013.  Let's pick a date.

13   He says:  "I started this on January 1, 2013."  Our position is

14   Dr. Wright -- and these Bitmessages are between Dr. Wright and

15   Mr. Kleiman.  Okay.  They're purported to be.  And they say

16   things that would be very supportive of Dr. Wright's defense in

17   this lawsuit.  Okay.

18           What we're saying is he -- and we say this for a lot

19   of things -- he created this evidence.  He created these

20   Bitmessages at a time it's impossible.  So they're not being

21   offered for the truth of Dr. Wright's communications.  We don't

22   think they're true.  We think they're forgeries.  But the only

23   way to show they are forgeries is to show:  Program created on

24   X date.  Messages purportedly were sent before the program

25   existed.
```

231

```
 1          That's what I was trying to say for 37 and 51.
 2    There's a bunch of these.  That's the only way we can prove it.
 3          THE COURT:  But Exhibit 51 is an exchange of
 4    Bitmessages from Dave Kleiman and Craig Wright.
 5          MR. BRENNER:  All of the Bitmessages we did.  It's the
 6    same thing, 37, 51.  They are all the same thing.
 7          MS. MCGOVERN:  Your Honor, if I could respond.
 8          They're using Jonathan Warren to introduce these
 9    Bitmessages just for one reason, for some confusing statement
10    that they must be fraudulent.  If they want these Bitmessages
11    in, they should get them in through the right witnesses, not
12    through a witness who has never seen them, doesn't know what
13    they are, and has absolutely no basis, no foundation to allow
14    their admission into evidence.  It is being admitted precisely
15    for the truth of the matter asserted, which is that these
16    Bitmessages are fake.
17          THE COURT:  Well, I think the witness can and has
18    testified that he certainly is aware of what Bitmessages are
19    because he was the creator of it.  So to the extent that this
20    is being offered not for its truth, but to establish the date
21    and the series of communications, I do agree for that purpose.
22    I will allow it in on P51.  So the objection is overruled.  For
23    that purpose, the Court will allow that in.
24          (Plaintiffs' Exhibit 51 received into evidence.)
25          MR. BRENNER:  And in 37 --
```

232

```
1        THE COURT:  It's the same with 54 and 74.  Are these
2   just an exchange for the time --
3        MS. MCGOVERN:  Yes.  Well, actually 54 is a little
4   different, but there is another -- the same argument applies,
5   Your Honor, to 74, 452 -- 74 and 452 are the same issue, Your
6   Honor.  I would further suggest, Your Honor, that there's a way
7   for them to properly address the issue they're trying to
8   address without the improper prejudice and the imprimatur of
9   some sort of forgery when he is not that witness, and that is
10  to simply say:  Redact the message.
11        So the purpose for this Bitmessage is one.  It's a
12  singular purpose.  The import to the jury is clear, which is
13  they are not real.  They're fake.  He doesn't have the ability
14  to determine that.  So he doesn't have a foundation to allow
15  the admission.  If it's just a date issue, then allow a
16  Bitmessage on a given date between two people, but not the
17  content of the document.
18        THE COURT:  All right.  Anything further?  I'm looking
19  at 54.
20        MS. MCGOVERN:  Your Honor, 54.  We have objected on
21  hearsay.  They're offering it for the proof that the release
22  date was November 27th, 2012, and that's hearsay.  They can
23  rely on his testimony, but the document they're trying to
24  present is hearsay.
25        MR. BRENNER:  Your Honor, we'll withdraw 54.
```

233

```
1            THE COURT:  All right.  Moving on to 74.

2            MS. MCGOVERN:  Yes.  We had the same objection that we

3   just discussed before on the foundation and the authenticity

4   for Jonathan Warren for 74.

5            MR. BRENNER:  It's the same thing we just did with 51.

6            MS. MCGOVERN:  And 37, yes.

7            MR. BRENNER:  And 37.

8            THE COURT:  It's not being offered for its truth, the

9   Court will permit it.

10       (Plaintiffs' Exhibit 74 received into evidence.)

11           THE COURT:  83.

12           MR. BRENNER:  We're withdrawing 83, Judge.

13           MS. MCGOVERN:  I think the last one, Your Honor, is --

14  452 is the same as 31 -- 37 and 51.  Foundation, authenticity,

15  improper purpose.

16           THE COURT:  All right.  These are the same, the

17  Bitmessages.  The objection is overruled.  It will be admitted.

18       (Plaintiffs' Exhibit 452 received into evidence.)

19           THE COURT:  466.

20           MS. MCGOVERN:  466, Your Honor, we have objected

21  because Jonathan Warren says he's never seen the document

22  before.  So we've objected on authenticity and hearsay.

23  There's a handwritten note on the document, Your Honor, that --

24  he's never seen it before.

25           MR. BRENNER:  I object to responding because I have an
```

234

```
 1    empty notebook here.  I have got to find 466.

 2              THE COURT:  I'm sorry?

 3              MR. BRENNER:  I said I object to responding to 466

 4    because I have an empty notebook.

 5              THE COURT:  All right.  Why don't you look at it.

 6              MR. BRENNER:  Oh, it's a Bitmessage, and the

 7    handwritten is how it was produced, and it's produced by the

 8    Defendant.  I confirmed the handwritten notes -- it's the same

 9    issue we have -- the handwritten notes, at least I have

10    confirmed and been told, it was on the production from the

11    Defendant.

12              MS. MCGOVERN:  Your Honor, it might have been

13    contained on the production, but he didn't recognize the

14    document, couldn't authenticate it.

15              THE COURT:  Mr. Brenner, what's the purpose of

16    introducing --

17              MR. BRENNER:  Well, I'm looking on Mr. Freedman's

18    computer, but I -- we'll withdraw it, Judge.

19              THE COURT:  All right.  Moving to Andresen.  306.

20              MS. MCGOVERN:  Your Honor, "The Satoshi Affair" is

21    Exhibit 1 to the second amended complaint.  It's hearsay.

22              MR. BRENNER:  Yes.  We withdrew that.

23              THE COURT:  367.

24              MS. MCGOVERN:  367, Your Honor, is hearsay.  It is an

25    email from Stefan Matthews to Gavin Andresen regarding
```

235

1    additional proof, dated May 2nd, 2016.  So we have objected on

2    hearsay.  We'd also add relevance, Your Honor.  This failed

3    proof issue in this case is not relevant to the core issues in

4    this case; namely, the relationship between Dave Kleiman and

5    Dr. Wright.  But we've also objected on hearsay because it's an

6    out-of-court statement.

7             MR. BRENNER:  We'll withdraw it, Judge.

8             THE COURT:  The objection is sustained.

9             All right.  384.

10            MS. MCGOVERN:  One second, Your Honor.

11            Your Honor, 384, the objections are hearsay,

12   relevance, authentication.  It's an email from Robert MacGregor

13   to Mr. Matonis and Gavin Andresen regarding a draft blog dated

14   May 4th, 2016.  It's hearsay.

15            THE COURT:  Response?

16            MR. BRENNER:  Withdraw, Judge.

17            THE COURT:  The objection is sustained.

18            411.

19            MS. MCGOVERN:  All right.  Your Honor, I believe the

20   last disputed exhibit for the Gavin Andresen is 411.  We've

21   objected on relevance and unduly prejudicial, Your Honor.  This

22   is an email from Dr. Wright to Gavin Andresen.  The subject is:

23   "A year ago," dated May 3rd, 2017, and it's Dr. Wright talking

24   about the failed proof a year later.  It's unduly prejudicial

25   because the last sentence, Your Honor, reads as follows:  "I'm

236

1   a fraud, but I'm a fraud that is free to work on what I need to

2   do."  That statement alone, Your Honor, is unduly prejudicial

3   and shouldn't come in.

4           MR. BRENNER:  Your Honor, this is an email from

5   Dr. Wright.  It has to do with his whole coming out as Satoshi

6   Nakamoto after Dave passed, and the fact that he calls himself

7   a fraud may be prejudicial but it's not unduly prejudicial.

8           THE COURT:  Well, how is it relevant with regard to

9   this witness and what was the purpose of its introduction?

10          MR. BRENNER:  I think it was an email from Dr. Wright

11  to Gavin Andresen.  Gavin sort of was -- I think you saw in the

12  testimony, was involved in the whole -- I call it the

13  coming-out, the Satoshi coming out process which took place in

14  or around this time.  So that's why Gavin Andresen testified

15  about it.

16          MS. MCGOVERN:  Your Honor, an email where our own

17  client is calling himself a fraud, there's no probative value

18  to that.

19          THE COURT:  Let me just look at the last line you're

20  referring to.

21      (Pause in proceedings.)

22          THE COURT:  I mean, those are the Defendant's words.

23  So I understand that they're prejudicial.

24          MS. MCGOVERN:  It is, Your Honor, but it's his words

25  out of context in a completely different setting.

237

```
1        THE COURT:  Well, then you have an opportunity during
2    the cross-examination or in the Defendant's case, but it's not
3    a misinterpretation of someone else saying something about
4    Dr. Wright.  These are his words.
5        MS. MCGOVERN:  I understand, Your Honor.  But if I can
6    just add that it's not within the context of the issues in this
7    case.  It's within the context of Dr. Wright coming out as
8    Satoshi Nakamoto.  It's not a sentence where Dave Kleiman is
9    even mentioned.  It's not a sentence where W&K is even referred
10   to.  There's no joint mining involved.
11       This is a completely separate set of circumstances in
12   which he's making a statement about himself.  The jury is
13   clearly going to be confused by that statement, and it could
14   potentially unfairly prejudice him with no probative value
15   going to any of the issues.
16       THE COURT:  Well, what is the probative value of this
17   email?  I understand it's written by the Defendant.  But when
18   it states:  "I'm diametrically opposed, positions on some
19   things to do with Bitcoin," as with Mr. Andresen, what's the
20   relevance?
21       MR. BRENNER:  So the relevance -- well, Andresen was
22   involved in the whole Satoshi coming-out affair.  What happens
23   is -- and you heard some of this from O'Hagan -- is there's a
24   transition in Dr. Wright.  So our theory of the case is that
25   there is a time where Dr. Wright is, as you've seen in some of
```

1    the documents, telling other people pretty regularly that he

2    and Dave were partners, and when he gets to the -- you know,

3    basically gets a lot of money thrown at him to come out alone

4    as Satoshi.  This is the beginning of that transition.  This is

5    part of that transition where he starts to cut Dave out.

6         MS. MCGOVERN:  Your Honor, there's no evidence in the

7    record of any of that.

8         THE COURT:  This is an email sent on May 3rd, 2017.

9    So how is this email to Gavin Andresen relevant with regard to

10   your theory or any issue related to the partnership,

11   conversion, civil theft, any of the claims?

12        MR. BRENNER:  Can I have Mr. Freedman answer that

13   question?

14        MR. FREEDMAN:  Thank you, Your Honor.

15        So what happens -- as the story comes out, what

16   happens is Dr. Wright eventually approaches other individuals,

17   Stefan Matthews -- you've seen these names -- Calvin Ayre, and

18   gets funding, raises funding for his entities.  As part of that

19   funding, he needs to come out as Satoshi Nakamoto.  That's part

20   of the deal.

21        In order to come out as Satoshi Nakamoto, he has this

22   big press event around him coming out as Satoshi Nakamoto.  And

23   as part of the big press event, Gavin Andresen, who at the time

24   was basically the successor to Satoshi Nakamoto -- he took over

25   Bitcoin for a period of time -- comes in for this large press

1    event to say -- and meets with Dr. Wright and he says:  "Yes, I

2    believe Craig Wright is Satoshi Nakamoto."

3        When Dr. Wright eventually fails to provide

4    cryptographic proof that he's in fact Satoshi Nakamoto, the

5    world dismisses him as Faketoshi and says he's not Satoshi

6    Nakamoto.  And Gavin begins correspondence with Dr. Wright,

7    that we covered in his deposition, where Dr. Wright begins

8    apologizing for essentially setting him up and making him come

9    out publicly and say he was Satoshi Nakamoto alone.

10        So this email is one from Craig Wright that goes

11    directly to the transition where Dr. Wright now needs to

12    satisfy his business partners that he alone is Satoshi

13    Nakamoto.  He throws this big event with Gavin Andresen, fails

14    to deliver on it, and is now apologizing for it, saying to

15    Gavin:  "I'm a fraud.  I couldn't prove to you I'm Satoshi."

16    That goes to Plaintiffs' theory they were really Satoshi

17    together and part of the fraud is that he's not Satoshi.

18        The Satoshi team requires other people -- the

19    partnership requires other people.  So this admission that "I

20    am a fraud because I failed to prove that I'm Satoshi" is

21    directly relevant to Plaintiffs' case.

22        MS. MCGOVERN:  Your Honor, this email is in 2017.  The

23    big press event that Mr. Freedman's referring to was 2016.  So

24    it was not contemporaneous.  It was not a state of mind.  It

25    was not any of that.  And there's no evidence in the record

240

```
1    that there's been a lot of money thrown at Dr. Wright for going

2    through the very public, you know, sort of grilling of being

3    Satoshi Nakamoto.

4         This theory that Plaintiffs are advocating right now

5    doesn't mean that the statement -- actually, I think it

6    confirms that the statement that Dr. Wright's making in this is

7    unduly prejudicial because it's going to be used for that exact

8    purpose when it's a year after the fact and it's completely out

9    of context and it is going to be used to mean something it

10   doesn't mean.

11        THE COURT:  I agree that its relevance is outweighed

12   by the danger of unfair prejudice, and the objection is

13   sustained with regard to 411.

14        MS. MCGOVERN:  Your Honor, I believe the next, I

15   think --

16        THE COURT:  Moving to Ms. Kobza.  122 is already in

17   evidence.

18        Moving to 638.

19        MS. MCGOVERN:  I think they've withdrawn -- oh, 638.

20   Yes, Your Honor.

21        For the record, our objection to the IP license

22   between Cloudcroft and GISCR, dated August 27th, 2013, is

23   hearsay, relevance, and authentication.  We understand the

24   purpose for the document, Your Honor, and that is somebody

25   signed this.  Somehow this thing got signed.  What's the story
```

1    behind it?  But she didn't authenticate it.  There's no

2    foundation for it.  She's never seen it before.  She said it

3    wasn't her signature, and nobody's established it was

4    Dr. Wright's signature.  So we've objected on foundation,

5    authenticity through this witness, Your Honor.

6         MR. FREEDMAN:  Your Honor, the document was produced

7    by the Defendant, appears to be signed by Craig Wright on the

8    final page, on Page 12, appears to be signed by Ms. Kobza, who

9    was shown the document in her deposition and testified that she

10   in fact did not sign the document.

11        THE COURT:  The objection is overruled.  It will be

12   admitted into evidence.

13        (Plaintiffs' Exhibit 638 received in evidence.)

14        THE COURT:  All right.  Mr. Nguyen.

15        MS. MCGOVERN:  Your Honor, the first document, 403, we

16   have objected on hearsay and relevance.  This has nothing to do

17   with the claims in this case.  It's an email from Jimmy Nguyen

18   to Mr. J. Diaferia, regarding the nChain Holding, Limited,

19   dated, January 23rd, 2017.  It's hearsay and it's not relevant.

20   There is no connection in this case to anything that was done

21   during Dave's lifetime and nChain.

22        MR. FREEDMAN:  Your Honor, after Dave dies, Dr. Wright

23   begins a systematic scheme to transfer all the intellectual

24   property they created together and transfer them into what

25   eventually becomes the nChain companies.  That's where the IP