IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME XI OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
    FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA McGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

| TAB NO. | DESCRIPTION |
|---|---|
| 210 | Plaintiffs' Motion to Compel Defendant to Comply with this Court's Orders Directing Him to Produce a List of the Bitcoins He Held as of December 31, 2013 |
| 429 | Order Granting in Part and Denying in Part Plaintiffs' Corrected Motion for Attorneys' Fees (DE 346), filed March 17, 2020 |
| 618 | Joint Proposed Jury Instructions, filed September 29, 2020 |
| 802-1 | Exhibit A to Defendant's Opposition to Motion for a New Trial (DE 861) — Final Jury Instruction Objections |
| 829 | Email from Craig S. Wright to Dave Kleiman, dated March 12, 2008 |
| 837 | Trial Transcript Day 1, dated November 1, 2021 |
| 838 | Trial Transcript Day 2, dated November 2, 2021 |
| 839 | Trial Transcript Day 3, dated November 3, 2021 |
| 840 | Trial Transcript Day 4, dated November 4, 2021 |
| 841 | Trial Transcript Day 5, dated November 5, 2021 |
| 842 | Trial Transcript Day 6, dated November 8, 2021 |
| 843 | Trial Transcript Day 7, dated November 9, 2021 |
| 845 | Trial Transcript Day 9, dated November 15, 2021 |

TAB NO.        DESCRIPTION

846            Trial Transcript Day 10, dated November 16, 2021

847            Trial Transcript Day 11, dated November 17, 2021

848            Trial Transcript Day 12, dated November 18, 2021

848            Trial Transcript Day 12, dated November 18, 2021

850            Trial Transcript Day 14, dated November 22, 2021

851            Trial Transcript Day 15, dated November 23, 2021

861            Law360 Article entitled, "No Proof Bitcoin 'Inventor'
               Owed Friend, Juror Tells Law360"

877            Joint Notice and Request for Judicial Ruling on
               Proposed Redactions to Admitted Trial Exhibits,
               filed January 31, 2022

**845**

28

```
 1         (Plaintiffs' Exhibit 727 received into evidence.)

 2              MR. FREEDMAN:  Can you go back to Page 4, please.

 3   BY MR. FREEDMAN:

 4   Q.  So, Dr. Wright, April 16th, 2014, Ira Kleiman emails you.

 5   "Dear Craig -- "Hi, Craig.  I just received an email from the

 6   Australian Taxation Office and they want me to answer some

 7   questions regarding W&K.  I'm attaching the document they sent

 8   me.  How would you like me to handle this?"

 9        Do you see that?

10   A.  Yes.  At that time, I was rather naive.  I didn't think

11   "clocktime2020" -- which strangely enough seems to be when my

12   trust is supposed to vest.  I really didn't think that -- "The

13   ATO had reached out to you on that email address."  How would

14   they know that?  What I didn't realize at the time was they

15   reached out to Dave Kleiman and someone pretended to be for a

16   while.

17              MR. FREEDMAN:  Ms. Vela, can you please bring up P862,

18   and this is in evidence.

19              And let's go to Page 44.

20              Oh, you know what?  Hold on.  Let's go back to Page 1.

21   BY MR. FREEDMAN:

22   Q.  Dr. Wright, this document is in evidence, it is from Andrew

23   Miller of the Australian Taxation Office.  It is sent to

24   clocktime2020@gmail.com and it is addressed to the executor for

25   the estate of Dave Kleiman.  Do you see that?
```

29

```
 1    A.  Yes, I do.  Because I'd like to -- I mean, that really sort
 2    of was something that got me thinking during this.  How on
 3    earth would a random Gmail account, one of hundreds that man
 4    runs, under hundreds of names, be picked up by a random
 5    auditor?  Not on websites, not on social media.  How would, out
 6    of the billions of emails, someone just happened to pick the
 7    right one out of the hundreds of accounts, hundreds of names,
 8    hundreds of false identities that man runs?  Yes, it really
 9    interested me.
10          MR. FREEDMAN:  Move to strike, Your Honor, as
11    non-responsive.
12          THE COURT:  Motion is denied.
13    BY MR. FREEDMAN:
14    Q.  Dr. Wright, the Australian Taxation Office actually in this
15    email says exactly how they got the right email address and the
16    right contact, don't they?  Your details have been provided to
17    us by a former colleague of Mr. Kleiman.
18    A.  Yes.  On Dave's email.
19    Q.  Does it say:  "On Dave's email" in the letter?
20          MS. MCGOVERN:  Objection, Your Honor.
21          THE COURT:  The basis?
22          MS. MCGOVERN:  Document speaks for itself.
23          THE COURT:  Sustained.
24          MR. FREEDMAN:  Ms. Vela, can you bring us to Page 44.
25
```

30

```
1    BY MR. FREEDMAN:
2    Q.  Official stamp of the Australian Taxation Office in the top
3    right corner of the attachment, Dr. Wright?
4    A.  Never seen the document.
5    Q.  That's because it's addressed to the executor of the estate
6    of Dave Kleiman, care of Ira Kleiman, right?
7    A.  Don't recognize it.  Sorry.
8            MR. FREEDMAN:  Ms. Vela, could you highlight that for
9    us, please?
10           Thank you.
11   BY MR. FREEDMAN:
12   Q.  And they say to the executor of the estate of Dave Kleiman:
13   "We request that you assist our inquiries by answering some
14   questions below.  A colleague of the late Mr. Kleiman has
15   provided us with your details and advised that you are the
16   executor of Mr. Kleiman's estate."
17        Do you see that?
18   A.  No.  Don't recognize the document.  Sorry.
19   Q.  I just asked if you saw it, Dr. Wright.
20   A.  I see a document I don't recognize.
21   Q.  "Legal action has been taken in Australia."
22        Do you see that?
23   A.  I see a document I don't recognize.
24   Q.  "Against a company associated with Mr. Kleiman, W&K Info
25   Defense Research.  W&K.  We have attached the documents
```

1   pertaining to W&K and they are provided to you in your capacity

2   as the executor for the estate of the director."

3        Do you see that?

4   A.  Don't recognize the document, but I see it.

5   Q.  "Can you please provide the following information:

6   Question 1, are you aware of the legal actions taken by

7   Dr. Craig Wright against W&K?"

8        Do you see that?

9   A.  I see a document I don't recognize, yes.

10            MR. FREEDMAN:  Ms. Vela, can you leave this one on the

11   side.  Let's push it to the left, and let's bring up, please,

12   P727, which I do not -- I don't know if it's in evidence.  So

13   let's take it down from publishing it until we find that out,

14   please.

15            Is P727 in evidence?  It is in evidence.

16            MS. MCGOVERN:  Yes, it is.

17            MR. FREEDMAN:  Okay.  Can we put it back up, Ms. Vela,

18   please.

19            And -- sorry.  And P862, is that in evidence?

20            Yes?  Yes.

21            THE COURT:  Hold on one second.

22            MR. FREEDMAN:  Can we replace the right side with

23   P862.

24            THE COURT:  862 is in evidence.  I think you had asked

25   the question.

32

```
1        MR. FREEDMAN:  Okay.

2     (Pause in proceedings.)

3        MR. FREEDMAN:  On the right -- on the left side is

4  P862?

5        Okay.  And on the right side, can we go to Page 2?

6  BY MR. FREEDMAN:

7  Q.  Okay.  Dr. Wright, do you see your email on April 16th,

8  2014?

9  A.  I do.

10 Q.  That's the day after --

11       MR. FREEDMAN:  Actually, Ms. Vela, let's go to the

12 email before this on the right side first.

13       No.  No.  One more.  One more forward.  One more.

14 BY MR. FREEDMAN:

15 Q.  Okay.  Dr. Wright, April 16th, 2014, the day after Ira

16 Kleiman receives this message from the Australian Taxation

17 Office, he emails you:  "Hi, Craig, I just received an email

18 from the Australian Taxation Office and they want me to answer

19 some questions regarding W&K."

20    Do you see that?

21 A.  Yes, I do.

22 Q.  "I'm attaching the documents they sent me."

23    Do you see that?

24 A.  Yes.  And I forwarded them to the accountants and others.

25       MR. FREEDMAN:  Ms. Vela, let's scroll up now and see
```

33

1    Dr. Wright's response.

2            One more time.

3    BY MR. FREEDMAN:

4    Q.  You respond:  "Hello, Ira.  No good deed goes unpunished.

5    I give you permission to talk to and go via the company's

6    Solicitor (lawyer) Andrew Sommer.  He is cc'd.  I believe you

7    have spoken to Uyen already?"

8            MR. FREEDMAN:  Let's see the next page of Dr. Wright's

9    response.

10   BY MR. FREEDMAN:

11   Q.  "You will have to state your answers, but as far as I can

12   see" -- and then, Dr. Wright, you lay out proposed responses

13   for each question of the document that you just claim you

14   didn't see.  Isn't that true?

15   A.  No.  I laid out responses based on what my accountant told

16   me.  And no, I didn't see the document.  It was just forwarded

17   to my accountant.  So no, I haven't seen the document.

18   Q.  And, in fact, Dr. Wright, let's look at your proposed

19   response to Question 1.

20       Question:  "Are you aware of the legal actions taken by

21   Dr. Craig Wright against W&K?"

22       Proposed Response 1:  "I told you of them.  They all

23   occurred after Dave's death to ensure the completion of the

24   contracts."

25       Do you see that?

34

```
 1    A.   I certainly do.   And --
 2    Q.   That was not true -- wasn't it, Dr. Wright?   You never told
 3    Ira Kleiman about the lawsuits against W&K?
 4    A.   I was actually still talking.   Sorry, you interrupted me.
 5    Q.   Oh, please finish your response.
 6    A.   So -- sorry.   I will try and let you speak but please do
 7    the same.   As I was saying, yes, I saw that.   I forwarded this
 8    to John Chesher and the audit team and they gave me a series of
 9    responses.   I forwarded those.
10    Q.   Dr. Wright, isn't it true you never told Ira Kleiman about
11    the lawsuits against W&K and you were asking him to lie for you
12    to the Australian Taxation Office?
13              MS. MCGOVERN:   Objection, Your Honor.
14              THE COURT:   Basis?
15              MS. MCGOVERN:   It misstates the evidence in the
16    record, Your Honor.
17              THE COURT:   Overruled.
18              THE WITNESS:   As stated, the Australian Court had
19    sent, both to Dave's post office box and to his home office and
20    to his emails, which it turns out Mr. Kleiman had access to,
21    all of the required forms for the starting of this case.   So
22    being that he received them, that Patrick Paige and others
23    received them, they could have easily just responded to the
24    Court if they didn't agree.
25              They could have sent something in.   It's asymmetric in
```

55

```
 1   that the cost of my responding to the Court would be far larger

 2   than him just sending an email to the Court going:  "We

 3   disagree."  That's all they needed to do.

 4           MR. FREEDMAN:  Ms. Vela, can you --

 5   BY MR. FREEDMAN:

 6   Q.  Are you done?

 7   A.  I was going to say one final thing, which is:  If he's got

 8   the email, if he's using the email, if he has the whole thing,

 9   if he's the executor, then it's very simple.  He would have, if

10   he read the documents sent to Dave on official letterhead,

11   known all about it.

12           MR. FREEDMAN:  Ms. Vela, can you scroll up on the left

13   document.

14   BY MR. FREEDMAN:

15   Q.  And, Dr. Wright, on the left-hand side, Question Number 14:

16   "Has the estate been contacted with a request to provide

17   software or intellectual property?  If so, has the estate

18   provided these to Dr. Wright?"

19       Proposed Response 14:  "We have the software.  W&K is not

20   the estate."

21       Do you see that?

22   A.  W&K isn't the estate.  And W&K maintained all rights to its

23   own software.  The little thing that everyone seems to be

24   neglecting here is I never -- when you transfer digital assets,

25   the rights can actually be two places.  The transfer of a
```

36

 1   license doesn't mean that the first person lost it.  W&K could

 2   have always exploited those rights.

 3       Like Coin-Exch., you would have had to work years and years

 4   to build something.  Just owning a piece of software doesn't

 5   give you a business.  Just owning intellectual property doesn't

 6   give you a business.  W&K had the rights and still has the

 7   rights to go out there and use that software to build an

 8   exchange.  They could build something like Coinbase or Kraken.

 9   They could have a cryptocurrency exchange.

10       Coinbase, which my software was better than even the

11   unimproved stuff, is now worth about a hundred billion US

12   dollars.  If none of that had been interfered with, Coin-Exch.

13   would be worth even more.  But -- and this is the big but --

14   you have to work your damn ass off when you have a founding

15   company that is new, that is trying to get customers.  Software

16   doesn't make money.  Customers do.

17       So the difference is W&K could do that, but someone has to

18   pull his finger out of his ass and work hard.

19           MR. FREEDMAN:  Thank you, Ms. Vela.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, after you provided proposed responses for Ira

22   to send to the Australian Taxation Office, you also put him in

23   touch with your lawyer to help him draft those responses,

24   correct?

25   A.  Yes.  That's probably the stupidest thing I've ever done.

37

```
 1   I've learnt my mistake.  Never ever waive privilege and give
 2   complete access to anyone that you have not met and don't know
 3   to your lawyers.  And basically it's pulling up the kilt and
 4   showing it all and it's a really, really dumb thing to do.  So
 5   advice to everyone:  Never do my stupid mistake.  Learn from
 6   me.  Stupid mistake.
 7            MR. FREEDMAN:  Ms. Vela, can you put P156 on the
 8   screen.  Let's go to Page 14.
 9            This document is in evidence, so can we please
10   publish.
11   BY MR. FREEDMAN:
12   Q.  And, Dr. Wright, this is the email from you offering to
13   have Andrew Sommer, your lawyer, draft the responses for the
14   Australian Taxation Office.  "Andrew can help you -- can help
15   if you want to answer the questions."
16   A.  That is correct.  As I said, Andrew is one of the top
17   lawyers in Australia.  The amount he charges is phenomenally
18   large, but he is -- when it comes to tax law and accounting
19   law, he is remarkable.  I'll say that even now.  The man can
20   quote tax law.  And I don't know if you have ever seen how much
21   damn tax law there is.  It is -- I'm impressed even now with
22   this guy.
23       So yes, he doesn't lie.  When I said this, and Andrew could
24   answer everything, I gave someone who would give the best, most
25   honest whole truth that anyone could ever imagine.  And yes, I
```

38

1   allowed that.

2          MR. FREEDMAN:  Ms. Vela, can you please put P240 on

3   the screen.

4          Can you go to the next page?

5   BY MR. FREEDMAN:

6   Q.  Andrew Sommer, the top lawyer in Australia who doesn't lie,

7   fired you for forging documents to the Australian Taxation

8   Office, didn't he?

9          MS. MCGOVERN:  Objection, Your Honor.  Asked and

10  answered in prior examination.

11         THE COURT:  Overruled.

12         THE WITNESS:  Again, a misstatement of what happened.

13  There was information that came out of the tax office, as I

14  said before, that basically was set up to make it look like

15  emails had been altered by me.  And no, it wasn't sent to me.

16  I'd already resigned from the companies because the tax office

17  targeted me all the time.  That's why I left.

18         MR. FREEDMAN:  Ms. Vela, let's go back to P156,

19  please.  And let's go to Page 14.

20  BY MR. FREEDMAN:

21  Q.  Dr. Wright, this was your offer to have Andrew Sommer help

22  draft the emails.

23         MR. FREEDMAN:  And, Ms. Vela, take us to Page 13 to

24  see Ira's response.

25

39

```
1    BY MR. FREEDMAN:
2    Q.  Dr. Wright, Ira responds:  "Sure.  Andrew can formulate
3    whatever response you're comfortable with and I will send it to
4    them."
5         Do you see that?
6    A.  Yes.  As I said, Ira, as someone offered a directorship, as
7    a major shareholder in my company, that basically because of
8    his brother inherited a part of my company that I founded,
9    could use Andrew to help him if he wished.  He could do
10   whatever he wanted.  He could use his own lawyers.  But he
11   didn't want to pay money so I allowed him mine.
12   Q.  The scheme worked, Dr. Wright, correct?
13             MS. MCGOVERN:  Objection, Your Honor.
14             THE COURT:  Sustained.
15             Rephrase.
16             MR. FREEDMAN:  Okay.  Thank you, Ms. Vela.
17   BY MR. FREEDMAN:
18   Q.  Dr. Wright, just so you know where I'm going with this, I'd
19   like to now talk about what happened with your companies during
20   the period where you were communicating with Ira in 2014.
21   Okay?
22   A.  Yes.
23   Q.  So after you obtained judgment from the Australian courts,
24   you then transferred W&K's IP to your various companies,
25   correct?
```

40

```
 1    A.  No.  Mischaracterization once again.  The information that

 2    I created an Australian company -- venture funded one called

 3    Greyfog, that was copied into W&K -- I retained.  And that was

 4    transferred.  The rights to W&K's software and any copies they

 5    had were never moved.  So sorry.  You're mischaracterizing that

 6    completely.

 7         MR. FREEDMAN:  Ms. Vela, can you please bring up P127.

 8         Let's go to Page 18.

 9    BY MR. FREEDMAN:

10    Q.  Dr. Wright, this is a transcript of your meeting with the

11    Australian Taxation Office.  And on the left-hand side, we're

12    looking at Andrew Sommer, your lawyer, who doesn't lie,

13    correct?

14    A.  No.  This is not correct.  As I've stated multiple times,

15    none of these were actual transcripts and none of them were

16    accurately transcripted.  And all of them remarkably lost the

17    original recorded document, which is really difficult if you're

18    going to transcribe something, but it turns out the document

19    that's recorded is lost.  I always found that funny.

20    Q.  And I'm looking at line 42.

21         MR. FREEDMAN:  Ms. Vela, can you highlight for us 23rd

22    September.

23    BY MR. FREEDMAN:

24    Q.  "Intellectual property that has been acquired by Dr. Wright

25    from W&K Info Defense is on supply to the Wright Family Trust
```

41

```
1    and then broken up and transferred to other group entities.
2    Hotwire, Coin-Exch.," and so on.
3        Do you see that?
4    A.  Yeah, and my explanation still stands.
5            MR. FREEDMAN:  Thank you, Ms. Vela.
6    BY MR. FREEDMAN:
7    Q.  Around this time, Dr. Wright, your companies were seeking
8    investors, correct?
9    A.  That's -- well, basically around that time is wrong.
10   Investors is ongoing.  So I said with Greyfog, which was back
11   in -- I think it was July or August of 2009, that was where we
12   started with angel funding and went up to round B.
13       I don't know if you know what the differences are in these
14   things but angel funding is something where you're really,
15   really small in seed which was when I first started Bitcoin.
16   And round A is like the first real vulture capitalist --
17   sorry -- venture capitalist.  And then round B is if you meet
18   some targets and you get further funding.  So any start-up
19   company continuously does this.
20   Q.  And in January 2014, you emailed someone named Stefan
21   Matthews a Hotwire investor pack, correct?
22   A.  I certainly did, yes.
23           MR. FREEDMAN:  Ms. Vela, can you please bring up P113.
24   BY MR. FREEDMAN:
25   Q.  And, Dr. Wright, do you recognize this as the email we've
```

42

```
1   just mentioned?

2   A.  I do.

3           MR. FREEDMAN:  Your Honor, Plaintiffs offer P113 into

4   evidence.

5           MS. MCGOVERN:  No objection, Your Honor.

6           THE COURT:  Without objection, admitted into evidence.

7       (Plaintiffs' Exhibit 113 received into evidence.)

8           MR. FREEDMAN:  Thank you, Ms. Vela.

9   BY MR. FREEDMAN:

10  Q.  Dr. Wright, during this period, your companies did work to

11  determine the value of the software that they obtained from

12  W&K; isn't that correct?

13  A.  That's not actually characterizing it correctly.  We had

14  software valuations for tax purposes.  The valuation is then

15  based on the number of lines of code, et cetera, to do a

16  replacement.  So that's a separate issue.

17      But for tax purposes, the auditors at KPMG required that we

18  had an external evaluation of the input value because some of

19  the people like myself who were founders had never charged the

20  company for what we did.  And thus, we needed a proper

21  valuation done.

22  Q.  You were seeking to determine the value of software from

23  W&K, correct?

24  A.  No.  We're talking about the replacement value of a --

25  intellectual property that we had so that we could actually
```

43

1   look at how much this would take to redo it from scratch.

2   Q.  That you had from W&K, correct?

3   A.  No.  That is not correct.  This is the software that we had

4   developed from 2009 on.  None of this came from W&K.  As I

5   stated, the information from Greyfog, which was an Australian

6   company, was initially transferred with rights to W&K.

7        W&K never gave the enhanced product back.  We kept working

8   in Australia and that is what we're talking about.

9        What you're confusing is the purchased software.  I made a

10  deal with a bunch of bankers from Saudi countries.  Basically,

11  Bitcoin -- a lot of people say it's like gold.  It's not really

12  like gold but for a simple explanation, it's a commodity.  So

13  we needed something.  And we took Islamic banking software

14  because there's no interest, and Bitcoin doesn't have interest.

15  There's a fixed amount.  You can't have an infinite thing.

16       So a banking software that worked like gold, that worked

17  like old-fashioned banking software was something we needed.

18       We had worked with Temenos, as well.  Temenos are one of

19  the Big Four core banking platforms.  But they couldn't do what

20  we wanted.  They weren't able to do the correct number of

21  digits.  There's a hundred million digits in Bitcoin for the

22  Satoshis.  Their platform couldn't handle it.

23       So even the guys from Al Baraka, their software couldn't

24  handle it, but we paid for source code and that's why there's

25  so many -- that's why there's 140 years' worth of coding,

44

```
1   because the Saudi bank had thousands of staff.  And we paid a

2   lot to get that source code so that we could modify it to make

3   a Bitcoin bank.  So that's what we're talking about.

4              MR. FREEDMAN:  Ms. Vela, can you please put P166 up

5   for the witness and counsel.

6   BY MR. FREEDMAN:

7   Q.  Dr. Wright, do you see that is an email from yourself to

8   others, including your wife, talking about W&K?

9   A.  It's not talking about W&K.  It is the transfer to Andrew

10  McCabe who was one of our commercial lawyers -- sorry --

11  administrators that we appointed.  He had asked for a copy of

12  the software document when we put the administrators in before

13  we purchased it back.

14             MR. FREEDMAN:  Your Honor, Plaintiffs offer P166 into

15  evidence.

16             MS. MCGOVERN:  Objection.  The underlying document is

17  hearsay.

18             THE COURT REPORTER:  I'm sorry?

19             THE COURT:  Yeah.  I'm having a hard time hearing you.

20             MS. MCGOVERN:  Hearsay.

21             THE COURT:  The objection is overruled.  It will be

22  admitted into evidence.

23        (Plaintiffs' Exhibit 166 received into evidence.)

24             MR. FREEDMAN:  Can we please publish.

25             Ms. Vela, can you zoom in on that email from Dr.
```

45

1    Wright, please, at the way top.

2    BY MR. FREEDMAN:

3    Q.  Dr. Wright, this is an email from yourself to others

4    including Ms. Watts, your wife, titled "Software Valuations."

5    And the first line opens up with:  "More on the valuation of

6    the W&K software is attached."

7        Do you see that?

8    A.  Yes.  As I said, I just called all of the stuff that I

9    purchased the "W&K" because I had done that with Dave.  So

10   we're talking about the valuation of the core banking software.

11   And the other software like the SCADA software that I

12   purchased.  So yes.

13   Q.  Except you didn't because the next line says:  "The other

14   software was obtained at market value"; isn't that right?

15   A.  No.  Again, you're mischaracterizing me.  The other

16   software was obtained at market value.  We purchased it.  We

17   didn't exchange.  But that doesn't mean what we can actually

18   value at.  So what you can value different things in accounting

19   terms are all messed up.

20       Accounting law is overly complex, and as a former auditor,

21   it's stupidly bad and makes life difficult for people trying to

22   run businesses.  So having differences in cash and accrual on

23   how you value the software, it would be so much easier if it

24   was just that much paid, that much claimed.  But it's not.

25

46

1    Q.  Do you see the attachment, Dr. Wright, to the email

2    "Hotwire PE W&K Information Defense Cost Assessment"?

3    A.  I don't see the attachment, no.

4            MR. FREEDMAN:  Okay.  Let's go to Page 47, Ms. Vela,

5    and show Dr. Wright the attachment.

6    BY MR. FREEDMAN:

7    Q.  "Hotwire PE W&K Information Defense Cost Assessment

8    Estimation W&K ID."

9        Do you see that?

10   A.  Can you scroll through the document for me, please?

11   Q.  Not yet.  Do you see that?

12   A.  I see the first page.

13           MR. FREEDMAN:  Thank you.

14           Ms. Vela, bring us to Page 51, please.

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, do you see it says:  "Cost evaluation

17   technique.  The technique used to evaluate the cost of the W&K

18   ID software pack has been based on the Cocomo II Software

19   Estimation Tool"?

20   A.  Cocomo.

21   Q.  Cocomo.  Thank you.

22           MR. FREEDMAN:  Ms. Vela, bring us to Page 53.

23   BY MR. FREEDMAN:

24   Q.  And, Dr. Wright, here we see:  "Assumptions.  The W&K ID

25   software purchase is a one-off license between seller and

1    Hotwire PE.  W&K ID software languages and software lines of

2    code" -- is that what SLOC stands for?  Software lines of code?

3    A.  Yes, it does.  And it's very interesting.  In the last page

4    that you showed -- I'd forgotten about that -- which was the

5    reference that I put in there to Brooks, is actually the

6    reference I use all through the Bitcoin source code as well.

7    But that's a different -- I reference him all over the place.

8        But yes, we had C# software, which was most of what the

9    Temenos, the Al Baraka software was in, and we had the C++

10   software.  And that's the breakdown.

11       So because I was involving Dave, yeah, I called it W&K ID.

12   I'm getting tongue-tied there.  And that's where we source --

13   like Dave helped me source the things.

14            MR. FREEDMAN:  Ms. Vela, can you zoom in to the

15   Paragraph 5, please.

16            Can you move it to the left-hand side of the screen

17   and bring up on the right P160, which I am fairly certain is in

18   evidence.

19            And, Ms. Vela, can you bring us to Page -- the next

20   page.

21            Oh, sorry, the first page.  You're right, Ms. Vela.

22   And zoom in down in the bottom.

23            Yeah.

24   BY MR. FREEDMAN:

25   Q.  Dr. Wright, on the right, we're looking at an email from

48

```
 1   yourself to Ira Kleiman.  We've seen this email before dated
 2   April 24th, 2014.  And on the left, we're looking at the cost
 3   estimation.  On the left, in the cost estimation, it totals the
 4   software lines of code to be 6,080,555.  And on the right in
 5   your email to Ira Kleiman you say:  "Dave Kleiman took two
 6   million lines of code that had in 2010, and transformed these
 7   into a documented set of over six million lines of code."
 8       Does "transform" mean "buy" to you, Dr. Wright?
 9   A.  Yes.  Actually, when you put all that together, this is not
10   one program.  We're not talking about a program.  And as it
11   says on the document there, the way that it works is W&K to me,
12   international, no GST, like I claimed.  And then me, my trust,
13   to the company, GST.
14       But as that document actually reads a little bit above, GST
15   cancels, not that I get $10 million like he keeps claiming.  It
16   cancels.  Except the trick that the government had that I
17   didn't think about was they made me pay within three months and
18   then they held my money for 18 months.
19       And I don't know if you know what it's like with cash flow
20   for a starting business.  But if you have to pay up front and
21   then beg your money back, beg, and you have to pay accountants
22   and lawyers huge amounts of money to try and get back part of
23   the money you've already paid to someone else, that's a good
24   way of killing a company.  If governments don't like what
25   you're doing, that's how they do it.
```

1          MR. FREEDMAN:  Ms. Vela, can you take down the

2     right-hand side.

3          Let's go back to the W&K ID software evaluation.

4          Can you go to Page 56, please?

5     BY MR. FREEDMAN:

6     Q.  Conclusion of the software evaluation, Dr. Wright, is that

7     an extremely conservative cost evaluation using industrial

8     standards is assessing minimum costs for the W&K ID software at

9     276,268,599 Australian dollars.  And assuming that W&K ID

10    software could be sold at a 10 percent margin, you would be

11    looking at a value for W&K's IP of 303,895,458 Australian

12    dollars; isn't that correct?

13    A.  Like I said, as I've been stating, if we could make this

14    into a business, it would have been a great idea.  If we ran

15    the exchange, if no one had interfered and tried to liquidate

16    the company so he could get his money early rather than taking

17    $12 million, if we had built a customer base sort of and a

18    support base where we had clients, it wouldn't be 300 million;

19    it would be a hundred plus billion.  Coinbase has nowhere near

20    the technical ability that our software could do.  The

21    difference is they have clients.  They have licenses.

22         So rather than work with us to try and get a working

23    company that over years could go to an IPO, where 10 years

24    later he'd get a payout that would be large, rather than

25    building that, yes, we had intellectual property that

50

1   technically -- a little bit older now -- but it could be done

2   up and W&K, if it wanted to try and compete with the existing

3   large players, could try and start from scratch.  Instead of in

4   2013, 2014, where there were no competitors and could have

5   built something, now you would have to come into a highly

6   competitive market starting from nowhere.  So at that stage,

7   this was a beautiful opportunity.

8   Q.  Dr. Wright, you obtained a second opinion regarding the

9   valuation of W&K's software in 2014, didn't you?

10  A.  I don't know.  My accountants did a number -- I think we

11  actually had three different ones.  We usually have three for

12  any of these.

13         MR. FREEDMAN:  Ms. Vela, can you please put up P181

14  for just the witness and counsel.

15  BY MR. FREEDMAN:

16  Q.  Dr. Wright, do you recognize the email on the bottom being

17  an email from you requesting an evaluation?

18  A.  Yes.  I recognize Lee 1 is a valuer that is highly regarded

19  by the tax office and was recommended by KPMG.

20         MR. FREEDMAN:  Your Honor, Plaintiffs offer P181 into

21  evidence.

22         MS. MCGOVERN:  Objection, Your Honor.  Hearsay.

23         THE COURT:  The objection is overruled.  It would be

24  admitted into evidence.

25         (Plaintiffs' Exhibit 181 received into evidence.)

51

```
1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, here you say:  "Hello, Lee.  The software you

3    are doing a cost evaluation for is the W&K project we have been

4    integrating into our group of companies."

5        Do you see that?

6    A.  I do.

7    Q.  And then you say:  "These total 6,080,555 lines of code."

8        Do you see that?

9    A.  Yes.  As I stated, the core banking platform is incredibly

10   complex.  That's what people don't realize.  The -- we're

11   actually quite happy with this.  It was less complex than the

12   Temenos software we'd used in the past.  But the comparative

13   was, we were looking at, the Australian Commonwealth Bank had

14   done an upgrade on their core banking, and their core banking

15   software for the Australian Commonwealth Bank to handle the

16   sort of volume we wanted to do cost 4 billion Australian

17   dollars in 2014.

18       So to be able to buy banking software for that price, I was

19   initially chauffed, happy, because I actually think the Saudis

20   gave us a discount thinking we couldn't sell it or couldn't do

21   like Temenos and they expected that we would fail.  So they

22   looked at it as they got a whole lot of rights to Bitcoin that

23   are now way more valuable.  And they said if we succeed, they

24   get a banking platform that works and is better; if we fail,

25   they lose nothing and they got something for free.  So ...
```

1    Q.  The next month, Dr. Wright, Mr. Goldstein sends you the

2    results of his valuation, correct?

3    A.  I don't remember the date.  Sorry.  I'd need to see it.

4          MR. FREEDMAN:  Ms. Vela, let's put up P183.  This

5    document is in evidence.

6    BY MR. FREEDMAN:

7    Q.  November 14th, 2014.  Subject:  "Valuation.  Kind regards,

8    Lee."

9        Do you see that?

10   A.  I see the email, yes.

11         MR. FREEDMAN:  Ms. Vela, can you please bring us to

12   Page 2.

13   BY MR. FREEDMAN:

14   Q.  And he's doing an assessment at your request of the W&K ID

15   software in your four companies, Cloudcroft, Hotwire,

16   Coin-Exch., and CO1N, correct?

17   A.  No.  It's not at my request.  It was for the companies, but

18   it's from the accounting team.

19         MR. FREEDMAN:  Okay.  Ms. Vela, can you please bring

20   us to Page 17 of the report, and can we zoom in to the bottom

21   half.

22         Yeah, right there.

23   BY MR. FREEDMAN:

24   Q.  "W&K Source Share, 46 percent.  W&K Source will enable

25   research activities associated with Virtual Universe."

53

```
1        Do you see that, Dr. Wright?
2    A.   Yes.  And if you just zoom out from the page again, what
3    you will actually see, as you tried to do, was computer
4    hardware designs.  Basically Cloudcroft there was buying
5    management software and the source is the Siemens software.
6        So we bought software from the Siemens Company in Germany,
7    which, whether you like it or not, was demonstrated to the tax
8    office; they just didn't like it.  And basically that was for
9    the management of computers.  So yes, all up, about a little
10   under two and a half million lines of code, all up.
11             MR. FREEDMAN:  Ms. Vela, can you please bring us to
12   Page 18 of the valuation report.  Can we zoom in to the "W&K
13   Source Share" again.
14   BY MR. FREEDMAN:
15   Q.   "W&K Source Share, 32 percent.  W&K Source will enable the
16   creation of a world-class solution platform and support to
17   research activities undertaken as part of Coin-Exch., CO1N and
18   Cloudcroft."
19        Do you see that?
20   A.   I certainly do.  And once again, as I was saying, what I
21   wanted to do was build a banking system based on Bitcoin.  Not
22   as easy as people think.  Certainly harder than -- I thought it
23   was easier.  I was wrong.
24             MR. FREEDMAN:  Ms. Vela, can you bring us to the next
25   page of the valuation report.
```

```
1          Thank you.
2   BY MR. FREEDMAN:
3   Q.  Dr. Wright, "W&K Source Share, 6 percent.  W&K Source will
4   enable the creating of a fast and stable trading platform to
5   trade Bitcoin as fundamental currency to buy and sell
6   traditional assets and securities."
7       Do you see that?
8   A.  I certainly do.  And again, if I had succeeded rather than
9   Coinbase, it would be Coin-Exch.  Rather than having Coinbase
10  as a hundred-billion-dollar company, it would be one of my
11  companies as this.
12      We were trying to do this.  We had invested a lot of money
13  in trying to do that.  And rather than having a
14  hundred-billion-dollar company that the Australian government
15  would tax immensely and take a lot of money from, they managed
16  to shut it all down because they didn't like Bitcoin.  And
17  unfortunately, your client helped.
18          MR. FREEDMAN:  Ms. Vela, can we go to the next page,
19  please.
20  BY MR. FREEDMAN:
21  Q.  "W&K Source Share, 16 percent.  W&K Source will enable the
22  development of transaction protocols and rule-based algorithms
23  to significantly reduce transaction times and design novel
24  security protocols and encryption algorithms without
25  compromising transaction times or scalability."
```

55

```
1       Do you see that?

2   A.  I certainly do.  And I'd forgotten about the Q2 compiler.

3   The CO1N supercomputer that I told you about, it required the

4   ability to use CUDA, which is a multi-core system.  So when you

5   look at graphics cards that are put in machines, like your

6   normal home computer may have 12 or 24 cores.  We were running

7   machines that had six cards or eight cards of six thousand

8   cores.  And we had a thousand of those, so we needed highly

9   specialized software to try and build this.

10      Because if you imagine trying to write parallelized

11  software over six cores being hard, now multiply six by six

12  thousand by a thousand.  So that's why we had -- at one point,

13  I had 50-something staff, a lot of them with Ph.D.s, a lot of

14  them with other things.  So we're talking -- machine learning

15  is what people call artificial intelligence now.  And graph

16  reduction is one of the most complex areas of mathematics.

17      Fibonacci retracements are used in system modeling, so we

18  were trying to even do this.  And the other aspect that I was

19  still working on that didn't go anywhere was VRML

20  visualization.  So I was actually one of the early development

21  team people.  I got -- if you remember Oculus, I was on the

22  development team for that.  I got one in my company early and

23  we were trying to actually do it so that we could have a future

24  visual world like Ready Player One, if people have seen that

25  movie.  I keep mentioning it because one of the games they
```

56

1   mention was actually one I designed, or helped design in the

2   '80s, but that's a side thing.  Sorry.

3      But we were trying to even go into the thing where we can

4   have a virtualized world where people could buy and sell like

5   Second Life, like Mark Zuckerberg's now doing, which is exactly

6   line for line my Metanet thing that I talked about in 2018 that

7   is now Metaverse.  And we were trying to do that in '13 and

8   '14.

9      So yes, I remember all that.

10  Q.  Dr. Wright, I've shown you four numbers: 46 percent, 32

11  percent, six percent and now 16 percent.  Those add up to a

12  hundred percent, correct?

13  A.  I haven't actually added them, but they're close.

14  Q.  So you transferred a hundred percent of W&K's source code

15  to these Australian companies, didn't you?

16  A.  No.  Once again, it's W&K's source, which means the things

17  that we purchased.  So, as I was saying, that's a total

18  misrepresentation.  I bought a lot of software.  My companies

19  bought a lot of software.

20     As I keep saying, if you're talking about machine learning,

21  you're doing around 50 to a hundred lines of code a day per

22  person.  Now, if you imagine when I've got 300,000 lines of

23  code, now divide that -- if you've got really good coders and

24  they're doing a hundred lines, that's 3,000 days.  3,000 man

25  days.  That's not something that you just flick your fingers

1   and it happens like he's trying to imagine.

2           MR. FREEDMAN:  Ms. Vela, let's go to Page 24 of the

3   valuation report, please.

4           Can you zoom in on the conclusion, please.

5   BY MR. FREEDMAN:

6   Q.  "The valuation report has valued the software engineering

7   for the four companies controlled by DeMorgan using the cost

8   base that the software has a value of $378,475,713."

9       Do you see that?

10  A.  Yes, I do.  And as I stated, the rights to be able to use

11  that software remained in W&K the whole time.  So, ironically,

12  if Ira wanted to go and compete with me, if Ira wanted to take

13  my code and the code that we did and start a company, if he had

14  wanted to build something -- not just take money, build.  To

15  hire staff, to watch something grow, to see a company and make

16  something grow from nothing to something which is -- anyone

17  who's had a business, it's something -- I don't know how to

18  describe it.

19      But if you have run a business before, if you started

20  something from nothing and watched it grow, there's a feeling.

21  It's a tingling feeling through your body.  It's electric.  If

22  he wanted to do that, he could have, and he still could.  He's

23  chosen -- doesn't want to.

24  Q.  Dr. Wright, in 2015, you then talked with a broker about

25  finding potential investors, correct?

58

1    A.   No.   We talked to people all the time.  See, I'm not a CEO

2    anymore because I hate that part of the job.  I'm just a chief

3    scientist now.  All I have to do is worry about inventing

4    things.

5        When I was CEO, the role of a CEO is to ensure that the

6    company is funded.  So it wasn't in 2015, I talked to someone.

7    In 2009, in 2010, in 2011, in 2012, in 2013, in 2014, in 2015,

8    I was always talking to people.  I would be out there selling

9    myself to venture capital firms.  I would be there -- basically

10   the only way to put it is prostituting myself to get money

11   invested in my companies.  I would go out there and try and

12   sell all the benefits and why this is the next best thing.

13   That's what CEOs do.

14   Q.   But in 2015, you spoke to a broker to find you an

15   investment called Sterling Group, correct?

16   A.   Sorry.  Don't remember Sterling.  Can you show me the

17   document?

18        MR. FREEDMAN:  Ms. Vela, can you please play clip

19   number 46 from Dr. Wright's deposition on March 18th, 2020,

20   Page 26, lines 4 through 11.

21        (Video played.)

22   BY MR. FREEDMAN:

23   Q.   In 2015, Dr. Wright, you met with Mr. Matthews regarding a

24   potential investment from Mr. Ayre, correct?

25   A.   No.  I'd already been meeting with Mr. Matthews from 2014,

1    as you showed in the other things.  I had been in continuous

2    negotiations and relations with Mr. Matthews from 2007 because

3    I was the auditor for Centrebet, which were a gaming company in

4    Australia, public listed one.

5        And I'd known Stefan through all his -- like with Bodog,

6    which was Calvin's company, gaming company.  So I didn't start

7    negotiations in 2015.  I had been talking with Stefan from

8    2009.  Stefan -- actually, I tried to get Stefan involved in

9    Bitcoin even in 2009.

10       I offered Stefan 50,000 Bitcoin for a hundred dollars.  If

11   you can imagine what that's worth now.  He turned me down.  He

12   actually told me:  "No.  I don't want this Bitcoin stuff, but

13   if you need the money, I'll give you a hundred dollars."

14       I said:  "I don't want your money.  I would like you to

15   take my Bitcoin.  I want to sell you Bitcoin."  He said:  "No.

16   How about I just give you a hundred dollars?"  I went:  "How

17   about I give you the Bitcoin?"  And he went:  "No.  I don't

18   want that shit."  I actually had a big argument with him.  "Can

19   you please buy my Bitcoin?"  He went:  "No.  But I'll give you

20   the hundred dollars."

21       So strangely enough, I couldn't even sell Bitcoin in 2009.

22   50,000 for a hundred dollars and he turned it down.

23       But I did get contacts through Mr. Ayre in 2014, as well as

24   Mr. MacGregor, two separate people, from Stefan, and I

25   continued -- I had meetings with them as well.

60

1         MR. FREEDMAN: Your Honor, now is a good time for a

2 break for us, if it works for the Court.

3         THE COURT: Yes. Certainly.

4         Ladies and Gentlemen, let's take a 20-minute recess.

5      (Jury not present, 11:22 a.m.)

6         THE COURT: All right. Go ahead and have a seat.

7         I have permitted over the last several days of

8 testimony, because it has been somewhat consistent with the

9 evidence that has been admitted into evidence, the expletives

10 and the gutter language that has been testified to. And I

11 would request that all witnesses refrain from using expletives

12 that are inappropriate in a court of law.

13         We'll take a 20-minute recess.

14      (Recess from 11:23 a.m. to 11:43 a.m.)

15         THE COURT: All right. Welcome back. Are we ready to

16 continue?

17         MR. FREEDMAN: Yes, Your Honor.

18         THE COURT: All right. Dr. Wright, you have been

19 given fair warning of your use of offensive language. If you

20 do it again, I will admonish you in front of the jury. Do you

21 understand that, sir?

22         THE WITNESS: I do. I was quoting someone, Your

23 Honor.

24         THE COURT: No, sir. It was said several times this

25 morning. It wasn't a quote. It wasn't referenced to testimony

61

```
1    or -- excuse me -- evidence in the record to which I have noted
2    that language.  I'm speaking of your testimony.  Do you
3    understand that, sir?
4              THE WITNESS:  I do.
5              THE COURT:  All right.  Let's bring in the jury.
6         (Before the Jury, 11:43 a.m.)
7              THE COURT:  All right.  Welcome back, Ladies and
8    Gentlemen.
9              Please be seated.
10             And we'll continue with the testimony.
11             MR. FREEDMAN:  Ms. Vela, can you please bring up P191
12   for the witness and counsel.
13   BY MR. FREEDMAN:
14   Q.  And, Dr. Wright, do you recognize the email at bottom of
15   the page from yourself to Stefan Matthews about an investment
16   we were talking about?
17   A.  Yes.  I recognize that I forwarded the letter to my
18   barrister at the time who was involved with our tax issues, and
19   yes, I was trying to get Mr. Ayre to invest.
20             MR. FREEDMAN:  Your Honor, Plaintiffs offer P191 into
21   evidence.
22             MS. MCGOVERN:  Objection, Your Honor.  Relevance.
23   Hearsay.
24             THE COURT:  The objection is overruled.  It will be
25   admitted into evidence.
```

62

```
1          (Plaintiffs' Exhibit 191 received into evidence.)
2    BY MR. FREEDMAN:
3    Q.  Dr. Wright, email from yourself to Stefan Matthews:
4    "Hello.  We have a face-to-face meeting with Stefan Matthews
5    who represents and runs Calvin Ayres Investment Trust next
6    week.  The call and email is as positive as one can hope for
7    right now.  We will look at an initial bridging loan and first
8    round $2 million investment."
9          Do you see that?
10   A.  Yes, I do.  And basically what this is saying is that we
11   tried to actually have a bridging loan over the company, which
12   is finance, and a potential $2 million investment into one of
13   the companies in the group.
14   Q.  And, Dr. Wright --
15          MR. FREEDMAN:  Thank you, Ms. Vela.
16   BY MR. FREEDMAN:
17   Q.  Dr. Wright, around this time, you told Mr. Ayre that you
18   were purportedly arranging things -- sorry -- that you were
19   purposely arranging things because you did not want to have any
20   challenges to any IP later on when things start to get big,
21   correct?
22   A.  I don't remember what I said.  Sorry.
23          MR. FREEDMAN:  Ms. Vela, can you put P217 up for the
24   witness and counsel.
25          And can we go to Page 2., and can you zoom into the
```

63

1    end of Dr. Wright's response.

2    BY MR. FREEDMAN:

3    Q.  Dr. Wright, this is an email from yourself to Calvin Ayre

4    speaking about companies and IP?

5    A.  Well, I can't see the rest of the email.

6         MR. FREEDMAN:  Ms. Vela, can you zoom out for

7    Dr. Wright, please.

8       (Pause in proceedings.)

9         THE WITNESS:  Yes.  This would have been something I

10   think it was Angela, my EA at the time, would have sent for me.

11   I don't recognize it, but I know that I asked for it to be

12   sent.  So it is a valid -- that I asked for.

13        MR. FREEDMAN:  Your Honor, Plaintiffs offer P217 into

14   evidence.

15        MS. MCGOVERN:  Objection, Your Honor.  Relevance.

16   Hearsay.

17        THE COURT:  On grounds of hearsay?

18        MS. MCGOVERN:  And relevance, Your Honor.

19        THE COURT:  Overruled.  It will be admitted into

20   evidence.

21      (Plaintiffs' Exhibit 217 received into evidence.)

22        MR. FREEDMAN:  Ms. Vela, can you bring us back to Page

23   2, the end of the email between Dr. Wright and Mr. Ayre.

24   BY MR. FREEDMAN:

25   Q.  "So what I'm seeking to do is have the entity as clean and

64

1   polished as I can before we start going forth.  I do not want

2   to have any challenges to any IP later on when things start to

3   get big.

4       "I want to remove any ownership from former directors

5   before they know what it could become so they cannot challenge

6   anything later."

7       Do you see that, Dr. Wright?

8   A.  Yes.  I did.  I had a interaction with a director that we'd

9   removed -- no, that's not Ira because he never accepted a

10  directorship -- and we wanted to make sure that that person did

11  not cause any problems.

12      And yes, we were trying to build an exchange in a bank, so

13  I needed it clean.

14  Q.  And shortly --

15          MR. FREEDMAN:  Thank you, Ms. Vela.

16  BY MR. FREEDMAN:

17  Q.  Shortly after this, Dr. Wright, in June of 2015, your

18  companies and Sterling Group reached a preliminary deal for

19  your companies to sell all of their intellectual property,

20  correct?

21  A.  Absolutely wrong.  We had a licensing agreement.  So what

22  he's again missing is that all my Australian companies kept one

23  hundred percent rights to build their software, but we licensed

24  the software to an overseas group.

25          MR. FREEDMAN:  Ms. Vela, can you pull back up P229 --

```
 1    sorry -- for counsel and the witness.

 2              And can you go to Page 7, please.

 3    BY MR. FREEDMAN:

 4    Q.  Dr. Wright, you see your signature down at the bottom?

 5    A.  I do.

 6              MR. FREEDMAN:  And, Ms. Vela, can you bring us to Page

 7    2 for a minute.

 8    BY MR. FREEDMAN:

 9    Q.  Do you see at the top paragraph it talks about intellectual

10    property being purchased?

11    A.  Yes.  I see this was a term sheet, but this isn't the one

12    that actually occurred.

13              MR. FREEDMAN:  Okay.  Your Honor, Plaintiffs offer

14    P229 into evidence.

15              MS. MCGOVERN:  Objection, Your Honor.  Relevance and

16    hearsay.

17              THE COURT:  The objection is overruled.  It will be

18    admitted into evidence.

19        (Plaintiffs' Exhibit 229 received into evidence.)

20              MR. FREEDMAN:  Ms. Vela, can you zoom in on that email

21    that attaches the term sheet.

22    BY MR. FREEDMAN:

23    Q.  So Robert MacGregor sends you an email.  Mr. Ayre is cc'd,

24    Mr. Matthews is cc'd, Ms. Watts, your wife, is cc'd.  Subject:

25    "Congratulations."
```

66

```
1         Do you see that?
2    A.  I do.  As I said, this was an initial term sheet.  It's not
3    actually the contractual -- what you do call it -- contractual
4    exchange.  What it did was give us a sort of loan agreement and
5    bridging finance while we were negotiating in full.
6              MR. FREEDMAN:  Ms. Vela, can you bring us to Page 2,
7    please.
8              And can you highlight, Ms. Vela, up until in the first
9    paragraph -- that's okay.  You can zoom in there.
10             Can you highlight the beginning paragraph that starts
11   off with:  $15 million asset purchase."
12             MS. MCGOVERN:  Objection, Your Honor.  Misstates the
13   document.
14             MR. FREEDMAN:  Sorry.  "$1.5 million asset purchase."
15             THE COURT:  Sustained.
16             MR. FREEDMAN:  Up until the number one.
17             Thank you.
18   BY MR. FREEDMAN:
19   Q.  Dr. Wright, can you read for us the summary of the agreed
20   terms that you executed, please, for the record.
21   A.  Sorry.  These weren't executed.  This is an initial term
22   sheet.  So technically that's not executed.
23             MR. FREEDMAN:  Ms. Vela, can you bring us to Page 7,
24   please.
25
```

67

```
 1    BY MR. FREEDMAN:
 2    Q.  Sorry, Dr. Wright, is that your signature on the bottom of
 3    page?
 4    A.  Yes.  I mean, I signed that, but the contract that followed
 5    was executed.  This is an agreement to have an agreement.
 6    Q.  And that's Ms. Watts's signature on the page?
 7    A.  Like I said, we had an agreement to have an agreement.  A
 8    later agreement was then followed up.
 9    Q.  And that's Mr. Matthews' signature on the page, as well,
10    correct?
11    A.  That is correct.
12    Q.  All right.
13          MR. FREEDMAN:  Let's go back to Page 2, please, Ms.
14    Vela.
15    BY MR. FREEDMAN:
16    Q.  Dr. Wright, please read the executed agreement that's
17    highlighted.
18    A.  Again, it's not an executed agreement.  I'll read the
19    agreement, but there's no executed agreement here.
20    Q.  Please.
21    A.  "Phase 1, stabilize and clean up.  $1.5 million asset
22    purchase Australian money.  NewCo will purchase outright all IP
23    and technology in DeMorgan Company and all company subsidiaries
24    and identified assets for 1.5 million."
25    Q.  Purchase outright all IP, not licensing IP, correct, Dr.
```

68

```
 1   Wright?
 2   A.  Again, this isn't the final agreement.  The agreement was
 3   not executed that way.
 4           MR. FREEDMAN:  Ms. Vela, can you please go to Page 3
 5   for us of that agreement.
 6   BY MR. FREEDMAN:
 7   Q.  "Equity in NewCo.  Upon incorporation, NewCo will
 8   immediately grant to the rights with 37 percent of issued and
 9   outstanding voting common stock."
10       Do you see that?
11   A.  Yes, I do.
12   Q.  So NewCo purchases all the IP and you get 37 percent of the
13   equity, correct?
14   A.  No.  It actually didn't happen that way.  Sorry.
15           MR. FREEDMAN:  Ms. Vela, can you highlight the bullet
16   that starts off with:  "3,500,000 Rights and Services
17   Agreement"?
18   BY MR. FREEDMAN:
19   Q.  Dr. Wright, can you please read that for us.
20   A.  Yes, I can.  "3.5 million Rights and Services Agreement.
21   NewCo will enter and a direct services deal with Craig Wright
22   as chief scientist," basically followed by an annual payment of
23   half-million dollars for five years.
24   Q.  You sell all of the IP for 1.5 million dollars, 37 percent
25   of it you'll retain ownership for, and you'll get a
```

```
1    $3.5 million salary?

2    A.  No.  Again, that's wrong.  I've got a 162.5 British pounds

3    salary per annum, which is not the biggest in the company.  So

4    this was the initial negotiation.  We didn't end up going

5    through with that.

6          MR. FREEDMAN:  Ms. Vela, can you please bring up P216

7    for the witness and counsel.

8          P216, Ms. Vela.

9    BY MR. FREEDMAN:

10   Q.  Dr. Wright, do you see this is an email from yourself to

11   Stefan Matthews and others talking about DeMorgan, and it's

12   characterized as a parent company?

13   A.  No.  I see it's an email from C to Craig Wright.  That's

14   forwarding an email.

15         MR. FREEDMAN:  Ms. Vela, can we help, Dr. Wright?

16         Thank you.

17   BY MR. FREEDMAN:

18   Q.  Do you see it now?

19   A.  I see that there's a forwarding email.  Inside, yes.

20         MR. FREEDMAN:  Okay.  Plaintiffs offer P216 into

21   evidence, Your Honor.

22         MS. MCGOVERN:  Objection, Your Honor.  Hearsay and

23   relevance.

24         THE COURT:  Overruled.  Admitted into evidence.

25      (Plaintiffs' Exhibit 216 received into evidence.)
```

70

```
1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, in this email -- in this email, you say that

3    the parent company -- "Also, can one of you guys" -- I'm

4    reading the subject.  "Also, can one of you guys give Catherine

5    the full legal name of the Australian R&D parent company.  The

6    Australian company parent company is DeMorgan?"

7         Do you see that?

8    A.  Yes.  I see that.

9         MR. FREEDMAN:  Okay.  Ms. Vela, you can take that

10   down.

11        Can we please put up P350 for the witness and counsel.

12        P350.  But just witness and counsel.

13        There we go.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright, do you see this is an implementation deed that

16   involves yourself?

17   A.  What I see is a later contract that was done between the

18   company, myself, and a different company, Calay Holdings.

19        MR. FREEDMAN:  And, Ms. Vela, can you please bring us

20   to Page 24.

21   BY MR. FREEDMAN:

22   Q.  Is that your signature at the bottom, Dr. Wright?

23   A.  Yes, that is.

24        MR. FREEDMAN:  Ms. Vela, can you bring us to Page 6.

25
```

```
1    BY MR. FREEDMAN:

2    Q.  Do you see the binding term sheet we've just mentioned

3    being referenced on the top of the page, Dr. Wright?

4    A.  Yes, I do.  And it also references the bridging loan that

5    was in there, as well.  So this is tied to a combination of the

6    bridging loan and the assets.

7         MR. FREEDMAN:  Your Honor, Plaintiffs offer P350 into

8    evidence.

9         MS. MCGOVERN:  Hearsay, Your Honor.

10        THE COURT:  The objection is overruled.  It will be

11   admitted into evidence.

12     (Plaintiffs' Exhibit 350 received into evidence.)

13   BY MR. FREEDMAN:

14   Q.  Dr. Wright, we're looking at something called an

15   "Implementation Deed" between DeMorgan, the parent company for

16   all the R&D, Calay Holdings, and Craig Steven Wright.  Do you

17   see that?

18   A.  I do.

19        MR. FREEDMAN:  Ms. Vela, let's show the signature page

20   on 24, please.

21   BY MR. FREEDMAN:

22   Q.  Like the binding term sheet, this is signed by both you,

23   Ms. Watts, and Mr. Matthews, correct?

24   A.  Yes, it is.

25        MR. FREEDMAN:  And, Ms. Vela, can you please bring us
```

```
1    to Page 6, and can you call out for us Paragraph 3.2.

2    BY MR. FREEDMAN:

3    Q.  Dr. Wright, you'll recall that the binding term sheet had

4    you selling all the intellectual property to NewCo.  In

5    paragraph 3.2 it says:  "The parties agree that NewCo, as

6    referred to in the binding term sheet, is nCrypt Holdings,

7    LTD."

8         Do you see that?

9    A.  I see the reference, yes.

10            MR. FREEDMAN:  Ms. Vela, can you put that on the

11   left-hand side.  Let's minimize that call out and put it on the

12   left-hand side.

13            And on the right, let's bring up P229, which is the

14   term sheet.  Let's go to Page 3, please.

15            And, Ms. Vela, can you highlight on the right-hand

16   side:  "Equity in NewCo upon incorporation."

17   BY MR. FREEDMAN:

18   Q.  So, Dr. Wright, you agree that you and your wife would be

19   part owners of this new company, correct?

20   A.  No --

21   Q.  Of nCrypt -- sorry.  Go ahead.

22   A.  No.  As I stated, this was a term sheet and the final sale

23   didn't work out this way.

24            MR. FREEDMAN:  Thank you, Ms. Vela.

25
```

73

```
1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, in 2015, you never mentioned anything to Ira

3    about nCrypt; isn't that correct?

4    A.  No reason to.

5    Q.  You did not mention anything to Ira about nCrypt, correct?

6    A.  Don't remember.  I had no reason to.

7             MR. FREEDMAN:  Ms. Vela, can you please play clip 50A

8    from Dr. Wright's March 18th, 2020 deposition?

9             For the record, it's Page 62, lines 12 through 14.

10       (Video played.)

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, you never mentioned to Ira throughout 2015 that

13   you were planning to sell Coin-Exch. intellectual property and

14   technology to Sterling Group, nCrypt or nChain, correct?

15   A.  Ira had never wanted to be a director.  If he chose to be a

16   director, he would have known about these things.  But -- I'm

17   sorry.  Day-to-day operations of companies don't involve sort

18   of shareholders.  Just the way it works.

19             MR. FREEDMAN:  Ms. Vela, can you please play clip 50B

20   from Dr. Wright's March 18th, 2020 deposition.

21             For the record, it's Page 62 lines 15 through 19.

22       (Video played.)

23   BY MR. FREEDMAN:

24   Q.  But around July of 2015, Dr. Wright -- and that's after the

25   term sheet is executed, but before the final IP agreement is
```

74

```
1    executed -- you email -- Ira emails you again about Coin-Exch.,

2    doesn't he?

3    A.  Don't remember.

4         MR. FREEDMAN:  Ms. Watts, can you -- sorry.  Ms. Vela,

5    can you please put up P241 for the witness and counsel.

6    BY MR. FREEDMAN:

7    Q.  Dr. Wright, do you see on the bottom you've got an email

8    from Ira Kleiman to you talking about Coin-Exch.?

9    A.  Don't recollect it.  Sorry.

10        MR. FREEDMAN:  Your Honor, Plaintiffs offer P241 into

11   evidence.

12        MS. MCGOVERN:  No objection.

13        THE COURT:  Without objection, admitted into evidence.

14     (Plaintiffs' Exhibit 241 received into evidence.)

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, Ira emails you on July 8th, 2015:  "I feel like

17   I'm pushed in a direction that leads toward legal action, but

18   it's really not what I want.  I don't want to cause anyone to

19   get in trouble.  I will sell most of my shares, but would still

20   like to retain a small part as part of Dave's involvement.  For

21   six million, I would sell 90 percent of my shares."

22     Do you see that, Dr. Wright?

23   A.  Yes, I do.

24   Q.  You forward that email on to Stefan Matthews, don't you:

25   "FYI"?
```

75

1   A.   That's what the document says.

2   Q.   And he responds back:  "I am laughing to myself and

3   rehearsing responses I would suggest.  Let's just sit on this

4   and discuss tomorrow."

5        Do you see that?

6   A.   I do.

7   Q.   So you were stripping the intellectual property out from

8   these companies that belonged to the estate and you were all

9   laughing to yourselves, weren't you?

10  A.   No.  These companies did not belong to the estate, like you

11  keep misrepresenting.  The shareholding is listed.  It was an

12  Australian public company.  Listed companies owned a small

13  amount by W&K, not Mr. Kleiman, had assets.  And no, no

14  stripping because the assets remained with those companies.

15       My plan had been to set up an exchange.  My plan had been

16  to set up a bank.  Unfortunately, I could not sell that idea to

17  anyone.

18  Q.   In an August --

19       MR. FREEDMAN:  Ms. Vela, can you please put up P256

20  for counsel and the witness.

21  BY MR. FREEDMAN:

22  Q.   Dr. Wright, in August, Ira Kleiman reaches out for more

23  information once again about Coin-Exch., doesn't he?

24  A.   I don't remember.  Sorry.

25  Q.   Do you see in the middle of the page --

76

```
1              MR. FREEDMAN:  Ms. Vela, can you zoom in on that for
2    us.
3    BY MR. FREEDMAN:
4    Q.  -- an email from Ira to yourself on August 28th, 2015?
5    A.  I see the document.
6              MR. FREEDMAN:  Your Honor, Plaintiffs offer P256 into
7    evidence.
8              MS. MCGOVERN:  No objection.
9              THE COURT:  Admitted into evidence.
10      (Plaintiffs' Exhibit 256 received into evidence.)
11   BY MR. FREEDMAN:
12   Q.  Dr. Wright, Ira says:  "I wish I could believe that you
13   have my best interests at heart, as I was first led to believe
14   in your early emails.  But after the long delays of promised
15   payments I was to receive each October and the strange offer to
16   purchase my shares from an undisclosed investor, obviously, I
17   have doubts.  Doing nothing is not a viable option for me any
18   longer."
19        Do you see that?
20   A.  Yes.  I see that when he was offered at the peak $12
21   million, where he could have gone to -- see, the thing with
22   owning shares, if I give you an offer for $12 million, and you
23   think I'm totally basically trying to rip you off, then you can
24   go out to the market.  And if someone offers you $15 million,
25   you take it.  That's how shares work.
```

1    So it's very simple here.  The largest offer on the table

2    was $12 million from me personally -- not the company, because

3    the company can't by back shares in Australia.  It's illegal --

4    me, me personally.  And he refused.  He wanted more.  He didn't

5    want to have tax.  Neither of those would work.  So very

6    simple.  He had offers.  He rejected them.

7        And the thing you are missing, as a director and as a CEO

8    of the company, my obligation is to the majority of the

9    shareholders.  He was not offered money every month.  He was

10   offered a directorship.  A directorship that, if he took, had

11   monthly payments.  Only -- and I emphasize only if he formally

12   accepted the directorship and worked.  Not that he gets to sit

13   there and get money for nothing.

14       I don't give people money for nothing.  I will pay people

15   to do a job.  I will pay people if they're obligated.  I will

16   not give someone money for nothing.  I don't care.  I had a

17   single mother.  I grew up watching someone work three jobs.  I

18   will never -- and I emphasize never -- give someone nothing --

19   sorry -- something for absolutely nothing.  I will give them

20   something.  I will give them a really, really good deal.

21       Thirty thousand dollars for 30 days' work -- 30,000 a month

22   for 30 days' work is more than most people ever imagine, more

23   than most people on this earth would dream about.  And he

24   turned it down.  So no, there was no offer for just getting

25   money to do nothing.

1    Q.  What you didn't tell Ira, Dr. Wright, is that you had

2    already signed a binding term sheet to strip all the

3    intellectual property out of the company that you told him he

4    was a shareholder of.  You looted the company by this point,

5    hadn't you?

6    A.  Again, I was already not a director at this stage.  And

7    secondly, what they were buying is me.  W&K had full rights to

8    that software at all points.  If he thinks he can go out there

9    and make a company on that software, he can today.  He can take

10   and it try and build a business.  Because here's the thing:  If

11   you have software, it is worth nothing without customers.

12       You might be the best plumber on earth.  But if you don't

13   get a customer, your business is not worth anything.  You might

14   be the best chef.  But if you can't get a customer into your

15   restaurant, it's worth nothing.

16   Q.  Let me ask you again, Dr. Wright:  Did you tell Ira Kleiman

17   that at this point you had already looted the company of all

18   its intellectual property?

19           MS. MCGOVERN:  Objection.  Asked and answered.

20           THE COURT:  Overruled.  I'll allow it.

21           THE WITNESS:  Again, no looting.  W&K owned every

22   single right, and it still does today.  He can take and exploit

23   the software today.  He can go out and try and find investors

24   today.  If he wanted to run W&K, if he wanted to hire people --

25   and I did.  My group of companies had 55 staff before all the

```
1    problems were exaggerated by Mr. Kleiman, 55 people who worked
2    hard.  Not -- I mean, I'm a horrible slave driver of a boss, as
3    any staff member will tell you.
4         Some of them ended up going on Twitter and calling me
5    all sorts of horrible names.  Others liked the fact that I work
6    them because they get great results.  Some of my staff have
7    worked with me to get some magnificent papers that are
8    published in places like Cambridge because I push them hard.  I
9    get results.  I work people to the bone and then I reward them
10   well when they do.  Some people like that.  Some people don't.
11        If he wants, every single bit of that software is
12   there right now.  He could take it.  He could try and build
13   something.  It's hard.
14   Q.  Dr. Wright, Ira Kleiman tells you:  "Tell me what you
15   believe is a reasonable settlement so I can just walk away.  If
16   we can't figure it out on our own, then let my attorney speak
17   with yours.  Maybe they can arrange something that will finally
18   put my concerns to rest."  Do you see that?
19   A.  Yes.  And as I said, $12 million, I think, for one week of
20   work for a friend who helped me put together code -- I think
21   $12 million -- I don't know about you, but I came from nothing.
22   Twelve million dollars is not nothing.  He's making out.
23   There's only:  "Didn't get enough.  I can see more."
24        The companies, in 2013 and 2014, weren't worth what they
25   are now.  The assets weren't worth what they are now.  So when
```

1    someone sits there and says:  "The 12 million, if it was in

2    Bitcoin, could be worth dot, dot, dot today," the thing to

3    remember is that man didn't want to hold Bitcoin.  He didn't

4    want to hold assets.  He didn't want to build.  He didn't want

5    to grow.  He didn't want people working basically to create

6    something.  He wanted to strip it.  He wanted to loot it.  He

7    wanted to take it and basically eviscerate it so that he could

8    sit there drinking Mai Tais, not actually working.

9        So what I have done is I've started again every time I have

10   had a failure.  And now I have, in what he calls a sham,

11   created companies that have hundreds, and I mean hundreds, of

12   staff.  And I work them.  Because when they achieve they are

13   proud.  I'm proud of what they do.  They're proud of what they

14   do.  Some of them are here.  Some of them are watching.  They

15   come and they're here and they want to watch this because

16   they're proud of what they're achieving.

17       So no, I don't loot.  I build.  And if you don't want to be

18   part of building, I'm not going to help you take money out.  If

19   you can find a buyer or a seller or you can get a deal, I'm not

20   stopping you.  If you can take that source code and you can

21   make a deal, I'm not stopping him.  But he doesn't know how.

22       So the simple answer is:  I'm not stopping him from making

23   more than $12 million.  The offer was there.  He rejected it.

24   No one else is offering him because he has no idea what to do

25   with it.

1    Q.  Actually, Dr. Wright, what you actually did with your group

2    is tell Ira to take a flying leap, essentially, unless he

3    actually had a lawyer contact you; isn't that right?

4            MS. MCGOVERN:  Objection.  Objection, Your Honor.

5            THE COURT:  The objection is overruled.  I'll allow

6    it.

7            THE WITNESS:  No.

8            MR. FREEDMAN:  Ms. Vela, can you please put up P257

9    for the witness and counsel.

10   BY MR. FREEDMAN:

11   Q.  Dr. Wright, you send an email to Stefan Matthews and Ramona

12   Watts.  And in response, you get an email from Stefan Matthews

13   about Ira.  Do you see that?

14   A.  Yes.  I understand that Stefan wanted Ira to take a flying

15   leap.

16           MR. FREEDMAN:  Your Honor, Plaintiffs offer P257 into

17   evidence.

18           MS. MCGOVERN:  Objection, Your Honor.  403, hearsay.

19           THE COURT:  Overruled.  It will be admitted into

20   evidence.

21      (Plaintiffs' Exhibit 257 received into evidence.)

22   BY MR. FREEDMAN:

23   Q.  August 28th, 2015, Dr. Wright.  Same day you received that

24   email from Ira, you send it over.  And Stefan Matthews, the guy

25   you sold all the intellectual property to, responds:  "Just

```
1    ignore him now.  If we get a note in any form from his lawyer,

2    we will consider a response.  But until then, he can take a

3    flying leap."  Do you see that?

4    A.  Yes.  Stefan thought I was completely mad.  I offered this

5    guy $12 million.  And as he says, interestingly, there is no

6    investment in any of the Australian entities, the thing that

7    you said that happened, and only an advance to DeMorgan to fund

8    legal.  An advance being a loan and acquire IP.  That is not

9    exclusive.  "Not the business."  So what ended up happening

10   wasn't the term sheet.

11   Q.  Dr. Wright, you just added words into that email.  What it

12   actually says is:  "Only an advance to DeMorgan to fund legal

13   and acquire IP, not the business," which was Stefan Matthews

14   telling you:  "The fact that Ira Kleiman has 49.5 percent of

15   the founder's shares in Coin-Exch. means nothing because you

16   stripped the IP out and you weren't selling the business.

17   Isn't that true?

18   A.  No.  The business kept going for a time in Australia while

19   we kept fighting the tax office.  And no, the business wasn't

20   purchased.  The business kept going as long as I could keep it

21   going.  So "acquire IP" doesn't mean, like you're saying,

22   stripping it.

23        Intellectual property's really interesting.  You know when

24   you buy a copy of a movie?  Guess what?  A studio owns the

25   rights.  When you buy another copy and another, and you
```

1   download it from Amazon, and you do all these things, guess

2   what?  Magic.  Intellectual property of that software, et

3   cetera, can be copied.  So two companies can have the same

4   thing.

5   Q.  Dr. Wright, I now want to talk to you about what happens

6   after this agreement is signed with Sterling Group.  You and

7   Mr. Matthews begin to take steps to ensure that W&K's IP was

8   protected, correct?

9   A.  W&K's, no.

10  Q.  And around this time, one of your companies, Hotwire, was

11  facing liquidation, correct?

12  A.  No.  Hotwire, we put into administration in 2014.  That was

13  one of the ones I mentioned the other day that own -- that had

14  the lease on the property; why we got locked out in 2014.  So

15  the price of Bitcoin was volatile, and I made a complete utter,

16  really bad, stupid error.

17      Bitcoin hit $1,200 around December, 2013.  And rather than

18  me being smart, and because I didn't cash out the cash, I

19  thought the value would stay up, which was a dumb thing because

20  I expanded the operations of the business and paid for a lot of

21  things, not realizing that Mt. Gox, the exchange, had a lot of

22  problems that other things had, and the price of Bitcoin

23  shortly after I made the expansions crashed back down to

24  between 200 and 300 dollars, leaving me with a lot of

25  short-term bills, a lot of staff to pay.  And Mt. Gox and other

1    exchanges that we had corporate accounts with were no longer

2    available to exchange.

3        So in 2014, I placed the company into voluntary

4    administration.  I had a shareholders' meeting and a staff

5    meeting.  And I said to everyone:  "If you don't force me to

6    put the company into administration, if you allow me to trade

7    through this, I will pay you a certain amount per month, and I

8    will give you eight Bitcoin each person, per month.

9        "If you -- it will be a secret vote, and the majority of

10   people will vote on that.  If you agree, basically, the

11   agreement would be I'll pay you that at the end."

12       I needed three months.  Unfortunately, the creditors voted

13   against me, and I took my deal.  I put the company into

14   voluntary administration, which some people wanted to force

15   into liquidation.  They didn't get to, and we traded out.

16       During that time, if I'd put Hotwire into liquidation, like

17   bankruptcy, then technically I could have bought it without

18   debt.  I don't know if people know how bankruptcy works, but

19   you can basically say that you'll make a deal only to pay 10

20   cents on the dollar.  I didn't.  I made a deal with the

21   administrators to pay 100 cents on the dollar, and I did.  And

22   a lot of people complained because it took me a year to pay

23   it -- everything off.  I did.  Every staff member got 100 cents

24   of everything they were owed.  Every creditor, right down to

25   that coffee maker that I've said who had a $150 bill, got paid,

1    rather than being the normal corporate executive who basically

2    has the typical:  "I don't care about anyone."

3        I could have walked away.  I could have been the nasty,

4    smart executive that everyone will say is smart and rational.

5    I didn't need to pay millions, millions to myself.  Imagine 55

6    staff with an average salary, because they're tech, of 1

7    point -- sorry -- 145,000 a year.  A lot of money.  Double that

8    with offices, computers, six million a year for our data center

9    costs.  I made sure we paid it all, every single cent.  So very

10   simply, no, it wasn't in liquidation.  We paid it out cleanly.

11   Q.  The question was:  Was facing liquidation?  And I believe

12   you just answered yes?

13   A.  No.  I didn't answer yes.  I said it was an administration

14   and it was not facing liquidation because I paid it out.  In

15   2015, we paid out the company clean.  No debt.  None.  Zero.

16   Zilch.

17       And if you have no -- the only debt -- the only debt that

18   was not paid was agreed, which was a little bit of debt to my

19   mother, a little bit to my wife's family, some debt to me, and

20   backpay to my wife.  We agreed to forego that and eventually I

21   paid back my mother, but much later.

22           MR. FREEDMAN:  Ms. Vela, can you please put up P --

23   sorry.

24   BY MR. FREEDMAN:

25   Q.  Mr. Matthews, Dr. Wright, sends you a Hotwire business

66

1    record that discusses issues with the Hotwire IP that came from

2    W&K and what might happen in liquidation.  Is that not correct?

3    A.  Can you to show me the document, please.

4         MR. FREEDMAN:  Ms. Vela, can you please put up P248

5    for the witness and counsel.

6    BY MR. FREEDMAN:

7    Q.  Do you see the email is from the Stefan Matthew to you and

8    Ms. Watts.  The subject is:  "Hotwire."  The attachment is:

9    "Hotwire Preemptive Intelligence PTY."

10        MR. FREEDMAN:  And, Ms. Vela, can you bring us to

11    Page 4.

12        And one more page forward.

13   BY MR. FREEDMAN:

14   Q.  And do you see W&K IP source code referenced, and the first

15   five words of that paragraph under "Core Issues"?

16   A.  This is referring to Coin-Exch.  Coin-Exch.  So if you're

17   looking at that here, this is, like it says, highlighted.  So

18   no, this is not the other.

19       This is the -- the tax office wanted to, as I said, force

20   payment of the GST before getting the refund.  So if they could

21   do that, that would be a different issue.  So this is not

22   liquidation of Hotwire.  This is the tax office trying to force

23   issues in the other company.

24        MR. FREEDMAN:  Your Honor, Plaintiffs offer P248 into

25   evidence.

67

```
 1              MS. MCGOVERN:  Hearsay and relevance, Your Honor.

 2              THE COURT:  Overruled.  Admitted into evidence.

 3         (Plaintiffs' Exhibit 248 received into evidence.)

 4              MR. FREEDMAN:  Ms. Vela, bring us back to the first

 5    page, please.

 6    BY MR. FREEDMAN:

 7    Q.  Dr. Wright, Stefan Matthews, a man who signed for Sterling

 8    Group on the IP agreement, sends you an email, cc's your wife,

 9    Ramona Watts, on July 24th, 2015.  It's entitled "Hotwire" and

10    the attachment is entitled "Hotwire Preemptive Intelligence

11    PTY, LTD."

12              MR. FREEDMAN:  Ms. Vela, please bring us to the next

13    page.

14    BY MR. FREEDMAN:

15    Q.  The document has a title "Hotwire Preemptive Intelligence

16    PTY, LTD."

17         Do you see that?

18    A.  I do.

19    Q.  "Hotwire has entered administration" -- first paragraph --

20    "Hotwire has not by law traded since entering administration."

21              MR. FREEDMAN:  Ms. Vela, bring us to Page 4, please.

22    "Core Issues."

23              Can you zoom in on that, Ms. Vela.

24    BY MR. FREEDMAN:

25    Q.  "In the event of liquidation, it is reasonable to assume
```

1    that the capitalized software assets and the receivable from

2    Coin-Exch. would come under scrutiny, and creditors, the

3    Australian Taxation Office, would seek to determine the extent

4    to which they are able to recover against these assets.  This

5    puts at risk software intellectual property held by Hotwire and

6    potentially software IP of Coin-Exch.

7        "It is" -- and do you see what Mr. Matthews puts in bold

8    and it italics:  "It is the W&K intellectual property source

9    code that is a concern, as it potentially exposes Satoshi

10   Nakamoto and core blockchain intellectual property."

11       Do you see that, Dr. Wright?

12   A.  Well, it doesn't actually say Satoshi Nakamoto but that is

13   what he was referencing.  And as I said, the software that went

14   from Greyfog, I called on the books W&K IP because it went also

15   to W&K and Dave was meant to actually build on it.  So yes, I

16   see it.

17           MR. FREEDMAN:  Ms. Vela, can you put that onto the

18   left hand side for me a minute.

19           And can you please pick up P709, the Australian

20   lawsuit, and let's go to Page 30.

21           And, Ms. Vela -- yes, please.  Can you call that out

22   for us.

23   BY MR. FREEDMAN:

24   Q.  Dr. Wright, Mr. Matthews' statement that the intellectual

25   property from W&K could expose Satoshi Nakamoto and core

1    blockchain intellectual property is completely consistent with

2    your statement to the Australian courts two years earlier that

3    the intellectual property and software is software and code

4    used in the creation of a Bitcoin system; isn't that correct?

5    A.  Yes, completely.  Because, as I said, a Bitcoin system, not

6    Bitcoin.  It was an exchange and a bank.  So I was with

7    Denariuz, with Coin-Exch., with all of these others, working as

8    hard as I could to get the world's first Bitcoin bank.

9         Unlike everyone else, the difference is I didn't go out

10    there and launch going:  "Oh, there's all these irregularities

11    with the law."  I tried to go to sort of the different banking

12    industries, and I tried to get a banking charter, rather

13    than -- and I tried to get a license and I tried to do that all

14    before.  Unlike every other exchange, the bucket shops out

15    there, I tried to actually be fully licensed and compliant

16    before launching to customers.  So that's what it is.

17    Q.  The W&K Info Defense Research IP would have exposed Satoshi

18    Nakamoto and core blockchain intellectual property.  It wasn't

19    banking software, Dr. Wright.

20    A.  Is that a question?

21    Q.  Oh, yeah.

22    A.  Well, no.  Actually, it is.  If you actually have a look at

23    your other document, it actually says it right on there.  It

24    says:  "Banking software."  It says:  "Exchange software."  And

25    the whole point of an organization that is launching a Bitcoin

90

1  bank, the whole purpose of core banking software is core

2  banking.  So I mean, it seems really, really simple to me.

3  Q.  No one's disputing you had banking software, Dr. Wright.

4  The question is the W&K software exposed Satoshi Nakamoto and

5  core blockchain IP; wasn't exposing banking software, correct?

6  A.  No.  It was core banking software that I had been

7  modifying.  So when you later get on to other documents, like

8  the ones from Temenos, what you will see that we were doing is

9  negotiating with all of the big banking software platforms.  We

10 were trying our hardest to build basically a friendly system

11 for Bitcoin, one that would enable the exchange as cash.

12      That's actually harder than people imagine right now

13 because the accounting platforms, and the way that modern

14 banking is done, is very different to the old-fashioned

15 depository system where people actually had physical gold or

16 silver or something like this.

17      So going back -- and some people would say going

18 forwards -- I actually think it's a better thing.  I don't like

19 the levels of inflation and the levels of manipulation that

20 central banks do.  I want something that is hard money.  I want

21 something that constrains government spending.  So yes, it is a

22 banking and a Bitcoin banking system.

23 Q.  Dr. Wright, November --

24      MR. FREEDMAN:  Thank you, Ms. Vela.

25

```
 1   BY MR. FREEDMAN:

 2   Q.  Dr. Wright, in 2015, your companies' lawyers sought to

 3   establish ownership over W&K's IP, correct?

 4   A.  The way that you're implying is incorrect.  Because, as

 5   I've been explaining, it is software.  So software rights can

 6   be distributed and assigned to multiple parties.  So unless

 7   there is an exclusive agreement where you abstract rights away

 8   from the other party, and there is an abeyance -- abeyance

 9   being a technical term meaning that you give up all rights --

10   unless you have that document saying:  "I forego my rights.  I

11   no longer have any right to use this," then both parties end up

12   with rights.

13   Q.  And, Dr. Wright, November of 2015, you received a report

14   from Baker & McKenzie.  Do you recall that?

15   A.  I received several reports from Baker & McKenzie.  So I

16   couldn't say on dates.  Sorry.

17   Q.  And you understand, Dr. Wright, that Baker McKenzie is a

18   massive international law firm with almost 5,000 lawyers

19   across --

20        MS. MCGOVERN:  Objection.  Objection.  Objection, Your

21   Honor.

22        THE COURT:  Sustained.

23   BY MR. FREEDMAN:

24   Q.  Let's lake a look at the report, Dr. Wright.

25        MR. FREEDMAN:  Ms. Vela, can you please put up for the
```

92

1   witness and counsel P296.

2   BY MR. FREEDMAN:

3   Q.  Do you see the name of the firm at the top right corner,

4   Baker McKenzie?

5   A.  Yes.  At this point, I was no longer a director or officer

6   of the company, though.

7       MR. FREEDMAN:  Ms. Vela, can you go to Page 1, please.

8   BY MR. FREEDMAN:

9   Q.  And do you see 1.4A?

10      MR. FREEDMAN:  Ms. Vela, can you highlight that for

11  Dr. Wright.

12      THE WITNESS:  Yes, it was driven by me.  As you've

13  already heard me testify multiple times -- well, I've said I'm

14  a slave driver.  I know people will call me that.  But it's my

15  vision, and so I'm driving people to do my vision, and I'm

16  still proud of it.

17      I'm -- the company I'm with at the moment doesn't want

18  to do an exchange.  They don't want to bank.  But one day I

19  intend to do this still.  I mean, I'm doing a lot of other

20  things at the moment.  There's only so much time in the day.

21  And unfortunately, the lawsuit takes up way too much of my

22  time.

23      But again, my vision is very simple.  I want a legal

24  global bank.  I want something that enables people in South

25  America, who are legally working across areas, to be able to

93

1    transmit money, to do it cheaply, quickly, without cost.  My

2    vision is there.  It remains.  And I don't care what hurdles

3    keep coming in my way.  I'm going to do this or die trying.  I

4    will work till I'm 99, and fall over dead or achieve what I'm

5    doing before that.  That simple.

6          So this is driven, yes.  I have a purpose.  And if

7    I -- I will do that and I'm going to achieve that.  And I don't

8    care how many obstacles, how many failures.  And you'll talk

9    about my failed companies.  I don't care.  I'll pay back the

10   people who loaned me money.  And I'll beg and grovel investors,

11   like he said, again, and I will start again.  And if I fail,

12   I'll sell all my stuff, like I said multiple times, and I will

13   start again.

14         So yes, by definition, I think that's driven.

15         MR. FREEDMAN:  Ms. Vela, can you go to Page 15 of the

16   document, please.

17   BY MR. FREEDMAN:

18   Q.  Dr. Wright, do you see the reference to W&K at 5.1?

19         MS. MCGOVERN:  Objection, Your Honor.  The document's

20   not in evidence.  Object to the reference to the substantive

21   nature of it until it is.

22         THE COURT:  It's only being shown to the witness; is

23   that correct?

24         Overruled.

25         MR. FREEDMAN:  That is correct, Your Honor.

94

```
1              Ms. Vela, could you back to the first page.

2              Your Honor, at this point Plaintiffs offer P296 into

3    evidence.

4              MS. MCGOVERN:  Objection, Your Honor.  There's been no

5    foundation.  This witness did not create this document, draft

6    this document, and there's no testimony to provide for the

7    adequate foundation and hearsay, Your Honor.

8              THE COURT:  Overruled.  P296 will be admitted into

9    evidence.

10       (Plaintiffs' Exhibit 296 received into evidence.)

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, this time the jury can see it on the screen.

13   So from the law firm of Baker & McKenzie in the top right

14   corner.  The document is entitled:  "DeMorgan Group

15   Intellectual Property Group Ownership Analysis," dated 27th of

16   November, 2015.  Do you see that?

17   A.  Yes.  I wasn't actually involved in the analysis, but I do

18   see it.  I know the company did that.

19             MR. FREEDMAN:  Ms. Vela, can you go to the next page,

20   please.

21             One more.

22             And can you zoom into 1.4 first.

23   BY MR. FREEDMAN:

24   Q.  Dr. Wright, here Baker & McKenzie's document says:  "Much

25   of the work undertaken by the DeMorgan Group to date has been
```

1    driven by Craig Steven Wright."

2         Do you see that?

3    A.  As I just explained, I'm the one who is the vision on all

4    of these things.  I'm the one who drives people.  I'm the one

5    who basically gives someone a concept that we want achieved.

6    I'm the one who won't stop.  I've nearly been stopped multiple

7    times, but I'm not going to.  So yes, I'm driven.

8    Q.  And then it says:  "In this report, Craig Wright, in his

9    personally capacity, and the Wright Family Trust are referred

10   to as the 'Craig Wright entities.'"

11        Do you see that?

12   A.  Yes.  I see what they called it.

13            MR. FREEDMAN:  Ms. Vela, can you zoom out, please.

14            And let's -- yep, please.  Can we bring up 1.1.

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, I'm about halfway through this.  "DeMorgan

17   Limited is in the process of undertaking investigations to help

18   it identify which intellectual property rights are currently

19   owned by it and certain related entities.  The purpose of this

20   report is to assist with this process."

21        Do you see that, Dr. Wright?

22   A.  Yeah.  I see what they wrote.

23            MR. FREEDMAN:  Ms. Vela, can we go to Page 5.  And can

24   we highlight 1.7.

25

96

```
1    BY MR. FREEDMAN:

2    Q.   "As noted" -- sorry -- 1.7 is entitled "Red Flag."

3         "Red Flag Third-Party Issues.  As noted above, the purpose

4    of this report is to seek to identify the core intellectual

5    property rights currently owned by the DeMorgan Group entities

6    and Craig Wright group entities.  The report does not focus on

7    intellectual properties rights owned by third parties.

8         "However, where the documentation provided to us indicates

9    that DeMorgan Limited believes that there are core intellectual

10   property rights owned by a DeMorgan group entity or Craig

11   Wright entity, and our review of the documentation provided to

12   us indicates a material risk that this is not the case and that

13   the relevant rights may be owned by third parties, we have

14   flagged this issue in the report as a red flag third-party

15   issue."

16        Do you see that?

17   A.   Yes, I do.  What I believe that they were doing was

18   flagging the fact that some of the entities shared rights with

19   other people.  So yes.

20   Q.   So in non-lawyer speak, this is saying:  "When we find

21   intellectual property that you think you own, but we think you

22   may not own, we're going to flag that for you," right?

23            MS. MCGOVERN:  Objection, Your Honor.

24            THE COURT:  Sustained.

25            MR. FREEDMAN:  Ms. Vela, let's go to Page 15, please.
```

97

```
 1     And can we zoom in to "Red Flag Third-Party Issue."

 2              There we go.  Thank you.

 3     BY MR. FREEDMAN:

 4     Q.  "Red Flag Third-Party Issue.  Red flag third-party issues

 5     have been identified throughout the report.  Where a red flag

 6     third-party issue has been raised, we recommend that DeMorgan

 7     Limited consider the importance and value of the relevant core

 8     intellectual property rights to which the red flag third-party

 9     issue relates and the risks associated with leaving the current

10     position as it is.

11          "Where the relevant core intellectual property rights are

12     of a material importance to the ongoing operations of DeMorgan

13     Group, one possibility may be considering whether the relevant

14     third party would be willing to assign the relevant core

15     intellectual property rights to new intellectual property

16     corporation in the appropriate circumstances.

17          "If the third party is unwilling to do so, further

18     consideration of the consequences of this refusal for the

19     DeMorgan Group and DeMorgan Limited's strategy for addressing

20     those consequences will need to be considered."

21          And the very first red flag third-party issue flagged is

22     w&K.  "One key third party that appears a number of times in

23     the review material is W&K."

24          Do you see that?

25     A.  Yes.  I see that they flagged it.  Because, as I said, we
```

98

```
1    had software from Siemens, software from Al Baraka, and the

2    changes to that, well, overlapped with other software rights.

3            MR. FREEDMAN:  Thank you, Ms. Vela.

4    BY MR. FREEDMAN:

5    Q.  Dr. Wright, around that time in late 2015, you received

6    another email from Ira, did you not?

7    A.  I don't remember.  Sorry.

8            MR. FREEDMAN:  Ms. Vela, please put up P301 for the

9    witness and counsel.

10   BY MR. FREEDMAN:

11   Q.  Dr. Wright, do you see at the bottom of chain there's an

12   email from Ira Kleiman to yourself asking for something?

13   A.  Yes.  I see that.

14           MR. FREEDMAN:  Your Honor, Plaintiffs offer P301 into

15   evidence.

16           MS. MCGOVERN:  Objection, Your Honor.  No objection to

17   the email from Ira, but objection to the rest as hearsay, Your

18   Honor.

19           THE COURT:  The objection is overruled.  It will be

20   admitted into evidence, each of the pages.

21           And it's just the one page; is that correct

22   Mr. Freedman?

23           MR. FREEDMAN:  All we want is the one page.  Are there

24   any additional pages?

25           THE COURT:  May I see the other page or is there --
```

1          MR. FREEDMAN:  Ms. Vela, is there another page to the

2    document?

3          No.  It's one page, Your Honor.

4          THE COURT:  All right.  Admitted into evidence.

5      (Plaintiffs' Exhibit 301 received into evidence.)

6          MR. FREEDMAN:  Can we zoom in, please.

7    BY MR. FREEDMAN:

8    Q.  Dr. Wright, Ira Kleiman writes you again on December 5th,

9    2015: "Hi.  I thought in November Coin-Exch. would hold a

10   meeting and I would finally receive some updates."

11        Do you see that?

12   A.  Yes.  I see that being that I had resigned as a director

13   and was no longer the CEO of the company, and that I had moved

14   to the UK, that I forwarded this to Stefan Matthews who was at

15   that point the CEO of DeMorgan.  So Ira sent me an email and I

16   forwarded it on to the relevant company officer.

17   Q.  From your craig.wright@demorgan.com.au email address?

18   A.  Yes.  I was still employed there.

19   Q.  And Mr. Matthews says:  "Park this till Monday.  No need to

20   respond."

21        Do you see that?

22   A.  Yeah.  Quite frankly, to put it simply, Stefan didn't think

23   this Ira would be a risk.

24   Q.  About a month later, Dr. Wright, you and your companies

25   enter into final agreements to sell all the intellectual

100

1    property owned by your companies, including Coin-Exch., Hotwire

2    and all the rest we've seen; isn't that correct?

3    A.  No.  Actually technically, as I said, it was incorrect.

4    The Australian companies kept trading and it was a transfer of

5    rights.  So it wasn't an exclusive deal where the intellectual

6    property is removed.  So the rights still remained with W&K.

7    The rights still remained with DeMorgan Group.  And the rights

8    were also then licensed to an overseas group that did nothing

9    with them.

10       Basically, I wanted -- and I still want to make an

11   exchange, and I want to make a global bank.  Unfortunately, so

12   far, I haven't been able to achieve that.

13           MR. FREEDMAN:  Ms. Vela, can you please bring up P469

14   for the witness and counsel.

15           It's in evidence, so let's publish, please.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, we have an IP assignment deed that lists all

18   the companies we've been looking at in Australia and "nCrypt

19   Holdings" at the top.  Do you see that?

20   A.  I do.

21           MR. FREEDMAN:  Let's go to Page 8, please, Ms. Vela.

22           Thank you.

23   BY MR. FREEDMAN:

24   Q.  "In consideration for the payment by the purchaser to the

25   vendors" -- we're going to get to who those are -- you can take

```
 1    me for now that purchaser is nCrypt and vendors are your
 2    Australian companies -- so:  "In consideration for the payment
 3    by nCrypt to the Australian companies of the contract amount in
 4    accordance with the Clause 4, each of your Australian companies
 5    hereby assign to the purchaser absolutely all of the
 6    intellectual property rights that it owns as of the effective
 7    date, free from any third-party interest, including any and all
 8    such intellectual property rights that it owns in the Items and
 9    Works identified in the IP schedule."
10         Do you see that, Dr. Wright?
11    A.  Yes.  And as I've been saying, that doesn't mean what's
12    being implied.  What that means very simply is that any
13    third-party rights are warranted.
14         So, for instance, I'm warranting that we own the Al Baraka
15    software, I'm warranting that we own the SCADA software, and
16    I'm warranting that we own all the rest, so no other party can
17    take claim to them or -- yeah.
18    Q.  You sold all the intellectual property held by these
19    companies, including the intellectual property that could
20    expose Satoshi Nakamoto and core blockchain IP, correct?
21    A.  As I've been saying, yes, I sold the banking software.  I
22    sold the exchange software.  I hoped those companies would keep
23    building what I wanted to build.  They haven't.  I'm still
24    trying to convince people of that.  I'm still working with
25    other companies to try and do it.
```

102

```
 1        I've worked trying to convince people of actually building

 2   something that isn't a bucket shop, that isn't a Bitcoin or

 3   cryptocurrency exchange where they gamble on price

 4   fluctuations, and where they build something that has

 5   real-world use, and I'm going to keep trying to do that.  I'm

 6   going to try and not have cryptocurrency gambling, but rather,

 7   digital money.

 8        And I don't care.  I'm going to keep trying on doing that.

 9   That simple.

10             MR. FREEDMAN:  Thank you, Ms. Vela.

11             Can you please bring up P871 for the witness and

12   counsel.

13             Can you zoom in on all of the text in the email chain,

14   just starting from "nCrypt Craig" all the way down to the end.

15             No.  No.  No.  No.  All the way from -- yeah.  Thank

16   you.

17   BY MR. FREEDMAN:

18   Q.  Dr. Wright, do you see this is an email from yourself to

19   Ms. Watts and Mr. Matthews?

20   A.  It says:  "NCrypt Craig."  It doesn't say me and I don't

21   recognize it.

22   Q.  You recall testifying that emails from nCrypt Craig were

23   from you?

24   A.  There was some, and there were also ones that were by other

25   staff members.
```

103

```
 1    Q.  And do you see that there's a mention from Mr. Matthews

 2    about patents and then you respond?

 3    A.  So what you're saying there is:  "NCrypt Craig," but that's

 4    not what I said.  Craig@ncrypt is not the same thing.  So --

 5    and no, I don't -- actually don't recollect it.

 6            MR. FREEDMAN:  Your Honor, Plaintiffs offer P781 into

 7    evidence.

 8            MS. MCGOVERN:  Objection, Your Honor.  Hearsay.

 9    Foundation.

10            THE COURT:  Is that the only page?  Can you go down?

11       (Pause in proceedings.)

12            THE COURT:  Is it two pages?

13            MR. FREEDMAN:  Are there any other pages to the

14    document?  How many pages is the document?

15            There are five pages.  There are five pages, Your

16    Honor.

17       (Pause in proceedings.)

18            THE COURT:  Go to the next page, please.

19            Is the objection on grounds of hearsay?

20            MS. MCGOVERN:  Yes, Your Honor.

21            THE COURT:  The objection is overruled.

22            MS. MCGOVERN:  And foundation, Your Honor.  He didn't

23    recognize the document.

24            THE COURT:  Overruled.  It will be admitted into

25    evidence.
```

```
 1          (Plaintiffs' Exhibit 781 received into evidence.)

 2              MR. FREEDMAN:  Can you please zoom into the text on

 3     that first page, please, Ms. Vela.

 4     BY MR. FREEDMAN:

 5     Q.  Dr. Wright, the bottom of the email chain on this page is

 6     an email from Lawrence Adrian at Baker McKenzie.  Do you see

 7     that?

 8     A.  See it.  Don't recognize it.

 9     Q.  And he says:  "Outside the DeMorgan Group documentation, we

10     are still awaiting signature of following our email yesterday,

11     the W&K IP assignment deed to be signed by Uyen."

12          Do you see that?

13     A.  I do for the first time, yes.

14     Q.  Despite waiting for signatures from W&K, Mr. Matthews

15     responds with an email to you saying:  "All clear.  Onward with

16     the patent program and filing now," smiley face.  Do you see

17     that?

18     A.  No.  There's no -- it's not forwarded to me.

19     Q.  Dr. Wright, you then respond from your nCrypt Craig email

20     account:  "Good," with a cc to Ms. Watts, your wife, correct?

21     A.  No.  Again, there are more than one person in my companies

22     and ones that I've founded.  So "nCrypt Craig" doesn't mean

23     craig@ncrypt.  It doesn't say:  "Craig.wright."  So

24     unfortunately, no.

25     Q.  Dr. Wright --
```

```
 1              MR. FREEDMAN:  Thank you, Ms. Vela.

 2    BY MR. FREEDMAN:

 3    Q.  Dr. Wright, during this period, nCrypt, nChain -- nChain

 4    maintained a list of patents applications and a spreadsheet,

 5    correct?

 6    A.  No.  They're two separate companies.

 7    Q.  Did nCrypt or nChain maintain a patent application registry

 8    in a spreadsheet?

 9    A.  I have no idea what nCrypt did -- and nChain were a

10    separate company that bought the rights out from Mr. MacGregor.

11    Q.  Did nChain or nCrypt maintain a patent application master

12    registry in an Excel document?

13    A.  I have no idea.  I was never involved in any Excel document

14    from nCrypt.

15              MR. FREEDMAN:  Ms. Vela, please play clip number 58

16    from the deposition of Craig Wright, March 18th, 2020.

17              For the record, Page 51, lines 13 through 16.

18         (Video played.)

19              MR. FREEDMAN:  Ms. Vela, can you please play clip 53

20    Dr. Wright's March 18th, 2020 deposition.

21              That's for the record, pages 51, line 22, through page

22    52, line 7.

23         (Video played.)

24    BY MR. FREEDMAN:

25    Q.  Does that help you remember that there was a patent
```

106

1    spreadsheet, Dr. Wright?

2    A.   Like I've just said in both of these, nChain did.  So the

3    person in charge of patenting nChain, the later company, had a

4    patent spreadsheet.  Alan Pederson was employed by DeMorgan.

5    DeMorgan had spreadsheets.  But as I said, I don't know exactly

6    everything Alan was doing.  He was the person in charge of like

7    the PMO office.  Project management.  He maintained all of that

8    and ran it.

9        The other company, when you said nChain or nCrypt, I'm very

10   pedantic on these things, and that is one or the other.  So one

11   of those companies did.  NCrypt, I don't know.  So very simply,

12   I don't know if they're talking about nCrypt.

13   Q.   You are the chief scientist of nChain, Dr. Wright, correct?

14   A.   NChain is not nCrypt.  But I am, yes.

15          MR. FREEDMAN:  Ms. Vela, can you please bring up P865

16   for the witness and counsel?  And can we go to Page 5, please.

17          Hold on before we move forward.

18   BY MR. FREEDMAN:

19   Q.   Dr. Wright, do you see this is an email from Alan Pederson,

20   the individual you said tracks all these things and is a good

21   project manager, to craig@ncrypt.com, stefan@ncrypt.com,

22   ramona@ncrypt.com.  Do you see that?

23   A.   Yeah.  I see the document.

24          MR. FREEDMAN:  Ms. Vela, can we go to Page 5.

25

107

```
 1    BY MR. FREEDMAN:

 2    Q.  And attached to that document is an Excel spreadsheet.  Do

 3    you see that, Dr. Wright?

 4    A.  You would need to zoom in a little bit on the details.

 5            MR. FREEDMAN:  Ms. Vela, can you zoom in for

 6    Dr. Wright.

 7    BY MR. FREEDMAN:

 8    Q.  Can you read on the top where it says -- the very top line.

 9    A.  Yes I recognize this as the sort of thing that Alan used to

10    do.

11            MR. FREEDMAN:  Your Honor, Plaintiffs offer P685 into

12    evidence.

13            MS. MCGOVERN:  Objection, Your Honor.  Relevance.

14    Hearsay.

15            THE COURT:  Overruled.  Admitted into evidence.

16       (Plaintiffs' Exhibit 685 received into evidence.)

17            MR. FREEDMAN:  Ms. Vela, can we go to Page 5, please.

18    BY MR. FREEDMAN:

19    Q.  Dr. Wright --

20            MR. FREEDMAN:  And, Ms. Vela, can you call out the

21    very first line on the Excel spreadsheet that's been attached

22    to the email.

23    BY MR. FREEDMAN:

24    Q.  Dr. Wright, this is the patent's progress and

25    prioritization spreadsheet, correct?
```

108

```
 1    A.   That's what it says.

 2              MR. FREEDMAN:   Ms. Vela, you can minimize that,

 3    please.

 4    BY MR. FREEDMAN:

 5    Q.   And, Dr. Wright, this registry shows that -- this document

 6    shows that, as of 2016, over 200 patents that are held by

 7    nCrypt were sourced from your Australian companies?

 8    A.   No.   We started actually writing them then.   That sounds a

 9    lot.   But before this court case that has slowed me down, I've

10    written 3,208 patents.   The last year, from February to

11    February -- and I have it all documented.   I've got tracking

12    software -- I wrote a total of 6.4 million words.

13         Now, this seems a lot.   The simple answer is:   In four

14    years, I created 3,208 patents.   They'll end up more than that.

15    So on a good day, I've written the equivalent of a master's

16    thesis.   It sounds strange and sounds unbelievable.

17         As I'm doing this trial, I'm enrolled in 19 different

18    universities doing degrees.   Not kidding.   One of those is

19    Harvard.   So they're not all low-end universities.   Some are.

20         Before this, I was enrolled, at my peak, in 25.   I'm doing

21    five different doctorates simultaneously.   On top of that, I'm

22    working.

23         So in a matter of months, I wrote 200 documents, as

24    unbelievable to some people as that seems.   And the simple fact

25    is, shortly afterwards, I continued, and I still do.   I
```

1    actually wrote three papers last night.

2            MR. FREEDMAN:  Ms. Vela, can you zoom in to the green

3    box, please, on the patent spreadsheet.

4    BY MR. FREEDMAN:

5    Q.  Dr. Wright, those are your Australian companies and

6    yourself, correct?

7    A.  Yes.  They were the ones going to actually do some patent

8    work.  They didn't.

9    Q.  And this shows that the patents per company entity total

10   209 patents from your Australian entities.  Do you see that?

11   A.  Again, no.  This is areas that would be used by those

12   different companies.

13       The nCrypt patent portfolio would then license back to my

14   Australian companies in the different areas.  So where your

15   seeing Zhul, that is the equivalent of Coursera.  I wanted to

16   do something like that.

17       Where you're seeing "Interconnected Research," this was

18   online corporate development of basically methodologies to

19   allow individuals in different areas to work together on

20   projects, et cetera.

21       When you're looking at Denariuz, that was the banking

22   software.  When you're looking at Coin-Exch, exchange -- so

23   patents per company entity is the other way round.

24       I wanted to keep the Australian entitles going.  So no,

25   these weren't doing it.  I was working at that stage for the

110

1    British company and doing it, and it was going to be used the

2    other way.  I still wanted the Australian companies to operate.

3    Q.  The same companies that you transferred all the

4    intellectual property from to nCrypt, they are now filing

5    patents with that intellectual property; isn't that right?

6    A.  No.  And this is very, very easy to check.  The way that

7    patents and are done is all public.  So when you file, all of

8    this is easily checked.  So it's not about spreadsheets about

9    what someone says these are.  You go to the patent filing and

10   you look at the owner.  It's public.  This is how patents work.

11   It's a public record.

12        We did keep them -- there's an 18-month secrecy window.  So

13   if you file a patent, you don't need to tell the world about it

14   for 18 months.  But after that 18 months, the monopolistic

15   protection you get on a patent that you had for 20 years, if

16   you're granted, means that you give up and make public your

17   knowledge, no trade secrets, no one gets to know what you're

18   doing.  The secret source how you're creating all these things

19   is given to the world, so that after the patent expires the

20   world can use it and anyone outside of the jurisdictions can

21   use it.

22        So, very simply, if you want to know who owns these, you go

23   to the patent register and you find it's the other way around.

24            MR. FREEDMAN:  Ms. Vela, could you please put up P457.

25            THE COURT:  Mr. Freedman, let me know when it might be

111

```
1    a good time for us to break for lunch.
2             MR. FREEDMAN:  I can stop now or in about six minutes.
3             THE COURT:  Why don't we stop now?
4             All right.  Ladies and Gentlemen, let's take a
5    one-hour recess for lunch and I'll see you back here at 2:00.
6         (Jury not present, 1:01 p.m.)
7             THE COURT:  All right.  Just for purposes of timing,
8    how much longer do you believe you have, sir?
9             MR. FREEDMAN:  Your Honor, about six minutes left to
10   this, and then maybe about 20 minutes on another thing.  And
11   I've got to go through all the documents because we can't agree
12   to admit them.  That could take a while.
13            THE COURT:  Do you believe this is going to take your
14   direct examination through the day?
15            MR. FREEDMAN:  That depends on Dr. Wright's answers,
16   Your Honor.
17            THE COURT:  I'm just --
18            MR. FREEDMAN:  I hope not, but our next witness is
19   here and ready to testify.  Dr. Edman is here.
20            THE COURT:  All right.  And, Ms. McGovern, with regard
21   to any cross-examination, do you anticipate doing that in the
22   Plaintiffs' case?
23            MS. MCGOVERN:  Your Honor, at this point, we do not.
24   If I could please reserve, so I can confer with my team.
25            THE COURT:  Of course.  Of course.  And I don't want
```

112

1    to hold you to it.  I'm just trying to make sure that we don't

2    have unnecessary gaps in time, okay?

3          Have a nice lunch.  I'll see you back here at 2:00.

4      (Recess from 1:02 p.m. to 2:03 p.m.)

5          THE COURT:  All right.  Welcome back.  Is there

6    anything we need to address before we continue?

7          MR. FREEDMAN:  I just need a lavalier.

8          THE COURT:  Go ahead and take one, Mr. Freedman.

9          Ms. McGovern, anything on behalf of the Defendant?

10         MS. MCGOVERN:  I'm just going to grab --

11         THE COURT:  Of course.

12         If that's all the partes need, let's go ahead and

13   bring in the jury.

14     (Before the Jury, 2:04 p.m.)

15         THE COURT:  All right.  Welcome back, ladies and

16   gentlemen.  Please be seated.  I trust that each of you had a

17   pleasant lunch and are ready to get back to work.

18         We'll continue with the questioning.

19                 DIRECT EXAMINATION [CONTINUED]

20   BY MR. FREEDMAN:

21   Q.  Good afternoon, Dr. Wright.

22   A.  Good afternoon, Mr. Freedman.

23   Q.  Before lunch, Dr. Wright, we were tracing the intellectual

24   property and various transactions that related to it.  Do you

25   recall that?

113

```
1    A.  We weren't actually tracing intellectual property.  We were
2    looking at the different corporations and different licensing
3    agreements.  So it's not actually correct that it's tracing it.
4    Q.  Acquisition agreements?
5    A.  Not the way that you're implying, no.  You're actually
6    incorrect, like you were saying with the patents, the wrong way
7    around.
8    Q.  Dr. Wright, in 2016 Baker McKenzie found that by 2017 the
9    intellectual property would be worth as much as 1.9 billion
10   pounds.
11          MS. MCGOVERN:  Objection.
12   BY MR. FREEDMAN:
13   Q.  Isn't that correct?
14          MS. MCGOVERN:  Objection.  Misstates the evidence.
15          THE COURT:  Overruled.
16          THE WITNESS:  I have no idea.  I had nothing to do
17   with any of that and I've never seen a $1.9 billion valuation.
18          MR. FREEDMAN:  Ms. Vela, can you please put up P457,
19   which is in evidence.
20   BY MR. FREEDMAN:
21   Q.  Dr. Wright, "Baker McKenzie IP Valuation Analysis."
22          MR. FREEDMAN:  Ms. Vela, can you bring us to Page 10.
23   BY MR. FREEDMAN:
24   Q.  Dr. Wright, on the bottom left corner --
25          MR. FREEDMAN:  Ms. Vela, can you make that pop out for
```

114

```
 1    us.
 2           Oh, that works.
 3    BY MR. FREEDMAN:
 4    Q.  "The table below shows the range of estimated values based
 5    on EITC filing 206 patents by 2017."  Upper core tile, do you
 6    see "Maximum value combined set 1,957,000,000 pounds"?
 7    A.  I haven't seen this document before.
 8           MR. FREEDMAN:  Ms. Vela, can you please bring us to
 9    the next page.
10           And one more.
11           Again.
12           One more time.
13           There we go.
14    BY MR. FREEDMAN:
15    Q.  Dr. Wright, isn't it true --
16           MR. FREEDMAN:  Ms. Vela, can you bring us -- yeah.
17           Thank you.
18    BY MR. FREEDMAN:
19    Q.  Dr. Wright, Baker McKenzie concluded that by 2018 the upper
20    value estimate for the intellectual property we are tracing
21    would be worth $2,614,000,000?
22    A.  No idea.  I haven't seen the document before.
23    Q.  That was 2018, right, Dr. Wright?
24    A.  Don't know.  I haven't investigated this document before.
25           MR. FREEDMAN:  Ms. Vela, can you highlight 2018.
```

1           Thank you.

2    BY MR. FREEDMAN:

3    Q.  Dr. Wright, the intellectual property has gone up in value

4    since 2018, hasn't it?

5    A.  No idea.  I haven't valued it.

6           MR. FREEDMAN:  Ms. Vela, can you take that down.

7    BY MR. FREEDMAN:

8    Q.  Dr. Wright, isn't it true that the intellectual property

9    within this case that you claim to own is worth around $252

10   billion today?

11   A.  That's not actually what I said.

12          MR. FREEDMAN:  Ms. Vela, can you please put up what

13   we'll mark as Impeachment Exhibit RF-6 for counsel and the

14   Court.

15          MS. MCGOVERN:  Objection.  Improper impeachment.

16          THE COURT:  This is a joint exhibit?

17          MR. FREEDMAN:  This is not, Your Honor.  This is the

18   exhibit the Court addressed based on a timing issue and allowed

19   it to be used for impeachment.

20          MS. MCGOVERN:  I restate our objection.  It is

21   improper impeachment because he stated that's not what he said.

22          THE COURT:  The objection is overruled.

23          You may continue.

24          MR. FREEDMAN:  Can you please publish to the jury.

25

```
1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, we have looked at this Slack channel before,

3    and you have testified that you are the only person that posts

4    from the CSW account.

5       On October 30th, 2021, two days before you started trial in

6    this case, you posted:  "Technically, the full value of the

7    intellectual property that I own that is in use within Bitcoin

8    is valued at around $252 billion."  And then you say:  "This is

9    the intellectual property within the Kleiman case."

10             MS. MCGOVERN:  Objection.

11   BY MR. FREEDMAN:

12   Q.  Isn't that correct, Dr. Wright?

13             MS. MCGOVERN:  Objection, Your Honor.  Improper lay

14   opinion.

15             THE COURT:  I'm sorry?  Improper lay opinion?

16             MS. MCGOVERN:  Yes.  Improper lay opinion used as

17   expert testimony, Your Honor.  Also hearsay.

18             THE COURT:  It is used for impeachment purposes.

19   Overruled.

20             THE WITNESS:  No.  What this was, is a discussion of

21   passing off.  So what I have claimed is that the passing off of

22   BTC as Bitcoin, which radically changes the protocol I created,

23   leaves a lot of companies exposed, including Coinbase,

24   including the core developers, including the others.  So during

25   this case I've actually had my lawyer send out letters.
```

1           Now, the bit you're mistaking is the intellectual

2    property that we're talking about.  The true intellectual

3    property that is being impinged upon is the passing-off rights

4    to the name of Bitcoin.

5           Now, to basically say how that works is the original

6    concept of Bitcoin that I created in the whitepaper, that I

7    launched as digital cash, there are people now with Taproot,

8    including mixers.  Now, mixers are a way of allowing money

9    laundering.  As the issuer of Bitcoin, I have a right to

10   determine what happens with the protocol in the database.  So

11   no one has asked me, no one has licensed me, no one has done

12   anything else.  So the potential here is in damages claims in a

13   lawsuit against all of those companies.

14          So you're misrepresenting what the intellectual

15   property is in this, basically, attempted impeachment.

16   BY MR. FREEDMAN:

17   Q.  Do you deny you said the words that are highlighted on this

18   page, Dr. Wright?

19   A.  No.  But as I said, this is not what you're claiming it to

20   be.  That's the difference.  It's not about patents.  It's not

21   about software.  It's about the rights to effectively the

22   Bitcoin name and database.

23      Now, the argument is that Bitcoin was released under an MIT

24   open source license.  The distinction is that the database

25   wasn't.  When I ran those nodes in 2009, I didn't put the

118

1    database at any point on the SourceForge database.  Meaning

2    that the database behind Bitcoin was never licensed open

3    source.  It is available for copy and use under a set protocol.

4    The one that I set in 2010 Bitcoin is set in stone.

5        By saying Bitcoin is set in stone, as the issuer, creator

6    and developer of the system, I have said you cannot change my

7    protocol.  Not it's a community project.  I have never once

8    said it's a community project.  I said:  "This is available to

9    everyone to use."  Not to change.

10       Going out there and changing my protocol and

11   misrepresenting fraudulently what it is, including companies

12   like Coinbase, leaves them open to lawsuits.  None of which

13   goes to me.

14   Q.  The intellectual property within the Kleiman case is worth

15   $252 billion?

16           MS. MCGOVERN:  Objection, Your Honor.  Asked and

17   answered.

18           THE COURT:  Sustained.

19           MR. FREEDMAN:  Thank you, Ms. Vela.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, just so you know where I'm going with this, I'm

22   going to show you a variety of documents, agreements, that took

23   place within the transactions we were looking at before.

24           MR. FREEDMAN:  Ms. Vela, can you put P230 on the

25   screen for Plaintiff -- for the witness and counsel.

119

```
1              And can you go to the first page of the document.
2              No.  P230.
3              Thank you.
4              Can you go to the first page of the document that's
5    attached.
6              Can you just go to the next page, please.
7    BY MR. FREEDMAN:
8    Q.  Dr. Wright --
9              MR. FREEDMAN:  Ms. Vela, can you show Page 16, please.
10   BY MR. FREEDMAN:
11   Q.  This is your signature, Dr. Wright?
12   A.  It is.
13             MR. FREEDMAN:  Ms. Vela, can you go back to Page 2.
14   BY MR. FREEDMAN:
15   Q.  Dr. Wright, "Doctor of Technologies in DeMorgan."  Were the
16   entities listed on the binding term sheet we looked at earlier?
17   A.  Could have been, but it's not "doctor."  It's "DR."
18   Q.  Okay.
19             MR. FREEDMAN:  Plaintiffs offer P230 into evidence.
20             MS. MCGOVERN:  Objection, Your Honor.  Hearsay.
21   Relevance.
22             THE COURT:  Overruled.
23      (Plaintiffs' Exhibit 230 received into evidence.)
24             MR. FREEDMAN:  Thank you, Ms. Vela.
25             Can you please put up P308 for the witness and
```

120

```
1    counsel.

2    BY MR. FREEDMAN:

3    Q.  Dr. Wright, again, this is an IP assignment deed between

4    nCrypt and DeMorgan?

5          MR. FREEDMAN:  And, Ms. Vela, can you go to Page 4.

6    BY MR. FREEDMAN:

7    Q.  Your signature on the bottom, Dr. Wright?

8    A.  Yes, it is.

9          MR. FREEDMAN:  Plaintiffs offer P308 into evidence.

10         MS. MCGOVERN:  Objection, Your Honor.  Relevance,

11   foundation, hearsay.

12         THE COURT:  Overruled.  Admitted into evidence.

13      (Plaintiffs' Exhibit 308 received into evidence.)

14         MR. FREEDMAN:  Ms. Vela, can you please bring up P310.

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, this is an assignment deed between yourself and

17   nCrypt Holdings.

18         MR. FREEDMAN:  Ms. Vela, can you please bring us to

19   Page 18.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, that's your signature on the top right corner

22   of the document?

23   A.  I'd need to see the rest of the document to make sure.

24         MR. FREEDMAN:  Your Honor, Plaintiffs offer P310 into

25   evidence.
```

121

```
1              MS. MCGOVERN:  Objection, Your Honor.  Foundation,
2    relevance, hearsay.
3              THE COURT:  Can you go back to the signature?
4              MR. FREEDMAN:  Ms. Vela, please take us to Page 18.
5              THE COURT:  Would you like to ask the question again?
6    BY MR. FREEDMAN:
7    Q.  Dr. Wright, is that your signature?
8    A.  It actually doesn't look like my signature.
9    Q.  That's not what I asked, Dr. Wright.  Is it your signature
10   on the document?
11   A.  I would need to check the document.  I can't answer that
12   because it doesn't look like my signature.
13   Q.  What page would you like to see, Dr. Wright?
14   A.  All of them.  If I'm going to look at a document and say
15   that's my document, I want to see the document.
16             MR. FREEDMAN:  Ms. Vela, can you start at the
17   beginning and show Dr. Wright each page of the document.
18        (Pause in proceedings.)
19             MR. FREEDMAN:  Tell us when you're ready to go to the
20   next page.
21             THE WITNESS:  Next.
22             MS. MCGOVERN:  Your Honor, we understand he wants to
23   go through this quickly, but I think Dr. Wright has the right
24   to just review the document as he needs to.
25             THE COURT:  Yes.  The witness has asked to review it
```

122

```
1   and I believe that's why we're going through the 16 pages.
2            MS. MCGOVERN:  I just want to make sure he has the
3   right to be able to do that.
4            THE WITNESS:  Next.
5            Next.
6            Next.
7            Next.
8            Next.
9            Next.
10           Next.
11           Excuse me.
12           Next.
13           Next.
14           Next.
15           Next.
16           Next.
17           Next.
18           And next.
19           I recognize the document, but it doesn't look like my
20   signature.
21           MR. FREEDMAN:  Plaintiffs offer P310 into evidence,
22   Your Honor.
23           MS. MCGOVERN:  Your Honor, we object for lack of
24   foundation and the absence of relevance to this case.
25           THE COURT:  Overruled.
```

```
 1              MS. MCGOVERN:  And hearsay.

 2              THE COURT:  310 will be admitted into evidence.

 3         (Plaintiffs' Exhibit 310 received into evidence.)

 4              MR. FREEDMAN:  Ms. Vela, can you please put up P315.

 5    BY MR. FREEDMAN:

 6    Q.  Dr. Wright, this is another agreement between DR

 7    Technologies, nCrypt, and DeMorgan, the parent company for the

 8    R&D.

 9              MR. FREEDMAN:  And, Ms. Vela, can you please bring us

10    to Page 28.

11    BY MR. FREEDMAN:

12    Q.  Dr. Wright, is that your signature on the bottom?

13    A.  Again, it doesn't actually look like my signature.

14              MR. FREEDMAN:  Plaintiffs offer P315 into evidence.

15              MS. MCGOVERN:  Relevance, foundation, hearsay, Your

16    Honor.

17              THE COURT:  The objection is noted.  It's overruled.

18              Admitted into evidence.

19         (Plaintiffs' Exhibit 315 received into evidence.)

20              MR. FREEDMAN:  Ms. Vela, can you please bring up P337.

21    BY MR. FREEDMAN:

22    Q.  Dr. Wright, you recognize this as an email from Stefan

23    Matthews with his DeMorgan email group to Ramona Watts of

24    DeMorgan attaching meeting minutes?

25    A.  No, I don't.
```

1          MR. FREEDMAN:  Ms. Vela, can you please bring us to

2     Page 9.

3     BY MR. FREEDMAN:

4     Q.  Dr. Wright, is that your signature on the bottom left

5     corner signed and sealed by Panopticrypt?

6     A.  That doesn't look remotely like my signature.

7     Q.  See your signature up above that, Misfit Games PTY, Ltd?

8     A.  No, I don't, actually.  It doesn't have Craig S. Wright.

9     It's Craig V., with a C at the end, and that's --

10    Q.  And your wife's signature across the right-hand side of the

11    document?

12    A.  Doesn't look that much like hers, to tell you the truth,

13    either.

14          MR. FREEDMAN:  Your Honor, Plaintiffs offer P337 into

15    evidence.

16          MS. MCGOVERN:  Foundation, relevance, hearsay, Your

17    Honor.

18          THE COURT:  It's noted.  Overruled.

19          Admitted into evidence.

20       (Plaintiffs' Exhibit 337 received into evidence.)

21          MR. FREEDMAN:  Ms. Vela, can you please bring up P398.

22    BY MR. FREEDMAN:

23    Q.  Dr. Wright, you recognize this as an agreement between

24    yourself and nCrypt to control various intellectual property?

25          MR. FREEDMAN:  Ms. Vela, can you show Dr. Wright his

125

```
 1    signature on Page 3.

 2    BY MR. FREEDMAN:

 3    Q.  Is that your signature, Dr. Wright?

 4    A.  No.  That one's not.

 5    Q.  And Mr. Pederson's signature right below that as a witness?

 6    A.  No.  I don't recognize it.  Sorry.

 7    Q.  And it's signed for nCrypt, Limited, the company that

 8    bought the intellectual property?

 9    A.  Don't know an M. Farnworth.

10         MR. FREEDMAN:  Your Honor, Plaintiffs offer P398 into

11    evidence.

12         MS. MCGOVERN:  Objection, Your Honor.  Hearsay,

13    foundation, relevance.

14         THE COURT:  The objection is noted.  It's overruled.

15         Admitted into evidence, 398.

16     (Defendants' Exhibit 398 received into evidence.)

17         MR. FREEDMAN:  Ms. Vela, can you please bring up P058.

18    BY MR. FREEDMAN:

19    Q.  Dr. Wright, I'm now switching to emails that you have sent,

20    just so you know where I'm going.

21         MR. FREEDMAN:  P058, Ms. Vela.

22         THE COURT:  P58?

23         MR. FREEDMAN:  P059.  Sorry.  I completely misstated

24    that.  But P059.

25
```

```
 1   BY MR. FREEDMAN:

 2   Q.  Dr. Wright, do you see this is an email from yourself to

 3   John Chesher and Ramona Watts?

 4   A.  It looks like one of them.  I don't recall it fully, but

 5   it's my email address.

 6   Q.  And it appears to be forwarding email messages from Dave

 7   Kleiman?

 8   A.  Yes.  This was a conversation about my divorce.

 9          MR. FREEDMAN:  Plaintiffs offer P059 into evidence.

10          MS. MCGOVERN:  No objection, Your Honor.

11          THE COURT:  Admitted into evidence.

12      (Plaintiffs' Exhibit 059 received into evidence.)

13   BY MR. FREEDMAN:

14   Q.  Dr. Wright, are these legitimate messages between yourself

15   and Dave Kleiman?

16          MS. MCGOVERN:  Objection, Your Honor.

17          THE COURT:  The basis?

18          MS. MCGOVERN:  403, Your Honor, referring to

19   legitimate emails between the two of them.

20          THE COURT:  Do you understand the question, sir?

21          THE WITNESS:  I do understand it.

22          THE COURT:  The objection is overruled.

23          THE WITNESS:  I don't know.  I know I had a

24   conversation about my divorce with Dave.  I can't remember all

25   the details.
```

127

```
 1              MR. FREEDMAN:  Thank you, Ms. Vela.

 2              Can you please bring up P134.

 3     BY MR. FREEDMAN:

 4     Q.  Dr. Wright, do you recognize this as an email from yourself

 5     to Ira Kleiman forwarding emails that purport to be from his

 6     deceased brother Dave Kleiman?

 7     A.   I remember I sent the Integyrs and Information Defense

 8     filings to say what I was doing to Dave because I wanted him to

 9     be part of one of my companies.  He didn't ever accept.  But I

10     mean, I don't remember the actual sending, but I know I did

11     send stuff to him.

12              MR. FREEDMAN:  Your Honor, Plaintiffs offer P134 into

13     evidence.

14              MS. MCGOVERN:  No objection, Your Honor.

15              THE COURT:  Admitted into evidence.

16        (Defendants' Exhibit 134 received into evidence.)

17     BY MR. FREEDMAN:

18     Q.  Dr. Wright, is this a legitimate email between you and Dave

19     Kleiman?

20     A.   I know I forwarded emails to Dave.  That's all I can say.

21              MR. FREEDMAN:  Ms. Vela, can you please bring up P140.

22     BY MR. FREEDMAN:

23     Q.  Dr. Wright, do you recognize this as an email between

24     yourself, Andrew Sommer -- from your lawyer in Australia -- and

25     Ramona Watts, your wife, and do you see that W&K is mentioned
```

1    in this email, Dr. Wright?

2    A.  Yes, I see this.

3         MR. FREEDMAN:  Your Honor, Plaintiffs offer P140 into

4    evidence.

5         MS. MCGOVERN:  No objection.

6         THE COURT:  Admitted into evidence.

7    (Plaintiffs' Exhibit 140 received into evidence.)

8         MR. FREEDMAN:  Ms. Vela, can you please bring up P142.

9    BY MR. FREEDMAN:

10   Q.  Dr. Wright, do you recognize this as an email between

11   yourself, John Chesher, Ramona Watts and Andrew Sommer where

12   W&K is mentioned in the top of the email?

13   A.  I see.

14        MR. FREEDMAN:  Your Honor, Plaintiffs offer P142 into

15   evidence.

16        MS. MCGOVERN:  No objection.

17        THE COURT:  Admitted into evidence.

18   (Plaintiffs' Exhibit 142 received into evidence.)

19        MR. FREEDMAN:  Ms. Vela, can you please bring up P209.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, do you recognize this as an email from yourself

22   to Andrew Sommer and his response?  Do you see it's talking

23   about DeMorgan, Limited and Bitcoin?

24   A.  Yes.  I see communications with the company lawyer about

25   structuring.

1          MR. FREEDMAN:  Your Honor, Plaintiffs offer P209 into

2   evidence.

3          MS. MCGOVERN:  No objection.

4          THE COURT:  Admitted into evidence.

5       (Plaintiffs' Exhibit 209 received into evidence.)

6          MR. FREEDMAN:  Ms. Vela, can you please bring up P210.

7   BY MR. FREEDMAN:

8   Q.  Dr. Wright, do you recognize this as an email from Stefan

9   Matthews, including a conversation, a Skype transcript clip --

10  I'm in the subject of the email -- between you and

11  Mr. Matthews?

12  A.  It says it's a Skype -- I mean, I don't recognize it as

13  that, but I could have sent those things.  I do.  And Stefan

14  could have as well.

15         MR. FREEDMAN:  Your Honor, Plaintiffs offer P210 into

16  evidence.

17         MS. MCGOVERN:  Objection, Your Honor.  Hearsay,

18  foundation, relevance.

19         THE COURT:  The objection is sustained at this point.

20         Let's lay the necessary foundation.

21  BY MR. FREEDMAN:

22  Q.  Dr. Wright, do you see the email at the top is an email

23  from Calvin Ayre to you forwarding on the transcript?

24  A.  I see that he cc'd me.

25  Q.  And the transcript below from Skype is -- I believe you

```
1    just testified, is things that you could have said but you do

2    not recall?

3    A.  That's correct.

4          MR. FREEDMAN:  Your Honor, Plaintiffs offer P210 into

5    evidence.

6          THE COURT:  All right.

7          MS. MCGOVERN:  Same objection, Your Honor.

8          THE COURT:  The objection is overruled.

9          It will be admitted into evidence.

10   (Plaintiffs' Exhibit 210 received into evidence.)

11         MR. FREEDMAN:  Ms. Vela, can you please bring up P211.

12   BY MR. FREEDMAN:

13   Q.  Dr. Wright, do you recognize this as an email from yourself

14   providing keys -- sorry.

15       Do you recognize this as an email from yourself providing

16   Bitcoin-related things to Mr. Matthews and others?

17   A.  No.  No, I don't, as that -- what you just said is not

18   correct.

19   Q.  Dr. Wright, do you see the second line where Bitcoin is

20   referenced?

21   A.  I see the second line, yes.

22   Q.  Do you see the third line where you talk about Bitcoin

23   wallets?

24   A.  I see the second line there and the third line.

25   Q.  And the third line you talk about wallet and keys?
```

```
1   A.  I see all of that.

2            MR. FREEDMAN:  Your Honor, Plaintiffs offer P211 into

3   evidence.

4            MS. MCGOVERN:  Objection, Your Honor.  Hearsay,

5   relevance, foundation.

6            THE COURT:  I think you need to ask the question again

7   with regard to the document, whether it's recognized.

8   BY MR. FREEDMAN:

9   Q.  Dr. Wright, you had an email address craig@rcjbr.org?

10  A.  I did.

11  Q.  And you sent this email?

12  A.  Well, no, I received that email from Calvin.

13  Q.  Talking about the one that's highlighted.  You sent that --

14  A.  I sent an email.  Let's see.  I was trying to negotiate

15  with Calvin Ayre to basically put money into the company and

16  give me a loan where Bitcoin would back it up.  Unfortunately,

17  that never went through.  So I remember those negotiations.

18           MR. FREEDMAN:  Your Honor, Plaintiffs offer P211 into

19  evidence.

20           THE COURT:  The objection is overruled.

21           It will be admitted into evidence.

22     (Plaintiffs' Exhibit 211 received into evidence.)

23           MR. FREEDMAN:  And, Ms. Vela, can you please bring up

24  P213.

25
```

1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, this is an email from yourself to Mr. Matthews.

3    You're talking about a paper Bitcoin wallet.  Do you see that?

4    A.  No.  It's an email from myself to Calvin Ayre and cc'd to

5    the others.

6    Q.  That is correct, Dr. Wright.  As well as to your wife,

7    correct?

8    A.  Yes.

9            MR. FREEDMAN:  Your Honor, Plaintiffs offer P213 into

10   evidence.

11           MS. MCGOVERN:  Objection, Your Honor.  Foundation and

12   relevance.

13           THE COURT:  Overruled.  Admitted into evidence.

14       (Plaintiffs' Exhibit 213 received into evidence.)

15           MR. FREEDMAN:  Ms. Vela, can you please bring up P214.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, do you recognize this as an email from yourself

18   to Mr. Matthews, Ramona Watts, Andrew Sommer, and some others

19   and in it you discuss a paper wallet?

20   A.  Yes.

21           MR. FREEDMAN:  Your Honor, Plaintiffs offer P214 into

22   evidence.

23           MS. MCGOVERN:  No objection.

24           THE COURT:  Admitted into evidence.

25       (Plaintiffs' Exhibit 214 received into evidence.)

```
 1              MR. FREEDMAN:  Ms. Vela, can you please bring up P215.
 2    BY MR. FREEDMAN:
 3    Q.  Dr. Wright, do you recognize this as an email from yourself
 4    to a few individuals, including Stefan Matthews and Andrew
 5    Sommer?
 6    A.  Yes.
 7    Q.  And in it you mention Bitcoin and your history?
 8    A.  Yes.
 9              MR. FREEDMAN:  Your Honor, Plaintiffs offer P215 into
10    evidence.
11              MS. MCGOVERN:  No objection.
12              THE COURT:  Admitted into evidence.
13        (Plaintiffs' Exhibit 215 received into evidence.)
14              MR. FREEDMAN:  Ms. Vela, can you please put up P219.
15              Your Honor, I'm happy to keep going through these, but
16    if Ms. McGovern will withdraw objections we might be able to
17    get through it a lot quicker.
18              MS. MCGOVERN:  I'd like you to lay the foundation, as
19    I explained earlier, Vel.
20              THE COURT:  All right.  Let's continue.
21    BY MR. FREEDMAN:
22    Q.  All right.  Dr. Wright, do you recognize this as an email
23    between yourself and Mr. Ayre attaching documents prepared by
24    yourself?
25    A.  Yes.  I recognize this as a negotiation that I was having
```

1    with both Calvin and Robert MacGregor.

2    Q.  Over intellectual property?

3    A.  No.  It was actually over a loan.  Calvin was willing to

4    put a loan into the company and potentially come in as an

5    investor.  This is part of why I needed the $12 million to pay

6    out Ira.  Calvin doesn't like other people in companies that he

7    can't -- he doesn't know.  And the deal was he would give me

8    money into the companies, keep them floating, keep them alive.

9    I had to put up Bitcoin as collateral, number one, which I was

10   going to do.  And number two, I had to get rid of Ira.  Those

11   were the two conditions.

12          MR. FREEDMAN:  Your Honor, Plaintiffs offer P219 into

13   evidence.

14          MS. MCGOVERN:  No objection.

15          THE COURT:  Admitted into evidence.

16      (Plaintiffs' Exhibit 219 received into evidence.)

17          MR. FREEDMAN:  Ms. Vela, can you please put up P223.

18   BY MR. FREEDMAN:

19   Q.  Dr. Wright, do you recall the Australian Taxation Office

20   transcripts that we looked at earlier in the case?

21   A.  Again, they weren't transcripts.  They were things that

22   were erroneous, that I kept saying were erroneous.

23   Q.  And do you recognize this as an email between yourself and

24   your wife, Ms. Watts, about those transcripts?

25   A.  Yes, where I was talking about one of the many areas they

1    get wrong.  I have this habit that my wife hates.  Rather than

2    put everything in one email, I document everything line by

3    line, and she really doesn't like it, because I'll do a hundred

4    different points instead of one email structured.  I will send

5    her a hundred emails and she usually goes berserk.

6            MR. FREEDMAN:  Your Honor, Plaintiffs offer P223 into

7    evidence.

8            MS. MCGOVERN:  No objection.

9            THE COURT:  Admitted into evidence.

10       (Plaintiffs' Exhibit 223 received into evidence.)

11           MR. FREEDMAN:  Can we publish this one to the jury,

12   please.

13   BY MR. FREEDMAN:

14   Q.  Dr. Wright, on the bottom we have an email from yourself --

15   from Andrew Miller of the Australian Taxation Office to John

16   Chesher, your CFO.  He says:  "Could you please review these

17   and advise of any errors or omissions.  If you are satisfied

18   that the minutes are an accurate reflection of the discussion,

19   please advise."

20       Dr. Wright, you respond to Ms. Watts in June of 2015 and

21   you say, page 10 of the 11-page document:  "The term 'cords' is

22   used.  This is 'cores.'"

23       Do you see that?

24   A.  Yes.  Like I just said, I responded to her multiple times.

25   I went into her office multiple times and said:  "This sucks."

136

1    I went back, and I won't say what I said because then I would

2    have to swear and that would not be good.  But I swore a lot

3    about it.  I walked back and forwards.  Then I threw the

4    document down and said:  "It's a piece of you know what."  And

5    then I had my lawyer write back directly to the ATO and said:

6    "None of these are accepted."

7    Q.  Except the only correction you made is cords to cores,

8    correct?

9              MS. MCGOVERN:  Objection.  Asked and answered.

10             THE COURT:  Overruled.

11             THE WITNESS:  No.  As I said, I went back and forwards

12   many times.  I have this habit -- this is why there's all these

13   little emails -- of being annoying in that I notice something

14   and I send an email.  And I mean, I do this to my lawyers too

15   and they pull me up on it.  Everyone pulls up on me.  Because

16   when I get annoyed, I have this habit of every single little

17   thing, rather than structuring in a nice big structured

18   document -- so what I'm trying to work on these days is I don't

19   send them directly.  I'll get my EA Brigy to get a big pile of

20   stuff and collate them.

21             But at this stage, no.  Every single one I did, every

22   single page, I would basically run in there and go:  This is

23   bleep," expletive, and then I'd run back and go a little bit

24   more and run back out and go:  "This is bleep," expletive.  And

25   yeah.  So no, this isn't the only one.

```
 1              MR. FREEDMAN:  Thank you, Ms. Vela.

 2              Can you put up P224.

 3   BY MR. FREEDMAN:

 4   Q.  Dr. Wright, do you recognize this as an email from yourself

 5   to Ms. Watts and Stefan Matthews and in it you reference

 6   software and the Australian Taxation Office?  There's also a

 7   reference to W&K in it.

 8   A.  Yes, talking about the software transfer.  Yep.

 9              MR. FREEDMAN:  Your Honor, Plaintiffs offer P224 into

10   evidence.

11              MS. MCGOVERN:  No objection.

12              THE COURT:  Admitted into evidence.

13        (Plaintiffs' Exhibit 224 received into evidence.)

14              MR. FREEDMAN:  Ms. Vela, can you please put up P274.

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, do you recognize this as an email from yourself

17   to Alan Pederson attaching the W&K Whitepaper?

18              MR. FREEDMAN:  Ms. Vela, can you show --

19              MS. MCGOVERN:  Objection.  Objection, Your Honor.

20   Misstates the document.

21              THE COURT:  Sustained.  Rephrase.

22              MR. FREEDMAN:  Ms. Vela, can you please show Dr.

23   Wright the first page of the attachment.

24   BY MR. FREEDMAN:

25   Q.  And, Dr. Wright, do you see where it says:  "Company name"
```

```
1    and lists W&K?

2    A.  Yes, I do.

3    Q.  In the top left it says:  "Whitepaper"?

4    A.  Yes.

5         MR. FREEDMAN:  Your Honor, Plaintiffs offer P274 into

6    evidence.

7         MS. MCGOVERN:  No objection.

8         THE COURT:  Admitted into evidence.

9    (Plaintiffs' Exhibit 274 received into evidence.)

10        MR. FREEDMAN:  Ms. Vela, can you please put up P313.

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, do you recognize this as an email from yourself

13   talking about the hard drive and them being wiped?

14   A.  This was to do with some hard dives being wiped, but it's

15   not all the hard dives being wiped.

16        MR. FREEDMAN:  Your Honor, Plaintiffs offer P313 into

17   evidence.

18        MS. MCGOVERN:  No objection.

19        THE COURT:  Admitted into evidence.

20   (Plaintiffs' Exhibit 313 received into evidence.)

21        MR. FREEDMAN:  Could we please publish this to the

22   jury.

23   BY MR. FREEDMAN:

24   Q.  Dr. Wright, do you see you email -- it says:  "Things that

25   help prove my involvement in Bitcoin to at least 2009."
```

```
1        Do you see that?

2   A.   I do.

3   Q.   Can you please read for the jury the email that your email

4   came from.

5   A.   Craig@ncrypt.com.

6   Q.   Thank you.

7        MR. FREEDMAN:  Ms. Vela, can you please put up P326.

8   BY MR. FREEDMAN:

9   Q.   Dr. Wright, do you recognize this as an email from yourself

10  surrounding the circumstances of the 2016 PR event?

11  A.   Again, no, I don't, and no, it doesn't help the other one.

12  You're saying nCrypt Craig, but that doesn't mean me.  I'm

13  sorry.  On one machine and a different machine, they can have

14  the same thing there differently.

15       That's a forwarded email and, no, the other one's not.

16  And -- let's see.

17  Q.   Dr. Wright, do you see numerous references to Satoshi

18  Nakamoto?

19  A.   I see some, yes.

20       MR. FREEDMAN:  Your Honor, Plaintiffs offer P326 into

21  evidence.

22       MS. MCGOVERN:  Objection, Your Honor.  Foundation,

23  hearsay, relevance.

24       THE COURT:  I'm sorry.  The basis?

25       MS. MCGOVERN:  Foundation, hearsay, relevance, Your
```

140

```
 1    Honor.

 2              THE COURT:  Overruled.

 3              326 admitted into evidence.

 4         (Plaintiffs' Exhibit 326 received into evidence.)

 5              MR. FREEDMAN:  Ms. Vela, can you please bring up P578.

 6    BY MR. FREEDMAN:

 7    Q.  Dr. Wright, do you recognize this as an email from yourself

 8    to Ira Kleiman?

 9    A.  It looks like it, yes.

10    Q.  And you were purportedly forwarding email communications

11    from his deceased brother, Dave Kleiman?

12    A.  I was forwarding emails that I had while he was alive.

13              MR. FREEDMAN:  Your Honor, Plaintiffs offer P578 into

14    evidence.

15              MS. MCGOVERN:  No objection, Your Honor.

16              THE COURT:  Admitted into evidence.

17         (Plaintiffs' Exhibit 578 received into evidence.)

18              MR. FREEDMAN:  Ms. Vela, can you please put up P598.

19    BY MR. FREEDMAN:

20    Q.  And, Dr. Wright, the top email there, do you recognize this

21    as an email from yourself to Mark Italia of the ATO?

22    A.  That looks familiar, I believe.  I can't remember all the

23    names, but Michael Hardy was definitely one of the ones I

24    emailed.

25              MR. FREEDMAN:  Your Honor, Plaintiffs offer P598 into
```

```
 1    evidence.
 2              MS. MCGOVERN:  Objection, Your Honor.  Relevance.
 3              THE COURT:  Overruled.  Admitted into evidence.
 4         (Plaintiffs' Exhibit 598 received into evidence.)
 5              MR. FREEDMAN:  Can we please publish this to the jury.
 6    BY MR. FREEDMAN:
 7    Q.  Dr. Wright, in this email to the Australian Taxation Office
 8    you tell them that you're funding -- your group controls 5
 9    percent of the global Bitcoin market?
10    A.  Yes.  I said that.
11    Q.  Thank you.
12              MR. FREEDMAN:  Ms. Vela, can you please bring up P664.
13    BY MR. FREEDMAN:
14    Q.  Dr. Wright, do you recognize this as an email from yourself
15    to your CFO and your lawyer attaching Dave Kleiman's public
16    keys?
17    A.  I can't see Dave's public keys on there, but it looks like
18    an email I sent.
19              MR. FREEDMAN:  Your Honor, Plaintiffs offer P664 into
20    evidence.
21              MS. MCGOVERN:  No objection, Your Honor.
22              THE COURT:  Admitted into evidence.
23         (Plaintiffs' Exhibit 664 received into evidence.)
24              MR. FREEDMAN:  Ms. Vela, can you please bring up P695.
25
```

```
 1   BY MR. FREEDMAN:

 2   Q.  Dr. Wright, do you recognize this as an email from yourself

 3   to Ms. Watts and Stefan Matthews talking about Patrick Paige

 4   and Dave Kleiman?

 5   A.  The exchange header means it would have been one of the

 6   ones I had my EA send, but I would have been the one who asked

 7   her to send it, as in dictated it.

 8        MR. FREEDMAN:  Your Honor, Plaintiffs offer P695 into

 9   evidence.

10        MS. MCGOVERN:  No objection.

11        THE COURT:  Admitted into evidence.

12     (Plaintiffs' Exhibit 695 received into evidence.)

13        MR. FREEDMAN:  Can we please publish -- no.  Never

14   mind.

15        Ms. Vela, can we show P707 to the witness and counsel.

16   BY MR. FREEDMAN:

17   Q.  Dr. Wright, do you recognize this as an email from yourself

18   to Ms. Watts attaching ATO responses?

19   A.  I can't see the responses.  Sorry.

20   Q.  And do you see where it says:  "Kleiman cost model"?

21   A.  I can see that term, but I can't see any of the

22   attachments.

23        MR. FREEDMAN:  Your Honor, Plaintiffs offer P707 into

24   evidence.

25        MS. MCGOVERN:  Objection, Your Honor.  Relevance,
```

1    hearsay.

2              THE COURT:  Is it just the one page?

3              MR. FREEDMAN:  It is not, Your Honor.

4    BY MR. FREEDMAN:

5    Q.  You have seen this document before, right, Dr. Wright?

6    A.  (No verbal response.)

7              MR. FREEDMAN:  Your Honor, because the top email is an

8    email from Dr. Wright --

9              MS. MCGOVERN:  I'm sorry.  I can't hear you.

10             THE COURT:  You're seeking to admit the exhibit, but

11   the exhibit has an attachment.  So let's lay the foundation,

12   please.

13             MR. FREEDMAN:  The attachment was attached to -- Ms.

14   Vela, can you please go to the first page, please.

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, this is your email to Ms. Watts and you

17   attached all these documents?

18   A.  I don't know.  I can't actually see the email address.

19             MR. FREEDMAN:  Ms. Vela, let's go through the

20   attachments.

21             You know what?  We'll try once.

22             Your Honor, Plaintiffs offer as an adoptive admission

23   P707.

24             MS. MCGOVERN:  Objection, Your Honor.  Foundation,

25   hearsay.

1           THE COURT:  Is it with regard to the email and the

2    attachment?  Are you seeking to introduce the entire document?

3           MR. FREEDMAN:  Yes, Your Honor.

4       (Pause in proceedings.)

5           THE COURT:  Go back, please.

6           MR. FREEDMAN:  Can you go back to the first page, Ms.

7    Vela.

8       (Pause in proceedings.)

9           THE COURT:  And the objection is on grounds of

10   relevance?

11          MS. MCGOVERN:  Foundation, relevance, hearsay, Your

12   Honor.

13          THE COURT:  Dr. Wright, do you recognize the first

14   exhibit as an email that you sent?

15          THE WITNESS:  I don't, but there was a corporate CEO

16   account.  So unless I see the document, I can't say whether it

17   would have been that.

18          THE COURT:  Is there any other reference to the actual

19   email address in this document?

20          MR. FREEDMAN:  Can you bring up the native?

21          Give us one minute, Your Honor.  We can bring up the

22   native.

23          THE COURT:  Certainly.

24       (Pause in proceedings.)

25          MR. FREEDMAN:  We're waiting for the Internet to pull

145

1    that up.  In the meantime, we'll continue making progress, Your

2    Honor, if that's okay.

3            THE COURT:  All right.

4            MR. FREEDMAN:  We'll come back to P707.

5            Ms. Vela, can you please bring up P055.

6    BY MR. FREEDMAN:

7    Q.  Dr. Wright, do you recognize this as a purported email

8    between yourself and Dave Kleiman?

9    A.  It's his email address and some of the words look familiar.

10           MR. FREEDMAN:  Your Honor, Plaintiffs offer P055 into

11   evidence.

12           MS. MCGOVERN:  No objection.

13           THE COURT:  Admitted into evidence.

14       (Plaintiffs' Exhibit 055 received into evidence.)

15   BY MR. FREEDMAN:

16   Q.  Dr. Wright, is this a legitimate email from Dave Kleiman?

17   A.  No idea.

18   Q.  Did you forge this email from Dave Kleiman?

19   A.  Did not.

20           MR. FREEDMAN:  Ms. Vela, can you please bring up P135.

21   BY MR. FREEDMAN:

22   Q.  Dr. Wright, do you recognize this as a purported email

23   between Dave Kleiman and yourself?

24   A.  I know we had an email "Bond Villains," but I don't

25   remember the text in this one.  It doesn't look right.

```
1              MR. FREEDMAN:  Your Honor, Plaintiffs offer --
2    BY MR. FREEDMAN:
3    Q.  Did you see the Bates label on the bottom, Dr. Wright,
4    saying that it was produced by your side?
5    A.  Yes, but as I've stated, produced by my side is over 30
6    staff computers, several servers, material received from third
7    parties, none of which I've reviewed.  So ...
8    Q.  So the emails between yourself and Dave Kleiman that you
9    were most concerned when you found out had been leaked was
10   something 30 staff members had access to?
11             MS. MCGOVERN:  Objection, Your Honor.  I'm also having
12   a difficult time hearing him.  Sorry.
13             THE COURT:  Overruled.
14             THE WITNESS:  Potentially, yes.  We had an IT team and
15   the IT team ran the exchange servers.  So I had a CTO -- a CIO,
16   which is a chief technology officer -- chief information
17   officer.  There were -- I had an exchange server, a Windows
18   domain administrator, and a database administrator, all of
19   which had administrative privileges.
20             The exchange administrator had two people who worked
21   for him, all of whom had full email access.  Like most
22   corporations, on top of that, we had general network IT people.
23   I'm really embarrassed, but I don't even remember their names.
24   So yes.
25             MR. FREEDMAN:  Your Honor, Plaintiffs offer P135 into
```

```
1    evidence.
2              MS. MCGOVERN:  Objection, Your Honor.  Foundation.
3    Hearsay.
4              THE COURT:  The objection is overruled.
5              Admitted into evidence.
6         (Plaintiffs' Exhibit 135 received into evidence.)
7    BY MR. FREEDMAN:
8    Q.  Dr. Wright, is this a legitimate email from Dave Kleiman?
9    A.  Actually don't recognize it.
10   Q.  Did you forge this email from Dave Kleiman?
11   A.  The thing is I don't recognize it.  Then no.
12             MR. FREEDMAN:  Ms. Vela, can you please put up P514.
13   BY MR. FREEDMAN:
14   Q.  Dr. Wright, do you recognize this as a purported email from
15   Dave Kleiman to yourself?
16   A.  Yep, that looks about right.
17             MR. FREEDMAN:  Your Honor, Plaintiffs offer P514 into
18   evidence.
19             MS. MCGOVERN:  No objection, Your Honor.
20             THE COURT:  Admitted into evidence.
21        (Plaintiffs' Exhibit 514 received into evidence.)
22   BY MR. FREEDMAN:
23   Q.  Dr. Wright, is this a legitimate email from Dave Kleiman?
24   A.  I couldn't actually say.  I don't know where you -- which
25   machine you got it from, so I don't know.
```

```
1   Q.  Did you forge this email from Dave Kleiman?

2   A.  No.  The trust documentation actually goes back to the

3   court case in Australia.  So no, Dave was actually alive during

4   the start of all this.

5            MR. FREEDMAN:  Ms. Vela, can you please put up P538.

6   BY MR. FREEDMAN:

7   Q.  Dr. Wright, do you recognize this as a purported email

8   between yourself and Dave Kleiman?

9   A.  Looks familiar.  I can't say more than that.

10           MR. FREEDMAN:  Your Honor, Plaintiffs offer P538 into

11  evidence.

12           MS. MCGOVERN:  No objection.

13           THE COURT:  Admitted into evidence.

14      (Plaintiffs' Exhibit 538 received into evidence.)

15  BY MR. FREEDMAN:

16  Q.  Dr. Wright, did you forge this email from Dave Kleiman?

17  A.  I have not forged any emails.

18  Q.  Is that a no?

19  A.  I have not forged any emails.

20  Q.  Did you forge this document the jury's looking at on their

21  screen now that purported --

22           MS. MCGOVERN:  Objection, Your Honor.  Asked and

23  answered.

24           THE COURT:  Overruled.

25           Did you hear the question, sir?
```

```
 1              THE WITNESS:  I did.

 2              THE COURT:  All right.

 3              THE WITNESS:  I have not forged any emails, including

 4     this one.

 5              MR. FREEDMAN:  Ms. Vela, can you please bring up P540.

 6     BY MR. FREEDMAN:

 7     Q.  Is this a purported email between yourself and Dave

 8     Kleiman, Dr. Wright?

 9     A.  There's some problems with this email.  So I had

10     communications with Dave around that time, but there's

11     something funky in the middle of that text.

12              MR. FREEDMAN:  Your Honor, Plaintiffs offer P540 into

13     evidence.

14              MS. MCGOVERN:  Objection, Your Honor.  Foundation,

15     hearsay.

16              THE COURT:  Overruled.  Admitted into evidence.

17       (Plaintiffs' Exhibit 540 received into evidence.)

18     BY MR. FREEDMAN:

19     Q.  Dr. Wright, did you forge this email to Dave Kleiman?

20     A.  As I've already stated, I have not forged any emails.

21              MR. FREEDMAN:  Ms. Vela, can you please --

22     BY MR. FREEDMAN:

23     Q.  Dr. Wright, I asked this email.  Did you forge this email

24     to Dave Kleiman?

25     A.  The definition of any would include any, all, everything.
```

```
 1    Q.  So --
 2    A.  Any existing email in existence ever.
 3    Q.  Maybe we're having a miscommunication.  Did you forge this
 4    email?  Yes or no.
 5            MS. MCGOVERN:  Objection.  Asked and answered.
 6            THE COURT:  "Did you forge," is that the question?
 7            MR. FREEDMAN:  This email, yes or no.
 8            THE WITNESS:  As I stated, I have never forged an
 9    email, any email.
10            THE COURT:  Does it include this email, sir?  Could
11    you answer the question, please.
12            THE WITNESS:  Including this email.  I have never
13    forged an email.
14            MR. FREEDMAN:  Thank you, Your Honor.
15            Ms. Vela, please put up P630.
16    BY MR. FREEDMAN:
17    Q.  Dr. Wright, do you recognize this as an email from yourself
18    to Ira Kleiman?
19    A.  Yes.  It looks like something I forwarded.
20    Q.  Purporting to be forwarding an email that's PGP key signed
21    by Dave Kleiman?
22    A.  Can't say whether it's purporting to be anything.  You have
23    to check PGP by other means.
24            MR. FREEDMAN:  Your Honor, Plaintiffs offer P630 into
25    evidence.
```

151

```
 1              MS. MCGOVERN:  No objection, Your Honor.

 2              THE COURT:  Admitted into evidence.

 3         (Plaintiffs' Exhibit 630 received into evidence.)

 4    BY MR. FREEDMAN:

 5    Q.  Dr. Wright, did you forge this email?

 6    A.  I have not forged any email, including this one, ever.

 7              MR. FREEDMAN:  Ms. Vela, could you please put up P797.

 8    BY MR. FREEDMAN:

 9    Q.  Do you recognize this, Dr. Wright, as a purported email

10    between Dave Kleiman and Uyen Nguyen?

11    A.  I don't.  I'm not involved.

12    Q.  Dr. Wright, your lawyers attached this document to a motion

13    in front of the Court --

14              MS. MCGOVERN:  Objection, Your Honor.  Foundation,

15    predicate.

16              THE COURT:  Sustained.

17              MR. FREEDMAN:  Ms. Vela, please take that down for

18    now.

19              Can we put up P799, please.

20    BY MR. FREEDMAN:

21    Q.  Dr. Wright, do you recognize this as a purported email

22    between yourself and Dave Kleiman?

23    A.  Not at all.  There's no recipient or other details.  So it

24    doesn't look like.

25    Q.  Do you see it says:  "To Craig Wright," it's signed:
```

1    "Dave" at the bottom?

2    A.  Hmm.  It's missing information, though.

3    Q.  Is that because it's a draft, Dr. Wright?

4    A.  Even a draft would have time stamps.  So I'm not sure

5    what's wrong with that one.

6        (Pause in proceedings.)

7    BY MR. FREEDMAN:

8    Q.  Do you see on the second page, Dr. Wright, there appears to

9    be a PGP key from Dave Kleiman signing the message?

10   A.  That's not correct.

11   Q.  Do you see:  "Begin PGP signature, end PGP signature"?

12   A.  That is potentially a PGP signature field.  It's not a key.

13   Q.  Okay.  Do you recognize it as being a PGP signature

14   purporting to be from Dave Kleiman?

15   A.  No.  The only way to validate that would be running it

16   through a computer program.  You can't do that by looking at

17   it.

18       MR. FREEDMAN:  Your Honor, Plaintiffs offer P799 into

19   evidence.

20       MS. MCGOVERN:  Objection, Your Honor.  Foundation,

21   hearsay, authenticity.

22       THE COURT:  With regard to the foundation, sustained.

23       MR. FREEDMAN:  Your Honor, may we approach for a

24   minute?

25       THE COURT:  You can attempt to lay the foundation,

1   Mr. Freedman.  There's no reason to approach.

2   BY MR. FREEDMAN:

3   Q.  Dr. Wright, do you recognize the craig@rcjbr email address

4   that's on the top of the email chain?

5   A.  As I stated, I recognize that it's saying to my address,

6   but I don't recognize this as an email to me.  This is --

7   there's something -- it's incomplete.

8   Q.  It is incomplete.  Subject is incomplete, correct?

9   A.  I don't know about the subject.  The subject says:  "D."

10  You can't say whether that's incomplete or not.  A single

11  letter could be a subject.  Nothing could be a subject.

12  Q.  And despite it being incomplete, it purports to have a

13  signed message from Dave Kleiman with PGP, correct?

14        MS. MCGOVERN:  Objection, Your Honor.  Asked and

15  answered.  Argumentative.

16        THE COURT:  Sustained.

17  BY MR. FREEDMAN:

18  Q.  And on the bottom you see a Bates label.  That means it was

19  produced from the machines that you collected it from, correct?

20  A.  No.  As I said, my lawyers were handed over everything from

21  the companies.  That included material from people in Australia

22  that worked for the companies.  It included material held

23  overseas.  It included something like 60 boxes that had been

24  sealed, and that I've never seen the contents of.

25        MR. FREEDMAN:  Plaintiffs offer P799 into evidence.

1          MS. MCGOVERN:  Objection.  Your Honor, there's no

2     foundation, authenticity, or indicia of reliability of this

3     document, and he stated that several times.

4          THE COURT:  Mr. Freedman, is that Dr. Wright's email

5     address?  Is there anything to show that that in fact was an

6     email that was sent from his email address?

7          MR. FREEDMAN:  Your Honor, it's a draft of an email

8     that eventually gets sent, and it's the beginning --

9          THE COURT:  All right.  Do you want to focus on the

10    one that was actually sent?

11         MR. FREEDMAN:  We need the draft, Your Honor, to show

12    the progress of what eventually became the final email that got

13    sent.

14         THE COURT:  And is the final the same email address?

15         MR. FREEDMAN:  Very similar.

16         Ms. Vela, could you please bring up P --

17         MS. MCGOVERN:  Your Honor, if I could just make a

18    statement, though.  There's no "To/From."  There's nothing in

19    the header that even suggests where this came from.  So with

20    respect to the email address, I'd simply like to note for the

21    record, there's no "From" even in the title.

22         THE COURT:  Agreed.  Sustained.

23         MR. FREEDMAN:  Ms. Vela, can you please bring up P630

24    next to it.

25         Your Honor, what indicates where it came from is the

155

1    Bates label on the bottom.

2    BY MR. FREEDMAN:

3    Q.   The one on the top, Dr. Wright, P630, is in evidence and it

4    is an email from yourself to Ira Kleiman.   The subject is:

5    "Designed by."The one on the left is the draft of that email.

6    Isn't that true, Dr. Wright?

7    A.   No, because that wouldn't have:   "Designed by" and they're

8    different email systems.   Completely different.   The RCJBR is a

9    Google Gmail account.   The other one is a hosted exchange

10   server account.   The names are different.   If you look at it,

11   "Craig Wright," "Craig S. Wright."   So the "Craig S. Wright" is

12   sent by Gmail.

13   Q.   Dr. Wright, you're comparing the wrong two.   Look at the

14   craig@rcjbr on the right-hand side and the craig@rcjbr on the

15   left-hand side.

16   A.   The name is set by Google.   So that means it has nothing to

17   do with my email.   If it's Craig Wright rather than Craig S.

18   Wright, it is not from my email account.   Sorry.   Not mine.

19        MR. FREEDMAN:   Your Honor, may we please approach on

20   this issue?   It's important.

21        THE COURT:   All right.   Come on forward.

22      (At sidebar on the record.)

23        MR. FREEDMAN:   Your Honor, the email that is on the

24   left-hand side is a draft email that was produced by the

25   Defense.   It is the draft to the forgery that ends up being

1   sent in P630.  It was on the right-hand side.

2        I have no way to verify that it is in fact an email

3   that was sent because it wasn't sent; it was saved as a draft.

4   E-Discovery picked it up and produced it over to us.  It shows

5   the progression of this and is identical almost to the document

6   that eventually gets sent out.  So he's verified that email

7   address.  It has his Bates label on the bottom, and the

8   identical one eventually gets sent.

9        MS. MCGOVERN:  Your Honor, at some point the

10  foundation from a witness being laid for the document has to

11  matter.  So there's 233,000 documents, over a million pages.

12  From about 10 different servers, including a supercomputer from

13  all over the place, from Australia, from England.  We have been

14  asked to argue before Your Honor whether the mere production of

15  the documents by us is somehow -- sort of provides the gateway

16  to admission in trial in front of a jury.

17       THE COURT:  Well, that I agree with.  The mere fact

18  that it was produced by the Defendant -- you need to lay the

19  proper foundation.

20       My question is -- if the witness does not agree that

21  that is an email that was sent but the email address is the

22  same email address that is with regard to other emails that

23  were sent, then it would appear to go to the weight as opposed

24  to its admissibility.  So the question for me is:  Was that

25  email Dr. Wright's email?

```
1          MR. FREEDMAN:  He's previously testified that RCJBR

2    email address is his in court today.

3          MS. MCGOVERN:  But, Your Honor, the problem that we're

4    having is that the document that they're seeking to admit --

5    just to be clear, because they're freely explaining what the

6    theories are.  They've got an expert that's coming in who's

7    going to say he forged the documents.  They need this.  I get

8    it.  But the reality is they've got to be able to lay the

9    foundation so that there's not an unfair prejudice to the

10   Defendant in front of the jury on these things.  He has

11   testified:  "I don't recognize the email."  You just have to

12   look at it.  It does --

13         THE COURT:  All right.  It certainly doesn't look like

14   a standard email.

15         MR. FREEDMAN:  This is a draft.

16         THE COURT:  If it was a forged email but it reflects

17   his address, then the fact that the witness has already

18   identified it as his email address, it would seem as if it

19   would go to the weight as opposed to its admissibility when he

20   says:  "It's not in a proper format; I don't recognize it in

21   this form."

22         MS. MCGOVERN:  But the proper format, Your Honor, is

23   it doesn't -- even though that it came from that email

24   address --

25         THE COURT:  Well, that's --
```

1          MS. MCGOVERN:  It says:  "To."

2          THE COURT:  Right.  That's the problem.

3          MS. MCGOVERN:  Who sent it?

4          MR. FREEDMAN:  Because it's supposed to be an email

5     from Dr. Wright.  The next email on the right-hand side of the

6     screen shows --

7          MS. MCGOVERN:  Your Honor --

8          MR. FREEDMAN:  Ms. McGovern, let me finish.

9          The email on the right-hand side shows the final

10    product of the forgery.  It is the same exact text, and it was

11    supposed to be -- Dr. Wright passed it off as an email from

12    Dave Kleiman to Craig Wright, and he was creating that forgery

13    with that draft document.

14         MS. MCGOVERN:  The problem with all of this is that

15    you haven't laid the foundation for the document, and the email

16    has no indicia of --

17         THE COURT:  I agree with regard to the draft.

18         630 is in evidence.

19    (End of discussion at sidebar.)

20         MR. FREEDMAN:  Ms. Vela, can you please put up P630 on

21    the right-hand side.

22    BY MR. FREEDMAN:

23    Q.  Dr. Wright, do you see P630, which is in evidence, is an

24    email from yourself to yourself?  Do you see that?

25    A.  I see that there's an email forwarded.

159

1   Q.  No.  No.  I'm looking at the one underneath from Craig S.

2   Wright to Craig Wright.

3      Do you see that?

4   A.  Yes, but I can't see the address.  Without the address, I

5   can't tell you.  Doesn't say craigwright@, anything like that.

6   So I can't answer that.  The "To" field can say anything.

7        THE COURT:  You may show the jury.  630 is in

8   evidence.

9        MR. FREEDMAN:  Your Honor, I'm taking one more shot at

10   P799.

11        MS. MCGOVERN:  Your Honor, we've objected to 799 and

12   it's been sustained, Your Honor.

13        THE COURT:  All right.  Let's continue.

14   BY MR. FREEDMAN:

15   Q.  Dr. Wright, did you draft the email on the right-hand side

16   that is from Craig Wright to Craig Wright?

17   A.  No.  That's a forwarded email.  So it's a forward of the

18   other.  So I didn't draft the email.  No.

19        MR. FREEDMAN:  Ms. Vela, put the one on the left-hand

20   side down, please, P799.

21        This is in evidence.  Can we publish this to the jury,

22   please.

23   BY MR. FREEDMAN:

24   Q.  Dr. Wright, I'm looking at the highlighting in the middle

25   of the page.  It says:  "From Craig S. Wright" --

```
 1   A.  Uh-huh.

 2   Q.  -- "sent Monday, 10th of December 2012, to Craig Wright."

 3       Do you see that?

 4   A.  I see that.

 5   Q.  So it's an email sent from Craig Wright to Craig Wright,

 6   correct?

 7   A.  I can't actually say correct because I don't know what the

 8   "Craig Wright" is.  The "Craig Wright" is a "To" field.  It

 9   could be the corporate CEO account.  It could be my email.  I

10   don't know without the email.  Cannot say.  Cannot answer.

11   Don't know without that information.

12   Q.  But, Dr. Wright, RCJBR is your email address, and that's

13   the "From" address, which means that's the email that sent the

14   email, correct?

15   A.  The email saying:  "Craig S. Wright" is mine.  The "To," I

16   don't know whether that's Craig Wright or something else.  It

17   could be anything.  I don't know.

18   Q.  Fine.

19            MR. FREEDMAN:  Ms. Vela, take down the callout.

20   BY MR. FREEDMAN:

21   Q.  So you sent the email below.  We don't know to who, but you

22   sent the email below, correct?  You just said that.  That's

23   your email address.  You sent it.  You just don't know to who,

24   correct?

25   A.  I don't know what the to address is.  I don't have the
```

1    original.  I know how it's displaying.

2    Q.  You sent the email below, correct?

3    A.  I sent the one that you have got highlighted at that point.

4    To who I don't know.

5         MR. FREEDMAN:  Your Honor, Plaintiffs' offer P799 into

6    evidence now.

7         MS. MCGOVERN:  Objection.  We've just gone over this,

8    Your Honor.  We restate our objection, Your Honor.  We're

9    simply redoing it.  This is another consideration of the same

10   argument we just made sidebar, Your Honor.  We object.

11        THE COURT:  Is it the same email address, sir?

12        MR. FREEDMAN:  It is, Your Honor.  It's the exact same

13   email address, and the witness has just testified that he sent

14   the email.  Now we're seeking to introduce the draft.

15        THE WITNESS:  That's not correct.

16        THE COURT:  Put the other one up for me.

17        MR. FREEDMAN:  Ms. Vela, can you please put up P799 on

18   the left-hand side for just the Court and counsel.

19        Can you highlight the email on the left-hand side that

20   Dr. Wright just testified is his own.

21        The "from" on the right and the "To" on the left, Your

22   Honor, they match.

23        THE WITNESS:  They do not.

24        MS. MCGOVERN:  Your Honor, our objection is with

25   respect to authenticity and foundation, the same as made

1  sidebar, Your Honor.

2      THE WITNESS:  That is a different email address on a

3  different server.  If it was my server, it would come up as

4  "Craig S. Wright."  It doesn't.  It is a separate person

5  sending it.

6      THE COURT:  The witness has testified that he sent

7  P630 to the email address craig@rcjbr.org.  The exhibit, which

8  is Plaintiffs' proposed 799, reflects that address.  That goes

9  to the weight as opposed to its admissibility.  That is what

10  the Court had a concern about and I believe that the foundation

11  has been sufficiently laid.

12      The objection is noted.  It's overruled.

13      799 will be admitted into evidence.

14  (Plaintiffs' Exhibit 799 received into evidence.)

15      THE COURT:  My apologies.  The court reporter's screen

16  just went down.  Let's stop the proceeding for a moment.

17      MR. FREEDMAN:  Your Honor, this is actually a great

18  time to take a break for us, if we want to take our 20-minute

19  break.

20      THE COURT:  Yes.  Let's go ahead and take a 20-minute

21  recess and we'll attempt to work on this equipment.

22  (Jury not present, 3:08 p.m.)

23  (Recess from 3:08 p.m. to 3:30 p.m.)

24      THE COURT:  All right.  Welcome back.

25      Are we ready to proceed, Yvette?

1      All right.  Anything we need to address before we

2  bring the jury back?

3      MR. FREEDMAN:  Just need to grab the mic.

4      THE COURT:  Ms. McGovern?

5      MS. MCGOVERN:  No, Your Honor.

6      THE COURT:  All right.  Let's bring the jury back in,

7  pleas.

8    (Before the Jury, 3:30 p.m.)

9      THE COURT:  All right.  Welcome back, Ladies and

10  Gentlemen of the Jury.  Please be seated.

11      And we'll continue with the questioning.

12      MR. FREEDMAN:  Your Honor, actually, one housekeeping

13  question.  P546, I have it as in evidence.

14      THE COURT:  546?

15      MR. FREEDMAN:  Yes.

16      THE COURT:  It is not in evidence.

17      MR. FREEDMAN:  Not in evidence.

18      Ms. Vela, can you please put up P546 for just counsel

19  and the witness.

20      THE COURT:  Can we put 546 up on the screen?

21      MR. FREEDMAN:  Is there an issue with the exhibit or

22  the system?

23  BY MR. FREEDMAN:

24  Q.  Dr. Wright, do you recognize this as a purported email

25  between Dave Kleiman and yourself?

1    A.  It looks familiar.  I don't remember the discussion.  We

2    had an email chat about my divorce.

3         MR. FREEDMAN:  Your Honor, Plaintiffs offer P546 into

4    evidence.

5         MS. MCGOVERN:  No objection.

6         THE COURT:  Admitted into evidence.

7      (Plaintiffs' Exhibit 546 received into evidence.)

8         MR. FREEDMAN:  Ms. Vela, can you put P720 on the

9    screen for counsel and the witness.

10   BY MR. FREEDMAN:

11   Q.  Dr. Wright, do you recognize this as an email between

12   yourself and Ira Kleiman?

13   A.  Yes.  It looks like one of the emails forwarded to Ira

14   Kleiman.

15        MR. FREEDMAN:  Your Honor, Plaintiffs offer P720 into

16   evidence.

17        MS. MCGOVERN:  No objection.

18        THE COURT:  Admitted into evidence.

19     (Plaintiffs' Exhibit 720 received into evidence.)

20        MR. FREEDMAN:  Ms. Vela, can you please bring up P807

21   for the witness and counsel.

22   BY MR. FREEDMAN:

23   Q.  Dr. Wright, this email that purports to be between Dave

24   Kleiman and Uyen Nguyen, did you authorize this letter to be

25   filed on your behalf in this litigation?

1    A.    No.    What happens is all of the computers, which would have

2    included some of Uyen's computers, were given over, as I

3    stated.    So there's no authorize anything to be filed.    What

4    happened was the company computers were all imaged: the staff,

5    ex-staff, directors, ex-directors, people who were contractors.

6    Anyone.    All of that material, all of the boxes, the paperwork,

7    anything I could get hold of, I was told to hand over.    Didn't

8    look at it.    Handed it over.    The lawyers do what the lawyers

9    do.

10   Q.    So I just want to clarify.    My question is not whether you

11   authorized it to be handed over.    It's did you authorize it to

12   be used as a filing in front of the Court?

13            MS. MCGOVERN:    Objection, Your Honor.    Privilege.

14            THE COURT:    Sustained.

15            MR. FREEDMAN:    I didn't hear the basis of the

16   objection.

17            MS. MCGOVERN:    Privilege.

18            THE COURT:    Privilege.

19            MR. FREEDMAN:    Ms. Vela, can you please bring up P809.

20            Actually, let's go to P824.

21   BY MR. FREEDMAN:

22   Q.    Dr. Wright, do you see this as an email from yourself,

23   craig@rcjbr, to yourself, craig@rcjbr?

24   A.    Yes.    Although the reply one, there's something different.

25   So the machine -- there's something different on the machine

1   because Google would always put it as "Craig S. Wright."

2   Q.  Subject is:  "D"?

3   A.  I see that.

4   Q.  And it's signed at the bottom:  "Dave"?

5   A.  His name's at the bottom.

6       MR. FREEDMAN:  Your Honor, Plaintiffs offer P824 into

7   evidence.

8       MS. MCGOVERN:  No objection.

9       THE COURT:  Admitted into evidence.

10   (Plaintiffs' Exhibit 824 received into evidence.)

11       MR. FREEDMAN:  And, Ms. Vela, can you please bring up

12   P856.

13   BY MR. FREEDMAN:

14   Q.  Dr. Wright, do you recognize this as another email from

15   yourself to yourself?

16   A.  No, I don't, because there's no other thing.  You can put

17   any name in a "From" and "To" field in Outlook.  So no, I

18   don't.

19       MR. FREEDMAN:  Ms. Vela, can you put up P824 side by

20   side.

21   BY MR. FREEDMAN:

22   Q.  Dr. Wright, this is also from Craig -- this is in evidence.

23   This is also from Craig S. Wright to Craig Wright, just like on

24   the left-hand side.  It also contains on the right-hand side --

25   it also contained an alleged PGP message from Dave Kleiman.

```
 1      Does that help?  You remember that in fact you did send
 2   this message from yourself to yourself?
 3   A.  They're both different, actually.  What you'll look at is
 4   the "From" and "To," they're both different.  Sorry.  They're
 5   not the same.
 6           MR. FREEDMAN:  Your Honor, Plaintiffs offer P856 into
 7   evidence.
 8           MS. MCGOVERN:  Objection, Your Honor.  Foundation.
 9           THE COURT:  Can I see the email address on 856,
10   please?
11           MR. FREEDMAN:  Your Honor, let me check if that
12   exists.  Could be that it was produced to us as a PDF and not
13   as an actual email file.  I'm going to check.
14           Your Honor, if we could have a moment, we're going to
15   access the form in which it was produced.
16           THE COURT:  All right.
17           MR. FREEDMAN:  In the interim, we'll get back to P856.
18           Ms. Vela, can you please put up P187.
19   BY MR. FREEDMAN:
20   Q.  Dr. Wright, do you recognize this as an email from yourself
21   to Andrew Sommer and Ramona Watts?
22   A.  I don't recognize it, but it looks like one.  I can't see
23   the address.
24           MR. FREEDMAN:  Your Honor, Plaintiffs offer P187 into
25   evidence.
```

```
 1              MS. MCGOVERN:  No objection.

 2              THE COURT:  Admitted into evidence.

 3         (Plaintiffs' Exhibit 187 received into evidence.)

 4              MR. FREEDMAN:  Ms. Vela, can you please bring up P853

 5    for the witness and counsel.  P853.

 6         (Pause in proceedings.)

 7              MR. FREEDMAN:  Are we having an issue with P853?

 8              Your Honor, our computer appears to have frozen.  Can

 9    you give us one minute.

10              THE COURT:  Certainly.

11         (Pause in proceedings.)

12              MR. FREEDMAN:  Okay.

13    BY MR. FREEDMAN:

14    Q.  Dr. Wright, this is your Slack channel, and do you see

15    here -- we've actually looked at this earlier in the case -- do

16    you see Mr. Kleiman is mentioned?

17              MS. MCGOVERN:  Mr. Freedman, what exhibit number is

18    this, please?

19              MR. FREEDMAN:  P853.  But there's a lot of them in

20    P853.

21              MS. MCGOVERN:  Because I have a different P853.

22              MR. FREEDMAN:  There's a lot of messages in P853.

23    We're only using this one.

24              MS. MCGOVERN:  It is not even related.  The one I have

25    is not this one.
```

1          THE COURT:  Yes.  The Court only allowed the first

2    page, one page of 853.

3          MR. FREEDMAN:  Right.  So we're looking to establish

4    another page.

5          THE COURT:  All right.

6    BY MR. FREEDMAN:

7    Q.  Dr. Wright, do you recognize this as your Slack account?

8    A.  I do.

9          MR. FREEDMAN:  Your Honor, we offer -- we'll call this

10   P853.2.

11         THE COURT:  Is it just this one page?

12         MR. FREEDMAN:  Ms. Vela, can you zoom out to show the

13   Court the entirety of the message.

14         That's the entirety of it, Your Honor.

15         THE COURT:  Is there any objection?

16         MS. MCGOVERN:  No objection, Your Honor.

17         THE COURT:  All right.  Admitted into evidence.

18     (Plaintiffs' Exhibit 853.2 received into evidence.)

19         MR. FREEDMAN:  Ms. Vela, do we have the native of P856

20   up?

21         MS. MCGOVERN:  Your Honor, if we could just make sure

22   we have the same document for P835.  I hate to take up the

23   Court's time or the time on this, but our P853 is not this

24   document.  It might be our mistake.

25         MR. FREEDMAN:  P853 -- well, as I understand it, P853

1    is a compilation of numerous documents, one of which is this.

2              Is this not included in any of the P853 that you have?

3              MS. MCGOVERN:  Can you just give me the Bates number

4    for this?

5              MR. FREEDMAN:  I don't know if there's a Bates number.

6              MS. MCGOVERN:  There is no Bates number?

7              MR. FREEDMAN:  There may not be.

8              THE COURT:  All right.  So there are now two pages of

9    Plaintiffs' Exhibit 853, correct?

10             MR. FREEDMAN:  Correct.

11             THE COURT:  All right.

12             MR. FREEDMAN:  Ms. Vela, the Court asked to see the

13   native of P856.  Can we show that?

14             MS. MCGOVERN:  Your Honor, if I could, just so the

15   record is clear and there's no confusion.  We do not have P853

16   as that Slack channel document.  It's a completely different

17   document as Plaintiffs' exhibit.  We can sort this out later,

18   but we would just like to make that this confusion clear.

19             THE COURT:  We'll correct that on the record outside

20   the presence of the jury.

21             MS. MCGOVERN:  Thank you.

22             MR. FREEDMAN:  Absolutely.

23   BY MR. FREEDMAN:

24   Q.  I'm back at the native of P856 because the Court asked to

25   see the actual email file.

```
 1        The email is craig.wright@hotwirepe.com.  Do you see that?

 2   A.  Yes, I see.  That's the shared address Slack CEO account.

 3   Q.  Did you have access to this address, Dr. Wright?

 4   A.  I could use it, yes, and my EA and a few other people did

 5   too.

 6   Q.  And you allowed your name to be associated with that

 7   account, correct?

 8   A.  That's generally what a CEO's account is.

 9        MR. FREEDMAN:  Your Honor, Plaintiffs offer P856 into

10   evidence.

11        MS. MCGOVERN:  No objection.

12        THE COURT:  Admitted into evidence.

13     (Plaintiffs' Exhibit 856 received into evidence.)

14        MR. FREEDMAN:  Your Honor, if I could check with my

15   team for a minute.  I think that might be all the document

16   module.  I think we might be through.  Can I just have one

17   moment?

18        THE COURT:  Yes.  Of course.

19     (Pause in proceedings.)

20        MR. FREEDMAN:  Okay.  Your Honor, just one correction,

21   addressing Ms. McGovern's correction.  This will be P853.2.

22        Ms. Vela, can you put it on for just counsel and the

23   witness.

24        853 is a compilation.  The Court's only admitted one

25   and we were trying to get one more added from P853.  This is
```

1    the one we would like to add.  No.  That's the wrong portion of

2    the document.  Can you zoom out, please.

3          There.

4    BY MR. FREEDMAN:

5    Q.  Dr. Wright, this is your Slack address, Slack account?

6    A.  Yes.  You're talking about the wrong Dave, though.

7    Q.  Okay.  And here you say -- you're talking about Dave and

8    coding?

9    A.  No.  I'm talking about Dave in 2001.  This is not the same

10   Dave.  Sorry.  I'm talking about a Dave.  I met Dave in 2003.

11   In 2001, I had a company in Australia.  I had people called

12   Dave working for me.  Many people in my life have been called

13   Dave.  There is Dave Jensen, who was a director.  Dave

14   Dornbreg, who was a director with me.  I could name all the

15   Daves in my life.  I don't think anyone's interested.

16   Q.  Okay.  Dr. Wright, you say he was --

17          MR. FREEDMAN:  Your Honor, Plaintiffs offer P853 --

18   and this will be the second image from that P853.2, into

19   evidence.

20          MS. MCGOVERN:  No objection, Your Honor.

21          THE COURT:  Admitted into evidence.

22      (Plaintiffs' Exhibit 853.2 previously received into

23   evidence.)

24          MR. FREEDMAN:  Take that down, please, Ms. Vela.

25          Thank you.

173

```
 1    BY MR. FREEDMAN:
 2    Q.  Dr. Wright, last week we spent some time on whether Dave
 3    Kleiman was part of the Satoshi Nakamoto partnership.  Do you
 4    recall that?
 5    A.  Not the way you're saying it, but I recall we went over
 6    these things.
 7    Q.  You denied it, right?
 8    A.  Well, because it's not true.
 9         MR. FREEDMAN:  All right.  Ms. Vela, for just the
10    witness and counsel, we're going to look at another part of
11    P853, please.
12        (Pause in proceedings.)
13    BY MR. FREEDMAN:
14    Q.  Dr. Wright, do you see this is your Slack account and the
15    "Satoshi trio" is mentioned?
16    A.  Sorry.  I'm looking for a "Satoshi trio."
17         MR. FREEDMAN:  Ms. Vela, can you highlight "Satoshi
18    trio."  It's about halfway down the page.  "I wonder if the
19    Satoshi trio."
20    BY MR. FREEDMAN:
21    Q.  And then you respond to that message, Dr. Wright?
22    A.  No.  I responded to the general communications.  So I don't
23    know if you know how chats work, but you don't always
24    respond -- when you start responding, you're not wait, next;
25    wait, next.  So sometimes you'll see six or seven different
```

1    questions before a response.  So no.

2              MR. FREEDMAN:  Your Honor, Plaintiffs offer P853.3.

3    So this will be the third image from P853 into evidence.

4              MS. MCGOVERN:  No objection.

5              THE COURT:  Admitted into evidence.

6         (Plaintiffs' Exhibit 853.3 received into evidence.)

7              MR. FREEDMAN:  Please publish to the jury.

8    BY MR. FREEDMAN:

9    Q.  Dr. Wright, someone on your Slack channel says:  "I wonder

10   if the Satoshi trio all dreamed of the same Bitcoin future."

11   And you respond:  "Dave K. did."

12        Do you see that?

13   A.  No.  I see:  "Kleiman was probably more on the

14   implementation side," and that's what he did.

15   Q.  He implemented Bitcoin for you?

16   A.  No.  He didn't implement.  He implemented machines.  You

17   don't implement code.  So Dave ran machines.

18        Later on, in 2011 and 2012, he helped with a number of

19   things, as I've stated, and he helped me with machine design in

20   2012.

21   Q.  Dr. Wright, you're aware that the Plaintiffs in this case

22   have alleged that you and Dave Kleiman mined Bitcoin together,

23   correct?

24   A.  Yes.  I'm completely aware that you like to make up

25   something that didn't exist until 2010.  So yes, I recognize

175

1    that you're making a claim that is provably falsifiable, that

2    you are using fallacia et album nigrum, or black-and-white

3    fallacy.  Basically you're believing one thing or the other.

4    Nothing in the middle.  Everything has to be something and you

5    can't follow other ways.  So, unfortunately, utterly false.

6    Q.  And, Dr. Wright, you realize that when the Plaintiffs say

7    that, they mean that you two agreed to mine Bitcoin together

8    for the joint benefit of the partnership, correct?

9    A.  No.  There was no partnership, as I stated.

10       And if you look at that document earlier -- I don't know if

11   you noticed, but in the BAA document, that he wanted to get in

12   today, it says W&K is a joint venture not between Craig and

13   Dave, but between Dave, a vet, and an Australian incorporated

14   company.  I had an incorporated company.  That formed a joint

15   venture.  That's why Information Defense.  And his evidence

16   that he said doesn't exist, he's actually put it in today.

17   Thank you.

18       And I had a number of companies in 2009.  They were all

19   founded.  They all have public records.  So if you wanted to

20   know who the shareholders are, you go to ASIC, which is the

21   Australian company register.  You go there and every company

22   registered in Australia has all of the directors, all of the

23   shareholders, all the other people.  You have the amount of

24   capital paid.  Easily just look it up and you'll find out who

25   was there with me in the beginning.

1    Q.  Dr. Wright, you deny that Dave and you mined Bitcoin

2    together, correct?

3    A.  As I said, nobody mined Bitcoin together.  Bitcoin was

4    designed -- as I said, it's a unilateral contract.  It's a

5    beautiful system where you encourage people to go out there and

6    keep the system running through economic means.  It was really,

7    really difficult.  Like I said at the beginning, earlier today,

8    I was trying to give away Bitcoin just about.  One hundred

9    dollars for 50,000 Bitcoin, and I could not get takers in 2009.

10       So we're talking about a system:  "Not I'm mining together,

11   it's going to be worth."  No.  I'm talking about a system I

12   spent millions, sunk my life into, ended up getting divorced

13   because of, and could not give away.

14   Q.  Dr. Wright, we've looked at documents which showed that you

15   and Dave were mining.  Do you recall those?

16   A.  No.  We don't show any:  "Dave and I were mining."  They

17   show I mined.  I mined into companies that I founded.  I

18   believed Dave was mining.  I asked Dave to mine.  I asked my

19   uncle, my mother, my sisters, people in companies.  I even had

20   a trip to Microsoft.  So I tried to flub Bitcoin off to

21   Microsoft.

22       Between September and October 2008, I had meetings with the

23   Bing team.  I was there in the BlueHat Conference.  I met with

24   the founders of like the Bing part of it.  I met the browser

25   people, the browser team.  I wanted basically to have Microsoft

```
1    run Bitcoin, like they did with -- they potentially ran eCash,

2    but it all fell apart.

3        I imagined that if that happened I would have a global

4    system where micropayments actually worked.  Unfortunately,

5    right at the end of October, there was a sort of freeze because

6    of the whole global financial crisis, and Microsoft basically

7    said:  "Sorry.  We can't do anything," and I ended up having to

8    launch myself.

9        MR. FREEDMAN:  Ms. Vela, can you put up P146, please,

10   for the witness and counsel.

11   BY MR. FREEDMAN:

12   Q.  See this is an email from yourself to John Chesher, your

13   CFO; Andrew Sommer, your lawyer; and Ms. Watts, your wife?

14   A.  Yeah, looks like that.

15   Q.  And you discuss Dave Kleiman.  Do you see that?

16   A.  It said:  "Dave."  I'd say that would be Mr. Kleiman, yeah.

17        MR. FREEDMAN:  Your Honor, Plaintiffs offer P146 into

18   evidence.

19        MS. MCGOVERN:  No objection, Your Honor.

20        THE COURT:  Admitted into evidence.

21      (Plaintiffs' Exhibit 146 received into evidence.)

22        MR. FREEDMAN:  Ms. Vela, can you highlight for us

23   Dr. Wright's statement on the third paragraph:  "As noted in

24   the contracts, Dave mined."

25
```

```
 1   BY MR. FREEDMAN:

 2   Q.  Dr. Wright, in previous days when I showed you documents

 3   about Dave mining, you said that that was him mining Testnet

 4   Bitcoins on supercomputers that he and you designed; is that

 5   correct?

 6   A.  That's not what I said.  I said he was helping in the

 7   companies to choose machines, et cetera.  So did he design the

 8   supercomputers?  No.

 9      I also said that the mining was done on those machines.

10   Dave didn't do that personally.  The whole thing with having

11   staff is staff do all this.  So when I keep saying I had these

12   people in Australia and these people overseas, that doesn't

13   mean that it's all Dave or me, when -- I have a team of people

14   who do everything; like I said, a CTO, a CIO, a security

15   person, an exchange person, a database person, software

16   developers.  So I didn't actually do any of those roles.  I

17   hired people who did.  So technically, I instructed people.

18   People did things, somewhere in Australia, somewhere in all

19   different countries.

20   Q.  Did Dave mine the Testnet Bitcoins?

21   A.  Dave helped manage that process.  He talked to other

22   people.  So it depends on how you look at what that meant.  If

23   he instructed people to do it, then that's a different issue.

24   Q.  He was an active part of the team that mined Testnet

25   Bitcoins with supercomputers.  Is that your testimony?
```

1    A.   Yes.  He was actually part of all that.  That's correct.

2            MR. FREEDMAN:  Ms. Vela, can you please play clip 105

3    from Dr. Wright's April 4th, 2019 deposition.  For the record,

4    that's Page 382, lines 18 through 23.

5        (Video played.)

6    BY MR. FREEDMAN:

7    Q.   Dave died before your supercomputers were even operating,

8    Dr. Wright.

9    A.   No.  CO1N was actually done in 2012.  But CO1N was only

10   part of the entire system.  The later computer was called

11   Tulip.  The first computer was launched in December 2012.  The

12   Tulip computer was the one launched April/May of 2014.

13       So if you consider the smaller system, then no, he was

14   there.  If you consider the larger system, he was dead.

15   Q.   Dr. Wright, the truth is that Dave Kleiman was mining

16   Bitcoin in at least March of 2009, correct?

17   A.   Incorrect.  Dave was in the hospital all of that time.

18       Now, this is what the wonderful thing of my system is.  If

19   you look right up until 2010, the difficulty that was explained

20   by Mr. Antonopoulos was one.  Now, one difficulty means about

21   175 computers needed to be mined before it went over that and

22   it became more difficult.  I only ran 69 computers.  There were

23   some in my church.  There were some that my uncle had, other

24   people had.  But even then, it sat below the threshold.

25       So technically, if one had come along, they could have

1    gotten more Bitcoin.  There are only about two-thirds of the

2    Bitcoin that were to be distributed done in that first year

3    that were meant to be.  So it took a lot longer because I just

4    couldn't get people to come in and mine.

5        So you can actually look at the difficulty level and you

6    can analyze this.  People say -- like Mr. Antonopoulos said:

7    "We don't know."  We do know.  Because every type of CPU has a

8    hash signature.  You can actually work out how many hash per

9    second a particular type of CPU from a particular type of

10   machine.  I actually did.

11       And there were no GPU mining.  So GPU mining was Laszlo and

12   also Shadders.  Steve Shadders now works for some of the

13   companies I'm with and he's starting his own new company in

14   those areas.  He helped found this.  And Laszlo and others

15   helped do GPU mining.  That wasn't in 2010.  So there's no GPU

16   mining, all CPUs.

17       So if you go back and you look at the intel tables, you

18   will see how many calculations per second any particular

19   machine can do.  You'll work out that even if Dave was mining,

20   then his mining on a laptop would be insignificant.  To mine on

21   a laptop at that stage, you could actually work out exactly how

22   many Bitcoin he would average over time.  None of this we

23   guesstimated.  You can work it out exactly.

24       And guess what?  There's no evidence of it.  If you analyze

25   the blockchain, which back at the time I didn't do, you can

```
1    tell.  That's the wonderful thing with this public record here.
2          MR. FREEDMAN:  Madam court reporter, can I bother you
3    to read the question and the first sentence of Dr. Wright's
4    response?  I don't remember it.
5       (Read back.)
6          MR. FREEDMAN:  Ms. Vela, for the witness and counsel,
7    can you please bring up Impeachment Exhibit RF-10.
8          Could you zoom out a little bit.
9       (Pause in proceedings.)
10         MR. FREEDMAN:  I can't see it on my screen.
11         It's up.
12         No.  You need to zoom out a little bit.
13         Can you pull it down for a second.
14      (Pause in proceedings.)
15         MR. FREEDMAN:  Okay.
16         No.  No.  No.
17         Perfect.
18         Thank you.
19         MR. FREEDMAN:  Your Honor, we would like to publish to
20   the jury.
21         MS. MCGOVERN:  No objection, Your Honor.
22         THE COURT:  All right.
23   BY MR. FREEDMAN:
24   Q.  Dr. Wright, your Slack channel, your posting:  "Dave, he
25   started mining in March 2009."
```

1    A.  As I had stated to you earlier, I talked to Dave.  I tried

2    to get him involved with mining.  My understanding was Dave

3    told me:  "Yes, I've mined."  At that stage, I had not checked

4    anything.

5       It's a public record.  I actually have now gone back and

6    I've looked at the amount of mining being done, and there's no

7    evidence of it.  I had hoped Dave had mined.  I had wanted Dave

8    to mine.  I had wanted everyone to.  But unfortunately, he

9    didn't.

10         MR. FREEDMAN:  Thank you, Ms. Vela.

11   BY MR. FREEDMAN:

12   Q.  Dr. Wright, we've looked at numerous documents from the

13   Australian Taxation Office showing that you previously told

14   them that Dave Kleiman funded the Tulip Trust with Bitcoin.  Do

15   you recall those documents?

16   A.  No, I don't.

17         MR. FREEDMAN:  Ms. Vela, can you please put up P607.

18   It's in evidence.

19             Let's go to Page 49.

20             Zoom in on Paragraph 271 for Dr. Wright.

21   BY MR. FREEDMAN

22   Q.  The bottom, second word from the bottom, second to the last

23   sentence:  "But Dr. Wright has also stated that the Trust's

24   Bitcoin come from both him and Mr. Kleiman."

25       Do you see that?

1    A.  I see what they wanted to put in their thing.  But no, it's

2    not correct.

3             MR. FREEDMAN:  Thank you, Ms. Vela.

4    BY MR. FREEDMAN:

5    Q.  Dr. Wright, you recall that you -- that we looked at the

6    Tulip Trust document that was dated October 2012?

7    A.  I don't recall which one's which.  Sorry.

8             MR. FREEDMAN:  Ms. Vela, can you please put up P036.

9    BY MR. FREEDMAN:

10   Q.  Dr. Wright, this document is dated 23rd of October, 2012.

11   The document made it seem --

12            MS. MCGOVERN:  Your Honor, we would like to pose an

13   objection to this repeated line of questioning to go over the

14   evidence again.  This is the fourth day of testimony.  We

15   object.

16            THE COURT:  It is in evidence.  I certainly am not

17   going to allow you to repeat the questions that were asked.  So

18   what is it that you're asking, Mr. Freedman?

19            MR. FREEDMAN:  Your Honor, I'm just establishing a

20   foundation for -- I have another document to come in.

21            THE COURT:  It's overruled.  You may continue.

22            MR. FREEDMAN:  Can we publish it?

23            Thank you.

24   BY MR. FREEDMAN:

25   Q.  And, Dr. Wright, you recall that we saw emails between

1    Denis Mayaka and yourself purchasing the Tulip Trading Company

2    two years after this document was dated?

3    A.  No, we did not.

4    Q.  And, Dr. Wright, while you claim that the Tulip Trust is

5    created in 2012, in the document there's actually a letter

6    stating that Tulip Trading has never entered into any contracts

7    before 2014; isn't that correct?

8           MS. MCGOVERN:  Objection.  Asked and answered.

9           THE COURT:  Overruled.

10           THE WITNESS:  That is completely fallacious, as

11    normal.

12           MR. FREEDMAN:  Ms. Vela, can you put -- let's hold on

13    to P036 for a moment.  Can we bring up P869.  It's not in

14    evidence yet, so just for counsel and the witness.

15    BY MR. FREEDMAN:

16    Q.  Dr. Wright, do you see this is an email from Abacus

17    Offshore to yourself attaching various documents relating to

18    Tulip Trading, Limited?

19    A.  It's to the corporate account, and yes, I get all of these

20    things sent on a periodic basis.

21           MR. FREEDMAN:  Your Honor, Plaintiffs move P869 into

22    evidence.

23           MS. MCGOVERN:  No objection.

24           THE COURT:  Admitted into evidence.

25        (Plaintiffs' Exhibit 869 received into evidence.)

```
1   BY MR. FREEDMAN:

2   Q.  So on the left we've got the Tulip Trust, created by --

3         MR. FREEDMAN:  Ms. Vela, can you highlight "Tulip

4   Trading, Ltd."

5   BY MR. FREEDMAN:

6   Q.  Deed allegedly entered into in October 2012.

7         MR. FREEDMAN:  Ms. Vela, on the right hand, can you

8   please bring us to the 13th attachment, the letter of

9   non-activity.

10  BY MR. FREEDMAN:

11  Q.  So, Dr. Wright, here's a letter from Abacus Seychelles, the

12  company that sold you Tulip Trading, dated 21st of October,

13  2014.  It's titled "Tulip Trading, Ltd."  It's the same name as

14  in the left-hand side of the company that allegedly created the

15  Tulip Trust in October of 2012.

16     It says:  "This is to confirm that the above-referenced

17  company has never traded or entered into any contracts or

18  obligations whatsoever and, consequently, this company has no

19  assets or liabilities."

20     Do you see that?

21  A.  Yes, I do.  And that's in error.  But the other one's not a

22  contract.  It's a deed of trust.

23  Q.  Dr. Wright, I asked you if this trust document was a

24  forgery and you denied it.  Do you recall?

25  A.  The trust document is not a forgery.  It was created by
```

1   lawyers in Australia in 2012, not myself, and it has been in a

2   2012 Australian Tax Office court case.  So it's really hard to

3   make it up in 2012 and then say that it's forged.  I mean --

4   actually saying that the wrong way.  It's really hard to forge

5   something that I used in a 2012 case court case in 2014.  You

6   cannot create something in 2014 that you have used in 2012.  I

7   mean, I'm not sure if you don't get that, but --

8   Q.  Dr. Wright, you understand it's the Plaintiffs' case in

9   this case that you have made up these trusts, they're fake?

10          MS. MCGOVERN:  Objection, Your Honor.  Asked and

11  answered.

12          THE COURT:  Overruled.

13          THE WITNESS:  No.  Actually, in a 2004 court case, the

14  transcript will show that I already mentioned this.  So if you

15  go into a 2004 court case and look at the transcript, and I've

16  mentioned the trust, and then you go into a 2006 tax office

17  audit and it's mentioned, and then a 2008 and a 2009 and a 2010

18  and a 2011 and a 2012 and a court case that I finally won in

19  the beginning of 2013, no.  Sorry.  People might want it to be

20  fake, people might try and set things up on me, but sorry.

21  It's really, really hard to fake something that is in public

22  record before the date.

23  BY MR. FREEDMAN:

24  Q.  Dr. Wright, I expect your lawyers will show the jury this

25  transcript --

```
 1              MS. MCGOVERN:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3  BY MR. FREEDMAN:

 4  Q.  Dr. Wright, isn't it true that you have admitted -- that

 5  you have admitted that you have created fake trusts?

 6  A.  No.  I have not admitted that I created fake trusts.  I

 7  said that I created trusts to ensure that the -- well,

 8  prosecution from the tax office was not successful.  I created

 9  something where I moved assets overseas because I had the tax

10  office issuing a bankruptcy notice.

11      What happened and why this occurred was because I got

12  tipped off by Andrew.  Andrew, my lawyer.  He said, basically,

13  in June 2011:  "The tax office are going to issue bankruptcy

14  proceedings."  He said:  "I can't tell you this.  You haven't

15  heard it from me."  Technically, he's probably not happy that I

16  said that now.  But the whole thing here was, I then

17  constructed, well, basically a movement of assets in an

18  existing trust.  I locked away control, making sure -- the

19  whole reason for 2020 is if I had control over those assets

20  before 2020, then the tax office could basically reverse the

21  transfers.  They could take my assets.

22      So why 2020?  Because if I didn't win -- and the way that

23  the tax office played this was on the Information Defense

24  transfer of assets, intellectual property, et cetera, they

25  tried to bankrupt me, literally.  They issued bankruptcy
```

 1   proceedings.  That would have given them all of the control of

 2   my assets, including Bitcoin, and if they did that, that would

 3   have shut down my whole thing and stopped my whole life's work.

 4       I moved that knowing that they were trying to bankrupt me,

 5   so that if they did, it was outside of any legal avenue for

 6   them to take it.  I moved that then because of that.  And yes,

 7   those bankruptcy proceedings are public and, yes, eventually

 8   what they wanted to do, which I think is really dirty, is if

 9   they bankrupted me, they appoint an administrator.  That

10   administrator has the right to close my court case, the one I

11   won.  But if they closed it, I lose.

12       So rather than letting me have my day in court, they wanted

13   to close my company -- close my case and win, which I think is

14   dirty.  So I moved my assets.  That's why I went before the

15   GAAR panel as well, several times, like the General

16   Anti-Avoidance Review Panel, because they tried to pull it

17   apart.  So that's my answer to it.

18   Q.  What was the question, Dr. Wright?

19            MS. MCGOVERN:  Objection, Your Honor.

20            THE COURT:  Sustained.

21            MR. FREEDMAN:  Ms. Vela, can you please put up P853

22   and what we'll call P853.4.  So this will be the fourth part of

23   that exhibit we'll be seeking to admit.

24            Just for counsel and the witness, please.

25            (Pause in proceedings.)

```
 1              MR. FREEDMAN:  Can you zoom up, please.

 2              Sorry.  Up meaning -- no, the other way.

 3              Down.  Down.

 4              More.

 5              Okay.  Wait.  A little farther up.

 6              One more.

 7              Wait.  Wait.  Stop.

 8              Okay.  A little farther up.

 9              No.  No.

10              Down.

11              Okay.  There we go.

12     BY MR. FREEDMAN:

13     Q.  Dr. Wright, do you see somebody named --

14              MR. FREEDMAN:  Ms. Vela, can you just zoom in to --

15     no.  No.  No.

16              You zoom up now -- now you got to scroll up again.

17              No.  This way.  Bring the document this way.

18              All right.  There we go.

19     BY MR. FREEDMAN:

20     Q.  Dr. Wright, do you see somebody called Timothy asks you a

21     question about real, fake, or multiple, and you respond below

22     that?

23     A.  I'm responding to a number of things that are --

24          (Court reporter interruption.)

25              THE WITNESS:  I am responding to multiple things in a
```

1    single thing.  So no, I'm actually not responding the way

2    you're thinking.

3              MR. FREEDMAN:  Ms. Vela, can you please highlight Dr.

4    Wright's response.

5              And, Your Honor, Plaintiffs' offer P853.4 into

6    evidence.

7              THE COURT:  Any objection?

8              MS. MCGOVERN:  No objection, Your Honor.

9              THE COURT:  All right.  Page 4 admitted into evidence.

10       (Plaintiffs' Exhibit P853.4 received into evidence.)

11             MR. FREEDMAN:  Can we publish to the jury?

12   BY MR. FREEDMAN:

13   Q.  Dr. Wright, this is your Slack channel again.  You get

14   asked by somebody named Tomothy:  "Wait.  I get so gosh darn

15   confused.  So you are suggesting that there's a separate real

16   trust and then a fake trust or multiple fake trusts?"

17        And, Dr. Wright, you respond:  "Real and fake."

18        Do you see that?

19   A.  Not the way you're saying and not in that order, and no.

20   That's more questioning.

21             MR. FREEDMAN:  Ms. Vela, can you scroll down on the

22   page.  So I'd like to see what was posted underneath.  So there

23   we go.

24             Keep going, please.  Keep going.

25             There we go.

1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, somebody says -- God Emperor of Dunes asks the

3    question:  "Why the fake trust?  To throw people off?"

4        And you say:  "A hundred thousand BTC plus."

5        Do you see that, Dr. Wright?

6    A.  No.  We're answering two different things.  That's talking

7    about price of Bitcoin that people are talking about.  So

8    again --

9    Q.  Thank you.

10        MS. MCGOVERN:  If you can please let him respond to

11    the question.

12        THE WITNESS:  No.  They are not question and answer

13    the way you're going.  Sorry.  Wrong.

14    BY MR. FREEDMAN:

15    Q.  Dr. Wright, you've previously said during your testimony

16    that your documents have been hacked.  You recall that?

17    A.  Computers are hacked and documents have been changed.  So

18    you're confounding the things a little bit.  So yes, I have had

19    a number of computers hacked.  I have had a number of staff do

20    incidents.  We have fired staff.  Some of the computers that

21    you have got are from staff that I fired.

22        I've got a number on Twitter still complaining about me,

23    saying how evil I was, including one who went off in a bender,

24    disappeared for a month, turned up in a hotel talking about how

25    much money he's going to make from me and if we don't pay him

1    lots of money, X, Y and Z is going to be released.  So lots of

2    things have happened.  Welcome to corporate life.

3    Q.  Dr. Wright, isn't it true that you were an early hacker, a

4    true hacker?

5            MS. MCGOVERN:  Objection, Your Honor.  Relevance, 403.

6            THE COURT:  Sustained.

7            MR. FREEDMAN:  Ms. Vela, for just the witness and

8    counsel, can you put P770 on the screen.

9    BY MR. FREEDMAN:

10   Q.  Dr. Wright, this is an email from yourself to Ms. Lynn

11   Wright --

12           MS. MCGOVERN:  Objection, Your Honor.  This is exactly

13   the objection that we've just made with respect to 403 and

14   relevance.  There's no foundation that links this to any

15   relevance.  It's improper character, Your Honor.

16           MR. FREEDMAN:  Your Honor, I'm attempting to lay a

17   foundation, and we're obviously going to be careful not to

18   discuss the document until it's admitted into evidence.

19           MS. MCGOVERN:  Your Honor, we can approach or I

20   could --

21           THE COURT:  Let me look at the contents.

22           MR. FREEDMAN:  Ms. Vela, can you highlight the -- one,

23   two, three, four -- five paragraphs down.

24           MS. MCGOVERN:  Mr. Freedman, could you please wait and

25   refrain from referring to anything in the document until it's

```
 1   been addressed by the Court.

 2            MR. FREEDMAN:  Ms. Vela, can you please highlight --

 3            MS. MCGOVERN:  This is improper character evidence,

 4   Your Honor.

 5            THE COURT:  The objection is sustained.

 6            MR. FREEDMAN:  Okay.

 7   BY MR. FREEDMAN:

 8   Q.  Dr. Wright, last week I showed you a list of Bitcoin

 9   holdings that you produced.  Do you recall that?

10   A.  Not in particular, no.

11            MR. FREEDMAN:  Ms. Vela, can you please put P554 on

12   the screen.  This is in evidence.

13   BY MR. FREEDMAN:

14   Q.  Do you recall it now?

15   A.  Again, I did not say this was a list of Bitcoin holdings I

16   sustain.  I said the first 15 addresses are mine.  The rest

17   I've no idea.

18            MR. FREEDMAN:  Ms. Vela, can you put that to the left

19   side of the screen and bring up P446.  I believe that's in

20   evidence.

21            Is it in evidence, P446?

22            THE COURT:  It is in evidence.

23            MR. FREEDMAN:  Okay.  Then let's publish P446 also,

24   please.

25
```

1    BY MR. FREEDMAN:

2    Q.  Dr. Wright, this filing that was filed on your behalf says:

3    "Dr. Wright notifies the Court that the third party has

4    provided the necessary information and key slice to unlock the

5    crypted file and Dr. Wright has produced a list of his Bitcoin

6    holdings as ordered by the magistrate judge to Plaintiffs

7    today."

8         Do you see that?

9    A.  Yes.  And as I specified, the first 15 were mine.  The

10   others were corporate.  So I have testified and I stick by the

11   fact the first 15 are mine.  I agree.  The others belong to the

12   company.  I don't know which ones belong to the company.  I

13   testified and I stand by it, the first 15 are mine.

14   Q.  Is it your Bitcoin holdings or is it not your Bitcoin

15   holdings?

16   A.  The first 15 are my Bitcoin holdings.  The first 15.

17   Q.  From 15 to 16,000 and change, those are not your Bitcoin

18   holdings?

19   A.  As I said, I set up a company and everything after that was

20   in the company.  So no.  So the thing is, when you set up a

21   company, when companies make assets, you don't own them.  You

22   talk about it that way.  I don't know if you have ever -- like

23   some of you here have had businesses.  When you talk about your

24   business, you technically get it wrong.  Because you sit there

25   and you say:  "My company, my assets," because you're proud of

1    it.  I mean, it's not really correct.  It's your company's

2    assets, your group's assets, your other directors' assets.

3        But the truth of the matter is if you're proud of your

4    company, you'd say:  "My."  You'd say:  "What I did.  What we

5    did.  What our business did."  And:  "Good.  Be proud."  I am.

6    Q.  Dr. Wright, the companies that own the balance of the

7    Bitcoin on this list, what is their names?

8    A.  I don't know if it's all there.  I can't verify that.

9    Well, technically I probably could now, but I couldn't at the

10   time.  Wright International Investments, Ltd.

11   Q.  So Wright International Investments, Ltd. owns all the

12   Bitcoin after block 16 that appears on this list; is that

13   correct?

14   A.  I have no idea whether it does or doesn't.  I'd been given

15   a list at that time.  I forwarded it.  My 15 are mine.  So I

16   sent those, and they are mine.

17       The other one, the accounts I've now got access to -- and

18   there are 825,050 Bitcoin owned by Wright International

19   Investments, and there are others and other things associated

20   with that as well.  It goes beyond that, but that is different

21   assets outside of the scope of what was asked.

22   Q.  Dr. Wright, Wright International Investments is wholly

23   owned by the Tulip Trust now, correct?

24   A.  The Tulip Trust owns it.  Technically, it's not owned by --

25   there are a number of corporate directors.  There's a

1   Seychelles company.  There's an Antiguan company.  There's a

2   Swiss company.  Because you have to have different companies to

3   own these things, and we don't live in the Seychelles.

4       So technically there's a trust over the ownership and

5   control.  It gets messy, but the simple way of putting it is,

6   yes, the Tulip Trust run by my wife owns it.

7   Q.  Isn't it true you purposely made sure you weren't a trustee

8   of these trusts because then people could force you to move

9   coins and could seize assets from you?

10       MS. MCGOVERN:  Objection Your Honor.  Asked and

11   answered, including the video clip.

12       THE COURT:  Overruled.

13       THE WITNESS:  Yes.  In 2011 when, as I said, the

14   Australian Tax Office wanted to bankrupt me, I made sure that

15   would not happen.  So I don't know if anyone's ever had sort of

16   difficulties with the IRS or something like that when they

17   don't like you.  The Australian Tax Office is the same.

18       When I talked about Bitcoin, they saw it as the same

19   as every cryptocurrency.  Not digital cash.  They looked upon

20   it as things like a new Liberty Reserve, a new e-gold, a new

21   way of doing criminal funding.  And right from the beginning,

22   right from the start, they called it a hobby.  All those

23   documents that he wants to put in say:  "Not an enterprise."

24   Not an enterprise means not that it didn't happen, that it

25   wasn't a business, that it's a hobby.  They wanted to say that

1    it's all not anything that amounts to anything.  Because when I

2    was doing this in 2009, remember, I said Stefan wouldn't take

3    it for even -- 50,000 for a hundred dollars.  I could not even

4    give the stuff away.  So you try going to the tax office and

5    explaining I've spent $2 million on this stuff no one will

6    take, and they thought it was a joke.

7         So yes, I worked with my lawyers, I worked with my

8    accountants, and I set up a system that would allow me to

9    structure things, and I moved it legally.  I claimed the move

10   on my tax.  People don't realize this.  I actually put the move

11   from the Australian entity to the overseas entity on my tax

12   form, and I claimed the taxation and I paid the tax on Bitcoin

13   at that stage.  So yes.

14   Q.  Yes, you've purposely made sure you weren't a trustee of

15   the trust because then people could force you to move coins and

16   could seize assets from you?

17         MS. MCGOVERN:  Objection.  Asked and answered.

18         THE COURT:  Sustained.

19   BY MR. FREEDMAN:

20   Q.  Dr. Wright, the 821,050 Bitcoin on that list are worth

21   about $53.7 billion; isn't that correct?

22         MS. MCGOVERN:  Objection, Your Honor.  Improper lay

23   opinion regarding damages.

24         THE COURT:  Overruled.

25         THE WITNESS:  No.  They have a market capitalization.

1    They are two different things.  Value and capitalization are

2    not the same.

3    BY MR. FREEDMAN:

4    Q.  They have a market and capitalization of $53.7 billion,

5    approximately?

6    A.  Yes.  But if they move, then the value of BTC will likely

7    tumble.  So technically, if any of these early Bitcoin move --

8    the market valuation is premised on Craig Wright will never

9    move his Bitcoin, which is not technically correct, but it

10   won't happen the way you're saying.  And when it does, the

11   value of BTC is going to slide.  It's going to fall.

12   Q.  Dr. Wright, you've said that you have several billion

13   dollars in value now, correct?

14   A.  I control that, yes.

15   Q.  And in fact, Dr. Wright, it is true that you are a

16   multi-billionaire, correct?

17          MS. MCGOVERN:  Objection, Your Honor.  403.

18          THE COURT:  Overruled.

19          MS. MCGOVERN:  Relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  If you want to be honest, I control

22   things in some ways and I have companies that I'm a CEO of.

23   Technically, no.  My wife is actually the multi-billionaire.

24   So technically, she's the person who owns it.  Yes, myself and

25   my kids are beneficiaries, but I've also put in covenants over

1    the things here.  So there's already a covenant over the trust.

2    The value of the trust is covenanted for projects that I said.

3         Now, that is 98 percent of all the value that I own

4    will be used in creating a system.  I've said this multiple

5    times.  The value, 98 percent of what he's talking about is

6    under a covenant.  Not for me, not for my kids; basically for

7    the idea I want.  I want to take that money and build a system

8    to take the poorest one billion people on earth and have them

9    in the digital economy.  If there's more money left over, I'll

10   work on the second billion people.

11        I will keep spending that money, the 98 percent, which

12   is now in law, now set, under a covenant of deed, irreversible.

13   I will start working on places like Africa, on India, on Asia,

14   on South America, and I will find a way of building digital

15   asset foundations for these people.

16        So in places like Venezuela or India where there are

17   shantytowns, those people don't own property.  They live there

18   for 20 years sometimes and don't own it.  So under property

19   rules, when you live somewhere and you can prove it, after 12

20   years in most places it becomes yours.  There's actually a case

21   where -- in Hyde Park in London -- they paid out a homeless man

22   20 million pounds because he had been living there for 15 years

23   and technically he had a claim over Hyde Park, center of

24   London.

25        I want a system that will enable those poorest billion

1    to have technology that proves immutably they own their

2    shantytown.  So the same systems that the economist Hernando

3    Soto talked about where those poor people cannot get

4    microloans, they will own their property.  They will own and

5    they will be able to get loans against it.  They will be able

6    to interact globally.

7            So technically, although I control those assets, they

8    are bound, and that's what they're bound to, 98 percent of it.

9            MR. FREEDMAN:  Your Honor, we object to the response.

10   We have a motion to make.

11           THE COURT:  All right.

12           MS. MCGOVERN:  Your Honor, he's simply responding to

13   the question.  Your Honor, they opened the door and he

14   responded accordingly.

15           THE COURT:  You can preserve the objection and do it

16   outside the presence of the jury.

17           Let's continue.

18           MR. FREEDMAN:  Ms. Vela, can you please put up RF-2

19   for the witness and counsel.

20   BY MR. FREEDMAN:

21   Q.  Dr. Wright, that's your Slack channel, and that first line

22   is your statement --

23           MR. FREEDMAN:  Your Honor, we would like to publish

24   this as impeachment.  The witness testified it was his wife.

25           MS. MCGOVERN:  Objection, Your Honor.  Improper

1    impeachment.  This does not correct what he's just stated.

2              THE COURT:  I agree.

3              You may use it for purposes of impeachment.

4              MR. FREEDMAN:  "You may"?

5              THE COURT:  You may.  You're permitted to.

6              MR. FREEDMAN:  Can we please publish to the jury.

7    BY MR. FREEDMAN:

8    Q.  Dr. Wright, can you please read the first line of your

9    response to the jury?

10   A.  Yes.  In 2018 I said:  "I am a multi-billionaire."

11             MR. FREEDMAN:  Thank you, Ms. Vela.

12   BY MR. FREEDMAN:

13   Q.  Dr. Wright, isn't it true that you have said to never feel

14   sorry for a multi-billionaire because they have no need for

15   pity?

16             MS. MCGOVERN:  Objection, Your Honor.  403.

17             THE COURT:  Sustained.

18             MR. FREEDMAN:  Your Honor, we have no further

19   questions of Dr. Wright.

20             THE COURT:  All right.  Any cross-examination?

21             MS. MCGOVERN:  Your Honor, we have no questions of

22   Dr. Wright at this time.

23             THE COURT:  All right.  Ladies and Gentlemen, you are

24   permitted to ask Dr. Wright any questions.  I would just ask

25   that you raise your right hand if you are formulating a written

```
 1    question so we can give you the time that you need.

 2              Does anyone have any questions for Dr. Wright?  If so,

 3    please raise your hand.

 4              All right.  I see no questions to be asked.

 5              Dr. Wright, you may sit with counsel.

 6              And if the Plaintiffs will call their next witness,

 7    please.

 8              THE WITNESS:  Thank you, Your Honor.

 9              MR. ROCHE:  Plaintiffs call Dr. Matthew Edman.

10              THE COURT:  All right.

11              All right.  Good afternoon, Dr. Edman.  If you'll step

12    forward, remain standing.  Raise your right hand to be placed

13    under oath.

14         DR. MATTHEW EDMAN, PLAINTIFF WITNESS, SWORN

15              COURTROOM DEPUTY:  Thank you.

16              Can you please state your name and also spell it for

17    the record.

18         (Court reporter interruption.)

19              THE COURT:  Yes.  Let's give everybody some time.

20         (Pause in proceedings.)

21              THE COURT:  Go ahead, sir.

22              THE WITNESS:  My name is Matthew Edman.

23    M-A-T-T-H-E-W.  E-D-M-A-N.

24              THE COURT:  And sir, if you'll speak right into

25    microphone.
```

```
 1                MR. ROCHE:  May it please the Court.

 2                THE COURT:  Of course.

 3                         DIRECT EXAMINATION

 4     BY MR. ROCHE:

 5     Q.  Good afternoon, Dr. Edman.  Would you please introduce

 6     yourself to the jury by stating your name and where you live.

 7     A.  My name is Matthew Edman.  I live in New York City.

 8     Q.  Have you been retained by the Plaintiffs in this case?

 9     A.  I have.

10     Q.  And are you charging for your services?

11     A.  I am.

12     Q.  At what rate are you charging the Plaintiffs?

13     A.  My employer receives 560 an hour for my services in this

14     matter.

15     Q.  And can you please tell the jury where you're presently

16     employed.

17     A.  I currently work for a consulting firm called Berkeley

18     Research Group in the Cyber Security Investigations Practice.

19     I'm a member of the Cyber Operations and Incident Response

20     Team.

21     Q.  And what is your field of expertise?

22     A.  My expertise is in digital forensic investigations and

23     cryptographic security.

24     Q.  Can you tell the jury what your educational background is.

25     A.  Sure.  I have a bachelor of science in computer science
```

1    from Baylor University.  I have a master of science in computer

2    science from Rensselaer Polytechnic Institute, and I have a

3    Ph.D. in computer science also from Rensselaer Polytechnic

4    Institute.

5    Q.  Rensselaer Polytechnic Institute, that's RPI?

6    A.  That is correct.

7    Q.  And what was the focus of your research during your Ph.D.

8    studies at RPI?

9    A.  My research was mainly focused on the design and analysis

10   of anonymous communications systems and cryptographic security

11   and wireless networks.

12   Q.  After completing your graduate studies, did you ever work

13   for an organization called MITRE Corporation?

14   A.  I did.

15   Q.  And what was your role at MITRE?

16   A.  So MITRE is a federally funded research and development

17   center that supports a number of different government agencies.

18   I in particular was assigned to support the FBI's Remote

19   Operations Unit based out of Quantico, Virginia.

20        THE COURT:  Dr. Edman, I'm just going to ask you to

21   speak up a little bit louder, sir.

22        Thank you.

23   BY MR. ROCHE:

24   Q.  While you were at MITRE Corporation, did there come a time

25   where you worked alongside the FBI?

1    A.   Yes.

2    Q.   And can you please describe for the jury the work that you

3    did for the FBI while you were at MITRE.

4    A.   Right.   So I primarily supported the FBI's Remote

5    Operations Unit in Quantico, Virginia.

6    Q.   And have you heard during the Defense's presentation

7    references to the dark market Silk Road?

8    A.   I have.

9    Q.   And what was the Silk Road marketplace?

10   A.   Silk Road was a darknet marketplace where users could buy

11   and sell illegal narcotics, among other things, in exchange for

12   Bitcoin.

13   Q.   And have any of the investigations you've been involved

14   with involved Silk Road?

15   A.   Yes.

16   Q.   Can you please describe for the jury the work you did in

17   relation to your Silk Road investigations?

18   A.   So the way that Silk Road was built is it was supposed to

19   be impossible to determine where the site was actually hosted,

20   and if the sites -- if you didn't know where the site was

21   hosted, it would have been impossible for law enforcement to

22   determine -- to actually seize the website.   So much of my work

23   was focused on trying to identify where Silk Road and its

24   associated infrastructure was hosted.

25        Later in the investigation, once we were able to determine

1    where the site was hosted, I supported the FBI and the

2    Icelandic national police in seizing those Silk Road websites,

3    as well as the Bitcoins that were hosted on wallets associated

4    with the marketplace.

5    Q.  So during the seizure of the website, did your work end up

6    involving any criminal prosecutions?

7    A.  It did, yes.

8    Q.  And can you please describe the work you did involving

9    those criminal prosecutions?

10   A.  Sure.  So later, as a senior director at FTI Consulting in

11   New York, I was retained by the U.S. Attorney's Office for the

12   Southern District of New York to review various forensic

13   evidence that was collected as part of the Silk Road

14   investigation, identify and extract forensic artifacts related

15   to Bitcoin activity, and conduct analysis to establish

16   significant and ongoing links between the Silk Road marketplace

17   and the defendant, its owner and operator, Ross Ulbricht.

18   Q.  I'd like to move forward to the work you did in this case.

19       What were you asked by Plaintiffs to analyze in this case?

20   A.  Plaintiffs in this case asked me to review certain

21   documents and determine, to the extent possible, whether or not

22   those documents appear to be authentic.

23   Q.  And can you summarize for the jury your findings.

24   A.  My findings in general were that many of the documents that

25   I reviewed were not authentic.

1   Q.  And I didn't catch -- can you repeat the last part of that?

2   A.  Sure.  So many of the documents that I reviewed were not

3   authentic.

4   Q.  Before we get into the substance of your analysis as to how

5   you drew those conclusions, can you please tell the jury the

6   methods you used to determine that certain documents were not

7   authentic.

8   A.  Sure.  So my methodology generally included an analysis of

9   the content and structure of the document, extracting and

10  reviewing metadata that's embedded within the documents and for

11  certain documents that contained cryptographic signatures, and,

12  when present, I would extract and analyze those as well.

13  Q.  Let's break that down.  I heard three primary modes of

14  analysis.

15       You said content.  You analyzed -- I may need to get a new

16  marker.  But can you describe for the jury what the content of

17  a document relates to.

18  A.  That's basically the portions of the document that you can

19  see, that's human readable.

20       THE COURT:  Mr. Roche, I'm just going to stress for

21  Dr. Edman -- because his voice is trailing off.  So if you

22  could just project your voice, sir, we would appreciate it.

23       Thank you.

24  BY MR. ROCHE:

25  Q.  And in addition to a document's content, you said you

1    analyzed metadata.  Can you tell the jury what metadata is.

2    A.  Sure.  So metadata is basically data about data.  In the

3    context of the documents that are reviewed, it's -- they

4    provide information about when the document was created, if or

5    when it was modified.  In some instances, who modified the

6    document.

7    Q.  And were some of those attributes some of the things we

8    looked at during the testimony of Craig Wright?

9    A.  Yes.

10   Q.  And finally, you said the third mode of analysis was

11   cryptographic signatures.  Can you describe to the jury what a

12   cryptographic signature is.

13   A.  A cryptographic signature is kind of like an electronic

14   stamp or a seal on a document that someone -- say if you're

15   sending an email, you use your private key to create the

16   signature, such that anyone who receives this document can

17   verify that it came from you and that it hasn't been modified

18   since you sent it.

19   Q.  So is a cryptographic signature sort of like a digital

20   stamp?

21   A.  In essence, yes.

22   Q.  So we're going to look at a lot of documents, and we've

23   already looked at a lot of documents in this case, and the

24   documents used these three modes of analysis.  But before we

25   dive into that analysis, is there any doubt in your mind that

209

```
1   every single document we are going to examine contains a

2   forgery of some kind?

3   A.  No.

4   Q.  Do you know whether any of the Defendant's experts have

5   opined that the documents you say are forgeries are in fact

6   authentic?

7   A.  They have not.  To my knowledge, they have not even

8   analyzed the documents.

9   Q.  They haven't even analyzed the documents?

10  A.  That's my understanding.

11         MR. ROCHE:  Dorian, can we bring up Plaintiffs'

12  Exhibit 823 -- actually, if we can bring that up in the --

13  perfect.

14         One second.

15     (Pause in proceedings.)

16         MR. ROCHE:  I believe 823 is already in evidence.

17         THE COURT:  It is.

18  BY MR. ROCHE:

19  Q.  Okay.  Dr. Edman, what is Plaintiffs' Exhibit 823?

20  A.  This is a PDF that purports to represent an email from Dave

21  Kleiman to Craig S. Wright on December 10, 2012.

22  Q.  And that's what's highlighted on the top?

23  A.  Correct.

24         MR. ROCHE:  Dorian, could you blow up the fifth

25  paragraph that is highlighted in red.
```

210

```
 1          Just can you call it out or -- perfect.
 2    BY MR. ROCHE:
 3    Q.  It reads:  "I love you like a brother, Craig, but you are a
 4    really difficult person to be close to.  You need people.  Stop
 5    pushing them away.  You have over one million Bitcoin now in
 6    the trust.  Start doing something for yourself and this family
 7    you have.  Later." Signed:  "Dave."
 8         Dr. Edman, in your opinion, is Plaintiffs' Exhibit 823 a
 9    forgery?
10    A.  Yes.
11    Q.  Okay.  We're going to write up here 823, and we're going to
12    refer to that as a forgery.
13          MR. ROCHE:  And, Dorian, can we now not publish to the
14    jury 823.2 and 823.3.  And if we can bring those up side by
15    side for Dr. Edman.
16    BY MR. ROCHE:
17    Q.  Dr. Edman, what is the two documents we're looking at on
18    the screen?
19    A.  I think the document on the left side of the screen is not
20    823.
21          MR. ROCHE:  Oh, okay.  Let's take the document on the
22    left side down and let's just look at 823.2.
23          THE WITNESS:  Okay.  That looks right.  These are PDF
24    metadata objects that I extracted from 823.
25          MR. ROCHE:  Okay.  Your Honor, we would move to admit
```

```
 1    823.1 and 823.2 into evidence.

 2              MR. RIVERO:  Without objection, Your Honor.

 3              THE COURT:  All right.  Admitted into evidence.

 4         (Plaintiffs' Exhibits 823.1 and 823.2 received into

 5    evidence.)

 6              MR. ROCHE:  Let's take those down.

 7              I think you had it up -- oh, please, let's not publish

 8    it to the jury yet.  823.3.

 9    BY MR. ROCHE:

10    Q.  Dr. Edman, we have Plaintiffs' Exhibit 823.3.  What is

11    823.3?

12    A.  823.3 shows analysis of a cryptographic signature that was

13    contained within 823.

14              MR. ROCHE:  Your Honor, at this point we would like to

15    move 823.3 into evidence.

16              MR. RIVERO:  Your Honor, one moment.  I didn't hear

17    the witness to begin with.  I'm not sure what he said.  If we

18    could have it read back or hear it.

19              THE COURT:  Certainly.

20              Yvette, do you want to read back Dr. Edman's answer?

21         (Read back.)

22              MR. RIVERO:  No, Your Honor.

23              THE COURT:  Admitted into evidence.

24         (Plaintiffs' Exhibit 823.3 received into evidence.)

25              MR. ROCHE:  And, Dorian, if we can go back to the
```

1    slide and publish that to the jury.

2    BY MR. ROCHE:

3    Q.  Dr. Edman, we have 823.2 on the screen.  This document

4    looks pretty dense.  So can you explain what this is, and is it

5    the metadata or is it a cryptographic signature we're looking

6    at here?

7    A.  This one is metadata.

8    Q.  And let's walk through your analysis of this metadata.  How

9    did you determine that forgery number one was in fact a forgery

10   from 823.2?

11   A.  There are multiple components, but first I looked at the

12   metadata embedded within the document.  So if you look at line

13   14, it shows that this document was created on March 26th, 2014

14   in time zone known as UTC+11.  And then line 13 shows that this

15   document was modified about a minute and a half later.  Lines

16   22 through 26 identify the creator of the document as a user

17   named Craig Wright.

18   Q.  You mentioned the time zone UTC+11.  Is there anything

19   noteworthy about that time zone?

20   A.  So UTC+11 is a time zone predominately associated with

21   Eastern Australia.

22   Q.  And were you here when Dr. Wright testified that he lived

23   in Australia during that time?

24   A.  I was, yes.

25        MR. ROCHE:  Okay.  And, Dorian, if we could go to the

```
 1    next slide, please.

 2    BY MR. ROCHE:

 3    Q.  This is -- you said you also examined a cryptographic

 4    signature related to forgery number one.  Can you tell the jury

 5    where the cryptographic signature is located in this document.

 6    A.  Sure.  It's located at the bottom of the document, between

 7    the lines that say:  "Begin PGP signature" and then continues

 8    on the other side to:  "End PGP signature."

 9    Q.  Okay.  So that's the full -- what Dorian has just pulled

10    there, that's the full cryptographic signature?

11    A.  Correct.

12    Q.  And how does somebody create -- it looks like a long string

13    of text.  What's the significance of this and how does somebody

14    create a cryptographic signature?

15    A.  So there are a number of different tools for creating

16    cryptographic signatures.  In this particular instance, the

17    version line at the top suggests that this cryptographic

18    signature was created with an open source software tool known

19    as GnuPG --

20         (Court reporter interruption.)

21              THE WITNESS:  Gnu -- G-N-U-P-G.

22              MR. ROCHE:  Dorian, if we could go to the next slide,

23    please.

24    BY MR. ROCHE:

25    Q.  Can you tell the jury how you analyzed the cryptographic
```

1    signature in 823 and what 823.3 shows about that signature?

2    A.  I used the GnuPG software to analyze the cryptographic

3    signature.  Even though the signature text kind of looks random

4    in the top left there, there's actually structure, and the

5    GnuPG software lets me extract and analyze information from

6    that structure.

7        So if you look at line 35 on the right, the signature

8    includes a time stamp that indicates the signature was made on

9    February 28th, 2014.

10   Q.  So the cryptographic signature in forgery one, email sent

11   from Dave to Craig, wasn't created until February 28th, 2014?

12   A.  Correct.

13   Q.  Do you believe this signature was created by Dave Kleiman?

14   A.  I do not.

15   Q.  Why not?

16   A.  My understanding is Dave had been dead for almost a year at

17   the time the signature appears to have been created.

18   Q.  So what does that tell you about the individual or

19   individuals who controlled that signature?

20   A.  It suggests that someone else had access to the private key

21   aside from Dave that was used to create this signature.

22   Q.  And did you review any other documents that indicate that

23   forgery number one is in fact a forgery?

24   A.  I did.

25            MR. ROCHE:  Dorian, if we could go to the next slide,

1    which I believe was admitted as Plaintiffs' Exhibit 799.

2    BY MR. ROCHE:

3    Q.  Dr. Edman, what is this document?

4    A.  This document appears to be a draft email which contains

5    two messages.  The one at the top is very similar to the

6    message that we were looking at in 823, and then the message at

7    the bottom appears to be separate but includes a cryptographic

8    signature.

9    Q.  And, Dr. Edman, were you here earlier when Mr. Freedman

10   questioned Dr. Wright about this exhibit?

11   A.  I was.

12   Q.  And you mentioned there's a cryptographic signature.  I see

13   that's on the second page.  Did you examine that cryptographic

14   signature?

15   A.  I did.

16         MR. ROCHE:  Dorian, if you could bring up and not take

17   down -- we're going to show Dr. Edman an exhibit that's not yet

18   admitted.  799.1.

19   BY MR. ROCHE:

20   Q.  Dr. Edman, what is Plaintiffs' Exhibit 799.1?

21   A.  This is the GnuPG output of analyzing the signature in 799.

22   Q.  And did you extract this data as part of your review of

23   forgery number one?

24   A.  I did.

25         MR. ROCHE:  Your Honor, we move to admit 799.1 into

1   evidence.

2           MR. RIVERO:  Without objection.

3           THE COURT:  All right.  Admitted into evidence.

4       (Plaintiffs' Exhibit 799.1 received into evidence.)

5           MR. ROCHE:  Dorian, if we could go back and go to the

6   next slide, please.

7   BY MR. ROCHE:

8   Q.  Dr. Edman, what does the data about the cryptographic

9   signature that you extracted show us about Plaintiffs' Exhibit

10  799, the draft email?

11  A.  It shows the cryptographic signature was created

12  February 27th, 2014 in Eastern Time, which would be

13  February 28th in UTC+11.

14  Q.  And about how long before the signature in 823 was this

15  signature created?

16  A.  It was a little less than an hour.

17  Q.  So the signature of the draft was created a little less

18  than an hour from the signature found in Plaintiffs' Exhibit

19  823?

20  A.  Correct.

21          MR. ROCHE:  Dorian, if we could go to the next slide,

22  please.

23  BY MR. ROCHE:

24  Q.  All right.  I think we've got on the screen Plaintiffs'

25  Exhibit 824 and Plaintiffs' Exhibit 799, the draft.  I see

1    there's -- are there any differences between the draft and the

2    Plaintiffs' Exhibit 824?

3    A.   Yes.  Plaintiffs' Exhibit 824 appears to be an email sent

4    from craig@rcjbr.org to craig@rcjbr.org.  And the text -- in

5    addition to including the cryptographic signature, the text is

6    also slightly different.

7    Q.   Is that what the red boxes indicate?

8    A.   Yes.

9    Q.   And so I see the box on the left says:  "You have one

10   million Bitcoin now in the trust.  Start doing something for

11   yourself and this family you have."

12       Dr. Edman, was that line added shortly after the draft was

13   initially created in 799?

14   A.   It appears so, yes.

15   Q.   Dr. Edman, did Dr. Wright send forgery number one to anyone

16   besides himself?

17   A.   Yes.

18          MR. ROCHE:  Dorian, if we could go to the next slide

19   please, Plaintiffs' Exhibit 630, which was previously admitted

20   into evidence.

21   BY MR. ROCHE:

22   Q.   Dr. Edman, what does Plaintiffs' Exhibit 630 show?

23   A.   630 shows a message that was forwarded from

24   craig.wright@hotwirepe.com to Ira Kleiman.

25   Q.   Are the contents of this message to Ira Kleiman on

1    February 28th, 2014 the same as the contents in forgery one?

2    A.  Yes, and they include identical cryptographic signatures.

3         MR. RIVERO:  Objection, Judge.  There were references

4    to two cryptographic signatures.  I'm not sure -- this is

5    unclear testimony.

6         THE COURT:  All right.

7         MR. ROCHE:  We'll clarify the relationship.

8    BY MR. ROCHE:

9    Q.  So what's the relationship between the cryptographic

10   signature we see in 630 and the cryptographic signature we

11   reviewed in 823?

12   A.  They are the same.

13   Q.  Dr. Edman, do you understand from the testimony you saw

14   from Dr. Wright that the first time he reaches out to the

15   family of David Kleiman was a couple weeks before this email

16   was sent to Ira?

17   A.  That is my understanding.

18        MR. ROCHE:  Dorian, could we go to the next slide,

19   please.

20   BY MR. ROCHE:

21   Q.  So on the left --

22        MR. ROCHE:  Let's keep this one on.

23   BY MR. ROCHE:

24   Q.  So on the left we have the copy of forgery one that was

25   sent to Ira and on the right we have the draft that Craig

```
 1    Wright sends to himself.

 2         What time was forgery number one sent to Ira?

 3    A.  At 5:56 a.m., which I believe is in UTC.

 4    Q.  And how does that timestamp compare to the timestamp you

 5    found in the cryptographic signature on the right?

 6    A.  They are within an hour of each other.  I think even within

 7    10 minutes.

 8    Q.  All right.  And you have a few things highlighted in these

 9    two slides.  What does that show?

10    A.  That shows differences between 824 and what was sent to Ira

11    Kleiman in 630.

12    Q.  And can you describe the nature of those edits.

13              MR. RIVERO:  Objection.  The document speaks for

14    itself, Judge.

15              THE COURT:  Overruled.  I'll allow it.

16              THE WITNESS:  It appears that a word was added and a

17    typo was fixed.

18    BY MR. ROCHE:

19    Q.  So a few typos were fixed just a few minutes before the

20    email craig@rcjbr.org forwards this to Ira?

21    A.  Correct.

22    Q.  Have you reviewed any evidence in this case that suggests

23    forgery number one was created by anybody besides Craig Wright?

24              MR. RIVERO:  Objection.  Calls for speculation, Judge.

25              THE COURT:  Based on the testimony, overruled.
```

```
 1              THE WITNESS:  I have not.

 2    BY MR. ROCHE:

 3    Q.  For all the forgeries we're going to examine today and

 4    tomorrow morning, have you seen any evidence that any of those

 5    forgeries were created by anyone but Craig Wright?

 6              MR. RIVERO:  Same objection, Your Honor.

 7              THE COURT:  It's noted.  Overruled.

 8              THE WITNESS:  I have not.

 9              MR. ROCHE:  Your Honor, we can stop here or we could

10    go like 10, 15 more minutes.

11              THE COURT:  No.  Why don't we go ahead and stop at

12    this time.

13              All right.  Ladies and Gentlemen, we are going to

14    adjourn for the evening.  Tomorrow's schedule will be the same.

15    Please make your way into the building, be here ready to come

16    into the courtroom at 9:45.

17              Have a pleasant evening.

18              As I stated previously, you're not to discuss this

19    case with anyone or permit anyone to speak with you.  You're

20    not to conduct any independent research.  Everything learned

21    about the case is learned within the courtroom.

22              If you'll place your juror notebooks in the jury room.

23    They will remain secure.

24              Have a pleasant evening.

25         (Jury not present, 5:02 p.m.)
```

```
1              THE COURT:  All right.  Thank you, Dr. Edman.  We'll
2      see you tomorrow morning.
3              Is there anything further on behalf of the Plaintiff?
4              MR. FREEDMAN:  Your Honor, there's two things for the
5      Plaintiffs.
6              THE COURT:  All right.  Go ahead and have a seat,
7      then.
8              MR. FREEDMAN:  One, the Plaintiffs filed a request for
9      judicial notice last night, Your Honor, about receiving
10     judicial notice on the equivalence or the exchange rates
11     between Great British pounds and U.S. dollars and Australian
12     dollars and U.S. dollars.  We don't need a ruling now.  I just
13     wanted to flag that for the Court.
14             THE COURT:  Did you comply with local Rule 7.183 and
15     confer with the Defendant?
16             MR. FREEDMAN:  Your Honor, I believe it's a noticed
17     request for a judicial notice, but if the Court wants --
18             THE COURT:  It would be helpful to the Court to know
19     that one of the prongs is that both sides are in agreement.
20             MR. FREEDMAN:  We will confer with the other side,
21     Your Honor.
22             THE COURT:  All right.  Then we'll take it up once
23     you've set forth a notification, and then at least the Court
24     can have some preparation before we have any argument.
25             MR. FREEDMAN:  Sure.
```

```
 1            THE COURT:  All right.  And the second item?

 2            MR. FREEDMAN:  The second item, Your Honor, is -- I'd

 3      like some time to discuss with my team, but if the Court

 4      recalls, before the trial started we flagged that Dr. Wright

 5      will claim that he is going to give his fortune to charity and

 6      that it was inappropriate.  He has now injected that into the

 7      case in response to a question, which was:  "Are you a

 8      multi-billionaire?"  So I don't know yet exactly what we want

 9      to do, but I notified the Court at the time that we objected to

10      the response and I'd just like the Court to just give us a day

11      to confer internally and advise the Court what, if anything, we

12      think is appropriate.

13            THE COURT:  All right.  You've preserved the

14      objection.  If there's any further action that you would like,

15      then you can address it at the appropriate name.

16            MR. FREEDMAN:  Thank you, Your Honor.  That's all for

17      Plaintiffs.

18            THE COURT:  On behalf of the Defendant?

19            MR. RIVERO:  Nothing from us, Judge.

20            THE COURT:  All right, then.  As I stated, you can use

21      the conference room.  We are going to need the courtroom

22      tomorrow morning.  But I'll plan on seeing you about 9:45 so we

23      can start right at 10:00.

24            Okay.  Have a pleasant evening.

25            MR. RIVERO:  Have a good evening, Judge.
```

1          (Proceedings adjourned at 5:04 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    UNITED STATES OF AMERICA      )

 2    ss:

 3    SOUTHERN DISTRICT OF FLORIDA  )

 4                    C E R T I F I C A T E

 5            I, Yvette Hernandez, Certified Shorthand Reporter in

 6    and for the United States District Court for the Southern

 7    District of Florida, do hereby certify that I was present at

 8    and reported in machine shorthand the proceedings had the 15th

 9    day of November, 2021, in the above-mentioned court; and that

10    the foregoing transcript is a true, correct, and complete

11    transcript of my stenographic notes.

12            I further certify that this transcript contains pages

13    1 - 224.

14            IN WITNESS WHEREOF, I have hereunto set my hand at

15    Miami, Florida this 21st day of November, 2021.

16

17                         /s/Yvette Hernandez
                           Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                         400 North Miami Avenue, 10-2
                           Miami, Florida 33128
19                         (305) 523-5698
                           yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25
```

**COURTROOM DEPUTY:
[2]**  4/6 202/15
**MR. BRENNER: [2]**
4/12 4/20
**MR. FERNANDEZ: [1]**
 5/5
**MR. FREEDMAN:
[383]**
**MR. KASS: [1]**  5/2
**MR. LAGOS: [1]**
4/16
**MR. MESTRE: [1]**
5/4
**MR. RIVERO: [11]**
4/25 211/2 211/16
211/22 216/2 218/3
219/13 219/24
220/6 222/19
222/25
**MR. ROCHE: [24]**
4/14 202/9 203/1
209/11 209/16
209/24 210/13
210/21 210/25
211/6 211/14
211/25 212/25
213/22 214/25
215/16 215/25
216/5 216/21
217/18 218/7
218/18 218/22
220/9
**MR. ZACK: [1]**
4/18
**MS. MCGOVERN:
[164]**  4/23 5/7
7/5 7/12 9/16 9/21
10/17 15/4 17/16
22/10 22/16 27/24
29/20 29/22 31/16
34/13 34/15 38/9
39/13 42/5 44/16

44/20 50/22 61/22
63/15 63/18 65/14
66/12 69/22 71/9
74/12 76/8 78/19
81/4 81/18 87/1
91/20 93/19 94/4
96/23 98/16 103/8
103/20 103/22
107/13 111/23
112/10 113/11
113/14 115/15
115/20 116/10
116/13 116/16
118/16 119/20
120/10 121/1
121/22 122/2
122/23 123/1
123/15 124/16
125/12 126/10
126/16 126/18
127/14 128/5
128/16 129/3
129/17 130/7 131/4
132/11 132/23
133/11 133/18
134/14 135/8 136/9
137/11 137/19
138/7 138/18
139/22 139/25
140/15 141/2
141/21 142/10
142/25 143/9
143/24 144/11
145/12 146/11
147/2 147/19
148/12 148/22
149/14 150/5 151/1
151/14 152/20
153/14 154/1
154/17 156/9 157/3
157/22 158/1 158/3
158/7 158/14
159/11 161/7
161/24 163/5 164/5

164/17 165/13
166/8 166/23 167/8
168/1 168/17
168/21 168/24
169/16 169/21
170/3 170/6 170/14
170/21 171/11
172/20 174/4
177/19 181/21
183/12 184/8
184/23 186/10
187/1 188/19 190/8
191/10 192/5
192/12 192/19
192/24 193/3
196/10 197/17
197/22 198/17
198/19 200/12
200/25 201/16
201/21
**THE COURT
REPORTER: [1]**
44/18
**THE COURT: [244]**
**THE WITNESS: [39]**
9/25 34/18 38/12
60/22 61/4 63/9
78/21 81/7 92/12
113/16 116/20
121/21 122/4
126/21 126/23
136/11 144/15
146/14 149/1 149/3
150/8 150/12
161/15 161/23
162/2 184/10
186/13 189/25
191/12 196/13
197/25 198/21
202/8 202/22
210/23 213/21
219/16 220/1 220/8

USCA11 Case: 22-11150    Document: 53    Date Filed: 11/30/2022    Page: 203 of 254

**$**

**$1.5 [2]**   66/14
 67/21
**$1.5 million [2]**
 66/14 67/21
**$1.9 [1]**   113/17
**$1.9 billion [1]**
 113/17
**$10 [3]**   21/1 21/5
 48/15
**$10.5 [1]**   8/4
**$10.5 million [1]**
 8/4
**$11 [8]**   8/6 8/8
 8/12 21/2 21/9
 21/11 21/14 21/17
**$12 [10]**   27/8
 49/17 76/20 76/22
 77/2 79/19 79/21
 80/23 82/5 134/5
**$15 [2]**   66/11
 76/24
**$150 [3]**   17/9
 17/12 84/25
**$150,000 [1]**   23/25
**$2 [3]**   62/8 62/12
 197/5
**$2,614,000,000 [1]**
 114/21
**$200,000 [1]**   15/25
**$252 [3]**   115/9
 116/8 118/15
**$3.5 [1]**   69/1
**$3.5 million [1]**
 69/1
**$300,000 [1]**   15/17
**$34 [1]**   19/16
**$378,475,713 [1]**
 57/8
**$38.4 [1]**   25/15
**$38.4 million [1]**
 25/15
**$53.7 [2]**   197/21

 198/4
**$53.7 billion [1]**
 197/21
**$60 [2]**   26/6 27/6

**'**

**'13 [2]**   25/19 56/7
**'14 [3]**   25/19
 25/21 56/8
**'15 [1]**   25/21
**'80s [1]**   56/2
**'cords' [1]**   135/21
**'cores.' [1]**
 135/22
**'Craig [1]**   95/10

**/**

**/s/Yvette [1]**
 224/17

**0**

**055 [2]**   3/9 145/14
**059 [2]**   2/21
 126/12

**1**

**1,957,000,000 [1]**
 114/6
**1.1 [1]**   95/14
**1.4 [1]**   94/22
**1.4A [1]**   92/9
**1.5 million [2]**
 67/24 68/24
**1.7 [2]**   95/24 96/2
**1.9 billion [1]**
 113/9
**10 [15]**   1/11 19/19
 21/6 21/15 21/17
 49/10 49/23 84/19
 113/22 135/21
 156/12 181/7
 209/21 219/7
 220/10
**10,642,000 [1]**
 23/16

**10-2 [2]**   1/24
**10.5 [1]**   8/14
**10.5 million [1]**
 8/10
**100 [3]**   1/17 84/21
 84/23
**1000 [1]**   1/22
**103 [1]**   2/17
**104 [1]**   2/17
**105 [1]**   179/2
**107 [2]**   2/17 2/17
**10:00 [1]**   222/23
**10th [1]**   160/2
**11 [6]**   21/5 58/20
 212/14 212/18
 212/20 216/13
**11-page [1]**   135/21
**113 [2]**   2/10 42/7
**119 [2]**   2/18 2/18
**11:22 [1]**   60/5
**11:23 [1]**   60/14
**11:43 [2]**   60/14
 61/6
**11th [7]**   11/15
 11/24 18/14 18/16
 20/5 22/22 23/5
**12 [6]**   24/5 24/7
 55/6 73/9 80/1
 199/19
**12.9 million [2]**
 25/20 25/22
**120 [2]**   2/18 2/18
**122 [1]**   2/19
**123 [3]**   2/19 2/19
 2/19
**124 [2]**   2/20 2/20
**125 [2]**   2/20 2/20
**126 [2]**   2/21 2/21
**127 [2]**   2/21 2/21
**128 [4]**   2/22 2/22
 2/22 2/22
**129 [2]**   2/23 2/23
**13 [3]**   38/23

USCA11 Case: 22-11150    Document: 53    Date Filed: 11/30/2022    Page: 204 of 254

**1**

**13...** **[2]** 105/17
212/14
**130** **[2]** 2/23 2/23
**131** **[2]** 2/24 2/24
**132** **[4]** 3/2 3/2
3/3 3/3
**133** **[2]** 3/3 3/3
**134** **[4]** 2/21 3/4
3/4 127/16
**135** **[4]** 3/4 3/4
3/9 147/6
**137** **[4]** 2/9 3/5
3/5 15/9
**138** **[4]** 3/5 3/5
3/6 3/6
**139** **[1]** 3/6
**13th** **[1]** 185/8
**14** **[6]** 35/15 35/19
37/8 38/19 73/9
212/13
**140** **[7]** 2/22 3/6
3/7 3/7 3/7 43/25
128/7
**141** **[3]** 3/7 3/8
3/8
**142** **[4]** 2/22 3/8
3/8 128/18
**145** **[2]** 3/9 3/9
**145,000** **[1]** 85/7
**146** **[3]** 3/9 3/16
177/21
**147** **[3]** 3/9 3/10
3/10
**148** **[2]** 3/10 3/10
**149** **[2]** 3/11 3/11
**14th** **[2]** 12/22
52/7
**15** **[17]** 1/5 2/9
2/9 25/20 73/21
93/15 96/25 193/16
194/9 194/11
194/13 194/16

194/16 194/17
195/5 199/6
220/10
**150** **[1]** 3/11
**150,000** **[1]** 24/1
**151** **[1]** 3/11
**15th** **[1]** 224/8
**16** **[6]** 54/21 56/11
105/17 119/9 122/1
195/12
**16,000** **[1]** 194/17
**162** **[2]** 3/12 3/12
**162.5** **[1]** 69/2
**164** **[4]** 3/12 3/12
3/13 3/13
**166** **[4]** 2/10 3/13
3/13 44/23
**167** **[1]** 3/14
**168** **[1]** 3/14
**169** **[2]** 3/14 3/14
**16th** **[3]** 28/4 32/7
32/15
**17** **[1]** 52/20
**171** **[2]** 3/15 3/15
**174** **[2]** 3/15 3/15
**175** **[1]** 179/21
**177** **[2]** 3/16 3/16
**18** **[8]** 40/8 48/18
53/12 110/14
110/14 120/19
121/4 179/4
**18-80176** **[1]** 4/6
**18-month** **[1]**
110/12
**181** **[2]** 2/11 50/25
**184** **[2]** 3/16 3/16
**187** **[2]** 3/14 168/3
**18th** **[6]** 17/25
58/19 73/8 73/20
105/16 105/20
**19** **[2]** 73/21
108/17
**190** **[2]** 3/17 3/17
**191** **[2]** 2/11 62/1

**1:01** **[1]** 111/6
**1:02** **[1]** 204/4

**2**

**20** **[4]** 110/15
111/10 199/18
199/22
**20-minute** **[4]** 60/4
60/13 162/18
162/20
**200** **[4]** 1/14 83/24
108/6 108/23
**2001** **[2]** 172/9
172/11
**2003** **[1]** 172/10
**2004** **[2]** 186/13
186/15
**2006** **[1]** 186/16
**2007** **[1]** 59/2
**2008** **[2]** 176/22
186/17
**2009** **[20]** 9/4 9/4
10/24 12/8 14/10
16/22 41/11 43/4
58/7 59/8 59/9
59/21 117/25
138/25 175/18
176/9 179/16
181/25 186/17
197/2
**2010** **[7]** 48/6 58/7
118/4 174/25
179/19 180/15
186/17
**2011** **[7]** 12/11
12/11 58/7 174/18
186/18 187/13
196/13
**2012** **[19]** 12/13
58/7 160/2 174/18
174/20 179/9
179/11 183/6
183/10 184/5 185/6
185/15 186/1 186/2

**2**

**2012**... **[5]** 186/3
186/5 186/6 186/18
209/21
**2013 [12]** 6/22
6/23 6/25 7/1 9/4
12/7 12/14 50/4
58/7 79/24 83/17
186/19
**2014 [43]** 7/3 7/20
9/12 9/15 10/15
10/21 11/15 11/24
12/22 17/25 18/14
18/16 20/5 20/11
22/22 23/5 28/4
32/8 32/15 39/20
41/20 48/2 50/4
50/9 51/17 52/7
58/7 58/25 59/23
79/24 83/12 83/14
84/3 179/12 184/7
185/13 186/5 186/6
212/13 214/9
214/11 216/12
218/1
**2015 [21]** 57/24
58/6 58/7 58/14
58/23 59/7 64/17
73/2 73/12 73/24
74/16 76/4 81/23
85/15 87/9 91/2
91/13 94/16 98/5
99/9 135/20
**2016 [3]** 108/6
113/8 139/10
**2017 [5]** 14/5 14/9
14/10 113/8 114/5
**2018 [6]** 56/6
114/19 114/23
114/25 115/4
201/10
**2019 [1]** 179/3
**2020 [8]** 58/19

73/8 73/20 105/16
105/20 187/8 187/9
187/20 187/22
**2021 [4]** 1/5 116/5
224/9 224/15
**203 [1]** 2/7
**206 [1]** 114/5
**209 [3]** 2/23
109/10 129/5
**20th [4]** 7/3 7/20
9/12 9/15
**210 [2]** 2/23
130/10
**211 [8]** 2/24 3/17
3/17 3/18 3/18
3/18 3/18 131/22
**213 [2]** 3/2 132/14
**214 [2]** 3/3 132/25
**215 [2]** 3/3 133/13
**216 [4]** 2/13 3/19
3/19 69/25
**217 [2]** 2/12 63/21
**219 [2]** 3/4 134/16
**21st [2]** 185/12
224/15
**22 [2]** 105/21
212/16
**223 [2]** 3/4 135/10
**224 [5]** 1/8 2/2
3/5 137/13 224/13
**229 [2]** 2/12 65/19
**23 [1]** 179/4
**230 [2]** 2/18
119/23
**233,000 [1]** 156/11
**23rd [2]** 40/21
183/10
**24 [4]** 55/6 57/2
70/20 71/20
**241 [2]** 2/14 74/14
**248 [2]** 2/15 87/3
**24th [2]** 48/2 87/9
**25 [3]** 25/24 25/25
108/20

**2525 [1]** 1/22
**256 [2]** 2/11 76/10
**257 [2]** 2/15 81/21
**25th [2]** 6/25
20/11
**26 [2]** 58/20
212/16
**26th [2]** 6/22
212/13
**27 [1]** 2/9
**271 [1]** 182/20
**274 [2]** 3/5 138/9
**276,268,599 [1]**
49/9
**27th [2]** 94/15
216/12
**28 [2]** 2/9 123/10
**2800 [1]** 1/17
**28th [6]** 76/4
81/23 214/9 214/11
216/13 218/1
**296 [2]** 2/16 94/10
**2:00 [2]** 111/5
112/3
**2:03 [1]** 112/4
**2:04 [1]** 112/14
**2nd [1]** 1/17

**3**

**3,000 [2]** 56/24
56/24
**3,208 [2]** 108/10
108/14
**3,500,000 [1]**
68/16
**3.2 [2]** 72/1 72/5
**3.5 million [1]**
68/20
**30 [6]** 24/1 77/21
77/22 88/20 146/5
146/10
**30,000 [1]** 77/21
**300 [4]** 18/21 19/6
49/18 83/24

USCA11 Case: 22-11150    Document: 53-11    Date Filed: 11/30/2022    Page: 206 of 254

## 3

**300,000 [1]**   56/22
**300-plus [1]**   18/24
**301 [2]**   2/16 99/5
**303,895,458 [1]**
 49/11
**305 [1]**   224/19
**308 [2]**   2/18
 120/13
**30th [2]**   6/23
 116/5
**310 [3]**   2/19 123/2
 123/3
**313 [2]**   3/6 138/20
**315 [2]**   2/19
 123/19
**32 [2]**   53/15 56/10
**326 [3]**   3/6 140/3
 140/4
**33128 [2]**   1/25
 224/18
**33131 [2]**   1/14
 1/18
**33134 [1]**   1/22
**337 [2]**   2/20
 124/20
**34 [1]**   19/20
**35 [1]**   214/7
**350 [2]**   2/13 71/12
**37 [3]**   68/8 68/12
 68/24
**382 [1]**   179/4
**398 [3]**   2/20
 125/15 125/16
**3:08 [2]**   162/22
 162/23
**3:30 [2]**   162/23
 163/8

## 4

**400 [2]**   1/24
 224/18
**403 [6]**   81/18
 126/18 192/5

192/13 198/17
201/5
**42 [3]**   2/10 2/10
 40/20
**44 [4]**   2/10 2/10
 28/19 29/24
**46 [3]**   52/24 56/10
 58/19
**47 [1]**   46/4
**49 [2]**   23/21
 182/19
**49.5 [6]**   23/16
 23/18 23/20 24/9
 24/15 82/14
**4th [1]**   179/3

## 5

**5,000 [1]**   91/18
**5.1 [1]**   93/18
**50 [3]**   2/11 2/11
 56/21
**50,000 [4]**   59/10
 59/22 176/9 197/3
**50-something [1]**
 55/13
**50A [1]**   73/7
**50B [1]**   73/19
**51 [3]**   46/14
 105/17 105/21
**514 [2]**   3/10
 147/21
**52 [1]**   105/22
**523-5698 [1]**
 224/19
**53 [2]**   46/22
 105/19
**538 [2]**   3/10
 148/14
**540 [2]**   3/11
 149/17
**546 [4]**   3/12
 163/14 163/20
 164/7
**55 [3]**   78/25 79/1

85/5
201/4
**56 [1]**   49/4
**560 [1]**   203/13
**5698 [1]**   224/19
**578 [2]**   3/7 140/17
**58 [1]**   105/15
**598 [2]**   3/7 141/4
**5:02 [1]**   220/25
**5:04 [1]**   223/1
**5:56 [1]**   219/3
**5th [1]**   99/8

## 6

**6,080,555 [2]**   48/4
 51/7
**6.4 million [1]**
 108/12
**60 [2]**   13/11
 153/23
**60-page [1]**   13/14
**61 [1]**   2/11
**62 [4]**   2/11 5/15
 73/9 73/21
**63 [2]**   2/12 2/12
**630 [9]**   3/11 151/3
 158/18 159/7
 217/19 217/22
 217/23 218/10
 219/11
**65 [2]**   2/12 2/12
**664 [2]**   3/8 141/23
**685 [2]**   2/17
 107/16
**69 [3]**   2/13 2/13
 179/22
**695 [2]**   3/8 142/12
**6th [2]**   10/15
 10/21

## 7

**7.183 [1]**   221/14
**71 [2]**   2/13 2/13
**720 [2]**   3/13

**7**

**720 . . . [1]**    164/19
**727 [2]**    2/9 28/1
**74 [2]**    2/14 2/14
**76 [2]**    2/14 2/14
**781 [2]**    2/17 104/1
**799 [10]**    3/12
  159/11 162/8
  162/13 162/14
  215/1 215/21
  216/10 216/25
  217/13
**799.1 [5]**    3/19
  215/18 215/20
  215/25 216/4

**8**

**80176 [1]**    4/6
**81 [2]**    2/15 2/15
**821,050 [1]**    197/20
**823 [13]**    209/12
  209/16 209/19
  210/8 210/11
  210/20 210/24
  211/13 214/1 215/6
  216/14 216/19
  218/11
**823.1 [3]**    3/17
  211/1 211/4
**823.2 [7]**    3/18
  210/14 210/22
  211/1 211/4 212/3
  212/10
**823.3 [9]**    3/18
  210/14 211/8
  211/10 211/11
  211/12 211/15
  211/24 214/1
**824 [6]**    3/13
  166/10 216/25
  217/2 217/3 219/10
**825,050 [1]**    195/18
**853 [3]**    169/2
  170/9 171/24

**853.2 [3]**    3/14
  169/19 171/22
**853.3 [2]**    3/15
  174/6
**853.4 [1]**    3/17
**856 [3]**    3/15 167/9
  171/13
**86 [1]**    2/15
**862 [1]**    31/24
**869 [2]**    3/16
  184/25
**87 [1]**    2/15
**8th [1]**    74/16

**9**

**90 [1]**    74/21
**94 [2]**    2/16 2/16
**98 [5]**    2/16 199/3
  199/5 199/11 200/8
**99 [2]**    2/16 93/4
**9:18-cv-80176-BB
  [1]**    1/2
**9:45 [2]**    220/16
  222/22
**9:58 [2]**    1/6 4/1
**9:59 [1]**    6/2

**A**

**a.m [8]**    1/6 4/1
  6/2 60/5 60/14
  60/14 61/6 219/3
**Abacus [2]**    184/16
  185/11
**abeyance [2]**    91/8
  91/8
**ability [2]**    49/20
  55/4
**able [12]**    43/20
  51/18 57/10 88/4
  92/25 100/12 122/3
  133/16 157/8 200/5
  200/5 205/25
**about [131]**    11/19
  12/2 12/3 13/19

13/21 14/18 14/25
16/14 16/17 16/19
17/9 18/1 18/7
18/21 19/22 22/8
24/12 24/17 25/11
27/20 34/3 34/10
35/11 36/11 39/19
42/24 43/8 44/3
44/8 44/9 45/10
47/4 48/10 48/17
53/9 55/2 55/3
56/6 56/20 57/24
58/3 59/16 59/17
61/15 61/16 63/4
65/9 69/11 73/3
73/5 73/16 74/1
74/8 75/23 77/23
79/21 81/13 83/5
85/2 93/9 95/16
99/24 103/2 106/12
110/8 110/8 110/13
111/2 111/9 111/10
117/2 117/20
117/21 117/21
126/8 126/24
128/23 128/24
130/22 130/25
131/13 132/3
134/24 134/25
136/3 137/8 138/13
142/3 147/16 153/9
156/12 162/10
164/2 172/6 172/7
172/9 172/10
173/18 176/8
176/10 176/11
178/3 179/20 180/1
189/21 191/7 191/7
191/22 191/24
194/22 194/23
196/18 197/21
199/5 200/3 208/2
208/4 212/15

USCA11 Case: 22-11150   Document: 13   Date Filed: 11/30/2022   Page: 208 of 254

# A

**about... [10]**
212/19 214/1
214/18 215/10
216/8 216/9 216/14
220/21 221/9
222/22

**above [5]** 48/14
96/3 124/7 185/16
224/9

**above-mentioned [1]**
224/9

**above-referenced
[1]** 185/16

**absence [1]** 122/24

**absolutely [4]**
64/21 77/19 101/5
170/22

**abstract [1]** 91/7

**academic [1]** 13/14

**academics [2]** 13/8
13/11

**accept [1]** 127/9

**accepted [4]** 8/8
64/9 77/12 136/6

**access [8]** 34/20
37/2 146/10 146/21
167/15 171/3
195/17 214/20

**accordance [1]**
101/4

**accordingly [1]**
200/14

**account [19]** 12/24
12/25 14/3 14/3
29/3 104/20 116/4
144/16 155/9
155/10 155/18
160/9 169/7 171/2
171/7 171/8 172/5
173/14 184/19

**accountant [5]**
11/19 14/17 15/15

33/15 33/17

**accountants [5]**
16/24 32/24 48/21
50/10 197/8

**accounting [6]**
12/12 37/18 45/18
45/20 52/18 90/13

**accounts [3]** 29/7
84/1 195/17

**accrual [1]** 45/22

**accruals [1]** 25/24

**accurate [1]**
135/18

**accurately [1]**
40/16

**achieve [4]** 80/12
93/4 93/7 100/12

**achieved [1]** 95/5

**achieving [1]**
80/16

**acknowledgment [1]**
9/19

**acquire [3]** 82/8
82/13 82/21

**acquired [1]** 40/24

**Acquisition [1]**
113/4

**across [3]** 91/19
92/25 124/10

**action [3]** 30/21
74/17 222/14

**actions [2]** 31/6
33/20

**active [1]** 178/24

**activities [2]**
52/25 53/17

**activity [2]** 185/9
206/15

**actual [6]** 8/17
40/15 127/10
144/18 167/13
170/25

**actually [109]**
7/21 7/22 8/5 8/7

8/18 12/10 13/20
15/21 18/8 18/8
18/20 19/13 19/15
21/8 21/11 25/18
26/16 26/18 29/14
32/11 34/4 35/25
42/13 42/25 45/17
47/5 48/9 48/14
50/11 51/11 51/19
53/3 55/20 55/23
56/1 56/13 59/8
59/12 59/18 62/11
65/12 66/3 68/14
80/8 81/1 81/1
81/3 82/12 88/12
88/15 89/15 89/22
89/22 89/23 90/12
90/15 90/18 94/17
100/3 102/1 103/5
108/8 109/1 109/7
113/1 113/3 113/5
115/11 116/25
121/8 123/13 124/8
134/3 143/18 147/9
147/24 148/2 148/3
154/10 160/7
162/17 163/12
165/20 167/3
168/15 175/16
177/4 178/16 179/1
179/9 180/5 180/8
180/10 180/21
182/5 184/5 186/4
186/13 190/1
197/10 198/23
199/20 205/19
205/22 209/12
214/4

**add [2]** 56/11
172/1

**added [5]** 56/13
82/11 171/25
217/12 219/16

USGA11 Case: 22-11150 Document: 153-14 Date Filed: 11/30/2022 Page: 209 of 254

**addition [2]**
207/25 217/5
**additional [1]**
98/24
**address [41]**  5/13
28/13 29/15 99/17
112/6 126/5 131/9
143/18 144/19
145/9 153/3 153/5
154/5 154/6 154/14
154/20 156/7
156/21 156/22
157/2 157/17
157/18 157/24
159/4 159/4 160/12
160/13 160/23
160/25 161/11
161/13 162/2 162/7
162/8 163/1 167/9
167/23 171/2 171/3
172/5 222/15
**addressed [4]**
28/24 30/5 115/18
193/1
**addresses [1]**
193/16
**addressing [2]**
97/19 171/21
**adequate [1]**  94/7
**adjourn [1]**  220/14
**adjourned [1]**
223/1
**administration [7]**
83/12 84/4 84/6
84/14 85/13 87/19
87/20
**administrative [1]**
146/19
**administrator [5]**
146/18 146/18
146/20 188/9
188/10

**administrators [3]**
144/15 144/18 146/13
**admissibility [3]**
156/24 157/19
162/9
**admission [3]**  5/16
143/22 156/16
**admit [7]**  14/11
111/12 143/10
157/4 188/23
210/25 215/25
**admits [1]**  15/1
**admitted [77]**  2/8
3/2 12/13 15/7
27/25 42/6 44/22
50/24 60/9 61/25
63/19 65/18 69/24
71/11 74/13 76/9
81/19 87/2 94/8
98/20 99/4 103/24
107/15 120/12
123/2 123/18
124/19 125/15
126/11 127/15
128/6 128/17 129/4
130/9 131/21
132/13 132/24
133/12 134/15
135/9 137/12 138/8
138/19 140/3
140/16 141/3
141/22 142/11
145/13 147/5
147/20 148/13
149/16 151/2
162/13 164/6
164/18 166/9 168/2
169/17 171/12
171/24 172/21
174/5 177/20
184/24 187/4 187/5
187/6 190/9 192/18
211/3 211/23 215/1
215/18 216/3

217/19
**admonish [1]**  66/20
**adoptive [1]**
143/22
**Adrian [1]**  104/6
**advance [3]**  82/7
82/8 82/12
**advice [1]**  37/5
**advise [3]**  135/17
135/19 222/11
**advised [2]**  5/17
30/15
**advising [1]**  9/13
**Africa [1]**  199/13
**after [23]**  11/18
18/1 18/2 25/21
27/10 32/10 32/15
33/23 36/21 39/23
64/17 73/24 76/14
83/6 83/23 110/14
110/19 184/2
194/19 195/12
199/19 204/12
217/12
**afternoon [4]**
112/21 112/22
202/11 203/5
**afterwards [1]**
108/25
**again [46]**  12/3
12/4 12/5 20/19
21/11 21/25 22/3
23/22 38/12 40/1
45/15 53/2 53/13
53/20 54/8 56/16
60/20 64/22 67/18
68/2 69/2 74/1
75/23 78/6 78/16
78/21 80/9 92/23
93/11 93/11 93/13
99/8 104/21 109/11
114/11 120/3 121/5
123/13 131/6
134/21 139/11

**A**

USCA11 Case: 22-11150    Document: 32    Date Filed: 11/30/2022    Page: 210 of 254

**again... [5]**
183/14 189/16
190/13 191/8
193/15

**against [10]**  6/25
30/24 31/7 33/21
34/3 34/11 84/13
88/4 117/13 200/5

**agencies [1]**
204/17

**ago [1]**  15/11

**agree [10]**  34/24
72/5 72/18 84/10
111/11 156/17
156/20 158/17
194/11 201/2

**agreed [5]**  66/19
85/18 85/20 154/22
175/7

**agreement [24]**
64/21 66/4 67/5
67/5 67/7 67/7
67/8 67/16 67/18
67/19 67/19 68/2
68/2 68/5 68/17
68/20 73/25 83/6
84/11 87/8 91/7
123/6 124/23
221/19

**agreements [5]**
10/13 99/25 113/3
113/4 118/22

**ahead [10]**  4/4
5/25 60/6 72/21
112/8 112/12
162/20 202/21
220/11 221/6

**Al [4]**  43/23 47/9
98/1 101/14

**Alan [5]**  106/4
106/6 106/19 107/9
137/17

**album [1]**  175/2

**algorithms [2]**
54/22 54/24

**alive [4]**  25/22
134/8 140/12 148/3

**all [183]**  5/10
5/12 5/12 5/18
5/22 5/23 5/25 7/8
7/13 10/13 16/6
17/1 18/21 19/17
19/19 20/3 20/23
27/25 33/22 34/21
35/3 35/11 35/22
37/4 38/17 40/16
45/8 45/19 47/6
47/7 48/9 53/9
53/10 54/16 56/9
58/1 58/3 58/12
59/5 60/6 60/11
60/15 60/18 61/5
61/7 64/19 64/22
67/12 67/22 67/23
67/25 68/12 68/24
71/16 72/4 75/8
78/2 78/8 78/17
78/25 79/5 81/25
83/1 85/9 89/7
89/10 89/13 90/9
91/9 93/12 95/3
98/23 99/4 99/25
100/2 100/17 101/5
101/7 101/16
101/18 102/13
102/14 102/15
104/15 106/7
106/20 108/11
108/19 110/3 110/7
110/7 110/18 111/4
111/7 111/11
111/20 112/5
112/12 112/15
117/13 121/14
126/24 127/20
130/6 131/1 133/20
133/22 136/12
143/17 145/3
146/18 146/21
148/4 149/2 149/25
151/23 154/9
155/21 156/13
157/13 158/14
159/13 162/24
163/1 163/6 163/9
165/1 165/4 165/6
165/6 167/16 169/5
169/17 170/8
170/11 171/15
172/14 173/9
174/10 175/18
175/19 175/22
175/22 175/23
177/2 178/11
178/13 178/18
179/1 179/17
180/16 181/22
184/19 188/1
189/18 190/9 195/8
195/11 196/22
197/1 199/3 200/11
201/20 201/23
202/4 202/10
202/11 211/3 216/3
216/24 218/6 219/8
220/3 220/13 221/1
221/6 221/22 222/1
222/13 222/16
222/20

**alleged [2]**  166/25
174/22

**allegedly [2]**
185/6 185/14

**allow [7]**  78/20
81/5 84/6 109/19
183/17 197/8
219/15

**allowed [5]**  38/1
39/11 115/18 169/1

**A**

**allowed... [1]**
171/6

**allowing [1]**  117/8

**almost [3]**  91/18
156/5 214/16

**along [1]**  179/25

**alongside [1]**
204/25

**already [15]**  23/2
33/7 38/16 48/23
58/25 78/2 78/6
78/17 92/13 149/20
157/17 186/14
199/1 208/23
209/16

**also [27]**  12/18
19/21 23/23 25/10
36/22 70/3 70/4
71/4 88/14 100/8
102/24 116/17
137/6 146/11
166/22 166/23
166/24 166/25
178/9 180/12
182/23 193/23
198/25 202/16
204/3 213/3 217/6

**altered [1]**  38/15

**although [2]**
165/24 200/7

**always [7]**  6/7
24/21 36/2 40/19
58/8 166/1 173/23

**am [8]**  47/17 75/2
106/14 183/16
189/25 195/5
201/10 203/11

**AMANDA [2]**  1/20
4/23

**Amazon [1]**  83/1

**America [5]**  8/1
8/2 92/25 199/14

224/1
**American [2]**
12/5

**Amit [1]**  5/8

**among [1]**  205/11

**amount [10]**  25/21
25/23 26/8 37/17
43/15 75/13 84/7
101/3 175/23 182/6

**amounts [2]**  48/22
197/1

**analysis [13]**
94/15 94/17 113/21
204/9 206/15 207/4
207/8 207/14
208/10 208/24
208/25 211/12
212/8

**analyze [6]**  180/6
180/24 206/19
207/12 214/2 214/5

**analyzed [5]**
207/15 208/1 209/8
209/9 213/25

**analyzing [1]**
215/21

**ANDRES [2]**  1/19
4/25

**ANDREW [26]**  1/16
4/12 10/5 15/16
28/22 33/6 37/13
37/14 37/16 37/23
38/6 38/21 39/2
39/9 40/12 44/9
127/24 128/11
128/22 132/18
133/4 135/15
167/21 177/13
187/12 187/12

**angel [2]**  41/12
41/14

**Angela [1]**  63/10

**annoyed [1]**  136/16

**annoying [1]**

136/13
**annual [1]**  68/23

**annum [1]**  69/3

**anonymous [1]**
204/10

**another [16]**  11/9
14/3 15/25 25/24
25/25 82/25 82/25
98/6 99/1 111/10
123/6 161/9 166/14
169/4 173/10
183/20

**answer [17]**  11/1
13/18 20/10 28/6
32/18 37/15 37/24
80/22 85/13 108/13
121/11 150/11
159/6 160/10
188/17 191/12
211/20

**answered [14]**
22/11 22/17 38/10
78/19 85/12 118/17
136/9 148/23 150/5
153/15 184/8
186/11 196/11
197/17

**answering [2]**
30/13 191/6

**answers [2]**  33/11
111/15

**Anti [1]**  188/16

**Anti-Avoidance [1]**
188/16

**anticipate [1]**
111/21

**Antiguan [1]**  196/1

**Antonopoulos [2]**
179/20 180/6

**any [65]**  7/14 17/4
19/15 40/4 41/18
50/12 62/19 62/20
64/2 64/2 64/4
64/11 76/17 79/3

**A**

**any...  [51]**  82/1
82/6 91/11 98/24
101/7 101/7 101/12
103/13 105/13
111/21 113/17
118/1 135/17
142/21 144/18
148/17 148/19
149/3 149/20
149/25 149/25
150/2 150/9 151/6
166/17 169/15
170/2 176/16
178/16 180/18
184/6 185/17 188/5
190/7 192/14 198/7
201/20 201/24
202/2 205/13 206/6
208/25 209/4
214/22 217/1
219/22 220/4 220/4
220/20 221/24
222/14

**anybody [1]**   219/23
**anymore [1]**   58/2
**anyone [17]**   24/6
24/6 26/22 37/2
37/25 57/16 74/18
75/17 85/2 110/20
165/6 202/2 208/16
217/15 220/5
220/19 220/19

**anyone's [2]**
172/15 196/15

**anything [24]**   5/12
64/6 73/2 73/5
78/13 112/6 112/9
117/12 150/22
154/5 159/5 159/6
160/17 163/1 165/3
165/7 177/7 182/4
192/25 197/1 197/1

212/18 221/3
222/5

**anywhere [1]**   55/19
**apart [2]**   177/2
188/17
**apologies [1]**
162/15
**appear [2]**   156/23
206/22
**appearances [2]**
1/12 4/8
**appears [11]**   97/22
126/6 152/8 168/8
195/12 214/17
215/4 215/7 217/3
217/14 219/16
**application [3]**
19/10 105/7 105/11
**applications [1]**
105/4
**appoint [2]**   23/23
188/9
**appointed [1]**
44/11
**appreciate [2]**   6/7
207/22
**approach [4]**
152/23 153/1
155/19 192/19
**appropriate [3]**
97/16 222/12
222/15
**approximately [1]**
198/5
**April [8]**   6/22
6/23 28/4 32/7
32/15 48/2 179/3
179/12
**April/May of [1]**
179/12
**are [115]**   5/8 5/11
5/12 10/9 11/20
17/14 19/6 19/6
30/15 31/1 31/6

33/20 35/6 41/13
45/16 51/23
51/23 55/5 55/17
60/12 60/15 77/7
79/7 79/25 79/25
80/12 80/14 80/14
88/4 92/25 95/9
95/18 96/9 97/11
98/23 100/25 101/1
101/13 103/13
103/15 103/15
104/10 104/21
106/13 108/6
108/19 109/5 110/4
110/7 110/9 112/17
114/20 116/3 117/7
117/8 117/17
126/14 135/17
135/18 136/6 144/2
155/10 157/6
162/25 168/7 170/8
175/2 175/20 180/1
187/13 188/7
189/23 190/15
191/7 191/12
191/17 191/21
193/16 194/11
194/13 194/16
194/17 195/15
195/16 195/18
195/19 195/25
197/20 198/1 198/1
198/15 198/25
199/16 200/8
201/23 201/25
203/10 203/12
208/3 209/1 209/5
209/5 210/3 210/23
212/11 213/15
217/1 217/25
218/12 219/6
220/13 221/19
222/7 222/21

**areas [8]**   19/8

USCA11 Case: 22-11150 Document: 53 Date Filed: 11/30/2022 Page: 213 of 254

**A**

**areas... [7]** 55/16
92/25 109/11
109/14 109/19
134/25 180/14
**argue [1]** 156/14
**argument [4]** 59/18
117/23 161/10
221/24
**Argumentative [1]**
153/15
**around [14]** 11/25
41/7 41/9 56/21
62/17 73/24 83/10
83/17 98/5 110/23
113/7 115/9 116/8
149/10
**arrange [1]** 79/17
**arranged [1]** 26/4
**arranging [2]**
62/18 62/19
**artifacts [1]**
206/14
**artificial [1]**
55/15
**as [220]** 1/3 6/7
8/13 8/13 10/23
13/3 13/24 14/12
14/16 15/18 16/1
16/21 20/7 22/6
27/9 27/12 27/19
29/10 31/2 33/11
33/11 34/7 34/18
37/16 38/13 39/6
39/6 39/6 40/14
41/25 43/4 43/18
45/8 45/20 47/6
48/10 48/14 49/13
51/9 51/22 53/3
53/17 53/20 53/22
53/22 54/5 54/10
54/11 56/17 56/20
57/10 59/1 59/23

59/23 59/25 62/6
62/12 65/3 65/24
66/2 67/9 68/22
69/12 71/5 72/5
72/22 74/20 76/13
77/7 77/7 79/2
79/19 82/5 82/20
82/20 86/19 88/9
88/13 89/5 89/7
89/8 90/11 91/4
92/12 95/3 95/10
96/2 96/3 96/14
97/10 97/25 98/17
99/12 100/3 101/6
101/11 101/21
106/5 107/9 108/6
108/17 108/23
108/24 113/9 113/9
115/13 116/16
116/22 117/7 117/9
117/19 118/5
121/24 123/22
124/23 125/5 127/4
127/23 128/10
128/21 129/8
129/12 129/14
130/13 130/15
130/17 132/6 132/6
132/17 133/3
133/18 133/22
133/25 134/4 134/9
134/23 136/11
137/4 137/16
138/12 139/9 140/7
140/21 141/14
142/2 142/7 142/17
143/22 144/14
145/7 145/22 146/5
147/14 148/7
149/20 150/8
150/17 151/9
151/21 152/13
153/5 153/6 153/20
156/3 156/23

157/18 157/18
161/9 161/11
161/25 162/3 162/9
163/13 163/24
164/11 165/2
165/12 165/22
166/1 166/14
167/12 167/13
167/20 169/7
169/25 170/16
170/17 174/19
175/9 176/3 176/4
177/23 182/1
184/10 185/13
188/15 194/6 194/9
194/19 195/20
196/13 196/18
196/19 196/20
200/24 206/3 206/3
206/10 206/13
207/4 207/12
210/12 212/14
212/16 213/19
215/1 215/22 218/1
220/18 222/20
**Asia [1]** 199/13
**ASIC [1]** 175/20
**aside [1]** 214/21
**ask [9]** 5/19 7/8
7/14 78/16 121/5
131/6 201/24
201/24 204/20
**asked [38]** 10/12
15/11 22/10 22/16
23/9 30/19 31/24
38/9 44/11 63/11
63/12 78/19 117/11
118/16 121/9
121/25 136/9 142/6
148/22 149/23
150/5 153/14
156/14 170/12
170/24 176/18
176/18 183/17

USCA11 Case: 22-11150    Document: 53-12    Date Filed: 11/30/2022    Page: 214 of 254

**A**

**asked... [10]**
184/8 185/23
186/10 190/14
195/21 196/10
197/17 202/4
206/19 206/20
**asking [10]**   5/16
10/16 13/16 16/19
18/18 22/5 22/8
34/11 98/12 183/18
**asks [2]**   189/20
191/2
**aspect [1]**   55/18
**ass [2]**   36/14
36/18
**assessing [1]**   49/8
**assessment [3]**
46/2 46/7 52/14
**asset [4]**   66/11
66/14 67/21 199/15
**assets [32]**   25/13
26/11 26/17 26/17
26/21 35/24 54/6
67/24 71/6 75/13
75/14 79/25 80/4
88/1 88/4 185/19
187/9 187/17
187/19 187/21
187/24 188/2
188/14 194/21
194/25 195/2 195/2
195/2 195/21 196/9
197/16 200/7
**assign [2]**   97/14
101/5
**assigned [2]**   91/6
204/18
**assignment [4]**
100/17 104/11
120/3 120/16
**assist [2]**   30/13
95/20

**associated [8]**
30/12 35/12 85/10
171/6 195/19
205/24 206/3
212/20
**assume [1]**   87/25
**assuming [1]**   49/9
**Assumptions [1]**
46/24
**asymmetric [1]**
34/25
**ATO [8]**   9/3 11/19
15/4 15/11 28/13
136/5 140/21
142/18
**attach [1]**   25/10
**attached [10]**
10/13 19/6 30/25
45/6 107/2 107/21
119/5 143/13
143/17 151/12
**attaches [1]**   65/21
**attaching [8]**   28/7
32/22 123/24
133/23 137/17
141/15 142/18
184/17
**attachment [12]**
20/10 30/3 46/1
46/3 46/5 86/8
87/10 137/23
143/11 143/13
144/2 185/8
**attachments [2]**
142/22 143/20
**attempt [2]**   152/25
162/21
**attempted [1]**
117/15
**attempting [1]**
192/16
**attorney [1]**   79/16
**Attorney's [1]**
206/11

**attributes [1]**
**audit [6]**   16/1
17/1 20/7 26/20
34/8 186/17
**audited [1]**   22/24
**auditing [1]**   15/14
**auditor [3]**   29/5
45/20 59/3
**auditors [2]**   17/1
42/17
**August [5]**   41/11
75/18 75/22 76/4
81/23
**Australia [22]**   8/2
12/4 19/17 30/21
37/17 38/6 43/8
59/4 77/3 82/18
100/18 127/24
148/3 153/21
156/13 172/11
175/22 178/12
178/18 186/1
212/21 212/23
**Australian [73]**
7/2 7/3 7/19 9/10
10/6 10/15 10/20
12/1 13/9 14/16
16/6 16/19 18/6
18/14 18/17 21/8
24/11 24/16 25/23
27/9 28/6 28/23
29/4 30/2 32/16
32/18 34/12 34/18
36/22 37/14 38/7
39/23 40/2 40/11
43/5 49/9 49/11
51/13 51/15 51/16
54/14 56/15 64/22
67/22 70/5 70/6
75/12 82/6 88/3
88/19 89/2 100/4
101/2 101/3 101/4
108/7 109/5 109/10

**Australian... [15]**
109/14 109/24
110/2 134/19
135/15 137/6 141/7
175/13 175/21
182/13 186/2
196/14 196/17
197/11 221/11
**authentic [5]**
206/22 206/25
207/3 207/7 209/6
**authenticity [3]**
152/21 154/2
161/25
**authorize [3]**
164/24 165/3
165/11
**authorized [1]**
165/11
**available [3]** 84/2
118/3 118/8
**avenue [3]** 1/24
188/5 224/18
**average [2]** 85/6
180/22
**Avoidance [1]**
188/16
**awaiting [1]**
104/10
**aware [4]** 31/6
33/20 174/21
174/24
**away [9]** 6/23
79/15 85/3 91/7
176/8 176/13
187/18 197/4 210/5
**Ayre [11]** 58/24
59/23 61/19 62/17
63/3 63/23 65/23
129/23 131/15
132/4 133/23
**Ayres [1]** 62/5

**BAA [1]** 175/11
**bachelor [1]**
203/25
**back [74]** 5/23 6/6
7/14 8/14 8/22
10/9 12/6 15/18
15/18 16/22 19/20
21/6 21/15 21/17
22/19 25/4 25/8
28/2 28/20 31/17
38/18 41/10 43/7
44/13 48/21 48/22
49/3 60/15 61/7
63/22 64/25 67/13
75/2 77/3 83/23
85/21 87/4 90/17
93/9 94/1 109/13
111/5 112/3 112/5
112/15 112/17
119/13 121/3
131/16 136/1 136/3
136/5 136/11
136/23 136/24
144/5 144/6 145/4
148/2 162/24 163/2
163/6 163/9 167/17
170/24 180/17
180/25 181/5 182/5
211/18 211/20
211/21 211/25
216/5
**background [1]**
203/24
**backpay [1]** 85/20
**bad [3]** 21/15
45/21 83/16
**Baker [10]** 91/14
91/15 91/17 92/4
94/13 94/24 104/6
113/8 113/21
114/19
**balance [5]** 25/11

26/13 26/15 27/6
189/6
**balanced [1]** 8/19
**bank [14]** 14/2
14/3 44/1 44/3
51/13 51/15 64/12
75/16 89/6 89/8
90/1 92/18 92/24
100/11
**bankers [1]** 43/10
**banking [26]** 43/13
43/16 43/17 43/19
45/10 51/9 51/14
51/14 51/18 51/24
53/21 89/11 89/12
89/19 89/24 90/1
90/2 90/3 90/5
90/6 90/9 90/14
90/22 90/22 101/21
109/21
**bankrupt [4]** 12/10
187/25 188/4
196/14
**bankruptcy [6]**
84/17 84/18 187/10
187/13 187/25
188/7
**bankrupted [1]**
188/9
**banks [1]** 90/20
**Baraka [4]** 43/23
47/9 98/1 101/14
**barrister [1]**
61/18
**base [3]** 49/17
49/18 57/8
**based [10]** 15/6
33/15 42/15 46/18
53/21 54/22 114/4
115/18 204/19
219/25
**basically [36]**
11/9 23/25 25/1
37/3 38/14 39/7

**B**

USCA11 Case: 22-11150  Document: 58-11  Date Filed: 04/30/2024  Page: 216 of 284

**basically... [30]**
41/9 43/10 53/4
53/8 58/9 62/10
68/22 76/23 80/5
80/7 84/10 84/19
85/1 90/10 95/5
100/10 109/18
117/5 117/15
131/15 136/22
175/3 176/25 177/6
187/12 187/17
187/20 199/6
207/18 208/2
**basis [6]** 29/21
34/14 126/17
139/24 165/15
184/20
**Bates [7]** 146/3
153/18 155/1 156/7
170/3 170/5 170/6
**Baylor [1]** 204/1
**BB [1]** 1/2
**be [142]** 5/18 5/20
6/4 14/11 15/7
17/10 18/11 18/12
18/12 19/25 26/5
27/2 27/14 28/11
28/15 29/4 35/1
35/23 35/25 36/13
44/21 45/23 48/4
49/10 49/10 49/18
49/19 49/24 50/1
50/23 51/18 54/9
54/10 57/10 58/8
58/9 61/9 61/24
63/11 63/19 65/17
71/10 72/18 73/15
73/15 78/12 78/14
80/2 80/17 81/19
83/3 84/9 84/11
86/21 89/15 91/6
92/25 94/8 96/13

97/13 97/14 97/20
98/19 99/23 103/5
104/11 109/11
110/1 110/25
112/16 113/9
114/21 115/19
117/20 122/3 123/2
126/6 127/5 127/9
130/9 131/21
133/16 136/2
150/20 150/22
152/9 152/14
152/15 153/11
153/11 157/5 157/8
158/4 158/11 160/9
160/9 160/17
162/13 163/10
164/23 164/24
165/3 165/11
165/12 167/12
169/24 170/7 171/6
171/15 171/16
171/21 172/18
174/3 175/4 176/11
177/16 179/21
180/2 180/3 180/20
186/19 188/22
188/23 192/1
192/17 195/5
198/21 199/4 200/5
200/5 202/4 202/12
205/19 206/22
210/4 215/4 215/7
216/12 217/3
220/14 220/15
221/18
**BEACH [1]** 1/2
**bear [1]** 5/19
**beautiful [2]** 50/7
176/5
**became [2]** 154/12
179/22
**because [87]** 7/9
8/19 9/3 13/4

13/18 13/18 15/21
24/2 24/20 29/1
30/5 38/16 39/7
42/18 43/14 44/1
45/9 45/13 47/11
51/19 54/16 55/10
55/25 58/2 59/2
60/8 62/19 64/9
75/14 77/2 78/10
79/6 79/8 80/12
80/15 80/24 82/15
83/18 83/19 84/22
85/6 85/14 88/14
89/5 90/13 91/4
97/25 111/11
115/21 121/12
127/8 135/3 136/1
136/15 143/7 152/3
155/7 156/3 157/5
158/4 160/7 166/1
166/16 168/21
170/24 173/8
176/13 177/5 180/3
180/7 187/9 187/11
187/22 188/6
188/16 194/24
194/25 196/2 196/8
197/1 197/15
199/22 201/14
207/21
**become [1]** 64/5
**becomes [1]** 199/20
**been [58]** 10/8
13/14 15/20 29/16
30/21 35/16 36/12
38/15 40/24 46/18
49/13 49/14 51/3
58/25 59/1 59/7
60/8 60/9 60/10
60/18 63/9 75/15
75/15 85/3 90/6
91/5 94/4 94/25
95/6 97/5 97/6

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/30/2023    Page: 217 of 254

**B**

**been... [27]**
100/12 100/18
101/11 101/21
107/21 119/17
142/5 142/6 144/17
146/9 153/23
156/13 159/12
162/11 172/12
186/1 191/16
191/17 193/1
195/14 199/22
203/8 205/13
205/21 208/17
214/16 214/17

**before [48]**   1/10
5/13 6/2 11/2
32/12 38/14 44/12
48/1 57/19 61/6
64/1 64/5 73/25
78/25 86/20 89/14
89/16 93/5 106/17
108/9 108/20 112/6
112/14 112/23
114/7 114/22
114/24 116/2 116/5
118/23 143/5
156/14 163/1 163/8
174/1 179/7 179/21
184/7 186/22
187/20 188/14
207/4 208/24
216/14 218/15
219/19 221/24
222/4

**beg [4]**   21/6 48/21
48/21 93/10

**begin [5]**   16/19
83/7 152/11 211/17
213/7

**beginning [7]**
66/10 121/17 154/8
175/25 176/7

186/19 196/21

**behalf [6]**   8/4
112/9 164/25 194/2
221/3 222/18

**behind [2]**   11/21
118/2

**being [25]**   9/20
11/10 13/22 34/22
50/16 55/11 65/10
71/3 82/8 83/18
85/1 91/9 93/22
99/12 101/12 117/3
136/13 138/13
138/14 138/15
152/13 153/12
155/25 156/10
182/6

**believe [18]**   33/6
76/12 76/13 79/15
85/11 96/17 111/8
111/13 122/1
129/25 140/22
162/10 193/19
209/16 214/13
215/1 219/3 221/16

**believed [1]**
176/18

**believes [1]**   96/9

**believing [1]**
175/3

**belong [3]**   75/10
194/11 194/12

**belonged [1]**   75/8

**below [9]**   30/14
114/4 125/5 129/25
160/21 160/22
161/2 179/24
189/21

**bender [1]**   191/23

**beneficiaries [1]**
198/25

**benefit [1]**   175/8

**benefits [1]**   58/12

**Berkeley [1]**

203/17

**berserk [1]**   135/5

**besides [2]**   217/16
219/23

**best [5]**   37/24
58/12 76/13 78/12
78/14

**BETH [1]**   1/10

**better [4]**   13/6
36/10 51/24 90/18

**between [39]**   10/13
12/1 46/25 63/23
70/17 71/15 83/24
120/3 120/16 123/6
124/23 126/14
126/19 127/18
127/23 128/10
129/10 133/23
134/23 145/8
145/23 146/8 148/8
149/7 151/10
151/22 163/25
164/11 164/23
175/12 175/13
176/22 183/25
206/16 213/6 217/1
218/9 219/10
221/11

**beyond [1]**   195/20

**biased [1]**   21/4

**big [8]**   36/13
43/19 59/18 62/20
64/3 90/9 136/17
136/19

**biggest [1]**   69/3

**bill [3]**   15/17
16/25 84/25

**billion [16]**   36/11
49/19 51/16 54/10
54/14 113/9 113/17
115/10 116/8
118/15 197/21
198/4 198/12 199/8
199/10 199/25

**B**

USCA11 Case: 22-11150    Document: 58-1    Date Filed: 11/30/2022    Page: 218 of 254

**billionaire [5]**
198/16 198/23
201/10 201/14
222/8

**billions [1]**   29/6

**bills [1]**   83/25

**binding [6]**   71/2
71/22 72/3 72/6
78/2 119/16

**Bing [2]**   176/23
176/24

**Biscayne [1]**   1/14

**bit [15]**   7/24 8/17
25/1 48/14 50/1
79/11 85/18 85/19
107/4 117/1 136/23
181/8 181/12
191/18 204/21

**Bitcoin [99]**   11/21
12/24 13/23 13/24
14/1 14/8 19/11
19/16 19/25 41/15
43/11 43/14 43/21
44/3 47/6 51/22
53/21 54/5 54/16
59/9 59/10 59/12
59/15 59/15 59/17
59/19 59/21 80/2
80/3 83/15 83/17
83/22 84/8 89/4
89/5 89/6 89/8
89/25 90/11 90/22
102/2 116/7 116/22
117/4 117/6 117/9
117/22 117/23
118/2 118/4 118/5
128/23 130/16
130/19 130/22
131/16 132/3 133/7
134/9 138/25 141/9
174/10 174/15
174/22 175/7 176/1

176/3 176/3 176/8
176/9 176/20 177/7
179/16 180/1 180/2
180/22 182/14
182/24 188/2 191/7
193/8 193/15 194/5
194/14 194/14
194/16 194/17
195/7 195/12
195/18 196/18
197/12 197/20
198/7 198/9 205/12
206/15 210/5
217/10

**Bitcoin-related [1]**
130/16

**Bitcoins [4]**   178/4
178/20 178/25
206/3

**black [1]**   175/2

**bleep [2]**   136/23
136/24

**block [1]**   195/12

**blockchain [6]**
88/10 89/1 89/18
90/5 101/20 180/25

**BLOOM [1]**   1/10

**blow [1]**   209/24

**BlueHat [1]**   176/23

**Bodog [1]**   59/5

**body [1]**   57/21

**BOIES [1]**   1/15

**bold [1]**   88/7

**Bond [1]**   145/24

**bone [1]**   79/9

**book [1]**   27/3

**books [1]**   88/14

**boss [1]**   79/2

**both [10]**   19/12
34/19 71/22 91/11
106/2 134/1 167/3
167/4 182/24
221/19

**bother [1]**   181/2

**bottom [29]**   17/22
50/16 52/20 61/14
65/4 67/2 70/22
74/7 98/11 104/5
113/24 120/7
123/12 124/4
135/14 146/3 152/1
153/18 155/1 156/7
166/4 166/5 182/22
182/22 213/6 215/7

**bought [6]**   53/6
56/18 56/19 84/17
105/10 125/8

**Boulevard [1]**   1/22

**bound [2]**   200/8
200/8

**box [3]**   34/19
109/3 217/9

**boxes [3]**   153/23
165/6 217/7

**break [5]**   60/2
111/1 162/18
162/19 207/13

**breakdown [1]**
47/10

**BRENNER [2]**   1/16
4/13

**bridging [5]**   62/7
62/11 66/5 71/4
71/6

**Brigy [1]**   136/19

**bring [82]**   5/25
14/19 22/19 23/2
25/8 28/17 29/24
31/11 40/7 41/23
46/14 46/22 47/17
47/19 52/11 52/19
53/11 53/24 61/5
61/11 63/22 65/6
66/6 66/23 69/6
70/19 70/24 71/25
72/13 86/10 87/4
87/12 87/21 95/14

USCA11 Case: 22-11150    Document: 53-10    Date Filed: 11/30/2022    Page: 219 of 254

**B**

**bring... [48]**   100/13 102/11
106/15 112/13
113/22 114/8
114/16 120/14
120/18 123/9
123/20 124/1
124/21 125/17
127/2 127/21 128/8
128/19 129/6
130/11 131/23
132/15 133/1 140/5
141/12 141/24
144/20 144/21
145/5 145/20 149/5
154/16 154/23
163/2 163/6 164/20
165/19 166/11
168/4 181/7 184/13
185/8 189/17
193/19 209/11
209/12 210/14
215/16
**British [3]**   69/2
110/1 221/11
**broken [1]**   41/1
**broker [2]**   57/24
58/14
**Brooks [1]**   47/5
**brother [6]**   18/2
18/12 39/8 127/6
140/11 210/3
**browser [2]**   176/24
176/25
**BS [1]**   13/12
**BTC [4]**   116/22
191/4 198/6 198/11
**bucket [2]**   89/14
102/2
**build [18]**   36/4
36/7 36/8 53/21
55/9 57/14 57/14

64/12 64/23 78/10
79/13 80/10 80/17
88/15 90/10 101/23
102/4 199/7
**building [6]**   49/25
80/18 101/23 102/1
199/14 220/15
**built [3]**   49/17
50/5 205/18
**bullet [1]**   68/15
**bunch [1]**   43/10
**business [24]**   10/8
15/18 15/23 17/10
26/23 36/5 36/6
48/20 49/14 57/17
57/19 78/10 78/13
82/9 82/13 82/16
82/18 82/19 82/20
83/20 85/25 194/24
195/5 196/25
**businesses [2]**
45/22 194/23
**buy [10]**   26/23
27/1 48/8 51/18
54/5 56/4 59/19
82/24 82/25 205/10
**buyer [1]**   80/19
**buying [2]**   53/4
78/7

**C**

**cake [1]**   21/16
**Calay [2]**   70/18
71/16
**calculations [1]**
180/18
**call [16]**   4/1 4/4
23/13 55/15 62/6
66/3 72/1 72/11
88/21 92/14 107/20
169/9 188/22 202/6
202/9 210/1
**called [14]**   40/2
45/8 47/11 58/15

71/14 88/14 95/12
179/10 189/20
196/22 203/17
204/13
**calling [2]**   4/6
79/4
**callout [1]**   160/19
**callouts [1]**   25/3
**calls [2]**   80/10
219/24
**Calvin [9]**   62/5
63/3 129/23 131/12
131/15 132/4 134/1
134/3 134/6
**Calvin's [1]**   59/6
**Cambridge [1]**   79/8
**came [11]**   17/5
23/24 38/13 43/4
79/21 86/1 139/4
154/19 154/25
157/23 208/17
**can [357]**
**can't [32]**   17/12
26/8 43/15 63/5
77/3 78/14 79/16
111/11 121/11
126/24 134/7
140/22 141/17
142/19 142/21
143/9 143/18
144/16 148/9
150/22 152/16
153/10 159/4 159/5
159/6 160/7 167/22
175/5 177/7 181/10
187/14 195/8
**cancels [2]**   48/15
48/16
**cannot [7]**   8/1
64/5 118/6 160/10
160/10 186/6 200/3
**capacity [2]**   31/1
95/9

**capital [2]** 58/9
175/24

**capitalist [2]**
41/16 41/17

**capitalization [5]**
26/18 26/25 197/25
198/1 198/4

**capitalize [1]**
26/24

**capitalized [1]**
88/1

**car [2]** 27/1 27/2

**cards [3]** 55/5
55/7 55/7

**care [7]** 30/6
77/16 85/2 93/2
93/8 93/9 102/8

**careful [1]** 192/17

**Carter [1]** 6/24

**case [40]** 1/2 4/4
4/6 12/7 12/8
12/14 34/21 96/12
108/9 111/22 115/9
116/6 116/9 116/25
118/14 122/24
134/20 148/3
168/15 174/21
186/2 186/5 186/5
186/8 186/9 186/13
186/15 186/18
188/10 188/13
199/20 203/8
206/18 206/19
206/20 208/23
219/22 220/19
220/21 222/7

**cases [1]** 12/16

**cash [7]** 45/22
48/19 83/18 83/18
90/11 117/7 196/19

**catch [1]** 207/1

**Catherine [1]** 70/4

**cause [2]** 64/11
74/18

**cc [1]** 104/20

**cc'd [6]** 33/6
65/23 65/24 65/24
129/24 132/4

**cc's [1]** 87/8

**cent [1]** 85/9

**center [3]** 85/8
199/23 204/17

**central [1]** 90/20

**Centrebet [1]** 59/3

**cents [3]** 84/20
84/21 84/23

**CEO [10]** 58/1 58/5
58/5 77/7 99/13
99/15 144/15 160/9
171/2 198/22

**CEO's [1]** 171/8

**CEOs [1]** 58/13

**certain [6]** 47/17
84/7 95/19 206/20
207/6 207/11

**certainly [16]**
5/22 13/3 20/22
22/2 34/1 41/22
53/20 53/22 54/8
55/2 60/3 144/23
157/13 168/10
183/16 211/19

**Certificate [1]**
2/2

**Certified [1]**
224/5

**certify [2]** 224/7
224/12

**cetera [5]** 42/15
83/3 109/20 178/7
187/24

**CFO [4]** 10/4
135/16 141/15
177/13

**chain [4]** 98/11
102/13 104/5 153/4

**chair [1]** 5/24

**challenge [2]**
15/16 64/5

**challenged [1]**
15/19

**challenges [2]**
62/20 64/2

**change [3]** 118/6
118/9 194/17

**changed [1]** 191/17

**changes [2]** 98/2
116/22

**changing [1]**
118/10

**channel [7]** 116/2
168/14 170/16
174/9 181/24
190/13 200/21

**character [2]**
192/15 193/3

**characterized [1]**
69/12

**characterizing [1]**
42/13

**charge [3]** 11/8
106/3 106/6

**charged [2]** 11/10
42/19

**charges [1]** 37/17

**charging [2]**
203/10 203/12

**charity [1]** 222/5

**charter [1]** 89/12

**chat [1]** 164/2

**chats [1]** 173/23

**chauffed [1]** 51/19

**cheaply [1]** 93/1

**check [7]** 22/20
110/6 121/11
150/23 167/11
167/13 171/14

**checked [2]** 110/8
182/3

**chef [1]** 78/14

**C**

**cherry [1]** 177/6
**cherry-picking [1]** 17/6
**Chesher [7]** 10/4 20/7 34/8 126/3 128/11 135/16 177/12
**chief [5]** 58/2 68/22 106/13 146/16 146/16
**choose [1]** 178/7
**chose [3]** 23/24 27/8 73/15
**chosen [1]** 57/23
**chunk [2]** 13/20 13/21
**church [1]** 179/23
**CIO [2]** 146/15 178/14
**circles [1]** 11/25
**circumstances [2]** 97/16 139/10
**City [1]** 203/7
**Civil [1]** 4/6
**claim [11]** 8/1 15/18 15/23 19/12 33/13 101/17 115/9 175/1 184/4 199/23 222/5
**claimed [8]** 15/17 19/18 19/20 45/24 48/12 116/21 197/9 197/12
**claiming [2]** 48/15 117/19
**claims [1]** 117/12
**clarify [2]** 165/10 218/7
**class [1]** 53/16
**Clause [1]** 101/4
**Clayton [1]** 15/17
**clean [4]** 63/25

64/13 67/21 85/15
**cleanly [1]** 85/14
**clear [4]** 104/15 157/5 170/15 170/18
**client [2]** 5/8 54/17
**clients [2]** 49/18 49/21
**clip [8]** 58/18 73/7 73/19 105/15 105/19 129/9 179/2 196/11
**clocktime2020 [2]** 28/11 28/24
**close [5]** 56/13 188/10 188/13 188/13 210/4
**closed [1]** 188/11
**Cloudcroft [3]** 52/15 53/4 53/18
**CLR [1]** 224/17
**CO1N [5]** 52/16 53/17 55/3 179/9 179/9
**Cocomo [3]** 46/18 46/20 46/21
**code [23]** 13/5 42/15 43/24 44/2 47/2 47/2 47/6 48/4 48/6 48/7 51/7 53/10 56/14 56/21 56/23 57/13 57/13 79/20 80/20 86/14 88/9 89/3 174/17
**coders [1]** 56/23
**coding [2]** 43/25 172/8
**coffee [4]** 17/7 17/8 17/8 84/25
**Coin [23]** 24/16 25/11 25/16 26/6 36/3 36/12 41/2

52/16 53/17 54/9 75/23 82/15 86/16 86/16 88/2 88/6 89/7 99/9 100/1 109/22
**Coin-Exch [23]** 24/16 25/11 25/16 26/6 36/3 36/12 41/2 52/16 53/17 54/9 73/13 74/1 74/8 75/23 82/15 86/16 86/16 88/2 88/6 89/7 99/9 100/1 109/22
**Coinbase [7]** 36/8 36/10 49/19 54/9 54/9 116/23 118/12
**coins [2]** 196/9 197/15
**collate [1]** 136/20
**collateral [1]** 134/9
**colleague [2]** 29/17 30/14
**collected [2]** 153/19 206/13
**combination [1]** 71/5
**combined [1]** 114/6
**come [15]** 5/23 17/8 50/5 80/15 88/2 134/4 145/4 155/21 162/3 179/25 180/4 182/24 183/20 204/24 220/15
**comes [1]** 37/18
**comfortable [1]** 39/3
**coming [2]** 93/3 157/6
**commercial [1]** 44/10

**C**

USCA11 Case: 22-11150   Document: 58-11   Date Filed: 11/30/2022   Page: 222 of 254

**commodity [1]**
43/12
**common [1]**  68/9
**Commonwealth [2]**
51/13 51/15
**communicating [1]**
39/20
**communications [6]**
24/20 128/24
140/10 149/10
173/22 204/10
**community [2]**
118/7 118/8
**companies [71]**  8/5
8/12 10/23 11/10
13/21 19/11 38/16
39/19 39/24 41/7
42/10 51/4 52/15
52/17 54/11 56/15
56/18 57/7 58/11
62/13 63/4 64/18
64/19 64/22 73/17
75/8 75/10 75/12
75/14 78/25 79/24
80/11 83/3 83/10
93/9 99/24 100/1
100/4 100/18 101/2
101/3 101/4 101/19
101/22 101/25
104/21 105/6
106/11 108/7 109/5
109/12 109/14
110/2 110/3 116/23
117/13 118/11
127/9 134/6 134/8
153/21 153/22
175/18 176/17
176/19 178/7
180/13 194/21
195/6 196/2 198/22
**companies' [1]**
91/2

**company [96]**  17/8
18/1 20/11 23/14/2
23/19 23/21 24/3
26/9 30/24 36/15
39/7 39/8 40/2
41/19 42/20 43/6
48/13 48/24 49/16
49/23 53/6 54/10
54/14 55/22 57/13
57/15 58/6 59/3
59/6 59/6 62/11
67/23 67/23 69/3
69/12 70/3 70/5
70/6 70/6 70/18
70/18 71/15 72/19
75/12 77/2 77/3
77/8 78/3 78/4
78/9 78/17 84/3
84/6 84/13 85/15
86/23 92/6 92/17
94/18 99/13 99/16
105/10 106/3 106/9
109/9 109/23 110/1
123/7 125/7 128/24
131/15 134/4
137/25 165/4
172/11 175/14
175/14 175/21
175/21 180/13
184/1 185/12
185/14 185/17
185/18 188/13
194/12 194/12
194/19 194/20
194/21 194/25
195/4 196/1 196/1
196/2
**company's [2]**  33/5
195/1
**comparative [1]**
51/12
**compare [1]**  219/4
**comparing [1]**
155/13

**compete [2]**  50/2
**competitive [1]**
50/6
**competitors [1]**
50/4
**compilation [2]**
170/1 171/24
**compiler [1]**  55/2
**complained [1]**
84/22
**complaining [1]**
191/22
**complains [1]**  24/4
**complete [8]**  8/23
8/24 10/25 11/1
13/12 37/2 83/15
224/10
**completely [14]**
7/22 8/25 9/1 9/2
18/3 40/6 82/4
89/1 89/5 125/23
155/8 170/16
174/24 184/10
**completing [1]**
204/12
**completion [1]**
33/23
**complex [4]**  45/20
51/10 51/11 55/16
**compliant [1]**
89/15
**comply [1]**  221/14
**component [1]**
25/13
**components [1]**
212/11
**compromising [1]**
54/25
**computer [10]**  53/3
55/6 152/16 168/8
179/10 179/11
179/12 203/25
204/1 204/3

**C**

USCA11 Case: 22-11150    Document: 58-9    Date Filed: 11/30/2022    Page: 223 of 254

**computers [11]**
53/9 85/8 146/6
165/1 165/2 165/4
179/21 179/22
191/17 191/19
191/20
**concept [2]**   95/5
117/6
**concern [2]**   88/9
162/10
**concerned [1]**
146/9
**concerns [1]**   79/18
**concluded [1]**
114/19
**conclusion [2]**
49/6 57/4
**conclusions [1]**
207/5
**conditions [1]**
134/11
**conduct [2]**   206/15
220/20
**confer [4]**   111/24
221/15 221/20
222/11
**conference [2]**
176/23 222/21
**confidence [2]**
17/13 18/5
**confirm [1]**   185/16
**confounding [1]**
191/18
**confused [1]**
190/15
**confusing [1]**   43/9
**confusion [2]**
170/15 170/18
**Congratulations [1]**
65/25
**Conrad [1]**   6/24
**consents [1]**   10/12

**consequences [2]**
97/18 97/20
**consequently [1]**
185/18
**conservative [1]**
49/7
**consider [4]**   82/2
97/7 179/13 179/14
**consideration [4]**
97/18 100/24 101/2
161/9
**considered [1]**
97/20
**considering [1]**
97/13
**consistent [2]**
60/8 89/1
**constant [1]**   9/2
**constrains [1]**
90/21
**constructed [1]**
187/17
**consulting [2]**
203/17 206/10
**contact [3]**   18/1
29/16 81/3
**contacted [2]**   8/25
35/16
**contacts [1]**   59/23
**contained [3]**
166/25 207/11
211/13
**contains [4]**
166/24 209/1 215/4
224/12
**content [4]**   207/9
207/15 207/16
207/25
**contents [4]**
153/24 192/21
217/25 218/1
**context [1]**   208/3
**continue [14]**   5/13
6/10 9/13 60/16

61/10 112/6 112/18
113/23 127/19 131/2
145/1 159/13
163/11 183/21
200/17
**continued [6]**   2/5
3/1 6/11 59/25
108/25 112/19
**continues [1]**
213/7
**continuous [2]**   9/1
59/1
**continuously [1]**
41/19
**contract [5]**   67/4
70/17 101/3 176/4
185/22
**contractors [1]**
165/5
**contracts [4]**
33/24 177/24 184/6
185/17
**contractual [2]**
66/3 66/3
**control [8]**   124/24
187/18 187/19
188/1 196/5 198/14
198/21 200/7
**controlled [2]**
57/7 214/19
**controls [1]**   141/8
**conversation [3]**
126/8 126/24 129/9
**convince [2]**
101/24 102/1
**copied [2]**   40/3
83/3
**copies [2]**   10/14
40/4
**copy [5]**   44/11
82/24 82/25 118/3
218/24
**Coral [1]**   1/22
**cords [1]**   136/7

**C**

**core [23]**  43/19
45/10  51/9  51/14
51/14  55/4  86/15
87/22  88/10  88/25
89/18  90/1  90/1
90/5  90/6  96/4
96/9  97/7  97/11
97/14  101/20  114/5
116/24

**cores [4]**  55/6
55/8  55/11  136/7

**corner [8]**  19/5
20/5  30/3  92/3
94/14  113/24
120/21  124/5

**corporate [9]**  84/1
85/1  109/18  144/15
160/9  184/19  192/2
194/10  195/25

**corporation [3]**
97/16  204/13
204/24

**corporations [2]**
113/2  146/22

**correct [100]**  17/4
18/19  21/10  22/9
22/13  27/7  27/11
36/24  37/16  39/12
39/25  40/13  40/14
41/8  41/21  42/12
42/23  43/2  43/3
43/20  49/12  52/2
52/16  56/12  57/25
58/15  58/24  62/21
64/20  67/10  67/11
67/25  68/13  71/23
72/19  73/3  73/5
73/14  83/8  83/11
86/2  89/4  90/5
91/3  93/23  93/25
98/21  100/2  101/20
104/20  105/5

106/13  107/25
109/8  111/3  113/1
116/12  130/3
130/18  132/6  132/7
136/8  152/10  153/8
153/13  153/19
160/6  160/7  160/14
160/22  160/24
161/2  161/15  170/9
170/10  170/19
171/7  174/23  175/8
176/2  178/5  179/1
179/16  183/2  184/7
195/1  195/13
195/23  197/21
198/9  198/13
198/16  201/1  204/6
209/23  213/11
214/12  216/20
219/21  224/10

**correction [3]**
136/7  171/20
171/21

**correctly [1]**
42/13

**correspondence [2]**
24/24  25/2

**cost [20]**  15/24
15/25  17/9  17/11
19/15  19/19  21/2
35/1  46/2  46/7
46/16  46/17  48/2
48/3  49/7  51/3
51/16  57/7  93/1
142/20

**costs [4]**  12/15
12/15  49/8  85/9

**could [100]**  19/12
20/9  24/7  30/8
34/23  34/25  36/1
36/8  36/9  36/17
37/23  37/25  39/9
39/9  39/10  42/25
44/2  49/10  49/13

49/16  49/20  49/23
55/23  56/4  57/22
57/22  64/5  75/16
76/12  76/21  79/12
79/12  80/2  80/7
82/20  84/17  85/3
85/3  86/20  88/25
89/8  94/1  101/19
110/24  111/12
111/24  119/17
129/13  129/14
130/1  135/16
138/21  150/10
151/7  153/11
153/11  154/16
154/17  160/9  160/9
160/17  165/7
167/12  167/14
169/21  170/14
171/4  171/14
172/14  176/9
176/13  179/25
180/21  181/8
187/20  187/21
192/20  192/24
195/9  196/8  196/9
197/3  197/15
197/16  205/10
207/22  209/24
211/18  212/25
213/22  214/25
215/16  216/5
216/21  217/18
218/18  220/9

**couldn't [10]**
43/19  43/22  43/23
51/20  51/20  59/21
91/16  147/24  180/4
195/9

**counsel [40]**  4/7
4/8  7/7  14/14
27/16  44/5  50/14
61/12  62/24  65/1

**C**

**counsel... [30]**
69/7 70/11 70/12
74/5 75/20 81/9
86/5 92/1 98/9
100/14 102/12
106/16 115/13
118/25 120/1
142/15 161/18
163/18 164/9
164/21 168/5
171/22 173/10
177/10 181/6
184/14 188/24
192/8 200/19 202/5
**countries [2]**
43/10 178/19
**country [1]**  11/5
**couple [1]**  218/15
**course [5]**  111/25
111/25 112/11
171/18 203/2
**Coursera [1]**
109/15
**court [56]**  1/1
1/23 1/24 4/1 11/4
12/7 12/8 12/11
12/16 14/7 14/25
19/22 34/18 34/24
35/1 35/2 60/2
60/12 108/9 115/14
115/18 148/3
151/13 157/2
161/18 162/10
162/15 165/12
169/1 169/13
170/12 170/24
181/2 186/2 186/5
186/13 186/15
186/18 188/10
188/12 189/24
193/1 194/3 202/18
203/1 213/20

221/13 221/17
221/19 221/23
222/3 222/9 222/10
222/11 224/6 224/9
**Court's [3]**  15/6
169/23 171/24
**courtroom [3]**
220/16 220/21
222/21
**courts [2]**  39/23
89/2
**covenant [3]**  199/1
199/6 199/12
**covenanted [1]**
199/2
**covenants [1]**
198/25
**CPU [2]**  180/7
180/9
**CPUs [1]**  180/16
**craig [74]**  1/7 2/5
4/7 20/9 28/5 28/5
31/7 32/17 33/21
68/21 69/13 71/16
95/1 95/8 96/6
96/10 102/14
102/20 102/22
103/3 103/4 104/19
104/22 104/23
105/16 106/21
124/8 124/9 131/9
139/5 139/12
151/25 153/3
155/11 155/11
155/11 155/14
155/14 155/17
155/17 158/12
159/1 159/2 159/16
159/16 159/25
160/2 160/5 160/5
160/8 160/8 160/15
160/16 162/4 162/7
165/23 165/23
166/1 166/22

166/23 166/23
166/23 207/8 209/8
209/21 210/3
212/17 214/11
217/4 217/4 218/25
219/20 219/23
220/5
**craig.wright [4]**
99/17 104/23 171/1
217/24
**craigwright [1]**
159/5
**crashed [1]**  83/23
**create [7]**  80/5
94/5 186/6 208/15
213/12 213/14
214/21
**created [25]**  40/2
80/11 108/14
116/22 117/6 184/5
185/2 185/14
185/25 187/5 187/6
187/7 187/8 208/4
212/13 213/18
214/11 214/13
214/17 216/11
216/15 216/17
217/13 219/23
220/5
**creating [5]**  54/4
110/18 158/12
199/4 213/15
**creation [2]**  53/16
89/4
**creator [2]**  118/5
212/16
**creditor [1]**  84/24
**creditors [2]**
84/12 88/2
**credits [2]**  8/1
8/1
**criminal [3]**
196/21 206/6 206/9
**crisis [1]**  177/6

USCA11 Case: 22-11150    Document: 53    Date Filed: 11/30/2022    Page: 236 of 254

**C**

**critical [1]** 13/15
**cross [2]** 111/21
201/20
**cross-examination [2]** 111/21 201/20
**CRR [1]** 224/17
**crucial [1]** 13/3
**crypted [1]** 194/5
**cryptocurrency [4]** 36/9 102/3 102/6 196/19
**cryptographic [29]** 203/23 204/10 207/11 208/11 208/12 208/13 208/19 211/12 212/5 213/3 213/5 213/10 213/14 213/16 213/17 213/25 214/2 214/10 215/7 215/12 215/13 216/8 216/11 217/5 218/2 218/4 218/9 218/10 219/5
**CSR [1]** 224/17
**CSW [2]** 11/24 116/4
**CTO [2]** 146/15 178/14
**CUDA [1]** 55/4
**culminated [1]** 12/7
**currency [1]** 54/5
**current [1]** 97/9
**currently [3]** 95/18 96/5 203/17
**customer [3]** 49/17 78/13 78/14
**customers [4]** 36/15 36/16 78/11 89/16

**cv [1]** 1/2
**Cyber [2]** 203/18 203/19

**D**

**damages [2]** 117/12 197/23
**damn [2]** 36/14 37/21
**dark [1]** 205/7
**darknet [1]** 205/10
**darn [1]** 190/14
**data [5]** 85/8 208/2 208/2 215/22 216/8
**database [8]** 117/10 117/22 117/24 118/1 118/1 118/2 146/18 178/15
**date [10]** 20/4 22/20 23/9 23/10 24/8 24/11 52/3 94/25 101/7 186/22
**dated [9]** 11/14 12/22 23/5 48/1 94/15 183/6 183/10 184/2 185/12
**dates [2]** 7/11 91/16
**Dave [104]** 6/22 6/23 11/20 12/23 13/3 13/13 18/11 25/21 25/22 27/13 28/15 28/25 30/6 30/12 35/10 45/9 47/11 47/13 48/5 88/15 126/6 126/15 126/24 127/6 127/8 127/18 127/20 140/11 141/15 142/4 145/8 145/16 145/18 145/23 146/8 147/8 147/10

147/15 147/23 148/14 148/15 148/16 149/7 149/10 149/19 149/24 150/21 151/10 151/22 152/1 152/9 152/14 153/13 158/12 163/25 164/23 166/4 166/25 172/6 172/7 172/9 172/10 172/10 172/10 172/12 172/13 172/13 172/13 173/2 174/11 174/17 174/22 175/13 175/13 176/1 176/15 176/16 176/18 176/18 177/15 177/16 177/24 178/3 178/10 178/13 178/20 178/21 179/7 179/15 179/17 180/19 181/24 182/1 182/2 182/7 182/7 182/14 209/20 210/7 214/11 214/13 214/16 214/21
**Dave's [7]** 18/10 29/18 29/19 33/23 34/19 74/20 141/17
**Daves [1]** 172/15
**David [3]** 1/4 27/14 218/15
**day [23]** 1/9 23/6 24/16 24/22 24/22 24/23 25/10 32/10 32/15 56/21 73/17 73/17 81/23 83/13 92/18 92/20 108/15 111/14 183/14

**D**

**day... [4]** 188/12
222/10 224/9
224/15
**days [10]** 11/18
11/25 12/1 17/25
56/24 56/25 60/7
116/5 136/18 178/2
**days' [3]** 24/1
77/21 77/22
**de [1]** 1/22
**dead [4]** 18/13
93/4 179/14 214/16
**deal [11]** 43/10
64/18 68/21 77/20
80/19 80/21 84/13
84/19 84/20 100/5
134/7
**Dear [2]** 20/7 28/5
**death [1]** 33/23
**debt [9]** 8/6 8/8
8/11 84/18 85/15
85/17 85/17 85/18
85/19
**deceased [2]** 127/6
140/11
**December [6]** 12/13
83/17 99/8 160/2
179/11 209/21
**deed [10]** 33/4
70/15 71/15 100/17
104/11 120/3
120/16 185/6
185/22 199/12
**defendant [8]** 1/8
1/19 112/9 156/18
157/10 206/17
221/15 222/18
**Defendant's [1]**
209/4
**Defendants' [2]**
125/16 127/16
**Defense [13]** 1/4

5/15 21/25 22/3
30/12 35/14 45/2
46/7 89/17 127/7
155/25 175/15
187/23
**Defense's [1]**
205/6
**definitely [1]**
140/23
**definition [2]**
93/14 149/25
**degrees [1]** 108/18
**delay [1]** 10/9
**delays [1]** 76/14
**demonstrated [1]**
53/7
**DeMorgan [28]** 57/7
67/23 69/11 70/6
71/15 82/7 82/12
94/14 94/25 95/16
96/5 96/9 96/10
97/6 97/12 97/19
97/19 99/15 100/7
104/9 106/4 106/5
119/15 120/4 123/7
123/23 123/24
128/23
**demorgan.com.au [1]**
99/17
**Denariuz [2]** 89/7
109/21
**denied [4]** 7/4
29/12 173/7 185/24
**Denis [1]** 184/1
**dense [1]** 212/4
**deny [2]** 117/17
176/1
**depends [2]** 111/15
178/22
**deposition [6]**
58/19 73/8 73/20
105/16 105/20
179/3
**depository [1]**

90/15
**depreciated [1]**
27/2
**Des [2]** 10/6 10/7
**describe [7]** 57/18
205/2 205/16 206/8
207/16 208/11
219/12
**describing [1]**
13/10
**design [5]** 54/23
56/1 174/19 178/7
204/9
**designed [5]** 56/1
155/5 155/7 176/4
178/4
**designs [1]** 53/4
**despite [2]** 104/14
153/12
**details [6]** 10/12
29/16 30/15 107/4
126/25 151/23
**determine [10]**
42/11 42/22 88/3
117/10 205/19
205/22 205/25
206/21 207/6 212/9
**developed [1]** 43/4
**developer [1]**
118/6
**developers [2]**
116/24 178/16
**development [6]**
25/19 54/22 55/20
55/22 109/18
204/16
**DEVIN [2]** 1/13 4/9
**dictated [1]** 142/7
**did [102]** 11/7
13/13 16/19 16/20
16/21 16/23 18/11
19/10 19/16 19/20
20/17 20/20 20/23
21/13 24/7 24/21

**D**

USCA11 Case 22-11150 Document 53-1 Date Filed 11/30/2022 Page 228 of 254

**did... [86]** 24/24
25/2 27/13 41/22
42/10 42/20 50/10
57/13 59/23 62/19
64/8 64/10 66/4
73/5 75/10 78/16
78/25 81/1 84/21
84/23 94/5 94/18
98/6 100/8 105/7
105/9 105/11 106/2
106/11 110/12
127/10 131/10
136/21 145/18
145/19 146/3
147/10 148/1
148/16 148/20
148/25 149/1
149/19 149/23
150/3 150/6 151/5
159/15 164/24
165/11 167/1 171/3
171/4 174/11
174/14 177/1 178/7
178/17 178/18
178/20 180/10
184/3 188/2 188/5
193/15 195/4 195/5
195/5 204/12
204/14 204/24
205/3 205/16 206/5
206/7 206/8 206/18
212/9 214/22
214/24 215/13
215/15 215/22
215/24 217/15
221/14
**didn't [66]** 9/17
9/17 9/21 12/15
18/7 18/10 19/15
21/2 21/9 23/8
24/4 24/18 27/12
28/10 28/12 28/14

33/14 33/16 34/24
38/18 44/19 45/14
45/17 48/17 50/9
53/8 54/16 55/19
56/15 59/6 68/14
69/4 72/23 77/4
78/1 79/23 80/3
80/3 80/4 80/4
80/5 83/18 84/15
84/20 85/5 85/13
89/9 99/22 103/22
109/8 117/25 127/9
159/18 165/7
165/15 174/16
174/25 178/10
178/16 180/25
182/9 187/22
196/24 205/20
207/1 211/16
**die [1]** 93/3
**died [2]** 25/21
179/7
**dies [1]** 6/22
**difference [4]**
36/17 49/21 89/9
117/20
**differences [4]**
41/13 45/22 217/1
219/10
**different [43]**
18/20 19/8 21/4
21/7 25/1 45/18
47/7 50/11 70/18
86/21 89/11 90/14
108/17 108/21
109/12 109/14
109/19 113/2 113/2
135/4 139/13 155/8
155/8 155/10
156/12 162/2 162/3
165/24 165/25
167/3 167/4 168/21
170/16 173/25
178/19 178/23

191/6 195/20 196/2
213/15 217/6
**differently [1]**
139/14
**difficult [7]** 23/8
40/17 45/21 146/12
176/7 179/22 210/4
**difficulties [1]**
196/16
**difficulty [3]**
179/19 179/20
180/5
**digital [8]** 35/24
102/7 117/7 196/19
199/9 199/14
203/22 208/19
**digits [2]** 43/21
43/21
**direct [7]** 2/5 2/7
6/11 68/21 111/14
112/19 203/3
**direction [1]**
74/17
**directly [2]** 136/5
136/19
**director [15]**
10/12 21/19 23/23
23/24 31/2 64/8
73/15 73/16 77/7
78/6 92/5 99/12
172/13 172/14
206/10
**directors [5]** 64/4
165/5 165/5 175/22
195/25
**directors' [1]**
195/2
**directorship [5]**
39/6 64/10 77/10
77/10 77/12
**dirty [2]** 188/8
188/14
**disagree [1]** 35/3

# D

**disappeared [1]**
191/24
**discount [1]** 51/20
**Discovery [1]**
156/4
**discuss [6]** 75/4
132/19 177/15
192/18 220/18
222/3
**discusses [1]** 86/1
**discussion [4]**
116/20 135/18
158/19 164/1
**displaying [1]**
161/1
**dispute [2]** 8/15
8/16
**disputed [2]** 7/10
7/12
**disputing [1]** 90/3
**distinction [1]**
117/24
**distributed [2]**
91/6 180/2
**DISTRICT [8]** 1/1
1/1 1/10 1/24
206/12 224/3 224/6
224/7
**dive [1]** 208/25
**dives [2]** 138/14
138/15
**divide [1]** 56/23
**DIVISION [1]** 1/2
**divorce [3]** 126/8
126/24 164/2
**divorced [1]**
176/12
**do [325]**
**doctor [2]** 119/15
119/17
**doctorates [1]**
108/21

**document [128]**
7/18 13/11/2 14/17
15/4 16/18 19/2
19/21 20/2 24/10
25/7 26/2 28/7
28/22 29/22 30/4
30/18 30/20 30/23
31/4 31/9 33/13
33/16 33/17 35/13
37/9 40/17 40/18
44/12 44/16 46/10
48/11 48/14 52/5
58/17 66/13 75/1
76/5 86/3 87/15
89/23 91/10 93/16
94/5 94/6 94/14
94/24 99/2 103/14
103/14 103/23
105/12 105/13
106/23 107/2 108/5
114/7 114/22
114/24 119/1 119/4
120/22 120/23
121/10 121/11
121/14 121/15
121/15 121/17
121/24 122/19
124/11 131/7 135/2
135/21 136/4
136/18 137/20
143/5 144/2 144/16
144/19 148/20
151/12 154/3 156/5
156/10 157/4
158/13 158/15
169/22 169/24
170/16 170/17
171/15 172/2
175/10 175/11
183/6 183/10
183/11 183/20
184/2 184/5 185/23
185/25 189/17
192/18 192/25

207/9 207/17
208/14 208/16
209/1 210/19
210/21 212/3
212/12 212/13
212/15 212/16
213/5 213/6 215/3
215/4 219/13
**document's [3]**
14/24 93/19 207/25
**documentation [5]**
20/8 96/8 96/11
104/9 148/2
**documented [2]**
48/7 108/11
**documents [45]**
5/15 5/17 5/19
17/6 19/9 20/3
25/4 30/25 32/22
35/10 38/7 90/7
108/23 111/11
118/22 133/23
143/17 156/11
156/15 157/7 170/1
176/14 178/2
182/12 182/15
184/17 191/16
191/17 196/23
206/21 206/22
206/24 207/2 207/6
207/10 207/11
208/3 208/22
208/23 208/24
209/5 209/8 209/9
210/17 214/22
**does [24]** 10/20
18/15 29/19 41/19
47/3 48/8 78/22
96/6 105/25 150/10
156/20 157/12
167/1 195/14
198/10 201/1 202/2
213/12 213/13

**D**

**does... [5]**   214/18
216/8 217/22 219/4
219/9

**doesn't [44]**   15/21
26/21 26/25 36/1
36/4 36/5 36/16
37/23 38/6 40/12
43/14 45/17 57/23
74/2 75/23 80/21
82/21 88/12 92/17
101/11 102/20
104/22 104/23
121/8 121/12
122/19 123/13
124/6 124/8 124/12
134/6 134/7 135/3
139/11 139/12
145/25 151/24
157/13 157/23
159/5 162/4 175/16
178/12 195/14

**doing [27]**   13/5
16/1 48/25 51/3
52/14 56/5 56/21
56/24 76/17 90/8
92/19 93/5 96/17
102/8 106/6 108/17
108/18 108/20
109/25 110/1
110/18 111/21
127/8 196/21 197/2
210/6 217/10

**dollar [5]**   8/11
54/10 54/14 84/20
84/21

**dollars [22]**   12/12
17/11 36/12 49/9
49/12 51/17 59/10
59/13 59/16 59/20
59/22 68/23 68/24
77/21 79/22 83/24
176/9 197/3 198/13

221/11 221/12
221/13

**domain [1]**   146/18
**don't [128]**   7/13
7/23 14/6 14/25
29/16 30/7 30/18
30/20 30/23 31/4
31/9 31/12 37/2
37/20 41/13 46/3
48/19 48/24 50/10
51/10 52/3 57/17
58/16 59/12 59/14
59/17 62/22 63/11
73/6 73/17 74/3
74/9 74/18 74/24
75/24 77/14 77/16
78/12 79/10 79/21
80/17 80/17 84/5
84/18 85/2 90/18
92/18 93/2 93/7
93/9 98/7 102/8
102/20 103/5 103/5
104/8 106/5 106/11
106/12 110/13
111/3 111/25 112/1
114/24 123/25
124/8 125/6 125/9
126/4 126/23
127/10 129/12
130/17 136/18
139/11 143/18
144/15 145/24
146/23 147/9
147/11 147/24
147/25 151/11
153/6 153/9 157/11
157/20 160/7
160/10 160/11
160/16 160/17
160/21 160/23
160/25 160/25
161/4 164/1 166/16
166/18 167/22
170/5 172/15

173/22 173/23
175/2 175/10
176/16 180/7 181/4
182/16 183/7 186/7
191/25 194/12
194/21 194/22
195/8 196/3 196/15
196/17 197/10
199/17 199/18
220/11 221/12
222/8

**done [17]**   15/20
15/22 35/6 36/25
42/21 45/9 50/1
51/14 70/17 80/9
90/14 110/7 117/11
178/9 179/9 180/2
182/6

**door [1]**   200/13
**Dorian [14]**   4/20
209/11 209/24
210/13 211/25
212/25 213/9
213/22 214/25
215/16 216/5
216/21 217/18
218/18

**Dornbreg [1]**
172/14

**dot [3]**   80/2 80/2
80/2

**Double [1]**   85/7
**doubt [1]**   208/25
**doubts [1]**   76/17
**down [35]**   24/2
25/3 31/13 47/22
49/1 54/16 59/11
59/22 65/4 70/10
77/24 83/23 84/24
102/14 103/10
108/9 115/6 136/4
151/17 159/20
160/19 162/16
172/24 173/18

**D**

**down... [11]**
181/13 188/3 189/3
189/3 189/10
190/21 192/23
207/13 210/22
211/6 215/17
**download [1]**  83/1
**DR [344]**
**Dr. [33]**  5/3 5/6
5/8 10/3 20/9 31/7
33/21 46/5 63/7
95/21 101/10 107/6
111/19 194/3 202/9
203/5 207/21
209/19 210/15
210/17 211/10
211/20 212/3
212/22 215/3
215/20 217/12
217/15 217/22
218/13 218/14
221/1 222/4
**Dr. Craig [3]**  20/9
31/7 33/21
**Dr. Edman [15]**
111/19 203/5
207/21 209/19
210/15 210/17
211/10 212/3 215/3
215/20 217/12
217/15 217/22
218/13 221/1
**Dr. Edman's [1]**
211/20
**Dr. Matthew [1]**
202/9
**Dr. Wright [13]**
5/3 5/6 5/8 10/3
46/5 63/7 95/21
101/10 107/6 194/3
212/22 218/14
222/4

**draft [25]**  36/23
37/13 38/22 94/5
152/3 152/4 154/7
154/11 155/5
155/24 155/25
156/3 157/15
158/13 158/17
159/15 159/18
161/14 215/4
216/10 216/17
216/25 217/1
217/12 218/25
**drawn [1]**  10/10
**dream [1]**  77/23
**dreamed [1]**  174/10
**drew [1]**  207/5
**drinking [1]**  80/8
**drive [1]**  138/13
**driven [5]**  92/12
93/6 93/14 95/1
95/7
**driver [2]**  79/2
92/14
**drives [1]**  95/4
**driving [1]**  92/15
**dumb [2]**  37/4
83/19
**Dunes [1]**  191/2
**during [13]**  29/2
39/19 42/10 84/16
105/3 116/24 148/3
191/15 204/7 205/6
206/5 208/8 212/23

**E**

**E-Discovery [1]**
156/4
**e-gold [1]**  196/20
**EA [4]**  63/10
136/19 142/6 171/4
**each [13]**  4/22 6/5
9/13 19/7 24/13
33/13 76/15 84/8
98/20 101/4 112/16

121/17 219/6
**earlier [9]**  89/22
119/16 133/19
134/20 168/15
175/10 176/7 182/1
215/9
**early [6]**  49/16
55/20 55/22 76/14
192/3 198/7
**earth [4]**  29/3
77/23 78/12 199/8
**easier [2]**  45/23
53/23
**easily [3]**  34/23
110/8 175/24
**Eastern [2]**  212/21
216/12
**easy [4]**  13/7
23/14 53/22 110/6
**eat [1]**  21/16
**eCash [1]**  177/1
**economic [1]**  176/6
**economist [1]**
200/2
**economy [1]**  199/9
**edited [1]**  13/4
**edits [1]**  219/12
**EDMAN [26]**  2/6
111/19 202/9
202/11 202/14
202/22 203/5 203/7
204/20 207/21
209/19 210/8
210/15 210/17
211/10 212/3 215/3
215/9 215/17
215/20 216/8
217/12 217/15
217/22 218/13
221/1
**Edman's [1]**  211/20
**educational [1]**
203/24
**effective [1]**

USCA11 Case: 22-11150   Document: 38   Date Filed: 11/30/2022   Page: 232 of 254

**E**

**effective... [1]**
101/6

**effectively [2]**
8/15 117/21

**eight [2]**  55/7
84/8

**EITC [1]**  114/5

**either [1]**  124/13

**electric [1]**  57/21

**electronic [1]**
208/13

**else [9]**  24/6 24/6
26/10 48/23 80/24
89/9 117/12 160/16
214/20

**email [243]**

**emailed [2]**  41/20
140/24

**emails [25]**  28/4
29/6 32/17 34/20
38/15 38/22 74/1
74/16 76/14 102/22
125/19 126/19
127/5 127/20 135/5
136/13 140/12
146/8 148/17
148/19 149/3
149/20 156/22
164/13 183/25

**embarrassed [1]**
146/23

**embedded [2]**
207/10 212/12

**Emperor [1]**  191/2

**emphasize [2]**
77/11 77/18

**employed [3]**  99/18
106/4 203/16

**employer [1]**
203/13

**enable [6]**  52/24
53/15 54/4 54/21

90/11 199/25

**enables [1]**  92/4

**encourage [1]**
176/5

**encryption [1]**
54/24

**end [14]**  63/1
63/23 69/4 84/11
91/11 102/14
108/14 108/19
124/9 152/11
158/19 177/5 206/5
213/8

**ended [6]**  12/7
19/24 79/4 82/9
176/12 177/7

**ends [1]**  155/25

**enforcement [1]**
205/21

**engineering [1]**
57/6

**England [1]**  156/13

**enhanced [1]**  43/7

**enough [4]**  24/4
28/11 59/21 79/23

**enrolled [2]**
108/17 108/20

**ensure [4]**  33/23
58/5 83/7 187/7

**enter [2]**  68/21
99/25

**entered [4]**  87/19
184/6 185/6 185/17

**entering [1]**  87/20

**enterprise [2]**
196/23 196/24

**entire [4]**  12/5
24/23 144/2 179/10

**entirety [2]**
169/13 169/14

**entities [9]**  9/13
41/1 82/6 95/19
96/5 96/6 96/18
109/10 119/16

**entities.' [1]**

**entitled [4]**  87/9
87/10 94/14 96/2

**entitles [1]**
109/24

**entity [7]**  63/25
96/10 96/11 109/9
109/23 197/11
197/11

**equipment [1]**
162/21

**equity [3]**  68/7
68/13 72/16

**equivalence [1]**
221/10

**equivalent [5]**
11/4 14/7 23/25
108/15 109/15

**erroneous [2]**
134/22 134/22

**error [2]**  83/16
185/21

**errors [1]**  135/17

**ESQ [10]**  1/13 1/13
1/16 1/16 1/17
1/19 1/20 1/20
1/21 1/21

**essence [1]**  208/21

**essentially [1]**
81/2

**establish [3]**  91/3
169/3 206/15

**establishing [1]**
183/19

**estate [13]**  1/4
13/17 28/25 30/5
30/12 30/16 31/2
35/16 35/17 35/20
35/22 75/8 75/10

**estimate [1]**
114/20

**estimated [1]**
114/4

**E**

estimation [4]
46/8 46/19 48/3
48/3
et [6]    42/15 83/2
109/20 175/2 178/7
187/24
evaluate [1]    46/17
evaluation [7]
42/18 46/16 49/3
49/6 49/7 50/17
51/3
even [32]    8/18
12/15 14/1 15/22
16/17 16/23 17/7
36/10 36/13 37/19
37/21 43/23 55/18
56/3 59/9 59/21
146/23 152/4
154/19 154/21
157/23 168/24
176/19 179/7
179/24 180/19
197/3 197/3 209/7
209/9 214/3 219/6
evening [5]    220/14
220/17 220/24
222/24 222/25
event [2]    87/25
139/10
eventually [7]
19/23 85/20 154/8
154/12 156/6 156/8
188/7
ever [12]    16/23
36/25 37/1 37/20
37/25 77/22 127/9
150/2 151/6 194/22
196/15 204/12
every [32]    9/1
13/25 16/21 16/23
17/5 17/6 18/20
20/16 20/19 22/6

22/6 22/14 22/23
22/24 24/14 24/24
24/22 77/9 78/21
79/11 80/9 84/23
84/24 85/9 89/14
136/16 136/21
136/21 175/21
180/7 196/19 209/1
everybody [1]
202/19
everyone [13]    4/2
4/3 4/3 5/10 5/11
35/23 37/5 84/5
85/4 89/9 118/9
136/15 182/8
everything [17]
7/21 15/14 18/2
20/16 20/17 37/24
84/23 84/24 106/6
135/2 135/2 149/25
153/2 175/4
178/14 194/19
220/20
evidence [255]
evil [1]    191/23
eviscerate [1]
80/7
ex [5]    2/8 3/2
13/20 165/5 165/5
ex-directors [1]
165/5
ex-staff [1]    165/5
ex-wife [1]    13/20
exact [3]    24/16
158/10 161/12
exactly [8]    18/5
29/15 56/5 106/5
180/21 180/23
192/12 222/8
exaggerated [1]
79/1
examination [9]
2/5 2/7 6/11 38/10
111/14 111/21

112/19 201/20
examine [3]    209/1
215/13 220/3
examined [1]    213/3
Excel [4]    105/12
105/13 107/2
107/21
Except [4]    24/5
45/13 48/16 136/7
Exch [23]    24/16
25/11 25/16 26/6
36/3 36/12 41/2
52/16 53/17 54/9
73/13 74/1 74/8
75/23 82/15 86/16
86/16 88/2 88/6
89/7 99/9 100/1
109/22
exchange [26]    36/8
36/9 45/17 49/15
64/12 66/4 75/15
83/21 84/2 89/6
89/14 89/24 90/11
92/18 100/11
101/22 102/3
109/22 142/5
146/15 146/17
146/20 155/9
178/15 205/11
221/10
exchanges [1]    84/1
exclusive [3]    82/9
91/7 100/5
excuse [2]    61/1
122/11
executed [10]
66/20 66/21 66/22
67/5 67/16 67/18
67/19 68/3 73/25
74/1
executive [2]    85/1
85/4
executor [6]    28/24

USCA11 Case: 22-11150   Document: 58-2   Date Filed: 18/30/2022   Page: 234 of 254

**E**

**executor... [5]**
30/5 30/12 30/16
31/2 35/9
**exercise [1]** 19/10
**exhibit [95]** 9/19
11/18 15/9 28/1
42/7 44/23 50/25
62/1 63/21 65/19
69/25 71/12 74/14
76/10 81/21 87/3
94/10 99/5 104/1
107/16 115/13
115/16 115/18
119/23 120/13
123/3 123/19
124/20 125/16
126/12 127/16
128/7 128/18 129/5
130/10 131/22
132/14 132/25
133/13 134/16
135/10 137/13
138/9 138/20 140/4
140/17 141/4
141/23 142/12
143/10 143/11
144/14 145/14
147/6 147/21
148/14 149/17
151/3 162/7 162/14
163/21 164/7
164/19 166/10
168/3 168/17
169/18 170/9
170/17 171/13
172/22 174/6
177/21 181/7
184/25 188/23
190/10 209/12
209/19 210/8
211/10 211/24
215/1 215/10

215/17 215/20
216/16 216/22
216/25 216/25
217/2 217/3 217/19
217/22
**exhibits [2]** 7/14
211/4
**exist [2]** 174/25
175/16
**existence [1]**
150/2
**existing [3]** 50/2
150/2 187/18
**exists [1]** 167/12
**exonerated [1]**
11/6
**expanded [1]** 83/20
**expansions [1]**
83/23
**expect [2]** 27/12
186/24
**expected [2]** 27/9
51/21
**expended [1]** 26/22
**expenditure [2]**
25/20 26/17
**expense [2]** 15/18
17/10
**expert [2]** 116/17
157/6
**expertise [2]**
203/21 203/22
**experts [1]** 209/4
**expires [1]** 110/19
**explain [2]** 7/23
212/4
**explained [3]** 95/3
133/19 179/19
**explaining [3]**
91/5 157/5 197/5
**explanation [2]**
41/4 43/12
**expletive [2]**
136/23 136/24

**expletives [2]**
**exploit [2]** 17/14
78/22
**exploited [1]** 36/2
**expose [2]** 88/25
101/20
**exposed [3]** 89/17
90/4 116/23
**exposes [1]** 88/9
**exposing [1]** 90/5
**extent [3]** 10/17
88/3 206/21
**external [4]** 16/24
16/25 17/8 42/18
**extract [4]** 206/14
207/12 214/5
215/22
**extracted [2]**
210/24 216/9
**extracting [1]**
207/9
**extremely [1]** 49/7

**F**

**fabrication [2]**
8/24 10/25
**face [3]** 62/4 62/4
104/16
**facing [3]** 83/11
85/11 85/14
**fact [17]** 8/25
11/5 33/18 79/5
82/14 96/18 108/24
154/5 156/2 156/17
157/17 167/1
194/11 198/15
209/5 212/9 214/23
**fail [3]** 51/21
51/24 93/11
**failed [2]** 7/22
93/9
**failure [1]** 80/10
**failures [1]** 93/8

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/30/2022    Page: 235 of 254

**fair [1]**   60/19

**fairly [1]**   47/17

**fake [10]**   186/9
186/20 186/21
187/5 187/6 189/21
190/16 190/16
190/17 191/3

**fall [2]**   93/4
198/11

**fallacia [1]**   175/2

**fallacious [1]**
184/10

**fallacy [1]**   175/3

**false [2]**   29/8
175/5

**falsifiable [1]**
175/1

**familiar [5]**   17/15
140/22 145/9 148/9
164/1

**family [6]**   40/25
85/19 95/9 210/6
217/11 218/15

**far [3]**   33/11 35/1
100/12

**Farnworth [1]**
125/9

**farther [2]**   189/5
189/8

**fashioned [2]**
43/17 90/14

**fast [1]**   54/4

**father [1]**   23/16

**favor [1]**   14/8

**FBI [3]**   204/25
205/3 206/1

**FBI's [2]**   204/18
205/4

**February [15]**
10/15 10/21 11/15
11/24 12/7 12/14
12/22 17/25 108/10

108/11 214/9
214/11 216/12
216/13 218/1

**February 11th [2]**
11/15 11/24

**February 14th [1]**
12/22

**February 18th [1]**
17/25

**February 27th [1]**
216/12

**February 28th [4]**
214/9 214/11
216/13 218/1

**February 6th [2]**
10/15 10/21

**February of [2]**
12/7 12/14

**federally [1]**
204/16

**feel [3]**   18/2
74/16 201/13

**feeling [2]**   57/20
57/21

**fees [2]**   12/12
15/25

**fell [1]**   177/2

**FERNANDEZ [2]**   1/21
5/6

**few [5]**   133/4
171/4 219/8 219/19
219/19

**fiancee [1]**   9/1

**Fibonacci [1]**
55/17

**field [5]**   152/12
159/6 160/8 166/17
203/21

**fifth [1]**   209/24

**fight [6]**   8/19 9/2
9/4 12/6 14/10
15/24

**fighting [2]**   15/25
82/19

**figure [1]**   79/16

**figures [1]**   62/25

**file [7]**   110/1
110/7 110/13
167/13 170/25
194/5

**filed [4]**   164/25
165/3 194/2 221/8

**files [1]**   13/1

**filing [6]**   104/16
110/4 110/9 114/5
165/12 194/2

**filings [2]**   9/1
127/8

**final [9]**   19/3
35/7 68/2 72/22
73/25 99/25 154/12
154/14 158/9

**finally [6]**   12/13
14/11 79/17 99/10
186/18 208/10

**finance [2]**   62/12
66/5

**financial [2]**
25/11 177/6

**find [12]**   6/22 7/3
11/9 21/13 31/13
58/14 78/23 80/19
96/20 110/23
175/24 199/14

**finding [1]**   57/25

**findings [2]**
206/23 206/24

**Fine [1]**   160/18

**finger [1]**   36/18

**fingers [1]**   56/25

**finish [3]**   16/7
34/5 158/8

**fired [3]**   38/7
191/20 191/21

**firm [6]**   15/17
26/20 91/18 92/3
94/13 203/17

**firms [1]**   58/9

**first [51]**   8/18

**F**

**first... [50]** 9/3
13/4 13/8 14/20
18/1 19/17 19/19
21/6 22/20 26/1
32/12 36/1 41/15
41/16 45/5 46/12
47/21 62/7 66/8
76/13 86/14 87/4
87/19 89/8 94/1
94/22 97/21 104/3
104/13 107/21
119/1 119/4 137/23
143/14 144/6
144/13 169/1
179/11 180/2 181/3
193/16 194/9
194/11 194/13
194/16 194/16
200/21 201/8
212/11 218/14
**five [12]** 11/18
12/1 18/18 18/22
24/17 27/1 68/23
86/15 103/15
103/15 108/21
192/23
**fixed [6]** 26/11
26/17 26/21 43/15
219/17 219/19
**flag [11]** 96/2
96/3 96/14 96/22
97/1 97/4 97/4
97/5 97/8 97/21
221/13
**flagged [4]** 96/14
97/21 97/25 222/4
**flagging [1]** 96/18
**FLEXNER [1]** 1/15
**flick [1]** 56/25
**floated [1]** 24/3
**floating [1]** 134/8
**FLORIDA [9]** 1/1

1/14 1/18 1/22
1/25 224/14 224/14
224/15 224/18
**flow [1]** 48/19
**flsd.uscourts.gov
[2]** 1/25 224/19
**flub [1]** 176/20
**fluctuations [1]**
102/4
**flying [3]** 81/2
81/14 82/3
**focus [3]** 96/6
154/9 204/7
**focused [2]** 204/9
205/23
**follow [1]** 175/5
**followed [3]** 67/4
67/8 68/22
**following [5]** 10/9
12/8 13/5 31/5
104/10
**force [6]** 84/5
84/14 86/19 86/22
196/8 197/15
**forego [2]** 85/20
91/10
**foregoing [1]**
224/10
**forensic [3]**
203/22 206/12
206/14
**forge [11]** 145/18
147/10 148/1
148/16 148/20
149/19 149/23
150/3 150/6 151/5
186/4
**forged [10]** 148/17
148/19 149/3
149/20 150/8
150/13 151/6 157/7
157/16 186/3
**forgeries [3]**
209/5 220/3 220/5

**forgery [20]** 4/16
158/12 185/24
185/25 209/2 210/9
210/12 212/9 212/9
213/4 214/10
214/23 214/23
215/23 217/15
218/1 218/24 219/2
219/23
**forging [1]** 38/7
**forgotten [2]** 47/4
55/2
**form [5]** 7/9 82/1
157/21 167/15
197/12
**formally [1]** 77/11
**format [2]** 157/20
157/22
**formed [1]** 175/14
**former [3]** 29/17
45/20 64/4
**forms [1]** 34/21
**formulate [1]** 39/2
**formulating [1]**
201/25
**forth [2]** 64/1
221/23
**fortune [1]** 222/5
**forward [8]** 32/13
74/24 86/12 106/17
155/21 159/17
202/12 206/18
**forwarded [16]**
32/24 33/16 34/7
34/9 61/17 99/14
99/16 104/18
127/20 139/15
150/19 158/25
159/17 164/13
195/15 217/23
**forwarding [8]**
69/14 69/19 126/6
127/5 129/23

USCA11 Case: 22-11150    Document 36    Date Filed: 14/30/2023    Page: 237 of 254

**F**

**forwarding... [3]**
140/10 140/12
150/20
**forwards [4]** 90/18
136/3 136/11
219/20
**fought [2]** 14/5
17/7
**found [7]** 21/8
40/19 113/8 146/9
180/14 216/18
219/5
**foundation [39]**
14/24 15/5 94/5
94/7 103/9 103/22
120/11 121/1
122/24 123/15
124/16 125/13
129/18 129/20
131/5 132/11
133/18 139/22
139/25 143/11
143/24 144/11
147/2 149/14
151/14 152/20
152/22 152/25
154/2 156/10
156/19 157/9
158/15 161/25
162/10 167/8
183/20 192/14
192/17
**foundations [1]**
199/15
**founded [5]** 26/1
39/8 104/22 175/19
176/17
**founder [4]** 23/17
23/20 24/10 24/16
**founder's [1]**
82/15
**founders [2]** 42/19

176/24
**founding [1]** 36/1
**four [7]** 17/25
43/19 52/15 56/10
57/7 108/13 192/23
**fourth [2]** 183/14
188/22
**frankly [1]** 99/22
**fraudulently [1]**
118/11
**free [2]** 51/25
101/7
**FREEDMAN [17]** 1/12
1/13 2/5 4/10 6/14
7/13 10/18 98/22
110/25 112/8
112/22 153/1 154/4
168/17 183/18
192/24 215/9
**freely [1]** 157/5
**freeze [1]** 177/5
**friend [1]** 79/20
**friendly [1]** 90/10
**front [6]** 48/20
60/20 151/13
156/16 157/10
165/12
**frozen [1]** 168/8
**FTI [1]** 206/10
**full [9]** 8/7 13/14
66/5 70/5 78/7
116/6 146/21 213/9
213/10
**fully [3]** 27/2
89/15 126/4
**fund [2]** 82/7
82/12
**fundamental [1]**
54/5
**funded [4]** 40/2
58/6 182/14 204/16
**funding [5]** 41/12
41/14 41/18 141/8
196/21

**funky [1]** 149/11
**funny [1]** 247/12
**further [7]** 20/8
41/18 97/17 201/18
221/3 222/14
224/12
**future [2]** 55/23
174/10
**FYI [1]** 74/25

**G**

**G-N-U-P-G [1]**
213/21
**GAAR [5]** 11/3 11/4
11/6 11/7 188/15
**Gables [1]** 1/22
**gain [1]** 17/13
**gains [1]** 20/1
**gamble [1]** 102/3
**gambling [1]** 102/6
**games [2]** 55/25
124/7
**gaming [2]** 59/3
59/6
**gaps [1]** 112/2
**gateway [1]** 156/15
**gave [4]** 34/8
37/24 43/7 51/20
**general [4]** 146/22
173/22 188/15
206/24
**generally [2]**
171/8 207/8
**gentlemen [8]** 6/3
60/4 61/8 111/4
112/16 163/10
201/23 220/13
**Germany [1]** 53/6
**get [73]** 4/4 5/21
6/6 10/7 13/11
13/13 14/10 15/23
19/3 21/6 21/15
24/1 25/4 26/19
36/15 41/18 44/2

## G

# G

**get:... [56]**   48/15
48/22 49/16 49/22
49/24 51/24 58/10
59/8 59/23 61/19
62/20 64/3 68/12
68/25 74/19 77/13
78/13 78/14 79/6
79/7 79/9 79/23
80/19 81/12 82/1
84/15 89/8 89/12
89/13 90/7 100/25
110/15 112/17
133/17 134/10
135/1 136/16
136/19 136/19
157/7 165/7 167/17
171/25 175/11
176/9 180/4 182/2
184/19 186/7
190/13 190/14
194/24 200/3 200/5
207/4 207/15

**gets [6]**   77/12
110/17 154/8 156/6
156/8 196/5

**getting [5]**   10/9
47/12 77/24 86/20
176/12

**give [35]**   8/13
8/22 21/17 33/5
36/5 36/6 37/1
37/24 59/13 59/16
59/17 59/19 66/4
70/4 76/22 77/14
77/16 77/18 77/19
77/20 84/8 91/9
110/16 131/16
134/7 144/21 168/9
170/3 176/8 176/13
197/4 202/1 202/19
222/5 222/10

**given [5]**   60/19

110/19 165/2 188/1
195/5

**gives [1]**   95/5

**global [5]**   92/24
100/11 141/9 177/3
177/6

**globally [1]**   200/6

**Gmail [3]**   29/3
155/9 155/12

**gmail.com [1]**
28/24

**Gnu [1]**   213/21

**GnuPG [4]**   213/19
214/2 214/5 215/21

**go [112]**   4/4 5/19
5/25 9/7 9/24
12/18 16/3 16/8
16/12 16/15 18/22
20/12 21/22 27/17
28/2 28/19 28/20
32/5 32/11 33/5
36/7 37/8 38/4
38/18 38/19 40/8
46/4 49/3 49/4
49/23 54/18 55/19
56/3 57/2 57/12
58/11 60/6 62/25
65/2 67/13 68/4
70/13 72/14 72/21
76/24 78/8 78/23
88/20 89/9 89/11
92/7 93/15 94/19
95/23 96/25 97/2
100/21 103/10
103/18 106/16
106/24 107/17
110/9 110/22
111/11 112/8
112/12 114/13
119/1 119/4 119/6
119/13 120/5 121/3
121/19 121/23
136/22 136/23
136/24 143/14

143/19 144/5 144/6
162/20 165/20
175/20 175/21
176/5 180/17
182/19 183/13
186/15 186/16
189/11 189/18
190/23 190/25
202/21 211/25
212/25 213/22
214/25 216/5 216/5
216/21 217/18
218/18 220/10
220/11 221/6

**God [1]**   191/2

**goes [6]**   33/4
118/13 135/5 148/2
162/8 195/20

**going [67]**   6/15
6/20 8/9 11/2 18/7
35/2 35/7 39/18
40/18 64/1 69/4
79/4 80/18 82/18
82/20 82/21 89/10
90/17 90/17 93/3
93/7 95/7 96/22
100/25 102/5 102/6
102/8 109/7 109/24
110/1 111/13
112/10 118/10
118/21 118/22
121/14 122/1
125/20 133/15
134/10 157/7
167/13 167/14
173/10 176/11
183/17 187/13
190/24 190/24
191/13 191/25
192/1 192/17 197/4
198/11 198/11
204/20 207/20
208/22 209/1

0off

USCA11 Case 22-11150   Document 53   Date Filed: 11/30/2022   Page 238 of 254

**G**

**going... [7]**
210/11 210/11
215/17 220/3
220/13 222/5
222/21
**gold [5]**  43/11
43/12 43/16 90/15
196/20
**Goldstein [1]**  52/1
**gone [5]**  7/10
76/21 115/3 161/7
182/5
**Gonzalez [1]**  5/8
**good [36]**  4/2 4/2
4/9 4/11 4/12 4/14
4/16 4/19 4/22
4/23 4/25 5/2 5/5
5/10 5/11 6/3 6/5
6/13 6/14 13/10
33/4 48/23 56/23
60/1 77/20 104/20
106/20 108/15
111/1 112/21
112/22 136/2 195/5
202/11 203/5
222/25
**goods [2]**  14/12
26/24
**Google [3]**  155/9
155/16 166/1
**gosh [1]**  190/14
**got [33]**  8/18
22/24 23/7 24/20
27/7 29/2 29/15
35/7 51/22 51/25
55/21 55/22 56/22
56/23 69/2 74/7
83/14 84/23 84/25
108/11 111/11
147/25 154/12
157/6 157/8 161/3
185/2 187/11

189/16 191/21
191/22 191/24
216/24
**gotten [1]**  180/1
**government [9]**
14/4 14/11 14/17
19/24 21/6 48/16
54/14 90/21 204/17
**governments [1]**
48/24
**Gox [2]**  83/21
83/25
**GPU [4]**  180/11
180/11 180/15
180/15
**grab [2]**  112/10
163/3
**graduate [1]**
204/12
**grant [1]**  68/8
**granted [1]**  110/16
**graph [1]**  55/15
**graphics [1]**  55/5
**great [4]**  49/14
79/6 162/17 221/11
**green [1]**  109/2
**grew [1]**  77/17
**Greyfog [4]**  40/3
41/10 43/5 88/14
**grounds [3]**  63/17
103/19 144/9
**group [25]**  41/1
51/4 58/15 62/13
64/18 64/24 73/14
78/25 81/1 83/6
87/8 94/14 94/15
94/25 96/5 96/6
96/10 97/13 97/19
100/7 100/8 104/9
123/23 141/8
203/18
**group's [1]**  195/2
**grovel [1]**  93/10
**grow [4]**  57/15

57/16 57/20 80/5
**GST [17]**  7/9 7/25
9/2 9/4 12/4 12/8
13/23 13/24 14/8
15/18 19/12 20/1
21/11 48/12 48/13
48/14 86/20
**guess [3]**  82/24
83/1 180/24
**guesstimated [1]**
180/23
**gutter [1]**  60/10
**guy [3]**  37/22
81/24 82/5
**guys [3]**  43/23
70/3 70/4

**H**

**habit [3]**  135/1
136/12 136/16
**hacked [3]**  191/16
191/17 191/19
**hacker [2]**  192/3
192/4
**had [148]**  4/3 6/6
8/16 8/18 9/3 12/6
12/24 13/14 14/10
15/16 15/17 15/24
16/25 17/8 17/10
18/8 20/25 21/2
23/23 23/25 24/5
26/4 28/13 31/24
34/18 34/20 36/3
36/6 36/12 38/15
40/5 42/13 42/18
42/19 42/25 43/2
43/3 43/18 44/1
44/11 45/9 47/8
47/9 48/6 48/16
49/15 49/17 49/18
49/25 50/1 51/13
54/8 54/12 55/7
55/8 55/12 55/13
57/13 57/17 59/1

# H

**had... [88]** 59/7
59/18 59/25 64/8
64/21 67/7 72/3
73/6 73/15 75/13
75/15 75/15 77/6
77/10 77/16 78/1
78/7 78/17 78/25
80/10 81/3 83/13
83/21 83/22 84/1
84/4 84/25 90/3
90/6 90/15 98/1
99/12 99/13 106/3
106/5 110/15
112/16 113/16
116/25 126/23
131/9 134/9 134/10
136/5 140/12 142/6
145/24 146/9
146/10 146/14
146/15 146/17
146/19 146/20
146/21 146/22
149/9 153/23
162/10 164/2
172/11 172/11
175/14 175/18
176/19 176/22
178/11 179/23
179/24 179/25
182/1 182/3 182/7
182/7 182/7 182/8
187/9 187/19
191/18 191/19
194/23 196/15
199/22 199/23
211/7 214/16
214/20 224/8
**hadn't [1]** 78/5
**half [10]** 8/3 8/11
8/20 8/20 21/3
21/18 52/21 53/10
68/23 212/15

**half-million [1]**
68/23
**half-million-dollar
[1]** 8/11
**halfway [2]** 95/16
173/18
**hand [33]** 13/5
19/5 23/1 23/4
35/15 40/11 47/16
49/2 72/11 72/12
72/15 88/18 124/10
155/14 155/15
155/24 156/1 158/5
158/9 158/21
159/15 159/19
161/18 161/19
165/7 166/24
166/24 185/7
185/14 201/25
202/3 202/12
224/14
**handed [3]** 153/20
165/8 165/11
**handle [4]** 28/8
43/22 43/24 51/15
**happen [5]** 68/14
86/2 196/15 196/24
198/10
**happened [11]** 8/8
11/6 18/23 29/6
38/12 39/19 82/7
165/4 177/3 187/11
192/2
**happening [1]** 82/9
**happens [4]** 57/1
83/5 117/10 165/1
**happy [5]** 5/11
51/11 51/19 133/15
187/15
**hard [14]** 36/18
44/19 55/11 79/2
79/8 79/13 89/8
90/20 138/13
138/14 138/15

186/2 186/4 186/21
**harder [2]** 53/22
90/12
**hardest [1]** 90/10
**hardware [1]** 53/4
**Hardy [1]** 140/23
**Harvard [1]** 108/19
**has [58]** 6/23 7/4
10/25 30/14 30/21
35/8 35/16 35/17
36/6 36/17 40/24
46/18 49/19 57/6
57/8 60/8 60/9
60/10 80/24 82/14
85/2 87/15 87/19
87/20 94/25 97/6
102/4 108/9 115/3
117/11 117/11
117/11 121/23
121/25 122/2
143/11 155/16
156/7 156/10
157/10 157/17
158/16 161/13
162/6 162/11 175/4
175/22 180/7
182/23 184/6
185/17 185/18
186/1 188/10 194/3
194/5 213/9 222/6
**hash [2]** 180/8
180/8
**hasn't [2]** 115/4
208/17
**hate [2]** 58/2
169/22
**hates [1]** 135/1
**have [229]**
**haven't [12]** 27/2
33/17 56/13 100/12
101/23 114/7
114/22 114/24
115/5 158/15
187/14 209/9

USGA11 Case 22-11150 7 Document 58-11 Date Filed: 11/30 Page 240 of 254

**H**

**having [12]**   8/11
44/19  45/22  54/9
54/13  133/25
146/11  150/3  157/4
168/7  177/7  178/10
**he [149]**   10/6
12/24  12/25  13/4
13/15  18/9  23/7
23/8  23/23  23/24
24/1  24/4  24/5
24/7  27/8  27/8
32/17  33/6  34/22
35/8  35/9  35/10
37/17  37/18  37/19
37/23  38/8  39/9
39/9  39/10  39/10
39/10  44/11  48/15
49/16  57/13  57/22
57/22  57/22  59/11
59/11  59/15  59/17
59/19  59/22  64/9
73/15  73/16  74/2
75/2  75/23  76/20
76/21  77/4  77/4
77/4  77/6  77/6
77/9  77/9  77/10
77/11  77/12  77/23
78/3  78/8  78/8
78/9  78/9  78/22
78/23  78/24  78/24
79/11  79/12  79/12
80/3  80/4  80/4
80/5  80/6  80/6
80/6  80/7  80/10
80/21  80/23  80/24
81/2  82/2  82/5
88/13  93/11  103/22
104/9  106/6  106/7
115/21  115/21
121/22  121/24
122/2  127/9  129/24
134/6  134/7  134/7

135/16  140/12
154/3  157/17
157/19  158/12
161/13  162/6
172/16  174/14
174/15  174/16
174/16  174/18
174/19  175/11
175/16  178/4  178/6
178/7  178/21
178/23  178/24
179/1  179/13
179/14  180/14
180/22  181/24
182/8  187/12
187/14  196/23
199/22  199/23
200/13  211/17
212/22  218/14
222/5  222/6
**he'd [1]**   49/24
**he's [27]**   8/3  8/4
8/17  8/23  9/3  10/5
11/5  13/22  17/5
21/1  35/7  35/8
35/9  52/14  57/1
57/22  64/22  79/22
156/6  157/1  175/16
180/13  187/15
191/25  199/5
200/12  201/1
**header [2]**   142/5
154/19
**healthy [2]**   5/12
6/5
**hear [7]**   9/17  9/21
143/9  148/25
165/15  211/16
211/18
**heard [4]**   92/13
187/15  205/6
207/13
**hearing [2]**   44/19
146/12

**hearsay [35]**   15/5
61/23  63/16  63/17
65/16  69/22  71/9
81/18  87/1  94/7
98/17  103/8  103/19
107/14  116/17
119/20  120/11
121/2  123/1  123/15
124/16  125/12
129/17  131/4
139/23  139/25
143/1  143/25
144/11  147/3
149/15  152/21
**heart [1]**   76/13
**held [6]**   10/23
48/18  88/5  101/18
108/6  153/22
**Hello [4]**   11/20
33/4  51/2  62/4
**help [12]**   36/23
37/14  37/14  38/21
39/9  69/15  80/18
95/17  105/25
138/25  139/11
167/1
**helped [9]**   47/13
54/17  56/1  79/20
174/18  174/19
178/21  180/14
180/15
**helpful [1]**   221/18
**helping [1]**   178/6
**hence [1]**   10/9
**her [4]**   135/5
135/24  135/25
142/7
**here [34]**   4/20
4/21  5/12  7/22  8/5
11/8  11/9  14/7
35/24  46/24  51/2
67/19  77/1  80/14
80/15  86/17  94/24

**H**

**here... [17]** 111/5
111/19 111/19
112/3 117/12
168/15 172/7 181/1
187/16 194/23
199/1 210/11 212/6
212/22 215/9 220/9
220/15
**here's [2]** 78/10
185/11
**hereby [2]** 101/5
224/7
**hereunto [1]**
224/14
**hernandez [6]** 1/23
1/25 224/5 224/17
224/17 224/19
**Hernando [1]** 200/2
**hers [1]** 124/12
**Hi [5]** 4/11 10/7
28/5 32/17 99/9
**highlight [20]**
20/4 23/12 24/8
24/11 30/8 40/21
66/8 66/10 68/15
72/15 92/10 95/24
114/25 161/19
173/17 177/22
185/3 190/3 192/22
193/2
**highlighted [8]**
67/17 86/17 117/17
131/13 161/3
209/22 209/25
219/8
**highlighting [1]**
159/24
**highly [3]** 50/5
50/18 55/8
**him [29]** 12/23
18/1 18/1 24/4
24/5 24/6 27/12

34/11 35/2 36/22
36/23 39/9 39/9
47/7 59/18 78/3
80/21 80/22 80/24
82/1 127/8 127/11
146/12 146/21
178/3 182/2 182/24
191/10 191/25
**himself [2]** 217/16
219/1
**hire [2]** 57/15
78/24
**hired [1]** 178/17
**his [36]** 8/25 18/1
18/12 23/7 34/19
34/20 36/18 36/18
39/8 39/10 49/16
52/2 59/5 82/1
95/8 123/23 124/25
127/5 128/22
140/11 145/9 154/6
156/7 157/2 157/17
157/18 161/20
166/5 175/15
180/13 180/20
194/5 198/9 200/24
207/21 222/5
**history [2]** 12/6
133/7
**hit [1]** 83/17
**Hmm [1]** 152/2
**hobby [2]** 196/22
196/25
**hold [10]** 9/14
28/20 31/21 80/3
80/4 99/9 106/17
112/1 165/7 184/12
**holdings [12]**
70/18 71/16 72/6
100/19 120/17
193/9 193/15 194/6
194/14 194/15
194/16 194/18
**holiday [2]** 6/6

7/10
**holidays [1]** 6/1
**home [2]** 34/19
55/6
**homeless [1]**
199/21
**honest [2]** 37/25
198/21
**honesty [1]** 8/24
**Honor [247]**
**HONORABLE [1]** 1/10
**hope [4]** 4/3 6/6
62/6 111/18
**hoped [2]** 101/22
182/7
**horrendously [1]**
13/6
**horrible [2]** 79/2
79/5
**hospital [1]**
179/17
**hosted [6]** 155/9
205/19 205/21
205/24 206/1 206/3
**hotel [1]** 191/24
**Hotwire [21]** 41/2
41/21 46/2 46/7
47/1 52/15 83/10
83/12 84/16 85/25
86/1 86/8 86/9
86/22 87/9 87/10
87/15 87/19 87/20
88/5 100/1
**hotwirepe.com [2]**
171/1 217/24
**hour [5]** 111/5
203/13 216/16
216/18 219/6
**housekeeping [1]**
163/12
**how [48]** 8/16
12/16 15/19 19/13
19/24 19/25 23/23
26/9 26/13 26/15

**H**

**how... [38]** 28/22
28/8 28/13 29/2
29/5 29/15 37/20
43/1 45/23 48/25
57/17 59/16 59/16
76/25 80/21 84/18
93/8 93/8 103/14
110/10 110/18
111/8 117/5 161/1
173/23 178/22
180/8 180/18
180/21 191/23
191/24 207/4 212/8
213/12 213/13
213/25 216/14
219/4
**However [1]** 96/8
**huge [1]** 48/22
**huh [1]** 160/1
**human [1]** 207/19
**hundred [20]** 36/11
43/21 49/19 54/10
54/14 56/12 56/14
56/21 56/24 59/10
59/13 59/16 59/20
59/22 64/23 135/3
135/5 176/8 191/4
197/3
**hundred-billion-dol
lar [2]** 54/10
54/14
**hundreds [7]** 29/3
29/4 29/7 29/7
29/8 80/11 80/11
**hurdles [1]** 93/2
**Hyde [2]** 199/21
199/23

**I**

**I'd [19]** 29/1
38/16 39/18 47/4
52/3 55/2 58/25
59/5 84/16 120/23

133/18 136/23
154/20 177/6
190/22 195/14
206/18 222/2
222/10
**I'll [17]** 37/19
59/13 59/19 67/18
78/20 81/5 84/11
93/9 93/10 93/12
111/5 112/3 135/3
136/19 199/9
219/15 222/22
**I'm [102]** 5/11
10/24 11/6 11/9
11/9 13/9 13/9
21/4 28/7 32/22
37/21 39/18 40/20
44/18 44/19 47/12
58/1 58/2 61/2
63/25 70/3 73/16
74/17 76/23 79/2
80/13 80/18 80/19
80/21 80/22 92/13
92/15 92/15 92/17
92/17 92/19 93/3
93/4 93/4 93/7
95/3 95/4 95/4
95/6 95/7 95/7
95/16 101/14
101/15 101/16
101/23 101/24
102/5 102/5 102/8
106/9 108/17
108/17 108/20
108/21 111/17
112/1 112/10
116/15 118/21
118/21 121/14
125/19 125/20
129/10 133/15
136/18 139/12
139/24 143/9
146/11 146/23
151/11 152/4 159/1

159/9 159/24
171/10 171/16
172/9 172/10
173/16 174/24
176/10 176/11
180/13 183/19
186/7 189/23 190/1
192/16 198/22
203/19 204/20
207/20 211/17
218/4
**I've [38]** 15/22
36/25 37/1 40/14
49/13 56/10 56/22
69/2 80/9 84/25
91/5 92/13 95/6
101/11 101/21
102/1 104/22 106/2
108/9 108/11
108/15 111/11
113/17 116/25
146/5 146/7 149/20
153/24 174/19
182/3 182/6 186/15
191/22 193/17
195/17 197/5
198/25 199/4
**Icelandic [1]**
206/2
**ID [9]** 46/8 46/18
46/24 47/1 47/11
49/3 49/8 49/9
52/14
**idea [14]** 18/8
19/25 49/14 75/16
80/24 105/9 105/13
113/16 114/22
115/5 145/17
193/17 195/14
199/7
**identical [3]**
156/5 156/8 218/2
**identified [4]**
67/24 97/5 101/9

USCA11 Case: 22-11150 Document: 41 Date Filed: 11/30/2022 Page: 244 of 254

**I**

**identified... [1]**
157/18

**identify [5]**  95/18
96/4 205/23 206/14
212/16

**identities [1]**
29/8

**ignore [1]**  82/1

**ignores [3]**  8/25
9/1 9/2

**ignoring [1]**  12/5

**II [1]**  46/18

**illegal [2]**  77/3
205/11

**image [2]**  172/18
174/3

**imaged [1]**  165/4

**imagine [9]**  14/2
37/25 55/10 56/22
57/1 59/11 77/22
85/5 90/12

**imagined [1]**  177/3

**immediately [1]**
68/8

**immensely [1]**
54/15

**immutably [1]**
200/1

**impeachment [10]**
115/13 115/15
115/19 115/21
116/18 117/15
181/7 200/24 201/1
201/3

**impinged [1]**  117/3

**implement [2]**
174/16 174/17

**implementation [3]**
70/15 71/15 174/14

**implemented [2]**
174/15 174/16

**implied [1]**  101/12

**imply [1]**  16/2

**implying [2]**
113/5

**importance [2]**
97/7 97/12

**important [1]**
155/20

**impossible [2]**
205/19 205/21

**impressed [1]**
37/21

**improper [10]**  7/5
115/15 115/21
116/13 116/15
116/16 192/15
193/3 197/22
200/25

**inappropriate [2]**
60/12 222/6

**Incident [1]**
203/19

**incidents [1]**
191/20

**include [3]**  149/25
150/10 218/2

**included [6]**
153/21 153/22
153/23 165/2 170/2
207/8

**includes [2]**  214/8
215/7

**including [21]**
24/23 44/8 45/4
100/1 101/7 101/19
116/23 116/24
116/24 117/8
118/11 129/9 133/4
149/3 150/12 151/6
156/12 188/2
191/23 196/11
217/5

**incomplete [5]**
153/7 153/8 153/8
153/10 153/12

**incorporated [2]**

**incorporation [2]**
68/7 72/16

**incorrect [4]**  91/4
100/3 113/6 179/17

**incredibly [1]**
51/9

**independent [1]**
220/20

**India [2]**  199/13
199/16

**indicate [2]**
214/22 217/7

**indicates [4]**  96/8
96/12 154/25 214/8

**indicia [2]**  154/2
158/16

**individual [2]**
106/20 214/18

**individuals [3]**
109/19 133/4
214/19

**industrial [1]**
49/7

**industries [1]**
89/12

**infinite [1]**  43/15

**inflation [1]**
90/19

**Info [6]**  1/4 21/25
22/3 30/24 40/25
89/17

**information [19]**
10/11 20/8 24/12
31/5 38/13 40/1
43/5 46/2 46/7
75/23 127/7 146/16
152/2 160/11
175/15 187/23
194/4 208/4 214/5

**infrastructure [1]**
205/24

**inherited [1]**  39/8

**I**

**initial [4]**  62/7
66/2 66/21 69/4
**initially [3]**  43/6
51/19 217/13
**injected [1]**  222/6
**input [3]**  7/25
20/25 42/18
**inquiries [1]**
30/13
**Inside [1]**  69/19
**insignificant [1]**
180/20
**instance [5]**  15/16
19/9 27/1 101/14
213/16
**instances [1]**
208/5
**instead [2]**  50/3
135/4
**Institute [3]**
204/2 204/4 204/5
**instructed [2]**
178/17 178/23
**integrating [1]**
51/4
**Integyrs [1]**  127/7
**intel [1]**  180/17
**intellectual [58]**
25/13 25/16 35/17
36/5 40/24 42/25
49/25 64/19 65/9
72/4 73/13 75/7
78/3 78/18 81/25
82/23 83/2 88/5
88/8 88/10 88/24
89/1 89/3 89/18
94/15 95/18 96/4
96/7 96/9 96/21
97/8 97/11 97/15
97/15 99/25 100/5
101/6 101/8 101/18
101/19 110/4 110/5

112/23 113/1 113/9
114/20 114/25 116/3
116/7 116/9 117/1
117/2 117/14
118/14 124/24
125/8 134/2 187/24
**intelligence [4]**
55/15 86/9 87/10
87/15
**intend [1]**  92/19
**interact [1]**  200/6
**interaction [1]**
64/8
**Interconnected [1]**
109/17
**interest [3]**  43/14
43/14 101/7
**interested [2]**
29/9 172/15
**interesting [2]**
47/3 82/23
**interestingly [1]**
82/5
**interests [1]**
76/13
**interfered [2]**
36/12 49/15
**interim [1]**  167/17
**internal [1]**  17/1
**internally [1]**
222/11
**international [6]**
48/12 91/18 195/10
195/11 195/18
195/22
**Internet [1]**
144/25
**interrupted [1]**
34/4
**interruption [3]**
189/24 202/18
213/20
**introduce [3]**
144/2 161/14 203/5

**inventing [1]**  58/3
**invest [1]**  61/25
**invested [3]**  25/23
54/12 58/11
**investigated [2]**
13/23 114/24
**investigation [3]**
11/3 205/25 206/14
**investigations [5]**
95/17 203/18
203/22 205/13
205/17
**investment [7]**
58/15 58/24 61/15
62/5 62/8 62/12
82/6
**Investments [4]**
195/10 195/11
195/19 195/22
**investor [3]**  41/21
76/16 134/5
**investors [5]**  41/8
41/10 57/25 78/23
93/10
**invoice [1]**  17/12
**involve [1]**  73/17
**involved [9]**  12/23
59/8 61/18 94/17
105/13 151/11
182/2 205/13
205/14
**involvement [2]**
74/20 138/25
**involves [1]**  70/16
**involving [3]**
47/11 206/6 206/8
**IP [30]**  39/24
49/11 62/20 63/4
64/2 67/22 67/25
67/25 68/12 68/24
73/25 82/8 82/13
82/16 82/21 83/7
86/1 86/14 87/8
88/6 88/14 89/17

**I**

USCA11 Case: 22-11150 Document: 53-11 Date Filed: 11/30/2022 Page: 246 of 253

**IP... [8]** 90/5
91/3 100/17 101/9
101/20 104/11
113/21 120/3
**IPO [1]** 49/23
**IRA [72]** 1/3 4/7
12/22 17/23 17/25
18/7 18/8 18/11
18/12 23/5 23/18
24/9 24/15 26/2
27/7 27/10 27/13
27/19 28/4 30/6
32/15 33/4 34/3
34/10 36/21 39/2
39/6 39/20 48/1
48/5 57/12 57/12
64/9 73/2 73/5
73/12 73/15 74/1
74/8 74/16 75/22
76/4 76/12 78/1
78/16 79/14 81/2
81/13 81/14 81/24
82/14 98/6 98/12
98/17 99/8 99/15
99/23 127/5 134/6
134/10 140/8
150/18 155/4
164/12 164/13
217/24 217/25
218/16 218/25
219/2 219/10
219/20
**Ira's [1]** 38/24
**ironically [1]**
57/11
**irregularities [1]**
89/10
**irreversible [1]**
199/12
**IRS [1]** 196/16
**is [550]**
**Islamic [1]** 43/13

**isn't [31]** 21/9
27/17 32/11 33/14
34/10 35/22 42/12
45/14 49/12 65/11
68/2 73/3 81/3
82/17 89/4 100/2
102/2 102/2 110/5
113/13 114/15
115/8 116/12
136/25 155/6 184/7
187/4 192/3 196/7
197/21 201/13
**issue [15]** 42/16
86/21 96/14 96/15
97/1 97/4 97/6
97/9 97/21 115/18
155/20 163/21
168/7 178/23
187/13
**issued [3]** 9/12
68/8 187/25
**issuer [2]** 117/9
118/5
**issues [8]** 12/8
61/18 86/1 86/15
86/23 87/22 96/3
97/4
**issuing [1]** 187/10
**it [511]**
**it's [141]** 4/2 8/2
8/3 8/21 11/8 11/9
13/6 13/10 14/5
14/18 15/7 17/20
21/6 23/14 23/20
24/19 25/1 26/17
30/5 31/12 34/25
35/9 37/3 37/4
43/11 43/11 43/12
44/9 45/21 45/24
47/3 48/19 52/17
52/18 56/16 57/17
57/21 57/21 66/2
67/18 69/11 69/13
73/9 73/21 74/18

77/1 77/3 78/15
83/14 87/24 89/15
92/14 93/22 98/21
99/3 100/15 104/18
110/8 110/10
110/11 110/23
113/3 113/3 117/20
117/20 117/21
118/7 118/8 119/17
119/17 123/17
124/9 124/18 125/7
125/14 126/5
128/22 129/12
131/7 132/4 136/4
138/14 145/9
150/22 151/25
152/2 152/3 152/12
153/5 153/7 154/7
154/8 155/17
155/20 157/20
158/4 159/12
159/17 160/5 161/1
161/12 162/12
165/11 166/4
170/16 173/8
173/18 176/4 176/4
176/11 178/13
181/11 182/5
182/18 183/1
183/21 184/13
184/19 185/13
185/13 185/22
186/2 186/3 186/4
186/8 186/17
186/21 192/15
192/18 192/25
195/1 195/1 195/8
195/24 196/25
197/1 198/11 208/3
213/6 220/7 221/16
**Italia [1]** 140/21
**italics [1]** 88/8
**item [2]** 222/1
222/2

**I**

**Items [1]**   101/8

**its [8]**   25/16
35/22 78/18 156/24
157/19 162/9
205/23 206/17

**itself [2]**   29/22
219/14

**J**

**January [5]**   7/3
7/20 9/12 9/15
41/20

**Jensen [1]**   172/13

**job [2]**   58/2 77/15

**jobs [1]**   77/17

**John [6]**   10/4 34/8
126/3 128/11
135/15 177/12

**joint [4]**   115/16
175/8 175/12
175/14

**joke [1]**   197/6

**JORGE [2]**   1/20 5/4

**judge [8]**   1/10
4/25 194/6 218/3
219/14 219/24
222/19 222/25

**judgment [1]**   39/23

**judgments [1]**
10/14

**judicial [3]**   221/9
221/10 221/17

**July [7]**   6/25
10/24 12/8 41/11
73/24 74/16 87/9

**June [7]**   9/4 9/4
10/24 12/8 64/17
135/20 187/13

**June/July [1]**   12/8

**jurisdictions [1]**
110/20

**juror [1]**   220/22

**jurors [2]**   5/11

6/1

**jury [52]**   6/1
9/8 17/20 26/22
60/5 60/20 61/5
61/6 94/12 111/6
112/13 112/14
115/24 135/11
138/22 139/3 141/5
156/16 157/10
159/7 159/21
162/22 163/2 163/6
163/8 163/10
170/20 174/7
181/20 186/24
190/11 200/16
201/6 201/9 203/6
203/15 203/24
205/2 205/16
206/23 207/5
207/16 208/1
208/11 210/14
211/8 212/1 213/4
213/25 220/22
220/25

**jury's [1]**   148/20

**just [104]**   5/14
5/19 6/20 9/5
11/18 11/25 14/14
17/11 23/9 24/10
27/16 28/5 29/6
30/19 32/17 33/13
33/16 34/23 35/2
36/4 36/5 39/18
42/1 45/8 45/24
50/14 53/2 53/8
56/25 57/14 58/2
59/16 70/12 71/2
73/18 75/3 77/24
79/15 81/25 82/11
85/12 95/3 98/21
102/14 106/2 111/7
111/17 112/1 112/7
112/10 118/21
119/6 121/24 122/2

125/20 130/1
143/2 154/17 157/5
157/11 160/22
160/23 161/7
161/10 161/13
161/18 161/20
162/16 163/3
163/18 165/10
166/23 169/11
169/21 170/3
170/14 170/18
171/16 171/20
171/22 173/9
175/24 176/8 180/3
183/19 184/14
188/24 189/14
192/7 192/13 201/1
201/24 204/20
207/20 207/22
210/1 210/22 213/9
219/19 221/12
222/10 222/10

**K**

**K's [9]**   39/24 40/4
49/11 50/9 56/14
56/16 83/7 83/9
91/3

**KASS [2]**   1/21 5/2

**keep [19]**   55/25
56/20 75/11 82/20
93/3 101/22 102/5
102/8 109/24
110/12 133/15
134/8 134/8 176/6
178/11 190/24
190/24 199/11
218/22

**keeps [1]**   48/15

**kept [7]**   43/7
64/22 82/18 82/19
82/20 100/4 134/22

**key [8]**   11/20

**K**

**key... [7]** 97/22
150/20 152/9
152/12 194/4
208/15 214/20
**keys [5]** 13/1
130/14 130/25
141/16 141/17
**kidding [1]** 108/18
**kids [2]** 198/25
199/6
**killing [1]** 48/24
**kilt [1]** 37/3
**kind [4]** 52/7
208/13 209/2 214/3
**KLEIMAN [106]** 1/3
1/4 4/7 4/20 6/22
6/23 11/24 12/2
12/22 12/23 13/17
17/23 17/25 18/7
18/8 18/12 23/5
23/18 24/9 24/15
26/2 27/7 27/10
27/13 27/14 27/20
28/4 28/15 28/25
29/17 30/6 30/6
30/12 30/14 30/24
32/16 34/3 34/10
34/20 48/1 48/5
48/5 74/8 75/13
75/22 78/16 79/1
79/14 82/14 98/12
99/8 116/9 118/14
126/7 126/15 127/5
127/6 127/19 140/8
140/11 142/4
142/20 145/8
145/16 145/18
145/23 146/8 147/8
147/10 147/15
147/23 148/1 148/8
148/16 149/8
149/19 149/24

150/18 150/21
151/5 151/5 152/3
152/9 152/14
153/13 155/4
158/12 163/25
164/12 164/14
164/24 166/25
168/16 173/3
174/13 174/22
177/15 177/16
179/15 182/14
182/24 209/21
214/13 217/24
217/25 218/15
219/11
**Kleiman's [2]**
30/16 141/15
**Kleimans [1]** 13/19
**knew [1]** 18/6
**know [75]** 13/12
15/19 17/13 24/19
26/13 26/15 26/23
28/14 28/20 31/12
37/2 37/20 39/18
41/13 41/13 48/19
48/19 50/10 57/17
63/11 64/5 79/21
80/21 82/23 84/18
84/18 92/14 94/18
106/5 106/11
106/12 110/17
110/22 110/25
114/24 118/21
125/9 125/20
126/23 126/23
127/10 127/20
134/7 136/4 143/18
143/21 145/24
147/24 147/25
153/9 160/7 160/10
160/11 160/16
160/17 160/21
160/23 160/25
161/1 161/4 170/5

173/23 173/23
175/2 178/6 179/18
180/7 180/7 194/12
194/22 195/8
196/15 205/20
209/4 221/18 222/8
**knowing [1]** 188/4
**knowledge [2]**
110/17 209/7
**known [5]** 35/11
59/5 73/16 212/14
213/18
**KPMG [4]** 16/25
17/1 42/17 50/19
**Kraken [1]** 36/8
**KYLE [2]** 1/13 4/14

**L**

**label [4]** 146/3
153/18 155/1 156/7
**lack [1]** 122/23
**ladies [8]** 6/3
60/4 61/7 111/4
112/15 163/9
201/23 220/13
**LAGOS [2]** 1/17
4/16
**laid [5]** 14/24
33/15 156/10
158/15 162/11
**lake [1]** 91/24
**language [3]** 60/10
60/19 61/2
**languages [1]** 47/1
**laptop [2]** 180/20
180/21
**large [3]** 37/18
49/24 50/3
**larger [2]** 35/1
179/14
**largest [1]** 77/1
**last [14]** 5/16
6/15 20/22 21/19
25/8 47/3 60/7

# L

**last... [7]**  108/10
109/1 173/2 182/22
193/8 207/1 221/9
**Laszlo [2]**  180/11
180/14
**late [2]**  30/14
98/5
**later [19]**  17/14
27/1 49/24 62/20
64/2 64/6 67/8
70/17 85/21 90/7
99/24 106/3 170/17
174/18 179/10
205/25 206/10
210/7 212/15
**laughing [2]**  75/2
75/9
**launch [2]**  89/10
177/8
**launched [3]**  117/7
179/11 179/12
**launching [2]**
89/16 89/25
**laundering [1]**
117/9
**lavalier [1]**  112/7
**law [12]**  37/18
37/19 37/20 37/21
45/20 60/12 87/20
89/11 91/18 94/13
199/12 205/21
**Lawrence [1]**  104/6
**lawsuit [4]**  6/25
88/20 92/21 117/13
**lawsuits [3]**  34/3
34/11 118/12
**lawyer [17]**  10/5
15/15 33/6 36/23
37/13 38/6 40/12
81/3 82/1 96/20
116/25 127/24
128/24 136/5

141/15 177/13
187/5211
**lawyers [16]**  16/23
37/3 37/17 39/10
44/10 48/22 91/2
91/18 136/14
151/12 153/20
165/8 165/8 186/1
186/24 197/7
**lay [12]**  33/12
116/13 116/15
116/16 129/20
133/18 143/11
152/25 156/18
157/8 192/16
197/22
**leads [1]**  74/17
**leaked [1]**  146/9
**leap [3]**  81/2
81/15 82/3
**Learn [1]**  37/5
**learned [2]**  220/20
220/21
**learning [2]**  55/14
56/20
**learnt [1]**  37/1
**lease [1]**  83/14
**least [3]**  138/25
179/16 221/23
**leave [2]**  22/25
31/10
**leaves [2]**  116/23
118/12
**leaving [2]**  83/24
97/9
**led [1]**  76/13
**Lee [3]**  50/18 51/2
52/8
**left [36]**  6/15
23/1 31/11 32/3
35/12 35/15 38/17
40/11 47/16 48/2
48/3 72/11 72/12
88/18 111/9 113/24

124/4 138/3 155/5
159/19 161/18
161/19 161/21
166/24 185/2
185/14 193/18
199/9 210/19
210/22 214/4 217/9
218/21 218/24
**left-hand [13]**
23/1 35/15 40/11
47/16 72/11 72/12
155/15 155/24
159/19 161/18
161/19 166/24
185/14
**legal [13]**  12/12
15/20 15/22 15/25
30/21 31/6 33/20
70/5 74/17 82/8
82/12 92/23 188/5
**legally [2]**  92/25
197/9
**legitimate [6]**
126/14 126/19
127/18 145/16
147/8 147/23
**Leon [1]**  1/22
**less [3]**  51/11
216/16 216/17
**let [11]**  6/9 7/23
16/7 34/6 78/16
79/16 110/25 158/8
167/11 191/10
192/21
**let's [61]**  4/4
5/25 9/7 9/24
17/20 28/19 28/20
31/11 31/11 31/13
32/11 32/25 33/8
33/18 37/8 38/18
38/19 40/8 46/4
49/3 52/4 57/2
60/4 61/5 67/13

**L**

**let's... [36]**
71/19 72/11 72/13
72/14 75/3 88/20
91/24 95/14 96/25
100/15 100/21
111/4 112/12
129/20 131/14
133/20 139/16
143/11 143/19
159/13 162/16
162/20 163/6
165/20 182/19
184/12 193/23
200/17 202/19
207/13 210/21
210/22 211/6 211/7
212/8 218/22
**lets [1]**  214/5
**letter [11]**  9/12
18/16 18/17 20/10
29/19 61/17 153/11
164/24 184/5 185/8
185/11
**letterhead [1]**
35/10
**letters [1]**  116/25
**letting [1]**  188/12
**level [2]**  17/2
180/5
**levels [2]**  90/19
90/19
**liabilities [1]**
185/19
**Liberty [1]**  196/20
**license [5]**  36/1
46/25 89/13 109/13
117/24
**licensed [5]**  64/23
89/15 100/8 117/11
118/2
**licenses [1]**  49/21
**licensing [3]**

64/21 67/25 113/2
**lie... [5]** 5/11 9/25 34/1
37/23 38/6 40/12
**life [6]**  45/21
56/5 172/12 172/15
176/12 192/2
**life's [1]**  188/3
**like [119]**  8/21
11/9 13/8 13/11
14/1 15/16 18/3
20/8 20/16 20/19
20/22 21/4 22/23
25/1 28/8 29/1
36/3 36/8 38/14
39/19 41/16 42/19
43/11 43/12 43/16
43/17 45/11 47/13
48/12 48/15 48/19
48/24 49/13 51/21
53/7 53/8 54/16
55/5 55/24 56/4
56/5 57/1 59/5
59/14 67/7 71/22
74/16 74/20 75/10
79/8 79/10 82/21
84/16 86/17 90/7
90/16 90/18 93/11
93/12 106/2 106/6
109/16 113/6
118/12 121/5 121/8
121/12 121/13
122/19 123/13
124/6 124/12 126/4
133/18 134/6 135/3
135/24 140/9
141/17 146/21
150/19 151/24
153/23 154/20
157/13 159/5
164/13 166/23
167/22 170/18
172/1 174/24 176/7
176/24 177/1
177/14 178/14

180/6 181/19
190/22 194/22
196/16 196/17
196/20 199/13
199/16 200/23
206/18 208/13
208/19 210/3
211/14 213/12
220/10 222/3
222/10 222/14
**liked [1]**  79/5
**likely [1]**  198/6
**Limited [6]**  95/17
96/9 97/7 125/7
128/23 184/18
**Limited's [1]**
97/19
**line [28]**  7/5
21/19 24/13 40/20
45/5 45/13 56/6
56/6 105/21 105/22
107/8 107/21
130/19 130/21
130/22 130/24
130/24 130/25
135/2 135/3 183/13
200/21 201/8
212/12 212/14
213/17 214/7
217/12
**lines [18]**  42/15
47/1 47/2 48/4
48/6 48/7 51/7
53/10 56/21 56/22
56/24 58/20 73/9
73/21 105/17 179/4
212/15 213/7
**links [2]**  192/14
206/16
**liquidate [1]**
49/15
**liquidation [9]**
83/11 84/15 84/16

**L**

**liquidation... [6]**
85/10 85/11 85/14
86/2 86/22 87/25
**list [10]** 5/15
16/5 105/4 193/8
193/15 194/5 195/7
195/12 195/15
197/20
**listed [4]** 59/4
75/11 75/12 119/16
**lists [2]** 100/17
138/1
**literally [1]**
187/25
**litigation [1]**
164/25
**little [20]** 7/24
19/10 35/23 48/14
50/1 53/9 85/18
85/19 107/4 136/13
136/16 136/23
181/8 181/12 189/5
189/8 191/18
204/21 216/16
216/17
**live [5]** 196/3
199/17 199/19
203/6 203/7
**lived [1]** 212/22
**living [1]** 199/22
**LLC [1]** 1/4
**LLP [2]** 1/12 1/19
**loan [9]** 62/7
62/11 66/4 71/4
71/6 82/8 131/16
134/3 134/4
**loaned [1]** 93/10
**loans [1]** 200/5
**local [1]** 221/14
**located [2]** 213/5
213/6
**locked [2]** 83/14

187/18
**London [2]** 199/2
199/24
**long [7]** 8/13 13/6
13/11 76/14 82/20
213/12 216/14
**longer [7]** 76/18
84/1 91/11 92/5
99/13 111/8 180/3
**look [39]** 18/23
25/18 33/18 38/14
43/1 55/5 62/7
89/22 91/24 110/10
121/8 121/12
121/14 122/19
123/13 124/6
124/12 145/9
145/25 151/24
155/10 155/13
157/12 157/13
165/8 167/3 173/10
175/10 175/24
178/22 179/19
180/5 180/17
186/15 192/21
208/22 210/22
212/12 214/7
**looked [20]** 10/2
10/4 10/22 10/22
11/17 13/4 18/17
51/22 116/2 119/16
134/20 168/15
176/14 182/6
182/12 183/5
196/19 208/8
208/23 212/11
**looking [28]** 7/18
10/20 13/1 23/4
25/22 26/18 40/12
40/20 47/25 48/2
49/11 51/13 71/14
86/17 100/18
109/21 109/22
113/2 118/23

148/20 152/16
159/24 160/16 162/3
173/16 210/17
212/5 215/6
**looks [18]** 21/4
21/4 25/1 126/4
140/9 140/22
141/17 147/16
148/9 150/19 164/1
164/13 167/22
177/14 210/23
212/4 213/12 214/3
**loop [1]** 10/8
**loot [2]** 80/6
80/17
**looted [2]** 78/4
78/17
**looting [1]** 78/21
**lose [2]** 51/25
188/11
**lost [4]** 12/14
36/1 40/16 40/19
**lot [28]** 5/19
13/12 43/11 44/2
51/22 54/12 54/15
55/13 55/13 56/18
56/19 83/20 83/21
83/24 83/25 84/22
85/7 92/19 108/9
108/13 116/23
133/17 136/2
168/19 168/22
180/3 208/22
208/23
**lots [2]** 192/1
192/1
**louder [1]** 204/21
**Louis [3]** 11/20
11/24 12/2
**love [1]** 210/3
**low [1]** 108/19
**low-end [1]** 108/19
**LTD [8]** 72/7 87/11
87/16 124/7 185/4

USCA11 Case: 22-11150   Document: 53-1   Date Filed: 11/30/2022   Page: 252 of 254

**L**

**LTD... [3]**   185/13
195/10 195/11
**lunch [5]**   111/1
111/5 112/3 112/17
112/23
**Lynn [1]**   192/10

**M**

**M-A-T-T-H-E-W [1]**
202/23
**MacGregor [4]**
59/24 65/23 105/10
134/1
**machine [12]**   17/7
55/14 56/20 139/13
139/13 147/25
165/25 165/25
174/19 180/10
180/19 224/8
**machines [7]**   55/5
55/7 153/19 174/16
174/17 178/7 178/9
**mad [1]**   82/4
**Madam [1]**   181/2
**made [19]**   11/24
17/7 18/1 43/9
48/17 83/15 83/23
84/20 85/9 136/7
161/10 161/25
183/11 186/9
192/13 196/7
196/14 197/14
214/8
**Magic [1]**   83/2
**magistrate [1]**
194/6
**magnificent [1]**
79/7
**Mai [1]**   80/8
**mainly [1]**   204/9
**maintain [2]**   105/7
105/11
**maintained [3]**

35/22 105/4 106/7
**major [1]**   39/7
**majority [2]**   77/8
84/9
**make [27]**   19/15
23/7 36/16 38/14
44/2 49/13 57/15
64/10 78/9 80/21
84/19 100/10
100/11 110/16
112/1 113/25
120/23 122/2
154/17 169/21
170/18 174/24
186/3 191/25
194/21 200/10
220/15
**maker [1]**   84/25
**makes [1]**   45/21
**making [7]**   10/7
13/22 79/22 80/22
145/1 175/1 187/18
**man [8]**   18/5 29/3
29/8 37/19 56/24
80/3 87/7 199/21
**manage [1]**   178/21
**managed [1]**   54/15
**management [3]**
53/5 53/9 106/7
**manager [1]**   106/21
**manipulation [1]**
90/19
**many [13]**   13/8
43/25 93/8 93/8
103/14 134/25
136/12 172/12
180/8 180/18
180/22 206/24
207/2
**March [14]**   18/14
18/16 20/5 20/11
22/22 23/5 58/19
73/8 73/20 105/16
105/20 179/16

181/25 212/13
**margin [1]**   248/24
**mark [3]**   56/5
115/13 140/21
**marker [1]**   207/16
**market [10]**   26/21
45/14 45/16 50/6
76/24 141/9 197/25
198/4 198/8 205/7
**marketplace [4]**
205/9 205/10 206/4
206/16
**massive [1]**   91/18
**master [2]**   105/11
204/1
**master's [1]**
108/15
**match [1]**   161/22
**material [7]**   96/12
97/12 97/23 146/6
153/21 153/22
165/6
**mathematics [1]**
55/16
**matter [4]**   108/23
156/11 195/3
203/14
**MATTHEW [6]**   2/6
86/7 202/9 202/14
202/22 203/7
**Matthews [33]**
41/21 58/23 58/25
59/2 61/15 62/3
62/4 65/24 69/11
71/23 74/24 81/11
81/12 81/24 82/13
83/7 85/25 87/7
88/7 99/14 99/19
102/19 103/1
104/14 123/23
129/9 129/11
130/16 132/2
132/18 133/4 137/5
142/3

**M**

**Matthews [2]**   6/7/9
88/24

**Maximum [1]**   114/6

**may [19]**   26/19
55/6 96/13 96/22
97/13 98/25 115/23
152/23 155/19
159/7 170/7 179/12
183/21 201/3 201/4
201/5 202/5 203/1
207/15

**Mayaka [1]**   184/1

**maybe [6]**   12/12
24/1 26/23 79/17
111/10 150/3

**McCabe [1]**   44/10

**MCGOVERN [7]**   1/20
4/24 111/20 112/9
133/16 158/8 163/4

**McGovern's [1]**
171/21

**McKenzie [9]**   91/14
91/15 91/17 92/4
94/13 104/6 113/8
113/21 114/19

**McKenzie's [1]**
94/24

**McMaster [1]**   10/6

**me [110]**   6/9 7/23
9/9 12/10 13/13
13/16 14/8 15/11
16/7 16/21 16/22
18/2 19/3 19/22
20/5 23/1 25/5
25/8 28/6 28/8
28/8 29/2 29/9
32/18 32/22 33/16
34/4 34/8 37/6
38/15 38/15 38/17
45/15 46/10 47/13
48/11 48/12 48/17
57/12 58/16 59/11

59/12 61/1 63/10
76/14 77/2 77/4
77/4 78/7 78/16
79/4 79/7 79/14
79/20 83/18 83/24
84/5 84/6 84/13
84/22 85/19 86/3
88/18 90/2 92/12
92/13 92/14 93/10
99/15 101/1 102/20
104/18 108/9
110/25 117/11
117/11 118/13
122/11 129/24
131/16 134/7
136/15 136/15
139/12 153/6
156/24 158/8
161/16 167/11
170/3 172/12
172/14 174/19
175/25 178/13
182/3 186/20
187/15 187/25
188/4 188/9 188/12
191/22 191/25
192/21 196/14
197/8 199/6 206/20
214/5

**mean [28]**   9/19
13/6 13/25 15/21
26/5 26/21 26/25
29/1 36/1 45/17
48/8 67/4 79/2
80/11 82/21 90/2
92/19 101/11
104/22 127/10
129/12 136/14
139/12 175/7
178/13 186/3 186/7
195/1

**meaning [3]**   91/9
118/1 189/2

**means [14]**   8/15

26/22 56/16 82/15
142/5 150/23
153/18 155/16
160/13 176/6
179/20 196/24

**meant [3]**   88/15
178/22 180/3

**meantime [1]**   145/1

**media [1]**   29/5

**meet [1]**   41/17

**meeting [8]**   10/10
40/10 58/25 62/4
84/4 84/5 99/10
123/24

**meetings [2]**   59/25
176/22

**member [3]**   79/3
84/23 203/19

**members [2]**   102/25
146/10

**mention [4]**   56/1
73/5 103/1 133/7

**mentioned [15]**
42/1 71/2 73/2
73/12 83/13 127/25
128/12 168/16
173/15 186/14
186/16 186/17
212/18 215/12
224/9

**mentioning [1]**
55/25

**mere [2]**   156/14
156/17

**merely [1]**   7/9

**message [12]**   6/24
32/16 152/9 153/13
166/25 167/2
169/13 173/21
215/6 215/6 217/23
217/25

**messages [4]**   126/6
126/14 168/22

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/30/2022    Page: 254 of 254

**messages... [1]**
215/5

**messed [1]**   45/19

**messy [1]**   196/5

**MESTRE [3]**   1/19
1/20 5/4

**met [5]**   37/2 58/23
172/10 176/23
176/24

**metadata [9]**
207/10 208/1 208/1
208/2 210/24 212/5
212/7 212/8 212/12

**Metanet [1]**   56/6

**Metaverse [1]**   56/7

**methodologies [1]**
109/18

**methodology [1]**
207/8

**methods [1]**   207/6

**Miami [7]**   1/14
1/18 1/24 1/25
224/15 224/18
224/18

**mic [1]**   163/3

**MICHAEL [3]**   1/21
5/5 140/23

**microloans [1]**
200/4

**micropayments [1]**
177/4

**microphone [1]**
202/25

**Microsoft [4]**
176/20 176/21
176/25 177/6

**middle [4]**   75/25
149/11 159/24
175/4

**might [11]**   27/2
78/12 78/13 86/2
110/25 133/16

169/24 171/15
171/15 186/19
186/20

**Miller [2]**   28/23
135/15

**million [64]**   8/4
8/6 8/8 8/10 8/11
8/12 12/12 19/16
19/20 21/1 21/2
21/5 21/6 21/9
21/11 21/14 21/15
21/17 24/5 24/7
25/15 25/20 25/22
25/25 25/25 26/7
27/6 27/8 43/21
48/6 48/7 48/15
49/17 49/18 53/10
62/8 62/12 66/11
66/14 67/21 67/24
68/20 68/23 68/24
69/1 74/21 76/21
76/22 76/24 77/2
79/19 79/21 79/22
80/1 80/23 82/5
85/8 108/12 134/5
156/11 197/5
199/22 210/5
217/10

**millions [3]**   85/5
85/5 176/12

**mind [2]**   142/14
208/25

**mine [15]**   39/11
155/18 160/15
175/7 176/18
178/20 180/4
180/20 182/8
193/16 194/9
194/11 194/13
195/15 195/16

**mined [10]**   174/22
176/1 176/3 176/17
176/17 177/24
178/24 179/21

182/3 182/7
**minimize [2]**   72/11
108/2

**minimum [1]**   49/8

**mining [17]**   176/10
176/15 176/16
176/18 178/3 178/3
178/9 179/15
180/11 180/11
180/15 180/16
180/19 180/20
181/25 182/2 182/6

**minus [1]**   19/12

**minute [11]**   60/4
60/13 65/7 88/18
144/21 152/24
162/18 162/20
168/9 171/15
212/15

**minutes [8]**   111/2
111/9 111/10
123/24 135/18
219/7 219/19
220/10

**Mischaracterization**
**[1]**   40/1

**mischaracterizing**
**[2]**   40/5 45/15

**miscommunication**
**[1]**   150/3

**Misfit [1]**   124/7

**misinforming [1]**
8/17

**misinterpreting [1]**
21/12

**misrepresentation**
**[1]**   56/18

**misrepresenting [3]**
75/11 117/14
118/11

**missing [4]**   17/5
64/22 77/7 152/2

**misstated [1]**
125/23