IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME XII OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
    FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA MCGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

TAB NO.          DESCRIPTION

210          Plaintiffs' Motion to Compel Defendant to Comply
with this Court's Orders Directing Him to Produce a
List of the Bitcoins He Held as of December 31, 2013

429          Order Granting in Part and Denying in Part Plaintiffs'
Corrected Motion for Attorneys' Fees (DE 346),
filed March 17, 2020

618          Joint Proposed Jury Instructions,
filed September 29, 2020

802-1        Exhibit A to Defendant's Opposition to Motion for a
New Trial (DE 861) — Final Jury Instruction
Objections

829          Email from Craig S. Wright to Dave Kleiman,
dated March 12, 2008

837          Trial Transcript Day 1, dated November 1, 2021

838          Trial Transcript Day 2, dated November 2, 2021

839          Trial Transcript Day 3, dated November 3, 2021

840          Trial Transcript Day 4, dated November 4, 2021

841          Trial Transcript Day 5, dated November 5, 2021

842          Trial Transcript Day 6, dated November 8, 2021

843          Trial Transcript Day 7, dated November 9, 2021

845          Trial Transcript Day 9, dated November 15, 2021

TAB NO.          DESCRIPTION

846              Trial Transcript Day 10, dated November 16, 2021

847              Trial Transcript Day 11, dated November 17, 2021

848              Trial Transcript Day 12, dated November 18, 2021

848              Trial Transcript Day 12, dated November 18, 2021

850              Trial Transcript Day 14, dated November 22, 2021

851              Trial Transcript Day 15, dated November 23, 2021

861              Law360 Article entitled, "No Proof Bitcoin 'Inventor'
                 Owed Friend, Juror Tells Law360"

877              Joint Notice and Request for Judicial Ruling on
                 Proposed Redactions to Admitted Trial Exhibits,
                 filed January 31, 2022

**845**

**M**

**misstatement [1]**
38/12

**misstates [4]**
34/15 66/12 113/14
137/20

**misstating [2]**
7/21 23/21

**mistake [4]**  37/1
37/5 37/6 169/24

**mistaking [1]**
117/1

**MIT [1]**  117/23

**MITRE [5]**  204/13
204/15 204/16
204/24 205/3

**mixers [2]**  117/8
117/8

**mode [1]**  208/10

**model [1]**  142/20

**modeling [1]**  55/17

**modern [1]**  90/13

**modes [2]**  207/13
208/24

**modified [4]**  208/5
208/5 208/17
212/15

**modify [1]**  44/2

**modifying [1]**  90/7

**module [2]**  5/18
171/16

**moment [8]**  15/11
92/17 92/20 162/16
167/14 171/17
184/13 211/16

**Monday [3]**  10/8
99/19 160/2

**money [43]**  8/22
8/22 14/2 14/4
14/11 15/23 19/15
19/15 21/13 24/4
36/16 39/11 48/18
48/21 48/22 48/23

49/16 54/12 54/15
57/1 57/12 57/19
59/14 67/22 77/9
77/13 77/14 77/16
77/25 80/18 85/7
90/20 93/1 93/10
102/7 117/8 131/15
134/8 191/25 192/1
199/7 199/9 199/11

**monopolistic [1]**
110/14

**month [9]**  17/9
52/1 77/9 77/21
84/7 84/8 99/24
110/12 191/24

**monthly [1]**  77/11

**months [7]**  9/2
48/17 48/18 84/12
108/23 110/14
110/14

**more [37]**  10/11
16/11 16/14 16/17
24/6 24/12 32/13
32/13 32/13 33/2
36/13 45/5 51/23
75/22 77/4 77/22
77/22 79/23 80/23
86/12 94/21 104/21
108/14 114/10
114/12 136/24
148/9 159/9 171/25
174/13 179/22
180/1 189/4 189/6
190/20 199/9
220/10

**morning [21]**  4/2
4/9 4/11 4/12 4/14
4/16 4/19 4/22
4/23 4/25 5/2 5/5
5/10 5/17 6/3 6/13
6/14 60/25 220/4
221/2 222/22

**most [9]**  37/24
47/8 55/16 74/19

77/22 77/23 146/9
151/4 152/1 195/20

**mother [4]**  77/17
85/19 85/21 176/19

**motion [3]**  29/12
151/12 200/10

**move [15]**  29/10
47/16 106/17
184/21 196/8 197/9
197/10 197/15
198/6 198/7 198/9
206/18 210/25
211/15 215/25

**moved [11]**  13/25
14/2 19/11 19/18
40/5 99/13 187/9
188/4 188/6 188/14
197/9

**movement [1]**
187/17

**movie [2]**  55/25
82/24

**MR [4]**  2/5 2/7
4/20 5/8

**Mr. [56]**  6/14 7/13
10/18 20/7 29/17
30/14 30/16 30/24
34/20 52/1 58/23
58/24 58/25 59/2
59/23 59/24 61/19
62/17 63/23 65/23
65/24 67/9 71/23
75/13 79/1 83/7
85/25 88/7 88/24
98/22 99/19 102/19
103/1 104/14
105/10 110/25
112/8 112/22 125/5
129/11 130/16
132/2 132/18
133/23 153/1 154/4
168/16 168/17
177/16 179/20
180/6 182/24

**M**

**Mr. . . . [4]**    183/18
192/24 207/20
215/9

**Mr. Antonopoulos
[2]**    179/20 180/6

**Mr. Ayre [7]**    58/24
59/23 61/19 62/17
63/23 65/23 133/23

**Mr. Chesher [1]**
20/7

**Mr. Freedman [13]**
6/14 7/13 10/18
98/22 110/25 112/8
112/22 153/1 154/4
168/17 183/18
192/24 215/9

**Mr. Goldstein [1]**
52/1

**Mr. Kleiman [9]**
29/17 30/14 30/24
34/20 75/13 79/1
168/16 177/16
182/24

**Mr. Kleiman's [1]**
30/16

**Mr. MacGregor [2]**
59/24 105/10

**Mr. Matthews [16]**
58/23 58/25 59/2
65/24 71/23 83/7
85/25 88/7 99/19
102/19 103/1
104/14 129/11
130/16 132/2
132/18

**Mr. Matthews' [2]**
67/9 88/24

**Mr. Pederson's [1]**
125/5

**Mr. Roche [1]**
207/20

**Ms [234]**

**Ms. [24]**    17/23
31/1 71/23 74/4 86/8
71/23 74/4 86/8
102/19 104/20
111/20 112/9
125/21 133/16
134/24 135/20
137/5 142/3 142/18
143/16 158/8 163/4
171/21 177/13
192/10

**Ms. Lynn [1]**
192/10

**Ms. McGovern [5]**
111/20 112/9
133/16 158/8 163/4

**Ms. McGovern's [1]**
171/21

**Ms. Vela [3]**    17/23
31/17 125/21

**Ms. Watts [13]**
65/24 71/23 74/4
86/8 102/19 104/20
134/24 135/20
137/5 142/3 142/18
143/16 177/13

**Ms. Watts's [1]**
67/6

**Mt [2]**    83/21 83/25

**much [19]**    8/16
13/6 13/9 26/9
26/22 37/20 43/1
45/23 45/24 45/24
85/21 92/20 92/21
94/24 111/8 113/9
124/12 191/25
205/22

**multi [6]**    55/4
198/16 198/23
201/10 201/14
222/8

**multi-billionaire
[5]**    198/16 198/23
201/10 201/14

222/8

**multi-core [1]**
55/4

**multiple [12]**
40/14 91/6 92/13
93/12 95/6 135/24
135/25 189/21
189/25 190/16
199/4 212/11

**multiply [1]**    55/11

**my [153]**    8/11 9/3
10/9 11/10 12/15
13/20 13/20 14/5
15/14 15/15 16/23
19/11 19/17 21/1
23/11 26/4 28/11
33/15 33/17 35/1
36/10 37/1 37/5
39/7 39/8 41/4
48/12 48/18 50/10
52/17 54/10 55/22
56/6 56/18 57/13
58/11 59/15 59/19
61/17 63/10 64/22
74/19 74/21 75/15
75/15 76/13 76/16
77/8 78/25 79/6
79/16 79/18 84/13
85/18 85/19 85/20
85/21 91/10 92/14
92/15 92/21 92/23
93/1 93/3 93/9
93/12 104/21
108/20 109/13
111/24 116/25
118/6 118/10 121/8
121/12 121/15
122/19 123/13
124/6 126/5 126/8
126/24 127/9 135/1
136/5 136/14
136/19 138/25
142/6 146/5 153/5
153/20 155/17

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/08/2022    Page: 496 of 254

## M

**my... [60]**  155/18
156/20 160/9 162/3
162/15 164/2
165/10 171/4
171/14 172/12
172/15 176/12
176/18 176/19
176/19 179/18
179/23 179/23
181/10 182/2
187/12 187/21
188/2 188/3 188/3
188/10 188/12
188/13 188/13
188/14 188/17
194/16 194/25
194/25 195/4
195/15 196/6 197/7
197/7 197/10
197/11 198/23
198/25 199/6
202/22 203/7
203/13 203/13
203/22 204/9
205/22 206/24
207/8 209/7 209/10
214/16 218/17
222/3 224/11
224/14

**myself [12]**  14/23
19/17 42/19 58/9
58/10 70/18 75/2
85/5 132/4 177/8
186/1 198/24

## N

**naive [1]**  28/10
**Nakamoto [9]**  12/25
88/10 88/12 88/25
89/18 90/4 101/20
139/18 173/3
**name [15]**  70/5
92/3 117/4 117/22
137/25 155/16
166/17 171/16
172/14 185/13
202/16 202/22
203/6 203/7 222/15
**name's [1]**  166/5
**named [4]**  41/20
189/13 190/14
212/17
**names [7]**  29/4
29/7 79/5 140/23
146/23 155/10
195/7
**narcotics [1]**
205/11
**nasty [1]**  85/3
**national [1]**  206/2
**native [5]**  144/20
144/22 169/19
170/13 170/24
**nature [2]**  93/21
219/12
**nChain [11]**  73/14
105/3 105/3 105/7
105/9 105/11 106/2
106/3 106/9 106/13
106/14
**nCrypt [34]**  72/6
72/21 73/3 73/5
73/14 100/18 101/1
101/3 102/14
102/20 102/22
103/3 103/4 104/19
104/22 104/23
105/3 105/7 105/9
105/11 105/14
106/9 106/11
106/12 106/14
108/7 109/13 110/4
120/4 120/17 123/7
124/24 125/7
139/12
**ncrypt.com [4]**
106/21 106/21

106/22 139/5
139/22 [1]  49/18
**nearly [2]**  13/11
95/6
**necessary [2]**
129/20 194/4
**need [27]**  5/13
15/22 52/3 59/13
85/5 97/20 99/19
107/4 110/13 112/6
112/7 112/12
120/23 121/11
131/6 154/11
156/18 157/7 163/1
163/3 181/12
201/14 202/1
207/15 210/4
221/12 222/21
**needed [12]**  13/12
13/18 13/18 35/3
42/20 43/13 43/17
55/8 64/13 84/12
134/5 179/21
**needs [1]**  121/24
**neglecting [2]**
20/24 35/24
**negotiate [1]**
131/14
**negotiating [2]**
66/5 90/9
**negotiation [2]**
69/4 133/25
**negotiations [3]**
59/2 59/7 131/17
**Neither [1]**  77/5
**network [1]**  146/22
**networks [1]**
204/11
**never [30]**  10/22
15/11 30/4 34/2
34/10 35/24 37/1
37/5 40/5 42/19
43/7 64/9 73/2
73/12 73/15 77/18

**N**

**never... [14]**
77/18 105/13
113/17 118/2 118/7
131/17 142/13
150/8 150/12
153/24 184/6
185/17 198/8
201/13

**new [11]** 36/15
72/19 97/15 180/13
196/20 196/20
196/20 203/7
206/11 206/12
207/15

**NewCo [8]** 67/22
68/7 68/7 68/12
68/21 72/4 72/5
72/16

**next [47]** 16/12
16/15 21/22 24/13
33/8 38/4 45/13
47/19 52/1 53/24
54/18 58/12 62/5
87/12 94/19 103/18
111/18 114/9 119/6
121/20 121/21
122/4 122/5 122/6
122/7 122/8 122/9
122/10 122/12
122/13 122/14
122/15 122/16
122/17 122/18
154/24 158/5
173/24 173/25
202/6 213/1 213/22
214/25 216/6
216/21 217/18
218/18

**Nguyen [2]** 151/10
164/24

**nice [4]** 4/3 6/6
112/3 136/17

**night [2]** 109/1
221/9

**nigrum [1]** 175/2

**no [270]**

**nobody [1]** 176/3

**nodes [1]** 117/25

**non [3]** 29/11
96/20 185/9

**non-activity [1]**
185/9

**non-lawyer [1]**
96/20

**non-responsive [1]**
29/11

**none [9]** 36/12
40/15 40/15 43/4
85/15 118/12 136/6
146/7 180/22

**normal [3]** 55/6
85/1 184/11

**North [2]** 1/24
224/18

**not [224]** 8/7 8/20
8/22 9/4 11/5 11/7
11/10 13/23 14/8
14/11 14/24 15/13
16/1 16/20 16/21
17/4 17/12 18/11
19/6 19/7 20/1
21/17 22/14 23/20
24/24 26/17 26/19
27/2 27/8 29/5
29/5 31/1 34/2
35/19 37/2 40/14
42/13 43/3 43/11
44/9 45/24 46/11
48/9 48/10 48/15
52/17 53/7 53/21
56/25 57/14 58/1
60/5 62/19 64/1
64/9 64/11 66/2
66/22 67/18 67/25
68/3 69/3 73/5
74/18 75/10 75/13
75/16 76/17 77/2
78/6 78/13 79/2
79/22 80/8 80/18
80/19 80/21 80/22
82/8 82/9 82/13
83/21 85/14 85/18
86/2 86/18 86/21
87/20 89/5 93/20
94/5 95/7 96/6
96/12 96/22 98/6
102/6 103/4 103/4
104/18 106/14
108/18 108/19
110/8 111/6 111/18
111/23 113/3 113/5
115/11 115/17
115/21 117/19
117/20 117/20
118/7 118/9 119/17
121/9 125/4 130/2
130/17 136/2
138/15 139/15
143/3 145/19
148/17 148/19
149/3 149/20 151/6
151/11 151/23
152/4 152/10
152/12 153/10
155/18 155/18
156/20 157/9
157/20 161/15
161/23 162/22
163/16 163/17
165/10 167/5
167/12 168/24
168/25 169/23
170/2 170/7 170/15
172/9 173/5 173/8
173/24 175/12
176/9 176/10
176/13 178/6 182/3
183/2 183/16 184/3
184/13 185/21

USCA11 Case: 22-11150   Document: 53-7   Date Filed: 11/08/2022   Page: 9 of 254

**N**

**not... [49]** 185/25
186/1 186/7 187/6
187/8 187/15 190/1
190/19 190/19
191/12 192/17
193/10 193/15
194/14 194/17
195/1 195/24
196/15 196/19
196/23 196/24
196/24 197/1 197/3
198/2 198/9 199/6
199/6 201/1 206/21
206/25 207/2 207/6
209/7 209/7 210/13
210/19 211/7
211/17 214/14
214/15 215/16
215/17 218/4 220/1
220/8 220/18
220/20 220/25
**note [2]** 82/1
154/20
**notebooks [1]**
220/22
**noted [10]** 15/7
61/1 96/2 96/3
123/17 124/18
125/14 162/12
177/23 220/7
**notes [1]** 224/11
**noteworthy [1]**
212/19
**nothing [23]** 27/7
51/25 57/16 57/20
76/17 77/13 77/14
77/16 77/18 77/19
77/25 78/11 78/15
79/21 79/22 82/15
100/8 113/16
153/11 154/18
155/16 175/4

222/19
**notice [6]** 133/7
136/13 187/10
221/9 221/10
221/17
**noticed [2]** 175/11
221/16
**notification [1]**
221/23
**notified [1]** 222/9
**notifies [1]** 194/3
**novel [1]** 54/23
**November [8]** 1/5
52/7 90/23 91/13
94/16 99/9 224/9
224/15
**now [70]** 11/9
12/22 13/6 13/18
16/18 26/21 32/25
36/11 37/19 37/21
39/19 50/1 50/5
51/23 55/11 55/15
56/5 56/7 56/11
56/22 56/23 58/3
59/11 60/1 62/7
69/18 79/12 79/25
79/25 80/10 82/1
83/5 90/12 101/1
104/16 108/13
110/4 111/2 111/3
117/1 117/5 117/7
117/8 117/23
125/19 148/21
151/18 161/6
161/14 170/8
179/18 179/20
180/12 182/5
187/16 189/16
189/16 193/14
195/9 195/17
195/23 198/13
199/3 199/12
199/12 210/5
210/13 217/10

221/12 222/6
**nowhere [2]** 49/19
50/6
**number [31]** 4/6
35/15 42/15 43/20
50/10 58/19 66/16
97/22 105/15 134/9
134/10 168/17
170/3 170/5 170/6
174/18 175/18
189/23 191/19
191/19 191/22
195/25 204/17
212/9 213/4 213/15
214/23 215/23
217/15 219/2
219/23
**numbers [1]** 56/10
**numerous [3]**
139/17 170/1
182/12

**O**

**oath [2]** 6/10
202/13
**object [9]** 5/16
5/17 10/17 15/5
93/20 122/23
161/10 183/15
200/9
**objected [2]**
159/11 222/9
**objection [151]**
7/5 9/16 17/16
22/10 22/16 22/18
27/24 29/20 34/13
38/9 39/13 42/5
42/6 44/16 44/21
50/22 50/23 61/22
61/24 63/15 65/15
65/17 66/12 69/22
71/10 74/12 74/13
76/8 78/19 81/4
81/4 81/5 81/18

**O**

**objection... [118]**
91/20 91/20 91/20
93/19 94/4 96/23
98/16 98/16 98/17
98/19 103/8 103/19
103/21 107/13
113/11 113/14
115/15 115/20
115/22 116/10
116/13 118/16
119/20 120/10
121/1 123/17
125/12 125/14
126/10 126/16
126/22 127/14
128/5 128/16 129/3
129/17 129/19
130/7 130/8 131/4
131/20 132/11
132/23 133/11
134/14 135/8 136/9
137/11 137/19
137/19 138/7
138/18 139/22
140/15 141/2
141/21 142/10
142/25 143/24
144/9 145/12
146/11 147/2 147/4
147/19 148/12
148/22 149/14
150/5 151/1 151/14
152/20 153/14
154/1 161/7 161/8
161/24 162/12
164/5 164/17
165/13 165/16
166/8 167/8 168/1
169/15 169/16
171/11 172/20
174/4 177/19
181/21 183/13

184/8 184/23
186/19 187/9
188/19 190/7 190/8
192/5 192/12
192/13 193/5
196/10 197/17
197/22 198/17
200/15 200/25
201/16 211/2 216/2
218/3 219/13
219/24 220/6
222/14

**objection's [1]**
15/7

**objections [1]**
133/16

**objects [1]**   210/24

**obligated [1]**
77/15

**obligation [1]**
77/8

**obligations [1]**
185/18

**obstacles [1]**   93/8

**obtained [5]**   39/23
42/11 45/14 45/16
50/8

**obviously [3]**   5/7
76/16 192/17

**occurred [4]**   11/18
33/23 65/12 187/11

**October [9]**   76/15
116/5 176/22 177/5
183/6 183/10 185/6
185/12 185/15

**October 2012 [1]**
185/6

**October 30th [1]**
116/5

**October of [1]**
185/15

**Oculus [1]**   55/21

**off [17]**   6/15 17/2
36/14 46/25 66/11

68/16 76/23 84/23
117/3 158/11
176/20 187/12
191/3 191/23
207/21

**offensive [1]**
60/19

**offer [77]**   15/3
24/4 27/22 38/21
42/3 44/14 50/20
61/20 63/13 65/13
69/20 71/7 74/10
76/6 76/15 76/22
77/1 77/24 80/23
81/16 86/24 94/2
98/14 103/6 107/11
119/19 120/9
120/24 122/21
123/14 124/14
125/10 126/9
127/12 128/3
128/14 129/1
129/15 130/4 131/2
131/18 132/9
132/21 133/9
134/12 135/6 137/9
138/5 138/16
139/20 140/13
140/25 141/19
142/8 142/23
143/22 145/10
146/1 146/25
147/17 148/10
149/12 150/24
152/18 153/25
161/5 164/3 164/15
166/6 167/6 167/24
169/9 171/9 172/17
174/2 177/17 190/5

**offered [10]**   2/8
3/2 24/5 27/8 39/6
59/10 76/20 77/9
77/10 82/4

O

**offering [2]**   57/12
80/24

**offers [2]**   76/24
77/6

**office [67]**   7/2
7/4 7/19 8/8 8/12
9/10 10/6 10/15
10/20 10/22 11/7
12/1 12/9 12/13
13/24 14/17 15/19
16/6 16/19 17/9
18/6 18/15 18/18
21/8 24/17 24/21
24/25 27/9 28/6
28/23 29/14 30/2
32/17 32/18 34/12
34/19 34/19 36/22
37/14 38/8 38/13
38/16 40/11 50/19
53/8 82/19 86/19
86/22 88/3 106/7
134/19 135/15
135/25 137/6 141/7
182/13 186/2
186/16 187/8
187/10 187/13
187/20 187/23
196/14 196/17
197/4 206/11

**Office's [1]**   24/12

**officer [4]**   92/5
99/16 146/16
146/17

**offices [1]**   85/8

**official [2]**   30/2
35/10

**Offshore [1]**
184/17

**oh [11]**   8/9 11/8
18/22 28/20 34/5
47/21 89/10 89/21
114/2 210/21 211/7

**okay [38]**   11/23
29/8 31/8 31/18
32/1 32/5 32/7
32/15 39/16 39/21
46/4 52/19 65/13
66/9 69/20 70/9
112/2 119/18 145/2
152/13 168/12
171/20 172/7
172/16 181/15
189/5 189/8 189/11
193/6 193/23
209/19 210/11
210/21 210/23
210/25 212/25
213/9 222/24

**old [2]**   43/17
90/14

**old-fashioned [2]**
43/17 90/14

**older [1]**   50/1

**omissions [1]**
135/17

**once [8]**   40/1
53/20 56/16 75/23
118/7 143/21
205/25 221/22

**oncoming [1]**   25/24

**one [155]**   5/14
8/18 11/8 13/12
13/14 13/20 14/2
16/25 19/7 19/11
21/16 24/7 25/5
25/8 29/3 29/7
31/10 31/21 32/13
32/13 32/13 33/2
35/7 37/16 40/2
43/18 44/10 46/25
48/10 49/15 54/10
55/12 55/16 55/20
55/22 55/24 55/25
56/1 59/4 62/6
62/12 64/22 65/11
66/16 70/3 70/4
79/19 80/24 83/10
86/22 89/3 90/24
92/18 94/21 95/3
95/4 95/4 95/6
97/13 97/22 98/21
98/23 99/3 104/21
106/10 106/10
108/18 110/17
111/5 112/8 114/10
114/12 117/11
117/11 117/11
118/4 126/4 127/9
131/13 134/9
134/25 135/2 135/4
135/11 136/21
136/25 139/11
139/13 140/23
142/5 142/6 143/2
144/21 145/25
149/4 151/6 152/5
154/10 155/3 155/5
155/9 156/8 159/1
159/9 159/19 161/3
161/16 163/12
164/13 165/24
167/22 168/9
168/23 168/24
168/25 169/2
169/11 170/1
171/16 171/20
171/24 171/25
172/1 175/3 176/8
179/12 179/20
179/20 179/25
188/10 189/6
191/23 192/22
195/17 197/5 199/8
209/14 210/5
211/16 212/7 212/9
213/4 214/10
214/23 215/5
215/23 217/9
217/15 218/1
218/22 218/24

USCA11 Case: 22-11150　Document: 11　Date Filed: 11/30/2022　Page: 12 of 254

# O

**one... [4]** 219/2
219/23 221/8
221/19
**one's [5]** 90/3
125/4 139/15 183/7
185/21
**one-hour [1]** 111/5
**one-off [1]** 46/25
**ones [11]** 16/24
18/20 50/11 83/13
90/8 102/24 104/22
109/7 140/23 142/6
194/12
**ongoing [3]** 41/10
97/12 206/16
**online [1]** 109/18
**only [28]** 8/2 8/3
13/6 13/9 13/17
26/9 58/10 77/11
77/11 79/23 82/7
82/12 84/19 85/17
85/17 92/20 93/22
103/10 116/3 136/7
136/25 152/15
168/23 169/1
171/24 179/9
179/22 180/1
**Onward [1]** 104/15
**open [4]** 117/24
118/2 118/12
213/18
**opened [1]** 200/13
**opens [1]** 45/5
**operate [1]** 110/2
**operating [1]**
179/7
**operations [6]**
73/17 83/20 97/12
203/19 204/19
205/5
**operator [1]**
206/17

**opined [1]** 209/5
**opinion [6]** 50/8
116/14 116/15
116/16 197/23
210/8
**opportunity [1]**
50/7
**opposed [3]** 156/23
157/19 162/9
**option [1]** 76/17
**order [2]** 4/1
190/19
**ordered [1]** 194/6
**organization [2]**
89/25 204/13
**original [3]** 40/17
117/5 161/1
**other [65]** 8/14
8/20 10/8 19/8
19/20 20/3 21/2
21/14 24/13 41/1
45/11 45/13 45/15
55/14 55/18 59/1
83/13 83/22 83/25
86/18 86/23 89/14
89/23 90/7 91/8
92/19 96/19 98/2
98/25 101/16
101/25 102/24
103/13 106/9
106/10 109/23
110/2 110/23 134/6
139/11 139/15
144/18 150/23
151/23 155/9
156/22 159/18
161/16 166/16
171/4 175/3 175/5
175/23 178/21
179/23 185/21
189/2 195/2 195/17
195/19 205/11
213/8 214/22 219/6
221/20

**others [15]** 32/24
44/8 45/23
69/11 79/5 89/7
116/24 130/16
132/5 132/18
180/14 194/10
194/11 195/19
**our [25]** 5/7 5/11
10/10 16/25 17/8
20/7 30/13 44/10
49/20 51/4 61/18
79/16 85/8 90/10
96/11 104/10
111/18 115/20
161/8 161/24
162/18 168/8
169/23 169/24
195/5
**out [84]** 6/22 7/3
10/8 12/1 12/2
12/3 13/17 13/22
18/7 18/9 18/15
19/16 20/10 23/13
24/10 24/11 27/6
27/10 27/10 27/12
27/13 28/13 28/15
29/5 29/7 31/13
33/12 33/15 34/20
36/7 36/18 38/13
40/18 53/2 58/8
58/11 63/6 72/1
72/11 72/23 75/7
75/22 76/24 78/3
78/8 78/23 79/16
79/22 80/18 82/16
83/14 83/18 84/15
85/10 85/14 85/15
88/21 89/9 89/14
95/13 105/10
107/20 113/25
116/25 118/10
134/6 136/24 146/9
156/6 169/12
170/17 172/2

**O**

**out... [12]** 175/24
176/5 180/8 180/19
180/21 180/23
181/8 181/12
199/21 204/19
210/1 218/14
**Outlook [1]** 166/17
**output [3]** 7/25
20/25 215/21
**outright [2]** 67/22
67/25
**outside [6]** 104/9
110/20 170/19
188/5 195/21
200/16
**outstanding [1]**
68/9
**over [40]** 5/15
7/22 8/15 8/16
14/7 17/12 26/6
47/7 48/7 49/23
55/11 60/7 62/11
81/24 91/3 93/4
108/6 134/2 134/3
146/5 153/20 156/4
156/11 156/13
161/7 165/2 165/7
165/8 165/11 173/5
179/21 180/22
183/13 187/19
196/4 198/25 199/1
199/9 199/23 210/5
**overlapped [1]**
98/2
**overly [1]** 45/20
**overruled [51]**
15/7 34/17 38/11
44/21 50/23 61/24
63/19 65/17 69/24
71/10 78/20 81/5
81/19 87/2 93/24
94/8 98/19 103/21

103/24 107/15
113/15 115/22
116/19 119/22
120/12 122/25
123/17 124/18
125/14 126/22
130/8 131/20
132/13 136/10
140/2 141/3 146/13
147/4 148/24
149/16 162/12
183/21 184/9
186/12 196/12
197/24 198/18
198/20 219/15
219/25 220/7
**overseas [7]** 19/12
64/24 100/8 153/23
178/12 187/9
197/11
**owe [1]** 8/21
**owed [2]** 21/14
84/24
**own [26]** 14/1 14/3
14/3 23/16 35/23
39/10 79/16 83/13
96/21 96/22 101/14
101/15 101/16
115/9 116/7 161/20
180/13 194/21
195/6 196/3 199/3
199/17 199/18
200/1 200/4 200/4
**owned [14]** 13/19
13/20 13/21 75/12
78/21 95/19 96/5
96/7 96/10 96/13
100/1 195/18
195/23 195/24
**owner [2]** 110/10
206/17
**owners [1]** 72/19
**ownership [5]** 64/4
68/25 91/3 94/15

196/4
**owning [1]** 36/24
36/5 76/22
**owns [8]** 82/24
101/6 101/8 110/22
195/11 195/24
196/6 198/24

**P**

**p.m [10]** 111/6
112/4 112/4 112/14
162/22 162/23
162/23 163/8
220/25 223/1
**P036 [2]** 183/8
184/13
**P055 [2]** 145/5
145/10
**P058 [2]** 125/17
125/21
**P059 [3]** 125/23
125/24 126/9
**P113 [2]** 41/23
42/3
**P117 [1]** 11/12
**P120 [1]** 12/18
**P124 [1]** 17/18
**P127 [1]** 40/7
**P134 [2]** 127/2
127/12
**P135 [2]** 145/20
146/25
**P137 [4]** 14/13
15/3 15/8 18/25
**P138 [1]** 23/2
**P140 [2]** 127/21
128/3
**P142 [2]** 128/8
128/14
**P146 [2]** 177/9
177/17
**P156 [2]** 37/7
38/18
**P160 [1]** 47/17

USCA11 Case: 22-11150    Document: 52-2    Date Filed: 11/09/2022    Page: 14 of 254

# P

**P166 [2]**   44/4
   44/14
**P175 [1]**   9/23
**P181 [2]**   50/13
   50/20
**P183 [1]**   52/4
**P187 [2]**   167/18
   167/24
**P191 [2]**   61/11
   61/20
**P209 [2]**   128/19
   129/1
**P210 [3]**   129/6
   129/15 130/4
**P211 [3]**   130/11
   131/2 131/18
**P213 [2]**   131/24
   132/9
**P214 [2]**   132/15
   132/21
**P215 [2]**   133/1
   133/9
**P216 [3]**   69/6 69/8
   69/20
**P217 [2]**   62/23
   63/13
**P219 [2]**   133/14
   134/12
**P223 [2]**   134/17
   135/6
**P224 [2]**   137/2
   137/9
**P229 [3]**   64/25
   65/14 72/13
**P230 [3]**   118/24
   119/2 119/19
**P240 [1]**   38/2
**P241 [2]**   74/5
   74/10
**P248 [2]**   86/4
   86/24
**P256 [2]**   75/19

76/6
**P257 [2]**   81/8
   81/16
**P274 [2]**   137/14
   138/5
**P296 [3]**   92/1 94/2
   94/8
**P301 [2]**   98/8
   98/14
**P308 [2]**   119/25
   120/9
**P310 [3]**   120/14
   120/24 122/21
**P313 [2]**   138/10
   138/16
**P315 [2]**   123/4
   123/14
**P326 [2]**   139/7
   139/20
**P337 [2]**   123/20
   124/14
**P350 [3]**   70/11
   70/12 71/7
**P398 [2]**   124/21
   125/10
**P446 [3]**   193/19
   193/21 193/23
**P457 [2]**   110/24
   113/18
**P469 [1]**   100/13
**P514 [2]**   147/12
   147/17
**P538 [2]**   148/5
   148/10
**P540 [2]**   149/5
   149/12
**P546 [3]**   163/13
   163/18 164/3
**P554 [1]**   193/11
**P578 [2]**   140/5
   140/13
**P58 [1]**   125/22
**P598 [2]**   140/18
   140/25

**P607 [1]**   182/17
**P630 [8]**   150/15
   150/24 154/23
   155/3 156/1 158/20
   158/23 162/7
**P637 [1]**   9/6
**P664 [2]**   141/12
   141/19
**P685 [1]**   107/11
**P695 [2]**   141/24
   142/8
**P707 [4]**   142/15
   142/23 143/23
   145/4
**P709 [1]**   88/19
**P720 [2]**   164/8
   164/15
**P727 [4]**   27/15
   27/22 31/12 31/15
**P770 [1]**   192/8
**P781 [1]**   103/6
**P797 [1]**   151/7
**P799 [7]**   151/19
   152/18 153/25
   159/10 159/20
   161/5 161/17
**P807 [1]**   164/20
**P809 [1]**   165/19
**P824 [3]**   165/20
   166/6 166/19
**P835 [1]**   169/22
**P853 [17]**   168/4
   168/5 168/7 168/19
   168/20 168/21
   168/22 169/23
   169/25 169/25
   170/2 170/15
   171/25 172/17
   173/11 174/3
   188/21
**P853.2 [3]**   169/10
   171/21 172/18
**P853.3 [1]**   174/2
**P853.4 [3]**   188/22

# P

**P853.4... [2]**
190/5 190/10

**P856 [7]**　166/12
167/6 167/17
169/19 170/13
170/24 171/9

**P862 [4]**　28/17
31/19 31/23 32/4

**P865 [1]**　106/15

**P869 [2]**　184/13
184/21

**P871 [1]**　102/11

**pack [2]**　41/21
46/18

**page [138]**　2/4
6/17 9/7 9/24
11/13 12/18 13/14
14/20 16/3 16/9
16/9 16/12 16/15
19/3 19/3 19/5
20/5 20/12 20/22
20/22 21/22 22/20
25/8 25/8 27/17
27/20 28/2 28/19
28/20 29/24 32/5
33/8 37/8 38/4
38/19 38/23 40/8
46/4 46/12 46/14
46/22 47/3 47/19
47/20 47/21 49/4
52/12 52/20 53/2
53/12 53/25 54/18
57/2 58/20 61/15
62/25 63/22 65/2
65/6 66/6 66/23
67/3 67/6 67/9
67/13 68/4 70/20
70/24 71/3 71/19
72/1 72/14 73/9
73/21 75/25 86/11
86/12 87/5 87/13
87/21 88/20 92/7

93/15 94/1 94/19
95/23 97/2 98/2
98/23 98/25 99/1
99/3 100/21 103/10
103/18 104/3 104/5
105/17 105/21
106/16 106/24
107/17 113/22
114/9 117/18 119/1
119/4 119/6 119/9
119/13 120/5
120/19 121/4
121/13 121/17
121/20 123/10
124/2 125/1 135/21
135/21 136/22
137/23 143/2
143/14 144/6 152/8
159/25 169/2 169/2
169/4 169/11
173/18 179/4
182/19 190/9
190/22 215/13

**Page 4 [2]**　27/20
86/11

**pages [19]**　1/8
13/11 18/21 18/22
18/24 19/2 24/17
98/20 98/24 103/12
103/13 103/14
103/15 103/15
105/21 122/1
156/11 170/8
224/12

**pages' [1]**　18/18

**paid [18]**　8/18
24/6 25/21 43/24
44/1 45/24 48/23
83/20 84/25 85/9
85/10 85/14 85/15
85/18 85/21 175/24
197/12 199/21

**Paige [3]**　6/24
34/22 142/3

**paint [1]**　21/12

**PALM [1]**　1/2

**panel [6]**　11/3
11/4 11/6 11/7
188/15 188/16

**Panopticrypt [1]**
124/5

**paper [4]**　13/7
13/14 132/3 132/19

**papers [2]**　79/7
109/1

**paperwork [1]**
165/6

**paragraph [12]**　9/9
47/15 65/9 66/9
66/10 72/1 72/5
86/15 87/19 177/23
182/20 209/25

**paragraphs [1]**
192/23

**parallelized [1]**
55/10

**parent [6]**　69/12
70/3 70/5 70/6
71/15 123/7

**Park [3]**　99/19
199/21 199/23

**part [26]**　18/9
19/24 20/7 22/5
23/13 25/20 39/8
48/22 53/17 58/2
72/19 74/20 74/20
80/18 127/9 134/5
173/3 173/10
176/24 178/24
179/1 179/10
188/22 206/13
207/1 215/22

**partes [1]**　112/12

**particular [10]**
18/22 19/7 22/6
22/8 180/9 180/9
180/18 193/10
204/18 213/16

# P

**parties [6]**   72/5
91/6 91/11 96/7
96/13 146/7
**partner [1]**   17/2
**partner-level [1]**
17/2
**partnership [3]**
173/3 175/8 175/9
**party [16]**   91/8
96/3 96/14 97/1
97/4 97/4 97/6
97/8 97/14 97/17
97/21 97/22 101/7
101/13 101/16
194/3
**passed [2]**   6/23
158/11
**passing [3]**   116/21
116/21 117/3
**passing-off [1]**
117/3
**past [1]**   51/12
**patent [13]**   104/16
105/7 105/11
105/25 106/4 109/3
109/7 109/13 110/9
110/13 110/15
110/19 110/23
**patent's [1]**
107/24
**patenting [1]**
106/3
**patents [14]**   103/2
105/4 108/6 108/10
108/14 109/9
109/10 109/23
110/5 110/7 110/10
113/6 114/5 117/20
**Patrick [3]**   6/24
34/22 142/3
**Pause [19]**   25/6
32/2 63/8 103/11

103/17 121/18
144/4 144/14 145/8
152/6 168/6 168/11
171/19 173/12
181/9 181/14
188/25 202/20
209/15
**pay [22]**   8/16 14/1
21/5 23/8 26/10
26/24 39/11 48/17
48/20 48/21 77/14
77/15 83/25 84/7
84/11 84/19 84/21
84/22 85/5 93/9
134/5 191/25
**payment [4]**   68/22
86/20 100/24 101/2
**payments [2]**   76/15
77/11
**payout [1]**   49/24
**PDF [4]**   12/24
167/12 209/20
210/23
**PE [3]**   46/2 46/7
47/1
**peak [2]**   76/20
108/20
**pedantic [1]**
106/10
**Pederson [3]**   106/4
106/19 137/17
**Pederson's [1]**
125/5
**pending [1]**   10/2
**people [79]**   11/21
14/6 20/24 42/19
43/11 45/21 51/10
53/22 55/15 55/21
55/24 56/4 58/1
58/8 59/24 77/14
77/14 77/15 77/22
77/23 78/24 79/1
79/9 79/10 79/10
80/5 84/10 84/14

84/18 84/22 90/12
92/15 92/24 93/10
95/4 96/19 101/24
102/1 108/24 117/7
134/6 146/20
146/22 153/21
165/5 171/4 172/11
172/12 175/23
176/5 176/19
176/25 178/12
178/12 178/13
178/17 178/17
178/18 178/22
178/23 179/24
180/4 180/6 186/19
186/20 191/3 191/7
196/8 197/10
197/15 199/8
199/10 199/15
199/17 200/3 210/4
**per [8]**   56/21 69/3
84/7 84/8 109/9
109/23 180/8
180/18
**percent [31]**   14/2
14/4 19/19 23/17
23/18 23/20 23/21
24/9 24/15 49/10
52/24 53/15 54/3
54/21 56/10 56/11
56/11 56/11 56/12
56/14 64/23 68/8
68/12 68/24 74/21
82/14 141/9 199/3
199/5 199/11 200/8
**perfect [3]**   181/17
209/13 210/1
**period [3]**   39/20
42/10 105/3
**periodic [1]**
184/20
**permission [1]**
33/5

USCA11 Case: 22-11150 Document: 23-5 Date Filed: 11/30/2022 Page: 17 of 254

**P**

**permit [1]** 220/19

**permitted [3]** 60/7
201/5 201/24

**person [14]** 36/1
56/22 64/10 84/8
104/21 106/3 106/6
116/3 162/4 178/15
178/15 178/15
198/24 210/4

**personal [1]** 1/3

**personally [4]**
77/2 77/4 95/9
178/10

**pertaining [1]**
31/1

**PGP [11]** 150/20
150/23 152/9
152/11 152/11
152/12 152/13
153/13 166/25
213/7 213/8

**Ph.D [2]** 204/3
204/7

**Ph.D.s [1]** 55/13

**Phase [1]** 67/21

**phenomenally [1]**
37/17

**Pholus [1]** 10/11

**physical [1]** 90/15

**pick [3]** 18/22
29/6 88/19

**picked [2]** 29/4
156/4

**picking [1]** 17/6

**piece [2]** 36/4
136/4

**pile [1]** 136/19

**pity [1]** 201/15

**place [4]** 47/7
118/23 156/13
220/22

**placed [3]** 6/10

84/3 202/12

**places [5]** 35/16
79/8 199/13 199/16
199/20

**PLAINTIFF [6]** 1/12
2/4 4/18 118/25
202/14 221/3

**Plaintiffs [84]**
1/5 4/10 4/13 4/15
4/17 27/22 42/3
44/14 50/20 61/20
63/13 65/13 69/20
71/7 74/10 76/6
81/16 86/24 94/2
98/14 103/6 107/11
119/19 120/9
120/24 122/21
123/14 124/14
125/10 126/9
127/12 128/3
128/14 129/1
129/15 130/4 131/2
131/18 132/9
132/21 133/9
134/12 135/6 137/9
138/5 138/16
139/20 140/13
140/25 141/19
142/8 142/23
143/22 145/10
146/1 146/25
147/17 148/10
149/12 150/24
152/18 153/25
164/3 164/15 166/6
167/6 167/24 171/9
172/17 174/2
174/21 175/6
177/17 184/21
194/6 202/6 202/9
203/8 203/12
206/19 206/20
221/5 221/8 222/17

**Plaintiffs' [150]**

2/9 2/9 2/10 2/10
2/12 2/13 2/13
2/14 2/14 2/15
2/15 2/16 2/16
2/17 2/17 2/18
2/18 2/19 2/19
2/20 2/20 2/21
2/21 2/22 2/22
2/23 2/23 2/24 3/2
3/3 3/3 3/4 3/4
3/5 3/5 3/6 3/6
3/7 3/7 3/8 3/8
3/9 3/9 3/10 3/10
3/11 3/11 3/12
3/12 3/13 3/13
3/14 3/14 3/15
3/15 3/16 3/16
3/17 3/17 3/18
3/18 3/19 4/8 15/9
28/1 42/7 44/23
50/25 62/1 63/21
65/19 69/25 71/12
74/14 76/10 81/21
87/3 94/10 99/5
104/1 107/16
111/22 119/23
120/13 123/3
123/19 124/20
126/12 128/7
128/18 129/5
130/10 131/22
132/14 132/25
133/13 134/16
135/10 137/13
138/9 138/20 140/4
140/17 141/4
141/23 142/12
145/14 147/6
147/21 148/14
149/17 151/3 161/5
162/8 162/14 164/7
164/19 166/10
168/3 169/18 170/9

USCA11 Case: 22-11150 Document: 53-2 Date Filed: 11/30/2022 Page: 18 of 254

**P**

**Plaintiffs . . . [26]**
170/17 171/13
172/22 174/6
177/21 184/25
186/8 190/5 190/10
209/11 209/19
210/8 211/4 211/10
211/24 215/1
215/20 216/4 216/9
216/18 216/24
216/25 217/2 217/3
217/19 217/22
**plan [3]** 75/15
75/15 222/22
**planning [1]** 73/13
**platform [5]** 43/22
51/9 51/24 53/16
54/4
**platforms [3]**
43/19 90/9 90/13
**play [6]** 58/18
73/7 73/19 105/15
105/19 179/2
**played [7]** 58/21
73/10 73/22 105/18
105/23 179/5
187/23
**Player [1]** 55/24
**players [1]** 50/3
**pleas [1]** 163/7
**pleasant [4]**
112/17 220/17
220/24 222/24
**please [221]** 4/7
6/4 9/6 9/8 9/23
11/1 11/12 12/17
12/19 16/7 17/21
17/22 19/3 20/9
21/23 23/1 23/13
25/8 25/12 27/17
28/2 28/17 30/9
31/5 31/11 31/14

31/18 34/5 34/6
37/9 38/2 39/25
40/7 41/23 44/4
44/24 45/1 46/10
46/14 47/15 49/4
50/13 52/11 52/19
53/11 54/19 57/3
57/4 58/18 59/19
61/9 61/11 63/7
65/2 66/7 66/20
66/24 67/13 67/16
67/20 68/4 68/19
69/6 70/11 70/19
71/20 71/25 72/14
73/7 73/19 74/5
75/19 81/8 85/22
86/3 86/4 87/5
87/12 87/21 88/19
88/21 91/25 92/7
93/16 94/20 95/13
95/14 96/25 98/8
99/6 100/13 100/15
100/21 102/11
103/18 104/2 104/3
105/15 105/19
106/15 106/16
107/17 108/3 109/3
110/24 111/24
112/16 113/18
114/8 115/12
115/24 119/6 119/9
119/25 120/14
120/18 121/4 123/4
123/9 123/20 124/1
124/21 125/17
127/2 127/21 128/8
128/19 129/6
130/11 131/23
132/15 133/1
133/14 134/17
135/12 135/16
135/19 137/14
137/22 138/10
138/21 139/3 139/7

140/5 140/18 141/5
142/13 143/12
143/14 143/14
144/5 145/5 145/20
147/12 148/5 149/5
149/21 150/11
150/15 151/7
151/17 151/19
154/16 154/23
155/19 158/20
159/20 159/22
161/17 163/10
163/18 164/20
165/19 166/11
167/10 167/18
168/4 168/18 172/2
172/24 173/11
174/7 177/9 179/2
181/7 182/17 183/8
185/8 188/21
188/24 189/1 190/3
190/24 191/10
192/24 193/2
193/11 193/24
200/18 201/6 201/8
202/3 202/7 202/16
203/1 203/5 203/15
205/2 205/16 206/8
207/5 211/7 213/1
213/23 216/6
216/22 217/19
218/19 220/15
**plumber [1]** 78/12
**plus [4]** 18/24
19/12 49/19 191/4
**PMO [1]** 106/7
**point [15]** 15/2
55/12 78/4 78/17
85/7 89/25 92/5
94/2 99/15 111/23
118/1 129/19 156/9
161/3 211/14
**points [3]** 10/10

**P**

**points... [2]** 78/8
135/4
**police [1]** 206/2
**polished [1]** 64/1
**Polytechnic [3]**
204/2 204/3 204/5
**Ponce [1]** 1/22
**pool [2]** 25/19
25/20
**poor [1]** 200/3
**poorest [2]** 199/8
199/25
**pop [1]** 113/25
**portfolio [1]**
109/13
**portion [1]** 172/1
**portions [1]**
207/18
**pose [1]** 183/12
**position [2]** 5/20
97/10
**positive [1]** 62/6
**possibility [1]**
97/13
**possible [1]**
206/21
**post [1]** 34/19
**posted [2]** 116/6
190/22
**posting [1]** 181/24
**posts [1]** 116/3
**potential [4]**
57/25 58/24 62/12
117/12
**potentially [6]**
88/6 88/9 134/4
146/14 152/12
177/1
**pounds [5]** 69/2
113/10 114/6
199/22 221/11
**PR [1]** 139/10

**Practice [1]**
203/18
**predicate [1]**
151/15
**predominately [1]**
212/20
**Preemptive [3]**
86/9 87/10 87/15
**prejudice [1]**
157/9
**preliminary [1]**
64/18
**premised [1]** 198/8
**preparation [1]**
221/24
**prepared [1]**
133/23
**presence [2]**
170/20 200/16
**present [7]** 5/9
60/5 111/6 162/22
207/12 220/25
224/7
**presentation [1]**
205/6
**presently [1]**
203/15
**preserve [1]**
200/15
**preserved [1]**
222/13
**pretended [2]**
27/14 28/15
**pretending [2]**
18/11 18/12
**pretty [1]** 212/4
**previous [2]** 15/6
178/2
**previously [8]** 6/9
7/15 157/1 172/22
182/13 191/15
217/19 220/18
**price [5]** 51/18
83/15 83/22 102/3

191/7
**primarily [1]**
205/4
**primary [1]** 207/13
**prior [1]** 38/10
**prioritization [1]**
107/25
**private [5]** 13/1
14/5 14/6 208/15
214/20
**privilege [4]** 37/1
165/13 165/17
165/18
**privileges [1]**
146/19
**probably [4]** 36/25
174/13 187/15
195/9
**problem [3]** 157/3
158/2 158/14
**problems [4]** 64/11
79/1 83/22 149/9
**proceed [2]** 6/8
162/25
**proceeding [1]**
162/16
**proceedings [24]**
25/6 32/2 63/8
103/11 103/17
121/18 144/4 144/8
144/24 152/6 168/6
168/11 171/19
173/12 181/9
181/14 187/14
188/1 188/7 188/25
202/20 209/15
223/1 224/8
**process [5]** 20/7
23/8 95/17 95/20
178/21
**produced [10]**
146/4 146/5 153/19
155/24 156/4
156/18 167/12

**P**

**produced... [3]**
167/15 193/9 194/5
**product [2]**   43/7
158/10
**production [1]**
156/14
**program [4]**   48/10
48/10 104/16
152/16
**progress [3]**
107/24 145/1
154/12
**progression [1]**
156/5
**project [6]**   51/3
106/7 106/21 118/7
118/8 207/22
**projects [2]**
109/20 199/2
**promised [2]**   24/15
76/14
**promising [2]**
23/18 24/9
**promptness [1]**   6/7
**prongs [1]**   221/19
**proper [4]**   42/20
156/19 157/20
157/22
**properties [1]**
96/7
**property [60]**
25/13 25/16 35/17
36/5 40/24 42/25
49/25 64/19 65/10
72/4 73/13 75/7
78/3 78/18 81/25
83/2 83/14 88/5
88/8 88/10 88/25
89/1 89/3 89/18
94/15 95/18 96/5
96/10 96/21 97/8
97/11 97/15 97/15

100/1 100/6 101/6
101/12 101/18
101/19 110/4 110/5
112/24 113/1 113/9
114/20 115/3 115/8
116/7 116/9 117/2
117/3 117/15
118/14 124/24
125/8 134/2 187/24
199/17 199/18
200/4
**property's [1]**
82/23
**proposed [6]**   33/12
33/18 33/22 35/19
36/21 162/8
**prosecution [1]**
187/8
**prosecutions [2]**
206/6 206/9
**prostituting [1]**
58/10
**protected [1]**   83/8
**protection [1]**
110/15
**protocol [5]**
116/22 117/10
118/3 118/7 118/10
**protocols [2]**
54/22 54/24
**proud [8]**   80/13
80/13 80/13 80/16
92/16 194/25 195/3
195/5
**provably [1]**   175/1
**prove [2]**   138/25
199/19
**proves [1]**   200/1
**provide [4]**   31/5
35/16 94/6 208/4
**provided [8]**   29/16
30/15 31/1 35/18
36/21 96/8 96/11
194/4

**provides [1]**
**providing [2]**
130/14 130/15
**PTY [4]**   86/9 87/11
87/16 124/7
**public [15]**   19/21
24/24 59/4 75/12
110/7 110/10
110/11 110/16
141/15 141/17
175/19 181/1 182/5
186/21 188/7
**publish [20]**   9/8
37/10 44/24 100/15
115/24 135/11
138/21 141/5
142/13 159/21
174/7 181/19
183/22 190/11
193/23 200/23
201/6 210/13 211/7
212/1
**published [1]**   79/8
**publishing [1]**
31/13
**pull [8]**   24/10
24/11 36/18 64/25
136/15 144/25
181/13 188/16
**pulled [1]**   213/9
**pulling [1]**   37/3
**pulls [1]**   136/15
**purchase [7]**   46/25
66/11 66/14 67/22
67/22 67/25 76/16
**purchased [9]**
19/11 43/9 44/13
45/9 45/12 45/16
56/17 65/10 82/20
**purchaser [3]**
100/24 101/1 101/5
**purchases [1]**
68/12

**P**

**purchasing [1]**
184/1

**purport [1]**   127/5

**purported [9]**
145/7 145/22
147/14 148/7
148/21 149/7 151/9
151/21 163/24

**purportedly [2]**
62/18 140/10

**purporting [3]**
150/20 150/22
152/14

**purports [3]**
153/12 164/23
209/20

**purpose [4]**   90/1
93/6 95/19 96/3

**purposely [3]**
62/19 196/7 197/14

**purposes [5]**   42/14
42/17 111/7 116/18
201/3

**push [2]**   31/11
79/8

**pushed [1]**   74/17

**pushing [1]**   210/5

**put [94]**   9/6 9/23
11/2 11/12 12/17
13/8 13/24 14/13
15/17 17/18 18/25
19/19 25/3 27/15
31/17 36/22 37/7
38/2 44/4 44/12
47/5 48/9 50/13
52/4 55/5 58/10
62/23 70/11 72/10
72/11 74/5 75/19
79/18 79/20 81/8
83/12 84/6 84/13
84/16 85/22 86/4
88/17 91/25 98/8

99/22 110/24
113/1 113/12 115/2
117/25 118/24
119/25 123/4
131/15 133/14
134/4 134/9 134/17
135/2 137/2 137/14
138/10 139/7
140/18 147/12
148/5 150/15 151/7
151/19 158/20
159/19 161/16
161/17 163/18
163/20 164/8 166/1
166/16 166/19
167/18 171/22
175/16 177/9
182/17 183/1 183/8
184/12 188/21
192/8 193/11
193/18 196/23
197/10 198/25
200/18

**puts [2]**   88/5 88/7

**putting [2]**   11/5
196/5

**Q**

**Q2 [1]**   55/2

**Quantico [2]**
204/19 205/5

**quarter [6]**   16/22
22/6 22/6 22/9
22/23 22/23

**queried [5]**   15/14
15/15 16/24 16/24
17/9

**query [1]**   15/14

**question [41]**   7/9
7/14 9/17 9/17
9/21 10/2 10/18
20/15 20/18 20/21
21/19 21/25 22/3
31/6 31/25 33/13

33/19 33/20 35/15
112/1 118/3 120/21
121/5 126/20 131/6
148/25 150/6
150/11 156/20
156/24 163/13
165/10 181/3
188/18 189/21
191/3 191/11
191/12 200/13
202/1 222/7

**questioned [5]**
16/21 16/22 20/17
20/20 215/10

**questioning [5]**
7/6 112/18 163/11
183/13 190/20

**questions [25]**
10/16 13/19 13/21
15/12 16/5 16/11
16/14 16/17 16/19
18/18 18/21 19/6
20/10 24/17 28/7
30/14 32/19 37/15
174/1 183/17
201/19 201/21
201/24 202/2 202/4

**quicker [1]**   133/17

**quickly [3]**   5/21
93/1 121/23

**quite [2]**   51/11
99/22

**quote [2]**   37/20
60/25

**quoting [1]**   60/22

**R**

**radically [1]**
116/22

**raise [3]**   201/25
202/3 202/12

**raised [1]**   97/6

**ramona [9]**   81/11
87/9 106/22 123/23

USCA11 Case: 22-11150    Document: 83-12    Date Filed: 11/30/2022    Page: 229 of 254

**ramona... [5]**
126/3 127/25
128/11 132/18
167/21
**ran [7]** 49/14
106/8 117/25
146/15 174/17
177/1 179/22
**random [3]** 29/3
29/4 214/3
**range [1]** 114/4
**rate [1]** 203/12
**rates [1]** 221/10
**rather [19]** 8/11
8/20 16/9 21/3
28/10 49/16 49/22
49/24 54/8 54/9
54/13 83/17 85/1
89/12 102/6 135/1
136/17 155/17
188/12
**rational [1]** 85/4
**rcjbr [8]** 153/3
155/8 155/14
155/14 157/1
160/12 165/23
165/23
**rcjbr.org [5]**
131/9 162/7 217/4
217/4 219/20
**reach [4]** 18/7
18/15 27/10 27/12
**reached [6]** 13/17
18/9 27/13 28/13
28/15 64/18
**reaches [3]** 27/10
75/22 218/14
**reaching [3]** 12/1
12/2 12/3
**read [18]** 13/7
13/15 23/14 26/13
26/15 35/10 66/19

67/16 67/18 68/19
107/8 129/13
181/5 201/8 211/18
211/20 211/21
**readable [1]**
207/19
**reading [1]** 70/4
**reads [2]** 48/14
210/3
**ready [10]** 5/20
6/6 6/7 55/24
60/15 111/19
112/17 121/19
162/25 220/15
**real [5]** 41/16
102/5 189/21
190/15 190/17
**real-world [1]**
102/5
**reality [3]** 8/5
10/25 157/8
**realize [7]** 14/6
18/10 18/12 28/14
51/10 175/6 197/10
**realizing [2]**
19/24 83/21
**really [28]** 28/12
29/1 29/8 37/4
37/4 40/17 41/14
41/15 43/11 56/23
74/18 77/20 77/20
82/23 83/16 90/2
90/2 135/3 146/23
176/6 176/7 186/2
186/4 186/21
186/21 188/8 195/1
210/4
**reason [6]** 13/17
18/9 73/4 73/6
153/1 187/19
**reasonable [2]**
79/15 87/25
**recall [26]** 7/18
7/21 11/17 11/23

12/21 13/1 13/16
72/6 72/9 72/14
102/22 112/25
126/4 130/2 134/19
173/4 173/5 176/15
182/15 183/5 183/7
183/25 185/24
191/16 193/9
193/14
**recalls [1]** 222/4
**recap [1]** 7/9
**receivable [1]**
88/1
**receive [5]** 18/16
21/5 24/24 76/15
99/10
**received [79]** 15/9
18/17 18/20 21/1
25/2 28/1 28/5
32/17 34/22 34/23
42/7 44/23 50/25
62/1 63/21 65/19
69/25 71/12 74/14
76/10 81/21 81/23
87/3 91/13 91/15
94/10 98/5 99/5
104/1 107/16
119/23 120/13
123/3 123/19
124/20 125/16
126/12 127/16
128/7 128/18 129/5
130/10 131/12
131/22 132/14
132/25 133/13
134/16 135/10
137/13 138/9
138/20 140/4
140/17 141/4
141/23 142/12
145/14 146/6 147/6
147/21 148/14
149/17 151/3
162/14 164/7

**R**

**received... [13]**
164/19 166/10
168/3 169/18
171/13 172/22
174/6 177/21
184/25 190/10
211/4 211/24 216/4
**receives [3]**  32/16
203/13 208/16
**receiving [1]**
221/9
**recenter [1]**  6/21
**recess [7]**  60/4
60/13 60/14 111/5
112/4 162/21
162/23
**recipient [1]**
151/23
**recognize [67]**
14/16 27/19 30/7
30/18 30/20 30/23
31/4 31/9 41/25
50/16 50/18 61/14
61/17 63/11 102/21
103/23 104/8 107/9
122/19 123/22
124/23 125/6 127/4
127/23 128/10
128/21 129/8
129/12 130/13
130/15 132/17
133/3 133/22
133/25 134/23
137/4 137/16
138/12 139/9 140/7
140/20 141/14
142/2 142/17
144/13 145/7
145/22 147/9
147/11 147/14
148/7 150/17 151/9
151/21 152/13

153/3 153/5 153/6
157/1 157/20
163/24 164/11
166/14 167/20
167/22 169/7
174/25
**recognized [1]**
131/7
**recollect [2]**  74/9
103/5
**recommend [1]**  97/6
**recommended [1]**
50/19
**record [20]**  4/8
7/7 34/16 61/1
66/20 73/9 73/21
86/1 105/17 105/21
110/11 154/21
155/22 170/15
170/19 179/3 181/1
182/5 186/22
202/17
**recorded [2]**  40/17
40/19
**records [1]**  175/19
**recover [2]**  12/15
88/4
**red [12]**  11/25
96/2 96/3 96/14
97/1 97/4 97/4
97/5 97/8 97/21
209/25 217/7
**redo [1]**  43/1
**redoing [1]**  161/9
**reduce [1]**  54/23
**reduction [1]**
55/16
**refer [2]**  7/14
210/12
**reference [10]**
14/23 47/5 47/6
47/7 72/9 93/18
93/20 137/5 137/7
144/18

**referenced [8]**
60/25 71/3 86/14
130/20 185/16
**references [7]**
19/8 19/22 20/2
71/4 139/17 205/7
218/3
**referencing [1]**
88/13
**referred [3]**  9/20
72/6 95/9
**referring [3]**
86/16 126/18
192/25
**reflection [1]**
135/18
**reflects [2]**
157/16 162/8
**refrain [2]**  60/11
192/25
**refund [8]**  7/4 8/4
8/7 8/10 8/16 19/9
20/23 86/20
**refunds [3]**  7/1
7/19 9/14
**refusal [1]**  97/18
**refused [1]**  77/4
**regard [7]**  20/9
111/20 131/7 144/1
152/22 156/22
158/17
**regarded [1]**  50/18
**regarding [6]**
10/11 28/7 32/19
50/8 58/23 197/23
**regards [1]**  52/7
**register [2]**
110/23 175/21
**registered [1]**
175/22
**registry [3]**  105/7
105/12 108/5
**rehearsing [1]**

**R**

rehearsing... [1]
75/3
rejected [4]   7/19
8/18 77/6 80/23
rejecting [1]   8/20
related [7]   9/13
95/19 112/24
130/16 168/24
206/14 213/4
relates [2]   97/9
207/17
relating [1]
184/17
relation [2]   20/9
205/17
relations [1]   59/2
relationship [2]
218/7 218/9
released [2]
117/23 192/1
relevance [28]
15/5 61/22 63/15
63/18 65/15 69/23
87/1 107/13 119/21
120/10 121/2
122/24 123/15
124/16 125/13
129/18 131/5
132/12 139/23
139/25 141/2
142/25 144/10
144/11 192/5
192/14 192/15
198/19
relevant [6]   96/13
97/7 97/11 97/13
97/14 99/16
reliability [1]
154/2
remain [2]   202/12
220/23
remained [4]   57/11

75/14 100/6 100/7
remains [1]   96/2
remarkable [1]
37/19
remarkably [1]
40/16
remember [22]   52/3
55/21 56/9 58/16
62/22 73/6 74/3
75/24 80/3 98/7
105/25 126/24
127/7 127/10
131/17 140/22
145/25 146/23
164/1 167/1 181/4
197/2
remind [1]   6/9
Remote [2]   204/18
205/4
remotely [1]   124/6
remove [1]   64/4
removed [2]   64/9
100/6
Rensselaer [3]
204/2 204/3 204/5
repeat [2]   183/17
207/1
repeated [1]
183/13
Rephrase [2]   39/15
137/21
replace [1]   31/22
replacement [2]
42/16 42/24
reply [1]   165/24
report [14]   5/11
52/20 53/12 53/25
57/3 57/6 91/13
91/24 95/8 95/20
96/4 96/6 96/14
97/5
reported [1]   224/8
reporter [6]   1/23
181/2 189/24

202/18 213/20
reporter's [1]
162/15
reports [1]   91/15
represent [1]
209/20
representative [1]
1/3
represents [1]
62/5
request [11]   7/4
7/20 20/8 24/12
30/13 35/16 52/14
52/17 60/11 221/8
221/17
requesting [1]
50/17
required [3]   34/21
42/17 55/3
research [12]   1/4
25/19 30/25 52/25
53/17 89/17 109/17
203/18 204/7 204/9
204/16 220/20
reserve [2]   111/24
196/20
resigned [2]   38/16
99/12
respect [4]   7/6
154/20 161/25
192/13
respond [13]   6/24
17/12 33/4 99/20
103/2 104/19
135/20 173/21
173/24 174/11
189/21 190/17
191/10
responded [4]
34/23 135/24
173/22 200/14
responding [7]
17/11 35/1 173/24

USCA11 Case: 22-11150    Document: 42    Date Filed: 11/30/2022    Page: 25 of 254

**R**

**responding... [4]**
189/23 189/25
190/1 200/12

**responds [4]**  39/2
75/2 81/25 104/15

**response [21]**  33/1
33/9 33/19 33/22
34/5 35/19 38/24
39/3 63/1 81/12
82/2 128/22 143/6
174/1 181/4 190/4
200/9 201/9 203/19
222/7 222/10

**responses [9]**
33/12 33/15 34/9
36/21 36/23 37/13
75/3 142/18 142/19

**responsive [1]**
29/11

**rest [7]**  63/5
79/18 98/17 100/2
101/16 120/23
193/16

**restate [2]**  115/20
161/8

**restaurant [1]**
78/15

**results [3]**  52/2
79/6 79/9

**retain [2]**  68/25
74/20

**retained [3]**  40/3
203/8 206/11

**retracements [1]**
55/17

**return [1]**  20/11

**reverse [1]**  187/20

**review [10]**  96/11
97/23 121/24
121/25 135/16
188/16 206/12
206/20 214/22

215/22

**reviewed [7]**  19/14
146/7 206/25 207/2
208/3 218/11
219/22

**reviewing [1]**
207/10

**reward [1]**  79/9

**RF [3]**  115/13
181/7 200/18

**RF-10 [1]**  181/7

**RF-2 [1]**  200/18

**RF-6 [1]**  115/13

**rid [2]**  13/13
134/10

**ridiculous [1]**
19/13

**right [137]**  5/10
5/22 5/23 5/25 7/8
7/13 14/5 14/10
16/22 19/5 20/5
22/22 23/4 23/23
24/3 24/5 25/7
26/3 27/25 29/7
29/15 29/16 30/3
30/6 31/22 32/3
32/5 32/12 45/14
47/17 47/21 47/25
48/4 49/2 52/22
60/6 60/15 60/18
61/5 61/7 62/7
67/12 72/13 72/15
78/22 79/12 81/3
84/24 89/23 90/12
91/11 92/3 94/13
96/22 99/4 110/5
111/4 111/7 111/20
112/5 112/15
114/23 117/9
120/21 121/23
122/3 124/10 125/5
130/6 133/20
133/22 143/5 145/3
145/25 147/16

149/2 154/9 155/14
157/13 158/2 158/5
158/9 158/21
159/13 159/15
161/21 162/24
163/1 163/6 163/9
166/24 167/16
169/3 169/5 169/17
170/8 170/11 173/7
173/9 177/5 179/19
181/22 185/7
188/10 189/18
190/9 196/21
196/22 200/11
201/20 201/23
201/25 202/4
202/10 202/11
202/12 202/24
205/4 210/23 211/3
214/7 216/3 216/24
218/6 218/25 219/5
219/8 220/13 221/1
221/6 221/22 222/1
222/13 222/20
222/23

**right-hand [12]**
19/5 23/4 49/2
72/15 124/10
155/14 156/1 158/5
158/9 158/21
159/15 166/24

**rights [40]**  35/22
35/25 36/2 36/6
36/7 40/4 43/6
51/22 57/10 64/23
68/8 68/16 68/20
78/7 82/25 91/5
91/7 91/9 91/10
91/12 95/18 96/5
96/7 96/10 96/13
96/18 97/8 97/11
97/15 98/2 100/5
100/6 100/7 100/7

USCA11 Case: 22-11150    Document: 83-57    Date Filed: 11/30/2022    Page: 261 of 254

**R**

**rights... [6]**
101/6 101/8 101/13
105/10 117/3
117/21
**rip [1]**  76/23
**risk [3]**  88/5
96/12 99/23
**risks [1]**  97/9
**RIVERO [3]**  1/19
1/19 4/25
**RMR [1]**  224/17
**Road [10]**  205/7
205/9 205/10
205/14 205/17
205/18 205/23
206/2 206/13
206/16
**Robert [2]**  65/23
134/1
**ROCHE [5]**  1/12
1/13 2/7 4/14
207/20
**role [4]**  23/24
23/24 58/5 204/15
**roles [1]**  178/16
**room [3]**  1/24
220/22 222/21
**Ross [1]**  206/17
**round [5]**  41/12
41/16 41/17 62/8
109/23
**RPI [2]**  204/5
204/8
**RPR [1]**  224/17
**rule [2]**  54/22
221/14
**rule-based [1]**
54/22
**ruled [1]**  14/7
**rules [1]**  199/19
**ruling [4]**  14/6
14/6 15/6 221/12

**run [9]**  26/23
45/4 82/3 136/21
136/22 136/23
136/24 177/1 196/6
**running [3]**  55/6
152/15 176/6
**runs [3]**  29/4 29/8
62/5

---

**S**

**said [98]**  8/9 8/12
10/23 13/3 14/8
15/13 15/13 15/19
16/21 17/10 20/16
20/19 22/6 22/14
22/14 22/23 27/12
37/16 37/23 38/14
39/6 41/10 45/8
49/13 51/23 59/14
59/15 60/24 62/22
66/2 67/7 79/19
82/7 84/5 84/25
85/13 86/19 88/13
89/5 92/13 93/11
93/12 97/25 100/3
103/4 106/2 106/5
106/9 106/20
115/11 115/21
117/17 117/19
118/6 118/8 118/8
130/1 130/17
135/24 135/25
136/1 136/4 136/5
136/11 141/10
153/20 160/22
175/16 176/3 176/4
176/7 177/7 177/16
178/3 178/6 178/6
178/9 178/14 180/6
187/7 187/12
187/14 187/16
191/15 193/16
194/19 196/13
197/2 198/12 199/2

199/4 201/10
205/14 206/7 206/8
207/25 208/10
211/17 213/3
**salary [4]**  23/24
69/1 69/3 85/6
**sale [2]**  19/19
72/22
**salient [1]**  10/10
**same [31]**  20/16
23/6 24/16 25/10
34/7 81/23 83/3
103/4 110/3 130/7
139/14 154/14
156/22 158/10
161/9 161/11
161/12 161/25
167/5 169/22 172/9
174/10 185/13
196/17 196/18
198/2 200/2 218/1
218/12 220/6
220/14
**Sarah [1]**  5/8
**sat [1]**  179/24
**satisfied [1]**
135/17
**Satoshi [14]**  12/25
88/9 88/12 88/25
89/17 90/4 101/20
139/17 173/3
173/15 173/16
173/17 173/19
174/10
**Satoshis [1]**  43/22
**Saudi [2]**  43/10
44/1
**Saudis [1]**  51/19
**saved [1]**  156/3
**saw [8]**  7/19 11/18
23/9 30/19 34/7
183/25 196/18
218/13
**say [55]**  11/2 11/8

# S

**say... [53]** 11/20
21/1 24/21 25/15
29/19 30/12 35/7
37/19 43/11 48/5
51/2 51/7 70/2
84/19 85/4 88/12
90/17 91/16 102/20
104/23 116/8 117/5
121/14 127/8
127/20 135/21
136/1 144/16
147/24 148/9
150/22 153/10
157/7 159/5 159/6
160/7 160/10 172/7
172/16 175/6
177/16 180/6 186/3
191/4 193/15
194/25 195/4 195/4
196/23 196/25
208/14 209/5 213/7
**saying [29]** 8/4
8/23 9/3 25/2 34/7
53/20 56/17 56/20
62/10 82/21 91/10
96/20 101/11
101/21 103/3
104/15 113/6 118/5
134/22 139/12
146/4 153/5 160/15
173/5 178/11 186/4
190/19 191/23
198/10
**says [41]** 10/6
26/2 29/15 45/13
46/16 48/11 72/5
75/1 76/12 80/1
82/5 82/12 86/17
89/23 89/24 89/24
94/24 95/8 99/19
102/20 104/9 107/8
108/1 110/9 129/12

135/16 137/25
138/1 138/2 138/15
142/20 151/25
153/9 157/20 158/1
159/25 174/9
175/12 185/16
191/2 194/2 217/9
**SCADA [2]** 45/11
101/15
**scalability [1]**
54/25
**schedule [2]** 101/9
220/14
**scheme [5]** 17/13
19/9 20/23 21/9
39/12
**SCHILLER [1]** 1/15
**science [5]** 203/25
203/25 204/1 204/2
204/3
**scientist [3]** 58/3
68/22 106/13
**scope [1]** 195/21
**scratch [2]** 43/1
50/3
**screen [24]** 12/18
14/14 17/19 19/1
23/1 27/16 37/8
38/3 47/16 94/12
118/25 148/21
158/6 162/15
163/20 164/9
181/10 192/8
193/12 193/19
210/18 210/19
212/3 216/24
**scroll [6]** 19/2
32/25 35/12 46/10
189/16 190/21
**scrutiny [1]** 88/2
**seal [1]** 208/14
**sealed [2]** 124/5
153/24
**seat [2]** 60/6

221/6
**seated [4]** 60/4
61/9 112/16 163/10
**second [21]** 14/18
16/8 25/5 31/21
50/8 56/5 130/19
130/21 130/24
152/8 172/18 180/9
180/18 181/13
182/22 182/22
199/10 209/14
215/13 222/1 222/2
**secondly [1]** 78/7
**secrecy [1]** 110/12
**secret [2]** 84/9
110/18
**secretary [1]** 26/4
**secrets [1]** 110/17
**secure [1]** 220/23
**securities [1]**
54/6
**security [5]** 54/24
178/14 203/18
203/23 204/10
**see [226]**
**seed [1]** 41/15
**seeing [3]** 109/15
109/17 222/22
**seek [2]** 88/3 96/4
**seeking [8]** 41/7
42/22 63/25 143/10
144/2 157/4 161/14
188/23
**seem [2]** 157/18
183/11
**seems [5]** 28/11
35/23 90/2 108/13
108/24
**seen [12]** 30/4
33/17 37/20 48/1
55/24 100/2 113/17
114/7 114/22 143/5
153/24 220/4
**seize [3]** 196/9

**S**

USCA11 Case: 22-11150   Document: 33-12   Date Filed: 11/30/2022   Page: 28 of 254

**seize... [2]**
197/16 205/22
**seizing [1]**   206/2
**seizure [1]**   206/5
**sell [17]**   24/3
24/5 51/20 54/5
56/4 58/12 59/15
59/21 64/19 68/24
73/13 74/19 74/21
75/16 93/12 99/25
205/11
**seller [2]**   46/25
80/19
**selling [3]**   58/8
72/4 82/16
**send [15]**   25/11
26/4 36/22 39/3
81/11 81/24 116/25
127/11 135/4
136/14 136/19
142/6 142/7 167/1
217/15
**sending [4]**   35/2
127/10 162/5
208/15
**sends [5]**   52/1
65/23 85/25 87/8
219/1
**senior [1]**   206/10
**sent [55]**   5/15
14/17 24/17 26/2
26/5 28/7 28/23
32/22 34/19 34/25
35/10 38/15 63/10
63/12 99/15 125/19
127/7 129/13
131/11 131/13
131/14 141/18
144/14 154/6 154/8
154/10 154/13
155/12 156/1 156/3
156/3 156/6 156/8

156/21 156/23
156/24 160/3
160/13 160/21
160/22 160/23
161/2 161/3 161/13
162/6 184/20
195/16 208/18
214/10 217/3
218/16 218/25
219/2 219/10
**sentence [3]**   14/18
181/3 182/23
**separate [7]**   42/16
59/24 105/6 105/10
162/4 190/15 215/7
**September [4]**   7/1
9/4 40/22 176/22
**series [1]**   34/8
**server [4]**   146/17
155/10 162/3 162/3
**servers [3]**   146/6
146/15 156/12
**services [9]**   14/12
15/20 15/22 26/24
68/16 68/20 68/21
203/10 203/13
**set [18]**   20/10
38/14 48/7 75/15
75/16 114/6 118/3
118/4 118/4 118/5
155/16 186/20
194/19 194/20
197/8 199/12
221/23 224/14
**settlement [1]**
79/15
**seven [1]**   173/25
**several [8]**   17/11
60/7 60/24 91/15
146/6 154/3 188/15
198/12
**Seychelles [3]**
185/11 196/1 196/3
**Shadders [2]**

180/12 180/12
**Shah [1]**   5/8
**sham [1]**   80/10
**shantytown [1]**
200/2
**shantytowns [1]**
199/17
**share [6]**   17/20
52/24 53/13 53/15
54/3 54/21
**shared [3]**   18/2
96/18 171/2
**shareholder [2]**
39/7 78/4
**shareholders [4]**
73/18 77/9 175/20
175/23
**shareholders' [1]**
84/4
**shareholding [1]**
75/11
**shares [13]**   23/7
23/16 23/17 23/20
24/10 24/16 74/19
74/21 76/16 76/22
76/25 77/3 82/15
**she [2]**   135/3
135/5
**she's [1]**   198/24
**sheet [18]**   25/11
26/13 26/15 27/7
65/11 65/21 66/2
66/22 71/2 71/22
72/3 72/6 72/14
72/22 73/25 78/2
82/10 119/16
**shit [1]**   59/18
**shop [1]**   102/2
**shops [1]**   89/14
**short [3]**   13/7
20/2 83/25
**short-term [1]**
83/25
**shorthand [2]**

**S**

**shorthand... [2]**
224/5 224/8

**shortly [6]**    27/10
64/14 64/17 83/23
108/25 217/12

**shot [1]**    159/9

**should [5]**    12/25
14/8 14/11 17/10
20/1

**show [26]**    16/5
19/13 46/5 58/16
71/19 86/3 118/22
119/9 121/17
124/25 137/18
137/22 142/15
154/5 154/11 159/7
169/12 170/13
176/16 176/17
186/14 186/24
215/17 216/9
217/22 219/9

**showed [6]**    12/21
47/4 59/1 176/14
178/2 193/8

**showing [4]**    8/3
11/25 37/4 182/13

**shown [3]**    27/6
56/10 93/22

**shows [15]**    26/6
108/5 108/6 109/9
114/4 156/4 158/6
158/9 211/12
212/13 212/14
214/1 216/11
217/23 219/10

**shut [2]**    54/16
188/3

**side [46]**    8/7 21/3
21/14 23/1 23/4
31/11 31/22 32/3
32/5 32/12 35/15
40/11 47/16 49/2

56/2 72/11 72/12
72/14 83/1 146/1
146/4 146/5 155/14
155/15 155/24
156/1 158/5 158/9
158/21 159/15
159/20 161/18
161/19 166/19
166/20 166/24
166/24 174/14
185/14 193/19
210/14 210/15
210/19 210/22
213/8 221/20

**sidebar [4]**    155/22
158/19 161/10
162/1

**sides [1]**    221/19

**Siemens [3]**    53/5
53/6 98/1

**signature [68]**
65/4 67/2 67/6
67/9 70/22 71/19
104/10 119/11
120/7 120/21 121/3
121/7 121/8 121/9
121/12 122/20
123/12 123/13
124/4 124/6 124/7
124/10 125/1 125/3
125/5 152/11
152/11 152/12
152/13 180/8
208/12 208/13
208/16 208/19
211/12 212/5 213/4
213/5 213/7 213/8
213/10 213/14
213/18 214/1 214/1
214/3 214/3 214/7
214/8 214/10
214/13 214/17
214/19 214/21
215/8 215/12

215/14 215/21
216/14 216/15
216/17 216/18
217/5 218/10
218/10 219/5

**signatures [6]**
104/14 207/11
208/11 213/16
218/2 218/4

**signed [14]**    17/2
67/4 71/22 78/2
83/6 87/7 104/11
124/5 125/7 150/20
151/25 153/13
166/4 210/7

**significance [1]**
213/13

**significant [1]**
206/16

**significantly [1]**
54/23

**signing [1]**    152/9

**Silk [10]**    205/7
205/9 205/10
205/14 205/17
205/18 205/23
206/2 206/13
206/16

**silver [1]**    90/16

**similar [2]**    154/15
215/5

**simple [13]**    24/19
35/9 43/12 77/1
77/6 80/22 90/2
92/23 93/5 102/9
108/13 108/24
196/5

**simply [8]**    85/10
99/22 101/12
106/11 110/22
154/20 161/9
200/12

**simultaneously [1]**

**S**

simultaneously...
**[1]** 108/21

**since [5]** 10/8
10/12 87/20 115/4
208/18

**Singapore [1]**
19/18

**single [19]** 13/25
16/22 17/5 17/6
20/19 22/23 24/20
24/22 24/23 77/17
78/22 79/11 85/9
136/16 136/21
136/22 153/10
190/1 209/1

**sir [13]** 27/21
60/21 60/24 61/3
111/8 126/20
148/25 150/10
161/11 202/21
202/24 204/21
207/22

**sisters [1]** 176/19

**sit [5]** 75/3 77/12
80/8 194/24 202/5

**site [3]** 205/19
205/20 206/1

**sites [1]** 205/20

**sits [1]** 80/1

**six [12]** 48/7 55/7
55/7 55/11 55/11
55/11 56/11 74/21
85/8 111/2 111/9
173/25

**Skype [3]** 129/9
129/12 129/25

**Slack [12]** 116/2
168/14 169/7
170/16 171/2 172/5
172/5 173/14 174/9
181/24 190/13
200/21

**slave [2]** 79/2
92/14

**slice [1]** 194/4

**slide [9]** 198/11
212/1 213/1 213/22
214/25 216/6
216/21 217/18
218/18

**slides [1]** 219/9

**slightly [1]** 217/6

**SLOC [1]** 47/2

**slowed [1]** 108/9

**small [3]** 41/15
74/20 75/12

**smaller [1]** 179/13

**smart [3]** 83/18
85/4 85/4

**smiley [1]** 104/16

**so [314]**

**social [1]** 29/5

**software [98]**
35/17 35/19 35/23
36/4 36/7 36/10
36/15 40/4 42/11
42/14 42/22 43/3
43/9 43/13 43/16
43/17 43/23 44/12
45/4 45/6 45/10
45/11 45/11 45/14
45/16 45/23 46/18
46/18 46/25 47/1
47/1 47/2 47/8
47/9 47/10 48/4
49/3 49/6 49/8
49/10 49/20 50/9
51/2 51/12 51/15
51/18 52/15 53/5
53/5 53/6 55/9
55/11 56/18 56/19
57/6 57/8 57/11
64/23 64/24 78/8
78/9 78/11 78/23
79/11 83/2 88/1
88/5 88/6 88/13

89/3 89/3 89/19
89/22 89/24 90/1
90/3 90/4 90/5
90/6 90/9 91/5
91/5 98/1 98/1
98/2 101/15 101/15
101/21 101/22
108/12 109/22
117/21 137/6 137/8
178/15 213/18
214/2 214/5

**sold [8]** 19/17
24/7 49/10 81/25
101/18 101/21
101/22 185/12

**Solicitor [1]** 33/6

**solution [1]** 53/16

**some [44]** 20/8
24/24 28/6 30/13
32/19 41/18 42/18
79/4 79/6 79/7
79/10 79/10 80/14
80/14 84/14 85/19
90/17 96/18 99/10
102/24 108/19
108/24 109/7
132/18 138/14
139/19 145/9 149/9
156/9 165/2 173/2
179/23 179/23
180/12 191/20
194/23 198/22
202/19 208/5 208/7
208/7 209/2 221/24
222/3

**somebody [6]**
189/13 189/20
190/14 191/2
213/12 213/13

**somebody's [1]**
17/14

**somehow [1]** 156/15

**someone [20]** 26/10
28/15 29/6 36/17

USCA11 Case: 22-11150    Document: 53-12    Date Filed: 11/30/2022    Page: 30 of 254

**S**

**someone... [16]**
37/24  39/6  41/20
48/23  58/6  60/22
76/24  77/16  77/17
77/18  80/1  95/5
110/9  174/9  208/14
214/20

**something [53]**
11/10  26/24  29/2
34/25  36/4  36/8
40/18  41/14  43/13
43/17  50/5  51/25
55/13  56/25  57/14
57/15  57/16  57/16
57/17  57/20  63/9
71/14  77/19  77/20
79/13  79/17  80/6
90/16  90/20  90/21
92/24  98/12  102/2
102/4  109/16
136/13  146/10
149/11  150/19
153/7  153/23
160/16  165/24
165/25  174/25
175/4  186/5  186/6
186/21  187/9
196/16  210/6
217/10

**sometimes [2]**
173/25  199/18
**somewhat [1]**  60/8
**somewhere [3]**
178/18  178/18
199/19
**Sommer [13]**  10/5
33/6  37/13  38/6
38/21  40/12  127/24
128/11  128/22
132/18  133/5
167/21  177/13
**Sommer's [1]**  15/16

**son [1]**  11/20
**sorry [58]**  9/6
10/24  11/1  11/6
13/9  20/13  26/14
30/7  30/18  31/19
34/4  34/6  40/5
41/17  44/10  44/18
47/21  52/3  56/2
58/16  62/18  62/22
65/1  66/14  66/21
67/2  68/14  72/21
73/17  74/4  74/9
75/24  77/19  85/7
85/23  91/16  96/2
98/7  116/15  125/6
125/23  130/14
139/13  139/24
142/19  143/9
146/12  155/18
167/4  172/10
173/16  177/7  183/7
186/19  186/20
189/2  191/13
201/14
**sort [14]**  12/5
19/13  29/1  49/17
51/16  66/4  73/17
89/11  107/9  156/15
170/17  177/5
196/15  208/19
**sorts [1]**  79/5
**Soto [1]**  200/3
**sought [1]**  91/2
**sounds [4]**  18/5
108/8  108/16
108/16
**source [24]**  43/24
44/2  47/6  47/12
47/13  52/24  52/24
53/5  53/13  53/15
53/15  54/3  54/3
54/21  54/21  56/14
56/16  80/20  86/14
88/8  110/18  117/24

118/3  213/18
**sourced [1]**  108/7
**SourceForge [1]**
118/1
**South [3]**  1/14
92/24  199/14
**Southeast [1]**  1/17
**SOUTHERN [4]**  1/1
206/12  224/3  224/6
**speak [6]**  34/6
79/16  96/20  202/24
204/21  220/19
**speaking [2]**  61/2
63/4
**speaks [2]**  29/22
219/13
**specialized [1]**
55/9
**specified [1]**
194/9
**speculation [1]**
219/24
**spell [1]**  202/16
**spend [2]**  21/9
26/9
**spending [3]**  12/11
90/21  199/11
**spent [8]**  15/22
21/13  25/18  25/25
26/8  173/2  176/12
197/5
**spoke [1]**  58/14
**spoken [1]**  33/7
**spreadsheet [8]**
105/4  105/8  106/1
106/4  107/2  107/21
107/25  109/3
**spreadsheets [2]**
106/5  110/8
**ss [1]**  224/2
**stabilize [1]**
67/21
**stable [1]**  54/4
**staff [23]**  17/9

**S**

USCA11 Case: 22-11150    Document: 53-12    Date Filed: 11/30/2022    Page: 32 of 254

**staff... [22]**
25/21 44/1 55/13
57/15 78/25 79/3
79/6 80/12 83/25
84/4 84/23 85/6
102/25 146/6
146/10 165/4 165/5
178/11 178/11
191/19 191/20
191/21
**stage [7]**   50/6
78/6 109/25 136/21
180/21 182/3
197/13
**stamp [4]**   30/2
208/14 208/20
214/8
**stamps [1]**   152/4
**stand [1]**   194/13
**standard [1]**
157/14
**standards [1]**   49/8
**standing [1]**
202/12
**stands [3]**   23/11
41/4 47/2
**start [20]**   10/20
11/3 12/25 41/18
50/3 57/13 59/6
62/20 64/1 64/2
93/11 93/13 121/16
148/4 173/24
196/22 199/13
210/6 217/10
222/23
**start-up [1]**   41/18
**started [13]**   4/5
9/4 10/24 12/8
13/5 41/12 41/15
57/19 80/9 108/8
116/5 181/25 222/4
**starting [6]**   4/8

34/21 48/20 50/6
102/14 180/18
**starts [3]**   10/15
66/10 68/16
**state [4]**   4/7 5/20
33/11 202/16
**stated [21]**   13/24
34/18 40/14 43/5
51/9 57/10 72/22
115/21 146/5
149/20 150/8 153/5
154/3 165/3 174/19
175/9 182/1 182/23
201/1 220/18
222/20
**statement [7]**   7/6
23/11 88/24 89/2
154/18 177/23
200/22
**statements [1]**
11/7
**STATES [4]**   1/1
1/10 224/1 224/6
**stating [3]**   49/13
184/6 203/6
**stay [1]**   83/19
**stefan [30]**   41/20
59/5 59/7 59/8
59/8 59/10 59/24
61/15 62/3 62/4
69/11 74/24 81/11
81/12 81/14 81/24
82/4 82/13 86/7
87/7 99/14 99/22
106/21 123/22
129/8 129/13 133/4
137/5 142/3 197/2
**stenographic [1]**
224/11
**step [1]**   202/11
**STEPHEN [4]**   1/16
1/17 4/16 4/18
**steps [1]**   83/7
**Sterling [6]**   58/15

58/16 64/18 73/14
**Steve [1]**   180/12
**Steven [2]**   71/16
95/1
**stick [1]**   194/10
**still [19]**   34/4
36/6 41/4 55/19
57/22 74/19 78/22
92/16 92/19 99/18
100/6 100/7 100/10
101/23 101/24
104/10 108/25
110/2 191/22
**stock [1]**   68/9
**stone [2]**   118/4
118/5
**stop [8]**   95/6
111/2 111/3 162/16
189/7 210/4 220/9
220/11
**stopped [2]**   95/6
188/3
**stopping [3]**   80/20
80/21 80/22
**strange [2]**   76/15
108/16
**strangely [2]**
28/11 59/21
**Strasan [1]**   10/11
**strategy [1]**   97/19
**Street [1]**   1/17
**stress [1]**   207/20
**strike [2]**   18/15
29/10
**string [1]**   213/12
**strip [2]**   78/2
80/6
**stripped [1]**   82/16
**stripping [3]**   75/7
75/14 82/22
**structure [4]**
197/9 207/9 214/4
214/6

# S

**structured [2]**
135/4 136/17
**structuring [2]**
128/25 136/17
**studies [2]**  204/8
204/12
**studio [1]**  82/24
**stuff [9]**  17/2
36/11 45/8 59/12
93/12 127/11
136/20 197/4 197/5
**stupid [5]**  15/21
19/25 37/5 37/6
83/16
**stupidest [1]**
36/25
**stupidly [1]**  45/21
**subject [12]**  52/7
65/24 70/4 86/8
129/10 153/8 153/9
153/9 153/11
153/11 155/4 166/2
**subsidiaries [1]**
67/23
**substance [1]**
207/4
**substantive [1]**
93/20
**succeed [1]**  51/23
**succeeded [1]**  54/8
**successful [1]**
187/8
**such [2]**  101/8
208/16
**sucks [1]**  135/25
**sufficiently [1]**
162/11
**suggest [1]**  75/3
**suggesting [1]**
190/15
**suggests [4]**
154/19 213/17

214/20 219/22
**Suite [3]**  1/13
1/17 1/22
**summarize [1]**
206/23
**summary [2]**  20/2
66/19
**sunk [1]**  176/12
**supercomputer [2]**
55/3 156/12
**supercomputers [4]**
178/4 178/8 178/25
179/7
**supply [1]**  40/25
**support [3]**  49/18
53/16 204/18
**supported [2]**
205/4 206/1
**supports [1]**
204/17
**supposed [4]**  28/12
158/4 158/11
205/18
**Supreme [1]**  14/7
**sure [24]**  7/16
23/7 39/2 64/10
85/9 112/1 120/23
122/2 152/4 169/21
186/7 187/18 196/7
196/14 197/14
203/25 206/10
207/2 207/8 208/2
211/17 213/6 218/4
221/25
**surrounding [1]**
139/10
**sustain [1]**  193/16
**sustained [23]**
17/17 22/15 22/18
29/23 39/14 66/15
91/22 96/24 118/18
129/19 137/21
151/16 152/22
153/16 154/22

159/12 165/14
188/20 192/6
193/5 197/18
201/17
**swear [1]**  136/2
**Swiss [1]**  196/2
**switching [1]**
125/19
**swore [1]**  136/2
**SWORN [1]**  202/14
**system [23]**  53/21
55/4 55/17 89/4
89/5 90/10 90/15
90/22 118/6 163/22
176/5 176/6 176/10
176/11 177/4
179/10 179/13
179/14 179/18
197/8 199/4 199/7
199/25
**systems [3]**  155/8
200/2 204/10

# T

**table [2]**  77/1
114/4
**tables [1]**  180/17
**Tais [1]**  80/8
**take [52]**  8/13
8/21 21/3 21/17
27/8 31/13 38/23
43/1 49/1 54/15
57/12 57/14 59/15
60/4 60/13 70/9
76/25 78/9 78/22
79/12 80/7 80/18
80/20 81/2 81/14
82/2 83/7 100/25
101/17 111/4
111/12 111/13
112/8 115/6 121/4
151/17 160/19
162/18 162/18
162/20 169/22

**T**

**take... [11]**
172/24 187/21
188/6 197/2 197/6
199/7 199/8 210/21
211/6 215/16
221/22
**taken [3]** 30/21
31/6 33/20
**takers [1]** 176/9
**takes [2]** 14/4
92/21
**taking [2]** 49/16
159/9
**talk [9]** 14/25
33/5 39/19 83/5
93/8 130/22 130/25
194/22 194/23
**talked [8]** 56/6
57/24 58/1 58/6
178/21 182/1
196/18 200/3
**talking [38]** 11/19
14/18 19/21 27/20
34/4 42/24 43/8
44/3 44/8 44/9
45/10 48/10 55/14
56/20 58/8 59/7
61/16 69/11 74/8
106/12 117/2
128/22 131/13
132/3 134/25 137/8
138/13 142/3 172/6
172/7 172/9 172/10
176/10 176/11
191/6 191/7 191/24
199/5
**talks [1]** 65/9
**Taproot [1]** 117/7
**targeted [1]** 38/17
**targets [1]** 41/18
**tax [45]** 7/1 8/8
8/12 9/10 10/22

11/7 12/9 12/13
13/2 13/12 19/60
20/1 21/9 23/8
24/2 24/20 24/25
37/18 37/20 37/21
38/13 38/16 42/14
42/17 50/19 53/7
54/15 61/18 77/5
82/19 86/19 86/22
186/2 186/16 187/8
187/9 187/13
187/20 187/23
196/14 196/17
197/4 197/10
197/11 197/12
**taxation [36]** 7/2
7/4 7/19 10/6
10/15 10/20 12/1
12/4 14/16 16/6
16/19 18/6 18/15
18/17 21/8 24/12
24/17 27/9 28/6
28/23 29/14 30/2
32/16 32/18 34/12
36/22 37/14 38/7
40/11 88/3 134/19
135/15 137/6 141/7
182/13 197/12
**taxed [1]** 14/11
**taxing [1]** 19/25
**team [15]** 17/1
34/8 52/18 55/21
55/22 111/24
146/14 146/15
171/15 176/23
176/25 178/13
178/24 203/20
222/3
**tech [1]** 85/6
**technical [2]**
49/20 91/9
**technically [18]**
50/1 66/22 84/17
100/3 116/6 178/17

179/25 187/15
195/24 196/4 198/7
198/9 198/23
198/24 199/23
200/7
**technique [2]**
46/17 46/17
**Technologies [2]**
119/15 123/7
**technology [4]**
67/23 73/14 146/16
200/1
**tell [24]** 11/6
12/23 18/1 19/3
20/24 78/1 78/16
79/3 79/14 81/2
110/13 121/19
124/12 141/8 159/5
181/1 187/14
203/15 203/24
207/5 208/1 213/4
213/25 214/18
**telling [1]** 82/14
**tells [2]** 11/24
79/14
**Temenos [6]** 43/18
43/18 47/9 51/12
51/21 90/8
**ten [2]** 14/1 14/4
**tenth [1]** 12/15
**term [19]** 17/15
65/11 65/21 66/2
66/21 71/2 71/22
72/3 72/6 72/14
72/22 73/25 78/2
82/10 83/25 91/9
119/16 135/21
142/21
**terms [4]** 7/10
10/10 45/19 66/20
**testified [12]**
60/10 116/3 130/1
157/1 157/11

**T**

**testified [7]**
161/13 161/20
162/6 194/10
194/13 200/24
212/22
**testify [2]**   92/13
111/19
**testifying [1]**
102/22
**testimony [15]**
5/13 6/10 60/8
60/25 61/2 61/10
94/6 116/17 178/25
183/14 191/15
208/8 218/5 218/13
219/25
**Testnet [3]**   178/3
178/20 178/24
**text [9]**   102/13
104/2 145/25
149/11 158/10
213/13 214/3 217/4
217/5
**than [28]**   8/11
24/7 35/2 36/10
49/16 49/22 49/24
51/11 53/22 54/8
54/9 54/13 77/22
77/23 80/23 83/17
85/1 89/13 90/12
104/21 108/14
135/1 136/17 148/9
155/17 188/12
216/16 216/18
**Thank [48]**   10/7
20/13 27/4 30/10
36/19 39/16 41/5
42/8 46/13 46/21
54/1 62/15 64/15
66/17 69/16 72/24
90/24 97/2 98/3
100/22 102/10

102/15 105/1
114/4 117/15
118/19 119/3
119/24 127/1 137/1
139/6 141/11
150/14 170/21
172/25 175/17
181/18 182/10
183/3 183/23 191/9
201/11 202/8
202/15 204/22
207/23 221/1
222/16
**that [913]**
**that's [114]**   8/20
9/19 9/20 12/16
15/13 18/10 18/23
22/14 23/16 25/18
25/19 26/2 26/5
30/5 32/10 35/3
36/25 38/17 40/19
41/9 42/13 42/16
43/24 43/25 44/3
47/7 47/10 47/12
48/23 48/25 51/10
55/12 56/2 56/17
56/24 56/25 58/13
59/11 64/9 66/9
66/22 67/6 67/9
67/16 69/2 69/13
73/24 75/1 76/25
89/16 90/12 93/14
103/3 105/21
107/21 108/1
112/12 115/11
115/21 117/20
119/4 120/21 121/9
121/15 122/1 124/9
127/20 130/3
131/13 139/15
145/2 150/20
152/10 153/4
153/10 157/6
157/25 158/2

159/17 160/12
160/15 160/16
160/22 161/15
169/14 171/2 171/8
172/1 174/14
175/15 178/6
178/23 179/1 179/4
181/1 185/21
188/14 188/17
190/20 191/6
193/19 200/8
200/21 204/5
207/10 207/18
207/19 209/10
209/22 213/9
213/10 215/13
215/17 222/16
**their [15]**   5/20
21/16 43/22 43/23
51/14 51/14 64/19
64/23 146/23
148/20 183/1 195/7
200/1 200/4 202/6
**them [56]**   5/18
8/16 13/18 14/5
14/10 17/5 17/14
20/11 21/14 24/6
24/7 24/13 27/12
32/24 33/22 34/22
34/23 39/4 40/15
40/16 55/13 55/14
56/13 59/25 77/6
77/19 77/20 79/4
79/6 79/8 79/9
80/12 80/14 80/14
100/9 101/17 108/8
110/12 111/12
118/12 121/14
126/4 126/19 134/8
134/8 136/19
136/20 138/13
141/8 168/19
182/14 188/1 188/6
194/21 199/8 210/5

# T

**then [73]**  8/9  8/22
9/15  10/2  10/4
11/17  11/23  12/21
15/24  18/6  18/14
19/18  19/18  19/20
21/6  25/23  33/12
35/9  39/24  41/1
41/17  42/14  48/12
48/18  48/21  51/7
57/24  67/8  76/23
79/9  79/16  82/2
84/17  91/11  95/8
100/8  103/2  104/19
108/8  109/13
111/10  116/8  136/1
136/3  136/5  136/23
147/11  156/23
157/17  173/21
178/23  179/13
179/24  180/20
186/3  186/16
186/17  187/16
187/20  188/6
190/16  193/23
196/8  197/15  198/6
212/14  213/7  215/6
221/7  221/22
221/23  222/15
222/20

**theories [1]**  157/6
**there [110]**  5/12
5/18  11/25  13/11
13/21  17/3  18/21
18/23  19/5  19/6
19/8  24/23  26/1
36/7  37/21  38/13
47/5  47/12  48/11
50/4  52/22  53/4
58/8  58/9  58/11
66/9  70/13  71/5
77/13  77/24  78/8
79/12  80/1  80/8

80/23  82/5  89/10
89/15  90/23  91/6
91/8  93/2  96/9
97/2  98/23  98/25
99/1  99/18  102/24
102/24  103/3
103/13  103/15
103/15  104/21
105/25  112/5
114/13  117/7
118/10  130/24
136/22  139/14
140/20  141/17
144/15  144/18
146/17  152/8  154/5
163/21  169/15
170/6  170/7  170/8
172/3  172/13  175/9
175/21  175/25
176/5  176/23  177/5
179/14  179/22
179/23  180/1
180/11  189/11
189/18  190/22
190/25  194/24
195/8  195/18
195/19  195/25
199/16  199/17
199/22  204/24
208/25  212/11
212/18  213/10
213/15  214/4  217/1
218/3  221/3

**there's [65]**  5/14
8/1  8/24  10/2  11/8
12/3  12/4  14/24
43/14  43/15  43/21
43/24  43/25  57/20
67/19  69/19  79/23
89/10  92/20  94/4
94/6  98/11  103/1
104/18  110/12
136/12  137/6  149/9
149/10  151/23

153/1  153/7  154/1
154/21  156/11
157/9  158/25  165/3
165/24  165/25
166/16  168/19
168/22  170/5
170/15  180/15
180/24  182/6  184/5
190/15  192/14
195/25  196/1  196/1
196/4  199/1  199/9
199/20  214/4
215/12  217/1  221/4
222/14

**these [47]**  7/11
15/20  19/8  35/18
40/15  41/13  48/6
50/12  51/7  56/15
66/21  73/16  75/8
75/10  83/1  88/4
89/7  89/10  95/4
101/18  106/2
106/10  106/20
109/25  110/9
110/18  110/22
126/14  133/15
135/16  136/6
136/12  136/18
143/17  157/10
173/6  178/11
178/12  184/19
186/9  196/3  196/8
198/7  199/15
208/24  210/23
219/8

**thesis [1]**  108/16
**they [161]**  5/12
5/16  5/17  5/17
5/20  8/9  10/22
10/23  10/24  12/3
12/10  14/8  15/13
15/14  15/14  15/15
16/20  16/21  16/21

**T**

**they... [142]**
16/22 16/24 16/24
17/5 17/7 18/9
20/17 20/20 20/23
21/13 21/16 21/16
22/5 22/8 27/10
27/13 27/13 28/6
28/7 28/14 28/14
29/15 29/16 30/12
31/1 32/18 32/22
33/22 34/8 34/23
34/24 34/25 35/3
36/8 36/9 40/4
42/11 43/19 43/20
48/17 48/18 48/25
49/21 49/21 51/21
51/21 51/22 51/23
51/23 51/25 51/25
53/8 54/15 54/16
55/25 64/5 64/5
78/7 79/6 79/10
79/17 79/24 79/25
80/12 80/12 80/13
80/13 80/14 80/15
84/15 84/24 86/20
88/4 92/18 95/12
95/22 96/17 97/25
101/23 102/3 102/4
109/7 109/8 110/4
134/21 134/21
134/25 136/15
139/13 157/7
161/22 161/23
175/7 175/18
175/19 176/16
177/1 177/1 179/25
183/1 187/21
187/24 187/25
188/2 188/4 188/5
188/8 188/9 188/9
188/11 188/12
188/16 191/12

195/16 196/16
196/18 196/19
196/22 196/25
197/6 197/25 198/1
198/4 198/6 199/17
199/21 200/1 200/4
200/4 200/5 200/5
200/7 200/13
201/14 208/3 209/7
209/7 209/9 218/2
218/12 219/6
220/23

**they'd [1]**   12/13
**They'll [1]**   108/14
**they're [20]**   26/25
56/13 56/24 77/15
80/13 80/15 80/16
80/16 85/6 105/6
106/12 108/19
155/7 157/4 157/5
167/3 167/4 167/4
186/9 200/8

**they've [2]**   157/6
157/8

**thing [42]**   5/14
8/23 11/8 12/15
14/7 15/21 19/14
21/3 35/7 35/8
35/23 36/25 37/4
43/15 56/2 56/3
56/6 58/12 76/21
77/7 78/10 80/2
82/6 83/4 83/19
90/18 103/4 107/9
111/10 136/17
139/14 147/11
166/16 175/3
178/10 179/18
181/1 183/1 187/16
188/3 190/1 194/20

**things [49]**   17/2
19/8 41/14 45/18
47/13 55/14 56/16
58/4 59/1 62/18

62/19 62/20 64/2
83/22 92/20 95/4
106/10 106/20
110/18 129/13
130/1 130/16
134/21 138/24
157/10 173/6
174/19 178/18
184/20 186/20
189/23 189/25
191/6 191/18 192/2
195/19 196/3
196/20 197/9 198/1
198/22 199/1
205/11 208/7 219/8
221/4

**think [32]**   7/9
13/10 18/21 28/10
28/12 31/24 41/11
48/17 50/10 51/19
53/22 63/10 76/23
79/19 79/20 90/18
93/14 96/21 96/21
99/22 121/23 131/6
171/15 171/16
172/15 188/8
188/13 210/19
211/7 216/24 219/6
222/12

**thinking [3]**   29/2
51/20 190/2
**thinks [1]**   78/8
**third [24]**   16/9
96/3 96/7 96/13
96/14 97/1 97/4
97/4 97/6 97/8
97/14 97/17 97/21
97/22 101/7 101/13
130/22 130/24
130/25 146/6 174/3
177/23 194/3
208/10

**third-party [10]**

**T**

**third-party... [10]**
96/3 96/14 97/1
97/4 97/4 97/6
97/8 97/21 101/7
101/13
**thirds [1]** 180/1
**Thirty [1]** 77/21
**this [400]**
**those [46]** 5/16
8/5 34/9 36/2
36/23 55/8 56/11
75/14 77/5 97/20
100/25 101/22
106/11 108/18
109/5 109/11
117/13 117/25
129/13 131/17
134/10 134/24
176/15 178/9
178/16 180/14
182/15 187/19
188/7 194/17
195/16 196/22
199/17 199/25
200/3 200/7 206/2
206/9 206/22 207/5
207/12 208/7
210/14 211/6
219/12 220/4
**though [7]** 14/9
92/6 152/2 154/18
157/23 172/6 214/3
**thought [5]** 53/22
82/4 83/19 99/9
197/6
**thousand [7]** 17/11
55/7 55/8 55/12
55/12 77/21 191/4
**thousands [1]** 44/1
**three [13]** 8/13
9/2 11/20 12/12
48/17 50/11 50/11

77/17 84/12 109/1
192/1 207/13
208/24
**threshold [1]**
179/24
**threw [1]** 136/3
**through [33]** 1/8
5/19 5/21 6/16
6/20 19/2 46/10
47/6 57/21 58/20
59/5 59/23 69/5
73/9 73/21 84/7
95/16 105/17
105/21 111/11
111/14 121/23
122/1 131/17
133/15 133/17
143/19 152/16
171/16 176/6 179/4
212/8 212/16
**throughout [2]**
73/12 97/5
**throw [1]** 191/3
**thus [1]** 42/20
**tied [2]** 47/12
71/5
**tile [1]** 114/5
**till [2]** 93/4
99/19
**time [59]** 10/7
10/10 13/25 17/5
18/10 28/10 28/14
33/2 38/17 41/7
41/9 44/19 57/11
58/1 60/1 61/18
62/17 63/10 80/9
82/18 83/10 84/16
92/20 92/22 94/12
98/5 104/13 111/1
112/2 114/12
146/12 149/10
152/4 162/18
169/23 169/23
173/2 179/17

180/22 180/25
201/22 202/1
202/19 204/24
212/14 212/18
212/19 212/20
212/23 214/8
214/17 216/12
218/14 219/2
220/12 222/3 222/9
**timeline [7]** 6/16
6/20 8/23 8/25 9/5
10/25 11/23
**times [14]** 40/14
54/23 54/25 60/24
92/13 93/12 95/7
97/22 135/24
135/25 136/12
154/3 188/15 199/5
**timestamp [2]**
219/4 219/4
**timing [2]** 111/7
115/18
**Timothy [1]** 189/20
**tingling [1]** 57/21
**tipped [1]** 187/12
**title [2]** 87/15
154/21
**titled [2]** 45/4
185/13
**today [12]** 78/9
78/22 78/23 78/24
80/2 115/10 157/2
175/12 175/16
176/7 194/7 220/3
**together [9]** 10/7
48/9 79/20 109/19
174/22 175/7 176/2
176/3 176/10
**told [13]** 13/13
15/11 33/15 33/22
34/2 34/10 55/3
59/12 62/17 78/3
165/7 182/3 182/13

**T**

USCA11 Case: 22-11150    Document: 3-1    Date Filed: 06/2011/30    Page: 39 of 254

**tomorrow [4]**   75/4
220/4 221/2 222/22

**Tomorrow's [1]**
220/14

**Tomothy [1]**   190/14

**tongue [1]**   47/12

**tongue-tied [1]**
47/12

**too [7]**   4/21 13/8
19/22 21/16 92/21
136/14 171/5

**took [8]**   19/16
43/13 48/5 77/10
84/13 84/22 118/22
180/3

**tool [2]**   46/19
213/18

**tools [1]**   213/15

**top [28]**   20/5
25/25 26/11 30/2
37/16 38/6 45/1
65/9 71/3 92/3
94/13 100/19 107/8
107/8 108/21
120/21 128/12
129/22 138/3
140/20 143/7
146/22 153/4 155/3
209/22 213/17
214/4 215/5

**total [5]**   26/6
51/7 56/17 108/12
109/9

**totally [1]**   76/23

**totals [1]**   48/3

**touch [1]**   36/23

**Tourist [2]**   19/9
20/23

**toward [1]**   74/17

**tracing [4]**   112/23
113/1 113/3 114/20

**tracking [1]**
108/11

**tracks [1]**   106/22

**trade [3]**   54/5
84/6 110/17

**traded [3]**   84/15
87/20 185/17

**trading [8]**   54/4
100/4 184/1 184/6
184/18 185/4
185/12 185/13

**traditional [1]**
54/6

**trailing [1]**
207/21

**transaction [15]**
8/19 13/22 16/23
17/7 20/17 20/19
20/24 20/25 21/7
21/15 22/7 22/14
54/22 54/23 54/25

**transactions [7]**
8/2 8/4 12/5 13/25
17/4 112/24 118/23

**transcribe [1]**
40/18

**transcript [11]**
1/9 40/10 129/9
129/23 129/25
186/14 186/15
186/25 224/10
224/11 224/12

**transcripted [1]**
40/16

**transcripts [4]**
40/15 134/20
134/21 134/24

**transfer [7]**   8/5
35/24 35/25 44/9
100/4 137/8 187/24

**transferred [6]**
39/24 40/4 41/1
43/6 56/14 110/3

**transfers [1]**
187/21

**transform [1]**   48/8

**transformed [1]**
48/6

**transmit [1]**   93/1

**trial [5]**   1/9
108/17 116/5
156/16 222/4

**trick [1]**   48/16

**tried [16]**   12/10
15/18 21/16 49/15
53/3 59/8 62/11
89/11 89/12 89/13
89/13 89/15 176/20
182/1 187/25
188/16

**trio [5]**   173/15
173/16 173/18
173/19 174/10

**trip [1]**   176/20

**trouble [1]**   74/19

**true [17]**   13/16
33/14 34/2 34/10
82/17 114/15 115/8
117/2 155/6 173/8
187/4 192/3 192/4
196/7 198/15
201/13 224/10

**trust [31]**   17/14
18/3 28/12 40/25
48/12 62/5 95/9
112/16 148/2
182/14 183/6 184/4
185/2 185/15
185/22 185/23
185/25 186/16
187/18 190/16
190/16 191/3
195/23 195/24
196/4 196/6 197/15
199/1 199/2 210/6
217/10

**Trust's [1]**   182/23

**trustee [2]**   196/7
197/14

USCA11 Case: 22-11150    Document: 12    Date Filed: 11/30/2022    Page: 406 of 234

**T**

**trusts [7]** 10/23 186/9 187/5 187/6 187/7 190/16 196/8

**truth [4]** 37/25 124/12 179/15 195/3

**try [17]** 5/21 7/23 34/6 48/22 49/22 50/2 50/3 55/9 58/11 78/10 78/23 79/12 101/25 102/6 143/21 186/20 197/4

**trying [32]** 16/2 21/1 21/5 21/12 23/7 36/15 45/21 54/12 54/13 55/10 55/18 55/23 56/3 56/7 57/1 61/19 64/12 76/23 86/22 90/10 93/3 101/24 102/1 102/5 102/8 112/1 131/14 136/18 171/25 176/8 188/4 205/23

**Tuesday [1]** 5/15

**Tulip [16]** 179/11 179/12 182/14 183/6 184/1 184/4 184/6 184/18 185/2 185/3 185/12 185/13 185/15 195/23 195/24 196/6

**tumble [1]** 198/7

**turned [5]** 24/2 59/11 59/22 77/24 191/24

**turns [2]** 34/20 40/18

**Twelve [1]** 79/22

**Twitter [2]** 79/4

191/22

**two [31]** 11/20 11/24 11/25 12/11 25/4 35/25 48/5 53/10 59/24 83/3 89/2 103/12 105/6 116/5 126/19 134/10 134/11 146/20 155/13 170/8 175/7 180/1 184/2 191/6 192/23 198/1 210/17 215/5 218/4 219/9 221/4

**two-thirds [1]** 180/1

**type [3]** 180/7 180/9 180/9

**typical [1]** 85/2

**typo [1]** 219/17

**typos [1]** 219/19

**U**

**U.S [4]** 1/24 206/11 221/11 221/12

**Uh [1]** 160/1

**Uh-huh [1]** 160/1

**UK [1]** 99/14

**Ulbricht [1]** 206/17

**unbelievable [2]** 108/16 108/24

**uncle [2]** 176/19 179/23

**unclear [1]** 218/5

**under [11]** 6/10 29/4 53/10 86/15 88/2 117/23 118/3 199/6 199/12 199/18 202/13

**underlying [1]** 44/16

**underneath [2]** 159/1 190/22

**understand [12]** 61/3 81/14 91/17 121/22 126/20 126/21 169/25 186/8 218/13

**understanding [4]** 182/2 209/10 214/16 218/17

**undertaken [2]** 53/17 94/25

**undertaking [1]** 95/17

**undisclosed [1]** 76/16

**unfair [2]** 8/21 157/9

**unfortunately [11]** 12/14 54/17 75/16 84/12 92/21 100/11 104/24 131/16 175/5 177/4 182/8

**unilateral [1]** 176/4

**unimproved [1]** 36/11

**Unit [2]** 204/19 205/5

**UNITED [4]** 1/1 1/10 223/2 224/6

**Universe [1]** 52/25

**universities [2]** 108/18 108/19

**University [1]** 204/1

**unless [5]** 7/10 81/2 91/6 91/10 144/16

**Unlike [2]** 89/9 89/14

**unlock [1]** 194/4

**unnecessary [1]** 112/2

**unpunished [1]**

# U

**unpunished... [1]**
33/4

**until [15]**   12/13
14/5 14/9 14/10
14/25 31/13 66/8
66/16 82/2 93/21
174/25 179/19
192/18 192/25
214/11

**unwilling [1]**
97/17

**up [170]**   9/6 9/23
11/2 11/5 11/12
14/10 17/5 18/21
19/24 23/2 24/13
25/19 28/17 29/4
31/11 31/17 32/25
35/12 37/3 38/14
40/7 41/1 41/12
41/18 41/23 44/4
45/5 45/19 47/17
48/20 50/2 50/13
52/4 53/9 53/10
56/11 61/11 62/23
64/25 66/8 66/16
67/8 67/21 69/4
69/6 70/11 72/13
74/5 75/15 75/16
75/19 77/17 79/4
81/8 82/9 83/19
85/22 86/4 88/19
91/9 91/11 91/25
92/21 95/14 98/8
100/13 102/11
106/15 108/14
110/16 110/24
113/18 115/3
115/12 119/25
120/14 123/4
123/20 124/7
124/21 125/17
127/2 127/21 128/8

128/19 129/6
130/1 130/22 131/16
131/23 132/15
133/1 133/14 134/9
134/17 136/15
136/15 137/2
137/14 138/10
139/7 140/5 140/18
141/12 141/24
144/20 144/21
145/1 145/5 145/20
147/12 148/5 149/5
150/15 151/7
151/19 154/16
154/23 155/25
156/4 158/20
161/16 161/17
162/3 163/18
163/20 164/20
165/19 166/11
166/19 167/18
168/4 169/20
169/22 174/24
175/24 176/12
177/7 177/9 179/19
181/7 181/11
182/17 183/8
184/13 186/3 186/9
186/20 188/21
189/1 189/2 189/5
189/8 189/16
189/16 191/24
193/19 194/19
194/20 197/8
200/18 204/21
206/5 209/11
209/12 209/24
210/11 210/14
211/7 215/16
221/22

**up P135 [1]**    145/20
**up P540 [1]**    149/5
**up P630 [1]**    154/23
**updates [1]**    99/10

**upgrade [1]**    51/14
**uphold [1]**    117/25
**upon [4]**    68/7
72/16 117/3 196/19
**upper [2]**    114/5
114/19
**us [71]**    4/20 4/21
5/17 5/20 6/21
8/21 14/19 15/25
17/11 21/23 22/19
23/13 25/4 29/17
29/24 30/9 30/15
36/11 38/23 40/21
46/14 46/22 47/19
49/22 51/20 52/11
52/20 53/11 53/24
60/2 63/22 65/6
66/4 66/6 66/19
66/23 68/5 68/19
70/19 70/24 71/25
72/1 76/2 86/10
87/4 87/12 87/21
88/22 96/8 96/12
111/1 113/22 114/1
114/8 114/16
120/18 121/4
121/19 123/9 124/1
144/21 156/4
156/15 162/18
167/12 168/9
177/22 185/8 216/9
222/10 222/19
**use [18]**    36/7 39/9
39/10 47/6 55/4
57/10 60/19 91/11
102/5 110/20
110/21 116/7 118/3
118/9 171/4 201/3
208/15 222/20
**used [20]**    7/15
46/17 51/12 55/17
89/4 107/9 109/11
110/1 115/19
116/16 116/18

## U

**used... [9]** 155/22
165/12 186/5 186/6
199/4 207/6 208/24
214/2 214/21
**user [1]** 212/16
**users [1]** 205/10
**using [7]** 18/9
35/8 49/7 57/7
60/11 168/23 175/2
**usually [2]** 50/11
135/5
**UTC [5]** 212/14
212/18 212/20
216/13 219/3
**utter [1]** 83/15
**utterly [1]** 175/5
**Utz [1]** 15/17
**Uyen [4]** 33/7
104/11 151/10
164/24
**Uyen's [1]** 165/2

## V

**valid [2]** 25/24
63/12
**validate [2]** 8/9
152/15
**valuable [1]** 51/23
**valuation [14]**
42/14 42/21 45/5
45/10 50/9 52/2
52/7 53/12 53/25
57/3 57/6 113/17
113/21 198/8
**valuations [2]**
42/14 45/4
**value [30]** 25/15
26/6 26/8 26/9
26/21 27/3 42/11
42/18 42/22 42/24
45/14 45/16 45/18
45/18 45/23 49/11
57/8 83/19 97/7

114/6 114/20 115/3
116/1 116/12 198/9
198/11 198/13
199/2 199/3 199/5
**valued [4]** 26/25
57/6 115/5 116/8
**valuer [1]** 50/18
**values [1]** 114/4
**variety [1]** 118/22
**various [5]** 39/24
112/24 124/24
184/17 206/12
**VAT [1]** 7/23
**Vel [1]** 133/19
**Vela [237]**
**vendors [2]** 100/25
101/1
**Venezuela [1]**
199/16
**venture [5]** 40/2
41/17 58/9 175/12
175/15
**verbal [1]** 143/6
**verified [1]** 156/6
**verify [3]** 156/2
195/8 208/17
**version [1]** 213/17
**very [23]** 14/18
20/2 21/4 21/7
24/19 35/9 47/3
77/1 77/5 85/9
90/14 92/23 97/21
101/12 106/9
106/11 107/8
107/21 110/6 110/6
110/22 154/15
215/5
**vest [1]** 28/12
**vet [1]** 175/13
**via [1]** 33/5
**viable [1]** 76/17
**video [7]** 58/21
73/10 73/22 105/18
105/23 179/5

196/11
**view [1]** 30/2
**Villains [1]**
145/24
**Virginia [2]**
204/19 205/5
**Virtual [1]** 52/25
**virtualized [1]**
56/4
**vision [5]** 92/15
92/15 92/23 93/2
95/3
**Vistomail [2]**
12/24 12/25
**visual [1]** 55/24
**visualization [1]**
55/20
**voice [2]** 207/21
207/22
**volatile [1]** 83/15
**volume [1]** 51/16
**voluntary [2]** 84/3
84/14
**vote [2]** 84/9
84/10
**voted [1]** 84/12
**voting [1]** 68/9
**VRML [1]** 55/19
**vs [1]** 1/6
**vulture [1]** 41/16

## W

**wait [9]** 16/7
18/15 173/24
173/25 189/5 189/7
189/7 190/14
192/24
**waiting [2]** 104/14
144/25
**waive [1]** 37/1
**walk [2]** 79/15
212/8
**walked [2]** 85/3
136/3

**W**

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/30/2022    Page: 43 of 254

**wallet [3]**   130/25
132/3 132/19

**wallet.dat [1]**
13/1

**wallets [2]**   130/23
206/3

**wankery [2]**   13/10
13/14

**want [56]**   5/23
6/20 7/8 8/12 8/13
9/18 18/22 23/8
24/19 28/6 32/18
37/15 39/11 57/23
59/12 59/14 59/15
59/18 62/19 64/1
64/4 74/18 74/18
77/5 80/3 80/4
80/4 80/4 80/5
80/15 80/17 83/5
90/20 90/20 92/17
92/18 92/23 92/24
95/5 98/23 100/10
100/11 110/22
111/25 121/15
122/2 154/9 162/18
165/10 186/19
198/21 199/7 199/7
199/25 211/20
222/8

**wanted [39]**   13/24
21/17 39/10 43/20
50/2 51/16 53/21
57/12 57/12 57/14
57/22 64/10 73/15
77/4 78/24 78/24
80/6 80/6 80/7
81/14 84/14 86/19
100/10 101/23
109/15 109/24
110/2 127/8 175/11
175/19 176/25
182/7 182/8 183/1

188/8 188/12
196/1 214 196/25
221/13

**wants [4]**   79/11
121/22 196/23
221/17

**warning [1]**   60/19

**warranted [1]**
101/13

**warranting [3]**
101/14 101/15
101/16

**was [309]**

**wasn't [23]**   8/15
8/17 9/3 11/10
14/9 18/8 34/2
38/15 58/6 60/25
60/25 82/10 82/19
85/10 89/18 90/5
94/17 100/5 117/25
156/3 180/15
196/25 214/11

**watch [2]**   57/15
80/15

**watched [1]**   57/20

**watching [2]**   77/17
80/14

**Watts [22]**   45/4
65/24 71/23 74/4
81/12 86/8 87/9
102/19 104/20
123/23 126/3
127/25 128/11
132/18 134/24
135/20 137/5 142/3
142/18 143/16
167/21 177/13

**Watts's [1]**   67/6

**way [45]**   7/25
13/10 13/22 19/25
21/12 45/1 48/11
48/24 51/23 58/10
68/3 68/14 72/23
73/18 90/13 91/4

92/21 93/3 102/14
104/23 106/16
110/2 110/6 110/23
113/5 113/6 117/8
152/15 156/2 173/5
186/4 187/22 189/2
189/17 189/17
190/1 190/19
191/13 194/22
196/5 196/21
198/10 199/14
205/18 220/15

**ways [2]**   175/5
198/22

**we [312]**

**we'd [2]**   51/12
64/8

**we'll [20]**   4/4
8/13 8/21 60/13
61/10 112/18
115/13 143/21
145/1 145/4 162/21
163/11 167/17
169/9 170/19
188/22 188/23
218/7 221/1 221/22

**we're [38]**   6/7 8/9
19/21 23/4 40/11
42/24 43/8 44/3
45/10 47/25 48/2
48/10 51/10 55/14
71/14 96/22 100/25
117/2 122/1 144/25
150/3 157/3 161/8
161/14 167/14
168/23 169/3
173/10 176/10
191/6 192/17
208/22 210/11
210/11 210/17
212/5 215/17 220/3

**we've [14]**   41/25
48/1 71/2 100/2
100/18 159/11

**W**

**we've... [8]**   161/7
168/15 176/14
182/12 185/2
192/13 208/22
216/24

**website [2]**   205/22
206/5

**websites [2]**   29/5
206/2

**week [6]**   5/16 6/15
62/6 79/19 173/2
193/8

**weekday [3]**   24/20
24/21 25/2

**weekend [2]**   4/3
6/6

**weeks [2]**   8/13
218/15

**weight [3]**   156/23
157/19 162/9

**Welcome [7]**   60/15
61/7 112/5 112/15
162/24 163/9 192/2

**well [30]**   9/18
24/5 24/19 41/9
43/18 47/6 59/23
59/25 63/5 67/9
71/5 79/10 88/12
89/22 92/13 98/2
129/14 131/12
132/6 156/17
157/25 169/25
173/8 187/7 187/17
188/15 195/9
195/20 206/3
207/12

**went [19]**   11/3
12/10 12/11 19/22
41/12 59/16 59/17
59/19 88/13 88/14
131/17 135/25
136/1 136/11

162/16 173/5
179/1 181/8 184/4
191/23

**were [101]**   6/9
6/15 6/20 6/21
7/10 13/21 16/1
16/25 17/5 18/21
18/23 19/8 22/5
22/8 34/11 39/20
40/5 40/15 40/15
41/7 42/19 42/22
50/4 51/13 54/12
55/6 55/18 55/23
56/3 56/7 59/3
61/16 62/18 62/18
64/12 66/5 73/13
75/7 75/8 78/7
79/1 84/1 84/24
90/8 90/10 96/17
100/8 102/22
102/24 102/24
105/9 108/7 109/7
112/23 113/1 113/6
118/23 119/15
134/11 134/21
134/22 134/22
140/10 146/9
146/17 153/20
156/23 165/2 165/4
165/5 171/25
175/18 176/15
176/16 179/7
179/22 179/23
180/2 180/3 180/11
183/17 188/4 192/3
194/9 194/10
204/24 205/3
205/25 206/3
206/19 206/24
206/25 207/2 207/6
208/7 212/22 215/6
215/9 218/3 219/19
220/5

**weren't [14]**   11/11

12/3 15/13 43/20
43/21 75/6 78/24
79/25 82/16 109/25
113/1 134/21 196/7
197/14

**WEST [1]**   1/2

**what [173]**   7/21
7/22 8/7 8/15 8/23
11/5 13/10 15/13
16/1 17/5 18/5
18/10 18/23 19/10
19/16 20/24 21/13
22/5 22/8 22/14
25/18 25/25 26/2
26/5 26/9 26/23
27/2 27/13 28/14
28/20 33/15 38/12
39/19 41/13 42/20
43/8 43/9 43/19
44/3 45/17 45/18
47/2 47/8 48/19
48/24 51/10 53/2
53/20 55/15 58/13
59/11 62/10 62/22
63/25 64/5 64/21
66/3 66/4 70/17
74/18 75/1 78/1
78/7 79/14 79/24
79/25 80/9 80/10
80/13 80/13 80/16
80/24 81/1 82/9
82/11 82/24 83/2
83/5 86/2 88/7
88/13 89/16 90/8
93/2 93/4 95/12
95/22 96/17 101/12
101/23 103/3 103/4
105/9 108/1 110/9
110/17 115/11
115/12 115/21
116/20 116/21
117/10 117/14
117/19 118/11
121/9 121/13 127/8

**W**

**what... [65]**
130/17 136/1 136/4
136/18 143/21
154/12 154/25
157/5 160/7 160/25
162/9 165/1 165/3
165/8 167/3 168/17
171/8 174/14 178/6
178/22 179/18
180/24 183/1
183/18 187/11
188/8 188/18
188/22 190/22
195/4 195/4 195/5
195/7 195/21 199/5
200/8 201/1 203/12
203/21 203/24
204/7 204/15 205/9
206/19 207/16
208/1 208/11
209/19 210/17
211/10 211/17
212/4 213/9 214/1
214/18 215/3
215/20 216/8 217/7
217/22 219/2 219/9
219/10 222/8
222/11

**what's [7]**   9/20
10/18 101/11 152/5
209/22 213/13
218/9

**whatever [2]**   39/3
39/10

**whatsoever [1]**
185/18

**when [61]**   6/15
13/4 13/8 16/18
19/3 21/5 24/3
24/4 25/1 25/22
26/1 28/11 35/24
36/14 37/18 37/23

41/15 44/12 48/9
55/3 56/22 58/8
62/20 64/2 76/20
79/10 79/25 80/12
82/23 82/25 90/7
96/20 106/9 109/21
109/22 110/7
110/25 117/25
121/19 136/16
146/9 157/19
173/24 175/6 178/2
178/11 178/13
194/20 194/21
194/23 196/13
196/16 196/18
197/1 198/10
199/19 207/12
208/4 208/5 212/22
215/9

**where [61]**   5/18
6/21 7/18 8/3 10/5
12/10 12/23 19/10
20/22 21/15 25/11
25/15 39/18 39/20
41/11 41/14 47/12
49/18 49/23 50/4
56/3 56/4 76/21
90/15 91/7 96/8
97/5 97/11 100/5
102/3 102/4 107/8
109/14 109/17
118/21 125/20
128/11 130/19
130/22 131/16
134/25 137/25
142/20 147/24
154/19 154/25
176/5 177/4 187/9
199/16 199/21
200/3 203/6 203/15
204/25 205/10
205/19 205/20
205/23 206/1 213/5

**WHEREOF [1]**   224/14

**whether [16]**   11/9
76/10 92/25
97/13 131/7 144/16
150/22 153/10
156/14 160/16
165/10 173/2
195/14 206/21
209/4

**which [69]**   11/4
11/18 12/18 13/19
13/25 15/20 19/19
23/2 25/24 28/11
31/12 34/20 35/7
36/10 40/17 41/10
41/15 43/5 47/4
47/8 47/17 53/7
55/4 56/5 56/16
57/16 59/3 59/6
61/1 62/11 69/3
72/13 82/13 83/19
84/14 85/18 88/4
95/18 97/8 113/19
116/22 118/12
134/9 146/7 146/16
146/19 147/24
158/23 160/13
162/7 165/1 167/15
170/1 175/20
176/14 180/25
183/7 183/7 188/8
188/13 194/12
198/9 199/11 215/1
215/4 216/12
217/19 219/3 222/7

**while [8]**   28/16
66/5 82/18 111/12
140/12 184/4
204/24 205/3

**white [1]**   175/2

**whitepaper [5]**
12/24 13/4 117/6
137/17 138/3

**who [41]**   16/25
18/13 37/24 38/6

USCA11 Case: 22-11150    Document: 53-12    Date Filed: 11/30/2022    Page: 46 of 254

**who... [37]**   40/12
42/19 44/10 61/18
62/5 79/1 79/20
84/25 85/1 87/7
92/25 93/10 95/3
95/4 95/5 95/6
99/14 100/25
110/22 142/6
146/20 158/3
160/21 160/23
161/4 165/5 172/13
172/14 175/20
175/24 178/14
178/17 191/23
198/24 208/5
208/16 214/19
**who's [3]**   26/22
57/17 157/6
**whole [13]**   13/12
35/8 37/25 51/22
57/11 89/25 90/1
177/6 178/10
187/16 187/19
188/3 188/3
**wholly [1]**   195/22
**whom [1]**   146/21
**why [19]**   7/13
24/19 38/17 43/24
43/25 55/12 58/12
83/14 111/3 122/1
134/5 136/12
175/15 187/11
187/22 188/14
191/3 214/15
220/11
**wife [16]**   13/20
44/8 45/4 65/24
72/18 85/20 87/8
104/20 127/25
132/6 134/24 135/1
177/13 196/6
198/23 200/24

**wife's [2]**   85/19
124/19
**will [79]**   5/18
6/10 15/7 26/10
26/23 33/11 34/6
39/3 44/21 52/24
53/4 53/15 54/3
54/21 60/20 61/24
62/7 63/19 65/17
67/22 68/7 68/21
71/10 74/19 77/14
77/15 77/15 77/18
77/19 77/20 79/3
79/17 81/19 82/2
84/7 84/8 84/9
84/10 85/4 90/8
92/14 93/4 93/7
93/11 93/12 94/8
97/20 98/19 103/24
123/2 130/9 131/21
133/16 135/4
162/13 171/21
172/18 174/3
180/18 186/14
186/24 188/22
197/5 198/6 198/8
199/4 199/11
199/13 199/14
199/25 200/4 200/4
200/5 200/5 202/6
220/14 220/23
221/20 222/5
**willing [2]**   97/14
134/3
**win [2]**   187/22
188/13
**window [1]**   110/12
**Windows [1]**   146/17
**wiped [3]**   138/13
138/14 138/15
**wireless [1]**
204/11
**wish [1]**   76/12
**wished [1]**   39/9

**withdraw [1]**
**within [14]**   8/2
8/13 48/17 115/9
116/7 116/9 118/14
118/23 207/10
211/13 212/12
219/6 219/6 220/21
**without [11]**   42/6
54/24 74/13 78/11
84/17 93/1 159/4
160/10 160/11
211/2 216/2
**witness [50]**   5/24
14/14 27/16 44/5
50/14 61/12 62/24
65/1 69/7 70/11
70/12 74/5 75/20
81/9 86/5 92/1
93/22 94/5 98/9
100/14 102/11
106/16 111/18
118/25 119/25
121/25 125/5
142/15 156/10
156/20 157/17
161/13 162/6
163/19 164/9
164/21 168/5
171/23 173/10
177/10 181/6
184/14 188/24
192/7 200/19
200/24 202/6
202/14 211/17
224/14
**witnesses [1]**
60/11
**won [5]**   12/14
15/24 19/23 186/18
188/11
**won't [3]**   95/6
136/1 198/10
**wonder [2]**   173/18

USCA11 Case: 22-11150   Document 51-7   Date Filed: 11/30/2022   Page: 474 of 254

**W**

**wonder... [1]**
174/9

**wonderful [2]**
179/18 181/1

**word [4]** 13/9
26/11 182/22
219/16

**words [6]** 21/19
82/11 86/15 108/12
117/17 145/9

**work [41]** 6/6
12/16 24/1 36/3
36/14 36/18 42/10
49/22 72/23 76/25
77/5 77/17 77/21
77/22 79/5 79/9
79/20 80/12 93/4
94/25 109/8 109/19
110/10 112/17
136/18 162/21
173/23 180/8
180/19 180/21
180/23 188/3
199/10 203/17
204/12 205/2
205/16 205/22
206/5 206/8 206/18

**worked [15]** 26/19
39/12 43/16 43/16
43/18 77/12 79/1
79/7 102/1 146/20
153/22 177/4 197/7
197/7 204/25

**working [12]** 43/7
49/22 55/19 80/5
80/8 89/7 92/25
101/24 108/22
109/25 172/12
199/13

**works [10]** 7/25
48/11 51/24 60/2
73/18 84/18 101/9

114/2 117/5 180/12
world... [1] 53/18
55/24 56/4 102/5
110/13 110/19
110/20

**world's [1]** 89/8

**world-class [1]**
53/16

**worry [1]** 58/3

**worth [22]** 18/18
18/21 19/16 24/1
25/15 27/2 36/11
36/13 43/25 59/11
78/11 78/13 78/15
79/24 79/25 80/2
113/9 114/21 115/9
118/14 176/11
197/20

**would [108]** 5/16
9/13 13/14 13/25
14/1 15/2 18/5
18/12 19/25 20/7
21/13 24/6 28/8
28/13 29/3 29/5
35/1 35/9 36/3
36/13 37/24 43/1
45/23 49/10 49/14
49/19 49/24 50/5
50/23 51/21 54/9
54/10 54/15 58/8
58/9 58/11 59/14
60/11 63/9 63/10
72/18 73/16 74/19
74/21 75/3 77/5
77/23 83/19 84/11
86/21 88/2 88/3
89/17 90/11 90/17
97/14 99/9 99/10
99/23 101/22 107/4
109/11 109/13
113/9 114/21 121/5
121/11 121/13
131/16 134/7 136/1
136/2 136/22 142/5

142/6 144/17
152/15 156/23
157/18 157/19
162/3 165/1 166/1
170/18 172/1 177/3
177/16 180/20
180/22 181/19
183/12 188/1 188/2
196/15 197/8
200/23 201/24
203/5 205/21
207/12 207/22
210/25 211/14
216/12 221/18
222/14

**wouldn't [3]** 49/18
155/7 197/2

**WRIGHT [386]**

**Wright's [15]** 24/9
33/1 33/8 58/19
63/1 73/8 73/20
105/20 111/15
154/4 156/25
177/23 179/3 181/3
190/4

**write [3]** 55/10
136/5 210/11

**writes [2]** 17/25
99/8

**writing [3]** 10/5
13/5 108/8

**written [3]** 108/10
108/15 201/25

**wrong [15]** 18/23
21/12 41/9 53/23
64/21 69/2 113/6
135/1 152/5 155/13
172/1 172/6 186/4
191/13 194/24

**wrote [6]** 11/23
13/8 95/22 108/12
108/23 109/1

# Y

**year [11]**　12/12
23/25　24/1　24/23
25/24　84/22　85/7
85/8　108/10　180/2
214/16
**years [14]**　12/11
27/1　36/3　36/3
49/23　49/23　68/23
89/2　108/14　110/15
184/2　199/18
199/20　199/22
**years' [1]**　43/25
**yep [3]**　95/14
137/8　147/16
**yes [164]**　6/18
11/22　13/13　14/23
18/5　20/16　20/19
22/5　22/23　23/7
24/19　25/2　25/18
26/12　26/12　26/16
28/10　29/1　29/8
29/18　31/9　31/16
31/20　31/20　32/21
32/24　34/7　36/25
37/23　37/25　39/6
39/22　41/22　45/8
45/12　47/3　47/8
48/9　49/25　50/18
51/9　52/10　53/2
53/9　56/9　57/10
60/3　60/17　61/17
61/19　62/10　63/9
64/8　64/12　65/11
67/4　68/11　68/20
69/19　70/8　70/23
71/4　71/24　72/9
74/23　76/20　79/19
81/14　82/4　85/12
85/13　88/15　88/21
89/5　90/21　92/5
92/12　93/6　93/14
94/17　95/7　95/12

96/17　96/19　97/25
98/13　99/18　100/25
101/11　101/21
103/20　104/13
106/14　107/9　109/7
116/16　120/8
121/25　126/8　128/2
128/24　130/21
132/8　132/20　133/6
133/8　133/25
134/25　135/24
137/8　138/2　138/4
139/19　140/9
141/10　144/3　146/5
146/14　146/24
150/4　150/7　150/19
159/4　162/20
163/15　164/13
165/24　169/1　171/2
171/4　171/18　172/6
174/24　174/25
179/1　182/3　184/19
185/21　188/6　188/7
191/18　194/9　196/6
196/13　197/7
197/13　197/14
198/6　198/14
198/24　201/10
202/19　205/1
205/15　206/7　208/9
208/21　210/10
212/24　217/3　217/8
217/14　217/17
218/2
**yesterday [1]**
104/10
**yet [5]**　46/11
184/14　211/8
215/17　222/8
**York [3]**　203/7
206/11　206/12
**you [1116]**
**you'd [2]**　195/4
195/4

**you'll [13]**　19/7
68/25　72/13
84/19　93/8　167/3
173/25　175/24
180/19　202/11
202/24　220/22
**you're [59]**　8/19
12/5　16/2　20/24
21/12　23/21　25/22
26/18　39/3　40/5
40/17　41/14　43/9
45/15　47/21　48/25
56/20　56/21　82/21
86/16　91/4　103/3
109/17　109/21
109/22　110/16
110/17　110/18
113/5　113/5　117/1
117/14　117/19
121/19　132/3
139/12　141/8
143/10　155/13
172/6　172/7　173/5
173/24　174/21
175/1　175/3　183/18
190/2　190/19
191/13　191/18
194/25　195/3
198/10　201/5
203/15　208/14
220/18　220/19
**you've [11]**　26/22
48/23　56/23　74/7
92/12　191/15
197/14　198/12
205/13　221/23
222/13
**your [401]**
**yours [2]**　79/17
199/20
**yourself [71]**　10/5
12/22　14/1　14/18
23/5　27/20　44/7
45/3　48/1　61/15

**Y**

**yourself... [61]**
62/3 63/3 69/10
70/16 76/4 98/12
102/18 109/6
120/16 124/24
126/2 126/14 127/4
127/24 128/11
128/21 130/13
130/15 132/2
132/17 133/3
133/23 133/24
134/23 135/14
137/4 137/16
138/12 139/9 140/7
140/21 141/14
142/2 142/17 145/8
145/23 146/8
147/15 148/8 149/7
150/17 151/22
155/4 158/24
158/24 163/25
164/12 165/22
165/23 166/15
166/15 167/2 167/2
167/20 177/12
184/1 184/17
192/10 203/6 210/6
217/11

**yourselves [1]**
75/9

**yvette [8]** 1/23
1/25 162/25 211/20
224/5 224/17
224/17 224/19

**Z**

**ZACK [2]** 1/16 4/18
**ZALMAN [2]** 1/21
5/2
**zero [2]** 20/23
85/15
**Zhul [1]** 109/15
**Zilch [1]** 85/16

**zone [4]** 212/14
212/15 212/19
212/20
**zoom [34]** 9/9
11/14 17/22 25/12
44/25 47/14 47/22
52/20 53/2 53/12
57/4 62/25 63/6
65/20 66/9 76/1
87/23 94/22 95/13
97/1 99/6 102/13
104/2 107/4 107/5
109/2 169/12 172/2
181/8 181/12
182/20 189/1
189/14 189/16
**Zuckerberg's [1]**
56/5

**846**

```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF FLORIDA
2                       WEST PALM BEACH DIVISION
                       CASE NO. 9:18-cv-80176-BB
3
    IRA KLEIMAN, as the personal representative
4   of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
5
              Plaintiffs,                  November 16, 2021
6                                          10:04 a.m.
              vs.
7
    CRAIG WRIGHT,
8
              Defendant.                   Pages 1 THROUGH 244
9   _____
                    TRANSCRIPT OF TRIAL DAY 10
10               BEFORE THE HONORABLE BETH BLOOM
                  UNITED STATES DISTRICT JUDGE
11                     And a Jury of 10

12  Appearances:
    FOR THE PLAINTIFF:   ROCHE FREEDMAN, LLP
13                       DEVIN FREEDMAN, ESQ.
                         KYLE ROCHE, ESQ.
14                       200 South Biscayne, Suite 5500
                         Miami, Florida 33131
15
                         BOIES SCHILLER & FLEXNER
16                       ANDREW BRENNER, ESQ.
                         STEPHEN N. ZACK, ESQ.
17                       100 Southeast 2nd Street, Suite 2800
                         Miami, Florida 33131
18
    FOR THE DEFENDANT:   RIVERO MESTRE, LLP
19                       ANDRES RIVERO, ESQ.
                         JORGE MESTRE, ESQ.
20                       AMANDA M. MCGOVERN, ESQ.
                         ZALMAN KASS, ESQ.
21                       MICHAEL A. FERNANDEZ, ESQ.
                         2525 Ponce de Leon Boulevard, Suite 1000
22                       Coral Gables, Florida 33134

23  COURT REPORTER:      Yvette Hernandez
                         U.S. District Court
24                       400 North Miami Avenue, Room 10-2
                         Miami, Florida 33128
25                       yvette_hernandez@flsd.uscourts.gov
```

```
 1                    I N D E X

 2    Certificate...................................    244
      Plaintiff rests .............................    213
 3
                    W I T N E S S
 4
      ON BEHALF OF THE PLAINTIFF:                      PAGE
 5    DR. MATTHEW EDMAN
      CONTINUED DIRECT EXAMINATION BY MR. ROCHE         15
 6    CROSS-EXAMINATION BY MR. RIVERO                    93
      REDIRECT EXAMINATION BY MR. ROCHE                 204
 7
      ON BEHALF OF THE DEFENDANT:                      PAGE
 8    KEVIN MADURA
      DIRECT EXAMINATION BY MR. KASS                    214
 9
                    E X H I B I T S
10    EX. NO.:                          OFFERED   ADMITTED
      Plaintiffs' 546.1                    18        18
11    Plaintiffs' 546.2                    18        18
      Plaintiffs' 135.1                    24        24
12    Plaintiffs'  55.1                    26        26
      Plaintiffs'  55.3                    26        26
13    Plaintiffs' 613                      32        32
      Plaintiffs' 807                      36        36
14    Plaintiffs' 807.1                    38        38
      Plaintiffs' 807.2                    38        38
15    Plaintiffs' 807.3                    38        38
      Plaintiffs' 856.1                    43        43
16    Plaintiffs' 856.2                    43        43
      Plaintiffs' 808                      45        45
17    Plaintiffs' 808.1                    47        47
      Plaintiffs' 808.2                    47        47
18    Plaintiffs' 514.1                    60        60
      Plaintiffs' 518.1                    60        60
19    Plaintiffs' 518.2                    60        60
      Plaintiffs' 518.7                    60        60
20    Plaintiffs' 518.3                    74        75
      Plaintiffs' 518.4                    74        75
21    Plaintiffs' 538.1                    78        78
      Plaintiffs' 538.2                    78        78
22    Plaintiffs' 540.1                    83        84
      Plaintiffs' 540.2                    83        84
23    Plaintiffs' 521.1                    88        88
      Plaintiffs' 521.7                    88        88
24    Defendant's 412                     171       171
      Plaintiffs'  34                     187       188
25
```

1      (Call to order of the Court, 10:04 a.m.)

2          THE COURT:  Good morning to everyone.  Go ahead and

3  have a seat.

4          How is everyone this morning?

5          MR. RIVERO:  Good morning, Judge.

6          THE COURT:  Are there items that we can address at

7  this time?

8          MR. BRENNER:  Judge, one for the Plaintiffs regarding

9  the -- excuse me -- regarding the request for judicial notice.

10  We have met and conferred.  I know that Mr. Rivero has an issue

11  that may be more time-sensitive because it has to do with

12  Dr. Edman, but happy to do both or either, whatever Your

13  Honor's pleasure.

14          MR. RIVERO:  Your Honor, our issue actually relates

15  directly to the testimony of Dr. Edman and the use of the word

16  "forgery," Your Honor, and I have a motion to make in that

17  regard.

18          THE COURT:  Why don't you make your motion now, sir.

19          MR. RIVERO:  Yes.  Judge, this is an issue that's been

20  considered both by you and by Judge Reinhart.  The specific

21  motion I'm making is both for the exclusion of further use of

22  the word "forgery" in Edman's testimony and also for an

23  instruction as to its use yesterday.  And the analysis is very

24  simple, Judge.  It's a 401/403 balancing.

25          Edman testified -- specifically the Court found this

1   and Judge Reinhart's also found this, that the word -- for him

2   the word "forgery," he uses it interchangeably with "altered,"

3   "modified" or "manipulated."  So therefore, Judge, on the 401

4   aspect of this balancing, using the word "forgery" adds

5   absolutely nothing on that side of the balance because there

6   are three other choices.  So when we are talking about

7   relevance, Judge, obviously the relevance of an expert's

8   testimony is to help the jury understand what's going on.  It

9   doesn't add on that side by his own testimony, and by a finding

10  of this Court, and by a finding of Judge Reinhart.

11          On the other hand, Judge, both this Court and Judge

12  Reinhart have found that the use of the word "forgery" could

13  be -- this Court said could be confusing.  Judge Reinhart

14  actually said something different.  He said it was, in fact, an

15  incorrect use of the term but he, as a fine lawyer and smart

16  judge, and the fact finder in that hearing, would be able to

17  distinguish and, therefore, he would permit its use.

18          The difference here is, Judge -- and I woke up in the

19  middle of the night thinking about this -- I looked up forgery

20  in the Merriam-Webster Dictionary, Your Honor, and also in the

21  Oxford Dictionary.  In both the denotation and the connotation

22  of that word, in English, bears an intent to defraud.  That's

23  what he's been barred from doing, and he says he's not offering

24  an opinion about the intent behind whatever change was made to

25  these documents.

```
 1          However, Judge, the problem is the word "forgery"
 2   inevitably and inherently, not potentially, confusing, means
 3   that someone is acting with a fraudulent intent.  The Court has
 4   not permitted him to say fraud.  By allowing forgery, Judge,
 5   now where there's no additional evidence, no additional value
 6   on the 401 side, this 403 side, Judge, pops way up.  The
 7   balance is completely out of whack.
 8          THE COURT:  All right.  Mr. Rivero, since this is the
 9   first time that this is being brought to the Court's attention,
10   what is the suggested description that you're asking for the
11   Plaintiffs to use?
12          MR. RIVERO:  Judge, they have themselves -- Dr. Edman
13   has testified there are three words that are equivalent:
14   "alteration," "modification," "manipulation."  We have no
15   objection because all three are clean in both denotation --
16   connotation may be different, Judge, and we understand
17   manipulation is different from modification, but those we
18   accept, that there's -- you know, there's planning.
19          Forgery's not that situation, Judge.  So my request is
20   very specific:  Instruction on the previous use of "forgery,"
21   that it does not bear -- he's not testifying about fraudulent
22   intent, and banning the use of "forgery" going forward.  That's
23   our request.
24          MR. ROCHE:  Your Honor, may I respond?
25          THE COURT:  Yes, of course.
```

```
 1              MR. ROCHE:  Mr. Rivero says he woke up in the middle
 2     of the night concerned about the use of the word "forgery."  It
 3     was in the expert reports that Dr. Edman submitted over a year
 4     and a half ago.  That's point one.
 5              Point two, Mr. Rivero was free to object to its use in
 6     front of the jury yesterday.  He did not.
 7              Third, finally, even if those two things weren't true,
 8     this goes to the weight of Dr. Edman's testimony.  Mr. Rivero
 9     is free to cross him on this.  And I understand that there's an
10     expert, Mr. Chambers, who is also going to be put up during
11     their case to rebut the weight of Dr. Edman's opinions.
12              THE COURT:  And is that expert going to say it's not a
13     forgery?
14              MR. ROCHE:  I don't -- that's a question for
15     Mr. Rivero.
16              MR. RIVERO:  Your Honor, he will be explaining that
17     that -- yeah, forgery for sure, Judge, because no one in this
18     case can give evidence that there's a fraudulent intent,
19     including Edman.  He's admitted that.
20              Given that he's admitted that he cannot testify about
21     fraud, given that forgery includes in the dictionary definition
22     an intent to defraud, it's plain, Judge -- the 403 balance.
23     This was raised with Judge Reinhart.  It was raised with the
24     Court.  The Court said it was confusing and so now they have
25     made it a central feature.
```

1          They just did forgery number one, Judge.  They're

2    going to talk about forgery number two, forgery number three.

3    There are 50 examples.  This is really a 403 problem and it

4    shouldn't be permitted, Judge.

5          MR. ROCHE:  Your Honor, we're not going to go through

6    all 50.  I promise you that.  But there's another point.  We

7    have used the word "forgery" in front of the jury yesterday.

8    To the extent -- and Mr. Rivero could have objected yesterday

9    to that.  To the extent we're now getting an instruction that

10   we have to remove that word, I do think that undercuts and

11   unfairly prejudices Dr. Edman and Plaintiffs' presentation.

12         THE COURT:  All right.  Is there anything further?

13         MR. ROCHE:  No, Your Honor.

14         THE COURT:  All right.  Anything further, Mr. Rivero?

15         MR. RIVERO:  No, Your Honor.

16         THE COURT:  All right.  Let me state that the

17   Defendants -- or the Defendant had access to the report, knew

18   that that was going to be Dr. Edman's testimony.  Whether the

19   description is a forgery, a fake, counterfeit, phony, sham,

20   whatever the description is, the testimony is that it was

21   certainly altered, modified, and manipulated.  So I think we're

22   mincing words.  And I don't believe that the use of "forgery"

23   or "counterfeit" connotes anything other than it supports the

24   testimony that that was his finding.

25         You're free to cross-examine, but I'm certainly not

 1   going to instruct the jury with regard to a use of a word that

 2   is certainly part of the opinion that it is a counterfeit, it

 3   is fake, it is not the true email or document.  And I don't

 4   believe that there's any instruction that needs to be given.

 5        With regard to the request for judicial notice, is

 6   there an objection on the part of the Defendant?

 7        MR. FERNANDEZ:  Good morning, Your Honor.

 8        So with respect to the request for judicial notice, we

 9   object on the grounds that Plaintiffs did not and could not lay

10   out a proper foundation for a conclusion that the dates

11   demanded in their judicial notice are relevant to purportedly

12   valuing any of the IP in question.

13        And further, Your Honor, to the extent that it is

14   coming in through judicial notice, it is suggesting to the jury

15   relevant dates for damages.  So we believe that that would be

16   an improper --

17        THE COURT:  Well, I'm asking with regard to judicial

18   notice.  And my question would be that if, in fact, the

19   applicable currency exchange rate cannot be determined through

20   these sources, what other sources are you stating should be

21   used?

22        MR. FERNANDEZ:  Your Honor, the objection's not to the

23   sources themselves but to the use of the judicial notice in

24   order to get this information in front of the jury.  I believe

25   that it should have been done through expert testimony

1  testifying about proper valuation and laying a foundation for

2  the relevance of that information.

3          Here, our concern is that basically by using judicial

4  notice, it is suggesting to the jury that those are relevant

5  dates for damages.  And it's coming with the imprimatur of the

6  Court.

7          THE COURT:  So with regard to the determination as to

8  whether a fact or facts in this case can be explained to the

9  Court by the Court taking judicial notice, the question is

10 whether these are facts that are not subject to reasonable

11 dispute.  Are these facts subject to reasonable dispute?

12         MR. FERNANDEZ:  The underlying exchange rates and

13 the -- on those particular dates are not subject to dispute,

14 Your Honor.  The issue that we dispute is the use of the

15 judicial notice mechanism to get information about the exchange

16 rates on those dates in front of the jury.  Because as I noted,

17 I believe it improperly primes the jury to find that those are

18 relevant dates.

19         THE COURT:  Well, isn't this information on an

20 official government website?  So is it subject to any dispute?

21         MR. FERNANDEZ:  No, Your Honor.  The information

22 itself is not subject to dispute.  It's just the use of the

23 judicial notice mechanism with which we're concerned.

24         THE COURT:  But do you believe that this is proper for

25 the Court to take judicial notice, that is there is no dispute?

```
 1              MR. FERNANDEZ:  Well, with respect to the underlying

 2     information itself, no.  But with respect to the relevance of

 3     those dates, and with respect to the information and the

 4     purpose for which it's being used, we do object, Your Honor,

 5     that it's a contested issue as to whether it's even relevant --

 6     that those dates are even relevant for purposes of calculating

 7     damages.

 8              THE COURT:  You don't believe that that information is

 9     relevant to this lawsuit?

10              MR. FERNANDEZ:  Not to the valuation of the

11     intellectual property, Your Honor.  We don't believe that it's

12     relevant because those are dates that -- for which relevance

13     hasn't been established by the Plaintiffs.

14              THE COURT:  A response?

15              MR. BRENNER:  Good morning, Your Honor.

16              I think Your Honor seized on the right question, that

17     the question before the Court at this point -- excuse me -- is:

18     Are these facts that are reasonably in dispute?  I think that

19     you've heard it from both sides that these are not reasonably

20     disputable facts.

21              I think our motion lays out -- but the dates are used

22     because they're the valuation dates in evidence of the

23     intellectual property.  There's three different dates.  They're

24     from documents that have already been received in evidence.  So

25     I'm not sure what the relevance argument is, but they're
```

1    clearly pegged to those dates.

2         What I understand the concern to be -- and maybe I'm

3    misunderstanding it -- they don't want the Court to put your

4    finger on the scale and sort of say these -- you know, I think

5    we can work that out in the jury instruction process, but as

6    far as whether these are facts in dispute and subject to

7    judicial notice, I think at this point that's not really

8    contested.

9         THE COURT:  All right.  Is there anything further?

10   Because it does appear that the Eleventh Circuit has allowed

11   the Court to take judicial notice of historical exchange rates.

12   I'm -- I think what your concern is, is that an expert may

13   testify to it.  You would have no objection to the expert, but

14   you would have some concern about the Court letting the jury

15   know that the Court instructs you that the exchange rate on

16   April 2nd, 2014 was "X."  That's what the concern is?

17        MR. FERNANDEZ:  Yes, Your Honor.  That's the concern,

18   that the Court is telling the jury that these are the relevant

19   exchange rates on those dates and, therefore, that the jury

20   believes that those dates are relevant for purposes of

21   determining damages calculations.

22        And as I noted, Your Honor, the actual relevance of

23   those dates for purposes of evaluating damages has not been

24   established in Plaintiffs' claim.

25        THE COURT:  All right.  Why don't you prepare an

```
 1    instruction and the Court will take judicial notice, because it
 2    doesn't appear that those dates and certainly the amount is in
 3    dispute.
 4              MR. BRENNER:  Thank you, Judge.
 5              THE COURT:  Okay.  All right.  If there's nothing
 6    further, then let's bring in the jury.  And I'm sorry.  Where
 7    is Dr. Edman?
 8              Come on forward, sir.
 9              MS. McGOVERN:  Your Honor, could I must mention one
10    scheduling thing for the Court?
11              THE COURT:  Yes, of course.
12              MS. McGOVERN:  We have a witness that we are going to
13    be calling remotely, and we just want to make sure that we're
14    not advising the Court without enough time to set that up.
15              Mr. Kuharcik had requested, because he has a
16    90-year-old mother, that he would like to testify remotely, so
17    we are going to be presenting that remotely.  And we would like
18    to be able to do that on Friday.
19              THE COURT:  On Friday.
20              All right.  And did you advise Liz, so Liz is aware?
21              MS. McGOVERN:  I thought I would just approach the
22    Court.
23              THE COURT:  And is this via Zoom?  So you want the
24    Court to set that up?
25              MS. McGOVERN:  Yes.
```

```
 1              THE COURT:  What time on Friday?

 2              MS. McGOVERN:  We're not sure if a witness will roll

 3     over from Thursday to Friday.  So Mr. Kuharcik is available to

 4     be flexible in that regard, but we're hoping that it would be

 5     in the morning on Friday at 10:00 a.m.

 6              THE COURT:  All right.  So that would be the first

 7     time, is Friday morning?  Because we would need to set up a

 8     Zoom link for that.

 9              MS. McGOVERN:  Yeah.  I think probably the safest

10     thing to do, in light of the fact that we don't control how the

11     witnesses are going to play, if perhaps we address this a

12     little bit later.  But I just wanted to advise that we're going

13     to be needing the Zoom.

14              MR. RIVERO:  May we have one moment, Your Honor?

15              THE COURT:  Yes.  Certainly.

16              MR. ROCHE:  Your Honor, before the jury comes in, I

17     know I've been told I have a problem speaking too loud.  I

18     think Dr. Edman has the opposite problem.  What I was hoping to

19     do was give Dr. Edman one of these so that he could -- so that

20     the mic picks it up better during the direct examination.

21              THE COURT:  Do you want to give that a try?  Because

22     it was very difficult to understand the testimony.

23              MR. RIVERO:  Your Honor, I thought it was my old ears,

24     but I was having a hard time.

25              THE COURT:  I think it was everyone here.
```

1           Do you want to give it a try?

2           MR. ROCHE:  Turn it on.  Give it a try.

3           THE WITNESS:  Test.

4           MR. ROCHE:  Better.

5           THE WITNESS:  Better?

6           MR. ROCHE:  Yes.

7           MR. FREEDMAN:  You can use both, Dr. Edman, so you

8    can -- also put the other mic closer.

9           MR. ROCHE:  Thank you, Your Honor.

10          THE COURT:  All right.  And with regard to the

11   witness, just let us -- today's obviously Tuesday.  So just let

12   us know at some point today or tomorrow when you need the Zoom

13   link.

14          MS. McGOVERN:  Thank you.

15          THE COURT:  Okay.  All right.  Let's bring in the

16   jury.

17     (Before the Jury, 10:19 a.m.)

18          THE COURT:  Good morning, Ladies and Gentlemen.

19   Please be seated.  It's good to see each of you.

20          And we are ready to get back to work.  You'll recall

21   that we were in the beginning of Dr. Edman's testimony.

22          And, Dr. Edman, let me remind you, you were previously

23   placed under oath.  And let us continue.

24          MR. ROCHE:  Your Honor, I know we have difficulty with

25   positioning this in four dimensions.  Can you see the

65

1    demonstrative if I place it here?

2            THE COURT:  A little bit ...

3            MR. ROCHE:  Okay.

4            THE COURT:  Okay.  Yeah.  Yeah.  Okay.

5            MR. ROCHE:  And no, my handwriting didn't suddenly get

6    better overnight.  That was my colleague, Judy, who rewrote it

7    for us.

8            MR. RIVERO:  May I step over here?

9            THE COURT:  Yes, of course.  Of course.

10                   DIRECT EXAMINATION [CONTINUED]

11   BY MR. ROCHE:

12   Q.  Good morning, Dr. Edman.  So where we left off yesterday

13   was your analysis and conclusions relating to forgery number

14   one.  And we're going to look at nine additional documents that

15   you analyzed this morning, for a total of 10 documents.

16       For those 10 documents, have you reviewed any evidence in

17   this case produced by the Defendants or opined by the experts

18   that anyone but Craig Wright was the one responsible for the

19   manipulations?

20   A.  I have not.

21           MR. ROCHE:  Dorian, can we bring back up the

22   presentation for -- where it was yesterday?  The end of --

23   right before 456.

24       (Pause in proceedings.)

25

16

```
 1            MR. ROCHE:  And I believe Plaintiffs' Exhibit 546 is
 2   already in evidence.
 3            MR. RIVERO:  Judge, our screen isn't working again.
 4            THE COURT:  Mr. Rivero, are you able to see -- look at
 5   another screen, or do you want us to stop the proceedings?
 6            MR. RIVERO:  Judge -- I'll figure it out, Judge.
 7            THE COURT:  Are you certain?
 8            MR. RIVERO:  If it becomes a problem, I'll let the
 9   Court know, but let me see what I can do, Judge.
10            THE COURT:  We're going to bring someone in from IT
11   right now.
12            COURTROOM DEPUTY:  I just sent Christian a message so
13   they can come down.
14            THE COURT:  All right.  And in answer, Mr. Roche, 546
15   is in evidence.
16            MR. ROCHE:  Can we publish to the jury, please.
17   BY MR. ROCHE:
18   Q.  Dr. Edman, is Plaintiffs' Exhibit 546 one of the other
19   documents that you determined was a forgery?
20   A.  It is.
21   Q.  Okay.  We'll refer to 546 as forgery number two.
22            MR. RIVERO:  Objection, Your Honor.  Same objection.
23            THE COURT:  Yes.  And, Mr. Rivero, why don't I give
24   you a continuing objection with regard to --
25            MR. RIVERO:  I appreciate it.  Thank you.
```

67

```
1    BY MR. ROCHE:

2    Q.  Dr. Edman, what does this document purport to be?

3    A.  This document purports to represent an email exchange

4    between Dave Kleiman and Craig Wright from September 7th, 2012.

5    Q.  Rough -- less than a year before Mr. Kleiman passed away?

6    A.  Yes.

7    Q.  And are there any cryptographic signatures contained in

8    this document?

9    A.  Yes.  There are two of them.

10   Q.  And can you show us where the two cryptographic signatures

11   are, or describe where they are on Plaintiffs' Exhibit 546?

12   A.  Sure.  One is at the bottom of the left page and then one

13   is at the bottom of the right page.

14   Q.  Okay.  Let's start with the cryptographic signature on the

15   bottom of the right page.

16        MR. ROCHE:  If we could take the -- down from the

17   jury.  We need to introduce a few exhibits into evidence.

18        Dorian, could we bring up 546.1 and 546.2.

19      (Pause in proceedings.)

20        MR. ROCHE:  Or we can do them one at a time, if that's

21   easier.

22        I think we have 546.2 on the right.

23   BY MR. ROCHE:

24   Q.  Dr. Edman, what is 546.2?

25   A.  546.2 is an analysis of the cryptographic signature from
```

18

```
 1    546.
 2    Q.  Okay.  And did you extract that data during your review of
 3    the authenticity of forgery number two?
 4    A.  I did.
 5            MR. ROCHE:  Dorian, if you can go back to the
 6    PowerPoint.  I think 546.1, we can review in the ...
 7            Go to the next.
 8            Perfect.
 9    BY MR. ROCHE:
10    Q.  Dr. Edman, what is 546.1?
11    A.  546.1 is the analysis of the other cryptographic signature
12    in 546.
13            MR. ROCHE:  Your Honor, we would move to admit 546.1
14    and 546.2 into evidence.
15            MR. RIVERO:  No objection, Your Honor.
16            THE COURT:  Admitted into evidence.
17        (Plaintiffs' Exhibits 546.1 & 546.2 received into
18    evidence.)
19            MR. ROCHE:  Can we publish to the jury, please.
20    BY MR. ROCHE:
21    Q.  Dr. Edman, what is the relationship between 546, which we
22    see the signature is on the top left, and 546.1, which is in
23    the bottom right?
24    A.  The bottom right shows the analysis of the cryptographic
25    signature in the top left.
```

1   Q.  And is there a date associated with the cryptographic

2   signature?

3   A.  There is.  It indicates that the signature was created on

4   February 28th, 2014.

5   Q.  So that signature is created the same day as forgery

6   number one?

7   A.  Correct.

8   Q.  And does that date match the date the email was purportedly

9   sent from Dave Kleiman to Craig Wright?

10  A.  It does not.

11       MR. ROCHE:  Dorian, could we go to the next slide,

12  please.

13       And if you can blow up the highlighted box.

14  BY MR. ROCHE:

15  Q.  Dr. Edman, this is the email that's associated with the

16  cryptographic signature we just looked at, correct?

17  A.  That is correct.

18  Q.  It reads:  "The trust is set up in the Seychelles.  I will

19  arrange a shelf company to manage it in the UK, as we

20  discussed, later.  There is no rush there.  I will leave you

21  and myself off for now and leave it as non-trading.  Just

22  listen to some advice for once, Craig, and trust me to be your

23  friend."

24       And that email was purportedly sent from Dave to Craig.

25  Dr. Edman, do you believe Dave Kleiman sent that email?

20

```
1    A.  I do not.

2    Q.  Why not?

3    A.  Dave was dead at the time the signature for this email was

4    sent.

5    Q.  Okay.

6    A.  Was created.

7    Q.  And did you analyze the other --

8         MR. ROCHE:  And you can take down the blowup for now.

9    BY MR. ROCHE:

10   Q.  Did you analyze the other signature contained within

11   forgery number two?

12   A.  I did.

13        MR. ROCHE:  Can we go to the next slide.

14   BY MR. ROCHE:

15   Q.  Is this similar to the signature we looked at in 546.1?

16   A.  It is.

17   Q.  Can you explain for the jury the relationship between the

18   first signature in 546 and what we're looking at in 546.2?

19   A.  It is the signature or the analysis of the signature in the

20   other email, the one on the left.  This signature purports to

21   have been made March 4th, 2014.

22   Q.  Okay.  And does that match the date of the email?

23   A.  It does not.

24        MR. ROCHE:  Dorian, could we go to the next slide,

25   please.  And could you blow up the text in the first email in
```

71

1    the chain that's highlighted.

2    BY MR. ROCHE:

3    Q.  And this email was purportedly written from Dave to Craig

4    on September 12th -- September 7th, 2012.  "You set up the

5    exchange in Australia and I get 10 percent of the company to be

6    issued as 80/20 between myself and my father when it is

7    running.  It is confirmed that I have 320,832 Bitcoin and

8    change.  As agreed, I will not tell you who the others I have

9    used here in the US are.  We will exchange soon.  You know this

10   is a great opportunity for you to come over with that lady of

11   yours and to see me.  It needs to be soon.  Too long.

12   Respectfully, Dave Kleiman."

13       Dr. Edman, in your opinion, did Dave Kleiman write that

14   email?

15   A.  No.

16   Q.  Why not?

17   A.  Dave was dead at the time the signature associated with

18   this email was created.

19   Q.  Dr. Edman, did you determine any other documents produced

20   in this litigation by Dr. Wright's team were forgeries?

21   A.  I did.

22       MR. ROCHE:  Dorian -- I believe, Your Honor,

23   Plaintiffs' 135 has already been admitted into evidence.

24       THE COURT:  Yes.  It's in evidence.

25       MR. ROCHE:  Dorian, could we go to the next slide,

1   please.

2   BY MR. ROCHE:

3   Q.  Dr. Edman, is Plaintiffs' Exhibit 135 one of those

4   exhibits?

5   A.  It is.

6       MR. ROCHE:  We'll refer to 135 as forgery number

7   three.

8   BY MR. ROCHE:

9   Q.  Can you describe to the jury --

10      MR. ROCHE:  And maybe if we can blow up the top half

11  of the page on the left?

12      A little further down to sort of have the long strings

13  of text included too.

14      Yeah.  Perfect.

15  BY MR. ROCHE:

16  Q.  What is Plaintiffs' Exhibit 135?

17  A.  This is an email from Craig S. Wright to John Chesher,

18  which forwards a purported email from Dave Kleiman to Craig

19  Wright from October 31st, 2012.

20  Q.  And I see some long strings of text in the email from Dave

21  to Craig.  What are those long strings?

22  A.  Those are Bitcoin addresses.

23  Q.  How do you know those are Bitcoin addresses?

24  A.  Visually they look like Bitcoin addresses and I also

25  verified each one of them by looking them up on a block

23

1    explorer called blockchain.info.

2    Q.  So you confirmed that those are real Bitcoin addresses?

3    A.  I did.

4         MR. ROCHE:  And if -- if you can actually blow that

5    part of the email up again.

6    BY MR. ROCHE:

7    Q.  From Dave to Craig, October 31st, 2012:  "Craig, you need

8    to use that Facebook picture of yours for a corporate profile.

9    Then with the UK group you can be Bond and the villain all at

10   the same time.  Right now, the trust holds the following keys."

11   And it goes on.

12       Those are -- "the following" are the Bitcoin public

13   addresses?

14   A.  Correct.

15   Q.  Dr. Edman, is this document a forgery?

16   A.  In my opinion, it is, yes.

17       MR. ROCHE:  And if you could open -- close that out

18   and focus on the cryptographic signature, the box on the right.

19   BY MR. ROCHE:

20   Q.  Did you analyze this signature?

21   A.  I did.

22       MR. ROCHE:  Dorian, if you could take that down and if

23   you can take down the presentation from the jury.

24       We'll move to 135.1.

25

```
1    BY MR. ROCHE:

2    Q.  Dr. Edman, what is Plaintiffs' Exhibit 135.1?

3    A.  This is my analysis of the cryptographic signature using

4    GnuPG.

5            MR. ROCHE:  Your Honor, at this point, we would move

6    to admit 135.1 into evidence.

7            MR. RIVERO:  No objection, Your Honor.

8            THE COURT:  Admitted into evidence.

9        (Plaintiffs' Exhibit 135.1 received into evidence.)

10           MR. ROCHE:  Dorian, if we could go back to the

11   presentation -- next.  Yep.  And -- great.

12   BY MR. ROCHE:

13   Q.  Dr. Edman, what is the relationship between 135, the

14   signature we see in the left, and 135.1 -- go ahead.  What's

15   the relationship?

16   A.  135 shows that the signature -- or 135.1, rather, shows

17   that the signature in 135 was created on March 2nd, 2014.

18   Q.  March 2nd?

19   A.  Correct.

20   Q.  So just two days after forgery one and two?

21   A.  Correct.

22   Q.  Dr. Edman, does that match the date in Plaintiffs' Exhibit

23   135?

24   A.  It does not.

25   Q.  And do you believe Dave Kleiman sent this email to Craig
```

1    Wright?

2    A.  I do not.

3    Q.  Why not?

4    A.  Dave was dead at the time.

5         MR. ROCHE:  Your Honor, the next exhibit we'd like to

6    show is 55, and I believe that's in evidence as well.

7         THE COURT:  Just one moment.

8      (Pause in proceedings.)

9         THE COURT:  Yes.  It is in evidence.

10   BY MR. ROCHE:

11   Q.  Dr. Edman, what does Plaintiffs' Exhibit 55 show?

12   A.  This purports to show an email exchange between Dave

13   Kleiman and Craig S. Wright on December 15th, 2012.

14   Q.  Dr. Edman, in your opinion, is Plaintiffs' Exhibit 55 a

15   forgery?

16   A.  Yes.

17   Q.  Okay.  We will refer to Plaintiffs' Exhibit 55 as forgery

18   number four.

19       Dr. Edman, how did you conclude Plaintiffs' Exhibit 55 was

20   a forgery?

21   A.  By analyzing the cryptographic signature.

22   Q.  And that's the box highlighted?

23   A.  Correct.

24         MR. ROCHE:  If we could take that down.

25         I want to just read the contents.  From Dave to Craig:

1    "No need.  There are several others from October if we come

2    into any issues, but we only need one.  Your trust is in the

3    Seychelles.  And you want to have nothing of mine in P, so it

4    should all be good.  We only need one dormant and untraded

5    company to sit as the owner of Bitcoin we are mining into them.

6    I am assuming you do not want W&K ID to be a director.  The

7    Brits do not allow this."

8            If we could take down the presentation and show

9    Dr. Edman 55.1 and 55.3.

10   BY MR. ROCHE:

11   Q.  Dr. Edman, what is Plaintiffs' Exhibit 55.1?

12   A.  55.1 shows metadata objects that I extracted from 55.

13   Q.  So 55.1's metadata?

14   A.  Correct.

15   Q.  And what's 55.3?

16   A.  55.3 is the analysis of the cryptographic signature in 55.

17   Q.  So you analyzed both the metadata and the cryptographic

18   signature in 55?

19   A.  Correct.

20           MR. ROCHE:  Your Honor, we move to admit 55.1 and 55.3

21   into evidence.

22           MR. RIVERO:  No objection.

23           THE COURT:  Admitted into evidence.

24       (Plaintiffs' Exhibits 55.1 & 55.3 received into evidence.)

25           MR. ROCHE:  Dorian, if we could go back to the next

27

1    page of the presentation.

2    BY MR. ROCHE:

3    Q.  Okay.  Dr. Edman, what does 55.1 show?  I see there's a

4    couple boxes.

5    A.  55.1 is the PDF metadata.  It shows that the PDF file is

6    created March 26th, 2014 in the time zone UTC+11 and then

7    modified about two and a half minutes later.  The creator of

8    the document appears to be a user named Craig Wright.

9         MR. ROCHE:  Dorian, if we could go to the next slide,

10   please, 55.3.

11   BY MR. ROCHE:

12   Q.  Dr. Edman, is this the analysis of the cryptographic

13   signature?

14   A.  It is.

15   Q.  And what -- can you explain for the jury the relationship

16   between 55 and 55.3?

17   A.  55.3 is my analysis of the cryptographic signature in 55.

18   Q.  And I'm sorry.  What's the date associated with the

19   cryptographic signature?

20   A.  The date on the cryptographic signature indicates it was

21   created March 2nd, 2014.

22   Q.  The same day as forgery number three and just a few days

23   after forgery one and two?

24   A.  Correct.

25   Q.  Does that signature match the date Dave Kleiman purportedly

28

1  sent this email to Craig Wright?

2  A.  It does not.

3  Q.  Do you believe Dave Kleiman sent this email to Craig

4  Wright?

5  A.  I do not.

6       MR. ROCHE:  Your Honor, I believe 452 is also already

7  in evidence.

8       THE COURT:  Yes.  It is in evidence.

9       MR. ROCHE:  Dorian, if we could go forward to the next

10 slide.

11 BY MR. ROCHE:

12 Q.  Dr. Edman, what is Plaintiffs' Exhibit 452?

13 A.  452 purports to show a screenshot of an application called

14 Bitmessage.

15 Q.  What is -- you said Bitmessage.  What is Bitmessage?

16 A.  Bitmessage is an encrypted peer-to-peer messaging system.

17 Q.  Okay.  So what's the difference between Bitmessage and a

18 normal text message?

19 A.  In Bitmessage, messages between users are relayed through

20 other Bitmessage users as opposed to, say, an SMS text which is

21 relayed through our phone provider.

22 Q.  So is what we're looking at here the purported history of

23 Bitmessages between Craig and Dave?

24 A.  Yes.

25 Q.  And the "From" field shows the sender, and the "To" field

29

1    says -- shows who received it?

2    A.  Yes.

3    Q.  Now, I see it's like -- the screen looks like the Windows

4    pop-up screen.  Is this an electronic document we're looking

5    at?

6    A.  No.  I believe this was produced as a scan of a hard copy.

7    Q.  All right.  And what -- what does the message -- what is

8    the purported date of the message that appears to be

9    highlighted in the printout?

10    A.  November 6th, 2012.

11           MR. ROCHE:  Dorian, could you blow up the top part of

12    the message -- or starting at:  "Craig," the bottom half of the

13    screen.

14           Perfect.

15    BY MR. ROCHE:

16    Q.  Reads:  "Craig, as you wanted, the trust will offer the

17    loan to you.  The process is defined as follows:  The keys are

18    divided using Shamir's secret sharing scheme you had us work

19    on.  There are 15 key segments divided with a threshold of 12."

20    Then it goes on to describe who holds those keys.  "Uyen and I

21    cannot let you know who the others are.  You do not know them

22    personally as far as I'm aware." The last line reads:  "The

23    remainder of the trust will vest when the conditions are

24    fulfilled.  As agreed, Dave."

25           Dr. Edman, in your opinion, is Plaintiffs' Exhibit 452

30

1   authentic?

2   A.  No.

3   Q.  Is it a forgery?

4   A.  In my opinion, yes.

5   Q.  We'll refer to this 452 as forgery number five.

6       Dr. Edman, what is the basis for your opinion that 452 is a

7   forgery?

8   A.  This particular message purports to have been received on

9   November 6th, 2012.  However, the Bitmessage application was

10  not publicly released until November 19th, 2012.

11  Q.  So this program, Bitmessage, wasn't even released until a

12  couple weeks after that message was sent?

13  A.  Correct.

14  Q.  How do you know that?

15  A.  I reviewed the GitHub history for Bitmessage.  I

16  interviewed the developer of Bitmessage, a gentleman named

17  Jonathan Warren, and I also reviewed Jonathan Warren's

18  deposition transcripts.

19  Q.  Okay.  So let's break that down.  You said:  "GitHub

20  history."  Can you describe to the jury what you mean when you

21  say you reviewed the GitHub history for Bitmessage?

22  A.  GitHub history -- GitHub is a website for sharing source

23  code, and it lets you look back at sort of the development

24  process associated with the software application.

25  Q.  And you said you interviewed Jonathan Warren and you read

81

```
1    his transcript.  Who is Jonathan Warren?

2    A.  The developer of Bitmessage.

3    Q.  The person who created this program?

4    A.  Correct.

5    Q.  Is he also the individual we saw testify by video

6    deposition I think two Fridays ago?

7    A.  I understand he did, yes.

8    Q.  Okay.  Dr. Edman, what does a person need to have in order

9    to send and receive a Bitmessage?

10   A.  You need to have a Bitmessage address which has associated

11   with it certain private keys.

12   Q.  So I need a private key to send a Bitmessage?

13   A.  Correct.

14   Q.  Okay.  And if I get a Bitmessage from somebody, can I see

15   who sent it?

16   A.  You can see the address of the individual who sent it,

17   which you can associate with a human readable name.

18   Q.  And so if I have somebody's private key for their

19   Bitmessage, can I impersonate that person?

20   A.  Yes.

21        MR. ROCHE:  Dorian, if we can take down from the jury.

22   And you can go to Plaintiffs' Exhibit 613.

23   BY MR. ROCHE:

24   Q.  Dr. Edman, what is Plaintiffs' Exhibit 613?

25   A.  613 is a keys.dat file produced by the Defendant.
```

32

```
1    Q.  So is it your understanding it was in the Defendant's
2    possession, custody, or control?
3    A.  That is my understanding.
4    Q.  And did you review this during your analysis of Plaintiffs'
5    Exhibit 452?
6    A.  I did.
7           MR. ROCHE:  Your Honor, we move to admit 613 into
8    evidence.
9           MR. RIVERO:  Objection, Your Honor.  No foundation has
10   been laid.  This is a document that was shown to the -- to
11   Dr. Wright, and they weren't able to lay a foundation.  So we
12   object to 613.
13          MR. ROCHE:  Your Honor, this document is not being
14   offered for the truth -- the foundation is that Dr. Edman
15   reviewed this.  It was produced by the Defendant, and he's
16   offering this document to show it, in fact, came from the
17   Defendant's possession, custody, or control.
18          THE COURT:  Anything further, Mr. Rivero?
19          MR. RIVERO:  Your Honor, just to be clear, it is not
20   being offered for the truth of the matter asserted.  If that's
21   the -- if that's understood, then we have no objection.
22          THE COURT:  The objection is noted.  It's overruled.
23   It will be admitted into evidence.
24      (Plaintiffs' Exhibit 613 received into evidence.)
25          MR. ROCHE:  Dorian, if we could go back to the slide
```

83

1    and publish the 613 exhibit.

2    BY MR. ROCHE:

3    Q.  Dr. Edman, what does Plaintiffs' Exhibit 613 show?

4    A.  613 shows an excerpt from a Bitmessage keys.dat file which

5    contains private keys and that are purportedly associated with

6    Dave Kleiman.

7    Q.  Keys.dat file, can we start with that?  What is a keys.dat

8    file?

9    A.  It's a configuration file for Bitmessage that contains

10   application settings as well as address blocks, addresses that

11   you can use to send Bitmessages.

12   Q.  So it's like a document used to store your keys.

13           MR. RIVERO:  Objection, Judge.  Leading.

14           THE COURT:  Sustained.

15   BY MR. ROCHE:

16   Q.  Can you use an analogy to describe what a keys.dat file is?

17   A.  It's sort of like a wallet that contains private keys that

18   you can use to communicate with other Bitmessage users.

19   Q.  And what does the Bitmessage documentation say about

20   keys.dat files?

21   A.  It says that your keys.dat files should be protected,

22   because if the contents were disclosed it could be used to

23   impersonate other Bitmessage users.

24   Q.  Do you agree with that description, that if it's not

25   protected it can be used to impersonate somebody else?

84

```
 1   A.  I do.
 2   Q.  So is what we're looking at in P613 essentially a password
 3   file for a Bitmessage account?
 4           MR. RIVERO:  Objection, Judge.  Leading.
 5           THE COURT:  Sustained.
 6   BY MR. ROCHE:
 7   Q.  Dr. Edman, can you read the name associated with this
 8   particular private key?
 9   A.  The "Label" field indicates that it's associated with Dave
10   Kleiman.
11   Q.  And where do you understand this keys.dat file to have
12   originated?
13   A.  I understand it was produced by the Defendant.
14   Q.  So, in essence, the Defendant had the ability to sign
15   Bitmessages with an account associated with Dave Kleiman?
16           MR. RIVERO:  Objection.  Leading.
17           THE COURT:  Sustained.
18   BY MR. ROCHE:
19   Q.  What does this tell us about the Defendant's ability to use
20   this keys.dat file?
21   A.  It tells us that the Defendant had the ability to create
22   Bitmessages similar to the ones shown in, I believe it was 452,
23   that purportedly came from Dave Kleiman.
24   Q.  And how do you know that this private key corresponds to
25   the address on the screen associated with Dave Kleiman?
```

1    A.  I used the Bitmessage software to verify that the private

2    keys shown in this particular screenshot correspond to the

3    address at the top associated with Dave Kleiman.

4    Q.  So you were able to use the software to verify that?

5    A.  Yes.

6    Q.  And were you able to determine when the last time this

7    keys.dat file was used?

8    A.  Yes.  The last hub key send time indicates that it was last

9    used on, I believe it was February 28th, 2014.

10   Q.  February 28th, 2014.  So forgeries one, two, three, four,

11   and five were all created approximately three days from each

12   other?

13          MR. RIVERO:  Objection.  Leading.

14          THE COURT:  Sustained.

15   BY MR. ROCHE:

16   Q.  Dr. Edman -- we'll move on.

17          MR. ROCHE:  If we can take down from the jury and go

18   to Plaintiffs' Exhibit 807.

19   BY MR. ROCHE:

20   Q.  Dr. Edman, can you see Plaintiffs' Exhibit 807?

21   A.  I can.

22   Q.  Dr. Edman, was this document produced by the Defendant in

23   this litigation?

24   A.  Yes.

25   Q.  Do you understand whether or not this document was ever

86

1    submitted to the Court in this litigation?

2    A.  I understand it was.

3    Q.  And did you previously opine on this document in the

4    context of that submission?

5    A.  I did.

6         MR. ROCHE:  Your Honor, we move to admit Plaintiffs'

7    Exhibit 807 into evidence.

8         MR. RIVERO:  Objection.  Hearsay, Your Honor.

9         MR. ROCHE:  Your Honor, it's not being offered for the

10   truth of the matter asserted.  It's being offered to show, one,

11   that the Defendant had possession, custody, or control of this

12   document, and two, that it was previously submitted in this

13   litigation.

14        THE COURT:  The objection is overruled.  It will be

15   admitted into evidence.

16     (Plaintiffs' Exhibit 807 received into evidence.)

17        MR. ROCHE:  If we could go back to the slide, please.

18   BY MR. ROCHE:

19   Q.  Dr. Edman, what is Plaintiffs' Exhibit 807?

20   A.  807 is a PDF that purports to represent an email from Dave

21   Kleiman, with Dave's last name spelled incorrectly, to Uyen

22   Nguyen on December 20th, 2012.

23   Q.  Where do you see his last name being spelled incorrectly?

24   A.  In the "From" field.

25        MR. ROCHE:  Could we highlight that.

87

1    BY MR. ROCHE:

2    Q.  So the "I" and the "E" are flipped?

3    A.  It appears so, yes.

4    Q.  Okay.

5        MR. ROCHE:  Dorian, could you highlight the -- or blow

6    up the paragraph that's highlighted.

7    BY MR. ROCHE:

8    Q.  From Dave purportedly to Uyen Nguyen:  "I will ask you to

9    be a director with me in W&K Information Defense Research.  We

10   are setting up a company in Australia and we'll move the assets

11   back from Panama once this is complete.  We placed them there

12   to protect Craig."

13       Dr. Edman, is this document an authentic email from Dave

14   Kleiman to Uyen Nguyen?

15   A.  In my opinion, it is not.

16   Q.  Running out of space here.  We're going to flip this over

17   and refer to this, 807, as forgery number six.

18       How did you determine that this document was a forgery?

19   A.  By analyzing the metadata associated with the document, as

20   well as the cryptographic signature.

21   Q.  Both the metadata and the cryptographic signature in this

22   document?

23   A.  Correct.

24       MR. ROCHE:  All right.  We're going to have to move

25   some things into evidence, so if we can take that down again.

88

```
1            801, 802, and 803, please.  We can start with -- one
2    by one.
3    BY MR. ROCHE:
4    Q.  Dr. Edman, what is 807.1?
5    A.  This is a metadata object that I extracted from the PDF.
6            MR. ROCHE:  If we can go to 807.2.
7    BY MR. ROCHE:
8    Q.  What is the document?
9    A.  This is a PDF object that I extracted from the PDF.
10   Q.  And when you say:  "Extracted from the PDF," you mean you
11   extracted it from 807?
12   A.  That is correct.
13   Q.  Okay.  And what is 807.3?
14   A.  This is my analysis of the cryptographic signature in the
15   document.
16   Q.  Cryptographic signature from 807?
17   A.  Correct.
18           MR. ROCHE:  Move to admit 807.1, 807.2 and 807.3 into
19   evidence.
20           MR. RIVERO:  No objection.
21           THE COURT:  Admitted into evidence.
22       (Plaintiffs' Exhibits 807.1, 807.2 & 807.3 received into
23   evidence.)
24           MR. ROCHE:  If we can go back to the -- all right.
25
```

1    BY MR. ROCHE:

2    Q.  Dr. Edman, what is the relationship between 807 and 807.3?

3    A.  807.3 shows my analysis of the cryptographic signature from

4    807.  In particular, it shows that the signature was made March

5    12th, 2014.

6    Q.  Does that match the date on the cover of the email from

7    Dave to Uyen Nguyen?

8    A.  It does not.

9        MR. ROCHE:  Dorian, if we could go to the next slide,

10   please.

11   BY MR. ROCHE:

12   Q.  Is there anything else about this document that indicates

13   it is a forgery?

14   A.  The create date shown on line 12 indicates that the

15   document was created April 17th, 2014 in time zone UTC+10.  And

16   then modified approximately five minutes afterwards.

17   Q.  Now, you -- I think yesterday we looked at a timestamp that

18   was UTC+11.  Is there any explanation for why this document

19   shows UTC+10 but the forgery number one showed UTC+11?

20   A.  UTC+10 and UTC+11 are two time zones predominately

21   associated with Eastern Australia.  It just depends on Daylight

22   Savings Time down there.

23   Q.  And do you understand April to have occurred after Daylight

24   Savings in Australia?

25   A.  Yes.

40

```
1            MR. ROCHE:  If we could, Dorian, go to 807.1.  Oh,
2    we're in -- 807.2.
3    BY MR. ROCHE:
4    Q.  Dr. Edman, can you tell us what 807.2 shows us about 807?
5    A.  807.2 is a PDF object that contains a marker called TouchUp
6    Text edit, which is shown in the box on the left there.
7    Typically, that indicates that portions of the following text
8    have been modified.
9        The red highlighted portions on the left indicate portions
10   of the text that have been modified which correspond to the red
11   text on the right from 807.
12   Q.  Okay.  So I want to break that down.  So 807 is a PDF?
13   A.  Yes.
14   Q.  And can you open up and edit a PDF?
15   A.  You can.
16   Q.  And the TouchUp Text edit, what does that indicate as to
17   how or whether the PDF was modified?
18   A.  It's usually an indicator that portions of the text
19   following the TouchUp Text edit marker have been modified.
20   Q.  And you said -- so I want to understand -- there's a bunch
21   of numbers on the left that we've highlighted sort of halfway
22   down the page.  How do those correspond -- because it's just a
23   bunch of numbers.  How does that correspond to the text on the
24   right?
25   A.  So the letters and numbers highlighted in red, each four
```

1    characters there -- so, for example, 0027 -- corresponds to a

2    particular letter displayed on the right.

3    Q.  So it's a code for the letter changes that appear in the

4    visible document?

5    A.  Correct.

6    Q.  Do you have any opinion about how the PDF for forgery

7    number six was created?

8    A.  I do.

9         MR. ROCHE:  Your Honor, I believe 856 is already in

10   evidence.

11        THE COURT:  Yes.  It's in evidence.

12        MR. ROCHE:  Don't go to the next slide yet.

13   BY MR. ROCHE:

14   Q.  How do you believe the PDF in 807 was created?

15   A.  I believe it was created from an email that was sent from

16   Craig Wright to Craig Wright, and then a PDF created of that

17   email.

18        MR. ROCHE:  Okay.  Dorian, could we go to the next

19   slide, please.

20   BY MR. ROCHE:

21   Q.  Is this the email you were referring to?

22   A.  It is.

23   Q.  And what does the comparison between 807 and 856 show?

24   A.  It shows that the messages are identical and they contain

25   identical cryptographic signatures, except for the email on the

42

```
1   right was sent April 16th, 2014.

2   Q.  April 16, 2014.  And did you compare the cryptographic

3   signatures --

4   A.  I did.

5   Q.  -- in 807?

6       What did that comparison show?

7   A.  They're identical.

8   Q.  So forgery number six was a PDF, but what we're looking at

9   on the right is the email that forgery number six comes from?

10  A.  Correct.

11  Q.  And did you analyze any of the headers contained within

12  856?

13  A.  I did.

14          MR. ROCHE:  If we could take it down from the jury.

15          And, Dorian, if we could please pull up 856.1 and

16  856.2.

17  BY MR. ROCHE:

18  Q.  Dr. Edman, what are 856.1 -- let's start with 856.1.

19  A.  856.1 shows the mail transport headers that I extracted

20  from the email.

21  Q.  And what does 856.2 show?

22  A.  856.2 is what's called a GeoIP lookup that maps an IP

23  address to an approximate physical location.

24  Q.  And did you, yourself, pull the results from 856.2?

25  A.  I did.
```

43

```
1    Q.  Is it reliable?

2    A.  I believe so.

3          MR. ROCHE:  Your Honor, we move to admit 856.1 and

4    856.2 into evidence.

5          MR. RIVERO:  No objection, Your Honor.

6          THE COURT:  Admitted into evidence.

7      (Plaintiffs' Exhibits 856.1 & 856.2 received into

8    evidence.)

9          MR. ROCHE:  If we could go to the next slide, please.

10   BY MR. ROCHE:

11   Q.  Okay.  A lot of text here.  Let's slowly walk through the

12   highlighted boxes on 856.1 and tell the jury what that tells us

13   about the email in 856.

14   A.  Sure.  So starting with line 40, the "From" field indicates

15   this email was sent from craig.wright@hotwirepe.com.

16      Line 41 shows the "To" field indicates the email was sent

17   to craig.wright@itmasters.edu.au.

18      Line 42 shows the subject was:  "Appointment letter" with

19   three P's.

20      And then line 45, the "Date" field indicates the email was

21   sent April 16th, 2014.

22   Q.  April 16th, 2014?

23   A.  Correct.

24   Q.  That's the date we wrote up on the board for forgery six?

25   A.  It is.
```

44

1    Q.  Dr. Edman, I see there's a final line there pointing to

2    856.2.  What does line 51 show?

3    A.  So line 51 on the left shows that the email originated from

4    the IP address 58.160.32.123, which, according to the GeoIP

5    lookup I did, corresponds to Eastern Australia.

6    Q.  All right.  Let's talk about that a little bit.  What is an

7    IP address?

8    A.  An IP address is sort of like a phone number for a computer

9    or device on the Internet.

10   Q.  Okay.  And are you able to tell -- I guess what does 856.2

11   tell us about that IP address?

12   A.  It tells us that the IP address at the time I performed

13   this lookup corresponded to Eastern Australia.

14   Q.  And were you here when the Defendant testified he lived in

15   Australia in 2014?

16   A.  I was.

17   Q.  Okay.  Now, did you review any other documents that were

18   created around the same time that forgery number six was

19   created?

20   A.  I did.

21        MR. ROCHE:  If we could take the document down.

22        And go to -- oh, from the jury.  My bad.

23        And go to the next slide, 808.

24   BY MR. ROCHE:

25   Q.  Dr. Edman, what is Plaintiffs' Exhibit 808?

1   A.   808 is another PDF that purports to represent a separate

2   email from Dave Kleiman to Uyen Nguyen on December 20th, 2012.

3   Q.   Dr. Edman, was this document produced by the Defendants in

4   this litigation?

5   A.   I understand it was, yes.

6   Q.   Do you understand whether or not it was ever submitted to

7   this Court?

8   A.   I understand it was, yes.

9   Q.   And did you previously opine on this document in the

10  context of that submission?

11  A.   I did.

12       MR. ROCHE:   Your Honor, we move to admit Plaintiffs'

13  Exhibit 808 into evidence.

14       MR. RIVERO:   Objection.   Hearsay, Judge.   We don't

15  think it's admissible as substantive evidence but only as a

16  demonstrative.

17       MR. ROCHE:   It's admissible because it's going to show

18  the Defendant's possession, custody, and control of the

19  document.

20       THE COURT:   The objection is noted.   It's overruled.

21  It will be admitted into evidence.

22    (Plaintiffs' Exhibit 808 received into evidence.)

23       MR. ROCHE:   If we could publish to the jury, please.

24       Thank you.

25

46

```
1    BY MR. ROCHE:

2    Q.  Dr. Edman, what does Plaintiffs' Exhibit 808 show?

3    A.  808 shows an email from Dave Kleiman -- and again with

4    Dave's last name spelled incorrectly -- to Uyen Nguyen on

5    Thursday, December 20th, 2012.

6    Q.  Okay.  And it says:  "Uyen, I am glad you will accept being

7    a director of W&K.  As soon as I am out of the VA, I will get

8    all of the paperwork fixed for the company.  We will make sure

9    it is maintained as I'm a little behind.  Nothing too bad, but

10   old illnesses.  I will be back soon."  And later it's signed

11   "Dave."

12       Dr. Edman, in your opinion, is Plaintiffs' Exhibit 808 a

13   forgery?

14   A.  Yes.

15   Q.  Okay.  We will refer to this as forgery number seven.

16       MR. ROCHE:  I apologize for my handwriting

17   progressively getting worse.

18   BY MR. ROCHE:

19   Q.  Dr. Edman, how did you determine that 808 was a forgery?

20   A.  By analyzing the metadata and contents of the PDF.

21       MR. ROCHE:  Could we take down and put up 807.1.

22   BY MR. ROCHE:

23   Q.  Dr. Edman, what is Plaintiffs' Exhibit 807.1?

24   A.  It is metadata that I extracted from the PDF file.

25       MR. ROCHE:  And let's go to 808.1.
```

47

1    BY MR. ROCHE:

2    Q.  What is 808.1?

3    A.  This is metadata that I extracted from 808.

4          MR. ROCHE:  And can we also bring up 808.2.

5    BY MR. ROCHE:

6    Q.  Dr. Edman, what is 808.2?

7    A.  This is a PDF object that I extracted from 808.

8          MR. ROCHE:  I believe 807.1 was already in evidence.

9    So move for 808.1 and 808.2 to be admitted into evidence.

10          MR. RIVERO:  No objection.

11          THE COURT:  Admitted into evidence.

12      (Plaintiffs' Exhibits 808.1 & 808.2 received into

13    evidence.)

14          MR. ROCHE:  If we could go to -- back to the slides,

15    please.

16    BY MR. ROCHE:

17    Q.  All right.  How did you determine 808.1 was a forgery?

18    A.  So if we look at the metadata, you see that on line 12, in

19    both boxes, for instance, the two documents have the same

20    create date.  If you look at line 11, you see that 808 was

21    modified about five minutes after 807.

22          MR. ROCHE:  Let's highlight 11 and 12, please, in

23    both -- 807.1.

24    BY MR. ROCHE:

25    Q.  And before we go on, 807.1 is metadata taken from forgery

48

1    number six?

2    A.  Correct.

3    Q.  And 808.1 is metadata that you extracted from 808?

4            MR. RIVERO:  Objection.  Leading.

5            THE COURT:  Sustained.

6    BY MR. ROCHE:

7    Q.  What is 808.1?

8    A.  808.1 is metadata that I extracted from 808.

9    Q.  Okay.  So besides the create date and modify date, is there

10   anything else about the metadata in 807.1 and 808.1 that

11   indicates that forgery number seven is a forgery?

12   A.  Yes.  If you look at lines 15 and 16 from both metadata

13   objects, you see that the two documents have the exact same

14   document ID, but different instance IDs.

15   Q.  Okay.  So line 15 is the document ID.  That's the 6a5e8226

16   number?

17   A.  Correct.

18   Q.  And they're the same in both 807.1 and 808.1?

19   A.  Correct.

20   Q.  What does that tell us?

21   A.  It tells us that the -- they are basically two revisions of

22   the exact same document.

23   Q.  And the -- what is an instance ID?

24   A.  So a document ID identifies a particular document, but an

25   instance ID identifies a revision of that document.

1    Q.  Can you describe for the jury an example of how someone

2    would create two documents with the same document ID but

3    different instance IDs?

4    A.  Sure.  If you open a document and then modify it and say

5    that it is a new document, it will have the same document ID

6    but different instance IDs.

7    Q.  So if you copy a file on your desktop, that would have the

8    same document ID?

9    A.  It would.

10        MR. ROCHE:  Let's go to the next slide, 808.2.

11   BY MR. ROCHE:

12   Q.  All right.  Dr. Edman, this looks similar to 807.2.  Can

13   you tell what 808.2 tells us about how forgery number seven was

14   created.

15   A.  The red boxes on the left in 808.2 correspond to the

16   modifications that were made in 807.  The blue highlighted text

17   corresponds to additional modifications that were made to

18   create 808.  In particular, you can see that certain portions

19   of the time associated with the purported email were changed.

20   Q.  So the edit in between forgery number six and forgery

21   number seven shown here is the time?

22   A.  Correct.

23        MR. ROCHE:  Dorian, if we could go to the next slide,

24   please.

25

50

```
 1    BY MR. ROCHE:

 2    Q.  All right.  We're looking at 807 on the left from Dave to

 3    Uyen, and 808 on the right from Dave to Uyen, forgery number

 4    six and forgery number seven.  Did Dr. Wright submit 807 and

 5    808 to this Court during this litigation?

 6    A.  I understand that he did.

 7    Q.  Do you understand the context of those submissions?

 8    A.  My understanding is that they were submitted in a previous

 9    motion, as I understand it, to get the case thrown out.

10         MR. RIVERO:  Objection.  Objection, Your Honor.

11    Objection.  This misstates the procedural history of this case

12    and this witness has no expertise --

13         THE COURT:  The objection is sustained.

14         Ladies and Gentlemen, you will disregard that last

15    comment.

16    BY MR. ROCHE:

17    Q.  Did you previously file affidavits with this Court showing

18    that forgeries number six and seven were, in fact, forgeries?

19    A.  I did.

20    Q.  Were these the only documents filed by the Defendant in

21    this case that you testified were forgeries?

22    A.  No.

23    Q.  We'll add a star here to indicate that these were

24    submitted --

25         MR. RIVERO:  Objection, Your Honor.  Objection.
```

1    Misstates the procedural history of this case and there's no

2    record evidence right now of that fact.

3              MR. ROCHE:  Your Honor --

4              MR. RIVERO:  This witness can't testify to that, Your

5    Honor.

6              MR. ROCHE:  Your Honor, if we may have a sidebar?

7              THE COURT:  Yeah.  Come on forward.

8         (At sidebar on the record.)

9              MR. ROCHE:  In your order overturning Judge Reinhart's

10   sanctions -- and I have a copy for you, Mr. Rivero -- that --

11   you said that:  "Plaintiffs have not carried their burden to

12   show that default sanctions are appropriate.  Instead, they

13   have laid the foundation for an overarching theme that the

14   Defendant has run a risk-benefit analysis to determine that

15   forgery and perjury is an affordable and, in fact, efficient

16   mechanism to fight this case.

17             "The evidence and arguments Plaintiffs raise in this

18   regard can be used effectively to persuade a jury, but they do

19   not establish bad faith by clear and convincing evidence."

20             So the point of your order was to show the fact that

21   he did this to the jury.

22             COURT REPORTER:  I can't hear you.

23             THE COURT:  Response?

24             MR. RIVERO:  Judge, they are getting a full chance to

25   establish, including the use of the word "forgery," everything

52

1    they say that this witness can testify about, but they are now

2    asking him to testify about the procedural history of the case.

3    And some of these statements -- first of all, he doesn't have a

4    basis.  He's not an expert about the procedural history of the

5    case.  And some of these statements are incorrect, Judge.

6         As a matter of fact, there was a document that they

7    have attempted to use that was withdrawn, as the Court may

8    recall.  So this is a complicated procedural history, Judge.

9    They may not be able to do that with this witness.  But if they

10   want to do that, then they could use other methods.  They would

11   have to show the procedural history.  But to now ask this

12   gentleman, who is not a lawyer and does not know what happened,

13   it's just not the right way to do it.  They're getting a full

14   exposition of their position.

15        MR. ROCHE:  Your Honor -- and during Craig Wright's

16   testimony, you objected on privilege grounds establishing that

17   it was filed through him.  Dr. Edman -- I understand the

18   objection that you sustained to his testimony about what those

19   submissions were about --

20        THE COURT:  It was with regard to his decision as to

21   what to provide.

22        MR. ROCHE:  Correct.  But the fact -- just to the fact

23   that they were submitted during this litigation --

24        THE COURT:  And --

25        MR. ROCHE:  -- is the only thing I ask for

```
 1   permission --

 2          THE COURT:  And, Mr. Roche, let me say that you

 3   certainly have the right to refer to a document provided by the

 4   Defendant.  It's clear the Bates stamp shows the "DEF," but I

 5   am not going to permit a rehashing of what occurred pretrial in

 6   this case, including any attempts to dismiss the case, any

 7   attempts to show that something was or was not a forgery.

 8          Anything pretrial is not admissible in this trial.

 9   You are free to use this expert in any way you choose in terms

10   of his expert opinions, but not with reference to what was

11   filed, what was argued, what was presented pretrial.  It's not

12   appropriate.

13          MR. ROCHE:  So I only ask for clarification because

14   we're about to get it into then, so we don't have to come back

15   up here -- is there's an affidavit, a sworn declaration, that

16   he made during this litigation that we want -- that is already

17   in evidence --

18          THE COURT:  Well, that affidavit is in evidence.

19          MR. ROCHE:  Right.

20          THE COURT:  But the continued reference to --

21          MR. ROCHE:  To the litigation.

22          THE COURT:  -- when the affidavit was presented --

23          MR. FERNANDEZ:  Got it.

24          THE COURT:  -- and for what purpose, is inappropriate.

25          MR. ROCHE:  Okay.  Got it.
```

54

```
 1          (End of discussion at sidebar.)

 2              MR. ROCHE:  All right.  If we could go to the next

 3   slide which was admitted into evidence as Plaintiffs'

 4   Exhibit 822.

 5   BY MR. ROCHE:

 6   Q.  Do you recognize this document?

 7   A.  I do.

 8   Q.  All right.  I just want you to describe what the document

 9   is, not the context or the circumstances surrounding the

10   document.

11   A.  This is a sworn declaration of Dr. Craig S. Wright

12   regarding a number -- the authenticity of --

13              MR. RIVERO:  Objection, Judge.  The document speaks

14   for itself.  Again, why does this witness have any expertise?

15              THE COURT:  Yeah.  The objection is sustained.  It's

16   in evidence.

17              MR. ROCHE:  Okay.

18   BY MR. ROCHE:

19   Q.  And do you understand that as part of this declaration

20   Dr. Craig Wright swore that certain documents were authentic?

21              MR. RIVERO:  Objection, Judge.  Leading, and it's the

22   same subject matter.

23              THE COURT:  It's in evidence.  You may certainly refer

24   to any portion of the exhibit as opposed to paraphrasing.

25              MR. ROCHE:  Okay.
```

55

```
1    BY MR. ROCHE:

2    Q.  Did any of the documents in Plaintiffs' Exhibit 822 -- did

3    you review any of the documents that Dr. Wright submitted in

4    connection with Plaintiffs' Exhibit 822?

5    A.  I did.

6    Q.  And did you determine that any of those that were sworn to

7    be authentic are, in fact, forgeries?

8    A.  In my opinion, yes.

9         MR. ROCHE:  Your Honor, can we check if 35 is in

10   evidence?  I believe it is.

11        THE COURT:  Yes.  It's in evidence.

12        MR. ROCHE:  Dorian, if we could go to the next

13   document, please.

14   BY MR. ROCHE:

15   Q.  All right.  We're looking at Plaintiffs' Exhibit 35.  Is

16   this one of the documents that Craig Wright swore was

17   authentic?

18   A.  It is.

19   Q.  Dr. Edman, is Plaintiffs' Exhibit 35 authentic?

20   A.  In my opinion, no.

21   Q.  All right.  Is it a forgery?

22   A.  In my opinion, yes.

23   Q.  Okay.  We'll refer to this as forgery number eight.

24        And who purportedly sends and receives this document?

25   A.  This document purports to represent an email from Dave
```

56

1   Kleiman to Craig S. Wright.

2   Q.  Okay.  And it says --

3         MR. ROCHE:  Dorian, could you highlight the date of

4   the document, Friday, June 24th, 2011.

5   BY MR. ROCHE:

6   Q.  It states:  "Craig, I think you are mad and this is risky,

7   but I believe in what we are trying to do.  Respectfully, Dave

8   Kleiman."  Then there is a number of attachments called Tulip

9   Trust.pdf.

10        MR. ROCHE:  Could we highlight those?

11  BY MR. ROCHE:

12  Q.  Dr. Edman, do you know how Plaintiffs' Exhibit 35 was

13  collected and produced in this litigation?

14  A.  I understand it was produced as a scan of a hard-copy

15  document.

16  Q.  So how did you determine that this document was a forgery

17  that was produced as a paper copy?

18  A.  I identified an electronic document among the documents

19  produced by the Defendant that appears to correspond to this

20  particular paper copy.

21        MR. ROCHE:  Dorian, if we could pull up 35 and 514,

22  the next slide.

23  BY MR. ROCHE:

24  Q.  Okay.  Dr. Edman, we looked at 35.  What are we looking at

25  in Plaintiffs' Exhibit 514?

57

```
1    A.  514 is the electronic copy identified that appears visually

2    identical to the document in P35.

3    Q.  And the document on the right which has been introduced as

4    51 -- it's got the same date and -- as the date in 35, correct?

5             MR. RIVERO:  Objection.  Leading.

6             THE COURT:  The objection is sustained.

7    BY MR. ROCHE:

8    Q.  Can you please compare the dates between 35 and 514.

9    A.  They're identical.

10   Q.  And did you review any other documents that appear visually

11   similar to 35 and 514?

12   A.  I did.

13            MR. ROCHE:  Dorian, if we could pull up -- oh, this

14   isn't published to the jury.  Can we publish this to the jury,

15   please.

16            Thank you.

17            If we can just -- it's the "Date" fields that are

18   highlighted in the top.

19            Let's move forward to 514 and 518.

20   BY MR. ROCHE:

21   Q.  Okay.  On the left, I see 514 of the document we just

22   looked at.  What is 518?

23   A.  518 is a separate electronic document that appears similar

24   to 514 but has a different date in the "Date" field.

25   Q.  Okay.  Can you compare for the jury the differences in
```

58

1  those dates?

2  A.  Sure.  518 has a date of October 17th, 2014, but 514 has a

3  date of June 24th, 2011.

4  Q.  Okay.  Were you here during Craig Wright's testimony when

5  an email from Denis Mayaka to Craig Wright was shown to the

6  jury?

7  A.  I was.

8  Q.  And do you understand -- what did that email show?

9  A.  That email, as I recall, showed the purchase of a shelf

10  company called Tulip Trading, Ltd.

11  Q.  And what was the date on that email from Denis Mayaka to

12  Craig Wright?

13  A.  I believe that was also October 17th, 2014.

14  Q.  The same date as Plaintiffs' Exhibit 518?

15      MR. RIVERO:  Objection.  Leading.

16      THE COURT:  Sustained.

17  BY MR. ROCHE:

18  Q.  All right.  Let's start with -- oh, Dr. Edman, in your

19  opinion, is there a connection between 518 and 514?

20  A.  Yes.

21      MR. ROCHE:  All right.  Let's start with 518.  We're

22  going to have -- let's do 514.1, 518.1, and let's take it down

23  from the jury.

24  BY MR. ROCHE:

25  Q.  Dr. Edman, what's 518.1?

1    A.  518.1 is a PDF metadata object that I extracted from 518.

2           MR. ROCHE:  And do we have 514 -- or we could go to

3    514.1.

4        (Pause in proceedings.)

5           MR. ROCHE:  Let's do 518.2 and 518.7.  518 ...

6    BY MR. ROCHE:

7    Q.  All right.  Dr. Edman, what is 518.7?

8    A.  518.7 is a printout of a Microsoft website showing an

9    Outlook version history.

10          MR. ROCHE:  Why don't we go back to the PowerPoint and

11   we can show Dr. Edman 514.1 and 518.2.

12   BY MR. ROCHE:

13   Q.  All right.  What is 518.2?

14          MR. RIVERO:  I'm sorry, Judge.  I'm just having

15   trouble following the reference to exhibit numbers because

16   they're not matching up with what I'm seeing.  So I'm confused

17   at this point.  I'm looking at 518.2, but there is a reference

18   to another number.

19          MR. ROCHE:  We haven't shown 518 -- we've just put

20   518.2 on the screen.

21          THE COURT:  Okay.  That's not being shown to the jury

22   yet, correct?

23          MR. ROCHE:  It is not.

24   BY MR. ROCHE:

25   Q.  Dr. Edman, what is 518.2?

60

1    A.   518.2 shows a PDF metadata object that I extracted from

2    518.

3              MR. ROCHE:  And I think if we scroll though we'll find

4    514.1.  If we can just click through the slides.

5              Keep going.

6              Go one more.

7              There we go.

8    BY MR. ROCHE:

9    Q.   And what is 514.1?

10   A.   514.1 shows an excerpt of a metadata object that I

11   extracted from 514.

12             MR. ROCHE:  We move to admit 514.1, 518.1, 518.2, and

13   518.7 into evidence.

14             MR. RIVERO:  No objection.

15             THE COURT:  Admitted into evidence.

16      (Plaintiffs' Exhibits 514.1, 518.1, 518.2 & 518.7 received

17   into evidence.)

18             MR. ROCHE:  Thank you.

19             If we could go back to 518.2.

20             Perfect.  There we go.

21   BY MR. ROCHE:

22   Q.   All right.  A lot of exhibits admitted there.  I think

23   we're looking at 518.2, which you testified was extracted from

24   518.  Can you explain to the jury what we are looking at in

25   518.2?

67

1    A.  518.2 is a PDF metadata object from 518.  If you look at

2    line 13, it shows that this document was created purportedly on

3    July 12th, 2011 in time zone UTC+10, but modified five days

4    before the document was even created, as shown in line 12.

5    Q.  So what's the significance of the fact this was modified

6    five days before it was created?

7    A.  Certainly the dates in the metadata are inconsistent.

8    Q.  Okay.  Does that show evidence of manipulation?

9    A.  Quite possibly, yes.

10   Q.  All right.  And if we look at lines 20 through 23 --

11        MR. ROCHE:  If we can highlight 20 to 23.

12   BY MR. ROCHE:

13   Q.  Walk us through the dates and the information in those

14   lines.

15   A.  Lines 20 through 23 provide additional information

16   regarding the email that was used to create this PDF.

17        Line 20 shows that it was created from an email from

18   craig@panopticrypt.com.

19        Line 21 shows that the email was sent to

20   craig@panopticrypt.com.

21        The subject is:  "Requested attached," as shown in line 22.

22        And line 23 indicates the date associated with the email as

23   October 17th, 2014 in time zone UTC+10.

24   Q.  518.2 is metadata extracted from 518?

25   A.  Correct.

1  Q.  So I want to understand.  Why does the metadata in lines 12

2  to 13 -- can you explain why there is a difference between the

3  dates in lines 12 to 13 and the date in line 23?

4  A.  The date in line 23 likely came from the dates associated

5  with the email used to create the PDF, whereas the dates in

6  lines 12 through 13 came from the computer that was used to

7  create the PDF.

8  Q.  And do you have an opinion as to which date is more

9  reliable?

10 A.  In my opinion, I would rely more on the date from the

11 email.

12 Q.  And why is that?

13 A.  Because that typically comes from a third-party source like

14 an email server, your ISP, as opposed to the "Date" field which

15 comes from the computer.

16 Q.  So -- but the date in line 23, that comes from the email

17 server that this email is routed through?

18         MR. RIVERO:  Objection.  Leading.  Judge, this is --

19         THE COURT:  Sustained.

20         MR. RIVERO:  -- an expert witness.

21         THE COURT:  Mr. Roche?

22         MR. ROCHE:  Yeah, sure.

23 BY MR. ROCHE:

24 Q.  Line 23, how is that date applied in the metadata?

25 A.  That date comes from the date associated with the email.

63

```
 1   Q.  Okay.  All right.  I want to talk -- oh, and if we look at
 2   the time zone, what's the time zone associated with the
 3   modified and create dates?
 4   A.  UTC+10.
 5   Q.  And can you remind the jury what geographic region UTC+10
 6   is associated with?
 7   A.  Eastern Australia.
 8   Q.  I want to look at this metadata a little more.
 9       MR. ROCHE:  Can we go to the next slide.
10   BY MR. ROCHE:
11   Q.  Okay.  Let's start with lines 60 to 64.  What do those
12   lines show?
13   A.  Line 60 shows the email was sent from
14   craig@panopticrypt.com.
15       Line 61 shows the email was sent to craig@panopticrypt.com.
16       Line 62 shows the subject was requested attached.
17       And line 63 shows that the date, according to the computer
18   that sent the email was June 24th, 2011 in time zone UTC+10.
19   Q.  Dr. Edman, can somebody manipulate the date associated with
20   a computer?
21   A.  They can.
22       MR. RIVERO:  Objection.  Leading.
23       THE COURT:  Overruled.
24   BY MR. ROCHE:
25   Q.  How would one manipulate the date associated with their
```

64

1  computer?

2  A.  You can essentially just right-click on the clock and

3  change your date settings and change the date and time

4  associated with your computer.

5  Q.  And let's talk through lines 49 through 52.  What do lines

6  49 through 52 show?

7  A.  Lines 49 through 52 show information added by the first

8  email server that relayed this message when it was sent.

9      In particular, line 49 shows that this email was sent from

10 a computer likely called PCCSW01.

11     Line 50 shows the account used to send the email was

12 craig@panopticrypt.com.

13     And in line 51, we show that the date this email server

14 received and processed this email was October 17th, 2014.

15 Q.  Okay.  And I want to look at line 49, P -- CSW.  What is

16 that field?

17 A.  That field shows the name of the computer device that sent

18 the email.

19 Q.  And "PC" stands for?

20 A.  Typically, personal computer.

21 Q.  And is there any significance to the CSW?

22 A.  It does correspond to the Defendant's initials.

23     MR. ROCHE:  Okay.  And if we could go back to the

24 previous slide.

25

65

```
 1    BY MR. ROCHE:
 2    Q.  Earlier, you were explaining the difference between the
 3    email added by the email server and the email on the computer.
 4    Can you give the jury an analogy for the date added by the
 5    email server?
 6    A.  Sure.  So if you think of sending a letter through the post
 7    office, the date added by the computer would be kind of like
 8    the date that you write on the letter, whereas, the date added
 9    by an email server is more like a stamp added by the post
10    office.
11    Q.  And so, in your opinion, which date is more reliable?
12    A.  I would rely on the latter, the date added by the post
13    office.
14    Q.  And what is that date?
15    A.  October 17th, 2014.
16         MR. ROCHE:  And let's go to the next slide, please.
17    BY MR. ROCHE:
18    Q.  All right.  We're looking at line 71 from 518.2 and Outlook
19    version history from 518.7.  What does the comparison between
20    these two exhibits show?
21    A.  518.2 on line 71 shows that this email was sent using a
22    program called Microsoft Outlook Version 15.
23         518.7 shows that Microsoft Outlook Version 15 corresponds
24    to what was publicly known as Outlook 2013.
25    Q.  Was Outlook 2013 available in June 2011 when this date
```

66

1  was -- when this email was purportedly sent to Dave?

2  A.  Not to my knowledge.

3  Q.  Can somebody send an email with software that doesn't even

4  exist yet?

5  A.  No.

6         MR. ROCHE:  Dorian, if we could go to the next slide,

7  please.

8  BY MR. ROCHE:

9  Q.  All right.  Back to 518.  Dr. Edman, the PDF appears to

10  show that was sent by Dave Kleiman to Craig Wright.  Did you

11  examine how that change was made?

12  A.  I did.

13         MR. ROCHE:  Dorian, if we could go to the next slide,

14  please.  Oh, actually, let's go back and take it down and show

15  518.3 and 518.4 to Dr. Edman.

16         Your Honor, it's 11:25.  This will probably be five to

17  10 more minutes.  Should we take a break now?

18         THE COURT:  Certainly.  This would be a good time.

19         Ladies and Gentlemen, let's take a 20-minute recess.

20     (Jury not present, 11:33 a.m.)

21         THE COURT:  We're on a 20-minute recess.

22         MR. FREEDMAN:  Your Honor, Plaintiffs have a

23  time-sensitive issue we have to raise with the Court.  I have

24  to ask Dr. Edman to step outside for a moment.

25         THE COURT:  All right.  Thank you, sir.  If you'll

67

1    step outside.

2        Go ahead and have a seat.

3      (Pause in proceedings.)

4        MR. FREEDMAN:  Your Honor, it's come to our attention

5    while Dr. Edman was on the stand that at 10:07 today, which I

6    believe corresponds to when Mr. Rivero was arguing that

7    Dr. Edman should not be able to use the word "fraud" in his

8    testimony, Dr. Wright has posted to his Slack message:  "You

9    know that you can sue, quote/unquote, experts who give

10   misleading evidence, statements of fraud when there is no

11   evidence of intent?"

12       Your Honor, we are concerned that this is a witness

13   intimidation tactic.  There are many more witnesses that are

14   coming.  Dr. Wright has a significant amount of resources and

15   is well-known for suing people around the world, and we are

16   concerned this will affect the testimony that this witness and

17   others will be giving in this case.

18       THE COURT:  Mr. Rivero or Ms. McGovern, is there any

19   dispute that Dr. Wright has been posting messages on his Slack

20   account?

21       MR. RIVERO:  Judge, of course I've been observing this

22   examination and I have absolutely no idea.

23       THE COURT:  Well, why don't we find out.

24       MR. RIVERO:  Exactly.  But, Judge, may I have the

25   break to figure out what -- this is the first time I hear of it

68

1    and if I could have a few minutes, Judge.  We are on a break

2    from the proceeding.

3           THE COURT:  All right.  I'll see you back here in 15

4    minutes.

5       (Recess from 11:30 a.m. to 11:48 a.m.)

6           THE COURT:  All right.  Back on the record.  Go ahead

7    and have a seat.

8           All right.  Addressing the Slack messages by

9    Dr. Wright at 10:07.

10          Mr. Rivero?

11          MR. RIVERO:  Your Honor, I have reviewed the Slack and

12   can confirm that the words that were read by counsel, that line

13   is in that Slack communication, which was the question the

14   Court had asked me.

15          Your Honor, without waiving privilege, I have

16   discussed this -- I want to say to the Court, counsel -- not

17   just Ms. McGovern and I, but all counsel were unaware, of

18   course, and that's why I wasn't able to answer the question,

19   Judge.

20          I have counseled my client to stay off of Slack,

21   Judge, and that is my instruction.  If I can say not -- Your

22   Honor, that is full stop period on that.  But I just want to

23   say, we take serious issue with the monitoring we think there

24   is, and I am going to do a cross-examination of this witness

25   about this because this came up in his deposition.  But that's

69

1   a separate subject, Judge.  And the context is a long

2   discussion of another case that Dr. Wright has.

3          I am not excusing anything, Judge.  I repeat, I've

4   discussed it with Dr. Wright.  I am confirming to the Court

5   that that statement is there and I'm confirming to the Court my

6   instruction.  And, Your Honor, if there is something else the

7   Court would direct me to do, I would, of course, consider

8   whatever I could do.

9          THE COURT:  Mr. Freedman, how are the Plaintiffs

10  prejudiced in this respect?

11         MR. FREEDMAN:  I'm sorry, Your Honor?

12         THE COURT:  How are the Plaintiffs prejudiced in this

13  respect?  The Court hasn't issued a gag order.  If a party to

14  this action wants to post messages, whether it's through Slack

15  or Instagram or any other medium, I'm at a loss as to where the

16  prejudice is to the Plaintiffs.

17         MR. FREEDMAN:  Your Honor, the prejudice here is

18  simply because -- I would take no issue for Dr. Wright.  He can

19  say whatever he wants on Slack whenever he wants.  The problem

20  is he crosses the line when he suggests he's going to sue

21  expert witnesses for their testimony here in court today.

22         That prejudices the Plaintiffs' ability to put on a

23  case.  That prejudices our ability to get witnesses who will

24  testify, both fact and expert witnesses, who don't want to go

25  toe-to-toe with a billionaire who could sue them and run a

70

1    significant legal bill up for them when they don't have nearly

2    enough assets to defend against that case.

3         THE COURT:  Well, do you believe this has had a

4    chilling effect on Dr. Edman's testimony?

5         MR. FREEDMAN:  As far as I'm aware, Dr. Edman does not

6    yet know about it.  But, Your Honor, it's not just Dr. Edman.

7    I'm sure Dr. Edman will find out about it because the press

8    attends these proceedings.  And so, if he's on -- I don't know

9    what he's doing now.  If he went on social media to check his

10   Facebook messages, he may see it and it may have a chilling

11   effect on him.  But he's not the only witness in this case,

12   Your Honor.  There are others that are coming.  There are other

13   experts that may need to be presented in rebuttal, and this is

14   a clear intimidation tactic and it's inappropriate and it will

15   prejudice Plaintiffs' ability to put on its case.

16        THE COURT:  So what is the relief that you're seeking,

17   sir?

18        MR. FREEDMAN:  First, Your Honor, I would seek an

19   admonishment from the Court directing him to stop intimidating

20   witnesses, one.

21        And beyond that, I'm not sure, Your Honor.  We found

22   out about it.  We wanted it to stop immediately.  We don't want

23   it to continue and so that's why we raised it.  I'd like a day

24   to talk to my co-counsel to see if there's anything else we

25   might seek, but in the interim a direct admonishment from the

1    Court to refrain from doing that.

2              THE COURT:  And, Mr. Rivero, you have reviewed

3    Dr. Wright's message and it is, in fact, a type of intimidation

4    toward witnesses?

5              MR. RIVERO:  No, Judge --

6              THE COURT:  Well, read it to me.  Read to me what

7    Dr. Wright posted.

8              MR. RIVERO:  As soon as I can have it --

9              MR. FREEDMAN:  Your Honor, it says:  "You know" -- and

10   this was literally as -- I believe this was literally as

11   Mr. Rivero was arguing that Dr. Edman should not be able to use

12   the word "fraud" because it requires intent -- "forgery."

13   Sorry.

14             Dr. Wright posted at 10:07:  "You know that you can

15   sue, quote/unquote, experts who give misleading evidence."  And

16   then shortly thereafter he said:  "Statements of fraud where

17   there is no evidence of intent, dot, dot, dot."

18             It's a clear expression to sue Dr. Edman for his use

19   of the word "forgery" in his testimony when there's no evidence

20   of intent.

21             THE COURT:  All right.  Well, I certainly don't see

22   how it could be interpreted in any other way.

23             MR. RIVERO:  Judge, I'm sorry.  I'm looking -- I don't

24   have the same -- then I'm going to have to ask for time, Judge,

25   because I'm looking at a string that doesn't include the later

1    statement and I'm looking at it on a device.

2              Maybe if I could be shown.

3        (Pause in proceedings.)

4              MR. RIVERO:  Judge, I'm seeing two different things.

5    Your Honor, if we're going to go this way, I would ask -- I

6    have seen one thing which is directly off a device.  And can I

7    please --

8              MR. FREEDMAN:  Why doesn't he ask his client if he

9    said it.

10             MR. RIVERO:  Sir, can I please finish what I'm saying?

11             MR. FREEDMAN:  Go ahead, Mr. Rivero.

12             THE COURT:  All right.  Let's finish.

13             MR. RIVERO:  Judge, if we're going to have this kind

14   of discussion about the actual -- the entire thing, because

15   there is an entire context before.  I have told the Court that

16   I have instructed the client.  I'm not opposed to an

17   admonishment, Your Honor.  But I don't know as I stand here

18   right now that this other thing is connected.  And, in fact, if

19   we look at the statements before, Judge, he has a database

20   litigation going on somewhere else and there's a discussion in

21   the list of things before about the database issues and then

22   the statement follows.

23             I don't know, Your Honor, is what I'm saying.  I don't

24   know.  I certainly don't know about this last statement.  I'm

25   not opposed to an admonishment, Your Honor.  But if we're going

1    to go deeper into this, I would need time to figure it out.

2             THE COURT:  Well, let me put this to rest once and for

3    all.  And Mr. Freedman, you can certainly speak with Dr. Edman

4    outside and if it has, in fact, had some type of effect, you

5    can let the Court know.

6             But absent that, let me state, Dr. Wright, that it's

7    not this Court's function to monitor your public or private

8    activities, but to the extent that it does have a chilling

9    effect on witnesses and is a direct or indirect threat, then I

10   do get involved.  So I am letting you know, sir, that I am not

11   going to tolerate that moving forward.

12            To the extent that you choose to make any type of

13   other statement, as you've seen with regard to several of those

14   statements, they were used for purposes of impeachment.  And

15   it's your decision.  I certainly don't know of a lot of

16   litigants that persist in publicly making statements throughout

17   the course of the trial, but that's entirely your decision.

18   And I'm not going to monitor those statements, other than

19   statements that may have an effect on witnesses over the course

20   of this trial.

21            Is that understood, sir?

22            THE DEFENDANT:  Yes, Your Honor.  I wasn't trying to

23   talk about this case and I wasn't trying to intimidate anyone

24   here.

25            THE COURT:  Well, it certainly sounded like you were,

74

1  sir.

2         THE DEFENDANT:  I'm sorry, Your Honor.

3         THE COURT:  So I'm letting you know, sir.

4         Is there anything further?

5         MR. FREEDMAN:  Not from Plaintiffs, Your Honor.

6         MR. RIVERO:  Not from Defense.

7         THE COURT:  All right.  Let's bring in the jury.

8         And where is Dr. Edman?

9         MR. FREEDMAN:  I'll get him.

10    (Before the Jury, 11:55 a.m.)

11         THE COURT:  All right.  Welcome back, Ladies and

12   Gentlemen.  Please be seated.

13         And welcome back, Dr. Edman.  If you'll step forward

14   to the witness chair and we'll continue with the testimony,

15   sir.

16    (Pause in proceedings.)

17   BY MR. ROCHE:

18   Q.  All right.  I think before we left for the break -- before

19   we left for the break, we were looking at --

20         MR. ROCHE:  Not yet to the jury.  518.3 and 518.4.

21   BY MR. ROCHE:

22   Q.  What are those documents?

23   A.  They represent two PDF objects that I extracted from 518.

24         MR. ROCHE:  Your Honor, we wish to introduce 518.3 and

25   518.4 into evidence.

75

```
 1            MR. RIVERO:  No objection, Your Honor.

 2            THE COURT:  Admitted into evidence.

 3        (Plaintiffs' Exhibits 518.3 & 518.4 received into

 4    evidence.)

 5            MR. ROCHE:  If we could publish to the jury.

 6            If we could go to the next slide.

 7    BY MR. ROCHE:

 8    Q.  All right.  What do lines 16 through 17 in 518 -- and just

 9    to take a step back because -- what are Exhibits 518 and 514

10    for the jury?

11    A.  518 is the October 17th, 2014 version of this particular

12    document.  And 514 is the purported June 24th, 2011.  And 518.2

13    is metadata corresponding to 518.  And 514.1 is metadata

14    corresponding to 514.

15    Q.  And let's look at the highlighted lines, lines 16 through

16    17, in both 518.2 and 514.1.  What's the significance of lines

17    16 and 17 in the metadata for these two documents?

18    A.  It shows that the two documents have the same document ID

19    but different instance IDs, which, again, indicates it's two

20    versions of the same document.

21    Q.  Okay.  And so the document ID is the number beginning

22    75d61?

23    A.  That is correct.

24    Q.  And that's similar to the document IDs we looked at in

25    relation to forgeries six and seven, correct?
```

76

1    A.   Correct.

2    Q.   And so what does that tell us about how 518 and 514 were

3    created?

4    A.   It suggests that the two documents are related.  In

5    particular, 514 is a revision of 518.

6    Q.   Okay.

7         MR. ROCHE:  And, Dorian, if we could go to the next

8    slide, please.

9    BY MR. ROCHE:

10   Q.   All right.  Is there anything else noteworthy about the

11   metadata for 514?  And 514 -- can you just remind the jury

12   which version of the PDF from Dave to Craig that is?

13   A.   514 is the purported June 24th, 2011 version.  Within 514,

14   the metadata appears to have been modified.  In particular,

15   line 21, the mail date is different.

16        Line 23 shows that the email was purportedly from

17   dave@davekleiman.com.

18        Line 25 shows that the email is still purportedly sent to

19   craig@panopticrypt.com.

20        And then in lines 26 through 28, the mail transport headers

21   also appear to have been modified.  In particular, a large

22   portion of it has been deleted.

23   Q.   So there is -- what does 26 and 27 show about how it was

24   manipulated?

25   A.   26 through 28, a number of -- or a large portion of the

1    mail transport headers have been removed.  And in particular,

2    in line 28, a "Date" field has been changed.

3    Q.  Okay.  Is there anything significant about the date

4    highlighted in line 28?

5    A.  The date in line 28, it's been changed to say:  "Thursday,

6    June 24th, 2011"; however, June 24th, 2011 was a Friday, not a

7    Thursday.

8    Q.  So Thursday, June 24th, 2011 is not a real date in history?

9            MR. RIVERO:  Objection.  Leading.

10           THE COURT:  Overruled.  I'll allow that.

11           THE WITNESS:  Correct.

12   BY MR. ROCHE:

13   Q.  We looked at a number of emails and PDFs.  514, 518,

14   related to how Plaintiffs' Exhibit 35, forgery number eight,

15   was created.  Is there any other noteworthy documents that you

16   have examined?

17   A.  Yes.

18           MR. ROCHE:  Dorian, if we could go to 538 which has

19   been previously admitted into evidence.

20           The next slide.  I think it's on the next slide,

21   Dorian.

22           Thank you.

23   BY MR. ROCHE:

24   Q.  Dr. Edman, what is Plaintiffs' Exhibit 538?

25   A.  538 purports to be a native email file corresponding to

1   forgery number eight.

2   Q.  Okay.  Do you know when this document was produced to

3   Plaintiffs in the litigation?

4   A.  My understanding is this document was produced to

5   Plaintiffs the night before a previous hearing in this matter.

6           MR. RIVERO:  Objection, Judge.

7           MR. ROCHE:  I'm not going to ask anything --

8           THE COURT:  The objection is sustained.

9   BY MR. ROCHE:

10  Q.  Dr. Edman, was there anything about 538 that suggests that

11  it is also a forgery?

12  A.  Yes.

13          MR. ROCHE:  Let's bring up 538.2, 538.1.

14          Take it down from the jury.

15  BY MR. ROCHE:

16  Q.  Dr. Edman, what's 538.1?

17  A.  538.1 shows the mail transport headers corresponding to

18  538.

19  Q.  And what is 538.2?

20  A.  538.2 is a conversion of a particular timestamp in 538.1.

21          MR. ROCHE:  Your Honor, at this time, we move for

22  538.1 and 538.2 to be admitted.

23          MR. RIVERO:  No objection, Your Honor.

24          THE COURT:  Admitted into evidence.

25      (Plaintiffs' Exhibits 538.1 & 538.2 received into

```
 1   evidence.)

 2   BY MR. ROCHE:

 3   Q.  All right.  Dr. Edman, let's start with 538.1.  Did you

 4   extract this from 538?

 5   A.  I did.

 6   Q.  Can you walk through the jury -- with the jury your

 7   findings in relation to 538.1?

 8   A.  Well, in 538.1, the mail transport headers, or at least the

 9   dates that are clearly days to a human looking through them,

10   appear to correspond to June 23rd or June 24th, 2011, depending

11   on the time zone.

12       However, in line 3, at the end of line 3, there is another

13   "Timestamp" field that's in a different format typically used

14   by computers and may not necessarily be immediately

15   recognizable to humans as a timestamp.

16   Q.  So -- my bad.

17   A.  As I said, the timestamp in line 3, as shown in 538.2,

18   actually corresponds to October 24th, 2012, as opposed to the

19   human readable timestamps which correspond to a completely

20   different date.

21   Q.  Okay.  I want to -- so the red box, it's just a long string

22   of numbers?

23   A.  Correct.

24   Q.  And what is -- what is the -- can you explain what the

25   significance of that long string of numbers are as it relates
```

130

```
 1    to 538.2?
 2    A.  It's a timestamp, but it's in a format typically used by
 3    computers.
 4    Q.  Is it difficult to recognize just based on the naked eye
 5    that that's a timestamp?
 6    A.  It is.  Unless you're familiar with that particular format.
 7    Q.  Okay.  So how does 538 compare to the other documents we
 8    looked at relating to forgery number eight?  Specifically 514,
 9    518, how does 538 relate to those?
10    A.  It just appears to be another version.
11    Q.  Okay.  Does it appear to be a better forgery than the
12    others?
13              MR. RIVERO:  Objection.
14              THE COURT:  Sustained.
15              Rephrase, please.
16    BY MR. ROCHE:
17    Q.  Can you say anything concerning the degree of effort put
18    into the manipulation in 538 compared to 514 and 518?
19    A.  This one definitely has a less obvious manipulation
20    compared to the previous forgeries.
21              MR. ROCHE:  Dorian, could we go to the next slide,
22    please.
23    BY MR. ROCHE:
24    Q.  We've looked at a lot of documents related to forgery
25    number eight, which is the purported email from Dave Kleiman to
```

1   Craig Wright attaching the Tulip Trust documentation.  Can you

2   walk the jury through the different versions that we're looking

3   at on the screen of forgery number eight?  So let's start with

4   35, 514, 518, and then end at 538.

5   A.  Sure.  So 35 was produced as a scan of a hard-copy document

6   that purports to represent a June 24th, 2011 email.

7       514 is an electronic version that is visually identical to

8   P35, but contains metadata indicating it's been manipulated.

9       518 is another version that is visually similar but has a

10  different date.  In particular, that one has an October 17th,

11  2014 date and contains mail transport headers that indicate it

12  was created from an email from craig@panopticrypt.com to

13  craig@panopticrypt.com on that date.

14      And then separately, 538 is a native email file that

15  purports to correspond to the documents on the left, but itself

16  contains another indication that it has been manipulated.

17  Q.  All right.  Thank you.

18         MR. ROCHE:  Dorian, could we go to the next slide,

19  540, which has already been admitted into evidence.

20  BY MR. ROCHE:

21  Q.  All right.  Dr. Edman, we're looking at Plaintiffs' Exhibit

22  540.  Did you determine that 540 -- did you determine whether

23  or not 540 is authentic?

24  A.  In my opinion, it is not.

25  Q.  All right.  We'll refer to this as forgery number nine.

```
 1        And what is the date -- the purported date of Plaintiffs'
 2   Exhibit 540?
 3   A.  April 2nd, 2013.
 4   Q.  And that date -- is there anything significant about that
 5   date in relation to Dave Kleiman?
 6   A.  It's purportedly shortly before his death.
 7   Q.  Okay.  I'll read the message.  "Hello, good sir.  I cannot
 8   do much right now, but I will accept a role as director of
 9   Coin-Exch. as we discussed.  The contracts are done and we will
10   use capital I have access to here.  I will leave any dealing
11   for the automation and banking software with you for the time
12   being.  I hope to see you in May, June as we discussed.  It is
13   good that you have engaged an accountant.  Make sure Mr. Wilson
14   is on top of it all.  Respectfully, Dave."
15        I see the reference to Coin-Exch.  Were you here during
16   Craig Wright's testimony about Coin-Exch.?
17   A.  I was.
18   Q.  Do you understand that shares in Coin-Exch. were offered to
19   the Plaintiff --
20             MR. RIVERO:  Objection --
21   BY MR. ROCHE:
22   Q.  -- by the Defendant?
23             MR. RIVERO:  Objection, Judge.  Leading.  It's his
24   expert witness.
25             THE COURT:  Sustained.
```

```
1    BY MR. ROCHE:

2    Q.  Was there anything significant -- we'll move on.

3        Dr. Edman, did you review the digital signature contained

4    within Plaintiffs' Exhibit 540?

5    A.  I did.

6            MR. ROCHE:  Let's take down and put up 540.2.

7        (Pause in proceedings.)

8            MR. ROCHE:  If we're having difficulty finding it, we

9    can just show the slides.  Just show 540.

10           There we go.

11   BY MR. ROCHE:

12   Q.  Dr. Edman, what is 540 --

13           MR. ROCHE:  We had it.

14           I'm sorry.  If we can take this down from the jury.

15           Okay.

16   BY MR. ROCHE:

17   Q.  Dr. Edman, what is 540.2?

18   A.  This is my analysis of the cryptographic signature from

19   540.

20   Q.  And what's 540.1?

21   A.  540.1 is a PDF metadata object that I extracted from 540.

22   Q.  Okay.

23           MR. ROCHE:  Your Honor, we move to admit 540.1 and

24   540.2 into evidence.

25           MR. RIVERO:  Without objection.
```

```
 1            THE COURT:  Admitted into evidence.

 2        (Plaintiffs' Exhibits 540.1 & 540.2 received into

 3    evidence.)

 4            MR. ROCHE:  You can go to the next slide, please.

 5    BY MR. ROCHE:

 6    Q.  All right.  All right.  We're starting with 540.2.  I see

 7    the digital signature up there on the top left.  Dr. Edman, can

 8    you walk us through the relationship between the digital

 9    signature and 540.2?

10    A.  The cryptographic signature shown in the top left indicates

11    that it was created October 22nd, 2014, as shown on line 35 on

12    the box on the right.

13    Q.  Dr. Edman, when did Dave Kleiman die?

14    A.  I understand it was April 2013.

15    Q.  So about how long after Dave Kleiman died was this

16    signature created?

17    A.  About a year and a half.

18    Q.  Was the key -- so earlier, we were talking about the keys

19    used to sign digital signatures.  Was the key in this -- used

20    to sign this signature used in any of the other exhibits we've

21    looked at today?

22    A.  It was used to create a signature that was attached to

23    forgery number eight.

24    Q.  So the same key used in forgery number eight was used in

25    forgery number nine?
```

65

```
 1    A.  Correct.

 2    Q.  Was there anything else about forgery number nine that

 3    showed it was not authentic?

 4    A.  Yes.

 5         MR. ROCHE:  Dorian, if we could go to the next slide,

 6    please.

 7         I think -- all right.  We've got these all in

 8    evidence.  540.1 and then 514.1 and 518.2, which we looked at

 9    earlier in relation to forgery number eight.

10    BY MR. ROCHE:

11    Q.  So let's look at line 16 to 17 in each of these.  Can you

12    walk the jury through what lines 16 to 17 show?

13    A.  Lines 16 and 17 shows that all three documents have the

14    exact same document ID but different instance IDs, which,

15    again, indicates that they are revisions of the same document.

16    Q.  So each of these three documents were created -- are

17    revisions of each other?

18    A.  Correct.

19         MR. ROCHE:  Dorian, could we go to the next slide,

20    please.

21    BY MR. ROCHE:

22    Q.  All right.  So we're looking at 518 -- so 518 and 514, the

23    Tulip Trust, forgery number eight, and then 540, forgery number

24    nine.  Are there any other similarities between these three

25    documents?
```

1    A.  Yes.  In the headers shown here, you can see they have the

2    same "From," "To," "Subject," and "Importance" field.  540

3    notably contains an "Attachments" field, even though it has no

4    attachments.  It appears they have just been deleted, but the

5    "Header" field shown here was left remaining.

6    Q.  Would you expect an authentic email that had no attachments

7    to display that?

8    A.  I would not.

9    Q.  And did you examine any other documents that Craig Wright

10   swore were authentic and were relating to his Bitcoin holdings?

11   A.  I did.

12        MR. ROCHE:  Dorian, if we could go to the next slide,

13   please, which was previously admitted as Plaintiffs' Exhibit

14   36.

15   BY MR. ROCHE:

16   Q.  What is this document?

17   A.  This document is -- or purports to be a deed of trust

18   between Wright International Investments, Ltd. and Tulip

19   Trading, Ltd. dated October 23rd, 2012.

20   Q.  Were you here when Dr. Wright testified about this

21   document?

22   A.  I was.

23   Q.  Let's read the text highlighted in Paragraph 3.

24        COURTROOM DEPUTY:  Mr. Roche, is this in evidence?

25        MR. ROCHE:  36 is in evidence.

137

```
1          THE COURT:  536?

2          MR. ROCHE:  No, 36.

3          THE COURT:  36.  I believe it is, but let me just

4    check for you.

5        (Pause in proceedings.)

6          THE COURT:  Yes.  It's in evidence.

7    BY MR. ROCHE:

8    Q.  All right.  So focusing back on Paragraph 3 from the deed

9    of trust dated October 23rd, 2012.  "All Bitcoin and associated

10   ledger assets transferred into Tulip Trading by David Kleiman

11   on Friday, 10th June 2011, following transfer to Mr. Kleiman

12   from Dr. Wright on June 9th, 2011.  This formalizes the

13   transfer from Mr. Kleiman of the assets moved June 9th, 2011

14   from Dr. Wright to the care of Mr. Kleiman.  This includes the

15   1.1 -- 1,100,111 Bitcoin held under the former arrangement and

16   the attached conditions, the software license payments from

17   casino gaming operations into Liberty Exchange."

18       Dr. Edman, in your opinion, is the deed of trust between

19   Wright International Investments and Tulip Trading, dated

20   October 23rd, 2012, an authentic document?

21   A.  No.

22   Q.  Okay.  We're going to refer to Plaintiffs' Exhibit 36 as

23   forgery number 10, the final forgery.

24       All right.  Is there anything about the content of this

25   document -- and remember, if we go back to the three analysis
```

1    modes you used from yesterday, the content, the metadata, and

2    the cryptographic signatures -- is there anything about the

3    content of this document that indicates it's a forgery?

4    A.  The fact that it is dated October 23rd, 2012 and references

5    Tulip Trading, Ltd., which I understand was not purchased by

6    the Defendant until October 2014.

7    Q.  Okay.  And did you review the metadata to this document?

8    A.  I did.

9    Q.  All right.  Before --

10           MR. ROCHE:  Let's take down from the jury, please.

11           Let's bring up -- we'll do first 521 and the next --

12   oh, 521.1 and after that 521.7.

13   BY MR. ROCHE:

14   Q.  Dr. Edman, what is 521.1?

15   A.  521.1 is metadata that I extracted from 521.

16   Q.  Metadata you extracted from forgery number 10?

17   A.  Correct.  The deed of trust.

18   Q.  And what is 521.7?

19   A.  521.7 shows properties associated with a font file that I

20   extracted from 521.

21           MR. ROCHE:  Your Honor, we move to admit 521.1 and

22   521.7 into evidence.

23           MR. RIVERO:  No objection.

24           THE COURT:  Admitted into evidence.

25       (Plaintiffs' Exhibits 521.1 &  521.7 received into

```
 1    evidence.)

 2            MR. ROCHE:  All right.  Let's go back to the slides

 3    and let's go to 521.1.

 4    BY MR. ROCHE:

 5    Q.  All right.  What does the metadata for this document show?

 6    A.  The metadata suggests this document was created October

 7    22nd, 2012 in zone UTC+11.  It also indicates the author of

 8    this document was named "craig.wright."

 9    Q.  But that date matches the deed of trust, right?

10    A.  It appears to.

11    Q.  Okay.  Well, is there anything else that you reviewed to

12    determine that this forgery number 10 is a forgery?

13    A.  Yes.

14            MR. ROCHE:  Let's go to the next slide.

15    BY MR. ROCHE:

16    Q.  All right.  I see on the right those annoying windows that

17    pop up on my computer, and on the left the deed of trust.  Can

18    you explain to me what 521.7 shows?

19    A.  521.7 shows properties associated with a font file that I

20    extracted from 521.  In particular, that font file for a font

21    called Calibri for Microsoft contains a copyright notice for

22    Microsoft dated 2015.

23    Q.  So this is a font file contained within 536.

24            MR. ROCHE:  And I believe, Your Honor, we have the

25    wrong exhibit number on the bottom there.  521 should be 36.
```

```
 1    BY MR. ROCHE:

 2    Q.  But can you confirm that --

 3            MR. ROCHE:  There we go.  The Bates stamps match up.

 4    BY MR. ROCHE:

 5    Q.  Dr. Edman, can you confirm that you extracted this font

 6    file from forgery number 10?

 7    A.  Yes.

 8    Q.  And do the Bates labels on there match up?

 9    A.  Yes.

10    Q.  So did you verify -- so it says:  "Microsoft Copyright

11    2015," which was later than the date this document was

12    purportedly created.  Did you verify that this font wasn't

13    created by Microsoft until 2015?

14    A.  I did.  I verified that the font contains a cryptographic

15    signature created by Microsoft.  That signature contained a

16    timestamp and that timestamp indicated the signature was

17    created in May or June of 2015.

18    Q.  So this font file didn't exist until at the earliest May,

19    2000 --

20    A.  2015.

21            MR. RIVERO:  Objection.  Leading.

22            THE COURT:  Overruled.

23    BY MR. ROCHE:

24    Q.  Is it possible for a font file in a document to exist --

25    let me -- is it possible for a font dated in 2015 to exist in a
```

1    document that's purportedly created in 2012?

2    A.  No.

3          MR. ROCHE:  Dorian, if we could go to the next slide.

4    BY MR. ROCHE:

5    Q.  All right.  Did you find any other font files contained in

6    forgery number 10?

7    A.  I did, yes.

8    Q.  And can you walk the jury through those four font files?

9    A.  Sure.  Each of those font files contained cryptographic

10   signatures from Microsoft dated in 2015.  Additionally, the

11   properties associated with those font files contained copyright

12   notices from either Microsoft or the Monotype Corporation, all

13   of which were also dated 2015.

14   Q.  Dr. Edman, what do the five font files found in forgery

15   number 10 tell us about Plaintiffs' Exhibit 36?

16   A.  It suggests it was not created until at least mid 2015.

17         MR. ROCHE:  Dorian, you can take those slides down.

18   BY MR. ROCHE:

19   Q.  Dr. Edman, we've looked at a lot of documents this morning

20   and yesterday.

21       Besides the 10 forgeries we've walked the jury through this

22   morning and yesterday afternoon, did you examine any other

23   documents in this case that were produced by the Defendant?

24   A.  I did.

25   Q.  Were there other examples of forgeries produced by the

92

1    Defendant in this case?

2    A.  There were.

3    Q.  And approximately how many additional forgeries did you

4    find?

5    A.  I'd estimate about 25 to 30.

6    Q.  Okay.  For the 10 forgeries we've written up there and

7    we've shown the jury today, is there any doubt in your mind

8    that those documents are not authentic and are, in fact,

9    forgeries?

10   A.  No.

11          MR. ROCHE:  No further questions at this time, Your

12   Honor.

13          THE COURT:  Cross-examination.

14          MR. ROCHE:  Wait.  Hold on.

15          THE COURT:  All right.  Certainly.

16      (Pause in proceedings.)

17          MR. ROCHE:  One final question, Your Honor.

18   BY MR. ROCHE:

19   Q.  Dr. Edman, are all of the opinions you've given to the jury

20   this morning given within a reasonable degree of certainty for

21   an expert in your field?

22   A.  In my opinion, yes.

23          MR. ROCHE:  No further questions at this time.

24          THE COURT:  All right.  Cross-examination.

25

```
 1                    CROSS-EXAMINATION

 2   BY MR. RIVERO:

 3   Q.  Good afternoon, sir.

 4   A.  Good afternoon.

 5   Q.  Dr. Edman, you're not here to give testimony about whether

 6   or not there was a business partnership between Dr. Wright and

 7   David Kleiman to avoid -- I'm sorry -- to invent and mine

 8   Bitcoin, correct?

 9   A.  That is correct.

10   Q.  Sir, you have three degrees in computer science?

11   A.  That is correct.

12   Q.  And your masters focused on applied cryptography and

13   anonymous communication systems, right?

14   A.  That is correct.

15   Q.  And your Ph.D. studies focused on computer security and

16   especially wireless security?

17   A.  Correct.

18   Q.  And, sir, the degrees are in computer science; isn't that

19   right?

20   A.  That is correct.

21   Q.  So you're a computer scientist?

22   A.  I suppose you could say that, sure.

23   Q.  Well, the degree itself has the word science in it, doesn't

24   it?

25   A.  It does.
```

1    Q.  All right.  So sir, in what your -- in your field, what you

2    do, you obviously apply the scientific method, right?

3    A.  Yes.  I believe so.

4    Q.  You know what the scientific method is, right?

5    A.  In general.

6    Q.  I'm sorry?

7    A.  Yes.

8    Q.  So sir, I just want to take you through this because I have

9    a ninth-grade biology understanding of the scientific method

10   and I think you can help us all.  You're an expert.

11       The scientific method is that, first, you, as a scientist,

12   would observe some events or conditions, some -- what might be

13   called in science some phenomenon, right?

14   A.  Okay.  Sure.

15   Q.  Okay.  And then you would make a theory about what -- how

16   that phenomenon works; isn't that right?  Isn't that where you

17   start?

18   A.  Yes.

19   Q.  And that's called -- in science, that's called a

20   hypothesis, right?

21   A.  Yes.

22   Q.  So then -- that's step one.  Step two, you would take that

23   hypothesis and as a scientist, you would make certain

24   predictions and a theory, and you would say:  "If this theory

25   is true, then I expect that A, B or C would happen."  Isn't

1   that the second step?

2   A.  I suppose, yes.

3   Q.  Well, sir, it's not a matter of supposing.  I mean, I'm

4   talking about the scientific method.  You do understand what

5   I'm talking about, right?

6   A.  I do.

7   Q.  So isn't it critical that for a scientist, you would say:

8   "This is my theory and this is" -- "if my theory is right, this

9   would happen and that would happen and that would happen"?

10  Right?

11  A.  Yes.

12  Q.  Then what you would do is very important, step three, to

13  make it science, is you would do something to test your theory.

14  Right?

15  A.  Yes.

16  Q.  And that's what we call experimentation, right?

17  A.  Yes.

18  Q.  Okay.  And that experimentation in the scientific method

19  has certain characteristics, you would agree.  Like, for

20  example, you would control the variables to make sure that

21  you're testing what you think you are testing, right?

22  A.  Yes.

23  Q.  Okay.  So there's -- the third step would be to experiment,

24  to test, right?

25  A.  Yes.

```
 1   Q.  And then the fourth step is:  Once you've experimented, the

 2   experiment either shows that what you have theorized tends to

 3   be confirmed or is disproved, or tends to be disproved, right?

 4   A.  Yes.

 5   Q.  And this fourth part is -- is what in science is called a

 6   theory, correct?

 7   A.  Yes.

 8   Q.  And would you agree with me that in science, as opposed to

 9   religion or philosophy or other ways of thinking -- in science,

10   it's always a theory that keeps being confirmed by experiments

11   until perhaps some day it's disproved.  Isn't that what science

12   is?

13   A.  I suppose that's a general description, yes.

14   Q.  Okay.  Now, sir, I won't belabor it, but to take a very

15   common example that we might use as just normal people in every

16   day, if you wake up in the morning -- posing a hypothetical --

17   and you plug your coffeemaker in and you push the button and it

18   doesn't work, you might form the hypothesis that the

19   coffeemaker is broken, right?

20   A.  You might.

21   Q.  And if we were doing the scientific method, we'd say:

22   "Well, if the coffeemaker" -- or you might have another idea.

23   You might say:  "Or the outlet doesn't work," right?

24   A.  Sure.

25   Q.  Okay.  And if you wanted to, if you said:  "Well, if the
```

1    outlet doesn't work," you might predict:  "Well, another

2    appliance, if I plug it in, that won't work either."  That

3    would be a prediction based on one hypothesis about what's

4    going on, right?

5    A.  Yes.

6    Q.  And then, as an experiment, you might then plug in the

7    toaster, and you would see that either the toaster works or it

8    doesn't work, right?

9    A.  Correct.

10   Q.  And if it works, then that would tend to disprove your

11   hypothesis that the outlet is messed up and might make you

12   think:  "Let me look at the coffeemaker," right?

13   A.  Yes.

14   Q.  Okay.  Now, you never took a course related in your studies

15   to determining whether a document is a forgery because there's

16   no such course at the schools you attended, correct?

17   A.  Not to my knowledge, true.

18   Q.  And you have never published any papers related to forensic

19   analysis of documents, right?

20   A.  I have not.

21   Q.  And you have never given any presentations related to the

22   forensic analysis of documents, correct?

23   A.  I have not.

24   Q.  And prior to this case, sir, have you ever testified in a

25   federal trial on forensic analysis of documents like this, what

```
1   you have given today?

2   A.  Yeah.  I believe so.

3   Q.  Okay.  And when was that, sir?

4   A.  I don't recall exactly.  I would estimate that that was

5   probably 2017.

6   Q.  All right.  So you say you have one other instance where

7   you have given such testimony?

8   A.  To the best of my recollection, yes.

9   Q.  All right.  You worked on the Silk Road case, correct?

10  A.  I did.

11  Q.  And you supported and provided consulting services related

12  to the seizure of Bitcoin in the Silk Road case, right?

13  A.  I did.

14  Q.  Silk Road -- this was brought up on direct -- Silk Road was

15  a dark website that involved illegal activities; isn't that

16  right?

17  A.  Yes.

18  Q.  And so, on Silk Road, there would be all kinds of illegal

19  activities, some of them terrible, sale of illegal weapons;

20  isn't that right?

21  A.  No.  I mean, to the best of my recollection, Silk Road did

22  have -- there were certain things that Silk Road would not

23  allow you to transact in.  Weapons, they created actually a

24  separate website for that called "The Armory."  Child

25  pornography was another thing that Silk Road prohibited you
```

```
 1   from transacting with.
 2   Q.  Did Mr. Ulbricht create other websites to allow the
 3   transaction in child pornography?
 4            MR. ROCHE:  Objection.  Relevance.  Beyond the scope
 5   of --
 6            MR. RIVERO:  Your Honor, this was brought up on
 7   direct.
 8            THE COURT:  With regard to other websites, the
 9   objection is sustained.
10   BY MR. RIVERO:
11   Q.  Bitcoin was important to the operation of Silk Road; isn't
12   that right?
13            MR. ROCHE:  Objection.  Speculation.  Outside the
14   scope of his --
15            THE COURT:  If the witness knows.  Overruled.
16            THE WITNESS:  To my knowledge, that was the only
17   currency accepted on Silk Road.  So yes, I would agree with
18   that.
19   BY MR. RIVERO:
20   Q.  The key person behind Silk Road, you were asked on direct,
21   was Ross Ulbricht, right?
22   A.  Correct.
23   Q.  And he went by the nickname the Dread Pirate Roberts?
24   A.  He did.
25   Q.  And you worked on the prosecution?
```

```
 1    A.  I supported the prosecution.

 2    Q.  Did you ever learn that Mr. Ulbricht had hired an expert

 3    named Andreas Antonopoulos to help him in his defense?

 4              MR. ROCHE:  Objection.  Relevance.  Outside the scope.

 5              THE COURT:  Sustained.

 6    BY MR. RIVERO:

 7    Q.  Now, sir, with regard to the forensic examination of

 8    documents, you have a single certification in that subject,

 9    right?

10    A.  It's a certification related to digital forensics.

11    Q.  That's the AccessData Certified Examiner?

12    A.  Correct.

13    Q.  Now, you're familiar with an organization called SANS,

14    S-A-N-S?

15    A.  I am.

16    Q.  That's an organization that certifies forensic examiners,

17    correct?

18    A.  There are a number of such organizations, yes.  But that is

19    one of them.

20    Q.  And you don't have a SANS certificate?

21    A.  I do not.

22    Q.  And you're familiar with GIAC?

23    A.  I am.

24    Q.  And that's also an organization that certifies forensic

25    examiners?
```

1   A.  To the best of my recollection, yes.

2   Q.  And you don't have any GIAC certifications, right?

3   A.  I do not.

4   Q.  And are you familiar with the EnCase, E-N-C-A-S-E -- I

5   don't know how to pronounce this, but it's EnCE, or E-N-C-E,

6   certification?  Do you know what I'm talking about?

7   A.  I do.

8   Q.  And that's the most widely used and accepted forensic

9   certification, right?

10   A.  I have no idea.

11   Q.  You don't have an EnCase EnCE certification, do you?

12   A.  We don't use EnCase in my practice, so no, I don't.

13   Q.  Now, you're aware that Dr. Wright has over 45 computer

14   certifications, right?

15          MR. ROCHE:  Objection.  Relevance.

16          THE COURT:  Sustained.

17   BY MR. RIVERO:

18   Q.  Sir, you're aware that David Kleiman had many of these

19   certifications?

20          MR. ROCHE:  Objection.  Relevance.

21          THE COURT:  Sustained.

22   BY MR. RIVERO:

23   Q.  Sir, you told the jury that your time is paid at $560 an

24   hour, correct?

25   A.  Correct.

102

1   Q.  You said it was being paid to your company, correct?

2   A.  Correct.

3   Q.  All right.  And in your company, what is your title?

4   A.  I'm a director.

5   Q.  You're a director.  That's at a certain level in the

6   company, I assume.  You don't start as a director?

7   A.  I did.

8   Q.  Right.  But one doesn't come in and start out from day one

9   as a director, I assume?

10   A.  I did.

11   Q.  I understand, sir.  Coming out of school, you wouldn't come

12   in as a director, would you?

13   A.  I did.

14   Q.  You had other experience before you went to your company.

15   You worked at MITRE, didn't you?

16   A.  I did.

17   Q.  All right.  So you didn't go straight out of school to

18   become a director at your company?

19   A.  BRG was not my first employer directly out of school, but I

20   did not hold any other positions at BRG since graduating

21   school.

22   Q.  Now, BRG, Berkeley Research Group, has been paid for your

23   work in this case, correct?  The company you are a director at.

24   A.  Yes.

25   Q.  And BRG has received more than $125,000 for your work on

103

```
 1    this case?
 2    A.  I honestly don't know how much BRG has received in total.
 3    Q.  Did you -- were you -- have you reviewed the invoices
 4    provided starting on July 16, 2019 in this case?
 5    A.  I think I would have reviewed them before they went out.
 6    Q.  Right.  So you don't recall that there was a July 16, 2019
 7    invoice that -- for your time that totaled $28,000 -- more than
 8    $28,000?
 9    A.  Not specifically, but I believe there probably was such an
10    invoice.
11    Q.  And you don't remember that by August, the next month, you
12    billed $16,000 -- more than $16,000 for your time?
13    A.  Again, I don't recall the specific amounts, but it seems
14    plausible.
15    Q.  Sir, did you start working sometime in 2019 on this case?
16    A.  To the best of my recollection, yes.
17    Q.  All right.  And you've been deeply in this case since at
18    least the middle of 2019, correct?
19    A.  I don't know if I'd say deeply.  Certainly, the work kind
20    of comes and goes as the case progresses.
21    Q.  Sir, you've been -- I've observed that you're sitting here
22    in the audience.  And can you tell us how many of the days of
23    this trial have you been sitting here?
24    A.  I believe I was here for half of last Monday, all of last
25    Tuesday, and then the first half of Wednesday.  I was also here
```

104

```
1    yesterday.

2    Q.  And you hadn't been here before that in the trial?

3    A.  No.  I don't believe so.

4    Q.  All right.  Sir, in this case, you're not -- I want to just

5    define the scope of what your testimony is.  You are not

6    testifying about any partnership between David Kleiman and

7    Craig Wright, correct?

8    A.  That is correct.

9    Q.  You're not -- you are not testifying about whether there

10   was any fraud in this case; isn't that right?

11   A.  That is correct.

12   Q.  You are not testifying about the motivations for any change

13   to any document in this case?

14   A.  I am not.

15   Q.  And you have no opinion to give about anything to do with

16   who invented Bitcoin?

17   A.  That is correct.

18   Q.  You don't have any opinion to give about who has mined

19   Bitcoin?

20   A.  That is correct.

21   Q.  You don't have an opinion to give on any valuation of

22   Bitcoin?

23   A.  That is also correct.

24   Q.  And you don't have any opinion to give on whether

25   Dr. Wright took anything from Dr. -- from David Kleiman; isn't
```

1    that right?

2    A.  That is also correct.

3    Q.  The issue that you're here -- the question that you're

4    testifying about is the authenticity versus the

5    non-authenticity of certain documents; isn't that correct?

6    A.  That is correct.

7    Q.  And as to the documents that you opine there are

8    authenticity issues, you have used in the course of this

9    proceeding -- sir, in the course of this proceeding, you've

10   testified now four times in deposition, right?

11   A.  I don't believe so.  I think it was -- I think I was

12   deposed three times, and then testified at a previous hearing

13   in this matter once.

14   Q.  You've testified at a hearing and, in your recollection,

15   three depositions, right?

16   A.  That is correct, I believe.

17   Q.  And you have given declarations in this case?

18   A.  Yes.  Declaration affidavits.

19   Q.  Okay.  And so you have taken oaths to tell the truth here

20   many times in this proceeding on testimony, right?

21   A.  I have.

22   Q.  And what you said in your various reports and your

23   testimony, sometimes you say these documents -- today, you used

24   the word "forgery," right?

25   A.  Yes.

106

```
1    Q.  Let me correct that.  Today, Plaintiffs' counsel used the
2    word forgery with you as to these documents, correct?
3    A.  Correct.
4    Q.  But at other times you've described these documents as
5    manipulated, correct?
6    A.  Correct.
7    Q.  At other times you have described these documents as
8    altered; isn't that right?
9    A.  Correct.
10   Q.  And at other times, talking about the same documents,
11   you've called them modified, correct?
12   A.  Correct.
13   Q.  And so the jury can understand your opinion clearly, all of
14   those four words, you agree they are -- they have the same
15   meaning?  They're all synonymous?
16   A.  In this context, yes, I believe so.
17   Q.  All right.  And you are not opining as to the motivations
18   behind any alteration?
19   A.  Correct.
20   Q.  And you're not giving any opinion as to whether -- you
21   don't have an opinion to give whether Dr. Wright is credible,
22   do you?
23   A.  No.
24   Q.  And you're not giving any opinion about Dr. Wright's
25   character; isn't that right?
```

107

```
 1    A.  That is correct.

 2    Q.  And you are not offering any opinion about whether any

 3    purported document manipulation constitutes fraud, are you?

 4    A.  I am not.

 5    Q.  You have no personal knowledge about who manipulated any

 6    document in this case?

 7    A.  I have no personal knowledge other than based on the

 8    evidence that I've seen from the documents that I reviewed.

 9    Q.  You cannot say with certainty that it was Dr. Wright who,

10    in fact, manipulated any one -- particular one of these

11    documents?

12    A.  I can't say with absolute certainty that he is the one.  I

13    mean, obviously there's a number of pieces of circumstantial

14    evidence that suggest he did.  But you are correct.  I can't

15    say with one hundred percent certainty that the Defendant did.

16    Q.  Now, it's your opinion -- you say -- today I think you said

17    that you have analyzed these 10 documents plus 25 to 30 others.

18    Let me restate that to make sure that we're clear.

19    A.  Thank you.

20    Q.  That you have arrived at an opinion on these ten plus 25 to

21    30, is I believe what you said on direct.

22    A.  To the best of my recollection, yes.  I don't recall the

23    exact number.

24    Q.  Okay.  And I'm going to ask you because I'm not clear,

25    Dr. Edman.  Have you opined about 50 documents or about 40
```

108

1   documents?

2   A.  I -- again, I don't recall the exact number.  That sounds

3   like about the number of documents that I've opined on the

4   authenticity.  But certainly in my review of certain documents

5   to determine their authenticity, there are related documents

6   that I would have also looked at.

7   Q.  And on these documents that we're talking about -- for

8   example, today, to be clear, the document -- I'm not talking

9   about the related documents.  Those are metadata documents or

10   other documents you compared.  There's a central document in

11   each of these examples that's the one you're opining about, so

12   we had 10 examples today.  Do you understand what I'm saying?

13   A.  I do.

14   Q.  All right.  And you think that number is 40.  Is that fair?

15   35 to 40 is your belief?

16   A.  Yeah, to the best of my recollection.

17   Q.  Could it be as high as 50?  Do you remember?

18   A.  I suppose.  Again, I don't recall specifically.

19   Q.  Now, it's your opinion that almost all of the documents

20   that you have looked at, you think those documents were created

21   for the most part in 2014, but there's some you say were in

22   2015, right?

23   A.  It appears so.

24   Q.  All right.  You're basing your opinion on artifacts related

25   to the metadata and other characteristics of the digital

109

1  documents like cryptographic signatures, correct?

2  A.  Yes.

3  Q.  And document metadata that has been altered doesn't

4  necessarily tell you who exactly did the alteration; isn't that

5  right?

6  A.  Sometimes it contains indicators, but I would agree that it

7  doesn't definitively tell you who did the alteration.

8  Q.  Now, you say that the manipulations are consistent with

9  them having been done by Dr. Wright, correct?

10  A.  Yes.

11  Q.  But sir, in science, would you agree with me that because

12  something is consistent doesn't mean, in fact, that the thing

13  happened that way?

14  A.  I would.

15  Q.  And you're familiar with the expression:  "Correlation is

16  not causation."  This is a scientific concept, is it not?

17  A.  I've certainly heard the phrase before, yes.

18  Q.  You would agree with me that if I said to you that in my

19  experience when I sneeze, it rains, even if I observed that

20  correlation, that doesn't mean my sneeze is the cause of the

21  rain, does it?

22  A.  Certainly not from one sneeze.

23  Q.  Okay.  When you say that the manipulations were consistent

24  with having been made by Dr. Wright, one of the things you say

25  is that you believe Dr. Wright had the means to do the

110

1    manipulation, correct?

2    A.  I would believe so, yes.

3    Q.  But you also agree, sir, that the fact that he had the

4    ability to do something is not proof that he did it?

5    A.  I would agree.

6    Q.  For example, someone can have hacking tools, but not have

7    used them for unauthorized purposes, right?

8    A.  I would agree.

9    Q.  And you, sir, have not taken any steps to determine whether

10   anyone else had the means to make the document manipulations

11   that you have identified here in court or the ones in your

12   report; isn't that right?

13   A.  I believe that's a different question than what I was asked

14   to do originally, which was just to determine whether or not

15   these documents are authentic.

16       I believe that determining exactly who created the

17   documents, that's a very different line of inquiry and would

18   require, you know, access to likely certain evidence that I did

19   not in the course of this investigation.  And I was also not

20   asked to determine exactly who created these forgeries.

21   Q.  Fair enough.  So there's two different questions.  One is:

22   Were the documents manipulated?  There, you were clear that you

23   were asked about that, right?

24   A.  I was.

25   Q.  But then there's a second part, this question of

1  consistency of -- you say of some evidence with Dr. Wright, but

2  were you asked to determine that or not?

3  A.  To the best of my recollection, I was asked for my opinion,

4  but I wasn't asked to definitively opine as to exactly who was

5  responsible for the forgeries.

6  Q.  I'm sorry.  I don't mean to step on your answer.

7      As a result of not being asked, you didn't, therefore, take

8  steps to try to, for example, eliminate other possible -- let's

9  call them suspects?

10  A.  Correct.  Again, that was -- that's a very different line

11  of inquiry.

12  Q.  You weren't asked to do that?

13  A.  I was not.

14  Q.  Okay.  So, for example, if, sir, I -- let's hypothetically

15  say that on document -- I think it was Plaintiffs' 807.

16      MR. RIVERO:  And I don't know, Mr. Shah, if you have

17  807 available.

18  BY MR. RIVERO:

19  Q.  But on 807, it was example number six, altered document

20  number six.

21      MR. RIVERO:  Let's see if we can show that.

22      It's in evidence.  You can show the jury.

23  BY MR. RIVERO:

24  Q.  Do you remember looking at this document with Plaintiffs'

25  counsel?

162

```
1    A.  I do.

2    Q.  And do you remember testifying that this document, in your

3    opinion, is altered?

4    A.  I do, yes.

5    Q.  Yeah.  Now, sir, if I'm able to demonstrate, for example,

6    through my expert that the IP address that you referred to in

7    number six -- I believe that was from document 856.2.

8         MR. RIVERO:  Mr. Shah, I don't know if you have access

9    to 856.2.  Can you show that to remind the jury.

10        Hmm.  I may have gotten the number wrong, sir.  But --

11   no, I don't think I did.

12   BY MR. RIVERO:

13   Q.  Do you see that there's a number in the middle --

14        MR. RIVERO:  Mr. Shah, if you could highlight under

15   "IP addresses" and draw out 58.160.32.123.

16   BY MR. RIVERO:

17   Q.  Can you see that?

18        MR. RIVERO:  Can you pull it out, Mr. Shah, and make

19   that big.

20   BY MR. RIVERO:

21   Q.  That number there, sir, that IP address, goes to -- does

22   that go to a certain device or does it go to a certain server?

23   What does that mean?

24   A.  It depends on the configuration of that device.  An IP

25   address could represent a single device or it could represent a
```

1   group of devices.

2   Q.  Okay.  Sir, you didn't do anything -- you didn't go behind

3   this -- you had this, right?  You had this document?

4   A.  Correct.

5   Q.  You had it with squares and lines and all in red when

6   Plaintiffs' counsel talked to you about that.  Do you remember

7   that?

8   A.  I do.

9   Q.  Did you do anything to find out what IP address

10  58.160.32.123 ties back into?

11  A.  Aside from this particular lookup, no, not to my

12  recollection.

13  Q.  What you did was you showed the jury that one document was

14  showing -- had this IP address.  And then this other document

15  had that IP address.  Do you remember that?

16  A.  I do.

17  Q.  Yeah.  But you didn't do anything to find out whose IP

18  address, or who that might be tied to, right?

19  A.  I don't believe I would have had the ability.  Typically,

20  to identify the subscriber or the individual or organization

21  associated with an IP address, in my experience from supporting

22  law enforcement investigations, you generally need a subpoena

23  to the ISP and then they can provide current and historical

24  records.  I don't have the ability to issue a subpoena.

25  Q.  You weren't able to get behind that IP address, right?

```
 1    A.  Correct.

 2    Q.  Okay.  And you didn't try to?

 3    A.  Again, I don't believe I had the ability to.

 4    Q.  Well, sir, you didn't have subpoena power, right?

 5    A.  As far as I know, sir, I don't.

 6             MR. ROCHE:  Objection --

 7    BY MR. RIVERO:

 8    Q.  But you know that Plaintiffs' counsel --

 9             THE COURT:  Hold on.  What's the basis of the

10    objection?

11             MR. ROCHE:  Relevance.

12             THE COURT:  Overruled.

13    BY MR. RIVERO:

14    Q.  You know Plaintiffs' counsel had subpoena power in the

15    case, right?

16    A.  Honestly, I don't.

17    Q.  Okay, sir.  So you don't know they could have gone and

18    asked to find out what this address was?  That's what you're

19    saying?

20             MR. ROCHE:  Objection.  Asking for a legal conclusion.

21             THE COURT:  Overruled.

22             THE WITNESS:  No.  I didn't know if they did or did

23    not have that ability.

24    BY MR. RIVERO:

25    Q.  Sir, Wooloowin, Queensland, Australia, that's a location
```

115

1    that's shown on here, right?

2    A.  It is.

3    Q.  And that has some association with this -- it's shown in

4    this metadata or GeoIP Precision lookup form?

5            MR. RIVERO:  If you can show the entire document.

6    BY MR. RIVERO:

7    Q.  Right?  It has some relationship, right?

8    A.  It does.

9    Q.  Did you look at a map to see where Wooloowin, Queensland,

10   Australia is?

11   A.  I believe so.

12   Q.  Okay.  And when you saw that, did you learn that it was

13   2,000 miles away from where Dr. Craig Wright lived?

14   A.  No.  Because, again, the GeoIP address provides you an

15   approximate geographic location.  I certainly wasn't relying on

16   specifically that IP address being associated with Wooloowin.

17   But my understanding is that Queensland, Australia is

18   consistent with Eastern Australia.

19   Q.  You know Australia is a continent, right?

20   A.  I'm aware, sir.

21   Q.  And you know it's a very big country?

22   A.  I'm well aware, sir.

23   Q.  And so you don't know -- you can't tell the jury where

24   Wooloowin is in relation, for example, to Bagnoo or wherever

25   Dr. Wright lived at this time?

116

1    A.  I don't know what Bagnoo is.  But no, I can't.

2         MR. RIVERO:  May I have one moment, Judge?

3         THE COURT:  Certainly.

4    (Pause in proceedings.)

5    BY MR. RIVERO:

6    Q.  So, sir, I just want to be clear.

7         MR. RIVERO:  If you could put that document back up,

8    Mr. Shah.  I don't know why it's down.

9         I'm sorry.  It's 856.2.

10   BY MR. RIVERO:

11   Q.  I just want to be clear.  For the moment, leaving aside the

12   detail of the IP address and the rest, you didn't check to see

13   if Wooloowin is more than a thousand kilometers away from where

14   Dr. Wright was living at this time.  You didn't look at a map

15   to determine that, right?

16   A.  I did not.

17   Q.  You didn't do anything to determine whether this IP address

18   tied into any specific device, correct?

19   A.  Correct.

20   Q.  And, sir, what you did in all -- in every instance -- in

21   every instance, what you did was you simply looked at what

22   either the metadata shows or what the cryptographic signature

23   shows, or what you call the human readable content shows.

24   That's what you looked at?

25   A.  As well as the internal structure of the documents in some

1   instances.

2   Q.  Internal structure of the document.

3      Okay.  Sir, the -- the -- I'm sorry that -- my next

4   question is escaping me, sir.  It doesn't happen so often.

5   I'll try to remember what it was.

6      Oh, but you certainly didn't do -- in this instance, you

7   didn't go beyond the structure of the document, what you could

8   read of the document, what the metadata attached to the

9   document.  All -- what you looked at was everything around that

10  digital document, right?

11  A.  In some instances, I would compare artifacts from the

12  electronic document to third-party sources, such as the GeoIP2

13  lookup.

14  Q.  Oh, the GeoIP.  I wanted to ask you about that.  Isn't it

15  the case that this GeoIP Precision lookup form, number one, it

16  has at least -- isn't it true it has two significant flaws?  It

17  is a tool to use for the purpose of figuring out where a

18  digital document came from.  Isn't it true there are two

19  significant flaws?

20  A.  Perhaps.  I'm sure you're going to tell me what those two

21  flaws are.

22  Q.  Well, sir, wait a minute.  I don't have a Ph.D. in computer

23  science, so I'm asking you:  Isn't it true there are two

24  significant flaws and you have testified about at least one of

25  them?

168

```
1    A.  Possibly.  I don't recall specifically.

2    Q.  Sir, let me ask you:  Don't you know?  Because I see in

3    this analysis stuff you go back and you go back and you look at

4    where fonts come from, when they were copyrighted, and this

5    kind of thing, right?

6    A.  I do.

7    Q.  So I assume that you have checked out the user instructions

8    on GeoIP, have you not?

9    A.  I have, I'm sure, at some point.  I'm familiar with the

10   service.

11   Q.  Let's be real clear.  When you use GeoIP -- when did you do

12   the search?  When did you do the lookup?

13   A.  This was 2019.

14   Q.  What it gives you is the GeoIP location at the time you

15   look it up; isn't that right?

16   A.  In this case, it does, yes.

17   Q.  And it doesn't give you a historical analysis of where the

18   GeoIP -- where the -- I'm going to get lost in jargon.  It

19   doesn't tell you where that came from at an earlier time,

20   right?

21   A.  So in the context of the GeoIP Precision service, which

22   MaxMind markets as its most up-to-date and most accurate

23   service, you're correct.  They advertise it as most accurate,

24   but it does not provide historical information.

25        I recall you asked me about this at one of my depositions.
```

1    Subsequent to that, I was able to access historical databases

2    for not this GeoIP2 Precision service, but it was a GeoIP2 City

3    service.

4    Q.  Sir --

5           MR. ROCHE:  Please let him finish the --

6           THE COURT:  Has the witness finished his answer?

7           THE WITNESS:  No.

8           THE COURT:  All right.  You may finish your answer,

9    sir.

10          THE WITNESS:  According to this separate GeoIP2 City

11   database, the results were consistent with what's shown in

12   GeoIP2 in the lookup form here, which is Eastern Australia.

13   BY MR. RIVERO:

14   Q.  Sir, let me go back to what we were talking about.

15       First of all, sir, I have never examined you before; isn't

16   that true?

17   A.  No.  I believe it was always Mr. Kass.

18   Q.  Right.  So sir, I'm asking about what -- this evidence that

19   you are showing the jury and that counsel has shown the jury is

20   from this GeoIP2 Precision lookup form, correct?

21   A.  It is.

22   Q.  And that the information that you presented in front of the

23   jury gives you the current state of the -- of where the device

24   would be located now; isn't that true?

25   A.  As of the time that the lookup was performed.

1    Q.  Thank you.  So in other words, if you looked at it in 2019,

2    it would tell you in 2019, correct?

3    A.  That is correct.

4    Q.  And it would not tell you where this device -- this would

5    not tell you where this device was in 2014?

6    A.  No.  Again, it doesn't provide historical access to this

7    database.

8    Q.  And I understand you're trying to volunteer some other

9    information about something.  Let me ask you, sir:  This

10   information you're volunteering, that's not found in your

11   expert report, is it?

12   A.  It is not.  This was subsequent to one of my depositions.

13   Q.  Yeah.  And sir, in other words, I could put out your four

14   expert reports here, and I would never find that testimony that

15   you just gave this jury anywhere in those reports, would I?

16   A.  That is true.

17   Q.  And we could look at your four testimonies before today and

18   we would never see that, would we?

19   A.  That's true.

20   Q.  Now, sir, isn't it the case that in many instances in these

21   documents -- well, let me just be precise about this --

22          MR. RIVERO:  And, Judge, I can continue or stop

23   whenever the Court prefers.

24          THE COURT:  Is this a good time to stop?

25          MR. RIVERO:  If you don't mind, I'll just ask a sort

121

```
 1    of closing-up question on that.

 2    BY MR. RIVERO:

 3    Q.  Sir, you didn't do anything to go outside of the documents,

 4    other than you say you went to something like another computer

 5    source, to determine whether the real-life events described in

 6    a document happened; isn't that right?

 7    A.  Correct.

 8    Q.  Okay.  So your analysis was limited to looking at the

 9    digital information; isn't that right?

10    A.  It was, yes, limited to looking at digital information.

11          MR. RIVERO:  Your Honor, that's a good stopping place.

12          THE COURT:  All right.  Ladies and Gentlemen, let's

13    take a recess for lunch.  I'll see you back here at 2:00.

14       (Jury not present, 1:01 p.m.)

15          THE COURT:  Okay.  Have a pleasant lunch.  I'll see

16    you back here at 2:00.

17       (Recess from 1:01 p.m to 2:00 p.m.)

18          THE COURT:  Welcome back.  I trust everyone had a nice

19    lunch.

20          We're waiting for Mr. Rivero and then we're ready to

21    go.  All right.

22          Mr. Rivero, are you ready to proceed?

23          MR. RIVERO:  Yes, Your Honor.

24          THE COURT:  Are the Plaintiffs ready to proceed?

25          MR. FREEDMAN:  We have two housekeeping matters.
```

```
1    First, your Honor, we believe that after Dr. Edman is done

2    testifying the Plaintiffs will rest their case.  Before we do

3    that, though, we want to make sure our list of admitted

4    exhibits matches the Court's.

5              THE COURT:  All right.

6              MR. FREEDMAN:  We don't think that has to be done

7    before.  So if the Court's okay with it, we'll announce that we

8    rest and that will be understood that is subject to confirming

9    that those in fact match.

10             THE COURT:  All right.  Is that acceptable, that we'll

11   do that outside the presence of the jury?

12             MR. RIVERO:  Yes, Your Honor.

13             THE COURT:  All right.  Can we also take up any

14   motions at the appropriate time and can we proceed right to the

15   Defendant's case?

16             MR. RIVERO:  Judge, we had a question how the Court

17   wanted to address that.  I don't know if we've -- I believe

18   we'll be filing a motion at the close of the Plaintiffs' case

19   and we don't know the timing that the Court would want to hear

20   that.

21             THE COURT:  So for purposes of preserving, you can

22   just state that you have a motion.  It's preserved for the

23   record.  Then we can address it at the appropriate time.

24             What I want to do is make use of the jury's time.  So

25   following Dr. Edman's testimony, and I'm not certain how much
```

1    longer you have for cross or any redirect, but I suspect that

2    we will have some time this afternoon for the Defendant to

3    present his case.

4             MR. RIVERO:  We will be ready to go, Judge.

5             MR. ROCHE:  Your Honor, one more matter.

6             On the cross-examination -- and I just want to bring

7    this up now so we don't waste the jury's time later.  During

8    the cross-examination Mr. Rivero asked a number of questions

9    relating to the billings that Dr. Edman did during the

10   preparation for and leading up to the June 28th hearing in

11   front of Honorable Reinhart.  I do think at this point it has

12   opened the door to a line of questioning concerning the

13   procedural history and the posture of this case.

14            MR. RIVERO:  Your Honor, absolutely not.  What I asked

15   was whether there was an amount as to one invoice.  There was

16   an amount to another invoice.  I didn't show the invoices.  I

17   made no reference to the purpose, and it was relatively brief,

18   Judge.  It was only to establish the amount that the company

19   had been paid on his behalf.  I absolutely did not go into the

20   subject --

21            MR. FREEDMAN:  I believe the quote was "deep in this

22   case."  So I do think the jury -- I do think that opens the

23   door for the jury understanding why Dr. Edman was doing work

24   deep in this case going back to June 2019.

25            THE COURT:  Well, let me ask you, Mr. Roche.  What is

124

 1   it that you're intending to introduce?  Dr. Edman coming into

 2   court to testify?

 3        MR. ROCHE:  I would ask for forgeries number six and

 4   number seven, that he has previously submitted evidence to the

 5   Court that forgeries six and seven were submitted in this case.

 6   That's it.

 7        THE COURT:  All right.  The expert's time and the

 8   expense as a result of that time is certainly relevant.  If you

 9   want to inquire with regard to the specifics of the time

10   without reference to any particular hearing, for example, if

11   Dr. Edman was required to testify during any pretrial

12   proceeding that may have necessitated a significant amount of

13   time, then you're free to ask that on redirect, but not with

14   regard to the specifics of the pretrial hearing.

15        MR. ROCHE:  And I just want to -- the only question I

16   wanted to ask, then, is with respect to the time in June 2019

17   was that related to an analysis of two documents that were

18   submitted in this litigation, forgeries six and seven.

19        THE COURT:  Well, I think all of his time is spent

20   analyzing documents.  If you want to focus on time spent

21   analyzing certain documents more than others --

22        MR. ROCHE:  Okay.

23        THE COURT:  -- and that's consistent with the time

24   records, but again, I don't want any reference to any pretrial

25   proceedings.  If his testimony was necessary before Judge

175

1    Reinhart, then you can certainly say:  "And at some point in

2    time did you testify and did you also incur expenses?"  That

3    would be the extent of it.  Not why he testified, where he

4    testified, and for what reason.

5         Okay.  We have clarification?

6         MR. ROCHE:  Yes, Your Honor.  Thank you.

7         THE COURT:  Let's bring in the jury.

8    (Before the Jury, 2:02 p.m.)

9         THE COURT:  All right.  Welcome back, Ladies and

10   Gentlemen.  Please be seated.

11        I trust you had a pleasant lunch and are ready to get

12   back to work.

13        We will continue with the questioning of Dr. Edman.

14                       CROSS-EXAMINATION

15   BY MR. RIVERO:

16   Q.  Dr. Edman, I had mentioned two flaws in the GeoIP site, and

17   we had discussed one.  I will come back to the other in the

18   course of the examination.

19        What I wanted to ask you now was on the subject of whether

20   you had done anything to determine whether anybody else had the

21   means to make the document manipulations that you have

22   identified.  One of the bases, sir, for believing that the

23   manipulations are consistent with having been done by

24   Dr. Wright is because of certain time zones associated with

25   Australia, correct?

126

```
 1   A.  Correct.
 2   Q.  Now, sir, you would agree with me that with regard to
 3   computer time zones, those can be set automatically by a
 4   computer or they can be set manually, right?
 5   A.  I would agree.
 6   Q.  Okay.  And, for example, I could set my computer here in
 7   Miami to Australia time if I wanted to?
 8   A.  You could.
 9   Q.  And then the documents created on my computer would reflect
10   Australia time, right?
11   A.  They would most likely, yes.
12   Q.  Most likely.  I notice that you said that a few times in
13   your direct testimony, sir.  By "most likely," it means that
14   based on your education and experience you believe that's the
15   most likely result?
16   A.  Correct.
17   Q.  Sir, I think you said:  "Most likely" at least a few times.
18   Does that mean you don't know for sure?
19   A.  I think it depends on the specific circumstances.
20   Q.  Let's take that one for just a second because I want to
21   make sure that we're on the same page, and I'll come back to
22   that in a little more detail.
23       I just posed a hypothesis to you, didn't I?
24   A.  It was a very general question, but yes.
25   Q.  The hypothesis was, if I set my computer to Australia time,
```

1    then my computer would reflect Australia time.  That's the

2    hypothesis, right?

3    A.  Yes.

4    Q.  Can we make a prediction from that?  Going back to the

5    scientific method, if I set my computer to Australia time, then

6    wouldn't you predict that if you looked at the metadata you

7    would find that the documents produced would reflect -- what is

8    it?  UTC+11, is that what it is?

9    A.  UTC+11 or +10.

10   Q.  Or +10 depending on Daylight Savings Time.  That would be

11   your prediction, right?

12   A.  It would be for the documents we discussed.

13   Q.  Right.  And I think right now you would say to the jury:

14   "Most likely," right?

15   A.  Yes.

16   Q.  That's a theory, right?

17   A.  I suppose it's consistent with my experience with these

18   types of documents, though.

19   Q.  I understand, sir.  It's also consistent with -- would you

20   agree with me that for thousands of years it was consistent

21   with human experience that the earth was flat?

22   A.  I suppose.

23   Q.  Right.  And that was a theory.  You know that that was a

24   theory at one time in the world, was that the earth was flat,

25   because if you looked at the horizon it looked flat.  You know

128

1   that, don't you?

2           MR. ROCHE:  Objection.  Relevance.

3           THE COURT:  Overruled.  I'll allow that.

4           THE WITNESS:  Sure.

5   BY MR. FREEDMAN:

6   Q.  And later, after we started circumnavigating the planet, we

7   learned as human beings -- we learned that the planet was not

8   flat.  You know that history.  That's not hidden, right?

9   A.  Sure.

10  Q.  Sir, when you say it's most likely that my computer

11  metadata would reflect Australia, that's based on your

12  experience, that's based on your expectations, your theory, but

13  to test it, wouldn't we need to change my computer to Australia

14  time, then create a document, and then look at the metadata to

15  see if it shows Australia time, UTC+11, or if it shows British

16  time or if it shows American time?  Wouldn't we need to do that

17  just to start to experiment on that question?

18  A.  I suppose.  But certainly it's been my experience that

19  creating, say, a PDF and then analyzing the metadata, it

20  reflects the time zone of my computer.

21  Q.  That's your experience, sir.  I'm talking about the

22  scientific method.  Wouldn't you need to test it to be able to

23  say:  "I tested my hypothesis"?

24  A.  I suppose you could, but I have no reason to believe that

25  UTC+10 is treated any differently than UTC-4 or 5.

```
1              MR. RIVERO:  I'm sorry.  I had a little bit of trouble
2    hearing you.  Can I ask the court reporter to read that back?
3       (Read back.)
4    BY MR. RIVERO:
5    Q.  Right, sir.  I understand.  My question is not about
6    whether UTC 11 is different from UTC 4.  My question is:  You
7    cannot in the scientific method test your theory unless you do
8    an experiment; isn't that true?
9    A.  I suppose, but the results of my analysis of this document
10   is still consistent with my experience with analyzing the
11   metadata of similar documents.
12   Q.  Sir, you're jumping way ahead in my examination.  But are
13   you saying by that answer that you didn't test any of these
14   hypotheses you came up with here?  Is that what you're saying?
15   A.  If your question is did I create a PDF in time zone UTC+10,
16   no, I did not.
17   Q.  And, sir, that wasn't my question anyway, but we're going
18   to get there.
19      My question was simply:  To start to prove or disprove that
20   the changing of the clock on my computer would result in a
21   certain result in metadata, you would need to do it on my
22   computer and see if that happens, wouldn't you, under the
23   scientific method?
24   A.  I suppose.
25   Q.  All right.  You agree with me that there are things that
```

180

1    can change the dates found in the metadata besides the system

2    clock or manual manipulation by a person?

3    A.  I'm not sure.  I think I would need an example.

4    Q.  I'm sorry.  I can't hear you.

5    A.  I'm sorry.  I'm not entirely sure.  I think I would need an

6    example.

7    Q.  So you don't know?

8    A.  Off the top of my head, I don't know what scenario that

9    would occur.

10   Q.  All right, sir.  Now, you do say that one of the reasons

11   that you're associating Dr. Wright with this is because certain

12   IP addresses are associated with Eastern Australia?

13   A.  Yes.

14   Q.  Okay.  But you did nothing, again, to go back to the

15   associated IP addresses to determine whose they were?

16   A.  Correct.  Aside from the GeoIP lookup.

17   Q.  Right.  And we will get back to the second flaw.

18       Another reason you believe the manipulations were

19   consistent with Dr. Wright is because of the computer names in

20   the metadata, right?

21   A.  Yes.

22   Q.  Okay.  But you would agree with me, sir, that computer

23   names are metadata and they can be manipulated, right?

24   A.  I would agree.

25   Q.  Okay.  And in fact, even if the emails were sent from

1    devices associated with Dr. Wright, even if that were the case,

2    you would agree with me that doesn't mean that Dr. Wright sent

3    them?

4    A.  I would agree.

5    Q.  And you would agree it's certainly possible that someone

6    could have gained access to either Dr. Wright's account or his

7    device; isn't that true?

8    A.  I would agree.

9    Q.  Now, isn't it true that Plaintiffs produced a document that

10   is an email exchange that reflects David Kleiman sending

11   himself an email on June 30th, 2018?

12   A.  I'm not familiar with this document.

13   Q.  Let me ask you --

14        MR. RIVERO:  Let me show just the counsel and the

15   witness D58.

16        Your Honor, I'd move the admission of this document as

17   an admission of a party opponent.  D58.

18        MR. ROCHE:  Your Honor, we object on the basis that

19   this expert, Dr. Edman, doesn't have the proper foundation to

20   examine this document.

21        MS. MCGOVERN:  I believe it's already in.

22        MR. RIVERO:  I'm sorry.  I'm corrected.  I'm told it's

23   in.  I don't know if that's right, Judge.

24        THE COURT:  D58 is in evidence.  You may use it.

25        MR. RIVERO:  All right.  Let's show the jury D58.

1    BY MR. RIVERO:

2    Q.  All right.  Now, the jury has it.  So I don't know that

3    this has been spoken about with precision, Dr. Edman.  So I'm

4    going to ask you:  Are you familiar with the fact that the

5    documents produced between the parties in the case have a

6    little number -- and sometimes we lawyers forget, you know,

7    that it could be that -- we make assumptions.  Do you see that

8    little number that Mr. Shah has blown up that says:  "Kleiman"

9    and then has a bunch of numbers after it?

10   A.  I do.

11   Q.  You do litigation-related work, so I assume you know that

12   that's what's called a Bates stamp, right?

13   A.  Yes.

14   Q.  And a Bates stamp is nothing more than an identifier often

15   with a name before it followed by a number that a party in

16   litigation will put on a stamp so everyone knows where it came

17   from, right?

18   A.  Yes.

19   Q.  Okay.  So do you understand this document was produced by

20   the Plaintiffs' side?

21   A.  I haven't seen this document, but I believe that based on

22   the Bates stamp.

23   Q.  You haven't seen this document because Plaintiffs' counsel

24   didn't ask you to look at this document, did they?

25   A.  No, not to my recollection.

1    Q.  All right.  So let's look at the document.

2          MR. RIVERO:  Mr. Shah, if you would put this back.

3    BY MR. RIVERO:

4    Q.  So, sir, you see this is a document that says from Dave

5    Kleiman to Dave Kleiman and is dated Saturday, June 30, 2018,

6    right?

7    A.  Yes.

8    Q.  All right.  I think you said many, many times that David

9    Kleiman was dead by April 26th, 2018.  Do you recall that?

10   A.  I think he was dead before April 26th, 2018.

11   Q.  Correct.  I said:  "By," but we don't know the exact date.

12        Sir, David Kleiman could not have sent himself this

13   document on June 30th, 2018, correct?

14   A.  Correct.  I believe so.

15   Q.  Okay.  So would you agree that we don't know how this came

16   about?  We have no idea who did this, right?

17   A.  I haven't analyzed this document, so no, I don't know.

18   Q.  Okay.  Sir, I think you would agree with me that a lot of

19   these manipulations that we saw were not very sophisticated,

20   right?

21   A.  In a sense, yeah, I would agree that there are some obvious

22   mistakes with manipulations.

23   Q.  I think Plaintiffs' counsel even took you to one where you

24   said it was less obvious.  Do you remember that?

25   A.  I do.

1    Q.  Yes.  It was the one that you said that, I think -- I'm not

2    sure what you meant, sir, but I am going to -- it was

3    Plaintiffs' 538.

4        Do you remember that?

5    A.  I believe I know which document you're talking about.

6    Q.  Yes.  What you testified to the jury on examination by

7    Plaintiffs' counsel was that one wasn't so obvious, right?

8    A.  Right.

9    Q.  Okay.  Sir, would you agree with me -- I think you would

10   agree with me -- that clocks being rolled back, that's not some

11   really sophisticated method for altering a document, is it?

12   A.  I would agree that's not sophisticated.

13   Q.  And human-readable text being changed with a touch-up

14   editor -- by the way, I don't want to -- I mean, I don't know

15   these things, but when you talk about TouchUp Text editing,

16   that's a way that you change what's in the document that you

17   can read, right?

18   A.  Yes.

19   Q.  Okay.  So changing what a document says by retyping a word

20   or, you know, cutting it out and then putting another word,

21   that's not very sophisticated, is it?

22   A.  No.

23   Q.  All right.  Any of us, essentially anybody who knows how to

24   use a word processor, would be able to do that, right?

25   A.  With the appropriate software, yes.

185

```
1    Q.  Okay.  So wouldn't you agree with me that someone who's

2    extremely proficient in computers and the use of computers

3    could make metadata changes without detection or close -- let

4    me restate that.

5        Wouldn't you agree with me that a person who's extremely

6    proficient in computers could make metadata modifications that

7    would be very difficult to detect?

8    A.  I suppose that's possible, yes.

9    Q.  Now, sir, you were able to easily discover these purported

10   document manipulations, right?

11   A.  There was some analysis involved, so I wouldn't say it was

12   necessarily easy, but certainly some of the manipulations were

13   fairly obvious.

14   Q.  We'll get back to how you got to select these documents,

15   but you didn't have a lot of difficulty finding a difference

16   between a metadata date and the date on the exhibit, did you?

17   A.  No.

18   Q.  You would agree, I assume, that Dr. Wright is an extremely

19   proficient user of computers?

20           MR. ROCHE:  Objection.  Relevance.  Outside the scope.

21           THE COURT:  Sustained.

22           MR. RIVERO:  Your Honor, may I have one moment, Judge?

23           THE COURT:  Certainly.

24       (Pause in proceedings.)

25           MR. RIVERO:  Your Honor, I would ask to be heard at
```

186

```
1    sidebar on this.

2              THE COURT:  You may continue.

3    BY MR. RIVERO:

4    Q.  Are you aware that Dr. Wright has over 45 computer

5    certifications related to computer forensics?

6              MR. ROCHE:  Objection.  Relevance.  Outside the scope.

7              THE COURT:  Sustained.

8    BY MR. RIVERO:

9    Q.  Sir, you did not take into account -- in making your

10   determinations or giving your opinion about consistency of

11   manipulations with Dr. Wright, you did not take into account

12   Dr. Wright's skill/abilities when you determined that?

13             MR. ROCHE:  Objection.  Relevance.  Outside the scope.

14             THE COURT:  Overruled.  I'll allow it.

15             THE WITNESS:  I have no knowledge of what skills

16   Dr. Wright may or may not have regarding these documents.

17   BY MR. RIVERO:

18   Q.  So I'm going to ask my question again, sir, and ask you to

19   answer that question.

20        You did not take into account anything to do with

21   Dr. Wright's computer skills in reaching the conclusion that

22   these changes were consistent with Dr. Wright having done it?

23   A.  Again, I have no knowledge of what his skills with respect

24   to manipulating documents may be, so no, I did not take that

25   into account.
```

187

```
1    Q.  Let's go back to the MaxMind.  The second flaw, sir.

2         You remember that you did tell me that certainly as of the

3    time you gave any report or prior testimony in this case you

4    had looked at a version of the GeoIP -- I think it's also

5    called MaxMind -- that did not give you historical information,

6    correct?

7    A.  Correct.

8    Q.  But separately, sir, MaxMind has another significant flaw,

9    does it not?

10   A.  I'm not sure what you're referring to.

11   Q.  Let's make sure we understand how MaxMind works.  IP

12   addresses are assigned by Internet providers, right?

13   A.  Yes.

14   Q.  That's what IP means is Internet provider?

15   A.  No.

16   Q.  I'm sorry.  Intellectual property.

17        So what is an Internet provider?

18   A.  An Internet service provider?

19   Q.  Yes.

20   A.  We'll say the company that provides you access to the

21   Internet.

22   Q.  Can you give us an example?

23   A.  Verizon.

24   Q.  Okay.  And so the ISP, the Internet service provider, would

25   assign the IP address; is that right?
```

1    A.  Yes.

2    Q.  Okay.  Then does that Internet service provider report the

3    IP address to MaxMind?  Is that how that works?

4    A.  Not necessarily.

5    Q.  How does MaxMind get it?

6    A.  Exactly how they collect their information I believe is

7    proprietary.  There are a number of public sources, such as

8    WhoIs information that I understand that they collect.

9    Q.  Okay.

10   A.  But I don't believe that MaxMind provides an exhaustive

11   list of exactly where they source all of their information.

12   Q.  Okay.  So you don't know.

13       You don't know, sir -- as you sit here today, you don't

14   know who Dr. Wright's Internet service providers were in 2014;

15   is that right?

16   A.  I believe that's correct, yes.

17   Q.  And you don't know who his Internet service providers were

18   in 2015?

19   A.  Correct.

20   Q.  And you don't know that information for 2013?

21   A.  Correct.

22   Q.  You will agree with me that MaxMind contains millions of

23   erroneous data items in its database, will you not?

24   A.  Perhaps.  I guess it depends on what you mean by erroneous.

25   Q.  Well, doesn't MaxMind itself claim that it is not 100

1    percent accurate?

2    A.  I agree with that, yes.

3    Q.  And isn't it the case that if you take its percentage of

4    error, in other words, the percentage that it admits it's off

5    from 100 percent, that there are millions of erroneous data

6    items in its database?  Isn't that true?

7    A.  I don't know the exact number, but you are correct that it

8    is less than 100 percent accurate.  However, my experience, I

9    have found it to be reliable.

10   Q.  Sir, isn't that at least eight million erroneous data

11   entries?

12   A.  Perhaps, but there are significantly more than eight

13   million IP addresses.

14   Q.  I understand, sir.

15       Sir, you don't know any reason why any IP address in this

16   case would not be among the erroneous data items on MaxMind, do

17   you?

18   A.  I suppose it could.  I have no reason to believe it, but it

19   is possible.

20   Q.  You have no reason to know that they're not?

21   A.  Sure.  Except for the results from it do appear to be

22   consistent with other evidence in this case.

23   Q.  Sir, so let's talk about that.  Do you know where Wooloowin

24   is?  You remember you saw Wooloowin, and I think that was --

25   let me see if I can get that number again.

140

```
 1        Do you know where Wooloowin is?
 2   A.  I understand it's in Queensland, but where exactly it is, I
 3   don't know.
 4   Q.  Yes.  Are you aware Wooloowin is in a city named Brisbane,
 5   Australia?
 6   A.  I wasn't before.
 7   Q.  You're not right now?
 8   A.  I'm taking your word on it.
 9   Q.  Okay.  So you don't know?
10   A.  I don't.
11   Q.  All right.  You didn't check it?
12   A.  I did not.
13   Q.  Do you know, sir, whether or not Brisbane, Australia, is
14   more than a thousand kilometers away from Sydney, Australia?
15   A.  I do not.
16   Q.  Do you know whether Wooloowin is a suburb of Brisbane?
17   A.  I do not.
18   Q.  Do you know whether Jamie Wilson lived in the suburb named
19   Wooloowin?
20   A.  I do not.
21   Q.  And you don't know whether Dr. Wright lived in Sydney?
22   A.  I do not.
23   Q.  You didn't check any of this?
24   A.  No.  Again, I was only relying on sort of the general
25   region, not necessarily the city.
```

141

```
1   Q.  Well, sir, let me show you 856.2.

2         MR. RIVERO:  Mr. Shah, if you would bring that up for

3   the jury.  It's in evidence, submitted by the Plaintiffs.

4         No.  No, sir.  856.2.

5         Can you pull out Wooloowin, Queensland, Australia.

6   BY MR. RIVERO:

7   Q.  Can you see that, sir?

8   A.  I can.

9   Q.  Sir, when you got the document -- and I understand that you

10  looked at all of these data items, metadata, the date created,

11  the date modified.  You showed us all that.  There was a lot of

12  red circles and highlighting and pullouts.  Right?

13  A.  Yes.

14  Q.  You spent some time looking at these pieces of paper --

15  sorry.  That's old school -- at these digital documents, right?

16  A.  Yes.

17  Q.  Did you notice that there was a location called Wooloowin?

18  A.  Only in this particular exhibit.

19  Q.  I understand, sir, but what I'm saying is:  One of the

20  things you say is consistent with Dr. Wright is that it was

21  Eastern Australia, right?

22  A.  Yes.

23  Q.  Your reports over and over and over again talk about the

24  geographic location being consistent with Dr. Wright, correct?

25  A.  Yes.
```

142

1    Q.  And, sir, by the way, just to be clear, do you understand

2    there's 19.4 million people living in Eastern Australia?  You

3    know that?

4    A.  I did not.

5    Q.  Okay.  Sir, this is not like some desert or something,

6    right?

7    A.  Some parts may be, but --

8    Q.  Sir, here's the point:  Did it ever occur to you in doing

9    your expert work to say:  "I am saying as an expert that this

10   is consistent with Dr. Wright because it's Eastern Australia,"

11   to look and see where that town is and determine whether that

12   town is close to where Dr. Wright lived?  Did that occur to

13   you?

14   A.  I believe I looked up where this was at one point.  But

15   again, I'm not really relying on the specific city.  Again, I'm

16   just looking at the general region.

17   Q.  Did you try to determine whether any other witness, like

18   Jamie Wilson, lived in this town?

19   A.  No, not to my recollection.  I don't believe I had any

20   reason to.

21   Q.  Okay.  Now --

22           MR. RIVERO:  Pardon me, Your Honor.  I've lost my

23   place.

24           THE COURT:  All right.

25           MR. RIVERO:  I'll just be one moment.

143

```
 1        (Pause in proceedings.)

 2   BY MR. RIVERO:

 3   Q.  Now, can you tell us what a VPN is, sir?

 4   A.  A VPN, or virtual private network, is a software protocol

 5   that you can use to route all of your traffic through another

 6   computer on the Internet.

 7   Q.  So does that allow somebody who has a VPN -- could they be

 8   sitting in one country but it could appear that they were

 9   actually in another country?

10   A.  It's possible, yes.

11   Q.  Well, for example, I don't know how this works, sir, but if

12   a VPN were used, would the metadata pick up the place where the

13   computer's located or would it pick up where the VPN is

14   projected to, or do you know?

15   A.  It would depend on the specific metadata you're talking

16   about.

17   Q.  You would need to look at the metadata, right?

18   A.  Yes.

19   Q.  But, sir, when you say it would depend on the specific

20   metadata, as you sit here right now I assume you're not able to

21   tell us the precise effects of the use of a VPN projecting from

22   one country to another on every kind of metadata, are you?

23   A.  On every possible kind of metadata?

24   Q.  Yes, sir.

25   A.  No.  I mean, I think we would need to talk about specifics.
```

144

```
1   Q.  Okay.  Perhaps we would need to test what happens if a VPN

2   projected from one country to another to see the effects on the

3   metadata to test what it actually does.  Is that possible to

4   do?

5   A.  I mean, again, I think we would need to look at specific

6   metadata.

7   Q.  Let me ask you a question.  I have a question.  If we

8   took -- if we did a test and we set up a computer here today

9   and we used a VPN, whatever it is, sir -- and I'm just using

10  initials that I don't really understand, but you apparently do.

11  If we used a VPN and it somehow, however these things work,

12  projected the computer into another country, could we print the

13  metadata to see if it reflected the geographic location here

14  versus in Mexico or wherever it was projected?  Could we do

15  something to see what it does?

16  A.  You could.

17  Q.  Okay.  Do you know whether people use VPNs -- what did you

18  call it?  A virtual?

19  A.  Virtual private network.

20  Q.  -- to watch television in a country where certain channels

21  are restricted?

22  A.  They do.

23  Q.  So like when I've been in these situations that I want to

24  open my Netflix but I'm in some other country and I can't get

25  Netflix, if I had a VPN, I might be able to get into the
```

145

```
 1    Netflix?

 2    A.  Possibly.

 3    Q.  All right.  And you would agree that somebody could have

 4    used -- somebody outside of Australia could have used a VPN to

 5    make it look like they were in Australia; isn't that possible?

 6    A.  It is possible.

 7    Q.  Now, the computer time zones are set by the computer user;

 8    is that right?

 9    A.  Typically.

10    Q.  And anyone can set their computer clock to a time zone

11    associated with Eastern Australia?

12    A.  Typically.

13    Q.  Now, you opined that the PGP version for Plaintiffs'

14    Exhibit 546 -- and I noticed something.  Let me change subjects

15    just for a moment, sir.

16        Every single one of these forgeries that you opined about,

17    every single one I noticed has a Plaintiffs' exhibit number;

18    isn't that right?

19    A.  I believe so, yes.

20    Q.  We didn't see -- out of the 10 that you showed, we didn't

21    see a single one that had a Defendant's exhibit number, did we?

22    A.  Not that I recall.

23    Q.  So you understand, sir -- you're familiar with

24    litigation -- that the Plaintiffs marked all those exhibits?

25            MR. ROCHE:  Objection.  Relevance.
```

146

```
1              THE COURT:  Sustained.

2    BY MR. RIVERO:

3    Q.  So you opined that the PGP in 546 -- and I want to see if

4    this is one of your examples.  Sir, I don't think you used it

5    today, but in your report, you opine about Plaintiffs' Exhibit

6    546.  Do you remember that?

7    A.  You'll have to refresh my memory.

8              MR. RIVERO:  All right.  Why don't we show the witness

9    and counsel Plaintiffs' 546.  It's in evidence, so I'd ask for

10   publication to the jury.

11             THE COURT:  Yes.

12             MR. RIVERO:  Thank you.

13   BY MR. RIVERO:

14   Q.  All right, sir.  Now 546 -- I'm pretty sure you weren't

15   shown it this morning, but you have in your report said that

16   you believe 546 is inauthentic, right?

17   A.  Correct.

18   Q.  Okay.  Do you -- sir, I'm not seeing it in my notes, but is

19   this one of the 10 examples?

20   A.  I believe this is forgery number two.

21   Q.  546 is altered document number two.

22        Okay.  Sir, you said that the document was really created

23   on March 4, 2014, if I remember correctly, or you said also it

24   could have been February 28th, 2014, right?

25   A.  Yes.  I believe this -- you're showing me just one page of
```

147

```
1   this document which had multiple pages and multiple signatures.

2   One of them I believe was February 28th, and the other, I

3   believe you are correct, was March 4th, 2014.

4   Q.  Okay.  So now, have you seen, sir -- I don't know if you

5   opined about Plaintiffs' 450.  Not today, but at another time.

6           MR. RIVERO:  I'll ask if that's in evidence.

7           If you can show the witness and counsel Plaintiffs'

8   450.

9   BY MR. RIVERO:

10  Q.  Sir, are you --

11          MR. RIVERO:  Your Honor, may I have one moment?

12          THE COURT:  Certainly.

13      (Pause in proceedings.)

14          MR. RIVERO:  All right.  Let's put that aside.

15  BY MR. RIVERO:

16  Q.  Now, one of your areas of expertise is responding to

17  computer hacks; isn't that true?

18  A.  Yes.

19  Q.  So you are familiar with what computer hackers are?

20  A.  Yes.

21  Q.  And you yourself possess many hacking tools?

22  A.  I suppose.

23  Q.  Well, you possess tools that are designed to be used to

24  compromise the security of computer systems, do you not?

25          MR. ROCHE:  Objection.  Relevance.
```

148

```
 1              THE COURT:  Overruled.  I'll allow it.

 2              THE WITNESS:  I suppose, yes.

 3   BY MR. RIVERO:

 4   Q.  You are familiar with how to detect a computer hack?

 5   A.  Yes.

 6   Q.  You have given expert testimony about this subject?

 7   A.  Not that I recall specifically regarding any sort of -- I

 8   think if you're referring to hacking tools, I have, yes.

 9   Q.  Okay.  You're aware that Dr. Wright -- you were here during

10   his testimony -- that he has testified that he and his company

11   computers were hacked.  You heard that?

12   A.  I heard the claim, yes.

13   Q.  You never looked at any of Dr. Wright's accounts to see if

14   there was any evidence of hacking, did you?

15   A.  I wasn't retained in this matter to determine whether or

16   not at any point Dr. Wright or any of his companies had been

17   hacked.  I think that's a very different line of inquiry.  I

18   don't believe I had access to the information that would allow

19   me to conduct that sort of investigation.

20   Q.  And also you didn't look at any of his devices to determine

21   whether he had been hacked?

22   A.  I didn't have access to any of these devices.  I understand

23   your experts did.

24   Q.  Did you ask, sir, for -- are you saying that you were

25   denied access to those?  Let me back up.
```

149

```
 1       Did you ask to look at those devices?

 2  A.   I believe we had discussions related to that, yes.

 3  Q.   And so did you make such a request?  Did you request:  "I

 4  want to look at those devices to determine hacks"?

 5  A.   I don't recall the exact language, but I know we did

 6  discuss it.

 7  Q.   Isn't it true that you have conceded that your access to a

 8  certain communications channel by Dr. Wright could constitute a

 9  form of hacking?

10          MR. ROCHE:  Objection.  Relevance.

11          MR. RIVERO:  Judge, if I may.  I'll tie it.

12          THE COURT:  Yes.  The objection is sustained.  You may

13  rephrase.

14  BY MR. RIVERO:

15  Q.   Are you aware that Dr. Wright has communications on a

16  channel called Slack?

17          MR. ROCHE:  Objection.  Relevance.  Outside the scope.

18          THE COURT:  Sustained.

19          MR. RIVERO:  Your Honor, I would request to go sidebar

20  on that.

21          THE COURT:  Come on forward.

22     (At sidebar on the record.)

23          MR. RIVERO:  Judge, this evidence has been used by the

24  Plaintiff from the Slack channel.

25          COURT REPORTER:  I can't hear you.
```

150

```
1           MR. RIVERO:  Oh, can you hear me now?

2           This evidence has been used by the Plaintiffs from the

3    Slack channel.  And in fact, this gentleman has testified that

4    he did do a form of hacking on the Slack channel.  The

5    question --

6           THE COURT:  And when did he testify that he did a form

7    of hacking in this case?

8           MR. RIVERO:  In his deposition, Judge.

9           THE COURT:  In this case?

10          MR. RIVERO:  Yes.

11          THE COURT:  Is that correct?

12          MR. ROCHE:  That he hacked it, no.

13          THE COURT:  That he did a form of looking at hacking

14   on a Slack channel?

15          MR. RIVERO:  Yes, Your Honor.

16          MR. ROCHE:  No.

17          MR. RIVERO:  Yes, Your Honor.

18          MR. ROCHE:  Let's see the deposition testimony.

19          MR. RIVERO:  Your Honor --

20          THE COURT:  Was he retained for that?

21          MR. ROCHE:  No.

22          THE COURT:  Then what's the issue?

23          MR. RIVERO:  No.  No, Judge.  Wait a minute.  These

24   gentlemen are misrepresenting the record.

25          He was asked if he had gotten access to a private
```

151

```
1    Slack channel belonging to Dr. Wright.  He was asked about
2    those credentials.  He said he was given those credentials
3    by -- and I'm not going to go into this part with him -- he was
4    given those credentials by Plaintiffs' counsel.  He said he
5    didn't believe he was authorized to use those credentials.  He
6    called it a form of hacking.  And I think I'm entitled to
7    establish about this hacking question that both he's hacked
8    Dr. Wright, which is what his own testimony says --
9         THE COURT:  Who's hacked Dr. Wright?
10        MR. RIVERO:  This gentleman.  He had said it in his
11   deposition testimony, Your Honor.
12        THE COURT:  You're going to have to give me a page and
13   line.  That he hacked Dr. Wright's computers?
14        MR. RIVERO:  He testified that -- he admitted it was a
15   form of hacking in his deposition testimony.
16        THE COURT:  No, but did he testify that he --
17        MR. RIVERO:  Yes.
18        THE COURT:  -- directly hacked --
19        MR. RIVERO:  Yes, Judge.
20        MR. ROCHE:  Your Honor, I think this would be a lot
21   more productive if we had the testimony in front of us.
22        MR. RIVERO:  Can I, please?
23        THE COURT:  Yes.  Let me see.  Let me see.  What's the
24   page and line?  Let me see it.
25        Is this it?
```

152

```
1              "I'll ask you the question.  The record says what it
2    says, but if you are not authorized" --
3              MR. RIVERO:  "You are not authorized to use, access
4    that workspace."
5              THE COURT:  Where is the testimony?  This is a
6    question.
7              MR. RIVERO:  Hold on.  "Witness" --
8              THE COURT:  "It could be"?
9              MR. RIVERO:  "It depends," Your Honor --
10             THE COURT:  No.  No.  We're so far afield.
11             The objection is sustained.
12         (End of discussion at sidebar.)
13    BY MR. RIVERO:
14    Q.  You have opined that approximately 40 documents have been
15    manipulated.  That's your opinion in this case?
16    A.  To the best of my recollection, that's the approximate
17    number.
18    Q.  Are you aware, sir, that between the two sides there were
19    hundreds of thousands of documents produced in the case?  Do
20    you know that?
21    A.  I do.
22    Q.  You didn't attempt, and it wouldn't be feasible, to review
23    all hundreds of thousands of documents to determine whether
24    with -- how many of them had manipulations, right?
25    A.  I did not, and I agree that it would not have been feasible
```

153

1    to do so.

2    Q.  You didn't attempt to review all the documents -- there

3    were something -- just about a thousand documents that were

4    marked between the two sides as exhibits.  Do you know that?

5    A.  I don't.

6    Q.  All right.  But you'll agree with me you didn't attempt to

7    review the thousand or so documents marked by both sides to

8    determine manipulations?

9         MR. ROCHE:  Objection.  Relevance.  His expert report

10   was submitted before the exhibit list.

11        THE COURT:  No.  No.  It's proper.  Overruled.

12        THE WITNESS:  I did not.

13   BY MR. RIVERO:

14   Q.  Sir, your fourth expert report was submitted after

15   October 1st of this year, was it not?

16   A.  No, I don't believe that's correct.

17   Q.  Sir, are you saying you didn't submit a supplemental expert

18   report naming three additional documents less than a month

19   before this trial?

20   A.  To the best of my recollection, I submitted the report

21   you're referring to on September 17th.

22   Q.  I see, sir.  So it was six weeks instead of less than 30

23   days, right?

24   A.  Yes.

25   Q.  Okay.  So, sir, when you submitted that report, the exhibit

154

1   list in this case had been in for a long time, hadn't it?

2   A.  I don't know exactly when the exhibit list was put in.  I

3   think there were a number of updates that were made to it, but

4   I can't speak to exactly when those changes were made.

5   Q.  Regardless, you didn't try to review a thousand-plus

6   documents to determine manipulations, right?

7   A.  I did not.

8   Q.  What you did was, if I understand correctly -- what I

9   understand that you did is that you took only the documents

10  produced from Dr. Wright's side and you only looked at

11  documents produced by Dr. Wright in this case.  Isn't that

12  true?

13  A.  I looked at the documents that the Plaintiffs, who hired

14  me, asked me to look at.

15  Q.  I am getting there, sir.  But before we get there, isn't it

16  true that every document you looked at was a document produced

17  from Dr. Wright?

18  A.  No.  I believe forgery number one was contained within a

19  document produced by Ira Kleiman.

20  Q.  So you're saying that one document, because it was a

21  forward from Craig Wright to Ira Kleiman, that's the single

22  document that you looked at from the Plaintiffs' side in your

23  recollection of things?

24  A.  To the best of my recollection, yes.

25  Q.  Every other single document you looked at was only from

155

```
1    Dr. Wright's side; isn't that right?

2    A.  To the best of my recollection, yes.

3    Q.  Okay.  Now I may -- sir, please correct me, because I'm not

4    sure that I understand what you have said about this.  But you

5    ran -- if I understand, you ran all of Dr. Wright's produced

6    documents and out of that you identified a subset that had some

7    characteristic that you then turned over to Plaintiffs'

8    counsel.  Is that how this process started?

9              MR. ROCHE:  Objection.

10             THE COURT:  The basis for the objection?

11             MR. ROCHE:  Privilege.

12             THE COURT:  Sustained.

13   BY MR. RIVERO:

14   Q.  All right, sir.  Isn't it true you identified ten thousand

15   documents that had artifacts that you thought could be

16   questionable?

17   A.  I don't recall that specifically.

18   Q.  Was it thousands?

19   A.  I don't recall.

20   Q.  Was it a large number?

21   A.  Probably.

22   Q.  And sir, at the end of the day, you were asked to look at

23   the -- whatever the number -- you were asked to look at 40 or

24   50 or whatever number of documents by Plaintiffs' counsel;

25   isn't that right?
```

156

```
 1    A.  Yes.

 2    Q.  And, sir, as to each document that Plaintiffs' counsel

 3    picked, you found that every single one was manipulated?

 4    A.  It appears so, yes.

 5    Q.  That's not my question.  By saying:  "It appeared so," does

 6    that mean there's doubt about your conclusion?  I'm not sure I

 7    understand that answer.

 8    A.  In my opinion those documents were manipulated.

 9    Q.  Okay.  So if you say:  "It appeared so" -- if by that you

10    mean you don't know, please tell us.

11    A.  Okay.

12    Q.  All right.  They gave you 40 documents.  You found 40

13    manipulated documents.  Isn't that right?

14    A.  I believe that's the approximate number.

15    Q.  If it was 45, whatever it was, whatever documents they

16    asked you to look at for manipulation, you said that's

17    manipulated?

18    A.  I believe that the documents that they asked me to look at

19    they had reason to believe were manipulated, and so they were

20    asking for an independent opinion.

21    Q.  Sir, hadn't you handed them a much bigger set of documents

22    and then they cherrypicked out of that much bigger set of

23    documents a subset?

24        MR. ROCHE:  Objection.  Improper question.  Calls for

25    speculation.
```

```
1              THE COURT:  If the witness knows.

2              THE WITNESS:  I don't know specifically why they

3      picked certain documents.  You would have to ask them.

4      BY MR. RIVERO:

5      Q.  Yes.  I understand that.  But I'm asking you a different

6      question.

7         Didn't you give them a much bigger universe and then they

8      handed you back a much smaller set?

9              MR. ROCHE:  Objection.  Asked and answered.  I believe

10     it was already --

11             THE COURT:  Overruled.  I'll allow it.

12             THE WITNESS:  Yes.

13     BY MR. RIVERO:

14     Q.  You reviewed the documents that Plaintiffs' counsel told

15     you to review?

16     A.  Yes.

17     Q.  And, sir, you're an expert witness.  I mean, you work for

18     the Plaintiffs' side, right?

19     A.  I do.

20     Q.  I'm not suggesting that -- you were just following the

21     instructions you've been given, right?

22     A.  In a sense.  Obviously I'm providing an independent

23     opinion, but I believe I need to stay within the scope of my

24     work.

25     Q.  It was certainly indicated to you that the reason you were
```

158

```
 1    reviewing these documents was suspicions?

 2              MR. ROCHE:  Objection.  Privilege, asking for the

 3    reason for reviewing the documents.

 4              THE COURT:  Sustained.

 5    BY MR. RIVERO:

 6    Q.  Later -- whatever that initial number was, later they asked

 7    you to look at a -- let me --

 8              MR. RIVERO:  Judge, I'm going to move on from that

 9    question, I think.

10              THE COURT:  All right.

11    BY MR. RIVERO:

12    Q.  Later, after -- at a later time, like September 17th, you

13    identified some additional documents, right, as manipulated?

14    A.  Yes.

15    Q.  Three?

16    A.  I believe so.

17    Q.  In that case, did you pick them to look at or did

18    Plaintiffs' counsel pick them to look at?

19              MR. ROCHE:  Objection.  Privileged.

20              THE COURT:  Sustained.

21    BY MR. RIVERO:

22    Q.  In reviewing these documents, sir, you didn't use what's

23    called a clean test environment, did you?

24    A.  Not initially, but as I testified I believe in my second

25    deposition, I re-reviewed the documents.  I didn't believe it
```

159

1   made any difference, and I confirmed that it made no

2   difference.

3   Q.  You didn't use a write blocker?

4   A.  No.

5   Q.  And the reason you felt you didn't need to use any of those

6   in the initial run was because you already had an idea what the

7   result you were going to find was?

8   A.  No, not necessarily.

9   Q.  Sir, you had -- before you looked at the documents, before

10  you actually did whatever you did, you had an idea of what the

11  nature of the manipulations might be as to these documents,

12  didn't you?

13  A.  Certainly the manipulations were consistent.  So as I wrote

14  a review on an additional document, I kind of had a framework

15  of indicators that I would look for.

16  Q.  Sir, when you went in to start your analysis, you already

17  had an idea of what you were going to find on those documents

18  because you had an idea of what the nature of the manipulations

19  was?

20  A.  Yes.

21  Q.  Sir, when you initially did your work at the beginning, you

22  didn't save a copy of the hash values that you generated for

23  these documents?

24  A.  I did not.

25  Q.  And, sir, this is going to take some explanation because I

160

1  certainly couldn't do it, but a hash value is some sort of

2  unique identifier that you can attach to a digital document.

3  Am I in the ballpark?

4  A.  It's sort of like a fingerprint.

5  Q.  Okay.  But you applied the -- like if you're using the

6  document, you can apply a fingerprint to it.  Is that how it

7  works?

8  A.  You can compute the fingerprint.

9  Q.  You could compute a fingerprint.  But in any event,

10  whatever it is that you do to get there, you could -- like if

11  you're starting to work with a document, you could get this

12  hash value, which is like a fingerprint, and then you know

13  exactly how it looked when you started with it, right?

14  A.  Yes.

15  Q.  You didn't do that when you first studied these documents,

16  right?

17  A.  I believe I did.

18  Q.  You didn't save them on the first go-round?

19  A.  Correct.

20  Q.  Okay.  Got it.  You did it, but then you didn't save it.

21  That's the only point I was asking.

22  A.  Correct.

23  Q.  Yes.  All right.

24        MR. RIVERO:  If you would show Plaintiffs' 630.

25        I believe it's in evidence, Your Honor.

161

```
 1            THE COURT:  It is in evidence.

 2            MR. RIVERO:  Thank you.  So if I may show the jury.

 3  BY MR. RIVERO:

 4  Q.  Plaintiffs' 630 I believe has already been shown to the

 5  jury.  This is the document that you referred to which was the

 6  single document that was from the Kleiman side that you were

 7  asked to look at, right?

 8  A.  Yes.

 9  Q.  And we know it's from the Kleiman side because --

10            MR. RIVERO:  If you would, Mr. Shah, pull up that

11  Bates name.

12  BY MR. RIVERO:

13  Q.  Okay.  But, sir, the reason -- okay.  The significance of

14  this document is what you find is inauthentic --

15            MR. RIVERO:  Mr. Shah, if you could just put the

16  document back up.

17  BY MR. RIVERO:

18  Q.  -- is the email underneath, the Craig Wright to Craig

19  Wright.  That's what you say is inauthentic, right?

20  A.  Yes.

21  Q.  You don't say that the Craig Wright to Ira Kleiman is

22  inauthentic?

23  A.  I don't believe it is.

24  Q.  So every single document that you determined the

25  authenticity of had to do with what Dr. Wright did; isn't that
```

162

1    right?

2    A.  With documents he produced.

3    Q.  Okay.  The reason that you didn't look at any Kleiman

4    documents is the Plaintiffs' lawyers didn't ask you to look at

5    the Kleiman documents?

6           MR. ROCHE:  Objection.  Objection.  Privileged.  He's

7    asking for the reason.

8           THE COURT:  Sustained.

9    BY MR. RIVERO:

10   Q.  In any event, you didn't look at a single Kleiman document?

11   A.  I'm looking at one right now.

12   Q.  Well, sir, again, with the conditions that we just

13   described, right?

14   A.  Correct.

15   Q.  You're not able to tell the jury whether there are any

16   other documents in this case other than the ones that you have

17   reported on, the 40 -- you can't tell them one way or another

18   whether any other document in the case has the same

19   characteristics of manipulation that you say these documents

20   have, can you?

21   A.  No.  I did not review every document produced in this case.

22   Q.  Right.  But other than the 40 or 50, whatever the number

23   is, you can't say as to any other document in this case whether

24   it's manipulated because you didn't look?

25   A.  Correct.

163

```
1    Q.  Now, sir, I'd like to show you --

2            MR. RIVERO:  Judge, if I may have one moment.

3        (Pause in proceedings.)

4            MR. RIVERO:  I'd like Mr. Shah to show you, and this

5    is evidence in the case, Plaintiffs' 2.  If you could, Mr.

6    Shah.

7    BY MR. RIVERO:

8    Q.  Now, sir, first, do you see this is a document that is

9    marked --

10           MR. RIVERO:  If you can blow up the bottom, Mr. Shah.

11   It's marked Plaintiffs' 2 at the bottom.

12   BY MR. RIVERO:

13   Q.  Do you see that, sir?

14   A.  I do.

15   Q.  You understand that's a document marked by the Plaintiffs?

16   A.  Yes.

17   Q.  Now let me ask you about this Bates number.  This

18   D-E-F-A-U-S with a number after it, you saw some of those,

19   right?

20   A.  I did.

21   Q.  Did you come to learn that those were documents produced by

22   Dr. Wright's counsel in Australia?

23   A.  I don't know exactly who produced them, but I did come to

24   learn that they came from Australia somehow.

25   Q.  All right.  Do you understand there were different sources
```

164

```
 1   for documents that were produced on behalf of Dr. Wright?

 2              MR. ROCHE:  Objection.  Foundation.

 3              THE COURT:  Sustained.

 4   BY MR. RIVERO:

 5   Q.  All right.  Let's look at the -- let's look at the document

 6   itself.  Sir, this document, did you have an opportunity in the

 7   case to review the Plaintiffs' Second Amended Complaint?

 8   A.  I believe I did at some point.

 9              MR. RIVERO:  Mr. Shah, could you pull up Plaintiffs'

10   Second Amended Complaint, and I'm going to have to remember

11   where -- this is the -- it might be Paragraph 35 from memory.

12              MR. ROCHE:  Your Honor, I don't know if this is in

13   evidence.  It may be.  I --

14              MR. RIVERO:  Judge, this has been used by both sides.

15              THE COURT:  35?

16              MR. RIVERO:  No, judge.  I don't know the exhibit

17   number.

18              THE COURT:  If it's Plaintiffs' 35, it's in evidence.

19              MR. RIVERO:  No.  I'm sorry, Judge.  That is a

20   reference to Paragraph 35.

21              THE COURT:  I'm sorry.  What's the exhibit number?

22              MR. RIVERO:  I'm sorry, Judge.

23              THE COURT:  Not a problem.

24              MR. RIVERO:  I was just doing it by memory.

25              THE COURT:  Okay.
```

165

```
1    BY MR. RIVERO:

2    Q.  While they're looking for it, sir, are you aware that this

3    document that we were looking at, Plaintiffs' 2, is a document

4    referred to in Plaintiffs' Second Amended Complaint?  Did you

5    know that?

6    A.  I don't recall specifically.

7    Q.  Okay.  In any event -- here it is.

8              MR. RIVERO:  Can I get an exhibit number?

9              404, Your Honor, and it's not 35.

10             If you could scroll up, Mr. Shah.  Keep going to the

11   relationship between Craig Wright and -- keep going.

12             Keep going.

13             Keep going.

14             No.  I'm sorry.  I meant -- I'm sorry.  If you could

15   go, I meant down.  I said it the wrong way.

16             Okay.  Keep going.  Yes.  Here we are.

17             Your Honor, if I may, this has been published to the

18   jury numerous times.

19             MR. ROCHE:  Objection.  I don't think this is in

20   evidence.

21             THE COURT:  It is not in evidence.

22             MR. RIVERO:  Judge, but I believe that both parties

23   have published this to the jury.

24             THE COURT:  You have on occasion.  Yes.  It's not in

25   evidence.
```

166

```
 1              Is there an objection to this?

 2              MR. ROCHE:  Objection.  Hearsay.  Lack of foundation.

 3              THE COURT:  Why don't you ask the question without

 4    reference to the ...

 5              MR. RIVERO:  Sure.

 6    BY MR. RIVERO:

 7    Q.  Well, sir, are you aware that at Paragraph 55 of the Second

 8    Amended Complaint there's a quote from Plaintiffs' 2?

 9              MR. ROCHE:  Objection.  Relevance.

10              THE COURT:  Sustained.

11    BY MR. RIVERO

12    Q.  All right, sir.  Let me show you Plaintiffs' 2.

13              MR. RIVERO:  Thank you, Mr. Shah.

14    BY MR. RIVERO:

15    Q.  Sir, did you analyze Plaintiffs' 2?

16    A.  I did not.

17    Q.  You were not asked to?

18    A.  I was not.

19    Q.  Isn't it true, sir, that there are the same kinds of issues

20    with the metadata as to this document that you have reported as

21    to other documents?

22              MR. ROCHE:  Calls for speculation.

23              MR. RIVERO:  No, Judge.  I'm asking --

24              THE COURT:  If the witness knows.

25              Overruled.
```

```
1              THE WITNESS:  I can't say without analyzing the

2    document.

3    BY MR. RIVERO:

4    Q.  Because you haven't up to now?

5    A.  I have not.

6    Q.  All right.

7              MR. RIVERO:  Could we show the witness 428, the

8    witness and counsel.  That's Defendant's 428.

9    BY MR. RIVERO:

10   Q.  Sir, I am going to show you metadata for that document.

11   Can you identify this as being metadata?

12   A.  Possibly.  I didn't create this document and I didn't

13   extract this metadata.

14             MR. RIVERO:  Let me ask, if we can, Mr. Shah, can you

15   put side by side Plaintiffs' 2 and Defendant's 428.

16   BY MR. RIVERO:

17   Q.  Sir, do you see at Plaintiffs' 2 DEFAUS Bates number

18   00081546?

19   A.  I do.

20   Q.  And do you see at the top of Defendant's 428 DEFAUS

21   00081546?

22   A.  I do.

23   Q.  All right, sir.  Does this document, Defendant's 428 -- if

24   you could show that -- sir, does that have the characteristics

25   of metadata?
```

168

1    A.  It may.  Again, I didn't create this document.  I didn't

2    extract this metadata.

3              MR. RIVERO:  Your Honor, I would --

4    BY MR. RIVERO:

5    Q.  Let me ask you, sir, to assume with me for a moment that

6    this is the metadata related to Plaintiffs' 2.  Can you do

7    that?

8    A.  I suppose.  Again, I didn't create this document.

9    Q.  Sir, you're an expert so I'm asking you to make an

10   assumption with me.  Do you understand?

11   A.  Sure.

12             MR. RIVERO:  Your Honor, on that basis I would ask to

13   publish D428 for the purpose of this hypothetical.

14             MR. ROCHE:  Objection.  Lack of foundation.

15             THE COURT:  Sustained.

16   BY MR. RIVERO:

17   Q.  Sir, isn't it the case that the metadata for Plaintiffs' 2,

18   this document dated March 12, 2008 -- isn't it the case that

19   the metadata shows a creation date of July 9, 2015?

20             MR. ROCHE:  Objection.  Lack of foundation.

21             THE COURT:  If the witness is able to answer.

22             THE WITNESS:  Again, I didn't create this document.  I

23   didn't extract this metadata.

24   BY MR. RIVERO

25   Q.  If you assume with me, sir, that -- assume with me that

```
 1    I'll be able to establish that the metadata for Plaintiffs' 2

 2    shows a creation date of July 9, 2015.  Would you agree with me

 3    that that is exactly the same kind of artifact that you have

 4    told this jury is the basis for your conclusion that 40 other

 5    documents are forgeries?

 6            MR. ROCHE:  Objection.  Foundation.  Calls for

 7    speculation.

 8            THE COURT:  Sustained.

 9    BY MR. RIVERO:

10    Q.  Sir, as --

11            MR. RIVERO:  Your Honor, may I pose a hypothetical to

12    this expert witness?

13            THE COURT:  You may.

14    BY MR. RIVERO:

15    Q.  All right.  Sir, hypothetically, if the creation date for

16    Plaintiffs' 2 is July 9, 2015, do you agree with me that that

17    would be an artifact consistent with the kinds of artifacts

18    that caused you conclude that the other documents were

19    manipulated?

20    A.  It could be, but it would depend on what this specific

21    timestamp is referring to.

22            MR. RIVERO:  Mr. Shah, could you show P2.  I thought

23    it was in front of the jury.

24            Yeah.  Just P2.

25            Yes, to make sure that the jury is aware of what we're
```

170

```
 1   talking about.
 2   BY MR. RIVERO:
 3   Q.  Let's move off that, sir.  But you certainly didn't look at
 4   the metadata on P2?
 5           MR. ROCHE:  Objection.  Foundation.
 6           THE COURT:  Overruled.
 7           THE WITNESS:  No.
 8   BY MR. RIVERO:
 9   Q.  Is that a no?
10   A.  I did not look at any metadata on P2.
11   Q.  All right.  I believe you've already said that metadata can
12   be intentionally modified, right?
13   A.  Yes.
14   Q.  And you agree that sometimes metadata can be
15   unintentionally modified, right?
16   A.  Yes.
17   Q.  I mean, isn't it true that sometimes the simple act of
18   saving a document on a different machine or in a different
19   place can cause a change to metadata?  Isn't that something
20   that can happen?
21   A.  It would depend on the specific metadata you're talking
22   about, but I suppose that could happen, yes.
23   Q.  You would agree that as a result of such changes metadata
24   could appear inconsistent with the content?
25   A.  Again, I think it would depend on the specific metadata
```

171

1    you're talking about.

2    Q.  All right.  But there are -- so that means there are

3    circumstances where it could?

4    A.  In the realm of possibilities, sure.

5    Q.  In fact, there's a document --

6            MR. RIVERO:  One moment, Your Honor.

7        (Pause in proceedings.)

8    BY MR. RIVERO:

9    Q.  I'd like to show you and counsel D412, sir, and ask you if

10   you recall this is an attachment.  This is attached to one of

11   your expert reports.  Do you recall this is attached to one of

12   your reports?

13   A.  I do.

14   Q.  All right.  Now, sir, isn't it the case --

15           MR. RIVERO:  Your Honor, this is an attachment to the

16   expert's report.  I'd move its admission, 412.

17           THE COURT:  Any objection?

18           MR. ROCHE:  No objection.

19           THE COURT:  Admitted into evidence.

20       (Defendant's Exhibit 412 received into evidence.)

21   BY MR. RIVERO:

22   Q.  So I take it that by attaching it to your report you're

23   saying it's authentic, right?

24   A.  It is.

25   Q.  Okay.  But, sir, doesn't this document have inconsistent

1    metadata?

2    A.  No.

3    Q.  It doesn't?

4    A.  No.

5    Q.  Sir, for example, it says that the last modified date -- if

6    you look at the related dates, it says the last modified date

7    is 2010, right?

8    A.  It does.

9    Q.  And it says the created date is September 17th, 2010,

10   right?

11   A.  Yes.

12   Q.  But it says the last printed is -- assuming that this is in

13   American form, is July 7th, 2002.

14   A.  Assuming it's American form, I think that's November 7th,

15   2002.

16   Q.  What did I say?

17   A.  July 7th, I believe.

18   Q.  I'm sorry about that.  I don't know.  I've lost my mind,

19   Dr. Edman.

20        The last printed says November 7th, 2002, right?

21   A.  It does.

22   Q.  Okay.  So you would agree with me that there is something

23   wrong because how could the document be printed before it was

24   created?

25   A.  So I believe I testified at my deposition about this, that

173

1   when you create and modify a Word document and print it, and

2   then if you modify it again and save it as a new document, the

3   created and modified are updated but the last printed still

4   remains.

5   Q.  Regardless of how it happened, sir, and I heard the words,

6   this shows a date of printing that's eight years before the

7   date of creation, right?

8   A.  Right.

9   Q.  Okay.  And you agree you can't print a document before it's

10  created, right?

11  A.  I would agree with that.

12  Q.  Okay.  And if I understand what you're saying is you're not

13  worried about that because sometimes when you save a document

14  some kinds of metadata may update but other kinds don't update.

15  Is that what you're saying?

16  A.  Specific fields, yes.  This is consistent with my analysis

17  of Word documents before.

18  Q.  Okay.  I didn't ask about analysis of Word documents.

19      Sometimes -- depending on how you save a document,

20  sometimes when you save a document, some metadata updates and

21  other metadata doesn't update, right?

22  A.  It depends on the specific type of document.

23  Q.  Okay.  You agree with me that the way metadata is stored

24  can affect the metadata?

25  A.  I think you would have to be more specific.

174

1    Q.  Well, would you agree that moving data from one server to

2    another can affect its metadata?

3    A.  Depends on the specific metadata you're talking about.

4    Q.  Some metadata can be affected by moving it from one server

5    to another?

6    A.  File system-related metadata, yes.

7    Q.  Say again?

8    A.  File system related metadata, yes, it could.

9    Q.  And you would agree that moving data from one storage media

10   to another can affect the metadata -- I'm sorry -- that moving

11   data from one storage media to another can affect metadata?

12   A.  I believe that can affect file system metadata.  However,

13   that's not what I was analyzing in my reports or that I

14   testified to today.

15   Q.  Now, you don't know who originally collected the documents

16   you reviewed, do you?

17   A.  My understanding is, regarding the electronic devices that

18   were collected, that your experts from AlixPartners collected

19   it.

20   Q.  You don't know how the documents were stored before they

21   reached you?

22   A.  I do not.

23   Q.  You don't know if other people handled these documents

24   between the time they were originally created and the time of

25   your examination?

```
 1    A.  I do not.

 2    Q.  Do you know whether any of these documents were collected

 3    by the Australian Taxation Office?

 4    A.  I do not.

 5    Q.  And you don't know that D-E-F-A-U-S means documents seized

 6    by the ATO and then provided to Dr. Wright's counsel in

 7    Australia?

 8              MR. ROCHE:  Objection.  Relevance.

 9              THE COURT:  Sustained.

10    BY MR. RIVERO

11    Q.  You don't know whether all the documents that you looked at

12    that were produced on behalf of Dr. Wright came actually from

13    computers that Dr. Wright had, do you?

14    A.  I do not.

15    Q.  Now, sir -- and this is important, going back to the

16    scientific method -- you have testified that there's certain

17    metadata artifacts, whether they be creation dates,

18    modification dates, some information within PGP signatures --

19    you showed us a number of different categories of data attached

20    to documents.  You testified that you believed those documents

21    were manipulated, correct?

22    A.  Yes.

23    Q.  But you haven't ever tried to replicate the manipulations

24    you believe and you opine occurred; isn't that right?

25    A.  I have not replicated the exact manipulations there, at
```

176

1    least in the context of this case, but it's consistent with my

2    analysis of other similar documents.

3    Q.   Other similar documents in other cases?

4    A.   And in my consulting work.

5    Q.   Okay.  What you're saying is consistent with experience

6    that you have.  I understand that to be your testimony.  Right?

7    A.   Yes.

8    Q.   But within the case, you never took, for example, a PDF,

9    and did those manipulations that you thought had occurred to

10   see if the results were the same artifacts that you opined are

11   manipulations?

12   A.   Correct.  I did not do any specific testing within the

13   context of this case.

14   Q.   You don't know of any studies -- I understand that you're

15   testifying from your experience, but you don't know of any

16   studies that discuss, consider, or talk about TouchUp Text

17   edits as an indicator of manipulations?

18   A.   I don't.

19   Q.   You aren't aware of any books that talk about TouchUp Text

20   edits as an indicator of modification alteration?

21   A.   I am not.

22   Q.   As to certain documents you pointed to manipulation based

23   on the idea that the PGP date was wrong -- was off, correct?

24   A.   Yes.

25   Q.   The date for the PGP signature is something that's taken

1   from the computer that was used to create the signature.  Do I

2   understand that correctly?

3   A.  Yes.

4   Q.  And you don't know as to any of the documents you looked at

5   whether the dates on the device where these documents that

6   you're talking about were created -- whether the time was set

7   correctly in any of those devices because you didn't look at

8   the devices?

9   A.  I did not look at the devices.  But, for example, in the

10  context of forgery number one, we actually have two sources of

11  time there.  We have the time from the signature and then we

12  also have the timestamp from the email produced by Ira Kleiman.

13  Both of those timestamps are consistent to at least within an

14  hour of each other.

15  Q.  Sir, as to the first document that you referred to, that

16  was produced by Ira Kleiman, right?

17  A.  I analyzed both a document produced by Ira Kleiman and a

18  document, multiple documents, produced by the Defendant.

19  Q.  As to that document you had access to these devices, didn't

20  you?  These are Ira Kleiman's devices.  They are -- I'm sorry.

21  I should say those are David Kleiman's devices, Defendant's

22  274, 273, 275, 272.  There are 14 in all, sir.

23      You had access to those devices, didn't you?

24  A.  I have never seen those devices before.

25  Q.  So you don't know that you had access to them?

178

```
 1    A.  No.
 2    Q.  Okay.  This is Defendant's 271.  Sir, you never looked at
 3    these devices, at any of these devices?
 4    A.  I wasn't aware those devices existed.
 5    Q.  So you certainly didn't do any study of any of these
 6    devices to see if they bore on your opinion?
 7         MR. ROCHE:  Objection.  Outside the scope.
 8         THE COURT:  Sustained.
 9    BY MR. RIVERO:
10    Q.  Well, sir, let me ask you, one thing that one could do --
11    in most of these documents, if I remember correctly, that you
12    talked about today, were purported emails between David Kleiman
13    and Craig Wright; isn't that right?
14    A.  Some were purportedly between Dave Kleiman and Uyen Nguyen
15    as well.
16    Q.  But most of them were between -- actually, David Kleiman
17    was in all of them.
18    A.  Yes, to the best of my recollection.
19    Q.  Right.  And you were asked to determine whether those
20    Kleiman emails were manipulated, right?
21    A.  Yes.
22    Q.  And you looked at the method and the contents of certain
23    digital documents produced by Dr. Wright, right?
24    A.  And the cryptographic signatures.
25    Q.  Okay.  But, sir, wouldn't another way to try to figure out
```

179

1    if a David Kleiman email were real or not would be to try to

2    look at David Kleiman's emails?

3    A.  Yes.  Quite possibly.

4    Q.  Well, let's be clear, sir.  If you're trying to figure out

5    an email by -- except for those odd circumstances where it's

6    from the same person to the same person, by its nature it is

7    from one person to another person, generally.  You would agree

8    with me?

9    A.  Yes.

10   Q.  And if you were trying to figure out if this email that was

11   in Dr. Wright's computer was really real or not, obviously you

12   could look at Dr. Wright's emails, and that's what you did,

13   right?

14   A.  Among other things, yes.

15   Q.  Okay.  But isn't another thing you could do is to look at

16   the other side, the sender or recipient, not just one side but

17   both sides?

18   A.  Yes.  To my recollection, I was able to do searches within

19   Relativity, but I don't know the extent to which Dave Kleiman's

20   emails were or were not collected.

21   Q.  All right.  So you don't know if whatever Relativity --

22   that's a database.  You don't know if the Relativity you were

23   looking at was only the Craig Wright side.  You don't know

24   that?

25   A.  I don't believe it was only the Craig Wright side.

180

```
 1    Q.  All right.  Sir, did you ever ask to look, to see if there
 2    were any Dave Kleiman devices that might shed light on the
 3    question of whether there was anything on the Dave Kleiman side
 4    that proved or disproved your theory that these were not
 5    authentic emails?
 6              MR. ROCHE:  Objection.  Outside the scope.
 7              THE COURT:  Sustained.
 8    BY MR. RIVERO:
 9    Q.  You stated some documents were manipulated because of
10    software versions?
11    A.  Inconsistencies with software versions.
12    Q.  In other words, you said that a certain document was
13    created before a software was released?
14    A.  Yes.
15    Q.  All right.  Now, you're aware that software is normally
16    tested before it's released to the general public?
17    A.  I am.
18    Q.  That is called an alpha or a beta version?
19    A.  Yes.
20    Q.  And you don't know whether software that had, in any of the
21    instances that you talk about -- I think you talked about
22    Calibri as a Microsoft font, right?
23    A.  Yes.
24    Q.  You don't know whether the Microsoft Calibri font was
25    circulating on the Internet as an alpha or a beta prior to the
```

1    time you showed us of the copyright date?

2            MR. ROCHE:  Objection.  Calls for speculation.

3            THE COURT:  If the witness knows.

4            THE WITNESS:  I don't know.  But the fonts that I

5    examined contained cryptographic signatures from Microsoft that

6    were dated 2015.

7    BY MR. RIVERO:

8    Q.  Okay.  So that would be the final release with the

9    copyright that you're showing us, right?

10   A.  I don't know if it was a final release.  All I know is that

11   there was a copyright of 2015 and a cryptographic signature

12   applied by Microsoft also dated 2015.

13   Q.  But you don't know if there were alpha or beta versions of

14   those prior to that time?

15   A.  I don't, and I don't believe it makes a difference.

16   Q.  Now, sir, you say that the time that a document was sent is

17   an indicator of manipulation if it's inconsistent with the

18   document, right?

19   A.  In general, yes.

20   Q.  But you would agree that the metadata showing time sent

21   isn't necessarily the actual time the email was sent?

22   A.  Depends on which specific "Date" field you're talking

23   about.

24   Q.  Well, for example, if the user hits "Send" when there was

25   no Wi-Fi -- and I don't know if that has happened to you,

```
1   Dr. Edman -- and the email went to "Draft" and then later,
2   maybe even without your knowledge, it got sent?
3   A.  Yes.
4   Q.  So that's a situation where the time sent isn't necessarily
5   the time that the person hit the button to send, right?
6   A.  Correct.
7   Q.  All right.  And there's such a thing as a time delay
8   feature also for email?
9   A.  As far as I know.
10  Q.  Sir, you said you also -- I think when you talk about the
11  structure of a document, you're talking in part about a visual
12  comparison of certain documents side by side to determine
13  whether they're visually identical; isn't that right?
14  A.  Yes.
15  Q.  Okay.  And you mean they would have the same formatting,
16  the same numbers, the same structure, right?
17  A.  Yes.
18  Q.  But, for example, you compared these two documents.
19          MR. RIVERO:  I'll ask Mr. Shah to show D453 for the
20  moment to counsel and the witness, and I'll ask if D453 is
21  admitted.  D453.
22          I don't believe it is, Your Honor.
23          THE COURT:  It is not.
24          MR. RIVERO:  So I'll just show the witness.
25
```

```
 1    BY MR. RIVERO:

 2    Q.  Sir, do you remember that you did an analysis of this

 3    document, D453?

 4    A.  Honestly, I don't recall specifically this document.

 5    Q.  Let me show you --

 6          MR. RIVERO:  If you can, Mr. Shah.  We're not showing

 7    it to the jury yet.  D318.

 8          And I believe that's not in evidence.  Is that

 9    correct, not in evidence?

10    BY MR. RIVERO:

11    Q.  Do you remember comparing these two, sir?

12    A.  (No verbal response.)

13    Q.  If you don't, just let me know.

14    A.  I don't specifically.

15    Q.  You don't.  Okay.  I'll move on, sir.

16          Now, to be very clear, when you use the term "forgery" in

17    your testimony, what you mean by that, your use of that word,

18    regardless of what any of the rest of us think, is a document

19    that has been manipulated to appear to be something other than

20    what it is, right?

21    A.  Yes.

22    Q.  Okay.  And you are not opining on the motives or the intent

23    for the alteration of the document, right?

24    A.  Correct.

25    Q.  And for that reason you use the word "forgery" to be
```

```
1   interchangeable with the words "manipulation," "modification,"

2   and "alteration," right?

3   A.  Yes.

4   Q.  For you those words are interchangeable?

5   A.  Yes.

6   Q.  Sir, when all this was done you could just as well -- in

7   fairness, you could have been shown alteration one, correct,

8   instead of the way it was termed here?

9   A.  I suppose, yes.

10  Q.  You could have been showed modification four.  Would you

11  agree with me?

12          MR. ROCHE:  Objection.  Relevance.

13          THE COURT:  Sustained.

14  BY MR. RIVERO:

15  Q.  Sir, you looked at nine plus -- nine emails and eight

16  Bitmessages.

17          MR. RIVERO:  Pardon me, Judge.  Your Honor, I don't

18  know if this is an appropriate time for a break because I have

19  to inquire about my next line of questioning.

20          THE COURT:  All right.  Then, Ladies and Gentlemen,

21  let's take a 20-minute recess.

22      (Jury not present, 3:23 p.m.)

23          THE COURT:  All right.  We're on a 20-minute recess.

24          MR. RIVERO:  Thank you.

25      (Recess from 3:23 p.m. to 3:40 p.m.)
```

```
 1            THE COURT:  All right.  Are we ready to continue?

 2            MR. RIVERO:  Yes, Your Honor.

 3            THE COURT:  On behalf of the Plaintiffs?

 4            MR. ROCHE:  Yes, Your Honor.

 5            THE COURT:  All right.  Let's bring in the jury.

 6       (Before the Jury, 3:42 a.m.)

 7            THE COURT:  All right.  Welcome back, Ladies and

 8    Gentlemen.  Please be seated.

 9            We'll continue with the cross-examination.

10    BY MR. RIVERO:

11    Q.  Dr. Edman, in terms of things you could have done outside

12    of the digital documents themselves, you could have, for

13    example, tried to talk to recipients or senders of some of

14    these emails, but you did not do that; isn't that right?

15            MR. ROCHE:  Objection.  Relevance.

16            THE COURT:  As to what the witness did, overruled.

17            THE WITNESS:  I mean, I suppose.

18    BY MR. RIVERO:

19    Q.  Well, sir, obviously being that Mr. Kleiman wasn't alive,

20    you could have attempted -- or other people on these emails --

21    and you could have attempted to talk to them to see if they had

22    sent or received emails, right?

23    A.  I mean, I believe in the context of forgeries six and

24    seven, to the best of my recollection, those were emails to

25    Uyen Nguyen.  As far as I know, she was not able to be located.
```

1    So I don't believe I could have spoken with her.

2    Q.  So there were more than 40 documents, and there were other

3    people on these documents; isn't that true?

4    A.  I don't recall the sender and recipient of each and every

5    one of these documents.

6    Q.  Some of those documents had handwritten signatures; isn't

7    that right?

8    A.  Yes.  I believe so.

9    Q.  You again determined authenticity based on the metadata,

10   but you didn't try to talk to any of the signatories to

11   determine whether they acknowledged having signed the

12   documents, did you?

13   A.  No.

14   Q.  You opined -- my subject matter is, bottom line is, you

15   didn't do anything outside of the documents to try to figure

16   out if the facts reflected there happened; isn't that right?

17   A.  I analyzed the documents and in some instances correlated

18   with third-party sources from the Internet, but I didn't

19   interview anyone, aside from Jonathan Warren, who I did speak

20   to regarding forgery number five.

21   Q.  You opined that the certificate of registration for

22   Panopticrypt was manipulated.

23        MR. RIVERO:  If we can show the witness and counsel

24   Plaintiffs' 34.

25

```
1    BY MR. RIVERO:

2    Q.  Do you recall that you gave expert testimony about this

3    document?

4    A.  I don't specifically remember this document.

5    Q.  Okay.  So let's see if we can show you.

6           MR. RIVERO:  Defendant Edman's December 13, 2009

7    report, at Pages 24 and 25.

8    BY MR. RIVERO:

9    Q.  Okay.  Sir, directing your attention to item N, do you see

10   the reference to DEFAUS 00521091?

11   A.  I do.

12   Q.  All right.

13          MR. RIVERO:  If you could pull back up, Mr. Shah,

14   Plaintiffs -- put side by side, if you would, of the Page 24

15   next to Plaintiffs' 34, if you would.

16   BY MR. RIVERO:

17   Q.  All right.  Sir, do you see -- I appear to have the wrong

18   DEFAUS number.  Okay.  I'm sorry, sir.

19       What I'm now showing you is the fourth page.  Do you see

20   the coincidence between the DEFAUS numbers?

21   A.  I do.

22   Q.  Does that refresh your recollection that you opined on this

23   document?

24   A.  It does.

25          MR. RIVERO:  All right.  Judge, I would move the
```

188

 1   admission of Plaintiffs' 34.

 2          MR. ROCHE:  Objection.  Outside the scope of the

 3   direct testimony.

 4          THE COURT:  Overruled.  It will be admitted into

 5   evidence.

 6      (Plaintiffs' Exhibit 34 received into evidence.)

 7   BY MR. RIVERO:

 8   Q.  And to be clear, Mr. Edman, you showed 10 documents, but

 9   you've opined about more than 40 documents, right?

10   A.  Yes.

11          MR. RIVERO:  May we show the jury?

12   BY MR. RIVERO:

13   Q.  And one of the ones you opined on, if we can compare, this

14   is your report on December 13, 2019, and it says that you

15   looked at DEFAUS 00521091, which is highlighted.

16          MR. RIVERO:  And then, Mr. Shah, if you would pull up

17   the DEFAUS number from Plaintiffs' 34.

18   BY MR. RIVERO:

19   Q.  So definitely one that you opined is not real, right?

20   A.  Yes.

21          MR. ROCHE:  Your Honor, the expert report is not in

22   evidence.

23          THE COURT:  The expert report should not be shown to

24   the jury.

25          MR. RIVERO:  Please take that down.

189

```
 1              All right.  Yes.

 2   BY MR. RIVERO:

 3   Q.  Sir, did you ever -- this is a document that says that it's

 4   a certificate of registration of a company named Panopticrypt.

 5   Do you see that?

 6   A.  I do.

 7   Q.  And it says that the date of register was June 20th, 2011,

 8   right?

 9   A.  Yes.

10   Q.  Did you ever try to or did you ever ask for any search to

11   be made of the Australian corporate registration records?

12   A.  I did not.

13   Q.  And are you aware, sir, that if you had, you would have

14   found that the registration was, in fact, submitted on June 19,

15   2011 in the registry in Australia?

16              MR. ROCHE:  Outside the scope.

17              Objection.  Out the scope.

18              THE COURT:  Overruled.

19              THE WITNESS:  I'm not.

20   BY MR. RIVERO:

21   Q.  Sir, would you agree with me that real-life facts could

22   tend to either support or contradict the opinions you gave

23   based on computer and evidence?

24   A.  It could, yes.

25   Q.  Now, you opined that a digital version of Dr. Wright's
```

190

1  university thesis was manipulated, did you not?

2  A.  I did.

3  Q.  And you did that, I think, on September 17th, right?

4  A.  I did.

5  Q.  Now, sir, that was a university thesis that was done by

6  Dr. Wright for his LLM at the University of Northumbria.  Do

7  you remember that?

8  A.  I do.

9  Q.  Now, sir, the thesis, if it was submitted, would be

10  submitted to the university; is that right?

11          MR. ROCHE:  Objection.  Foundation.

12          THE COURT:  Sustained.

13  BY MR. RIVERO:

14  Q.  Well, sir, let me ask you:  You have a master's degree,

15  correct?

16  A.  I do.

17  Q.  And you have a doctorate?

18  A.  I do.

19  Q.  And I assume you did a doctoral thesis?

20  A.  I did.

21  Q.  And a master's thesis?

22  A.  I did.

23  Q.  Your theses are submitted to the university, right?

24  A.  I guess.  I believe I submitted them to my advisor.

25  Q.  Okay.  Sir, did you do anything to go to the University of

```
 1    Northumbria to determine whether the thesis was in fact in the

 2    registry of the university?

 3    A.  I did not.

 4            MR. RIVERO:  One moment, Judge.

 5        (Pause in proceedings.)

 6    BY MR. RIVERO:

 7    Q.  All right, sir.  We already talked about Plaintiffs' 2.

 8    You observed when Ira Kleiman testified about Plaintiffs --

 9    were you here for Ira Kleiman's testimony?

10    A.  I was not.

11    Q.  Okay.  Are you aware that the Plaintiff testified that he

12    saw no metadata on Plaintiffs' 2?

13            MR. ROCHE:  Objection.  Foundation.

14            THE COURT:  Sustained.

15        (Pause in proceedings.)

16    BY MR. RIVERO:

17    Q.  And, sir, let me go back for a moment to Plaintiffs' 2.

18            MR. RIVERO:  If we could show that again to the jury

19    as well.

20    BY MR. RIVERO:

21    Q.  Sir, you see that this document reflects an email of

22    craig@rcjbr.org?

23    A.  I do.

24    Q.  All right.  Sir, let me show just the witness and counsel.

25    Let me ask you:  Are you aware when the domain rcbjr.org was
```

192

1    registered?

2    A.  I don't recall specifically.

3    Q.  No.  And, sir, would you agree with me if it was registered

4    at a time later than the date of the email March 12th, 2008,

5    that that would be an artifact that would, based on the way you

6    analyzed the other documents -- that would indicate

7    manipulation?

8    A.  I would.

9    Q.  Let me show you D426.

10            MR. RIVERO:  Just to counsel and the witness.

11   BY MR. RIVERO:

12   Q.  Sir, are you familiar with ICANN Lookup?

13   A.  I am.

14   Q.  And, sir, does this appear to be a result from an ICANN

15   Lookup?

16   A.  It appears to be, but I did not create this document.

17   Q.  I understand.  But is this a tool that one might use to

18   determine -- what is ICANN?

19   A.  They're an organization that administers domains and IP

20   addresses.

21   Q.  It is the organization that administers domain names?

22   A.  Yes.

23   Q.  Okay.  And so it's a well-known official organization,

24   right?

25   A.  Yes.

193

```
1    Q.  Right.

2            MR. RIVERO:  Your Honor, I would move the admission of

3    D426.

4            MR. ROCHE:  Objection.  Foundation.

5            THE COURT:  Sustained.

6    BY MR. RIVERO:

7    Q.  Sir, are you familiar with what registrations from ICANN

8    look like?

9    A.  Not really.  This is not a source that I rely upon.

10   Q.  Sir, if the create date for the rcjbr.org were November

11   2nd, 2011 on an email dated March 12, 2008, you would agree

12   with me that that would be consistent with a theory of

13   manipulation as you have stated for these other documents?

14           MR. ROCHE:  Objection.  Compound and calls for

15   speculation.

16           THE COURT:  Yes.  Let's break that down.

17           Sustained.

18   BY MR. RIVERO:

19   Q.  All right.  Sir, assume with me that the create date for

20   the email address on Plaintiffs' 2 is November 2nd, 2011.  Do

21   you understand what I'm asking you to assume?

22   A.  I believe so.

23   Q.  Yes.  Would that date be after the date of the email at

24   Plaintiffs' 2?

25   A.  I believe so, but, again, I haven't analyzed the email.
```

```
 1          MR. RIVERO:  Could you show Plaintiffs' 2 to the jury

 2    and to --

 3    BY MR. RIVERO

 4    Q.  All right.  That's dated March 12th, 2008, right?

 5    A.  Yes.

 6    Q.  It's from an address craig@rcjbr.org, right?

 7    A.  Yes.

 8    Q.  Would you agree with me if the create date for

 9    craig@rcjbr.org were November 2nd, 2011, that would be an

10    artifact indicating some kind of manipulation in the same way

11    you said as to these other documents?

12          MR. ROCHE:  Objection.  Asked and answered.

13          THE COURT:  Overruled.  I'll allow it.

14          THE WITNESS:  I think you are conflating an email

15    address and a domain name.  But assuming the domain were

16    created in November of 2011 and the email were from March 12th,

17    2008, then I would consider that an indicator that it has been

18    manipulated.

19    BY MR. RIVERO:

20    Q.  Thank you for the correction, sir.

21          The domain name is the last part of the email, right?

22    A.  Yes, sir.

23    Q.  Okay.  All right.  Let me move on.  I'd like to show you

24    Plaintiffs' 115.

25          MR. RIVERO:  And ask that it be shown to counsel.
```

195

```
 1              Your Honor, I do not know if this is in evidence.
 2              THE COURT:  It is not in evidence.
 3              MR. RIVERO:  Okay.  Then, Judge, I'll move on.
 4              THE COURT:  All right.
 5    BY MR. RIVERO:
 6    Q.  Sir, you were shown on your direct examination Plaintiffs'
 7    55.  Do you remember that?
 8    A.  You would have to refresh my memory.
 9    Q.  Yep.  Will do.
10         When you were on the direct examination, Plaintiffs' 55 was
11    identified to you as number four.  Do you remember that?
12    A.  I do.
13    Q.  Okay.  So let me show you number four, according to what
14    counsel did with you this morning.
15              MR. RIVERO:  And I'll ask that be shown to the jury.
16    BY MR. RIVERO:
17    Q.  Now, you're saying this document is not real, correct?
18    A.  Correct.
19    Q.  Now, you understand the statement that's highlighted is one
20    that would be purportedly from David Kleiman to Craig Wright
21    saying:  "As owner of the Bitcoin, we are mining into that,"
22    referring, I think, to some dormant and untraded company,
23    right?
24              MR. ROCHE:  Objection.  Relevance.
25              MR. RIVERO:  Judge, this is a document that was shown
```

196

1    to the witness this morning.

2         THE COURT:  Overruled.

3    BY MR. RIVERO:

4    Q.  My question, sir, is:  You understand the statement in the

5    document, as read to you by counsel for Plaintiff, is:  "We

6    only need one dormant and untraded company to sit as an owner

7    of the Bitcoin we are mining into them."  Right?

8    A.  I see the statement.

9    Q.  You opined this morning that this document is a forgery,

10   right?

11   A.  I did.

12   Q.  Let me show you Plaintiffs' 135, which I'm not sure you

13   were shown this morning, but we will.

14   A.  I believe this was forgery three.

15   Q.  Thank you, sir.  Number three.

16       Now, this document you say is a false document, right?

17   A.  It contains a false document.

18   Q.  Right.  In other words, that part of it that's below the

19   line?

20   A.  Correct.

21   Q.  Okay.  Now, that's supposed to be a list of Bitcoin, right?

22   A.  It is a list of Bitcoin addresses.

23   Q.  And you told the jury that you looked at the list of

24   Bitcoin and that you determined that they were real Bitcoin,

25   right?

197

```
 1              MR. ROCHE:  Misstates the witness's testimony.

 2              THE COURT:  Overruled.  The jury will recall the

 3    testimony.

 4              THE WITNESS:  I believe I testified that these

 5    addresses, I looked them up and they had transactions

 6    associated with them.  I didn't do any analysis regarding the

 7    volume of transactions or how many Bitcoins each address may

 8    have held at one point.

 9    BY MR. RIVERO:

10    Q.  Sir, I may have misheard you this morning.  Didn't you say

11    that those were Bitcoin public addresses this morning?

12    A.  I did.

13    Q.  Okay.  Now, sir, did you try to look at any of these to

14    determine whether they could have belonged to David Kleiman or

15    to Craig Wright or whether it was impossible for them to belong

16    to David Kleiman or Craig Wright?

17    A.  No.

18    Q.  Isn't it true that there is an address there?

19              MR. RIVERO:  I'm going to ask Mr. Shah to highlight --

20    I believe 1933 is here.  Might be on the second page.

21              Yeah.  Just highlight 1933, if you would, sir.

22    BY MR. RIVERO:

23    Q.  Isn't it true that there is evidence that 1933 would never

24    have belonged to either Dr. Wright or to David Kleiman?

25              MR. ROCHE:  Objection.  Outside the scope.
```

198

```
 1              THE COURT:  The objection is sustained.

 2    BY MR. RIVERO:

 3    Q.  Do you know one way or another whether there is evidence

 4    that this --

 5              MR. RIVERO:  Judge, he was asked about these addresses

 6    in direct.

 7              THE COURT:  You may ask another question.

 8              MR. RIVERO:  Okay.  Thank you.

 9    BY MR. RIVERO:

10    Q.  Do you know one way or another whether there is evidence

11    that 1933 could never have belonged to David Kleiman or to

12    Craig Wright?

13    A.  No.  I was asked to analyze the document, not the addresses

14    contained within them.

15    Q.  But this document says that some trust holds the following

16    keys, right?

17    A.  (No verbal response.)

18    Q.  Look at the last line of text.

19              MR. ROCHE:  The document speaks for itself.

20              THE COURT:  Overruled.  You may refer to it.  It's in

21    evidence.

22              THE WITNESS:  It does say that.

23    BY MR. RIVERO:

24    Q.  Okay.  So, sir, the question is:  You didn't do anything to

25    determine whether any of these keys could not have belonged to
```

199

```
 1    these gentlemen, right?

 2    A.  No.

 3    Q.  Okay.  Now let me show you 546, and I believe we may have

 4    spoken about 546.  Do you recall seeing that one this morning,

 5    sir?

 6    A.  Yes.  This was forgery number one.

 7    Q.  So this was number one.

 8        So here, sir, do you see that it says -- there's a

 9    reference to:  "It is confirmed that I have" -- this is

10    supposedly from David Kleiman -- "I have Bitcoin, 320,832.1,"

11    right?

12    A.  I see that.

13            MR. RIVERO:  One moment, Judge.

14        (Pause in proceedings.)

15    BY MR. RIVERO

16    Q.  Sir, you're saying this document is fake?

17    A.  Yes, sir.

18    Q.  Okay.  Now, just before we close, sir, you have studied

19    cryptography, correct?

20    A.  I have.

21    Q.  And so you are familiar with its principles?

22    A.  You would have to be more specific.

23    Q.  Well, for example, you know that private keys are used in

24    cryptography?

25    A.  I do.
```

200

```
1    Q.  And you know that the idea is you're supposed to keep your
2    private keys private, don't you?
3    A.  Yes.
4    Q.  Let me show you -- you have had access to the Defendant's
5    exhibit list; isn't that right?
6    A.  I believe I've seen it.
7    Q.  You had the ability to review any of the documents on --
8    whether or not you were asked to is a different question, but
9    I'm asking whether you had the ability to review any of the
10   documents that were listed on the exhibit list.  Isn't that
11   right?
12   A.  Assuming I had access to whatever documents were listed, I
13   suppose so, yes.
14   Q.  And so were you asked to review any single email
15   communication between -- after the March 12 email all the way
16   to the end?  That's March 12, 2008 all the way past the date of
17   the Bitcoin Whitepaper on Halloween 2008.  Were you asked to
18   look at any single communication between Dr. Kleiman --
19   Dr. Wright and Mr. Kleiman, David Kleiman, between those dates?
20   A.  I don't remember the date of each and every single email
21   and document I reviewed, but I don't recall any within that
22   date.
23   Q.  Well, you certainly weren't asked to review, we've already
24   established, the March 12, 2008 email, right?
25   A.  Right.
```

1    Q.  So let me show you just as an example what is Joint Exhibit

2    55.

3                MR. RIVERO:  If we could show it to the jury.  And

4    this is in evidence.

5                If you would, Mr. Shah -- if you would pull out the

6    second email where it says:  "Craig."

7    BY MR. RIVERO:

8    Q.  Okay.  This email, sir, you did not --

9                MR. RIVERO:  We need to show that to the jury.  It's

10   Joint Exhibit 55.

11   BY MR. RIVERO:

12   Q.  You were not asked to and you did not analyze Joint Exhibit

13   55, right?

14   A.  Correct.  I don't recognize this.

15   Q.  Okay.  So you don't recognize this email that says:

16   "Craig, how are you?  I've been laid up for a bit," and then it

17   continues on, the next-to-the-last sentence:  "I have not

18   worked in about 10 days, so I have a lot of catching up to do."

19       You never analyzed that exhibit?

20   A.  No, not to my recollection.

21   Q.  And you have no evidence that this document is manipulated

22   in any way; isn't that right?

23   A.  I haven't analyzed it, so no.

24   Q.  Therefore, you cannot have evidence since you didn't

25   analyze it?

```
 1    A.   Correct.

 2    Q.   All right, sir.   There are many, so I will just show a few

 3    examples.

 4              MR. RIVERO:   If we could look at Defendant's 340.

 5              Also, I believe, Your Honor, in evidence.

 6              THE COURT:   It is in evidence.

 7              MR. RIVERO:   If we could show that to the jury.

 8    BY MR. RIVERO:

 9    Q.   Sir, this email from Mr. Kleiman to Craig Wright and an

10    individual named Shyaam, S-H-Y-A-A-M:   "My availability or

11    unavailability over the next 10 days, my schedule over the next

12    10 days, consider all this includes over 1,500 miles of

13    driving," and then it has detail.

14         You were never asked to analyze this document; isn't that

15    right?

16    A.   Not that I recall.

17    Q.   And you have no evidence that this document is manipulated?

18    A.   Since I haven't analyzed it, no, I have no evidence one way

19    or the other.

20              MR. RIVERO:   Document JE052.

21    BY MR. RIVERO:

22    Q.   Later, sir --

23              MR. RIVERO:   We can show it to the jury.   It's a joint

24    exhibit.

25
```

```
 1    BY MR. RIVERO:

 2    Q.  This is between Mr. Kleiman and Craig Wright.  "Subject:

 3    How are you?"  It starts with Dr. Wright writing to Dave

 4    Kleiman:  "How are you?  Just checking up and seeing how you

 5    are.  You've been quiet as of late."

 6         The response from David Kleiman:  "Actually, I had some

 7    minor surgery.  I was in the VA Hospital until February 9

 8    without my computer.  I did see a bunch of emails from you on

 9    my phone but have not had time to read through them all yet."

10         Sir, you were not asked to analyze this Joint Exhibit 52,

11    correct?

12    A.  Not to my recollection.

13    Q.  And you have no evidence to give that this document is a

14    forgery, correct?

15    A.  Since I haven't analyzed it, I have no evidence one way or

16    the other.

17    Q.  And, sir, there are dozens of emails.  Are you aware there

18    are dozens of emails between David Kleiman and Craig Wright in

19    the period after that March 12th, 2008 email and the end of

20    David Kleiman's life?  You didn't analyze the vast majority of

21    those, did you?

22    A.  I don't know what emails are available from that time

23    period.

24    Q.  Let me ask you, Dr. Edman:  You opined that certain

25    documents are forgeries, correct?
```

```
 1   A.  I did.

 2   Q.  Sir, you are telling the jury that those documents are fake

 3   in some way, correct?

 4   A.  Yes.

 5   Q.  So I take it you are telling the jury to ignore the

 6   contents of those documents; is that correct?

 7              MR. ROCHE:  Objection.

 8              THE COURT:  Sustained.

 9   BY MR. RIVERO:

10   Q.  Sir, are you telling the jury to believe fake documents?

11              MR. ROCHE:  Objection.

12              THE COURT:  Sustained.

13              MR. RIVERO:  May I have one moment, Your Honor?

14       (Pause in proceedings.)

15              MR. RIVERO:  Your Honor, I have no further questions

16   for Dr. Edman.

17              THE COURT:  All right.  Any redirect?

18              MR. ROCHE:  Yes, Your Honor.  One second.

19       (Pause in proceedings.)

20                      REDIRECT EXAMINATION

21   BY MR. ROCHE:

22   Q.  Dr. Edman, good afternoon again.

23       You were asked during your testimony whether you were able

24   to prove that it was Craig Wright himself who created -- let's

25   go back here -- forgeries number one through five and forgeries
```