IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME XIV OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
  FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA MCGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

TAB NO.          DESCRIPTION

210          Plaintiffs' Motion to Compel Defendant to Comply
with this Court's Orders Directing Him to Produce a
List of the Bitcoins He Held as of December 31, 2013

429          Order Granting in Part and Denying in Part Plaintiffs'
Corrected Motion for Attorneys' Fees (DE 346),
filed March 17, 2020

618          Joint Proposed Jury Instructions,
filed September 29, 2020

802-1        Exhibit A to Defendant's Opposition to Motion for a
New Trial (DE 861) — Final Jury Instruction
Objections

829          Email from Craig S. Wright to Dave Kleiman,
dated March 12, 2008

837          Trial Transcript Day 1, dated November 1, 2021

838          Trial Transcript Day 2, dated November 2, 2021

839          Trial Transcript Day 3, dated November 3, 2021

840          Trial Transcript Day 4, dated November 4, 2021

841          Trial Transcript Day 5, dated November 5, 2021

842          Trial Transcript Day 6, dated November 8, 2021

843          Trial Transcript Day 7, dated November 9, 2021

845          Trial Transcript Day 9, dated November 15, 2021

| TAB NO. | DESCRIPTION |
|---------|-------------|
| 846 | Trial Transcript Day 10, dated November 16, 2021 |
| 847 | Trial Transcript Day 11, dated November 17, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 850 | Trial Transcript Day 14, dated November 22, 2021 |
| 851 | Trial Transcript Day 15, dated November 23, 2021 |
| 861 | Law360 Article entitled, "No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360" |
| 877 | Joint Notice and Request for Judicial Ruling on Proposed Redactions to Admitted Trial Exhibits, filed January 31, 2022 |

**847**

108

```
1    exceeds the scope of direct.
2            THE COURT:  Overruled at this point.
3    BY MR. ROCHE:
4    Q.  You understand that Dr. Edman testified that 10 of the
5    documents that were collected by the Defendant in this
6    litigation were, in fact, forgeries?
7    A.  I was here for that testimony, yes.
8    Q.  And you reviewed the metadata that Dr. Edman submitted with
9    his report associated with forgeries one through 10, didn't
10   you?
11           MR. FERNANDEZ:  Objection, Your Honor.  It exceeds the
12   scope of direct.
13           THE COURT:  I'll allow it.  Overruled at this point.
14           THE WITNESS:  I reviewed Dr. Edman's reports, yes.
15           MR. ROCHE:  Dorian, if we could pull up the first
16   slide from Dr. Edman's presentation.
17           And, Your Honor, this is Plaintiffs' Exhibit 823.  It
18   was previously admitted.  We would like to publish it to the
19   jury.
20           THE COURT:  All right.  It's in evidence.  You may.
21   BY MR. ROCHE:
22   Q.  Mr. Chambers, you testified that you reviewed the metadata
23   submitted by Dr. Edman in his report associated with
24   Plaintiffs' Exhibit 823.  What did you conclude about the
25   cryptographic signature?
```

109

```
 1          MR. FERNANDEZ:  Objection, Your Honor.  Exceeds the

 2     scope of direct.

 3          MR. ROCHE:  Your Honor, he's testified that he's

 4     reviewed this data.

 5          THE COURT:  Overruled.  I'll allow it.

 6     BY MR. ROCHE:

 7     Q.  What did you conclude about the cryptographic signature in

 8     what Dr. Edman testified as forgery number one, Plaintiffs'

 9     Exhibit 823?

10     A.  I did not make a conclusion about the metadata

11     specifically.

12     Q.  But you reviewed it?

13     A.  I did.

14     Q.  So did you come to any conclusion as to the date?

15     A.  I reviewed Dr. Edman's reports to review his methodology

16     and look at his conclusions.

17     Q.  Okay.

18          MR. ROCHE:  Dorian, can we go to the next slide,

19     please.

20     BY MR. ROCHE:

21     Q.  Mr. Chambers, you have Plaintiffs' Exhibit 823.2 in front

22     of you?

23     A.  Yes.  I see that.

24     Q.  And you've reviewed this document?

25     A.  I have seen this document, yes.
```

110

```
 1    Q.  Okay.  And you didn't come to any conclusions?

 2              MR. FERNANDEZ:  Your Honor, if I can have a continuing

 3    objection to this line of questioning.  He's exceeding the

 4    scope of direct.

 5              MR. ROCHE:  Your Honor, he's testified he reviewed

 6    these documents.

 7              THE COURT:  I am certainly -- it goes to the

 8    qualifications of the witness.  I will allow it and I will give

 9    you a continuing objection.

10              MR. FERNANDEZ:  Thank you, Your Honor.

11    BY MR. ROCHE:

12    Q.  Mr. Chambers, you reviewed lines 13 to 15 of Plaintiffs'

13    Exhibit 823.2?

14    A.  As I mentioned, I reviewed Dr. Edman's reports for the

15    purposes of reviewing his methodology and coming to the

16    conclusions whether his methodology was flawed.

17    Q.  But you didn't come to any conclusions about lines 13 to 15

18    in Plaintiffs' Exhibit 823.2?

19    A.  I was not asked to come to any conclusions about that

20    specifically, no.

21    Q.  In fact, you reviewed all of the metadata and cryptographic

22    signatures in forgeries one through 10, and you didn't come to

23    any conclusions about the exhibits associated with forgeries

24    one through 10?

25    A.  As I mentioned, I was not asked to review those for the
```

1    purposes of coming to a conclusion about the metadata itself.

2    It was more looking at Dr. Edman's methodology.

3    Q.  But you're not testifying -- you didn't testify during your

4    direct examination about Dr. Edman's methodology?

5    A.  No.

6    Q.  So you have no opinions as to whether or not forgery number

7    one is an authentic document?

8           MR. FERNANDEZ:  Objection.  Asked and answered, Your

9    Honor.

10          THE COURT:  Sustained.

11   BY MR. ROCHE:

12   Q.  Do you have any opinions as to whether any of forgeries one

13   through 10 are authentic documents?

14          MR. FERNANDEZ:  Objection.  Asked and answered, Your

15   Honor.

16          THE COURT:  Overruled.  I'll allow it.

17   BY MR. ROCHE:

18   Q.  Do you have any opinions as to whether forgeries one

19   through 10 are authentic documents?

20   A.  No.

21   Q.  Okay.  I'd like to change gears here and discuss the drives

22   you analyzed.  You're not an expert on Bitcoin?

23   A.  I do not consider myself an expert on Bitcoin, no.

24   Q.  You're not an expert on cryptocurrencies?

25   A.  No.

112

```
1    Q.  You have no opinion one way or another as to whether
2    Dr. Wright stole Bitcoin from Dave or W&K?
3    A.  I was not asked to look into that, no.
4    Q.  You have no opinion one way or the other as to whether
5    Dr. Wright took intellectual property from Dave -- from Dave
6    Kleiman's estate or W&K?
7    A.  No.
8    Q.  And you didn't review any data related to that on any of
9    these drives?
10   A.  No, not specifically related to that.
11   Q.  Your role in this litigation was to perform data
12   collections, process those data collections, and perform a
13   forensic analysis of those data collections?
14   A.  I was involved in the data collection process and the
15   forensic analysis, but I was not involved in processing.
16   Q.  In fact, you were -- we were together when we collected
17   these five devices on the left side of the screen about a year
18   and a half ago?
19   A.  That's right.
20   Q.  Okay.  And so you analyzed the 14 devices that were
21   provided to you by Plaintiff and Plaintiffs' counsel in this
22   litigation?
23   A.  I analyzed the forensic images of those devices.
24   Q.  Okay.  And your opinion boils down to the fact that we'll
25   never know what is on -- before Dave Kleiman died, what was on
```

113

```
1    these 14 devices?

2              MR. FERNANDEZ:  Objection, Your Honor.

3    Mischaracterizes his testimony.

4              THE COURT:  Overruled.  I'll allow it.

5              THE WITNESS:  Can you repeat the question, sir?

6    BY MR. ROCHE:

7    Q.  Your opinion boils down to:  We will not know before Dave

8    Kleiman died what was on these 14 devices?

9    A.  My opinion is that we will not know what was overwritten on

10   these drives and on these devices and what was there before the

11   actions that took place.

12   Q.  And how many of the drives are you testifying had

13   overwritten data?

14   A.  Thirteen of the 14.

15   Q.  Thirteen of the 14.  Okay.

16        When a file is deleted by a user -- I think we went through

17   an analogy earlier.  When a file is deleted by a user, the file

18   allocation table -- when a file is deleted by a user, the file

19   allocation table tells the computer what can be removed and

20   overwritten and what cannot be?

21   A.  The file table on the file system marks the space, the

22   areas where the file resides, as available to be overwritten.

23   Q.  Okay.  And so it's -- and I think you testified it's

24   equivalent to -- the file table we can think of as books in a

25   library.  And files that are supposed to be there are -- or
```

114

1   files that a user wants to remove are marked for deletion, but

2   aren't actually moved off the bookshelf until something else

3   takes its place?

4   A.  I think I testified that a file system is like a library,

5   not the file table.

6   Q.  File system.  Okay.

7       And the books are individual files in the library?

8   A.  In the analogy that we're using, yes.

9   Q.  Okay.  So the file table's the library.  The books are the

10  files?

11  A.  The file table is the card catalog.

12  Q.  The card catalog.

13  A.  The file system is the library.

14  Q.  File system's the library.  Okay.

15      So -- and it's the card catalog is what marks things for

16  deletion so that they can be removed if space is needed?

17  A.  It marks what's available to be overwritten and available

18  to be used by something else and what is in use, generally

19  speaking.

20  Q.  But until the card catalog marks something for removal, the

21  book -- that book is not marked for deletion, right?  So

22  basically it requires a user to tell the card catalog:  "Hey,

23  this book no longer needs to be on the shelf."  Is that a fair

24  characterization of the analogy you're using?

25  A.  A user or a program, operating system, but yes.

115

1    Q.   Okay.  So it would be -- if I have a number of files on my

2    desktop and I delete one, that's the equivalent of telling the

3    card catalog that this can now be overwritten in the library,

4    can be taken off the shelf and removed and replaced with

5    something else?

6    A.   With that analogy, yes.

7    Q.   Mr. Chambers, you understand the devices you reviewed

8    belonged to Dave Kleiman?

9    A.   Yes.

10   Q.   And you have no evidence to suggest that Dave Kleiman

11   deleted or marked for deletion any files related to Bitcoin?

12   A.   I can only opine on what is on the drives currently and

13   what I can determine from a forensic examination.

14   Q.   I'm asking you:  Do you have any evidence that Dave Kleiman

15   marked for deletion, before he passed away, files related to

16   Bitcoin -- marked them for deletion off the shelf?

17   A.   No.

18   Q.   What about any private keys?

19   A.   No.

20   Q.   So anything related to Bitcoin whatsoever?

21   A.   No.

22   Q.   Would it make sense for Dave Kleiman to delete files

23   relating to his private keys, to mark them for removal off the

24   shelf?

25   A.   If you're referring to him specifically deleting a file

116

1    versus some other operation on the drive, I don't think I can

2    speculate on what would make sense related to cryptocurrency or

3    Bitcoin in that regard.

4    Q.  Okay.  And were you here, I believe it is two weeks ago

5    now, when Ira Kleiman testified about his use of his brother's

6    devices?

7    A.  I was not here, but I did read the transcripts.

8    Q.  Okay.  And do you understand Ira Kleiman testified that he

9    did not delete, mark for deletion, files on these devices?

10   A.  I don't believe that's correct.

11   Q.  What's -- you're -- Ira Kleiman testified he marked for

12   deletion?

13   A.  I'm sorry.  Let me clarify.  That is Ira Kleiman's

14   testimony, yes.

15   Q.  And you did not find any Bitcoin private keys on any of the

16   14 devices that you reviewed?

17   A.  No, I did not.

18   Q.  You didn't find any -- and you only found one Bitcoin

19   public address on the devices you reviewed?

20   A.  That's right, yes.

21   Q.  And you reviewed the fragmented data?

22   A.  Yes.

23   Q.  What data did you -- what's the categories of data you

24   reviewed?

25   A.  I reviewed data that we recovered from the devices via what

117

1    is called file carving.  And file carving, to step back for a

2    second, is -- file carving is essentially recovering data from

3    the devices without the use of the original file system.

4        So in instances where the card catalog has been thrown out,

5    to use the library analogy, it's essentially wandering the

6    shelves trying to piece back together what was there, which can

7    be hit and miss and fairly difficult, since we don't have the

8    pointers to know exactly how things were put together in the

9    original place.

10       And so to answer your question, Mr. Roche, yes, I reviewed

11   fragmentary data, and deleted data, and data that was present

12   on the devices that was not overwritten.

13   Q.  And you reviewed all that data, and you didn't find any

14   private keys in the devices?

15   A.  I did not find any private keys on the devices.  However,

16   as I mentioned, I'm not able to recover and examine data that

17   has been overwritten.  I can only --

18   Q.  Finish, please.

19   A.  I can only look at data that has not been overwritten.

20   Q.  You have no evidence that any private keys were

21   overwritten?

22   A.  I did not see evidence of private keys being overwritten,

23   no.

24            MR. ROCHE:  Your Honor, I think now is a good time for

25   a lunch break.  I'll come back and I'll finish up 15 minutes,

118

```
1    20 minutes.

2              THE COURT:  All right.

3              All right.  Then, Ladies and Gentlemen, let's go ahead

4    and take our one-hour lunch recess and I will see you back at

5    2:00.

6        (Jury not present, 12:59 p.m.)

7              THE COURT:  Okay.  Have a pleasant lunch.  I'll see

8    you back at 2:00.

9        (Recess from 12:59 p.m to 1:59 p.m.)

10             THE COURT:  We're a little early.  My apologies.

11             MR. RIVERO:  We can proceed from the Defense, Your

12   Honor.

13             THE COURT:  Do you want to wait for Ms. McGovern?

14             MR. RIVERO:  Judge, no.  It's okay if we start.

15             THE COURT:  Are you certain?

16             MR. RIVERO:  Yes.

17             THE COURT:  Is Mr. Fernandez here?

18             MR. FERNANDEZ:  Yes, Your Honor.

19             THE COURT:  All right.  Are they ready to go?

20             COURT SECURITY OFFICER:  They are all here, Judge.

21   Ready to go.

22             THE COURT:  Okay.  All right, then.  Let's bring in

23   the jury.

24        (Before the Jury, 2:00 p.m.)

25             THE COURT:  All right.  Welcome back, Ladies and
```

119

```
 1   Gentlemen.  Please be seated.  I hope that you did have a
 2   pleasant lunch and ready to get back to work.
 3          We'll continue with the cross-examination of Mr.
 4   Chambers.
 5          MR. ROCHE:  May it please the Court.
 6   BY MR. ROCHE:
 7   Q.  I went over my notes at lunch and I just have one last
 8   question for you, Mr. Chambers.
 9      You have testified this morning about 14 of Dave Kleiman's
10   devices.  Are you aware that the only person who has said that
11   there are Bitcoin private keys on these 14 devices is Craig
12   Wright?
13   A.  I have not reviewed Dr. Wright's testimony in that regard,
14   no.
15   Q.  No one else you're aware of has testified that there's
16   Bitcoin private keys on those 14 devices?
17   A.  Not that I'm aware of.
18          MR. ROCHE:  No further questions.
19          THE COURT:  All right.  Any redirect?
20          MR. FERNANDEZ:  Yes, Your Honor.
21                      REDIRECT EXAMINATION
22   BY MR. FERNANDEZ:
23   Q.  Mr. Chambers, prior to lunch you testified about what
24   digital forensics is.  Can you please remind the jury of what
25   is digital forensics.
```

120

```
 1    A.  Digital forensics is the scientific investigation analysis
 2    and recovery of data on electronic media.
 3    Q.  And can digital forensics be used to determine whether a
 4    device -- a document has been forged?
 5              MR. ROCHE:  Objection.
 6              THE COURT:  Overruled.
 7              MR. ROCHE:  Calls for speculation.
 8              THE COURT:  Overruled.
 9              THE WITNESS:  In my opinion, forgery implies intent.
10    That's my understanding of the word.  And I would not use that
11    word in the context of digital forensics.  And in my opinion
12    and my experience, digital forensics is not able to determine
13    if a document is a forgery or not.
14    BY MR. FERNANDEZ:
15    Q.  And in your experience, have you ever been asked to
16    determine whether a document has been forged?
17    A.  I have before, and I pushed back on that client and said
18    I'm not able to make that determination because digital
19    forensics is not able to apply intent based on digital
20    evidence.
21    Q.  And does digital forensics permit you to ascribe conduct to
22    someone?
23    A.  Digital forensics alone is not able to put a person behind
24    a keyboard.  You would need other corroborating evidence to
25    assert that.
```

121

```
1   Q.  And were you here for Dr. Edman's testimony?

2   A.  I was, yes.

3   Q.  And have you ever heard anyone in your field define forgery

4   in the way he did?

5           MR. ROCHE:  Objection.

6           THE COURT:  Sustained.

7   BY MR. FERNANDEZ:

8   Q.  Did you review Dr. Edman's report?

9   A.  I reviewed all of Dr. Edman's reports, yes.

10  Q.  And in your opinion, would it be appropriate to describe a

11  document as forged based on metadata alone?

12  A.  No.

13  Q.  Did you review Dr. Edman's conclusion?

14  A.  I did.

15  Q.  And did you need to review any documents to opine on the

16  scientific basis of his opinion?

17  A.  No.  I was able to look at his conclusion and look at his

18  methodology without reviewing the documents themselves.  I had

19  looked at his reports.

20  Q.  And what about his methodology led you to your conclusion?

21          MR. ROCHE:  Your Honor, I'm having trouble hearing.

22  If he can take off the mask.  I think it's --

23          THE COURT:  Well, you certainly don't need to take off

24  the mask, but if you want to speak right into the microphone.

25          MR. FERNANDEZ:  Yes, Your Honor.
```

122

```
1    BY MR. FERNANDEZ:

2    Q.  And what about Dr. Edman's methodology did you find

3    problematic?

4    A.  Dr. Edman's methodology was flawed in several ways,

5    particularly -- and I'm happy to run through those if you would

6    like.

7    Q.  Yes, please.

8    A.  The first reason being that he failed to consider the

9    historical background and chain of custody of a document when

10   he was doing the analysis.

11       The second, he did not use, based on the reports that he

12   provided, forensic best practices for those documents during

13   the analysis of those documents.

14       And third, he did not independently verify the content and

15   source of documents where that option was available.

16           MR. FERNANDEZ:  Thank you, Your Honor.  No further

17   questions.

18           THE COURT:  All right.  Thank you.

19           Ladies and Gentlemen, you have the right to ask

20   questions to Mr. Chambers.  Does anybody have a question?

21           If you do, just raise your right hand so I can give

22   you the time to write down your question.

23           Does anyone have any questions for Mr. Chambers?

24           All right.  Seeing no questions.

25           Is Mr. Chambers excused?
```

123

```
1              MR. FERNANDEZ:  Yes, Your Honor.  He's excused.

2              THE COURT:  All right.  On behalf of the Plaintiffs?

3              MR. ROCHE:  No further questions.

4              THE COURT:  All right.  Thank you, Mr. Chambers.  You

5      are excused.

6         (Witness excused.)

7              THE COURT:  And the Defendant's next witness, please.

8              MS. MCGOVERN:  Your Honor, at this time, we would like

9      to play the videotaped deposition of Lynn Wright.

10             THE COURT:  All right.  And can you give me the date

11     of that deposition, please.

12             MS. MCGOVERN:  Yes, Your Honor.  January 13th, 2020.

13             THE COURT:  All right.  Thank you.

14        (Video played, 2:06 p.m. - 2:53 p.m.)

15             THE COURT:  Have we concluded the testimony?

16             MS. MCGOVERN:  Yes.

17             THE COURT:  All right.

18             The Defendant's next witness.

19             MS. MCGOVERN:  Yes.  Your Honor, the Defendant calls

20     Don Lynam via video deposition.

21             THE COURT:  And can you give me the date of the

22     gentleman's deposition.

23             MS. MCGOVERN:  April 2nd, 2020, Your Honor.

24             THE COURT:  Thank you.

25        (Video played.)
```

```
 1            MS. McGOVERN:  Could you stop for one second.  I

 2   apologize, Your Honor.  Just for planning purposes, this video

 3   is about an hour and 15 minutes long.

 4            THE COURT:  Why don't we stop it about 3:25, if we

 5   can.

 6            MR. RIVERO:  Sure.

 7            THE COURT:  Thank you.

 8            MS. McGOVERN:  Could you start from the top, please.

 9       (Video played, 2:54 p.m. - 3:24 p.m.)

10            THE COURT:  All right.  Thank you, Ms. McGovern.

11            At this point in time, Ladies and Gentlemen, let's

12   take a 20-minute recess.

13       (Jury not present, 3:25 p.m.)

14            THE COURT:  Okay.  We're on a 20-minute recess.

15       (Recess from 3:25 p.m. to 3:43 p.m.)

16            MS. McGOVERN:  I apologize, Your Honor.  We did not

17   realize you were here.

18            THE COURT:  I think our clock in chambers is a

19   little -- I apologize.  This is the second time I did that.

20            MS. McGOVERN:  If it makes you feel any better, we

21   were all talking.

22            THE COURT:  Let me say that I appreciate everybody

23   being so prompt when we take breaks.

24            MS. McGOVERN:  We're prepared to proceed.

25            THE COURT:  We're ready to proceed?
```

125

```
 1              MS. MCGOVERN:  Yeah.  Just so Your Honor knows --
 2              THE COURT:  Certainly.
 3              MS. MCGOVERN:  -- we still have another 35 minutes on
 4    the video, 40 minutes on the video, and then we'll call a live
 5    witness and we'll be done.
 6              THE COURT:  All right.  Thank you.
 7         (Before the Jury, 3:45 p.m.)
 8              THE COURT:  All right.  Welcome back, Ladies and
 9    Gentlemen.  Please be seated.
10              And we will continue with the testimony.
11         (Video played, 3:45 p.m. - 4:32 p.m.)
12              MS. McGOVERN:  Your Honor, at this time, we would call
13    Dr. MacIntyre.
14              THE COURT:  All right.  Certainly.
15              Good afternoon, sir.  Let me ask that you step
16    forward, remain standing, raise your right hand to be placed
17    under oath.
18         DR. DUGALD STEWART MACINTYRE, DEFENSE WITNESS, SWORN
19              COURTROOM DEPUTY:  Thank you.
20              THE COURT:  Sir, I'm not certain if you were here when
21    it was announced, but we are following CDC guidelines.  So to
22    the extent that you are fully vaccinated, and you feel
23    comfortable, you are permitted to take your mask off while you
24    are testifying.
25              THE WITNESS:  Thank you.
```

126

```
 1              I'm fully vaccinated.
 2              THE COURT:  Entirely your decision.  I did want to let
 3    you know, sir.
 4              Mr. Kass?
 5                        DIRECT EXAMINATION
 6    BY MR. KASS:
 7    Q.  Dr. MacIntyre, are you here to provide expert testimony?
 8    A.  That is correct.
 9    Q.  And what is the subject matter --
10              COURTROOM DEPUTY:  I'm sorry.  Mr. Kass, would you
11    please like to introduce the witness?
12              MR. KASS:  Oh, sorry.
13    BY MR. KASS:
14    Q.  Dr. MacIntyre, can you please state your name for the
15    record.
16    A.  My name is Dugald Stewart MacIntyre, Jr.
17    Q.  Dr. MacIntyre, are you here to provide expert testimony?
18    A.  That's correct.
19              MR. RIVERO:  I'm sorry, Your Honor.  I'm having
20    trouble hearing Dr. MacIntyre.
21              THE COURT:  Dr. MacIntyre, if you'll speak directly
22    into the microphone.
23              Thank you, sir.
24              THE WITNESS:  Is that better?
25              MR. KASS:  Moderately, but hopefully we'll see how it
```

127

```
1    goes.

2    BY MR. KASS:

3    Q.  Dr. MacIntyre, what's the subject matter of your expertise

4    and the opinion that you will be providing today?

5    A.  The general field of infectious disease.

6    Q.  Is it with respect to any person in particular?

7    A.  It's in respect to Mr. Kleiman.

8    Q.  Is that Mr. David Kleiman?

9    A.  That is correct.

10   Q.  Are you being compensated for your work as an expert?

11   A.  Yes, I am.

12   Q.  How much is your compensation?

13   A.  It's $500 an hour, and that's across the board.  It's

14   reviewing records, courtroom time, conference time.

15   Q.  Could you tell the jury a little bit about your educational

16   history.

17   A.  Well, I was privileged to graduate from one of the best

18   high schools in the country in East Grand Rapids, Michigan.  I

19   went to undergraduate at Yale University in New Haven,

20   Connecticut, including one -- the third year I was in Ludwig

21   Maximilian University in Munich, Germany, for a third year in

22   Germany.

23       Following undergraduate, I wet to medical school at the

24   University of Michigan in Ann Arbor.  Then I had a one-year

25   rotating internship at the University of Oregon in Portland.
```

128

1    Rotating means I rotated through various services: medicine,

2    surgery, pediatrics.

3        Following that, I had a three-year residency in internal

4    medicine back in Ann Arbor, University of Michigan.  Then I had

5    two years' service in the US Army.  I was posted to the Canal

6    Zone, one year in Colon on the Atlantic end and then the other

7    year at Gorgas Hospital on the Pacific end.

8        Then I had a two-year fellowship in infectious disease at

9    the University of Miami, Jackson Memorial Hospital and the

10   Miami Veterans Administration Medical Center.

11   Q.  Dr. MacIntyre, after the fellowship, did you continue

12   working as a doctor?

13   A.  Yes, I did.  I had four years.  I stayed on in the

14   full-time faculty at the University of Miami.  I'm still at

15   Jackson and the VA.  Following that I entered private practice,

16   where I have been ever since.

17   Q.  In total, how many years have you been a practicing doctor?

18   A.  Since 1975, including those four years on the full-time

19   faculty.

20   Q.  And in how many of those years have you been specializing

21   in infectious disease?

22   A.  Well, the entire time because that's where my fellowship

23   was, and I stayed on in that field.

24   Q.  Have you ever worked at a VA hospital?

25   A.  Yes, I have.  I had experience at the Ann Arbor VA hospital

129

1    when I was a resident there, and then the Miami VA hospital

2    during my fellowship and time on full-time faculty.

3    Q.  So in total, how much time have you worked or been a fellow

4    in a VA hospital?

5    A.  Well, I've been on and off, because obviously I was not at

6    the VA the entire time.  But it would be for a total of four --

7    four, six -- nine years.

8    Q.  Are VA hospitals similar to typical hospitals?

9    A.  In many ways they are, but they have substantial

10   differences as well.

11   Q.  Could you tell the jury what those substantial differences

12   are.

13   A.  Well, the first thing is the VA -- a VA hospital is part of

14   the VA system that has complete interchangeability of records

15   among the various VA hospitals.

16        Secondly, their patient population consists of veterans of

17   the United States military, and as such tend to be more men

18   than women, although that difference is starting to decrease

19   now.

20        Also, being associated with veterans, they tend to form --

21   they tend to function in many ways like the military,

22   particularly in their leave-of-absence regulations.  It's

23   almost like a leave of absence in the military.  If a furlough

24   from the hospital for an inpatient who is in the hospital --

25   there has to be a starting and ending time, it has to be

130

1    specifically ordered, and also a reason is given.

2    Q.  Is another difference the likelihood of having interns or

3    fellows in the hospital?

4            MR. RIVERO:  Objection.  Leading.

5            THE COURT:  Sustained.

6    BY MR. KASS:

7    Q.  Dr. MacIntyre, are you aware of any additional differences

8    between a regular hospital and a VA hospital?

9    A.  Well, when the VA system was first set up back in the

10   late -- in the 1940s, somebody had the good sense of

11   associating major VA hospitals with major universities, such

12   that the Ann Arbor VA, where I was, was University of Michigan,

13   and the VA in Miami is University of Miami.

14       As such, they are teaching hospitals.  Now, that doesn't

15   mean that there are not other teaching hospitals.  Jackson, for

16   instance.  But as a teaching hospital, they have interns,

17   residents and fellows on service, and these individuals who are

18   physicians, they are MDs or DOs.  They also see the patients,

19   usually on rounds, in groups.

20   Q.  Have you previously treated an individual with paraplegia?

21   A.  Yes, I have.

22   Q.  Approximately, how many times have you done it?

23   A.  Well, seeing as they are not very common, I don't see them

24   tremendously often.  But I do see maybe two, three or four a

25   year.

1    Q.  And in what context do you typically see those paraplegic

2    patients?

3    A.  Well, paraplegia in itself leads to problems with

4    infections.  So it's not at all surprising that an infectious

5    specialist would be seeing a paraplegic, particularly a

6    hospitalized paraplegic.

7    Q.  Have you reviewed Dave Kleiman's medical records?

8    A.  Yes, I have.

9    Q.  Do you recall approximately how many pages of medical

10   records you reviewed?

11   A.  Well, I reviewed medical records from the VA system, most

12   of which were from his final hospitalization from September

13   2010 until March 2013.  In all, there were -- it was in five

14   figures, so it was between 10 and 11,000 pages.

15          MR. KASS:  Mr. Reed, could you please pull up

16   Defendant's Exhibit 91 and show it to Judge, counsel, and the

17   witness, but not the jury.

18   BY MR. KASS:

19   Q.  Dr. MacIntyre, do you recognize the document in front of

20   you?

21   A.  Yes, I do.  Uh-huh.

22   Q.  What do you recognize it to be?

23   A.  It is a request for records to the Department of Veterans

24   Affairs.

25          MR. KASS:  Mr. Reid, if you could just scroll down a

132

1    little bit to get past the letter.

2            Just scroll a few more pages.

3            There we go.  That's perfect.

4    BY MR. KASS:

5    Q.  And, Dr. MacIntyre, what do you recognize this document to

6    be, this portion of the document?

7    A.  Well, this is a portion of the records during that

8    hospital -- that prolonged hospitalization that I was talking

9    about.  This particular portion is a list of problems.

10   Q.  Dr. MacIntyre, in your review of the medical records, did

11   you see any statements by Dave Kleiman?

12   A.  Excuse me.  Again?

13   Q.  In your review of the medical records, were there any

14   statements made by Dave Kleiman in the records?

15   A.  There are statements quoted by the nursing personnel that

16   they say he made.

17   Q.  Okay.  And were those statements or quotes in connection

18   with him obtaining medical treatment?

19   A.  Well, they had to do with medical treatments usually.

20           MR. KASS:  Your Honor, I'd like to introduce

21   Defendant's Exhibit 91 into evidence.

22           MR. BRENNER:  No objection, Your Honor.

23           THE COURT:  All right.  Exhibit 91 is admitted into

24   evidence.

25       (Defendant's Exhibit 91 received into evidence.)

133

```
 1            MR. KASS:  Mr. Reed, would you be able to pull up

 2     Defendant's Exhibit 92.

 3     BY MR. KASS:

 4     Q.  Dr. MacIntyre, do you recognize this to be another one of

 5     the medical records that you reviewed?

 6     A.  Yes.  That is correct.  It's from the same hospitalization.

 7     These particular are consultations.

 8            MR. KASS:  Your Honor, I'd like to introduce

 9     Defendant's Exhibit 092 into evidence.

10            MR. BRENNER:  Your Honor, I believe these are broken

11     down into about 10 exhibits, the medical records.  I'm not

12     going to have an objection to any of them.

13            MR. KASS:  Your Honor, if it's all right, could I read

14     into the record the different exhibit numbers?

15            THE COURT:  Certainly.

16            And, Mr. Brenner, let the Court know if there is any

17     objection to any of these exhibits.

18            MR. KASS:  The additional exhibits would be

19     Defendant's Exhibit 93, Defendant's Exhibit 94, Defendant's

20     Exhibit 95, Defendant's Exhibit 96, Defendant's Exhibit 97,

21     Defendant's Exhibit 98, Defendant's Exhibit 99, Defendant's

22     Exhibit 100, Defendant's Exhibit 101, Defendant's Exhibit 102.

23            Your Honor, I'd like to move all those medical records

24     into evidence.

25            MR. BRENNER:  No objection, Your Honor.
```

```
 1            THE COURT:  All right.  Without objection, admitted

 2    into evidence.

 3       (Defendant's Exhibit 93 through 102 received into

 4    evidence.)

 5            MR. KASS:  Mr. Reed, could you pull up Tab 16.  Tab

 6    16.

 7            And, again, show it only to the witness, counsel, and

 8    the Court.

 9    BY MR. KASS:

10    Q.  Dr. MacIntyre, do you recognize this document?

11    A.  Yes, I do.

12    Q.  What do you believe it to be or recognize it as?

13    A.  This is a brief summary of the dates of the hospitalization

14    that I was talking about previously.

15    Q.  And does the information in here accurately reflect what

16    you saw in the long medical records that were previously shown

17    to you?

18    A.  That is correct.

19            MR. KASS:  Your Honor, I'd like to introduce

20    Defendant's summary exhibit into evidence.

21            MR. BRENNER:  Your Honor, I have no objection to this

22    as a demonstrative, but it's not evidence in and of itself.

23            THE COURT:  Right.  This is your exhibit that you're

24    using to assist Dr. MacIntyre with his testimony?

25            MR. KASS:  Well, Your Honor, we actually would like to
```

135

```
1    introduce it substantively as a summary exhibit.
2              THE COURT:  What exhibit number is it?
3              MR. KASS:  Your Honor, I don't believe that summary
4    exhibits had to be listed on the exhibit list.  We did share
5    this previously with opposing counsel.
6              THE COURT:  For demonstrative purposes or an exhibit?
7              MR. KASS:  As a summary exhibit.
8              THE COURT:  All right.  And, Mr. Brenner, your
9    objection is?
10             MR. BRENNER:  I don't think it should go into
11   evidence.  I have no problem with it being displayed to the
12   jury as a demonstrative.
13             THE COURT:  Well, unless there's a reason to believe
14   that the information contained in this exhibit is not accurate,
15   then I would need this exhibit to be marked and the Court will
16   allow it into evidence.
17             MR. KASS:  Your Honor, we will mark it as Defendant's
18   1000 -- we'll mark it as a 1020.
19             THE COURT:  All right.
20        (Defendant's Exhibit 1020 received into evidence.)
21             MR. KASS:  Could I have this exhibit published to the
22   jury?
23             THE COURT:  You may.
24   BY MR. KASS:
25   Q.  Dr. MacIntyre, could you read or explain what are the
```

1   high-level events going on in this summary exhibit to the jury.

2   A.  Okay.  The first entry there, which is dated September

3   24th, 2010, was the date of admission of Mr. Kleiman to

4   Miami -- to West Palm Beach VA hospital.  He presented there

5   with sepsis and bacteremias related to the pressure ulcers that

6   he had prior to admission.

7       The next entry, September 28th, is -- and this is typical

8   for the VA system, that they will transfer internally, from one

9   VA hospital to another, in this case to the Miami VA Hospital,

10  for more specialized treatment that he required.

11      The final entry is when he was last seen at the Miami VA

12  Hospital.  He left on a pass at that time.

13  Q.  Between September 24th, 2010 and March 21st, 2013, was Dave

14  Kleiman discharged from the hospital for any period of time?

15  A.  He was not discharged from the hospital.  He did receive

16  passes, like I outlined before, temporary passes or furloughs.

17          MR. KASS:  Mr. Reed, could you pull up Tab 16 -- 17.

18  I apologize.  17.

19          Not to the jury yet.  We haven't introduced it.

20  BY MR. KASS:

21  Q.  Dr. MacIntyre, do you recognize this document?

22  A.  Yes, I do.

23  Q.  And what do you recognize it to be?

24  A.  This is a listing of the various furloughs or passes issued

25  to Mr. Kleiman while he was an inpatient during that prolonged

137

1   hospitalization.

2   Q.  Is this an accurate reflection of the information contained

3   in Dave Kleiman's lengthy medical records?

4   A.  Yes, it is.  It corresponds to what I noted during my

5   review of the records.

6           MR. KASS:  Your Honor, I'd like to introduce this

7   summary exhibit as Defendant's 1021.

8           MR. BRENNER:  Can I see just the next three pages,

9   please.

10          MR. KASS:  Oh, of course.

11          Mr. Reed, if you could scroll down.

12          MR. BRENNER:  Give me one second.

13          Okay.  Okay.

14          No objection, Your Honor.

15          THE COURT:  Admitted into evidence.

16      (Defendant's Exhibit 1021 received into evidence.)

17          MR. KASS:  Mr. Reed, if you could pull up the

18   Defendant's demonstrative exhibit, with respect to the stay in

19   the hospital.

20   BY MR. KASS:

21   Q.  Dr. MacIntyre, do you recognize this demonstrative exhibit?

22   A.  Yes, I do.  I have seen it before.

23   Q.  And what does it show?

24   A.  Well, this particular -- what's up there now, shows his

25   time -- his days as an inpatient at the Miami Veterans

138

```
1    Administration Medical Center during the year 2010.

2    Q.  What does the pinkish color reflect?

3    A.  The days that he was an actual inpatient at the hospital.

4    Q.  On the legend there's a little bit of a blue.  What would

5    that reflect?

6    A.  Well, the blue would be overnight passes.  Now, during the

7    year that's up now, he did not have any.

8         MR. KASS:  Mr. Reed, if you could move on to the next

9    stop in the slide.

10   BY MR. KASS:

11   Q.  Dr. MacIntyre, what year was this added to this

12   demonstrative exhibit?

13   A.  Well, the year 2011.

14   Q.  Do you see that Dave Kleiman had any overnight passes or

15   extended day passes in 2011?

16   A.  None that are indicated during that year.

17   Q.  So does that mean throughout that entire year he was in the

18   hospital?

19   A.  That is correct.  The entire year.

20        MR. KASS:  Mr. Reed, would you move on.

21   BY MR. KASS:

22   Q.  Dr. MacIntyre, what year was just added to the

23   demonstrative exhibit?

24   A.  The year 2012.

25   Q.  In the year 2012, did Dave Kleiman have a number of
```

139

1    overnight passes or extended day passes?

2    A.   That is correct.

3    Q.   How many of those overnight passes or extended day passes

4    did he have in 2009?

5    A.   There were two overnight passes.  Actually, it would be one

6    pass over two days, in February 2012.  In September, he was out

7    on pass seven days out of the month.  In October, six days out

8    of the month.  The November and December had no overnight

9    passes.

10   Q.   Apart from those overnight or extended day passes, was Dave

11   Kleiman continuously in the hospital?

12   A.   He was in the hospital as an inpatient all that time.

13   Q.   Dr. MacIntyre, what year was just added to the

14   demonstrative exhibit?

15   A.   The year 2013.

16   Q.   And how many overnight or extended day passes did Dave

17   Kleiman have in the year of 2013?

18   A.   Again, I'm going to have to amend what I was saying because

19   an overnight pass is actually indicated by two days here.  So

20   he had one overnight pass in January, three of them in

21   February.

22   Q.   And apart from those passes, was Dave continuously in the

23   hospital inpatient?

24   A.   Well, he was up until March 21st, 2013.

25   Q.   Okay.  What happened on March 21st, 2013?

140

1    A.   That's not indicated on this graphic.  However, from my

2    review of the records, I found that he was issued an overnight

3    pass on that day and left the hospital.  The records indicated

4    that the next day he called in and he received an extension for

5    one more day.

6         After that time, he did not contact the hospital nor return

7    to the hospital.  The hospital personnel attempted to contact

8    him and were unsuccessful.  Because of that, he was issued what

9    is called an irregular discharge.

10        MR. KASS:  Mr. Reed, you could take down the

11   demonstrative -- sorry.  If you could go back to that.

12   BY MR. KASS:

13   Q.   Dr. MacIntyre, what does this demonstrative exhibit

14   reflect?

15   A.   Well, it's a pie chart showing a comparison of the total

16   amount of time he spent as an inpatient during this

17   hospitalization, namely, two years, five months and two days,

18   and the number of days that he was out on pass overnight, which

19   was 23 days.

20        MR. KASS:  Mr. Reed, you can take it down now.

21   BY MR. KASS:

22   Q.   Dr. MacIntyre, I want to know if you could explain a little

23   bit more to the jury, what are day passes, overnight passes,

24   how long do they last, what's their purpose?

25   A.   Well, as I mentioned previously in the description of a VA

141

1    hospital, when an individual is going to actually physically

2    leave the hospital, he has to be issued a pass, which is signed

3    off by one of the physicians, and the pass has to be for a

4    reason.

5        The pass indicates the time that he's expected to leave and

6    the time he's expected back.  It can either be a day pass, when

7    he's only gone during one day, or an overnight pass, when he

8    leaves on one day and returns the next day.

9    Q.  From your review of the records, is there an indication as

10   to why these passes were just for a day or a day and overnight?

11   A.  That depends on what he was requesting, if he requested a

12   day pass or an overnight pass.

13   Q.  Was there a medical reason from the records as to why he

14   wouldn't be able to take an extended pass to leave the

15   hospital?

16   A.  In general, no, but one exception that he was granted some

17   passes, in order to supervise the installation of a piece of

18   equipment in his home, a lift in the shower.  That could be

19   considered a medical reason.  Other than that, his reasons were

20   non-medical.

21   Q.  Was there anything that you saw in the medical records that

22   would prevent him from taking an extended stay out of the

23   hospital?

24           MR. BRENNER:  Objection.  Asked and answered.

25           THE COURT:  Sustained.

142

```
1   BY MR. KASS:

2   Q.  Do the medical records indicate Dave Kleiman's medical

3   condition?

4   A.  Yes, they do.

5   Q.  And what do they show about his medical condition?

6   A.  Well, in general, he was seriously ill during that entire

7   time.

8   Q.  Would that serious illness prevent him from leaving the

9   hospital for extended furloughs?

10  A.  Yes, it would, because he required rather extensive care,

11  which he would not be receiving outside of the hospital for an

12  extended period of time.

13  Q.  Could you describe at a high level the various medical

14  conditions that Dave Kleiman had.

15  A.  Well, his basic underlying medical condition was

16  paraplegia.  This was the result of a motor vehicle accident

17  several years prior to the admission that we're talking about.

18  But because of that, he had no use of the muscles from the

19  waist down and he had no sensation the waist down.  Thus, he

20  was a paraplegic.

21      This condition carried a number of complications.  The

22  major complications were pressure ulcers, which result from him

23  lying with a bony prominence over a hard surface, causing loss

24  of circulation to that area of the body, which leads to death

25  of the cells and eventual formation of a skin ulceration.
```

143

1    Those are sometimes call decubitus ulcers or bedsores.  He had

2    a number of these before he came into the hospital in September

3    2010, and the care of these throughout the hospitalization was

4    most important.

5        Now, he also had infections relating to these bedsores.

6    Being an open sore, they become infected, and that frequently

7    leads to infection of the underlying bone, which is called

8    osteomyelitis, which requires extended antibiotic treatment and

9    frequently surgical management.

10        Now, he also had loss of control of the bladder sphincter,

11    meaning he could not urinate normally.  Because of that he had

12    to have catheterizations of the bladder; either a chronic Foley

13    catheter was left in place or intermittent catheterizations in

14    and out in order to empty the bladder.  This, in turn, can lead

15    to infections, bladder infections, kidney infections, and they

16    can also escape into the bloodstream relating to this problem.

17        Then, finally, he had loss of control of the anal

18    sphincter, meaning that defecation was not through the normal

19    route.  He would require stimulation or it would occur

20    spontaneously without control.  And this, of course, can lead

21    to contamination of the pressure ulcers.  I think that should

22    be rather obvious.

23    Q.  Dr. MacIntyre, what was the condition of Dave's bones?

24    A.  The bones in the area of paraplegia -- and that is from the

25    waist down -- were not subjected to weight bearing and not

1   subjected to general use.  Bones that are not subjected to

2   weight bearing or general use lose calcium and become brittle,

3   easily fractured.  He had one fracture of his femur, which

4   occurred just during physical therapy.

5           MR. KASS:  Your Honor, this would be a good place to

6   stop on my end, if that's okay with the Court.

7           THE COURT:  All right.  Certainly.

8           All right.  Ladies and Gentlemen, we will adjourn for

9   the evening.  I will see you tomorrow morning at 9:45.  If

10  you'll make your way into the jury room.

11          Please remember, you're not to discuss the case with

12  anyone, nor permit anyone to speak with you.  Everything

13  learned about the case is learned within the courtroom.  You're

14  not to conduct any independent research.

15          Have a pleasant evening.  I'll see you tomorrow

16  morning.

17      (Jury not present, 4:59 p.m.)

18          THE COURT:  Dr. MacIntyre, we'll see you tomorrow

19  morning, sir.

20          All right.  Is there anything further that we need to

21  address this evening on behalf of the Plaintiffs?

22          MR. FREEDMAN:  Your Honor, one thing.

23          THE COURT:  Go ahead and have a seat.

24          Thank you, Dr. MacIntyre.  We'll see you tomorrow

25  morning.

145

```
 1            Dr. MacIntyre, you're free to go, sir.  Thank you.
 2    We'll see you tomorrow morning.
 3        (Pause in proceedings.)
 4            THE COURT:  Mr. Freedman.
 5            MR. FREEDMAN:  Your Honor, never mind.  Apologize.
 6    We're all set.
 7            THE COURT:  Is there anything to address on behalf of
 8    the Plaintiffs?
 9            MR. FREEDMAN:  No, Your Honor.
10            THE COURT:  Is there anything to address on behalf of
11    the Defendant?
12            MS. McGOVERN:  Just one quick thing, Your Honor.  I
13    was speaking earlier today -- we're going to be taking
14    probably -- just to make sure we don't have any gaps, we're
15    going to be taking Mr. Kuharcik tomorrow afternoon, not Friday
16    morning.  To just be ready with that for the Zoom.
17            One question that came up is:  What happens with
18    exhibits that are not admitted already, if they were to come in
19    through Mr. Kuharcik?  If it's by Zoom, I don't know if the
20    Court has a procedure in that regard so that the jury doesn't
21    see the exhibit before it's admitted.  But I can send the
22    exhibits to Mr. Kuharcik in advance.  Whatever you prefer.
23            THE COURT:  Well, obviously, he would need to have the
24    exhibits in hand to review, and I would suggest that an
25    instruction be given -- because the jury is going to be
```

146

```
 1    watching this witness -- that he is not to display the exhibit
 2    until you lay the necessary foundation.
 3          Now, to the extent that the parties can come to an
 4    agreement on the admissibility of these documents, then perhaps
 5    that cures any issue.
 6          MS. MCGOVERN:  Perfect.  Thank you, Your Honor.
 7          THE COURT:  Okay.  All right.  So I believe that Liz
 8    has already sent you the Zoom link.  So now you have pretty
 9    much control to just let him know, and obviously let the Court
10    know, when it's time for the witness.  But will we have any
11    other gaps in time?
12          MS. McGOVERN:  No.
13          THE COURT:  All right.  So we'll finish with
14    Dr. MacIntyre, and then who will be the next witness?
15          MS. McGOVERN:  Kimon Andreou and then Carter Conrad
16    and then Mr. Kuharcik.
17          THE COURT:  Do you believe that that will take us
18    through the day?
19          MS. McGOVERN:  I do.  And in fact, if it doesn't,
20    there's a video clip that we'll play.
21          THE COURT:  All right, then.
22          Okay.  If there's nothing further, have a pleasant
23    evening.  Take your time, but I do wish to remind you that
24    we're going to be using the counsel table tomorrow morning.
25          Have a nice evening.
```

1          (Proceedings adjourned at 5:02 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES OF AMERICA        )

2   ss:

3   SOUTHERN DISTRICT OF FLORIDA  )

4                   C E R T I F I C A T E

5           I, Yvette Hernandez, Certified Shorthand Reporter in

6   and for the United States District Court for the Southern

7   District of Florida, do hereby certify that I was present at

8   and reported in machine shorthand the proceedings had the 17th

9   day of November, 2021, in the above-mentioned court; and that

10  the foregoing transcript is a true, correct, and complete

11  transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13  1 – 148.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15  Miami, Florida this 27th day of November, 2021.

16

17                      /s/Yvette Hernandez
                        Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                      400 North Miami Avenue, 10-2
                        Miami, Florida 33128
19                      (305) 523-5698
                        yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25

**COURT SECURITY OFFICER: [2]** 39/3 118/20

**COURTROOM DEPUTY: [4]** 81/22 81/25 125/19 126/10

**MR. BRENNER: [8]** 132/22 133/10 133/25 134/21 135/10 137/8 137/12 141/24

**MR. FERNANDEZ: [26]** 80/14 80/20 81/4 81/6 81/10 81/12 81/17 95/12 98/17 99/11 99/14 107/10 107/14 107/25 108/11 109/1 110/2 110/10 111/8 111/14 113/2 118/18 119/20 121/25 122/16 123/1

**MR. FREEDMAN: [97]** 3/4 3/8 4/1 4/3 4/25 6/5 6/8 9/3 10/19 12/4 12/11 13/25 14/11 15/17 19/18 19/24 20/2 20/19 20/24 21/13 22/25 23/3 23/17 23/20 24/1 24/7 24/16 25/9 25/23 27/16 27/24 28/7 28/13 29/1 29/16 29/18 29/24 30/11 30/16 30/23 31/1 31/25 32/13 33/5 33/12 34/8 35/5 35/17 38/9 38/13 39/4 39/19 40/22 49/25 50/11 51/8

51/11 51/15 51/19 51/23 52/4 52/6 52/10 53/7 55/11 55/25 56/4 56/7 56/25 57/5 57/7 57/11 57/25 58/14 63/2 63/9 65/25 66/2 66/4 66/11 66/24 67/16 67/24 68/14 69/13 70/14 75/7 77/19 77/22 78/5 78/7 78/12 80/2 80/6 144/22 145/5 145/9

**MR. KASS: [96]** 12/6 12/9 12/13 14/2 14/6 14/9 14/15 14/18 14/21 14/25 15/3 15/5 15/12 15/22 19/1 19/9 19/20 19/22 19/25 20/3 20/6 21/1 21/6 23/6 23/10 23/18 23/22 24/18 25/15 28/15 28/19 33/15 33/20 33/24 36/7 36/11 37/12 37/17 37/25 39/6 39/8 39/15 39/18 40/4 40/17 42/3 42/23 43/4 51/14 51/17 51/22 52/12 56/2 56/6 56/16 56/18 57/9 57/12 59/12 61/17 68/19 72/14 72/23 73/20 73/25 76/15 76/19 76/23 77/18 79/25 80/4 126/12 126/25 131/15 131/25 132/20 133/1 133/8 133/13 133/18 134/5 134/19 134/25

135/3 135/7 135/17 137/1 137/3 137/4 137/6 137/10 137/17 138/8 138/20 140/10 140/20 144/5

**MR. RIVERO: [8]** 66/12 78/13 118/11 118/14 118/16 124/6 126/19 130/4

**MR. ROCHE: [15]** 103/11 106/20 106/25 108/15 109/3 109/18 110/5 117/24 119/5 119/18 120/5 120/7 121/5 121/21 123/3

**MS. MCGOVERN: [30]** 4/12 5/13 6/22 8/8 9/19 9/25 10/6 51/18 52/2 61/7 77/14 78/11 123/8 123/12 123/16 123/19 123/23 124/1 124/8 124/16 124/20 124/24 125/1 125/3 125/12 145/12 146/6 146/12 146/15 146/19

**THE COURT: [201]**

**THE WITNESS: [31]** 12/18 20/5 20/9 24/21 25/25 30/1 31/4 32/3 32/15 34/10 35/8 37/19 38/2 39/23 42/6 61/19 69/15 73/21 78/23 78/25 79/4 79/13 79/17 81/24 101/10 107/2 108/14 113/5 120/9 125/25 126/24

**$**

**$500 [1]**  127/19
**$665 [3]**  41/11
 41/12 42/19

**'**

**'80s [4]**  58/22
 60/6 60/10 63/23
**'X' [1]**  72/11

**.**

**.pdf [1]**  101/8

**/**

**/s/Yvette [1]**
 148/17

**0**

**0.1 [2]**  47/20
 67/10
**0010689 [1]**  50/13
**0010690 [3]**  49/23
 50/6 55/19
**092 [1]**  133/9

**1**

**10 [15]**  1/11 39/17
 40/10 71/20 81/6
 103/21 107/23
 108/4 108/9 110/22
 110/24 111/13
 111/19 131/14
 133/11
**10-2 [2]**  1/24
 148/18
**100 [2]**  1/17
 133/22
**1000 [2]**  1/21
 135/18
**101 [1]**  133/22
**102 [3]**  2/17
 133/22 134/3
**1020 [3]**  2/17
 135/18 135/20
**1021 [2]**  137/7

 137/16
**1021 [1]**  2/8
**107 [1]**  2/8
**10:09 [1]**  11/11
**10th [2]**  14/5
 14/23
**11 [6]**  1/9 2/5
 4/14 101/22 103/21
 106/9
**11,000 [1]**  131/14
**119 [1]**  2/9
**11:28 [1]**  66/7
**11:29 [1]**  66/9
**11:47 [2]**  66/9
 66/14
**12 [3]**  64/23 65/1
 100/18
**123 [1]**  2/10
**124 [1]**  2/12
**125 [1]**  2/12
**126 [1]**  2/13
**12:59 [2]**  118/6
 118/9
**13 [8]**  62/20 63/3
 63/6 100/18 105/7
 105/18 110/12
 110/17
**132 [2]**  2/16 2/16
**133 [1]**  2/17
**134 [1]**  2/17
**135 [2]**  2/17 2/17
**137 [2]**  2/18 2/18
**13th [1]**  123/12
**14 [20]**  84/18 97/6
 97/6 100/18 101/19
 101/22 102/11
 102/15 105/8
 105/18 106/9
 112/20 113/1 113/8
 113/14 113/15
 116/16 119/9
 119/11 119/16
**140 [2]**  19/23 20/3
**148 [3]**  1/8 2/2

 148/13
**148 [2]**  2/2
 110/17 117/25
 124/3
**15,000 [1]**  17/19
**16 [4]**  65/4 134/5
 134/6 136/17
**17 [3]**  1/5 136/17
 136/18
**17th [4]**  14/19
 14/20 14/24 148/8
**18 [5]**  12/6 12/9
 14/2 14/10 14/11
**19 [3]**  19/22 19/23
 20/3
**19.2 [3]**  62/23
 63/13 63/16
**1940s [1]**  130/10
**1975 [1]**  128/18
**1:59 [1]**  118/9
**1st [1]**  106/9

**2**

**20 [5]**  3/16 10/25
 33/17 90/13 118/1
**20-minute [4]**  66/6
 66/8 124/12 124/14
**200 [1]**  1/14
**2007 [1]**  69/6
**2008 [3]**  60/19
 60/24 65/2
**2009 [2]**  35/24
 139/4
**2010 [7]**  65/7 65/9
 131/13 136/3
 136/13 138/1 143/3
**2011 [5]**  22/22
 24/22 27/20 138/13
 138/15
**2012 [3]**  138/24
 138/25 139/6
**2013 [16]**  22/23
 27/21 37/2 96/12
 101/18 101/20

USCA11 Case: 22-11150   Document: 53-14   Date Filed: 11/30/2022   Page: 48 of 254

## 2

**2013... [10]**
103/19 105/6 105/8
105/16 131/13
136/13 139/15
139/17 139/24
139/25
**2014 [2]** 105/21
106/4
**2015 [2]** 105/23
106/5
**2016 [2]** 105/25
106/5
**2017 [2]** 69/3
106/2
**2018 [8]** 34/18
35/4 36/5 36/20
36/21 36/24 106/6
106/9
**2019 [1]** 97/21
**2020 [7]** 14/5
14/19 64/22 65/1
81/7 123/12 123/23
**2021 [3]** 1/5 148/9
148/15
**21st [3]** 136/13
139/24 139/25
**22 [2]** 51/12 51/23
**22nd [2]** 4/10
105/16
**23 [2]** 3/17 140/19
**24 [1]** 81/8
**24th [2]** 136/3
136/13
**2525 [1]** 1/21
**26 [1]** 3/17
**26th [2]** 101/18
105/6
**27th [1]** 148/15
**2800 [1]** 1/17
**28th [1]** 136/7
**2:00 [3]** 118/5
118/8 118/24

**2:06 [1]** 123/14
**2:53 [1]** 123/14
**2:54 [1]** 124/9
**2nd [2]** 1/17
123/23

## 3

**30 [2]** 50/1 50/3
**305 [1]** 148/19
**31 [2]** 12/6 12/8
**33 [2]** 12/6 12/8
**33128 [2]** 1/24
148/18
**33131 [2]** 1/14
1/17
**33134 [1]** 1/22
**34 [1]** 14/2
**35 [2]** 14/2 125/3
**36 [1]** 2/6
**3:24 [1]** 124/9
**3:25 [3]** 124/4
124/13 124/15
**3:43 [1]** 124/15
**3:45 [2]** 125/7
125/11

## 4

**40 [3]** 4/16 18/18
125/4
**400 [2]** 1/24
148/18
**41 [1]** 14/3
**44 [1]** 38/15
**4:32 [1]** 125/11
**4:59 [1]** 144/17

## 5

**50 [2]** 4/15 34/22
**50,000 [5]** 62/14
62/15 62/18 70/6
70/7
**512 [1]** 99/25
**523-5698 [1]**
148/19
**54 [2]** 12/7 12/9

**55 [1]** 63/3
**55002 [1]** 1/4
**56 [1]** 63/10
**5698 [1]** 148/19
**5:02 [1]** 147/1

## 6

**60 [1]** 25/13
**63 [1]** 25/14
**64 [2]** 81/7 81/8
**68 [3]** 2/6 51/12
51/23
**69 [2]** 51/12 51/24
**69.1 [1]** 62/15

## 8

**80 [1]** 18/18
**82 [1]** 2/8
**823 [3]** 108/17
108/24 109/9
**823.2 [3]** 109/21
110/13 110/18
**83 [1]** 33/17
**8th [1]** 35/24

## 9

**91 [5]** 2/16 131/16
132/21 132/23
132/25
**92 [1]** 133/2
**93 [2]** 133/19
134/3
**93-102 [1]** 2/17
**94 [1]** 133/19
**95 [1]** 133/20
**96 [1]** 133/20
**97 [1]** 133/20
**98 [1]** 133/21
**99 [1]** 133/21
**9:18-cv-80176-BB**
**[1]** 1/2
**9:45 [1]** 144/9
**9:58 [2]** 1/6 3/1

**A**

**abilities [3]**
69/16 71/10 71/13

**ability [20]**    45/20
54/18 68/23 69/19
70/13 76/11 91/9
91/11 91/19 91/21
91/23 91/24 92/7
93/9 93/20 102/4
102/6 102/19
106/13 106/16

**able [35]**    5/6 6/19
6/20 16/14 22/24
24/6 28/3 34/5
34/12 35/1 44/15
70/22 75/11 76/5
85/5 93/16 93/24
93/25 99/17 100/6
100/9 100/10
101/13 101/15
103/6 106/18 107/6
117/16 120/12
120/18 120/19
120/23 121/17
133/1 141/14

**about [93]**    3/8 4/8
4/15 5/8 6/10 6/11
8/13 9/9 10/25
11/1 17/23 21/16
21/25 25/6 30/21
36/21 39/13 42/19
45/4 46/13 46/15
47/16 47/17 47/17
49/15 50/20 52/23
54/7 56/4 59/6
60/21 62/12 65/4
65/19 68/23 69/22
70/11 70/21 71/7
74/15 76/11 82/5
82/12 82/19 84/17
84/22 85/20 85/20
86/3 86/18 87/7
88/6 88/8 89/1

90/7 90/13 90/16
92/2 93/3 94/9
95/24 96/2 96/4
96/5 96/7 96/8
96/19 98/20 100/12
100/15 101/16
103/14 108/24
109/7 109/10
110/17 110/19
110/23 111/1 111/4
112/17 115/18
116/5 119/9 119/23
121/20 122/2 124/3
124/4 127/15 132/9
133/11 134/14
142/5 142/17
144/13

**above [1]**    148/9
**above-mentioned [1]**
148/9

**absence [3]**    53/12
129/22 129/23

**absolutely [3]**
5/20 91/6 104/17

**abundance [1]**    4/22

**accepted [4]**    13/5
18/10 84/11 85/4

**access [8]**    7/23
8/2 31/12 93/23
94/23 100/9 100/10
101/13

**accessing [1]**    86/9

**accident [1]**
142/16

**according [3]**
57/21 63/6 63/13

**account [5]**    35/23
36/3 36/23 67/4
67/9

**accounting [6]**
12/1 13/23 15/19
16/1 16/6 16/10

**accurate [5]**    10/20
35/2 35/15 135/14
137/2

**accurately [1]**

**acknowledges [1]**
4/20

**across [2]**    94/10
127/13

**act [1]**    91/23

**action [2]**    7/5 7/8

**actions [5]**    6/20
9/5 107/3 107/8
113/11

**activities [1]**
106/12

**activity [6]**    24/12
24/14 96/11 96/12
96/16 96/17

**actual [8]**    44/6
60/5 88/4 88/17
88/22 97/2 99/21
138/3

**actually [14]**    7/2
8/1 8/17 10/8
10/24 12/22 36/2
72/23 96/23 114/2
134/25 139/5
139/19 141/1

**add [4]**    6/19 87/24
88/10 93/14

**added [16]**    18/11
87/2 87/6 90/7
105/3 105/5 105/7
105/14 105/17
105/19 105/21
106/4 106/8 138/11
138/22 139/13

**adding [7]**    91/23
91/25 93/11 96/22
104/4 105/10 107/5

**addition [3]**    6/18
49/12 68/7

**additional [7]**
4/11 22/7 72/2
72/15 72/16 130/7
133/18

**A**

**address [12]** 3/3
18/5 27/8 33/3
33/9 33/10 34/6
34/17 116/19
144/21 145/7
145/10
**addresses [1]**
34/13
**adds [1]** 72/2
**adjourn [1]** 144/8
**adjourned [1]**
147/1
**adjust [2]** 22/8
22/13
**Administration [2]**
128/10 138/1
**admissibility [1]**
146/4
**admission [3]**
136/3 136/6 142/17
**admit [3]** 56/9
56/14 56/23
**admitted [9]** 2/16
47/15 56/13 108/18
132/23 134/1
137/15 145/18
145/21
**admonishment [2]**
6/18 7/21
**advance [2]** 9/6
145/22
**advanced [1]** 48/9
**advised [1]** 7/11
**Affairs [1]** 131/24
**affect [11]** 91/8
91/19 91/21 91/22
91/24 92/7 93/9
93/20 97/10 103/15
106/13
**affects [1]** 11/6
**affirmative [2]**
44/13 84/23

**after [11]** 14/5
24/23 33/17 96/6
101/18 103/19
105/5 105/8 106/9
128/11 140/6
**afternoon [5]**
81/18 82/3 82/4
125/15 145/15
**again [16]** 7/10
11/3 11/14 19/25
20/24 22/13 26/9
33/12 35/5 44/8
72/7 94/6 101/24
132/12 134/7
139/18
**against [1]** 7/6
**age [1]** 11/3
**ago [4]** 53/21
90/13 112/18 116/4
**agree [3]** 8/9
25/14 56/23
**agreeing [1]** 37/4
**agreement [1]**
146/4
**ahead [4]** 3/6 66/6
118/3 144/23
**algorithms [5]**
13/17 16/24 17/1
17/10 17/11
**alias [1]** 47/10
**align [1]** 13/1
**alignment [1]** 75/2
**alive [1]** 46/9
**AlixPartners [9]**
40/20 40/25 41/20
41/25 42/9 42/13
42/17 43/2 83/2
**all [114]** 3/6 3/10
5/1 5/14 5/17 6/1
8/14 9/4 9/17 9/21
10/20 10/23 11/15
12/17 14/7 14/22
16/2 19/14 19/21
20/9 26/12 26/20

26/23 27/4 27/8
35/21 41/8 45/23
48/20 50/20 53/25
59/7 66/5 66/8
66/13 66/15 68/6
68/8 68/18 69/25
75/13 76/17 76/21
76/24 77/10 77/15
78/8 78/14 78/16
79/21 79/22 80/3
80/18 80/21 81/5
81/15 84/11 87/25
89/13 89/20 89/21
93/12 93/15 94/20
97/11 97/20 99/23
100/14 101/3
104/19 104/23
106/11 106/12
107/12 107/16
108/20 110/21
117/13 118/2 118/3
118/19 118/20
118/22 118/25
119/19 121/9
122/18 122/24
123/2 123/4 123/10
123/13 123/17
124/10 124/21
125/6 125/8 125/14
131/4 131/13
132/23 133/13
133/23 134/1 135/8
135/19 139/12
144/7 144/8 144/20
145/6 146/7 146/13
146/21
**allocation [2]**
113/18 113/19
**allow [14]** 20/4
24/19 25/24 29/25
32/14 35/7 56/11
69/14 108/13 109/5
110/8 111/16 113/4
135/16

USCA11 Case: 22-11150 Document: 14 Date Filed: 11/14/2022 Page: 51 of 254

**A**

**allowing [1]** 31/12

**allows [3]** 90/10
93/14 99/4

**almost [2]** 89/10
129/23

**alone [6]** 7/7
22/15 47/13 48/9
120/23 121/11

**along [3]** 88/18
88/23 92/15

**already [4]** 89/3
89/24 145/18 146/8

**also [41]** 4/14
9/15 16/25 19/7
19/9 19/23 20/17
20/22 21/21 26/11
31/12 42/12 42/21
56/12 72/15 72/16
75/13 76/8 81/23
83/16 84/3 84/19
85/17 86/12 86/19
88/20 89/16 89/19
91/3 91/23 91/24
98/9 102/13 102/15
103/15 129/20
130/1 130/18 143/5
143/10 143/16

**alterations [1]**
97/25

**although [6]** 47/1
60/25 61/24 64/14
65/16 129/18

**always [4]** 31/8
86/1 95/6 95/8

**am [11]** 3/25 11/4
19/22 21/10 41/6
42/14 82/11 83/3
84/3 110/7 127/11

**AMANDA [1]** 1/20

**amend [1]** 139/18

**AMERICA [1]** 148/1

**among [2]** 102/25

129/15

**amongst [1]** 9/14

**amount [8]** 5/3 5/4
23/4 24/24 41/2
41/5 95/4 140/16

**anal [1]** 143/17

**analogy [15]** 86/10
86/25 87/3 88/14
89/4 91/13 93/1
94/5 95/2 99/7
113/17 114/8
114/24 115/6 117/5

**analysis [10]**
40/16 53/18 85/23
96/4 101/16 112/13
112/15 120/1
122/10 122/13

**analyze [1]** 21/20

**analyzed [3]**
111/22 112/20
112/23

**Andreou [10]** 49/13
56/12 56/14 56/15
67/20 68/3 68/6
68/11 76/9 146/15

**ANDRES [1]** 1/19

**ANDREW [1]** 1/16

**andrewbrenner [1]**
9/15

**anecdotal [1]** 68/7

**angst [1]** 8/16

**Ann [4]** 127/24
128/4 128/25
130/12

**announced [1]**
125/21

**another [17]** 14/23
15/10 16/19 21/5
42/22 48/24 49/2
49/7 56/22 77/12
78/21 79/19 112/1
125/3 130/2 133/4
136/9

**answer [4]** 52/22

78/24 79/12 117/10

**answered [3]** 25/1
111/14 141/24

**answers [2]** 52/18
70/22

**antibiotic [1]**
143/8

**anticipate [2]**
3/23 5/24

**anticipating [1]**
5/20

**Antonopoulos [8]**
21/25 22/17 23/6
23/18 24/11 25/15
31/7 45/22

**Antonopoulos' [2]**
30/21 31/17

**any [90]** 4/6 19/16
21/11 21/22 24/12
24/22 24/24 25/3
25/17 34/16 40/7
43/18 47/9 48/8
51/13 59/1 59/3
59/23 60/18 61/1
63/24 68/18 69/18
69/18 70/3 72/10
72/12 72/21 73/10
73/23 74/18 74/19
77/2 78/3 79/22
82/16 83/11 83/19
84/1 84/6 85/11
91/9 92/14 97/25
98/21 100/16
100/16 101/17
103/15 103/16
103/16 105/5
106/23 109/14
110/1 110/17
110/19 110/23
111/12 111/12
111/18 112/8 112/8
115/11 115/14
115/18 116/15
116/15 116/18

USCA11 Case: 22-11150   Document: 14   Date Filed: 11/30/2022   Page: 52 of 254

**A**

**any... [21]**   117/15
117/15 117/20
119/19 121/15
122/23 124/20
127/6 130/7 132/11
132/13 133/12
133/16 133/17
136/14 138/7
138/14 144/14
145/14 146/5
146/10
**anybody [2]**   21/20
122/20
**anymore [2]**   89/14
103/6
**anyone [7]**   40/16
77/1 77/5 121/3
122/23 144/12
144/12
**anything [11]**   3/3
24/6 61/1 61/15
61/22 100/12
115/20 141/21
144/20 145/7
145/10
**anywhere [4]**   18/18
27/3 88/17 88/22
**apart [2]**   139/10
139/22
**apologies [1]**
118/10
**apologize [7]**   3/18
11/14 124/2 124/16
124/19 136/18
145/5
**apparent [1]**   29/15
**apparently [2]**
7/17 7/21
**appear [6]**   12/12
19/14 20/14 56/5
100/13 101/12
**Appearances [1]**

**appeared [1]**
102/17
**appears [9]**   7/19
8/4 21/4 33/13
55/20 73/21 99/22
100/21 104/25
**application [1]**
17/1
**apply [2]**   94/18
120/19
**appreciate [1]**
124/22
**appreciated [1]**
9/17
**appropriate [3]**
8/5 65/23 121/10
**approval [1]**   18/7
**approximately [6]**
4/15 4/16 17/19
71/20 130/22 131/9
**April [12]**   14/5
14/18 14/20 14/23
14/23 22/23 27/21
37/2 64/22 101/18
105/5 123/23
**Arbor [4]**   127/24
128/4 128/25
130/12
**are [154]**
**area [5]**   84/2
87/25 105/12
142/24 143/24
**areas [3]**   83/20
88/1 113/22
**aren't [2]**   54/7
114/2
**Army [1]**   128/5
**around [5]**   17/20
72/1 94/6 94/22
99/9
**arranged [1]**   86/7
**as [151]**
**ascribe [1]**   120/21

**ask [13]**   3/19
20/20 40/16 45/8
46/14 70/11 77/1
77/3 78/18 85/19
95/12 122/19
125/15
**asked [33]**   3/8
6/16 8/23 14/16
40/15 52/17 52/23
56/20 68/22 69/22
71/7 72/7 74/15
82/12 84/17 84/18
84/19 84/21 95/9
96/8 96/9 96/11
96/13 96/14 96/16
96/17 110/19
110/25 111/8
111/14 112/3
120/15 141/24
**asking [3]**   8/21
70/21 115/14
**assert [1]**   120/25
**assess [1]**   54/18
**assessment [2]**
4/25 5/8
**assign [1]**   79/18
**assigning [1]**
97/14
**assigns [1]**   79/7
**assist [1]**   134/24
**associated [6]**
84/20 90/4 108/9
108/23 110/23
129/20
**associating [1]**
130/11
**Association [1]**
83/13
**associations [3]**
83/11 84/4 84/15
**assuming [1]**   76/4
**Atlantic [1]**   128/6
**attached [1]**   50/16
**attack [4]**   12/21

**A**

**attack... [3]**
13/11 13/12 95/1
**attempt [2]**  25/21
85/17
**attempted [2]**
85/13 140/7
**attempting [2]**
13/19 22/10
**attend [1]**  60/23
**attended [1]**  60/18
**attending [1]**
60/25
**attention [3]**  6/8
10/17 11/9
**attorney [3]**  77/24
78/1 78/2
**attorneys [1]**  77/8
**Australian [1]**
6/11
**authentic [4]**  68/7
111/7 111/13
111/19
**author [1]**  38/20
**authorize [1]**  18/8
**automating [1]**
76/1
**available [13]**
60/12 85/7 87/10
88/16 88/20 88/22
89/15 92/23 104/21
113/22 114/17
114/17 122/15
**Avenue [2]**  1/24
148/18
**aware [20]**  41/25
42/6 42/12 49/14
49/18 53/24 55/6
55/8 58/20 59/15
60/2 60/5 61/24
62/5 62/8 62/14
119/10 119/15
119/17 130/7

**away [3]**  92/19
101/8 145/5

**B**

**bachelor [1]**  82/7
**bachelor's [2]**
65/13 65/14
**back [42]**  16/19
20/8 21/16 28/6
35/20 46/13 48/12
52/8 52/9 52/11
55/4 66/10 66/15
73/5 74/2 86/5
87/3 88/13 90/11
90/11 90/19 91/9
91/13 92/9 92/12
98/12 99/7 101/2
101/24 117/1 117/6
117/25 118/4 118/8
118/25 119/2
120/17 125/8 128/4
130/9 140/11 141/6
**background [6]**
45/17 46/5 53/15
82/6 86/3 122/9
**bacteremias [1]**
136/5
**baffled [1]**  8/1
**bald [1]**  6/11
**bank [1]**  32/6
**Bar [1]**  84/4
**based [7]**  5/5
41/16 56/8 99/19
120/19 121/11
122/11
**basic [3]**  65/18
98/12 142/15
**basically [4]**  18/8
99/9 103/8 114/22
**basics [1]**  86/5
**basis [10]**  23/2
29/17 39/7 41/6
46/13 48/12 49/9
54/13 54/16 121/16

**Bates [5]**  49/22
50/12 52/5 54/17
55/18
**Bates-labeled [1]**
49/22
**BB [1]**  1/2
**be [160]**
**be essentially [1]**
30/3
**BEACH [7]**  1/2
58/21 59/3 59/8
63/21 63/22 136/4
**bearing [2]**  143/25
144/2
**because [37]**  4/9
5/18 7/5 7/14 8/17
8/23 10/7 12/20
13/3 13/7 14/4
20/10 21/19 24/22
30/3 33/24 53/10
80/25 87/19 90/10
91/15 92/22 93/6
96/2 96/6 102/7
103/6 106/12
120/18 128/22
129/5 139/18 140/8
142/10 142/18
143/11 145/25
**become [5]**  22/7
23/16 23/21 143/6
144/2
**becomes [2]**  22/11
87/11
**becoming [1]**  69/9
**bedsores [2]**  143/1
143/5
**been [26]**  6/10
9/14 36/5 47/23
60/11 64/22 65/2
65/4 65/9 72/1
82/12 83/3 84/13
103/6 103/18 117/4
117/17 117/19
120/4 120/15

**B**

**been... [6]**  120/16
128/16 128/17
128/20 129/3 129/5
**before [57]**  1/10
3/3 4/7 5/1 6/13
6/14 7/3 7/20 9/5
11/11 16/10 31/9
32/21 34/21 36/21
45/1 46/14 49/6
50/12 52/10 58/11
60/13 60/18 60/24
64/20 65/1 65/13
65/14 66/14 66/22
67/13 68/12 75/17
90/18 92/11 93/4
93/7 95/19 95/20
96/8 96/11 104/6
106/15 106/24
107/3 107/6 112/25
113/7 113/10
115/15 118/24
120/17 125/7
136/16 137/22
143/2 145/21
**began [2]**  45/1
82/21
**begin [1]**  5/15
**behalf [13]**  2/4
37/15 41/21 42/15
78/1 78/2 79/24
80/1 80/5 123/2
144/21 145/7
145/10
**behind [2]**  68/9
120/23
**being [29]**  3/22
8/11 8/11 9/2 9/8
9/12 10/12 10/12
35/25 44/14 57/11
57/12 68/9 68/22
69/22 71/7 74/15
80/18 90/2 105/7

106/8 106/24
117/1 122/3
124/23 127/10
129/20 135/11
143/6
**belief [1]**  7/12
**believe [36]**  3/21
5/11 11/1 17/9
33/13 35/4 37/11
37/19 38/2 41/8
42/11 42/16 45/16
69/15 70/2 70/3
71/21 74/3 74/23
75/13 76/8 76/13
76/20 78/5 100/4
103/22 106/3
106/10 116/4
116/10 133/10
134/12 135/3
135/13 146/7
146/17
**belittling [4]**
8/15 8/20 8/22
10/15
**belonged [1]**  115/8
**belonging [1]**
84/18
**best [4]**  5/22 98/6
122/12 127/17
**BETH [1]**  1/10
**better [2]**  124/20
126/24
**between [15]**  7/5
16/12 36/18 38/4
38/21 39/25 53/2
72/22 73/10 73/18
73/19 82/16 130/8
131/14 136/13
**beyond [2]**  44/17
96/7
**Bill [7]**  64/9
68/23 68/25 69/2
69/5 69/11 69/16
**biology [1]**  98/13

**Biscayne [1]**  1/14
**bitcoin [24]**  8/4 12/2
18/13 20/12 25/6
72/24 72/24 73/2
73/3 74/5 85/19
86/3 86/17 87/11
92/12 93/5 96/7
101/5 102/25 103/4
127/15 132/1 138/4
140/23
**Bitcoin [126]**  7/15
10/11 10/12 11/23
11/24 12/3 13/1
13/6 13/14 13/15
13/24 15/25 16/6
16/7 16/13 16/15
16/18 16/22 17/4
17/7 17/14 17/15
17/18 17/24 17/25
18/1 18/3 18/5
18/8 18/10 18/20
18/21 19/13 19/17
20/10 20/11 21/8
21/9 21/17 21/17
21/23 22/7 22/18
22/20 22/22 22/23
23/4 23/7 24/5
25/4 25/16 27/20
27/22 28/17 28/21
30/22 31/10 31/13
31/14 31/19 31/23
31/23 32/4 32/7
32/9 32/17 32/20
32/22 33/2 33/3
33/8 33/11 34/5
34/12 34/13 34/16
34/23 34/25 35/12
35/16 35/22 36/2
36/23 43/18 43/21
43/24 44/2 44/5
44/6 44/11 44/16
44/21 44/24 45/8
45/11 45/18 45/23
46/4 46/6 46/24

USCA11 Case: 22-11150    Document: 53-4    Date Filed: 11/30/2023    Page: 55 of 254

**B**

**Bitcoin... [26]**
47/3 47/6 47/19
48/3 53/23 54/8
54/9 54/12 64/1
64/2 64/17 68/9
69/3 69/6 79/9
111/22 111/23
112/2 115/11
115/16 115/20
116/3 116/15
116/18 119/11
119/16

**Bitcoins [1]**  17/2
**bladder [4]**  143/10
143/12 143/14
143/15
**block [4]**  13/4
13/4 18/11 34/22
**blockchain [16]**
13/1 17/14 17/18
17/24 17/25 21/23
31/23 32/8 33/2
33/8 34/12 35/12
35/16 53/23 54/9
54/13
**blocker [1]**  98/10
**blocks [1]**  13/9
**bloodstream [1]**
143/16
**BLOOM [1]**  1/10
**blue [2]**  138/4
138/6
**board [4]**  19/4
29/22 95/11 127/13
**body [1]**  142/24
**BOIES [1]**  1/15
**boils [2]**  112/24
113/7
**bolster [1]**  51/4
**bone [1]**  143/7
**bones [3]**  143/23
143/24 144/1

**bony [1]**  142/23
**book [39]**  57/24
75/1 75/3 75/6
75/11 86/14 86/17
86/18 86/20 86/22
87/3 87/7 87/8
87/14 87/14 87/19
87/21 88/14 88/16
88/17 88/21 92/13
92/14 92/16 92/17
92/18 92/18 92/19
92/24 93/2 93/2
93/3 93/4 93/5
93/5 99/8 114/21
114/21 114/23
**books [7]**  74/6
86/12 87/1 89/21
113/24 114/7 114/9
**bookshelf [2]**
105/13 114/2
**both [5]**  32/17
32/23 33/1 73/15
73/16
**Boulevard [1]**  1/21
**box [3]**  26/19 32/5
32/7
**boxes [1]**  76/2
**break [4]**  65/24
66/3 95/6 117/25
**breaks [1]**  124/23
**breakthrough [1]**
16/20
**breakthroughs [1]**
16/15
**BRENNER [5]**  1/16
8/13 8/23 133/16
135/8
**brief [1]**  134/13
**briefly [2]**  55/10
72/7
**bring [5]**  11/9
57/25 58/4 66/13
118/22
**bringing [1]**  11/8

**brittle [1]**  144/2
**broadcast [2]**  143/5
18/9
**broken [1]**  133/10
**brother's [1]**
116/5
**brought [3]**  6/8
10/16 65/17
**brute [1]**  95/1
**build [1]**  71/5
**built [2]**  32/3
71/4
**bunch [1]**  94/11
**business [7]**  3/20
52/21 52/23 52/24
52/25 53/2 53/10

**C**

**C-H-A-M-B-E-R-S [1]**
81/24
**calcium [1]**  144/2
**California [1]**
82/9
**call [21]**  3/1 17/7
26/1 26/5 27/3
28/16 34/19 81/13
86/7 88/2 89/8
92/1 93/6 95/1
97/2 98/9 100/24
105/9 125/4 125/12
143/1
**called [19]**  5/2
16/16 22/9 25/1
32/4 34/24 38/5
42/13 42/21 47/22
60/4 62/9 79/6
90/4 100/2 117/1
140/4 140/9 143/7
**calls [4]**  106/20
106/25 120/7
123/19
**came [7]**  50/12
86/18 92/15 93/3
100/23 143/2

**C**

**came... [1]**  145/17

**can [138]**  6/3
11/10 12/14 15/1
15/8 16/5 16/21
18/16 18/17 18/17
18/23 20/2 20/12
21/3 21/20 21/20
22/20 25/16 26/10
30/6 32/4 32/8
34/20 35/21 38/10
38/11 38/15 39/4
40/22 49/25 50/3
50/12 55/11 55/25
56/14 57/1 57/8
57/25 58/3 58/5
58/14 58/17 59/2
63/2 63/9 66/24
67/16 67/24 67/25
68/14 71/1 72/11
72/16 73/20 73/25
74/9 74/11 77/2
77/12 77/16 78/21
79/2 80/24 80/25
81/22 82/5 82/19
85/12 85/20 86/5
86/12 86/21 86/23
87/9 87/20 87/21
88/23 89/17 91/5
91/19 91/21 91/22
91/24 92/4 92/16
92/20 92/23 92/24
93/1 93/2 93/4
93/5 93/5 94/17
94/18 95/4 96/9
97/12 98/17 99/4
99/5 99/6 99/18
100/23 104/21
104/21 104/22
109/18 110/2 113/5
113/19 113/24
114/16 115/3 115/4
115/12 115/13

116/1 117/6 117/17
117/19 118/9
119/24 120/3
121/22 122/21
123/10 123/21
124/5 126/14 137/8
140/20 141/6
143/14 143/16
143/20 145/21
146/3

**can't [6]**  4/24
16/16 16/17 16/18
47/6 94/8

**Canal [1]**  128/5

**cannot [2]**  92/10
113/20

**capable [3]**  19/12
20/9 40/13

**capacity [1]**  46/2

**card [29]**  41/15
86/12 86/14 86/16
87/7 87/9 87/18
88/3 88/15 88/19
89/4 89/12 89/14
89/19 90/1 90/10
91/1 91/12 91/18
92/21 102/1 102/22
114/11 114/12
114/15 114/20
114/22 115/3 117/4

**care [2]**  142/10
143/3

**career [7]**  82/21
83/6 83/8 83/18
85/8 85/9 85/13

**carried [1]**  142/21

**Carter [1]**  146/15

**carving [5]**  7/18
96/15 117/1 117/1
117/2

**case [42]**  1/2 3/22
3/24 4/7 7/22 7/24
8/16 8/18 8/24 9/5
9/9 37/22 37/24

38/4 38/22 40/8
41/10 42/1 42/12
42/22 43/3 43/9
54/6 68/4 75/23
79/9 82/13 84/17
84/22 87/1 97/10
97/17 101/1 104/8
106/6 106/10 136/9
144/11 144/13

**cases [5]**  37/7
37/16 83/9 83/10
98/8

**catalog [28]**  86/13
86/14 86/16 87/7
87/9 87/18 88/3
88/15 88/19 89/4
89/12 89/14 89/19
90/1 90/10 91/1
91/12 91/18 92/21
102/1 102/23
114/11 114/12
114/15 114/20
114/22 115/3 117/4

**categories [1]**
116/23

**catheter [1]**
143/13

**catheterizations
[2]**  143/12 143/13

**cause [1]**  22/5

**causing [1]**  142/23

**caution [1]**  4/22

**CDC [1]**  125/21

**cellphones [1]**
85/11

**cells [1]**  142/25

**center [4]**  26/6
82/22 128/10 138/1

**central [1]**  11/23

**certain [14]**  17/1
21/12 31/17 34/13
46/7 48/13 70/21
86/11 95/9 95/10

**C**

certain... **[4]**
104/10 104/13
118/15 125/20

certainly **[13]**
19/21 36/9 56/23
76/21 76/25 81/15
99/13 110/7 121/23
125/2 125/14
133/15 144/7

Certificate **[1]**
2/2

certification **[1]**
84/9

certifications **[8]**
53/15 56/8 56/10
73/15 73/16 73/19
73/23 84/6

certified **[2]**  84/8
148/5

certify **[2]**  148/7
148/12

chain **[1]**  122/9

chambers **[25]**  2/7
5/14 42/13 80/17
81/13 81/16 81/21
81/24 82/3 82/15
95/16 107/19
107/21 108/22
109/21 110/12
115/7 119/4 119/8
119/23 122/20
122/23 122/25
123/4 124/18

Chambers' **[1]**
98/18

chance **[2]**  8/13
72/24

change **[4]**  22/6
104/3 106/13
111/21

changed **[4]**  22/3
41/2 60/6 107/5

changes **[3]**  22/5
93/18 93-94 / 10

changing **[3]**  76/2
91/7 101/25

characteristics **[1]**
99/19

characterization
**[2]**  62/8 114/24

characters **[2]**
18/18 18/22

charge **[1]**  42/9

charges **[1]**  42/9

chart **[1]**  140/15

checking **[1]**  76/2

chemistry **[1]**
98/12

cherrypicked **[1]**
7/10

chips **[1]**  25/2

Choi **[1]**  42/21

choose **[1]**  87/8

chosen **[1]**  17/2

chronic **[1]**  143/12

chunk **[2]**  101/4
103/1

circulation **[1]**
142/24

circumstances **[2]**
6/25 31/18

civil **[1]**  83/8

claiming **[1]**  10/10

clarify **[3]**  28/14
28/18 116/13

class **[2]**  16/10
60/9

classes **[4]**  58/23
58/25 59/1 59/3

clean **[2]**  89/22
98/7

clear **[1]**  9/12

clearing **[2]**  91/3
91/4

clearly **[1]**  64/2

client **[2]**  67/10

120/17

client's **[1]**  25/6

clip **[4]**  80/15
80/18 81/7 146/20

clock **[1]**  124/18

close **[1]**  75/22

closest **[1]**  62/6

closing **[1]**  4/7

CLR **[1]**  148/17

co **[2]**  36/8 107/11

co-counsel **[2]**
36/8 107/11

code **[48]**  16/25
17/3 17/8 17/18
17/20 44/6 44/12
44/15 44/25 45/3
45/4 45/4 45/5
45/6 45/9 45/18
45/19 45/21 45/23
46/7 46/19 46/24
47/3 47/7 47/22
47/24 48/3 51/1
51/1 54/12 64/1
64/2 64/17 64/19
64/23 65/12 67/10
69/12 69/19 70/11
70/23 70/25 71/6
71/17 75/4 75/5
76/5 79/7

coded **[7]**  17/16
17/21 17/22 64/9
69/3 69/7 79/5

coder **[4]**  64/15
70/12 75/10 79/17

coders **[9]**  62/14
62/15 62/20 62/23
63/6 63/13 69/25
70/7 70/8

codes **[1]**  70/24

coding **[54]**  17/7
17/14 44/6 44/16
45/1 45/3 46/20
47/2 52/19 53/9
53/12 53/13 53/18

**C**

**coding... [41]**
53/2 53/22 53/25
54/2 54/4 54/7
54/12 54/14 54/25
55/2 59/7 61/12
61/23 62/3 65/5
65/18 68/23 69/2
69/3 69/6 69/6
69/16 69/23 70/9
70/13 71/10 71/13
71/18 72/11 72/12
73/23 74/20 75/14
75/16 77/16 77/16
78/9 79/2 79/2
79/15 79/19
**coin [2]**    31/11
31/16
**coinbase [5]**    34/18
34/20 34/24 35/1
36/22
**colleague [1]**
53/16
**colleagues [2]**
49/13 62/1
**collected [3]**
97/15 108/5 112/16
**collection [1]**
112/14
**collections [3]**
112/12 112/12
112/13
**college [12]**    58/21
59/4 59/8 62/23
63/14 63/21 63/25
64/11 64/13 64/16
64/20 65/7
**Colon [1]**    128/6
**color [1]**    138/2
**comb [1]**    7/21
**combination [3]**
95/3 102/18 102/20
**come [19]**    11/10

22/7 23/24 28/23
31/2 45/23 57/1
57/3 87/14 88/23
94/10 109/14 110/1
110/17 110/19
110/22 117/25
145/18 146/3
**comes [3]**    87/3
88/18 92/16
**comfortable [1]**
125/23
**coming [4]**    48/12
84/25 110/15 111/1
**comment [1]**    9/7
**commercially [1]**
60/12
**common [2]**    34/5
130/23
**communication [2]**
7/23 11/4
**community [5]**    9/16
58/21 59/4 59/8
63/21
**compared [1]**    73/12
**compares [1]**    10/9
**comparing [1]**
10/10
**comparison [3]**
73/18 73/20 140/15
**compensated [1]**
127/10
**compensation [1]**
127/12
**competency [1]**
54/18
**complete [6]**    10/18
10/18 18/12 65/23
129/14 148/10
**completed [1]**
79/12
**completely [4]**
27/16 62/21 63/6
89/22
**complex [2]**    69/9

75/22
**Complicated [1]**
64/7
**complications [2]**
142/21 142/22
**components [5]**
12/22 17/13 26/21
26/24 29/11
**compress [1]**    18/17
**compute [1]**    22/12
**computer [44]**
11/25 18/24 22/15
25/2 26/6 29/23
49/10 49/15 51/2
51/6 53/2 53/3
54/10 54/20 58/20
59/7 59/16 59/24
60/2 60/23 62/7
62/24 63/14 63/17
63/20 65/17 65/20
69/8 75/10 75/16
82/7 82/8 84/7
85/10 85/18 90/17
93/14 93/16 96/6
101/3 104/18
104/18 104/24
113/19
**computers [3]**    30/7
65/20 90/13
**computing [1]**    13/8
**concept [3]**    15/25
16/23 90/4
**concepts [3]**    11/23
11/24 65/17
**concern [1]**    5/16
**conclude [2]**
108/24 109/7
**concluded [1]**
123/15
**conclusion [11]**
5/15 49/9 53/17
60/21 104/10
109/10 109/14
111/1 121/13

**C**

USCA11 Case: 22-11150   Document: 83-14   Date Filed: 11/30/2022   Page: 59 of 254

**conclusion... [2]**
121/17 121/20
**conclusions [9]**
84/25 85/5 97/10
109/16 110/1
110/16 110/17
110/19 110/23
**condition [5]**
142/3 142/5 142/15
142/21 143/23
**conditions [1]**
142/14
**conduct [2]** 120/21
144/14
**conducted [2]**
83/23 84/1
**conducts [1]** 83/24
**confer [2]** 36/8
61/1
**conference [1]**
127/14
**conferences [2]**
84/5 84/15
**configuration [2]**
75/24 76/3
**configure [2]** 27/2
27/6
**Connecticut [1]**
127/20
**connection [2]**
43/9 132/17
**Conrad [1]** 146/15
**consider [6]** 20/17
20/22 21/4 80/22
111/23 122/8
**considered [2]**
18/11 141/19
**considering [1]**
45/1
**consistent [5]**
44/14 45/17 46/20
47/1 104/11

**consistently [1]**
26/18
**consists [1]**
129/16
**construct [2]** 18/2
32/21
**consult [1]** 107/10
**consultant [1]**
82/25
**consultations [1]**
133/7
**consulting [2]**
82/25 83/9
**contact [2]** 140/6
140/7
**contain [1]** 54/14
**contained [2]**
135/14 137/2
**container [4]**
98/23 99/5 99/24
100/5
**contains [3]** 12/9
97/4 148/12
**contamination [1]**
143/21
**content [7]** 94/2
97/4 99/21 104/21
106/18 107/3
122/14
**contents [9]** 39/9
91/7 93/18 93/24
96/18 101/13
101/25 106/13
107/5
**context [7]** 7/1
7/2 7/11 37/23
74/25 120/11 131/1
**continue [10]**
12/17 16/2 21/5
25/19 66/10 66/17
73/1 119/3 125/10
128/11
**continued [3]** 2/5
11/18 106/4

**continuing [2]**
26/11 89/12
**continuously [2]**
139/11 139/22
**continuum [1]**
75/15
**contribute [1]**
45/3
**contributed [4]**
44/5 44/11 63/25
64/17
**contributions [1]**
44/16
**control [13]** 5/21
31/8 31/10 31/13
31/14 31/15 31/22
32/25 93/14 143/10
143/17 143/20
146/9
**controls [1]** 20/11
**conversation [2]**
6/2 8/12
**cooling [4]** 26/16
26/19 26/20 28/22
**coordinate [2]**
26/11 27/7
**copies [4]** 96/3
97/7 97/23 100/14
**copy [13]** 15/6
15/7 15/12 48/15
49/18 49/19 55/5
55/6 68/11 97/13
97/18 97/19 100/8
**copying [1]** 88/5
**Coral [1]** 1/22
**correct [93]** 3/25
31/20 32/15 36/24
37/5 37/6 37/24
39/17 40/3 40/8
40/9 40/11 40/12
40/20 40/21 41/1
42/10 43/3 43/15
43/16 43/18 43/19
43/21 43/22 43/24

**C**

**correct... [68]**
43/25 44/2 44/6
44/12 44/18 44/19
44/25 45/11 45/14
45/15 45/19 46/18
46/22 46/23 47/5
47/7 47/11 47/13
47/18 47/22 48/4
48/10 48/11 48/22
49/16 51/3 53/10
53/25 54/2 54/4
54/5 54/21 55/2
58/13 59/4 59/5
59/19 61/3 61/4
62/4 62/16 63/23
64/1 64/10 64/17
64/25 65/2 65/3
65/5 65/6 65/16
72/8 81/3 81/4
98/3 99/1 100/7
105/9 106/3 116/10
126/8 126/18 127/9
133/6 134/18
138/19 139/2
148/10
**correctly [2]**
58/22 59/25
**corresponds [1]**
137/4
**corroborating [1]**
120/24
**corruption [1]**
20/13
**could [78]**   10/1
11/19 12/2 12/25
13/13 13/23 18/13
18/22 19/1 19/9
20/5 20/7 20/19
21/1 21/22 22/17
23/4 23/7 25/6
28/6 28/10 28/14
28/16 30/11 31/22

35/22 36/1 36/7
39/11 43/5 44/14
45/17 51/25 52/8
61/19 62/3 63/25
64/16 69/4 69/11
70/20 72/14 72/18
72/19 73/6 73/8
74/5 75/14 75/19
76/15 76/19 80/12
85/7 94/14 98/9
99/7 99/8 108/15
124/1 124/8 127/15
129/11 131/15
131/25 133/13
134/5 135/21
135/25 136/17
137/11 137/17
138/8 140/10
140/11 140/22
141/18 142/13
143/11
**couldn't [2]**   33/5
75/7
**counsel [19]**   9/6
9/7 9/24 10/16
10/22 36/8 38/10
40/15 50/1 50/11
51/8 55/12 96/4
107/11 112/21
131/16 134/7 135/5
146/24
**country [1]**   127/18
**couple [3]**   89/5
89/17 99/19
**course [7]**   59/11
60/2 60/18 60/23
60/25 137/10
143/20
**courses [5]**   59/20
59/22 59/23 60/1
63/19
**coursework [3]**
62/24 63/14 63/18
**court [40]**   1/1

1/23 1/23 3/1 3/11
6/9 8/11 8/18 8/22
9/4 10/17 15/8
20/7 21/24 49/15
49/20 50/22 52/25
53/3 54/7 55/5
67/6 77/4 77/25
80/11 81/2 101/9
119/5 133/16 134/8
135/15 144/6
145/20 146/9 148/6
148/9
**Court's [2]**   3/12
11/9
**courtroom [4]**
39/13 67/2 127/14
144/13
**courts [1]**   84/11
**CRAIG [13]**   1/7
10/12 36/18 43/15
43/20 43/23 45/10
45/13 68/8 80/15
81/13 82/17 119/11
**create [5]**   18/1
18/4 18/6 34/22
88/8
**created [4]**   8/16
34/23 45/14 97/21
**creates [2]**   13/6
16/13
**creating [1]**   44/16
**creation [2]**   44/5
45/7
**credentials [1]**
7/25
**credit [1]**   47/6
**Crime [1]**   83/12
**criminal [1]**   83/9
**cross [16]**   2/6 2/8
5/5 5/20 5/23 6/20
8/5 10/25 36/12
36/13 65/23 66/17
74/18 107/16

USCA11 Case: 22-11150    Document: 33-84    Date Filed: 11/30/2022    Page: 61 of 254

**C**

**cross... [2]**
107/17 119/3
**cross-examination**
**[12]**  2/6 2/8 5/23
8/5 10/25 36/12
36/13 65/23 66/17
107/16 107/17
119/3
**cross-examine [1]**
6/20
**crosses [1]**  5/5
**CRR [1]**  148/17
**crypto [2]**  9/16
10/9
**cryptocurrencies**
**[1]**  111/24
**cryptocurrency [1]**
116/2
**cryptographic [6]**
13/20 16/24 17/13
108/25 109/7
110/21
**cryptography [3]**
17/4 17/6 17/11
**CSR [1]**  148/17
**cures [1]**  146/5
**currently [3]**  83/2
92/18 115/12
**curriculum [2]**
60/3 60/6
**custody [1]**  122/9
**cv [2]**  1/2 56/22
**cybersecurity [1]**
83/4
**cyberware [1]**  8/10

**D**

**D425 [3]**  19/2
19/10 95/12
**damage [1]**  20/13
**damaged [1]**  103/7
**damaging [1]**  103/4
**data [97]**  18/21

20/11 85/12 85/17
85/23 86/1 86/5
86/7 86/9 88/4
88/5 88/10 88/12
88/13 88/22 89/13
90/23 91/2 91/4
91/9 91/11 91/20
91/22 91/23 91/24
91/24 91/25 92/1
92/1 92/5 92/7
92/20 93/6 93/9
93/20 93/23 93/24
94/1 94/2 94/3
94/25 96/13 96/14
96/22 96/22 97/16
98/8 98/10 99/4
99/22 99/22 101/1
101/5 101/11 102/2
102/5 102/6 102/9
102/19 103/15
104/19 104/22
104/22 105/3 105/5
105/7 105/10
105/10 105/14
105/17 105/19
105/21 106/4 106/8
106/14 106/16
106/23 107/5 109/4
112/8 112/11
112/12 112/13
112/14 113/13
116/21 116/23
116/23 116/25
117/2 117/11
117/11 117/11
117/13 117/16
117/19 120/2
**data did [1]**
116/23
**date [8]**  35/22
36/1 80/24 105/14
109/14 123/10
123/21 136/3
**dated [2]**  14/18

136/2
136/17 136/23
134/13
**Dave [80]**  14/12
14/13 36/18 37/1
43/14 43/17 43/20
43/23 44/4 44/10
44/13 44/20 44/23
45/2 45/7 45/10
45/13 45/17 46/5
46/9 46/11 46/14
48/3 48/24 49/2
49/14 49/18 49/19
50/21 51/1 52/20
54/11 55/4 55/5
55/6 57/21 58/3
58/20 59/6 59/15
60/18 60/22 61/5
61/11 61/23 62/5
62/6 62/24 63/14
63/17 67/11 68/8
68/8 72/5 72/11
96/11 101/20
103/19 112/2 112/5
112/5 112/25 113/7
115/8 115/10
115/14 115/22
119/9 131/7 132/11
132/14 136/13
137/3 138/14
138/25 139/10
139/16 139/22
142/2 142/14
**Dave's [5]**  48/15
69/18 76/11 105/8
143/23
**David [5]**  1/4 48/8
82/16 84/19 127/8
**day [23]**  1/9 4/4
16/7 18/16 138/15
139/1 139/3 139/10
139/16 140/3 140/4
140/5 140/23 141/6
141/7 141/8 141/8

**dates [2]**  35/24

**D**

**day... [6]**   141/10
141/10 141/12
146/18 148/9
148/15
**days [11]**   4/11
15/10 137/25 138/3
139/6 139/7 139/7
139/19 140/17
140/18 140/19
**de [1]**   1/21
**deadline [1]**   3/9
**dealing [1]**   89/18
**death [5]**   96/12
101/20 103/19
105/8 142/24
**decedent [1]**   84/19
**December [1]**   139/8
**decided [1]**   92/13
**decision [1]**   126/2
**decrease [1]**
129/18
**decubitus [1]**
143/1
**dedicate [1]**   13/8
**dedicated [1]**
22/12
**deeper [1]**   51/6
**defecation [1]**
143/18
**Defendant [11]**   1/8
1/18 2/4 3/14 3/14
4/6 78/2 79/24
108/5 123/19
145/11
**Defendant's [29]**
2/16 2/17 2/17
2/18 80/9 123/7
123/18 131/16
132/21 132/25
133/2 133/9 133/19
133/19 133/19
133/20 133/20

133/21 133/21
133/21 133/22
133/22 134/3
134/20 135/17
135/20 137/7
137/16 137/18
**Defense [5]**   1/4
81/21 82/22 118/11
125/18
**define [2]**   43/11
121/3
**defrag [1]**   90/17
**defragment [1]**
90/14
**degree [5]**   63/25
64/13 64/16 65/13
65/15
**delay [1]**   11/14
**delete [4]**   100/14
115/2 115/22 116/9
**deleted [16]**   85/25
88/12 88/13 88/21
88/21 92/13 92/18
92/18 96/15 104/21
105/3 113/16
113/17 113/18
115/11 117/11
**deleting [1]**
115/25
**deletion [8]**   114/1
114/16 114/21
115/11 115/15
115/16 116/9
116/12
**demonstrate [1]**
54/17
**demonstrative [14]**
22/14 39/5 98/18
99/12 134/22 135/6
135/12 137/18
137/21 138/12
138/23 139/14
140/11 140/13
**demonstratives [2]**

95/10 95/14
**denied [1]**   56/24
**Department [2]**
82/22 131/23
**depending [4]**
18/15 29/11 71/1
89/18
**depends [3]**   40/15
90/25 141/11
**deposit [2]**   32/5
32/7
**deposition [25]**
2/10 2/12 6/12
7/24 47/15 49/12
51/11 51/16 51/25
52/14 52/15 52/17
62/2 62/12 63/3
63/10 67/19 80/18
80/24 81/1 81/7
123/9 123/11
123/20 123/22
**derivative [1]**
72/2
**describe [5]**   28/10
86/10 92/12 121/10
142/13
**described [7]**
28/16 62/6 62/16
91/1 98/3 104/2
107/4
**describing [2]**
98/15 103/10
**description [3]**
12/9 12/14 140/25
**designing [1]**
44/24
**desktop [3]**   29/22
30/2 115/2
**detect [6]**   98/21
99/17 99/18 100/15
100/19 101/15
**detected [1]**
100/17
**determination [2]**

# D

**determination...**
**[2]** 46/21 120/18
**determine [8]** 35/2
91/16 100/20 107/2
115/13 120/3
120/12 120/16
**determined [3]**
35/3 88/14 92/17
**develop [3]** 69/21
71/6 71/16
**developed [1]** 17/8
**developer [3]**
17/16 17/17 64/2
**developing [1]**
76/14
**development [5]**
48/2 53/16 62/1
71/2 82/24
**device [41]** 20/15
21/12 26/10 27/2
85/25 86/6 86/7
86/9 87/1 87/2
88/10 88/25 89/2
89/23 89/24 90/23
90/24 91/8 91/10
91/20 92/8 93/9
93/21 94/23 95/7
97/5 97/10 97/12
97/15 100/18
101/25 102/1 102/7
102/9 102/13
102/15 102/17
102/19 104/4 106/4
120/4
**devices [71]** 19/4
19/7 19/12 20/18
30/3 84/18 85/8
85/13 85/15 90/15
95/10 95/16 95/19
95/20 95/21 96/3
96/9 96/13 96/14
96/14 96/23 97/2

97/7 98/5 98/7
98/11 99/3 100/6
101/19 101/21
101/22 101/23
102/5 102/10
103/17 103/19
103/20 103/21
104/1 104/10
104/13 105/3 105/5
105/7 105/8 105/15
105/17 105/21
106/4 106/9 106/19
106/23 112/17
112/20 112/23
113/1 113/8 113/10
115/7 116/6 116/9
116/16 116/19
116/25 117/3
117/12 117/14
117/15 119/10
119/11 119/16
**DEVIN [1]** 1/13
**devote [1]** 6/3
**did [80]** 3/14 22/2
23/15 23/24 30/21
38/20 40/16 45/10
46/10 49/6 49/10
49/21 58/24 59/1
59/10 59/20 59/23
60/22 60/23 62/13
64/21 67/23 71/21
76/11 76/11 85/1
96/2 96/23 97/1
97/17 97/25 98/2
98/4 98/5 98/15
98/21 99/23 100/15
100/19 100/24
101/16 101/16
102/4 103/5 103/15
103/18 108/24
109/7 109/10
109/13 109/14
116/7 116/9 116/15
116/17 116/23

117/15 117/22
117/23 118/11
121/13 121/14
121/15 122/2
122/11 122/14
124/16 124/19
126/2 128/11
128/13 132/10
135/4 136/15 138/7
138/25 139/4
139/16 140/6
**didn't [30]** 5/24
24/12 38/22 44/20
44/23 46/9 46/11
48/25 55/7 55/10
58/23 59/3 60/1
61/3 61/21 63/19
63/24 64/20 65/7
80/10 92/14 96/1
108/9 110/1 110/17
110/22 111/3 112/8
116/18 117/13
**died [3]** 37/1
112/25 113/8
**differ [1]** 29/22
**difference [2]**
129/18 130/2
**differences [5]**
72/21 73/10 129/10
129/11 130/7
**different [30]**
11/25 12/25 21/9
26/11 26/21 26/23
27/5 27/7 35/21
49/5 54/3 55/20
55/21 65/17 69/8
71/15 73/18 75/16
84/15 86/2 87/17
88/1 89/5 89/6
90/8 90/11 94/15
94/16 94/18 133/14
**differs [1]** 41/16
**difficult [5]**
22/11 79/18 92/25

**D**

**difficult... [2]**
99/18 117/7

**difficulty [8]**
21/25 22/3 22/5
22/9 22/13 24/22
25/7 25/17

**digital [30]**   19/14
82/8 82/11 82/13
83/1 83/4 83/9
83/15 83/19 83/21
83/21 83/22 84/3
84/6 84/12 84/13
85/21 85/22 85/24
97/14 119/24
119/25 120/1 120/3
120/11 120/12
120/18 120/19
120/21 120/23

**diligence [1]**   6/24

**direct [14]**   2/5
2/8 2/13 5/4 5/23
11/18 39/8 82/1
108/1 108/12 109/2
110/4 111/4 126/5

**directly [3]**   23/18
44/3 126/21

**directs [1]**   5/5

**disappoint [1]**
4/24

**discharge [1]**
140/9

**discharged [2]**
136/14 136/15

**disclosed [4]**   4/6
25/10 35/6 49/1

**discontinued [1]**
99/3

**discovery [1]**   42/1

**discuss [2]**   111/21
144/11

**discussed [2]**   53/9
55/4

**discussion [1]**
78/15

**discussions [2]**
44/24 68/8

**disease [3]**   127/5
128/8 128/21

**disk [2]**   18/25
102/24

**disorganized [1]**
90/21

**disparate [1]**
60/25

**display [1]**   146/1

**displayed [1]**
135/11

**displaying [1]**
51/5

**dispute [4]**   7/3
7/4 7/12 7/14

**distinction [1]**
53/2

**distributed [3]**
16/8 16/13 21/19

**DISTRICT [7]**   1/1
1/1 1/10 1/23
148/3 148/6 148/7

**dives [2]**   100/16
100/17

**divisible [1]**
99/25

**DIVISION [1]**   1/2

**do [136]**   4/5 4/5
4/6 4/10 4/21 5/11
5/13 6/24 8/1 8/17
8/17 15/12 15/14
19/4 19/6 19/7
19/8 22/14 22/16
22/17 24/11 24/13
25/21 26/3 26/7
26/24 30/9 30/14
31/6 31/17 32/19
34/3 34/16 38/7
38/18 38/24 39/1
42/11 43/7 43/10

49/23 52/14 55/18
60/10 61/11 66/1
67/11 67/19 67/21
67/23 68/4 68/9
68/22 68/25 69/11
69/22 69/25 70/3
70/8 70/17 70/17
71/7 71/18 72/15
73/16 73/17 73/20
74/15 74/24 75/4
75/10 76/4 76/12
77/2 81/2 82/10
82/10 86/4 90/23
90/25 91/2 93/15
93/16 94/24 95/5
95/16 95/18 96/8
96/10 98/5 100/10
100/14 100/23
101/21 104/13
104/15 104/18
105/2 105/4 107/19
111/12 111/18
111/23 115/14
116/8 118/13
122/21 130/24
131/1 131/9 131/19
131/21 131/22
132/5 132/19 133/4
134/10 134/11
134/12 136/21
136/22 136/23
137/21 137/22
138/14 140/24
142/2 142/4 142/5
146/17 146/19
146/23 148/7

**doctor [2]**   128/12
128/17

**document [23]**
18/23 50/15 56/13
57/10 72/15 72/16
74/19 88/8 94/4
94/11 109/24

**D**

**document... [12]**
109/25 111/7 120/4
120/13 120/16
121/11 122/9
131/19 132/5 132/6
134/10 136/21

**documents [19]**
39/2 40/2 40/7
46/7 48/13 48/20
68/6 101/16 101/17
108/5 110/6 111/13
111/19 121/15
121/18 122/12
122/13 122/15
146/4

**does [56]**   17/4
17/5 17/6 17/12
17/14 17/15 17/24
23/21 29/5 29/21
29/23 31/19 32/18
38/19 42/18 50/5
50/7 50/20 53/24
56/25 57/3 63/5
63/12 71/10 71/24
72/11 75/4 76/5
77/1 78/8 79/15
88/25 89/11 89/19
89/23 90/23 91/6
92/7 93/8 93/20
97/9 101/11 101/12
101/23 102/18
103/25 106/11
106/16 120/21
122/20 122/23
134/15 137/23
138/2 138/17
140/13

**doesn't [15]**   7/19
33/24 54/2 54/4
54/14 60/25 88/17
88/22 89/14 89/14
92/22 100/22

130/14 145/20
146/19

**doing [4]**   9/1
40/13 89/25 122/10

**Don [1]**   123/20

**don't [52]**   5/2
5/10 8/25 10/4
10/25 12/12 13/17
13/22 15/6 15/7
15/18 16/9 31/15
33/13 33/21 37/21
46/17 47/3 47/12
47/15 48/24 49/2
49/8 50/17 50/18
51/14 51/15 52/5
54/14 59/6 60/10
60/11 60/17 62/22
63/1 67/5 67/15
70/2 79/9 94/7
100/23 102/8 116/1
116/10 117/7
121/23 124/4
130/23 135/3
135/10 145/14
145/19

**DONALD [1]**   2/11

**done [10]**   5/7
16/15 36/11 37/7
37/23 76/20 77/17
79/3 125/5 130/22

**door [2]**   94/6 95/2

**Dorian [2]**   108/15
109/18

**DOs [1]**   130/18

**double [1]**   16/17

**double-spend [1]**
16/17

**down [21]**   27/10
40/22 67/17 68/5
68/15 72/18 72/23
73/25 74/9 77/3
112/24 113/7
122/22 131/25
133/11 137/11

140/10 140/20
143/25

**download [1]**   21/20

**DR [29]**   2/13 6/11
6/20 7/13 7/16
8/15 9/9 10/10
37/7 37/15 37/21
37/23 38/20 40/1
41/21 42/15 42/21
43/2 43/8 43/17
44/24 47/10 47/12
48/17 48/21 67/2
119/13 121/1
125/18

**Dr. [57]**   6/10 8/7
39/13 42/2 48/25
67/10 80/15 81/13
82/17 84/20 107/21
107/23 108/4 108/8
108/14 108/16
108/23 109/8
109/15 110/14
111/2 111/4 112/2
112/5 121/8 121/9
121/13 122/2 122/4
125/13 126/7
126/14 126/17
126/20 126/21
127/3 128/11 130/7
131/19 132/5
132/10 133/4
134/10 134/24
135/25 136/21
137/21 138/11
138/22 139/13
140/13 140/22
143/23 144/18
144/24 145/1
146/14

**Dr. Craig [3]**
80/15 81/13 82/17

**Dr. Edman [8]**   6/10
39/13 107/21

**D**

**Dr. Edman... [5]**
107/23  108/4  108/8
108/23  109/8
**Dr. Edman's [12]**
84/20  108/14
108/16  109/15
110/14  111/2  111/4
121/8  121/9  121/13
122/2  122/4
**Dr. MacIntyre [28]**
125/13  126/7
126/14  126/17
126/20  126/21
127/3  128/11  130/7
131/19  132/5
132/10  133/4
134/10  134/24
135/25  136/21
137/21  138/11
138/22  139/13
140/13  140/22
143/23  144/18
144/24  145/1
146/14
**Dr. Wright [5]**  8/7
42/2  67/10  112/2
112/5
**Dr. Wright's [1]**
48/25
**drafted [1]**  38/8
**drafting [2]**  69/20
72/17
**dramatically [2]**
69/9  71/3
**drawn [1]**  95/13
**drive [37]**  28/6
86/25  87/24  88/5
89/2  89/6  89/9
89/18  90/3  90/8
91/2  91/4  91/7
91/16  91/24  91/25
92/1  92/20  93/11

93/19  97/5  99/6
102/1  102/20
102/22  103/1  103/1
103/3  104/5  104/23
104/24  105/10
105/10  105/12
105/12  106/13
116/1
**drives [19]**  85/11
85/11  95/22  95/24
96/1  96/2  96/18
98/22  98/24  100/15
105/19  106/14
106/15  107/6
111/21  112/9
113/10  113/12
115/12
**dropout [1]**  64/11
**dropped [4]**  68/25
69/2  69/5  85/18
**drown [1]**  74/7
**due [2]**  6/24  107/3
**DUGALD [3]**  2/13
125/18  126/16
**during [19]**  8/5
24/23  41/14  83/18
85/13  97/1  111/3
122/12  129/2  132/7
136/25  137/4  138/1
138/6  138/16
140/16  141/7  142/6
144/4
**dynamically [2]**
22/8  22/13

**E**

**each [17]**  5/25
11/13  26/5  26/9
27/2  27/2  30/7
32/18  32/24  32/25
47/6  50/8  78/18
90/20  91/15  100/14
105/19
**earlier [3]**  90/7

113/17  145/13
earliest [1]
105/16
**early [1]**  118/10
**earned [2]**  84/6
84/8
**easily [1]**  144/3
**East [1]**  127/18
**easy [1]**  4/21
**ECF [1]**  15/1
**edit [1]**  44/21
**editor [8]**  57/22
58/7  58/18  71/5
74/16  74/24  75/5
75/11
**Edman [8]**  6/10
39/13  107/21
107/23  108/4  108/8
108/23  109/8
**Edman's [13]**  84/20
108/14  108/16
109/15  110/14
111/2  111/4  121/1
121/8  121/9  121/13
122/2  122/4
**education [4]**  64/4
65/16  65/19  83/14
**educational [2]**
82/5  127/15
**effect [1]**  11/5
**efficient [2]**  8/18
23/11
**effort [2]**  7/21
9/16
**efforts [1]**  9/17
**either [12]**  11/5
30/5  54/15  65/23
72/10  77/12  78/21
89/25  90/1  99/4
141/6  143/12
**elaborate [1]**  12/2
**Elan [1]**  10/10
**electricity [1]**
13/10

USCA11 Case: 22-11150    Document: 53-14    Date Filed: 11/30/2022    Page: 67 of 254

**E**

**electronic [8]**
11/3 18/24 42/1
85/10 85/12 85/16
85/23 120/2
**else [12]** 16/19
24/6 31/12 77/5
88/18 88/23 92/15
96/24 114/2 114/18
115/5 119/15
**eluding [1]** 90/6
**email [3]** 50/23
68/3 68/11
**embedded [1]** 17/3
**employed [2]** 40/20
41/20
**employer [1]** 43/8
**employment [1]**
82/19
**empty [3]** 104/14
105/1 143/14
**enabled [1]** 35/11
**EnCase [2]** 84/8
84/10
**EnCE [1]** 84/8
**encode [1]** 18/17
**encrypt [8]** 92/6
94/5 99/4 99/5
99/5 99/6 99/8
99/8
**encrypted [15]**
92/6 93/24 94/2
94/21 94/25 96/13
99/20 100/21 101/1
101/11 101/12
102/13 102/16
102/17 102/20
**encryption [26]**
91/21 92/2 92/3
92/4 93/20 93/22
94/10 94/15 94/16
94/17 94/18 94/22
95/6 98/21 99/17

100/16 100/17
100/19 100/20
100/22 101/13
101/15 102/18
102/24 103/1 103/5
**end [13]** 3/20 4/4
16/7 18/15 35/25
75/19 75/21 78/15
91/15 94/10 128/6
128/7 144/6
**ending [1]** 129/25
**enforcement [1]**
83/16
**engineering [1]**
82/7
**enrolled [2]** 58/24
59/23
**ensure [3]** 98/3
98/7 98/10
**ensures [1]** 13/17
**entered [1]** 128/15
**entire [11]** 12/12
71/4 97/4 99/9
99/10 102/16
128/22 129/6
138/17 138/19
142/6
**entirely [3]** 40/15
61/5 126/2
**entirety [1]** 97/4
**entries [1]** 86/16
**entry [5]** 86/14
87/6 136/2 136/7
136/11
**environment [1]**
98/7
**environments [1]**
71/3
**equipment [3]**
13/10 24/25 141/18
**equivalent [2]**
113/24 115/2
**error [1]** 3/18
**escape [1]** 143/16

**ESQ [9]** 1/13 1/13
1/16 1/16 1/19
1/19 1/20 1/20
1/21
**essentially [58]**
12/20 13/2 13/4
13/7 13/8 13/11
13/16 13/17 13/18
16/11 16/13 16/23
17/1 17/12 18/1
18/2 18/5 18/7
18/19 22/9 23/25
23/25 24/25 25/2
26/3 26/6 26/13
27/8 30/3 30/7
31/7 31/10 34/5
34/25 44/13 71/2
71/5 71/6 72/1
72/4 74/25 76/1
88/15 89/3 90/18
90/21 92/4 93/14
94/6 95/2 95/3
97/3 97/14 101/11
102/21 103/4 117/2
117/5
**established [1]**
47/24
**estate [2]** 1/4
112/6
**even [15]** 10/20
47/9 47/12 48/9
51/6 65/14 69/20
75/24 76/14 78/9
79/16 101/7 101/7
103/5 104/24
**evening [6]** 8/12
144/9 144/15
144/21 146/23
146/25
**events [1]** 136/1
**eventual [1]**
142/25
**ever [9]** 21/23
36/2 46/11 84/13

**E**

USCA11 Case: 22-11150    Document: 83-34    Date Filed: 11/30/2022    Page: 68 of 254

**ever... [5]** 106/18
120/15 121/3
128/16 128/24

**every [5]** 27/2
86/14 95/3 100/13
106/3

**everybody [3]**
13/19 13/21 124/22

**everyone [3]** 3/2
11/13 18/9

**everything [4]**
27/1 89/12 90/19
144/12

**evidence [36]**
16/25 56/1 56/11
56/24 57/4 66/21
66/25 67/13 67/25
68/4 73/6 74/3
74/4 74/10 85/6
108/20 115/10
115/14 117/20
117/22 120/20
120/24 132/21
132/24 132/25
133/9 133/24 134/2
134/4 134/20
134/22 135/11
135/16 135/20
137/15 137/16

**evolved [2]** 69/9
71/3

**EX [1]** 2/16

**exact [6]** 96/3
97/7 97/13 97/18
97/19 97/22

**exactly [8]** 7/1
38/25 85/20 87/12
87/19 96/21 100/23
117/8

**examination [28]**
2/5 2/6 2/6 2/8
2/8 2/9 2/13 5/23

8/5 10/25 11/18
26/18 33/1 33/9
65/23 66/17 68/20
82/1 83/21 97/1
102/7 107/16
107/17 111/4
115/13 119/3
119/21 126/5

**examinations [1]**
84/12

**examine [7]** 5/4
6/20 84/18 95/9
98/5 106/14 117/16

**examined [2]** 85/8
85/9

**examiner [3]** 82/11
84/8 104/20

**examining [2]**
85/16 98/11

**example [12]** 18/25
26/14 27/11 31/18
32/6 34/6 44/20
79/7 92/13 94/14
96/19 101/24

**exceeded [1]** 3/15

**exceeding [1]**
110/3

**exceeds [3]** 108/1
108/11 109/1

**except [1]** 10/17

**exception [1]**
141/6

**excuse [2]** 94/17
132/12

**excused [7]** 80/3
80/7 80/8 122/25
123/1 123/5 123/6

**exhibit [53]** 6/19
15/2 19/2 19/10
38/11 38/12 38/13
108/17 108/24
109/9 109/21
110/13 110/18
131/16 132/21

132/23 132/25
133/12 133/17 134/14
133/19 133/19
133/20 133/20
133/20 133/21
133/21 133/22
133/22 133/22
134/3 134/20
134/23 135/1 135/2
135/4 135/6 135/7
135/14 135/15
135/20 135/21
136/1 137/7 137/16
137/18 137/21
138/12 138/23
139/14 140/13
145/21 146/1

**exhibits [9]**
107/24 110/23
133/11 133/17
133/18 135/4
145/18 145/22
145/24

**existed [2]** 35/16
36/21

**existence [1]**
34/25

**exists [1]** 32/7

**expect [4]** 27/13
75/2 93/15 94/4

**expected [2]** 141/5
141/6

**experience [9]**
45/20 48/4 50/24
71/14 82/20 99/19
120/12 120/15
128/25

**experienced [1]**
70/12

**experiences [1]**
44/14

**expert [32]** 12/5
14/1 14/22 19/19
21/8 23/3 24/2

**E**

**expert... [25]**
24/8 24/17 25/10
25/11 25/17 27/17
29/24 42/12 42/22
43/11 46/2 49/14
51/4 53/2 53/4
53/22 54/6 54/11
72/17 111/22
111/23 111/24
126/7 126/17
127/10
**expertise [4]** 61/1
83/10 85/20 127/3
**experts [1]** 41/12
**explain [14]** 11/22
12/25 13/13 13/23
16/5 16/21 18/13
25/6 33/21 34/20
75/14 86/23 135/25
140/22
**explanation [2]**
8/6 53/11
**extended [10]**
138/15 139/1 139/3
139/10 139/16
141/14 141/22
142/9 142/12 143/8
**extension [1]**
140/4
**extensive [1]**
142/10
**extent [4]** 46/4
53/23 125/22 146/3

**F**

**facing [1]** 52/20
**fact [22]** 7/13
8/12 10/20 36/20
37/15 38/19 40/11
46/2 47/3 47/15
48/20 50/20 54/13
60/21 64/19 97/9
106/8 108/6 110/21

112/16 112/24
146/19
**factor [3]** 20/17
20/22 22/9
**factors [1]** 86/2
**faculty [3]** 128/14
128/19 129/2
**failed [2]** 27/11
122/8
**fair [7]** 10/8
56/11 98/14 98/16
103/9 103/22
114/23
**fairly [4]** 17/17
24/23 55/15 117/7
**fairness [1]** 4/9
**fake [1]** 10/12
**falls [2]** 75/15
75/19
**familiar [5]** 21/8
62/9 69/16 79/18
93/12
**family [1]** 5/7
**fan [1]** 26/19
**fans [1]** 29/7
**far [2]** 23/15 45/9
**farm [6]** 22/15
28/16 29/5 29/14
29/21 30/9
**fault [1]** 11/14
**feasible [2]** 5/9
95/8
**features [3]** 60/8
72/2 72/3
**February [3]** 22/22
139/6 139/21
**February 2012 [1]**
139/6
**February of [1]**
22/22
**federal [1]** 82/23
**feel [3]** 28/24
124/20 125/22
**fellow [1]** 129/3

**fellows [2]** 130/3
**fellowship [4]**
128/8 128/11
128/22 129/2
**femur [1]** 144/3
**FERNANDEZ [5]** 1/21
2/8 2/9 80/14
118/17
**few [4]** 6/14 53/21
60/13 132/2
**field [6]** 85/2
85/19 85/20 121/3
127/5 128/23
**fields [1]** 11/25
**figure [1]** 27/2
**figures [1]** 131/14
**file [46]** 18/23
86/7 86/8 86/24
87/23 87/24 88/2
88/21 89/2 89/3
89/24 90/7 91/14
92/22 96/15 96/15
97/3 99/5 99/20
99/20 100/25 101/5
101/8 102/16
104/22 113/16
113/17 113/17
113/18 113/18
113/21 113/21
113/22 113/24
114/4 114/5 114/6
114/9 114/11
114/13 114/14
115/25 117/1 117/1
117/2 117/3
**filed [5]** 3/9 3/13
3/20 4/4 7/15
**files [29]** 71/2
79/10 87/1 87/24
89/13 90/12 93/11
93/15 98/23 99/24
100/2 100/5 100/7
100/9 100/10

**F**

**files... [14]**
100/12 100/13
101/15 104/4 104/4
113/25 114/1 114/7
114/10 115/1
115/11 115/15
115/22 116/9
**filing [2]** 106/6
106/10
**filling [1]** 70/13
**final [2]** 131/12
136/11
**finally [1]** 143/17
**find [13]** 13/4
15/21 66/21 86/22
87/20 87/20 88/3
100/6 116/15
116/18 117/13
117/15 122/2
**finding [1]** 13/9
**Fine [1]** 78/7
**fingerprint [1]**
97/15
**finish [4]** 61/21
117/18 117/25
146/13
**finished [3]** 4/10
78/24 79/20
**finishes [1]** 5/1
**finishing [1]** 5/11
**firm [7]** 38/23
41/5 41/16 41/19
41/20 53/16 62/1
**firms [2]** 84/2
84/16
**first [31]** 3/12
9/4 10/20 27/4
34/16 34/18 35/2
36/1 47/19 60/2
77/10 78/19 86/20
87/4 87/5 87/20
89/8 93/25 95/9

98/25 99/21 101/4
101/11 102/25
105/14 108/15
122/8 129/13 130/9
136/2
**fit [3]** 30/9 30/14
103/9
**five [7]** 18/3 18/5
32/22 95/22 112/17
131/13 140/17
**flags [1]** 76/2
**flawed [2]** 110/16
122/4
**FLEXNER [1]** 1/15
**flipping [1]** 76/1
**FLORIDA [9]** 1/1
1/14 1/17 1/22
1/24 148/3 148/7
148/15 148/18
**flsd.uscourts.gov
[2]** 1/25 148/19
**focus [1]** 9/21
**folder [1]** 100/2
**Foley [1]** 143/12
**follow [2]** 79/23
88/7
**follow-up [1]**
79/23
**following [11]**
52/17 52/18 78/19
79/1 79/14 101/20
102/20 125/21
127/23 128/3
128/15
**follows [2]** 4/12
77/11
**force [1]** 95/1
**foregoing [1]**
148/10
**forensic [32]** 38/7
38/8 38/20 51/2
52/20 53/4 83/9
83/22 84/11 84/12
94/1 96/2 96/5

96/24 97/3 97/6
97/12 97/16 97/17
97/20 97/21 98/1
98/6 104/20 112/13
112/15 112/23
115/13 122/12
**forensically [1]**
106/14
**forensicist [1]**
91/9
**forensics [26]**
49/15 53/2 82/8
82/11 82/13 83/1
83/4 83/15 83/19
83/21 84/3 84/6
84/7 84/14 85/21
85/22 85/24 119/24
119/25 120/1 120/3
120/11 120/12
120/19 120/21
120/23
**forensics-related
[1]** 84/7
**forged [3]** 120/4
120/16 121/11
**forgeries [9]**
39/14 40/3 40/11
108/6 108/9 110/22
110/23 111/12
111/18
**forgery [6]** 40/10
109/8 111/6 120/9
120/13 121/3
**forging [1]** 7/16
**form [3]** 48/20
54/25 129/20
**formal [2]** 65/16
65/19
**formalized [2]**
64/4 65/21
**format [8]** 18/15
88/25 89/6 89/8
89/10 89/25 90/1

## F

formact... [1]    91/2

formation [1]
142/25

formatting [11]
86/23 86/24 89/1
89/2 89/9 89/16
89/16 89/22 89/24
96/21 107/4

formed [4]    54/13
66/22 67/14 68/12

forming [2]    49/19
67/22

forward [3]    11/10
81/19 125/16

found [5]    62/20
98/20 100/2 116/18
140/2

foundation [5]
30/16 56/19 61/8
61/17 146/2

four [7]    27/3
101/19 128/13
128/18 129/6 129/7
130/24

fourth [2]    68/5
68/5

fracture [1]    144/3

fractured [1]
144/3

fragmentary [3]
93/6 104/22 117/11

fragmentation [3]
90/4 90/6 90/9

fragmented [1]
116/21

fraud [1]    6/15

fraudulently [1]
7/6

free [2]    99/3
145/1

FREEDMAN [12]    1/12
1/13 2/6 4/20 6/22

8/14 8/14 9/1 10/3
10/4 143/5 143/11

Freedman's [1]
5/16

frequent [2]    84/2
84/3

frequently [2]
143/6 143/9

Friday [2]    6/1
145/15

friends [3]    62/6
64/14 69/19

front [5]    104/17
104/24 104/25
109/21 131/19

full [10]    30/6
89/16 89/16 89/22
89/25 91/2 102/24
128/14 128/18
129/2

full-disk [1]
102/24

full-time [3]
128/14 128/18
129/2

fully [4]    102/15
102/20 125/22
126/1

function [2]    53/3
129/21

fundamental [1]
51/7

fundamentally [5]
93/18 101/25
105/11 106/12
107/5

furlough [1]
129/23

furloughs [3]
136/16 136/24
142/9

further [12]    68/16
72/7 72/25 77/7
79/22 107/14

119/18 122/16
144/20
146/22 148/12

## G

Gables [1]    1/22

gag [1]    9/5

gain [1]    41/17

game [9]    11/25
12/2 12/10 12/11
12/14 12/15 12/18
12/21 15/18

gaps [2]    145/14
146/11

Gates [6]    64/9
68/25 69/2 69/5
69/11 69/16

Gates' [1]    68/23

gave [2]    6/18
52/18

gears [1]    111/21

general [5]    127/5
141/16 142/6 144/1
144/2

generally [5]    34/4
46/19 87/5 94/19
114/18

generate [3]    29/5
29/8 29/10

generates [1]
26/17

genius [1]    62/7

gentleman's [1]
123/22

Gentlemen [12]
11/12 66/5 66/16
76/25 78/16 80/21
118/3 119/1 122/19
124/11 125/9 144/8

Germany [2]    127/21
127/22

get [14]    4/18 4/19
5/12 7/25 9/22
45/4 46/13 48/12

**G**

**get... [6]** 94/22
96/5 96/8 100/9
119/2 132/1
**getting [2]** 56/14
92/25
**GitHub [1]** 79/6
**give [16]** 15/1
15/3 19/20 31/11
39/19 47/6 48/25
51/8 72/24 76/15
77/3 110/8 122/21
123/10 123/21
137/12
**given [4]** 50/9
56/9 130/1 145/25
**giving [1]** 15/6
**global [1]** 83/4
**globally [1]** 16/8
**go [41]** 3/6 12/22
19/9 21/16 21/22
28/11 32/19 35/20
38/15 41/18 46/14
50/3 55/4 57/8
66/5 73/3 73/5
74/2 74/8 77/10
85/15 86/2 86/21
87/10 87/20 88/13
88/17 88/22 89/6
91/9 92/9 92/19
109/18 118/3
118/19 118/21
132/3 135/10
140/11 144/23
145/1
**goes [4]** 23/15
41/13 110/7 127/1
**going [35]** 4/9
4/21 7/12 9/23
11/4 13/18 13/22
15/24 19/25 35/20
42/15 43/13 51/11
51/22 51/23 52/5

66/20 70/12 74/12
80/15 82/5 87/6
89/20 92/12 95/12
99/7 101/24 133/12
136/1 139/18 141/1
145/13 145/15
145/25 146/24
**gone [4]** 4/17 41/7
90/3 141/7
**good [18]** 3/2 3/4
11/12 11/13 11/20
11/21 36/15 36/16
60/15 64/15 81/18
82/3 82/4 107/19
117/24 125/15
130/10 144/5
**Gorgas [1]** 128/7
**got [1]** 48/17
**government [2]**
71/15 82/23
**GPU [3]** 26/2 27/21
28/22
**GPUs [6]** 25/1 26/5
26/7 26/18 27/4
27/22
**grade [1]** 96/6
**graduate [1]**
127/17
**graduated [1]**
64/20
**Grand [1]** 127/18
**granted [1]** 141/16
**graph [1]** 22/2
**graphic [1]** 140/1
**graphical [1]** 25/1
**great [1]** 9/16
**greatly [4]** 91/11
102/6 102/7 106/17
**Gregory [3]** 38/5
38/21 40/1
**groups [1]** 130/19
**guess [2]** 31/2
75/15
**guidelines [1]**

125/21

**H**

**Ha [1]** 10/14
**hacking [1]** 7/25
**had [56]** 3/13 3/14
3/24 6/10 6/24
8/12 8/13 22/2
26/23 26/23 28/15
29/14 48/24 52/23
54/12 60/11 62/23
63/13 63/17 64/16
64/22 65/13 69/20
85/6 90/14 92/13
95/20 97/6 97/11
104/10 105/17
113/12 121/18
127/24 128/3 128/4
128/8 128/13
128/25 130/10
132/19 135/4 136/6
138/14 139/8
139/20 142/14
142/18 142/19
143/1 143/5 143/10
143/11 143/17
144/3 148/8
**half [2]** 83/3
112/18
**hammer [1]** 103/8
**hand [8]** 77/2
81/19 85/16 85/16
122/21 125/16
145/24 148/14
**handled [1]** 41/25
**handy [1]** 51/17
**happen [6]** 87/5
87/6 92/16 92/20
93/1 93/4
**happened [1]**
139/25
**happens [6]** 87/2
87/23 88/12 88/15
92/24 145/17

**H**

**happier [1]**    5/6
**happy [1]**    122/5
**hard [8]**    18/25
 85/11 91/14 91/16
 95/22 100/16
 100/17 142/23
**hardware [1]**    29/11
**Harvard [3]**    69/1
 69/2 69/5
**has [33]**    4/6 8/16
 9/4 11/5 32/19
 32/25 41/2 41/7
 41/10 42/21 43/2
 43/8 60/6 60/8
 77/5 86/11 89/3
 89/24 99/18 117/4
 117/17 117/19
 119/10 119/15
 120/4 120/16
 129/14 129/25
 129/25 141/2 141/3
 145/20 146/8
**hash [1]**    98/3
**hashing [2]**    13/17
 17/10
**hate [2]**    4/23 35/5
**have [185]**
**Haven [1]**    127/19
**haven't [3]**    6/23
 73/12 136/19
**having [6]**    31/23
 97/11 103/18
 121/21 126/19
 130/2
**he [95]**    7/14 9/10
 22/2 31/19 31/19
 42/17 42/18 46/9
 48/8 49/20 56/7
 56/9 56/20 57/21
 58/23 58/23 59/1
 59/1 59/3 59/7
 59/10 59/11 59/20

 59/23 59/23 60/22
 62/3 63/1 63/3
 64/14 67/3 69/20
 76/11 76/11 76/13
 105/2 105/3 110/5
 115/15 116/8
 116/11 121/4
 121/22 122/8
 122/10 122/11
 122/11 122/14
 132/16 136/4 136/6
 136/10 136/11
 136/12 136/15
 136/15 136/25
 138/3 138/7 138/17
 139/4 139/6 139/12
 139/20 139/24
 140/2 140/4 140/4
 140/6 140/8 140/16
 140/18 141/2 141/7
 141/11 141/11
 141/13 141/16
 142/6 142/10
 142/11 142/18
 142/19 142/19
 143/1 143/2 143/5
 143/10 143/11
 143/11 143/17
 143/19 144/3
 145/23 146/1
**he's [10]**    7/13
 42/15 109/3 109/3
 110/3 110/5 123/1
 141/5 141/6 141/7
**head [1]**    96/7
**header [1]**    100/25
**hear [4]**    30/21
 33/5 75/7 80/10
**heard [4]**    64/5
 69/18 90/17 121/3
**hearing [2]**    121/21
 126/20
**hearsay [3]**    56/2
 56/6 56/18

**heat [2]**    26/17
**held [1]**    43/21
**help [10]**    9/16
 15/6 38/19 50/5
 63/5 63/12 70/8
 71/4 71/6 76/13
**helpful [3]**    8/24
 15/13 52/1
**helping [1]**    8/19
**her [1]**    31/19
**here [35]**    19/5
 21/24 30/20 31/4
 37/1 38/11 39/3
 40/7 43/12 44/17
 46/2 53/1 54/6
 54/8 77/10 82/15
 90/16 95/10 102/13
 106/12 107/20
 107/21 108/7
 111/21 116/4 116/7
 118/17 118/20
 121/1 124/17
 125/20 126/7
 126/17 134/15
 139/19
**hereby [1]**    148/7
**hereunto [1]**
 148/14
**hernandez [6]**    1/23
 1/25 148/5 148/17
 148/17 148/19
**Hey [1]**    114/22
**Hi [1]**    3/2
**hidden [1]**    104/19
**high [8]**    65/9
 83/12 85/18 90/14
 98/12 127/18 136/1
 142/13
**high-level [1]**
 136/1
**higher [4]**    75/18
 75/19 75/20 75/21
**higher-level [2]**

**H**

USCA11 Case: 22-11150   Document: 33-14   Date Filed: 11/30/2022   Page: 74 of 254

**higher-level... [2]**
75/18 75/21

**highlight [1]**  58/6

**highly [1]**  48/3

**him [17]**  6/15 8/20
8/22 30/21 42/22
51/22 52/5 52/25
53/3 69/21 115/25
132/18 140/8
141/22 142/8
142/22 146/9

**himself [8]**  10/10
31/20 61/6 61/11
61/15 61/16 61/23
62/3

**hired [2]**  41/21
43/2

**his [70]**  6/14 7/7
7/7 8/21 9/9 31/19
31/19 39/8 39/18
42/4 42/19 45/20
45/20 48/4 49/12
50/23 50/24 50/24
51/4 51/21 52/23
52/24 53/2 53/9
53/10 53/13 53/15
53/15 53/16 53/19
54/14 56/22 59/25
62/1 63/2 63/10
64/14 67/3 67/7
69/16 69/19 72/17
77/19 77/22 104/11
104/13 108/9
108/23 109/15
109/16 110/15
110/16 113/3
115/23 116/5 116/5
121/16 121/17
121/17 121/19
121/20 131/12
134/24 137/24
137/25 141/18

141/19 142/5
142/15 144/3

**historical [1]**
122/9

**history [2]**  79/10
127/16

**hit [1]**  117/7

**hitting [1]**  103/9

**hold [8]**  14/4 14/4
14/4 32/11 32/12
77/15 77/24 85/12

**holds [2]**  103/1
103/3

**home [1]**  141/18

**honest [1]**  38/22

**honesty [1]**  5/17

**Honor [151]**

**Honor's [1]**  10/16

**HONORABLE [1]**  1/10

**hope [1]**  119/1

**hoped [1]**  3/24

**hopefully [1]**
126/25

**horizontally [1]**
30/5

**hospital [40]**
30/10 30/15 30/15
128/7 128/9 128/24
128/25 129/1 129/4
129/13 129/24
129/24 130/3 130/8
130/8 130/16 132/8
136/4 136/9 136/9
136/12 136/14
136/15 137/19
138/3 138/18
139/11 139/12
139/23 140/3 140/6
140/7 140/7 141/1
141/2 141/15
141/23 142/9
142/11 143/2

**hospitalization [7]**
131/12 132/8

133/6 134/13 137/1

**hospitalized [1]**
131/6

**hospitals [6]**
129/8 129/8 129/15
130/11 130/14
130/15

**hour [8]**  40/25
41/3 41/11 41/12
42/19 118/4 124/3
127/13

**hours [1]**  89/17

**how [80]**  6/3 8/2
11/2 11/23 12/2
12/10 12/19 12/25
13/13 13/15 13/23
16/5 16/21 17/1
17/18 17/24 18/20
19/12 21/16 22/2
22/23 23/10 24/14
27/22 29/21 32/18
32/19 34/25 41/19
43/7 46/4 47/3
50/8 51/1 51/6
64/19 65/20 66/1
70/21 71/18 75/4
75/5 76/4 76/5
77/16 78/8 79/2
79/15 85/8 85/13
86/4 86/5 87/12
88/8 91/16 91/16
92/5 92/7 93/8
93/8 93/20 94/10
99/17 102/3 102/4
102/18 105/17
106/16 113/12
117/8 126/25
127/12 128/17
128/20 129/3
130/22 131/9 139/3
139/16 140/24

**however [5]**  7/2
8/9 60/9 117/15

**H**

**however... [1]**
140/1
**HTCIA [1]**   83/13
**huh [1]**   131/21
**humans [1]**   87/12
**humor [1]**   11/1
**hundreds [3]**   26/2
83/8 85/9

**I**

**I'd [10]**   9/25 10/2
10/6 66/20 111/21
132/20 133/8
133/23 134/19
137/6
**I'll [19]**   20/4
23/22 24/19 25/24
28/16 29/25 32/14
35/7 67/6 69/14
89/6 108/13 109/5
111/16 113/4
117/25 117/25
118/7 144/15
**I'm [58]**   5/18 9/23
14/4 14/7 14/11
14/18 18/9 20/19
25/13 29/1 30/11
30/25 33/5 33/19
33/22 35/20 37/22
38/12 41/23 42/6
42/20 51/11 51/20
52/5 54/8 55/8
55/17 57/24 61/21
61/24 65/11 66/20
75/7 76/20 77/21
79/20 80/10 82/18
83/12 84/2 95/12
98/11 101/10
115/14 116/13
117/16 119/17
120/18 121/21
122/5 125/20 126/1
126/10 126/19

126/19 128/14
132/13 139/18
**I've [7]**   8/22 8/23
38/8 83/2 83/8
85/9 129/5
**idea [1]**   5/20
**identical [1]**
73/13
**identified [6]**
98/23 101/19
103/18 105/7
105/16 106/8
**identifier [6]**
100/22 100/24
101/4 101/6 101/7
101/12
**identify [12]**   33/9
35/21 78/9 78/10
79/15 79/16 80/12
80/24 80/25 96/11
96/13 100/25
**ill [1]**   142/6
**illness [1]**   142/8
**image [7]**   96/5
97/9 97/11 97/13
97/16 97/18 97/20
**images [8]**   96/3
96/24 97/3 97/6
97/7 97/21 98/1
112/23
**immediately [2]**
5/14 5/15
**impact [6]**   88/6
96/12 96/17 102/4
102/19 106/16
**impacts [4]**   91/11
102/6 102/7 106/17
**impeach [1]**   51/20
**impeaching [1]**
51/22
**impeachment [5]**
52/5 56/21 57/6
57/9 58/2
**implication [1]**

23/8
**implies [1]**   120/9
**important [6]**
11/22 13/15 87/18
90/10 91/17 143/4
**importantly [1]**
86/19
**improper [1]**   57/9
**inaccessible [2]**
92/5 93/23
**incentive [1]**   13/7
**incentives [1]**
12/25
**incentivized [3]**
12/20 13/2 13/8
**incentivizes [1]**
13/11
**incident [1]**   83/15
**include [3]**   50/24
85/10 107/4
**includes [2]**   4/14
54/16
**including [9]**   4/13
9/16 11/1 54/10
61/25 70/23 98/7
127/20 128/18
**inconsistent [5]**
45/2 46/6 48/4
53/13 61/24
**incorporates [2]**
11/24 17/7
**Incorporating [1]**
45/20
**increase [1]**   41/13
**increased [2]**
24/23 41/10
**indeed [2]**   5/2
68/9
**independent [1]**
144/14
**independently [1]**
122/14
**index [3]**   88/2
88/3 91/3

# I

indicate [1]    142/2

indicated [4]
138/16 139/19
140/1 140/3

indicates [1]
141/5

indication [1]
141/9

indicator [1]
29/12

individual [8]
78/9 78/10 79/8
79/15 79/16 114/7
130/20 141/1

individuals [4]
7/5 16/12 54/19
130/17

industry [3]    83/25
84/9 85/3

inefficient [1]
23/11

infected [1]    143/6

infection [1]
143/7

infections [5]
131/4 143/5 143/15
143/15 143/15

infectious [4]
127/5 128/8 128/21
131/4

infer [1]    61/14

Info [1]    1/4

inform [1]    16/24

information [14]
48/6 68/7 82/23
85/25 86/16 86/17
87/2 87/7 94/23
98/8 106/19 134/15
135/14 137/2

informs [2]    12/19
46/4

inpatient [7]

129/24 136/25
137/1 138/3
139/12 139/23
140/16

install [2]    27/5
93/17

installation [2]
104/3 141/17

installed [4]
103/16 103/19
104/1 104/11

installing [5]
91/22 93/8 93/10
96/21 107/4

instance [5]    94/7
94/9 99/8 101/2
130/16

instances [1]
117/4

instantaneous [1]
89/11

instead [5]    12/21
13/10 13/12 45/16
97/6

Institute [1]
83/23

instruction [1]
145/25

intact [1]    90/10

integrity [2]    11/6
40/7

intellectual [2]
45/14 112/5

intended [1]    7/18

intent [2]    120/9
120/19

intention [1]    7/4

interact [1]    12/19

interacting [1]
75/24

interchangeability
[1]    129/14

interconnected [1]
28/23

interests [1]    9/6

interjected [1]
23/6

intermittent [1]
143/13

internal [1]    128/3

internally [1]
136/8

interns [2]    130/2
130/16

internship [1]
127/25

interrupting [1]
10/3

interruption [3]
77/25 80/11 101/9

intimidates [1]
9/10

introduce [7]
10/15 126/11
132/20 133/8
134/19 135/1 137/6

introduced [4]
17/12 74/2 74/3
136/19

invention [1]
44/11

investigation [6]
40/13 52/20 83/1
83/13 85/22 120/1

invisible [1]
104/23

invited [1]    84/13

involve [3]    17/4
17/6 17/14

involved [10]    8/1
9/2 9/23 24/14
25/7 25/17 25/22
83/11 112/14
112/15

involves [3]    16/22
93/11 104/3

involving [1]    38/4

IRA [11]    1/3 68/4

**I**

**IRA... [9]** 68/6
80/16 104/7 105/2
107/9 116/5 116/8
116/11 116/13
**irregular [1]**
140/9
**is [377]**
**isn't [3]** 7/9
52/19 63/24
**issue [3]** 6/5 9/11
146/5
**issued [4]** 136/24
140/2 140/8 141/2
**issues [3]** 84/7
84/14 84/21
**it [324]**
**it's [134]** 3/10
3/21 4/9 4/20 5/8
5/9 5/20 7/10 7/11
8/24 9/10 9/14
10/7 10/8 10/8
11/13 13/5 13/18
14/2 14/9 14/21
16/15 17/3 18/18
18/21 19/25 20/10
21/19 23/3 31/1
33/16 33/22 33/24
34/4 34/24 37/1
38/13 39/8 41/17
47/1 47/1 47/22
47/23 51/19 51/19
51/23 52/4 52/24
54/22 54/24 55/2
55/16 55/21 56/16
56/18 57/11 57/13
57/17 57/17 59/10
59/11 64/18 69/11
71/5 71/25 74/12
75/19 79/10 79/18
83/13 84/9 85/19
86/1 86/11 86/14
86/20 86/25 87/11

87/14 87/15 87/18
88/23 88/24 89/6
89/10 89/13 90/9
90/21 90/25 91/14
91/15 91/16 91/17
92/17 93/6 93/17
94/3 94/11 94/12
95/6 95/8 96/7
97/14 97/19 101/4
101/5 101/6 101/7
102/3 103/4 103/6
103/8 103/22
104/17 104/25
108/20 113/23
113/23 114/15
117/5 118/14
121/22 127/7
127/13 127/13
129/22 131/4 133/6
133/13 134/22
140/15 145/19
145/21 146/10
**items [1]** 92/21
**its [12]** 17/10
17/10 54/9 88/18
88/23 89/5 89/12
91/6 92/16 92/19
105/11 114/3
**itself [12]** 17/3
17/15 21/21 30/6
45/9 46/19 93/19
97/10 97/12 111/1
131/3 134/22

**J**

**Jackson [3]** 128/9
128/15 130/15
**Jaime [1]** 6/23
**Jamie [5]** 6/11
6/12 6/13 7/11
7/16
**January [4]** 35/24
81/6 123/12 139/20
**Java [1]** 60/9

**JMOL [1]** 3/9
**JORGE [1]** 1/25
**Jr [1]** 126/16
**JUDGE [4]** 1/10
118/14 118/20
131/16
**jumble [2]** 94/3
99/22
**jurors [1]** 6/2
**jury [53]** 1/11
3/24 4/9 4/24 8/19
11/6 11/9 11/11
11/22 13/13 13/23
16/5 16/21 18/13
25/6 28/10 34/20
36/1 57/11 57/12
58/1 58/16 66/7
66/13 66/14 68/1
74/4 75/15 82/5
82/19 85/21 86/23
95/11 99/12 108/19
118/6 118/23
118/24 119/24
124/13 125/7
127/15 129/11
131/17 135/12
135/22 136/1
136/19 140/23
144/10 144/17
145/20 145/25
**just [61]** 5/2 7/10
8/6 10/1 10/8 10/8
10/19 16/11 17/9
18/16 18/21 25/1
30/2 30/3 30/7
33/22 36/7 38/9
38/14 39/19 41/15
45/6 49/25 50/11
51/20 51/20 52/5
57/6 60/11 63/14
66/20 70/7 71/2
72/18 77/2 78/3
79/10 86/8 86/25
88/22 89/13 89/15

# J

**just...** [19]   94/12
97/3 102/10 102/16
119/7 122/21 124/2
125/1 131/25 132/2
137/8 138/22
139/13 141/10
144/4 145/12
145/14 145/16
146/9

# K

**KASS** [9]   1/20 2/5
2/6 2/13 15/21
39/7 56/17 126/4
126/10
**keep** [2]   31/14
90/10
**keeps** [1]   16/8
**KEVIN** [1]   2/5
**key** [21]   18/2 18/6
18/15 31/12 32/5
32/6 32/12 32/12
32/19 32/24 32/25
32/25 33/3 77/12
78/20 94/7 95/3
103/2 103/4 103/5
103/9
**keyboard** [1]
120/24
**keys** [30]   18/14
18/20 18/21 19/13
19/17 20/10 20/18
20/23 21/9 21/12
30/22 31/8 31/9
31/11 31/15 31/16
31/19 32/9 33/10
37/5 43/24 115/18
115/23 116/15
117/14 117/15
117/20 117/22
119/11 119/16
**kidney** [1]   143/15
**Kimon** [10]   49/13

49/22 50/6 50/13
55/11 63/17 66/8
68/11 76/9 146/15
**kind** [13]   26/6
75/20 75/20 75/22
86/3 86/13 93/7
96/16 98/12 98/14
98/20 100/19
100/25
**kinds** [1]   83/6
**KLEIMAN** [62]   1/3
1/4 9/13 36/18
37/1 44/5 44/20
44/23 45/2 46/9
46/11 46/14 48/3
48/8 48/24 49/3
49/14 51/1 54/12
55/4 58/20 59/6
59/15 60/22 61/5
61/11 61/23 62/6
62/24 63/15 63/17
67/10 67/11 68/4
68/6 72/11 80/16
82/16 84/19 105/2
107/9 112/25 113/8
115/8 115/10
115/14 115/22
116/5 116/8 116/11
127/7 127/8 132/11
132/14 136/3
136/14 136/25
138/14 138/25
139/11 139/17
142/14
**Kleiman's** [25]
14/12 14/13 44/14
45/7 45/17 46/5
49/18 49/20 50/22
52/20 55/5 55/6
57/21 58/3 62/6
96/12 101/20
103/19 104/7 112/6
116/13 119/9 131/7
137/3 142/2

**knew** [3]   51/1
55/23 76/12
**know** [70]   3/10
5/23 10/25 13/17
13/22 16/10 19/1
26/8 30/9 30/14
34/3 34/16 37/1
38/22 43/7 43/12
45/25 46/9 46/17
47/3 47/15 48/24
49/2 49/6 49/21
50/8 53/22 59/6
60/10 60/17 61/11
65/22 66/20 67/15
68/25 69/11 69/25
70/8 70/17 70/17
71/3 74/24 75/2
75/4 75/4 75/5
75/10 76/4 79/17
87/12 92/5 92/22
93/23 97/17 100/10
101/6 102/8 106/18
106/23 107/6
112/25 113/7 113/9
117/8 126/3 133/16
140/22 145/19
146/9 146/10
**knowing** [2]   53/13
101/7
**knowledge** [2]
84/10 102/2
**known** [4]   17/12
47/19 69/11 83/13
**knows** [3]   61/18
76/4 125/1
**Kuharcik** [4]
145/15 145/19
145/22 146/16
**KYLE** [1]   1/13
**kyleroche** [1]   9/15

# L

**labeled** [1]   49/22
**laboratory** [1]

USCA11 Case: 22-11150   Document: 41   Date Filed: 11/30/2022   Page: 79 of 254

**L**

**laboratory... [1]**
98/13

**Ladies [12]**   11/12
66/5 66/15 76/25
78/16 80/21 118/3
118/25 122/19
124/11 125/8 144/8

**language [16]**
17/21 48/9 48/9
54/20 54/22 54/23
54/24 55/2 57/15
57/16 57/17 57/19
60/7 60/12 72/4
72/12

**languages [9]**   54/3
54/17 69/8 71/16
71/18 71/25 72/12
75/18 75/18

**laptop [10]**   22/20
22/23 23/8 23/15
23/16 23/25 24/5
24/6 25/16 30/2

**large [11]**   24/15
24/21 24/24 24/24
25/21 25/25 28/17
28/21 29/14 29/21
87/14

**large-scale [2]**
25/25 29/21

**larger [1]**   30/2

**last [7]**   8/14 9/13
14/6 43/7 119/7
136/11 140/24

**lastly [1]**   83/1

**late [1]**   130/10

**later [2]**   15/10
65/7

**laughing [2]**   8/20
8/21

**law [4]**   38/23
83/16 84/2 84/16

**lawsuit [1]**   41/22

**lay [1]**   146/2

**layperson [1]**
104/18

**lead [2]**   143/14
143/20

**leading [5]**   35/17
69/13 70/14 83/24
130/4

**leads [3]**   131/3
142/24 143/7

**learned [3]**   59/6
144/13 144/13

**learning [1]**   70/20

**least [1]**   90/1

**leave [6]**   74/1
129/22 129/23
141/2 141/5 141/14

**leaves [1]**   141/8

**leaving [1]**   142/8

**led [3]**   29/12
100/4 121/20

**ledger [6]**   15/23
15/25 16/8 16/11
16/13 21/21

**left [6]**   20/14
93/7 112/17 136/12
140/3 143/13

**legal [3]**   48/17
48/21 48/25

**legend [1]**   138/4

**length [1]**   5/25

**lengthy [1]**   137/3

**Leon [1]**   1/21

**less [1]**   61/2

**let [18]**   3/12 9/4
9/21 11/16 11/17
28/4 35/20 48/9
65/22 77/7 106/3
116/13 124/22
125/15 126/2
133/16 146/9 146/9

**let's [29]**   4/8 6/1
9/22 11/9 12/17
16/2 21/5 28/4

28/4 38/10 45/6
48/12 55/4 66/25
66/13 72/23 73/14
86/3 87/14 92/2
96/7 96/8 98/20
101/15 103/14
107/19 118/3
118/22 124/11

**lets [1]**   88/3

**letter [1]**   132/1

**level [11]**   22/13
41/16 51/7 57/17
65/21 75/17 75/18
75/20 75/21 136/1
142/13

**levels [2]**   69/23
94/15

**library [33]**   17/8
86/10 86/11 86/13
86/13 86/15 86/18
86/19 86/22 86/25
87/3 87/4 88/3
88/13 89/20 91/13
91/17 92/13 92/14
92/25 94/5 95/2
99/7 99/9 101/24
113/25 114/4 114/7
114/9 114/13
114/14 115/3 117/5

**life [1]**   48/7

**lift [1]**   141/18

**light [2]**   29/10
29/12

**lights [1]**   29/13

**like [55]**   3/5 3/10
7/9 8/19 9/25 10/1
10/2 10/6 11/2
12/13 18/24 19/1
28/11 29/21 30/9
30/14 32/18 49/15
56/4 62/24 63/14
66/20 71/5 71/20
86/10 91/5 91/11
93/17 93/22 94/2

USCA11 Case: 22-11150  Document: 53-2  Date Filed: 11/30/2022  Page: 80 of 254

**L**

**like... [25]**   94/3
94/11 94/11 95/16
96/19 97/11 102/7
102/21 103/8 103/8
108/18 111/21
114/4 122/6 123/8
126/11 129/21
129/23 132/20
133/8 133/23
134/19 134/25
136/16 137/6
**likelihood [1]**
130/2
**likely [6]**   3/25
60/6 64/3 70/9
75/24 85/15
**limit [1]**   3/15
**limited [4]**   38/5
38/21 39/25 45/16
**line [11]**   15/22
47/6 51/12 51/24
73/12 73/12 79/5
80/25 81/7 81/8
110/3
**lined [1]**   5/15
**lines [10]**   17/18
17/19 51/12 51/23
63/10 77/16 79/2
79/7 110/12 110/17
**link [2]**   39/20
146/8
**linked [1]**   7/9
**liquid [1]**   26/19
**list [7]**   6/19
14/12 54/4 73/16
73/21 132/9 135/4
**listed [5]**   60/3
71/14 71/18 71/21
135/4
**listening [1]**
30/20
**listing [2]**   71/15

136/24
**lists [2]**   53/24
73/18
**litigation [7]**
7/18 38/20 39/25
42/6 108/6 112/11
112/22
**little [25]**   12/2
18/13 20/12 25/6
72/23 72/24 73/2
73/3 74/5 85/19
86/3 86/17 87/11
92/25 93/5 96/7
99/18 101/4 102/25
118/10 124/19
127/15 132/1 138/4
140/22
**live [1]**   125/4
**living [1]**   82/10
**Liz [2]**   15/14
146/7
**LLC [1]**   1/4
**LLP [2]**   1/12 1/18
**local [1]**   3/15
**location [2]**   77/12
78/21
**lock [6]**   34/5 94/8
95/4 103/5 103/6
103/8
**locked [3]**   34/13
94/6 95/2
**locking [8]**   33/16
33/16 34/3 34/7
35/3 35/8 35/11
35/14
**logic [1]**   26/6
**logical [1]**   99/25
**logically [2]**   75/1
87/13
**long [11]**   7/3 9/14
18/16 18/18 44/23
64/19 72/1 83/12
124/3 134/16
140/24

**long-time [1]**
54/3
**longer [6]**   23/25
66/1 88/14 89/17
92/14 114/23
**look [22]**   5/10 6/3
28/11 34/12 35/1
59/20 59/23 72/24
73/12 73/14 87/9
94/1 95/16 96/16
96/17 101/17
103/15 109/16
112/3 117/19
121/17 121/17
**looked [4]**   5/23
98/20 103/14
121/19
**looking [10]**   4/5
25/13 33/2 33/8
33/22 70/8 94/2
97/18 104/25 111/2
**looks [2]**   55/15
94/2
**lose [1]**   144/2
**losing [1]**   102/1
**loss [3]**   142/23
143/10 143/17
**lost [1]**   106/19
**lot [3]**   43/2 47/16
65/19
**low [2]**   57/17
75/17
**low-level [1]**
75/17
**Ludwig [1]**   127/20
**lunch [6]**   117/25
118/4 118/7 119/2
119/7 119/23
**lying [1]**   142/23
**LYNAM [2]**   2/11
123/20
**LYNN [2]**   2/10
123/9

USCA11 Case: 22-11150    Document: 53-34    Date Filed: 11/30/2022    Page: 81 of 254

**Macbook [1]** 95/13

**machine [1]** 148/8

**machines [1]** 26/11

**MACINTYRE [31]**
2/13 125/13 125/18
126/7 126/14
126/16 126/17
126/20 126/21
127/3 128/11 130/7
131/19 132/5
132/10 133/4
134/10 134/24
135/25 136/21
137/21 138/11
138/22 139/13
140/13 140/22
143/23 144/18
144/24 145/1
146/14

**Madam [1]** 20/7

**made [10]** 3/17 8/7
9/24 65/1 84/25
97/20 98/1 98/10
132/14 132/16

**MADURA [75]** 2/5
5/11 11/10 11/16
11/20 12/25 13/13
15/24 16/5 16/21
17/23 19/4 19/12
21/8 21/24 23/10
23/15 23/24 24/5
24/11 25/10 25/17
26/23 28/15 28/21
29/21 30/20 32/11
34/3 35/20 35/25
36/11 36/15 36/17
37/7 38/24 40/20
41/20 43/7 43/11
50/2 50/8 50/13
51/12 51/20 52/14
53/24 54/20 56/19
58/16 58/20 59/15
60/17 62/5 63/2
63/5 63/9 63/20
63/24 64/19 66/20
67/2 68/3 68/17
68/22 72/17 72/21
72/24 73/10 74/15
77/1 77/6 78/18
78/19 80/3

**Madura's [4]** 19/25
38/10 50/1 51/15

**major [3]** 130/11
130/11 142/22

**make [17]** 4/23
4/23 9/21 10/14
21/17 26/25 46/21
72/2 92/5 95/21
97/22 109/10
115/22 116/2
120/18 144/10
145/14

**makes [1]** 124/20

**making [5]** 12/22
53/1 74/25 77/11
78/20

**man [1]** 6/11

**manage [1]** 26/20

**management [1]**
143/9

**manipulated [1]**
40/2

**manner [1]** 85/11

**many [35]** 11/24
17/18 19/12 22/23
25/2 25/3 26/1
26/1 26/7 27/22
29/11 34/6 69/10
70/5 70/7 71/18
77/17 79/3 83/16
83/20 83/22 84/15
85/8 85/13 94/16
105/17 113/12
128/17 128/20
129/9 129/21
130/22 131/9 139/3

139/16

**mapping [2]** 5/19
5/19

**March [5]** 10/11
131/13 136/13
139/24 139/25

**mark [4]** 115/23
116/9 135/17
135/18

**marked [9]** 88/16
88/22 114/1 114/21
115/11 115/15
115/16 116/11
135/15

**marks [4]** 113/21
114/15 114/17
114/20

**Maryland [5]** 59/16
59/21 60/3 63/20
63/22

**Maryland's [1]**
60/15

**mask [3]** 121/22
121/24 125/23

**massive [3]** 93/10
93/18 104/3

**master [2]** 103/2
103/4

**match [3]** 55/17
95/21 97/17

**matched [1]** 98/4

**materials [3]** 49/1
61/13 61/25

**math [1]** 16/22

**mathematical [3]**
17/1 97/13 98/2

**mathematics [1]**
16/23

**matter [7]** 47/14
67/14 101/23
103/25 106/11
126/9 127/3

**matters [2]** 83/10
106/12

# M

**Maximilian [1]**
127/21

**Maxwell [3]**  38/5
38/21 40/1

**may [20]**  8/3 8/7
9/21 10/19 12/15
25/19 35/25 49/6
53/9 56/22 57/3
70/3 74/19 90/17
99/11 105/16
107/10 108/20
119/5 135/23

**May 22nd [1]**
105/16

**maybe [10]**  18/18
28/18 55/10 60/11
86/17 87/16 91/14
93/3 106/3 130/24

**MCGOVERN [5]**  1/20
9/18 10/4 118/13
124/10

**MDs [1]**  130/18

**me [36]**  3/12 3/23
5/6 6/23 9/4 9/21
10/3 11/16 12/13
15/1 15/3 19/20
35/20 39/19 40/15
44/8 51/8 65/22
76/15 77/7 85/7
85/19 87/12 94/17
96/3 99/19 100/4
104/21 106/3
116/13 123/10
123/21 124/22
125/15 132/12
137/12

**mean [8]**  5/6 31/6
57/1 76/5 88/25
89/23 130/15
138/17

**meaning [2]**  143/11
143/18

**meaningfully [2]**
63/25 64/1

**means [6]**  31/11
90/22 92/4 93/22
94/24 128/1

**mechanism [3]**
15/23 32/3 32/7

**media [13]**  7/22
8/10 8/15 18/24
19/15 83/21 85/10
85/11 85/16 85/17
85/23 91/7 120/2

**medical [24]**
127/23 128/10
131/7 131/9 131/11
132/10 132/13
132/18 132/19
133/5 133/11
133/23 134/16
137/3 138/1 141/13
141/19 141/20
141/21 142/2 142/2
142/5 142/13
142/15

**medicine [2]**  128/1
128/4

**member [2]**  82/24
83/12

**members [1]**  83/16

**Memorial [1]**  128/9

**men [1]**  129/17

**mention [3]**  49/10
53/24 54/2

**mentioned [15]**
13/3 17/16 18/22
31/9 32/21 34/21
49/4 53/19 75/17
91/12 110/14
110/25 117/16
140/25 148/9

**mentions [1]**  33/15

**merely [1]**  8/6

**message [4]**  6/9
10/9 67/3 68/3

**messages [4]**  6/19
6/20 67/12 68/4

**MESTRE [2]**  1/18
1/19

**metadata [6]**  108/8
108/22 109/10
110/21 111/1
121/11

**methodology [10]**
85/3 109/15 110/15
110/16 111/2 111/4
121/18 121/20
122/2 122/4

**methods [1]**  85/1

**Miami [18]**  1/14
1/17 1/24 1/24
28/6 128/9 128/10
128/14 129/1
130/13 130/13
136/4 136/9 136/11
137/25 148/15
148/18 148/18

**MICHAEL [2]**  1/21
80/14

**Michigan [4]**
127/18 127/24
128/4 130/12

**microphone [3]**
80/13 121/24
126/22

**Microsoft [2]**  64/5
75/25

**middle [1]**  41/9

**might [6]**  8/10
49/4 65/22 94/10
103/14 105/1

**military [3]**
129/17 129/21
129/23

**million [1]**  27/22

**mind [3]**  15/6
15/14 145/5

**mine [17]**  11/15
22/11 22/18 22/20

**M**

**mine... [13]**    22/24
23/5 23/7 24/15
24/24 25/3 25/16
27/20 28/16 28/21
37/4 44/2 45/10

**mined [5]**    34/16
35/22 36/2 36/23
43/18

**miner [2]**    13/7
13/18

**miners [5]**    12/19
12/20 13/2 18/10
22/7

**mining [30]**    13/1
13/16 21/25 22/3
22/15 22/22 22/23
23/12 23/15 23/16
23/24 24/5 24/12
24/15 24/21 25/21
25/25 26/17 26/24
27/3 27/6 27/8
27/22 28/16 29/5
29/14 29/21 30/9
30/14 34/21

**minute [5]**    45/5
66/6 66/8 124/12
124/14

**minutes [7]**    4/15
4/16 117/25 118/1
124/3 125/3 125/4

**Mischaracterizes
[1]**    113/3

**miss [1]**    117/7

**model [1]**    95/21

**Moderately [1]**
126/25

**modify [1]**    16/16

**moment [10]**    4/1
15/3 19/20 36/7
39/19 46/14 51/9
76/16 76/20 78/5

**moments [1]**    53/21

**Monday [3]**    3/11
3/20 53/14

**money [4]**    13/10
16/17 42/9 43/8

**monitor [4]**    11/4
27/9 28/4 28/6

**monitoring [2]**
9/23 27/12

**month [2]**    139/7
139/8

**months [1]**    140/17

**more [35]**    6/4 8/25
18/13 19/16 20/12
21/4 22/9 22/10
22/11 22/12 25/6
41/14 46/24 62/14
65/18 65/18 65/20
69/9 69/10 70/7
70/9 72/3 73/2
75/22 75/22 76/19
86/17 86/19 92/12
111/2 129/17 132/2
136/10 140/5
140/23

**morning [18]**    3/2
3/4 6/1 6/23 11/12
11/20 11/21 36/15
36/16 107/19 119/9
144/9 144/16
144/19 144/25
145/2 145/16
146/24

**most [7]**    3/25
11/25 34/5 100/23
102/24 131/11
143/4

**mother [3]**    18/3
31/19 32/22

**motherboard [3]**
26/5 27/11 28/23

**motherboards [2]**
26/10 26/13

**motion [4]**    3/9
3/13 3/22 9/22

**motor [1]**    142/16

**move [5]**    17/22
55/25 133/23 138/8
138/20

**moved [3]**    82/25
83/2 114/2

**MR [19]**    2/5 2/6
2/6 2/8 2/8 2/9
2/13 10/3 12/25
13/13 24/11 39/7
73/10 74/15 95/16
119/3 119/23
138/20 145/19

**Mr. [144]**    4/19
4/20 5/11 5/14
5/16 6/22 7/6 8/13
8/14 8/14 8/23 9/1
10/14 11/10 11/16
11/20 15/21 15/24
16/5 16/21 17/23
19/4 19/12 19/25
21/8 21/24 21/25
22/17 23/6 23/10
23/15 23/18 23/24
24/5 24/11 25/10
25/15 25/17 26/23
28/15 28/21 29/21
30/20 30/21 31/7
31/17 32/11 34/3
35/20 35/25 36/11
36/15 36/17 37/7
38/10 38/24 39/4
40/20 41/20 43/7
43/11 45/22 50/1
50/2 50/8 50/13
51/12 51/15 51/20
52/14 53/24 54/20
56/12 56/14 56/15
56/17 56/19 58/16
58/20 59/15 60/17
62/5 63/2 63/5
63/9 63/12 63/24
64/19 65/22 66/20
67/2 68/3 68/6

USCA11 Case: 22-11150    Document: 83-14    Date Filed: 11/30/2021    Page: 84 of 254

# M

**Mr. . . . [51]** 68/17
68/22 72/17 72/21
72/24 77/1 77/6
78/18 78/19 80/3
80/17 81/13 81/16
82/3 82/15 98/18
107/19 107/21
108/22 109/21
110/12 115/7
117/10 118/17
119/8 122/20
122/23 122/25
123/4 126/4 126/10
127/7 127/8 131/15
131/25 133/1
133/16 134/5 135/8
136/3 136/17
136/25 137/11
137/17 138/8
140/10 140/20
145/4 145/15
145/22 146/16

**Mr. Andreou [4]**
56/12 56/14 56/15
68/6

**Mr. Antonopoulos
[8]** 21/25 22/17
23/6 23/18 24/11
25/15 31/7 45/22

**Mr. Antonopoulos'
[2]** 30/21 31/17

**Mr. Brenner [4]**
8/13 8/23 133/16
135/8

**Mr. Chambers [15]**
5/14 81/16 82/3
82/15 107/19
107/21 108/22
109/21 110/12
115/7 119/8 122/20
122/23 122/25
123/4

**Mr. Chambers' [1]**
98/18

**Mr. David [1]**
127/8

**Mr. Fernandez [1]**
118/17

**Mr. Freedman [8]**
4/20 6/22 8/14
8/14 9/1 10/14
65/22 145/4

**Mr. Freedman's [1]**
5/16

**Mr. Kass [4]** 15/21
56/17 126/4 126/10

**Mr. Kleiman [3]**
127/7 136/3 136/25

**Mr. Kuharcik [3]**
145/15 145/22
146/16

**Mr. Madura [69]**
5/11 11/10 11/16
11/20 15/24 16/5
16/21 17/23 19/4
19/12 21/8 21/24
23/10 23/15 23/24
24/5 25/10 25/17
26/23 28/15 28/21
29/21 30/20 32/11
34/3 35/20 35/25
36/11 36/15 36/17
37/7 38/24 40/20
41/20 43/7 43/11
50/2 50/8 50/13
51/12 51/20 52/14
53/24 54/20 56/19
58/16 58/20 59/15
60/17 62/5 63/2
63/5 63/9 63/12
63/24 64/19 66/20
67/2 68/3 68/17
68/22 72/17 72/21
72/24 77/1 77/6
78/18 78/19 80/3

**Mr. Madura's [4]**

19/25 38/10 50/1
52/15

**Mr. Nicholas [2]**
80/17 81/13

**Mr. Reed [9]**
131/15 133/1 134/5
136/17 137/11
137/17 138/8
140/10 140/20

**Mr. Reid [1]**
131/25

**Mr. Rivero [1]**
4/19

**Mr. Roche [2]** 39/4
117/10

**Mr. Wilson [1]** 7/6

**Ms [17]** 9/18 38/9
40/22 49/25 50/11
53/7 55/11 57/8
57/25 58/3 58/5
63/2 63/9 66/24
67/16 67/24 68/14

**Ms. [3]** 10/4
118/13 124/10

**Ms. McGovern [3]**
10/4 118/13 124/10

**much [18]** 6/4
18/23 24/14 30/1
30/2 43/8 47/3
61/1 64/8 66/1
67/10 69/8 75/22
75/22 89/16 127/12
129/3 146/9

**multiple [3]** 33/15
90/8 94/18

**multisig [25]** 32/4
32/23 33/3 33/9
33/13 33/16 33/19
33/20 33/21 34/7
34/14 34/17 34/18
35/3 35/11 35/13
35/15 35/22 35/23
36/1 36/2 36/17
36/20 36/21 36/23

USCA11 Case: 22-11150    Document: 53-4    Date Filed: 11/30/2022    Page: 85 of 254

**M**

**multitude [1]**   94/4

**Munich [1]**   127/21

**muscles [1]**   142/18

**my [50]**   6/8 9/13
15/6 18/3 18/6
32/22 32/25 36/4
36/8 36/25 41/5
44/13 49/1 52/22
53/17 53/17 54/16
65/16 71/14 71/14
74/25 82/21 83/8
83/9 84/8 85/7
85/9 96/7 97/1
97/20 98/9 99/19
104/12 106/3 113/9
115/1 118/10 119/7
120/9 120/10
120/11 120/12
126/16 128/22
129/2 137/4 140/1
144/6 148/11
148/14

**mylegacykid [1]**
9/17

**myself [1]**   111/23

**mystical [1]**   85/19

**N**

**Nakamoto [6]**   46/15
46/17 46/22 47/10
47/13 47/16

**name [4]**   7/16
81/22 126/14
126/16

**named [1]**   100/14

**namely [1]**   140/17

**naturally [1]**
41/15

**nature [6]**   30/4
91/6 99/24 101/3
104/19 105/11

**Navigant [1]**   82/25

**nearly [1]**   73/12

**necessarily [3]**
53/5 53/7 141/14

**necessary [3]**   6/4
9/1 146/2

**need [43]**   3/3 4/10
4/18 7/23 7/25
10/18 18/2 24/24
25/2 26/1 26/7
26/9 26/12 26/12
26/18 26/20 26/24
27/1 27/4 27/5
27/6 27/7 27/9
27/11 27/23 30/5
31/10 32/5 32/8
32/23 70/25 75/4
77/24 88/1 89/15
92/14 94/21 120/24
121/15 121/23
135/15 144/20
145/23

**needed [3]**   88/14
88/24 114/16

**needs [4]**   75/5
75/10 87/4 114/23

**network [14]**   12/21
13/3 13/5 13/6
13/11 13/12 13/19
16/9 18/9 21/17
21/18 21/18 22/10
22/13

**networking [2]**
26/10 83/14

**never [4]**   7/18
10/16 112/25 145/5

**new [19]**   13/6 13/9
17/11 17/23 87/2
87/3 87/6 88/5
88/8 89/5 89/12
90/7 92/16 92/19
93/3 93/4 103/25
104/10 127/19

**next [15]**   13/18
13/22 43/12 58/4
80/9 90/20 109/18

123/7 123/18 136/7
141/8 146/14

**nice [1]**   146/25

**NICHOLAS [6]**   2/7
42/13 80/17 81/13
81/21 81/24

**night [2]**   8/14
9/13

**nine [2]**   95/24
129/7

**ninth [1]**   96/6

**ninth-grade [1]**
96/6

**no [121]**   1/2 2/16
5/1 5/6 5/20 8/4
9/3 9/5 9/8 14/6
14/18 16/14 17/11
19/23 23/4 23/25
33/21 36/19 36/20
36/23 44/3 44/7
44/22 45/6 45/9
45/12 46/16 46/19
47/8 47/14 47/14
49/5 49/21 49/24
50/2 50/2 50/2
50/17 50/19 51/19
51/19 52/12 53/5
56/19 58/25 59/9
59/22 60/1 60/1
60/20 61/7 61/14
62/8 64/13 64/16
67/11 68/16 72/13
73/24 75/12 76/7
77/7 77/14 77/18
78/7 78/11 78/12
78/13 78/23 78/23
79/22 79/25 80/2
82/18 88/14 92/9
97/11 98/8 98/10
107/2 107/2 107/14
110/20 111/5 111/6
111/20 111/23
111/25 112/1 112/3

**N**

**no... [31]**   112/4
112/7 112/10
114/23 115/10
115/17 115/19
115/21 116/17
117/20 117/23
118/14 119/14
119/15 119/18
121/12 121/17
122/16 122/24
123/3 132/22
133/25 134/21
135/11 137/14
139/8 141/16
142/18 142/19
145/9 146/12
**noise [1]**   29/6
**non [3]**   83/14 84/4
141/20
**non-medical [1]**
141/20
**non-profit [2]**
83/14 84/4
**none [2]**   48/6
138/16
**nonetheless [2]**
53/12 63/25
**Nope [1]**   46/12
**normal [3]**   41/12
41/17 143/18
**normally [2]**   56/8
143/11
**North [2]**   1/24
148/18
**not [203]**
**notably [1]**   11/25
**noted [1]**   137/4
**notes [2]**   119/7
148/11
**nothing [4]**   10/21
37/4 61/13 146/22
**notice [1]**   6/14

**noticed [2]**   9/17
100/13
**notification [1]**
3/13
**notion [1]**   31/8
**novel [2]**   16/15
16/19
**November [4]**   1/5
139/8 148/9 148/15
**novice [2]**   48/10
70/21
**now [34]**   4/13 14/5
31/1 51/16 52/2
55/8 57/13 58/16
65/25 66/2 71/2
72/5 72/5 73/5
73/15 74/2 74/9
74/11 88/16 92/25
102/10 115/3 116/5
117/24 129/19
130/14 137/24
138/6 138/7 140/20
143/5 143/10 146/3
146/8
**number [17]**   15/1
15/2 18/16 25/3
50/9 55/18 85/15
86/2 102/11 109/8
111/6 115/1 135/2
138/25 140/18
142/21 143/2
**numbers [4]**   25/3
50/8 55/17 133/14
**nursing [1]**   132/15

**O**

**oath [4]**   11/17
52/15 81/20 125/17
**object [4]**   35/5
60/4 60/7 60/8
**object-oriented [3]**
60/4 60/7 60/8
**objecting [1]**   29/2
**objection [85]**   8/4

12/4 13/25 19/18
20/24 20/25 21/14
22/25 23/2 23/13
23/17 24/1 24/7
24/16 24/19 25/9
25/18 25/23 27/16
27/24 29/1 29/16
29/24 30/16 30/23
30/25 31/25 34/8
35/17 37/12 37/17
37/18 37/25 38/1
39/6 39/11 39/15
39/21 40/4 40/4
40/17 42/3 42/23
43/4 51/13 52/6
52/12 56/2 56/24
59/12 61/7 61/17
69/13 70/14 77/14
77/18 78/4 78/7
78/11 78/12 78/13
103/11 103/12
106/20 106/25
107/25 108/11
109/1 110/3 110/9
111/8 111/14 113/2
120/5 121/5 130/4
132/22 133/12
133/17 133/25
134/1 134/21 135/9
137/14 141/24
**objections [4]**
15/9 28/7 28/13
32/13
**observer [1]**   10/24
**obtaining [1]**
132/18
**obvious [1]**   143/22
**obviously [4]**   5/11
129/5 145/23 146/9
**occur [1]**   143/19
**occurred [2]**   21/23
144/4
**occurring [1]**   16/9
**October [2]**   106/9

**O**

**october... [1]**
139/7

**October 1st [1]**
106/9

**off [10]** 56/10
114/2 115/4 115/16
115/23 121/22
121/23 125/23
129/5 141/3

**offered [2]** 2/16
39/1

**offering [9]** 43/14
43/17 43/20 43/23
44/1 44/4 44/10
45/13 47/9

**officer [2]** 67/6
77/4

**often [1]** 130/24

**oh [5]** 57/12 58/14
73/4 126/12 137/10

**okay [55]** 12/8
18/4 19/22 21/6
21/11 23/9 23/22
36/12 43/13 46/15
50/10 53/6 57/21
66/22 66/23 67/7
67/8 71/21 72/21
73/8 74/8 74/24
77/7 77/24 78/7
88/12 95/9 96/23
98/17 105/5 109/17
110/1 111/21
112/20 112/24
113/15 113/23
114/6 114/9 114/14
115/1 116/4 116/8
118/7 118/14
118/22 124/14
132/17 136/2
137/13 137/13
139/25 144/6 146/7
146/22

**old [3]** 65/4 86/13
93/15

**old-school [1]**
86/13

**once [7]** 11/3
11/14 12/12 24/12
26/23 52/5 92/10

**one [147]** 3/5 3/8
4/1 4/14 5/6 6/5
8/10 8/11 11/1
13/22 14/6 14/23
15/3 16/14 16/14
20/22 21/4 22/17
22/20 22/22 23/4
24/5 24/6 24/15
25/21 26/24 27/10
27/20 28/3 28/11
28/16 28/21 28/23
29/14 29/22 31/22
32/11 32/12 32/25
34/12 35/22 36/7
36/20 36/23 39/3
39/14 39/19 40/10
43/7 46/17 46/22
46/25 49/12 51/8
53/9 53/11 54/1
55/15 55/18 55/23
60/5 60/17 61/25
62/5 63/8 68/5
70/5 70/10 70/24
71/25 72/6 72/6
73/5 73/6 74/2
74/9 74/10 75/4
75/5 75/10 76/4
76/15 76/19 77/11
77/17 77/24 78/1
78/2 78/5 78/20
79/3 79/19 80/15
80/18 84/23 84/23
87/8 87/15 87/16
87/20 87/25 89/5
89/12 90/19 91/14
94/6 94/14 94/25
100/13 100/25

102/10 103/23
105/7 106/14
108/9 109/8 110/22
110/24 111/7
111/12 111/18
112/1 112/4 115/2
116/18 118/4 119/7
119/15 124/1
127/17 127/20
127/24 128/6 133/4
136/8 137/12 139/5
139/20 140/5 141/3
141/7 141/8 141/16
144/3 144/22
145/12 145/17

**One is [1]** 3/5

**one-hour [1]** 118/4

**one-sided [1]** 8/11

**one-year [1]**
127/24

**ongoing [1]** 7/14

**only [17]** 7/16
9/25 47/17 67/3
69/20 70/5 74/22
94/25 96/6 100/21
115/12 116/18
117/17 117/19
119/10 134/7 141/7

**onwards [1]** 24/23

**open [6]** 17/9
21/19 94/11 94/24
95/3 143/6

**operate [1]** 94/20

**operates [1]** 11/23

**operating [17]**
64/7 75/25 76/3
91/22 93/8 93/10
93/12 93/13 93/17
96/21 103/16
103/18 103/25
104/2 104/11 107/4
114/25

**operation [7]** 26/1
93/10 93/18 93/19

USCA11 Case: 22-11150    Document: 13-4    Date Filed: 11/30/2022    Page: 88 of 254

**O**

**operation... [3]**
97/14 98/2 116/1

**operational [2]**
12/23 26/25

**opine [3]**   25/11
115/12 121/15

**opined [2]**   40/1
56/8

**opines [1]**   44/13

**opining [5]**   23/10
36/17 40/7 40/10
44/17

**opinion [46]**   23/4
24/8 24/17 29/24
30/17 43/12 43/14
43/17 43/20 43/23
44/1 44/4 44/10
45/7 45/13 45/16
46/5 46/13 47/12
47/14 48/2 48/12
48/13 48/21 49/19
52/22 53/17 54/8
54/11 54/13 58/12
60/21 66/22 67/22
68/12 82/15 112/1
112/4 112/24 113/7
113/9 120/9 120/11
121/10 121/16
127/4

**opinions [6]**   39/1
56/22 67/14 111/6
111/12 111/18

**opportunity [3]**
6/24 10/2 77/1

**opposing [2]**   9/7
135/5

**option [1]**   122/15

**options [1]**   94/25

**order [9]**   3/1 4/18
8/1 9/5 13/10 32/6
94/21 141/17
143/14

**ordered [1]**   130/1

**orders [1]**   130/15

**ordinarily [1]**
86/6

**Oregon [1]**   127/25

**organization [3]**
83/14 83/17 83/24

**organizations [1]**
84/4

**organized [5]**   72/3
87/12 87/13 91/17
102/3

**organizing [1]**
86/9

**oriented [3]**   60/4
60/7 60/8

**original [13]**
17/19 35/13 35/14
44/15 45/18 71/25
79/9 97/12 97/13
97/18 97/19 117/3
117/9

**originals [1]**   97/8

**OS [1]**   93/13

**osteomyelitis [1]**
143/8

**other [41]**   4/15
5/12 6/5 21/18
30/7 31/24 32/12
32/12 35/14 37/7
37/16 41/21 42/1
44/11 49/5 54/17
54/18 60/17 70/24
71/5 73/5 74/18
74/19 84/5 84/7
90/21 91/15 91/19
98/8 98/8 98/8
100/14 101/16
103/14 112/4 116/1
120/24 128/6
130/15 141/19
146/11

**others [4]**   34/6
69/21 70/22 94/19

**otherwise [1]**   3/23

**our [17]**   4/25
5/14 5/21 6/3 6/19
8/16 41/19 62/12
85/4 87/3 92/12
94/1 101/24 106/13
118/4 124/18

**out [44]**   5/3 5/19
5/19 5/20 7/1 7/11
7/18 12/15 47/6
49/7 60/22 61/3
66/21 68/25 69/2
69/5 70/1 70/5
70/5 70/13 85/18
86/4 88/3 89/4
89/11 89/19 89/21
90/2 91/1 91/3
91/12 93/1 94/16
96/16 96/17 102/1
102/22 117/4 139/6
139/7 139/7 140/18
141/22 143/14

**outlined [1]**
136/16

**outside [22]**   12/4
13/25 19/18 23/3
25/9 29/18 30/23
31/1 31/25 33/12
35/6 37/23 39/8
39/18 42/3 44/6
44/16 45/4 45/6
77/19 77/22 142/11

**over [18]**   3/22
4/17 4/17 8/14
19/5 22/3 31/14
64/23 69/9 71/3
83/6 84/12 85/8
85/9 93/7 119/7
139/6 142/23

**Overflow [2]**   62/9
63/7

**overnight [16]**
138/6 138/14 139/1
139/3 139/5 139/8

**O**

**overnight... [10]**
139/10 139/16
139/19 139/20
140/2 140/18
140/23 141/7
141/10 141/12

**overruled [27]**
12/17 16/2 20/4
24/19 25/24 29/25
31/3 32/2 32/14
34/9 35/7 37/13
37/18 38/1 39/11
39/21 42/5 61/18
69/14 107/1 108/2
108/13 109/5
111/16 113/4 120/6
120/8

**overwrites [3]**
102/22 104/5
105/12

**overwriting [8]**
92/1 92/7 92/9
92/12 96/20 96/22
103/3 105/9

**overwritten [13]**
92/10 106/24 113/9
113/13 113/20
113/22 114/17
115/3 117/12
117/17 117/19
117/21 117/22

**own [2]** 21/20
32/19

**Ownership [1]**
15/22

**P**

**p.m [16]** 118/6
118/9 118/9 118/24
123/14 123/14
124/9 124/9 124/13
124/15 124/15
125/7 125/11

125/11 144/17
144/17

**P478 [6]** 55/11
55/25 57/25 72/14
73/6 74/4

**P767 [1]** 67/24

**P853.1 [1]** 66/24

**Pacific [2]** 82/21
128/7

**package [2]** 17/9
17/10

**packet [1]** 38/11

**page [21]** 2/4 3/15
14/8 15/17 19/9
38/15 50/1 50/8
51/12 51/12 51/23
51/24 58/4 63/3
63/9 72/18 73/14
73/14 80/25 81/7
81/8

**pages [8]** 1/8 3/16
3/16 131/9 131/14
132/2 137/8 148/12

**Paige [1]** 62/5

**PALM [7]** 1/2 58/21
59/3 59/7 63/21
63/22 136/4

**paper [1]** 15/6

**paragraph [18]**
12/6 14/2 14/3
14/9 14/10 14/11
15/18 15/19 19/22
20/2 20/3 20/3
25/13 33/17 33/17
50/1 50/3 68/5

**paragraphs [1]**
12/14

**paraplegia [4]**
130/20 131/3
142/16 143/24

**paraplegic [4]**
131/1 131/5 131/6
142/20

**part [16]** 5/18 8/8

12/3 13/6 13/14
16/6
47/10 49/9 53/18
53/20 74/18 83/16
102/22 129/13

**participants [4]**
21/18 22/8 22/10
32/23

**participated [2]**
83/18 83/20

**participation [1]**
45/7

**particular [16]**
17/2 19/16 33/9
35/8 39/9 62/17
63/8 63/16 79/5
79/7 79/19 86/18
127/6 132/9 133/7
137/24

**particularly [4]**
24/22 122/5 129/22
131/5

**parties [1]** 146/3

**partners [1]** 43/15

**partnership [2]**
45/11 82/16

**parts [2]** 74/19
93/2

**pass [15]** 136/12
139/6 139/7 139/19
139/20 140/3
140/18 141/2 141/3
141/5 141/6 141/7
141/12 141/12
141/14

**passcode [3]** 92/6
94/21 94/24

**passed [1]** 115/15

**passes [19]** 136/16
136/16 136/24
138/6 138/14
138/15 139/1 139/1
139/3 139/3 139/5
139/9 139/10

# P

passes... **[6]**
139/16 139/22
140/23 140/23
141/10 141/17
**password [1]**
100/11
**past [1]** 132/1
**pasting [1]** 88/5
**patent [3]** 7/5 7/6
7/15
**path [1]** 39/22
**patient [1]** 129/16
**patients [2]**
130/18 131/2
**Patrick [1]** 62/5
**Pause [13]** 4/2
15/4 15/20 33/18
36/6 36/10 51/10
52/7 76/18 76/22
78/6 107/13 145/3
**PDF [4]** 94/4 101/2
101/5 101/7
**PDFs [1]** 101/3
**pediatrics [1]**
128/2
**people [8]** 22/10
33/4 34/17 35/3
37/4 43/2 70/20
70/20
**per [1]** 41/11
**percent [6]** 62/15
62/20 62/23 63/6
63/13 63/16
**perfect [5]** 66/2
73/4 74/8 132/3
146/6
**perform [4]** 40/16
98/13 112/11
112/12
**perhaps [1]** 146/4
**period [2]** 136/14
142/12

**Perl [15]** 54/20
57/16 57/17 58/2
58/6 58/17 74/11
74/16 75/6 75/11
75/13 75/15 75/20
75/23 76/5
**permissible [1]**
78/18
**permit [2]** 120/21
144/12
**permitted [1]**
125/23
**person [19]** 8/21
22/24 31/18 31/24
32/11 32/12 46/17
46/22 46/25 47/4
77/12 77/17 78/20
79/3 79/19 104/17
119/10 120/23
127/6
**persona [2]** 47/17
47/18
**personal [3]** 1/3
48/7 71/8
**personally [2]**
64/23 65/12
**personnel [2]**
132/15 140/7
**photo [1]** 18/23
**phrase [4]** 30/22
31/6 31/7 31/10
**phrased [1]** 29/1
**physical [11]**
24/12 24/14 25/7
25/11 30/4 95/20
97/2 97/4 97/5
97/15 144/4
**physically [7]**
18/13 26/4 27/1
27/14 45/21 96/2
141/1
**physicians [2]**
130/18 141/3
**pie [1]** 140/15

**piece [9]** 13/15
57/16 62/11 64/19
90/19 90/20 91/13
117/6 141/17
**pieces [6]** 66/21
85/10 87/19 88/4
90/8 90/12
**pinkish [1]** 138/2
**place [21]** 5/6 7/3
7/12 86/12 87/8
88/18 88/23 89/3
89/5 89/12 92/16
92/19 92/23 93/5
105/11 105/13
113/11 114/3 117/9
143/13 144/5
**placed [5]** 11/17
81/19 87/25 88/1
125/16
**placing [2]** 86/24
89/1
**PLAINTIFF [3]** 1/12
80/16 112/21
**Plaintiffs [14]**
1/5 3/5 3/10 6/16
7/17 8/2 9/14 78/2
78/4 80/1 80/5
123/2 144/21 145/8
**Plaintiffs' [8]**
96/4 108/17 108/24
109/8 109/21
110/12 110/18
112/21
**planning [3]** 6/14
27/21 124/2
**platform [1]** 7/23
**play [2]** 123/9
146/20
**played [6]** 5/3
81/11 123/14
123/25 124/9
125/11
**playing [1]** 80/15
**pleasant [4]** 118/7

USCA11 Case: 22-11150    Document: 44-4    Date Filed: 11/30/2022    Page: 91 of 254

**P**

**pleasant... [3]**
119/2 144/15
146/22

**please [38]**  10/7
11/10 11/13 14/8
15/2 16/5 16/21
28/18 44/9 49/25
52/1 57/25 58/14
66/16 66/24 67/25
73/25 77/8 80/13
81/22 82/5 82/19
99/15 109/19
117/18 119/1 119/5
119/24 122/7 123/7
123/11 124/8 125/9
126/11 126/14
131/15 137/9
144/11

**pleasure [1]**  9/14

**plug [5]**  26/5 26/9
26/9 26/12 27/1

**plus [1]**  3/16

**point [14]**  6/17
9/23 10/8 11/1
11/8 16/3 23/24
39/11 39/22 42/5
68/8 108/2 108/13
124/11

**pointers [2]**  102/2
117/8

**Ponce [1]**  1/21

**population [1]**
129/16

**portability [2]**
20/17 20/22

**portion [3]**  132/6
132/7 132/9

**portions [1]**  81/1

**Portland [1]**
127/25

**position [6]**  5/22
41/14 51/4 86/21

93/2 105/13

**possibility [3]**
4/6 60/22 61/3

**possible [16]**  33/2
33/8 46/24 47/1
53/11 59/10 59/11
61/5 62/3 64/18
78/10 79/16 85/24
86/1 95/6 104/16

**post [1]**  6/23

**posted [2]**  67/15
128/5

**posting [1]**  6/10

**postings [1]**  47/17

**posts [2]**  67/3
67/9

**potential [1]**  51/5

**potentially [5]**
20/13 63/22 85/9
89/17 95/5

**power [6]**  13/9
22/12 26/12 26/13
26/14 28/22

**practical [2]**
23/25 84/10

**practically [1]**
95/8

**practice [4]**  83/1
83/5 85/4 128/15

**practices [2]**  98/6
122/12

**practicing [1]**
128/17

**prefer [1]**  145/22

**preferable [1]**
21/5

**preference [1]**
21/11

**premise [1]**  56/22

**prepackaged [1]**
17/8

**prepared [3]**  84/21
84/23 124/24

**preparing [2]**

86/25 89/9

**prerogative [1]**
9/10

**present [7]**  32/18
66/7 117/11 118/6
124/13 144/17
148/7

**presentation [1]**
108/16

**presented [1]**
136/4

**presenter [1]**  84/3

**president [1]**  83/4

**pressure [3]**  136/5
142/22 143/21

**pretty [2]**  67/10
146/8

**prevent [3]**  61/15
141/22 142/8

**prevented [1]**
61/23

**previous [4]**  6/9
6/10 102/9 104/22

**previously [11]**
11/16 41/2 62/2
89/1 104/2 108/18
130/20 134/14
134/16 135/5
140/25

**primary [2]**  70/10
70/17

**principle [1]**
94/20

**prior [7]**  3/22
5/16 51/21 79/18
119/23 136/6
142/17

**private [34]**  7/23
8/2 9/24 11/5 18/2
18/6 18/14 18/15
18/20 18/21 19/13
19/17 20/10 20/18
20/23 21/9 21/12
31/8 31/9 31/12

**P**

**private... [14]**
37/5 43/24 77/12
78/20 115/18
115/23 116/15
117/14 117/15
117/20 117/22
119/11 119/16
128/15
**privileged [2]**
40/17 127/17
**probably [2]**   26/2
145/14
**problem [4]**   9/8
16/17 135/11
143/16
**problematic [1]**
122/3
**problems [2]**   131/3
132/9
**procedure [2]**   88/7
145/20
**proceed [7]**   3/3
11/15 11/17 99/15
118/11 124/24
124/25
**proceeding [2]**
56/13 80/16
**proceedings [15]**
4/2 15/4 15/20
33/18 36/6 36/10
51/10 52/7 76/18
76/22 78/6 107/13
145/3 147/1 148/8
**process [6]**   86/4
89/10 89/17 90/5
112/12 112/14
**processing [2]**
25/1 112/15
**produced [1]**   39/2
**production [1]**
42/1
**professional [4]**

48/7 50/24 83/11
83/18
**professionally [3]**
64/23 65/5 65/13
**professionals [2]**
83/15 83/25
**profit [2]**   83/14
84/4
**program [4]**   17/15
70/20 99/3 114/25
**programmed [1]**
46/6
**programmer [3]**
48/8 48/10 64/3
**programmers [1]**
70/21
**programming [22]**
44/12 49/10 51/2
54/3 54/10 54/17
54/19 54/20 54/23
57/16 57/19 60/4
60/7 60/12 60/18
60/23 65/20 69/8
71/16 71/25 75/17
75/18
**programs [5]**   69/21
71/4 71/5 93/15
94/18
**progress [1]**   11/6
**prolonged [2]**
132/8 136/25
**prominence [1]**
142/23
**promoted [1]**   41/14
**prompt [1]**   124/23
**proper [1]**   3/21
**properly [4]**   3/16
4/20 15/9 52/3
**properties [1]**
13/16
**property [3]**   13/20
45/14 112/5
**proposed [1]**   29/22
**protocol [7]**   12/3

13/14 13/24 16/6
**prove [1]**   97/12
**proven [1]**   84/10
**provide [8]**   14/8
41/21 54/8 76/11
77/4 82/15 126/7
126/17
**provided [10]**   42/6
48/21 49/3 50/15
58/11 67/13 68/11
83/9 112/21 122/12
**provides [1]**   83/14
**providing [2]**
70/22 127/4
**public [7]**   9/24
11/5 21/21 47/17
47/19 52/20 116/19
**public-facing [1]**
52/20
**publications [2]**
14/12 14/14
**publish [5]**   57/1
58/1 58/14 99/11
108/18
**published [5]**   58/5
60/13 74/12 95/13
135/21
**pull [11]**   19/1
72/14 72/16 73/20
73/25 108/15
131/15 133/1 134/5
136/17 137/17
**pull-up [1]**   73/20
**pull-ups [1]**   73/25
**pulling [1]**   52/2
**purchased [1]**
10/12
**pure [1]**   61/8
**purpose [2]**   56/3
140/24
**purposes [7]**   56/21
57/6 58/1 110/15
111/1 124/2 135/6

USCA11 Case: 22-11150 Document: 51-6 Date Filed: 11/30/2022 Page: 93 of 254

**P**

**pushed [1]** 120/17
**put [18]** 6/13
38/11 50/12 55/11
66/24 67/24 87/16
87/17 87/21 90/11
90/19 90/20 91/5
92/9 98/17 99/9
117/8 120/23
**puts [1]** 89/12
**putting [3]** 18/7
89/5 94/6
**puzzle [1]** 13/20

**Q**

**qualifications [1]**
110/8
**qualified [1]**
25/11
**question [32]** 20/5
20/7 20/19 23/22
28/18 30/12 33/6
43/7 52/8 52/10
52/19 61/21 61/22
67/9 69/4 75/8
77/3 77/5 77/11
77/15 77/21 78/3
78/8 78/19 79/1
79/14 113/5 117/10
119/8 122/20
122/22 145/17
**questioning [2]**
11/17 110/3
**questions [28]**
40/15 43/12 46/15
52/17 56/20 68/16
68/22 69/22 70/11
70/21 70/23 71/7
72/8 74/15 77/1
77/2 77/7 78/17
78/17 79/22 79/23
107/15 119/18
122/17 122/20
122/23 122/24

123/3
**quick [6]** 89/8
89/10 89/10 89/25
91/1 145/12
**quite [2]** 87/12
93/3
**quote [8]** 6/12 7/2
9/18 9/19 9/20
10/1 10/5 10/6
**quoted [1]** 132/15
**quotes [1]** 132/17

**R**

**raise [6]** 3/5 6/6
77/2 81/19 122/21
125/16
**raised [1]** 6/9
**random [2]** 94/3
99/22
**randomly [1]** 94/12
**range [1]** 51/5
**Rapids [1]** 127/18
**rate [7]** 41/7
41/10 41/13 41/15
41/15 41/17 42/19
**rather [3]** 87/21
142/10 143/22
**reach [1]** 46/5
**reaching [1]** 60/21
**read [18]** 10/4
10/6 20/8 52/5
52/8 52/9 52/11
56/10 69/18 78/3
86/22 86/22 87/22
94/4 104/7 116/7
133/13 135/25
**readable [2]** 94/3
94/4
**readily [1]** 29/15
**reading [2]** 64/22
65/12
**reads [3]** 75/1
77/11 79/14
**ready [8]** 5/14

11/15 66/10 118/19
124/25 145/16
**realistic [1]** 5/8
**realize [1]** 124/17
**really [10]** 7/22
16/7 16/14 18/16
18/16 31/18 65/16
65/19 86/8 94/1
**rearranging [1]**
107/19
**reason [13]** 3/21
10/7 53/9 70/3
70/10 100/4 100/21
122/8 130/1 135/13
141/4 141/13
141/19
**reasons [2]** 100/4
141/19
**rebuttal [5]** 14/21
20/1 25/17 84/20
84/24
**rebutting [1]**
45/21
**recall [28]** 22/14
22/17 24/11 31/17
37/21 38/6 38/7
39/1 49/8 49/23
50/17 50/18 55/18
59/2 62/22 63/1
67/5 67/19 68/13
68/22 69/22 71/7
74/15 74/21 104/13
104/15 105/2 131/9
**receive [4]** 13/3
34/22 34/23 136/15
**received [9]** 3/13
41/3 41/5 43/8
132/25 134/3
135/20 137/16
140/4
**receiver [2]** 77/13
78/21
**receives [1]** 40/25

**R**

**receiving [1]**
142/11

**recess [8]**   66/6
66/8 66/9 118/4
118/9 124/12
124/14 124/15

**recognize [9]**
131/19 131/22
132/5 133/4 134/10
134/12 136/21
136/23 137/21

**recollection [7]**
38/10 38/14 38/19
50/5 50/20 63/5
63/12

**record [10]**   9/12
10/2 10/7 10/18
16/11 77/9 80/25
81/23 126/15
133/14

**recording [1]**
15/23

**records [22]**
127/14 129/14
131/7 131/10
131/11 131/23
132/7 132/10
132/13 132/14
133/5 133/11
133/23 134/16
137/3 137/5 140/2
140/3 141/9 141/13
141/21 142/2

**recover [22]**   85/14
85/17 85/24 86/1
91/9 91/11 91/19
91/21 91/23 91/24
92/7 92/10 93/9
93/20 96/14 102/5
102/6 102/19 104/6
106/14 106/16
117/16

**recovered [1]**
116/25

**recovering [1]**
117/2

**recovery [3]**   85/23
96/15 120/2

**redirect [6]**   2/6
2/9 68/18 68/20
119/19 119/21

**Reed [10]**   131/15
133/1 134/5 136/17
137/11 137/17
138/8 138/20
140/10 140/20

**refer [1]**   90/9

**reference [12]**   7/8
15/8 21/1 21/3
71/10 72/10 74/6
74/20 74/22 77/16
79/2 88/2

**references [3]**
71/12 90/2 102/8

**referred [1]**   47/23

**referring [5]**
10/11 10/12 19/22
41/23 115/25

**refers [3]**   7/2
31/7 34/4

**reflect [4]**   134/15
138/2 138/5 140/14

**reflection [1]**
137/2

**reformat [5]**   89/23
90/23 91/1 101/24
103/2

**reformatted [5]**
91/8 101/18 101/19
101/23 102/11

**reformatting [8]**
89/24 90/5 90/25
91/5 102/4 102/19
102/21 102/21

**refresh [7]**   38/10
38/14 38/19 50/5

50/20 63/5 63/12

**regard [8]**   3/19
5/25 43/5 56/21
79/23 116/3 119/13
145/20

**regarding [2]**   6/23
48/7

**regular [3]**   29/22
41/5 130/8

**regulations [1]**
129/22

**Reid [1]**   131/25

**related [15]**   7/15
37/22 62/24 63/14
63/17 82/12 83/20
84/7 112/8 112/10
115/11 115/15
115/20 116/2 136/5

**relates [1]**   45/9

**relating [4]**   73/23
115/23 143/5
143/16

**relationship [1]**
71/24

**release [1]**   35/14

**released [3]**   10/11
45/2 60/11

**relevance [7]**
21/13 37/12 37/17
37/25 39/10 42/23
107/25

**relevant [6]**   51/2
52/19 52/24 52/24
52/25 53/10

**relied [4]**   48/20
49/19 53/12 67/22

**rely [1]**   85/1

**remain [5]**   81/19
89/13 93/2 93/6
125/16

**remained [1]**   92/15

**remaining [1]**
94/25

**remains [1]**   91/2

# R

**remedy [1]** 6/17

**remember [10]**
22/19 38/24 52/14
53/21 58/22 59/25
71/18 90/14 101/21
144/11

**remind [3]** 11/16
119/24 146/23

**remotely [2]** 28/4
28/6

**removal [2]** 114/20
115/23

**remove [1]** 114/1

**removed [4]** 92/19
113/19 114/16
115/4

**render [1]** 93/22

**rendered [1]** 58/11

**rendering [1]**
54/11

**reorganize [1]**
90/18

**repeat [7]** 20/5
20/7 20/19 30/11
61/19 69/4 113/5

**rephrase [2]** 23/22
70/15

**replaced [1]** 115/4

**replicate [2]** 85/5
85/7

**report [43]** 12/5
12/12 14/1 14/5
14/5 14/7 14/17
14/18 14/21 14/22
15/11 15/15 19/19
19/23 19/24 20/1
21/2 21/3 23/4
24/2 25/10 27/17
33/13 33/22 35/6
37/21 38/7 38/20
38/24 39/1 39/9
44/13 49/1 50/1

50/2 72/6 72/17
77/12 93/7 108/6
108/9 108/23 121/8

**reported [2]** 69/23
148/8

**reporter [7]** 1/23
20/7 77/25 80/11
81/2 101/9 148/5

**reports [12]** 14/15
37/15 38/8 84/21
84/23 85/1 108/14
109/15 110/14
121/9 121/19
122/11

**repository [1]**
79/6

**represent [2]** 3/14
67/6

**representation [3]**
3/17 4/23 10/21

**representations [1]**
10/17

**representative [3]**
1/3 69/25 70/4

**represented [1]**
8/11

**representing [1]**
7/6

**request [2]** 56/23
131/23

**requested [1]**
141/11

**requesting [1]**
141/11

**require [4]** 24/12
26/16 33/10 143/19

**required [5]** 27/14
44/2 76/13 136/10
142/10

**requirements [1]**
25/11

**requires [5]** 26/8
33/3 34/17 114/22
143/8

**requisite [1]**

**research [3]** 1/4
82/22 144/14

**reside [3]** 86/18
87/19 104/23

**resided [1]** 102/9

**residency [1]**
128/3

**resident [1]** 129/1

**residents [1]**
130/17

**resides [2]** 88/16
113/22

**residing [1]** 92/18

**respect [9]** 6/24
7/8 7/14 13/1
69/19 71/12 127/6
127/7 137/18

**respond [5]** 3/9
3/11 10/19 12/13
70/22

**responded [1]**
62/15

**responds [1]** 67/11

**response [10]** 3/19
3/20 6/21 8/4 9/22
44/7 46/16 70/23
80/10 83/15

**responsible [1]**
107/8

**restate [1]** 20/2

**rested [1]** 9/14

**result [2]** 142/16
142/22

**results [3]** 23/11
85/7 98/9

**resume [37]** 48/15
48/17 48/24 49/2
49/7 49/10 49/18
49/20 49/22 50/5
50/12 50/16 50/21
50/24 53/9 53/13
53/19 53/24 54/14

**R**

**resume... [18]**
54/15 54/16 55/5
55/6 55/14 56/5
56/7 57/21 58/3
58/11 60/1 71/8
71/10 71/12 71/19
71/22 72/17 72/19
**resumes [7]**   72/5
72/10 72/22 73/11
73/16 73/16 74/1
**retain [2]**   31/13
32/24
**return [1]**   140/6
**returns [1]**   141/8
**review [24]**   36/4
50/15 55/7 58/23
59/1 59/3 60/1
63/19 67/13 96/23
97/1 97/6 109/15
110/25 112/8 121/8
121/13 121/15
132/10 132/13
137/5 140/2 141/9
145/24
**reviewed [55]**   46/7
47/7 48/7 48/13
48/15 49/1 49/10
49/22 50/6 50/13
50/16 50/21 53/15
55/5 55/15 55/19
61/13 61/25 66/22
72/17 76/8 95/17
95/21 95/22 95/24
96/24 97/2 97/9
97/22 98/22 108/8
108/14 108/22
109/4 109/12
109/15 109/24
110/5 110/12
110/14 110/21
115/7 116/16
116/19 116/21

116/24 116/25
117/1 117/8 117/13
119/13 121/9 131/7
131/10 131/11
133/5
**reviewing [8]**
46/19 50/18 56/22
67/19 98/6 110/15
121/18 127/14
**ride [1]**   9/14
**rig [2]**   26/15 27/3
**right [149]**
**rigs [1]**   27/5
**risk [1]**   91/5
**RIVERO [3]**   1/18
1/19 4/19
**RMR [1]**   148/17
**ROCHE [5]**   1/12
1/13 2/8 39/4
117/10
**role [1]**   112/11
**room [9]**   1/24
28/11 28/23 29/8
30/3 30/6 30/10
30/15 144/10
**room-sized [1]**
30/3
**rotated [1]**   128/1
**rotating [2]**
127/25 128/1
**rounds [1]**   130/19
**route [1]**   143/19
**RPR [1]**   148/17
**rubberized [1]**
20/15
**ruggedized [2]**
20/12 20/15
**rule [4]**   3/22 15/9
60/22 61/3
**rules [3]**   3/15
86/9 86/11
**run [5]**   28/4 81/7
93/15 94/17 122/5
**running [5]**   26/18

27/12 29/5 29/7

**S**

**safety [2]**   32/5
32/7
**said [19]**   4/19 9/4
9/8 9/12 9/13 11/2
48/6 64/22 76/8
93/17 93/22 95/9
96/6 96/24 102/8
102/21 105/3
119/10 120/17
**salary [1]**   41/5
**same [26]**   13/19
13/21 18/24 20/24
23/17 25/23 27/8
27/24 28/7 28/13
32/7 32/9 32/13
33/1 40/4 59/24
62/20 69/2 69/6
73/21 85/17 88/7
88/9 93/3 94/20
133/6
**SANS [1]**   83/23
**Satoshi [10]**   10/13
46/15 46/17 46/21
47/10 47/13 47/16
47/22 47/24 48/2
**save [1]**   88/10
**saw [8]**   55/9 55/14
55/23 59/17 63/17
72/6 134/16 141/21
**say [26]**   4/22 7/20
8/9 9/4 9/21 10/1
12/15 18/3 18/4
24/22 28/4 28/5
32/22 37/3 45/6
53/13 55/24 62/19
64/14 75/19 75/24
76/11 87/14 103/22
124/22 132/16
**saying [10]**   11/1
14/23 15/10 18/4

USCA11 Case: 22-11150 Document: 28-2 Date Filed: 11/30/2022 Page: 97 of 254

**S**

**saying... [6]** 18/7
23/7 44/20 44/23
45/10 139/18
**says [6]** 10/9
15/23 31/19 50/23
58/17 58/19
**scale [12]** 24/15
24/21 24/24 25/21
25/25 26/15 26/17
28/17 28/22 29/21
30/1 35/25
**schedule [3]** 4/8
4/12 5/3
**schedule-wise [1]**
5/3
**schedules [2]** 5/19
6/3
**schemes [4]** 94/16
94/17 94/18 94/19
**SCHILLER [1]** 1/15
**school [9]** 59/18
59/24 60/15 65/9
85/18 86/13 90/14
98/12 127/23
**schools [1]** 127/18
**science [15]** 11/25
58/21 59/7 59/16
59/24 60/2 62/24
63/14 63/17 63/20
65/17 82/7 82/8
85/18 96/6
**science-related [1]**
63/17
**scientific [3]**
85/22 120/1 121/16
**scope [22]** 12/5
14/1 19/19 23/3
25/10 29/18 30/24
31/1 31/25 33/12
35/6 38/24 39/8
39/18 42/3 43/11
77/19 77/22 108/1

108/12 109/2 110/4
**scrambled [2]** 92/24
103/2 103/4
**screen [10]** 19/7
38/17 51/14 51/18
51/19 52/4 58/1
67/25 74/10 112/17
**screens [1]** 52/3
**script [8]** 33/16
34/3 34/7 34/13
35/3 35/9 54/24
76/5
**scripting [16]**
54/22 54/24 57/15
57/17 57/22 58/6
58/17 74/11 74/16
75/6 75/11 75/14
75/15 75/19 75/23
76/12
**scripts [5]** 33/16
35/11 35/14 69/20
76/14
**scroll [8]** 72/18
72/23 73/6 74/5
74/7 131/25 132/2
137/11
**scrolling [1]** 73/1
**seat [2]** 3/6
144/23
**seated [4]** 11/13
66/16 119/1 125/9
**second [20]** 8/8
10/23 15/12 15/14
19/9 51/8 72/18
77/15 78/3 79/1
87/17 87/21 99/24
101/2 107/10 117/2
122/11 124/1
124/19 137/12
**Secondly [1]**
129/16
**section [1]** 103/3
**sections [2]** 99/6
104/5

**secure [3]** 71/16
**security [6]** 57/23
58/6 58/17 74/16
75/24 77/4
**see [57]** 4/5 4/6
6/1 6/3 11/13
15/18 19/4 19/7
22/2 28/11 28/12
28/12 28/24 29/13
38/10 38/17 51/14
58/9 58/17 63/16
67/11 67/12 68/4
68/9 68/10 72/19
73/16 87/9 89/14
89/14 94/8 96/1
97/25 102/13
104/18 104/21
104/21 104/22
106/15 109/23
117/22 118/4 118/7
126/25 130/18
130/23 130/24
131/1 132/11 137/8
138/14 144/9
144/15 144/18
144/24 145/2
145/21
**seeing [5]** 22/14
77/7 122/24 130/23
131/5
**seek [3]** 6/17 6/18
56/9
**seeking [1]** 51/20
**seem [1]** 95/20
**seen [9]** 72/5 72/5
92/21 92/21 95/19
95/20 109/25
136/11 137/22
**self [5]** 62/7
62/16 62/21 63/6
69/23
**self-reported [1]**
69/23

**S**

**self-taught [4]**
62/7 62/16 62/21
63/6
**send [4]** 16/18
18/3 32/22 145/21
**sender [2]** 77/13
78/21
**sending [1]** 18/9
**senior [3]** 41/14
82/25 83/3
**seniority [1]**
41/17
**sensation [1]**
142/19
**sense [4]** 9/21
115/22 116/2
130/10
**senses [2]** 28/12
28/25
**sensitive [1]**
20/10
**sent [4]** 13/7 18/8
96/3 146/8
**separate [3]** 32/9
33/10 90/20
**sepsis [1]** 136/5
**September [7]**
27/20 131/12 136/2
136/7 136/13 139/6
143/2
**series [2]** 68/22
69/22
**serious [1]** 142/8
**seriously [1]**
142/6
**service [2]** 128/5
130/17
**services [5]** 41/21
41/23 42/7 42/10
128/1
**set [18]** 15/24
24/12 26/3 27/4

27/9 27/14 28/3
28/13 28/24 28/24
28/24 29/14 32/4
32/8 86/11 130/9
145/6 148/14
**sets [4]** 12/15
50/25 51/5 54/19
**setting [5]** 24/14
25/7 25/12 25/22
25/25
**seven [3]** 15/10
83/3 139/7
**several [2]** 122/4
142/17
**share [6]** 5/17
5/17 31/19 31/22
67/25 135/4
**shared [2]** 6/22
43/24
**sharing [1]** 37/5
**shelf [16]** 86/20
87/16 87/16 87/17
87/17 87/20 87/20
88/17 88/21 91/4
92/15 99/10 114/23
115/4 115/16
115/24
**shelves [8]** 86/12
87/8 89/13 89/20
91/16 94/7 99/9
117/6
**short [1]** 39/22
**shorthand [2]**
148/5 148/8
**should [9]** 3/23
31/8 31/14 41/17
87/13 91/15 92/17
135/10 143/21
**show [12]** 8/22
21/1 49/25 56/23
57/3 63/2 63/9
66/21 131/16 134/7
137/23 142/5
**showed [1]** 22/14

**shower [1]** 141/18
**showing [3]** 14/11
22/2 140/15
**shown [10]** 56/7
56/19 57/11 57/12
72/6 74/4 74/18
74/18 74/22 134/16
**shows [4]** 48/8
73/15 84/9 137/24
**sic [1]** 69/3
**side [4]** 8/16
32/19 74/10 112/17
**sidebar [3]** 77/8
77/9 78/15
**sided [1]** 8/11
**sign [3]** 32/18
32/24 33/1
**signature [4]** 7/17
18/6 108/25 109/7
**signatures [1]**
110/22
**signed [1]** 141/2
**significant [5]**
25/3 26/17 72/21
73/10 95/4
**significantly [1]**
24/23
**signing [1]** 17/11
**signs [2]** 98/21
100/16
**silly [1]** 11/2
**similar [7]** 32/5
55/15 85/15 86/25
87/23 88/2 129/8
**similarly [1]** 40/2
**simple [4]** 69/20
76/12 76/14 91/23
**simply [8]** 5/9
15/23 23/10 45/6
49/3 53/10 86/24
92/9
**since [8]** 41/7
56/9 60/6 81/1
100/10 117/7

**S**

**since... [2]**
128/16 128/18
**single [9]** 27/4
46/20 47/2 47/4
97/3 99/5 99/8
100/13 102/16
**sir [16]** 6/7 9/1
66/1 76/24 78/24
79/12 79/21 80/7
81/18 113/5 125/15
125/20 126/3
126/23 144/19
145/1
**site [1]** 8/7
**sits [1]** 75/21
**sitting [2]** 104/17
104/24
**situation [2]** 8/10
32/23
**six [4]** 27/3
101/15 129/7 139/7
**size [5]** 26/15
30/4 89/18 93/3
99/25
**sized [1]** 30/3
**skill [3]** 50/24
51/5 54/19
**skilled [1]** 48/8
**skills [5]** 44/1
44/14 45/20 48/4
54/12
**skin [1]** 142/25
**Slack [5]** 6/9 6/19
67/3 67/4 67/9
**slate [1]** 89/22
**slide [3]** 108/16
109/18 138/9
**slightly [1]** 72/3
**so [184]**
**social [3]** 7/22
8/10 8/14
**software [25]** 12/3

17/3 17/7 17/15
21/12 23/24 25/7
32/4 35/13 44/15
44/17 47/19 48/3
53/16 62/1 69/3
69/6 79/9 83/22
84/11 85/7 99/3
100/3 100/6 100/8
**solution [4]** 26/16
26/20 27/9 27/12
**solve [1]** 13/20
**solves [1]** 16/16
**some [35]** 5/12
6/24 12/21 17/12
19/14 20/13 20/14
26/10 26/13 26/16
26/19 26/19 27/9
27/11 29/12 45/18
46/2 46/15 62/23
63/13 63/17 64/4
69/23 71/7 72/2
74/19 94/17 94/17
94/18 94/19 96/19
100/23 107/19
116/1 141/16
**somebody [8]** 25/16
28/5 38/5 42/21
63/24 64/13 67/9
130/10
**somehow [1]** 27/7
**someone [10]** 16/18
17/24 20/17 31/11
45/17 46/6 64/16
85/5 104/24 120/22
**something [21]**
11/1 11/2 11/2
20/12 30/1 71/20
76/1 76/11 87/10
88/18 88/23 90/15
92/10 92/15 94/5
96/24 105/11 114/2
114/18 114/20
115/5
**sometime [3]** 36/5

41/9 60/23
**sometimes [10]**
47/22 86/1 87/13
87/15 87/24 87/25
90/7 92/24 93/1
143/1
**somewhat [1]** 62/16
**somewhere [3]**
16/18 16/19 17/20
**sophisticated [4]**
17/17 61/1 64/3
64/3
**sophistication [1]**
71/1
**sore [1]** 143/6
**sorry [26]** 14/18
20/5 20/20 30/11
30/25 33/5 33/19
37/10 38/12 56/18
57/13 57/15 58/16
61/21 65/11 65/14
69/4 75/7 77/21
80/10 101/10
116/13 126/10
126/12 126/19
140/11
**sort [4]** 7/17
69/23 74/19 82/16
**sorts [2]** 70/24
104/19
**sounds [3]** 7/1 7/9
91/5
**source [6]** 16/25
17/9 44/6 45/18
47/7 122/15
**sources [1]** 21/22
**South [1]** 1/14
**Southeast [1]** 1/17
**SOUTHERN [4]** 1/1
82/9 148/3 148/6
**space [4]** 30/6
88/15 113/21
114/16
**spaces [2]** 87/9

S

USCA11 Case: 22-11150   Document: 53-14   Date Filed: 11/30/2022   Page: 100 of 254

**spaces... [1]**
88/20

**SPAWAR [1]**   82/21

**speak [6]**   80/13
91/4 96/9 121/24
126/21 144/12

**speaker [3]**   84/2
84/4 84/13

**speaking [5]**   87/5
90/16 94/20 114/19
145/13

**special [1]**   34/23

**specialist [1]**
131/5

**specialized [4]**
24/25 25/2 26/14
136/10

**specializing [2]**
82/8 128/20

**specific [9]**   9/18
29/11 36/4 37/22
58/25 59/22 60/1
79/7 79/23

**specifically [21]**
10/9 36/22 49/20
49/24 50/21 52/23
59/9 60/20 61/2
62/22 63/1 63/19
65/19 67/5 75/23
79/5 109/11 110/20
112/10 115/25
130/1

**spectrum [1]**   75/21

**speculate [1]**
116/2

**speculation [10]**
21/4 27/24 29/18
32/1 59/12 61/8
61/17 106/20
106/25 120/7

**spell [1]**   81/23

**spend [8]**   5/7 8/25

16/17 16/17 16/19
18/7 53/14 137/10

**spending [1]**   13/10

**spent [2]**   17/2
140/16

**sphincter [2]**
143/10 143/18

**split [5]**   87/16
87/25 88/19 90/8
91/15

**spoke [1]**   89/1

**spoken [1]**   8/22

**sponsor [1]**   56/15

**spontaneously [1]**
143/20

**spot [1]**   92/17

**squiggles [1]**
94/11

**ss [1]**   148/2

**stack [3]**   30/5
62/9 63/7

**stacked [1]**   30/7

**stamp [1]**   18/7

**stand [4]**   10/21
22/15 80/23 81/14

**stand-alone [1]**
22/15

**standard [6]**   84/9
85/3 85/4 100/24
101/3 101/6

**standardized [1]**
72/3

**standing [2]**   81/19
125/16

**start [6]**   35/15
41/9 65/7 89/21
118/14 124/8

**started [7]**   6/13
22/22 41/3 65/4
65/14 90/13 98/13

**starting [3]**   69/7
129/18 129/25

**starts [4]**   15/22
72/19 89/20 91/14

**state [7]**   3/12
81/22 84/4 126/14

**stated [2]**   7/1
33/22

**statement [8]**   7/4
7/11 8/7 8/9 8/20
10/15 76/13 106/3

**statements [6]**
8/15 8/23 132/11
132/14 132/15
132/17

**STATES [5]**   1/1
1/10 129/17 148/1
148/6

**stating [1]**   8/6

**statistical [2]**
13/16 13/20

**statistics [4]**
12/1 13/13 13/15
15/18

**stay [2]**   137/18
141/22

**stayed [2]**   128/13
128/23

**stays [1]**   88/17

**stenographic [1]**
148/11

**step [4]**   81/18
101/2 117/1 125/15

**STEPHEN [1]**   1/16

**steroids [1]**   71/6

**STEWART [3]**   2/13
125/18 126/16

**still [6]**   10/21
56/18 56/18 104/23
125/3 128/14

**stimulation [1]**
143/19

**stole [1]**   112/2

**stop [6]**   8/23 73/8
124/1 124/4 138/9
144/6

**stopped [1]**   22/23

USCA11 Case: 22-11150    Document: 53-14    Date Filed: 11/30/2022    Page: 101 of 254

**S**

**stops [1]**   37/4

**storage [2]**   19/15
20/15

**store [2]**   18/23
87/1

**stored [10]**   18/16
18/20 18/22 18/24
85/23 86/6 86/20
87/4 87/9 90/2

**storing [6]**   19/13
19/17 20/9 20/18
21/9 21/11

**storying [1]**   20/23

**Street [1]**   1/17

**string [1]**   18/22

**strip [1]**   26/13

**striving [1]**   4/19

**stronger [1]**   94/19

**structure [3]**
41/15 45/3 86/8

**studied [3]**   58/20
59/15 63/20

**study [1]**   55/10

**studying [1]**   59/7

**style [5]**   46/20
47/2 78/9 79/15
79/19

**subject [6]**   9/6
17/23 56/14 106/24
126/9 127/3

**subjected [3]**
143/25 144/1 144/1

**submitted [5]**
38/23 40/1 54/1
108/8 108/23

**submitting [1]**
38/7

**subset [2]**   17/10
33/25

**subsidy [1]**   13/4

**substantial [2]**
129/9 129/11

**substantively [1]**
135/5

**successful [1]**
13/18

**such [20]**   13/21
16/16 21/22 25/7
25/21 26/15 28/10
29/15 34/13 35/11
41/12 48/9 86/16
91/21 91/22 93/12
104/5 129/17
130/11 130/14

**sue [1]**   6/15

**suggest [5]**   7/19
7/19 7/19 115/10
145/24

**suitable [1]**   19/16

**Suite [3]**   1/14
1/17 1/21

**summary [7]**   134/13
134/20 135/1 135/3
135/7 136/1 137/7

**superset [1]**   72/4

**supervise [1]**
141/17

**supplies [1]**   28/22

**supply [1]**   26/12

**support [5]**   12/21
13/2 13/12 42/6
82/24

**supported [1]**
35/13

**supports [2]**   27/3
53/23

**supposed [1]**
113/25

**sure [20]**   10/14
14/9 15/22 20/3
20/6 28/15 28/19
37/22 41/23 42/20
55/17 57/24 69/5
74/25 82/7 86/7
86/24 97/22 124/6
145/14

**surface [1]**   142/23

**surgery [1]**   143/2

**surgical [1]**   143/9

**surprising [1]**
131/4

**survey [7]**   62/14
62/20 63/7 63/8
63/13 63/16 70/6

**surveys [1]**   70/13

**sustained [29]**
20/25 21/14 23/13
24/3 24/9 25/13
25/18 27/18 28/1
28/8 29/3 29/19
30/18 34/1 35/18
40/5 40/18 42/24
43/5 56/24 59/13
61/9 70/15 103/12
106/21 111/10
121/6 130/5 141/25

**SWORN [2]**   81/21
125/18

**symbols [1]**   94/12

**system [57]**   12/20
16/15 16/20 21/19
22/7 22/8 25/8
26/19 26/24 26/25
27/12 27/15 27/21
28/3 28/10 28/11
28/14 28/22 28/24
29/5 29/15 30/14
46/4 64/7 75/22
75/25 76/3 86/8
86/8 86/24 87/23
88/2 89/2 89/3
89/25 91/22 92/22
93/8 93/10 93/12
93/13 93/17 96/21
103/25 104/2
104/11 107/5
113/21 114/4 114/6
114/13 114/25
117/3 129/14 130/9
131/11 136/8

USCA11 Case: 22-11150    Document: 53-1    Date Filed: 11/30/2022    Page: 102 of 254

**S**

**system's [1]** 114/14

**systems [5]** 27/7 51/6 103/16 103/18 104/22

---

**T**

**Tab [3]** 134/5 134/5 136/17

**table [8]** 8/16 113/18 113/19 113/21 113/24 114/5 114/11 146/24

**table's [1]** 114/9

**tactical [1]** 57/22

**taint [1]** 98/9

**take [27]** 5/4 7/12 15/7 16/18 40/22 65/23 66/3 66/6 67/16 68/14 73/25 74/9 88/23 89/17 92/23 95/4 118/4 121/22 121/23 124/12 124/23 125/23 140/10 140/20 141/14 146/17 146/23

**taken [4]** 5/5 7/10 16/10 115/4

**takes [5]** 30/6 88/18 105/11 105/12 114/3

**taking [5]** 70/6 103/8 141/22 145/13 145/15

**talk [12]** 4/8 8/13 46/11 56/4 86/3 92/2 96/5 96/7 96/8 98/20 101/16 103/14

**talked [4]** 62/12 90/6 96/19 100/15

**talking [11]** 6/11 9/9 31/16 36/21 45/4 88/6 94/9 124/21 132/8 134/14 142/17

**Tampa [1]** 28/5

**tamper [1]** 16/14

**taught [10]** 60/9 60/10 61/5 61/11 62/3 62/7 62/16 62/21 63/6 64/19

**teaches [1]** 65/19

**teaching [5]** 61/15 61/23 130/14 130/15 130/16

**team [6]** 46/18 46/22 48/17 48/21 48/25 82/24

**technical [8]** 44/1 58/6 58/18 74/16 74/24 75/5 75/11 91/25

**technically [1]** 75/2

**techniques [1]** 71/16

**technological [1]** 31/22

**technologies [1]** 54/9

**technology [3]** 54/9 82/24 83/12

**tell [20]** 3/23 18/9 33/2 33/9 34/12 36/1 77/16 79/2 79/4 82/5 82/19 85/21 86/5 86/19 86/21 91/14 100/23 114/22 127/15 129/11

**teller's [1]** 32/6

**telling [1]** 115/2

**tells [5]** 68/6 87/19 99/19 101/5

113/19

**temporary [1]** 136/16

**tend [3]** 129/17 129/20 129/21

**term [3]** 34/4 90/17 91/25

**terms [2]** 3/15 88/20

**test [1]** 97/25

**tested [1]** 98/2

**testified [26]** 6/12 21/25 23/19 25/15 39/13 53/21 62/2 67/3 71/21 75/13 102/10 107/21 107/23 108/4 108/22 109/3 109/8 110/5 113/23 114/4 116/5 116/8 116/11 119/9 119/15 119/23

**testify [8]** 15/25 30/21 42/15 56/12 82/12 84/17 84/22 111/3

**testifying [14]** 4/13 7/13 22/17 24/11 42/21 49/15 52/25 53/3 54/7 56/20 80/23 111/3 113/12 125/24

**testimony [38]** 6/14 7/3 7/24 8/15 8/21 30/21 31/17 39/18 42/4 47/9 49/12 51/2 51/21 53/1 53/16 61/25 67/7 69/18 76/9 80/17 80/19 80/22 84/20 104/7 104/11 104/13 104/15 105/2 108/7 113/3 116/14 119/13

**T**

**testimony... [6]**
121/1 123/15
125/10 126/7
126/17 134/24
**testing [1]** 98/14
**text [5]** 71/2 71/5
75/1 79/10 94/13
**than [13]** 5/6 8/25
21/5 30/2 44/11
46/25 49/5 62/14
70/7 75/20 94/19
129/18 141/19
**thank [32]** 11/8
15/16 40/23 53/7
67/16 68/14 76/24
78/14 78/16 79/21
80/7 81/9 81/10
81/12 81/25 99/14
107/14 110/10
122/16 122/18
123/4 123/13
123/24 124/7
124/10 125/6
125/19 125/25
126/23 144/24
145/1 146/6
**Thanks [1]** 9/15
**Thanksgiving [3]**
4/7 5/1 5/7
**that [581]**
**that's [88]** 7/13
8/8 9/3 9/9 9/19
9/20 12/6 14/13
14/16 15/13 15/14
16/14 20/12 21/23
23/8 29/23 32/15
36/21 36/25 37/6
40/9 40/12 40/21
41/19 43/16 43/19
43/22 43/25 44/19
45/15 46/23 47/5
47/11 47/18 48/11

50/23 52/22 53/11
53/25 54/5 56/9
58/19 59/5 59/18
59/19 62/4 63/23
64/10 64/25 65/3
65/6 65/16 70/5
70/10 73/4 73/6
74/9 76/23 77/19
77/22 89/8 89/9
89/22 90/6 90/8
90/9 90/21 91/17
93/6 95/25 97/1
98/16 102/12
102/15 103/24
104/12 112/19
115/2 116/10
116/20 120/10
126/18 127/13
128/22 132/3 138/7
140/1 144/6
**their [22]** 9/6
13/8 20/18 20/23
21/20 28/12 28/25
32/19 32/24 32/25
37/5 41/13 54/19
70/9 79/18 82/25
99/4 99/24 101/3
129/16 129/22
140/24
**them [27]** 4/10 5/4
13/11 19/14 20/9
26/9 27/5 27/10
29/12 30/5 31/12
62/18 69/10 71/3
73/12 73/19 87/21
89/14 90/20 99/25
101/4 105/17
115/16 115/23
130/23 133/12
139/20
**themselves [5]**
62/16 79/11 97/2
97/7 121/18
**then [50]** 3/7 4/8

4/10 4/24 6/2
13/16 14/1 15/21
15/23 16/18 18/6
18/8 26/15 27/1
27/5 27/9 32/11
32/17 32/19 33/10
56/10 60/11 60/13
68/7 70/22 72/15
75/14 75/18 80/16
80/21 81/5 87/7
87/21 91/3 103/9
118/3 118/22 125/4
127/24 128/4 128/6
128/8 129/1 135/15
143/17 146/4
146/14 146/15
146/16 146/21
**theoretical [1]**
12/22
**theory [8]** 12/1
12/2 12/10 12/11
12/15 12/15 12/18
15/18
**therapy [1]** 144/4
**there [102]** 3/2
4/19 5/24 6/10 7/4
7/5 7/21 7/25 7/25
10/21 14/5 15/8
15/10 17/11 17/20
19/16 21/21 23/24
29/7 31/22 34/6
46/14 49/2 49/4
49/6 49/7 58/24
59/1 61/15 61/22
67/5 70/1 70/6
70/24 71/4 72/10
72/21 73/8 73/10
73/23 74/8 74/12
74/19 77/5 78/3
78/17 79/22 82/16
82/23 82/24 86/11
90/4 91/14 91/25
92/11 92/22 93/4
93/7 93/13 94/8

**T**

**there... [42]**
94/12 94/15 94/16
94/16 94/22 95/10
96/8 97/25 98/8
100/12 101/17
103/15 103/16
104/6 105/5 106/15
106/23 107/2 107/3
107/6 113/10
113/25 117/6
119/11 129/1
129/25 130/15
131/13 132/3
132/13 132/15
133/16 136/2 136/4
137/24 139/5 141/9
141/13 141/21
144/20 145/7
145/10

**there's [33]**   4/25
7/24 8/6 9/5 10/9
12/21 14/15 14/23
16/25 23/4 32/3
33/15 55/6 56/18
61/7 61/13 69/10
70/7 75/13 75/14
75/17 75/18 86/2
86/12 86/14 89/5
89/16 92/9 119/15
135/13 138/4
146/20 146/22

**these [57]**   5/2
6/19 6/20 7/5 7/10
18/14 19/12 26/12
26/20 27/22 30/4
32/19 43/12 66/22
72/22 73/11 73/15
79/23 81/1 95/13
95/16 96/9 96/13
96/23 97/20 98/5
98/6 98/21 99/23
99/25 100/2 100/10
100/12 100/24
101/14 102/25
102/25 106/19
107/6 110/6 112/9
112/17 113/1 113/8
113/10 113/10
116/9 119/11
130/17 133/7
133/10 133/17
141/10 143/2 143/3
143/5 146/4

**they [58]**   7/9 13/3
13/4 13/4 13/8
21/20 27/21 27/22
28/6 28/12 28/12
28/24 32/17 32/17
32/19 32/24 32/25
41/22 42/11 52/5
71/1 73/12 76/4
78/17 85/7 89/15
92/23 94/20 95/18
95/20 97/16 97/17
97/22 98/4 100/5
104/16 106/24
114/16 118/19
118/20 129/9 129/9
129/20 129/21
130/14 130/16
130/18 130/18
130/23 132/16
132/19 136/8
140/24 142/4 142/5
143/6 143/15
145/18

**they're [8]**   27/8
31/15 31/16 76/5
89/15 90/7 92/22
92/22

**thing [8]**   9/25
31/9 87/4 87/5
87/22 129/13
144/22 145/12

**things [21]**   3/5
4/3 7/10 8/10 8/18
8/19 30/4 56/4
88/20 90/2 91/19
91/21 91/22 93/15
96/19 103/14
114/15 117/8

**think [31]**   4/9
4/18 10/17 20/14
30/6 37/9 38/15
48/6 49/4 50/23
51/4 56/9 59/25
64/14 69/1 70/6
77/19 77/22 86/5
87/13 98/12 113/16
113/23 113/24
114/4 116/1 117/24
121/22 124/18
135/10 143/21

**third [7]**   77/21
78/8 79/14 100/2
122/14 127/20
127/21

**Thirteen [2]**
113/14 113/15

**this [190]**

**those [51]**   8/23
12/14 25/3 26/2
32/17 42/9 62/15
62/20 62/23 69/15
69/15 70/6 70/23
72/10 83/10 83/22
83/24 84/25 86/16
92/23 95/19 95/20
96/3 100/4 100/4
100/9 101/21
101/22 101/23
103/20 104/1 104/4
107/8 110/25
112/12 112/13
112/23 119/16
122/5 122/12
122/13 128/18
128/20 129/11
131/1 132/17

**T**

**chose... [5]**
133/23 139/3
139/10 139/22
143/1
**though [2]**  40/13
55/9
**thousands [3]**
85/10 93/11 104/4
**three [11]**  3/16
68/5 78/17 79/23
98/23 98/25 100/17
128/3 130/24 137/8
139/20
**three-year [1]**
128/3
**through [31]**  1/8
4/18 7/22 27/20
39/17 40/10 51/12
51/24 58/16 63/3
63/10 73/6 81/8
83/8 86/21 89/6
89/20 92/2 106/6
108/9 110/22
110/24 111/13
111/19 113/16
122/5 128/1 134/3
143/18 145/19
146/18
**throughout [3]**
16/25 138/17 143/3
**throw [3]**  91/1
91/12 93/1
**throwing [5]**  89/4
89/21 91/3 102/1
102/22
**thrown [3]**  90/2
92/19 117/4
**throws [2]**  89/11
89/19
**thumb [8]**  85/11
95/24 96/1 96/2
98/22 98/24 100/15

105/19
**Thus [1]**  34/10
**time [69]**  5/3 5/4
5/19 5/25 6/3 6/4
8/5 8/25 9/22 9/23
11/8 13/19 13/21
22/3 22/5 23/24
24/22 24/23 24/25
25/4 26/2 26/8
27/4 32/9 34/16
35/2 41/7 41/13
41/14 60/18 69/9
71/4 72/1 77/3
81/13 83/12 85/17
95/4 97/15 97/19
117/24 122/22
123/8 124/11
124/19 125/12
127/14 127/14
128/14 128/18
128/22 129/2 129/2
129/3 129/6 129/25
136/12 136/14
137/25 139/12
140/6 140/16 141/5
141/6 142/7 142/12
146/10 146/11
146/23
**timeline [1]**  35/21
**times [1]**  130/22
**title [1]**  86/17
**titled [1]**  57/22
**today [8]**  5/10
5/12 41/6 43/12
44/17 53/1 127/4
145/13
**together [14]**
26/11 26/21 27/7
37/4 45/14 65/17
87/22 90/11 90/11
90/19 91/13 112/16
117/6 117/8
**tomorrow [9]**  3/20
4/4 144/9 144/15

144/18 144/24
145/11 145/15
146/24
**too [3]**  37/16
42/17 59/16
**took [12]**  7/3
52/14 58/23 59/1
59/3 59/11 59/20
59/22 92/15 101/8
112/5 113/11
**tools [3]**  70/24
94/1 104/20
**top [4]**  20/14 30/7
58/3 124/8
**topics [1]**  82/12
**total [6]**  3/16
43/8 128/17 129/3
129/6 140/15
**towards [2]**  22/12
74/5
**traced [2]**  77/13
78/22
**track [1]**  16/8
**tracking [1]**  86/15
**Trading [4]**  38/5
38/11 38/21 39/25
**training [1]**  85/6
**trainings [5]**
83/19 83/20 83/23
83/24 84/1
**transact [2]**  17/25
21/16
**transacting [1]**
17/24
**transaction [16]**
18/1 18/3 18/4
18/11 21/17 21/23
32/22 32/24 33/1
34/18 34/20 34/24
34/24 36/2 36/4
36/22
**transaction was [1]**
36/2
**transactions [9]**

USCA11 Case: 22-11150 Document: 18-4 Date Filed: 11/30/2022 Page: 106 of 254

**T**

transactions... [9] 13/9 15/24 16/9 16/11 18/10 34/22 35/1 77/11 78/20

transcribe [1] 81/2

transcript [9] 1/9 51/20 52/1 56/19 67/19 104/7 148/10 148/11 148/12

transcripts [1] 116/7

transfer [1] 136/8

treated [1] 130/20

treatment [3] 132/18 136/10 143/8

treatments [1] 132/19

tremendous [1] 8/16

tremendously [1] 130/24

trial [6] 1/9 5/8 6/13 10/24 11/7 23/7

tricky [1] 87/11

tried [1] 4/17

trouble [3] 69/20 121/21 126/20

true [4] 9/3 52/19 64/16 148/10

TrueCrypt [15] 98/23 99/2 99/3 99/18 99/20 99/21 99/24 100/2 100/3 100/5 100/6 100/8 100/9 102/16 102/25

trust [3] 31/18 31/23 43/21

try [3] 39/3 90/20

94/22

trying [9] 8/11 8/17 13/21 24/15 90/18 91/13 95/3 103/9 117/6

Tuesday [3] 3/25 4/20 4/23

Tulip [4] 38/4 38/11 38/21 39/25

turn [2] 78/18 143/14

tweet [3] 9/13 10/21 10/23

tweeted [2] 8/14 10/24

two [41] 3/5 4/3 4/14 6/19 7/5 8/9 14/15 32/8 33/3 33/10 34/17 35/3 37/4 60/25 65/7 65/13 66/21 68/5 72/5 72/10 72/22 73/11 73/15 73/18 73/19 84/23 85/15 87/15 87/15 89/6 90/20 103/18 116/4 128/5 128/8 130/24 139/5 139/6 139/19 140/17 140/17

two-people [1] 35/3

two-year [1] 128/8

type [28] 17/6 18/24 19/14 20/13 20/15 21/12 24/24 25/3 26/10 26/13 26/16 26/19 26/19 27/9 27/11 29/12 33/16 34/7 34/23 35/8 36/4 41/23 61/1 64/4 75/3 79/10 90/25 100/20

types [2] 75/16 83/24

typical [3] 30/2

typically [9] 20/11 60/8 70/19 70/20 70/23 79/4 85/15 85/16 131/1

**U**

U.S [1] 1/23

Uh [1] 131/21

Uh-huh [1] 131/21

ulceration [1] 142/25

ulcers [4] 136/5 142/22 143/1 143/21

unable [4] 46/21 79/4 100/20 104/5

uncompetitive [2] 23/16 23/21

under [5] 11/17 52/15 74/12 81/20 125/17

undergraduate [2] 127/19 127/23

underlying [4] 16/23 54/9 142/15 143/7

underneath [1] 82/22

understand [10] 5/16 25/18 27/10 27/12 31/6 81/1 107/23 108/4 115/7 116/8

understanding [8] 12/18 36/25 51/6 65/18 74/25 97/20 104/12 120/10

Understood [1] 57/5

undisclosed [7] 23/1 24/2 24/7 24/16 27/17 29/24

USGA11 Case: 22-11150 Document: 45-14 Date Filed: 11/30/2022 Page: 307 of 254

**U**

**undisclosed... [1]**
30/16
**unit [2]**   26/4
26/14
**UNITED [5]**   1/1
1/10 129/17 147/2
148/6
**units [2]**   25/1
26/2
**universities [1]**
130/11
**university [17]**
59/16 59/20 60/3
60/15 63/20 68/25
69/5 82/9 127/19
127/21 127/24
127/25 128/4 128/9
128/14 130/12
130/13
**unless [8]**   3/23
11/5 79/5 79/17
92/5 93/23 93/24
135/13
**unlock [8]**   32/6
32/9 33/4 33/10
34/17 93/25 94/25
103/6
**unpack [1]**   26/4
**unsuccessful [1]**
140/8
**until [12]**   36/20
36/23 65/7 88/18
92/15 97/21 106/9
114/2 114/20
131/13 139/24
146/2
**up [56]**   5/15 8/22
19/1 24/12 24/14
25/7 25/12 25/22
25/25 26/3 27/4
27/9 27/14 28/3
28/3 28/5 28/6

28/24 29/14 30/6
32/24 33/4 35/25
39/20 41/7 41/18
52/2 55/17 57/25
72/14 72/16 73/3
73/20 74/5 79/23
86/11 87/25 89/17
90/8 95/3 95/10
98/17 106/6 106/9
108/15 117/25
130/9 131/15 133/1
134/5 136/17
137/17 137/24
138/7 139/24
145/17
**update [1]**   9/13
**upon [1]**   5/15
**ups [1]**   73/25
**upwards [1]**   30/5
**urinate [1]**   143/11
**us [10]**   4/6 11/17
58/4 70/1 86/5
86/19 88/3 90/11
128/5 146/17
**usage [1]**   83/22
**use [22]**   8/4 18/6
20/12 24/6 34/6
50/22 57/9 84/10
86/10 88/20 89/15
94/5 95/2 114/18
116/5 117/3 117/5
120/10 122/11
142/18 144/1 144/2
**used [20]**   16/24
36/17 36/20 45/18
49/20 69/21 71/16
78/9 79/15 84/11
85/1 85/3 88/16
89/9 91/25 92/6
98/6 98/9 114/18
120/3
**useful [1]**   12/19
**user [12]**   71/1
89/11 93/14 94/10

99/4 104/20 113/16
114/1 114/22
114/25
**users [3]**   62/17
70/18 70/19
**uses [1]**   17/9
**using [13]**   17/2
27/21 38/14 85/24
89/4 90/13 91/12
98/7 104/18 114/8
114/24 134/24
146/24
**usually [2]**   130/19
132/19
**utilize [1]**   17/12
**utilized [1]**   69/21
**utilizing [1]**   79/6

**V**

**VA [25]**   30/10
30/15 128/15
128/24 128/25
129/1 129/4 129/6
129/8 129/13
129/13 129/14
129/15 130/8 130/9
130/11 130/12
130/13 131/11
136/4 136/8 136/9
136/9 136/11
140/25
**vaccinated [2]**
125/22 126/1
**valid [2]**   13/4
34/22
**validated [1]**
18/11
**validating [1]**
13/9
**values [1]**   98/3
**variables [1]**
75/25
**variety [6]**   11/24

USCA11 Case: 22-11150    Document: 51    Date Filed: 11/30/2022    Page: 108 of 254

**V**

**variety... [5]**
18/17 35/14 54/3
54/17 71/15

**various [5]** 105/21
128/1 129/15
136/24 142/13

**vehicle [1]** 142/16

**Vela [16]** 38/9
40/22 49/25 50/11
53/7 55/11 57/8
57/25 58/3 58/5
63/2 63/9 66/24
67/16 67/24 68/14

**verbal [2]** 44/7
46/16

**verify [1]** 122/14

**version [7]** 17/19
21/21 47/19 47/20
49/5 49/7 103/2

**versus [1]** 116/1

**very [16]** 39/22
40/2 64/2 64/3
64/8 64/15 72/1
87/14 89/10 90/1
91/6 91/14 99/24
101/6 104/19
130/23

**veterans [5]**
128/10 129/16
129/20 131/23
137/25

**via [8]** 2/10 2/12
86/7 96/14 97/13
98/2 116/25 123/20

**vice [1]** 83/3

**video [15]** 2/10
2/12 4/15 4/15
6/12 81/11 123/14
123/20 123/25
124/2 124/9 125/4
125/4 125/11
146/20

**videos [1]** 4/14

**videotaped [1]**
123/9

**view [5]** 21/22
48/6 93/24 94/21
96/2

**viewed [1]** 99/22

**virtually [1]** 5/1

**visible [2]** 21/18
94/12

**visit [1]** 70/9

**visiting [1]** 70/10

**volume [3]** 87/16
87/17 87/21

**volumes [2]** 87/15
87/15

**vs [1]** 1/6

**W**

**waist [3]** 142/19
142/19 143/25

**wait [1]** 118/13

**wall [1]** 99/9

**wallet [1]** 17/3

**wandering [1]**
117/5

**want [22]** 3/14
8/25 15/7 17/23
18/3 18/4 18/5
20/11 21/16 32/22
43/11 44/8 46/13
46/14 74/2 81/2
85/19 87/22 118/13
121/24 126/2
140/22

**wanted [6]** 27/20
28/5 28/21 31/13
32/17 86/22

**wants [1]** 114/1

**was [229]**

**wasn't [7]** 10/1
52/19 53/10 60/5
60/12 62/8 102/16

**watching [1]** 146/1

**water [1]** 20/13

**way [22]** 3/14
15/8 16/16 31/22
32/8 60/17 86/11
90/1 90/18 92/9
93/23 98/14 100/25
102/24 103/9
106/23 107/2 112/1
112/4 121/4 144/10

**ways [10]** 18/17
21/9 34/5 44/11
89/6 89/7 94/22
122/4 129/9 129/21

**we [151]**

**we'd [1]** 3/5

**we'll [20]** 4/23
5/12 6/2 6/2 66/17
80/16 88/13 96/5
96/5 112/24 119/3
125/4 125/5 126/25
135/18 144/18
144/24 145/2
146/13 146/20

**we're [28]** 5/11
5/19 5/19 8/17
8/17 15/5 36/11
38/13 52/2 66/8
85/16 89/4 91/13
92/25 93/24 97/18
102/1 104/5 114/8
118/10 124/14
124/24 124/25
142/17 145/6
145/13 145/14
146/24

**we've [3]** 4/17 5/2
100/15

**website [11]** 60/3
62/9 62/17 69/23
69/25 70/5 70/9
70/10 70/13 70/18
70/19

**website are [1]**
70/18

**W**

**websites [1]**   21/22

**weeks [2]**   6/14
116/4

**weight [2]**   143/25
144/2

**Welcome [4]**   66/10
66/15 118/25 125/8

**well [52]**   5/10 8/3
14/9 14/16 15/7
17/12 26/16 27/25
31/13 35/13 41/25
45/1 45/21 53/15
54/16 55/18 57/12
70/5 70/19 71/1
71/4 71/15 72/23
73/14 74/3 75/1
79/6 89/21 95/13
121/23 127/17
128/22 129/5
129/10 129/13
130/9 130/23 131/3
131/11 132/7
132/19 134/25
135/13 137/24
138/6 138/13
139/24 140/15
140/25 142/6
142/15 145/23

**well-known [1]**
17/12

**went [9]**   27/10
58/16 59/18 59/24
98/5 98/13 113/16
119/7 127/19

**were [89]**   10/20
11/16 21/24 25/21
27/21 28/11 28/23
30/20 34/16 35/1
35/11 39/13 40/2
43/15 44/14 45/2
48/21 49/1 49/18
50/15 52/15 57/15

59/15 62/21 63/6
65/13 66/7 67/8
68/11 69/16 72/7
74/18 74/18 74/22
83/23 84/17 84/21
95/9 96/3 96/8
96/9 96/16 97/21
97/22 97/25 98/3
99/17 100/1 100/2
100/9 100/14
100/18 101/15
101/17 101/17
101/19 101/21
101/22 101/23
103/16 103/20
104/13 106/24
107/21 107/24
108/5 108/6 112/16
112/16 112/20
116/4 117/8 117/20
121/1 124/17
124/21 125/20
131/12 131/13
132/13 132/17
134/16 139/5 140/8
141/10 141/19
142/22 143/25
145/18

**weren't [5]**   41/22
49/3 58/11 104/16
107/6

**WEST [2]**   1/2 136/4

**wet [1]**   127/23

**what [158]**

**what's [14]**   16/16
22/5 22/8 24/25
38/17 73/18 79/6
94/8 114/17 116/11
116/23 127/3
137/24 140/24

**whatever [3]**   8/6
94/21 145/22

**whatsoever [1]**
115/20

**wheelchair [1]**

**when [80]**   5/18
9/10 13/4 18/1
20/22 21/17 21/24
22/5 23/15 23/21
23/24 26/18 30/20
32/21 34/16 34/21
34/21 34/22 35/11
35/22 35/22 39/13
41/3 56/19 58/23
59/1 59/7 59/23
65/4 65/22 67/2
67/15 69/2 69/3
69/5 69/6 70/24
77/11 78/20 84/25
85/16 86/18 87/2
87/24 88/12 88/13
89/23 90/13 90/23
91/8 92/20 93/1
93/17 94/1 94/1
94/5 94/11 98/5
98/6 98/20 99/21
101/24 103/2
104/25 107/21
112/16 113/16
113/17 113/18
116/5 122/9 124/23
125/20 129/1 130/9
136/11 141/1 141/6
141/7 146/10

**where [45]**   6/1
10/8 15/21 28/16
28/24 31/18 32/4
32/5 33/14 33/19
43/12 59/18 62/14
66/20 72/19 73/14
73/15 74/19 75/15
83/2 83/2 86/12
86/13 86/19 87/11
87/11 87/19 88/4
88/16 90/2 90/7
91/14 91/15 92/17
97/14 100/23 102/2

**W**

**where... [8]**    102/8
105/2 113/22 117/4
122/15 128/16
128/22 130/12

**whereas [1]**    75/21
**WHEREOF [1]**    148/14
**whether [48]**    25/16
25/16 30/9 30/14
33/3 33/9 34/13
39/1 39/2 40/2
40/10 43/14 43/17
43/20 43/23 44/4
44/10 45/13 45/16
46/17 46/21 47/9
47/12 51/1 54/11
59/6 60/17 61/11
61/18 66/21 69/11
70/8 70/17 75/4
75/10 76/4 82/16
97/25 101/17
103/15 110/16
111/6 111/12
111/18 112/1 112/4
120/3 120/16

**which [54]**    3/16
3/24 6/8 7/17 9/10
15/25 19/24 20/2
25/1 33/3 33/10
34/24 38/22 50/15
54/16 58/23 66/25
67/25 68/4 72/16
73/5 74/3 74/4
79/7 82/21 83/13
83/23 84/8 84/11
92/4 95/1 95/13
97/3 97/17 97/20
98/4 99/22 99/25
100/13 100/17
103/20 106/10
107/5 117/6 131/12
136/2 140/18 141/2
142/11 142/22

142/24 143/7 143/8
144/3

**while [5]**    17/2
46/9 59/20 125/23
136/25

**whitepaper [2]**
44/21 45/1

**who [19]**    4/13 5/14
8/21 10/24 13/18
13/22 45/17 46/6
63/24 64/16 69/15
70/8 70/17 79/5
107/8 119/10
129/24 130/17
146/14

**whole [2]**    87/22
99/6

**why [15]**    5/10 7/13
10/4 53/9 70/3
87/18 90/9 91/17
96/1 101/23 103/25
106/11 124/4
141/10 141/13

**wide [1]**    51/5

**widely [3]**    60/12
69/11 85/1

**will [38]**    4/5 5/14
7/20 8/9 22/8
22/13 39/20 39/21
45/4 56/12 56/13
78/18 81/7 86/16
86/19 86/21 87/14
87/15 87/24 87/25
92/18 92/19 106/18
110/8 110/8 113/7
113/9 118/4 125/10
127/4 135/15
135/17 136/8 144/8
144/9 146/10
146/14 146/17

**William [1]**    42/21
**Wilson [4]**    6/11
6/23 7/6 7/11

**Wilson's [1]**    7/16

**Windows [9]**    57/22
74/16 75/23 75/25
76/3 93/12

**wise [1]**    5/3
**wish [1]**    146/23
**within [5]**    13/1
17/3 69/15 70/23
144/13

**without [7]**    5/7
31/23 101/7 117/3
121/18 134/1
143/20

**withstand [1]**
20/13

**witness [29]**    4/13
5/16 5/25 38/9
43/5 49/14 50/1
50/11 55/12 61/18
66/18 80/8 80/9
80/22 80/23 81/21
110/8 123/6 123/7
123/18 125/5
125/18 126/11
131/17 134/7 146/1
146/10 146/14
148/14

**witness's [3]**
19/19 38/14 51/25

**witnesses [8]**    4/5
4/14 4/18 5/2 5/12
5/15 5/24 9/10

**women [1]**    129/18

**word [8]**    12/15
15/18 18/23 33/13
33/24 94/4 120/10
120/11

**words [1]**    12/11
**work [18]**    4/10
32/11 32/18 37/7
37/23 38/4 40/25
41/4 50/8 51/6
70/22 71/14 71/14
79/18 83/2 86/4

USCA11 Case: 22-11150    Document: 53-14    Date Filed: 10/31/2022    Page: 111 of 254

**W**

**work'... [2]** 119/2
 127/10
**worked [6]** 49/14
 82/23 83/6 83/8
 128/24 129/3
**working [6]** 9/15
 15/5 51/18 52/3
 65/14 128/12
**works [9]** 12/10
 13/15 41/19 42/17
 46/4 58/5 65/20
 74/13 102/24
**world [2]** 70/7
 84/12
**worrying [1]** 5/8
**would [154]**
**wouldn't [2]** 56/9
 141/14
**WP [1]** 10/11
**WRIGHT [39]** 1/7
 2/10 6/11 6/20
 7/13 8/7 9/9 9/13
 10/10 36/18 37/7
 37/15 37/21 37/23
 38/20 40/1 41/21
 42/2 42/15 42/21
 43/2 43/8 43/18
 43/21 43/24 44/24
 45/10 45/14 47/10
 47/12 67/2 67/10
 80/15 81/13 82/17
 112/2 112/5 119/12
 123/9
**Wright's [6]** 7/16
 8/15 48/17 48/21
 48/25 119/13
**write [9]** 45/18
 45/21 71/2 72/11
 77/3 84/19 92/20
 98/10 122/22
**writes [1]** 10/14
**writing [7]** 37/21

 64/23 65/12 92/1
 92/14 104/3 105/4
**written [6]** 37/15
 46/24 47/4 47/24
 89/15 92/23
**wrong [1]** 10/22

**Y**

**Yale [1]** 127/19
**yeah [16]** 12/9
 29/11 33/14 37/3
 42/11 47/21 49/8
 57/7 61/21 61/21
 62/19 70/19 78/1
 80/12 88/7 125/1
**year [24]** 59/25
 63/22 112/17
 127/20 127/21
 127/24 128/3 128/6
 128/7 128/8 130/25
 138/1 138/7 138/11
 138/13 138/16
 138/17 138/19
 138/22 138/24
 138/25 139/13
 139/15 139/17
**years [15]** 60/13
 64/23 65/1 65/4
 65/7 65/13 83/3
 90/13 128/13
 128/17 128/18
 128/20 129/7
 140/17 142/17
**years' [1]** 128/5
**yes [175]**
**yesterday [17]** 3/9
 4/19 6/10 6/16
 6/18 7/21 8/12
 13/3 17/16 49/4
 49/6 55/9 55/14
 55/23 56/7 56/10
 72/7
**yet [3]** 45/4 54/6
 136/19

**you [664]**
**you noticed [1]**
 100/12
**you'd [1]** 27/5
**you'll [4]** 19/20
 81/18 126/21
 144/10
**you're [58]** 5/22
 8/5 9/1 14/23
 15/10 31/12 34/5
 34/21 36/17 40/7
 40/10 40/13 40/20
 41/16 41/20 41/23
 43/23 44/1 44/10
 44/17 44/20 44/23
 45/10 45/13 46/2
 46/21 47/9 49/14
 51/22 53/24 54/6
 55/6 58/20 62/9
 62/14 65/11 79/5
 88/6 89/18 89/25
 90/15 94/2 94/6
 95/3 102/22 103/6
 104/25 111/3
 111/22 111/24
 114/24 115/25
 116/11 119/15
 134/23 144/11
 144/13 145/1
**you've [5]** 33/22
 37/7 72/5 72/5
 109/24
**your [275]**
**yourself [9]** 10/15
 31/14 31/15 41/12
 49/15 64/19 70/12
 80/12 84/1
**yvette [6]** 1/23
 1/25 148/5 148/17
 148/17 148/19

**Z**

**ZACK [1]** 1/16
**ZALMAN [1]** 1/20

**Z**

**zeus [1]**   11/2
**Zone [1]**   128/6
**zoom [5]**   58/5
 74/11 145/16
 145/19 146/8

**848 (AM)**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                 WEST PALM BEACH DIVISION
                 CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
             Plaintiffs,            November 18, 2021
 6                                  9:59 a.m.
             vs.
 7
    CRAIG WRIGHT,
 8
             Defendant.             Pages 1 THROUGH 124
 9  _____
              TRANSCRIPT OF TRIAL DAY 12, AM SESSION
10           BEFORE THE HONORABLE BETH BLOOM
                UNITED STATES DISTRICT JUDGE
11                 And a Jury of 10

12  Appearances:
    FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
13                      DEVIN FREEDMAN, ESQ.
                        KYLE ROCHE, ESQ.
14                      200 South Biscayne, Suite 5500
                        Miami, Florida 33131
15
                        BOIES SCHILLER & FLEXNER
16                      ANDREW BRENNER, ESQ.
                        STEPHEN N. ZACK, ESQ.
17                      ALEXANDER HOLTZMAN, ESQ.
                        100 Southeast 2nd Street, Suite 2800
18                      Miami, Florida 33131

19  FOR THE DEFENDANT:  RIVERO MESTRE, LLP
                        ANDRES RIVERO, ESQ.
20                      JORGE MESTRE, ESQ.
                        AMANDA M. MCGOVERN, ESQ.
21                      ZALMAN KASS, ESQ.
                        2525 Ponce de Leon Boulevard, Suite 1000
22                      Coral Gables, Florida 33134

23  COURT REPORTER:     Yvette Hernandez
                        U.S. District Court
24                      400 North Miami Avenue, Room 10-2
                        Miami, Florida 33128
25                      yvette_hernandez@flsd.uscourts.gov
```

```
 1                    I N D E X

 2      Certificate..................................     124

 3                  W I T N E S S

 4
        ON BEHALF OF THE DEFENDANT:                      PAGE
 5
        DR. DUGALD STEWART MACINTYRE
 6      CONTINUED DIRECT EXAMINATION BY MR. KASS            6
        CROSS-EXAMINATION BY MR. BRENNER                   21
 7      REDIRECT EXAMINATION BY MR. KASS                   80

 8      KIMON ANDREOU
        DIRECT EXAMINATION BY MR. MESTRE                   93
 9

10                  E X H I B I T S
        EX. NO.:                        OFFERED   ADMITTED
11      Defendant's  480                   108        108

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            (Call to order of the Court, 9:59 a.m.)

2                 THE COURT:  All right.  Good morning to everyone.

3                 How is everyone this morning?

4                 MR. BRENNER:  Good.

5                 THE COURT:  All right.  Go ahead and have a seat.

6       Let's call the case and make sure we know who's here this

7       morning.

8                 And is Dr. MacIntyre with us?

9                 All right.  Come on forward, sir.

10                COURTROOM DEPUTY:  Calling Civil Case Number 18-80176,

11      Ira Kleiman v. Dr. Craig Wright.

12                Counsel, please state your appearances for the record,

13      starting with Plaintiffs' counsel.

14                MR. BRENNER:  Good morning, Your Honor.  Andrew

15      Brenner on behalf of the Plaintiffs.

16                MR. HOLTZMAN:  Good morning, Your Honor.  Alexander

17      Holtzman on behalf of the Plaintiffs.

18                MR. FREEDMAN:  Good morning, Your Honor.  Vel Freedman

19      on behalf of Plaintiffs.

20                MR. ROCHE:  Good morning, Your Honor.  Kyle Roche on

21      behalf of Plaintiffs.

22                MR. ZACK:  Good morning, Your Honor.  Steve Zack on

23      behalf of Plaintiff.

24                THE COURT:  Good morning.

25                MR. FREEDMAN:  And with us at counsel table is Ms.
```

1    Vela and Ira Kleiman.

2            THE COURT:  Good morning to each of you.

3            MR. RIVERO:  Good morning, Judge.  Andres Rivero.  And

4    before my fellow counsel introduce themselves, I would just say

5    that Dr. Wright is with us, our crack paralegal, Sarah

6    Gonzalez, and Mr. Reed as a hot seat.

7            MS. McGOVERN:  Good morning, Your Honor.  Amanda

8    McGovern for Dr. Wright.

9            MR. KASS:  Good morning, Your Honor.  Zalman Kass on

10   behalf of Dr. Wright.

11           MR. MESTRE:  Jorge Mestre for Dr. Wright.

12           Good morning, Judge.

13           THE COURT:  Good morning to each of you.

14           So is Mr. Reed handling the IT for Mr. Shah?

15           MR. RIVERO:  Yes, Judge.  Mr. Shah went home for the

16   holidays, Judge.

17           THE COURT:  All right.  Well, let me state that it

18   certainly has been a pleasure, both with Ms. Vela and Mr. Shah,

19   and I have no doubt with Mr. Reed -- that the presentation to

20   the jury of the exhibits has been exceptional.

21           MR. RIVERO:  Judge, I appreciate you saying it and

22   became very fond of Mr. Shah and I will relay that to him.

23           THE COURT:  All right.  Are there any matters that we

24   need to address -- all the jurors are present -- before we

25   proceed?

```
 1            MR. BRENNER:  Your Honor, just one quick matter.  We

 2   are endeavoring and will meet Your Honor's deadline for filing

 3   the JMOL response.  We're finding that we may need some extra

 4   pages.  Would it be okay -- we think it's going to end up being

 5   around 30, instead of 20.  Is that okay?

 6            THE COURT:  That's exceptional, yes -- I mean,

 7   acceptable to the Court and I'll allow it.  Not exceptional --

 8            MR. BRENNER:  I hope it's exceptional too.

 9            THE COURT:  I don't know.  I haven't read it yet.

10            It's acceptable to the Court.  And is the deadline --

11   I know that I said by the end of today.  I want to give you

12   through the evening, but I would like to have the response so

13   that I can work on it tomorrow in the afternoon after we

14   conclude and the weekend.

15            MR. BRENNER:  Sure.  If it's okay with Your Honor, if

16   we could -- it would give us a chance, the three of us in

17   court, to review it tonight after court.  And if we could get

18   it to you by the -- that you will have it when you look in the

19   morning.  Is that fine?

20            THE COURT:  Yeah.  I think I said the end of business,

21   I think, before midnight.  I mean --

22            MR. BRENNER:  End of our business day.

23            THE COURT:  Yes.  Yes.  Thank you.

24            Okay.  Any other issues we need to address?

25            MR. BRENNER:  Nothing for the Plaintiffs.
```

```
1          THE COURT:  Okay.  And good morning to Dr. MacIntyre.

2          Let's bring in the jury.

3      (Before the Jury, 10:02 a.m.)

4          THE COURT:  Good morning, Ladies and Gentlemen.

5  Please be seated.

6          As each day passes, I become more impressed with your

7  promptness.  And you have certainly been paying close attention

8  to the testimony.  So I do appreciate your service to the Court

9  and to the parties and to our system of justice.

10          Dr. MacIntyre, let me remind you, you were previously

11  placed under oath yesterday.  And we'll continue with the

12  questioning.

13              DIRECT EXAMINATION [CONTINUED]

14  BY MR. KASS:

15  Q.  Good morning, Dr. MacIntyre.

16  A.  Good morning.

17  Q.  I would like to pick up from where we left off yesterday.

18  And I believe at the end of the day you had told the jury about

19  the various medical conditions that David Kleiman had.  Do you

20  recall that?

21  A.  Yes, I do.

22  Q.  And do you recall at the end talking about the condition of

23  David Kleiman's bones?

24  A.  Yes.

25  Q.  What was the condition of his bones?
```

```
 1   A.  Well, best described as brittle from the waist down because
 2   of immobility and lack of muscle control.  And with the lack of
 3   weight-bearing, bones would lose their calcium and become more
 4   likely to fracture.
 5   Q.  Did Dave Kleiman have to have any procedures because of the
 6   condition of his bones?
 7   A.  Well, he had to have procedures because of two problems
 8   relating to bones.  The one we're talking about, the brittle
 9   bones, he had a fracture of his left femur that was almost
10   spontaneous.  It occurred during physical therapy and it just
11   broke, and that had to be dealt with.
12      He also had various procedures because of infections of the
13   bone and joints relating to his pressure ulcers.
14   Q.  Do you know, in total, how many different operational
15   procedures Dave Kleiman had?
16   A.  Well, I counted seven formal operations on him.  Now, in
17   addition to that, he would have had bedside debriding and so
18   forth for the pressure ulcers.
19   Q.  After those surgeries -- do the records reflect whether
20   Dave Kleiman had any sort of downtime after the surgeries?
21   A.  Well, each surgery, of course, requires anesthesia and
22   there is a downtime after that anesthesia during recovery and
23   for some time until all of the anesthetic medications have worn
24   off.
25      He also would require pain medications relating to that.
```

1    Now, obviously, he's not getting pain from below the waist

2    because he's anesthetic there, but he does have pain elsewhere

3    relating to the surgery.

4    Q.  I want to go back to something that you mentioned

5    yesterday.  And I believe it was that Dave Kleiman had pressure

6    ulcers.

7    A.  That is correct.

8    Q.  Could you tell the jury where the pressure ulcers were

9    located?

10   A.  Well, pressure ulcers are generally located over bony

11   prominences where the bone is against the surface.  The patient

12   is either lying or sitting on a surface causing the loss of

13   circulation in the area.

14       In his case, he had pressure ulcers over the ischial

15   prominences, which, I think I mentioned yesterday, are the

16   bones that you sit on, which is related to sitting down, and

17   also over the sacrum, which is the lower back, from lying down.

18   He also had some pressure ulcers on the feet.

19   Q.  Do the records indicate what sort of treatment Dave Kleiman

20   was receiving for those pressure ulcers?

21   A.  Well, he received operative procedures that I already

22   mentioned.  These included debridement, which is removing dead

23   tissue, in essence, and cleaning up the ulcer so that it's more

24   likely to heal.

25       He also received bedside debridements which are not formal

1  operations, do not require anesthetic, but do require the wound

2  care people to work on the wound.

3      And then, in addition to that, he had a number of

4  procedures relating to the infections.  He had a -- he had

5  actually two procedures on the hip.  The first one was an

6  attempt to remove the hip joint entirely, which, of course, you

7  can do because he was paralyzed.  He didn't need it.  This

8  procedure had to be stopped because of excessive bleeding and

9  also because they encountered an abscess in one of the bones.

10  And then there was a second procedure to treat that abscess,

11  which completed the first procedure.

12      He also had a similar procedure on his knee because of an

13  infection there.

14  Q.  Do the records indicate whether David Kleiman was supposed

15  to be in a certain position due to his pressure ulcers?

16  A.  Yes, they do.  That specifically he had to avoid lying on

17  his back for any length of time.  That doesn't mean he couldn't

18  lie on his back some time, but he had to -- and we use the term

19  "offload" for this -- to take the gravity pressure off the back

20  periodically.  In addition to this, he had to avoid sitting

21  down; same reasoning.

22      Now, the nursing service had standing orders to turn him

23  every two hours so that he wouldn't be lying on his back.  He'd

24  be turned to one side.  And he couldn't be left that way very

25  long either or he'd develop a pressure ulcer over his hip.  So

1    he had to be turned to the other side, or to his belly.  And

2    this was -- the standing orders were to turn every two hours.

3        Now, likewise, he was not supposed to sit down over two

4    hours.  And he was instructed -- and physical therapy would

5    help him in learning how to shift his weight in a wheelchair to

6    try to offload at least one side or the other while he was

7    sitting in the wheelchair.

8        Now, the standing orders to turn the patient, those are

9    frequent in patients that are immobilized for some reason or

10   another.  And I always remember I went to a hospital once where

11   every two hours, a popular song that was popular back in the

12   '70s -- dah, dah, dah, dah, dah, turn, turn, turn, dah, dah,

13   dah, dah, turn, turn, turn, turn.  I think some of the older

14   people like myself probably remember that song.  And that was

15   played over the PA every two hours to remind the nursing staff

16   to turn the patients.

17   Q.  Did David suffer from any type of bacterial infections?

18   A.  Most definitely.

19   Q.  Could you tell the jury a little bit more about those

20   infections?

21   A.  Well, basically he had two chronic bacterial infections.

22   One was a chronic urinary tract infection which was present

23   throughout the hospitalization and had been present before.

24   This is related to having to have artificial drainage of the

25   bladder, a tube in there.  Either a continuous tube -- or a

1    Foley catheter, or intermittent catheterization, putting it in

2    and out.

3        All of these things lead to infection in the bladder,

4    which, in turn, can lead to infection in the kidneys and escape

5    of bacteria into the bloodstream, which is called bacteremia.

6    So that was one infection.  It was chronically there with

7    superimposed acute episodes of infection with -- and at least

8    three times bacteremia.

9        The other chronic infection, or infections, were bone

10   infections relating to these pressure ulcers.  Bacteria, of

11   course, gain access directly to the bone through the ulcer and

12   infect the bone.  And an infection in the bone is very hard to

13   treat because the bacteria become attached to the bone itself,

14   to the spicules of bone.  It's something called a biofilm.

15   That the bacteria excrete filmy material which protects them

16   and it makes it difficult for the antibiotics to get to the

17   bacteria.  They're protected by this biofilm.

18       So the bony infection, which is -- osteomyelitis is the

19   term used for it, requires long-term antibiotics and surgical

20   management frequently.

21   Q.  Dr. MacIntyre, do David's medical records reflect whether

22   he was prescribed medications?

23   A.  Well, yes.  He was prescribed many medications.

24   Q.  Can you identify some of the medications that you observed

25   reviewing the medical records?

1  A.  Well, first, obviously, my field is infectious disease, so

2  I'm most interested in the antibiotic medications that he was

3  prescribed.  He was prescribed multiple long-term antibiotics.

4      Now, one of the problems in his case, and in many other

5  cases, are that when antibiotics have to be prescribed or given

6  for long periods of time, the bacteria can develop resistance

7  to them.  And he had infection with resistant bacteria.  One of

8  them is staphylococcus aureus methicillin-resistant, frequently

9  known as M-R-S-A, or MRSA, and I think most of us have heard of

10  that at one time or another.

11      He also had bacteria normally found in the gut that had

12  become resistant to antibiotics.  It's called extended-spectrum

13  beta-lactamase bacteria.  Beta-lactamase are enzymes produced

14  by the bacteria that break down antibiotics.  So this ESBL,

15  extended spectrum beta-lactamase bacteria, were also affecting

16  him.  And these require longer-term and different antibiotics

17  than he would normally use.

18      So he received multiple different antibiotics, given

19  intravenously frequently, given by mouth, and also applied

20  topically to the ulcers.  So that's one group of medications

21  that he received.

22      Now, he also received medications because of the

23  possibility of pain or muscle spasm relating to his paraplegia.

24  The interruption of the innervation to the lower part of the

25  body doesn't necessarily eliminate all pain, although it

1    reduces it and makes it anesthetic frequently.

2        So he received pain medications specifically related to the

3    surgeries that he had.  And these included Percocet, which is a

4    well-known pain medication given by mouth, and fentanyl, which

5    is, of course, rather notorious now.  It's given by vein

6    usually when it's given medically.

7        He also was receiving a medication called Diazepam, which

8    is -- the trade name for that is Valium.  It's a tranquilizer

9    and depressive medication.  In his case, it was used

10   chronically to reduce muscle spasms.

11       Now, when there's innervation of an area of the body, the

12   muscles will become spastic because of the nerve circuits that

13   are cut loose from central control by the denervation, so

14   spasms occur.  And these can be painful.  And they can

15   interfere with his moving around and interfere with his

16   physical therapy.

17       So he received Valium.  And the order was Valium given

18   every six hours by mouth.  And that order was in place

19   throughout his hospitalization.  So that group of medications

20   are another one.

21       Now, he also received other medications for various other

22   things, like blood pressure and so forth.

23   Q.  Based on your experience, do any of those medications that

24   you just listed have the ability to alter one's mental state?

25   A.  Well, the pain medications, I think it's pretty evident, do

1    that.  Valium, its effects are very similar to the effects of

2    alcohol, and as such, are depressant.  They interfere with

3    control of impulses.  And in fact, Valium is used sometimes to

4    treat withdrawal from alcohol.

5        An alcoholic who has to go cold turkey for some reason or

6    another, a way to protect him from withdrawal symptoms are to

7    give a reducing dose of Valium over time.  That's one way to

8    treat alcohol withdrawal.

9    Q.  I want to know if you could expand a little bit on how the

10   intravenous medication was administered to Dave, like what were

11   the mechanics of it.

12   A.  Well, in his case, he received intravenous medications by

13   two mechanisms.  One is by a peripheral intravenous line.

14   These are IVs where the needle is placed in a vein in the

15   forearm, sometimes in the ante-cubital space there, or in the

16   hand or wrist.

17       This is attached, of course, to a tube that goes to the

18   bag.  It contains the antibiotic or the other medications that

19   he's receiving, including the fentanyl that I mentioned before.

20   So in a peripheral intravenous line is one way and he received

21   that at various times.

22       Also, during a large part of this hospitalization, he was

23   attached to a central intravenous line.  And in his case, these

24   were what they call a PICC, a peripherally inserted central

25   catheter, P-I-C-C.  And these are placed in the upper arm

1   either side and are left in place for long periods of time.

2   And these, in turn, again, are attached to the tube that goes

3   to the bag of the medication.

4   Q.  Did those intravenous lines have any effect on Dave

5   Kleiman's mobility?

6   A.  Well, obviously, the peripheral lines interfere with the

7   mobility of the arm where they're placed.  They're there, you

8   move around, they can move around.  They might actually fall

9   out.  It can be painful to move them around.  So they are

10  quite -- they basically immobilize that arm.

11     The central lines are less troublesome, but they also lead

12  to a certain degree of immobility because one is attached to a

13  tube that goes to the bag of medication that has to be hanging

14  somewhere.  Normally, it's hanging on a pole which is moved

15  around with a patient.

16     Sometimes, if the patient is in a wheelchair, they can be

17  attached to a pole on the wheelchair.  But as such, the

18  presence of this tube can interfere with mobility.  I think

19  that could be perfectly obvious thinking of it, or if anyone

20  has actually ever been in the hospital and had one placed.

21  Q.  Was David prescribed any medications that had the

22  possibility of psychotic effects?

23  A.  Well, as I mentioned, the pain medications and the Valium

24  can, as a side effect, lead to mental status changes, including

25  psychotic or at least psychotic-appearing effects.  Those

1    medications reduce the impulse control.  They essentially

2    disconnect the frontal lobe from various centers in the center

3    part of the brain.  So that can happen.

4        Also, antibiotics, not really causing psychotic -- that's a

5    rather strong term for it -- but a depressive effect in general

6    can occur with antibiotics.  It's not very severe, and usually

7    is noted only when the antibiotics are discontinued.

8        And I've seen patients note this to me on multiple

9    occasions.  They have been on antibiotics for a period of time.

10   We stop the antibiotic, and the next day the patient comes to

11   me and says:  "I feel so much better being off those

12   antibiotics," an effect that wasn't evident, but then when you

13   stop it, it was evident that it was occurring.

14           MR. BRENNER:  Your Honor, just pose an objection to

15   Dr. MacIntyre talking about what other patients may say or not

16   and focus on Mr. Kleiman's records.

17           THE COURT:  Sustained.  The objection is sustained.

18   BY MR. KASS:

19   Q.  Dr. MacIntyre, from reviewing Dave Kleiman's medical

20   records, did you see anything that could have affected his

21   ability to do continuous work while in the hospital?

22   A.  Well, first, the presence of intravenous lines.  We've

23   already gone over that.

24       Secondly, the depressive effects of medications,

25   particularly the Valium.

```
 1      And third, it's not a medication, but the fact that he was

 2   in the hospital and being interrupted all the time for various

 3   treatments and visits by physicians and so forth, interrupt any

 4   train of thought that might be going on.

 5   Q.  Could you tell the jury a little bit more about what type

 6   of physician interruptions you saw in the medical records.

 7          MR. BRENNER:  Your Honor, I'm having trouble hearing

 8   Mr. Kass when he backs away from the microphone.

 9          THE WITNESS:  Are you not hearing me well?

10          THE COURT:  Do you want to restate the question for

11   Mr. Brenner?

12          MR. KASS:  Madam court reporter, could you repeat it?

13      (Read back.)

14          MR. BRENNER:  Thank you.

15          THE WITNESS:  Okay.  The medical record reflects the

16   orders given to the nurses for various interruptions.  They

17   also reflect the notes that various -- I'm sorry.  This thing

18   has a hood on it, so it's hard to tell.  It's protected.

19          There are the notes from the physicians indicating

20   when they saw the patient as well.  And, of course, notes from

21   other therapists, the nursing staff I mentioned already,

22   physical therapists, occupational therapists.  He was receiving

23   recreational therapy.  He would be visited sometimes by the

24   spiritual therapy patient -- or individuals.  So he was being

25   seen frequently by people, and that's reflected in the record.
```

1    I think anybody that's been in a hospital for any time knows

2    what I'm talking about.

3    BY MR. KASS:

4    Q.  Was David treated by different specialty doctors?

5    A.  Yes, he was.  He had a number of different problems going

6    on, that were handled by different specialties.  One of them,

7    of course, infectious disease.  He was being seen by infectious

8    disease specialists.  In fact, one of the specialists that saw

9    him I know personally because he was at the same VA where I

10   was.  He was also seen by the surgeons, obviously.  And he was

11   seen by multiple other specialties, all of which are reflected

12   in the record.

13        Now, he, of course, was in the Miami Veterans

14   Administration Hospital.  That's a teaching hospital.  And each

15   specialty group has interns, residents, and fellows associated

16   with them that go around in the group and also see the patient

17   individually, and this is all reflected in the record.

18   Q.  How often did David receive wound care?

19   A.  Generally, he would receive wound care daily, sometimes

20   three times a week.  Now, there were some times when he would

21   refuse wound care for various reasons, but he received it most

22   of the time.

23   Q.  Did you see any records reflecting David using his computer

24   while in the hospital?

25   A.  It was noted by the nursing staff on multiple occasions

1    that he was using his computer.  That is correct.

2    Q.  Did the nurses make any records what they observed David

3    doing on his computer?

4    A.  They only record what he said he was doing on the computer,

5    which he referred to as "work."

6        They do say that they observed him seeing movies on the

7    computer on a couple of occasions.

8    Q.  Now I want to move on to the circumstances surrounding Dave

9    Kleiman's -- when he left the hospital.  Could you tell the

10   jury a little bit more about what happened that Dave was no

11   longer in the hospital at the end of March.

12   A.  Well, I think we discussed yesterday the concept of a

13   furlough or a leave of absence from the hospital.  That it's a

14   little bit like a leave of absence in the military.  That it

15   has to be specifically ordered and for a reason and with a time

16   to leave and a time to return.

17       And in March 2013, he was given a leave of absence to leave

18   the hospital.  The reason given was to supervise the

19   installation of a lift facility in his bathroom, I think in the

20   shower.  That he was having a piece of equipment installed, and

21   he was to supervise that.  That was the reason for the leave of

22   absence.

23       And initially, the return time was the day after he left.

24   Well, the day after he left, the record reflects that he called

25   in and asked for an extension of the leave for another day,

1    which was granted.

2        The following day, he did not call in and the staff at the

3    hospital attempted to contact him and noted in the record that

4    they could not contact him.  And this went on for a period of

5    time.  I don't remember exactly how many days they kept trying

6    to do it, until they finally officially considered him

7    discharged from the hospital, which is called an irregular

8    discharge.

9        And there's no more medical record from the hospital staff

10   on what happened to him.

11   Q.  Prior to Dave being -- well, considered AWOL from the

12   hospital, do the medical records reflect whether his medical

13   condition was -- whether he was sufficiently well to leave the

14   hospital for an extended period of time?

15   A.  Long-term discharge plans were being worked on.  But at the

16   time that he left, he was not considered ready for discharge.

17        MR. KASS:  Your Honor, if you could just give me one

18   moment.

19        THE COURT:  Yes.  Of course.

20        (Pause in proceedings.)

21   BY MR. KASS:

22   Q.  Dr. MacIntyre, I believe you just testified that Dave

23   wasn't ready for discharge from the hospital when he left in

24   March of 2013.  Could you explain to the jury why he wasn't

25   ready to be discharged.

1   A.  Because he was requiring multiple treatments: physical

2   therapy, occupational therapy, medications, including

3   intravenous medications.  And arrangements had not been made

4   for any of that to be given as an outpatient.

5   Q.  Were his pressure ulcers still there?

6   A.  Most definitely so.  Now, they were improved, but there

7   were still open pressure ulcers requiring care, wound care.

8             MR. KASS:  That's it, Your Honor.

9             THE COURT:  All right.  Thank you, sir.

10            Cross-examination.

11            MR. BRENNER:  Can I have one moment, Your Honor?

12            THE COURT:  Yes.  Of course.

13        (Pause in proceedings.)

14            MR. BRENNER:  May it please the Court.

15                    CROSS-EXAMINATION

16   BY MR. BRENNER:

17   Q.  Good morning, Dr. MacIntyre.  How are you?

18   A.  Good morning.  Hanging in there.

19   Q.  I'm sorry?

20   A.  Hanging in there.

21   Q.  Hanging in there.  Okay.  Beats the alternative, right?

22        You remember we met on a couple of occasions, right?

23   A.  That is correct.

24   Q.  Okay.  I took your deposition in January of 2020, I think.

25   Does that sound right?

1   A.  I believe it was 2020.  It might have been 2019.  I'd have

2   to look at the date of it.

3   Q.  Okay.  And then again, the second one, we did during Zoom.

4   Do you remember that?

5   A.  Yes, I do.

6   Q.  So we met in person once and the other over the computer

7   technology, right?

8   A.  Yes.

9   Q.  So let's get a couple things clear.  You are an infectious

10  disease doctor, correct?

11  A.  That is correct.

12  Q.  In reaching your opinions that you've expressed here today,

13  you never spoke with any of Dave Kleiman's treating physicians

14  about him, correct?

15  A.  That is also correct.

16  Q.  You never talked with any of his friends about him,

17  correct?

18  A.  That is also correct.

19  Q.  And you never spoke with any of his business colleagues

20  about him, correct?

21  A.  No, I haven't.

22  Q.  Now, at the beginning of your examination, Mr. Kass moved

23  in a set of exhibits that -- those were the medical records

24  that you were provided for Dave Kleiman, right?

25  A.  Most of them were medical records and some of them were

1    exhibits that were abstracted from the medical records.

2    Q.  Putting aside the demonstratives, the things that you

3    summarized.  But the evidence itself, the medical records, you

4    reviewed what you were given regarding Dave Kleiman, correct?

5    A.  That is correct.

6    Q.  And those records is what you base most of your opinions on

7    today, correct?

8    A.  That is also correct.

9    Q.  And those opinions -- those records start in 2010.  I think

10   it's September.  Am I right about that?

11   A.  The hospitalization of -- in question started in September

12   2010.  I did have some VA records that went back into around

13   1995 as well.

14   Q.  Right.  What you were talking about today was what was

15   going on in Dave's final hospitalization between 2010 and 2013,

16   right?

17   A.  That is correct.

18   Q.  Okay.  Now, you're not offering any opinion whatsoever

19   regarding Dave Kleiman's ability to do complex tasks or

20   computations prior to September 2010; is that correct?

21   A.  That is correct.

22   Q.  And you also have no information about Mr. Kleiman's mental

23   ability before 2010, correct?

24   A.  In general, correct.  There were some references to mental

25   ability in the records that I saw previous to 2010, but the

1    opinions now are not based on those.

2    Q.  Well, let me just go to your April deposition.  And we're

3    going to go to Page 54, lines 6 to 15.

4        (Pause in proceedings.)

5            MR. BRENNER:  May I proceed, Your Honor?

6            THE COURT:  Yes, you may.

7    BY MR. BRENNER:

8    Q.  So you sat for deposition in April of 2020, correct?

9    A.  That's correct.

10   Q.  And you took the same oath there that you took today,

11   correct?

12   A.  That's correct.

13   Q.  And let me just read for you the questions I asked you and

14   the answers you gave then.

15       Question:  "Anything -- anything about his mental

16   ability -- his mental ability before 2010, correct?"

17       Your answer:  "I have no information on that."

18       Question:  "Well, if you have no information, it's correct

19   you don't have an opinion on his mental ability prior to 2010;

20   is that correct?"

21       And your answer was:  "I have no information."

22       Those were the questions and answers you gave in 2010 --

23   I'm sorry -- April 2020?

24   A.  Well, that is what I remember, yes.

25   Q.  Okay.  Great.

```
1        You also have no information about Dave's ability to work
2   before 2010, correct?
3   A.   That is correct.
4   Q.   And you have no information about Dave's ability to write
5   computer code before 2010?
6   A.   No.  At the time of the deposition, that is correct.
7   Q.   Are you suggesting that you have gone back and done
8   additional work since the deposition?
9   A.   I'm suggesting that --
10  Q.   That's a yes or no.  Have you, sir?
11  A.   Depends on your definition of work.
12  Q.   Have you reviewed additional materials since your
13  deposition?
14  A.   I looked back at the records that I had, which were
15  cursory, not very much, from prior to 2010, and noted there
16  were some comments in there about mental status --
17           MR. KASS:  Your Honor?
18           THE WITNESS:  -- and I did not remember that at the
19  time of the deposition.
20           MR. KASS:  Objection.
21           THE COURT:  Dr. MacIntyre, you may finish your answer.
22           THE WITNESS:  And I'm supposed to be telling the
23  truth.  And now I can remember there were some references to
24  that that I didn't remember at the time of the deposition.
25
```

1    BY MR. BRENNER:

2    Q.  And did you tell those to your -- to counsel for Dr. Wright

3    before you came today?

4           MR. KASS:  Your Honor, calls for privileged

5    communications.

6           THE COURT:  Overruled.

7    BY MR. BRENNER:

8    Q.  Did you, sir?

9    A.  No.

10   Q.  Okay.  So we're going to go through and actually show a lot

11   of the medical records.  A lot of questions you were asked on

12   direct examination were:  "Could this be this," and:  "Could

13   this be that."  You would agree with me it may make sense to

14   look at the actual medical records, right?  Those are the best

15   evidence of what was going on?

16   A.  In general, yes.

17   Q.  Okay.  Great.

18      You know that while Mr. Kleiman was in the hospital, that

19   his doctors actually ran assessments of his mental capacity.

20   Do you know that, sir?

21   A.  That's correct.  There were psychology notes on several

22   occasions.

23   Q.  Well, that's not it, sir?  Is there --

24   A.  Well, psychology, that's the field that assesses this type

25   of thing.

27

```
1    Q.  Okay.

2    A.  And there are such notes in the record.

3    Q.  Do you know that he was given something called a Folstein

4    Mini-Mental State Exam?  Do you remember that?

5    A.  I don't remember that specifically, but that probably

6    appears in the psychology notes.

7    Q.  Okay.  So when you were going through your work in this

8    case, did you understand that the issue in this case, or one of

9    the issues in this case, was Dave's mental ability while he was

10   in the hospital?  Did you have that understanding?

11   A.  I have been told that, yes.

12   Q.  Okay.  And so when you went through the records, you

13   yourself didn't find any such specific test done on his mental

14   state, did you?

15   A.  I did not look for that.  I was looking for infectious

16   disease-related problems.

17   Q.  Right.  You're an infectious disease doctor.  You're not a

18   doctor that has any -- it's not your job to look at mental

19   issues and mental capacity?

20   A.  That is correct.

21       MR. BRENNER:  So let's bring up, Ms. Vela, if we

22   could, D -- Your Honor, these are all in evidence.  These will

23   all be from the medical records.

24       If we could publish for the jury D91 at Page 920.

25
```

1   BY MR. BRENNER:

2   Q.  Okay.  So this is a Folstein Mini-Mental Exam.  You don't

3   remember seeing this in the records, right?

4   A.  Not specifically, no.  I would have gone through it because

5   it's in the records, but I don't specifically remember that.

6   Q.  Right.  Because it wasn't your focus, right?

7   A.  That's correct.

8   Q.  Okay.  Great.

9       So you see on this -- this is a mental state exam.  Do you

10  see that Dave got a 30 out of 30?

11  A.  It says something called:  "Total score, 30 over 30."

12  Q.  Right.  That's 30 out of 30, isn't it, sir?

13  A.  Well, 30/30.

14  Q.  Okay.  Let's go through it.  Do you not read that as, on

15  "Orientation," you could get 10 possible points and he got a

16  10?  That's not how you read this record?

17  A.  I'm not sure how that works.

18  Q.  Okay.  So you're not familiar with this type of test?

19  A.  No, I'm not.

20  Q.  Okay.  So let's look at the section that says:  "Spoken

21  language comprehension."

22      That one says:  "No evidence of difficulty understanding

23  multistep or complex instructions, complex, abstract, implied

24  or indirect questions, or complex or abstract information."

25      You have no reason to doubt the findings of Mr. Kleiman's

1    own physicians, do you?

2    A.  I am not familiar with this type of test.  I don't know how

3    well it's validated.  I don't know whether there is any

4    evidence in the literature that it means anything.  And it

5    says:  "No evidence," and I would presume -- and this is my own

6    presumption -- that that means no evidence in this test of

7    difficulty, and that's all I can say about it; in other words,

8    I don't know.

9    Q.  Again, outside your field, right?

10   A.  That's correct.

11   Q.  You actually don't have an opinion as to if Dave's mental

12   ability was ever diminished while he was in the hospital?

13   A.  I have no opinion regarding this test.

14   Q.  Well, you can't quantify in any way how much Dave's mental

15   ability was diminished, if at all, in the hospital, right?

16   A.  I cannot do that, no.

17   Q.  Okay.  Great.

18        So -- but we do know that at least the doctor that

19   administered this test -- we do know his or her findings,

20   correct?

21   A.  According to what's written here.  According to this test,

22   his findings relating to that test.

23   Q.  Okay.  Great.

24        So let's talk a little bit about where we finished -- it's

25   not about we -- where you finished yesterday and Mr. Kass

1  stepped right up and picked it up today.

2      So at the very end of the day, you were asked to

3  describe -- I believe the word is in high level, Mr. Kleiman's

4  medical condition during his hospitalization.  Do you recall

5  that?

6  A.  Yes.

7  Q.  And then Mr. Kass repeated that question to you today.  You

8  recall that?

9  A.  Yes.

10  Q.  And right away, these are the things you talked about.  So

11  let's go through them with the jury.  At the end of the day,

12  within -- I think it's within seconds.  It's certainly less

13  than a minute -- you referred to the fact that Mr. Kleiman --

14  well, let's step back one second.

15      Mr. Kleiman was a paraplegic, correct?

16  A.  That is correct.

17  Q.  As a result of a physical injury, a motorcycle accident,

18  right?

19  A.  That is correct.

20  Q.  No evidence anywhere, no suggestion anywhere that that

21  motorcycle accident caused brain damage, correct?

22  A.  I really can't answer that question.  It's out of my field.

23  Q.  Great.  Thank you.

24      Nevertheless, when you were asked yesterday and today --

25  I'm going to go through the things that you felt -- Mr. Kass

```
 1   left it open to you.  He gave you the floor.  He let you talk

 2   about what you felt was important.  So let's see what you felt

 3   was important.

 4       You told this jury, first, that Mr. Kleiman had difficulty

 5   or had lost control of his bladder sphincter.  Do you recall

 6   that?

 7   A.  That's correct.

 8   Q.  Okay.  That was medical condition number one.

 9       Medical condition number two is -- again, what you felt was

10   important was you told the jury that Mr. Kleiman had lost

11   control of his anal sphincter, right?

12   A.  That is correct.

13   Q.  Okay.  And then where you ended yesterday and picked up

14   back today, you talked about -- and I wrote it down -- you

15   talked about that Mr. Kleiman had what you called "brittle

16   bones"?

17   A.  That is correct.

18   Q.  And I think you said -- and correct me if I'm wrong -- that

19   for the most part, the brittleness in the bones was

20   concentrated in his lower body?

21   A.  That is correct.

22   Q.  In the area of the paralysis?

23   A.  That is correct.

24   Q.  Okay.  And then you seemed to talk a decent chunk about it.

25   You talked about his pressure ulcers.
```

32

```
1   A.  That is also correct.

2   Q.  Is that sometimes called bedsores?

3   A.  That's a common colloquial term.

4   Q.  Okay.  And that's what you shared with the jury?

5   A.  That's correct.

6   Q.  And then, at the very end, almost as an afterthought --

7   well, let me ask you this:  You have some -- you met with the

8   lawyers before you gave your report in this case, right?

9   A.  Yes.

10  Q.  You met with the lawyers again before you and I first met,

11  whether it was January 2020 or '19 -- whenever that was, you

12  met with the lawyers before that, too, right?

13  A.  That is correct.

14  Q.  Then after that deposition, you met with the lawyers again.

15  Do you remember that?

16  A.  That is correct.

17  Q.  And then you issued another opinion.  Remember that?

18  A.  I was requested another opinion, right.

19  Q.  From the lawyers, right?

20  A.  From the lawyers.

21  Q.  Not from me.  When I say:  "The lawyers," I didn't request

22  another opinion.  Dr. Wright's lawyers said:  "Dr. MacIntyre,

23  can you go back and can you add to or supplement your prior

24  opinions," right?

25  A.  All I know is it was requested by the lawyers that were
```

1   discussing it with me.  Where they got their ideas, I don't

2   know.

3   Q.  Understood.  I'm just trying to clarify the lawyers that

4   discussed it with you were not myself, Mr. Freedman, or

5   Mr. Roche.  They were some folks over -- some of my colleagues

6   that are representing Dr. Wright?

7   A.  That is correct.

8   Q.  Okay.  And then you issued another report, right?

9   A.  That is correct.

10  Q.  Okay.  And so you understood in all of those conversations

11  generally what the case was about, right?

12  A.  I had some idea.  Actually, early on when I was reviewing

13  it, I didn't really know that much.  I eventually was given a

14  legal document that described the case a little more.

15  Q.  Right.  Right.  You were given I think a copy of a legal --

16  a complaint, right?

17  A.  That is correct.  I think they called it the second amended

18  complaint.

19  Q.  Right.  Great.  And you understood from reading that that

20  no one, not Dr. Wright's lawyers, not Mr. Kleiman's lawyers --

21  no one was making a claim or a defense one way or the other

22  about whether Mr. Kleiman was able to control his urination.

23  You understood that, right?  Did you understand that, or no?

24  A.  That's my understanding.

25  Q.  Okay.  That is your understanding, right?

```
 1   A.  Yes.

 2   Q.  And you understood from reading the complaint and your

 3   discussions with the lawyers, that no one -- not Dr. Wright's

 4   lawyers, not Mr. Kleiman's lawyers -- were making any claim or

 5   defense on whether Mr. Kleiman, a paraplegic, was able to

 6   control his defecation.  You knew that that wasn't what was at

 7   issue, right?

 8   A.  That is correct.  I understand there was no malpractice

 9   claim being made.

10   Q.  Of course not.  Of course not.

11       And there was no claim about the use of the bones in his

12   lower body.  Everyone knew he was paralyzed, correct?

13   A.  That is correct.

14   Q.  Partially paralyzed, correct?

15       So -- but what was important was Dave's brain.  You

16   understood that, right?  Or did you not?

17   A.  I was not asked to evaluate his brain.

18   Q.  You were not asked to evaluate any of his mental capacity,

19   correct?

20   A.  Mental capacity, no.

21   Q.  Okay.  But Mr. Kass, at the very end, said to you something

22   like:  "Hey, were there some records that talked about him

23   using his computer," and you said:  "Yeah.  They don't really

24   say what he's doing.  I think some say a movie."  But you

25   think -- it would make sense for us to walk through those
```

1    records a little bit, wouldn't it?  That would give the jury a

2    better sense of the volume of the records and what Mr. Kleiman

3    was noted as doing, correct?

4    A.  Well, from my review of the records, he was -- multiple

5    times the nursing service mentioned, and other services as

6    well, that he was working on his computer.

7    Q.  Right.  It's not just nurses.  It's not just doctors.  It's

8    across the board.  It is a feature of Mr. Kleiman's medical

9    records that he is constantly working on his computer, isn't

10   it?

11   A.  I would not say he was constantly working on his computer.

12   Q.  Okay.  Great.  So let's take a look.

13        In fact, I think you mentioned this.  At times, the records

14   even show that he was so focused on his work that he turned

15   down and refused other treatment.  You remember that?

16   A.  That is correct.

17   Q.  Okay.  So let's take a look -- let's take a look at the

18   records.  By the way, do you recall during your examination,

19   because -- if -- you showed -- if Mr. Kass showed you in front

20   of the jury a single medical record?  Do you recall?  Did you

21   discuss any medical record of Dave Kleiman on your direct

22   examination?  Actually showed it so the jury could see what the

23   actual evidence is?  Do you recall that?

24   A.  I don't remember whether he did.  I don't think he did.

25   Q.  You don't think he did.  Okay.

```
 1        All right.  So let's start off -- let's start with -- let's

 2    just start with D101, 633.

 3            MR. BRENNER:  May we publish all these to the jury as

 4    they come up, Your Honor?

 5            THE COURT:  Yes.  They're in evidence.

 6    BY MR. BRENNER:

 7    Q.  Okay.  So let's orient the jury of what we're looking at.

 8    This is, in fact, a medical record that -- of Dave Kleiman,

 9    correct?

10    A.  That is correct.

11    Q.  One which you reviewed, correct?

12    A.  That is correct.

13    Q.  Okay.  And if you look down at the bottom part there, it

14    says:  "Entry date, October 23rd," or:  "Date of note, October

15    23rd, 2010"?

16    A.  That refers to another note.

17    Q.  The date of note next to it, October -- you think -- is

18    that the next note?

19    A.  No.  Below that horizontal line is the next note.

20            MR. BRENNER:  Okay.  So let's go one page before then,

21    Ms. Vela, so we can get the date of this note.

22            One more.

23    BY MR. BRENNER:

24    Q.  So this note is also actually October 23rd, right?

25    A.  That's the date of this note, correct.
```

1   Q.  Let's go back to where we were.  So you made reference in

2   your direct examination that one of the issues because of

3   Mr. Kleiman's condition -- and I think you attributed it to the

4   pressure ulcers -- was that it wasn't impossible for him to lay

5   down, but it was a position that the doctors would like to

6   avoid when they can; is that right?

7   A.  That's correct.

8   Q.  Okay.  So here -- here, this note says:  "Patient was

9   received sitting up in bed working on his computer," right?

10  A.  That is correct.

11  Q.  Okay.  So let's go -- and we're just going to march through

12  each month and see what we find.

13  A.  There's more in that paragraph than just that line.

14  Q.  There sure is.

15  A.  I would also point out that:  "Bilateral trochanter wounds

16  cleaned and dressing changed per MD's order.  Scrotal wound

17  also cleaned and dressing changed, vac running continuously."

18  A vac, by the way, is a dressing that's attached to a hose that

19  goes out to a pump providing vacuum to the wound.  It's a very

20  good way.  Somebody should have gotten a Nobel Prize for that.

21      So it shows how many interruptions were occurring during

22  that shift.

23  Q.  Okay.  So just so we get, again, what you want to --

24  because you want to emphasize it.  So now you want to also add

25  to your list -- you want to emphasize scrotal cleaning, scrotal

1   wounds?  That's what you want to emphasize?

2   A.  That's one.

3   Q.  Correct, Doctor?

4   A.  That's one.

5   Q.  Okay.  And that he was:  "Soiling from his stool."  That

6   means he had defecated on himself, right?

7   A.  That's correct.

8   Q.  You wanted to make sure that we didn't move past the record

9   too quick.  You wanted the jury to understand that that's in

10  there, right?

11  A.  And those all provided interruptions.  So we can't say he

12  was sitting up in bed working on his computer during that

13  entire shift.

14  Q.  We can't say anything because we weren't there.  What we

15  know is that the nurse -- is this a nurse's note?

16  A.  This is a nurse's note, that's correct.

17  Q.  What we know is the nurse who was actually there, who no

18  doubt in your mind is there to provide care to Mr. Kleiman --

19  right?

20  A.  I don't see anything else she should be doing.

21  Q.  Right.  It's her job.  And part of her job is to -- is to

22  note what she observes, right?

23  A.  That is correct.

24  Q.  She has no interest -- and this is in 2010, right?  So she

25  has no interest in how whatever she's observed is going to play

1    in a courtroom 11 years later, right?

2    A.  That is correct.

3    Q.  Right.  And so what she observed is that:  "Patient,"

4    Mr. Kleiman, "was received sitting up in bed working on his

5    computer."  Meaning when she came in, that's what he was doing?

6    A.  That is correct.

7    Q.  And then presumably while she was doing her cleaning -- was

8    it cleaning the wounds we just talked about and helping

9    Mr. Kleiman to clean himself, because unfortunately he had

10   defecated -- you think that that interrupted the work on the

11   computer and that's what you wanted the jury to understand?

12   A.  That is correct.

13   Q.  Okay.  Thank you, Doctor.

14           MR. BRENNER:  Let's go to D101 at Page 707.

15   BY MR. BRENNER:

16   Q.  Okay.  This is a note -- as you see above, it's going to be

17   October 20th, right?

18   A.  That is correct.

19   Q.  Okay.  So again, a progress note.  This is a nursing note?

20   A.  No.  That's not a nursing note.

21   Q.  Okay.  It's a -- oh, this is an infectious disease note?

22   A.  That is correct.  That's from what appears to be the

23   infectious disease resident or fellow.

24   Q.  Okay.  And that's -- looks like Alessandra, probably,

25   Regatieri?

40

```
1    A.  That is correct.

2    Q.  And she's the author of the note.  And she notes -- now,

3    this is someone who -- the residents, as you call -- or did you

4    call them residents or interns?  Just what did you say?

5    A.  Could be a resident.  Could be an intern.

6    Q.  Could also be a doctor, right?

7    A.  Well, they are all doctors.

8    Q.  Okay.  Sure.

9    A.  Yeah.  Residents and interns are all graduate --

10   Q.  They're MDs?

11   A.  -- physicians.  They are MDs or DOs.

12   Q.  Right.  Right.  Again, like the nurses, no question in your

13   mind that Dr. Regatieri is there to provide care and treatment

14   to Mr. Kleiman, correct?

15   A.  That's correct.

16   Q.  No question she is there to provide, as part of that care

17   and treatment -- well, let's talk about this.  There's

18   something called continuity of care.  Do you know that concept?

19   A.  That is talked about a lot.

20   Q.  Sure.  And one of the things that's important is, for

21   doctors, nurses, psychologists -- it's important to note what's

22   going on in the medical records because when the next doctor,

23   nurse, psychologist comes, they see the medical records and

24   they understand what they're looking at, what's gone on until

25   that moment, right?
```

```
 1    A.  That's one of the things that we work on a lot.  There is a

 2    problem that occurs with the electronic medical record that

 3    frequently we're not as good as we should be in dealing with

 4    this sort of thing.

 5    Q.  Okay.  But everyone's trying, right?

 6    A.  Everyone tries.

 7    Q.  And here Dr. Regatieri says:  "Patient always in his

 8    computer."  Probably meant "on his computer," right?

 9    A.  Yeah.  I guess 24/7 he was working on his computer,

10    according to her.

11    Q.  Really?

12    A.  Well --

13    Q.  Oh, so now you think Dr. Regatieri was exaggerating it?

14    A.  Well, I think she was doing what she says the patient was

15    being; very sarcastic.

16    Q.  It doesn't say -- you said this to Mr. Kass, and it's just

17    simply -- with all due respect, it's simply not true.  This is

18    not her saying:  "Mr. Kleiman told me:  'I'm always in my

19    computer.'" This is her observation based on her seeing Mr.

20    Kleiman on his computer.

21         MR. KASS:  Objection.  The document speaks for itself.

22         THE COURT:  Overruled.  I'll allow it.

23    BY MR. BRENNER:

24    Q.  Yeah.  So that just wasn't really accurate.

25         What really is happening here is the doctor walks in, or
```

42

1    the nurse walks in, and he or she makes their own observation,

2    right?

3    A.  I can't say for sure that that is a correct observation.

4    Q.  Okay.  And you're -- are you having difficulty deferring to

5    the doctor who was there looking at him?

6    A.  I guess then he was 24/7 sitting on a computer, always, or

7    she was being sarcastic, like the patient was.

8    Q.  Oh, so Dr. Regatieri may have been sarcastic?

9    A.  Yeah, like the patient.

10   Q.  Oh, so she -- okay.  She got in there and she's a trained

11   doctor, right?  And she decided, instead of keeping an accurate

12   medical record, she's going to mimic the patient and become

13   sarcastic at herself and write:  "Always in his computer"?

14   That's your best assessment looking back 11 years later on what

15   is before you?

16   A.  Well, I can't figure out why she'd use the word "always"

17   for any other reason.

18   Q.  Well, would another reason be that every time she came into

19   his room he was on his computer?  Would that be -- excuse me,

20   sir.  Let me finish.

21       As you and I both understand the English language, would

22   that be a reasonable way to report:  "Every time I go in this

23   guy's room, he's on his computer"?  Would that be a reasonable

24   way for Dr. Regatieri to report:  "Patient always in his

25   computer"?

1    A.  I think that's adding a lot to what she says.

2    Q.  Okay.  Great.  Then let's look at a few more and see if we

3    can fill in the picture of what was going on.

4          MR. BRENNER:  If you would bring up, Ms. Vela, D101,

5    Page 189.

6    BY MR. BRENNER:

7    Q.  Okay.  So this one, you saw this all the time, right?  This

8    is from November 2010.  Okay.  I'm not going to get fixated on

9    if it's the 23rd or 24th.  It's November of 2010, right?

10   A.  This is November 2010.  I can't say that I saw this all the

11   time.

12   Q.  No.  I didn't say -- I misspoke if I said -- not that you

13   saw this all the time.  I misspoke if I said that.  In fact,

14   you don't remember seeing a lot of these, right?

15   A.  I saw several.  A lot.

16   Q.  Several?  Hundreds?

17   A.  I didn't count them.

18   Q.  You didn't count them.  Okay.

19        So this one says:  "Patient awake and alert and on his

20   computer."

21   A.  Correct.

22   Q.  Consistent with what's throughout Mr. Kleiman's

23   hospitalization, correct?

24   A.  Well, it's mentioned in many places, yes.

25          MR. BRENNER:  Okay.  So let's go to the next one, D101

```
 1    at Page 53.

 2    BY MR. BRENNER:

 3    Q.  We're now up to -- we're now up to December.  I'm going to

 4    ask you to take my word for it.

 5         MR. BRENNER:  But you know what?  Go back one page,

 6    please.

 7         Got to go one more.

 8    BY MR. BRENNER:

 9    Q.  See that "December 2010"?

10    A.  It says:  "December 2nd, 2010."

11         MR. BRENNER:  Okay.  So go to where we were, please.

12    BY MR. BRENNER:

13    Q.  And then again:  "Patient is alert and interactive."

14    That's another assessment doctors make when they come into a

15    room, right?  So if you walk into a room and a patient is,

16    let's say, drugged out, they're on -- they're on -- you know,

17    they're just sleepy, they're drugged out, they're coming down

18    from surgery, you don't write:  "Alert and interactive" because

19    they're not alert and interactive, right?

20    A.  I think that's a fair assessment, yes.

21    Q.  Right.  So Mr. Kleiman -- and we'll talk about your

22    opinions on medications later, but at least on this day, he's

23    quite alert and interactive and he's working on his computer,

24    right?

25    A.  That is correct.
```

```
 1            MR. BRENNER:  Okay.  So let's go to the next one,
 2    Ms. Vela, which is D100 at 251.
 3            Let's focus on:  "Mr. Kleiman has been busy."  If you
 4    could just highlight that.
 5            Can you get rid of all the highlighting and go back
 6    to:  "Mr. Kleiman has been busy"?
 7    BY MR. BRENNER:
 8    Q.  Okay.  "Mr. Kleiman has been busy with work and briefly
 9    discussed a conference that he was missing."
10        You see that?
11    A.  Okay.
12    Q.  Okay.  He's been busy with work.  Now, that is a quote from
13    her.  That one we know is what Mr. Kleiman said because they
14    put a quotation mark.  He told the nurse or physician he had
15    been busy with work, right?
16    A.  They are relating what the patient said to --
17    Q.  Right.  So the nurses and the doctors know how to
18    differentiate between what they are seeing and what the patient
19    is saying.  And here's one where the patient is saying:  "Hey,
20    I'm really busy with work and even had to miss a conference,"
21    right?
22    A.  That's what this medical student said.
23    Q.  Okay.  Actually, this one's signed by a Ph.D., right?
24    A.  No.  Go up to the top.
25            MR. BRENNER:  Okay.  Take that down, please.  You can
```

46

```
 1   take that down, Ms. Vela.  Take down the callout.

 2            THE WITNESS:  "Student note."  It's entitled "Student

 3   note."

 4   BY MR. BRENNER:

 5   Q.  Right.  So what happens is Steven Rosenstein is the

 6   student?

 7   A.  That's correct.

 8   Q.  And then there's a sign-off by a Ph.D., right?

 9   A.  That's correct.

10   Q.  Okay.

11   A.  That's the usual way of handling things.

12            MR. BRENNER:  Okay.  So let's go to the next one,

13   which is D100 at Page 1.

14   BY MR. BRENNER:

15   Q.  I think we're still in January.  Again:  "Awake, alert, and

16   interactive and working on his computer," right?

17   A.  That is correct.  And there are many other notes in the

18   record similar to that.

19   Q.  Okay.  Hundreds?

20   A.  I did not count them.

21   Q.  Okay.  So let's go through.

22            MR. BRENNER:  Let's go to D99 at 567.

23   BY MR. BRENNER:

24   Q.  We're now into March.  We've just done January and

25   February.  Again:  "Alert, awake, appears active and working on
```

47

1    his computer"?

2    A.  That's what it says.

3    Q.  Starting to sense a pattern?

4    A.  I think I mentioned already that there are many notes of

5    this type.

6    Q.  Okay.

7            MR. BRENNER:  One moment, Your Honor.

8            THE COURT:  Certainly.

9        (Pause in proceedings.)

10           MR. BRENNER:  Okay.  So let's go on.  Let's go to the

11   next month.  D99 at 360.

12   BY MR. BRENNER:

13   Q.  By the way, I know you didn't count them, but you

14   understand -- and we'll tally them up a little at the end.  But

15   you understand this is taking place regularly, these types of

16   notes, right?

17   A.  There are many notes to that effect.

18           MR. BRENNER:  Okay.  So let's go to April 2011.

19           For the record, Your Honor, this is D99 at 363.

20   BY MR. BRENNER:

21   Q.  We're in April 2011 again.  "Patient was working on his

22   computer," right?

23   A.  That is correct.

24   Q.  Again, observation of the people that are there caring for

25   him in real time, right?

48

```
1    A.   That's right.

2    Q.   They didn't walk in and he had no computer running and he

3    said:  "Hey, I'm working on my computer" and they said:  "Well,

4    we don't see it, but we'll take your word for it"?  That's not

5    what's happening, right?

6    A.   At the moment in question:  "Patient was working on his

7    computer."

8    Q.   Okay.

9         MR. BRENNER:  Let's go to the next one, which is D98

10   at 730.

11   BY MR. BRENNER:

12   Q.   Okay.  Okay.  Again, this is one of the ones you talked

13   about how the -- it was the decision of the healthcare

14   providers that were caring for Mr. Kleiman that it was better

15   for his condition, to the extent they could do it, for him to

16   be sitting up, right?  I mean, lying down was not great for his

17   condition?

18   A.   I think sitting up was -- I also mentioned that that's one

19   of the worst positions.

20   Q.   So sitting up was bad?

21   A.   Sitting up was bad.

22   Q.   And lying down is bad?

23   A.   Lying down is bad.

24   Q.   Everything's bad?

25   A.   Not everything's bad.
```

49

```
 1    Q.  What's good?  Standing up?  He can't stand up.

 2    A.  Lying on side, lying on his stomach.

 3    Q.  He can't stand.

 4          MR. KASS:  Objection, Your Honor.  The witness is in

 5    the middle of speaking.

 6    BY MR. BRENNER:

 7    Q.  He can't stand, correct?

 8          MR. KASS:  Your Honor --

 9          THE COURT:  The objection is sustained.

10          Dr. MacIntyre, did you conclude your answer?

11    BY MR. BRENNER:

12    Q.  You can go ahead, Dr. MacIntyre.

13    A.  I think I've already gone over this.  As regards to his

14    pressure ulcers, his bedsores, there were two positions that

15    are particularly bad.  One is sitting up and one is lying flat

16    on his back.

17    Q.  Okay.

18    A.  All other positions were not as bad, but he couldn't stay

19    for a long time in any other position or he'd have a new

20    bedsore.

21    Q.  Right.  Okay.  So this one, the note is:  "He's received

22    sitting up in bed, working on his computer, awake and alert,"

23    right?

24    A.  That is correct.

25          MR. BRENNER:  Let's go to the next month, which is D98
```

50

```
 1    at 568.

 2    BY MR. BRENNER:

 3    Q.  Again:  "Awake, alert, working on his computer and talking

 4    on the phone," right?

 5    A.  That's correct.

 6    Q.  In fact, it's generally the number one observation every

 7    time a healthcare professional walks into this gentleman's

 8    room, right?

 9    A.  I would not say that for sure.  I would have to go back and

10    review every note and do an analysis of how many times the

11    first note -- the first thing noted was that.

12        It is true that, in a physical exam, you usually have

13    "general" as the first line and that would indicate usually the

14    position of the patient, how alert he was, and so forth.  That

15    doesn't necessarily mean that's the most important observation.

16    It just means it's the first in the template.

17    Q.  No.  But it's the visual observation.  They walk in the

18    room, right?  Here's the patient.  They walk in.  They note his

19    position, right?  Sometimes they note his position?

20    A.  Sometimes.  That is correct.

21    Q.  They almost always make some note about whether they're

22    alert and active or interactive?

23    A.  Well, they sometimes do.  Sometimes they don't bother to.

24    Q.  Okay.  Well, here we seem to see it a lot, right?

25    A.  That's correct.
```

```
 1    Q.  And the other thing they observe generally -- they all do
 2    it.  Doesn't matter if it's a doctor, a student, a
 3    psychologist, a nurse.  The common theme is everyone notes that
 4    Dave Kleiman is a guy who's always working on his computer,
 5    right?
 6    A.  I wouldn't say everyone and I wouldn't say always.
 7    Q.  Okay.  You wouldn't because you didn't focus on that when
 8    you went through the records?
 9    A.  I think it would have been impossible for him to be working
10    on the computer all the time with the amount of treatments and
11    things that he was getting.
12    Q.  So if I were being literal, you're right.  It is impossible
13    for him 24 hours a day, seven days a week to be working on his
14    computer, right?
15    A.  That is correct.
16    Q.  Okay.  But you don't disagree that the medical records
17    demonstrate a pattern that he's working on his computer a whole
18    lot in the hospital, right?
19    A.  I would say that he was frequently working on a computer.
20    Q.  Okay.  Great.
21    A.  I can't say what percent of his time he was working on the
22    computer.  I can't say what he was doing on the computer.
23    Q.  Right.  You didn't like my word "a lot."  You went with
24    "frequently"?
25    A.  "Frequently," yeah.
```

52

```
 1   Q.  Okay.  That's better.  We'll use "frequently."

 2         MR. BRENNER:  Next one's D98 at 124.

 3   BY MR. BRENNER:

 4   Q.  Now we're into July.  Again:  "Awake, alert, working on his

 5   computer."

 6   A.  That is correct.

 7   Q.  Okay.

 8         MR. BRENNER:  Okay.  So let's look at D97 at 571,

 9   which is in August.

10   BY MR. BRENNER:

11   Q.  Okay.  This is what the patient reports, correct?

12   A.  That is correct.

13   Q.  2011 he's reporting this, right?

14   A.  That is correct.

15   Q.  You understand he's reporting it to the people that are

16   providing him care and treatment, correct?

17   A.  I didn't have a chance to see what the source of this note

18   is.  I thought it was a psychology note.

19   Q.  Okay.  Let's go back.  Let's go back.  Do you want to go --

20   so this is from Natalie Bustillo, right?

21   A.  Yeah.  It says up there it's a psychology note.

22   Q.  Right.  A psychology note.  This one's not -- unlike the

23   others -- I think the other psychology note was a student.

24   This one is -- it doesn't say:  "Student," right?

25   A.  Well, I'd have to look at the bottom and see who signed it
```

```
 1    off.

 2           MR. BRENNER:  Okay.  Let's go to the next page,

 3    please.

 4           Thank you, Ms. Vela.

 5    BY MR. BRENNER:

 6    Q.  The next page, it's signed off by Maria Pilar Somoza,

 7    Ph.D.?

 8    A.  She's a Ph.D. psychologist.

 9    Q.  And she is signing off for Natalie Bustillo, who's also a

10    Ph.D.?

11    A.  No.

12           MR. BRENNER:  No.  No.  Up.  Up.

13           THE WITNESS:  There.

14           MR. BRENNER:  Yeah.

15    BY MR. BRENNER:

16    Q.  So Ms. Pilar Somoza.  And if we looked -- or Dr. Pilar

17    Somoza -- excuse me -- if we looked at the previous page, she's

18    the supervising Ph.D., right?

19           MR. BRENNER:  Let's go to the previous page so you can

20    see.

21           THE WITNESS:  Yeah.  I don't see why they have two

22    Ph.D. psychologists signing off on this note, but they do.

23    BY MR. BRENNER:

24    Q.  But they do.

25       Okay.  Are you now comfortable that you know what the note
```

54

```
1   is?

2   A.  Well, yeah.  As I said before, a psychology note.

3   Q.  Okay.  Great.  Next page.

4       "He," meaning Dave Kleiman, "reported he works in the field

5   of computer forensics and is able to conduct business from his

6   hospital bed using his laptop computer."

7       You see that?

8   A.  That's right.  That's what the patient reported to the

9   psychologist.

10  Q.  And the patient actually said:  "He indicated his ability

11  to continue working has helped him cope with all his medical

12  problems."  That's not unusual.  He uses his work to help him

13  cope.  He had serious medical problems.  We could agree with

14  that, right?

15  A.  He had serious medical problems.

16  Q.  He had a serious accident.  He's got a serious permanent

17  medical condition.  No question, he had serious medical

18  problems, right?

19  A.  That is correct.

20  Q.  And he's telling the doctors one of the ways that he copes

21  with the position he finds himself medically is he works?

22  A.  That's what the psychologist reports him saying.

23  Q.  Right.  And you have no reason to doubt that he said that,

24  right?

25  A.  No.  He said that.
```

55

```
1    Q.  Okay.  But do you have some doubt that he meant it?

2    A.  I have no idea.  I'm not the psychologist.

3    Q.  And you're not Dave Kleiman, right?

4    A.  I don't know whether that's a true statement or not.

5    Q.  Okay.  Let's go to September.  This is an issue that you

6    talked about with Mr. Kass, but we didn't see any records on

7    it.  So let's take a look at that.

8              MR. BRENNER:  D97 at 239.

9    BY MR. BRENNER:

10   Q.  Doctor, I want to make sure you're oriented as to who is

11   taking the note because that -- you want me to scroll up and

12   let you see that?

13   A.  That is correct.

14             MR. BRENNER:  Okay.  So let's go up.

15             Up.

16             So I guess -- no.  We go to the -- no.

17   BY MR. BRENNER:

18   Q.  It's -- the author is Scott Charlebois, right?

19   A.  Yes.  That's a --

20   Q.  He's an occupational therapist, right?

21   A.  Okay.  That's occupational therapy, yeah.

22   Q.  So now it's another -- another -- how would I put this --

23   another category of healthcare providers that are visiting

24   Mr. Kleiman?

25   A.  They would have interrupted what he was doing, correct.
```

56

```
 1    Q.  Right.  So Mr. -- well, yeah -- well, we'll see about that.
 2    So Mr. Charlebois comes in, and his reason for being there is
 3    he's going to provide -- he's going to provide occupational
 4    therapy, right?
 5    A.  That's correct.  He's an occupational therapist.
 6    Q.  Right.  And he's unable to do what he came to do because
 7    Mr. Kleiman says:  "I'm working on my computer"?
 8    A.  That's correct.
 9    Q.  Okay.  So that's the example of what you're talking about.
10    He even -- Mr. Kleiman was so focused on his work in the
11    hospital that sometimes -- and you probably don't think this is
12    a good idea for him -- but sometimes he turned away medical
13    treatment or, in this case, occupational therapy?
14    A.  This is one of the ones that -- I believe I remember noting
15    this one, that he would refuse his therapy sometimes.  I also
16    notice in this note that they measured his grip strength.  So
17    they were able to do something with him.
18    Q.  Correct.  He says that.
19    A.  And the grip strength was impaired.
20    Q.  Right.  He did something.  He did part -- I think he calls
21    it a mini?
22    A.  Mini grip strength.
23    Q.  Right.  He does some, but then Mr. Kleiman says:
24    "Mr. Charlebois, I'm not going to do the rest because I've got
25    work to do"?
```

57

```
1   A.  Yeah.  That's interesting.  It's also interesting that he

2   had diminished grip strength.  I hadn't noted that before.

3   Q.  Okay.  Well -- because you weren't looking for this stuff,

4   right?

5   A.  I wasn't.  No.

6   Q.  Okay.

7        MR. BRENNER:  Let's go to December, D96 at 336.

8   BY MR. BRENNER:

9   Q.  Okay.  Again, yet another record where the observation --

10  when I say:  "The first observation," I'm not -- I don't know

11  what the doctor felt was most important or not.  But what he

12  notes first, if this is a he -- what he or she notes is that:

13  "The patient's alert," right?  Not looped out on drugs, right?

14  A.  "Patient is alert."

15  Q.  "Interactive"?

16  A.  That's what they say.

17  Q.  That means able to interact with the doctor or nurse or who

18  is ever in there, correct?

19  A.  That's correct.

20  Q.  "And working on his computer"?

21  A.  That's correct.

22  Q.  Okay.

23  A.  You'll also note that all of these, when it's a physical

24  exam, the general template is to put "general" first.

25  Q.  Yes.  No doubt.  No doubt.
```

```
 1          MR. BRENNER:  Okay.  Let's go to the next one because
 2     I'm going to ask you -- let's bring up D96 at 105.
 3     BY MR. BRENNER:
 4     Q.  Sir, do you remember -- you talked about this -- that -- I
 5     think you said everyone on the jury would understand and you
 6     sort of smiled.  But you talked about how when you are in the
 7     hospital -- in this case the VA, but in the hospital too.  It's
 8     no different -- that people talk about how like they feel like
 9     people are always coming in and prodding and poking them at all
10     hours, right?
11     A.  That is correct.
12     Q.  Yeah.  It could be annoying.  I don't mean annoying that
13     the doctors are doing anything wrong.  They're doing what they
14     need and the nurses are doing what they need to take care of
15     the patient.  But for example, they may need to be taking
16     temperature readings every few hours, and that's annoying if
17     you're trying to sleep, right?
18     A.  And they're also turning the patient every two hours.
19     Q.  Okay.  I'm going to tie my shoe.  Excuse me for one second.
20          (Pause in proceedings.)
21     BY MR. BRENNER:
22     Q.  So did you notice when you went through the medical records
23     that sometimes, because -- for whatever reason, they noted the
24     time of when they were seeing Mr. Kleiman?
25     A.  They're supposed to.  That's correct.
```

1   Q.  Okay.  So in this one, they're saying they're there in the

2   early morning.  So they get there early morning.  Now, in

3   doctor speak, early morning is probably pretty early, right?

4   A.  I don't know what this particular individual considers

5   early in the morning.

6   Q.  You know doctors round early in the morning, right?

7   A.  Well, some do.  Some don't.

8   Q.  Some do.  Some don't.  Okay.

9   A.  Nurses frequently round early.

10  Q.  Sure.

11      And in this particular record, they note that it's early in

12  the morning, and guess what?  Dave is what?  What's he doing?

13  A.  You want me to read it?

14  Q.  Sure.

15  A.  "Patient was in a pleasant mood this early morning and

16  worked on his computer."

17  Q.  I've been working so hard doing the reading, I thought I

18  would let you take a few.  Is that okay?

19  A.  That's what it says.

20  Q.  Okay.  Great.

21          MR. BRENNER:  Let's go to the next one.  February.

22  D95 at 719.

23  BY MR. BRENNER:

24  Q.  Okay.  This is in February.  Again:  "Patient was alert and

25  interactive and working on computer"?

60

```
1    A.   Yeah.  This is interesting.  That's the only thing he notes
2    in his physical examination.
3    Q.   Okay.  Interesting, right?
4    A.   That's right.
5         MR. BRENNER:  Okay.  Next, March 2012.  D95 at 346.
6    BY MR. BRENNER:
7    Q.   So this one says:  "Alert, interactive, working on his
8    computer."  Do you see that?
9    A.   He seems to have adopted that particular template for his
10   exams.
11   Q.   He?
12   A.   Or she.
13   Q.   No.  No.  Many.  It's across -- it's doctors, it's nurses,
14   it's occupational therapists, it's psychologists.  It's not
15   "he."
16   A.   Well, here, we see two word-for-word the same statements.
17   I wouldn't be surprised if it was the same person who wrote it.
18   Maybe not.
19   Q.   You don't know?  You didn't look.
20   A.   No -- well, I didn't have a chance to look.
21   Q.   Did someone stop you -- was -- excuse me, let me --
22   A.   You took this off pretty quickly.
23   Q.   Oh, no.  You want to see the whole record?  Well, first of
24   all, we cut off half a word.  So let's not do that.  We don't
25   mean to do -- so what would you like to see, Doctor?
```

1    When I said you didn't look, I mean you didn't look through

2    the records to do this analysis to see if it was one doctor or

3    a hundred doctors that are making this --

4    A.  What I looked was through to see -- and as I stated on

5    multiple occasions, frequently various caretakers make a

6    statement that he was working on his computer.

7    Q.  Got it.

8         MR. BRENNER:  And the next one, if you could bring up

9    the full blowup that includes the word "neuro."

10   BY MR. BRENNER:

11   Q.  You see that right under "general"?

12   A.  Yes.  Uh-huh.

13   Q.  Okay, Doctor.  And that had been cut off and that was

14   inadvertent.  In the "Neuro": "A times OX times three."  That

15   means alert and oriented times three, right?  Or do you not use

16   that?

17   A.  I don't use that abbreviation.  That's a rather weird

18   abbreviation.

19   Q.  But you're familiar with when doctors write that a patient

20   is alert and oriented times three, right?

21   A.  That's correct.

22   Q.  And it means what?

23   A.  It means he knows where he is; that's one.  He knows who he

24   is; that's two.  He knows when it is; that's three.

25   Q.  Got it.

```
 1           MR. BRENNER:  Okay.  Let's go to -- give me one
 2   second.
 3           Okay.  Let's go to April, which is D95 at 316.
 4   BY MR. BRENNER:
 5   Q.  So this is April 2012.  Again, you seemed to -- you seemed
 6   to think it was interesting they were using the same words, so
 7   here we're -- different words, right?  Again, doctor or nurse
 8   is in there giving what they're observing, right?
 9   A.  Yeah.  This one was a nurse and she says the same thing.
10   Q.  Well, yes.  She says the same thing:  "Dave's working on
11   his computer," but you seemed to point out before that you
12   thought it was sort of a template.  So I'm just pointing out to
13   you she uses different words, right?
14   A.  This particular one is using different words.  It's
15   probably a different person writing the note.
16   Q.  Okay.  So:  "Patient was received sitting up in bed and
17   working on his computer", "patient was awake and alert," right?
18   A.  Right.
19           MR. BRENNER:  Okay.  Let's go to the next one, May.
20   D94 at 725.
21           I'm sorry, Ms. Vela.  I don't mean to make you read my
22   mind.
23   BY MR. BRENNER:
24   Q.  Again, this is a nursing note from Tyrone Boyd, right?
25   A.  That is correct.
```

65

```
 1   Q.  No question in your mind that Tyrone Boyd is being an

 2   honest and accurate recorder of what he is observing at that

 3   moment?

 4   A.  That is correct.

 5   Q.  And he observes that he:  "Received the patient in bed,

 6   alert and oriented times three, working on computer, breathing

 7   even and unlabored," right?

 8   A.  That is correct.  Like frequently occurred elsewhere in the

 9   notes.

10   Q.  Right.

11        MR. BRENNER:  Okay.  Let's go to -- let's go to D94 at

12   604, which is June.

13   BY MR. BRENNER:

14   Q.  Again:  "Patient was received in bed -- received sitting up

15   in bed working on his computer," right?

16   A.  That's what it says.

17        MR. BRENNER:  Okay.  Let's go to July 2012, which is

18   D94 at 221.

19   BY MR. BRENNER:

20   Q.  Are you ready to read one?

21   A.  If you would like me to, I'll read it.

22   Q.  I would.

23   A.  "Received patient in bed, alert, oriented times three.

24   Working" --

25        (Court reporter interruption.)
```

1          THE WITNESS:  "Received patient in bed, alert,

2    oriented times three, working on computer, breathing even and

3    unlabored.  No signs or symptoms of distress or complaint of

4    pain noted.  Skin dry and warm to touch, indwelling catheter."

5    BY MR. BRENNER:

6    Q.  Okay.  The last part is he's not -- that means -- "or CO

7    pain," that means he's not complaining of pain?

8    A.  That's correct.

9          MR. BRENNER:  Let's go to D94 at 27.

10   BY MR. BRENNER:

11   Q.  And, Doctor, just so you know, we're in August now of 2012.

12   Again:  "Received patient in bed, alert and oriented times

13   three, working on computer, breathing even and unlabored.

14   No" -- what's SS?  I'm sorry.  I didn't catch it last time.

15   A.  Signs or symptoms.  This is exactly the same wording as the

16   last note.

17   Q.  Correct.  Correct.  This is Tyrone Boyd again, right?

18   A.  He seems to like that particular formula.

19   Q.  Right.  But -- he likes that formula, but you have no doubt

20   what he's saying is what he's observing, right?

21   A.  I think it's fair to state that, yes.

22   Q.  Yeah.  Okay.  But he likes a particular way to word it,

23   Mr. Boyd.

24          MR. BRENNER:  Okay.  Let's go to September 2012, which

25   is D93 at 659.  It says -- can you blow up the whole thing that

```
 1    says:  "Activities"?

 2    BY MR. BRENNER:

 3    Q.  It says:  "Activities," although it's spelled wrong.  It

 4    says "OOB"?  Is that out of bed?

 5    A.  Out of bed.

 6    Q.  Out of bed.  Okay.

 7        So on this time, he's out of bed and he's working on his

 8    computer.  And does the slash mean he's also getting rehab

 9    while he was working on his computer?

10    A.  That is what the patient reports to this particular

11    therapist as what he does, his activities.

12    Q.  Okay.  So he tells the therapist --

13    A.  That's what he tells the therapist.

14    Q.  Right.  He's basically got two things going on in his life

15    at that point.

16    A.  He says:  "Working on computer and rehab."

17    Q.  Right.  He does both.  Right?

18    A.  That's correct.

19    Q.  Okay.

20    A.  He doesn't seem to mention all the other -- well, of

21    course, under rehab, would be the wound care and so forth.

22    Q.  Sure.  Did you want to talk about his painful and -- wound

23    care again?

24    A.  Well, I didn't say:  "Painful," but there are many other

25    things going on that he doesn't mention.
```

```
 1    Q.  Sure.  Because he's focused on his work, right?  That's

 2    what he's focused on?

 3    A.  That's what he tells the therapist that he's doing.

 4    Q.  Okay.  You have no basis or reason to deny -- to call into

 5    question that Mr. Kleiman is being honest with his healthcare

 6    professionals, right?

 7    A.  He was working on his computer many, many times is

 8    definitely in the record.

 9         MR. BRENNER:  Okay.  Let's go to D93 at 455.

10    BY MR. BRENNER:

11    Q.  We're up to October.  Again, this is a different nurse.

12    This is Valerie Allison, right?

13    A.  That is correct.

14    Q.  She's a staff nurse.  So she's an LPN.  What's an LPN?

15    A.  Licensed practical nurse.

16    Q.  Okay.  And Ms. Allison says that -- again, her

17    observations.  First comment she notes:  "Received the patient

18    sitting up in bed, talking on the phone, and working on his

19    computer"?

20    A.  Now, also:  "Patient denied pain but admitted to not

21    feeling well."

22    Q.  Okay.  Well, I don't want to deprive you of the opportunity

23    to talk about the records.  So let's blow it up.

24        Let's see.  Did you find other things here that you thought

25    would be important for the jury to know?
```

67

```
 1   A.  Well, I found it interesting he's not feeling well.

 2   Q.  Okay.  Feeling well or not feeling well, he's still working

 3   on his computer, right?

 4   A.  That's right.

 5   Q.  Okay.  Are you good with that record?  Can we move on?

 6   A.  Well, I'm sure you have another 50 of these to go over, so

 7   let's go.

 8   Q.  You have to be somewhere?

 9   A.  No.  It's just that we have been doing the same thing for

10   the last hour.

11   Q.  Okay.

12   A.  I will agree that there are many references in the record

13   that he was working on a computer.

14   Q.  Okay.

15        MR. BRENNER:  Let's go to the next one, D93 at Page

16   78, 79.

17   BY MR. BRENNER:

18   Q.  Here, it's actually -- it's not -- this is -- this is

19   Ms. Somoza.  Dr. Somoza, if you recall from the prior record,

20   she's the supervising Ph.D., right?

21   A.  That is correct.

22   Q.  And in other records we saw Dr. Somoza was signing off on

23   the records of -- in one case, another Ph.D.; in another case,

24   one of her students.  Do you recall that?

25   A.  That is correct.
```

1   Q.  Here it appears to me, and you correct me if I'm wrong,

2   that Dr. Somoza herself is making the observation, right?

3   A.  That is correct.

4   Q.  And she says Mr. Kleiman was working at the time of the

5   visit, right?

6   A.  That is correct.

7   Q.  And while she's there, he continues to work, right?

8   A.  That is correct.

9   Q.  Okay.

10         MR. BRENNER:  Your Honor, I could do one more and then

11  take a small break before we get to 2013.

12         THE COURT:  Yes.  Of course.

13         MR. BRENNER:  So let's do the last one for 2012.  It's

14  D93 at Page 1.

15  BY MR. BRENNER:

16  Q.  And again:  "Patient" -- "received patient in bed."  This

17  is Mr. Boyd.  He's actually using different language than he

18  used before, right?  Or was this his language?

19  A.  What's the question?

20  Q.  Yeah.  This is Mr. Boyd.  I think he's using different

21  language.  You said he always does the same thing.  I think

22  this one's different, right?

23  A.  It's somewhat different.

24  Q.  Says:  "Received patient in bed."  Again:  "Alert and

25  oriented."

1    A.  "Working on computer, breathing even and labored."  Again,

2    as I said, there are many, many times -- frequently there are

3    references to him working on a computer.

4            MR. BRENNER:  Your Honor, can we take a brief recess?

5            THE COURT:  Yes.

6            MR. BRENNER:  Thank you.

7            THE COURT:  All right.  Ladies and Gentlemen, let's

8    take a 20-minute recess.

9        (Jury not present, 11:23 a.m.)

10           THE COURT:  Okay.  We're on a 20-minute recess.

11           MR. BRENNER:  Thank you, Judge.

12       (Recess from 11:24 a.m. to 11:44 a.m.)

13           THE COURT:  All right.  Welcome back.

14           All right.  Dr. MacIntyre, come forward.

15           Anything we need to address?  Are we ready to

16   continue?

17           MR. BRENNER:  Ready from the Plaintiffs.

18           MR. RIVERO:  Defendant is ready, Your Honor.

19           THE COURT:  Okay.  Let's bring in the jury.

20       (Before the Jury, 11:44 a.m.)

21           THE COURT:  All right.  Welcome back.  Please be

22   seated.

23           And we'll continue with the questioning.

24   BY MR. BRENNER:

25   Q.  Good afternoon again, Dr. MacIntyre.  Still good morning.

70

```
1        Okay.  I'm going to pick up where we left off, but I'm

2   going to move a little more quickly through the records.  I

3   said we would talk about 2013.  So let's do a couple from then,

4   okay?

5   A.  Okay.

6            MR. BRENNER:  Ms. Vela, if you could bring up D92 at

7   657.

8   BY MR. BRENNER:

9   Q.  Okay.  So this is from January 11th, 2013.  See that?

10  A.  Yes, I do.

11  Q.  And it's a nurse's note.  See that?  Valerie Allison?

12  We've seen Ms. Allison before.

13  A.  Yes.  Uh-huh.

14  Q.  Nursing note, right?

15           MR. BRENNER:  Oh, I'm sorry.  Can we publish that?

16  BY MR. BRENNER:

17  Q.  Let's start over.  Dr. MacIntyre, you have in front of you

18  D92 at Page 657.  It's a nursing note from January 11th, 2013.

19  You see that?

20  A.  Yes, I do.

21  Q.  And we've seen Ms. Allison before, right?

22  A.  Yes, I do.

23  Q.  Okay.  So this one, remember we talked about earlier the

24  note that Dave Kleiman's working on his computer early in the

25  morning?
```

```
 1    A.  Yes.

 2    Q.  So this one's actually at 2000 hour; that's 8:00 at night

 3    in military time?

 4    A.  That is correct.

 5    Q.  Okay.  So here's a note at 8:00 at night, right?

 6    A.  That is correct.

 7    Q.  And, again, whether it's early morning or late at night,

 8    he's just sitting up in bed working on his computer, right?

 9    A.  That is correct.

10         MR. BRENNER:  So let's go to one more, which is D92 at

11    316.

12    BY MR. BRENNER:

13    Q.  This one is -- so we have early morning.  We have 8:00 at

14    night.  Now this one says that he's sleeping when they walked

15    up -- when they walk up, right?

16    A.  That's what it says.

17    Q.  And it says the reason he's sleeping this time is because

18    he stayed up late last night working, right?

19    A.  That's what it said.

20    Q.  Okay.  Well, yes.  He's sleeping when the nurse sees him.

21    And he explains to her why he's sleeping, right, because he

22    needs to sleep late because he was up late working, right?

23    A.  That's what he said.

24    Q.  Okay.  Great.

25         Doctor, would you have any reason to dispute that there are
```

72

1    over 250 references in Dave's medical records to him working in

2    the VA.

3    A.   As I said before, I didn't count them myself but they are

4    frequently referred to.

5    Q.   Would you have any reason to dispute there are 520

6    references to him working on his computer?

7    A.   The same story.  I didn't count them myself but it's

8    frequently referred to.

9    Q.   Any reason to dispute there's over 3,000 references to him

10   being oriented?

11   A.   Well, I would presume because that's a standard statement

12   for anybody as a part of the general physical examination.

13   Q.   And over 4,000 references to him being alert.  Any reason

14   to dispute that?

15   A.   And, again, that's one of the standard statements being

16   made.

17   Q.   Okay.  And there's nothing in Dave's physical condition

18   that prevented him from using his computers, correct?

19   A.   Well, I wouldn't say that that's always the case.  But in

20   many -- most of the time, there's nothing to prevent him from

21   working.  The problem would be that he's being interrupted

22   frequently as he worked.

23   Q.   Right.  So he could be working all day, except when they

24   come in and have to do their stuff to help provide care to him,

25   right?

1   A.  Which would be a large part of the day, yes.

2   Q.  Okay.  I want to talk just about a couple more items.  You

3   talked urinary tract infections.  You say basically he had a

4   constant urinary tract infection?

5   A.  That he was -- there was an underlying presence of bacteria

6   in the urine at all times.  But then there were -- an acute

7   anachronic problem, that he would have acute exacerbations with

8   some occasions leading to bacteremia.

9   Q.  Right.  We'll talk about -- say that word again?

10  A.  Bacteremia.

11  Q.  Bacteremia.

12  A.  Presence of bacteria in the bloodstream.

13  Q.  Okay.  I was going to miss one of those syllables.  Thank

14  you.

15      The truth is, between 1995 and 2013, there's only five or

16  six times that Dave Kleiman had a symptomatic infection,

17  urinary tract infection?  Twenty-year period?

18  A.  I think that would be what has been recorded, but that

19  doesn't mean that he didn't have a chronic problem with the

20  urinary tract.

21  Q.  In the medical records you reviewed, five or six times over

22  a 20-year period he is noted to have a symptomatic urinary

23  tract infection?

24  A.  That is correct.  And also during that entire time he

25  required catheterization for the urine.

74

1    Q.  Right.  We talked about the bladder sphincter, that he had

2    lost control of that?

3    A.  That is correct.  Not just the sphincter, the ability of

4    the bladder to contract.  I didn't mention that before, but

5    that's part of the problem.

6    Q.  Okay.  So Dave needs help passing urine, right?

7    A.  That's correct.

8    Q.  And other than the times that there is bacteremia, a UTI

9    would not affect someone's mental ability, correct?

10   A.  In general, that is correct.

11   Q.  Okay.  And you told me in deposition Dave had bacteremia a

12   total of three times?

13   A.  That's what I found in the record during this particular

14   hospitalization.

15   Q.  That's all you have to go by.

16   A.  During this hospitalization, that's correct.

17   Q.  Sure.  Each time, it lasted only a short period of time,

18   correct?

19   A.  Well, it was adequately treated.

20   Q.  Right.  And you saw no evidence that these three short

21   periods had any effect on Dave's mental state, correct?

22   A.  Well, in general, bacteremia can do that.  But I don't see

23   anything in the record specifying that.

24   Q.  Right.  Can; just didn't with Dave?  No record that it did

25   with Dave?

1    A.  Not specified in the record.

2    Q.  Okay.  And that's all we have to go by, right?

3    A.  Well, again, one of the problems with medical records,

4    there is an overlying idea that if it's not recorded, it didn't

5    happen.  But that is never necessarily the case.  We miss out

6    on things frequently in the medical record.  So I would not

7    agree with the statement if it's not recorded, it didn't

8    happen.

9    Q.  Okay.  We'll move on to another subject, which is

10   surgeries.  Just real quick, seven surgeries between 2010 and

11   2013, right?

12   A.  Yeah.  I accounted -- I counted seven formal surgical

13   procedures.  That's not counting bedside debridements.

14   Q.  Right.  And you're not offering an opinion in this case

15   that any of Dave's surgeries had any -- caused any sustained

16   impairment on Dave's ability to think, correct?

17   A.  Correct.  The key word being "sustained."

18   Q.  Right.  Well, when he's under anesthesia, he's not thinking

19   great, right?

20   A.  That's correct.

21   Q.  And the anesthesia takes like a day to wear off, maybe two

22   days?

23   A.  One to two days is what I said before, yes.

24   Q.  Seven surgeries.  Let's give him two.  Let's give you the

25   bonus day.  That would be 14 days over a -- I tried to count

76

```
 1    it.
 2           MR BRENNER:  How many days was it, Mr. Holtzman?
 3    BY MR. BRENNER:
 4    Q.  Nine hundred days that you looked at?
 5    A.  It is counted up in one of those exhibits that came by
 6    yesterday.
 7    Q.  Okay.  So I think it's like high 800s, whatever it is.  So
 8    14 of those days, he may have had the effect of anesthesia?
 9    A.  That are recorded, that's correct.
10    Q.  Right.  Just that are recorded in Dave's medical records,
11    right?
12    A.  That's correct.
13    Q.  Okay.  Let's just talk briefly about medication.  You sort
14    of broad-brushed it a little bit, so let me break it down.  You
15    mentioned -- you told us in your expert opinion -- just so the
16    jury understands, you gave an expert report in this case.  You
17    recall that?
18    A.  Well, I gave --
19    Q.  Two.
20    A.  -- two reports.
21    Q.  My bad.  You gave two.  You gave one in December of '19, I
22    think?
23    A.  Yes.
24    Q.  And then you gave -- I forgot if you called it a
25    supplemental or amended, something you gave in April of 2020?
```

1  A.  That is correct.

2  Q.  Right.  And in those reports, you outline for us -- because

3  that's what the rules require, you outlined what your opinions

4  were, right?

5  A.  That is correct.

6  Q.  And then I had an opportunity to take your deposition to

7  make sure that your report adequately covered your opinions.

8  You remember that?

9  A.  That is also correct.

10 Q.  Right.  And in your report, you identified two medications

11 that could -- remember the word "could" -- could have had an

12 effect on Dave Kleiman's mental ability?

13 A.  That is also correct.

14 Q.  One of them was -- and you're going to have to help me with

15 the pronunciation -- it's called Ertapenem?

16 A.  That's an antibiotic, yes.

17 Q.  So that was your antibiotic opinion.  And do you recall,

18 did you look -- so he -- Dave definitely was subscribed --

19 prescribed, not subscribed -- prescribed Ertapenem while he was

20 in the hospital, right?

21 A.  He had a course of Ertapenem, that's correct.

22 Q.  And I think -- let's just for -- so we could move it along,

23 let's assume there's about 850 to 900 days that you looked at

24 records, okay?

25 A.  Well, sure.

```
 1    Q.  Okay.  Dave was prescribed Ertapenem for a total of -- do

 2    you remember?

 3    A.  I don't remember, but the usual -- it would be from one to

 4    six weeks.

 5    Q.  Right.  He had 10 days total.

 6    A.  Well, I would have to go back and see that.  He didn't

 7    receive it for a long period of time.

 8    Q.  He did not -- or what did you say?

 9    A.  He did not receive it for a long period of time.  Of course

10    it depends on your definition of long.  He had one course of

11    Ertapenem.

12    Q.  Mine's 10 days.  Are we calling that long or short?

13    A.  I'll agree to that.

14    Q.  You'll agree to that.  So 10 days he received this

15    antibiotic.  And you agree with me that the side effect of --

16    that it has some sort of effect on your alertness or whatever

17    is a rare side effect of Ertapenem.  Do you agree with that?

18    A.  It is unusual.  I've seen it once.

19    Q.  It's not usual.  And none of the medical records note that

20    Dave had any effect from Ertapenem, right?

21    A.  That is correct.

22    Q.  Okay.  Then you also mentioned Valium, right?  That was

23    this other drug you mentioned?

24    A.  That is correct.

25    Q.  And I think there's Valium -- there's another name for it,
```

75

```
 1    right?
 2    A.  Well, the generic name is diazepam.
 3    Q.  Got it.  So we'll call it Valium.  That's what you called
 4    it on direct.  You don't know if Valium had any -- well, strike
 5    that.
 6        There's no record that Valium had any negative effect -- in
 7    Dave's medical records, there's no medical record that
 8    demonstrates that Valium had any negative effect on Dave's
 9    mental state?
10    A.  It's not specifically recorded as such.
11    Q.  Right.  It's not generally recorded.  There's no record of
12    it?
13    A.  It's not specifically recorded as such.
14    Q.  Okay.  In fact, there isn't a single notation in the
15    medical records that -- medical records that you reviewed that
16    Dave ever had a decreased mental state because of any
17    medication that he was prescribed at the VA, correct?
18    A.  It's not specifically recorded as such.
19    Q.  In fact, you went and looked for that, didn't you, Doctor?
20    A.  In general, yes.
21    Q.  And you didn't find it, right?
22    A.  I didn't find any, no.
23            MR. BRENNER:  Okay.  Let me check with my colleagues,
24    Judge.
25            THE COURT:  Certainly.
```

```
1          (Pause in proceedings.)
2              MR. BRENNER:  Doctor, thank you so much for your time.
3              Your Honor, I have no further questions.
4              THE COURT:  All right.  Any redirect?
5              MR. KASS:  Yes, Your Honor.
6                         REDIRECT EXAMINATION
7    BY MR. KASS:
8    Q.  Dr. MacIntyre, do you remember being asked whether Dave's
9    medical records were introduced into evidence yesterday?
10   A.  Whether I was asked if his medical record was introduced
11   into evidence?
12   Q.  Yes.  Do you recall that?
13   A.  I'm trying to remember.  I'm sure it was, but ...
14   Q.  Well, I'll make this easier.
15             MR. KASS:  Mr. Reed, if you could pull up D091.  D091.
16          (Pause in proceedings.)
17             MR. KASS:  If we could show D091 to the witness and
18   the jury.
19          (Pause in proceedings.)
20             THE COURT:  Liz, do you want to call IT?  He might
21   have a problem on his end.
22             Oh, there we go.  Okay.
23             MR. KASS:  I'm sorry, but if you could take that down.
24   I don't believe that's 091.
25             There we go.
```

87

```
1    BY MR. KASS:

2    Q.  Dr. MacIntyre, I believe we have the exhibit up.  Do you

3    recall being shown this document yesterday?

4    A.  I remember seeing this.  Yes.  Uh-huh.

5         MR. KASS:  And, Mr. Reed, if you could go down to the

6    second page.

7    BY MR. KASS:

8    Q.  And do you recognize this as the medical records that you

9    were shown yesterday?

10   A.  That is correct.  It says at the bottom:  "Page 2 of

11   1,000."  What happened was it was divided up into packets of

12   1,000 pages each.

13   Q.  Do you recall if this document was admitted into evidence

14   yesterday by counsel for the Defense?

15   A.  Yes.

16   Q.  And do you recall if the other sections of this medical

17   record that was broken down was introduced into evidence

18   yesterday?

19   A.  My understanding is that all those over 10,000 pages were

20   introduced.  That is correct.

21   Q.  Right.  And would that include D091, D092, D093, D094,

22   D095, D096, D097, D098, D099, D100, D101, and D102?

23   A.  Yes.  I remember that list being read off.  Each one of

24   those is one of those packets of a thousand pages.

25   Q.  And those are the ones that were introduced into evidence
```

1    yesterday by counsel for Defense?

2    A.  That is correct.

3    Q.  Mr. Brenner spent a significant amount of time going

4    through Mr. Kleiman's medical records, methodically pointing

5    out certain instances where Dave was noted to have been working

6    on his computer.  Do you recall approximately around how many

7    times they were, how many documents he had shown you?

8    A.  Well, again, as I said with him, I didn't add them up or

9    count them out.  I believe he asked:  "Do you think it would

10   have been 100 times," and I would have to agree with that.  It

11   may be more.

12   Q.  But would you be surprised if he had shown you more than 25

13   in this courtroom today?

14   A.  Yeah.  It was getting to be a bit repetitious.

15   Q.  Okay.  Now, Mr. -- and as far as -- so if he showed you

16   around 25 pages today of Dave Kleiman's medical records -- and

17   we know Dave Kleiman's medical records are how many thousands

18   of pages, did you say?

19   A.  Around 11,000.

20   Q.  Okay.  Percentage-wise, do you have any idea -- you would

21   agree it's a pretty small percentage, correct?

22   A.  It's a lot of paper.

23   Q.  Okay.

24          MR. KASS:  Mr. Reed, if you could pull up the

25   demonstrative exhibit showing the days Dave Kleiman was in the

```
 1    hospital.
 2              COURTROOM DEPUTY:  Mr. Kass, is that for everyone to
 3    see?
 4              MR. KASS:  Yes, it is.  It was shown yesterday without
 5    objection.
 6         (Pause in proceedings.)
 7              MR. KASS:  If you can go to the slide right before
 8    that where you see the total amount of days.
 9              Okay.  Perfect.
10    BY MR. KASS:
11    Q.  Dr. MacIntyre, do you recall being shown this yesterday?
12    A.  Yes, I do.
13    Q.  And is it a calendar showing the total amount of days that
14    Dave Kleiman was in the hospital?
15    A.  That is correct.  During this particular hospitalization.
16    Q.  And as far as 2011 and 2012, it's a complete year, correct?
17    Each time is a complete year.
18    A.  That is correct.
19    Q.  So 365 plus 365, about 700 days?
20    A.  That is correct.
21    Q.  And if we look in 2011, there's another three months.  So
22    then we have to add another 90 days?
23    A.  Yes.
24    Q.  So already we're at 790.  And then we have, in 2011, about
25    another three months, right?
```

1   A.  Yeah, or another two and a half months.  Whatever.

2   Q.  Another two and a half months.  So we're talking 850 days,

3   give or take, continuous hospital stays?

4   A.  That is correct.  Yes.

5   Q.  We had discussed how there were interruptions when Dave

6   Kleiman was in the hospital, correct?

7   A.  That is correct.

8   Q.  And I believe you had discussed how there were doctors

9   coming into his room checking up on him?

10          MR. BRENNER:  Objection.  Leading.

11          THE COURT:  Sustained.

12          THE WITNESS:  That is correct.

13          THE COURT:  The objection is sustained.  Rephrase.

14          MR. KASS:  Okay.

15  BY MR. KASS:

16  Q.  Were there interruptions during Dave Kleiman's stay in the

17  hospital?

18  A.  Yes.  I think I went over this previously.  There are many

19  interruptions that occur.  There are administration of

20  medications by the nurses.  There's this turning every two

21  hours that has been talked about.  There's interruption for

22  wound care, each one of which would have taken not just a

23  couple of minutes but longer than that.

24      Then there was physical therapy and occupational therapy,

25  and there were notes from those mentioned during the previous

65

1    discussions.  Then there were interruptions from the multiple

2    medical teams coming in from different subspecialties in a

3    teaching hospital.

4        Over and all, there were multiple many interruptions

5    throughout the day for this patient or any patient, in

6    particular this patient because of the type of problems that he

7    had.  The pressure ulcers, the Foley catheter, the IVs, all of

8    those lead to interruptions.

9    Q.  Dr. MacIntyre, how do you know all of that occurred with

10   Dave Kleiman?

11   A.  Well, I know from two ways.  One is the documentation in

12   the record that the people who are doing the interrupting

13   documented what they did.

14       And secondly, from a personal knowledge of what happens in

15   hospitals.  So I work in hospitals.  I know what goes on.  I

16   was a patient last April in a hospital and I know what happened

17   to me.

18   Q.  With respect to Dave Kleiman, around how many times would

19   there be notes from a doctor or a physical therapist or a nurse

20   on a daily basis?

21   A.  Oh, I would have to go back and do a little addition and

22   subtraction, but I would say from five to 10.

23   Q.  So on every day, there were five to 10 notes with regards

24   to treatment of Dave Kleiman?

25           MR. BRENNER:  Objection.  Leading.

```
 1              THE COURT:  (No verbal response.)

 2              THE WITNESS:  Correct.

 3   BY MR. KASS:

 4   Q.  And any of those notes could have talked about what Dave

 5   Kleiman was doing at that point in time?

 6   A.  Well, it was either at the time or at the end of a shift,

 7   the nurse would write a summary note for the shift.

 8   Q.  But the note would include something about Dave Kleiman,

 9   correct?

10              MR. BRENNER:  Objection.  Leading.

11              THE COURT:  The objection is sustained.

12              THE WITNESS:  There might be --

13              THE COURT:  Hold on.  Hold on.  There's no pending

14   question.  The objection is sustained.

15   BY MR. KASS:

16   Q.  So what would what those note -- what would those eight to

17   10 notes each day state?

18   A.  They would state physical findings on the patient, items

19   related by the patient to the therapist, and what the therapist

20   did to the patient during the time.

21   Q.  Okay.  If we do a little multiplication over here.  It's

22   going to be simple.  It's going to be factor of 10, so it

23   shouldn't be too hard.

24      We had discussed there was about 810 -- 850 days that Dave

25   Kleiman was in the hospital during this last hospital stay?
```

67

```
1              MR. BRENNER:  Objection.  Leading.

2              THE COURT:  Sustained.

3   BY MR. KASS:

4   Q.  How many days had you testified approximately Dave Kleiman

5   was in the hospital during this last hospital stay?

6   A.  Well, we just added it up and it came to around 850.

7   Q.  And how many -- approximately how many times a day would

8   there be notes with respect to Dave Kleiman?

9   A.  Well, I believe I said before five to 10, although I would

10  have to go back and do a little addition and subtraction to see

11  exactly.

12  Q.  If we do some rough, rough arithmetic, around how many

13  notes would there be about Dave Kleiman's condition all

14  throughout that stay?

15  A.  Well, again, five to 10.

16  Q.  Well, if you were to multiply the 850 by five to 10, what

17  would you get?

18  A.  I did pass high school math, but I can't do that

19  multiplication in my head without writing something down.  But

20  it's a high number.

21  Q.  Okay.

22  A.  850 times five -- well, times 10 would be 8,500.  Times

23  five, it would be half of that.  So somewhere between 4,250 and

24  8,500.  How's that for mental addition and subtraction?

25  Q.  Thank you.
```

1    And I just want to ask you one final thing.  Did anything

2   that Mr. Brenner -- well, sorry.  One thing before the one

3   final thing.

4    Was there any condition -- so I believe you had testified

5   that Dave Kleiman sitting down or on his back wasn't a good

6   position for him, correct?

7        MR. BRENNER:  Objection.  Leading.

8        THE COURT:  Sustained.

9   BY MR. KASS:

10  Q.  New question.  Okay.  What was the best position for Dave

11  Kleiman to be resting in?

12  A.  Well, the best position would be either lying on one side

13  or lying on his belly.  Now, that doesn't mean that he couldn't

14  lie on his back, so long as it wasn't for a prolonged period of

15  time.  And it doesn't mean he couldn't sit down as in a

16  wheelchair or bed.  It's just that he should interrupt that

17  every so often to offload -- like I used the terminology

18  before, to offload the pressure ulcers.

19  Q.  And this will be the final round of questions.  Was there

20  anything that Mr. Brenner asked you that changed your opinions

21  with respect to the interruptions that Dave Kleiman had

22  throughout the day?

23  A.  I would say no.

24  Q.  Did anything that he asked you change your opinion with

25  respect to Dave Kleiman's medical condition?

```
 1    A.  I would also say no.

 2    Q.  Was there anything that he said that would change your

 3    opinion with respect to the medications that Dave Kleiman was

 4    taking?

 5    A.  Again, I would say no.

 6              MR. KASS:  That's all, Your Honor.

 7              THE COURT:  All right.  Thank you, sir.

 8              Ladies and Gentlemen, you have the right to ask

 9    Dr. MacIntyre questions.  Do any of you have any questions for

10    Dr. MacIntyre?

11              If so, if you'll raise your hand.  Let me give you the

12    opportunity to write down your question.

13        (Pause in proceedings.)

14              THE COURT:  All right.  And may I see the attorneys

15    sidebar, please?

16        (At sidebar on the record.)

17              THE COURT:  All right.  The first question reads as

18    follows:  "When a patient is given a special overnight pass,

19    does the patient need to fulfill certain qualifications to be

20    able to leave the hospital?"

21              Any objection?

22              MR. FREEDMAN:  Nope.

23              MR. BRENNER:  No objection.

24              THE COURT:  Okay.  I just need one person from the

25    Plaintiffs and one person from the Defendant.
```

```
1                MR. BRENNER:  No objection from the Plaintiff.

2                THE COURT:  Mr. Kass, since you are --

3                MR. KASS:  No objection from the Defendant.

4                THE COURT:  All right.  Second question:  "Is the

5      patient required to have a companion (friend or family member)

6      to be able to leave the hospital?"

7                MR. BRENNER:  Your Honor, I would object.  That

8      potentially runs afoul of your motion in limine that said there

9      can't be anything about friend and family support.  It is in

10     the order you ordered.  I think it's in the motion in limine.

11     I could grab it, but I think it would run afoul.

12               MR. KASS:  Your Honor, we have no objections to it.

13     They're simply asking what the requirements are, not whether

14     there was a friend or family member there.

15               MR. BRENNER:  And also, I don't think it's relevant to

16     any of the issues in the case whether a friend or family member

17     was there.  I think it runs afoul of your order.

18               THE COURT:  I think it relates to capacity.  It

19     doesn't speak of a particular sibling.  The objection is noted.

20     It's overruled and the questions are proper.

21         (End of discussion at sidebar.)

22               THE COURT:  All right.  Ladies and Gentlemen, I want

23     to thank you for your questions.

24               There are two questions, Dr. MacIntyre, and they read

25     as follows:
```

1          The first question is:  "When a patient is given a

2   special overnight pass, does the patient need to fulfill

3   certain qualifications to be able to leave the hospital?"

4          THE WITNESS:  That is up to the physician who

5   authorizes the pass.  In other words, if the patient is felt

6   not to qualify to be out for overnight by that physician, he

7   will not sign off on the pass.  So I can't give specific

8   qualifications because it depends on the circumstances and

9   which physician it is that's authorizing it.  But in the

10   opinion of that physician, the patient could have the pass

11   without it being detrimental to his treatment or health.

12          THE COURT:  The second question reads as follows:  "Is

13   the patient required to have a companion (friend or family

14   member) to be able to leave the hospital?"

15          THE WITNESS:  I'm not familiar with the specific

16   requirement in that for this particular hospital.  That would

17   probably be up to the physician that does the ordering.

18          In general, it would be prudent to have a companion

19   available to take the patient out of the hospital, but I can't

20   say specifically whether there was a regulation to that effect.

21          THE COURT:  All right.  Thank you, Dr. MacIntyre.

22          Any follow-up by the attorneys on behalf of the

23   Defendant?

24          MR. KASS:  No, Your Honor.

25          THE COURT:  On behalf of the Plaintiffs?

```
 1              MR. BRENNER:  No, Your Honor.

 2              THE COURT:  All right.  Is Dr. MacIntyre excused?

 3              MR. KASS:  Yes, Your Honor.

 4              MR. BRENNER:  Yes, Your Honor.

 5              THE COURT:  All right.  Thank you, sir.

 6              You are excused.

 7         (Witness excused.)

 8              THE COURT:  And the Defendant's next witness.

 9              MR. MESTRE:  The Defense calls Kimon Andreou.

10              THE COURT:  All right.  Thank you.

11         (Pause in proceedings.)

12              THE COURT:  All right.  Mr. Andreou, if you'll step

13    forward.  If you'll remain standing, raise your right hand to

14    be placed under oath.

15         KIMON ANDREOU, DEFENSE WITNESS, SWORN

16              COURTROOM DEPUTY:  Have a seat, please.

17              If you can just state your name and also spell it for

18    the record.

19              THE WITNESS:  Kimon Andreou.  K-I-M-O-N.

20    A-N-D-R-E-O-U.

21              THE COURT:  Mr. Andreou, consistent with the CDC

22    guidelines, if you are fully vaccinated and you feel

23    comfortable, you are permitted to take your mask off while you

24    are testifying.

25              THE WITNESS:  Thank you.
```

```
1                        DIRECT EXAMINATION
2    BY MR. MESTRE:
3    Q.  Good morning, Mr. Andreou.
4    A.  Good morning.
5    Q.  Can you give the jury a brief history of your educational
6    background?
7    A.  Okay.  I have an undergrad in accounting and finance, a
8    master's degree in management information systems -- oh, sorry.
9    An undergrad in accounting and finance, a master's in
10   management information systems, and I am halfway through a
11   doctorate degree in information systems.
12   Q.  And can you give the jury a brief description of your work
13   background?
14   A.  My entire career, over 20 years, has been in the broader IT
15   space: network security, network administration, software
16   development, and data analytics.  And that has been the primary
17   focus of my career over the past -- well, the majority of my
18   career.
19   Q.  And where do you work now?
20   A.  General Motors.
21   Q.  And what do you do at General Motors?
22   A.  I head up the data analytics team for the contact centers
23   there.
24   Q.  Now, did you know David Kleiman?
25   A.  Yes.
```

```
 1    Q.  When did you first meet him?

 2    A.  I met him in 2002 or '3, when we both worked for S-Doc, a

 3    software -- security software company in West Palm Beach.

 4    Q.  What did you do at S-Doc?

 5    A.  I headed up the application development and the QA, quality

 6    assurance, which is testing of software.  And then it evolved

 7    to also do sales engineering, which also added to my portfolio,

 8    supporting the sales team on the field.

 9    Q.  What did Dave Kleiman do at S-Doc?

10    A.  He was the chief information security officer, so he was

11    responsible for the server security side, the network security

12    side of the company and of the software we would sell.

13    Q.  Did you work with him after S-Doc?

14    A.  On occasion, he would ask me to -- on cases that he would

15    do for forensic work that he did, whenever he needed any sort

16    of programming help, he would come to me and I would write a

17    quick script or a quick program for him or any such thing.

18    Q.  And why would he ask you to do that?

19            MR. BRENNER:  Objection.  Calls for speculation.

20            THE COURT:  Overruled.

21            THE WITNESS:  He asked me because he just didn't know

22    how to program.  So he knew that I knew how to program, so he

23    would ask me to do it.

24    BY MR. MESTRE:

25    Q.  Dave Kleiman was not a programmer?
```

```
 1              MR. BRENNER:  Objection.  Leading.

 2              THE COURT:  Sustained.

 3   BY MR. MESTRE:

 4   Q.  Was Dave Kleiman a programmer?

 5   A.  No.

 6   Q.  Would it -- while you worked with him, did you get to know

 7   his background and skill set?

 8   A.  Yes.

 9   Q.  Did you develop a friendship with Dave?

10   A.  Yes.

11   Q.  And how did that friendship develop?

12   A.  We worked together for a few years and we would just spend

13   time outside of work as well, either going to dinner or going

14   to a gun show or just hanging out.

15   Q.  Was he a good friend?

16   A.  Yes.

17   Q.  Would you consider him your closest friend?

18   A.  He would be among my closest, yes.

19   Q.  After you -- and I think you said you met him in 2002,

20   2003?

21   A.  Yes.

22   Q.  After you met him in 2002 or 2003, was he ever

23   hospitalized?

24   A.  Yes.

25   Q.  When was the first time that you know that he was
```

96

```
1   hospitalized?

2   A.  I don't remember when, but he always had issues.  He was in

3   a wheelchair, so he would always get some sort of infection

4   which would require him to be hospitalized.

5   Q.  And how would that affect his ability to -- how would that

6   affect his day-to-day life?

7   A.  Well, he would be in the hospital, so he couldn't -- he

8   wouldn't be at home.  He wouldn't have access to all his

9   equipment.  But until the last hospital stay, his stays, to my

10  recollection, were not lengthy.

11  Q.  When was the -- what you're calling the last hospital stay,

12  when was that?

13  A.  The one that he -- I don't know if he entered -- was it in

14  2010 or '11, but he was -- the one where -- the last hospital

15  stay before he died.

16  Q.  Okay.  So let me show you what I believe is in evidence.

17          MR. MESTRE:  Mr. Reed, if you could pull up Joint

18  Exhibit 55 for me.

19          I believe this is in evidence, Your Honor.

20          MS. McGOVERN:  It is.

21          MR. MESTRE:  Okay.  Can you publish this to the jury,

22  please.

23  BY MR. MESTRE:

24  Q.  This is already a document in evidence, Mr. Andreou.  If

25  you look at the email from Dave Kleiman on April 9th, 2008 at
```

1    2:18 a.m.

2         MR. MESTRE:  If you could call that part out for me,

3    Mr. Reed.

4    BY MR. MESTRE:

5    Q.  He says:  "I've been laid up for a bit."  And then a few

6    lines down he says:  "I haven't worked in about 10 days."

7         Do you remember that?  I know this is not an email to you.

8    But do you remember him being laid up at this time in 2008?

9    A.  I -- I honestly don't remember that time frame, but he had

10   been -- he would end up in the hospital every now and then

11   because of those infections.  I don't recall this particular

12   case.

13   Q.  Okay.  Let me pull up another exhibit.

14        MR. MESTRE:  Mr. Reed, if you can pull up Joint

15   Exhibit 52, which I think is also in evidence, and publish it

16   to the jury, please.

17   BY MR. MESTRE:

18   Q.  So this is an email, Mr. Andreou, from Dave Kleiman to

19   Craig Wright on February 19th of 2009.  He says:  "Actually, I

20   had some minor surgery."

21        Do you know what he was having surgery for at this time in

22   2009?

23   A.  I'm not certain what it was.  But no, I don't know -- I

24   can't say.

25   Q.  But is that --

```
 1    A.  I can't say definitively.

 2    Q.  Apologies.  But is that consistent with your testimony that

 3    he was in and out of the hospital?

 4    A.  Yes.  Yes.  Yes.  Because of his wheelchair, he would get

 5    any minor scrape or scratch or whatever.  He had -- because he

 6    had no sense below the waist, it would end up getting infected.

 7    Q.  Okay.  I'm going to show you another exhibit that's in

 8    evidence.  It's D1021.

 9         MR. MESTRE:  If you could pull that up, Mr. Reed.

10         (Pause in proceedings.)

11         MR. MESTRE:  That's the wrong exhibit, but I don't

12    think I need it.

13    BY MR. MESTRE:

14    Q.  If I told you that -- so the second time period that you're

15    talking about, what you called the last time period that he was

16    in the hospital, would that have been from September of 2010 to

17    March of 2013?  Is that the period you're speaking about?

18    A.  Yes.  Yes.

19    Q.  Okay.

20         MR. MESTRE:  You can take down the exhibit, Mr. Reed.

21    BY MR. MESTRE:

22    Q.  So during that -- we'll call it the last hospitalization or

23    the most recent -- would you visit Dave Kleiman?

24    A.  Yes.  Regularly.

25    Q.  And where did you work at the time?
```

```
 1    A.   I worked for Royal Caribbean at the Port of Miami.  So it
 2    was a straight shot from the office to the VA.
 3    Q.   At that time, was Dave Kleiman at the Miami VA?
 4    A.   Yes.
 5    Q.   Where is the Miami VA?
 6    A.   It's right off of 395.  So just take that from the office
 7    over there, take the exit, and it was right off of the exit
 8    straight.  It would only take me maybe 10 minutes to get there.
 9    Q.   And would you go after work to visit?
10    A.   After work.  So I would usually show up between 6:00 and
11    7:00, I think.
12    Q.   How often would you go?
13    A.   Daily.  Monday through Friday.  Because I was in the office
14    and I would just go there.  I would bring him food.
15    Q.   Every day?
16    A.   Almost.
17    Q.   Did he ever ask you to take him Hooters wings, for example?
18    A.   That was his favorite.
19    Q.   Was there a Hooters on the way?
20    A.   Yes.
21    Q.   Can you describe the hospital room?
22    A.   Sure.  It was in the unit for spinal injuries, towards the
23    back of that.  And he -- even though it was a two-bedroom,
24    usually he was on his own in there.  And his bed was closest to
25    the door and he would have all of his stuff there.
```

100

```
1    Q.  Were there times where he shared it with another patient?

2    A.  Yes.

3    Q.  Why would you go so often?

4    A.  He was my friend.

5    Q.  Your close friend?

6    A.  Yeah.

7    Q.  Did you ever visit him at home?

8    A.  No.

9    Q.  Do you know, when he was home, if he needed help with his

10   daily activities?

11   A.  Not to my knowledge.

12   Q.  Was Dave Kleiman shy?

13   A.  He was private, not shy.

14   Q.  Was he timid?

15   A.  No.

16   Q.  Strong personality?

17   A.  Very strong.

18   Q.  Do you know if he had a business partnership with Carter

19   Conrad and Patrick Paige?

20   A.  Yes.

21   Q.  How did you know that?

22   A.  He told me.

23   Q.  He didn't keep it secret?

24   A.  No.

25   Q.  Given his physical limitations, do you know whether Patrick
```

101

```
 1   Paige and Carter Conrad helped him with his engagements?

 2   A.  I'm not aware of that.

 3   Q.  I should ask them.

 4       I want to talk a little bit now about David Kleiman's skill

 5   set, which I think you said you are familiar with.  And you

 6   have already said that he was not a programmer.  Was Dave

 7   Kleiman a coder?

 8   A.  No.

 9   Q.  Did you ever tell him that he couldn't code?

10   A.  Yes.

11   Q.  What did you tell him?

12   A.  I would tease him --

13           MR. BRENNER:  Objection.  Calls for hearsay, Your

14   Honor.

15           THE COURT:  Sustained.

16   BY MR. MESTRE:

17   Q.  In your opinion, could Dave Kleiman code himself out of a

18   paper bag?

19   A.  No.

20           MR. BRENNER:  Objection, Your Honor.  Argumentative

21   and calls for speculation.

22           THE COURT:  Sustained.

23   BY MR. MESTRE:

24   Q.  How would you describe his ability to code?

25   A.  It was minimal to nil.
```

```
 1    Q.  Did he ever reach out to you and ask you for help with

 2    coding?

 3              MR. BRENNER:  Objection.  Asked and answered.

 4              THE COURT:  Sustained.

 5              MR. MESTRE:  Your Honor, I asked about the

 6    programming.  I haven't asked --

 7              THE COURT:  The coding?

 8              MR. MESTRE:  He has testified that he called him about

 9    programming because he could program.  I haven't asked him yet

10    if he called him about coding.  It's not asked and answered.

11              THE COURT:  I'll allow it.

12    BY MR. MESTRE:

13    Q.  Did he ever call you about coding?

14    A.  Yes.

15    Q.  Why did he do that?

16              MR. BRENNER:  Objection.  Calls for speculation.

17              THE COURT:  Overruled.

18              THE WITNESS:  Because he didn't know how and he knew

19    that I knew how to do that.

20    BY MR. MESTRE:

21    Q.  I want to talk to you now about some papers that David

22    Kleiman was involved with.  Did he ever discuss with you any

23    papers that he wrote?

24    A.  Yes.

25    Q.  Was he proud about the papers that he wrote?
```

103

```
1    A.  Very much so.

2    Q.  Did he keep papers that he wrote secret from you?

3    A.  If he did, I wouldn't know.

4    Q.  That's a good point.  Did he ever mention a paper about

5    overwriting data that he worked on with Craig Wright?

6    A.  Yes.

7    Q.  Was that paper about secure wiping?

8    A.  Yes.

9    Q.  Was it also about recovering information from computer

10   devices?

11   A.  It was about preventing the recovery.

12   Q.  You improved my question.  That's right.

13       Was it also about -- was it about overwriting data?

14   A.  Yes.

15   Q.  Would it be fair -- have you heard that paper referred to

16   or did he ever refer to that paper as a data wipe fallacy

17   paper?

18   A.  I don't remember him using those words.

19   Q.  But this paper that we're talking about now, was he proud

20   of it?

21   A.  Yes.

22   Q.  Did he mention it to you more than once?

23   A.  Yes.

24   Q.  How many times did he mention it to you?

25   A.  Several times.
```

104

```
 1    Q.  So I want to talk to you about a thumb drive that there's
 2    been testimony about.  Do you know if he had a thumb drive that
 3    he kept with him?
 4    A.  Yes.
 5    Q.  Did you ever see what was on it?
 6    A.  No.
 7    Q.  Did he always have it on his person?
 8    A.  Yes.
 9    Q.  Did he take good care of it?
10    A.  Yes.
11    Q.  Where did he keep it?
12    A.  He kept it with his keys, usually attached to his
13    wheelchair or in his backpack.
14    Q.  Did it ever leave his sight?
15    A.  Not that I'm aware of.  He was very careful about it.
16    Q.  Do you know whether or not it was encrypted?
17    A.  Yes, it was.  He had encrypted information on it.  I don't
18    remember if the whole thing was encrypted or parts of it, but
19    there was encrypted data on it, yes.
20    Q.  And how do you know that?
21    A.  Because he would tell me.  And when he needed something, he
22    would have to type in his password.
23    Q.  Is it fair to say that whatever was on it was very
24    important to him?
25          MR. BRENNER:  Objection.  Leading.
```

105

```
 1              THE COURT:  Sustained.
 2   BY MR. MESTRE:
 3   Q.  Was whatever was on it important to him?
 4              MR. BRENNER:  Objection.  Leading.
 5              THE COURT:  Sustained.  Rephrase.
 6              MR. MESTRE:  I think I've made the point.
 7   BY MR. MESTRE:
 8   Q.  I want to get to his finances now, Dave Kleiman's finances.
 9   Do you know whether or not he was having financial
10   difficulties?
11   A.  Yes.  He did have.
12   Q.  Were they serious or pretty bad difficulties?
13   A.  Yes.  His house -- he was always behind in his house
14   payments, in his FP&L payments, power; all sorts of bills he
15   was behind on.
16   Q.  Okay.  So let me break that down.  Was he having problems
17   making his mortgage payments?
18   A.  Yes.
19   Q.  Did he ever tell you that his house was going to go into
20   short sale?
21              MR. BRENNER:  Objection.  Leading.
22              MR. MESTRE:  That's not a leading question.
23              THE COURT:  I'll allow it.  Overruled.
24              THE WITNESS:  Yes.  He did tell me.
25
```

```
 1   BY MR. MESTRE:

 2   Q.  Did he ever tell you that it might go into foreclosure?

 3   A.  Yes.

 4   Q.  Do you know whether or not he was trying to refinance?

 5   A.  I believe he mentioned that.

 6   Q.  He said to you -- he said that to you?

 7   A.  Yes.

 8            MR. BRENNER:  Objection.  Leading.

 9            THE COURT:  Overruled at this point.

10   BY MR. MESTRE:

11   Q.  Was he trying to refinance because he wanted to keep his

12   house?

13   A.  That is the conclusion I came to.  Why else would he do it?

14   Q.  I don't know if you said this already, but I want to make

15   it clear.  Was he also having problems paying for the

16   utilities?

17   A.  Yes.

18   Q.  Do you know if he was having trouble paying for his Comcast

19   bill?

20   A.  I don't know that one specifically.  I remember he would

21   complain that he's behind on his bills.

22   Q.  Did Dave Kleiman like playing the Lotto?

23   A.  Yes.

24   Q.  Would you buy Lotto tickets for Dave Kleiman?

25   A.  Yes.
```

107

1  Q.  How often would you play with him?

2  A.  Maybe once a month, but it was pretty frequent.

3  Q.  Would you text with him?

4  A.  Yes.

5      MR. MESTRE:  If you could pull up only for counsel and

6  the witness and the Court what's exhibit Plaintiffs' 463.  It's

7  also Defendant's 480.

8  BY MR. MESTRE:

9  Q.  And, Mr. Andreou, I'd ask if you recognize these

10  documents -- this document, and we can scroll through it if you

11  need.

12  A.  Okay.

13      MR. BRENNER:  Can you do it a little slower, please?

14      MR. MESTRE:  That's as far as I think you need to go.

15  BY MR. MESTRE:

16  Q.  Do you recognize this?

17  A.  Yeah.  This is an exchange that I had with Dave.

18      MR. MESTRE:  Can you go to the first page, Mr. Reed,

19  please.

20  BY MR. MESTRE:

21  Q.  Are these text messages that you had with Dave?

22  A.  Yes.

23  Q.  Do you see a phone number where it says:  "Participants"

24  and it says:  "Dave Kleiman"?

25  A.  Yep.

108

```
1   Q.  Was that his phone number?

2   A.  I don't -- I don't remember it by heart, but it's -- he did

3   have a 561 number.

4   Q.  Okay.  I think these days nobody remembers a phone number

5   by heart.

6            MR. MESTRE:  Your Honor, I'd move for the admission of

7   Defendant's 480, Plaintiffs' 463.

8            MR. BRENNER:  Mr. Mestre, we saw eight pages.  Do you

9   know how many pages this is?

10           MR. MESTRE:  It is about 198 pages.  It's an exhibit

11  that was on the Plaintiffs' exhibit list.

12           THE COURT:  Is there any objection?

13           MR. BRENNER:  No objection, Your Honor.

14           THE COURT:  Admitted into evidence.

15      (Defendant's Exhibit 480 received into evidence.)

16           MR. MESTRE:  If we could go, Mr. Reed -- and I'm going

17  to take you through some of these texts.  If we could go to

18  Page 36, which is Kimon, a bunch of zeros, 59.  So the Bates

19  number is 59.  The page number is 36.

20           Okay.  There we are.  And if you could highlight first

21  the date.  It's Thursday, November 4th.

22           You don't need to call it out.  If you could just

23  highlight it, just because it's hard to see.

24  BY MR. MESTRE:

25  Q.  Do you see that's November 4th, 2010?
```

109

```
 1   A.  Yes.

 2   Q.  Okay.  Would that have been the date of this text message?

 3   A.  Yeah.

 4          MR. MESTRE:  Okay.  And if you could highlight -- and

 5   if we could publish all of this to the jury now, please.

 6   BY MR. MESTRE:

 7   Q.  You see it says:  "Jody might not come on Saturday, sigh,

 8   so you have to pick up the vaca frita."

 9      Do you see that?

10   A.  Yeah.

11   Q.  That was from Dave?

12   A.  Yes.

13   Q.  Who was Jody?

14   A.  Jody was a coworker from S-Doc.

15   Q.  Coworker of yours and Dave's?

16   A.  Yes.

17   Q.  Did you know Jody?

18   A.  Yes.

19   Q.  Was Jody a friend of Dave Kleiman's?

20   A.  Yes.

21   Q.  Do you know if Jody would help him physically at his house,

22   for example?

23          MR. BRENNER:  Your Honor, objection to the relevance

24   of this line of questioning.

25          THE COURT:  Overruled.  I'll allow it.
```

110

```
 1          THE WITNESS:  I know that Jody would visit him at
 2   home.  I don't know what they did.
 3          MR. MESTRE:  Okay.  If we can go, Mr. Reed, to -- do
 4   you prefer the page number or the Bates number?
 5          The Bates.
 6          Okay.  So Bates 69.  The first three or four messages
 7   and the date, if you could call that out.
 8   BY MR. MESTRE:
 9   Q.  Okay.  So you see here, Mr. Andreou, a text from Dave
10   Kleiman on December 24th.  I'm going to read it.  It says:
11   "Okay.  Well, that got all screwed up.  The OR doctors saw
12   something wrong with my knee, called X-ray to the OR, and they
13   saw one of the many metal rods I have was causing the infection
14   so they had to cancel the current surgery and open my knee.
15   Now they have to schedule to have the rod removed and
16   reschedule the other surgery.  Whatever.  Guess I will live
17   here forever."
18          So do you see that?
19   A.  Yes.
20   Q.  So did you visit him around this time?
21   A.  Well, from the date -- that's Christmas Eve, so I wouldn't
22   have visited him until January when I got back.
23   Q.  Not necessarily this day, but around that time, would you
24   have seen him?
25   A.  Yeah.
```

1   Q.  And how -- how was he doing physically at this point?

2   A.  Well, he was laid up in bed in the hospital, as expected,

3   but his mood was down because he wanted to get out.

4   Q.  Were there other times during this hospital stay, this last

5   hospital stay, where his mood was down?

6   A.  Yes.

7   Q.  And what were some of the ways in which you observed that?

8   A.  Well, when he would -- he wouldn't have his usual upbeat

9   personality.  He wouldn't crack jokes.  He wouldn't make

10  comments like he's making here, like:  "Whatever.  I guess I'll

11  live here forever."

12          MR. MESTRE:  Let me go to Kimon 77.

13          And from "brought to ICU" to the end, if you can call

14  that whole thing out.

15  BY MR. MESTRE:

16  Q.  So let's keep looking at how he was doing.  Okay.  This --

17  and I will -- we can go back and look at it, but I will

18  represent that that is a text from Friday, March 4th, 2011.

19          MR. MESTRE:  He found it as fast as I could say it.

20          Thank you.

21          So we can go to the next page.

22  BY MR. MESTRE:

23  Q.  So let's see how he's doing.  He says -- so Dave says:

24  "Brought to ICU," intensive care unit.  "Only have phone for

25  five minutes.  If you have anything important, let me know.

112

1     Will check text messages once I'm okay."

2         You say:  "How can you be okay and be taken to ICU?  Does

3     not compute."

4         Dave says:  "I was not okay, but now okay.  Dorky."

5         "Ah.  So what happened?  Was it acute steak deficiency,

6     which is fine?"

7         "Yes."

8         He, still in ICU:  "Yes, but they took the tube out of my

9     nose."

10        So do you see that?  Did I read that accurately?

11    A.  Yes.

12    Q.  Okay.  So were you worried that he was in the intensive

13    care unit?

14    A.  Yes.

15    Q.  Okay.  And were you concerned that he had a tube in his

16    nose?

17    A.  When I found out, yes.

18    Q.  Okay.  And did you visit him at about this time?

19    A.  I don't remember, but I would not have visited him if he

20    was in the ICU.

21    Q.  Would you have visited him after perhaps?

22    A.  Yeah.  When he was back in his room, yes.

23    Q.  Okay.  Do you remember visiting him after this particular

24    time?

25    A.  I know I did visit him after this.  I don't remember which

```
 1   day, though, when I started going back.
 2   Q.  He wouldn't be working while he was in intensive care?
 3            MR. BRENNER:  Objection.  Leading.
 4            THE COURT:  Sustained.
 5            MR. MESTRE:  Let's go to Kimon 87.
 6   BY MR. MESTRE:
 7   Q.  And this is a page -- you see at the top it says:  "Monday,
 8   April 25th, 2011."  So that's the date.  And about the middle
 9   of the page, it says --
10            MR. MESTRE:  I want to highlight where it says:  "I
11   know, but it's" -- exactly.
12            And the rest of the page.
13            Great.
14   BY MR. MESTRE:
15   Q.  So Dave says:  "I know, but it is like I cannot even go
16   down the hall to get soda out of the soda machine.  Do you know
17   how imprisoned, weak, useless that makes you feel, especially
18   if you deal with it for months upon months?  I bet just a few
19   weeks of that would drive a normal person insane."
20       Now, this must have been very hard for you to see.  But how
21   did you -- what was your view about his mental health at this
22   point?
23            MR. BRENNER:  Objection.  Calls for expert opinion.
24            THE COURT:  Sustained.
25
```

114

```
1    BY MR. MESTRE:

2    Q.  How did you think he was doing?

3    A.  He was obviously unhappy.

4    Q.  Did you see him shortly after this or before?

5    A.  Most likely.

6    Q.  Do you remember?

7    A.  I know that I would visit him regularly.  I just don't

8    remember the dates.

9    Q.  But do you remember -- were there any moments that you saw

10   him where he may have felt or acted in a way consistent with

11   this text message?

12            MR. BRENNER:  Objection.  Leading.

13            THE COURT:  Overruled.  I'll allow it.

14            THE WITNESS:  Yes.

15   BY MR. MESTRE:

16   Q.  And how was he?

17   A.  He would be down, wouldn't want to talk too much.  And he

18   just -- Dave usually was very jovial, would always want to talk

19   about something, no matter what it is.  When he would be --

20   when he would be down, he just wouldn't want to talk about

21   anything.  He would just close up.

22            MR. BRENNER:  Your Honor, may we approach for one

23   minute?

24            THE COURT:  All right.  Come on forward.

25        (At sidebar on the record.)
```

115

```
1          MR. BRENNER:  Thank you, Judge.

2          I asked to approach because I'm concerned where this

3    is heading.  I want to make sure the witness has been

4    adequately counseled.  Your Honor has entered an order

5    regarding they can't put into evidence that he was suicidal or

6    having suicidal thoughts.  And I don't --

7          MR. MESTRE:  That is absolutely not where I'm headed.

8          MR. BRENNER:  I'm not suggesting Mr. Mestre is heading

9    there, but I am suggesting that I'm afraid the witness is.

10   I've been letting it go, but as we keep going --

11         THE COURT:  Yeah.  Maybe the witness is unaware.

12         So how far are we going here?

13         MR. MESTRE:  I'm trying to establish his physical

14   ability during this period of time and his mental ability,

15   which they have put into question.  He just spent an hour with

16   our previous expert doing that, and this is a firsthand

17   recollection of what happened.

18         THE COURT:  Okay.  I just -- I merely asked how far.

19         MR. MESTRE:  I have no intent to ask that question

20   remotely.  I don't believe I'm going to elicit that testimony.

21   But Mr. Brenner, I understand what you're saying, but I'm not

22   going to ask any question that I think comes near that.

23         THE COURT:  Is this witness aware of the Court's

24   prohibition on that topic?

25         MR. MESTRE:  I couldn't tell you specifically because
```

 1   my intent was never to do that.

 2          THE COURT:  Well, that's why I asked how far you're

 3   going.

 4          MR. MESTRE:  We didn't talk about that.  I have never

 5   spoken to him about the suicide --

 6          THE COURT:  That's why there's a danger here if we

 7   continue.

 8          MR. MESTRE:  Well, you know, I mean, we can -- may I

 9   consult for a moment?

10      (Pause in proceedings.)

11          MR. MESTRE:  So I can move on from this subject matter

12   now.  We're going to have the lunch break in 10 minutes and

13   then I can give him that admonition.

14          THE COURT:  Okay.  That's fair.

15          MR. BRENNER:  And when you do, I would just ask he

16   also be advised of the other Court's order regarding the

17   familial relationship part of the order.  So we make sure he

18   doesn't --

19          THE COURT:  Right.  You're not going to be asking who

20   else may have been at his house or anything about --

21          MR. MESTRE:  I'm sorry.  I'm also losing my hearing.

22          THE COURT:  You're not asking about who may have been

23   at the house or the hospital or his relationship with his

24   brother, correct?

25          MR. MESTRE:  I wasn't intending to ask that either.

117

```
1              THE COURT:  Okay.  Then I think we're good.
2              MR. BRENNER:  Thank you, Judge.
3              THE COURT:  All right.  Yvette, thank you.
4         (End of discussion at sidebar.)
5              THE COURT:  All right.  Let us continue.
6              MR. MESTRE:  Read me the last question, please.
7         (Read back.)
8              MR. MESTRE:  I'm going to move on.  I'll come back to
9    that.  And if we can go to Bates number 88, the very next one.
10   BY MR. MESTRE:
11   Q.  And if you look in the middle of the page, and I think --
12   and the date is on the page before.  The date, I'll just
13   represent this is -- this is Monday, May 2nd, 2011, just for
14   context.  So he says:  "Oh, yeah, on the 19th.  Who knows if
15   I'll even make it through this one."
16        Do you see that?
17   A.  Yes.
18   Q.  Is that yet another surgery?
19   A.  Yes.
20   Q.  Did you visit him after this surgery?
21   A.  Most likely.
22   Q.  And do you recall how he was doing physically after that
23   surgery?
24   A.  I don't recall this particular surgery.  He had several
25   surgeries while he was there.
```

118

```
1          MR. MESTRE:  So let me move on now to Kimon 90.

2    BY MR. MESTRE:

3    Q.  And this is a text message.  The dates are hard to see.

4    Tuesday, May 3rd, 2011.  Do you see that, just for context?

5    A.  Yes.

6    Q.  Okay.  So Dave says -- and I want to talk a little bit

7    about the financial troubles now.  Okay?

8         So Dave says:  "So my electric is good for another four

9    months, my water for three months, 40 a month even if I don't

10   use any water.  I have to pay 300 to Comcast before they will

11   disconnect the service."

12        You say:  "And how many months is the penalty waived?"

13        "No.  I owe them a back bill from last month.  My account

14   is suspended, so they can't do anything until I pay it."

15        "Oh, okay."

16        "Funny, I was watching HBO this weekend on Xfinity.  Lady

17   said my account has been suspended for 11 days."

18        Do you see that?

19   A.  Yes.

20   Q.  Have I read that accurately?

21   A.  Yes.

22   Q.  Okay.  Is this an example of the financial troubles that

23   you testified about before a few minutes ago?

24   A.  Yes.

25          MR. MESTRE:  Okay.  So if we can move to Kimon 104.
```

```
1    BY MR. MESTRE:

2    Q.  And he says near the bottom -- and the date here from the

3    prior page, it's May -- goodness -- May 31st, 2011.  And he

4    says --

5           MR. MESTRE:  If you can now go to 104.

6    BY MR. MESTRE:

7    Q.  -- "Whenever you go home later, you have to stop at your

8    Publix or whatever for Powerball tickets.  It's huge tonight,"

9    gives a number.  "Quick Picks for me, please.  If I win, I'll

10   give you 20 million."

11       Do you see that?

12   A.  Yes.

13   Q.  Did you believe him?

14   A.  Yes.

15   Q.  Was he a generous person?

16   A.  When he could.

17   Q.  Sir, I want to get back to the health issues.

18          MR. MESTRE:  If we can go to 114, Kimon 114.

19          Now, this is Saturday, July 30th, 2011.  If you can

20   bring up the rest of it.

21          Exactly.

22   BY MR. MESTRE:

23   Q.  So Dave says:  "Out of surgery.  In ICU."

24       When he says:  "In ICU," do you know if he meant the

25   intensive care unit?
```

120

```
 1   A.  Yes.
 2   Q.  Okay.  So he says:  "Out of surgery.  In ICU.  Everything
 3   is fine.  Just got my phone.  Forgot to leave it off on
 4   Wednesday, so the battery's only 35 percent.  So my phone may
 5   be off today.  Text messages are easiest, as the intensive care
 6   unit is supposed to be a quiet place."
 7       "Got it.  I called SICU yesterday" -- that's you.  What is
 8   SICU?
 9   A.  I believe it was the spinal ICU.
10   Q.  Spinal intensive care unit.
11       Okay.  So:  "I called SICU yesterday to ask about you, but
12   you were sleeping.  I take it everything went well?"
13       So was this yet another surgery?
14   A.  Yeah.  He had -- it was surgery after surgery after surgery
15   with him.
16   Q.  Do you know what this one was for?
17   A.  No.  I don't recall.
18   Q.  Do you recall what his physical condition was while he was
19   in the intensive care unit?
20   A.  I didn't visit him there, but he -- he was not well.
21   That's why they kept him at the VA.  He would get infections.
22   He would have -- they would have to scrape his -- scrape the
23   bone.  So he would always have issues while there.
24   Q.  Okay.  And I know that this -- I know this is hard.  So I'm
25   going through it, but I understand that it's your friend and
```

121

```
 1    it's not easy.
 2            MR. MESTRE:  So if you go -- let's go to Page Kimon
 3    115.  Same date.  This is the same string.
 4    BY MR. MESTRE:
 5    Q.  So you say:  "No more surgeries, right?"
 6        He says:  "Nope.  Woo-hoo.  So Chima in October."
 7        Is Chima a restaurant?
 8    A.  Yes.
 9    Q.  Okay.  And he says:  "You are buying because I'm broke."
10    You see that?
11    A.  Yeah.
12    Q.  Okay.  Is that consistent again with the money issues that
13    he was having that you testified about before?
14    A.  Yes.
15    Q.  Did you think he was broke?
16    A.  He had no reason to lie.
17            MR. MESTRE:  So if we can go to Kimon 130.
18    BY MR. MESTRE:
19    Q.  And this is -- if you look at the page before -- oh, we
20    don't need to look at the page before.  It's right there.  So
21    it's Sunday, October 30th, 2011.  Do you see that?
22    A.  Yes.
23    Q.  Okay.  So he says -- Dave says to you:  "Had fever every
24    night all week.  Going for CAT scan today."
25        Do you see that?  Did I read that correctly?
```

122

```
 1    A.  Yes.

 2    Q.  Okay.  So were there -- well, do you have any idea what

 3    this particular CAT scan might have been for?

 4    A.  No.  Just by reading the texts.

 5    Q.  Did he often have -- we've talked about surgeries, but this

 6    is not a surgery.  This is a CAT scan and he says he has a

 7    fever.  Other than the surgeries, were there instances like

 8    this one, others where he's not feeling well because he's

 9    having procedures done at the hospital?

10    A.  Yes.

11    Q.  And did that happen often during the time that he was there

12    from 2011 to 2013?

13    A.  I don't know how often, but it would happen frequently

14    enough.  He wouldn't always tell me.  As you could see here, he

15    wouldn't always tell me.

16         MR. MESTRE:  Your Honor, this may be a good moment to

17    break.

18         THE COURT:  All right.  Ladies and Gentlemen, let's

19    take our one-hour recess for lunch.  I'll see you go back here

20    at 2:00.  Have a pleasant lunch.

21      (Jury not present, 12:58 p.m.)

22         THE COURT:  Mr. Andreou, we'll see you back here at

23    2:00.

24         Okay.  Have a pleasant lunch.

25         MR. BRENNER:  Thank you, Your Honor.
```

123

1          (Adjourned for lunch 12:58 p.m.)

124

1    UNITED STATES OF AMERICA      )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                    C E R T I F I C A T E

5          I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 18th

9    day of November, 2021, in the above-mentioned court; and that

10   the foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12         I further certify that this transcript contains pages

13   1 - 124.

14         IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida this 28th day of November, 2021.

16

17                          /s/Yvette Hernandez

                            Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                          400 North Miami Avenue, 10-2
                            Miami, Florida 33128
19                          (305) 523-5698
                            yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25

**COURTROOM DEPUTY:**
**[3]** 3/10 83/2
92/16
**MR BRENNER: [1]**
76/2
**MR. BRENNER: [96]**
3/4 3/14 5/1 5/8
5/15 5/22 5/25
16/14 17/7 17/14
21/11 21/14 24/5
27/21 36/3 36/20
39/14 43/4 43/25
44/5 44/11 45/1
45/25 46/12 46/22
47/7 47/10 47/18
48/9 49/25 52/2
52/8 53/2 53/12
53/14 53/19 55/8
55/14 57/7 58/1
59/21 60/5 61/8
62/1 62/19 63/11
63/17 64/9 64/24
66/9 67/15 68/10
68/13 69/4 69/6
69/11 69/17 70/6
70/15 71/10 79/23
80/2 84/10 85/25
86/10 87/1 88/7
89/23 90/1 90/7
90/15 92/1 92/4
94/19 95/1 101/13
101/20 102/3
102/16 104/25
105/4 105/21 106/8
107/13 108/8
108/13 109/23
113/3 113/23
114/12 114/22
115/1 115/8 116/15
117/2 122/25
**MR. FREEDMAN: [3]**
3/18 3/25 89/22

**MR. HOLTZMAN: [1]**
3/16
**MR. KASS: [24]**
4/9 17/12 20/17
21/8 25/17 25/20
26/4 41/21 49/4
49/8 80/5 80/15
80/17 80/23 81/5
82/24 83/4 83/7
84/14 89/6 90/3
90/12 91/24 92/3
**MR. MESTRE: [43]**
4/11 92/9 96/17
96/21 97/2 97/14
98/9 98/11 98/20
102/5 102/8 105/6
105/22 107/5
107/14 107/18
108/6 108/10
108/16 109/4 110/3
111/12 111/19
113/5 113/10 115/7
115/13 115/19
115/25 116/4 116/8
116/11 116/21
116/25 117/6 117/8
118/1 118/25 119/5
119/18 121/2
121/17 122/16
**MR. RIVERO: [4]**
4/3 4/15 4/21
69/18
**MR. ROCHE: [1]**
3/20
**MR. ZACK: [1]**
3/22
**MS. McGOVERN: [2]**
4/7 96/20
**THE COURT: [91]**
3/2 3/5 3/24 4/2
4/13 4/17 4/23 5/6
5/9 5/20 5/23 6/1
6/4 16/17 17/10
20/19 21/9 21/12

24/6 25/21 26/6
27/18 41/22 47/23
49/9 68/12 69/5
69/7 69/10 69/13
69/19 69/21 79/25
80/4 80/20 84/11
84/13 86/1 86/11
86/13 87/2 88/8
89/7 89/14 89/17
89/24 90/2 90/4
90/18 90/22 91/12
91/21 91/25 92/2
92/5 92/8 92/10
92/12 92/21 94/20
95/2 101/15 101/22
102/4 102/7 102/11
102/17 105/1 105/5
105/23 106/9
108/12 108/14
109/25 113/4
113/24 114/13
114/24 115/11
115/18 115/23
116/2 116/6 116/14
116/19 116/22
117/1 117/3 117/5
122/18 122/22
**THE WITNESS: [20]**
17/9 17/15 25/18
25/22 46/2 53/13
53/21 64/1 84/12
86/2 86/12 91/4
91/15 92/9 92/25
94/21 102/18
105/24 110/1
114/14

**'**

**'11 [1]** 96/14
**'19 [2]** 32/11
76/21
**'3 [1]** 94/2
**'70s [1]** 10/12
**'I'm [1]** 41/18

**/**

**/s/Yvette [1]**
124/17

**0**

**091 [1]**    80/24

**1**

**1,000 [2]**    81/11
81/12
**10 [17]**    1/11  28/15
28/16  78/5  78/12
78/14  85/22  85/23
86/17  86/22  87/9
87/15  87/16  87/22
97/6  99/8  116/12
**10,000 [1]**    81/19
**10-2 [2]**    1/24
124/18
**100 [2]**    1/17  82/10
**1000 [1]**    1/21
**104 [2]**    118/25
119/5
**105 [1]**    58/2
**108 [2]**    2/11  2/11
**10:02 [1]**    6/3
**11 [3]**    39/1  42/14
118/17
**11,000 [1]**    82/19
**114 [2]**    119/18
119/18
**115 [1]**    121/3
**11:23 [1]**    69/9
**11:24 [1]**    69/12
**11:44 [2]**    69/12
69/20
**11th [2]**    70/9
70/18
**12 [1]**    1/9
**124 [4]**    1/8  2/2
52/2  124/13
**12:58 [2]**    122/21
123/1
**130 [1]**    121/17

**14 [2]**    75/25  76/8
**15 [1]**    124/2
**18 [1]**    1/5
**18-80176 [1]**    3/10
**189 [1]**    43/5
**18th [1]**    124/8
**198 [1]**    108/10
**1995 [2]**    23/13
73/15
**19th [2]**    97/19
117/14

**2**

**20 [3]**    5/5  93/14
119/10
**20-minute [2]**    69/8
69/10
**20-year [1]**    73/22
**200 [1]**    1/14
**2000 [1]**    71/2
**2002 [3]**    94/2
95/19  95/22
**2003 [2]**    95/20
95/22
**2008 [2]**    96/25
97/8
**2009 [2]**    97/19
97/22
**2010 [23]**    23/9
23/12  23/15  23/20
23/23  23/25  24/16
24/19  24/22  25/2
25/5  25/15  36/15
38/24  43/8  43/9
43/10  44/9  44/10
75/10  96/14  98/16
108/25
**2011 [14]**    47/18
47/21  52/13  83/16
83/21  83/24  111/18
113/8  117/13  118/4
119/3  119/19
121/21  122/12
**2012 [7]**    60/5  62/5

63/17  64/11  64/24
66/21  83/13
**2013 [11]**    19/17
20/24  23/15  68/11
70/3  70/9  70/18
73/15  75/11  98/17
122/12
**2019 [1]**    22/1
**2020 [6]**    21/24
22/1  24/8  24/23
32/11  76/25
**2021 [3]**    1/5  124/9
124/15
**20th [1]**    39/17
**21 [1]**    2/6
**221 [1]**    63/18
**239 [1]**    55/8
**23rd [4]**    36/14
36/15  36/24  43/9
**24 [1]**    51/13
**24/7 [2]**    41/9  42/6
**24th [2]**    43/9
110/10
**25 [2]**    82/12  82/16
**250 [1]**    72/1
**251 [1]**    45/2
**2525 [1]**    1/21
**25th [1]**    113/8
**27 [1]**    64/9
**2800 [1]**    1/17
**28th [1]**    124/15
**2:00 [2]**    122/20
122/23
**2:18 [1]**    97/1
**2nd [3]**    1/17  44/10
117/13

**3**

**3,000 [1]**    72/9
**30 [8]**    5/5  28/10
28/10  28/11  28/11
28/12  28/12  28/13
**30/30 [1]**    28/13
**300 [1]**    118/10

**3**

**305 [1]**    124/19
**30th [2]**    119/19
 121/21
**316 [2]**    62/3 71/11
**31st [1]**    119/3
**33128 [2]**    1/24
 124/18
**33131 [2]**    1/14
 1/18
**33134 [1]**    1/22
**336 [1]**    57/7
**346 [1]**    60/5
**35 [1]**    120/4
**36 [2]**    108/18
 108/19
**360 [1]**    47/11
**363 [1]**    47/19
**365 [2]**    83/19
 83/19
**395 [1]**    99/6
**3rd [1]**    118/4

**4**

**4,000 [1]**    72/13
**4,250 [1]**    87/23
**40 [1]**    118/9
**400 [2]**    1/24
 124/18
**455 [1]**    66/9
**463 [2]**    107/6
 108/7
**480 [4]**    2/11 107/7
 108/7 108/15
**4th [3]**    108/21
 108/25 111/18

**5**

**50 [1]**    67/6
**52 [1]**    97/15
**520 [1]**    72/5
**523-5698 [1]**
 124/19
**53 [1]**    44/1

**54 [1]**    24/3
**55 [1]**    96/18
**5500 [1]**    1/14
**561 [1]**    108/3
**567 [1]**    46/22
**568 [1]**    50/1
**5698 [1]**    124/19
**571 [1]**    52/8
**59 [2]**    108/18
 108/19

**6**

**604 [1]**    63/12
**633 [1]**    36/2
**657 [2]**    70/7 70/18
**659 [1]**    64/25
**69 [1]**    110/6
**6:00 [1]**    99/10

**7**

**700 [1]**    83/19
**707 [1]**    39/14
**719 [1]**    59/22
**725 [1]**    62/20
**730 [1]**    48/10
**77 [1]**    111/12
**78 [1]**    67/16
**79 [1]**    67/16
**790 [1]**    83/24
**7:00 [1]**    99/11

**8**

**8,500 [2]**    87/22
 87/24
**80 [1]**    2/7
**800s [1]**    76/7
**80176 [1]**    3/10
**810 [1]**    86/24
**850 [6]**    77/23 84/2
 86/24 87/6 87/16
 87/22
**87 [1]**    113/5
**88 [1]**    117/9
**8:00 [3]**    71/2 71/5
 71/13

**9**

**90 [2]**    83/22 118/1
**900 [1]**    77/23
**920 [1]**    27/24
**93 [1]**    2/8
**9:18-cv-80176-BB
 [1]**    1/2
**9:59 [2]**    1/6 3/1
**9th [1]**    96/25

**A**

**a.m [8]**    1/6 3/1
 6/3 69/9 69/12
 69/12 69/20 97/1
**abbreviation [2]**
 61/17 61/18
**ability [22]**    13/24
 16/21 23/19 23/23
 23/25 24/16 24/16
 24/19 25/1 25/4
 27/9 29/12 29/15
 54/11 74/3 74/9
 75/16 77/12 96/5
 101/24 115/14
 115/14
**able [9]**    33/22
 34/5 54/5 56/17
 57/17 89/20 90/6
 91/3 91/14
**about [95]**    6/18
 6/22 7/8 10/19
 16/15 17/5 18/2
 19/10 22/14 22/16
 22/20 23/10 23/14
 23/22 24/15 25/1
 25/4 25/16 29/7
 29/24 29/25 30/10
 31/2 31/14 31/15
 31/24 31/25 33/11
 33/22 34/11 34/22
 39/8 40/17 40/19
 44/21 48/13 50/21
 55/6 56/1 56/9
 58/4 58/6 58/8

**A**

USCA11 Case: 22-11150   Document: 53-19   Date Filed: 01/30/2022   Page: 241 of 254

**about... [52]**
65/22 66/23 70/3
70/23 73/2 73/9
74/1 76/13 77/23
83/19 83/24 84/21
86/4 86/8 86/24
87/13 90/9 97/6
98/15 98/17 101/4
102/5 102/8 102/10
102/13 102/21
102/25 103/4 103/7
103/9 103/11
103/13 103/13
103/19 104/1 104/2
104/15 108/10
112/18 113/8
113/21 114/19
114/20 116/4 116/5
116/20 116/22
118/7 118/23
120/11 121/13
122/5
**above [2]** 39/16
124/9
**above-mentioned [1]**
124/9
**abscess [2]** 9/9
9/10
**absence [4]** 19/13
19/14 19/17 19/22
**absolutely [1]**
115/7
**abstract [2]** 28/23
28/24
**abstracted [1]**
23/1
**acceptable [2]** 5/7
5/10
**access [2]** 11/11
96/8
**accident [3]** 30/17
30/21 54/16

**according [3]**
29/25 29/25 41/4
**account [2]** 118/13
118/17
**accounted [1]**
75/12
**accounting [2]**
93/7 93/9
**accurate [3]** 41/24
42/11 63/2
**accurately [2]**
112/10 118/20
**across [2]** 35/8
60/13
**acted [1]** 114/10
**active [2]** 46/25
50/22
**activities [4]**
65/1 65/3 65/11
100/10
**actual [2]** 26/14
35/23
**actually [16]** 9/5
15/8 15/20 26/10
26/19 29/11 33/12
35/22 36/24 38/17
45/23 54/10 67/18
68/17 71/2 97/19
**acute [4]** 11/7
73/6 73/7 112/5
**add [4]** 32/23
37/24 82/8 83/22
**added [2]** 87/6
94/7
**adding [1]** 43/1
**addition [6]** 7/17
9/3 9/20 85/21
87/10 87/24
**additional [2]**
25/8 25/12
**address [3]** 4/24
5/24 69/15
**adequately [3]**
74/19 77/7 115/4

**Adjourned [1]**
124/1
**administered [2]**
14/10 29/19
**administration [3]**
18/14 84/19 93/15
**admission [1]**
108/6
**admitted [4]** 2/10
66/20 81/13 108/14
**admonition [1]**
116/13
**adopted [1]** 60/9
**advised [1]** 116/16
**affect [3]** 74/9
96/5 96/6
**affected [1]** 16/20
**affecting [1]**
12/15
**afoul [3]** 90/8
90/11 90/17
**afraid [1]** 115/9
**after [21]** 5/13
5/17 7/19 7/20
7/22 19/23 19/24
32/14 94/13 95/19
95/22 99/9 99/10
112/21 112/23
112/25 114/4
117/20 117/22
120/14 120/14
**afternoon [2]** 5/13
69/25
**afterthought [1]**
32/6
**again [40]** 15/2
22/3 29/9 31/9
32/10 32/14 37/23
39/19 40/12 44/13
46/15 46/25 47/21
47/24 48/12 50/3
52/4 57/9 59/24
62/5 62/7 62/24
63/14 64/12 64/17

**A**

USCA11 Case: 22-11150   Document: 53-143   Date Filed: 11/30/2022   Page: 242 of 254

**again... [15]**
65/23 66/11 66/16
68/16 68/24 69/1
69/25 71/7 72/15
73/9 75/3 82/8
87/15 89/5 121/12
**against [1]** 8/11
**ago [1]** 118/23
**agree [10]** 26/13
54/13 67/12 75/7
78/13 78/14 78/15
78/17 82/10 82/21
**Ah [1]** 112/5
**ahead [2]** 3/5
49/12
**alcohol [3]** 14/2
14/4 14/8
**alcoholic [1]** 14/5
**alert [25]** 43/19
44/13 44/18 44/19
44/23 46/15 46/25
49/22 50/3 50/14
50/22 52/4 57/13
57/14 59/24 60/7
61/15 61/20 62/17
63/6 63/23 64/1
64/12 68/24 72/13
**alert and [1]**
44/13
**alertness [1]**
78/16
**Alessandra [1]**
39/24
**ALEXANDER [2]** 1/17
3/16
**all [72]** 3/2 3/5
3/9 4/17 4/23 4/24
7/23 11/3 12/25
17/2 18/11 18/17
21/9 27/22 27/23
29/7 29/15 32/25
33/10 36/1 36/3

38/11 40/7 40/9
41/16 43/1 43/13
43/13 45/5 49/18
51/1 51/10 54/11
57/23 58/9 60/24
65/20 69/7 69/13
69/14 69/21 72/23
73/6 74/15 75/2
80/4 81/19 85/4
85/7 85/9 87/13
89/6 89/7 89/14
89/17 90/4 90/22
91/21 92/2 92/5
92/10 92/12 96/8
99/25 105/14 109/5
110/11 114/24
117/3 117/5 121/24
122/18
**Allison [5]** 66/12
66/16 70/11 70/12
70/21
**allow [6]** 5/7
41/22 102/11
105/23 109/25
114/13
**almost [4]** 7/9
32/6 50/21 99/16
**along [1]** 77/22
**already [9]** 8/21
16/23 17/21 47/4
49/13 83/24 96/24
101/6 106/14
**also [54]** 7/12
7/25 8/17 8/18
8/25 9/9 9/12
12/11 12/15 12/19
12/22 13/7 13/21
14/22 15/11 16/4
17/17 18/10 18/16
22/15 22/18 23/8
23/22 25/1 32/1
36/24 37/15 37/17
37/24 40/6 48/18
53/9 56/15 57/1

57/23 58/18 65/8
77/13 78/22 89/1
90/15 92/17 94/7
94/7 97/15 103/9
103/13 106/15
107/7 116/16
116/21
**alter [1]** 13/24
**alternative [1]**
21/21
**although [3]** 12/25
65/3 87/9
**always [21]** 10/10
41/7 41/18 42/6
42/13 42/16 42/24
50/21 51/4 51/6
58/9 68/21 72/19
96/2 96/3 104/7
105/13 114/18
120/23 122/14
122/15
**am [5]** 1/9 23/10
29/2 93/10 115/9
**AMANDA [2]** 1/20
4/7
**amended [2]** 33/17
76/25
**AMERICA [1]** 124/1
**among [1]** 95/18
**amount [4]** 51/10
82/3 83/8 83/13
**anachronic [1]**
73/7
**anal [1]** 31/11
**analysis [2]** 50/10
61/2
**analytics [2]**
93/16 93/22
**ANDREOU [12]** 2/8
92/9 92/12 92/15
92/19 92/21 93/3
96/24 97/18 107/9
110/9 122/22

**A**

**ANDRES [2]**  1/19
4/3
**ANDREW [2]**  1/16
3/14
**anesthesia [5]**
7/21 7/22 75/18
75/21 76/8
**anesthetic [4]**
7/23 8/2 9/1 13/1
**annoying [3]**  58/12
58/12 58/16
**another [32]**  10/10
12/10 13/20 14/6
19/25 32/17 32/18
32/22 33/8 36/16
42/18 44/14 55/22
55/22 55/23 57/9
67/6 67/23 67/23
75/9 78/25 83/21
83/22 83/25 84/1
84/2 97/13 98/7
100/1 117/18 118/8
120/13
**answer [5]**  24/17
24/21 25/21 30/22
49/10
**answered [2]**  102/3
102/10
**answers [2]**  24/14
24/22
**ante [1]**  14/15
**ante-cubital [1]**
14/15
**antibiotic [6]**
12/2 14/18 16/10
77/16 77/17 78/15
**antibiotics [13]**
11/16 11/19 12/3
12/5 12/12 12/14
12/16 12/18 16/4
16/6 16/7 16/9
16/12

**any [61]**  4/23 5/24
7/5 8/20 9/17
10/17 13/23 15/4
15/21 17/3 18/1
18/23 19/2 21/4
22/13 22/16 22/19
23/18 27/13 27/18
29/3 29/14 34/4
34/18 35/21 42/17
49/19 55/6 71/25
72/5 72/9 72/13
74/21 75/15 75/15
75/15 78/20 79/4
79/6 79/8 79/16
79/22 80/4 82/20
85/5 86/4 88/4
89/9 89/9 89/21
90/16 91/22 94/15
94/17 98/5 102/22
108/12 114/9
115/22 118/10
122/2
**any condition [1]**
88/4
**anybody [2]**  18/1
72/12
**anyone [1]**  15/19
**anything [18]**
16/20 24/15 24/15
29/4 38/14 38/20
58/13 69/15 74/23
88/1 88/20 88/24
89/2 90/9 111/25
114/21 116/20
118/14
**anywhere [2]**  30/20
30/20
**Apologies [1]**  98/2
**appearances [2]**
1/12 3/12
**appearing [1]**
15/25
**appears [4]**  27/6
39/22 46/25 68/1

**application [1]**
**applied [1]**  12/19
**appreciate [2]**
4/21 6/8
**approach [2]**
114/22 115/2
**approximately [3]**
82/6 87/4 87/7
**April [11]**  24/2
24/8 24/23 47/18
47/21 62/3 62/5
76/25 85/16 96/25
113/8
**are [86]**  4/23 4/24
5/2 8/10 8/15 8/25
10/8 10/9 12/5
12/13 13/13 13/20
14/1 14/2 14/6
14/14 14/25 15/1
15/2 15/9 15/11
16/7 17/9 17/19
18/11 21/17 22/9
24/1 25/7 26/14
27/2 27/22 30/10
33/6 40/7 40/9
40/11 42/4 45/16
45/18 46/17 47/4
47/17 47/24 49/15
52/15 53/25 55/23
58/6 58/9 58/13
58/14 61/3 63/20
65/24 67/5 67/12
69/2 69/2 69/15
71/25 72/3 72/5
76/9 76/10 78/12
81/25 82/17 84/18
84/19 85/12 90/2
90/13 90/20 90/24
92/6 92/22 92/23
92/24 101/5 107/21
108/20 115/12
118/3 120/5 121/9
**area [3]**  8/13

USCA11 Case: 22-11150    Document: 53-4    Date Filed: 11/30/2022    Page: 244 of 254

**A**

area... [2]   15/11
31/22

Argumentative [1]
101/20

arithmetic [1]
87/12

arm [3]   14/25 15/7
15/10

around [16]   5/5
13/15 15/8 15/8
15/9 15/15 18/16
23/12 82/6 82/16
82/19 85/18 87/6
87/12 110/20
110/23

arrangements [1]
21/3

artificial [1]
10/24

as [62]   1/3 4/6
6/6 7/1 12/9 14/2
15/17 15/23 15/24
17/20 19/5 21/4
23/13 28/14 29/11
30/17 32/6 35/3
35/5 36/3 39/16
40/3 40/16 41/3
41/3 42/21 49/13
49/18 50/13 54/2
55/10 61/4 64/15
65/11 69/2 72/3
72/12 72/22 79/10
79/13 79/18 81/8
82/8 82/15 82/15
83/16 83/16 88/14
88/15 89/17 90/25
91/12 95/13 103/16
107/14 107/14
111/2 111/19
111/19 115/10
120/5 122/14

aside [1]   23/2

ask [17]   32/7 44/4
58/2 88/4 89/8
94/14 94/18 94/23
99/17 101/3 102/1
107/9 115/19
115/22 116/15
116/25 120/11

asked [21]   19/25
24/13 26/11 30/2
30/24 34/17 34/18
80/8 80/10 82/9
88/20 88/24 94/21
102/3 102/5 102/6
102/9 102/10 115/2
115/18 116/2

asking [3]   90/13
116/19 116/22

assesses [1]   26/24

assessment [3]
42/14 44/14 44/20

assessments [1]
26/19

associated [1]
18/15

assume [1]   77/23

assurance [1]   94/6

attached [8]   11/13
14/17 14/23 15/2
15/12 15/17 37/18
104/12

attempt [1]   9/6

attempted [1]   20/3

attention [1]   6/7

attorneys [2]
89/14 91/22

attributed [1]
37/3

August [2]   52/9
64/11

aureus [1]   12/8

author [2]   40/2
55/18

authorizes [1]
91/5

authorizing [1]

available [1]
91/19

Avenue [2]   1/24
124/18

avoid [3]   9/16
9/20 37/6

awake [7]   43/19
46/15 46/25 49/22
50/3 52/4 62/17

aware [3]   101/2
104/15 115/23

away [3]   17/8
30/10 56/12

AWOL [1]   20/11

**B**

back [40]   8/4 8/17
9/17 9/18 9/19
9/23 10/11 17/13
23/12 25/7 25/14
30/14 31/14 32/23
37/1 42/14 44/5
45/5 49/16 50/9
52/19 52/19 69/13
69/21 78/6 85/21
87/10 88/5 88/14
99/23 110/22
111/17 112/22
113/1 117/7 117/8
118/13 119/17
122/19 122/22

background [3]
93/6 93/13 95/7

backpack [1]
104/13

backs [1]   17/8

bacteremia [8]
11/5 11/8 73/8
73/10 73/11 74/8
74/11 74/22

bacteria [13]   11/5
11/10 11/13 11/15

USCA11 Case: 22-11150    Document: 53-15    Date Filed: 11/30/2022    Page: 255 of 264

**B**

**bacteria... [9]**
11/17 12/6 12/7
12/11 12/13 12/14
12/15 73/5 73/12
**bacterial [2]**
10/17 10/21
**bad [10]** 48/20
48/21 48/22 48/23
48/24 48/25 49/15
49/18 76/21 105/12
**bag [4]** 14/18 15/3
15/13 101/18
**base [1]** 23/6
**based [3]** 13/23
24/1 41/19
**basically [4]**
10/21 15/10 65/14
73/3
**basis [2]** 66/4
85/20
**Bates [5]** 108/18
110/4 110/5 110/6
117/9
**bathroom [1]** 19/19
**battery's [1]**
120/4
**BB [1]** 1/2
**be [91]** 5/4 6/5
7/11 9/8 9/15 9/23
9/24 9/24 10/1
12/5 13/14 15/9
15/13 15/16 15/19
17/4 17/23 19/15
20/25 21/4 25/22
26/12 26/13 27/23
38/20 39/16 39/22
40/5 40/5 40/6
41/3 42/18 42/19
42/22 42/23 48/16
51/9 51/13 58/12
58/15 60/17 65/21
66/25 67/8 69/21

72/21 72/23 73/1
73/13 74/5 79/3
82/11 82/12 82/14
85/19 86/12 86/22
86/22 86/23 87/8
87/13 87/22 87/23
88/11 88/12 88/19
89/19 90/6 90/9
91/3 91/6 91/14
91/17 91/18 92/14
95/18 96/4 96/7
96/8 103/15 112/2
112/2 113/2 114/17
114/19 114/20
116/16 116/19
120/5 120/6 122/16
**BEACH [2]** 1/2 94/3
**bearing [1]** 7/3
**Beats [1]** 21/21
**became [1]** 4/22
**because [56]** 7/1
7/5 7/7 7/12 8/2
9/7 9/8 9/9 9/12
11/13 12/22 13/12
15/12 18/9 21/1
28/4 28/6 35/19
37/2 37/24 38/14
39/9 40/22 44/18
45/13 51/7 55/11
56/6 56/24 57/3
58/1 58/23 66/1
71/17 71/21 71/22
72/11 77/2 79/16
85/6 91/8 94/21
97/11 98/4 98/5
99/13 102/9 102/18
104/21 106/11
108/23 111/3 115/2
115/25 121/9 122/8
**become [6]** 6/6 7/3
11/13 12/12 13/12
42/12
**bed [23]** 37/9
38/12 39/4 49/22

54/6 62/16 63/5
63/10 63/12 63/23
64/1 64/12 65/4
65/5 65/6 65/7
66/18 68/16 68/24
71/8 88/16 99/24
111/2
**bedroom [1]** 99/23
**bedside [3]** 7/17
8/25 75/13
**bedsore [1]** 49/20
**bedsores [2]** 32/2
49/14
**been [38]** 4/18
4/20 6/7 10/23
15/20 16/9 18/1
21/3 22/1 27/11
42/8 45/3 45/6
45/8 45/12 45/15
51/9 59/17 61/13
67/9 73/18 82/5
82/10 84/21 93/14
93/16 97/5 97/10
98/16 104/2 109/2
113/20 115/3
115/10 116/20
116/22 118/17
122/3
**before [40]** 1/10
4/4 4/24 5/21 6/3
10/23 14/19 23/23
24/16 25/2 25/5
26/3 32/8 32/10
32/12 36/20 42/15
54/2 57/2 62/11
68/11 68/18 69/20
70/12 70/21 72/3
74/4 75/23 83/7
87/9 88/2 88/18
96/15 114/4 117/12
118/10 118/23
121/13 121/19
121/20
**beginning [1]**

USCA11 Case: 22-11150    Document: 51-14    Date Filed: 11/30/2022    Page: 246 of 254

**B**

**beginning... [1]**
22/22

**behalf [9]**   2/4
3/15 3/17 3/19
3/21 3/23 4/10
91/22 91/25

**behind [3]**   105/13
105/15 106/21

**being [25]**   5/4
16/11 17/2 17/24
18/7 20/11 20/15
34/9 41/15 42/7
51/12 56/2 63/1
66/5 72/10 72/13
72/15 72/21 75/17
80/8 81/3 81/23
83/11 91/11 97/8

**believe [18]**   6/18
8/5 20/22 22/1
30/3 56/14 80/24
81/2 82/9 84/8
87/9 88/4 96/16
96/19 106/5 115/20
119/13 120/9

**belly [2]**   10/1
88/13

**below [3]**   8/1
36/19 98/6

**best [5]**   7/1 26/14
42/14 88/10 88/12

**bet [1]**   113/18

**beta [3]**   12/13
12/13 12/15

**beta-lactamase [3]**
12/13 12/13 12/15

**BETH [1]**   1/10

**better [4]**   16/11
35/2 48/14 52/1

**between [6]**   23/15
45/18 73/15 75/10
87/23 99/10

**Bilateral [1]**
37/15

**bild... [2]**   118/14
118/13

**bills [2]**   105/14
106/21

**biofilm [2]**   11/14
11/17

**Biscayne [1]**   1/14

**bit [12]**   10/19
14/9 17/5 19/10
19/14 29/24 35/1
76/14 82/14 97/5
101/4 118/6

**bladder [5]**   10/25
11/3 31/5 74/1
74/4

**bleeding [1]**   9/8

**blood [1]**   13/22

**bloodstream [2]**
11/5 73/12

**BLOOM [1]**   1/10

**blow [2]**   64/25
66/23

**blowup [1]**   61/9

**board [1]**   35/8

**body [4]**   12/25
13/11 31/20 34/12

**BOIES [1]**   1/15

**bone [9]**   7/13 8/11
11/9 11/11 11/12
11/12 11/13 11/14
120/23

**bones [11]**   6/23
6/25 7/3 7/6 7/8
7/9 8/16 9/9 31/16
31/19 34/11

**bonus [1]**   75/25

**bony [2]**   8/10
11/18

**both [4]**   4/18
42/21 65/17 94/2

**bother [1]**   50/23

**bottom [4]**   36/13
52/25 81/10 119/2

**Boulevard [1]**   1/21

**Boyd [6]**   62/24
63/1 64/17 64/23
68/17 68/20

**brain [4]**   16/3
30/21 34/15 34/17

**break [6]**   12/14
68/11 76/14 105/16
116/12 122/17

**breathing [4]**   63/6
64/2 64/13 69/1

**BRENNER [8]**   1/16
2/6 3/15 17/11
82/3 88/2 88/20
115/21

**brief [3]**   69/4
93/5 93/12

**briefly [2]**   45/8
76/13

**bring [9]**   6/2
27/21 43/4 58/2
61/8 69/19 70/6
99/14 119/20

**brittle [3]**   7/1
7/8 31/15

**brittleness [1]**
31/19

**broad [1]**   76/14

**broad-brushed [1]**
76/14

**broader [1]**   93/14

**broke [3]**   7/11
121/9 121/15

**broken [1]**   81/17

**brother [1]**   116/24

**brought [2]**   111/13
111/24

**brushed [1]**   76/14

**bunch [1]**   108/18

**business [5]**   5/20
5/22 22/19 54/5
100/18

**Bustillo [2]**   52/20
53/9

**B**

**busy [6]**   45/3 45/6
45/8 45/12 45/15
45/20
**buy [1]**   106/24
**buying [1]**   121/9

**C**

**calcium [1]**   7/3
**calendar [1]**   83/13
**call [15]**   3/1 3/6
14/24 20/2 40/3
40/4 66/4 79/3
80/20 97/2 98/22
102/13 108/22
110/7 111/13
**called [21]**   11/5
11/14 12/12 13/7
19/24 20/7 27/3
28/11 31/15 32/2
33/17 40/18 76/24
77/15 79/3 98/15
102/8 102/10
110/12 120/7
120/11
**calling [3]**   3/10
78/12 96/11
**callout [1]**   46/1
**calls [8]**   26/4
56/20 92/9 94/19
101/13 101/21
102/16 113/23
**came [7]**   26/3 39/5
42/18 56/6 76/5
87/6 106/13
**can [57]**   5/13 9/7
11/4 11/24 12/6
13/14 13/14 15/8
15/9 15/16 15/18
15/24 16/3 16/6
21/11 25/23 29/7
32/23 32/23 36/21
37/6 43/3 45/5
45/25 49/12 53/19

64/25 67/5 69/4
70/11 73/14 73/24
83/7 92/17 93/5
93/12 96/21 97/14
98/20 99/21 107/10
107/13 107/18
110/3 111/13
111/17 111/21
112/2 116/8 116/11
116/13 117/9
118/25 119/5
119/18 119/19
121/17
**can't [20]**   29/14
30/22 38/11 38/14
42/3 42/16 43/10
49/1 49/3 49/7
51/21 51/22 87/18
90/9 91/7 91/19
97/24 98/1 115/5
118/14
**cancel [1]**   110/14
**cannot [2]**   29/16
113/15
**capacity [5]**   26/19
27/19 34/18 34/20
90/18
**care [24]**   9/2
18/18 18/19 18/21
21/7 21/7 38/18
40/13 40/16 40/18
52/16 58/14 65/21
65/23 72/24 84/22
104/9 111/24
112/13 113/2
119/25 120/5
120/10 120/19
**career [3]**   93/14
93/17 93/18
**careful [1]**   104/15
**caretakers [1]**
61/5
**Caribbean [1]**   99/1
**caring [2]**   47/24

48/14
**Carter [2]**   100/18
101/1
**case [24]**   1/2 3/6
3/10 8/14 12/4
13/9 14/12 14/23
27/8 27/8 27/9
32/8 33/11 33/14
56/13 58/7 67/23
67/23 72/19 75/5
75/14 76/16 90/16
97/12
**cases [2]**   12/5
94/14
**CAT [3]**   121/24
122/3 122/6
**catch [1]**   64/14
**category [1]**   55/23
**catheter [4]**   11/1
14/25 64/4 85/7
**catheterization [2]**
11/1 73/25
**caused [2]**   30/21
75/15
**causing [3]**   8/12
16/4 110/13
**CDC [1]**   92/21
**center [1]**   16/2
**centers [2]**   16/2
93/22
**central [4]**   13/13
14/23 14/24 15/11
**certain [6]**   9/15
15/12 82/5 89/19
91/3 97/23
**certainly [5]**   4/18
6/7 30/12 47/8
79/25
**Certificate [1]**
2/2
**Certified [1]**
124/5
**certify [2]**   124/7
124/12

USCA11 Case: 22-11150    Document: 13-14    Date Filed: 11/30/2022    Page: 248 of 254

## C

**chance [3]**  5/16 52/17 60/20

**change [2]**  88/24 89/2

**changed [3]**  37/16 37/17 88/20

**changes [1]**  15/24

**Charlebois [3]** 55/18 56/2 56/24

**check [2]**  79/23 112/1

**checking [1]**  84/9

**chief [1]**  94/10

**Chima [2]**  121/6 121/7

**Christmas [1]** 110/21

**chronic [4]**  10/21 10/22 11/9 73/19

**chronically [2]** 11/6 13/10

**chunk [1]**  31/24

**circuits [1]**  13/12

**circulation [1]** 8/13

**circumstances [2]** 19/8 91/8

**Civil [1]**  3/10

**claim [4]**  33/21 34/4 34/9 34/11

**clarify [1]**  33/3

**clean [1]**  39/9

**cleaned [2]**  37/16 37/17

**cleaning [4]**  8/23 37/25 39/7 39/8

**clear [2]**  22/9 106/15

**close [3]**  6/7 100/5 114/21

**closest [3]**  95/17 95/18 99/24

**CLR [1]**  124/17

**CO [1]**  64/26

**code [4]**  25/5 101/9 101/17 101/24

**coder [1]**  101/7

**coding [4]**  102/2 102/7 102/10 102/13

**cold [1]**  14/5

**colleagues [3]** 22/19 33/5 79/23

**colloquial [1]** 32/3

**Comcast [2]**  106/18 118/10

**come [9]**  3/9 36/4 44/14 69/14 72/24 94/16 109/7 114/24 117/8

**comes [4]**  16/10 40/23 56/2 115/22

**comfortable [2]** 53/25 92/23

**coming [4]**  44/17 58/9 84/9 85/2

**comment [1]**  66/17

**comments [2]**  25/16 111/10

**common [2]**  32/3 51/3

**communications [1]** 26/5

**companion [3]**  90/5 91/13 91/18

**company [2]**  94/3 94/12

**complain [1]** 106/21

**complaining [1]** 64/7

**complaint [4]** 33/16 33/18 34/2 64/3

**complete [3]**  83/16

**completed [1]**  9/11

**complex [4]**  23/19 28/23 28/23 28/24

**comprehension [1]** 28/21

**computations [1]** 23/20

**compute [1]**  112/3

**computer [70]** 18/23 19/1 19/3 19/4 19/7 22/6 25/5 34/23 35/6 35/9 35/11 37/9 38/12 39/5 39/11 41/8 41/8 41/9 41/20 42/6 42/13 42/19 42/23 42/25 43/20 44/23 46/16 47/1 47/22 48/2 48/3 48/7 49/22 50/3 51/4 51/10 51/14 51/17 51/19 51/22 51/22 52/5 54/5 54/6 56/7 57/20 59/16 59/25 60/8 61/6 62/11 62/17 63/6 63/15 64/2 64/13 65/8 65/9 65/16 66/7 66/19 67/3 67/13 69/1 69/3 70/24 71/8 72/6 82/6 103/9

**computer.' [1]** 41/19

**computers [1]** 72/18

**concentrated [1]** 31/20

**concept [2]**  19/12 40/18

**concerned [2]**

**C**

USCA11 Case: 22-11150   Document: 14   Date Filed: 11/30/2022   Page: 249 of 254

**concerned... [2]**
112/15 115/2

**conclude [2]**   5/14
49/10

**conclusion [1]**
106/13

**condition [16]**
6/22 6/25 7/6
20/13 30/4 31/8
31/9 37/3 48/15
48/17 54/17 72/17
87/13 88/4 88/25
120/18

**conditions [1]**
6/19

**conduct [1]**   54/5

**conference [2]**
45/9 45/20

**Conrad [2]**   100/19
101/1

**consider [1]**   95/17

**considered [3]**
20/6 20/11 20/16

**considers [1]**   59/4

**consistent [5]**
43/22 92/21 98/2
114/10 121/12

**constant [1]**   73/4

**constantly [2]**
35/9 35/11

**consult [1]**   116/9

**contact [3]**   20/3
20/4 93/22

**contains [2]**   14/18
124/12

**context [2]**   117/14
118/4

**continue [6]**   6/11
54/11 69/16 69/23
116/7 117/5

**CONTINUED [2]**   2/6
6/13

**continues [1]**   68/7

**continuity [1]**
40/18

**continuous [3]**
10/25 16/21 84/3

**continuously [1]**
37/17

**contract [1]**   74/4

**control [9]**   7/2
13/13 14/3 16/1
31/5 31/11 33/22
34/6 74/2

**conversations [1]**
33/10

**cope [2]**   54/11
54/13

**copes [1]**   54/20

**copy [1]**   33/15

**Coral [1]**   1/22

**correct [164]**

**correctly [1]**
121/25

**could [58]**   5/16
5/17 8/8 10/19
14/9 15/19 16/20
17/5 17/12 19/9
20/4 20/17 20/24
26/12 26/12 27/22
27/24 28/15 35/22
40/5 40/5 40/6
45/4 48/15 54/13
58/12 61/8 68/10
70/6 72/23 77/11
77/11 77/11 77/22
80/15 80/17 80/23
81/5 82/24 86/4
90/11 91/10 96/17
97/2 98/9 101/17
102/9 107/5 108/16
108/17 108/20
108/22 109/4 109/5
110/7 111/19
119/16 122/14

**couldn't [8]**   9/17

9/24 49/18 88/13
96/1 96/21 109/9
115/25

**counsel [8]**   3/12
3/13 3/25 4/4 26/2
81/14 82/1 107/5

**counseled [1]**
115/4

**count [8]**   43/17
43/18 46/20 47/13
72/3 72/7 75/25
82/9

**counted [3]**   7/16
75/12 76/5

**counting [1]**   75/13

**couple [6]**   19/7
21/22 22/9 70/3
73/2 84/23

**course [17]**   7/21
9/6 11/11 13/5
14/17 17/20 18/7
18/13 20/19 21/12
34/10 34/10 65/21
68/12 77/21 78/9
78/10

**court [15]**   1/1
1/23 1/23 3/1 5/7
5/10 5/17 5/17 6/8
17/12 21/14 63/25
107/6 124/6 124/9

**Court's [2]**   115/23
116/16

**courtroom [2]**   39/1
82/13

**covered [1]**   77/7

**coworker [2]**
109/14 109/15

**crack [2]**   4/5
111/9

**CRAIG [4]**   1/7 3/11
97/19 103/5

**CROSS [3]**   2/6
21/10 21/15

**CROSS-EXAMINATION
[3]**   2/6 21/10

USCA11 Case: 22-11150    Document: 14-2    Date Filed: 11/30/2022    Page: 250 of 254

## C

**CROSS-EXAMINATION..**
**. [1]**    21/15
**CRR [1]**    124/17
**CSR [1]**    124/17
**cubital [1]**    14/15
**current [1]**    110/14
**cursory [1]**    25/15
**cut [3]**    13/13
 60/24 61/13
**cv [1]**    1/2

## D

**D091 [4]**    80/15
 80/15 80/17 81/21
**D092 [1]**    81/21
**D093 [1]**    81/21
**D094 [1]**    81/21
**D095 [1]**    81/22
**D096 [1]**    81/22
**D097 [1]**    81/22
**D098 [1]**    81/22
**D099 [1]**    81/22
**D100 [3]**    45/2
 46/13 81/22
**D101 [5]**    36/2
 39/14 43/4 43/25
 81/22
**D102 [1]**    81/22
**D1021 [1]**    98/8
**D91 [1]**    27/24
**D92 [3]**    70/6 70/18
 71/10
**D93 [4]**    64/25 66/9
 67/15 68/14
**D94 [4]**    62/20
 63/11 63/18 64/9
**D95 [3]**    59/22 60/5
 62/3
**D96 [2]**    57/7 58/2
**D97 [2]**    52/8 55/8
**D98 [3]**    48/9 49/25
 52/2
**D99 [3]**    46/22

47/11 47/19
**dab [9]**    10/12
10/12 10/12 10/12
10/12 10/12 10/12
10/13 10/13
**daily [4]**    18/19
85/20 99/13 100/10
**damage [1]**    30/21
**danger [1]**    116/6
**data [6]**    93/16
93/22 103/5 103/13
103/16 104/19
**date [15]**    22/2
36/14 36/14 36/17
36/21 36/25 108/21
109/2 110/7 110/21
113/8 117/12
117/12 119/2 121/3
**dates [2]**    114/8
118/3
**Dave [83]**    7/5 7/15
7/20 8/5 8/19
14/10 15/4 16/19
19/8 19/10 20/11
20/22 22/13 22/24
23/4 23/19 28/10
35/21 36/8 51/4
54/4 55/3 59/12
70/24 73/16 74/6
74/11 74/24 74/25
77/12 77/18 78/1
78/20 79/16 82/5
82/16 82/17 82/25
83/14 84/5 84/16
85/10 85/18 85/24
86/4 86/8 86/24
87/4 87/8 87/13
88/5 88/10 88/21
88/25 89/3 94/9
94/25 95/4 95/9
96/25 97/18 98/23
99/3 100/12 101/6
101/17 105/8
106/22 106/24

107/17 107/21
108/23 108/24
109/19 110/9
111/23 112/4
113/15 114/18
118/6 118/8 119/23
121/23
**Dave's [18]**    23/15
25/1 25/4 27/9
29/11 29/14 34/15
62/10 72/1 72/17
74/21 75/15 75/16
76/10 79/7 79/8
80/8 109/15
**David [13]**    1/4
6/19 6/23 9/14
10/17 15/21 18/4
18/18 18/23 19/2
93/24 101/4 102/21
**David's [1]**    11/21
**day [29]**    1/9 5/22
6/6 6/18 16/10
19/23 19/24 19/25
20/2 30/2 30/11
44/22 51/13 72/23
73/1 75/21 75/25
85/5 85/23 86/17
87/7 88/22 96/6
96/6 99/15 110/23
113/1 124/9 124/15
**days [23]**    20/5
51/13 75/22 75/23
75/25 76/2 76/4
76/8 77/23 78/5
78/12 78/14 82/25
83/8 83/13 83/19
83/22 84/2 86/24
87/4 97/6 108/4
118/17
**de [1]**    1/21
**dead [1]**    8/22
**deadline [2]**    5/2
5/10
**deal [1]**    113/18

**D**

**dealing [1]** 41/3
**dealt [1]** 7/11
**debridement [1]**
8/22
**debridements [2]**
8/25 75/13
**debriding [1]** 7/17
**December [6]** 44/3
44/9 44/10 57/7
76/21 110/10
**decent [1]** 31/24
**decided [1]** 42/11
**decision [1]** 48/13
**decreased [1]**
79/16
**defecated [2]** 38/6
39/10
**defecation [1]**
34/6
**Defendant [7]** 1/8
1/19 2/4 69/18
89/25 90/3 91/23
**Defendant's [5]**
2/11 92/8 107/7
108/7 108/15
**defense [7]** 1/4
33/21 34/5 81/14
82/1 92/9 92/15
**deferring [1]** 42/4
**deficiency [1]**
112/5
**definitely [4]**
10/18 21/6 66/8
77/18
**definition [2]**
25/11 78/10
**definitively [1]**
98/1
**degree [3]** 15/12
93/8 93/11
**demonstrate [1]**
51/17

**demonstrates [1]**
79/18
**demonstrative [1]**
82/25
**demonstratives [1]**
23/2
**denervation [1]**
13/13
**denied [1]** 66/20
**deny [1]** 66/4
**depends [3]** 25/11
78/10 91/8
**deposition [11]**
21/24 24/2 24/8
25/6 25/8 25/13
25/19 25/24 32/14
74/11 77/6
**depressant [1]**
14/2
**depressive [3]**
13/9 16/5 16/24
**deprive [1]** 66/22
**describe [3]** 30/3
99/21 101/24
**described [2]** 7/1
33/14
**description [1]**
93/12
**detrimental [1]**
91/11
**develop [4]** 9/25
12/6 95/9 95/11
**development [2]**
93/16 94/5
**devices [1]** 103/10
**DEVIN [1]** 1/13
**diazepam [2]** 13/7
79/2
**did [95]** 7/5 10/17
15/4 16/20 18/18
18/23 19/2 20/2
22/3 23/12 25/18
26/2 26/8 27/8
27/10 27/14 27/15

33/23 34/16 35/20
40/3 40/4 46/20
49/10 56/20 56/20
58/22 60/21 65/22
66/24 74/24 77/18
78/8 78/8 78/9
82/18 85/13 86/20
87/18 88/1 88/24
93/24 94/1 94/4
94/9 94/13 94/15
95/6 95/9 95/11
98/25 99/17 100/7
100/21 101/9
101/11 102/1
102/13 102/15
102/22 103/2 103/3
103/4 103/16
103/22 103/24
104/5 104/7 104/9
104/11 104/14
105/11 105/19
105/24 106/2
106/22 108/2
109/17 110/2
110/20 112/10
112/18 112/25
113/21 114/2 114/4
117/20 119/13
121/15 121/25
122/5 122/11
**didn't [38]** 9/7
25/24 27/13 32/21
33/13 38/8 43/12
43/17 43/18 47/13
48/2 51/7 51/23
52/17 55/6 60/19
60/20 61/1 61/1
64/14 65/24 72/3
72/7 73/19 74/4
74/24 75/4 75/7
78/6 79/19 79/21
79/22 82/8 94/21
100/23 102/18

**D**

**didn't... [2]**
116/4 120/20

**died [1]** 96/15

**different [17]**
7/14 12/16 12/18
18/4 18/5 18/6
58/8 62/7 62/13
62/14 62/15 66/11
68/17 68/20 68/22
68/23 85/2

**differentiate [1]**
45/18

**difficult [1]**
11/16

**difficulties [2]**
105/10 105/12

**difficulty [4]**
28/22 29/7 31/4
42/4

**diminished [3]**
29/12 29/15 57/2

**dinner [1]** 95/13

**direct [8]** 2/6 2/8
6/13 26/12 35/21
37/2 79/4 93/1

**directly [1]** 11/11

**disagree [1]** 51/16

**discharge [4]** 20/8
20/15 20/16 20/23

**discharged [2]**
20/7 20/25

**disconnect [2]**
16/2 118/11

**discontinued [1]**
16/7

**discuss [2]** 35/21
102/22

**discussed [6]**
19/12 33/4 45/9
84/5 84/8 86/24

**discussing [1]**
33/1

**discussion [2]**
90/25 114/7

**discussions [2]**
34/3 85/1

**disease [8]** 12/1
18/7 18/8 22/10
27/16 27/17 39/21
39/23

**disease-related [1]**
27/16

**dispute [4]** 71/25
72/5 72/9 72/14

**distress [1]** 64/3

**DISTRICT [7]** 1/1
1/1 1/10 1/23
124/3 124/6 124/7

**divided [1]** 81/11

**DIVISION [1]** 1/2

**do [144]**

**Doc [5]** 94/2 94/4
94/9 94/13 109/14

**doctor [25]** 22/10
27/17 27/18 29/18
38/3 39/13 40/6
40/22 41/25 42/5
42/11 51/2 55/10
57/11 57/17 59/3
60/25 61/2 61/13
62/7 64/11 71/25
79/19 80/2 85/19

**doctorate [1]**
93/11

**doctors [16]** 18/4
26/19 35/7 37/5
40/7 40/21 44/14
45/17 54/20 58/13
59/6 60/13 61/3
61/19 84/8 110/11

**document [6]** 33/14
41/21 81/3 81/13
96/24 107/10

**documentation [1]**
85/11

**documented [1]**
85/13

**documents [2]** 82/7
107/10

**does [11]** 8/2
21/25 56/23 65/8
65/11 65/17 68/21
89/19 91/2 91/17
112/2

**doesn't [13]** 9/17
12/25 41/16 50/15
51/2 52/24 65/20
65/25 73/19 88/13
88/15 90/19 116/18

**doing [25]** 19/3
19/4 34/24 35/3
38/20 39/5 39/7
41/14 51/22 55/25
58/13 58/13 58/14
59/12 59/17 66/3
67/9 85/12 86/5
111/1 111/16
111/23 114/2
115/16 117/22

**don't [63]** 5/9
20/5 24/19 27/5
28/2 28/5 29/2
29/3 29/8 29/11
33/1 34/23 35/24
35/24 35/25 38/20
43/14 44/18 48/4
50/23 51/16 53/21
55/4 56/11 57/10
58/12 59/4 59/7
59/8 60/19 60/24
61/17 62/21 66/22
74/22 78/3 79/4
80/24 90/15 96/2
96/13 97/9 97/11
97/23 98/11 103/18
104/17 106/14
106/20 108/2 108/2
108/22 110/2
112/19 112/25
114/7 115/6 115/20

## D

**don't...** [5]
117/24 118/9
120/17 121/20
122/13
**done** [4] 25/7
27/13 46/24 122/9
**door** [1] 99/25
**Dorky** [1] 112/4
**DOs** [1] 40/11
**dose** [1] 14/7
**doubt** [8] 4/19
28/25 38/18 54/23
55/1 57/25 57/25
64/19
**down** [33] 7/1 8/16
8/17 9/21 10/3
12/14 31/14 35/15
36/13 37/5 44/17
45/25 46/1 46/1
48/16 48/22 48/23
76/14 80/23 81/5
81/17 87/19 88/5
88/15 89/12 97/6
98/20 105/16 111/3
111/5 113/16
114/17 114/20
**downtime** [2] 7/20
7/22
**DR** [13] 2/5 4/5
4/8 4/10 4/11 26/2
32/22 33/6 33/20
34/3 41/7 41/13
70/17
**Dr.** [32] 3/8 3/11
6/1 6/10 6/15
11/21 16/15 16/19
20/22 21/17 25/21
32/22 40/13 42/8
42/24 49/10 49/12
53/16 67/19 67/22
68/2 69/14 69/25
80/8 81/2 83/11

85/9 89/9 89/10
90/24 92/2
**Dr. Craig** [1] 3/11
**Dr. MacIntyre** [24]
3/8 6/1 6/10 6/15
11/21 16/15 16/19
20/22 21/17 25/21
32/22 49/10 49/12
69/14 69/25 80/8
81/2 83/11 85/9
89/9 89/10 90/24
91/21 92/2
**Dr. Pilar** [1]
53/16
**Dr. Regatieri** [3]
40/13 42/8 42/24
**Dr. Somoza** [3]
67/19 67/22 68/2
**drainage** [1] 10/24
**dressing** [3] 37/16
37/17 37/18
**drive** [3] 104/1
104/2 113/19
**drug** [1] 78/23
**drugged** [2] 44/16
44/17
**drugs** [1] 57/13
**dry** [1] 64/4
**due** [2] 9/15 41/17
**DUGALD** [1] 2/5
**during** [21] 7/10
7/22 14/22 22/3
30/4 35/18 37/21
38/12 73/24 74/13
74/16 83/15 84/16
84/25 86/20 86/25
87/5 98/22 111/4
115/14 122/11
**during Zoom** [1]
22/3

## E

**each** [12] 4/2 4/13
6/6 7/21 18/14

37/12 74/17 81/12
83/17 84/2 84/2
86/17
**earlier** [1] 70/23
**early** [13] 33/12
59/2 59/2 59/3
59/3 59/5 59/6
59/9 59/11 59/15
70/24 71/7 71/13
**easier** [1] 80/14
**easiest** [1] 120/5
**easy** [1] 121/1
**educational** [1]
93/5
**effect** [15] 15/4
15/24 16/5 16/12
47/17 74/21 76/8
77/12 78/15 78/16
78/17 78/20 79/6
79/8 91/20
**effects** [5] 14/1
14/1 15/22 15/25
16/24
**eight** [2] 86/16
108/8
**either** [8] 8/12
9/25 10/25 15/1
86/6 88/12 95/13
116/25
**electric** [1] 118/8
**electronic** [1]
41/2
**elicit** [1] 115/20
**eliminate** [1]
12/25
**else** [3] 38/20
106/13 116/20
**elsewhere** [2] 8/2
63/8
**email** [3] 96/25
97/7 97/18
**emphasize** [3]
37/24 37/25 38/1
**encountered** [1]

USCA11 Case: 22-11150   Document: 53-14   Date Filed: 11/30/2022   Page: 254 of 254

**E**

**encountered... [1]**
9/9

**encrypted [4]**
104/16 104/17
104/18 104/19

**end [19]**  5/4 5/11
5/20 5/22 6/18
6/22 19/11 30/2
30/11 32/6 34/21
47/14 80/21 86/6
90/21 91/10 98/6
111/13 117/4

**endeavoring [1]**
5/2

**ended [1]**  31/13

**engagements [1]**
101/1

**engineering [1]**
94/7

**English [1]**  42/21

**enough [1]**  122/14

**entered [2]**  96/13
115/4

**entire [3]**  38/13
73/24 93/14

**entirely [1]**  9/6

**entitled [1]**  46/2

**Entry [1]**  36/14

**enzymes [1]**  12/13

**episodes [1]**  11/7

**equipment [2]**
19/20 96/9

**Ertapenem [7]**
77/15 77/19 77/21
78/1 78/11 78/17
78/20

**ESBL [1]**  12/14

**escape [1]**  11/4

**especially [1]**
113/17

**ESQ [9]**  1/13 1/13
1/16 1/16 1/17

1/19 1/20 1/20
1/21

**essence [1]**  8/23

**essentially [1]**
16/1

**establish [1]**
115/13

**Estate [1]**  1/4

**evaluate [2]**  34/17
34/18

**Eve [1]**  110/21

**even [11]**  35/14
45/20 56/10 63/7
64/2 64/13 69/1
99/23 113/15
117/15 118/9

**evening [1]**  5/12

**eventually [1]**
33/13

**ever [17]**  15/20
29/12 57/18 79/16
95/22 99/17 100/7
101/9 102/1 102/13
102/22 103/4
103/16 104/5
104/14 105/19
106/2

**every [17]**  9/23
10/2 10/11 10/15
13/18 42/18 42/22
50/6 50/10 58/16
58/18 84/20 85/23
88/17 97/10 99/15
121/23

**everyone [8]**  3/2
3/3 34/12 41/6
51/3 51/6 58/5
83/2

**everyone's [1]**
41/5

**everything [2]**
120/2 120/12

**everything's [1]**
48/24 48/25

**evidence [24]**  23/3
27/24 28/5
29/4 29/5 29/6
30/20 35/23 36/5
74/20 80/9 80/11
81/13 81/17 81/25
96/16 96/19 96/24
97/15 98/8 108/14
108/15 115/5

**evident [3]**  13/25
16/12 16/13

**evolved [1]**  94/6

**EX [1]**  2/10

**exacerbations [1]**
73/7

**exactly [5]**  20/5
64/15 87/11 113/11
119/21

**exaggerating [1]**
41/13

**exam [5]**  27/4 28/2
28/9 50/12 57/24

**examination [16]**
2/6 2/6 2/7 2/8
6/13 21/10 21/15
22/22 26/12 35/18
35/22 37/2 60/2
72/12 80/6 93/1

**example [5]**  56/9
58/15 99/17 109/22
118/22

**exams [1]**  60/10

**except [1]**  72/23

**exceptional [4]**
4/20 5/6 5/7 5/8

**excessive [1]**  9/8

**exchange [1]**
107/17

**excrete [1]**  11/15

**excuse [4]**  42/19
53/17 58/19 60/21

**excused [3]**  92/2
92/6 92/7

**exhibit [12]**  81/2