IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆

IRA KLEIMAN, as the Personal Representative
of the ESTATE OF DAVID KLEIMAN,

*Plaintiff-Appellant,*

W&K INFO DEFENSE RESEARCH, LLC,

*Plaintiff,*

—v.—

CRAIG WRIGHT,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## SUPPLEMENTAL APPENDIX
## VOLUME XVI OF XVII

ANDREW S. BRENNER
LASELVE ELIJAH HARRISON
ALEXANDER J. HOLTZMAN
SAMANTHA MARIE LICATA
MAXWELL PRITT
STEPHEN NEAL ZACK
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
(305) 539-8400

DEVIN FREEDMAN
FREEDMAN NORMAND
   FRIEDLAND, LLP
1 SE Third Avenue, Suite 1240
Miami, Florida 33131
(305) 306-9211

—and—

KYLE ROCHE
STEPHEN LAGOS
ROCHE FREEDMAN LLC
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
jcyrulnik@rcfllp.com

*Attorneys for Plaintiff-Appellant*

ANDRÉS RIVERO
JORGE A. MESTRE
AMANDA MCGOVERN
ALAN H. ROLNICK
ROBERT J. KUNTZ JR.
ALLISON HENRY
RIVERO MESTRE LLP
2525 Ponce de León Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile:  (305) 445-2505
arivero@riveromestre.com
jmestre@riveromesre.com
amcgovern@riveromestre.com
arolnick@riveromestre.com
rkuntz@riveromestre.com
ahenry@riveromestre.com

MICHAEL A. FERNÁNDEZ
AMY C. BROWN
RIVERO MESTRE LLP
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 880-9451
Facsimile:  (212) 504-9522
mfernandez@riveromestre.com
abrown@riveromestre.com

*Attorneys for Defendant-Appellee*

# TABLE OF CONTENTS

TAB NO.            DESCRIPTION

210                Plaintiffs' Motion to Compel Defendant to Comply
                   with this Court's Orders Directing Him to Produce a
                   List of the Bitcoins He Held as of December 31, 2013

429                Order Granting in Part and Denying in Part Plaintiffs'
                   Corrected Motion for Attorneys' Fees (DE 346),
                   filed March 17, 2020

618                Joint Proposed Jury Instructions,
                   filed September 29, 2020

802-1              Exhibit A to Defendant's Opposition to Motion for a
                   New Trial (DE 861) — Final Jury Instruction
                   Objections

829                Email from Craig S. Wright to Dave Kleiman,
                   dated March 12, 2008

837                Trial Transcript Day 1, dated November 1, 2021

838                Trial Transcript Day 2, dated November 2, 2021

839                Trial Transcript Day 3, dated November 3, 2021

840                Trial Transcript Day 4, dated November 4, 2021

841                Trial Transcript Day 5, dated November 5, 2021

842                Trial Transcript Day 6, dated November 8, 2021

843                Trial Transcript Day 7, dated November 9, 2021

845                Trial Transcript Day 9, dated November 15, 2021

| TAB NO. | DESCRIPTION |
| --- | --- |
| 846 | Trial Transcript Day 10, dated November 16, 2021 |
| 847 | Trial Transcript Day 11, dated November 17, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 848 | Trial Transcript Day 12, dated November 18, 2021 |
| 850 | Trial Transcript Day 14, dated November 22, 2021 |
| 851 | Trial Transcript Day 15, dated November 23, 2021 |
| 861 | Law360 Article entitled, "No Proof Bitcoin 'Inventor' Owed Friend, Juror Tells Law360" |
| 877 | Joint Notice and Request for Judicial Ruling on Proposed Redactions to Admitted Trial Exhibits, filed January 31, 2022 |

**850**

49

1      THE COURT:  All right.  Ladies and Gentlemen, please

2   be seated.

3      And we'll continue with the questioning.

4   BY MR. BRENNER:

5   Q.  Okay.  Dr. Klin, we're almost through.

6      For the next series of questions, I'm going to ask you to

7   assume certain things.  I'm not asking you to agree with them,

8   but I'm going to ask you to make certain assumptions.  Okay?

9   A.  Yes.

10  Q.  I want you to assume that the jury has heard evidence that

11  Dr. Wright has submitted altered or forged documents.  You

12  would agree with me that there's nothing about autism that

13  would cause Dr. Wright to submit altered or forged documents,

14  correct?

15  A.  There is nothing in autism that makes that person commit

16  perjury or forge documents or lie.

17  Q.  I want you to assume again that the jury has heard expert

18  testimony that Dr. Wright produced fraudulent documents.

19  There's nothing in the nature of individuals who have autism

20  that would cause them to produce fraudulent documents, correct?

21  A.  No.

22  Q.  I'm correct?

23  A.  You are correct.

24  Q.  Thank you.

25      And I want you to also assume that the jury has seen

50

```
 1    evidence that Dr. Wright submitted written declarations that
 2    are contradicted by his own testimony.  There's nothing about
 3    autism that would cause someone to do that either, right?
 4    A.  That is correct, with the proviso that individuals with
 5    autism may see a given situation very differently than others
 6    because they don't share the same social context or because
 7    they are overly pedantic, or they are overly obsessed with
 8    irrelevant details in a particular situation that would make
 9    them basically make statements outside of the context that
10    everybody would judge them as doing so.
11    Q.  Okay.  The jury has seen evidence that Dr. Wright submitted
12    affidavits -- I want you to assume the jury's seen --
13            MS. MCGOVERN:  Objection, Your Honor.  The manner in
14    which the statement is being made mischaracterizes the evidence
15    in the record.  I think the question that was discussed earlier
16    was not this one.
17            THE COURT:  Yes.  As a hypothetical.  Sustained.
18    Rephrase.
19    BY MR. BRENNER:
20    Q.  I want you to assume that the jury has heard evidence that
21    Dr. Wright submitted affidavits to two different Courts that
22    directly contradict each other.  Okay?  That's the assumption,
23    okay?
24    A.  Okay.
25    Q.  And nothing about autism would cause him to do that either,
```

```
 1   correct?

 2   A.  Except for what I've mentioned to you before, that

 3   individuals with autism tend to make statements outside of the

 4   shared context, that they have a tendency for

 5   self-incrimination.

 6       And part of what we do is to try and understand the context

 7   that they come from so that we don't punish them for their

 8   disability.

 9           MR. BRENNER:  Your Honor, can I publish P710 and P748?

10           MS. MCGOVERN:  Could I see the two beforehand, please?

11   Could we look at them before they are published?

12           MR. BRENNER:  Not to the jury, please.

13           You know what, Your Honor?  Give me one moment.

14           MS. MCGOVERN:  Your Honor, I object to the use of the

15   evidence with respect to this witness for the same reason we

16   discussed with the other exhibit.

17           MR. BRENNER:  You know what, Your Honor?  I'll

18   withdraw the question.

19           Dr. Klin, thank you so much for your time.

20           I've concluded my examination, Your Honor.

21           THE COURT:  All right.  Any redirect?

22           MS. MCGOVERN:  Very short.

23                      REDIRECT EXAMINATION

24   BY MS. MCGOVERN:

25   Q.  Good morning, Dr. Klin.
```

52

```
 1   A.  Good morning.

 2   Q.  I was just checking the time.

 3        Dr. Klin, based on your three-plus decades of work,

 4   research in the field of autism and your role in defining it

 5   for the world, do you have any reservation whatsoever with

 6   respect to your diagnosis of autism for Dr. Wright?

 7   A.  I do not.

 8   Q.  Dr. Klin, you testified earlier, and in your report at

 9   Pages 5, 8 and 11, you state that:  "The human condition of

10   autism carries with it a difficulty in establishing meaningful

11   and maintaining meaningful reciprocal friendship."

12        Do you recall that?

13   A.  Yes.

14   Q.  If such a friendship is found, a meaningful, perceived --

15   albeit one-sided reciprocal friendship with a person with

16   autism is found, what sort of attributes can you expect to

17   present?

18        MR. BRENNER:  Objection.  Beyond the scope of cross

19   and also beyond the expert report.

20        MS. MCGOVERN:  Your Honor, it's specifically --

21        THE COURT:  Overruled.  I'll allow it.

22        THE WITNESS:  Individuals with autism do not have the

23   same opportunities as their peers to develop relationships and

24   friendships.  Individuals with high intellect and autism, they

25   tend to alienate others with their circumscribed interests and
```

53

```
1    their one-sided approaches, sometimes with their obsession

2    about others.  They also don't understand their role in the

3    reaction of others.

4    BY MS. MCGOVERN:

5    Q.  Can sometimes a friendship be enhanced?

6    A.  In the case of Dr. Wright over the course of his life, a

7    friend would be somebody who shared his interests and tolerated

8    his obsession about his interests.

9        Later, this also became people who would not call him

10   everything that he heard --

11            MR. BRENNER:  Objection.  This is a narrative beyond

12   the question asked.

13            THE COURT:  Sustained.

14   BY MS. MCGOVERN:

15   Q.  If you could simply briefly conclude your answer, Dr. Klin,

16   simply with respect to the type of attributes that can be

17   presented when a reciprocal friendship is perceived to be

18   achieved.

19   A.  In individuals with autism, it is often the case that not

20   only the relationship is not reciprocated but the level of

21   relationship is not reciprocated.

22            MS. MCGOVERN:  Thank you very much, Your Honor.  No

23   further questions for Dr. Klin.

24            THE COURT:  All right.  Thank you, Dr. Klin.

25            Is Dr. Klin excused?
```

54

```
 1              MS. MCGOVERN:  Yes, he is, Your Honor.

 2              THE COURT:  On behalf of the Plaintiffs?

 3              MR. BRENNER:  Yes, Your Honor.

 4              THE COURT:  All right.  You are excused, sir.

 5         (Witness excused.)

 6              THE COURT:  And the Defendant's next witness?

 7              MS. MCGOVERN:  Your Honor, would you mind terribly

 8    giving us a brief recess for 10 minutes to assess the testimony

 9    that we may or may not need to bring?  If we could take a brief

10    break?

11              THE COURT:  All right.  Let's take a short five-minute

12    stretch break, all right?

13              MS. MCGOVERN:  Thank you, Your Honor.

14         (Jury not present, 10:50 a.m.)

15              MS. MCGOVERN:  Your Honor, I don't know if this is

16    important, but we did not ask the jury if they have questions

17    for Dr. Klin.

18              THE COURT:  Oh, yes.  Is Dr. Klin still with us?  He's

19    here?

20              MS. MCGOVERN:  He should be.

21              THE COURT:  All right.  So let's figure out who our

22    next witness is.

23              MS. MCGOVERN:  Thank you, Your Honor.

24              THE COURT:  And then let me bring -- actually, let me

25    ask the jury so I don't need to bring Dr. Klin back.
```

55

 1          But, Dr. Klin, if you wouldn't mind staying for the

 2     five minutes, and let's see if the jury has any questions for

 3     you.

 4          And thank you for bringing that to the Court's

 5     attention.

 6          All right.  We're on a five-minute recess.

 7     (Recess from 10:51 a.m. 10:59 a.m.)

 8          THE COURT:  Dr. Klin, well, perhaps if they do have

 9     questions it might make sense -- they may not have any

10     questions.  But let's see.

11     (Before the Jury, 10:59 a.m.)

12          THE COURT:  All right.  Welcome back, Ladies and

13     Gentlemen.

14          Please be seated.

15          I neglected to ask if any of you had any questions for

16     Dr. Klin.

17          Is there anyone that has a question for Dr. Klin?

18          If you do, just raise your hand, so I know that you

19     are writing your question down.

20          And since we do have a question, let me have the

21     attorneys sidebar, please.

22     (At sidebar on the record.)

23          THE COURT:  All right.  Thank you.

24          The first question reads as follows:  "Does a person

25     diagnosed with autism show emotion just as easily as a person

56

1    who is not?"

2            MS. MCGOVERN:  No objection.

3            MR. BRENNER:  No objection.

4            THE COURT:  Second question:  "How often is it seen

5    for an autistic person to become successful and independent out

6    of their household?"

7            MS. MCGOVERN:  No objection.

8            MR. BRENNER:  No objection.

9            THE COURT:  Okay.

10       (End of discussion at sidebar.)

11           THE COURT:  All right.  Thank you, Ladies and

12   Gentlemen.  The questions are permissible and I will ask the

13   questions.  There are two, and I will ask them one at a time.

14           Dr. Klin, does a person who is diagnosed with autism

15   show emotion just as easily as a person who is not?

16           THE WITNESS:  That is a wonderful question.

17           Individuals with autism have emotions and they express

18   them particularly when they are under stress or when they are

19   angry about something.

20           So as we usually say to parents, yes, children feel

21   emotion.  They can get hurt and they often do.  However,

22   individuals with autism have difficulty in expressing emotions

23   communicatively, meaning that they use their own faces and

24   non-verbal gestures to communicate intent to others.

25           So in the case of Dr. Wright, for example, one of the

57

1   questions that his wife raised is the fact that he likes to be

2   congratulated, but you would never know that he is actually

3   happy.  On Dr. Wright's side, saying that:  "I am happy, but

4   she's not seeing it." She's not seeing it because he's not

5   smiling his intention of communicating something to the other.

6   So that's typically what happens in autism.

7        Yes for emotional expressions.  And sometimes under

8   stress they can be extreme.  Dr. Wright's mother called this

9   adult tantrums.

10       THE COURT:  The second question reads as follows:

11  "How often is it seen for an autistic person to become

12  successful and independent outside of their household?"

13       THE WITNESS:  Another wonderful question.

14       Unfortunately, this is -- this does not happen very

15  often.  Forty-two percent of individuals with autism have

16  intact intellect or have gifted skills.  Of those 42 percent, a

17  very -- a small minority of those individuals can actually

18  succeed.  And those typically are the individuals who build on

19  their circumscribed interests, on their obsessions with

20  learning and knowledge, and make them into a vocation.

21       So there are professors who have autism at places like

22  MIT and Georgia Institute of Technology and Carnegie Mellon

23  because they were able to use something that they do so well

24  for the purpose of a vocation.

25       Having said that, the very same individuals may have

58

```
 1    extreme disabilities in areas other than what they are focusing
 2    on, for example, at their job.
 3              THE COURT:  Thank you, Dr. Klin.  You are excused.
 4              And the Defendant's next witness.
 5              MR. RIVERO:  Your Honor, the Defense calls Dr. Craig
 6    Steven Wright.
 7              THE COURT:  All right.  Dr. Wright, if you'll step
 8    forward once again.  Remain standing, raise your right hand to
 9    be placed under oath.
10      CRAIG WRIGHT, DEFENDANT, SWORN
11              THE COURT:  You may be seated, sir.
12              Dr. Wright, let me advise you that if you have been
13    fully vaccinated, and you are comfortable, you are permitted to
14    take your mask off while you are responding to questions and
15    testifying.
16              THE WITNESS:  Thank you, Your Honor.
17              MR. RIVERO:  May it please the Court, counsel, Ladies
18    and Gentlemen of the Jury.
19              Pardon me, Judge.  I'm trying to keep track of my
20    time.
21                         DIRECT EXAMINATION
22    BY MR. RIVERO:
23    Q.  Good morning, Dr. Wright.
24    A.  Good morning.
25    Q.  Dr. Wright, did you form a business partnership agreement
```

59

1    with David Kleiman to invent and mine Bitcoin?

2    A. No.

3    Q. Sir, please -- as I ask you questions, what I'm going to

4    ask you to do is to listen to my question and answer my

5    question. Do you understand?

6    A. I do.

7    Q. Would it be helpful to have a pad of paper and a pen in

8    order to -- during the examination?

9    A. Yes. When I read and write, I find it easier than when I

10    listen.

11         MR. RIVERO: Your Honor, I would ask permission to

12    hand Dr. Wright a blank pad of paper and a pen, if there's no

13    objection and if the Court would permit it.

14         THE COURT: You may do so.

15         MR. RIVERO: Let me just show the pad to counsel, so

16    that there's no issue that it's a blank pad of paper.

17     (Pause in proceedings.)

18    BY MR. RIVERO:

19    Q. Dr. Wright, where were you born?

20    A. I was born in Chermside, a suburb of Brisbane, which is in

21    Queensland, Australia.

22    Q. What year?

23    A. 1970.

24    Q. And sir, can you tell the jury something about your coming

25    up in life. If you could, start with your family.

60

```
1    A.  My mother and father separated and divorced when I was five

2    years of age.  My mother and father had fights over me,

3    including my father taking me away.  The last time I was raised

4    by my father was when I was 10.

5        My mother had a number of other men in her life, including

6    other husbands.  Most of those were abusive.

7    Q.  Let me take that by parts, sir.  Was your father in your

8    life after age 10?

9              MR. FREEDMAN:  Objection.  Relevance.

10             THE COURT:  Sustained.

11             THE WITNESS:  I met him very --

12             THE COURT:  The objection is sustained, sir.

13   BY MR. RIVERO:

14   Q.  Sir, in -- what was the family unit that you did live with

15   in your growing-up years?

16   A.  My mother --

17             MR. FREEDMAN:  Objection.  Relevance.

18             THE COURT:  The objection is overruled.

19             THE WITNESS:  My mother, my sisters -- I had quite a

20   few sisters -- and the various stepfathers that I had on and

21   off.

22   BY MR. RIVERO:

23   Q.  Sir, did you -- besides the family that you have mentioned,

24   did you have a relationship with your grandparents?

25   A.  Very close, yes, on my mother's side.
```

```
 1    Q.  And did they live nearby when you were growing up?

 2    A.  At times.  At another time I used to ride there on my bike,

 3    which was further.

 4    Q.  I'm sorry.  I didn't hear.

 5         MR. FREEDMAN:  I'm having trouble hearing the witness.

 6    If we could move the microphone a bit closer, please.

 7         THE WITNESS:  At times, sometimes when my mother was a

 8    bit further I used to ride there on my bike.

 9    BY MR. RIVERO:

10    Q.  And sir, just give us an idea of how much time you spent

11    with your grandparents.

12    A.  My mother would drop me off in the morning before she went

13    to her first job, and I would go there after school before my

14    mother had her second job at night.

15         I used to go there on the weekends as well.  I spent most

16    weekends with my grandparents when I was growing up.

17    Q.  What did you call them?

18    A.  Nana, which was my grandmother, and Pop, which was my

19    grandfather.

20    Q.  What was your relationship like with your Nana?

21         MR. FREEDMAN:  Objection.  Relevance.

22         THE COURT:  Sustained.

23         MR. RIVERO:  Your Honor, I think the background is

24    relevant to --

25         THE COURT:  Yes.  Some background.  But the objection
```

1    is sustained.

2    BY MR. RIVERO:

3    Q.  All right, sir.  What was your relationship with your

4    grandfather?

5    A.  My grandfather and I were very close.  I spent a lot of

6    time with him.  I -- well, basically, the hamshack that

7    everyone talked about, and his electronics workshops, and his

8    computer room.  I spent I think 90 percent of my time with him

9    growing up in there.

10   Q.  Sir, explain what a hamshack is.

11   A.  It's like a radio station.  Like he had his own -- it's an

12   amateur radio station.  He would build radios and try and

13   communicate with people around the world.  So people in

14   Germany, America, other such places.  And he would also send

15   telegraph and other communications using electronic

16   methodologies.

17   Q.  And sir, did your grandfather teach you about technology as

18   a relatively young child?

19   A.  I don't know if you would say "teach."  He was like me.

20   I'm a terrible teacher that way.  But he would make me learn.

21   So he would basically sit me down and I would have to learn

22   things if I wanted to continue spending time with him.

23   Q.  Besides radio, did he have other background in technology?

24   A.  Yes.  He worked with some of the people and had

25   communications with the -- what do you call it -- University of

63

```
 1   Melbourne, and a number of other universities to do with the

 2   early Internet protocols.

 3       He had dumb terminal connections to a number of VMS

 4   machines in Australia in different companies.  He taught me how

 5   to use VMS and also was involved with DECK for Deckers.  He was

 6   involved with electronics.  He was an electronic engineer as

 7   well.  So he taught me about building systems.  We used to

 8   build a lot of different things, like electronic computers.  I

 9   built my own computer when I was a kid.  So we used to build

10   all the time.

11   Q.  What -- at what age did you build an electronic computer?

12   A.  Eleven.

13   Q.  And what year was that?

14   A.  That was in end of '81, beginning of '82.

15   Q.  Was that on your own or with your Pop?

16           MR. FREEDMAN:  Objection.  Relevance.

17           THE COURT:  Sustained.

18   BY MR. RIVERO:

19   Q.  Sir, did your grandfather have in his hamshack or in his

20   house -- did he have any Japanese memorabilia?

21   A.  Yes.  He had quite a lot.  My grandfather had been on the

22   Philippines during the US occupation.  He helped build radio

23   stations for the sort of anti-occupation forces in the

24   Philippines.  And he paved the way for MacArthur to come back.

25       So he had a lot of Japanese memorabilia.  He had uniforms.
```

64

```
 1    He had basically a crate of both Malaysian, Singaporean, and
 2    Australian occupation money.  He had swords, the ones that he
 3    got at the end of the war.  He had different records from the
 4    Japanese.  He had a lot of older samurai memorabilia that he
 5    had when MacArthur came back in that was left.  He had Japanese
 6    weapons.  He had Japanese tea sets.  I used to always like
 7    that.  I had one of those from him when he died.  And also, a
 8    lot of other bamboo-type items that were decorative.
 9    Q.  Sir, do you today, as a result, collect Japanese
10    memorabilia?
11              MR. FREEDMAN:  Objection.  Relevance.
12              THE COURT:  Sustained.
13    BY MR. RIVERO:
14    Q.  Sir, can you please describe your education, but only up to
15    Halloween 2008 -- and sir, let's take it by parts.  Can you
16    tell us where you studied through high school.
17    A.  I went to Everton Park, first of all, for year eight to
18    year 10, but I had a number of problems there.  I had --
19    people -- well, I ended up moving.  My mother moved me because
20    I topped the state in Australian math and physics tests, but I
21    had other problems and the school had difficulty with me.
22        They had diagnosed me as social maladjustment disorder at
23    the time.  And my mother moved me to Padua College in year 11.
24    In Padua College, when I started having problems -- they saw
25    how I was doing in math and couldn't understand, so the school
```

65

```
 1    psychologist had me tested and told me I had Asperger's.
 2           MR. FREEDMAN:  Your Honor, objection.  Narrative and
 3    relevance.
 4           THE COURT:  Sustained.
 5    BY MR. RIVERO:
 6    Q.  Sir, did you -- you say you were attending a college at age
 7    17.  Did I understand that correctly?
 8    A.  I also -- yes.  I ended up going to the Brisbane College of
 9    Advanced Education and got my first degree, which was a
10    bachelor of applied science in discrete mathematics in 1987.
11    Q.  And in 1987, you were 17 years old?
12    A.  Yes.
13    Q.  All right, sir.  So --
14    A.  I turned 17.  I was 16 for most of it.
15    Q.  Sir, can you tell us if you had friends up to this point in
16    your life.
17    A.  I used to study with Steven Wong, who was the Chinese
18    exchange student.  We had rivalry and competition over who did
19    best in math.
20    Q.  Anyone else?
21    A.  I got on very well with Father Edwin Nally.  Father Nally
22    was a priest who was also a psychologist.  And I used to visit
23    him every week up until my thirties because he passed away.
24    Q.  This was a catholic priest at a school you attended?
25           MR. FREEDMAN:  Objection.  Relevance.
```

66

```
 1            THE COURT:  Sustained.
 2    BY MR. RIVERO:
 3    Q.  Sir, once you completed your first -- your first
 4    undergraduate degree in 2007, did you continue to study at
 5    universities?  And I only want to go up until Halloween of
 6    2008.
 7    A.  Yes.
 8    Q.  Can you describe that -- if you can, describe it by parts.
 9    Take us one degree and I'll go to the next one.  I don't want
10    to cause a narrative answer, sir.
11    A.  In 199 -- sorry -- '88, I studied at the University of
12    Queensland.  I was doing a joint degree in electrical
13    engineering and bachelor of science in computer science.  So
14    two degrees.
15    Q.  Where did you study that?
16    A.  Queensland, in University of Queensland.
17    Q.  And did you obtain that degree -- those were two subjects.
18    Did you obtain one or two degrees in 1988?
19    A.  No.  My third year, I was diagnosed with cancer and I had
20    to drop out.
21    Q.  So you did not obtain those degrees?
22    A.  The science and the other, I went back through open
23    university by distance.  And while I was being treated, I did
24    that degree.  But I didn't finish the fourth year of
25    engineering.
```

67

```
1    Q.  Sir, once you recovered from your illness and returned to
2    your studies, did you start working at this point in time?
3    A.  I'd been working through university as well.  And I had
4    actually joined the Royal Australian Air Force during part of
5    it.  So I was working on my holidays.
6    Q.  So tell me, when did you join the Royal Australian Air
7    Force?
8              MR. FREEDMAN:  Objection.  Relevance.
9              THE COURT:  Sustained.
10   BY MR. RIVERO:
11   Q.  Why did you join the Royal Australian --
12             MR. FREEDMAN:  Objection.  Relevance.
13             THE COURT:  Sustained.
14   BY MR. RIVERO:
15   Q.  Sir, after recovering from illness, did you at any point
16   study theology?
17   A.  I did.
18             MR. FREEDMAN:  Objection.  Relevance.
19             THE COURT:  Sustained.
20             MR. RIVERO:  Your Honor, Dr. Wright's studies --
21             THE COURT:  The objection is sustained, Mr. Rivero.
22   You may ask your next question.
23             MR. RIVERO:  Your Honor -- sorry.
24   BY MR. RIVERO:
25   Q.  Dr. Wright, were you ordained as a minister in a
```

68

```
1    Protestant --
2              MR. FREEDMAN:  Objection.  Relevance.
3              THE COURT:  Sustained.
4    BY MR. RIVERO:
5    Q.  Sir, what was the next degree that you obtained?
6              MR. FREEDMAN:  Objection.  Relevance.
7              THE COURT:  Overruled.  I'll allow it.
8              THE WITNESS:  I did my bachelor of divinity and then
9    continued through to get a doctorate in theology.
10             Simultaneously, during that process, I also kept
11   studying a number of other areas in mathematics and computer
12   science.  Those continued with a master's degree in network
13   systems administration.
14   BY MR. RIVERO:
15   Q.  Where did you obtain your master's degree in network
16   administration?
17   A.  Charles Sturt University.
18   Q.  I'm sorry.  Charles Stewart University?
19   A.  Sturt.
20   Q.  And where is that located?
21   A.  That's in Wagga Wagga in Australia.
22   Q.  In what year?
23   A.  That was in 2003, I think.
24   Q.  All right, sir.  And during this time, up to 2003, did you
25   have jobs?
```

69

```
1    A.  Yes, I did.

2    Q.  What jobs did you have?

3          MR. FREEDMAN:  Objection.  Relevance.

4          THE COURT:  Sustained.

5    BY MR. RIVERO:

6    Q.  Sir, did you work in computer coding at any time during

7    this period of time?

8    A.  Yes.  Right back till 1985.  I was a game programmer when I

9    was young.  So I worked by contract for a game company called

10   Thermonuclear WarGames, which was later bought by Electronic

11   Arts.  It had a number of early like movie-based games.

12   "Kangaroo Jack" -- what do you call it?  A number of other

13   things like that.

14   Q.  Sir, what is the first time that you started coding

15   computers?  What age?

16   A.  Late in -- when I was eight years of age in 1989.

17   Q.  What language?

18   A.  I started back then in a combination of assembly language.

19   In Fortran, Forth, C, COBOL, and also a couple other, like

20   Pascal, but I didn't like Pascal.

21   Q.  Sir, just to make sure that I understand, you say you're

22   coding at age eight in a combination of languages.  Is that

23   what you have just described?

24   A.  Yes.  My first video game that I sold was in 1982.

25   Q.  So, when you say:  "C," can you explain to the jury what
```

70

1   you mean that you were coding in the C language at age eight.

2   A.   I started learning how to do it.  I started a computer

3   club.  We built our own computers.  We basically took some of

4   the BBC Micro designs and built them.  It was a ZED80-type

5   system.

6        I started following coding magazines, electronic

7   engineering magazines.  I started building little things like

8   door openers, things to turn kettles on and off, just equipment

9   for around the house.  I just thought of random things and

10  built them and coded it.

11  Q.   Sir, let me just -- sir, I'm going to ask you:  What is

12  C -- what is C language in coding?  Can you explain what that

13  means.

14  A.   So C is a sort of open platform language.  It's based on

15  some of the early Unix forms.  It derives from something that

16  was originally called B that was done by AT&T and others, I

17  believe.  And what it is, is it's a low-level language that is

18  very close to the machine without being machine language.

19       Machine language, ASM, et cetera, is direct code that gets

20  turned into the ones and zeros when it's assembled.  So C is

21  then a language that is linked and controlled using object --

22  sort of compilers, et cetera, that goes down into assembly

23  language and then gets assembled into machine language.

24  Q.   Are there then derivatives from the original C language?

25  A.   Yes.  Later on, I learned C++.  C++ is effectively C with a

1   whole lot of libraries built in.  I started on Borland C.

2   Borland C was one of the early ones back in the 1980s.

3       So as I said, the early days with CP/M, which was an early

4   operating system, I used to write a variety of different

5   programs to try and supplement my income and buy textbooks that

6   was buying.  That would include some of the game programs, but

7   also I did accounting software as well.

8   Q.  Sir, when did you start -- first start using coding

9   languages in a job?

10  A.  Technically, when I was doing my own stuff -- I don't know

11  if I would say it's a job, but I was writing and submitting

12  programs and they would be sold.  I had a number of early ones

13  for both the Commodore and Omega, but also a number of CP/M

14  programs that were sold.

15      I also --

16  Q.  Dr. Wright, I'm going to ask you to slow down because I am

17  having difficulty hearing you, understanding you, and the

18  accent isn't normal to me.  So if you would just slow down,

19  but -- yeah.  Thank you.

20  A.  So probably the first real job type that I did was in 1985.

21  I did some work with the Royal Australian Air Force because I

22  had family there and I helped redesign a parts database for the

23  F-111s.

24  Q.  Sir, who was the family member who was in the Royal

25  Australian Air Force?

72

```
 1              MR. FREEDMAN:  Objection.  Leading.

 2              THE COURT:  Overruled.  I'll allow it.

 3              THE WITNESS:  Uncle Don.

 4    BY MR. RIVERO:

 5    Q.  Okay.  And were you associated with a business or a job at

 6    this point in time in 1995 when you were doing computer-related

 7    work for the Australian Air Force?

 8              MR. FREEDMAN:  Objection.  Relevance.

 9              THE COURT:  Sustained.

10    BY MR. RIVERO:

11    Q.  What jobs did you have that related to coding, sir?

12    A.  I worked with Kmart.  Kmart in Australia where -- a store I

13    did the computer stuff and I helped out with businesses that

14    were buying computers at the time.  I was 15 at that stage.  I

15    also did contract coding and also the stuff that I did

16    occasionally for the Air Force.

17        Later on, I ended up submitting programs to contract for

18    Thermonuclear WarGames for a time.  I also then later started

19    doing early Pegasus work.  There was a BBS and early Internet

20    ISP in Australia that we helped --

21              MR. FREEDMAN:  Objection.  Narrative.

22              THE COURT:  Sustained.

23    BY MR. RIVERO:

24    Q.  Dr. Wright, tell me after 1995 what was the next job or

25    setting where you did coding.
```

73

1    A.    I worked in Aussie Maille in Australia at that point.

2    Q.    What did you do related to coding -- what did you do at

3    Aussie Maille?

4    A.    I was the corporate services manager and I had a team of

5    people.  We built all of the systems, including databases, for

6    large clients, including -- like New South Wales school

7    systems.  So we developed software in the early days of the web

8    before anyone else was online.

9    Q.    Sir, how long did you continue doing that function at

10   Aussie Maille?  From when to when?

11   A.    I started there about '94 and finished up in '96, when I

12   went to the Australian Stock Exchange.

13   Q.    At the Australian Stock Exchange, did you do any coding

14   work?

15   A.    Yes.  I was involved in building the Nipper Network.  The

16   Nipper Network was the broken network that had all the trading

17   networks between the global connections and the Australian

18   brokers.  We also connected the various state exchanges and we

19   built the system.  There was no exchange software at this time.

20   We took it from when -- the old broad-based trading and we

21   built some of the first exchange software.

22   Q.    Sir, you had mentioned a degree -- how long were you at the

23   exchange -- the stock exchange?  From when to when?

24   A.    In the -- 18 months later, I decided to start my own

25   company based on my software.  I kept contracting to the stock

1    exchange and I kept doing work with them.  So I was still

2    there, but for about 15 hours a week.

3    Q.  Sir, up until -- when is it that you leave the stock

4    exchange to start your own business?  What year?

5    A.  '97.

6    Q.  Okay.  What, then, is your business -- is your business

7    related to computer technology and coding?

8    A.  It is.

9    Q.  What is that business called starting 1997?

10   A.  DeMorgan.  And there were a variety different ones.

11   DeMorgan Information Security Systems, DeMorgan PTY Limited.

12   Q.  Okay.  What was the business of -- how long did you operate

13   DeMorgan?

14   A.  Technically, I had a fight with different staff members in

15   2004.  But eventually I took back the company.  And I still --

16   I mean, there's DeMorgan Singapore still.

17   Q.  All right.  So let's talk about the period then -- I

18   believe you're saying this is from approximately '98 to 2004.

19   What is the business of DeMorgan related to technology in that

20   time period?

21   A.  We built the platform and helped launch Lasseters online

22   casino, which was the first legally licensed casino operation.

23   We built the audit software that allowed the Northern Territory

24   Government to monitor every trade.  We built the statistical

25   software that allowed all of the monitoring of individuals to

1    ensure that problem gambling could be detected.

2        We built the software for some of the News Limited sites

3    getting online.  We helped control the security systems for the

4    Australian Stock Exchange.  I can --

5    Q.  Dr. Wright, please -- so just give me a chance to ask you a

6    question.

7    A.  Sorry.

8    Q.  So I'll return to Lasseters.  But during this period of

9    time, do you -- up to 2003 -- you had described a degree in

10    2003.  Do you obtain other degrees relating to technology,

11    finance, or the like?

12    A.  Yes.  Before that, I had a master's degree in -- what do

13    you call it -- network and database design, which was from The

14    Open University system.

15    Q.  What year?

16    A.  That would be about 2001, from memory.

17    Q.  What was the next degree you obtained?

18    A.  Can't remember which particular one.  I got -- from Charles

19    Sturt University, I got a master's in information security and

20    a master's in management.  I'm not sure which one was first.

21    About 2004 and '05.

22    Q.  Okay.  You anticipated my question, sir.

23        Now, you said there was some issue, if I understood you

24    correctly, with the employees of DeMorgan.  Did that company --

25    did you continue to work at that company or did you go to other

76

```
1    employment as of 2004?
2    A.  2004, I was working with my other company called Ridges
3    Estate.  Ridges Estate did basically tokenized research.  And i
4    also worked with the Australian Federal Police, New South Wales
5    Police, South Australian Police, and a number of American
6    agencies.
7        We developed software and tracking systems.  And some of
8    the Australian side of the Grokster takedown, the LimeWire
9    peer-to-peer takedown, and other things.  We helped develop
10   software for anti-Napster and helped in the Napster case.
11   Q.  By the way, sir, in this now long period of time from when
12   a teenager -- a boy and a teenager, now to when you move over
13   to Ridges Estate in about 2004 or 2005, do you have social
14   friends?
15            MR. FREEDMAN:  Objection.  Relevance.
16            THE COURT:  Sustained.
17   BY MR. RIVERO:
18   Q.  Do you get married in this time period, sir?
19   A.  I got married in 1996.
20            MR. RIVERO:  Your Honor, may I have one moment?
21            THE COURT:  Certainly.
22            MR. RIVERO:  Thank you.
23        (Pause in proceedings.)
24   BY MR. RIVERO:
25   Q.  Now, sir, with -- how long were you at Ridges Estates?
```

1    A.   I closed Ridges Estate in 2007/'08.   The roll-up then

2    followed up from there.

3    Q.   Why?

4    A.   I had moved over to working in BDO, BDO Kendalls in

5    Australia, which was an accounting and audit firm.   I ended up

6    becoming an audit director and I continued working in that

7    organization.

8    Q.   Is this into the -- in Australia, related to the American

9    accounting firm BOD Seidman?

10          MR. FREEDMAN:   Objection.   Relevance.

11          THE COURT:   Sustained.

12   BY MR. RIVERO:

13   Q.   Sir, why did you go to an accounting firm?

14          MR. FREEDMAN:   Objection.   Relevance.

15          THE COURT:   Sustained.

16          MR. RIVERO:   Your Honor, may I have a sidebar?

17          THE COURT:   As to why?

18          MR. RIVERO:   Yes, Your Honor.

19          THE COURT:   Come on forward.

20      (At sidebar on the record.)

21          MR. RIVERO:   Judge, this is a central issue in the

22   case.   And I'm not sure if I can be heard.   A central issue in

23   the case is the claim by the Plaintiffs that Dr. Wright's claim

24   to be the sole inventor of Bitcoin is of recent fabrication.

25   And I'm attempting to establish those credentials.   And I

78

```
1    haven't been able to establish a number of them that would
2    establish that he has the ability solely to do this.  And we
3    don't --
4            THE COURT:  I'm sorry.  The question was:  "Why did he
5    move to a particular" -- that's where we are now.  I just
6    sustained the objection.  So why would I allow that?
7            MR. RIVERO:  Judge, the answer is -- and I can ask it
8    in a different way -- the answer is that he went to the
9    accounting firm because of the experience at this Lasseters
10   outfit.  And it's actually directly part of the flow of
11   establishing how he gets the idea to develop Bitcoin.
12           THE COURT:  Okay.
13           MR. RIVERO:  Now, I can ask a different question --
14           THE COURT:  Is there anything on behalf of the
15   Plaintiffs?
16           MR. FREEDMAN:  Only thing I would say, Your Honor, is
17   it's not Plaintiffs' contention that Dr. Wright couldn't have
18   made Bitcoin on his own.  It's that he didn't make Bitcoin on
19   his own.  Nobody's disputing that he is a talented computer
20   expert.  I mean, this is just a --
21           THE COURT:  Okay.  We don't need sidebars when I
22   sustain an objection with regard to why somebody goes to a
23   certain place.
24           The objection is again sustained.
25       (End of discussion at sidebar.)
```

```
 1    BY MR. RIVERO:

 2    Q.  Sir, did your move to the accounting firm have to do with

 3    the work you were doing for Lasseters?

 4              MR. FREEDMAN:  Objection.  Leading.

 5              THE COURT:  Sustained.

 6    BY MR. RIVERO:

 7    Q.  What was the purpose of your move to BDO?

 8    A.  I had studied accounting, but I found I didn't have enough

 9    knowledge.  It's very different to study in a university and to

10    actually do.  So I went and worked for an accounting firm, so

11    that I could learn what it's really like to have accounting.  I

12    mean, I've run businesses --

13              MR. FREEDMAN:  Objection.  Narrative and relevance.

14              THE COURT:  Sustained.

15    BY MR. RIVERO:

16    Q.  Did you continue to work for Lasseters?

17    A.  I did work on and off as a consultant right up until the

18    American anti-gaming act happened in 2005.  That stopped

19    Lasseters --

20              MR. FREEDMAN:  Objection.  Narrative and relevance.

21              THE COURT:  Overruled.  I'll allow it.

22              THE WITNESS:  That stopped has Lasseters from being

23    able to have the SWIFT connections in banking that they needed.

24    Most of the gambling clients were either in Hong Kong or

25    Malaysia.  But the block in money transfer from those Asian
```

1    countries by the American government trying to stop gambling

2    into America also, effectively, killed off Lasseters.

3    BY MR. RIVERO:

4    Q.  Sir, did you start to develop a gaming token for Lasseters?

5    A.  I did, yes.

6    Q.  What is a gaming token?

7    A.  So a token is effectively like an electronic poker chip.  I

8    wanted to be able to tokenize both different types of money,

9    like a ringgit, Singaporean dollar, Hong Kong dollar, and even

10   yen and yuan, and then also Australian dollar.  And then we

11   could have different effectively poker chips that we -- could

12   be traded.  And not only that, would allow us in different

13   areas, like the 7-Elevens in those countries, to spend and take

14   their money out without all of the problems that we were having

15   from the international banking system and SWIFT.

16   Q.  So had there been -- this is for an online casino that

17   we're referring to, right?

18   A.  Yes.

19            MR. FREEDMAN:  Objection.  Leading.

20            THE WITNESS:  I'd also worked with other casinos --

21            THE COURT:  Overruled.  I'll allow it.

22   BY MR. RIVERO:

23   Q.  I'm sorry.  Dr. Wright, I didn't hear your answer.

24   A.  I'd also done some work with other casinos.  I'd done work

25   with MGM Grand in America.  And I was also dealing in the past

1   with Playboy Gaming.

2   Q.  So my question is about the Lasseters operation.  That was

3   an online casino; is that right?

4   A.  Yes.  That's correct.

5   Q.  So let's say that one was a gambler and went into this

6   online casino.  Would you buy a token?

7          MR. FREEDMAN:  Objection.  Relevance.

8          THE COURT:  Overruled.  I'll allow it.

9          THE WITNESS:  What I was hoping was it wasn't just at

10  the casino, but you could use it and even transfer within

11  country.  That would allow more than that because then people

12  in somewhere like Hong Kong as a maid would be able to take

13  that money back and transfer it in their own country.

14  BY MR. RIVERO:

15  Q.  When did you first start thinking about this idea about

16  using tokens in the fashion -- for the online gaming operation

17  in the fashion that you're describing?

18  A.  I started the first thing after talking with Tim May in

19  1998.  Tim May had been talking about a concept called Blacknet

20  and crypto credits.  The other founders of early token money

21  that I had worked with included some of the eCash people.  And

22  what I wanted to do was find a system that didn't have the

23  failings of the previous ones.

24  Q.  So what were you doing now in this time period as you moved

25  to BDO to advance the idea that you have, if anything?

1  A.  I agreed to contract with BDO that allowed me to keep my

2  intellectual property that I built outside of work hours.  At

3  BDO, I developed audit software, computer-aided audit

4  techniques.  I developed statistical software to detect fraud,

5  and that was used in a number of listed companies.  That

6  allowed for the detection of fraud in Wattyl, which was a large

7  paint company, saving the company probably three percent of

8  their annual turnover.

9      So on top of that, I had a number of meetings with people

10 in BDO about the different systems I was developing.

11 Q.  Okay.  My question was:  What, if anything, were you doing

12 for Lasseters now in this time period that you transitioned to

13 the BDO firm?  What kind of work are you doing on this token

14 system?

15 A.  Oh, sorry.  When Lasseters had the problem in 2005 because

16 of the US gaming act, I started trying to extend my token

17 system from '5 to '7.  I worked between those couple years

18 trying to get a system that would enable them to keep gaming.

19 In 2007, however, they started closing down the operations, so

20 I stopped doing any work at that point.

21 Q.  And sir, let me -- I think I mentioned it briefly, but you

22 had married in here.  Can you tell us what year you got

23 married.

24 A.  1996.

25 Q.  And who was -- what was the name of your first wife?

1    A.   Lynn Wright.  Carol Lynn Wright.

2    Q.   How long were you married to Ms. Wright?

3    A.   Our problems started happening in 2009 when I left BDO.

4    And my marriage fell apart in 2010.  We then got separated in

5    2010 and subsequently divorced.

6    Q.   When in 2010?

7    A.   We separated first in the -- living in the same house in

8    August 2010.  And formally moved out a few months later.

9    Q.   All right.  We'll come back to Lynn.

10        But let me just ask now in this time frame when you've --

11   when you have now learned that the online gaming system won't

12   work, and you're thinking about tokens, do you come up with a

13   new idea?

14   A.   Yes.  The work that I have been doing in the meantime,

15   where I had actually worked against botnets, LimeWire, and

16   Grokster, taught me a lot about peer-to-peer networks.  I

17   didn't work building them.  I worked tracking them and taking

18   them down from the government.  And I learned working with the

19   federal police and teaching them just how resilient these

20   things could be.

21        So what I then integrated, rather than a single system like

22   eCash had, was a distributed system so that multiple nodes

23   would be validating.  I thought that would be much more

24   sustainable, and then if any one company goes broke, the others

25   would just take over the thing.

64

```
 1      So I started a game-theoretic system so that if one
 2  particular node goes down it makes it more profitable for
 3  others.  Which, more profit attracts people and it self-heals.
 4  Q.  When is it that you're forming up this idea?
 5  A.  I started formulating that in about 2006, but it didn't
 6  really coalesce until 2007.
 7  Q.  And is there a point where you start to actively work on
 8  whatever this sort of nascent idea or sort of new idea is?
 9  A.  Yes.  I actually approached the -- my managing partner and
10  partner in BDO.  I had a number of meetings.  I set a formal
11  task.  I agreed to work extra time on my own to do it and put
12  my own money into the system to start building.  I had a number
13  of meetings with BDO, including Neville Sinclair, the corporate
14  services division, the audit division.  And it went to a
15  partnership discussion at one stage, and I actually ran a
16  formal project that I tried to present to BDO a number of
17  occasions.
18  Q.  Sir, who was the boss that you say you spoke to at BDO?
19  A.  Allan Granger.  Sorry.
20  Q.  And sir, was there a point where you actually wrote a memo
21  to Allan Granger?
22  A.  Yes.  There was.
23       MR. RIVERO:  Mr. Reed, if you could show counsel and
24  the Court only Defendant's 164 -- and of course the witness.
25
```

85

```
1   BY MR. RIVERO:

2   Q.  Sir, can you tell us what -- just as to the nature of the

3   documents, are these -- is this a form from the BDO -- used at

4   the BDO Seidman company?

5   A.  Yes, it is.  It's a minute -- meeting minutes note from BDO

6   when I was employed there.

7   Q.  Whose handwriting is on this document?

8   A.  It's mine.

9   Q.  And the date, sir?

10  A.  August '07.

11          MR. RIVERO:  Your Honor, I'd move the admission of

12  Defendant's 164.

13          THE COURT:  Is there any objection?

14          MR. FREEDMAN:  No objection, Your Honor.

15          THE COURT:  Admitted into evidence.

16      (Defendant's Exhibit 164 received into evidence.)

17          MR. RIVERO:  If we could show the jury Defendant's

18  Exhibit 164.

19  BY MR. RIVERO:

20  Q.  Now, sir, please explain -- first of all, let's just look

21  at the form itself.  This has, at the very bottom --

22          MR. RIVERO:  Mr. Reed, if you could pull out just the

23  Quill logo, so that we could see it.

24  BY MR. RIVERO:

25  Q.  What is that?
```

86

```
 1   A.  That's the logo from a company called Quill.  They're a --

 2   they're large in UK and Australia.  That logo is not the

 3   current one.  They changed it in '08.

 4   Q.  So sir, is this a document that was used internally at BDO

 5   or was it a form document?

 6   A.  It's the internal meeting notes.

 7   Q.  Okay.  But my question is not that.  My question is -- I

 8   understand that's internal meeting notes.  But was the form

 9   itself -- not the writing -- was it something that the business

10   was providing or something you brought from outside?

11   A.  It's stationery from the company.

12   Q.  Okay.  And so this stationery from the company would have:

13   "Minutes."  And then states:  "Meeting venue, attendees" --

14   apologies -- it just has a sort of fill-in-the-blank kind of

15   thing; is that right?

16   A.  Yes.

17   Q.  All right, sir.  And this -- where did this occur?  Where

18   did this meeting occur?

19   A.  This occurred in Allan Granger's office.  He had a meeting

20   room like with a side thing as a partner.  I had a meeting

21   between him and myself.  I'm not sure if this particular

22   meeting I had some of my staff actually there or not.  It

23   doesn't seem to be.  They are not noted.

24   Q.  And did you make notes of this meeting?

25   A.  I put down a project timeline that was agreed.  Allan let
```

67

```
1   me go off and do my project partly in work time, partly on my

2   own.  And gave me deadlines, and I agreed to those deadlines.

3   Q.  What were you proposing to Allan Granger -- by the way, let

4   me make sure I understand.  Are these notes the agenda that you

5   want to talk with Allan Granger about or are they the result of

6   your discussion with Allan Granger?

7   A.  They're the result.  This is what we agreed to.

8   Q.  What were you describing here to Allan Granger?

9   A.  So basically, on line 1, I had a deadline to finish the

10  code by August '08.  I'd already started coding and already had

11  some of the code from Lasseters.

12  Q.  Yeah.  Dr. Wright, are you proposing something to do with

13  what becomes later Bitcoin?

14  A.  I am.

15  Q.  All right.  When you say in line 1:  "Finish code," and you

16  put a date, what do you mean by that note?

17  A.  I mean I agreed to finish the main code of Bitcoin by

18  August 2008.

19      MR. RIVERO:  Okay.  If we could again -- see the

20  document again.

21      Thank you, Mr. Reed.

22  BY MR. RIVERO:

23  Q.  What is the second entry:  "Finish POC"?  What does that

24  mean?

25  A.  Effectively, what I'm doing is the proof client, so the
```

1   working system.  So that that will enable -- that's not POC.

2   That's "doc."  Sorry.  That's:  "Finish doc."  It's my

3   handwriting.  When you said:  "POC," I was thinking of the

4   other -- no.  This is:  "Finish doc," which would be the

5   whitepaper, by October 2008.

6   Q.  Got it, Dr. Wright.  Okay.  So that's not P-O-C.  It's

7   D-O-C?

8   A.  Yeah.  Sorry.

9   Q.  What about entry 3?

10  A.  Entry 3 is:  "Run up of the test system," which were nodes

11  in the computer room for the company in Sydney.  At that point,

12  there had been test systems using equipment in BDO.

13  Q.  Let me ask you a question.  The entries up to now had a "C"

14  in this third column.  This one has "AG."  What does that refer

15  to?

16  A.  Allan Granger.  Allan was one of the partners.  He was the

17  partner in charge of the computer operations at BDO

18  Australia-wide.  And without his sign-off no access to the

19  network would be possible.

20  Q.  And -- got it.  Let's look at entry 4.

21       MR. RIVERO:  Mr. Reed, we may have to show just below

22  it.  I think this goes outside of the box.

23       Yeah.

24  BY MR. RIVERO:

25  Q.  What is this in reference to?

1    A.  "Set timechain in action."  The original name I gave to

2    Bitcoin was timechain.

3    Q.  All right.  Let's look at entry 5.  What does this mean:

4    "Have P2P"?

5    A.  It goes over to the next line too.  It should be:  "Have

6    P2P eCash."

7    Q.  What does that mean?

8    A.  The concept here -- as I said, eCash was a very centralized

9    controlled system that allowed it now to be fragile.  So using

10   peer-to-peer -- I know that looks like "D," but they're

11   actually my "Ps" -- eCash would be a distributed system where,

12   after an initial issue, the distribution of all the tokens

13   would be done by a contract.  So this is what that's referring

14   to.

15   Q.  Okay.  And then let's look at the next entry.

16       What does this mean?

17   A.  "As paper."  So that would follow -- so it's documenting.

18   Q.  Okay.  And then, sir, there's a reference on line 7 with

19   your initial to:  "Write paper."  What is that a reference to?

20   A.  That says that the final paper would be then documented

21   after the code in the July, August time frame.

22   Q.  Okay.  And then if we can just look at the next line.

23       What does this mean?

24   A.  That should continue with the next one as well.  But the

25   graph model I wanted to propose to the University of Newcastle,

90

1   where I was doing a master's degree in statistics -- I wanted

2   to do the modeling of the network for Bitcoin as a thesis.

3   Unfortunately, it got rejected.  But the idea here -- my team

4   was there and I worked with Ignatius Payne, who was one of my

5   staff members, who was a network -- sort of like -- not

6   networks as in networks, but network mathematics.  And he

7   helped me with coding some of the mathematics behind this.

8   Q.  And sir, let me ask --

9        MR. RIVERO:  Mr. Reed, if we can just see the whole

10  document.

11  BY MR. RIVERO:

12  Q.  Let me just go back to that first line.  Had you or had you

13  not started coding at the time of this meeting?

14  A.  I already had, yes.

15  Q.  When did you start coding the Bitcoin blockchain?

16  A.  In the beginning of '07, although I had already had some of

17  the code from earlier with Lasseters software.

18  Q.  And what language did you code in?

19  A.  It's C++, but the script language that's built in is

20  actually based on Forth.

21  Q.  And sir, I'll come back to put us in August of 2007.  But

22  when approximately did you finish the coding, whatever that

23  means in this context?

24  A.  I finished the coding a bit earlier than this.  It says

25  August, but it would have been by about March or April.  What I

1  hadn't chosen was the graph model parameters.  So I didn't know

2  how many tokens that -- the final 21 million that I decided, I

3  didn't know that I would have 10 minutes as a block time.  I

4  didn't know how the difficulty would change.  So basically, I'd

5  done a random program allowing me to plug values in, so I could

6  then play with the software and see how it would work.

7  Q.  And that was -- that without the variables that -- those

8  other factors that you just talked about, that was

9  approximately done by March or April of 2008.  Is that what

10  you're saying?

11  A.  Yes.

12  Q.  Sir, what -- BDO did not accept ultimately this proposal

13  for their participation; isn't that right?

14  A.  No.  And I got enough people with their backs up that when

15  the financial crisis happened they were very happy to give me a

16  redundancy package.  And some of the -- Allan was very unhappy,

17  but some of the other staff were very happy to see me go.

18  Q.  When was that, when you were out at BDO?

19  A.  I took the redundancy in December of 2008.

20  Q.  And just -- the financial crisis you're talking about, is

21  that the financial crisis that some may recall from the early

22  Fall of 2008?  Is that what you're referring to?

23  A.  Yes.

24  Q.  Now, sir, had you -- prior to this time, had you formed any

25  relationship -- did you have any friends in the time up to this

 1  August of 2007?

 2          MR. FREEDMAN:  Objection.  Relevance.

 3          THE COURT:  Sustained.

 4  BY MR. RIVERO:

 5  Q.  Had you formed a relationship with David Kleiman?

 6  A.  I used to talk to him on the phone occasionally and we

 7  emailed online.

 8  Q.  And did you invite David Kleiman at any time in 2007 to

 9  assist with the coding of Bitcoin?

10  A.  No.  He couldn't code.

11  Q.  How many lines of code did you write for the Bitcoin

12  blockchain?

13  A.  All up -- that's a difficult question because there are

14  probably about 32,000, but I pruned a lot.  I had had the poker

15  software still in the original version.  So there's stubs from

16  that.  And I also had a digital marketplace where I was trying

17  to experiment on that.  So both of those were removed from when

18  I put it live.

19  Q.  So my question is:  How many lines of code were in the

20  released blockchain?

21  A.  Between 15 and 16,000.

22  Q.  Did anyone help you prior to March, April 2008 in writing

23  code?

24  A.  Not before that date, no.

25  Q.  Was David Kleiman ever involved in anything to do with the

1    coding, or debugging, or anything like that of Bitcoin up to

2    the time of its release in approximately January 3, 2009?

3    A.  No.  Sorry.  2009?

4    Q.  Did I say 2009?  Yes.  2009.  Yes, sir.

5    A.  I'd asked him to look at the paper.  I don't remember

6    exactly when.  That was after I asked Don, my uncle, to look at

7    it.

8    Q.  Right.  Sir, I'd ask you to listen to my question.  I asked

9    about coding.

10   A.  Coding, no.  Sorry.

11   Q.  Now, sir, after you finished the coding of the whitepaper

12   in approximately March, April of 2008, was there a point at

13   which you started working on a paper related to what you were

14   working on?

15   A.  There were -- fragments of the paper go back to my 2002

16   AusIndustry filings for research and development.  The first

17   filings I had for a project I called -- which was BlackNet,

18   which -- because Tim May called it that -- go back to that

19   date.  So the origins of tokens and crypto credits, and some of

20   the bits that I self-plagiarized go back that far.  The later

21   paper developed and got larger and larger and then got smaller.

22       So yes and no.  There are bits of it.

23   Q.  Okay.  So my question is:  Did you start preparing a paper

24   as to the work you had done after March or April of 2008?

25   A.  So I took that other, basically, group of documentation and

94

```
1    then produced a large handwritten paper, first of all.  And
2    then continued and then after advice from Don --
3    Q.  Sir, please just --
4    A.  Yes.
5    Q.  -- answer my question and then I think this will go more
6    smoothly.
7         Sir, let me just go back on one subject.  Other than David
8    Kleiman, did anybody help you to code the Bitcoin blockchain
9    before its release on approximately January 3, 2009?
10   A.  Yes.
11   Q.  Who?
12   A.  There are a number of people from the various mailing
13   lists.  The main person was Hal Finney.
14   Q.  And sir, I'm referring to the time period before release.
15   A.  Yes.  I'd sent not the whole code, but fragments of code to
16   Hal.  And Wei Dai, way before this, like in the middle of the
17   year, had sent me code for like some of the cryptographic
18   algorithm, SHA and ECDSA.
19   Q.  Who was Hal Finney?
20   A.  Hal Finney was one of the people who worked on the PGP team
21   and he was an older programmer from America.
22   Q.  Who is Wei Dai?
23   A.  Wei Dai is a professor over here.  I'm not sure what
24   university he's with now.
25   Q.  Now, sir, what was the first -- the paper that we've been
```

95

```
1   talking about, was it called a whitepaper?
2   A.  Yes.  Whitepaper is pretty --
3   Q.  Why?
4   A.  Basically, whitepaper is a prepublication technical
5   description document.
6   Q.  And when did you have a first draft of the whitepaper?
7   Approximately, what month and what year?
8   A.  If you're considering the handwritten one, it would be
9   about March of '08.
10  Q.  Did you reduce that to a typed version?
11  A.  Yes, I did.
12  Q.  And approximately when did you do that?
13  A.  That would be April, May '08.
14  Q.  How long was that typed version?
15  A.  The first version was about 40 pages.  The second version
16  was 20.  And then --
17  Q.  Sir, I'm asking about the first version.
18  A.  The first version was about 40 pages.
19  Q.  Who, if anyone, did you share that version with?
20  A.  I shared that, first of all, with Don, my uncle, and Max, a
21  cousin.  I also shared a copy -- I showed it to a person called
22  Zoren Illievich and a couple other people from universities I
23  was with.
24  Q.  Who is Zoren Illievich?
25  A.  He's a person who does a lot of government contract work in
```

96

```
1    Canberra, Australia.
2    Q.  And when you say:  "Don and Max," are you referring to Don
3    and Max Lynam?
4    A.  Yes.
5    Q.  And did any of these people, Don, Max, Zoren, or whoever
6    else it is you shared the first version with, make any comment
7    as to that first version?
8    A.  Verbal ones.  The main thing I got was it was too long, too
9    convoluted, and too complex.
10   Q.  Who said that to you?
11   A.  Don, Max, Zoren.  I think everyone.
12   Q.  What did you do in response -- by the way, did you share
13   that version with David Kleiman?
14   A.  Not that version, no.
15   Q.  What did you do in response to the comments you got on the
16   first version of the paper?
17   A.  I pruned it very heavily and cut down the number of pages.
18   Q.  Was there a second version?
19   A.  Yes.
20   Q.  And how long was that one?
21   A.  Probably 20 pages, if I have to remember on that one.
22   Q.  Approximately, when was that prepared?  When was that
23   ready?
24   A.  April, May of the same year.
25   Q.  And who, if anyone, did you share the second version with?
```

97

1    A.  I would have given that to Gareth Williams.  I also gave it

2    to some people at the university I was with in Newcastle,

3    Australia.  My wife at the time.  And I showed people at BDO at

4    that stage as well.

5    Q.  Did you share that version with David Kleiman?

6    A.  Not that version, no.

7    Q.  Okay.  And what, if any, comments did you get as to the

8    second version?

9    A.  Still too complex, too much math.

10   Q.  And what did you do in re -- when did you -- approximately

11   when did you receive those comments?

12   A.  Around the same time.  I sent it back to people and they

13   looked at it, they flicked through it.  They said:  "It still

14   needs more out."

15   Q.  And was Don Lynam in the second round?

16   A.  Yes.

17   Q.  And what did you do in response to those comments?

18   A.  I cut it right back to about 10 pages at that stage.

19   Q.  When was that?

20   A.  That would be about May, still of '08.

21   Q.  And what did you do with this third version?

22   A.  That was then tidied up quite -- at that stage, there were

23   a lot of different versions floating around because I'm not

24   terribly neat and tidy when it comes to how I store my files.

25   And I have different versions of the same, so it wasn't just

98

1   one and I tried with a few differences.  I didn't delete them

2   when I made the change, so I'd just make a change and save.

3   And I had a number of versions that were between nine and 10

4   pages.

5   Q.  Who did you share that with?

6   A.  One of those went to Wei Dai.  One of them went to Gareth

7   Williams, Zoren, some of the people at uni, Allan Granger, Don.

8   Dave Kleiman got a copy.  Let's see.  Wei Dai got a copy.  Adam

9   Back got a copy, and there are a few others as well.

10  Q.  From that point, were there further comments?

11  A.  Not a lot, no.  There were a couple I discussed with Wei

12  Dai.  He was more interested in how the code would work.  Wei

13  pointed me to a project he had been running called b-money.

14  Wei discussed how b-money was very similar to what I was

15  talking about, but he thought that my project wouldn't scale.

16  So he thought it would fail.

17  Q.  Did David Kleiman have comments -- Kleiman have comments on

18  your paper at this point?

19  A.  We talked about it over Skype, and he thought it was

20  exciting.  And he basically told me:  "This is great.  You've

21  been working on this sort of stuff for ages," and asked about

22  when it's going to be released, that sort of stuff.

23  Q.  Did he make comments?

24  A.  Not of any real detail, no.

25  Q.  And did he make any proposed -- did he transmit any

99

```
1    proposed edits?

2    A.  He pointed out some sort of typos and formatting problems

3    that I had when we talked over the phone.  There were some line

4    breaks because of the software program I was using at the time

5    that were wrong and a couple other problems like that.  Other

6    than that, no.

7    Q.  Sir, over that Summer of 2008, did you work on a different

8    paper, called the Data Wipe Fallacy paper, with David Kleiman?

9    A.  Yes.

10   Q.  And who else worked on that with you?

11   A.  Shyaam.

12   Q.  Who is Shyaam?

13   A.  Shyaam is a friend of mine that was a student once.

14   Q.  And was that -- was that project -- was that completed,

15   that whitepaper?

16   A.  It was.

17   Q.  Was it submitted?

18   A.  It was.  It was published and I presented it at conference

19   in India.

20   Q.  What was David Kleiman's role in the preparation of the

21   Data Wipe Fallacy paper?

22   A.  He did some editing.  He was meant to do a bit more, but he

23   was ill at the time.

24   Q.  Now, sir, let me just ask:  When is the whitepaper -- the

25   Bitcoin Whitepaper released?  Is that Halloween 2008?
```

1   A.  I had a FTP site on upload.ie in Australia.  That was -- it

2   hosted it going back till May.  So it was technically there,

3   and I pointed people out to the link, like Wei Dai and things,

4   in May.  But I formally released it and publicly told everyone,

5   not just individuals, on the 31st of October.

6   Q.  Sir, after the release of the code, the actual blockchain,

7   in January of 2009, was there a debugging process for the code?

8   A.  Yes.  I made a whole lot of terrible assumptions.  I was

9   using Visual Studio with Boost.  And I found a lot of people

10  didn't have the dynamic link libraries that Bitcoin needed.  So

11  when it was running on my machines, it ran fine.  But Hal

12  Finney, who is a coder, uses GCC, a different form of C

13  compiler.  He didn't have any of the library files, the native

14  ones that come with Microsoft in Visual Studio and Boost.  So

15  it fell over straight away on his machine.  And right after he

16  started running it he had problems.

17  Q.  My question was:  Did anybody help you with debugging the

18  code after January 3, 2009?

19  A.  Yeah.  That's what I'm trying to say.  That's a debugging

20  process.  So where we went back and forth with those errors --

21  and he sent me some of the problems.  He emailed me in -- I

22  think it was January 12th.  And then we kept going back and

23  forwards with that.  I'd already talked about some other

24  prerelease versions of it with him in November and December of

25  '08.

101

```
1    Q.  With whom?

2    A.  Hal Finney and Bear.

3    Q.  Who is Bear?

4    A.  Bear is an online identity.  I'm not sure of his real name.

5    I've got suspicions, but I don't really know.  I would just be

6    speculating.

7    Q.  Did Wei Dai help in debugging at all?

8    A.  No.  Wei Dai just gave me a block of code.

9    Q.  Now, sir, was -- did Dave Kleiman help in debugging?

10   A.  No.

11   Q.  Now, at some point, did an individual named Gavin Andresen

12   become involved with the blockchain?

13   A.  Yes.  Like a year into the project Gavin got heavily

14   involved.

15   Q.  Did he do work related to debugging the system?

16   A.  Yes.  Gavin was actually amazing.  Gavin's pulled together

17   a lot of project management sections and organized the eSvn,

18   the how you download and manage the code.  I had it on

19   SourceForge at that stage, and it was very much controlled by

20   me.  But Gavin started being very interactive.  He made a lot

21   of comments on it.

22       Hal was starting to have problems.  So Hal, at that

23   stage -- Hal Finney -- wasn't as engaged.  There were a lot of

24   other people making other comments and doing things as well,

25   people that started building Linux versions and Mac versions.
```

102

```
 1   And Gavin really took over that process and started pulling all

 2   these people together because I'm not good at managing people

 3   that way, and Gavin was just amazing.

 4   Q.  Sir, of the numerous people you've now mentioned who either

 5   saw the paper or looked at the code -- I'll try to list some of

 6   them -- Gavin Andresen, Hal Finney, Wei Dai, David Kleiman, and

 7   others -- did these people help in regard to the Bitcoin

 8   project?

 9   A.  Oh, immensely.  Bitcoin wouldn't be here today without

10   these people.  I mean, they're a godsend.

11   Q.  What was David Kleiman's role?

12   A.  He was my emotional support at the time.  I dropped out of

13   a director position where I was on partnership of a major

14   accounting firm, which I didn't discuss with my wife, as I

15   said.  And I talked through all of this.  I mean, this -- I

16   guess Dave's point of view was this was my dream.  And he

17   convinced me to follow it.

18   Q.  What was your relationship with -- like with Dave Kleiman?

19   A.  My wife called it a bromance.

20   Q.  Did you both appear on certain kinds of blogs, like

21   computer security blogs and this kind of thing?

22   A.  Yeah.  We used to email back and forwards.  And Dave always

23   loved my ability technically.  And I loved the fact that Dave

24   just made friends.  Dave was just amazing, in my opinion, that

25   way.  I go in and I find it hard to make friends.  And Dave
```

103

```
1    walks in a room and everyone loves him.
2    Q.  Sir, was David Kleiman a coinventor of the blockchain with
3    you?
4    A.  No.
5    Q.  Was Wei Dai?
6    A.  No.
7    Q.  Was Hal Finney?
8    A.  In a way, you would have to say yes.  I mean, he didn't
9    invent the technology, but it would not be here without him.
10   So he's not really a coinventor, but he's a codeveloper, if
11   that's a better way of putting it.
12   Q.  What about Zoren Illievich?
13   A.  No.
14   Q.  What about Bear?
15   A.  Same with Hal.  Bear wasn't as engaged, but he made a lot
16   of good comments to me.
17   Q.  Don Lynam?
18   A.  No.
19   Q.  Max Lynam?
20   A.  No.
21   Q.  Was David Kleiman a business partner in inventing or mining
22   Bitcoin?
23   A.  No.
24   Q.  Sir, let me -- before I go to another topic, I want to ask
25   you some smaller questions.  What -- your mother's residence
```

1    you said -- you were born in Brisbane.  Where does she live

2    now?

3    A.  Now she lives between Ipswich and Toowoomba.  So it's out

4    west in Queensland.  It's like hour and bit drive from

5    Brisbane.

6    Q.  And when is the last time she lived in Brisbane?

7    A.  She lived on the outskirts in a small town called

8    Springwood, in a suburb called Karabi, which is about 40 to 50

9    kilometers out of -- down from Brisbane.  That was in like '13

10   to '16.

11   Q.  Now, where -- do you know on personal knowledge where Jamie

12   Wilson lives?

13   A.  Yes.  He had a couple places.  One was just outside

14   Wooloowin.  The other was down south a little bit.  He also has

15   a business operation -- like two of them.  He had his

16   accounting one down south a little bit.  And he had his main

17   sort of operation about five kilometers from the -- sharing the

18   same exchange as Wooloowin.

19          MR. RIVERO:  Your Honor, I need a moment to identify

20   an exhibit number.

21          THE COURT:  All right.

22      (Pause in proceedings.)

23          THE COURT:  How is everyone doing, Ladies and

24   Gentlemen?  Is anybody in need of a short comfort break?

25          All right, then.

105

```
1        (Pause in proceedings.)

2    BY MR. RIVERO:

3    Q.  Dr. Wright, while I'm trying to determine that exhibit

4    number, let me ask on another subject.

5        When the Bitcoin system went operative in approximately

6    January 3, 2009, did you have -- were you running -- were you

7    running the system on computers?

8    A.  Yes.

9    Q.  And how many computers were you operating at the outset of

10   the Bitcoin blockchain?

11   A.  At my farm in Bagnoo and at my house in Lisarow, I had four

12   racks of computers, servers.  So I had two desktop machines and

13   three laptops that I used for management.  I also had 69

14   computers in the four racks.  They were on Windows machines on

15   Xen.  So there were also controllers.  There were multiple

16   domain controllers.  And I had some machines in Malaysia and

17   Tokyo.

18       I also had permission from my churches and in Ourimbah,

19   Tumbi Umbi, and Lisarow, the churches that I was associated

20   with and that I acted sort of as a pastor at.  We ran computers

21   and had Internet connections in each of those.  On top of that,

22   there were a number of other ones for people I paid.

23   Q.  Sir, so -- thank you.

24       What's the first address you were talking about?  Was that

25   your home address?
```

106

```
1    A.  The Lisarow or the Bagnoo?

2    Q.  Sir, let me just start over.

3        Were you running computers at your home?

4    A.  Yes.  But both those were my home.

5    Q.  Where was your home?

6    A.  I had one residence in Lisarow in the central coast in --

7    just outside Sydney and one residence in Bagnoo, which was a

8    farm.

9    Q.  Okay.  How many computers did you have running the Bitcoin

10   blockchain at your home in Lisarow outside of Sydney?

11   A.  That would have been half -- about 30.

12   Q.  All right.  And these computers, were they sitting on the

13   ground?  How did you have them set up?

14   A.  No.  They were in racks.  So 19-inch racks and those racks

15   were full.  So there were two computer racks and one comms

16   rack.

17   Q.  Where?  Where in your home?

18   A.  I had redone the garage.  So the garage didn't have the

19   cars in it.  So it was a double garage that I had insulated and

20   air-conditioning installed.  In there, I also had an office and

21   a workspace, but also the racks and communication and also

22   power.

23   Q.  Did these computers have to be networked or hooked

24   together?

25   A.  Yes.  They were all networked and hooked together.  And we
```

1   had fiber connections put in there and fiber just outside to a

2   copper junction at the other place.

3       So there were also a number of InfiniBand, which is very

4   high-end network fiber equipment.

5   Q.   How many computers did you have at Bagnoo?

6   A.   There would be the 39 primary ones, plus the domain

7   controllers, plus the DNS, plus the other systems.

8   Q.   Were those set up in a similar fashion?

9   A.   Yes.  I actually had a mezzanine put in the farm shed and

10  that mezzanine then was isolated to run a small computer room.

11  Q.   And sir, you mentioned air-conditioning.  Why was

12  air-conditioning necessary in a garage in Lisarow?

13  A.   The computers would fail otherwise.  The -- we needed

14  actually to have two air-conditioning units put in just to make

15  sure one wouldn't stop.  The room would get up to probably 70

16  to 80 degrees centigrade -- I don't know what that is in

17  Fahrenheit over here -- if I didn't air-condition them, because

18  the numbers of servers running just creating heat all day long.

19  Q.   Now, you mentioned that -- you personally -- were those --

20  the 69 computers -- did you personally have any other computers

21  running?

22  A.   They are the main ones.  But as I said, there's the network

23  equipment to support them.  We had a Cisco PIX firewall in one

24  layer, then a Check Point firewall was the next layer, the

25  switch equipment, the Cisco routers, the management systems,

108

```
1   the systems to run the Xen virtual servers.  I mean, depends on

2   what you can -- if it's a support system, then yes.

3   Q.  What did it cost to set up 69 computers and two locations

4   with all the accessories that you're referring to?  What was

5   the cost just of the equipment approximately?

6   A.  Little over $600,000.

7   Q.  Now, sir, what did electricity cost, approximately, to run

8   those computers -- by the way, when you say -- is that in

9   Australian dollars or in American dollars?

10  A.  It's in Australian, yes.

11  Q.  What approximately would that have been at that time period

12  in American dollars?

13  A.  Four hundred fifty to five hundred --

14          MR. FREEDMAN:  Objection.

15          THE COURT:  And the basis?

16          MR. FREEDMAN:  Calls for expert testimony or judicial

17  notice of some kind.

18          THE COURT:  I'll allow it.  Overruled.

19  BY MR. RIVERO:

20  Q.  Sir, if you remember, what was the cost -- the monthly cost

21  in electricity?

22  A.  About $11,000.

23  Q.  Again, Australian?

24  A.  Yes.

25  Q.  And that would be somewhat less in American dollars?
```

109

1    A.   About 8K American at the time.

2    Q.   Now, sir, did you -- why did you have to have so many

3    computers running?

4    A.   Basically, I needed to try and get up to the minimum

5    difficulty level, which for over a year was set at one.  And I

6    couldn't even do that.  So we didn't even make the 10-minute

7    time frame for quite a while.  And so I'd overjudged how many

8    people would come on board.

9    Q.   Not to oversimply it, sir, but when you and

10   Mr. Antonopoulos and Mr. Madura talk about difficulty level, is

11   that the sufficient number of computers competing so that it

12   would end up taking about 10 minutes to solve the problem and

13   allow competition between those computers?  Is that right?

14          MR. FREEDMAN:  Objection.  Leading.

15          THE COURT:  Sustained.

16   BY MR. RIVERO:

17   Q.   Sir, can you explain what the relationship is between the

18   number of computers and the difficulty level.

19   A.   So a difficulty level of one would be equivalent to around

20   300 i3 computers -- like Intel i3-type computers at the time.

21   Now, that would be, for Xenon servers, about 177.

22       Now, what we needed to do was get more than that number of

23   computers on the network to push the number up.  So if

24   someone's running a laptop, say an i3 or i5, they're between

25   1/250th or 1/300th of the network capability.  What we were

110

```
1    attempting to do with all the people helping me, including Hal
2    Finney, was try and get people involved.  I told everyone to
3    come in for this reason.
4        So what you need to do is get more people and more
5    resilient.  That's why I set computers up at Burnside, which is
6    a charity I worked with.  My --
7            MR. FREEDMAN:  Objection.  Narrative.
8            THE COURT:  Sustained.
9    BY MR. RIVERO:
10   Q.  Who did you invite -- who did you ask to start mining?
11   A.  I'd love to say everyone, but that would be technically
12   wrong because I didn't say it to people in McDonald's or
13   something.  But my family, people at universities I was with,
14   former coworkers at BDO, people I knew, people in mailing
15   lists, anyone I talked to in the Australian government, all
16   sorts of people.  Everyone.  I just -- everyone I talked to.
17   Q.  Did you ask David Kleiman to mine?
18   A.  Yes.
19   Q.  Did you ask your uncle Don to mine?
20   A.  Yes.
21   Q.  Did you ask your cousin Max to mine?
22   A.  Yes.
23   Q.  Sir, by the way, with regard to all these computers, were
24   there any difficulties in keeping them running or did they just
25   take care of themselves all the time?
```

1    A.  Oh, no.  No.  No.  Definitely not.

2    Q.  So what were the difficulties?

3    A.  So between the two locations and the churches, it wasn't a

4    dust-free environment.  So some of the servers would have dust

5    problems and crash.  I had to -- I had burnout on power

6    supplies.  The power supplies on a large server rack are quite

7    heavy.  They're about five kilograms, 10 pounds.  And you have

8    two of those, and you need to take them out periodically, clean

9    them, flush them.  The server needs to keep running while

10   you're doing this or go through proper shutdown.

11       There's the battery systems to do with it.  The battery

12   systems need to be updated and changed.  The batteries weigh

13   about 40 to 50 kilos.

14       Then the actual units for running the uninterrupted power

15   supplies to keep it going, it was basically -- sometimes I'd

16   find there would be power outages at the farm, even though I

17   had my own transformer.  We had a lightning strike one time.

18   And we had to have that replaced.  And the secondary power was

19   burnt out, so I had that run up there and get all that done.

20   We had flooding.  So we had to try and raise computers over the

21   flooded area.

22   Q.  Sir, did the maintenance of computers on this scale -- did

23   it require any physical effort?

24   A.  Oh, a lot.  Not only was there driving between my different

25   locations, but getting in and out of the racks, changing the

112

```
 1    power supplies, doing the battery changes.  It could be

 2    difficult.  Moving the battery system in, it's 40 kilos.

 3    Q.  Did you do that alone?

 4    A.  No.  I hired a person called Hector.  Hector Malbburang

 5    worked with me.  He was on my staff in BDO.  And I think he was

 6    my first hire after my wife in my company in Australia.

 7    Q.  Was he available 24/7?

 8    A.  No.  He didn't work on Sundays.

 9    Q.  Let me go back to -- I'd like to show you what's been

10    introduced as Plaintiffs' 856.2.

11            MR. RIVERO:  Mr. Reed, if you could pull that one up.

12            And this is already in evidence, I believe, Your

13    Honor?

14            THE COURT:  Yes, it is.

15            MR. RIVERO:  If I could show this to the jury as well.

16            THE COURT:  You may.

17            MR. RIVERO:  Thank you.

18    BY MR. RIVERO:

19    Q.  Dr. Wright, were you here during the testimony of

20    Dr. Matthew Edman?

21    A.  I was.

22    Q.  Do you recall seeing this document being shown in relation

23    to one of the documents described as forgeries?

24    A.  I do.

25    Q.  Sir, the location here, Wooloowin, Queensland, Australia,
```

113

```
1    is that related to you?

2    A.  No.

3    Q.  Do you know anyone in -- with whom you had dealings who

4    lives at that location or lives in this area?

5    A.  In 2012, and then 2013, I had a change request that I

6    authorized in my companies to add this IP address for Jamie

7    Wilson.  It was to do with his accounting practice and also his

8    other firm up in Brisbane.

9    Q.  You're referring to the IP address?

10   A.  Yes.

11   Q.  And how do you recognize this IP address?

12   A.  This was put through --

13           MR. RIVERO:  Can we highlight the IP address -- sorry,

14   Dr. Wright.  Can we highlight the IP address.

15           Thank you, sir.

16   BY MR. RIVERO:

17   Q.  How do you know about this IP address?

18   A.  Any changes to the firewall policy were personally signed

19   off by me.

20   Q.  And sir, this address, Wooloowin, Queensland, Australia,

21   did you live there?

22   A.  No.

23   Q.  Did your mother live there?

24   A.  No.

25   Q.  Where did Mr. Wilson live?
```

```
 1    A.  He had one residence there and another one further out,

 2    about 10K away from that.  This one was in his wife's name and

 3    the other one was his.

 4    Q.  Sir, let me show you and counsel --

 5          MR. RIVERO:  Well, first of all, let's put up

 6    Plaintiffs' Exhibit 2, Mr. Reed.

 7    BY MR. RIVERO:

 8    Q.  Dr. Wright, have you seen this document during the course

 9    of the litigation?

10    A.  Yes.

11    Q.  All right, sir.  I would like to show you --

12          MR. RIVERO:  Mr. Reed, if you would show just to Dr.

13    Wright, counsel and the Court what's been marked -- pardon me,

14    Judge.  I just need a moment to get the exhibit number.

15          (Pause in proceedings.)

16          MR. RIVERO:  Mr. Reed, if you could show Defendant's

17    428 to the witness, the Court, and counsel.

18    BY MR. RIVERO:

19    Q.  Sir, have you -- in relation to Plaintiffs' 2, have you

20    seen this document, Defendant's 428?

21    A.  As a part of this sort of court process, yes, I have.

22    Q.  And what is this document?

23    A.  This is basically metadata information to do with that

24    information.

25          MR. RIVERO:  Your Honor, I'd move the admission of
```

115

```
 1   Defendant's 428.
 2            MR. FREEDMAN:  Objection, Your Honor.  Foundation.
 3            MR. RIVERO:  Your Honor --
 4            THE COURT:  Hold on one second.  Let me just get to
 5   428.
 6            The objection is sustained.
 7            MR. RIVERO:  Your Honor -- I'm sorry.
 8   BY MR. RIVERO:
 9   Q.  Dr. Wright, have you personally reviewed this in relation
10   to Plaintiffs' 2?
11   A.  Yes, I have.
12   Q.  And have you determined what the relationship is between
13   this document and Plaintiffs' 2?
14   A.  Yes, I have.
15   Q.  What is it?
16   A.  This is metadata behind the email that demonstrates how
17   it's being created and the origins, et cetera.
18   Q.  And are you -- do you have the ability, because of your
19   technology experience, to make that determination?
20   A.  Yes, I do.  I developed a master's degree in digital
21   forensics, and have been on 100 cases for the prosecution side
22   for the federal police in the past, and have multiple degrees
23   in that area, yes.
24            MR. RIVERO:  Your Honor, move the admission of
25   Defendant's 428.
```

116

```
1            MR. FREEDMAN:  Your Honor, we object.  If they want to
2     show a native of the file and show the metadata associated with
3     the native, that's fine.  But we don't know where this came
4     from and Dr. Wright has not testified that he personally pulled
5     the metadata.
6            THE COURT:  Sustained.
7     BY MR. RIVERO:
8     Q.  All right, sir.  Let me ask you as to --
9            MR. RIVERO:  If we can go back to Plaintiffs' 2.
10    BY MR. RIVERO:
11    Q.  Sir, do you see the --
12           MR. RIVERO:  Mr. Reed -- could we show this -- P2 is
13    in evidence.  Could we show it to the jury?
14           THE COURT:  You may.
15    BY MR. RIVERO:
16    Q.  All right.  Dr. Wright, I thought the jury had seen it
17    before.  This is the document that I'm asking you about in
18    relation to the metadata.  Here's my question:  Do you see it
19    says:  "From Craig S. Wright, craig@rcjbr.org"?
20    A.  Yes.  I see that.
21    Q.  All right.  What is that craig@rcjbr.org?
22    A.  Rcjbr is a domain that I started registering on the 27th of
23    October 2011.  I did that --
24    Q.  Sir, my question is:  What is craig@rcjbr.org?  Is that an
25    email address?
```

```
 1    A.  I was explaining the whole lot, yes.

 2    Q.  I just want to know if it's an email.

 3    A.  Yes.  It is an email address.

 4    Q.  Are email addresses set up so there's a name and the name

 5    is at a domain?

 6    A.  Yes.  An Internet domain.  That's correct.

 7    Q.  What is the domain for this email?

 8    A.  Rcjbr.org.

 9    Q.  And can you tell the jury what rcjbr.org stands for?

10    A.  Ramona, Craig, Josh, Ben, Rachel.  That's my wife, sitting

11    there, and my children.  That was formed in -- after I met her.

12    Q.  Your wife Ramona is here in the courtroom.  That's the R?

13    A.  Yes.

14    Q.  The C is for who?

15    A.  Me.

16    Q.  Craig Wright.

17        J?

18    A.  Yes.  Josh, the oldest boy.

19    Q.  B?

20    A.  Ben, the second oldest.

21    Q.  And R?

22    A.  Rachel, the youngest.

23    Q.  And when did you start your relationship with your now

24    wife?

25    A.  I met her in December or something -- November, December
```

118

```
1   2010.  And I started dating her the next year.

2   Q.  When was the domain rcjbr.org created?

3   A.  I put in the application on the 27th of October, 2011, and

4   it was formally granted and then published on her birthday and

5   then went live on the 2nd of November, 2011.

6           MR. RIVERO:  Mr. Reed, can we see Defendant's 426.

7   BY MR. RIVERO:

8   Q.  Sir, do you see 426?

9   A.  I do.

10  Q.  And sir, is this the registration to which you refer?

11  A.  That's the WhoIs record for it.  Yes.  That's the

12  registration details.

13  Q.  ICANN is the official registry for domain sites worldwide?

14  A.  For org and top-level domains like org and com, yes.

15  Q.  And are you familiar with D426?

16  A.  Yes.

17  Q.  Are you the one who did the registration of rcjbr.org?

18  A.  Yes.  I did the domain registration and built a site as a

19  birthday present to my wife.

20          MR. RIVERO:  And Mr. Reed, could we see D427.

21  BY MR. RIVERO:

22  Q.  And what is D427 in relation to rcjbr?

23  A.  This is the public details for the registry that states the

24  update and the name servers and when the site was first

25  created, the first time it was on the Internet.
```

119

```
 1          MR. RIVERO:  Your Honor, I'd move the admission of
 2   Defendant's 426 and Defendant's 427.
 3          MR. FREEDMAN:  Objection, Your Honor.  Foundation.
 4   Dr. Wright has not pulled this information directly.
 5          THE COURT:  Sustained.
 6   BY MR. RIVERO:
 7   Q.  Do you know the date on which the domain was created, sir?
 8   A.  Yes.  As I've already said, I first put the registration in
 9   on the 27th of October.  And it was fully granted and live on
10   the 2nd of November.  So yes.
11   Q.  Now, sir, I'd like to show you what's been marked as Joint
12   Exhibit 101.
13          And sir, can you tell us what Joint Exhibit 101 is?
14   A.  That's the electronic print of the tax return for
15   individuals for myself.  It's electronically filed and this
16   gets printed out.
17          MR. RIVERO:  And Judge, I don't think it should be
18   shown to the jury just yet because I'm going to move its
19   admission.
20          THE COURT:  It's admitted into evidence.
21       (Joint Exhibit 101 received into evidence.)
22          MR. RIVERO:  Thank you.
23          So now we can show it to the jury.
24          THE COURT:  You may.
25          MR. RIVERO:  Thank you.
```

120

```
1    BY MR. RIVERO:
2    Q.  Sir, this is a -- this is an individual tax return for
3    2009?
4    A.  It's an individual tax return for me personally and any
5    business income that I associated for the period of the 1st of
6    July, 2008 to the 30th of June, 2009.
7    Q.  And Dr. Wright, it says here:  "Suburb or town for the
8    address which is below," is in Bagnoo NSW.
9    A.  Yes.  That's my farm -- or was.
10   Q.  Okay.  What is NSW?
11   A.  New South Wales.
12   Q.  And where is that in relation to Sydney?
13   A.  It's about three and a half to four hours' drive out of
14   Sydney.
15   Q.  And Lisarow -- how far is that from Sydney?
16   A.  Depends on traffic, but -- I mean, a bad day -- I hate to
17   speculate.  But a good day 40 minutes.
18   Q.  Okay.  And have you lived in Brisbane, Australia at any
19   time since you were an adult?
20   A.  In the early '90s.  I mean, I don't remember exactly when I
21   moved.  But I was -- when I was talking about -- that's in
22   Sydney, so before '94 sometime.  I don't remember the exact
23   time I moved.
24   Q.  How many hours' drive is it from Sydney to Brisbane,
25   Australia?
```

121

```
 1    A.  These days, you could probably do it in 10, with the new

 2    highways.  But when I was young, like 20 years ago plus, then

 3    it would take sometimes 17, 18 hours.

 4    Q.  Okay.

 5         MR. RIVERO:  Could we see Page 2 of this document,

 6    Mr. Reed.

 7    BY MR. RIVERO:

 8    Q.  Okay, sir.  What's the reference here at number 4 in the

 9    Income, "Employment Termination Payments, Date of Payment

10    January 22nd, 2009"?  What is that about?

11    A.  That's a final payment done as a lump sum.

12    Q.  From whom?

13    A.  BDO.

14    Q.  At what time had you actually left -- what date had you

15    actually left BDO?  You referred to it earlier.

16    A.  I left at the -- I think the 28th of December was my final

17    day.

18    Q.  What year?

19    A.  2008.

20    Q.  And then why is there a payment on January 22nd recorded

21    here -- January 22nd, 2009?

22    A.  Because that's when the final payment date came across

23    after I had left.  So this is after I've left the firm.  There

24    was a final payment.

25         MR. RIVERO:  Let's go to the next page, Mr. Reed.
```

122

```
1    BY MR. RIVERO:

2    Q.  Now, sir, there's listings of deductions.  Are these

3    business deductions or what are these?

4    A.  These are to do with work-related expenses, things that I

5    was doing like personally that had to do with any business that

6    I was doing, operations of research projects that I was doing.

7    Q.  All right, sir.  And I don't see -- on this list, I don't

8    see a reference to major expenditures for computers on the

9    order of what you had said before.  Is that reflected somewhere

10   in this return?

11   A.  That would be in the business section.

12   Q.  All right.  Let's flip forward.  But in page -- before Mr.

13   Reed does that, there are things like work-related car

14   expenses, there's self-education expenses, there are interest

15   in dividend deductions, those kind of things.  Let me ask you:

16   What self-education expenses were you claiming from the

17   Australian government for 2009?

18   A.  I was doing a number of degrees.  And in the '08 year and

19   '09 year, I had finished up my master's degree in statistics

20   and the final payments for my master's in law.  I was doing a

21   Ph.D. in computer science and economics and a couple smaller

22   like non-master's, under master's level.

23   Q.  And I don't think we covered those.  And I was asking about

24   before Halloween of 2008.  When did you get the statistics

25   degree?  What was the degree, where, and --
```

123

```
 1    A.   University of Newcastle in Australia.  I did a degree in

 2    statistics, a master's degree.  Looking at heteroscedastics and

 3    network statistics.

 4    Q.   And when did you obtain that degree?

 5    A.   I studied between 2006 and to 2008, and submitted in

 6    like -- finally submitted in 2009.

 7    Q.   And in what degree is it?

 8         MR. FREEDMAN:  Objection.  Relevance.

 9         THE COURT:  Overruled.  I'll allow it.

10         THE WITNESS:  It's --

11    BY MR. RIVERO:

12    Q.   I'm saying is it master's, doctorate, bachelor's?

13    A.   It's a master's degree, like a master's of science in

14    statistics.

15    Q.   You said you obtained in this time period -- and I'm

16    talking about before Halloween of 2008 -- a law degree.  What

17    law degree did you obtain?

18    A.   I finished my post-graduate and -- of law and then did a

19    master's in law, LLM, in Northumbria University in the UK.

20    That was in international commercial law, specializing in

21    intermediaries and like international finance and

22    communications.

23    Q.   When did you obtain that degree?

24    A.   I submitted in 2007, with the -- 2008, I got a commendation

25    and finished.
```

124

1    Q.  All right.  Now let's just flip forward, sir.

2          MR. RIVERO:  If you would, Mr. Reed, if you would flip

3    forward.  These are tax offsets.

4          Next page.

5          Next page, sir.

6          Next.

7          We're looking for the business section.

8    BY MR. RIVERO:

9    Q.  Oh, these spousal details, are these references -- that we

10   just went by, are these references to Lynn Wright?

11   A.  Yes.

12   Q.  All right.

13         MR. RIVERO:  Let's go forward.

14         Declaration.  If we can keep going.

15   BY MR. RIVERO:

16   Q.  Sir, is this related to the business aspects of this

17   return?

18   A.  "Supplementary Income, Partnerships, Trust," yes.  That's

19   correct.  So this is the partnership, and then the personal

20   services, and then the other business income, yes.

21   Q.  Okay.

22         MR. RIVERO:  Let's go to the next page, Page 10.

23   BY MR. RIVERO:

24   Q.  Now, sir, it says -- it reflects at Page 10 of your return

25   "total current year capital gains," and there's an amount of

125

```
 1    2,235,000, I assume Australian dollars.  What is that about?
 2    A.  So I sold from my personal trust company into my other
 3    companies the rights to the database in Bitcoin, to the Bitcoin
 4    I was mining, and all of the software I'd developed.  So I did
 5    a personal sale and then not claimed but was taxed on.
 6         So I filed with the tax department an income increase of $2
 7    million and paid the tax on that.  So effectively, I said my
 8    software for Bitcoin was worth 2.2 million for all my expenses
 9    so far, and then I paid the tax on the 2.2 million that I said
10    I earned by selling it to my company.
11         MR. RIVERO:  Let's go forward to the next page,
12    Mr. Reed.
13         And I believe -- let's flip forward further.
14    BY MR. RIVERO:
15    Q.  Dr. Wright, let's keep going.  Dr. Wright, can you tell me
16    when there's some other entries related to your business.
17         MR. RIVERO:  If you could go to Page 13.
18         Okay.  Fourteen.  Let's stop right there.
19         If we can go back one.
20    BY MR. RIVERO:
21    Q.  This describes the business as:  "Computer system design
22    and related services"; is that correct?
23    A.  Yes.
24    Q.  What business was that?
25    A.  This is basically Information Defense and Integyrs at this
```

126

```
1    time, the sale to them.  So I -- for Craig R&D, that business
2    sold into those companies.  There was also the farm.  The farm
3    made $8,800 all up.  The farm wasn't terribly profitable at
4    that stage.  It was drought.  And then the non-primary
5    production is the sale to other entities of the software, et
6    cetera, apart from the capital gains.
7    Q.  Dr. Wright, if you look at P5, there is a reference to a
8    business name and then an ABN?
9    A.  Yes.
10   Q.  Is this the business name that you used?
11   A.  Yes.
12   Q.  Craig Wright R&D?
13   A.  Yes.  That was one of them.  Craig Wright R&D was my main
14   one.
15   Q.  And it says it on the form:  "Australian business number,
16   ABN."  Where are the ABN for Craig Wright R&D reflected?
17   A.  If I'm doing business and --
18   Q.  You may not have heard my question.  Where is the number
19   reflected?
20   A.  In P5, down at the bottom, under "ABN," it has the ABN
21   number.
22          MR. RIVERO:  Next page, Mr. Reed.
23   BY MR. RIVERO:
24   Q.  All right.  Here, sir, can you explain to the jury these
25   entries here for business income and expenses where there are
```

127

1    expenses -- one showed in the column "Non-Primary Production

2    Opening Stock and Close of Cost."  What is that?

3    A.  So the non-primary production area in the other -- Opening

4    Stock includes all of the equipment, et cetera, that we're

5    doing, products, and costs -- excuse me -- and closing stock

6    after selling.

7        So what I did was I bought computer equipment personally

8    and then sold it into my company when it was running.  Because

9    I started the -- I started buying in the beginning of January,

10   but my company hadn't been formed officially till the 22nd of

11   January.  I did the purchases under my own name and then sold

12   them back into my companies.  So this details the purchase of

13   the equipment that I sold into my companies.

14   Q.  Dr. Wright, how did you learn of David Kleiman's death?

15   A.  I was informed by --

16   Q.  Sorry.  How did you learn of David Kleiman's death?

17   A.  I was informed by email.

18   Q.  And how did you react to his death?

19   A.  I broke down.

20   Q.  Why?

21   A.  '11, '12, after my marriage fell apart, Dave was my rock.

22   I called him all the time.  I spent time talking about my

23   personal problems.  I talked about the problems I'd have with

24   my invention and what I thought was going on.  And I spent

25   hours just pulling myself back together with Dave.

128

```
1   Q.  Did you steal anything from David Kleiman?

2   A.  No, I did not.

3   Q.  Did you defraud David Kleiman?

4   A.  No, I did not.

5   Q.  Did you breach any agreement with David Kleiman?

6   A.  No, I did not.

7            MR. RIVERO:  No further questions, Your Honor.

8            THE COURT:  All right.  This might be a good time for

9   us to take a lunch recess and then we'll continue with the

10  cross-examination.

11           Ladies and Gentlemen, it's 12:40, and I'll see you

12  back here at 1:40.

13           Have a pleasant lunch.

14      (Jury not present, 12:40 p.m.)

15           THE COURT:  Have a pleasant lunch.

16      (Adjourned for lunch, 12:40 p.m.)

17

18

19

20

21

22

23

24

25
```

129

1    UNITED STATES OF AMERICA        )

2    ss:

3    SOUTHERN DISTRICT OF FLORIDA  )

4                 C E R T I F I C A T E

5          I, Yvette Hernandez, Certified Shorthand Reporter in

6    and for the United States District Court for the Southern

7    District of Florida, do hereby certify that I was present at

8    and reported in machine shorthand the proceedings had the 22nd

9    day of November, 2021, in the above-mentioned court; and that

10   the foregoing transcript is a true, correct, and complete

11   transcript of my stenographic notes.

12          I further certify that this transcript contains pages

13   1 - 129.

14          IN WITNESS WHEREOF, I have hereunto set my hand at

15   Miami, Florida this 30th day of November, 2021.

16

17                    /s/Yvette Hernandez
                      _____
                      Yvette Hernandez, CSR, RPR, CLR, CRR, RMR
18                    400 North Miami Avenue, 10-2
                      Miami, Florida 33128
19                    (305) 523-5698
                      yvette_hernandez@flsd.uscourts.gov
20

21

22

23

24

25

**COURTROOM DEPUTY:**

**MR. BRENNER: [54]**
3/8 3/13 4/20 5/6
7/10 7/17 8/7 8/10
10/2 10/17 10/21
11/14 19/1 19/5
20/9 24/3 24/5
24/17 26/24 28/11
29/20 30/7 32/20
32/23 33/3 33/24
34/4 34/7 38/25
39/3 39/9 40/19
41/2 41/4 41/8
44/8 44/11 45/5
45/12 45/18 47/11
48/3 48/7 48/13
48/20 48/24 51/9
51/12 51/17 52/18
53/11 54/3 56/3
56/8

**MR. FREEDMAN: [36]**
60/9 60/17 61/5
61/21 63/16 64/11
65/2 65/25 67/8
67/12 67/18 68/2
68/6 69/3 72/1
72/8 72/21 76/15
77/10 77/14 78/16
79/4 79/13 79/20
80/19 81/7 85/14
92/2 108/14 108/16
109/14 110/7 115/2
116/1 119/3 123/8

**MR. RIVERO: [54]**
3/14 3/24 4/21
48/16 58/5 58/17
59/11 59/15 61/23
67/20 67/23 76/20
76/22 77/16 77/18
77/21 78/7 78/13
84/23 85/11 85/17

85/22 87/19 88/21
90/21 91/13 93/10
112/15 112/17
113/13 114/5
114/12 114/16
114/25 115/3 115/7
115/24 116/9
116/12 118/6
118/20 119/1
119/17 119/22
119/25 121/5
121/25 124/2
124/13 124/22
125/11 125/17
126/22 128/7

**MS. MCGOVERN: [30]**
8/9 8/14 18/4
24/7 32/21 32/24
33/2 33/5 39/6
39/14 40/4 42/22
46/11 48/17 48/21
48/23 50/13 51/10
51/14 51/22 52/20
53/22 54/1 54/7
54/13 54/15 54/20
54/23 56/2 56/7

**THE COURT: [114]**
3/2 3/12 3/19 3/25
4/22 4/24 7/12
10/20 18/5 19/4
24/10 32/25 34/1
34/5 39/2 39/11
39/15 39/20 39/23
40/18 40/20 40/23
40/25 41/3 41/6
42/21 44/7 44/10
44/13 45/8 45/15
47/10 47/18 48/4
48/9 48/22 49/1
50/17 51/21 52/21
53/13 53/24 54/2
54/4 54/6 54/11
54/18 54/21 54/24
55/8 55/12 55/23

56/4 56/9 56/11
58/6 58/8 58/9
58/11 59/14 60/10
60/12 60/18 61/22
61/25 63/17 64/12
65/4 66/1 67/9
67/13 67/19 67/21
68/3 68/7 69/4
72/2 72/9 72/22
76/16 76/21 77/11
77/15 77/17 77/19
78/4 78/12 78/14
78/21 79/5 79/14
79/21 80/21 81/8
85/13 85/15 92/3
104/21 104/23
108/15 108/18
109/15 110/8
112/14 112/16
115/4 116/6 116/14
119/5 119/20
119/24 123/9 128/8
128/15

**THE WITNESS: [18]**
7/19 18/6 24/4
24/12 40/22 52/22
56/16 57/13 58/16
60/11 60/19 61/7
68/8 72/3 79/22
80/20 81/9 123/10

**$**

**$11,000 [1]**   108/22
**$2 [1]**   125/6
**$600,000 [1]**   108/6
**$8,800 [1]**   126/3

**'**

**'05 [1]**   75/21
**'07 [2]**   85/10
90/16
**'08 [8]**   77/1 86/3
87/10 95/9 95/13
97/20 100/25

USCA11 Case: 22-11150  Document: 18  Date Filed: 11/30/2022  Page: 87 of 254

'

**'08 . . . [1]**   122/18
**'09 [1]**   122/19
**'11 [1]**   127/21
**'12 [1]**   127/21
**'13 [1]**   104/9
**'16 [1]**   104/10
**'17 [1]**   6/24
**'20 [1]**   5/25
**'21 [2]**   5/25  6/3
**'5 [1]**   82/17
**'7 [1]**   82/17
**'81 [1]**   63/14
**'82 [1]**   63/14
**'88 [1]**   66/11
**'90s [2]**   8/22
120/20
**'94 [2]**   73/11
120/22
**'96 [1]**   73/11
**'97 [1]**   74/5
**'98 [1]**   74/18
**'come [1]**   37/1

.

**.5 [1]**   5/16

/

**/s/Yvette [1]**
129/17

0

**0's [1]**   23/3

1

**1's [1]**   23/3
**1/250th [1]**   109/25
**1/300th [1]**   109/25
**10 [16]**   1/11 32/20
33/3 40/21 54/8
60/4 60/8 64/18
91/3 97/18 98/3
109/12 111/7 121/1
124/22 124/24
**10-2 [2]**   1/24

129/18
**10-minute [2]**
39/21 109/6
**100 [2]**   1/17
115/21
**1000 [1]**   1/22
**101 [4]**   2/12
119/12 119/13
119/21
**10:22 [1]**   39/22
**10:33 [1]**   48/8
**10:40 [1]**   48/8
**10:43 [1]**   48/25
**10:50 [1]**   54/14
**10:51 [1]**   55/7
**10:59 [2]**   55/7
55/11
**10K [1]**   114/2
**11 [2]**   52/9 64/23
**111s [1]**   71/23
**119 [2]**   2/12 2/12
**12 [2]**   8/7 8/12
**122 [1]**   41/22
**129 [3]**   1/8 2/2
129/13
**12:40 [3]**   128/11
128/14 128/16
**12th [1]**   100/22
**13 [1]**   125/17
**14 [1]**   1/9
**15 [8]**   8/8 8/12
12/10 12/12 12/25
72/14 74/2 92/21
**16 [1]**   65/14
**16,000 [1]**   92/21
**164 [5]**   2/11 84/24
85/12 85/16 85/18
**17 [6]**   32/20 33/3
65/7 65/11 65/14
121/3
**176 [1]**   41/19
**177 [1]**   109/21
**18 [2]**   73/24 121/3
**18-80176 [1]**   3/4

**19-inch [1]**   106/14
**195 [1]**   23/7
**1970 [1]**   59/23
**1980s [1]**   71/2
**1982 [1]**   69/24
**1984 [1]**   21/9
**1985 [2]**   69/8
71/20
**1987 [2]**   65/10
65/11
**1988 [1]**   66/18
**1989 [1]**   69/16
**199 [1]**   66/11
**1995 [2]**   72/6
72/24
**1996 [2]**   76/19
82/24
**1997 [1]**   74/9
**1998 [1]**   81/19
**1:40 [1]**   128/12
**1st [1]**   120/5

2

**2,235,000 [1]**
125/1
**2.2 million [2]**
125/8 125/9
**20 [3]**   95/16 96/21
121/2
**200 [1]**   1/14
**2001 [1]**   75/16
**2002 [1]**   93/15
**2003 [4]**   68/23
68/24 75/9 75/10
**2004 [6]**   74/15
74/18 75/21 76/1
76/2 76/13
**2005 [3]**   76/13
79/18 82/15
**2006 [2]**   84/5
123/5
**2007 [7]**   66/4
82/19 84/6 90/21
92/1 92/8 123/24

USCA11 Case: 23-11150    Document: 51-16    Date Filed: 11/30/2021    Page: 88 of 254

**2**

**2007/08 [1]**   77/1
**2008 [18]**   64/15
 66/6 87/18 88/5
 91/9 91/19 91/22
 92/22 93/12 93/24
 99/7 99/25 120/6
 121/19 122/24
 123/5 123/16
 123/24
**2009 [15]**   83/3
 93/2 93/3 93/4
 93/4 94/9 100/7
 100/18 105/6 120/3
 120/6 121/10
 121/21 122/17
 123/6
**2010 [5]**   83/4 83/5
 83/6 83/8 118/1
**2011 [4]**   46/18
 116/23 118/3 118/5
**2012 [1]**   113/5
**2013 [1]**   113/5
**2016 [3]**   6/23 7/4
 7/14
**2017 [1]**   7/16
**2019 [2]**   5/21 5/24
**2020 [1]**   6/3
**2021 [3]**   1/5 129/9
 129/15
**21 [1]**   91/2
**22 [2]**   1/5 38/13
**22nd [5]**   121/10
 121/20 121/21
 127/10 129/8
**24/7 [1]**   112/7
**25 [1]**   35/5
**250th [1]**   109/25
**2525 [1]**   1/22
**27th [3]**   116/22
 118/3 119/9
**2800 [1]**   1/17
**288 [3]**   32/20

 32/23 32/24
**28th [1]**   120/6
**2nd [3]**   1/17 118/5
 119/10

**3**

**30 [2]**   8/4 106/11
**300 [1]**   109/20
**300th [1]**   109/25
**305 [1]**   129/19
**30th [2]**   120/6
 129/15
**31st [1]**   100/5
**32,000 [1]**   92/14
**33128 [2]**   1/25
 129/18
**33131 [2]**   1/14
 1/18
**33134 [1]**   1/22
**35 [4]**   7/22 8/2
 8/4 8/23
**37 [2]**   34/24 35/5
**39 [2]**   29/14 107/6

**4**

**40 [7]**   26/2 95/15
 95/18 104/8 111/13
 112/2 120/17
**400 [2]**   1/24
 129/18
**41 [1]**   26/25
**42 [1]**   57/16
**425 [4]**   15/11
 16/16 16/21 17/6
**426 [3]**   118/6
 118/8 119/2
**427 [1]**   119/2
**428 [5]**   114/17
 114/20 115/1 115/5
 115/25
**43 [1]**   22/7
**45 [1]**   35/6
**459 [4]**   39/11 41/2
 41/4 41/5

**47 [1]**   28/14
**49 [1]**   26/3
**49-year-old [18]**
 15/16 16/1 16/11
 21/5 21/11 21/18
 22/3 24/22 26/3
 26/7 27/12 27/25
 28/8 30/3 30/4
 30/10 30/23 31/8

**5**

**50 [2]**   104/8
 111/13
**51 [5]**   2/7 28/12
 28/13 28/17 29/20
**52 [2]**   28/17 28/17
**523-5698 [1]**
 129/19
**5500 [1]**   1/14
**56 [1]**   23/16
**5698 [1]**   129/19
**57 [1]**   19/2
**58 [4]**   2/8 19/2
 20/17 20/25

**6**

**65 [1]**   13/23
**69 [3]**   105/13
 107/20 108/3

**7**

**7-Elevens [1]**
 80/13
**70 [3]**   11/1 26/22
 107/15
**733 [1]**   42/1
**76 [3]**   10/24 11/1
 11/6

**8**

**80 [1]**   107/16
**80176 [1]**   3/4
**85 [2]**   2/11 2/11
**856.2 [1]**   112/10
**8K [1]**   109/1

**9**

**90 [1]** 82/8

**99 [5]** 31/21 31/25
32/1 32/5 33/10

**9:18-cv-80176-BB**
**[1]** 1/2

**9:32 [2]** 1/6 3/1

**9:34 [1]** 4/23

**A**

**a.m [11]** 1/6 3/1
4/23 39/22 48/8
48/8 48/25 54/14
55/7 55/7 55/11

**abilities [3]**
23/12 47/19 47/23

**ability [7]** 29/11
34/20 37/23 47/20
78/2 102/23 115/18

**able [16]** 7/6 17/1
18/8 18/20 21/23
23/12 24/12 29/3
30/17 32/17 32/18
57/23 78/1 79/23
80/8 81/12

**ABN [5]** 126/8
126/16 126/16
126/20 126/20

**about [97]** 7/22
8/2 8/23 9/7 9/8
10/10 10/15 11/11
11/19 12/9 13/12
14/6 16/16 20/7
23/16 24/6 24/16
24/25 26/2 30/3
30/15 30/21 30/22
31/16 35/17 35/19
36/18 42/11 45/22
46/3 46/16 49/12
50/2 50/25 53/2
53/8 56/19 59/24
62/7 62/17 63/7
73/11 74/2 74/17
75/16 75/21 76/13

81/2 81/15 81/15
81/15 83/2 83/8
83/16 84/5 87/5
88/9 90/25 91/8
91/20 92/14 93/9
95/1 95/9 95/15
95/17 95/18 97/18
97/20 98/15 98/19
98/21 100/23
103/12 103/14
104/8 104/17
105/24 106/11
108/22 109/1
109/10 109/12
109/21 111/7
111/13 113/17
114/2 116/17
120/13 120/21
121/10 122/23
123/16 125/1
127/22 127/23

**above [1]** 129/9

**above-mentioned [1]**
129/9

**absolute [1]** 42/23

**absolutely [6]**
21/3 24/24 25/9
26/16 30/5 46/25

**abusive [1]** 60/6

**accent [1]** 71/18

**accept [2]** 23/17
91/12

**access [1]** 88/18

**accessories [1]**
108/4

**accommodate [1]**
39/25

**according [1]**
28/19

**accounting [12]**
71/7 77/5 77/9
77/13 78/9 79/2
79/8 79/10 79/11
102/14 104/16

113/7

**accurate [1]** 36/14

**accurately [1]**
36/12

**achieve [2]** 15/25
16/4

**achieved [5]** 16/24
16/25 21/6 21/8
53/18

**acquired [2]** 21/14
32/11

**acquisition [1]**
28/24

**across [5]** 11/9
12/18 32/8 33/22
121/22

**act [3]** 47/20
79/18 82/16

**acted [1]** 105/20

**acting [1]** 43/10

**action [1]** 89/1

**actions [1]** 48/2

**actively [1]** 84/7

**actual [4]** 13/5
35/10 100/6 111/14

**actually [36]** 5/24
7/4 14/4 14/6 14/7
14/21 15/7 17/24
18/1 18/25 19/18
21/6 26/20 30/12
35/12 38/2 38/12
42/15 54/24 57/2
57/17 67/4 78/10
79/10 83/15 84/9
84/15 84/20 86/22
89/11 90/20 101/16
107/9 107/14
121/14 121/15

**Adam [1]** 98/8

**adaptive [6]** 21/6
23/10 26/20 26/22
27/22 28/23

**add [1]** 113/6

**addenda [1]** 6/16

**A**

**addendums [1]** 6/14

**additional [5]** 25/8 25/8 25/15 25/17 25/18

**address [17]** 4/17 4/18 39/17 39/18 48/11 105/24 105/25 113/6 113/9 113/11 113/13 113/14 113/17 113/20 116/25 117/3 120/8

**addresses [1]** 117/4

**ADIR [1]** 12/14

**Adjourned [1]** 128/16

**administer [3]** 18/15 21/12 24/22

**administered [1]** 27/4

**administration [2]** 68/13 68/16

**admission [5]** 85/11 114/25 115/24 119/1 119/19

**admitted [4]** 2/11 45/3 85/15 119/20

**adolescents [1]** 32/15

**adopted [1]** 25/11

**adult [7]** 10/6 16/5 31/21 32/1 33/11 57/9 120/19

**adulthood [2]** 15/21 17/17

**adults [2]** 16/14 32/15

**advance [1]** 81/25

**Advanced [1]** 65/9

**advice [1]** 94/2

**advise [2]** 39/23 58/18

**affect [1]** 47/5

**affects [2]** 47/23 48/1

**affidavits [2]** 50/12 50/21

**afraid [1]** 29/4

**after [27]** 13/12 14/9 36/20 36/24 37/4 38/17 46/18 60/8 61/13 67/15 72/24 81/18 89/12 89/21 93/6 93/11 93/24 94/2 100/6 100/15 100/18 112/6 117/11 121/23 121/23 127/6 127/21

**after' [1]** 37/1

**AG [1]** 88/14

**again [16]** 10/24 12/1 13/3 13/19 13/21 32/22 36/16 38/15 41/11 41/19 49/17 58/8 78/24 87/19 87/20 108/23

**against [1]** 83/15

**age [20]** 17/21 18/20 23/21 25/22 26/1 26/7 26/10 26/11 27/9 27/13 27/15 32/11 60/2 60/8 63/11 65/6 69/15 69/16 69/22 70/1

**agencies [1]** 76/6

**agenda [1]** 87/4

**ages [2]** 36/1 98/21

**ago [4]** 14/7 43/22 47/8 121/2

**agree [8]** 22/3 29/15 38/6 44/21

46/2 47/24 49/7

**agreed [7]** 25/12 82/1 84/11 86/25 87/2 87/7 87/17

**agreement [2]** 58/25 128/5

**ahead [4]** 3/3 3/20 39/20 40/3

**aided [1]** 82/3

**air [11]** 67/4 67/6 71/21 71/25 72/7 72/16 106/20 107/11 107/12 107/14 107/17

**air-condition [1]** 107/17

**air-conditioning [4]** 106/20 107/11 107/12 107/14

**albeit [1]** 52/15

**algorithm [1]** 94/18

**alienate [1]** 52/25

**all [88]** 3/25 4/22 9/6 10/23 13/13 13/16 14/13 14/22 15/21 15/23 17/17 19/16 22/3 22/8 24/13 25/9 36/1 38/22 39/11 40/2 41/6 42/21 44/13 46/19 47/18 48/9 48/22 49/1 51/21 53/24 54/4 54/11 54/12 54/21 55/6 55/12 55/23 56/11 58/7 62/3 63/10 64/17 65/13 68/24 73/5 73/16 74/17 74/25 80/14 83/9 85/20 86/17 87/15 89/3 89/12 92/13 94/1 95/20 101/7

**A**

**all... [29]**    102/1
102/15 104/21
104/25 106/12
106/25 107/18
108/4 110/1 110/15
110/23 110/25
111/19 114/5
114/11 116/8
116/16 116/21
122/7 122/12 124/1
124/12 125/4 125/8
126/3 126/24 127/4
127/22 128/8
**Allan [12]**    84/19
84/21 86/19 86/25
87/3 87/5 87/6
87/8 88/16 88/16
91/16 98/7
**allow [14]**    25/19
29/2 52/21 68/7
72/2 78/6 79/21
80/12 80/21 81/8
81/11 108/18
109/13 123/9
**allowed [7]**    43/11
43/13 74/23 74/25
82/1 82/6 89/9
**allowing [1]**    91/5
**alluding [1]**    32/6
**almost [6]**    14/23
14/24 29/6 29/16
29/25 49/5
**alone [3]**    6/24
6/24 112/3
**already [11]**    44/4
44/14 44/20 45/11
87/10 87/10 90/14
90/16 100/23
112/12 119/8
**also [46]**    6/5 9/3
13/4 16/24 18/17
25/2 31/24 32/4

32/9 49/25 52/19
53/2 53/8 62/4
63/5 64/7 65/8
65/22 68/10 69/19
71/7 71/13 71/15
72/15 72/15 72/18
73/18 76/4 80/2
80/10 80/20 80/24
80/25 92/16 95/21
97/1 104/14 105/13
105/15 105/18
106/20 106/21
106/21 107/3 113/7
126/2
**altered [3]**    45/25
49/11 49/13
**although [2]**    4/8
90/16
**always [4]**    42/12
42/13 64/6 102/22
**am [6]**    1/9 21/1
21/1 57/3 71/16
87/14
**AMANDA [3]**    1/20
3/15 39/14
**amateur [1]**    62/12
**amazing [3]**    101/16
102/3 102/24
**amendments [1]**
4/17
**America [5]**    62/14
80/2 80/25 94/21
129/1
**American [8]**    76/5
77/8 79/18 80/1
108/9 108/12
108/25 109/1
**AMI [1]**    2/6
**among [1]**    11/6
**amongst [1]**    32/13
**amount [2]**    17/13
124/25
**analysis [1]**    24/23
**ANDRES [2]**    1/19

3/14
**Andresen [2]**
101/11 102/6
**ANDREW [2]**    1/16
3/9
**angry [1]**    56/19
**annual [1]**    82/8
**another [16]**    11/18
12/14 12/21 20/4
22/5 28/2 28/6
30/9 37/4 37/8
41/17 57/13 61/2
103/24 105/4 114/1
**answer [17]**    8/17
8/25 14/5 24/11
28/5 32/19 33/8
33/13 33/17 34/2
53/15 59/4 66/10
78/7 78/8 80/23
94/5
**answered [3]**    18/4
36/10 37/16
**answers [2]**    13/20
14/10
**anti [3]**    63/23
76/10 79/18
**anti-gaming [1]**
79/18
**anti-Napster [1]**
76/10
**anti-occupation [1]**
63/23
**anticipated [1]**
75/22
**Antonopoulos [1]**
109/10
**any [46]**    4/17 4/18
13/10 14/3 17/6
17/7 17/25 17/25
17/25 18/12 24/19
24/20 25/7 40/11
44/19 51/21 52/5
55/2 55/9 55/15
55/15 63/20 67/15

**A**

USCA11 Case: 22-11150    Document: 1    Date Filed: 11/30/2022    Page: 92 of 254

**any... [23]** 69/6
73/13 82/20 83/24
85/13 91/24 91/25
92/8 96/5 96/6
97/7 98/24 98/25
98/25 100/13
107/20 110/24
111/23 113/18
120/4 120/18 122/5
128/5
**anybody [3]** 94/8
100/17 104/24
**anyone [8]** 55/17
65/20 73/8 92/22
95/19 96/25 110/15
113/3
**anything [11]** 14/3
44/7 45/1 47/10
48/11 78/14 81/25
82/11 92/25 93/1
128/1
**apart [3]** 83/4
126/6 127/21
**apologies [1]**
86/14
**appear [2]** 29/11
102/20
**appearances [2]**
1/12 3/6
**appears [2]** 22/19
40/13
**applicable [1]**
21/16
**application [2]**
4/11 118/3
**applied [1]** 65/10
**applies [1]** 47/16
**apply [4]** 16/12
16/14 21/22 41/13
**applying [1]** 47/15
**appreciate [1]** 4/4
**approached [1]**

84/9
**approaches [1]**
53/1
**appropriate [17]**
4/16 16/11 17/7
24/22 26/2 30/3
30/13 30/15 30/21
30/22 30/25 30/25
45/4 45/15 47/1
47/24 48/4
**approximately [14]**
74/18 90/22 91/9
93/2 93/12 94/9
95/7 95/12 96/22
97/10 105/5 108/5
108/7 108/11
**approximation [1]**
18/13
**April [7]** 90/25
91/9 92/22 93/12
93/24 95/13 96/24
**are [100]** 4/18 5/1
5/11 7/7 7/19 7/24
7/25 12/17 12/18
13/23 13/23 14/15
14/15 15/11 15/14
15/17 15/23 16/7
16/10 16/10 16/10
16/11 17/15 17/16
18/19 19/16 19/18
19/18 20/7 20/8
21/6 21/12 21/24
23/11 26/4 26/13
29/6 30/17 30/19
31/2 31/3 31/5
31/5 32/6 32/24
35/9 35/10 37/10
37/13 40/5 43/13
44/16 45/1 49/23
50/2 50/7 50/7
51/11 54/4 55/19
56/12 56/13 56/18
56/18 57/18 57/21
58/1 58/3 58/13

58/13 58/14 70/24
80/7 84/11 85/24
86/23 87/4 87/5
87/12 92/13 93/22
94/12 96/2 98/9
107/22 111/6
115/18 117/4
118/15 118/17
122/2 122/3 122/4
122/13 122/14
124/3 124/9 124/10
126/16 126/25
**area [6]** 30/17
43/14 111/21 113/4
115/23 127/3
**areas [5]** 18/23
29/7 58/1 68/11
80/13
**arguing [1]** 44/2
**argument [2]** 44/2
44/18
**around [8]** 32/11
43/20 44/22 62/13
70/9 97/12 97/23
109/19
**Arts [1]** 69/11
**as [91]** 1/3 3/22
4/2 4/7 4/10 4/10
4/13 4/13 5/2 7/21
7/21 8/20 9/4 10/7
12/13 12/13 12/25
14/2 14/3 21/17
21/18 24/21 25/4
26/9 31/1 31/2
34/14 35/16 36/19
40/12 40/12 41/7
41/11 43/15 44/4
47/25 50/10 50/17
52/23 55/24 55/25
55/25 56/15 56/15
56/20 57/10 59/3
61/15 62/17 63/6
64/9 64/22 67/3
67/25 71/3 71/7

**A**

**as... [35]** 76/1
77/17 79/17 81/12
81/24 85/2 86/20
89/8 89/17 89/24
90/2 90/6 91/3
93/24 96/7 97/4
97/7 98/9 101/23
101/24 102/14
103/15 104/18
105/20 107/22
112/10 112/15
112/23 114/21
116/8 118/18 119/8
119/11 121/11
125/21

**ascertain [1]**
29/10

**Asian [1]** 79/25

**ask [53]** 4/7 4/13
15/16 16/5 17/7
17/24 23/17 26/2
26/6 30/3 30/13
30/15 30/21 30/22
30/22 31/4 38/1
41/13 42/8 45/1
45/12 45/14 45/24
47/22 49/6 49/8
54/16 54/25 55/15
56/12 56/13 59/3
59/4 59/11 67/22
70/11 71/16 75/5
78/7 78/13 83/10
88/13 90/8 93/8
99/24 103/24 105/4
110/10 110/17
110/19 110/21
116/8 122/15

**asked [23]** 6/17
8/16 8/24 17/9
17/14 17/24 18/4
27/2 30/22 33/7
33/16 36/3 36/18

36/19 37/3 42/10
42/18 53/46 / 16 59/14
93/5 93/6 93/8
98/21

**asking [10]** 7/24
17/22 42/7 43/1
47/14 47/15 49/7
95/17 116/17
122/23

**ASM [1]** 70/19

**aspects [1]** 124/16

**Asperger's [1]**
65/1

**assembled [2]**
70/20 70/23

**assembly [2]** 69/18
70/22

**assess [1]** 54/8

**assessing [1]** 13/6

**assessment [6]**
11/18 11/21 20/16
21/17 30/24 31/15

**assessments [1]**
9/7

**assist [1]** 92/9

**associated [4]**
72/5 105/19 116/2
120/5

**assume [9]** 45/24
46/1 49/7 49/10
49/17 49/25 50/12
50/20 125/1

**assuming [1]** 17/5

**assumption [2]**
16/23 50/22

**assumptions [2]**
49/8 100/8

**asterisk [1]** 27/3

**attempting [2]**
77/25 110/1

**attended [1]** 65/24

**attendees [1]**
86/13

**attending [1]** 65/6

**attention [2]** 32/7

**attorneys [2]** 7/24
55/21

**attracts [1]** 84/3

**attributes [2]**
52/16 53/16

**audit [6]** 74/23
77/5 77/6 82/3
82/3 84/14

**August [8]** 83/8
85/10 87/10 87/18
89/21 90/21 90/25
92/1

**AusIndustry [1]**
93/16

**Aussie [3]** 73/1
73/3 73/10

**Australia [19]**
59/21 63/4 68/21
72/12 72/20 73/1
77/5 77/8 86/2
88/18 96/1 97/3
100/1 112/6 112/25
113/20 120/18
120/25 123/1

**Australia-wide [1]**
88/18

**Australian [24]**
46/9 64/2 64/20
67/4 67/6 67/11
71/21 71/25 72/7
73/12 73/13 73/17
75/4 76/4 76/5
76/8 80/10 108/9
108/10 108/23
110/15 122/17
125/1 126/15

**author [2]** 15/8
27/21

**authorized [1]**
113/6

**authors [2]** 15/9
15/18

## A

**autism [39]**    11/1
11/7 21/25 23/11
29/4 29/6 30/16
30/19 32/13 34/11
35/9 37/10 45/21
46/3 47/5 47/20
48/1 48/1 49/12
49/15 49/19 50/3
50/5 50/25 51/3
52/4 52/6 52/10
52/16 52/22 52/24
53/19 55/25 56/14
56/17 56/22 57/6
57/15 57/21
**autistic [2]**    56/5
57/11
**automated [1]**
14/23
**available [1]**
112/7
**Avenue [2]**    1/24
129/18
**aware [3]**    15/12
15/17 44/10
**away [6]**    3/22
46/22 60/3 65/23
100/15 114/2

## B

**b-money [2]**    98/13
98/14
**baby [3]**    16/6
21/22 21/23
**babyhood [3]**    15/21
16/1 17/17
**bachelor [3]**    65/10
66/13 68/8
**bachelor's [1]**
123/12
**back [46]**    5/1 6/19
8/22 24/2 24/3
24/5 29/19 29/20
36/1 38/14 41/2

41/4 41/5 47/2
47/13 54/6 54/16
55/12 63/24 64/5
66/22 69/8 69/18
71/2 74/15 81/13
83/9 90/12 90/21
93/15 93/18 93/20
94/7 97/12 97/18
98/9 100/2 100/20
100/22 102/22
112/9 116/9 125/19
127/12 127/25
128/12
**background [5]**
17/4 36/8 61/23
61/25 62/23
**backs [1]**    91/14
**bad [1]**    120/16
**Bagnoo [5]**    105/11
106/1 106/7 107/5
120/8
**ballpark [1]**    16/17
**bamboo [1]**    64/8
**bamboo-type [1]**
64/8
**banking [2]**    79/23
80/15
**basal [9]**    15/20
15/25 16/4 16/7
16/24 17/13 17/23
24/13 28/5
**based [8]**    11/9
31/19 52/3 69/11
70/14 73/20 73/25
90/20
**basically [17]**
15/25 35/14 50/9
62/6 62/21 64/1
70/3 76/3 87/9
91/4 93/25 95/4
98/20 109/4 111/15
114/23 125/25
**basics [1]**    11/20
**basis [2]**    32/16

108/15
**bathroom [1]**    39/16
**batteries [1]**
111/12
**battery [4]**    111/11
111/11 112/1 112/2
**BB [1]**    1/2
**BBC [1]**    70/4
**BBS [1]**    72/19
**BDO [26]**    77/4 77/4
79/7 81/25 82/1
82/3 82/10 82/13
83/3 84/10 84/13
84/16 84/18 85/3
85/4 85/5 86/4
88/12 88/17 91/12
91/18 97/3 110/14
112/5 121/13
121/15
**be [87]**    4/25 7/1
7/6 7/21 8/5 10/10
14/16 17/1 17/14
18/8 18/20 21/7
21/12 21/16 23/10
25/1 27/14 29/3
30/18 32/14 32/15
32/17 32/18 34/11
34/18 40/13 40/21
42/18 43/13 44/2
44/3 45/6 46/5
46/6 46/16 48/3
48/19 49/2 53/5
53/7 53/16 53/17
54/20 55/14 57/1
57/8 58/9 58/11
59/7 71/12 75/1
75/16 77/22 77/24
80/8 80/12 81/12
83/20 83/23 83/23
86/23 88/4 88/19
89/5 89/9 89/11
89/13 89/20 95/8
95/13 97/20 98/22
101/5 102/9 103/9

**B**

**be... [12]** 106/23
 107/6 108/25
 109/19 109/21
 110/11 111/12
 111/16 112/1
 119/17 122/11
 128/8
**BEACH [1]** 1/2
**Bear [5]** 101/2
 101/3 101/4 103/14
 103/15
**became [1]** 53/9
**because [53]** 6/2
 7/25 8/21 10/10
 11/5 12/5 16/11
 16/18 17/3 17/4
 17/7 17/12 21/5
 22/10 24/6 25/4
 26/7 26/16 26/21
 27/9 28/23 30/16
 31/14 32/15 36/3
 37/12 38/12 38/21
 42/8 42/18 47/25
 50/6 50/6 57/4
 57/23 64/19 65/23
 71/16 71/21 78/9
 81/11 82/15 92/13
 93/18 97/23 99/4
 102/2 107/17
 110/12 115/18
 119/18 121/22
 127/8
**become [3]** 56/5
 57/11 101/12
**becomes [1]** 87/13
**becoming [1]** 77/6
**been [32]** 4/2 6/8
 6/18 8/4 9/3 21/9
 21/14 38/22 40/6
 42/23 42/24 43/17
 45/2 58/12 63/21
 67/3 78/1 80/16

 81/19 83/14 88/12
 90/2 93/96 / 25 Fi95/14
 98/21 106/11
 108/11 112/9
 114/13 115/21
 119/11 127/10
**before [35]** 1/10
 4/5 4/18 4/23 8/6
 10/23 12/9 24/8
 24/19 29/23 39/7
 40/5 40/7 42/10
 46/19 48/11 48/25
 51/2 51/11 55/11
 61/12 61/13 73/8
 75/12 92/24 94/9
 94/14 94/16 103/24
 116/17 120/22
 122/9 122/12
 122/24 123/16
**beforehand [1]**
 51/10
**began [1]** 8/21
**beginning [3]**
 63/14 90/16 127/9
**begun [2]** 23/1
 34/19
**behalf [4]** 2/5 3/9
 54/2 78/14
**behaves [1]** 33/14
**behavior [5]** 23/2
 26/20 26/22 27/23
 28/24
**behaviors [4]**
 18/18 18/19 20/5
 21/6
**behind [2]** 90/7
 115/16
**being [21]** 8/16
 8/24 25/20 33/7
 33/16 34/14 35/12
 35/13 36/2 38/17
 43/2 43/3 43/15
 43/15 50/14 66/23
 70/18 79/22 101/20

 112/22 115/17
**be-labor [1]** 115/21
**believe [11]** 5/22
 6/8 6/17 28/12
 34/11 37/15 44/16
 70/17 74/18 112/12
 125/13
**believes [1]** 44/14
**below [2]** 88/21
 120/8
**Ben [2]** 117/10
 117/20
**besides [2]** 60/23
 62/23
**best [4]** 16/23
 25/4 25/6 65/19
**BETH [1]** 1/10
**better [4]** 14/1
 14/21 29/17 103/11
**between [13]** 73/17
 82/17 86/21 92/21
 98/3 104/3 109/13
 109/17 109/24
 111/3 111/24
 115/12 123/5
**beyond [5]** 11/1
 17/21 52/18 52/19
 53/11
**bike [2]** 61/2 61/8
**binder [2]** 19/2
 29/14
**birthday [2]** 118/4
 118/19
**Biscayne [1]** 1/14
**bit [8]** 12/18 61/6
 61/8 90/24 99/22
 104/4 104/14
 104/16
**Bitcoin [26]** 41/25
 59/1 77/24 78/11
 78/18 78/18 87/13
 87/17 89/2 90/2
 90/15 92/9 92/11
 93/1 94/8 99/25

USCA11 Case: 22-11150    Document: 53-2    Date Filed: 11/30/2022    Page: 96 of 254

# B

**Bitcoin... [10]**
100/10 102/7 102/9
103/22 105/5
105/10 106/9 125/3
125/3 125/8
**bits [2]**  93/20
93/22
**Blacknet [2]**  81/19
93/17
**blank [3]**  59/12
59/16 86/14
**block [4]**  12/21
79/25 91/3 101/8
**blockchain [9]**
90/15 92/12 92/20
94/8 100/6 101/12
103/2 105/10
106/10
**blogs [2]**  102/20
102/21
**BLOOM [1]**  1/10
**blow [1]**  28/1
**blow-up [1]**  28/1
**board [2]**  11/9
109/8
**BOD [1]**  77/9
**BOIES [1]**  1/15
**book [1]**  38/13
**Boost [2]**  100/9
100/14
**Borland [2]**  71/1
71/2
**born [3]**  59/19
59/20 104/1
**boss [1]**  84/18
**both [13]**  9/11
11/10 12/13 12/20
25/1 26/22 47/20
64/1 71/13 80/8
92/17 102/20 106/4
**botnets [1]**  83/15
**bottom [2]**  85/21

126/20
**bought [2]**  69/17
127/7
**Boulevard [1]**  1/22
**box [1]**  88/22
**boy [2]**  76/12
117/18
**breach [1]**  128/5
**break [5]**  48/4
48/5 54/10 54/12
104/24
**breaks [2]**  39/25
99/4
**BRENNER [10]**  1/16
2/6 3/9 5/5 40/15
40/18 41/6 44/7
47/22 48/19
**brief [2]**  54/8
54/9
**briefly [3]**  11/19
53/15 82/21
**bring [18]**  4/19
4/22 6/23 7/10
10/2 10/17 16/16
19/1 20/9 23/17
29/14 41/4 41/5
42/4 48/11 54/9
54/24 54/25
**bringing [1]**  55/4
**Brisbane [9]**  59/20
65/8 104/1 104/5
104/6 104/9 113/8
120/18 120/24
**broad [1]**  73/20
**broad-based [1]**
73/20
**broke [2]**  83/24
127/19
**broken [1]**  73/16
**brokers [1]**  73/18
**bromance [1]**
102/19
**brought [1]**  86/10
**build [6]**  57/18

62/12 63/8 63/9
**building [6]**  63/7
70/7 73/15 83/17
84/12 101/25
**built [15]**  63/9
70/3 70/4 70/10
71/1 73/5 73/19
73/21 74/21 74/23
74/24 75/2 82/2
90/19 118/18
**burnout [1]**  111/5
**Burnside [1]**  110/5
**burnt [1]**  111/19
**business [32]**
38/18 41/16 41/20
42/15 42/16 58/25
72/5 74/4 74/6
74/6 74/9 74/12
74/19 86/9 103/21
104/15 120/5 122/3
122/5 122/11 124/7
124/16 124/20
125/16 125/21
125/24 126/1 126/8
126/10 126/15
126/17 126/25
**businesses [2]**
72/13 79/12
**buy [2]**  71/5 81/6
**buying [3]**  71/6
72/14 127/9

# C

**call [9]**  3/1 3/3
32/7 48/18 53/9
61/17 62/25 69/12
75/13
**called [23]**  11/2
11/6 11/23 12/14
15/20 57/8 69/9
70/16 74/9 76/2
81/19 86/1 93/17
93/18 95/1 95/21

C

called... [7]
98/13 99/8 102/19
104/7 104/8 112/4
127/22
calling [2]   3/4
42/14
calls [4]   34/1
41/16 58/5 108/16
came [4]   29/24
64/5 116/3 121/22
can [62]   4/16 5/14
6/23 10/10 13/3
13/6 13/7 13/7
13/8 13/10 23/23
24/15 24/17 29/14
32/9 33/24 34/18
39/9 39/10 39/17
40/19 41/1 41/4
41/5 42/18 47/5
51/9 52/16 53/5
53/16 56/21 57/8
57/17 59/24 64/14
64/15 65/15 66/8
66/8 69/25 70/12
75/4 77/22 78/7
78/13 82/22 85/2
89/22 90/9 108/2
109/17 113/13
113/14 116/9 117/9
118/6 119/13
119/23 124/14
125/15 125/19
126/24
can't [2]   33/14
75/18
Canberra [1]   96/1
cancer [1]   66/19
capability [1]
109/25
capacity [4]   7/22
8/2 8/20 18/21
capital [2]   124/25

126/6
care... [1]   122/13
care [1]   110/25
careful [2]   40/6
43/19
caregiver [1]   28/3
caregiver's [1]
21/23
Carnegie [1]   57/22
Carol [1]   83/1
carries [1]   52/10
cars [1]   106/19
case [26]   1/2 3/3
3/4 5/20 6/11 8/18
9/22 11/21 18/1
18/2 21/11 27/21
27/25 40/6 41/14
43/2 43/10 43/16
44/17 47/15 53/6
53/19 56/25 76/10
77/22 77/23
cases [17]   5/24
6/6 6/9 6/18 6/20
6/25 7/2 7/2 7/4
7/11 7/14 7/16
7/19 7/22 8/22
8/23 115/21
casino [6]   74/22
74/22 80/16 81/3
81/6 81/10
casinos [2]   80/20
80/24
category [2]   44/12
46/12
catholic [1]   65/24
cause [7]   45/22
46/3 49/13 49/20
50/3 50/25 66/10
ceiling [4]   15/20
16/5 16/7 16/25
Celine [2]   15/7
15/9
center [1]   48/19
centigrade [1]

107/16
central [3]   72/21
77/22 106/6
centralized [1]
89/8
certain [12]   16/3
16/13 17/15 17/20
43/10 46/17 46/18
48/1 49/7 49/8
78/23 102/20
certainly [9]   4/8
4/14 4/16 34/3
34/5 39/25 43/17
45/3 76/21
Certificate [1]
2/2
Certified [1]
129/5
certify [2]   129/7
129/12
cetera [5]   70/19
70/22 115/17 126/6
127/4
challenge [1]
29/12
chance [1]   75/5
change [4]   91/4
98/2 98/2 113/5
changed [3]   27/14
86/3 111/12
changes [3]   29/23
112/1 113/18
changing [2]   34/9
111/25
charge [2]   4/8
88/17
charity [1]   110/6
Charles [3]   68/17
68/18 75/18
Check [1]   107/24
checking [1]   52/2
Chermside [1]
59/20
child [3]   16/13

USCA11 Case: 22-11150    Document: 34    Date Filed: 11/30/2022    Page: 98 of 254

**C**

**child... [2]** 36/19
62/18
**childhood [1]** 21/7
**children [12]**
16/12 19/20 25/22
26/1 26/7 27/9
27/15 30/10 30/11
32/14 56/20 117/11
**Chinese [1]** 65/17
**chip [1]** 80/7
**chips [1]** 80/11
**choices [1]** 24/21
**chosen [1]** 91/1
**churches [3]**
105/18 105/19
111/3
**Cicchetti [1]**
15/19
**circumscribed [4]**
40/10 43/4 52/25
57/19
**Cisco [2]** 107/23
107/25
**Civil [1]** 3/4
**claim [2]** 77/23
77/23
**claimed [1]** 125/5
**claiming [1]**
122/16
**clarifications [1]**
25/15
**classic [1]** 47/17
**clean [1]** 111/8
**clear [3]** 7/21
32/12 45/6
**clerk [1]** 4/7
**client [4]** 3/11
34/19 35/1 87/25
**clients [2]** 73/6
79/24
**clinical [5]** 26/5
27/11 27/20 31/3

37/8
**clinician [9]**
14/17 25/6 26/9
27/12 27/20 30/15
31/1 31/2
**clinicians [2]**
17/12 29/10
**close [4]** 60/25
62/5 70/18 127/2
**closed [1]** 77/1
**closer [1]** 61/6
**closing [3]** 44/2
82/19 127/5
**CLR [1]** 129/17
**club [1]** 70/3
**coalesce [1]** 84/6
**coast [1]** 106/6
**COBOL [1]** 69/19
**code [23]** 70/19
87/10 87/11 87/15
87/17 89/21 90/17
90/18 92/10 92/11
92/19 92/23 94/8
94/15 94/15 94/17
98/12 100/6 100/7
100/18 101/8
101/18 102/5
**coded [1]** 70/10
**coder [1]** 100/12
**codeveloper [1]**
103/10
**coding [24]** 69/6
69/14 69/22 70/1
70/6 70/12 71/8
72/11 72/15 72/25
73/2 73/13 74/7
87/10 90/7 90/13
90/15 90/22 90/24
92/9 93/1 93/9
93/10 93/11
**cognitive [2]**
18/20 23/12
**coinventor [2]**
103/2 103/10

**collect [1]** 64/9
**collection [3]**
38/13
**college [4]** 64/23
64/24 65/6 65/8
**column [2]** 88/14
127/1
**com [1]** 118/14
**combination [2]**
69/18 69/22
**come [16]** 25/5
36/20 36/24 38/17
39/12 47/2 48/9
51/7 63/24 77/19
83/9 83/12 90/21
100/14 109/8 110/3
**comes [3]** 9/21
31/16 97/24
**comfort [1]** 104/24
**comfortable [2]**
25/19 58/13
**coming [2]** 37/3
59/24
**commendation [1]**
123/24
**commensurate [1]**
23/10
**comment [3]** 37/20
43/2 96/6
**comments [11]**
96/15 97/7 97/11
97/17 98/10 98/17
98/17 98/23 101/21
101/24 103/16
**commercial [1]**
123/20
**commit [1]** 49/15
**Commodore [1]**
71/13
**comms [1]** 106/15
**communicate [2]**
56/24 62/13
**communicating [1]**
57/5

**C**

communication [11]
18/24 19/19 19/23
19/24 32/6 33/23
40/14 44/15 44/19
45/10 106/21

communications [3]
62/15 62/25 123/22

communicatively [1]
56/23

community [7]    20/1
20/9 20/12 20/12
20/14 20/15 20/16

companies [7]    63/4
82/5 113/6 125/3
126/2 127/12
127/13

company [22]    41/24
41/24 41/25 69/9
73/25 74/15 75/24
75/25 76/2 82/7
82/7 83/24 85/4
86/1 86/11 86/12
88/11 112/6 125/2
125/10 127/8
127/10

comparing [1]    14/4

comparison [1]
10/11

compatible [1]
11/7

competing [1]
109/11

competition [2]
65/18 109/13

compiler [1]
100/13

compilers [1]
70/22

complete [7]    9/20
16/3 16/8 17/15
17/20 24/10 129/10

completed [5]    10/7

13/15 44/5 66/3
99/14

completing [1]
16/6

complex [2]    96/9
97/9

computer [29]    9/17
9/17 9/22 9/23
13/21 14/10 14/11
14/20 31/19 62/8
63/9 63/11 66/13
68/11 69/6 70/2
72/6 72/13 74/7
78/19 82/3 88/11
88/17 102/21
106/15 107/10
122/21 125/21
127/7

computer-aided [1]
82/3

computer-related
[1]    72/6

computerized [1]
19/10

computers [31]
63/8 69/15 70/3
72/14 105/7 105/9
105/12 105/14
105/20 106/3 106/9
106/12 106/23
107/5 107/13
107/20 107/20
108/3 108/8 109/3
109/11 109/13
109/18 109/20
109/20 109/23
110/5 110/23
111/20 111/22
122/8

concept [4]    17/25
28/23 81/19 89/8

conclude [1]    53/15

concluded [1]
51/20

conclusion [1]

condition [3]    29/9
52/9 107/17

conditioning [4]
106/20 107/11
107/12 107/14

conduct [1]    25/5

conducted [2]
11/23 24/24

conference [2]    4/9
99/18

congratulated [1]
57/2

connected [1]
73/18

connection [2]
6/10 43/8

connections [5]
63/3 73/17 79/23
105/21 107/1

consecutively [1]
17/20

considerably [1]
6/3

considered [1]
36/5

considering [1]
95/8

consistently [6]
22/15 22/16 22/18
22/20 22/21 28/25

consists [1]    33/23

constantly [1]
42/14

consultant [1]
79/17

consultation [1]
24/25

contains [1]
129/12

content [1]    13/16

contention [1]
78/17

**C**

**context [11]**    11/2
30/16 31/3 37/22
43/23 47/6 50/6
50/9 51/4 51/6
90/23
**continue [10]**    5/5
48/5 49/3 62/22
66/4 73/9 75/25
79/16 89/24 128/9
**continued [6]**    2/6
5/7 68/9 68/12
77/6 94/2
**contract [6]**    69/9
72/15 72/17 82/1
89/13 95/25
**contracting [1]**
73/25
**contradict [2]**
46/7 50/22
**contradicted [1]**
50/2
**contradictory [1]**
46/8
**contrived [1]**
38/21
**control [1]**    75/3
**controlled [3]**
70/21 89/9 101/19
**controllers [3]**
105/15 105/16
107/7
**conversation [3]**
12/6 12/9 12/22
**convinced [1]**
102/17
**convoluted [1]**
96/9
**coping [1]**    20/3
**copper [1]**    107/2
**copy [7]**    8/10 8/11
16/18 95/21 98/8
98/8 98/9

**Coral [1]**    1/22
**corporate [2]**    78/13
84/13
**correct [56]**    5/25
6/9 7/5 8/2 9/25
10/12 11/11 11/21
11/22 11/24 12/1
12/2 12/7 12/8
12/15 13/22 14/25
15/6 15/10 16/15
18/15 19/12 19/13
19/17 20/22 20/23
21/19 22/1 22/9
22/12 22/24 23/5
25/12 30/2 31/22
31/23 32/2 32/3
32/5 33/12 35/21
36/5 37/7 37/24
45/21 49/14 49/20
49/22 49/23 50/4
51/1 81/4 117/6
124/19 125/22
129/10
**correctly [3]**
33/25 65/7 75/24
**corroborated [1]**
13/17
**cost [6]**    108/3
108/5 108/7 108/20
108/20 127/2
**costs [1]**    127/5
**could [51]**    7/1
7/10 7/17 8/5 10/2
10/17 11/14 13/5
14/4 23/17 24/7
25/5 32/21 36/7
46/13 46/15 46/16
46/16 46/18 46/19
46/20 46/21 48/17
51/10 51/11 53/15
54/9 59/25 61/6
75/1 79/11 80/11
80/11 81/10 83/20
84/23 85/17 85/22

85/23 87/19 91/5
112/15 114/16
116/12 116/13
118/20 121/1 121/5
125/17
**couldn't [4]**    64/25
78/17 92/10 109/6
**counsel [10]**    3/6
3/7 32/25 43/11
58/17 59/15 84/23
114/4 114/13
114/17
**count [1]**    20/24
**counted [1]**    15/13
**countries [2]**    80/1
80/13
**country [3]**    26/18
81/11 81/13
**couple [8]**    20/6
69/19 82/17 95/22
98/11 99/5 104/13
122/21
**course [3]**    53/6
84/24 114/8
**court [22]**    1/1
1/23 1/24 3/1 4/3
4/4 4/6 4/12 6/3
7/24 41/4 43/4
46/9 46/9 58/17
59/13 84/24 114/13
114/17 114/21
129/6 129/9
**Court's [2]**    47/3
55/4
**courtroom [2]**
47/20 117/12
**Courts [1]**    50/21
**cousin [2]**    95/21
110/21
**covered [2]**    45/19
122/23
**COVID [1]**    6/2
**coworkers [1]**

**C**

**coworkers... [1]**
110/14
**CP [2]**   71/3 71/13
**CP/M [2]**   71/3
71/13
**crack [1]**   3/16
**craig [18]**   1/7 2/8
3/5 3/15 3/17 9/12
58/5 58/10 116/19
116/19 116/21
116/24 117/10
117/16 126/1
126/12 126/13
126/16
**crash [1]**   111/5
**crate [1]**   64/1
**create [1]**   17/20
**created [4]**   115/17
118/2 118/25 119/7
**creating [1]**
107/18
**credentials [1]**
77/25
**credibility [2]**
40/8 40/17
**credible [1]**   42/7
**credits [2]**   81/20
93/19
**crisis [3]**   91/15
91/20 91/21
**criteria [3]**   14/15
14/15 14/18
**critical [1]**   26/16
**cross [6]**   2/6 5/7
47/17 48/3 52/18
128/10
**cross-examination
[4]**   2/6 5/7 47/17
128/10
**CRR [1]**   129/17
**crypto [2]**   81/20
93/19

**cryptographic [1]**
129/17
**CSR [1]**   129/17
**current [2]**   86/3
124/25
**cut [2]**   96/17
97/18
**cutoff [1]**   10/24
**cv [1]**   1/2

**D**

**D-O-C [1]**   88/7
**D426 [1]**   118/15
**D427 [2]**   118/20
118/22
**Dai [11]**   94/16
94/22 94/23 98/6
98/8 98/12 100/3
101/7 101/8 102/6
103/5
**daily [3]**   18/24
19/19 19/25
**data [3]**   21/2 99/8
99/21
**database [3]**   71/22
75/13 125/3
**databases [1]**   73/5
**date [8]**   85/9
87/16 92/24 93/19
119/7 121/9 121/14
121/22
**dating [1]**   118/1
**Daubert [4]**   41/10
42/9 43/8 43/16
**Dave [14]**   41/16
41/23 42/14 42/16
43/22 98/8 101/9
102/18 102/22
102/23 102/24
102/25 127/21
127/25
**Dave's [1]**   102/16
**David [21]**   1/4
59/1 92/5 92/8

92/25 94/7 96/13
99/1 99/13 99/16
99/20 102/6 102/11
103/2 103/21
110/17 127/14
127/16 128/1 128/3
128/5
**day [11]**   1/9 32/4
32/4 33/15 33/15
107/18 120/16
120/17 121/17
129/9 129/15
**days [3]**   71/3 73/7
121/1
**de [1]**   1/22
**deadline [1]**   87/9
**deadlines [2]**   87/2
87/2
**deal [1]**   42/18
**dealing [2]**   15/25
80/25
**dealings [1]**   113/3
**death [3]**   127/14
127/16 127/18
**debugging [7]**   93/1
100/7 100/17
100/19 101/7 101/9
101/15
**decades [1]**   52/3
**deceitful [1]**
43/15
**deceive [3]**   43/11
44/23 44/23
**December [5]**   91/19
100/24 117/25
117/25 121/16
**decided [2]**   73/24
91/2
**DECK [1]**   63/5
**Deckers [1]**   63/5
**declaration [2]**
46/17 124/14
**declarations [4]**
46/7 46/8 46/9

**D**

**declarations... [1]**
50/1

**decorative [1]**
64/8

**deductions [3]**
122/2 122/3 122/15

**deemed [1]** 24/22

**Defendant [4]** 1/8
1/19 2/5 58/10

**Defendant's [15]**
2/11 4/5 54/6 58/4
84/24 85/12 85/16
85/17 114/16
114/20 115/1
115/25 118/6 119/2
119/2

**Defense [3]** 1/4
58/5 125/25

**deficits [1]** 32/14

**Define [1]** 37/1

**defined [2]** 14/16
36/24

**defines [1]** 32/12

**defining [1]** 52/4

**Definitely [1]**
111/1

**definition [3]**
23/11 29/6 38/11

**definitions [1]**
38/12

**defraud [1]** 128/3

**degree [26]** 65/9
66/4 66/9 66/12
66/17 66/24 68/5
68/12 68/15 73/22
75/9 75/12 75/17
90/1 115/20 122/19
122/25 122/25
123/1 123/2 123/4
123/7 123/13
123/16 123/17
123/23

**degrees [7]** 66/14
66/18 66/21 75/4
107/16 115/22
122/18

**delayed [1]** 30/18

**delete [1]** 98/1

**delineates [1]**
26/23

**demands [1]** 29/2

**demonstrates [1]**
115/16

**DeMorgan [7]** 74/10
74/11 74/11 74/13
74/16 74/19 75/24

**denying [1]** 4/5

**department [1]**
125/6

**depending [1]**
23/22

**depends [3]** 48/22
108/1 120/16

**deposed [2]** 8/4
9/3

**deposing [2]** 37/15
38/2

**deposition [6]** 8/1
8/17 8/19 33/8
45/2 45/20

**depositions [1]**
7/23

**derivatives [1]**
70/24

**derives [1]** 70/15

**describe [4]** 34/14
64/14 66/8 66/8

**described [4]**
18/25 69/23 75/9
112/23

**describes [1]**
125/21

**describing [3]**
33/22 81/17 87/8

**description [1]**
95/5

**design [2]** 75/13
70/6 112/8 75/4

**designs [1]** 70/4

**desktop [1]** 105/12

**detail [3]** 13/21
18/25 98/24

**details [5]** 50/8
118/12 118/23
124/9 127/12

**detect [1]** 82/4

**detected [1]** 75/1

**detection [1]** 82/6

**determination [1]**
115/19

**determine [2]**
46/23 105/3

**determined [1]**
115/12

**develop [4]** 52/23
76/9 78/11 80/4

**developed [8]**
41/20 73/7 76/7
82/3 82/4 93/21
115/20 125/4

**developing [3]**
23/9 32/17 82/10

**development [1]**
93/16

**developmentally [1]**
17/16

**DEVIN [1]** 1/13

**diagnosed [4]**
55/25 56/14 64/22
66/19

**diagnosis [4]** 11/7
45/21 45/22 52/6

**dictionary [3]**
38/11 38/12 38/13

**did [168]**

**didn't [29]** 17/24
23/15 24/6 24/16
30/21 31/4 42/3
61/4 66/24 69/20
78/18 79/8 80/23

USGA11 Case: 22-11150 Document: 53-16 Date Filed: 11/30/2022 Page: 203 of 254

**D**

**didn't... [16]**
81/22 83/17 84/5
91/1 91/3 91/4
98/1 100/10 100/13
102/14 103/8
106/18 107/17
109/6 110/12 112/8
**died [1]** 64/7
**differences [1]**
98/1
**different [27]**
7/25 12/19 25/25
28/21 28/21 28/23
33/22 43/18 50/21
63/4 63/8 64/3
71/4 74/10 74/14
78/8 78/13 79/9
80/8 80/11 80/12
82/10 97/23 97/25
99/7 100/12 111/24
**differently [1]**
50/5
**difficult [2]**
92/13 112/2
**difficulties [2]**
110/24 111/2
**difficulty [9]**
52/10 56/22 64/21
71/17 91/4 109/5
109/10 109/18
109/19
**digital [2]** 92/16
115/20
**dinner [1]** 42/2
**direct [9]** 2/8
40/8 40/10 42/3
42/23 44/5 47/9
58/21 70/19
**directions [1]**
16/7
**directives [1]**
17/19

**directly [8]** 9/21
30/1 37/6 43/7
47/25 50/22 78/10
119/4
**director [2]** 77/6
102/13
**disabilities [3]**
21/10 32/18 58/1
**disability [4]**
26/14 30/17 43/14
51/8
**disagree [1]** 46/2
**discarded [2]**
13/14 13/18
**discrepancies [3]**
32/7 32/13 33/21
**discrete [1]** 65/10
**discuss [3]** 4/14
39/7 102/14
**discussed [5]**
25/13 50/15 51/16
98/11 98/14
**discussing [1]**
25/7
**discussion [6]**
25/8 39/19 56/10
78/25 84/15 87/6
**disorder [3]** 11/2
11/7 64/22
**disputing [1]**
78/19
**distance [1]** 66/23
**distributed [2]**
83/22 89/11
**distribution [1]**
89/12
**DISTRICT [7]** 1/1
1/1 1/10 1/24
129/3 129/6 129/7
**dive [1]** 39/8
**dividend [1]**
122/15
**divinity [1]** 68/8
**division [3]** 1/2

84/14 84/14
**divorced [2]** 66/1
83/5
**DNS [1]** 107/7
**do [133]**
**do-over [1]** 44/4
**doc [3]** 88/2 88/2
88/4
**docketed [1]** 4/6
**doctor [2]** 3/25
27/18
**doctorate [2]** 68/9
123/12
**document [17]** 21/9
26/5 32/17 41/22
85/7 86/4 86/5
87/20 90/10 95/5
112/22 114/8
114/20 114/22
115/13 116/17
121/5
**documentation [1]**
93/25
**documented [1]**
89/20
**documenting [1]**
89/17
**documents [11]**
41/15 44/17 46/1
46/6 49/11 49/13
49/16 49/18 49/20
85/3 112/23
**does [34]** 6/25
10/4 12/3 16/16
16/22 18/21 20/20
22/14 22/15 25/21
26/9 27/13 28/6
28/18 28/20 29/1
30/1 31/9 31/9
38/1 38/3 38/3
55/24 56/14 57/14
87/23 88/14 89/3
89/7 89/16 89/23
95/25 104/1 122/13

**D**

**doesn't [7]**   20/19
32/10 37/22 43/24
45/14 46/2 86/23

**doing [30]**   16/12
25/6 46/23 50/10
64/25 66/12 71/10
72/6 72/19 73/9
74/1 79/3 81/24
82/11 82/13 82/20
83/14 87/25 90/1
101/24 104/23
111/10 112/1 122/5
122/6 122/6 122/18
122/20 126/17
127/5

**dollar [3]**   80/9
80/9 80/10

**dollars [5]**   108/9
108/9 108/12
108/25 125/1

**domain [16]**   19/21
20/13 20/24 23/22
32/7 33/23 105/16
107/6 116/22 117/5
117/6 117/7 118/2
118/13 118/18
119/7

**domains [12]**   18/19
19/15 19/16 19/18
19/21 21/7 23/13
25/18 32/8 33/22
33/23 118/14

**domestic [1]**   19/25

**Don [13]**   15/19
72/13 93/6 94/2
95/20 96/2 96/2
96/5 96/11 97/15
98/7 103/17 110/19

**don't [35]**   3/22
6/8 6/21 7/1 8/3
11/8 15/15 16/5
17/21 18/13 18/14

21/21 40/18 41/6
44/15 50/6 51/24
53/2 54/15 54/25
62/19 66/9 71/10
78/3 78/21 93/5
101/5 107/16 116/3
119/17 120/20
120/22 122/7 122/7
122/23

**done [19]**   10/1
10/23 12/16 12/17
12/20 26/11 26/12
38/19 42/22 48/19
70/16 80/24 80/24
89/13 91/5 91/9
93/24 111/19
121/11

**door [3]**   40/16
43/25 70/8

**Dorian [1]**   3/11

**double [1]**   106/19

**down [20]**   6/3
11/14 24/13 24/15
24/17 55/19 62/21
70/22 71/16 71/18
82/19 83/18 84/2
86/25 96/17 104/9
104/14 104/16
126/20 127/19

**download [1]**
101/18

**DR [98]**   2/6 9/13
10/4 10/24 11/9
12/12 15/19 15/19
16/21 18/1 18/2
18/3 20/22 21/17
25/22 26/6 27/8
27/14 28/2 28/7
29/25 30/14 31/17
31/19 31/20 33/9
34/14 35/18 36/18
37/5 37/7 38/2
38/4 38/20 40/14
41/11 41/15 41/19

41/22 42/4 42/7
44/14 45/22 45/25
46/16 46/17 46/21
47/3 47/19 48/9
49/11 49/13 49/18
50/1 50/11 50/21
52/6 53/6 53/23
53/24 53/25 55/1
56/25 57/3 57/8
58/7 58/12 58/23
58/25 59/12 59/19
67/20 67/25 71/16
72/24 75/5 77/23
78/17 80/23 87/12
88/6 105/3 112/19
113/14 114/8
114/12 115/9 116/4
116/16 119/4 120/7
125/15 125/15
126/7 127/14

**Dr. [70]**   3/5 3/15
3/17 3/23 5/2 5/3
5/9 8/16 11/21
11/23 12/3 13/3
13/20 14/9 15/9
16/21 16/22 17/6
18/7 19/2 21/15
22/1 22/8 23/15
23/15 24/21 25/16
25/25 26/5 28/8
30/21 31/9 33/7
34/9 35/17 39/5
39/8 40/7 40/19
40/20 42/3 43/1
43/2 43/6 43/18
43/21 44/5 44/13
44/20 45/13 46/25
47/1 47/12 48/18
49/5 51/19 51/25
52/3 52/8 53/15
54/17 54/18 54/25
55/8 55/16 55/17
56/14 58/3 58/5

**D**

**Dr. ...... [1]**   112/20
**Dr. Celine [1]**
15/9
**Dr. Craig [4]**   3/5
3/15 3/17 58/5
**Dr. Edman's [1]**
47/1
**Dr. Klin [39]**   3/23
5/2 5/3 5/9 8/16
25/25 30/21 33/7
34/9 39/5 39/8
40/7 40/19 40/20
42/3 43/1 43/2
43/6 43/18 43/21
44/5 44/13 45/13
46/25 48/18 49/5
51/19 51/25 52/3
52/8 53/15 54/17
54/18 54/25 55/8
55/16 55/17 56/14
58/3
**Dr. Klin's [3]**
19/2 44/20 47/12
**Dr. Matthew [1]**
112/20
**Dr. Saulnier [18]**
11/21 11/23 12/3
13/3 13/20 14/9
16/21 16/22 17/6
18/7 21/15 22/1
22/8 23/15 24/21
25/16 26/5 28/8
**Dr. Wright [3]**
23/15 31/9 35/17
**draft [1]**   95/6
**dream [1]**   102/16
**drew [1]**   44/24
**drive [5]**   34/20
34/20 104/4 120/13
120/24
**driving [2]**   34/23
111/24

**drop [2]**   61/12
66/23
**dropped [1]**   102/12
**drought [1]**   126/4
**dumb [1]**   63/3
**during [9]**   59/8
63/22 67/4 68/10
68/24 69/6 75/8
112/19 114/8
**dust [2]**   111/4
111/4
**dust-free [1]**
111/4
**dynamic [1]**   100/10

**E**

**each [13]**   3/19
4/25 9/13 11/8
18/18 19/14 19/21
22/11 23/22 39/23
47/4 50/22 105/21
**earlier [5]**   50/15
52/8 90/17 90/24
121/15
**early [14]**   21/6
63/2 69/11 70/15
71/2 71/3 71/3
71/12 72/19 72/19
73/7 81/20 91/21
120/20
**earned [1]**   125/10
**easier [1]**   59/9
**easily [2]**   55/25
56/15
**eCash [5]**   81/21
83/22 89/6 89/8
89/11
**ECDSA [1]**   94/18
**economics [1]**
122/21
**editing [1]**   99/22
**edits [1]**   99/1
**Edman [1]**   112/20
**Edman's [1]**   47/1

**educate [1]**   47/19
**educates [1]**   47/25
**education [4]**
64/14 65/9 122/14
122/16
**Edwin [1]**   65/21
**effect [3]**   9/5
37/16 47/19
**effectively [6]**
70/25 80/2 80/7
80/11 87/25 125/7
**effort [1]**   111/23
**efforts [1]**   44/22
**eight [5]**   20/25
64/17 69/16 69/22
70/1
**either [5]**   9/21
50/3 50/25 79/24
102/4
**electrical [1]**
66/12
**electricity [2]**
108/7 108/21
**electronic [8]**
62/15 63/6 63/8
63/11 69/10 70/6
80/7 119/14
**electronically [1]**
119/15
**electronics [2]**
62/7 63/6
**Eleven [1]**   63/12
**Elevens [1]**   80/13
**elicit [1]**   30/17
**eligibility [2]**
26/18 26/19
**eliminate [1]**
40/11
**else [6]**   10/15
40/14 65/20 73/8
96/6 99/10
**email [9]**   35/17
102/22 115/16
116/25 117/2 117/3

**E**

USCA11 Case: 22-11150 Document: 16-3 Date Filed: 11/30/2022 Page 106 of 254

**email... [3]**  117/4
117/7 127/17

**emailed [2]**  92/7
100/21

**emails [1]**  46/18

**emotion [3]**  55/25
56/15 56/21

**emotional [2]**  57/7
102/12

**emotions [2]**  56/17
56/22

**employed [1]**  85/6

**employees [1]**
75/24

**employment [2]**
76/1 121/9

**enable [2]**  82/18
88/1

**end [13]**  22/6
39/19 43/20 44/22
45/6 47/1 48/3
56/10 63/14 64/3
78/25 107/4 109/12

**ended [4]**  64/19
65/8 72/17 77/5

**engaged [2]**  101/23
103/15

**engaging [1]**  8/21

**engineer [1]**  63/6

**engineering [3]**
66/13 66/25 70/7

**enhanced [1]**  53/5

**enormous [1]**  32/13

**enough [3]**  19/11
79/8 91/14

**ensure [2]**  13/10
75/1

**enter [1]**  14/22

**entered [1]**  4/4

**entire [2]**  13/15
43/16

**entities [1]**  126/5

**entitled [1]**  42/12

**entries [3]**  88/3
125/16 126/25

**entry [6]**  87/23
88/9 88/10 88/20
89/3 89/15

**environment [1]**
111/4

**equipment [9]**  70/8
88/12 107/4 107/23
107/25 108/5 127/4
127/7 127/13

**equivalent [1]**
109/19

**errors [1]**  100/20

**ESQ [10]**  1/13 1/13
1/16 1/16 1/17
1/19 1/20 1/20
1/21 1/21

**essence [1]**  27/19

**essentially [2]**
46/22 47/2

**establish [5]**
24/13 28/5 77/25
78/1 78/2

**established [1]**
17/23

**establishing [2]**
52/10 78/11

**Estate [5]**  1/4
76/3 76/3 76/13
77/1

**Estates [1]**  76/25

**estimate [6]**  5/18
8/21 17/6 17/25
18/12 25/6

**estimation [1]**
8/22

**eSvn [1]**  101/17

**et [5]**  70/19 70/22
115/17 126/5 127/4

**etymological [1]**
35/24

**evaluating [1]**

21/24

**evaluation [3]**
13/25 25/4 25/7

**even [11]**  23/23
28/20 33/21 35/14
42/9 45/21 80/9
81/10 109/6 109/6
111/16

**eventually [1]**
74/15

**ever [1]**  92/25

**Everton [1]**  64/17

**every [5]**  11/9
24/24 47/4 65/23
74/24

**everybody [1]**
50/10

**everyday [6]**  14/13
18/22 18/22 28/25
29/2 31/20

**everyone [13]**  3/2
3/9 3/20 40/3 62/7
96/11 100/4 103/1
104/23 110/2
110/11 110/16
110/16

**everything [1]**
53/10

**evidence [25]**  39/2
39/5 40/5 43/2
43/5 43/5 43/25
45/3 45/23 45/25
46/20 46/24 47/4
49/10 50/1 50/11
50/14 50/20 51/15
85/15 85/16 112/12
116/13 119/20
119/21

**EX [1]**  2/11

**exact [1]**  120/22

**exactly [11]**  17/1
17/22 17/24 18/8
18/11 18/12 21/15
45/10 46/11 93/6

# E

**exactly... [1]**
120/20

**examination [14]**
2/6 2/7 2/8 5/7
40/10 42/11 42/23
44/5 47/17 51/20
51/23 58/21 59/8
128/10

**example [12]** 5/19
21/21 22/5 35/8
35/12 35/13 35/16
36/16 38/17 45/24
56/25 58/2

**examples [6]** 14/12
18/23 20/6 25/18
38/23 38/23

**except [2]** 18/20
51/2

**exchange [11]**
65/18 73/12 73/13
73/19 73/21 73/23
73/23 74/1 74/4
75/4 104/18

**exchanges [1]**
73/18

**exciting [1]** 98/20

**excuse [6]** 9/12
23/15 31/25 40/19
41/24 127/5

**excused [4]** 53/25
54/4 54/5 58/3

**exhibit [15]** 38/25
41/1 41/17 45/3
45/15 51/16 85/16
85/18 104/20 105/3
114/6 114/14
119/12 119/13
119/21

**exhibits [1]** 41/18

**expect [4]** 18/19
23/9 32/16 52/16

**expenditures [1]**

122/8

**expenses [7]** 122/7
122/14 122/14
122/16 125/8
126/25 127/1

**experience [4]**
7/21 17/4 78/9
115/19

**experiences [2]**
33/15 36/19

**experiment [1]**
92/17

**expert [13]** 5/16
6/11 27/11 27/20
29/10 46/21 46/25
47/14 47/24 49/17
52/19 78/20 108/16

**explain [12]** 34/2
41/10 42/4 45/20
46/22 47/5 62/10
69/25 70/12 85/20
109/17 126/24

**explained [1]** 37/2

**explaining [1]**
117/1

**expound [1]** 36/7

**express [1]** 56/17

**expresses [1]** 33/9

**expressing [1]**
56/22

**expressions [1]**
57/7

**expressive [2]**
19/16 19/24

**expressly [1]**
40/10

**extend [2]** 7/3
82/16

**extended [1]** 7/2

**extent [1]** 48/1

**extra [3]** 8/10
8/11 84/11

**extreme [4]** 29/7
32/14 57/8 58/1

**extremely [1]**

# F

**F-111s [1]** 71/23

**fabrication [1]**
77/24

**face [1]** 28/3

**faced [1]** 46/12

**faces [1]** 56/23

**fact [9]** 17/3 17/5
25/13 43/11 43/24
44/16 46/3 57/1
102/23

**factors [1]** 91/8

**facts [4]** 35/14
41/14 47/15 47/16

**Fahrenheit [1]**
107/17

**fail [2]** 98/16
107/13

**failing [1]** 32/14

**failings [1]** 81/23

**fair [4]** 16/14
19/11 25/2 35/23

**Fall [1]** 91/22

**Fallacy [2]** 99/8
99/21

**familiar [1]**
118/15

**families [1]** 29/13

**family [8]** 9/4
15/24 59/25 60/14
60/23 71/22 71/24
110/13

**far [4]** 7/21 93/20
120/15 125/9

**farm [8]** 105/11
106/8 107/9 111/16
120/9 126/2 126/2
126/3

**fashion [4]** 18/22
81/16 81/17 107/8

**father [7]** 60/1

**F**

**father... [6]** 60/2
60/3 60/4 60/7
65/21 65/21
**fault [1]** 35/14
**favorite [1]** 38/12
**fed [1]** 9/17
**federal [3]** 76/4
83/19 115/22
**feel [3]** 8/4 25/19
56/20
**fell [3]** 83/4
100/15 127/21
**felt [1]** 25/14
**FERNANDEZ [2]** 1/21
3/16
**feverishly [1]** 4/3
**few [5]** 41/22
60/20 83/8 98/1
98/9
**fiber [3]** 107/1
107/1 107/4
**field [1]** 52/4
**fifty [1]** 108/13
**fight [1]** 74/14
**fights [1]** 60/2
**figure [1]** 54/21
**figures [1]** 37/9
**file [1]** 116/2
**filed [2]** 119/15
125/6
**files [2]** 97/24
100/13
**filing [2]** 46/7
46/7
**filings [2]** 93/16
93/17
**fill [1]** 86/14
**filled [1]** 9/13
**fills [1]** 10/4
**final [7]** 89/20
91/2 121/11 121/16
121/22 121/24

122/20
**finally [2]** 34/20
123/6
**finance [2]** 75/11
123/21
**financial [3]**
91/15 91/20 91/21
**find [5]** 17/12
59/9 81/22 102/25
111/16
**fine [3]** 29/18
100/11 116/3
**finish [9]** 24/8
66/24 87/9 87/15
87/17 87/23 88/2
88/4 90/22
**finished [6]** 73/11
90/24 93/11 122/19
123/18 123/25
**Finney [9]** 94/13
94/19 94/20 100/12
101/2 101/23 102/6
103/7 110/2
**firewall [3]**
107/23 107/24
113/18
**firm [10]** 77/5
77/9 77/13 78/9
79/2 79/10 82/13
102/14 113/8
121/23
**first [40]** 17/9
28/1 34/18 46/12
55/24 61/13 64/17
65/9 66/3 66/3
69/14 69/24 71/8
71/20 73/21 74/22
75/20 81/15 81/18
82/25 83/7 85/20
90/12 93/16 94/1
94/25 95/6 95/15
95/17 95/18 95/20
96/6 96/7 96/16
105/24 112/6 114/5

118/24 118/25
**five [10]** 20/25
32/11 48/5 54/11
55/2 55/6 60/1
104/17 108/13
111/7
**five-minute [3]**
48/5 54/11 55/6
**FLEXNER [1]** 1/15
**flicked [1]** 97/13
**flip [4]** 122/12
124/1 124/2 125/13
**floating [1]** 97/23
**flooded [1]** 111/21
**flooding [1]**
111/20
**FLORIDA [9]** 1/1
1/14 1/18 1/22
1/25 129/3 129/7
129/15 129/18
**flow [1]** 78/10
**flsd.uscourts.gov
[2]** 1/25 129/19
**flush [1]** 111/9
**focused [7]** 20/4
35/10 35/22 35/24
37/6 38/5 38/9
**focusing [1]** 58/1
**follow [3]** 24/9
89/17 102/17
**followed [2]** 46/13
77/2
**following [4]** 8/16
8/17 33/8 70/6
**follows [2]** 55/24
57/10
**Force [6]** 67/4
67/7 71/21 71/25
72/7 72/16
**forces [1]** 63/23
**foregoing [1]**
129/10
**forensics [1]**

USCA11 Case: 22-11150    Document: 53-12    Date Filed: 11/30/2022    Page: 109 of 254

## F

**forensics... [1]**
115/21
**forge [1]**   49/16
**forged [3]**   45/25
49/11 49/13
**forgeries [1]**
112/23
**form [13]**   4/11
4/13 9/18 9/20
13/7 16/18 58/25
85/3 85/21 86/5
86/8 100/12 126/15
**formal [2]**   84/10
84/16
**formally [3]**   83/8
100/4 118/4
**formatting [1]**
99/2
**formed [4]**   91/24
92/5 117/11 127/10
**former [1]**   110/14
**forming [1]**   84/4
**forms [2]**   10/11
70/15
**formulating [1]**
84/5
**forth [3]**   69/19
90/20 100/20
**Fortran [1]**   69/19
**Forty [1]**   57/15
**Forty-two [1]**
57/15
**forward [10]**   4/1
48/10 58/8 77/19
122/12 124/1 124/3
124/13 125/11
125/13
**forwarded [1]**
35/18
**forwards [2]**
100/23 102/22
**found [9]**   31/18

31/20 31/24 32/4
42/5 52/6 52/11
79/8 100/9
**Foundation [2]**
115/2 119/3
**founders [1]**   81/20
**four [11]**   6/19 7/4
7/16 7/19 20/25
32/11 48/20 105/11
105/14 108/13
120/13
**Fourteen [1]**
125/18
**fourth [1]**   66/24
**fragile [1]**   89/9
**fragments [2]**
93/15 94/15
**frame [3]**   83/10
89/21 109/7
**fraud [2]**   82/4
82/6
**fraudulent [3]**
46/6 49/18 49/20
**free [2]**   45/1
111/4
**FREEDMAN [3]**   1/12
1/13 3/10
**frequent [1]**   39/24
**Friday [6]**   5/15
9/7 34/10 34/18
38/4 38/16
**friend [2]**   53/7
99/13
**friends [5]**   65/15
76/14 91/25 102/24
102/25
**friendship [5]**
52/11 52/14 52/15
53/5 53/17
**friendships [1]**
52/24
**front [3]**   18/6
46/14 46/20
**FTP [1]**   100/1

**full [1]**   106/15
**fully [2]**   118/13
119/9
**function [1]**   73/9
**functions [2]**
31/25 31/25
**further [12]**   44/7
47/10 47/11 47/17
53/23 61/3 61/8
98/10 114/1 125/13
128/7 129/12

## G

**Gables [1]**   1/22
**gain [1]**   14/4
**gains [2]**   124/25
126/6
**gambler [1]**   81/5
**gambling [3]**   75/1
79/24 80/1
**game [5]**   69/8 69/9
69/24 71/6 84/1
**game-theoretic [1]**
84/1
**games [4]**   30/10
30/25 31/10 69/11
**gaming [8]**   79/18
80/4 80/6 81/1
81/16 82/16 82/18
83/11
**garage [4]**   106/18
106/18 106/19
107/12
**Gareth [2]**   97/1
98/6
**gave [9]**   13/13
16/18 31/10 35/16
36/16 87/2 89/1
97/1 101/8
**Gavin [7]**   101/11
101/13 101/16
101/20 102/1 102/3
102/6
**Gavin's [1]**   101/16

USCA11 Case: 22-11150    Document: 16    Date Filed: 11/30/2022    Page: 110 of 254

# G

**GCC [1]**  100/12

**geared [1]**  16/11

**generally [1]**  18/2

**generated [2]**
13/22 14/10

**generates [1]**
14/22

**gentleman [2]**  35/4
35/5

**Gentlemen [8]**  4/24
39/20 49/1 55/13
56/12 58/18 104/24
128/11

**Georgia [1]**  57/22

**Germany [1]**  62/14

**gestures [1]**  56/24

**get [26]**  3/3 5/1
5/14 7/17 8/11
10/5 23/3 23/3
29/14 35/2 36/17
45/20 56/21 68/9
76/18 82/18 97/7
107/15 109/4
109/22 110/2 110/4
111/19 114/14
115/4 122/24

**gets [8]**  14/12
27/8 27/9 37/6
70/19 70/23 78/11
119/16

**getting [4]**  12/12
21/1 75/3 111/25

**gifted [1]**  57/16

**give [10]**  4/7 4/15
8/11 22/5 47/24
48/4 51/13 61/10
75/5 91/15

**given [6]**  7/22 8/1
25/20 25/20 50/5
97/1

**giving [5]**  8/17
8/24 33/8 33/16

54/8

**glean [1]**  53/6

**global [1]**  73/17

**go [47]**  3/2 3/20
7/17 11/8 11/18
11/19 13/20 16/4
17/22 22/6 24/13
24/20 28/6 29/19
30/7 31/6 39/15
39/20 40/3 43/13
43/24 47/3 61/13
61/15 66/5 66/9
75/25 77/13 87/1
90/12 91/17 93/15
93/18 93/20 94/5
94/7 102/25 103/24
111/10 112/9 116/9
121/25 124/13
124/22 125/11
125/17 125/19

**godsend [1]**  102/10

**goes [10]**  15/20
16/5 39/6 43/1
70/22 78/22 83/24
84/2 88/22 89/5

**going [49]**  4/7
4/13 6/19 8/7 16/1
21/12 21/12 23/10
23/14 24/16 29/23
34/24 35/5 35/6
36/1 37/2 37/16
37/17 37/20 38/14
39/25 40/5 40/15
40/16 41/8 41/13
41/14 41/18 42/5
42/17 44/2 44/8
45/12 45/14 48/19
49/6 49/8 59/3
65/8 70/11 71/16
98/22 100/2 100/22
111/15 119/18
124/14 125/15
127/24

**going 45 [1]**  35/6

**gold [1]**  30/23

**gone [3]**  12/16
46/13 46/15

**Gonzalez [1]**  3/17

**good [17]**  3/2 3/12
3/13 3/19 4/24
4/25 5/9 5/10 5/13
51/25 52/1 58/23
58/24 102/2 103/16
120/17 128/8

**got [29]**  8/11 14/8
16/9 24/19 27/3
28/18 40/7 64/3
65/9 65/21 75/18
75/19 76/19 82/22
83/4 88/6 88/20
90/3 91/14 93/21
93/21 96/8 96/15
98/8 98/8 98/9
101/5 101/13
123/24

**gotten [1]**  34/20

**government [6]**
74/24 80/1 83/18
95/25 110/15
122/17

**graduate [1]**
123/18

**Grand [1]**  80/25

**grandfather [6]**
61/19 62/4 62/5
62/17 63/19 63/21

**grandmother [1]**
61/18

**grandparents [3]**
60/24 61/11 61/16

**Granger [8]**  84/19
84/21 87/3 87/5
87/6 87/8 88/16
98/7

**Granger's [1]**
86/19

**granted [2]**  118/4
119/9

USCA11 Case: 22-11150    Document: 18-1    Date Filed: 11/30/2022    Page: 111 of 254

**G**

**graph [2]** 89/25
91/1
**great [7]** 13/2
15/1 29/19 30/6
30/17 32/7 98/20
**Grokster [2]** 76/8
83/16
**ground [1]** 106/13
**group [1]** 93/25
**growing [4]** 60/15
61/1 61/16 62/9
**growing-up [1]**
60/15
**guess [3]** 5/15
48/22 102/16
**guys [1]** 9/23

**H**

**had [146]**
**hadn't [2]** 91/1
127/10
**hair [1]** 43/12
**hair-split [1]**
43/12
**Hal [13]** 94/13
94/16 94/19 94/20
100/11 101/2
101/22 101/22
101/23 102/6 103/7
103/15 110/1
**half [2]** 106/11
120/13
**Halloween [5]**
64/15 66/5 99/25
122/24 123/16
**hamshack [3]** 62/6
62/10 63/19
**hand [4]** 55/18
58/8 59/12 129/14
**hands [1]** 37/18
**handwriting [2]**
85/7 88/3
**handwritten [2]**

94/1 95/8
**happen [1]** 57/11
**happened [2]** 79/18
91/15
**happening [1]** 83/3
**happens [3]** 13/19
43/14 57/6
**happy [4]** 57/3
57/3 91/15 91/17
**hard [3]** 24/8
37/10 102/25
**has [35]** 4/4 4/12
13/20 15/11 23/1
28/5 36/5 38/21
39/15 41/9 42/4
43/17 44/14 44/19
45/25 45/25 46/25
48/18 49/10 49/11
49/17 49/25 50/11
50/20 55/2 55/17
78/2 79/22 85/21
86/14 88/14 104/14
116/4 119/4 126/20
**hate [1]** 120/16
**have [146]**
**haven't [2]** 7/23
78/1
**having [7]** 12/5
18/7 57/25 61/5
64/24 71/17 80/14
**he [143]**
**he's [14]** 38/8
38/9 41/12 42/3
42/13 42/14 44/20
46/18 54/18 57/4
94/24 95/25 103/10
103/10
**heals [1]** 84/3
**hear [2]** 61/4
80/23
**heard [9]** 41/11
45/25 47/21 49/10
49/17 50/20 53/10
77/22 126/18

**hearing [3]** 37/13
**heart [1]** 43/16
**heat [1]** 107/18
**heavily [2]** 96/17
101/13
**heavy [1]** 111/7
**Hector [2]** 112/4
112/4
**help [6]** 92/22
94/8 100/17 101/7
101/9 102/7
**helped [9]** 63/22
71/22 72/13 72/20
74/21 75/3 76/9
76/10 90/7
**helpful [1]** 59/7
**helping [1]** 110/1
**her [19]** 13/13
13/15 13/16 13/18
16/24 17/2 17/3
17/4 22/1 22/3
23/20 24/21 60/5
61/13 61/14 117/11
117/25 118/1 118/4
**here [28]** 8/10
16/20 18/6 19/7
19/14 34/10 37/16
37/17 37/20 46/23
54/19 82/22 87/8
89/8 90/3 94/23
102/9 103/9 107/17
112/19 112/25
117/12 120/7 121/8
121/21 126/24
126/25 128/12
**Here's [2]** 8/10
116/18
**hereby [1]** 129/7
**hereunto [1]**
129/14
**hernandez [6]** 1/23
1/25 129/5 129/17
129/17 129/19

USCA11 Case: 22-11150    Document: 53-8    Date Filed: 11/30/2022    Page: 112 of 254

**H**

**heteroscedastics [1]** 123/2

**Hi [2]** 3/2 3/12

**high [5]** 21/20 30/20 52/24 64/16 107/4

**high-end [1]** 107/4

**higher [2]** 11/10 11/11

**highlight [4]** 10/18 26/25 113/13 113/14

**highly [1]** 21/11

**highways [1]** 121/2

**him [37]** 11/11 26/2 31/8 36/18 36/19 36/20 37/3 37/5 37/15 38/17 41/13 41/15 42/6 42/7 42/10 42/11 45/1 45/20 45/24 46/1 47/4 48/18 50/25 53/9 60/11 62/6 62/8 62/22 64/7 65/23 86/21 92/6 93/5 100/24 103/1 103/9 127/22

**himself [1]** 33/10

**hire [1]** 112/6

**hired [1]** 112/4

**his [63]** 7/11 10/18 10/24 11/11 24/8 25/22 26/1 26/7 26/10 27/9 27/13 27/15 28/7 28/17 30/22 32/4 32/6 33/14 36/8 36/13 38/12 40/9 41/8 41/11 41/13 41/16 42/14 42/16 43/24 44/15 44/15 45/10 45/19 45/21

47/9 47/15 47/20 48/2 50/16 51/20/12 53/6 53/7 53/8 53/8 57/1 57/5 62/7 62/7 62/11 63/19 63/19 78/18 78/19 88/18 100/15 101/4 104/15 104/16 113/7 113/7 114/2 114/3 127/18

**history [2]** 21/8 35/25

**hold [2]** 42/6 115/4

**holding [2]** 36/24 37/17

**holidays [1]** 67/5

**home [6]** 105/25 106/3 106/4 106/5 106/10 106/17

**Hong [3]** 79/24 80/9 81/12

**Honor [61]** 3/8 3/14 3/17 3/24 4/20 5/6 7/11 10/18 33/24 34/4 38/25 39/3 39/6 40/4 41/19 42/22 43/20 44/9 45/19 46/8 46/11 47/7 48/17 50/13 51/9 51/13 51/14 51/17 51/20 52/20 53/22 54/1 54/3 54/7 54/13 54/15 54/23 58/5 58/16 59/11 61/23 65/2 67/20 67/23 76/20 77/16 77/18 78/16 85/11 85/14 104/19 112/13 114/25 115/2 115/3 115/7 115/24 116/1 119/1 119/3 128/7

**Honor's [3]** 42/9

**HONORABLE [1]** 1/10

**hooked [2]** 106/23 106/25

**hope [2]** 3/20 4/25

**hoping [1]** 81/9

**hosted [1]** 100/2

**hour [7]** 12/10 12/12 12/21 12/25 29/24 34/23 104/4

**hours [4]** 74/2 82/2 121/3 127/25

**hours' [2]** 120/13 120/24

**house [4]** 63/20 70/9 83/7 105/11

**household [2]** 56/6 57/12

**how [55]** 5/11 8/19 16/8 16/20 17/6 17/25 18/2 29/1 30/18 31/15 38/18 38/20 42/12 47/5 47/15 47/23 48/1 56/4 57/11 61/10 63/4 64/25 70/2 73/9 73/22 74/12 76/25 78/11 83/2 83/19 91/2 91/4 91/6 92/11 92/19 95/14 96/20 97/24 98/12 98/14 101/18 104/23 105/9 106/9 106/13 107/5 109/7 113/11 113/17 115/16 120/15 120/24 127/14 127/16 127/18

**however [2]** 56/21 82/19

**Hugely [1]** 22/1

**human [1]** 52/9

**humor [3]** 35/20

**H**

**humor... [2]**   36/6
37/10
**hundred [2]**   108/13
108/13
**hundreds [1]**   15/23
**hurt [1]**   56/21
**husbands [1]**   60/6
**hypothetical [3]**
47/14 47/24 50/17

**I**

**I'd [21]**   67/3
80/20 80/24 80/24
85/11 87/10 91/4
93/5 93/8 94/15
98/2 100/23 109/7
110/11 111/15
112/9 114/25 119/1
119/11 125/4
127/23
**I'll [26]**   3/8 3/14
7/6 22/5 23/17
27/6 31/12 41/10
41/18 42/19 44/10
48/23 51/17 52/21
66/9 68/7 72/2
75/8 79/21 80/21
81/8 90/21 102/5
108/18 123/9
128/11
**I'm [63]**   4/7 4/13
5/12 17/9 20/7
20/7 20/24 23/14
23/25 24/2 26/4
28/14 29/4 32/23
33/3 35/21 35/21
36/24 37/5 38/4
39/15 40/17 41/8
41/13 41/14 41/18
42/5 42/7 42/9
42/17 49/6 49/7
49/8 49/22 58/19
59/3 61/4 61/5

62/20 68/18 70/11
71/15 75/20 77/22
77/25 78/4 80/23
86/21 87/25 94/14
94/23 95/17 97/23
100/19 101/4 102/2
105/3 115/7 116/17
119/18 123/12
123/15 126/17
**I've [11]**   6/8 6/18
10/23 15/13 15/13
51/2 51/20 79/12
101/5 119/8 121/23
**i3 [3]**   109/20
109/20 109/24
**i3-type [1]**   109/20
**i5 [1]**   109/24
**ICANN [1]**   118/13
**idea [14]**   17/8
17/25 31/14 31/15
41/20 61/10 78/11
81/15 81/25 83/13
84/4 84/8 84/8
90/3
**identified [1]**
14/2
**identify [1]**
104/19
**identity [1]**   101/4
**Ignatius [1]**   90/4
**ignore [1]**   47/3
**ill [1]**   99/23
**Illievich [3]**
95/22 95/24 103/12
**illness [2]**   67/1
67/15
**illustrate [2]**
5/19 34/17
**illustrations [1]**
14/13
**immensely [1]**
102/9
**impairment [2]**
23/5 27/8

**important [6]**   22/18
29/5 48/18 54/16
**importantly [1]**
33/21
**inappropriate [2]**
44/3 44/6
**inch [1]**   106/14
**include [1]**   71/6
**included [8]**   25/22
25/23 26/3 26/3
28/2 28/4 28/8
81/21
**includes [1]**   127/4
**including [6]**   60/3
60/5 73/5 73/6
84/13 110/1
**income [7]**   71/5
120/5 121/9 124/18
124/20 125/6
126/25
**incomplete [1]**
25/14
**inconsistencies [1]**
14/3
**increase [1]**   125/6
**incriminating [1]**
35/15
**incrimination [2]**
35/13 51/5
**independent [2]**
56/5 57/12
**India [1]**   99/19
**individual [10]**
10/16 13/6 23/21
29/12 32/9 32/10
34/23 101/11 120/2
120/4
**individuals [29]**
23/9 23/11 25/6
26/10 26/11 26/12
27/13 27/15 29/4
29/6 30/11 30/19
32/17 37/10 49/19

**I**

**individuals... [14]**
50/4 51/3 52/22
52/24 53/19 56/17
56/22 57/15 57/17
57/18 57/25 74/25
100/5 119/15
**infer [1]**  42/15
**InfiniBand [1]**
107/3
**Info [1]**  1/4
**informants [1]**
38/22
**information [20]**
4/3 9/21 10/10
10/12 12/6 12/13
13/11 13/17 13/17
14/4 14/14 25/17
30/18 31/18 74/11
75/19 114/23
114/24 119/4
125/25
**informed [2]**
127/15 127/17
**initial [2]**  89/12
89/19
**input [3]**  12/7
13/20 31/18
**inputs [2]**  14/9
14/19
**insinuate [1]**
46/15
**installed [1]**
106/20
**Institute [1]**
57/22
**instructions [2]**
4/10 4/12
**instrument [1]**
27/22
**insulated [1]**
106/19
**intact [1]**  57/16

**integrated [1]**
93/25
**Integyrs [1]**
125/25
**Intel [1]**  109/20
**intellect [5]**
21/20 23/22 30/20
52/24 57/16
**intellectual [2]**
21/10 82/2
**intelligent [1]**
21/11
**intended [2]**  36/11
45/10
**intending [1]**  45/6
**intends [1]**  44/17
**intent [6]**  31/3
43/10 44/23 44/23
46/15 56/24
**intention [2]**
37/22 57/5
**interactive [1]**
101/20
**interest [7]**  25/22
25/24 26/1 26/10
27/9 27/13 122/14
**interested [2]**
26/6 98/12
**interests [4]**
52/25 53/7 53/8
57/19
**intermediaries [1]**
123/21
**internal [2]**  86/6
86/8
**internally [1]**
86/4
**international [3]**
80/15 123/20
123/21
**internationally [1]**
16/23
**Internet [5]**  63/2
72/19 105/21 117/6

118/25
**interpersonal [2]**
20/2 22/6 23/23
**interpretation [3]**
43/5 44/15 44/18
**interpreting [1]**
21/2
**interview [9]**
11/24 12/4 16/6
25/16 29/24 31/5
31/19 36/17 38/21
**interviews [1]**
12/19
**introduce [1]**  3/8
**introduced [1]**
112/10
**invade [3]**  40/7
40/11 43/4
**invent [2]**  59/1
103/9
**inventing [1]**
103/21
**invention [1]**
127/24
**inventor [1]**  77/24
**invite [2]**  92/8
110/10
**invoice [1]**  12/22
**involved [12]**  6/6
6/8 6/18 6/20 6/25
63/5 63/6 73/15
92/25 101/12
101/14 110/2
**IP [6]**  113/6 113/9
113/11 113/13
113/14 113/17
**Ipswich [1]**  104/3
**IQ [4]**  23/8 23/9
26/20 26/22
**IRA [3]**  1/3 3/5
3/11
**irony [1]**  37/9
**irrelevant [1]**
50/8

USCA11 Case: 22-11150    Document: 51-13    Date Filed: 11/30/2022    Page: 115 of 254

**I**

**irrespective [1]**
30/19

**is [349]**

**isn't [5]**   7/4
31/21 44/4 71/18
91/13

**isolated [1]**
107/10

**ISP [1]**   72/20

**issue [8]**   39/6
43/24 45/17 59/16
75/23 77/21 77/22
89/12

**issues [2]**   4/18
40/16

**it [252]**

**it's [74]**   4/8 4/25
7/14 9/16 9/18
10/12 11/1 11/6
12/3 12/4 12/5
14/10 14/23 18/21
21/7 22/11 22/18
23/4 24/8 25/11
28/13 28/24 30/13
30/21 30/22 31/4
44/1 44/2 45/3
45/3 47/1 47/1
47/7 47/8 47/16
47/23 47/25 48/20
52/20 59/16 62/11
62/11 70/14 70/17
70/20 71/11 78/10
78/17 78/18 79/9
79/11 85/5 85/8
86/6 86/11 88/2
88/6 89/17 90/19
98/22 104/3 104/4
108/2 108/10 112/2
115/17 117/2
119/15 119/20
120/4 120/13
123/10 123/13

128/11
**item [36]**   5/6
21/24 31/1 31/2
31/3 31/7

**items [17]**   13/23
14/14 15/14 15/23
16/1 16/25 17/1
17/2 17/15 17/16
17/20 18/9 18/15
21/12 25/20 31/5
64/8

**its [6]**   4/4 4/10
21/8 93/2 94/9
119/18

**itself [2]**   85/21
86/9

**J**

**Jack [1]**   69/12

**Jamie [2]**   104/11
113/6

**January [11]**   93/2
94/9 100/7 100/18
100/22 105/6
121/10 121/20
121/21 127/9
127/11

**Japanese [6]**   63/20
63/25 64/4 64/5
64/6 64/9

**jest [1]**   37/20

**job [8]**   58/2 61/13
61/14 71/9 71/11
71/20 72/5 72/24

**jobs [3]**   68/25
69/2 72/11

**join [2]**   67/6
67/11

**joined [1]**   67/4

**joint [5]**   2/12
66/12 119/11
119/13 119/21

**JORGE [2]**   1/20
3/15

**Josh [2]**   117/10

**judge [12]**   1/10
4/21 34/7 39/10
41/5 48/7 50/10
58/19 77/21 78/7
114/14 119/17

**judgment [3]**   22/2
23/20 24/21

**judicial [1]**
108/16

**July [2]**   89/21
120/6

**junction [1]**   107/2

**June [1]**   120/6

**juror [2]**   39/15
39/24

**jury [49]**   1/11
3/22 4/10 4/13
4/19 4/22 4/23
5/16 6/5 19/3 20/6
37/4 39/1 39/9
39/22 40/8 42/15
44/2 45/20 45/25
46/14 46/22 47/19
47/25 48/12 48/25
49/10 49/17 49/25
50/11 50/20 51/12
54/14 54/16 54/25
55/2 55/11 58/18
59/24 69/25 85/17
112/15 116/13
116/16 117/9
119/18 119/23
126/24 128/14

**jury's [4]**   42/12
42/17 43/4 50/12

**just [93]**   3/8 4/14
7/21 9/3 11/8
11/19 11/24 14/9
15/15 16/10 17/3
17/5 18/13 20/6
20/9 21/5 22/5
24/4 24/4 26/24

**J**

**just...** [73]   34/18
35/21 38/18 38/19
39/17 39/23 39/24
41/11 41/13 41/14
44/5 44/8 45/6
45/13 45/20 46/13
52/2 55/18 55/25
56/15 59/15 61/10
69/21 69/23 70/8
70/9 70/11 71/18
75/5 78/5 78/20
81/9 83/10 83/19
83/25 85/2 85/20
85/22 86/14 88/21
89/22 90/9 90/12
91/8 91/20 94/3
94/7 97/25 98/2
99/24 100/5 101/5
101/8 102/3 102/24
102/24 104/13
106/2 106/7 107/1
107/14 107/18
108/5 110/16
110/24 114/12
114/14 115/4 117/2
119/18 124/1
124/10 127/25

**K**

**Kangaroo** [1]   69/12
**Karabi** [1]   104/8
**Karl** [1]   3/17
**KASS** [2]   1/21 3/16
**keep** [12]   18/11
22/10 23/25 24/3
29/5 58/19 82/1
82/18 111/9 111/15
124/14 125/15
**keeping** [1]   110/24
**Kendalls** [1]   77/4
**kept** [4]   68/10
73/25 74/1 100/22
**kettles** [1]   70/8

**key** [2]   22/16
22/22
**kid** [1]   63/9
**kids** [1]   36/20
**killed** [1]   80/2
**kilograms** [1]
111/7
**kilometers** [2]
104/9 104/17
**kilos** [2]   111/13
112/2
**kind** [5]   82/13
86/14 102/21
108/17 122/15
**kinds** [1]   102/20
**KLEIMAN** [28]   1/3
1/4 3/5 3/11 41/16
42/14 42/16 43/22
59/1 92/5 92/8
92/25 94/8 96/13
97/5 98/8 98/17
98/17 99/8 101/9
102/6 102/18 103/2
103/21 110/17
128/1 128/3 128/5
**Kleiman's** [4]
99/20 102/11
127/14 127/16
**KLIN** [49]   2/6 3/23
5/2 5/3 5/9 8/16
19/1 25/25 30/21
33/7 34/9 39/5
39/8 40/7 40/19
40/20 42/3 43/1
43/2 43/6 43/18
43/21 44/5 44/13
45/13 46/16 46/21
46/25 47/3 48/9
48/18 49/5 51/19
51/25 52/3 52/8
53/15 53/23 53/24
53/25 54/17 54/18
54/25 55/1 55/8
55/16 55/17 56/14

58/3
**Klin's** [3]   18/23
44/20 47/12
**Kmart** [2]   72/12
72/12
**knew** [1]   110/14
**know** [40]   4/2 5/23
6/2 12/21 13/12
15/2 15/5 15/14
15/15 16/20 17/1
17/3 17/13 17/22
17/25 18/2 18/13
23/14 27/2 31/15
42/12 51/13 51/17
54/15 55/18 57/2
62/19 71/10 89/10
91/1 91/3 91/4
101/5 104/11
107/16 113/3
113/17 116/3 117/2
119/7
**knowing** [1]   29/1
**knowledge** [3]
57/20 79/9 104/11
**knows** [2]   10/8
10/16
**Kong** [3]   79/24
80/9 81/12
**KYLE** [2]   1/13 3/10

**L**

**Ladies** [8]   4/24
39/20 49/1 55/12
56/11 58/17 104/23
128/11
**language** [16]
19/24 35/9 69/17
69/18 70/1 70/12
70/14 70/17 70/18
70/19 70/21 70/23
70/23 70/24 90/18
90/19
**languages** [2]
69/22 71/9

USCA11 Case: 22-11150 Document: 53-16 Date Filed: 11/30/2023 Page: 117 of 254

**L**

**laptop [1]** 109/24

**laptops [1]** 105/13

**large [6]** 8/3 73/6
82/6 86/2 94/1
111/6

**larger [2]** 93/21
93/21

**Lasseters [14]**
74/21 75/8 78/9
79/3 79/16 79/19
79/22 80/2 80/4
81/2 82/12 82/15
87/11 90/17

**last [3]** 42/1 60/3
104/6

**Late [1]** 69/16

**later [12]** 12/7
13/14 21/8 53/9
69/10 70/25 72/17
72/18 73/24 83/8
87/13 93/20

**launch [1]** 74/21

**law [8]** 4/7 7/24
122/20 123/16
123/17 123/18
123/19 123/20

**lay [1]** 46/13

**layer [2]** 107/24
107/24

**Leading [4]** 72/1
79/4 80/19 109/14

**learn [5]** 62/20
62/21 79/11 127/14
127/16

**learned [3]** 70/25
83/11 83/18

**learning [2]** 57/20
70/2

**least [2]** 25/7
29/15

**leave [1]** 74/3

**left [8]** 9/6 64/5

83/3 121/14 121/15
121/16 121/21 121/23
121/23

**legal [1]** 8/21

**legally [1]** 74/22

**leisure [1]** 20/3

**Leon [1]** 1/22

**less [1]** 108/25

**let [35]** 4/2 5/3
8/10 20/6 24/5
24/10 39/11 39/17
42/19 44/13 46/12
54/24 54/24 55/20
58/12 59/15 60/7
70/11 82/21 83/10
86/25 87/3 88/13
90/8 90/12 94/7
99/24 103/24 105/4
106/2 112/9 114/4
115/4 116/8 122/15

**let's [45]** 3/2
4/22 5/14 8/6
11/13 11/18 11/19
19/1 20/9 22/10
24/10 26/24 26/24
28/1 28/6 28/10
28/11 29/14 29/19
29/20 30/7 39/20
48/5 54/11 54/21
55/2 55/10 64/15
74/17 81/5 85/20
88/20 89/3 89/15
98/8 114/5 121/25
122/12 124/1
124/13 124/22
125/11 125/13
125/15 125/18

**level [10]** 18/20
23/21 53/20 70/17
109/5 109/10
109/18 109/19
118/14 122/22

**libraries [2]** 71/1
100/10

**library [1]** 100/13

**LICATA [2]** 1/17
3/10

**licensed [1]** 74/22

**lie [1]** 49/16

**life [17]** 5/17
17/9 22/19 23/12
29/1 29/1 29/2
29/8 30/12 30/16
30/22 38/22 53/6
59/25 60/5 60/8
65/16

**lightning [1]**
111/17

**like [60]** 8/3
13/19 14/9 14/23
16/10 16/17 21/22
23/8 29/10 37/19
38/1 38/3 38/3
46/15 57/21 61/20
62/11 62/11 62/19
63/8 64/6 69/11
69/13 69/19 69/20
70/7 73/6 75/11
79/11 80/7 80/9
80/13 81/12 83/21
86/20 89/10 90/5
93/1 94/16 94/17
99/5 100/3 101/13
102/18 102/20
104/4 104/9 104/15
109/20 112/9
114/11 118/14
119/11 121/2 122/5
122/13 122/22
123/6 123/13
123/21

**likely [1]** 11/1

**likes [1]** 57/1

**LimeWire [2]** 76/8
83/15

**limine [1]** 41/10

**Limited [2]** 74/11
75/2

USCA11 Case: 22-11150    Document: 53-16    Date Filed: 19/30/2022    Page: 118 of 254

# L

**line [9]**   42/10
44/24 87/9 87/15
89/5 89/18 89/22
90/12 99/3
**lines [5]**   32/20
32/24 33/2 92/11
92/19
**link [2]**   100/3
100/10
**linked [1]**   70/21
**Linux [1]**   101/25
**Lisarow [7]**   105/11
105/19 106/1 106/6
106/10 107/12
120/15
**list [10]**   6/18
6/19 6/20 6/22 7/6
7/11 16/17 18/18
102/5 122/7
**listed [1]**   82/5
**listen [4]**   25/25
59/4 59/10 93/8
**listens [2]**   32/4
33/9
**listings [1]**   122/2
**lists [2]**   94/13
110/15
**literal [16]**   32/10
34/12 34/15 35/13
35/23 37/25 38/8
38/9 38/17 41/13
41/15 42/13 43/13
44/15 44/18 44/19
**literally [1]**
48/20
**litigation [1]**
114/9
**little [6]**   12/18
13/21 70/7 104/14
104/16 108/6
**live [9]**   60/14
61/1 92/18 104/1

113/21 113/23
113/23 113/25
**lived [3]**   104/6
104/7 120/18
**lives [4]**   104/3
104/12 113/4 113/4
**living [5]**   18/24
19/19 19/25 31/21
83/7
**LLC [1]**   1/4
**LLM [1]**   123/19
**LLP [2]**   1/12 1/19
**load [1]**   15/24
**located [1]**   68/20
**location [2]**
112/25 113/4
**locations [3]**
108/3 111/3 111/25
**logo [3]**   85/23
86/1 86/2
**long [11]**   47/8
73/9 73/22 74/12
76/11 76/25 83/2
95/14 96/8 96/20
107/18
**look [20]**   8/6 13/2
14/3 24/20 25/9
26/24 26/24 28/1
28/10 28/11 29/20
51/11 85/20 88/20
89/3 89/15 89/22
93/5 93/6 126/7
**looked [5]**   12/9
25/1 25/2 97/13
102/5
**looking [7]**   19/14
21/13 21/15 21/16
27/4 123/2 124/7
**looks [3]**   24/12
28/3 89/10
**lot [23]**   15/14
15/15 15/16 62/5
63/8 63/21 63/25
64/4 64/8 71/1

83/16 92/14 95/25
99/22 100/8 100/8
100/9 101/17
101/20 101/23
103/15 111/24
117/1
**love [1]**   110/11
**loved [2]**   102/23
102/23
**loves [1]**   103/1
**low [2]**   21/13
70/17
**low-level [1]**
70/17
**lower [2]**   23/5
26/22
**lump [1]**   121/11
**lunch [4]**   128/9
128/13 128/15
128/16
**Lynam [4]**   96/3
97/15 103/17
103/19
**Lynn [4]**   83/1 83/1
83/9 124/10

# M

**Mac [1]**   101/25
**MacArthur [2]**
63/24 64/5
**machine [6]**   70/18
70/18 70/19 70/23
100/15 129/8
**machines [5]**   63/4
100/11 105/12
105/14 105/16
**made [15]**   5/16
24/21 37/8 37/19
40/9 42/3 47/6
50/14 78/18 98/2
100/8 101/20
102/24 103/15
126/3
**Madura [1]**   109/10

**M**

**magazines [2]** 70/6
70/7
**maid [1]** 81/12
**mailing [2]** 94/12
110/14
**Maille [3]** 73/1
73/3 73/10
**main [6]** 87/17
94/13 96/8 104/16
107/22 126/13
**maintaining [1]**
52/11
**maintenance [1]**
111/22
**major [3]** 29/12
102/13 122/8
**make [30]** 15/15
36/2 36/7 36/10
36/23 36/23 40/18
41/7 44/17 44/22
48/17 49/8 50/8
50/9 51/3 55/9
57/20 62/20 69/21
78/18 86/24 87/4
96/6 98/2 98/23
98/25 102/25
107/14 109/6
115/19
**makes [2]** 49/15
84/2
**making [1]** 101/24
**maladaptive [1]**
20/4
**maladjustment [1]**
64/22
**Malaysia [2]** 79/25
105/16
**Malaysian [1]** 64/1
**Malbburang [1]**
112/4
**man [5]** 24/22 26/3
26/8 27/25 30/23

**manage [1]** 101/18
**management [4]**
75/20 101/17
105/13 107/25
**manager [1]** 73/4
**managing [2]** 84/9
102/2
**manner [1]** 50/13
**manual [1]** 14/16
**many [15]** 8/19 9/3
16/20 17/6 17/25
18/2 91/2 92/11
92/19 105/9 106/9
107/5 109/2 109/7
120/24
**map [1]** 14/17
**maps [1]** 14/14
**March [6]** 90/25
91/9 92/22 93/12
93/24 95/9
**marked [2]** 114/13
119/11
**marketplace [1]**
92/16
**marriage [2]** 83/4
127/21
**married [5]** 76/18
76/19 82/22 82/23
83/2
**mask [1]** 58/14
**master's [16]**
68/12 68/15 75/12
75/19 75/20 90/1
115/20 122/19
122/20 122/22
122/22 123/2
123/12 123/13
123/13 123/19
**match [1]** 27/11
**materials [2]**
19/11 27/5
**math [4]** 64/20
64/25 65/19 97/9
**mathematics [4]**

65/10 68/11 90/6
91/11 110/13 126/7
**Matthew [1]** 112/20
**Max [7]** 95/20 96/2
96/3 96/5 96/11
103/19 110/21
**may [40]** 5/5 7/11
7/12 10/18 10/20
19/3 19/4 28/15
34/2 34/4 38/25
39/2 42/15 42/18
45/2 50/5 54/9
54/9 55/9 57/25
58/11 58/17 59/14
67/22 76/20 77/16
81/18 81/19 88/21
91/21 93/18 95/13
96/24 97/20 100/2
100/4 112/16
116/14 119/24
126/18
**May '08 [1]** 95/13
**May called [1]**
93/18
**May had [1]** 81/19
**May in [1]** 81/18
**May of [1]** 96/24
**maybe [3]** 7/6 8/23
42/1
**McDonald's [1]**
110/12
**MCGOVERN [10]** 1/20
2/7 3/15 8/7 8/12
33/3 40/2 42/19
42/21 44/21
**me [96]** 5/3 6/11
6/17 7/6 7/24 8/10
9/12 13/16 16/16
17/22 18/7 23/15
23/24 24/4 24/5
24/9 25/10 31/25
35/21 36/17 38/2
38/3 39/11 39/17
41/25 44/13 46/12

USCA11 Case: 22-11150   Document: 35316/2   Date Filed: 11/30/2022   Page: 120 of 254

**me...** **[69]**   49/12
51/13 54/24 54/24
55/20 58/12 58/19
59/15 60/2 60/3
60/7 61/12 62/19
62/20 62/21 63/4
63/7 64/19 64/21
64/22 64/23 65/1
65/1 67/6 70/11
71/18 72/24 75/5
82/1 82/21 83/10
83/16 87/1 87/2
87/4 88/13 90/7
90/8 90/12 91/5
91/15 91/17 94/7
94/17 98/13 98/20
99/24 100/21
100/21 101/8
101/20 102/17
103/16 103/24
105/4 106/2 110/1
112/5 112/9 113/19
114/4 114/13 115/4
116/8 117/15 120/4
122/15 125/15
127/5
**me ask [1]**   90/8
**mean [21]**   21/21
25/18 37/12 41/18
70/1 74/16 78/20
79/12 87/16 87/17
87/24 89/3 89/7
89/16 89/23 102/10
102/15 103/8 108/1
120/16 120/20
**meaning [9]**   35/23
35/25 36/8 37/6
38/5 38/8 38/8
38/9 56/23
**meaningful [3]**
52/10 52/11 52/14
**means [12]**   15/25

20/21 22/14 23/1
27/13 33/16/2 40/13
41/12 42/5 42/16
70/13 90/23
**meant [6]**   5/23
43/6 43/13 43/22
45/9 99/22
**meantime [1]**   83/14
**measurement [1]**
27/22
**meeting [10]**   85/5
86/6 86/8 86/13
86/18 86/19 86/20
86/22 86/24 90/13
**meetings [3]**   82/9
84/10 84/13
**Melbourne [1]**   63/1
**Mellon [1]**   57/22
**member [1]**   71/24
**members [2]**   74/14
90/5
**memo [1]**   84/20
**memorabilia [4]**
63/20 63/25 64/4
64/10
**memory [1]**   75/16
**men [1]**   60/5
**mentioned [10]**
14/7 22/10 51/2
60/23 73/22 82/21
102/4 107/11
107/19 129/9
**MESTRE [3]**   1/19
1/20 3/15
**met [4]**   26/2 60/11
117/11 117/25
**met him [1]**   60/11
**metadata [5]**
114/23 115/16
116/2 116/5 116/18
**metaphors [1]**   37/9
**methodologies [1]**
62/16
**mezzanine [2]**

107/9 107/10
**MGM [1]**   80/25
**Miami [7]**   1/14
1/18 1/24 1/25
129/15 129/18
129/18
**MICHAEL [2]**   1/21
3/16
**Micro [1]**   70/4
**microphone [1]**
61/6
**Microsoft [1]**
100/14
**middle [2]**   36/1
94/16
**might [6]**   18/17
37/19 43/6 43/21
55/9 128/8
**mile [1]**   34/23
**million [4]**   91/2
125/7 125/8 125/9
**mind [3]**   29/5 54/7
55/1
**mine [6]**   59/1 85/8
99/13 110/17
110/19 110/21
**mined [1]**   41/25
**minimum [2]**   17/13
109/4
**mining [3]**   103/21
110/10 125/4
**minister [1]**   67/25
**minority [1]**   57/17
**minute [9]**   8/9
12/21 29/24 39/21
48/5 54/11 55/6
85/5 109/6
**minutes [12]**   12/10
12/12 12/25 40/21
40/22 54/8 55/2
85/5 86/13 91/3
109/12 120/17
**mischaracterizes**
**[1]**   50/14

**M**

**misrepresenting [1]**
26/5

**mistaken [1]** 40/17

**misunderstood [2]**
43/15 46/16

**MIT [1]** 57/22

**model [2]** 89/25
91/1

**modeling [1]** 90/2

**module [1]** 46/10

**moment [5]** 34/4
51/13 76/20 104/19
114/14

**money [9]** 64/2
79/25 80/8 80/14
81/13 81/20 84/12
98/13 98/14

**monitor [1]** 74/24

**monitoring [1]**
74/25

**month [1]** 95/7

**monthly [1]** 108/20

**months [2]** 73/24
83/8

**more [22]** 6/6 6/8
13/21 22/10 23/3
23/4 23/5 23/13
33/21 42/10 44/12
81/11 83/23 84/2
84/3 94/5 97/14
98/12 99/22 109/22
110/4 110/4

**morning [13]** 3/2
3/12 3/13 3/19 4/6
4/24 5/9 5/10
51/25 52/1 58/23
58/24 61/12

**most [6]** 21/6
27/22 60/6 61/15
65/14 79/24

**mother [13]** 16/6
57/8 60/1 60/2

60/5 60/16 60/19
61/1 61/12 63/16
64/19 64/23 113/23

**mother's [2]** 60/25
103/25

**motion [3]** 4/5
41/9 43/8

**motor [1]** 19/20

**move [12]** 45/7
47/13 61/6 76/12
78/5 79/2 79/7
85/11 114/25
115/24 119/1
119/18

**moved [7]** 64/19
64/23 77/4 81/24
83/8 120/21 120/23

**movie [1]** 69/11

**movie-based [1]**
69/11

**moving [2]** 64/19
112/2

**MR [9]** 2/6 2/8
84/23 88/21 114/16
118/6 122/12 124/2
126/22

**Mr. [22]** 5/5 40/15
40/18 41/6 44/7
47/22 48/19 67/21
85/22 87/21 90/9
109/10 109/10
112/11 113/25
114/6 114/12
116/12 118/20
121/6 121/25
125/12

**Mr. Antonopoulos
[1]** 109/10

**Mr. Brenner [7]**
5/5 40/15 40/18
41/6 44/7 47/22
48/19

**Mr. Madura [1]**
109/10

**Mr. Reed [11]**
109/10 109/10
112/11 114/6
114/12 116/12
118/20 121/6
121/25 125/12

**Mr. Rivero [1]**
67/21

**Mr. Wilson [1]**
113/25

**Mrs. [2]** 25/17
26/6

**Mrs. Watts [2]**
25/17 26/6

**MS [3]** 2/7 9/16
41/5

**Ms. [13]** 8/7 8/12
9/12 10/1 11/16
12/1 12/13 33/3
40/2 42/19 42/21
44/21 83/2

**Ms. McGovern [7]**
8/7 8/12 33/3 40/2
42/19 42/21 44/21

**Ms. Vela [1]** 11/16

**Ms. Watts [3]** 9/12
12/1 12/13

**Ms. Watts' [1]**
10/1

**Ms. Wright [1]**
83/2

**much [8]** 15/18
21/22 51/19 53/22
61/10 83/23 97/9
101/19

**multiple [3]** 83/22
105/15 115/22

**my [137]**

**myself [4]** 29/10
86/21 119/15
127/25

**N**

**Nally [2]** 65/21

**N**

**Nally... [1]**   85/21

**name [10]**   82/25
89/1 101/4 114/2
117/4 117/4 118/24
126/8 126/10
127/11

**named [1]**   101/11

**Nana [2]**   61/18
61/20

**Napster [2]**   76/10
76/16

**narrative [8]**
33/24 53/11 65/2
66/10 72/21 79/13
79/20 110/7

**narratives [2]**
14/12 31/6

**nascent [1]**   84/8

**nationally [1]**
16/22

**native [3]**   100/13
116/2 116/3

**nature [3]**   33/20
49/19 85/2

**navigate [1]**   29/2

**nearby [1]**   61/1

**neat [1]**   97/24

**necessary [2]**
23/19 107/12

**necessary for [1]**
23/19

**need [25]**   4/14
4/18 15/24 16/3
17/14 17/15 17/19
17/22 26/18 26/19
29/3 29/10 32/19
34/2 37/21 48/11
54/9 54/25 78/21
104/19 104/24
110/4 111/8 111/12
114/14

**needed [8]**   28/7

28/18 28/25 79/23
100/5 101/10 108/3
109/4 109/22

**needs [5]**   14/17
31/6 39/24 97/14
111/9

**nefarious [1]**
43/15

**neglected [1]**
55/15

**network [15]**   68/12
68/15 73/15 73/16
73/16 75/13 88/19
90/2 90/5 90/6
107/4 107/22
109/23 109/25
123/3

**networked [2]**
106/23 106/25

**networks [4]**   73/17
83/16 90/6 90/6

**never [11]**   6/5
15/13 22/25 28/18
28/22 28/23 29/16
29/16 29/25 29/25
57/2

**Neville [1]**   84/13

**new [6]**   73/6 76/4
83/13 84/8 120/11
121/1

**Newcastle [3]**
89/25 97/2 123/1

**News [1]**   75/2

**next [29]**   7/17
16/9 24/8 28/13
42/18 45/17 46/10
49/6 54/6 54/22
58/4 66/9 67/22
68/5 72/24 75/17
89/5 89/15 89/22
89/24 107/24 118/1
121/25 124/4 124/5
124/6 124/22
125/11 126/22

**nice [1]**   3/21

**night [1]**   82/16

**nine [1]**   98/3

**Nipper [2]**   73/15
73/16

**no [69]**   1/2 2/11
4/14 4/20 7/4 8/14
17/9 17/10 17/23
24/4 25/25 30/10
30/25 31/10 32/25
33/5 34/1 35/5
37/20 38/21 44/23
46/25 48/16 49/21
53/22 56/2 56/3
56/7 56/8 59/2
59/12 59/16 66/19
73/19 85/14 88/4
88/18 91/14 92/10
92/24 93/3 93/10
93/22 96/14 97/6
98/11 98/24 99/6
101/8 101/10 103/4
103/6 103/13
103/18 103/20
103/23 106/14
111/1 111/1 111/1
112/4 112/8 113/2
113/22 113/24
128/2 128/4 128/6
128/7

**Nobody's [1]**   78/19

**node [1]**   84/2

**nodes [2]**   83/22
88/10

**non [6]**   32/10
56/24 122/22 126/4
127/1 127/3

**non-literal [1]**
32/10

**non-master's [1]**
122/22

**non-primary [3]**
126/4 127/1 127/3

**non-verbal [1]**

USCA11 Case: 22-11150    Document: 53-16    Date Filed: 11/30/2022    Page: 123 of 254

**N**

non-verbal... [1] 56/24
noon [1] 48/19
normal [1] 71/18
normative [2] 11/5 23/8
North [2] 1/24 129/18
Northern [1] 74/23
Northumbria [1] 123/19
not [119] 12/3 12/16 16/1 16/10 17/7 18/2 18/7 18/11 18/14 18/14 18/21 19/9 19/18 20/8 21/9 21/14 22/2 23/1 23/11 23/11 25/22 26/3 26/6 26/11 26/12 26/21 27/15 27/24 28/20 28/24 29/2 30/25 31/1 31/9 31/9 33/13 35/12 35/24 38/21 38/22 39/9 39/22 40/7 40/14 42/7 42/9 43/4 43/9 43/12 43/13 43/19 43/21 45/4 45/14 45/15 46/13 47/1 47/11 47/12 48/19 49/7 50/16 51/12 52/7 52/22 53/9 53/19 53/20 53/21 54/9 54/14 54/16 55/9 56/1 56/15 57/4 57/4 57/4 57/14 66/21 75/20 77/22 78/17 80/12 86/2 86/7 86/9 86/21 86/22 86/23 88/1

88/6 90/5 90/13 91/13 92/24 94/4 94/23 96/14 97/6 97/23 98/11 98/24 100/5 101/4 102/2 103/9 103/10 109/9 111/1 111/24 116/4 119/4 125/5 126/18 128/2 128/4 128/6 128/14
note [2] 85/5 87/16
noted [1] 86/23
notepad [1] 13/7
notes [10] 13/3 13/4 13/4 13/13 13/18 86/6 86/8 86/24 87/4 129/11
nothing [14] 4/21 41/9 44/11 45/22 46/3 47/16 48/13 48/14 48/15 49/12 49/15 49/19 50/2 50/25
Nothing's [1] 37/17
notice [1] 108/17
November [7] 1/5 100/24 117/25 118/5 119/10 129/9 129/15
now [50] 6/5 7/21 8/11 10/23 10/24 15/2 16/16 21/11 23/14 24/15 24/19 31/14 31/16 37/19 41/13 75/23 76/11 76/12 76/25 78/5 78/13 81/24 82/12 83/10 83/11 85/20 88/13 89/9 91/24 93/11 94/24 94/25 99/24 101/9 101/11 102/4 104/2 104/3

104/11 107/19 107/24 108/25 109/2 109/21 109/22 117/23 119/11 119/23 122/2 124/1 124/24
nowadays [1] 14/21
NSW [2] 120/8 120/10
number [47] 3/4 6/21 8/3 16/3 17/1 17/2 17/15 17/20 18/8 18/14 21/12 23/2 23/19 28/2 60/5 63/1 63/3 64/18 68/11 69/11 69/12 71/12 71/13 76/5 78/1 82/5 82/9 84/10 84/12 84/16 94/12 96/17 98/3 104/20 105/4 105/22 107/3 109/11 109/18 109/22 109/23 114/14 121/8 122/18 126/15 126/18 126/21
numbers [2] 18/8 107/18
numerous [1] 102/4

**O**

oath [2] 5/4 58/9
object [4] 33/24 51/14 70/21 116/1
objection [59] 8/14 18/4 33/5 39/6 40/4 42/18 42/24 44/3 45/4 48/2 50/13 52/18 53/11 56/2 56/3 56/7 56/8 59/13 60/9 60/12 60/17 60/18 61/21 61/25 63/16 64/11 65/2

USCA11 Case: 22-11150    Document: 16-2    Date Filed: 11/30/2022    Page: 124 of 254

**O**

**objection... [32]**
65/25 67/8 67/12
67/18 67/21 68/2
68/6 69/3 72/1
72/8 72/21 76/15
77/10 77/14 78/6
78/22 78/24 79/4
79/13 79/20 80/19
81/7 85/13 85/14
92/2 108/14 109/14
110/7 115/2 115/6
119/3 123/8
**observation [1]**
37/8
**observations [1]**
14/13
**obsessed [1]** 50/7
**obsession [2]** 53/1
53/8
**obsessions [1]**
57/19
**obtain [8]** 66/17
66/18 66/21 68/15
75/10 123/4 123/17
123/23
**obtained [3]** 68/5
75/17 123/15
**occasionally [2]**
72/16 92/6
**occasions [1]**
84/17
**occupation [3]**
63/22 63/23 64/2
**occur [2]** 86/17
86/18
**occurred [1]** 86/19
**October [5]** 88/5
100/5 116/23 118/3
119/9
**off [10]** 9/6 58/14
60/21 61/12 70/8
79/17 80/2 87/1

88/18 113/19
**offered [2]** 2/1
38/22
**office [2]** 86/19
106/20
**officer [1]** 35/1
**official [1]**
118/13
**officially [1]**
127/10
**offsets [1]** 124/3
**often [5]** 53/19
56/4 56/21 57/11
57/15
**Oh [12]** 15/18
23/25 24/2 28/14
32/23 48/14 54/18
82/15 102/9 111/1
111/24 124/9
**okay [101]** 3/9
5/19 5/23 6/5 6/10
6/23 7/10 8/1 8/6
8/19 9/2 9/6 9/16
10/1 11/13 11/23
12/3 12/9 12/25
13/2 14/5 14/8
15/1 15/11 16/19
17/11 17/13 18/11
18/16 19/1 19/14
20/12 20/15 20/21
21/4 22/5 22/14
22/21 23/7 23/14
23/18 24/15 24/16
25/3 25/11 25/21
26/12 26/15 26/17
27/2 27/14 28/1
28/6 28/10 29/19
30/3 30/6 31/14
31/17 31/24 32/20
34/7 34/17 36/15
38/2 38/15 38/24
39/5 39/17 44/11
48/21 49/5 49/8
50/11 50/22 50/23

50/24 56/9 72/5
78/12 78/21 82/11
86/7 86/12 87/19
88/6 89/15 89/18
89/22 93/23 97/7
106/9 120/10
120/18 121/4 121/8
124/21 125/18
**old [21]** 15/16
16/1 16/11 21/5
21/11 21/18 21/25
22/3 24/22 26/3
26/7 27/12 27/25
28/8 30/3 30/4
30/10 30/23 31/8
65/11 73/20
**older [2]** 64/4
94/21
**oldest [2]** 117/18
117/20
**Omega [1]** 71/13
**once [8]** 13/15
14/12 24/24 31/18
58/8 66/3 67/1
99/13
**one [94]** 5/24 6/6
6/8 6/16 6/17 8/9
9/9 9/11 10/18
11/10 11/24 12/1
13/3 14/1 15/7
15/9 18/18 19/21
20/9 20/25 22/7
22/10 25/21 26/19
26/20 27/8 28/2
28/2 28/4 30/13
31/6 34/4 35/16
36/17 37/14 41/16
42/1 42/10 44/12
46/4 48/17 50/16
51/13 52/15 53/1
56/13 56/25 64/7
66/9 66/9 66/18
71/2 75/18 75/20

**o**

**one... [40]**   78/20
81/5 83/24 84/1
84/15 86/3 88/14
88/16 89/24 90/4
94/7 94/20 95/8
96/20 96/21 98/1
98/6 98/6 104/13
104/16 106/6 106/7
106/15 107/15
107/23 109/5
109/19 111/17
112/11 112/23
114/1 114/1 114/2
114/3 115/4 118/17
125/19 126/13
126/14 127/1

**one-sided [2]**
52/15 53/1

**ones [11]**   64/2
70/20 71/2 71/12
74/10 81/23 96/8
100/14 105/22
107/6 107/22

**online [12]**   9/18
14/24 73/8 74/21
75/3 80/16 81/3
81/6 81/16 83/11
92/7 101/4

**only [15]**   5/20
5/20 5/24 12/22
16/14 21/7 33/13
47/11 53/20 64/14
66/5 78/16 80/12
84/24 111/24

**only taken [1]**
5/20

**open [4]**   40/16
66/22 70/14 75/14

**openers [1]**   70/8

**opening [3]**   43/25
127/2 127/3

**operate [1]**   74/12

**operating [2]**   71/4
105/9

**operation [5]**
74/22 81/2 81/16
104/15 104/17

**operations [3]**
82/19 88/17 122/6

**operative [1]**
105/5

**opine [1]**   43/21

**opining [1]**   43/6

**opinion [5]**   41/14
46/25 47/1 47/16
102/24

**opportunities [1]**
52/23

**opportunity [2]**
4/9 4/15

**ordained [1]**   67/25

**order [17]**   3/1 4/5
4/6 13/10 14/16
15/20 15/24 16/3
37/20 41/10 42/9
43/20 44/9 44/10
47/3 59/8 122/9

**org [2]**   118/14
118/14

**organization [1]**
77/7

**organized [2]**
17/16 101/17

**original [4]**   15/18
70/24 89/1 92/15

**originally [1]**
70/16

**origins [4]**   35/25
38/14 93/19 115/17

**other [60]**   5/24
17/3 17/4 22/5
26/10 26/20 36/20
37/12 37/21 37/22
38/18 44/16 45/18
47/23 50/22 51/16
57/5 58/1 60/5

60/6 62/14 62/15
64/21 66/22 68/11
69/12 69/19 75/10
75/25 76/2 76/9
80/20 80/24 81/20
88/4 91/8 91/17
93/25 94/7 95/22
99/5 99/5 100/23
101/24 101/24
104/14 105/22
107/2 107/7 107/20
113/8 114/3 124/20
125/2 125/16 126/5
127/3

**others [16]**   23/13
29/12 30/9 30/24
31/9 36/5 50/5
52/25 53/2 53/3
56/24 70/16 83/24
84/3 98/9 102/7

**otherwise [2]**
29/11 107/13

**our [10]**   3/11 3/16
6/2 25/4 32/14
40/10 44/5 54/21
70/3 83/3

**Ourimbah [1]**
105/18

**out [33]**   9/13 9/17
9/23 10/4 16/21
25/16 29/23 29/24
31/16 42/8 42/17
43/17 46/13 54/21
56/5 66/20 72/13
80/14 83/8 85/22
91/18 97/14 99/2
100/3 102/12 104/3
104/9 111/8 111/19
111/25 114/1
119/16 120/13

**outages [1]**   111/16

**outdoor [2]**   30/9
30/24

# O

**outfit [1]**  78/10

**output [1]**  19/10

**outset [1]**  105/9

**outside [13]**  31/10
40/20 47/20 50/9
51/3 57/12 82/2
86/10 88/22 104/13
106/7 106/10 107/1

**outskirts [1]**
104/7

**over [27]**  6/18 7/2
7/3 11/6 15/13
21/8 35/1 35/4
44/4 53/6 60/2
65/18 76/12 77/4
83/25 89/5 94/23
98/19 99/3 99/7
100/15 102/1 106/2
107/17 108/6 109/5
111/20

**overjudged [1]**
109/7

**overlap [1]**  12/18

**overly [5]**  34/12
35/12 37/25 50/7
50/7

**overruled [11]**
18/5 48/2 52/21
60/18 68/7 72/2
79/21 80/21 81/8
108/18 123/9

**oversimply [1]**
109/9

**own [21]**  8/11 9/13
28/7 28/17 50/2
56/23 62/11 63/9
63/15 70/3 71/10
73/24 74/4 78/18
78/19 81/13 84/11
84/12 87/2 111/17
127/11

**Oxford [1]**  38/13

# P

**P-O-C [1]**  88/6

**p.m [2]**  128/14
128/16

**P2 [1]**  116/12

**P2P [2]**  89/4 89/6

**P459 [1]**  38/25

**P5 [2]**  126/7
126/20

**P710 [1]**  51/9

**P748 [1]**  51/9

**package [1]**  91/16

**pad [5]**  13/4 59/7
59/12 59/15 59/16

**Padua [2]**  64/23
64/24

**page [25]**  2/5 7/18
8/7 19/2 26/25
28/12 28/12 28/14
29/14 30/7 32/20
32/21 32/21 34/19
121/5 121/25
122/12 124/4 124/5
124/22 124/22
124/24 125/11
125/17 126/22

**pages [9]**  1/8 52/9
95/15 95/18 96/17
96/21 97/18 98/4
129/12

**paid [3]**  105/22
125/7 125/9

**paint [1]**  82/7

**PALM [1]**  1/2

**pandemic [1]**  6/2

**paper [20]**  37/1
59/7 59/12 59/16
89/17 89/19 89/20
93/5 93/13 93/15
93/21 93/23 94/1
94/25 96/16 98/18
99/8 99/8 99/21
102/5

# paralegal [1]  3/16

**parameter [1]**  25/4

**parameters [1]**
91/1

**pardon [2]**  58/19
114/13

**parent [1]**  28/3

**parent/caregiver
[1]**  28/3

**parents [1]**  56/20

**Park [1]**  64/17

**part [7]**  10/7 25/4
29/9 51/6 67/4
78/10 114/21

**partial [1]**  25/7

**participation [1]**
91/13

**particular [13]**
17/21 22/19 23/2
29/3 31/7 35/17
35/25 44/11 50/8
75/18 78/5 84/2
86/21

**particularly [2]**
38/8 56/18

**partly [2]**  87/1
87/1

**partner [12]**  41/17
41/21 42/2 42/15
42/16 43/12 46/19
84/9 84/10 86/20
88/17 103/21

**partners [1]**  88/16

**partnership [4]**
58/25 84/15 102/13
124/19

**Partnerships [1]**
124/18

**parts [4]**  60/7
64/15 66/8 71/22

**Pascal [2]**  69/20
69/20

**passed [2]**  13/15
65/23

**P**

**past [3]** 8/4 80/23
115/22
**pastor [1]** 105/20
**patient [2]** 10/14
34/19
**Pause [9]** 8/13
33/4 34/6 40/24
59/17 76/23 104/22
105/1 114/15
**paved [1]** 63/24
**payment [5]** 121/9
121/11 121/20
121/22 121/24
**payments [2]** 121/9
122/20
**Payne [1]** 90/4
**pedantic [1]** 50/7
**peer [6]** 76/9 76/9
83/16 83/16 89/10
89/10
**peers [4]** 25/24
26/10 27/15 52/23
**Pegasus [1]** 72/19
**pen [2]** 59/7 59/12
**pending [2]** 4/5
33/1
**people [41]** 34/10
35/8 37/19 53/9
62/13 62/13 62/24
64/19 73/5 81/11
81/21 82/9 84/3
91/14 94/12 94/20
95/22 96/5 97/2
97/3 97/12 98/7
100/3 100/9 101/24
101/25 102/2 102/2
102/4 102/7 102/10
105/22 109/8 110/1
110/2 110/4 110/12
110/13 110/14
110/14 110/16
**per [1]** 42/8

**perceived [2]**
52/12 53/6
**percent [11]** 5/17
23/16 26/23 31/21
32/1 32/5 33/11
57/15 57/16 62/8
82/7
**perfectly [3]**
29/18 30/3 47/23
**performs [2]** 22/20
31/20
**perhaps [1]** 55/8
**period [14]** 6/18
7/3 69/7 74/17
74/20 75/8 76/11
76/18 81/24 82/12
94/14 108/11 120/5
123/15
**periodically [1]**
111/8
**perjury [1]** 49/16
**permissible [1]**
56/12
**permission [2]**
59/11 105/18
**permit [1]** 59/13
**permitted [1]**
58/13
**person [27]** 10/8
10/15 11/1 11/24
12/1 18/19 18/21
21/10 22/14 22/15
22/19 23/1 37/4
37/21 46/3 49/15
52/15 55/24 55/25
56/5 56/14 56/15
57/11 94/13 95/21
95/25 112/4
**person's [3]** 22/19
29/11 30/16
**personal [7]** 1/3
19/25 104/11
124/19 125/2 125/5
127/23

**personally [8]**
113/18 115/9 116/4
120/4 122/5 127/7
**PGP [1]** 94/20
**Ph.D [1]** 122/21
**Philippines [2]**
63/22 63/24
**phone [2]** 92/6
99/3
**physical [1]**
111/23
**physics [1]** 64/20
**pick [2]** 5/14 9/6
**piece [2]** 37/17
47/4
**PIX [1]** 107/23
**place [3]** 13/4
78/23 107/2
**placed [2]** 5/4
58/9
**places [3]** 57/21
62/14 104/13
**plagiarized [1]**
93/20
**PLAINTIFF [2]** 1/12
44/17
**Plaintiffs [11]**
1/5 3/10 39/8 40/5
40/15 48/13 48/14
48/15 54/2 77/23
78/15
**Plaintiffs' [9]**
3/7 43/11 78/17
112/10 114/6
114/19 115/10
115/13 116/9
**Plans [1]** 29/23
**platform [2]** 70/14
74/21
**play [4]** 20/3 31/9
31/9 91/6
**Playboy [1]** 81/1
**playground [1]**

**P**

**playground... [1]**
36/20

**Plays [2]**   30/9
30/24

**pleasant [3]**   5/1
128/13 128/15

**please [21]**   3/6
4/25 8/9 20/10
24/7 24/17 25/25
32/22 33/2 49/1
51/10 51/12 55/14
55/21 58/17 59/3
61/6 64/14 75/5
85/20 94/3

**plug [1]**   91/5

**plus [5]**   52/3
107/6 107/7 107/7
121/2

**POC [3]**   87/23 88/1
88/3

**point [16]**   34/17
65/15 67/2 67/15
72/6 73/1 82/20
84/7 84/20 88/11
93/12 98/10 98/18
101/11 102/16
107/24

**pointed [3]**   98/13
99/2 100/3

**poker [3]**   80/7
80/11 92/14

**police [6]**   35/1
76/4 76/5 76/5
83/19 115/22

**policy [1]**   113/18

**Ponce [1]**   1/22

**Pop [2]**   61/18
63/15

**population [5]**
11/6 31/21 32/1
32/5 33/11

**portal [2]**   9/18

13/22

**pose [1]**   7/19

**position [1]**
102/13

**possible [2]**   40/11
88/19

**post [1]**   123/18

**post-graduate [1]**
123/18

**potentially [1]**
47/5

**pounds [1]**   111/7

**power [7]**   106/22
111/5 111/6 111/14
111/16 111/18
112/1

**practical [1]**
31/20

**practice [2]**   25/4
113/7

**precise [5]**   35/9
36/13 37/6 38/5
38/18

**Precisely [1]**
36/12

**premature [1]**   4/8

**preparation [1]**
99/20

**prepared [2]**   4/12
96/22

**preparing [1]**
93/23

**prepublication [1]**
95/4

**prerelease [1]**
100/24

**present [7]**   39/22
52/17 54/14 84/16
118/19 128/14
129/7

**presented [7]**   43/3
43/3 46/18 47/4
47/8 53/17 99/18

**pretty [1]**   95/2

**previous [2]**   29/21
29/23

**previously [1]**   5/3

**priest [2]**   65/22
65/24

**primarily [1]**   21/9

**primary [4]**   107/6
126/4 127/1 127/3

**print [1]**   119/14

**printed [1]**   119/16

**prior [2]**   91/24
92/22

**probably [6]**   71/20
82/7 92/14 96/21
107/15 121/1

**probed [1]**   16/25

**problem [3]**   75/1
82/15 109/12

**problems [13]**
64/18 64/21 64/24
80/14 83/3 99/2
99/5 100/16 100/21
101/22 111/5
127/23 127/23

**procedure [1]**
24/24

**proceedings [10]**
8/13 33/4 34/6
40/24 59/17 76/23
104/22 105/1
114/15 129/8

**process [5]**   68/10
100/7 100/20 102/1
114/21

**produce [1]**   49/20

**produced [2]**   49/18
94/1

**production [3]**
126/5 127/1 127/3

**products [1]**   127/5

**professional [4]**
5/17 7/22 8/2 8/20

**professor [1]**
94/23

USCA11 Case: 22-11150    Document: 36    Date Filed: 11/30/2022    Page: 129 of 254

**P**

**professors [1]**
57/21

**proffer [2]**    40/18
41/7

**profit [1]**    84/3

**profitable [2]**
84/2 126/3

**program [2]**    91/5
99/4

**programmer [2]**
69/8 94/21

**programs [5]**    71/5
71/6 71/12 71/14
72/17

**project [11]**    41/23
84/16 86/25 87/1
93/17 98/13 98/15
99/14 101/13
101/17 102/8

**projects [1]**    122/6

**proof [1]**    87/25

**proper [1]**    111/10

**properly [1]**    42/24

**property [1]**    82/2

**proposal [1]**    91/12

**propose [1]**    89/25

**proposed [3]**    4/12
98/25 99/1

**proposing [2]**    87/3
87/12

**prosecution [1]**
115/21

**Protestant [1]**
68/1

**protocols [1]**    63/2

**provide [6]**    4/3
4/14 26/21 32/18
32/21 41/1

**provided [5]**    6/11
6/12 6/14 6/19
19/11

**providing [2]**    6/22

86/10

**province [3]**    40/7
40/12 46/22

**proviso [2]**    33/13
50/4

**pruned [2]**    92/14
96/17

**Ps [1]**    89/11

**psychologist [3]**
8/20 65/1 65/22

**PTY [1]**    74/11

**public [1]**    118/23

**publications [1]**
6/17

**publicly [1]**    100/4

**publish [7]**    7/11
10/18 19/3 28/15
38/25 39/9 51/9

**published [4]**
46/14 51/11 99/18
118/4

**pull [2]**    85/22
112/11

**pulled [5]**    35/1
35/4 101/16 116/4
119/4

**pulling [2]**    102/1
127/25

**punish [1]**    51/7

**purchase [1]**
127/12

**purchases [1]**
127/11

**purpose [3]**    47/18
57/24 79/7

**purposes [1]**    46/1

**push [1]**    109/23

**put [17]**    13/21
14/10 24/5 45/23
46/20 84/11 86/25
87/16 90/21 92/18
107/1 107/9 107/14
113/12 114/5 118/3
119/8

**put through [1]**

**putting [2]**    14/23
103/11

**Q**

**Queensland [7]**
59/21 66/12 66/16
66/16 104/4 112/25
113/20

**question [65]**    8/17
8/24 16/9 17/10
17/22 18/11 18/12
22/11 24/8 25/25
26/1 27/3 27/14
28/1 28/6 28/13
29/20 30/9 30/11
33/1 33/7 33/9
33/16 33/25 34/1
36/2 36/3 36/10
38/1 45/14 46/4
46/5 46/6 50/15
51/18 53/12 55/17
55/19 55/20 55/24
56/4 56/16 57/10
57/13 59/4 59/5
67/22 75/6 75/22
78/4 78/13 81/2
82/11 86/7 86/7
88/13 92/13 92/19
93/8 93/23 94/5
100/17 116/18
116/24 126/18

**questioning [2]**
5/2 49/3

**questionnaire [1]**
9/13

**questions [43]**
7/25 15/11 15/15
16/5 16/10 16/17
16/20 17/6 17/14
18/1 18/3 20/17
21/1 21/16 21/22
22/7 24/21 25/21

**Q**

**questions... [25]**
30/15 31/4 31/14
31/15 43/9 43/18
45/19 46/2 47/22
48/6 48/20 49/6
53/23 54/16 55/2
55/9 55/10 55/15
56/12 56/13 57/1
58/14 59/3 103/25
128/7

**quickly [1]**    5/15
**Quill [2]**    85/23
86/1
**quite [7]**    7/1
35/24 60/19 63/21
97/22 109/7 111/6
**quote [3]**    30/24
34/11 36/20

**R**

**Rachel [2]**    117/10
117/22
**rack [2]**    106/16
111/6
**racks [8]**    105/12
105/14 106/14
106/14 106/14
106/15 106/21
111/25
**radio [4]**    62/11
62/12 62/23 63/22
**radios [1]**    62/12
**raise [3]**    55/18
58/8 111/20
**raised [4]**    40/4
40/6 57/1 60/3
**raising [1]**    40/13
**Ramona [5]**    9/12
28/19 29/25 117/10
117/12
**ran [6]**    41/23
41/24 41/25 84/15
100/11 105/20

**random [2]**    70/9
91/15
**range [4]**    10/25
11/10 14/1 17/21
**rather [1]**    83/21
**rating [4]**    11/3
13/24 14/2 27/8
**rcjbr [2]**    116/22
118/22
**rcjbr.org [7]**
116/19 116/21
116/24 117/8 117/9
118/2 118/17
**re [1]**    97/10
**reached [1]**    25/16
**react [1]**    127/18
**reaction [1]**    53/3
**read [4]**    32/9
33/25 44/8 59/9
**reading [4]**    12/5
31/1 37/14 38/4
**reads [3]**    33/10
55/24 57/10
**ready [2]**    5/1
96/23
**real [6]**    23/12
29/1 29/8 71/20
98/24 101/4
**real-life [3]**
23/12 29/1 29/8
**reality [1]**    27/11
**realize [3]**    24/6
24/16 35/4
**really [8]**    5/15
44/19 44/24 79/11
84/6 101/5 102/1
103/10
**reason [4]**    29/9
47/8 51/15 110/3
**reasons [1]**    13/25
**recall [13]**    5/2
5/17 5/21 5/22 6/6
6/21 7/1 9/7 9/9
18/17 52/12 91/21

112/22
**receive [2]**    30/8
97/11
**received [2]**    85/16
119/21
**recent [1]**    77/24
**Receptive [2]**
19/16 19/23
**recess [6]**    39/21
48/8 54/8 55/6
55/7 128/9
**reciprocal [3]**
52/11 52/15 53/17
**reciprocated [2]**
53/20 53/21
**recognize [2]**    19/7
113/11
**record [7]**    3/6
39/13 39/18 50/15
55/22 77/20 118/11
**recorded [1]**
121/20
**records [1]**    64/3
**recovered [1]**    67/1
**recovering [1]**
67/15
**redesign [1]**    71/22
**redirect [5]**    2/7
47/3 48/22 51/21
51/23
**redone [1]**    106/18
**reduce [1]**    95/10
**redundancy [2]**
91/16 91/19
**Reed [19]**    3/17
84/23 85/22 87/21
88/21 90/9 112/11
114/6 114/12
114/16 116/12
118/6 118/20 121/6
121/25 122/13
124/2 125/12
126/22
**refer [2]**    88/14

USCA11 Case: 22-11150    Document: 16-2    Date Filed: 11/30/2022    Page: 131 of 254

**refer... [1]**
118/10
**reference [7]**   43/8
88/25 89/18 89/19
121/8 122/8 126/7
**referenced [1]**
19/15
**references [2]**
124/9 124/10
**referred [1]**
121/15
**referring [10]**
14/5 43/22 46/19
80/17 89/13 91/22
94/14 96/2 108/4
113/9
**reflected [3]**
122/9 126/16
126/19
**reflects [1]**
124/24
**regard [8]**   44/18
44/19 44/24 45/1
47/23 78/22 102/7
110/23
**regarding [2]**   4/10
43/9
**regards [1]**   27/12
**registering [1]**
116/22
**registration [5]**
118/10 118/12
118/17 118/18
119/8
**registry [2]**
118/13 118/23
**rejected [1]**   90/3
**related [14]**   72/6
72/11 73/2 74/7
74/19 77/8 93/13
101/15 113/1 122/4
122/13 124/16

125/16 125/22
**relates [2]**   21/2
21/18
**relating [1]**   75/10
**relation [6]**
112/22 114/19
115/9 116/18
118/22 120/12
**relationship [11]**
53/20 53/21 60/24
61/20 62/3 91/25
92/5 102/18 109/17
115/12 117/23
**relationships [4]**
20/3 22/7 23/23
52/23
**relatively [1]**
62/18
**release [4]**   93/2
94/9 94/14 100/6
**released [4]**   92/20
98/22 99/25 100/4
**relevance [23]**
44/19 60/9 60/17
61/21 63/16 64/11
65/3 65/25 67/8
67/12 67/18 68/2
68/6 69/3 72/8
76/15 77/10 77/14
79/13 79/20 81/7
92/2 123/8
**relevant [6]**   17/12
47/12 47/13 47/25
48/2 61/24
**remain [2]**   21/7
58/8
**remember [27]**   6/10
6/12 6/14 6/20
6/21 8/16 8/24
12/10 13/11 27/4
31/11 33/7 33/16
34/12 34/15 34/21
34/24 35/19 36/21
36/25 37/14 75/18

93/5 96/21 108/20
**remind [1]**   5/3
**removed [1]**   92/17
**Rephrase [1]**   50/18
**Rephrasing [1]**
27/11
**replaced [1]**
111/18
**report [14]**   6/11
6/12 10/7 10/19
10/23 11/9 13/15
18/17 18/25 19/7
19/9 34/14 52/8
52/19
**reported [5]**   10/12
10/13 10/15 11/11
129/8
**REPORTER [2]**   1/23
129/5
**reporting [1]**   9/9
**represent [2]**
23/14 29/12
**representation [1]**
23/18
**representative [1]**
1/3
**request [4]**   9/4
40/1 48/17 113/5
**requested [3]**
19/13 25/17 25/18
**requests [1]**   4/17
**require [3]**   25/8
47/2 111/23
**required [1]**   25/15
**research [5]**   1/4
52/4 76/3 93/16
122/6
**researched [1]**
15/13
**reservation [1]**
52/5
**residence [4]**
103/25 106/6 106/7

USCA11 Case: 22-11150 Document: 58-11 / Date Filed: 11/30/2022 / 1 Page: 132 of 254

**R**

**residence... [1]**
114/1
**resilient [2]**
83/19 110/5
**respect [10]** 40/8
40/9 40/16 43/12
43/25 46/23 46/25
51/15 52/6 53/16
**respond [1]** 42/19
**responding [1]**
58/14
**response [5]** 34/2
48/16 96/12 96/15
97/17
**responsiveness [1]**
11/5
**restroom [1]** 39/24
**result [3]** 64/9
87/5 87/7
**return [7]** 75/8
119/14 120/2 120/4
122/10 124/17
124/24
**returned [1]** 67/1
**revealing [1]**
10/10
**review [2]** 4/9
4/16
**reviewed [2]** 45/2
115/9
**ride [2]** 61/2 61/8
**Ridges [5]** 76/2
76/3 76/13 76/25
77/1
**right [105]** 3/25
4/22 6/3 6/12 6/19
6/25 7/14 7/16 9/6
9/14 9/17 9/19
10/5 10/9 11/8
12/20 13/5 13/9
13/14 15/22 16/9
16/9 16/16 17/2

17/5 17/18 19/8
20/19 21/6 21/11
21/5 22/3 22/17
22/25 23/3 27/10
28/4 28/19 28/21
30/1 35/2 35/8
35/11 35/21 36/9
36/12 37/2 37/11
38/9 39/11 40/2
41/6 41/13 42/10
42/21 44/1 44/13
47/18 48/9 49/1
50/3 51/21 53/24
54/4 54/11 54/12
54/21 55/6 55/12
55/23 56/11 58/7
58/8 62/3 65/13
68/24 69/8 74/17
79/17 80/17 81/3
83/9 86/15 86/17
87/15 89/3 91/13
93/8 97/18 100/15
104/21 104/25
106/12 109/13
114/11 116/8
116/16 116/21
122/7 122/12 124/1
124/12 125/18
126/24 128/8
**rights [1]** 125/3
**ringgit [1]** 80/9
**rivalry [1]** 65/18
**RIVERO [5]** 1/19
1/19 2/8 3/15
67/21
**RMR [1]** 129/17
**ROCHE [3]** 1/12
1/13 3/10
**rock [1]** 127/21
**role [4]** 52/4 53/2
99/20 102/11
**roll [1]** 77/1
**roll-up [1]** 77/1
**room [7]** 1/24 62/8

86/20 88/11 103/1
103/19 107/15
**round [1]** 97/15
**routers [1]** 107/25
**Royal [5]** 67/4
67/6 67/11 71/21
71/24
**RPR [1]** 129/17
**ruled [1]** 47/7
**ruling [8]** 40/8
40/12 42/25 43/17
44/3 45/5 45/7
46/14
**run [12]** 11/21
12/14 43/20 44/22
45/6 47/2 79/12
88/10 107/10 108/1
108/7 111/19
**running [16]** 30/23
98/13 100/11
100/16 105/6 105/7
106/3 106/9 107/18
107/21 109/3
109/24 110/24
111/9 111/14 127/8

**S**

**said [29]** 5/15
5/19 5/20 12/22
14/8 29/25 35/4
35/5 35/22 37/3
37/5 37/15 43/9
43/22 57/25 71/3
75/23 88/3 89/8
96/10 97/13 102/15
104/1 107/22 119/8
122/9 123/15 125/7
125/9
**sale [3]** 125/5
126/1 126/5
**SAMANTHA [2]** 1/17
3/10
**same [24]** 3/14
10/4 10/24 12/16

**S**

**same... [20]**   12/19
12/20 16/4 16/12
25/10 32/9 34/19
46/5 46/6 46/11
50/6 51/15 52/23
57/25 83/7 96/24
97/12 97/25 103/15
104/18
**samurai [1]**   64/4
**Sara [1]**   15/19
**Sarah [1]**   3/17
**sarcasm [1]**   37/10
**Saulnier [22]**
11/21 11/23 12/3
12/12 13/3 13/20
14/9 16/21 16/22
17/6 18/3 18/7
21/15 22/1 22/8
23/15 24/21 25/16
26/5 28/2 28/8
35/18
**Saulnier's [1]**
31/19
**save [1]**   98/2
**saving [1]**   82/7
**saw [4]**   24/4 46/8
64/24 102/5
**say [30]**   8/22 9/3
18/14 22/2 26/4
26/9 37/4 43/7
44/13 45/10 45/13
47/12 56/20 62/19
65/6 69/21 69/25
71/11 78/16 81/5
84/18 87/15 93/4
96/2 100/19 103/8
108/8 109/24
110/11 110/12
**saying [7]**   18/11
20/7 46/17 57/3
74/18 91/10 123/12
**says [18]**   22/16

22/22 33/14 41/12
41/15 41/16 41/17
41/19 41/22 42/2
42/5 45/13 89/20
90/24 116/19 120/7
124/24 126/15
**scale [5]**   11/3
13/24 14/2 98/15
111/22
**SCHILLER [1]**   1/15
**school [6]**   61/13
64/16 64/21 64/25
65/24 73/6
**science [7]**   65/10
66/13 66/13 66/22
68/12 122/21
123/13
**scope [1]**   52/18
**score [23]**   9/17
9/23 9/24 11/9
11/11 13/22 14/10
16/21 23/5 23/16
25/19 27/2 27/3
28/21 30/10 30/13
30/25 31/7 31/10
31/16 31/17 32/6
33/21
**scored [12]**   9/18
18/1 18/9 20/7
20/21 21/1 22/8
22/11 23/4 23/15
31/5 31/8
**scores [12]**   9/16
10/1 10/5 10/24
11/6 14/18 14/19
14/22 14/22 18/6
19/10 26/19
**scoring [8]**   12/7
14/15 14/15 14/18
15/16 28/3 29/15
31/2
**script [2]**   12/4
90/19
**seat [2]**   3/20 40/3

**seated [4]**   4/25
**second [16]**   6/17
13/2 14/7 22/10
35/16 56/4 57/10
61/14 87/23 95/15
96/18 96/25 97/8
97/15 115/4 117/20
**secondary [1]**
111/18
**section [4]**   18/18
20/4 122/11 124/7
**sections [1]**
101/17
**security [4]**   74/11
75/3 75/19 102/21
**see [29]**   4/25 5/14
19/15 20/17 23/23
27/7 31/11 39/10
39/11 50/5 51/10
55/2 55/10 85/23
87/19 90/9 91/6
91/17 98/8 116/11
116/18 116/20
118/6 118/8 118/20
121/5 122/7 122/8
128/11
**seeing [3]**   57/4
57/4 112/22
**seem [1]**   86/23
**seen [8]**   49/25
50/11 50/12 56/4
57/11 114/8 114/20
116/16
**Seidman [2]**   77/9
85/4
**self [12]**   9/8 10/7
10/12 10/13 11/9
35/13 35/15 51/5
84/3 93/20 122/14
122/16
**self-education [2]**
122/14 122/16
**self-heals [1]**

**S**

**self-heals... [1]**
84/3

**self-incriminating**
**[1]**   35/15

**self-incrimination**
**[2]**   35/13 51/5

**self-plagiarized**
**[1]**   93/20

**self-report [2]**
10/7 11/9

**self-reported [2]**
10/12 10/13

**selling [2]**   125/10
127/6

**semi [4]**   11/24
12/5 31/4 31/19

**semi-structured [4]**
   11/24 12/5 31/4
31/19

**send [1]**   62/14

**sense [6]**   12/4
14/1 15/16 35/20
36/5 55/9

**sent [6]**   35/18
35/18 94/15 94/17
97/12 100/21

**separated [3]**   60/1
83/4 83/7

**series [2]**   45/18
49/6

**server [2]**   111/6
111/9

**servers [6]**   105/12
107/18 108/1
109/21 111/4
118/24

**services [8]**   26/19
26/21 26/23 32/19
73/4 84/14 124/20
125/22

**SESSION [1]**   1/9

**set [9]**   84/10 89/1

106/13 107/8 108/3
109/16 110/5 111/17
129/14

**sets [1]**   64/6

**setting [1]**   72/25

**settle [1]**   48/23

**seven [1]**   20/25

**several [4]**   7/2
13/25 18/15 18/23

**severe [4]**   10/25
11/2 11/6 11/10

**SHA [1]**   94/18

**share [6]**   50/6
95/19 96/12 96/25
97/5 98/5

**shared [5]**   51/4
53/7 95/20 95/21
96/6

**sharing [1]**   104/17

**she [45]**   12/3 13/3
13/5 13/13 13/13
14/12 14/12 14/13
14/14 14/18 14/19
14/19 16/24 16/25
16/25 17/5 17/23
23/15 23/16 23/19
24/12 24/13 24/22
24/24 24/25 25/1
25/2 25/9 25/9
25/11 25/18 26/9
27/24 28/3 28/5
31/4 31/8 31/10
35/2 35/18 61/12
104/1 104/3 104/6
104/7

**she'll [1]**   12/7

**she's [7]**   12/4
12/5 12/6 13/15
27/2 57/4 57/4

**shed [1]**   107/9

**sheet [1]**   27/2

**shoots [2]**   9/17
9/23

**short [3]**   51/22

54/11 104/24

**shorten [1]**   56/24

**shorthand [2]**
129/5 129/8

**should [10]**   9/3
21/5 21/13 39/7
44/3 44/4 54/20
89/5 89/24 119/17

**show [26]**   7/6 23/1
25/22 26/9 27/13
29/3 41/14 44/22
55/25 56/15 59/15
84/23 85/17 88/21
112/9 112/15 114/4
114/11 114/12
114/16 116/2 116/2
116/12 116/13
119/11 119/23

**showed [5]**   24/4
38/16 95/21 97/3
127/1

**showing [1]**   23/24

**shown [4]**   9/16
10/1 112/22 119/18

**Shows [2]**   26/1
27/9

**shutdown [1]**
111/10

**Shyaam [3]**   99/11
99/12 99/13

**side [6]**   6/11 57/3
60/25 76/8 86/20
115/21

**sidebar [10]**   39/7
39/12 39/13 39/19
55/21 55/22 56/10
77/16 77/20 78/25

**sidebars [1]**   78/21

**sided [2]**   52/15
53/1

**sign [1]**   88/18

**sign-off [1]**   88/18

**signed [1]**   113/18

**silly [1]**   29/11

**S**

**similar [2]**    98/14
107/8
**simply [2]**    53/15
53/16
**Simultaneously [1]**
68/10
**since [7]**    5/21
15/13 18/7 21/9
42/17 55/20 120/19
**Sinclair [1]**    84/13
**Singapore [1]**
74/16
**Singaporean [2]**
64/1 80/9
**single [1]**    83/21
**sir [111]**    7/15
32/25 34/2 35/4
40/21 40/23 44/7
54/4 58/11 59/3
59/24 60/7 60/12
60/14 60/23 61/10
62/3 62/10 62/17
63/19 64/9 64/14
64/15 65/6 65/13
65/15 66/3 66/10
67/1 67/15 68/5
68/24 69/6 69/14
69/21 70/11 70/11
71/8 71/24 72/11
73/9 73/22 74/3
75/22 76/11 76/18
76/25 77/13 79/2
80/4 82/21 84/18
84/20 85/2 85/9
85/20 86/4 86/17
89/18 90/8 90/21
91/12 91/24 93/4
93/8 93/11 94/3
94/7 94/14 94/25
95/17 99/7 99/24
100/6 101/9 102/4
103/2 103/24

105/23 106/2
107/5 106/17
108/20 109/2 109/9
109/17 110/23
111/22 112/25
113/15 113/20
114/4 114/11
114/19 116/8
116/11 116/24
118/8 118/10 119/7
119/11 119/13
120/2 121/8 122/2
122/7 124/1 124/5
124/16 124/24
126/24
**sisters [2]**    60/19
60/20
**sit [1]**    62/21
**site [3]**    100/1
118/18 118/24
**sites [2]**    75/2
118/13
**sitting [4]**    16/20
18/6 106/12 117/10
**situation [3]**
46/12 50/5 50/8
**situations [2]**
32/1 38/19
**six [2]**    6/25 20/25
**skill [5]**    23/8
28/24 28/25 28/25
29/3
**skilled [1]**    14/21
**skills [11]**    17/21
18/24 19/19 19/25
20/3 20/3 23/10
23/13 29/1 29/8
57/16
**Skype [1]**    98/19
**slash [1]**    20/21
**slide [1]**    29/21
**slow [2]**    71/16
71/18
**slowed [1]**    6/3

**small [3]**    57/17
**smaller [3]**    93/21
103/25 122/21
**smiling [1]**    57/5
**smoothly [1]**    94/6
**so [203]**
**social [8]**    11/5
30/12 30/16 30/22
31/25 50/6 64/22
76/13
**socialization [3]**
18/24 19/20 20/2
**software [20]**
14/21 71/7 73/7
73/19 73/21 73/25
74/23 74/25 75/2
76/7 76/10 82/3
82/4 90/17 91/6
92/15 99/4 125/4
125/8 126/5
**sold [8]**    69/24
71/12 71/14 125/2
126/2 127/8 127/11
127/13
**sole [1]**    77/24
**solely [1]**    78/2
**solid [1]**    16/4
**solve [1]**    109/12
**some [50]**    6/14
8/21 16/10 20/7
20/7 21/7 23/13
25/15 25/17 25/18
29/7 36/18 37/19
39/24 46/15 61/25
62/24 70/3 70/15
71/6 71/21 73/21
75/2 75/23 76/7
80/24 81/21 86/22
87/11 90/7 90/16
91/16 91/17 91/21
93/19 94/17 97/2
98/7 99/2 99/3
99/22 100/21

**S**

**some... [8]**   100/23
101/11 102/5
103/25 105/16
108/17 111/4
125/16

**somebody [5]**   10/7
40/14 43/14 53/7
78/22

**somehow [1]**   38/19

**someone [2]**   10/15
50/3

**someone's [1]**
109/24

**something [22]**
5/15 9/4 15/19
22/18 28/18 28/20
29/25 32/10 37/12
37/15 38/3 39/7
56/19 57/5 57/23
59/24 70/15 86/9
86/10 87/12 110/13
117/25

**sometime [1]**
120/22

**sometimes [14]**   7/2
12/16 22/23 23/2
28/20 29/7 29/16
30/19 53/1 53/5
57/7 61/7 111/15
121/3

**somewhat [1]**
108/25

**somewhere [2]**
81/12 122/9

**Sophocles [1]**   32/9

**sorry [23]**   23/25
24/2 26/4 28/14
32/23 33/3 39/15
61/4 66/11 67/23
68/18 75/7 78/4
80/23 82/15 84/19
88/2 88/8 93/3

93/10 113/13 115/7
127/5

**sort [20]**   19/15
27/8 40/11 42/4
43/17 46/15 52/16
63/23 70/14 70/22
84/8 84/8 86/14
90/5 98/21 98/22
99/2 104/17 105/20
114/21

**sorts [1]**   110/16

**sound [8]**   6/25
16/16 16/17 21/5
37/19 38/1 38/3
38/3

**sounds [2]**   8/3
20/19

**SourceForge [1]**
101/19

**south [7]**   1/14
73/6 76/4 76/5
104/14 104/16
120/11

**Southeast [1]**   1/17

**SOUTHERN [3]**   1/1
129/3 129/6

**Sparrow [1]**   15/19

**speaks [1]**   33/20

**special [1]**   26/19

**specializing [1]**
123/20

**specific [4]**   14/14
14/18 16/7 40/5

**specifically [3]**
43/7 43/7 52/20

**spectrum [3]**   11/2
11/7 22/6

**speculate [1]**
120/17

**speculating [1]**
101/6

**speech [3]**   32/10
33/10 37/9

**speeches [1]**   42/5

**speed [1]**   34/23

**spend [1]**   60/23

**spending [1]**   62/22

**spent [6]**   61/10
61/15 62/5 62/8
127/22 127/24

**split [1]**   43/12

**spoke [1]**   84/18

**spousal [1]**   124/9

**spouse [1]**   10/23

**Springwood [1]**
104/8

**SRS [8]**   9/8 10/6
13/19 13/24 14/5
14/7 14/9 36/3

**SRSs [1]**   14/4

**ss [1]**   129/2

**staff [5]**   74/14
86/22 90/5 91/17
112/5

**stage [8]**   72/14
84/15 97/4 97/18
97/22 101/19
101/23 126/4

**stand [4]**   24/20
40/7 42/8 44/4

**standard [1]**   30/23

**standardized [1]**
14/17

**standing [1]**   58/8

**stands [1]**   117/9

**start [17]**   15/24
16/1 59/25 67/2
71/8 71/8 73/24
74/4 80/4 81/15
84/7 84/12 90/15
93/23 106/2 110/10
117/23

**started [29]**   3/3
7/4 64/24 69/14
69/18 70/2 70/2
70/6 70/7 71/1
72/18 73/11 81/18
82/16 82/19 83/3

USCA11 Case: 22-11150   Document: 36   Date Filed: 14/30/2022   Page: 137 of 254

**started... [13]**
84/1 84/5 87/10
90/13 93/13 100/16
101/20 101/25
102/1 116/22 118/1
127/9 127/9
**starting [3]**   3/7
74/9 101/22
**state [5]**   3/6
26/21 52/9 64/20
73/18
**stated [1]**   37/1
**statement [2]**   24/8
50/14
**statements [4]**
40/11 47/6 50/9
51/3
**states [6]**   1/1
1/10 86/13 118/23
129/1 129/6
**station [2]**   62/11
62/12
**stationery [2]**
86/11 86/12
**stations [1]**   63/23
**statistical [2]**
74/24 82/4
**statistics [6]**
90/1 122/19 122/24
123/2 123/3 123/14
**staying [1]**   55/1
**steal [1]**   128/1
**stenographic [1]**
129/11
**step [3]**   3/25
40/20 58/7
**stepfathers [1]**
60/20
**STEPHEN [1]**   1/16
**Steve [1]**   3/11
**Steven [2]**   58/6
65/17

**Stewart [1]**   68/18
**sticking [1]**   89/7
**sticky [2]**   13/4
13/7
**still [8]**   54/18
74/1 74/15 74/16
92/15 97/9 97/13
97/20
**stock [9]**   73/12
73/13 73/23 73/25
74/3 75/4 127/2
127/4 127/5
**stop [3]**   80/1
107/15 125/18
**stopped [4]**   9/8
79/18 79/22 82/20
**store [2]**   72/12
97/24
**stories [1]**   34/17
**story [1]**   34/18
**straight [1]**
100/15
**Street [1]**   1/17
**strengths [2]**   29/7
32/13
**stress [2]**   56/18
57/8
**stretch [2]**   48/5
54/12
**strike [2]**   47/13
111/17
**structured [4]**
11/24 12/5 31/4
31/19
**stubs [1]**   92/15
**student [2]**   65/18
99/13
**studied [4]**   64/16
66/11 79/8 123/5
**studies [3]**   38/14
67/2 67/20
**Studio [2]**   100/9
100/14
**study [6]**   25/8

**studying [1]**   68/11
**stuff [6]**   46/7
71/10 72/13 72/15
98/21 98/22
**Sturt [3]**   68/17
68/19 75/19
**sub [2]**   32/8 33/23
**sub-domains [2]**
32/8 33/23
**subdomain [5]**
20/12 20/13 20/14
20/15 20/16
**subdomains [2]**
19/21 19/22
**subject [7]**   9/21
9/22 10/14 42/18
44/12 94/7 105/4
**subject's [1]**   9/22
**subjects [1]**   66/17
**submissions [2]**
4/4 4/10
**submit [1]**   49/13
**submitted [8]**
49/11 50/1 50/11
50/21 99/17 123/5
123/6 123/24
**submitting [3]**
46/5 71/11 72/17
**subsequent [1]**
25/15
**subsequently [1]**
83/5
**suburb [3]**   59/20
104/8 120/7
**succeed [1]**   57/18
**successful [2]**
56/5 57/12
**such [2]**   52/14
62/14
**sufficient [1]**
109/11
**Suite [3]**   1/14

**S**

Suite... **[2]**  1/17
1/22
sum **[1]**  121/11
summarize **[1]**
35/22
summarizes **[1]**
14/19
summary **[1]**  14/22
Summer **[1]**  99/7
Sundays **[1]**  112/8
supplement **[1]**
71/5
Supplementary **[1]**
124/18
supplies **[4]**  111/6
111/6 111/15 112/1
support **[3]**  102/12
107/23 108/2
sure **[20]**  7/8
10/12 11/4 13/12
16/2 36/2 36/7
36/10 36/23 36/23
37/5 40/14 69/21
75/20 77/22 86/21
87/4 94/23 101/4
107/15
surprised **[1]**
30/18
suspicions **[1]**
101/5
sustain **[1]**  78/22
sustainable **[1]**
83/24
sustained **[36]**
24/11 42/21 42/24
44/3 45/4 50/17
53/13 60/10 60/12
61/22 62/1 63/17
64/12 65/4 66/1
67/9 67/13 67/19
67/21 68/3 69/4
72/9 72/22 76/16

77/11 77/15 78/6
78/25 79/7 79/14
91/16 91/23 92/2
92/3 109/15 110/8
115/6 116/6 119/5
SWIFT **[2]**  79/23
80/15
switch **[1]**  107/25
swords **[1]**  64/2
SWORN **[1]**  58/10
Sydney **[8]**  88/11
106/7 106/10
120/12 120/14
120/15 120/22
120/24
symptomatology **[1]**
14/2
system **[25]**  6/3
70/5 71/4 73/19
75/14 80/15 81/22
82/14 82/17 82/18
83/11 83/21 83/22
84/1 84/12 88/1
88/10 89/9 89/11
101/15 105/5 105/7
108/2 112/2 125/21
systems **[14]**  63/7
68/13 73/5 73/7
74/11 75/3 76/7
82/10 88/12 107/7
107/25 108/1
111/11 111/12

**T**

take **[26]**  3/22
11/14 13/2 13/4
24/15 24/17 27/6
28/7 31/6 31/12
39/21 39/24 48/5
54/9 54/11 58/14
60/7 64/15 66/9
80/13 81/12 83/25
110/25 111/8 121/3
128/9
takedown **[2]**  76/8

76/9
taken **[4]**  15/20
5/21 5/24 46/19
takes **[3]**  13/3
14/13 28/17
taking **[3]**  60/3
83/17 109/12
Tal **[1]**  4/13
talented **[1]**  78/19
talk **[6]**  24/16
31/16 74/17 87/5
92/6 109/10
talked **[14]**  11/19
13/12 18/7 24/25
35/17 62/7 91/8
98/19 99/3 100/23
102/15 110/15
110/16 127/23
talking **[17]**  9/7
9/8 14/6 16/24
20/7 24/6 36/18
37/4 81/18 81/19
91/20 95/1 98/15
105/24 120/21
123/16 127/22
tantrums **[1]**  57/9
task **[2]**  22/19
84/11
tasks **[1]**  31/20
taught **[3]**  63/4
63/7 83/16
tax **[7]**  119/14
120/2 120/4 124/3
125/6 125/7 125/9
taxed **[1]**  125/5
tea **[1]**  64/6
teach **[2]**  62/17
62/19
teacher **[1]**  62/20
teaching **[1]**  83/19
team **[3]**  73/4 90/3
94/20
technical **[1]**  95/4
technically **[5]**

USCA11 Case: 22-11150 Document: 58-16 Date Filed: 11/30/2022 Page: 139 of 254

**T**

**technically... [5]**
71/10 74/14 100/2
102/23 110/11
**techniques [1]**
82/4
**technology [8]**
57/22 62/17 62/23
74/7 74/19 75/10
103/9 115/19
**teenager [2]** 76/12
76/12
**telegraph [1]**
62/15
**tell [14]** 7/6 18/8
36/17 42/17 59/24
64/16 65/15 67/6
72/24 82/22 85/2
117/9 119/13
125/15
**telling [1]** 13/23
**temperature [2]**
28/7 28/17
**Ten [1]** 40/22
**tend [3]** 34/11
51/3 52/25
**tendency [1]** 51/4
**tends [2]** 44/21
44/22
**tens [3]** 18/15
18/23 38/23
**term [2]** 36/24
43/12
**terminal [1]** 63/3
**Termination [1]**
121/9
**terms [1]** 43/15
**terrible [2]** 62/20
100/8
**terribly [3]** 54/7
97/24 126/3
**Territory [1]**
74/23

**test [13]** 10/25
12/13 13/6 13/8 15/4
15/5 15/11 16/8
16/13 17/19 22/16
33/20 88/10 88/12
**tested [1]** 65/1
**testified [7]** 8/1
8/19 34/10 44/14
44/20 52/8 116/4
**testifying [3]**
5/21 7/21 58/15
**testimony [23]** 6/7
27/16 27/18 27/19
36/25 38/4 38/16
40/9 41/9 41/11
43/3 43/24 44/20
45/11 46/21 47/9
47/12 47/21 49/18
50/2 54/8 108/16
112/19
**tests [1]** 64/20
**text [1]** 13/16
**textbooks [1]** 71/5
**than [24]** 6/6 6/8
11/10 11/11 17/3
17/4 23/13 26/22
28/22 31/21 31/25
32/1 32/5 33/10
37/12 50/5 58/1
59/9 81/11 83/21
90/24 94/7 99/6
109/22
**thank [30]** 5/6
5/12 10/21 11/16
19/5 31/13 33/19
34/7 39/3 41/3
48/7 49/24 51/19
53/22 53/24 54/13
54/23 55/4 55/23
56/11 58/3 58/16
71/19 76/22 87/21
105/23 112/17
113/15 119/22
119/25

**Thanksgiving [1]**
**that [621]**
**that's [68]** 3/9
6/9 9/25 10/6
13/21 21/8 21/24
22/2 22/7 25/25
26/16 28/11 28/12
28/12 28/18 29/9
29/9 29/18 29/24
32/25 33/11 33/14
35/15 37/7 37/25
38/2 38/20 40/5
42/8 43/3 44/24
45/9 45/9 45/13
46/3 46/4 46/10
46/23 50/22 57/6
68/21 78/5 81/4
86/1 86/8 88/1
88/2 88/2 88/6
89/13 90/19 92/13
100/19 100/19
103/11 110/5 116/3
117/6 117/10
117/12 118/11
118/11 119/14
120/9 120/21
121/11 121/22
124/18
**their [28]** 9/13
23/9 23/10 23/12
29/7 29/13 30/19
32/17 35/9 38/14
44/1 51/7 52/23
52/25 53/1 53/1
53/2 56/6 56/23
57/12 57/19 57/19
58/2 80/14 81/13
82/8 91/13 91/14
**them [46]** 11/8
13/13 13/13 13/14
14/1 14/19 15/13
19/15 22/8 23/16
26/20 32/16 32/18

**T**

**them... [33]**    49/7
49/20 50/9 50/10
51/7 51/11 56/13
56/18 57/20 61/17
70/4 70/10 74/1
78/1 82/18 83/17
83/17 83/18 83/19
98/1 98/6 102/6
104/15 106/13
107/17 107/23
110/24 111/8 111/9
111/9 126/1 126/13
127/12

**themselves [1]**
110/25

**then [87]**    4/16
4/22 6/14 9/16
9/23 10/4 12/3
12/6 13/17 13/19
14/8 14/14 14/17
14/18 14/18 16/4
19/24 20/4 22/22
25/7 31/6 35/16
36/16 37/2 37/2
39/11 39/17 41/17
41/22 42/1 43/13
43/16 46/5 46/7
46/19 47/12 48/5
54/24 68/8 69/18
70/21 70/23 70/24
72/18 74/6 74/17
77/1 80/10 80/10
81/11 83/4 83/21
83/24 86/13 89/15
89/18 89/20 89/22
91/6 93/21 94/1
94/2 94/2 94/5
95/16 97/22 100/22
104/25 107/10
107/24 108/2
111/14 113/5 118/4
118/5 121/2 121/20

123/18 124/19
124/20 125/5 125/18
126/4 126/8 127/8
127/11 128/9

**theology [2]**    67/16
68/9

**theoretic [1]**    84/1

**there [102]**    4/18
6/16 6/16 7/19
12/17 12/17 13/23
14/15 15/14 15/19
15/23 16/6 16/7
16/10 18/18 18/23
19/18 19/20 20/4
25/13 25/14 32/12
36/2 37/8 41/24
41/24 41/25 42/18
42/23 43/8 44/16
44/18 46/5 46/6
48/11 49/15 55/17
56/13 57/21 61/2
61/8 61/13 61/15
62/9 64/18 70/24
71/22 72/19 73/11
73/19 74/2 74/10
75/23 77/2 78/14
80/16 84/7 84/20
84/22 85/6 85/13
86/22 88/12 90/4
92/13 93/12 93/15
93/22 94/12 96/18
97/22 98/9 98/10
98/11 99/3 100/2
100/7 101/23
105/15 105/15
105/22 106/15
106/20 107/1 107/3
107/6 110/24
111/16 111/19
111/24 113/21
113/23 114/1
117/11 121/20
121/23 122/13
122/14 125/18

126/2 126/7 126/25
128/4

**there's [28]**    11/4
13/4 16/13 20/17
20/21 20/24 21/22
22/7 23/4 30/9
32/25 41/17 45/21
49/12 49/19 50/2
59/12 59/16 74/16
89/18 92/15 107/22
111/11 117/4 122/2
122/14 124/25
125/16

**therefore [3]**
13/24 31/5 38/14

**Thermonuclear [2]**
69/10 72/18

**these [25]**    17/2
23/16 31/4 31/5
32/13 47/6 83/19
85/3 87/4 96/5
102/2 102/7 102/10
106/12 106/23
110/23 121/1 122/2
122/3 122/4 124/3
124/9 124/9 124/10
126/24

**thesis [1]**    90/2

**they [61]**    7/7
12/17 12/18 16/11
17/7 17/16 19/18
21/7 22/22 22/25
23/3 26/14 29/6
32/19 34/24 35/9
35/10 35/10 37/12
44/1 50/6 50/7
50/7 51/4 51/7
51/11 52/24 53/2
54/16 55/8 55/9
56/17 56/18 56/18
56/21 56/21 56/23
57/8 57/23 57/23
58/1 61/1 64/22
64/24 71/12 79/23
82/19 86/3 86/23

USCA11 Case: 22-11150 Document: 56 Date Filed: 23/30/2022 Page: 141 of 254

**T**

**they... [12]** 87/5
91/15 97/12 97/13
97/13 105/14
106/12 106/14
106/25 107/22
110/24 116/1
**they're [11]** 12/20
43/25 44/1 46/23
86/1 86/2 87/7
89/10 102/10
109/24 111/7
**They're a [1]** 86/1
**thing [16]** 10/4
10/5 16/4 22/14
23/17 42/10 42/11
45/18 47/11 78/16
81/18 83/25 86/15
86/20 96/8 102/21
**things [30]** 7/25
12/16 16/13 21/13
25/1 25/2 25/7
25/13 29/1 29/11
41/23 42/5 43/10
45/23 46/14 46/17
49/7 62/22 63/8
69/13 70/7 70/8
70/9 76/9 83/20
100/3 101/24 122/4
122/13 122/15
**think [25]** 6/1 8/3
12/21 12/24 22/3
28/7 30/13 35/18
36/3 39/7 45/8
47/17 50/15 61/23
62/8 68/23 82/21
88/22 94/5 96/11
100/22 112/5
119/17 121/16
122/23
**thinking [3]** 81/15
83/12 88/3
**third [4]** 36/16

66/19 88/14 97/21
**thirties [1]** 65/23
**this [214]**
**those [45]** 6/24
7/1 7/2 7/25 12/16
14/17 14/19 15/15
15/23 16/25 18/19
19/16 19/21 27/24
47/16 57/16 57/17
57/18 60/6 64/7
66/17 66/21 68/12
77/25 79/25 80/13
82/17 87/2 91/7
92/17 97/11 97/17
98/6 100/20 105/21
106/4 106/14 107/8
107/19 108/8
109/13 111/8
122/15 122/23
126/2
**though [1]** 111/16
**thought [7]** 70/9
83/23 98/15 98/16
98/19 116/16
127/24
**three [12]** 19/18
19/21 20/25 32/8
32/11 33/23 34/17
38/23 52/3 82/7
105/13 120/13
**three-plus [1]**
52/3
**threshold [1]**
26/23
**through [24]** 1/8
5/14 9/11 11/8
11/19 13/20 14/2
15/21 17/17 31/6
32/20 33/3 33/10
41/18 42/3 49/5
64/16 66/22 67/3
68/9 97/13 102/15
111/10 113/12
**thrown [1]** 43/17

**tidied [1]** 97/22
**tidy [1]** 97/24
**till [3]** 69/8
100/2 127/10
**Tim [3]** 81/18
81/19 93/18
**time [73]** 3/22 4/8
4/15 4/16 6/18 7/3
12/16 12/17 17/9
24/19 24/20 24/24
26/7 47/8 51/19
52/2 56/13 58/20
60/3 61/2 61/10
62/6 62/8 62/22
63/10 64/23 67/2
68/24 69/6 69/7
69/14 72/6 72/14
72/18 73/19 74/20
75/9 76/11 76/18
81/24 82/12 83/10
84/11 87/1 89/21
90/13 91/3 91/24
91/25 92/8 93/2
94/14 97/3 97/12
99/4 99/23 102/12
104/6 108/11 109/1
109/7 109/20
110/25 111/17
118/25 120/19
120/23 121/14
123/15 126/1
127/22 127/22
128/8
**timechain [2]** 89/1
89/2
**timeline [3]** 44/1
46/20 86/25
**timely [1]** 4/4
**times [6]** 8/2 8/4
8/19 9/3 61/2 61/7
**today [5]** 16/20
24/20 39/25 64/9
102/9
**together [7]** 3/15

**T**

**together... [6]**   25/5 101/16 102/2 106/24 106/25 127/25

**token [7]**   80/4 80/6 80/7 81/6 81/20 82/13 82/16

**tokenize [1]**   80/8

**tokenized [1]**   76/3

**tokens [5]**   81/16 83/12 89/12 91/2 93/19

**Tokyo [1]**   105/17

**told [11]**   5/16 6/5 8/6 34/17 34/18 38/15 45/9 65/1 98/20 100/4 110/2

**tolerated [1]**   53/7

**too [9]**   10/5 16/10 21/21 89/5 96/8 96/8 96/9 97/9 97/9

**took [8]**   5/25 25/9 70/3 73/20 74/15 91/19 93/25 102/1

**tool [1]**   27/20

**Toowoomba [1]**   104/3

**top [3]**   82/9 105/21 118/14

**top-level [1]**   118/14

**topic [2]**   16/23 103/24

**topics [1]**   34/9

**topped [1]**   64/20

**total [2]**   20/17 124/25

**touching [1]**   42/9

**town [2]**   104/7 120/7

**track [1]**   58/19

**tracking [2]**   76/7 92/1

**trade [1]**   74/24

**traded [1]**   80/12

**trading [2]**   73/16 73/20

**traffic [1]**   120/16

**trained [2]**   15/18 27/21

**trait [4]**   11/5 35/8 38/16 38/22

**transcript [4]**   1/9 129/10 129/11 129/12

**transcriptions [1]**   37/14

**transfer [3]**   79/25 81/10 81/13

**transformer [1]**   111/17

**transitioned [1]**   82/12

**translate [2]**   23/12 29/7

**translating [1]**   31/2

**transmit [1]**   98/25

**treated [1]**   66/23

**tremendous [1]**   33/21

**TRIAL [1]**   1/9

**tried [3]**   42/4 84/16 98/1

**trouble [1]**   61/5

**true [3]**   37/7 46/3 129/10

**trust [4]**   16/18 17/2 124/18 125/2

**trusted [1]**   27/24

**truth [2]**   35/10 45/9

**truthful [1]**   35/14

**try [7]**   51/6 62/12 71/5 102/5 109/4

110/2 111/20

**trying [11]**   17/23 20/24 32/15 35/21 58/19 80/1 82/16 82/18 92/16 100/19 105/3

**Tumbi [1]**   105/19

**turn [2]**   21/23 70/8

**turned [2]**   65/14 70/20

**turnover [1]**   82/8

**two [27]**   6/6 6/8 6/16 6/24 7/14 10/11 12/18 14/4 20/25 21/25 25/6 26/19 46/8 50/21 51/10 56/13 57/15 66/14 66/17 66/18 104/15 105/12 106/15 107/14 108/3 111/3 111/8

**two-year-old [1]**   21/25

**type [5]**   53/16 64/8 70/4 71/20 109/20

**typed [2]**   95/10 95/14

**types [1]**   80/8

**typically [9]**   10/7 17/12 18/15 23/9 26/11 26/12 32/16 57/6 57/18

**typos [1]**   99/2

**U**

**U.S [2]**   1/24 41/23

**UK [2]**   86/2 123/19

**ultimately [2]**   23/4 91/12

**Umbi [1]**   105/19

**unable [1]**   29/6

**uncle [4]**   72/3

# U

**uncle... [3]** 93/6
95/20 110/19
**under [12]** 5/4
18/17 19/23 19/25
20/2 42/25 56/18
57/7 58/9 122/22
126/20 127/11
**undergraduate [1]**
66/4
**understand [15]**
32/10 32/16 37/3
37/21 37/21 45/5
45/7 51/6 53/2
59/5 64/25 65/7
69/21 86/8 87/4
**understanding [6]**
32/12 36/8 36/13
43/5 47/7 71/17
**understands [3]**
20/6 32/5 33/9
**understood [1]**
75/23
**Unfortunately [2]**
57/14 90/3
**unhappy [1]** 91/16
**uni [1]** 98/7
**uniforms [1]** 63/25
**uninterrupted [1]**
111/14
**unit [1]** 60/14
**UNITED [4]** 1/1
1/10 128/17 129/6
**units [2]** 107/14
111/14
**universities [4]**
63/1 66/5 95/22
110/13
**university [15]**
62/25 66/11 66/16
66/23 67/3 68/17
68/18 75/14 75/19
79/9 89/25 94/24

97/2 123/1 123/19
**Unix [1]** 70/15
**unless [6]** 12/21
26/14 26/21 30/17
32/12 40/17
**until [5]** 65/23
66/5 74/3 79/17
84/6
**up [71]** 5/14 5/16
6/23 7/10 9/6 10/2
10/17 16/4 16/17
19/1 19/7 20/9
22/10 23/17 23/25
24/2 24/3 24/5
24/19 25/5 28/1
29/14 41/2 41/4
41/5 42/4 43/25
59/25 60/15 61/1
61/16 62/9 64/14
64/19 65/8 65/15
65/23 66/5 68/24
72/17 73/11 74/3
75/9 77/1 77/2
77/5 79/17 83/12
84/4 88/10 88/13
91/14 91/25 92/13
93/1 97/22 106/13
107/8 107/15 108/3
109/4 109/12
109/23 110/5
111/19 112/11
113/8 114/5 117/4
122/19 126/3
**update [1]** 118/24
**updated [1]** 111/12
**upload.ie [1]**
100/1
**us [21]** 4/21 6/19
8/6 19/11 25/19
38/15 47/2 54/8
54/18 61/10 63/22
64/16 65/15 66/9
80/12 82/16 82/22
85/2 90/21 119/13

128/9
**usage [1]** 28/24
**use [12]** 10/6 12/7
23/16 23/19 27/24
41/7 41/18 51/14
56/23 57/23 63/5
81/10
**used [22]** 13/24
16/21 21/9 27/20
35/23 46/21 61/2
61/8 61/15 63/7
63/9 64/6 65/17
65/22 71/4 82/5
85/3 86/4 92/6
102/22 105/13
126/10
**uses [1]** 100/12
**using [10]** 27/12
45/8 62/15 70/21
71/8 81/16 88/12
89/9 99/4 100/9
**usually [5]** 22/14
22/16 22/18 37/12
56/20

# V

**vaccinated [1]**
58/13
**validating [1]**
83/23
**values [1]** 91/5
**variables [1]** 91/7
**variety [2]** 71/4
74/10
**various [4]** 33/22
60/20 73/18 94/12
**Vel [1]** 3/10
**Vela [3]** 3/11
11/16 41/5
**venue [1]** 86/13
**verbal [3]** 48/16
56/24 96/8
**Verdict [2]** 4/11

**V**

**verdict... [1]**
4/13

**version [19]**   92/15
95/10 95/14 95/15
95/15 95/17 95/18
95/19 96/6 96/7
96/13 96/14 96/16
96/18 96/25 97/5
97/6 97/8 97/21

**versions [6]**   97/23
97/25 98/3 100/24
101/25 101/25

**very [50]**   7/25 8/3
10/8 10/10 11/1
12/18 13/23 15/18
16/7 16/23 21/24
27/21 29/5 35/9
35/10 35/15 35/22
37/6 37/10 38/5
38/9 38/17 40/6
40/6 41/12 41/15
43/18 48/18 50/5
51/22 53/22 57/14
57/17 57/25 60/11
60/25 62/5 65/21
70/18 79/9 85/21
89/8 91/15 91/16
91/17 96/17 98/14
101/19 101/20
107/3

**vetted [1]**   13/17

**video [1]**   69/24

**view [1]**   102/16

**Vineland [33]**
11/18 11/20 11/20
11/20 12/13 12/25
14/6 14/8 14/9
15/2 15/3 15/5
15/6 15/7 15/11
15/20 17/16 18/18
18/21 19/10 19/17
19/19 20/16 21/8

23/8 25/14 25/16
25/16 26/6 26/11
27/12 27/19 28/6

**Vineland-3 [4]**
15/6 15/7 15/11
20/16

**virtual [1]**   108/1

**visit [1]**   65/22

**Visual [2]**   100/9
100/14

**VMS [2]**   63/3 63/5

**vocation [2]**   57/20
57/24

**voice [1]**   21/23

**volumes [1]**   38/13

**vs [1]**   1/6

**W**

**Wagga [2]**   68/21
68/21

**Wales [3]**   73/6
76/4 120/11

**walk [1]**   41/18

**walks [1]**   103/1

**want [30]**   3/22 4/2
4/15 5/14 6/23 9/6
13/10 16/16 18/14
23/25 26/18 31/10
31/16 35/10 39/23
41/2 42/20 46/1
48/4 49/10 49/17
49/25 50/12 50/20
66/5 66/9 87/5
103/24 116/1 117/2

**wanted [12]**   24/2
25/5 36/2 36/7
36/10 36/23 36/23
62/22 80/8 81/22
89/25 90/1

**wants [1]**   47/22

**war [1]**   64/3

**WarGames [2]**   69/10
72/18

**was [300]**

**wasn't [15]**   20/21
38/2 38/19 38/19
45/6 45/12 81/9
97/25 101/23
103/15 111/3 126/3

**Watts [8]**   9/12
9/12 12/1 12/13
25/17 26/6 28/19
29/25

**Watts' [2]**   9/16
10/1

**Wattyl [1]**   82/6

**way [26]**   13/10
15/21 17/17 23/4
24/13 33/14 33/20
35/2 36/1 36/11
38/1 46/13 47/9
62/20 63/24 76/11
78/8 87/3 94/16
96/12 102/3 102/25
103/8 103/11 108/8
110/23

**we [150]**

**we'll [10]**   3/3
13/2 13/20 27/7
40/21 45/7 48/5
49/3 83/9 128/9

**we're [11]**   8/7
14/6 15/2 16/17
19/14 39/25 49/5
55/6 80/17 124/7
127/4

**we've [5]**   10/1
10/1 40/10 44/4
94/25

**weapons [1]**   64/6

**weather [1]**   29/23

**web [1]**   73/7

**week [2]**   65/23
74/2

**weekend [2]**   3/21
5/1

**weekends [2]**   61/15

**W**

USCA11 Case: 22-11150   Document: 53-16   Date Filed: 11/30/2022   Page: 145 of 254

**weekends... [1]**
 61/16
**Wei [13]**  94/16
 94/22 94/23 98/6
 98/8 98/11 98/12
 98/14 100/3 101/7
 101/8 102/6 103/5
**weigh [1]**  111/12
**weird [4]**  35/19
 35/20 36/4 36/5
**Welcome [2]**  48/9
 55/12
**well [37]**  4/7 4/10
 4/13 5/12 7/1 8/5
 8/6 10/8 10/16
 12/17 12/20 14/3
 16/22 17/24 22/2
 27/17 28/11 40/12
 44/10 44/13 45/8
 47/5 55/8 57/23
 61/15 62/6 63/7
 64/19 65/21 67/3
 71/7 89/24 97/4
 98/9 101/24 112/15
 114/5
**went [14]**  61/12
 64/17 66/22 73/12
 78/8 79/10 81/5
 84/14 98/6 98/6
 100/20 105/5 118/5
 124/10
**were [101]**  5/2 5/3
 6/5 6/16 6/20 6/24
 6/24 9/8 12/16
 16/12 17/2 18/1
 18/9 18/23 18/25
 21/1 24/6 24/16
 25/13 25/14 25/14
 29/19 33/22 34/10
 34/24 35/5 35/23
 36/18 37/4 37/15
 40/6 43/18 45/8

 47/6 57/23 59/19
 60/16 61/5 63/5
 64/8 65/6 65/11
 66/17 67/25 70/1
 71/14 72/5 72/6
 72/14 73/22 74/10
 76/25 79/3 79/24
 80/14 81/24 82/11
 83/2 87/3 87/8
 88/10 91/15 91/17
 91/18 92/17 92/19
 93/13 93/15 97/22
 98/3 98/10 98/11
 99/3 99/5 101/23
 104/1 105/6 105/6
 105/9 105/14
 105/15 105/15
 105/22 105/24
 106/3 106/4 106/12
 106/14 106/15
 106/15 106/25
 107/3 107/8 107/19
 109/25 110/23
 111/2 112/19
 113/18 120/19
 122/16
**weren't [1]**  17/7
**west [2]**  1/2 104/4
**what [186]**
**what's [8]**  37/16
 37/20 45/17 105/24
 112/9 114/13
 119/11 121/8
**whatever [3]**  23/19
 84/8 90/22
**whatsoever [1]**
 52/5
**when [100]**  10/6
 13/6 13/19 15/16
 19/13 20/7 21/24
 23/4 26/2 27/2
 28/7 28/17 28/25
 34/10 36/2 42/5
 42/14 43/9 43/22

 46/17 46/18 53/17
 59/9 60/1 60/4
 61/1 61/7 61/16
 63/9 64/5 64/7
 64/24 67/6 69/8
 69/16 69/25 70/20
 71/8 71/10 72/6
 73/10 73/10 73/11
 73/20 73/23 73/23
 74/3 76/11 76/12
 78/21 81/15 82/15
 83/3 83/6 83/10
 83/11 84/4 85/6
 87/15 88/3 90/15
 90/22 91/14 91/18
 91/18 92/17 93/6
 95/6 95/12 96/2
 96/22 96/22 97/10
 97/11 97/19 97/24
 98/2 98/22 99/3
 99/24 100/11 104/6
 105/5 108/8 109/9
 117/23 118/2
 118/24 120/20
 120/21 121/2
 121/22 122/24
 123/4 123/23
 125/16 127/8
**whenever [1]**  22/18
**where [48]**  9/6
 9/11 9/20 17/23
 20/21 22/7 29/19
 40/14 40/15 41/15
 41/17 41/19 41/22
 42/2 44/24 45/19
 45/20 59/19 64/16
 66/15 68/15 68/20
 72/12 72/25 78/5
 83/15 84/7 84/20
 86/17 86/17 89/11
 90/1 92/16 100/20
 102/13 104/1
 104/11 104/11

**W**

**where... [10]**
106/5 106/17
106/17 113/25
116/3 120/12
122/25 126/16
126/18 126/25
**WHEREOF [1]**   129/14
**whether [6]**   18/21
21/9 30/24 42/7
43/9 43/12
**which [49]**   9/8
12/14 14/14 15/25
16/9 17/21 23/2
24/21 25/6 25/17
26/23 33/23 37/9
42/1 42/11 43/16
43/23 44/17 46/8
47/6 50/14 59/20
61/3 61/18 61/18
65/9 69/10 71/3
74/22 75/13 75/18
75/20 77/5 82/6
84/3 88/4 88/10
93/13 93/17 93/18
102/14 104/8 106/7
107/3 109/5 110/5
118/10 119/7 120/8
**while [6]**   45/3
58/14 66/23 105/3
109/7 111/9
**whitepaper [9]**
88/5 93/11 95/1
95/2 95/4 95/6
99/15 99/24 99/25
**who [47]**   7/24 10/7
10/15 16/6 26/2
27/20 30/11 32/10
34/19 49/19 53/7
53/9 54/21 56/1
56/14 56/15 57/18
57/21 65/17 65/18
65/22 71/24 71/24

82/25 84/18 90/4
90/15 93/16 94/4
94/20 94/22 95/19
95/24 95/25 96/10
96/25 98/5 99/10
99/12 100/12 101/3
102/4 110/10
110/10 113/3
117/14 118/17
**whoever [1]**   96/5
**WhoIs [1]**   118/11
**whole [7]**   15/5
15/16 71/1 90/9
94/15 100/8 117/1
**whom [3]**   101/1
113/3 121/12
**Whose [1]**   85/7
**why [18]**   21/8 29/9
40/18 41/6 46/16
67/11 77/3 77/13
77/17 78/4 78/6
78/22 95/3 107/11
109/2 110/5 121/20
127/20
**wide [1]**   88/18
**widespread [1]**
27/22
**wife [15]**   9/13
9/22 11/11 26/2
30/23 57/1 82/25
97/3 102/14 102/19
112/6 117/10
117/12 117/24
118/19
**wife's [1]**   114/2
**will [10]**   3/25
23/19 26/21 30/18
40/20 48/3 56/12
56/13 88/1 94/5
**Williams [2]**   97/1
98/7
**Wilson [3]**   104/12
113/7 113/25
**Windows [1]**   105/14

**Wipe [2]**   99/8
99/24
**wish [1]**   45/12
**withdraw [1]**   51/18
**within [2]**   11/2
81/10
**without [8]**   18/6
18/7 70/18 80/14
88/18 91/7 102/9
103/9
**witness [18]**   5/16
24/7 24/10 24/20
44/25 45/4 45/16
47/14 47/18 51/15
54/5 54/6 54/22
58/4 61/5 84/24
114/17 129/14
**won't [1]**   83/11
**wonderful [2]**
56/16 57/13
**Wong [1]**   65/17
**Wooloowin [4]**
104/14 104/18
112/25 113/20
**word [8]**   27/6
31/12 35/19 35/25
36/1 36/8 36/13
38/11
**words [7]**   27/24
35/20 35/23 37/6
38/5 38/9 38/14
**work [33]**   5/1 5/16
52/3 69/6 71/21
72/7 72/19 73/14
74/1 75/25 79/3
79/16 79/17 80/24
80/24 82/2 82/13
82/20 83/12 83/14
83/17 84/7 84/11
87/1 91/6 93/24
95/25 98/12 99/7
101/15 112/8 122/4
122/13
**work-related [2]**

**W**

**work-related... [2]**
122/4 122/13

**worked [16]**   62/24
69/9 72/12 73/1
76/4 79/10 80/20
81/21 82/17 83/15
83/17 90/4 94/20
99/10 110/6 112/5

**working [12]**   4/3
67/2 67/3 67/5
76/2 77/4 77/6
83/18 88/1 93/13
93/14 98/21

**workshops [2]**
16/22 62/7

**workspace [1]**
106/21

**world [3]**   27/23
52/5 62/13

**worldwide [1]**
118/13

**worse [5]**   31/21
31/25 32/1 32/5
33/10

**worse than [1]**
31/25

**worth [1]**   125/8

**would [106]**   8/22
16/12 16/13 21/16
21/22 22/2 22/3
25/19 26/6 26/9
29/11 32/7 32/14
32/15 38/1 40/11
42/23 42/24 43/17
45/13 45/22 45/24
46/3 46/5 46/6
47/2 47/5 47/12
47/13 49/12 49/13
49/20 50/3 50/8
50/10 50/25 53/7
53/9 54/7 57/2
59/7 59/11 59/13

61/12 61/13 62/12
62/16 62/19 62/20
62/21 62/21 71/6
71/11 71/12 71/18
75/16 78/1 78/6
78/16 80/12 81/6
81/11 81/12 82/18
83/23 83/23 83/25
86/12 88/4 88/19
89/11 89/13 89/17
89/20 90/25 91/3
91/4 91/6 95/8
95/13 97/1 97/20
98/12 98/16 101/5
103/8 103/9 106/11
107/6 107/13
107/15 108/11
108/25 109/8
109/12 109/19
109/21 110/11
111/4 111/16
114/11 114/12
121/3 122/11 124/2
124/2

**wouldn't [10]**   17/1
17/12 18/8 32/17
32/18 42/8 55/1
98/15 102/9 107/15

**WRIGHT [93]**   1/7
2/8 3/5 3/16 3/18
9/13 10/4 10/24
16/21 18/2 20/22
21/17 23/15 25/22
26/6 27/8 27/14
28/7 29/25 30/14
31/9 31/17 31/20
33/9 34/14 35/17
36/18 37/5 37/7
38/2 38/5 38/20
40/14 41/12 41/15
41/19 41/22 42/7
43/6 43/9 43/21
44/14 45/22 45/25
46/17 49/11 49/13

49/18 50/1 50/11
56/25 58/6 58/7
58/10 58/12 58/23
58/25 59/12 59/19
67/25 71/16 72/24
75/5 78/17 80/23
83/1 83/1 83/2
87/12 88/6 105/3
112/19 113/14
114/8 114/13 115/9
116/4 116/16
116/19 117/16
119/4 120/7 124/10
125/15 125/15
126/7 126/12
126/13 126/16
127/14

**Wright's [9]**   9/12
11/9 18/1 42/4
47/19 57/3 57/8
67/20 77/23

**write [9]**   13/5
13/6 13/7 13/7
13/10 59/9 71/4
89/19 92/11

**writes [1]**   33/10

**writing [4]**   55/19
71/11 86/9 92/22

**written [4]**   19/9
19/16 19/24 50/1

**wrong [6]**   12/23
14/8 35/21 36/17
99/5 110/12

**wrote [3]**   13/13
13/13 84/20

**X**

**Xen [2]**   105/15
108/1

**Xenon [1]**   109/21

**Y**

**yeah [10]**   10/17

**Y**

**yeah... [9]**    14/23
24/5 28/11 71/19
87/12 88/8 88/23
100/19 102/22
**year [42]**    6/6 6/9
15/16 16/1 16/11
21/5 21/11 21/18
21/25 22/3 24/22
26/3 26/7 27/12
27/25 28/8 30/3
30/4 30/10 30/23
31/8 59/22 63/13
64/17 64/18 64/23
66/19 66/24 68/22
74/4 75/15 82/22
94/17 95/7 96/24
101/13 109/5 118/1
121/18 122/18
122/19 124/25
**years [13]**    6/19
6/21 6/24 7/2 8/4
15/14 43/22 60/2
60/15 65/11 69/16
82/17 121/2
**yen [1]**    80/10
**yes [147]**
**yesterday [1]**
13/12
**yet [2]**    25/15
119/18
**you [576]**
**you just [1]**    17/3
**you to [1]**    50/12
**you'll [2]**    36/17
58/7
**you're [26]**    13/6
14/5 14/23 15/16
15/25 16/1 17/5
17/22 21/13 21/15
23/24 31/1 31/1
37/17 69/21 74/18
81/17 83/12 84/4

91/10 91/20 91/22
95/8 99/10 100/13
113/9
**you've [6]**    7/22
25/11 25/11 83/10
98/20 102/4
**young [3]**    62/18
69/9 121/2
**younger [3]**    16/12
16/13 19/20
**youngest [1]**
117/22
**your [162]**
**yuan [1]**    80/10
**yvette [6]**    1/23
1/25 129/5 129/17
129/17 129/19

**Z**

**ZACK [2]**    1/16 3/11
**ZALMAN [2]**    1/21
3/16
**ZED80 [1]**    70/4
**ZED80-type [1]**
70/4
**zeros [1]**    70/20
**zone [1]**    34/24
**Zoren [6]**    95/22
95/24 96/5 96/11
98/7 103/12

**851**

```
 1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                      CASE NO. 9:18-cv-80176-BB
 3
    IRA KLEIMAN, as the personal representative
 4  of the Estate of David Kleiman, and W&K Info
    Defense Research, LLC,
 5
            Plaintiffs,               November 23, 2021
 6                                    9:26 a.m.
            vs.
 7
    CRAIG WRIGHT,
 8
            Defendant.               Pages 1 THROUGH 192
 9  _____

10                 TRANSCRIPT OF TRIAL DAY 15
               BEFORE THE HONORABLE BETH BLOOM
11               UNITED STATES DISTRICT JUDGE
                    And a Jury of 10
12
    Appearances:
13  FOR THE PLAINTIFF:  ROCHE FREEDMAN, LLP
                        DEVIN FREEDMAN, ESQ.
14                      KYLE ROCHE, ESQ.
                        200 South Biscayne, Suite 5500
15                      Miami, Florida 33131

16                      BOIES SCHILLER & FLEXNER
                        ANDREW BRENNER, ESQ.
17                      STEPHEN N. ZACK, ESQ.
                        STEPHEN LAGOS, ESQ.
18                      100 Southeast 2nd Street, Suite 2800
                        Miami, Florida 33131
19

20  FOR THE DEFENDANT:  RIVERO MESTRE, LLP
                        ANDRES RIVERO, ESQ.
21                      JORGE MESTRE, ESQ.
                        AMANDA M. MCGOVERN, ESQ.
22                      MICHAEL A. FERNANDEZ, ESQ.
                        ZALMAN KASS, ESQ.
23                      2525 Ponce de Leon Boulevard, Suite 1000
                        Coral Gables, Florida 33134
24

25
```

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:   DAMIAN VALORI, LLP
                          AMANDA L. FERNANDEZ, ESQ.
3                         1000 Brickell Avenue, Suite 1020
                          Miami, Florida 33131
4

5    COURT REPORTER:      Yvette Hernandez
                          U.S. District Court
6                         400 North Miami Avenue, Room 10-2
                          Miami, Florida 33128
7                         yvette_hernandez@flsd.uscourts.gov

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

## I N D E X

2   Certificate.....................................    192
    Jury Instructions ..............................     20
3   Plaintiffs' closing argument ...................     56
    Defendant's closing argument ...................    110
4   Plaintiffs' rebuttal close .....................    175
    Final Jury Instructions ........................    184

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Call to order of the Court, 9:26 a.m.)

 2            THE COURT:  Good morning to each of you.

 3            Are the attorneys present, as well as the parties, and

 4     are we able to call the case a few minutes early?

 5            MR. FREEDMAN:  Your Honor, if it's all right, I think

 6     the lawyers need to talk to you at sidebar for one second.

 7            MR. RIVERO:  We certainly request a sidebar if we can.

 8            THE COURT:  Certainly.

 9            All right.  Come on forward.

10        (At sidebar on the record.)

11            MR. FREEDMAN:  The gentleman in the back of the

12     courtroom with the tattoos and the white shirt intends at some

13     point to stand up and talk about how Craig Wright has ruined

14     his life.  He's on the left-hand side -- the left-hand of the

15     gallery, white shirt, second to back.

16            MR. RIVERO:  One thing is -- like I learned a long

17     time ago, when people have these kinds of problems, not to look

18     at them.  The second thing is, Judge --

19            THE COURT:  I just would - I would let the marshal

20     know.

21            MR. RIVERO:  -- I didn't hear the comment, but

22     Mr. Zack and Mr. Freedman reported it to me.  And it has the

23     indicia of credibility to us, Judge, because -- I mean, I know

24     personally -- Ms. McGovern and I have received emails from

25     people who, terribly, I would characterize as cranks, saying
```

1    things like what Mr. Freedman --

2             THE COURT:  Oh, okay.

3             MR. RIVERO:  -- and we are very concerned and we don't

4    know what to do about it.

5             THE COURT:  So, I mean, for my purpose, I want to make

6    sure that everyone is protected.  So if I know ahead of time --

7             MR. RIVERO:  White T-shirt, Judge.

8             THE COURT:  Oh, I see him.  I thought you said in the

9    back.  Okay.  I got it.

10            MR. RIVERO:  Judge, let me just say this:  I guess if

11   we're talking about what he's saying -- we are in a court, and

12   I know it's a public proceeding, and I know the Court -- its

13   powers are quite great, but to a limit.  If it's going to be an

14   interruption while I'm speaking, so be it.  If that's what it

15   is, it is.  But Judge, what I would ask is if the gentleman

16   starts going on, that the marshals be prepared -- that the

17   security people be prepared to escort him out.

18            THE COURT:  Yeah.  That's why I want to let Scott

19   know.  So if it's all right -- Officer Campbell is here -- I

20   can actually instruct him that anybody; this gentleman or

21   anybody else -- that they need to leave the courtroom.

22            MR. RIVERO:  And Judge, I don't know what Mr. Freedman

23   had in mind, so I don't want to speak for him.  I mean,

24   obviously, it's not that we wouldn't agree that he should be

25   removed preemptively in advance, but I think there could be a

1    constitutional problem with that because --

2            THE COURT:  Well, I'm not going to do it in advance.

3    I mean, he would have to do something to obstruct the case.

4            Is that the only issue?

5            MR. BRENNER:  We have a couple issues, which we can do

6    not at sidebar regarding jury instructions.

7            THE COURT:  Yeah.  Okay.  Perfect.

8            Thank you.

9        (End of discussion at sidebar.)

10           THE COURT:  All right.  Let's go ahead and call the

11   case and we can get started.

12           COURTROOM DEPUTY:  Calling Civil Case Number 18-80176,

13   Ira Kleiman v. Dr. Craig Wright.

14           Counsel, please state your appearances for the record,

15   starting with Plaintiffs' counsel.

16           MR. FREEDMAN:  Good morning, Your Honor.  Vel Freedman

17   for the Plaintiffs.

18           MR. ROCHE:  Kyle Roche for Plaintiffs.

19           MR. LAGOS:  Stephen Lagos for Plaintiffs.

20           MR. ZACK:  Stephen Zack for the Plaintiffs.

21           MR. BRENNER:  Good morning.  Andrew Brenner for

22   Plaintiffs.  We also have at counsel table Ira Kleiman and

23   Dorian Vela.

24           THE COURT:  Good morning to each of you.

25           MR. RIVERO:  Good morning, Your Honor.  Andres

1  Rivero -- and I'll go ahead and introduce our team to make this

2  quicker, Judge -- of course Amanda McGovern, Jorge Mestre,

3  Dr. Wright is present, Michael Fernandez, and Zalman Kass, all

4  lawyers with us, Sarah Gonzalez of our office and Karl Reed.

5  Judge, also Ms. Amanda Fernandez, who argued to the Court

6  yesterday.  Good morning, Your Honor.

7          THE COURT:  Good morning to each of you.

8          Last night, the Court did rule on the objections at

9  our charge conference.  I did file the Court's instructions to

10  the jury, as well as the Verdict Form.  And that would include

11  the objections and the Court's consideration and ruling on each

12  of the objections that were made.

13          Are there any final objections to the Court's

14  instructions to the jury or the Verdict Form?

15          MR. BRENNER:  Your Honor, if I could raise just a

16  couple issues.  One, I think the parties are in agreement on

17  the slight change to instruction -- the fraudulent concealment

18  instruction on Page 15.

19          THE COURT:  All right.  Let me get to it.

20      (Pause in proceedings.)

21          THE COURT:  All right.

22          MR. BRENNER:  We think it should read as follows:

23  "Fraudulent concealment goes beyond a defendant's mere

24  non-disclosure of fact," and then I have a period there.  And

25  then the next sentence should start with:  "It requires."  So

1    take out:  "Must constitute."

2            THE COURT:  All right.

3            MR. BRENNER:  "Active and willful concealment of a

4    material fact," and then the word "where" should become

5    "unless."

6            THE COURT:  "Unless."  All right.

7            MR. BRENNER:  And then the rest of the sentence is:

8    "Unless the plaintiffs did not have the equal opportunity to

9    become apprised of the fact."

10            And if I could just read it from beginning to end, to

11    make sure we're ...

12            THE COURT:  After one and two, it should state:

13    "Fraudulent concealment goes beyond a defendant's mere

14    non-disclosure of a fact.  It requires active and willful

15    concealment of a material fact, unless the plaintiffs did not

16    have the equal opportunity to become apprised of the fact."

17            MR. BRENNER:  I believe that is correct.

18            THE COURT:  All right.  What other changes?

19            MR. BRENNER:  So on the -- Your Honor, may I approach

20    and hand something up?  May I approach to hand something up?

21    Because it will be easier to follow the instruction.

22            THE COURT:  Certainly.

23        (Pause in proceedings.)

24            THE COURT:  All right.  And the next change that the

25    parties have agreed to?

1        MR. BRENNER:  Your Honor, we're now focused on the

2    instruction on partnership defined on Pages 8 and 9.  And so

3    the record is clear, what I've handed to Your Honor is a --

4    sort of a one-page bullet point of what I'm going to ask for,

5    and then the second page has the proposed changes.  I have

6    given this to Defense counsel.  I'm confident they will not

7    agree.  So -- but I did hand it to them when I got here this

8    morning.

9        So here's what happened, Judge:  You had an original

10   instruction on partnership defined, and then yesterday evening

11   you sent out a revised instruction.  And here's our concern:

12   What appears to have happened is you've added, based on -- what

13   I must presume is based on the Williams v. Obstfeld case.

14        THE COURT:  That's right.

15        MR. BRENNER:  You added certain elements.  And what

16   our concern is, in adding those elements, you did not also add

17   the elements that -- the fact that RUPA, which is controlling,

18   also presumes, in the absence of agreement, some of those same

19   elements.  So now we have an instruction that added elements,

20   but then doesn't add the presumptions that RUPA provides.

21        So we obviously would go back -- would ask that we go

22   back to our original instruction.  But if not, I think this

23   instruction needs certain additional language, which is what

24   I've given to you on the second page that I handed up to the

25   Court.  And the additional language is in bold.  So that's our

1    request.

2         We object to the new instruction and ask either to go

3    back to the old one or to add this new language, which I'm

4    happy to file what I've handed up to the Court so it's part of

5    the court record.

6         THE COURT:  But you would agree that the four factors

7    of the elements are appropriate to instruct the jury.

8         MR. BRENNER:  No.  I believe that Williams is

9    pre-RUPA.  And so I don't agree.  But our position is if Your

10   Honor's going to do those elements, we believe it's appropriate

11   to also instruct on the presumptions according to RUPA.

12        THE COURT:  Okay.  A response?

13        MS. FERNANDEZ:  Thank you, Your Honor.  Amanda

14   Fernandez on behalf of Dr. Wright.

15        As to the fraudulent concealment, we are in agreement

16   that, for those changes, that's fine.

17        As to the definition of partnership, we disagree that

18   the elements that were added by Your Honor should be removed.

19   We did cite two cases post-RUPA that still require those

20   elements, such as Dreyfuss and Rafael -- and the Roca case, 856

21   So.2d 1.  We are fine with including the bold language that

22   states whether or not the persons intend to form a partnership.

23   We agree that that is what the statute states.

24        THE COURT:  And as to the assets?

25        MS. FERNANDEZ:  Would you like to argue that first

```
 1    or --
 2            MR. BRENNER:  Yeah.  I think I did because I gave Her
 3    Honor this paper.  So ...
 4            MS. FERNANDEZ:  As to the partnership assets, we would
 5    disagree as to the first part of the bold language and the
 6    losses of the partnership.  The statute language, which is
 7    620.8401, states -- we would say that we should use the exact
 8    language from the statute, which should be:  "Is chargeable
 9    with a share of partnership losses in proportion to partner's
10    share of profits."
11            And as to the rest of the language, we were fine with
12    that addition.  "In addition, in the absence of contrary
13    agreement among the partners, each partner has equal rights in
14    the management and conduct of the partnership business," as
15    that is what the statute says, Your Honor.
16            THE COURT:  Okay.  Are there any others?
17            MR. BRENNER:  Your Honor, I think you made it clear,
18    but just for the record, when you said you ruled on objections,
19    I take it from your instructions you've also -- or should I
20    take it that you have denied the Plaintiffs' motion for
21    judgment as a matter of law on the laches and statute of
22    limitations defenses?
23            THE COURT:  That is correct.  It's a question of fact.
24            MR. BRENNER:  Okay.  So we have nothing further other
25    than to restate all our prior objections and submissions and
```

1    arguments as already heard by the Court.

2         THE COURT:  All right.  And with regard to the Verdict

3    Form, are there any additional objections?

4         MR. BRENNER:  No additional objections from the

5    Plaintiffs, Your Honor.

6         THE COURT:  On behalf of the Defendant?

7         MS. FERNANDEZ:  Other than the objections we raised

8    yesterday, no additional objections, Your Honor.

9         THE COURT:  All right.  Then thank you for the

10   additional comments.  At this point, I am going to ask Liz to

11   make copies for the jurors of the jury instructions, as well as

12   a Verdict Form.  Many jurors are visual learners and I believe

13   that it helps the jury to have a copy of the jury

14   instructions -- okay -- if there's nothing further with regard

15   to jury instructions and Verdict Form.

16        MR. BRENNER:  Right.  Are you adding what we agreed

17   upon?

18        THE COURT:  I am.  I'm adding that language.

19        MR. BRENNER:  Okay.  Thank you, Judge.

20        THE COURT:  Okay.  All right, then.

21        Let me discuss with you -- as we are going to be

22   making the copies, I would ask at this time that we have an

23   acknowledgment on the record regarding the uploading of

24   exhibits, one exhibit list that can be provided to the

25   courtroom deputy, and I would like to see the laptops and have

 1   the laptops given to the courtroom deputy, so at the time that

 2   the jury deliberates we can bring the laptops in to them.  I

 3   just want to make sure that if there's a password in order to

 4   get into the laptop that the information is also provided.

 5        MR. BRENNER:  Your Honor, can I check to get the

 6   status of all that?  I think it's all done.

 7        THE COURT:  Certainly.

 8        MS. MCGOVERN:  Your Honor, could I bring one issue to

 9   the attention of the Court?

10        THE COURT:  Yes.

11        MS. MCGOVERN:  There was an issue raised this morning

12   regarding an exhibit, which is a Slack channel, Exhibit 853.4.

13   We looked back at the trial transcript because our

14   understanding on that exhibit was that it was the two pages

15   that was referenced during the examination.  And when we went

16   back to the transcript, because we didn't want to raise an

17   issue with the Court that we didn't think it was right, but it

18   actually does specifically say -- there was confusion as to the

19   numbered exhibit.  There was reference that it's just two

20   pages.

21        This is Day 9, 11/15/21 on Page 170 of the transcript.

22   And we specifically say:  "There's a bit of confusion about the

23   Slack channel exhibit.  We can address it outside the presence

24   of the jury."  Your Honor agreed, as did Plaintiffs' counsel.

25   We've now been advised they want the entire Slack channel as

1  the exhibit for 853.4 that goes beyond two pages that was

2  referenced.  And we would ask the Court not to allow that, but

3  rather just to allow the specific reference that was made

4  during that examination, which we reserved the right to address

5  later, Your Honor, so that we wouldn't cause confusion in front

6  of the jury and delay the proceedings.

7          THE COURT:  All right.  Response?

8          MR. BRENNER:  Your Honor, I was just chatting with

9  Mr. Freedman very quickly.  I think that there's not going to

10 be disagreement.  Let us just look at it.  But I think our

11 position is going to be the same as the Defendant's.

12         THE COURT:  All right.  So have the exhibits been

13 uploaded?

14         MR. BRENNER:  As of last night they were uploaded and

15 both sides were reviewing them.  So I'm assuming they got that

16 done.  But I'll find out.  And I believe the list was approved

17 by both sides.

18         MS. MCGOVERN:  Yes.

19         MR. BRENNER:  So there's a list.

20         THE COURT:  Actually, Scott, do you want to just let

21 me have the list so I can give it to Liz?

22         MS. MCGOVERN:  Can we just make sure that what we just

23 talked about is reflected?  853.4, just the two pages.

24         THE COURT:  All right.  So I'll leave it to the

25 attorneys.  I would like to have that done at some point before

1    the jury goes back to deliberate, so that we don't spend a lot

2    of time with the uploading of exhibits.  So if we can work on

3    that now that would be helpful.

4           Mr. Brenner, if you can provide the court security

5    officer with the exhibit list or is that subject to change?

6           MR. BRENNER:  Let me make sure it's right with

7    Ms. McGovern.  Because this last exhibit I'm not sure what --

8           THE COURT:  All right.

9           MS. MCGOVERN:  Your Honor, I've just been advised that

10   there's an agreement, that the parties are going to meet.  It's

11   going to be ready to go by lunchtime.  They're just going to

12   confer for 10 minutes and we should be good to go.

13          THE COURT:  Well, let me discuss with you an

14   anticipated schedule because I certainly am sensitive to taking

15   breaks within the time period that you're presenting closing

16   argument.  I try very hard to avoid that and I'd like to avoid

17   it in this trial.

18          I have set forth a schedule that I believe works well.

19   The jury has been advised that they are going to have a later

20   lunch than usual.  They have snacks in the jury room.  They're

21   comfortable in the jury room.  They've told the courtroom

22   deputy that they do not want to be in the conference room.

23   They would like to be in the jury room, that they're very

24   comfortable.  They have the restrooms.  They have coffee.  So

25   they would like to stay there.

1          The anticipated schedule -- hopefully, we'll stay

2     within give or take a few moments -- would be the Court would

3     give the charge to the jury between 9:30 and 10:15.  I would

4     suggest that at that time the Plaintiff proceed with the

5     closing argument, which is 70 minutes that you have asked on

6     the first close, of 10:15 to 11:25.  We would then take a

7     20-minute break from 11:25 to 11:45.  We would then return.

8     And from 11:45 to 1:15 the Defendant would present the 90

9     minutes of closing.  Then the Plaintiff would have an

10    opportunity, after a 15-minute break, from 1:15 to 1:30, to

11    give the 20-minute rebuttal from 1:30 to 1:50.  We've ordered

12    lunch for the jurors.  The jury will have lunch and begin their

13    deliberations at 1:50.

14          I am asking Liz whether they are able to stay a little

15    bit later than 5:00.  I certainly don't want to keep them past

16    6:00.  If they have not concluded their deliberations and

17    decided their verdict by 6:00 p.m., then we would bring them

18    back on Monday morning.

19          You do not need to be here on Monday morning.  They

20    would be assembled outside and the court security officer --

21    once all 10 of them are here, they would be brought back into

22    the jury room.  The jury room would be secured with the

23    laptops.  So they don't need to come back into the courtroom.

24    They would go right into the jury room.

25          So does the schedule that I have given present an

```
 1    issue for either side?  On behalf of the Plaintiffs?

 2              MR. FREEDMAN:  Your Honor, the only thing is that if

 3    you recall we were aiming for 70, but there's a chance we might

 4    go 80 minutes and then 10 only in rebuttal.  So I just don't

 5    know that.

 6              THE COURT:  I'll keep track of your time.  You have a

 7    full 90 minutes.  So you can use as much time as you want on

 8    the front end.  If you use less, then I'll credit you that time

 9    on your final close.

10              MR. FREEDMAN:  Thank you, Your Honor.  Then no other

11    issues from the Plaintiff.

12              THE COURT:  Okay.  All right.  Then give us some time

13    to make the copies of the jury instructions and Verdict Form.

14    You'll be given a copy as well.  And can we take this time now,

15    the next five minutes or so, to work on the exhibits and the

16    laptops?

17              MS. MCGOVERN:  Yes, Your Honor.

18              THE COURT:  Okay.  All right.  I'll see you back here

19    in five minutes.

20         (Recess from 9:45 a.m. to 9:55 a.m.)

21              THE COURT:  All right.  Go ahead and have a seat.  You

22    are now being provided the jury instructions and Verdict Form,

23    and when the jurors come in they will be provided that as well.

24              Is there anything further we need to address?

25              MR. BRENNER:  Your Honor, you wanted a copy of the
```

```
 1   exhibit list.
 2           THE COURT:  Yes.  If you can provide that to Liz.
 3           Thank you.
 4           And then the laptops?  Have we --
 5           MR. BRENNER:  On the laptops, both sides are doing a
 6   final pass-through on exhibits.  Hopefully, the laptops will be
 7   here by noon.
 8           THE COURT:  All right.  Wonderful.  So we'll address
 9   that at the break.
10       (Pause in proceedings.)
11           THE COURT:  All right.  Anything further we need to
12   address?  Behalf of the Plaintiffs?
13           MR. FREEDMAN:  One moment, Your Honor.
14           Can we just have a moment to look at the instructions,
15   Your Honor?
16           THE COURT:  Yes.  Of course.
17           MR. BRENNER:  It's not a big deal, Your Honor.
18   There's a slight typo on what was just added.  It says:
19   "Intended to form a partnership," but --
20           THE COURT:  What page?  What page?
21           MR. BRENNER:  8.  Page 8.
22           THE COURT:  All right.  So it's not substantive?
23           MR. BRENNER:  No.  It's just --
24           THE COURT:  Oh, okay.  Hold on.  Hold on.
25           On Page 8?
```

1          MR. BRENNER:  I think it's in the first paragraph at

2   the very end of the partnership definition.

3          Can I grab it, Judge?

4          THE COURT:  Yeah.  Yeah.  I have it.  I'm just trying

5   to -- oh, "form."  Okay.  It just needed a space.  Not a

6   problem.  Okay.

7          MR. BRENNER:  Is that it guys?  Is that it?

8          Okay.  Thank you, Judge.

9          THE COURT:  On behalf of the Defendant, ready to

10  proceed?

11         MS. MCGOVERN:  Yes, Your Honor.

12         THE COURT:  All right.  Let's bring in the jury.

13     (Before the Jury, 9:56 a.m.)

14         THE COURT:  Hi.  Good morning, Ladies and Gentlemen.

15  It's good to see each of you.  Please be seated.

16         We have been working very hard and we are at the stage

17  where both the Plaintiffs and the Defendant have rested their

18  case and it is the Court's responsibility to instruct you on

19  the law that you must apply.  Following the Court's

20  instruction, the attorneys will then have the opportunity to

21  make their final arguments.

22         As some of us are auditory learners, some of us are

23  visual learners, copies of the jury instructions have been made

24  for you, as well as the form of verdict.  You are welcome to

25  follow along.  You don't need to follow along, but I would ask

1    that you pay close attention to the instructions that I'm about

2    to give you.

3        And I see that everyone has a copy.

4        Members of the Jury:

5        It is my duty to instruct you on the rules of law that

6    you must use in deciding this case.  When I have finished, you

7    will go to the jury room and begin your discussions, which are

8    called deliberations.

9        Your decision must be based only on the evidence

10    presented here.  You must not be influenced in any way by

11    either sympathy for or prejudice against anyone.

12        You must follow the law as I explain it, even if you

13    do not agree with the law.  And you must follow all of my

14    instructions as a whole.  You must not single out or disregard

15    any of the instructions on the law.

16        The fact that a limited liability company is involved

17    as a party must not affect your decision in any way.  A

18    company, like all other persons, stand equal before the law and

19    must be dealt with as equals in a court of justice.

20        When a company is involved, of course it may act only

21    through people as its employees.  And in general, a company is

22    responsible under the law for the acts and statements of its

23    employees that are made within the scope of their duties as

24    employees of the company.

25        As I said before, you must consider only the evidence

1   that I have admitted in this case.

2          Evidence includes the testimony of witnesses and the

3   exhibits admitted.  But anything the lawyers say is not

4   evidence and is not binding on you.

5          You should not assume from anything I have said that I

6   have any opinion about any factual issue in this case.  Except

7   for my instructions to you on the law, you should disregard

8   anything I may have said during the trial in arriving at your

9   own decision about the facts.

10          Your own recollection and interpretation of the

11   evidence is what matters.

12          In considering the evidence, you may use reasoning and

13   common sense to make deductions and reach conclusions.  You

14   should not be concerned about whether the evidence is direct or

15   circumstantial.

16          Direct evidence is the testimony of a person who

17   asserts that he or she has actual knowledge of a fact, such as

18   an eyewitness.

19          Circumstantial evidence is proof of a chain of facts

20   and circumstances that tend to prove or disprove a fact.  There

21   is no legal difference in the weight you may give to either

22   direct or circumstantial evidence.

23          When I say you must consider all the evidence, I do

24   not mean that you must accept all the evidence as true or

25   accurate.  You should decide whether you believe what each

1    witness had to say and how important that testimony was.  In

2    making that decision, you may believe or disbelieve any witness

3    in whole or in part.

4        The number of witnesses testifying concerning a

5    particular point does not necessarily matter.

6        To decide whether you believe any witness, I suggest

7    that you ask yourself a few questions.  Did the witness impress

8    you as one who was telling the truth?  Did the witness have any

9    particular reason not to tell the truth?  Did the witness have

10   a personal interest in the outcome of the case?  Did the

11   witness seem to have a good memory?  Did the witness have the

12   opportunity and ability to accurately observe the things he or

13   she testified about?  Did the witness appear to understand the

14   questions clearly and answer them directly?  And did the

15   witness's testimony differ from other testimony or other

16   evidence?

17       You should also ask yourself whether there was

18   evidence that a witness testified falsely about an important

19   fact.  And ask yourself whether there was evidence that at some

20   other time a witness said or did something or did not say or do

21   something that was different from the testimony the witness

22   gave during this trial.

23       But keep in mind that a simple mistake does not mean a

24   witness was not telling the truth as he or she remembers it.

25   People naturally tend to forget some things or remember them

1    inaccurately.  So if a witness misstated something, you must

2    decide whether it was because of an innocent lapse in memory or

3    an intentional deception.  The significance of your decision

4    may depend on whether the misstatement is about an important

5    fact or an unimportant detail.

6         When scientific, technical, or other specialized

7    knowledge might be helpful, a person who has special training

8    or experience in that field is permitted to state an opinion

9    about the matter.  This person is referred to as an expert

10   witness.  As with any other witness's testimony, you must

11   decide for yourself whether to rely upon an expert's opinion.

12   The expert witnesses who testified in this case did so to

13   assist you in reaching a decision about these issues.

14        The testimony of these expert witnesses might have

15   conflicted.  You must remember that you are the sole trier of

16   the facts and their testimony relates to questions of fact.

17   The way you resolve these conflicts is the same way that you

18   decide other fact questions and the same way you decide whether

19   to believe ordinary witnesses.  You may give the testimony of

20   each expert witness the weight that you think it deserves in

21   light of all the evidence.

22        Plaintiff Ira Kleiman, on behalf of the estate of

23   David Kleiman, has asserted claims against Defendant Dr. Craig

24   Wright, or Dr. Wright, of breach of partnership, conversion,

25   civil theft, fraud, constructive fraud, and unjust enrichment.

1        Plaintiff W&K Info Defense Research, LLC, or W&K, has

2   asserted claims against Defendant Dr. Craig Wright for

3   conversion, civil theft, fraud, constructive fraud, breach of

4   fiduciary duty, and unjust enrichment.

5        In this case, it is the responsibility of the

6   Plaintiffs to prove all but one of their claims by a

7   preponderance of the evidence.  The Plaintiffs must prove their

8   civil theft claims by clear and convincing evidence.  This is

9   sometimes called the burden of proof, or the burden of

10  persuasion.

11       A preponderance of the evidence simply means an amount

12  of evidence that is enough to persuade you that the Plaintiffs'

13  claim is more likely true than not true.

14       Since there is more than one claim involved, you

15  should consider each claim separately.

16       In deciding whether any fact has been proven by a

17  preponderance of the evidence, you may consider the testimony

18  of all the witnesses, regardless of who may have called them,

19  and all the exhibits received in evidence, regardless of who

20  may have produced them, along with facts stipulated by the

21  parties.

22       If the proof fails to establish any essential part of

23  Ira Kleiman or W&K's claims by a preponderance of the evidence,

24  you should find for Dr. Craig Wright as to that particular

25  claim.

1    In addition, Plaintiffs have the burden of proving

2  their civil theft claims by clear and convincing evidence.

3  This is a higher standard of proof than the preponderance of

4  the evidence standard and requires that the Plaintiffs prove

5  that the claim is highly probable or reasonably certain, not

6  merely more likely true than not true.

7    In deciding whether any fact has been proven by clear

8  and convincing evidence, you may consider the testimony of all

9  the witnesses, regardless of who may have called them, and all

10  the exhibits received in evidence, regardless of who may have

11  produced them, along with facts stipulated by the parties.

12    If the proof fails to establish any essential part of

13  Ira Kleiman or W&K's civil theft claim by clear and convincing

14  evidence, you should find for Dr. Craig Wright as to that

15  particular claim.

16    In this case, the Defendant Dr. Craig Wright asserts

17  the affirmative defenses of statute of limitations and laches.

18  Even if Ira Kleiman or W&K prove their claims, the Defendant,

19  Dr. Craig Wright, can prevail on that claim if he proves an

20  affirmative defense to that claim by a preponderance of the

21  evidence.

22    Since more than one affirmative defense is involved,

23  you should consider each one separately.  However, you should

24  consider each affirmative defense only as to the claim or

25  claims to which it is directed.

26

1          I caution you that the Defendant, Dr. Craig Wright,

2    does not have to disprove the Plaintiffs Ira Kleiman and W&K's

3    claims.  But if the Defendant, Dr. Craig Wright, raises an

4    affirmative defense, the only way he can prevail on that

5    specific defense is if he proves that defense by a

6    preponderance of the evidence.

7          Similarly, if the proof fails to establish an

8    essential part of any of the Defendant's affirmative defenses

9    by a preponderance of the evidence, you should find against the

10   Defendant, Dr. Craig Wright, on that affirmative defense.

11         Sometimes the parties have agreed that certain facts

12   are true.  Such agreement is called a stipulation.  You must

13   treat these stipulated facts as proved for this cause.

14         The stipulated facts are:  One, Plaintiff filed this

15   action on February 14th, 2018.

16         Two, the Plaintiffs in this case are Ira Kleiman as

17   the personal representative of the estate of David Kleiman and

18   W&K Info Defense Research, LLC, W&K.

19         Three, Ira Kleiman is David Kleiman's brother and he

20   serves as the personal representative of David Kleiman's

21   estate.

22         Four, David Kleiman was a resident of Florida at all

23   material times.

24         Five, on February 14th, 2011, W&K was formed as a

25   Florida limited liability company.

1           Six, Dr. Craig Wright is an Australian citizen.

2           Seven, the Bitcoin Whitepaper was publicly released on

3     October 31st, 2008 under the pseudonym Satoshi Nakamoto.

4           Eight, Ira Kleiman opened an estate proceeding related

5     to David Kleiman in the Circuit Court for Palm Beach County,

6     the probate proceeding.

7           Plaintiff W&K is a limited liability company.  A

8     limited liability company, or LLC, is a business structure

9     whereby the owners are not personally liable for the company's

10    debts or assets.  An LLC combines some characteristics of a

11    corporation with those of a partnership.  LLCs are managed by

12    their members unless explicitly stated otherwise in an

13    operating agreement or formation document.

14          The Rules of Evidence allow me to accept facts that no

15    one can reasonably dispute.  The law calls this judicial

16    notice.  There is some evidence in the record referring to

17    currencies other than the US dollars.  I have accepted the

18    following currency exchange rates as proved:

19          On April 2nd, 2014, the exchange rate for US dollars

20    to Australian dollars was 0.9236 US dollars per Australian

21    dollar.

22          On November 13th, 2014, the exchange rate for US

23    dollars to Australian dollars was 0.8730 US dollars per

24    Australian dollar.

25          And on October 20th, 2016, the exchange rate for US

1    dollars to British pounds was 1.2256 US dollars per British

2    pound.

3            You must accept these exchange rates as true for this

4    case.

5            Certain demonstrative exhibits, such as charts and

6    diagrams, have been shown to you.  Those charts and diagrams

7    are used for convenience and to help explain the facts of the

8    case.  They are not themselves evidence or proof of any facts.

9            The estate of David Kleiman has brought a claim

10   against Dr. Craig Wright for breach of partnership.

11   Specifically, the estate of David Kleiman claims that David

12   Kleiman and Dr. Craig Wright formed a partnership to develop

13   the original Bitcoin protocol to mine Bitcoin and to develop

14   related blockchain technology.

15           The estate further alleges that no assets of the

16   partnership were distributed to it after David Kleiman's death.

17   Dr. Craig Wright does not dispute that no assets were

18   distributed.  Instead, he claims that there was no partnership

19   and therefore no distribution was required.

20           Accordingly, you will be asked to determine two

21   questions on this claim.  One, whether there was a partnership

22   between David Kleiman and Dr. Craig Wright and whether

23   Dr. Craig Wright breached his duties to the partnership.  And

24   if so, two, what portion of the partnership's assets are now

25   owed to the estate of David Kleiman.

1          A partnership means an association of two or more

2     persons to carry on as co-owners of a business for profit,

3     whether or not the persons intend to form a partnership.

4          A partnership based on a written or oral agreement

5     must include each of the following elements:  Number one, a

6     common purpose.  Two, a joint proprietary interest in the

7     subject matter or purpose of the partnership.  Three, the right

8     to share profits and the duty to share losses.  And four, joint

9     control or right of control over the partnership.

10          Plaintiffs must prove each of these elements by a

11     preponderance of the evidence to establish the existence of a

12     partnership.

13          If you find that there was a partnership between David

14     Kleiman and Dr. Craig Wright, you will then have to determine

15     the assets of the partnership and what share of those assets

16     belong to David Kleiman and are now owed to his estate.

17          On the issue of determining the respective parties'

18     ownership share in the partnership, I instruct you that in the

19     absence of a contrary agreement among the partners, the

20     partners in a partnership are entitled to share equally in the

21     assets and profits of the partnership and the losses of the

22     partnership.

23          In addition, in the absence of a contrary agreement

24     among the partners, each partner has equal rights in the

25     management and conduct of the partnership business.

1          Further, on the issue of what assets are owed to the

2     estate of David Kleiman, I instruct you that if rather than

3     winding up the partnership's business following the death of

4     his partner, the surviving partner continues the partnership

5     business with partnership assets, then the surviving partner

6     acts as a trustee for the deceased partner.

7          As a trustee, the surviving partner is required to

8     administer the portion of partnership assets belonging to the

9     deceased partner solely in the interest of deceased partner's

10    estate and not for the interest of the surviving partner.

11         The surviving partner must administer the partnership

12    assets belonging to the deceased partner as a prudent person

13    would, in light of the circumstances, exercising reasonable

14    care, skill, and caution.

15         Furthermore, the surviving partner is required to

16    account to the deceased partner's estate and provide a list of

17    the partnership assets to the deceased partner's heirs.  The

18    rationale underlying the rule is based upon the surviving

19    partner's superior knowledge.

20         The surviving partner does not deal at arm's length

21    with the heirs of a deceased partner, but must make an open and

22    full disclosure to them.

23         The heirs are at a big disadvantage in dealing with

24    the surviving partners, lacking knowledge of the extent of the

25    partnership property or information about the amount of

1    business done or the value of the partnership.

2            Partners in a partnership owe duties to each other and

3    to the partnership.  These duties include a duty of care, a

4    duty of loyalty, and an obligation of good faith and fair

5    dealing.

6            Under the duty of care, the partner must not engage in

7    grossly negligent or reckless conduct, intentional misconduct,

8    or a knowing violation of law.

9            Under the duty of loyalty, a partner must account to

10   the partnership and hold as trustee for the partnership any

11   property, profit, or benefit derived by the partner in the

12   conduct and winding up of the partnership business or derived

13   from a use by the partner of partnership property, including

14   the appropriation of a partnership opportunity.

15           A partner must discharge his duties to the other

16   partner and to the partnership and act in a manner that does

17   not frustrate the agreed common purpose of the parties and

18   deprive the other party of the benefits of the agreement.

19           W&K has asserted a claim for breach of a fiduciary

20   duty against Dr. Craig Wright.  W&K claims that Dr. Craig

21   Wright breached his fiduciary duties in fraudulently procuring

22   a judgment against it in Australia following David Kleiman's

23   death, using that judgment to claim ownership over W&K's

24   assets, and then using those assets for his benefit.

25           The two issues for your determination on this claim:

1 One, did Dr. Craig Wright owe a fiduciary duty to W&K?  And if

2 so, two, did he breach that duty?

3   On the first issue, whether Dr. Craig Wright owed W&K

4 a fiduciary duty, W&K must prove the following by a

5 preponderance of the evidence:  One, a relationship existed

6 between W&K and Dr. Craig Wright.  Two, Dr. Craig Wright was in

7 a position of trust with respect to W&K's financial and

8 property interests.  And three, Dr. Craig accepted that trust.

9   If you find that Dr. Craig Wright owed a fiduciary

10 duty to W&K, you will then consider the issue of whether he

11 breached that duty.

12   A fiduciary duty imposes a duty to act with the utmost

13 good faith in the best interest of the company.  This includes

14 the duty to refrain from self-dealing, the duty of loyalty, the

15 duty to disclose material facts, and the overall duty not to

16 take unfair advantage and to act in the best interest of the

17 company.

18   To prove a breach of a fiduciary duty, W&K must show,

19 one, that Dr. Wright breached a fiduciary duty by

20 misappropriating W&K's intellectual property.  And two, that

21 this breach was a legal cause of damages to W&K.

22   The estate of David Kleiman and W&K have asserted

23 claims for conversion against Dr. Craig Wright.  They claim

24 that Dr. Craig Wright wrongfully exercised control over the

25 property of David Kleiman and the property of W&K.

1        Conversion means a distinct act of control wrongfully

2   asserted over another's personal property in a manner that is

3   inconsistent with the other's right to that property.

4        There are a number of ways that conversion can occur,

5   such as intentionally dispossessing another of the property,

6   using the property without authority, or disposing of the

7   property by selling, pledging, gifting, or leasing it.

8        To prevail on their claim of conversion, the

9   Plaintiffs must prove each of the following by a preponderance

10  of the evidence:  One, Dr. Craig Wright wrongfully asserted

11  dominion or ownership over certain property.  Two, this

12  property belonged to the estate of David Kleiman and/or W&K

13  respectively.  And three, Dr. Craig Wright's action was

14  inconsistent with the ownership or right to possess the

15  property by the estate of Ira Kleiman and/or W&K.

16       The estate of David Kleiman and W&K have asserted

17  claims for civil theft against Dr. Craig Wright.  The

18  Plaintiffs must prove the following by clear and convincing

19  evidence:  Number one, Dr. Craig Wright obtained, used, or

20  attempted to obtain or use, the estate of David Kleiman's,

21  W&K's, or the partnership's property.  Two, the criminal intent

22  to deprive the estate of David Kleiman, W&K or the partnership

23  either temporarily or permanently of that property or a benefit

24  from that property.  And three, Dr. Craig Wright's actions were

25  a legal cause of damage to the estate of David Kleiman or W&K.

1    The estate of David Kleiman and W&K have asserted

2    claims of unjust enrichment against Dr. Craig Wright.  To

3    prevail on their claims of unjust enrichment, the estate of

4    David Kleiman and/or W&K must prove the following by a

5    preponderance of the evidence:  One, David Kleiman and/or W&K

6    conferred a benefit on Dr. Craig Wright.  Two, that Dr. Craig

7    Wright voluntarily accepted and retained that benefit.  And

8    three, it would be inequitable or unfair for Dr. Craig Wright

9    to retain the benefit without paying the value of the benefit

10   to the estate of David Kleiman and/or W&K.

11   The estate of David Kleiman and W&K have alleged

12   claims against Dr. Craig Wright for fraud.  To prevail on their

13   claims of fraud, the Plaintiffs must prove the following by a

14   preponderance of the evidence:  One, Dr. Craig Wright made a

15   false statement or omission of a material fact.  Two, that he

16   knew the statement was false at the time it was made.  Three,

17   Dr. Craig Wright intended that David Kleiman, Ira Kleiman, or

18   W&K would rely on the false statement or omission.  Four, David

19   Kleiman, Ira Kleiman, or W&K relied on the false statement or

20   omission.  And five, the false statement or omission caused

21   damage to the estate of David Kleiman or W&K.

22   The estate of David Kleiman and W&K have asserted

23   claims for constructive fraud against Dr. Craig Wright.  For

24   the Plaintiffs to prevail on their constructive fraud claims,

25   they must prove the following by a preponderance of the

1    evidence:  One, a relationship of trust and confidence existed

2    between one or more of the Plaintiffs and Dr. Craig Wright.

3    Two, Dr. Craig Wright took advantage of this relationship of

4    trust and confidence.  Three, proximately caused one or more of

5    the Plaintiffs to suffer damages.

6         If you find that the estate of David Kleiman and W&K

7    have proven by a preponderance of the evidence one or more of

8    their claims against Dr. Craig Wright, then you shall next

9    consider the affirmative defenses raised by Dr. Wright.

10        In this case, Dr. Craig Wright asserts the affirmative

11   defenses of statute of limitation and laches and contends that

12   the claims asserted by the Plaintiffs have not been filed

13   timely, and as a result those claims are barred.

14        Even if the Plaintiffs prove their claims by a

15   preponderance of the evidence, or by clear and convincing

16   evidence for civil theft, the Defendant can prevail in this

17   case if he proves an affirmative defense by a preponderance of

18   the evidence.

19        When more than one affirmative defense is involved, as

20   it is here, you should consider each one separately.

21        The statute of limitations requires the Plaintiffs to

22   commence their lawsuit within certain time periods, as

23   prescribed by law.  The Defendant's statute of limitation

24   defense is directed at each of the Plaintiffs' claims, except

25   the civil theft claim.  As such, you should not consider the

36

1  statute of limitations affirmative defense as to Plaintiffs'

2  civil theft claim.

3          The Plaintiffs' remaining claims each have a four-year

4  statute of limitations.  This lawsuit was filed on

5  February 14th, 2018.  Accordingly, to prevail on the statute of

6  limitations affirmative defense, the Defendant must prove by a

7  preponderance of the evidence that the Plaintiffs' claims,

8  excluding the civil theft claim, accrued before February 14th,

9  2014.

10          A cause of action accrues when the Plaintiffs

11  discover, or should have discovered through the exercise of

12  reasonable care and diligence, the facts establishing the

13  elements of a cause of action.

14          If you find by a preponderance of the evidence that

15  Defendant has proven that one or more of Plaintiffs' claims

16  accrued before February 14th, 2014, then you must find in favor

17  of the Defendant.

18          If, however, you find that the preponderance of the

19  evidence does not support Defendant Dr. Craig Wright's statute

20  of limitations affirmative defense, you must find against him

21  on this affirmative defense.

22          An exception to the statute of limitations affirmative

23  defense is the doctrine of fraudulent concealment.  Where a

24  plaintiff alleges that a defendant engaged in willful

25  concealment of the claim or cause of action using fraudulent

1    means, such fraudulent actions will delay the beginning of the

2    limitations period until the plaintiff either knows or should

3    have known that the plaintiff suffered damages.

4         You will only consider the fraudulent concealment

5    exception if you find that the Defendant has proven a statute

6    of limitations affirmative defense.  The Defendant's statute of

7    limitations affirmative defense cannot succeed if the Defendant

8    fraudulently concealed his misconduct.

9         To prove fraudulent concealment, the estate of David

10   Kleiman or W&K must prove by a preponderance of the evidence:

11   One, Dr. Craig Wright fraudulently concealed the causes of

12   action from the estate of David Kleiman and W&K until at least

13   February 14th, 2014.  And two, the estate of David Kleiman or

14   W&K exercised reasonable care and diligence in seeking to

15   discover the facts that formed the basis of the claim.

16        Fraudulent concealment goes beyond a defendant's mere

17   non-disclosure of a fact.  It requires active and willful

18   concealment of a material fact.  Unless the Plaintiffs did not

19   have the equal opportunity to become apprised of the fact,

20   Plaintiffs bear the burden of establishing by a preponderance

21   of the evidence that fraudulent concealment should be applied.

22        Ira Kleiman and W&K claim that their claims were

23   timely filed.  In the alternative, they contend that the

24   commencement of the statute of limitations for their claim

25   should be delayed because Dr. Craig Wright fraudulently

1    concealed their claims.

2          Dr. Craig Wright denies that fraudulent concealment

3    should apply because there's no evidence that he actively and

4    willfully concealed any of the Plaintiffs' purported claims.

5          Laches is an equitable doctrine that prevents the

6    estate of David Kleiman and W&K from recovering damages on

7    their claims if they have inexcusably delayed asserting their

8    claims and the delay has caused undue hardship to Dr. Craig

9    Wright.

10          To prevail on his affirmative defense of laches, the

11    Defendant must prove the following by a preponderance of the

12    evidence:  Number one, a delay in the Plaintiffs' assertion of

13    their claims.  Two, that the delay was inexcusable.  And three,

14    that the delay caused the Defendant undue prejudice.

15          If you find by a preponderance of the evidence that

16    Plaintiffs have inexcusably delayed bringing their claims,

17    which caused undue prejudice to the Defendant, then you must

18    find in favor of the Defendant.

19          If, however, you find that the preponderance of the

20    evidence does not support Defendant Dr. Craig Wright's laches

21    affirmative defense, then you must find against him on this

22    affirmative defense.

23          If you find for the estate of David Kleiman and/or W&K

24    on any of its claims, you must consider the matter of damages.

25    Generally, you should award an amount of money that the

1    preponderance of the evidence shows will fairly and adequately

2    compensate the estate of David Kleiman and/or W&K for its

3    damages.

4            If you find for the estate of David Kleiman or W&K on

5    civil theft, you should award the estate of David Kleiman or

6    W&K an amount of money, if any, that the clear and convincing

7    evidence shows are the actual damages sustained by the estate

8    of David Kleiman or W&K.

9            You should consider the following types of damages:

10   The amount of money you find to be justified by a preponderance

11   of the evidence as full, just, and reasonable compensation for

12   the Plaintiffs' damages caused by the Defendant.

13           If you find that David Kleiman and Dr. Craig Wright

14   had a partnership, you will be asked to determine the value of

15   the assets of the partnership that correspond to David

16   Kleiman's partnership interest, which will now belong to his

17   estate.  As I explained earlier, absent a contrary agreement,

18   the assets of the partnership are to be divided equally among

19   partners.  Because the assets of the partnership were never

20   distributed to David Kleiman or his estate at the time of his

21   death, the damages you should award should be based on present

22   value of any Bitcoin and/or intellectual property you find was

23   part of the partnership.

24           First, you will be asked to determine the quantity of

25   any Bitcoin, if any, owned by the partnership.  You will then

40

1    be asked to decide the current value of that Bitcoin and award

2    the estate 50 percent of that value, unless you find that there

3    was a different amount agreed upon by David Kleiman and

4    Dr. Craig Wright.  In which case, you should adjust the portion

5    you award to the estate of David Kleiman to reflect the amount

6    you have decided.

7         Second, you will be asked to determine the

8    intellectual property, if any, owned by the partnership.  You

9    will then be asked to determine the current value of the

10   intellectual property and award the estate 50 percent of that

11   value, unless you find that there was a different amount agreed

12   upon by David Kleiman and Dr. Craig Wright.  In which case, you

13   should adjust the portion you award to the estate of David

14   Kleiman to reflect the amount you have decided.

15        If you find for the estate of David Kleiman or W&K on

16   conversion, you should award the estate of David Kleiman or W&K

17   the quantity of assets, if any, you determine were converted

18   and the value of those assets.  Plaintiffs are entitled to the

19   highest value of the assets between the time of conversion and

20   the date of your verdict.

21        If you find for the estate of David Kleiman and/or W&K

22   on their claims of civil theft, you should award the estate of

23   David Kleiman or W&K an amount of money, if any, that the clear

24   and convincing evidence shows are the actual damages sustained

25   by the estate of David Kleiman or W&K.

1      Plaintiffs are entitled to highest value of the assets

2  between the time of conversion and the date -- and actually,

3  this should say the time of civil theft and the date of your

4  verdict.  So if you'll make that note accordingly, that it's

5  the value of the assets between the time of the civil theft and

6  the date of your verdict.

7      If you find for the estate of David Kleiman and/or W&K

8  on either fraud or constructive fraud, you should award the

9  estate of David Kleiman or W&K the amount of any damages

10  calculated as of the time the Defendant committed the fraud or

11  the constructive fraud.

12      If you find for W&K on its claim for breach of

13  fiduciary duty, you should award W&K the amount of any damages,

14  if any, calculated as of the time the Defendant breached his

15  fiduciary duty to W&K.

16      If you find for the estate of David Kleiman and/or W&K

17  on their claims for unjust enrichment, then they are entitled

18  to an amount of money equal to the value of the benefit

19  conferred upon the Defendant and attributable to his

20  wrongdoing.

21      If you find for the estate of David Kleiman or W&K on

22  their conversion, fraud, and/or constructive fraud claims, you

23  must decide whether to award punitive damages in addition to

24  any compensatory damages awarded.

25      Punitive damages are warranted against Dr. Craig

1    Wright if you find by clear and convincing evidence that he

2    engaged in intentional misconduct or gross negligence, which

3    was a substantial cause of damage to the estate of David

4    Kleiman or W&K.

5          Under those circumstances, you may, in your

6    discretion, award punitive damages against Dr. Wright.  If

7    clear and convincing evidence does not show such conduct by

8    Dr. Craig Wright, punitive damages are not warranted against

9    him.

10         Intentional misconduct means that Dr. Craig Wright had

11   actual knowledge of the wrongfulness of the conduct and that

12   there was a high probability of injury or damage to the estate

13   of David Kleiman or W&K and, despite that knowledge, the

14   Defendant intentionally pursued that course of conduct

15   resulting in injury or damage.

16         Gross negligence means that the Defendant's conduct

17   was so reckless or wanton in care that it constituted a

18   conscious disregard or indifference to the life, safety, or

19   rights of persons exposed to such conduct.

20         If you decide that punitive damages are warranted

21   against the Defendant, then you must decide the amount of

22   punitive damages, if any, to be assessed at punishment against

23   the Defendant and as a deterrent to others.  This amount would

24   be in addition to any compensatory damages you award to the

25   Plaintiffs.

```
 1              In making this determination, you should consider the

 2     following:  One, the nature, extent, and degree of misconduct

 3     and the related circumstances, including the following:  A,

 4     whether the wrongful conduct was motivated solely by

 5     unreasonable financial gain; B, whether the unreasonably

 6     dangerous nature of the conduct, together with the high

 7     likelihood of injury resulting from the conduct, was actually

 8     known by the Defendant; C, whether at the time of damage the

 9     Defendant had a specific intent to harm a plaintiff and the

10     conduct of the Defendant did, in fact, harm a plaintiff.

11              Two, the financial resources of Defendant.

12              You may in your discretion decline to assess punitive

13     damages.

14              You have been permitted to take notes during the

15     trial.  Most of you, perhaps all of you, have taken advantage

16     of that opportunity.  You must use your notes only as a memory

17     aid during deliberations.  You must not give your notes

18     priority over your independent recollection of the evidence and

19     you must not allow yourself to be unduly influenced by the

20     notes of other jurors.

21              I emphasize that notes are not entitled to any greater

22     weight than your memories or impressions about the testimony.

23              Now, in your deliberations, you will consider and

24     decide distinct claims and affirmative defenses.  Although

25     these claims and affirmative defenses have been tried together,
```

44

1    each is separate from the others and each party is entitled to

2    have you separately consider each claim and affirmative defense

3    as it affects that party.

4         Therefore, in your deliberations, you should consider

5    the evidence as it relates to each claim and affirmative

6    defense separately, as you would had each claim and affirmative

7    defense been tried before you separately.

8         Of course, the fact that I have given you instructions

9    concerning the issue of the Plaintiffs Ira Kleiman and W&K's

10   damages should not be interpreted in any way as an indication

11   that I believe that the Plaintiffs should or should not prevail

12   in this case.  You must decide the case solely on the evidence

13   and the law before you and must not be influenced by any

14   personal likes or dislikes, opinions, prejudices, sympathy, or

15   biases.

16        Your verdict must be unanimous; in other words, you

17   must all agree.

18        Your deliberations are secret and you will never have

19   to explain your verdict to anyone.

20        Each of you must decide the case for yourself, but

21   only after fully considering the evidence with other jurors.

22        You must discuss this case with one another and try to

23   reach an agreement.  While you are discussing the case, do not

24   hesitate to reexamine your own opinion and change your mind if

25   you become convinced that you were wrong.  But do not give up

1   your honest beliefs just because others think differently or

2   because you simply want to get the case over with.  Remember

3   that in a very real way you are judges, judges of facts.  Your

4   only interest is to seek the truth from the evidence in the

5   case.

6          When you get to the jury room, you'll choose one of

7   your members to act as foreperson.  The foreperson will direct

8   your deliberations and speak for you in court.

9          A Verdict Form has been prepared for your convenience.

10  The Verdict Form contains questions and directions for

11  answering them.

12          In answering the questions, you must apply the law in

13  these instructions to the facts that were proven by the

14  evidence.  You may also refer to the jury instructions for

15  guidance on the law applicable to the subject matter covered by

16  each question.

17          The questions are organized by claim, first asking

18  whether you find the Defendant liable for the particular claim.

19  If your answer to the first question is yes, you are then

20  instructed to answer further questions asking you to identify

21  which Plaintiffs have proven their claims and the amount of

22  damages to be awarded to each Plaintiff.

23          You will then consider the Defendant's affirmative

24  defenses and decide whether they bar or preclude certain

25  claims.

46

 1          Finally, you will consider whether punitive damages
 2     are appropriate as to certain claims.
 3          You must agree on each answer before you complete the
 4     Verdict Form.
 5          After you reach a verdict, your foreperson should be
 6     designated to complete the Verdict Form by inserting all
 7     necessary answers in the form.
 8          Let us now go through the Verdict Form.
 9          "We, the jury, return the following verdict in this
10     matter:
11          "Breach of partnership asserted by the estate of David
12     Kleiman.
13          "Question 1:  Do you find that Craig Wright is liable
14     to the estate of David Kleiman for breach of partnership?
15          "Answer yes or no.
16          "If you answered no to question 1, please skip to
17     question 3.
18          "If you answered yes to question 1, please continue to
19     question 2.
20          "Question 2:  What is the amount of damages you find
21     were caused by Craig Wright's breach of partnership?"
22          There are two lines.  One is:  "Provide numerical
23     amount owed from Bitcoin."  The second line is:  "Provide
24     numerical amount owed from intellectual property.
25          "Please answer question 3.

47

 1         "Conversion asserted by the estate of David Kleiman

 2   and W&K Info Defense Research, LLC.

 3         "Question 3:  Do you find that Craig Wright is liable

 4   to the estate of David Kleiman and/or W&K Info Defense

 5   Research, LLC for conversion?

 6         "Answer yes or no.

 7         "If you answered no to question 3, please skip to

 8   question 6.

 9         "If you answered yes to question 3, please continue to

10   question 4.

11         "Question 4:  If you answered yes to question 3,

12   identify the Plaintiff to whom Craig Wright is liable for

13   conversion by placing an identifying marking next to one or

14   both of the following."

15         And there's a line for estate of David Kleiman and a

16   line for W&K Info Defense Research, LLC.

17         "Please answer question 5.

18         "Question 5:  For each Plaintiff you checked yes to in

19   question 4, what is the amount of compensatory damages you find

20   were caused by Craig Wright's conversion?

21         "Estate of Dave Kleiman."  There are two lines.  One:

22   "Provide a numerical amount owed from Bitcoin."  The second

23   line:  "Provide a numerical amount owed from intellectual

24   property."

25         "W&K Info Defense Research, LLC."  One line:  "Provide

48

1    numerical amount owed from Bitcoin."  The second line:

2    "Provide numerical amount owed from intellectual property.

3            "Please answer question 6.

4            "Civil theft asserted by the estate of David Kleiman

5    and W&K Info Defense Research, LLC.

6            "Question 6:  Do you find that either the estate of

7    David Kleiman or W&K Info Defense Research, LLC has proven its

8    claim for civil theft against Craig Wright by clear and

9    convincing evidence?

10           "Answer yes or no.

11           "If you answered no to question 6, please skip to

12   question 9.

13           "If you answered yes to question 6, please continue to

14   question 7.

15           "Question 7:  If you answered yes to question 6,

16   identify which Plaintiff has proven their claims of civil theft

17   by placing an identifying mark next to one or both of the

18   following," and there's a line for estate of David Kleiman, a

19   line for W&K Info Defense Research, LLC.

20           "Please answer question 8.

21           "Question 8:  For each Plaintiff that you checked yes

22   to in question 7, what is the amount of compensatory damages

23   you find was caused by Craig Wright's civil theft?

24           "Estate of David Kleiman."  There are two lines.  One

25   is:  "Provide a numerical amount owed from Bitcoin."  The

1    second is:  "Provide numerical amount owed from intellectual

2    property."

3          "W&K Info Defense Research, LLC."  Two lines.  One

4    for:  "Provide numerical amount owed from Bitcoin."  One for:

5    "Provide numerical amount owed from intellectual property."

6          "Please answer question 9.

7          "Fraud asserted by the estate of David Kleiman and W&K

8    Info Defense Research, LLC.

9          "Question 9:  Do you find that Craig Wright is liable

10    to the estate of David Kleiman and/or W&K Info Defense

11    Research, LLC for fraud?

12          "Answer yes or no.

13          "If you answered no to question 9, please skip to

14    question 12.

15          "If you answered yes to question 9, please continue to

16    question 10.

17          "Question 10:  If you answered yes to question 9,

18    identify which Plaintiffs were subject to fraud by placing an

19    identifying mark next to one or both of the following."

20          There's a line for estate of David Kleiman, a line or

21    W&K Info Defense Research, LLC.

22          "Please answer question 11.

23          "Question 11:  If you answered yes to question 9, for

24    each Plaintiff that you checked yes to in question 10, what is

25    the amount of compensatory damages you find were caused by

50

```
1   Craig Wright's fraud?

2           "Estate of David Kleiman."  There are two lines.  One:

3   "Provide numerical amount owed from Bitcoin."  Second:

4   "Provide numerical amount owed from intellectual property."

5           "W&K Info Defense Research, LLC."  Two lines.  One

6   for:  "Provide numerical amount owed from Bitcoin."  The

7   second:  "Provide numerical amount owed from intellectual

8   property."

9           "Please answer question 12.

10          "Constructive fraud asserted by the estate of David

11  Kleiman and W&K Info Defense Research, LLC.

12          "Question 12:  Do you find that Craig Wright is liable

13  to the estate of David Kleiman and/or W&K Info Defense

14  Research, LLC for constructive fraud?

15          "Answer yes or no.

16          "If you answered no to question 12, please skip to

17  question 15.

18          "If you answered yes to question 12, please continue

19  to question 13.

20          "Question 13:  If you answered yes to question 12,

21  please identify which Plaintiffs were subject to constructive

22  fraud by placing an identifying mark next to one or both of the

23  following."  There's a line for estate of David Kleiman, a line

24  for W&K Info Defense Research, LLC.

25          "Please answer question 14.
```

```
1              "Question 14:  If you answered yes to question 12, for

2     each Plaintiff that you checked yes to in question 13, what is

3     the amount of compensatory damages you find were caused by

4     Craig Wright's constructive fraud?

5              "Estate of David Kleiman."  There are two lines.  One:

6     "Provide numerical amount owed from Bitcoin."  One:  "Provide

7     numerical amount owed from intellectual property."

8              "W&K Info Defense Research, LLC."  There are two

9     lines.  One:  "Provide numerical amount owed from Bitcoin."

10    The second:  "Provide numerical amount owed from intellectual

11    property."

12             "Please answer question 15.

13             "Breach of fiduciary duty asserted by W&K Info Defense

14    Research, LLC.

15             "Question 15:  Do you find that Craig Wright is liable

16    to W&K Info Defense Research, LLC for breach of fiduciary duty?

17             "Answer yes or no.

18             "If you answered no to question 15, please skip to

19    question 17.

20             "If you answered yes to question 15, please continue

21    to question 16.

22             "Question 16:  If yes, what is the amount of

23    compensatory damages you find were caused to W&K Info Defense

24    Research, LLC by Craig Wright's breach of fiduciary duty?"

25    There are two lines.  One:  "Provide numerical amount owed from
```

52

1  Bitcoin."  Second:  "Provide numerical amount owed from

2  intellectual property."

3          "Please answer question 17.

4          "Unjust enrichment asserted by the estate of David

5  Kleiman and W&K Info Defense Research, LLC.

6          "Question 17, if you found for the estate of David

7  Kleiman on its claim for breach of partnership in question 1,

8  you should skip the next three questions with respect to the

9  estate of David Kleiman.  Please answer them with respect to

10  W&K Info Defense Research, LLC.

11          "Do you find that Craig Wright is liable to the estate

12  of David Kleiman and/or W&K Info Defense Research, LLC for

13  unjust enrichment?

14          "Answer yes or no.

15          "If you answered no to question 17, please skip to

16  question 20.

17          "If you answered yes to question 17, please continue

18  to question 18.

19          "Question 18:  If you answered yes to question 17,

20  identify the Plaintiffs to whom Craig Wright is liable for

21  unjust enrichment by placing an identifying mark next to one or

22  both of the following."  There's a line for estate of David

23  Kleiman, a line for W&K Info Defense Research, LLC.

24          "Please answer question 19.

25          "Question 19:  If you answered yes to question 17, for

1   each Plaintiff that you checked yes to in question 18, what is

2   the amount of compensatory damages you find were caused by

3   Craig Wright's unjust enrichment?

4           "Estate of Dave Kleiman."  There are two lines.  One:

5   "Provide numerical amount owed from Bitcoin."  The second:

6   "Provide numerical amount owed from intellectual property."

7           "W&K Info Defense Research, LLC."  There are two

8   lines.  One:  "Provide numerical amount owed from Bitcoin."

9   The second:  "Provide numerical amount owe from intellectual

10  property."

11          "Please answer question 20.

12          "Amount of Bitcoin.

13          "Question 20:  If you found for Plaintiffs, estate of

14  David Kleiman and/or W&K Info Defense Research, LLC, on some or

15  all of the claims above, what number of Bitcoin do you find

16  belongs to the estate of David Kleiman?"  There's a line:

17  "Provide a number of Bitcoin."

18          "W&K Info Defense Research, LLC."  There's a line:

19  "Provide a number of Bitcoin."

20          "Please answer question 21.

21          "Affirmative defense of statute of limitations

22  asserted by Dr. Craig Wright as to the estate's claims.

23          "Question 21:  Do you find that any of the following

24  claims by the estate of David Kleiman are barred by the statute

25  of limitations?"

1      You are to check one related to breach of partnership,

2  conversion, unjust enrichment, fraud, and constructive fraud.

3  The lines are "barred" and "not barred."

4      "Please answer question 22.

5      "Affirmative defense of statute of limitations

6  asserted by Dr. Craig Wright as to W&K's claims.

7      "Question 22:  Do you find that any of the following

8  claims by W&K Info Defense Research, LLC are barred by the

9  statute of limitations?"

10     There are two lines, one for barred, one for not

11 barred, as to conversion, unjust enrichment, fraud,

12 constructive fraud, breach of fiduciary duty.  You are to check

13 one line as to each claim.

14     "Please answer question 23.

15     "Affirmative defense of laches asserted by Dr. Craig

16 Wright as to the estate's claims.

17     "Question 23:  Do you find that any of the following

18 claims by the estate of David Kleiman are barred by laches?"

19     There are two lines, one for barred, one for not

20 barred.  You are to check one as to each of breach of

21 partnership, conversion, unjust enrichment, fraud, constructive

22 fraud, and civil theft.

23     "Affirmative defense of laches asserted by Dr. Craig

24 Wright as to W&K's claims.

25     "Question 24:  Do you find that any of the following

 1    claims by W&K Info Defense Research, LLC are barred by laches?"

 2         There are two lines, one for barred, one for not

 3    barred.  You are to check only one line as to the following

 4    claims:  Conversion, unjust enrichment, fraud, constructive

 5    fraud, breach of fiduciary duty, civil theft.

 6         "Please answer question 25.

 7         "Punitive damages.

 8         "Question 25:  If you found in favor of the estate of

 9    David Kleiman and/or W&K Info Defense Research, LLC on their

10    conversion, fraud, or constructive fraud claims, then you must

11    decide whether punitive damages are appropriate.  And if so,

12    determine the amount of punitive damages to award to the estate

13    of David Kleiman and/or W&K Info Defense Research, LLC.

14         "Do you find that Craig Wright is liable to the estate

15    of David Kleiman on claims asserted by the estate of Dave

16    Kleiman for punitive damages?

17         "If the answer is yes, set forth the amount."  There's

18    a line:  "Provide numerical amount."

19         "Do you find that Craig Wright is liable to W&K Info

20    Defense Research, LLC on claims asserted by W&K Info Defense

21    Research, LLC for punitive damages?

22         "If the answer is yes, set forth the amount."  There's

23    a line:  "Provide numerical amount."

24         Please have the foreperson sign and date the Verdict

25    Form.

56

1          "So say we all," with the date and the line for

2     foreperson to sign the Verdict Form.

3          Ladies and Gentlemen, the attorneys now will have an

4     opportunity to present their final arguments.  Each side will

5     have equal time, but the Plaintiffs are entitled to divide this

6     time between an opening argument and a rebuttal argument after

7     the Defendant has spoken.

8          I would ask that you put down the jury instructions

9     and Verdict Form and give the attorneys your undivided

10    attention, unless they specifically refer to a provision in the

11    law or the Verdict Form.

12         And at this point in time we will proceed.

13         On behalf of the Plaintiffs?

14         MR. FREEDMAN:  May it please the Court.

15         Ladies and Gentlemen of the Jury, it's been a long

16    month.  It's been a long trial.  And I thank you for the

17    attention you have given me, my colleagues, the other side, and

18    all the witnesses who have appeared in this trial.

19         At the beginning of this trial, my partner, Kyle

20    Roche, told each of you that this case was about a choice, a

21    choice that Craig Wright made after he found out that Dave

22    Kleiman, his best friend and business partner, died.

23         His choice has led us here today.  And in our final

24    moments together, I'd like to walk through the evidence showing

25    that Craig chose to steal from his dead best friend and to

1    cover up that theft with forgeries and lies.

2           But now, more than eight years after Dave Kleiman's

3    death, the final decision is not up to Craig Wright, Ira

4    Kleiman, or anyone else in Dave Kleiman's family.  The final

5    determination as to how this story ends comes down to a choice

6    that each of you have to make.

7           Plaintiffs are asking you to return to them half of

8    the partnership's 1.1 million Bitcoin and half of the value of

9    the intellectual property that Dave Kleiman and Craig Wright

10   jointly developed in W&K.

11          Plaintiffs submit to you that this would be the fair

12   way for this partnership, this partnership that created one of

13   the most revolutionary technologies the world has ever seen --

14   that would be a fair way for this partnership to end.

15          When you go back to deliberate later, the choice each

16   of you now confront is to either award the estate its fair

17   share of these assets or allow Craig Wright to get away with

18   the spoils of his theft and fraud.

19          Does Craig Wright get away with his fraudulent scheme

20   to steal Dave's share of the partnership assets?  Does he get

21   away with the lies he told to Dave's grieving family?  Does he

22   get away with the forgeries he drafted in the name of his dead

23   best friend?  Does he get away with the fake trusts he created

24   to hide his theft and frustrate Dave's family's ability to

25   recover the assets in this case?  And does he get away with the

1   lies he told you when he looked each of you in the eye for four

2   straight days and told you that he was the victim, all while

3   bragging about how smart and how rich he is?  He should not get

4   away with this.  He just shouldn't.

5          In the United States of America, we resolve our

6   disputes in courtrooms.  We resolve our disputes with evidence.

7   And we ask our juries, our peers, to fulfill a civic, but

8   sacred duty.  We ask you to review the evidence, to weigh that

9   evidence, and to render a decision.  We are asking you to do

10  that here, no more and no less.

11         Now, the lawyers in this case have had years to review

12  the evidence.  The trials are formal and the evidence that

13  comes in through trial comes in in formal channels.  And

14  sometimes that can make it hard to put together all the

15  evidence.  It's almost like a puzzle.  So it will be my job now

16  to walk you through this evidence in a clear and coherent way.

17         Before we do that in detail, though, I think it would

18  be helpful if I give a very high-level map of what the evidence

19  shows happened here.

20         Craig and Dave partnered to create and mine Bitcoin.

21  We saw Craig tell the New South Wales Police that he was

22  working on Bitcoin with Dave since 2004.

23         They released the whitepaper.  They released the

24  Bitcoin protocol.  They released the Bitcoin software and they

25  begin mining Bitcoin.

1      When that starts getting traction, they release --

2  they create intellectual property from W&K and they continue

3  their mining in intellectual property through W&K.

4      They know their invention can change the world and

5  threaten government currency, so they keep it a secret.  In

6  fact, at some point, they get so scared that they agree to

7  delete all records of their partnership.  You heard Craig

8  testify about that in one of his videotaped deposition clips.

9      But Dave dies unexpectedly in 2013, and Craig sees an

10  opportunity.  As we've discussed, Craig takes the partnership's

11  assets for himself, his access to the Bitcoin because they

12  mined it into a trust.

13      But he needs title to the intellectual property, so he

14  can sell it.  So he files sham lawsuits against W&K to steal

15  its intellectual property and he forges Dave's signature on a

16  contract weeks before -- that is dated weeks before Dave dies,

17  which says that Dave gives Craig 570,000, half of the

18  1.1 million Bitcoin -- to Craig, gives Craig all of W&K's

19  shares and all of W&K's intellectual property, all in exchange

20  for a minority stake in a company that doesn't even exist yet

21  and a company that amounted to nothing called Coin-Exch.

22      Of course, Dave isn't around to dispute this

23  outrageous contract.  So Craig just forges Dave's signature on

24  it.

25      But Craig's greedy.  He then takes all the IP he stole

60

1    from W&K and he applies to the Australian Taxation Office for

2    tens of millions of dollars in tax rebates.  Which, as you

3    might expect, results in a tax audit.

4         The ATO doesn't want to cut the $10 million check

5    without proof.  And so they start digging.  It seems that, like

6    the IRS, the evidence shows that the ATO was dogged.  They

7    examined everything.  And when they start doing that, Craig is

8    forced to start revealing the truth about his partnership with

9    Dave to defend himself from the Australian authorities.

10        To be sure, he's not entirely truthful with the ATO

11   either.  And he forges documents with them too.  For example,

12   he lies to them about supercomputers.  And he gets himself in

13   trouble in Australia as well.

14        Eventually, the Australian Taxation Office finds that

15   he forged documents and that he lied to them.  When his

16   Australian lawyers, that never tell a lie, find out that he

17   submitted forged documents to the Australian Taxation Office,

18   they fire him too.  Think about that for a minute.  His own

19   lawyers fire him for forging documents.

20        And that's why you've seen documents in this case from

21   the Australian Taxation Office.  These documents help us piece

22   together the story of this incredible partnership and they help

23   us get to the truth of the matter.

24        But I'm getting a little bit ahead of myself.  Let me

25   start with partnership.  Judge Bloom has instructed you on the

61

```
 1    law.  Her instructions are clear.  The law does not require a
 2    written partnership agreement.  People can and do form oral
 3    partnerships.  And the law obligates us to respect those when
 4    they are formed.  In fact, Judge Bloom has instructed you that
 5    a partnership means an association of two or more persons to
 6    carry on as co-owners of a business for profit whether or not
 7    those persons intend to form a partnership.
 8          To find that Craig and Dave partnered, you must find
 9    that they had a common purpose.  That's easy.  The evidence
10    shows that Dave and Craig had a common purpose to create
11    Bitcoin, to mine 1.1 million Bitcoin, and to create
12    intellectual property based on Bitcoin.
13          You have to find that they had a joint proprietary
14    interest in the purpose of the partnership.  They clearly were
15    mining Bitcoin and creating intellectual property for profit,
16    as Craig told the Australian Taxation Office that they were
17    mining into trust to fund their research for the benefit of
18    their cryptocurrencies, and Craig eventually sells all the
19    intellectual property.
20          You have to find that they had a right to share in the
21    profits and losses.  Craig told the ATO that they mined the
22    Bitcoin into the trust to fund their research activities.  And
23    Craig told Ira that he convinced Dave to wait until 2014, in
24    October, to finally take some money from the Bitcoin and spend
25    it on themselves.
```

62

1    And you have to find that they had joint control over

2    the partnership.  And we've already clearly seen that in emails

3    from Craig to Dave he refers to the Bitcoin that are in the

4    trusts and:  "What we are going to do with it."

5    We're going to see more on all of these factors later.

6    But in opening, Ladies and Gentlemen, we promised you evidence,

7    hard evidence, that Craig Wright and Dave Kleiman weren't just

8    friends, but were business partners to create Bitcoin, to mine

9    Bitcoin, and to create Bitcoin-based IP.  And we delivered.  We

10    showed you time and time again that Craig Wright said he and

11    Dave were business partners; he and Dave mined Bitcoin; he and

12    Dave created intellectual property.  We're going to run through

13    that evidence quickly.

14    Now, the Defense has made a big deal out of the fact

15    that there is no written agreement.  But again, the law doesn't

16    require one.  And you heard Carter Conrad, one of Dave's best

17    friends, testify in court that Dave was a "my word is my bond"

18    type of guy, that his word was his honor.  And that if he

19    committed to do something, he would do that based on his word

20    alone.  He didn't need written agreements.

21    You heard that Craig was similar.  Craig's ex-wife,

22    Lynn Wright, testified by video deposition.  And she said that

23    he was informal in business, that they wrote nothing down

24    except when they hired employees.  And so it's no surprise that

25    these best friends didn't have a written partnership agreement.

1          While the Defense promised you that you wouldn't see

2     contemporaneous emails between Craig and Dave about Bitcoin,

3     what they failed to tell you was that Dave and Craig agreed to

4     keep their partnership to create and mine Bitcoin a secret and

5     that these computer experts, who literally wrote the paper on

6     how to destroy digital data, agreed to delete all records of

7     their partnership to create and mine Bitcoin.

8          During Kyle's opening statement, he flagged for you

9     that you were going to see two different Craig Wrights.  You

10    were going to see the pre-litigation Craig Wright who admitted

11    Dave's role to a select few people he trusted or to people he

12    needed something from, and a post-litigation Craig who swore:

13    "Dave was never my partner" and that Craig would never form a

14    partnership and that he will never form a partnership, that he

15    hates the whole concept of a partnership, that he will never be

16    a partner, and that he will never have a partner.

17         And at trial we walked you through the written

18    admissions of Craig.  We're going to quickly run through those

19    in a moment, so you have them fresh in your mind when you begin

20    deliberations.  But recall that, in addition to the written

21    evidence, Ira testified that Craig told him they were 50/50

22    partners.  And Jamie Wilson testified that Craig described Dave

23    as his business partner.

24         (Video:)

25              "A.  No.  Not me personally, no.

64

```
1                "Q.  Had you heard of Dave Kleiman?

2                "A.  Yes, I had.

3                "Q.  How did you hear of Dave Kleiman?

4                "A.  Through Craig.  Said he was his best friend and

5     they had been working on projects together.

6                "Q.  Did he describe him as his partner?

7                "A.  A good mate.

8                "Q.  Okay.  And I don't mean a romantic partner.  I

9     mean --

10               "A.  No.  No.  No.  No.  Business partner.

11               "Q.  Did he describe him as a business partner?

12               "A.  Yes.

13               "Q.  Okay.  And somebody he was working on projects

14    with?

15               "A.  That's right."

16          (End of video.)

17               Described him as his business partner.

18               But after seeing the evidence that Plaintiffs

19    collected in this case, even Craig himself realized he had to

20    change course from his original testimony that he hates

21    partnerships.  And he testified at trial that in a variety of

22    different contexts and at times Dave had been his business

23    partner.

24               Let's move to the documentary evidence.  We saw a

25    Skype chat between Craig Wright and Mark Ferrier in 2013 right
```

65

1  before and after Dave dies.  Craig calls Dave his business

2  partner three times.

3        Craig didn't only tell business associates that he was

4  his business partner, though, he told that to people you trust.

5  He told that to people you rely on in times of need.  He told

6  the police that.  He told his lawyer that.  He tells the

7  government that during a tax investigation.

8        And we see that things don't go well between Craig and

9  Ferrier.  And in 2014 Craig eventually goes to the police for

10  help.  In doing that, he sends the police a written witness

11  statement.  And in that statement to Detective Catherine Unger

12  from the New South Wales Police Department, he says that he had

13  been business partners with Dave Kleiman in Bitcoin for over a

14  decade.  Over a decade.  Craig submitted this statement in

15  2014.  That means he and Dave were partners in Bitcoin since

16  2004.

17        When asked about the admission at trial, Craig had

18  nothing to say other than deny it was true; in other words, his

19  defense is that he lied to the police.

20        But Craig told his lawyers that Dave was his business

21  partner too.  And faced with that evidence at trial, he

22  admitted that Dave and he were partners.

23        And when the ATO began investigating Craig, they met

24  with him multiple times.  His lawyers were there, his

25  accountants were there.  And in those 40-page transcripts with

1     his meetings with the ATO, he tells them:  "We were partners

2     for years."

3         We saw in 2015, years later, Craig is still telling

4     the same story.  He emails Michele Seven that:  "Dave Kleiman

5     was my best friend and business partner."  And when confronted

6     with this at trial, Craig denied this admission of partnership

7     because he claimed Michele Seven was blackmailing him.  But

8     look at this email.  This isn't the exchange of a blackmailer.

9         Craig says to Michele Seven, who he said was his --

10    Dave was his business partner -- he says:  "What I need is a

11    person who can be my secret, know the secrets I have, and be

12    the mirror I need."  And Michele writes back:  "I know I'm fun,

13    but at my core I'm just very sweet.  You should find someone

14    who is more detached."  That's not an exchange with a

15    blackmailer.

16        One of the most damning admissions of all, though, is

17    the one Craig makes to Ira directly in Thanksgiving -- about

18    Thanksgiving 2009.  Recall that in May of 2009 no litigation

19    has been filed.  Craig Wright has reached out to Ira and

20    promised him the world.  "Dave was one of the cocreators of

21    Bitcoin.  Dave got a digital fortune.  I can help you get it.

22    You have shares in this company called Coin-Exch."

23        Ira completely trusts Craig, thinks he's the greatest

24    guy in the world, and Ira is reminiscing about his memory of

25    Dave, and he tells him:  "I remember this one time Dave may

67

1    have mentioned Bitcoin to me.  It was Thanksgiving 2009.  It

2    was the first time Dave was meeting my newborn baby girl.  And

3    at that Thanksgiving dinner, I said to him:  'Hey' -- we were

4    talking about Facebook and how successful it was, and he

5    says" -- Ira says to Dave:  "Are you working on anything

6    interesting?"  And Dave says:  "I'm making my own money."

7         Ira immediately flips out.  "You're making your own

8    money?  Are you making counterfeit money?  What?  You're making

9    your own money?"

10        Dave says:  "No.  No.  No.  I'm making digital money,"

11   and he pulls out a business card, he flips it over, he writes

12   the Bitcoin logo on the back, he hands it to Ira.  And he tells

13   Ira:  "I'm working with this well-to-do foreign man."  Ira says

14   to him -- he speculates to Craig, he says:  "I asked him:  'Why

15   don't you partner with this man?'"  And Dave just kind of looks

16   at him, and Ira says to Craig:  "Well, I thought that that

17   might have been Dave's way -- he didn't want to tell me you

18   were already partners."

19        And what does Craig respond with?  What does Craig say

20   to Ira's question of:  "Maybe he didn't want to directly come

21   out and say that you guys were already partners"?  Craig says:

22   "We did partner."

23        Confronted with this evidence at trial, what's Craig's

24   explanation?  That Ira catfished him.  Really?

25        In the same email, Craig says to Ira that he will try

68

1  to find him "the old Bitcoin logo we did," thus, demonstrating

2  again that he and Dave designed the first Bitcoin logo.

3      The evidence that there's a partnership is

4  overwhelming.  And the only thing Craig has to rebut the

5  evidence that there is a partnership is the word of Craig

6  Wright.

7      Realizing that at trial, Craig attempts to pivot.  He

8  now claims, in conflict with his sworn testimony, that he hates

9  partnerships and would never form a partner -- never has a

10  partner -- that he and Dave were partners, just not to create,

11  mine and develop Bitcoin -- 1.1 million Bitcoin and

12  Bitcoin-based IP.  Yeah, right.

13      I want to underscore that for a moment.  After this

14  admission, there can be no real dispute that they were

15  partners.  And the evidence is equally as powerful about what

16  the partnership was for.  As you'll recall, the evidence that

17  Dave and Craig were two halves to the Satoshi Nakamoto

18  partnership to create Bitcoin, to mine 1.1 million Bitcoin that

19  were worth over $73 billion, and to develop what is now worth

20  over $252 billion worth of intellectual property, is likewise

21  overwhelming.

22      In fact, you need not go any further than Craig's own

23  recorded statements when asked directly about Satoshi Nakamoto.

24  He admitted it was a partnership.  He admitted it was with him

25  and Dave.  And he admitted that Satoshi died with Dave.

69

1    (Video:)

2          "Q.  Have you claimed to be Satoshi?

3          "A.  I said I was part of the creation.  I've also

4    said that if you have a partnership and someone dies, it's no

5    longer a partnership.

6          "Q.  So the Nakamoto part of the partnership died?

7          "A.  Well, there's no real part of the partnership.

8    If you had (inaudible) and all partners disappear and you don't

9    have a K or anything like that, you just have nothing.  It's

10   not an individual.

11         "Q.  So you're saying Satoshi Nakamoto is a pseudonym

12   for a group of at least two or more people that you were a part

13   of?

14         "A.  Umm, I had help from Dave.

15         "Q.  Dave's not here.  Dave's not here, man.

16         "A.  I know.  Dave's not here.  Dave is never going to

17   be here again."

18      (End of video.)

19         There's far more evidence than this recording to prove

20   that Dave and Craig were partners in Satoshi Nakamoto to create

21   Bitcoin.

22         Patrick Paige, one of Dave's good friends and

23   colleagues, testified that, quote, Craig Wright told him that

24   Dave Kleiman was one of the creators of Bitcoin and that

25   Craig's new claim in this lawsuit that Dave is not a cocreator

1  of Bitcoin is inconsistent with Craig's statements to him, it's

2  inconsistent with Craig's emails to him, and it is inconsistent

3  with Craig's promise to Patrick that when this all comes out

4  there is no way Dave will be left off the credit.

5          Gavin Andresen, Satoshi Nakamoto's successor,

6  testified that Craig told him the person of Satoshi was Dave,

7  Craig, and some mystery person.

8          Ms. Vela?

9      (Video:)

10         "Q.  And do you know in what context Dave Kleiman was

11  raised in this initial conversation?

12         "A.  I think we had a conversation about the person of

13  Satoshi actually being the three people, Dave Kleiman, Craig

14  Wright, and some other mysterious person who I never asked

15  about."

16     (End of video.)

17         Jamie Wilson testified that Craig told him he started

18  Bitcoin and that Craig told him:  "I did it with Dave Kleiman."

19     (Video:)

20         "Q.  Okay.  And did Craig tell you that?

21         "A.  Yes.

22         "Q.  Okay.  And how many occasions did Craig tell you

23  that?

24         "A.  Well, that's how he started blockchain Bitcoin.

25  And it was a matter of:  'I did it with Dave Kleiman.'"

1    (End of video.)

2    Andrew O'Hagan, the serious Scottish award-winning

3    investigative journalist, testified that Craig told him Dave

4    Kleiman was the man that helped him do Satoshi's work.

5    (Video:)

6    "Q.  Is it accurate that Dr. Wright told you that Dave

7    Kleiman was the man that helped him do Satoshi's work?

8    "A.  Yes."

9    (End of video.)

10    All of these men have no stake in the outcome of this

11    lawsuit.  They are simply reporting what pre-litigation Craig

12    told them.

13    But it goes beyond just direct testimony from

14    disinterested witnesses.  There's also written evidence from

15    Craig himself.  In 2014, Craig emailed Ira and told him that

16    Satoshi was a team.  Without the other part of that team, he

17    died.  That same month, Craig emails Louis Kleiman, Dave's late

18    father.  He says:  "Your son Dave and I are two of the three

19    key people behind Bitcoin.  Know also that Dave was a key part

20    of an invention that will revolutionize the world."

21    Still, in February of 2014, Craig confirms to Ira that

22    Dave helped him write the Bitcoin Whitepaper and confirms to

23    Ira that Dave had the famous Satoshi Nakamoto Vistomail

24    account, the account that announced the Bitcoin Whitepaper to

25    the world, and that mining was one of Satoshi Nakamoto's

1    partnerships' jobs.

2         We've established it was a partnership.  We've

3    established it was Satoshi Nakamoto.  Well, what else did it

4    encompass beyond the creation of Bitcoin?  It encompassed

5    Bitcoin mining.  The fact that Bitcoin mining was one of

6    Satoshi Nakamoto's jobs is undeniable.  Recall that

7    Mr. Antonopoulos testified that Satoshi Nakamoto's mining was

8    absolutely critical to the start of Bitcoin.  There would be no

9    Bitcoin if Satoshi Nakamoto was not mining to move the chain

10   along.

11        Jamie Wilson, Craig's former CFO, testified that Craig

12   told him he obtained Bitcoin through mining with Dave Kleiman

13   and also told him that Dave and Craig set up Bitcoin and were

14   Satoshi.  In fact, Jamie testified that when Craig showed him

15   his Bitcoin and his Bitcoin wallets, he also told him that he

16   mined that Bitcoin with Dave.

17     (Video:)

18        "Q.  Do you know how Craig Wright obtained Bitcoin?

19        "A.  Through mining with Dave Kleiman.  That was my

20   understanding.

21        "Q.  What is your understanding based on?

22        "A.  From Craig saying that he was working with a

23   great man who was in the USA.  And they set up Bitcoin.  And

24   that it was Satoshi.

25        "Q.  Craig Wright never told you that he mined with

1   Dave?

2           "A.  Yes, he did.

3           "Q.  When did he tell you that?

4           "A.  Well, that's how I knew all about the Bitcoin and

5   his wallets."

6       (End of video.)

7       Andrew O'Hagan testified that Craig told him that Dave

8   and Craig's mining led to a complicated trust.

9       (Video:)

10          "Q.  Dr. Wright told you that his and Kleiman's mining

11  activity had led to a complicated trust?

12          "A.  That's what he said."

13      (End of video.)

14      This testimony again is backed up by hard evidence.

15  In April of 2014, Craig emails his wife, his lawyer, and his

16  CFO.  These are all people you do not lie to.  And he says to

17  them:  "Dave mined all this outside Australia."  And he says:

18  "I was not the person doing the mining.  Dave was."

19      And remember, when Craig submitted a witness statement

20  to the police, he attaches an email chain between him and Mark

21  Ferrier, where Mark Ferrier asks Craig:  "Where did you get

22  this Bitcoin from?"  And Craig responds:  "I moved it in the

23  mining process to Dave Kleiman."  And less than an hour later,

24  he follows that up with another email.  He says:  "I had Dave

25  mine the Bitcoin overseas."

1          One year later, Craig is engaging with the Australian

2     Taxation Office, fighting for his life, in terms of the rebates

3     and the audits.  And he confirms to them directly that the

4     Bitcoin he controls was mined in the United States, somewhere

5     Craig has never lived and somewhere Dave has always lived.  And

6     that statement is absolutely consistent with what he then tells

7     Patrick Paige and Carter Conrad, that Dave mined the Bitcoin in

8     the United States for both of them.

9          A year later, he confirms the same statement again to

10    his wife.  He forwards the email from Patrick to Ramona Watts

11    and he says:  "I said:  'We mined.'"

12          Craig confirmed this, that Dave did the mining for

13    them in the United States, to the Australian Taxation Office.

14    Craig's chief financial officer, John Chesher, told the ATO in

15    that meeting that Craig took the Bitcoin that he had mined

16    overseas, by Dave, and he started W&K with Dave Kleiman, an

17    entity created for the purpose of mining Bitcoins.

18          Craig says the exact same thing to Ira in 2014.  Craig

19    founds a company with Dave Kleiman in 2011 that's called W&K.

20    It's set up to mine Bitcoin.

21          One year later, Craig says the same thing to Uyen

22    Nguyen.  2011 established W&K with Dave Kleiman.  It was set up

23    to mine Bitcoin.

24          Then in early 2014, Craig sends a LinkedIn message.

25    He's looking to be introduced to one of the Winklevoss twins

1  from Facebook.  And in seeking that introduction, he says:

2  "The Winklevoss twins are right into Bitcoin.  Dave Kleiman and

3  I started mining in 2009."

4        Next, in August of 2014, Craig tells the Australian

5  Taxation Office that he and Dave set up a trust to put Bitcoin

6  that Dave was mining into, and the purpose of the trust was to

7  fund research that both Craig and Dave were doing on promoting

8  cryptocurrencies.  This is the very definition of a

9  partnership.  Dave is contributing mining into a trust for

10  their joint work.

11        Seven days later, Craig is back to meeting with the

12  Australian Taxation Office.  In that meeting, he tells them

13  that the assets of the trust, the real trust -- he tells them

14  the assets of the trust were originally sourced from both him

15  and Dave Kleiman.  They even ask him to confirm:  "And David?"

16        "Yes."

17        Ladies and Gentlemen, I want this to sink in for a

18  moment.  Craig admitted unequivocally that both he and Dave

19  funded the trust together.  We know the trust was funded with

20  Bitcoin.  That is the definition of partnership; joint

21  contribution of assets for a common goal.

22        And the ATO was clear about this too.  In April of

23  2016, the Australian Taxation Office issues an incredibly

24  detailed 56-page decision denying Craig's tax refunds.  And in

25  doing so, they document in excruciating detail the

76

1  investigation conclusions and reasons for reaching their

2  decision.

3       In that report, they say that Craig told them directly

4  that the trust Bitcoin came from both Craig and Dave Kleiman.

5  They also say that Ms. Uyen Nguyen told them that while Craig

6  contributed 650,000 Bitcoin into the trust of the 1.1 million,

7  Dave contributed 350,000.

8       Not only did Craig and Dave mine the Bitcoin together

9  for the partnership; they treated that jointly mined Bitcoin as

10  partnership property.  In a statement to the New South Wales

11  Police, Craig says that he and Dave held the Bitcoin together.

12  Specifically, he says the only way that he could pay Mark

13  Ferrier was:  "With Bitcoin that Dave and I held."  And

14  eventually after Dave dies, Craig pays Ferrier that Bitcoin,

15  thus proving he had access to Bitcoin that he and Dave held.

16       But it wasn't just communications to third parties.

17  In the few communications Craig did save from his partnership

18  with Dave, he forwarded some to Ira after making Ira promise to

19  delete them.  In these communications it is very clear that

20  Craig and Dave treated decisions about what to do with the

21  trust Bitcoin as a joint decision, decisions that had to be

22  made by both Craig and Dave.

23       For example, in October 10th, 2012, Craig emails Dave

24  saying:  "We need to discuss the trust and work out what the F

25  we are going to do with it all."  And when confronted with this

1    evidence at trial, Craig actually claimed that when he said

2    "we" here, he meant "the royal we."  Absurd.

3         In May of 2012, Craig emails Dave again.  And he again

4    says that the decisions about what to do with the trust Bitcoin

5    are a joint decision.  And that decision was not to sell any of

6    their joint Bitcoin at that time.  Specifically, he says to

7    Dave:  "We do not touch the trusts, not yet, not even for this.

8    One day, they will change the world.  Not millions, not

9    billions.  If I am right, they will be trillions."

10        And while Craig claims that there is no written

11   agreement to hold the Bitcoin in trust jointly, that's not

12   true.  If you recall, we showed Craig a document he signed that

13   includes a long list of Bitcoin wallets.  And on the right side

14   in Craig's own handwriting is written:  "As agreed, all wallets

15   to be held in the UK in trust until all regulatory issues

16   solved and group company formed with Dave K and Craig Steven

17   Wright."  So Craig and Dave did agree to hold all the Bitcoin

18   in trust.

19        At trial, I asked Craig about this document.  And

20   sitting right there before you, he testified it was not his

21   handwriting and it was not his signature.  Unbelievable because

22   we have him on video testifying exactly the opposite.

23   (Video:)

24        "Q.  Can you look at Page 9 of 10.

25        "A.  Yes.

1         "Q.  And the signature at the bottom, is that your

2    signature?

3         "A.  Yes.

4         "Q.  The handwriting on the right-hand side of all the

5    Bitcoin wallets listed there, whose handwriting is that?

6         "A.  That looks like mine."

7       (End of video.)

8        And when I confronted him with those lies while he was

9    on the stand, right in front of you, he says that I got him

10   angry at his deposition.  Come on.  You saw that video.  That

11   man's not angry.

12       The evidence we've just reviewed is clear.  Dave mined

13   Bitcoin for the partnership.  He mined that Bitcoin into a

14   trust that funded Dave and Craig's research.  They treated the

15   Bitcoin as joint property and they made joint decisions about

16   what to do with it all.  In fact, Craig wrote it in his own

17   handwriting that all wallets were to be held in trust until a

18   joint company could be formed between him and Dave.

19       And I'd like to walk you through in a minute -- we've

20   done partnership.  We've done creation of Bitcoin.  We've done

21   Bitcoin mining.  How much Bitcoin?  The evidence shows the

22   partnership mined 1.1 million Bitcoin.  But Craig's own

23   testimony shows that he at least agrees that he mined and

24   controls a little over 800,000 Bitcoin.

25       First, we have Andrew O'Hagan, who testified that

1    Craig admitted to him that the Satoshi horde was around one

2    million Bitcoin.

3        (Video:)

4            "Q.  The Satoshi mine horde is around a million

5    Bitcoin?

6            "A.  Yes.  That's what he said."

7        (End of video.)

8            Craig admitted the same to the Australian Taxation

9    Office.  On August 11th, 2014, he told them:  "At the start of

10   this, we have approximately 1.1 approximately Bitcoin."

11           Later, in that exact same interview, Craig tells the

12   ATO again -- he says:  "The entire pot of Bitcoin is

13   1.1 million Bitcoin."

14           And importantly, while the Plaintiffs have proven they

15   are entitled to half of the 1.1 million Bitcoin -- that would

16   be 550,000 Bitcoin -- Craig himself has admitted that Dave owns

17   at least 300,000 Bitcoin in the trust.  Ira emails Craig in

18   March of 2014.  And in that email, he says:  "It appears from

19   emails you've sent that Dave told you you have a million

20   Bitcoin in the trust.  And since you," Craig, "told me that

21   Dave had 300,000, that means that yours is around 700."

22           And what does Craig respond?  He says:  "Around that."

23   He doesn't say:  "No.  Dave didn't have any Bitcoin in the

24   trust."  He doesn't say:  "What are you talking about 300,000

25   is Dave's?"  He says:  "Around that."  At a minimum, Craig has

1    admitted 300,000 Bitcoin in the trust belong to Dave Kleiman.

2         We've also submitted a list into evidence that

3    contains a list of 820,200 Bitcoin that Craig Wright submitted

4    to this Court to fulfill a court order that he identify his

5    Bitcoin holdings.  That's P554.  It contains 16,404 Bitcoin

6    addresses, which at the time of production included 50 Bitcoin

7    per address.  That's 820,200 Bitcoin.

8         At trial, Craig testified that Wright International

9    Investments owns the balance of the Bitcoin on the list and

10   that he owns 100 percent of the Wright International

11   Investments in trust.

12        And while Craig now claims he mined this Bitcoin

13   through various companies, he's previously said that the

14   825,000 Bitcoin that was mined in 2009 and 2010 was mined as

15   Satoshi, the very partnership at issue in this case.

16        And while obviously Plaintiffs have put forward

17   evidence to show you it was Dave that did this mining for the

18   partnership, I put this forward to show you that even Craig has

19   admitted that the Satoshi Nakamoto partnership mined 825,000

20   Bitcoin.

21        And we've demonstrated Dave and Craig mined over

22   1.1 million Bitcoin.  One million, one hundred thousand, one

23   hundred and eleven Bitcoin to be exact.  That's one million,

24   one hundred thousand, one hundred and eleven Bitcoin.  That is

25   the exact amount that Craig puts into his forged Tulip Trust

1   document to create a false paper trail to make it seem like

2   Dave has nothing.  And we will get there in a moment.

3         So half of 1,100,111, that's 550,055.5 Bitcoin for

4   Dave and 550,050.5 Bitcoin for Craig.  That's an even split of

5   the partnership's Bitcoin.

6         As we showed at trial, Craig and Dave partnered to

7   develop Bitcoin-based intellectual property too.  Robert

8   Radvanovsky testified that he attended a conference call in

9   2009 where Craig and Dave were discussing a partnership to

10  create revolutionary blockchain-related intellectual property.

11  And while he's refused to answer the simple question at trial,

12  his previous deposition testimony couldn't be cleaner.  He

13  worked on intellectual property with Dave.

14     (Video:)

15         "Q.  Did you ever work on any intellectual property

16  with Dave?

17         "A.  Yes."

18     (End of video.)

19         And that intellectual property included software that

20  they developed together, including Bitcoin software that Dave

21  enhanced.  In fact, Craig wrote to Ira that Dave took two

22  million lines of code and turned it into six million lines of

23  code.  He also told both Ira and Mark Ferrier that Dave was

24  involved in creating a completely open and malleable form of

25  scriptable money.  He told the New South Wales Police that he

1    and Dave were developing a Bitcoin exchange by which smart

2    contracts would be connected since 2004.

3        And in the same document, he said that Dave and him

4    conceived of the idea to develop a system that integrated SCADA

5    and a Bitcoin exchange.  The record is clear that Craig and

6    Dave created Bitcoin-based intellectual property in W&K.

7        Now, in opening statement, Ms. McGovern told you that

8    the evidence would not show that the intellectual property has

9    tremendous value.  She is wrong.  She was wrong.  We saw the IP

10   grow in value as Bitcoin grew in popularity and value, which

11   just makes sense.

12       In July and August of 2013, Craig filed lawsuits

13   against W&K valuing its IP at $56 million.  He expressly tells

14   the Australian Taxation Office, after telling him that he

15   didn't want to rip off the estate, that it was valued at $56

16   million.  Less than a year after valuing the IP at $56 million

17   in 2013, Craig commissions a valuation of the W&K source code

18   that pegged it at 303,895,458 Australian dollars.

19       THE COURT:  Mr. Freedman, I apologize, but one of the

20   jurors needs to take a restroom break.

21       MR. FREEDMAN:  Absolutely.

22       THE COURT:  All right.  So let's go ahead and take a

23   15-minute recess, Ladies and Gentlemen.

24    (Jury not present, 11:27 a.m.)

25       THE COURT:  All right.  We're on a 15-minute recess.

1          MR. FREEDMAN:  Thank you, Your Honor.

2       (Recess from 11:27 a.m. to 11:42 a.m.)

3          THE COURT:  All right.  Welcome back.

4          Mr. Freedman, you were at 45 minutes, sir.  I just

5    wanted to let you know.

6          MR. FREEDMAN:  Your Honor, we have 43.

7          THE COURT:  I'm sorry?  You have 43?  I had that you

8    started at 10:43 and we took a recess at 11 -- I'm sorry -- a

9    recess at 11 --

10         MR. FREEDMAN:  I just had Mr. Brenner on a literal

11   stopwatch.

12         THE COURT:  We've two minutes apart?

13         MR. BRENNER:  Yeah.  I have 43.

14         THE COURT:  Okay.  All right.  We'll put two minutes

15   in the reserve.

16         All right.  Let's bring the jury back in.

17      (Before the Jury, 11:44 a.m.)

18         THE COURT:  All right.  Welcome back, Ladies and

19   Gentlemen.  Please be seated.

20         We will continue with the closing argument.

21         MR. FREEDMAN:  Less than a year after valuing the

22   intellectual property at $56 million, Craig commissions a

23   valuation of W&K's IP source code that gets it pegged at 303

24   million Australian dollars.

25         Six months later, a second valuation is put in by a

1    valuation expert, 378 million Australian dollars.  And a little

2    less than a year after the nChain deal closes, and Craig has

3    sold all of W&K's intellectual property into nChain, a new

4    valuation projected -- done by Baker McKenzie, projects the

5    valuation in 2018 to be worth 2.6 billion pounds.  That's about

6    3.19 billion US dollars.  You can do the math with the Court's

7    judicially noticed exchange rates.  The Court has given you the

8    exchange rates.

9         And then Dr. Wright has given you the most up-to-date

10   valuation for these -- for this intellectual property.  Two

11   days before trial, he pronounced that the value of the

12   intellectual property at issue in this case is worth 252

13   billion US dollars.  Remember, that when Craig made this

14   statement he had every incentive to lie about the value.  He

15   knew he was about to face a trial.  He knew he was about to

16   face a jury.  He knew there were lawyers on the other side.

17   And despite that, he admitted the intellectual property at

18   issue in this case is worth an astronomical $252 billion.

19        Craig then takes this intellectual property and

20   transfers it to his Australian entities.  His honest lawyer,

21   Andrew Sommer, that never lies, says so.  And his wife admits

22   it in an email in 2015.  He then sells it all through various

23   agreements, not telling Ira anything about these sales.  And

24   eventually these companies file patents based on W&K's

25   intellectual property, all when Craig's associates admitted

```
1    that W&K's intellectual property would potentially expose

2    Satoshi Nakamoto and core blockchain intellectual property.

3         So the next thing I'd like to walk you through is

4    Craig's scheme to steal all this Bitcoin and intellectual

5    property from his dead best friend's estate.  I'd like to make

6    something very clear here.  The Defense has said over and over

7    that Dave Kleiman never said anything bad about Craig Wright.

8    Dave Kleiman never had a bad word to say about Craig Wright.

9    Of course not.  Craig waited until he died to steal from him.

10   Dead men tell no tales.

11        And to put it in Craig's own words:

12   (Video:)

13        "Dave is never going to be here again."

14   (End of video.)

15        So Craig Wright is now sitting on 1.1 million Bitcoin

16   that he and Dave mined.  He knows that no one really knows

17   about it because he and Dave agreed to keep it a secret.  And

18   that's the type of person Dave was.  He was a man of his word.

19   So he realizes he needs a paper trail to cover up his theft.

20   What does Craig do next?  He forges trust documents to make it

21   look like Dave Kleiman agrees that he owns all 1.1 million

22   Bitcoin in the trust.

23        And before we get into these forgeries, I want to

24   remind you that Craig has admitted he creates fake trusts.  We

25   showed you this at trial.  "I get so damn confused.  You're
```

1    suggesting there's a separate real trust and then a fake trust,

2    or multiple fake trusts?"  And Craig says:  "Real and fake."

3    He creates fake trusts.  You see it in his own words.

4        Let's start with the first fake trust.  This document

5    appears to be an email from Dave Kleiman to Craig, dated June

6    24th, 2011.  It is not.  It is a forgery.  It attaches a Tulip

7    Trust document that appears to be a document written by Dave

8    Kleiman.  It says:  "I, Dave Kleiman, have received

9    1,100,111" -- that's the number of the partnership's Bitcoin.

10   This is the fake paper trail he creates to hide that number.

11   This is the number of the partnership's Bitcoin.  And he

12   says -- he forges Dave's name on this contract -- "I, Dave

13   Kleiman, have received 1,100,111 Bitcoin from Craig Wright.

14   All Bitcoin will be returned to Dr. Wright on January 1st,

15   2020."  That's basically Dave saying:  "None of it's mine."

16       So if this document is real, it shows that Craig has

17   all the Bitcoin in the partnership.  But it's not real.

18   Remember, Dave dies in April of 2013.  And right here is an

19   identical version of the email that you just saw, dated June

20   24th, 2011, except it's dated October 17th, 2014, a year and a

21   half after Dave dies.  Craig forgot to delete the draft when he

22   forged the email.

23       Dr. Edman brought you through all the metadata.

24   Dr. Edman gave unrebutted expert testimony that that email is a

25   forgery created in October 17th, 2014.  If I may, write that

1   date down, October 17th, 2014.  We're going to come back to it

2   in a minute.

3        The next fake trust that Craig makes to hide the

4   spoils of his theft, is Tulip Trust I.  Craig makes it look

5   like this document was formed between Wright International

6   Investments and Tulip Trading in October of 2012.  At trial,

7   Craig swore it was authentic.  But like the last fake trust

8   document, it also makes it appear that Dave has no claim to the

9   1.1 million Bitcoin.  It says:  "The assets and joint agreement

10  and deed between the parties include the 1,100,111 Bitcoin."

11  That's the partnership's Bitcoin.

12       But the truth is -- the truth is that Craig had no

13  connection to Tulip Trading, one of the companies that created

14  this fake trust in 2012, because he didn't buy Tulip Trading

15  until 2014, two years later.  This email shows Craig reaching

16  out to a company he calls Abacus Offshore.  They say to him:

17  "Hey, we got your request to buy a shelf company."  That's a

18  company that you form -- these different corporations, they

19  form companies.  They put them on a shelf until somebody wants

20  to buy them and they sell them the company.  They say:  "Hey,

21  we got your request to buy a shelf company.  Here's a list of

22  companies.  Tell me which one you want."

23       Craig Wright, October 16th, 2014:  "I want Tulip

24  Trading, Limited," with a creation date of 2011.  It's been on

25  the shelf for three years.

```
 1          Craig arranges to pay for this company and he
 2     transfers the money that's required to pay for this company to
 3     Abacus Offshore.  This is October 17th, 2014, commonwealth
 4     transfer.  See, he's transferring the money for Abacus
 5     Offshore.  At the bottom is a reference to an invoice.  We have
 6     that invoice.  That invoice is an invoice to purchase a
 7     Seychelles 2011 shelf company called Tulip Trading, Limited.
 8     It's dated October 17th, 2014.  Recall Dr. Edman also gave
 9     unrebutted expert testimony this document is a forgery, the
10     Tulip Trust I.
11          I want you to go back to that date, October 17th,
12     2014, the date of the email that he forged to make it look like
13     it was June 2011, same day he buys Tulip Trading.
14     October 17th, 2014.  Craig had a pretty busy October 17th,
15     2014, forging two documents to hide his theft of Dave Kleiman's
16     Bitcoin.  So now he can show the world that he's got trusts
17     where Dave Kleiman signed off and says:  "No.  No.  No.  It's
18     all yours, Craig."  They're forgeries.
19          So truth of the matter is Craig forged both versions
20     of the Tulip Trust documents we've seen to make it look like
21     Dave Kleiman signed off on owning the partnership's property.
22     Let that sink in for a moment.
23          The evidence is undeniable and unrebutted that Craig
24     Wright forged fake trusts to hide the fortune he stole from his
25     dead best friend.  Unreal.
```

```
 1              That's not the only forgery in this case.  You'll

 2     recall that Dr. Edman testified -- gave unrebutted expert

 3     testimony that Craig created over 40 forgeries.  And I'm going

 4     to focus on just one more.  Craig needed to dupe Ira into

 5     thinking Craig owned everything after he reached out to him.

 6     So what does he do?  He creates a series of emails from his

 7     dead best friend that appear to confirm the fact that he owns

 8     the Bitcoin and Dave owns nothing.

 9              This was forgery number one.  Dr. Edman told you it

10     was created on February 28th, 2014.  That's less than two weeks

11     after Craig's first email exchange with Ira.  Dr. Edman showed

12     you that Craig forged a draft email that appeared to come from

13     Dave.  And that less than an hour before he sends that forgery

14     to Ira Kleiman, he adds this bombshell forged sentence.  He

15     says to him -- he makes it look like Dave Kleiman emailed him

16     an email which says:  "You have over one million Bitcoin now in

17     the trust.  Start doing something for yourself and this family

18     you have."  And then Craig takes that forgery and sends it to

19     Ira to pass it off as if Dave Kleiman told him:  "All million

20     Bitcoin in the trust belong to you."

21              This man forged documents to steal his dead best

22     friend's fortune and told his brother that that's what he did.

23              I want to walk you through the timeline of what

24     happened after Dave dies.  On April 30th, 2013, Carter Conrad

25     emails some of Dave's friends telling them that he's passed.
```

1    Craig is on that email.  Craig responds to that email to

2    express sorrow for the loss.  But he never mentions his

3    business partnership with Dave.  He never mentions that Dave

4    had Bitcoin, Dave had intellectual property, or that he could

5    locate a literal fortune of digital assets.  He also doesn't

6    reach out to Dave's family.  In fact, it would be over nine and

7    a half months before Craig did any of those things.  On the

8    stand, he told you about some reach-out to a fiancee.  Did you

9    see any evidence of that?  No.  Did the fiancee come and

10   testify?  No.  Another lie.

11        And during those nine months, Craig completely strips

12   out Dave Kleiman's estate from all of its assets, all of its

13   Bitcoin, all of its intellectual property, and strips Dave's

14   legacy.

15        We showed how that less than three months after Dave

16   died, Craig sues Dave's company W&K and claims it owes him $60

17   million.  We then saw he told the Australian courts that he,

18   Craig Wright, was the legal agent and representative and

19   director of W&K.  And that through him W&K agreed it owed Craig

20   Wright $60 million.  He was the plaintiff and the defendant in

21   this case.  He was sitting at both sides of the table.

22        We showed you he submitted a document to the

23   Australian courts that made it look like Jamie Wilson had

24   agreed on behalf of W&K to transfer W&K's intellectual property

25   to Craig.  But we then heard Jamie Wilson testify that he had

1    nothing to do with W&K.

2            Ms. Vela?

3        (Video:)

4            "Q.  Were you ever a director of W&K?

5            "A.  No.

6            "Q.  Were you ever a shareholder of W&K?

7            "A.  No.

8            "Q.  Were you ever an officer of W&K?

9            "A.  No.  I wasn't even aware of it."

10       (End of video.)

11           Left-hand side, forged signature from Jamie Wilson,

12   Jamie Wilson's sworn testimony.

13           We showed you the next thing Craig did was to rush to

14   the courthouse in Australia to trick the judge into giving him

15   what he wanted.  He told the judge he was the sole director of

16   W&K, precisely the opposite of his sworn declaration in this

17   court that he never was a director in W&K.

18           Craig then told the Australian judge that he had

19   already taken control over W&K's accounts, that he had a

20   statutory declaration to prove it, and that the lawsuit in

21   front of that judge was a mere formality.

22           Craig only submitted one statutory declaration in

23   Australia and that statutory declaration contains a list of

24   Bitcoin addresses.  Craig took control over W&K's Bitcoin

25   addresses.

92

1          We showed you that there was a forged contract between

2     Dave, Craig, and W&K, with outrageous terms, the deathbed

3     contract.  Dave never signed that outrageous deathbed contract.

4     Dave's signature is a forgery.  We showed you that Dave's real

5     electronic signature was a cryptographic signature.  On the

6     right-hand side, all the little details on the Computer

7     Forensic's signature, that was Dave Kleiman, the cryptographic

8     expert -- that was his signature.  And it looks nothing like

9     the deathbed contract on the left-hand side.

10         We showed you Dave's handwritten signature, the one --

11    Ms. Vela, could you go back one moment.

12         We showed you Dave's handwritten signature that --

13    sorry -- go ahead, Ms. Vela, please.

14         Dave's handwritten signature looks absolutely nothing

15    like the signature on the deathbed contract.  And Carter Conrad

16    and Ira Kleiman both testified that was not Dave Kleiman's

17    signature.

18         The only person, the only person to claim that this

19    was Dave's signature was Craig Wright, who, under the contract,

20    would receive assets that are now worth billions of dollars,

21    hundreds of billions of dollars.

22         Craig treated the forged contract as real, though.  He

23    goes back to the Australian courts and tells them that now he

24    owns all of W&K.  And he confirmed that he already obtained

25    W&K's IP.  And because Dave had died, and no one was there to

1   defend W&K, his fraud worked and the Court signed off on his

2   sham.

3          So Craig obtains W&K's IP and he already had full

4   control over the partnership's 1.1 million Bitcoin.

5          Jamie Wilson testified that the Bitcoin came from Dave

6   and Craig's mining operation.  Craig admitted it too.  He told

7   the Australian Taxation Office that the Bitcoin came into his

8   control as a matter of fate and other circumstances and that

9   Dave Kleiman had been a central part of that project but had

10  died earlier that year.  And at deposition, Craig admitted that

11  the fate that resulted in him having all this Bitcoin was

12  Dave's death.

13     (Video:)

14          "Q.  Was that something (inaudible)?

15          "A.  Yes.  This sounds like something I would

16  (inaudible).

17          "Q.  What did you mean by fate?

18          "A.  I mean exactly the meaning of the word.  Fate

19  means circumstances beyond control.  So the fact that my best

20  friend died is fate, misfortune.  It would not be a random

21  occurrence."

22     (End of video.)

23          As with many stories, it's Craig's greed that results

24  in his downfall.  He had almost gotten away with it.  But in

25  September 2013, he applies for $10 million tax refunds from the

1  Australian government based on the intellectual property he had

2  stolen.  The Australian government quickly audits Craig's

3  companies -- Ms. Vela, if you could jump ahead with me --

4  quickly audits Craig's companies.  And then after auditing his

5  companies, in February of 2014, they begin asking questions

6  about W&K.

7          Can you guys jump ahead for me, please.  I'm on Page

8  40.

9          Craig finally reaches out -- do we have a

10  technological issue?

11          It was then, right after W&K -- right after the ATO

12  reaches out about W&K, five days later, all of a sudden Craig

13  Wright reaches out.  Make no mistake.  This is not a good man

14  doing a good deed.  This is a desperate man attempting to

15  protect the fruits of his theft and protect himself from the

16  Australian Taxation Office breathing down his neck.  He needed

17  the Kleimans to help him convince the Australian government

18  that his actions against W&K were proper.

19          So he emails Ira Kleiman and he promises them fool's

20  gold.  Knowing that Dave's Bitcoin is really in the trust, he

21  tells them:  "Oh, I can help you find Dave's Bitcoin on these

22  drives."  He's Dave's best friend.  He knows Dave's a computer

23  forensic expert.  He knows there are encrypted files on the

24  drives.  He knows he has the perfect excuse when Bitcoin is

25  never found because it's already in the trust.  "Yeah.  Oh,

1    they're probably in that encrypted file."

2         Craig's trick works.  When the Australian Taxation

3    Office finally reaches out to Ira Kleiman, Ira reaches back out

4    to Craig.  He says:  "What should I say to them?"  Craig, the

5    confidence man.  It worked.  Ira trusted Craig, Ira believed in

6    Craig, and Ira did what he wanted.

7         In this case, the Defense has almost no reliable

8    evidence to offer.  So instead, they implemented what lawyers

9    sometimes call the spaghetti defense.  They throw everything

10   against the wall to see what sticks.  But their defenses are so

11   desperate that they contradict each other.  On the one hand,

12   the Defense is telling you that Dave couldn't have mined

13   Bitcoin with Craig Wright because he was poor; couldn't have

14   paid his bills, and anyone with millions of dollars in Bitcoin

15   wouldn't have fallen on tough times.

16        But they also ask you to believe that Dave died in

17   poverty with a fortune of Bitcoin locked on his devices that

18   Ira Kleiman deleted.  Which is it?  Did he have Bitcoin on his

19   devices?  And he died in poverty?  No.  The only thing that

20   makes sense is that Dave didn't have any Bitcoin in his

21   personal devices, which is why he was short on cash.  The

22   Bitcoin were in the partnership's trusts.  And Craig wouldn't

23   agree to distribute the partnership's trusts.

24        You heard Carter Conrad testify that Dave was not a

25   thief.  He was an honorable person.  He never stole from his

1    partnership with Carter Conrad.  He never took assets from

2    Computer Forensics without Patrick's permission, even though he

3    was on tough times.

4         Dave wouldn't have stolen from the Satoshi Nakamoto

5    partnership either.  And that's completely consistent with

6    Ira's testimony that Craig told him that he and Dave had an

7    agreement in place not to sell Bitcoin.  It's also consistent

8    with Craig's communications with Dave where he says:  "We don't

9    touch the trust, not now, not ever.  One day they'll be worth

10   billions."

11        It's also consistent with Craig's own life during that

12   period.  His own wife testified in deposition that she was

13   working two jobs, that her and Craig didn't have a lot of

14   money, that it was financially very difficult for them and she

15   couldn't even put proper food on the table.

16        It also aligned perfectly with Jamie Wilson's

17   testimony that as soon as Dave died Craig and Dave's -- Craig's

18   partner Dave was no longer around to make sure he honored the

19   deal, Craig began spending like a madman; $15,000 top shelf

20   champagne, new cars, flashy suits, new watches.  All of a

21   sudden, he could spend the money.

22        The Bitcoin are on Dave's devices fails even if you

23   ignore the fact that it's contradictory and that it was clearly

24   a ploy by Craig to gain Ira's trust.  There's zero credible

25   evidence supporting it.  The only person who has ever said that

```
 1   Craig Wright.

 2           And Craig Wright's own expert Nicholas Chambers

 3   testified on cross-examination that he found no evidence of any

 4   Bitcoin private keys on those devices.  The Defense is simply a

 5   continuation of the fraud that Craig perpetuated against the

 6   Kleiman estate in 2014.  It wasn't true then.  It's not true

 7   now.  There are no Bitcoin on those drives.  They're in the

 8   trust that Craig told the ATO over and over that they were

 9   mining Bitcoin into.

10           The next thing is Craig claims Dave was too sick to

11   mine Bitcoin.  That's absurd.  Every fact witness in the case,

12   Patrick Paige, Carter Conrad, Kimon Andreou, testified Dave

13   worked in the hospital with powerful computers by his bedside.

14   Dave's medical records contain hundreds of references to him

15   working on his computers.  Carter testified Dave leveraged his

16   expertise in networking to remotely control computers.  And

17   Antonopoulos testified that somebody being in a wheelchair

18   doesn't stop you from mining.  And Craig himself -- Craig

19   himself told the ATO that Dave Kleiman was, quote -- he was

20   still working in the damn hospital, unquote.

21           I want to touch briefly on autism.  First, no one in

22   this courtroom disputes that autism or Asperger's is a serious

23   condition that affects many people.  I'm not a medical

24   professional.  But what I can say is that it's odd that Dr.

25   Wright was first diagnosed with this condition at 50 years old
```

```
 1    by a doctor that was hired by his lawyers after a lawsuit was

 2    brought against him.

 3          But most importantly, autism diagnosis is irrelevant

 4    to this case.  Dr. Klin told you that this condition does not

 5    cause you to lie, or forge documents, or submit false

 6    affidavits to courts.  If anything, Dr. Klin's statements that

 7    Craig Wright is overly literal should all but resolve this

 8    case.  Craig has admitted time and time again that Dave was his

 9    business partner, that Dave mined the Bitcoin, that Dave

10    created IP for him.  And if he's literal, it's true.

11          Craig tried to explain away the ATO evidence.  "They

12    had a witch hunt against me.  Des McMaster was sent to Papua

13    New Guinea."  I told him I was to ask you -- for him -- to ask

14    you if he proved it.  He didn't prove it.  I dared him to do

15    it.  He couldn't do it.  It's all lies.  The ATO didn't write

16    him a written letter of apology.  He fled the country.

17          Craig has tried to poke holes in the coding.  He says:

18    "Dave didn't know how to code."  Well, putting aside the fact

19    that Craig Wright said that Dave Kleiman was an okay coder,

20    which is the same words that he used to describe, by the way --

21    put that all aside for a moment, there's so much more to

22    Bitcoin than a code.  There's one part of Bitcoin that's a

23    code.  That's the software.  Beyond that, there's the

24    whitepaper.  There's thinking of the idea.  There's mining.

25    There's interacting with the people.  There's the Satoshi
```

1    Nakamoto email accounts, the Satoshi Nakamoto Bitcoin Talk

2    accounts.  There's partnership.  So much more than just code.

3         I'd like to take you for a moment through the Verdict

4    Form the Court has shown you.

5         Ms. Vela, can we get that on the screen, please.

6         The first question on the Verdict Form asks you

7    whether you would find the Defendant is liable to the estate of

8    Dave Kleiman for breach of partnership.  You should write:

9    "Yes."

10        Dave's Kleiman's estate should receive his share of

11   the partnership's assets that's 1.1 million Bitcoin --

12   1,100,111.  You've heard about it many times.

13        As Judge Bloom instructed you, the appropriate measure

14   of damages for this partnership claim is the current value of

15   Dave's interest in the partnership.  You heard Antonopoulos

16   testify that the current price of Bitcoin is -- write this down

17   if you want -- $61,637.76 -- excuse me -- per Bitcoin.  You can

18   use the calculator on the laptops that are given in your jury

19   room.

20        The total amount of damages for the partnership claim,

21   550,055.5 Bitcoin multiplied by the price of Bitcoin, is

22   $33,904,188,895.68.  That's half of the partnership in Bitcoin.

23        You'll leave the next line blank because, as the

24   evidence showed, the IP was with W&K.  The Bitcoin were with

25   the partnership; the estate, the IP, is with W&K.

100

1          So question 3 asks you to find whether the Defendant

2    is liable for conversion.  You should write:  "Yes."

3          In question 4, you should put checkmarks by both the

4    estate of Dave Kleiman and W&K because Craig stole from them

5    both; Bitcoin from the estate and intellectual property from

6    W&K.

7          Each of these claims stand by itself, which means you

8    need to fill each one out.  It's not going to add up each claim

9    to each other.  Fill out each one as you see it.

10          As Judge Bloom instructed you, the appropriate measure

11   of damages for the conversion claim is the highest value of the

12   stolen asset between the time of theft and trial.  You heard

13   Andreas Antonopoulos testify that the highest price of

14   Bitcoin -- write this down, if you need it -- is $64,947.44 per

15   Bitcoin.  Multiplied by the half of the partnership's Bitcoin,

16   that's 550,000 -- 550,055.5, that's $35,724,696,582.92.

17          The IP is with W&K, so let's go there next.  In W&K,

18   you need the value of the intellectual property.  Craig Wright

19   said that the IP at issue in this case is worth $252 billion.

20   He said it when he had all incentives to lie about it.  That is

21   W&K's IP which Dr. Wright stole.  So you should award at least

22   half of the intellectual property to W&K.  That is $126

23   billion, half of the 252 it's worth.

24          The next questions are about civil theft.  The clear

25   and convincing evidence in this case shows that Craig stole

1  from his dead best friend's estate and stole from W&K.  In

2  fact, the evidence is basically unrebutted.  Because the theft

3  was from both the estate and W&K, you should check both for the

4  estate and W&K in question 7.  Question 7.

5       Now let's go to Question 8, please.  In question 8,

6  the Court has instructed you that civil theft damages are also

7  the highest value between the theft and trial.  You should fill

8  in the same numbers based on the same calculation that gets us

9  to -- I'm going to read the numbers this time -- 35, comma,

10  724, comma, 696, comma, 582, decimal, 92.  And for W&K, 126

11  billion.

12       Next, you'll consider the estate and W&K's fraud

13  claims.  All the elements for fraud were met.  So in question 9

14  you should say:  "Yes."

15       For question 10, you should put checkmarks next to

16  both the estate and W&K because Craig Wright defrauded them

17  both.

18       For question 11, Judge Bloom has instructed you that

19  the amount of damages for fraud is calculated at the time Craig

20  committed the fraud or constructive fraud; therefore, the

21  damages from Craig Wright's fraud calculated at the time Craig

22  committed the fraud is the estate's share of 1.1 million

23  Bitcoin and W&K's share of the IP.

24       As you already filled in the partnership claims, the

25  estate's share of Bitcoin, which the estate continues to be

102

```
1    deprived of by Craig Wright's fraud, is -- I'm going to read

2    the numbers -- 33, comma, 904, comma, 188, comma, 895.68.  And

3    the damages for Defendant's fraud against W&K is $126 billion.

4              Next is the constructive fraud claim.  Because Wright

5    betrayed the trust of both W&K and Dave Kleiman you should

6    write:  "Yes" in question 12.

7              For question 13, you should put checkmarks by both

8    Plaintiffs.

9              And for question 14, the damages are the same for

10   fraud.  $33,904,188,895.68.  And for W&K half of the 252, 126

11   billion.

12             Next, you will consider W&K's breach of fiduciary

13   duty.  By misrepresenting his relationship with W&K to the

14   Australian courts, and then stealing W&K's IP, Craig breached

15   his fiduciary duty to W&K.  You should write:  "Yes" for

16   question 15.

17             Again, the harm from the breach of fiduciary duty to

18   W&K is its lost IP.  Half of 252 billion is 126 billion.

19             Plaintiffs' final claim is for unjust enrichment.  You

20   should write:  "Yes" here.  And if, as you have suggested, you

21   find Dave Kleiman and Craig Wright were a partnership, you will

22   skip this question for the estate because it doesn't apply if

23   you found there was a partnership for the estate.

24             Question 19.  You check -- question 19.

25             Thank you.
```

103

1          Here, the award for -- you skip this question for the

2     estate because you have found for the estate on partnership

3     claims.  And so now for the intellectual property you'll put

4     126 billion for W&K.

5          The Court has also asked you to determine the number

6     of Bitcoin that you find belonged to the estate and/or W&K.

7     The evidence you have seen has shown you over and over again

8     that supports 550,055.5 Bitcoin.  550 -- there it is on the

9     screen.

10          The next stage of the Verdict Form is about statute of

11     limitations and laches.  The idea that the Kleimans should have

12     figured out Craig's complex fraud before Craig even emailed Ira

13     Kleiman is absurd.  You should reject "not barred" on all of

14     these claims.

15          Finally, punitive damages.  Punitive damages are

16     different than compensatory damages.  They're damages that ask

17     you to not give the estate back what it's owed.  That's not a

18     punishment.  Punitive damages are meant to punish wrongful

19     conduct.  Ordering Craig to return what he took wrongfully

20     isn't punishment.  What amount of punishment is up to you.  If

21     there should be punishment is up to you.  But we would submit

22     to you that forcing Craig to give the other half of his half,

23     so half of his half of the Bitcoin would be punishment, be

24     about $17 billion.

25          THE COURT:  Mr. Freedman, I just want to remind you

104

1    you've exceeded the allotted time.  I'll give you more time on

2    the front.

3            MR. FREEDMAN:  Thank you.

4            $17 billion.  It will still leave Craig with $17

5    billion in Bitcoin and $126 billion worth of intellectual

6    property, but it will hurt.

7            Finally, Ladies and Gentlemen, I want to thank you one

8    last time.  This case hasn't been easy, and I know.  It's got a

9    lot of information.  But at the end of the day, the two issues

10    at the heart of Plaintiffs claim are this:  Did Dave and Craig

11    have a partnership and did that partnership mine Bitcoin and

12    intellectual property?  Clearly, yes.

13            And after Dave's death, did Craig steal Dave's share

14    of the partnership assets from Dave's family?  Clearly, yes.

15            The instructions Judge Bloom read to you this morning

16    say we must prove the estate's claim by only a preponderance of

17    the evidence.  That means our side just has to be more likely

18    than not right.  It's like if you take one of those old-time

19    scales and you're weighing the evidence and you put everything

20    we've shown you on one side.  Dr. Wright should be all the way

21    at the top.  In order for us to lose, the evidence Dr. Wright

22    has put forward needs to not just even the scales; he needs to

23    outweigh us.  I'll submit to you he's not even close.

24            We've submitted evidence, witnesses, testimony,

25    documents.  Dr. Wright has told you his own words.  And you

1    have seen with your own eyes you can't believe his words.  We

2    have to be just a little bit heavier.  We are way more than

3    that, Ladies and Gentlemen.

4          As I sit down, you're going to hear from Mr. Rivero.

5    He may try to point to the absence of a written partnership

6    agreement, which is not required under the law.  He may point

7    to the absence of communications with Dave, which Craig

8    admittedly destroyed to distance himself from Satoshi.

9          You may -- he may ask you to ignore what you saw, what

10    you heard, and what Dr. Wright means when he says with his

11    hyper-literalness that he repeatedly called Dave his partner

12    and repeatedly said Dave Kleiman mined 1.1 million Bitcoin.

13          I want you to listen closely to Mr. Rivero.

14          What does he say to explain away the mountains of

15    admissions that Craig Wright made before the estate brought

16    this lawsuit?  What does he say to explain away the testimony

17    of Jamie Wilson, Patrick Paige, Carter Conrad, Andrew O'Hagan,

18    and the others who have said that Craig Wright told them he

19    partnered with Dave?

20          What does he say about the forgeries that Craig wrote

21    in his dead best friend's name?

22          What does he say about the ATO transcripts, the ATO

23    documents?

24          We told you at the start of this trial that the case

25    was about a choice made by Dr. Wright.  He could have done the